8

In addition to these issues, Colorado wishes to express its concern that the cooperating agencies were not given an opportunity to review and comment on the final PRMP – specifically, the final version of Alternative E. The cooperators were given one day to preview the final version of the PRMP before it was released to the public, triggering the 30-day protest period. In the year that passed between the time that the cooperators saw the first draft of Alternative E in 2018 and its final rollout in June 2019, substantial changes were made to Alternative E, including the elimination of Ecological Emphasis Areas and other changes that appear to favor energy resource development. During that same time period, the Service completed the Biological Opinion for the PRMP, which Colorado had to request from the Service, as BLM did not include it with the PRMP/FEIS.

This abrupt rollout has damaged the good will that the UFO staff had been developing post-2016 and made it challenging for the cooperating agencies to review and digest the contents of the final PRMP and FEIS. This process is not consistent with the MOUs signed between the cooperators and the BLM, which require the BLM/UFO to provide the cooperating agency with "meaningful opportunities for participation." Moreover, it is inconsistent with the purpose of the cooperating agency relationship, which is intended to result in better decisions by fostering trust and cooperation between various federal, state, and local governments. We hope that future RMP planning processes in Colorado show greater respect for the input and needs of the cooperating agencies.

Thank you for your attention to our concerns. We greatly appreciate BLM's partnership with Colorado in managing lands and wildlife for multiple uses while conserving imperiled species and habitat.

Sincerely,

Dan Gibbs, Executive Director
Colorado Department of Natural Resources
1313 Sherman Street, Room 718
Denver, CO 80203
(303) 866-3311

# ATTACHMENT A

BLM_0076850

# The Economic Contributions of Outdoor Recreation in Colorado: A regional and county-level analysis





**Colorado Parks & Wildlife**
**Denver, CO**

**February 24, 2014**



PO Box 6435
Fernandina Beach, FL  32035
Tel (904) 277-9765

i

BLM_0076851

# Executive Summary

This study, conducted by Southwick Associates for Colorado Parks and Wildlife, quantifies the economic contribution of outdoor recreation in Colorado and 7 regions within the state[1]. Outdoor recreation constitutes a substantial part of the Colorado economy. The total economic output associated with outdoor recreation amounts to $34.5 billion dollars, contributing $19.9 billion dollars to the Gross Domestic Product of the state. This economic activity supports over 313,000 jobs in the state, which represents 13.2% of the entire labor force in Colorado and produces $12.4 billion dollars in salaries and wages. In addition, this output contributes $4.9 billion dollars in local, state and federal tax revenue.

**Table S1.** Total Economic Contribution of Outdoor Recreation in Colorado, by Region ($millions)

|  | Northwest | North Central | Metro | Northeast | Southeast | South Central | Southwest | State |
|---|---|---|---|---|---|---|---|---|
| Output | $9,284 | $8,295 | $3,630 | $385 | $1,053 | $4,142 | $2,173 | **$34,514** |
| Salaries & Wages | $3,355 | $2,940 | $1,460 | $116 | $324 | $1,344 | $714 | **$12,431** |
| GDP Contribution | $5,432 | $4,734 | $2,216 | $204 | $580 | $2,282 | $1,242 | **$19,931** |
| State/Local Taxes | $697 | $582 | $259 | $34 | $97 | $341 | $182 | **$2,404** |
| Federal Taxes | $718 | $619 | $295 | $25 | $70 | $258 | $148 | **$2,546** |
| Jobs | 91,822 | 78,521 | 34,057 | 4,528 | 12,705 | 47,017 | 24,568 | **313,404** |

**Figure S1.** SCORP Regions



---

[1] Part of the analysis for this study was based on work performed or supported by the Outdoor Industry Association (OIA). (http://www.outdoorindustry.org/advocacy/recreation/economy.html)
This study uses a broader definition of outdoor recreation, and for this reason the results of these two studies should not be directly compared. Rather, these two studies should be used together to gain a better understanding of the economic contributions of outdoor recreation to the Colorado economy.

BLM_0076852

# Table of Contents

Executive Summary                                                                                          ii

1. Introduction                                                                                            1
2. Data Sources & Methods                                                                                  1
3. Outdoor Recreation Participation                                                                        2
4. Outdoor Recreation Expenditures                                                                         3
5. Economic Contributions of Outdoor Recreation                                                            4
6. Economic Contributions of Fishing, Hunting, and Wildlife Watching                                       6
7. Hunting Economic Contributions by Destination County                                                    7
8. Comparison to Previous Studies                                                                          11

References                                                                                                 12
Appendix A Definitions for Economic Contribution                                                           13
Appendix B Methodology for Economic Contribution                                                           15
Appendix C Spending Methodology                                                                            17
Appendix D Overall Activities Data Summary                                                                 21
Appendix E Non-Motorized Activities Data Summary                                                           23
Appendix F Motorized Activities Data Summary                                                               24
Appendix G Selected Activities Data Summary                                                                25
Appendix H Retail Trade Sales by County                                                                    29
Appendix I Estimates of Spending and Days by Activity Group                                                31

BLM_0076853

## 1. Introduction

This study, conducted by Southwick Associates for Colorado Parks and Wildlife (CPW), was undertaken to quantify the economic contributions of outdoor recreation in Colorado. This investigation was part of a broader CPW effort to characterize outdoor recreation both statewide and regionally for the Colorado Statewide Comprehensive Outdoor Recreation Plan (SCORP, 2013). Recreation in fishing, hunting, and wildlife watching were of particular interest, and the specific contributions of these three activities were also examined. Additionally, the county-level contributions of hunting were estimated for a more detailed view of the economic contributions of hunting in Colorado.

Part of the analysis for this study was based on work performed or supported by the Outdoor Industry Association (OIA). In particular, the statewide economic contributions relied on data from a 2012 OIA study (OIA, 2011; OIA 2012).[2] Although components of the analysis presented here relied on OIA data, the results of this study differ somewhat from the state-level results of the OIA study for two reasons. First, this study incorporates a wider range of outdoor recreation activities, which leads to larger economic estimates of outdoor recreation. Second, this study relies principally on the SCORP survey data to characterize participation, and these numbers differ from the OIA-based participation numbers as a consequence of using different data sources. For this reason, the results of these two studies should not be directly compared, but rather should be used together to gain a broader understanding of the economic contributions of outdoor recreation to the Colorado economy.

## 2. Data Sources & Methods

Outdoor recreation in this study includes a set of 38 activities corresponding to questions in a CPW survey sent to 7,000 Colorado residents in 2013 as part of the Colorado Statewide Comprehensive Outdoor Recreation Plan (SCORP, 2013). Spending in Colorado was estimated by applying spending profiles to participation numbers for the 38 activities included in the 2013 SCORP survey. These activities were combined into 18 activity groups in order to match participation numbers to available spending data. Statewide spending was then estimated using appropriate data sources for each activity group (Appendix D). In constructing spending profiles for each activity, this study largely relied on spending data from two OIA surveys administered for the purpose of quantifying the economic contributions of outdoor recreation with the U.S. and each of the 50 states (OIA, 2011; OIA, 2012). Because this study incorporated a wider range of activities than the OIA study, additional data sources were incorporated in characterizing spending profiles for a number of activities. The estimation of spending varied by activity as a result. Detailed descriptions of these procedures are included in Appendix C.

---

[2] The Outdoor Recreation Economy (OIA, 2012).
http://www.outdoorindustry.org/advocacy/recreation/economy.html

BLM_0076854

State-level expenditures were allocated to regions using data that specified the proportion of spending activity within each region. Because outdoor recreationists often make equipment purchases in a different region from their trip destination, equipment and trip-related spending were allocated differently by region. Trip-related spending was allocated using the proportion of activity days by region (SCORP, 2013), while equipment spending was allocated based on the proportion of retail trade sales by region (CDOR, 2012). Details are included in Appendix C.

The spending estimates were analyzed using standard economic models to quantify economic contributions. The definitions of key economic terms are presented in Appendix A. The IMPLAN economic modeling software was used to estimate economic contributions. Details of the economic contribution methodology are presented in Appendix B.


## 3. Outdoor Recreation Participation

The 2013 SCORP survey of Outdoor Recreation was used to characterize participation in Colorado regionally and statewide for residents of the state (SCORP, 2013). The survey included a set of 38 activities that were grouped into 5 larger categories (Table 1). The survey results suggest that outdoor recreation is very popular among Colorado residents, with an estimated 3.4 million adults (90% of adult residents) having engaged in at least one of the 38 activities in 2012. Trail activities were the most popular, with nearly 83% of adults participating. The Northwest and North Central regions were notable in their popularity, with 54% and 51% of Colorado adults participating in each region respectively.

**Table 1.** SCORP Survey Activity Groups (SCORP, 2013)

| Activity Group | Activities in Group |
| --- | --- |
| Trail/Road | Walking, Jogging/Running (outdoors), Hiking/Backpacking, Horseback riding, Road biking, Mountain biking, Off-road motorcycling, ATV riding or 4-wheel driving |
| Water-based | Swimming (outdoors), Fishing, Power boating, Water skiing, Jet skiing, Sailing, Canoeing, Kayaking, Whitewater rafting, Stand up paddleboarding |
| Winter | Skiing or snowboarding at a ski area, Backcountry skiing, Sledding/tubing, Ice skating (outdoors), Snowmobiling, Snowshoeing or cross country skiing, Ice fishing |
| Wildlife-related | Big game hunting, Upland bird and small game hunting, Waterfowl hunting, Wildlife viewing (including birding) |
| Other Outdoor | Developed/RV camping, Tent camping, Picnicking, Target or skeet shooting, Rock climbing, Team or individual sports (outdoors), Playground activities, Golf, Geocaching |

BLM_0076855

**Table 2.** SCORP Survey Participants (in thousands) for Activity Groups by Region (SCORP, 2013)

| Activity | Northwest | North Central | Metro | Northeast | Southeast | South Central | Southwest | State |
|---|---|---|---|---|---|---|---|---|
| Trail/Road | 1,513 | 1,706 | 1,140 | 204 | 285 | 1,006 | 570 | **3,164** |
| Water-based | 694 | 1,037 | 454 | 91 | 173 | 509 | 325 | **2,188** |
| Winter | 1,291 | 694 | 245 | 18 | 25 | 325 | 221 | **1,921** |
| Wildlife-related | 433 | 429 | 99 | 175 | 85 | 265 | 197 | **1,122** |
| Other Outdoor | 1,071 | 1,320 | 755 | 182 | 190 | 846 | 432 | **2,784** |
| Any Outdoor Activity | 2,071 | 1,962 | 1,352 | 423 | 399 | 1,274 | 755 | **3,434** |

## 4. Outdoor Recreation Expenditures

The popularity of outdoor recreation by both Colorado residents and nonresidents leads to significant consumer spending in the Colorado economy. Outdoor recreationists in Colorado spent over $21 billion dollars on trips and equipment in 2012 (Table 3). The Northwest region included the largest amount of outdoor recreation spending at $6.84 billion, followed by the North Central region at $5.57 billion (Figure 1). Combined, these two regions accounted for over half of all the outdoor recreation spending within Colorado. Also, because retail sales are concentrated in more populous regions, the ratio of equipment to trip-related sales varies widely from one region to the next (Table 3). Partly as a result of these differences, the nature of economic contributions (e.g., industries impacted, types of jobs supported) varies regionally.

**Table 3.** Spending by Region (Trip-Related versus Equipment Spending)

| | Northwest | North Central | Metro | Northeast | Southeast | South Central | Southwest | State |
|---|---|---|---|---|---|---|---|---|
| **Total Spending** | | | | | | | | |
| Trip-related | $6,507 | $4,085 | $1,250 | $301 | $747 | $2,747 | $1,576 | **$17,212** |
| Equipment | $337 | $1,490 | $1,141 | $66 | $156 | $521 | $138 | **$3,848** |
| Total | $6,844 | $5,574 | $2,391 | $367 | $902 | $3,268 | $1,714 | **$21,060** |
| | | | | | | | | |
| **Percent Spending by Type** | | | | | | | | |
| Trip-related | 95.1% | 73.3% | 52.3% | 81.9% | 82.8% | 84.1% | 92.0% | **81.7%** |
| Equipment | 4.9% | 26.7% | 47.7% | 18.1% | 17.2% | 15.9% | 8.0% | **18.3%** |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | **100.0%** |

BLM_0076856

**Figure 1.** Total Outdoor Recreation Spending by Region (in $millions)



## 5. Economic Contributions of Outdoor Recreation

As a result of the economic multiplier effect, the $21 billion dollars of outdoor recreation expenditures produce additional rounds of economic activity throughout the state's economy. These include indirect contributions, arising from additional spending within industries, and induced contributions, which result from spending of salaries and wages by employees of these industries. These indirect/induced effects total $13.5 billion, and when combined with direct expenditures, contribute $34.5 billion dollars to the Colorado economy (Table 4). This total output contributes $19.9 billion to U.S. Gross Domestic Product (GDP), which amounts to 7.2% of the total GDP contribution of Colorado (BEA, 2013).[3]

An important result of outdoor recreation spending is the number of jobs supported in the state. An estimated 313,000 jobs in Colorado are supported by outdoor recreation expenditures, which accounts for 13.2% of all jobs in Colorado, larger than the combined construction and manufacturing labor force in the state (BLS, 2013). These jobs are especially important to the economies of specific locales in the state. In the Northwest region alone nearly 92,000 jobs are supported by the total economic contribution of outdoor recreation, representing one third of the entire adult population in that region (Figure 2).

---

[3] GDP contribution is smaller than total output because GDP only measures the costs of final goods and services (i.e., any intermediate products are excluded). While total output is a broader measure of economic activity, GDP contribution is included for comparison to the other GDP-based measures.

BLM_0076857

**Table 4.** Economic Contributions by Region (dollar values in $millions)

|  | Northwest | North Central | Metro | Northeast | Southeast | South Central | Southwest | State |
|---|---|---|---|---|---|---|---|---|
| **Direct** | | | | | | | | |
| Output | $6,844 | $5,574 | $2,391 | $367 | $902 | $3,268 | $1,714 | **$21,060** |
| Salaries & Wages | $2,314 | $1,832 | $844 | $93 | $232 | $948 | $520 | **$7,097** |
| GDP Contribution | $3,455 | $2,713 | $1,209 | $153 | $405 | $1,506 | $857 | **$10,563** |
| State/Local Taxes | $504 | $396 | $172 | $28 | $79 | $265 | $144 | **$1,545** |
| Federal Taxes | $478 | $375 | $169 | $19 | $50 | $177 | $106 | **$1,420** |
| Jobs | 64,247 | 53,330 | 23,051 | 3,780 | 9,881 | 35,674 | 18,420 | **201,442** |
| **Indirect/Induced** | | | | | | | | |
| Output | $2,440 | $2,721 | $1,239 | $18 | $150 | $874 | $459 | **$13,454** |
| Salaries & Wages | $1,041 | $1,109 | $616 | $24 | $92 | $396 | $194 | **$5,334** |
| GDP Contribution | $1,977 | $2,021 | $1,007 | $51 | $175 | $776 | $385 | **$9,368** |
| State/Local Taxes | $193 | $186 | $87 | $6 | $18 | $76 | $38 | **$859** |
| Federal Taxes | $239 | $244 | $126 | $6 | $20 | $82 | $42 | **$1,125** |
| Jobs | 27,575 | 25,191 | 11,006 | 748 | 2,825 | 11,343 | 6,148 | **111,962** |
| **Total** | | | | | | | | |
| Output | $9,284 | $8,295 | $3,630 | $385 | $1,053 | $4,142 | $2,173 | **$34,514** |
| Salaries & Wages | $3,355 | $2,940 | $1,460 | $116 | $324 | $1,344 | $714 | **$12,431** |
| GDP Contribution | $5,432 | $4,734 | $2,216 | $204 | $580 | $2,282 | $1,242 | **$19,931** |
| State/Local Taxes | $697 | $582 | $259 | $34 | $97 | $341 | $182 | **$2,404** |
| Federal Taxes | $718 | $619 | $295 | $25 | $70 | $258 | $148 | **$2,546** |
| Jobs | 91,822 | 78,521 | 34,057 | 4,528 | 12,705 | 47,017 | 24,568 | **313,404** |

**Figure 2.** Jobs Supported by Outdoor Recreation in Colorado Regions



BLM_0076858

## 6. Economic Contributions of Fishing, Hunting, and Wildlife Watching

Outdoor recreation includes a diverse set of activities that participants pursue in Colorado. Of particular interest for this study are the contributions of fishing, hunting, and wildlife watching. These three activities together produce over $5 billion dollars of economic output, which supports nearly 50,000 jobs within the state. Wildlife watching alone contributes $2.2 billion dollars in economic output per year, supporting over 19,000 jobs in Colorado (Table 5).

**Table 5.** Total Economic Contributions of Fishing, Hunting, and Wildlife Watching by Region

| | Northwest | North Central | Metro | Northeast | Southeast | South Central | Southwest | State |
|---|---|---|---|---|---|---|---|---|
| **Economic Output ($millions)** | | | | | | | | |
| Fishing | $241 | $523 | $304 | $36 | $131 | $294 | $110 | **$1,916** |
| Hunting | $181 | $208 | $139 | $28 | $35 | $112 | $82 | **$919** |
| Wildlife Watching | $271 | $615 | $282 | $65 | $129 | $361 | $213 | **$2,280** |
| | | | | | | | | |
| **Salaries & Wages ($millions)** | | | | | | | | |
| Fishing | $81 | $178 | $123 | $11 | $39 | $92 | $37 | **$673** |
| Hunting | $72 | $85 | $62 | $10 | $14 | $43 | $31 | **$368** |
| Wildlife Watching | $88 | $197 | $106 | $17 | $37 | $109 | $69 | **$771** |
| | | | | | | | | |
| **GDP Contribution ($millions)** | | | | | | | | |
| Fishing | $134 | $288 | $186 | $18 | $69 | $157 | $63 | **$1,081** |
| Hunting | $112 | $127 | $88 | $16 | $22 | $68 | $51 | **$561** |
| Wildlife Watching | $146 | $329 | $165 | $30 | $66 | $188 | $117 | **$1,261** |
| | | | | | | | | |
| **State and Local Taxes ($millions)** | | | | | | | | |
| Fishing | $17 | $35 | $21 | $3 | $11 | $22 | $9 | **$127** |
| Hunting | $13 | $13 | $9 | $2 | $3 | $8 | $6 | **$60** |
| Wildlife Watching | $18 | $40 | $19 | $5 | $10 | $26 | $16 | **$148** |
| | | | | | | | | |
| **Federal Taxes ($millions)** | | | | | | | | |
| Fishing | $18 | $37 | $25 | $2 | $8 | $18 | $8 | **$138** |
| Hunting | $15 | $17 | $12 | $2 | $3 | $8 | $6 | **$73** |
| Wildlife Watching | $19 | $42 | $22 | $4 | $8 | $21 | $14 | **$160** |
| | | | | | | | | |
| **Jobs** | | | | | | | | |
| Fishing | 2,222 | 4,698 | 2,730 | 347 | 1,388 | 2,968 | 1,119 | **16,413** |
| Hunting | 2,242 | 2,413 | 1,375 | 407 | 603 | 1,625 | 1,346 | **10,882** |
| Wildlife Watching | 2,514 | 5,501 | 2,878 | 657 | 1,332 | 3,682 | 2,135 | **19,541** |

BLM_0076859

Pursuing big game is the most popular form of hunting in Colorado among both residents of the state and those traveling from other locations. Residents make up a majority of days spent hunting big game in the state at 66.8 percent (CPW, 2013a). However, the average nonresident big game hunter spends more money per day than residents. As a result, the economic output contributed by nonresident big game hunters makes up nearly 50 percent of the statewide total (Table 6).

**Table 6.** Total Economic Contributions of Big Game Hunting in Colorado

|  | Output ($millions) | Labor Income ($millions) | GDP Contribution ($millions) | State/Local Taxes ($millions) | Federal Taxes ($millions) | Jobs |
|---|---|---|---|---|---|---|
| Resident | 322.6 | 111.1 | 191.5 | 22.5 | 26.9 | 2,953 |
| Nonresident | 286.4 | 133.9 | 199.2 | 17.9 | 29.4 | 3,895 |
| Total | 609.1 | 244.9 | 390.6 | 40.3 | 56.3 | 6,848 |

## 7. Hunting Economic Contributions by Destination County

Hunting is a popular form of outdoor recreation in Colorado, with participants that are typically active over many years. The type of hunting that Colorado residents and visitors engage in varies greatly by location. Through extensive surveys of hunters, CPW has been able to characterize hunting effort by destination county within the state over a range of species pursued (CPW, 2013a). Using these survey results allowed us to estimate hunter effort by county of activity for three species groups; big game, small game, and waterfowl (Appendix G, Table G2). Pursuing big game is the most popular hunting activity in Colorado, and the Northwest region includes the largest contribution of hunting effort by a fairly large margin (Table 7).

**Table 7.** Hunting Effort by Region (CPW, 2013a)

|  | Northwest | North Central | Metro | Northeast | Southeast | South Central | Southwest | State |
|---|---|---|---|---|---|---|---|---|
| **Hunter Days per Year** | | | | | | | | |
| Big Game | 671,700 | 87,785 | 36,730 | 45,658 | 73,131 | 234,241 | 341,573 | **1,490,818** |
| Small Game | 104,898 | 64,725 | 4,171 | 114,212 | 36,398 | 43,565 | 37,422 | **405,391** |
| Waterfowl | 15,478 | 70,607 | 888 | 30,437 | 14,667 | 7,441 | 6,213 | **145,731** |

7

BLM_0076860

The detailed hunting effort data also allowed economic contributions of hunting effort to be examined at the county level. The economic contributions of the top ten counties by total output from hunting are included in Table 8. Detailed contributions for all counties are displayed in Table 9.

**Table 8.** Top 10 Counties for Total Hunting Economic Contributions by Output

| County | Output ($thousands) | Labor Income ($thousands) | GDP Contribution ($thousands) | State/Local Taxes ($thousands) | Federal Taxes ($thousands) | Jobs |
|---|---|---|---|---|---|---|
| Arapahoe | $55,601 | $24,299 | $34,756 | $3,385 | $4,756 | 580 |
| El Paso | $51,495 | $21,366 | $31,899 | $3,493 | $3,723 | 604 |
| Denver | $44,854 | $20,640 | $28,653 | $2,485 | $3,548 | 411 |
| Jefferson | $43,155 | $19,199 | $27,187 | $2,894 | $3,641 | 513 |
| Larimer | $38,123 | $14,851 | $23,140 | $2,587 | $3,088 | 574 |
| Mesa | $33,688 | $12,468 | $20,007 | $2,438 | $2,694 | 484 |
| Adams | $31,593 | $13,852 | $20,171 | $2,704 | $2,163 | 392 |
| Weld | $26,164 | $11,396 | $16,433 | $1,793 | $2,156 | 520 |
| Boulder | $24,172 | $11,013 | $15,769 | $1,624 | $2,084 | 296 |
| Garfield | $22,593 | $9,463 | $14,874 | $1,747 | $2,008 | 322 |

BLM_0076861

**Table 9.** Total Hunting Economic Contributions by County

| County | Output ($thousands) | Labor Income ($thousands) | GDP Contribution ($thousands) | State/Local Taxes ($thousands) | Federal Taxes ($thousands) | Jobs |
|---|---|---|---|---|---|---|
| **Northwest Region** | | | | | | |
| Eagle | $16,523 | $7,225 | $11,118 | $1,259 | $1,576 | 203 |
| Garfield | $22,593 | $9,463 | $14,874 | $1,747 | $2,008 | 322 |
| Grand | $15,884 | $5,932 | $10,434 | $1,361 | $1,344 | 237 |
| Jackson | $4,891 | $1,503 | $2,912 | $595 | $306 | 62 |
| Mesa | $33,688 | $12,468 | $20,007 | $2,438 | $2,694 | 484 |
| Moffat | $15,628 | $5,809 | $9,262 | $1,091 | $1,323 | 248 |
| Pitkin | $5,980 | $2,864 | $4,203 | $452 | $532 | 70 |
| Rio Blanco | $13,737 | $6,487 | $9,626 | $1,098 | $1,260 | 191 |
| Routt | $19,889 | $8,663 | $13,355 | $1,445 | $1,818 | 292 |
| Summit | $6,669 | $2,887 | $4,475 | $500 | $615 | 103 |
| **North Central Region** | | | | | | |
| Adams | $31,593 | $13,852 | $20,171 | $2,704 | $2,163 | 392 |
| Arapahoe | $55,601 | $24,299 | $34,756 | $3,385 | $4,756 | 580 |
| Boulder | $24,172 | $11,013 | $15,769 | $1,624 | $2,084 | 296 |
| Clear Creek | $1,997 | $776 | $1,212 | $167 | $172 | 32 |
| Gilpin | $636 | $313 | $454 | $50 | $62 | 15 |
| Larimer | $38,123 | $14,851 | $23,140 | $2,587 | $3,088 | 574 |
| Weld | $26,164 | $11,396 | $16,433 | $1,793 | $2,156 | 520 |
| **Metro Region** | | | | | | |
| Broomfield | $4,903 | $2,164 | $3,019 | $280 | $396 | 57 |
| Denver | $44,854 | $20,640 | $28,653 | $2,485 | $3,548 | 411 |
| Douglas | $20,090 | $9,097 | $12,863 | $1,477 | $1,801 | 252 |
| Jefferson | $43,155 | $19,199 | $27,187 | $2,894 | $3,641 | 513 |
| **Northeast Region** | | | | | | |
| Cheyenne | $580 | $232 | $387 | $58 | $54 | 12 |
| Elbert | $2,013 | $734 | $1,185 | $202 | $151 | 26 |
| Kit Carson | $1,816 | $630 | $1,062 | $181 | $135 | 34 |
| Lincoln | $2,098 | $767 | $1,270 | $202 | $146 | 36 |
| Logan | $4,755 | $1,937 | $2,986 | $384 | $368 | 91 |
| Morgan | $5,501 | $2,357 | $3,460 | $402 | $452 | 116 |
| Phillips | $879 | $241 | $474 | $83 | $59 | 10 |
| Sedgwick | $1,478 | $594 | $928 | $147 | $111 | 27 |
| Washington | $1,296 | $452 | $787 | $127 | $94 | 29 |
| Yuma | $3,494 | $1,081 | $1,861 | $307 | $218 | 46 |

BLM_0076862

**Table 9 (Continued).** Total Hunting Economic Contributions by County

| County | Output ($thousands) | Salaries & Wages ($thousands) | GDP Contribution ($thousands) | State/Local Taxes ($thousands) | Federal Taxes ($thousands) | Jobs |
|---|---|---|---|---|---|---|
| **Southeast Region** | | | | | | |
| Baca | $1,388 | $524 | $888 | $139 | $97 | 23 |
| Bent | $1,220 | $307 | $644 | $159 | $55 | 13 |
| Crowley | $416 | $204 | $298 | $38 | $28 | 10 |
| Huerfano | $3,264 | $1,079 | $1,944 | $327 | $238 | 73 |
| Kiowa | $798 | $193 | $427 | $106 | $54 | 8 |
| Las Animas | $5,317 | $2,200 | $3,486 | $460 | $431 | 127 |
| Otero | $2,213 | $901 | $1,427 | $199 | $184 | 54 |
| Prowers | $1,795 | $688 | $1,090 | $174 | $137 | 33 |
| Pueblo | $13,722 | $5,980 | $8,987 | $1,094 | $1,165 | 190 |
| **South Central Region** | | | | | | |
| Alamosa | $3,392 | $1,409 | $2,130 | $287 | $265 | 57 |
| Chaffee | $6,425 | $2,236 | $3,998 | $556 | $482 | 133 |
| Conejos | $3,206 | $1,246 | $2,043 | $316 | $230 | 67 |
| Costilla | $1,069 | $452 | $721 | $107 | $82 | 25 |
| Custer | $2,744 | $813 | $1,577 | $272 | $199 | 59 |
| El Paso | $51,495 | $21,366 | $31,899 | $3,493 | $3,723 | 604 |
| Fremont | $5,841 | $2,157 | $3,438 | $529 | $333 | 87 |
| Lake | $1,520 | $546 | $936 | $153 | $106 | 30 |
| Mineral | $1,222 | $564 | $823 | $108 | $110 | 32 |
| Park | $6,944 | $2,156 | $3,995 | $742 | $465 | 213 |
| Rio Grande | $3,261 | $1,260 | $2,088 | $291 | $269 | 94 |
| Saguache | $6,905 | $2,700 | $4,457 | $696 | $494 | 184 |
| Teller | $3,902 | $1,515 | $2,424 | $342 | $319 | 84 |
| **Southwest Region** | | | | | | |
| Archuleta | $6,618 | $2,463 | $4,233 | $530 | $520 | 138 |
| Delta | $7,303 | $2,630 | $4,532 | $641 | $558 | 171 |
| Dolores | $3,583 | $1,396 | $2,179 | $380 | $249 | 71 |
| Gunnison | $17,041 | $5,960 | $10,170 | $1,413 | $1,281 | 277 |
| Hinsdale | $2,177 | $895 | $1,412 | $231 | $166 | 47 |
| La Plata | $11,072 | $4,392 | $6,952 | $833 | $797 | 162 |
| Montezuma | $6,059 | $2,230 | $3,726 | $505 | $464 | 113 |
| Montrose | $12,021 | $4,621 | $7,609 | $931 | $936 | 218 |
| Ouray | $2,644 | $918 | $1,665 | $242 | $202 | 55 |
| San Juan | $972 | $257 | $568 | $115 | $66 | 13 |
| San Miguel | $4,637 | $1,926 | $3,086 | $367 | $385 | 63 |

BLM_0076863

## 8. Comparison to Previous Studies

Previous studies have been undertaken to estimate the economic impacts of fishing, hunting, and wildlife watching in Colorado. CPW supported studies in both 2004 and 2008 to estimate these economic contributions (CPW 2004; CPW 2008). Additionally, USFWS estimates expenditures for fishing, hunting, and wildlife watching by state every five years based on a National Survey (USFWS, 2011). The direct expenditure estimates of these three studies are comparable in scope; retail trip and equipment expenditures made by fishing, hunting, and wildlife watchers in a given year. The spending estimates from each of these studies are summarized in Table 10.

**Table 10.** Estimates of Annual Fishing, Hunting, and Wildlife Watching Expenditures from Comparable Data Sources

| Data Source | Fishing and Hunting Expenditures | Wildlife Watching Expenditures |
|---|---|---|
| CPW (2004) | $845,300,000 | $526,000,000 |
| CPW (2008) | $1,017,800,000 | $703,200,000 |
| USFWS (2011) | $1,551,577,000 | $1,432,579,000 |
| Current Study | $1,604,218,256 | $1,322,968,136 |

Because different studies incorporate different data sources to characterize participation and spending habits of outdoor recreationists, the resulting expenditure estimates vary as a result. The current study relies largely on the USFWS National Survey to characterize average spending for fishers, hunters, and wildlife watchers. Because the participation numbers used in this study are similar to those estimated by USFWS, the overall statewide expenditures estimates are also similar.

BLM_0076864

# References

BEA (2013). National Economic Accounts. *U.S. Department of Commerce, Bureau of Economic Analysis.* Retrieved on 11-17-2013 from www.bea.gov.

BLS (2013). State and Metro Area Employment, Hours, and Earnings. *U.S. Department of Labor, Bureau of Labor Statisitcs.* Retrieved on 11-17-2013 from www.bls.gov.

CDOR (2012). Colorado Department of Revenue Annual Report. *Colorado Department of Revenue.*

CPW (2004). The Economic Impacts of Hunting, Fishing and Wildlife Watching in Colorado. *Colorado Parks & Wildlife, BBC Research and Consulting*

CPW (2008). The Economic Impacts of Hunting, Fishing and Wildlife Watching in Colorado. *Colorado Parks & Wildlife, BBC Research and Consulting*

CPW (2013a). Hunter days by County. *Colorado Parks & Wildlife.* Unpublished data.

CPW (2013b). Resident fishing licenses sold in 2012. *Colorado Parks & Wildlife.* Unpublished data.

Davies, S., Watson, P., Cramer, A., & Thilmany, D. (2004). The Economic Contribution of Colorado's Golf Industry. *Department of Agricultural and Resource Economics.* Fort Collins, CO.

Martinson, K., Schneider, I., Earing, J., Date, A., & Venegas, E. (2009). Economic Contribution and Demographics of Recreational Horse Trail Users in Minnesota. *University of Minnesota.*

NGF (2004-2011). Rounds played in the United States. *National Golf Foundation.*

NSSF (2012). Survey of Target Shooting in the United States. *National Shooting Sports Foundation.* Unpublished raw data.

OIA (2011). Survey of Outdoor Recreation in the U.S. *Outdoor Industry Association.* Unpublished data.

OIA (2012). Survey of Outdoor Recreation in U.S. states. *Outdoor Industry Association.* Unpublished data.

SCORP (2013). Survey of Outdoor Recreation in Colorado. *Colorado Parks & Wildlife, Statewide Comprehensive Outdoor Recreation Plan.* Unpublished data.

Venegas, E. (2009). Economic Contribution of Recreational Trail Use in Different Regions of Minnesota. *University of Minnesota Tourism Center.*

USDOL (2013). Consumer Price Index for All Urban Consumers, Annual Average. *U.S. Department of Labor.* Retrieved on 9-17-2013 from http://www.bls.gov/cpi/.

USFWS (2011). 2011 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation. *U.S. Fish & Wildlife Service, U.S. Census Bureau.*

BLM_0076865

## Appendix A Definitions for Economic Contribution

**Economic benefits** can be estimated by two types of economic measures: economic contributions and economic values. An **economic contribution** addresses the business and financial activity resulting from the use of a resource. **Economic value**, on the other hand, is a non-business measure that estimates the value people receive from an activity after subtracting for their costs and expenditures. This concept is also known as <u>consumer surplus</u>.

There are three types of economic contribution: direct, indirect and induced. A **direct contribution** is defined as the economic contribution of the initial purchase made by the consumer (the original retail sale). **Indirect contributions** are the secondary effects generated from a direct contribution, such as the retailer buying additional inventory, and the wholesaler and manufacturers buying additional materials. Indirect contributions affect not only the industry being studied, but also the industries that supply the first industry. An **induced contribution** results from the salaries and wages paid by the directly and indirectly effected industries. The employees of these industries spend their income on various goods and services. These expenditures are induced contributions, which, in turn, create a continual cycle of indirect and induced effects.

The direct, indirect and induced contribution effects sum together to provide the overall economic contribution of the activity under study. As the original retail purchase (direct contribution) goes through round after round of indirect and induced effects, the economic contribution of the original purchase is multiplied, benefiting many industries and individuals. Likewise, the reverse is true. If a particular item or industry is removed from the economy, the economic loss is greater than the original lost retail sale. Once the original retail purchase is made, each successive round of spending is smaller than the previous round. When the economic benefits are no longer measurable, the economic examination ends.

This study presents several important measures:

**Retail Sales** – these include expenditures made by outdoor recreationists for equipment, travel expenses and services related to their outdoor activities over the course of the year. These combined initial retail sales represent the "direct output".

**Total Economic Effect** – also known as "total output" or "total multiplier effect," this measure reports the sum of the direct, indirect and induced contributions resulting from the original retail sale. This figure explains the total activity in the economy generated by a retail sale. Another way to look at this figure is, if the activity in question were to disappear and participants did not spend their money elsewhere, the economy would contract by this amount.

**Salaries & Wages** – this figure reports the total salaries and wages paid in all sectors of the economy as a result of the activity under study. These are not just the paychecks of those employees directly serving recreationists or manufacturing their goods, it also includes portions of the paychecks of, for example, the truck driver who delivers food to the restaurants serving recreationists and the accountants who manage the books for companies down the supply chain, etc. This figure is based on the direct, indirect and

BLM_0076866

induced effects, and is essentially a portion of the total economic effect figure reported in this study.

**Jobs** – much like Salaries and Wages, this figure reports the total jobs in all sectors of the economy as a result of the activity under study. These are not just the employees directly serving recreationists or manufacturing their goods, they also include, for example, the truck driver who delivers food to the restaurants serving recreationists and the accountants who manage the books for companies down the supply chain, etc. This figure is based on direct, indirect and induced effects.

**GDP Contribution** – this represents the total "value added" contribution of economic output made by the industries involved in the production of outdoor recreation goods and services. For a given industry, value added equals the difference between gross output (sales and other income) and intermediate inputs (goods and services imported or purchased from other industries). It represents the contribution to GDP in a given industry for production related to outdoor recreation.

14

BLM_0076867

## Appendix B Methodology for Economic Contribution

The extent of the economic contributions associated with spending for outdoor recreation can be estimated in two ways:

- **Direct effects**: These include the jobs, income and tax revenues that are tied directly to the spending by outdoor recreationists without including multiplier effects.

- **Total effects**: These include the jobs, income and tax revenues that are tied directly to the spending by outdoor recreationists plus the jobs, income and tax revenues that result from the multiplier effects of outdoor recreation spending. The multiplier effect occurs when a direct purchase from a business leads to increased demand for goods and services from other businesses along their supply chain. Also included is economic activity associated with household spending of incomes earned in the affected businesses.

The economic contributions from outdoor recreation, both direct effects and total effects, were estimated with an IMPLAN input-output model for the state and regional economies of Colorado, and the county economies for hunting economic contributions. The IMPLAN model was developed by MIG, Inc. originally for use by the U.S. Forest Service. Inherent in each IMPLAN model is the relationship between the economic output of each industry (i.e. sales) and the jobs, income and taxes associated with a given level of output. Through those models, it is possible to determine the jobs, income and taxes supported directly by wildlife-based recreationists with and without the multiplier effects.

Input-output models describe how sales in one industry affect other industries. For example, once a consumer makes a purchase, the retailer buys more merchandise from wholesalers, who buy more from manufacturers, who, in turn, purchase new inputs and supplies. In addition, the salaries and wages paid by these businesses stimulate more benefits. Simply, the first purchase creates numerous rounds of purchasing. Input-output analysis tracks the flow of dollars from the consumer through all of the businesses that are affected, either directly or indirectly.

To apply the IMPLAN model, each specific expenditure for outdoor recreation activities was matched to the appropriate industry sector affected by the initial purchase. The spending was estimated with models of the Colorado economy, therefore all of the resulting contributions represent salaries and wages, total economic effects, jobs and tax revenues that occur within the state of Colorado. Likewise, models based on specific regions or counties represent the economic effects within the selected region or county. The results do not include any economic activity or indirect contributions that leak out of the state, region, or county of interest. As a result of this leakage, economic contributions at the state level are larger than the sum of corresponding regional or county contributions. This occurs because a portion spending in a particular region (or county) leaks to other regions (or counties) within the state, and this within-state leakage is captured in the Colorado model.

BLM_0076868

**Estimating Tax Revenues**

The IMPLAN model estimates detailed tax revenues at the state and local level and at the federal level. The summary estimates provided in this report represent the total taxes estimated by the IMPLAN model including all income, sales, property and other taxes and fees that accrue to the various local, state and federal taxing authorities.

16

BLM_0076869

# Appendix C Spending Methodology

## I. Overview

Spending in Colorado was estimated by applying spending profiles to participation numbers for 18 activity groups (Table D2). The procedure involved first estimating participation and spending at the state level and then allocating spending to each region.

### A. Estimating Participation

For the majority of the 18 activity groups, a single data source was not sufficient to characterize both resident and nonresident participation in Colorado (Table D2).[4] Procedures used to estimate final participation numbers varied between activity groups as a result of differences in the data available for each group. The specific procedures used are detailed within sections II through IV.

### B. Estimating Spending at the State Level

Spending profiles for each activity group included a set of expenditures by item for a typical participant. Each spending profile included two components; equipment spending, and trip-related spending.[5] Spending profiles were applied differently by activity due to differences in source data (Sections II through IV).

### C. Allocating Spending to each Region

Spending totals were allocated to regions differently for equipment and trip spending. We assumed that most consumers would not make many equipment purchases during a trip. Instead, they would likely purchase equipment prior to going on a trip. As a result many equipment purchases would be expected to occur in different regions than trip-related purchases. In order to more accurately reflect locations of equipment purchases, we used retail trade sales data by county (CDOR, 2012; Appendix H) to allocate these expenditures regionally. SCORP survey data was used to allocate trip-related expenditures.[6] The percentages used to allocate regional expenditures are shown in Tables E2, F2, and G3.

Regional Allocation Calculations:

$$equipment\ spending\ in\ region\ j = (equipment\ spending) \times (retail\ trade\ \%\ in\ region\ j)$$
$$trip\ spending\ in\ region\ j = (trip\ spending) \times (participation\ days\ \%\ in\ region\ j)$$

---

[4] For horseback riding and target shooting, only resident expenditures were estimated in this analysis due to lack of reliable data for characterizing nonresident participation. The resulting underestimation is negligible assuming that nonresident spending for these activities is a small fraction of total spending.

[5] For golfing, only trip-related expenditures were included because the spending data consisted of purchases made at golf courses only (Davies et al., 2004). As a result, the golf-related spending estimates included in this analysis are likely more conservative than estimates for the other activities.

[6] For hunting, participation data from Colorado Parks and Wildlife were used to allocate trip-related spending regionally (CPW, 2013a).

BLM_0076670

## II. Non-Motorized Activity Details

Trip spending profiles for non-motorized activities were specified on a per trip basis (OIA, 2012). In order to apply these profiles we estimated the total number of trips (resident/nonresident, day/overnight) taken for each non-motorized activity.

State-level Spending Calculations:
$$equipment\ spending = (resident\ participants) \times (equipment\ spending\ profile)$$
$$trip\ spending = (adjusted\ trips) \times (trip\ spending\ profile)$$

### Estimating Trips by Activity in Colorado
The SCORP survey was used as the primary data source for participation. In order to align the SCORP data with OIA spending profiles, the days of participation estimates were converted to trip estimates. These were estimated using OIA data that included recreation in the U.S. Mountain Region.[7]

OIA Trip Estimation Data for Non-Motorized Activities:
- Ratio of day to overnight trips
- Average days per overnight trip
- Ratio of nonresident to resident trips

During a single trip a participant might engage in more than one outdoor recreation activity and may or may not spend money during the trip. In order to avoid overestimating expenditures, we accounted for these effects by adjusting the trip estimates using OIA data based on responses from the U.S. Mountain Region:
- Percent of trips where participants spent money
- Percent of trips taken for the primary purpose of the selected activity

State-level Trip Calculations:
1. $average\ day\ trips = (SCORP\ ave\ days) \times (OIA\ \%\ day\ trip\ days)$
2. $average\ overnight\ trips = (SCORP\ ave\ days) \times (OIA\ \%\ overnight\ trip\ days) \div (OIA\ days\ per\ overnight\ trip)$
3. $resident\ trips = (SCORP\ participants) \times (average\ trips)$
4. $nonresident\ trips = (resident\ trips) \times (OIA\ nonresident\ to\ resident\ trip\ ratio)$
5. $adjusted\ trips =$
   $(trips) \times (OIA\ \%\ trips\ with\ money\ spent) \times (OIA\ \%\ primary\ purpose\ trips) \times (0.1 \times OIA\ \%\ non\ primary\ purpose\ trips)$

---

[7] Because OIA survey sample sizes for Colorado were small, data on the 7 states in the Mountain Region (Arizona, Colorado, Idaho, Montana, New Mexico, Utah, and Wyoming) were included to produce more robust estimates.

18

BLM_0076871

## III. Motorized Activity Details

Spending for motorized activities was estimated using the non-motorized activity procedure, with 2 additional steps. Because a particular motorized vehicle is often used for outdoor recreation as well as other purposes, additional adjustments were made to exclude the economic contributions of non-outdoor recreation related activities and also to reallocate part of motorized vehicle expenditures to relevant outdoor recreation categories (e.g., powerboat expenditures used for fishing).[8] These adjustments were made using OIA survey data for activity responses in the U.S. Mountain Region.

### A. Adjusting Trip Estimates to Exclude Non-Outdoor Recreation
In the OIA survey respondents were asked to identify the percentage of trips by motorized activity for 4 primary purposes (outdoor recreation, cruising, special events, or other uses). The final trip estimation was adjusted by excluding the percentage for "special events" and "other uses."

Final Trip Calculation:
$$final\ trips = (adjusted\ trips) \times (\%\ cruising\ trips + \%\ outdoor\ recreation\ trips)$$

### B. Reallocating Contributions to Non-motorized Activities
In order to attribute motorized expenditures made for the purposes of other outdoor activities (e.g., fishing, hunting, etc.) a portion of the motorized economic contributions were reallocated to 8 non-motorized activities. The "outdoor recreation" portion of each motorized activity was allocated to non-motorized activities based on an OIA survey question indicating the proportion of outdoor recreation trips for each activity.

Reallocation Calculation:
$$\%\ allocated\ to\ nonmotor\ activity\ j = (economic\ estimate\ for\ motor\ activity) \times$$
$$(\%\ outdoor\ recreation\ trips) \div (\%\ cruising\ trips) \times (\%\ outdoor\ trips\ for\ activity\ j)$$


## IV. Selected Activity Details

Spending for each activity in the "selected" group was estimated in a unique way due to the particular nature of the data that were used.  Each of the following 6 sub-sections includes the estimation details for the corresponding activity.

---

[8] For equipment expenditures, a primary purpose adjustment was included when constructing spending profiles. For this reason, no additional adjustments were made to equipment spending in order to exclude contributions of non-outdoor recreation related activities.

BLM_0076872

## A. Fishing

In 2012 there were 739,885 resident anglers who purchases fishing licenses in Colorado (CPW, 2013b). The ratio of resident to nonresident anglers in Colorado, taken from the 2011 USFWS National survey, was used to produce the estimate of 218,286 nonresident anglers. The per participant spending profile (excluding motorized items) from the National Survey was applied to estimate total fishing spending at the state level.

## B. Hunting

Hunting spending profiles were constructed using the USFWS 2011 National Survey. Hunter days by county (Table G2) were combined to estimate total hunter days in Colorado for residents and nonresidents combined (CPW, 2013a).  For each hunting type (big game, small game, and waterfowl) hunter day estimates were applied to the respective spending profiles to estimate total spending for hunting in Colorado.[9] Trip spending by county was allocated using CPW participation estimates, and equipment spending by county was allocated using county trade sales data (CDOR, 2012; Appendix H).

## C. Wildlife Watching

An estimated 713,581 Colorado residents participated in wildlife watching within the state in 2013 (SCORP, 2013). The ratio of resident to nonresident wildlife viewers in Colorado, taken from the 2011 USFWS National survey, was used to produce the estimate of 451,129 nonresident wildlife viewers. Spending for wildlife watching was estimated by using the non-motorized per participant spending profile taken from the 2011 USFWS National Survey.

## D. Golfing

Spending for golfing was characterized by updating an estimate of total spending at golf courses in Colorado in 2002 (Davies et al., 2004). The 2002 estimate was adjusted to 2011 dollars using consumer price indices (USDOL, 2013). An adjustment for change in participation was applied based on rounds played data produced annually from 2004 to 2011 (National Golf Foundation).

## E. Horseback Riding

The horseback riding spending profile was based on a 2009 study that included trip spending estimates by day (Venegas et al., 2009) and annual equipment spending estimates by person (Martinson et al., 2009) for horseback riders in Minnesota. These profiles were adjusted to 2011 dollars using consumer price indices (USDOL, 2013). Participation was characterized using the 2013 SCORP survey (Table G1).

## F. Target Shooting

A recent survey by the National Shooting Sports Foundation was used to estimate spending profiles for target shooters in Colorado (NSSF, 2012). Spending and participation data for Colorado residents were used to construct the target shooter spending profile. This profile was applied to the 2013 SCORP participation numbers to estimate total spending.

---

[9] The "migratory bird" spending profile from the 2011 USFWS National Survey was used to estimate waterfowl expenditures.

BLM_0076873

# Appendix D Overall Activities Data Summary

**Table D1.** SCORP Outdoor Recreation Activities and Combined Activity Groups

| SCORP Survey Activity | Activity Group for Economic Estimates |
|---|---|
| **Trail** | |
| Walking | Trail (apparel only) |
| Jogging/Running (outdoors) | Trail (apparel only) |
| Hiking/Backpacking | Trail |
| Horseback riding | Horseback Riding |
| Road biking | Biking |
| Mountain biking | Biking |
| Off-road motorcycling | Off-road (motorcycle) |
| ATV riding or 4-wheel driving | Off-road (other) |
| **Water-based** | |
| Swimming (outdoors) | Trail (apparel only) |
| Fishing | Fishing |
| Power boating | Boating |
| Water skiing | Boating |
| Jet skiing | Boating |
| Sailing | Water Sports |
| Canoeing | Water Sports |
| Kayaking | Water Sports |
| Whitewater rafting | Water Sports |
| Stand up paddleboarding | Water Sports |
| **Winter** | |
| Skiing or snowboarding at a ski area | Snow Sports |
| Backcountry skiing | Snow Sports |
| Sledding/tubing | Snow Sports (apparel only) |
| Ice skating (outdoors) | Snow Sports (apparel only) |
| Snowmobiling | Snowmobiling |
| Snowshoeing or cross country skiing | Snow Sports |
| Ice fishing | Fishing |
| **Wildlife-based** | |
| Big game hunting | Hunting |
| Upland bird and small game hunting | Hunting |
| Waterfowl hunting | Hunting |
| Wildlife Watching (including birding) | Wildlife Watching |
| **Other Outdoor** | |
| Developed/RV camping | RV Camping |
| Tent camping | Tent Camping |
| Picnicking | Trail (apparel only) |
| Target or skeet shooting | Target Shooting |
| Rock climbing | Trail |
| Team or individual sports (outdoors) | Trail (apparel only) |
| Playground activities | Trail (apparel only) |
| Golf | Golfing |
| Geocaching | Trail (apparel only) |

*Note: For "apparel only" categories, only apparel expenditures were included in the economic estimates.*

21

**Table D2.** Data Sources Used to Estimate Participation and Spending Profiles

| Activity Group | Spending Profile Data Sources | Participation Data Sources |
|---|---|---|
| **Motorized Activities** | | |
| Boating | OIA (2011) | SCORP (2013), OIA (2012) |
| Off-road (motorcycle) | OIA (2011) | SCORP (2013), OIA (2012) |
| Off-road (other) | OIA (2011) | SCORP (2013), OIA (2012) |
| RV Camping | OIA (2011) | SCORP (2013), OIA (2012) |
| Snowmobiling | OIA (2011) | SCORP (2013), OIA (2012) |
| | | |
| **Non-Motorized Activities** | | |
| Biking | OIA (2011) | SCORP (2013), OIA (2012) |
| Snow Sports | OIA (2011) | SCORP (2013), OIA (2012) |
| Snow Sports (apparel only) | OIA (2011) | SCORP (2013), OIA (2012) |
| Tent Camping | OIA (2011) | SCORP (2013), OIA (2012) |
| Trail | OIA (2011) | SCORP (2013), OIA (2012) |
| Trail (apparel only) | OIA (2011) | SCORP (2013), OIA (2012) |
| Water Sports | OIA (2011) | SCORP (2013), OIA (2012) |
| | | |
| **Selected Activities** | | |
| Fishing | USFWS (2011) | CPW (2013b), SCORP (2013), USFWS (2011) |
| Hunting | USFWS (2011) | CPW (2013a) |
| Wildlife Watching | USFWS (2011) | SCORP (2013), USFWS (2011) |
| Golfing | Davies (2004) | SCORP (2013), Davies (2004), NGF (2004-2011) |
| Horseback Riding | Venegas (2009), Martinson (2009) | SCORP (2013) |
| Target Shooting | NSSF (2012) | SCORP (2013) |

BLM_0076875

# Appendix E Non-Motorized Activities Data Summary

**Table E1.** SCORP Survey Annual Non-Motorized Participation

| | Northwest | North Central | Metro | Northeast | Southeast | South Central | Southwest | State |
|---|---|---|---|---|---|---|---|---|
| **Numbers of Participants (thousands)** | | | | | | | | |
| Biking | 400 | 658 | 482 | 53 | 98 | 245 | 127 | **1,386** |
| Tent Camping | 593 | 582 | 123 | 16 | 59 | 411 | 231 | **1,357** |
| Snow Sports | 1,133 | 493 | 75 | 5 | 8 | 232 | 165 | **1,533** |
| Trail Sports | 1,073 | 1,077 | 360 | 48 | 85 | 645 | 355 | **2,066** |
| Water Sports | 214 | 208 | 74 | 1 | 53 | 155 | 146 | **625** |
| Trail (apparel only) | 1,095 | 1,424 | 1,129 | 271 | 251 | 721 | 388 | **3,043** |
| Snow (apparel only) | 256 | 278 | 174 | 12 | 13 | 70 | 46 | **709** |
| **Average Days per Participant** | | | | | | | | |
| Biking | 17.1 | 27.2 | 27.2 | 18.1 | 21.8 | 20.1 | 18.4 | **34.8** |
| Tent Camping | 7.3 | 7.1 | 5.5 | 6.4 | 6.0 | 7.4 | 6.8 | **10.4** |
| Snow Sports | 13.2 | 9.1 | 6.0 | 1.6 | 6.1 | 9.3 | 11.4 | **15.6** |
| Trail Sports | 12.1 | 16.4 | 15.9 | 7.6 | 11.4 | 15.3 | 10.8 | **24.9** |
| Water Sports | 9.7 | 8.9 | 7.7 | 5.1 | 12.0 | 14.4 | 7.1 | **13.5** |
| **Number of Respondents** | | | | | | | | |
| Biking | 117 | 87 | 72 | 17 | 27 | 60 | 75 | **316** |
| Tent Camping | 128 | 64 | 20 | 11 | 22 | 93 | 102 | **329** |
| Snow Sports | 234 | 69 | 10 | 4 | 8 | 61 | 109 | **399** |
| Trail Sports | 249 | 150 | 60 | 18 | 33 | 160 | 180 | **531** |
| Water Sports | 67 | 29 | 13 | 3 | 14 | 34 | 56 | **177** |
| Trail (apparel only) | 310 | 219 | 193 | 105 | 104 | 213 | 242 | **875** |
| Snow (apparel only) | 58 | 27 | 21 | 6 | 5 | 16 | 44 | **159** |

**Table E2.** Regional Spending Allocation for Non-Motorized Activities

| | Northwest | North Central | Metro | Northeast | Southeast | South Central | Southwest | State |
|---|---|---|---|---|---|---|---|---|
| **Equipment Spending** | | | | | | | | |
| All Activities | 8.8% | 38.7% | 29.7% | 1.7% | 4.0% | 13.5% | 3.6% | **100.0%** |
| **Trip Spending** | | | | | | | | |
| Biking | 14.2% | 37.1% | 27.2% | 2.0% | 4.4% | 10.2% | 4.8% | **100.0%** |
| Tent Camping | 30.4% | 29.0% | 4.8% | 0.7% | 2.5% | 21.4% | 11.1% | **100.0%** |
| Snow Sports | 62.2% | 18.8% | 1.9% | 0.0% | 0.2% | 9.0% | 7.9% | **100.0%** |
| Trail Sports | 25.3% | 34.3% | 11.2% | 0.7% | 1.9% | 19.2% | 7.5% | **100.0%** |
| Water Sports | 24.7% | 22.0% | 6.8% | 0.1% | 7.6% | 26.6% | 12.2% | **100.0%** |

BLM_0076876

## Appendix F Motorized Activities Data Summary

**Table F1.** SCORP Survey Annual Motorized Participation

|  | Northwest | North Central | Metro | Northeast | Southeast | South Central | Southwest | State |
|---|---|---|---|---|---|---|---|---|
| **Numbers of Participants** | | | | | | | | |
| Boating | 172,199 | 235,905 | 92,424 | 31,770 | 58,216 | 62,827 | 31,206 | **556,489** |
| Off-road (motorcycle) | 108,927 | 23,828 | 12,286 | 17,713 | 14,755 | 41,996 | 18,615 | **213,490** |
| Off-road (other) | 277,655 | 158,497 | 24,082 | 52,996 | 87,963 | 225,052 | 167,565 | **646,152** |
| RV Camping | 271,326 | 184,777 | 66,372 | 54,738 | 56,780 | 140,125 | 113,905 | **562,840** |
| Snowmobiling | 125,882 | 4,928 | 4,721 | 482 | 1,753 | 39,871 | 48,150 | **191,592** |
| **Average Days per Participant** | | | | | | | | |
| Boating | 8.3 | 11.8 | 18.8 | 20.1 | 39.1 | 30.8 | 14.2 | **20.2** |
| Off-road (motorcycle) | 7.5 | 4.2 | 14.7 | 6.0 | 8.7 | 20.9 | 11.1 | **11.3** |
| Off-road (other) | 12.1 | 14.2 | 15.9 | 14.5 | 16.8 | 13.4 | 11.5 | **20.4** |
| RV Camping | 6.3 | 7.9 | 4.9 | 4.6 | 5.9 | 10.7 | 7.8 | **11.5** |
| Snowmobiling | 6.1 | 27.4 | 10.0 | 20.0 | 5.3 | 12.3 | 10.4 | **10.2** |
| **Number of Respondents** | | | | | | | | |
| Boating | 43 | 27 | 17 | 15 | 16 | 13 | 31 | **141** |
| Off-road (motorcycle) | 22 | 6 | 3 | 4 | 6 | 17 | 19 | **61** |
| Off-road (other) | 92 | 32 | 6 | 13 | 22 | 66 | 101 | **240** |
| RV Camping | 84 | 37 | 17 | 10 | 25 | 59 | 73 | **212** |
| Snowmobiling | 33 | 2 | 2 | 1 | 2 | 5 | 26 | **66** |

**Table F2.** Regional Spending Allocation for Motorized Activities

|  | Northwest | North Central | Metro | Northeast | Southeast | South Central | Southwest | State |
|---|---|---|---|---|---|---|---|---|
| **Equipment Spending** | | | | | | | | |
| All Activities | 8.8% | 38.7% | 29.7% | 1.7% | 4.0% | 13.5% | 3.6% | **100.0%** |
| **Trip Spending** | | | | | | | | |
| Boating | 12.7% | 24.8% | 15.5% | 5.7% | 20.2% | 17.2% | 3.9% | **100.0%** |
| Off-road (motorcycle) | 33.9% | 4.2% | 7.4% | 4.4% | 5.3% | 36.3% | 8.5% | **100.0%** |
| Off-road (other) | 25.6% | 17.0% | 2.9% | 5.8% | 11.2% | 22.8% | 14.6% | **100.0%** |
| RV Camping | 26.4% | 22.6% | 5.1% | 3.9% | 5.2% | 23.1% | 13.7% | **100.0%** |
| Snowmobiling | 39.0% | 6.9% | 2.4% | 0.5% | 0.5% | 25.1% | 25.6% | **100.0%** |

BLM_0076877

## Appendix G Selected Activities Data Summary

**Table G1.** Participation for Selected Activities (SCORP, 2013)

| | Northwest | North Central | Metro | Northeast | Southeast | South Central | Southwest | State |
|---|---|---|---|---|---|---|---|---|
| **Numbers of Participants** | | | | | | | | |
| Fishing | 406,418 | 634,220 | 182,522 | 67,415 | 142,606 | 428,749 | 240,813 | **1,399,845** |
| Golfing | 171,190 | 259,190 | 251,529 | 23,900 | 36,718 | 161,947 | 42,547 | **713,581** |
| Horseback Riding | 105,052 | 129,865 | 53,406 | 25,340 | 8,745 | 66,666 | 20,585 | **282,247** |
| Hunting | 252,899 | 166,360 | 13,660 | 148,581 | 73,799 | 135,314 | 103,885 | **593,619** |
| Shooting | 89,653 | 259,045 | 35,765 | 31,943 | 40,822 | 119,859 | 52,738 | **520,724** |
| Wildlife Watching | 218,917 | 304,051 | 89,706 | 43,355 | 56,542 | 192,707 | 143,801 | **733,220** |
| **Average Days per Participant** | | | | | | | | |
| Fishing | 12.6 | 12.6 | 18.2 | 6.9 | 16.8 | 15.9 | 11.7 | **20.7** |
| Golfing | 8.2 | 13.6 | 9.5 | 16.6 | 9.2 | 15.7 | 13.4 | **15.7** |
| Horseback Riding | 7.7 | 6.6 | 8.1 | 8.2 | 10.2 | 3.9 | 11.0 | **10.2** |
| Hunting | 10.1 | 10.4 | 28.1 | 6.9 | 20.6 | 13.3 | 14.1 | **17.6** |
| Shooting | 11.3 | 9.3 | 3.6 | 8.6 | 17.1 | 12.9 | 5.5 | **12.2** |
| Wildlife Watching | 9.8 | 12.7 | 10.2 | 16.3 | 20.2 | 17.3 | 16.2 | **19.7** |
| **Number of Respondents** | | | | | | | | |
| Fishing | 151 | 111 | 37 | 37 | 57 | 129 | 138 | **482** |
| Golfing | 63 | 39 | 51 | 21 | 20 | 47 | 39 | **222** |
| Horseback Riding | 25 | 14 | 4 | 13 | 7 | 12 | 26 | **85** |
| Hunting | 86 | 32 | 6 | 59 | 27 | 48 | 80 | **255** |
| Shooting | 34 | 31 | 11 | 28 | 18 | 35 | 32 | **167** |
| Wildlife Watching | 87 | 56 | 19 | 35 | 21 | 62 | 96 | **272** |

*Note: Not all of the above numbers were included in specifying participation for this analysis (see Appendix D, Section IV for details).*

BLM_0076878

**Table G2.** Hunting Participation by County in Hunter Days (CPW, 2013a)

| County | Big Game | Small Game | Waterfowl |
|---|---|---|---|
| **Northwest Region** | | | |
| Eagle | 64,716 | 7,164 | 1,486 |
| Garfield | 91,843 | 9,828 | 1,978 |
| Grand | 87,672 | 4,445 | 1,952 |
| Jackson | 50,316 | 3,054 | 905 |
| Mesa | 73,920 | 40,582 | 6,062 |
| Moffat | 75,224 | 23,974 | 1,659 |
| Pitkin | 27,286 | 1,342 | 47 |
| Rio Blanco | 87,070 | 2,685 | 740 |
| Routt | 92,686 | 7,659 | 508 |
| Summit | 20,967 | 4,165 | 142 |
| **North Central Region** | | | |
| Adams | 3,645 | 3,300 | 6,570 |
| Arapahoe | 4,768 | 4,141 | 675 |
| Boulder | 9,597 | 8,711 | 5,448 |
| Clear Creek | 7,552 | 4,420 | 0 |
| Gilpin | 4,763 | 1,132 | 0 |
| Larimer | 49,027 | 13,145 | 13,886 |
| Weld | 8,433 | 29,876 | 44,028 |
| **Metro Region** | | | |
| Broomfield | 485 | 0 | 0 |
| Denver | 1,890 | 43 | 132 |
| Douglas | 9,484 | 1,190 | 644 |
| Jefferson | 24,871 | 2,938 | 113 |
| **Northeast Region** | | | |
| Cheyenne | 4,577 | 649 | 0 |
| Elbert | 7,876 | 2,141 | 126 |
| Kit Carson | 5,080 | 9,509 | 180 |
| Lincoln | 8,134 | 3,856 | 105 |
| Logan | 4,313 | 20,011 | 8,138 |
| Morgan | 5,160 | 17,345 | 17,266 |
| Phillips | 581 | 8,739 | 97 |
| Sedgwick | 2,260 | 14,902 | 2,816 |
| Washington | 3,916 | 10,249 | 347 |
| Yuma | 3,761 | 26,811 | 1,360 |

BLM_0076879

**Table G2 (Continued).** Hunting Participation by County in Hunter Days (CPW, 2013a)

| County | Big Game | Small Game | Waterfowl |
|---|---|---|---|
| **Southeast Region** | | | |
| Baca | 5,411 | 4,036 | 125 |
| Bent | 4,493 | 7,211 | 2,786 |
| Crowley | 2,606 | 646 | 710 |
| Huerfano | 15,833 | 574 | 150 |
| Kiowa | 5,154 | 1,034 | 558 |
| Las Animas | 22,841 | 2,019 | 1,710 |
| Otero | 3,619 | 6,469 | 2,766 |
| Prowers | 2,833 | 4,735 | 1,300 |
| Pueblo | 10,341 | 9,674 | 4,564 |
| **South Central Region** | | | |
| Alamosa | 6,982 | 2,887 | 1,422 |
| Chaffee | 22,696 | 4,533 | 889 |
| Conejos | 20,704 | 2,860 | 131 |
| Costilla | 7,571 | 65 | 237 |
| Custer | 12,729 | 1,821 | 173 |
| El Paso | 17,677 | 4,313 | 548 |
| Fremont | 20,682 | 3,359 | 265 |
| Lake | 5,584 | 5,963 | 14 |
| Mineral | 10,515 | 374 | 38 |
| Park | 34,735 | 5,648 | 1,122 |
| Rio Grande | 14,265 | 5,340 | 1,348 |
| Saguache | 46,775 | 3,713 | 972 |
| Teller | 13,326 | 2,690 | 279 |
| **Southwest Region** | | | |
| Archuleta | 30,091 | 6,864 | 62 |
| Delta | 33,894 | 5,314 | 2,509 |
| Dolores | 25,501 | 1,598 | 0 |
| Gunnison | 83,731 | 4,723 | 603 |
| Hinsdale | 16,192 | 122 | 0 |
| La Plata | 37,096 | 5,278 | 446 |
| Montezuma | 22,293 | 2,710 | 119 |
| Montrose | 45,767 | 7,486 | 2,412 |
| Ouray | 14,891 | 258 | 20 |
| San Juan | 9,148 | 926 | 0 |
| San Miguel | 22,969 | 2,142 | 43 |

BLM_0076880

**Table G3.** Regional Spending Allocation for Miscellaneous Activities

| | Northwest | North Central | Metro | Northeast | Southeast | South Central | Southwest | State |
|---|---|---|---|---|---|---|---|---|
| **Equipment Spending** | | | | | | | | |
| All Activities | 8.8% | 38.7% | 29.7% | 1.7% | 4.0% | 13.5% | 3.6% | **100.0%** |
| **Trip Spending** | | | | | | | | |
| Fishing | 17.7% | 27.6% | 11.5% | 1.6% | 8.3% | 23.5% | 9.8% | **100.0%** |
| Golfing | 12.6% | 31.6% | 21.4% | 3.6% | 3.0% | 22.7% | 5.1% | **100.0%** |
| Horseback Riding | 28.0% | 29.6% | 15.1% | 7.3% | 3.1% | 9.0% | 7.8% | **100.0%** |
| Shooting | 16.0% | 37.9% | 2.0% | 4.3% | 10.9% | 24.3% | 4.6% | **100.0%** |
| Wildlife Watching | 14.8% | 26.8% | 6.3% | 4.9% | 7.9% | 23.1% | 16.2% | **100.0%** |
| **Trip Spending for Hunting** | | | | | | | | |
| Big Game | 45.1% | 5.9% | 2.5% | 3.1% | 4.9% | 15.7% | 22.9% | **100.0%** |
| Small Game | 25.9% | 16.0% | 1.0% | 28.2% | 9.0% | 10.7% | 9.2% | **100.0%** |
| Waterfowl | 10.6% | 48.4% | 0.6% | 20.9% | 10.1% | 5.1% | 4.3% | **100.0%** |

**Table G4.** Trail Activities Participation by Percent of Population

| Trail Activities | Northwest | North Central | Metro | Northeast | Southeast | South Central | Southwest | State |
|---|---|---|---|---|---|---|---|---|
| **Non-Motorized** | | | | | | | | |
| Walking | 69.3% | 69.0% | 63.0% | 48.0% | 54.5% | 68.9% | 74.5% | **66.3%** |
| Jogging/Running | 26.7% | 32.8% | 36.5% | 13.1% | 17.1% | 26.8% | 17.7% | **30.8%** |
| Hiking/Backpacking | 64.4% | 57.0% | 48.5% | 17.5% | 23.6% | 54.0% | 52.3% | **51.9%** |
| Horseback riding | 9.9% | 7.4% | 8.4% | 5.6% | 4.5% | 4.1% | 12.8% | **7.4%** |
| Mountain biking | 30.0% | 26.2% | 18.5% | 4.7% | 12.6% | 19.9% | 27.3% | **22.1%** |
| Snowshoe/X-Country Ski | 30.6% | 23.9% | 12.9% | 1.3% | 4.4% | 10.3% | 26.6% | **17.7%** |
| Any Non-motorized Trail | 89.1% | 81.9% | 80.4% | 54.0% | 60.5% | 84.2% | 84.2% | **80.8%** |
| **Motorized** | | | | | | | | |
| Off-road motorcycling | 11.5% | 3.8% | 6.2% | 5.7% | 5.9% | 5.5% | 7.3% | **5.6%** |
| ATV/4-wheel driving | 30.5% | 11.6% | 14.9% | 11.2% | 21.2% | 24.1% | 28.6% | **16.9%** |
| Any Motorized Trail | 33.4% | 13.0% | 15.4% | 12.4% | 22.9% | 27.6% | 32.2% | **18.6%** |
| **Combined** | | | | | | | | |
| Any Trail | 93.7% | 82.7% | 81.0% | 57.5% | 66.7% | 86.3% | 90.4% | **82.6%** |

BLM_0076881

## Appendix H Retail Trade Sales by County

**Table H1.** Retail Trade Sales by County (CDOR, 2012)

| County | Trade Sales | % of State Total |
|---|---|---|
| **Northwest Region** | | |
| Eagle | $895,221 | 1.35% |
| Garfield | $1,011,264 | 1.52% |
| Grand | $160,955 | 0.24% |
| Jackson | $10,543 | 0.02% |
| Mesa | $2,183,408 | 3.29% |
| Moffat | $189,238 | 0.29% |
| Pitkin | $348,020 | 0.52% |
| Rio Blanco | $55,190 | 0.08% |
| Routt | $348,346 | 0.53% |
| Summit | $608,117 | 0.92% |
| **North Central Region** | | |
| Adams | $5,697,508 | 8.59% |
| Arapahoe | $8,889,189 | 13.40% |
| Boulder | $3,855,848 | 5.81% |
| Clear Creek | $81,823 | 0.12% |
| Gilpin | $11,236 | 0.02% |
| Larimer | $4,038,476 | 6.09% |
| Weld | $3,106,335 | 4.68% |
| **Metro Region** | | |
| Broomfield | $1,008,975 | 1.52% |
| Denver | $7,613,904 | 11.48% |
| Douglas | $3,982,905 | 6.00% |
| Jefferson | $7,069,549 | 10.66% |
| **Northeast Region** | | |
| Cheyenne | $14,220 | 0.02% |
| Elbert | $146,396 | 0.22% |
| Kit Carson | $88,029 | 0.13% |
| Lincoln | $139,613 | 0.21% |
| Logan | $284,896 | 0.43% |
| Morgan | $306,094 | 0.46% |
| Phillips | $17,258 | 0.03% |
| Sedgwick | $24,757 | 0.04% |
| Washington | $13,663 | 0.02% |
| Yuma | $106,949 | 0.16% |

BLM_0076882

**Table H1 (Continued).** Retail Trade Sales by County (CDOR, 2012)

| County | Trade Sales | % of State Total |
|---|---|---|
| **Southeast Region** | | |
| Baca | $41,540 | 0.06% |
| Bent | $23,059 | 0.03% |
| Crowley | $16,568 | 0.02% |
| Huerfano | $65,846 | 0.10% |
| Kiowa | $11,709 | 0.02% |
| Las Animas | $170,706 | 0.26% |
| Otero | $191,333 | 0.29% |
| Prowers | $160,785 | 0.24% |
| Pueblo | $2,000,847 | 3.02% |
| **South Central Region** | | |
| Alamosa | $342,012 | 0.52% |
| Chaffee | $263,645 | 0.40% |
| Conejos | $34,653 | 0.05% |
| Costilla | $12,090 | 0.02% |
| Custer | $23,201 | 0.03% |
| El Paso | $7,525,106 | 11.34% |
| Fremont | $340,110 | 0.51% |
| Lake | $47,375 | 0.07% |
| Mineral | $9,286 | 0.01% |
| Park | $65,577 | 0.10% |
| Rio Grande | $75,314 | 0.11% |
| Saguache | $25,219 | 0.04% |
| Teller | $211,815 | 0.32% |
| **Southwest Region** | | |
| Archuleta | $115,808 | 0.17% |
| Delta | $290,862 | 0.44% |
| Dolores | $18,303 | 0.03% |
| Gunnison | $189,076 | 0.28% |
| Hinsdale | $8,848 | 0.01% |
| La Plata | $741,886 | 1.12% |
| Montezuma | $361,865 | 0.55% |
| Montrose | $527,781 | 0.80% |
| Ouray | $26,853 | 0.04% |
| San Juan | $5,950 | 0.01% |
| San Miguel | $90,829 | 0.14% |

BLM_0076883

# Appendix I Estimates of Spending and Days by Activity Group[10]

**Table I1.** Estimated Annual Acitivity Days in Colorado

| Activity Group | Residents | Nonresidents | Total |
|---|---:|---:|---:|
| **Motorized Activities** | | | |
| Motorized Boating | 11,252,974 | 6,998,784 | 18,251,757 |
| Off-Road Motorcycles | 2,420,919 | 1,385,487 | 3,806,406 |
| ATVs | 13,190,020 | 8,251,407 | 21,441,427 |
| Recreational Vehicles | 6,474,549 | 11,316,801 | 17,791,351 |
| Snowmobiles | 1,955,665 | 4,134,048 | 6,089,713 |
| | | | |
| **Non-Motorized Activities** | | | |
| Biking | 48,170,190 | 21,637,784 | 69,807,974 |
| Camping | 14,158,319 | 12,426,131 | 26,584,450 |
| Snow Sports | 23,983,623 | 37,480,193 | 61,463,816 |
| Trail Activities | 51,512,396 | 41,176,069 | 92,688,465 |
| Water Sports | 8,412,174 | 14,910,582 | 23,322,756 |
| | | | |
| **Selected Activities** | | | |
| Fishing | 9,352,587 | 1,177,307 | 10,529,894 |
| Hunting | 1,452,438 | 589,503 | 2,041,940 |
| Wildlife Watching | 6,123,666 | 2,820,877 | 8,944,543 |
| Horseback Riding | 2,874,784 | N/A | 2,874,784 |
| Target Shooting | 4,488,592 | N/A | 4,488,592 |

---

[10] Golfing is excluded from these tables because estimates in terms of days of golfing were not incorporated in this study.

BLM_0076884

**Table I2.** Estimated Spending per Day of Activity in Colorado

| Activity Group | Average Spending per Day |
|---|---|
| **Motorized Activities** | |
| Motorized Boating | $36.05 |
| Off-Road Motorcycles | $37.99 |
| ATVs | $49.66 |
| Recreational Vehicles | $18.73 |
| Snowmobiles | $23.17 |
| | |
| **Non-Motorized Activities** | |
| Biking | $19.59 |
| Camping | $73.75 |
| Snow Sports | $118.32 |
| Trail Activities | $24.43 |
| Water Sports | $56.04 |
| | |
| **Selected Activities** | |
| Fishing | $103.16 |
| Hunting | $253.67 |
| Wildlife Watching | $147.91 |
| Horseback Riding | $253.81 |
| Target Shooting | $55.45 |

32

# ATTACHMENT B



THE SECRETARY OF THE INTERIOR
WASHINGTON

ORDER NO. 3362

Subject: Improving Habitat Quality in Western Big-Game Winter Range and Migration
Corridors

Sec. 1 **Purpose**. This Order directs appropriate bureaus within the Department of the Interior
(Department) to work in close partnership with the states of Arizona, California, Colorado,
Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming to enhance
and improve the quality of big-game winter range and migration corridor habitat on Federal
lands under the management jurisdiction of this Department in a way that recognizes state
authority to conserve and manage big-game species and respects private property rights.
Through scientific endeavors and land management actions, wildlife such as Rocky Mountain
Elk (elk), Mule Deer (deer), Pronghorn Antelope (pronghorn), and a host of other species will
benefit. Additionally, this Order seeks to expand opportunities for big-game hunting by
improving priority habitats to assist states in their efforts to increase and maintain sustainable big
game populations across western states.

Sec. 2 **Authorities**. This Order is issued under the authority of section 2 of Reorganization Plan
No. 3 of 1950 (64 Stat. 1262), as amended, as well as the Department's land and resource
management authorities, including the following:

      a.     Federal Land Policy and Management Act of 1976, as amended, 43 U.S.C. 1701,
*et seq*.;

      b.     U.S. Geological Survey Organic Act, as amended, 43 U.S.C. 31, *et seq*.;

      c.     National Wildlife Refuge System Improvement Act of 1997, as amended,
16 U.S.C. 668dd *et seq*.; and

      d.     National Park Service Organic Act of 1916, as amended, 54 U.S.C. 100101, *et seq*.

Sec. 3 **Background**. The West was officially "settled" long ago, but land use changes continue
to occur throughout the western landscape today. Human populations grow at increasing rates
with population movements from east and west coast states into the interior West. In many
areas, development to accommodate the expanding population has occurred in important winter
habitat and migration corridors for elk, deer, and pronghorn. Additionally, changes have
occurred across large swaths of land not impacted by residential development. The habitat
quality and value of these areas crucial to western big-game populations are often degraded or
declining.

2

The Bureau of Land Management (BLM) is the largest land manager in the United States (U.S.) with more than 245 million acres of public land under its purview, much of which is found in Western States. The U.S. Fish and Wildlife Service (FWS) and National Park Service (NPS) also manage a considerable amount of public land on behalf of the American people in the West. Beyond land management responsibilities, the Department has strong scientific capabilities in the U.S. Geological Survey (USGS) that can be deployed to assist State wildlife agencies and Federal land managers. Collectively, the appropriate bureaus within the Department have an opportunity to serve in a leadership role and take the initiative to work closely with Western States on their priorities and objectives as they relate to big-game winter range and migration corridors on lands managed by the Department.

Consistent with the American conservation ethic, ultimately it is crucial that the Department take action to harmonize State fish and game management and Federal land management of big-game winter range and corridors. On lands within these important areas, if landowners are interested and willing, conservation may occur through voluntary agreements.

Robust and sustainable elk, deer, and pronghorn populations contribute greatly to the economy and well-being of communities across the West. In fact, hunters and tourists travel to Western States from across our Nation and beyond to pursue and enjoy this wildlife. In doing so, they spend billions of dollars at large and small businesses that are crucial to State and local economies. We have a responsibility as a Department with large landholdings to be a collaborative neighbor and steward of the resources held in trust.

Accordingly, the Department will work with our State partners and others to conserve and/or improve priority western big-game winter range and migration corridors in sagebrush ecosystems and in other ecotypes as necessary. This Order focuses on the Western States of: Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming. These States generally have expansive public lands with established sagebrush landscapes along with robust big-game herds that are highly valued by hunters and tourists throughout the Nation.

The Department has broad responsibilities to manage Federal lands, waters, and resources for public benefit, including managing habitat to support fish, wildlife, and other resources. Secretary's Order 3356, "Hunting, Fishing, Recreational Shooting, and Wildlife Conservation Opportunities and Coordination with States, Tribes, and Territories," (SO 3356) was issued on September 15, 2017. SO 3356 primarily focused on physical access to lands for recreational activities, particularly hunting and fishing. This Order is focused on providing access to big game animals by providing direction regarding land management actions to improve habitat quality for big-game populations that could help ensure robust big-game populations continue to exist. Further, SO 3356 includes a number of directives related to working with States and using the best available science to inform development of guidelines, including directing relevant bureaus to:

      a.      Collaborate with State, tribal, and territorial fish and wildlife agencies to attain or sustain State, tribal, and territorial wildlife population goals during the Department's land management planning and implementation, including prioritizing active habitat management

BLM_0076888

3

projects and funding that contributes to achieving wildlife population objectives, particularly for wildlife that is hunted or fished, and identifying additional ways to include or delegate to States habitat management work on Federal lands;

b.      Work cooperatively with State, tribal, and territorial wildlife agencies to enhance State, tribe, and territorial access to the Department's lands for wildlife management actions;

c.      Within 180 days, develop a proposed categorical exclusion for proposed projects that utilize common practices solely intended to enhance or restore habitat for species such as sage grouse and/or mule deer; and

d.      Review and use the best available science to inform development of specific guidelines for the Department's lands and waters related to planning and developing energy, transmission, or other relevant projects to avoid or minimize potential negative impacts on wildlife.

This Order follows the intent and purpose of SO 3356 and expands and enhances the specific directives therein.

Sec. 4  **Implementation**.  Consistent with governing laws, regulations, and principles of responsible public stewardship, I direct the following actions:

a.      With respect to activities at the national level, I hereby direct the BLM, FWS, and NPS to:

(1)      Within 30 days, identify an individual to serve as the "Coordinator" for the Department.  The Coordinator will work closely with appropriate States, Federal agencies, nongovernmental organizations, and/or associations to identify active programs focused on big-game winter range and/or migration corridors.  The programs are to be organized and cataloged by region and other geographic features (such as watersheds and principles of wildlife management) as determined by the Deputy Secretary, including those principles identified in the Department's reorganization plan.

(2)      Within 45 days, provide the Coordinator information regarding:

(i)      Past and current bureau conservation/restoration efforts on winter range and migration corridors;

(ii)      Whether consideration of winter range and corridors is included in appropriate bureau land (or site) management plans;

(iii)      Bureau management actions used to accomplish habitat objectives in these areas;

(iv)      The location of areas that have been identified as a priority for conservation and habitat treatments; and

4

        (v)     Funding sources previously used and/or currently available to the bureau for winter range and migration corridor conservation/restoration efforts.

        (3)     Within 60 days, if sufficient land use plans are already established that are consistent with this Order, work with the Coordinator and each regional Liaison (see section 4b) to discuss implementation of the plans. If land use plans are not already established, work with the Coordinator and each regional Liaison to develop an Action Plan that summarizes information collected in section 4 (a) (1) and (2), establishes a clear direction forward with each State, and includes:

        (i)     Habitat management goals and associated actions as they are associated with big game winter range and migration corridors;

        (ii)     Measurable outcomes; and

        (iii)     Budgets necessary to complete respective action(s).

        b.     <u>With respect to activities at the State level</u>, I hereby direct the BLM, FWS, and NPS to:

        (1)     Within 60 days, identify one person in each appropriate unified region (see section 4a) to serve as the Liaison for the Department for that unified region. The Liaison will coordinate at the State level with each State in their region, as well as with the Liaison for any other regions within the State. The Liaison will schedule a meeting with the respective State fish and wildlife agency to assess where and how the Department can work in close partnership with the State on priority winter range and migration corridor conservation.

        (2)     Within 60 days, if this focus is not already included in respective land management plans, evaluate how land under each bureau's management responsibility can contribute to State or other efforts to improve the quality and condition of priority big-game winter and migration corridor habitat.

        (3)     Provide a report on October 1, 2018, and at the end of each fiscal year thereafter, that details how respective bureau field offices, refuges, or parks cooperated and collaborated with the appropriate State wildlife agencies to further winter range and migration corridor habitat conservation.

        (4)     Assess State wildlife agency data regarding wildlife migrations early in the planning process for land use plans and significant project-level actions that bureaus develop; and

        (5)     Evaluate and appropriately apply site-specific management activities, as identified in State land use plans, site-specific plans, or the Action Plan (described above), that conserve or restore habitat necessary to sustain local and regional big-game populations through measures that may include one or more of the following:

(i)     restoring degraded winter range and migration corridors by removing encroaching trees from sagebrush ecosystems, rehabilitating areas damaged by fire, or treating exotic/invasive vegetation to improve the quality and value of these areas to big game and other wildlife;

(ii)     revising wild horse and burro-appropriate management levels (AML) or removing horses and burros exceeding established AML from winter range or migration corridors if habitat is degraded as a result of their presence;

(iii)     working cooperatively with private landowners and State highway departments to achieve permissive fencing measures, including potentially modifying (via smooth wire), removing (if no longer necessary), or seasonally adapting (seasonal lay down) fencing if proven to impede movement of big game through migration corridors;

(iv)     avoiding development in the most crucial winter range or migration corridors during sensitive seasons;

(v)     minimizing development that would fragment winter range and primary migration corridors;

(vi)     limiting disturbance of big game on winter range; and

(vii)     utilizing other proven actions necessary to conserve and/or restore the vital big-game winter range and migration corridors across the West.

c.     With respect to science, I hereby direct the USGS to:

(1)     Proceed in close cooperation with the States, in particular the Western Association of Fish and Wildlife Agencies and its program manager for the Crucial Habitat Assessment Tool, prior to developing maps or mapping tools related to elk, deer, or pronghorn movement or land use; and

(2)     Prioritize evaluations of the effectiveness of habitat treatments in sagebrush communities, as requested by States or land management bureaus, and identified needs related to developing a greater understanding of locations used as winter range or migration corridors.

d.     I further hereby direct the responsible bureaus and offices within the Department to:

(1)     Within 180 days, to update all existing regulations, orders, guidance documents, policies, instructions, manuals, directives, notices, implementing actions, and any other similar actions to be consistent with the requirements in this Order;

(2)     Within 30 days, provide direction at the state or other appropriate level to revise existing Federal-State memorandums of agreement to incorporate consultation with State agencies on the location and conservation needs of winter range and migration routes; and

BLM_0076891

6

       (3)     Consult with State wildlife agencies and bureaus to ensure land use plans are consistent and complementary to one another along the entire wildlife corridor in common instances where winter range or migration corridors span jurisdictional boundaries.

     e.    <u>Heads of relevant bureaus</u> will ensure that appropriate members of the Senior Executive Service under their purview include a performance standard in their respective current or future performance plan that specifically implements the applicable actions identified in this Order.

Sec. 5 **Management**. I hereby direct the Deputy Secretary to take is responsible for taking all reasonably necessary steps to implement this Order.

Sec. 6 **Effect of Order**. This Order is intended to improve the internal management of the Department. This Order and any resulting reports or recommendations are not intended to, and do not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person. To the extent there is any inconsistency between the provision of this Order and any Federal laws or regulations, the laws or regulations will control.

Sec. 7 **Expiration Date**. This Order is effective immediately. It will remain in effect until its provisions are implemented and completed, or until it is amended, superseded, or revoked.

Secretary of the Interior

Date:   FEB 0 9 2018

# ATTACHMENT C

BLM_0076893



**COLORADO**

**Department of Natural Resources**

Executive Director's Office
1313 Sherman Street, Room 718
Denver, CO 80203

November 1, 2016

Ms. Teresa Pfifer
Acting Field Office Manager
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Uncompahgre Field Office Draft Resource Management Plan/ Environmental Impact Statement

Dear Ms. Pfifer:

The Colorado Department of Natural Resources submits the following comments on the Uncompahgre
Field Office (UFO) Draft Resource Management Plan / Environmental Impact Statement prepared by two
of our divisions: Colorado Parks and Wildlife (CPW) and the Colorado Water Conservation Board (CWCB).

CPW recommends additional detail be included in the preferred alternative in the final RMP/EIS to
incorporate the desired conditions, suggested standards, and best management practices related to the
management, preservation, and conservation of fish and wildlife species and habitat, while also remaining
consistent with species management plans, agreements, listing decisions, and BLM policies. CPW also
offers specific comments related to aquatic species, bighorn sheep, land health standards, and
stipulations for fluid mineral leasing and other surface disturbing activity.

Further, the draft RMP/EIS lacks the appropriate analysis and protections related to the Gunnison Sage
Grouse (GuSG) given its current listing status as a threatened species under the Endangered Species Act.
(Indeed, Chapter 3 and Appendix O both state incorrectly that the Gunnison sage-grouse is merely a
candidate species, with a proposal to list it as endangered.  That changed two years ago when the U.S.
Fish & Wildlife Service issued a rule listing the species as threatened.)  Although the language in Section
2.2.4 of the Draft RMP acknowledges the concurrent planning process under way for a Gunnison sage-
grouse ranngewide RMP amendment intended to provide specific management guidance to conserve
Gunnison sage-grouse and their habitat (GuSG RMP), we are concerned that Section 2.2.4 contains no
commitment either to amend the final UFO RMP with the provisions of the final GuSG RMP (should the
UFO RMP be finalized before the GuSG RMP) or to incorporate the provisions of the final GuSG RMP into
the UFO RMP (should the GuSG RMP be finalized first).  BLM must provide stronger assurances that the
UFO RMP will provide adequate protection for this federally listed species.

CWCB offers specific comments related to the preferred alternative (Alternative D) and the findings of
the Draft Wild and Scenic River Suitability Report.  CWCB's comments reflect a dual purpose of addressing
Colorado's water-related needs, while also continuing to afford the appropriate environmental
protections for stream segments with outstanding remarkable values (ORVs).  I would encourage the BLM
to work with the CWCB to consider the possibility of utilizing its Instream Flow Program as an alternative
method of flow protection for flow-related ORVs.

1313 Sherman Street, Room 718, Denver, CO 80203   P 303.866.3311   F 303.866.2115   www.colorado.gov/dnr
John W. Hickenlooper, Governor   |   Robert Randall, Executive Director



BLM_0076894

Finally, CPW has devoted significant staff resources to reviewing and attempting to improve the Draft RMP throughout the multi-year planning process, yet the BLM at times seemed disinclined to utilize CPW's special expertise in wildlife management and in the status and needs of wildlife in the planning area. Accordingly, the Draft RMP contains factual inaccuracies, methodological errors, conflicts with other planning documents, and critical omissions. As described in CPW's comment letter, we see a need for significant revisions to address these deficiencies before issuance of a Final RMP/EIS. CPW staff continue to be available to assist in these efforts, and we remain hopeful that future cooperative processes result in more productive outcomes.

Thank you for the opportunity to submit these comments. DNR looks forward to finding solutions to these matters and to continue working with the UFO as this important planning process moves forward.

Sincerely,

Robert Randall
Executive Director



**COLORADO**
**Parks and Wildlife**

Department of Natural Resources

Montrose Service Center
2300 South Townsend Avenue
Montrose, CO 81401
Phone (970) 252-6000

November 1, 2016

Ms. Teresa Pfifer
Acting Field Office Manager
Bureau of Land Management Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

**RE: UNCOMPAHGRE FIELD OFFICE DRAFT RESOURCE MANAGEMENT PLAN AND ENVIRONMENTAL IMPACT STATEMENT-MAY 2016**

Dear Ms. Pfifer:

Colorado Parks and Wildlife (CPW) reviewed the Bureau of Land Management's (BLM) Draft Resource Management Plan (RMP) and Environmental Impact Statement (EIS) for the Uncompahgre Field Office (UFO). CPW became a Cooperating Agency in 2010 and last submitted cooperating agency comments to the BLM on the administrative final version of this document in June of 2012. In summary, CPW has concerns about the lack of integration of several species management plans and agreements[1], absence of desired condition and standards for big game ungulates, raptors and fishes, the use of Ecological Emphasis Areas to achieve ecosystem functionality (without regulatory protections), the inclusion of a risk of contact model for bighorn sheep that is built on several incorrect assumptions, and an inadequate analysis of Gunnison sage grouse, given its current listing status and BLM policies. Our detailed comments are included below.

CPW enters into cooperating agency relationships on large scale NEPA documents when the requesting federal agency has a sincere desire for CPW's expertise, a willingness to collaborate on the impact analysis, and common goals to implement strategies that avoid, minimize, and mitigate impacts to wildlife resources. CPW asked to be included during the earliest planning/conceptualization/alternatives development stages, and volunteered to provide staff to assist with writing and reviewing sections of the RMP where particular expertise in wildlife, wildlife habitat, and wildlife management is needed or in areas where other resources may have impacts on wildlife. CPW participated in all official cooperating agency meetings, provided substantive written and verbal comments, and met with UFO field staff outside of formal cooperating agency meetings on numerous occasions between 2010-2012 in an attempt to discuss and resolve outstanding issues in the development of the RMP.

Based on the cooperating agency process and RMP document review, CPW's input was largely confined to reviewing and commenting on draft text rather than being utilized as an agency with 'special expertise' (40 CFR 1508.26). The BLM did not respond to our cooperating agency comments (see administrative

---

[1] Gunnison Sage-grouse Range-wide Conservation Plan (2005), Range-wide conservation agreement and strategy for roundtail chub, bluehead sucker and flannelmouth sucker (2006), 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, 2006 Conservation Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, Gunnison and White-tailed prairie dog conservation strategy (2010), Uncompahgre Habitat Partnership Program-Habitat Management Plan (2010), Uncompahgre Plateau Deer Management Plan D-19 (2005), Uncompahgre Plateau Elk Management Plan E-20 (2005), RBS-21 West San Juan bighorn sheep DAU Plan, Colorado Bighorn Sheep management Plan 2009-2019, and State Wildlife Action Plan (2015).

Bob D. Broscheid, Director, Colorado Parks and Wildlife • Parks and Wildlife Commission: Robert W. Bray • Chris Castilian, Chair • Jeanne Horne, Vice-Chair
John Howard • Bill Kane • Dale Pizel • James Pribyl, Secretary • James Vigil • Dean Wingfield • Michelle Zimmerman • Alex Zipp



record Cooperating Agency Meeting #10 Minutes). We were not provided a final administrative copy of the RMP to review prior to the document being finalized and sent to the Colorado State Office or the Washington Office. Nor, were we provided an opportunity to review the Draft RMP prior to it being distributed to the public after nearly 4 years since our last review.

The Cooperating Agency meeting notes in the administrative record detail some of the concerns that we raised, and were recorded as 'Action Items' for the BLM and their contractor to address within the RMP. These action items are not reflected in the Draft RMP. Outlined below is a reiteration of many of the comments previously submitted via direct written, verbal or email communication that were left unaddressed in this Draft RMP. In addition, in many instances on the ground conditions within the planning area and BLM policies have changed. The Draft RMP does not adequately reflect those changed conditions or the latest BLM guidance, policy or law.

## Wildlife
The goals and objectives for resource condition, the proposed actions and management practices fail to describe the desired conditions of wildlife populations and wildlife habitat across the planning area per 43 CFR 1601.0-5(n). There are few metrics with which to evaluate the range of alternatives, the affected environment, and environmental consequences of the RMP resource allocation.

The wildlife section does not identify specific opportunities that the BLM will pursue for individual species conservation and management, and does not clearly identify how wildlife issues will be managed in association with competing resource values. CPW recommends including clear descriptions of the desired resource condition, goals, and objectives within the planning area so that the EIS can substantively and reliably evaluate BLMs proposed land use allocations with respect to wildlife. Those descriptions would also allow for comparison of each alternative with the desired outcomes stated in applicable State and Federal wildlife conservation and management plans, ensuring their compatibility and consistency, as required by FLPMA. The RMP should incorporate the objectives and commitments contained in the following plans and agreements: Gunnison Sage-grouse Range-wide Conservation Plan (2005), The Range-wide conservation agreement and strategy for roundtail chub, bluehead sucker and flannelmouth sucker (2006), 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, 2006 Conservation Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, Gunnison and White-tailed prairie dog conservation strategy (2010), Uncompahgre Habitat Partnership Program-Habitat Management Plan (2010), Uncompahgre Plateau Deer Management Plan D-19 (2005), Uncompahgre Plateau Elk Management Plan E-20 (2005), RBS-21 West San Juan bighorn sheep DAU Plan, Colorado Bighorn Sheep management Plan 2009-2019, and State Wildlife Action Plan (2015). Currently, the RMP does not incorporate these plans or contain clear rationale describing why the desired conditions, goals and objectives in these plans are not addressed.

Previous administrative RMP drafts contained "priority species and habitat types" and had specific desired conditions, goals, objectives, and actions to promote, enhance, and conserve wildlife and wildlife habitat within the UFO boundary. During the cooperating agency process UFO staff explained that there are no unique habitats or key species within the planning boundaries except for Federally designated critical habitat under the ESA. As a result, opportunities for species conservation were purposely removed from the Draft RMP. Regardless of key habitats or priority species designations, the RMP should contain descriptions and criteria for the management, preservation, and conservation of fish and wildlife species and habitat within the planning area.

2

Below is a list of suggested Desired Conditions and suggested Standards to include in the Final Draft RMP, many of which are incorporated into the BLM Tres Rios RMP (2015). CPW recommends incorporating these into the UFO RMP to provide consistency between the Field Offices and to reflect the commitments and strategies associated with the aforementioned plans.

## Desired Conditions

- Big game severe winter range, winter concentration areas, production areas and desert bighorn sheep summer ranges are capable of supporting populations that meet State of Colorado population objectives. These areas provide sustainable forage and habitat in areas with acceptable levels of human disturbance which do not reduce habitat effectiveness.
- Invasive exotic wildlife species and diseases do not become established within the planning area. Existing invasive exotic wildlife species and diseases do not spread.
- Habitat components (e.g., snags and downed logs) are maintained. Unique habitat types (e.g., springs, seeps, willow carrs, caves, and cliffs) support associated flora and fauna (with abundance and distribution commensurate with the capability of the land).
- Large predator species contribute to ecological diversity and ecosystem functioning.
- Projects and activities occurring on BLM lands near state and federal highways are designed to provide for long-term connectivity and integrity of habitats to facilitate effective wildlife movement.
- Effective raptor nesting habitat occurs throughout the planning area with abundance and distribution commensurate with the capability of the land to sustain populations.
- Ecosystems and habitat conditions for terrestrial wildlife species sensitive to human disturbance are maintained.
- Vegetation openings created through management actions preserve the natural patchiness inherent in Southern Rocky Mountain ecosystems.
- Habitat continuity and travel corridors exist and persist to facilitate species movement and establishment into newly suitable areas as a result of changing habitats.
- Populations are conserved by maintaining or improving habitat availability and quality through the incorporation of conservation strategies and species' habitat needs during project development and implementation.
- Riparian and aquatic habitat, including springs and fens, support well-distributed populations of invertebrate and vertebrate riparian and aquatic dependent wildlife.
- Disturbances from management activities occur at levels that support critical life functions and sustain key habitat characteristics for wildlife species.
- Areas identified as critical habitat or proposed critical habitat for special status wildlife species have the characteristics to support sustainable populations, promoting recovery of the species.
- Management actions maintain or improve habitat conditions for special status species, contributing to the stability and/or recovery of these species.
- Special status species are able to disperse within the planning area and into adjacent lands. This will allow for the interchange between populations and the maintenance of genetic diversity.
- Wildlife are able to disperse freely across the planning area allowing for the interchange between populations and the maintenance of genetic diversity.

## Standards

- **Raptors**: Raptor nesting disturbance buffers and timing limitations adhere to CPW's Raptor Buffer Recommendations (CDOW 2008)
- **Ungulates:** Projects or activities in big game critical winter range, winter concentration areas, severe winter range, production areas, and important migration corridors are designed and

3

conducted in a manner that preserves and does not reduce habitat effectiveness within those mapped areas.

- **Ungulates:** In order to provide for healthy ungulate populations capable of meeting state population objectives, anthropomorphic activity and improvements across the planning area are designed to maintain and continue to provide effective habitat components that support critical life functions. This includes components of size and quality on the landscape providing connectivity to seasonal habitats (wildlife travel corridors), production areas, critical winter range, severe winter range, and winter concentration areas, along with other habitat components necessary to support herd viability.

- **Road and Trail Density for Ungulate Production Areas, Winter Concentration Areas, Severe Winter Range, and Critical Winter Range on BLM Lands:** The intent is to ensure no net loss of existing habitat effectiveness within the areas listed below. In order to maintain wildlife habitat effectiveness of BLM lands, road and trail densities should be addressed when analyzing and approving management actions that affect routes. Where management actions would result in road and trail densities exceeding 1 mile/square mile on UFO lands actions should be designed to maintain habitat effectiveness on UFO lands throughout each mapped wildlife habitat listed below.
  - Habitat effectiveness is considered maintained when road and trail densities within the CPW mapped big game production areas (calving or lambing areas), elk and deer severe winter range, elk and deer winter concentration areas, mule deer critical winter range, pronghorn summer concentration areas, and bighorn sheep summer concentration areas on UFO lands are less than or equal to 1 mile/square mile. If route densities exceed 1 mile/square mile within the CPW mapped areas listed below on UFO lands, densities should not be increased without compensatory mitigation designed to maintain habitat effectiveness.

### Aquatic Species

Section 3.1.7 does not include a adequate discussion of the distribution, status, or baseline habitat conditions of the endangered fish species that are in the Gunnison River and its tributaries including the Colorado pikeminnow, razorback sucker and bonytail chub, the three species (roundtail chub, bluehead sucker and flannelmouth sucker) and the Colorado River cutthroat trout. Likewise, the wildlife section of the draft RMP does not identify actions to sustain in-stream conditions, attempt to address other resource management issues that contribute to aquatic habitat degradation (e.g. sedimentation from stream bank destabilization resulting in degraded habitat and the loss of spawning habitat), or identify a desired future conditions for the aquatic environment.

Below we have outlined several additional desired conditions, many of which are incorporated into the BLM Tres Rios RMP (2015) for the benefit of aquatic species. CPW recommends incorporating these into the UFO RMP as they are consistent with the commitments and strategies associated with the aforementioned plans.

- Streams, lakes, riparian vegetation, and adjacent uplands provide habitats adequate to maintain healthy aquatic ecosystems capable of supporting a variety of native and desired non-native aquatic communities.
- The quantity and quality of aquatic habitats are maintained or enhanced to provide for the long-term sustainability of biological diversity and population viability of all native and/or desired non-native vertebrate species.
- Channel characteristics, water quality, flow regimens, and physical habitat features are diverse and appropriately reflect the climate, geology, and natural biota of the area.

4

BLM_0076899

- An adequate range of stream flow provides for the long-term maintenance of physical habitat features. Channel features, including bank stability, width-to-depth ratio, pool/riffle ratio, pool depth, slope, sinuosity, cover, and substrate composition, are commensurate with those expected to occur under natural ranges of stream flow.
- Water flow conditions in streams, lakes, springs, seeps, wetlands, fens, and aquifers support functioning habitats for a variety of aquatic and semi-aquatic species and communities.
- Macroinvertebrate diversity and abundance reflect high water quality.
- Populations of aquatic species are adequately mobile, genetically diverse, and functionally diverse throughout the planning area.
- Aquatic systems are connected in a manner that avoids fragmentation of aquatic habitats and isolation of aquatic species.
- Connectivity between water bodies provides for all life history functions of aquatic species except where barriers are beneficial and necessary to achieve conservation goals for certain aquatic species.
- Non-native fish removal is a supported and encouraged management strategy in areas where CPW identifies restoration efforts for native aquatic species conservation and recovery.

## Ecological Emphasis Areas

BLM staff selected Ecological Emphasis Areas (EEA) using very narrow criteria to provide connectivity between large blocks of relatively un-fragmented habitats. The purpose of the EEA designation was to dominantly manage for ecological processes and functionality. We were initially encouraged by BLM's efforts to identify and designate areas where core wildlife and native plant habitat were provided extra protection in the RMP. CPW provided recommendations on criteria to identify important core wildlife habitat and management strategies for their protection. In particular we suggested defining some EEA's using limiting habitat factors for ungulates, given that priority species designations and key habitats were removed from the administrative draft RMP.

The RMP includes one CPW suggested EEA, Simms Mesa (designated for Gunnison Sage Grouse). CPW has identified several areas that we recommend be designated as Ecological Emphasis Areas (Figure 1). These areas incorporate some of the highest densities of wintering big game within the UFO boundary, and were selected by CPW staff based on mapped winter concentration areas, CPW classification flight data, and VHF and GPS collar data. These polygons represent the best available data in their development. Some of the EEAs overlap with portions of the CPW identified big game polygons, however it is unclear what data sources were used to develop the proposed EEAs and thus the overlap appears to be largely coincidental.

CPW is concerned that the draft RMP will not achieve the purpose for which the Ecological Emphasis Areas were selected. RMP land use authorizations are not restrictive enough and allow competing uses that may preclude or significantly impact the functionality of these areas for wildlife. For instance, without density restrictions in mineral leasing and development, wintering wildlife may be displaced or avoid the Ecological Emphasis Area. It is not clear in the draft RMP how these competing uses such as grazing, travel management, mineral leasing and development, ROW authorizations, recreation, lands and realty will be managed to support the values that are contained within each unique Ecological Emphasis Area.

Many EEAs (or significant portions of them) have also been identified as Special Recreation Management Areas (SRMAs). Of the twelve identified EEAs in the Draft RMP, nine are also designated as an SRMA. We agree that similar allocation restrictions may benefit both recreationalist and wildlife within the same

5

geographic area, yet they are also potentially in conflict. The draft RMP does not indicate how these types of potential conflicts will be managed.

Despite the lack of detail in how the resources with the Ecological Emphasis Areas will be managed, we have been generally supportive of the concept through the development of the RMP during the Cooperating Agency process since 2010. However, during a recently convened Cooperating Agency Meeting (10-14-2016) we learned that the BLM does not consider EEAs as an area designation, but rather as a "resource designation". This is a contradictory statement to the development of these areas and is not reflected in the language within the RMP. The lack of communication continues to create disconnects regarding the intent of the Cooperating Agency relationship in the development of the UFO RMP.

### Big Horn Sheep

The BLM Washington Office recently issued policy guidance 1730-Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016) and the Colorado BLM State Office recently designated Rocky Mountain bighorn sheep as a BLM Sensitive Species[2]. The recent policy and status designation are not reflected in the Draft RMP. In addition, the Draft RMP lacks desired conditions to promote the conservation of special status species, and thus is in conflict with BLM Handbook H-6840, *Special Status Species Management.*

The Draft RMP/EIS details the methodology and results of both the "Probability of Interaction" (a.k.a the local model) and the "Risk of Contact" (a.k.a. the national model) for domestic sheep and bighorn sheep. The local model was developed by the Uncompahgre Field Office and the national model was developed by the BLM and U.S. Forest Service.

In our cooperating agency role throughout the completion of the UFO RMP/EIS, we reiterated that the local model relies on numerous incorrect assumptions, is not based on the best available science, and has not undergone peer review. CPW recommends that BLM use its national Risk of Contact model for the analysis in the UFO RMP/EIS and work with stakeholders to develop meaningful management prescriptions. An abbreviated summary of our concerns with the local model is detailed below.

- The local model assumes that CPW's mapped bighorn sheep range is equivalent to "suitable habitat." CPW's mapped bighorn sheep range is "occupied habitat." There is a considerable difference between suitable and occupied habitat particularly when attempting to model interaction.
- The local model assumes high, moderate or "some" risk categories based on the percentage of overlap between domestic and bighorn sheep. The existing biological and behavioral bighorn sheep data indicates that the distance between wild and domestic sheep increases the risk of contact. When there is no distance between sheep, i.e., direct overlap there is high risk of contact.
- The local model assumes that temporal separation may affect risk. CPW assumes year round occupancy in some areas mapped as bighorn sheep habitat.
- The local model assumes that bighorn sheep are not attracted to domestic sheep outside of the breeding season. Sheep are gregarious and CPW has documented domestic and bighorn sheep at the same location within hours of each other outside of the breeding season. Desert bighorn sheep have been documented to breed year round.
- The local model assumes that slopes greater than or equal to 60% lower the probability of

---

[2] BLM Information Bulletin No. CO-2015-034

BLM_0076901

contact. Slope, as used in this assessment, is not a barrier to interaction and meets the definition of suitable bighorn habitat.
- The local model assumes flat terrain as a 100% barrier to wild sheep. CPW GPS collar data illustrates that flat terrain is not a barrier to wild sheep, especially rams.

The RMP allows the conversion of "Some" and "Moderate" probability allotments from cattle to sheep. We are concerned that conversion of cattle allotments to sheep allotments in areas identified as Some Probability could have the unintended consequence of moving domestic sheep into closer proximity or directly onto existing occupied bighorn sheep habitat. The EIS does not disclose this potential conflict and demonstrates a major shortcoming with the RMP's reliance on the PoI model results. We recommend the BLM clarify in the RMP that conversion of allotments will not result in any degradation or increased risk of disease transmission to BLM sensitive species.

The UFO RMP/EIS incorporates some but not all of the 2012 WAFWA Best Management Practices (BMPs) in its allotment management prescriptions described in Figure K-3 Management of Risk. CPW agrees with the BLM that incorporating BMPs should reduce risk of contact and that they are necessary and reasonable steps that land managers and operators can implement in instances where existing conditions have resulted in domestic sheep and wild sheep being in relatively close proximity. The effectiveness of the many of the BMPs at preventing contact remains untested and uncertain. BMPs in recent domestic-wild sheep contact events were unsuccessful in preventing contact.

The capacity of BMPs to prevent contact in these instances, and the heavy reliance on BMPs within the EIS to manage contact does not 'construe a high degree of confidence that there is low or no risk of contact[3]' with wild sheep as a result of the management actions outlined in the RMP. We recommend that the BLM remove this model from the UFO RMP and to exclude it from future planning efforts to inform or manage for effective separation between domestic and bighorn sheep in Colorado until it has been peer reviewed. We recommend that the BLM's National Risk of Contact model be used in its place.

In addition, to the 2012 WAFWA BMPs, CPW recommends the following BMPs be included in the RMP where there is overlap and/or a risk of contact:

- Prohibit supplemental feeding of domestic sheep on allotments. If the range condition cannot support the energy demands of domestic sheep, allotment management should be adjusted accordingly. Supplemental feeding may attract bighorn sheep into close proximity with domestics.
- Require reporting of any bighorn sheep sighting within 2 miles proximity of domestic sheep within 24 hours to the BLM and CPW.
- Require removal plan for live or dead domestic sheep left on allotment following sweeping. Clarify removal responsibilities, courses of action, and timelines if permittee is not available.
- In existing allotments with overlap or where the RoC is High Probability- maintain domestic sheep band of no greater than 2000 head, based on manageability by herder **only** if grazing period will be shorter than running a smaller band.
- Annual operating plans should include adaptive changes to allotment management that address issues identified the previous year.
- Require trucking of sheep to allotments where trailing routes are within existing overlap or the RoC modeled risk categories of High or Moderate.

---

[3] BLM WO policy guidance 1730-Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016)

7

- Modify allotment boundaries or pasture boundaries to eliminate grazing in direct overlap with occupied habitat.
- Require count-on and count-off reports for all domestic sheep allotments where the allotment is categorized as High, Moderate, Some and Low using the Risk of Contact model.
- Require report within 24 hours of known missing sheep and notify CPW and BLM in domestic sheep allotments where the allotment is categorized as High, Moderate, Some and Low using the Risk of Contact model.
- Require entire domestic sheep band in treed habitat to be within .5 mile of each other to minimize opportunity for domestic sheep to be spread out and lose track of smaller groups.
- Develop plan to allow for authorized removal of bighorn sheep that interact with domestic sheep by herder or permittee following defined criteria, immediate follow up with CPW and BLM personal following action, and incident evaluation to determine legitimacy of kill.

In the Final RMP, Chapter 4 should include a discussion of the effects of potential disease transmission and potential impacts on bighorn sheep within the planning area.

**Gunnison Sage Grouse**
The Gunnison Sage-grouse (GuSG) was listed as a threatened species under the ESA by the U.S. Fish and Wildlife Service on November 20, 2014 (79 Fed. Reg. 69192).[4] The RMP fails to include the necessary land protection, resource allocation, and stipulations to protect and enhance GuSG within the UFO. The BLM has initiated a planning effort to amend all of the RMPs throughout the GuSG range to address the federally threatened status of the species and outline management actions that will conserve and assist in the recovery of GuSG (GuSG Rangewide RMP Amendments). The Draft UFO RMP does not contain consistent habitat definitions with BLM's administrative Draft GuSG Rangewide RMP Amendments and does not contain consistent proposed management actions to conserve and recover GuSG. Instead, the UFO RMP agency preferred alternative relies on the use of an EEA in GuSG with few land use restrictions associated with that designation (see EEA discussion above). The use of EEAs for GuSG as the sole land designation and source of management emphasis for GuSG in the preferred alternative is not consistent with the approach in BLM's administrative Draft GuSG Rangewide RMP Amendments, and is inadequate for GuSG conservation and recovery efforts. We recommend that the BLM commit to providing a consistent management approach in the UFO RMP and the GuSG Rangewide Plan Amendments, either by amending the final UFO RMP with the provisions of the final GuSG Rangewide Plan or by incorporating the final GuSG Rangewide Plan into the final UFO RMP as discussed in Section 2.2.4. We recommend that the EEAs for GuSG in the UFO RMP be incorporated as ACECs in the preferred alternative. ACECs are supported by established BLM policy and law.

**Land Health Standards**
The draft RMP does not have any discussion on how Land Health Standards (LHS) will be achieved through grazing implementation. The Draft EIS indicates that out of the 181 grazing allotments, 30 of those allotments are "not meeting" or "meeting with problems" the LHS with grazing identified as the cause. The RMP should indicate that the best available science will be used to design grazing systems that

---

[4] Table 3-23 should be updated to include GuSG, and the information included for the GuSG on page 3-73 should be corrected by removing the statement, "The species is proposed for listing under the ESA," and replacing with the current listing status. Additionally, the western yellow-billed cuckoo was listed as a threatened species under the ESA by the U.S. Fish and Wildlife Service on October 03, 2014, effective November 03, 2014 (79 Fed. Reg. 59992). This species should also be included in Table 3-23.

8

allow the LHS to be achieved and describe the monitoring frequency that is necessary to substantiate the grazing forage allocations.

## Stipulations for Fluid Mineral Leasing and other Surface Disturbing Activity

CPW appreciates BLM including a "No Surface Occupancy" stipulation for fluid mineral leasing within State Parks and State Wildlife Areas in the Draft RMP (Appendix B, Table B-2, p. B-38). This stipulation will help avoid conflicts between mineral development and existing and planned recreational activities on State Parks and State Wildlife Areas while continuing to allow mineral resources to be developed.

In many instances, stipulations intended to address impacts to wildlife vary across alternatives in ways that render the stipulations ineffective for reducing impacts. For example, the shortening of a seasonal timing limitation on development may no longer provide any intended benefit to wildlife if it does not correspond with the life history requirements of the species for the sensitive biological season it was intended to address. CPW recommends varying wildlife-related stipulations across alternatives by geographic application of the stipulation, not by changing the substance of biologically-based stipulations in ways that may render their intended benefit to wildlife meaningless. CPW is not aware of this approach being used as a planning tool by any other BLM Resource Area in Colorado.

In some cases, the stipulations identified for the preferred alternative are not consistent with lease stipulations recommended to BLM by CPW. On December 13, 2010, CPW provided BLM's State Office recommendations for fluid mineral lease stipulations relevant to Resource Management Plan (RMP) revisions and quarterly lease sales in Colorado (statewide stipulation letter). CPW has provided this document to UFO staff and EMPSI in 2011. CPW's statewide stipulation recommendations reflect our understanding of the best available science regarding protective lease stipulations necessary to maintain existing wildlife populations. Moreover, many of these stipulations can also be applied to minimize impacts from other land use authorizations (travel management, coal, uranium, recreation, etc).

CPW has provided extensive background information to UFO regarding the need to implement these stipulations to minimize the impacts to wildlife resources from specific developments (please refer to 3 February 2012 CPW August 2012 Lease Sale Comments and CPW 24 April 2012 Bull Mountain Master Development Plan Preliminary Environmental Assessment (DOI-BLM-CO-S050-2009-0005). CPW recommends that Appendix B be modified where necessary to include these statewide stipulation recommendations for the preferred alternative. If the BLM elects to not incorporate our recommendations in the preferred alternative, we recommend the analysis provide data, with clear rationale supporting that decision and alternative recommendations to avoid, minimize, and mitigate impacts.

Finally, the stipulations and restrictions on surface disturbance in the RMP intended to protect GuSG are inconsistent with the stipulations and restrictions described in BLM's recently released Draft GuSG Rangewide RMP Amendments. These documents need to be consistent. Please update the RMP as needed to reference and incorporate the stipulations and surface use constraints contained in BLM's Draft GuSG Rangewide RMP Amendments.

## Conclusion

The BLM did not use CPW as a cooperating agency resource with special expertise in wildlife management to help guide development of the RMP. The RMP is lacking resource allocation direction for wildlife and contains resource management decisions that conflict with and/or fail to incorporate other BLM and CPW planning documents. We see a need for significant revisions before publishing the Final

9

RMP/EIS and CPW staff are available to assist in these efforts. We are hopeful that future cooperating agency processes result in shared efforts with meaningful outcomes.

Sincerely,

Renzo DelPiccolo, Area Wildlife Manager- Montrose

xc: Broscheid, Dorsey, A. McLaughlin, Magee, Wenum, Wait, Alves, Holst, SWRO File, Area 18 File, DNR File

10

BLM_0076905

BLM_0076906

**Figure 1:  CPW recommened big game winter range emphasis areas and BLM proposed ecological emphasis areas.**



### Legend

- Winter range emphasis areas
- Elk Winter Range
- Mule Deer Winter Range
- Draft Proposed Ecological Emphasis Areas
- Uncomaphgre Field Office - BLM

Map developed by:
Brad Banulis
Wildlife Biologist
10.18.2016

Miles
0   4   8        16        24        32



**COLORADO**
Colorado Water
Conservation Board
Department of Natural Resources

John Hickenlooper, Governor

Robert Randall, DNR Executive Director

James Eklund, CWCB Director

October 7, 2016

Barbara Sharrow
Acting Southwest District Manager
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

**Subject:  Uncompahgre Field Office (UFO) Draft Resource Management Plan (RMP) / Environment Impact Statement (EIS)**

Dear Ms. Sharrow:

The Colorado Water Conservation Board (CWCB) appreciates the opportunity to comment on the Bureau of Land Management (BLM)'s preferred alternative (Alternative D) that recommends three segments in the Lower Gunnison Basin, eight segments in the San Miguel Basin and five segments in the Dolores River Basin as suitable for inclusion in the National Wild and Scenic Rivers System (NWSRS), as presented in the Uncompahgre Field Office (UFO) Draft Resource Management Plan (RMP)/Environment Impact Statement (EIS).

The CWCB recognizes the strength of a Wild and Scenic suitability determination as a land management tool and a means to protect outstandingly remarkable values (ORVs). The CWCB also acknowledges that a suitability determination can hold implications for water rights and water development within the State of Colorado.  The recommendations in this letter are intended to address the CWCB's water-related concerns while recognizing the BLM's desire to use suitability as a land management tool to protect environmental values.  As emphasized in Colorado's Water Plan, our state is striving to meet water supply demands of our growing population while fostering a strong and resilient natural environment.

<u>Stakeholder Process Background</u>

Utilizing the CWCB's Wild and Scenic Alternatives fund, the Gunnison Basin Wild & Scenic Stakeholder Group met in Delta, Colorado roughly ten times between October 2010 and February 2011. The process resulted in a consensus recommendation that many of the segments in the Gunnison Basin should be considered "not suitable." However, the group did not reach consensus on the suitability of the three tributary segments that the BLM has proposed as suitable.

For the San Miguel and Dolores Rivers, the Southwest Resource Advisory Council (SW RAC) subgroup conducted ten public meetings between November 2010 and January 2011. Through this stakeholder process, the SW RAC considered private land, the potential for mining, and

Interstate Compact Compliance • Watershed Protection • Flood Planning & Mitigation • Stream & Lake Protection
Water Project Loans & Grants • Water Modeling • Conservation & Drought Planning • Water Supply Planning



UFO Draft RMP/EIS
October 7, 2016
Page 2

existing and proposed projects, and recommended that some reaches not be found suitable. The SW RAC held public hearings and voted unanimously to recommend that eight segments in the San Miguel Basin and five segments in the Dolores Basin be found suitable. The BLM incorporated these recommendations into its preferred Alternative D.

## Update of Information

The CWCB recognizes that much of the work for the suitability analysis was completed many years ago. Accordingly, the BLM is aware of the need to update the suitability analyses to incorporate new information. The CWCB recommends that the BLM consider the following new information that has come out to update the BLM's original suitability analysis:

- Colorado's Water Plan (CWP)
- Southwest (SW) Basin Roundtable's Basin Implementation Plan (BIP), including an updated Identified Projects and Processes (IPP) list
- Dolores Water Conservancy District (DWCD) 2014 Water Management and Conservation Plan
- Stipulation Between the CWCB Staff and the DWCD, In the Matter of the CWCB Staff's Recommendation for an Instream Flow Appropriation on the Dolores River, dated August 31, 2015 (Dolores ISF Stipulation)
- Letter from Ruth Welch, BLM Acting State Director, to Mike King, Executive Director, Colorado Department of Natural Resources, January 6, 2015 (Tres Rios RMP Letter)
- San Miguel River Flow Survey being prepared by American Whitewater, anticipated in 2017
- DWCD Drought Contingency Plan, anticipated April 2017
- Colorado Decision Support System (CDSS)
- Statewide Water Supply Initiative (SWSI) 2010 (Appendix P - Summary of Draft Wild and Scenic River Suitability Report contains several references to SWSI 2004)

The CWCB requests specific updates to Appendix P as set forth below:

1. On page P-37 in the first paragraph of the "Water Rights and Uses" section, please revise the last sentence to read as follows: "The CWCB took final action on the appropriation at a hearing on September 13, 2011, and the Division 4 Water Court decreed this instream flow water right on May 20, 2013." This comment also applies to the last sentence of the second paragraph of the "Water Rights and Uses" section on page P-41.
2. For the Lower Dolores River segment, in the first paragraph on page P-47, please delete the second sentence ("There is no instream flow water right protection on the segment.") and replace it with: "In January 2015, the CWCB declared its intent to appropriate an instream flow water right on the Dolores River from its confluence with the San Miguel River to the confluence with West Creek for the following flow rates: 900 cfs (4/15-6/14), 400 cfs (6/15-7/15), 200 cfs (7/16-8/14), 100 cfs (8/15-3/15), and 200 cfs (3/16-4/14). The CWCB took final action on the appropriation at a hearing in September 2015, and filed an application for this instream flow water right on December 30, 2015 that is pending in the Division 4 Water Court."

## Permitting Concerns

Sections 7(a) and (b) of 36 CFR 297 indicate that any water projects with a federal nexus that exist in, above or below a designated Wild and Scenic reach could be prohibited or restricted through the consultation process if they would "invade the area or unreasonably diminish the ORV." If a stream segment were designated as Wild and Scenic, this provision would apply to all existing, new or enlarged structures (regardless of water right status) that have a federal nexus, such as being located on federal land, using federal funds or requiring a Section 404 permit from the Corps of Engineers.

While the current process is only a step towards a Wild and Scenic designation, this same provision would apply to structures on BLM lands at the suitability stage. Upon a finding of suitability, the BLM would be required to manage suitable segments as if they were designated when reviewing proposed actions on BLM land.

Colorado's Water Plan contemplates the construction and/or enlargement of reservoirs to meet future water demands. The SW Basin Roundtable's BIP indicates that the region's municipal and industrial demand is expected to be met by "investigating means of providing additional water, firming of existing supplies, and enlargement of distribution systems," with many of the necessary water rights already decreed. Furthermore, the BIP identifies permitting as one of the primary constraints in developing these future projects.

Montrose County holds conditional water rights within the San Miguel Basin pursuant to decrees entered in Case Nos. 10CW164, 10CW165, 10CW166 and 10CW169. The development of reservoir sites associated with these rights represents a reasonably foreseeable action within the RMP planning area. This action should be included in Draft RMP Section 4.2.2 "Past, Present and Reasonably Foreseeable Future Actions" as well as any other sections that are applicable to this action.

The CWCB has partnered with Montrose County to assist in the required geotechnical and feasibility analyses necessary for development of the conditional water rights. These analyses are otherwise known as the Montrose County Firming Project. Given the substantial work and investment that has already gone into this project, the CWCB wishes to assure that the proposed RMP does not adversely impact the future potential of the conditional water rights held by Montrose County. In furtherance of this goal, the CWCB requests that the following language be included in the RMP.

> Development of Montrose County's existing conditional water rights within the San Miguel Basin shall be subject to review to the extent required by law. Nothing in this RMP, including an administrative determination of WSR suitability, shall be construed as a prohibition on the rights of Montrose County with regard to development of the existing water rights decreed in Case Nos. 10CW164, 10CW165, 10CW166 and 10CW169, or a limitation that would result in Montrose County being unable to meet its water supply needs with the Montrose County Firming Project.

The CWCB understands that the BLM may also use the suitability findings as a basis for the agency's comments on projects that have a federal nexus. Additional planned projects that may fall into this category include the following (this list is not exhaustive):

- Upper Plateau Storage Reservoir
- Gurley Reservoir
- Straw Dam
- Lone Cone Reservoir

- Projects identified in the 2014 DWCD Water Management Plan
- Other projects listed as IPPs

It is unclear at this time whether the BLM or other federal agencies would consider the implementation of these projects as unreasonably diminishing the flow-related ORVs in the proposed downstream segments. For projects with downstream suitable segments, a federal agency's determination that diminishment of an ORV would occur may lead to permitting delays and reduced yield from these future projects. Additionally, the CWCB is concerned that required mitigation could reduce the project yields such that the region may not be able to meet its future demands. The CWCB proposes that the BLM, the CWCB, the DWCD (where applicable) and any interested project sponsors work together to address these concerns while considering mitigation measures needed to protect the ORVs. We recommend that these meetings occur prior to issuance of the proposed final RMP/EIS.

## Federal Reserved Water Rights

Historically, the CWCB has taken the position that federal reserved water rights are not the best method for protecting flow-related ORVs in river corridors. Rather, the CWCB's Instream Flow (ISF) Program may provide adequate protection of flow-related values in the subject stream segments. The CWCB notes that in recent decisions, the BLM has taken into account its long-standing working relationship with the CWCB and use of the state's ISF Program. However, the CWCB and the BLM have not yet had an opportunity to develop a joint approach for addressing float boating recreational ORVs until now. For San Miguel Segments 1, 2 and 3, Lower Dolores, and Dolores Segments 1a and 2, the CWCB requests that the BLM consider any recreational float boating protections that may be gained by coordinating with local governmental entities to obtain a recreational in-channel diversion water right (RICD) rather than obtaining a federal reserved water right. The CWCB acknowledges that whitewater structures would be required to obtain a RICD right; however, the SW Basin Roundtable's BIP indicates that local water users are considering a RICD as an IPP for the San Miguel River.

The CWCB requests that the BLM analyze and address the projected flow needs for recreational ORVs and compare those to the average amount of water available on the subject stream segments to identify the likelihood of a conflict between meeting recreational and water development needs. The CWCB also requests that the BLM analyze and consider the totality of existing senior water rights that may already pull water through these reaches to support the recreational ORVs. For example, the BLM should consider the flows that will be pulled downstream by the pending ISF appropriation on the Dolores River when evaluating impacts of upstream projects during the permitting process. The CWCB requests that the BLM present the results of these analyses to the CWCB, the DWCD (where applicable), interested project sponsors, and other stakeholders at the meetings requested above.

## Dolores River Segment Comments

### Clarification of Proposed Suitability Findings on Dolores Project Operations

In the analysis of the proposed suitability determinations on the Dolores River, the BLM has noted several times that flow through the Dolores River sections is greatly diminished by the operation of the McPhee Dam upstream. The issue of the relationship between Wild and Scenic Rivers Act suitability determinations and the operation of the Dolores Project was raised in the recent Tres Rios Resource Management Plan process and was addressed by the BLM in the Tres Rios RMP Letter and in the section of the Tres Rios Resource Management Plan addressing Government to Government

BLM_0076910

consultation—Ute Mountain Ute. The CWCB invites the BLM to work with the CWCB to develop language for the UFO RMP and EIS that provides similar clarity on the relationship of the UFO Wild and Scenic Rivers Act suitability determinations and the operation of the Dolores Project. Such language could include incorporating the January 6, 2015 letter from the BLM State Director to the Executive Director of the Colorado Department of Natural Resources by reference, citing the Government-to-Government consultation provisions in the Tres Rios RMP, and some version of the following language to be included as findings for the Dolores River segments:

> The Wild and Scenic Rivers Act suitability determinations found in Sections [denote section of the UFO RMP] will not affect the delivery of water allocations in the Dolores Project. Rather, the suitability determinations are intended to guide BLM land use decisions that could affect the streams that are determined to be suitable. When the BLM determines that a river is suitable under the Wild and Scenic Rivers Act, the authority to protect ORVs is limited to existing BLM authorities under the Federal Land Policy and Management Act. A suitability determination by BLM does not obligate other agencies, such as Reclamation, to utilize their authorities to protect the ORVs identified by the BLM. Congress has not granted any authority to BLM that would allow the BLM to dictate how a Reclamation project is operated, nor could a BLM administrative decision supersede congressionally enacted legislative direction for the Dolores Project. Accordingly, the Dolores River suitability determinations and the BLM identification of flow-based ORVs on the Dolores River below the Dolores Project will not affect the delivery of water allocations or water rights decrees for the Dolores Project.

## Upper Dolores River Segment 1a and La Sal Creek Segment Comments

Three of the four segments considered for suitability (Dolores River, Segment 1a and La Sal Creek, Segments 2 & 3) in the Upper Dolores River are in the area currently being considered for a National Conservation Area (NCA). The CWCB anticipates that, if an NCA is established on these segments, Congress will determine that none of these segments are suitable.

## Upper Dolores River Segment 2 Comments

For the Dolores River Segment 2, the CWCB is concerned that there could be conflict between the proposed suitability determination and water rights associated with the operation of the Dolores Project. In addition to the CWCB's suggestions regarding "Clarification of Proposed Suitability Findings on Dolores Project Operations," the CWCB proposes that the BLM work with the CWCB, water users, and other collaborative stakeholders on the Dolores River to protect flow-based ORVs on this reach with the existing ISF water right and available water supply from McPhee Reservoir, in conformance with Dolores Project contracts and Reclamation laws applicable to the Dolores Project. The CWCB requests that the BLM include the following language in the final RMP:

> If alternative forms of flow protection are provided to support flow-related ORVs, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.

## Lower Dolores River Segment Comments

The CWCB stipulated with the DWCD in 2015 in the ISF appropriation proceeding on the Lower Dolores River segment. Among other things, this stipulation states that "it is the Board's intent that this ISF water right is adequate to meet all requirements as a streamflow guideline in federal administrative or regulatory permitting contexts." We encourage the BLM to consider the spirit of this stipulation when considering flow-related concerns associated with suitability of this reach and to consider the CWCB's suggestions regarding a "Clarification of Proposed Suitability Findings on Dolores Project Operations." The stipulation also provides a number of provisions intended to make sure that the pending ISF water right does not reach up the Dolores River, into McPhee Reservoir and above McPhee, to protect State appropriated water rights above the confluence of the San Miguel and the Dolores Rivers. The CWCB requests that the intent outlined in the stipulations for protection of upstream water rights be acknowledged by the BLM in the final RMP.

Further, the BLM, in its Grand Junction Field Office (GJFO) Proposed RMP and Final EIS, found a segment of the Dolores River suitable. We recommend that a similar finding be included in any Lower Dolores River Segment's RMP's suitability finding as indicated below:

If the Colorado water court system decrees an ISF water right for the lower Dolores River in the locations, flow rates, and timing appropriated by the CWCB at its March 2014 Board meeting, and if the instream flow right is vigorously enforced by the CWCB, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.

## Gunnison River Segment Comments

We request and invite the BLM to work with the CWCB in seeking new or increased ISF water rights to address the flow-related ORVs for the proposed Gunnison River Segments with some version of the following language included as findings:

If the BLM is able to obtain an alternative form of flow protection to support flow-related ORVs, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.

## San Miguel Segment Comments

Recognizing that the SW RAC's public process resulted in recommending that eight segments in the San Miguel Basin be found suitable, the CWCB will not recommend against the results of that process provided that the CWCB's permitting, water right and classification concerns are addressed. The CWCB requests and invites the BLM to work with its staff in seeking new or increased ISF water rights to address the flow-related ORVs for the proposed San Miguel River Segments, with the following language to be included as findings for these segments:

If the BLM is able to obtain an alternative form of flow protection to support flow-related ORVs, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.

UFO Draft RMP/EIS
October 7, 2016
Page 7

The CWCB would like to thank you for considering our comments.  We look forward to working with you to ensure a successful outcome for the citizens of Colorado and the ORVs that you have identified for protection. Please contact Suzanne Sellers or Linda Bassi of my staff if you have any questions.

Best regards,

James Eklund, Director
Colorado Water Conservation Board


cc:    CWCB Members
       Dana Wilson, Acting Field Manager

Attachments

# ATTACHMENT D

BLM_0076914



**COLORADO**
Gov. John Hickenlooper

July 17, 2018

Gregory Shoop, Acting Colorado State Director
U.S. Bureau of Land Management
2850 Youngfield Street
Lakewood, Colorado 80205

*Sent via email to gshoop@blm.gov and submitted through the ePlanning portal*

RE: State of Colorado's Scoping Comments to the Bureau of Land Management's (BLM) December 2018
Oil and Gas Lease Sale

Dear Mr. Shoop:

Thank you for the opportunity to provide scoping comments to the BLM for the December 2018 lease
sale. With the release of BLM IM 2018-034, I understand it is no longer a policy of the BLM to require
public comment during the lease sale process. I applaud you for using your discretion to allow the State
and the public the opportunity to provide scoping comments, as well as a public comment opportunity
on the Environmental Assessment later this summer.

While I believe you and your staff are doing the best you can to work with the State, the new IM has
created significant barriers for us to efficiently review the parcels under consideration for sale.
Colorado Department of Natural Resources Executive Director Bob Randall wrote to you in April to
express concerns about IM 2018-034.  I reaffirm those concerns now as we see the impacts of the IM
first-hand during this sale.  With 227 parcels representing 236,010 acres spread across the state, I must
stress to you the great burden this expanded sale and condensed review schedule puts on State staff
to adequately review parcels.

Colorado Parks and Wildlife (CPW) routinely reviews BLM parcels proposed for sale and recommends
opportunities to avoid or minimize impacts to wildlife.  Detailed comments from CPW are included in
Attachments 1 and 2. In addition, below we highlight several issues of particular interest to the State.
We encourage BLM staff to respond to these concerns in your Environmental Assessment (EA).

**Greater Sage-Grouse**

This lease sale currently includes 143 parcels totaling approximately 108,600 acres in priority and
general habitat for Greater Sage-grouse (GRSG).  That equates to 62% of total parcels and 46% of total
acreage in the sale. In May 2018, the BLM published the Northwest Colorado Greater Sage-Grouse Draft
Resource Management Plan Amendment (Draft RMPA) and Environmental Impact Statement.  The State
supports a targeted plan amendment that maintains a commitment to the overall conservation goals
for GRSG and remedies lingering concerns from the 2015 Northwest Colorado Greater Sage-Grouse
Approved Resource Management Plan Amendment (ARMPA).  A significant effort is currently underway
by the BLM, the State, local governments, and interested parties to achieve this goal in a new RMPA.
Given the amount of GRSG habitat potentially impacted by this sale, and the plan amendment process
currently underway, we request that any parcels in GRSG habitat be removed from this sale until the
RMPA is finalized.

BLM_0076915

While IM 2018-034 states that the BLM will not routinely defer leasing when waiting for a plan amendment or revision to be signed, it does not remove your discretion to recommend deferral to the Washington Office. If you are unable to remove these parcels from the sale, despite our strong recommendation, then we request the following changes, at a minimum:

1. The 2015 ARMPA stipulates that no new leasing will occur within 1 mile of a GRSG lek. Staff at CPW have identified 19 parcels in the sale that fall within 1 mile of a lek and have requested those parcels be removed from the sale (see Attachment 1). We appreciate the verbal commitment we have received from BLM staff to make this change.

2. CPW staff have informed the BLM's Kremmling Field Office that parcels located in that field office do not have the necessary stipulations to comply with the 2015 ARMPA. BLM staff have acknowledged this oversight and we appreciate the verbal commitment to include the necessary stipulations.

**Big Game Winter Range and Migration Corridors**

Department of the Interior (DOI) Secretarial Order 3362, *Improving Habitat Quality in Western Big-Game Winter Range and Migration Corridors,* directs DOI bureaus to work with the states "to enhance and improve the quality of big-game winter range and migration corridor habitat on Federal lands . . . ." We welcome the direction SO 3362 provides to consider how federal land management actions can improve habitat quality for big-game populations and ensure robust big-game populations persist. SO 3362 specifically directs DOI bureaus to apply actions that conserve habitat necessary to sustain local and regional big-game populations by minimizing development that would fragment winter range and primary migration corridors and limiting disturbance of big game on winter range.

There is a growing body of evidence that timing limitation stipulations on oil and gas drilling activities are not adequate to protect big game use of crucial winter habitats and migratory corridors, and that additional limitations on the density of surface facilities may be necessary to maintain big game populations in areas heavily developed for oil and gas.[1,2,3] Impacts to big game use of crucial winter habitats and migration corridors increase dramatically when well pad densities exceed one pad/mile.[2,4,5] These adverse impacts are a result of reduced habitat effectiveness from increased road densities and well-related traffic. Impacts to big game populations are considered high or extreme when well pad densities and associated roads exceed four pads/mile.[2,6,7]

To respond to the direction provided by SO 3362, we recommend that BLM incorporate a stipulation that limits the density of surface facilities to no greater than one well pad/mile[2] for the specific parcels that contain the highest priority big game winter habitats and migratory corridors (see Attachment 1). This recommendation continues to allow for multi-well pads and efficient development of fluid mineral

[1] Sawyer H., N.M. Korfanta, R.M. Nielsen, K.L. Monteith, and D. Strickland. 2017, Mule deer and energy development – long term trends of habituation and abundance. Global Change Biology 2017;1-9

[2] Anderson,C.R., Jr., and C.J. Bishop. 2014. Migration patterns of adult female mule deer in response to energy development. Pages 46-50 in R.A. Coon & M.C. Dunfee, editors. Transactions of the 79th North American Wildlife and Natural Resources Conference. Wildlife Management Institute, Gardners, PA, USA

[3] Sawyer H., M.J. Kaufman, A.D. Middleton, T.A. Morrison, R.M. Nielsen, and T.B. Wyckoff. 2013. A framework for understanding semi-permeable barrier effects on migratory ungulates. Journal of Applied Ecology 2013, 50, 68-78

[4] Wilbert, M., Thomson, J., and N. Culver. 2008. Analysis of habitat fragmentation from oil and gas development and its impact on wildlife, The Wilderness Society ecology and economic research department, Washington, D.C. 31 pp.

[5] Hebblewhite, M. 2008. A literature review of the effects of energy development on ungulates: Implications for central and eastern Montana. Report prepared for Montana Fish, Wildlife and Parks, Miles City, MT. 125 pp.

[6] Wyoming Game and Fish Department. 2008. Recommendations for development of oil and gas resources within crucial and important wildlife habitats. Internal Document. Cheyenne, Wyoming. 237 pp.

[7] Lutz, D. W., J. R. Heffelfinger, S. A. Tessmann, R. S. Gamo, and S. Siegel. 2011. Energy development guidelines for mule deer. Mule Deer Working Group, Western Association of Fish and Wildlife Agencies, USA. 27 pp.

resources in Colorado using common development practices and currently available drilling technology. If the specific parcels identified in Attachment 1 cannot be limited to one well pad/mile[2] through existing lease stipulations, CPW recommends that BLM defer these parcels from sale until the existing RMPs are updated through plan maintenance to incorporate a stipulation to address well pad density. Staff at CPW are available as needed to assist BLM with efforts to update the existing RMPs to address this issue.

**North Fork Valley Parcels**

Local governments and citizens in the North Fork Valley have been heavily engaged in efforts to grow and diversify its economy. First, the local community has been engaged in the Uncompahgre Field Office (UFO) RMP revision since 2010. The BLM is expected to release a proposed final RMP to the public this fall, with an anticipated Record of Decision in Spring 2019. The Draft UFO RMP, which was open for public comment in 2016, includes Alternative B.1 which is specific to oil and gas leasing in the North Fork Valley. It makes sense to us to defer parcels in the North Fork Valley until the BLM responds to public comments on Alternative B.1, and other alternatives, and publishes a final decision.

Second, the North Fork Coal Mine Methane Working Group was formed in February by local governments, mining companies, electric utilities, and conservation organizations, with assistance from State agencies. The purpose of the group is to support the coal mines and surrounding communities in the North Fork Valley through the development of a comprehensive strategy for education, capture, exploration of mitigation, and economic utilization of coal mine methane.

We ask that the BLM strongly consider the position of the North Fork Valley community and members of the North Fork Coal Mine Methane Working Group as you evaluate public scoping comments and conduct the EA for this lease sale.

Thank you for your consideration of our comments. They have been made to ensure that oil and gas development in Colorado can occur in a manner that avoids or minimizes impacts to our most important natural resources, and takes into account local community interests.

Sincerely,

John W. Hickenlooper
Governor

# ATTACHMENT E

BLM_0076918

# STATE OF COLORADO



**OFFICE OF THE GOVERNOR**
136 State Capitol Building
Denver, Colorado 80203
(303) 866 - 2471
(303) 866 - 2003 fax

**John W. Hickenlooper**
**Governor**

September 11, 2018

Gregory Shoop
Acting Colorado State Director
U.S. Bureau of Land Management
2850 Youngfield Street
Lakewood, CO 80205

***Sent via email to gshoop@blm.gov and submitted through the ePlanning portal***

RE:  State of Colorado Response to the Bureau of Land Management's (BLM) Sept 6 Letter Regarding the December 2018 Oil and Gas Lease Sale

Dear Mr. Shoop:

Thank you for your September 6 letter in response to the State of Colorado's scoping comments on the December 2018 lease sale.  I appreciate the time you and your staff have taken to provide this information, and I share the value you place in our positive working relationship.

As we work through implementation of the first quarterly lease sale governed under Instructional Memorandum (IM) 2018-034 we continue to experience frustration with the new policy.  I do hope you are correct in your prediction that future quarterly lease sales will be smaller in both parcels and acreage in order to help the BLM, the State and the public better respond in such a short timeframe.  However, our frustration with the new policy extends beyond large parcel volumes and short timelines.

We were surprised to see that on August 27 Colorado BLM posted Environmental Assessments (EAs) for only two of the field offices involved in this state-wide lease sale; at that time no other information was posted.  This left the State, local governments, and interested parties to assume how BLM plans to analyze parcels nominated for sale in the remaining Field Offices.  Prior to IM 2018-034, the State and the public would have had the opportunity to comment on any Determination of NEPA Adequacy (DNA) decision made by BLM during a lease sale.  We now are only provided the opportunity to review and comment on  EAs.

While we understand that BLM believes it can justify utilizing existing NEPA documentation to analyze parcels for oil and gas development in several Field Offices, relying on DNAs for an oil and gas lease sale of this magnitude is a significant change to common practice.  And removal of the opportunity for the public to comment on those DNAs is also a significant change.  The result is a process that does not afford the State, local governments or the public an opportunity to comment on stipulations for parcels BLM plans to include in the lease sale until the Notice of Competitive Lease Sale is published.  Once the notice is published the only remaining formal opportunity to communicate concerns to the BLM, and for BLM to respond to those concerns, is a condensed 10-day protest period.

BLM_0076919

This new process is insufficient to allow for meaningful input into a sale that currently includes 224 parcels and 230,944 acres across Colorado.

Again, we appreciate that your September 6 letter provided more detail about the BLM's current analysis and removal of parcels from this sale, especially for parcels outside of the two EAs that were made public. However, despite your explanation, we remain concerned about the inclusion of specific parcels in your December 2018 lease sale. Below we expand upon the concerns and recommendations provided in our scoping comments.

## Greater Sage-Grouse

Thank you for removing from this sale portions of 17 parcels, and one complete parcel, that are unavailable for leasing in accordance with the 2015 Approved Northwest Colorado Greater Sage Grouse Resource Management Plan Amendment (RMPA). We remain convinced that it is in the best interest of the State for all 143 parcels in greater sage grouse habitat to be removed from this sale until the current RMPA is finalized. IM 2018-034 gives you discretion to recommend to the BLM Washington Office deferral of parcels for sale when a plan amendment or revision is pending. We explicitly request that you make this recommendation.

Since submission of our scoping comments we have become more uncertain about the outcome of the current Northwest Colorado Greater Sage Grouse RMPA. BLM IM 2018-093 regarding compensatory mitigation greatly limits the BLM's ability to fulfill critical elements of the proposed alternative in the Draft RMPA. By participating in this plan amendment process, the BLM, the State, local governments and interested parties are expending significant effort to achieve long-lasting conservation for the species and greater certainty for oil and gas development.

Additionally, the 2015 RMPA and associated Record of Decision (ROD) direct BLM to prioritize leasing outside of greater sage grouse habitat. The ROD states that BLM must "prioritize oil and gas leasing and development outside of identified PHMAs [Priority Habitat Management Areas] and GHMAs [General Habitat Management Areas]." This lease sale still has the potential to impact over 100,000 acres of habitat for greater sage grouse. The BLM should take the time to ensure that new oil and gas leasing in priority or general habitat fully complies with all aspects of the RMPA once this plan amendment is finalized. As always, our species experts at Colorado Parks and Wildlife (CPW) stand ready to assist the BLM in this effort.

## North Fork Valley Parcels

Thank you for confirming that the BLM has removed from the December 2018 sale three parcels in Delta County, as well as the parcels under Paonia Reservoir. We understand that Gunnison County Commissioners have expressed concern over the adequacy of the analysis conducted in the Uncompahgre EA for this lease sale, including questioning local land use authority, and request deferral of remaining parcels in the North Fork Valley from this sale. While the analysis in this EA incorporated information from the current draft Uncompahgre Field Office (UFO) RMP, making development decisions prior to a ROD could limit the BLM's decision space as you finalize management decisions in the new RMP. Given the continued local concern, we request that the remaining five parcels in the North Fork Valley be deferred from this sale until the draft UFO RMP is finalized. IM 2018-034 gives you discretion to recommend to the BLM Washington Office deferral of parcels for sale when a plan amendment or revision is pending. We explicitly request that you make this recommendation.

More specifically, Parcel 8320, adjacent to Paonia State Park, remains a concern as development on this parcel and access to it could negatively affect operations at Paonia State Park. And finally, the Colorado Department of Public Health and Environment has also submitted comments on the Uncompahgre EA regarding the analysis of air quality impacts and consideration of source water protection plans.

**Big Game Winter Range and Migration Corridors**

In our scoping comments we requested that BLM incorporate a stipulation that limits the density of surface facilities to no greater than one well pad/mile² for specific parcels that contain the highest priority big game winter habitats and migratory corridors. We believe incorporating this stipulation would help satisfy the intent and specific requirements outlined in the Department of the Interior (DOI) Secretarial Order 3362, *Improving Habitat Quality in Western Big-Game Winter Range and Migration Corridors,* which directs DOI bureaus to work with States "to enhance and improve the quality of big-game winter range and migration corridor habitat on Federal lands . . . ."

Your September 6 letter suggests that timing limitations consistent with current RMPs have been applied to relevant parcels, and that any reduction of surface disturbance will be considered when BLM analyzes site-specific lease development. Timing limitations alone are inadequate to maintain the functionality of habitat for big game, and a stipulation to limit the density of surface facilities in big game winter range and migration corridors is supported by the best available science. Based on this understanding, CPW has consistently recommended a stipulation to limit density in their leasing correspondence with BLM since 2008. Additionally, CPW is often told that density limitations cannot be applied at the development stage when a stipulation is not included in the governing RMP.

At least one BLM Colorado Field Office, the Tres Rios Field Office, has recognized the need for a stipulation to limit the density of surface facilities by incorporating a Controlled Surface Use Stipulation in their 2015 RMP revision. This stipulation was incorporated into the Tres Resource RMP due to inadequate existing mechanisms to limit the density of surface facilities post-lease when faced with development proposals and individual drilling permits. We encourage you to incorporate this stipulation, or one like it, state-wide. And we request that you defer from this sale specific parcels included in our scoping comment letter until the BLM is able to apply a stipulation that limits the density of surface facilities to no greater than one well pad/mile.

In a conversation with Secretary Zinke he assured me that the State of Colorado's concerns regarding this lease sale would be addressed. We greatly value the opportunity to discuss these issues with you and your staff. Thank you for your continued consideration of our concerns.

Sincerely,

John W. Hickenlooper
Governor

# ATTACHMENT F

BLM_0076922



**COLORADO**
Department of Natural Resources

Executive Director's Office
1313 Sherman Street, Room 718
Denver, CO 80203

April 16, 2019

Jamie Connell, Colorado State Director
Bureau of Land Management
2850 Youngfield Street
Lakewood, CO 80215

Sent via email to jconnell@blm.gov

RE:  Colorado Department of Natural Resources – Scoping Comments for the Bureau of Land Management's September 2019 Fluid Mineral Lease Sale

Dear Jamie,

Thank you for your and your staff's ongoing efforts to coordinate with the State of Colorado during the oil and gas lease sale process. As you know, Colorado Parks and Wildlife (CPW) routinely reviews BLM parcels proposed for lease sales and recommends opportunities to avoid or minimize impacts to wildlife. In keeping with this, CPW also has submitted two comment letters on the September 2019 lease sale, one to the Grand Junction Field Office and one to the Royal Gorge Field Office. (Attachments 1 and 2).

I write separately on behalf of the Colorado Department of Natural Resources (DNR) to emphasize the importance of our partnership and mitigation as a conservation tool as we address a number of issues related to:
1. Impacts to Greater Sage-Grouse;
2. Big Game Winter Range and Migration Corridors; and
3. Impacts to High Priority Habitat for the Lesser Prairie-Chicken.


**Greater Sage-Grouse**

Thank you for deferring parcels from the December 2018 and March 2019 sales as requested by former Governor Hickenlooper and former DNR Director Bob Randall until the completion of the Record of Decision for the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment (ARMPA). As you know, DNR and CPW staff dedicated considerable effort as cooperating agencies in finalizing the ARMPA. Both DNR and CPW now focus on operation of ARMPA to ensure its conservation priorities and protections are implemented.



BLM_0076923

Accordingly, DNR remains committed to our close partnership with BLM to ensure strict adherence to the direction set forth in the ARMPA. Our review of the scoping documents associated with the September 2019 lease sale demonstrates the State's continued efforts to remain attentive and engaged. CPW has reviewed the parcels and associated lease stipulations consistent with the ARMPA. The result of this analysis is detailed in CPW's Northwest Region comments submitted to the Grand Junction Field Office (Attachment 1).

The ARMPA contains a number of provisions directing the BLM to work closely and in collaboration with the State of Colorado on requests for waivers, exceptions, and modifications and with regard to mitigation. Should requests for waivers, exceptions and modifications be received, we expect that these consultation requirements will be honored as outlined in the ARMPA because, as we know, mitigation is critically important to achieving successful conservation outcomes. We support the BLM's reliance on the mitigation hierarchy and coordination with the State to ensure consistency with the principles outlined in Appendix H of the ARMPA. Similarly, we appreciate the BLM's recognition that the State may require compensatory mitigation, and we look forward to working with you on this process should these parcels be developed.

Further, Objective MR-1 in the ARMPA states that priority for fluid mineral leasing will be given to parcels outside of priority habitat management areas (PHMA) and general habitat management areas (GHMA), and that priority will be given to non-habitat areas first and then in the least suitable habitat for Greater Sage-Grouse. We note that 77% of the proposed lease acreage overlaps with Greater Sage-Grouse habitat, but expect that this percentage is uniquely high due to including parcels previously deferred while BLM finalized the ARMPA. Recognizing the importance of Objective MR-1 to Colorado, we request a meeting with your staff to better understand how this prioritization process will be implemented.

In addition to collaborating with our federal partners on management actions, the State continues to create and employ tools to support protection of Greater Sage-Grouse and other wildlife populations. For example, the Colorado General Assembly recently passed SB19-181 to reprioritize the protection of public health, safety, welfare, the environment, and wildlife. As part of that bill, the General Assembly specifically clarified that the State can require off-site mitigation for wildlife as part of the oil and gas permitting process.

**Big Game Winter Range and Migration Corridors**

We appreciate your staff's willingness to work with CPW to develop a long-term solution to minimize the impacts of future oil and gas leasing within important big game habitats. Current scientific literature suggests that limiting density of oil and gas surface facilities is important to maintain healthy big game populations. We



continue to believe, based on this research, that a surface density stipulation can allow for efficient development of fluid minerals on public lands in Colorado, while protecting crucial winter habitats and migration corridors. A statewide, long-term solution is the best approach, and similar to our meeting request above, we would like to discuss opportunities for a path forward.

In the meantime, we request BLM consider partial deferrals for portions of the lease sale parcels that intersect high priority big game habitats. CPW has identified those portions of overlap within the September lease sale, and an analysis has been provided to your staff. Identifying a long-term solution to address these parcels by minimizing impacts to big game habitat offers an opportunity for the BLM to implement the directives outlined in the Department of Interior's February 2018 Secretarial Order 3362 (SO 3362).

### Lesser Prairie-Chicken

Finally, we urge the BLM to consider our concerns regarding the lesser prairie-chicken, which is currently under consideration for listing by the U.S. Fish and Wildlife Service. Given the current federal assessment of the species and its state status as a threatened species, CPW recommends deferral of all parcels that overlap with lesser prairie-chicken focal and corridor areas. Please review and consider CPW's detailed analysis submitted to the Royal Gorge Field Office and included as Attachment 2.

We appreciate our working relationship with BLM's Colorado State Office. Thank you for your consideration of these comments. I will reach out to you to schedule a time for DNR and BLM staff to discuss the prioritization process for Greater Sage-Grouse parcels and long-term, statewide solution to minimize impacts in big game habitat as well as answer any questions BLM may have about these scoping comments.

Sincerely,

Dan Gibbs
Executive Director



Attachment 1



# COLORADO
**Parks and Wildlife**

Department of Natural Resources

Northwest Regional Office
711 Independent Avenue
Grand Junction, CO 81505

April 16, 2019

Danielle Courtois
Bureau of Land Management
Grand Junction Field Office
2815 H Road
Grand Junction, CO 81506

*Sent via email to* **dcourtois@blm.gov**

**RE:   Colorado Parks and Wildlife (CPW) Northwest Region - Scoping Comments for the Bureau of Land Management's September 2019 Oil and Gas Lease Sale**

Dear Danielle,

Colorado Parks and Wildlife's statutory mission is to perpetuate the wildlife resources of the State, to provide a quality State parks system, and to provide enjoyable and sustainable outdoor recreation opportunities that educate and inspire current and future generations to serve as strategic stewards of Colorado's natural resources. This mission is implemented through our 2015 Strategic Plan, and the goals it embraces which are designed to make CPW a national leader in wildlife management, conservation, and sustainable outdoor recreation for current and future generations.

CPW's Northwest Region thanks you for the opportunity to review and provide scoping comments for the September 2019 oil and gas lease sale. CPW staff has reviewed the scoping documents and associated stipulations assigned to the proposed lease parcels. Based on this review, CPW would like to provide the following comments to help avoid and minimize wildlife impacts to the greatest extent possible.

Due to the number of proposed parcels in the September 2019 lease sale, CPW has included its habitat-specific analysis within Attachment 1 (*CPW Wildlife Review*). This table identifies high priority habitat intersects that would necessitate the application of existing BLM state-wide stipulations, or requirements from individual field office resource management plans. Additionally, Attachment 2 (*CPW Property Recommendations*) contains recommendations related to CPW's public access leases and conservation easements that overlap with the proposed lease parcels.

Within Attachment 1, CPW has identified lease sale parcels that intersect high priority big-game winter range and migration corridor habitats relating to the Department of Interior's February 2018 Secretarial Order 3362 (S.O. 3362). This order directs relevant bureaus of the Interior to, *"Review and use the best available science to inform development of specific guidelines for the Department's lands and waters related to planning and developing energy, transmission, or other relevant projects to avoid or minimize potential negative impacts on wildlife."* CPW hopes to work together to address the need for a long-term state-wide solution for fluid mineral leasing within high priority big-game habitats.

Jeffrey M. Ver Steeg, Acting Director, Colorado Parks and Wildlife • Parks and Wildlife Commission: Taishya Adams • Robert W. Bray • Charles Garcia
Marie Haskett • Carrie Besnette Hauser • John Howard, Chair • Marvin McDaniel • Luke Schafer • Eden Vardy
James Vigil, Secretary • Michelle Zimmerman, Vice-Chair



In addition to big game habitats, CPW staff has coordinated with the BLM greater sage-grouse (GrSG) coordinators to ensure that the Northwest Colorado 2019 Greater Sage-grouse Approved Resource Management Plan Amendment (ARMPA) is being accurately applied. Attachment 1 (green highlighted rows) contains CPW's scoping analysis of greater sage-grouse habitat intersects and associated lease stipulations consistent with the 2019 GrSG plan amendment.

CPW appreciates our working relationship with the Bureau of Land Management's fluid mineral leasing team and looks forward to future coordination on this and future lease sales. If there are any questions regarding these comments, or if we can provide additional information, please contact Northwest Region Energy Liaison, Taylor Elm, at (970) 255-6180 or by email at taylor.elm@state.co.us.

Sincerely,

J.T. Romatzke,
Northwest Regional Manager

Cc:     Jonathan Fairbairn, Branch Chief of Fluid Minerals (BLM)
        Amy Moyer, Assistant Director (DNR)
        Dean Riggs, Deputy Regional Manager (CPW)
        Taylor Elm, Regional Energy Liaison (CPW)
        File

| Parcel ID | Parcel Acres | County | High Priority Wildlife Habitat | Overlapping Acres | Intersect Percent | Current RMP Stipulations and S.O. 3362 Implementation Opportunities |
|---|---|---|---|---|---|---|
| 8317 | 975.34 | JACKSON | Greater Sage-Grouse Active Lek - 1 mile buffer | 136 | 13.94 | No Surface Occupancy - (NSO-1) within 1 mile of an active lek |
| 8365 | 1680.58 | JACKSON | Greater Sage-Grouse Active Lek - 1 mile buffer | 14 | 0.83 | No Surface Occupancy - (NSO-1) within 1 mile of an active lek |
| 8332 | 1959.27 | JACKSON | Greater Sage-Grouse Active Lek - 1 mile buffer | 7 | 0.36 | No Surface Occupancy - (NSO-1) within 1 mile of an active lek |
| 8315 | 361.68 | JACKSON | Greater Sage-Grouse Active Lek - 1 mile buffer | 1 | 0.28 | No Surface Occupancy - (NSO-1) within 1 mile of an active lek |
| 8285 | 177.69 | JACKSON | Greater Sage-Grouse Active Lek - 1 mile buffer | 9 | 5.07 | No Surface Occupancy - (NSO-1) within 1 mile of an active lek |
| 8443 | 1287.64 | RIO BLANCO | Greater Sage-Grouse Priority Habitat - HPH | 1.27 | 0.1 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8265 | 1008.42 | ROUTT | Greater Sage-Grouse Priority Habitat - HPH | 2.73 | 0.27 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8369 | 81.23 | GARFIELD | Greater Sage-Grouse Priority Habitat - HPH | 7.42 | 9.13 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8272 | 40.2 | ROUTT | Greater Sage-Grouse Priority Habitat - HPH | 18 | 44.78 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8473 | 1710.54 | ROUTT | Greater Sage-Grouse Priority Habitat - HPH | 30.11 | 1.76 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8312 | 39.45 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 39.45 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8314 | 39.73 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 39.73 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8342 | 39.95 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 39.95 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8292 | 40.53 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 40.53 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8288 | 41.35 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 41.35 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8355 | 2541.56 | RIO BLANCO | Greater Sage-Grouse Priority Habitat - HPH | 43.83 | 1.72 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8284 | 157.98 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 50.47 | 31.95 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8447 | 56.56 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 56.56 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8369 | 81.23 | GARFIELD | Greater Sage-Grouse Priority Habitat - HPH | 70.81 | 87.17 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8293 | 77.46 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 77.46 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8336 | 80.12 | MOFFAT | Greater Sage-Grouse Priority Habitat - HPH | 80.12 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8474 | 1444.15 | ROUTT | Greater Sage-Grouse Priority Habitat - HPH | 102.42 | 7.09 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8430 | 120.55 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 120.55 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8286 | 121.56 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 121.56 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8368 | 1948.43 | GARFIELD | Greater Sage-Grouse Priority Habitat - HPH | 141.78 | 7.28 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8285 | 177.69 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 168.68 | 94.93 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8305 | 197.45 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 197.45 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8276 | 276.86 | ROUTT | Greater Sage-Grouse Priority Habitat - HPH | 242.96 | 87.76 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8367 | 1502.2 | GARFIELD | Greater Sage-Grouse Priority Habitat - HPH | 254.52 | 16.94 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8370 | 2209.82 | GARFIELD | Greater Sage-Grouse Priority Habitat - HPH | 259.51 | 11.74 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8256 | 642.56 | RIO BLANCO | Greater Sage-Grouse Priority Habitat - HPH | 279.88 | 43.56 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8271 | 282.81 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 282.81 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8331 | 283.07 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 283.07 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8338 | 320.31 | MOFFAT | Greater Sage-Grouse Priority Habitat - HPH | 320.31 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8335 | 360.49 | MOFFAT | Greater Sage-Grouse Priority Habitat - HPH | 360.49 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8315 | 361.68 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 361.68 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8321 | 396.61 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 375.19 | 94.6 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8264 | 1048.52 | ROUTT | Greater Sage-Grouse Priority Habitat - HPH | 404.8 | 38.61 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8368 | 1948.43 | GARFIELD | Greater Sage-Grouse Priority Habitat - HPH | 456.5 | 23.43 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8303 | 2248.94 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 555.63 | 24.71 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8316 | 564.51 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 564.51 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8446 | 641.33 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 640.81 | 99.92 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8263 | 706.47 | ROUTT | Greater Sage-Grouse Priority Habitat - HPH | 662.55 | 93.78 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8299 | 765.05 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 765.05 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |

| | | | | | | |
|---|---|---|---|---|---|---|
| 8366 | 1297.96 | GARFIELD | Greater Sage-Grouse Priority Habitat - HPH | 795.11 | 61.26 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8325 | 879.68 | MOFFAT | Greater Sage-Grouse Priority Habitat - HPH | 879.68 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8313 | 899.42 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 899.42 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8371 | 942.43 | GARFIELD | Greater Sage-Grouse Priority Habitat - HPH | 941.55 | 99.91 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8319 | 952.11 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 952.11 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8333 | 958.09 | MOFFAT | Greater Sage-Grouse Priority Habitat - HPH | 958.09 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8318 | 969.43 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 969.43 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8317 | 975.34 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 975.34 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8367 | 1502.2 | GARFIELD | Greater Sage-Grouse Priority Habitat - HPH | 1023.93 | 68.16 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8300 | 1082.95 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 1082.95 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8311 | 1090.7 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 1090.7 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8326 | 1120.86 | MOFFAT | Greater Sage-Grouse Priority Habitat - HPH | 1120.86 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8370 | 2209.82 | GARFIELD | Greater Sage-Grouse Priority Habitat - HPH | 1150.83 | 52.08 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8270 | 1886.45 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 1175.22 | 62.3 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8365 | 1680.58 | GARFIELD | Greater Sage-Grouse Priority Habitat - HPH | 1176.43 | 70 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8334 | 1201.38 | MOFFAT | Greater Sage-Grouse Priority Habitat - HPH | 1201.38 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8322 | 1316.11 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 1308.02 | 99.39 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8269 | 1649.58 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 1406.51 | 85.28 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8280 | 1438.04 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 1438.04 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8327 | 1499.12 | MOFFAT | Greater Sage-Grouse Priority Habitat - HPH | 1489.71 | 99.37 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8330 | 1512.39 | JACKSON | Greater Sage-Grouse Priority Habitat - HPH | 1512.39 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8323 | 1643.32 | MOFFAT | Greater Sage-Grouse Priority Habitat - HPH | 1643.32 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8337 | 1751.12 | MOFFAT | Greater Sage-Grouse Priority Habitat - HPH | 1751.12 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8339 | 1839.96 | MOFFAT | Greater Sage-Grouse Priority Habitat - HPH | 1839.96 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8332 | 1959.27 | MOFFAT | Greater Sage-Grouse Priority Habitat - HPH | 1959.27 | 100 | No Surface Occupancy - (NSO-2); Lease Notification - (GRSG LN-46e) limit disturbance to one facility per 640 acres |
| 8369 | 81.23 | GARFIELD | Greater Sage-Grouse General Habitat - HPH | 3 | 3.69 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8474 | 1444.15 | MOFFAT | Greater Sage-Grouse General Habitat - HPH | 4.05 | 0.28 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8379 | 2227.98 | RIO BLANCO | Greater Sage-Grouse General Habitat - HPH | 4.24 | 0.19 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8368 | 1948.43 | GARFIELD | Greater Sage-Grouse General Habitat - HPH | 7.41 | 0.38 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8327 | 1499.12 | MOFFAT | Greater Sage-Grouse General Habitat - HPH | 9.41 | 0.63 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8291 | 726.33 | JACKSON | Greater Sage-Grouse General Habitat - HPH | 25.15 | 3.46 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8284 | 157.98 | JACKSON | Greater Sage-Grouse General Habitat - HPH | 26.92 | 17.04 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8263 | 706.47 | ROUTT | Greater Sage-Grouse General Habitat - HPH | 43.93 | 6.22 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8473 | 1710.54 | ROUTT | Greater Sage-Grouse General Habitat - HPH | 50.51 | 2.95 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8289 | 246.4 | JACKSON | Greater Sage-Grouse General Habitat - HPH | 74.81 | 30.36 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8378 | 328.27 | GARFIELD | Greater Sage-Grouse General Habitat - HPH | 81.25 | 24.75 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8349 | 558.4 | RIO BLANCO | Greater Sage-Grouse General Habitat - HPH | 82.95 | 14.85 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8228 | 680.65 | RIO BLANCO | Greater Sage-Grouse General Habitat - HPH | 114.93 | 16.89 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8303 | 2248.94 | JACKSON | Greater Sage-Grouse General Habitat - HPH | 122.11 | 5.43 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8270 | 1886.45 | JACKSON | Greater Sage-Grouse General Habitat - HPH | 157.91 | 8.37 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8255 | 161.25 | RIO BLANCO | Greater Sage-Grouse General Habitat - HPH | 161.25 | 100 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8367 | 1502.2 | GARFIELD | Greater Sage-Grouse General Habitat - HPH | 223.74 | 14.89 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8378 | 328.27 | GARFIELD | Greater Sage-Grouse General Habitat - HPH | 247.02 | 75.25 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8355 | 2541.56 | RIO BLANCO | Greater Sage-Grouse General Habitat - HPH | 248.47 | 9.78 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8377 | 555.1 | RIO BLANCO | Greater Sage-Grouse General Habitat - HPH | 291.71 | 52.55 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8210 | 1258.81 | RIO BLANCO | Greater Sage-Grouse General Habitat - HPH | 303.35 | 24.1 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 8370 | 2209.82 | GARFIELD | Greater Sage-Grouse General Habitat - HPH | 333.17 | 15.08 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8381 | 1532.99 | GARFIELD | Greater Sage-Grouse General Habitat - HPH | 339.12 | 22.12 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8256 | 642.56 | RIO BLANCO | Greater Sage-Grouse General Habitat - HPH | 362.69 | 56.44 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8359 | 817.29 | RIO BLANCO | Greater Sage-Grouse General Habitat - HPH | 365.57 | 44.73 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8472 | 1916.83 | ROUTT | Greater Sage-Grouse General Habitat - HPH | 408.58 | 21.32 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8370 | 2209.82 | GARFIELD | Greater Sage-Grouse General Habitat - HPH | 466.28 | 21.1 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8366 | 1297.96 | GARFIELD | Greater Sage-Grouse General Habitat - HPH | 502.85 | 38.74 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8365 | 1680.58 | GARFIELD | Greater Sage-Grouse General Habitat - HPH | 504.12 | 30 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8443 | 1287.64 | RIO BLANCO | Greater Sage-Grouse General Habitat - HPH | 584.12 | 45.36 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8473 | 1710.54 | MOFFAT | Greater Sage-Grouse General Habitat - HPH | 597.08 | 34.91 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8380 | 2347.08 | GARFIELD | Greater Sage-Grouse General Habitat - HPH | 671.73 | 28.62 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8474 | 1444.15 | ROUTT | Greater Sage-Grouse General Habitat - HPH | 733.08 | 50.76 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8346 | 1250.21 | MOFFAT | Greater Sage-Grouse General Habitat - HPH | 1167.62 | 93.39 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8381 | 1532.99 | GARFIELD | Greater Sage-Grouse General Habitat - HPH | 1193.87 | 77.88 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8344 | 1242.79 | MOFFAT | Greater Sage-Grouse General Habitat - HPH | 1242.79 | 100 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8350 | 1243.12 | RIO BLANCO | Greater Sage-Grouse General Habitat - HPH | 1243.12 | 100 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8345 | 1279.78 | MOFFAT | Greater Sage-Grouse General Habitat - HPH | 1279.78 | 100 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8368 | 1948.43 | GARFIELD | Greater Sage-Grouse General Habitat - HPH | 1342.74 | 68.91 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8380 | 2347.08 | GARFIELD | Greater Sage-Grouse General Habitat - HPH | 1624.11 | 69.2 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8376 | 1832.12 | RIO BLANCO | Greater Sage-Grouse General Habitat - HPH | 1678.84 | 91.63 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8379 | 2227.98 | GARFIELD | Greater Sage-Grouse General Habitat - HPH | 1978.9 | 88.82 | No Surface Occupancy - (MD MR-4) within 2 miles of an active lek; or as applicable, apply (GRSG TL-46e) from March 1 to July 20 |
| 8303 | 2248.94 | JACKSON | Elk Migration Corridor - HPH | 20.56 | 0.91 | Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8285 | 177.69 | JACKSON | Elk Migration Corridor - HPH | 32.92 | 18.53 | Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8280 | 1438.04 | JACKSON | Elk Migration Corridor - HPH | 1101.67 | 76.61 | Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8276 | 276.86 | ROUTT | Elk Severe Winter Range - HPH | 3.14 | 1.13 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8284 | 157.98 | JACKSON | Elk Severe Winter Range - HPH | 3.64 | 2.3 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8286 | 121.56 | JACKSON | Elk Severe Winter Range - HPH | 7.13 | 5.87 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8285 | 177.69 | JACKSON | Elk Severe Winter Range - HPH | 13.55 | 7.63 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8321 | 396.61 | JACKSON | Elk Severe Winter Range - HPH | 39.21 | 9.89 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8300 | 1082.95 | JACKSON | Elk Severe Winter Range - HPH | 105.75 | 9.76 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8291 | 726.33 | JACKSON | Elk Severe Winter Range - HPH | 486.67 | 67 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8269 | 1649.58 | JACKSON | Elk Severe Winter Range - HPH | 582.48 | 35.31 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8473 | 1710.54 | MOFFAT | Elk Severe Winter Range - HPH | 824.9 | 48.22 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8280 | 1438.04 | JACKSON | Elk Severe Winter Range - HPH | 880.67 | 61.24 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8270 | 1886.45 | JACKSON | Elk Severe Winter Range - HPH | 1106.93 | 58.68 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8303 | 2248.94 | JACKSON | Elk Severe Winter Range - HPH | 1755.46 | 78.06 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8381 | 1532.99 | GARFIELD | Elk Winter Concentration Area - HPH | 1.18 | 0.08 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8284 | 157.98 | JACKSON | Elk Winter Concentration Area - HPH | 3.25 | 2.06 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8366 | 1297.96 | GARFIELD | Elk Winter Concentration Area - HPH | 69.32 | 5.34 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8280 | 1438.04 | JACKSON | Elk Winter Concentration Area - HPH | 106.93 | 7.44 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8269 | 1649.58 | JACKSON | Elk Winter Concentration Area - HPH | 120.39 | 7.3 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8473 | 1710.54 | MOFFAT | Elk Winter Concentration Area - HPH | 202.85 | 11.86 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8349 | 558.4 | RIO BLANCO | Elk Winter Concentration Area - HPH | 263.94 | 47.27 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8210 | 1258.81 | RIO BLANCO | Elk Winter Concentration Area - HPH | 383.58 | 30.47 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8346 | 1250.21 | MOFFAT | Elk Winter Concentration Area - HPH | 419.4 | 33.55 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8316 | 564.51 | JACKSON | Elk Winter Concentration Area - HPH | 439.45 | 77.85 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |

BLM_0076930

| 8350 | 1243.12 | RIO BLANCO | Elk Winter Concentration Area - HPH | 509.97 | 41.02 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
|------|---------|------------|--------------------------------------|--------|-------|------|
| 8265 | 1008.42 | ROUTT | Elk Winter Concentration Area - HPH | 524.85 | 52.05 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8325 | 879.68 | MOFFAT | Elk Winter Concentration Area - HPH | 546.29 | 62.1 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8359 | 817.29 | RIO BLANCO | Elk Winter Concentration Area - HPH | 613.73 | 75.09 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8327 | 1499.12 | MOFFAT | Elk Winter Concentration Area - HPH | 808.33 | 53.92 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8381 | 1532.99 | GARFIELD | Elk Winter Concentration Area - HPH | 826.78 | 53.93 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8323 | 1643.32 | MOFFAT | Elk Winter Concentration Area - HPH | 889.47 | 54.13 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8326 | 1120.86 | MOFFAT | Elk Winter Concentration Area - HPH | 923.77 | 82.42 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8365 | 1680.58 | GARFIELD | Elk Winter Concentration Area - HPH | 1052.2 | 62.61 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8270 | 1886.45 | JACKSON | Elk Winter Concentration Area - HPH | 1076.87 | 57.08 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8303 | 2248.94 | JACKSON | Elk Winter Concentration Area - HPH | 1513.84 | 67.31 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8355 | 2541.56 | RIO BLANCO | Elk Winter Concentration Area - HPH | 2132.65 | 83.91 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8473 | 1710.54 | ROUTT | Mule Deer Critical Winter Range - HPH | 1.04 | 0.06 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8315 | 361.68 | JACKSON | Mule Deer Critical Winter Range - HPH | 25.56 | 7.07 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8264 | 1048.52 | ROUTT | Mule Deer Critical Winter Range - HPH | 37.71 | 3.6 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8377 | 555.1 | RIO BLANCO | Mule Deer Critical Winter Range - HPH | 68.16 | 12.28 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8376 | 1832.12 | RIO BLANCO | Mule Deer Critical Winter Range - HPH | 292.16 | 15.95 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8210 | 1258.81 | RIO BLANCO | Mule Deer Critical Winter Range - HPH | 464.2 | 36.88 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8228 | 680.65 | RIO BLANCO | Mule Deer Critical Winter Range - HPH | 485.69 | 71.36 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8350 | 1243.12 | RIO BLANCO | Mule Deer Critical Winter Range - HPH | 486.94 | 39.17 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8443 | 1287.64 | RIO BLANCO | Mule Deer Critical Winter Range - HPH | 1044.94 | 81.15 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8473 | 1710.54 | MOFFAT | Mule Deer Critical Winter Range - HPH | 1085.61 | 63.47 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8332 | 1959.27 | MOFFAT | Mule Deer Critical Winter Range - HPH | 1141.63 | 58.27 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8346 | 1250.21 | MOFFAT | Mule Deer Critical Winter Range - HPH | 1194.28 | 95.53 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8210 | 1258.81 | RIO BLANCO | Mule Deer Migration Corridor - HPH | 510.99 | 40.59 | Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8315 | 361.68 | JACKSON | Mule Deer Severe Winter Range - HPH | 25.56 | 7.07 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8264 | 1048.52 | ROUTT | Mule Deer Severe Winter Range - HPH | 37.71 | 3.6 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8355 | 2541.56 | RIO BLANCO | Mule Deer Severe Winter Range - HPH | 151.1 | 5.95 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8377 | 555.1 | RIO BLANCO | Mule Deer Severe Winter Range - HPH | 240.12 | 43.26 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8350 | 1243.12 | RIO BLANCO | Mule Deer Severe Winter Range - HPH | 483.49 | 38.89 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8228 | 680.65 | RIO BLANCO | Mule Deer Severe Winter Range - HPH | 485.69 | 71.36 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8376 | 1832.12 | RIO BLANCO | Mule Deer Severe Winter Range - HPH | 820.77 | 44.8 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8332 | 1959.27 | MOFFAT | Mule Deer Severe Winter Range - HPH | 821.67 | 41.94 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8473 | 1710.54 | MOFFAT | Mule Deer Severe Winter Range - HPH | 939.68 | 54.93 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8443 | 1287.64 | RIO BLANCO | Mule Deer Severe Winter Range - HPH | 1078.15 | 83.73 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8346 | 1250.21 | MOFFAT | Mule Deer Severe Winter Range - HPH | 1194.28 | 95.53 | Timing Limitation - December 1-April 15; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8327 | 1499.12 | MOFFAT | Pronghorn Antelope Winter Concentration Area - HPH | 15.87 | 1.06 | Timing Limitation - January 1-March 31; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8319 | 952.11 | JACKSON | Pronghorn Antelope Winter Concentration Area - HPH | 123.06 | 12.92 | Timing Limitation - January 1-March 31; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8317 | 975.34 | JACKSON | Pronghorn Antelope Winter Concentration Area - HPH | 857.63 | 87.93 | Timing Limitation - January 1-March 31; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8322 | 1316.11 | JACKSON | Pronghorn Antelope Winter Concentration Area - HPH | 1070.16 | 81.31 | Timing Limitation - January 1-March 31; Opportunity for Implementation of Secretarial Order (SO) 3362 |
| 8344 | 1242.79 | MOFFAT | Aquatic Habitat Recovery and Cons. Water - HPH | 11.95 | 0.96 | No Surface Occupancy - Within 300 feet of the Ordinary High Water Mark of the river |
| 8264 | 1048.52 | ROUTT | Aquatic Habitat Recovery and Cons. Water - HPH | 29.8 | 2.84 | No Surface Occupancy - Within 300 feet of the Ordinary High Water Mark of the river |
| 8332 | 1959.27 | MOFFAT | Aquatic Habitat Recovery and Cons. Water - HPH | 34.97 | 1.78 | No Surface Occupancy - Within 300 feet of the Ordinary High Water Mark of the river |
| 8265 | 1008.42 | ROUTT | Aquatic Habitat Recovery and Cons. Water - HPH | 48.62 | 4.82 | No Surface Occupancy - Within 300 feet of the Ordinary High Water Mark of the river |
| 8263 | 706.47 | ROUTT | Aquatic Habitat Recovery and Cons. Water - HPH | 55.39 | 7.84 | No Surface Occupancy - Within 300 feet of the Ordinary High Water Mark of the river |
| 8334 | 1201.38 | MOFFAT | Aquatic Habitat Recovery and Cons. Water - HPH | 65.09 | 5.42 | No Surface Occupancy - Within 300 feet of the Ordinary High Water Mark of the river |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 8345 | 1279.78 | MOFFAT | Aquatic Habitat Recovery and Cons. Water - HPH | 93.54 | 7.31 | No Surface Occupancy - Within 300 feet of the Ordinary High Water Mark of the river |
| 8476 | 2158.32 | ROUTT | Aquatic Habitat Recovery and Cons. Water - HPH | 108.21 | 5.01 | No Surface Occupancy - Within 300 feet of the Ordinary High Water Mark of the river |
| 8475 | 1919.22 | ROUTT | Aquatic Habitat Recovery and Cons. Water - HPH | 205.69 | 10.72 | No Surface Occupancy - Within 300 feet of the Ordinary High Water Mark of the river |
| 8474 | 1444.15 | ROUTT | Aquatic Habitat Recovery and Cons. Water - HPH | 664.74 | 46.03 | No Surface Occupancy - Within 300 feet of the Ordinary High Water Mark of the river |
| 8321 | 396.61 | JACKSON | Bald Eagle Active Nest Site - HPH | 34.61 | 8.73 | No Surface Occupancy within 0.25 miles of nest site; Controlled Surface Use - No human encroachment within 0.5 miles of nest between October 15-July 31; Controlled Surface Use - re-construction surveys may be required |
| 8314 | 39.73 | JACKSON | Bald Eagle Active Nest Site - HPH | 39.73 | 100 | No Surface Occupancy within 0.25 miles of nest site; Controlled Surface Use - No human encroachment within 0.5 miles of nest between October 15-July 31; Controlled Surface Use - re-construction surveys may be required |
| 8346 | 1250.21 | MOFFAT | Black-Footed Ferret Release Site - HPH | 455.24 | 36.41 | Timing Limitation - Entire Area March 1-July 15 to protect black-footed ferret important life cycle periods |
| 8276 | 276.86 | ROUTT | Columbian Sharp-Tailed Grouse Lek Site - HPH | 67.51 | 24.38 | No Surface Occupancy - within 0.4 miles of the lek |
| 8474 | 1444.15 | ROUTT | Columbian Sharp-Tailed Grouse Lek Site - HPH | 189.48 | 13.12 | No Surface Occupancy - within 0.4 miles of the lek |
| 8263 | 706.47 | ROUTT | Columbian Sharp-Tailed Grouse Lek Site - HPH | 245.96 | 34.82 | No Surface Occupancy - within 0.4 miles of the lek |
| 8472 | 1916.83 | ROUTT | Columbian Sharp-Tailed Grouse Lek Site - HPH | 246.85 | 12.88 | No Surface Occupancy - within 0.4 miles of the lek |
| 8475 | 1919.22 | ROUTT | Columbian Sharp-Tailed Grouse Production Area - HPH | 25 | 1.3 | Timing Limitation - March 15-July 30; Controlled Surface Use - Surface density limitation of one pad per section; Controlled Surface Use - Limit noise not to exceed 49 dB measured 30 ft from the source |
| 8265 | 1008.42 | ROUTT | Columbian Sharp-Tailed Grouse Production Area - HPH | 185.53 | 18.4 | Timing Limitation - March 15-July 30; Controlled Surface Use - Surface density limitation of one pad per section; Controlled Surface Use - Limit noise not to exceed 49 dB measured 30 ft from the source |
| 8264 | 1048.52 | ROUTT | Columbian Sharp-Tailed Grouse Production Area - HPH | 213.02 | 20.32 | Timing Limitation - March 15-July 30; Controlled Surface Use - Surface density limitation of one pad per section; Controlled Surface Use - Limit noise not to exceed 49 dB measured 30 ft from the source |
| 8276 | 276.86 | ROUTT | Columbian Sharp-Tailed Grouse Production Area - HPH | 276.86 | 100 | Timing Limitation - March 15-July 30; Controlled Surface Use - Surface density limitation of one pad per section; Controlled Surface Use - Limit noise not to exceed 49 dB measured 30 ft from the source |
| 8476 | 2158.32 | ROUTT | Columbian Sharp-Tailed Grouse Production Area - HPH | 418.57 | 19.39 | Timing Limitation - March 15-July 30; Controlled Surface Use - Surface density limitation of one pad per section; Controlled Surface Use - Limit noise not to exceed 49 dB measured 30 ft from the source |
| 8263 | 706.47 | ROUTT | Columbian Sharp-Tailed Grouse Production Area - HPH | 706.47 | 100 | Timing Limitation - March 15-July 30; Controlled Surface Use - Surface density limitation of one pad per section; Controlled Surface Use - Limit noise not to exceed 49 dB measured 30 ft from the source |
| 8474 | 1444.15 | ROUTT | Columbian Sharp-Tailed Grouse Production Area - HPH | 1303.65 | 90.27 | Timing Limitation - March 15-July 30; Controlled Surface Use - Surface density limitation of one pad per section; Controlled Surface Use - Limit noise not to exceed 49 dB measured 30 ft from the source |
| 8472 | 1916.83 | ROUTT | Columbian Sharp-Tailed Grouse Production Area - HPH | 1421.89 | 74.18 | Timing Limitation - March 15-July 30; Controlled Surface Use - Surface density limitation of one pad per section; Controlled Surface Use - Limit noise not to exceed 49 dB measured 30 ft from the source |
| 8378 | 328.27 | GARFIELD | Cutthroat Trout Designated Critical Habitat - HPH | 12.14 | 3.7 | No Surface Occupancy - Within 300 feet of the Ordinary High Water Mark of the stream; Timing Limitation - Spawning - No instream work between June 1-September 1; Controlled Surface Use - Surface density limitation of one pad per section within watershed |
| 8380 | 2347.08 | GARFIELD | Cutthroat Trout Designated Critical Habitat - HPH | 178.92 | 7.62 | No Surface Occupancy - Within 300 feet of the Ordinary High Water Mark of the stream; Timing Limitation - Spawning - No instream work between June 1-September 1; Controlled Surface Use - Surface density limitation of one pad per section within watershed |
| 8381 | 1532.99 | GARFIELD | Cutthroat Trout Designated Critical Habitat - HPH | 338.92 | 22.11 | No Surface Occupancy - Within 300 feet of the Ordinary High Water Mark of the stream; Timing Limitation - Spawning - No instream work between June 1-September 1; Controlled Surface Use - Surface density limitation of one pad per section within watershed |
| 8474 | 1444.15 | MOFFAT | Elk Production Area - HPH | 4.05 | 0.28 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8379 | 2227.98 | RIO BLANCO | Elk Production Area - HPH | 8.25 | 0.37 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8369 | 81.23 | GARFIELD | Elk Production Area - HPH | 10.42 | 12.83 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8280 | 1438.04 | JACKSON | Elk Production Area - HPH | 29.15 | 2.03 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8369 | 81.23 | GARFIELD | Elk Production Area - HPH | 70.81 | 87.17 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8378 | 328.27 | GARFIELD | Elk Production Area - HPH | 81.25 | 24.75 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8286 | 121.56 | JACKSON | Elk Production Area - HPH | 112.67 | 92.69 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8368 | 1948.43 | GARFIELD | Elk Production Area - HPH | 149.19 | 7.66 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8255 | 161.25 | RIO BLANCO | Elk Production Area - HPH | 161.25 | 100 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8300 | 1082.95 | JACKSON | Elk Production Area - HPH | 188.14 | 17.37 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |

BLM_0076932

| 8269 | 1649.58 | JACKSON | Elk Production Area - HPH | 204.55 | 12.4 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8289 | 246.4 | JACKSON | Elk Production Area - HPH | 246.4 | 100 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8378 | 328.27 | GARFIELD | Elk Production Area - HPH | 247.02 | 75.25 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8473 | 1710.54 | ROUTT | Elk Production Area - HPH | 296.92 | 17.36 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8228 | 680.65 | RIO BLANCO | Elk Production Area - HPH | 325.47 | 47.82 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8381 | 1532.99 | GARFIELD | Elk Production Area - HPH | 339.12 | 22.12 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8270 | 1886.45 | JACKSON | Elk Production Area - HPH | 499.04 | 26.45 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8377 | 555.1 | RIO BLANCO | Elk Production Area - HPH | 555.1 | 100 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8256 | 642.56 | RIO BLANCO | Elk Production Area - HPH | 642.56 | 100 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8380 | 2347.08 | GARFIELD | Elk Production Area - HPH | 671.73 | 28.62 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8370 | 2209.82 | GARFIELD | Elk Production Area - HPH | 725.79 | 32.84 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8291 | 726.33 | JACKSON | Elk Production Area - HPH | 726.33 | 100 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8359 | 817.29 | RIO BLANCO | Elk Production Area - HPH | 817.29 | 100 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8371 | 942.43 | GARFIELD | Elk Production Area - HPH | 938.75 | 99.61 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8265 | 1008.42 | ROUTT | Elk Production Area - HPH | 1008.42 | 100 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8367 | 1502.2 | GARFIELD | Elk Production Area - HPH | 1086.31 | 72.31 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8473 | 1710.54 | MOFFAT | Elk Production Area - HPH | 1088.62 | 63.64 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8381 | 1532.99 | GARFIELD | Elk Production Area - HPH | 1193.87 | 77.88 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8366 | 1297.96 | GARFIELD | Elk Production Area - HPH | 1297.96 | 100 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8474 | 1444.15 | ROUTT | Elk Production Area - HPH | 1440.1 | 99.72 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8370 | 2209.82 | GARFIELD | Elk Production Area - HPH | 1484.03 | 67.16 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8303 | 2248.94 | JACKSON | Elk Production Area - HPH | 1579.89 | 70.25 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8380 | 2347.08 | GARFIELD | Elk Production Area - HPH | 1675.35 | 71.38 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8365 | 1680.58 | GARFIELD | Elk Production Area - HPH | 1680.55 | 100 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8368 | 1948.43 | GARFIELD | Elk Production Area - HPH | 1799.24 | 92.34 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8376 | 1832.12 | RIO BLANCO | Elk Production Area - HPH | 1832.12 | 100 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8472 | 1916.83 | ROUTT | Elk Production Area - HPH | 1916.83 | 100 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8475 | 1919.22 | ROUTT | Elk Production Area - HPH | 1919.22 | 100 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8476 | 2158.32 | ROUTT | Elk Production Area - HPH | 2158.32 | 100 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8379 | 2227.98 | GARFIELD | Elk Production Area - HPH | 2219.73 | 99.63 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8355 | 2541.56 | RIO BLANCO | Elk Production Area - HPH | 2304.68 | 90.68 | Timing Limitation - May 15-June 30; Controlled Surface Use - Surface density limitation of one pad per section |
| 8264 | 1048.52 | ROUTT | Golden Eagle Active Nest Site - HPH | 144.68 | 13.8 | No Surface Occupancy - Within 0.25 mile of nest; Timing Limitation - No human encroachment within 0.50 mile of nest between December 15-July 15; Controlled Surface Use - Pre-construction surveys may be required |
| 8280 | 1438.04 | JACKSON | Prairie Falcon Active Nest Site - HPH | 167.6 | 11.65 | No Surface Occupancy - Within 0.50 miles of a nest; Timing Limitation - No human encroachment within 0.50 miles of a nest between March 15-July 15; Controlled Surface Use - Pre-construction surveys may be required |

BLM_0076933

| BLM Parcel ID | Parcel Acres | BLM Field Office | TRS Desc. | CPW Property Type | CPW Property Name | Interest | Owner | Intersect Acres | CPW Recommendation |
|---|---|---|---|---|---|---|---|---|---|
| 8263 | 707.22 | LSFO | 06N_89W_24 | Cons. Easement | Adobe Ridge SHA | CE | PRIVATE | 328.59 | CPW recommends a NSO stipulation for Conservation Easements purchased to protect the wildlife habitat conservation values. |
| 8263 | 707.22 | LSFO | 06N_89W_25 | Cons. Easement | Adobe Ridge SHA | CE | PRIVATE | 163.96 | CPW recommends a NSO stipulation for Conservation Easements purchased to protect the wildlife habitat conservation values. |
| 8263 | 707.22 | LSFO | 06N_89W_25 | Public Access Lease | Stokes Gulch STL | Lease | SLB | 0.85 | CPW recommends a TL stipulation that precludes construction, drilling and completion activities during small game & big game hunting seasons (typically Aug. 15 - Nov. 30) |
| 8472 | 1916.25 | LSFO | 10N_88W_02 | Cons. Easement | Brush Mountain Ranch SHA | CE | PRIVATE | 473.74 | CPW recommends a NSO stipulation for Conservation Easements purchased to protect the wildlife habitat conservation values. |
| 8472 | 1916.25 | LSFO | 10N_88W_03 | Cons. Easement | Brush Mountain Ranch SHA | CE | PRIVATE | 632.11 | CPW recommends a NSO stipulation for Conservation Easements purchased to protect the wildlife habitat conservation values. |
| 8473 | 1714.12 | LSFO | 11N_88W_07 | Cons. Easement | Grieves Easement SWA | CE | PRIVATE | 133.92 | CPW recommends a NSO stipulation for Conservation Easements purchased to protect the wildlife habitat conservation values. |
| 8473 | 1714.12 | LSFO | 11N_88W_07 | Cons. Easement | Slater Lake Ranch SHA | CE | PRIVATE | 165.16 | CPW recommends a NSO stipulation for Conservation Easements purchased to protect the wildlife habitat conservation values. |
| 8474 | 1443.26 | LSFO | 11N_88W_16 | Cons. Easement | Slater Lake Ranch SHA | CE | PRIVATE | 40 | CPW recommends a NSO stipulation for Conservation Easements purchased to protect the wildlife habitat conservation values. |
| 8474 | 1443.26 | LSFO | 11N_88W_19 | Cons. Easement | Slater Lake Ranch SHA | CE | PRIVATE | 283.78 | CPW recommends a NSO stipulation for Conservation Easements purchased to protect the wildlife habitat conservation values. |
| 8474 | 1443.26 | LSFO | 11N_88W_20 | Cons. Easement | Slater Lake Ranch SHA | CE | PRIVATE | 249.71 | CPW recommends a NSO stipulation for Conservation Easements purchased to protect the wildlife habitat conservation values. |
| 8474 | 1443.26 | LSFO | 11N_88W_21 | Cons. Easement | Slater Lake Ranch SHA | CE | PRIVATE | 236.9 | CPW recommends a NSO stipulation for Conservation Easements purchased to protect the wildlife habitat conservation values. |
| 8474 | 1443.26 | LSFO | 11N_88W_29 | Cons. Easement | Slater Lake Ranch SHA | CE | PRIVATE | 145.25 | CPW recommends a NSO stipulation for Conservation Easements purchased to protect the wildlife habitat conservation values. |
| 8475 | 1920.00 | LSFO | 11N_88W_27 | Cons. Easement | Brush Mountain Ranch SHA | CE | PRIVATE | 118.25 | CPW recommends a NSO stipulation for Conservation Easements purchased to protect the wildlife habitat conservation values. |
| 8476 | 2160.00 | LSFO | 11N_88W_28 | Cons. Easement | Brush Mountain Ranch SHA | CE | PRIVATE | 81.19 | CPW recommends a NSO stipulation for Conservation Easements purchased to protect the wildlife habitat conservation values. |
| 8476 | 2160.00 | LSFO | 11N_88W_28 | Cons. Easement | Slater Lake Ranch SHA | CE | PRIVATE | 355.97 | CPW recommends a NSO stipulation for Conservation Easements purchased to protect the wildlife habitat conservation values. |
| 8476 | 2160.00 | LSFO | 11N_88W_33 | Cons. Easement | Brush Mountain Ranch SHA | CE | PRIVATE | 280.55 | CPW recommends a NSO stipulation for Conservation Easements purchased to protect the wildlife habitat conservation values. |
| 8476 | 2160.00 | LSFO | 11N_88W_33 | Cons. Easement | Slater Lake Ranch SHA | CE | PRIVATE | 199.24 | CPW recommends a NSO stipulation for Conservation Easements purchased to protect the wildlife habitat conservation values. |
| 8476 | 2160.00 | LSFO | 11N_88W_34 | Cons. Easement | Brush Mountain Ranch SHA | CE | PRIVATE | 278.35 | CPW recommends a NSO stipulation for Conservation Easements purchased to protect the wildlife habitat conservation values. |

 Attachment 2

**COLORADO**

Parks and Wildlife

Department of Natural Resources

SE Region Office
4255 Sinton Rd.
Colorado Springs, CO 80907
P 719.227.5200 | F 719.227.5297

April 16, 2019

Mr. Keith Berger, Field Manager
BLM Royal Gorge Field Office
3028 E. Main St.
Canon City, CO 81212

**Re: CPW Review of September 2019 Oil and Gas Lease Sale Parcels**

Dear Mr. Berger:

Thank you for the opportunity to provide scoping comments on the BLM September 2019 quarterly lease sale. Colorado Parks and Wildlife (CPW) appreciates the opportunity to coordinate with BLM Field Office staff early in the review process and to provide BLM with the best available information regarding protection of wildlife resources during oil and gas development.

CPW is pleased to see that BLM proposes lease stipulations for wildlife species on the lease parcels in this sale. Several tracts are located in COGCC Rule defined Sensitive Wildlife Habitat and/or Restricted Surface Occupancy Area, which requires the lessee to comply with Colorado Oil and Gas Conservation Commission rules to minimize adverse impacts to wildlife resources. Compliance also includes consultation with CPW in those areas prior to development. In addition, CPW offers the following recommendations for the lease parcels associated with the September 2019 quarterly lease sale. The tracts are referenced by their Parcel ID number.

**Aquatic Habitat Recovery and Conservation Waters**
Aquatic habitat recovery and conservation waters are defined as reaches containing species under management for population conservation and recovery. These species may include fish such as the Arkansas darter, brassy minnow, common shiner, flathead chub, plains minnow, northern and southern redbelly dace, Iowa darter, plains orangethroat darter, suckermouth minnow, and plains topminnow as well as amphibian species such as the northern leopard frog and plains leopard frog; all of which are state-listed as species of special concern, threatened, or endangered. CPW discourages drilling both within the river channel and associated sandbars, as impacts to riparian and wetland vegetation could occur as the developer accesses this site, as does the increased potential for water contamination. Portions of parcel 8481 in Cheyenne County overlap Big Sandy Creek. CPW recommends a

Jeffrey M. Ver Steeg, Acting Director, Colorado Parks and Wildlife • Parks and Wildlife Commission: Taishya Adams • Robert W. Bray • Charles Garcia • Marie Haskett
Carrie Besnette Hauser • John Howard, Chair • Marvin McDaniel • Luke Schafer • Eden Vardy • James Vigil, Secretary • Michelle Zimmerman, Vice-Chair



BLM_0076935

**minimum buffer of 300 ft** extending from the outermost limit of the riparian vegetation zone within the affected parcels:
**Cheyenne County: Parcel # 8481**

**Lesser Prairie-Chicken Focal Area, Corridor Area, and Expected Occupied Range**
On May 12, 2014, the U.S. Fish and Wildlife Service (the Service) listed the lesser prairie-chicken as a threatened species under the Endangered Species Act (the Act), severely restricting development in associated habitat. In September 2015, however, the U.S. District Court for the Western District of Texas vacated the listing decision for the lesser prairie-chicken, citing in part the failure of the service to give appropriate consideration to the voluntary conservation efforts undertaken to improve habitat and to diminish threats to the lesser prairie-chicken. As a result of the court's order, the Service issued a direct final rule to formally remove the lesser prairie-chicken from the List of Endangered and Threatened Wildlife in July 2016. Although the lesser prairie-chicken is currently a non-listed species, on Nov 30, 2016, U.S. Fish and Wildlife Service announced a positive 90-day finding on a new petition to list the lesser prairie-chicken as endangered and initiated a 12-month status review to determine whether protection for the species under the ESA is warranted. One component of that assessment will be the relevant voluntary conservation efforts that partner states have undertaken to conserve and enhance the core habitat for lesser prairie-chicken, organized under the Western Association of Fish and Wildlife Agencies (WAFWA) Lesser Prairie-chicken Range-wide Conservation Plan. The State of Colorado lists lesser prairie-chicken as a threatened species under state law.

The State of Colorado is a partner in the WAFWA Lesser Prairie-Chicken Range-wide Conservation Plan and CPW follows the recommendations in the plan when commenting on development in lesser prairie-chicken habitat. At the core of these recommendations are conservation efforts that emphasize habitat quality and avoid development in high priority habitat. Parcel 8482 in Kiowa County is entirely within lesser prairie-chicken Focal Area, area considered the highest priority habitat for conservation. Parcel 8481 in Cheyenne County includes overlap with Focal Area, Corridor Area, and Expected Occupied Range. Given the current federal assessment of the species and its state status as a threatened species, CPW recommends deferral of all parcels that overlap with lesser prairie-chicken focal areas and corridor areas. For the portion of parcel 8481 in Expected Occupied Range, if the BLM chooses to lease, CPW recommends BLM and/or its lessees engage in voluntary conservation efforts that benefit the lesser prairie-chicken within its expected range. CPW recommends the lessee consult with the US Fish and Wildlife Service, or contact the Western Association of Fish and Wildlife Agencies (WAFWA) to enroll the parcels in the Lesser Prairie- Chicken Range-Wide Plan.

If any parcels in lesser prairie-chicken habitat must be leased, **CPW recommends a stipulation with the following measures**: a) no surface occupancy within 0.6 mile of any active lesser prairie-chicken leks; b) avoid oil and gas operations within 2.2 miles of active leks and within lesser prairie-chicken nesting and early brood-rearing habitat outside the 2.2 mile buffer; c) where oil and gas activities must occur within 2.2 miles of active leks, conduct

BLM_0076936

these activities outside the period between March 15 and June 15; d) restrict well site visitations to portions of the day between 9:00 a.m. and 4:00 p.m. during the lekking season (March 15 to June 15); e) avoid surface facility density in excess of 10 well pads per 10-square mile area (one well pad per section) in lesser prairie-chicken nesting and early brood-rearing habitat (within 2.2 miles of active leks); f) locate compressor stations at least 2.2 miles away from lesser prairie-chicken active and historic (within last 5 years) lek sites, when compressor stations must be sited within 2.2 miles of lesser prairie-chicken active and historic (within last 10 years) lek sites, locate compressor stations farther than 0.6 mile (3200 feet) from lesser prairie-chicken lek sites; g) muffle or otherwise control exhaust noise from pump jacks and compressors so that operational noise will not exceed 49 dB measured at 30 feet from the source. The following parcels apply (see attached map for details):

Focal Area: **Cheyenne County: Parts of Section 24 in Parcel# 8481**
             **Kiowa County: Parcel # 8482**
Corridor Area: **Cheyenne County: Section 14 and parts of Section 24 in Parcel # 8481**
Expected Occupied Range: **Cheyenne County: Section 2 of Parcel# 8481**

Mountain Plover Potential Nest Sites
Mountain plover is a Colorado State Species of Special Concern.  The below parcels are located within mapped potential nesting habitats for Mountain Plovers. Therefore, if the initial site disturbance is planned to occur between March 15 through July 31, then CPW recommends that a biologist survey these parcels for any active mountain plover nests. If an active nest is observed, then CPW recommends no surface occupancy within a 300-ft buffer of the active nest until the young are no longer dependent on the nest. The following parcels are applicable:

**Cheyenne County: Parcel# 8481**
**Weld County: Parcel# 8477**

CPW appreciates your consideration of these comments on the BLM's September 2019 quarterly lease sale. Thank you for the opportunity to comment on these parcels in the preliminary review process and prior to preparation of an Environmental Assessment and formal offering for lease. If you have any questions regarding this letter, please contact CPW's Southeast Region Energy Liaison Karen Voltura at 719-227-5232 or karen.voltura@state.co.us.

Sincerely,

Dan Prenzlow
SE Regional Manager


cc:
    Brett Ackerman, SE Deputy Regional Manager

Tom Kroening, NE Deputy Regional Manager
Karen Voltura, SE Region Energy Liaison
Brandon Marette, NE Region Energy Liaison
Aaron Richter, BLM (arichter@blm.gov)

# BLM Sept. 2019 Lease Sale - HPH Intersects Parcels 8481 & 8482



BLM_0076939

# ATTACHMENT G

BLM_0076940



**COLORADO**
Department of
Natural Resources
Executive Director's Office
1313 Sherman Street, Room 718
Denver, CO 80203

June 12, 2019

Jamie Connell, Colorado State Director
Bureau of Land Management
2850 Youngfield Street
Lakewood, CO 80215

Sent via email to jconnell@blm.gov

RE:  Colorado Department of Natural Resources – Comments for the Bureau of Land
Management's September 2019 Fluid Mineral Lease Sale; Draft Environmental
Assessment

Dear Jamie,

Thanks to you and your staff for meeting with us recently regarding our agencies'
ongoing efforts to coordinate throughout the oil and gas lease sale process. The State
of Colorado appreciates your interest in and support for the State leading wildlife
conservation efforts. To that end, Colorado has embarked upon a couple of important
initiatives, which are briefly discussed below. We anticipate that these initiatives will
complement long-term solutions that both BLM and Colorado can implement to
minimize the impacts of future oil and gas leasing within important wildlife habitat in
Colorado.

On behalf of Colorado, two divisions within the Colorado Department of Natural
Resources (DNR) – Colorado Parks and Wildlife (CPW) and Colorado Oil and Gas
Conservation Commission (COGCC) – continue to work in partnership to avoid,
minimize, and mitigate impacts on wildlife from oil and gas development. As the state
implements the recently-enacted SB19-181, CPW and COGCC will consult on wildlife
issues to ensure state-permitting processes protect wildlife and their habitat. In
addition, CPW continues to develop and refine the best-available information
regarding wildlife migration corridors that it can use to make recommendations to
BLM and COGCC regarding avoiding or minimizing important big game habitat in
Colorado.

For the September 2019 lease sale, DNR supports the two comment letters submitted
by CPW with specific recommendations supported by current scientific literature. DNR
relies on CPW's expertise to review BLM parcels proposed for lease sales and
recommend opportunities to avoid or minimize impacts to wildlife. The two comment



letters, one to the Grand Junction Field Office and one to the Royal Gorge Field Office are included as Attachments 1 and 2.

I also write to reiterate two points from CPW's comments – one from each letter. First, regarding big game habitat, we are concerned that lease stipulations for other species do not provide a long-term solution to protect big game winter range and migration corridors. Big game habitat does not always overlap with other species habitat, and substituting the disturbance cap in Greater Sage-Grouse habitat for a development density limitation does not provide equivalent long-term habitat protection. In addition, Greater Sage-Grouse stipulations contain waiver, modification, and exception criteria that do not consider impacts to big game habitat. With this in mind, we agree with CPW that achieving big game habitat protection by utilizing density-limiting stipulations already in place is an interim solution for this sale where there is overlap. However, we continue to reiterate the need to develop and implement a new stipulation that provides long-term protections beyond the proposed lease notification (LN-CO-57). Second, regarding the lesser prairie-chicken, DNR and CPW are concerned regarding BLM's ability to enforce the no surface occupancy or use stipulations where surface ownership of the parcels is private. DNR, through consultation between COGCC and CPW, remains committed to protecting lesser prairie-chicken habitat in all iterations of surface ownership. Given these limitations, we support CPW's recommendations for partial deferral of parcels where stipulations are not available to meet conservation objectives for limiting the density of surface facilities in winter range and migration corridors and for parcels 8481 and 8482 that overlap with lesser prairie-chicken focal and corridor areas.

In closing, I appreciate our working relationship with BLM's Colorado State Office and your willingness to continue to meet and discuss these short-term and long-term solutions. Thank you for your consideration of comments from DNR and CPW. I look forward to continued collaboration on a long-term, statewide solution to minimize impacts in big game habitat.

Sincerely,

Dan Gibbs
Executive Director





**COLORADO**
**Parks and Wildlife**
Department of Natural Resources

Attachment 1

Northwest Regional Office
711 Independent Avenue
Grand Junction, CO 81501

June 10, 2019

Danielle Courtois
Bureau of Land Management
Grand Junction Field Office
2815 H Road
Grand Junction, CO 81506

*Sent via email to dcourtois@blm.gov*

RE:  **Colorado Parks & Wildlife Comments for the Bureau of Land Management's September 2019 Oil & Gas Lease Sale NW District Draft Environmental Assessment**

Dear Danielle,

Colorado Parks and Wildlife's statutory mission is to perpetuate the wildlife resources of the State, to provide a quality state parks system, and to provide enjoyable and sustainable outdoor recreation opportunities that educate and inspire current and future generations to serve as strategic stewards of Colorado's natural resources. This mission is implemented through our 2015 Strategic Plan, and the goals it embraces which are designed to make CPW a national leader in wildlife management, conservation, and sustainable outdoor recreation for current and future generations.

CPW's Northwest Region thanks you for the opportunity to review and provide comments on the September 2019 Oil and Gas Lease Sale Northwest District Draft Environmental Assessment (NWD EA) and unsigned FONSI. CPW provided scoping comments to the BLM regarding the September lease sale in a letter dated April 16, 2019. Included with these comments were spreadsheets identifying parcels that intersect CPW's high priority wildlife habitats and CPW property interests. Additionally, CPW provided recommended lease stipulations to avoid, minimize, and mitigate adverse impacts to wildlife.

CPW appreciates the BLM providing us with a corrected version of the Draft EA, including an accurate application of lease stipulations in Attachment C. Since this version of the EA was not available for the public's review process, CPW respectfully requests verification that the corrected document will be posted with the final lease notifications. Upon our review of the corrected NWD EA, there does not appear to be any change to the total number of leases or the total acreage being offered for lease. CPW's recommendations during the scoping period are largely still applicable with minor revisions to big game habitats discussed herein with regard to the Department of Interior's Secretarial Order 3362, *Improving Habitat Quality in Western Big-Game Winter Range and Migration Corridors* (SO 3362).

Dan Prenzlow, Director, Colorado Parks and Wildlife • Parks and Wildlife Commission: Taishya Adams • Robert W. Bray •Charles Garcia • Marie Haskett
Carrie Besnette Hauser • John Howard, Chair • Marvin McDaniel • Luke B. Schafer • Eden Vardy • James Vigil, Secretary • Michelle Zimmerman, Vice-Chair



BLM_0076943

## Big Game Migration Corridors and High Priority Winter Ranges

CPW has reviewed the language of the big game migration corridor lease notification (LN-CO-57) found in Attachment D and page 44 of the Draft EA. The lease notification speaks specifically about big game migration corridors, but does not contain language indicating it will also be applied to high priority winter range habitats described in SO 3362. CPW recommends that the lease notification language be modified to include these high priority winter range habitats in addition to big game migration corridors. For this sale, CPW appreciates BLM's confirmation that the lease notification is being applied to parcels containing high priority winter range habitat.

Additionally, CPW has recommended that the BLM limit the density of oil and gas development within important big game winter ranges for fluid minerals lease sales since December of 2010. More recently, CPW has provided detailed rationale and scientific literature that indicates seasonal timing restrictions alone are not adequate to provide long-term protections in these vital big game habitats. Furthermore, it is imperative to incorporate these measures during the leasing stage so oil and gas operators are aware of the limitations early on and can plan their future development accordingly.

There is a body of evidence indicating that seasonal timing limitations on oil and gas activities are not adequate to protect big game use of high priority winter ranges and migratory corridors, and that additional limitations on the density of surface facilities may be necessary to maintain big game populations in areas heavily developed for oil and gas. [1,2,3] Impacts to big game use of crucial winter habitats and migration corridors increases dramatically when well pad densities exceed one pad per square mile. [2,4,5] These adverse impacts are a result of reduced habitat effectiveness from increased road densities and well-related traffic. Impacts to big game populations are considered high or extreme when facility densities and associated roads exceed four pads per square mile. [2,6,7] Based on this literature and CPW's obligation to manage big game herds at their population objectives, we recommend that BLM incorporate a lease stipulation to limit oil and gas facilities to no more than one pad per square mile.

As an interim solution, CPW is amenable to achieving this objective through existing lease stipulations for other species. Specifically, the 2019 Northwest Colorado Greater Sage-grouse Approved Resource Management Plan Amendment contains lease stipulations for greater sage-grouse (GrSG) that would also adequately protect big game habitats, where they happen to overlap. The most relevant lease stipulations are NSO-2 and LN-46e *(1 facility per 640 acres)* to be applied within GrSG priority habitat management areas (PHMA). These no surface

[1] Sawyer H., N.M. Korfanta, R.M. Nielsen, K.L. Monteith, and D. Strickland. 2017, Mule deer and energy development - long term trends of habituation and abundance. Global Change Biology 2017;1-9

[2] Anderson,C.R., Jr., and C.J. Bishop. 2014. Migration patterns of adult female mule deer in response to energy development. Pages 46-50 in R.A. Coon & M.C. Dunfee, editors. Transactions of the 79th North American Wildlife and Natural Resources Conference. Wildlife Management Institute, Gardners, PA, USA

[3] Sawyer H., M.J. Kaufman, A.D. Middleton, T.A. Morrison, R.M. Nielsen, and T.B. Wyckoff. 2013. A framework for understanding semi-permeable barrier effects on migratory ungulates. Journal of Applied Ecology 2013; 50, 68-78

[4] Wilbert, M., Thomson, J., and N. Culver. 2008. Analysis of habitat fragmentation from oil and gas development and its impact on wildlife, The Wilderness Society ecology and economic research department, Washington, D.C. 31 pp.

[5] Hebblewhite, M. 2008. A literature review of the effects of energy development on ungulates: Implications for central and eastern Montana. Report prepared for Montana Fish, Wildlife and Parks, Miles City, MT. 125 pp.

[6] Wyoming Game and Fish Department. 2008. Recommendations for development of oil and gas resources within crucial and important wildlife habitats. Internal Document. Cheyenne, Wyoming. 237 pp.

[7] Lutz, D. W., J. R. Heffelfinger, S. A. Tessmann, R. S. Gamo, and S. Siegel. 2011. Energy development guidelines for mule deer. Mule Deer Working Group, Western Association of Fish and Wildlife Agencies, USA. 27 pp.

occupancy and density restriction stipulations meet or exceed CPW's desired protections for big game habitats. We have conducted a GIS analysis to determine how much of the big game habitat contained in the September lease sale also overlaps with GrSG PHMA. According to this analysis, approximately 42% (11,000 acres) of the 26,329 acres of big game priority habitat will be covered by existing GrSG stipulations prohibiting surface occupancy and/or limiting surface densities to one pad per square mile.

Additional existing lease stipulations may also address some of the remaining acreage by restricting surface occupancy or density of facilities, at a minimum. CPW encourages BLM to further analyze existing lease stipulations that would adequately address impacts to big game and then consider partial deferrals for any remaining acreage that does not contain appropriate protections to meet CPW's conservation objectives for density limitations. CPW staff is available to review the results of this analysis and assist where necessary.

Furthermore, CPW looks forward to continued conversations about development of a long-term big game-specific lease stipulation to address the potential impacts of oil and gas development within high priority winter range habitat and migration corridors. For all other wildlife habitat recommendations, including greater sage-grouse, please refer to CPW's April 16th scoping comments spreadsheet mentioned above.

CPW truly appreciates our working relationship with the Bureau of Land Management's fluid mineral leasing team and looks forward to future coordination on this and future lease sales. If there are any questions regarding these comments, or if we can provide additional information, please contact Northwest Region Energy Liaison, Taylor Elm, at (970) 255-6180 or by email at taylor.elm@state.co.us.

Sincerely,

J.T. Romatzke,
Northwest Regional Manager

Cc:    Jonathan Fairbairn, Branch Chief of Fluid Minerals (BLM)
       Amy Moyer, Assistant Director (DNR)
       Dean Riggs, Deputy Regional Manager (CPW)
       Taylor Elm, Regional Energy Liaison (CPW)
       File



**COLORADO**
Parks and Wildlife
Department of Natural Resources

Attachment 2

Southeast Region
4255 Sinton Rd.
Colorado Springs, CO 80907
P 719.227.5200  |  F 719.227.5297

June 11, 2019

Mr. Keith Berger, Field Manager
BLM Royal Gorge Field Office
3028 E. Main St.
Canon City, CO 81212

**Re: BLM Environmental Assessment for the September 2019 Competitive Oil & Gas Lease Sale, DOI-BLM-CO-F020-2019-0025-EA**

Dear Mr. Berger:

Thank you for the opportunity to comment on the BLM's Environmental Assessment (EA) for the September 2019 quarterly lease sale. As described in our April 16, 2019 scoping comments (Attachment 1), Colorado Parks and Wildlife (CPW) identified overlap of the proposed parcels with habitat for lesser prairie-chickens, Aquatic Habitat Recovery and Conservation Waters, and nesting habitat for Mountain Plovers.

CPW appreciates the opportunity to coordinate with BLM Field Office staff early in the review process and to provide BLM with the best available information regarding protection of wildlife resources during oil and gas development. CPW supports the preferred alternative detailed in the EA, DOI-BLM-CO-F020-2019-0025-EA, with the exception of the leasing of parcels in lesser prairie-chicken focal and corridor area. The preferred alternative of the EA acknowledges issues identified in CPW's scoping comments but not CPW's recommendation for deferral of parcels 8481 and 8482 located in Cheyenne and Kiowa County that overlap with lesser prairie-chicken habitat. CPW is pleased to see that the preferred alternative includes lease stipulations for wildlife species on all of the lease parcels in this sale and includes stipulations specifically addressing CPW's scoping comments. Many tracts are located in COGCC Rule defined Sensitive Wildlife Habitat and/or Restricted Surface Occupancy Area, which requires the lessee to comply with Colorado Oil and Gas Conservation Commission rules to minimize adverse impacts to wildlife resources. Compliance also includes consultation with CPW in those areas prior to development.

CPW does note that in some cases the BLM stipulations attached to these leases differ from CPW's recommended best management practices for oil and gas development as described in our April 2019 scoping comments and in the 2010 CDOW letter to the state BLM office. CPW also acknowledges that the differences in recommendations and stipulations between CPW and BLM are being examined as part of the ongoing BLM Eastern Colorado Resource Management Plan review process.

Dan Prenzlow, Director, Colorado Parks and Wildlife • Parks and Wildlife Commission: Taishya Adams • Robert W. Bray • Charles Garcia • Marie Haskett
Carrie Besnette Hauser • John Howard • Marvin McDaniel, Acting Vice-Chair • Luke B. Schafer • Eden Vardy • James Vigil, Secretary • Michelle Zimmerman, Acting Chair



In this EA BLM recognizes Big Sandy Creek as 'a periodic corridor' for movement of some fish species and identifies the possible relocation of surface disturbance away from the stream area. CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone within parcel 8481.

The EA identifies Mountain Plover habitat in this assessment as occurring in Baca County. CPW previously identified mountain plover nesting habitat in the Cheyenne and Weld county parcels included in this sale. BLM included in the EA the statement that '*mitigation (plover nesting survey, timing limitations, etc.) to prevent take will be identified at the APD planning stage*' and CPW requests that this mitigation be applied to parcels 8481 and 8477.

Regarding the parcels in Kiowa and Cheyenne County, the EA states '*The Southern Great Plains Crucial Habitat Assessment Tool (SGP CHAT) models the estimated occupied range of LPC within the action area. Parcels 8481 and 8482 occur within the modeled occupied range.*' While those parcels are within the modeled occupied range, CPW's previous scoping comments identified overlap with both focal areas and corridor areas indicating potentially more significant impacts than BLM has identified in this EA. The EA does identify some of the potential impacts to lesser prairie-chickens from infrastructure related to oil and gas development. The stipulations applied to these parcels include Exhibit CO-02 (NSO) to protect "grouse dancing grounds" and Exhibit R-03 that applies a timing limitation of no surface use March 1 through July 31. These stipulations are helpful but they do not address all of CPW's concerns as stated in the April 2019 comment letter. The BLM stipulations may also have limited impact at implementation given the private surface ownership of these parcels. CPW continues to recommend deferral of the portions of parcels 8481 and 8482 that overlap with lesser prairie-chicken focal and corridor areas and application of the stipulations presented in the April 2019 letter for the remainder of the parcels that overlap with Expected Occupied Range.

CPW appreciates the consideration of these comments on the BLM's September 2019 quarterly lease sale Environmental Assessment. If you have any questions regarding this letter, please contact CPW's Southeast Region Energy Liaison Karen Voltura at 719-227-5232 or karen.voltura@state.co.us.

Sincerely,

Brad Henley
Acting SE Regional Manager


cc:  Aaron Richter, BLM (arichter@blm.gov)
     Matt Rustand, BLM (mrustand@blm.gov)
     Brett Ackerman, SE Deputy Regional Manager
     Karen Voltura, SE Region Energy Liaison

BLM_0076947



**COLORADO**

Parks and Wildlife

Department of Natural Resources

SE Region Office
4255 Sinton Rd.
Colorado Springs, CO 80907
P 719.227.5200  |  F 719.227.5297

April 16, 2019

Mr. Keith Berger, Field Manager
BLM Royal Gorge Field Office
3028 E. Main St.
Canon City, CO 81212

**Re: CPW Review of September 2019 Oil and Gas Lease Sale Parcels**

Dear Mr. Berger:

Thank you for the opportunity to provide scoping comments on the BLM September 2019 quarterly lease sale. Colorado Parks and Wildlife (CPW) appreciates the opportunity to coordinate with BLM Field Office staff early in the review process and to provide BLM with the best available information regarding protection of wildlife resources during oil and gas development.

CPW is pleased to see that BLM proposes lease stipulations for wildlife species on the lease parcels in this sale. Several tracts are located in COGCC Rule defined Sensitive Wildlife Habitat and/or Restricted Surface Occupancy Area, which requires the lessee to comply with Colorado Oil and Gas Conservation Commission rules to minimize adverse impacts to wildlife resources. Compliance also includes consultation with CPW in those areas prior to development. In addition, CPW offers the following recommendations for the lease parcels associated with the September 2019 quarterly lease sale. The tracts are referenced by their Parcel ID number.

**Aquatic Habitat Recovery and Conservation Waters**
Aquatic habitat recovery and conservation waters are defined as reaches containing species under management for population conservation and recovery. These species may include fish such as the Arkansas darter, brassy minnow, common shiner, flathead chub, plains minnow, northern and southern redbelly dace, Iowa darter, plains orangethroat darter, suckermouth minnow, and plains topminnow as well as amphibian species such as the northern leopard frog and plains leopard frog; all of which are state-listed as species of special concern, threatened, or endangered. CPW discourages drilling both within the river channel and associated sandbars, as impacts to riparian and wetland vegetation could occur as the developer accesses this site, as does the increased potential for water contamination. Portions of parcel 8481 in Cheyenne County overlap Big Sandy Creek. CPW recommends a

Jeffrey M. Ver Steeg, Acting Director, Colorado Parks and Wildlife • Parks and Wildlife Commission: Taishya Adams • Robert W. Bray • Charles Garcia • Marie Haskett
Carrie Besnette Hauser • John Howard, Chair • Marvin McDaniel • Luke Schafer • Eden Vardy • James Vigil, Secretary • Michelle Zimmerman, Vice-Chair



**minimum buffer of 300 ft** extending from the outermost limit of the riparian vegetation zone within the affected parcels:
**Cheyenne County: Parcel # 8481**

**Lesser Prairie-Chicken Focal Area, Corridor Area, and Expected Occupied Range**
On May 12, 2014, the U.S. Fish and Wildlife Service (the Service) listed the lesser prairie-chicken as a threatened species under the Endangered Species Act (the Act), severely restricting development in associated habitat. In September 2015, however, the U.S. District Court for the Western District of Texas vacated the listing decision for the lesser prairie-chicken, citing in part the failure of the service to give appropriate consideration to the voluntary conservation efforts undertaken to improve habitat and to diminish threats to the lesser prairie-chicken. As a result of the court's order, the Service issued a direct final rule to formally remove the lesser prairie-chicken from the List of Endangered and Threatened Wildlife in July 2016. Although the lesser prairie-chicken is currently a non-listed species, on Nov 30, 2016, U.S. Fish and Wildlife Service announced a positive 90-day finding on a new petition to list the lesser prairie-chicken as endangered and initiated a 12-month status review to determine whether protection for the species under the ESA is warranted. One component of that assessment will be the relevant voluntary conservation efforts that partner states have undertaken to conserve and enhance the core habitat for lesser prairie-chicken, organized under the Western Association of Fish and Wildlife Agencies (WAFWA) Lesser Prairie-chicken Range-wide Conservation Plan. The State of Colorado lists lesser prairie-chicken as a threatened species under state law.

The State of Colorado is a partner in the WAFWA Lesser Prairie-Chicken Range-wide Conservation Plan and CPW follows the recommendations in the plan when commenting on development in lesser prairie-chicken habitat. At the core of these recommendations are conservation efforts that emphasize habitat quality and avoid development in high priority habitat. Parcel 8482 in Kiowa County is entirely within lesser prairie-chicken Focal Area, area considered the highest priority habitat for conservation. Parcel 8481 in Cheyenne County includes overlap with Focal Area, Corridor Area, and Expected Occupied Range. Given the current federal assessment of the species and its state status as a threatened species, CPW recommends deferral of all parcels that overlap with lesser prairie-chicken focal areas and corridor areas. For the portion of parcel 8481 in Expected Occupied Range, if the BLM chooses to lease, CPW recommends BLM and/or its lessees engage in voluntary conservation efforts that benefit the lesser prairie-chicken within its expected range. CPW recommends the lessee consult with the US Fish and Wildlife Service, or contact the Western Association of Fish and Wildlife Agencies (WAFWA) to enroll the parcels in the Lesser Prairie- Chicken Range-Wide Plan.

If any parcels in lesser prairie-chicken habitat must be leased, **CPW recommends a stipulation with the following measures**: a) no surface occupancy within 0.6 mile of any active lesser prairie-chicken leks; b) avoid oil and gas operations within 2.2 miles of active leks and within lesser prairie-chicken nesting and early brood-rearing habitat outside the 2.2 mile buffer; c) where oil and gas activities must occur within 2.2 miles of active leks, conduct

these activities outside the period between March 15 and June 15; d) restrict well site visitations to portions of the day between 9:00 a.m. and 4:00 p.m. during the lekking season (March 15 to June 15); e) avoid surface facility density in excess of 10 well pads per 10-square mile area (one well pad per section) in lesser prairie-chicken nesting and early brood-rearing habitat (within 2.2 miles of active leks); f) locate compressor stations at least 2.2 miles away from lesser prairie-chicken active and historic (within last 5 years) lek sites, when compressor stations must be sited within 2.2 miles of lesser prairie-chicken active and historic (within last 10 years) lek sites, locate compressor stations farther than 0.6 mile (3200 feet) from lesser prairie-chicken lek sites; g) muffle or otherwise control exhaust noise from pump jacks and compressors so that operational noise will not exceed 49 dB measured at 30 feet from the source. The following parcels apply (see attached map for details):

<u>Focal Area</u>: **Cheyenne County: Parts of Section 24 in Parcel# 8481**
        **Kiowa County: Parcel # 8482**
<u>Corridor Area</u>: **Cheyenne County: Section 14 and parts of Section 24 in Parcel # 8481**
<u>Expected Occupied Range:</u> **Cheyenne County: Section 2 of Parcel# 8481**

<u>Mountain Plover Potential Nest Sites</u>
Mountain plover is a Colorado State Species of Special Concern.  The below parcels are located within mapped potential nesting habitats for Mountain Plovers. Therefore, if the initial site disturbance is planned to occur between March 15 through July 31, then CPW recommends that a biologist survey these parcels for any active mountain plover nests. If an active nest is observed, then CPW recommends no surface occupancy within a 300-ft buffer of the active nest until the young are no longer dependent on the nest. The following parcels are applicable:

**Cheyenne County: Parcel# 8481**
**Weld County: Parcel# 8477**

CPW appreciates your consideration of these comments on the BLM's September 2019 quarterly lease sale. Thank you for the opportunity to comment on these parcels in the preliminary review process and prior to preparation of an Environmental Assessment and formal offering for lease. If you have any questions regarding this letter, please contact CPW's Southeast Region Energy Liaison Karen Voltura at 719-227-5232 or karen.voltura@state.co.us.

Sincerely,

Dan Prenzlow
SE Regional Manager


cc:
    Brett Ackerman, SE Deputy Regional Manager

Tom Kroening, NE Deputy Regional Manager
Karen Voltura, SE Region Energy Liaison
Brandon Marette, NE Region Energy Liaison
Aaron Richter, BLM (arichter@blm.gov)

# BLM Sept. 2019 Lease Sale - HPH Intersects Parcels 8481 & 8482



BLM_0076952

# ATTACHMENT H

BLM_0076953




# United States Department of the Interior

### FISH AND WILDLIFE SERVICE
Colorado Ecological Services

IN REPLY REFER TO:
FWS/R6/ES CO

Front Range:
Post Office Box 25486
Mail Stop 65412
Denver, Colorado 80225-0486

Western Slope:
445 W. Gunnison Avenue
Suite 240
Grand Junction, Colorado 81501-5711

TAILS 06E24100-2018-F-0248

December 17, 2018

Memorandum

To:       Field Manager, Uncompahgre Field Office, Bureau of Land Management,
          Montrose, Colorado

From:     Western Slope Supervisor, U.S. Fish and Wildlife Service, Ecological Services,
          Grand Junction, Colorado

*Ann Timberman*   12/17/2018

Subject:  Biological Opinion – Revision of the Resource Management Plan for the
          Uncompahgre Field Office

This responds to your July 31, 2018, submission of a biological assessment, to the US Fish and
Wildlife Service (Service) requesting formal Section 7 consultation on the effect of the subject
project on species and habitats listed under the Endangered Species Act of 1973, as amended (16
U.S.C. § 1531 et seq.; [Act]).  The project described in your memorandum and the
accompanying BA occurs on the Uncompahgre Field Office located in Delta, Gunnison, Mesa,
Montrose Ouray, and San Miguel Counties, Colorado.  We received your request on
July 31, 2018.

The Bureau of Land Management (BLM) is proposing a revised Resource Management Plan
(RMP).  The RMP provides direction for managing public lands administered by the BLM's
Uncompahgre Field Office in Colorado.  The biological assessment describes the effects caused
by implementing the RMP.  The revised RMP replaces the previous 1989 Uncompahgre Basin
Resource Management Plan.

The UFO determined there are 10 federally listed species affected by the proposed action.  Table
1 provides a list of species identified by the BLM as potentially affected by the proposed action.
The Uncompahgre Field Office also contains designated critical habitat for six of the identified
species, and proposed critical habitat for one of the species.

BLM_0076954

**Table 1**
**List of Threatened, Endangered, Proposed and Candidate Species Addressed in Uncompahgre Field Office RMP Biological Assessment**

| Common Name | Species Name | Federal Status[1] |
|---|---|---|
| **Listed Species for Consultation** | | |
| Plants | | |
| Colorado hookless cactus | *Sclerocactus glaucus* | T |
| Clay-loving wild buckwheat | *Eriogonum pelinophilum* | E |
| Fish | | |
| Colorado pikeminnow[2] | *Ptychocheilus lucius* | E |
| Greenback cutthroat trout | *Oncorhynchus clarki stomias* | T |
| Razorback sucker[2] | *Xyrauchen texanus* | E |
| Bonytail[2] | *Gila elegans* | E |
| Humpback chub[2] | *Gila cypha* | E |
| Birds | | |
| Mexican spotted owl | *Strix occidentalis lucida* | T |
| Gunnison sage-grouse[2] | *Centrocercus minimus* | T |
| Western yellow-billed cuckoo[3] | *Coccyzus americanus* | T |

[1]Status: E = Endangered; T = Threatened; P = Proposed for listing; C = Candidate for listing
[2]Critical Habitat
[3]Proposed critical habitat

The BLM made the following effects determinations for listed, proposed, or candidate species and critical habitat, where applicable:

**May affect, not likely to adversely affect:**

Greenback cutthroat trout
Mexican spotted owl
Western yellow-billed cuckoo
Colorado pikeminnow*
Razorback sucker*
Bonytail*
Humpback chub*

**May affect, likely to adversely affect:**
Colorado hookless cactus
Clay-loving wild buckwheat*
Gunnison sage-grouse*

*Includes critical habitat.

In email correspondence dated October 25, 2018, determinations for the fish species potential affected by the plan were revised to, may affect, but not likely to adversely affect. Based on our review of the information provided in your BA, we concur with the determination that the

2

proposed action may affect, but is not likely to adversely affect the greenback cutthroat trout, Mexican spotted owl, western yellow-billed cuckoo, Colorado pikeminnow, razorback sucker, bonytail, humpback chub.

We also agree with your determination of may affect, and likely to adversely affect, for the following species and designated critical habitat (as appropriate):  Colorado hookless cactus, clay-loving wild buckwheat, Gunnison sage-grouse.  We address these species and designated critical habitat in the enclosed biological opinion.

Section 7 (a) (4) of the Act requires conferencing with the Service when a proposed action is likely to jeopardize the continued existence of a proposed species or destroy or adversely modify proposed critical habitat.  The biological assessment concluded that the proposed action is not likely to destroy or adversely modify proposed critical habitat for the western yellow-billed cuckoo.  Since conferencing is not required, we will not address proposed critical habitat issues for this species.

Attachment(s)

BLM_0076956

Programmatic Biological Opinion Regarding the Effects from the implementation of the revised Resource Management Plan within the Uncompahgre Field Office of the Bureau of Land Management

Species and Critical Habitat (if designated or proposed) Addressed include

Gunnison sage-grouse *Centrocercus minimus and CH*
Clay-loving wild buckwheat *Eriogonum pelinophilum and CH*
Colorado hookless cactus *Sclerocactus glaucus*

Prepared by the
U.S. Fish and Wildlife Service
Western Colorado Office
Grand Junction, Colorado
December 2018

1

BLM_0076957

## INTRODUCTION

The Proposed Resource Management Plan (RMP) planning area includes approximately 3.1 million acres of lands administered by the Bureau of Land Management (BLM), U.S. Department of Agriculture, Forest Service, National Park Service, State of Colorado lands, and private property.  The decision area is a subset of the planning area, which includes only BLM-administered lands and Federal mineral estate under BLM jurisdiction.  The RMP provides management direction within the decision area (675,800 acres of BLM-administered lands), which includes withdrawn lands, and 971,220 acres of Federal mineral estate under BLM jurisdiction.  Withdrawn lands include the Dominguez – Escalente National Conservation Area and the Gunnison Gorge National Conservation Area (see Figure 1 in biological assessment, page 24).

## CONSULTATION HISTORY

The Service issued two programmatic section 7 biological opinions in western Colorado, analyzing water depletions resulting from the BLM's activities in the Colorado River basin. These consultations include the December 19, 2008, "Programmatic Biological Opinion (PBO) for Water Depletions Associated with the BLM's Fluid Mineral Program within the Upper Colorado River Basin in Colorado" (ES/GJ-6-CO-08-F-0006), and the February 25, 2009, "PBO for Water Depletions Associated with BLM's projects (excluding Fluid Mineral Development within the Upper Colorado River Basin in Colorado" (ES/GJ-6-CO-08-F-0010).  On December 26, 2017, the Service issued a third PBO (TAILS 65413-2008-F-0073-R00l), which superseded PBO number ES/GJ-6-CO-08-F-0006.  Both biological opinions address adverse effects to the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail, and their respective critical habitats, associated with depletions resulting from projects and activities implemented under the revised RMP.  Water depletions resulting from oil and gas exploration and other water development on the UFO fall under the two respective BLM PBOs.  Therefore, BLM has fulfilled their section 7 consultation requirement for water depletion effects to the Colorado River fishes.

In addition, the UFO requested consultation for their Integrated Weed Management Plan, Tails: 06E24100-2013-F-0040 and, livestock grazing on three Field Offices including the UFO, Tails: 06E24100-2012-F-0020.  Service issued two programmatic biological opinions for listed plant species (see tails numbers above), and the Service concurred that the effects of the Integrated weed management plan and livestock grazing would not adversely affect the GUSG, Tails: 06E24100-2013-F-0040 or its designated critical habitat, Tails: 06E24100-2013-F-0040-R001 .

- January 9, 2018—Meeting between the BLM and USFWS to present a general PRMP overview.  The group discussed some specific management, including open off-highway vehicle (OHV) areas and potential conservation measures to reduce effects.
- March 16, 2018—Meeting between the BLM, USFWS, and Environmental Management and Planning Solutions, Inc. (EMPSi; contractor) to review species to be analyzed in the BA.  The group reviewed management actions that could affect listed species and methods for analysis.
- June 14, 2018—Meeting between the BLM, USFWS, and EMPSi to discuss comments

2

on the first draft of the BA and resolve team questions.

During the consultation project, the Service requested clarification of the effects analysis and determinations for the Colorado River fishes, and the greenback linage cutthroat trout.  In an email dated October 25, 2018, BLM revised their determination for all fish species, concluding that implementation of the proposed RMP may affect, but is not likely to adversely affect these species, and in our cover memorandum, concur with the revised determinations.

At the request of the Service, BLM provided a clarification for the biological assessment regarding the federally list plant species potentially affected by PRMP implementation (K. Holsinger, BLM pers comm.).

The Service based this biological opinion on the BA prepared for the proposed action, listing and critical habitat decision documents, information contained in scientific literature, and other sources of information.  For GUSG the BLM used the GUSG Rangewide Conservation Plan (RCP) (GUSG Rangewide Steering Committee (GSRSC) 2005), information contained in scientific literature, and other sources of information.  A complete administrative record of this consultation is on file in the Service's Western Colorado Office, Grand Junction, Colorado.

## BIOLOGICAL OPINION

PROPOSED ACTION

The proposed action consists of implementation of the Proposed Resource Management Plan (RMP) for the Uncompahgre Field Office of the BLM.  The RMP provides strategic guidance for future management of BLM lands managed by the UFO.  The RMP provides a decision-making framework and guides resource management programs, practices, uses, and projects.  The RMP revision does not include specific project and activity decisions.  Those decisions are made later, after more detailed analysis and further public involvement.

Proposed Resource Management Plan

Table 3-1 in the BA (page 3) describes the goals, objectives, and actions by resource and resource use of the RMP that are relevant to the protection of biological resources.  The full RMP and list of best management practices (BMPs) for other resource and resource use programs appear as appendices to the BA (Appendices A and B).  Below is a list of the resources and resource uses described in BA table 3-1 (page 3).  The BA describes the specific goals, objectives, and actions, which we incorporate here by reference.

Special Status Species
Special Status Plants
Special Status Fish and Aquatic Wildlife
Special Status Terrestrial Wildlife
Special Status Terrestrial Wildlife—Western Yellow-Billed Cuckoo
Special Status Terrestrial Wildlife—Gunnison Sage-Grouse
Special Status Terrestrial Wildlife—Mexican Spotted Owl

3

Climate
Land Health
Soils and Geology
Water Resources
Vegetation
Areas of Critical Environmental Concern
Fish and Wildlife
Wildland Fire Ecology and Management
Forestry and Woodland Products
Livestock Grazing
Recreation and Travel Management
Lands and Realty
Fluid Leasable Minerals (Oil and Gas and Geothermal Resources)
Mineral Materials and Non-energy Leasable Minerals

**Action Area**

Action area is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action" (50 CFR § 402.02). The action area for the proposed action consists of the BLM's Uncompahgre Field Office, the 675,800 acres of BLM-administered lands and 971,220 acres of Federal mineral estate within the UFO planning area. Bureau of Land Management manages lands within the Dominguez-Escalante and McInnis Canyons National Conservation Areas by separate RMPs. Therefore, these areas were not included in the UFO RMP revision. The action area includes the area described in the project biological assessment (BA).

## STATUS OF THE SPECIES

We summarized the species descriptions and life histories below. We incorporated the detailed description of the species and life histories herein, where appropriate, by reference.

Colorado Hookless Cactus

The Service listed the Unita Basin hookless cactus as a threatened species in 1979. On September 15, 2009, the Service officially recognized the taxonomic split of this species into three distinct species, one of which is the Colorado hookless cactus (*Sclerocactus glaucus*) (74 FR 47112). In April 2010, the Service released a recovery outline (Service 2010), which provided an overview of the known information for Colorado hookless cactus and serves to guide recovery efforts, and inform consultation and permitting activities until we approve a comprehensive recovery plan for the species. The Recovery Outline also provided an updated and thorough review of the species' status.

Colorado hookless cactus is a small ball or barrel-shaped cactus endemic to Montrose, Delta, Mesa, and Garfield Counties in western Colorado. This species has two population centers, one associated with the Gunnison River and its tributaries near Delta, Colorado, and the other with the Colorado River and its tributaries near DeBeque, Colorado. During the development of the

4

BLM_0076960

Recovery Outline, data indicate 98 occurrences totaling with approximately 19,000 individuals (Service 2010). These occurrences cover approximately 1,700 square miles, with an estimated 618,000 acres of potential habitat (Service 2010). Current data indicate 93 element occurrences with approximately 23,000 individuals, however, about one third of the occurrences have very few individuals, and many others are considered historical (NatureServe © 2018).

Colorado hookless cactus grows primarily in the salt desert shrub community on alluvial terraces associated with the Gunnison and Colorado Rivers. Soils commonly consist of Mancos shale often with a thin over layer of alluvium, and range from fine silty clay to coarse gravel with volcanic cobbles and boulders scattered on the surface. Mancos shale communities that favor the cactus have little resilience to disturbance due to soil chemistry and structure and limited available moisture (BLM 2002). The Service did not designate critical habitat for this species.

*Abundance and Viability*

For each occurrence in their database, CNHP assesses the estimated viability of a species or ecological integrity of its community using ranks from A to D for excellent to poor. Of the 98 CNHP occurrences of Colorado hookless cactus, approximately 22 percent are ranked excellent to good (A, B, or BC), 10 percent fair (C), and 6 percent fair to poor (CD or D). The remainder are either considered historic because they have not been confirmed in over 20 years (42 percent, H rank), extirpated (1 percent, E rank), or they could not be ranked for a variety of reasons. The 21 occurrences ranked A or B represent at least 1,000 individuals (Service 2010).

In addition to the known 98 occurrences recorded by CNHP, recent surveys for another project documented more than 6,000 individual plants. These additional 6,000 plants bring the estimated range-wide abundance to approximately 19,000 (FWS 2010). The Colorado Natural Heritage Program would likely rank these 6,000 individuals A-B, with the result that at least 37 percent of the estimated known individuals are in occurrences currently considered viable or ecologically intact.

Clay-loving Wild Buckwheat

The Service listed the clay-loving wild buckwheat as endangered in 1984, with a concurrent critical habitat designation (49 FR 28562). Thought to be confined to one occurrence at the time of listing, the species is currently known from 14 element occurrences totaling approximately 278,600 individuals. There are seven historic element occurrences that have not been revisited to verify continued species presence; based on past estimates, these unverified occurrences may contain 3,500 individuals (74 FR 49835). In 2013, BIO-Logic mapped an estimated 6,350 individuals of clay-loving wild buckwheat on private land within the action area (BIO-Logic 2013). Occupied habitat totaling over 582 acres is distributed across a range of approximately 11.5 miles wide (east to west) and 28.5 miles long (north to south) (74 FR 49835).

Clay-loving wild buckwheat is a low, slow-growing, and long-lived subshrub known only from Delta and Montrose Counties, Colorado. Plants bloom from late May to early September, with fruits maturing from late June through October. Mature clay-loving wild buckwheat plants grow four to eight inches in height, forming a densely branching, and low, rounded subshrub with a

BLM_0076961

woody base.  The deciduous leaves are very short and narrow, typically less than one centimeter long and several millimeters wide, and appear needle-like.  Flowers are hermaphroditic, with a mixed mating system requiring an insect vector for pollen transfer (Bowlin et al. 1992).  Large pollinators such as common bees, wasps, flies, and ants have been observed visiting flowers (Tepedino 2009).

Clay-loving wild buckwheat is endemic to clay soils derived from Mancos shales, locally known as adobe soils; these soils are alkaline due to high concentrations of calcium carbonate, are high in selenium, and highly erosive.  The soils display a dramatic shrink-swell capacity, resulting in a lumpy, uncompacted surface that freeze-thaw expansion.  The soils may be particularly sensitive to compaction when wet.  Within Mancos shale soils, this species occurs in mat saltbrush (*Atriplex corrugate*) or black sagebrush (*Artemisia nova*) dwarf shrublands.  Matt saltbrush and black sagebrush are the dominant species associates; other associates include charming woodyaster (*Xylorhiza venusta*), shadscale saltbrush (*Atriplex confertifolia*), Gardner's saltbrush (*Atriplex gardneri*), and bud sagebrush (*Picrothamnus desertorum*).  Within these communities, buckwheat is typically found in the basin portions of the adobe badland system of draws and ridges, at elevations ranging from 5,180 to 6,350 feet (1,579 to 1,935 meters) (Service 2009).  At a finer scale, plants are often concentrated on the north or east face of small hummocks where snow drifts remain later into the spring.

Critical habitat for clay-loving wild buckwheat consists of approximately 121 acres on two private working ranches near Austin in Delta County, Colorado.  Two conservation easements held by the Colorado West Land Trust (formerly Black Canyon Regional Land Trust) protect the entirety of designated critical habitat.  One purpose of the conservation easements is to conserve clay-loving wild buckwheat populations on the properties (Barger 2018, cited in BA).  At the time of listing, critical habitat encompassed the entire known populations of the species.  We define the primary constituent elements of critical habitat as, those factors associated with the whitish clay soils within the sparsely vegetated badlands of Mancos shale (49 FR 28562).

Gunnison Sage-grouse

*Species Description*

Sage-grouse are the largest grouse in North America.  Sage-grouse (both greater and Gunnison) are most easily identified by their large size, dark brown color, distinctive black bellies, long pointed tails, and association with sagebrush habitats.  They are dimorphic in size, with females being smaller.  Both sexes have yellow-green eye combs, which are less prominent in females.  Sage-grouse are known for their elaborate mating ritual where males congregate on strutting grounds called leks and ''dance'' to attract a mate.  During the breeding season, males have conspicuous filoplumes (specialized erectile feathers on the neck), and exhibit yellow-green apteria (fleshy bare patches of skin) on their breasts (Schroeder et al. 1999 in 79 FR 69192).  Gunnison sage-grouse are smaller in size, have more white barring in their tail feathers, and have more filoplumes than greater sage-grouse.

*Life History*

6

Gunnison and greater sage-grouse depend on a variety of shrub-steppe habitats throughout their life cycle and are considered obligate users of several species of sagebrush (Patterson 1952, p.42; Braun et al. 1976; Schroeder et al. 1999; Connelly et al. 2000; Connelly et al. 2004, Miller et al. in press). Dietary requirements of the two species are also similar, being composed of nearly 100 percent sagebrush in the winter, and forbs and insects as well as sagebrush in the remainder of the year (Wallestad et al. 1975, p. 21; Schroeder et al. 1999, p. 5; Young et al. 2000, p. 452). Gunnison and greater sage-grouse do not possess muscular gizzards and, therefore, lack the ability to grind and digest seeds (Leach and Hensley 1954, p. 389). In addition to serving as a primary year-round food source, sagebrush also provides cover for nests and chicks (Connelly et al. 2000). Thus, sage-grouse distribution is strongly correlated with the distribution of sagebrush habitats (Schroeder et al. 2004, p. 364). Connelly et al. (2000) segregated habitat requirements into four seasons: (1) breeding (2) summer - late brood rearing (3) fall and (4) winter. Depending on habitat availability and proximity, some seasonal habitats may be indistinguishable. The Gunnison Sage-grouse Rangewide Steering Committee (GSRSC) (2005, p. 27-31) segregated habitat requirements into three seasons: (1) breeding (2) summer–late fall and (3) winter. For purposes of this finding, the seasons referenced in GSRSC (2005) are used because that publication deals specifically with GUSG. Sage-grouse exhibit strong site fidelity (loyalty to a particular area) to seasonal habitats, which includes breeding, nesting, brood rearing, and wintering areas, even when the area is no longer of value (Connelly et al. 2004, p. 3-1). Adult sage-grouse rarely switch among these habitats once they have been selected, limiting their adaptability to changes. Sage-grouse distribution is associated with sagebrush (Schroeder et al. 2004 p. 364), although sagebrush is more widely distributed than sage-grouse because sagebrush does not always provide suitable habitat due to fragmentation and degradation (Schroeder et al. 2004, pp. 369, 372).

*Status and Distribution*

The Service listed the GUSG as a threatened species on November 20, 2014 (79 FR 69192). Concurrently, the Service designated 1,429,551 million acres of critical habitat for the species in nine southwestern Colorado counties and two southeastern Utah counties (79 FR 69312). Following is a brief description of the current distribution of the species' range-wide population and trends. A detailed discussion of GUSG taxonomy, the species description, historical distribution, habitat, and life history characteristics can be found in the Service's 12-month finding for the GUSG (75 FR 59804).

Gunnison sage-grouse currently occur in seven widely scattered and isolated populations in Colorado and Utah, occupying 3,795 square kilometers (km2) (1,511 square miles [mi2]) (GSRSC 2005; CDOW 2009a). The seven populations are Gunnison Basin, San Miguel Basin, Monticello–Dove Creek, Piñon Mesa, Crawford, Cerro Summit–Cimarron–Sims Mesa, and Poncha Pass (FR 69192). Trends in the high-male count indicate declines in all populations over the last three years with some increasing since 2011. The largest population, the Gunnison Basin population, while showing variation over the years, has been relatively stable through the 1996-2018 period (CPW 2018). Six of the populations are very small and fragmented (all with less than 40,500 hectares (ha) (100,000 acres [ac]) of habitat likely used by grouse and, less than 50 males counted on leks (communal breeding areas)) (CDOW 2009b; CPW 2018). The San Miguel population is the second largest and comprises six fragmented subpopulations.

7

BLM_0076963

## ENVIRONMENTAL BASELINE

Regulations implementing the ESA (50 CFR 402.02) define the environmental baseline as the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed State or Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State of private actions which are contemporaneous with the consultation process. The implementing regulations for section 7(a)(2) define the "action area" as all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action (50 *CFR* 402.02).

Colorado Hookless Cactus

*Status of the Species in the Action Area*

Within the action area, the BLM documented 314 distinct Colorado hookless cactus occurrences (i.e. populations) occupying greater than 0.25-acre, and 950 occurrences occupying less than 0.25-acre, (BA, page 30). This does not include the Dominguez-Escalante or Gunnison Gorge National Conservation Areas (NCAs), both of which contain significant occurrences adjacent to the action area. Currently identified Colorado hookless cactus occurrences occupy more than 3,000 acres within the action area (BA, page 30).

Numerous point-in-time population estimates conducted between 2012 and 2017 suggest that historic Element Occurrence Records drastically underestimate the size of the occurrences. Since the publication of the 2010 USFWS Recovery Outline, BLM documents 94 new distinct occurrences within the action area, totaling well over 2,000 individuals. Continued survey is likely to add additional occurrences within the action area.

On November 15, 2012, the Service issued biological opinion number ES/GJ-6-CO-12-F-006. The opinion evaluated the effects of livestock grazing on the Colorado hookless cactus, DeBeque phacelia, and the clay-loving wild buckwheat on three BLM Field Offices including the UFO. The 2012 BO found that grazing activities would cause adverse effects to the Colorado hookless cactus, but that these activities would not jeopardize the continued survival of the cactus. The BLM does not anticipate additional effects to the Colorado Hookless cactus caused by the PRMP implementation. Therefore, this BiOp will not address the effects of livestock grazing on these two species.

*Past and Present Impacts*

The primary threats to Colorado hookless cactus are (Service 2010):
- Natural gas exploration and production
- Pipelines, utilities, and other rights-of-way (ROWs)
- Off-highway vehicle activity
- Livestock grazing and trampling
- Herbicides and pesticides
- Hybridization

8

- Illegal human collection
- Potential water developments
- Climate change

Clay-loving wild buckwheat

Clay-loving wild buckwheat has an extremely limited range of approximately 890 acres within the action area, and is at a high risk of habitat loss. Fragmentation of clay-loving wild buckwheat habitat and populations into potentially nonviable sizes is the greatest threat to the species (USFWS 1988). Habitat loss and degradation have resulted from habitat conversion to irrigated agricultural land and residential development, as well as subsequent road building and off-road vehicle use. Other threats include ROWs for utilities and land access, pipelines, and new irrigation canals, which often skirt the bases of clay-loving wild buckwheat habitats (CNHP 2014). As stated in the BA, BLM consulted on two previous actions within the action area for their Integrated Weed Management Plan, and livestock grazing, where the effects of these actions adversely affect the species.

Gunnison Sage-grouse

*Status of the Species within the Action Area*

The action area for the proposed RMP encompasses lands within the UFO including GUSG habitat designated as "occupied," and "unoccupied" critical habitat as described in the final rule (79 FR 69312). Within the UFO, GUSG occur in the Crawford, San Miguel Basin, and Cerro Summit-Cimarron-Sims Mesa population areas. Table 1 displays GUSG designated habitat acreage figures within the respective populations.

Table 1. GUSG Habitat on the Uncompahgre Field Office

| Population | Occupied Critical Habitat | | | Unoccupied Critical Habitat | | |
|---|---|---|---|---|---|---|
| | BLM Surface | Split Estate | Total | BLM Surface | Split Estate | Total |
| CSCSM | 4,526 | 8,332 | 12,858 | 3,888 | 4,375 | 8,262 |
| Crawford | 0 | 0 | 0 | 2,727 | 4,159 | 6,887 |
| Gunnison | 0 | 0 | 0 | 326 | 21 | 347 |
| San Miguel | 821 | 6,790 | 7,610 | 0 | 1,228 | 1,228 |
| **Total** | **5,347** | **15,122** | **20,469** | **6,941** | **9,784** | **16,725** |

The Crawford population is located in Montrose and Delta Counties, about eight miles southwest of the town of Crawford and north of the Gunnison River. The primary area this population uses is west of Poison Spring Gulch to Green Mountain, and between the Gunnison River on the south and Red Canyon on the north. Most of this population falls within the Gunnison Gorge NCA RMP. There are currently five known active leks; BLM-administered land within this area. Colorado Parks and Wildlife (CPW) has monitored these leks for the past 27 years. Recently, the population trend appears to be declining (CPW 2018), CPW augmented this population with 74 birds from Gunnison Basin (2011-2013).

The San Miguel Basin population is patchy and consists of six subpopulations located in Montrose and San Miguel Counties, Colorado.

9

BLM_0076965

The Cerro Summit-Cimarron and Sims Mesa population consists of two subpopulations. The Sims Mesa area is located approximately seven miles south of Montrose, Colorado. Habitat consists of small patches of sagebrush heavily fragmented by pinyon-juniper woodland, residential and recreational development, and agricultural lands. Land use in the Sims Mesa area is primarily ranching. There is one known lek site in the Sims Mesa subpopulation on BLM-administered land; however, the lek is currently vacant (Phillips pers. comm., cited in BA)

The BLM evaluated habitat in the Cerro Summit-Cimarron in 2015 and Sims Mesa populations in 2016 per the Habitat Assessment Framework (Stiver et al. 2015). The results of the assessments are displayed in Tables 2 and 3 respectively.

Table 2

| Cerro Summit-Cimarron Habitat Assessment Habitat Suitability | | | |
|---|---|---|---|
| Suitability Description | Nesting/Brood Rearing | Winter | Summer |
| Unsuitable | 32 percent | 81 percent | 32 percent |
| Marginal | 52 percent | 15 percent | 20 percent |
| Suitable | 15 percent | 14 percent | 48 percent |

Table 3

| Sims Mesa | | | |
|---|---|---|---|
| Suitability Description | Nesting/Brood Rearing | Winter | Summer |
| Unsuitable | 31 percent | 38 percent | 55 percent |
| Marginal | 60 percent | 40 percent | 43 percent |
| Suitable | 9 percent | 22 percent | 1 percent |

As displayed in the tables, most nesting/brood rearing and winter habitats are marginal or unsuitable for both subpopulations. The Cerro Summit-Cimarron subpopulation has more suitable summer habitat, whereas most summer habitat is unsuitable or marginal for the Sims Mesa subpopulation.

## EFFECTS OF THE ACTION

Effects of the action refer to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated and interdependent with that action that are added to the environmental baseline. Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration. Indirect effects are those that are caused by the proposed action and are later in time, but are still reasonably certain to occur.

The BLM's BA included the following assumptions:

- Effects on listed species can occur from actions that result in direct mortality, loss of habitat or modifications to habitat suitability, and actions that displace individuals or disrupt behavior. Because threatened and endangered species have specific habitat requirements, and their habitats are often diminishing, disturbance of the species or their

10

BLM_0076966

habitat could result in population declines, which could adversely affect viability of local populations.

- The health of threatened and endangered species populations is directly related to the overall health and functional capabilities of upland, aquatic, riparian, and wetland resources, which in turn are a reflection of overall watershed health.

- Ground-disturbing activities could lead to positive or negative modification of habitat and loss or gain of individuals, depending on the nature of the activity, the intensity of the surface disturbance, the amount of area disturbed, the location of the disturbance, and the species affected.

- Species' health, population levels, and habitat conditions fluctuate in response to natural factors. Periods of drought or excessive moisture and outbreaks of diseases that affect species directly or affect habitat (e.g., Ips beetle) would likely affect threatened and endangered species population levels.

- BLM will assess Implementation-level actions on an appropriate spatial and temporal scale. Additional field inventories would likely be needed to determine whether any such species could be present in the action area.

- Manage land uses to maintain or move toward meeting the BLM Colorado Public Land Health Standards (BLM 1997) on a landscape basis. Site-specific analysis would assess whether management actions would contribute to the maintenance or achievement of land health standards or risk causing a decline in land health conditions.

- All permitted activities that may affect federally threatened or endangered species would undergo ESA Section 7 consultation with the Service. Mitigate the effects of activities to ensure that threatened or endangered species would not be jeopardized on a project-specific basis or at a cumulative level.

- The BLM would implement the standard operating procedures and mitigation measures from the UFO Weed Management Strategy. These would mitigate the potential effects from herbicide treatments.

- Success of mitigation depends on the proper implementation of specific protective measures employed. Adaptive management, such as changing techniques, would be used until success is achieved.

- Many of the resources and uses have NSO or CSU stipulations that extend beyond or overlap the NSO or CSU stipulations listed for protection of special status species. Although NSO or CSU stipulations for other resources and uses may offer additional benefits (e.g., reduced erosion, sedimentation, and weed invasion) and indirectly support special status species management, in most cases, these benefits would be negligible or redundant to the protections provided by stipulations for special status species. For these reasons, effects on special status species from NSO or CSU stipulations associated with other resources will only be addressed if they are anticipated to provide substantial additional protection.

- Stipulations, including NSOs, CSUs, TLs, and SSRs, could be excepted, modified, or waived by the BLM Authorized Officer as described and defined in Appendix B of the FEIS. Waivers, exceptions, and modifications are rare in the UFO, and there is no known waiver, exception, or modification that was granted where listed species were present. While BLM assumed they would not grant waivers, exceptions, or modifications unless there were changed conditions or new information leading to the conclusion that there would be no effect on listed species. However, the Service cannot rely of this assumption

11

for our effects analysis.

The BA stated that although data on known locations and habitats in the action area are available, the data are neither complete nor comprehensive. The BA considered known and potential species and habitat locations in the analysis. However, the BA also considered the potential for species to occur outside designated critical habitat areas. The BLM quantified effects when possible. In the absence of quantitative data, we applied best professional judgment based on scientific reasoning to determine the severity of effects. Additionally, the analysis of effects are programmatic in scope, which does not address site-specific proposals or projects. Consequently, we describe the general effects to the species of implementing RMP activities.

**Effects of the Action within the Action Area**

Colorado Hookless Cactus and Clay-loving Wild Buckwheat

The proposed action (revised RMP) will not cause additional effects from grazing or weed management beyond the effects documented in previous consultations (see consultation history) Therefore, we will not discuss these effects further. However, adverse effects to these plant species may result from implementation of vegetation management, comprehensive travel and transportation management under the proposed action. Specifically, the designation of routes within the UFO is likely to result in negative effects to these species. In addition, adverse effects to the plants are likely to occur from the presence of wild horses and the issuance of permits to drill on existing leased lands.

Below, we describe the general effects to federally listed plants anticipated by implementation of the PRMP.

Direct mortality can result from crushing, trampling, or physically removing plants. Contact with herbicides or other chemicals may cause direct mortality. Where occurrences of a plant are small, loss of a portion of the plants can compromise its viability. Loss of occurrences can compromise species viability due to reduced genetic diversity and a reduced ability to withstand natural or anthropogenic disturbances.

Trampling or coming in contact with chemicals may result in loss of vigor or reduced reproductive success, but may not always result in mortality. However, reduced vigor, may affect the plant's ability to reproduce and sustain the population. Herbivory can reduce reproductive success, or in some cases result in death. Fugitive dust deposited on federally listed plants may reduce their photosynthetic ability, or the ability of pollinators to transfer pollen between plants.

We define direct habitat loss as the physical destruction or conversion to a condition that no longer supports the species. Direct habitat loss can be short-term or permanent. Surface-disturbing activities, such as construction and use of roads, trails, parking lots, buildings, power poles, wind turbines, and ponds, may result in permanent loss of occupied or potentially occupied habitat. This would reduce the total habitat capable of supporting listed plant populations and fragment remaining populations.

12

BLM_0076968

Short-term, temporary habitat loss can occur with habitat improvement projects, such as those addressing encroaching junipers in sagebrush or salt-desert shrub habitats.  Closure or reclamation of disturbed areas may eventually restore lost habitat.  However, disturbance can require years or decades for recovery to pre-disturbance condition.  If reclamation does not result in habitat suitable for sustaining federally listed plants, habitat may be permanently lost.

Changes in habitat structure - A canopy cover of shrubs offers habitat characteristics that appear to be favorable for several plant species, such as the Colorado hookless cactus, to germinate and establish.  Shrubs may protect some plants from herbivory or trampling and may provide improved moisture availability or reduced moisture loss under the canopy.  Surface-disturbing activities that significantly reduce the percent canopy cover of shrubs may allow increased herbivory or moisture loss, resulting in decreased vigor or mortality of special status plants.

Competition - Changes in species composition also affect listed plant populations.  Proliferation of noxious weeds or other invasive plants may render habitat unsuitable by outcompeting listed plants for water and nutrients or by preventing seedling germination and establishment.  Cheatgrass dominated areas appear to inhibit seedling cactus germination, thereby threatening the long-term viability of occupied Colorado hookless cactus habitat.  In some cases, increases in canopy cover and density of native species, particularly grasses, can compete with listed plants for limited water and nutrients.

Other species, such as clay-loving wild buckwheat, thrive in environments where vegetation is sparse and competition is low.  Increases in vegetation cover (following disturbances, such as fire or seeding) may cause competition with listed plants, resulting in decreased vigor or mortality.

Loss of pollinators or pollinator habitat - Actions that disturb pollinators or that destroy their habitat can have a detrimental effect on plant species.  Long-term loss of pollinators can reduce the reproductive ability of these plant species and affect maintenance and genetic diversity of populations.

Habitat fragmentation occurs when contiguous habitat is broken into smaller blocks by surface-disturbing activities and distances between suitable habitat patches increase.  Because pollinators fly only limited distances, they are less likely to use small and isolated patches of habitat.  Habitat fragmentation can effectively isolate pollinators from federally listed plants.  Smaller populations receive fewer pollinator visits, so seed production is lower in small populations.

Small population size decreases reproductive success, increases inbreeding, and loss of genetic variation.  As a result, fragmentation may lower population viability and increase local population extinction risk (Kolb 2008).  Herbivory does not decrease with population size.  Instead, it enforces fragmentation by further reducing the number of flowering individuals (Kolb 2008).  Closure and rehabilitation of roads in listed plant habitat may benefit the long-term survival of populations by decreasing habitat fragmentation.

Soil compaction resulting from heavy equipment or vehicle travel may reduce soil pore size,

13

BLM_0076969

inhibit water infiltration, and restrict root penetration, thereby inhibiting maintenance and establishment of special status plants.

Special status plants may be washed away or their roots may be exposed by erosion from surface-disturbing activities, such as blading or bulldozing for roads. Sedimentation may bury listed plants resulting from disturbances upslope of plant populations.

Changes in species composition, either in special status plant habitat or in adjacent plant communities, may alter the natural fire regime to which the plants are adapted. Cheatgrass, a highly flammable annual grass, may drastically increase the fire frequency in special status plant habitat, affecting the survivability and viability of the population.

Habitat restoration can restore hydrologic function, remove invasive species, restore historic fire regimes, alter grazing management, or other methods. However, design of habitat restoration projects for listed plants must focus on the individual plant species and its specific habitat and site conditions. Generalized habitat restoration projects that do not focus on listed plant needs can have negative effects on these species.

At this broad programmatic scale, it is not possible to quantify the loss of plants impacted by implementation of the proposed action. The conservation measures for listed species within the revised RMP should significantly reduce impacts to federally listed plants and critical habitat (as appropriate). We anticipate a low level of mortality of plants relative to the populations of Colorado hookless cactus and the clay-loving wild buckwheat within the UFO. The proposed RMP provides stipulation NSO-22, and manages habitat for federally listed plant species as ROW avoidance that will reduce loss of individual plants. Since designated critical habitat for clay-loving wild buckwheat only occurs on private lands, BLM concluded that implementation of the RMP will not affect critical habitat (BA p. 97).

14

Gunnison sage-grouse

Table 4 displays the overlap between some of the activities under the RMPR.

Table 4.

| Resource Management/Allocation | Unoccupied Habitat | Occupied Habitat |
|---|---|---|
| Closed to fluid mineral leasing | 0 | 0 |
| Open to fluid mineral leasing, subject to standard lease terms and conditions | 0 | 0 |
| Open to fluid mineral leasing, subject to NSO stipulation | 2,800 | 20,470 |
| Open to fluid mineral leasing, subject to CSU stipulation | 13,930 | 0 |
| Open to ROW development | 0 | 0 |
| ROW avoidance areas | 6,941 | 5,347 |
| ROW exclusion areas | 1,330 | 0 |
| Habitat management areas | 2,330 | 2,680 |
| Open to livestock grazing | 5,920 | 4,590 |
| Closed to livestock grazing | 1,020 | 760 |
| Acres within SRMAs | 350 | 210 |
| Acres within ERMAs | 1,280 | 0 |

This biological assessment assumes three types of disturbance cause changes to listed fish and wildlife habitats: disruption from casual use, disruption from permitted activities, and disturbance to habitat condition.

Casual uses, such as recreation and motorized vehicle use, are not subject to site-specific environmental review and monitoring requirements.  Some species may adapt to disturbances over time and could recolonize disturbed habitats.  Effects are more likely to occur in easily accessible areas, where visitation would be high, and in areas open to intensive motorized use. Effects still occur in areas limited to designated routes due to noise disturbance, human presence, potential for weed spread and habitat degradation, and potential for injury or mortality to wildlife from vehicle collisions.  In general, the more acres of routes that are designated in the action area, the greater the likelihood of habitat fragmentation and disturbance to species and habitats.

The BA concluded, implementation of the RMP where the following resources or issues occur will not affect the GUSG or its critical habitat: air quality, areas of critical environmental concern, cultural resources, lands with wilderness characteristics, land tenure, paleontological resources, visual resources, National Trails and Byways, Native American Tribal interests, public health and safety, watchable wildlife viewing sites, wild horses, wild and scenic rivers,

15

BLM_0076971

and wilderness and wilderness study areas. Management of these resources and resource uses do not occur in designated critical habitat, or will not adversely modify designated critical habitat, or disturb Gunnison sage-grouse. Therefore, we will not be further addressed these issues within this biological opinion.

Timing limitation TL-16 prohibits surface use and surface disturbing and disruptive activities within all designated critical habitat from December 1 to March 15. Timing limitation TL-18 prohibits surface use and surface disturbing and disruptive activities within designated occupied critical habitat from March 1 to July 15. These timing limitations also apply to areas outside of designated critical habitat but occupied by GUSG. Stipulation NSO-31 prohibits surface occupancy and use within designated occupied critical habitat, and application of site-specific relocation requirements within occupied but undesignated habitat. The BLM may apply Stipulation CSU-29/SSR-34 to relocate activities within unoccupied designated critical habitat, which could limit surface disturbing activities. The majority of GUSG habitat falls under the ROW avoidance scenario, which allows for surface disturbing activities, and approximately 1,330 acres under ROW exclusion, which prohibits surface disturbing activities.

Sagebrush habitats within the range of GUSG are becoming increasingly fragmented by various changes in land uses and the expansion in the density and distribution of invasive plant species (Oyler-McCance et al. 2001; Schroeder et al. 2004). Based on spatial modeling, a variety of human developments including roads, energy development, residential development, and other factors known to cause habitat decline were correlated with historical loss of range and extirpation of Gunnison and greater sage-grouse (Wisdom et al. 2011). The model indicated that no secure areas (areas where the risk of extirpation appears low) of occupied range are evident for GUSG (Wisdom et al. 2011). Landscapes containing large and contiguous sagebrush patches and sagebrush patches in close proximity had an increased likelihood of sage-grouse persistence (Wisdom et al. 2011).

The decline or loss of lek and brood-rearing habitats can have serious consequences for sage-grouse population viability by reducing reproductive success and recruitment (survival of young to breeding age). Limitations in the quality and quantity of nesting and early brood-rearing habitats, in particular, are especially important because GUSG population dynamics are most sensitive during these life-history stages (GSRSC 2005). Juvenile recruitment is one of the most important demographic factors influencing or limiting sage-grouse population growth rates and viability (Connelly et al. 2004, GSRSC 2005).

Roads

Road impacts to GUSG may include direct habitat loss, direct mortality, barriers to migration corridors or seasonal habitats, facilitation of predation and spread of invasive vegetative species, and other indirect influences such as noise (Forman and Alexander 1998).

Roads fragment GUSG habitat, when birds avoid roads presumably to limit exposure to human activity and predation (Oyler-McCance et al. 2001). The probability of GUSG habitat occupancy (presence based on pellet surveys or sage-grouse observation) was positively correlated with distance to roads and habitat patch size (Oyler-McCance et al. 1999).

16

BLM_0076972

Gunnison sage-grouse may avoid road areas because of noise, visual disturbance, pollutants, and predators moving along roads. These stressors further reduce the amount of functional habitat availability. An unpublished study by Western State Colorado University and CPW in the Gunnison Basin found that anthropogenic noise was significantly higher at leks closer to roads and human activity centers than leks farther from those sources (Piquette et al. 2013). Leks with higher noise levels were associated with lower GUSG male counts and attendance (Piquette et al. 2013). Landscape-scale spatial modeling predicted GUSG nest site selection showed strong avoidance of areas with high road densities of paved highways through primitive roads with 2-wheel drive sedan clearance (i.e. class 1 through 4) within 6.4 km (4 mi) of nest sites (Aldridge et al. 2012). Nest sites also decreased with increased proximity to primary and secondary paved highways (roads classes 1 and 2) (Aldridge et al. 2012). Male greater sage-grouse lek attendance declined within 3 km (1.9 mi) of a deep seam natural gas well haul road where traffic volume exceeded one vehicle per day (Holloran 2005). Younger males will not be drawn to the lek and eventually leks will become inactive if noise from roads interferes with mating displays, and thereby female attendance (Amstrup and Phillips 1977; Braun 1986). However, other information (CPW 2013) suggests GUSG in the Gunnison Basin may be somewhat tolerant of roads, even more heavily used highways and county routes, and the potential direct or indirect effects of those roads.

The presence of roads increases human access and resulting disturbance effects in remote areas (Forman and Alexander 1998; Forman 2000; Connelly et al. 2004). In addition, roads can provide corridors for predators to move into previously unoccupied areas. Some mammalian species known to prey on sage-grouse, such as red fox (*Vulpes vulpes*), raccoons (*Procyon lotor*), and striped skunks (*Mephitis mephitis*), have greatly increased their distribution by dispersing along roads (Forman and Alexander 1998; Forman 2000; Frey and Conover 2006). Corvids (Family Corvidae: crows, ravens, magpies, etc.) also use linear features such as primary and secondary roads as travel routes (Bui 2009), expanding their movements into previously unused regions (Knight and Kawashima 1993; Connelly et al. 2004). Corvids are significant sage-grouse nest predators and were responsible for more than 50 percent of nest predations in Nevada (Coates 2007).

The expansion of road networks also contributes to exotic plant invasions via introduced road fill, vehicle transport, and road maintenance activities (Forman and Alexander 1998; Forman 2000; Gelbard and Belnap 2003; Knick et al. 2003; Connelly et al. 2004). Invasive species are not limited to roadsides, but encroach into surrounding habitats (Forman and Alexander 1998; Forman 2000; Gelbard and Belnap 2003). Upgrading unpaved four-wheel-drive roads to paved roads resulted in increased cover of exotic plant species within the interior of adjacent plant communities (Gelbard and Belnap 2003). This effect was associated with road construction and maintenance activities, and vehicle traffic. The incursion of exotic plants into native sagebrush systems can negatively affect GUSG through habitat losses and conversions.

Powerlines

Depending on the infrastructure design, size, location, and site-specific factors, powerlines can directly affect greater sage-grouse by posing a collision and electrocution hazard (Braun 1998; Connelly et al. 2000) and can have indirect effects by decreasing lek recruitment (Braun et al.

17

2002, Walker et al. 2007), increasing predation (Connelly et al. 2004), fragmenting habitat (Braun 1998), and facilitating the invasion of exotic annual plants (Knick et al. 2003; Connelly et al. 2004).

In areas where vegetation is low and the terrain relatively flat, power poles provide an attractive hunting, roosting, and nesting perch for many species of raptors and corvids, known predators of GUSG (Steenhof et al. 1993; Connelly et al. 2000; Manville 2002; Vander Haegen et al. 2002). Power poles increase a raptor's range of vision, allow for greater speed during attacks on prey, and serve as territorial markers (Steenhof et al. 1993; Manville 2002), thereby increasing the likelihood of predation where sage-grouse occur. Golden eagle (*Aquila chrysaetos*) predation on sage-grouse at leks increased from 26 to 73 percent of the total predation after completion of a transmission line within 200 meters (m) (220 yards (yd)) of an active sage-grouse lek in northeastern Utah (Ellis 1985). The lek was eventually abandoned, and Ellis (1985) concluded that the presence of the powerline resulted in changes in sage-grouse dispersal patterns and caused fragmentation of the habitat.

Powerlines may negatively affect sage-grouse habitats even if raptors are not present. Use of otherwise suitable habitat decreased within 600 m (660 yd) of powerlines (Braun 1998), indicating sage-grouse avoidance of powerlines. Based on those unpublished data, Braun (1998) reported that the presence of powerlines may limit Gunnison and greater sage-grouse use within 1 km (0.6 mi) in otherwise suitable habitat. Based on spatial modeling, the presence of powerlines appears correlated to extirpation of sage-grouse (Wisdom et al. 2011).

Livestock Grazing

Livestock grazing can adversely affect nesting and brood-rearing habitat by decreasing vegetation available for concealment from predators. Decreases in vegetation may result in nest failure, or reduced or lost productivity. Grazing activity may compacts soils, decrease herbaceous abundance, increase erosion, and increase the probability of invasion of exotic plant species (GSRSC 2005). The impacts of livestock operations on GUSG depend upon stocking levels and season of use.

We know that grazing can have negative impacts to sagebrush and consequently to GUSG at local scales. Impacts to sagebrush plant communities as a result of grazing are occurring on a large portion of the range of the species. Given the widespread nature of grazing within the range of GUSG, the potential for population-level impacts exists.

Livestock grazing may also have positive effects on sage-grouse under some habitat conditions. Sage-grouse use grazed meadows significantly more during late summer than ungrazed meadows because grazing stimulated the regrowth of forbs (Evans 1986). Greater sage-grouse sought out and used openings in meadows created by cattle grazing in northern Nevada (Klebenow 1981). In addition, both sheep and goats have been used to control invasive weeds (Mosley 1996 in Connelly et al. 2004; Merritt et al. 2001; Olsen and Wallander 2001) and woody plant encroachment (Riggs and Urness 1989) in sage-grouse habitat.

Implementation of the grazing program is unlikely to result in large-scale detrimental effects to

18

BLM_0076974

GUSG. Substantial localized negative effects may occur from over-utilization of forage. However, on-going monitoring of range conditions will result in the appropriate modification of stocking rate, timing, duration and intensity of grazing in those areas over-utilized by livestock.

Trampling of nests, or nest abandonment may occur due to the presence of livestock. In addition, flushing of hens from active nests may result in predation of eggs. We understand the potential for these events to occur on active allotments, but we do not have any means to meaningfully detect or measure these effects, primarily due to low sage-grouse population numbers within the UFO. In addition, the mere presence of livestock in an area occupied by GUSG may not necessarily result in exposure of the birds to these effects.

Grazing management improvement actions such as fences, corrals, windmills, and stock pond development may result in substantial negative effects to GUSG. Fences may expose grouse to increased predation risk from avian predators and collisions.

Water developments may alter existing habitat by congregating livestock use in previously unused upland habitat or by lowering water tables associated with riparian areas. Although water developments can be used to improve overall riparian habitat condition by drawing livestock and wild ungulates away from previously degraded areas, GUSG may be exposed to mosquitoes that may carry West Nile virus (WNV), which has been known to cause population declines in wild bird populations, including sage-grouse (GSRSC 2005). We are aware of three WNV caused mortalities of captive bred GUSG, so it is reasonable to assume that they are susceptible to the virus based on known infection and mortality in greater sage-grouse. Therefore, in situations where ponds are developed to provide for livestock water, there is a risk for production of mosquitoes that transmit WNV, resulting in the possible infection, and mortality to GUSG associated with water development project within and near grouse habitat.

Fences

Effects of fencing on sage-grouse include direct mortality through collisions, creation of raptor and corvid perch sites, the potential creation of predator corridors along fences (particularly if a road is maintained next to the fence), incursion of exotic species along the fencing corridor, and habitat decline (Call and Maser 1985; Braun 1998; Connelly et al. 2000; Beck et al. 2003; Knick et al. 2003; Connelly et al. 2004). However, fences can also benefit GUSG by facilitating the management of livestock forage use and distribution to achieve desired habitat objectives (GSRSC 2005).

Sage-grouse frequently fly low and fast across sagebrush flats, and fences can create a collision hazard resulting in direct mortality (Call and Maser 1985; Christiansen 2009). Not all fences present the same mortality risk to sage-grouse. Mortality risk appears to be dependent on a combination of factors including design of fencing, landscape topography, and spatial relationship with seasonal habitats (Christiansen 2009).

Although we expect the impacts of fences to GUSG are similar to those observed in greater sage-grouse, studies on fence strike-related mortality in GUSG are limited. In 10 years of tracking and studying over 1,000 radio-collared sage-grouse in Colorado, CPW has documented only two

19

BLM_0076975

strike-related mortalities in GUSG due to fences, including one confirmed case in Poncha Pass attributed to bird release methods, and one unconfirmed case in the Gunnison Basin.

Fence posts create perching places for raptors and corvids, which may increase the ability of these birds to prey on sage-grouse (Braun 1998; Oyler-McCance et al. 2001; Connelly et al. 2004). This impact is potentially significant for sage-grouse reproduction because corvids were responsible for more than 50 percent of greater sage-grouse nest predations in Nevada (Coates 2007). Greater sage-grouse avoidance of habitat adjacent to fences, presumably to minimize the risk of predation, effectively results in habitat fragmentation even if the actual habitat is not removed (Braun 1998). Because of similarities in behavior and habitat use, the response of GUSG should be similar to that observed in greater sage-grouse.

Vegetation Management

Management to improve and protect vegetation conditions throughout the planning area would improve vegetative cover, reduce the likelihood for erosion and sedimentation, and maintain seed banks. Implementation of timing limitations will avoid impacts to GUSG during sensitive periods, avoiding direct effects to GUSG. Vegetation treatments would improve habitat for GUSG in the long-term by providing more opportunities for lekking, nesting, brood rearing, wintering, cover, and foraging. However, in the short-term, vegetation treatments may remove habitat or increase the potential for weed spread. In addition, human disturbance and noise associated with the use of heavy equipment for vegetation removal could temporarily displace GUSG from foraging habitat. Timing restriction in the PRMP will reduce the effects to breeding, nesting, and wintering habitats.

Recreation and Travel Management

Habitat loss, degradation, and fragmentation from roads are a major threat to GUSG (79 FR 69162). Recreation, particularly motorized and mechanized, on or off existing roads and trails can cause disturbance to GUSG at sensitive times of the year, particularly during lekking, nesting early brood rearing, and winter. The road and motorized trail system in motorized suitable areas are not currently under consideration for expansion or substantial alteration of the transportation system. The proposed action eliminates cross-country motorized use in most of the planning area, except in a limited area. We consider restrictions on motorized access to existing roads and trails beneficial, because the risk of flushing nesting grouse and other behavioral impacts or destruction of a nest from cross-country travel will be effectively reduced or eliminated.

Off-highway vehicles would be limited to designated trails on portions of the Kinikin Hills and Dry Creek SRMAs, where GUSG designated critical habitat occurs. Due to the open nature of the landscape, however, this travel management action could be difficult to enforce, and effects on Gunnison sage-grouse designated critical habitat could result.

Open cross-country motorized use would be allowed on 3,950 acres within the action area (54 percent fewer than under current management), which would reduce effects to Gunnison sage-grouse compared to previous management. While areas closed to motorized travel would be reduced compared to current management (880 acres, 93 percent fewer acres than under current

20

BLM_0076976

management), 57,400 acres would be closed to motorized and mechanized travel (30 percent more than under current management) and 613,570 acres would be limited to designated routes (4 times more acres than under current management). Overall, this management would reduce the potential for effects on Gunnison sage-grouse associated with motorized and mechanized travel to a greater extent than under current management.

Lands and Realty

Construction and operation of ROW facilities, such as pipelines, roads, and transmission lines, may result in habitat loss, fragmentation, and degradation. Surface disturbance during construction removes vegetation and important habitat components for GUSG and, in most cases, renders the habitat unsuitable. Rights of way, such as those for roads and industrial facilities, may lead to permanent loss of GUSG habitat. Reclaimed ROWs, such as those for pipelines or buried power lines, may lead to a more short-term loss of habitat. However, following natural succession regimes, sagebrush communities would take 20 to 30 years to return to preconstruction conditions. In addition to removing vegetation, long-term occupancy of structures and facilities leads to direct habitat loss.

Rights-of-way may also lead to habitat fragmentation and degradation. Right of way projects can reduce patch size and increase edge habitats. Since GUSG require large blocks of intact habitat, linear disturbances reduce habitat quality. Surface disturbance can also lead to new weed infestations and spread weeds where infestations already occur. Noxious and invasive weeds are often of lower value to wildlife, and degrade wildlife habitat by reducing optimal cover or food. Sagebrush-steppe communities are among the ecosystems most vulnerable to invasion and degradation by invasive weeds. Not only can invasive species outcompete most native plants when moisture is limited, they can also change site-specific fire ecology and result in the loss of critical shrub communities. The loss and degradation of sagebrush habitat can reduce the carrying capacity of local breeding populations of GUSG, especially in areas where high quality sagebrush habitat is limited (Braun 1998; Connelly et al. 2000). As such, permitted ROW would cause impacts on GUSG and their habitat compared to areas where ROWs are excluded or avoided.

Both the construction and operation phases of ROW projects can lead to disruption impacts. Noise and an increase in human presence during construction may displace GUSG into lower quality habitat and may disrupt breeding and nesting (Holloran 2005). Although construction impacts are generally short term, many impacts would continue during routine maintenance and operation of the ROWs. Gunnison sage-grouse would likely avoid habitat in the vicinity of infrastructure (Holloran et al. 2010), resulting in functional habitat loss. In addition, noise and an increase in traffic during ROW operation and maintenance would disturb and likely displace GUSG (Lyon and Anderson 2003; Holloran 2005). Avoidance of habitat would be most prevalent during levels of high human activity, such as ROW construction. Gunnison sage-grouse may avoid otherwise suitable habitat as the density of roads and infrastructure increases (Holloran 2005). Avian predators, particularly raptors and corvids (i.e., crows, ravens, and magpies), are attracted to overhead utility lines because they provide perches for various activities, including hunting (Avian Power Line Interaction Committee 2006). Increased predation and harassment of GUSG may occur from new ROW projects involving power lines or

21

BLM_0076977

other tall structures (Connelly et al. 2004). However, the RMP includes management to remove or modify raptor perches, thereby reducing this threat. In addition, road ROWs may increase mammalian predator densities. Construction and operation of ROW facilities may also lead to direct mortality of GUSG. The potential for GUSG mortality from project construction would be low and likely limited to nesting hens or young chicks that have limited mobility. Direct mortality may occur from collisions with turbines, power lines, or meteorological towers or their supporting infrastructure, such as guy wires (Connelly et al. 2004; Beck et al. 2006). In addition, an increase of traffic on roads from ROW maintenance and operations can lead to direct mortality through vehicle collisions.

The RMP includes ROW exclusion areas, which are any areas within a 0.6-mile radius of any sage-grouse lek (Table 4). Additionally, BLM identified all occupied sage-grouse habitat, or areas within a 4-mile radius of sage-grouse leks as ROW avoidance areas. These measures would reduce or eliminate impacts on GUSG and their habitat by restricting new ROWs.

Lands

New ROW authorizations may necessitate the removal of GUSG habitat and may cause other indirect effects. There is no reasonable means available to predict the timing or location of rights-of-way requests, and we are unable to meaningfully predict an approximate habitat impact from such requests. However, we believe that the revised RMP directs the BLM to reduce the negative impacts of such requests, and is unlikely to result in significant losses of GUSG habitat within the planning area. This allows the BLM to require retrofitting of existing power lines with raptor perch deterrents when reauthorizing ROW permits.

Energy and Mineral Development

Fluid Mineral development potential occurs within or near established GUSG populations in the UFO planning area. However, the proposed management plan includes an NSO stipulation within occupied GUSG habitat, which will limit effects to approximately 20,470 acres of occupied critical habitat, and 2,800 acres of unoccupied critical habitat. The Plan also provides a controlled surface use stipulation on approximately 13,930 acres of unoccupied critical habitat, which could avoid of eliminate effects.

We recognize that the PRMP includes exceptions, modifications, and waivers to stipulations, controlled surface uses, and timing limitations. For the purposes of this biological opinion, we assume that the BLM granting of exceptions, modifications, or waivers, to stipulations or controlled surface uses, or timing restrictions within critical habitat for the GUSG will be rare and requires separate section 7 consultation. We make this assumption for the purpose of a simplified effects analysis. It is not possible for to anticipate use of exceptions, modifications, or waivers, therefore we cannot reasonably predict or quantify the negative effects to GUSG or their critical habitat associated with their use. The use of exceptions, modifications, and waivers within critical habitat for the GUSG may require reinitiation of section 7 consultation.

22

Species and Critical Habitat Response to Proposed Action

The nature of such a broad reaching programmatic analysis makes evaluating the species and critical habitat response to the proposed action difficult if not impossible to predict. The revised RMP contains direction to minimize impacts to the GUSG (as described in the proposed plan) thus reducing the potential for adverse effects to the species and its designated critical habitat. However, project level decisions will occur within occupied critical habitat for GUSG that will result in some of the effects detailed previously. Implementation of the revised RMP is likely to result in low levels of adverse effects to GUSG, and equally low levels of effect to designated critical habitat, primarily as indirect effects from project level decisions. However, given the uncertainty of the timing, location, size, and extent of future actions it is not possible to meaningfully quantify adverse effects caused by implementation of the revised RMP at this programmatic scale. Therefore, all subsequent actions that affect GUSG will be subject to future section 7 analysis and consultation requirements.

CUMULATIVE EFFECTS

Cumulative effects include the effects of future State, tribal, local, or private actions that are reasonably certain to occur in the action area considered in this conference opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the ESA.

The planning area occurs within Delta, Gunnison, Mesa, Montrose, Orray, and San Miguel Counties Colorado, which have experienced significant population growth since 1987, and population forecasts expect the growth trend will continue (Colorado Division of Local Government, State Demography Office 2013). As such, we anticipate continued use and development within the planning area. Past, present and reasonably foreseeable future actions and conditions on non-federal lands in the action area that will likely continue to affect Gunnison Sage-Grouse, Colorado hookless cactus, and the Clay-loving wild buckwheat are as follows:

- Mineral exploration and development
- Agricultural development
- ROW and infrastructure development
- Livestock grazing
- Recreation
- Road construction
- Weed invasion and spread
- Wildland fires
- Drought
- Farming

We are not aware of any specific non-Federal actions within the action area that are reasonably certain to occur that will negatively affect the species or critical habitats discussed herein.

23

BLM_0076979

**CONCLUSION**

Colorado Hookless Cactus and Clay-loving Wild Buckwheat

After reviewing the current status of the Colorado hookless cactus and clay-loving wild buckwheat, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the Service's biological opinion that implementation of the RMP, as proposed, is not likely to jeopardize the continued existence of the Colorado hookless cactus and the Clay-loving wild buckwheat.  The Service's rationale is presented below.

Implementation of the revised RMP, including the conservation measures, will reduce multiple threats to the Colorado hookless cactus, and clay-loving wild buckwheat by, significantly curtailing off-road and off-trail  mechanized and motorized travel; implementing standard operating procedures and best management practices; applying No Surface Occupancy (NSO) stipulations; incorporating conservation measures contained in the programmatic grazing BA/BO of November 15, 2012 (BLM, 2012; Service BO number ES/GJ-6-CO-12-F-006); designation of right-of way exclusion and avoidance areas.

The biggest change in the proposed action is the specific designation of routes for motorized travel.  Cross-country motorized travel will not be allowed under the proposed action.

We anticipate a low level of adverse effects to Colorado hookless cactus, and clay-loving wild buckwheat , but the majority of these effects will be widely distributed across cactus habitat in the UFO and likely of low intensity and severity.  Any subsequent action implemented under the revised RMP that may affect the Colorado hookless cactus, clay-loving wild buckwheat or future critical habitat designations must go through separate section 7 consultation.

Gunnison Sage-grouse

After reviewing the current status of the GUSG, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the Service's biological opinion that implementation of the RMP, as proposed, is not likely to jeopardize the continued existence of the GUSG.  The Service's rationale is presented below.

Implementation of the RMP, including the conservation measures and use stipulations, will reduce multiple threats to the GUSG and could restore the species to formerly occupied range. We anticipate some low level of adverse effects to GUSG, but the majority of these effects would be widely distributed across GUSG habitat in the UFO and likely be of low intensity and severity.  Any subsequent actions implemented under the revised plan that may affect the GUSG or critical habitat must go through separate section 7 consultations.

**INCIDENTAL TAKE STATEMENT**

Endangered Species implementing regulation 50 CFR § 402.14 (i) (6) states, "for a framework programmatic action, an incidental take statement is not required at the programmatic level; any incidental take resulting from any action subsequently authorized, funded, or carried out under

24

the program will be addressed in subsequent section 7 consultation, as appropriate." Since the proposed RMP constitutes a framework programmatic action, we are not providing an incidental take statement.

**Conservation Recommendations**

Section 7(a)(1) of the ESA directs Federal agencies to utilize their authorities to further the purposes of the ESA by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information.

We envision recovery for the Colorado hookless cactus includes sizable, stable populations maintained on conserved suitable habitat, with acceptable levels of connectivity between subpopulations for pollinator movement, gene flow, and seed dispersal. Populations will be maintained to provide sufficient representation, resiliency, and redundancy to ensure a high probability of survival for the foreseeable future. Meeting these goals will require that threats be sufficiently understood and abated. Range-wide monitoring will be necessary.

<u>Recovery outline for the Colorado hookless cactus is as follows:</u>

Recovery needs for Colorado hookless cactus include: (1) survey to accurately document populations and suitable habitat; (2) protect and restore habitat including pollinator habitat and corridors to provide connectivity; and (3) protect individual plants and populations from direct and indirect threats. Specific actions include:

**Surveys and Monitoring**

- Completion of a comprehensive survey throughout the species' range. This would include areas that are not likely to be disturbed. Survey results will provide an accurate population estimate and allow us to identify core population areas so we can more effectively protect the species. This will require evaluation of habitat components likely to support Colorado hookless cactus.

- Surveys also should more accurately delineate the Colorado hookless cactus range relative to other *Sclerocactus* species.

- Locate possible population connectivity corridors.

- Continue ongoing monitoring efforts and expand monitoring to include a larger and more representative sample of occupied sites. This data should improve our understanding of trends.

**Threats Abatement**

- Identify sites in urgent need of habitat protection, set protection priorities, and implement protective measures. In the long run, land management agencies should establish formal land management designations to provide for long-term protection of important populations and habitat.

25

BLM_0076981

- Oil and gas leasing and other mineral extraction activities should avoid occupied sites and other important habitat.

- Develop and implement standard conservation measures to minimize future project and use impacts.

- Coordinate with land management agencies, project proponents, and other partners early in the planning process to limit direct and indirect impacts of planned activities.

- Prevent the collection of Colorado hookless cactus plants from natural populations.

**Research**

- Resolve the taxonomic status of Colorado hookless cactus regarding the species relationship with *S. parviflorus*. Secondarily, this study would assess genetic differences between Colorado hookless cactus populations.

- Continue research into Colorado hookless cactus life history and ecology, including pollinators.

- Study population dynamics and conduct a population viability analysis.

- Encourage investigations that project *Sclerocactus* species' vulnerability and response to climate change.

- Improve our understanding of livestock and native (e.g., rodent) grazing impacts.

- Monitor cactus-borer beetle (*Moneilema semipunctatum*) infestations, and study the relationship of episodic infestations with drought and other environmental factors.

Monitor changes in invasive species prevalence and impacts on Colorado hookless cactus. Additionally, continue to explore approaches to minimize the risk posed by invasives and associated remediation actions.

Recovery Plan for clay-loving wild buckwheat

The recovery plan made the following recommendation to BLM for conservation and moving towards recovery of the clay-loving wild buckwheat. The BLM has completed most if not all of these actions.

Remove threats to the clay-loving wild-buckwheat and secure populations and their ecosystems.

- ➢ Protect populations on land administered by the Bureau of Land Management.
  - Develop a Bureau Habitat Management Plan.
  - Establish Areas of Critical Environmental Concern and/or State Natural Areas on viable sites (completed).
  - Eliminate off-road and all-terrain vehicle use within populations (completed).
  - Designate areas closed to off-road and all-terrain vehicles (completed).
  - Conduct intensive management in problem areas.
  - Consider mineral withdrawals and no-surface-occupancy stipulations for leases (completed.

26

BLM_0076982

Additional measures identified in the recovery plan include Inventory all potential habitat, monitor populations and habitat, conduct minimum viable population modeling study feasibility of population augmentations if desirable.  It is currently unclear whether these additional measures were completed; however, we recommend continued survey effort and monitoring of populations to determine long-term population trends.

Investigate the advantages of establishing critical habitat on Federal sites.

<u>Gunnison Sage-grouse</u>

The UFO should consider full implementation of the conservation strategy presented in the GUSG Rangewide Conservation Plan.  The purpose of the RCP is to identify measures and strategies to achieve the goal of protecting, enhancing, and conserving GUSG and their habitats.

Range-wide Conservation planning strategies, include, but are not limited to, the following:

1) Protect occupied habitats from permanent loss.  If permanent habitat loss from development (primarily) or conversion is not addressed, successful implementation of all the other conservation strategies is not likely to be successful in conserving GUSG.  An equally important strategy is preventing significant degradation, whatever the cause, of existing habitat that is seasonally important to GUSG.

2) Coordinate with CPW in their effort to stabilize existing populations demographically and genetically through augmentation, and establish new populations in suitable historically occupied habitats (i.e. unoccupied critical habitat).

3) Improve habitat within currently occupied and adjacent potential habitats.

4) Protect suitable unoccupied habitat areas from permanent loss.

5) Improve habitat conditions within unoccupied habitat, which will accommodate item 2 above.

Additional recommendations are as follows:

- Any activity that results in the permanent loss of proposed critical habitat should include mitigation of offset such losses.
- Recreation - Only allow special recreation permits that have neutral or beneficial affects to occupied habitat areas.
- Lands/Realty – Retain public ownership of proposed critical habitat.  Subject to valid, existing rights, co-locate new rights-of-way within existing ROWs
- Range Management - Within proposed critical habitat, incorporate GUSG habitat objectives and management considerations into all BLM grazing allotments through allotment management plans or permit renewals.  Work cooperatively on integrated ranch planning within GUSG habitat so operations with deeded/BLM allotments can be planned as single units.  Design any new structural range improvements and location of

27

supplements (i.e. salt or protein blocks) to conserve, enhance, or restore GUSG habitat through an improved grazing management system relative to GUSG objectives. When developing or modifying water developments, use best management practices to mitigate potential impacts from West Nile virus.

- Fluid Minerals - When considering waivers, exceptions, and modifications within NSO designated areas, we recommend implementing the criteria developed for the Northwest Colorado Greater Sage-Grouse RMPA as follows:

  **Exceptions or modifications may be considered if, in consultation with the State of Colorado, it can be demonstrated that there is no impact on Gunnison sage-grouse based on one of the following:

  1. Topography/areas of non-habitat create an effective barrier to impacts
  2. No additional impacts would be realized above those created by existing major infrastructure (for example, State Highway 50).
  3. The exception or modification precludes or offsets greater potential impacts if the action were proposed on adjacent parcels (for example, due to landownership patterns).

  **In order to approve exceptions or modifications to this lease stipulation, the Authorized Officer must obtain: agreement, including written justification, between the BLM District Managers and CPW that the proposed action satisfies at least one of the criteria listed above

  Waivers - No waivers are authorized unless the area or resource mapped as possessing the attributes protected by the stipulation is determined during collaboration with the State of Colorado to lack those attributes or potential attributes. A 30-day public notice and comment period is required before waiver of a stipulation. Waivers would require BLM State Director approval.

- Incorporate "Available Conservation Measures" and "Overarching Conservation Objectives" found in the GUSG final listing rule (79 FR 69192, p. 69305-69309).

**Reinitiation-Closing Statement**

This concludes formal consultation for the potential effects of the implementation of the revised RMP. As provided in 50 CFR 402.16, reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion; (3) the action is subsequently modified in a manner that causes an effect to the listed species or critical habitat not considered in this opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action (50 CFR §402.16).

28

BLM_0076984

We appreciate your efforts to ensure the conservation of endangered, threatened, and candidate species.  If you have questions regarding this letter or your responsibilities under the Act, please contact Kurt Broderdorp at the letterhead address or phone 970-628-7186.

29

BLM_0076985

## LITERATURE CITED

Aldridge, C. L., D. J. Saher, T. M. Childers, K. E. Stahlnecker, and Z. H. Bowen. 2012. Crucial nesting habitat for GUSG: a spatially explicit hierarchical approach. Journal of Wildlife Management 76:391-406.

Amstrup, S.C. and R.L. Phillips. 1977. Effects of coal extraction and related development on wildlife populations: Effects of coal strip mining on habitat use, activities and population trends of sharp-tailed grouse (*Pedioecetes phasianellus*). Annual progress report. Denver Wildlife Research Center. U.S. Fish and Wildlife Service. Denver, CO. 37 pp.

Beck, J.L., D.L. Mitchell, and B.D. Maxfield. 2003. Changes in the distribution and status of sage-grouse in Utah. Western North American Naturalist 63:203-214.

Beck, J. L., K. P. Reese, J. W. Connelly, and M. B. Lucia. 2006. Movements and survival of juvenile greater sage-grouse in southeastern Idaho. Wildlife Society Bulletin 34:1070-1078.

BIO-Logic, Inc. Montrose, CO.

Bowlin W. R., V. J. Tepedino, and T. L. Griswold. 1992. The Reproductive Biology of *Eriogonum Pelinophilum*. Proceedings of the Southwestern Rare and Endangered Plant Conferece. Edited by R. Sivinski and K. Lightfoot. New Mexico Forestry and Resources Conservation Division. Energy, Minerals and Natrual Resources Department. Sante Fe, NM. Miscellaneous Publication No. 2. Pages 296-301.

Bureau of Land Management 1997. BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado. BLM, Colorado State Office, Lakewood, Colorado. 186 pp.

Bureau of Land Management, Uncompahgre Field Office (BLM). 2002. North Delta Land Health Assessment. 2001-2002. Montrose, CO. 110 pp.

Braun, C.E. 1986. Changes in sage grouse lek counts with advent of surface coalmining. Proc. Issues and Technology in the Management of Impacted Western Wildlife 2:227-231.

Braun, C.E. 1998. Sage grouse declines in western North America: What are the problems? Proceedings of Western Association of Fish and Wildlife Agencies 78:139-156.

Braun, C.E., M.F. Baker, R.L. Eng, J.W. Gashwiler, and M.H. Schroeder. 1976. Conservation committee report on effects of alteration of sagebrush communities on the associated avifauna. The Wilson Bulletin 88:165-171.

Braun, C.E., O.O. Oedekoven, and C.L. Aldridge. 2002. Oil and gas development in western North America: Effects on sagebrush steppe avifauna with particular emphasis on sage-grouse. Transactions of the North American Wildlife Natural Resources Conference 67. 19 pp.

30

Bui, T.D.  2009.  The effects of nest and brood predation by common ravens (*Corvus corax*) on greater sage-grouse (*Centrocercus urophasianus*) in relation to land use in western Wyoming. M.S. Thesis, University of Washington.  48 pp.

Bureau of Land Management (BLM).  1997.  Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado.  U.S. Department of the Interior, Bureau of Land Management.  186 pp.

Call, M.W. and C. Maser.  1985.  Wildlife habitats in managed rangelands - The Great Basin of southeastern Oregon sage grouse.  General Technical Report PNW-187, U.S. Department of Agriculture, Forest Service, La Grande, OR.  30 pp.

Christiansen, T. in litt.  2009.  Fence marking to reduce greater sage-grouse (*Centrocercus urophasianus*) collisions and mortality near Farson, Wyoming - summary of interim results. Wyoming Game and Fish Department.  Unpublished data.  3 pp.

CNHP (Colorado Natural Heritage Program). 2014.  *Sclerocactus glaucus* Element Global Rank Report 44168. Fort Collins, Colorado.

Coates, P.S.  2007.  Greater sage-grouse (*Centrocercus urophasianus*) nest predation and incubation behavior.  Ph.D. Thesis, Idaho State University, Boise, ID.  191 pp.

Colorado Division of Wildlife (CDOW).  2009a. Spreadsheet summarizing land ownership by Gunnison sage-grouse population and status.  Submittal to the Service.  5 pp.

Colorado Division of Wildlife (CDOW).  2009b. 2009 CDOW Statewide summary information request.  Submittal to the Service.  157 pp.

Colorado Parks and Wildlife (CPW). 2013. Comments on the proposed rule to list Gunnison sage-grouse as endangered. Submittal to the Service.  26 pp.

Colorado Parks and Wildlife (CPW). 2018.  Unpublished Data of 2018 GUSG Lek Count Data.

Connelly, J. W., H. W. Browers and R. J. Gates. 1988. Seasonal movements of sage grouse in southeastern Idaho.  Journal of Wildlife Management 52: 116-182.

Connelly, J.W., M.A. Schroeder, A.R. Sands, and C.E. Braun.  2000. Guidelines to manage sage grouse populations and their habitats.  Wildlife Society Bulletin 28:967-985.

Connelly, J. W., S. T. Knick, M. A. Schroeder, and S. Stiver.  2004.  Conservation assessment of greater sage-grouse and sagebrush habitats.  Western Association of Fish and Wildlife Agencies. www.wafwa.org.

Ellis, K.L.  1985.  Effects of a new transmission line on distribution and aerial predation of breeding male sage grouse.  Final report, Deseret Generation and Transmission Cooperative, Sandy, UT.  28 pp.

31

BLM_0076987

Evans, C.C. 1986. The relationship of cattle grazing to sage grouse use of meadow habitat on the Sheldon National Wildlife Refuge. MS Thesis, University of Nevada, Reno, NV. 92 pp.

Forman, R.T.T. 2000. Estimate of the area affected ecologically by the road system in the United States. Conservation Biology 14:31-35.

Forman, R.T.T. and L.E. Alexander. 1998. Roads and their major ecological effects. Annual Review of Ecology and Systematics 29:207-231 plus C2.

Frey, N. S. and M. R. Conover. 2006. Habitat use by meso-predators in a corridor environment. Journal of Wildlife Management 70: 1111-1118.

Gelbard, J.L. and J. Belnap. 2003. Roads as conduits for exotic plant invasions in a semiarid landscape. Conservation Biology 17:420-432.

Gunnison Sage-grouse Rangewide Steering Committee (GSRSC). 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA.

Heil, K.D. and J.M. Porter. 1994. Sclerocactus (Cactaceae): A revision. Haseltonia 2:20-46.

Heil, K.D. and J.M. Porter. 2004. Sclerocactus in Flora of North America. Online at: http://www.efloras.org/florataxon.aspx?flora_id=1&taxon_id=129764. Accessed Dec. 6, 2011.

Holloran M.J. 2005. Greater Sage-Grouse (*Centrocercus urophasianus*) Population Response to Natural Gas Field Development in Western Wyoming. PhD, Department of Zoology and Physiology, December, 2005. 215 pp.

Holloran, M.J., R.C. Kaiser, and W.A. Hubert. 2010. Yearling greater sage-grouse response to energy development in Wyoiming. Journal of Wildlif3e Management 74: 65-72

Klebenow, D.A. 1981. Livestock grazing interactions with sage grouse. Proceedings of the Wildlife-Livestock Relationship Symposium. 113-123 pp.

Knick, S.T., D.S. Dobkin, J.T. Rotenberry, M.A. Schroeder, W.M. Vander Haegen, and C. Van Riper III. 2003. Teetering on the edge or too late? Conservation and research issues for avifauna of sagebrush habitats. Condor 105:611-634.

Knight, R.L. and J.Y. Kawashima. 1993. Responses of raven and red-tailed hawk populations to linear right-of-ways. Journal of Wildlife Management 57:266-271.

Kolb A. 2008. Habitat fragmentation reduces plant fitness by disturbing pollination and modifying response to herbivory. Biological Conservation 141:2540-2549.

Leach, H. R. and A. L. Hensley. (1954). The Sage Grouse in California, with special reference to food habits. Calif. Fish Game no. 40:385-394.

32

Lyon, A.G. and S.H. Anderson.  2003.  Potential gas development impacts on sage grouse nest initiation and movement.  Wildlife Society Bulletin 31:486-491.

Manville, A.M.  2002.  Bird strikes and electrocutions at power lines, communication towers, and wind turbines:  State of the art and state of the science – next steps toward mitigation.  International Partners in Flight Conference, Monterey, CA. 28 pp.

Merritt, S., C. Prosser, K. Sedivec, and D. Bangsund.  2001.  Multi-species grazing and leafy spurge.  U.S.D.A.–ARS Team Leafy Spurge Area-Wide IPM Program, Sidney, Montana.  28 pp.

NatureServe.  Copyright © 2018 NatureServe, 4600 N. Fairfax Dr., 7th Floor, Arlington Virginia 22203, U.S.A. All Rights Reserved. Each document delivered from this server or web site may contain other proprietary notices and copyright information relating to that document. The following citation should be used in any published materials which reference the web site.

NatureServe.  2018. NatureServe Explorer: An online encyclopedia of life [web application]. Version 7.1.  NatureServe, Arlington, Virginia.  Available http://explorer.natureserve.org/servlet/NatureServe?searchName=Sclerocactus+glaucus (Accessed: October 25, 2018).

Olsen, B. E., and R. T. Wallander.  2001.  Sheep grazing spotted knapweed and Idaho fescue.  Journal of Range Management 54:25-30.

Oyler-McCance, S.J. 1999. Genetic and habitat factors underlying conservation strategies for Gunnison sage-grouse.  Ph.D. Dissertation, Colorado State University, Fort Collins, CO. 162 pp.

Oyler-McCance, S.J., K.P. Burnham, and C.E. Braun.  2001.  Influence of changes in sagebrush on Gunnison sage grouse in southwestern Colorado.  Southwestern Naturalist 46:323-331.  Patterson, R.L.  1952.  The sage grouse in Wyoming.  Wyoming Game and Fish Commission, Sage Books Inc., Denver, CO.  344 pp.

Piquette D., D.A. Keck, N. Seward, B. Magee, and P. Magee. 2013. Anthropogenic noise assessment around Gunnison sage-grouse leks within the Gunnison Basin, Colorado.  Unpublished data. 20 pp.

Riggs, R.A. and P.J. Urness.  1989.  Effects of goat browsing on gambel oak communities in northern Utah.  Journal of Range Management 42:354-360.

Schroeder, M.A., J.R. Young, and C.E. Braun.  1999.  Sage grouse (*Centrocercus urophasianus*). 28 pages In Poole, A. and F. Gill, eds.  The Birds of North America, No. 425.  The Birds of North America, Inc., Philadelphia, Pennsylvania.

Schroeder, M.A., C.L. Aldridge, A.D. Apa, J.R. Bohne, C.E. Braun, S.D. Bunnell, J.W. Connelly, P.A. Deibert, S.C. Gardner, M.A. Hilliard, G.D. Kobriger, S.M. McAdam, C.W.

33

BLM_0076989

McCarthy, J.J. McCarthy, D.L. Mitchell, E.V. Rickerson, and S. J. Stiver. 2004. Distribution of sage-grouse in North America. Condor 106:363-376.

Steenhof, K., M. N. Kochert, and J. A. Roppe. 1993. Nesting by raptors and common ravens on electrical transmission line towers. Journal of Wildlife Management 57:271-281.

Stiver, S. J., E. T. Rinkes, D. E. Naugle, P. D. Makela, D. A. Nance, and J. W. Karl. 2015. Sage-Grouse Habitat Assessment Framework: A Multiscale Assessment Tool. Technical Reference 6710-1. Bureau of Land Management and Western Association of Fish and Wildlife Agencies. Denver, Colorado.

Tepedino, V. J. PhD. 2009. The Pollination Biolgoby of a Peceance Basin Endemic *Physaria obcordata.* Report prepared for Colorado Natural areas Program, Denver, CO. 25 pp.

US Fish and Wildlife Service. 2010. Recovery Outline for the Colorado Hookless Cactus (*Sclerocactus glaucus*). Colorado Ecological Services Field Office. 17pp.

US Fish and Wildlife Service. 1988. Recovery Plan for the Clay-loving wild buckwheat. 21pp.

Vander Haegen, W. M., M. A. Schroeder, and R. M. DeGraaf. 2002. Predation on real and artificial nests in shrubsteppe landscapes fragmented by agriculture. Condor 104:496-506.

Walker, B.L., D.E. Naugle, and K.E. Doherty. 2007. Greater sage-grouse population response to energy development and habitat loss. Journal of Wildlife Management 71:2644-2654.

Wallestad, R. O., and J.G. Peterson. 1975. Foods of Adult Sage Grouse in Central Montana. Journal of Wildlife Management. 39 (3): 628-630.

Wisdom, M.J., C.W. Meinke, S.T. Knick, and M.A. Schroeder. 2011. Factors associated with extirpation of sage-grouse. Pp. 451–472 in S. T. Knick and J. W. Connelly (editors). Greater Sage-Grouse: ecology and conservation of a landscape species and its habitats. Studies in Avian Biology (vol. 38), University of California Press, Berkeley, CA.

Young, J. R. 1994. The influence of sexual selection on phenotypic and genetic divergence among sage grouse populations. Dissertation, Purdue University, West Lafayette, Indiana, USA.

Young, J.R., C.E. Braun, S.J. Oyler-McCance, J.W. Hupp, and T.W. Quinn. 2000. A new species of sage-grouse (Phasianidae: Centrocercus) from southwestern Colorado. Wilson Bulletin 112:445-453.

34

# ATTACHMENT I



# United States Department of the Interior



## FISH AND WILDLIFE SERVICE

Ecological Services
445 West Gunnison, Suite 240
Grand Junction, Colorado  81501-5711

IN REPLY REFER TO:
ES/CO: BLM GUSG RMPA
TAILS 06E24100-2016-CPA-0044

February 3, 2016

Memorandum

To:       Gunnison Sage-Grouse Project Manager, Bureau of Land Management, Uncompahgre Field Office, Montrose, Colorado

From:     Western Colorado Supervisor, U.S. Fish and Wildlife Service, Grand Junction, Colorado

Subject:   The Bureau of Land Management's Resource Management Plan Amendments for Gunnison Sage-Grouse

Thank you for meeting with us on January 28, 2016, to discuss the Gunnison sage-grouse Resource Management Plan Amendments (RMPA).  As requested by the Bureau of Land Management (BLM), we are reiterating our concerns from the meeting and providing recommendations for improving the management direction in the RMPA to better conserve Gunnison sage-grouse.  The Endangered Species Act (Act) [as amended] states that the terms conserve, conserving, and conservation mean to use and the use of all methods and procedures which are necessary to bring any federally listed species to the point where the measures provided pursuant to the Act are no longer necessary. All Federal agencies are directed to conserve threatened and endangered species under the Act. In this context, we believe the RMPA should focus on the conservation of Gunnison sage-grouse.  The RMPA should clearly communicate it will improve the condition of (conserve) Gunnison sage-grouse on BLM lands by working towards increasing grouse numbers and by improving and increasing grouse habitat through conservation actions.

First, because Gunnison sage-grouse satellite populations are small, generally declining, and highly imperiled, BLM's management direction should explicitly prohibit any additional impacts to the bird and its habitat in these satellite populations.  Generally, the management direction in Alternative B is appropriate for these satellite populations, although opportunities for surface disturbance in the satellite populations should be prohibited (see our bullets below).  The satellite populations will require habitat restoration to increase the amount of available habitat.  This habitat restoration and corresponding targets for this restoration should be more clearly prioritized and described in the RMPA.

BLM_0076992

Second, when we list or delist a species under the Act, we must consider five listing factors, one of these five listing factors is "the inadequacy of existing regulatory mechanisms." For listing decisions, we can evaluate conservation efforts (like the RMPA) under our Policy for Evaluation of Conservation Efforts (PECE). The PECE policy allows us to evaluate if a conservation effort will be implemented and if a conservation effort will be effective at reducing threats. We do not have a PECE policy for delisting decisions, but use a similar rationale for evaluating conservation efforts. Therefore, we are using these two standards when evaluating the RMPA. Incorporating an adaptive management strategy into the RMPA provides more certainty that conservation efforts will be implemented and effective, and provides more regulatory certainty. Therefore, we strongly encourage the BLM to incorporate adaptive management monitoring criteria, and thresholds (with triggers) into the RMPA.

An adaptive management strategy should include appropriate mechanisms (monitoring, criteria, and thresholds or triggers) to prohibit additional loss of Gunnison sage-grouse if population levels drop below a certain point or if habitat impacts exceed a certain threshold. Restrictive management prescriptions such as "prohibit" or "exclude" ensure a greater degree of certainty, and so, may require a less detailed adaptive management strategy. In addition, a more restrictive management direction significantly reduces project level ESA section 7 consultation workload. Less restrictive management such as the "avoid and mitigate" approach, requires a stronger and more detailed adaptive management approach in order to provide the regulatory certainty needed to conserve and recover Gunnison sage-grouse. However, the "avoid and mitigate" approach requires more involved project level discussion and a significantly higher number of individual section 7 consultations. This also raises concern that habitat will be lost, even if mitigated, on an ongoing basis.

An effective adaptive management approach requires, among other things, a wide range of management direction across the range of alternatives where increasingly stricter requirements can be imposed if thresholds or triggers are reached or surpassed. In a few instances, we believe the range of management direction in the RMPA is insufficient across the range of alternatives to provide this most restrictive management direction. With this in mind, we recommend the following be included in the range of alternatives:

- We recommend that Row 4 of Table 2.8, Alternative B, and the No Surface Occupancy (NSO) stipulation described on page A-727, line 12809, read as follows: **Prohibit surface disturbance within occupied and unoccupied habitat.** Approximately 81 percent of Gunnison sage-grouse, associated with a lek across all seasons of use, are found within 4 miles from the lek of capture (GSGRSC 2005, p. J-9). Conversely, almost 20 percent of the area used by the birds is located outside this 4 mile area. Alternative B limits the prohibition for habitat disturbance to a four mile area around a lek, which does not protect all occupied and unoccupied habitat and does not protect all Gunnison sage-grouse.
- We recommend the Rangewide Conservation Plan's (RCP) (GSGRSC 2005) structural habitat guidelines be relabeled as structural habitat standards within the RMPA. As stated in the RCP, the (structural habitat) guidelines should be considered minimum standards, and managers should strive to meet the full potential of any given site (GSGRSC 2005).

BLM_0076993

- A minimum criterion is needed for effective adaptive management to trigger more restrictive management direction.
- Noise impacts should be limited across all habitats from March 1-July 15, to 10 dBA above ambient with maximum noise levels at approximately 30 dBA, based on recommendations from Patricelli *et al.* 2013.
- Across all program areas, BLM should reserve the ability to exclude or prohibit all human entry or activities that may conflict with the conservation of Gunnison sage-grouse.  This would have particular relevance for authorizing or amending any Rights-of-Ways (ROW) within occupied or unoccupied habitat where a more restrictive measure should be applied when and where population levels drop below a certain point or if habitat impacts exceed a certain threshold.
- Areas of Critical Environmental Concern (ACECs) should apply to all occupied and unoccupied habitat.

In designing an adaptive management strategy for the RMPA and when making important decisions that could impact Gunnison sage-grouse, BLM should also consider the following:

- Establish a review team (including Colorado Parks and Wildlife and the U.S. Fish and Wildlife Service (Service)) and move decisions to the State Office level when considering waivers, exemptions, modification, or for any exceptions that could allow an activity resulting in effects to Gunnison sage-grouse that are not insignificant or discountable, or that results in any adverse effects to habitat.
- Establish a review team (including Colorado Parks and Wildlife and the Service) and move decisions to the State Office level for actions where the mitigation hierarchy is employed.
- Provide additional specificity in the management direction for all program areas, similar to, but more protective, than the specificity provided by the greater sage-grouse RMPA. As one example, we believe the purpose and need of the greater sage-grouse RMPA is more protective than the current purpose and need for the Gunnison sage-grouse RMPA.
- Although many of the action alternatives require mitigation of any unavoidable impacts, mitigation may create a temporal lag between habitat restoration or improvement and when that habitat restoration or improvement becomes a benefit to Gunnison sage-grouse. This temporal lag must be considered when considering if an action results in a net gain for the species.

We do not have any further adaptive management recommendations at this time, but would appreciate an opportunity to work with BLM to develop appropriate adaptive management and identify specific thresholds and trigger points.

Thank you for this opportunity to comment.  If you have any further questions please contact Kurt Broderdorp of my staff at (970) 628-7186.

cc:  Kathy Griffin, CPW, Grand Junction
      Brian St. George, BLM State Office
      Drue DeBerry, USFWS, Lakewood

BLM_0076994

# ATTACHMENT J

BLM_0076995

---------- Forwarded message ----------
From: <rsayre@blm.gov>
Date: Thu, Jun 7, 2018 at 2:58 PM
Subject: GUSG Monthly Coop Agency Call - Final notes for now
To: <jrae@ftitel.net>, <lynnp@sanmiguelcountyco.gov>, <bclayton@blm.gov>, <cbailey@utah.gov>, <joanm@sanmiguelcountyco.gov>, <wmaez@saguachecounty-co.gov>, <amy.moyer@state.co.us>, <cclementson@blm.gov>, <cochranfwc@hughes.net>, <rsayre@blm.gov>, <ncaveny@osmre.gov>, <kathy.griffin@state.co.us>, <jwaschbusch@montrosecounty.net>, <jon.holst@state.co.us>, <michael.vanderhoof@state.co.us>, <petermcdonald@fs.fed.us>, <d1bocc@mtngeogeek.com>, <madeleine.west@state.co.us>, <kath.griffin@state.co.us>, <kcaddy@montrosecounty.net>, <nsandberg@sanjuancounty.org>, <janderson@saguachecounty-co.gov>, <cclawson@montrosecounty.net>, <dbaumgarten@gunnisoncounty.org>, <mroeber@deltacounty.com>, <kurt_broderdorp@fws.gov>, <ann_timberman@fws.gov>, <theresa_childers@nps.gov>, <etrent@osmre.gov>, <patrick.coleman@mesacounty.us>, <cinnamon.levi-

flinn@state.co.us>, <langen@wapa.gov>, <blevins@wapa.gov>, <chanda.pettie@co.usda.gov>, <jmunson@blm.gov>, <rlevalley@deltacounty.com>, <drue_deberry@fws.gov>, <cbaird@grandcountyutah.net>, <amberswasey@mesacounty.us>


Hello GUSG Cooperators,

The BLM has put the GUSG RMP Amendment on indefinite pause and this will be our last cooperating agency meeting. The project was not funded for 2019, meanwhile the USFWS has started its recovery plan. BLM will continue to be involved as a cooperator with USFWS recovery plan, as well as efforts such as the Collaborative Action Plan (CAP) for Gunnison Basin.

This was our final cooperating agency call for now, and you will not be receiving any more email reminders for upcoming meeting. If or when this project starts up again we will contact you or contacts in your agency.

If you have any additional questions on the GUSG RMP Amendment and the planning process, contact Bridget Clayton 970-240-3045 or Roger Sayre at 303-239-3709

**GUSG Monthly Coop Agency Call**
Please check with me before inviting others to this call

| | |
|---|---|
| When | Thu Jun 7, 2018 2pm – 3pm Mountain Time |
| Where | 1 (866) 616-2692 Participant 2292690# (map) |
| Video call | https://plus.google.com/hangouts/_/doi.gov/rsayre |
| Who | • rsayre@blm.gov - organizer |
| | • theresa_childers@nps.gov |
| | • cclementson@blm.gov |
| | • jwaschbusch@montrosecounty.net |
| | • amy.moyer@state.co.us |
| | • Joan May |
| | • ann_timberman@fws.gov |
| | • keith.fife@mesacounty.us |
| | • langen@wapa.gov |
| | • vaarmstrong@blm.gov |
| | • drue_deberry@fws.gov |
| | • cinnamon.levi-flinn@state.co.us |
| | • cbaird@grandcountyutah.net |
| | • jmunson@blm.gov |
| | • kcaddy@montrosecounty.net |
| | • nsandberg@sanjuancounty.org |
| | • bstgeorg@blm.gov |
| | • ncaveny@osmre.gov |
| | • kath.griffin@state.co.us |
| | • bclayton@blm.gov |
| | • Michael Vanderhoof - CDOT |
| | • dbaumgarten@gunnisoncounty.org |

- janderson@saguachecounty-co.gov
- dhenhorin@blm.gov
- mroeber@deltacounty.com
- wmaez@saguachecounty-co.gov
- madeleine.west@state.co.us
- lynnp@sanmiguelcountyco.gov
- patrick.coleman@mesacounty.us
- cbailey@utah.gov
- mastouff@blm.gov
- blevins@wapa.gov
- jon.holst@state.co.us
- Robbie LeValley
- d1bocc@mtngeogeek.com
- petermcdonald@fs.fed.us
- jrae@ftitel.net
- cochranfwc@hughes.net
- cclawson@montrosecounty.net
- etrent@osmre.gov
- Kathy Griffin - DNR
- chanda.pettie@co.usda.gov
- kurt_broderdorp@fws.gov

--
*Jon Holst*

P 970.375.6713 | F 970.375.6705 | C 970.759.9588
415 Turner Drive, Durango CO 81303
jon.holst@state.co.us | www.cpw.state.co.us
"*Even if you're on the right track, you'll get run over if you just sit there*" - Will Rogers

To: Jamie Connell, BLM State Director
From:
RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office
Date:

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments NOV 1 2016
of the Draft RMP (comments dated: 560052), I respectfully submit the
following protest. My contact information is: Dave Bristow Mine rd.
970 779 4609                                    17367 Farmers
dinodave 2004 @ yahoo.com Paonia, Co, 81428

My protest addresses the following issues that I have raised in my previous
comments: The distruction of my water supply,
Healthy air + water, the destruction of my
community, hazard on the road. The public
Land will be ruined, Wildlife is a major concern.
BLM did not address any of these issues!

Those issues are addressed in the following sections of the RMP:
ALTERNATIVE E

I believe the BLM has erred in adopting the Proposed RMP for the following
reasons:

- Alternative E was improperly adopted and was not subject to public
  comments.
- 

Sincerely,

Dave Bristow          Date: 7-29-19

To: Jamie Connell, BLM State Director                29 July 2019
From:
RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office
Date:

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP, I have read the draft FEIS and proposed RMP and now respectfully submit the following protest. My contact information is:
Dr. David W. Inouye
38213 Highway 133
Hotchkiss, CO 81419
dwinouye@gmail.com

My protest addresses the following issues that I have raised in my previous comments, as well as new issues that are raised by the Proposed RMP:

I believe the BLM has erred in adopting the Proposed RMP for the following reasons:
        The new Alternative E was improperly adopted and was not subject to public comments. While an agency can modify a proposed action in light of public comments, a supplemental EIS is required if BLM makes substantial changes that are relevant to environmental concerns, as it has in adopting the new Alternative E. Therefore, BLM must prepare a supplemental EIS.

        The no-leasing option that many concerned citizens requested was not included. The "no leasing" or "limited leasing" alternatives should have been considered in light of the best available information and science, and in consideration of national policy. BLM failed to do so.

        The Proposed RMP does not sufficiently consider the consequences of the proposed alternatives for climate change. Public lands management needs to consider the impact of increasing the trajectory of global temperature, and the impacts on precipitation. BLM claims that "a full closure to fluid mineral leasing alternative was not carried forward because the BLM has no suitable thresholds or standards to measure and compare the significance of impacts related to greenhouse gas emissions under that alternative relative to other alternatives." FEIS at 2-16. This excuse is inadequate under NEPA. As a scientist (Ph.D. in biology) I know that there are multiple scientifically-robust methods to calculate the impact of greenhouse gas emissions, but this was not done.

        BLM failed to consider explicitly a renewable energy alternative, yet the results of the bidding last year for new power sources by Colorado utilities showed that renewable energy resources (with backup) were less expensive than natural gas or coal. A transition to clean energy is critical to avoiding climate disruption but you did not consider this.

BLM_0076999

In the Reasonable Foreseeable Development Scenario for oil and gas for the Uncompahgre Field Office, projections for oil and gas production were limited to 2029, rather than the 20-year period of the plan. Why? In addition, the Proposed RMP only discloses projected production for conventional oil and gas and conventional coalbed oil and gas. The RFD does not appear to account for unconventional development, even though this has now been demonstrated to be a less-expensive option, which would avoid harmful greenhouse gas emissions.

The air-quality impacts of oil and gas extraction are unquestionable, with consequences for human health. You have not considered these potentially dangerous impacts, which would threaten the health of residents of the North Fork Valley, as well as elsewhere in the state.  The dilution solution is not an adequate response. The RMP DEIS does not adequately analyze impacts of withdrawals for fracking and other drilling methods on the area's water supply, and endangered fish populations downstream.  This is in violation of NEPA and Section 7 of the Endangered Species Act.

My wife and I live next to Highway 133, which has already seen increased truck traffic from the limited drilling operations currently in place. The Proposed RMP does not analyze adequately the impact that large-scale extractive industrialization would have on the safety of residents of the North Fork Valley, the condition of its roads, and air quality.

I am a part-time resident of Gunnison County (a researcher at the Rocky Mountain Biological Laboratory), and am concerned that the Proposed RMP/Final EIS was drafted without consideration of Gunnison County's formal planning and land-use regulatory regimes. I had the pleasure of observing the threatened Gunnison Sage-grouse on leks this spring, and find that the Proposed RMP/Final EIS does not adequately consider the Gunnison Sage-grouse population, habitat and designation as a "threatened species."  Gunnison County (and to a lesser extent Delta County) is highly dependent on its natural resources for outdoor recreation (hunting, fishing, skiing, mountain biking, etc.). The Proposed RMP/Final EIS does not adequately consider management, protection and enhancement of outdoor recreation.

Methane is a valuable resource as well as a potent greenhouse gas, and the Proposed RMP/Final EIS does not adequately consider issues regarding coal mine methane, including capture and other mechanisms for mitigation of waste methane from existing and abandoned mines, or from oil or gas drilling in the North Fork Valley. Methane should be capture, not vented to the atmosphere, as that represents a waste of federal resources.

It is with good reason that groups ranging from the West Elks Winery Association, the Valley Organic Growers Association, and the Terror Ditch and Reservoir Company, to county government (e.g., Gunnison County), and many local residents, are concerned about the inadequate and incomplete analysis presented in the Proposed RMP. I have read the letters from Gunnison County and the Western

Environmental Law Center, and find their arguments compelling and hope that you do too.

I urge the BLM to prepare a supplemental EIS that: (1) fully considers a range of alternatives, including a "no-leasing" alternative; (2) fully considers the problem of methane waste, and takes steps to control methane waste; (3) fully considers current scientific and economic information, especially regarding climate change; and (4) strengthens its "hard look" at impacts to air, water, and human health, including by conducting a Health Impact Assessment.

Sincerely,

Dr. David W. Inouye
Certified Senior Ecologist
Professor Emeritus of Biology, University of Maryland
Principal Investigator, Rocky Mountain Biological Laboratory
38213 Highway 133
Hotchkiss, CO 81419
dwinouye@gmail.com
970-349-5801

P.S. Please see below a copy of my declaration of impact related to the proposed Resource Management Plan released in June 2016 by the BLM.

Name: Dr. David W. Inouye
Address: 38213 Hwy 133, Hotchkiss, CO 81419
Date: 28 September 2016

In 2003 my wife and I purchased our 34-acre property, which is adjacent to a 25-acre BLM inholding (parcel 324303400011 in the Delta County Assessor's office records). We purchased our property because we were attracted by the isolation, views, solitude, and wildlife. We have watched eagles, bear, elk, deer, bobcat, and wild turkeys on our property. We are concerned about the impacts that development of gas production facilities on this property might have on our health and economic well-being.

The oil and gas industries can have a significant negative effect on property values of nearby properties because of the negative effects they can have on noise, air pollution, light pollution, and water pollution. We are concerned that if the adjoining property is developed for oil or gas extraction that we will no longer find the quiet, clean air, and solitude that attracted us to that area, that there would be potential health impacts from air pollution, and that the stream that flows across the

BLM_0077001

BLM property and ours could be contaminated. These impacts would reduce the value of our property when we try to sell it in the future.

As documentation of the potential environmental impacts we could suffer as a consequence of leasing the BLM property adjacent to ours for oil or gas development, or if there is large-scale development in the North Fork valley, please consider these relevant scientific studies:

There has been much recent research on the potentially adverse health consequences of oil and gas extraction activities. For example, a recent "study was designed to characterize and quantify emission rates and dispersion of air toxics, ozone precursors, and greenhouse gases from oil and gas operations in the Denver-Julesburg Basin on the northern Front Range of Colorado. Based on a review of critical knowledge gaps and input from a study Technical Advisory Panel, particular focus was placed on quantifying emissions of individual volatile organic compounds (VOCs), methane, and ethane from oil and gas production sites and from hydraulic fracturing ("fracking") and flowback, important steps in the completion of new wells." (http://www.colorado.gov/airquality/tech_doc_repository.aspx?action=open&file=CSU_NFR_Report_Final_20160908.pdf). Reported dated 15 September 2016, accessed 28 September 2016.

The chemicals released by fracking, flowback, and production included methane, ethane, propane, i-pentane, n-pentane, benzene, toluene, ethylbenzene, and m+p-xylene, at concentrations that can be predicted to have potential health impacts on humans for at least hundreds of meters from the release site. The consequences of the release of these chemicals for air quality and human health must be considered. They are likely to have impacts on local vegetation and wildlife as well. Such risks led the Governor of New York to ban fracking in that state in December 2014. The risks include both air and water pollution.

**McKenzie, L. M., et al. 2014. Birth outcomes and maternal residential proximity to natural gas development in rural Colorado. Environmental Perspectives 122:412-417.**

This study examined associations between maternal residential proximity to natural gas development and birth outcomes in a retrospective cohort study of 124,842 births between 1996 and 2009 in rural Colorado. They calculated inverse distance-weighted natural-gas well counts within a 10-mile radius of maternal residence to estimate maternal exposure, and found an association between density and proximity of natural gas wells and the prevalence of congenital heart defects and possibly neural tube defects. The chemicals responsible are probably the same cohort described in the study described above.

Additional information on the health consequences of gas drilling is available in these publications, which are not cited in the RMP, but should be considered in a revision:

**Bamberger, M., Oswald, R. (2012).Impacts of Gas Drilling on Animal and Human Health.** *New Solutions: A Journal of Environmental and Occupational Health,* **22(1): 51-77.**

The researchers conducted interviews with animal owners in six states–Colorado, Louisiana, New York, Ohio, Pennsylvania, and Texas–affected by gas drilling. They also interviewed the owners' veterinarians, and examined the results of water, soil, and air testing as well as the results of laboratory tests on affected animals and their owners. The study highlights the possible links between gas drilling and negative health effects, along with the difficulties associated with conducting careful studies of such a link.

**Colborn T, Kwiatkowski C, Schultz K, Bachran M. 2012.Natural Gas Operations from a Public Health Perspective,***Human and Ecological Risk Assessment: an International Journal* **17(5):1039-1056.**

The authors examined the chemicals known to be used in natural gas fracking procedures. Researchers were able to compile a list of 632 chemicals, though this list is incomplete due to trade secret exemptions given to the energy companies by Congressional allies. Many of the chemicals are toxic and represent the 'bad boys' of health concerns–causing everything from skin and eye irritation to cancer and mutations. They also highlight the "side effect" of air pollution and the resulting irreversible damage to lung tissue, along with damage to vegetation in the surrounding area.

**McKenzie L, Witter RZ, Newman LS, Adgate JL, 2012, Human Health Risk Assessment of Air Emissions from Development of Unconventional Natural Gas Resources,** *Science of the Total Environment,***424:79-87.**

Researchers from the Colorado School of Public Health used EPA guidance to estimate chronic and subchronic non-cancer hazard indices and cancer risks from exposure to hydrocarbons for two populations: (1) residents living > ½ mile from wells and (2) residents living ≤ ½ mile from wells. Risks were higher for those living less than a 1/2 mile from wells than those living further from drilling sites.

**Stephen G. Osborn, Avner Vengosh, Nathaniel R. Warner, and Robert B. Jackson Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing PNAS 2011 108: 8172-8176.**

Scientists found methane contamination of drinking water associated with shale-gas extraction. Average and maximum methane concentrations in drinking-water wells increased with proximity to the nearest gas well. Researchers also found a potential explosion hazard with the related concentrations of methane.

**Kassotis, C. D., et al. Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region. 2013. Endocrinology DOI:** http://dx.doi.org/10.1210/en.2013-1697

This study found that a selected subset of chemicals used in natural gas drilling operations and also surface and ground water samples collected in a drilling-dense region of Garfield County, Colorado, can exhibit estrogen and androgen receptor activities. Water samples were collected, solid-phase extracted, and measured for estrogen and androgen receptor activities using reporter gene assays in human cell lines. Of the 39 unique water samples, 89%, 41%, 12%, and 46% exhibited estrogenic, antiestrogenic, androgenic, and antiandrogenic activities, respectively. Testing of a subset of natural gas drilling chemicals revealed novel antiestrogenic, novel antiandrogenic, and limited estrogenic activities. The Colorado River, the drainage basin for this region, exhibited moderate levels of estrogenic, antiestrogenic, and antiandrogenic activities, suggesting that higher localized activity at sites with known natural gas–related spills surrounding the river might be contributing to the multiple receptor activities observed in this water source. The majority of water samples collected from sites in a drilling-dense region of Colorado exhibited more estrogenic, antiestrogenic, or antiandrogenic activities than reference sites with limited nearby drilling operations. Our data suggest that natural gas drilling operations may result in elevated endocrine-disrupting chemical activity in surface and ground water.

**Vidic, R. D., et al. 2013. Impact of shale gas development on regional water quality. Science 340 (6134): DOI: 10.1126/science.1235009**

Horizontal drilling and hydraulic fracturing make the extraction of tightly bound natural gas from shale formations economically feasible. These technologies are not free from environmental risks, however, especially those related to regional water quality, such as gas migration, contaminant transport through induced and natural fractures, wastewater discharge, and accidental spills. The focus of this Review is on the current understanding of these environmental issues.

**Jackson RB, B Rainey Pearson, SG Osborn, NR Warner, A Vengosh. 2011. Research and policy recommendations for hydraulic fracturing and shale-gas extraction. Center on Global Change, Duke University, Durham, NC.**

The potential for contamination from wastewaters associated with hydraulic fracturing depends on many factors, including the toxicity of the fracturing fluid and the produced waters, how close the gas well and fractured zone are to shallow ground water, and the transport and disposal of wastewaters. Despite precautions by industry, contamination may sometimes occur through corroded well casings, spilled fracturing fluid at a drilling site, leaked wastewater, or, more controversially, the direct movement of methane or water upwards from deep underground.

During the first month of drilling and production alone, a single well can produce a million or more gallons of waste water that can contain pollutants in concentrations far exceeding those considered safe for drinking water and for release into the environment. These pollutants sometimes include formaldehyde, boric acid, methanol, hydrochloric acid, and isopropanol, which can damage the brain, eyes, skin, and nervous system on direct contact. Another potential type of contamination comes from naturally occurring salts, metals, and radioactive chemicals found deep underground. After hydraulic fracturing, fracking fluids and deep waters flow through the well to the surface along with the shale gas.

BLM_0077004

As a group, these studies raise serious concerns about the health and environmental impacts of development of natural gas wells. These impacts would have serious consequences for the economy of the North Fork valley, which depends on clean air and water for agriculture, recreation, and domestic consumption. These impacts and consequences need to be addressed, as the only way to guarantee that there will be no such environmental and health consequences is a no-fracking option in a revised resource management plan.

Sincerely,

Dr. David W. Inouye
38213 Hwy 133
Hotchkiss, CO 81419
inouye@umd.edu

BLM_0077005

To: Jamie Connell, BLM State Director
From: Elyssa Edgerly
RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office
Date: 29 July 2019

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP through Citizens for Healthy Community Form Letters in October 2016, I respectfully submit the following protest. My contact information is: Elyssa Edgerly 970.948.5163    41621 Reds Road Paonia, CO. 81428


My protest addresses the following issues that I have raised in my previous comments:

-water quality and contamination
-wildlife impact
-Alternative E…the BLM has not given the public a chance to provide comments on an alternative; adopting a new alternative at this stage is a violation of NEPA
-outdoor recreation
-impacts on organic agriculture
-air quality
-dependence on water as our most important/valuable resource
-agricultural tourism…orchards, viticulture, farm tours, organic agriculture
-human health
-No-leasing alternative should be considered
-local economic risks
-roads and traffic
-natural disaster risks (flooding, mudslides, rockslides).

Those issues are addressed in the following sections of the RMP:

-Alternative E (all of it)
-Section 3.4.2 Public Health and Safety
-Section 4.3.1 Air Quality & Climate
-Section 4.3.2 Soils & Geology
-Section 4.3.3 Water Resources
-Section 4.3.5 Fish & Wildlife


I believe the BLM has erred in adopting the Proposed RMP for the following reasons:
- Alternative E was improperly adopted and was not subject to public comments. This is in violation of federal law.
- The BLM has not considered a no- leasing or no-development alternative as a baseline alternative.

- The Proposed RMP is inconsistent with Colorado's statutory changes to put the people, environment and climate first.
- The Proposed RMP does not properly take into account public health risks associated with oil and gas development despite provided evidence that it has negative and adverse effects on human health.
- The Proposed RMP drastically decreases the stipulations in Alternative B1 and even the Preferred Alternative D that were designed to protect resources of value from oil and gas development. Our most important resource in this area is clean water…the Proposed RMP undervalues this resource.
- The Proposed RMP reduces setbacks from water supplies, waterways, and areas with highly erodible soils. It allows oil & gas surface use on lands with steep slopes greater than 40 percent. We are extremely prone to rock and mudslides in this area (we are the second most geologically unstable area in Colorado)…we are constantly fixing the roads after big rockfall and it is inappropriate to create more risk on our public lands.
- The Proposed RMP eliminates Ecological Emphasis Areas entirely, reduces Areas of Critical Environmental Concern, and significantly weakens the proposed protections for the Jumbo Mountain Special Recreation Management Area, and does not include any "No Surface Occupancy" stipulations in that area, effectively opening Jumbo Mountain to oil and gas development. This is one of our town's main recreation areas and where people come to enjoy nature just outside of town. Opening up this area to oil and gas development would destroy this valuable asset to our town.
- The Proposed RMP anticipates over 1,000 new hydraulically fractured wells in the UFO, yet does not address the Programmatic Biological Opinion from the US Fish and Wildlife Service that caps surface water withdrawals on the North Fork of the Gunnison River at ~600 acre-feet per year for energy development purposes. Current oil and gas development in the area is already pushing that threshold. The BLM has failed to acknowledge that there is simply not enough water in the North Fork to sustain the level of oil and gas development anticipated in the Proposed RMP. This water is necessary for our local agricultural economy…farms, orchards, vineyards, ranches, etc.

Please actually take the public desire into consideration. For the reasons stated above, I protest the proposed RMP.

Sincerely,

Elyssa Edgerly

29 July 2019

see attached letter

To: Jamie Connell, BLM State Director

From: Ethel M Leslie

RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office

Date: July 29,2019

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP 8/9/2016 during the protest period,  I respectfully submit the following protest. My contact information is:

Ethel Leslie

331 North Fork Ave

PO Box 826

Paonia, CO 81428

970-527-3284

Skiing34@ymail.com

My protest addresses the following issues that I have raised in my previous comments:

The North Fork Valley has developed farming, winery and tourism.  The area has developed to grow and support local business, artists, musicians and real estate.  I am a Board Member for Mountain Harvest Festival which brings economic growth to this area.  We do not support the impact on the infrastructure that gas and drilling will require.  Our roads are in a state of disrepair and air pollution will negatively impact the businesses that are growing in this area.  North Fork Valley works to maintain the water and sewer

Systems for the residents and I strongly oppose gas drilling in this area.

The business my husband owns and operates provides scenic flights for a variety of purposes, including West Elk Mountain Rescue.  The flights are provided for

Residents and tourists.

Alternative E in its entirety

  Adopting a new alternative at this stage is unacceptable and a violation of the National Environmental Policy Act.  The public has not had a meaningful opportunity to comment on this proposa.,

The BLM cannot adopt an alternative the public has not been able to provide comments for.

Due to air moving down valley to the Town of Paonia from BLM lands, oil and gas development will result in poor air quality that will settle over the Town of Paonia which will be detrimental to the residents.

The negative effects of oil and gas drilling will concentrate on the inhabited and agricultural areas of this valley and it&rsquo;s water.

These issues are addressed in the following sections of the RMP:

Section 3.4.2 Public Health &amp; Safety

The Proposed RMO which opens 95% of the area to oil and gas drilling will

Negatively impact the public health and safety of every person living in this area with impacts to water and air.

Section 4.3.1 Air Quality &amp; Climate

The Proposed RMO will negatively impact air quality in this area and have detrimental effects on our business of flight.

Sincerely,

Ethel M Leslie  July 29,2019

PRMP-1-500000151

As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP (comment number: 000382_Oeserl_20161024 ), I respectfully submit the following protest. My contact information is:

324 Orchard Ave

Paonia, CO 81428

720-785-0374

My protest addresses the following issues that I have raised in my previous comments:

- Impacts on the unique economy and character of the North Fork Valley, including organic farming and agricultural tourism; outdoor recreation and recreational tourism; hunting and fishing activities and related tourism; and scenic qualities

- Decreased numbers of people moving to and staying in North Fork Valley

- Threats to clean water and air, and thereby public health and agriculture

- Decreased value of recreational areas

- Decreased value of natural habitat for animals

BLM_0077011

Those issues are addressed in the following sections of the RMP:

- Alternative E in its entirety

- Section 4.3.5 Fish and Wildlife

- Section 4.4.4 Recreation and Visitor Services

- Section 4.6.2 Public Health and Safety

- Section 4.6.3 Socioeconomics

I believe the BLM has erred in adopting the Proposed RMP for the following reasons:

- I protest the entirety of the Proposed RMP&#39;s &quot;Alternative E.&quot; This is a new alternative that the public did not have a chance to fully review and comment on during a public comment period. The selection of an alternative without full public notice and full vetting is a violation of NEPA and undermines the public commenting process.

- The Proposed RMP opens a large percentage of public lands -- 95% -- to oil and gas development, ignoring the impact stated in page 4-446, of the Proposed RMP: &ldquo;The organic farming and agritourism industry could be impacted by real or perceived effects from development. Potential impacts include changes to water quality or quantity, soil quality, or other factors that result in a decrease in quantity or quality of the product produced, impacts due to a perceived degradation of the area&rsquo;s quality of product that resulted in decreased sales and/or visitation.&rdquo;

- The BLM recognizes that increased oil and gas leasing in the management area is a threat to the value of my home and my desire to live in the area, yet oil and gas development is open to almost all of

the BLM lands in the North Fork Valley. From page 4-447, of the Proposed RMP: &ldquo;Residents in all five socioeconomic units cited the scenic beauty of the landscapes and sense of community as strong factors in their decision to live and work in the area. While the BLM has not attempted to provide a monetary value on these factors, they do play an important role for both retaining residents and attracting new visitors.&rdquo;

- The Proposed RMP eliminates Ecological Emphasis Areas, reduces Areas of Critical Environmental Concern, and includes inadequate protections for Jumbo Mountain, with lack of an NSO designation, leaving Jumbo Mountain open to development. NSO designations overall are insufficient, decreased from 26% to only 11% compared to Alternative D. This decision does not support proper management of our recreational assets, failing to take into account the impact stated on page 4-447 of the Proposed RMP, which states: &ldquo;Recreation plays a vital role in all five socioeconomic units (see Chapter 3 for a complete description and map of these units). Many people in the study area not only value their own proximity to recreation areas but see their towns as gateways to these areas, enabling them to attract tourists.&rdquo;

- In the Proposed RMP, the Jumbo Mountain SRMA covers only 1600 acres instead of 5200 acres (as proposed in Alternative B), even though the Proposed RMP recognizes that recreation provides economic and intrinsic value to the management area as stated above. Reducing the size of the SRMA leaves the majority of Jumbo Mountain altogether unprotected from oil and gas development, undermining the designation of the SRMA, which is meant to preserve the unique characteristics of the area. Nearby gas wells will ruin the scenic aspects of this SRMA.

- The Proposed RMP increases the percentage of oil and gas leases with &ldquo;standard stipulations&rdquo; -- from 0% to 12% -- primarily in the North Fork Valley and lower Gunnison watershed. This decision ignores the economy and character of the North Fork Valley and the impacts that increased, weakly regulated oil and gas development will have on our future.

Ian Oeser

PRMP-1-500000151          Ian Oeser      324 Orchard    324 Orchard          Paonia
            Colorado      81428   United States    720-785-0374    iodesignbuild@gmail.com

BLM_0077013

To: Jamie Connell, BLM State Director
From: Jennifer Chavez
RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office
Date: Monday, July 29, 2019

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP (comments dated: 500170_ChavezJ_20161028 ), I respectfully submit the following protest. My contact information is:

Jennifer Chavez
413 Vista Drive
Paonia, CO 81428
970.201.7692
jennifer.chavez44@yahoo.com

I am a resident of Paonia, CO and I live in town.  I teach at North Fork Montessori School at Crawford.  I am a mother of a 12 and 14 year old.  I have lived in the valley for over 18 years and worked one summer for the US Forest Service in the Raggeds Wilderness Area.

My protest addresses the following issues that I have raised in my previous comments:

Recreation:  The jumbo mountain area is adjacent to where I now reside with my husband and two children.  This area has many special recreational opportunities that are used by many multi-use participants and should be managed with that in mind.

Health/Safety/Water Resources:  Clean water is vital to the livelihoods of our valley.  Agriculture, ranching, vineyards and orchards depend on this.

Those issues are addressed in the following sections of the RMP:

Section 4.4.4  - Recreation
Section 4.3.5 -  Water Resources

I believe the BLM has erred in adopting the Proposed RMP for the following reasons:
- Alternative E was improperly adopted and was not subject to public comments.

- Section 4.4.4:  The RMP does not take into account the incredible use of Jumbo Mountain for many types of recreation.  Bicyclists, hikers, trail runners, and horseback riders enjoy this special area for recreation.  There should not be any oil and gas leasing in this area.
- Section 4.6.3:  The RMP doesn't fully address the threat of potential air, water, and soil contamination that could potentially destroy the North Fork Valley's farms, ranches, orchards, and vineyards to be able to market their products as organic, which is how they sustain their livelihoods.

On behalf of a family who lives in Paonia because of its clean air, incredible landscapes, clean water, ability to attain organic and quality food, I strongly feel that the BLM failed to address the needs of the people in the RMP draft in the communities of the RMP area.   On the first page of your RMP Draft, you state your mission and it includes the phrase, "sustain the <u>health</u> . . of public lands. . ."  I feel that the RMP draft allows too much land to be available to oil and gas drilling, which in my view, is against your mission.  Please help us protect where we live.

Sincerely,

Jennifer Chavez
Teacher and Concerned resident of Paonia

Sincerely,

_____Date:

To: Jamie Connell, BLM State Director
From: Joshua Paigen
RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office
Date: 7/29/19

Dear Director Connell,

As a resident of the North Fork Valley and as a concerned citizen who has previously
submitted comments on the Draft RMP (through the Citizens for a Healthy Community
Form Letter in October 2016), I respectfully submit the following protest. My contact
information is:

Joshua Paigen
41621 Reds Road
Paonia, CO 81428
(970) 404-1078
joshuapaigen@hotmail.com

My protest addresses the following issues that I have raised in my previous comments:

The proposed RMP fails to…

- properly assess the impacts of volatile weather, flooding, landslides, and geological
  instability, especially with relation to the high-risk North Fork Valley.
- adequately address oil and gas development's negative impact on many of the North
  Fork Valley's unique characteristics, including by not limited to: organic agriculture,
  gold medal fishing, viticulture, orchards, big game hunting, and extensive outdoor
  recreational opportunities.
- consider the cumulative impacts of unregulated gas-gathering and transportation lines.
- consider a "no-leasing" baseline alternative.
- address the significant impacts to public health and safety.
- address the impact of permanently withdrawing water from the hydrological cycle.
- properly protect water sources.
- address the impact that oil and gas development will have on air and water pollution
  and in turn the impact that these pollutions will have on wildlife.

As is stands the RMP you have proposed is an inappropriate use of public lands as it
prioritizes oil and gas development over all other uses. The proposed alternative for the
RMP that you have proposed will contribute to increased greenhouse gas emissions,
potentially exacerbating climate change. The risk to human, animal, and environmental
health from oil and gas development in this region is simply too high!

In addition, the proposed alternative (Alternative E) is completely unacceptable as
adopting a proposal that the public has not had an opportunity to comment on is unfair,
irresponsible, and likely illegal. Adopting a new alternative at this stage is a violation of
NEPA.

Those issues are addressed in the following sections of the RMP:

•Section 3.4.2 Public Health & Safety
•Section 4.3.1 Air Quality & Climate
•Section 4.3.2 Soils & Geology
•Section 4.3.3 Water Resources
•Section 4.3.5 Fish & Wildlife
•Alternative E in its entirety

I believe the BLM has erred in adopting the Proposed RMP for the following reasons:

- Alternative E was improperly adopted and was not subject to public comments. Adopting a wholly new alternative at this stage is unacceptable, and a violation of the National Environmental Policy Act (NEPA).
- The Proposed RMP downplays public health risks, and ignores significant evidence we have provided that shows increased oil and gas development can have serious adverse impacts on public health.
- The Proposed RMP drastically decreases the stipulations in Alternative B1 and even the Preferred Alternative D that were designed to protect resources of value from oil and gas development. It increases lands available for oil & gas lease with 'standard stipulations' from 0% to 12%.
- It drastically decreases the amount of land with No Surface Occupancy (NSO) from 26% to 11% compared to Preferred Alternative D.
- The Proposed RMP reduces setbacks from water supplies, waterways, areas with highly erodible and saline soils.
- It allows oil & gas surface use on lands with steep slopes greater than 40 percent.
- It weakens CSU stipulations & reduces Timing Limitations near critical wildlife habitat
- The Proposed RMP eliminates Ecological Emphasis Areas entirely, reduces Areas of Critical Environmental Concern, and significantly weakens the proposed protections for the Jumbo Mountain Special Recreation Management Area, and does not include any "No Surface Occupancy" stipulations in that area, effectively opening Jumbo Mountain to oil and gas development.
- The Proposed RMP opened more of the federal mineral estate to oil and gas development without giving adequate consideration to the impact this will have on infrastructure maintained by the State and other local governments.
- The Proposed RMP anticipates over 1,000 new hydraulically fractured wells in the UFO, yet does not address the Programmatic Biological Opinion from the US Fish and Wildlife Service that caps surface water withdrawals on the North Fork of the Gunnison River at ~600 acre-feet per year for energy development purposes.  Current oil and gas development in the area is already pushing that threshold. The BLM has failed to acknowledge that there is simply not enough water in the North Fork to sustain the level of oil and gas development anticipated in the Proposed RMP.

For all of the above reasons, I strongly protest the proposed RMP!  While the federal administration may be pushing a pro-extractive, oil and gas agenda, this does not excuse you from heeding the public comments you have been submitted and the subsequent protests for this RMP.  The recent article "Sounding the alarm at the BLM," in the July 22, 2019 issue of the High Country News reveals abuses of power by multiple BLM staff, as corporate and federal agendas and priorities are promoted without respect for public process and scientific findings.  Please remember that you are a government employee tasked with managing public lands, and that you serve the public in this capacity.  We, the people, will continue to hold the BLM, and you as State Director, responsible should you fail to uphold you duty to honor public comments, protests, and scientific findings throughout the RMP process.

Sincerely,

Date: 7/29/19

BLM_0077018

PRMP-1-500000102

As a resident and home owner in the North Fork Valley, I am distressed that you would allow the Oil and Gas industry to operative on PUBLIC LANDS. They will poison the air and water, make people, especially children, sick, and disrupt a geologically sensitive area. The Proposed RMP downplays all of these concerns, and ignores the public outcry that has been consistent for nearly a decade. Increasing access to OUR LAND by the oil and gas industry will destroy the way of life in the North Fork Valley. We are organic farmers and gardeners, and highly value clean water. You have no right to lease that away.

Kate Redmond

| PRMP-1-500000102 | | Kate Redmond | P.O. Box 824 | | Paonia, Co |
| Colorado | 81428 | United States | 720-285-5562 | rockymountainkate@yahoo.com |

8/12/2019                   Colorado - Uncompahgre FO - Uncompahgre Field Office Resource Management Plan



U.S. DEPARTMENT OF THE INTERIOR   BUREAU OF LAND MANAGEMENT

ePlanning                                                                    (User: Gina M Phillips)   Help

ePlanning Production
Back Office

## Back Office Comment Submission Form
### Submission Acknowledgement

| Comments | Name & Address | Submission Classification | Review Submission | Submission Acknowledgement |
|:---:|:---:|:---:|:---:|:---:|
| 1 | 2 | 3 | 4 | 5 |

### Submission Successful
### Your Submission ID is: PRMP-1-500000126

## Names & Addresses

Kathy Thompson
P. O. Box 633
Paonia, Colorado 81428, United States
Email Address:       kthompson2898@gmail.com
Day Phone:           1303-919-2029
Agency:              Public Web Page

## Comments

*Comment ID:*        1
*Comment Title:*     Protest of Proposed RMP/Final EIS
*Comment:*           I protested the Draft RMP on 11/01/16, and now protest the Proposed RMP/Final EIS for
some of the same reasons, and one additional reason.  The additional reason first: The
Proposed RMP supports Alternative E.  It is against public policy and NEPA (National
Environmental Policy Act) to adopt a new alternative without giving the public the time to
meaningfully comment on it.

I protest Section 4.3.2 Soils and Geology in the Proposed RMP, as I did previously.  The
BLM falls short in considering the negative impact to the fragile soil, geology and topography
of the North Fork Valley of the Gunnison.  Neither the geology (which is fragile rock) nor the
nature of the roads, which are 2-lane, curvy, and mountainous, can
sustain the extractive activity that the BLM is proposing.  Seiizmic activity is likely to occur, as
it has in other regions in the U.S.; and in order for the industry to get to the proposed sites,
the industry would be restricting passage on this narrow highway by the general public for
travel, recreation, and wildlife viewing.  Highway 133 was closed just last night due to severe
rock debris on the highway.  The extractive activity would generate heavy truck traffic that
the roads could not withstand; and the injection well activity would destabilize the surrounding
mountanous terrain.  This terrain is unique with its mountains and valleys - not flat

| Close Window | | Add a New Submission | Edit | Print | Download |

USA.Gov  |  No Fear Act  |  DOI  |  Disclaimer  |  About BLM  |  Notices  |  Get Adobe Reader®

Privacy Policy  |  FOIA  |  Kids Policy  |  Contact Us  |  Accessibility  |  Site Map  |  Home

This page was created by the Bureau of Land Management

BLM_0077020

PRMP-1-500000152

<ul>

    <li>Dear Sirs/Madam.

I am protesting your proposed Resource Management plan that was released on June 28th of this year.  It appears that you are catering only to the needs of the oil and gas industry without giving any concessions to us residents who live around BLM land.

    <ul>

    <li>Many of my concerns I have submitted to you in the past, but these are reiterations with specifics to your present proposed plan:

1. You have incresed the the amount of land available to drilling versus reduced it as requested

2. You have slashed lands available to protect wildlife corridors, water, road infrastructure, and recreation (example Jumbo Mountain outsdie of Paonia)

3. You have decreased the requested 1/2 mile setback (alternative plan submitted) to 250 feet for surface water

4. you have outlined no protections for our ranches, farms and orchards

5. You have given the green light to drilling on slopes greater than even 40%

This proposed plan is NOT CONSISTENT with state goals to reduce carbon emissions and protect the health and welfare of its citizens.

Please scrap this plan and include the overwhelming wishes of the citenzenry in Delta County.

Respectfully,

Katie Reily </li>

PRMP-1-500000152        Ms. Katie Reily  212 Minnesota Ave.        Paonia
    Colorado      81428  United States

BLM_0077021