To: Jamie Connell, BLM State Director
From:
RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office
Date:

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP (comments dated: 07-01-17) I respectfully submit the following protest. My contact information is: Krista.dudley@gmail.com

My protest addresses the following issues that I have raised in my previous comments: Creating a new "Alternative E" does not reflect community input, and that presenting an entirely new alternative with out public comment is a violation of federal law. Opening 95% of the fed. mineral estate to oil & gas

Those issues are addressed in the following sections of the RMP:

I believe the BLM has erred in adopting the Proposed RMP for the following reasons:

- Alternative E was improperly adopted and was not subject to public comments.
- Reduces setbacks from water supplies Waterways areas with highly-erodible and failure soils.
- Allows oil and gas surface use on lands with steep slopes greater than 40%
- Weakens Controlled Surface Use stipulations and reduces Timing Limitations near Critical Wildlife habitat

Sincerely,

07-27-19 _____ Date:

Laurie K. Milford
714 Maple Drive
Hotchkiss, CO 81419
307-399-8440 (mobile)
lkmilford@gmail.com


July 29, 2019

Jamie Connell
BLM State Director
2850 Youngfield St.
Lakewood, CO 80215

<div align="center">RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office</div>

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP (comments dated October 31,2016, from a former address in Paonia, 416 Delta), I respectfully submit the following protest. My contact information is above.

To address Alternative E specifically:

Adopting a new alternative at this stage violates the National Environmental Policy Act (NEPA), as the public has not had a meaningful opportunity to comment on this alternative.The BLM cannot adopt an alternative the public has not been able to provide comments on.

The proposed alternative is an inappropriate use of public lands, and prioritizes oil and gas development over all other uses.

It is for these reasons that I am protesting these sections of the FEIS:
• Alternative E in its entirety
• Section 3.4.2 Public Health & Safety
• Section 4.3.1 Air Quality & Climate
• Section 4.3.2 Soils & Geology
• Section 4.3.5 Water Resources
• Section 4.4.3 Fish & Wildlife

The Proposed RMP drastically decreases the stipulations in Alternative B1 and even the Preferred Alternative D that were designed to protect resources of value from oil and gas development. It increases lands available for oil & gas lease with "standard stipulations" - from 0 to 12 percent. It drastically decreases the amount of land with No Surface Occupancy (NSO) from 26 to 11 percent compared to Preferred Alternative D.

The Proposed RMP eliminates Ecological Emphasis Areas entirely, reduces Areas of Critical Environmental Concern, and significantly weakens the proposed protections for the Jumbo Mountain Special Recreation Management Area. It also does not include any "No Surface Occupancy" stipulations in that area, effectively opening Jumbo Mountain to oil and gas development.

The Proposed RMP opens more of the federal mineral estate to oil and gas development without giving adequate consideration to the impact this will have on infrastructure maintained by the State and other local governments.

The Proposed RMP anticipates over 1,000 new hydraulically fractured wells in the field office, yet does not address the Programmatic Biological Opinion from the US Fish and Wildlife Service that caps surface water withdrawals on the North Fork of the Gunnison River at ~600 acre-feet per year for energy development purposes.  Current oil and gas development in the area is already pushing that threshold. The BLM has failed to acknowledge that there is simply not enough water in the North Fork to sustain the level of oil and gas development anticipated in the Proposed RMP.

*Reasons for Protest*

I live near BLM lands on the property I own in Hotchkiss, CO. I have lived in the North Fork Valley for three years. Prior to that, I lived and worked in Laramie, Casper, and Lander, Wyoming, for nearly twenty years. During that time, I came to know many landscapes and communities that have been drilled intensely for oil and gas, including the Pinedale, Worland, Casper, and Rawlins Field Offices. In these places, oil and gas drilling severely degraded air quality, polluted sources of household water and water used for livestock, harmed mule deer, sage-grouse, and other wildlife, and left the landscape pocked with drilling rigs and, later, wells. By the mid-2000s, within a decade of the beginning of the Town of Pinedale was an "ozone nonattainment zone." The Wind River Range was dimmed by haze, and the lights of drilling rigs lit up a sky that was dark for eons before. Now the North Fork Valley of Colorado is home to my husband, young son, and me. We moved here because the landscape is still beautiful, and the water and air are still clean. I am protesting the FEIS and proposed RMP for the Uncompahgre Field Office because it does not protect these resources.

My family and I care deeply about BLM lands around Paonia and Hotchkiss, including Jumbo Rocks, the foothills of the West Elks, and the land of the greater Grand Mesa. We trail-run and walk, and our son is learning to ride his first gear bike on some of these beautiful trails.

But it isn't just one or a few specific points on a map that need to be protected. Our clean air and water must be safeguarded as well. When we moved to Paonia from Portland, OR, in August, our son had an elevated level of lead in his blood—perhaps from the high levels of lead found recently in the air and soil in Portland, where we lived until 2016.

We chose the Western Slope in part because the air here is still clean, and we believed our son would have the chance to grow up breathing cleaner air and drinking clean water. The water at our house comes from the Hotchkiss municipal water supply, from nearby surface and ground water, and our irrigation water comes from the Paonia Reservoir. If nearby BLM lands are leased and drilled according to the FEIS, North Fork Valley water, both drinking and household water and the water used in the local agricultural industry, would risk contamination. This FEIS does not provide for a safe distance between oil and gas activities and irrigation ditches, domestic water decrees, dams, irrigation intakes, reservoirs, lakes, ponds, and canals.

The final plan also fails to protect ecological resources, aquatic habitat, recreational attractions, fishing; nor the effects of withdrawing water permanently from the hydrological cycle. It also does not protect perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters from surface activities. Further, it does not protect air quality or have an adequate plan for compliance with air quality laws. And it does not provide for controlling floods.

*Conclusion*

For these reasons, I respectfully protest the Proposed RMP and FEIS and the sections therein that I have outlined.


Sincerely,

Laurie K. Milford

BLM_0077025

<p>To: Jamie Connell, BLM State Director</p>

<p>From:</p>

<p>RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office</p>

<p>Date:</p>

<p> </p>

<p>Dear Director Connell,</p>

<p> </p>

<p>As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP (comments dated: Oct 24, 2016), I respectfully submit the following protest. My contact information is:</p>

<p>Linda Lindsey</p>

<p>P.O. Box 6,</p>

<p>Paonia CO 81428</p>

<p>970-201-4512</p>

<p> </p>

<p>My husband and I have lived for over 40 years on a ranch outside of Paonia where we raised domestic elk and alpacas. The proposed actions proposed in the BLM RMP would put our entire operation in danger and threaten our livelihood.</p>

<p> </p>

<p>My protest addresses the following issues that I have raised in my previous comments:</p>

<p>The &ldquo;Preferred Alternative&rdquo; chosen by the BLM in the Draft plan would open 90% of the Uncompaghre area to oil and gas leasing! The new proposed Alternative E would be even worse, and I was not given the opportunity to comment on it, as required under NEPA, the National Environmental Protection Act of 1976.</p>

<p> </p>

<p>The issues being protested:</p>

<p>Lack of protection for public health and safety</p>

<p>Lack of protection for air quality and climate</p>

<p>Lack of protection for the land and wildlife</p>

<p>Lack of protection for water resources</p>

<p> </p>

<p>Those issues are addressed in the following sections of the RMP:</p>

<p>Alternative E in its entirety</p>

<p>Section 3.4.2, Public Health and Safety</p>

<p>Section 4.3.1, Air Quality and Climate</p>

<p>Section 4.3.2, Soils and Geology</p>

<p>Section 4.3.5, Water Resources</p>

p>Section 4.4.3, Fish and Wildlife.</p>

<p> </p>

<p>I believe the BLM has erred in adopting the Proposed RMP for the following reasons:</p>

<p>The adoption of Alternative E, a new alternative and was not subject to public comments, is not just unacceptable, it is illegal under NEPA.</p>

<p>It ignores the impact of the chosen alternative on the characteristics of the North Fork Valley, including Gold Medal fishing, innovative ranching such as elk ranching, organic agriculture and orcharding, outdoor recreation and hunting.</p>

<p>It downplays risks to the health of the human population and to farm</p>

<ul>

</ul>

<p>animals, such as the elk, alpacas, sheep, pheasants, cattle, etc. that are being raised by farmers in the North Fork Valley.</p>

<p>The Proposed RMP removes protections in the previous Alternative Bl and even the Preferred Alternative D that were intended to protect valuable resources from the detrimental effects of oil and gas development.</p>

<p>The Proposed RMP increases lands open to leasing with &ldquo;standard stipulations&rdquo; from zero percent to 12 percent. The amount of land with a No Surface Occupancy designation is decreased from twenty-six percent to eleven percent at the same time compared to Alternative D at the same time. This is a drastic reduction in protections.</p>

<p>The Proposed RMP reduces setbacks for oil and gas drilling from nearby water supplies, waterways, as well as areas with highly erodible and saline soils. It also allows surface use on lands with steep slopes greater than 40 percent. It even reduces Timing Limitations near critical wildlife habitat.</p>

<p>The Proposed RMP entirely eliminates Ecological Emphasis Areas, as well as reducing Areas of Critical Environmental Concern. It is clear that the main effort of this RMP is to remove environmental protections for the land, wildlife and humans in the area.</p>

<p>The Proposed RMP effectively opens up the Jumbo Mountain area to oil and gas development, by weakening the proposed protections for the Jumbo Mountain Special Recreation Management Area and includes no &ldquo;No Surface Area Occupancy&rdquo; stipulations whatsoever. Jumbo Mountain, for your information, is a beloved local landmark and recreational area.</p>

<ul>

</ul>

<p> </p>

<p>Finally, the Proposed RMP totally ignores the findings of the Fish and Wildlife Service . It anticipates over a thousand new fracking wells in the UFO but does not mention the Programmatic Biological Opinion given by the U.S. Fish and Wildlife Service that caps surface water withdrawals in the North Fork of the Gunnison River at around 600 acre feet per year for energy development purposes. This means that the BLM in its rush to push oil and gas development, has failed to recognize that there is not enough water in the North Fork of the Gunnison to sustain the level of development proposed in the RMP. I believe this reveals not just an oversight, but a lack of integrity on the part of the BLM.</p>

<ul>

</ul>

<p> </p>

<p> </p>

<p>Therefore, for the reasons outlined above, I respectfully protest the Proposed RMP, and in particular, the sections indicated.</p>

<p> </p>

<p>Sincerely yours,</p>

<p> </p>

BLM_0077028

<p> </p>

<p>Linda Lindsey</p>

<p>Date: July 29, 2019</p>

BLM_0077029

To: Jamie Connell, BLM State Director

From: Luke R Tembrock

RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office

Date: 29 July 2019

Dear Director Connell,

As a former longtime resident of the North Fork Valley and lifelong resident of Colorado who has previously submitted comments of the Draft RMP (comments dated: 31 October 2016; comment number 000404_TembrockL_20161031), I respectfully submit the following protest. My contact information is:

Luke R Tembrock
512 E Monroe Dr Unit D423
Fort Collins, CO 80525

My protest addresses the following issues that I have raised in my previous comments:

-Damage to resources including air, water, soil, vegetation, wildlife, and archeological artifacts with effects on all businesses and individuals utilizing these resources especially tourism and agriculture.
-Loss of recreation opportunities from industrial activities.
-Reduced economic opportunities and overreliance on boom bust economy.
-Reduced property values.

  Those issues are addressed in the following sections of the RMP:
- Alternative E in its entirety
- Section 4.3.1 Air Quality and Climate
- Section 4.3.3 Water Resources
- Section 4.3.5 Fish and Wildlife
- Section 4.4.4 Recreation and Visitor Services
- Section 4.6.2 Public Health and Safety
- Section 4.6.3 Socioeconomics

I believe the BLM has failed in properly adopting the Proposed RMP for the following reasons:

-Alternative E was improperly adopted and was not subject to public comments.
-The BLM recognizes that increased oil and gas leasing in the management area is a threat to the value of my home and my desire to live in the area, yet oil and gas development is open to almost all of the BLM lands in the North Fork Valley. From page 4-447, of the Proposed RMP: "Residents in all five socioeconomic units cited the scenic beauty of the landscapes and sense of community as strong factors in their decision to live and work in the area. While the BLM has not attempted to provide a monetary value on these factors, they do play an important role for both retaining residents and attracting new visitors."

BLM_0077030

-The Proposed RMP reduces setbacks from water supplies and waterways, threatening an already stressed water delivery infrastructure.

-The Proposed RMP eliminates Ecological Emphasis Areas, reduces Areas of Critical Environmental Concern, and includes inadequate protections for Jumbo Mountain, with lack of an NSO designation, leaving Jumbo Mountain open to development. NSO designations overall are insufficient, decreased from 26% to only 11% compared to Alternative D. This decision does not support proper management of our recreational assets, failing to take into account the impact stated on page 4-447 of the Proposed RMP, which states: "Recreation plays a vital role in all five socioeconomic units (see Chapter 3 for a complete description and map of these units). Many people in the study area not only value their own proximity to recreation areas but see their towns as gateways to these areas, enabling them to attract tourists."

-In the Proposed RMP, the Jumbo Mountain SRMA covers only 1600 acres instead of 5200 acres (as proposed in Alternative B), even though the Proposed RMP recognizes that recreation provides economic and intrinsic value to the management area as stated above. Reducing the size of the SRMA leaves the majority of Jumbo Mountain altogether unprotected from oil and gas development, undermining the designation of the SRMA, which is meant to preserve the unique characteristics of the area.

-The Proposed RMP increases the percentage of oil and gas leases with "standard stipulations" -- from 0% to 12% -- primarily in the North Fork Valley and lower Gunnison watershed. This decision ignores the economy and character of the North Fork Valley and the impacts that increased, weakly regulated oil and gas development will have on our future.


Sincerely,

Luke R Tembrock     Date: 29 July 2019

BLM_0077031

To: Jamie Connell, BLM State Director
From:
RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office
Date:

Dear Director Connell,

I am a resident who lives in the Uncompahgre Field Office's Proposed RMP and I have previously submitted comments concerning the Draft RMP dated October 31, 2016 (BLM submission number 000508_DrakeM_20161101). I respectfully submit the following protest. My contact information is:

> Michael L. Drake
> PO Box 1534
> Paonia, CO 81428
> Physical Address – 40275 Stewart Mesa Road, Paonia, CO
> Phone number (970) 527-4535
> Email – mldht1@live.com

My protest of the Proposed UFO RMP addresses the following issues that I have raised in my previous comments letter BLM submission number 000508_DrakeM_20161101 (attached in Appendix A) and specifically covers the following areas in Volume IV of the Proposed RMP:

- Section 5.3 – NEPA: Range of alternatives/purpose and need
- Section 5.4 – NEPA: Best available information—baseline data
- Section 5.6 – NEPA: Direct/indirect impacts
- Section 18.3 – Health and Safety: Impact analysis
- Section 21.1 – Leasable Minerals – Fluid: Range of alternatives
- Section 30.3 – Socioeconomics and Environmental Justice: Impact analysis
- Section 37.3 – Water: Impact analysis

In the Proposed RMP the BLM has continued to make multiple errors and has not faithfully upheld the BLM Mission. The proposed RMP doesn't support the tenets of the operational goals of the BLM from the BLM website –
**https://www.blm.gov/about/our-mission**

- **Our Mission** – The Bureau of Land Management's mission is to sustain the health, diversity, and productivity of public lands for the use and enjoyment of present and future generations.
- **Our vision** – To enhance the quality of life for all citizens through the balanced stewardship of America's public lands and resources.
- **Our Values** – To serve with honesty, integrity, accountability, respect, courage, and commitment to make a difference.
- **Our Guiding Principles** – To improve the health and productivity of the land to support the BLM multiple-use mission. To cultivate community-based conservation, citizen-centered stewardship, and partnership through consultation, cooperation, and communication. To respect, value, and support our employees, giving them resources and opportunities to succeed. To pursue excellence in

business practices, improve accountability to our stakeholders, and deliver better service to our customers.

The following details each area that I'm protesting on the proposed RMP:

- **Section 5.3 – NEPA: Range of alternatives/purpose and need**
  - Comment Number: 000508_DrakeM_20161101-6
    - Comment Excerpt Text – The UFO proposed RMP does not contain an alternative that offers the level of protection these lands warrant. The proposed RMP has ignored:
      1. What the communities and the public in your planning area have specifically requested
      2. The economic development plans that Gunnison and Delta Counties are implementing
      3. What federal law requires.

Protest area #1
  - **One BLM response in this section proves that my first and second comments above were ignored.** The BLM statements shown below demonstrates that the administration directives were the only factors considered:
    - B. Policy and directives from Executive Order 13783 (Promoting Energy Independence and Economic Growth) and Secretarial Order 3354 help guide BLM lands management decisions. The range of alternatives is consistent with the current administration's directives.
    - C. Secretarial Order 3360 rescinded BLM Mitigation Manual (MS-1794) and Mitigation Handbook (H-1794-1). Regional mitigation strategies described in the last paragraph of Draft RMP/EIS Section 2.3.1, Management Common to All Alternatives (page 2-6), was deleted

Protest area #2
  - **Another BLM response demonstrates that BLM avoids potential hazardous situation on the landscape scale by assuming that the situation can be controlled by a "Site specific mitigation"** as shown in the following:
    - C. Draft RMP/EIS Table 2-2, line 5, management common to all alternatives, stated that best management practices (BMPs), other site-specific mitigation, and/or off-site mitigation measures would be applied. BMPs were included in Draft RMP/EIS Appendix G.

Protest area #3
  - **BLM's action of proposing Alternative E as the proposed RMP demonstrates my comment number 3** because that alternative was improperly adopted in that there were no public comments allowed for this alternative.

- **Section 5.4 – NEPA: Best available information—baseline data**
  - Comment Number: 000508_DrakeM_20161101-4

- Comment Excerpt Text – The majority of your reference materials were not generated within the last five years. This situation is totally unacceptable because of the rapid advancements in technology and studies in the O&G area. I am confident that multiple organizations are providing you with recommendations on how to update your reference material, which would greatly affect some of the conclusions in the RMP and any Risk Management Plan.

Protest area #4

- The three BLM responses to this section indicate that some of the reference materials were replaced with more updated material. It is impossible for any logical rational person to comprehend that updated information caused no fundamental change in the BLM's view on oil and gas leasing across the UFO region. This directly indicates that the administration directives were again the only factors considered in the decision making process.

Protest area #5

- **Also note that there was comment on the BLM Risk Management Plan in the responses.** However, BLM's answer to the question of Risk Management Plan is given in Section 5.6, along with my response to the BLM statements.

- **Section 5.6 – NEPA: Direct/indirect impacts**
  - Comment Number: 000508_DrakeM_20161101-7
  - Comment Excerpt Text – Although this detailed process covers many of the requirements for a management plan, it is missing the key management element required for successful implementation of any management plan. That key element is a Risk Management Plan. A risk is defined as "an uncertain event or condition that, if it occurs, has a positive or negative effect on a project's objectives." Risk is inherent with any project, and project managers should assess risks continually and develop plans to address them. The risk management plan contains an analysis of likely risks with both high and low impact, as well as mitigation strategies to help the project avoid being derailed should common problems arise. Risk management plans should be periodically reviewed by the project team to avoid having the analysis become stale and not reflective of actual potential project risks. A Risk Management Plan is a document prepared by a project manager to foresee/define risks, to estimate both the probability of the occurrence and the details of the impact for the risks defined (the risk assessment matrix), rank the identified risks by the level of impact, to create mitigation plans to reduce the probability of occurrence of the risks, and to create recovery plans for the most critical impact risks.
  - BLM response - **A risk management plan is not required by NEPA analysis.** The Final EIS will disclose to the decision-maker the impacts and risks for consideration in making a choice among alternatives. Overall, the BLM gathered the necessary data essential to make a reasoned choice of the preferred alternative among the alternatives analyzed in

detail in the Draft RMP/EIS, and provided an adequate analysis that led to disclosure of the potential environmental consequences of the alternatives (see Chapter 4, Environmental Consequences). As a result, the BLM has taken a "hard look," as required by the NEPA (see 40 CFR 1502.16) at the environmental consequences of the alternatives in the Draft RMP/EIS to enable the decision maker to make an informed decision.

Protest area #6

- o **The BLM response that a risk management plan is not required by NEPA analysis is a direct indication that the BLM NEPA analysis is totally outdated and inaccurate for assessing the risk and potential impact of oil and gas development.** We just celebrated the fiftieth anniversary of the first human landing on the Moon. That major milestone would have failed without a risk management plan. Just how far behind the times is the BLM? Or is the problem simply that BLM see any risk in oil and gas development as someone else's problem?"

- **Section 18.3 – Health and Safety: Impact analysis**
  - o Comment Excerpt Text – The following response by BLM on the risks and public health, safety and welfare, including the environment and wildlife resources provides a keen look into the thought process of BLM and the key element of process planning for Risk Management.
  - o BLM Response –
    - Further, the Colorado Oil and Gas Conservation Commission is the primary agency charged with fostering the responsible development of Colorado's oil and gas natural resources in a manner consistent with the protection of public health, safety, and welfare, including the environment and wildlife resources. Although the BLM does have standards and regulations for mineral extraction and development, the BLM requires that all operators be in full compliance with standards and measures set by the Colorado Oil and Gas Conservation Commission when conducting operations on public lands.
    - While a Human Impact Assessment can inform a NEPA analysis, it is not required by NEPA statute, implementing regulation, or policy. The BLM reviewed the specific human health concerns noted in the comments and added additional information to the Proposed RMP/Final EIS impacts analysis as appropriate to addresses these issues.

Protest area #7

- o **The Direct Takeaway from these responses** is that BLM does everything in their power to make sure that the risks of oil and gas development is someone else's problem. **These BLM responses only further supports the Section 5.6 – NEPA: Direct/indirect impacts comments about BLM's view of risk management.**

- **Section 21.1 – Leasable Minerals – Fluid: Range of alternatives**
  - o Comment Number: 000508_DrakeM_20161101-2

- o Comment Excerpt Text – There is no doubt that if the UFO had completed a Risk Management Plan that there would be multiple areas within the UFO region what would have been identified as appropriate for a "No Lease for O&G" option. Considering the O&G risk impacts and the current worldwide surplus with O&G, it is obvious that delaying O&G development for the next 20 years is reasonable. There is little doubt that the extraction technologies will greatly improve in the next 20 years and the risks associated with the O&G development will drop.
- o BLM response - The UFO RMP is a planning-level document that does not make site-specific decisions on mineral leasing, including moratoriums. Assigning decision area-wide surface use and timing stipulations on BLM-administered lands during the RMP planning-level analysis is appropriate in order to provide general direction for potential site-specific applications for resource use.

Protest area #8
- o **BLM's 60,000 foot planning-level document needs to be changed to a 30,000 foot planning-level document that includes a complete Risk analysis and management program.** BLM needs such an improved planning document because once a lease is signed, BLM can't stop drilling. Detailing high level site specific issues would make the entire process better for all.

- **Section 30.3 – Socioeconomics and Environmental Justice: Impact analysis**
  - o Comment Number: 000508_DrakeM_20161101-2
  - o Comment Excerpt Text – Delta County and the Delta County Economic Development organization received a grant from the federal government to complete a study aimed at defining the best ways to develop a resilient and sustainable economy in Delta County. The Better City Company located in Utah developed that plan. The bottom line from that plan was to expand agricultural, increase "value-added" agriculture businesses, increase Agri-tourism, and increase recreational and arts tourism. If you refer to the above "Farm Operations" and "Home Life" sections **(in Appendix A)**, you can rabidly see how O&G development poses a great risk to the plan that Delta County has started to implement.
  - o BLM response –The BLM appreciates the comments. Additional information on the general types of impacts from development on the agri-tourism and organic farming industry and the qualitative impacts by alternative was added to the Proposed RMP/Final EIS. As noted in the response to Section 5 (NEPA), Section 5.3 (Range of Alternatives/Purpose and Need), of this report, prior to development, **FURTHER SITE-SPECIFIC ANALYSIS OF IMPACTS** would be required, including potential impacts on the local agri-tourism and organic farming industry. 5. The BLM appreciates the comments. Information on the general types of impacts from development on local property values was added to the Proposed RMP/Final EIS. Quantitative analysis is not appropriate at the RMP planning level due to a lack of site-specific development locations.

As noted in the response to Section 5 (NEPA), Section 5.3 (Range of Alternatives/Purpose and Need), of this report, prior to development, further site-specific analysis of impacts would be required, including potential impacts on the local agri-tourism and organic farming industry.

Protest area #9

- o **The Bottom Line – You cannot control the impacts agri-tourism, organic farming, traditional farming, and value added Ag production through site specific analysis. These impacts occur over an area much larger than a site specific evaluation. The impact must be evaluated on the watershed area. The results should place limitations on oil and gas development. This is exactly why the RMP planning document has to be done at a more detailed.**

- • **Section 37.3 – Water: Impact analysis**
  - o Comment Number: 000508_DrakeM_20161101-12
  - o Comment Excerpt Text – The Final Resource Management Plan must include the detailed evaluation of the reduction in Colorado water supply in future years based on the fact that the water used in O&G development is removed from the earth's water cycle.
  - o Comment Number: 000508_DrakeM_20161101-3
  - o Comment Excerpt Text – The RMP does not consider the O&G water use impact on the Colorado Water Conservation Board's (CWCB) studies indicating that the Colorado will have a water deficit as early as 2030. The O&G development uses about 0.5% of the total water usage in Colorado in a year. That means that every decade the total amount of water available in Colorado drops by 5% because the water used by O&G development is removed from the earth's water cycle. The earth isn't generating any new water, just reusing what has been here for millennials. CWCB's website is http://cwcb.state.co.us/watermanagement/ Pages /WaterManagementHome.aspx
  - o BLM response - Draft RMP/EIS Chapter 4 analyzes the effects of hydraulic fracturing on water resources (see pages 4-83 and 4-87). As stated in Draft RMP/EIS Section 2.4.3, Prohibit Fluid Mineral Leasing throughout Decision Area, on page 2-16, "resource values that can only be protected by prohibiting all fluid mineral leasing throughout the decision area have not been identified. An alternative that prohibits fluid mineral leasing throughout the decision area would not meet the purpose of and need for the RMP (detailed in Section 1.1), part of which is management direction in accordance with principles of multiple use and sustained yield. Leasing of BLM-administered lands for fluid mineral exploration and production is authorized and directed by the FLPMA, BLM Land Use Planning Handbook (H-1790-1), Mineral Leasing Act of 1920 (as amended), and Energy Policy Act of 2005 (Public Law 109-58). **Site-specific NEPA analysis would consider potential impacts on water quality and quantity at a more detailed level based on specific proposed activities.**

Protest area #10

- ○ **The Bottom Line – Watershed issues cover a significantly larger area than a site specific area.** Therefore, you cannot control watershed level issues through site specific analysis. At the site specific time, the lease has already been granted. **Watershed issues must be addressed in the RMP because these issues cover most of the UFO area. However watershed issues currently can't be addressed because of the extremely high altitude level of the RMP planning document.**

**Because of the failures of the BLM defined above, my direct request is the proposed RMP for the UFO district be completely revised.**

Sincerely,

_Michael Duke_ Date: July 28, 2019

# Appendix A

# Michael L. Drake comments concerning the Draft RMP dated October 31, 2016 (BLM submission number 000508_DrakeM_20161101)

BLM_0077039

Michael L. Drake

Paonia, CO, 81428

October 31, 2016

BLM, Uncompahgre Field Office

2465 S. Townsend Ave.

Montrose, CO 81401

**Re: Draft Resource Management Plan for the Uncompahgre Field Office**

Dear BLM Uncompahgre Field Office (UFO) Staff and RMP Comment Team,

The UFO draft Resource Management Plan (RMP) does not contain an alternative that offers the level of protection these lands warrant. The current draft RMP appears to have ignored:

- What the communities and the public in your planning area have specifically suggested/requested
- The economic development plans that Gunnison and Delta Counties are implementing
- What federal law requires.

**Declaration of Impacts** – The "preferred" Alternative D, as well as the rest of the Alternatives, would have a significant impact on my family's life in the North Fork Valley (NFV). The following details the impacts on my life if any of the current RMP alternatives are adopted.

In 1977 I started my almost annual trip from Ohio to Colorado to hunt. In 2000, my job moved me from Dayton, Ohio to Ogden, Utah, which greatly reduced my trip to hunt in Colorado. In 2001, my wife and I started evaluating where in the West we were going to live when we retired. We investigated and visited multiple places in Idaho, Wyoming, Montana, and Colorado. We decided that Colorado was the best place for us to live. We looked across the state from Canon City to Craig. In late 2002, we found Paonia, in the NFV.

It was 2004 before we found and closed on our home in the NFV. We became permanent residents in February 2008. We live on a 7-acre mini-farm where we have an organic home garden. We have been improving much of our property to allow organic grazing for sheep and goats, and expect to start the grazing operation in 2017.

We choose the NFV because of the following:

- The abundant organic animal, vegetable, and fruit farms
- The organic wineries
- The traditional farms and ranches
- The year-round outdoor activities such as hiking, biking, fishing, hunting, camping and cross-country skiing
- The clean air and water

- The small town and rural environment
- The brilliant night sky

Both the indigenous Ute Indians and the US immigrant population that settled this area after the Utes were forced out, were in the NFV because of the valley's abundant clean water, fertile soil, and climate. At the 1893 World Fair in Chicago, all six NFV fruits entered in that Fair won the Gold Medal for their category. The NFV continues to be known for the fruits, vegetables and livestock grown here.

My wife and I started hiking, camping, and fishing in the NFV in 2003. In 2006 we started archery hunting in the NFV. I have killed two elk and two deer here, and my wife has killed two deer.

My direct impacts from the development of oil and gas in the North Fork Valley occur in each of the three major parts of my life – farm operations, home life, and outdoor activities.

**Farm Operations** – My farm, like most farms in the valley, exists because of the irrigation water rights that I own. Clean irrigation water is the key to successful farming in the NFV.

Two separate irrigation water facts combine to prove that O&G development in the NFV will have a devastating impact on my farm and farming in general within the NFV. The first fact is that all irrigation water in the NFV will be impacted directly by any surface water contamination. The second fact is that reports from all O&G development sites document a variety of regular spills that result in surface water contamination. In 2014 there were over 700 spills reported in Colorado. The only mitigation plan for a contaminated open dirt ditch irrigation system is the remediation of the contaminated ditch dirt and all the contaminated farms served by that ditch, including the on-farm irrigation systems such as sprinkler systems. I should note that my particular irrigation company used sections of naturally occurring creeks, in conjunction with both dirt ditches and piped ditches, to deliver irrigation water to the farms served.

Air pollution from O&G development will provide a significant risk to both organic and traditional farming operations in the NFV, including my farm.

**Home Life** – We use irrigation water for our home organic garden. Therefore, all the comments above about irrigation water contamination from O&G applies to our organic garden. When a spill contaminates our irrigation water, our garden system of 10 raised beds will require complete replacement of the contaminated soil.

Our home drinking water comes from springs in the mountains close to Paonia. O&G spills will directly impact our drinking water source. The entire water system from the source, raw water storage, purification system, treated water storage, and water delivery will require decontamination. Not only will there be a large loss of water from the contamination event, but there also will be a large amount of water lost through the decontamination process. Water wasted in Colorado should be a crime because of the limited amount of water available and the predicted large water shortage by 2050.

BLM_0077041

Most of the drinking water in the NFV will be directly impacted by O&G spills that contaminate surface water. The town of Somerset and the three coal mines in the area get their drinking water directly from the North Fork of the Gunnison River, with the mines also getting their industrial water for mining operations directly from the North Fork River. All creeks in the NFV Mountains flow into this river. Again, the cost of remediation of the town and coal mine water systems would be large.

**Life Activities** – This first paragraph details a very personal impact of O&G air pollution.

As the Executive Director of Painted Sky Resource Conservation and Development, I had the opportunity to observe a demonstration of a new technology for handling O&G produced water. The demonstration was being conducted at a Vernal Utah outdoors O&G evaporation pond facility. My wife and a co-worker accompanied me on the trip to see the demonstration. The tech demo was on the far side of the facility. Within a couple of minutes of us driving through this large multi-pond facility, my wife started feeling lightheaded and sick to her stomach. The people running the demonstration told her to stay inside the office trailer, which had an air conditioners in a couple of the windows and all the rest of the windows were closed. They told us that other folks have had the same reaction. My co-worker and I had no problem. Our demonstration and tour lasted about 30 minutes. About an hour after leaving the facility, my wife's symptoms remained and we stopped in Rangely, Colorado to get something to settle her stomach. The rapid onset of my wife's symptoms demonstrated my wife's susceptibility to O&G air pollution. BLM's responsibility is to protect those with the highest levels of sensitivities. Obviously, we cannot go hiking, biking, fishing, hunting, camping or cross-country skiing in an area where there is O&G development.

Hunting and fishing will be directly impacted by O&G development. The impact will require us stop hunting 45 minutes from the house and revert to driving 3 to 7 hours to get to a place with no O&G development to hunt. Needless to say, this defeats one of the main reasons we moved to the NFV. The impacts on hunting and fishing involve surface water contamination, air pollution, habitat fragmentation. Additional impacts are the industrial light and noise, traffic and human activities that O&G development brings to the area. Combined, the impacts cause the game to avoid these areas and disrupt migration patterns. We saw directly the habitat fragmentation impact from the results of logging in the area that reduced the elk population. The elk simply left the area because of the changes in the required elk habitat and to avoid the human traffic and activities. As the area recovers from the logging, the elk are slowing coming back.

Our hiking, biking, camping and cross-country skiing activities (including wildlife viewing during all these activities) will all be impacted by the industrialization from O&G development in the NFV. The prime drivers of the impacts will be the surface water contamination and the air pollution, industrial noise, traffic and human activities that O&G development brings. The impacts

BLM_0077042

defined above also cause the wildlife to avoid these areas, disrupt migration patterns and greatly reducing the area's wildlife viewing opportunities.

There are multiply problems that come with surface water contamination. One of the major concerns would be that safe drinking water would not be available. All current water filters that most hunters, anglers, hikers, bikers, campers, and skiers do not provide protection from O&G pollution.

