imperative that the BLM, the Uncompahgre Field Office and this RMP employ effective and efficient science-based planning and analysis methods to support robust and legitimate decision-making processes.

The effective application of science to land management planning and decision-making requires three "essential ingredients":

- Well-defined, measurable **standards** (e.g. wildlife population or habitat condition targets), developed via robust public involvement processes
- The employment of science-based **analytical tools** to evaluate compliance with the standards (e.g. population viability analysis, or the spatially explicit Decision Support System recommended by the Western Governors' Association)
- **Consistent implementation** of science-based analysis and decision-making (i.e. dedicated funding for monitoring and science-based adaptive management processes)[11]

The Uncompahgre RMP should consider these essential elements as it moves forward with efforts to respond to the pressing land management challenges of the coming decades.

*Well-defined standards*
Providing functioning habitat for wildlife and ensuring the long-term persistence of wildlife populations are part of the BLM's responsibilities to manage the public lands for multiple use and sustained yield. FLPMA specifically directs that management of public lands "takes into account the long-term needs of future generations" for wildlife, as well as other resources, and is implemented toward "achievement and maintenance in perpetuity" 43 U.S.C. §§ 1712(c)(1); 1702(c) and (h).  Achieving these goals for wildlife can best be realized by establishing well-defined, measurable standards.  The use of well-articulated concepts and operational planning practices associated with the literature and practice of population viability assessment may provide Uncompahgre land managers with effective and efficient means of applying science-based conservation methods to wildlife planning decisions.

*Science-based analytical tools*
In order to adopt a legitimate, efficient and effective science-based planning framework, the Uncompahgre Field Office should look to the well-established conservation planning and population viability assessment literature, as well as models employed by other BLM units and neighboring agencies.[12]  For example, the neighboring Grand Mesa, Uncompahgre and Gunnison (GMUG) National Forests monitor populations of "management indicator species" to measure the effects of management activities on unmeasured species and to provide insights into the integrity of the ecological systems to which they belong.  The use of an indicator or focal species approach, in combination with robust knowledge of the link between species and habitats, allows managers an effective means to apply science-based principles to resource management decisions.  Species such as the Red-naped sapsucker and northern goshawk (ponderosa pine ecosystems), Brewer's sparrow (sagebrush) and Colorado River cutthroat trout (aquatic) have been identified as key indicator species by the GMUG and have also been identified by Colorado's Comprehensive Wildlife Conservation Strategy and Wildlife Action Plans as

---

[11] Rohlf, D.J. 2004. Science, Law, and Policy in Managing Natural Resources: Toward a Sound Mix Rather than a Sound Bite. Pages 127-142  *in* K. Arabas and J. Bowersox, editors. *Future futures: science, politics, and policy for the next century.* Rowman and Littlefield, Lanham, Maryland, USA.

[12] See U.S. Department of Agriculture, Committee of Scientists. (March 15, 1999). *Sustaining the People's Lands:  Recommendations for Stewardship of the National Forests and Grasslands into the Next Century,* from http://www.fs.fed.us/emc/nfma/includes/cosreport/Committee%20of%20Scientists%20Report.htm.

BLM_0077522

species of greatest conservation concern.  Indeed, to meet the challenges of 21st century land management and conservation, agencies will need to cooperate on vital management planning activities, including the sharing and co-generation of biological information.

Another example of a comprehensive monitoring approach can be found in Appendix 2 - "Implementation, Monitoring, and Evaluation Process" - of the Jack Morrow Hills Coordinated Activity Plan, prepared by the Wyoming BLM, available at: http://www.blm.gov/pgdata/etc/medialib/blm/wy/field-offices/rock_springs/jmhcap/rod.Par.76416.File.dat/31apx02.pdf (and attached).  We particularly note the following, as examples of the sort of detail that should be contained in the Uncompahgre RMP:

- Table A17-1 Resource Management Indicators - p. 8
- Table A17-2 Indicator Detail - pp. 9-11
- Table A17-3 Measurement Detail - pp. 12-14
- Figure A17-3 CAP Management Process - p. 16
- Discussion of the JMH CAP - pp. 20-21

*Landscape-level planning*
The adoption of a science-based approach to RMP development is also consistent with the agency's commitments in the Health Lands Initiative (HLI).  HLI is premised on the BLM's recognition of major changes to the landscape arising from population growth, energy development and global warming. The goal of HLI is "to preserve the diversity and productivity of public and private lands across the landscape."  HLI is to be implemented through specific projects, which will "enable and encourage local BLM managers to set priorities across a broader scale and mitigate impacts to an array of resources in ways not previously available to them" and "give managers flexibility to identify lands where a particular resource might be emphasized in order to encourage sustained health and balance across a broader ecosystem or landscape."  *See, generally*, HLI Factsheet at: http://www.blm.gov/pgdata/etc/medialib/blm/wo/Communications_Directorate/public_affairs/healthy_lands_initiative.Par.80058.File.dat/HLI-National_FY09.pdf .  Implementation of the management approach described above will further support efforts to address habitat fragmentation and climate change, as discussed in later sections of these scoping comments.

**Recommendations**:  The Uncompahgre RMP should adopt planning and decision-making processes (including data collection, analysis, and monitoring) that employ measurable planning objectives at multiple biological scales (i.e. fish and wildlife populations, habitat and ecosystem conditions) to ensure viable wildlife populations. This recommendation is strongly echoed by the Western Governors' Association's *Wildlife Corridor Initiative* (http://www.westgov.org/index.php?option=com_content&view=article&id=123&Itemid=68) and the Sportsmen for Responsible Energy Development's *Recommendations for Responsible Oil and Gas Development* (www.sportsmen4responsibleenergy.org ).

## 5.   Special Status Species/Plants

This section includes recommendations for managing special status species to best protect viable populations and habitats while still adequately managing the other resources in the Uncompahgre Field Office. BLM should manage threatened, endangered, and special status species so as to: 1) maintain healthy ecosystems and native biodiversity, 2) maintain and restore thriving populations of rare and imperiled species, and 3) meet BLM's obligations regarding special status species.

BLM_0077523

We ask that BLM make the conservation and preservation of rare and imperiled species, and the habitat and movement corridors necessary to sustain healthy populations of such species, an explicit goal of the revised RMP.  We ask that this goal be clearly reflected in the objectives and standards set forth by the new plan.  BLM should identify crucial habitat, including movement corridors, necessary to sustain healthy populations of all of the rare and imperiled species present in the Uncompahgre Field Office.  Additionally, crucial habitat for rare and imperiled species, and particularly biologically rich areas, should be protected through ACEC designations.  ACECs should be managed such that protection of rare and imperiled species and the ecosystems of which they are a part is emphasized above all other uses.  Activities that have the potential to negatively impact rare and imperiled species, or degrade ecosystem health, should not be allowed in ACECs.  In addition to protecting key habitat with ACEC designations, the RMP should avoid making habitat for rare and imperiled species available to activities, such as oil and gas development, off road vehicle use, and livestock grazing, that have the potential to negatively impact rare and imperiled species.  The new plan should also strive to apply minimization and mitigation measures that will clearly ensure that activities authorized on BLM lands through the plan will not contribute to declines of rare and imperiled species.

    a.   <u>ACEC Designation</u>

Both FLPMA and the BLM's ACEC Manual (1613) emphasize the BLM's important duty to designate <u>and protect</u> Areas of Critical Environmental Concern.  For example, FLPMA states:

> The Congress declares that it is the policy of the United States that - ...

> regulations and plans for the protection of public land areas of critical environmental concern be promptly developed...FLPMA Title I Sec.102(a) [43 USC 1701]

> The Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern. FLPMA Title II Sec. 201(a) [43 USC 1711]

> In the development and revision of land use plans, the Secretary shall - ...

> give priority to the designation and protection of areas of critical environmental concern....FLPMA Title II Sec. 202(c) [43 USC 1712]

Therefore, ACEC designation and protective management are supposed to be a high priority within the BLM's mission.  ACEC designation provides an important mechanism for the BLM to actively conserve and recover imperiled species so that the protections afforded by the Endangered Species Act and the designation of Critical Habitat are less necessary.  Choosing not to conserve ACECs may contribute to the need to list species under the Act, and is inconsistent with the BLM's special status species obligations.

    b.   <u>Special Status Species Management</u>

We anticipate that the recent changes to the BLM Manual weakening protections for special status species will be overturned by the Obama administration.  Therefore we encourage the Uncompahgre Field Office to ensure that it meets the obligations outlined in the special status species portion of the Manual as it appeared before it was weakened and note that these measures are still consistent with the direction of the manual as revised.  BLM Manual 6840.06.D set forth the policy for management of Sensitive species:

22

State Directors, usually in cooperation with state wildlife agencies, may designate sensitive species. By definition, the sensitive species designation includes species that could easily become endangered or extinct within a state. Therefore, if sensitive species are designated by a State Director, the protection provided by the policy for candidate species shall be used as the minimum level of protection.

Therefore, the BLM must provide Sensitive species with a minimum of candidate-level protection. Candidate species were to be managed as follows:

BLM shall carry out management, consistent with the principles of multiple use, for the conservation of candidate species and their habitats and shall ensure that actions authorized, funded, or carried out do not contribute to the need to list any of these species as threatened/endangered. Specifically, BLM shall:

Determine the distribution, abundance, reasons for the current status, and habitat needs for candidate species occurring on lands administered by BLM, and evaluate the significance of lands administered by BLM or actions in maintaining those species.

For those species where lands administered by BLM or actions have a significant effect on their status, manage the habitat to conserve the species by:

Including candidate species as priority species in land use plans.

Developing and implementing rangewide and/or site-specific management plans for candidate species that include specific habitat and population management objectives designed for recovery, as well as the management strategies necessary to meet those objectives.

Ensuring that BLM activities affecting the habitat of candidate species are carried out in a manner that is consistent with the objectives for those species.

Monitoring populations and habitats of candidate species to determine whether management objectives are being met.

Request technical assistance from FWS/NMFS, and any other qualified source, on any planned action that may contribute to the need to list a candidate species as threatened/endangered.  BLM Manual 6840.06.C

During the RMP revision, the BLM must take a hard look at whether it is meeting these obligations, and make any necessary changes to ensure that special status species are being adequately managed so that the agency is complying with the Manual.

The BLM has special duties toward special status species when conducting land use planning.  First, BLM must "[i]dentify watersheds that may need special protection from the standpoint of human health concerns, aquatic ecosystem health, or other public uses."  BLM Land Use Planning Handbook H-1601-1, Appendix C at 2.  For riparian areas within these watersheds, BLM must also identify desired width/depth ratios, streambank conditions, channel substrate conditions, and large woody material characteristics."  *Id*.  Second, BLM must "[d]esignate priority plant species and habitats, including Special Status Species and populations of plant species recognized as significant for at least one factor such as density, diversity, size, public interest, remnant character, or age." BLM Land Use Planning Handbook H-1601-1, Appendix C at 3. Finally, BLM must "[d]esignate priority species and habitats, including Special Status Species, and populations of fish or wildlife species recognized as significant for at least one factor

23

such as density, diversity, size, public interest, remnant character, or age." BLM Land Use Planning Handbook H-1601-1, Appendix C at 7.

BLM must also identify the measures necessary for protecting each of these priority areas and species:

For priority watersheds and riparian areas, "[i]dentify measures, including filing for water rights under state permit procedures, to ensure water availability for multiple use management and functioning, healthy riparian and upland systems." BLM Land Use Planning Handbook H-1601-1, Appendix C at 2.

For priority plant species and habitats, "[i]dentify the actions and areawide use restrictions needed to achieve desired vegetative conditions." BLM Land Use Planning Handbook H-1601-1, Appendix C at 3.

For priority populations, species, or habitats of fish and wildlife, "[i]dentify actions and areawide use restrictions needed to achieve desired population and habitat conditions while maintaining a thriving natural ecological balance and multiple-use relationships." BLM Land Use Planning Handbook H-1601-1, Appendix C at 7.

Also, BLM must "[i]dentify site-specific actions, such as riparian fencing, guzzler placement, etc., needed to manage ecosystems for all species and habitat for special status species." BLM Land Use Planning Handbook H-1601-1, Appendix C at 7.

Additionally, BLM must:

Identify strategies and decisions to conserve and recover special status species. Given the legal mandate to conserve threatened or endangered species and BLM's policy to conserve all Special Status Species, land use planning strategies and decision should result in a reasonable conservation strategy for these species. Land use plan decisions should be clear and sufficiently detailed to enhance habitat or prevent avoidable loss of habitat pending the development and implementation of implementation-level plans. This may include identifying stipulations or criteria that would be applied to implementation actions. Land use plan decisions should be consistent with BLM's mandate to recover listed species and should be consistent with objectives and recommended actions in approved recovery plans, conservation agreements and strategies, MOUs, and applicable biological opinions for threatened and endangered species.

BLM Land Use Planning Handbook H-1601-1, Appendix C at 5. The BLM Manual's definition of a "Conservation Strategy" states:

A strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threat. Conservation strategies are generally developed for species of plants and animals that are designated as BLM Sensitive species or that have been determined by the Fish and Wildlife Service or National Marine Fisheries Service to be Federal candidates under the Endangered Species Act.

BLM Manual § 1601, Glossary at 2.

**BLM must manage oil and gas development in a way that retains special status species and moves them toward recovery.**

As we have noted in our citations of FLPMA and the BLM Manual above, the BLM has a mandate to conserve imperiled species. The agency cannot prioritize oil and gas drilling or recreation at the expense

24

of meeting its duties toward special status species.  This includes all aspects of oil and gas development and off-road vehicle use – the BLM must ensure that its authorized activities do not compromise air quality, water quality, opportunities for solitude, plant and wildlife habitat, cultural resources, soil crusts, or any of the other resources that the agency must conserve under its multiple use mandate. The RMP must provide a blueprint for how the BLM will ensure that oil and gas development (all phases, including leasing, exploration, infrastructure construction, drilling, and reclamation) and travel management will be made compatible with the other aspects of its mission.  In some cases, this may mean disallowing development activity or motorized vehicle use altogether.

**The RMP revision must address noxious weeds and propose mitigation strategies.**
Noxious weeds are a real threat throughout the West, and this is especially true in areas that may become infested with cheatgrass, and in places where soils are actively being disturbed.  The BLM must limit surface disturbance whenever possible and implement Integrated Pest Management strategies in conjunction with all surface-disturbing activities in order to contain noxious weeds.  The agency must monitor the efficacy of noxious weed containment after surface disturbance, and use the results of the monitoring to both provide realistic analyses of the effects of disturbance in planning for future projects, and to design projects that are more resistant to noxious weed proliferation.  RMP revision should seriously address this threat.

**The BLM must have a proven track record of successful reclamation before considering disturbances to be "temporary."**
The BLM has shown interest lately in phased or rolling development, but this framework assumes that managers are able to successfully reclaim areas that have been disturbed.  We consider successful reclamation to consist of a return to baseline conditions, which would mean a return to the pre-disturbance vegetative composition and structure, retention of the original soil type, and recolonization by the animals that used an area prior to disturbance.  We remain concerned that these results may be very difficult to achieve here in the arid West, where lack of precipitation and an abundance of invasive species may prevent even the best management practices or Conditions of Approval from being effective.  Before the BLM adopts this approach, or even uses it to calculate acres of "temporary" versus "permanent" disturbance, it should be able to point to a proven track record of mature, successful reclamation projects demonstrating that this is possible and that the BLM has the ability (including funding) to make this an outcome with a reasonable expectation of being fulfilled.  RMP revision should clearly state reclamation standards including necessary monitoring, and should define success in an ecologically sound way.

**Dust abatement is a growing concern on BLM lands.**
With the explosion of surface-disturbing activities on BLM lands in Colorado, we are increasingly concerned about indirect effects, including dust deposition.  Dust may harm rare species and/or their pollinators, or facilitate the establishment of nonnatives.  The RMP should thoroughly address dust abatement requirements, and BLM should actively monitor dust deposition associated with surface disturbance as well as the effects on imperiled species, pollinators, and noxious weed proliferation.

**The BLM should consider input from regional conservation plans.**
Several regional conservation plans have been developed which include this field office.  The BLM should consult the following sources during the RMP revision:

Southern Rockies Ecosystem Project's Southern Rockies Wildland Network Design
The Nature Conservancy's Colorado Plateau Ecoregional Plan

25

The Nature Conservancy's Southern Rocky Mountains Ecoregional Plan
Heart of the West Conservation Plan

Roadless areas, Citizens' Proposed Wilderness, wildlife corridors identified by Southern Rockies Ecosystem Project, and Colorado Natural Heritage Program Networks of Conservation Areas not mentioned above are also important resources that the BLM should consider in this round of planning.

**The BLM should retain existing ACECs and consider strengthening the protective management attached to them.**
BLM should carefully review existing management of ACECs, ensure that the agency is meeting its obligations under the BLM Manual, and strengthen protections in these areas if necessary.  Again, ACEC protection is one of the main tools at the BLM's disposal to conserve imperiled species, and the agency must take this responsibility seriously.

c.  Rare Plant Habitat

The BLM is a partner of the Center for Native Ecosystems in the Colorado Rare Plant Initiative, which recently finalized a set of best management practices for oil and gas drilling in rare plant habitat. Those BMPs can be accessed at http://conserveonline.org/workspaces/corareplantinitiative/documents/recommended-best-management-practices-for-plants/view.html. We also encourage the BLM to adopt the following prescriptions in ACECs designated because of their rare plant values, and to consider applying these in other rare plant habitats as well:

Fluid-Mineral Development (including but not limited to oil and gas development):
- Make all areas that have not yet been leased throughout the entire ACEC unavailable for fluid mineral leasing, or apply No Surface Occupancy (NSO) stipulations to all such areas, with no opportunity for modification, waiver, or exception under any circumstances.
- Make all existing fluid-mineral leases within the ACEC unavailable for future leasing following expiration; or, when existing fluid-mineral leases expire, apply NSO stipulations (with no opportunity for modification, waiver, or exception under any circumstances) prior to reissue of such leases.
- Apply right-of-way exclusion throughout the entire ACEC.
- Consider buying back existing fluid-mineral leases within the ACEC.

Site Inventories:
- When surface disturbing projects are proposed within the ACEC, site specific inventories should be conducted prior to NEPA analysis, and prior to initiation of any project activities.
- These site-specific surveys should be required in any known or potential habitats, and must take place when the plants can be detected, for example, during the flowering period.
- Surveys should document both individual plant locations and suitable habitat distributions.
- All surveys should be conducted by qualified individuals.
- Survey data should also be reported to the Colorado Natural Heritage Program.

BLM_0077528

Monitoring:
- Surface disturbing activities should be monitored throughout the duration of the project, and measures designed to minimize impacts should be evaluated to ensure that desired results are being achieved.

Project design:
- Establish a buffer of a minimum of 300 feet between individuals or groups of rare plants/lichens and any ground disturbing activities.
- Translocation of rare plants/lichens shall not be used as a substitute for avoidance.
- Construction should occur down slope of rare plants/lichens, and all project activities should be designed to avoid concentrating water flows or sediments into rare plant/lichen occupied habitat.
- Visibly identify areas that are to be avoided during and post-construction with temporary fencing and flagging
- For surface pipelines use a 300 foot buffer from any rare plant/lichens locations.  If on a slope, use stabilizing construction techniques to ensure the pipelines don't move toward the population.
- Ensure that water extraction or disposal practices do not result in change of surface or subsurface hydrologic regime.
- Limit disturbances to and within suitable habitat by staying on designated routes
- Limit new access routes created by the project, minimize the length and environmental impact of new roads constructed to service well locations, and utilize existing roads to the maximum degree possible.
- Place signing to limit motorized travel in sensitive areas.
- Require implementation of dust abatement practices near occupied rare plant/lichen habitat.
- For interim reclamation, either require that all disturbed areas be revegetated with native species comprised of species indigenous to the area (ideally from local genetic stock), or if there are major problems with preventing establishment of noxious weeds, require that disturbed areas be revegetated with either sterile F1 hybrids or with locally appropriate early successional native species capable of outcompeting weeds while also seeding for indigenous natives at the same time.
- For final reclamation, require that the area be revegetated with native species indigenous to the area and that vegetative structure, species composition, and percent cover have returned to baseline conditions (or improved, for sites in poor condition to begin with).
- Require post construction monitoring for invasive species, and specific measures for the control of noxious weeds.  Enforce these measures through use of fines and suspension of activities when failure to control noxious weeds is documented.
- Require use of directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in rare plant/lichen habitat.  Ensure that such directional drilling does not intercept or degrade alluvial aquifers.

27

- Restrict the total area of each pad to the least amount of acreage required to drill the wells planned for that pad.
- Close and reclaim roads as soon as they are no longer needed, and gate them to prevent unauthorized use.
- Use busing or van transportation of crews and remote monitoring of wells to minimize truck traffic and associated dust.
- Identify rare plant pollinators, and develop mitigation and minimization measures that provide adequate protection to pollinator species.
- Conduct routine site visits for permit compliance, set timelines for fixing permit violations, and issue fines for not meeting requirements.
- In addition to requiring the above as conditions of approval for APDs, ask operators to undertake any additional voluntary measures that would further minimize or mitigate the negative impacts of their activities on rare plant populations and the ecological integrity of the ACEC.

Other ground-disturbing activities:
- Apply a No Ground Disturbance restriction to the entire ACEC with specific authorization for an exception only for management activities that are necessary to conserve the ecological integrity of the ACEC and that further conservation goals for the values for which the ACEC was designated.  For example, an exception could be made for construction of fencing/exclosures when needed to further rare plant conservation goals.
- Designate the entire ACEC as a right-of-way Exclusion Area.

Non-fluid mineral development:
- Withdraw the ACEC from mineral entry.
- Apply the No Ground Disturbance restriction discussed above to existing non-fluid mineral leases.

Travel management:
- Limit use of roads to designated routes.
- Close routes that affect important habitat for these rare plants/lichens in order to limit dust, invasion of habitat by noxious weeds, and illegal off-road vehicle (ORV) use.
- Close the entire ACEC to ORV use.

Non-motorized recreation:
- Encourage those engaging in non-motorized recreation to use designated roads and trails, and to avoid important habitat for these rare plants.
- Prohibit overnight camping and campfires within 300 feet of rare plant/lichen populations.

Grazing:
- Retire grazing allotments within the ACEC whenever possible
- Prohibit treatments designed to increase forage for livestock, including seeding and irrigation.
- If trampling by livestock is identified as a concern where grazing allotments exist, create cattle exclosures around rare plant/lichen populations, and include a 300 foot buffer within the exclosure to minimize indirect effects of grazing on rare plant populations.

28

- Manage livestock grazing within occupied or potential habitat for rare plants/lichens to promote plant health, maintain sufficient residual vegetation, minimize potential for trampling, minimize potential for invasion of non-native plant species, and sustain overall watershed functions.

Lands and realty:
- Work towards acquisition of private inholdings.
- Apply right-of-way exclusion to entire ACEC.
- Establish memorandums of understanding with willing landowners to encourage private land management actions that enhance protection of ACEC values on and adjacent to private inholdings (*e.g.*, control of noxious weeds).

Management of noxious weeds:
- Promote natural processes and healthy native plant/lichen communities to deter noxious weeds.
- Minimize fragmentation of habitat and associated risk of invasion by noxious weeds and other aggressive non-native species.
- Develop an integrated weed management program that emphasizes prevention, inventory, detection and monitoring, and includes control techniques (*e.g.*, mechanical and hand-applied herbicides) that will not damage rare plant/lichen species, or other non-target species.
- Where practicable, eliminate any existing human-caused disturbance that is contributing to the spread of noxious weeds.
- Continue and expand public education.

Other:
- Prohibit collection of plants, plant materials and seeds, except for scientific or research purposes.  Such collection must have no detrimental impact on long-term survival and reproduction of rare species or significant communities.
- Where practicable, restore to a naturally functioning state any existing human-caused disturbance that is impairing natural ecosystem processes affecting habitat for rare plant species or significant plant communities.
- Cooperate with the Colorado Natural Heritage Program to develop and carry out a plan to inventory and monitor plant/lichen species, unique natural communities, and to monitor the overall ecological integrity of the ACEC.
- Cooperate with the Colorado Natural Heritage Program and other entities to allow for and facilitate additional research on rare and imperiled species and unique natural communties.
- If monitoring identifies new threats or suggests that the management recommended above is not adequately protecting rare plant/lichen populations and/or unique natural communities from significant negative impacts (including indirect or cumulative impacts), take appropriate action to prevent such negative impacts.

   d.   Rare and Imperiled Species and Watchable Wildlife in the Planning Area

The Center for Native Ecosystems is submitting detailed comments regarding rare and imperiled species, big game and watchable wildlife in the Uncompahgre planning area that would benefit from ACEC designations and/or special management. We herein reference and support those comments.

BLM_0077531

## 6. Travel Management

Travel management decisions should be made in the RMP.

BLM's internal guidance states that "each RMP will divide planning areas into OHV area designations that are open, limited or closed." IM No. 2004-005; *see also* 43 C.F.R. § 8342.2(b). This internal guidance was also incorporated into the updated version of BLM's *Land Use Planning Handbook*. H-1601, Appendix C, Section II.D (Comprehensive Trails and Travel Management). The *Land Use Planning Handbook* states that BLM should:

> Complete a defined travel management network (system of areas, roads and/or trails) during the development of the land use plan, to the extent practical. If it is not practical to define or delineate the travel management network during the land use planning process, a preliminary network must be identified and a process established to select a final travel management network. (emphasis added)

Furthermore, Colorado IM No. CO-2007-020 directs Colorado BLM Field Offices to complete comprehensive travel management plans as part of the RMP process:

> Nationally, BLM is moving towards a system of limiting use to designated roads, primitive roads and trails/areas and not encouraging extensive cross-country travel by motorized and mechanized vehicles. Current planning guidance (H-1601-1, Land Use Planning Handbook – Appendix C, Section D, attachment 2) requires identifying a defined travel management network system of areas, roads, primitive roads and trails, in all Land Use Plans. It is our expectation that each RMP Record of Decision will include a system of designated routes for those areas in the limited category.

The *Land Use Planning Handbook* (Appendix C, Section II.D) also sets out requirements for travel management at both the land use and implementation planning levels:

- At the land use plan level, BLM must identify areas for use based on program goals and objectives, primary users, reason for "allowing travel" into an area, setting character to be maintained (including Visual Resource Management and Recreation Opportunity Spectrum classifications), and primary means of travel appropriate to meet objectives and keep setting character; and
- At the implementation level, BLM must define a detailed travel management network, "establish a process" to identify roads, trails, etc. with criteria for selections, guidelines for management, monitoring and maintenance, and indicators for future plan maintenance.

We understand that BLM is not planning to complete comprehensive travel management planning as part of the Uncompahgre RMP revision. We also note that the Dry Creek area has a travel plan in place, and the Field Office-wide travel plan for the remainder of the field office is in progress. In this context, we would like to provide comments for travel planning to be incorporated in the RMP, as well as comments for the future comprehensive travel plan.

BLM_0077532

The Land Use Planning Handbook provides guidelines for addressing travel planning in the RMP even if comprehensive travel planning is deferred. Appendix C, pp 18-19 states:

> If the final travel management network is to be deferred in the RMP, then the RMP should document the decision-making process used to develop the initial network, provide the basis for future management decisions, and help set guidelines for making road and trail network adjustments throughout the life of the plan. The identification of the uncompleted travel management networks should be delineated in the land use plan and the following tasks completed for each area:
> 1) Produce a map of a preliminary road and trail network;
> 2) define short-term management guidance for road and trail access and activities in areas or sub-areas not completed;
> 3) outline additional data needs, and a strategy to collect needed information;
> 4) provide a clear planning sequence, including public collaboration, criteria and constraints for subsequent road and trail selection and identification;
> 5) provide a schedule to complete the area or sub-area road and trail selection process; and
> 6) identify any easements and rights-of-ways (to be issued to the BLM or others) needed to maintain the preliminary or existing road and trail network.
> If the decision on delineating travel management networks is deferred in the land use plan to the implementation phase, the work normally should be completed within 5 years of the signing of the ROD for the RMP.

Colorado IM 2007-020 further instructs that:
> "Limited to existing roads, primitive roads and trails" designations should be used only as an interim measure prior to your next scheduled RMP revision. Where the Field Offices choose an **interim** designation of "limited to existing roads, primitive roads and trails", a map showing the existing travel and transportation network is required.
> - An inventory and map of roads, primitive roads and trails is necessary to assess and evaluate the need for individual routes as part of the travel and transportation network.
> - Without baseline inventory the Field Offices will not be able to confirm and document when new routes have been created or adequately monitor resource conditions. Baseline inventory maps are essential to effectively respond to the issue of user created route proliferation.
> - Inventory and baseline data is needed to provide supporting rationale to justify management actions such as closures and rehabilitation of routes created after the interim designation is made.
> - The BLM needs to provide the public clear and consistent information regarding access opportunities and provide a map showing the location of existing roads, primitive roads and trails that are available for public use and access.

The Uncompahgre RMP must set out the process that will be used to complete a comprehensive field office-wide travel management plan. The RMP should also provide a baseline route inventory and use that data to institute road closures that cannot wait until the full travel plan is completed. The RMP should also set travel management prescriptions for special management areas, such as lands with wilderness characteristics and ACECs.

31

The Little Snake Field Office did not complete comprehensive travel planning as part of its recent RMP revision; however, the RMP (available online at http://www.co.blm.gov/lsra/rmp/index.htm) identified priorities for sub-regions to receive comprehensive travel management planning, which can also be useful for guiding implementation. Appendix F of the Little Snake Draft RMP (attached) sets out criteria for prioritizing areas to receive comprehensive travel management planning, including:

- Special management areas
- Areas identified as "limited to designated roads and trails"
- Areas that meet fragile soil criteria
- User and resource conflicts
- Excessive complaints
- Wildlife/wild horse population trends
- Evidence of trail/road proliferation
- Areas with high road densities
- Impacts on cultural resources
- Unacceptable erosion
- Degradation of water quality
- Impacts on visual resources
- Loss of trail integrity
- Habitat fragmentation and damage
- Impacts on sensitive plants
- Need to provide a variety of user experiences

We encourage the Uncompahgre RMP to prioritize areas in this manner. One additional type of sub-region that should be prioritized for travel planning is areas with low road densities that have the potential to be managed as primitive, backcountry, nonmotorized wildlife or quiet use areas. The RMP should identify **specific** areas that will be prioritized for travel planning and establish time commitments for completing each specific area, in addition to the 5-year deadline for completing travel planning for the entire field office.

Travel and recreation planning are inextricably linked, and recreation planning decisions affect travel planning (and vice versa). The comprehensive travel plan for the Uncompahgre Field Office must be coordinated with recreation planning efforts in this RMP.

***Recommendations***:  The Uncompahgre RMP should establish the methodology for comprehensive travel planning, establish interim travel management, and identify priorities for completing travel management planning. Special management areas, such as ACECs, special recreation management areas and citizen-proposed wilderness, will include travel designations within their boundaries. The RMP must identify not only areas for use, but also reasons for permitting travel into an area and appropriate criteria for determining routes that will be made available for different uses, taking into account such factors as undeveloped recreation opportunities available and natural settings.

2. Landscape level planning.

Travel planning requires the agency to manage human travel across the landscape.  The land use planning process, which addresses the broader landscape within a planning area, provides one of the best opportunities to make travel planning decisions in the appropriate context.  While we understand that BLM does not have authority to close or relocate highways, major roads, or County roads, BLM must include these routes when analyzing the transportation network as they have a great impact on

32

habitat fragmentation and reduction in core area size (discussed in length later in these comments and in Appendix 1). The placement and design of travel routes defines which areas will remain or become roadless, and which areas will be disturbed and how. In other words, route decisions determine the fragmentation of the landscape, and, thus, how naturally or unnaturally a landscape will behave in terms of water flow and quality, wildlife migration, and species composition and function.

NEPA requires federal agencies to assess the direct, indirect and cumulative environmental impacts of proposed actions, taking a "hard look" at environmental consequences and performing an analysis commensurate with the scale of the action at issue. 42 U.S.C. § 4321 et seq; 40 C.F.R. § 1508.8; see also Metcalf v. Daley, 214 F.3d 1135, 1151 (9th Cir. 2000); Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348 (1989). Travel planning affects the entire landscape and can only be thoroughly and properly assessed by considering potential impacts and making decisions at a comparable level. In terms of how to evaluate the potential impacts of travel management decisions, NEPA's definition of "cumulative impact" is instructive:

> the impact on the environment which results from the incremental impact of the action **when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions**. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. (emphasis added). BLM must account for the direct, indirect, and cumulative impacts of all roads in the Uncompahgre Field Office when completing a comprehensive travel management plan.

**_Recommendation_**: BLM should address travel management on a landscape-wide basis by addressing the impacts of all roads in the planning area and accounting for the landscape-wide impacts of these roads.

3. Mapping of routes.

As part of comprehensive travel management planning, we anticipate that BLM will produce route maps to illustrate a base travel network, to generate various route designation proposals, and for purposes of receiving public comments. In these contexts, it is vital that the agency clearly mark on all maps or proposed maps areas with existing restrictions on motorized use, such as: wilderness areas, WSAs, primitive non-motorized designations, Wild and Scenic Rivers, and ACECs. Depicting existing restrictions will ensure that public comments are informed by the knowledge that additional routes will not be permitted in certain areas. Further, maps should indicate resources that could be affected by motorized use, such as wilderness characteristics and wildlife habitat. Public comments will then be informed by the potential resource conflicts and the best opportunities for designating areas for non-motorized recreation.

Route maps should also distinguish user-created routes from roads that were created and are maintained by the BLM to serve planned transportation needs. Also, user-created routes in areas that have motorized restrictions should only be shown as closed and/or for prioritizing restoration. To be added to the transportation system, user-created routes must go through NEPA analysis to ensure they are not damaging resources and comply with BLM regulations, such as the minimization criteria for ORV use discussed in these comments.

33

In addition, as part of designating routes, BLM should use consistent definitions of roads, primitive roads, and trails. IM 2006-173 ("Implementation of Roads and Trails Terminology Report"), sets out and defines these terms, and includes a definition of a road as:

> A linear route declared a road by the owner, managed for use by low-clearance vehicles having four or more wheels, and maintained for regular and continuous use.

It is important that BLM use these terms to distinguish both the types of routes and the appropriate types of motorized use.

**_Recommendations_**:  BLM should identify both existing restrictions on motorized access and other areas that can be damaged by motorized use on all maps used in travel planning. User-created routes should be distinguished from legitimate roads on travel planning maps, and, where they were created illegally, should be excluded from the baseline inventory.


4.  Habitat fragmentation.

As mentioned in the beginning of this section of our comments, BLM must address travel management on a landscape level to ensure that BLM meets its responsibility as stewards of the public land and mitigates against habitat fragmentation.  We have included The Wilderness Society's recent Science and Policy Brief, "Habitat Fragmentation from Roads:  Travel Planning Methods to Safeguard BLM Lands" (Appendix 1).  Also included in Appendix 1 are four scientific reports prepared by TWS and discussed in the habitat fragmentation report.  These include _Fragmenting Our Lands:  The Ecological Footprint from Oil and Gas Development, Protecting Northern Arizona's National Monuments: The Challenge of Transportation Management, Wildlife at a Crossroads:  Energy Development in Western Wyoming,_ and _Ecological Effects of a Transportation Network on Wildlife._  In addition to summarizing the four reports included, "Habitat Fragmentation from Roads:  Travel Planning Methods to Safeguard BLM Lands" provides a summary of available scholarly and government reports and studies on the impact of habitat fragmentation on wildlife, provides methods for calculating habitat fragmentation, and provides recommendations on how to integrate fragmentation analysis into travel management.

We also recommend you look at the travel planning criteria set out in the Record of Decision for the Dillon (MT) RMP (relevant sections attached and also available on-line at: http://www.mt.blm.gov/dfo/rod/contents.htm), as an example of criteria that incorporate key aspects of BLM's ORV regulations as well as ecological metrics.  This field office did not complete a comprehensive travel management plan as part of its RMP revision; however, it included road density targets and included an appendix outlining the principles it will use when completing a comprehensive travel management plan during implementation. The Uncompahgre Field Office should adopt a similar approach.

**_Recommendation_**:  BLM should use the information provided in Appendix 1 to measure habitat fragmentation, conduct a thorough fragmentation analysis, and inform decisions regarding road closure and other limitations on use in the Uncompahgre RMP. Specific fragmentation analysis can be done as part of the future comprehensive travel plan; route density targets and roads in need of immediate closure should be addressed in the RMP.

34

5. <u>Principles of travel management.</u>

When completing a comprehensive travel management plan, it is vital to complete it in a systematic and transparent manner.

***<u>Key principles of travel planning</u>***

(1) Travel management is part of land use planning and should address both recreation and transportation needs from a landscape perspective; therefore, travel planning must be coordinated with recreation management planning.

(2) Prior to conducting an inventory or designation of routes, BLM should assess the present resources, requirements for protection, and which uses for recreation and development are compatible with these resources, requirements and other users.

(3) BLM should use a legal definition of "road" when designating routes.

(4) BLM's consideration of ORV use should take into account its potential damage to resources and other uses, including exclusion of other users.

(5) Where BLM presents a baseline travel system, it must present route maps in a responsible manner that does not legitimize or misrepresent the official status of the existing network of unauthorized ways/routes routes.

(6) BLM should include a detailed closure and restoration schedule in the plan.

(7) BLM should include and implement a monitoring plan.

(8) BLM should include and implement education and outreach in the plan.

Furthermore, Colorado IM No. CO-2007-020 instructs Field Offices to select roads and trails based on comprehensive travel management goals:

> Design a travel system with RMP and transportation network goals in mind rather than just choosing from inherited roads, primitive roads and trails. Instead of a decision-making process to only decide which individual routes should be closed or left open, design a travel system with a desired goal of sustainable routes that meet patrons' needs (i.e. loops) and varying levels of difficulty. Also, consider a broader range of management options that include reroutes, reconstruction or new construction, as well as closures.

The RMP revision and future comprehensive travel plan provide opportunities for BLM to evaluate its travel system goals and whether the current system of roads and trails is furthering or hampering these goals. BLM should create a travel network that best serves the many resources which the agency is tasked with managing and does not inadvertently do a disservice to any other resource or public land visitor.

The Wilderness Society and the Colorado Mountain Club have developed a template for conducting travel management planning, including a detailed discussion of these key principles of travel planning, which we have attached and recommend that the BLM incorporate into the RMP as the process for future travel planning.

35

BLM_0077537

**Recommendations**:  BLM should follow the eight travel planning principles detailed above to ensure that only routes which truly serve a valid purpose for the public remain open. BLM should also create comprehensive travel and recreation management goals and designate routes accordingly.

## 7.  Recreation and Special Recreation Management Areas

Using the language of Benefits Based Management, which emphasizes user "experience" rather than recreation "activity" or "resources," we would like to identify ourselves as representing a range of Quiet Use organizations whose hundreds of thousands of members are passionate about preserving traditional forms of recreation such as hiking, backpacking, non-motorized hunting, angling, horseback riding, and birdwatching.

On BLM lands we and our members want to experience naturalness, quiet natural soundscapes, undeveloped scenery, an undisturbed natural landscape, the timelessness and geological sweep of the BLMs remote and rugged landscapes, a low level of facilities and management presence, and opportunities for uncrowded and solitary experiences. We want to be able to recreate in primitive, undeveloped, natural appearing settings. The experiences we are looking for are closeness to nature, a contemplative relationship with the natural world, savoring the total sensory experience of a natural landscape, escape from crowds, quieting our minds by escaping urban traffic and crowding, and a sense of humanity's place in the larger universe, as well as improved outdoor knowledge, independence, self-reliance and a sense of adventure.

We and our members are whole-hearted participants in these types of experiences with a keen interest in preserving for future generations these time-honored traditional experiences of the outdoors.

a.  Preservation, creation and enhancement of opportunities for quiet recreation.

The recreation resource on public lands is becoming increasingly valuable: more people want to recreate on a finite amount of public land.  As mentioned above, the vast majority of recreationists and other public land visitors desire solitude, clean air, clean water, vast undeveloped landscapes, and a place to witness healthy natural systems thriving with native plants and wildlife. The Uncompahgre Resource Area can provide a wealth of these types of experiences, encompassing many natural and scenic landscapes. The RMP should accommodate those desires as they are consistent with BLM Colorado's strategy for recreation management and the national BLM publication "Priorities & Goals for Recreation & Visitor Services."

**FLPMA and Off-Road Vehicle (ORV) Regulations Applicable to Noise**: As discussed above, FLPMA requires the BLM to manage the multiple uses and resources of the public lands, which include fish and wildlife, watersheds, scenic values, recreation opportunities, scientific and historic values, and other natural values, such as wilderness characteristics. FLPMA also provides for the agency to do so by excluding or limiting certain uses of these lands.  BLM's regulations relating to management of off-road vehicles, similarly acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, *taking into account noise and other factors*."  43 C.F.R. § 8342.1 (emphasis added). Providing a "quiet" recreation experience, as also discussed in reference to opportunities for primitive, unconfined recreation and for solitude provided by lands with wilderness characteristics, also requires

36

thoughtful management to provide for a quiet soundscape.  Much research exists on the importance of natural sound to public land visitors. Noise impacts on the recreational experience have become a looming issue in today's noisy urban world.  A recent study by the National Park Service showed that 91% of park visitors consider enjoyment of natural quiet and the sounds of nature as compelling reasons for visiting National Parks (McDonald, Baumgartner, and Ichan 1995).**We recommend the UFO conduct a soundscape analysis to guide formulation of intended user experiences**, for example by analyzing how canyon topography and vegetation might reflect or propagate vehicular sound and how that might affect quiet users, neighboring homeowners and wildlife habitat effectiveness. We ask that the alternatives specifically compare impacts of, and the potential for the increase of ORV noise on natural sound and other resources, consistent with the BLM's regulations. We have included a more detailed discussion on soundscape management later in these comments.

The BLM's ORV regulations also provide for protection of other values that are critical parts of not only a healthy ecosystem on BLM lands, but also of enjoying quiet recreation activities, such as hunting, photography and bird-watching, requiring that management minimize "damage to soil, watershed, vegetation, air, or other resources of the public lands" and harassment of wildlife or disruption of habitat; and to prevent impairment of wilderness suitability or adverse affects on natural areas. 43 C.F.R. § 8342.1.  Landscape level planning, including through use of the travel planning template attached to these comments and assessing road density, as described in more detail above, is another important tool for ensuring that quiet recreation opportunities are preserved.

**National Visitor Use Monitoring Program:** The Moab Field Office completed a National Visitor Use Monitoring Program (NVUM) as a pilot project for visitor use monitoring on BLM lands. The NVUM for the Moab Field Office was developed through an interagency agreement with the Forest Service to be useful, in part, for making decisions during the planning process.  BLM's website on the program explains the NVUM's relevance and applicability:

> Such visitor monitoring information enables BLM to incorporate statistically valid visitor use monitoring information into planning and management decisions as well as long-term monitoring assessment.  The FS NVUM system provides BLM with accurate data with high confidence levels for reporting to Congress and constituents, thereby building credibility and establishing legal protection in decision-making.

BLM, Visitor Use Surveys & Research, http://www.blm.gov/wo/st/en/prog/Recreation/national_recreation/visitor_use_surveys.html.

The information provided from the NVUM shows that motorized use is a small portion of recreation activity on public lands in the Moab Field Office. The NVUM states: "In terms of total participation, the top five recreation activities of the visits to the Moab Field Office were viewing natural features, hiking/walking/trail running, relaxing (hanging out, escaping heat and noise), viewing wildlife and driving for pleasure (Table 16)."

**The Uncompahgre Field Office should conduct a similar survey in preparation of the RMP**. If the UFO also finds that quiet-use recreation is the most prevalent type of activity on public lands within the field office, it should ensure the RMP reflects that finding and adequately accommodates quiet users.

**Colorado BLM Instruction Memorandum CO-2007-020**:  This guidance acknowledges the importance of comprehensive recreation and ORV management to "facilitate attainment of management objectives

37

BLM_0077539

and maintain prescribed setting character—which is also essential to achieving Benefits-Based Management objectives."  The IM also restates BLM's commitment to generally limiting motorized use to designated roads and trails, such that "open areas will be limited to a size that can be realistically managed and geographically identifiable" and "expansive open areas allowing cross-country travel, without a corresponding and identified user need/demand, will not be designated in RMP revisions."

Further, the guidance provides for designating routes to dispersed camping and day use sites and limiting use of motorized vehicles to these routes, only providing for use off of these routes where "needed" and "appropriate," and then subject to specified distances and time periods; in this context the IM refers to being "consistent with the policies of the United States Forest Service OHV Rule."  Since the Forest Service has been updating its guidance, we wanted to clarify the manner in which dispersed camping should be handled to be both consistent with this policy and with BLM's other goals for management of the public lands in the Uncompahgre Field Office.  The Forest Service Travel Management Rule (36 C.F.R. § 212.51(b)) provides, in relevant part:

> The responsible official may include in the designation the limited use of motor vehicles within a specified distance of certain designated routes *solely for the purposes* of dispersed camping or big game retrieval. Such designations represent *site-specific decisions* associated with specific roads and trails or road or trail segments, rather than a blanket exception to the rule. Designations under 36 CFR 212.51(b) will be applied sparingly to avoid undermining the purposes of the rule and to promote consistency in implementation.  (emphasis added).

The Forest Service Travel Management Directives, proposed March 9, 2007, and finalized December 8, 2008, reinforces that the allowance for dispersed camping is a designation of motorized use, as opposed to a blanket exception to designation of motorized use.  FSM 7715.64 provides, in relevant part:

> 2. [This authority] should be used sparingly to avoid undermining the purposes of the travel management rule and to promote consistency in its implementation.
> . . . .
> 4. Responsible officials should consider providing designating [sic] routes to dispersed camping sites as an alternative to authorizing off-route use...

Accordingly, as stated in the rule and directives, any dispersed camping allowance must be treated as a specific designation and consistent with other travel planning regulation and guidance, which is also consistent with the provisions of Colorado IM CO-2007-020.  The Southern Rockies Conservation Alliance recommendations on application of the Forest Service approach are similarly applicable here:

BLM should allow visitors to disperse camp generally, but restrict motor vehicle travel *for the purposes of dispersed camping* according to a combination of the following options, as dictated by resource, safety, and private property concerns:

> a) Forest visitors may park a motor vehicle within one vehicle length from the edge of the road surface when it is safe to do so and without causing damage to the resources of the public lands (campers walk to access a backcountry camp of their choosing), and/or
> b) Motor vehicles may access signed campsites via designated camp spur routes that are signed and demarcated on a travel management map.

BLM_0077540

In certain places or certain times, the BLM may need to restrict dispersed camping altogether.  These provisions should be incorporated in the Uncompahgre RMP.

We recognize that the Uncompahgre Field Office has recently become a leader on this issue and we commend the UFO for the dispersed camping policy established in 2009 in the Dry Creek TMP.  The Dry Creek EA seemed to describe the situation clearly and due to this established a very strong and well supported policy. For example, page 184 of the EA stated:

> **Off-Route Parking, Camping, and Game Retrieval Policy**: For BLM Public Lands and National Forests the distance that OHVs are currently permitted to drive off existing or designated routes for parking, camping and game retrieval is 300 feet. This regulation applies generally to most BLM and Forest Service-managed lands, with the exception of developed recreation facilities and other areas of concentrated use where parking or camping is restricted to designated parking areas and camping spurs. Due to higher levels of public use on the Public Lands and National Forests, BLM and Forest Service managers are concerned that the long-standing 300 foot regulation is outdated and no longer provides adequate protection of vegetation and other resources. One of the major concerns with the 300 foot regulation is that new routes are often created through repeated use, and these new routes in turn become the starting points for additional 300-foot long or longer extensions. As a result of these concerns, both the Forest Service and BLM are revising their regulations to decrease or eliminate the distance that motor vehicles can legally drive off routes to park, camp, and retrieve game.)

The Dry Creek Record of Decision CO-150-2008-33 EA, Page 3, states:

> **Parking** *In order to minimize resource impacts and help prevent new user-created routes, users are allowed to park motorized or mechanized modes of travel immediately adjacent and parallel to available designated routes for any purpose. Parking is limited to one vehicle-width from the edge of the route. Users are encouraged to park motorized or mechanized modes of travel in already disturbed areas whenever possible, consider safety, and keep routes passable for other users.* **Camping** *Short spur routes leading to popular dispersed campsites are designated and identified. Dispersed camping is allowed in other areas, consistent with parking requirements described above.*

We fully support this policy and therefore request that this policy be carried over on the entire Uncompahgre Field Office in this RMP. The Dry Creek EA acknowledges the many impacts to resources associated with routes created for dispersed camping. The RMP should not ignore those impacts which BLM already found to be significant and lasting; the RMP should assess those impacts field office-wide and take comparable steps to mitigate them.

**Land Health Standards:**  Healthy lands are a critical part of recreation experience, and it is equally important that recreation not degrade the quality of the public lands, as acknowledged by FLPMA and the regulations discussed above. **We recommend that the recreation portion of the RMP take as one of its primary objectives to meet or exceed the 1996 Colorado BLM Land Health Standards (approved in February 1997 by the Secretary of Interior ) pertaining to "Upland Soils and Riparian Systems," "Healthy Plant and Animal Communities," "Special Status and Threatened and Endangered Species," and "Water Quality."** The Colorado BLM's Recreation  Management Guidelines, issued in December of 2000 by the Resource Advisory Councils of Colorado in partnership with the agency, commit to management of recreation "while at the same time minimizing and preventing adverse impacts to land

BLM_0077541

health, ecosystems, and cultural or natural resources" and specifically incorporate and attach the Land Health Standards.

**Colorado BLM Recreation and Visitors' Strategy**:  The 2007 Colorado BLM Recreation and Visitors' Strategy directs managers to consider impacts on "land health standards" (p. 4) and the need to "uphold our [BLM's] fundamental duty to meet or exceed land health standards" (p. 6).  This strategy also provides an approach that will maintain the open spaces on the lands managed by the Uncompahgre Field Office.  Many portions of Uncompahgre BLM lands, not just WSAs and proposed wilderness, fall into the more primitive category of BLM lands that are at particular risk for losing their naturalness. The 2007 Colorado BLM Recreation Strategy emphasizes the importance of maintaining the "distinctive character" and "wide open spaces" of Colorado BLM lands (p.3). The Strategy emphasizes the "need to maintain the distinctively undeveloped and open space character of its [BLM's] recreation settings" (p. 7).  **The BLM should commit to actively managing these lands to protect and enhance the primitive, backcountry experience**.

**Guidelines for Managing Access between BLM and Private Lands:**  Attached to these comments are guidelines that have been adopted by the Royal Gorge Field Office and endorsed by the BLM's Front Range Resource Advisory Council.  The guidelines provide generally that: "Other than for foot and horse uses, entry to public lands from private lands must comply with the designated transportation system and be limited to the same means of travel that the general public uses from public access points." These guidelines were developed to address a substantial increase in user-created motorized roads and trails leading from private lands onto the adjoining public lands that did not comply with federal management. **These guidelines should be incorporated into the Uncompahgre RMP.**

**Standards for Issuance of Special Recreation Permits**:  BLM should adopt unambiguous, protective criteria for issuance of special recreation permits (SRPs) in order to effectively manage the increase in commercial and competitive group activities that can have a significant impact on the lands in the Uncompahgre Field Office.  The BLM Handbook on Recreation Permit Administration (H-2930-1) clearly states that field offices can and should develop guidelines for issuing SRPs. The Handbook states: "Field Offices are encouraged to develop thresholds through land use planning for when permits are required for organized groups and events for specific types of recreation activities, land areas, or resource settings" H-2930-1 at 13. On the issue of Special Area Permits, the Handbook states: "Applications for Special Area Permits issued to individuals are processed according to the area-specific land use and/or business plan, or guidelines approved by the State Director." H-2930-1 at 17. The Uncompahgre Field Office therefore must provide clear guidelines for processing Special Area Permits, because in this situation the Handbook directs that permit issuance will tier to the RMP.[13]

The Price Field Office Draft RMP, Appendix 14, (attached to these comments) provides an excellent example for evaluating SRP applications and issuing such permits.  It classifies SRPs into four distinct classes, ranging from least intensive to most intensive, based on specific factors such as type of equipment, size of area used, number of participants, etc.  These factors are defined and then compared in a simple permit classification matrix consisting of Classes I through IV (with I being for smaller and less impacting events and IV being for larger, more impacting events).  Each Class also has an example of the type of event that may fit into the category. After the Class is determined, the BLM can then look to see

---

[13] Analysis of the impacts of permits on a cumulative basis is also best accomplished in the RMP, since it will provide for a more comprehensive, informed analysis that can look at both cumulative and site-specific environmental consequences, as required by NEPA.

how permit types fit into Recreation Opportunity Spectrum Classifications and/or Special Recreation Management Area (SRMA) or Extensive Recreation Management Area. Various SRMAs can be broken into classes and it is easy to see what types of uses and events should be permitted for each area. Because the standards set out in the Price Draft RMP are very specific (for example, surface disturbance of 5-40 acres ranks as "medium intensity"), BLM can easily determine whether to issue an SRP and where, and can better estimate cumulative impacts from such permits.  The Uncompahgre RMP should use the model provided by the Price Draft RMP for classification of SRPs to define which uses may be appropriate or inappropriate in specific areas.  BLM has not only the discretion to establish SRP guidelines, but also the obligation to do so in order to protect the resources that the RMP is intended to protect and sustain.

**Criteria for Addition of New Motorized Trails:**  In order to ensure that priority ORV management is addressed, the BLM should implement a prioritization hierarchy in which new construction is secondary to and incumbent upon successful restoration and prior achievement of other ORV related management goals. Management activities such as restoration and rehabilitation of existing impacts, signage and achieving compliance should take precedence over approving new motorized construction or adding motorized system trails that further increase the agency's management burden and might further retard other resource actions that are critical if not addressed first.

The goal of this priority hierarchy is to 1) take care of the resource impacts from past ORV related activities; 2) establish conditions to prevent new and/or reoccurring ORV related impacts; 3) secure long term commitments, stipulations, and thresholds of new and existing system routes; and (4) once above priorities have been met, new proposals can be considered and reviewed through NEPA.

Thus, in assessing whether additional motorized trails are to be considered, and if appropriate, approved, we recommend the following set of principles which builds upon the Royal Gorge Field Office's criteria set out in the Arkansas River Travel Management Plan Environmental Assessment, Appendix 6 (pp. 225-227).

To provide for appropriate motorized uses, while also protecting the area's resources, the BLM should establish the following criteria for addition of new motorized trails to help guide future management and development of the ORV activities on the Uncompahgre FO:

1. Approve construction of new or additional trails only after the following conditions have been met:
   a. The decision to approve the trail(s) has been authorized under a site specific EA or EIS that analyzes the site specific environmental effects of the proposal.
   b. The proposal would further the goals and desired future conditions (DFCs) identified by the agency.
   c. Priority implementation of effective on-the-ground closures (i.e. barriers, gates, berms) and restoration work (i.e. ripping/seeding, decommissioning, re-countouring, re-vegetation) has been completed and adequate funding and grants, partnerships/volunteer commitments, staff time allocations has been secured and employed.
   d. Implementation of all necessary signage (for closed and open routes) has been fully installed and adequate funding and staff/volunteer time for installment has been committed to.

41

  e. The proposal is sponsored under a partnership agreement that includes a plan for securing the necessary funds and/or volunteer commitments to construct and maintain the trail to accepted standards.

  f. The proposal is accompanied by long term commitments, and stipulations and thresholds are agreed to that if surpassed, corrective management actions will be taken to protect resource health.

2. A significant factor in approving new trails depends on the ability to maintain existing trails to agreed standards. With the participation of cooperating partners, develop accepted standards and guidelines for constructing and maintaining new and existing trails.

3. With the participation of cooperating partners, establish a system and procedures for monitoring trail conditions and performing necessary maintenance work.

4. Continue and strengthen long-term partnerships with motorized user groups for the purposes of maintaining existing trail networks.

Note that new construction does not include incidental construction in order to reroute, mitigate, and/or prevent resource impacts as this would be included under number 1 (c); rather, this refers to new ORV opportunities that are considerable and are added to the current system and agency burden.

This approach is consistent with the letter and the spirit of BLM's obligation to minimize impacts from ORVs to other users and resources. As discussed previously in these comments, Executive Orders (EO No. 11644 (1972) as amended by Executive Order No. 11989 (1977)) and the BLM's regulations (43 C.F.R. § 8342.1) require BLM to ensure that areas and trails for off-road vehicle use are located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability; to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands; and to minimize distress and other impacts to wildlife.

**_Recommendations_**:  In managing recreation on the lands of the Uncompahgre Field Office, the RMP should ensure that quiet recreation opportunities are given sufficient attention and that management of motorized recreation, in general, is also designed to protect the experiences of other public land visitors. Comprehensive travel management planning, including landscape level planning and road density analysis, as well as compliance with land health standards, will also ensure healthy ecosystems that can support positive recreation experiences. Further, coordinated BLM and Forest Service guidance on management of motorized vehicles and dispersed camping, managing access between public and private lands, issuance of special recreation permits, and strict criteria for addition of motorized trails will also help the agency to maintain the distinctive open space character of Uncompahgre BLM lands.

 b. <u>Special Recreation Management Areas</u>

  i. General.

In the Uncompahgre RMP we encourage the BLM to use special recreation management areas to reverse the ongoing downslide of recreational settings into more developed categories and preserve or restore settings to the primitive and backcountry category – providing a prescriptive approach to creating, enhancing and protecting quiet recreation experiences on our public lands, using the tools and guidance set out above.

42

The Land Use Planning Handbook (in Appendix C and as further defined in the Glossary) provides for BLM to establish special recreation management areas (SRMAs) in the lands governed by the Uncompahgre RMP.  Depending upon the anticipated use of each SRMA, BLM should adopt different management strategies.  The Handbook identifies the following general types of recreational use:

- Undeveloped – These areas are managed to support dispersed recreation, maintaining their highly-valued, distinctive, undeveloped recreation setting character.  Within the bounds of legal requirements and sound management practices, resource and visitor management actions exercise minimal regulatory constraint and exclude major investments in facilities and visitor assistance to preserve the visitor's freedom to choose where to go and what to do.

- Community – These areas adjoin communities and are managed to provide structured recreation opportunities in response to recreation-tourism demand generated by community and/or tourism growth and development.  The areas are managed to maintain natural resource and/or community setting character, with appropriate restrictions on marketing, administration and other management actions.

- Destination – These areas have distinctive, highly visible, or otherwise outstanding resource attractions that are managed to provide structured recreation opportunities in response to demonstrated national or regional recreation-tourism demand.  The areas are managed to maintain natural resource and/or community setting character, with appropriate restrictions on marketing, administration and other management actions.

In the context of the BLM's Benefits Based Management (BBM) framework, it is critical that the range of SRMAs, including recreation management zones (RMZ), and their management prescriptions are written to enhance the other values that ultimately contribute to the benefits and experiences of the area and provide significant opportunities for primitive recreation experiences.  SRMAs should include those with an "Undeveloped" market and, even though they will not be managed by extensive facilities, require active management to protect their lands from other uses and activities that will destroy the undeveloped recreation setting and experience.

Some of the supporting materials for analysis of recreation settings set out standards for primitive physical settings that appear to unreasonably limit the lands that could be considered to provide a remote, primitive recreation "experience." Accordingly, the BLM should not use those standards as a "bright-line test" to disqualify areas which are or could in the future provide a primitive recreation experience. Rather, the standards should be used as a goal which proper management could help the areas achieve and focus on the experience that can be achieved.

IM CO-2007-020 directs BLM managers to:  "Ensure that travel management decisions...maintain prescribed setting character..." (p. 2).  The IM specifies tools to be used for maintaining settings, stating on page 2 that:  "For areas with Limited and Open categories, managers may impose several different kinds of limitations including vehicle numbers, types, use times or seasons, permitted use......" (emphasis added). The notion of limiting numbers of recreation users needs to be incorporated into the adaptive management measures adopted for all recreation planning in the Uncompahgre Field Office, particularly for portions of the field office where growth in recreation use should not be the goal. Prescriptions to ensure primitive recreation opportunities are provided should also include soundscapes, special recreation permits, and road density.

In this manner and as part of achieving the goals of a BBM system, areas which have primitive character should be managed for that experience and desired future condition, even if they do not currently meet

43

all of the criteria that the BLM has set for primitive physical settings or designation.  By adopting such a prescriptive, or aspirational management approach, as opposed to a more descriptive or reactive approach of just basing the management of the zones on perceived evidence of human presence or an expectation of more people wanting to use the area, the BLM can ensure that some level of existing disturbance does not disqualify areas which do provide a primitive experience from a decision to manage them to protect and enhance such qualities and provide this important experience.

**_Recommendations_**:  BLM should adopt a range of SRMAs and management prescriptions which provide adequate opportunities for non-motorized or quiet recreational experiences and are written to enhance the other values that ultimately contribute to the benefits and experiences of the area.  BLM should use an aspirational approach which allows the agency to ensure that some level of existing disturbance does not disqualify areas which do provide a primitive experience from a decision to manage them to protect and enhance such qualities and provide this important experience.  The SRMA proposals and wilderness inventory submitted under separate cover identify key areas for protecting primitive recreation experiences.

   ii.   Preserving the "Backcountry" recreation setting

One of the factors the BLM uses to determine setting prescriptions is "distance from an improved road," or the "remoteness" criterion found in the Settings Classification Matrix. Greater distances from roads will put an area into a less developed setting on the Settings Classification Matrix. The developed or undeveloped character of a physical setting in turn helps determine the level of development a setting will have in the social and managerial settings of the matrix.

We have noticed a tendency for "distance from a road" to be justification for classifying an area as more developed on paper than the actual conditions on the ground warrant.  This in turn makes it easier for social and administrative settings to be similarly skewed toward a more developed management goal.

Like many Colorado BLM lands, the Uncompahgre Resource Area contains historic "constructed" roads that get little or no use and therefore do not interfere with the essential backcountry character and feel of the land. Visitors may experience a remote, backcountry feeling, even in the presence of seldom used roads. Spatially analyzing "distance from a road" and using the criterion for determining a landscape's remoteness does not take into account other subjective qualities of the landscape and does not give the BLM an accurate frame of reference from which to make a decision on the undeveloped and backcountry nature of an area.

Another reason that existing settings may be upgraded to a more developed setting within the matrix may be due to the long lifespan of an RMP.  Managers anticipate increased recreation demand over the life of an RMP, and assign Front Country or Rural settings to areas that are currently Backcountry in character. Upgrading existing settings in this manner becomes a self-fulfilling prophecy. Setting high numbers of encounters and group sizes up front opens up an area to increased use, leading in turn to further setting upgrades down the line.

**_Recommendations_**:  Despite the likelihood of increased demand and the physical proximity of a road, we feel it is important to make every effort to preserve the undeveloped and backcountry experience wherever possible. We recommend that settings, visitor encounters and group sizes be adjusted from less crowded to more crowded settings incrementally over time through adaptive management, rather than up front, before recreation demand has actually materialized.

44

Adaptive management strategies need to be based on comprehensive and statistically rigorous monitoring based on defined levels of acceptable change, as was done in the Jack Morrow Hills plan in Wyoming. This approach can be used to limit use of an area for primitive recreation and to limit facilities unless or until certain criteria are met – such as increased demand and a determination that more visitors can be accommodated without undermining targeted recreation values.  Again, the Jack Morrow Hills plan in Wyoming is a good example of how the BLM could implement adaptive management with specific monitoring of key resources, targets for management, and triggers for action.

We recommend that the RMP include specifics on the monitoring and metrics that will be used to evaluate successful meeting of targets for SRMAs and other recreation areas.

We understand that experiential outcomes and setting retention are the end goals of the Benefits Based Management "Chain of Causality" (experiential outcomes result from settings and activities which result from market demand, user groups, and activities). For this reason the RMP needs to be specific about the metrics to be used for evaluating the attainment of the experiential "Outcomes."

Examples of Adaptive Management responses could be: reduced marketing, smaller trailheads and parking, fewer improved trails, more challenging trails, and other ways of limiting vehicle numbers as referenced previously in the 2007 Colorado BLM IM, p. 2. Setting motorized use levels through permits, in desired but overcrowded settings such as rocking crawling areas and other intensive motorized use areas in Dry Creek, should not be ruled out. This recommendation applies not just to places where motorized use is occurring under a formal Special Recreation Permit, but to areas where general public use is occurring **not** under any permit.

In applying adaptive management, we caution against resorting too quickly to the common solution of dispersing use to other areas. This merely spreads resource impacts more broadly across the land and invites more growth, more off-trail use, more trail maintenance expense and more management and enforcement challenges over a greater expanse of land. It is not the BLM's job to indefinitely absorb an unlimited expansion in recreation demand.  Setting limits on recreational use to protect BLM resources and experience will lead to other providers stepping forward to absorb increased demand.

   iii.   Managing promotion and marketing.

A key aspect of implementing SRMAs is marketing (H-1601-1 – Land Use Planning Handbook, Appendix C, pp. 15-17, Recreation and Visitor Services, C, 4). Experience shows that designating new trail systems and other recreation opportunities can lead to unanticipated increases in use, potentially straining BLM resources and shifting less crowded settings into more crowded ones.

The 2007 State Recreation and Visitor Services Strategy points to the inconsistency between the "recreation tourism demand" generated by a "vigorous Colorado Tourism Office promotion budget" and the BLM's "fundamental duty to meet or exceed land health standards" (p.6). The Recreation Strategy goes on to state: "tourism industry promotion... sends increasing numbers of outdoor adventurers to BLM public lands," challenging the BLM's ability to "maintain the distinctively undeveloped and open-space character of its recreation settings" (p. 7).

In response to this problem, both Appendix C of the LUP Handbook and the State Recreation Strategy direct the BLM to manage marketing so as to maintain targeted recreation settings. For example, the

BLM_0077547

SRMA definitions section in Appendix C includes "appropriate restrictions on marketing" as one of several implementation actions to be done on SRMAs.

Objective 2 in the Recreation Strategy similarly calls upon businesses and local governments to "agree" to the BLM's "approved recreation setting prescriptions and management objectives" and to "market public lands responsibly" (p. 9). For example, the Glenwood Springs Field Office, has obtained an agreement from local government to limit marketing efforts to ensure its Community SRMAs do not evolve into Destination SRMAs.

The Recreation Strategy further directs BLM field offices to "engage the business community and local governments in …..managing….use of public lands that meet or exceed land health standards" (p. 9).

**_Recommendations_**: In accordance with this direction, we recommend that the Uncompahgre RMP be specific about the marketing strategies it will use for each new SRMA and recreation area. The marketing strategies should be designed to hold use levels down to those that are manageable within budgets, and that will maintain the "distinctive, open-space character" of BLM settings referred to above. The BLM should obtain specific agreements/MOUs laying out the nature and extent of the publicity that will be done on each SRMA or other recreation area.

   c.   Areas needing special attention to recreation management.

In addition to designating new SRMAs and protecting lands with wilderness characteristics in accordance with our separate proposals, certain areas in the Uncompahgre Field Office merit special attention for management of recreation.  At this time, we would like to highlight the following areas:

**_Adobe Badlands_**:  The lands immediately adjacent to the Adobe Badlands WSA and citizen-proposed wilderness area are severely degraded by intense motorized use, causing noise and dust pollution and impacting the WSA. The revised Uncompahgre RMP should give special attention to managing this area to reduce and minimize impacts to the WSA or the citizen-proposed wilderness from motorized vehicles.

**_Tabeguache_**: The Tabeguache area managed by the Forest Service was congressionally designated to protect its wilderness values. The BLM should close motorized and mechanized routes in the adjacent BLM lands in order to avoid motorized or mechanized intrusions into the Tabeguache area and to otherwise ensure preservation of the wilderness values there. Specifically, the relatively unroaded, unmotorized BLM lands north of the Tabeguache Creek Special Management Area, including the Shavano, Campbell, and Burro Creek drainages, should be closed to motorized recreation.

**_Roubideau_**: The Roubideau Area managed by the Forest Service was congressionally designated to protect its wilderness values. The Uncompahgre Field Office closed a deteriorated jeep trail in the Monitor Creek area, creating a large contiguous area adjacent to the FS Roubideau Area, covering over 20,000 acres on BLM land which includes the Camel Back WSA and citizen-proposed wilderness. The RMP should reaffirm this closure and manage recreation in this area to protect natural values.

BLM_0077548

8.   **Natural Soundscapes**

Evaluating and protecting natural soundscapes is essential to the land use planning process. As part of providing opportunities for quiet recreation, BLM must consider activities that interfere with the soundscape associated with quiet recreation opportunities. Research shows that for many people, especially quiet recreationists, the primary reason for visiting primitive landscapes is to attain a sense of solitude and tranquility, which are interrupted by non-natural noises. A study performed by psychologists at Colorado State University found that acoustic stressors impact visual landscape quality, meaning non-natural noise actually affects the perceived naturalness of a landscape (Mace 1999). Therefore, in order to preserve the naturalness of an area, BLM must preserve the natural soundscape.

Furthermore, the authors of the study note that "tranquility" and "solitude" are explicitly addressed in the Wilderness Act as values that must be preserved by land management agencies. BLM guidance directs the preservation of "naturalness" in Wilderness Study Areas, Visual Resource Management I zones, and other areas managed to protect wilderness qualities. All of these values are negatively impacted when the natural soundscape is impacted; therefore, BLM must retain the natural soundscape in wilderness-quality lands and primitive recreation areas.

A. BLM's Obligation to Preserve Natural Soundscapes
Executive Order 11644 (1972), as amended by E.O. 11989 (1977), orders the BLM to locate areas and trails to

> Minimize conflicts between off-road vehicle use and other existing or proposed recreation uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

BLM regulations at 43 C.F.R. Sec. 8342.1 reiterate this E.O.

In order to effectively and appropriately achieve this goal, the Colorado BLM issued "A Recreation and Visitor Services Strategy" ("Recreation Strategy") to help field offices provide quality recreation experiences for all users. The Recreation Strategy recognizes that BLM's obligation to provide recreation areas for many user types requires designation of quiet recreation zones. It defines "quiet recreation" as "Outdoor recreation enthusiasts such as hikers, skiers, mountain bikers, equestrians, bird watchers, hunters and anglers *who seek the opportunity to enjoy natural soundscapes*" (P. 17) (Emphasis added).

We encourage the Uncompahgre Field Office to similarly implement BLM guidance for minimizing conflict between user groups by establishing quiet use areas and mitigating potential noise impacts on these areas.

Additionally, courts have upheld the responsibility of federal land management agencies to evaluate noise impacts on the natural soundscape. *See Izaak Walton v. Kimbell*, 516 F. Supp. 2nd 982, 985, 995-96 (D. Minn. 2007). (EA prepared by USDA Forest Service for plan to construct snowmobile trail adjacent to Boundary Waters Canoe Area Wilderness failed to properly analyze noise impacts from snowmobile use, as required by NEPA; EA provided no quantitative evidence of analysis of decibel levels to be projected by snowmobile use of the trail into adjoining wilderness.)

47

BLM_0077549

B. Effective Soundscape Analysis

In order to effectively preserve the natural soundscape in quiet recreation areas, BLM must quantitatively measure (1) the decibel (dB) levels of the natural soundscape; and (2) ORV dB levels on the natural soundscape. Quantification of ORV traffic volume, duration, and frequency are thus necessary components of soundscape analysis.

There are many tools available to BLM to adequately measure noise impacts and set prescriptions to prevent negative impacts. The Wilderness Society recently created a GIS model based on the System for the Prediction of Acoustic Detectability (SPreAD), a workbook issued by the Forest Service and Environmental Protection Agency for land managers to "evaluate potential … acoustic impacts when planning the multiple uses of an area." The Wilderness Society adapted the SPreAD model to a GIS environment so that potential noise impacts could be integrated with other variables being considered in the planning process. We believe the Uncompahgre Field Office has an up-to-date version of this software, and we would be happy to provide more information at your request. The SPreAD-GIS model can be implemented in your existing ArcGIS software at no additional cost. The SPreAD-GIS model was developed for the Forest Service, but its applicability extends seamlessly to BLM lands, as the inputs include vegetation and topography.

The Uncompahgre Field Office should use the SPreAD-GIS model to determine what sounds will impact visitors in each segment of the planning area, and what steps must be taken to mitigate these impacts. It is important to note that the original SPreAD operates under the premise that in primitive recreation areas, *no noise should be audible above the natural soundscape*. We envision this model as eventually being used throughout the field office, but at this stage believe BLM should at least apply it to special management areas and/or other strategically prioritized portions of the field office.

**_Recommendations:_** The preservation of natural soundscapes is important to provide visitors with adequate opportunities for quiet recreation. The USGS finds that dissatisfaction with recreational opportunities can "diminish public support for land-management programs" (Douglas xiii). We encourage BLM to utilize the SPreAD-GIS model to analyze and preserve the natural soundscape of the Uncompahgre planning area, especially in special management areas managed for quiet use recreation.

9. **Retaining and Restoring Natural Forest Ecosystems**

Section 201 of FLPMA mandates that BLM inventory the resources of the public lands, their resources and values. 43 U.S.C. § 1711. The Preparation Plan for the RMP revision states that "[t]he Uncompahgre Field Office manages small areas of spruce/fir forests and ponderosa pine forests, and large areas of pinyon-juniper woodlands." The BLM must carefully inventory its forest resources and evaluate alternatives that do not cause adverse environmental impacts and unnecessary and undue degradation. The RMP should analyze impacts to forest resources and identify ways to minimize and mitigate these impacts for each type of forest ecosystem.

We discuss management recommendations for each forest type in relevant detail below.

BLM_0077550

<u>Pinyon-Juniper Ecosystem</u>

   a.   Ecology

 According to recent research, pinyon-juniper (p-j) forests can be classified as one of the tree types as follows:

   1) Persistent p-j. Canopy can range from sparse, with only scattered trees, to a fairly dense, closed canopy. Soils may be rocky and unproductive to deeper and moderately productive, but this type is more often found on the former. Understory can consist of a variable cover of gasses, forbs, and shrubs, but in the dense canopied stands, any understory will be sparse. Fires probably varies in frequency, but rotations were usually quite long (440+ years), and most fires were stand-replacing.

   2) P-j savanna. This type has a low to moderate density and cover of p-j, with a well-developed and nearly continuous understory of grass, along with some forbs. Shrubs, if they exist, are usually only a minor component. This type is most often found where summer precipitation constitutes a high proportion of the average annual total. The natural disturbance regime for this type is not well understood.

   3) Wooded shrubland. The p-j component in this type varies from sparse to relatively dense. Shrubs constitute the main portion of the understory, and there are varying amounts of grasses and forbs. This type is most often found where winter precipitation is dominant. Fires tended to be high intensity events that killed all or most of the trees and top-killed all of the shrubs.

See Romme et al, 2008, and Romme et al, 2009.

It is not likely that the area covered by the Uncompahgre Field Office has or had much of type 2. See Romme et al, 2009, at 126. Extensive field research is needed to determine which types exist and what the disturbance, composition, and structural history is of each stand or area containing p-j.

It is commonly thought that the increase in density and coverage of p-j forests since the beginning of the 20th Century has been caused by fire suppression, i. e., that the lack of low-intensity fire that formerly burned off young trees has allowed p-j forests to grow much more dense. In reality, the situation is more complicated than this simple scenario, and in the planning area, it does not appear to be true at all.

In the persistent p-j type, fire suppression cannot be said to be responsible for any increase in density of p-j because fire was very infrequent in this type. Romme et al, 2008, 2009. It is also likely that that there are factors other than fire suppression that are helping to drive increases in p-j densities in all three of its types, including:  climate change (warming since the end of the little ice age 12,000 years ago) that is favorable to tree growth; recovery from past disturbances (such as intensive logging, especially during the mining era[14]; chaining, a common practice in the 1950s and '60s; and periodic, and often intense, insect-caused mortality in pinyon pine); and livestock grazing, which probably favors tree persistence and increased tree density[15], as has occurred on the Uncompahgre Plateau[16]. The relative importance of each of these in shaping our current p-j ecosystems is unknown. Romme et al, 2008. Increased

---

[14] See Young and Svejcar, 1999.
[15] See Goodrich and Reid, 1999.
[16] See Shinneman, 2006.

BLM_0077551

atmospheric carbon dioxide, occurring from human use of fossil fuels, would also favor growth of trees, once established, over other vegetation.

If fire was frequent in any of the p-j types, fire scars and dead trees would likely be easy to find. But, according to Romme et al 2008, they are quite rare or absent in areas where studies have been done. This would tend to indicate that fire may not have been frequent in any of the p-j types.

Shinneman and Baker, in a study on the Uncompahgre Plateau published in 2009 (a), confirmed these findings. These researches found no fire scars on live trees, but they did find charred snags and charcoal in 41 percent of the plots they surveyed. This strongly indicates that low-intensity fires never or seldom occurred (or were so minor in coverage and frequency that any evidence of them has disappeared), while higher-severity, stand-replacement type fires did occur. Based on the data they gathered and analyzed, a fire return interval of 400-600 years in areas with p-j stands on the Plateau is suggested by the researchers. Id.

Shinneman and Baker, id., also found considerable establishment of pinyon following an extended, and often severe, drought in the area that lasted from about 1620 to 1820. In other words, pinyon is responding to more favorable conditions in the last 200 years to reestablish itself on the landscape. It is important to note that the beginning of this period well precedes human settlement, which is said to have begun in earnest around 1880. Pinyon may also be have started recovering from heavy mortality from drought and from attacks of *ips confusus*, a bark beetle that ravaged pinyon pine in Colorado in 2002 through about 2004.

Romme et al, 2008, noted that any net increase in p-j trees may be small when viewed over a long time period, as periods of increasing density are balanced by periods of extensive mortality. In the planning area, this is much more true for pinyon than juniper, as the latter species seemed to maintain a relatively steady density over 500 years. Shinneman and Baker, 2009a.

    b.   Effects From Human Use

While fire suppression does not appear to have affected vegetation in the planning area, other factors have, especially livestock grazing.

Shinneman et al, 2008 found that the semi-arid ecosystems of the Uncompahgre Plateau

> have experienced significant declines in grass and forb cover, biological soil crust cover, native species richness, compositional evenness, and relative species abundance, occurring at both stand- and landscape-levels.

Shinneman et al, 2008, at 223.

This research also found that sites with the heaviest p-j overstory removal via chaining were among the most degraded, while sites that had a light thinning of p-j were less degraded. Shinneman and Baker, 2009b, cite numerous studies linking sites degraded by grazing to cheatgrass invasion.

50

c.   Restoration Needs

Restoration should focus on: a) retaining existing sites with minimal degradation from natural conditions, b) removal or reduction of activities causing degradation, such as livestock grazing, and c) active restoration of some of the most degraded sites by restoring native gasses, forbs, and shrubs and eliminating or reducing non-native species.

Restoring native plant species will not be easy. First, removal of non-native plant species will be necessary, especially cheatgrass (*Bromus tectorum*). However, complete eradication of this species is not likely. See Goodrich and Huber, 1999. See also Goodrich and Rooks, 1999, who stated that cheatgrass is "explosively invading" and "highly competitive" against native species. They recommend use of non-natives to reduce the invasion of cheatgrass, especially after a large fire. However, Shinneman and Baker, 2009b, found no difference in cheatgrass coverage in areas seeded versus those not seeded after fires on the Uncompahgre Plateau.

Introduced, non-native species almost always outcompete native species. See Walker, 1999. See also Erskine and Goodrich, 1999, who found dominance by introduced annuals or seeded species after fire in p-j stands with closed canopies. That means that introduced species will tend to dominate such sites, making it harder, and maybe impossible, to restore native biological diversity.

It may not be possible to completely remove or greatly reduce livestock grazing. If so, other strategies can be employed such as:  exclusion of stock from the most sensitive areas, seasonal closures, reduction of time that grazing is allowed in certain areas, and reduction in the number of animals allowed to graze.

If native plant species are not present, removal of livestock alone will not restore these species. Seeding will be necessary. However, seeding could cause undesirable impacts, if e. g., motorized equipment or even humans walking over large areas destroyed or damaged biological crust while dropping or drilling seed. Therefore, lower-impact methods should be used, such as aerial seeding. The same seed mix should not be used over a large area, even if it consists solely of native species, as this could reduce diversity of native plant over the area seeded. See Shinneman et al, 2008.

Old-growth stands should be retained. Old growth p-j stands are more structurally complex than other stands and provide habitat for many bird species. See Miller et al, 1999. It is hard to say how p-j old growth stands should be defined, but Mehl, 1992 provides a good start. It may be necessary to consider site-specific data on stand history in determining what constitutes p-j old-growth in any location.

d.   Management Recommendations

1. Inventory the planning area's p-j stands. To properly manage p-j, whether that means active management or not, information on the current condition (composition and structure) and the historical disturbance regimes of these areas is essential. A considerable amount of data has already be gathered for the Shinneman and Baker, 2009 study discussed above; this data can be used along with other data that is gathered.

Since there is much uncertainty about the history of most p-j stands, any stands where any manipulation will be allowed should be thoroughly field surveyed. Manipulation includes, but is not limited to: commercial and non-commercial wood cutting, thinning, prescribed fire, fire use (prescribed fire after

BLM_0077553

natural ignitions), extensive and/or heavy livestock grazing, roller chopping, and chaining or cabling of p-j.

The ever present danger is that without site-specific knowledge, any management, no matter how well-intended, could result in the affected areas becoming even further outside the range of historical variability, thus making any future restoration efforts even more difficult or impossible.

2. Collect seed of native grasses, forbs, and shrubs. Use these seeds in restoration projects, or after large fires, as appropriate.

3. Reduction of pinyon and juniper via chaining, cabling, and/or logging is not necessary, and would not in any way aid restoration of native species or historical stand structures and composition. Trees whose origin pre-date human settlement (beginning around 1880) should not be killed for any reason unless they constitute a hazard (such as falling across a road open to public use).

4. Eradicate exotic species to the degree practicable.  Areas open to public motor vehicle use and those that have been heavily and/or persistently grazed by livestock will be the areas most likely to have weeds. Management should be directed to favor establishment and persistence of native plant species over introduced non-natives.

The most important weed to eradicate or control is cheatgrass.

Native species should be used for reseeding to the maximum degree possible.

5. Consider reducing or eliminating livestock grazing in areas where continuation of it:  would further ecologically degrade vegetation, damage soils, damage riparian areas, or hinder active or passive restoration efforts. Grazing must not be allowed in areas with the best representations of native grasses, forbs, and shrubs, i. ., those sits with Rank 1 in Shinneman and Baker, 2009a.

6. Retain old-growth stands. See discussion above under RESTORATION NEEDS.

7. Do not allow large commercial sales of any products from p-j stands. Light activity, such as fuelwood gathering, is acceptable. Any logging should be confined to areas accessible by or very near existing roads.

Logging for any purpose should generally be limited to trees that have established since human settlement, but not all such trees should be cut in any one stand or area.

8. Restore stands toward historical conditions where possible. This would include reestablishment of native vegetation. Where such vegetation is present, prohibiting activities that tend to harm vegetation, such as livestock grazing, motor vehicle use, and commercial logging, may be sufficient to start achieving restoration of native species. In severely degraded areas, reseeding and/or planting will be necessary.

9. Closely monitor all activities, using appropriate control sites for before and after comparisons. Monitoring is particularly necessary to assess the effectiveness of any restoration efforts. It is also very important after fire, to assess cheatgrass invasion, establishment of native species, and soil stability.

BLM_0077554

Ponderosa Pine Ecosystem

Ponderosa pine ecosystems in Colorado were shaped by fire. Fires likely burned at variable intervals and intensities, i.e., some fires were low-severity, burning ground vegetation and small trees and maintaining open, park-like tree stands, while others were stand-replacing events.

A study of ponderosa pine and mixed conifer stands on the Uncompahgre Plateau found that fire suppression over the last 125 years has likely increased the density of ponderosa pine stands somewhat. See Binkley et al, 2008, but see cautionary note for application on p. 11 of that publication.

    a.   Management Recommendations

1. The Uncompahgre Field Office should inventory its ponderosa pine stands for the following attributes: tree species composition, tree stand structure and density, old growth characteristics (see Mehl, 1992), percent of trees with origin after human settlement, evidence of fire (such as scars on live trees), native versus non-native understory plant composition, and wildlife species' presence.

2. Dense ponderosa pine stands composed primarily of trees of post-settlement origin can be thinned to reduce the threat of an unnaturally hot stand-replacing fire. Generally, only some (not all – see below) of the younger (origin after 1879[17]), smaller trees should be removed. This would be most appropriate in the lower-elevation ponderosa-dominated  stands, as these stands likely had the most frequent fire and thus likely have been changed the most by fire suppression. At the higher elevations of ponderosa pine, stands may have historically been dense at times, and if so, they should have minimal to no thinning.[18]

3. Old growth stands must be conserved. A light thinning of young trees may be appropriate in such stands, if post-settlement trees are dense.

4. Fire should be gradually reintroduced into ponderosa-dominated stands, to the extent feasible, over time. To avoid a very hot, stand replacing fire in dense stands that would be outside the range of natural variability, some stands will have to first be thinned. Again, removal should concentrate on smaller-diameter trees, particularly those that form fire ladders into the crowns of large, older trees. Also, gambel oak (known as oakbrush) may have to be reduced where it exists with ponderosa pine prior to any burning to avoid post-fire domination of the sites by oakbrush. See Binkley et al, id., at 10.

5. Large Douglas-fir trees should be retained, as they likely existed prior to fire suppression. Some small Douglas-fir should also be retained to ensure retention of conifer trees in case ponderosa pine become infested by bark beetles. Some smaller, younger ponderosa should also be retained for the same purpose.

6. Results of all activity must be monitored. Items to look for include:  weed infestation and/or spread, conifer tree regeneration, gambel oak sprouting, effects of any livestock grazing, and ground vegetation response to activities. Control areas will need to be established prior to any activity to allow before and after comparisons.

---

[17] This corresponds to the time of settlement of the area by European descendants, and it is also, according to Binkley et al, id.,  the year of a major fire on the Plateau.

[18] Binkley et al note that the mixed-conifer forests on the Plateau they sampled appear to be largely within the range of historic variability (HRV). Id. at 9, 13. It thus stands to reason that some of the highest elevation stands dominated by ponderosa pine would also be within the HRV.

BLM_0077555

Spruce-Fir Ecosystem

This ecosystem occurs at the higher elevations of forested areas in Colorado, generally above about 9,000 feet. These ecosystems have not been affected by fire suppression, as the fire return interval is in the hundreds of years. Due to the short growing season and harsh conditions, recovery from disturbances, natural and human, takes a very long time.

No active management is needed or justified in this ecosystem. The one exception might be after a large, stand-replacement fire, where soil stabilization might be needed in a few areas to help conserve water quality.

## 10. **Cultural Resources**

FLPMA obligates the BLM to protect cultural, geologic, and paleontologic resource values (43 U.S.C. §§ 1701(a)(8) 1702(c)).  In the context of historical and cultural resources, the National Historic Preservation Act of 1966 ("NHPA") (16 U.S.C. § 470 et seq.) affords heightened protection to these resources, establishing a cooperative federal-state program for the protection of historic and cultural resources.  In particular, the review process set out in Section 106 (16 U.S.C. § 470f) obligates the BLM to consider the effects of management actions on historic and cultural resources listed or eligible for inclusion under NHPA.  Additionally, Section 106 requires the BLM to consider the effects of its management actions on all historic resources and to give the Advisory Council on Historic Preservation an opportunity to comment before the BLM takes action.  Section 110 of the NHPA requires the BLM to assume responsibility for the preservation of historic properties it owns or controls (16 U.S.C. § 470h-2(a)(1)), and to manage and maintain those resources in a way that gives "special consideration" to preserving their historic, archaeological, and cultural values.  Section 110 also requires the BLM to ensure that all historic properties under the jurisdiction of the field office are identified, evaluated, and nominated to the National Register of Historic Places. *Id.* § 470h-2(a)(2)(A).

Further, the President's "Preserve America" initiative (*See* Exec. Order 13287, March 3, 2003) requires the BLM to advance the protection, enhancement, and contemporary use of its historic properties.  The BLM must ensure that "the management of historic properties in its ownership is conducted in a manner that promotes the long-term preservation and use of those properties as Federal assets."

Therefore, the Uncompahgre Field Office must carefully consider the effects of all RMP decisions on the archaeological and cultural values located in the planning area.  Since it will be difficult to evaluate the effect of decisions when the location of cultural resources is unknown, the BLM should undertake an archaeological inventory wherever necessary. One area within the Uncompahgre Field Office with known cultural resources is the northern side of the Paradox Valley west of Bedrock. A number of immense Petroglyph panels can be found on a few boulders and in a small finger canyon of Wingate Sandstone there. BLM should inventory this area, if it hasn't already, and protect these resources in the RMP.

In regards to travel planning, the BLM should consider where motorized and non-motorized routes are directing people, inventory cultural resources along those routes, and carefully consider the potential impacts to those resources. Specifically, BLM should evaluate whether dust from vehicle use, energy development, and other authorized uses is impacting Petroglyph panels. Furthermore, dust

54

BLM_0077556

suppressants have been shown to impact rock art in Nine Mile Canyon, Utah.[19] These impacts must be analyzed and minimized.

***Recommendations***: BLM's goal should be to protect, conserve, and where appropriate restore archeological and historical sites and landscapes. To that end, BLM should:

- Survey all known or discoverable cultural and historic sites, or those adjacent sites may be adversely affected.
- Determine the sites or areas that are most vulnerable to current and future impact and adopt management actions necessary to protect, conserve, and restore cultural resources.
- Complete a Cultural Resource Management Plan that coordinates with the objectives of the RMP and seeks to provide for an appropriate proactive process of inventorying for cultural resources, making determinations of eligibility for the National Register, and seeking to nominate eligible properties to the National Register. The RMP should establish a timeline for completing the Cultural Resources Management Plan, and prioritize areas to be inventoried for cultural resources.
- Outline specific management actions, such as stabilization, fencing, signing, closures, or interpretative development, to protect, conserve, and where appropriate restore cultural resources.
- Adopt measures to protect cultural resources from artifact collectors, looters, thieves, and vandals.
- Consult with the Native American community to determine whether there are sites or specific areas of particular concern, including sites of traditional religious and cultural significance.

## 11. Wild & Scenic Rivers

We are submitting separate, detailed comments on the Wild and Scenic Rivers Eligibility Report; however, we want to include some general comments on protecting streams and segments within the Uncompahgre Field Office as part of this RMP revision.

Rivers deemed eligible for inclusion in the Wild and Scenic Rivers System must be managed to protect their values until the suitability determination is made, and suitable rivers must be managed so as to protect their qualities until Congress has an opportunity to designate the river as part of the System. Given that water is relatively sparse and that riparian areas are scarce in the study area, each stream is of tremendous value, and the BLM should fully protect these priceless resources via the Wild and Scenic Rivers Act and the Uncompahgre RMP.

**Protect all eligible segments**
Whether found suitable or not, all segments found eligible must, under the provisions of the Wild and Scenic Rivers Act and accompanying regulations, be managed in order to preserve the characteristics that make those segments eligible.

**Protective measures must be specific to wild and scenic eligibility and suitability**
Protective management prescriptions and requirements—specific to segments' values that prompt findings of wild and scenic eligibility and suitability—must be included the final RMP and so must be carefully analyzed in preparation of the draft plan. Consideration other management prescriptions or

---

[19] Kloor, Keith. "Dust Storm Rising Over Threat to Famed Rock Art in Utah." *Science* 319 (2008): 394. Available online at http://www.ninemilecanyoncoalition.org/ninemilestudy.pdf.

BLM_0077557

designations that could, by coincidence, help protect features that contribute to the segments' eligibility and suitability are helpful (wilderness study areas, areas of critical environmental concern, visual resource management classes, mineral withdrawals, etc.). Those coincidental protections and designations must, in the final RMP and in its implementation, must specifically supplement wild and scenic river purposes, or similar measures must be provided in the final plan exclusively for wild and scenic river purposes.

Similarly, the BLM can protect river values through other special management designations. Such management designations should supplement, and not replace, complete consideration of wild and scenic river values or complete protection under the terms of the Wild and Scenic Rivers Act and its provisions for study and for interim protection.

**Apply available protections specific to wild and scenic**

Whatever the ultimate collection of stream segments found to be suitable, BLM should consider the following management options for protecting each segment and apply those that are necessary for adequate protection:
- closed to off-highway vehicle use;
- withdrawn from mineral entry;
- as VRM Class I or Class II areas;
- as right-of-way exclusion areas;
- subject to remedial actions to ensure sensitive species habitat is maintained or enhanced;
- subject to extensive and reliable no-surface-occupancy stipulations for all activities;
- with related ACECs closed to off-highway vehicle use;
- with related ACECs closed to oil and gas exploration and development;
- among other appropriate measures.

**Reconsider and expand eligibility determinations**

The criteria for eligibility evaluation are clear. The Department of the Interior's Bureau of Land Management Manual chapter "8351 –Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, and Management (BLM Manual). Section .31A of that manual states:

> Basis for Determination. To be eligible, a river segment must be "free-flowing" and must possess at least one river-related value considered to be "outstandingly remarkable." These factors are summarized in Illustration 1. *No other factors are considered in determining the eligibility of a river segment. All other factors are considered in determining suitability.*" (emphasis added)

Since more detailed management decisions about stream segments would be made later in the suitability determination phase, as part of the current RMP revision or in subsequent amendments, it makes sense to list as eligible *all* segments that have any variation of the primary eligibility criteria, including even one outstandingly remarkable value. When in doubt, include them as eligible.

Further, the BLM must disclose the scope of the outstandingly remarkable values (ORV) inventory process used in the draft eligibility report, and the BLM must extend that analysis to include all stream-related ORVs and study corridors wide enough to incorporate those ORVs. We note that some past wild and scenic have relied too heavily and arbitrarily on a one-quarter-mile "buffer" around identified segments in its initial identification of ORVs.  BLM guidance is clear that such a "buffer" is not the appropriate measure for an ORV's association with a river.  For example, ORVs can "owe their location

56

BLM_0077558

or existence to the presence of the river" (IM 04-196), a standard on which it would be arbitrary for BLM to place a numerical value. We are concerned that if BLM uses this arbitrary buffer, the agency will overlook significant ORVs that are tied to a segment.

Geologic and scenic ORVs, as examples, could easily extend or originate from distances greater than one-quarter-mile from a segment. In an arid western slope climate, important cultural and historic values that are directly tied to segments used as water sources and migration routes for historic human populations are likely to exist a variety of distances from a segment yet "owe their location or existence to the presence of the river." *Id.* With vast amount of BLM land having never undergone formal cultural survey, it is important that BLM employ generous and inclusive boundaries in their inventory.

***Recommendation***:  The Uncompahgre RMP must carefully study *all* potentially eligible stream segments, adopt requirements to ensure eligible and suitable rivers are protected pending decisions on their designation, and ensure any designated rivers and river corridors are managed to preserve their values.

## 12. **Oil and Gas Management**

### a. Scope of Oil and Gas Leasing

BLM must consider the following when deciding which areas to allow fluid mineral leasing and development: 1) the BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for oil and gas development. 43 U.S.C. § 1712(c)(1); 2) BLM must consider a *reasonable* range of alternatives in regards to areas open to oil and gas leasing.  40 C.F.R. § 1502.14; and 3) any decision which leaves the vast majority of the field office open to oil and gas development will preclude the effectiveness or long term viability of any conservation measures as there is always the potential that those conservation measures could be jeopardized by oil and gas development, regardless of how low the potential for development is currently.

1. The BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for oil and gas development.

FLPMA obligates the BLM to abide by the principles of multiple use and sustained yield, especially during the land use planning process.  Specifically, multiple-use is defined as:

> ...the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output. 43 U.S.C. § 1702(c).

The definition of multiple use makes it clear that the BLM is obligated to manage the land for a number of resources other than oil and gas leasing, and states specifically that the BLM should manage some land for less than all of the resources and should not always be concerned with managing the land in order to receive the greatest economic return.  The definition of multiple-use makes it clear that simply because a particular resource exists does not mean that the BLM needs to be able to extract that resource for a profit.  It is well within the realm of BLM's multiple-use mandate to not have a significant

57

portion of the Uncompahgre Field Office open to oil and gas leasing.  Further, BLM should consider alternatives which choose not to re-lease areas formerly leased when those leases expire or are terminated.  Areas where there are specific resource concerns or that are identified as important habitat should be considered for other uses besides oil and gas leasing.  These areas may include, but are not limited to: Areas of Critical Environmental Concern, Special Recreation Management Areas, Potential Conservation Areas, critical habitat, areas with cultural resources, proposed wilderness and lands with wilderness characteristics.

BLM's answer to charges that it is not adequately protecting resources from oil and gas impacts is often to provide leasing with No Surface Occupancy (NSO) stipulations.  While NSO stipulations are a marked improvement over offering leases with standard lease terms, it is important to note that NSO stipulations do not necessarily resolve the wildlife and other resource concerns associated with oil and gas leasing.  There are adverse consequences to wildlife associated with oil and gas development, regardless of whether or not there is an NSO stipulation on the lease.  An example of this, noted by Clait Braun (2006) in *A Blueprint for Sage-grouse Conservation and Recovery*, a copy of which is attached to these comments, is that "oil and gas development influenced the rate of nest initiation of sage-grouse in excess of 3 km of construction activities.  Clearly, the amount and (likely) frequency of noise associated with development has major negative effects on greater sage-grouse."

Further, BLM often offers companies exceptions, modifications or waivers from the application of NSO stipulations.  Having NSO stipulations on a majority of the lands within the field office is better than allowing surface occupancy in terms of wildlife and resource concerns, but that does not supplant the BLM's obligation to manage for a variety of resources, of which oil and gas is only one.

2.   NEPA requires the BLM to consider and evaluate a reasonable range of
     alternatives for oil and gas development.

The range of alternatives is "the heart of the environmental impact statement." 40 C.F.R.  § 1502.14. NEPA requires BLM to "rigorously explore and objectively evaluate" a range of alternatives to proposed federal actions. *See* 40 C.F.R. §§ 1502.14(a) and 1508.25(c). "An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action." Northwest Envtl Defense Center v. Bonneville Power Admin., 117 F.3d 1520, 1538 (9th Cir. 1997). An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. City of Tenakee Springs v. Clough, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R. § 1502.14).  This evaluation extends to considering more environmentally protective alternatives and mitigation measures.  *See, e.g.,* Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094,1122-1123 (9th Cir. 2002) (and cases cited therein).  For this Draft RMP, the consideration of more environmentally protective alternatives is consistent with the requirement of FLPMA to "minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved." 43 U.S.C. §1732(d)(2)(a).

NEPA requires that an actual "range" of alternatives is considered, such that the Act will "preclude agencies from defining the objectives of their actions in terms so unreasonably narrow that they can be accomplished by only one alternative (i.e. the applicant's proposed project)." Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1174 (10th Cir. 1999), citing Simmons v. United States Corps of Engineers, 120 F.3d 664, 669 (7th Cir. 1997).  This requirement prevents the EIS from becoming "a foreordained formality."  City of New York v. Department of Transp., 715 F.2d 732, 743 (2nd Cir. 1983). *See also*, Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002).

BLM_0077560

In order to comply with NEPA, BLM must consider a broad spectrum of alternatives in regards to which lands will be available for oil and gas leasing.  A Draft RMP which leaves all the lands within the planning area open to oil and gas leasing or only allows for very slight differences between the alternatives in this regard fails to meet the "reasonable range of alternatives" directive.  BLM has an obligation to rigorously explore and evaluate a range of alternatives.

3.  A decision which leaves the vast majority of the Field Office open to oil and gas development necessarily negates the effectiveness or long term viability of any conservation measures as there is always the potential that those conservation measures could be jeopardized by oil and gas development, regardless of how low the potential for development is.

BLM has an opportunity in this RMP to make great strides in conservation and habitat restoration. However, the long term viability of these strategies, programs and goals could be severely impacted by oil and gas development.  Oil and gas development is known to cause a variety of problems that are detrimental to wildlife, and by leaving nearly the entire planning area open to leasing, the BLM may undermine any conservation efforts or goals it identifies in the RMP.  The West is pockmarked with many places which were left open to oil and gas leasing based on the belief that these areas had low potential for development.  As a result, when an economically recoverable reservoir of oil and/or gas was discovered, the area had insufficient protection measures in place.

This lack of forethought has created many problems for wildlife and other resources.  The impacts from oil and gas development are now well known, as such, areas of high ecological or cultural resource density should simply not be available for leasing.  For example, Clait Braun, a leading researcher on sage grouse in the west, has stressed the impacts that oil and gas development can have on sage grouse populations:

> Road building, well pad construction, and noise disturbance associated with oil and gas development can fragment effective sage grouse habitat and compromise the quality of seasonal use areas. In addition, by creating more linear areas and smaller habitat patches, energy development can boost predation rates on sage grouse. So, for a variety of reasons, major oil and gas development reduces the area useable by sage grouse, which often leads to greater isolation of populations and a reduced ability to handle droughts, severe winters, or other natural disturbances[20]

BLM simply cannot expect to have ecologically effective sage grouse habitat, or any other type of important wildlife habitat, and unlimited oil and gas development in the same area.  A situation arrives in which the goals, programs, and designations BLM uses to protect a valuable resource is only effective until such time that the right technology and/or price of oil and gas reaches a point that a previously non-economically extractable supply becomes economically extractable, or until a previously unknown supply not thought to exist is discovered. History tells us that BLM must consider the impacts of oil and gas development across the planning area and close areas which have important wildlife, cultural, or wilderness values.

---

[20] This paragraph is adapted from detailed scoping comments on Upper Green sage grouse population trends and management issues prepared by Dr. Braun and submitted to the Pinedale BLM in October, 2002. Contact Linda Baker, Upper Green River Valley Coordinator (307-360-7198) to receive a copy of his 14 page comment letter.

59

**Recommendations**:  In order for the BLM to comply with FLPMA and NEPA the agency should, at a minimum, consider and "rigorously explore" the possibility and design alternatives which do not leave a significant portion of the Field Office open to oil and gas leasing.  *See* 43 U.S.C. § 1712(c)(1) and 40 C.F.R. §§ 1502.14(a) and 1508.25(c).  We recommend, at a minimum, that the areas identified as having "low" oil and gas potential be removed from consideration for leasing.  Further, BLM must consider a range of alternatives that will address what to do with currently leased lands which are not developed and are either terminated or expire.  Not allowing oil and gas leasing in these areas would help the BLM move towards meeting its goal of managing the federal lands within its jurisdiction for a variety of uses, not primarily for oil and gas leasing.  For lands which area identified as appropriate for leasing, a variety of non-waivable stipulations, conditions of approvals (COAs), and Best Management Practices (BMPs – discussed later) should be developed to protect the many resources present in the planning area.

      b.   <u>Additional Impacts of Oil and Gas Leasing</u>

NEPA requires that federal agencies take a "hard look" at the direct and indirect environmental impacts of oil and gas development <u>before</u> any action that will lead to such development takes place.  *See, e.g., Pennaco Energy, Inc. v. U.S. Department of the Interior*, 377 F.3d 1147 (10th Cir. 2004); *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988); *Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983).  NEPA's regulations further provide that the "effects" on the environment that agencies must consider include those that are "direct, indirect, or cumulative."  40 C.F.R. § 1508.8.  The NEPA regulations define "cumulative impact" as:

> the impact on the environment which results from the **incremental impact of the action when added to other past, present, and reasonably foreseeable future actions** regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  **Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time**.

40 C.F.R. § 1508.7. (emphasis added).  The analysis of impacts included in the FEIS must adequately address the cumulative impacts of oil and gas operations within the region or the impacts inherent in the proposed action.

Federal caselaw amplifies that agencies must disclose the direct and indirect environmental effects a federal action will have on non-federal lands.  *See City of Davis v. Coleman*, 521 F.2d 631, 677-81 (9th Cir. 1975) (where federal approval of highway project likely to have impacts on development of surrounding area, agency must analyze development impacts in EIS); *Coalition for Canyon Preservation v. Bowers*, 632 F. 2d 774, 783 (9th Cir. 1980) (same); *Sierra Club v. Marsh*, 769 F.2d 868, 877-89 (1st Cir. 1985) (striking down EA where agency failed to account for private development impacts likely to result from its approval of causeway and port facility); *Mullin v. Skinner*, 756 F.Supp 904, 920-22, (E.D. N.C. 1990) (striking down EA where agency failed to account for private development impacts likely to result from agency approval of bridge).  Such impacts must be disclosed, particularly where facilitating private development may be the project's "reason for being."  *See Citizens Comm. Against Interstate Route 675 v. Lewis*, 542 F.Supp. 496, 562 (S.D. Ohio 1982).

BLM must consider impacts of region-wide development and also consider impacts on private lands. Existing development from neighboring planning areas as well as development within the field office

60

affects the Uncompahgre planning area.  Similarly, although the BLM may not have formal control over adjacent private lands, these lands can also be affected by oil and gas development.  The impacts of oil and gas development do not recognize management boundaries.

***Recommendation***:  In considering the need and ways to manage these lands to protect the many resources of these public lands, the agency must consider the cumulative impacts from regional oil and gas development and the cumulative impacts to adjacent lands from oil and gas development.  This analysis should inform the manner in which BLM allocates lands as available or unavailable for oil and gas development and the conditions under which development may be permitted.

c.   Best Management Practices

Significant portions of the Uncompahgre RMP planning area will likely remain open to oil and gas development.  As discussed with respect to the many other values of the lands within the planning area, many of these lands should not be open to leasing and others require non-waivable lease stipulations to protect their resources, such as wildlife habitat, water quality and wilderness characteristics. It is vital that the RMP require the use of best management practices (BMPs) for oil and gas exploration and development, which can drastically reduce the impacts of oil and gas development on the other natural resources of the public lands.

BLM's guidance requires consideration of BMPs for oil and gas development.  BLM's Instruction Memorandum 2004-194 directs consideration of BMPs and both the IM and the recently updated Gold Book provide examples of BMPs that can be applied to both new and existing leases, in order to limit the damage from oil and gas development.  It is critical that the RMPs consider and make BMPs mandatory in order to comply with BLM's guidance and obligations to protect the many natural values of these lands.

***Recommendations***:  The Uncompahgre RMP must identify BMPs and make them mandatory, especially in sensitive areas.  BMPs should include:

- Phased or strategic development - in terms of timing (developing one area, then restoring before moving to another), location (such as staying out of big game corridors), limiting amount of equipment in use at any given time, limiting amount of surface disturbance on a lease at any given time and requiring successful restoration before permitting additional disturbance;
- directional drilling;
- clustered drilling;
- closed loop drilling;
- interim reclamation;
- restoration standards;
- unitization; and
- increased bonding.

## 13. Air Quality

The RMP must thoroughly analyze impacts of each alternative on air quality, especially in the context of oil and gas development. The Environmental Protection Agency is currently proposing to lower the National Ambient Air Quality Standard (NAAQS) to better protect human health. The EPA's proposal

61

would strengthen the 8-hour "primary" ozone standard to a level within the range of 0.060-0.070 parts per million (ppm). EPA is also proposing to establish a seasonal "secondary" standard, designed to protect sensitive vegetation and ecosystems, including forest and wilderness areas, set within the range of 7-15 ppm-hours. Although non-attainment is most frequently expected and witnessed in large urban areas, rural counties with high levels of oil and gas development have experienced startlingly high levels of ozone pollution. The RMP should analyze air quality in the context of the new NAAQS, which should be finalized before the draft RMP is released.

In addition to ozone pollution, oil and gas development activities contribute to CO, $NO_x$, $SO_2$, HAPs and volatile organic compound (VOCs) pollution, through activities like flaring, drilling, processing plants, and wellhead compressors and compressor stations, to name a few.  Additionally, recreational ORV use cause fugitive dust emissions, particulate matter and contribute CO, $NO_x$, and hydrocarbon emissions.

Furthermore, deterioration of air quality is shown to have substantial economic costs, and good air quality provides many economic benefits. Attached please find a fact sheet (incorporated into these comments by reference), prepared by The Wilderness Society, entitled, "Assessing Costs Associated with Impacts to Air Quality."

The Wilderness Society reviewed three studies: two Reports to Congress prepared by the EPA and one recent peer-reviewed article whose principal author is a researcher employed by the EPA.[21]  These three studies summarize nearly all of the extant epidemiological and economic research related to the health consequences of ozone exposure.[22]  The studies, released in 1997, 1999, and 2005, show five patterns clearly:

1. Improvements in air quality result in substantial economic benefits well in excess of economic costs.

2. The range of known and scientifically-valid health consequences from polluted air in general, and elevated ozone levels in particular, is increasing.

3. The increasing breadth and depth of valuation research in economics provides evidence that can be used to quantify and monetize the health-related benefits of reduced air pollution.

4. High levels of inflation for goods and services related to health care suggest that the economic costs of ozone exposure will grow rapidly in the future, even if NAAQS standards are not further tightened.

5. There is a well-stocked tool box available to BLM to use in estimating the economic cost of the increased air pollution likely to result from accelerated oil and gas development and other pollution-generating activities on BLM lands.

In making land use decisions, federal agencies have an obligation under NEPA to take a "hard look" at the environmental consequences of a proposed action, and the requisite analysis "must be appropriate

---

[21] This review was originally conducted by Dr. Joe Kerkvliet as part of his comments on the Final Supplemental Environmental Impact Statement for the Pinedale Anticline Oil and Gas Exploration and Development Project.

[22] The Hubbell, et al., paper is attached to these comments. The EPA reports are too voluminous to attach to this letter, but can be accessed at http://yosemite.epa.gov/EE/epa/eerm.nsf/vwRepNumLookup/EE-0295?OpenDocument and http://www.epa.gov/oar/sect812/1990-2010/fullrept.pdf. Last accessed Mar. 26, 2010.

BLM_0077564

to the action in question." 42 U.S.C. § 4321 et seq.; *Metcalf v. Daley*, 214 F.3d 1135, 1151 (9th Cir. 2000); *Robertson v. Methow Valley Citizens Council*, *supra.* The impacts and effects of a proposed action, such as oil and gas development, that federal agencies are required to assess include: "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8. Under the Data Quality Act, federal agencies are required to use information that is of high quality and that is objective, useful, and verifiable by others.[23] Agencies must also use "sound statistical and research" methods.[24] In order to complete a sufficient analysis of air quality, the data provided with this fact sheet should be incorporated into the BLM's air quality analysis.

Protecting air quality should be a priority in the Uncompahgre RMP. FLPMA requires BLM to consider the relative value of the various resources, and clean air is quickly becoming (along with undeveloped landscapes) a most valued, yet dwindling resource. Therefore, BLM should take a proactive approach to managing air quality by, among other things: setting aggressive standards (beyond that simply found in existing regulations); requiring any actions on public lands to meet those standards (i.e. no flaring, no two-stroke engine use on public lands, etc); analyzing the cumulative impact of any proposed action with other past, present, and reasonably foreseeable actions; establishing an effective monitoring program; and halting any actions that contribute to air pollution if such monitoring reveals that standards have been exceeded.

Furthermore, NEPA requires BLM to analyze both adverse and beneficial impacts of its decisions. Therefore, the RMP should assess not only negative impacts to air quality from activities such as oil and gas development, but also the potential benefits of controlling those effects.

***Recommendations***: BLM should analyze impacts to air quality using the EPA's proposed NAAQS, and include management actions and best management practices in the RMP that minimize and mitigate those impacts. BLM should consider economic and other benefits of protecting air quality.

## 14. Uranium

The history of uranium mining and milling in the United States (and indeed, around the globe) is replete with environmental damage, serious worker safety and health abuses, and harm to entire communities. Many remote and unique landscapes continue to suffer the effects of an industry characterized by several years of speculation-driven booms followed by decades-long periods of inactivity. The affected communities have been both low income and in great measure comprised of rural and indigenous populations, representative of an all too common pattern of environmental injustice. Additionally, most of the environmentally damaged sites have not received adequate stabilization, let alone cleanup of past harms. Where cleanup and decontamination of the radioactive and toxic effects has been carried out, most of the cost has been borne by taxpayers rather than the owners of the largely Canadian-based companies who are engaged in the uranium mining and milling industry, including Energy Fuels Inc, the Canadian based company proposing the Piñon Ridge Uranium Mill in the Paradox Valley. The RMP and NEPA analysis provides the opportunity and duty for BLM to inventory these un-reclaimed mines and contaminated lands and to present the direct, indirect, and cumulative impacts of uranium mining,

---

[23] Treasury and General Government Appropriations Act for Fiscal Year 2001, Pub.L.No. 106-554, § 515. *See also*, Office of Management and Budget "Information Quality Guidelines," available at http://www.whitehouse.gov/omb/inforeg/iqg_oct2002.pdf and individual "Agency Information Quality Guidelines," available at http://www.whitehouse.gov/omb/inforeg/agency_info_quality_links.html.

[24] *Ibid.*

BLM_0077565

along with a robust set of alternative courses of action and mitigation measures which will guide the BLM in its ongoing attempts to handle abandoned mines in the Uncompahgre Field Office, while simultaneously attempting to consider and approve the industry's attempts to open new mines.

The boom and bust of the uranium mining industry in the Uravan Mineral Belt has left un-reclaimed, abandoned and mining operations "temporarily on hold" waiting for the next boom. Many of these operations are using these sites as long-term storage for uranium ore, resulting in unnecessary and undue degradation of the land, air, water, and wildlife on which multiple uses of these lands depend. In addition to imposing strict standards for the handling and stockpiling of ore, wasterock, and overburden during actual mining operations, the RMP should impose an outright ban on the ongoing practice of using mine pads for the long-term storage of uranium ore.

The BLM should acknowledge in the RMP that it has the authority to deny mining claims altogether to comply with FLPMA's requirement that, "[i]n managing the public lands the Secretary [of the Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). The requirement to avoid unnecessary or undue degradation is the "heart of FLPMA [and] amends and supersedes the Mining Law." Mineral Policy Center, 292 F. Supp. 2d 30, 33 (D.D.C. 2003). Congress explicitly recognized that this requirement would "impair the rights of any locators or claims under the Act, including, but not limited to, rights of ingress and egress." 43 U.S.C. § 1732(b).

Specifically concerning the Department of Energy Lease Program in the UFO the RMP should recognize that the BLM continues to have management authority over the lease tracts. The RMP must make management decisions in accordance with the public land laws, all of which still apply on uranium lease tracts co-managed by the BLM and DOE. Our review finds no applicable NEPA analysis of the BLM's past decisions or the BLM management duties as they apply to the ongoing activities on these lease tracts.

Because of the unique and significant impacts posed by each of the uranium mines in the Uncompahgre Field Office, the RMP must include specific commitment that, for any proposed uranium mining projects, the BLM will evaluate all necessary, site-specific information within the requirements of an EIS. The process and analyses required in an EIS is necessary to protect the environment and public health, ensure that any recovery minimizes and mitigates negative impacts to sensitive resources like wilderness quality lands, clean air and water, wildlife habitat, cultural resources, and recreation opportunities. No federal agency has prepared a NEPA-compliant analysis of the cumulative impacts – past, present, and future - of the uranium mining and milling activity in the Uncompahgre Field Office, which includes the Uravan Mineral Belt and the area shown by the map published by Energy Fuels to demonstrate the geographic scope of the uranium mining and milling activities in the Uncompahgre region. Such a cumulative impacts analysis should at a minimum include the cumulative impacts of uranium mining and milling on the quantity and quality of regional groundwater supplies, the cumulative impacts on regional airsheds, and the cumulative impacts on regional surface water supplies. Impacts to wildlife, and necessary restrictions and mitigation measures must be considered, especially the impacts to threatened and endangered species, sensitive species, and bats, which are attracted to mine sites. Additionally, in the RMP, the BLM should evaluate and identify practices that can be required to minimize the impacts on the other natural resources of the planning area by limiting water use and surface disturbances. Last, because circumstance may arise at the site-specific level where the impacts cannot be adequately mitigated, the RMP must recognize that field offices must consider a "no action alternative" and may choose to deny a mining or exploration request in such situations.

64

**_Recommendation_**: BLM should protect areas from uranium mining where appropriate, thoroughly analyze the cumulative impacts of any proposed uranium recovery and make every effort to minimize and mitigate negative impacts to sensitive resources.

## 15. Fugitive Dust

Oil and gas development, mining, grazing, and off-road vehicle use are activities managed by the BLM that can destabilize soils and make them susceptible to windborne erosion. The resulting dust can cause impacts to wildlife, air quality, climate, and human health. The Monticello and Richfield (Utah) Proposed RMPs declare that surface disturbing activities such as oil and gas development and motorized vehicles contribute to fugitive dust (see, e.g. Richfield PRMP at 4-6, Monticello PRMP at 4-17, 3-13). The Uncompahgre RMP should also recognize this impact, analyze it in each of the alternatives, and adopt management actions that minimize pollution from fugitive dust emissions.

a.   Impacts to Ecosystems

Fugitive dust suspended in the air has the potential to impact more total area than any other impact of roads (paved or unpaved), and it can have significant effects on ecosystems and wildlife habitat. Forman _et al._, 2003; Westec, 1979.  Motorized vehicles create fugitive dust by travelling on unpaved roads and through cross country travel; it is then dispersed along roadsides or carried further afield via wind currents.  An example of fugitive dust plumes caused by ORV traffic is documented in 1973 satellite photos. These photos show six dust plumes in the Mojave Desert covering more than 1,700 $km^2$ (656.2 $mi^2$). These plumes were attributed to destabilization of soil surfaces resulting from ORV activities. Nakata et al., 1976; Gill 1996.

Fugitive dust can have serious consequences for plant and animal species.  One study of Alaskan roads heavily traveled by various types of vehicles found that dust had buried mosses and very low-statured vegetation in the 10-m-wide area adjacent to each side of the road; dust blankets measured up to 10 cm (3.9 in) deep. Walker and Everett 1987.  According to the EPA,

> Dust can cause both physical and chemical effects. Deposition of inert PM [i.e., particulate matter] on above-ground plant organs sufficient to coat them with a layer of dust may result in changes in radiation received, a rise in leaf temperature, and the blockage of stomata. Crust formation can reduce photosynthesis and the formation of carbohydrates needed for normal growth, induce premature leaf-fall, damage leaf tissues, inhibit growth of new tissue, and reduce starch storage. Dust may decrease photosynthesis, respiration, and transpiration; and it may result in the condensation and reactivity of gaseous pollutants with PM, thereby causing visible injury symptoms and decreased productivity.

EPA, Draft Integrated Science Assessment for Particulate Matter, at 9-108 to 9-109 (Dec. 2008), _available at_ http://oaspub.epa.gov/eims/eimscomm.getfile?p_download_id=485679. The BLM should address the impact of fugitive dust on vegetation in and near the Uncompahgre Field Office, including the disruption of photosynthetic and respiration processes and resulting reduced plant growth, reproduction, and survivorship.  It should also evaluate the impacts of dust on wildlife.

65

b.   Climate Change

A hard look at impacts from fugitive dust is also necessary in order to understand and disclose to the public the likely contributions to regional climate change caused by this plan.  In September 2009, Dr. Jayne Belnap of the United States Geological Survey gave a presentation to the Colorado Water Conservancy District.[25]  Dr. Belnap's presentation addressed the connection between increased temperature, disturbance, invasive species and dust.  This presentation focused much attention on the impacts from ORVs and noted the cycle of increasing temperatures, which increases dust, which is exacerbated by ORV use, which increases the effects of climate change (temperature increases), with the key indicator of these problems being earlier snowmelts.  Of particular concern is the amount of dust that results from motorized routes, which settles upon snow pack and alters the melt rate which, in turn, alters the availability of warm season infusion of water into streams and lakes, when such water is critical to wildlife.  For example, in 2005 and 2006, disturbed desert dust melted snow cover 18 to 35 days earlier in the San Juan Mountains.[26] In 2009, disturbed desert dust melted snow cover 48 days earlier in the San Juans.[27]

Neff, et.al, (2008) found that "dust deposition onto snow cover in the western United States has recently been shown to accelerate melt and reduce snow-cover duration by approximately one month, a finding that has broad implications for water resources in mountainous regions of the United States" (citing Painter, T. H. *et al.* The impact of disturbed desert soils on duration of mountain snow cover. *Geophys. Res. Lett.* 24 (2007), attached).

c.   Air Quality

Fugitive dust is also a significant contributor to air quality impairment.  In fact, according to the National Emissions Inventory, road dust is the single greatest source of $PM_{10}$.  EPA, Draft Integrated Science Assessment for Particulate Matter, at 3-171 (Dec. 2008), available at http://oaspub.epa.gov/eims/eimscomm.getfile?p_download_id=485679. Fugitive dust accounts for approximately 50% of primary $PM_{2.5}$, with 40% of that arising from unpaved roads. EPA, Air Quality Criteria for Particulate Matter, at 3-94 (Oct. 2004), available at http://oaspub.epa.gov/eims/eimscomm.getfile?p_download_id=435945. Further, a recent California study clearly demonstrates that ORV activity is a major contributor to high particulate matter concentrations in nearby airsheds because of destruction of soil crusts and vegetation. Craig, Cahill, and Ono 2010, available at http://www.slocleanair.org/pdf/PM2-final_report.pdf .  The RMP should discuss impacts the travel system and ORV use can have on air quality in the resource area and airsheds outside the resource area.

d.   Human Health

In addition to the concerns raised above, we are worried that increased levels of particulate matter will have negative effects on human health inside and outside the resource area.  According to the EPA, "[n]umerous scientific studies have linked particle pollution exposure to a variety of problems, including

---

[25] PowerPoint presentation given September 18, 2009 at the Colorado River Water Conservancy District seminar, attached as Appendix C and available online at http://www.crwcd.org/page_305).

[26] Thomas H. Painter et al., Impact of Disturbed Desert Soils on Duration of Mountain Snow Cover, Geophysical Research Letters, Vol. 24, L12502 (June 23, 2007).

[27] Thomas H. Painter, Presentation, Colorado River District Water Seminar, September 18, 2009, Grand Junction, Colorado (Painter Grand Junction Presentation).

66

BLM_0077568

increased respiratory symptoms, such as irritation of the airways, coughing, or difficulty breathing, for example; decreased lung function; aggravated asthma; development of chronic bronchitis; irregular heartbeat; nonfatal heart attacks; and premature death in people with heart or lung disease." http://www.epa.gov/pm/health.html, last accessed March 9, 2010. In fact, recently a group of doctors in Utah cited increased dust due to climate change, which, as noted above, is exacerbated as a result of ORV use on fragile soils, as a top public health concern in the arid West.  (See attached article.)  The BLM should analyze the effects of fugitive dust on human health in the resource area, including the potential for airborne fugitive dust to travel and affect human health beyond the boundaries of the Uncompahgre Field Office.

***Recommendations***: BLM should analyze the amount of dust that will be generated from the road system, including for ORV use and energy development, through the use of readily available modeling techniques and sampling for particulate matter generated along a representative sample of routes proposed for designation.  This has been done for BLM projects (the West Tavaputs Plateau Natural Gas Full Field Development Plan, DEIS February 2008 and the Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal, FEA December 2007), and the models for these projects demonstrate that fugitive dust from vehicular travel on unpaved roads can create significant levels of ambient pollution. The Uncompahgre RMP should complete a similar analysis, which comprehensively inventories and describes fugitive dust emissions and models near-field, far-field, and cumulative effects of fugitive dust. The RMP should limit surface disturbing activities as necessary to reduce windborne soil erosion.

## 16. Renewable Energy

The RMP should identify zones for renewable energy projects and limit all renewable energy development to those zones. Zones should be based on high-resource, low-conflict areas that are on already-degraded lands and near existing infrastructure. The BLM is already taking a similar approach in the ongoing Programmatic Environmental Impact Statement for Solar Energy Development and this RMP should designate zones for all types of renewable energy and then limit development to those zones.  In addition, within the zones, BLM should prioritize lands that are most suitable for development, ensure adequate protective measures are imposed on development, and require both on-site and off-site mitigation of impacts to resources, as well as loss of uses (such as recreation).

For off-site mitigation, we also direct BLM's attention to IM 2008-204, which describes the broad type of actions that may be taken to address both direct impacts of a project and greater cumulative effects that development is having on a landscape. IM 2008-204 identifies and elaborates on the types of off-site mitigation that can be used, stating:

- Offsite mitigation may include, as appropriate:
  - In-kind: Replacement or substitution of resources that are of the same type and kind as those being impacted.
    - Example: For every acre of new, long-term surface disturbance in important sage-grouse nesting/early brood-rearing habitat in Area (A), (X) acres of unsuitable habitat in Area (B) is reclaimed, treated, or planted to create new or suitable nesting/early brood-rearing sage-grouse habitat.
  - Out-of-kind: Replacement or substitute resources that, while related, are of equal or greater overall value to public lands.

BLM_0077569

- Example: For every acre of new, long-term surface disturbance in important sage-grouse nesting/early brood-rearing habitat in Area (A), the project proponent agrees to bury (Y) miles of existing power lines and remove the power poles used as hunting perches by raptors in Area (B).
  - o  In-lieu-fee: Payment of funds to the BLM or a natural resource management agency, foundation, or other appropriate organization for performance of mitigation that addresses impacts of a project.
    - Example: The applicant may make payment to the BLM or a conservation group based on the amount of acres that will be disturbed in exchange for commitment from the recipient to apply the funds toward local sage-grouse core habitat protection/restoration projects.

In the context of renewable energy development, there may be additional conservation priorities that can be pursued to mitigate the impacts of individual projects and BLM could being discussions with interested stakeholders to identify these potential targets for off-site mitigation efforts or funding.

***Recommendations***: The Uncompahgre RMP should identify zones for all types of renewable energy development that prioritize high potential for energy development areas that contain degraded lands and are in close  proximity to new transmission, while excluding sensitive conservation lands, such as citizen-proposed wilderness areas and ACECs. The RMP should also specifically preclude development outside the designated zones. Within the zones, the RMP should also set out prioritization criteria, which direct development to degraded lands and identifies other areas where  development is more likely to lead to conflict, as well as setting out protective stipulations to safeguard other resources. We have provided a proposed "Sensitivity Based Prioritization for Development Areas Within Renewable Energy Zones" (attached to these comments) to be used by the Uncompahgre Field Office in implementing these recommendations. For off-site mitigation, BLM should provide for addressing a wide range of options to address the cumulative, far-reaching impact of renewable energy development (as set out in IM 2008-204) and should design a process to reach out to stakeholders and develop a set of conservation priorities to target in connection with off-site mitigation.

## 17. Energy Corridors

As part of the process to designate West-wide Energy Corridors mandated by the Energy Policy Act of 2005, the Department of Energy's Final Programmatic Environmental Impact Statement (PEIS) designates several energy corridors for pipelines and powerlines through the Uncompahgre Field Office. Especially of note is corridor 130-131 (S), which intersects the northern edge of our Norwood Canyon CWP. This corridor could have significant and lasting impacts to the area.

Public comments on the Draft PEIS, attendees at public meetings held by the Department of Energy and cooperating agencies, and Congressmen, utility companies, renewable energy experts, and representatives from state and local governments participating in an oversight hearing held by the House Natural Resources Committee, Subcommittee on National Parks, Forests, and Public Lands and Subcommittee on Energy and Minerals all voiced major concerns about the corridor designation process.  These concerns included:
- lack of adequate consultation with Native American tribes, state and local governments and communities, and local citizens;
- lack of access for renewable energy transmission;

BLM_0077570

- failure to analyze the opportunity to reduce transmission need and the need to designate new corridors with increased efficiency, distributed generation, and new technologies;
- lack of analysis of cumulative impacts;
- failure to analyze impacts to non-federal lands;
- and inadequate protection for special places, protected lands, wildlife habitat, cultural resources, and recreation opportunities.

Many of these concerns were largely ignored in the formulation of the Final PEIS. During the RMP revision, BLM should evaluate potential impacts from corridor 130-131 as well as other corridors within the field office to determine if these corridors are found to be compatible with appropriate resource management.

***Recommendation****: To ensure a sustainable and reliable transmission infrastructure while limiting negative impacts, BLM should designate corridor locations and widths that are based on BLM's local expertise, appropriately account for concerns of local communities, and protect field office resources.

## 18. Climate Change

The Uncompahgre planning area will undoubtedly experience real effects of climate change during the 20 year period that the RMP is in effect. The RMP must analyze climate change both in terms of mitigating contributions to climate change from management decisions and adapting to inevitable impacts of climate change.

We strongly encourage BLM to address the impacts of climate change both from land management actions and to the resource area in this planning revision. There is a global scientific consensus that human-induced climate change is currently altering the landscape and ecological functions at an unprecedented rate. According to the U.S. Climate Change Science Program, the Southwest landscape could be greatly transformed due to drought, wildfire, invasive species, and rising temperatures (4°F to 10°F above the historical baseline). It is imperative that BLM, as the primary landowner in the area, consider, analyze, and mitigate the impacts of global climate change in this management plan revision.

1. BLM must take a hard look at climate change impacts

Impacts to the ecosystem from climate change include shrinking water resources; dust-covered snowpack causing earlier, faster snowmelt; invasion of more flammable non-native plant species; soil erosion; loss of wildlife habitat; and larger, hotter wildfires. Many of these impacts have been catalogued in recent studies by federal agencies showing the impacts of climate change specifically in the United States such as the recent report entitled Global Climate Change Impacts in the United States, *available at* http://www.globalchange.gov/publications/reports/scientific-assessments/us-impacts.

On September 14, 2009, Interior Secretary Salazar issued Secretarial Order (S.O.) No. 3289. This order unequivocally mandates all agencies within the Department of Interior to "analyze potential climate change impacts when underlining long-range planning exercises, setting priorities for scientific research and investigations, developing multi-year management plans, and making major decisions regarding potential use of resources under the Department's purview." S.O. 3289, *incorporating* S.O. 3226 (emphasis added). The Uncompahgre RMP revision falls squarely under this guidance and BLM must

69

assess impacts from the proposed actions that may directly, indirectly, or cumulatively result in exacerbating climate change within this document.

The BLM must fully analyze the cumulative and incremental impacts of the proposed decisions in the RMP. Center for Biological Diversity v. National Travel Safety and Highway Administration, 538 F.3d 1172, 1217 (9th Cir. 2008). In CBD v. NTSHA, the NTSHA failed to provide analysis for the impact of greenhouse gas emissions on climate change and was rebuked by the U.S. Court of Appeals for the Ninth Circuit, which observed that "[t]he impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." 538 F.3d at 1217. For example, off-road vehicle designations, oil and gas management stipulations, and renewable energy development may significantly increase or reduced greenhouse gas emissions contributing to climate change and must be analyzed under NEPA.

Further, NEPA regulations require that NEPA documents address not only the direct effects of federal proposals, but also "reasonably foreseeable" indirect effects.  These are defined as:

> Indirect effects, which are caused by the action and are later in time or farther removed in distance, *but are still reasonably foreseeable*. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b).

For example, the U.S. Climate Change Science Program working group published a report on September 11, 2007 which predicts and elaborates on the widespread impact of climate change on public lands arid regions.  *See* U.S. Department of Agriculture, *The effects of climate change on agriculture, land resources, water resources and biodiversity*, *available at* http://www.climatescience.gov/Library/sap/sap4-3/default.php. That report notes that "the climate changes that we can expect are very likely to continue to have *significant effects* on the ecosystems of the United States." *Id.* at 3 (emphasis added).  These significant impacts include:

- Climate effects on disturbances such as fire, insect outbreaks and wind and ice storms are very likely important in shaping ecosystem structure and function;
- Grasslands will transform into woody shrublands with reduced capacity for water absorption and greater vulnerability to channelization and erosion;
- Droughts early in the 21st Century are likely to increase rates of perennial plant mortality in arid lands, accelerate rates of erosion and create opportunities for exotic plant invasions;
- Proliferation of non-native annual and perennial grasses are virtually certain to predispose sites to fire.  The climate-driven dynamics of the fire cycle is likely to become the single most important feature controlling future plant distribution in U.S. arid lands;
- Climate change is likely to result in shrinking water resources and place increasing pressure on montane water sources to arid land rivers, and increase competition among all major water depletions in arid land river and riparian ecosystems;
- Major disturbances like floods and droughts that structure arid land river corridors are likely to increase in number and intensity (with associated increases in erosion and native plant loss);

70

BLM_0077572

- Land use change, increased nutrient availability, increasing human water demand and continued pressure from exotic species will act synergistically with climate warming to *restructure* the rivers and riparian zones of arid lands;
- Climate change will increase the erosive impact of precipitation and wind;
- Surface soils will become more erodible;
- Increases in wind speed and gustiness will likely increase wind erosion.

*Id.* at 9. While these findings are dramatic, the report further notes that "[i]t is likely that these changes will increase over the next several decades in both frequency and magnitude, and it is possible that they will accelerate." *Id.* at 23.

A report released last year by the Bipartisan Policy Center and edited by the Wildlife Management Institute, provides detailed information about the impacts of climate change on fish and game. *See* http://www.seasonsend.com/downloads/SeasonsEnd.pdf. The Season's End report is not only edited by the Wildlife Management Institute,[28] but quotes a number of biologists in various state fish and game agencies. It is clear from this report that it is indeed possible to use modeling to determine losses of stream habitat for various temperature and climate scenarios. *Id.* at 31.

Finally, the BLM should take advantage of the special conditions of the landscape to advance the important study of global climate change. Due to the fact that BLM is the primary landowner in the area, it is well-suited to provide a scientific model in ongoing research on global climate change by regularly monitoring and reporting on the ecological conditions of the area. This RMP revision provides BLM with the opportunity to collect vital data on climate change in the region to inform the global scientific community.

**_Recommendation_**:  Pursuant to agency policy and case law, BLM must address the impacts of climate change from the proposed action. We recommend that the EIS for this plan incorporate a landscape-level analysis of how the proposed management decisions may contribute to or assuage climate change. The BLM must also evaluate how predicted shifts in climate may lead to an altered management regime in the future.

2. BLM must develop a range of reasonable alternatives minimizing the adverse effects of climate change from the proposed action

In addition to the agencies' duty to take a hard look at the impacts of climate change to and from the proposed vegetation management plan, the agencies must also include a range of alternatives that includes a strategy for mitigating these impacts. CEQ regulations instruct agencies to consider alternatives to their proposed action that will have less of an environmental impact. 40 C.F.R. § 1500.2(e) states that "[f]ederal agencies shall to the fullest extent possible: . . . Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment."

A June 2008 report, prepared by the Environmental Protection Agency, specifically "identifies strategies to address management challenges posed by climate change for a subset of federally protected lands

---

[28] According to its website, the Institute's work is done by "resource personnel [who] are highly trained and experienced wildlife science and management professionals, typically working away from the public limelight to catalyze and facilitate strategies, actions, decisions and programs to benefit wildlife and wildlife values." http://www.wildlifemanagementinstitute.org/. It has been in existence for nearly 100 years.

71

and waters.  These strategies can also be broadly applied to other lands and waters managed by governmental or nongovernmental entities."  U.S. Climate Change Science Program Final Report, Synthesis and Assessment Product 4.4, "Preliminary Review of Adaptation Options for Climate-Sensitive Ecosystems and Resources" (June 2008), *available at* http://www.epa.gov/ord/npd/pdfs/gcrp-factsheet_SAP-4-4.pdf.  This information should be included in the analysis of the proposed action in order to craft a reasonable range of management alternatives for addressing climate change.

**_Recommendations_**:  Proposed alternatives for the RMP should include those that help public lands and resources or proposed projects mitigate climate change or build resiliency to the potential effects of climate change. The RMP should incorporate adaptive management solutions that include monitoring of ecosystem conditions and changing strategies in order to protect the resources of the area and ensure the preservation of important ecosystem services in the face of climate change.

3.   BLM must take steps to prevent unnecessary or undue degradation from climate change

In addition to consideration of impacts from climate change, BLM must also minimize adverse impacts from climate change under FLPMA. FLPMA provides that BLM must *"take any action necessary to prevent unnecessary or undue degradation to managed resources."* 43 U.S.C. §1732(b). Intertwined with this provision is a similar responsibility for BLM to manage public lands *"without permanent impairment to the productivity of the land and the quality of the environment."* 43 U.S.C. §1702(c). These provisions combine to necessitate on-the-ground implementation of climate change policies.

**_Recommendations_**:  Under FLPMA's mandate to prevent unnecessary or undue degradation, BLM must consider how prescriptions in the RMP will minimize adverse impacts of climate change to the resource area.

4.   BLM must develop adequate monitoring strategy to address unforeseen management challenges in the face of climate change

In order to respond to the land management challenges presented by climate change, the agencies must have the best available data as well as a strategy in place to respond to uncertainties as they arise. A vigilant science-based monitoring system should be set out in the RMP in order to address unforeseeable shifts to the ecosystem.

A detailed monitoring approach is also required under the BLM's planning regulations:

> The proposed plan shall establish intervals and standards, as appropriate, for monitoring and evaluation of the plan. Such *intervals and standards shall be based on the sensitivity of the resource* to the decisions involved and shall provide for evaluation to determine whether mitigation measures are satisfactory, whether there has been significant change in the related plans of other Federal agencies, State or local governments, or Indian tribes, or whether there is new data of significance to the plan. The Field Manager shall be responsible for monitoring and evaluating the plan in accordance with the established intervals and standards and at other times as appropriate to determine whether there is sufficient cause to warrant amendment or revision of the plan.

43 C.F.R. § 1610.4-9 (emphasis added).

BLM_0077574

Such vigilant monitoring is absolutely necessary in order to create an effective adaptive management framework in the face of climate change.

**_Recommendation_**:  A vigilant science-based monitoring system should be set out in the RMP in order to address unforeseeable shifts to the ecosystem due to the best available information on climate change. This should include coordination with the DOI's Climate Change Response Council, Regional Climate Change Response Centers, and Landscape Conservation Cooperatives as established in S.O. 3289.

## 19. Socioeconomic Analysis

The BLM must do a full analysis of all of the socioeconomic consequences of each alternative for the Uncompahgre RMP. We previously submitted detailed comments to EMPSi for consideration in the socioeconomic analysis for the Uncompahgre RMP revision. Those comments, which are attached to this letter in Appendix 2, address a wide range of often overlooked socioeconomic issues that the BLM must consider in addition to estimating jobs and income from commodity extraction on the lands in the Uncompahgre Field Office.

The attached comments provide detailed discussions of several socioeconomic issues that must be considered when the BLM does its analysis for the Uncompahgre RMP. These include a discussion of the issues associated with economic-base theory and its application for predicting impacts from land management, recommendations that the BLM look at trends in total personal income and employment in order to see a more complete picture of the Uncompahgre region's evolving economy, a discussion of the importance of using economically recoverable resource estimates for oil and gas in order to avoid overstating the potential impacts of such development, a discussion of the economic benefits of wilderness-quality lands, and a recommendation that the agency do all planning analysis based on realistic budget assumptions. These socioeconomic analyses are necessary for the BLM to adequately and equitably asses the socioeconomic impacts of the Uncompahgre RMP alternatives.

We recommend that the BLM use a total economic value approach that includes the estimation of non-market values for the wildlands and open spaces in the Uncompahgre planning area. BLM recently affirmed its commitment to this approach in draft IM 2010-061, which explicitly directs managers to evaluate non-market values in RMP analyses. We will be submitting comments to BLM on this draft IM, and we will be happy to provide the Uncompahgre Field Office with a copy of our comments because this issue is especially relevant to western Colorado communities. The total economic value analysis should include the full range of non-market values, including use values – such as recreation – as well as non-use values such as existence value (the benefit one gains just knowing wildlands are protected), option values (the benefit of knowing that one can visit a wildland for recreation) and bequest values (the benefit gained from knowing that wildlands are protected for future generations).

Also included in Appendix 2 are two socioeconomic scoping briefs and The Wilderness Society's recent report, *Natural Dividends: Wildland Protection and the Changing Economy of the Rocky Mountain West*. The first scoping brief, entitled "Socio-Economic Framework for Public Land Management Planning: Indicators for the West's Economy," details our expectations for the baseline analysis of the region's economy as well as the analysis of the potential impacts of proposed management alternatives on the area. This brief describes the changing economy of the Rocky Mountain West, and the role that public lands can play in bringing economic diversity to the communities of the Uncompahgre planning area. The second brief, entitled "The Economic and Social Impacts of Oil and Gas Development," describes the

73

significant and often hidden costs associated with oil and gas drilling. The analysis in the RMP must include an assessment of these costs in order to describe net (rather than gross) benefits of any proposed oil and gas leasing. We request that your analysis of socioeconomic considerations in the Uncompahgre Resource Area follow the approach set out in these documents, as well as the more specific considerations detailed in our attached comments.

**_Recommendations_**: The RMP should evaluate non-market values provided by wildlands, per BLM's commitment set out in draft IM 2010-061. BLM should utilize the materials included in Appendix 2 to inform the RMP's socioeconomic analysis and ensure a full accounting of the costs and benefits of each of the alternatives.

Thank you for your consideration of our scoping comments.  We look forward to seeing these issues addressed as the Uncompahgre RMP revision process continues.

Sincerely,

Steve Smith, Assistant Regional Director
Juli Slivka, BLM Action Center
**The Wilderness Society**
1660 Wynkoop St. Ste. 850
Denver, CO 80202
(303) 650-5818

Bethany Gravell, Executive Director
**Center for Native Ecosystems**
1536 Wynkoop St. Ste. 303
Denver, CO 80202
(303) 546-0214

Hilary White, Director
**Sheep Mountain Alliance**
PO Box 389
Telluride, CO 81435
(970) 729-2321

Roz McClellan
**Rocky Mountain Recreation Initiative**
1567 Twin Sisters Rd.
Nederland, CO 80466
(303) 447-9409

Kate Graham, Public Lands Organizer
**Colorado Environmental Coalition**
546 Main St. #404
Grand Junction, CO 81501
(970) 243-0002

74

BLM_0077576

Amber Kelley, Dolores River Campaign Coordinator
**San Juan Citizens Alliance**
PO Box 2461
Durango, CO 81302
(970) 259-3583

Rocky Smith
**Colorado Wild**
1030 Pearl #9
Denver, CO 80203
(303) 839-5900

Christine Canaly, Director
**San Luis Valley Ecosystem Council**
PO Box 223
Alamosa, CO 81101
(719) 256-4758

Peter Hart, Conservation Analyst/Staff Attorney
**Wilderness Workshop**
PO Box 1442
Carbondale, CO 81623
(970) 963-3977

Mike Chiropolos, Lands Program Director
**Western Resource Advocates**
2260 Baseline, Suite 200
Boulder, CO 80302
(330) 444-1188

Andrea Robinsong, Chair of the Public Lands Committee
**Western Colorado Congress**
PO Box 1931
Grand Junction, CO 81502
(970) 250-8515

Bryan Martin, Director of Conservation
**Colorado Mountain Club**
710 10th Street, Suite 200
Golden, CO 80401
(303) 279-3080

Tom Sobal
**Quiet Use Coalition**
PO Box 1452
Salida, CO 81201
(719) 207-4112

75

BLM_0077577

Robert Peters, PhD., Executive Director
**Western Slope Environmental Resource Council**
PO Box 1612
Paonia, CO 81428
(970) 527-5307

76

BLM_0077578

**Attachments**

1. BLM, Jarbidge Field Office, Idaho, Analysis of the Management Situation for the Jarbidge Resource Management Plan: Resource Management Plan/Environmental Impact Statement at 212-216 and Figure 39 (Locations of Current ACECs) and Figure 40 (Wilderness Study Areas), July 2007.

2. Monticello Proposed RMP, Response to Comments, comment no. 007-48

3. *State of Utah v. Norton,* Motion to Stay Briefing and for a Status Conference, September 9, 2005.

4. State of Utah v. Norton, Case No. 2:96-CV-0870, Order and Opinion (D.Utah September 20, 2006)

5. Brief of the Federal Appellees, State of Utah v. Kempthorne, Case No. 06-4240 (February 26, 2007)

6. Southern Utah Wilderness Alliance v. Norton, 457 F. Supp. 2d 1253 (D. Utah 2006)

7. IM No. AZ-2005-007

8. Appendix 2 - "Implementation, Monitoring, and Evaluation Process" - of the Jack Morrow Hills Coordinated Activity Plan, prepared by the Wyoming BLM.

9. Little Snake Draft RMP, Appendix F – Criteria for Subsequent Activity Planning

10. Excerpts from the Record of Decision (ROD) for the Dillon Resource Management Area (Montana).

11. Travel Management Planning Template

12. Guidelines for Managing Access between BLM and Private Lands in the Royal Gorge Field Office, incorporated in the Royal Gorge RMP and endorsed by the Front Range Resource Advisory Council (Resolution – FRRAC 06-05).

13. Price Field Office Draft RMP, Appendix 14: Special Recreation Permits.

14. *A Blueprint for Sage-grouse Conservation and Recovery*

15. "Assessing Costs Associated with Impacts to Air Quality"

16. Hubbell, B., A. Halberg, D.R. McCubbin, E. Post. 2005. Health Related Benefits of Attaining the 8-Hour Ozone Standard. Environmental Health Perspectives. 113(1): 73-82.

17. Thomas H. Painter et al., Impact of Disturbed Desert Soils on Duration of Mountain Snow Cover, Geophysical Research Letters, Vol. 24, L12502 (June 23, 2007).

BLM_0077579

18. "Doctors see climate change as dire health threat," Desert News. Oct. 22, 2009.

19. "Sensitivity Based Prioritization for Development Areas Within Renewable Energy Zones"

Appendix 1: Habitat Fragmentation
a. *Habitat Fragmentation from Roads:  Travel Planning Methods to Safeguard BLM Lands*, The Wilderness Society, 2006.

b. Wilbert, M., Thomson, J., Culver, N. 2008. Analysis of Habitat Fragmentation from Oil and Gas Development and its Impact on Wildlife: A Framework for Public Land Management Planning. The Wilderness Society: Washington, DC. 31 p.

c. Weller, C., Thomson, J., Morton, P., Aplet, G. 2002. Fragmenting Our Lands: The Ecological Footprint from Oil and Gas Development. The Wilderness Society: Washington, DC. 24 p.

d. Hartley, D. A., Thomson, J. L., Morton, P., Schlenker-Goodrich, E. 2003. Ecological Effects of a Transportation Network on Wildlife. The Wilderness Society: Washington, DC. 27 p.

e. Thomson, J. L., Hartley, D. A., Ozarski, J., Murray, K., Culver, N. W. 2004. Protecting Northern Arizona's National Monuments: The Challenges of Transportation Management. The Wilderness Society: Washington, DC. 39 p.

f. Thomson, J. L., Schaub, T. S., Culver, N. W. Aengst, P.C. 2005. Wildlife at a Crossroads: Energy Development in Western Wyoming. The Wilderness Society: Washington, DC. 40 p.

Appendix 2: Socioeconomic Analysis
a. Socioeconomic Scoping Comments

b. Socioeconomic Framework for Public Land Management Planning: Indicators for the West's Economy (2006)

c. The Economic and Social Impacts of Oil and Gas Development (2006)

d. Haefele, M., Morton, P., Culver, N. 2007. Natural Dividends: Wildland Protection and the Changing Economy of the Rocky Mountain West. Washington, DC. The Wilderness Society.

Appendix 3: Map and Descriptions of Citizen-Proposed Wilderness Areas

## References

Binkley, Dan, Bill Romme, and Tony Cheng, 2008.  Historical Forest Structure on the Uncompahgre Plateau: Informing restoration prescriptions for mountainside stewardship. Colorado Forest Restoration Institute, Ft. Collins, CO.

Britton L. Mace et al., *Aesthetic, Affective, and Cognitive Effects of Noise on Natural Landscape Assessment*, Society & Natural Resources, 12: 225-242, 1999.

BLM_0077580

Douglas S. Ouren et al., USGS, Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources (2007).

Erskine, Ivan, and Sherel Goodrich, 1999. Applying Fire to Pinyon-Juniper Communities of the Green River Corridor, Daggett County, Utah. IN:  Proceedings:  Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9

Goodrich, Sherel, and Chad Reid, 1999.  Soil and Watershed Implications of Ground Cover and Unburned Pinyon-Juniper Sites at Rifle Canyon and Jarvies Canyon [Utah]. IN:  Proceedings:  Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9.

Goodrich, Sherel, and Allen Huber, 1999. Response of A Seed Mix and Development of Ground Cover On Northerly and Southerly Exposures In the Jarvies Canyon Burn, Daggett County, Utah.  IN:  Proceedings:  Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9.

Goodrich, Sherel, and Dustin Rooks, 1999.  Control of Weeds at a Pinyon-Juniper Site By Seeding Grasses. IN:  Proceedings:  Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9.

Mehl, Mel S, 1992.  Old-Growth Descriptions For The Major Forest Cover Types in the Rocky Mountain Region.  IN:  Old-Growth Forests in the Southwest and Rocky Mountain Regions:  Proceedings of A Workshop.  USDA Forest Service, Rocky Mountain Research Station, General Technical Report RM-213.

Miller, Rick, Robin Tausch, and Wendy Waichler, 1999. Old-Growth Juniper and Pinyon Woodlands.  IN:  Proceedings:  Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9.

Robin T. Harrison et al., US Forest Service, Project Record: Predicting Impact of Noise on Recreationists (1980).

Romme, William H., Craig D. Allen, John D. Bailey, William L. Baker,
Brandon T. Bestelmeyer, Peter M. Brown, Karen S. Eisenhart, Lisa Floyd-Hanna,
David W. Huffman, Brian F. Jacobs, Richard F. Miller, Esteban H. Muldavin,
Thomas W. Swetnam, Robin J. Tausch, and Peter J. Weisberg, 2008.  Historical and Modern Disturbance Regimes, Stand Structures, and Landscape Dynamics in Piñon-Juniper Vegetation of the Western U.S. Colorado Forest Restoration Institute, Ft. Collins CO.

Romme, William H., Jeffery S. Redders, Lisa Floyd-Hanna, and David D. Hanna, 2009.  Pinyon-Juniper Woodlands.  IN:  Romme, William M., M. Lisa Floyd, and David Hanna. Historical Range of Variability and Current Landscape Condition Analysis:  South Central Highlands Section, Southwestern Colorado & Northern New Mexico. Colorado Forest Restoration Institute, Ft. Collins, CO.

79

BLM_0077581

Shinneman, D.J. 2006. Determining Restoration Needs for Piñon-Juniper Woodlands and Adjacent Semi-Arid Ecosystems On The Uncompahgre Plateau, Western Colorado. Dissertation. University of Wyoming, Laramie, Wyoming, USA.

Shinneman, D. J., W. L. Baker, and P. Lyon,, 2008.  Ecological Restoration Needs Derived From Reference Conditions For A Semi-Arid Landscape In Western Colorado, USA.  Journal of Arid Environments 72 (2008) 207-227.

Shinneman, Douglas J., and William L. Baker, 2009a.  Historical Fire And Multidecadal Drought As Context For Pinyon–Juniper Woodland Restoration In Western Colorado.  Ecological Applications 19(5), pp. 1231-1245.

Shinneman, D. J., and W. L. Baker, 2009b.  Environmental And Climatic Variables As Potential Drivers Of Post-Fire Cover Of Cheatgrass (*Bromus Tectorum*) In Seeded And Unseeded Semiarid Ecosystems. International Journal of Wildland Fire 2009, *18*, 191–202

Walker, Scott C., 1999. Species Compatibility and Successional Processes Affecting Seeding of Pinyon-Juniper Types.  In:  Proceedings:  Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9.

Young, James A., and T. J. Svejcar, 1999.  Harvesting Energy From the 19th Century Great Basin Woodlands.  IN:  Proceedings:  Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9.

BLM_0077582



# Recommended Approach for Using Oil and Gas Development Potential to Inform Land Use Planning Decisions:

## A Proposal to the Uncompahgre Field Office

Submitted to the BLM Uncompahgre Field Office on November 1, 2016, with our comments on the Uncompahgre Draft Resource Management Plan.

Contact: Juli Slivka; (303) 650-1179, juli_slivka@tws.org

1660 Wynkoop Street, Suite 850, Denver, CO  80202  |  ph  303.650.5818  |  **wilderness.org**

100% post consumer fiber

BLM_0077583

This document is a proposal for an updated approach to making oil and gas allocations and management decisions that BLM can and should use in the Uncompahgre Resource Management Plan (RMP). Our proposal stems from research The Wilderness Society conducted into BLM's decision-making process for oil and gas allocations, summarized along with policy recommendations in our report, *No Exit: Fixing the BLM's Indiscriminate Energy Leasing*.[1] The proposal draws on recommendations that should be applied to BLM resource management planning everywhere, including in national guidance, and is tailored herein to the Uncompahgre RMP.

The proposal includes three parts:

I.   The case for an updated approach to oil and gas management in land use planning
II.  Recommended methodology for this new approach
III. Outcomes from applying our recommended methodology to the Uncompahgre RMP

These concepts have been applied successfully in other field offices, and they are clearly consistent with BLM's multiple use mandate and overarching guidance.[2] In fact, as detailed in the introductory section of this proposal, BLM's Handbook H-1624-1 directs BLM to base oil and gas allocation decisions on development potential for oil and gas resources, which is the starting point for our recommended approach as well.  Additionally, this proposal could be largely implemented within the range of alternatives for the Uncompahgre Draft RMP.

This is a proposal to the Uncompahgre Field Office for managing oil and gas resources in the Uncompahgre RMP. At the same time, it includes a strong case for BLM to manage oil and gas resources similarly across the West and describes in general terms how these concepts should be applied to BLM planning, in addition to how they should be applied to the Uncompahgre RMP specifically.

**This proposal does not apply to the North Fork area. We support the North Fork Valley community's vision for public lands management in their region, including oil and gas management.**

An online data portal for exploring the data and recommendations included in this proposal is available at http://arcg.is/2fnGM8C.

---

[1] http://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web_0.pdf.
[2] For example, the Dinosaur Trail Master Leasing Plan, as adopted by the BLM White River Field Office, implements a phased leasing and development approach based on oil and gas development potential in which leasing would occur first in areas with medium to high development potential. Leasing within areas of low oil and gas potential would occur "once the BLM has completed additional analysis and planning." White River Approved RMPA for Oil and Gas Development (2015) at p. 2-45.

1

## I.   The case for a new approach to oil and gas management in land use planning

Ninety percent of the public lands and minerals managed by the Bureau of Land Management are open to open to oil and gas leasing, even in areas with little or no potential for developing those resources. Making low development potential areas available for leasing compromises protections for wildlife, recreation and other resources while encouraging speculative leasing. An examination of current BLM policies and management practices shows that there is little effort to protect at least some public lands from oil and gas leasing.[3] Fundamental flaws in BLM's guidance have led to a current total of 32 million acres leased for oil and gas development, with less than 13 million under development.[4] And a Congressional Budget Office report recently found that, for parcels leased between 1996 and 2003 (all of which have reached the end of their 10-year exploration period), only about 10 percent of onshore leases issued competitively and three percent of those issued noncompetitively actually entered production.[5]

BLM's Handbook H-1624-1 guides the agency on planning for fluid mineral resources. Chapter III of Handbook H-1624-1 directs BLM to plan for oil and gas development on federal lands in light of where recoverable deposits of oil and gas are most likely to exist. The guidance requires that BLM use "development potential" to predict where future drilling activity will take place and where impacts from oil and gas development will likely be focused within a planning area. Using this information, the guidance directs BLM to assign lease stipulations and other management prescriptions to protect competing resources and mitigate unwanted impacts from drilling and development.

However, when applied in land use planning, this guidance often produces illogical allocation decisions and management prescriptions that result in significant resource conflicts. It tends to lead BLM to *open* low and no potential lands to leasing, and, in many instances, apply weaker protections and stipulations in these areas than high potential areas. Since low potential lands are open to leasing with weak stipulations, they are frequently targeted for speculative leasing. In turn, speculative leases in low potential areas often preclude management decisions that might benefit other public lands resources, such as wilderness-quality lands, wildlife and recreation.

The guidance prescribes a sequence of steps by which development potential is applied to make oil and gas lease stipulation planning and allocation decisions. Essentially, development potential is used to predict the location and intensity of oil and gas development assuming that existing management prescriptions will remain in place. Then, alternatives to existing management are formulated to mitigate impacts and resolve conflicts that would likely result from continuing with existing management.

Under Handbook H-1624-1, stipulations beyond existing management prescriptions or standard terms and conditions are to be applied where impacts from development require mitigation. That is, heightened protections are imposed in areas where more significant impacts are predicted. However, impacts are more likely to exist in areas with moderate to high development potential. The implied corollary is that strict constraints and strong protections are not necessary in low potential areas because standard or existing lease terms are likely to mitigate the impacts from oil and gas development

---

[3] See No Exit (http://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web_0.pdf) and accompanying technical report (https://wilderness.org/sites/default/files/Development%20Potential-Technical%20Report%20%286.6.16%29.pdf).
[4] www.blm.gov/style/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE_PROTECTION_/energy/oil__gas_statistics/data_sets.Par.69959.File.dat/summary.pdf
[5] https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/51421-oil_and_gas_options.pdf

2

BLM_0077585

to an acceptable level. Consequently, application of the sequence of steps prescribed by the guidance produces stricter lease stipulations in areas with high development potential than in areas with low development potential.

The following flowchart illustrates how application of the guidance can result in decisions to make low potential areas open to leasing with relatively weak lease stipulations, regardless of the presence of other resources that could be harmed should development happen:[6]



The outcome of this approach to decision-making is that low development potential lands are frequently nominated and leased, presumably for speculative purposes, leading to public conflict and precluding protective management of other resources.

For example, in the Colorado River Valley Resource Management Plan, BLM decided not to manage lands for the protection of wilderness characteristics in the Grand Hogback lands with wilderness characteristics unit based on the presence of oil and gas leases, even though the leases had never experienced any development:

> The Grand Hogback citizens' wilderness proposal unit contains 11,360 acres of BLM lands. All of the proposed area meets the overall criteria for wilderness character...There are six active oil and gas leases within the unit, totaling approximately 2,240 acres. None of these leases shows any active drilling or has previously drilled wells. The ability to manage for wilderness characteristics in the unit would be difficult. If the current acres in the area continue to be leased and experience any development, protecting the unit's wilderness characteristics would be infeasible. . . .

Colorado River Valley PRMP (2015) at p. 3-135.

---

[6] See https://wilderness.org/sites/default/files/Development%20Potential-Technical%20Report%20%20%286.6.16%29.pdf for detailed case studies.

3

BLM_0077586

The Colorado River Valley RMP was finalized in July 2015, and already 5 of the 6 leases in the Grand Hogback lands with wilderness characteristics unit have expired. Yet, BLM has made a 20-year decision to not protect the wilderness qualities of this area. The Uncompahgre RMP can and should make better-reasoned decisions.

Similarly, last year, Wyoming BLM declined to manage the Rough Gulch area in the Cody Field Office for wilderness protection because "64% of the area [was] covered] by oil and gas leases," even though the leases had never been drilled. Rough Gulch borders a WSA—the McCullough Peaks WSA—and has "very low" potential for oil and gas development. Like most federal leases, especially those in areas with low development potential, the leases in Rough Gulch were never drilled, and they expired earlier this year. Yet, because the leases were in effect last year, when WY BLM made its land use planning decision for the area, BLM is not currently managing Rough Gulch for wilderness protection.

Prioritizing leasing outside of low potential areas also makes sense from an economic perspective. Leases in low potential areas generate minimal revenue but can carry significant costs. In terms of revenue, they are most likely to be sold at or near the minimum bid of $2/acre, and they are least likely to actually produce oil or gas and generate royalties.[7] *See* Bighorn Basin PRMP (2015) at p. 73 ("Leasing may be based on speculation, with leases within high risk prospects usually purchased for the lowest prices."); White River PRMP (1996) at p. A-7 ("At any given time, most of the acreage that is available for oil and gas leasing in the WRRA is under lease. . . . Most of the area is leased for speculative purposes and consequently only a small percentage of leases will ever be developed."). In terms of costs, leasing in low potential areas requires processing lease nominations, preparing environmental reviews, and resolving protests and resource use conflicts.

On the other hand, limiting leasing in low potential areas conflicts the least with industry objectives and can confer significant public benefits. Low potential lands are the "low-hanging fruit" by which the BLM can fulfill other objectives of its multiple-use mission, such as managing for fish, wildlife and recreation. Yet, as described above, speculative leases on low potential lands can prevent the BLM from otherwise managing lands for alternative purposes and fulfilling its multiple-use mandate. *See also* White River DRMPA (2012) at p. 4-377 (". . . authorized oil and gas uses would likely preclude other incompatible land use authorizations"). In addition, limiting exploration and development on low potential lands necessarily conflicts the least with industry objectives. As discussed in the Bighorn Basin PRMP (2015):

> [A]lternatives D and F place additional stipulations on oil and gas-related surface disturbances in the Absaroka Front, Fifteenmile, and Big Horn Front MLP analysis areas for the protection of big game, geologic features, and LRP soils. As a result, alternatives D and F could have additional adverse impacts on oil and gas development in these MLP analysis areas. . . . However, because of the generally low to very low potential for oil and gas development and redundancies with other restrictions on mineral leasing from the management of other program areas, management specific to the MLP is less likely to adversely affect oil and gas development in these areas.

---

[7] Center for Western Priorities, "A Fair Share" ("Oil Companies Can Obtain an Acre of Public Land for Less than the Price of a Big Mac. The minimum bid required to obtain public lands at oil and gas auctions stands at $2.00 per acre, an amount that has not been increased in decades. In 2014, oil companies obtained nearly 100,000 acres in Western states for only $2.00 per acre. . . .Oil companies are sitting on nearly 22 million acres of American lands without producing oil and gas from them. It only costs $1.50 per year to keep public lands idle, which provides little incentive to generate oil and gas or avoid land speculation.").

4

Bighorn Basin PRMP at p. 4-87; *see also* White River DRMP (1994) at p. 4-21 ("Prohibiting development in Class I areas would not affect oil and gas production because oil and gas potential in these areas is low.").

There are also legal arguments for changing how BLM manages low potential lands for oil and gas development. As described in Instruction Memorandum 2010-117, the multiple-use mandate requires that "there [be] no presumed preference for oil and gas development over other uses." *See* p. 2; *see also New Mexico Ex. Rel. Richardson v. BLM*, 565 F.3d 683, 710 (10th Cir. 2009) ("It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses."). Yet, H-1624-1 provides that all lands, regardless of development potential, are presumptively open to oil and gas leasing under "least restrictive" stipulations. *See* H-1624-1 at p. III-11 ("The least restrictive stipulations that effectively accomplishes the resource objectives or uses for a given alternative should be used . . . the preferred alternative of the RMP/EIS should provide evidence that less restrictive measures were considered but found inadequate to provide effective protection for other land uses or resource values determined through the planning process to be deserving of protection."). Stricter stipulations and closures are only applied when necessary to mitigate conflicts and unwanted environmental impacts. *See, e.g.*, Kremmling PRMP (2014) at p. 2-1 ("It is the policy of the BLM that lands are generally available for oil and gas leasing where measures can be taken to mitigate conflicts and environmental consequences to an acceptable level. . . ."). Yet, as described above, leaving lands open to oil and gas leasing does not simply allow oil and gas resources to compete on a level playing field with other resources—it gives preference to oil and gas development over other uses.[8]

As demonstrated, BLM's typical application of the guidance leaves low and no potential lands open to leasing and assigns weak stipulations and protective measures in these areas. We detail several significant problems stemming from this practice in our report *No Exit*:

- It precludes lands from being managed for multiple values.
- It impedes meaningful conservation from taking place on sensitive lands.
- Other resources are endangered by oil and gas leases that do not include sufficient protections.
- It undermines the public's engagement in the land planning process.
- It causes poor fiscal stewardship of taxpayer-owned resources.
- It prevents us from effectively achieving our national climate targets.

Since low potential lands have favorable lease stipulations and can be acquired and held for minimal cost, low potential areas are often targeted for speculative leasing, though rarely drilled and developed. Although leases on low potential lands generate minimal revenue, BLM devotes significant administrative resources to managing nominations and protests and administering leases on low potential lands. In addition, undeveloped leases on low potential lands impose less obvious opportunity costs in the form of precluding designations and management decisions that would otherwise benefit alternative resources. This, in turn, limits the ability of the BLM to fully comply with its multiple-use mandate. Eliminating the presumption that all lands, regardless of development potential, should be open to leasing would help ensure that other resources and uses of the public lands, such as wildlife and recreation, are on equal footing with oil and gas development. Doing so would also create opportunities

---

[8] Oil and gas interests can obtain valid existing rights (i.e., leases) in interim periods between RMP revisions that can later preclude management decisions benefiting alternative resources and uses. There is no analogous mechanism for uses alternative of oil and gas to gain interim vested rights that will later preclude oil and gas development. In this sense, presumptively opening lands to oil and gas development gives preference to oil and gas development over other uses.

BLM_0077588

to enhance the management of those other resources, particularly in areas with low or no development potential.

We argue in our report *No Exit* that BLM should update agency guidance to reflect a smarter, more balanced approach to oil and gas management. However, BLM has the ability to apply a more balanced approach in current land use planning efforts in the absence of new guidance. A more thoughtful, realistic approach would be consistent with BLM's mandate to manage the public lands for multiple use and sustained yield. The agency's governing statute identifies a wide range of uses and values and provides for using lands "for some or all of these resources" and "with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." 43 U.S.C. § 1702(c). Other aspects of BLM's legal obligations also support limiting or eliminating leasing in low- and no-potential areas, including for purposes of protecting other important resources. For example, BLM is subject to numerous requirements to "minimize" the environmental and other impacts of oil and gas leasing and development.[9] By taking a proactive approach to managing oil and gas development as just one of the many uses of our public lands, BLM can also reduce unnecessary costs associated with speculative leasing and undeveloped lands, while making room for designating and managing lands for other uses, such as recreation, wilderness values, and fish and wildlife.

The approach described below is unquestionably consistent with BLM's multiple use mandate and overarching guidance. Faithfully applying a current understanding of laws and policies would lead to closing more lands to oil and gas leasing, consistent with the agency's multiple use obligations. We therefore urge the Uncompahgre Field Office to apply these principles to the ongoing Uncompahgre RMP to achieve a more balanced land use plan that protects important resources and reduces the potential for public conflict over oil and gas leasing and development.

---

[9] See 43 C.F.R. § 3101.1-2 (reasonable measures may be required to minimize adverse impacts on leases); 43 C.F.R. § 2920.7(b)(2) (land use authorizations shall minimize damage to specified environmental resources); BLM Standard Lease Form 3100-11 (lessees "must" conduct their operations so as to minimize adverse impacts); Onshore Order No. 1 §§ IV and III(F)(a)(3) (operators "must" minimize adverse impacts and BLM may require reasonable measures to minimize adverse impacts when APDs are approved); BLM Gold Book (several provisions referencing minimization including a provision to "minimizes undesirable impacts to the environment").

6

## II.  Recommended methodology for a new approach

We developed a flow chart that BLM should follow in determining oil and gas allocations and management prescriptions in land use planning. This recommended methodology better reflects the agency's multiple use and sustained yield mandate, would lead to development of more balanced resource management plans, and would reduce conflict and costs associated with speculative leasing. Following BLM's current guidance, the first step is identifying oil and gas development potential across the planning area. We group development potential into two categories in the first step in the flowchart: high/medium development potential and low/no development potential. From there, BLM should determine levels of resource conflict and make land use planning decisions that protect important resources while providing for oil and gas development in areas with high/medium development potential, and prioritize management of other public lands resources in areas with low/no development potential.

Our methodology includes the following four steps to work through our recommended flowchart:

1.  Map oil and gas development potential
2.  Define areas of high, medium, low and no resource conflict
3.  Make allocations for areas with high and medium oil and gas development potential
4.  Make allocations for areas with low or no oil and gas development potential

We describe these steps in detail below. The next section of this proposal describes the outcomes of applying this methodology to the Uncompahgre RMP.

7

BLM_0077590



Decision Framework for Oil and Gas Allocations in Land Use Planning

| Oil and Gas Development Potential | Resource Conflict | Land Use Plan Decisions |
|---|---|---|
| High/Medium | High—Indicated by Special Management Area allocations, such as LWC, ACEC, EEA, SRMA. These places are specifically managed to prioritize resources and uses other than oil and gas. | Robust management measures are put in place, including closures where necessary.<br>Detailed planning decisions may be developed for the broader landscape, such as MLP. |
| | Medium/Low– Other resources exist that merit stipulations but are not included in a special management area, or no resource conflicts exist. | Stipulations are applied to resources with flexibility as appropriate.<br>Places with no conflict are open with standard lease terms. |
| Low/None | High—Indicated by Special Management Area allocations, such as LWC, ACEC, EEA, SRMA. These places are specifically managed to prioritize resources and uses other than oil and gas. | Closed |
| | Medium/Low– Other resources exist that merit stipulations but are not included in a special management area, or no resource conflicts exist. | Closed; or deferred pending additional planning; or subject to phased leasing |

**Step #1: Map oil and gas development potential**

*Generally*

This methodology is based on making oil and gas allocations dependent on oil and gas development potential. Therefore, the first step in the process, and one which BLM already completes in developing RMPs, is to map oil and gas development potential across the planning area. The success of this approach relies on the collection of accurate resource potential data, precise mapping, a mechanism for utilizing this information in the planning process and the desire to allow it to inform management decisions. BLM has well-established and defensible data collection and mapping processes and utilizes this information in developing the reasonably foreseeable development (RFD) analysis.

As discussed above, current guidance on resource potential data collection and analysis is set forth in BLM Handbook H-1624-1 (Planning for Fluid Mineral Resources), Chapter III. This Handbook section establishes procedural guidance and outlines a multi-step process for field offices to follow when making fluid mineral resource determinations. Most relevant to this discussion, the Handbook addresses how to assemble data, analyze resource capability and potential and project reasonably foreseeable development.

When initiating this process, BLM requires a review of data from all available sources in order to determine what resources are present as well as other factors that could influence the economic viability of those reserves. That includes historic drilling and leasing trends and expressions of interest in the planning area. BLM utilizes data from the Department of Energy, the American Petroleum Institute, state agencies, professional societies, and academic sources as well as previous BLM documentation and analysis. Perhaps the most integral information comes from the geologic data provided by the U.S. Geological Survey (USGS).

USGS conducts periodic assessments of both continuous and conventional recoverable oil and gas resources. This program was initiated in 2000 under the National Oil and Gas Assessment and provides the most comprehensive and accurate oil and gas potential data available. These assessments are regional in scale and develop geology-based estimates of technically recoverable resources. It is important to note that USGS includes "resources which cannot currently be drilled because of economic limits." H-1624-1 at Chapter III (B)(1)(c). These USGS assessments are key in the development of "occurrence potential" estimates in the RFD.

Occurrence potential is defined by BLM as:

> A rating of the potential for the presence of hydrocarbon resources to occur within the Study Area. The rating is based on geological and geophysical indications that hydrocarbons are present. Other factors, such as, accessibility, exploration cost, risk, oil and gas prices, and analysis period are not include[ed] in an analysis of Occurrence Potential.

2012 Uncompahgre Field Office RFD, Glossary.

While BLM assumes occurrence potential is constant within a play, it "does not imply a uniform distribution of the oil and gas resources nor of development within the play." H-1624-1 at Chapter III (B)(3). BLM addresses some of this variability by breaking down occurrence potential into four

9

categories: high, medium, low and none. "High" and "medium" designations signify demonstrated existence or an indication of the presence of the necessary geologic features, while "low" or "none" show a demonstrated absence of or indications that one or more of the necessary geologic features are absent in a given area.

Based on occurrence potential, and taking into consideration anticipated exploration and development activity, operator input, past and present activity, economics, drilling and completion technology, and accessibility to drilling locations and infrastructure, BLM estimates "development potential." Development potential is projected through the preparation of an RFD, and a map detailing the location of high, medium, low and no potential areas accompanies the final document.

The RFD is instrumental in the development of draft alternatives in an RMP. While the data collection and analysis processes used to determine development potential in the RFD do not require any major modifications, BLM's utilization of the development potential and RFD to analyze and ultimately adopt management decisions must be modified for reasons detailed previously in this proposal.

Given that this methodology, and the outcomes that result from applying it in the planning process, hinge on development potential data, BLM must be prepared to reevaluate oil and gas allocations as new information regarding development potential becomes available or there is significant a shift in a key variable used to generate the initial projection. Energy markets can crash or emerge, new reserves can be identified, technology can improve or other market forces can change drastically enough to alter supply and demand. BLM should include in the RMP or RFD examples of new information which would trigger such a reevaluation and commit to utilizing similar methodology in considering and deciding on new allocations when necessary. We note that changing oil and gas allocations based on new information would require an RMP amendment. By adhering to a systematic process such as the methodology proposed herein, BLM could have an efficient and expedient targeted amendment process.

*Specific to the Uncompahgre RMP*

The Uncompahgre RFD was completed in July 2012 and as a result relies on severely outdated information. The RFD made projections based on a number of assumptions that have proven to be wildly inaccurate. The RFD states that shale gas production would grow almost fourfold from 2009 to 2035 and that "Rising fuel prices [will] spur domestic energy production across all fuels."[10] It also relies on the EIA's 2012 Annual Energy Outlook (AEO) which projected natural gas prices to rise to $10.35/MMBtu and crude oil prices to move above $125 per barrel by 2035. Revised estimates from EIA show the 2012 projections to be overstated and recent inactivity in the Piceance basin clearly illustrates that shale gas production is not occurring to the extent predicted in 2012. Based on inaccurate assumptions and projections, BLM estimated that by 2035 the planning area could see as many as 1,271 wells drilled; 782 of those for the production of coalbed methane. The RFD analysis was then used to inform the development potential and environmental consequences for the area and eventually contributed to the development of the range of draft alternatives and selection of a preferred alternative.[11]

---

[10] 2012 UFO RFD, p. 57-58

[11] BLM notes in Chapter 4 that "It can be anticipated that assuming current rates of severance and royalty taxes, as presented in **Chapter 3**, increased production of oil and gas on BLM-administered lands would result in a comparable increase in contributions to local counties and communities."

10

The assumptions underlying the 2012 development potential projections and the RFD scenario have changed dramatically. BLM needs to reevaluate development potential and the RFD based on this new information. A new RFD and analysis of development potential will change the assumptions used in the development of the draft alternatives, in analyzing environmental consequences, in projecting the impact of oil and gas development in terms of jobs and revenues and ultimately the selection of the appropriate preferred alternative. It's likely that new data would indicate the initial analysis grossly overestimated development potential and the associated positive impacts of fossil fuel development in the region. A new RFD would make the case for developing a more balanced management plan that prioritizes protecting those resources and values that are most important to the local communities and broader public over fossil fuel extraction. More realistic and conservative oil and gas development projections that would come from a reevaluation of the RFD in light of new data could drastically alter the decisions made in the Uncompahgre RMP.

**Step #2: Define areas of high, medium, low and no resource conflicts**

### a.  Defining/identifying areas with high resource conflicts

*Generally*

Areas of high resource conflict are those for which BLM is prioritizing management for resources, values and uses other than oil and gas development. These generally include special management areas and other lands that are allocated for specific management that would conflict with oil and gas development. Lands with wilderness characteristics, Areas of Critical Environmental Concern, Recreation Management Areas and Backcountry Conservation Areas are all areas that BLM delineates in Resource Management Plans for emphasizing values and uses that would conflict with oil and gas, such as recreation, wildlife habitat, cultural resources and wilderness experiences.

*Specific to the Uncompahgre RMP*

In the Uncompahgre Draft RMP, BLM is considering the following management tools and designations that denote high resource conflict with oil and gas development: lands with wilderness characteristics, Areas of Critical Environmental Concern, Ecological Emphasis Areas, Special Recreation Management Areas, Extensive Recreation Management Areas, Wild and Scenic Rivers, and National Historic Trails. All of these potential special management areas should be considered high resource conflict under this methodology.

### b.  Defining/identifying areas with medium to low resource conflicts

*Generally*

Outside of special designations and areas allocated for specific management other than oil and gas, there is a wide range of public lands resource and uses that warrant restrictions on oil and gas development. This could include a number of factors such as special status species, fragile soils, visual resources, or any number of site-specific characteristics. It could also include places where oil and gas development counters management objectives for an area, such as places identified for ecological restoration or compensatory mitigation actions. BLM should fully consider the needs of resources and other resource uses, management goals and objectives, and compatible land use decisions in identifying locations with medium to low conflict.

11

*Specific to the Uncompahgre RMP*

In the Uncompahgre Draft RMP, BLM evaluates restrictions on oil and gas development for resources and areas that occur outside of special management areas. These resources include:

- Sensitive and special soils
- Steep slopes
- Agricultural operations
- Water resources
- Vegetation
- Terrestrial wildlife
- Big game species
- Fisheries
- Special Status Species
- Migratory birds, raptors and other bird species
- Cultural resources
- Visual resources
- Public health and safety
- Land health
- Paleontological resources
- Geologic hazards

Evidently, BLM has determined a potential need for limiting the impacts of oil and gas development on these resources. All resources which BLM considers protective stipulations for in Alternative B of the Draft RMP should be considered medium to low conflict, outside of areas that were previously established as high conflict.

### c.  Defining/identifying areas with no resource conflicts

Generally speaking, there are very few lands that contain no resources which would conflict with oil and gas development. This is evidenced by the fact that in modern RMPs, BLM applies at least one stipulation to significant portions of the planning area. For example, the recently-completed RMP amendment for oil and gas development in the White River Field Office made zero acres of federal mineral estate open to leasing with standard lease terms. White River Approved RMPA (2015) at p. 2-35. Similarly, the proposed Moab Master Leasing Plan would apply stipulations to 100% of the federal minerals addressed in the plan across the range of action alternatives. Moab MLP Final EIS (2016) at p. 2-18. Some areas have minimal resource conflicts that require minimal stipulations. However, if BLM identifies lands with no resource conflicts, those areas should be documented and addressed appropriately through this methodology.

12

BLM_0077595

**Step #3: Make allocations for areas with high and medium oil and gas development potential**



a. **Planning in areas with high/medium oil and gas development potential and high resource conflicts**

*Generally*

When an area has high or medium oil and gas development potential and overlaps with an identified special management area, it should be considered as having high potential for resource conflict. In high conflict areas the agency should apply robust management measures including NSO stipulations without waiver, exception or modification, or with specifically limited exceptions. In some cases, closures to leasing may be necessary to protect extraordinarily important and vulnerable resources. These areas may also be good candidates for Master Leasing Plans or other detailed planning decisions. MLPs are a "stepped-down leasing analysis" that evaluates "in greater detail than the RMP the impacts of leasing and likely development" and identifies "key issues such as protection of air quality, watersheds, wilderness, wildlife, and nearby land uses" and "leasing and higher-level development mitigation measures to protect the environment.[12] Agency guidance directs that MLPs are appropriate for areas with high development potential and high likelihood of conflict with other resources.

*Specific to the Uncompahgre RMP*

BLM should close the following lands with wilderness characteristics to oil and gas leasing to protect the extraordinarily valuable wilderness resources that exist in these areas from oil and gas development:
- Roc Creek

---

[12]http://www.blm.gov/style/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE_PROTECTION_/energy/leasing_reform.Par.54947.File.dat/Leasing_Reform_05-11-2011.pdf (emphases in original).

BLM_0077596

- Adobe Badlands WSA Adjacent[13]

BLM should apply strong stipulations to the following areas with high resource conflict that overlap with high and medium development potential.
- Lands with wilderness characteristics: Shavano Creek, Lower Tabeguache/Campbell Creek, Dolores River Canyon WSA Adjacent
- Areas of Critical Environmental Concern (ACECs): Salt Desert Shrub Ecosystem[14], East Paradox, West Paradox, Paradox Rock Art, La Sal Creek, San Miguel River, San Miguel Gunnison Sage-grouse, Tabeguache Pueblo and Tabeguache Caves
- Ecological Emphasis Areas: Adobe, Tabeguache, La Sal, Naturita Canyon, San Miguel
- Recreation Management Areas: San Miguel River, Burn Canyon, Paradox Valley
- Suitable Wild and Scenic River segments: San Miguel River, Dolores River, Beaver Creek, Saltado Creek, Naturita Creek, Dry Creek, Tabeguache Creek, La Sal Creek, Spring Creek, Lion Creek, North Fork Mesa Creek, Deep Creek, West Fork Terror Creek, Ice Lake Creek, Gunnison River

### b. Planning in areas with high/medium oil and gas development potential and medium or low resource conflicts

*Generally*

When an area has high or medium oil and gas development potential and does not overlap with any special management areas but does contain resources that warrant protective stipulations, it should be considered as having medium to low potential for resource conflict. In these areas, BLM is not prioritizing management of specific other resources as is the case in special management areas. However, BLM must give attention to all public lands resources and minimize impacts from oil and gas development.  In these areas the agency should apply protective but flexible resource-specific stipulations as appropriate.

*Specific to the Uncompahgre RMP*

In areas with moderate and high potential for oil and gas and medium to low potential for resource conflict outside, BLM should adopt the stipulations contemplated in Alternative B. This only applies

---

[13] The Adobe Badlands WSA-adjacent unit contains oil and gas leases that are part of the Whitewater Unit. However, the Master Development Plan for the Whitewater Unit that is currently under evaluation only proposes development in the northern portion of the unit and explicitly states that "development in the southern portion of the Whitewater Unit is not reasonably foreseeable." Fram Whitewater Unit MDP EA at 1.1. Furthermore, According to the unitization agreement, the Whitewater Unit was supposed to contract, and lands outside the "participating area" (PA) of the unit were supposed to be automatically eliminated, in July 2015. However, BLM granted a suspension that tolled contraction of the unit based on a pending APD for the Federal 12-98-24-2 well. The relevant BLM orders indicate that the unit will now contract roughly 120 days after BLM approves the APD. Therefore, BLM should ignore the presence of the overlapping unit for purposes of planning decisions in the RMP, because it is likely the unit will contract to exclude the Adobe LWC prior to the RMP being finalized.
[14] Because this ACEC overlaps with some high development potential and some very low development potential, we consider the overall potential for conflict to be high and recommend BLM put robust management prescriptions in place to protect the ACEC values while providing for oil and gas development where appropriate. The same rationale applies to all special management areas that overlap with some high/medium development potential and some low development potential.

12

outside of special management areas such as lands with wilderness characteristics, ACECs and recreation management areas. Although there are few if any areas with high energy development potential no resource conflict, if such areas are identified we recommend BLM allow that acreage to remain open under standard leasing terms.

**Step #4 Make allocations for areas with low or no oil and gas development potential**



a.  **Planning in areas with low/no oil and gas development potential and high resource conflicts**

*Generally*

Areas with low or no development potential that overlap with special management areas should be closed to leasing. There is no reason to allow for speculative leasing to put other important resources at risk and lead to public conflict.

*Specific to the Uncompahgre RMP*

All lands with wilderness characteristics, Areas of Critical Environmental Concern, Ecological Emphasis Areas, recreation management areas, suitable Wild and Scenic River segments, and National Historic Trails that occur in areas with low or no development potential should be closed to leasing. These include the following:
- Dry Creek Basin, Camel Back WSA Adjacent LWCs
- Roubideau Corridors, Roubideau-Potter-Monitor, Lower Uncompahgre Plateau Cultural, Sims-Cerro Gunnison Sage-grouse, Fairview South ACECs
- Monitor-Potter-Roubideau, Dry Creek, Spring Canyon, Sims Mesa, Ridgway EEAs
- Dry Creek, Spring Creek, Roubideau, North Delta, Kinikin Hills, Ridgway Trails RMAs
- Old Spanish National Historic Trail
- Roubideau Creek, Potter Creek, Monitor Creek Suitable Wild and Scenic River segments

13

**b.  Planning in areas with low/no oil and gas development potential and medium or low resource conflict**

*Generally*

BLM should also consider closing areas with low or no development potential to new leasing that overlap with medium or low resource conflict areas. Speculative leasing limits BLM's authority to make management decisions for public lands and disservices American taxpayers, and there is not a good argument for allowing industry to lease lands with little or no potential of producing oil and gas. While technology and resource information may change over time, thus making these areas desirable for development, this is actually an argument for ensuring an RMP amendment is required in such a situation so that the necessary analysis for developing those areas occurs. BLM must retain its ability to adequately plan for development in these areas if development become feasible.

If BLM does not simply close all lands with low or no development potential to oil and gas leasing, the agency should consider alternative planning decisions for areas with medium or low resource conflict to ensure speculative leasing does not put these other resources at risk. One option would be requiring phased and clustered leasing so that BLM drives where and how leasing occurs across the low and no development potential areas. Another option would be to defer all leasing in low or no development potential areas pending a Master Leasing Plan. BLM would not need to complete a Master Leasing Plan unless and until industry interest in developing the low and no development potential area arises. This would ensure that speculative leasing doesn't put resources at risk in areas with no and low development potential and would commit BLM to conducting adequate planning and analysis at the time that such analysis is warranted.

*Specific to the Uncompahgre RMP*

We recommend BLM close all areas with low or no development potential to leasing in the Uncompahgre RMP. This would be the best way to ensure other resources are not put at risk from speculative or inadequately analyzed leasing and development. This would also prevent BLM from wasting resources conducting NEPA analysis for lease parcels and managing leases that will never enter production. Alternatively, BLM should defer all leasing in areas with low or no development potential pending completion of Master Leasing Plans. BLM would not need to conduct analysis required to support leasing until industry shows interest in developing those areas, which would likely result from new resource information becoming available. At that time, BLM could conduct Master Leasing Plans to analyze and plan for reasonably foreseeable development. This would ensure resources are not put at risk to speculative leasing, ensure necessary planning and analysis is conducted in the event these areas become desirable for development, and ensure BLM does not waste resources analyzing leasing where development is highly unlikely to occur.

14

### III.  Outcomes from applying our recommended methodology to the Uncompahgre RMP

   a.   Maps (included at the end of this document)

   1.   Oil and gas development potential and areas of high resource conflict
   2.   Oil and gas development potential and areas of medium to low resource conflict
   3.   Web mapper available at http://arcg.is/2fnGM8C

   b.   Allocations recommended for the Uncompahgre RMP[15]

   1.   High/medium development potential

**BLM should close the following lands with wilderness characteristics to oil and gas leasing to protect the extraordinarily valuable wilderness resources that exist in these areas from oil and gas development:**
-   Roc Creek
-   Adobe Badlands WSA Adjacent[16]

**BLM should apply robust stipulations to the following areas with high resource conflict that overlap with high and medium development potential.**
-   Lands with wilderness characteristics: Shavano Creek, Lower Tabeguache/Campbell Creek, Dolores River Canyon WSA Adjacent
-   Areas of Critical Environmental Concern (ACECs): Salt Desert Shrub Ecosystem[17], East Paradox, West Paradox, Paradox Rock Art, La Sal Creek, San Miguel River, San Miguel Gunnison Sage-grouse, Tabeguache Pueblo and Tabeguache Caves
-   Ecological Emphasis Areas: Adobe, Tabeguache, La Sal, Naturita Canyon, San Miguel
-   Recreation Management Areas: San Miguel River, Burn Canyon, Paradox Valley
-   Suitable Wild and Scenic Rivers segments: San Miguel River, Dolores River, Beaver Creek, Saltado Creek, Naturita Creek, Dry Creek, Tabeguache Creek, La Sal Creek, Spring Creek, Lion Creek, North Fork Mesa Creek, Deep Creek, West Fork Terror Creek, Ice Lake Creek, Gunnison River

**BLM should adopt the stipulations contemplated in Alternative B for all areas outside of special management areas.**

---

[15] The majority of these recommendations fit squarely within the range of alternatives in the Draft RMP, particularly in Alternative B which considers robust closures and restrictions for oil and gas leasing in areas evaluated for special management and other areas with important resource values. While other recommendations do not fit squarely within the range of alternatives, the concepts are considered in the RMP and therefore would require minimal supplementary analysis.

[16] See footnote 10.

[17] Because this ACEC overlaps with some high development potential and some very low development potential, we consider the overall potential for conflict to be high and recommend BLM put robust management prescriptions in place to protect the ACEC values while providing for oil and gas development where appropriate. The same rationale applies to all special management areas that overlap with some high/medium development potential and some low development potential.

15

BLM_0077600

2. Low development potential

**BLM should close to oil and gas leasing all special management areas that occur in areas with low or no development potential:**
- Dry Creek Basin, Camel Back WSA Adjacent LWCs
- Roubideau Corridors, Roubideau-Potter-Monitor, Lower Uncompahgre Plateau Cultural, Sims-Cerro Gunnison Sage-grouse, Fairview South ACECs
- Monitor-Potter-Roubideau, Dry Creek, Spring Canyon, Sims Mesa, Ridgway EEAs
- Dry Creek, Spring Creek, Roubideau, North Delta, Kinikin Hills, Ridgway Trails RMAs
- Old Spanish National Historic Trail
- Roubideau Creek, Potter Creek, Monitor Creek Suitable Wild and Scenic River segments

**BLM should close all areas with low or no development potential to leasing in the Uncompahgre RMP. Alternatively, BLM should defer all leasing in areas with low or no development potential pending completion of Master Leasing Plans, which would be completed at the time that industry shows interest in developing those areas and/or development is reasonably foreseeable.**

16



# Oil and Gas Development Potential and Areas of High Resource Conflict
## Uncompahgre Field Office





**Oil and Gas Development Potential and Areas of Medium to Low Resource Conflict**
**Uncompahgre Field Office**

BLM_0077603

# Scoping Comments
# Uncompahgre Resource Management Plan Revision

## by Western Colorado Congress
## and Western Slope Environmental Resource Council

March 29, 2010

_Heather Tischbein_

_____

Heather Tischbein, Executive Director, Western Colorado Congress

_Robert Peters_

_____

Robert Peters, Executive Director, Western Slope Environmental Resource Council

BLM_0077604

**Introduction**

Western Colorado Congress (WCC) and the Western Slope Environmental Resource Council (WSERC) hereby submit comments regarding the Uncompahgre Resource Management Plan Revision.

Western Colorado Congress (WCC) is a grassroots, democratic organization dedicated to challenging injustice by organizing people to increase their power over decisions that affect their lives.  WCC is the largest, most well-established grassroots citizen group in Western Colorado, with over 2400 members in six affiliated community groups from Steamboat Springs to Ridgway.  WCC's community groups and members work together to create healthy, sustainable communities, social and economic justice, environmental stewardship, and a truly democratic society.  Community groups within the BLM's Uncompahgre planning area include Ridgway-Ouray Community Council, Uncompahgre Valley Association, and Western Slope Environmental Resource Council.

WSERC is a grassroots non-profit conservation organization based in Paonia, Colorado. WSERC organized in 1977 and has over 500 ` members. Our organization promotes "Healthy Lands, Healthy Lives," and is dedicated to protecting and enhancing the environment and quality of life in Delta County and Colorado's Western Slope.

Because our two groups have signed on to group comments by the Dolores River Coalition, et al and Southern Rockies Conservation Alliance, we are focusing this letter on specific recommendations for places our members know well.

In addition to these comments, WCC and WSERC contributed materially to the comments separately submitted by the Center for Native Ecosystems (CNE) by identifying and convening a group of scientists and others with expertise in the species, ecosystems and special places on the UFO. Please see the CNE comments for specific recommendations on species and places not covered in detail here.

Our members value intact natural ecosystems that maintain their preColumbian constituent species in natural abundances. Protected natural ecosystems on public lands are the last refuges of many threatened, endangered, and dwindling species. These ecosystems provide valuable natural resources and ecosystem services, such as water collection and purification systems and carbon sinks that protect against global warming. For the communities in and nearby the UFO, they are the basis of a renewable, vibrant recreation economy.

The economic benefits to the community of preserving wild lands should be evaluated and quantified, and possible harm to these benefits should be carefully evaluated when considering mineral extraction, logging, grazing, or other projects that disturb wild lands.

We urge the UFO to control and strictly limit gas production, mining, motorized recreation, and other uses that threaten the long-term health of natural ecosystems. We urge you to preserve BLM land for future generations and to favor the following low-

2

impact uses:

- o Wide open, rugged, remote backcountry/landscapes/open spaces.
- o Backcountry silence and solitude.
- o Areas for bird watching, hiking, quiet use, nonmotorized hunting.
- o Quiet, natural soundscapes and landscapes, free of motorized noise.
- o All wilderness study areas.
- o Large blocks of undisturbed, unfragmented habitat.
- o Corridors of natural habitat that protect core areas.
- o Integrity of ecosystems and wildlife habitat.
- o Undisturbed late seral stages of vegetation, which are increasingly rare, and upon which many species depend.

We note that multiple use of public land should not be interpreted to mean that all uses can or should coincide in all areas. The "natural" values listed above are generally lost when lands are opened to commodity production. Therefore, land must be set aside specifically for natural ecosystems in which degrading uses are prohibited.

## Comments

### 3.1 - Recreation and Visitor Services

<u>North Delta Designated OHV Play Area.</u> On the basis of the excellent signing, fencing, patrolling and other management that the UFO has implemented in the OHV open areas in Peach Valley/Gunnison NCA, we recommend that the North Delta motorized open area remain open with management practices in place that are equivalent to Peach Valley/Gunnison NCA.

We do not want other OHV Play Areas created because of likely damage to native ecosystems.

<u>Jumbo Mountain</u>. Historically Jumbo Mountain, near Paonia, was sparsely used, primarily by hikers. However, use has increased greatly in the past 20 years, with ATV users and mountain bikers appearing as new user groups. Because Jumbo Mountain is so close to Paonia and because it is used intensely for recreation, it should be used exclusively for recreation. For safety reasons, BLM should exclude mountain bikes and ATVs from trails designated for hiking and horse riding. The BLM should investigate whether new access points might be developed that would decrease conflict between user groups. Several of our members are adjacent property owners and we urge the BLM to work closely with them on access issues.

<u>Recreation Permits</u>. Allow competitive recreation events only if they can be managed to have low impacts and if they do not significantly increase overall use. Set carrying

3

BLM_0077606

capacity limits and other restrictions on commercial outfitter guides and Special Use Permits

<u>Antler collection</u>. Continue to implement and enforce prohibitions on elk and deer antler collection to stop impacts on soils, vegetation, watersheds and wildlife.

<u>Dispersed camping</u>
All motorized travel should be restricted to existing roads and trails and designated parking and pull-out areas. Dispersed camping should be restricted to existing campgrounds, which should be designated as official campsites. The BLM should not allow vehicular camping anywhere else.

## 3.2 - Travel Management

We know that the UFO is not starting its travel management planning at this time. However, many of our comments on the RMP involve controls on travel, so we are placing them in this section. Please consider these comments now rather than deferring their consideration to the travel management scoping period.

<u>Limit motorized use</u>
- Limit motorized use in the UFO to existing trails.
- As soon as possible complete ORV route designations on all UFO areas where this has not been done.
- In the interim, make a plan for how to contain expanding use.
- In the interim, close all damaging routes.
- Limit off-road vehicles to areas where they will have minimal impacts on wildlife habitat, quiet users and the solitude of BLM backcountry. According to retired Forest Service wildlife biologist Craig Grother, "It is clear that motorized vehicles affect big game populations, security, distribution, and reduce habitat effectiveness. "

<u>Identify and close sensitive areas</u>
- Sensitive areas/habitat needed by elk, deer, big horn sheep, antelope, rare and sensitive plant and animal species such as Gunnison sage grouse, prairie dogs and burrowing owls
- Sensitive watersheds, riparian areas
- Erosive soil areas
- Fragile vegetation types
- Big game winter range, calving, lambing and fawning areas. Studies, for example those by Michael Wisdom, have shown that deer and elk are disturbed and leave areas frequented by both ATV's and mountain bikes.
- Remote areas that cannot easily be enforced
- Areas where motorized noise will disturb wildlife and Quiet Users.
- Some of these areas also may need to be closed to mountain biking or even hiking in the case of highly sensitive areas.
- Any sensitive sites should be closed (seasonally, if appropriate) to antler

4

BLM_0077607

collection, as is now being done on UFO to protect sage grouse habitat.

Close or keep closed the following places to motorized recreation
- BLM lands north of the Tabeguache Creek WSA/Special Management Area including the Shavano, Campbell, and Burro Creek drainages.
- Monitor Creek, Potter Creek, and Criswell Creek Canyons adjacent to the Camel Back WSA.
- Portions of San Miguel River Corridor.
- Undeveloped areas in and adjacent to all WSAs.
- Camp Ridge and Sowbelly Ridge, Rose Creek, and Open Draw drainages, adjacent to Dominguez Canyon Wilderness,
- Close the Gunnison and McCarty Trail systems to ORVs and mountain bikes and set them aside as horse and foot trails.
- Dolores River Canyon. This area has red sandstone cliffs, river otters, peregrine falcons, etc. WCC supports the more detailed recommendations as outlined in the Dolores River Coalition's comments.
- Norwood Canyon. This portion of the San Miguel River corridor provides habitat for mountain lions, hawks, eagles, and both rare and familiar native fish.
- Roubideau/Potter/Monitor canyon system west of Delta. Maintain existing road closures and do not build a new ATV loop into Potter and Monitor Canyons. These areas are relatively undisturbed and provide excellent habitat.
- BLM lands north of the Tabguache Creek WSA/Special Management Area which include the Shavano, Campbell, and Burro Creek dranages. This area has very high wildlife values and excellent opportunities for non-motorized recreation and hunting.
- Conduct road closures of user-developed OHV trails in the west end of Montrose and San Miguel Counties where they were established following vegetation treatments (e.g. chainings) and post-fire revegetation projects. Areas associated with the Burn Canyon fire include Hamilton Creek, Hamilton Mesa, Callan Draw, Burn Canyon, and McKee Draw. The Campbell Creek fire opened up protions of Campbell Creek and Shavano Creek to motor vehicles. Other examples include Bramiers Draw, Wickson Draw, and Mailbox Park.
- Conduct an inventory to identify areas of roadless or low road-density (< 1 mile per section) and manage them as primitive backcountry areas with no motorized uses. An evaluation should be done as to whether to close these areas to mountain bikes as well.

Keep routes open conditional on user compliance
Institute a policy that designated OHVs routes remain open subject to compliance. If resource damage and off-route use can not be controlled these routes would be closed.

## 3.4 - Cultural and Paleontological Resources
The BLM did an excellent job addressing management of cultural and paleontological resources in its management plan for the Gunnison Gorge NCA. The UFO RMP should mimic that management approach. Cultural resources are non-renewable and should be managed for permanent protection.

5

BLM_0077608

## 4.1 - Wilderness and Wilderness Study Areas

Camel Back

Camel Back needs permanent protection by wilderness designation. Camel Back supports bighorn sheep and is as remote and beautiful as Dominguez Canyon. Consideration should be given to incorporating adjacent Roubideau Forest Service lands into the wilderness area. This is one of the most important areas to our members.

Adobe Badlands

Although we are aware that the UFO did not find the Adobe Badlands suitable for wilderness designation, we believe there is enough significance to this remnant landscape that it is deserving of permanent wilderness protection. It contains imperiled endemics, and fragile Mancos shale formation. The Adobe Badlands WSA is the last untouched example of this habitat type in the UFO and possibly anywhere on the Western Slope. If not protected by wilderness designation, then none of this type of landscape will be protected. Because of increasing development pressure, particularly from gas development, this area will be heavily degraded without wilderness protection.

Dolores River Canyon and Sewemup Wilderness Study Areas

We continue to recommend that the BLM advise Congress, when the opportunity arises, to grant full wilderness protection to these areas.

Tabeguache Special Management Area

We commend the BLM's management of this area as non-motorized and non-mechanized. The Tabeguache Special Management Area overlaps with a Potential Conservation Area recommended by the Colorado Natural Heritage Program for protection of sensitive plant communities.   It is not suitable for mechanized travel and should be managed for its valuable wildlife habitat and hiking opportunities.

## 4.2 - Wild and Scenic Rivers

Protect as many eligible rivers and tributaries as possible. All of the river segments listed in the BLM's draft Wild & Scenic Rivers Eligibility Report should retain their eligibility for inclusion in the National Wild and Scenic Rivers System, and should be carefully evaluated for the next level of protection.   Particularly deserving are those with unusually good understories of buffalo berry, New Mexico privet, or box elder, or stands of cottonwoods.

Cottonwood Creek, Monitor Creek, Potter Creek, and Roubideau Creek. These creeks provide and complement wildife habitat and ecological diversity near the rich country along Monitor Mesa and the surrounding or nearby Roubideau/Camel Back Wilderness Study Area;

Escalante Creek.  Escalante Creek and its tributaries define the surrounding country; protecting these streams will ensure healthy wildlife, productive agriculture, and stable water tables.

6

BLM_0077609

<u>Gunnison</u> River. The Gunnison River itself contains segments that should be carefully evaluated to ensure enduring protection for the important fish habitat and recreation opportunities there, whether through wild & scenic river measures or other approaches. Protection strategies should recognize and integrate the protections already in place in the Dominguez-Escalante National Conservation Area and should ensure that no new dams or major water diversions occur on the Gunnison above its confluence with the Colorado River.

<u>North Fork of the Gunnison</u>. This watershed faces increasing development and recreation pressure. All eligible streams there should be carefully reviewed for protection.

<u>San Miguel River</u>. This watershed is nearly incomparable across the western United States for its intimate ecological settings, remote and thriving backcountry, naturally varying and flowing river and streams, contribution to important water systems in several states, and scenic wonder. Every eligible stream segment in this watershed should receive prompt, extensive, and reliable protection, both through wild & scenic suitability findings and through clear and firm management prescriptions in the BLM's resource management plan:

<u>Beaver Creek, Dry Creek, Fall Creek, Naturita Creek, and Saltado Creek.</u> These creeks are important contributors to the flows and health of the San Miguel itself and provide essential riparian habitat and geographically important streamflows in their own rights.

<u>San Miguel River</u>. Segments of this river warrant the most thorough analysis and the highest level of protection for habitat, riparian health, and avoidance of industrial intrusions.

<u>Tabeguache Creek</u>. This creek should be designated in keeping with the surrounding lands status as a congressionally designated area for preserving wilderness values.

<u>Dolores River</u>. Few streams boast the unique natural values—and extent of threats to those values—as are found along the Dolores River. The river itself, and all its eligible tributaries, should receive immediate, thorough, and enduring protection. As larger conversations, among a diverse and extensive collection of experts, local governments, and stakeholders, are now proceeding toward a more natural and reliable regime of streamflows in the Dolores River, it is both timely and essential that the BLM provide the interim protection afforded under wild & scenic suitability. This action, and correspondingly protective measures in an update resource management plan, will both contribute to, and provide opportunity for, those broader conversations to reach successful conclusion.

## **4.3 - Areas of Critical Environmental Concern (ACECs)**

All existing ACECs should be kept.  There are four ACECs in the UFO: Fairview, Needle Rock, Adobe Badlands, and San Miguel.  The Fairview ACEC protects only part

7

BLM_0077610

of the habitat of the endemic clay-loving buckwheat. This ACEC should be enlarged for greater protection.

To protect the significant values present within the ACECs, the BLM should withdraw all mineral leases from these areas, including oil and gas leases. The development of gravel mines in the San Miguel River occurred in the past and should now be prohibited in order to protect the unique riparian vegetation communities, wildlife, recreation, and scenic values.

The Colorado Natural Heritage Program has recommended additional ACECs within the UFO to protect rare and imperiled plants. We support designation of all ACECs recommended by the CNHP.

Some areas to consider for ACEC status:
- Tabeguache Pueblo and Tabeguache Caves. These contain important archaeological sites that show a relationship between the Fremont and Anasazi cultures.  There is some evidence of farming (corn production).
- Paradox/Long Valley: important rock art and archaeological area.  Investigate possible conflicts between peregrine falcons and hang gliders on the cliffs above Paradox.  The Paradox Valley lupine, deserves ACEC.
- Lower Uncompahgre Plateau Area. There are many scattered important archaeological sites that include archaic to Ute occupation in the 1880s, e.g. the Harris Site, rock art sites, and wickiups.
- Gunnison sage grouse sites. The UFO should designate known Gunnison sage grouse lek sites and concentrated nesting and brood rearing habitat as an ACEC. Specific sites are displayed in the Gunnison Sage Grouse plan for the San Miguel Basin.


## 5.1 - Special Status Species

Sensitive Plant and Animal Species
The UFO should strive to identify new special status plant or wildlife areas or species needing special protection or likely to need special protection in the future.  The UFO should be proactive in establishing ACECs for such areas and/or species likely to be threatened in the future. ACECs could be designated for all sensitive sites in the UFO area.

Special status species include Gunnison Prairie Dog, Gunnison Sage Grouse, Uinta Basin Hookless Cactus, and Yellow-billed Cuckoo.

Prairie dogs and associated species. The UFO can play a major role in recovering prairie dogs and species dependent on prairie dogs by managing to increase prairie dog numbers and to increase the area occupied by large prairie dog towns. Burrowing owl, (wintering) feruginous hawk, golden eagle, long-nosed leopard lizard, and kit fox could be preserved by good conservation of the two prairie dog species' habitats. Management actions could

8

include restrictions on motorized travel, restrictions on shooting in prairie dog habitat, prohibiting surface disturbance due to oil and gas drilling, and managing vegetation to benefit prairie dogs, notably control of cheat grass and other weeds.

There is a need for ACECs to protect wildlife habitat in the best remaining large areas of semi desert/salt desert habitat for the two prairie dog species and their associated species. The most obvious place for this is the east side of Highway 50, across from the Escalante Canyon turn off. This would fit the CDOW plan to "Work with public land agencies and other affected stakeholders to identify management emphasis areas (MEAs) (within the GUPD and WTPD IPAs) where intensive management can focus on landscape scale conservation for the entire prairie dog ecosystem." from their Grand Valley and Uncompahgre Valley Action Plan for white-tailed prairie dogs. If there is a similar area of Gunnison's prairie dogs in the UFO's west end, it could be considered as an ACEC, too. Management of these would be mainly travel management and weed control.

Gunnison Sage Grouse. The UFO should incorporate the management guidelines in the statewide Gunnison Sage Grouse Conservation Plan into the RMP so that subsequent grazing, mineral extraction, and travel management decisions will be based on these guidelines. The UFO should manage to increase occupied habitat area and quality of habitat, increase population sizes, increase connectivity between populations (between the San Miguel Basin population and the Pinon Mesa, Cerro, and Monticello populations, for example) and increase potential for Gunnison Sage Grouse to reoccupy historic habitat that is not used now. Strategies include reversing permanent loss of habitat trends on private land through conservation easements or fee acquisitions, reducing fragmentation of occupied, potential, and historically used sage habitat by strict travel management policies and by not allowing oil and gas development, and by reducing or eliminating antler collecting in occupied habitat.

Quality of habitat should be improved using best science regarding increase of forbs, reduction of PJs, and protecting wet areas. (Recommendations on connectivity using historic habitat, oil and gas development, and habitat vegetation are addressed in the *San Miguel Basin GUSG Working Group Conservation Plan* from 2010.) New transmission or other utility lines should not be allowed in Priority Habitats or Special Status Species habitats, but GUSG are probably the most sensitive of nearly any species to them.

Bighorn sheep
The UFO supports populations of both Rocky Mountain and desert bighorn sheep. Rocky Mountain bighorn are present on and adjacent to BLM lands near Sawpit and Deep Creek. Desert bighorn occupy portions of the Uncompahgre Plateau from Big Dominguez Creek to the Roubideau. Research demonstrates that domestic sheep can give wild sheep disease, including pasturella, which can cause massive die offs of bighorn. There are presently active domestic sheep allotments that overlap both Rocky Mountain and desert bighorn herds within the UFO. The RMP should plan to gradually phase out allotments that overlap wild sheep habitat.

Clay-loving buckwheat. All populations should have total protection from any damaging

BLM_0077612

uses, especially travel.

Yellow-Billed Cuckoo
The BLM should protect all riparian areas that are capable of supporting any cottonwood species in order to increase the low population of Yellow-Billed Cuckoos. The desired outcome for <u>Yellow-Billed Cuckoo</u> would be protection of all riparian areas that are capable of supporting any cottonwood species, and increasing the low population of cuckoos. This would require eliminating tamarisks and Russian knapweed, (and replacing them with native species), encouraging regeneration of cottonwoods, and maintaining large areas of large shrubs beneath and adjacent to the cottonwoods. This would also benefit countless other species of birds, bats and other wildlife. Willows may not affect cuckoos but are critical for other species.

Fish, Wildlife and Migratory Birds:
Management of remaining wildlife on public lands has become more important with the inevitable fragmentation of adjoining private land. This has to be considered by land management agencies and they must take a larger scale approach to planning. Any possible action to help plan, encourage or fund conservation easements on adjoining land is now worth it.

Priority species and habitats (in addition to SSS): Priority species could include the remaining predators (mountain lion, bear, raptors), migratory big game (deer, elk), and some obligates (Pinyon Jay) of the habitat for which UFO is primarily responsible. All of the bats from the State BLM Sensitive list that are in the UFO area should be protected by protecting caves, shafts and structures and by improving and protecting riparian areas. Current or historic Peregrine Falcon nests should be undisturbed. In the case of obligate species for each habitat type, it might be easier to focus on the habitat. In either case, all of the UFO habitat types are important. In addition to riparian, sage, and semi-desert mentioned above, PJ and mountain shrub are very important for a variety of wildlife.

Desired conditions of all of these habitats are more late seral stages than usually exist now, less fragmentation and better connectivity, and fewer weeds. The shrubs/understory are very important to wildlife in PJs and riparian areas. Non-native weeds are especially important in riparian areas and semi-desert shrub habitat. Rocky Mountain Bird Observatory studies being done for the Tamarisk Coalition on the Colorado Plateau Rivers show that *all* bird species are less common when tamarisk make up most of the understory. Literature that indicates tamarisk may not be quite as bad may be comparing them to no understory, rather than to native shrubs. Any management activity that affects native vegetation seems to affect some wildlife species.

Noise policy for wildlife
The BLM should institute a noise control policy that minimizes the impact of off-road vehicles, extractive industries, and other producers of noise on wildlife and quiet users. Sources of noise should not be allowed in habitat that is critical to noise-sensitive species.

BLM_0077613

## 6.1 - Vegetation and Land Health

All of the UFO's habitat types are important for some species, and many of those species need advanced seral stages or mature trees and other vegetation. Management should strive to ensure that both the overstory and understory of any vegetation type should be in the historic range of variability of age classes.

Our primary concern is that the BLM maintain and restore healthy, functioning ecosystems and wildlife habitat. The UFO should meet or exceed the State BLM Land Health Standards pertaining to "Upland soils," "Riparian Systems," "Healthy, productive plant and animal communities," Threatened and Endangered species, and "Water quality."

## 6.2 - Managing for Livestock and Against Weeds

Weed control and vegetative treatments
Vegetative treatments, such as prescribed burning and mechanical brush removal, should focus on areas that are degraded because of past heavy grazing and that need improvement to support continued grazing. Areas with infestations of weeds should not be burned or mechanically treated until pretreatments have been done to prevent further infestations during or after the treatment.

The RMP should prohibit aerial spraying of pesticides and toxicants on public land. Avoid application of herbicides to broad areas (>80 acre patches) in any single season. If APHIS becomes involved in pest control on adjoining private lands, the UFO's default/starting position for pest control on public lands should be "No Aerial Spray," regardless of whether APHIS has met NEPA requirements.

Areas that should be left untreated include those that are far from roads, have minimal human and/or grazing intrusion, and have high vegetation diversity and populations of sensitive plants/animals. (See CNHP database to assist in identifying such areas).

Harvesting by people of vegetative products should be directed toward areas slated for treatment, and/or close to well-used roads.

Weed and pest control terms should be defined in the RMP, including the following: Pesticides are chemicals used to control undesirable arthropods; toxicants are chemicals used to control troublesome vertebrates; herbicides are chemicals used to control weeds and/or to adjust the relative competitive advantage of various plants on a site. BLM has some good rules about the use of herbicides, which are not as dangerous as pesticides and toxicants. Nonetheless, the UFO should use herbicides as a last resort when other management options will not suffice.

Grazing
Grazing is a historical use that we value however a balance needs to be struck between the economics of grazing and land health and impact. We recommend that BLM increase

11

its monitoring and managing of lands that are leased for grazing to impede negative impacts to water and vegetation.

Ensure livestock grazing is done with best management practices, improving rather than degrading native ecosystems. Special care needs to be taken in riparian areas that are easily degraded by cattle, for instance the Jay Creek and Love Gulch in the North Fork area.

Impact of grazing should be reduced where grazing degrades high-quality watersheds or wildlife habitat (e.g. winter concentration areas, fawning areas). Examples would be the San Miguel watershed and McDonald Mesa area between Crawford and Paonia.

Unallocated and vacant allotments should remain such. More than 7% of land should be unallocated, and priority should be given to un-allocating lands that have had minimal grazing and that have good vegetation diversity and few weeds.

Grazing permitees and recreational users should be taught to identify problem weed areas so they can be control before weeds spread. Contact local recreation and environmental groups to solicit volunteers for weed identification and inventory.

### 7.1 - Coal, Oil & Gas

The BLM must put the health and safety of the land and people ahead of mineral extraction.

Coal
- The BLM should only allow new coal leases in Inventoried Roadless Areas where the leases would be adjacent to existing mines. The pristine sections of the Grand Mesa National Forest on the south slope of the Grand Mesa that have been designated as IRA represent the only remaining link for wildlife travel/migration between the wilderness areas of the Elk Mountains and the Grand Mesa.  Linkages such as these are crucial to maintaining genetic diversity among resident populations of all species in this area.
- The Dry Creek area identified in earlier plans as available for coal mining is not only in one of these areas but represents one of the few areas of aspen and oak brush, i.e. lower elevation habitats within the UFO that may be considered nearly "wilderness" in character.  On terms of maintaining a "multiple use" focus in the UFO and GMUG this parcel is of prime importance to grazers and outfitters.  Both of these activities would be impacted by coal mine development.
- The BLM should find a way to ensure that methane vented from coal mines is captured and used.

Gas and Oil
- Directional drilling. Gas producers should be required to drill multiple wells from single pads whenever possible to decrease surface disturbance.

12

- <u>Well pad density</u>. The allowed density of well pads should be determined on a case-by-case basis to decrease negative effects on the air, water, wildlife, views, and quiet.
- <u>Clustering of pads</u>. Clustering of pads should be considered because in some cases clustered pads may cause less overall surface impact than the same number of pads evenly distributed over more acreage.
- <u>Comprehensive plans</u>. Please continue your excellent efforts to encourage development of comprehensive plans. APDs should not be approved unless the proposed wells are included in a long-term area-wide plan.
- <u>Cumulative impacts</u>. When making decisions as to lease stipulations or APDs, the BLM should consider total impact of drilling including associated roads, road traffic, pipelines, lights, noise, etc.
- <u>GMUG IRAs</u>. No leases that allow surface occupancy should be sold in GMUG Inventoried Roadless Areas (IRAs). No leases should be sold in the 300-foot setback zone on either side of existing roads in GMUG IRAs. If there are already leases in the setback zones, these should not be permitted for drilling.
- <u>Split-estate</u>. On split-estate lands, landowners have most problems with water quality, air quality, and noise, and the BLM should do all possible to minimize such problems.
- <u>Set backs from residences</u>. At the very least the set back requirements of pads and other facilities from residences should be increased to 200 meters.
- <u>Environmental monitoring</u>. Air, water, and noise monitoring should be ongoing with remote reporting so problems can be detected quickly and rectified.
- <u>Visual and noise pollution</u>. Require vegetative buffers or constructed barriers to block noise and hide eyesores. Require mitigation of noise from trucks, heavy equipment, and compressors, etc. in populated areas or wildlife birthing and nesting areas.
- <u>Ground-water contamination</u>. Ground-water contamination is perhaps the most crucial issue since once an aquifer is compromised it cannot be recovered. Any failure of well casings or any other occurrence that introduces drilling materials, frac fluids, fuels, produced water or any other potential contaminant into domestic or livestock wells should be prevented by state-of-the-art engineering.
- <u>Bonding</u>. Bonds should be sufficient to cover the value of any public lands or private property harmed by gas activities, including water pollution and loss of agricultural production. The size of such bonds should be based on an accurate assessment of possible harm, and should not be limited to the minimum set forth in the *Gold Book* (p. 13). It is not an adequate response for the operator to simply provide an alternative source of water. These bonding requirements need to be passed on to any subsequent owners of wells.
- <u>Watershed protection</u>. The Water Conservation Service (WCS) has defined setbacks that exceed the COGCC rules for protection of these water sources and delivery systems. The BLM should stipulate no-surface-occupancy (NSO) within these WCS-determined watershed setbacks. Moreover, dependent on the watershed, larger areas might need to be stipulated as NSO for adequate protection. Each watershed needs to be fully characterized in terms of recharge area, slope characteristics, vegetative cover, etc. so as to safely determine how

13

BLM_0077616

surface disturbances and drawdown effect of well development and production may affect the system in the long term.

- Air quality protection. In areas where air flow could transport dust, other particulates, or gases that could be annoying or hazardous to health, the BLM should consider NSO stipulations on leases.

- Evaluation guidelines. The RMP should state clearly what BMP's, lease stipulations, and conditions of approval will be employed in areas open to leasing.

- Engineering guidelines. Because gas production practices change rapidly, the BLM *Gold Book* should be updated frequently to ensure that it mandates best practices.

- Frac'ing fluids and produced water. Conditions of approval for drilling should include full disclosure of chemical constitution of frac'ing fluids. Likewise, there should be regular analysis and disclosure of the chemical composition of produced water because of the possibility it contains chemicals like toluene and benzene. If such volatile carcinogenic materials are present they should not be stored in such a way that they contaminate air. Requiring closed loop drilling may help prevent spillage and leaks from surface storage of drilling muds, fracing fluids, and produced water.

- Water protection. As a condition of approval, the BLM should require the developer of a well to collect baseline data on all ground water and surface water sources that could possibly be contaminated. Continued monitoring should continue during the lifetime of the well. This obligation should transfer to any new owners of such wells. Irrigation water sources and canals are essential to our agricultural base and need protection from contamination.

- Storm water management. Runoff from well sites must be managed in a more effective way than using straw bales or the plastic sheeting that collapses under snow conditions.

- Restoration versus reclamation. Well pads or other areas where native plants have been disturbed should be *restored* to natural conditions, including similar mixes of species and seral stages. Roads created for development should be obliterated and made impassable to off-road vehicles when no longer needed.

- Holding leases by production. The BLM needs to apply valid economic criteria in determining whether a lease is held by production. Simply drilling a well should not be grounds for "holding by production." Instead, there must be a realistic likelihood, based on the production of gas and the cost to connect to a pipeline, that the well will eventually be connected to a pipeline, i.e. that it will eventually be producing in the sense of getting gas to market. Because drilling costs are currently low, operators may be tempted to drill wells to hold leases that they have little or no likelihood of bringing into production. To make such economically-based assessments, the BLM must have access to personnel qualified to judge whether a given test volume is meaningfully economic at prevailing gas prices, including consideration of how quickly the well's initial output would decline.

BLM_0077617

## 7.2 - Uranium and Other Mineral Resources

The revised management plan needs to address how uranium mining will occur to ensure proper protections and prohibit leasing within the river corridors. BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:

- Prove that there will be no harm to both surface and ground water quality and quantity;
- Prove that the long-term ecological health of the area will not be jeopardized;
- Have viable restoration plans in place before permits can be granted; and
- Have an adequate bonding mechanism in place sufficient enough to cover the entire cost of restoration.

## 7.3 - Renewable Energy Resources

Although we support the development of a strong renewable energy sector, we caution that large-scale alternative energy development projects, such as wind farms, solar arrays, or geothermal plants can cause the same types of harm to natural ecosystems as gas and other traditional energy projects. Therefore any proposed alternative energy projects should receive the same scrutiny and restrictions that we advocate for gas development herein.

## 8.1 - Land Tenure

We encourage the BLM to hold preliminary discussions with local jurisdictions (including fire departments) about land parcels BLM is considering offering for sale or exchange.

BLM_0077618



# The North Fork Alternative Plan: A Proposal to the BLM for Managing Oil and Gas Development in the North Fork Valley

DECEMBER 2013

BLM_0077619

## Executive Summary

The North Fork Alternative Plan (NFAP) is a resource-based set of recommendations provided to the U.S. Bureau of Land Management (BLM) as guidance regarding oil and gas leasing and development for BLM lands and minerals in the North Fork and Smith Fork drainages of the Gunnison River, primarily in Delta and Gunnison Counties of Colorado ("the North Fork" or "North Fork Project Area").

*Figure A - The North Fork Alternative Plan Management Area.*



*The recommendations of the NFAP would apply only to the BLM minerals and surface lands (BLM surface shown in light brown, with BLM minerals shown in cross-hatching). The locator map depicts the North Fork project area outlined in red within the BLM-UFO (light brown). The NFAP recommendations would not apply to U.S. Forest Service lands (green) or private lands/minerals (white with no cross-hatching).*

The NFAP forms one piece of a Resource Management Plan revision covering the entire BLM Uncompahgre Field Office, and proposes a set of recommendations under **six specific management zones** to protect the North Fork's (1) economies of agriculture and coal mining, (2) water supplies, (3) schools, parks and other community areas, (4) rivers and riparian areas, (5) important wildlife habitat, and (6) sensitive soils and geology. The NFAP also proposes **two special management designations** aimed to protect the scenic quality of the North Fork Valley as well as to ensure continuation of the popular recreational use of the Jumbo Mountain area near Paonia.

BLM_0077620

## The North Fork Alternative Plan Context and Background

The NFAP was developed with the input of a set of stakeholders representing agricultural, tourism, realty, businesses, and conservation organizations.  It came about through a process that identified key resources, land uses, and values of the North Fork which could be impacted by oil and gas development, and applying protection to those through management stipulations that would close certain areas of public lands and minerals to oil and gas leasing, and would impose development setbacks with strict surface restrictions in places where leasing might be allowed to occur.

The BLM-UFO administers over two million acres of federal minerals and nearly one million acres of public lands. The NFAP area comprises about 7% of the BLM-UFO lands and less than one percent (0.7 %) of the BLM lands in the state.  BLM lands represent a crucial piece of the North Fork Valley but make up less than ten percent of the overall project area (see Table A below).

*TABLE A – The North Fork Alternative Plan Project Area Acreages*

| BLM Lands/Minerals in Colorado and the Uncompahgre Field Office | acres |
|---|---|
| BLM Lands in Colorado | 8,349,000 |
| BLM Lands in the Uncompahgre Field Office | 926,655 |
| BLM Minerals in Colorado | 27,100,000 |
| BLM Minerals in Uncompahgre Field Office | 2,443,186 |
| *North Fork Alternative Plan Project Area* | acres |
| **Lands in the North Fork Alternative Plan Project Area** | **692,482** |
| National Forest Lands in North Fork Project Area | 384,311 |
| Private land in North Fork Project Area | 207,087 |
| North Fork Project Area BLM Surface | 63,391 |
| **BLM Fluid Minerals in the North Fork** | **137,612** |
| BLM lands with minerals | 63,391 |
| Split Estate' minerals (BLM minerals/Private or other non-Federal surface) | 74,221 |
| *Existing Oil and Gas Leases in the North Fork* | acres |
| **Currently Leased Lands/Fluid Minerals in the North Fork** | **151,895** |
| North Fork BLM surface leased | 13,049 |
| North Fork National Forest surface leased | 90,801 |
| North Fork Split Estate leased (private surface/Federal minerals) | 47,251 |
| North Fork Split Estate leased (other surface/Federal minerals) | 794 |

The North Fork's BLM lands are closely connected with the valley's human environment, towns, farms, water supplies, residences, and businesses.  Although it affects only a fraction of the public lands and minerals managed by the BLM-UFO, the NFAP focuses on an area with a concentration of resources, heavy public utilization already, and high public value.  It is within the BLM's authority to implement the North Fork Alternative Plan, which comprises a reasonable, prudent, and narrowly crafted component of the final management plan for the public lands in the North Fork Valley.

BLM_0077621

## North Fork Alternative Plan Management Recommendations

The NFAP includes the application of a range of specific oil and gas stipulations to protect the resources, values, and uses of the public lands and lands associated with BLM fluid minerals in the North Fork Valley.  These stipulations are based on known best management practices, existing or recommended stipulations, state regulations, proposed rulemakings, among other sources. The oil and gas stipulations range from NO LEASING to LEASING with surface use restrictions, described basically as follows:

- NO LEASING: Lands/minerals are not available for oil and gas leasing.
- LEASING-NSO: Leasing with mandatory (non-modifiable, non-waivable, and non-exemptible) No Surface Occupancy stipulations (NSO); the minerals are available but the lessee has no right to occupy the surface.  This means that no temporary or permanent facility can be located on the public lands wherever the stipulation is in effect; and, for non-federal, split-estate land with BLM minerals, the lease carries no right for the lessee to access or disturb the surface.
- LEASING-CSU/TL: Leasing with Controlled Surface Use (CSU)/Timing Limitations (TL), the minerals are available with restrictions that require additional measures or seasonal restrictions.

### Proposed Management Zones

**Mining & Agriculture Management Zone** would protect coal mining and agriculture from the risks associated with oil and gas development.

- NO LEASING within ¼-mile of active or existing coal leases, except to facilitate capture and commercial use of coal mine methane.
- LEASING-NSO within ¼-mile of any Prime and Unique farmlands, livestock operation, any organic or conventional farm, ranch, or orchard and the West Elks American Viticultural Area.

**North Fork Valley Towns, Schools & Community Management Zone** would keep development away from busy community areas to better protect public health and safety as well as quality-of-life.

- NO LEASING within ½-mile of the Crawford, Hotchkiss, and Paonia town limits
- LEASING-NSO within ¼-mile around community facilities:
  - North Fork Swimming Pool (33 Bulldog St., Hotchkiss, CO 81419)
  - Crawford School (51 Fir Ave., Crawford, CO 81415)
  - Hotchkiss High School (438 Bulldog St., Hotchkiss, CO 81419)
  - North Fork Community Montessori School (397 Bulldog St., Hotchkiss, CO 81419)
  - The North Fork Recycling Center (36577 K50 Rd., Hotchkiss, Colorado)

**Clean & Dependable Water Supply Management Zone** would protect the water sources and supplies for area towns, farms, residents, and businesses.

- NO LEASING within ¼-mile of municipal or private water systems.
- LEASING-NSO within ½-mile of any private well, municipal or private water system, including ditches.  LEASING-NSO within ¼-mile of any dam, ditch, irrigation intake, canal or other water conveyance.

BLM_0077622

**River Areas & Riparian Corridors Management Zone** would protect the land immediately adjacent to rivers and riparian areas, which are critical to wildlife, to protecting water quality, and for recreation.

- NO LEASING within ½-mile of rivers and water bodies.
- LEASING-NSO within 1-mile of the North Fork and Smith Fork of the Gunnison Rivers.

**Wildlife Management Zone** would protect important wildlife habitats in the area.

- LEASING-NSO for critical habitat including important range for elk and mule deer, migration routes, and raptor nest sites.
- LEASING-NSO within ½-mile of streams or river segments that provides habitat for native trout.
- LEASING-TL for other habitat during critical seasons per Colorado Parks & Wildlife recommendations.

**Landscape Management Zone** would protect water quality from downstream impacts associated with selenium loading from Mancos soils, and would protect against geologic hazards.

- NO LEASING within lands identified as high and very-high potential for selenium loading.
- LEASING-NSO for lands with Mancos Shale soils within an additional ¼-mile of lands with high and very-high potential for selenium loading.
- LEASING-NSO for all areas with medium to high geologic hazard.
- LEASING-CSU/TL for areas with low to medium geologic hazard.

### Special Management and Resources Designations

**Jumbo Mountain Special Recreation Management Area** would protect outstanding recreational opportunities in the area, Jumbo Mountain would be designated as a Special Recreation Management Area (SRMA) with surface oil and gas development prohibited.

- LEASING-NSO within the Jumbo Mountain SRMA.

**Visual Resource Management** would protect top quality, nearby scenic resources subject to high public sensitivity, recommended Visual Resource Management for the North Fork would apply a VRM Class II designation to the following lands, with the following management prescriptions:

- NO LEASING of select prominent landscape features.
- LEASING-NSO within 1-mile of travel and scenic corridors.
- LEASING-CSU with other VRM-specific Conditions of Approval for all other lands associated with BLM minerals visible from important vistas and travel corridors.

### Support for the North Fork Alternative Plan

- Valley Organics Growers Association
- West Elks Winery Association
- Town of Paonia
- Town of Crawford
- Paonia Chamber of Commerce
- Western Colorado Congress
- North Fork Realtors
- Citizens for a Healthy Community
- Western Slope Conservation Center
- Western Colorado Congress
- More than 600 local residents

BLM_0077623

# Table of Contents

Executive Summary.............................................................................................................. 1

Table of Contents.............................................................................................................. 5

Acknowledgments.............................................................................................................. 7

List of Commonly Used Acronyms ...................................................................................... 8

Introduction: Project Area & Alternative Plan Background ............................................. 10

    Purpose & Need ............................................................................................................. 10

    Background: BLM Lands in the North Fork Valley .......................................................... 15

        History of the North Fork Valley ................................................................................ 16

        The North Fork Today & Tomorrow........................................................................... 19

    Management Authority and Rationale behind the North Fork Alternative Plan ................... 21

        North Fork Valley BLM Lands Are Already Heavily Utilized & Highly Valued ...................... 23

        FLPMA Land Use Planning Requires Careful Consideration of Public Input, & Changing Uses/Values of Public Lands ......................................................................................... 25

    North Fork Alternative Plan Methodology ..................................................................... 26

        A Note about Maps .................................................................................................. 27

        Proactive Counter Proposal to the North Fork Oil and Gas Lease Sale ............................ 27

North Fork Alternative Plan Management Recommendations ........................................... 30

    Proposed Management Zones ........................................................................................ 30

        Mining & Agriculture................................................................................................ 30

        Towns, Schools & Community ................................................................................... 37

        Clean & Dependable Water Supply............................................................................ 43

        Riparian Areas & River Corridors ............................................................................. 53

        Wildlife................................................................................................................... 60

        Landscape .............................................................................................................. 68

    Special management and resources designations............................................................. 75

        Visual Resource Management and the Jumbo Mountain Special Recreation Management Area..... 75

        Special Designations on BLM and Adjacent Lands......................................................... 76

        Jumbo Mountain Special Recreation Management Area ................................................ 77

        Visual Resource Management for the North Fork ......................................................... 81

    General Concerns & Management Recommendations ...................................................... 88

        Air Quality .............................................................................................................. 88

BLM_0077624

Traffic ................................................................................................................................................ 90

Degradation of Rural Character ......................................................................................................... 92

Socio-Economics & Property Values .................................................................................................. 94

Recommended Best Management Practices .................................................................................... 100

Conclusion .......................................................................................................................................... 101

Appendix A – Full Size Maps

Appendix B – Community Support & Documentation; Map Data Sources

Appendix C – Exhibits

BLM_0077625

## Acknowledgments

The North Fork Alternative Plan was crafted in conjunction with a stakeholder group representing agricultural, tourism, realty, businesses and conservation organizations, to present to the BLM for consideration in its land use plan revision.

**Stakeholder Representatives:**

- Daniel Feldman, Board Chair of Citizens for a Healthy Community
- Brent Helleckson, Owner of Stone Cottage Cellars, Member of the West Elks Winery Association, and Board Member of Citizens for a Healthy Community
- Pete Kolbenschlag, Owner of Mountain West Strategies
- Bob Lario, Majority Owner and Broker of Record, RE/MAX Mountain West
- John Moore, Board Chair of the Western Slope Conservation Center
- Jim Ramey, Director of Citizens for a Healthy Community
- Sarah Sauter, Executive Director of the Western Slope Conservation Center
- Tom Stevens, Owner of TA Stevens Ranch
- Mark Waltermire, Owner of Thistle Whistle Farm & President of Valley Organic Growers Association
- Nancy Wood, Broker Associate RE/MAX Mountain West

**Report Authors:** The primary authors of the North Fork Alternative Plan were Jim Ramey, Citizens for a Healthy Community and Pete Kolbenschlag, Mountain West Strategies.  John Moore, Western Slope Conservation Center and Barbara Hawke, formerly of Juniper Canyon Consulting also contributed certain sections.

**Cartography:** Sarah Sauter, Western Slope Conservation Center.

**Cover Photo:** Rita H. Clagett.

**Content Editors:** Daniel Feldman, Citizens for a Healthy Community; Sarah Sauter, Western Slope Conservation Center; and Kyle Tisdel, Western Environmental Law Center.

**Copy Editors:** Marilyn Stone and Mike Drake.

**Lay-out and Design:** Jim Ramey, Citizens for a Healthy Community.

## List of Commonly Used Acronyms

AVA – American Viticultural Area

BLM – Bureau of Land Management

BMDWD – Bone Mesa Domestic Water District

BMP – Best Management Practice

BOR – Bureau of Reclamation

CAS – Conservation Agreement and Strategy

CNHP – Colorado Natural Heritage Program

COAs – Conditions of Approval

CPW – Colorado Parks & Wildlife

CRCT – Colorado River Cutthroat Trout

CSU – Controlled Surface Use

DEIS – Draft Environmental Impact Statement

EA – Environmental Assessment

EIS – Environmental Impact Statement

FLPMA – Federal Land Policy and Management Act

FMC – Fire Mountain Canal

FONSI – Finding of No Significant Impact

GMUG – Grand Mesa, Uncompahgre, and Gunnison (National Forests)

KRCRA – Known Recoverable Coal Resource Area

MUSYA – Multiple Use and Sustained Yield Act

NEPA – National Environmental Policy Act

NFAP – North Fork Alternative Plan

NSO – No Surface Occupancy

PCA – Potential Conservation Area

RMP – Resource Management Plan

BLM_0077627

ROD – Record of Decision

SAP – Sustained Annular Pressure

SCP – Sustained Casing Pressure

SRMA – Special Recreation Management Area

TL – Timing Limitation

TU – Trout Unlimited

UFO – Uncompahgre Field Office

USDA – U.S. Department of Agriculture

USDOI – U.S. Department of Interior

USFS – U.S. Forest Service

VRM – Visual Resource Management

VOC – Volatile Organic Compound

BLM_0077628

# Introduction: Project Area & Alternative Plan Background

## Purpose & Need

The North Fork Alternative Plan (NFAP) is provided by stakeholders to offer additional guidance and recommendations to the Bureau of Land Management (BLM) regarding oil and gas leasing and development decision-making for BLM fluid minerals and the BLM public lands.  In particular, the NFAP focuses on those areas in the North Fork and Smith Fork watersheds of Delta and Gunnison Counties, Colorado that lie within the Uncompahgre Field Office (UFO) boundary.

The project area is shown in Figure 1 below.  Note that the recommendations of the NFAP would apply only to the BLM surface lands, shown in light brown, and to the cross-hatched public minerals.  The NFAP recommendations would not apply to a majority of the project area shown below; the NFAP would not apply to U.S. Forest Service (USFS) lands shown in green, private lands shown in white, and private minerals.

*Figure 1 - The North Fork Alternative Plan Project Area.*



BLM_0077629

To be clear, the NFAP management would only apply to BLM lands and BLM-administered mineral estate within the project area.  Figure 2 below highlights the BLM lands and minerals, outlined in black, to which the NFAP recommendations would apply.

*Figure 2 - BLM Lands & Minerals to which NFAP Management Would Apply, Highlighted in Black*



The NFAP was developed through the identification of key features, sensitive resources, and important attributes of the North Fork Valley that could be impacted by oil and gas leasing and development of the BLM lands (and lands with BLM-administered fluid minerals), and includes the application of a range of specific oil and gas stipulations to protect these critical resource values.[1]

It is important to note that there are many existing oil and gas leases in the North Fork area.  Figure 3 below shows existing leases in the project area.[2]

---

[1] Recommended management ranges from NO LEASING to LEASING with surface stipulations including NO SURFACE OCCUPANCY (NSO), CONTROLLED SURFACE USE (CSU), and TIMING LIMITATIONS (TL).

[2] Note: The existing lease data is from May 31, 2013.  A considerable number of the Oak Mesa leases have already expired, according to searches of BLM's LR2000 database system, and those expired leases are shown on the map.

BLM_0077630

*Figure 3 - Existing Leases in the NFAP Project Area.*



Since these existing leases have already been issued, any oil and gas development that may occur there would be governed by the terms and stipulations of those leases.  To the extent possible, the BLM should encourage companies to abide by the proposed management in the NFAP for any existing leases they hold within the NFAP project area.  When existing leases expire, should those lands/minerals be eligible for leasing and if they are leased in the future, the management recommendations of the NFAP would apply.

The NFAP project area is but one component of the entire BLM Uncompahgre Field Office.  In fact, within the NFAP project area, there are only 137,612 acres to which the management recommendations of the NFAP would apply.  This compares to 926,655 acres of BLM surface lands, and 2,443,186 acres of BLM-administered mineral estate, in the entire UFO (see Table A in the Executive Summary for more figures and comparisons).  Figure 4 below shows the NFAP project area, the NFAP management area (highlighted in black, cross-hatch), and the boundary of the UFO.

BLM_0077631

*Figure 4 - NFAP Management Area Compared to Entire Uncompahgre Field Office*



The NFAP identifies eight sets of resources that the BLM is obligated to protect and proposes rational and lawful solutions for protecting those resources with strong and consistent protections.  The NFAP utilized input from a broad set of stakeholders, as well as from documents and comments crafted and compiled during the previously proposed, and now deferred, North Fork lease sales.  This process identified key resources, land uses, and values that require careful consideration.  The resulting North Fork Alternative Plan groups its recommendations under **six specific management zones** to protect 1) the economies of agriculture and coal mining, 2) water supplies, 3) schools, parks and other community areas, 4) river and riparian areas, 5) important wildlife habitat, and 6) sensitive soils and geology; as well as **two special management designations** aimed to protect visual resources and the popular recreational use of the Jumbo Mountain area near Paonia.

While it does have the aggregate effect of closing a significant percentage of the North Fork's BLM lands and BLM-administered minerals to oil and gas leasing, the North Fork Alternative Plan would not forbid development entirely.  Where the NFAP does recommend an area be withdrawn from development, that recommendation is based on important and credible reasoning, which is well within the scope of the BLM's authority to implement.

BLM_0077632

The BLM has the authority to implement all portions of the NFAP.  Its features and proposed stipulations for specific resources are prudent and should be adopted into BLM's new Resource Management Plan (RMP) for the UFO.  A more detailed discussion regarding the rationale and development for the North Fork Alternative Plan follows under "Management Authority and Rationale" and "Methodology" in this section, below; and throughout the document in the various proposed management sections.

At its most fundamental level, the Federal Land Policy and Management Act (FLPMA), BLM's 'organic' act, requires that the BLM avoid harming the public's resources while allowing for a range of statutory



*Figure 5 - Dusk over the West Elks in autumn 2013. Credit: Jim Ramey.*



**Figure 6 - To illustrate the importance of BLM lands on the scenic quality of the area, the red lands show BLM-administered lands and public minerals from the vantage point of the photo in Figure 5 above, taken from the West Elks Scenic Byway Loop, along Hwy 92 near Hotchkiss. Credit: Google Earth.**

BLM_0077633

'multiple uses' and the harmonious and coordinated management of the various resources without impairment of the productivity of the land and the quality of the environment.[3]  Notably, however, FLPMA also provides for the BLM to manage multiple uses such that there is "use of some land for less than all of the resources" and "not necessarily to the combination of uses that will give the greatest economic return..."[4]

This mandate also requires the agency to have current land use plans in place to properly manage and protect resources and public uses.  In developing land use plans, the BLM must identify important resources, public uses, and values of the lands, particularly those that could be harmed by the agency's later management actions, so that it may apply proper stipulations and management tools.  Supporting the current economies—agriculture and coal mining—and protecting water supplies are top concerns of local residents, and are reflected in the NFAP.  In addition, many site-specific resource and community values are fundamental to maintaining the regional character, including the following:

- Keeping any industrial oil and gas development outside of the immediate zone of community and shared facilities, including schools and parks;
- Maintaining and enhancing recreational opportunities on the BLM lands;
- Preserving the visual appeal and highly scenic qualities of the North Fork Valley; and,
- Safeguarding important wildlife habitat, migration routes, and winter range.

These concerns are a priority for a broad range of individuals, agricultural operators, and business owners living and working in the North Fork Valley, as well as for cooperating agencies in the RMP revision process, such as the Town of Paonia, the Delta Conservation District, and Colorado Parks & Wildlife (CPW).

The BLM is statutorily obligated to manage for other resources, including recreation; range; timber; watershed; wildlife and fish; and natural scenic, scientific and historical values; in addition to minerals.[5] The scuttled North Fork oil and gas lease sale (initially scoped in December 2011 and deferred a second time in February 2013) demonstrated a need to ensure that strong management for any potential oil and gas development is in place before such activity is even contemplated.  The North Fork needs and deserves a management plan that protects what exists today on and around the lands impacted by BLM minerals management, and that will sustainably manage those resources with an eye toward the future.

## Background: BLM Lands in the North Fork Valley

The North Fork communities of Crawford, Hotchkiss, and Paonia offer a unique, rural way of life in the Mountain West.  The area surrounding and between the towns, which each lie roughly ten miles apart,

---

[3] Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1702 (2001), available at http://www.blm.gov/flpma/FLPMA.pdf (last visited Nov. 27, 2013).
[4] *Id.*
[5] *Id.*

BLM_0077634

has been referred to as "the golden triangle" by *Forbes Magazine* for its one of-a-kind appeal.[6]  As described by the town Chambers of Commerce on their shared website:

> The physical setting of the Valley—tucked between the mountains to the east, the Grand Mesa to the North, and the canyons and high desert of the southwest and west portions of the county make this a distinct sliver of paradise—and one with its own identity.  Since the 1880's, agriculture and animal husbandry have been not only a means of making a living, but have become enmeshed in the fabric of the community's identity.[7]

The North Fork's BLM lands are intermixed with private, commercial and municipal lands in the valley, part of a prized landscape of scenic, agricultural, natural, and historical value.[8]  These public resources and lands comprise an integral part of the valley, enhancing its visual appeal, supporting its local economies, and impacting the overall health of its other lands and the use of the lands themselves.  Local concerns are focused on protecting rural quality-of-life, agricultural resources, public health, and the highly scenic setting of the North Fork.

The BLM lands are interspersed throughout the Valley, and are adjacent and nearby to ranching and agricultural operations; provide access to coal reserves; encompass municipal watersheds; and are adjacent to wells that comprise the water sources for many valley residents.  The BLM lands also include valuable wildlife habitat and provide important hunting access.  Significant riparian areas exist along the North Fork and the Smith Fork Rivers, and along several creeks, that provide critical fish, wildlife and bird habitat, fishing access, and boating opportunities.  The Mancos Shale formation—highly erodible with high salt and selenium content—that is exposed on the surface in much of the valley is largely unstable geologically and poses unique management challenges.  These conditions have been the subject of a multi-agency, multi-year planning process.  Direct, indirect, and cumulative effects from BLM agency action have real potential to impact all these resources.

### History of the North Fork Valley
Although many people and many new businesses have relocated here bringing new ideas and economic activity, the North Fork Valley and Crawford Country are still places rooted in their past—with agricultural and coal mining providing the foundation for most of the economy.

> The pioneer spirit that created Delta County lives on today … Our history reflects a hard-won heritage of courage, ingenuity, labor, and love for the land.  It is a community heritage of loyalty and integrity that has captured the hearts of many families who,

---

[6] Lorraine Cademartori, *The best-kept secret in Colorado's second-home market? Delta County*, FORBES MAGAZINE, Mar. 13, 2006, available at www.adventuremedianews.com/viewarticles.asp?ClientID=400&AID=425 (last visited July 24, 2013).

[7] North Fork Valley Combined Chambers of Commerce, *Heritage and History*, No date, available at www.northforkvalley.net/page.cfm?pageid=14736 (last visited Nov. 24, 2013).

[8] UNCOMPAHGRE FIELD OFFICE, BUREAU OF LAND MANAGEMENT, U.S. DEPARTMENT OF INTERIOR, RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT: FINAL SCOPING SUMMARY REPORT (July 2010), available at www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_docs.Par.81341.File.dat/Scoping_Report_FINAL_070710_508.pdf (last visited Nov. 24, 2013).

BLM_0077635

generation after generation, have invested their talents, their labor and their lives in the land and its people – farmers, ranchers, businessmen, miners, construction workers, engineers, parents and teachers...

Our history reflects a love of the landscape and a physical environment that is the result of millions of hours of work.  Our roads, farms, and orchards, schools, churches, businesses, and irrigations systems—all are the result of a century-long story of community building.  However, as important as the farms, ranches, orchards and our public lands are, our greatest natural resource will always be the people and the strength of our communities.[9]

Father Escalante and Father Dominguez were among the first Europeans to cross what is now known as the North Fork Valley in 1776.  Enos Hotchkiss, the first non-native person to explore and settle in the valley in 1879, recognized the area's agricultural potential.  As word quickly spread about the moderate climate and fertile soils, settlers were soon trekking over McClure Pass and Black Mesa to homestead in what is now the East Muddy, Crawford Country, and the North Fork Valley.

By 1892, Sam Hartman—an early "mover and shaker" cattleman and later director of Hotchkiss' first bank—was running nearly 2,000 head of cattle in Maher, putting up more than 800 tons of hay to feed more than 1,500 cattle through winter.  Smaller ranches in the Muddy together grazed a similar number in summer and like ranchers still do today, wintered them in the North Fork Valley.

Orchardists planted the valley's first fruit trees in 1883.  A decade later, the North Fork's fruit earned national and international recognition at the 1893 Chicago World's Fair and again in 1898, at the Trans-Mississippi and International Exposition in Omaha.  The success prompted farmers to plant more fruit trees and led to the construction of the Western Slope's first canning facility.

The expanding fruit industry, hay crops, and pasture demanded more irrigated land.  Farmers and ranchers built ditches to augment the high desert climate with average annual precipitation of only 15 inches.  The twelve mile long Farmers' Ditch was constructed in 1893, diverting water two miles above Paonia and transporting it to Hansen Mesa.  Farmers knew their economic prosperity depended on abundant, clean water.  Shareholders excavated the Fire Mountain Canal (FMC) over five winters.  They used no dynamite, as about sixty farmers, ranchers and their teams worked 12-hour days digging frozen ground to create a 32 mile ditch that brought water to Rogers Mesa.

Eastern markets demanded more North Fork fruit and farmers responded by planting more trees.  Teamsters drove the fruit to the rail line in Delta until the rail company extended it to Somerset in 1903.  More efficient transportation meant farmers could meet an ever-greater demand.  In 1905, farmers shipped 200 rail cars of fruit from Hotchkiss.  By 1917, 300 rail cars of apples and 400 rail cars of peaches were shipped from Paonia.  Orchardists more than doubled that record in 1920 when 1,000 rail cars of fruit left Paonia for California in the west and as far east as Chicago.

---

[9] Jim Wetzel, A Spirit Returns (The Donning Company Publishers 2003).

BLM_0077636

### Generations of Agricultural Heritage



Steve Ela, a fourth-generation Delta County farmer, voiced his support for the North Fork Alternative:

**"The bottom line is that we are investing in our economy and our community for the long term. Please support the alternative plan and the protections it gives to our local communities and our local farms.  Agriculture is here for the long term and will always be a mainstay of this area."**

Source: DELTA COUNTY INDEPENDENT, Nov. 6, 2013. Image credits: Ela Family Farms web site: http://www.elafamilyfarms.com/.



Trains carried more than fruit out of the region, however.  Coal miners had discovered substantial coal reserves near the surface just as miners today tap coal deposits in the same area.  Miners from Bowie and Somerset loaded the first shipments in 1903.  The Farmer's Mine on Garvin Mesa Road was opened in 1911, shipping coal by rail to Grand Junction and beyond.

Today, agriculture in the North Fork unites a century-old tradition with new, emerging markets.  More than one hundred years after Enos Hotchkiss recognized the valley's potential, the pioneer spirit and love for the land still prevail.  Families invest to plant orchards, develop vineyards, and grow vegetables.  They devote long hours to fulfill aspirations shared with the early homesteaders.  The many varieties of fruit and produce grown here and the high quality meat and goat cheese are in high demand locally and in communities such as Aspen, Crested Butte, and Telluride.

Rail transportation enabled the expansion of the valley's farm economy to a national level, but while agriculture continues to be a North Fork mainstay, economies have shifted to present new opportunities for value-added operations and products.  The Paonia Chamber of Commerce describes the current economy as one "comprised of a vibrant and thriving arts-community, coal mining, niche-agriculture, viticulture, cattle ranching, hunting and tourism."[10]

Today's North Fork farmers and ranchers focus on food security and bio-regionalism, and the area is known for having the highest concentration of organic farms in the state and the highest altitude vineyards in the world.  Many in the area and beyond share the desire to preserve what's unique and

---

[10] Letter from Alexis Halbert, et. al., Paonia Chamber of Commerce to the Bureau of Land Management, et. al. (Jan. 25, 2012), attached as Exhibit 1.

BLM_0077637

special about the North Fork—the agricultural heritage, clean and abundant water resources, and a growing agritourism industry.

### The North Fork Today & Tomorrow

Bounded by Wilderness and high-quality public lands, the North Fork is a staging ground for hunters from all over the nation, who often access the backcountry through BLM lands.  The North Fork Valley sits at the heart of the West Elk Loop Scenic Byway, home to wineries, farms, festivals and outstanding recreational opportunities.  Its location in a bucolic river valley, with a National Park, National Recreation Area, and National Conservation Area all next door, is making it an increasingly popular destination for visitors and folks looking for a new place to call home.  Local governments and business associations undertake significant efforts to promote this image year-round and to welcome the hunters and tourists each season.

The North Fork area has a high concentration of small and specialty farms with a traditional emphasis on orchards and an emerging recognition for vineyards, wineries, organic produce, local meats, and sustainable farming.  The North Fork is home to many varieties of small, specialty farms, producing "...fruit, vegetables, meat, cheese, wine, and farm-based products and experiences..." according to a comment letter submitted by the Valley Organics Growers Association.[11]  In its letter, the West Elk Winery Association noted its dozen members "...now account for $1.5 to $2 million annually in direct sales and an additional $5 to 10 million in indirect sales..." in the local economy.[12]

*The Denver Post* published an article about agritourism with Delta County held up as an example:

> The Colorado Tourism Office is joining the Colorado Department of Agriculture [USDA] in a new push to elevate the state's myriad agricultural tourism opportunities. ... "It connects people back to their land, their people, their place," said Kelli Hepler, whose Delta County Tourism has a seven-year agritourism program. ... In Delta County, visitors can pick potatoes and grapes, help shear sheep, visit cheese makers and even mend fences. They can go harvest produce for a meal they cook back at their B&B.  They can dine with farmers and tour wineries on bikes.[13]

This vibrant sector of the local economy relies on the small family-oriented farms, orchards and ranches in the valley, as well as the overall beauty and highly scenic quality of the place.  Elected officials and local governments, the agricultural community, and business associations have worked diligently on these issues; having refined and marketed the qualities of the valley, and expressed interest, developed plans, and engaged the BLM on management of the public lands

---

[11] Letter from The Valley Organic Growers Association Board of Directors to Whom It May Concern (no date), attached as Exhibit 2.
[12] Letter from Brent Helleckson, et. al., West Elks Winery Association to Barbara Sharrow, Uncompahgre Field Office, Bureau of Land Management (Jan. 12, 2012), attached as Exhibit 3.
[13] Jason Blevins, *Colorado Tourism Office and ag department join in agritourism effort*, DENVER POST, Nov. 29, 2012, available at http://www.denverpost.com/ci_22092568/colorado-tourism-and-agriculture-officials-partner-agritourism-push (last visited Nov. 27, 2013).

BLM_0077638

here.  The North Fork Alternative Plan is but one example of an active and broad segment of the community involved with the management of their public lands.

In May 2013, the North Fork Valley was designated by the State of Colorado as a Certified Creative District.[14]  "This distinction is incredibly important and beneficial for the North Fork Valley.  By certifying the North Fork Valley as a Creative District, the State is affirming its confidence in the need for the creative industries as an economic driver for the North Fork's rural communities," said North Fork Creative Coalition Director Susie Kaldis.  "The designation will assist the North Fork Valley in attracting visitors to experience the heritage of our small Western region while enjoying the wonder of its natural landscape and the talent of its artisans."[15]  The Coalition's website notes:

> The North Fork Valley Creative District in the heart of the Western Slope in Delta County encompasses the three towns of Paonia, Hotchkiss, and Crawford.  The District hosts an incredibly vibrant cultural scene, with many festivals and events that draw visitors from around the state.  It is home to every kind of artistic talent.  The Valley is peppered with the studios and home workshops of traditional artists … fine artists … writers, performing artists … and technological artists … as well as culinary artists and creators of value-added agricultural products on numerous organic farms, vineyards, and orchards.

The North Fork is becoming increasingly popular for its festivals and community-wide activities that combine art, local food and drink, music, and rural heritage, all of which benefit from the undeveloped character and scenic quality of the area, including the BLM lands.  These activities bring visitors from across the state, nation, and world to sample local culture, visit area galleries and farms, try valley restaurants, and visit and enjoy the area's public lands.  One visitor to the North Fork remarked: "The experience of the North Fork Valley is unlike any other in Colorado."[16]

For residents and visitors, the public lands are a key part of the defining landscape of the North Fork Valley.  Industrial activities like oil and gas development have real likelihood to cause significant, negative impacts to public enjoyment of these lands and could impact other resources and uses as well, including community water and irrigation supplies and public infrastructure.  The Paonia Chamber raised concerns about what many view as an incompatible industry in the valley.

> Scientific studies and real life stories show that some of the impacts of the proposed development include significant air pollution, permanent water and soil contamination, reduction of water supplies, serious damage to human health, reduction of property values, pasture destruction, livestock deaths, earthquakes and infrastructure stresses.[17]

---

[14] Kathy Browning, *North Fork is a certified Creative District*, DELTA COUNTY INDEPENDENT, June 26, 2013, available at http://www.deltacountyindependent.com/index.php/news/north-fork-times/6576-north-fork-is-a-certified-creative-district (last visited Nov. 27, 2013).
[15] *Id.*
[16] North Fork Valley Combined Chambers of Commerce, *Heritage and History*, no date, available at http://www.northforkvalley.net/page.cfm?pageid=14736 (last visited Aug. 12, 2013).
[17] *Id.*

North Fork Alternative Plan

BLM_0077639

Beyond the direct impacts, which can be both significant and severe, when oil and gas development occurs within a human-occupied landscape some of the most significant impacts are those that are indirect and cumulative—degradation of air quality, loss of the dark night ski, a massive increase in traffic on already dangerous and crumbling roads.

Change is inevitable.  Embracing change that honors and builds on tradition is an important part of what many value about the North Fork.  Another local collaborative project, the Heart and Soul Project, has worked to define what makes the valley such a special place, and, with the help of the community, is determining how best to incorporate those values into creating a vibrant and prosperous future.[18]  The *Merchant Herald* reported that preliminary survey results indicate top value statements identified by the Heart and Soul Project were: "We value our abundant natural resources that provide opportunity for work, play and connection to this place," and "We value access to North Fork food and water."[19]

Indeed, what makes the North Fork communities special are the many resources for which protections are sought in this North Fork Alternative Plan—plentiful and clean water resources, protection for major economic drivers like coal mining and agriculture, recognition of the value of healthy agricultural lands and preserved wildlife habitat, maintaining its highly scenic and publicly cherished visual resources, and access to dedicated recreational areas.

## Management Authority and Rationale behind the North Fork Alternative Plan

The North Fork Alternative Plan is consistent with multiple use management for the public lands and mineral estate, and meets all other agency obligations.  The NFAP is within the scope of analysis for the Uncompahgre Field Office RMP revision, and the NFAP offers reasonable, prudent and well-thought-out protections for the important resources in the area.

The National Environmental Policy Act (NEPA) and FLPMA both require that the agency consider reasonable alternatives in the Environmental Impact Statement (EIS) that analyzes the Resource Management Plan revision.[20]  This range of alternatives is not limited to only those crafted by the agency, but must also include approaches and alternatives proposed by the public, stakeholders, cooperating agencies, as well as other interested parties, so long as those alternatives fall within the scope of the analysis, are reasonable, and accomplish the management goals and obligations of the

---

[18] North Fork Heart & Soul Project, *North Fork Heart & Soul – Home*, no date, available at http://www.northforkheartsoul.com/ (last visited Nov. 27, 2013).

[19] *Community Values Rural Natural Environment, Resources and Local Food and Water Above All*, MERCHANT HERALD, Aug. 21st, 2013, available at http://www.merchantherald.com/community-values-rural-natural-environment-resources-and-local-food-and-water-above-all/ (last visited Nov. 25, 2013).

[20] Consideration of alternatives is the "heart" of the NEPA process, and is one of the ways the agency must show it has taken a "hard look" at the consequences of its proposed action. *See* U.S. COUNCIL ON ENVIRONMENTAL QUALITY, EXECUTIVE OFFICE OF THE PRESIDENT, A CITIZEN'S GUIDE TO THE NEPA: HAVING YOUR VOICE HEARD (Dec. 2012), available at www.blm.gov/pgdata/etc/medialib/blm/wy/information/NEPA/hddo/gatewaysouth.Par.44369.File.dat/05-citizens-guide-NEPA.pdf (last visited Nov. 27, 2013). *See also* 40 C.F.R. § 1502.14, available at http://www.gpo.gov/fdsys/pkg/CFR-2012-title40-vol34/pdf/CFR-2012-title40-vol34-sec1502-14.pdf (last visited Nov. 27, 2013).

BLM_0077640

agency.[21]  The North Fork Alternative Plan includes input and support from all these entities, and is designed to protect the myriad resources of the valley, including BLM lands and lands above BLM-administered minerals.

It is within the BLM's authority to fully implement the NFAP, using it to guide potential future oil and gas leasing and development on public lands.[22]  Moreover, given the high concentration and overlap of critical resources on the valley's BLM lands, and the unique configuration of those public lands and BLM minerals within the landscape of the valley, the NFAP is not only lawful and reasonable, but offers a prudent and necessary approach to managing potential future oil and gas leasing and development in the area.[23]  The NFAP contains a set of recommended actions that the agency can take in pursuit of legitimate, supportable resource objectives.  It is clearly 'reasonable' in that it offers a resource-based plan that identifies the resources that the BLM is obligated or authorized to consider, and then applies known and established management prescriptions to those resources.

In addition to the obligations under NEPA and FLPMA, BLM management is bound by other laws.  Oil and gas leasing and development of public lands and minerals in the North Fork has the ability to cause direct, indirect, and cumulative impacts, including impacts to threatened, endangered and sensitive species; local drinking and irrigation water sources and supplies; wildlife habitat; riparian areas and water bodies; delicate and selenium-rich soils; water and air quality; high quality scenic features; recreation on, and access to, the area's public lands; geologic hazards; and public health and safety.  Each of these are resources and factors for which the BLM has some level of obligation or authority to provide management.[24]  Protection of these resources, as prescribed in the NFAP, in no way conflicts with, infringes on, or is contrary to other agency obligations.  Rather, as discussed above, this approach

---

[21] *See* Colorado Environmental Coalition v. Salazar, 875 F. Supp. 2d 1233 (D. Colo. 2012), available at www.casetext.com/case/colo-envtl-coal-v-salazar/ (last visited Nov. 27, 2013). The Court found that the Final EIS was deficient in failing to sufficiently address the "Community Alternative" recommended by environmental organizations, area governments, and members of the public.

[22] *See*, e.g., BUREAU OF LAND MANAGEMENT, DEPARTMENT OF INTERIOR, INSTRUCTIONAL MEMORANDUM 2010-117 (May 17, 2010), available at http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2010/IM_2010-117.html (last visited Nov. 27, 2013): "The BLM recognizes that, in some cases, leasing of oil and gas resources may not be consistent with protection of other important resources and values… Under applicable laws and policies, there is no presumed preference for oil and gas development over other uses." *See also* 43 C.F.R. §3000.8, available at http://www.ecfr.gov/cgi-bin/text-idx?SID=24c9b6e854bdca2f59838f2359a6227b&node=43:2.1.1.3.42&rgn=div5#43:2.1.1.3.42.1.31.9 (last visited Nov. 27, 2013).

[23] *See* Council on Environmental Quality, *supra* note 20: "Some of the most constructive and beneficial interaction between the public and an agency occurs when citizens identify or develop reasonable alternatives that the agency can evaluate in the EIS. … Reasonable alternatives are those that substantially meet the agency's purpose and need."  For other purposes reasonable is defined as 'not arbitrary,' but rather supported with reasons. *See*, e.g., William Griffin, *NEPA and the Roan Plateau: Forcing the BLM to Take a Hard Look*, 40 B.C. ENVTL. AFF. L. REV. 533 (2013), available at http://lawdigitalcommons.bc.edu/cgi/viewcontent.cgi?article=2111&context=ealr (last visited Nov. 27, 2013).  'Prudent' is elsewhere defined as avoiding both unnecessary and undue damage of the public's resources. *See* OFFICE OF THE SOLICITOR, U.S. DEPARTMENT OF INTERIOR, MEMORANDUM M0-36999, REGULATION OF HARDROCK MINING (Dec. 27, 1999), available at www.doi.gov/solicitor/opinions/M-36999.pdf (last visited Nov. 27, 2013): "Commentators agree that the 'undue degradation' standard gives BLM the authority to impose restrictive standards in particularly sensitive areas, 'even if such standards were not achievable through the use of existing technology'…"

[24] BUREAU OF LAND MANAGEMENT, DEPARTMENT OF INTERIOR, LAWS, REGULATIONS, POLICIES, COURT DECISIONS (last updated Oct. 20, 2009), http://www.blm.gov/wo/st/en/info/regulations.html (last visited Nov. 27, 2013).

BLM_0077641

is consistent with BLM's obligations to manage the public lands to achieve "…a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations…"[25]

### North Fork Valley BLM Lands Are Already Heavily Utilized & Highly Valued

Although the Multiple Use and Sustained Yield Act of 1960 (MUSYA) predates FLPMA, it nonetheless provides a useful framework for the management of BLM lands.  In its original 1960 formulation, the MUSYA recognized recreation, wildlife habitat, and watershed protection, along with range and timber, as key elements of the multiple use concept: "…[public lands] shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes."[26]

The 1960 Act further specifies that 'Multiple Use' means:

> The management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output.[27]

In 1976 the passage of FLPMA expanded 'Multiple Use' to include BLM lands, making it the policy of the United States that for these public lands: "…management be on the basis of multiple use and sustained yield unless otherwise specified by law[.]"  FLPMA followed that with its declaration, specifying by law, that it was also policy that the public lands should:

> …be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use[.][28]

To further provide that the BLM's directive included protecting resources like clean water, air, recreation and wildlife habitat, Congress expanded upon the definition of 'Multiple Use' as applied to the BLM by directing the agency to include in land use planning consideration:

> …a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including,

---

[25] 43 U.S.C. § 1702.
[26] Multiple Use and Sustained Yield Act (as amended through 1996), 16 U.S.C. 528, available at
http://www.fs.fed.us/emc/nfma/includes/musya60.pdf (last visited Nov. 27, 2013).
[27] Id.
[28] 43 U.S.C. § 1702.

North Fork Alternative Plan                                             Page **23** of **102**

but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values...[29]

Thus, BLM's obligations under FLPMA are to manage resources according to the MUSYA, but also, to do so in a way that avoids undue harm to federal and non-federal lands, other resources values, and in a way that accounts for current and emerging resource needs and public values.

This reinforces what is suggested in the MUSYA itself, which notes that every allowable use is not necessary on all lands, and that the most appropriate use or uses are not necessarily those that result in the most or immediate financial gain. In particular, both the MUSYA and FLPMA direct the agency to consider relative and changing value of resources, lands, and public uses; and, during the land use planning process, to place consideration of these factors into a large enough framework that different levels of management can address a range of uses and resources; in particular:

> ...over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources...[30]

The North Fork's BLM lands are connected with the valley's human environment, towns, farms, water supplies, residences, and businesses. The economy is intertwined with and dependent upon these lands. The BLM lands also provide critical wildlife habitat, migration routes, and important riparian areas. The high concentration of resources that are affected by management of North Fork BLM lands and minerals is an indication that these lands are 'multiple use.' From coal mining to recreation and grazing to hunting access, from scenic views to water sources and conveyances; the North Fork's BLM lands already provide ample and enduring public benefit. Moreover, the value of these particular public lands gives them high relative worth when considering activity that has potential to alter, or even destroy, these uses.

The NFAP forms one component of a field office wide RMP revision. Just as the BLM lands represent a crucial piece of the North Fork Valley, but comprise less than ten percent (9.15%) of the land base, the North Fork's BLM lands are likewise only a small part of the much larger UFO, which is the total area being considered in the RMP revision. Thus, the size of the overall landscape, as well as the scope of the revision itself, further highlights the reasonableness of the North Fork Alternative Plan.[31]

The UFO administers over two million acres of federal minerals and nearly one million acres of public lands. The mineral estate impacted by the North Fork Alternative Plan comprises one-half of one percent (< 0.5%) of public mineral estate in Colorado. The NFAP area comprises only 7% of the BLM lands administered by the UFO, and less than one percent (0.7 %) of the BLM lands in Colorado.

---

[29] *Id.*
[30] *Id.*
[31] The NFAP would apply only to the BLM lands and minerals in the North Fork valley (which is about 10% of the surface and 20% of the minerals in the Gunnison and Delta County portions of the North and Smith Forks of the Gunnison drainage). Both the MUSYA and FLPMA (borrowing from it) require that the BLM develop RMPs "over areas large enough..." to be suitable to proper analysis. In the case of the North Fork Alternative Plan, that "area large enough" is the Uncompahgre Field Office.

BLM_0077643

Although it affects only a fraction of the BLM UFO's surface lands and mineral estate, the NFAP focuses on a portion of that larger area that has a unique concentration of sensitive resources, a well-documented and heavy utilization of the public lands already, as well as a high community and public value overall, with likely increasing value for these resources and amenities in the future.

### FLPMA Land Use Planning Requires Careful Consideration of Public Input, & Changing Uses/Values of Public Lands

At its most fundamental level, FLPMA requires that the BLM have current land use plans in place that allow it to properly manage and protect the resources while allowing for the range of statutory 'multiple uses' and, borrowing from the MUSYA, for the: "...harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment."[32]  The mandate that BLM's management be "harmonious and coordinated" results in the FLPMA requirement that, to the extent consistent with federal law, the agency coordinate its management of the public lands with that of other federal agencies, as well as state and local governments.[33]

BLM's multiple use mandate does not require oil and gas leasing take precedence over other uses of the public's estate; nor does it require that the BLM make any particular lands available for oil and gas leasing, or even that it leases any specific tract that is potentially available per an earlier RMP.  Federal law does require that in order to properly manage public resources, the BLM must first identify those resources—paying particular attention to resources that could be harmed by later agency actions—so



Figure 7 – BLM lands in the North Fork are so heavily utilized and highly valued that nearly 100 local residents travelled to the BLM Office in Montrose in Feb. 2012 to protest the original proposed lease sale.

---

[32] 43 U.S.C. § 1702.
[33] 43 U.S.C. § 1712(c)(9).

BLM_0077644

that it may apply proper management tools beforehand in a coordinated land use planning process.  As declared in FLPMA:

> ...the national interest will be best realized if the public lands and their resources are periodically and systematically inventoried and their present and future use is projected through a land use planning process coordinated with other Federal and State planning efforts...[34]

The North Fork's BLM lands and BLM-administered minerals are in the midst of a human-occupied landscape of natural, scenic, and historic value.  This landscape includes: critical wildlife habitat and riparian areas; popular recreational areas; municipal, domestic, and irrigation water sources, facilities, and springs (or are immediately adjacent to such) for towns and most valley residents; public infrastructure (like highways, dams, and schools); as well as resource challenges such as delicate soils and geologic hazards.

BLM is obligated to consider resources and land use within the broad framework of its RMP EIS analysis, and it is obligated to protect many of them through other federal laws, agency directives, and state and local requirements.  As do MUSYA and FLPMA, the Mineral Leasing Act gives BLM authority to implement the North Fork Alternative Plan.[35]  That includes the broad discretionary authority to close particularly sensitive public lands to oil and gas leasing altogether.

The requirements of NEPA direct the BLM to consider reasonable alternatives as it prepares its EIS for the RMP revision.  The North Forth Alternative Plan comprises a reasonable, prudent, and narrowly crafted component of a reasonable alternative within the RMP revision, and should be included as part of the final management plan for the public lands in the North Fork Valley.

### North Fork Alternative Plan Methodology

The North Fork Alternative Plan is a resource-based set of recommendations that seeks to protect the existing economy of the valley along with its water sources, rivers and wildlife areas, community and recreational areas, and the sensitive and scenic features of the landscape.  The NFAP would close certain areas to oil and gas leasing, and would also impose development setbacks with strict surface use restrictions—including No Surface Occupancy (NSO), Controlled Surface Use (CSU), and Timing Limitations (TL)—in places where leasing might be allowed to occur.

The North Fork Alternative Plan was crafted in conjunction with a stakeholder group representing agricultural, tourism, realty, businesses, and conservation organizations in order to present to the BLM for consideration in its land use plan revision.  Information on the stakeholder advisory group meetings, map data sources, and other details of regarding formulation of the North Fork Alternative Plan are available in Appendix B.

---

[34] 43 USC § 1701.

[35] The public minerals proposed for NO LEASING under the North Fork Alternative Plan represent only 4% of the entire mineral estate managed by the BLM Uncompahgre Field Office, and do not include any of the federal minerals underlying National Forest lands.

BLM_0077645

### A Note about Maps

With the exception of the visual resource management (VRM) map, the maps used in conjunction with the NFAP are illustrative only and not the final depiction of where these resources occur on the lands described.  With the exception of the VRM map, resource information depicted on the maps comes from the best available data identified in preparation of the NFAP, from public and government sources whenever possible.  If more current or comprehensive high-quality data are available, then the BLM must incorporate that data into the RMP revision analysis.  Full page copies of all maps shown in the NFAP are available in Appendix A.  Data sources are listed on each map and in Appendix B.  The VRM map depicts lands that the North Fork Alternative Plan has itself identified as possessing sensitive scenic qualities and important valley view sheds, and what management is recommended for those lands.

### Proactive Counter Proposal to the North Fork Oil and Gas Lease Sale

In response to the initial scoping of the (deferred) oil and gas lease sale, some 3,000 comments were submitted to the local BLM office.[36]  After the initial deferral, a group of stakeholders sought means to ensure that the BLM put sound and protective management in place prior to considering which lands should be leased, and to help shape that management though recommendation of a 'community alternative' as a public comment on the pending BLM Uncompahgre Field Office RMP revision.

First, key resource concerns and other issues were identified from those scoping comments, lease sale environmental assessment (EA) comments, as well as from the RMP revision scoping report and stakeholder discussions.  Efforts then went into understanding, describing, assessing, and, when possible, mapping these key resources and concerns.  This preliminary information was shared by stakeholder representatives with their own memberships and colleagues, and then brought back to the advisory group.  From this, a set of six key resource 'zones' were identified, in addition to the valley's overall scenic features and specific recreational opportunities at Jumbo Mountain.

The next stage involved researching protections for each specific set of resources, values, and uses, based on known best management practices (BMPs), existing or recommended stipulations (from other BLM Resource Management Plans or other agencies), state regulations, and proposed rulemakings.  A set of preliminary recommendations went back to the advisory group, and back to advisory group members' memberships and colleagues, then was presented at a community meeting in December 2012 in Paonia.[37]

---

[36] Dennis Webb, *BLM to proceed with North Fork oil, gas leasing*, GRAND JUNCTION DAILY SENTINEL, Nov. 16, 2012, available at http://www.gjsentinel.com/breaking/articles/blm-to-proceed-with-north-fork-oil-gas-leasing/ (last visited Nov. 27, 2013).

[37] In November 2012 the stakeholder group's work was interrupted when BLM moved to lease North Fork lands, announcing a 30-day protest period for a February 2013 sale.  After the sale was deferred a second time, work on the Plan resumed.

A draft of the North Fork Alternative Plans recommendations was made available to the public online starting in March 2013.  A public support statement began to circulate in the community and online to gather individual supporters of the NFAP, and discussions began with the area's town councils, and other organizations to secure additional pubic and stakeholder support.  Then, the draft management recommendations that comprise the foundation of the NFAP were presented to the BLM in April 2013. Other meetings in the spring of 2013 included a phone conversation with Gunnison County staff in May, and a briefing with Delta County oil and gas staff in April.  The Town of Hotchkiss Board of Trustees were



*Figure 8 - In Jan. 2013, local residents traveled to Washington, DC for a second time seeking the deferral of proposed oil and gas leases in the North Fork Valley, shown here prior to a meeting with BLM senior officials. From left to right, food and wine author Eugenia Bone; Ty Gillespie, owner of Azura Cellars and Gallery; Landon Deane, owner of the Eagle Butte Ranch near Hotchkiss; North Fork Alternative Plan stakeholder group member and owner of Mountain West Strategies, Pete Kolbenschlag; and Marley Hodgson, owner of the Smith Fork Ranch near Crawford. Credit: Pete Kolbenschlag, Mountain West Strategies.*

briefed on the NFAP in a May work session. The wildlife data and recommendations in the NFAP were discussed and shared with staff at the Colorado Department of Parks and Wildlife in June 2013.  Several newspapers articles, guest columns, and many letters-to-the-editor in local papers have been published on the North Fork Alternative Plan.[38]

---

[38] *See* Citizens for a Healthy Community, *Learn More About the North Fork Alternative Plan*, last updated Nov. 14, 2013, available at http://www.citizensforahealthycommunity.org/news/learn-more-about-the-north-fork-alternative-plan (last visited Nov. 25, 2013).

BLM_0077647

Public, stakeholder, and agency outreach resulted in several minor adjustments (as compared to the original management proposed in March 2013) to maps and recommendations, noted in Appendix B. An update on the North Fork Alternative Plan was given at an open community meeting held in Hotchkiss by Citizens for a Healthy Community and the Western Slope Conservation Center on October 29, 2013; and the NFAP was presented in detail by stakeholders to a work session of the Delta County Board of County Commissioners on November 12, 2013.  BLM staff were in attendance at both meetings.

This document represents the complete, community-prepared North Fork Alternative Plan as presented to the BLM prior to its release of the draft environment impact statement (DEIS), and includes the latest recommendations, background, rationale and supporting information.  It was also shared with the Boards of County Commissioners for Gunnison and Delta Counties, each of the North Fork's municipalities, and also was made available to the public in December 2013.  An augmented version, detailed comments, and additional supporting material will be submitted during the formal public comment period on the DEIS.

BLM_0077648

# North Fork Alternative Plan Management Recommendations

## Proposed Management Zones

In order to protect the myriad important resources in, adjacent to, or nearby BLM-managed lands in the North Fork Valley, the North Fork Community Advisory Group has developed a series of proposed special management zones and management stipulations for each zone. These management zones and the prescribed management (e.g. setbacks, stipulations, etc.) described herein are an overview of the kind of management the community would like to see the BLM implement in its new RMP. These recommendations were developed with the hope that the BLM will include them in the final RMP. Under NEPA, the onus is on the BLM to consider this information and conduct all appropriate analysis of the North Fork Alternative Plan's recommendations when crafting the new RMP.

### Mining & Agriculture

The proposed **Mining & Agriculture Management Zone** would protect the existing and emerging economies of the North Fork Valley from the risks associated with oil and gas development.



The proposed management zone would protect coal miners from induced seismic events associated with oil and gas development by establishing a buffer zone between drilling and coal mining operations. It would not affect the ability of mines to vent or capture methane. The proposed management area would

*Figure 9 - Coal mining and agriculture have a long and proud history in the North Fork Valley. Credit: Ecoflight.*

prohibit oil and gas leasing within ¼-mile of active (and future) coal leases and existing (inactive, retired) coal leases, except when associated with coal leases in order to facilitate capture and commercial use of coal mine methane (i.e. to allow capture and commercial use of coal mine methane instead of venting it into the atmosphere). The NFAP is a proposal for a management framework for oil and gas leasing and development on BLM lands and of federal minerals; it takes no position on how the BLM should manage its coal program.

BLM_0077649

The proposed management zone would also protect the agricultural economy by requiring a mandatory NSO stipulation on oil and gas leasing within ¼-mile of any Prime and Unique farmlands,[39] livestock operation, any organic or conventional farm, ranch, or orchard and the West Elks American Viticultural area. Prohibiting ground disturbing activities near agricultural resources will protect these critical areas from spills, releases, and other impacts associated with oil and gas development (e.g. road building, well pad clearing, pipeline installation, etc.). The proposed **Mining & Agriculture Management Zone** and stipulations are illustrated in Figure 10 below.[40]

*Figure 10 - Mining & Agriculture Proposed Management Zone*



---

[39] NATURAL RESOURCE CONSERVATION SERVICE, U.S. DEPARTMENT OF AGRICULTURE, NATIONAL SOIL SURVEY HANDBOOK, PART 622 – ECOLOGICAL AND INTERPRETATIVE GROUPS (2013), available at http://www.nrcs.usda.gov/Internet/FSE_DOCUMENTS/nrcs142p2_052852.doc (last visited Nov. 27, 2013).
[40] Please note: Maps are provided to depict how management prescriptions and development setbacks and stipulations protect specific resources. Maps do not necessarily indicate where all such resources are found, and may not correctly depict all places where such stipulations do or do not apply. The map for this proposed management zone map does not show the farms, orchards, ranches, and other agricultural operations that should be taken into consideration by the BLM in its NEPA analysis.

BLM_0077650

*Coal Mining*

Coal mining has been an important component of the local economy in the North Fork for decades. "The UFO manages six active federal coal leases located below the mesas surrounding the North Fork Valley of the Gunnison River stretching from Paonia to Somerset, Colorado.  Approximately 85 million recoverable tons are under lease, with potential for additional reserves to be proven."[41]  In addition to the three currently active mines—Elk Creek, Bowie No. 2, and West Elk—the BLM UFO recently approved an exploration plan for a potential new mine on Oak Mesa.[42]

Recent reports and studies indicate that oil and gas development results in seismic activity that has the potential to disrupt coal mining, and poses safety risks to miners as well as economic risks should the mine close for a time as a result of nearby seismicity.  The practice of hydraulic fracturing has been directly linked to earthquakes in Lancashire, United Kingdom[43] and British Columbia, Canada.[44] In the U.K., a report found that hydraulic fracturing was related

> "It has long been known that impoundment of reservoirs, surface and underground mining, withdrawal of fluids and gas from the subsurface, and injection of fluids into underground formations are capable of inducing earthquakes. Microearthquakes (that is, those with magnitudes below 2) are routinely produced as part of the hydraulic fracturing (or "fracking") process… Yet, wastewater disposal by injection into deep wells poses a higher risk, because this practice can induce larger earthquakes."
>
> - William Ellsworth, researcher at the U.S. Geological Survey, from the Journal *Science*, 341, 1225942 (2013), DOI: 10.1126/science.1225942, available at http://www.sciencemag.org/content/341/6142/1225942.

to two earthquakes, of magnitude 2.3 and 1.5, and 28 much weaker seismic events.[45]  Further, a report by the British Columbia Oil and Gas Commission found that seismic events "…between 2009 and 2011 were caused by fluid injection during hydraulic fracturing in proximity to pre-existing faults."[46]  Most recently, an academic journal article in *Science* discussed the induced seismicity from oil and gas

---

[41] Uncompahgre Field Office, Bureau of Land Management, U.S. Department of Interior, Southern Colorado Federal Coal Leases (last updated Aug. 28, 2012), available at http://www.blm.gov/co/st/en/fo/ufo/solids_and_fluids/CoalLeasing.html (last visited Nov. 27, 2013).

[42] Uncompahgre Field Office, Bureau of Land Management, U.S. Department of Interior, Decision Record DOI-BLM-CO-S050-2011-0036 EA (Sept. 11, 2012), available at http://www.blm.gov/pgdata/etc/medialib/blm/co/information/nepa/uncompahgre_field/11-36_oak_mesa_ea.Par.0506.File.dat/11-36%20Oak%20Mesa%20FINAL%20EA%20DR.pdf (last visited Nov. 27, 2013).

[43] *Fracking tests near Blackpool 'likely cause' of tremors*, BBC News, Nov. 2, 2011, available at http://www.bbc.co.uk/news/uk-england-lancashire-15550458 (last visited Nov. 27, 2013).

[44] *Fracking causes minor earthquakes, B.C. regulator says*, The Canadian Press, Sept. 6, 2012, available at http://www.cbc.ca/news/canada/british-columbia/story/2012/09/06/bc-fracking-earthquakes.html (last visited Nov. 27, 2013).

[45] C.J. de Pater and Stefan Baisch, *Geomechanical Study of Bowland Shale Seismicity: Synthesis Report*, at 51, Report Commissioned by Cuadrilla Resources, Nov. 2, 2011, available at http://www.cuadrillaresources.com/wp-content/uploads/2012/02/Geomechanical-Study-of-Bowland-Shale-Seismicity_02-11-11.pdf (last visited Nov. 27, 2013).

[46] BC Oil and Gas Commission, *Investigation of Observed Seismicity in the Horn River Basin*, August 2012, available at http://www.bcogc.ca/node/8046/download?documentID=1270 (last visited Nov. 27, 2013).

development operations of hydraulic fracturing and fluid disposal through injection wells.  That study found that microearthquakes are "routinely" produced as a result of hydraulic fracturing (or fracking).[47]

Furthermore, induced seismicity from underground waste water disposal via injection wells pose a risk to the coal mines and miners' safety.  A recent report by the National Research Council found that "...seismic events caused by or likely related to energy development have been measured and felt in Alabama, Arkansas, California, Colorado, Illinois, Louisiana, Mississippi, Nebraska, Nevada, New Mexico, Ohio, Oklahoma, and Texas."[48]  As a specific example, waste water injection wells have been linked to earthquakes in Ohio:

> Since March 2011, the Youngstown [Ohio] area has experienced 12 low-magnitude seismic events along a previously unknown fault line. These events ranged from 2.1- to 4.0-magnitude and were recorded by the Ohio Department of Natural Resources' (ODNR) Ohio Seismic Network (OhioSeis). The 2011 earthquakes are distinct from previous seismic activity in the region because of their proximity to a Class II deep injection well, known as the Northstar 1 well.  In fact, all of the events were clustered less than a mile around the well.[49]

Perhaps most alarming, a scientific article in the journal *Geology* found that in Oklahoma in 2011, a 5.7 magnitude quake—preceded by a 5.0 magnitude quake and thousands of aftershocks—has been linked to injection wells.[50]

Given this evidence that demonstrates a considerable risk from oil and gas development to the existing and important coal mining industry in the North Fork Valley, the BLM needs to develop management to protect the coal mining economy, including miners' safety, from the risks of oil and gas development.  Furthermore, the use of coal mine methane capture should be encouraged to reduce the amount of methane that is vented into the atmosphere.  The management zone should only allow for gas leasing associated with the commercial use of coal mine methane capture.

### *Agriculture*

Delta County's orchards, farms, and vineyards have established it as a premier agricultural area in the Rocky Mountain West.  Many area farmers, ranchers, vintners, and orchardists have chosen to raise crops or livestock using organic, chemical-free, or other sustainable methods.  Much of the valley's land is classified as prime or unique farmland, or farmland of statewide importance.[51]  Delta County has the

---

[47] William L. Ellsworth, *Injection-Induced Earthquakes*, Science 341, 1225942 (2013), DOI: 10.1126/science.1225942, attached as Exhibit 4.

[48] National Research Council, Committee on Induced Seismicity Potential in Energy Technologies, et. al., *Induced Seismicity Potential in Energy Technologies*, The National Academies Press (2012). Available for download at https://download.nap.edu/catalog.php?record_id=13355 (last visited Nov. 27, 2013) and attached as Exhibit 5.

[49] Ohio Department of Natural Resources, Preliminary Report on the Northstar 1 Class II Injection Well and the Seismic Events in the Youngstown, Ohio Area (March 2011), available at http://ohiodnr.com/downloads/northstar/UICreport.pdf (last visited Nov. 27, 2013).

[50] Keranen, Katie M. et. al., *Potentially induced earthquakes in Oklahoma, USA: Links between wastewater injection and the 2011 $M_w$ 5.7 earthquake sequence*, Geology, Mar. 26, 2013, doi: 10.1130/G34045.1, attached as Exhibit 6.

[51] U.S. Department of Agriculture, North Fork Gunnison Watershed, Rapid Assessment, Hydrologic Unit Code 14020004, at 12 (Dec. 2009), available at

---

BLM_0077652

highest concentration of organic farms in the state of Colorado, if not in the entire Rocky Mountain West.[52]

> According to USDA Economic Research Service, direct sales are highest in urban corridors in the Northeast and on the West Coast, but the region in and surrounding the North Fork Valley is an outlier – reporting up to [$]2.5 million or more in annual sales. This data illustrates that our rural county has successfully developed a sustainable, agriculture-based economy.[53]

Produce from the North Fork Valley is delivered to farmers markets in Carbondale, Gunnison, Telluride, Basalt, Crested Butte,[54] and Aspen,[55] and even to communities on the Front Range, including Denver, Boulder, Fort Collins, Longmont, and Golden.[56]  According to the 2007 Agriculture Census (the most recent data available), Delta County produces almost $47 million in agricultural products each year.[57]

The North Fork Valley is also home to the West Elks American Viticultural Area (AVA) and the highest altitude vineyards in the entire Northern Hemisphere.[58]  The West Elks AVA was granted in 2001 and comprises an area of about 48,000 acres from the western end of Rogers Mesa, west of Hotchkiss, eastward nearly to Somerset.  The West Elks AVA is one of only two in Colorado, and its wineries are responsible for $1.5 to $2 million in direct sales annually, with an additional $5 to $10 million of in-direct sales.[59]  The areas' wineries regularly win regional and national accolades.[60]  State Tourism literature refers to the West Elks AVA as the "Heart of Colorado Wine Country;" the area's wines and wineries have gained national recognition and attention in *Sunset Magazine*, *Forbes Magazine*, *Practical Vineyard and Winery*, *USA Today*, *The Denver Post*, *Edible Front Range*, *Edible Aspen*, and internationally in *Gilbert & Gaillard*.[61]

---

http://www.slowfoodwesternslope.org/uploads/6/6/7/3/6673621/usdanorth_fork_gunnison_december_2009.pdf (last visited Nov. 27, 2013).

[52] *See* NATIONAL AGRICULTURAL STATISTICS SERVICE, U.S. DEPARTMENT OF AGRICULTURE, 2007 CENSUS OF AGRICULTURE – COUNTY DATA, TABLE 43 – ORGANIC AGRICULTURE (2007), available at
http://www.agcensus.usda.gov/Publications/2007/Full_Report/Volume_1,_Chapter_2_County_Level/Colorado/st08_2_043_043.pdf (last visited Nov. 27, 2013). The USDA shows 58 organic farms in Delta County, the highest number in the state.
[53] Letter from Anastacia Gall, Vice President, Valley Organic Growers Association to Uncompahgre Field Office, Bureau of Land Management (April 2, 2012), attached as Exhibit 7.
[54] Valley Organic Growers Association, *2012-2013 Directory*, available at
http://www.vogaco.org/uploads/6/6/7/3/6673621/voga2012-13proof4.pdf (last visited Nov. 27, 2013).
[55] Zephyros Farm & Garden, Our Farm, no date, http://www.zephyrosfarmandgarden.com/ (last visited Nov. 29, 2013).
[56] Ela Family Farms, *Farmers Market's*, no date, http://www.elafamilyfarms.com/farmers-marketscsasevents/farmers-markets (last visited Nov. 27, 2013).
[57] NATIONAL AGRICULTURAL STATISTICS SERVICE, U.S. DEPARTMENT OF AGRICULTURE, 2007 CENSUS OF AGRICULTURE, VOLUME 1, CHAPTER 2: COUNTY LEVEL DATA – TABLE 2, MARKET VALUE OF AGRICULTURAL PRODUCTS SOLD INCLUDING DIRECT SALES: 2007 AND 2002, available at
http://www.agcensus.usda.gov/Publications/2007/Full_Report/Volume_1,_Chapter_2_County_Level/Colorado/st08_2_002_002.pdf (last visited Nov. 27, 2013).
[58] West Elks American Viticultural Area, *West Elks AVA – Colorado's North Fork Valley Wineries*, http://www.westelksava.com/ (last visited Nov. 27, 2013).
[59] Helleckson, *supra* note 12 (attached previously as Exhibit 3).
[60] *Id.*
[61] *Id.*

BLM_0077653

This unique agricultural setting has established the Delta County area as a premier food and wine destination in the Rocky Mountains. The BLM should recognize the importance of the local agricultural economy and the tourism it generates, and protect the areas' important farmlands, existing agricultural operations, and the West Elks AVA from the risks associated with oil and gas development.

## Management Recommendations & Rationale

In order to protect the myriad important agricultural and coal mining resources in the North Fork, the BLM should designate the **Mining & Agriculture Management Zone**. The management zone would close areas to oil and gas leasing within ¼-mile of active (and future) coal leases, in addition to other existing (inactive, retired) coal leases, except in conjunction with coal leases to facilitate capture and use of coal mine methane.

BLM has partially, but not fully, recognized the need to protect coal mines and miners. In the Final EA for the proposed February 2013 lease sale of lands in the North Fork, the BLM proposed a coalbed methane/coal mining stipulation.[62] The stated purpose of the stipulation is "[t]o protect the maximum economic recovery and safety of coal mining where the overburden is 3500 feet or less."[63] However, the stipulation provides an exemption that leaves wide discretion for the field office instead of setting a firm policy that is protective of coal mines and miners:

### Delta County Agriculture



Delta County's historical agricultural prominence has established the region as a breadbasket for Colorado. Here are some of the numbers that show how important agriculture is to Delta County:

- Delta County has the highest concentration of organic farms in the state of Colorado

- Produce from the North Fork Valley feeds communities across Colorado from Basalt to Boulder and Telluride to Aspen

- The North Fork Valley is home to the West Elks American Viticultural Area (AVA) and the highest altitude vineyards in the entire Northern Hemisphere

- Delta County produces about $47 million in agricultural products per year

- Orchards in the Delta Conservation District supply more than half of Colorado's apples, peaches, pears, and cherries

Sources: 2007 USDA Agricultural Census, West Elks AVA web site, VOGA 2012-2013 Directory, Ela Family Farms web site, Delta Conservation District.

---

[62] Uncompahgre Field Office, Bureau of Land Management, U.S. Department of Interior, Final Environmental Assessment, DOI-BLM-CO-S050-2012-0009-EA, Exhibit UB-10 at F-7 (Nov. 16, 2012), available at http://www.blm.gov/pgdata/etc/medialib/blm/co/information/nepa/uncompahgre_field/12-09_august_og_lease/2012-1116_12-09_lease0.Par.0143.File.dat/FINAL2012-09_EA_16NOV2012.pdf (last visited Oct. 18, 2013).
[63] Id.

North Fork Alternative Plan

BLM_0077654

> Within the Paonia-Somerset Known Recoverable Coal Resource Area (KRCRA), coal and oil and gas leasing and development will be managed consistent with land use plans and lease terms. More specifically, the portions of the KRCRA where the overburden above the B-Seam of the Mesa Verde coals is less than 3500 feet will be managed primarily for the exploration and development of the coal resources. Oil and gas operators anticipating exploration or development operations are encouraged to consult and coordinate their activities with the affected coal operators. In the event that the oil and gas and coal operators are unable to reach agreement on proposed oil and gas exploration or development, the BLM authorized officer will intervene and use all pertinent lease terms, regulations, and policy to determine what course of action is in the public's interest. However, under no circumstances will the BLM approve any oil and gas operations that compromise maximum economic coal recovery or the safety of underground mining operations.[64]

The strongest protection of the existing coal mining operations, miners' safety, and related economy would be best achieved through closing these lands to oil and gas leasing altogether. A situation where competing interests of an oil and gas company and a coal company over the same underground area simply cannot be allowed to occur.

Furthermore, this management zone would require mandatory NSO stipulations within ¼-mile of any Prime and Unique farmlands as identified by the USDA, livestock operations and ranches, traditional and organic farms and orchards, and the West Elks American Viticultural Area. In Colorado and other parts of the country, the oil and gas industry's operations have been known to have negative impacts on agricultural operations. For example, in Sept. 2013 a wheat farmer in North Dakota "...discovered an oil spill the size of seven football fields while out harvesting wheat..."[65] and in July 2013 a malfunctioning well in Colorado "...sent a fine mist of gas and crude oil spraying 850 feet from the wellhead onto a farmer's land."[66] The unique mix of land ownership in the North Fork, where public and private lands are intertwined, requires special management to protect the region's important agricultural economy.

---

[64] *Id.*

[65] The Associated Press, *Massive oil pipeline break under N.D. farmer's wheat field*, CBS News, Oct. 11, 2013, available at http://www.cbsnews.com/8301-201_162-57607081/ (last visited Nov. 27, 2013).

[66] Bobby Magill, *Malfunction sends crude oil spraying 850 feet from well near Severance*, Fort Collins Coloradoan, July 22, 2013, available at http://www.coloradoan.com/article/20130722/NEWS01/307220019 (last visited Nov. 27, 2013).

BLM_0077655

## Towns, Schools & Community

The North Fork towns of Crawford, Hotchkiss, and Paonia offer a rural lifestyle unique in the Mountain West.  The website of the three town's Chambers of Commerce describes the qualities of the area:

> The physical setting of the Valley—tucked between the mountains to the east, the Grand Mesa to the North, and the canyons and high desert of the southwest and west portions of the county make this a distinct sliver of paradise—and one with its own identity.  Since the 1880's, agriculture and animal husbandry have been not only a means of making a living, but have become enmeshed in the fabric of the community's identity.[67]

All three towns are located on the West Elk Scenic Byway Loop, which delivers tourists to shops, cafés, and wineries.  "The experience of the North Fork Valley is unlike any other in Colorado."[68]

What makes the North Fork special are in fact the resources for which protections are sought in the North Fork Alternative Plan—plentiful and clean water resources, agricultural lands, farms and ranches, wildlife habitat, scenic qualities and recreation areas, as well as the towns themselves.  The Paonia Chamber of Commerce describes the current economy as one "...comprised of a vibrant and thriving arts-community, coal mining, niche-agriculture, viticulture, cattle ranching, hunting and tourism."[69]



*Figure 11 - All three towns in the North Fork are bordered by public lands managed by BLM. Shown here, the Town of Crawford lies below BLM-managed public lands on Youngs Peak. Credit: Jim Ramey; Ecoflight.*

---

[67] North Fork Valley Joint Chamber of Commerce, *Heritage and History*, http://www.northforkvalley.net/page.cfm?pageid=14736 (last visited Nov. 27, 2013).
[68] *Id.*
[69] Halbert, et. al., *supra* at note 10 (attached previously as Exhibit 1).

North Fork Alternative Plan

BLM_0077656

The towns serve as gathering places for commerce, social and cultural events, and as population centers.  Each of the three towns has its own unique character:

- Hotchkiss features a variety of annual events, including the Delta County Fair each August, the Hotchkiss Sheep Camp Stock Dog Trials, and the Black Canyon Art Exhibit.  Hotchkiss is truly one of the "friendliest towns" around.[70]
- Crawford is nestled between the North Rim of the Black Canyon of the Gunnison National Park and the West Elk Wilderness, serving as the gateway to both destinations.  Crawford is home to the annual Pioneer Days Festival and its parade, food, arts, and contests.[71]
- Award-winning journalism at *High Country News* and *KVNF Community Radio*, the Blue Sage Center for the Arts, and the Paradise Theatre all give flavor to Paonia, home to the annual Cherry Days and Mountain Harvest festivals, and the BMW Motorcycle Club's Top O' The Rockies Rally.[72]

The three towns in the North Fork have been called "the golden triangle" by *Forbes Magazine*, as a "best kept secret" of Colorado.[73]  Industrial activity surrounding the towns would increase dust, traffic, noise



*Figure 12 - The Hotchkiss High School, Community Montessori School, and North Fork Swimming Pool are literally surrounded on all sides by BLM lands. Credit: Rita H. Clagett; Ecoflight.*



---

[70] Delta County Colorado Tourism, *Delta County, Colorado—Communities—Hotchkiss* (2013), http://www.deltacountycolorado.com/communities/hotchkiss.aspx (last visited Nov. 27, 2013).
[71] Delta County Colorado Tourism, *Delta County, Colorado—Communities—Crawford* (2013), http://www.deltacountycolorado.com/communities/crawford.aspx (last visited Nov. 27, 2013).
[72] Delta County Colorado Tourism, *Delta County, Colorado—Communities—Paonia* (2013), http://www.deltacountycolorado.com/communities/paonia.aspx (last visited Nov. 27, 2013).
[73] Lorraine Cademartori, *The best-kept secret in Colorado's second-home market? Delta County*, Forbes Magazine, March 13, 2006, available at www.adventuremedianews.com/viewarticles.asp?ClientID=400&AID=425 (last visited Nov. 27, 2013).

BLM_0077657

and toxins in areas that are heavily utilized and occupied.  The Paonia Chamber of Commerce continues to stress concerns raised by new industrial activity from oil and gas development:

> Scientific studies and real life stories show that some of the impacts of the proposed [oil and gas] development include significant air pollution, permanent water and soil contamination, reduction of water supplies, serious damage to human health, reduction of property values, pasture destruction, livestock deaths, earthquakes and infrastructure stresses.[74]

The proposed **North Fork Valley Towns, Schools & Community Management Zone** (illustrated in Figure 13 below) would close BLM lands to oil and gas leasing within ½-mile of the Crawford, Hotchkiss, and Paonia town limits.[75]  The management zone would also require mandatory NSO stipulations within ¼-mile of schools and identified community facilities.  In addition to providing better protections for public health and safety, this designation will also protect the North Fork's unique small town, rural setting.

*Figure 13 - Towns, Schools & Community Proposed Management Zone*



---

[74] Halbert, et. al., *supra* note 10 (attached previously as Exhibit 1).
[75] Please note:  Maps are provided to depict how management prescriptions and development setbacks and stipulations protect specific resources.  Maps do not necessarily indicate where all such resources are found, and may not correctly depict all places where such stipulations do or do not apply.

North Fork Alternative Plan

BLM_0077658

Oil and gas leasing on the public lands immediately adjacent to the North Fork's towns, or industrial activity next to community facilities, would present hazards to health and safety, provoke commercial and public conflict, and foster an overall loss in quality of life for the towns' residents and visitors. Any oil and gas activity on public lands within a half mile of towns will require significant industrial activity within town limits, on town roads, utilizing town resources. Impacts to public health and safety are top concerns for community members. Water contamination is always a problem in oil and gas development, which is also known to negatively impact air quality.[76]

Mishaps do happen.[77] Trucks spill toxic loads and damage roads.[78] Fracking flowback spews for hours.[79] Waste ponds breech in heavy rains.[80] Wells explode into flames.[81] These are all recent occurrences in oil and gas fields. Even when things go well, and they never always do, oil and gas development entails massive amounts of truck and industrial traffic, especially during pad construction, drilling, completion



*Figure 14 - The Town of Paonia, with 'P Hill' above the downtown, is bordered by BLM lands to the east in the Jumbo Mountain proposed Special Recreation Management Area. Credit: Rita H. Clagett; Ecoflight.*



---

[76] Mark Jaffe, *Study finds oil and gas drilling caused air pollution in West*, THE DENVER POST, Feb. 19, 2013, available at http://www.denverpost.com/ci_22623664/study-finds-oil-and-gas-drilling-caused-air (last visited Nov. 27, 2013).
[77] Staff Reports, *Oil and gas spill report for Aug. 26*, GREELEY TRIBUNE, Aug. 26, 2013, available at http://www.greeleytribune.com/news/local/7835455-113/aug-spill-impacted-reported (last visited Nov. 27, 2013).
[78] Barley Kives, *Oil's not well with our roads*, WINNIPEG FREE PRESS, Aug. 19, 2013, available at http://www.winnipegfreepress.com/local/oils-not-well-with-our-roads-220149481.html (last visited Nov. 27, 2013).
[79] Nick McGurk, *Workers stop fracking-fluid leak after 30 hours*, NBC 9NEWS, Feb. 12, 2013, available at http://www.9news.com/news/article/316565/222/Workers-stop-fracking-fluid-leak-after-30-hours (last visited Nov. 27, 2013).
[80] William Pentland, *Fracking Blamed For Widespread Death Of Federally-Protected Fish In Kentucky*, FORBES, Aug. 28, 2013, available at http://www.forbes.com/sites/williampentland/2013/08/28/fracking-blamed-for-widespread-death-of-federally-protected-fish-in-kentucky/ (last visited Nov. 27, 2013).
[81] Staff Reports, *Ruptured EOG Resources Eagle Ford oil well burning*, REUTERS, Aug. 29, 2013, available at http://www.reuters.com/article/2013/08/29/eog-blowout-texas-idUSL2N0GU10V20130829 (last visited Nov. 27, 2013).

BLM_0077659

and fracking.  The towns of the North Fork are small towns with children, pets, livestock, slow moving farm machinery and other hazards regularly on the roads, in town and between them.

The BLM administered public lands near the towns and community facilities facilitate significant human, recreational, and commercial activity, and are heavily utilized by area residents and visitors.  Closing public lands to oil and gas leasing immediately adjacent to the towns and keeping industrial activity away from other community facilities will decrease opportunities for conflict, which are likely when a highly impactful industrial use like oil and gas drilling clashes with a rural town.

The scarring of the landscape that accompanies oil and gas development and the burdensome nuisance it would bring—including a suddenly bright night, heavy industrial traffic on already insufficient roads, noise, and noxious odors—are all measures of a loss of quality of life to many in the North Fork.  Other management in the NFAP more directly addresses some of these concerns, but expanding the no leasing area to ½-mile around incorporated towns, and requiring mandatory NSO stipulations around other community facilities can also help address some of these concerns.

Public lands that would be closed to leasing in proximity to towns include the flanks of Jumbo Mountain near Paonia, lands around Youngs Peak ('C' Hill) near Crawford, and public lands between the Town of Hotchkiss and the high school.  Public lands that would prohibit drilling or any industrial activity on the surface include those within ¼-mile of Hotchkiss high school, Crawford School, and the North Fork Swimming Pool.

*Management Recommendation & Rationale*

In order to protect the communities in the North Fork, the NFAP recommends a ½-mile buffer around the town limits of Crawford, Hotchkiss, and Paonia; and a ¼-mile NSO buffer around community facilities.  Identified community facilities in the North Fork consist of:

- North Fork Swimming Pool (33 Bulldog St., Hotchkiss, CO 81419)
- Crawford School (51 Fir Ave., Crawford, CO 81415)
- Hotchkiss High School (438 Bulldog St., Hotchkiss, CO 81419)
- North Fork Community Montessori School (397 Bulldog St., Hotchkiss, CO 81419)
- The North Fork Recycling Center (36577 K50 Rd., Hotchkiss, Colorado)

The heavy industrial nature of oil and gas development makes it incompatible with the daily activity of North Fork towns and in close proximity to community facilities like schools and recreation centers.  A prohibition on leasing within ½-mile of towns is a prudent expansion on current restrictions that prohibit leasing within incorporated municipalities, which better reflects current settlement patterns

BLM_0077660

and human activity in the North Fork.[82]  The population density, the concentration of activity, mixed use lands, and infrastructure are the same within towns as on their edges.  Leasing of public lands immediately adjacent to towns also presents high likelihood for conflict and undue negative impact to communities.

An NSO requirement for BLM lands within ¼-mile of any community buildings or facilities builds upon recommendations at the state level that drilling take place 1,000 feet or more away from schools and other high-occupancy buildings.[83]  In addition, the recently proposed BLM fracking rule drew widespread criticism for its failure to require setbacks from high-occupancy buildings like schools, recreation centers and other community facilities.[84]  The BLM has partially recognized these concerns, when it deferred from its 2012/2013 lease sales in the North Fork a 40-acre tract that was located near the Hotchkiss High School and North Fork Montessori School.[85]   However, the NFAP seeks lasting protection throughout the duration of the new RMP's management direction for the use of public lands here.

---

[82] Federal lands that are always closed to oil and gas leasing include "…(ii) Incorporated cities, towns and villages." 43 C.F.R. 3100. This codifies the Mineral Leasing Act which lists specific lands closed to leasing.  FLPMA further allows the BLM to close certain other areas to leasing in a Resource Management Plan or amendment.  The BLM notes "Federal minerals excluded from such [oil and gas] leasing by legislation or secretarial policy include those underlying units of the National Park System, National Wildlife Refuges, Native American reservations, incorporated cities, and lands closed under previous land use decisions." BAKERSFIELD FIELD OFFICE, BUREAU OF LAND MANAGEMENT, U.S. DEPARTMENT OF INTERIOR, APPENDIX G – MINERALS MANAGEMENT, BAKERSFIELD FIELD OFFICE DRAFT RMP/DRAFT EIS, available at http://www.blm.gov/pgdata/etc/medialib/blm/ca/pdf/bakersfield/planning/draft_rmp.Par.36281.File.dat/Appendix%20G%20-%20Minerals%20Management.pdf (last visited Nov. 27, 2013).

[83] COLORADO OIL AND GAS CONSERVATION COMMISSION, RULE 604(A)(3) HIGH OCCUPANCY BUILDINGS (effective Aug. 1, 2013), available at https://cogcc.state.co.us/RR_HF2012/Setbacks/FinalRules/Final_SetbackRules.pdf (last visited Nov. 27, 2013).

[84] See, e.g., Kathy Browning, State and local organizations weigh in on BLM fracking rule, DELTA COUNTY INDEPENDENT, Sept. 11, 2013, available at http://www.deltacountyindependent.com/index.php/news/north-fork-times/7689-state-and-local-organizations-weigh-in-on-blm-fracking-rule (last visited Nov. 26, 2013). See also Michael Brune, Protect Public Lands From Reckless Fracking? Yes We Can!, HUFFINGTON POST, Aug. 22, 2013, available at http://www.huffingtonpost.com/michael-brune/protect-public-lands-from_b_3797112.html (last visited Nov. 26, 2013).

[85] See UNCOMPAHGRE FIELD OFFICE, BUREAU OF LAND MANAGEMENT, U.S. DEPARTMENT OF INTERIOR, FINAL ENVIRONMENTAL ASSESSMENT, DOI-BLM-CO-S050-2012-0009-EA (Nov. 16, 2012), at G-25, available at http://www.blm.gov/pgdata/etc/medialib/blm/co/information/nepa/uncompahgre_field/12-09_august_og_lease/2012-1116_12-09_lease0.Par.0143.File.dat/FINAL2012-09_EA_16NOV2012.pdf (last visited Nov. 27, 2013).

North Fork Alternative Plan

BLM_0077661

### Clean & Dependable Water Supply

The **Clean & Dependable Water Supply Management Zone** would close lands to oil and gas leasing within ¼-mile of any municipal or private water system including intakes and springs.  Further, the management zone would require mandatory NSO stipulations within ½-mile of any private well, municipal or private water system, including ditches with domestic water decrees; and require mandatory NSO stipulations within ¼-mile of any dam, ditch, irrigation intake, canal or other water conveyance.  Figure 15 below illustrates BLM managed lands and minerals with associated NSO or NO LEASING recommendations for this management zone.[86]

*Figure 15 - Clean & Dependable Water Supply Proposed Management Zone*



The North Fork Valley's domestic drinking and irrigation water supply—of wells, springs, irrigation ditches, and canals—is a far-reaching and intricate array of infrastructure and natural water resources that warrant special management consideration from the BLM.  Indeed, these water assets are hugely important to the valley's residents.  Analyses of the monetary value of the North Fork Valley's irrigation

---

[86] Please note:  Maps are provided to depict how management prescriptions and development setbacks and stipulations protect specific resources.  Maps do not necessarily indicate where all such resources are found, and may not correctly depict all places where such stipulations do or do not apply.

BLM_0077662

water and drinking water supplies estimate their value at \$163 million and \$56.5 million, respectively.[87] This value is so great because water sustains the valley's economy, allowing farmers and ranchers to grow fruits and vegetables, and raise cattle and other livestock. Furthermore, the clean irrigation water supply allows for the North Fork Valley to maintain its agricultural prominence, and allows for the sustainable agriculture and agritourism industries to continue to continue to grow and thrive.

Figure 16 below shows the complex patchwork of water resources in relation to lands and minerals managed by the BLM. As shown in the map, much of the water infrastructure is concentrated on the private lands in the valley, but most of it lies down-gradient of BLM-managed lands and minerals, and many miles of ditches, and many wells and springs, lie close-by or within BLM's management jurisdiction on public lands or above public minerals.

*Figure 16 - Lower North Fork Valley Water Supplies*



---

[87] Letter from the Western Environmental Law Center, on behalf of Citizens for a Healthy Community, to Barbara Sharrow, Field Office Manager, Uncompahgre Field Office, Bureau of Land Management, Exhibits 9 and 10 (Feb. 8, 2012), attached here as Exhibits 8 and 9.

North Fork Alternative Plan

BLM_0077663

### Municipal & Domestic Water Systems, Springs, & Wells

Many water resources are located on BLM-managed lands, or lie above federal minerals.  As observed from the map above, BLM lands contain miles of irrigation ditches, and numerous wells and springs.  Further, many of the area's BLM lands lie up-gradient of these water supplies, making protective management on BLM lands extremely important throughout the North Fork area.

The three towns in the North Fork operate municipal water companies.  The Town of Paonia serves "...1536 water taps with an averaged equivalent of 3300 residents both in town and outside town limits, including 26 private water companies."[88]  The Town of Hotchkiss provides drinking water to more than 1,000 taps in the area.[89]  The Town's water supply is dependent on BLM lands in the Leroux Creek, Denver Creek, Short Draw, and Jay Creek drainages.[90]  Like Paonia and Hotchkiss, the Town of Crawford, which receives its drinking water supply solely from Wiley Springs, requested that its drinking water supply be protected.[91]  Crawford also asked that the BLM protect the delivery system for its water supply, which comes within 100 yards of BLM-managed lands, as well as its wastewater treatment facility, which is accessed through BLM lands.[92]  Clearly, the water supplies and associated facilities for the North Fork's towns require management that will allow for continued protection of this resource.

> **"Water is the most precious resource in the State of Colorado. To run the risk of contaminating potable water sources for the North Fork Valley in order to open up a relatively small portion of federal land to gas exploration in a geological area whose potential for gas production is marginal at best ... is simply foolish."**
>
> - Lionel Atwill, representative for Jay Creek Water Company from comment letter on the proposed Aug. 2012 oil and gas lease sale

In addition to the three towns in the North Fork, numerous private water companies supply clean drinking water to residents who reside outside of town limits.  For example, during scoping comments on the proposed August 2012 oil and gas lease sale, the Bone Mesa Domestic Water District (BMDWD) registered significant concerns about proposed leasing on BLM lands that could affect their operations.[93]  The BMDWD, which serves 167 taps between Paonia and Hotchkiss, requested that lands important to their operations not be leased for oil and gas development.[94]  Furthermore, the Jay Creek Water

---

[88] Letter from Town of Paonia Board of Trustees Letter to Barbara Sharrow, Field Office Manager, Uncompahgre Field Office, Bureau of Land Management (Jan. 24, 2012), attached as Exhibit 10.
[89] Letter from Wendell A. Koontz, Mayor, Town of Hotchkiss to [BLM] Uncompahgre Field Office (Jan. 29, 2012), attached as Exhibit 11.
[90] Id.
[91] Letter from The Town of Crawford Mayor and Board of Trustees, Town of Crawford to Uncompahgre Field Office, Bureau of Land Management (Jan. 13, 2012), attached as Exhibit 12.
[92] Id.
[93] Letter from Mark LeValley, et. al., Bone Mesa Domestic Water District to Barbara Sharrow, [BLM] Uncompahgre Field Office (Jan. 18, 2012), attached as Exhibit 13.
[94] Id.

North Fork Alternative Plan

BLM_0077664

Company[95] and the Stucker Mesa Domestic Water Company[96] also requested that the BLM not lease lands for oil and gas development that could impact the water supplies that feed their customers' taps.

Similarly, many residents have private water wells they rely upon. For example, Ty and Helen Gillespie depend on a water well located only 800 feet down-slope from BLM lands that were previously proposed for leasing.[97] The Gillespies depend on this water, not only for personal use, but for operation of their winery. Under the proposed management of the North Fork Alternative Plan, their water well would be protected from potential risks associated with oil and gas development, by requiring mandatory NSO stipulations for lands within ½-mile of domestic water wells.

*Irrigation Infrastructure & Water Supplies*

The drainages, creeks and streams, and reservoirs that sustain the North Fork's farms and ranches work together with the valley's complex web of irrigation ditches and canals to sustain the valley's agricultural prominence. Similarly, the North Fork Alternative Plan's **River & Riparian Areas Management Zone** works together with the **Clean & Dependable Water Supply Management Zone** to ensure that the Valley's agricultural and agritourism economies will not be harmed by oil and gas development. As the President of the Crawford Clipper Ditch Company, Gary Kraai, said, "water is everything" for those who live and make their living in the North Fork Valley.[58]

The ditches and canals in the North Fork often pass through, or lie down-gradient of, BLM-managed lands. This places water supplies at higher risk of contamination from oil and gas operations should drilling and fracking occur nearby. For example, the FMC & Reservoir Company operates the Paonia Reservoir, the diversion structure on the North Fork of the Gunnison, and the 34.7-mile Fire Mountain Canal. The FMC's Board requested that no drilling or construction activities related to oil and gas take place near its facilities, out of concern that such activities "...could compromise reservoir or dam

> "The incidents of spills that contaminate water supplies are greater than I'm comfortable with. The ditch water I use for irrigation has to be protected."



- Mark Waltermire, owner of Thistle Whistle Farms and stakeholder representative for the North Fork Alternative Plan Advisory Group.

Quote from: *Frackers and farmers*, COLORADO BIZ MAGAZINE, Aug. 1, 2013.
Photo credit: VOGA.

---

[95] *See* Letter from Lionel Atwill, Representative for Jay Creek Water Company to the BLM Uncompahgre Field Office (Dec. 26, 2011), attached as Exhibit 14.
[96] *See* Letter from Steve Wolcott, President, Stucker Mesa Domestic Water Company to Barb Sharrow, Field Manager, Uncompahgre Field Office, Bureau of Land Management (Jan. 27, 2012), attached as Exhibit 15.
[97] Letter from Ty and Helen Gillespie, Azura Cellars & Gallery to Barb Sharrow, Field Manager, Uncompahgre Field Office, Bureau of Land Management (no date), attached as Exhibit 16.
[98] Letter from Gary Kraai, Crawford Clipper Ditch Company Letter to Uncompahgre Field Office, Bureau of Land Management (Jan. 28, 2012), attached as Exhibit 17.

BLM_0077665

structural integrity..." and that pollution from drilling operations could be transported by torrential downpours.[99]

## Flooding & Gas Drilling Don't Mix





*Figure 17 – Above, flooding on Garvin Mesa on July 28, 2013. Over a half-inch of rain fell on July 27, with 1.63 inches more on July 28. Credit: Eugenie McGuire, Desert Weyr. Below, historic flooding on Colorado's Front Range during September 2013 flooded thousands of well sites, including this one where a drilling rig was present. Photo credit: Ecoflight.*

Similarly, many other local ditch companies in the North Fork registered their concerns about proposed lease sales in the area.  Many of those concerns focused on the potential for water contamination from drilling and fracking operations, increased heavy truck traffic on unsuitable roads, and the North Fork's topographic and geologic hazards that ditch companies already face, such as unstable and steep slopes, which could be exacerbated by oil and gas development.  For example, the Saddle Mountain Ditch Company noted that BLM lands nominated for development lie on steep slopes above the ditch where "...the ditch traverses several hundred yards across a rock-slide of igneous plate-like talus boulders that are eroding off the slopes of Saddle Mountain."[100]  The North Fork's irrigation supply system must be managed for and protected by the BLM.

### Oil & Gas Development's Impacts to Water Resources

Members of the community in the North Fork simply cannot tolerate spills, releases, or other accidents that result from oil and gas operations that could impact water resources in the North Fork area.  The potential for harm caused by even one small or medium sized spill or accident is simply too great, and therefore the BLM must select proper management to protect water supplies and abide by its "due no harm" mandate under FLPMA.

---

[99] Letter from Randall Fisher, Fire Mountain Canal Board of Directors to Uncompahgre Field Office, Bureau of Land Management (Jan. 4, 2012), attached as Exhibit 18.
[100] Letter from Tony Prendergast, Saddle Mountain Ditch Company, Board of Directors to Uncompahgre Field Office, Bureau of Land Management (Jan. 31, 2012), attached as Exhibit 19.

BLM_0077666

## Surface Spills & Accidents

Torrential downpours and resulting flash-floods would pose serious threats to agricultural operations in the North Fork if they included hazardous or toxic substances from drilling operations.  Flash flooding in the North Fork, such as the one pictured on the previous page that occurred on Garvin Mesa in July 2013, would result in serious impacts if oil and gas development significantly expanded there.  Very recent experience from flooding on the Front Range of Colorado highlights potential impacts from extreme weather events.  As of September 24, 2013, the State of Colorado was tracking 11 significant spills that had released 34,500 gallons of pollutants, including crude oil and produced water, into the environment.[101]

> **"It had a pretty good reach. The wind was blowing pretty good. Some of it blew 2 miles."**
>
> - Dave Drovdal, who owns the land where a Bakken oil well blew out in December 2012 near Watford City, N.D. The blowout released so much oil that "...crude dripped off the roof of a house a half-mile away."
>
> - Source: *U.S. well sites in 2012 discharged more than Valdez*, ENERGYWIRE, July 8, 2013.

Recent experience from the oil and gas industry reveals that spills are commonplace.  In 2012, Colorado experienced about 400 spills, of which 63 impacted ground water and 22 impacted surface water.[102]  "More than half of last year's spills—211—resulted from equipment failure.  Sixty-five were the result of human error, and 62 were historical, a reference to old leaks discovered during current operations."[103]  In the first half of 2013, Colorado saw 179 spills, with 26 that contaminated groundwater and 15 that contaminated surface water.[104]  Across the United States in 2012, oil and gas well sites discharged more pollutants into the environment than the Exxon Valdez spill.[105]

Specific examples of spills highlight the magnitude of impact such an event could have on the North Fork Valley.  In February 2012, a blowout of an oil well near Windsor, Colorado caused "...oil-laden fracking flowback water to spew from the well at a rate of 20 barrels per hour..." for a total of 2,350 barrels released into the environment.[105]  In late 2012, a natural gas liquids pipeline began leaking benzene and diesel range organics into the soil creating a contamination plume 1,500 feet long, 308 feet wide, and 10 feet thick very close to Parachute Creek; surrounding groundwater, and eventually the surface water

---

[101] The Associated Press, *Three additional flooding-related oil spills reported Tuesday by Colorado agency*, THE DENVER CHANNEL, Sept. 24, 2013, available at http://www.thedenverchannel.com/weather/september-flooding/three-additional-flooding-related-oil-spills-reported-tuesday-by-colorado-agency (last visited Sept. 24, 2013).
[102] Dennis Webb, *State had 400 oil, gas spills in 2012, report says*, GRAND JUNCTION DAILY SENTINEL, June 10, 2013, available at http://www.gjsentinel.com/news/articles/state-had-400-oil-gas-spills-in-2012-report-says/ (last visited Sept. 24, 2013).
[103] *Id.*
[104] Bruce Finley, *Colorado absorbs 179 oil and gas spills as Parachute cleanup continues*, THE DENVER POST, June 23, 2013, available at http://www.denverpost.com/environment/ci_23519695/colorado-absorbs-179-oil-and-gas-spills-parachute#ixzz2XAIZVubJ (last visited Sept. 20, 2013).
[105] Mike Soraghan, *U.S. well sites in 2012 discharged more than Valdez*, ENERGYWIRE, July 8, 2013, available at http://www.eenews.net/stories/1059983941 (last visited Sept. 24, 2013).
[106] Bobby Magill, *State inspector calls fracking fluid leak near Windsor a 'blowout'*, FORT COLLINS COLORADOAN, Feb. 28, 2013, available at http://www.coloradoan.com/article/20130228/WINDSORBEACON/302280034/State-inspector-calls-fracking-fluid-leak-near-Windsor-blowout- (last visited Sept. 24, 2013).

BLM_0077667

in the creek, were contaminated.[107]  In Pennsylvania, a stream was impacted for 65 days with chemicals from drilling operations when a valve was left open on a storage tank in November 2010, and a spring was also contaminated.[108]

## Groundwater Impacts

Reports of groundwater contamination of drinking water supplies—both from direct experience of residents living near drilling and fracking operations, and from reports and studies—are also very concerning for North Fork farmers, ranchers, and residents.  According to a recent study completed by researchers at Duke University "[e]levated levels of methane and other stray gases have been found in drinking water near natural gas wells in Pennsylvania's gas-rich Marcellus Shale region."[109]  The principal author of that study, Robert Jackson of Duke, said: "[t]he bottom line is strong evidence for gas leaking into drinking water in some cases … We think the likeliest explanation is leaky wells."[110]

> **"In 10 to 100 years we are going to find out that most of our groundwater is polluted. A lot of people are going to get sick, and a lot of people may die."**
>
> - Mario Salazar, an engineer who worked for 25 years as a technical expert with the EPA's underground injection program in Washington
>
> - Source: *Injection Wells: The Poison beneath Us*, ProPublica, June 21, 2012.

Other high-profile cases of water contamination related to oil and gas development in Dimock, PA, Parker County, TX, and Pavillion, WY, are cause for further concern, especially as the EPA has abandoned efforts to fully investigate these cases.[111]

Furthermore, an article in the *Oilfield Review* quarterly publication, published by industry giant Schlumberger, showcases the oil and gas industry's own admission that: "[g]as migration and sustained casing pressure occur with unpredictable frequency in many parts of the world."[112]  And despite technological advances, "…many of today's wells are at risk…" for gas leaks and migration due to "…[t]ubing and casing leaks, poor drilling and displacement practices, improper cement selection and design, and production cycling."[113]

> Since the earliest gas wells, **uncontrolled migration of hydrocarbons to the surface has challenged the oil and gas industry**.  Gas migration, also called annular flow, can lead to sustained casing pressure (SCP), sometimes called sustained annular pressure (SAP).

---

[107] Western Colorado Congress, *Parachute Creek spill an ongoing concern*, Aug. 16, 2013, available at http://wccongress.org/wcc/2013/08/16/parachute-creek-spill-an-ongoing-concern/ (last visited Sept. 24, 2013).

[108] Andrew Maykuth, *Shale criminal charges stun drilling industry*, The Philadelphia Inquirer, Sept. 12, 2013, attached as Exhibit 20.

[109] John Roach, *Natural gas found in drinking water near fracked wells*, NBC News, June 24, 2013, available at http://www.nbcnews.com/science/natural-gas-found-drinking-water-near-fracked-wells-6C10433123; The referenced Duke University study is also available at http://www.pnas.org/content/110/28/11250.full.pdf+html?with-ds=yes (both links last visited Sept. 25, 2013).

[110] *Id.*

[111] Neela Banerjee, *Internal EPA Report Highlights Dispute Over Fracking and Well Water*, The Los Angeles Times, July 27, 2013, attached as Exhibit 21.

[112] Claudio Brufatto, et. al., *From Mud to Cement—Building Gas Wells*, Oilfield Review, Autumn 2003, at 76, available at http://energyindepth.org/wp-content/uploads/2013/01/MudCement2003.pdf (last visited Sept. 27, 2013).

[113] *Id* at 63.

BLM_0077668

Sustained casing pressure can be characterized as the development of annular pressure at the surface that can be bled to zero, but then builds again.  The presence of SCP indicates that there is communication to the annulus from a sustainable pressure source because of inadequate zonal isolation.  Annular flow and SCP are **significant problems affecting wells in many hydrocarbon-producing regions** of the world (emphasis added).[114]

Unfortunately, this age-old problem is not likely to be solved soon.

It should be noted that, **even with ongoing technological and chemistry improvements in cement and in cementing, loss of wellbore integrity is still common**.  For example, during 2011, Cabot drilled 68 new Marcellus wells in Pennsylvania, and was cited by PA [Department of Environmental Protection] seven times for "[f]ailure to report defective, insufficient, or improperly cemented casing [within] 24 [hours] or submit [a] plan to correct [within] 30 days."  Chesapeake Appalachia drilled 279 wells and was cited 24 times for the same violation (emphasis added).[115]

The evidence of potential groundwater contamination is simply too great to warrant risking the North Fork's water supplies by opening up lands for oil and gas leasing and development.

## Irrigation Water & Infrastructure

The U.S. government shares our concerns about water impacts, and specifically the potential impacts to irrigation infrastructure and facilities.  The Bureau of Reclamation (BOR) raised the following issues and concerns in their comments on proposed lease sales in the North Fork area:

- "Protection of Reclamation project lands, facilities, purposes, and water resources (both quantity and quality)."[116]
- "Potential for degradation of surface and ground water quality and contamination of soils. Of particular interest or concern are:
    - Increased salinity and selenium loading to the Gunnison and Colorado rivers and their tributaries from disturbance and erosion of soils derived from Mancos Shale or from other activities related to the lease program.
    - Underground migration of fracking fluids and natural gas following fracking.
    - Oil/gas development related spills at the well sites and ancillary facilities, or during transportation.
    - Seepage of oil/gas development fluids and wastes from reserve pits, evaporation ponds, tank batteries, etc."[117]

---

[114] *Id.*

[115] Anthony Ingraffea, *Fluid Migration Mechanisms Due to Faulty Well Design and/or Construction: an Overview and Recent Experiences in the Pennsylvania Marcellus Play*, Oct. 2012, available at http://www.scribd.com/doc/112348175/Gas-Well-Leaks (last visited Sept. 27 2013).

[116] Letter from Kathleen Ozga, Bureau of Reclamation, U.S. Department of Interior to Barbara Sharrow, Uncompahgre Field Office, Bureau of Land Management (Feb. 9, 2012), attached as Exhibit 22.

[117] *Id.*

North Fork Alternative Plan

BLM_0077669

- "What is the anticipated source of water for oil/gas development in the area? Any use of Reclamation project water is subject to prior authorization, which currently does not include uses other than irrigation."[118]

Similar to concerns raised by BOR, the U.S. Army Corps of Engineers has explicitly asked for protection of its facilities from proposed oil and gas development activities.  In comments to the USFS on proposed drilling in the George Washington National Forest, near Washington, DC, the Washington Aqueduct (part of the Army Corps) stated that enough study "...has been done and information has been published to give us great cause of concern about the potential for degradation of the quality of our raw water supply as well as impact to the quantity of supply."[119]  Furthermore, the Corps has "...declared a 3,000-foot buffer around its dams and water-control structures within which it will not allow new wells, drilling pads or pipelines."[120]

### Impacts to Water Quantity

Impacts to the amount of water available for residential, municipal, and agricultural use in the North Fork must also be taken into consideration.  "The current volume of water required annually for new oil and natural gas well development in Colorado is enough to serve an estimated 44,200 to 79,000 Colorado households for an entire year."[121]  While the amount of water used by the oil and gas industry statewide in Colorado may seem insignificant when compared to other industries, "...[y]ou have to look at a county-by-county scale to capture the intense and short-term impact on water supplies..." according to Monika Freyman, who authored a report on water demand for fracking in water-stressed regions.[122]  That report found that in Colorado from January 2011 through September 2012, "92 percent of the 3,862 [oil and gas] wells were in extremely high water stress areas. ... Extremely high water stress means over 80 percent of available water is already being withdrawn for municipal, industrial and agricultural uses."[123]

> "BLM should consider whether the sensitive parcels may be inappropriate for oil and gas development due to the impact of those operations ... on the quality and quantity of water resources and air quality on agricultural operations..."
>
> - Ralph D'Alessandro, president of the Delta Conservation District from the District's protest of the proposed Feb. 2013 oil and gas lease sale

---

[118] *Id.*

[119] Mark Drajem, *Fracking Limits for Virginia Forest Spark Debate on Water*, Bloomberg, Sept. 5, 2013, available at http://www.bloomberg.com/news/2013-09-06/fracking-limits-for-virginia-forest-spark-debate-on-water.html (last visited Sept. 25, 2013).

[120] Randy Lee Loftis, *Corps worries that fracking gas wells might hurt dams*, The Dallas Morning News, July 31, 2011, available at http://www.dallasnews.com/news/community-news/grand-prairie/headlines/20110731-corps-worries-that-fracking-barnett-shale-gas-wells-might-hurt-dams.ece?action=reregister (last visited Sept. 27, 2013).

[121] Laura Belanger, et. al., Western Resource Advocates, *Fracking Our Future: Measuring Water & Community Impacts from Hydraulic Fracturing* (June 2012), available at http://www.westernresourceadvocates.org/frackwater/WRA_FrackingOurFuture_2012.pdf (last visited Sept. 27, 2013).

[122] Felicity Barringer, *Spread of Hydrofracking Could Strain Water Resources in West, Study Finds*, The New York Times, May 2, 2013, available at http://www.nytimes.com/2013/05/02/science/earth/hydrofracking-could-strain-western-water-resources-study-finds.html (last visited Sept. 27, 2013).

[123] Monika Freyman and Ryan Salmon, Ceres, *Hydraulic Fracturing & Water Stress: Growing Competitive Pressures for Water* (May 2013), available at http://www.ceres.org/press/press-releases/new-study-hydraulic-fracturing-faces-growing-competition-for-water-supplies-in-water-stressed-regions (last visited Sept. 27, 2013).

BLM_0077670

The amount of water required to develop a shale oil or gas well ranges, on average, from two to 10 million gallons.[124]  Much of this water, "…more than 30 trillion gallons of toxic liquid…" over the last decade by one account, is permanently removed from the hydrologic cycle and disposed of via injection wells.[125]  Though some new technologies are allowing industry to use less water to conduct hydraulic fracturing, such as proposed use of carbon dioxide and methanol foam, water would still be required for other related activities such as "…drilling, completion, dust control and hydrostatic testing."[126]  In the North Fork, water quantity is a significant concern for which protections are sought in the NFAP.

*Management Recommendations*
Because of the myriad impacts to water resources—surface and ground water quality, and water quantity—discussed above, the **Clean & Dependable Water Supply Management Zone** is necessary to protect these resources.  This proposed management would further existing state rules that require an external buffer zone up to ½-mile from domestic water supplies[127] and add much needed protections for other infrastructure like wells, dams, and ditches.  These management stipulations would help to ensure clean and abundant water supplies for drinking and other agricultural and livestock uses.

Elsewhere, the BLM has recognized the need to protect water supplies from oil and gas industrial activities.  For example, in the Tres Rios Field Office, the BLM requires NSO within 3,000 horizontal feet of jurisdictional dams used to impound water.[128]  The state justification for this stipulation is to "[a]void structural damage to dams and subsequent risk to public safety and dam infrastructure due to disturbance associated primarily with drilling and completion/re-completion activities."[129]  Similarly, the BLM has offered an NSO stipulation in the Tres Rios Office within 1,000 feet of a classified water supply stream segment and domestic water supplies using a groundwater well or spring.[130]  These stipulations are necessary, the BLM noted, for the protection of "…public water supplies, water quality, aquatic habitat and human health."[131]  While a positive step in recognizing the need to protect water supplies, we feel that strong stipulations in the North Fork area are necessary due to the imperative, fundamental value that water has to the community here.

[124] *Id.*
[125] Abraham Lustgarten, *Injection Wells: The Poison Beneath Us*, PROPUBLICA, June 21, 2012, available at http://www.propublica.org/article/injection-wells-the-poison-beneath-us (last visited Sept. 30, 2013).
[126] GRAND JUNCTION FIELD OFFICE, BUREAU OF LAND MANAGEMENT, U.S. DEPARTMENT OF INTERIOR, DOI-BLM-CO-130-2012-0003-EA, ENVIRONMENTAL ASSESSMENT FOR THE FRAM WHITEWATER MASTER DEVELOPMENT PLAN (June 2013), at 86, available at http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/grand_junction_field/nepa_log/2013_nepa0/Fram_Whitewate r_MDP_DOI-BLM-CO-130-2012-0001-EA.Par.82927.File.dat/Fram_Whitewater__EA_6-28-2013.pdf (last visited Nov. 29, 2013).
[127] COLORADO OIL AND GAS CONSERVATION COMMISSION, RULE 317B PUBLIC WATER SYSTEM PROTECTION, available at https://cogcc.state.co.us/RR_Docs_new/rules/300Series.pdf (last visited Nov. 29, 2013).
[128] TRES RIOS FIELD OFFICE, BUREAU OF LAND MANAGEMENT, U.S. DEPARTMENT OF INTERIOR, FINAL ENVIRONMENTAL IMPACT STATEMENT, VOLUME III. APPENDIX H - OIL AND GAS LEASING STIPULATIONS, at H-14, available at http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/san_juan_public_lands/land_use_planning/proposed_lrmp.Par .54223.File.dat/App_H_Leasing_Stips_FINAL.pdf (last visited Nov. 29, 2013).
[129] *Id.*
[130] *Id* at H-8.
[131] *Id.*

BLM_0077671

## Riparian Areas & River Corridors

The proposed **River Areas & Riparian Corridors Management Zone** would protect water bodies[132] and surrounding riparian areas in the North Fork.  The proposed management zone would close areas to leasing within ½-mile of water bodies.  Further, areas within 1-mile of the North Fork and Smith Fork of the Gunnison Rivers would require a mandatory NSO stipulation for oil and gas leasing.  Figure 18 illustrates the proposed **Riparian Areas & River Corridors Management Zone** and stipulations.[133]

*Figure 18 - Riparian Areas & River Corridors Proposed Management Zone*



### Importance of Riparian Areas and Water Bodies in the North Fork

Riparian areas and water bodies are key resources that support the unique values of the North Fork. Water-dependent values include ecosystems, wildlife, agriculture, recreation, drinking water, and

---

[132] Water bodies should include a similar definition to that of the Colorado Oil and Gas Conservation Commission (COGCC), which states that: "Waters of the state include, but are not limited to, all streams, lakes, ponds, impounding reservoirs, wetlands, watercourses, waterways ... situated wholly or partly within or bordering upon the State." COGCC REGULATIONS, 100 SERIES – DEFINITIONS, available at https://cogcc.state.co.us/RR_Docs_new/rules/100Series.pdf (last visited Nov. 29, 2013). Note: irrigation ditches, and sub-surface water supplies, are managed for separately in the **Clean & Dependable Water Supply Management Zone**.

[133] Please note:  Maps are provided to depict how management prescriptions and development setbacks and stipulations protect specific resources.  Maps do not necessarily indicate where all such resources are found, and may not correctly depict all places where such stipulations do or do not apply.

North Fork Alternative Plan                                                    Page **53** of **102**

BLM_0077672