**Major Flaws in the RMP** – the BLM Mission statement from the draft RPM states, "It is the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations."

1. My declaration of impact makes it clear that the current RMP does not meet the mission statement of the BLM.

2. The RMP is the management plan for the next 20 to 30 years. The plan presents a process in Table ES-2 for the resource categories and planning issues statement for these resource categories. The plan includes a process to analyze and evaluate projected impacts. These processes are detailed throughout Volume 1 and 2 of the RMP.
Although this detailed process covers many of the requirements for a management plan, it is missing the key management element required for successful implementation of any management plan. That key element is a Risk Management Plan.

   A risk is defined as "an uncertain event or condition that, if it occurs, has a positive or negative effect on a project's objectives." Risk is inherent with any project, and project managers should assess risks continually and develop plans to address them. The risk management plan contains an analysis of likely risks with both high and low impact, as well as mitigation strategies to help the project avoid being derailed should common problems arise. Risk management plans should be periodically reviewed by the project team to avoid having the analysis become stale and not reflective of actual potential project risks.

   A Risk Management Plan is a document prepared by a project manager to foresee/defme risks, to estimate both the probability of the occurrence and the details of the impact for the risks defined (the risk assessment matrix), rank the identified risks by the level of impact, to create mitigation plans to reduce the probability of occurrence of the risks, and to create recovery plans for the most critical impact risks.

   With the current state of risk management technology and the utilization of the risk management technology by many different organizations within the US government, the lack of a detailed Risk Management Plan makes the BLM look like an archaic organization and potentially criminally liable for the occurrence of the BLM identified risks in the RMP.

3. There is no doubt that if the UFO had completed a Risk Management Plan that there would be multiple areas within the UFO region what would have been identified as appropriate for a "No Lease for O&G" option. Considering the O&G

risk impacts and the current worldwide surplus with O&G, it is obvious that delaying O&G development for the next 20 years is reasonable. There is little doubt that the extraction technologies will greatly improve in the next 20 years and the risks associated with the O&G development will drop.

4. The RMP does not consider the O&G water use impact on the Colorado Water Conservation Board's (CWCB) studies indicating that the Colorado will have a water deficit as early as 2030. The O&G development uses about 0.5% of the total water usage in Colorado in a year. That means that every decade the total amount of water available in Colorado drops by 5% because the water used by O&G development is removed from the earth's water cycle. The earth isn't generating any new water, just reusing what has been here for millennials. CWCB's website is http://cwcb.state.co.us/water-management/Pages/WaterManagementHome.aspx

5. The majority of your reference materials were not generated within the last five years. This situation is totally unacceptable because of the rapid advancements in technology and studies in the O&G area. I am confident that multiple organizations are providing you with recommendations on how to update your reference materials, which would greatly affect some of the conclusions in the RPM and any Risk Management Plan.

6. Delta County and the Delta County Economic Development organization received a grant from the federal government to complete a study aimed at defining the best ways to develop a resilient and sustainable economy in Delta County. The Better City Company located in Utah developed that plan. The bottom line from that plan was to expand the agriculture base, increase "value-added" agriculture businesses, increase Agri-tourism, and increase recreational and arts tourism. If you refer to the above "Farm Operations" and "Home Life" sections, you can rapidly see how O&G development poses a great risk to the plan that Delta County has started to implement.

The final Resource Management Plan must:

- Include a complete Risk Management Plan

- Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans. There is little doubt that multiple areas with the UFO, like the NFV and all of Delta County, need the no-leasing alternative to be incorporated in the final "Preferred Alternative"

- Include the detailed evaluation of the reduction in Colorado water supply in future years based on the fact that the water used in O&G development is removed from the earth's water cycle.

- Include the detailed evaluation of the impacts of O&G on the economic development effort underway in Delta and Gunnison counties.

Without detailed consideration of the bullet list above and considering how the no-leasing option would be integrated into the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of reasonable management possibilities.

Sincerely,

Michael L. Drake

8/12/2019

# Proposed RMP/Final EIS

## Submission Successful
## Your Submission ID is: PRMP-1-500000213

## Names & Addresses

Mr. Robin B. Nicholoff
36295 Sunshine Mesa Rd.
Hotchkiss, Colorado 81419, United States
Email Address:     robgret@tds.net
Day Phone:        1970-527-3997
Evening Phone:    970-527-3997
Other Phone:      970-778-7814
Agency:           Public Web Page

Mr. Robin B. Nicholoff
36295 Sunshine Mesa Rd.
Hotchkiss, Coiorado 81419, United States
Email Address:     robgret@tds.net
Day Phone:        1970-527-3997
Evening Phone:    970-527-3997
Other Phone:      970-778-7814
Agency:           Pubiic Web Page

## Comments

Comment ID:   1

Comment Title:   Protest of BLM response to my comments in the Draft RMP

Comment:   1. PROTEST OF PORTIONS OF PROPOSED RESOURCE MANAGEMENT PLAN AND FINAL EIS FOR UNCOMPAHGRE FiELD OFFiCE, BUREAU OF LAND MANAGEMENT, U.S. DEPT. OF THE iNTERIOR

1.To allow the working public only 30 days to review, analyze, and write comments on 4 volumes of documents that took the BLM 10 years and thousands of paid person-hours to produce is ridicuious and disgusting.

2. I own and operate a family farm adjacent to BLM land and have done so for the past 46 years. During such time I have engaged the BLM in a number of issues including livestock grazing on the adjacent grazing allotment, wiidiife habitat improvement, wildfire suppression and post-fire rehabiiitation, vegetative treatment, and minerai extraction.  Since the early 1980's I have engaged in public participation of various NEPA documents. My family's liveiihood, heaith, and weii-being are criticaiiy affected by management of BLM iands for severai reasons inciuding the following:
+ Our domestic water source originates on BLM land.
+ Our irrigation water is conveyed through and partiaiiy originates on BLM iand.
+ We regularly recreate on nearby BLM land.
+ We lost 30 acres of woodland to a wildfire that originated on BLM land.
+ Although the 1979 UFO RMP caiied for fencing our common border with BLM iand, it never happened, and consequently we are impacted by trespassing cattle every fall.
+ i have extinguished more than a dozen iightning-caused fires near my home that originated on BLM iand over the years.

Thus, i am compeiied to protest the Proposed RMP/Finai EiS, although due to time constraints (see #1 above) these comments will not be as specific or as numerous as I would like.

1. 3.BLM's response to my comments  000555_NicholofR_20161101-4,5,6 in the Draft RMP.

Your response : "As discussed in Section 21 (Leasable Minerals – _Fluid) of this report, future site-specific analysis will assess those specific areas for which an applicant has submitted an application for permit to drill." (R-636).

In granting a lease to extract fluid minerals BLM is conferring a property right that, to a great extent, constitutes an irretrievable commitment of resources and that under NEPA requires a hard look at the consequences of such a commitment. The agency cannot kick the can down the road by avoiding analysis of such an action as leasing by assuming that all potential impacts can be mitigated. Some lands, such as most Federal lands in the area of the North Fork of the Gunnison River and its tributaries, should not be leased. You cannot prevent damage to watersheds when reported spills of toxic liquids occur on average twice a day in Colorado, and undoubtedly many more unreported spills occur.  Deferring assessments until drilling is imminent is unacceptable where the possible

1/4

BLM_0077045

harm affects hundreds of families and a major segment of our county's economy.

4.The same argument applies to potential damage to wildlife, soils, vegetation, and water resources in the North Fork Valley area. As noted in the comments on the draft RMP,

"BLM can and should close the North Fork area to oil and gas leasing in the final RMP.

The existing range of alternatives in the Draft RMP adequately supports closing the North Fork area to oil and gas leasing in the final RMP. The planning area for the Uncompahgre RMP includes 917,030 acres of fluid minerals, of which the North Fork area is 139,540 acres. Alternative B1 would close 104,750 acres in the North Fork area (75% of the minerals in the North Fork area) to leasing. Uncompahgre Draft RMP at 2-189—191. Closing the full North Fork area to leasing would only close an additional 34,790 acres in a 917,030-acre decision area, which is 3.8% of the planning area. This change fits within the range of alternatives and would not require supplemental NEPA." (see p. 62 of Comments on the Draft RMP and EIS.)

In summary, your plan to lease 95% of the UFO lands and most of the lands in the North Fork area for oil and gas development poses a threat to my family's livelihood, health and well-being.

Finally, whoever programmed this Comment Submission Form did a poor job, as I was not allowed to copy and paste accurately from a MicroSoft Word document, the most commonly-used word processing program in the world.

Robin Nicholoff
36295 Sunshine Mesa Road
Hotchkiss, CO 81419
970-527-3997

Comment ID: 2

Comment:  1. 1.To allow the working public only 30 days to review, analyze, and write comments on 4 volumes of documents that took the BLM 10 years and thousands of paid person-hours to produce is ridiculous and disgusting.

 1. 2. I own and operate a family farm adjacent to BLM land and have done so for the past 46 years. During such time I have engaged the BLM in a number of issues including livestock grazing on the adjacent grazing allotment, wildlife habitat improvement, wildfire suppression and post-fire rehabilitation, vegetative treatment, and mineral extraction.  Since the early 1980's I have engaged in public participation of various NEPA documents. My family's livelihood, health, and well-being are critically affected by management of BLM lands for several reasons including the following:

+ Our domestic water source originates on BLM land.
+ Our irrigation water is conveyed through and partially originates on BLM land.
+ We regularly recreate on nearby BLM land.
+ We lost 30 acres of woodland to a wildfire that originated on BLM land.
+ Although the 1979 UFO RMP called for fencing our common border with BLM land, it never happened, and consequently we are impacted by trespassing cattle every fall.
+ I have extinguished more than a dozen lightning-caused fires near my home that originated on BLM land over the years.
  Thus, I am compelled to protest the Proposed RMP/Final EIS, although due to time constraints (see #1 above) these comments will not be as specific or as numerous as I would like.

 1. 3. BLM's response to my comments  000555_NicholofR_20161101-4,5,6 in the Draft RMP.

Your response : " "As discussed in Section 21 (Leasable Minerals – _Fluid) of this report, future site-specific analysis will assess those specific areas for which an applicant has submitted an application for permit to drill." (R-636).

In granting a lease to extract fluid minerals BLM is conferring a property right that to a great extent constitutes an irretrievable commitment of resources and that under NEPA requires a hard look at the consequences of such a commitment. The agency cannot kick the can down the road by avoiding analysis of such an action as leasing by assuming that all potential impacts can be mitigated. Some lands, such as most Federal lands in the area of the North Fork of the Gunnison River and its tributaries, should not be leased. You cannot prevent damage to watersheds when reportedspills of toxic liquids occur on average twice a day in Colorado, and undoubtedly many more unreportedspills occur.  Deferring assessments until drilling is imminent is unacceptable where the possible harm affects hundreds of families and a major segment of our county's economy.

BLM_0077046

8/12/2019

4.The same argument applies to potential damage to wildlife, soils, vegetation, and water resources in the North Fork Valley area. As noted in the comments on the draft RMP,

"BLM can and should close the North Fork area to oil and gas leasing in the final RMP.

The existing range of alternatives in the Draft RMP adequately supports closing the North Fork area to oil and gas leasing in the final RMP. The planning area for the Uncompahgre RMP includes 917,030 acres of fluid minerals, of which the North Fork area is 139,540 acres. Alternative B1 would close 104,750 acres in the North Fork area (75% of the minerals in the North Fork area) to leasing. Uncompahgre Draft RMP at 2-189—191. Closing the full North Fork area to leasing would only close an additional 34,790 acres in a 917,030-acre decision area, which is 3.8% of the planning area. This change fits within the range of alternatives and would not require supplemental NEPA."  (see p. 62 of Comments on the Draft RMP and EIS.)

In summary, your plan to lease 95% of the UFO lands and most of the lands in the North Fork area for oil and gas development poses a threat to my family's livelihood, health and well-being.

Finally, whoever programmed this Comment Submission Form did a poor job, as I was not allowed to copy and paste accurately from a MicroSoft Word document, the most commonly-used word processing program in the world. Furthermore, when I needed to go to previous step, everything I had entered was erased and had to be re-entered. Finally, copying to your protocol distorted my text, deleting spaces between words and randomly adding letters. Serious incompetence at work.

Robin Nicholoff
36295 Sunshine Mesa Road
Hotchkiss, CO 81419
970-527-3997

Referenced comments as per your requirements:
Comment Number: 000555_NicholofR_20161101-6 Organization1:

Commenter1:Robin Nicholoff

Commenter Type: Individual

Other Sections: 21.3

Comment Excerpt Text: The third major component of Delta County's wildliferelated economy is fishing. The potential damage to our fisheries resource would be mainly from contamination of streams by toxic hydrofracturing compounds, produced water, fuel spills, sediment loading from soil erosion associated with well pad construction and pipe line installation, etc. [ In 2015 the oil and gas industry reported 615 spills, or nearly 2 per day. The number of unreported spills is unknown.]

Comment Number: 000555_NicholofR_20161101-4

Organization1:

Commenter1:Robin Nicholoff

Commenter Type: Individual

Comment Excerpt Text:

The negative effects on deer and elk from roads have been welldocumented over the past four decades. For mule deer "Roads generally decrease the value of habitat for distances up to 1/2 mile from the road. If roads are to be left open in an area, the combined length of roads should be less than 1 mile per square mile of habitat." (Managing Forested Lands For Wildlife, Colorado Division of Wildlife and USDA Forest Service, 1984). Elk are sensitive to human activity and "should be afforded maximum protection from disturbance... It is important that elk be relatively free from human disturbances. This is particularly true during parturition, young rearing, and in winter." (Ibid.) More recently, studies of deer populations around Pinedale Wyoming show a 45% decline in mule deer populations over the past 3 years thanks to intensive gas drilling and development.

Parachute Creek Mule Deer Monitoring Report 19822000, by BioResources, Inc. is a major long term study of deer populations near Parachute, Colorado commissioned by then energy giant

UNOCAL Corporation. It concludes that Natural gas drilling operations in the lower valley add another adverse impact that should require mitigation of negative influence on the health of the deer herd. At present, the mule deer herd should be managed with several years of deferred hunting, and sheep and cattle grazing should be managed to avoid the steep slope xeric shrub habitat. Natural gas development operations need to initiate a concerted mitigation program with realistic, measurable, resultoriented habitat and herd management. ...land management in Parachute Creek needs to assist the recovery by decreasing human land use impacts. Human presence should be controlled while deer occupy winter range. (emphasis added)

BLM_0077047

8/12/2019

In other words, not only the hunting economy would likely be damaged, but the livestock industry as well. In fact, restoration of deer herd health and numbers from the effects of gas well activity will require the radical measure of controlling mere human presence.

Comment Number: 000555_NicholofR_20161101-5

Organization1:

Commenter1:Robin Nicholoff

Commenter Type: Individual

Other Sections: 14.3

Comment Excerpt Text:

The study found that deer populations declined "most drastically" in areas of gas well drilling:

Since 1993 mule deer habitat has been reduced by the development of additional gas well installations, well access roads, and the constant traffic associated with ongoing well service personnel. Ongoing natural gas operations should mandate a wellplanned and executed mitigation plan with UNOCAL that will measurably demonstrate revegetation and mule deer habitat restoration success.

Gas well drilling and pipe line construction each require road construction and high levels of truck traffic and heavy machinery operations that will disturb deer and elk. Such disturbance during calving and fawning would likely result in increased calf and fawn mortality. Disruption to migration patterns is another likely detriment. Chronic Wasting Disease may be exacerbated by the increased stress to herds from prolonged disturbance. Some wells would likely be drilled in deer and elk security areas which are a requirement for healthy populations.

Comment Number: 000555_NicholofR_20161101-3

Organization1:

Commenter1:Robin Nicholoff

Commenter Type: Individual

Other Sections: 30.2

Comment Excerpt Text:


Comment Number: 000555_NicholofR_20161101-2

Organization1:

Commenter1:Robin Nicholoff

Commenter Type: Individual

## Submission Classification

| | |
|---|---|
| Response Type: | Front Office Submission Form |
| Delivery Type: | Front Office Submission Form |
| Receipt Date: | 07/29/2019 |
| Status: | ACTIVE |

## Agreements

Yes -   Please include me on the mailing list for this project?
No -   Withhold personally identifying information from future publications on this project?
Yes -   Protesting the Proposed RMP/Final EIS

## Original Submission Files

4/4



JOHN E. PETERS
BEN TISDEL
DON BATCHELDER

## BOARD OF COUNTY COMMISSIONERS

P.O. Box C  •  Ouray, Colorado 81427  •  970-325-7320  •  FAX: 970-325-0452

July 29, 2019

Director (210)
Attn: Protest Coordinator
P.O. Box 71383
Washington, D.C. 20224-1383

And

Director (210)
Attn: Protest Coordinator
20 M. Street SE, Room 2134 LM
Washington, D.C. 20003

*U.S. Mail and Electronically Submitted*
*via Instructions Received:*
https://www.blm.gov/programs/planning-and-nepa/public-participation/filing-a-plan-protest

Re: Ouray County Protest to Proposed RMP/Final EIS

Dear Protest Coordinator,

### I.  INTRODUCTION:

The Board of County Commissioners of Ouray County, Colorado ("Ouray County") respectfully submits this protest ("Protest") regarding the "Proposed Resource Management Plan and Final Environmental Impact Statement for the Uncompahgre Field Office" ("Proposed RMP/Final EIS"). Pursuant to 43 § C.F.R. 1610.5-2, by this correspondence Ouray County formally protests approval of the Proposed RMP/Final EIS.

The Proposed RMP/Final EIS contains a primary document numbering more than 800 pages, and 20 appendices numbering more than 2,600 pages, created at a cost identified by the Bureau of Land Management ("BLM") to be $3,592,000. The Proposed RMP/Final EIS describes and analyzes five alternatives and one partial alternative for managing a planning area of approximately 3.1 million acres including 2,234,670 acres of federal mineral estate in southwestern Colorado throughout six counties, of which Ouray County is one.

Ouray County is exercising its opportunity to file this Protest within the required thirty (30) days of the date of the formal publication of the Proposed RMP/Final EIS.

Ouray County identifies below its authority to bring this Protest, the analytical framework that the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act of 1976 ("FLPMA") require of the Proposed RMP/Final EIS, and a critical review of the Proposed RMP/Final EIS.

Ouray County formally protests regarding the following issues and requests the BLM to consider these issues both individually and collectively:

A. In our letter dated November 1, 2016, we identified many parcels requested to not be identified as lands suitable for disposal. The Proposed RMP/Final EIS designates most of these lands as suitable for disposal.

B. Alternative E is a substantially new agency alternative that differs so dramatically from the alternatives canvassed in the Draft RMP/EIS – and which was drafted in disregard of the requirements of NEPA, FLPMA and the MOU between the BLM and Ouray County – as to preclude meaningful consideration by Ouray County and the public.

BLM_0077049

C. Alternative E was presented in the Proposed RMP/Final EIS without all supporting data and files being made publicly and timely available.

D. The Proposed RMP/Final EIS was drafted without consideration of Ouray County's formal planning and land use regulatory regimes.

E. The Proposed RMP/Final EIS does not adequately consider the Gunnison Sage-grouse population, habitat and designation as a "threatened species."

F. The Proposed RMP/Final EIS does not adequately consider oil and gas development, its related impacts and, in particular, the newly adopted Colorado Senate Bill 19-181.

G. The Proposed RMP/Final EIS does not adequately consider or provide protections for sensitive, threatened and endangered fish, including half mile riparian "no surface occupancy" ("NSO") setbacks and other important wildlife habitat mapped by Colorado Parks and Wildlife ("CPW").

H. The Proposed RMP/Final EIS does not adequately consider the consequences of climate change.

I. The Proposed RMP/Final EIS does not adequately consider protection and enhancement of agriculture.

J. The Proposed RMP/Final EIS does not adequately consider management, protection and enhancement of outdoor recreation.

K. The Proposed RMP/Final EIS is based on inadequate NEPA analysis and protections for waterbodies, aquatic, wetland and hydrologic resources, source water protection areas, domestic water supplies, and cultural resources for fluid mineral leasing and surface disturbing activities.

L. Alternative E inappropriately contains lands identified for "disposal" that are adjacent to or intersecting Gunnison Sage-grouse critical habitat, or are adjacent to private land conserved for Gunnison Sage-grouse habitat, or the disposal of which would conflict with existing user access to public or private lands, or water rights and irrigation.

Ouray County further protests the fact that the BLM did not timely or publicly make identification of these lands available for the Protest period – or for the 2016 Draft RMP/Draft EIS.

M. Ouray County protests that, regarding certain species, the BLM failed to make available the BLM Biological Assessment ("BA") and the Fish and Wildlife Service ("USFWS") Biological Opinion ("BO"); it is not clear what Alternative the BA and BO analyzed.

N. There is inadequate analysis and protections for waterbodies, aquatic, wetland and hydrologic resources, source water protection areas, domestic water supplies, and cultural resources from the impacts of fluid mineral leasing and other surface disturbing activities.

## II. OURAY COUNTY'S AUTHORITY TO PROTEST

Ouray County formally participated as a "cooperating agency" during the development of the Proposed RMP/Final EIS, and has authority to protest both procedural and substantive errors in the Proposed RMP/Final EIS.

The formal cooperating agency relationship is intended to provide a framework for intergovernmental efforts by:

- Gaining early and consistent involvement;
- Incorporating local knowledge of economic, social, and environmental conditions and land use requirements;
- Addressing intergovernmental issues and avoiding duplication of effort;
- Enhancing credibility and support for EIS's;
- Building a relationship of trust and cooperation that results in better decisions.

As the government of general jurisdiction in Ouray County, Colorado, which jurisdiction includes land use planning and activities, and protection of the health, safety and welfare of persons in Ouray County, and the protection of the environment and wildlife in Ouray County, the Board of County Commissioners of Ouray County has an interest which is or may be adversely affected by the approval of the Proposed RMP/Final EIS. Relevant statutes include Colo. Rev. Stat. § 18-9-117, 29-20-101, 30-28-101 et seq., 30-11-107 et seq., 38-1-202, 42-1-102, 42-4-106, 43-1-217, 43-2-101, 43-2-201.1.

BLM_0077050

### III. RELATIONSHIP AMONG THE NATIONAL ENVIRONMENTAL POLICY ACT ("NEPA"), THE FEDERAL LAND POLICY AND MANAGEMENT ACT OF 1976 ("FLPMA"), AND THE PROPOSED RMP/FINAL EIS

The National Environmental Policy Act ("NEPA") is our "basic national charter for the protection of the environment," achieving its purpose through "action forcing procedures... requir[ing] that agencies take a hard look at environmental consequences." 40 C.F.R. § 1500.1; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citations omitted) (emphasis added). This includes the consideration of the best available information and data, as well as disclosure of any inconsistencies with federal policies and plans. NEPA requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action, as well as reasonable alternatives. *See* 42 U.S.C. § 4331(b) (congressional declaration of national environmental policy); *DOT. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004). The BLM must "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action in comparative form, so as to provide a "clear basis for choice among the options" open to the agency. 40 C.F.R. § 1502.14. At a minimum, the agency must identify and analyze its preferred alternative, as well as a null or "no action" alternative that would occur if the agency elected to maintain the current state of affairs unchanged. In addition, the agency should address all other reasonable alternatives to the proposed action. *See Colorado Envtl. Coal v. Salazar*, 875 F. Supp. 2d 1233, 1249. (D. Colo. 2012).

Through the RMP planning process, the BLM Uncompahgre Field Office is required to "estimate and display the physical, biological, economic, and social effects of implementing each alternative considered in detail. The estimation of effects shall be guided by the planning criteria and procedures implementing [NEPA]." 43 C.F.R. § 1610.4-6. Essential to any NEPA process is a robust analysis of alternatives to the proposed action. Consideration of reasonable alternatives is necessary to ensure that the agency has before it, and takes into account, all possible approaches to, and potential environmental impacts of, a particular project. NEPA's alternatives requirement, therefore, ensures that the "most intelligent, optimally beneficial decision will ultimately be made." *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Com. 146 U.S. App. D.C. 33,* 449 F.2d 1109, 1114 (1971).

"[T]he heart" of an environmental analysis under NEPA is the analysis of alternatives to the proposed project, and agencies must evaluate all reasonable alternatives to a proposed action." *Colo. Envtl. Coal.,* 185 F.3d 1162 at 1174 (10th Cir. 1999)(quoting 40 C.F.R. § 1502.14). An agency must gather "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Greater Yellowstone,* 359 F.3d at 1277 (citing *Colo. Envtl. Coal.,* 185 F.3d 1162 at 1174); *see also Holy Cross Wilderness Fund v. Madigan,* 960 F.2d 1515, 1528 (10th Cir. 1992). Thus, agencies must "ensure that the statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision." *Izaak Walton League of America v. Marsh,* 655 F.2d 346, 371 (D.C. Cir. 1981) (citing *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21 (1976)).

When determining whether an EIS analyzed sufficient alternatives to allow the BLM to take a hard look at the available options, courts apply the "rule of reason." *N.M. ex rel. Richardson v. the BLM.,* 565 F.3d 683, 709 (10th Cir. 2009) (citing *Westlands Water Dist. v. U.S. Dep't of the Interior,* 376 F.3d 853, 868 (9th Cir. 2004)).

"The reasonableness of the alternatives considered is measured against two guideposts. First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate." *Westlands,* 376 F.3d at 866. Second, reasonableness is judged with reference to an agency's objectives for a particular project.[1] *See Dombeck,* 185 F.3d at 1174–75; *Simmons v. U.S. Army Corps of Eng'rs,* 120 F.3d 664, 668–69 (7th Cir. 1997); *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1520 (9th Cir. 1992).

FLPMA is the BLM's organic act and delegates authority to the agency to create and amend land use plans. FLPMA's congressional declaration states:

---

[1] While an agency may restrict its analysis to alternatives that suit the "basic policy objectives" of a planning action, *Seattle Audubon Soc'y v. Moseley,* 80 F.3d 1401, 1404 (9th Cir. 1996), it may do so only as long as "the statements of purpose and need drafted to guide the environmental review process ... are not unreasonably narrow," *Dombeck,* 185 F.3d at 1175.

BLM_0077051

"[I]t is the policy of the United States that … the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use…" 43 U.S.C. § 1701(a)(8).

The BLM is duty bound to develop and revise land use plans according to this congressional mandate, so as to "observe the principles of multiple use." 43 U.S.C. § 1712(c)(1). "Multiple use" means "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." 43 U.S.C. § 1702(c).

The RMP revision process, subject to NEPA and undertaken pursuant to FLPMA, requires the BLM to engage in the type of foundational land use planning that is intended to give context to the agency's multiple use mandate. Accordingly, FLPMA provides specific criteria for land use plan revisions, requiring consideration of things such as: observation of the principles of multiple use and sustained yield; integrated consideration of physical, biological, economic, and other sciences; reliance on public lands resources and other values; consideration of present and future uses of the public lands; consideration of the relative scarcity of resource values; and weighing the long-term benefits to the public against the short-term benefits. *See* 43 U.S.C. § 1712(c)(1)-(9).

Critically, FLPMA does not mandate that every use be accommodated on every piece of land; rather, delicate balancing is required. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004). "'Multiple use' requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage." *Public Lands Council v. Babbitt*, 167 F.3d 1287, 1290 (10th Cir. 1999) (citing 43 U.S.C. § 1702 (c)). As provided by the Tenth Circuit:

"It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses… BLM's obligation to manage for multiple use does not mean that development *must* be allowed on [a particular piece of public land]. Development is a *possible* use, which BLM must weigh against other possible uses—including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration." *N.M. ex rel. Richardson*, 565 F.3d at 710.

Accordingly, the Proposed RMP/Final EIS revision must consider, on equal footing, the value of permanent protection and preservation of public lands in the planning area, along with the potential value of development of those public lands. It is incumbent on the BLM Uncompahgre Field Office to evaluate these competing resources and give suitable weight to FLPMA's mandate to preserve and protect public lands in their natural condition. *See* 43 U.S.C. § 1701(a)(8). This is, after all, the agency's statutory mandate. *See N.M. ex rel. Richardson*, 565 F.3d at 709.

As stated by the BLM:

"The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses…BLM regulations require that existing land use plans be revised when necessary to address current resource conditions, changes in circumstances (e.g., evolving demands on resources), and new or revised national-level policy." Proposed RMP/Final EIS at 1-2.

This purpose does not take development in the planning area as a foregone conclusion. Rather, the central purpose is to "provide broad-scale direction" in light of "current resource conditions, changes in circumstances… and new or revised national-level policy." *See N.M. ex rel. Richardson*, 565 F.3d at 710-11.

FLPMA also recognizes the importance of Ouray County's role in the planning process providing that the BLM shall:

BLM_0077052

"...to the extent consistent with the laws governing the administration of the public, lands, coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of other Federal departments and agencies and of the State and local governments within which the lands are located...assure that consideration is given to those State, local, and tribal plans that are germane in the development of land use plans for public lands; assist in resolving, to the extent practical, inconsistencies between Federal and non-Federal Government plans, and shall provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-Federal lands..." 43 U.S.C. § 1702(c)(9).

## IV. ALTERNATIVES

To facilitate review of this Protest, Ouray County is informed of the following "alternatives" identified in the Proposed RMP/Final EIS:

### Alternative A

Alternative A meets the requirement that a "no action" alternative be considered.  Alternative A continues current management direction and prevailing conditions derived from existing planning documents.

### Alternative B

Alternative B emphasizes improving, rehabilitating, and restoring resources and sustaining the ecological integrity of habitats for all priority plant, wildlife, and fish species, while allowing appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, rights-of-way (ROW), and livestock grazing). It particularly targets the habitats needed for the conservation and recovery of federally listed, proposed, or candidate threatened and endangered plant and animal species. Goals and objectives focus on environmental and social outcomes achieved by sustaining relatively unmodified physical landscapes and natural and cultural resource values for current and future generations. This alternative would establish the greatest number of special designation areas such as areas of critical environmental concern ("ACEC")[2] and special recreation management areas, with specific measures designed to protect or enhance resource values. Appropriate and allowable uses and restrictions would be contingent on minimizing impacts on natural and cultural resources.

### Alternative B.I

Alternative B.I is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River (referred to as the North Fork), primarily in portions of Delta and Gunnison counties.  Alternative B.I is a resource-based set of recommendations provided by a community group.

### Alternative C

Alternative C would emphasize maximizing utilization of resources, while mitigating impacts on land health. Management direction would recognize and expand existing uses and accommodate new uses to the greatest extent possible. The appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, ROWs, renewable energy, and livestock grazing) would emphasize maximizing resource production in an environmentally responsible manner, while maintaining the basic protection needed to sustain resources.

### Alternative D

Alternative D was the Agency-Preferred Alternative from the Draft RMP/EIS, dated 6/3/2016 which emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat. This alternative incorporates a balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land

---

[2] ACEC's are areas identified by the BLM in accord with the 1976 Federal Lands Policy and Management Act ("FLPMA") which established the first conservation ecology mandate for the BLM, where special management attention is needed to protect important historical, cultural, and scenic values, or fish and wildlife or other natural resources.

BLM_0077053

uses. Goals and objectives focus on environmental, economic, and social outcomes achieved by strategically addressing demands across the landscape.

### Alternative E: Agency-Proposed RMP

Alternative E, a wholly new proposed alternative not previously available for review or comment, is the BLM's Proposed RMP. The BLM proposes that Alternative E is a reasonable combination of objectives and actions from the five alternatives (A, B, B.1., C, and D) presented in the Draft RMP/EIS. The BLM states that, among other reasons for presentation of a wholly new alternative for the first time in the Proposed RMP/Final EIS, there are certain "changes in policy and guidance ..." (Proposed RMP/Final EIS Vol. 1, 1-9.) 43 U.S.C. § 1702(1). Presumably this relates to this Department of Interior's policies to prioritize oil and gas development above other uses, despite the clear direction of FLPMA's multiple use mandate. For example, both a March 28, 2017 Executive Order on "Promoting Energy Independence and Economic Growth" and the related March 29, 2017 Interior Secretarial Order 3349 issued to implement it seek to eliminate regulations and policies that "burden" energy development, but actually eliminate actions that would achieve the required balance that is essential to multiple use management. These policies have led to changes in agency policies, especially in managing oil and gas leasing and development, and also infuse the creation of Alternative E.

### V. ISSUES PROTESTED BY OURAY COUNTY

A. ISSUE 1: ALTERNATIVE E IS A SUBSTANTIALLY NEW AGENCY ALTERNATIVE THAT DIFFERS SO DRAMATICALLY FROM THE ALTERNATIVES CANVASSED IN THE DRAFT RMP/EIS – AND WHICH WAS DRAFTED IN DISREGARD OF THE REQUIREMENTS OF NEPA, FLPMA AND THE MOU BETWEEN THE BLM AND OURAY COUNTY – AS TO PRECLUDE MEANINGFUL CONSIDERATION BY OURAY COUNTY AND THE PUBLIC.

The overarching – and procedurally fatal – flaw in the Proposed RMP/Final EIS is the development of a wholly new Alternative E in disregard of the requirements of NEPA and FLPMA. FLPMA requires the BLM to ensure that the views of the general public and third-party participation are adequately incorporated into the land planning process. 43 U.S.C. 1701(a)(5); 43 C.F.R. 1610.2. The disregard of NEPA and FPLMA has denied to Ouray County the "meaningful opportunities" guaranteed by those laws to participate in the iterative BLM process that resulted in the Proposed RMP/Final EIS. "The agency (now) has an obligation to re-circulate if a proposed action ultimately differs so dramatically from the alternatives canvassed in the draft EIS as to preclude meaningful consideration by the public." *W. Org. of Res. Councils v. the BLM*, 591 F. Supp. 2d 1206, 1218 n.2 (D. Who. 2008), citing *California v. Block*, 690 f. 2d 753, 770 (9th Cir. 1982).

In addition, the creation of a wholly new Alternative E – with neither notice to Ouray County nor an opportunity for Ouray County to comment – is in direct contradiction to the BLM's formal recognition, in the MOU, of the "compelling need to ensure that the interests of Ouray County are accounted for and that [Ouray County will be] meaningfully engaged in the...resource management planning effort and associated 'EIS'" and the BLM's obligation to create the opportunity for Ouray County to participate "to the fullest extent possible" in the development of the Proposed RMP/Final EIS. This obligation is also set out in FLPMA, in the BLM's obligation to provide for "meaningful" input and "early" notice to local governments with affected lands and regulations, like Ouray County.

While the BLM states that "(t)he policy of the BLM is to provide opportunities for the public, various groups, other federal agencies, Native American Tribal Governments, and state and local governments to participate meaningfully and substantively by providing input and comments during the preparation of the RMP/EIS," (Proposed RMP/Final EIS, Vol. 1, ES-1), the BLM has created – in the Proposed RMP/Final EIS – a wholly new Alternative E that thwarts the opportunity for such participation.

REQUESTED REMEDY: Ouray County asserts that the only solution to this overarching and procedurally fatal flaw in the Proposed RMP/Final EIS is to provide a full "comment" opportunity. This is also required by NEPA, based on the new alternative that has been created through the BLM's creation of Alternative E without sufficient explanation other than an oblique reference to its new policies but fundamentally changed the overall approach to management throughout the planning area. 40 C.F.R. § 1502.9(c)(1)(i)(supplemental NEPA analysis, including an opportunity for comment, is required if an "agency makes substantial changes in the proposed action that are relevant to environmental concerns"); see also *N.M. ex rel. Richardson*, 565 F.3d at 705.

BLM_0077054

B. ISSUE 2: ALTERNATIVE E WAS PRESENTED IN THE PROPOSED RMP/FINAL EIS WITHOUT ALL SUPPORTING DATA AND FILES BEING MADE PUBLICLY AND TIMELY AVAILABLE.

The 30-day Protest period was initiated by the publication of the official Notice of Availability in the Federal Register on Friday, June 28, 2019. On that date, on the federal e-planning website[3] there were no GIS files newer than June 23, 2016. Although the Proposed RMP/Final EIS states on page ES-1 "(t)his website contains background information about the project, a public involvement and project timeline, maps and relevant GIS data of the Planning Area, and copies of public information documents released throughout the RMP/EIS process." There were no GIS data files for the new Alternative E. Further the Proposed RMP/Final EIS maps in Volume II, Appendix A are at a scale that shows the entire Uncompahgre Field Office decision area across six counties. This scale does not permit effective review of proposed disposal parcels in context. Nor does this scale allow for examination of proposed actions and the proposed Alternative E in an informed manner.

REQUESTED REMEDY: Ouray County asserts that the only solution to this fundamental and fatal flaw is to provide a full "comment period" that is fully informed by timely provision to the public of all supporting data and files.

C. ISSUE 3: THE PROPOSED RMP/FINAL EIS WAS DRAFTED WITHOUT CONSIDERATION OF OURAY COUNTY'S FORMAL PLANNING AND LAND USE REGIMES

The BLM stated that decisions on the Proposed RMP/Final EIS will strive to be compatible with existing plans and policies of local "agencies within the Planning Area" as long as the decisions are consistent with the purposes, policies, and programs of federal law, and regulations applicable to public lands. As noted above, this is also required by FLPMA, 43 U.S.C. § 1702(c)(9). The Proposed RMP/Final EIS is fatally flawed because it does not consider – much less align with – fundamental Ouray County regulatory regimes.

D. ISSUE 7: THE PROPOSED RMP/FINAL EIS DOES NOT ADEQUATELY CONSIDER THE CONSEQUENCES OF CLIMATE CHANGE

- Alternative E does not acknowledge climate change, make climate change a priority, nor in any substantial way include an analysis of climate impacts of any of the alternatives.

  REQUESTED REMEDY: An adequate RMP/EIS must, at a minimum, include a carbon emission reduction plan that is demonstrably consistent with those efforts of the State to meet the State's climate and carbon emission reduction goals.

E. ISSUE 14: ALTERNATIVE E INAPPROPRIATELY CONTAINS LANDS IDENTIFIED "FOR DISPOSAL" THAT ADJACENT TO OR INTERSECTING OURAY SAGE-GROUSE CRITICAL HABITAT, , OR THE DISPOSAL OF WHICH WOULD CONFLICT WITH EXISTING USER ACCESS TO PUBLIC OR PRIVATE LANDS, OR WATER RIGHTS AND IRRIGATION. OURAY COUNTY FURTHER PROTESTS THE FACT THAT THE BLM DID NOT TIMELY OR PUBLICLY MAKE IDENTIFICATION OF THESE LANDS AVAILABLE FOR THE PROTEST PERIOD OR FOR THE 2016 DRMP/DEIS.

- Alternative E inappropriately contains lands identified "for disposal" that are adjacent to or intersecting Ouray Sage-grouse critical habitat, or the disposal of which would conflict with existing user access to public or private lands, or water rights and irrigation. Ouray County further protests the fact that the BLM did not timely or publicly make identification of these lands available for the protest period or for the 2016 DRMP/DEIS.

REQUESTED REMEDY: A full "comment" opportunity is necessary to address these concerns.

## VI. RESERVATION

Given the time constraints of filing this Protest, Ouray County may not have addressed all issues. Therefore, Ouray County reserves its right to further process regarding any and all issues identified by other protestors or commenters.

## VII. CONTACT INFORMATION:

---

[3] https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&CurrentPageId=86604

Pursuant to 43 C.F.R. 1610. 5-2, please send all notices and correspondence regarding this Protest to:

Carol Viner
Masters and Viner LLP
County Attorney for Ouray County
PO BOX C
Ouray, Colorado 81427
(email): cav@mastersviner.com

and

Connie Hunt
County Administrator
PO Box C
Ouray, Colorado 81427
(email): chunt@ouraycountyco.gov

Signed on this 29th Day of July, 2019.

Ben Tisdel
Vice Chair, Ouray County Board of County Commissioners
PO Box C
Ouray, Colorado 81427

Enc.    Ouray County – 11-01-2016 UFO BLM Resource Management Plan / Environmental Impact Statement
Comment Letter

BLM_0077056



LYNN M. PADGETT

BEN TISDEL

DON BATCHELDER

## BOARD OF COUNTY COMMISSIONERS

541 4th Street   •   P.O. Box C   •   Ouray, Colorado 81427   •   970-325-7320   •   FAX: 970-325-0452

November 1, 2016

Joseph Meyer, Southwest District Manager
Dana Wilson, Acting Uncompahgre Field Office Manager
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Via Email: uformp@blm.gov

Dear Joe and Dana,

Ouray County is pleased to be able to provide comments on the Uncompahgre Field Office of the Bureau of Land Management (UFO BLM) Draft UFO Resource Management Plan (RMP) / Environmental Impact Statement (EIS) [hereafter, "*DRMP/EIS*"].

In 2015, Ouray County Board of County Commissioners approved Resolution 2015-014 "Stating the value of public lands to Ouray County's economy, recreation, heritage and quality of life, and supporting continued federal ownership of federal public lands."

Ouray County's Master Plan[1], Land Use Code[2] and zoning[3], orient higher density development and commercial activity towards our municipalities in exchange for preserving our rural working landscapes, scenic vistas, open space, wildlife habitat, and outdoor recreation opportunities towards the unincorporated portions of the county and our public lands.  We have sections of our land use code addressing visual impact mitigation of development to protect our economically important scenic vistas, wildfire mitigation, protecting wildlife corridors and sensitive landscapes, avoiding geohazards and floodplains, and protecting dark skies.  Our countywide economic goals include working toward abundant, affordable and redundant broadband, and enhancing outdoor recreation opportunities in all seasons. [4,5]

We offer the following comments on the DRMP/EIS:

**1.  Land Disposals.**

The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "consider disposal of lands that would consolidate public ownership for greater management efficiency while serving the public interest, including communities and their expanding needs." [6]

---

[1] http://co-ouraycounty.civicplus.com/DocumentCenter/View/144
[2] http://ouraycountyco.gov/DocumentCenter/Index/41
[3] http://ouraycountyco.gov/DocumentCenter/View/145
[4] http://www.ouraycountyco.gov/ArchiveCenter/ViewFile/Item/96
[5] http://www.ouraycountycolorado.org/bottomup/Ouray_County_Resolution_2011_022.pdf
[6] Page 2-319;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2
_UFO-DRMP-2016_508.pdf

BLM_0077057

The lands identified for disposal were identified on Appendix A, Figure 2-59 to 2-62[7] and legal descriptions were provided in Appendix N.[8]

BLM has a number of "in-holdings" within Ouray County that may be subject to disposal by BLM. Ouray County would like to have notice of any proposed disposal so that the County may engage in discussions regarding any proposed transfer of lands and potential new uses.

Ouray County desires that the BLM not dispose of any public lands that would increase the amount of private land intersected by public rights-of-way, including county roads and trails. Please see Ouray County Resolution 2014-014[9] and the map that comprises Exhibit A[10] for an inventory of designated public rights-of-way. There may be more, including some new trails within the system known as the "RAT" trails in the Ridgway area that are not yet on Exhibit A.

In general, Ouray County does not want land disposals to create parcels that are non-conforming to our county land use code and minimum parcel sizes within our zones.

A GIS shapefile of land disposal parcels was obtained from UFO staff on October 31, 2016. We could not match up the legal descriptions of the parcels as described in Appendix N with the parcel legal descriptions in the GIS shapefile.

A parcel of approximately 22 acres, that our GIS shows is in T45N R8W Section 9 and lies on the west side of the Uncompahgre River and contains a portion of the Uncompahgre Riverway trail is not recommended for disposal under Alternatives A, C and D, but is recommended for disposal under alternative B. Ouray County does not support disposal of this parcel, as it is imperative for trail linkage and recreation that it remain accessible to the public. The public uses this parcel as a popular picnicking area, bird watching area, and for quiet reflection by the river. It has facilities that are used for needed breaks along the approximately 4-mile trailway.

There are two parcels east of US 550 within T44N R8W Section 13 that are adjacent to U.S. Forest Service lands, in the general vicinity of Lake Lenore. These parcels are recommended for deferral under Alternative C but not the agency preferred alternative D. Because they are proximal to other public lands and are mapped as having a public trail intersecting them. Ouray County does not support disposal of these parcels.

There are two parcels west of US 550 that are recommended for disposal under several alternatives but not Alternative D, south of Portland. The northern of these two is also within T44N R8W Section 13 and contains the Uncompahgre River corridor and riparian habitat. It should not be disposed of. The southern parcel is within T44N R9W Section 14 and contains portions of a public trail. It also should not be disposed of.

A parcel consisting of approximately 129 acres within T44N R8W Section 11, lies on the slopes of Miller Mesa. It appears that it contains a public trail and contains Elk Ridge Trail Road, used as access for private lands. It is recommended for disposal under Alternative D. Prior to disposal the county should be consulted so that a full investigation can be conducted to learn if there will be any loss of historic access to other properties or public rights of way. If disposed of, the BLM should ensure that it is transferred so that no ROWs are altered or lost. A portion of County Road 17 intersects the southwest corner of this parcel. This parcel also contains the drainage that feeds into Black Lake. It is the desire of Ouray County that any diseased forests be treated prior to any land disposal, and we are aware of significant forest health issues on this parcel.

There are two parcels within Cow Creek Valley area on the east side of U.S. 550 not recommended for disposal in Alternative D due to saline soil conditions.

---

[7] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par.78374.File.d at/App%20A%20Combined.pdf
[8] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.77552.File. dat/N_Disposal_UFO-DRMP-2016_508.pdf
[9] http://ouraycountyco.gov/ArchiveCenter/ViewFile/Item/229
[10] http://ouraycountyco.gov/documentcenter/view/2476

The three isolated approximately 35-40 acre parcels on Log Hill Mesa recommended for disposal seems to make sense for disposal so long as there is access for a new private owner.  County Road 1 splits one of the parcels, and Ouray County would desire that any lands disposed of be done in a way that does not create parcels that do not conform to our underlying zoning.  This should be able to be accomplished with this parcel.

## 2.  Areas of Critical Environmental Concern (ACEC)s.

There are no existing ACECs in Ouray County.  Alternative B contemplates creating the Cerro Summit-Sims Mesa Gunnison Sage-grouse ACEC in northern Ouray County, where there is BLM land proximal to occupied habitat.

On November 12, 2014, the U.S. Fish and Wildlife Service (USFWS) announced that it determined that the Gunnison Sage-grouse, a ground-dwelling bird found only in southwestern Colorado and southeastern Utah, required the protection of the Endangered Species Act (ESA) as a threatened species.  The USFWS originally proposed to list the species as 'endangered' under the ESA in January 2013, but efforts by the two states, tribes, local communities, private landowners and other stakeholders to conserve the species and its habitat were found to have helped reduce the threats to the bird sufficiently to give it the more flexibly protected status of 'threatened.'[11]

The supporting EIS for the Threatened Status designation of the Gunnison Sage-grouse[12] and for the Designation of Critical Habitat for the Gunnison Sage-grouse[13] is dated November 9, 2014.

These designations prompted a process for the BLM to prepare a draft Gunnison Rangewide Plan Amendment that would potentially result in multiple resource plan amendments (GuSG DRMPa) and a companion draft environmental impact statement (GuSG DEIS) which more closely analyzes planning issues, including energy and minerals actions, in order "to analyze the addition of GuSG conservation measures to several existing RMPs", including the BLM UFO DRMP/EIS.  The deadline for comments on the GuSG DRMPa is after the deadline to comment on this UFO DRMP/EIS.  The GuSG DRMPa documents were released as drafts in August 2016.

In the GuSG DRMPa, the BLM states, "The BLM manages approximately 40 percent of GUSG habitat across twelve counties in southwestern Colorado and southeastern Utah…The inadequacy of regulatory mechanisms in land use plans was identified as a major threat in the FWS listing decision." [14]

The Purpose section of the GuSG DRMPa states, "This RMP amendment provides a framework for conserving and assisting with the recovery of the GuSG and for conserving and restoring habitat upon which the species depends on BLM-administered public lands across the range of the bird."  The Need section of this document states, "The BLM conducted land use plan evaluations in accordance with its planning regulations, which require that RMPs 'shall be revised as necessary based on …, new data, new or revised policy…(43 CFR 1610.5-6).'"[15]

Due to the UFO DRMP/EIS alternative formulation and scoping work occurring mostly between 2010 and 2013, that the latest work done by the USFWS and BLM for the GuSG DRMPa was not incorporated into this UFO DRMP/EIS.   The UFO Gunnison Sage-grouse ACEC analysis was not informed by the latest information, nor the oil and gas stipulations, travel management and several other sections of this UFO DRMP/EIS.

Thus, if the UFO DRMP/EIS moves forward, it should have its Record of Decision signed prior to the BLM DRMPa ROD so that the BLM DRMPa will amend the relevant portions of this RMP to adequately protect Gunnison Sage-grouse and incorporate the latest science and best management practices.   All leases within the UFO should be deferred until the ROD is signed for the GuSG RMPa so that no lease

---

[11] https://www.fws.gov/mountain-prairie/pressrel/2014/11122014_ServiceProtectsGunnisonSageGrouseAsThreatenedUnderESA.php
[12] https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GUSGFinalListingRule_11202014.pdf
[13] https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GuSGCriticalHabitat_11202014.pdf
[14] Page I; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf
[15] Page iii; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf

is allowed a 20-year period with out-of-date stipulations and practices.  While the GuSG DRMPa goes much further than this UFO DRMP/EIS for incorporating protections, conservation measures, and habitat enhancement and connectivity measures, it still needs additional work and we plan on providing comments for the GuSG DRMPa separately.

### 3. Special Recreation Management Areas (SRMAs).

Ouray County appreciates the collaborative work the UFO staff did with the Ridgway Area Trails (RAT) group (now a chapter of Colorado Plateau Mountain Bike Trail Association, COPMOBA) to allow for a multi-use single-track trail system to be accomplished on BLM lands just north of Ridgway.  This new trail system has been successful economically, in that as soon as the first 3 miles of trails were open, Ridgway had a new bike shop and two new jobs. During the season the trails are open, it is typical to see vehicles with plates from multiple states and from all over Colorado.  Local families with children are also enjoying the highly scenic trail system.   These trails also leverage other trails along the Uncompahgre Riverway and Ridgway State Park.  We support RAT and COPMOBA in their comments and requests to enhance our trail systems.  The Ridgway Trails and Spring Creek SRMAs will be welcome in Ouray County.

Ouray County fully supports the Zone 1 Objective of the Ridgway Trails SRMA, which states "Through the life of the plan, manage Zone 1 for visitors of all abilities to engage in day use nonmotorized and educational activities, including disabled accessible trails…" and supports the Zone 2 Objective which states, "…manage Zone 2 for visitors to engage in day use, stacked loop, nonmotorized, trail activities, including challenging, natural surfaced, disabled accessible trails…"[16]  We are curious if "single-track" should have been included in the objective for Zone 2?

Ouray County fully supports the Zone 1 Objective of the Spring Creek SRMA, which states "…manage Zone 1 for visitors to engage in day use, nonmotorized, single-track, stacked loop, trail activities…"; supports the Zone 2 Objective which states, "…manage Zone 2 for visitors to engage in canyon viewing through single-track trail activities..."; and supports the Zone 3 Objective, "…manage Zone 3 for visitors to engage in camping and scenic viewing through motorized and nonmotorized trail activities…"[17]  Only Zones 2 and 3 occur within Ouray County, but the three zones are complimentary of each other.

Ouray County agrees with the stipulations for both SRMAs and all Zones, presented in Appendix J. [18]

### 4. Enhanced Ecological Areas (EEAs).

The County applauds the BLM for the recent cooperative efforts in enlarging the trail opportunities on BLM lands within Ouray County.  It appears that BLM has identified additional potential trails systems which could be developed within Ouray County, including opportunities to increase travel and recreation on McKenzie Butte.  The County supports these efforts to increase recreation, including hunting, hiking, horseback riding, trail biking, and OHV uses.

In this spirit, we notice that McKenzie Butte and Pinon Ridge on Log Hill Mesa are recommended to be included in a Ridgway EEA.

Ouray County appreciates that the UFO is trying to incorporate connectivity of core habitat for multiple species into the management plan.  However, we are concerned about the stipulations recommended that include ROW avoidance in Alternative D.

---

[16]Pages 2-258 to 2-262;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf
[17]Pages 2-281 to 2-287;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf
[18]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.40130.File.dat/J_Rec_UFO-DRMP-2016_508.pdf

BLM_0077060

Appendix D describes the proposed Ridgway EEA as:

| Ridgway | BLM land on Log Hill Mesa and around Billy Creek State Wildlife Area. Contributes to linkage between Cimarron Ridge and Uncompahgre Plateau, in critical big game wintering area. Divided into four zones. | Pinyon-juniper, mountain shrub | Mountain lion, mule deer, elk, bear |
|---|---|---|---|

We encourage the UFO to work with Ouray County trails groups and stakeholders to ensure that there can be a companion trail system, similar to the quality and benefits of the RAT trail system north of Ridgway, that can be located on the McKenzie Butte parcel. It will be important to refine any stipulations for this Core Zone 1, to ensure that this possibility can be realized in the next few years.

The parcel outlined in bright blue below, is where McKenzie Butte and Pinon Ridge are located:



Figure 5.a. Showing parcels of the proposed Ridgway EEA.

Ouray County does not desire the designation of the western parcel (Core Zone 1) to be included in this EEA, if this would interfere and prohibit the ability to develop enhanced single-track trail systems for pedestrians, horses, and mountain biking. Log Hill Mesa is home to approximately ⅓ of Ouray Country residents and this area.

The ridge and butte are also topographically advantageous to expanding cell phone service and wireless broadband on the mesa. Currently, outside of the southern portion of Log Hill Mesa, where

infrastructure on Tower Road is able to serve residents and where limited DSL exists, much of the mesa area suffers from little landline, spotty cell phone, and no broadband service. It appears the EEA stipulations being contemplated for Alternative D, and certainly for Alternative B, for Core Zone 1 could prohibit a ROW for communications and/or broadband infrastructure. Cell phones and satellite dishes are neither affordable, nor reliable replacements for broadband. Ouray County continues to be a place that attracts entrepreneurs, telecommuters, and "creatives". It will be essential to have a topographically suitable location to provide essential communications and broadband services with a minimum of towers or infrastructure. Power and fiber are generally needed to be able to be extended to sites for infrastructure.

## 5. Wildlife and Watchable Wildlife Viewing Areas

Ouray County encourages the BLM to work with Colorado Parks and Wildlife (CPW) to ensure that the species-specific buffers, timing limitations, best management practices and other wildlife data relating to alternatives and stipulations is incorporated into the final RMP/Record of Decision. At the October 15, 2016 cooperators' meeting with the BLM in Montrose, CPW staff indicated that information they had provided was not yet incorporated. Ouray County also supports CPW's desire to protect big game winter range and other important habitats by limiting well pad densities to no more than 1 per 160 acres, and requiring Master Leasing Plans and implementing compensatory mitigation requirements.

Ouray County would support the creation of watchable wildlife viewing sites within BLM lands as discussed in Chapter 3 (page 3-170) near Billy Creek State Wildlife Area and the Uncompahgre Riverway. Winter bald eagle viewing is very popular along the Uncompahgre Riverway by locals and visitors. Increasing educational opportunities adds value to our public lands and promotes conservation and consideration of human impacts on wildlife.

Ouray County prefers Alternative B stipulations for fluid minerals over the agency preferred Alternative D.

Ouray County has had several landowners place conservation easements on their property, thousands of acres in aggregate, to benefit big game habitat, riparian habitat, Gunnison Sage-grouse habitat, and scenic open space. We request that the BLM obtain from the county and other sources GIS files showing the locations of these conservation easements, and that an NSO stipulation be placed on all private conserved lands with split estate.

## 6. Slopes

Ouray County is concerned about the Alternative D stipulations that change 30% slopes to 40% slopes for the threshold of applying a stipulation. We have highly saline and easily erodible soils and loose rocks. We desire that the BLM leave stipulations that are related to slopes at the percentages they are in Alternative A and B.

## 7. Visual Resources and Dark Skies.

Ouray County appreciates the language in the RMP providing protections to dark skies and limiting lights. Please add language that says that lights left on at night should be directed downward, which is good for wildlife and for preserving our dark skies. Dark skies are good for our economy, star gazing, astronomy, and protect our rural character.

## 8. Top of the Pines.

Ouray County has specific comments or requested revisions as follows:

The current RMP contains an action item to transfer timber rights on the property conveyed to Ouray County known as the Top of the Pines property (approximately 168 acres that was formerly a Girl Scout camp, conveyed to the County in 2000). The Draft RMP/EIS is unclear as to the intent of BLM with regard to the reserved timber resource. Table 2-2 at page 2-156 seems to indicate that the preferred alternative is the same as the current RMP. If that is an accurate interpretation of Table 2-2, page 2-156, then the County supports the preferred alternative. To the extent that Table 2-2 simply reflect that 168 acres have been deeded to the County, but BLM retains the timber resource, the County requests that BLM clarify Table 2-2, page 2-156, to reflect that BLM will proceed to deed to the County the currently-reserved retained interest in the timber resource at the Top of the Pines property. The County believes that conveyance of the timber will eliminate unnecessary potential disagreements between

BLM and the County over fire mitigation work and other non-commercial uses and stewardship of the timber and the property that has already been conveyed to the County. Given that BLM has eliminated the timber from its commercial resource inventory, conveyance of the reserved interest to the County would seem to have negligible impact to BLM.

If there are any questions or clarifications regarding Ouray County's comments, please do not hesitate to contact us.

Respectfully submitted,

Lynn M. Padgett
Chair, Ouray County Board of County Commissioners



# BOARD OF COMMISSIONERS

## HILARY COOPER   KRIS HOLSTROM   LANCE WARING

July 29, 2019

Director (210)
Attention: Protest Coordinator, WO-210
20 M St SE, Room 2134LM
Washington, D.C. 20003

Via electronic submission button (https://eplanning.blm.gov/epl-front-office/eplanning/comments/commentSubmission.do?commentPeriodId=77137) and overnight (non-USPS) delivery.

> RE: San Miguel County, Colorado Protest of the Proposed Resource Management Plan (PRMP) and Final Environmental Impact Statement (FEIS) for the Bureau of Land Management (BLM) Uncompahgre Field Office (UFO), June 2019

Dear Director,

Please accept this timely protest which is filed in accordance with 43 C.F.R. § 1610.5-2.

**Statement of Resource Management Plan Being Protested:**
We are protesting the Proposed Resource Management Plan (PRMP) and Final Environmental Impact Statement (FEIS) for the Bureau of Land Management (BLM) Uncompahgre Field Office (UFO) released to the public on June 28, 2019.

**This protest is submitted by the Board of County Commissioners (BOCC), San Miguel County, Colorado (SMC).**

> **Protester**
> **Name:** Board of County Commissioners, San Miguel County, Colorado
> **Address:** Via U.S. Mail – PO Box 1170, Telluride, CO 81435
> Via Delivery (non-USPS) – 333 West Colorado Avenue, 3rd Floor, Telluride, CO 81435
> **Phone:** 970-728-3844
> **Email:** bocc@sanmiguelcountyco.gov

BLM_0077064

**Statement of Protester's Interest:**

The San Miguel County (SMC) Board of County Commissioners (BOCC) are responsible for ensuring health, safety and welfare—including environmental health—within the County. Watershed health, soil health and protection of wildlife habitat are essential elements of San Miguel County. SMC has collaborated, cooperated and coordinated with federal land agencies on federal land planning and projects. Sixty percent of the land in San Miguel County is federal public land with another 4 percent being owned by the State of Colorado. Only 36 percent of San Miguel County consists of private land. San Miguel County is 70.6 percent federal mineral estate.

San Miguel County has assisted in the protection of thousands of acres of private lands with important wildlife habitat values, especially Gunnison sage grouse (GuSG) critical habitat, by participating in the acquisition of conservation easements intended to preserve and protect GuSG habitat. San Miguel County has financially contributed approximately $2 million for GuSG habitat conservation and improvements through the County's Land Heritage Program, co-funding of the Gunnison sage-grouse Working Group and funding of other actions intended to provide direct benefits to GuSG recovery and resilience. SMC continues to actively participate with the stakeholder group that developed the Gunnison sage-grouse Rangewide Conservation Plan and is currently participating in the U.S. Fish and Wildlife Service's 5-year species status review, Species Status Assessment, Recovery Plan and Collaborative Action Plan.

San Miguel County commissioned "A Natural Heritage Assessment San Miguel and Western Montrose Counties, Colorado," prepared by the Colorado Natural Heritage Program in 2000, which identified several areas having high biodiversity as Potential Conservation Areas (PCAs). [1] Citizens of San Miguel County have long recognized the need to plan for the conservation of plants and animals that are native to the San Miguel And Dolores River Basins and have demonstrated their desire to protect significant natural heritage and natural resources by organizing the San Miguel Watershed Coalition, San Miguel Conservation Foundation, San Miguel County Open Space Commission, San Miguel County Land Heritage Program and providing co-funding of collaborative groups such as the previously mentioned Gunnison sage-grouse Working Group and the Public Lands Partnership.

In addition, San Miguel County elected officials, staff and liaisons regularly and vigorously participate publicly and as a cooperating agency in federal public lands planning processes. We have participated throughout the BLM UFO RMP planning process as a cooperating agency and through official public comment periods. SMC has been a cooperating agency with BLM UFO for this RMP revision process since June 10, 2010 when an MOU was signed (attached). We are similarly a cooperating agency for the BLM Gunnison Sage-Grouse (GuSG) Resource Management Plan Amendment (RMPa) process (MOU attached) which was expected to amend or be inserted into the GuSG portion of this plan. We have a 2017 MOU with the UFO to emphasize continued SMC and UFO consultation, coordination, cooperation, collaboration and communication in land use actions and ratifying our partnership for the continued coordination and cooperation for implementation of the "Connecting with Communities" Recreation Strategy (attached). We

---

[1] http://www.cnhp.colostate.edu/download/documents/2000/San_Miguel_and_Western_Montrose.pdf

BLM_0077065

commented on the Section 368 Corridor Review (attached) which is reviewing an energy corridor that intersects San Miguel County and the UFO.

Additional recent and ongoing planning processes that SMC is actively participating in include the BLM Tres Rios Field Office (TRFO) RMP/FEIS; BLM TRFO Travel Area Planning (TAP) process; BLM TRFO Areas of Critical Concern (ACEC) RMP amendment process; Alpine Ranger coalition with the BLM, US Forest Service (USFS); the USFS Grand Mesa, Uncompahgre and Gunnison National Forests (GMUG) Forest Plan Revision process; USFS Spruce Beetle Epidemic and Aspen Decline (SBEADMR); Uncompahgre Collaborative Forest Restoration project and others.

Federal lands agency resource management plans and forest plans directly impact San Miguel County's mandate to provide health, safety and welfare services to our citizens and visitors. They impact our socio-economic opportunities, environmental quality and quality of life. We will continue to participate in the planning process for the BLM UFO RMP.

**Issues Being Protested:**

1. Excessive delay between the Draft RMP/EIS (DRMP/DEIS) and Proposed RMP/Final EIS (PRMP/FEIS) and development of a substantially new agency alternative without providing a public comment period.

2. Inadequate Public Comment opportunity without all supporting data and files being made publicly available for the full Protest Period.

3. References to the Gunnison sage grouse: The failure to make available the Biological Assessment (BA) and Biological Opinion (BO). A lack of clarity on which Alternative the BA and BO analyzed. Inadequate NEPA analysis and protections for Gunnison sage grouse and the designation of a Section 368 Energy Corridor that will negatively impact Gunnison sage grouse populations and habitat.

4. Inadequate NEPA analysis and protections for water bodies, aquatic, wetland, and hydrologic resources, source water protection areas, domestic water supplies and cultural resources for fluid mineral leasing and surface disturbing activities.

5. General Wildlife: Failure to follow Colorado Parks & Wildlife (CPW) recommendations and guidelines for wildlife species, including Gunnison sage grouse, aquatic species, desert bighorn sheep and big game migration corridors. Lack of consistency with CPW Best Management Practices (BMPs), species-specific stipulations and ungulate winter range protection. In all cases, BLM UFO RMP should require collaboration, coordination, cooperating and consulting with CPW on wildlife species and habitats.

6. San Miguel River: Inadequate visual resource management protection of the San Miguel River Corridor, adjacent Scenic Byways, and San Miguel River ACEC and inadequate management of lands within the proposed San Miguel River Expansion ACEC.

BLM_0077066

7. **Burn Canyon: Failure to appropriately manage Burn Canyon as a Special Recreation Management Area (SRMA) vs. an Extensive Recreation Management Area (ERMA) or provide management direction for appropriate visual resource management protection and protection of sensitive riparian areas from motorized or mechanized uses or surface occupancies.**

8. **Dolores River: Inadequate management direction to protect the lands within the analyzed Dolores River Slickrock Canyon ACEC to protect and prevent degradation of the significant natural, biological, cultural, recreational and scenic resources and values.**

9. **San Miguel River Segment 1 and Beaver Creek Segment ORVs are incompatible with hydro, solar, wind, and mineral development.**

10. **Lands Identified for Disposal: San Miguel County opposes Lands Identified for Disposal within San Miguel County that are within 4-miles of a Gunnison sage grouse lek, adjacent to or intersecting Gunnison sage grouse Critical Habitat, contain Public Rights-Of-Way, contain Lone Cone Reservoir and are adjacent to private land conserved for Gunnison sage grouse Habitat.**

11. **The Proposed PRMP/FEIS does not adequately consider the consequences of climate change.**

12. **Underlying analysis of uranium and other locatable minerals is factually incorrect which renders the analysis of the direct, indirect and cumulative impacts arbitrary, capricious and factually incorrect.**

**Detailed Discussion of Issues with Identification of Parts of the Plan Being Protested:**
Our discussion of each of these issues below provides a statement of the part(s) of the plan being protested (including Chapter, Section, Page and/or Map) with a concise statement explaining why the State Director's decisions are believed to be wrong.

**Excessive delay between the Draft RMP/EIS (DRMP/DEIS) and Proposed RMP/Final EIS (PRMP/FEIS) and development of a substantially new agency alternative without providing a public comment period.**
The Draft RMP/DEIS was released in 2016 and the Proposed RMP/FEIS was released in June 2019 with an entirely new Agency Preferred Alternative. The 30-day protest period does not provide adequate time for a thorough analysis or comparison of the alternatives, especially the previous Agency Preferred Alternative D and the new Preferred Alternative E. The 30-day protest period does not allow for public comment and restricts the ability to protest to those that have commented in the past and restricts content to issues that have been raised in the past. In the three years since the Draft RMP was released, there may be new stakeholders who should have the ability to comment on a Resource Management Plan that is intended to guide land-use

4

BLM_0077067

decisions for at least the next decade. Also, the release of a new Alternative may raise new issues that were not commented on in the past. Without adequate time for review, adequate analysis is not possible by the public and cooperating agencies.

The DRMP/DEIS was released for review May 20, 2016. San Miguel County commented on the DRMP/DEIS in October 2016. We received UFO agency responses to our October 2016 comments in April of 2018. The BLM Southwest Resource Advisory Council (RAC) examined a range of alternatives presented by UFO in February of 2013 and a more timely review should be allowed.

Volume 1, Page I-9 of the Proposed RMP states that following the introduction of the agency preferred alternative in the DRMP/DEIS there was a 150-day comment period incorporating a 60-day extension and six open houses in six Planning Area communities. In contrast, following the PRMP/FEIS with a NEW Alternative there is no opportunity for comment, minimal public outreach and no open houses.

Given the 30-day Protest Period, SMC worked diligently to review the over 4000-page document provided and requested additional information to improve our ability to analyze in the short period of time. GIS other supporting data and documents were not provided on a timely basis for us to adequately understand the potential impacts of the new Alternative.

***Requested Remedy:*** BLM should rescind the Proposed RMP and release the new Alternative as a Draft RMP with a 60-day comment period.

**Inadequate Public Comment opportunity without all supporting data and files being made publicly available for the full Protest Period.**
Issue Reference Citations:
- Volume I, Executive Summary, Page ES-1
- Volume I, Chapter 2, Page 2-5 and Table 2-2
- Volume II, Appendix A, Figures (Pages A1-A267)
- https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=86012
- https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=86011

The 30-day Protest Period was initiated by the publication of the official Notice of Availability in the Federal Register on Friday, June 28, 2019. At that time there were no GIS files newer than June 2016 available on the e-planning website[2]. There were no GIS data files for the new

---

[2] https://eplanning.blm.gov/epl-front office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=86004

BLM_0077068

proposed alternative. After SMC staff requested the current GIS files, they were made available on July 11, 2019. SMC staff identified at least one important supporting data file (Lands Identified for Disposal) still missing from the BLM's e-planning data web page[3]. This file was emailed to SMC staff on July 16, 2019, but as of July 21, 2019 is still not publicly available. Lands Identified for Disposal is a topic which was previously a SMC subject of concern and detailed comments from San Miguel County were provided for the agency preferred alternative to the DRMP/DEIS in 2016. The PRMP/FEIS maps in Volume II, Appendix A are at a scale that shows the entire UFO decision area across six counties. This scale is not conducive to reviewing a 40-acre proposed disposal parcel in context.

Additionally, this scale does not allow for examination of proposed actions and the proposed decision to inform comments and plan understanding. The BLM is required to consult with local governments and citizens regarding site-specific knowledge when making land-use decisions. GIS data files and interactive maps similar to the "Story Maps" made available online by the USFS as part of the Grand Mesa, Uncompahgre, and Gunnison National Forests Plan Revision are needed to examine how the proposed actions affect lands and resources and allow informed input to ensure the best land-use decisions.

Page ES-1 of the PRMP states, "This website contains background information about the project, a public involvement and project timeline, maps and relevant GIS data of the Planning Area, and copies of public information documents released throughout the RMP/EIS process."

This statement is not true and over half of the protest period has passed without the agency publicly posting relevant maps and GIS data to inform reviews of the new proposed alternative. All relevant supporting material upon which the agency's alternative has been based or which contains proposed management codes and administrative or designated area boundaries must be provided at the onset of the protest or public comment period.

There is a significant difference between the objective of Alternative D, the agency preferred alternative in the DRMP/DEIS which described incorporating a "balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses,"[4] and the new Proposed Alternative E, which is described by the BLM as a "reasonable combination of objectives and actions from A, B, C, and D"[5]. There is no rationale provided for this significant switch to determine if it is actually "reasonable." "Reasonable" is a subjective term that should not be used for an official Agency Preferred Alternative.
SMC would like the time to conduct a thorough GIS analysis of the Ecological Emphasis Areas, included in Alternative D and eliminated from Alternative E to determine any potential loss of protection of resources.

---

[3] https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=86012
[4] PRMP/FEIS Page 2-5
[5] PRMP/FEIS Page 2-5

BLM_0077069

**Requested Remedy:**  BLM should rescind the Proposed RMP based on the numerous substantive changes made to the alternatives without public and cooperating agency access to complete supporting materials and GIS files at the initial time of publication. Further supplemental analysis is required. An adequate public comment period is warranted due to the introduction of a new Alternative and lack of supporting documentation for review. **All** supporting background and data should be publicly available at the beginning of the comment period or protest period.

**References to the Gunnison Sage Grouse: The failure to make available the Biological Assessment (BA) and Biological Opinion (BO). A lack of clarity on which Alternative the BA and BO analyzed. Inadequate NEPA analysis and protections for Gunnison sage grouse and the designation of a Section 368 Energy Corridor that will negatively impact Gunnison sage grouse populations and habitat.**

Issue Reference Citations:

- Volume I, Pages 1-8, 1-9, 2-38, 2-113, 2-129, 2-130, 3-45, 3-48, 3-52, 3-59, 3-62, 4-13, 4-126, 4-128, 4-129, 4-133, 4-138, 4-141, 4-144, 4-148, 4-149, 4-176, 4-362, 4-363, 4-364, 4-365, 4-366, 4-370, 4-371, 4-372, 4-373, 4-374, 4-375, 4-376, and 4-474
- Volume I, Appendix A, Figure 2-92
- Volume I, Appendix B (all)
- Volume II, Chapter 5, Page 5-2
- Volume III, Appendix T, Pages T-113, T-114, T-115, T-116, T-117, T-235, T-239, T-244, T-245, T-251, T-255, T-256, T-259, T-408, T-409, T-412, T-464, T-465, and T-466

The Gunnison sage grouse (GuSG) was listed as a threatened species under the Endangered Species Act (ESA) by the U.S. Fish and Wildlife Service on November 20, 2014 (79 Fed. Reg. 69192).

San Miguel County, a Cooperating Agency, and the general public are denied the opportunity to adequately review the new Proposed Alternative E in the PRMP/FEIS for GuSG and habitat impacts. It is unclear how the proposed actions in the PRMP/FEIS were contemplated by the BLM's referenced Biological Assessment, which has not been made available or contemplated by the USFWS's Biological Opinion (BO), referenced in the PRMP/FEIS as having been signed on December 17, 2018, and also not provided for review.[6] The PRMP/FEIS was published in the Federal Register on June 28, 2019. A Biological Opinion is a document prepared by USFWS stating their opinion as to whether or not a federal action will likely jeopardize the continued existence or adversely modify the habitat of a listed threatened or endangered species.

According to the PRMP/FEIS (page 5-2), the Biological Opinion was issued "concurring with the determinations that the Proposed RMP: 1) may affect, but is not likely to adversely affect, the greenback cutthroat trout, Mexican spotted owl, western yellow-billed cuckoo, Colorado

---

[6] Biological Opinion – Revision of the Resource Management Plan for the Uncompahgre Field Office. Western Slope Supervisor, US Department of the Interior, Fish and Wildlife Service, Ecological Services, Grand Junction, CO. December 17, 2018.

BLM_0077070

pikeminnow, razorback sucker, bonytail, and humpback chub; and 2) may affect, and is likely to adversely affect, Colorado hookless cactus, clay-loving wild buckwheat (including designated critical habitat), and Gunnison sage grouse (including designated critical habitat) (USFWS 2018d)."

In 2016, San Miguel County provided substantial comments on the DRMP/DEIS treatment of the GuSG and critical habitat, which took into consideration that there was a more robust Gunnison Sage Grouse Rangewide RMP Amendment process underway which was considering making all GuSG critical habitat an Area of Critical Environmental Concern and was considering protective stipulations for not just BLM lands designated as habitat and/or within 4-miles of GuSG leks, but also split estate.

At the time of release of this PRMP/FEIS, the Gunnison Sage Grouse Rangewide RMP Amendment has been canceled and the process ended. This new situation changes the context and importance of comments and input into the need for necessary land protection, resource allocation and stipulations to protect and enhance GuSG populations and habitat within the UFO.

San Miguel County desired the GuSG Rangewide RMP Amendment[7] to modify and strengthen the UFO RMP measures after completion of this UFO RMP. Although we have not had adequate time to thoroughly review the PRMP/FEIS we do find that it allows for discretion to waive the protective stipulations that are present in the new Proposed Alternative E.

San Miguel County has been participating in the Section 368 West Wide Energy Corridor review process[8] since the DRMP/DEIS was released. SMC recommended relocation of the corridor going north-south through SMC because it would have significant negative impacts on GuSG. SMC provided these comments to responsible officials at the UFO and discussed them in-person in 2018.

We are attaching our comments on both the Section 368 West Wide Energy Corridor and the GuSG Rangewide RMP Amendment DRMP/DEIS.

**Requested Remedies:**

1.     Provide the BLM's Biological Assessment and the USFWS Biological Opinion for review and clarify whether the BO was based on the June 28, 2019 PRMP/FEIS or a different alternative.  UFO should incorporate any recommendations of the Biological Opinion into the PRMP/FEIS.  Cooperating Agencies and the public should be allowed to comment on the new Proposed Alternative E within the current context of no forthcoming GuSG

---

[7] https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=renderDefaultPlanOrProjectSite&projectId=39681
[8] http://corridoreis.anl.gov

BLM_0077071

Rangewide RMP Amendment. This PRMP/FEIS fails to adequately protect GuSG or address split estate.

2.   The UFO should fully follow and incorporate the recommendations of the Biological Opinion for GuSG[9] and the 2005 Rangewide Conservation Plan[10] which include:

   a.   *Protect occupied habitats from permanent loss. If permanent habitat loss from development (primarily) or conversion is not addressed, successful implementation of all the other conservation strategies is not likely to be successful in conserving GUSG. An equally important strategy is preventing significant degradation, whatever the cause, of existing habitat that is seasonally important to GUSG.*

   b.   *Coordinate with Colorado Parks & Wildlife in their effort to stabilize existing populations demographically and genetically through augmentation, and establish new populations in suitable historically occupied habitats (i.e., unoccupied critical habitat).*

   c.   *Improve habitat within currently occupied and adjacent potential habitats.*

   d.   *Protect suitable unoccupied habitat areas from permanent loss.*

   e.   *Improve habitat conditions within unoccupied habitat, which will accommodate item 2 above.*

3.   The BLM should not allow stipulations intended to protect GuSG to be available for administrative waivers, exceptions and modifications without clear criteria and process. The UFO RMP Proposed Alternative should follow the following guidance of the Biological Opinion[11]:

***Fluid Minerals - When considering waivers, exceptions, and modifications within NSO designated areas, we recommend implementing the criteria developed for the Northwest Colorado Greater Sage-Grouse RMPA as follows:***

*\*\*Exceptions or modifications may be considered if, in consultation with the State of Colorado, it can be demonstrated that there is no impact on Gunnison sage-grouse based on one of the following:*

   1.   *Topography/areas of non-habitat create an effective barrier to impacts*

   2.   *No additional impacts would be realized above those created by existing major infrastructure (for example, State Highway 50).*

   3.   *The exception or modification precludes or offsets greater potential impacts if the action were proposed on adjacent parcels (for example, due to land ownership patterns).*

*\*\*In order to approve exceptions or modifications to this lease stipulation, the Authorized Officer must obtain: agreement, including written justification, between the BLM District Managers and CPW that the proposed action satisfies at least one of the criteria listed above*

---

[9] Biological Opinion – Revision of the Resource Management Plan for the Uncompahgre Field Office. Western Slope Supervisor, US Department of the Interior, Fish and Wildlife Service, Ecological Services, Grand Junction, CO. December 17, 2018; Pages 27-28

[10] https://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx

[11] Biological Opinion – Revision of the Resource Management Plan for the Uncompahgre Field Office. Western Slope Supervisor, US Department of the Interior, Fish and Wildlife Service, Ecological Services, Grand Junction, CO. December 17, 2018; Page 28

BLM_0077072

*San Miguel County, Colorado*

*Waivers - No waivers are authorized unless the area or resource mapped as possessing the attributes protected by the stipulation is determined during collaboration with the State of Colorado to lack those attributes or potential attributes. A 30-day public notice and comment period is required before waiver of a stipulation. Waivers would require BLM State Director approval.*

*•Incorporate "Available Conservation Measures" and "Overarching Conservation Objectives" found in the GUSG final listing rule (79 FR 69192, p. 69305-69309).*

4. *Incorporate the management prescriptions and protective ACECs developed for the Gunnison sage grouse Rangewide RMP Amendment into the UFO RMP, since the Gunnison Sage-Grouse Rangewide RMP process is no longer active. BLM and Cooperating Agencies invested many years into researching and developing that RMP. See Attachment 3.*

5. *Un-designate or relocate the portion of the Section 368 West Wide Energy Corridor that goes through San Miguel County. There is no ROW on non-federal land that will not significantly impact GuSG habitat.  See Attachment 4.*

**<u>Inadequate NEPA analysis and protections for waterbodies, aquatic, wetland, and hydrologic resources, source water protection areas, domestic water supplies and cultural resources for fluid mineral leasing and surface disturbing activities.</u>**
Issue Reference Citations:

- Chapter 2, Pages 2-8 to 2-11, under the headers of Fluid Mineral Leasing, Restrictions for Surface-disturbing Activities, and Locatable Minerals, Mineral Materials, and Non-energy Solid Leasable Minerals
- Appendix B: Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities constitute an entirely new Alternative

The fluid mineral leasing acreage in the new Proposed Alternative E, retains the same open and closed acreage as Alternative A, the current condition. The current RMP predates the concerns for Canada lynx, Gunnison sage grouse and many new conditions that have developed, including new science and data regarding climate change. There is no explanation for the changes in the new Proposed Alternative E.  The acreage identified for NSO is significantly reduced in the new alternative. Omission of stipulations NL-8 (Page B-9), NSO-6/SSR-8 (Page B-17), NSO-9/SSR-11 (Page B-18), NSO-11/SSR-13 (Page B-19), NSO-19/SSR-16 (Page B-23), NSO-31/SSR-32 (Page B-128), NSO-69 (Page B-52), CSU-16 (Page B-63), ad CSU-23/SSR-26 (B-67) are inadequate for protection of special resources.

***Requested Remedy:*** The fluid mineral leasing acreage significantly changes from Alternative D to Alternative E and the BLM must allow for adequate public comment and re-consider Cooperating Agency input prior to a protest period for this new Proposed Alternative which significantly reduces protections for hydrologic, aquatic, riparian, water supply resources, as well as cultural

BLM_0077073

and wildlife resources.  Colorado Parks and Wildlife guidelines and standards need to be followed.

**General Wildlife: Failure to follow Colorado Parks & Wildlife recommendations and guidelines for wildlife species, including Gunnison sage grouse, aquatic species, desert bighorn sheep and big game migration corridors. Lack of consistency with CPW Best Management Practices (BMPs), species-specific stipulations and ungulate winter range protection. In all cases, BLM UFO RMP should require collaboration, coordination, cooperating and consulting with CPW on wildlife species and habitats.**

Issue Reference Citations:
- Volume I, Chapter 2
- Volume I, Table 2-2, especially, but not limited to Fish & Wildlife, Special Status Species, and Livestock Grazing
- Volume II, Chapters 4-5 and Appendix B
- Volume III, Appendix K
- Volume IV, Appendix T, Description of Alternatives

San Miguel County works closely with State of Colorado wildlife biologists and CPW staff to ensure the protection of wildlife and habitat in the county. The Final RMP should fully incorporate protective stipulations including NSO's, timing limitations and best management practices in collaboration and consultation with CPW. San Miguel County continues to support Alternative D's overall direction on Page 2-127: "Alternative D's overall management direction is similar to Alternative B, with additional direction to promote ecosystem integrity and protect and restore ecosystem processes. As a result, Alternative D would reduce adverse impacts on special status species, compared with Alternative A, and would provide beneficial impacts through active management to restore and enhance habitats."  In contrast, Alternative E, through the seemingly less restrictive Controlled Surface Use stipulation reduces protections according to the overall management direction on Page 2-127: "The BLM's overall management direction and associated impacts would be similar to Alternative D, although across fewer acres and with less-protective stipulations (i.e., CSU versus NSO)."

*Requested Remedy:* Incorporate the additional details for desired conditions, standards suggested by CPW and best management practices related to the management, preservation, and consideration of fish and wildlife species and habitat. Fully incorporate previous CPW requests offered during the DRMP/DEIS comment period on Alternative D, through their specific comments on GuSG, aquatic species, bighorn sheep, land health standards and stipulations for fluid mineral leasing and other surface disturbing activities.

**San Miguel River: Inadequate visual resource management protection of the San Miguel River Corridor, adjacent Scenic Byways, and San Miguel River ACEC and inadequate management of lands within the proposed San Miguel River Expansion ACEC.**

Issue Reference Citations:
- Volume I, Page 2-160 to 2-161

BLM_0077074

*San Miguel County, Colorado*

- Volume II, Appendix B
- Volume IV, Page T-490 and T-491
- Volume I, Appendix A: Figures 2-84 [Alternative B], 2-85 [Alternative C], 2-86 [Alternative D], and 2-103 [Alternative E]
- Index, Page I-1, Entire list of ACEC references as they apply to the San Miguel River and San Miguel River Expansion ACECs.

The lands within the existing San Miguel River ACEC currently have a visual resource management protection level of VRM-II (V-2). The Proposed Alternative will change that to VRM-III (V-3). The PRMP/FEIS will treat the San Juan Skyway as VRM Class III and Unaweep/Tabeguache Byway as VRM Class III within 0.5 mile of the road. Visual resources are extremely important to San Miguel County's economy, tourism, and quality of life (see Attachments 1 and 2). The San Miguel River Canyon should be given the greatest possible visual resource management level, no less than a VRM-II.

The BLM describes VRM-II class and objective as follows: "To retain the existing character of the landscape. Allowed Level of Change: The level of change to the characteristic landscape should be low. Management activities may be seen, but should not attract the attention of the casual observer. Any changes must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape." VRM Class III Objective is described as follows: "To partially retain the existing character of the landscape. Allowed Level of Change: The level of change to the characteristic landscape should be moderate. Management activities may attract attention, but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape."[12]

Proposed Alternative E removes the stipulation presented in Alternative D for excluding wind, solar, and hydropower from the San Miguel River ACEC and changes it to avoidance. We have not had adequate time for review of these new and significantly changed stipulations and how they will be put into practice. Due to the strong support from our business, recreation and conservation communities, we continue to support the exclusion of any impacts that would alter the native character and scenic beauty of the San Miguel River corridor and its scenic, recreational, vegetation and wildlife values.

To provide cohesive management and avoid conflicts with recreation and ecological values of the San Miguel River Canyon, San Miguel County believes the final alternative and decision should include the San Miguel River Expansion ACEC and the protective management stipulations described in Alternative B of the DRMP/DEIS.

***Requested Remedy:*** Manage the San Miguel River ACEC and lands within the San Juan Skyway and Unaweep/Tabeguache Byway as VRM Class II. It is unacceptable to diminish the VRM Class and objective of these lands so that objective is to only "partially retain" the existing scenic

---

[12] http://blmwyomingvisual.anl.gov/vr-mgmt/blm/index.cfm

BLM_0077075

character. Incorporate the management prescriptions and designate the San Miguel River Expansion ACEC as described in Alternative B.

**Burn Canyon: Failure to appropriately manage Burn Canyon as a Special Recreation Management Area (SRMA) vs. an Extensive Recreation Management Area (ERMA) or provide management direction for appropriate visual resource management protection and protection of sensitive riparian areas from motorized or mechanized uses or surface occupancies.**

Issue Reference Citations:

- Volume I, Page 2-11, 2-84 to 2-91, 3-112, 3-113, 4-6, 4-212, 4-276, 4-283, 4-284, 4-291, 4-296, 4-298, 4-305
- Volume II, Appendix B
- Volume IV, Appendix T
- Index, Page I-3, I-4, and I-8, Entire lists of SMRA and ERMA references as they apply to the Burn Canyon SMRA or Burn Canyon ERMA

In our previous comments, San Miguel County requested to have Burn Canyon managed as an SRMA vs and ERMA, primarily to retain the sensitive riparian areas in the drainages as non-motorized areas. We requested that if the Burn Canyon is managed as an ERMA, it be given a clear NSO, with the riparian areas in the canyons closed to motorized and mechanized uses. We requested that these areas have VRM-II to further protect the scenic resources. The Proposed Alternative E significantly alters the previous Agency Alternative and removes stipulations for CSU. This is a major change of use in areas considered during the trail planning stages for Burn Canyon to be sensitive habitats which should be avoided.

Burn Canyon and Naturita Canyon were analyzed in Alternative B as Ecological Emphasis Areas. San Miguel County recommended in our 2016 comments (Attachment 2) that the full Naturita Canyon EEA as described in Alternative B and stipulations for the Burn Canyon EEA and the Naturita Canyon EEA presented in Alternative B be incorporated into the final alternative and decision.

***Requested Remedy:*** Burn Canyon should be managed to limit recreational activities to non-motorized, non-mechanized, backcountry primitive types of recreation in the sensitive scenic and riparian areas within the canyon terrain. These areas should be VRM-II. See Attachments 1 and 2. SMC continues to support the management stipulations for the Naturita Canyon EEA and Burn Canyon EEA, as described in Alternative B of the DEIS/FEIS.

**Dolores River: Inadequate management direction to protect the lands within the analyzed Dolores River Slickrock Canyon ACEC to protect and prevent degradation of the significant natural, biological, cultural, recreational and scenic resources and values.**

Issue Reference Citations:

- Volume I, Chapter 2, Including Table 2-2
- Volume II, Chapter 4, Tables 4-69 through 4-72

BLM_0077076

- Volume IV, Appendix T
- All references to Dolores River Slickrock Canyon ACEC and SRMA in Volume II, Index Pages I-1 and I-8.

Management of the Dolores River Slickrock Canyon ACEC should protect and prevent damage to the significant "scenic, cultural and paleontological resources, desert bighorn sheep, peregrine falcon, roundtail chub and sensitive plant communities, including sensitive species Kachina daisy and Naturita milkvetch. Not including recognition or protection for these resources, plants and animals will likely result in the degradation of significant natural, biological, cultural, recreational and scenic values that are unique to the Dolores River Slickrock Canyon. SMC continues to support the Dolores River Slickrock Canyon ACEC considered in Alternative B of the DRMP/DEIS which was adequate to protect the unique landscape and ecosystems of this section of the Dolores River. SMC continues to support the following stipulations for this section of the Dolores River; ROW exclusion, No Lease, No Ground Disturbance, No Recreational Mining, No Commercial Seed Collection, No Commercial Wood Collection, No Campfires, Camping Only In Designated Sites, Petition Sec of Interior to withdrawal for locatable minerals and exclusion from hydro, solar, and wind energy developments.

***Requested Remedy:*** At a minimum, return to the management levels contained in Alternative D and summarized on Page T-49 and designate a Dolores River Slick Canyon ACEC, which provides a balance between the management levels warranted and other input:
"Manage 9,780 acres as the Dolores River Slickrock Canyon ACEC to protect scenic values, cultural and paleontological resources, desert bighorn sheep, peregrine falcon, roundtail chub, and plant communities and the BLM sensitive species Kachina daisy and Naturita milkvetch. Management actions are as follows:

- Close to motorized and mechanized travel.
- Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, restrooms, barricades and fences, as needed for resource protection.
- Allow dispersed camping unless otherwise posted.
- Prohibit open campfires: require use of fire pans, stoves, or grills.
- Allow on-site collection of dead and downed wood for campfires (fire pans, stoves, or grills required), unless monitoring indicates a need for change.
- Close to wood product sales and/or harvest.
- Require porta-potties for overnight use if restroom is not available.
- Manage as VRM Class II.
- Allowable Use: **STIPULATION** NSO-58/ SSR-57: *Special Designation ACEC*. Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.)
- Manage as ROW avoidance.
- Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry.
- Allowable Use: Close to mineral materials disposal.
- Allowable Use: Close to non-energy solid mineral leasing.

BLM_0077077

The Dolores River SRMA offers some management protection for a lesser extent of the Dolores River Slickrock Canyon, however, stipulations for fluid mineral leasing and other surface disturbing activities are subject to administrative waiver or modification where they would be in effect and if allowed could severely degrade the unique and sensitive conditions of the Dolores River Slickrock Canyon area.

**San Miguel River Segment 1 and Beaver Creek Segment ORVs are incompatible with hydro, solar, wind, and mineral development.**
Issue Reference Citations:
- Wild and scenic river (WSR), 1-5, 2-124, 2-157, 3-118, 3-128, 3-129, 4-47, 4-60, 4-83, 4-104, 4-107, 4-148, 4-193, 4-209, 4-301, 4-313, 4-321, 4-396, 4-400, 4-405, T-25, T-43, T-49, T-163
- Volume II, Appendix A, Figures
- Appendix P

Similar to Alternative D of the DRMP/DEIS, new Proposed Alternative E finds the San Miguel River Segment 1 is Suitable and recommended for a Recreational classification with Scenic, Recreational, Wildlife, Historic, Vegetation, and Paleontology Outstandingly Remarkable Values (ORVs). Beaver Creek is Suitable and recommended for a Recreational classification with Vegetation ORV.  Unlike Alternative D, the protective stipulations provided in the new Alternative E omit exclusion of hydro, solar, or wind energy. This will allow inappropriate and incompatible development of marginal renewable energy resources in these segments.

*Requested Remedy:* Retain the stipulations that exclude wind, solar, and hydro from Beaver Creek and San Miguel River Segment 1. Review Attachment 1 and consider the list of stipulations that are warranted for these segments and the lands within the San Miguel River ACEC, San Miguel River Expansion ACEC and San Miguel River SRMA. These stipulations provide appropriate and warranted protection and management for these areas which provide irreplaceable scenic beauty, ecological services that protect watershed and forest health, habitat and recreation opportunities that are important to our environmental quality and economy.

**Lands Identified for Disposal: San Miguel County opposes Lands Identified for Disposal within San Miguel County that are within 4-miles of a Gunnison sage grouse lek, adjacent to or intersecting Gunnison sage grouse Critical Habitat, contain Public Rights-Of-Way, contain Lone Cone Reservoir and are adjacent to private land conserved for Gunnison sage grouse habitat.**
Issue Reference Citations:
- Volume III, Appendix N, Page N-6
- Volume II, Appendix A, Figure 2-62 and Table 2-2 (Page 2-12)

Three parcels are in the PRMP/FEIS proposed alternative as Lands Identified for Disposal within San Miguel County on Page N-6:

BLM_0077078

N. Legal Descriptions of Lands Identified for Disposal

| Township | Range | Section | Aliquot Lot Tract | Acres | Alt A | Alt B | Alt C | Alt D | Alt E BLM Proposed |
|---|---|---|---|---|---|---|---|---|---|
| 43 N | 13 W | 12 | NESW | 40 | No | Yes | No | Yes | Yes |
| 44 N | 13 W | 24 | NESE | 40 | Yes | Yes | Yes | Yes | Yes |
| 44 N | 13 W | 35 | NWSW | 40 | Yes | Yes | Yes | Yes | Yes |

The three parcels are within Lone Cone and Gurley Reservoir areas. The parcel within T43 N R13 W Section 12 intersects Lone Cone Reservoir and is surrounded by Gunnison sage grouse critical habitat (Figure VIII.a below). The parcel is within 0.25 miles of the active Lone Cone Lek complex. It is less than one mile from a historic lek. Due to the conflicts with existing uses, water rights, access and Gunnison sage grouse critical habitat, San Miguel County opposes this action.

The parcel within T44 N R13 W Section 35 intersects and is adjacent to Gunnison sage grouse critical habitat (Figure VIII.a below). The parcel is within 1.25-1.5 miles of the active Lone Cone Lek complex and an additional historic lek. It is surrounded by private land with a conservation easement in place to protect Gunnison sage grouse habitat. There is a BLM route (undesignated) on this parcel and aerial imagery shows tracks that connect to adjacent land. Due to the conflicts with existing uses, access, and Gunnison sage grouse critical habitat and lands conserved for Gunnison sage grouse, San Miguel County opposes this action.

The parcel within T44 N R13 W Section 24 is adjacent to private land with a conservation easement in place to protect Gunnison sage grouse habitat (Figure VIII.a below). The parcel is within 3-4 miles of the active Lone Cone and Beaver Mesa Lek complex and additional historic leks. There is a BLM route (undesignated) on this parcel and aerial imagery shows tracks that connect to adjacent land.  Due to the conflicts with existing uses, access, and Gunnison sage grouse critical habitat and lands conserved for Gunnison sage grouse, San Miguel County opposes this action.

San Miguel County is opposed to any land disposal that interferes with public or private land access, water rights and irrigation and the protection of Gunnison sage grouse habitat or populations. The GIS shapefile of the Lands Identified for Disposal was not made publicly available for the protest period or for the 2016 DRMP/DEIS, which should be considered to be a procedural error.

BLM_0077079

*San Miguel County, Colorado*



Figure VIII.a: Showing the locations of the three parcels identified for disposal in the new Proposed Alternative

> ***Requested Remedy:*** BLM should not include the three parcels above within San Miguel County as "Lands Identified For Disposal" in the final decision due to conflicts with existing water rights and Lone Cone Reservoir, conflicts with existing access routes between public and private lands and conflicts with Gunnison sage grouse habitat conservation.

BLM_0077080

**The Proposed PRMP/FEIS does not adequately consider the consequences of climate change.**
Alternative E does not acknowledge climate change, make climate change a priority, nor in any substantial way include an analysis of climate impacts of any of the alternatives.
***Requested Remedy***: An adequate PRMP/FEIS must, at a minimum, include a carbon emission reduction plan that is demonstrably consistent with the efforts of the State to meet the State's climate and carbon emission reduction goals.

**Underlying analysis of uranium and other locatable minerals is factually incorrect which renders the analysis of the direct, indirect and cumulative impacts arbitrary, capricious and factually incorrect.**

**Issue Reference Citations:**
- **Volume 1, Chapter 2, 3 & 4**

The current status of the public lands and the likelihood of uranium mining within the project area is set out in Federal District Court Judge Martinez's March 18, 2019 Order (see attachments A-D) dissolving the injunction on lease tracts within the UFO jurisdiction where Dpt of Energy (DOE) manages the minerals and BLM manages the surface. The PRMP/FEIS relies on outdated information and analysis based on the now-invalidated Pinon Ridge Mill license. As stated in the Martinez ruling (page 11): "[T]he supplemental BA [the US Fish and Wildlife Service prepared for the uranium lease tracts jointly managed by BLM and DOE] plausibly and adequately explains why the Piñon Ridge Mill will likely never be constructed, and why substantial uranium mining is not likely to occur anyway". The Pinon Ridge license was revoked by Colorado regulators on April 26, 2018, based on the April 17, 2018 findings entered by Hearing Officer Dana, pursuant to the September 3, 2014 remand order of the Colorado District Judge McGahey that held the license in abeyance. Federal Judge Martinez's Order further confirms that "the only potential location that ULMP-generated uranium ore could be milled is the White Mesa Mill near Blanding, Utah, roughly 100 miles from Paradox Valley." (page 11). Both of Judge Martinez's conclusions - uranium mining is not likely, and White Mesa is the only potential mill for ore mined from the project area -  must be applied to analysis of all uranium mines, whether part of the relocatable minerals BLM leads or the DOE lease program that BLM serves as the surface management agency.

The PRMP/FEIS - and particularly the decision to adopt the new Alternative E - is devoid of accurate direct, indirect and cumulative impacts analysis of the current legal status or actual conditions that have changed since the DRMP/DEIS was issued.

Due to the lack of time for an adequate review of Preferred Alternative E and the considerable time that has elapsed between the initiation of this RMP Revision and the delay between the DRMP and PRMP/FEIS, we assume there are additional errors of fact, due to lack of current information.

BLM_0077081

**Requested Remedy:** Based on the considerably extended ten-year planning process for this RMP, we request that the BLM restart the planning process in order to allow for factually correct and current information used to conduct the thorough analysis needed to develop the ultimate preferred Alternative. We also continue to request that the public and cooperating agencies have adequate time to review and comment on all alternatives.

**List of attachments submitted to BLM UFO and DOI during the planning process by San Miguel County:**

1. April 23, 2018: Letter from San Miguel County to UFO.
2. October 31, 2016: Comments from San Miguel County to UFO on the DRMP/EIS.
3. January 9, 2017: Comments by the San Miguel County, Colorado Board of County Commissioners regarding the Gunnison Sage Grouse Rangewide Draft Resource Management Amendment/Draft EIS ("GuSG DRMPa"); 81 Fed. Reg. 53503 (August 12, 2016)
4. February 28, 2018: Section 368 West-Wide Energy Corridors Region 2 Review Cooperating Agency Agreements demonstrating SMC is an interested and engaged party:
   a. June 10, 2010, MOU Between SMC and BLM UFO to be a Cooperating Agency for the RMP revision
   b. September 4, 2014, MOU Between SMC and Colorado BLM to be a Cooperating Agency for the Gunnison Sage Grouse EIS
   c. May 3, 2017, MOU Between SMC and BLM UFO establishing a mechanism for consultation, coordination, cooperation, collaboration and communication in land use actions and ratifying our partnership for the continued coordination and cooperation for implementation of the "Connecting with Communities" Recreation Strategy.

**List of additional attachments:**

A. A.Doc 166 Order Dissolving.pdf
B. B.12A1318b Findings Conclusions and Ruling on Remand
C. C.Radiation Management - State Licensing - Revocation - Colorado Radioactive Materials License Number CO 1170-01-1
D. D.Order RE_ Energy Fuels Resources Corporation's Motion to Remand to Hearing Officer

**In summary, the State Director's decision does not comply with NEPA, FLPMA or MOU's signed with San Miguel County, does not consider local land use jurisdiction and contains analysis lacking accurate direct, indirect and cumulative impacts.**

Ther agency preferred alternative introduced in the DRMP/DEIS was shaped through considerable public and cooperating agency input over a six-year period. Volume IV, Section 5.2, Page 5-2 states, "The BLM implemented an extensive collaborative outreach and public involvement process that has included conducting a community assessment (BLM 2009f), coordinating with cooperating agencies, and working closely with the Colorado Southwest Resource Advisory Council and a specially created and sanctioned subgroup of the resource

BLM_0077082

advisory council. ***The BLM will continue to meet with interested agencies and organizations throughout the planning process, as appropriate, and will continue coordinating closely with cooperating agencies and the resource advisory council subgroup.*** [Emphasis added].

Section 5.24, Pages 5-2 to 5-4 also state that, "The BLM invites agency cooperation early in the RMP process using the process outlined in 43 CFR 1501.6. A cooperating agency is any federal, state, or local government agency or Indian tribe that enters into a formal agreement with the lead federal agency to help develop an environmental analysis. More specifically, cooperating agencies "work with the BLM, sharing knowledge and resources, to achieve desired outcomes for public lands and communities within statutory and regulatory frameworks" (BLM Land Use Planning Handbook H-1601-1; BLM 2005a). ***The primary role of cooperating agencies during the planning process is to provide input on issues for which they have a special expertise or jurisdiction.*** [Emphasis added].

The UFO has not satisfied the stated Purpose of the MOU or followed through on certain stated Roles and Responsibilities listed in the Memorandum of Understanding Between San Miguel County and the Bureau of Land Management Uncompahgre Field Office (MOU). In the MOU signed in June 2010 (Attachment 5(a)), the BLM provided in the Purpose that, "…the BLM recognizes a compelling need to ensure that the interests of San Miguel County are accounted for, and that they are meaningfully engaged in…resource management planning effort and associated EIS."

The UFO Roles and Responsibilities are listed in Section V.A(i-iv) of the document:

## V.   ROLES AND RESPONSIBILITIES

### A.  RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i.   To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii.  To provide San Miguel County with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,

- identifying or providing data that is suitable, available and relevant to the planning effort,

- reviewing and commenting on draft sections of the EIS for which San Miguel County provided input due to its special expertise.

iii. To consider and incorporate information and comments provided by San Miguel County into EIS documents to the extent possible and where appropriate.

iv.  To make all final determinations regarding the content of the EIS document.

The San Miguel County Roles and Responsibilities are listed in Section V.B(i-vii) of the document:

BLM_0077083

B. RESPONSIBILITIES OF SAN MIGUEL COUNTY

San Miguel County has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i. Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii. To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii. To provide data of potential relevance and value to the RMP revision/EIS effort. This data may include but is not limited to the following:

  • approved San Miguel County programs, plans and policies potentially affected by the RMP,

  • information regarding planning area resources and current and proposed uses and management actions,

  • environmental analyses on issues for which San Miguel County has special expertise,

  • socio-economic data such as demographics, activities and values.

iv. To review and provide comments during specified review periods on preliminary baseline and other technical reports for which San Miguel County has contributed data or other pertinent information.

v. To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

  • preliminary range of alternatives to be considered in detail,

  • relevant portions of the "Affected Environment" section (including the socio-economic portion),

  • relevant portions of the "Environmental Consequences" section,

  • relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi. During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii. To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

In March 2018, San Miguel County and Cooperating Agencies were invited to meet with UFO and learned about their consideration of new concepts for the RMP. We offered comments on a draft revised Table 2-2 provided to us electronically on March 29, 2018 (see Attachment 1). There was no meaningful opportunity to help develop Alternative E. The public and cooperating agencies have never been given the opportunity to officially comment on this Alternative which introduces completely new concepts and direction. Supporting data including but not limited to, the Biological Assessment, Biological Opinion and GIS files were not made available for all or a significant part of this 30-day Protest Period. It is a procedural error and violation of FLPMA to deny the public an opportunity to comment on materials upon which the BLM bases its decisions. New situations have developed since 2016, such as the halting of the GuSG Rangewide RMP Amendment, which may significantly affect comments received that were contextual to concurrent planning processes and expectations, which have now changed. With the changed

BLM_0077084

condition of the stalled GuSG Rangewide RMP process, this RMP/EIS needs to reconsider GuSG management and protections and allow adequate public comment and cooperating agency collaboration. With the significantly changed status of the Pinon Ridge Uranium Mill, the BLM must revise the analysis of all potential impacts of related land use, environmental and socio-economic considerations.

**RESERVATION**:  Given the time constraints of filing this Protest, San Miguel County may not have addressed all issues. Therefore, San Miguel County reserves its right to further process regarding any and all issues identified by other protestors or commenters.

CONTACT INFORMATION:  Pursuant to 43 C.F.R. 1610. 5-2, please send all notices and correspondence regarding this Protest to:

Amy Markwell
San Miguel County Attorney
333 West Colorado Ave. 3rd Floor
PO Box 791
Telluride, CO 81435
Ph: (970)728-3879
amym@sanmiguelcountyco.gov

Sincerely,
San Miguel County, Colorado
Board of Commissioners

Kris Holstrom, Chair
Hilary Cooper
Lance Waring

BLM_0077085

Attacment A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 08-cv-1624-WJM-NRN

COLORADO ENVIRONMENTAL COALITION,
INFORMATION NETWORK FOR RESPONSIBLE MINING,
CENTER FOR NATIVE ECOSYSTEMS,
CENTER FOR BIOLOGICAL DIVERSITY, and
SHEEP MOUNTAIN ALLIANCE,

        Plaintiffs,

v.

OFFICE OF LEGACY MANAGEMENT, and
UNITED STATES DEPARTMENT OF ENERGY,

        Defendants.

---

## ORDER GRANTING MOTION TO DISSOLVE INJUNCTION AND DIRECTING ENTRY OF FINAL JUDGMENT

---

Plaintiffs bring this lawsuit under the Administrative Procedure Act ("APA"),

5 U.S.C. §§ 701 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C.

§§ 4231 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*,

challenging certain decisions made by the United States Department of Energy's Office

of Legacy Management (for purposes of this order, "DOE") concerning a uranium

mining program in southwestern Colorado that DOE oversees.  That program was

known as the Uranium Lease Management Program ("ULMP").  At some point, the

program dropped "Management" from its title and now goes by "ULP," but the Court will

continue to refer to it as "ULMP" for consistency with prior orders.

In an earlier phase of this lawsuit, the Court enjoined DOE from implementing its

most recent decisions regarding the ULMP.  Currently before the Court is DOE's Motion

to the Dissolve Injunction ("Motion to Dissolve").  (ECF No. 160.)  For the reasons

explained below, the Court will grant this motion, dissolve the injunction, and enter final

judgment.

## I. BACKGROUND

**A.      Early Stages and Original Injunction**

In 2007 and 2008, DOE approved new uranium mining under the ULMP, mostly

on lands around Paradox Valley in southwestern Colorado.  Plaintiffs sued in July 2008,

claiming that DOE had not satisfied its obligations under NEPA, ESA, and associated

regulations when making this decision.  (ECF No. 1.)  Substantive proceedings moved

slowly at first due to parallel litigation over collateral matters, and to limited discovery

the Court permitted.  (ECF No. 41.)  The case was transferred to the undersigned upon

his appointment in February 2011.  (ECF No. 71.)

In October 2011, having finally received full substantive briefing, the Court

partially agreed with Plaintiffs' challenges.  *See Colo. Envtl. Coal. v. Office of Legacy*

*Mgmt.*, 819 F. Supp. 2d 1193 (D. Colo. 2011) (ECF No. 94) ("*CEC I*").  Consequently,

the Court vacated DOE's environmental review documents, stayed all existing ULMP

leases, and enjoined DOE from approving additional leases or other ULMP-related

activities on the lease tracts.  *Id.* at 1224.  The Court then invited DOE to "move . . . to

dissolve this injunction" after it had "conduct[ed] an environmental analysis on remand

that complies with NEPA, ESA, all other governing statutes and regulations, and this

Order."  *Id.*

BLM_0077087

**B.      Previous Motion to Dissolve Injunction**

In April 2017, DOE moved to dissolve the injunction.  (ECF No. 147.)  The Court

resolved that motion in February 2018.  *See Colo. Envtl. Coal. v. Office of Legacy*

*Mgmt.*, 302 F. Supp. 3d 1251 (D. Colo. 2018) (ECF No. 151) ("*CEC II*").  The Court

agreed with DOE that it had corrected all previously noted errors, save for one.  The

ESA requires federal agencies to evaluate whether their actions might jeopardize the

habitat of an endangered or threatened species, and this evaluation process may

include consultation with the United States Fish & Wildlife Service ("FWS").  *See id.* at

1269–70.  In this case, the main question was whether reasonably foreseeable uses

and discharges of water in the course of mining and associated activities might

ultimately affect four endangered fish species living in the Colorado River.  *Id.* at 1270,

1273–74.  DOE requested FWS's opinion on the matter (a "Biological Opinion" or

"BiOp") by sending to FWS the DOE's Biological Assessment ("BA") that that water

usage would have at least *some* adverse effect on the endangered Colorado River fish.

*Id.* at 1270.  FWS's resulting BiOp concluded that there was no likelihood of

jeopardizing or threatening those fishes' habitat.  *Id.* at 1270–71.

However, when requesting the BiOp, DOE conveyed to FWS only the forecasted

annual water consumption of ULMP mines, and not water consumption for "other mining

operations expected to coincide with renewed mining on ULMP lease tracts."  *Id.* at

1273.  In particular, DOE's water consumption analysis did not address a uranium mill

planned for Paradox Valley, to be known as the Piñon Ridge Mill:

> Among the many things DOE says about this mill, DOE
> predicts "[a] surge in uranium exploration, mining, and
> permitting . . . if the mill is constructed," referring to mining
> on BLM land rather than ULMP lease tracts.  DOE notes that

3

BLM_0077088

> the Piñon Ridge Mill would require water as part of its milling operations.  DOE does not, however, estimate the mill's water requirements, nor the water requirements of the non-ULMP uranium mines it predicts will come into existence.

*Id.* (citations omitted; alterations in original).  "Notably," the Court added,

> DOE does not claim that it lacks information from which it can reasonably estimate the amount of water the Piñon Ridge Mill will likely consume, or the amount of water non-ULMP uranium mines will likely consume.  The Court is therefore compelled to presume that DOE possesses the necessary information.

*Id.* at 1274.

With the ability to predict all water consumption associated with renewed mining on the ULMP tracts—whether caused by DOE's decision to resume mining there, or simply coinciding with it and reasonably foreseeable to occur—the Court held that DOE had acted arbitrarily and capriciously by relying on FWS's resulting BiOp, knowing that the BiOp was formulated with materially incomplete information.  *Id.; see also id.* at 1272 ("An agency acts 'not in accordance with law,' 5 U.S.C. § 706(2)(A), when it fails to convey material information in its possession to FWS, and the agency behaves arbitrar[ily] and capriciously when it relies on a BiOp resulting from a materially defective consultation.").  "Fortunately," the Court continued,

> the remedy in this circumstance does not require total vacatur . . . .  Instead, the Court will leave the existing injunction in place, for the time being, and order DOE to reinitiate consultation with FWS based on a supplemental BA.  The supplemental BA may be limited solely to the question of water depletion based on DOE's estimates of the likely combined annual water usage of ULMP mines, non-ULMP mines likely to become operational, and the Piñon Ridge Mill.  Upon receiving FWS's response (presumably an additional or supplemental BiOp), DOE may then issue an updated or supplemental ROD [*i.e.*, record of decision] and move once again to dissolve the injunction.  Such a motion

4

> need only address whether DOE fulfilled its ESA § 7
> consultation duties with respect to water depletion that may
> affect Colorado River endangered fish.

*Id.* (footnote omitted).

## C.   Current Motion to Dissolve

By letter dated May 2, 2018, DOE transmitted a supplemental BA to FWS.  (ECF

No. 160-1.)  The supplemental BA reports DOE's efforts to search for all relevant

current or reasonably foreseeable uranium mining and related activities in the area, and

to estimate annual water usage of all these activities.  (*Id.* at 4–7.)  The BA also

tabulates all of the estimated water usage.  (*Id.* at 7–10.)

The most notable development reported in the supplemental BA is that, not long

after this Court issued *CEC II*, a Colorado administrative law judge ruled that the

Colorado Department of Public Health and Environment ("CDPHE") should not have

issued the license under which the Piñon Ridge Mill was to be constructed and

operated.  (*Id.* at 5–6.)  The supplemental BA further reports that CDPHE elected not to

appeal the judge's decision, and "therefore the license [was] revoked as of April 26,

2018."  (*Id.* at 6.)  In this light, the supplemental BA announces that the Piñon Ridge Mill

is no longer a reasonably foreseeable action coinciding with renewed ULMP mining, so

DOE would not consider its potential water usage.  (*Id.*)  However, perhaps out of a

desire not to appear to be shirking the Court's instructions in *CEC II*, DOE included

within the supplemental BA the amount of water the Piñon Ridge Mill had been

expected to consume.  (*Id.*)  DOE also included a parting comment about the changing

uranium market and its potential relationship to the defunct Piñon Ridge proposal:

> Finally, in the [previous BA's] discussion regarding
> cumulative effects from the yet-to-be constructed Piñon

5

BLM_0077090

> Ridge Mill, whose licensed was revoked in April 2018, DOE
> cited the following text from that company's reports for the
> mill: "A surge in uranium exploration, mining, and permitting
> is anticipated if the mill is constructed, including permitting
> and development of uranium/vanadium deposits controlled
> by Energy Fuels Resources." The cited reports were circa
> 2009 to 2012. This statement may have been appropriate at
> that time; however, since then, various world events
> happened (e.g., Fukushima in 2011) that contributed to
> continued low uranium ore prices—lower than economically
> feasible for new mining or a surge in mining.

(*Id.* at 10–11.)

By letter dated June 19, 2018, FWS responded to DOE's supplemental BA.

(ECF No. 160-2.)  As to Piñon Ridge, FWS agreed that it was no longer the sort of

reasonably foreseeable action that must be considered.  (*Id.* at 3.)  As to all other data

reported in the supplemental BA, FWS announced that its previous BiOp was still

accurate in predicting no jeopardy to the Colorado River endangered fishes' habitat.

(*Id.* at 2–4.)

Having received this information, DOE moved to dissolve the injunction in July

2018.  (ECF No. 160.)  Plaintiffs remain opposed to dissolving the injunction, except as

to ULMP least tracts that will be reclaimed rather than newly mined.  (ECF No. 162 at

9–10.)

## II.  LEGAL STANDARD

In opposing the *first* motion to dissolve, Plaintiffs argued from case law that a

party seeking to dissolve an injunction bears a heavy burden to show that

circumstances have changed.  (*See* ECF No. 148 at 10–11.)  The Court rejected this

argument: "Plaintiffs' cited case law relates to injunctions that were meant to last

indefinitely.  Here, however, the Court specifically contemplated lifting its injunction after

BLM_0077091

DOE completed the necessary environmental review." *CEC II*, 302 F. Supp. 3d at 1255 (citing *CEC I*, 819 F. Supp. 2d at 1224).

In opposing DOE's *current* Motion to Dissolve, Plaintiffs once again argue that DOE bears a heavy burden of showing changed circumstances. (ECF No. 162 at 4.) The Court again rejects this argument, for the reasons just stated. Although DOE bears the burden in this procedural posture, it is simply a burden to show that it has materially complied with the Court's instructions.

## III.  ANALYSIS

### A.      Whether a New or Supplemental Administrative Record is Needed

DOE attached its supplemental BA and FWS's response to its Motion to Dissolve (ECF Nos. 160-1, 160-2), but has not submitted any other documents generated during the re-consultation process the Court ordered in *CEC II*. Plaintiffs' primary challenge is that DOE cannot move to dissolve the injunction without first assembling and lodging a new or supplemental administrative record, comprising all documents related to the re-consultation. (ECF No. 162 at 5–6.)

The parties have not cited, nor has the Court located, any authority establishing that a government agency must, in all instances, assemble and disclose a full administrative record before seeking a Court's approval of its administrative action. The case law *assumes* that an administrative record will be assembled, but without discussing it as some sort of categorical or jurisdictional requirement.

Despite the paucity of case law on the topic, judicial review of administrative action will, by nature, nearly always require an administrative record. Under the unique circumstances presented here, however, the Court finds that DOE committed no error,

BLM_0077092

or, if it did, the error is attributable to Plaintiffs as the equivalent of invited error.  These

outcomes are evident from the procedures that led up to the Motion to Dissolve.

To repeat, the Court's instructions in *CEC II* were as follows:

> Fortunately, the remedy in this circumstance does not
> require total vacatur . . . .  Instead, the Court will leave the
> existing injunction in place, for the time being, and order
> DOE to reinitiate consultation with FWS based on a
> supplemental BA.  The supplemental BA may be limited
> solely to the question of water depletion based on DOE's
> estimates of the likely combined annual water usage of
> ULMP mines, non-ULMP mines likely to become operational,
> and the Piñon Ridge Mill.  Upon receiving FWS's response
> (presumably an additional or supplemental BiOp), DOE may
> then issue an updated or supplemental ROD and move once
> again to dissolve the injunction.  Such a motion need only
> address whether DOE fulfilled its ESA § 7 consultation
> duties with respect to water depletion that may affect
> Colorado River endangered fish.

302 F. Supp. 3d at 1274 (footnote omitted).  A few months later, DOE submitted a

status report announcing that it had transmitted its supplemental BA to FWS and

"intend[ed] to file a motion to dissolve the injunction as soon as practicable after receipt

of [FWS's] final response to the [BA]."  (ECF No. 154 at 1–2.)  The Court then ordered

the parties to "confer and . . . file a joint status report explaining their views (including

their respective views, if they cannot agree) on: (1) what steps remain, if any, before

[DOE] may file a motion to dissolve the injunction, and (2) an appropriate briefing

schedule for such a motion."  (ECF No. 155.)  In the joint status report, "[t]he parties

agree[d] that the only step remaining before [DOE] may file a motion to dissolve the

injunction is for [DOE] and [FWS] to complete their consultation over [the supplemental

BA]."  (ECF No. 156 at 1.)  The parties also presented an agreed-upon briefing

schedule, with the motion to dissolve due "30 days after receipt of final response from

BLM_0077093

FWS to Supplemental BA." (*Id.* at 3.)  The Court adopted the proposed briefing schedule, with the first deadline (*i.e.*, filing of the motion to dissolve) set for 30 days after DOE received a final response from FWS regarding the supplemental BA.  (ECF No. 157.)

This course of events reveals three things.  First, the Court charged DOE with a limited, discrete task—in contrast to a reopening of the entire process that the Court ordered in *CEC I*.  Second, the Court expressed its expectation of an updated or supplemental ROD,[1] but the Court said nothing about a new or supplemental administrative record—in contrast to proceedings before the original motion to dissolve (ECF No. 147), where the Court specifically required a new administrative record (*see* ECF No. 132).  Third, the Court asked the parties to describe "what steps remain, if any, before [DOE] may file a motion to dissolve the injunction" (ECF No. 155), and Plaintiffs did not at that time raise the need to produce a new or supplemental administrative record.

Accordingly, because the Court did not require a new administrative record, DOE did not err in failing to produce one.  Also, the situation is equivalent to "invited error" because Plaintiffs had their opportunity to insist on an administrative record as part of the scheduling order but did not.  *See, e.g.*, *United States v. Edward J.*, 224 F.3d 1216, 1222 (10th Cir. 2000).

Finally, assembling an administrative record would take more time and likely more briefing.  The Court finds that it would not be in the interest of justice to delay

---

[1] No party has pointed the Court to an updated or supplemental ROD, unless the supplemental BA (ECF No. 160-1) is deemed to be the same thing.  But Plaintiffs do not object on this account, so the Court will not explore the matter further.

BLM_0077094

resolution of the matter any further.  This case is almost eleven years old, and the

Court's injunction has been in place for more than seven years.

For all these reasons, the Court holds under the unusual circumstances

presented here that DOE need not have assembled and disclosed a full administrative

record before seeking review of its limited, Court-ordered re-consultation with FWS.

**B.      Whether DOE Properly Evaluated the Significance of the Piñon Ridge Mill Developments**

Plaintiffs' only other argument against dissolving the injunction is that DOE

purportedly did not recognize the true significance of the Piñon Ridge Mill's demise.

(ECF No. 162 at 6–8.)  Plaintiffs note that the Piñon Ridge Mill was expected to

consume a substantial amount of water—substantial enough to exceed a numeric

threshold that FWS finds significant, particularly when added to all other estimated

water usage.  (*Id.* at 7.)  Plaintiffs argue that FWS therefore should have considered the

Piñon Ridge estimate as a proxy for whatever mill will handle the uranium likely to be

mined in the area: "the newly presented fact that [the] Piñon Ridge Mill license is no

longer effective *and another mill must be used* does not allow [DOE] to arbitrarily

exclude the water depletions needed to mill the oars from the [DOE] uranium lease

tracts."  (*Id.* (emphasis added).)  Plaintiffs' argument fails for at least three reasons.

First, Plaintiffs fail to recognize the significance of the Piñon Ridge Mill in the

Court's previous ruling.  The Court noted DOE's prediction that the Piñon Ridge Mill

would prompt a uranium mining boom in the area, particularly on non-ULMP tracts.

*CEC II*, 302 F. Supp. 3d at 1273.  The Court thus faulted DOE for failing to "estimate the

mill's water requirements, [and] the water requirements of the non-ULMP uranium

mines [DOE] predicts will come into existence."  *Id.*  And that is what the Court tasked

BLM_0077095

DOE with estimating and then transmitting to FWS. *Id.* at 1274. The Court never faulted DOE's estimates for water usage associated with ULMP lease tracts. Regardless, the supplemental BA plausibly and adequately explains why the Piñon Ridge Mill will likely never be constructed, and why substantial uranium mining is not likely to occur anyway. There is no hint that the mining that likely *will* occur will require anywhere near the fairly large amount of water predicted for the Piñon Ridge Mill.

Second, FWS in fact conveyed the Piñon Ridge Mill estimate to FWS. It did so, of course with a significant caveat, *i.e.*, that it no longer viewed the estimate as relevant and it was not seeking FWS's opinion in light of the estimate. (ECF No. 160-1 at 5–6.) Nonetheless, FWS came to its own conclusion, in agreement with DOE, that the Piñon Ridge estimate was not a matter it needed to consider. (ECF No. 160-2 at 3.) DOE therefore did not fail to convey the relevant information to FWS—and conveying that information is what the Court ordered in *CEC II*.

Third, the only potential location that ULMP-generated uranium ore could be milled is the White Mesa Mill near Blanding, Utah, roughly 100 miles from Paradox Valley. DOE conveyed White Mesa's estimated water requirements to FWS. (ECF No. 160-1 at 7.) Plaintiffs fault DOE for relying on a 1979 figure for that estimate, stating that "[c]urrent data is [*sic*] presumably available." (ECF No. 162 at 8.) But Plaintiffs then go on to note that the previously-filed administrative record shows the White Mesa Mill processes "only alternate feed" (nuclear waste generated through non-natural processes, from which uranium may be extracted), not uranium ore. (*Id.* (internal quotation marks omitted).) This strongly suggests that useful data for White Mesa Mill are *not* available, given that the mill does not presently process what ULMP and other

11

BLM_0077096

uranium mines would produce—uranium ore.

For these reasons, the Court finds that DOE did not fail to convey adequate information to FWS during the re-consultation process. Consequently, DOE has remedied the only lingering problem noted in *CEC II*, and is entitled to have the injunction dissolved.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendants' Motion to Dissolve the Injunction (ECF No. 160) is GRANTED;

2. The Court's injunction entered October 18, 2011 (ECF No. 94, as modified by ECF No. 102) is DISSOLVED;

3. The Clerk shall enter judgment in favor of Defendants and against Plaintiffs, and shall terminate this action; and

4. The parties shall bear their own costs.

Dated this 18th day of March, 2019.

BY THE COURT:

William J. Martinez
United States District Judge

12

Attachment B

JAG No. 12 A 1318; Pursuant to § 24-4-105, C.R.S.

IN RE: THE APPLICATION OF ENERGY FUELS RESOURCES, INC. FOR A
RADIOACTIVE MATERIALS LICENSE FOR THE **PIÑON RIDGE URANIUM MILL**

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND RULING – APRIL 17, 2018**

## PROCEDURAL HISTORY

Beginning November 7, 2012 and concluding on November 13, 2012, the undersigned, acting as the hearing officer appointed by the director of the Colorado Department of Public Health and the Environment (hereafter CDPHE), presided over a hearing in Nucla, Colorado to consider the application of Energy Fuels filed with CDPHE for issuance of a license to mill radioactive materials. Sheep Mountain Alliance, Rocky Mountain Wild, Center for Biological Diversity, Colorado Environment Coalition and Dr. Robert L. Grossman (collectively hereafter referred to as Sheep Mountain Alliance, et al.) sought and were granted party status to resist the issuance of the license sought by Energy Fuels.

On January 14, 2013, the undersigned entered "Findings of Fact, Conclusions of Law and Ruling (hereafter January 14, 2013 Ruling)" following a public hearing. As noted at pages one and five of the January 14, 2013 Ruling, the undersigned concluded as a matter of law that the hearing was an intermediate step in CDPHE's consideration of Energy Fuels application. Sheep Mountain Alliance, et al. and Rocky Mountain Wild, the Plaintiffs in the current Judicial Proceeding, argued at the hearings held in 2012 and reassert in the current Judicial Proceeding that the undersigned committed error in refusing to issue an "initial decision" and make findings and conclusions upon all material issues of fact, law or discretion.

An administrative appeal of the January 14, 2013 Ruling to the Executive Director of CDPHE was denied and on April 25, 2013 CDPHE issued the uranium milling license sought by Energy Fuels. Plaintiffs thereafter filed a complaint in the Denver District Court (Action No. 13CV32397) seeking judicial review of the April 24, 2013 license, including adequacy of the 2012 hearing and the January 14, 2013 Ruling. Plaintiffs' claims for relief include:

1. Failure of the January 14, 2013 Ruling to meet the requirements of an "initial decision" as required by the Administrative Procedure Act. §24-4-105 (14)(a), C.R.S.
2. Failure of the January 14, 2013 Ruling to provide and adhere to an explicit and predetermined burden of proof.
3. Failure of the January 14, 2013 Ruling to make factual and legal determinations upon each of the procedural requirements and substantive issues enumerated in part 18 of the Rules and Regulations pertaining to Radiation Control promulgated by CDPHE.

1

4.  Failure of the January 14, 2013 Ruling to conclude that the absence of competent localized economic data requires a conclusion that Energy Fuels failed to meet its burden of proof.

5.  Inadequacy of the Environmental Impact Analysis upon which the April 24, 2013 license was based.

Plaintiffs' seek a declaration that the license issued is void.

On September 3, 2014, Judge Robert L. McGahey, Jr. of the Denver District Court issued an Order remanding Plaintiffs' action (1) for an "initial decision" as to whether Energy Fuels application met all criteria under state law for issuance of a license pursuant to § 25-11-203 and (2), C.R.S. for a *post hoc* determination of the burdens of proof in the hearing. After limited discovery, the matter was referred to the undersigned as the original hearing officer.

The decision in this review is to be based upon the record made in the hearing held in Nucla, Colorado in 2012. In requiring an "initial decision" upon the evidence previously presented the Court's Order requires a statement of findings and conclusions upon all the material issues of fact, law, or discretion presented by the record. § 24-4-105 (14)a, C.R.S. The parties disagreed about the appropriateness of an additional hearing or briefing to address the application of the standard of an "initial decision" to the record. Therefore the required review of the record and the evidence offered was undertaken without the assistance of counsel.

BURDEN OF PROOF

The parties do not significantly disagree about the applicable burden of proof, Energy Fuels, as the applicant and proponent of the license, bears the ultimate burden of proof to support the entry of an Order that the license should be issued. § 24-4-105 (7), C.R.S.; 6 C.C.R.1007-1 §18.7.6.5. In the briefs filed by Energy Fuels and by Sheep Mountain Alliance, et al., the parties agree, and the undersigned now concludes, that Sheep Mountain Alliance, et al., as the party seeking an affirmative order, bears the burden of persuasion in challenging the sufficiency of the notice for the hearing held and the competence of the Environmental Impact Analysis prepared by CDPHE. As noted in the Conclusions of Law below, § 25-11-203 (3) (c) (III), C.R.S. assigns the burden of proof upon the technical issues argued at the hearing to the Applicant, Energy Fuels. The requirements of proof shall conform, to the extent practicable, with those in civil nonjury cases in the district courts. §24-4-105 (7), C.R.S.. To satisfy the burden of proof, a party must therefore prove its position by a preponderance of the evidence.

JANUARY 14, 2013 RULING

In that earlier ruling, the undersigned made a number of Findings of Fact and Conclusions of Law that are necessary to an "initial decision." That Ruling is attached hereto (Attachment A) and made a part of this Ruling and the undersigned specifically again finds by a preponderance of the evidence that Findings of Fact Number 2 & 3 and Conclusions of Law Number 1, 2 and 3 remain valid and should be repeated in this Ruling.

2

BLM_0077099

INITIAL DECISION

The initial decision as to whether Energy Fuels application met all criteria under state law for issuance of a license pursuant to § 25-11-203, C.R.S. as required by the District Court Order of September 3, 2014, shall include a statement of findings and conclusions upon all the material issues of fact, law or discretion presented by the record and the appropriate order, sanction, relief or denial thereof. § 24-4-105 (14) (a), C.R.S. That initial decision is then subject to appeal to CDPHE.

The conflicting perceptions of counsel and the undersigned about the purpose of the hearing held in Nucla, Colorado in the fall of 2012 caused Energy Fuels and CDPHE to limit the evidence they offered to the voluminous documents filed in support of and response to the application for a license together with an overview of that application process by the witnesses offered by those parties. Sheep Mountain Alliance, et al. offered technical evidence addressing specific argued deficiencies in the application or CDPHE's evaluation of it. In some instances, Energy Fuels and CDPHE offered technical evidence in response to those argued deficiencies. The written record prepared by CDPHE and presented at the hearing was submitted to the undersigned in electronic form without an index, making access to all of the material relating to a particular argument highly difficult.

FINDINGS OF FACT

Applying the burden of proof adopted above to the evidence offered, the undersigned now finds, by a preponderance of the evidence:

1. Energy Fuels and CDPHE substantially complied with the notice and process requirements governing the issuance of a license to mill radioactive materials. § 25-11-201 et seq., C.R.S.; 6 C.C.R.1007-1 part 18. Minor procedural defects, if any, in that process do not preclude issuance of a license. As noted in Conclusion of Law #3 below, the hearing fully satisfied the requirements of § 24-4-105, C.R.S.

2. The Environmental Assessment prepared by Energy Fuels and Submitted to the CDPHE pursuant to § 25-11-203 (2) (b) (II), C.R.S.; § 25-11-203 (2) (c), C.R.S.; 6 C.C.R. 1007-1 §3.8.8; 6 C.C.R. 1007-1 §18.3.4; and 6 C.C.R. 1007-1 §28.3.5.4 substantially complies with the requirements of the statutes of the State of Colorado and the regulations adopted by CDPHE. A specific dispute with all or part of that Assessment does not make the document unlawful or insufficient.

3. The Environmental Impact Analysis prepared by CDPHE pursuant to C.C.R. 1007-1 §18.4.1 substantially complies with the requirements of the regulations adopted by CDPHE. A specific dispute with all or part of that Analysis does not make the document unlawful or insufficient.

4. Counsel for Rocky Mountain Wild, Center for Biological Diversity and Colorado Environmental Coalition, (hereafter collectively referred to as the "Wildlife Coalition"), offered documentary evidence that the proposed mill site was a potential habitat area for a number of species of animals, birds and plants. They further argued that there has been an historical impact

3

BLM_0077100

upon aquatic life in the rivers in the region from the uranium mining and milling industry. With the exception of one sighting of the Gunnison Sage Grouse several years ago, there was no evidence offered of the presence of an endangered or threatened species on or in the immediate proximity of the proposed mill site. There are some references in the record reflecting consideration within the Environmental Assessment and the Environmental Impact Analysis of impacts upon animals, birds and plants in proximity to the proposed mill site. The undersigned now finds that Energy Fuels has failed to meet its burden to prove that those impacts have been fully considered.

5. Dr. Craig Little and Dr. Robert Grossman were qualified and testified as experts in the air modeling process and possible wind dispersion of radioactive dust from the tailings ponds and the materials storage piles at the proposed mill. The conflicts in the expert testimony and the lack of clarity in the documentary record leads the undersigned to find that Energy Fuels has failed to meet its burden to prove that the statutory and regulatory requirements to minimize the impacts to the public and the environment of windborne radioactive dust have been met..

6. Ann Maest testified as an expert to address the qualities of the caffeinate to be discharged to the tailings ponds and its comparison with water quality standards for the ground water and surface water in the vicinity of the proposed mill, and the studies of and issues related to the designed pond liners and pond construction. Kimberly F. Morrison testified as an expert to discuss the liner systems proposed for the tailings piles and netting to mitigate access of waterfowl. The conflicts in the testimony and ambiguities in the documentary record leads the undersigned to find that Energy Fuels has failed to meet its burden to prove that the statutory and regulatory requirements to minimize the impacts of contaminated ground water to the public and the environment have been met..

7. Constance L Travers testified as an expert to address the sufficiency of the ground water supply plan and the ground water investigation and monitoring plan, and dispute the conclusion found in the Environmental Assessment and the Environmental Impact Assessment (EIA) that no pathways are present for ground water below the site. Roman Popielak testified as an expert to address the ground water investigation and the possibility of perched ground water evidenced in the test wells. The conflicts in the testimony and the lack of clarity in the documentary record leads the undersigned to find that Energy Fuels has failed to meet its burden to prove that the statutory and regulatory requirements to assure a sufficient water supply for operation of the proposed mill have been satisfied.

8. Dr. Thomas M. Power and Sandra L. Goodman testified as experts about the socioeconomic impacts of the proposed mill, each using the employment prediction of Energy Fuels for direct jobs to be created and different study areas for a calculation of indirect jobs that might be created. Any cost-benefit analysis for this proposed site, as with any other site, is entirely dependent upon the physical area of impact to be studied. The broader the area included in the study, the less statistically significant the possible benefit would be and the greater the impact of a possible or potential risk. Considering the reports of each witness, and the absence of separate and distinct economic data for the west end of Montrose County, the conclusions reached by each of them seems highly speculative and without significant probative value. The proposed mill site is intentionally located as far as possible from any population center. The absence of precise economic data to support the opinions of experts does not, however, preclude

BLM_0077101

a thorough analysis of the environmental, social, technical and other benefits of the proposed application against environmental costs and social effects while considering available alternatives. The hundreds of individuals interviewed or offering comments at numerous public hearings, including the November 2012 hearing in Nucla, where more than two hundred individuals offered oral or written comments, provide a sufficient data base to support CDPHE's conclusions about the socio-economic impact of the proposed license. Energy Fuels has satisfied its burden of proof that is has fully considered the socio-economic impact of the proposed mill.

9. Many of the individuals offering public comments and counsel for Sheep Mountain Alliance, et al. challenge the adequacy of the bond amount set by CDPHE although each relate their objections to the cost of remediation at historic mills that were more loosely regulated or to the cost that might be realized if an upset condition existed. The statutory and regulatory requirements that the bond amount be regularly reviewed make a finding upon the bond amount set in 2012 unnecessary.

10. (2013 Finding #2) Energy Fuels has had internal discussions about the capacity of the proposed mill and the possibility of seeking an amendment or amendments to the license to allow for a greater capacity of production. Those discussions and related analysis and design documents do not mandate a modification of the application to reflect that greater capacity or require a modified Environmental Impact Assessment to reflect that increased capacity. The application seeks to process 500 tons per day and any application to enlarge that capacity would require another full review by CDPHE. There is no evidence offered supporting a conclusion that CDPHE would attempt to circumvent that full review.

11. (2013 Finding #3) Counsel for Sheep Mountain Alliance, et al., and a number of the individuals making public comments, complain that there were too many informal conversations between Energy Fuels and CDPHE, and that the informality of that relationship is evidence of a bias or at least a lack of objectivity on the part of CDPHE in favor of Energy Fuels. Informality in the relationship between a regulated party and the regulator may simply indicate civility. The evidence does not evidence a bias in the behavior of CDPHE or its employees.

CONCLUSIONS OF LAW

Considering the foregoing Findings of Fact, the undersigned now makes the following conclusions of law:

1. § 25-11-203 (3) (c) (II), C.R.S. provides that "the department (CDPHE) may order reasonable mitigation measures to address any substantial adverse impacts to public health or the environment or transportation infrastructure or transportation facilities within the county attributable solely to approval of the license…pertaining to the facility's receipt of the radioactive material." § 25-11-203 (3) (c) (III), C.R.S. provides, in part, "the applicant shall demonstrate that if the license . . . pertaining to the facility's receipt of the radioactive material is approved, then the receipt, storage, processing, and disposal of radioactive material will: (A) Be conducted such that the exposures to workers and the public are within the dose limits of part 4 of the department's rules pertaining to radiation control for workers and the public; (B) Not cause releases to the air, ground or surface or groundwater that exceed permitted limits; . . ."

5

2. 6 C.C.R.1007-1 §4.5.2 provides that "the licensee. . . shall use, to the extent practical, procedures and engineering controls based upon sound radiation protection principles to achieve occupational doses and doses to members of the public that are as low as reasonably achievable (ALARA),"

3. (2013 Conclusion #1) The hearing conducted as described in the record of these proceedings fully satisfies the requirements of § 24-4-105, C.R.S., in that notice was properly issued; any entity or individual who sought party status was admitted as a party; the parties were offered the opportunity to call witnesses and offer exhibits and cross-examine the witnesses who testified without limitation; the rules of evidence were relaxed to allow the tender of documents as exhibits without foundation; each step of the proceedings were recorded by a reporter and transcripts of those proceedings were made available to the parties; and that oral and written comments were solicited from members of the public who had not sought party status, without limitation on the time they wished to speak or the content of their comments.

4. (2013 Conclusion #2) As discussed above the purpose and scope of this ruling is to render an "initial decision" as to whether Energy Fuels application met all criteria under state law for issuance of a license pursuant to § 25-11-203, C.R.S., and (2) for a *post hoc* determination of the burdens of proof in the hearing. As an initial issue the undersigned must address the purpose and scope of this hearing. Many of those offering public comments, either oral or written, exceeded the scope of the hearing and the broader issues they raised require some discussion of the role of CDPHE, and its appointed hearing officer, in the regulation of uranium milling. Those public comments offered in support of the application and the proposed license cited primarily the economic opportunities to be realized by bringing additional employment to the west end of Montrose County. Many of the public comments offered in opposition to the application and the proposed license discussed the general impact upon the environment of any energy development, the risk of nuclear power production as evidenced by incidents in the Ukraine and in Japan, the risk of nuclear power production compared to production from other energy sources, the adequacy of the regulatory process put in place to regulate uranium mining and milling, the inherent health and environmental risk from the processing and handling of radioactive materials, alternate possibilities for employment, the possible use of thorium as a safer nuclear fuel and the possible proliferation of nuclear weapons.

Decisions to allow the mining, milling and use of uranium have been made by the United States Congress through the Atomic Energy Act and the Uranium Mill Radiation Control Act and by the legislative process in Colorado through the Radiation Control Act. Through the agreement with the Nuclear Regulatory Commission and the provisions of the Radiation Control Act, the regulation of the nuclear industry has been delegated to CDPHE, which also receives its funding through the state budgetary process. Perhaps the more collegiate process suggested in the testimony of Dr. Grossman would produce a superior result but it is not the process provided by law. The statutory obligation of CDPHE to consider Energy Fuel's application may conflict with both its mission statement and its vision. Neither CDPHE nor its appointed hearing officer has the authority to simply ignore the statutory mandate to consider and act upon Energy Fuels Application. Consideration of the broader questions raised during the public comments must be addressed to the Congress of the United States or the Legislature of the State of Colorado.

6

5. (2013 Conclusion #3) Arguments and a number of public comments urge the possibility that the market price of the minerals produced will be inadequate to support construction and operation of the proposed mill.  Economic consequences of that nature are highly speculative and are typically left to the market for resolution.

Applying the Conclusions of Law above to the Findings of Fact above the undersigned now finds that Energy Fuels has failed to meet its burden of proof upon the following issues:

1.  Impacts upon animals, birds and plants in proximity to the proposed mill site;
2.  Limiting, so far as reasonably achievable, wind dispersion of radioactive materials;
3.  Limiting, so far as reasonably achievable, contamination of ground water at the proposed mill site; and
4.  Provision of an adequate water supply for operation of the proposed mill.

Application of Energy Fuels for a license to mill radioactive materials should, absent an additional hearing, be denied.

Entered in Denver, Colorado this 17th day of April, 2018.

Richard W. Dana
Appointed Hearing Officer

7

BLM_0077104

CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of April, 2018, a true and correct copy of the foregoing FINDINGS OF FACT, CONCLUSIONS OF LAW AND RULING – APRIL 17, 2018, was served via electronic filing (E-Mail), addressed to the following:

Jerry W. Goad, Esq.
Ralph Carr Judicial Center
1300 Broadway, 7th Floor
Denver, Colorado 80203
Jerry.goad@coag.gov

Jeffrey C. Parsons, Esq.
Western Mining Action Project
P.O. Box 349
Lyons, Colorado 80537
wmap@igc.org

John D. Fognani, Esq.
Haynes and Boone, LLP
1050 Seventeenth Street, Suite 1800
Denver, Colorado 80265
John.fognani@haynesboone.com

Matt Sandler, Esq.
Rocky Mountain Wild
1536 Wynkoop St., Suite 303
Denver, Colorado 80202
matt@rockymountainwild.org

Travis Stills, Esq.
Energy Conservation Law
1911 Main Avenue, Suite 238
Durango, Colorado 81301
stills@frontier.net

Dr. Robert Grossman
6215 Baseline Road
Boulder, Colorado 80303
grossman@colorado.edu

Original Signature on File
Lisa Garcia, Administrative Clerk
Judicial Arbiter Group, Inc.

8

BLM_0077105

# ATTACHMENT A

JAG No. 12 A 1318

IN RE: THE APPLICATION OF ENERGY FUELS RESOURCES, INC. FOR A
RADIOACTIVE MATERIALS LICENSE FOR THE **PIÑON RIDGE URANIUM MILL**

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND RULING – JANUARY 14, 2013

---

By a Judicial Review Order entered June 13, 2012 by Judge John M. McMullen of the
Denver District Court in Action No. 2011CV861 the Colorado Department of Public Health and
the Environment (CDPHE) was ordered to convene a hearing pursuant to C.R.S. § 24-04-105.
On August 6, 2012 the undersigned was appointed as a hearing officer for that proceeding and
CDPHE issued a Notice of Public Hearing and Opportunity for Public Comment describing the
process for participation in the hearing and announcing, pursuant to a stipulation of the parties to
the District Court litigation and approval by the Court on August 7, 2012, a tentative schedule for
pre and post hearing procedures.

Without specific repeating each event here, the parties participated in a pre-hearing and
post-hearing process fully described in the Record of Proceedings circulated with this Ruling,
specifically including Minute Orders dated August 23, 2012, September 10, 2012, September 19,
2012, October 5, 2012, October 15, 2012, November 2, 2012, November 5, 2012, Hearing
Minutes, Index of Exhibits, and a Minute Order dated November 27, 2012. The findings and
conclusions made in each of those intermediate Orders and during the hearing are now
incorporated in and made a part of these Findings of Fact and Conclusions of Law.

Having concluded as a matter of law that this hearing is an intermediate step in CDPHE's
consideration of Energy Fuels application and considering that the administrative record may be
further expanded before a final agency action on the license application, the undersigned has
limited further Findings of Fact to listing issues and expressing opinions about the evidence
presented except in those situations where the evidence offered by all parties appears fully
developed.

### FINDINGS OF FACT

1) The District Court Order entered by Judge McMullen sitting in the Denver District
Court calls for this hearing as a substitute for a second public meeting occurring on February 17,
2012, and calls for this record to be a part of the record to be considered during CDPHE's
reconsideration and remaking of its licensing decision. The Notice of Public Hearing issued and
published by CDPHE described the purpose of the hearing as an opportunity to receive comment
and evidence on the application of Energy Fuels Resource Corp. (Energy Fuels) for a radioactive
materials license and on the Environmental Impact Assessment prepared by CDPHE.

2) Energy Fuels has had internal discussions about the capacity of the proposed mill and
the possibility of seeking an amendment or amendments to the license to allow for a greater

9

capacity of production.  Those discussion and related analysis and design documents do not mandate a modification of the application to reflect that greater capacity or require a modified Environmental Impact Assessment to reflect that increase capacity.  The application seeks to process 500 tons per day and any application to enlarge that capacity would require another full review by CDPHE.  There is no evidence offered supporting a conclusion that CDPHE would attempt to circumvent that full review.

3) Counsel for Sheep Mountain Alliance and a number of the individuals making public comments complain that there were too many informal conversations between Energy Fuels and CDPHE and that the informality of that relationship is evidence of a bias or at least a lack of objectivity on the part of CDPHE in favor of Energy Fuels.  Informality in the relationship between a regulated party and the regulator may simply indicate civility.  The evidence does not evidence a bias in the behavior of CDPHE or its employees.

4) Counsel for Rocky Mountain Wild, Center for Biological Diversity and Colorado Environmental Coalition, hereafter referred to as the "Wildlife Coalition", offered documentary evidence that the proposed mill site was a potential habitat area for a number of species of animals, birds and plaints and further that there has been an historical impact upon aquatic life in the rivers in the region from the uranium mining and milling industry.  With the exception of one sighting of the Gunnison Sage Grouse several years ago there was no evidence offered of the presence of an endangered or threatened species on or in the immediate proximity of the proposed mill site.  CDPHE is required to consider the evidence and comments offered during this hearing as a part of the administrative record.

5) Dr. Craig Little and Dr. Robert Grossman were qualified and testified as experts in the air modeling process and possible wind dispersion of radioactive dust from the tailings ponds and the materials storage piles at the proposed mill.  CDPHE is required to consider the evidence and comments they offered during this hearing as a part of the administrative record.

6) Ann Maest testified as an expert to address the qualities of the caffeinate to be discharged to the tailings ponds and its comparison with water quality standards for the ground water and surface water in the vicinity of the proposed mill, the studies of and issues related to the designed pond liners and pond construction.  Kimberly F. Morrison testified as an expert to discuss the liner systems proposed for the tailings piles and netting to mitigate access of waterfowl.  CDPHE is required to consider the evidence and comments they offered during this hearing as a part of the administrative record.

7) Constance L Travers testified as an expert to address the sufficiency of the ground water supply plan and the ground water investigation and monitoring plan and dispute the conclusion found in the application and the Environmental Impact Assessment (EIA) that no pathways are present for ground water below the site.  Roman Popielak testified as an expert to address the ground water investigation and the possibility of perched ground water evidenced in the test wells.  CDPHE is required to consider the evidence and comments they offered during this hearing as a part of the administrative record.

BLM_0077107

8) Dr. Thomas M. Power and Sandra L. Goodman testified as experts about the socioeconomic impacts of the proposed mill, each using the employment prediction of Energy Fuels for direct jobs to be created and different study areas for a calculation of indirect jobs that might be created. Any cost-benefit analysis for this proposed site, as with any other site is entirely dependent upon the physical area of impact to be studied. The broader the area included in the study the less statistically significant the possible benefit would be and the greater the impact of a possible or potential risk. Considering the reports of each witness and the absence of separate and distinct economic data for the west end of Montrose County the conclusions reached by each of them seems highly speculative and without significant probative value. CDPHE is required to consider the evidence and comments they offered during this hearing as a part of the administrative record.

9) Many of the individuals offering public comments and counsel for Sheep Mountain Alliance challenge the adequacy of the bond amount set by CDPH although each relate their objections to the cost of remediation at historic mills that were more loosely regulated or to the cost that might be realized if an upset condition existed. CDPHE is required to consider the evidence and comments offered during this hearing as a part of the administrative record.

## CONCLUSIONS OF LAW

1) The hearing conducted as described in the record of these proceedings fully satisfies the requirements of C.R.S. §24-4-105 in that notice was properly issued; any entity or individual who sought party status was admitted as a party, the parties were offered the opportunity to call witnesses and offer exhibits and cross-examine the witnesses who testified without limitation; the rules of evidence were relaxed to allow the tender of documents as exhibits without foundation; each step of the proceedings were recorded by a reporter and transcripts of those proceedings were made available to the parties; and that oral and written comments were solicited from members of the public who had not sought party status, without limitation on the time they wished to speak or the content of their comments.

2) As an initial issue the undersigned must address the purpose and scope of this hearing. A broad issue is presented with the relief sought by those making public comments, either oral or written, and that broader issue requires some discussion of the role of CDPHE, and its appointed hearing officer, in the regulation of uranium milling. Those public comments offered in support of the application and the proposed license cited primarily the economic opportunities to be realized by bringing additional employment to the west end of Montrose County. Many of the public comments offered in opposition to the application and the proposed license discussed the general impact upon the environment of any energy development, the risk of nuclear power production as evidenced by incidents in the Ukraine and in Japan, the risk of nuclear power production compared to production from other energy sources, the adequacy of the regulatory process put in place to regulate uranium mining and milling, the inherent health and environmental risk from the processing and handling of radioactive materials, alternate possibilities for employment, the possible use of thorium as a safer nuclear fuel and the possible proliferation of nuclear weapons.

11

Decisions to allow the mining, milling and use of uranium have been made by the United States Congress through the Atomic Energy Act and the Uranium Mill Radiation Control Act and by the legislative process in Colorado through the Radiation Control Act. Through the agreement with the Nuclear Regulatory Commission and the provisions of the Radiation Control Act the regulation of the nuclear industry has been delegated to CDPHE which also receives its funding through the state budgetary process. Perhaps the more collegiate process suggested in the testimony of Dr. Grossman would produce a superior result but it is not the process provided by law. The statutory obligation of CDPHE to consider Energy Fuel's application may conflict with both its mission statement and its vision. Neither CDPHE nor its appointed hearing officer has the authority to simply ignore the statutory mandate to consider and act upon Energy Fuels Application. Consideration of the broader questions raised during the public comments must be addressed to the Congress of the United States or the Legislature of the State of Colorado.

3) Arguments and a number of public comments urge the possibility that the market price of the minerals produced will be inadequate to support construction and operation of the proposed mill. Economic consequences of that nature are highly speculative and are typically left to the market for resolution.

4) In addition to the general issues raised by those offering public comments there is a fundamental dispute between those granted party status about the scope and purpose of this hearing. Energy Fuels and CDPHE urge that the limited purpose of this hearing is to offer an adversarial hearing with an opportunity to participate, cross-examine and offer comments, and that that hearing becomes part of the record to be considered in the future deliberations of CDPHE about the Energy Fuels application. Sheep Mountain Alliance, the three environmental entities referred to as the "Wildlife Coalition", and the Town of Ophir urge that procedural and substantive deficiencies in Energy Fuel's application and in the Environmental Impact Analysis (EIA) prepared by CDPHE are sufficient to preclude the issuance of the requested license. Dr. Robert Grossman offered evidence and arguments challenging the air pollution conclusions and transportation issues discussed in the EIA and raised issues regarding the design and objectivity of the permitting process.

5) Considering the Order of the Denver District Court and the Published Notice of this Hearing compels a conclusion that this hearing is an intermediate step in CDPHE's consideration of Energy Fuel's application. The undersigned may make findings of fact or conclusions of law upon the evidence presented and the issues raised but those findings and conclusions are to be considered in the future deliberations of CDPHE and are not a final agency decision subject to appeal.

6) During cross examination of witnesses employed by CDPHE by counsel for Sheep Mountain Alliance it became apparent that each individual employee of CDPHE who played a part in the review of the license application at issue in this proceeding may have retained individual files relating to that review process and that those files may not have been placed in the public record available to the parties to this proceeding. Discovery of those files was conducted in a post hearing procedure in the office of CDPHE on November 27, 2012 as reflected in the Minute Order of that date. Sheep Mountain Alliance complains that those documents were not earlier produced in response to the general and broad requests for

12

production of documents earlier addressed to CDPHE.  There was no effort before the hearing to conduct depositions of those CDPHE employees and no reason to conclude that the existence of those individual files would not have been disclosed in any formal or informal discovery process. The documents discovered are now a part of the record in this proceeding.  The record does not support a conclusion that CDPHE failed to respond to reasonable discovery requests and sanctions for discovery violations or reopening the hearing are not appropriate.

Having concluded that this hearing is an intermediate step in CDPHE's consideration of Energy Fuels the single additional issue upon which a Conclusions of Law is made addresses the discovery issue arising from delayed production of personal files from CDPHE personnel.

This Ruling was scheduled to be delivered on January 11, 2013.  In light of the volume of material submitted in the proposed Findings of Fact and Conclusions of Law presented by the parties its completion and delivery was delayed until January 14, 2013.

Entered in Denver, Colorado this 14th day of January, 2013

s/Richard W. Dana
Richard W. Dana
Appointed Hearing Officer

13

BLM_0077110

Attachment C

 **COLORADO**
Department of Public
Health & Environment

Dedicated to protecting and improving the health and environment of the people of Colorado

April 26, 2018

Pinon Ridge Resources Corporation
31161 Highway 90
PO Box 825
Nucla, CO 81424-0825

Attention: George Glasier, President and CEO

Re: Revocation – Colorado Radioactive Materials License Number CO 1170-01

On April 17, 2018, Richard W. Dana, Appointed Hearing Officer, issued the findings of fact, conclusions of law and ruling in response to Judge Robert L. McGahey, Jr.'s September 3, 2014 order on Colorado Radioactive Materials License Number CO 1170-01. In his ruling, Judge Dana concluded that Energy Fuels failed to meet its burden of proof on four issues and that the application of Energy Fuels for a license to mill radioactive materials should, absent an additional hearing, be denied.

Although the Department believes the original decision on the license application was appropriate, the department has elected not to challenge Judge Dana's decision. As such, this decision provides the Department with the rationale to revoke the license pursuant to Section 3.23.2 of the *Colorado Rules and Regulations Pertaining to Radiation Control*. Therefore, effective the date of this letter, Colorado Radioactive Materials License Number CO 1170-01 is revoked.

If you have any questions regarding this letter please contact me at 303-692-3403 or jennifer.opila@state.co.us.

*Jennifer T. Opila*

Jennifer T. Opila, MPA
Radiation Program Manager
Hazardous Materials and Waste Management Division

CC:     Steven Brown, Radiation Safety Officer
        Jerry Goad, Colorado Attorney General's Office



Attachment D

<table>
<tr><td>

DISTRICT COURT, CITY AND
COUNTY OF DENVER, COLORADO
1437 Bannock Street
Denver, Colorado 80202

</td><td></td></tr>
<tr><td>

SHEEP MOUNTAIN ALLIANCE and
ROCKY MOUNTAIN WILD
Plaintiffs;
v.
COLORADO DEPARTMENT OF
PUBLIC HEALTH AND
ENVIRONMENT, JENNIFER OPILA, IN
HER OFFICIAL CAPACITY; CDPHE
EXECUTIVE DIRECTOR DR.
CHRISTOPHER URBINA, IN HIS
OFFICIAL CAPACITY;
and
DEFENDANT INDISPENSABLE
PARTY ENERGY FUELS RESOURCES
CORPORATION,
Defendants.

</td><td>

DATE FILED: September 3, 2014 12:17 PM
CASE NUMBER: 2013CV32397

▢COURT USE ONLY▢

Case No.  13CV32397

Division 409

</td></tr>
<tr><td colspan="2">

**ORDER RE: ENERGY FUELS RESOURCES CORPORATION'S
MOTION FOR REMAND TO HEARING OFFICER**

</td></tr>
</table>

THIS MATTER comes before me on Energy Fuels Resources Corporation's ("Energy Fuels") Motion for Remand to Hearing Officer, filed on May 2, 2014. I have reviewed the Motion, the Colorado Department of Public Health and Environment ("CDPHE") Response, the Sheep Mountain Alliance ("SMA") and others Response, Reply, the entire case file, as well as the applicable case and statutory law, and make the following findings of fact and conclusions of law:

## I.       Background

On November 18, 2009, indispensable party Energy Fuels submitted an application to defendant Colorado Department of Public Health and Environment ("CDPHE") for the issuance of a Radioactive Materials License. Energy Fuels sought to construct and operate a Uranium Mill in Montrose County, Colorado. CDPHE determined that the application, including a voluminous Environmental Impact Analysis, was substantially complete and ready to be presented for public hearings required by Colorado statute. *See* C.R.S. § 25-11-203 (2)(b)(I) (2013). Several public hearings were held, and the license was issued by CDPHE to Energy Fuels in 2011.

Plaintiff Sheep Mountain Alliance ("SMA"), among others, filed an appeal of CDPHE's license decision with the Colorado District Court, alleging that the public hearings held by Energy Fuels and CDPHE did not meet statutory requirements. On June 13, 2012, the Denver District Court found CDPHE's action of issuing Energy Fuels a license without first holding a hearing pursuant to C.R.S. § 24-4-105 to be illegal. The prior court invalidated the issued license and remanded with instructions to hold a §105 hearing, and included a new timeframe for the parties to follow.

The parties proceeded. At the Hearing Plaintiffs claimed the purpose of the Hearing was determine whether Energy Fuel's application met all criteria under state law for issuance of a license. Energy Fuel claimed the purpose was to gather evidence within the procedural confines of APA § 105. The Hearing Officer agreed with Energy Fuels and determined the Hearing was an intermediate step in CDPHE's granting the license. A decision was then reached by CDPHE granting a license to Energy Fuels.

Plaintiffs sought invalidation of a Radioactive Materials License issued to Energy Fuels by CDPHE on April 25, 2013. Plaintiffs made six claims in arguing that the license should be invalidated: (1) CDPHE deprived SMA of an "initial decision" following the required hearing, (2) the hearing officer failed to determine and adhere to an explicit burden of proof in the hearing as required by 6 C.C.R. 1007-1 § 18 ("part 18 regulations"), (3) the hearing officer did not apply the substantive protections of part 18 regulations, (4) the hearing lacked competent socioeconomic data in violation of part 18 regulations, (5) CDPHE arbitrarily relied on an unlawful Environmental Impact Analysis, and (6) cumulatively, CDPHE's licensing action and decision violates the Uranium Mill Tailings Radiation Control Act ("UMTRCA"), the Atomic Energy Act ("AEA"), the Administrative Procedure Act ("APA"), Colorado Radiation Control Act ("RCA"), and part 18 of the implementing regulations.

I denied CDHPE's Motion to Dismiss the Complaint on September 9, 2013 and denied Energy Fuels' Motion to Dismiss the Complaint on September 16, 2013.

In order to resolve issues raised in the Complaint, Energy Fuels requests that I hold its license in abeyance and remand the entire matter to CDPHE and the Hearing Officer to address all of Plaintiff's claims. Specifically, Energy Fuels moves that I (1) order the Hearing Officer render an initial decision based solely on the record from the initial Hearing and (2) determine which party bore the burden of proof and whether that burden was satisfied. Defendant moves that CDPHE review all Plaintiffs substantive and procedural claims (3), (4), (5), and (6). Defendant and Indispensable Party argue remand is appropriate, asserting that the Hearing Officer's Finding of Fact, Conclusions of Law, and Ruling were deficient. They also claim such and order would promote judicial efficiency.

### III.   Law and Analysis

### A.   Order is Not Prejudicial and Promotes Judicial Economy

A review of the case record suggests the Order is not Prejudicial because it is not likely to require Plaintiff to expend unnecessary resources. Further, judicial economy is served by remanding this case because it directly allows for the resolutions of issues raised by Plaintiff.

**B.     Hearing Officer Can Resolve Plaintiff's Claim Surrounding the Burden of Proof**

Public officials acting in an adjudicatory capacity are entitled to "quasi-judicial absolute immunity" if there are sufficient procedural safeguards in the adjudicatory actions. *Churchill v. Univ. of Colo. At Boulder*, 285 P.3d 986, 999-1005 (Colo. 2012). There is no case law to suggest that the remand of a post-hearing assignment of the burdens of proof is a violation of due process rights.

**C.     Remand is Appropriate**

The Administrative Procedure Act is to provide "a plain, simple, and prompt remedy to persons or parties . . . aggrieved by agency actions." C.R.S. § 24-4-106(1). When there can be no meaningful review on the merits, the proper action is to remand the case for appropriate proceedings. *See Lawless v. Bach*, 489 P.2d 316, 318 (Colo. 1971); C.R.S. § 24-4-106(7). Remand is appropriate where a hearing officer "failed to adopt any findings or conclusions or to give any reasons for its action." *Ivy v. State Personnel Bd.*, 860 P.2d 602, 605 (Colo. App. 1993). "[T]he court shall determine all questions of law and interpret the statutory and constitutional provisions involved and shall apply such interpretation to the facts duly found or established." C.R.S. § 24-4-106(7).

Here, the Hearing Officer failed to make a conclusion as to whether Energy Fuels application met all criteria for issuance of a license pursuant to C.R.S. § 25-11-203. Additionally, there are no questions of law or constitutional issues that I need to resolve.

## IV.  Order

It is ordered that:  (1) **The Energy Fuels license is held in abeyance**, (2) **That this matter is remanded for hearing consistent with this Order**, including the following:

A. CDPHE is ordered to convene an appropriate Hearing Officer. Original Hearing Officer shall be selected if he or she is available and are eligible to issue a *post hoc* determination of the burdens of proof in the hearing. If Original Hearing Officer is unavailable or ineligible to issue a *post hoc* determination of the burdens of proof in the hearing, then CDPHE shall select another appropriate Hearing Officer. That Hearing Officer shall review the record of the initial §105 hearing.

B. Limited Discovery shall be made available only for the purpose of determining whether the original Hearing Officer is eligible to enter *post hoc* determinations of the burdens of proof in the hearing due to post-hearing ex-parte communications.

C.  After limited discovery, CDPHE shall decide whether the original Hearing Officer is eligible.

D.  The Hearing Officer formally assigned to the case shall issue an initial decision as to whether Energy Fuels' application met all criteria under state law for issuance of a license pursuant to C.R.S. § 25-11-203.  Hearing Officer shall also issue a *post hoc* determination of the burdens of proof in the hearing.

E.  Said Hearing Officer shall make decisions based on the record from the initial §105 hearing.

F.  Parties may modify terms of who is the Hearing Officer by written stipulation signed by all parties, provided that any such stipulation does not impair the rights of any party.

G.  Following proceedings with the Hearing Officer, CDPHE shall review whether the original Hearing Officer  in the original Hearing  applied substantive protections of part 18 regulations, possessed competent socioeconomic data as per part 18 regulations, whether CDPHE arbitrarily relied on an unlawful Environmental Impact Analysis and whether the CDPHE's licensing violated UMTRCA, AEA, APA, RCA, and part 18 of the implementing regulations,

H.  CDPHE shall review the determination of Energy Fuel's License with regards to prior §105 record and additional proceedings mandated by this order.


SO ORDERED this 3rd day of August, 2014.

BY THE COURT:

_____
Robert L. McGahey, Jr.
District Court Judge

BLM_0077115



## GOVERNMENT AFFAIRS/NATURAL RESOURCES

### LYNN PADGETT

April 23, 2018

RE: Draft Alternative E CA Meeting Follow-up

Dear Greg and Matt,

San Miguel County appreciates the opportunity to continue working with the Uncompahgre Field Office as a Cooperating Agency during the extended Resource Management Plan revision process.

Thank you for providing a draft of Uncompahgre Field Office (UFO) and Agency Preferred Alternative, new Alternative E as summarized in the draft revised Table 2-2 for us to review following the UFO RMP Cooperating Agency (CA) meeting held in Montrose on March 28 where some of the concepts of Alternative E were introduced.  Immediately following the March 28 meeting, San Miguel County forwarded a comment document submitted by the Board of County Commissioners on the West-Wide Energy Corridor segment going north-south through San Miguel County for the Section 368 West-Wide Energy Corridors Region 2 Review comment period to help inform UFO and the RMP of our concerns regarding the location of this corridor.

We are grateful to you both for taking the time to meet with Commissioner May and me on April 16 to dialogue about questions and concerns San Miguel County has with the draft Alternative E.

It is our recollection that during our April 16 meeting we heard that Alternative E has been crafted to incorporate new information, BLM and administrative priorities, input from the BLM's interdisciplinary team, comments received from the public and Cooperating Agencies, and to reduce some of the complexities of having overlapping management prescriptions from special designations.

Our recollection and takeaways of our discussion of the important topics that were discussed during our April 16 meeting were:

- San Miguel County expressed a desire that the San Miguel River Expansion ACEC be designated in the final RMP.  We heard from UFO that the mosaic of landownership makes management of the expanded area more difficult.  San Miguel County suggested that the north end of an expanded ACEC could be terminated at the San Miguel County line.  We indicated if this is not possible, that the existing San Miguel River ACEC and SRMA is supported by San Miguel County and is desired to have the highest possible visible resource management and be managed to protect and not degrade important riparian ecosystems and bird habitat and avoid conflicts between recreation, permitted outfitter activities, new routes and rights-of-way, and in-stream mining.  We also asked

P.O. BOX 1170  •  Telluride, Colorado  81435  •  (970) 369-5469  •
lynnp@sanmiguelcountyco.gov

that the stipulations that had been part of Alternative D within the existing ACEC, specifically the codes LOCATE, HYDROE, SOLARE, and WINDE be retained in Alternative E with HYDROE being incorporated for all WSR segments being designated as Suitable, vs. just those classified as Wild.

- We asked that the San Miguel River SRMA have a visual resource management level of V-2.  With more protective stipulations that emphasize sustaining the ecological integrity and scenic beauty of the San Miguel River corridor, and Beaver and Saltado Creeks and important riparian habitat, San Miguel County can be supportive of not having an Ecological Emphasis Area co-designated.  We heard that the agency would consult with its interdisciplinary team about the current conditions, but that the UFO would not want to manage areas that have Visual Resource Management Class 3 characteristics as a Class 2.

- During this meeting, we learned more about why target shooting stipulations have changed between Alternatives D and E.

- We indicated concern with potential Gunnison Sage-grouse management differences if they are based on neighbor resource management plans that were created using pre-listing NEPA.  The Gunnison Sage-grouse was listed as a Threatened species and critical habitat was designated by the U.S. Fish and Wildlife Service (USFWS) in November of 2014.

- We indicated desire to have Burn Canyon managed as an SRMA vs. an ERMA as recommended in draft Alternative E, primarily to have the sensitive riparian areas in the drainages be retained as non-motorized area.  We learned from UFO that the BLM has concerns that an SRMA will over-emphasize and/or advertise recreational uses and potentially exacerbate access and enforcement conflicts vs. an ERMA.  UFO has put a lot of thought into this change and has taken into consideration the difficulty of access, the safety of access on existing narrow county roads, honoring and incorporating the recent Burn Canyon Travel Management Plan, and agency direction for energy dominance.

- San Miguel County compared the management codes between the SRMA in Alternative B and the ERMA in Alternatives D and E.  Burn Canyon would have had a clear NSO in Alternative B, with the riparian canyon portions closed to motorized and mechanized uses and/or have visual resource management levels of V-2.  We asked for the UFO to take another look at the ERMA stipulations which would only be CSU, V-3, and DAY for the entire area and re-consider adding more of the protective management to protect the scenic and riparian resources in this incredible area.

- San Miguel County requested more explanation of the new language in draft Alternative E that uses slight variations of language such as "…for greater than 80 percent of [stream segments/vegetation communities/etc.] in ACECs, WSAs, suitable wild and scenic river segments, lands managed to protect wilderness characteristics, and greater than 70 percent of [stream segments/vegetation communities/etc.] on the remaining BLM-administered lands, over 10 years with 80 percent confidence.  We wondered if this could result in losing 30 percent of special characteristics of a special area during successive 10-year intervals.  We also said one interpretation was that BLM was going to manage only 10 percent more of the stream/vegetation communities/etc. (see Rows 43, 63 and 75 for examples of the language) if they were in a special area vs. a non-special area

BLM_0077117

documented as having special qualities.  We asked how 80 percent confidence will be measured and achieved in a non-subjective way.  We hope to get more information about this new assessment, monitoring and evaluation concept from the BLM.

- We indicated that we would verify if Norwood had a Source Water Protection Area designated and help UFO know where any such areas are in San Miguel County.  In 2002, the Town of Norwood did prepare a Sourcewater Assessment and Protection Report.  San Miguel County will scan and send Greg and Matt the documents we have on file.  The San Miguel County Source Water Assessment Reports we have documentation of are Aldasoro Ranch HOA, Ilium Valley WS, Last Dollar PUD, Mountain Village, Norwood Water Commission, Town of Ophir, Town of Telluride, Wilson Mesa, Telluride Regional Airport, Camp Ilium, Skyline Guest Ranch Ski Lodge, Matterhorn Campground, and Sunshine Campground.  Colorado Department of Public Health and Environment (CDPHE) should also be a reference for these reports and boundaries of source water protection areas.

We did not get a chance to discuss a few topics that San Miguel County has flagged as becoming a concern in the draft Table 2-2 and Alternative E.  We'd like to let you know that we have concerns about what appears to be changes in direction with the new draft Alternative E:

- Lesser protective management for hydrology and wetland features, and omission of protective buffering for intermittent and ephemeral streams, and riparian areas.  Rows 77 and 82 are a couple examples of this.  Where many tributaries in our headwaters position are snow-fed and are technically intermittent, managing resources to provide protection of hydrological systems and water quality is extremely important.
- Changes in language between cooperating, collaborating and coordinating with Colorado Parks and Wildlife (CPW) in various rows.
- Less protective management for irreplaceable cultural resources and national/historic trails.
- No longer proposing to manage Dolores (River) Slickrock Canyon ACEC as an ACEC in Alternative E.  The previous agency preferred alternative D would have managed the Dolores River Slickrock Canyon ACEC to protect and prevent damage to the significant "scenic, cultural and paleontological resources, desert bighorn sheep, peregrine falcon, roundtail chub, and plan communities and the BLM sensitive species Kachina daisy and Naturita milkvetch" (See revised draft Table 2-2, Row 534).  We support the collaborative stakeholder process of the Dolores River Dialogue and feel that management of the Dolores River Slickrock Canyon ACEC as provided in the previous agency preferred Alternative D best protects these significant natural, biological, cultural, recreational and scenic resources and values.


We really appreciated the opportunity to spend a couple hours with you both to learn more about the proposed revisions and Alternative F and to discuss our concerns and make suggestions.  We value our close working relationship with the UFO and its dedicated staff.


Sincerely,

Lynn Padgett
Director, Government Affairs/Natural Resources
San Miguel County

# SAN MIGUEL COUNTY

## BOARD OF COMMISSIONERS

### ART GOODTIMES        AMY LEVEK        JOAN MAY

October 31, 2016

Joseph Meyer, Southwest District Manager
Dana Wilson, Acting Uncompahgre Field Office Manager
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Via Email: uformp@blm.gov

Dear Joe and Dana,

San Miguel County (SMC) is pleased to be offered the opportunity to comment on the Uncompahgre Field Office of the Bureau of Land Management (UFO BLM) Draft UFO Resource Management Plan (RMP) / Environmental Impact Statement (EIS) [hereafter, "*DRMP/EIS*"]

In 2015, the San Miguel County Board of County Commissioners approved Resolution 2015-009[1] (Attachment A), stating that public land under the management of the U.S. Forest Service and BLM constitute more than 60% of the land within San Miguel County and included the following statements:

- federal public lands are essential to the quality of life in San Miguel County, providing public recreational opportunities for wildlife watching, hiking, hunting, fishing, backpacking, horseback riding, skiing, bicycling, sightseeing, and numerous other outdoor recreational activities;
- federal public lands provide essential habitat for wildlife;
- wildlife and scenic landscapes on the public lands attract outdoor recreation and tourism that are the dominant drivers of San Miguel County's economy;
- San Miguel County business owners attract employees in large part because of the iconic landscape and recreational opportunities on federal public lands;
- San Miguel County's agriculture industry includes numerous ranchers and sheepherders who are dependent on grazing on federal public land;
- San Miguel County residents are actively collaborating among diverse interests and with public land managers to improve public land management and public access.

We have attempted to recommend actions that San Miguel County would like to have incorporated into the Final RMP and Record of Decision (ROD) and recommend improvements for what we consider shortcomings in portions of the plan and.  We are not asking for just a single alternative to be implemented.  We have identified places where we do not agree with the agency preferred Alternative D, and might agree in whole or in part with another Alternative, such as Alternative B.  However, we have tried to approach each item that we perceive to be within or directly affecting San Miguel County in such a way as to offer desired actions and stipulations, which may be a customized mix or hybrid of different alternatives.  We have attempted to offer our desires so that they can be practically accomplished when implementation of the Final RMP begins.  We believe incorporating our

---

[1] http://www.sanmiguelcountyco.gov/301/Document-Viewer

BLM_0077119

recommendations will strengthen the document so that it provides clearer guidance and expectations in resource management programs, practices, and protections for the present and for the future.

Our comments are also offered in the spirit of the DRMP/EIS statement, "The BLM's planning regulations require that RMPs be consistent with officially approved or adopted resource-related plans …so long as they are also consistent with the purposes, policies, and programs of federal laws and regulations applicable to BLM-administered lands."[2]

We also offer our comments in the spirit that the BLM attempted to "explore opportunities to enhance management of resources and resources uses; resolve conflicts among resources and resource uses; meet the purpose and need for the RMP; and are feasible to accomplish."

While San Miguel County philosophically is more supportive of the intent of Alternative B over Alternatives C and D, there are times where our comments realize that a balanced multiple use and human activities and structures are necessary for economic development and recreation, where they can avoid or mitigate impacts to other activities or wildlife needs.

> ### 2.3.3   Alternative B
> Alternative B emphasizes improving, rehabilitating, and restoring resources and sustaining the ecological integrity of habitats for all priority plant, wildlife, and fish species, while allowing appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, ROWs, and livestock grazing). It particularly targets the habitats needed for the conservation and recovery of federally listed, proposed, or candidate threatened and endangered plant and animal species. Goals and objectives focus on environmental and social outcomes achieved by sustaining relatively unmodified physical landscapes and natural and cultural resource values for current and future generations. This alternative would establish the greatest number of special designation areas such as ACECs and special recreation management areas, with specific measures designed to protect or enhance resource values. Appropriate and allowable uses and restrictions would be contingent on minimizing impacts on natural and cultural resources.

(From Page 2-7 of the DRMP/EIS)

> ### 2.3.6   Alternative D: Agency Preferred
> Alternative D is the agency-preferred alternative, which emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat. This alternative incorporates a balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses. Goals and objectives focus on environmental, economic, and social outcomes achieved by strategically addressing demands across the landscape. **Section 2.5** (Considerations in Selecting a Preferred Alternative) outlines the selection process for the preferred alternative.

(From Page 2-8 of the DRMP/EIS)

---

[2] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.7326.File.dat/1_UFO-DRMP-2016_508.pdf

BLM_0077120

With the intent that our comments are practical, we are not commenting on Alternative B-1 or designations that are not within or do not have direct impacts on San Miguel County.

We have prepared our comments mostly by special designation or resource use categories, and our comments are generally specific to areas, resources, resource uses, and potential designations within San Miguel County. In some cases where the RMP decision may affect San Miguel County, we have also commented. We have attempted to provide clear comments and recommendations, but in reviewing a plan, supporting materials, and spatial data, we realize our comments may not be as clear as we intended. Please encourage the UFO staff to contact our staff lead, at 970-369-5441 or lynnp@sanmiguelcountyco.gov if there are any questions or clarifications needed.

1. **LANDS WITH WILDERNESS CHARACTERISTICS/WILDERNESS STUDY AREAS (WSAs)**
   Summary: There are no Lands with Wilderness Characteristics or WSAs mapped within San Miguel County. San Miguel County appreciates that these lands were inventoried by the BLM and supports comments being submitted by Conservation Colorado and Western Colorado Congress on this subject.

2. **WILD AND SCENIC RIVER (WSR) SUITABILITY.**
   Summary:
   - San Miguel County fully supports the designations of the identified river segments with in the San Miguel Basin as suitable.
   - San Miguel County fully supports the designation as "suitable" of the segments proposed in DRMP/EIS Alternative D, with some differences in the Alternative D stipulations.
   - See Rational/Discussion for specific comments on segment management stipulations.

   Rationale/Discussion:

   **Determination of Suitability**
   By making a determination of "suitable" for inclusion in the National Wild and Scenic Rivers System for the segments contained in Alternative D of the DRMP/EIS, the UFO BLM is honoring the countless hours of work from local stakeholders, citizens, sub-RAC (Resource Advisory Council), RAC members, and state and federal agency specialists, along with all of the public input gathered in-person and via multiple written comment periods.

   The number of segments recommended as "suitable" is a very small subset of the number of segments analyzed and their designation as suitable was found to be the best locally acceptable method to maintaining important native fish or other critical wildlife habitat, recreation and scenic values. Private property rights and water rights were carefully considered during the suitability process led by the stakeholder group and had been appropriately respected in Alternative D of the draft RMP/EIS. [3, 4]

   San Miguel County urges the UFO BLM to support these determinations of suitability within the Dolores and San Miguel Basin and to work with the Colorado Water Conservation Board (CWCB) to obtain flow protections using state processes to support the flow-related Outstandingly Remarkable Values (ORVs) where they do not already exist within these segments.

   In June 2010, the UFO BLM published their findings of eligibility for 174 river segments studied and evaluated in advance of the Uncompahgre Resource Management Plan (RMP). The analysis area included

---

[3]Pages 3-164-167;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.96289.File.dat/3_UFO-DRMP-2016_508.pdf
[4]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.2133.File.dat/P_WSR-Suit_UFO-DRMP-2016_508.pdf

3

a portion of the Dominguez-Escalante National Conservation Area (NCA). An additional segment of the Dolores River, identified in the San Juan Public Lands Draft Land Management Plan, was evaluated by the UFO BLM because the northernmost 11.8-mile downstream portion of this segment is within the UFO planning area.

The BLM found after completion of field assessments and data analysis that informed their eligibility determination process, that 34 segments out of the 174 segments scoped were determined to be both free-flowing and to possess one or more outstandingly remarkable values (ORVs) that are necessary for Wild and Scenic River eligibility.  During the eligibility process, reviews of free-flowing character and determinations of ORVs were made by Colorado Parks and Wildlife (formerly Colorado Division of Wildlife; CPW), U.S. Fish and Wildlife Service (USFWS), and Colorado Natural Heritage Program (CNHP). The Draft Eligibility Report had a typical public comment period with comments received by the BLM from diverse interests.

In addition, fish values were assessed by Colorado Parks and Wildlife (CPW) on the San Miguel and Dolores Rivers. A presentation by Dan Kowalski, Aquatic Biologist, CPW, stated that San Miguel River Segments 1 and 2 are very important and highly used fisheries with important recreational fishing values. San Miguel River Segment 2 was identified as exceeding the Gold Medal Biomass standard in some years. Native fish species identified on the San Miguel River are Colorado Pikeminnow (Federally Endangered/State Threatened); Bluehead Sucker (State Threatened); Flannelmouth Sucker (State Threatened); Roundtail chub (State Species of Special Concern; BLM Sensitive Species); Colorado River Cutthroat Trout (State Species of Special Concern); Speckled Dace and Mottled Sculpin.[5]

In February 2013, the UFO BLM published their final Wild and Scenic River Suitability Report, which further analyzed the suitability of 28 river segments, including the 11 .88-mile segment of the Dolores River.[6] (Six river segments, found eligible, were separately analyzed for suitability within the Dominguez-Escalante NCA RMP.)

During the robust suitability process, the BLM weighed protective measures for eligible river segments and the corresponding corridor in relation to current and potential identified uses. Possible environmental and economic consequences of, management issues resulting from, and reasonable alternatives to WSR designation were considered. Preliminary segment boundaries and classifications were reevaluated in response to public input. Geographic information systems data was recalculated, at times resulting in modified segment lengths and land ownership measures. Public participation and comments resulted in refinement of which segments were considered suitable for 10 stakeholder group meetings within the Dolores/San Miguel Basin.  (Separate stakeholder processes were initiated for segments in the Gunnison River Basin and those in the Dolores and San Miguel river basins.) Stakeholder groups held public meetings during late 2010 and early 2011. The Dolores/San Miguel Basin subgroup considered BLM analysis and public input and developed recommendations for each of the Dolores-San Miguel segments. A second public comment period was held to receive even more input prior to suitability recommendations from the stakeholder group. Hundreds of public comments were considered during the formal suitability public comment period.

San Miguel County fully believes that the stakeholder group, co-chaired by John Reams, a construction and mining contractor and rancher based in Norwood and Naturita, and Peter Mueller, a project director for the Nature Conservancy, based in Telluride, represented diverse backgrounds and interests and solicited diverse input from the public that was deeply considered in the final results of the process.

---

[5]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/wsr_docs.Par.32765.File.dat/San%20Miguel%20Dolores%20Fish%20DOW%20Presentation%20Dan%20Kowalski.pdf

[6]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.70506.File.dat/WSR%20Suitability%20Report_Final_04272012.pdf

Stakeholder meetings were held in Norwood, Naturita, and Telluride, whose residents are known to have very different political views on energy, minerals, recreation, agriculture, and forestry.[7] The Dolores/San Miguel Basin subgroup examined 21 different stream segments and public input received was incorporated into their findings.[8] The stakeholder group found 7 segments to be Suitable with modifications, 6 segments to be Suitable, and 8 to be Not Suitable.[9] Their recommendations were then considered by the BLM Southwest Resource Advisory Council (SW RAC) which voted unanimously to recommend that 8 segments in the San Miguel Basin and 5 segments in the Dolores Basin be found suitable. The BLM incorporated these recommendations into its preferred Alternative D of the UFO draft RMP/EIS.

San Miguel County is supportive of NCA legislation on the Dolores River Segments 1 and 2 and the La Sal Creek Segments 2 and 3, which overlap with the Tres Rios and Uncompahgre BLM offices.  If the NCA is successful, we believe that a Suitability determination would no longer be relevant. However, until an NCA is agreed upon, Suitability is a powerful tool to bring stakeholders and governments to the table to agree on NCA terms. Currently, there is no guarantee that an NCA will happen in the near future or that there will be agreement as to how the NCA will protect flows in place of current Suitability. Therefore, until such time as an NCA may be established that protects both flow-related and non-flow dependent ORVs, San Miguel County urges the CWCB to support the Alternative D suitability recommendations for the Dolores River. If an NCA is established that accomplishes full protection of ORVs, we would then support the determination for these 4 segments to be changed to not suitable.

San Miguel County understands that when the CWCB voted to appropriate an Instream Flow right (ISF) on the Dolores River from the San Miguel to Gateway (Lower Dolores Segment), the BLM offered in an unprecedented agreement, not to seek a federal water right on this river segment to protect the ORV flows. This was a very important consideration by the CWCB in voting to appropriate the ISF. We support the CWCB in asking for this language to be carried through on the other Dolores River sections.

While the ISF is important to protect the Lower Dolores segment (25), the ISF alone would not protect the wide array of ORVs, including: recreational and the extraordinary rafting, kayaking and canoeing opportunities; peregrine falcon habitat, including for breeding and nesting; and geologic and scenic, including the historic hanging flume.  The BLM's Report admits that due to the limited unappropriated water, it is unlikely that the high flows needed to sustain recreational activities could be secured. The Suitability determination on the Lower Dolores sections would complement the State's ISF by adding land management protection for this incredibly scenic and remote stretch of river with its historical, cultural and wildlife attributes.

San Miguel County also understands that The Lower Dolores from McPhee Dam to Bedrock already operates with a Suitability designation that was in place when the dam was built. The BLM has made it clear that it can't take away the senior water rights of the Dolores Project or require new reservoir releases through Suitability; rather it must work within the Colorado water rights system. The current Suitability determination on the Dolores has not appeared to affect Drought Contingency Planning or any coordinated management efforts.

    **A. San Miguel River Segment 1** – ORVs are Scenic, Recreational, Wildlife, Historic, Vegetation, and Paleontology.  Over 19 miles of this segment lies within the existing San Miguel ACEC, and it

---

[7] http://www.telluridenews.com/news/article_d60c6f40-91d2-542e-8dad-e06bb13d4e85.html
[8] http://matchbin-assets.s3.amazonaws.com/public/sites/165/assets/64CW_The_Watch___March_17___2011.pdf
[9] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/wsr_docs.Par.31074.File.dat/2011-0225%20WSR%20Dolores%20San%20Miguel%20Segment%20Analysis%20RAC%20Recommendation.pdf

BLM_0077123

appears nearly the whole segment lies within the proposed San Miguel Expansion ACEC (GIS files). [10]

The San Miguel River corridor is extremely important for the local economy. Preserving scenic views while allowing for high-quality boating, fishing, and retaining the existing travel management plan uses/limitations is extremely important to San Miguel County.

Due to the scenic and recreational ORVs, the fact that this segment is within the designated San Juan Skyway Scenic Byway and the Unaweep-Tabeguache Scenic and Historic Byway, it is very important to retain no less than a V-2 category for visual resource management. This is consistent with the San Juan Scenic Byway Management Plan[11], the Unaweep-Tabeguache Scenic and Historic Byway Corridor Management Plan[12], and the San Miguel County Comprehensive Development Plan[13]. While the DRMP/EIS states "The BLM would not permit any actions that would adversely affect the free-flowing condition, ORVs, and adequate water quality to support those ORVs or tentative classification of any of the segments, or would result in the reduction of water quality to the extent that it would no longer support the ORVs…"[14], the stipulations provided in Alternative D do not provide the safeguards needed to make this a true statement. If this is indeed a fact, then stronger stipulations are needed to replace those in Alternative D and/or in addition to the Alternative D stipulations. Also, reaches within this segment contain four globally vulnerable (G3) riparian communities.

**B. Saltado Creek** – This segment is proposed for a WSR designation of Wild in Alternative D. The stated ORV for this segment is Vegetation, described as an "A-ranked" superior occurrence of globally vulnerable (G3) narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest, which is a primary reason the existing San Miguel ACEC was created.[15]

**C. Beaver Creek** --
This segment is proposed for a WSR designation of Recreational in Alternative D. The stated ORV for this segment is Vegetation, described as an "A-ranked" superior occurrence of globally vulnerable (G3) narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest, which is a primary reason the existing San Miguel ACEC was created.[16] The designation of Recreational received strong support from a primary private landowner and San Miguel County, and was chosen to provide "reasonable certainty that future water development projects would receive consideration and could move forward with minimal difficulty." [17]

---

[10] http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp/ufo_draft_rmp_shape.html
[11] https://www.codot.gov/travel/scenic-byways/southwest/san-juan-skyway/SanJuanSkywayCorridorManagmentPlan.pdf/at_download/file
[12] https://www.codot.gov/travel/scenic-byways/southwest/unaweep-tabeguache/unaweep-tageguache-byway-corridor-management-plan-sep-2013
[13] http://www.sanmiguelcountyco.gov/DocumentCenter/Home/View/222
[14] Page 4-409; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_2.Par.12939.File.dat/4_UFO-DRMP-2016_508.pdf
[15] Page 64; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_docs.Par.16348.File.dat/Final%20WSR%20Eligibility%20Report%20Final%20Web%20071210.pdf
[16] Page 64; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_docs.Par.16348.File.dat/Final%20WSR%20Eligibility%20Report%20Final%20Web%20071210.pdf
[17] Page 37; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.70506.File.dat/WSR%20Suitability%20Report_Final_04272012.pdf

BLM_0077124

**3. SAN MIGUEL RIVER/SALTADO CREEK/BEAVER CREEK AREA COMMENTS:**

First, the San Miguel River corridor along with tributaries Saltado and Beaver Creeks was analyzed by San Miguel County staff holistically.  These areas have several existing and proposed designations within either Alternative A, Alternative B, and/or Alternative D.  However, we found that the stipulations provided in the UFO BLM DRMP/EIS GIS files did not match the language within the RMP, and added quite literally, layers of complexity to understand which stipulation (generally the most protective or stringent) would apply to which portion of land within this area.

To aid in this analysis, San Miguel County staff prepared a comparison table (Attachment B) that showed the stated stipulations for each designation category, for the San Miguel River mainstem and surrounding canyon/Area of Critical Environmental Concern (ACEC) lands; the Saltado Creek drainage and surrounding canyon/ACEC lands; and the Beaver Creek drainage and surrounding canyon/ACEC lands.

As one example of the inconsistencies of stipulations in this area, a single place within the San Miguel River proposed Wild and Scenic River (WSR) Segment 1, near the confluence with Specie Creek -- was within:
- the Alternative D WSR segment proposed as Suitable, Recreation;
- the Alternative D San Miguel River Special Recreation Management Area (SRMA);
- the Alternative A and D existing San Miguel River Area of Critical Environmental Concern (ACEC) designated in 1993 to protect the high-quality riparian vegetation resources, habitat for many bird species, and the scenic value of the corridor, within or proximal to a State designated Scenic Byway; (According to the BLM's ACEC Final Report of 2013, the riparian vegetation community exists "mainly due to the undammed San Miguel River and its intact hydrology."  The report when on to state, "Such communities are becoming increasingly rare in Colorado." [18] The report also states that the Visual Resource Index (VRI) should be V-2 for the existing San Miguel River ACEC.)
- the Alternative D San Miguel Ecological Emphasis Area;
- the Alternative D fluid minerals stipulation: No Surface Occupancy (NSO)
- the Alternative B San Miguel River Expansion ACEC which would expand the ACEC to protect additional lands having high-quality riparian vegetation resources, bird habitats, and scenic values, within or proximal to State designated Scenic Byways; (The BLM's ACEC Final Report states that the VRI should be V-2 for the San Miguel River Expansion ACEC.)
- the Alternative B fluid minerals stipulation: No Lease (NL);
- the Alternative A lands shown as <u>not</u> having Coal potential.

What we found in our comparison table was that the preferred Alternative D, for the above designations and shapefiles, would classify this with a hodge-podge of V-2 within the WSR polygon, but V-3 within the ACEC and SRMA.  This makes no sense because these lands are proximal/in/adjacent to two state-designated scenic byways.  The Enhanced Ecological Area and WSR would have a Controlled Surface Occupancy (CSO) stipulation, while the overlapping ACEC, SMRA, and fluid minerals layers would have No Surface Occupancy (NSO) for Alternative D.  The SMRA, ACEC Expansion, and fluid minerals Alternative B stipulation would be NL.

---

[18] Page 41: http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.52182.File.dat/ACEC%20Report%20Final%2001152013.pdf

BLM_0077125

Rather than have so many overlapping layers with varying and conflicting stipulations overlying each other on the ground, a situation that will certainly be more prone to human error in interpretation and implementation, San Miguel County desires that the lands within the San Miguel Expansion ACEC and/or San Miguel SMRA Alternative B boundaries be given protections that will be simplified, allow for appropriate recreation, allow for adequate protection for the ACEC and WSR values, provide co-protection for wildlife, and adequately protect the visual resources.

**The final decision should:**

A.  Include a determination of "suitable" for inclusion in the National Wild and Scenic Rivers System for San Miguel River Segment 1, Beaver Creek and Saltado Creek.

B.  Expand the San Miguel River ACEC to include all of the lands within the existing San Miguel River ACEC and the proposed San Miguel River Expansion ACEC in Alternative B.

C.  Continue the existing San Miguel River SRMA which is included in the agency preferred Alternative D.  There are an additional 76 acres that would be included in the SRMA just southwest of the confluence of Willow Creek and the San Miguel River.  San Miguel County does not want this SRMA changed to become the San Miguel River Corridor Extensive Recreation Management Area (ERMA) that is proposed in Alternative C.  The VRM classification should be changed from VRM-III to VRM-II to be consistent with the ACEC and the two state-designated scenic byways.  The incredible scenic qualities of this area are very important economically to the region and should be maintained and managed at VRM-II.  The SRMA should be expanded to match the San Miguel River Expansion ACEC boundary, such as in Big Bear Creek area.

According to the BLM, any area not identified as an SRMA is automatically managed as an ERMA.  On the BLM UFO Recreation Management Area web page, the BLM states:  "Within ERMAs, recreation is unstructured and does not require intensive management or significant investment in trails or facilities.  This type of custodial or "dispersed" recreation management provides minimal visitor services and few developed recreational facilities."[19]  Because there is a large identified local, regional, national and international market demand for structured recreation, the San Miguel River SRMA is the best management fit.  Within the San Miguel River SRMA, there are developed recreation sites, including campgrounds, staging areas, visitor information, and limited facilities.

D.  With appropriate stipulations for the above, the complex mosaic of Enhanced Ecological Areas as proposed in the San Miguel River Expansion ACEC/SRMA areas should <u>not</u> be needed as wildlife will be getting protection benefits from the management decisions and implementation of the WSRs, SMRA, and expanded ACEC.  The stipulations contained in the Enhanced Ecological Area shapefile for Alternatives B and D are much weaker than those for the other intersecting designations of ACEC, SRMA, and WSR (see Attachment A). [20]

The BLM's stated reason for contemplating an EEA in the San Miguel River is provided in its description in the DRMP/EIS Appendix D[21]:

---

[19]http://www.blm.gov/co/st/en/fo/ufo/recreation.print.html

[20]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.60521.File.dat/ecological_emphasis_areas.zip

[21]Page
D4;http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par.39615.File.dat/D_EEAs_UFO-DRMP-2016_508.pdf

BLM_0077126

| Ecological Emphasis Area Name | Description | Habitat Type | Primary Benefiting Species |
|---|---|---|---|
| San Miguel | Links the Mount Wilson area on National Forest across the San Miguel Canyon to the Uncompahgre Plateau, and contributes to linkage between Mount Sneffels area and Lizard Head area; includes parts of the existing San Miguel ACEC. Divided into seven zones. | Riverine and riparian, cliff and canyon, mountain shrub, pinyon-juniper, montane forest | Bear, mountain lion, lynx, mule deer, elk, native cold water fish |

San Miguel County desires that within the San Miguel River existing/expansion ACEC - San Miguel River SRMA - San Miguel Segment 1/Beaver Creek/Saltaldo Creek WSRs that the final RMP/ROD does not designate the additional San Miguel Enhanced Ecological Areas.  With the stipulations recommended below, these areas will be well served.  All of the stipulations recommended for Alternative D for creating the San Miguel EEA are included or exceeded in our list of stipulations below.

The BLM defines Ecological Emphasis Areas (EEAs) as areas that are "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors," with the objective of having a designated EEA being "manage to preserve the continuity of habitats, vegetation communities, and native wildlife within, while following vegetation mosaic objectives" [22]

E.  San Miguel County believes that the San Miguel River, including the Saltado and Beaver Creek areas, can be served by a single set of stipulations that meet the needs and criteria of all of the overlapping designations recommended by the BLM and/or requested by San Miguel County (San Miguel ACEC Expansion, San Miguel River SRMA, and all 3 WSR segments).  The stipulations for these lands collectively should include:

- **"7"** = Limit camping to 7 days, 6 nights maximum within a 30-day period for dispersed camping.
  - SMC Note: Do not change the current maximum length of stays at the improved BLM campgrounds: Fall Creek (7 days), Caddis Flats (14 days), or Lower Beaver (7 days).
- **"AVOID"** = ROW Avoidance.
  - SMC Note: San Miguel County would support an EXCL = ROW Exclusion for some areas where no ROWs currently exist, however, it is the county's desire to have the ability to scope a bike path or trail from Telluride to Placerville somewhere off of State Highway 135 and near the San Miguel River and/or additional broadband infrastructure on existing ROWs or short segments of new ROW, if there are not significant negative impacts to ACECs, WSR, or recreation.
- **"CAMPFIRE"** = No Campfires for dispersed camping.
  - SMC Note:  San Miguel County is ok with campfires in existing campgrounds - - Fall Creek, Caddis Flats and Lower Beaver if already allowed.
- **"COAL"** = Closed to coal mineral leasing.
  - SMC Note:  BLM data that there is little to no actual coal potential and allowing for coal mineral disposal would negatively impact ORVs with little actual mineral resource benefit.  This entire area is given a classification of no coal potential in Alternative A.

---

[22] Page 2-68; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf

BLM_0077127

- **"CWOD"** = Closed to commercial wood cutting.
- **"DES"** = Limited to designated routes / Limited to existing routes.
- **"DR_Timing"** = Designated routes - Timing Limitations, Limited to designated routes all other times (for wildlife).
- *"**HYDROE**" = Exclusion area for hydropower.
  - SMC Note:  This is consistent with the importance of this segment for fishing and recreational boating.
- **"LOCATE"** = Petition Secretary of Interior to withdrawal for locatable minerals.
- **"NL"** = No lease.
  - SMC Note: There are low oil and gas potential in the eastern portion of the expanded San Miguel River ACEC.  According to Colorado Oil & Gas Commission (COGCC), Well Data downloaded in September 2016, only one well has been drilled within 2 miles of the proposed WSR suitable segments.  This well was a wildcat well near Placerville, drilled in 1960 and was "DA:  dry and abandoned."
  - SMC Note:  SMC finds that the negative impacts to the San Miguel River, Beaver Creek, and Saltado Creek corridors, scenic byways, traffic, recreation, visual resources, and wildlife in an area without any oil/gas infrastructure, identified oil/gas fields, and history of interest or past production far outweighs any possible benefits from resource exploration or extraction within this area.  According to the Fluid Minerals Alt D code in the Fluid Minerals Alt D shapefile[23], the entire San Miguel River Segment 1, Beaver Creek, and Saltado Creek WSRs, and the existing and expanded San Miguel ACEC and San Miguel SRMA is coded as NSO for the preferred alternative.  However, this stipulation seems to missing from the WSR Alt D shapefile attribute table[24].  Alternative B gives all these areas the stipulation of "NL" which is preferred by San Miguel County as it conserves valuable staff time and resources from even going through the federal lease process.
- **"RANGE"** = Closed to livestock grazing.
  - SMC Note: essentially already recommended in Alternatives B and D.  This is a high conflict area with many uses constrained in a narrow canyon.  Monsoonal rains cause road closures, debris flows, and rockfalls multiple times each summer.  Grasses and forbs should not be grazed as they provide protection.  Wildlife needs this food source.
- **"RECMINE"** = No recreational mining.
  - SMC Note:  SMC has found recreational mining is disruptive to other quiet uses, wildlife, and has caused conflicts with public access, boating, fishing, hiking, photography and other quiet use activities within the San Miguel River corridor.  Non-motorized recreational mining does not have the same level of impact and disruption to the aquatic and riparian ecosystems as motorized recreational mining.  San Miguel County believes that to protect the WSR, ACEC, SRMA, and highly scenic and important riparian and aquatic ecosystems, there at should be no motorized recreational mining on the San Miguel River Segment 1, and the Beaver and Saltado Creek segments found suitable for WSR designation.
- **"SALABLE"** = Closed to salable mineral disposal.

---

[23] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_1.Par.20291.File.dat/fluid_minerals_alt_d.zip

[24] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.28698.File.dat/WSR_ALT_D_FINAL.zip

BLM_0077128

- o SMC Note:  Gravel and dimension stone mining is not consistent with the ORVs and ACEC riparian values.
- **"SEED"** = Area closed to seed collection.
- **"SHEEP"** = Grazing of sheep and goats not permitted
  - o SMC Note: essentially already recommended in Alternatives B and D.  SMC Note:  This is a high conflict area with many uses constrained in a narrow canyon.  Monsoonal rains cause road closures, debris flows, and rockfalls multiple times each summer.  Grasses and forbs should not be grazed as they provide protection.  Wildlife needs this food source.
- *"SOLARE"** = Exclusion area for solar.
  - o SMC Note: Commercial solar concentrators or PV panels are not compatible with the WSR/SRMA/ACEC/scenic and wildlife values here.  The San Miguel River corridor is determined to have "Very Good" Solar PV potential by the UFO BLM Renewable Energy Potential Report (2010), which doesn't take into account distance from substations.  PV arrays for off-site uses need to be proximal to substations. [25]
- **"SOLID"**= Closed to non-energy solid mineral leasing.
  - o SMC Note:  Ground disturbing activities, such as surface mining, are not consistent with the ORVs, wildlife and ACEC values, nor the important scenic qualities.
- **"SSR"** = Site-Specific Relocation.
- **"TAR"**=Prohibit target shooting.
  - o SMC Note:  Target shooting in the narrow rock-walled canyons results in amplified noise and disturbances to the wildlife, birds and pristine experiences of these areas.
- **"V-2"**=VRM II
  - o SMC Note:  WSR and San Miguel River Existing/Expansion ACEC should have a VRM II, as the DRMP/EIS states "Managing the segments according to VRM Class 1 or II objectives would provide direct protection to segments with a scenic ORV by requiring that the alterations to the landscape be done so as not to dominate the viewshed.  If alterations cannot be mitigated to reach the VRM class objective, they would not be permitted...In turn, this would provide indirect protection to segments with a cultural or historical ORV." [26] As noted elsewhere, the BLM 2013 ACEC Final Report states that the San Miguel existing and expansion ACECs should have VRM II.
  - o SMC Note:  Beaver Creek was not provided any VRM stipulation in the WSR Alt D shapefile.  WSR should have a VRM II.
- *"WINDE"**=Exclusion area for the wind.
  - o SMC Note:  The San Miguel River corridor is determined to have "Poor" wind potential by the UFO BLM Renewable Energy Potential Report (2010). [27]
- **"WOOD"**=Closed to wood cutting.

[25]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf
[26]Page 4-412;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_2.Par.12939.File.dat/4_UFO-DRMP-2016_508.pdf
[27]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf

BLM_0077129

*All above stipulations apply where there is BLM surface estate, however, HYDROE, SOLARE, AND WINDE are not included as stipulations on the non-BLM surface estate (private, U.S. Forest Service lands).

We obtained definitions of these codes from BLM GIS metadata made available for each BLM UFO DRMP/EIS shapefile, such as the WSR Alt D shapefile metadata.[28]

3.  **Special Recreation Management Areas (SRMAs) & Extensive Recreation Management Areas (ERMAs)**
    Summary:  There are two SRMAs discussed in the DRMP/EIS within San Miguel County:  San Miguel River (which includes the San Miguel River Segment 1, Saltado Creek and Beaver Creek segments determined to be suitable for Wild & Scenic River designation in Alternative D; and Burn Canyon.  We commented above that we desire to continue the designation of the San Miguel River SRMA.  The San Miguel River SRMA already exists but the preferred Alternative D would add approximately 76 acres to this SRMA, just southwest of the confluence of Willow Creek and San Miguel River.

    Specific to the Burn Canyon SRMA, we note that it is within the proposed Naturita Canyon EEA.  The Burn Canyon SRMA is recommended in Alternative B, but not in the agency preferred alternative, Alternative D.  Under Alternative B, if designated, the Burn Canyon SRMA would have the following management stipulations:

**SRMA Scenario (Alternative B)**



28http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.87378.File.dat/WSR_ALT_D_FINAL.html

BLM_0077130

Figure 3.1 -- showing the Burn Canyon SRMA Alternative B scenario.

It would have travel restricted to mostly designated routes, portions (purple) would be closed to mechanized (bikes) and motorized vehicles, and would not allow competitive events.  It would be closed to coal and solid mineral leasing, the BLM would petition for withdrawal of locatable minerals, and there would be no surface occupancy for oil and gas.  It would have VRM II.

Targeted activities would be hiking and horseback riding and enjoyment of nature in the canyons.  On the mesa tops and slopes, activities would also include mountain biking.

Under the agency preferred ERMA in Alternative D, the ERMA would have VRM III and controlled surface use for oil/gas development only.  The SRMA and ERMA have the same boundary.  However, under the ERMA scenario, the lands would be managed to allow ATVs and motorcycles, mountain biking, and hiking in both the canyons and the mesa top/slopes, while retaining a natural appearing landscape and providing necessary recreation facilities such as trails/trailheads/staging areas/signage to facilitate recreational activities. [29]

---

[29]Pages J-5-7; J-91;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.40130.File.dat/J_Rec_UFO-DRMP-2016_508.pdf

13

**ERMA Scenario (Alternative D)**



| alt_d_code |
|---|
| CSU,V-3 |

Figure 3.2 -- showing the Burn Canyon SRMA Alternative D scenario.

San Miguel County desires that the Burn Canyon SMRA as mapped and stipulated in Alternative B be approved and incorporated into the final RMP.  We believe that the SRMA will complement the proposed Naturita Canyon EEA as mapped and recommended in Alternative B, along with the fluid minerals stipulations from Alternative B in this area.

**4.  Enhanced Ecological Areas (EEAs)**

**A.  San Miguel EEA.**

The BLM UFO DRMP/EIS contemplates two EEAs within San Miguel County:  San Miguel EEA and Naturita Canyon EEA. [30]  The San Miguel River Expanded ACEC preferred by San Miguel County, the existing San Miguel SRMA and the Alternative D recommended WSR segments for San Miguel River Segment 1,

---

[30]Pages D-3 & D-4;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par.39615.File.dat/D_EEAs_UFO-DRMP-2016_508.pdf

BLM_0077132

Beaver Creek and Saltado Creek.  San Miguel County recommended a standardized set of stipulations (pages 7-9 of this document) that would meet the needs of all of these San Miguel County desired designations, and also meet and exceed the stipulations that had been proposed by the BLM for the San Miguel EEA.

**B.  Naturita Canyon EEA.**

The BLM describes the reasons for considering Naturita Canyon EEA on Page D-4 of Appendix D of the DRMP/EIS as:

| Ecological Emphasis Area Name | Description | Habitat Type | Primary Benefiting Species |
|---|---|---|---|
| Naturita Canyon | Adjoins National Forest System lands leading up to Lone Cone area; includes the major Naturita Canyon drainage, which has wildlife/indicator species emphasis on adjoining National Forest. Divided into four zones. | Riparian, cliff and canyon, pinyon-juniper | Bear, mountain lion, mule deer, elk, native warm water and cold water fish |

Geographically, there are several parcels mapped as comprising the Naturita Canyon EEA for Alternative B.  The purple and red polygons (see figures below) make up the Naturita Canyon EEA.  It would provide linkages between adjacent State land (blue) and National Forest land (green).  The hatching shows occupied critical Gunnison Sage-grouse habitat as designated by U.S. Fish and Wildlife Service (USFWS).  The DRMP/EIS does not list Gunnison Sage-grouse (GuSG) as a species that the EEA would be managed to benefit.

BLM_0077133



Figure 4b.1 -- Showing the Naturita Canyon EEA Alternative B.

In Alternative D, the agency preferred alternative, only the two red parcels of the Naturita Canyon EEA would actually be designated as an EEA:

16

BLM_0077134



Figure 4b.2 is showing Naturita Canyon EEA Alternative D and Colorado Oil and Gas Commission (COGCC) wells.

Above, the BLM surface that would not be part of the Naturita Canyon EEA is shown in yellow. We also show oil and gas wells, with green wells being producing oil or gas wells, and red wells being mostly wildcat wells that are non-producing. An EEA consisting of just the red polygons, especially with simply controlled surface use (CSU) and ROW avoidance (AVOID), instead of no surface occupancy (NSO), designated routes- timing limitations (DR_TIMING), seems this would result in two small token EEA parcels without meaningful habitat protection or connectivity, beyond what is already anticipated by the fluid minerals management in Alternative D. Most of these two polygons are already anticipated to be

BLM_0077135

NSO.  However, the remainder of the area that is analyzed for Naturita Canyon EEA is CSU under alternative D.

Alternative D, agency preferred, for Naturita Canyon EEA and fluid minerals stipulations:





Figure 4b.3 -- showing the Naturita Canyon EEA Alternative D with fluid minerals Alternative D

BLM_0077136

Alternative B, San Miguel County preferred, for Naturita Canyon EEA and fluid minerals stipulations:



Figure 4b.4 showing Naturita Canyon Alternative B and fluid minerals Alternative B.

San Miguel County believes that since the wildlife values warranted studying the Naturita Canyon area for an EEA, that Alternative B for the EEA boundary and EEA stipulations, as well as Alternative B fluid

19

BLM_0077137

minerals stipulations, should be applied by the final decision in this area.  We could not locate a discussion in the DRMP/EIS explaining the BLM rationale for how choosing Alternative D over Alternative B with respect to this EEA and the fluid minerals stipulations that overlap, would achieve the stated objectives of preserving the continuity of habitats, vegetation communities, and native wildlife. [31]

San Miguel County recommends that the full Naturita Canyon EEA be designated, as mapped in Alternative B, along with Alternative B fluid minerals stipulations.  This will be complimented by also designating the Burn Canyon SRMA as mapped in Alternative B.

## 5.  Areas of Critical Environmental Concern (ACECs)

The UFO DRMP/EIS contemplates three ACECs within San Miguel County:

### A.  San Miguel River ACEC and San Miguel River Expansion ACEC.

These ACECs have been discussed in detail in this document above, and San Miguel County strongly supports Alternative B, which would designate the additional lands within the San Miguel River Expansion ACEC.  According to the BLM's Final ACEC report (2013), all of the relevance and importance criteria were met, just as with the existing San Miguel River ACEC. [32]  San Miguel County also strongly supports a cohesive management of the overlapping ACEC lands, SRMA lands, and WSR segments within San Miguel River Segment 1, Beaver Creek and Saltado Creek through one set of stipulations, with a VRM II stipulation.  The agency preferred VRM III stipulation does not adequately protect the exceptional scenic qualities of this area, nor the regional economy, nor the viewshed of the two state-designated Scenic Byways.  Please see this document, Section 3, pages 5-9 above for specific requests for changes and implementation that San Miguel County desires in the final decision.

### B.  San Miguel Gunnison Sage-grouse ACEC.

This ACEC is comprised of 470 acres in multiple parcels occurring on scattered critical Gunnison Sage-grouse habitat that whose surface estate is managed by the BLM.  San Miguel County was originally one of the proponents of this ACEC.  When the BLM's Final ACEC report was published in 2013, this was prior to the federal decision to list the Gunnison Sage-grouse as Threatened and designate critical habitat in 2014.

On November 12, 2014, the U.S. Fish and Wildlife Service (USFWS) announced that it determined that the Gunnison Sage-grouse, a ground-dwelling bird found only in southwestern Colorado and southeastern Utah, required the protection of the Endangered Species Act (ESA) as a threatened species.  The USFWS originally proposed to list the species as 'endangered' under the ESA in January 2013, but efforts by the two states, tribes, local communities, private landowners and other stakeholders to conserve the species and its habitat were found to have helped reduce the threats to the bird sufficiently to give it the more flexibly protected status of 'threatened.' [33]

The supporting EIS for the Threatened Status designation of the Gunnison Sage-grouse[34] and for the Designation of Critical Habitat for the Gunnison Sage-grouse[35] is dated November 9, 2014.

---

[31] Pages 2-68 & 2-69;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf
[32] Pages 41-47;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.52182.File.dat/ACEC%20Report%20Final%2001152013.pdf
[33] https://www.fws.gov/mountain-prairie/pressrel/2014/11122014_ServiceProtectsGunnisonSageGrouseAsThreatenedUnderESA.php
[34] https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GUSGFinalListingRule_11202014.pdf
[35] https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GuSGCriticalHabitat_11202014.pdf

BLM_0077138

The Gunnison Sage-grouse ACEC as proposed in this UFO DRMP/EIS does not contemplate the status of the species or critical habitat as listed in the federal register in 2014, does not contemplate surface disturbance and other disturbances on critical habitat that may be non-BLM surface estate but is BLM-managed federal mineral estate, and does not contemplate guidelines within numerous plans and the latest best management practices for stipulations and buffers from leks.

The UFO DRMP/EIS does not take into consideration that Occupied GuSG Habitat includes specific properties (and split estate) that the USFWS excluded from the critical habitat designation.  The political removal of surface lands coinciding within these specific private properties under conservation easements from listed critical habitat is appropriate, but the removal of subsurface public lands from Occupied Habitat is not appropriate because it excludes the subsurface mineral estate from the management actions contained in the UFO DRMP/EIS.

A.  In summary, San Miguel County does not support the Gunnison Sage-grouse ACEC as proposed in Alternative B of this UFO DRMP/EIS.  The proposed alternatives with regards to Gunnison Sage-grouse and this ACEC are neither adequate, accurate, nor informed by the most recent federal actions and data available.  The UFO DRMP/FEIS also predates the new alternative B analysis within the GuSG DRMPa/DEIS which analyzes an ACEC for all GUSG Occupied and Unoccupied Habitat.  Please see Section 6, Gunnison Sage-grouse.

**6. Gunnison Sage-grouse.**

These designations prompted a process for the BLM to prepare a draft Gunnison Rangewide Plan Amendment that would potentially result in multiple resource plan amendments (GuSG DRMPa) and a companion draft environmental impact statement (GuSG DEIS) which more closely analyzes planning issues, including energy and minerals actions, in order "to analyze the addition of GuSG conservation measures to several existing RMPs", including the BLM UFO DRMP/EIS.  The deadline for comments on the GuSG DRMPa is after the deadline to comment on this UFO DRMP/EIS.  The GuSG DRMPa documents were released as drafts in August 2016.

In the GuSG DRMPa, the BLM states, "The BLM manages approximately 40 percent of GUSG habitat across twelve counties in southwestern Colorado and southeastern Utah...The inadequacy of regulatory mechanisms in land use plans was identified as a major threat in the FWS listing decision." [36]

We realize that since much of the UFO DRMP/EIS work occurred between 2010 and 2013, that the latest work done by the USFWS and BLM for the GuSG DRMPa was not incorporated into this UFO DRMP/EIS.  The San Miguel Gunnison Sage Grouse ACEC analysis was not informed by the latest information, nor the oil and gas stipulations, travel management and several other sections of this UFO DRMP/EIS.

Thus, if the UFO DRMP/EIS moves forward, it should have its Record of Decision signed prior to the BLM RMPa ROD so that the BLM RMPa will amend the relevant portions of this RMP to adequately protect Gunnison Sage-grouse and incorporate the latest science and best management practices.   All leases within the UFO should be deferred until the ROD is signed for the GuSG RMPa so that no lease is allowed a 20-year period with out-of-date stipulations and practices.   While the GuSG DRMPa goes much further than this UFO DRMP/EIS for incorporating protections, conservation measures, and habitat enhancement

---

[36] Page I; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf

BLM_0077139

and connectivity measures, it still needs additional work, which San Miguel County will comment on separately under that comment process.  The GuSG DRMPa does contemplate that removal of subsurface public lands from Occupied Habitat management actions is inappropriate, which is differently than how these lands are treated in the UFO DRMP/EIS.

It would be remiss to issue leases under any circumstances within the UFO until there is a final decision on the Gunnison Sage-grouse amendments.

The Purpose section of the GuSG DRMPa states, *"This RMP amendment provides a framework for conserving and assisting with the recovery of the GuSG and for conserving and restoring habitat upon which the species depends on BLM-administered public lands across the range of the bird."*  The Need section of this document states, *"The BLM conducted land use plan evaluations in accordance with its planning regulations, which require that RMPs 'shall be revised as necessary based on ..., new data, new or revised policy...(43 CFR 1610.5-6).'"* [37]

San Miguel County believes that the listing of the GuSG and designation of critical habitat is a new circumstance that requires modification of the UFO DRMP/EIS, but to be consistent where the San Miguel Basin population has key areas such as Miramonte Reservoir area that are split among the UFO and Tres Rios Field Office (TRFO) there needs to be a consistent set of management guidelines and stipulations across the entire San Miguel Basin population.  There may be different lek buffers and needs between the different subpopulations, such as the Gunnison Basin and the San Miguel Basin populations.  Seasonal habitat has not been delineated within the San Miguel Basin population the way it has in the Gunnison population.  The fact that the BLM is conducting the GuSG DRMPa/DEIS process and recommending a preferred alternative that would amend the TRFO RMP seems to point to that need.  San Miguel County also does not agree that the range of alternatives analyzed in the 2013 TRFO RMP/FEIS nor this UFO DRMP/EIS is appropriate with respect to the needs of GuSG.

The range of alternatives considered in the GuSG DRMP/DEIS includes having the stipulation of No Surface Occupancy being applied to all BLM lands within 4-miles of a lek.  These documents analyze all BLM lands within occupied, unoccupied or a 4-mile buffer of a lek as the decision area.  Yet, the 2005 Gunnison Sage-grouse Rangewide Conservation Plan[38] and the presence of occupied critical habitat more than 4 miles from leks within the San Miguel Basin show that GuSG is found occupying habitat and using seasonal habitat 6 or more miles away from leks. [39]  For example, the occupied habitat within the Dry Creek Basin area, San Miguel Basin GuSG population, shown on Map 1 that is beyond the 4-mile lek buffer, is between 6- and 6.25-miles from leks.  The BLM should allow for additional review of appropriate protections for Gunnison Sage-Grouse habitat from oil and gas development within at least a 6-mile buffer, preferably a 6.2-mile buffer of leks within the San Miguel Basin.

### Section 7.  Lands Identified For Disposal.

The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "consider disposal of lands that would consolidate public ownership for greater management efficiency while serving the public interest, including communities and their expanding needs." [40]

---

[37] Page iii; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf

[38] http://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx

[39] Page J-5; http://cpw.state.co.us/Documents/WildlifeSpecies/SpeciesOfConcern/GunnisonSageGrouse/ConsPlan/AppendixJSGHabitatUse03.pdf

[40] Page 2-319; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf

BLM_0077140

The lands identified for disposal were identified on Appendix A, Figure 2-60[41] and legal descriptions were provided in Appendix N.[42] It appears that only the lands recommended for disposal under the agency preferred alternative D are shown in Figure 2-60.

We recommend that it would be very helpful for the reviewing public and agencies if the UFO made more readily available the Land Tenure/Land Disposal GIS files on the UFO RMP GIS web page, and also if the name of the county were provided in Appendix N.  We were able to obtain from UFO GIS staff the land tenure shapefile via email.  While actual reasons for recommending individual parcels for disposal or non-disposal in the four alternatives were not located in the DRMP/EIS, there were some cryptic rationales present within the land tenure shapefile attribute table for a few but not all parcels.

San Miguel County does not desire any parcels to be disposed of that would interfere with existing public roads or trails, existing private driveways or access roads, irrigation ditches or other easements.  Any parcels disposed of should conform with the criteria and standards set forth in the San Miguel County Comprehensive Plan.  Parcels that contain critical habitat for sensitive or listed species or that provide connectivity between other public lands should not be disposed of.  If the BLM doesn't want to manage such parcels, then the adjacent federal or state agency should be given an opportunity for management or ownership.

The metadata from the land tenure shapefile for the 10 parcels analyzed by the DRMP/EIS for disposal within San Miguel County is below:

| SMC Parcel Ref # | RMP | gis_ac res | alt _A | alt _B | alt _C | alt _D | alt_B_c ode | alt_C_c ode | alt_D_c ode | Comment_ |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | San Juan / San Miguel Planning Area RMP 1985 | 35 | Yes | No | Yes | No | | DISPOS AL | | Riparian |
| 2 | San Juan / San Miguel Planning Area RMP 1985 | 35 | Yes | No | Yes | No | | DISPOS AL | | Riparian |
| 3 | San Juan / San Miguel Planning Area RMP 1985 | 214 | Yes | No | Yes | No | | DISPOS AL | | Range, Veg, Riparian |
| 4 | San Juan / San Miguel Planning Area RMP 1985 | 88 | Yes | No | Yes | No | | DISPOS AL | | Range, Veg, Riparian, Recreation |
| 5 | San Juan / San Miguel Planning Area RMP 1985 | 82 | Yes | No | Yes | No | | DISPOS AL | | Range, Veg, Riparian, Recreation |
| 6 | San Juan / San Miguel Planning Area RMP 1985 | 38 | Yes | Yes | Yes | Yes | DISPOS AL | DISPOS AL | DISPOS AL | |
| 7 | San Juan / San Miguel Planning Area RMP 1985 | 40 | Yes | Yes | Yes | No | DISPOS AL | DISPOS AL | | |
| 8 | San Juan / San Miguel Planning Area RMP 1985 | 41 | Yes | Yes | Yes | Yes | DISPOS AL | DISPOS AL | DISPOS AL | |
| 9 | San Juan / San Miguel Planning Area RMP 1985 | 133 | Yes | No | Yes | No | | DISPOS AL | | salinity/selenium, GuSG |
| 10 | 2011 RMP | 40 | No | Yes | No | Yes | DISPOS AL | | DISPOS AL | |

Table 7.1 -- the land tenure GIS shapefile attribute table for parcels within San Miguel County.

### a. Fall Creek Area Parcels.

We attempted to map the legal descriptions of the parcels (SMC Parcel Reference #s 1 & 2 in the table above) within San Miguel County and found that these two of the parcels (in T42N R11W Section 2) were

---

[41]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par.78374.File.dat/App%20A%20Combined.pdf
[42]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.77552.File.dat/N_Disposal_UFO-DRMP-2016_508.pdf

BLM_0077141

just east of Little Cone, adjacent to Fall Creek Road, County Road 57 P (see pink outlines below).  It appears these two parcels were currently listed for disposal by the existing RMP (Alternative A), and are not recommended for disposal in Alternatives B or D.  They are located within the Fall Creek riparian corridor.  San Miguel County agrees with the Alternative D (no disposal) for these parcels.



Figure 7a.  Fall Creek area parcels in T42N R11W Section 2, not recommended by SMC or agency preferred Alternative D for disposal.

### b. Beaver Creek and Saltado Creek Area Parcels.

We could not quite get the legal descriptions rectified for the parcels in Saltado Creek between Appendix N and the GIS land tenure file provided.  However, the parcel within the Saltado Creek area intersects the Saltado Creek WSR segment, the existing ACEC and the SRMA.  It also is adjacent to critical occupied Gunnison Sage-grouse habitat.  It is within 1 to 2 miles of 3 active leks.  It should not be disposed of.

The Beaver Creek parcel in T43N R12W Sections 9 & 10 is within the Beaver Creek WSR segment, existing ACEC and SRMA.  It also is adjacent to critical occupied Gunnison Sage-grouse habitat.  It is within 0.3 to 0.75 mile of 3 active leks.  It should not be disposed of.

BLM_0077142

Both of these areas appear also to be within the San Miguel River Expansion ACEC (which San Miguel County recommends be designated.  The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "retain lands in public ownership when it will serve the public interest, protect valuable resources, or achieve management goals." [43]  Alternative B and Alternative D state that the UFO action will be to retain lands that are within ACECs or SRMAs. [44] Lands immediately adjacent to critical Gunnison Sage-grouse habitat should not be disposed of.  The 2005 Gunnison Sage-grouse Rangewide Conservation Plan[45] and the presence of occupied critical habitat more than 6 to 6.25 miles from leks within the San Miguel Basin subpopulation show that GuSG is found occupying habitat and using seasonal habitat 6 or more miles away from leks. [46]

---

[43]Page 2-321;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_U FO-DRMP-2016_508.pdf
[44]Page 2-322;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_U FO-DRMP-2016_508.pdf
[45]http://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx
[46]Page J-5;
http://cpw.state.co.us/Documents/WildlifeSpecies/SpeciesOfConcern/GunnisonSageGrouse/ConsPlan/AppendixJSGHabitat Use03.pdf

BLM_0077143



Figure 7b.  Showing the Beaver Creek (left) and Saltado Creek (right) area disposal parcels in T43N R12W Sections 9 & 10; not recommended by SMC or agency preferred Alternative D for disposal.  If sold for private development, there would be impacts to the scenic and primitive qualities of these areas, as well as the important riparian ecosystem and wildlife.  Alternatives B and D do not recommend these parcels for disposal.  San Miguel County believes it is best for the public and for the protection of valuable river corridors, ORVs, and Gunnison Sage-grouse if these parcels are not disposed of.

### c. Lone Cone & Gurley Reservoir Area Parcels.

The BLM land tenure shapefile identified 3 parcels in the Lone Cone/Gurley Reservoir area that are recommended for disposal under the agency preferred Alternative D (according to the shapefile attribute table). They are shown with the bright blue highlight around the pink parcel boundaries in Figure 7c below:

BLM_0077144



Figure 7c. Lone Cone Reservoir and Gurley Reservoir Area Parcels identified in GIS metadata within the provided land tenure GIS shapefile as being recommended for disposal in the agency preferred Alternative D.

Appendix N only recommends two parcels for disposal in the agency preferred Alternative D. So we are concerned that there is an error in mapping the southernmost parcel on Figure 7c. It appears to be within T43N R13W S12. However, this does not match a legal description in Appendix N. Appendix N, and the land tenure shapefile should be rectified before the final RMP and ROD. The southernmost parcel is entirely surrounded by Gunnison Sage-grouse occupied habitat and is also mapped on top of (or under?) the Lone Cone Reservoir. This parcel is within 0.5 miles of an active lek and 0.7 miles of a second inactive lek. San Miguel County does not support disposal of this parcel.

The parcel directly west of Gurley Reservoir (just south of Red Cone Rd.) is the parcel with the legal description of T44N R13W Section 35. The parcel directly north of Gurley Reservoir in the northern portion of Figure 7c is the parcel with the legal description of T44N R13W Section 35.

BLM_0077145

The northernmost parcel in Section 24 is 1.5 miles north of occupied Gunnison Sage-grouse habitat but is also surrounded by private land.  It is 3.5 miles from the nearest active lek and 2 miles from the nearest inactive lek.  If a parcel were to be disposed of, this would probably be the only parcel that makes sense.  There are some undesignated BLM routes mapped on the fringes of this parcel.

The parcel in Section 35 is within 0.5 miles of an active lek and is adjacent to occupied Gunnison Sage-grouse critical occupied habitat.  There is an undesignated BLM route mapped on this parcel.  <u>San Miguel County does not recommend disposal of this parcel.</u>

**d. Hastings Mesa Area Parcel**
One additional isolated BLM parcel was analyzed for disposal is located on Hastings Mesa near Alder Creek in T44N R10W Section 29 adjacent to the Alder Creek Ranches subdivision.  This parcel is entirely surrounded by private land.  It was recommended for disposal in Alternatives A-C.  However, no reason is given why it is not included for disposal in the agency preferred Alternative D.  It is close to the Alder Creek riparian area.  We would like an opportunity to review this parcel further with the UFO to examine it with respect to our Comprehensive plan, public rights of way, easements and other items, and to understand the UFO rationale for not including it for disposal in Alternative D.  San Miguel County desires that if the BLM disposes of parcels it ensures there are either public ROW or private easements already in place prior to disposal, to ensure ingress/egress for future owners.

BLM_0077146



Figure 7c.  Hastings Mesa/Alder Creek Area Parcel within T44N R10W Section 29.  This parcel is not recommended for disposal in the agency preferred Alternative D.

**e. Big Bear Creek Area Parcels**
These parcels are within T42N R10W Section 4.  Under the agency preferred alternative they are not recommended for disposal.  San Miguel County agrees that they should not be disposed of by the BLM.  They are within the Big Bear Creek riparian corridor, and the San Miguel River Expansion ACEC desired to be designated by San Miguel County.  <u>The San Miguel SRMA boundary should be expanded to match the San Miguel River Expansion ACEC boundary in this area.</u>

BLM_0077147



Figure 7e.  Showing the Big Bear Creek Area parcels.  If sold for private development, there would be impacts to the scenic and primitive qualities of these areas, as well as the important riparian ecosystem and wildlife.  Alternatives B and D do not recommend these parcels for disposal.  <u>San Miguel County believes it is best for the public and for the protection of valuable river corridors and riparian habitat if these parcels are not disposed of.  The San Miguel River Expansion ACEC should be designated, and it would include these parcels.  The San Miguel River SRMA boundary should be expanded to include all of these parcels and the expansion ACEC.</u>

## Section 8.  Wildlife management.

San Miguel County urges the BLM to further consult and consider the Colorado Parks and Wildlife (CPW), formerly Colorado Department of Wildlife (CDOW), detailed list of Best Management Practices (BMPs) for oil and gas development titled "Actions to Minimize Adverse Impacts to Wildlife Resources." with species-specific BMPs, including recommendations on protective buffers, timing information, and recommendations on surface density caps, referenced in their letter to BLM State Director Helen Hankins dated December 13, 2010.

BLM_0077148

We appreciate the statement in the DRMP/EIS on Page I-11 of Volume 1[47] that says "The BLM will consult with Colorado Parks and Wildlife (CPW). The RMP will recognize the State's responsibility and authority to manage wildlife." At the UFO RMP co-operator meeting in Montrose on October 15, 2016, we heard CPW staff say that their information was not incorporated into at least one alternative and that the RMP has not included BMPs, timing limitations or stipulations offered by CPW.

San Miguel County supports CPW's desire that at least a "No Surface Occupancy" (NSO) stipulation be applied to all Federal minerals within the boundaries of State Wildlife Areas (SWAs) and State Park boundaries to balance mineral extraction with the protection of surface resources.

San Miguel County has assisted in the protection of thousands of acres of private lands with important wildlife habitat values, including GuSG critical habitat, during the last few decades by participating in the acquisition of conservation easements intended to preserve and protect GuSG habitat. San Miguel County has contributed between roughly $1.4 and $1.6 million during this period for habitat conservation and improvements through the County's Land Heritage Program, co-funding of the GuSG working group, and other actions to benefit GuSG.

U.S. Fish and Wildlife Service did not include in its final listed critical habitat private lands that were under conservation easement. However, the BLM states in the GuSG DRMPa on Page ii, in the introductory discussion of occupied habitat for Gunnison Sage-grouse[48] that "Occupied Habitat includes specific properties coinciding with BLM-administered federal minerals that the [US] FWS excluded from critical habitat designation. While the removal of surface lands with these properties from critical habitat is appropriate, the removal of subsurface public lands from Occupied Habitat is not." In other words, the BLM in its GuSG DRMPa understands that subsurface mineral estate actions should not be precluded from management actions. San Miguel County requests that the UFO RMP obtain from San Miguel County our GIS shapefile and database of private land conservation easements, and where split estate managed by the BLM exists, that the BLM implement NSO and other stipulations consistent with the primary conservation easement values on these properties.

San Miguel County supports CPW in their statement in the 2010 letter, "As the surface density of development increases beyond one well pad per section, literature sources strongly suggest that avoidance and minimization measures alone are no longer sufficient to address adverse impacts to some species, and compensatory mitigation is necessary to offset the permanent loss of wildlife resources." We support the concept that the UFO (and Tres Rios) RMP incorporate ways to obtain compensatory mitigation when surface density exceeds one well pad per section (within habitats identified by CPW).

San Miguel County requests that the UFO examine carefully CPW recommended species-specific stipulations and ensured that the stipulations in the final UFO RMP/ROD meet or exceed the recommended species-specific stipulations. We also request that standards and guidelines be developed for oil and gas activities in Gunnison Sage-grouse habitat, mule deer winter range, raptor nesting areas, bighorn sheep lambing areas, lynx denning and winter foraging habitat to address impacts from oil and gas operations to the maximum extent possible. Such standards and guidelines within these habitats should require that operators use the best technically and economically available development technology to meet the intent of guidelines while acting on a right to develop a lease.

---

[47]Page I-11;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.7326.File.dat/1_UFO-DRMP-2016_508.pdf
[48]Page ii; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf

BLM_0077149

San Miguel County requests that the UFO RMP also consider adding winter range to ungulate protection strategies, which we understand has implications across all management activities.  CPW has strongly recommended the use of deer and elk winter range as defined in CPW species mapping when applying protection strategies for deer and elk in RMP documents in Colorado[49].  CPW states, "Winter concentration areas and critical winter range are more narrowly defined subsets within the broader winter range category that fail to capture the totality of important wintering areas for ungulates.  'Winter Range' is defined as that part of the overall range where 90% of individuals reside during five winters out of ten.  During an 'average' winter, animals residing in 'winter range' are no less sensitive to disturbance than those on severe winter range or winter concentration areas."

San Miguel County requests revisions to the DRMP/EIS and stipulations to acknowledge the increasing body of evidence that Timing Limitation Stipulations on oil and gas development activities are not adequate to protect winter habitats and migratory corridors for big game, and that additional limitations on the density of surface facilities may be necessary to maintain big game populations in developing areas. [50,51,52,53,54]

San Miguel County further requests that a Master Leasing Plan be prepared and implemented as required by BLM IM No. 2010-117.

**Section 9.  Watchable Wildlife Viewing Areas.**

Incorporating a watchable wildlife viewing area under the federal Watchable Wildlife Program to foster education and appreciation of wildlife in their habitats would be a positive addition within the UFO.  When there are enhanced opportunities for public and educational institutions like local and regional schools to view, enjoy, and learn about wildlife, then there are tangible positive benefits for the local and regional economies and for appreciation of the national treasure that our public lands are.  When people know about the needs and impacts of human activities on species, then they are more likely to support resource conservation and the hard choices of altering human activities that lead to climate change.

The San Miguel River is identified as being a very rich terrestrial bird habitat within North America by the BLM, the Audubon Society, and others. [55]  San Miguel County supports the concept of studying the San Miguel River ACEC and San Miguel River Expansion ACEC for creating one or more watchable wildlife viewing areas.  We believe this will actually help with future mitigation of threats such as invasive plants, non-native species, feral cats, and other disturbances.  The scenic qualities of this area also further enhance the potential high-quality viewing experience.

---

[49]Such as in the CPW San Juan Plan Revision comment letter dated April 11, 2008 titled "San Juan Public Lands Center, Draft Land Management Plan and Draft Environmental Impact Statement, 72 Fed. Reg. 71148 (December 14, 2007)" and addressed to the San Juan Plan Revision, P.O. Box 162909 Sacramento, CA 95816-2909.
[50]http://fwpiis.mt.gov/content/getItem.aspx?id=35572
[51]http://www.wyofile.com/wp-content/uploads/2011/04/Deer.2010annualreport_muledeer.pdf
[52]http://onlinelibrary.wiley.com/doi/10.2193/2008-478/abstract
[53]http://www.blm.gov/style/medialib/blm/wy/information/NEPA/pfodocs/anticline/revdr-comments/eg.Par.10425.File.dat/02Bio-attach1.pdf
[54]https://www.fws.gov/southwest/ES/Documents/Oil-Gas-Fragmentation-Wilbert%20et%20al%202008.pdf
[55]Page 3-171;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.96289.File.dat/3_UFO-DRMP-2016_508.pdf

BLM_0077150

We appreciate your consideration of these comments for the Uncompahgre Field Office Draft Resource Management Plan/Environmental Impact Statement.  As we have offered specific requests, we hope the final RMP and ROD will not simply take the recommendations of a single alternative but will create a final hybrid decision that will incorporate our specific requests.

Respectfully,

SAN MIGUEL COUNTY
BOARD OF COUNTY COMMISSIONERS

Joan May, Chair

BLM_0077151

ATTACHMENT A:  RESOLUTION 2015-009
ATTACHMENT B: COMPARISON TABLES

BLM_0077152

**RESOLUTION OF THE BOARD OF COUNTY COMMISSIONERS OF
SAN MIGUEL COUNTY, COLORADO,
PUBLICLY STATING THE VALUE OF PUBLIC LANDS TO THE COUNTY'S ECONOMY,
RECREATION, HERITAGE, AND QUALITY OF LIFE; AND OPPOSING ANY EFFORT TO
CLAIM, TAKE OVER, LITIGATE FOR, OR SELL OFF FEDERAL PUBLIC LANDS WITHIN
SAN MIGUEL COUNTY, COLORADO**

**Resolution #2015 - 9**

**WHEREAS,** San Miguel County includes many beautiful, natural landscapes, including mountains, rivers, forests, lakes, basins and plateaus; and

**WHEREAS,** many of those stunning places are public lands owned by all Americans; and

**WHEREAS,** public land under the management of the U.S. Forest Service and U.S. Bureau of Land Management constitutes more than 60% of the land in San Miguel County; and

**WHEREAS,** these federal public lands are essential to the quality of life in San Miguel County, providing public recreational opportunity for wildlife watching, hiking, hunting, fishing, backpacking, horseback riding, skiing, bicycling, sightseeing, and numerous other outdoor recreational activities; and

**WHEREAS,** these federal public lands provide essential habitat for wildlife; and

**WHEREAS,** wildlife and the scenic landscape on public lands attract outdoor recreation and tourism that are the dominant drivers of San Miguel County's economy; and

**WHEREAS,** the unified, consistent management of Federal land by the Federal Land Agencies across the nation best protects the national value and utility of the public lands for all Americans and the values on which the economy in San Miguel County is dependent; and

**WHEREAS,** San Miguel County business owners attract employees in large part because of the iconic landscape and recreational opportunities on federal public lands; and

**WHEREAS,** San Miguel County's agriculture industry includes numerous ranchers and sheepherders who depend on grazing on federal public land; and

**WHEREAS,** there is a broad consensus in San Miguel County of the need for effective management of our federal public lands and wildlife, and that collaborative approaches in which federal public land management agencies cooperate with Colorado Parks and Wildlife, San Miguel County officials, and our community are more likely to produce effective management than would ownership or management of federal public lands by the state of Colorado; and

**WHEREAS,** San Miguel County residents are actively collaborating among diverse interests and with public land managers to improve public land management and public access; and

**WHEREAS,** federal public land management agencies employ residents of San Miguel County who are passionate and expert at their jobs, despite lack of adequate federal funding, pay taxes, and contribute to our community; and

**WHEREAS,** Americans from throughout the country value these public lands as a part of our national

BLM_0077153