tourism, among others.  Wetland and riparian areas also provide critical ecosystem services.  In parts of the arid west like the North Fork, the role and significance of waterways is amplified.

## Ecosystems and Biological Diversity

Many of the North Fork of the Gunnison's headwaters tributaries are home to the greenback cutthroat trout, a native species formerly thought to be extinct.  Near the mouth of the North Fork is the world-class Gold Medal Trout Fishery of the Gunnison River, home to an excellent trout population, including rainbow, brown, cutthroat as well as three Colorado State Sensitive species (roundtail chub, flannelmouth sucker, and bluehead sucker).  The Colorado Natural Heritage Program (CNHP) has conducted several studies in the region including the project area for the North Fork Alternative Plan.  Findings from these studies reflect the critical importance of preserving water quality, stream flow, and riparian and wetland conditions in this region.  The Natural Heritage Biological Survey for Delta County found that "...lower elevation riparian communities with good stands of cottonwoods, and an understory of native shrubs, grasses and forbs, are the most imperiled plant communities in Delta County."[134]

The CNHP identified thirteen Potential Conservation Areas (PCAs) approximately within the boundaries of the North Fork Alternative Plan project area.  PCAs are intended to identify rare and imperiled species, natural communities and natural systems in need of protection.  Water-dependent values are important to the biodiversity significance of several of these PCAs, as detailed below.

While some of the following PCAs include land owned by the USFS, private landowners, or the U. S. Fish and Wildlife Service, the riparian-associated values depend on water quality and stream function upstream and in the surrounding watershed.  The BLM should pay special attention to lands under its jurisdiction near water bodies or in riparian areas, and many of the BLM-managed lands in the North Fork are located up-gradient, nearby, and sometimes contain surface water resources and riparian zones.  As noted by Colorado Parks & Wildlife:

> The condition of upland habitats that buffer wetlands is associated with the integrity of adjacent wetlands.  Adjacent upland habitats are also important to species of wildlife that only require wetlands for a portion of their annual life cycle.[135]

Three PCAs are especially important to note within the North Fork Alternative Plan project area:

- North Fork PCA – This PCA aims to protect riparian plant communities, the globally imperiled Fremont's cottonwood riparian forest (*Populus deltoides/ Rhus trilobata,* G3 S3),[136] the state-

---

[134] Peggy Lyon and Earl Williams, Colorado Natural Heritage Program, Natural Heritage Biological Survey for Delta County, at 11 (Feb. 1998), available for download at http://cospl.coalliance.org/fedora/repository/co:12025 (last visited Nov. 29, 2013).

[135] Terrestrial Habitat Conservation Program, Terrestrial Section, Wildlife Programs Branch, Colorado Parks & Wildlife, Statewide Strategies for Wetland and Riparian Conservation, Strategic Plan for the Wetland Wildlife Conservation Program, at 8 (July 2011), available at http://wildlife.state.co.us/SiteCollectionDocuments/DOW/LandWater/WetlandsProgram/CDOWWetlandsProgramStrategicPlan 110804.pdf (last visited Sept. 5, 2013).

[136] Note: the species names and codes (e.g. G5 S1) represent rarity in the biologic field at the global and state level; for example, G1 is imperiled, or very rare, globally and S3 is somewhat rare at the state level. For more information on species ranks, see the CNHP web site at http://www.cnhp.colostate.edu/about/heritage.asp.

BLM_0077673

rare Arizona centaury (*Centaurium arizonicum* G5 S1) that grows in wet areas along the North Fork of the Gunnison, the Narrowleaf cottonwood/skunkbrush riparian community (*Populus angustifolia/ Rhus trilobata* G3S3), the Northern leopard frog (*Lithobates pipiens, G5S3*) and Great Basin spadefoot (*Spea intermontana, G5S3*).

- Fish Hatchery PCA – This PCA aims to protect the Giant helleborine orchid (*Epipactis gigantea,* G4 S2S3), that is found in seeps along the Gunnison River near Hotchkiss.
- Smith Fork at Crawford PCA – This PCA aims to protect a Narrowleaf cottonwood riparian forest (*Populus angustifolia/Salix exigua,* G4 S4), a great blue heronry *(Ardea herodias)*, and Narrowleaf cattail marsh (*Typha latifolia*, G5 S4).



*Figure 19 - Though outside of the North Fork Alternative Plan project area, this portion of the Gunnison River, between the Black Canyon and the North Fork confluence, would be impacted by oil and gas development up-stream near the Smith Fork of the Gunnison. The gold medal waters pictured here attract anglers from across the state.*

The CNHP Delta County Inventory also reflected that the North Fork Alternative Plan area provides important habitat for the following wetland-dependent wildlife species of concern:  Northern leopard frog (G5 S3), included in the Lawhead Gulch PCA; Great blue heron *(Ardea herodias)*; and Greater sandhill crane (*Grus canadensis tabida, G5T4 S2B, S4N)*.

### Ecosystem services

Wetlands provide a number of critical ecosystem services that are often taken for granted until they are degraded or impaired.  As noted by Colorado Parks & Wildlife:

> Hydrological functions of wetlands are ecologically significant and socio-economically important to Colorado residents.  Wetlands help sustain water flows in streams and rivers, recharge ground water supplies, act as temporary storage areas for flood water, and slow the flow of water allowing impurities to settle, thereby cleansing the water. Protecting hydrological functions conserves ecological integrity, and society benefits through economic savings.[137]

Oil and gas development can threaten water quality and hydrologic function, not only through drilling and fracking, but also through transportation and distribution infrastructure that can introduce pollutants, increased sediment, and invasive species into watersheds.  These concerns are particularly

---

[137] *Id* at 8.

BLM_0077674

relevant in the North Fork area, due to the combination of extensive steep slopes and highly erodible soils composed of Mancos Shale.[138]  These factors increase the potential for ground disturbance to amplify already serious problems with salinity and selenium loading in the Gunnison River and its tributaries, which in turn causes problems for aquatic wildlife both here and downstream.

## Riparian Zone Health

Comments previously submitted to the BLM as part of the NEPA process discuss riparian health at length.  The following information from High County Citizens' Alliance, et. al., regarding proposed lease sales in the North Fork, highlights important considerations for riparian health:

> Rivers and riparian zones are essential wildlife habitat and corridors for the diverse flora of the North Fork.  While riparian zones comprise only a small percentage of the North Fork landscape, they are utilized by a disproportionately high number of wildlife species. Riparian zones function as corridors for wildlife movement and dispersal between larger areas of habitat.  Thus, keeping riparian zones intact helps protect biological diversity and allows animal movement across the landscape.[139]

> Rivers and creeks in the North Fork drainage are primarily dependent upon riparian vegetation to prevent streambank erosion and associated land loss.  Riparian vegetation acts as a filter to intercept sediment and chemicals that would otherwise enter the stream and decrease water quality.  Nutrients, such as phosphorous or nitrogen, and metals from surrounding land disturbance can be absorbed by the plants in the riparian corridor.  Thus, maintaining riparian vegetation is important to maintaining water quality, dissipating flood energy, protecting ecological functions and supporting fishing and hunting, all important quality of life values in the North Fork.[140]

Since its inception in 1996, the North Fork River Improvement Association (now the Western Slope Conservation Center) has collaborated with the community to restore the North Fork of the Gunnison River.  They have restored eight miles of river bank, over 50 acres of riparian habitat, and reengineered seven irrigation diversions for safe fish and boating passage.  Riparian zone health continues to be an important issue for members of the community here.

## Recreation

Rivers, streams, reservoirs and other water bodies in the North Fork Alternative project area provide key recreational attractions.  Rafting, kayaking, boating, and fishing are important recreation opportunities for North Fork communities.

The North Fork and Smith Fork Rivers, their tributaries, and other local water bodies offer prime fishing locations:

---

[138] *See* the **Landscape Management Zone** section of the North Fork Alternative Plan for more on Mancos soils.
[139] Letter from High Country Citizens' Alliance, et. al., to BLM Uncompahgre Field Office (Feb 8, 2012), available at http://cdn.theconservationcenter.org/wp-content/uploads/2012/11/NWCC_ScopingComments.pdf (last visited Nov. 29, 2013).
[140] *Id.*

BLM_0077675

Recreational fisheries resources include 14 trout stocked lakes and ponds, one trout stocked stream, one warm water stocked lake, 39 stocked wild trout lakes, and 66 wild trout stream segments. Stream fisheries are dominated by the excellent wild trout streams throughout the North Fork watershed, including Anthracite, Hubbard, Muddy, Terror and many other tributary streams throughout the basin. The North Fork mainstem offers fishing for both stocked and wild trout.[141]

River recreation is also an important factor for which BLM must manage. The North Fork River provides for early-season raft and kayak trips. There are four major river access points to the North Fork River: the BLM-owned lands immediately below the Paonia Dam, the Paonia River Park which is operated in partnership by the Western Slope Conservation Center and the Town of Paonia, the Hwy 92 Bridge in Hotchkiss, and Pleasure Park/BLM Gunnison Forks. In addition to boating on the river, the Western Slope Conservation Center and its partners have invested over $600,000 in the development of the Paonia River Park. The River Park is the only developed public access point to the North Fork River. It serves as a local swimming hole, a living laboratory for students, and valuable wetland habitat[142]. "The Paonia River Park now contains a river viewing platform, picnic area, boat launch, entryway arch, and a trail to access the river."[143] These existing uses must be protected.



Figure 20 - Early season rafting on the North Fork. Credit: Jeremy Puckett.

The Colorado Parks & Wildlife website states that "...steep mountainsides, pristine water, alpine scenery and peaceful environment make Paonia [State Park] a haven for water and nature lovers..." and that "...the park's natural beauty and abundance of wildflowers make it a 'must see' for photographers and nature lovers."[144] The website urges visitors to "...camp near a babbling stream, water-ski on a mountain reservoir, have a picnic, observe wildlife, all in view of the majestic Ragged Mountains."[145] The Paonia State Park is bordered on all sides by public lands and minerals managed by the BLM. Since this area is facing increased development, as much of it is already leased for oil and gas with many

---

[141] North Fork River Improvement Association, *North Fork of the Gunnison River Watershed Plan Update*, June 30, 2010, available at http://www.npscolorado.com/NFRIAWatershed_Action_Plan.pdf (last visited Sept. 9, 2013).
[142] The U.S. Bureau of Reclamation funded about $160,000 of wetland habitat restoration in 2012 to mitigate for wetlands lost due to the Minnesota Canal and Reservoir Company's ditch lining project.
[143] Western Slope Conservation Center, *Paonia River Park*, http://www.theconservationcenter.org/what-we-do/river-park, (last visited Mar. 16, 2013).
[144] Colorado Parks & Wildlife, *Paonia State Park* (Feb. 9, 2012), http://parks.state.co.us/Parks/paonia/Pages/PaoniaStateParkHome.aspx (last visited Sept. 9, 2013).
[145] *Id.*

existing and proposed wells nearby, BLM must ensure it does no harm to the State Park and the resources there.

*Figure 21 - Paonia Reservoir and State Park with the Ragged Mountains in the background. Credit: Colorado Parks & Wildlife.*



The Crawford State Park provides visitors with "inspiring scenery" and "…invites anglers, boaters, hikers and water sports enthusiasts to the western slope."[146]  The park offers water based recreation such as motor boating, jet-skiing, and water skiing.  Like Paonia State Park, the Crawford State Park has public lands around its borders.  Oil and gas activity in close proximity to the park is an incompatible use.

Oil and gas extraction is incompatible with the current uses of the area's State Parks, National Conservation Areas, rivers, streams and other water bodies.  Nearby drilling operations would be visible or audible to boaters, hikers, campers and other recreationists who otherwise come to enjoy the peaceful tranquility of the area.  The introduction of industrial activity could dramatically alter scenic qualities, ruining the experience for visitors.  In addition, degradation of water quality, or a reduction in water quantity, that result from oil and gas development activities can significantly impact the current uses of the area's waterways by boaters and anglers.

### Tourism, Scenic Appeal, & Economic Growth

Natural and undeveloped rivers, streams and water bodies attract tourists and new residents to the area.  Water bodies are a factor in a "Human and Natural Amenities" index used by The Center for the Study of Rural America to develop a set of Regional Asset Indicators that are linked to the potential for economic growth in rural counties.[147]  Counties with high levels of natural amenities (such as varied topography, access to water bodies, and a pleasant climate), like the North Fork Valley, are more likely

---

[146] Colorado Parks & Wildlife, *Crawford State Park* (Feb. 9, 2012), http://www.parks.state.co.us/Parks/Crawford/Pages/CrawfordHome.aspx/ (last visited Sept. 9, 2013).

[147] Stephan Weiler, Center for the Study of Rural America, Federal Reserve Bank of Kansas City, The Main Street Economist – Racing Toward New Frontiers: Helping Regions Compete in the Global Marketplace (March 2004), available at http://www.kansascityfed.org/publicat/mse/MSE_0304.pdf (last visited Nov. 29, 2013). *See* Center for the Study of Rural America, Federal Reserve Bank of Kansas City, *Regional Asset Indicators: Human Amenities* (May 16, 2006), available at http://www.kansascityfed.org/publications/research/mse/regional-asset-indicators.cfm (last visited Nov. 29, 2013).

BLM_0077677

to experience both higher population and economic growth than those counties with fewer such amenities.[148]  Protection of water bodies in the North Fork Alternative project area is essential to maintain and grow the area as a desirable destination for tourists, new businesses and new residents.

*Management Recommendations*

Water bodies and riparian areas in the NFAP project area are important to the community and the economy here and warrant protection.  The recommendations of the NFAP would protect water bodies, riparian areas, and associated wildlife and plant species from risks of industrial oil and gas development. Such risks are well documented, and are related to the entire process of natural gas or oil exploration, development, and transportation.  Accidents, human error, and equipment failure continue to occur.

Because of the myriad critical resources and values described above that depend on healthy, natural streams and water bodies in the North Fork, the following management recommendations are essential: areas within ½-mile of any water bodies should be closed to oil and gas leasing, and mandatory NSO stipulations should be required within 1-mile of the North Fork and Smith Fork of the Gunnison Rivers. Such stipulations are not unprecedented, as the BLM has recommended 2,500-feet of NSO from the ordinary high water mark of major river corridors in order to protect riparian areas, water resources, and flood plains.[149]

Furthermore, the BLM should consider a NSO requirement for 100 year floodplains throughout the project area. The White River Field Office proposed RMP amendment for oil and gas leasing considered NSO for flood plains: "Surface occupancy would not be allowed in the following areas: 1) identified 100-year flood plains."[150]  The recent flooding of oil and gas fields on the Front Range of Colorado warrants serious consideration of prohibiting surface occupancy in flood plains.

---

[148] DAVID MCGRANAHAN, FOOD AND RURAL ECONOMICS DIVISION, ECONOMIC RESEARCH SERVICE, U.S. DEPARTMENT OF AGRICULTURE, AGRICULTURAL ECONOMICS REPORT NO. 781, NATURAL AMENITIES DRIVE RURAL POPULATION CHANGE (Sept. 1999), available at http://www.ers.usda.gov/ersDownloadHandler.ashx?file=/media/252390/aer781.pdf (last visited Nov. 29, 2013).
[149] SAN JUAN NATIONAL FOREST, U.S. FOREST SERVICE, U.S. DEPARTMENT OF AGRICULTURE; AND TRES RIOS FIELD OFFICE, BUREAU OF LAND MANAGEMENT, U.S. DEPARTMENT OF INTERIOR, FINAL SAN JUAN NATIONAL FOREST / PROPOSED TRES RIOS FIELD OFFICE LAND AND RESOURCE MANAGEMENT PLAN AND FINAL ENVIRONMENTAL IMPACT STATEMENT, VOLUME III, APPENDIX H – OIL AND GAS LEASING STIPULATIONS, at H-10, available at http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/san_juan_public_lands/land_use_planning/proposed_lrmp.Par .54223.File.dat/App_H_Leasing_Stips_FINAL.pdf (last visited Nov. 29, 2013).
[150] WHITE RIVER FIELD OFFICE, BUREAU OF LAND MANAGEMENT, U.S. DEPARTMENT OF INTERIOR, DRAFT RESOURCE MANAGEMENT PLAN AMENDMENT AND ENVIRONMENTAL IMPACT STATEMENT FOR THE WHITE RIVER FIELD OFFICE, APPENDIX A – OIL AND GAS LEASING STIPULATIONS AND LEASE NOTICES, at A-3 (Aug. 2012), available at http://www.blm.gov/pgdata/etc/medialib/blm/co/programs/land_use_planning/rmp/white_river/documents/rmpa-3.Par.17322.File.dat/08_WRFO_RMPA-EIS_Appendix%20A_Aug2012.pdf (last visited Nov. 29, 2013).

BLM_0077678

## Wildlife

Many wildlife species depend upon the public lands in the North Fork and Smith Fork watersheds. The **Wildlife Management Zone** would protect the most important wildlife habitats in the area, through requiring mandatory (i.e. not subject to waiver) NSO stipulations for important habitat like critical winter range, like severe winter range and winter concentration areas, for elk and mule deer; raptor nest sites; and near stream or river segments that provides habitat for native trout. Figure 22 below illustrates the proposed **Wildlife Management Zone**.[151]

*Figure 22 - Wildlife Proposed Management Zone*



### Big Game

There are large areas of BLM managed lands throughout the North Fork Valley that provide critical winter and other important habitat for big game. Notably, elk are heavily dependent upon BLM lands for their habitat. Important elk habitat for which NSO stipulations are recommended consists of severe

---

[151] Please note: Maps are provided to depict how management prescriptions and development setbacks and stipulations protect specific resources. Maps do not necessarily indicate where all such resources are found, and may not correctly depict all places where such stipulations do or do not apply. It should be noted that COGCC recently revised its wildlife maps, but the revisions do not appear to significantly affect big game or other wildlife habitat in the North Fork Alternative Plan project area.

BLM_0077679

winter range, winter concentration areas, migration corridors, and production areas.  Figure 23 below shows BLM lands and federal minerals identified important habitat for elk.

*Figure 23 - NSO stipulations proposed for important elk habitat*



Similarly, mule deer also rely on a considerable amount of public lands in the North Fork for their habitat.  Identified important mule deer habitat consists of winter concentration areas and severe winter range.  The identified important mule deer habitat is shown in Figure 24 below.

BLM_0077680

*Figure 24 – NSO stipulations proposed for important mule deer habitat*



Note that there is significant overlap between the important lands for mule deer and elk, stressing the importance of protecting these lands from industrialization due to their necessity in maintaining healthy big game populations, and thus a prominent hunting economy, in the North Fork.  Preserving these portions of big game habitat is very important for maintaining herd health and population levels.  As noted by Colorado Parks & Wildlife, "[c]rucial winter habitats and migratory corridors are known to be a limiting factor on big game populations in western Colorado and other high mountain areas of the western United States (citing Sawyer et al. 2009, Bishop et al. 2009, and Bartman et al. 1992)."[152]

CPW has proposed limiting road and well pad densities as a helpful tool in mitigating adverse impacts to big game.[153]   However, a mandatory NSO stipulation is the best mechanism to accomplish undue and unnecessary degradation to important wildlife populations and the regional hunting economy. A mandatory NSO stipulation is the only way to adequately protect these areas, as timing restrictions for operations and maintenance of a well would need to be waived in the case of an emergency.  "Only by

---

[152] Letter from Tom Spezze, Colorado Parks & Wildlife to Barb Sharrow, Uncompahgre Field Office, Bureau of Land Management at 2 (Feb. 3, 2012). Attached as Exhibit 23.
[153] *Id.* at 2-3.

BLM_0077681

utilizing an NSO stipulation for the life of the [oil or gas] well will the impacts from disturbances caused by maintenance and servicing wells be prevented."[154]

Furthermore, the North Fork of the Gunnison Committee, Habitat Partnership Program has raised concerns about allowing oil and gas leasing on critical winter big game habitat in the area. "Development and operation of oil or gas wells on these parcels [nominated for the August 2012 lease sale] will likely put pressure on big game to move off these parcels and on to adjacent private lands. This will cause increased conflicts with private land owners."[155] Again, there is significant overlap in the important big game habitat, as shown above in Figure 23, which shows important elk habitat; and Figure 24, which shows important habitat for mule deer. Numerous sportsmen groups, including the Bull Moose Sportsmen's Alliance; Center for Responsible Energy Development, Theodore Roosevelt Conservation Partnership; and Backcountry Hunters and Anglers, among others, have raised concerns about proceeding with energy development in the North Fork area without adequately protecting important big game habitat.[156] We feel that limiting surface disturbance densities would be insufficient to limit undue and unnecessary degradation to the big game population, and thus the hunting economy. Therefore, a mandatory NSO stipulation is best suited to protect these important habitat areas.



*Figure 25 - Elk winter on private lands above public mineral estate at the Eagle Butte Ranch, east of Hotchkiss. Credit: Eagle Butte Ranch.*

*Aquatic Wildlife*

There is a need for protecting sensitive water bodies in the North Fork that provide habitat to threatened species such as the Colorado River Cutthroat Trout (CRCT) and the bonytail chub. Trout Unlimited (TU) has requested that "...the BLM implement stronger lease stipulations that adequately protect surface waters, streams, rivers, and riparian habitat with buffer setbacks of .25 mile **or more**, depending on the value of the area" (emphasis added).[157] TU further notes, in regard to the proposed oil and gas leasing in the North Fork, that:

> Oil and gas activities have been shown to degrade soils, contribute to erosion potential, and increase sedimentation loads to watersheds. The UFO has identified this area as

---

[154] Letter from Cathy Purves, Trout Unlimited and David Nickum, Colorado Trout Unlimited to Barb Sharrow, Field Manager, BLM Uncompahgre Field Office (Feb. 9, 2012), attached as Exhibit 24.
[155] Letter from David Bradford, North Fork of the Gunnison Habitat Partnership Program to Barb Sharrow, BLM Uncompahgre Field Office (Feb. 6, 2012), attached as Exhibit 25.
[156] See Letter from Gaspar Perricone, Director, Bull Moose Sportsmen's Alliance, et. al., to Helen M. Hankins, State Director, Colorado BLM State Office (Jan 7, 2013), attached as Exhibit 26.
[157] Purves supra at note 154.

BLM_0077682

having steep terrains with loose unstable Mancos Shale soils.  Most of the parcels are located in areas of fragile soil bases.[158]

"The Colorado BLM is a signatory to the Colorado River Cutthroat Trout (CRCT) Conservation Agreement and Strategy (CAS), established in 2002."[159]  As a signatory to the CAS, the BLM has supported the stated goal that "Areas that currently support CRCT will be maintained, while other areas will be managed for increased abundance.  New populations will be established where ecologically and economically feasible, while the genetic diversity of the species is maintained."[160]  The stated objectives of the CAS include "Secure and enhance conservation populations," "Restore populations," and "Secure and enhance watershed conditions."[161]

TU has identified numerous stream segments that serve current CRCT populations, conservation populations, or expansion habitat that overlie federal minerals, or are located on or nearby BLM-managed minerals and lands.  Identified current population stream segments in the North Fork area include, but are not limited to, Grove Creek, Henderson Creek, Clear Fork, Anthracite Creek, Snowshoe Creek, Coal Creek, Terror Creek, and the South Fork of Minnesota Creek.  Identified conservation population stream segments include, but are not limited to, Roberts Creek and Deep Creek.  Identified expansion habitat stream segments in the area include, but are not limited to, Coal Creek, West Roatcap Creek, Williams Creek, Minnesota Creek, Reynolds Creek, Bell Creek, the Smith Fork of the Gunnison River, and the upper segment of the North Fork of the Gunnison River just below Paonia Reservoir.[162]

Establishing a protective buffer between oil and gas operations and native trout stream segments and potential habitat would further the BLM's commitment to the CAS.  The CAS requires management to **protect both existing and potential habitat**.  Protective management is also needed for habitat for other endangered, candidate, or threatened species, such as the roundtail chub, and other non-aquatic species as discussed below.[163]

*Other Wildlife*
The U.S. Fish and Wildlife Service has identified numerous threatened, candidate, and endangered species under the Endangered Species Act that could have been impacted by the proposed lease sales in the North Fork area.  The following list includes wildlife for which the BLM must adequately manage for in the revised RMP:

- Mexican spotted owl
- Gunnison sage-grouse

---

[158] *Id.*
[159] *Id.*
[160] CRCT COORDINATION TEAM, COLORADO DIVISION OF WILDLIFE, CONSERVATION STRATEGY FOR COLORADO RIVER CUTTHROAT TROUT (ONCORHYNCHUS CLARKII PLEURITICUS) IN THE STATES OF COLORADO, UTAH, AND WYOMING (June 2006), available at http://wildlife.state.co.us/SiteCollectionDocuments/DOW/Research/Aquatic/pdf/CRCT_Conservation_Strategy_Jun06.pdf (last visited Nov. 29, 2013).
[161] *Id.*
[162] Purves *supra* at note 154.
[163] Spezze *supra* at note 152.

North Fork Alternative Plan                                    Page **64** of **102**

BLM_0077683

- Yellow-billed cuckoo[164]
- Canada lynx
- Black-footed ferret
- Gunnison's prairie dog
- North American wolverine
- Humpback chub
- Colorado pikeminnow
- Bonytail chub
- Razorback sucker
- Greenback cutthroat trout
- Clay-loving wild buckwheat
- Colorado hookless cactus.[165]

In addition, an Assessment of Biological Impact screen was conducted by Rocky Mountain Wild for the North Fork Alternative Plan project area.[166]  This screen lists many important wildlife, wilderness and other resource values found within the project area.  Some of the important wildlife habitat includes: bald eagle, golden eagle, peregrine falcon, white-tailed Prairie-dog, river otter, turkey, black bear and more.

*Economic Impact*

CPW notes that "...[d]ue in large part to plentiful big game populations, Delta and Gunnison counties received combined economic benefits of approximately $80.9 million in 2007 from hunting and fishing activities that support an estimated 912 jobs."[167]  As CPW stated in its comments on the proposed August 2012 oil and gas lease sale of public lands in the North Fork:

> The economic benefits from hunting and fishing recreational activities are a sustainable annual source of economic benefit for Delta and Gunnison counties only if wildlife populations, and particularly big game populations, are maintained and quality hunting opportunities continue to exist.[168]

---

[164] The Western Yellow-Billed Cuckoo was recently proposed for federal endangered species protection. *See* SACRAMENTO FISH & WILDLIFE OFFICE, U.S. FISH & WILDLIFE SERVICE, U.S. DEPARTMENT OF INTERIOR, PUBLIC ADVISORY: WESTERN YELLOW-BILLED CUCKOO PROPOSED FOR FEDERAL PROTECTIONS (Oct. 17, 2013), available at http://www.fws.gov/sacramento/outreach/Public-Advisories/WesternYellow-BilledCuckoo/outreach_PA_Western-Yellow-Billed-Cuckoo.htm (last visited Nov. 29, 2013).
*See also* Jason P. Beason, Rocky Mountain Bird Observatory, *2011 Yellow-Billed Cuckoo Surveys in Western Colorado*, Jan. 2012, available at http://rmbo.org/v3/Portals/0/Documents/Science/2011/USFWS_YBCU_Report_2012_Final.pdf (last visited Nov. 24, 2013).
[165] Letter from Charlie Sharp, U.S. Fish and Wildlife Service to Field Manager, Uncompahgre Field Office, Bureau of Land Management (Feb. 8, 2012), attached as Exhibit 27.
[166] The spreadsheet 13-047_NorthForkProjectAreaScreen (attached as Exhibit 28) shows all values in the entire North Fork Alternative Plan project area, categorized according to the Rocky Mountain Wild ranking system that ranks areas and species by importance and also by data quality. The spreadsheet 13-047_NorthForkProjectAreaScreenFederalMinerals (attached as Exhibit 29) is the same except that it lists the type of federal subsurface minerals found under each value type (all minerals; coal only; oil, gas, and coal only; other) and excludes areas with no subsurface minerals.
[167] Spezze *supra* at note 152.
[168] *Id.*

BLM_0077684

From an economic standpoint, these activities are critically important to the local economy and therefore protective management is needed from the BLM to maintain healthy big game and other wildlife populations.

### Management Recommendation

The recommendations of this plan are largely consistent with those of CPW.  In 2008, CPW issued a set of recommendations for how oil and gas operations in the state should be managed in order to protect wildlife.[169]  Some of CPW's notable 2008 recommendations that are carried forward in the North Fork Alternative Plan include:

- "Avoid oil and gas activities within mule deer critical winter range [including severe winter range and winter concentration areas], elk winter concentration areas, elk production areas, and migration corridors" (CPW Report, p. 18).
- "No surface occupancy within 0.6 miles of any known Gunnison or greater sage-grouse lek" (p. 22).
- "Avoid oil and gas operations within 4 miles of any known Gunnison or greater sage-grouse lek, and within mapped Gunnison or greater sage-grouse breeding, summer, and winter habitat outside of the 4 mile buffer" (p. 22).
- "No surface occupancy (beyond that which historically occurred in the area) within 0.25 mile of any active or historic bald eagle nest site" (p. 31).
- "No surface occupancy (beyond that which historically occurred in the area) within 0.25 mile of any active golden eagle nest site" (p. 31).
- "No surface occupancy (beyond that which historically occurred in the area) within 0.5 mile of any active or historic peregrine falcon nest site" (p. 32).

In addition, consistent with CPW's recommendations in comments on BLM lease sales in this area, we recommend NSO within 0.25 mile of northern leopard frog breeding sites.[170]  The NFAP recommends mandatory NSO stipulations for important big game habitat (which consists of winter concentration areas and severe winter range for mule deer; and severe winter range, winter concentration areas, migration corridors, and production areas for elk), within the distances noted above for bald and golden eagles, peregrine falcons, and the Gunnison Sage Grouse; and within ½-mile of native trout stream segments.

A mandatory NSO stipulation is best suited to protect the surface resource in question (in this instance, big game and other wildlife habitat in the area).  Through our research, we could not identify instances of BLM implementation of limiting surface densities, as suggested by CPW in order to protect big game habitat.  Most alarmingly, in the draft Tres Rios RMP, the BLM acknowledges "...that **TL stipulations on oil and gas development activities are not adequate to protect critical winter habitat and migratory**

---

[169] *See* Colorado Division of Wildlife, Actions to Minimize Adverse Impacts to Wildlife Resources (Oct. 27, 2008), available at http://www.mde.state.md.us/programs/Land/mining/marcellus/Documents/CO26ColoradofinalBMP1008.pdf (last visited Nov. 29, 2013).
[170] *See* Spezze *supra* at note 152.

BLM_0077685

**corridors for big game**" (emphasis added).[171]  Despite this admission, the BLM proposes only CSU and TL, subject to waiver and modification, to protect critical big game habitat in that draft RMP.

Timing Limitations and Controlled Surface Use stipulations are insufficient to protect wildlife habitat because they can, and likely would, be waived, and may not apply to service vehicles and work necessary during winter months.  The NFAP recommendation for setbacks from water bodies for wildlife concerns are consistent with the recommendation for setbacks from water bodies as discussed in the section on the **Riparian Areas and River Corridors Management Zone**, in which we recommend a ½ mile NO LEASING buffer to protect water bodies.

---

[171] *See* SAN JUAN NATIONAL FOREST AND TRES RIOS FIELD OFFICE *supra* note 149.

BLM_0077686

### Landscape

The North Fork Alternative Plan would designate a **Landscape Management Zone** to protect the uniquely problematic soils and unusually unstable geology prevalent across the area, with specific management for erodible Mancos Shale and to protect against geologic hazards.

The North Fork region is geologically unique.  The Mancos Shale is both a weak, unstable unit prone to failure where it underlies much of the region; and it is a highly erodible, highly saline, selenium-rich unit where it is exposed.  Slope failure in the Mancos is well-known in Colorado.[172]  Landslides, rockfalls, slope failure and other mass wasting events occur frequently.  The area around Paonia Reservoir, for instance, includes some of the largest areas of mass wasting landscape in the United States.[173]  Poorly managed geologic hazards do not just threaten the public lands themselves; they also put at risk community and public safety, local water supplies, highways and roads, other public land uses, and private property.[174]

The Mancos Shale soils throughout the North Fork have long been identified as a top contributor to salinity and selenium loads within the Gunnison and Colorado River systems.[175]  Salinity loads are a major concern for downstream agricultural interests including the nation of Mexico, and have long been considered the "most serious water quality problem" in the Colorado River Basin.[176]  Selenium is a top concern, as loading in the Gunnison River has a high likelihood to adversely affect endangered species in the river and further downstream.  Efforts to limit and reduce salinity in the Colorado River and selenium loading from Mancos Shale in particular represent several multi-agency, multi-state, multi-year undertakings.  One, the Regional Partnership Project, found that:

- Salinity levels of the Colorado River result in an annual cost of approximately $330 million (USDOI, 2001).
- More than half of the salt load originates in the Upper Colorado River Basin and a significant portion of that load can be related to Mancos Shale landscapes.  Selenium, thought to originate from the Mancos Shale, has led to the non-compliance with the Clean Water Act.[177]

---

[172] "This pattern of the basal failure plane lying within bedrock … was also observed by Chen and Associates (1981, 1985) in a landslide on Mancos Shale at the Buttermilk Ski Area in Aspen, CO, which reactivated in 1984…" GEO-HAZ CONSULTING FOR U.S. FOREST SERVICE, CHAPTER 2 – GEOLOGY AND SLOPE STABILITY OF SNODGRASS MOUNTAIN SKI AREA (March 2008), available at http://www.fs.fed.us/outernet/r2/gmug/policy/ski/snodgrass/geo_report/CHAPTER_2r.pdf (last visited Nov. 29, 2013).

[173] Netra Raj Regmi, *Hillslope Dynamics in the Paonia-McClure Pass Area, Colorado, USA* (Aug. 2010), attached as Exhibit 30.

[174] "Geologic hazards cost Colorado citizens and taxpayers millions of dollars every year, yet ignoring them is the most costly thing we can do." GREG WALCHER, COLORADO GEOLOGIC SURVEY, ROCK TALK, VOL. 3, NO. 1, WHO CARES ABOUT THE COLORADO GEOLOGIC SURVEY? (Jan. 2000), available at http://geosurvey.state.co.us/pubs/Documents/rtv3n1.pdf (last visited Nov. 29, 2013).

[175] Colorado River Basin Salinity Control Forum, *2011 Review: Water Quality Standards for Salinity Colorado River System*, Oct. 2011, available at http://www.crb.ca.gov/Salinity/2011/2011%20REVIEW-October%20Final.pdf (last visited Nov. 29, 2013).

[176] ROBERT G. EVANS, ET. AL., U.S. ENVIRONMENTAL PROTECTION AGENCY, EPA-600/S2-87-077, OPTIMIZING SALINITY CONTROL STRATEGIES FOR THE UPPER COLORADO RIVER BASIN (Feb. 1983), attached as Exhibit 31.

[177] A Regional Partnership Project: U.S. Geological Survey, U.S. Bureau of Land Management, U.S. Bureau of Reclamation, *Mancos Shale Landscapes: Science and Management of Black Shale Terrains* (2009), http://minerals.cr.usgs.gov/projects/mancos_shale/ (last visited Nov. 29, 2013).

BLM_0077687

Saturated Mancos Shale soils from irrigated fields and runoff from poorly managed development on non-irrigated lands are both thought to be leading human-based contributors to selenium loading.[178]

The **Landscape Management Zone** would close to leasing lands with high and very-high potential for selenium loading; and would require mandatory NSO stipulations for lands with Mancos soils within an additional ¼-mile of those lands with high and very-high potential.  This management zone would require mandatory NSO stipulations for all areas with medium to high geologic hazard, and CSU/TL for areas with low to medium geologic hazard.[179]   Figure 26 illustrates the proposed management zone.[180]

*Figure 26 - Proposed Landscape Management Zone*



---

[178] SELENIUM MANAGEMENT PROGRAM WORKGROUP, COMPILED BY US DEPARTMENT OF INTERIOR BUREAU OF RECLAMATION, PROGRAM FORMULATION DOCUMENT GUNNISON RIVER BASIN, COLORADO (October 2011), available at http://www.seleniumtaskforce.org/images/Final-SMP-ProgForm.pdf (last visited Nov. 29, 2013).

[179] *See* GRAND MESA, UNCOMPAHGRE, GUNNISON NATIONAL FOREST, U.S. FOREST SERVICE, U.S. DEPARTMENT OF AGRICULTURE, OIL AND GAS LEASING, FINAL ENVIRONMENTAL IMPACT STATEMENT, VOLUME I, at III-55 to 56 (April 1993), available at http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fsbdev7_003178.pdf (last visited Nov. 29, 2013) for the definition of geologic hazards. "Active mudflows, earthflows, and landslides, and areas prone to avalanche are categorized as High Geologic Hazard areas. Moderate Geologic Hazards are those failed slopes that are no longer active (stabilized earthflows, mudflows, and landslides); those slopes adjacent to failed slopes or active earthflows, mudflows or landslides and avalanche chutes; areas of rockfall; flash flood zones, and areas with potential mining related problems (i.e. subsidence, acid drainage)."

[180] Please note:  Maps are provided to depict how management prescriptions and development setbacks and stipulations protect specific resources.  Maps do not necessarily indicate where all such resources are found, and may not correctly depict all places where such stipulations do or do not apply.

BLM_0077688

The geology of the North Fork is unique and poses distinct management challenges that justify strong and encompassing protections. The landslide risks, mass wasting potential, and likelihood for slope failure of the upper North Fork and Muddy Creek area are widely recognized. The contribution that the North Fork's Mancos Shale make to salinity levels in the Colorado System is internationally significant. Specifically, selenium has the ability to affect a multi-state endangered species recovery project. The North Fork Alternative Plan provides the proper and necessarily strong management framework to protect the unique and sensitive resources of the North Fork's landscape.

### *Delicate and Erodible Soils: Selenium Loading and Salinity*

The need to address water quality impacts is especially important because the North Fork of the Gunnison River is listed as impaired due to selenium pollution.[181] Agricultural and water users, including the Delta Conservation District, a formal Cooperating Agency with the BLM on the UFO RMP revision, are particularly concerned that failure to address this issue may impact the use of irrigation water.[182] Of particular concern is the effect that high selenium concentrations have on the endangered fish in the lower Gunnison and downstream in the Colorado River. Low-flows exacerbate the problem; one solution—if upland selenium control is unsuccessful—is to ensure more water makes it into the river, directly impacting upstream water-users. [183]

The Bureau of Reclamation's Gunnison Basin Selenium Management Program has as its goal "...to reduce adverse effects of selenium on endangered fish species in the Gunnison and Colorado rivers" in order to prevent further action by the U.S. Fish and Wildlife Service, such as requiring higher flow in the river. The Gunnison Basin Selenium Task Force, a multi-jurisdictional, multi-agency public and private partnership has found that "...[f]uture development, if it continues at the same pace and fashion ... on previously non-irrigated Mancos soils, has the potential to significantly contribute to selenium loading in our water systems."[184]

The Gunnison Basin Selenium Task Force's Action Plan, developed with involvement from the BLM, includes among its shared objectives the following: "Retire high selenium lands (from additional development and irrigation); Focus zero discharge development in high selenium loading areas; and, Control erosion on public Mancos Shale lands."[185]

The Task Force reminded the BLM of these obligations, to which the agency is a signatory, in scoping comments on the deferred leasing proposal from 2011. That letter reminded the BLM of its responsibility of "...[p]romoting [Selenium Management Program] objectives and Best Management Practices for selenium control to the extent possible..." and that "...BLM will: evaluate options to

---

[181] 43 U.S.C. § 1712(c)(8); PAUL VON GUERARD, U.S. GEOLOGICAL SURVEY, SELENIUM STUDIES AND REMEDIATION PLANNING IN THE UPPER COLORADO RIVER BASIN, available at
http://www.water.ca.gov/saltonsea/historicalcalendar/ac/03.16.2005/UpperBasinSeStudies-1.pdf (last visited Nov. 29, 2013).
[182] Letter from Ralph D'Alessandro, President, Board of Supervisors, Delta Conservation District to Helen Hankins, Colorado State Director, Colorado State Office, Bureau of Land Management (Dec. 17, 2012), attached as Exhibit 32.
[183] Sharp *supra* at note 165.
[184] Gunnison River Basin Selenium Task Force, *Action Plan: Working Version -- revised 11-02-09*, available at
http://www.seleniumtaskforce.org/images/GB_Action_Plan_Updated_11-02-09.pdf (last visited Nov. 29, 2013). *See also*
SELENIUM MANAGEMENT PROGRAM WORKGROUP *supra* at note 178.
[185] *Id.*

North Fork Alternative Plan                                                 Page **70** of **102**

conform to a goal of 'no net new selenium loading' from land exchanges, sales, and other actions involving public land."[186]

Poorly managed development on the selenium-rich and highly erodible soils of the Mancos Shale has a significant likelihood of worsening selenium loading in the Gunnison River.  This would result in a net increase of loading to the system, threatening both water quality and water quantity.  Water quality would be impacted through increased salinity and selenium and water quantity through imposed mitigations to protect the endangered fish in the Colorado River system as required by the Endangered Species Act and the Clean Water Act.

*Unstable Geology – Landslide, Mass Wasting & 'Geologic Hazards'*

The Mancos Shale layer is highly erodible when exposed and notoriously unstable, whether exposed or not.  The Mancos was identified as one of the three "most problematic units in Colorado for slope stability..."[187]  The overall geology in the North Fork is characterized as follows:

> The Mancos Shale may be subject to slope instability, expansive soils, hydrocompaction, and severe erosion; the Mesaverde Formation is subject to mass wasting in the form of rockfalls, debris avalanches, and landslides; and the Wasatch Formation is dominated by active landslides and slope-failure complexes.[188]

Proper management for geologic hazards is necessary to avoid undue and irreparable harm to the public's resources.[189]  The BLM is also required to coordinate its management of the public lands with the State and local governments.[190]  Colorado has long recognized the importance of identifying geologic hazards before permitting activities that would allow development, and the state's management for geologic-hazards goes back at least to 1972.[191]

The Gunnison County Board of County Commissioners raised numerous issues regarding steep slopes and the high occurrence of significant geological hazards on the BLM-administered lands in the North Fork area, including: "...landslide areas, mudflow areas, rockfall areas, potentially unstable slopes, expansive soils and progressive expansive soil and rock areas, debris flow areas, sheet flow flooding and

---

[186] Letter from Sonja Chavez de Baca, Coordinator, Gunnison Basin Selenium Task Force to Barbara Sharrow, Manager, Uncompahgre Field Office, Bureau of Land Management (Feb. 9, 2012), attached as Exhibit 33.
[187] Paul Santi, Colorado School of Mines, *Presentation at the Joint Meeting of The Geological Society of America: Problematic Slope Stability Units in Colorado* (2008), abstract available at
https://gsa.confex.com/gsa/2008AM/finalprogram/abstract_148204.htm (last visited Nov. 29, 2013).
*See also* Andrew E. Godfrey, *Mass Movement of Mancos Shale Crust near Caineville, Utah: A 30-Year Record*, GEOGRAFISKA ANNALER, Series A, Physical Geography Vol. 79, No. 3 (1997).
[188] Regmi *supra* at note 173.
[189] 43 U.S.C. § 1711.
[190] 43 U.S.C. § 1712 (c) 9.
[191] Colorado Geological Survey, Department of Natural Resources, *Solving Land Use Problems* (1998), available at
http://geosurvey.state.co.us/land/Documents/LANDUSEBOOKV2.pdf (last visited Nov. 29, 2013).

BLM_0077690

erosion areas and physiographic flood plain areas."[192]  The County also indicated its intent to file lawsuit, if necessary, to block the leasing of these lands under the old and stale 1989 RMP.[193]

Standard Lease Terms are unable to protect against the geological hazards prevalent in the North Fork area.  The USFS concluded as much 20-years ago for the lands on the same slopes and in the same geology as the UFO BLM lands, immediately adjacent differing only by an administrative boundary.  The 1993 Grand Mesa, Uncompahgre, and Gunnison National Forest (GMUG) Oil & Gas Amendment Record of Decision (ROD) notes that applying only Standard Lease Terms to areas of geologic hazard would have:

> ...the greatest potential to produce adverse effects, such as the acceleration or triggering of slope failures, excessive soil movement (erosion), and the resultant risk to the aquatic ecosystem if sediment reaches streams.[194]

The USFS concludes that NSO stipulations are required at a minimum for lands with high geological hazard, and that CSU stipulations are required at a minimum for areas deemed at moderate risk: "STANDARD LEASE TERMS - Potential for natural activation of Geology conditions.  TIMING LIMITATION - Timing would not provide mitigation impacts over Standard Lease Terms."[195]

*Management Recommendation & Rationale*

The North Fork Alternative Plan's **Landscape Management Zone** provides strong, reasonable, and necessary protections for the area's uniquely unstable geology and erodible seleniferous soils, with specific management for erosive Mancos Shale and to protect against geologic hazards.  The BLM should close to leasing the BLM-administered lands and minerals associated with lands with high and very-high potential for selenium loading.  In addition, a mandatory NSO stipulation should be required for lands with Mancos Shale soils within an additional ¼-mile of with lands with high and very-high potential for selenium loading.  For geologic hazards, medium to high geologic hazards should have a mandatory NSO stipulation while low to medium hazards should require a CSU stipulation.

The public minerals administered by the BLM which have surface lands associated in very-high and high selenium mobilization potential areas, should not be open to oil and gas leasing.  Certainly, the BLM must analyze and should select an alternative that closes these lands to oil and gas leasing altogether, as recommend by the Gunnison Basin Selenium Task Force in its scoping comments on the deferred lease sale:

---

[192] Letter from Hap Channell, Chairperson, Board of County Commissioners, Gunnison County, Colorado to Barbara Sharrow, Field Office Manager, Uncompahgre Field Office, Bureau of Land Management (Feb. 7, 2012), attached as Exhibit 34.  These comments include extensive mapping of steep slopes and known geologic hazards as Appendices A and B.
[193] *Id*.
[194] GRAND MESA, UNCOMPAHGRE, GUNNISON NATIONAL FOREST supra at note 179, at II-56.
[195] GRAND MESA, UNCOMPAHGRE, GUNNISON NATIONAL FOREST, U.S. FOREST SERVICE, U.S. DEPARTMENT OF AGRICULTURE, OIL AND GAS LEASING, FINAL ENVIRONMENTAL IMPACT STATEMENT, RECORD OF DECISION (April 1993), available at http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fsbdev7_003180.pdf (last visited Nov. 29, 2013).

BLM_0077691

> Wherever possible, **lease sales should not occur in highly seleniferous areas that have been identified**.  Land disturbance activities in these areas can mobilize selenium and result in increased loads to the river system (emphasis added).[196]

No leasing provides the strongest protections to ensure that the BLM is meeting its obligations and not increasing the 'net loading' of downstream selenium levels.  NSO stipulations are much weaker, they can be (and very often are) changed, modified, or waived, and they do not provide the same level of surety.  To keep facilities, roads, and activity that could exacerbate selenium loading or respond to storm water events, the North Fork Alternative Plan includes an additional setback from very-high and high mobilization areas, by requiring a NSO stipulation for ¼-mile beyond the No Leasing area.

The North Fork Alternative Plan requires a mandatory NSO stipulation for all areas with medium to high geologic hazard.  For the purposes of lands associated with BLM minerals, high geologic hazard includes slopes over 30% (due to the uniquely unstable, and well-documented, nature of the geology) and mapped hazards with high potential for further activity, including "Active mudflows, earthflows, and landslides, and areas prone to avalanche…"  This description of geologic hazards is from the USFS.[197]

Stipulations to protect against geologic hazards are well-known to land management agencies.  While the USFS has a specific statutory requirement to manage for geologic hazards, the BLM is similarly obligated to avoid unnecessary and undue harm to the public lands as its fundamental management directive.[198]  Oil and gas development in areas with high geologic hazard have a high likelihood to cause such unacceptable damage, as noted by the federal government itself for lands immediately adjacent and indistinguishable from the UFO-administered BLM lands in the area:

> A High Geologic Hazard area has a high level of major geologic or geomorphic activity or instability, or has a high potential for such activity, either naturally or due to disturbance by management activities.  **Major disturbances in these areas have a high probability of causing unacceptable resource damage** (emphasis added).[199]

BLM stipulations to protect steep slopes can be found in most Resource Management Plans and Oil and Gas Leasing Plans, for example: "Surface occupancy is also prohibited on slopes exceeding 30 degrees to prevent excessive soil erosion, slope failure, and mass wasting...."[200]

For areas with low to medium geologic hazards, CSU and TL should be utilized depending on the specific hazard.  For public lands immediately adjacent to those being managed by the BLM (surface and/or minerals) the USFS found that CSU stipulations were needed at a minimum in areas of moderate geologic hazard, which it describes as:

---

[196] de Baca *supra* at note 186.

[197] GRAND MESA, UNCOMPAHGRE, GUNNISON NATIONAL FOREST *supra* at note 194, at III-56.

[198] 43 U.S.C. § 1732.

[199] *Id.*

[200] U.S. DEPARTMENT OF ENERGY NATIONAL PETROLEUM TECHNOLOGY OFFICE, PREPARED BY ALL CONSULTING AND MONTANA BOARD OF OIL AND GAS CONSERVATION, COAL BED METHANE PRIMER: NEW SOURCE OF NATURAL GAS, at 58 (Feb. 2004), available at http://www.all-llc.com/publicdownloads/CBMPRIMERFINAL.pdf (last visited Nov. 29, 2013).

BLM_0077692

Moderate Geologic Hazards are those failed slopes that are no longer active (stabilized earthflows, mudflows, and landslides); those slopes adjacent to failed slopes or active earthflows, mudflows or landslides and avalanche chutes; areas of rockfall; flash flood zones, and areas with potential mining related problems (i.e. subsidence, acid drainage).

Moderate Geologic Hazards are found throughout the analysis area, but are commonly found associated with those areas of High Geologic Hazard. **Those areas underlain by the Mancos Shale, the Wasatch Formation, and clay soils derived from the Morrison Formation are potentially subject to slope failure, as a result of management activities.** The contact zone between the Mancos Shale and the overlying Mesaverde Group rocks also tends to be prone to slope failure (emphasis added).[201]

Timing limits would be appropriate in areas where heavy rainfall, snowmelt, or other factors increase slope instability during a certain season or in response to particular events; Controlled Surface Use could simply be stipulated that operations will require specific Conditions of Approval (COAs) for any areas where low- to moderate geologic hazard may occur. For example: "If stipulated or a Lease Notice is attached to the lease, the operator and the administrator are aware of the geologic hazard that exists in the lease parcel."[202]

Geologic hazards are somewhat unpredictable, and they often respond to other events, such as weather. Thus, flash flood prone areas might normally appear stable, only to become highly problematic during an intense 10-year or 100-year event flood event. CSU stipulations can help guard against calamity by imposing specific protections for flood-prone areas, even those far removed from the normal riparian zone. In addition, the North Fork includes numerous historic coal mining areas, some of which have problems with subsidence and long-burning coal seam fires. CSU provides the BLM with specific tools to ensure that any surface activity associated with these areas is properly and carefully managed to prevent further damage.

---

[201] GRAND MESA, UNCOMPAHGRE, GUNNISON NATIONAL FOREST *supra* at note 194, at III-15.
[202] GRAND MESA, UNCOMPAHGRE, GUNNISON NATIONAL FOREST *supra* at note 194, at II-24.

BLM_0077693

## Special management and resources designations

In addition to highlighting a set of important resources and protecting them through six management zones, the NFAP also highlights two particularly important resources in the valley for special management attention: the Jumbo Mountain area for outdoor recreation, and the overall scenic qualities North Fork.  The BLM is directed to provide for outdoor recreation on the public lands and to consider scenic qualities in its land use planning, and plan revisions by FLPMA:

> FEDERAL LANDS POLICY AND MANAGEMENT ACT DECLARATION OF POLICY.
> The Congress declares that it is the policy of the United States that… the public lands be managed in a manner that will protect the quality of scientific, **scenic**, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that **will provide for outdoor recreation** and human occupancy and use; (emphasis added).[203]

Other unique lands and sensitive resources on the BLM lands in the North Fork also warrant special attention when considering oil and gas leasing and development—including Needle Rock Outstanding Natural Area and other potential special management areas, such as Areas of Critical Environmental Concern.[204]  Nearby lands with special designations include Gunnison Gorge National Conservation Area, state parks and wildlife areas, Colorado Roadless Areas and the Black Canyon of the Gunnison National Park.  Lands and streams in the region provide habitat for endangered, threatened and candidate species (including the Gunnison Sage Grouse and Greenback Cutthroat trout), and thus also require special management attention.

### Visual Resource Management and the Jumbo Mountain Special Recreation Management Area

To protect the quality of the scenic values of the public lands, the agency has developed its VRM system, described as "…a methodical approach to inventorying and managing the scenic resources of the public lands."[205]  Simply put, VRM management—and the rational, methodical recognition and protection of the North Fork's important scenic values—is one tool that the BLM can use to impose strong management (including 'avoidance') of oil and gas development in the valley.

In addition to being directed as fundamental policy (as per the FLPMA Declaration of Policy) the BLM is also directed by FLPMA, in the land use planning requirements of the law, to pay attention to recreational plans and local priorities, such as the Town of Paonia's formal support for directed recreation management at Jumbo Mountain.[206]  Strong management to protect the unique and special

---

[203] 43 U.S.C. § 1701 (a) (8).
[204] The above citation from FLPMA requires the BLM to protect unique scientific values, like Needle Rock ONA; while other parts of the law require that the BLM prioritize management for Areas of Critical Environmental Concern, *See* 43 U.S.C. § 1711 (a).
[205] *Visual Resource Management Classes and Objectives for Bureau of Land Management-Administered Lands,* available at http://caminorealheritage.com/BLM/q%2Oappendix%2Oh%2Ovisual%2Oresource%2Omanagement%2Oclassesobjectives.pdf (last visited Nov. 29, 2013).
[206] 43 U.S.C. § 1712 (c) (9).

BLM_0077694

outdoor recreational opportunities at Jumbo Mountain and the valley's highly scenic values are reasonable and prudent agency actions.

## Special Designations on BLM and Adjacent Lands

In addition to the Congressional requirements that the BLM protect outdoor recreation and the North Fork's scenic values, BLM need also give careful attention to management on lands that border areas that have special designations themselves.  This would include BLM lands in the North Fork that border two state parks, and a National Park, as well as a BLM-administered National Conservation Area.  BLM lands also border several Colorado Roadless Areas on the National Forest and State Wildlife Areas.

BLM_0077695

## Jumbo Mountain Special Recreation Management Area

Jumbo Mountain is a prominent feature throughout much of the valley.  The public lands of the proposed Jumbo Mountain Special Recreation Management Area (SRMA) are comprised of a series of rising ridges that form the southwestern flanks of Jumbo Mountain, itself a foothill of the West Elk range.  Jumbo Mountain has long been popular for recreation.  The proposed SRMA is immediately adjacent to Paonia and frames the northeast horizon of town.

*Delta County Independent*                    April 14, 2010

### Jumbo Mountain 'Special Recreation Management Area'

**Paonia chamber wants special recreational designation**

Once again the Community Room at Paonia Town Hall was full, as those interested in recreational uses on public lands met on March 31.



Unlike the first meeting which was hosted by the Bureau of Land Management (BLM), this meeting was called by the Paonia Chamber of Commerce to specifically discuss the future of recreation on Jumbo Mountain... public land adjacent to the Town of Paonia...

...The chamber's board of directors had sent a letter to ...BLM, several days before the meeting.  It encouraged BLM "to consider creating a Special Recreation Management Area (SMRA) in the area bordering the town of Paonia and continuing up to the face of Jumbo Mountain.

An informal trail system is well-used by mountain bikers, trail runners, and hikers offering outstanding opportunities for unconfined recreation.[207]

Providing for nearby primitive and dispersed recreation, Jumbo Mountain is an asset to Paonia.  The Chamber of Commerce, the Town Council, and the local 'Single-track Society' along with numerous local businesses and residents support creation of an SRMA.

> The Paonia Chamber of Commerce believes that the creation of an SRMA in this area is a unique opportunity to increase the quality of life for the residents of Paonia, to enhance the economic viability of the town, to serve the community's wishes for recreational access to public land...

> Mayor Neal Schwieterman of Paonia said anytime a diverse group of people sit down together is a good thing. Schwieterman is a mountain biker, but was representing the Town of Paonia. ... The Town of Paonia would like there to be better access to Jumbo Mountain. ... The Town of Paonia is a Cooperating Agency working with BLM on the resource plan...[208]

---

[207] MESA STATE COLLEGE, NATURAL RESOURCES AND LAND POLICY INSTITUTE, BLM UNCOMPAHGRE FIELD OFFICE: RECREATION FOCUS GROUP REPORT, TABLE 7: OUTSTANDING RECREATIONAL OPPORTUNITIES, at 9 (May 2010), available at http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_docs.Par.64248.File.dat/Recreation%20Focus%20Group%20Report%20UFO-RMP%202010_NEW.pdf (last visited Nov. 29, 2013).
[208] Kathy Browning, *Paonia chamber wants special recreational designation for Jumbo Mountain*, DELTA COUNTY INDEPENDENT, April 14, 2010, available at http://askturf.com/park/pNews_det.php?id=258 (last visited Nov. 29, 2013).

North Fork Alternative Plan

BLM_0077696

In scoping the revised RMP, the BLM has identified the important recreational values and uses at Jumbo Mountain.  One commenter to BLM called Jumbo: "The best mountain bike trail system in the region."[209] The Final Scoping Summary Report from July 2010, as part of the revision process for the UFO RMP, notes specific and strong support for a Jumbo Mountain SRMA.

> Commenters provided detailed suggestions for the designation of Special Recreation Management Areas in particular areas in the planning area, notably Jumbo Mountain outside of the town of Paonia.[210]

Community members that attended BLM scoping meetings in 2010 noted the community was willing to partner with the agency if it would protect the public lands on Jumbo and managed them for recreation.

> This area is has a long historical usage as a recreation area by hikers, runners, hunters, ATV riders and since 2000 by mountain bikers.  Its proximity to town makes it an ideal recreational area for all these groups.  However there are many issues that need to be addressed to avoid resource damage, user conflicts, access issues.  Many folks in our community are ready to work with the BLM to make this happen.[211]

To maintain, manage, facilitate and improve the primitive recreational opportunities of these popular public lands, the **Jumbo Mountain Special Recreation Management Area** would prohibit any surface occupancy or disturbance associated with oil and gas leasing, exploration, or development.  No exceptions, waivers, or variances would be allowed to this stipulation.  The proposed SRMA is illustrated in Figure 27 below.[212]

---

[209] UNCOMPAHGRE FIELD OFFICE *supra* at note 8, Comment #434 at C-181.

[210] *Id.* at 3-9.

[211] *Id.* Comment #301 at C-180.

[212] Please note:  Maps are provided to depict how management prescriptions and development setbacks and stipulations protect specific resources.  Maps do not necessarily indicate where all such resources are found, and may not correctly depict all places where such stipulations do or do not apply.

BLM_0077697

*Figure 27 - Jumbo Mountain Special Recreation Management Area*



Oil and gas development would conflict with the purposes of the Jumbo Mountain SRMA by introducing an industrial use into an area prized for its primitive and unconfined recreational opportunities.  Any oil and gas activity on these public lands, which also border subdivisions and an elderly residential care facility, will focus significant industrial activity in these places and impinge on access to these multiple-use public lands further harming their value for recreation.

In addition to the degradation of the natural qualities that make the Jumbo Mountain area attractive to many visitors, oil and gas development would present hazards to health and safety, provoke public confrontation and resentment, and foster an overall loss in quality of life for local residents and visitors due to the loss of a popular running, biking, and hiking area.

The BLM administered public lands at Jumbo Mountain provide important and nearby recreational opportunities for the Town of Paonia.  Prohibiting any surface disturbance associated with leasing, exploration or development of oil and gas will avoid conflicting uses and allow the community to work with the agency to further develop and better maintain the Jumbo's recreational use.

*Management Recommendation & Rationale*
In order to protect outstanding opportunities for primitive recreation present in the Jumbo Mountain SRMA the entire area should be stipulated as NSO with no exceptions.  The heavy industrial nature of oil

BLM_0077698

and gas development makes it incompatible with management of the Jumbo Mountain area as a trail-oriented, natural recreation landscape.

Heavy truck traffic, industrial activity, exposure to toxins, public hazards, and other factors present in an oil and gas field are incongruous with a healthy, enjoyable recreation experience.  The steep topography and ridges that provide for plentiful human screening, enhancing the experience of solitude, would require massive alteration—cut and fill—to locate any oil and gas roads or infrastructure, ruining the scenic qualities of the place.

An NSO requirement for the Jumbo Mountain SRMA is consistent with BLM management in other Colorado field offices, including the Colorado River Valley Field Office.  That field office closed SRMAs to any oil and gas surface disturbance, without exception, nearly 15 years ago in the 1999 oil and gas amendment to the RMP.[213]

---

[213] COLORADO STATE OFFICE, BUREAU OF LAND MANAGEMENT, U.S. DEPARTMENT OF INTERIOR, GLENWOOD SPRINGS RESOURCE AREA, OIL & GAS LEASING AND DEVELOPMENT, RECORD OF DECISION AND RESOURCE MANAGEMENT PLAN AMENDMENT (March 1999), available at http://www.blm.gov/pgdata/etc/medialib/blm/co/programs/land_use_planning/rmp/archives/glenwood_springs/amendments.Par.69979.File.dat/990_GA_ROD.PDF (last visited Nov. 29, 2013).

BLM_0077699

### Visual Resource Management for the North Fork

Although a human-impacted landscape, the North Fork is an area with high scenic qualities.  The BLM notes in its Visual Resource Inventory Manual: "Man-made features that complement the natural landscape may enhance the scenic value.  Evaluations should avoid any bias against man-made modification to natural landscape."[214]  The mixture of agricultural lands, undeveloped lands, and historical and current coal mining add to the character of the valley.  A BLM PowerPoint presentation for agency staff on VRM confirms this: "The scenic significance of many landscapes is cultural or historic."[215] Many of the BLM lands are visible from important scenic corridors and viewpoints.  Retaining its visual features—its appeal as a non-industrial rural landscape, as well as of its undeveloped and popular public lands—is a top concern of residents, local government, and businesses.



Figure 28 - A summer sunset over the West Elk Mountains, from near Azura Cellars & Gallery. Credit:  Jim Ramey.

VRM is an important agency tool for proper consideration and protection of an area's scenic qualities. [216] In the RMP revision process, VRM consists of an inventory (identifying which public lands should receive which general VRM class designations) and outlining management prescriptions within those

---

[214] Bureau of Land Management, U.S. Department of Interior, H-8410-1, Visual Resource Inventory Manual, available at http://www.blm.gov/pgdata/etc/medialib/blm/wo/Information_Resources_Management/policy/blm_handbook.Par.31679.File.dat/H-8410.pdf (last visited Nov. 29, 2013).

[215] Bureau of Land Management, U.S. Department of Interior, PowerPoint Presentation: Visual Resource Management, Las Vegas, NV (Nov. 3 - 7, 2008), available at www.ntc.blm.gov/krc/uploads/35/Unit%2001%20Overview%20VRM%2011%2005%2008.pdf (last visited Nov. 29, 2013).

[216] Id. The BLM defines VRM as: "The inventory and planning actions taken to identify visual values and to establish objectives for managing those values; and the management actions taken to achieve the visual management objectives."

North Fork Alternative Plan                                                   Page **81** of **102**

designations.  The BLM's Visual Resource Inventory Manual (H-8410-1) lists three factors for the inventory: scenic quality, sensitivity, and distance zone.[217]

### Nearby Scenic Qualities

The North Fork's BLM lands have outstanding scenic qualities, which are important to the community and a fundamental force driving local tourism.  Festivals and events in the valley rely on the ambiance and non-industrial nature of the landscape, including the nearby BLM lands.  The area also includes a dozen wineries, many with popular tasting rooms that are adjacent to and look out on the valley's BLM lands.[218]  Many of these BLM lands lie within the fore- and middle-ground zone (within three to five miles) of town centers, travel corridors, wineries, or other notable viewpoints.

The North Fork's BLM lands cradle large stretches of the West Elk Loop Scenic Byway, designated by the State of Colorado in 1991.  The West Elk Loop and the area it covers are world-renown for their fall color displays, and lands in the Kebler and McClure Pass areas include the world's largest aspen groves (each made up of a single cloned organism) with some of the most impressive fall foliage in the Western United States.[219]  Among the many community-based efforts promoting the West Elk Loop, and the communities along its route, the "Official [Web] Site of Gunnison-Crested Butte, CO" notes:

> The West Elk Loop has been described by a forest ranger as "the closest you can come to a wilderness experience in a passenger car."  Even through the windshield, one is likely to see bears, elk, deer, bighorn sheep, coyotes, eagles and any variety of wildlife. … The road skirts canyon rims, follows Whitewater Rivers, plunges into deep forests and traverses desert and sagebrush plains.  The West Elk Loop provides immersion in the scenery, history and the culture of Western Colorado.[220]

Further, the West Elk Loop Scenic and Historic Byway Corridor Management Plan, highlights the highly scenic qualities of the Byway.

> The Byway is near the heart of the Rocky Mountains and at the edge of the Colorado plateau and canyon country.  The magnificent landscapes of both regions have immediate and almost universal recognition nationally and, increasingly, internationally as well.  The scenic qualities of the West Elk Loop Scenic Byway are truly outstanding and varied.  They include both dramatic, natural landscapes as well as lands whose character has been enhanced by visible signs of the long and hard-earned tenure of those who have come to settle the land.[221]

---

[217] BUREAU OF LAND MANAGEMENT *supra* at note 214.
[218] *See* Helleckson *supra* at note 12 (previously attached as Exhibit 3).
[219] *Five Autumn Drives & Outdoor Fun a Gold Rush in Gunnison-Crested Butte, Colorado*, SAN FRANCISCO CHRONICLE, Aug. 14, 2013, available at http://www.sfgate.com/business/press-releases/article/Five-Autumn-Drives-Outdoor-Fun-a-Gold-Rush-in-4734234.php (last visited Oct. 2, 2013).
[220] Gunnison-Crested Butte Tourism Association, *West Elk Scenic & Historic Byway* (2008), http://www.gunnisoncrestedbutte.com/area-tour/west-elk-scenic-and-historic-byway (last visited Nov. 29, 2013).
[221] EDAW, prepared for the West Elk Loop Scenic and Historic Byway Steering Committee, *West Elk Loop Scenic and Historic Byway Corridor Management Plan*, at II-1 (2000), available at http://www.coloradodot.info/travel/scenic-byways/southwest/west-elk-loop/ScenicByway-WestElkLoop (last visited Oct. 2, 2013).

BLM_0077701

> The West Elk Loop Scenic and Historic Byway contains a number of significant resources. ... they include scenic landscapes, outstanding natural features, diverse recreational resources, nationally significant historic sites, and distinctive cultures and ways of life. It is these intrinsic qualities for which the Byway was established.  It is also the qualities that make this a distinctive and special place for the people who reside here.  For both reasons, it is critically important to protect the resources, and way of life, found along the Byway.[222]

The Scoping Report prepared by the UFO for this RMP revision notes: "[Representatives of the West Elk Byway] also ask that the byway remain relatively natural in appearance, including the viewshed."[223]  The combination of undeveloped and rural landscapes enhances the North Fork's scenic qualities.  Preserving these features is important to residents, local governments, and businesses in the valley.

## High Public Sensitivity

Prominent features on the public lands, like Needle Rock and Jumbo Mountain, dominate many views in the valley.  Many of the BLM lands are nearby and highly visible from the North Fork's important travel corridors, town centers, vista points and viewing areas.  The confined and relatively small configuration of the valley makes impacts on the public lands more noticeable.

In discerning public sensitivity of and around visual resources, BLM staff is directed to consider six factors: type of users; amount of use; public interest; adjacent land uses; special areas; and, other factors.[224]  Regarding these factors, the agency's Visual Resource Inventory Manual notes:

- Recreational sightseers may be highly sensitive to any changes in visual quality.
- Areas seen and used by large numbers of people are potentially more sensitive.
- The visual quality of an area may be of concern to local, State, or National groups... Public controversy created in response to proposed activities that would change the landscape character should also be considered.
- The interrelationship with land uses in adjacent lands can effect the visual sensitivity of an area.  For example, an area within the viewshed of a residential area may be very sensitive.
- Management objectives for special areas ... frequently require special consideration for the protection of the visual values.
- Consider any other information ... that includes indicators of visual sensitivity.[225]

Consideration of these six factors points to high levels of sensitivity around visual resources in the North Fork.  Many of the thousands of comments and protests received on the two deferred lease sales in 2012 and 2013—'public controversy created in response to proposed activities'—document (among other things) that these public lands are already heavily utilized and valued for their scenic qualities, for recreation, and their benefit to tourism.  These comments also document that the BLM lands lie

---

[222] *Id* at III-1.
[223] UNCOMPAHGRE FIELD OFFICE *supra* at note 8.
[224] BUREAU OF LAND MANAGEMENT *supra* at note 214.
[225] *Id*.

North Fork Alternative Plan

BLM_0077702

adjacent to towns, farms, businesses, and residences.[226]  In addition the BLM lands encompass and border special areas, like the Needle Rock Outstanding Natural Area, the West Elk and Raggeds Wilderness Areas, Paonia State Park, Crawford State Park, McClusky Public Access State Wildlife Area, and several Colorado National Forest Roadless Areas.[227]

BLM lands also include riparian zones along the North Fork and Smith Fork of the Gunnison Rivers, home to plant species and wildlife that enhance the scenic quality of the area.  Then there are the 'other factors' that impact VRM, like visual scarring resulting from poor reclamation success in an arid valley with a notoriously unstable geology subject to monsoonal downpours.[228]  The farms, businesses and residences surrounded by and intermixed with BLM lands derive real value from the scenic rural atmosphere and visual appeal of the North Fork area.  Thus, there is a high level of sensitivity around maintaining the North Fork's landscape features and scenic qualities which are widely regarded as spectacular.

Oil and gas development, with roads, well pads, pipelines, waste pits, compressor stations, storage and condensate tanks, and sundry industrial facilities, can have a profound impact on landscape features that is not limited to their surface impact only.  Such visual scarring would have a significant impact on the culture and economy of the North Fork.

The proposed **Visual Resource Management** in the North Fork, illustrated in Figure 29, below,[229] would apply a VRM Class II designation to the following lands, with the following management prescriptions: NO LEASING of select prominent landscape features; NSO stipulations within one mile of travel and scenic corridors; and CSU stipulations and other VRM-specific Conditions of Approval for all other lands associated with BLM minerals visible from important vistas and travel corridors.[230]

---

[226] *See*, e.g., Paonia Town Council Letter *supra* at note 88 (previously attached as Exhibit 10); Hotchkiss Town Council Letter *supra* at note 89 (previously attached as Exhibit 11); Crawford Town Council Letter *supra* at note 91 (previously attached as Exhibit 12); West Elks Winery Association Letter *supra* at note 12 (previously attached as Exhibit 3).

[227] *See* Rocky Mountain Region, U.S. Forest Service, U.S. Department of Agriculture, *Colorado Roadless Rule*, available at http://www.fs.usda.gov/detail/r2/home/?cid=stelprdb5200050 (last visited Nov. 29, 2013).

[228] Amateur video captures monsoonal storm water flooding reclaimed coal mining area near Bowie, Colorado July 28, 2013, available at http://instagram.com/p/cU1bIKxUyL/#.

[229] Please note:  Maps are provided to depict how management prescriptions and development setbacks and stipulations protect specific resources.  Maps do not necessarily indicate where all such resources are found, and may not correctly depict all places where such stipulations do or do not apply.

[230] BUREAU OF LAND MANAGEMENT *supra* at note 214, at 5: "VRM Class II: The level of change to the characteristic landscape should be low. Management activities may be seen, but should not attract the attention of the casual observer."

BLM_0077703

*Figure 29 - Proposed Visual Resource Management in the North Fork*



## Management Recommendations & Rationale

Generally, many of the highly-visible BLM public lands in the North Fork should be managed under a VRM Class II designation seeking to: "[r]etain existing character of landscape..."  Lands that include prominent features, that lie within the fore- or middle-ground, or are otherwise highly visible, would require VRM prescriptions that might include No Leasing, NSO, or CSU stipulations.

## No Leasing of Prominent Features

Select prominent landmarks deserve special attention and should be closed to leasing under the revised plan.  These prominent landmarks consist of the face of Jumbo Mountain; 'C' Hill (Youngs Peak); 'H' Hill; the near flanks of the West Elks; and Needle Rock.  There is nearby precedent for closing certain highly scenic and cherished public lands to leasing, in the Gunnison National Forest.  The USFS's 1993 Oil and Gas EIS/Plan Amendment, ROD closes the Kebler Pass road beyond Erickson Springs to oil and gas leasing, and rightfully notes:

The corridor is between the West Elk and Raggeds Wildernesses and has very high scenic and recreational values.  It is also designated a Scenic Byway. **… There is very strong local support to not lease in the Kebler Corridor** (emphasis added).[231]

## No Surface Occupancy along key scenic and travel corridors and around key viewpoints

For lands associated with BLM minerals that lie along scenic travel routes—portions of the West Elk Scenic Byway (Colorado Highways 92 and 133, and Gunnison County Road 12 (i.e. Kebler Pass Rd.)), and 3100, North, Crawford and Back River Roads—No Surface Occupancy stipulations would be required within 1-mile to protect visual resources.

There are widespread examples of NSO stipulations to manage for visual resources along travel corridors.  For instance in the BLM's Glenwood Spring 1999 Oil and Gas RMP Amendment/Supplemental EIS:

> BLM has determined that the associated [Controlled Surface Use] CSU may be inadequate in those situations where special design considerations or even moves of greater than 200 meters may be inadequate to achieve VRM Class II objectives.  [For lands in sensitive places along the I-70 viewshed].[232]

Nearly 30 years ago in Utah, the BLM imposed NSO stipulations to protect the visual resources along travel corridors in the Book Cliffs: "To protect the visual resources, no occupancy or other surface disturbance will be allowed within 2500 feet north of highway 40, east of the Green River."[233]  And the Intermountain Oil and Gas BMP (Best Management Practice) Project includes this example from Wyoming BLM: "Surface disturbance will be prohibited in any of the following areas or conditions… Within important scenic areas (Class I and II Visual Resource Management Areas)."  Protection of the North Fork's visual features by prohibiting any surface activity or occupancy within 1 mile of notable travel corridors is a prudent, reasonable, and standard stipulation for areas with high scenic qualities and public sensitivity.

## CSU and Lease Notices/Conditions of Approval for All Other View-Sensitive Lands

For other lands associated with BLM minerals visible from travel corridors beyond 1 mile, or visible from other important viewpoints (defined as the 12 wineries of the West Elks AVA, and downtown Paonia, Hotchkiss, and Crawford), CSU stipulations and other VRM-specific road, well pad, well or facility design features would apply to protect visual resources.[234]

---

[231] Grand Mesa, Uncompahgre, Gunnison National Forest *supra* at note 195, at 15.

[232] Colorado State Office *supra* at note 213.

[233] Bureau of Land Management, Book Cliffs Resource Management Plan and Record of Decision, 1985, at Figure 2-8.

[234] CSU stipulations allow the agency to move the proposed surface location of an operator's road, pad or facility more than the standard 200 meters, and to impose other VRM-specific surface use requirements regarding well pad construction, road location, natural screening, etc.  Examples of such surface use requirements include camouflaged construction equipment, shielded lighting, walls or hay bales around the well pad, etc.

BLM_0077705



*Figure 30 - While Highway 133 and Kebler Pass Road are often cited as highly scenic portions of the West Elks Scenic Byway, Highway 92 also offers incredibly scenic views. This photo was taken along Highway 92 South of Crawford. Credit: Jim Ramey.*

The primary VRM authority that CSU stipulations give the agency is more control over siting to take advantage of natural screening.  Thus the stipulation should also include—in addition to this siting authority—specific additional notice that updated COAs may also be required.  In one RMP amendment, the BLM framed a CSU stipulation as such:

> The BLM may require special design, construction, operation, mitigation, or reclamation measures, or relocation by more than 200 meters in VRM Class II areas … to retain the existing landscape character and allow only limited changes.[235]

Some examples of specific COAs that might be applied at a later time include: below-grade wellheads; concentration of facilities; mitigations to reduce light pollution; and use of 'low-contrast' (usually native) material for roads, pads, etc.[236]

---

[235] Intermountain Oil and Gas BMP Project, *BMP ID 3228*, GS-CSU-ROAN-14 SSR/CSU VRM Class II, ROD for the Approval of Portions of the Roan Plateau RMP Amendment/EIS, available at http://www.oilandgasbmps.org/view.php?id=3228 (last visited Nov. 29, 2013).

[236] Intermountain Oil and Gas BMP Project, *BMP Search*, available at http://www.oilandgasbmps.org/bmpsearch.php?mode=1&kw=vrm&cat=0&loc=0 (last visited Nov. 29, 2013). A search for the term "VRM" reveals 64 records.

North Fork Alternative Plan

BLM_0077706

## General Concerns & Management Recommendations

Aside from the many resource issues addressed in discussion of proposed management above, other general concerns around oil and gas development on public lands are at the forefront of community members' minds.  Primary among these concerns are impacts to air quality, traffic, and the overall degradation of rural character of the North Fork. In addition to a discussion of these concerns, and applicable mitigation measures and protective management, we also discuss recommended best management practices that should be required for any oil and gas development in the area.

> "Gerald Nelson, who studies global climate change and food security, is currently stationed in Grand Junction and investigating the long-term impact of ozone on the area's wine and fruit production.
>
> 'In the Grand Valley, with ozone levels between 40 and 70 [parts per billion], you get a yield reduction of 5 percent to 20 percent,' Nelson said. 'A 20 percent yield reduction is going to hurt that bottom line.'
>
> Nelson added that for produce like grapes, cherries and peaches, which ripen yearly on the same plant as opposed to crops planted anew every year like corn or wheat, the effects of ozone are long term, impacting quality and quantity of produce for years to come."
>
> Source: Tessa Cheek, *Colorado farmers join fight for tougher air quality rules*, COLORADO INDEPENDENT, Nov. 1, 2013, available at http://www.coloradoindependent.com/144709/colorado-farmers-join-fight-for-tougher-air-quality-rules.

### Air Quality

Fortunately, because of its rural and un-industrialized nature, the North Fork area enjoys relatively clean air unlike other areas in Colorado that have suffered ozone non-attainment.[237]  Over the course of 2013, air "…monitoring stations in Fort Collins, Greeley, Boulder, Golden, and even Rocky Mountain National Park…" violated federal ozone standards.[238]  Air quality is incredibly important for the North Fork's agricultural sector, as clean air is necessary for production of the area's prized produce.  Clean air is so vitally important that both local conservation organizations, Citizens for a Healthy Community and the Western Slope Conservation Center, have undertaken baseline air sampling projects to test for chemicals in the air sourced from, and related to, drilling and fracking.[239]

Pollution from oil and gas operations releases Volatile Organic Compounds (VOCs), which are precursors to ozone pollution.[240]  "These compounds do contribute to ozone production, which has a lot of well-established negative health effects on people.  Ozone causes increased death rates,' according to Detlev

---

[237] Bob Brewyn, *Colorado unlikely to hit ozone standard due to oil and gas drilling*, COLORADO INDEPENDENT, Oct. 17, 2013, available at http://www.coloradoindependent.com/144473/colorado-unlikely-to-hit-ozone-standard-due-to-oil-and-gas-drilling (last visited Nov. 29, 2013).

[238] *Id.*

[239] Dennis Webb, *Project aims to assess effects of pollution*, GRAND JUNCTION DAILY SENTINEL, Oct. 27, 2013, available at http://www.gjsentinel.com/news/articles/project-aims-to-assess-effects-of-pollution (last visited Nov. 29, 2013).

[240] Tessa Cheek, *Colorado farmers join fight for tougher air quality rules*, COLORADO INDEPENDENT, Nov. 1, 2013, available at http://www.coloradoindependent.com/144709/colorado-farmers-join-fight-for-tougher-air-quality-rules (last visited Nov. 29, 2013).

BLM_0077707

Helmig, a chemist at the Institute of Alpine and Arctic Research at the University of Colorado."[241]
In addition, according to Helmig, "high ozone levels similarly stress vegetation, which is why Colorado
farmers on both sides of the Continental Divide are seeing reduced yields and profits."[242]  An estimate of
the lost revenue statewide from just one crop, winter wheat, due to increased ozone levels, may have
cost Colorado farmers $24 million.[243]  With the North Fork's historic agricultural economy, along with
the growing agritourism economy, clean air is an absolute necessity.

Numerous organizations have submitted extensive comments about concerns about impacts to air
quality, among other resource concerns, from oil and gas development in the North Fork.  For more
information about air quality concerns, see the following comment letters, hereby incorporated by
reference into the NFAP:

- Comments submitted on Aug. 13, 2013 to the BLM on the proposed Whitewater Master
  Development Plan by the Western Environmental Law Center, on behalf of Citizens for a
  Healthy Community.[244]
- Comments submitted on April 23, 2012 to the BLM on the proposed Bull Mountain Unit Master
  Development Plan by the Western Environmental Law Center, on behalf of Citizens for a
  Healthy Community.[245]
- Scoping comments submitted on Feb. 8, 2012 to the BLM on the proposed Aug. 2012 lease sale
  by the Western Environmental Law Center, on behalf of Citizens for a Healthy Community.[246]
- Comments submitted on April 19, 2012 to the BLM on the proposed Aug. 2012 lease sale, draft
  EA and Finding of No Significant Impact (FONSI), by the Western Environmental Law Center, on
  behalf of Citizens for a Healthy Community.[247]
- Protest submitted on Dec. 14, 2012 to the BLM on the proposed Feb. 2013 lease sale by the
  Western Environmental Law Center, on behalf of Citizens for a Healthy Community.[248]
- Scoping comments submitted on Feb. 7, 2012 to the BLM on the proposed Aug. 2012 lease sale
  by The Endocrine Disruption Exchange.[249]

---

[241] *Id.*
[242] *Id.*
[243] Michael Bowman, *Why Colorado Agriculture Should Care About Fuguitive Natural Gas Emissions*, COLORADO POLS, Sept. 27,
2013, available at http://coloradopols.com/diary/50007/why-colorado-agriculture-should-care-about-fugitive-emissions (last
visited Nov. 15, 2013.
[244] Available at http://www.citizensforahealthycommunity.org/wp-content/uploads/2013/08/Whitewater_Draft-EA-
Comments-FINAL.pdf (last visited Nov. 27, 2013).
[245] Available at http://citizensforahealthycommunity.org/wp-content/uploads/2012/05/Comments_Draft-EA-Bull-
Mtn_FINAL.pdf (last visited Nov. 27, 2013).
[246] Available at http://citizensforahealthycommunity.org/wp-content/uploads/2010/12/CHC_Comments-on-August-2012-lease-
sale-FINAL-21.pdf (last visited Nov. 27, 2013).
[247] Available at http://citizensforahealthycommunity.org/wp-content/uploads/2012/04/Comments_Draft-EA-
Aug2012_Final.pdf (last visited Nov. 27, 2013).
[248] Available at http://www.citizensforahealthycommunity.org/wp-content/uploads/2012/12/Feb.-2013-Lease-Sale-Protest-
FINAL.pdf (last visited Nov. 27, 2013).
[249] Attached as Exhibit 35.

BLM_0077708

- Comments submitted to the BLM on the proposed Whitewater Master Development Plan by Western Colorado Congress and the Western Slope Conservation Center.[250]
- Comments submitted on April 19, 2012 to the BLM on the proposed Aug. 2012 lease sale, draft EA and FONSI, by High Country Citizens' Alliance, et. al.[251]

### Traffic

Another significant, related concern to oil and gas development on public lands is traffic. Exhaust from diesel trucks and increased dust create economic, health, and safety concerns. And the constant barrage of truck traffic that would accompany oil and gas drilling and fracking would degrade the rural nature of the community.

"Specifically as a vineyard and winery, we have concerns about traffic and dust," Brent Helleckson, member of the North Fork Alternative Stakeholder group and owner of Stone Cottage Cellars, told *Colorado Public Radio*.[252] "In the process of growing grapes, the grapes are susceptible to dust. There's a dust mite actually that takes up residence on the vines and leaves when there are dusty conditions, and that dust mite can actually taint the flavor of the wine."[253]

---

### Drilling & Fracking Truck Traffic:

"It's the Wild West. Everybody is making up their own rules." – Lynne Irwin, director of Cornell University's local roads program.[A]

"When you have a virtual bomb on wheels, you need to be careful. I'm very sensitive to road issues. I've been in a lot of near misses." - Nancy Jacobsen, Garfield County resident.[B]

"When considering safety risks to residents … increased traffic is likely to create negative health impacts. … Because children often walk and ride bicycles and are not as safety conscious, children are considered more vulnerable than most adults to the impacts of traffic. … The traffic will be frequent in some cases … where it is estimated that several hundred trucks [would be] passing a day for several months."[C]

Sources: A) Jim Efstathiou Jr., *Taxpayers Pay as Fracking Trucks Overwhelm Rural Cow Paths*, Bloomberg Businessweek, May 15, 2012, available at http://www.businessweek.com/news/2012-05-15/taxpayers-pay-as-fracking-trucks-overwhelm-rural-cow-paths. B) Donna Gray, *Oil and gas traffic troubles residents*, Glenwood Post Independent, Oct. 25, 2005, available at http://www.postindependent.com/article/20051030/VALLEYNEWS/110300006. C) Lisa McKenzie, et. al., Colorado School of Public Health, *Draft Battelement Mesa Health Impact Assessment*, Sept. 2010, at ES-page VII, available at http://www.healthimpactproject.org/resources/document/Battlement-Mesa-CO.pdf.

---

[250] Available at http://cdn.theconservationcenter.org/wp-content/uploads/2013/04/WCC-WSCC-comments-FRAM-MDP.pdf (last visited Nov. 27, 2013).
[251] Available at http://cdn.theconservationcenter.org/wp-content/uploads/2012/11/NWCC_NF_EA_Comments.pdf (last visited Nov. 27, 2013).
[252] Lesley McClurg, *Fracking and Wine... A Bad Blend?*, Colorado Public Radio, Jun. 5, 2013, available at http://www.cpr.org/article/Fracking_and_Wine_A_Bad_Blend (last visited Nov. 15, 2013).
[253] *Id.*

North Fork Alternative Plan

BLM_0077709

## Traffic from Drilling

 

*Figure 31 - Left, semis hauling water for a fracking operation travel South on Highway 133 near Marble. Right, a Cal Frac truck hauls fracking chemicals along Highway 133 near the Hotchkiss K-8 school.*

The towns and residents of the North Fork also hold concerns about traffic related to development. Highway 92 passes through downtown Hotchkiss and Crawford, and Highway 133 passes through Hotchkiss and nearby Paonia.  Both highways would be utilized for development on area public lands, should development occur.  In addition, access to public lands nearby the three towns would require use of local roads not designed "to handle the 80,000-pound (36,300 kilogram) trucks that serve well sites."[254]

In heavily drilled areas across the country, repairs to fix the resulting road damage can cost into the tens of millions.[255]  In the most extreme example of damage to main thoroughfares, a portion of U.S. Highway 2 near Williston, ND that was built in 2004 had already reached its 20-year traffic projection by 2012, which necessitated re-construction.[256]  The Sheriff of Marshall County, WV, has said that drivers hired by the drilling industry were "'...disrespectful' of local residents..." and that his "...office lacks the authority or manpower to police the industry."[257] At an April 2012 hearing, the Sheriff testified:

> "Our roads are destroyed from these overloaded vehicles, and our state is a willing participant in this destruction. ... The drivers are not familiar with our winding narrow roads.  Many of our residents are run off the road by the large trucks."[258]

---

[254] Jim Efstathiou Jr., *Taxpayers Pay as Fracking Trucks Overwhelm Rural Cow Paths*, Bloomberg Businessweek, May 15, 2012, available at http://www.businessweek.com/news/2012-05-15/taxpayers-pay-as-fracking-trucks-overwhelm-rural-cow-paths (last visited Nov. 30, 2013).
[255] *Id.*
[256] *Id.*
[257] *Id.*
[258] *Id.*

BLM_0077710

Marshall County, WV, with a 2010 population of 32,674, is a comparable rural county similar to Delta County, CO.[259]  Such road damage impacts would be suffered by local governments and residents as the result of any permitted industrial oil and gas development on public lands.

In addition, public safety concerns arise along with the increased amount of heavy truck traffic.  In March 2013, a jury in Santa Fe, NM awarded $58.5 million in damages to the family of a deceased victim of a fracking related truck accident after the fracking truck driver "…was hauling produced water from oil wells…" when he "…cut right out in front of [the victim]."[260]  The jury released a statement after the verdict, stating that: "Our hope is that our judgment will clearly communicate that we expect a much higher standard of safety and training in the trucking industry."[261]  The attorney for the victim added that the jury "…sent a clear message to the trucking industry, and the oil and gas industry in particular, that those companies who choose not to follow safety rules, and who place profits over human life, will be held accountable for the harm that they cause."[262]

It can take up to 1,365 truck trips[263] to deliver about a million pounds of sand per well,[264] the approximately three to five million gallons of water needed for fracking,[265] along with the other chemicals and equipment needed.  A recent statistical analysis that compared heavily fracked, rural counties in Pennsylvania to counties without active fracking, found a significant increase in heavy truck traffic accidents.[266]  That study found that heavily fracked counties experienced an average annual increase in heavy truck crashes of 8.8%, compared to a decrease of 3.1% in unfracked counties.[267]

Since the amount of traffic and related problems that come along with drilling is so significant, the BLM should take great care to consider the impacts of traffic on communities, residents, agriculture, and other business when considering management for the North Fork in the forthcoming RMP.  Specifically, the BLM should consult with the towns of the North Fork and Delta County when considering approval of drilling with access that would impact residents of the towns or county.

## Degradation of Rural Character
The North Fork today offers "…a very bucolic, pastoral sort of setting."[268]  Brent Helleckson, one of the North Fork Alternative Plan stakeholders, notes the dark night skies peppered with stars, and that often

---

[259] U.S. CENSUS BUREAU, STATE & COUNTY QUICKFACTS – MARSHALL COUNTY, WEST VIRGINIA, http://quickfacts.census.gov/qfd/states/54/54051.html (last visited Nov. 15, 2013).
[260] Tom Sharpe, *$58M verdict in death suit could be New Mexico record*, SANTA FE NEW MEXICAN, Mar. 21, 2013, available at http://www.santafenewmexican.com/news/local_news/article_ae2d5ecd-688c-5441-b5d8-3319f5d30c30.html (last visited Nov. 15, 2013).
[261] *Id.*
[262] *Id.*
[263] U.S. GOVERNMENT ACCOUNTABILITY OFFICE. GAO-12-732, INFORMATION ON SHALE RESOURCES, DEVELOPMENT, AND ENVIRONMENTAL AND PUBLIC HEALTH RISKS, at 33 (Sept. 2012), available at http://www.gao.gov/products/GAO-12-732 (last visited Nov. 15, 2013).
[264] Dennis Webb, *The silica solution*, GRAND JUNCTION DAILY SENTINEL, June 22, 2013, available at http://www.gjsentinel.com/news/articles/the-silica-8232solution (last visited Nov. 15, 2013).
[265] U.S. GOVERNMENT ACCOUNTABILITY OFFICE *supra* at note 263, at 37.
[266] Food & Water Watch, *The Social Costs of Fracking: A Pennsylvania Case Study* (Sept. 2013), available at http://documents.foodandwaterwatch.org/doc/Social_Costs_of_Fracking.pdf (last visited Nov. 18, 2013).
[267] *Id.*
[268] McClurg *supra* at note 252.

BLM_0077711

the loudest noise he hears in the morning is a hummingbird.[269]  The rural character of the area, and the quality of life that comes along with, is something that needs to be preserved.  Oil and gas development in the North Fork has tremendous potential to disturb the rural character of the valley.

## Degradation of Rural Character





*Figure 32 - Top, the mixing of water with fracking fluids on a well pad. Bottom, scarred landscape in the Four Corners region of New Mexico. Credit: Joshua Doubek, Wikimedia Commons; Ecoflight.*

In heavily developed areas of Colorado, and other parts of the country, gas and oil development have scarred the land and industrialized neighborhoods.  Well pads are cleared with bulldozers, heavy trucks bring in equipment, and an industrial process commences, continuing 24-7 until drilling and fracking are complete.  On Colorado's Front Range, Congressman Jared Polis recently described how a fracking operation began on a neighbor's property, leaving his residence "...nearly rendered uninhabitable due to issues such as the noise, dust and traffic associated with the drilling work."[270]  "The congressman said the entire experience 'is just an example of how little rights that homeowners have; how, without recourse, families can be driven from their homes for weeks or even months, and we really need to change the laws in Colorado.'"[271]  In the North Fork, protecting the rural character of the community is incredibly important because of the impact degradation of that character would have on area businesses that are part of, and are dependent upon, the rapidly growing agritourism industry.  For instance, Stone Cottage Cellars' owner Brent Helleckson has noted that the West Elks Wineries contribute $1.5 million to $2 million in direct sales annually, and probably five to seven times that in indirect sales (restaurants, retail, lodging, etc.).[272]

---

[269] *Id.*

[270] Charlie Brennan, *Jared Polis: Fracking Complaint 'An Example Of How Little Rights That Homeowners Have'*, THE HUFFINGTON POST, Aug. 30, 2013, available at http://www.huffingtonpost.com/2013/08/31/jared-polis-fracking-complaint-sundance_n_3842411.html (last visited Nov. 18, 2013).

[271] *Id.*

[272] McClurg *supra* at note 252.

North Fork Alternative Plan

BLM_0077712

### Socio-Economics & Property Values

The socio-economic characteristics of the North Fork sets it apart from many other communities.  Many people choose to live here, and increasingly many move here from elsewhere, because of the exceptional quality of life offered due to the many resources discussed in the North Fork Alternative Plan.  Summarizing those resources, the North Fork Heart & Soul Project has worked to examine:

> What makes the North Fork Valley and its three towns, Crawford, Hotchkiss and Paonia, unique?  What are some common values that people in our valley share?  How do we work together toward creating a common vision for the future? [273]

During a survey conducted in 2013, in an attempt to address some of these questions, the two top theme statements that local residents agreed with were "We value our abundant natural resources that provide opportunity for work, play and connection to this place" and "We value access to North Fork food and water."[274] These two most popular themes "…cover a very broad range of the local status quo including: support for coal mining, local farms, wineries and ranches, maintaining views, outdoor recreation opportunities and a general lack of pollution and the presence of clean air and water."[275]  Shown in Figure 33 at right, the group created a customized Venn diagram to highlight the initial assessment of what a diverse and vibrant economy in the North Fork looks like.

*Figure 33 - The North Fork Economy.*
*Source: North Fork Heart & Soul Project.*



Given the myriad resources discussed at length in the management sections above, it is not surprising that the most valued resources include natural resources, local food, and clean air and water.  These resources contribute to the great quality of life that residents of the North Fork enjoy.  Such a quality of life is partially responsible for the demographic and economic breakdown of the North Fork.

The North Fork Valley has an older population than the average for Colorado, because people choose to retire here.  According to the U.S. Census Bureau, American Community Survey, older residents in the

---

[273] North Fork Heart & Soul Project, Home, http://www.northforkheartsoul.com/ (last visited Nov. 29, 2013).
[274] Thomas Wills, *Community Values Rural Natural Environment, Resources and Local Food and Water Above All*, Merchant Herald, Aug. 21, 2013, available at http://www.merchantherald.com/community-values-rural-natural-environment-resources-and-local-food-and-water-above-all/ (last visited Nov. 15, 2013).
[275] *Id.*

BLM_0077713

North Fork zip codes (81415 – Crawford, 81419 – Hotchkiss, and 81428 – Paonia) make up a larger share of the community here than on average in Colorado.[276]  Residents between the ages of 60 to 84 are more frequent in the North Fork zip codes than Colorado on average, shown in Figure 34 below.

*Figure 34 - American Community Survey Age Breakdown of the North Fork Zip Codes Compared to Colorado. Source: U.S. Census Bureau.*



Similar to the importance of the older population to Delta County, the state of Colorado has noted the aging trend in Colorado.  "The older population in Colorado is an important and growing segment of its population."[277]  Between 2000 and 2010, the 65 years and older population in Colorado grew by 32%, outpacing population growth statewide, which grew at 17%.[278]  Colorado's growth of the 65 and older population was the fourth fastest in the U.S.[279]  It is interesting to note that Delta County has a higher median age than the Colorado average.  The Delta County median age is 47.2, 11 years older than the state average of 36.2.[280]

Along with this older than average population in Delta County comes a larger importance for non-labor income.  Best illustrated by Headwaters Economics, non-labor income is incredibly important in Delta County.  In Delta County, non-labor income ($434 million) was the largest income category in 2011, followed by the labor income categories of services ($193 million), non-services ($148 million), and government ($127 million).[281]  In comparison, in the state of Colorado services ($117.7 billion) is the top

---

[276] U.S. CENSUS BUREAU, TABLE DP05: ACS DEMOGRAPHIC AND HOUSING ESTIMATES, 2007-2011 AMERICAN COMMUNITY SURVEY 5-YEAR ESTIMATES, data obtained from http://www.census.gov/acs/www/ (last visited Nov. 23, 2013).
[277] STATE DEMOGRAPHY OFFICE, DEPARTMENT OF LOCAL AFFAIRS, STATE OF COLORADO, AGING IN COLORADO (July 2012), available at http://www.colorado.gov/cs/Satellite?c=Document_C&childpagename=DOLA-Main%2FDocument_C%2FCBONAddLinkView&cid=1251627655008&pagename=CBONWrapper (last visited Nov. 23, 2013).
[278] *Id.*
[279] *Id.*
[280] U.S. CENSUS BUREAU, TABLE DP05: ACS DEMOGRAPHIC AND HOUSING ESTIMATES, 2009-2012 AMERICAN COMMUNITY SURVEY 3-YEAR ESTIMATES, attached as Exhibit 36.
[281] Headwaters Economics, *West-Wide Economic Atlas* (2013), available at http://headwaterseconomics.org/interactive/west-wide-atlas (last visited Nov. 23, 2013). Note:  "Non-labor income is primarily from investments and retirement. Services include health care, architecture, engineering, retail trade, food services, education, and others. Non-services include agriculture, forestry, manufacturing, mining (incl. oil and gas), and construction."

BLM_0077714

personal income generator, followed by non-labor income ($68.7 billion), government ($31.3 billion), and non-services ($28.1 billion). These stark differences are show below in Figure 35.

*Figure 35 - Personal Income Growth, 1970 to 2011. Source: Headwaters Economics.*



The retirement population, along with other characteristics of the Delta County economy such as tourism, healthy lifestyles, and recreation, were highlighted in 2011 as part of Governor Hickenlooper's "Bottom-Up" Economic Development Initiative.[282]  This plan was developed "...based on current input from local citizens, businesses and other interested stakeholders."[283]  The top five goals for economic development in Delta County were:

1.  Retain and support all local sustainable businesses/industries including agriculture.
2.  Retain and create jobs that add value for Delta County.
3.  **Gain Statewide, Regional, & National recognition emphasizing healthy lifestyle, tourism, retirement, and recreation** (emphasis added).
4.  Improve and increase infrastructure capabilities that promote a business friendly environment.

---

[282] Colorado Office of Economic Development and International Trade, 'Bottom-Up' 2011 County Economic Development Summary – Top Five Economic Development Goals & Strategies For Delta County, Colorado, attached as Exhibit 37.
[283] *Id.*

BLM_0077715

5.   Improve and beautify towns and highways including main street revitalization.[284]

These five goals were signed-off on by a wide variety of diverse stakeholders, including:  Bruce Hovde, Delta County Commissioner; Kristin Amundson, Delta County Economic Development, Inc.; Elaine Brett, Business Consultant, Western CO Food & Ag Council; Kathy Welt, Mountain Coal Company, Arch Coal; Charlie Richmond, Forest Supervisor, GMUG; and Kelli Hepler, Delta County Tourism Coordinator.[285]  The forecast for labor force demand for Delta County reflects those economic development priorities.  That forecast reveals that the strongest growth areas through 2040 are forecasted to be in non-basic resident services, regional and national services, retiree generated jobs, and investment income and wealth.[286]  Figure 36 below shows forecasted labor force demand for Delta County through 2040.

*Figure 36 - Delta County Labor Force Demand Forecast. Source: Colorado State Demography Office.*



Current jobs in Delta County also reveal the importance of retirees, non-labor income, retail, government, and health jobs.  A close look at the 2012 labor force reveals that the most important job sectors in Delta County are Government (19.6% of jobs), Retail Trade (11.5%), Health Services (11.6%), and Agriculture (9.8%).[287]  In particular, the retail and agricultural jobs could be negatively impacted by oil and gas development.  Figure 37 below shows the percent of estimated jobs by sector in 2012 for Colorado and Delta County.

---

[284] *Id.*

[285] *Id.*

[286] STATE DEMOGRAPHY OFFICE, DEPARTMENT OF LOCAL AFFAIRS, STATE OF COLORADO, ECONOMIC FORECASTS – FORECASTING WORKSHEETS (Oct. 19, 2013), available at http://www.colorado.gov/cs/Satellite?c=Document_C&childpagename=DOLA-Main%2FDocument_C%2FCBONAddLinkView&cid=1251610045838&pagename=CBONWrapper (last visited Nov. 24, 2013). Attached as Exhibit 38.

[287] STATE DEMOGRAPHY OFFICE, COLORADO JOBS BY SECTOR – NAICS BASED (2001) TO CURRENT PARAMETERS, reports available at https://dola.colorado.gov/demog_webapps/jsParameters.jsf?sic=F (last visited Nov. 24, 2013), attached as Exhibit 39.

BLM_0077716

*Figure 37 - 2012 Delta County vs. Colorado Employment by Sector.*
*Data Source: Colorado State Demography Office.*



Along with the "quality of life" socio-economic indicator, property values in the area are directly impacted by the resources that contribute to quality of life here.  Property values, and the broader real estate market, stand to be negatively impacted should oil and gas drilling occur, or even if the perception exists that development will occur in the near future.

When the BLM proposed leasing 30,000 acres in the North Fork in December 2011, the Realtors in the area immediately felt the negative impact.  It was not the act of drilling or fracking itself, not the act of an Application for Permit to Drill submission to the BLM, but **it was the BLM's announcing of proposed oil and gas leases that had a real, negative economic impact on the North Fork**.[288]  Here in the North Fork, the mere threat that development will happen close to communities, in the scenic viewshed of the area, and nearby agricultural lands and water supplies, is enough to have a negative socio-economic impact.  This is one of many reasons why the North Fork Alternative Plan seeks strong protections for the important resources that make the North Fork unique.

---

[288] Letter from Bob Lario, President, RE/MAX Mountain West to Uncompahgre Field Office (Jan. 3, 2012), attached as Exhibit 40.

BLM_0077717

To be sure, the actual impacts of drilling and fracking are also detrimental to property values and other quality of life indicators.[289]  A recent study found that concerns about water quality nearby drilling and fracking reduced property values by up to 26 percent in Pennsylvania.[290]  Here in Colorado, in La Plata County, the County studied impacts of drilling on the community and found that "...properties with a CBM [coal bed methane] well located on them (12 of 754 properties studied) have had a net reduction in sales value of 22 percent."[291]  In the most drastic cases of industrialization and pollution from the oil and gas industry, like that of Louis Meeks in Pavillion, WY, property values can plummet.  About two years after his home and property were appraised at $239,000, and after significant industrial drilling and fracking activity close by, Meeks received a letter from a local realtor "...saying his place was essentially worthless and she could not list his property."[292]  The realtor wrote him: "'Since the problem was well documented ... and since no generally-accepted reason for the blowout has been agreed upon ... buyers may feel reluctant to purchase a property with this stigma.'"[293]



*Figure 38 - Aside from direct impacts of a heavy industrial activity nearby communities, the perception that oil and gas development will come to the community has a harmful impact on property values and the real estate market. Credit: a resident of Mansfield, TX.*

The BLM should consider the negative impacts associated with oil and gas development in the North Fork, such as negative impacts to the travel, tourism, and agricultural industries, and how the negative impacts to those resources will compound negative impacts to property values and the socio-economics of the area.  Specifically, the BLM should analyze those negative costs highlighted by The Wilderness Society in its 2006 brief on economic and social impacts of oil and gas development.[294]  The North Fork Alternative Plan seeks to establish a comprehensive management strategy for oil and gas development that would protect the important socio-economic indicators, and property values, in the North Fork.

---

[289] Resource Media, *Fracking the American Dream: Drilling Decreases Property Value*, Ecowatch, Nov. 13, 2013, available at http://ecowatch.com/2013/11/13/fracking-american-dream-drilling-decreases-property-value/ (last visited Nov. 18, 2013).

[290] Lucija Muehlenbachs, et. al., *Discussion Paper: Shale Gas Development and the Costs of Groundwater Contamination Risk*, Resources for the Future, July 2012; revised March 2013, available at http://www.rff.org/RFF/Documents/RFF-DP-12-40-REV.pdf (last visited Nov. 20, 2013).

[291] La Plata County, *Final La Plata County Impact Report*, at E-2 (Oct. 2002), available at http://www.co.laplata.co.us/sites/default/files/departments/planning/documents/final_ir1.pdf (last visited Nov. 23, 2013).

[292] Abraham Lustgarten, *Hydrofracked? One Man's Mystery Leads to a Backlash Against Natural Gas Drilling*, ProPublica. Feb. 25, 2011, available at http://www.propublica.org/article/hydrofracked-one-mans-mystery-leads-to-a-backlash-against-natural-gas-drill/single (last visited Nov. 23, 2013).

[293] *Id.*

[294] *See* The Wilderness Society, *The Economic & Social Impacts of Oil and Gas Development*, Table 1 at 8-10 (June 2006), available at http://wilderness.org/sites/default/files/Cost%20to%20Communities%20from%20Oil%20and%20Gas%20Development%20.pdf (last visited Nov. 18, 2013).

BLM_0077718

### Recommended Best Management Practices

In addition to the proposed management zones and additional designations discussed above, the BLM UFO should require all known and available BMPs to protect myriad resources in the community. BMPs are mitigation measures applied to areas being developed for oil and gas to promote energy development in an environmentally sensitive manner. Such measures are both reasonable and immediately deployable and should be included in the RMP in order to be mandated, via stipulation, at the lease stage. No waiver, variance, or exception should be granted to these BMPs.

The Intermountain Oil and Gas BMP Project, which is maintained by the Natural Resources Law Center at the University of Colorado Law School, provides supplemental information, including construction specifications, illustrations, pictures, maps, monitoring reports, and evaluations of the potential of the practice for mitigating impacts of development.[295] Among other resources, the Intermountain Oil and Gas BMP Project maintains a database of available BMPs that address a variety of resources and issues, including:

- Air Quality and Emissions
- Aquatic and Riparian Values
- Community
- Cultural/Historic
- Grazing and Agriculture
- Human Health and Safety
- Land Surface Disturbance
- Noise
- Other
- Soils (Conservation, Pollution, Reclamation)
- Vegetation
- Visual Aesthetics
- Water Quality and Pollution
- Water Quantity and Rights
- Wildlife

Each individual resource category listed above contains hundreds of BMPs aimed at developing oil and gas reserves in a manner that protects the many human and environmental resources at stake. The BLM should evaluate these BMPs thoroughly and include protective BMPs as available lease stipulations in the final RMP. Moreover, the BLM should further consider as lease stipulations the ten technical proven and commercially available methane emissions reduction technologies identified in the "Harvey Report" at 18, Table 4, which together can capture more than 80 percent of the methane currently going to waste.[296] Such management is both prudent and necessary to protect the air quality in the North Fork.

---

[295] *See* Intermountain Oil and Gas BMP Project, available at: http://www.oilandgasbmps.org/ (last visited Nov. 15, 2013).
[296] Susan Harvey, et. al., *Leaking Profits: The U.S. Oil and Gas Industry Can Reduce Pollution, Conserve Resources, and Make Money by Preventing Methane Waste*, NATURAL RESOURCES DEFENSE COUNCIL (March 2012), available at http://www.nrdc.org/energy/files/Leaking-Profits-Report.pdf (last visited Nov. 30, 2013).

BLM_0077719

## Conclusion

The North Fork Alternative Plan was developed with the input of a set of community stakeholders representing agriculture, tourism, real estate, businesses, and conservation organizations; and the NFAP has considerable, widespread community support.  As a proactive response to the previously proposed oil and gas lease sale in the North Fork, the NFAP is crafted to provide thorough, protective management for the many resources and uses of the public lands here.  The NFAP protects these resources by closing certain areas of public lands and minerals to oil and gas leasing, and imposing development setbacks with strict surface restrictions in places where leasing might be allowed to occur. Figure 39 below illustrates the cumulative effect of the NFAP's management zones, VRM designations, and the Jumbo Mountain SRMA.

*Figure 39 - NFAP Cumulative Effect of All Proposed Management*



The NFAP's mix of closing areas to leasing, and applying NSO, CSU, and TL stipulations to other lands, offers prudent and responsible management that would protect important resources here.  Through the designation of six management zones and the Jumbo Mountain SRMA, along with enhanced VRM, the BLM can better protect the myriad, important resources here from the risks associated with oil and gas development.  It is important to note that even if the BLM does adopt the proposed management of the NFAP, the existing leases in the area would still permit oil and gas development of those already leased

BLM_0077720

minerals. In other words, the oil and gas leases (shown in Figure 3 on page 12) would still permit development to occur even if the BLM adopts the NFAP in the final version of the RMP.

The NFAP management area includes only BLM-administered surface lands and publicly-owned fluid minerals in the North Fork and Smith Fork of the Gunnison watersheds that lie within the Uncompahgre Field Office. The NFAP would not impact U.S. Forest Service lands, private lands, or private mineral rights. The NFAP management area comprises less than 7% of the BLM-UFO lands and about 5% of public minerals in the UFO.

Not taking into account existing leases, the cumulative effect of the NFAP would impact the affected BLM lands and minerals in the NFAP management area as such: about 77% would be closed to leasing, about 17% would be available to leasing with mandatory NSO stipulations, about 4% would be available to leasing with CSU stipulations, and less than 2% would not be subject to NO LEASING, NSO, or CSU stipulations. The NFAP would only close to leasing about 4% of the entire mineral estate managed by the UFO, which is less than 1% (only 0.39%) of the BLM-managed mineral estate in Colorado. These figures are shown in Table 1 below.

| Table 1. Cumulative Effect of NFAP Management by Stipulations | | | | |
|---|---|---|---|---|
| | Acres | Percent of NFAP Management Area | Percent of UFO Minerals | Percent of BLM Minerals in Colorado |
| **NO LEASE** | 105,502 | 76.7% | 4.3% | 0.39% |
| **NSO** | 24,053 | 17.5% | 1.0% | 0.09% |
| **CSU** | 5,689 | 4.1% | 0.2% | 0.02% |
| **None of the above** | 2,368 | 1.7% | 0.1% | 0.01% |

It is within the BLM's authority to include the NFAP in the final UFO RMP, since the NFAP comprises a reasonable, prudent, and narrowly crafted alternative. We are hopeful that the agency will adopt the recommendations included herein as part of the final RMP for the UFO in order to provide protection of the North Fork's many resources from the risks of oil and gas development.

BLM_0077721



**COLORADO**
Gov. John Hickenlooper

July 17, 2018

Gregory Shoop, Acting Colorado State Director
U.S. Bureau of Land Management
2850 Youngfield Street
Lakewood, Colorado 80205

*Sent via email to gshoop@blm.gov and submitted through the ePlanning portal*

RE: State of Colorado's Scoping Comments to the Bureau of Land Management's (BLM) December 2018
Oil and Gas Lease Sale

Dear Mr. Shoop:

Thank you for the opportunity to provide scoping comments to the BLM for the December 2018 lease
sale. With the release of BLM IM 2018-034, I understand it is no longer a policy of the BLM to require
public comment during the lease sale process. I applaud you for using your discretion to allow the State
and the public the opportunity to provide scoping comments, as well as a public comment opportunity
on the Environmental Assessment later this summer.

While I believe you and your staff are doing the best you can to work with the State, the new IM has
created significant barriers for us to efficiently review the parcels under consideration for sale.
Colorado Department of Natural Resources Executive Director Bob Randall wrote to you in April to
express concerns about IM 2018-034.  I reaffirm those concerns now as we see the impacts of the IM
first-hand during this sale.  With 227 parcels representing 236,010 acres spread across the state, I must
stress to you the great burden this expanded sale and condensed review schedule puts on State staff
to adequately review parcels.

Colorado Parks and Wildlife (CPW) routinely reviews BLM parcels proposed for sale and recommends
opportunities to avoid or minimize impacts to wildlife.  Detailed comments from CPW are included in
Attachments 1 and 2. In addition, below we highlight several issues of particular interest to the State.
We encourage BLM staff to respond to these concerns in your Environmental Assessment (EA).

**Greater Sage-Grouse**

This lease sale currently includes 143 parcels totaling approximately 108,600 acres in priority and
general habitat for Greater Sage-grouse (GRSG).  That equates to 62% of total parcels and 46% of total
acreage in the sale. In May 2018, the BLM published the Northwest Colorado Greater Sage-Grouse Draft
Resource Management Plan Amendment (Draft RMPA) and Environmental Impact Statement.  The State
supports a targeted plan amendment that maintains a commitment to the overall conservation goals
for GRSG and remedies lingering concerns from the 2015 Northwest Colorado Greater Sage-Grouse
Approved Resource Management Plan Amendment (ARMPA).  A significant effort is currently underway
by the BLM, the State, local governments, and interested parties to achieve this goal in a new RMPA.
Given the amount of GRSG habitat potentially impacted by this sale, and the plan amendment process
currently underway, we request that any parcels in GRSG habitat be removed from this sale until the
RMPA is finalized.

136 State Capitol, Denver, CO 80203 | P 303.866.2471 | F 303.866.2003 | www.colorado.gov/governor

While IM 2018-034 states that the BLM will not routinely defer leasing when waiting for a plan amendment or revision to be signed, it does not remove your discretion to recommend deferral to the Washington Office. If you are unable to remove these parcels from the sale, despite our strong recommendation, then we request the following changes, at a minimum:

1.  The 2015 ARMPA stipulates that no new leasing will occur within 1 mile of a GRSG lek.  Staff at CPW have identified 19 parcels in the sale that fall within 1 mile of a lek and have requested those parcels be removed from the sale (see Attachment 1).  We appreciate the verbal commitment we have received from BLM staff to make this change.

2.  CPW staff have informed the BLM's Kremmling Field Office that parcels located in that field office do not have the necessary stipulations to comply with the 2015 ARMPA.  BLM staff have acknowledged this oversight and we appreciate the verbal commitment to include the necessary stipulations.

**Big Game Winter Range and Migration Corridors**

Department of the Interior (DOI) Secretarial Order 3362, *Improving Habitat Quality in Western Big-Game Winter Range and Migration Corridors,* directs DOI bureaus to work with the states "to enhance and improve the quality of big-game winter range and migration corridor habitat on Federal lands . . . ."  We welcome the direction SO 3362 provides to consider how federal land management actions can improve habitat quality for big-game populations and ensure robust big-game populations persist. SO 3362 specifically directs DOI bureaus to apply actions that conserve habitat necessary to sustain local and regional big-game populations by minimizing development that would fragment winter range and primary migration corridors and limiting disturbance of big game on winter range.

There is a growing body of evidence that timing limitation stipulations on oil and gas drilling activities are not adequate to protect big game use of crucial winter habitats and migratory corridors, and that additional limitations on the density of surface facilities may be necessary to maintain big game populations in areas heavily developed for oil and gas.[1,2,3] Impacts to big game use of crucial winter habitats and migration corridors increase dramatically when well pad densities exceed one pad/mile.[2,4,5]  These adverse impacts are a result of reduced habitat effectiveness from increased road densities and well-related traffic. Impacts to big game populations are considered high or extreme when well pad densities and associated roads exceed four pads/mile.[2,6,7]

To respond to the direction provided by SO 3362, we recommend that BLM incorporate a stipulation that limits the density of surface facilities to no greater than one well pad/mile[2] for the specific parcels that contain the highest priority big game winter habitats and migratory corridors (see Attachment 1). This recommendation continues to allow for multi-well pads and efficient development of fluid mineral

[1] Sawyer H., N.M. Korfanta, R.M. Nielsen, K.L. Monteith, and D. Strickland.  2017,  Mule deer and energy development – long term trends of habituation and abundance.  Global Change Biology 2017;1-9

[2] Anderson,C.R., Jr., and C.J. Bishop.  2014.  Migration patterns of adult female mule deer in response to energy development.  Pages 46-50 in R.A. Coon & M.C. Dunfee, editors.  Transactions of the 79th North American Wildlife and Natural Resources Conference.  Wildlife Management Institute, Gardners, PA, USA

[3] Sawyer H., M.J. Kaufman, A.D. Middleton, T.A. Morrison, R.M. Nielsen, and T.B. Wyckoff.  2013.  A framework for understanding semi-permeable barrier effects on migratory ungulates.  Journal of Applied Ecology 2013, 50, 68-78

[4] Wilbert, M., Thomson, J., and N. Culver. 2008.  Analysis of habitat fragmentation from oil and gas development and its impact on wildlife, The Wilderness Society ecology and economic research department, Washington, D.C.  31 pp.

[5] Hebblewhite, M.  2008.  A literature review of the effects of energy development on ungulates: Implications for central and eastern Montana. Report prepared for Montana Fish, Wildlife and Parks, Miles City, MT.  125 pp.

[6] Wyoming Game and Fish Department. 2008.  Recommendations for development of oil and gas resources within crucial and important wildlife habitats.  Internal Document.  Cheyenne, Wyoming.  237 pp.

[7] Lutz, D. W., J. R. Heffelfinger, S. A. Tessmann, R. S. Gamo, and S. Siegel. 2011.  Energy development guidelines for mule deer.  Mule Deer Working Group, Western Association of Fish and Wildlife Agencies, USA.  27 pp.

resources in Colorado using common development practices and currently available drilling technology. If the specific parcels identified in Attachment 1 cannot be limited to one well pad/mile[2] through existing lease stipulations, CPW recommends that BLM defer these parcels from sale until the existing RMPs are updated through plan maintenance to incorporate a stipulation to address well pad density. Staff at CPW are available as needed to assist BLM with efforts to update the existing RMPs to address this issue.

**North Fork Valley Parcels**

Local governments and citizens in the North Fork Valley have been heavily engaged in efforts to grow and diversify its economy. First, the local community has been engaged in the Uncompahgre Field Office (UFO) RMP revision since 2010. The BLM is expected to release a proposed final RMP to the public this fall, with an anticipated Record of Decision in Spring 2019. The Draft UFO RMP, which was open for public comment in 2016, includes Alternative B.1 which is specific to oil and gas leasing in the North Fork Valley. It makes sense to us to defer parcels in the North Fork Valley until the BLM responds to public comments on Alternative B.1, and other alternatives, and publishes a final decision.

Second, the North Fork Coal Mine Methane Working Group was formed in February by local governments, mining companies, electric utilities, and conservation organizations, with assistance from State agencies. The purpose of the group is to support the coal mines and surrounding communities in the North Fork Valley through the development of a comprehensive strategy for education, capture, exploration of mitigation, and economic utilization of coal mine methane.

We ask that the BLM strongly consider the position of the North Fork Valley community and members of the North Fork Coal Mine Methane Working Group as you evaluate public scoping comments and conduct the EA for this lease sale.

Thank you for your consideration of our comments. They have been made to ensure that oil and gas development in Colorado can occur in a manner that avoids or minimizes impacts to our most important natural resources, and takes into account local community interests.

Sincerely,

John W. Hickenlooper
Governor

## ATTACHMENT 1 - CPW WILDLIFE STIPULATION RECOMMENDATIONS FOR BLM DECEMBER 2018 LEASE SALE

| BLM Parcel ID | Total Parcel Acres | Field Office | High Priority Habitat | CPW Recommendation |
|---|---|---|---|---|
| 8280 | 1477 | KFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |
| 8283 | 1585 | KFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |
| 8285 | 539 | KFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |
| 8286 | 204 | KFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |
| 8287 | 409 | KFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |
| 8293 | 599 | KFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |
| 8311 | 1128 | KFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |
| 8315 | 679 | KFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |
| 8331 | 283 | KFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |
| 8248 | 1307 | LSFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |
| 8306 | 1732 | LSFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |
| 8310 | 1549 | LSFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |
| 8340 | 1709 | LSFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |
| 8223 | 880 | LSFO/WRFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |
| 8251 | 1450 | WRFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |
| 8253 | 1290 | WRFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |
| 8254 | 322 | WRFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |
| 8364 | 1791 | WRFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |

| 8365 | 1967 | WRFO | Greater Sage-Grouse PHMA within 1 Mile of Active GrSG Lek | CPW recommends following the Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment which states that "PHMA is closed to fluid mineral leasing within 1 mile of active leks." |
|---|---|---|---|---|
| 8269 | 1650 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8270 | 1886 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8271 | 283 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8279 | 2360 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8280 | 1498 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8281 | 120 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8282 | 41 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8283 | 1625 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8284 | 158 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8285 | 539 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8286 | 204 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8287 | 409 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8288 | 41 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8292 | 41 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8293 | 599 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8294 | 1428 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8299 | 765 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8300 | 1083 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8301 | 1951 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8303 | 2249 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8304 | 636 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8305 | 197 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8311 | 1128 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8312 | 39 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8313 | 899 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8314 | 40 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8315 | 679 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8316 | 565 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8317 | 975 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8318 | 969 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8319 | 952 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8321 | 397 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8322 | 1007 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8330 | 1512 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8331 | 283 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8342 | 40 | KFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8247 | 174 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8248 | 1307 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8249 | 241 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8250 | 160 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8261 | 1705 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |

BLM_0077726

| 8263 | 706 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
|------|------|------|------|------|
| 8264 | 1049 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8265 | 1008 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8266 | 1603 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8267 | 1082 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8268 | 200 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8272 | 40 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8273 | 800 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8274 | 640 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8276 | 277 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8295 | 797 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8296 | 630 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8297 | 602 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8306 | 1732 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8307 | 1766 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8308 | 892 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8309 | 1042 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8310 | 1390 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8323 | 1643 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8324 | 1587 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8325 | 881 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8326 | 1121 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8327 | 1499 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8328 | 320 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8329 | 321 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8332 | 1959 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8333 | 958 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8334 | 1201 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8335 | 360 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8336 | 80 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8337 | 1751 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8338 | 320 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8339 | 1840 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8340 | 1709 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8393 | 444 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8396 | 561 | LSFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8223 | 880 | LSFO, WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8232 | 2208 | LSFO, WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8259 | 1514 | LSFO, WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8262 | 1340 | LSFO, WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8277 | 1081 | LSFO, WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8395 | 1271 | LSFO/WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8224 | 1760 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |

BLM_0077727

| 8225 | 640 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8251 | 1450 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8252 | 401 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8253 | 1290 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8254 | 322 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8256 | 643 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8278 | 920 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8355 | 2542 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8357 | 1880 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8360 | 1154 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8361 | 1197 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8362 | 1604 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8363 | 1630 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8364 | 1791 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8365 | 1967 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8366 | 1298 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8367 | 1502 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8368 | 1948 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8369 | 81 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8370 | 2210 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8371 | 942 | WRFO | Greater Sage-Grouse Priority Habitat - HPH | CPW recommends a NSO stipulation (NSO-46e(l)) and limit disturbance to one facility per 640 acres |
| 8270 | 1886 | KFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8284 | 158 | KFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8289 | 246 | KFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8291 | 726 | KFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8303 | 2249 | KFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8247 | 174 | LSFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8248 | 1307 | LSFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8249 | 241 | LSFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8250 | 160 | LSFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8261 | 1705 | LSFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8263 | 706 | LSFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8266 | 1603 | LSFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8267 | 1082 | LSFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8268 | 200 | LSFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8273 | 800 | LSFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8274 | 640 | LSFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8306 | 1732 | LSFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8327 | 1499 | LSFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8344 | 1243 | LSFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8345 | 1280 | LSFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8393 | 444 | LSFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8396 | 561 | LSFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |

BLM_0077728

| 8223 | 880 | LSFO, WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8232 | 2208 | LSFO, WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8233 | 1810 | LSFO, WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8259 | 1514 | LSFO, WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  March 1 to July 15 |
| 8262 | 1340 | LSFO, WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8277 | 1081 | LSFO, WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8395 | 1271 | LSFO/WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8197 | 1282 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8200 | 1244 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8203 | 1246 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8206 | 400 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8207 | 638 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8208 | 1155 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8210 | 1259 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8212 | 1636 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8213 | 635 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8214 | 503 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8215 | 1921 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8216 | 1916 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8217 | 1913 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8220 | 1918 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8221 | 319 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8224 | 1760 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8225 | 640 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8227 | 480 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8228 | 681 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8231 | 241 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8234 | 613 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8252 | 401 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8253 | 1290 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8255 | 161 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8256 | 643 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8278 | 920 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8346 | 1451 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8348 | 163 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8349 | 558 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8350 | 1243 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8354 | 2119 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8355 | 2542 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8356 | 1838 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8357 | 1880 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8359 | 817 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8360 | 1154 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |

BLM_0077729

| | | | | |
|---|---|---|---|---|
| 8361 | 1197 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8362 | 1604 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8363 | 1630 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8364 | 1791 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8365 | 1967 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8366 | 1298 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8367 | 1502 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8368 | 1948 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8369 | 81 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8370 | 2210 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8371 | 942 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8376 | 1832 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8377 | 555 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8378 | 328 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8379 | 2228 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8380 | 2347 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8381 | 1533 | WRFO | Greater Sage-Grouse General Habitat - HPH | CPW recommends a NSO (NSO 46e(2)) within 2 miles of an active lek; or as applicable, apply GRSG TL 46e  from March 1 to July 15 |
| 8118 | 2082 | GJFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8222 | 1357 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8243 | 474 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8263 | 706 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8264 | 1049 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8265 | 1008 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8273 | 800 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8274 | 640 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8295 | 797 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8296 | 630 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8306 | 1732 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8307 | 1766 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8308 | 892 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8309 | 1042 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8310 | 1390 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8332 | 1959 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8334 | 1201 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8340 | 1709 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8344 | 1243 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8345 | 1280 | LSFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8408 (Sec. 4) | | RGFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8408 (Sec. 6) | | RGFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8140 | 297 | UFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8351 | 878 | UFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8389 | 2203 | UFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8390 | 2473 | UFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |

| 8252 | 401 | WRFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
|---|---|---|---|---|
| 8381 | 1533 | WRFO | Aquatic Habitat Recov. and Conserv. Water - HPH | CPW recommends a minimum buffer of 300 ft extending from the outermost limit of the riparian vegetation zone |
| 8321 | 397 | KFO | Bald Eagle Active Nest Site - HPH | CPW recommends NSO within 0.25 mile buffer year round, and a Timing Limitiation within 0.50 mile from October 15 through July 31 |
| 8314 | 40 | KFO | Bald Eagle Active Nest Site - NSO | CPW recommends NSO within 0.25 mile buffer year round, and a Timing Limitiation within 0.50 mile from October 15 through July 31 |
| 8314 | 40 | KFO | Bald Eagle Active Nest Site - SWH | CPW recommends NSO within 0.25 mile buffer year round, and a Timing Limitiation within 0.50 mile from October 15 through July 31 |
| 8321 | 397 | KFO | Bald Eagle Active Nest Site - SWH | CPW recommends NSO within 0.25 mile buffer year round, and a Timing Limitiation within 0.50 mile from October 15 through July 31 |
| 8373 (both parcels) | | RGFO | Bald Eagle Roost Site - SWH | CPW recommends a TL stipulation of no human encroachment of 0.50 mile of roost site from November 15 to March 15 |
| 8214 | 503 | WRFO | Bald Eagle Roost Site - SWH | CPW recommends a TL stipulation of no human encroachment of 0.50 mile of roost site from November 15 to March 15 |
| 8237 | 1479 | WRFO | Bald Eagle Roost Site - SWH | CPW recommends a TL stipulation of no human encroachment of 0.50 mile of roost site from November 15 to March 15 |
| 8241 | 237 | WRFO | Bald Eagle Roost Site - SWH | CPW recommends a TL stipulation of no human encroachment of 0.50 mile of roost site from November 15 to March 15 |
| 8397 | 942 | WRFO | Bald Eagle Roost Site - SWH | CPW recommends a TL stipulation of no human encroachment of 0.50 mile of roost site from November 15 to March 15 |
| 8398 | 1759 | WRFO | Bald Eagle Roost Site - SWH | CPW recommends a TL stipulation of no human encroachment of 0.50 mile of roost site from November 15 to March 15 |
| 8341 | 1889 | RGFO | Bighorn Sheep Production Area - HPH, RSO | CPW recommends a NSO stipulation in all CPW-identified bighorn sheep production areas and recommends a TL for human activities in these habitats (including over flights) from April 15-June 30 |
| 8343 | 1160 | RGFO | Bighorn Sheep Production Area - HPH, RSO | CPW recommends a NSO stipulation in all CPW-identified bighorn sheep production areas and recommends a TL for human activities in these habitats (including over flights) from April 15-June 30 |
| 8341 | 1889 | RGFO | Bighorn Sheep Winter Range - HPH, SWH | CPW recommends a NSO stipulation in all CPW-identified bighorn sheep winter areas and recommends a TL for human activities in these habitats (including over flights) from November 1-April 15. |
| 8343 | 1160 | RGFO | Bighorn Sheep Winter Range - HPH, SWH | CPW recommends a NSO stipulation in all CPW-identified bighorn sheep winter areas and recommends a TL for human activities in these habitats (including over flights) from November 1-April 15. |
| 8233 | 1810 | LSFO, WRFO | Black-Footed Ferret Release Site - SWH | CPW recommends a TL stipulation of no surface disturbance between March 1 and July 15. Conduct seismic activity outside the period of March 1 to July 15. |
| 8234 | 613 | WRFO | Black-Footed Ferret Release Site - SWH | CPW recommends a TL stipulation of no surface disturbance between March 1 and July 15. Conduct seismic activity outside the period of March 1 to July 15. |
| 8237 | 1479 | WRFO | Black-Footed Ferret Release Site - SWH | CPW recommends a TL stipulation of no surface disturbance between March 1 and July 15. Conduct seismic activity outside the period of March 1 to July 15. |
| 8346 | 1451 | WRFO | Black-Footed Ferret Release Site - SWH | CPW recommends a TL stipulation of no surface disturbance between March 1 and July 15. Conduct seismic activity outside the period of March 1 to July 15. |
| 8348 | 163 | WRFO | Black-Footed Ferret Release Site - SWH | CPW recommends a TL stipulation of no surface disturbance between March 1 and July 15. Conduct seismic activity outside the period of March 1 to July 15. |
| 8347 | | RGFO | Burrowing Owl potential nesting habitat | CPW recommends at TL from March 1-August 15 within 300 feet of a nest. |
| 8405 | | RGFO | Burrowing Owl potential nesting habitat | CPW recommends at TL from March 1-August 15 within 300 feet of a nest. |
| 8406 | | RGFO | Burrowing Owl potential nesting habitat | CPW recommends at TL from March 1-August 15 within 300 feet of a nest. |
| 8212 | 1636 | WRFO | Colorado Pikeminnow Restricted Water - HPH | CPW recommends a 300-foot setback above the 100-year floodplain.  Coordination and consultation with US Fish & Wildlife Service is recommended. |
| 8214 | 503 | WRFO | Colorado Pikeminnow Restricted Water - HPH | CPW recommends a 300-foot setback above the 100-year floodplain.  Coordination and consultation with US Fish & Wildlife Service is recommended. |
| 8237 | 1479 | WRFO | Colorado Pikeminnow Restricted Water - HPH | CPW recommends a 300-foot setback above the 100-year floodplain.  Coordination and consultation with US Fish & Wildlife Service is recommended. |

| 8240 | 949 | WRFO | Colorado Pikeminnow Restricted Water - HPH | CPW recommends a 300-foot setback above the 100-year floodplain.  Coordination and consultation with US Fish & Wildlife Service is recommended. |
| 8397 | 942 | WRFO | Colorado Pikeminnow Restricted Water - HPH | CPW recommends a 300-foot setback above the 100-year floodplain.  Coordination and consultation with US Fish & Wildlife Service is recommended. |
| 8237 | 1479 | WRFO | Colorado pikeminnow USFWS Critical Habitat - HPH | CPW recommends a 300-foot setback above the 100-year floodplain.  Coordination and consultation with US Fish & Wildlife Service is recommended. |
| 8240 | 949 | WRFO | Colorado pikeminnow USFWS Critical Habitat - HPH | CPW recommends a 300-foot setback above the 100-year floodplain.  Coordination and consultation with US Fish & Wildlife Service is recommended. |
| 8397 | 942 | WRFO | Colorado pikeminnow USFWS Critical Habitat - HPH | CPW recommends a 300-foot setback above the 100-year floodplain.  Coordination and consultation with US Fish & Wildlife Service is recommended. |
| 8263 | 706 | LSFO | Columbian Sharp-Tailed Grouse Lek Area - | CPW recommends a NSO stipulation of 0.4 mile buffer around the lek site. |
| 8273 | 800 | LSFO | Columbian Sharp-Tailed Grouse Lek Area - | CPW recommends a NSO stipulation of 0.4 mile buffer around the lek site. |
| 8274 | 640 | LSFO | Columbian Sharp-Tailed Grouse Lek Area - | CPW recommends a NSO stipulation of 0.4 mile buffer around the lek site. |
| 8276 | 277 | LSFO | Columbian Sharp-Tailed Grouse Lek Area - | CPW recommends a NSO stipulation of 0.4 mile buffer around the lek site. |
| 8295 | 797 | LSFO | Columbian Sharp-Tailed Grouse Lek Area - | CPW recommends a NSO stipulation of 0.4 mile buffer around the lek site. |
| 8296 | 630 | LSFO | Columbian Sharp-Tailed Grouse Lek Area - | CPW recommends a NSO stipulation of 0.4 mile buffer around the lek site. |
| 8306 | 1732 | LSFO | Columbian Sharp-Tailed Grouse Lek Area - | CPW recommends a NSO stipulation of 0.4 mile buffer around the lek site. |
| 8307 | 1766 | LSFO | Columbian Sharp-Tailed Grouse Lek Area - | CPW recommends a NSO stipulation of 0.4 mile buffer around the lek site. |
| 8308 | 892 | LSFO | Columbian Sharp-Tailed Grouse Lek Area - | CPW recommends a NSO stipulation of 0.4 mile buffer around the lek site. |
| 8309 | 1042 | LSFO | Columbian Sharp-Tailed Grouse Lek Area - | CPW recommends a NSO stipulation of 0.4 mile buffer around the lek site. |
| 8310 | 1390 | LSFO | Columbian Sharp-Tailed Grouse Lek Area - | CPW recommends a NSO stipulation of 0.4 mile buffer around the lek site. |
| 8242 | 879 | LSFO | Columbian Sharp-Tailed Grouse Production Area - | CPW recommends a TL stipulation to restrict construction, drilling and completion activities between March 15 to July 30. |
| 8243 | 474 | LSFO | Columbian Sharp-Tailed Grouse Production Area - | CPW recommends a TL stipulation to restrict construction, drilling and completion activities between March 15 to July 30. |
| 8263 | 706 | LSFO | Columbian Sharp-Tailed Grouse Production Area - | CPW recommends a TL stipulation to restrict construction, drilling and completion activities between March 15 to July 30. |
| 8264 | 1049 | LSFO | Columbian Sharp-Tailed Grouse Production Area - | CPW recommends a TL stipulation to restrict construction, drilling and completion activities between March 15 to July 30. |
| 8265 | 1008 | LSFO | Columbian Sharp-Tailed Grouse Production Area - | CPW recommends a TL stipulation to restrict construction, drilling and completion activities between March 15 to July 30. |
| 8273 | 800 | LSFO | Columbian Sharp-Tailed Grouse Production Area - | CPW recommends a TL stipulation to restrict construction, drilling and completion activities between March 15 to July 30. |
| 8274 | 640 | LSFO | Columbian Sharp-Tailed Grouse Production Area - | CPW recommends a TL stipulation to restrict construction, drilling and completion activities between March 15 to July 30. |
| 8275 | 119 | LSFO | Columbian Sharp-Tailed Grouse Production Area - | CPW recommends a TL stipulation to restrict construction, drilling and completion activities between March 15 to July 30. |
| 8276 | 277 | LSFO | Columbian Sharp-Tailed Grouse Production Area - | CPW recommends a TL stipulation to restrict construction, drilling and completion activities between March 15 to July 30. |
| 8295 | 797 | LSFO | Columbian Sharp-Tailed Grouse Production Area - | CPW recommends a TL stipulation to restrict construction, drilling and completion activities between March 15 to July 30. |
| 8296 | 630 | LSFO | Columbian Sharp-Tailed Grouse Production Area - | CPW recommends a TL stipulation to restrict construction, drilling and completion activities between March 15 to July 30. |
| 8297 | 602 | LSFO | Columbian Sharp-Tailed Grouse Production Area - | CPW recommends a TL stipulation to restrict construction, drilling and completion activities between March 15 to July 30. |
| 8306 | 1732 | LSFO | Columbian Sharp-Tailed Grouse Production Area - | CPW recommends a TL stipulation to restrict construction, drilling and completion activities between March 15 to July 30. |
| 8307 | 1766 | LSFO | Columbian Sharp-Tailed Grouse Production Area - | CPW recommends a TL stipulation to restrict construction, drilling and completion activities between March 15 to July 30. |
| 8308 | 892 | LSFO | Columbian Sharp-Tailed Grouse Production Area - | CPW recommends a TL stipulation to restrict construction, drilling and completion activities between March 15 to July 30. |
| 8309 | 1042 | LSFO | Columbian Sharp-Tailed Grouse Production Area - | CPW recommends a TL stipulation to restrict construction, drilling and completion activities between March 15 to July 30. |
| 8310 | 1390 | LSFO | Columbian Sharp-Tailed Grouse Production Area - | CPW recommends a TL stipulation to restrict construction, drilling and completion activities between March 15 to July 30. |
| 8340 | 1709 | LSFO | Columbian Sharp-Tailed Grouse Production Area - | CPW recommends a TL stipulation to restrict construction, drilling and completion activities between March 15 to July 30. |
| 8307 | 1766 | LSFO | Cutthroat Trout Designated Critical Habitat - NSO | CPW recommends a minimum NSO buffer of 300 ft extending from the Ordinary High Water Mark |
| 8131 | 519 | UFO | Cutthroat Trout Designated Critical Habitat - NSO | CPW recommends a minimum NSO buffer of 300 ft extending from the Ordinary High Water Mark |
| 8140 | 297 | UFO | Cutthroat Trout Designated Critical Habitat - NSO | CPW recommends a minimum NSO buffer of 300 ft extending from the Ordinary High Water Mark |
| 8351 | 878 | UFO | Cutthroat Trout Designated Critical Habitat - NSO | CPW recommends a minimum NSO buffer of 300 ft extending from the Ordinary High Water Mark |

BLM_0077732

| 8389 | 2203 | UFO | Cutthroat Trout Designated Critical Habitat - NSO | CPW recommends a minimum NSO buffer of 300 ft extending from the Ordinary High Water Mark |
| 8378 | 328 | WRFO | Cutthroat Trout Designated Critical Habitat - NSO | CPW recommends a minimum NSO buffer of 300 ft extending from the Ordinary High Water Mark |
| 8380 | 2347 | WRFO | Cutthroat Trout Designated Critical Habitat - NSO | CPW recommends a minimum NSO buffer of 300 ft extending from the Ordinary High Water Mark |
| 8381 | 1533 | WRFO | Cutthroat Trout Designated Critical Habitat - NSO | CPW recommends a minimum NSO buffer of 300 ft extending from the Ordinary High Water Mark |
| 8120 | 2163 | GJFO | DeBeque phacelia USFWS Critical Habitat - HPH | CPW recommends a NSO of 200 m and preclude activities/impacts within the NSO |
| 8125 | 879 | GJFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8126 | 1920 | GJFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8127 | 1959 | GJFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8128 | 1321 | GJFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8279 | 2360 | KFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8280 | 1498 | KFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8281 | 120 | KFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8282 | 41 | KFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8283 | 1625 | KFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8285 | 539 | KFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8301 | 1951 | KFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8302 | 2173 | KFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8303 | 2249 | KFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8296 | 630 | LSFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8307 | 1766 | LSFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8309 | 1042 | LSFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8212 | 1636 | WRFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8214 | 503 | WRFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8215 | 1921 | WRFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8216 | 1916 | WRFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8219 | 1281 | WRFO | Elk Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8133 | 325 | CRVFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8134 | 21 | CRVFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8257 | 165 | KFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8258 | 40 | KFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8269 | 1650 | KFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8270 | 1886 | KFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8279 | 2360 | KFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8280 | 1498 | KFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |

| 8283 | 1625 | KFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8286 | 204 | KFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8287 | 409 | KFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8289 | 246 | KFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8290 | 1370 | KFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8291 | 726 | KFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8293 | 599 | KFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8294 | 1428 | KFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8300 | 1083 | KFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8301 | 1951 | KFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8302 | 2173 | KFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8303 | 2249 | KFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8242 | 879 | LSFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8243 | 474 | LSFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8265 | 1008 | LSFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8307 | 1766 | LSFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8308 | 892 | LSFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8197 | 1282 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8200 | 1244 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8203 | 1246 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8210 | 1259 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |

| 8211 | 2196 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8225 | 640 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8226 | 1280 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8227 | 480 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8228 | 681 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8229 | 1802 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8230 | 1485 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8251 | 1450 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8252 | 401 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8253 | 1290 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8254 | 322 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8255 | 161 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8256 | 643 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8352 | 1976 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8354 | 2119 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8355 | 2542 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8356 | 1838 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8357 | 1880 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8358 | 1995 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8359 | 817 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8360 | 1154 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |

BLM_0077735

| 8361 | 1197 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8362 | 1604 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8363 | 1630 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8364 | 1791 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8365 | 1967 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8366 | 1298 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8367 | 1502 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8368 | 1948 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8369 | 81 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8370 | 2210 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8371 | 942 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8376 | 1832 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8377 | 555 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8378 | 328 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8379 | 2228 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8380 | 2347 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8381 | 1533 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8394 | 978 | WRFO | Elk Production Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completions activities from May 15 to June 30, and a CSU to limit surface-density to one pad per section. |
| 8242 | 879 | LSFO | Golden Eagle Active Nest Site - HPH | CPW recommends NSO within 0.25 mile buffer year round, and a Timing Limitiation within 0.50 mile from December 15 through July 15 |
| 8264 | 1049 | LSFO | Golden Eagle Active Nest Site - NSO | CPW recommends NSO within 0.25 mile buffer year round, and a Timing Limitiation within 0.50 mile from December 15 through July 15 |
| 8264 | 1049 | LSFO | Golden Eagle Active Nest Site - SWH | CPW recommends NSO within 0.25 mile buffer year round, and a Timing Limitiation within 0.50 mile from December 15 through July 15 |

BLM_0077736

| 8257 | 165 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8258 | 40 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8269 | 1650 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8271 | 283 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8279 | 2360 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8280 | 1498 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8283 | 1625 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8284 | 158 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8285 | 539 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8286 | 204 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8289 | 246 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8290 | 1370 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8291 | 726 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8293 | 599 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8299 | 765 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8300 | 1083 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8301 | 1951 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8302 | 2173 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8303 | 2249 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8311 | 1128 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8313 | 899 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |

| 8314 | 40 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8315 | 679 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8317 | 975 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8321 | 397 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8322 | 1007 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8331 | 283 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8342 | 40 | KFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8140 | 297 | UFO | Moose Concentration Area - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8257 | 165 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8258 | 40 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8269 | 1650 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8270 | 1886 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8271 | 283 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8279 | 2360 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8280 | 1498 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8283 | 1625 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8284 | 158 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8285 | 539 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8286 | 204 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8287 | 409 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8289 | 246 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |

| 8290 | 1370 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8291 | 726 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8293 | 599 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8294 | 1428 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8298 | 121 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8299 | 765 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8300 | 1083 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8301 | 1951 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8302 | 2173 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8303 | 2249 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8311 | 1128 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8313 | 899 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8314 | 40 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8315 | 679 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8317 | 975 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8321 | 397 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8322 | 1007 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8331 | 283 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8342 | 40 | KFO | Moose Priority Habitat - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8132 | 151 | CRVFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8133 | 325 | CRVFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |

BLM_0077739

| 8134 | 21 | CRVFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8136 | 169 | GJFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8137 | 39 | GJFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8139 | 324 | GJFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8257 | 165 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8269 | 1650 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8270 | 1886 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8271 | 283 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8279 | 2360 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8280 | 1498 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8283 | 1625 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8284 | 158 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8285 | 539 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8286 | 204 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8287 | 409 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8289 | 246 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8290 | 1370 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8291 | 726 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8293 | 599 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8294 | 1428 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8298 | 121 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |

| 8299 | 765 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8300 | 1083 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8301 | 1951 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8302 | 2173 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8303 | 2249 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8311 | 1128 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8313 | 899 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8314 | 40 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8315 | 679 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8316 | 565 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8317 | 975 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8321 | 397 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8322 | 1007 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8331 | 283 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8342 | 40 | KFO | Moose Winter Range - HPH | CPW recommends that moose habitat is given protection through riparian and stream buffer zone stipulations (300 feet from live water and riparian habitats) and controlled surface use of activities. |
| 8118 | 2082 | GJFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8119 | 1560 | GJFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8120 | 2163 | GJFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8121 | 1922 | GJFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8122 | 2476 | GJFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8129 | 1652 | GJFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |

| 8130 | 613 | GJFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8315 | 679 | KFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8248 | 1307 | LSFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8264 | 1049 | LSFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8268 | 200 | LSFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8273 | 800 | LSFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8274 | 640 | LSFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8295 | 797 | LSFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8296 | 630 | LSFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8297 | 602 | LSFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8332 | 1959 | LSFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8340 | 1709 | LSFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8393 | 444 | LSFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8392 | 692 | LSFO/WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8395 | 1271 | LSFO/WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8123 | 158 | UFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8320 | 331 | UFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8195 | 269 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8197 | 1282 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8198 | 1274 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8199 | 1272 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |

| 8200 | 1244 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8201 | 1924 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8202 | 1282 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8203 | 1246 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8204 | 361 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8205 | 523 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8206 | 400 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8207 | 638 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8208 | 1155 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8209 | 91 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8210 | 1259 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8211 | 2196 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8212 | 1636 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8213 | 635 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8214 | 503 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8215 | 1921 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8216 | 1916 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8217 | 1913 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8218 | 1440 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8219 | 1281 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8220 | 1918 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |

| 8221 | 319 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8224 | 1760 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8225 | 640 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8226 | 1280 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8227 | 480 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8228 | 681 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8229 | 1802 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8230 | 1485 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8231 | 241 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8236 | 1443 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8237 | 1479 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8238 | 1882 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8239 | 1924 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8240 | 949 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8241 | 237 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8346 | 1451 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8348 | 163 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8350 | 1243 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8376 | 1832 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8377 | 555 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8397 | 942 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |

| | | | | |
|---|---|---|---|---|
| 8398 | 1759 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8399 | 641 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8400 | 1884 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8401 | 1923 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8402 | 2537 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8403 | 1774 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8404 | 481 | WRFO | Mule Deer Critical Winter Range - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8119 | 1560 | GJFO | Mule Deer Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8128 | 1321 | GJFO | Mule Deer Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8129 | 1652 | GJFO | Mule Deer Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8130 | 613 | GJFO | Mule Deer Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8197 | 1282 | WRFO | Mule Deer Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8200 | 1244 | WRFO | Mule Deer Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8203 | 1246 | WRFO | Mule Deer Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8210 | 1259 | WRFO | Mule Deer Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8212 | 1636 | WRFO | Mule Deer Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8216 | 1916 | WRFO | Mule Deer Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8220 | 1918 | WRFO | Mule Deer Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8251 | 1450 | WRFO | Mule Deer Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8252 | 401 | WRFO | Mule Deer Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8253 | 1290 | WRFO | Mule Deer Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8254 | 322 | WRFO | Mule Deer Migration Corridor - HPH | CPW Recommends a CSU to limit surface-density to one pad per section. |
| 8119 | 1560 | GJFO | Parachute beardtongue USFWS Critical Habitat - HPH | CPW recommends a NSO of 200 m and preclude activities/impacts within the NSO |
| 8121 | 1922 | GJFO | Parachute beardtongue USFWS Critical Habitat - HPH | CPW recommends a NSO of 200 m and preclude activities/impacts within the NSO |
| 8122 | 2476 | GJFO | Parachute beardtongue USFWS Critical Habitat - HPH | CPW recommends a NSO of 200 m and preclude activities/impacts within the NSO |
| 8127 | 1959 | GJFO | Parachute beardtongue USFWS Critical Habitat - HPH | CPW recommends a NSO of 200 m and preclude activities/impacts within the NSO |
| 8128 | 1321 | GJFO | Parachute beardtongue USFWS Critical Habitat - HPH | CPW recommends a NSO of 200 m and preclude activities/impacts within the NSO |
| 8129 | 1652 | GJFO | Parachute beardtongue USFWS Critical Habitat - HPH | CPW recommends a NSO of 200 m and preclude activities/impacts within the NSO |
| 8410 | | RGFO | Plains Sharp-tailed Grouse Lek Area - NSO | CPW recommends No lease of this parcel. |
| 8410 | | RGFO | Plains Sharp-tailed Grouse Production Area | CPW recommends No lease of this parcel. |
| 8280 | 1498 | KFO | Prairie Falcon Active Nest Site - HPH | CPW recommends a NSO of 0.5 miles around the active nest site. |
| 8283 | 1625 | KFO | Prairie Falcon Active Nest Site - HPH | CPW recommends a NSO of 0.5 miles around the active nest site. |
| 8306 | 1732 | LSFO | Pronghorn Antelope Migration Corridor - HPH | CPW recommends a CSU to limit surface-density to one pad per section. |
| 8317 | 975 | KFO | Pronghorn Antelope Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completion activities from January 1 to March 31 |
| 8319 | 952 | KFO | Pronghorn Antelope Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completion activities from January 1 to March 31 |
| 8322 | 1007 | KFO | Pronghorn Antelope Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completion activities from January 1 to March 31 |

BLM_0077745

| 8327 | 1499 | LSFO | Pronghorn Antelope Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completion activities from January 1 to March 31 |
|---|---|---|---|---|
| 8340 | 1709 | LSFO | Pronghorn Antelope Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling and completion activities from January 1 to March 31 |
| 8118 | 2082 | GJFO | Roundtail Chub Restricted Water - HPH | CPW recommends a 300-foot setback above the 100-year floodplain, additionally, a TL stipulation is recommended for May 1 to July 15 for instream or streambank work. |
| 8242 | 879 | LSFO | Roundtail Chub Restricted Water - HPH | CPW recommends a 300-foot setback above the 100-year floodplain, additionally, a TL stipulation is recommended for May 1 to July 15 for instream or streambank work. |
| 8243 | 474 | LSFO | Roundtail Chub Restricted Water - HPH | CPW recommends a 300-foot setback above the 100-year floodplain, additionally, a TL stipulation is recommended for May 1 to July 15 for instream or streambank work. |
| 8296 | 630 | LSFO | Roundtail Chub Restricted Water - HPH | CPW recommends a 300-foot setback above the 100-year floodplain, additionally, a TL stipulation is recommended for May 1 to July 15 for instream or streambank work. |
| 8309 | 1042 | LSFO | Roundtail Chub Restricted Water - HPH | CPW recommends a 300-foot setback above the 100-year floodplain, additionally, a TL stipulation is recommended for May 1 to July 15 for instream or streambank work. |
| 8212 | 1636 | WRFO | Roundtail Chub Restricted Water - HPH | CPW recommends a 300-foot setback above the 100-year floodplain, additionally, a TL stipulation is recommended for May 1 to July 15 for instream or streambank work. |
| 8214 | 503 | WRFO | Roundtail Chub Restricted Water - HPH | CPW recommends a 300-foot setback above the 100-year floodplain, additionally, a TL stipulation is recommended for May 1 to July 15 for instream or streambank work. |
| 8237 | 1479 | WRFO | Roundtail Chub Restricted Water - HPH | CPW recommends a 300-foot setback above the 100-year floodplain, additionally, a TL stipulation is recommended for May 1 to July 15 for instream or streambank work. |
| 8240 | 949 | WRFO | Roundtail Chub Restricted Water - HPH | CPW recommends a 300-foot setback above the 100-year floodplain, additionally, a TL stipulation is recommended for May 1 to July 15 for instream or streambank work. |
| 8397 | 942 | WRFO | Roundtail Chub Restricted Water - HPH | CPW recommends a 300-foot setback above the 100-year floodplain, additionally, a TL stipulation is recommended for May 1 to July 15 for instream or streambank work. |
| 8398 | 1759 | WRFO | Roundtail Chub Restricted Water - HPH | CPW recommends a 300-foot setback above the 100-year floodplain, additionally, a TL stipulation is recommended for May 1 to July 15 for instream or streambank work. |
| 8401 | 1923 | WRFO | Roundtail Chub Restricted Water - HPH | CPW recommends a 300-foot setback above the 100-year floodplain, additionally, a TL stipulation is recommended for May 1 to July 15 for instream or streambank work. |
| 8403 | 1774 | WRFO | Roundtail Chub Restricted Water - HPH | CPW recommends a 300-foot setback above the 100-year floodplain, additionally, a TL stipulation is recommended for May 1 to July 15 for instream or streambank work. |
| 8347 | | RGFO | Swainson's Hawk Nest | CPW recommends a NSO of 0.25-mile if this nest is active and a TL stipulation that restricts human encroachment from April 1 to July 15. |
| 8347 | | RGFO | Swift Fox | CPW recommends a TL from March 15 through June 15 within  0.25 miles of den sites. |
| 8405 | | RGFO | Swift Fox | CPW recommends a TL from March 15 through June 15 within  0.25 miles of den sites. |
| 8406 | | RGFO | Swift Fox | CPW recommends a TL from March 15 through June 15 within  0.25 miles of den sites. |
| 8407 | | RGFO | Swift Fox | CPW recommends a TL from March 15 through June 15 within  0.25 miles of den sites. |
| 8409 | | RGFO | Swift Fox | CPW recommends a TL from March 15 through June 15 within  0.25 miles of den sites. |
| 8410 | | RGFO | Swift Fox | CPW recommends a TL from March 15 through June 15 within  0.25 miles of den sites. |
| 8411 | | RGFO | Swift Fox | CPW recommends a TL from March 15 through June 15 within  0.25 miles of den sites. |
| 8412 | | RGFO | Swift Fox | CPW recommends a TL from March 15 through June 15 within  0.25 miles of den sites. |
| 8408 (Sec. 10) | | RGFO | Swift Fox | CPW recommends a TL from March 15 through June 15 within  0.25 miles of den sites. |
| 8408 (Sec. 23) | | RGFO | Swift Fox | CPW recommends a TL from March 15 through June 15 within  0.25 miles of den sites. |
| 8408 (Sec. 4) | | RGFO | Swift Fox | CPW recommends a TL from March 15 through June 15 within  0.25 miles of den sites. |
| 8408 (Sec. 6) | | RGFO | Swift Fox | CPW recommends a TL from March 15 through June 15 within  0.25 miles of den sites. |

| 8118 | 2082 | GJFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8119 | 1560 | GJFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8120 | 2163 | GJFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8269 | 1650 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8270 | 1886 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8271 | 283 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8279 | 2360 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8280 | 1498 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8281 | 120 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8282 | 41 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8283 | 1625 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8284 | 158 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8285 | 539 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8286 | 204 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8287 | 409 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8288 | 41 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8289 | 246 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8291 | 726 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8292 | 41 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8293 | 599 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8294 | 1428 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |

| 8299 | 765 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8300 | 1083 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m from nests from March 1 to August 15 |
| 8301 | 1951 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8302 | 2173 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8303 | 2249 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8304 | 636 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8305 | 197 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8311 | 1128 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8312 | 39 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8313 | 899 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8314 | 40 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8315 | 679 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8316 | 565 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8317 | 975 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8318 | 969 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8319 | 952 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8321 | 397 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8322 | 1007 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8330 | 1512 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8331 | 283 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8342 | 40 | KFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |

| 8247 | 174 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8261 | 1705 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8266 | 1603 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8267 | 1082 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8268 | 200 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8323 | 1643 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8324 | 1587 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8325 | 881 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8326 | 1121 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8327 | 1499 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8328 | 320 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8329 | 321 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8332 | 1959 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8333 | 958 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8334 | 1201 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8335 | 360 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8336 | 80 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8337 | 1751 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8338 | 320 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8339 | 1840 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8340 | 1709 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |

| 8344 | 1243 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8345 | 1280 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m nests from March 1 to August 15 |
| 8396 | 561 | LSFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8223 | 880 | LSFO, WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8232 | 2208 | LSFO, WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8233 | 1810 | LSFO, WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8259 | 1514 | LSFO, WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8262 | 1340 | LSFO, WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8277 | 1081 | LSFO, WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8395 | 1271 | LSFO/WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8123 | 158 | UFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8212 | 1636 | WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8214 | 503 | WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8224 | 1760 | WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8225 | 640 | WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8234 | 613 | WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8236 | 1443 | WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8237 | 1479 | WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8240 | 949 | WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8346 | 1451 | WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8348 | 163 | WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |

| 8349 | 558 | WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8350 | 1243 | WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8397 | 942 | WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8398 | 1759 | WRFO | White-tailed Prairie Dog Overall Range - HPH | CPW recommends a TL stipulation to avoid direct disturbance to active colonies from March 1 through June 15.  If nesting burrowing owls are present, apply a TL stipulation from March 1 to August 15 within 300m of nests from March 1 to August 15 |
| 8118 | 2082 | GJFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8119 | 1560 | GJFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8125 | 879 | GJFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8126 | 1920 | GJFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8127 | 1959 | GJFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8128 | 1321 | GJFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8129 | 1652 | GJFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8139 | 324 | GJFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8269 | 1650 | KFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8270 | 1886 | KFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8279 | 2360 | KFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8280 | 1498 | KFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8284 | 158 | KFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8294 | 1428 | KFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8301 | 1951 | KFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8302 | 2173 | KFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8303 | 2249 | KFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |

BLM_0077751

| 8304 | 636 | KFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8242 | 879 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8247 | 174 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8248 | 1307 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8249 | 241 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8250 | 160 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8261 | 1705 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8263 | 706 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8264 | 1049 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8265 | 1008 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8266 | 1603 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8267 | 1082 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8268 | 200 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8272 | 40 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8273 | 800 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8274 | 640 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8275 | 119 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8276 | 277 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8295 | 797 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8296 | 630 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8297 | 602 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |

BLM_0077752

| 8309 | 1042 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8327 | 1499 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8340 | 1709 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8393 | 444 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8396 | 561 | LSFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8223 | 880 | LSFO, WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8232 | 2208 | LSFO, WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8233 | 1810 | LSFO, WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8244 | 1200 | LSFO, WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8245 | 1518 | LSFO, WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8259 | 1514 | LSFO, WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8260 | 1280 | LSFO, WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8262 | 1340 | LSFO, WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8277 | 1081 | LSFO, WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8392 | 692 | LSFO/WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8395 | 1271 | LSFO/WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8320 | 331 | UFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8351 | 878 | UFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8390 | 2473 | UFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8195 | 269 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8197 | 1282 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |

| 8210 | 1259 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8212 | 1636 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8213 | 635 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8214 | 503 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8215 | 1921 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8216 | 1916 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8217 | 1913 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8218 | 1440 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8219 | 1281 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8220 | 1918 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8221 | 319 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8224 | 1760 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8234 | 613 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8235 | 481 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8236 | 1443 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8237 | 1479 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8238 | 1882 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8239 | 1924 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8240 | 949 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8246 | 1340 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8278 | 920 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |

| 8346 | 1451 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8349 | 558 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8350 | 1243 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8352 | 1976 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8354 | 2119 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8355 | 2542 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8356 | 1838 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8357 | 1880 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8358 | 1995 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8359 | 817 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8360 | 1154 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8361 | 1197 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8362 | 1604 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8363 | 1630 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8364 | 1791 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8365 | 1967 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8366 | 1298 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8397 | 942 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |
| 8400 | 1884 | WRFO | Elk Winter Concentration Area - HPH | CPW recommends a TL stipulation that restricts construction, drilling, and completion activities from December 1 through April 15, and a CSU to limit surface-density to one pad per section. |

BLM_0077755

**ATTACHMENT 2 - CPW PROPERTY STIPULATION RECOMMENDATIONS FOR BLM DECEMBER 2018 LEASE SALE**

| BLM Parcel ID | Field Office | Prop Type | Property Name | Interest | Owner | CPW Recommendation |
|---|---|---|---|---|---|---|
| 8233 | LSFO, WRFO | 3rd Party | Cross Mountain Ranch SWA - RFP | AccessEasement | PRIVATE | CPW recommends a TL stipulation that restricts construction, drilling and completion activities from August 15-November 30 to avoid conflicts to seasons. |
| 8247 | LSFO | SHA | Tuttle Ranch SHA - RFP | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8248 | LSFO | SHA | Crooked Wash Ranch SWA - RFP | AccessEasement | PRIVATE | CPW recommends a TL stipulation that restricts construction, drilling and completion activities from August 15-November 30 to avoid conflicts during hunting seasons. |
| 8248 | LSFO | SHA | Crooked Wash Ranch SWA - RFP | AccessEasement | PRIVATE | CPW recommends a TL stipulation that restricts construction, drilling and completion activities from August 15-November 30 to avoid conflicts during hunting seasons. |
| 8248 | LSFO | SHA | Crooked Wash Ranch SWA - RFP | AccessEasement | PRIVATE | CPW recommends a TL stipulation that restricts construction, drilling and completion activities from August 15-November 30 to avoid conflicts during hunting seasons. |
| 8248 | LSFO | SHA | Crooked Wash Ranch SWA - RFP | AccessEasement | PRIVATE | CPW recommends a TL stipulation that restricts construction, drilling and completion activities from August 15-November 30 to avoid conflicts during hunting seasons. |
| 8249 | LSFO | SHA | Tuttle Ranch SHA - RFP | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8259 | LSFO, WRFO | SHA | Tuttle Ranch SHA - RFP | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8259 | LSFO, WRFO | SHA | Tuttle Ranch SHA - RFP | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8259 | LSFO, WRFO | SHA | Tuttle Ranch SHA - RFP | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8259 | LSFO, WRFO | SHA | Tuttle Ranch SHA - RFP | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8263 | LSFO | SHA | Adobe Ridge SHA - CSCP | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8263 | LSFO | SHA | Adobe Ridge SHA - CSCP | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8266 | LSFO | SHA | Tuttle Ranch SHA - RFP | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8266 | LSFO | SHA | Tuttle Ranch SHA - RFP | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8266 | LSFO | SHA | Tuttle Ranch SHA - RFP | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8267 | LSFO | SHA | Tuttle Ranch SHA - RFP | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8267 | LSFO | SHA | Tuttle Ranch SHA - RFP | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8267 | LSFO | SHA | Tuttle Ranch SHA - RFP | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |

BLM_0077756

| 8295 | LSFO | 3rd Party | Smith Rancho SHA 3DP - RFP | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8306 | LSFO | 3rd Party | Smith Rancho SHA 3DP - RFP | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8306 | LSFO | SHA | Red Hawk Ranch Parcel A | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8306 | LSFO | SHA | Red Hawk Ranch Parcel B | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8306 | LSFO | 3rd Party | Smith Rancho SHA 3DP - RFP | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8306 | LSFO | 3rd Party | Smith Rancho SHA 3DP - RFP | CE | PRIVATE | CPW recommends a NSO stipulation for Conservation Easement purchased to protect the wildlife habitat conservation values. |
| 8322 | KFO | SWA | Silver Spur Land & Cattle Parcel (2) | Lease | PRIVATE | CPW recommends a NSO stipulation for State Wildlife Areas |
| 8393 | LSFO | SHA | Crooked Wash Ranch SWA - RFP | AccessEasement | PRIVATE | CPW recommends a TL stipulation that restricts construction, drilling and completion activities from August 15-November 30 to avoid conflicts during hunting seasons. |
| 8393 | LSFO | SHA | Crooked Wash Ranch SWA - RFP | AccessEasement | PRIVATE | CPW recommends a TL stipulation that restricts construction, drilling and completion activities from August 15-November 30 to avoid conflicts during hunting seasons. |
| 8395 | LSFO/WRFO | 3rd Party | Cross Mountain Ranch SWA - RFP | AccessEasement | PRIVATE | CPW recommends a TL stipulation that restricts construction, drilling and completion activities from August 15-November 30 to avoid conflicts during hunting seasons. |
| 8396 | LSFO | SHA | Crooked Wash Ranch SWA - RFP | AccessEasement | PRIVATE | CPW recommends a TL stipulation that restricts construction, drilling and completion activities from August 15-November 30 to avoid conflicts during hunting seasons. |
| 8197 | WRFO | Nat. Area | Yanks Gulch/Upper Greasewood | Designated Natural Area | BLM | CPW recommends a NSO stipulation for all designated Colorado Natural Areas |
| 8229 | WRFO | Nat. Area | Blacks Gulch | Designated Natural Area | BLM | CPW recommends a NSO stipulation for all designated Colorado Natural Areas |
| 8229 | WRFO | Nat. Area | Blacks Gulch | Designated Natural Area | BLM | CPW recommends a NSO stipulation for all designated Colorado Natural Areas |
| 8398 | WRFO | Nat. Area | Lower Greasewood | Designated Natural Area | BLM | CPW recommends a NSO stipulation for all designated Colorado Natural Areas |
| 8401 | WRFO | Nat. Area | Lower Greasewood | Designated Natural Area | BLM | CPW recommends a NSO stipulation for all designated Colorado Natural Areas |
| 8402 | WRFO | Nat. Area | Lower Greasewood | Designated Natural Area | BLM | CPW recommends a NSO stipulation for all designated Colorado Natural Areas |

BLM_0077757

**BLM_CO_UFO_Leasing**

| | |
|---|---|
| **From:** | Charles_Sharp@fws.gov |
| **Sent:** | Wednesday, February 08, 2012 1:57 PM |
| **To:** | BLM_CO_UFO_Leasing |
| **Cc:** | Stranathan, Thane A; Krickbaum, John |
| **Subject:** | USFWS comments on August 2012 Lease Sale |
| **Attachments:** | BLM_UFO_Aug_2012_Oil_and_Gas_LeaseSale_CommentLetter_signed_02_08_12.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

*(See attached file: BLM_UFO_Aug_2012_Oil_and_Gas_LeaseSale_CommentLetter_signed_02_08_12.pdf)*

Charlie Sharp
Fish and Wildlife Biologist
U.S. Fish & Wildlife Service, Ecological Services
764 Horizon Drive, Bldg B
Grand Junction, Colorado 81506
(970) 243-2778 x18
(970) 245-6933 fax

1



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Ecological Services
Colorado Field Office
P.O. Box 25486, DFC (65412)
Denver, Colorado 80225-0486



IN REPLY REFER TO:
ES/CO: BLM/UFO/OGLeaseSale
TAILS 06E24100-2012-TA-0072

February 8, 2012

Memorandum

To:         Field Manager, Bureau of Land Management, Uncompahgre Field Office,
            Montrose, Colorado

From:       Colorado Field Supervisor, Fish and Wildlife Service, Ecological Services,
            Lakewood, Colorado

Subject:    Comments on the August 2012 Oil and Gas Lease Sale

The U.S. Fish and Wildlife Service (Service) would like to provide the following comments on
the proposed August 2012 Oil and Gas Lease Sale in Gunnison and Delta Counties, Colorado.
Twenty-two parcels comprised of approximately 30,000 acres are being nominated for leasing of
Federal mineral estate, of which 29,100 acres occur on Bureau of Land Management (BLM)
administered lands. Leasing by the BLM would authorize the exploration, development, and
extraction of Federal fluid mineral resources.

## Proposed Lease Stipulations

The BLM is proposing several stipulations and lease notices for select parcels, or portions
thereof, for the August 2012 Lease Sale. As with past lease sales, these stipulations are derived
from those specifically identified in the 1989 Uncompahgre Basin Resource Management Plan
(1989 RMP) (stipulations identified as "UB"), as well as several lease notices issued by the BLM
Colorado State Office (stipulations identified as "CO"). Related to known or potentially
occurring species identified below, following is a list of stipulations and lease notices included in
the August 2012 lease sale:

The *Endangered Species Act section 7 consultation lease stipulation* (CO-34) is attached to
certain parcels, or portions thereof, to notify lessees of the potential for threatened, endangered,
or other special status species to in the area:

> The lease area may now or hereafter contain plants, animals, or their habitats
> determined to be threatened, endangered, or other special status species. BLM may
> recommend modifications to exploration and development proposals to further its
> conservation and management objective to avoid BLM-approved activity that will
> contribute to a need to list such a species or their habitat. BLM may require
> modifications to or disapprove proposed activity that is likely to result in jeopardy
> to the continued existence of a proposed or listed threatened or endangered species

or result in the destruction or adverse modification of a designated or proposed critical habitat. BLM will not approve any ground-disturbing activity that may affect any such species or critical habitat until it completes its obligations under applicable requirements of the Endangered Species Act as amended, 16 U.S.C. § 1531 et seq., including completion of any required procedure for conference or consultation.

The *timing limitation stipulation for highly erodible and/or saline soil areas* (UB-01) is attached to certain parcels, or portions thereof, to protect those resources: "No surface use is allowed during the following period(s): March 1 – May 31. This stipulation does not apply to operation and maintenance of production facilities."

The *timing limitation stipulation for bald eagle winter concentration areas* (UB-03) is attached to certain parcels, or portions thereof, to protect those resources: "No surface use is allowed during the following period(s): December 1 – April 30. This stipulation does not apply to operation and maintenance of production facilities."

## Species List

The Service's primary concern with any project is avoidance of impacts to threatened, endangered, proposed, and candidate species, as well as species-at-risk and their habitats within the project area. To assist with planning, we provide the following list of federally listed threatened and endangered species, and potential candidates for future listing that could be impacted by the proposed project.

| Common Name | Scientific Name | Status |
|---|---|---|
| Mexican spotted owl | *Strix occidentalis lucida* | T |
| Gunnison sage-grouse | *Centrocercus minimus* | C |
| Yellow-billed cuckoo | *Coccyzus americanus* | C |
| Canada lynx | *Lynx canadensis* | T |
| Black-footed ferret | *Mustela nigripes* | E |
| Gunnison's prairie dog | *Cynomys gunnisoni* | C |
| North American wolverine | *Gulo gulo luscus* | C |
| Humpback chub* | *Gila cypha* | E |
| Colorado pikeminnow* | *Ptychocheilus lucius* | E |
| Bonytail chub* | *Gila elegans* | E |
| Razorback sucker* | *Xyrauchen texanus* | E |
| Greenback cutthroat trout # | *Oncorhynchus clarki stomias* | T |
| Clay-loving wild buckwheat | *Eriogonum pelinophilum* | E |
| Colorado hookless cactus | *Sclerocactus glaucus* | T |

T = federally listed threatened, E = federally listed endangered, C = Federal candidate species
\* Water depletions in the Upper Colorado River Basin may affect the species and/ or critical habitat in downstream reaches in other states.
# Recent genetic tests identified cutthroat population as greenback lineage; therefore, consultation is an interim measure until genetic and taxonomic issues are resolved.

We compiled the above list from an inventory for Gunnison and Delta Counties, Colorado, and therefore it may be that some or all of the species do not presently occupy or use the proposed

BLM_0077760

more candidate species potentially occur within the project area. Federal candidates for official listing as threatened or endangered have no legal protection under the Endangered Species Act of 1973 (Act), as amended. However, it is within the spirit of the Act to consider project impacts to these species.

The Service has determined that water depletions adversely affect the bonytail chub, Colorado pikeminnow, humpback chub, and razorback sucker, and their critical habitats. Small water depletions should be addressed and reported by BLM under the *Programmatic Biological Opinion for Water Depletions Associated with BLM's Fluid Mineral Program within the Upper Colorado River Basin in Colorado* (ES/GJ-6-CO-08-F-0006; TAILS # 65413-2008-F-0073) (BLM PBO). All other water depletions not meeting the requirements and conditions of the BLM PBO would be addressed under separate section 7 consultations under the umbrella of the Gunnison River Basin Programmatic Biological Opinion (ES/GJ-6-CO-0-09-F-0001; TAILS # 65413-2009-F-0044) (USFWS 2009).

### Known or Potentially Occurring Species
Based on a review of the above species list and an assessment of parcel locations and habitat, we identified the following known or potentially occurring species in the project area.

#### *Colorado River endangered fish*
Critical habitat is designated for the Colorado pikeminnow and razorback sucker on the Gunnison River from the confluence of the Uncompahgre River to the confluence of the Colorado River and downstream from the confluence on the Colorado River to the inflow to Lake Powell. Colorado pikeminnow also have been found in the Gunnison River upstream from the confluence with Uncompahgre River as far as the Hartland Diversion Dam (approximately 4 miles). Upon completion of the Hartland fish passage, some fish may migrate upriver, although this will likely be limited by colder water temperatures. There are no specific population estimates for Colorado pikeminnow in the Gunnison River, however, adult fish occur there, and spawning has been documented. Few wild razorback suckers occur in the action area; however, the population is being augmented by stocking both in the Colorado and Gunnison Rivers (USFWS 2009).

#### *Greenback cutthroat trout*
Based on recent genetic work, cutthroat trout in Colorado have been assigned to different DNA lineages, including the following: GB (greenback), CR (Colorado River), and RG (Rio Grande). It is not known if the DNA lineages represent subspecies. Until more information is available, the Service has advised Federal agencies to conduct consultations for any actions that may affect cutthroat trout populations identified as GB lineage in Colorado as a federally threatened species. Based on recent genetic work and survey information, fish in the following streams have been identified as GB lineage and may represent greenback cutthroat trout (*Oncorhynchus clarkii stomias*): Deep Creek (Parcel 6215), Henderson Creek (Parcel 6211), and Terror Creek (Parcel 6207).

#### *Canada lynx*

3

Areas mapped by the U.S. Forest Service as *primary* and *secondary suitable habitat* for this species abut with BLM lands containing Parcels 6197 and 6206. To date, BLM has not updated their mapping or assessment of habitat suitability for Canada lynx. Therefore, these parcels, and possibly others, should be evaluated for suitability for Canada lynx prior to leasing.

*Clay-loving wild buckwheat*
Although the project area is outside the species' current known range, based on our data, clay-loving wild buckwheat historically occurred south of Hotchkiss, Colorado. Furthermore, potential habitat for this species occurs in numerous proposed parcels, primarily at lower elevations within Mancos Shale soils and salt desert shrub communities. Parcels should be evaluated for suitability for this species prior to leasing.

*Colorado hookless cactus*
Although the project area is outside the species' current known range, Colorado hookless cactus potential habitat occurs in numerous proposed parcels. Parcels should be evaluated for suitability for this species prior to leasing.

**Service Comments**
In general, our concerns include the potential direct and indirect effects of oil and gas exploration and development including, but not limited to, species impacts such as displacement or loss of fitness; or habitat degradation, loss, and fragmentation. We are particularly concerned with the potential contamination of aquatic systems in the Gunnison River Basin due to selenium loading, and our comments highlight this issue.

*Selenium Contamination and Colorado River endangered fish*
Mancos Shale geology and soils are common in upper Gunnison River Basin and occur in a number of parcels proposed for leasing. Sediments derived from Mancos Shale are often high in selenium (USFWS 2009). Selenium loading above natural concentrations typically occurs as a result of irrigation and other water development, where it is mobilized and transported from soils to waterways such as the Gunnison and Colorado Rivers, primarily via deep percolation and seepage. Related to fluid mineral development, selenium and other contaminant sources include reinjection, discharge, or improper use of produced water where there is a hydrologic connection with surface waters; impoundment in evaporation ponds or improper disposal or application of drilling wastes; accidental spills or leaks of pollutants; and soil erosion due to surface disturbance and/ or inadequate stormwater management (EPA 2008). In addition to air emissions, produced water and drilling wastes were identified by EPA (2008) as the leading environmental concerns associated with oil and gas development in the region. Furthermore, water depletions, including those associated with energy development, continue to increase selenium concentrations, as well as that of heavy metals, salts, pesticides, and other contaminants in the Upper and Lower Colorado River Basins (USFWS 2009).


The negative effects of selenium loading on water quality, fishes, and wildlife are well known. Toxic levels of selenium and dietary bioaccumulation can detrimentally affect fish health and physiology (Sorensen 1991, Lemly 1998) and reproduction and recruitment (Lemly 1998).

4

BLM_0077762

Additionally, selenium tends to be at higher concentrations in low velocity areas known to be important habitats for the Colorado pikeminnow and razorback sucker (Hamilton 1998, Osmundson et al. 2000, Lemly 2002, Butler et al. 1996). In the Gunnison and Colorado Rivers, selenium contamination is currently at levels which inhibit the survival and recovery of Colorado River fish (Stephens et al. 1992; Stephens and Waddell 1998; Osmundson et al. 2000). Consequently, high selenium concentrations in water and the food chain have been identified by the Service as a threat to recovery of the four Colorado River fish and their critical habitat (USFWS 2002a-d). If development of these parcels occurs, we recommend that the BLM monitor water quality, including collection of baseline condition data, in order to assess selenium and other contaminant effects on waterways in the area.

In accordance with the Service's PBO for the Gunnison River Basin and effects on the Colorado River fish, the Selenium Management Program Workgroup (SMP) was organized. The SMP includes a partnership of stakeholders including the Bureau of Reclamation, the Service, the BLM, and others. The group's goals are to reduce selenium concentrations, assist in the recovery of endangered fish, and to improve water quality in the lower Gunnison River Basin of western Colorado.

Also, a number of these stakeholders, including the BLM, are signatories to the 2010 Memorandum of Understanding, which facilitated the development of the *SMP Formulation Document for the Gunnison River Basin, Colorado* (SMP 2011). SMP (2011) includes goals for maintaining or improving the recent downward trend in selenium concentrations in the lower Gunnison River to assist in the recovery of the Colorado pikeminnow and razorback sucker. SMP (2011) identifies fluid mineral development on Federal lands as one of several BLM programs having the greatest potential to impact selenium transport. However, the SMP notes that energy development is currently limited in the lower Gunnison Basin. The document also provides a list of possible selenium control measures, including employing best management practices, controlling erosion on public lands where Mancos Shale occurs, reducing or eliminating new unlined ponds in selenium problem areas, mitigating effects of new depletions in the basin, and others.

*Proposed Stipulations*
We are concerned that the proposed stipulations do not provide specific or adequate protection for razorback sucker, Colorado pikeminnow, humpback chub, bonytail chub, greenback cutthroat trout, Canada lynx, clay-loving wild buckwheat, Colorado hookless cactus, and other Federal trust resources (e.g., migratory birds, raptors, bald and golden eagle). Under the proposed action, protection of listed species is limited primarily to the endangered species stipulation (CO-34), which essentially notifies lessees of the potential for federally listed and other sensitive species to occur in subject parcels, and the possibility that project activities may be modified by the BLM to avoid jeopardizing those species. The stipulation does not identify the means to avoid or minimize effects on listed species or habitat and, therefore, provides no assurances that those resources will be protected.

Considering the proposed action's potential effects on several federally listed species and their habitats, we recommend attaching new or modified stipulations to protect those resources, based

5

on the best available information and science, and consistent with guidance provided in BLM's *Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews* (WO IM no. 2010-117) and the *BLM Colorado Oil and Gas Leasing Reform Implementation Strategy* (BLM 2010). As part of the lease parcel review, lease issuance process, and NEPA compliance, BLM (2010) tasks field offices with evaluating the adequacy of existing stipulations and determining whether new stipulations are necessary to ensure the protection of existing identified resource objectives (p. 9). We understand that applying newly created stipulations may require an RMP amendment if they are not consistent with the intent and decisions of the 1989 RMP. Therefore, we recommend that BLM identify and apply stipulations that both address the above resource concerns and satisfy the intent and decisions of the 1989 RMP. For instance, the highly erodible and saline soils stipulation, could be applied more broadly, or modified, to address lands where selenium concentrations are high, or where the potential for contamination is significant. We also recommend that the BLM reevaluate waterfowl habitat potential, including unmapped areas, in the proposed parcels (in particular, Parcels 6202, 6205, 6206, and 6207), and apply the 1989 RMP waterfowl timing stipulation (UB-06) (March 15 – June 30) where appropriate.

If new stipulations cannot be added, or existing stipulations be modified, sufficient to protect federally listed species, we recommend deferring those parcels where listed species or suitable habitats occur until adequate stipulations are established. BLM (2010) states that, "If the lease stipulations do not provide adequate protection, it may be necessary to defer a parcel in order to develop new lease stipulations…(p.10)." Furthermore, BLM (2010) specifies that a "…parcel may be deferred pending completion of a RMP revision due to a potential change in resource condition objectives or a potential change in lease stipulations that were identified in the draft preferred alternative (p.5)." As you know, based on the most recent version of the BLM Uncompahgre Field Office RMP Revision (RMP Revision) alternatives, the Draft Preferred Alternative includes significant changes in stipulations, or "allowable uses", as compared to the Uncompahgre Basin Resource Area RMP (1989 RMP) and the Colorado BLM standard stipulations (e.g., CO-34). In accordance with BLM land use planning guidance, these restrictions were identified through the RMP Revision process as necessary to meet resource desired outcomes (goals and objectives) of the RMP. Specifically, the Draft Preferred Alternative proposes numerous new stipulations not included in the 1989 RMP [e.g., No Surface Occupancy, No Ground Disturbance, Timing Limitation, Controlled Surface Use, and Site-Specific Relocation stipulations)] for the following resources, among others:

- Steep slopes
- Major rivers and floodplains
- Perennial streams
- Intermittent and ephemeral streams
- Naturally occurring riparian and wetland areas
- Waterfowl and shorebird breeding habitats
- Federally listed and candidate plant occupied habitat and critical habitat
- Listed fish and native cutthroat trout occupied habitat
- Raptor nest sites and breeding habitat
- Bald eagle winter roosts and habitat
- Selenium and saline soils

6

- Saturated soils
- Migratory birds and breeding habitat
- Yellow-billed cuckoo habitat
- Canada lynx habitat
- Gunnison's and white-tailed prairie dogs and habitat

We understand that certain minimization measures may be incorporated at the application for permit to drill stage, i.e., as conditions of approval, subject to leaseholder rights. However, we believe it is appropriate to address and disclose anticipated conflicts such as these at the leasing stage. The proposed lease sale should incorporate species-based avoidance and minimization measures via stipulations to ensure protection of listed species, conservation of occupied or priority habitats, and seasonally important habitats, and maintenance of conditions necessary to the survival and recovery of these species.

*Migratory Birds and Bald and Golden Eagles*
Please be aware of the potential application of the Migratory Bird Treaty Act (MBTA) of 1918, as amended, 16 U.S.C. 703 et seq., and the Bald and Golden Eagle Protection Act (BGEPA) of 1940, as amended, 16 U.S.C. 668 et seq., to your project. The MBTA does not require intent to be proven and does not allow for "take," except as permitted by regulations. Section 703 of the MBTA provides: "Unless and except as permitted by regulations... it shall be unlawful at any time, by any means or in any manner, to... take, capture, kill, attempt to take, capture, or kill, possess . . . any migratory bird, any part, nest, or eggs of any such bird ... " The BGEPA prohibits knowingly taking, or taking with wanton disregard for the consequences of an activity, any bald or golden eagles or their body parts, nests, or eggs, which includes collection, molestation, disturbance, or killing activities.

The project area provides habitat for a variety of migratory bird species. Efforts should be undertaken to avoid, minimize, or mitigate impacts to these species and their habitats. Based on our data, active and historical nests and territories occur in the proposed action area, including the following species: peregrine falcon, golden eagle, bald eagle, and northern goshawk. We recommend that future exploration, development, and operations follow guidelines included in *CDOW Recommended Buffer Zones and Seasonal Restrictions for Colorado Raptors*. As with the other species noted above, we believe protective stipulations should be applied at the lease sale stage. Also related to MBTA compliance, please refer to our earlier comment regarding applying the 1989 RMP waterfowl habitat stipulation (UB-06) where appropriate.

**Conclusion**
The proposed lease sale should incorporate species-based avoidance and minimization measures via stipulations to ensure protection of listed species, conservation of occupied or priority habitats and seasonally important habitats, and maintenance of conditions necessary to the survival and recovery of these species. Again, we recommend this be accomplished by modifying existing stipulations or adding new stipulations, or deferring affected parcels pending completion of the RMP Revision and the adoption of adequate stipulations.

7

Based on the information above, we would like to point out that Section 7 consultation would be appropriate for the proposed action. The BLM must evaluate the effects of the action, including the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline (50 CFR 402.02). In this case it would be the responsibility of the Bureau of Land Management, Uncompahgre Field Office, to complete consultation with the Service on effects to listed species prior to approving the proposed oil and gas lease sale, if listed species or their habitat may be affected in or near the project area.

We appreciate the opportunity to comment on the proposed project. If the Service can be of further assistance, please contact Charlie Sharp (970) 243-2778, extension 18, or charles_sharp@fws.gov.

## Literature Cited

Bureau of Land Management (BLM). 2011. Bureau of Land Management Colorado oil and gas leasing reform implementation strategy. Lakewood, Colorado.

Butler, D.L., W.G. Wright, K.C. Stewart, B.C. Osmundson, R.P. Krueger, and D.W. Crabtree. 1996. Detailed study of selenium and other constituents in water, bottom sediment, soil, alfalfa, and biota associated with irrigation drainage in the Uncompahgre Project area and in the Grand Valley, west-central Colorado, 1991-93. Water-Resources Investigations Report 96-4138. U.S. Geological Survey, Denver, Colorado.

Environmental Protection Agency (EPA). 2008. An assessment of the environmental implications of oil and gas production: a regional case study. Working draft. Region 8 (Colorado, Montana, North Dakota, South Dakota, Utah, and Wyoming). Denver, Colorado. September.

Hamilton, S.J. 1998. Selenium effects on endangered fish in the Colorado River Basin. Pages 297-313 In: Environmental Chemistry of Selenium. Edited by W.T. Frankenberger, Jr. and R.A. Engberg. Marcel Dekker, Inc. New York, New York. 713 pages.

Lemly, A.D. 1998. Chapter 15. Pathology of selenium poisoning in fish. Pages 281-295 in Frankenberger, W.T., and R.A. Engberg (editors), Environmental Chemistry of Selenium. Marcel Dekker, Inc., New York, NY. 713 pp.

Lemly, D.A. 2002. Selenium assessment in aquatic ecosystems: a guide for hazard evaluation and water quality criteria. Springer-Verlag. New York, New York. 161 pages.

Osmundson, B.C., T.W. May, and D.B. Osmundson. 2000. Selenium concentrations in the Colorado pikeminnow (*Ptychocheilus lucius*): relationship with flows in the upper Colorado River. Arch. Environ. Contam. Toxicol. 38:479-485.

BLM_0077766

Selenium Management Program Workgroup (SMP). 2011. Program formulation document, Gunnison River Basin, Colorado. Compiled by the Bureau of Reclamation. December.

Sorensen.E.M.B. 1991. Chapter II: selenium. Pages 17-62 In: E.M.B. Sorensen (editor), Metal Poisoning in Fish. CRC Press, Boca Raton, FL. 374 pp.

Stephens, D.W., B. Waddell, and J.B. Miller. 1992. Detailed study of selenium and selected elements in water, bottom sediment, and biota associated with irrigation drainage in the middle Green River Basin, Utah, 1988-90. U.S. Geological Survey Water Resources Invest. Report No. 92-4084.

Stephens, D.W., and B. Waddell. 1998. Selenium sources and effects on biota in the Green River Basin of Wyoming, Colorado, Utah. In: Frankenberger, W.T., Jr., and R.A. Engberg, eds., Environmental Chemistry of Selenium: New York, Marcel Dekker, p. 183-204.

U.S. Fish and Wildlife Service (USFWS). 2002a. Colorado pikeminnow (*Ptychocheilus lucius*) recovery goals: amendment and supplement to the Colorado Squawfish Recovery Plan. U.S. Fish and Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

USFWS. 2002b. Razorback sucker (*Xyrauchen texanus*) recovery goals: amendment and supplement to the Razorback Sucker Recovery Plan. U.S. Fish and Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

USFWS. 2002c. Humpback chub (*Gila cypha*) recovery goals: amendment and supplement to the Humpback Chub Recovery Plan. U.S. Fish and Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

USFWS. 2002d. Bonytail (*Gila elegans*) recovery goals: amendment and supplement to the Bonytail Chub Recovery Plan. U.S. Fish and Wildlife Service, Mountain-Prairie Region (6), Denver, Colorado.

USFWS. 2009. Final Gunnison River Basin programmatic biological opinion. ES/GJ-6-CO-0-09-F-0001; TAILS # 65413-2009-F-0044. Colorado Ecological Services, Lakewood, Colorado. December 4.

9

BLM_0077767

BLM_0077768

To: Jamie Connell, BLM State Director
From: Ursula Ostrander
RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office
Date: 7/29/2019

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments
of the Draft RMP (comments dated: July 9th, 2019), I respectfully submit the
following protest. My contact information is:
440 North Fork Ave Paoina, CO 81428
uostrander@coa.edu


My protest addresses the following issues that I have raised in my previous
comments:
Alternative E
-Adopting a wholly new alternative at this stage is unacceptable, and a violation
of the National
Environmental Policy Act (NEPA). The public has not had a meaningful
opportunity to comment on this
proposal.
-Infrastructure impacts
-Air and water quality
-Health risks o Wildlife resources
- Recreation Management Areas

Those issues are addressed in the following sections of the RMP:
Alternative E in its entirety
- Section 3.4.2 Public Health &amp; Safety
- Section 4.3.1 Air Quality &amp; Climate
- Section 4.3.2 Soils &amp; Geology
- Section 4.3.3 Water Resources
- Section 4.3.5 Fish &amp; Wildlife


I believe the BLM has erred in adopting the Proposed RMP for the following
reasons:
- Alternative E was improperly adopted and was not subject to public
  comments.
- The Proposed RMP downplays public health risks, and ignores significant
  evidence we have provided that shows increased oil and gas development
  can have serious adverse impacts on public health. The Proposed RMP
  drastically decreases the stipulations in Alternative B1 and even the
  Preferred Alternative D that were designed to protect resources of value

2

from oil and gas development. It increases lands available for oil and gas lease with 'standard stipulations' - from 0% to 12%. It drastically decreases the amount of land with No Surface Occupancy (NSO) from 26% to 11% compared to Preferred Alternative D. The Proposed RMP reduces setbacks from water supplies, waterways, areas with highly erodible and saline soils. It allows oil and gas surface use on lands with steep slopes greater than 40 percent. It weakens CSU stipulations and reduces Timing Limitations near critical wildlife habitat The Proposed RMP eliminates Ecological Emphasis Areas entirely, reduces Areas of Critical Environmental Concern, and significantly weakens the proposed protections for the Jumbo Mountain Special Recreation Management Area, and does not include any "No Surface Occupancy" stipulations in that area, effectively opening Jumbo Mountain to oil and gas development. The Proposed RMP opened more of the federal mineral estate to oil and gas development without giving adequate consideration to the impact this will have on infrastructure maintained by the State and other local governments. The Proposed RMP anticipates over 1,000 new hydraulically fractured wells in the UFO, yet does not address the Programmatic Biological Opinion from the US Fish and Wildlife Service that caps surface water withdrawals on the North Fork of the Gunnison River at ~600 acre-feet per year for energy development purposes. Current oil and gas development in the area is already pushing that threshold. The BLM has failed to acknowledge that there is simply not enough water in the North Fork to sustain the level of oil and gas development anticipated in the Proposed RMP. For those reasons, I respectfully protest the Proposed RMP, and the sections I have outlined above.

Sincerely,

Date: 7/29/2019

Ursula Ostrander

BLM_0077770



| Northwest | Rocky Mountains | Southwest |
|---|---|---|
| 1216 Lincoln Street | 103 Reeder's Alley | 208 Paseo del Pueblo Sur #602 |
| Eugene, Oregon 97401 | Helena, Montana 59601 | Taos, New Mexico 87571 |
| (541) 485-2471 | (406) 443-3501 | (575) 751-0351 |

**Defending the West**   www.westernlaw.org

# Western Environmental Law Center

July 29, 2019

*Sent via e-Planning (comments) and Certified Mail (exhibits)*

Director (210)
Attention: Protest Coordinator, WO-210
P.O. Box 71383
Washington, D.C. 20024-1383

**Re:    Protest of the Uncompahgre Field Office's Proposed Resource Management Plan
and Final Environmental Impact Statement**

Dear Uncompahgre RMP Project Manager:

The Western Environmental Law Center, along with Citizens for a Healthy Community,
Center for Biological Diversity, Sierra Club, WildEarth Guardians, and High Country
Conservation Advocates (together "Conservation Groups"), submit the following protest
regarding the Bureau of Land Management ("BLM") Uncompahgre Field Office ("UFO")
Resource Management Plan ("Draft RMP") and Environmental Impact Statement ("EIS"). The
Uncompahgre RMP planning area includes 3,097,460 acres of federal, private, state, and city
land in Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties in southwestern
Colorado. The Uncompahgre RMP planning area covers about 675,800 acres of BLM-
administered public lands—including portions of the Dominguez Canyon Wilderness Area and
four river systems (the Gunnison, San Miguel, Dolores, and Uncompahgre)—and 971,220 acres
of federal subsurface mineral estate. Quantities of natural gas and oil production for the
Uncompahgre Study Area are projected in the Reasonable Foreseeable Development Scenario.
RFD at Tables 6a, 6b, 7a, 7b. BLM's preferred alternative, Alternative E, includes the following
projected production volumes:[1]

---

[1] U.S. Department of the Interior, Bureau of Land Management, *Inventory of Onshore Federal
Oil and Natural Gas Resources and Restrictions to Their Development*, Phase III Inventory –
Onshore United States (2008) *found at:*
https://www.blm.gov/sites/blm.gov/files/EPCA_III_Inventory_Onshore_Federal_Oil_Gas.pdf.
These oil and gas volume estimates were derived from publicly-available Energy Policy and
Conservation Act (EPCA) Phase III data developed by and for Department of Interior agencies.
The purpose of this data is to estimate oil and gas volumes on public lands, as required by
Section 604 of the EPCA, as amended by Section 364 of the Energy Policy Act of 2005. We

BLM_0077771

Oil Volume:
CSU: 5.404678 mmbbl
NL: 0.974315 mmbbl
NSO: 2.076926 mmbbl
OPEN: 9.996115 mmbbl

Gas Volume:
CSU: 44.500764 bcf
NL: 3.971663 bcf
NSO: 12.867885 bcf
OPEN: 61.360176 bcf

Estimated direct GHGs from development allowed in Alternative E is 2,512,570 tons of $CO_2e$ per year. FEIS at 4-22. Estimated indirect GHGs from the high production scenario is 129 million tons $CO_2e$ over a 30 year period. FEIS at 4-22. 37% of that 129 million tons would come from federally-managed minerals. *Id.*

Conservation Groups' mailing addresses are as follows:

Western Environmental Law Center
120 Shelton McMurphey Blvd., Ste. 340
Eugene, OR 97401
(541) 485-2471

Citizens for a Healthy Community
P.O. Box 1283
Paonia, CO 81428
(970) 399-9700

Center for Biological Diversity
1536 Wynkoop St., Suite 421
Denver, CO 80202
(720) 925-2521

Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5500

WildEarth Guardians
301 N. Guadalupe, Suite 201

clipped the EPCA data by the project area boundary provided by BLM in a GIS format to generate project-specific oil and gas volume estimates.

BLM_0077772

Santa Fe, NM 87501
(505) 988-9126

High Country Conservation Advocates
P.O. Box 1066
Crested Butte, CO 81224
(970) 349-7104

This protest focuses on the BLM's failure to adequately analyze and disclose the direct, indirect, and cumulative impacts of fossil fuel leasing and development authorized and made available by BLM in the Uncompahgre Draft Resource Management Plan and Environmental Impact Statement, and correspondingly, the impact that such development will have on air, water, human health, and climate change. Finalizing the Uncompahgre RMP, as proposed, would cement BLM's place as dramatically out of step with the realities facing modern public lands management, including current science and national policy on climate change.

On behalf of members and supporters that live, work, and recreate in Colorado, the Conservation Groups call on the BLM to reconsider the wisdom of the fossil fuel leasing and development considered by the Uncompahgre RMP/EIS. Specifically, Conservation Groups request that BLM not finalize the Uncompahgre RMP/EIS until:

- BLM considers and analyze a "no-leasing" alternative that would bar new fossil fuel leases in the Uncompahgre planning area.
- BLM takes steps to reduce methane emissions from both oil and gas operations and coal mining, including (1) by undertaking a true hard-look analysis of methane waste and global warming potential; (2) by adopting enforceable mitigation requirements to minimize methane emissions and waste; and (3) by considering alternatives that require coal mines in the Uncompahgre planning area to capture or flare methane emissions.
- BLM addresses new scientific and economic information, including regarding (1) the impacts of climate change on the Uncompahgre planning area; (2) the social burden, or cost, of carbon and methane waste that would be authorized by the RMP; and (3) fossil fuel production and employment.
- BLM takes a hard look at impacts to air, water, and human health, which must include a detailed Health Impact Assessment.

# I.    Conservation Groups' Statement of Interest in the Uncompahgre RMP

Conservation Groups have participated in the planning process for the UFO RMP—specifically by submitting a comment letter on the Draft RMP/Draft EIS on November 1, 2016, as well as submitting two supplemental information letters with the BLM, on October 23, 2012 and February 3, 2014, all of which are incorporated herein by this reference—and have interests that are adversely affected by planning decisions made in the EIS. *See* 43 C.F.R. § 1610.5-2. Conservation Group, Citizens for a Healthy Community ("CHC"), also participated in the collaborative effort developing the North Fork Alternative Plan ("NFAP"), which was submitted

BLM_0077773

to BLM on December 2, 2013 and included as BLM Alternative B.1. Moreover, Conservation Groups contracted with air resources expert, Megan Williams, who submitted comments on the Bull Mountain Master Development Plan on April 14, 2015 [hereinafter Williams Comments]. The Williams Comments were attached as Exhibit 313 to Conservation Groups' comment on the Draft RMP/Draft EIS and are incorporated herein by this reference.

The **Western Environmental Law Center** ("WELC") uses the power of the law to defend and protect the American West's treasured landscapes, iconic wildlife and rural communities. WELC combines legal skills with sound conservation biology and environmental science to address major environmental issues in the West in the most strategic and effective manner. WELC works at the national, regional, state, and local levels; and in all three branches of government. WELC integrates national policies and regional perspective with the local knowledge of our 100+ partner groups to implement smart and appropriate place-based actions, including in southwestern Colorado.

**Citizens for a Healthy Community** ("CHC") is a grass-roots organization with more than 450 members formed in 2010 for the purpose of protecting communities (people and their environment) within the air-, water- and food-sheds of Delta County, Colorado from the impacts of oil and gas development. CHC's members and supporters include organic farmers, ranchers, vineyard and winery owners, sportsmen, realtors, and other concerned citizens impacted by oil and gas development. CHC members have been actively involved in commenting on BLM's oil and gas activities.

The **Center for Biological Diversity** is a non-profit environmental organization with over 48,500 members, many of whom live and recreate in western Colorado. The Center uses science, policy and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive. The Center has and continues to actively advocate for increased protections for species and their habitats in Colorado. The lands that will be affected by the proposed resource management plan include habitat for listed, rare, and imperiled species that the Center has worked to protect including rare, endangered and threatened species like the Gunnison Sage-Grouse and the Gunnison and Uncompahgre River's fish species such as the Colorado Pikeminnow and Razorback Sucker. The Center's board, staff, and members use the public lands in Colorado, including the lands and waters that would be affected by expanded fossil fuel development authorized by this resource management plan, for quiet recreation (including hiking and camping), scientific research, aesthetic pursuits, and spiritual renewal.

The **Sierra Club** is America's largest grassroots environmental organization, with more than 3.5 million members and supporters nationwide, including more than 22,000 members in Colorado. Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

**WildEarth Guardians** ("Guardians") is dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Guardians is a west-wide

BLM_0077774

environmental advocacy organization with thousands of members in Colorado and surrounding states. Guardians members live in and regularly use and enjoy lands in the Uncompahgre Field Office.

**High Country Conservation Advocates** (HCCA) is located in Crested Butte, Colorado and has over 900 members. HCCA was founded in 1977 to protect the health and natural beauty of the land, rivers, and wildlife in and around Gunnison County now and for future generations. For over 40 years HCCA has engaged on public lands issues, ranging from oil and gas development to travel planning to logging. HCCA is a grassroots organization that collaborates with local stakeholders and policymakers, applies sound science, educates, and upholds the environmental laws affecting our community.

## II.    Conservation Groups' Statement of the Issues Protested

### A.    *The FEIS Violated NEPA in Adopting an Alternative Not Presented to the Public.*

In the FEIS, BLM includes for the first time a new alternative, Alternative E. While an agency can modify a proposed action in light of public comments, 40 C.F.R. § 1503.4(a), a supplemental EIS is required if BLM makes substantial changes that are relevant to environmental concerns, as it has in adopting the new Alternative E, 40 C.F.R. § 1502.9(c). Therefore, BLM must prepare a supplemental EIS.

In introducing this new Alternative as the Preferred Alternative only in the FEIS, BLM undermines the purpose of NEPA. While NEPA focuses on disclosure of impacts, the statute has an "'action-forcing' purpose in two important respects. It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S. Ct. 1835, 1845 (1989) (internal citations omitted). In developing Alternative E internally, after the ordinary opportunity for the public to consider and comment on the agency's proposal, BLM unlawfully subverts this process.

BLM's approach is especially egregious, given the dramatic difference between what it presented to the public in the draft EIS as its Preferred Alternative, and what it now presents—after the opportunity for public participation has ended—as its true Preferred Alternative. In contrast to the Preferred Alternative in the draft EIS (alternative D), in Alternative E:

- 18,320 acres have been changed from "managed to protect wilderness characteristics" to "managed to minimize impacts on wilderness character, while managing for other uses." FEIS at 2-6 to 2-7.
- 177,700 acres of "ecological emphasis areas" identified in Alternative D are zeroed out. FEIS at 2-7.
- Thousands of acres have been moved from more protective classes to less protective classes of visual resource management classification. FEIS at 2-6.

BLM_0077775

- There are hundreds of thousands fewer acres on which surface-disturbing activities are restricted. FEIS at 2-10.
- 3,950 more trails are open to cross-country motorized travel. FEIS at 2-12.
- 20,000+ fewer acres are protected as Areas of Critical Environmental Concern. FEIS at 2-12.

Alternative E does not present mere tweaks or minor improvements to Alternative D, developed in response to comments. On the contrary, the new Alternative E is directly contrary to the comments received, and represents a dramatic change from the project that commenters were able to comment on.

Moreover, Alternative E was presented in the FEIS without all supporting data and files being made publicly and timely available. GIS files for the new alternative were not made available when the protest period was initiated on June 28, 2019. The Proposed RMP/Final EIS states on page ES-1 that "(t)his website contains background information about the project, a public involvement and project timeline, maps and relevant GIS data of the Planning Area, and copies of public information documents released throughout the RMP/EIS process." However, there were no GIS data files for the new Alternative E available until July 15, which shortened the meaningful time for comment. Further, the Proposed RMP/Final EIS maps in Volume II, Appendix A are at a scale that shows the entire UFO decision area across six counties. This scale does not permit effective review of proposed disposal parcels in context. Nor does this scale allow for examination of proposed actions and the proposed Alternative E in an informed manner. Additionally, the BLM did not make hard copies of the UFO RMP available for the public to review until well into halfway through the comment period, further frustrating public participation.

### B.   BLM Failed to Consider "No Leasing" or "Limited Leasing" Alternatives.

As Conservation Groups urged in their comments on the Draft RMP/Draft EIS (attached as Exhibit 1-1) at pp. 22-28, BLM must also consider "no leasing" or "limited leasing" alternatives in light of the best available information and science, and in consideration of national policy. BLM failed to do so. Instead, all of the final EIS alternatives, including the new "agency-proposed" alternative E, propose to leave available extensive lands for fossil fuel leasing and development. FEIS at 2-8. BLM's range of alternatives fails to satisfy its statutory obligations under FLPMA and NEPA.[2]

Climate change has fundamentally altered the paradigm of public lands management—a reality reflected in state, national, and international policy and commitments, as well as the best available science—but ignored by the Uncompahgre RMP EIS. The business-as-usual approach reflected by BLM fails to meet the needs of present and future generations—the agency's core mandate in managing public lands and minerals. 43 C.F.R. § 1702(c). Both science and common sense dictate that perpetuating a management approach which has substantially contributed to

---

[2] Conservation Groups addressed BLM's failure to consider an adequate range of alternatives in their November 1, 2016 comments at pp. 15-39

BLM_0077776

climate change is no longer sufficient. The agency must consider alternatives that are responsive to this reality, including not leasing fossil fuel minerals.

### Summary of Alternatives[3]

| Resource | Alt. A | Alt. B | Alt. B.1 | Alt. C | Alt. D | Alt. E* |
|---|---|---|---|---|---|---|
| Oil & Gas Open to Leasing (Acres) | 871,810 | 696,450 | 609,360 | 871,810 | 865,970 | 871,810 |
| Oil & Gas Closed to Leasing (Acres) | 44,220 | 219,580 | 306,670 | 44,220 | 50,060 | 44,220 |
| Coal Acceptable to Leasing (Acres) | 144,780 | 320,440 | 320,440 | 405,230 | 371,400 | 371,250 |
| Coal Unacceptable for Leasing (Acres) | 0 | 96,650 | 96,650 | 11,860 | 45,690 | 44,570 |

(*)Agency Preferred Alternative

For example, with respect to coal mining, the final EIS considers six alternatives with varying levels of lands open ("acceptable") to coal leasing. But, as the table above demonstrates, the range is skewed toward leaving the vast majority of coal-bearing lands open for leasing.

Yet even under this lopsided "range" of alternatives, the likely amount of coal produced and burned is identical. *See* FEIS at 2-144 ("Coal production is expected to remain the same across all alternatives.") A recent case from the District of Montana found that the range of coal-leasing alternatives in two RMPs in Montana and Wyoming was inadequate because the alternatives (five alternatives in one RMP, and four in the other) were identical. *W. Org. of Res. Councils v. U.S. Bureau of Land Mgmt.*, 2018 WL 1475470, at *7-9 (D. Mont. Mar. 26, 2018), *appeal dismissed*, No. 18-35836, 2019 WL 141346 (9th Cir. Jan. 2, 2019) ("BLM's failure to consider any alternative that would decrease the amount of extractable coal available for leasing rendered [the EISs] inadequate.") So too here. BLM does not respond to the problem of identical coal alternatives other than to say generically that it has "developed and analyzed a reasonable range of alternatives" pursuant to its authorities. FEIS at R-495.

Notably, the final EIS indicates that nearly all of the coal production in the resource area will come from a 40,000 acre area that is almost entirely open to leasing under each alternative: the Somerset coal field. FEIS at 4-454; S-104-289 ("Coal production would not change across alternatives even though there are differences in the number of acres. That is because production is expected to come from one mine, and those acres of federal coal are currently leased.") The only way to produce a range of alternative coal outcomes would be to analyze alternatives that placed significant portions of the Somerset area off-limits to coal mining—which BLM failed to do, in violation of NEPA. Conservation Groups here reiterate their previous request that BLM evaluate at least one alternative that will result in at least a 50% reduction in coal production in

---

[3] FEIS at 2-8.

BLM_0077777

the resource area over the 20-year life of the plan, and another that will eliminate new coal leasing.

Moreover, the "range" of alternatives regarding coal production is not reasonably broad based on its treatment of other coal producing regions within the Uncompahgre field office area. For example, the vast majority of the Tongue Mesa coal field is left open under each action alternative, despite the fact that "[t]he coal resources in the Tongue Mesa Coal Field are heavily faulted, with no rail access to the area, making it economically unviable to mine in the next 20 years." FEIS at S-10. Similarly, while most of the Grand Mesa coal-field is open to coal leasing under all three action alternatives, coal there is also unlikely to be mined in the next two decades. *Id.* This begs the question: if no coal will be mined in the Tongue Mesa and Grand Mesa coal fields, why did BLM fail to consider an alternative that eliminates coal mining there? Although this question was posed by Conservation Groups in their comments on the DEIS, BLM fails to answer it in its final EIS.

BLM's alternatives fail to account for current resource conditions, changes in circumstances, and new or revised state and national laws and policy, in particular with regard to climate change. Specifically, Colorado has adopted significant new laws and policies to reduce greenhouse gas pollution and climate change impacts to our state's communities. The decades of continued fossil fuel expansion green-lighted under the UFO RMP would undermine those efforts.

In particular, HB 1261 enacts aggressive greenhouse gas emissions targets for the State— 26% by 2025, 50% by 2030, and 90% by 2050. The foreseeable development scenarios for the UFO RMP move in the opposite direction, anticipating an additional 1200 oil and gas wells while making vast acreages available for new oil, gas, and coal leasing. Estimated direct GHGs from development allowed in Alternatives D and E are 2,497,194 tons of $CO_2$ per year and 2,512,570 tons per year, respectively (approximately 75 million tons of $CO_2e$ over a 30-year period) (Vol I pg. 4-22 of the FEIS). Estimated indirect GHGs from the high production scenario is approximately 129 million tons $CO_2e$ over a 30 year period. (Vol 1 pg. 4-29 of the FEIS). Together, direct and indirect emissions across 30 years are equivalent to the annual emissions of 52 coal-fired power plants. Colorado's climate goals and greenhouse gas reductions targets would be impossible to attain with BLM's expansion of fossil fuel development for another 20 years under the UFO RMP.

SB 181, which was signed into law on April 16, 2019, requires prioritization of public health, safety, and the environment when necessary and reasonable over oil and gas development. It also allows for non-production of oil and gas minerals when necessary and reasonable to protect public health, safety, welfare, the environment and wildlife. The UFO RMP takes the opposite approach; it prioritizes oil and gas development over protection of public health, safety, the environment and wildlife, which directly conflicts with Colorado policy. SB 181 also seeks to put communities impacted by oil and gas on the same level footing as industry and local government. The BLM ignored 42,000 public comments (80% of the total comments received), including local government comments of frontline impacted communities, regarding the incompatibility of leasing 95% of BLM lands and minerals to oil and gas with protecting the

BLM_0077778

health, safety and welfare of the community. The UFO RMP undermines Colorado's goals to put protection of public health, safety, environment and wildlife first.

In addition, S.B. 19-181 provides local government jurisdictions the ability to develop oil and gas land use regulations that could be more restrictive than the State's permitting requirements. As the BLM is likely aware, Gunnison County has the authority to protect and promote the public health, welfare and safety of the people of Gunnison County, and the authority to regulate land use planning and quality and protection of the environment in the County. To this end, Gunnison County has adopted regulations to exercise such authorities including the review, approval or denial of proposed activities and uses of land and natural resources including oil and gas. It is critical for the BLM to include compliance with all Gunnison County regulations regarding oil and gas exploration, development, operation and upstream activities as a mandatory element of the Proposed RMP/Final EIS. In addition, the BLM should include a requirement that any lessee comply with any other land use or environmental regulation imposed by Gunnison County in any way relates to operations on an oil and gas leasehold, including but not limited to water quality, public roads, emergency response, wildlife concerns, agricultural uses and recreation uses.

Beyond the agency's failure to take a meaningful hard look at resource impacts from global warming, BLM failed in its basic obligation to consider all reasonable alternatives, including alternatives that would significantly reduce planning area greenhouse gas emissions, and in particular an alternative that considers not leasing public lands for fossil fuel development. 40 C.F.R. § 1502.14.

BLM claims that "a full closure to fluid mineral leasing alternative was not carried forward because the BLM has no suitable thresholds or standards to measure and compare the significance of impacts related to greenhouse gas emissions under that alternative relative to other alternatives." FEIS at 2-16. This excuse is inadequate under NEPA. BLM also does not address why it could not consider a "limited leasing" alternative.

In fact, as Conservation Groups have explained, there are multiple scientifically robust methods to meaningfully disclose the impact of greenhouse gas emissions. One such tool is the social cost of carbon, which was "designed to quantify a project's contribution to costs associated with global climate change." *High Country Conserv. Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1189-90 (D. Colo. 2014). Specifically, the social cost of carbon protocol is a valid, well-accepted, credible, and interagency-endorsed method of calculating the costs of greenhouse gas emissions and understanding the potential significance of such emissions.[4] The protocol is just the sort of tool that can be used as a proxy for understanding climate impacts and to compare alternatives, as required by NEPA. *See* 40 C.F.R. § 1502.22(a) (stating agency "shall" include all "information relevant to reasonably foreseeable significant adverse impacts [that] is essential to a reasoned choice among alternatives").

---

[4] *See* Interagency Working Group on the Social Cost of Carbon, United States Government, *Technical Support Document: Technical Update on the Social Cost of Carbon for Regulatory Impact Analysis – Under Executive Order 12866* (May 2013) at 2 (hereinafter 2013 TSD) (previously attached as Exhibit 109).

CONSERVATION GROUPS' PROTEST                                                        9
UNCOMPAHGRE FIELD OFFICE PRMP AND FEIS

In rejecting a "no leasing alternative," BLM also states that "The Mineral Leasing Act (30 US Code 226) gives BLM the authority to lease and manage federal fluid mineral estate." But BLM fails to acknowledge that it also has legal authority under FLPMA, the MLA and NEPA to adopt a no-leasing alternative as necessary to respond to the threats posed by climate change. BLM has broad discretion in determining when, how, and if fossil fuel resources are made available for leasing.

With regard to oil and gas, the MLA states: "All lands subject to disposition under this Act which are known or believed to contain oil or gas deposits *may* be leased by the Secretary." 30 US.C. § 226(a) (emphasis added); *see also Udall v. Tallman*, 30 U.S. 1, 4 (1965) (MLA "left the Secretary discretion to refuse to issue any lease at all on a given tract"); *Burglin v. Morton*, 527 F.2d 486, 488 (9th Cir. 1975) ("The permissive word 'may' in Section 226(a) allows the Secretary to lease such lands, but does not require him to do so."); *Pease v. Udall*, 332 F.2d 62, 63 (9th Cir. 1964) ("[T]he Mineral Leasing Act has consistently been construed as leaving to the Secretary, within his discretion, a determination as to what lands are to be leased thereunder.").

Although the MLA states that, for oil and gas, "[l]ease sales shall be held for each State where eligible lands are available at least quarterly and more frequently *if* the Secretary of the Interior determines such sales are necessary," quarterly leasing is *not required* if no lands are "eligible" and "available" due to factors including withdrawal from the operation of the MLA under FLPMA, allocation decisions under an applicable land management plan, need for additional environmental review, or exercise of Secretarial discretion. 30 U.S.C. § 226(b)(1)(A); *see also* 43 C.F.R. § 3120.1-1; U.S. Bureau of Land Management, Oil and Gas Leasing Reform, Instruction Memorandum No. 2010-117 ("Eligible lands include those identified in 43 C.F.R. § 3120.1-1 as being available for leasing (BLM Manual 3120, Competitive Leases). They are considered available for leasing when all statutory requirements have been met, including compliance with the NEPA, appropriate reviews have been conducted, and *lands have been allocated for leasing in the RMP* (BLM Handbook H-3101-1, Issuance of Leases).") (emphasis added). Thus, a decision to allocate an area as ineligible for leasing through the planning process is contemplated by BLM's regulations, contradicting any perceived requirement that BLM must lease the area.

The Federal Onshore Oil and Gas Leasing Reform Act ("FOOGLRA")—while not altering the fundamental leasing structure of the MLA—imposed a competitive bidding requirement on all offered leases. 30 U.S.C. §§ 188, 195, 226. Critically, FOOGLRA did not repeal or alter Secretarial discretion of *whether* to offer any particular lands for lease. *See Western Energy Alliance v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013) ("Before the MLA was amended by the [FOOGLRA]…it was well established that the Secretary had extremely broad discretion and was not obligated to issue any lease on public lands…. The MLA, as amended by the Reform Act of 1987, continues to vest the Secretary with considerable discretion to determine which lands are 'to be leased' under § 226(b)(1)(A)."). As held by the Court of Appeals in *Bob Marshall Alliance v. Hodel*:

the Mineral Leasing Act gives the Interior Secretary discretion to determine which lands are to be leased under the statute. 30 U.S.C. §226(a) (1982); *see*

BLM_0077780

*Mountain States,* 499 F.Supp. at 391-92. We have held that the Mineral Leasing Act "allows the Secretary to lease such lands, but does not require him to do so.... [T]he Secretary has discretion to refuse to issue any lease at all on a given tract." *Burglin v. Morton,* 527 F.2d 486, 488 (9th Cir. 1975) (citing *Udall v. Tallman,* 380 U.S. 1, 4 (1965), *cert denied,* 425 U.S. 973 (1976)).

852 F.2d 1223, 1230 (9th Cir. 1988).

For coal, the Federal Coal Leasing Amendments Act ("FLCAA") provides that the Interior Secretary "is authorized" to identify tracts for leasing and thereafter "shall, in his discretion … from time to time, offer such lands for leasing …." 30 U.S.C. § 201. *See also WildEarth Guardians v. Salazar,* 859 F. Supp. 2d 83, 87 (D.D.C. 2012) ("Under the [FLCAA], the Secretary is *permitted* to lease public lands for coal mining operations after conducting a competitive bidding process.") (emphasis added). This discretion has been consistently upheld by the courts. *See, e.g., Krueger v. Morton,* 539 F.2d 235, 238-40 (D.C. Cir. 1976); *NRDC v. Hughes,* 437 F.Supp. 981, 983-85 (D.D.C. 1977). Further, the Secretary has discretion to reject lease applications on the grounds that "leasing of the lands covered by the application, for environmental or other sufficient reasons, would be contrary to the public interest." 43 C.F.R. § 3425.1-8(a)(3).

The Secretary of the Interior also has authority under FLPMA to "withdraw" an area of federal land from oil, gas or coal leasing to "maintain . . . public values" or for a "particular public purpose." FLPMA defines a withdrawal as:

> withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program . . .

43 U.S.C. § 1702(j). FLPMA further provides that Congress declares that it is the policy of the United States that "the public lands [shall] be managed in a manner that will protect the quality of … air and atmospheric … values." 43 U.S.C. § 1701(a)(8).

Under FLPMA's "multiple use and sustained yield" management directive, *id.* § 1701(a)(7), the federal government must manage public lands and resources in a manner that "takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land[,]" *id.* § 1702(3). Further, "[i]n managing the public lands the Secretary shall … take any action necessary to prevent unnecessary or undue degradation of the lands." *Id.* § 1732(b).

Under these authorities, BLM is required not only to evaluate the impacts of federal fossil fuel leasing to public lands, water, and wildlife resources, but to avoid harm to those resources whenever possible.

Accordingly, the MLA and FLPMA provide BLM the legal authority to either decide not to lease particular lands, or to withdraw large tracts from leasing.[5]

Every ton of carbon dioxide added to the atmosphere worsens climate change. So any additional oil and gas or coal production permitted on BLM land managed by the Uncompahgre field office and the combustion of those fossil fuels will worsen climate change. Due to the urgent need to protect mankind and federal public lands from the potentially devastating impacts of catastrophic global warming, BLM must consider and analyze an alternative or alternatives that reduce or eliminate the number of new fossil fuel leases in the Uncompahgre area.

An alternative is "reasonable" if it falls within the agency's statutory mandate, and meets at least a part of the agency's purpose and need. *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 866 (9th Cir. 2004); *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 (9th Cir. 1992). As described above, no-leasing and limited leasing alternatives fall within the agency's statutory mandate.

They also meet the agency's purpose and need. BLM defines a new purpose and need in the final EIS, as follows:

> The resource management planning process is a key tool that the BLM uses, in collaboration with interested public parties, to ensure a coordinated and consistent approach to managing BLM-administered lands. An RMP is a set of comprehensive long-range decisions concerning the use and management of resources administered by BLM. In general, the purpose of an RMP is twofold:
>
> 1. It provides an overview of goals, objectives, and needs associated with public lands management.
>
> 2. It resolves multiple-use conflicts or issues associated with those requirements that drive the preparation of the RMP.

---

[5] Even if BLM concludes that the agency lacks authority to bar new oil, gas, and coal leasing throughout the planning area, it should still consider such an alternative because it is otherwise reasonable. Federal courts hold that agencies have the duty to consider reasonable alternatives that are outside the jurisdiction of the agency or that require a change of law to implement. *See* 40 C.F.R. § 1502.14(c) (an EIS "shall" "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency"); Council on Environmental Quality, Executive Office of the President, Publication of Memorandum to Agencies Containing Answers to 40 Most Asked Questions on NEPA Regulations, 46 Fed. Reg. 18,026–01 at 18,027 (1981) ("An alternative that is outside the legal jurisdiction of the lead agency must still be analyzed in the EIS if it is reasonable. A potential conflict with local or federal law does not necessarily render an alternative unreasonable"); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (setting aside EIS for failure to address alternative requiring Congressional action).

BLM_0077782

Although the 1985 and 1989 RMPs have been subsequently amended, they do not satisfactorily address new and emerging issues. Laws, regulations, policies, and issues regarding management of BLM-administered lands have changed during the life of the plans. The BLM needs to revise the 1985 and 1989 RMPs to ensure compliance with current mandates and to address issues that have arisen since their preparation.

FEIS at 1-1. Barring new leases to achieve national, regional and local greenhouse gas reduction goals would "address" the "new and emerging issues" surrounding our understanding of climate change. A desired outcome for a reasonable alternative could be reducing the planning area's contribution to climate pollution. It would establish that certain uses—oil, gas, and coal production—would be allowable only on current leases, and it would enable BLM to achieve a desired outcome of reducing the chance of catastrophic climate change and increasing the chance for the U.S. to reach its greenhouse gas reduction goals set by the Paris Agreement. Such management direction would adhere to the law and BLM's multiple use mandate.

Additionally, a no-leasing or limited leasing alternative would "resolve[] multiple-use conflicts." The principle of multiple use explicitly anticipates that some use would be prohibited on public lands. Further, the keystone of multiple use is to "take[] into account the long-term needs of future generations for renewable and nonrenewable resources." 43 U.S.C. § 1702(3). There is no greater or more urgent threat to public land resources in the long-term than climate change. Taking action on climate change by limiting one use—fossil fuel extraction—to benefit all the others is the very essence of the kind of trade-off anticipated to be resolved by the multiple use mandate.

Further, the Tenth Circuit Court of Appeals has explicitly rejected the argument that FLPMA's multiple use mandate requires that public lands be made available for fossil fuel extraction.

BLM's obligation to manage for multiple use does not mean that development *must* be allowed on [a particular piece of public lands]. Development is a *possible* use, which BLM must weigh against other possible uses – including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.

*New Mexico ex rel. Richardson*, 565 F.3d at 710 (emphasis in original).

As such, a no or limited fossil fuel leasing alternative would meet the purpose and need for the RMP.

BLM_0077783

### C. BLM Failed to Explicitly Consider a Renewable Energy Alternative or Include Renewable Energy as a Priority Element in Each Alternative.

None of the alternatives considered look specifically at renewable energy. However, a transition to clean energy is critical to avoiding climate disruption. Conservation Groups raised this issue in their comments on the DEIS, attached as Exhibit 1-1, at pp. 35-39.

A Comparative Summary of Alternatives is presented in Table 2-1. FEIS 2-6. It shows that many resource uses were considered, including coal and fluid minerals, but, other than addressing ROWs and utility corridors generally, the table plainly illustrates how the Alternatives considered fail to incorporate renewable energy as a resource. The FEIS fails to even list renewable energy development as an Alternatives Considered but Eliminated from Detailed Analysis. FEIS 2-15 to 2-18. On the other hand, the FEIS provides an extensive look at coal and fluid minerals leasing. FEIS 4-236 to 4-273. The Uncompahgre Field Office also conducted an extensive Reasonable Foreseeable Development Scenario report for oil and gas development in 2012.[6]

The BLM conducted a study of renewable energy potential for the planning area in 2010.[7] The Reasonable Foreseeable Development Scenario for solar development states that:

> The likelihood of future solar project development in the Uncompahgre RMP planning area can be estimated by considering the quality of solar resources, the acreage of lands with slope less than five percent (which is required for Central Generation Technology), existing solar projects in the area, the number of pending ROW applications within the UFO, the quality of solar resources in the UFO compared with other areas in the region, and expressions of interest by solar companies.[8]

However, the BLM failed to develop information about these factors to conduct a detailed analysis to determine the likelihood of future solar development.

Contradicting the lack of in-depth analysis of renewable energy potential, the BLM assumes that the demand for renewable energy ROWs "would increase over the life of this RMP." FEIS 4-312. The basis for this assumption and the magnitude of this increase go unexplained. Yet, ultimately, BLM dismisses the potential for renewable energy development in

---

[6] Uncompahgre Field Office, Reasonable Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office, Colorado, 2012, available at https://eplanning.blm.gov/epl-front-office/projects/nepa/66641/81689/95910/UncompahgreRFD_Feb2012.pdf (previously attached as Exhibit 40) ("UFO RFD").

[7] Uncompahgre Field Office, "Renewable Energy Potential Report," Resource Management Plan Revision and Environmental Impact Statement, May 2010, available at: https://eplanning.blm.gov/epl-front-office/projects/lup/62103/78800/90467/UFO_RenewEnergy_05-25-2010_508.pdf (previously attached as Exhibit 39).

[8] Id. at 3-5.

BLM_0077784

the planning area, stating that: "Although state of Colorado policies and financial incentives are classified as favorable for renewable energy development, the UFO does not rank nationally among the top 25 BLM field offices with potential." FEIS 3-117. The FEIS further states that "the demand for renewable energy-related ROWs should increase nationally, although within the Planning Area, the potential for wind, solar, and biomass energy is considered to be low relative to other field offices in BLM." FEIS 3-118. This dismissive approach ignores the high potential found for solar photovoltaic resources, and future economic conditions and energy demand in the planning area. The planning area's national rank is immaterial to BLM's requirement to adequately analyze the potential for renewable energy.

Importantly, the BLM also fails to consider the impacts of coal and oil and gas development on renewable energy resources and the potential incompatibility of these resource uses. Instead, the FEIS simply states generally that:

> *Implementing management for the following resources would have negligible or no impact on renewable energy and are therefore not discussed in detail*: air quality, climate, soils and water, vegetation, fish and wildlife, special status species, wild horses, wildland fire ecology and management, cultural resources, paleontological resources, lands with wilderness characteristics, forestry and woodland products, livestock grazing, *energy and minerals*, comprehensive trails and travel management, lands and realty, renewable energy, ACECs, wild and scenic rivers, national trails and byways, watchable wildlife viewing sites, Native American tribal uses, and public health and safety.

FEIS 4-321 (emphasis added).

Nevertheless, the BLM recognizes that renewable energy facilities are usually sited based on resource potential and proximity to transmission lines or end uses. Oil and gas development that will impinge on these areas would create conflicts with renewable energy development that must be addressed. The discussion of cumulative impacts does identify the impacts of oil and gas on renewable energy development as follows, but no further analysis is conducted:

> Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect renewable energy are energy and minerals development . . . .

FEIS 4-324. Given the urgent need to transition away from fossil fuels and toward renewable energy to address climate change, it is incumbent upon the BLM to ensure that renewable energy development, especially photovoltaic solar development, is not precluded in the planning area by new oil and gas development. Further, the BLM is required to include a renewable energy alternative or include renewable energy as a priority element in each alternative to ensure that a thorough analysis of this important public lands resource is conducted.

### D.  BLM Failed to Consider Carbon Budgeting or Align Its Decision-making with Paris Agreement Goals.

BLM failed to take a 'hard look' at the climate impacts of its preferred plan by refusing

BLM_0077785

to consider carbon budgeting as a means of informing the public and decisionmakers about the impact of continued fossil fuel development in the planning area.[9] BLM must disclose and assess the portion of the carbon budget that fossil fuel production under the UFO RMP will consume. On December 12, 2015, 197 nation-state and supra-national organization parties meeting in Paris at the 2015 United Nations Framework Convention on Climate Change Conference of the Parties consented to the Paris Agreement committing its parties to take action so as to avoid dangerous climate change. The Paris Agreement commits all signatories— including the United States—to a target holding long-term global average temperature "to well below 2°C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C above pre-industrial levels."[10] Although President Trump announced on June 1, 2017 that the U.S. would withdraw from the Paris Agreement, the earliest possible effective withdrawal date is November 4, 2020, in accordance with Article 28 of the Agreement.

A 2018 report from the Intergovernmental Panel on Climate Change (IPCC), a group of scientists convened by the United Nations, finds that the risks and impacts of 2°C of warming are much greater than those of 1.5°C, including risks and impacts associated with extreme heat; heavy precipitation; drought; sea level rise; impacts on biodiversity and ecosystems, including species loss and extinction; and health, livelihoods, food security, water supply, human security, and economic growth (hereinafter, "IPCC 1.5°C Report").[11] This report was written by 91 authors and 133 contributing authors, cites over 6,000 references, and involved 42,001 expert and government reviewers.[12] It was prepared in response to a request made during the 2015 United Nations Framework Convention on Climate Change decision adopting the Paris Agreement.[13]

As an initial matter, the report establishes that the world has already warmed by 1°C due to human activity.[14] This warming is already affecting people and ecosystems worldwide, with disproportionate effects on poor and vulnerable populations, small islands, megacities, coastal regions, and high mountain ranges.[15]

The IPCC 1.5°C Report projects that, if greenhouse gas emissions continue at the current rate, the atmosphere will warm by 1.5° Celsius above preindustrial levels between 2030 and

---

[9] Conservation Groups addressed carbon budgeting at pp. 5-15 of their Nov. 1, 2016 comments (attached hereto as Exhibit 1-1).
[10] Paris Agreement at Art. 2 (previously attached as Exhibit 2).
[11] Intergovernmental Panel on Climate Change, *Global Warming of 1.5°C, an IPCC special report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways, in the context of strengthening the global response to the threat of climate change, sustainable development, and efforts to eradicate poverty* (October 6, 2018) (hereinafter, "IPCC 1.5°C Report") *available at:* http://www.ipcc.ch/report/sr15/ (attached as Exhibit 1).
[12] IPCC 1.5°C Report.
[13] *Id.*
[14] *Id.*
[15] *Id.* at 51.

BLM_0077786

2052.[16] Further, 1.5°C of warming would result in about 14% of the world population being exposed to severe heat waves at least once every five years;[17] more than 350 million people worldwide being exposed to severe drought;[18] mass mortalities of coral reefs worldwide;[19] 31 to 69 million people worldwide being exposed to flooding from sea level rise;[20] and the loss of biodiversity and biomass.[21]

In short, the world is already experiencing impacts from climate change, and those impacts are expected to intensify. A world that warms by 1.5° Celsius above preindustrial levels will be more livable than a world that warms by 2° Celsius, but even at 1.5° Celsius, the world will face staggering challenges and losses.

The report finds that, to stabilize global temperature, the world would need to achieve "net zero" emissions, meaning that the amount of carbon dioxide entering the atmosphere must equal the amount that is removed.[22] All 1.5°C-consistent pathways analyzed in the report use to some extent technologies that would *remove* carbon dioxide from the atmosphere, but the authors also note that ideas for $CO_2$ removal have not been proven to work at scale."[23]

The IPCC 1.5°C report also finds that warming will not be limited to 1.5°C or 2°C unless "emissions decline rapidly across all of society's main sectors," including energy.[24] Current national commitments on emission reduction are not sufficient to bridge the emissions gap in 2030.[25] As noted by the United Nations Environment Programme:

Technically, it is still possible to ensure global warming stays well below 2°C and 1.5°C, but if countries do not scale up their ambitions before 2030, exceeding the 1.5°C can no longer be avoided. Now more than ever, unprecedented and urgent action is required by all nations. The assessment of actions by the G20 countries indicates that this kind of action is yet to happen; in fact, global CO2 emissions increased in 2017 after three years of stagnation.[26]

In other words, far greater emissions reductions are necessary to stay below 2.0°C, let

---

[16] *Id.*

[17] *Id.* at 191.

[18] *Id.* at 215.

[19] IPCC 1.5°C Report at 222.

[20] *Id.* at 231.

[21] *See, e.g., id.* at 254 (9% of insects are projects to lose over half their range at 1.5°C, which suggests a significant loss of functionality in associated ecosystems owing to the critical role of insects in nutrient cycling, pollination, and other important processes).

[22] *Id.* at 161.

[23] *Id.* at 114.

[24] Id. at 161.

[25] United Nations Environment Programme, *Emissions Gap Report 2018* at xiv, *available at: http://wedocs.unep.org/bitstream/handle/20.500.11822/26895/EGR2018_FullReport_EN.pdf?sequence=1&isAllowed=y* (attached as Exhibit 2).

[26] *Id.*

BLM_0077787

alone aspire to limit warming to 1.5°C. If no further progress were made beyond the goals stated in the Paris Agreement, expected warming by 2100 would be about 3°C.[27] UNEP found that "if the emissions gap is not closed by 2030, it is very plausible that the goal of a well-below 2°C temperature increase is also out of reach."[28]

With specific regard to United States' commitments, the U.S. set a 2020 target to reduce GHG emissions by 17 percent below 2005 levels and committed to reducing emissions by 26-28 percent below 2005 levels by 2025 in its Nationally Determined Contribution ("NDC").[29] However, under its currently implemented policies, the U.S. is unlikely to meet its NDC target for 2025 and it is uncertain whether it will meet its 2020 target.[30]

The IPCC 1.5°C Report calculates a remaining carbon budget of 420 $GtCO_2$ from the start of 2018 for about a two-thirds chance of limiting warming to 1.5°C, but the uncertainties in this estimate are large – greater than the entire estimated remaining carbon budget.[31] In addition, the IPCC found that "[p]otential additional carbon release from future permafrost thawing and methane release from wetlands would reduce the budget by up to 100 $GtCO_2$ over the course of this century and more thereafter."[32] Actions to reduce non-$CO_2$ GHGs could also alter the remaining budget by ±250 $GtCO_2$. At current emission rates, the remaining budget of 420 $GtCO_2$ is being depleted by 42 ± 3 $GtCO_2$ per year,[33] meaning that at current emissions rates, we could reach 1.5°C by 2028.

The potential carbon emissions from *existing* fossil fuel reserves—the known belowground stock of extractable fossil fuels—considerably exceed both the 1.5°C and 2°C targets. According to one study, global coal, oil and gas resources considered currently economically recoverable contain potential greenhouse gas emissions of 4,196 $GtCO_2$,[34] with other estimates as high as 7,120 $GtCO_2$.[35]

According to one report, in the United States, the potential GHG emissions from federal

---

[27] *Id.*; *see also* David Spratt, *Climate Reality Check: After Paris, Counting the Cost* (March 2016) at 8 (previously attached as Exhibit 10).

[28] UNEP Emissions Gap Report 2018 at xiv.

[29] *Id.* at 15.

[30] *Id.*

[31] IPCC 1.5°C Report at 96; *see also* Dustin Mulvaney, *et al.*, *Over-Leased: How Production Horizons of Already Leased Federal Fossil Fuels Outlast Global Carbon Budgets*, EcoShift Consulting (July 2016) (previously attached as Exhibit 17) at 2 (citing Joeri Rogelj, *et al.*, *Difference between carbon budget estimates unraveled*, Nature Climate Change (2016) (previously attached as Exhibit 18).

[32] IPCC, *Global Warming of 1.5°C: Summary for Policymakers* at 14 (attached as Exhibit 3).

[33] *Id.* at 14.

[34] Michael Raupach, *et al.*, *Sharing a quota on cumulative carbon emissions*, Nature Climate Change (Sept. 2014) (emphasis added) (previously attached as Exhibit 21).

[35] IPCC AR5, Mitigation of Climate Change, Contribution of Working Group III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (2014) at Table 7.2 (previously attached as Exhibit 21).

BLM_0077788

and non-federal fossil fuels in the United States are 697-1,070 $GtCO_2$.[36] As for federal fossil fuel resources, the United States contains enough recoverable coal, oil and gas that, if extracted and burned, would result in as much as 492 $GtCO_2$, consuming all of the global carbon budget for a 1.5°C target.[37] Unleased federal fossil fuels comprise 91% of these potential emissions, with already leased federal fossil fuels accounting for as much as 43 $GtCO_2$.[38]

New leasing of federal fossil fuel resources is inconsistent with a carbon budget that would seek to avoid catastrophic climate change. Nationwide emissions from fossil fuels extracted from Federal lands in 2014 were 1,332.1 million metric tons (MMT) of $CO_2$ equivalent[39] ($CO_2$Eq).[40] Between 2005 and 2014, fossil fuel emissions from Federal lands accounted for, on average, 23.7 percent of national $CO_2$ emissions, 7.3 percent of national methane ($CH_4$) emissions, and 1.5 percent of national nitrous oxide ($N_2O$) emissions.[41] Continued leasing and development of fossil fuels commits the world to extremely dangerous warming well beyond the 2°C threshold. As one study put it, "the disparity between what resources and reserves exist and what can be emitted while avoiding a temperature rise greater than the agreed 2°C limit is therefore stark."[42]

Based on the foregoing, the U.S. must halt new fossil fuel production and rapidly phase out existing production on federal lands to avoid the worst dangers of climate change. One study estimated the U.S. carbon budget consistent with a 1.5°C target at 25 $GtCO_2$eq to 57 $GtCO_2$eq on average,[43] depending on the sharing principles used to apportion the global budget across

---

[36] Dustin Mulvaney, *et al.*, *The Potential Greenhouse Gas Emissions from U.S. Federal Fossil Fuels*, EcoShift Consulting (Aug. 2015) at 16 (previously attached as Exhibit 23).

[37] *Id.*

[38] *Id.*

[39] $CO_2$ equivalents allow direct comparison of warming caused by different GHGs and are calculated by multiplying the amount of GHG gas by its global warming potential (GWP). The USGS study uses an outdated value for the 100-year GWP of methane of 25, from the IPCC AR4 report. Using the current 100-year GWP for fossil methane of 36, from IPCC AR5, total 2014 emissions from fossil fuels extracted from public lands equals 1353 MMT $CO_2$Eq.

[40] U.S. Geological Survey, *Federal Lands Greenhouse Gas Emissions and Sequestration in the United States: Estimates for 2005-2014* (2018), available at https://pubs.er.usgs.gov/publication/sir20185131 (attached as Exhibit 4).

[41] *Id.*; *see also* Energy Information Administration, *Sales of Fossil Fuels Produced from Federal and Indian Lands, FY 2003 through FY 2014* (July 2015) (previously attached as Exhibit 24); Stratus Consulting, *Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters: An Update* (Dec. 2014) (previously attached as Exhibit 24).

[42] Christophe McGlade & Paul Ekins, *The geographical distribution of fossil fuels unused when limiting global warming to 2°C*, Nature (Jan 2015) at 188 (previously attached as Exhibit 20).

[43] Robiou du Pont, Yann et al., *Equitable mitigation to achieve the Paris Agreement goals,* Nature Climate Change 38 (2017), 7 and Supplemental Tables 1 and 2 (attached as Exhibit 5). Quantities measured in $GtCO_2$eq include the mass emissions from $CO_2$ as well as the other well-mixed greenhouse gases ($CO_2$, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons and $SF_6$) converted into $CO_2$-equivalent values, while quantities measured in $GtCO_2$ refer to mass emissions of just $CO_2$ itself.

CONSERVATION GROUPS' PROTEST                                                                                              19
UNCOMPAHGRE FIELD OFFICE PRMP AND FEIS

countries.[44] The estimated U.S. carbon budget consistent with limiting temperature rise to 2°C – a level of warming well above what scientists say is devastatingly harmful – ranges from 34 $GtCO_2$ to 123 $GtCO_2$,[45] depending on the sharing principles applied. Under any scenario, the remaining U.S. carbon budget compatible with the Paris climate targets is extremely small.

Furthermore, research that models emissions pathways for limiting warming to 1.5°C or 2°C shows that a rapid end to fossil fuel extraction in the United States is critical. Specifically, research indicates that *global* fossil fuel $CO_2$ emissions must *end entirely* by mid-century and likely as early as 2045 for a reasonable likelihood of limiting warming to 1.5°C or 2°C.[46] Due to

---

[44] Robiou du Pont et al. (2017) averaged across IPCC sharing principles to estimate the U.S. carbon budget from 2010 to 2100 for a 50 percent chance of returning global average temperature rise to 1.5°C by 2100, consistent with the Paris Agreement's "well below 2°C" target, and based on a cost-optimal model. The study estimated the U.S. carbon budget consistent with a 1.5°C target at 25 $GtCO_2eq$ by averaging across four equity principles: capability (83 $GtCO_2eq$), equal per capita (118 $GtCO_2eq$), greenhouse development rights (-69 $GtCO_2eq$), and equal cumulative per capita (-32 $GtCO_2eq$). The study estimated the U.S. budget at 57 $GtCO_2eq$ when averaging across five sharing principles, adding the constant emissions ratio (186 $GtCO_2eq$) to the four above-mentioned principles. However, the constant emissions ratio, which maintains current emissions ratios, is not considered to be an equitable sharing principle because it is a grandfathering approach that "privileges today's high-emitting countries when allocating future emission entitlements." For a discussion of sharing principles, *see* Kartha, S. et al., *Cascading biases against poorer countries*, 8 Nature Climate Change 348 (2018).

[45] Robiou du Pont et al. (2017) estimated the U.S. carbon budget for a 66 percent probability of keeping warming below 2°C at 60 $GtCO_2eq$ based on four equity principles (capability, equal per capita, greenhouse development rights, equal cumulative per capita), and at 104 $GtCO_2eq$ based on five principles (adding in constant emissions ratio, but see footnote above). For a 66 percent probability of keeping warming below 2°C, Peters et al. (2015) estimated the U.S. carbon budget at 34 $GtCO_2$ based on an "equity" approach for allocating the global carbon budget, and 123 $GtCO_2$ under an "inertia" approach. The "equity" approach bases sharing on population size and provides for equal per-capita emissions across countries, while the "inertia" approach bases sharing on countries' current emissions. Similarly using a 66 percent probability of keeping warming below 2°C, Gignac et al. (2015) estimated the U.S. carbon budget at 78 to 97 $GtCO_2$, based on a contraction and convergence framework, in which all countries adjust their emissions over time to achieve equal per-capita emissions. Although the contraction and convergence framework corrects current emissions inequities among countries over a specified time frame, it does not account for inequities stemming from historical emissions differences. When accounting for historical responsibility, Gignac et al. (2015) estimated that the United States has an additional cumulative carbon debt of 100 $GtCO_2$ as of 2013. *See* Peters, Glen P. et al., Measuring a fair and ambitious climate agreement using cumulative emissions, 10 Environmental Research Letters 105004 (2015) (attached as Exhibit 6); Gignac, Renaud and H. Damon Matthews, Allocating a 2C cumulative carbon budget to countries, 10 Environmental Research Letters 075004 (2015) (attached as Exhibit 7).

[46] Rogelj, Joeri et al., Energy system transformations for limiting end-of-century warming to below 1.5°C, 5 Nature Climate Change 519 (2015) (attached as Exhibit 8); IPCC 1.5°C Report (attached above as Exhibit 1).

BLM_0077790

the small remaining U.S. carbon budget, the United States must end fossil fuel $CO_2$ emissions even earlier: between 2025 and 2030 on average for a reasonable chance of staying below 1.5°C, and between 2040 and 2045 on average for a reasonable chance of staying below 2°C.[47] Ending U.S. fossil fuel $CO_2$ emissions between 2025 and 2030, consistent with the Paris 1.5°C target, will require "urgent" and "unprecedented" action.[48] An immediate halt to new production and a transition to closing most existing oil and gas fields and coal mines before their reserves are fully extracted would be consistent with this goal.

Ending the approval of new fossil fuel production and infrastructure is also critical for preventing "carbon lock-in," where approvals and investments made now can lock in decades worth of fossil fuel extraction that are inconsistent with climate targets. New approvals for wells, mines, and fossil fuel infrastructure -- such as pipelines, marine and rail import and export terminals -- require upfront investments that provide financial incentives for companies to continue production for decades into the future.[49] Given the long-lived nature of fossil fuel projects, ending the approval of new fossil fuel projects avoids the lock-in of decades of fossil fuel production and associated emissions.[50]

---

[47] See Climate Action Tracker, USA (last updated 17 June 2019), http://climateactiontracker.org/countries/usa at Country Summary figure showing U.S. emissions versus year. At the current annual emission rate of 6.5 $GtCO_2$, the United States will exhaust the budget consistent with 1.5°C target between 2025 and 2030 and will exhaust the budget consistent with 2°C target between 2040 and 2045, leaving no room for additional fossil fuel $CO_2$ emissions.

[48] UNEP Emissions Gap Report 2018 at xiii (attached above as Exhibit 2); IPCC 1.5°C Report at TS-6 (attached above as Exhibit 1).

[49] Davis, Steven J. and Robert H. Socolow, *Commitment accounting of CO2 emissions*, Environmental Research Letters 9: 084018 (2014) (attached as Exhibit 9); Erickson, Peter et al., Assessing carbon lock-in, 10 Environmental Research Letters 084023 (2015) (attached as Exhibit 23); Erickson, Peter et al., *Carbon lock-in from fossil fuel supply infrastructure*, Stockholm Environment Institute, Discussion Brief (2015) (attached as Exhibit 10); Seto, Karen C. et al., *Carbon Lock-In: Types, Causes, and Policy Implications*, 41 Annual Review of Environmental Resources 425 (2016) (attached as Exhibit 11); Green, Fergus and Richard Denniss, *Cutting with both arms of the scissors: the economic and political case for restrictive supply-side climate policies*, Climatic Change, https://doi.org/10.1007/s10584-018-2162-x (2018) (attached as Exhibit 26).

[50] Erickson et al. (2015): "The essence of carbon lock-in is that, once certain carbon-intensive investments are made, and development pathways are chosen, fossil fuel dependence and associated carbon emissions can become "locked in", making it more difficult to move to lower-carbon pathways and thus reduce climate risks." Green and Denniss (2018): "When production processes require a large, upfront investment in fixed costs, such as the construction of a port, pipeline or coalmine, future production will take place even when the market price of the resultant product is lower than the long-run opportunity cost of production. This is because rational producers will ignore 'sunk costs' and continue to produce as long as the market price is sufficient to cover the marginal cost (but not the average cost) of production. This is known as 'lock-in.'"

BLM_0077791

One analysis shows that, of expected federal fossil fuel production in 2040, about two-thirds is either not yet under lease or is under lease but is not yet producing.[51] The authors conclude that if new leasing ceases and existing non-producing leases are not renewed, 40% of forecast coal production could be avoided in 2025 and 74% of coal production could be avoided in 2040. As for oil and gas, 12% of oil production could be avoided in 2025 and 65% could be avoided by 2040 while 6% of natural gas production could be avoided in 2025 and 59% could be avoided by 2040.[52]

This avoided production has the potential to significantly reduce future U.S. emissions. The study concludes that cessation of new and renewed leases for federal fossil fuel extraction could reduce $CO_2$ emissions by about 100 Mt per year by 2030. Annual emission reductions could become greater than that over time as production declines on existing leases and maintaining or increasing production becomes dependent on yet-to-be issued leases.[53]

According to the study, a comparison with other measures shows that a policy of "no new leasing" could be a very significant part of U.S. efforts to address climate change. The estimated 100 Mt $CO_2$ emissions savings that could result from no leasing in 2030 compares favorably with EPA standards for light- and medium-vehicles that are expected to yield 200 Mt in $CO_2$ savings in 2030, and with standards for heavy-duty vehicles that are expected to yield 70 Mt in $CO_2$ savings in the same year. Cessation of new and renewed leases could make an important contribution to U.S. climate change mitigation efforts.[54]

### E.    BLM Failed to Take a Hard Look at Climate Change Impacts.

In the Reasonable Foreseeable Development Scenario for oil and gas for the Uncompahgre Field Office, projections for oil and gas production are limited to 2029, rather than spanning the 20-year period of the plan. Additionally, the agency only discloses projected production for conventional oil and gas and conventional coalbed oil and gas. The RFD does not appear to account for unconventional development.

Quantities of natural gas and oil production for the Uncompahgre Study Area are projected in the Reasonable Foreseeable Development Scenario, although not summed. RFD at Tables 6a, 6b, 7a, 7b. BLM's preferred alternative, Alternative E, includes the following projected production volumes:

Oil Volume:
CSU: 5.404678 mmbbl
NL: 0.974315 mmbbl
NSO: 2.076926 mmbbl

---

[51] Peter Erickson and Michael Lazarus, *How Would Phasing Out U.S. Federal Leases for Fossil Fuel Extraction Affect CO2 Emissions and 2°C Goals?*, Stockholm Environmental Institute (2016) at 12 (previously attached as Exhibit 323).
[52] *Id.* at 16.
[53] *Id.* at 26.
[54] *Id.* at 27.

BLM_0077792

OPEN: 9.996115 mmbbl

Gas Volume:
CSU: 44.500764 bcf
NL: 3.971663 bcf
NSO: 12.867885 bcf
OPEN: 61.360176 bcf

Estimated direct GHGs from development allowed in Alternative E is 2,512,570 tons of CO2e per year. FEIS at 4-22. Estimated indirect GHGs from the high production scenario is 129 million tons CO2e over a 30 year period. FEIS at 4-22. 37% of that 129 million tons would come from federally-managed minerals. *Id.*

BLM fails to adequately address climate change in its Plan or EIS, as NEPA requires, through robust consideration of reasonable alternatives, mitigation measures and standards in the plan. Conservation Groups raised these issues in their comments on the DEIS, which is attached as Exhibit 1-1, at pp. 39-69. BLM acknowledges that "the projected emissions sources" from the Plan "will emit greenhouse gases, and will thus contribute to the accumulation of atmospheric greenhouse gases, and potential climate change effects" as projected by the Intergovernmental Panel on Climate Change. FEIS at R-141. However, instead of taking action to reduce GHG impacts from the UFO planning area below the level of significance, *e.g.* by further limiting development and/or requiring further emission controls, the UFO insists that action is either not possible or not meaningful:

> Unfortunately, no analysis tools currently exist to describe the planning area's incremental contributions to the global phenomenon of climate change in terms of potential warming, drought, sea level rise, or other common environmental metrics associated with increasing concentrations of greenhouse gases. The problem is, by nature, a cumulative issue, and any downscaling of the projected global climate changes effects to project/planning area scales (based on emissions scaling) does not provide meaningful analysis due to the fact that no studies have identified the precise relationship between specific levels of emissions from a particular source, and measurable differences in climate-change-related impacts. Nor has EPA or any other regulatory body adopted standards based on such impacts. Without specific thresholds with which to compare expected emissions, a quantitative analysis of potential differences in climate change impacts and mitigation among alternatives is not possible.

FEIS at R-141.

This type of dismissive approach fails to satisfy the guidance outlined in Department of Interior Secretarial Order 3226, discussed below, or the requirements of NEPA. "Reasonable forecasting and speculation is … implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labelling any and all discussion of future environmental effects as 'crystal ball inquiry.'" *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1246 n.9 (9th Cir. 1984) (quoting *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm.*, 481 F.2d 1079, 1092 (D.C. Cir. 1973)).

BLM_0077793

The GHG emissions from BLM actions in the planning area are significant. The UFO estimates annual direct emissions from BLM actions under the Uncompahgre RMP of 2,512,570 metric tons $CO_2e$. FEIS at 4-22.[55] BLM estimated 30-year total estimated cumulative indirect greenhouse gas emissions for "high" and "low" UFO oil and gas production scenarios: approximately 129 million tons $CO_2e$ for the "high" UFO oil and gas production scenario, and approximately 8 million tons $CO_2e$ for the "low" UFO oil and gas production scenario. FEIS at 4-29. Such emissions would make a significant contribution to total emissions from federal lands, and contribute significantly to total U.S. emissions.[56] Nowhere that we have found in the FEIS does BLM add up the direct and indirect emissions under the plan—a major failing that BLM must correct.

With respect to coal, BLM states that it is relying on a U.S. Forest Service EIS for the West Elk coal mine, which, according to the UFO, "concluded that it was not reasonable to assume that the 'No Action' Alternative (not making UFO coal available) would result in overall cumulative (global) greenhouse gas emissions reductions." FEIS at 4-29. That conclusion is incorrect. The Forest Service analysis referred to by BLM *did conclude* there would be substitution between coal and other fuels under a No Action scenario, such that overall U.S. GHG emissions would be different comparing Action and No Action alternatives. Moreover, the modeling the U.S. Forest Service relied on for West Elk assumed a full and immediate implementation of the Clean Power Plan. That assumption substantially changed the modelling's substitution outputs; such an assumption cannot be justified today, and BLM cannot credibly rely on an analysis that is based on underlying assumptions that are no longer true.

Meaningful consideration of GHGs is clearly within the scope of required NEPA review. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008). As the Ninth Circuit has held, in the context of fuel economy standard rules:

> The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct. Any given rule setting a CAFE standard might have an "individually minor" effect on the environment, but these rules are "collectively significant actions taking place over a period of time" *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1216 (9th Cir. 2008)(quoting 40 C.F.R. § 1508.7).

---

[55] As discussed below, these totals are improperly low.  BLM relies on methane's 100-year global warming potential (GWP) of 34 to convert all methane emissions – direct and indirect – into $CO_2e$, while omitting the fact that methane's 20-year GWP is 84-87. BLM recently took the approach of calculating GHG emissions in its Buffalo and Miles City Draft RMPs using both methane's short- and long-term GWP. The agency must take the same approach here.

[56] The Wilderness Society, *Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters*, February 2012, available at: http://wilderness.org/sites/default/files/FINAL%20STRATUS%20REPORT.pdf (previously attached as Exhibit 24).

BLM_0077794

The courts have ruled that federal agencies should consider indirect GHG emissions resulting from agency policy, regulatory, planning and leasing decisions. For example, agencies cannot ignore the indirect air quality and climate change impact of decisions that would open up access to coal reserves. *See Mid States Coal. For Progress v. Surface Transp. Bd.*, 345 F.3d 520, 532, 550 (8th Cir. 2003); *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F.Supp. 3d 1174, 1197-98 (D.Colo. 2014).

A slew of recent cases have held that downstream greenhouse gas emissions are reasonably foreseeable indirect impacts of a federal fossil fuel action, that an agency must estimate downstream greenhouse gas emissions or explain why it could not, and finally, that a cumulative impacts analysis must include considerations of downstream greenhouse gas emissions under NEPA. *Wilderness Workshop v. United States Bureau of Land Mgmt.*, 342 F. Supp. 3d 1145, 1155 (D. Colo. 2018); *San Juan Citizens All. v. United States Bureau of Land Mgmt.*, 326 F. Supp. 3d 1227, 1244 (D.N.M. 2018); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 73 (D.D.C. 2019); *W. Org. of Res. Councils v. U.S. Bureau of Land Mgmt.*, No. CV 16-21-GF-BMM, 2018 WL 1475470, at *13 (D. Mont. 2018); *Sierra Club v. Fed. Energy Regulatory Comm'n*, 867 F.3d 1357, 1374 (D.C. Cir. 2017); *WildEarth Guardians v. Zinke*, No. CV 17-80-BLG-SPW-TJC, 2019 WL 2404860 at *12 (D. Mont. Feb. 11, 2019); *Indigenous Envtl. Network v. United States Dep't of State*, 347 F. Supp. 3d 561, 578-579 (D. Mont. 2018).

The volume of potential coal, oil and gas from the parcels available for lease in the UFO draft RMP and EIS is quantifiable, and the lifecycle GHG emissions impact from these new lease parcels must be disclosed to the public. In our comments on the DEIS (at pp. 44-48), we easily generated an accurate, site-specific impact analysis for each alternative by utilizing BLM's own Energy Policy and Conservation Act phase III Oil and Gas Inventory Model geodatabase and the Uncompahgre draft RMP DEIS alternative GIS shapefiles to establish future extractible oil and gas volume from the planning area.[57] Then, we generated potential lifecycle greenhouse gas emissions for resultant oil and gas volumes using a peer-reviewed carbon calculator and lifecycle greenhouse gas emissions model developed by EcoShift consulting.[58] This model is not novel in

---

[57] Center for Biological Diversity, Maps and volume estimates of future extractible oil and gas volume in the Uncompahgre planning area based on GIS mapping of U.S. Bureau of Land Management's EPCA Phase III Inventory GIS Data, published May 2008, *found at* http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/EPCA_III/EPCA_III_geodata.html; U.S. Bureau of Land Management, Uncompahgre Field Office draft Resource Management Plan and Environmental Impact Statement GIS mapping shapefiles, published June 3, 2016 *found at* http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html; Emails and Dropbox files from David Sinton, Geographic Information Systems Specialist, BLM Uncompahgre Field Office, re: Uncompahgre draft RMP and EIS shapefiles supplemental data (October 7, 2016 2:14 PM MT). *Methodology used*: Intersect the leasable oil and gas areas for each alternative provided in the Dropbox files and on the planning website for the Uncompahgre field office's draft RMP and EIS with the model layer from BLM's Oil and Gas Inventory Model geodatabase. Then calculate new acreage for each polygon and multiply the "Total Oil Density" and "Total Gas Density" layers by this acreage to create volume data. The resultant maps are attached as Exhibits 79-83.
[58] *See* Mulvaney (attached as Exhibit 23).

CONSERVATION GROUPS' PROTEST                                                                 25
UNCOMPAHGRE FIELD OFFICE PRMP AND FEIS

its development or methodology. Numerous greenhouse gas calculation tools exist to develop lifecycle analyses, particularly for fossil fuel extraction, operations, transport and end-user emissions.

Despite the fact that Conservation Groups provided BLM with a complete GHG lifecycle emissions analysis, BLM failed to use it or conduct its own analysis.

The extreme urgency of the climate crisis requires BLM to pursue all means available to limit the climate change effects of its actions, beginning with a robust and accurate quantitative analysis of potential greenhouse gas emissions from fossil fuel development proposed in the planning area. Any emissions source, no matter how small, is potentially significant, such that BLM should fully explore mitigation and avoidance options for all sources.

## F.    BLM Failed to Quantify the Severity of Harm from Greenhouse Gas Emissions.

As Conservation Groups stated in their comments on the DEIS (attached as Exhibit 1-1), at pp. 62-69, the BLM failed to monetize climate damages stemming from the UFO RMP. BLM uses faulty reasoning to defend why it has chosen not to use the social cost of greenhouse gas metric to monetize the RMP's emissions.

First, the BLM reasons that "this action is not a rulemaking for which the SCC protocol was originally developed." FEIS at R-181. However, application of the social cost of carbon is not limited to rulemakings. NEPA requires agencies to fully and accurately estimate environmental, public health, and social welfare differences between alternatives, and the social cost of carbon is the best available tool to compare the climate impacts of alternatives. The tool, which provides a dollar estimate of the damage caused by each additional ton of carbon dioxide emitted into the atmosphere, operates the same way whether those emissions result from a federal agency rulemaking, a federal resource management plan, or a project-level approval.

NEPA requires a more searching analysis than merely disclosing the amount of pollution. Rather, BLM must examine the "ecological[,]… economic, [and] social" impacts of those emissions, including an assessment of their "significance." 40 C.F.R. §§ 1508.8(b), 1502.16(a)-(b). The U.S. Supreme Court has called the disclosure of impacts the "key requirement of NEPA," and held that agencies must "consider and disclose the *actual environmental effects*" of a proposed project in a way that "brings those effects to bear on [the agency's] decisions." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 96 (1983) (emphasis added); *see also* 40 C.F.R. § 1508.8(b) (requiring assessment of the "ecological," "economic," "social," and "health" "*effects*") (emphasis added). In particular, "[t]he impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impact analysis that NEPA requires." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008). Furthermore, the analyses included in environmental assessments and impact statements "cannot be misleading." *High Country Conservation Advocates v. U.S. Forest Service*, 52 F. Supp. 3d 1174, 1182 (D. Colo. 2014). The BLM must provide the contextual information necessary to ensure that the public and decisionmakers grasp the true climate impacts of the RMP.

BLM_0077796

The methodology on which the social cost of carbon protocol is built is rigorous, transparent, and based on best available data. The protocol was developed by the Interagency Working Group (IWG) on Social Cost of Greenhouse Gases, which included experts from a dozen federal agencies and White House offices. In 2014, the U.S. Government Accountability Office concluded that the IWG had followed a "consensus-based" approach, relied on peer-reviewed academic literature, disclosed relevant limitations, and adequately planned to incorporate new information through public comments and updated research.[59] Leading economists and climate policy experts have endorsed the Working Group's values as the best available estimates.[60]

The social cost of carbon protocol is perfectly suited to measure marginal climate damages such as those flowing from the UFO Resource Management Plan. The protocol translates emissions into changes in atmospheric greenhouse gas concentrations, atmospheric concentrations into changes in temperature, and changes in temperature into economic damages. The benefit of the protocol is that it does not require specific impacts to be assessed in isolation. Instead, the protocol groups and monetizes climate impacts, enabling agencies to assess whether an individual plan passes the threshold for significance and allowing the comparison of alternatives.

Second, the BLM points to Executive Order 13,783, by which President Donald Trump withdrew the Technical Support Documents upon which the social cost of carbon protocol was based and disbanded the Interagency Working Group (IWG) on Social Cost of Greenhouse Gases, and argues that "there is [currently] no Executive Order requirement to apply the SCC protocol to project decisions." FEIS at R-181. However, Executive Order 13,783 does not prevent BLM from using the same methodology and inputs used by the IWG to develop its social cost of carbon protocol. Indeed, the President's executive order withdrew the Technical Support Documents on political, not scientific, grounds. Moreover, Executive Order 13,783 assumes that federal agencies will continue to "monetiz[e] the value of changes in greenhouse gas emissions" and instructs agencies to ensure such estimates are "consistent with the guidance contained in OMB Circular A-4." Exec. Order No. 13,783 § 5(c), 82 Fed. Reg. 16,093 (Mar. 28, 2017). As agencies follow the Circular's standards for using the best available data and methodologies, they will necessarily choose similar data, methodologies, and estimates as the IWG, since the IWG's work continues to represent the best available estimates.[61]

---

[59] Gov't Accountability Office, *Regulatory Impact Analysis: Development of Social Cost of Carbon Estimates* 12-19 (2014), *available at* http://www.gao.gov/assets/670/665016.pdf.
[60] See, e.g., Richard Revesz et al., *Best Cost Estimate of Greenhouse Gases*, 357 Science 655 (2017) (attached as Exhibit 12); Michael Greenstone et al., *Developing a Social Cost of Carbon for U.S. Regulatory Analysis: A Methodology and Interpretation*, 7 Rev. Envtl. Econ. & Pol'y 23, 42 (2013) (attached as Exhibit 13); Richard L. Revesz et al., *Global Warming: Improve Economic Models of Climate Change*, 508 Nature 173 (2014) (previously attached as Exhibit 111).
[61] *See* Richard L. Revesz et al., *Best Cost Estimate of Greenhouse Gases*, 357 Science 6352 (2017) (explaining that, even after Trump's Executive Order, the social cost of greenhouse gas estimate of around $50 per ton of carbon dioxide is still the best estimate) (attached as Exhibit 12).

BLM_0077797

Third, the BLM argues that NEPA does not require a cost-benefit analysis, and that, "[w]ithout a complete monetary cost-benefit analysis, which would include the social benefits of the proposed action to society as a whole and other potential positive benefits, inclusion solely of an SCC cost analysis would be unbalanced, potentially inaccurate, and not useful." FEIS at R-181. However, although NEPA does not require a formal cost-benefit analysis, [62] the statute does require "a reasonably thorough discussion of the significant aspects of the probable environmental consequences," including real-world climate impacts and their significance, to "foster both informed decisionmaking and informed public participation." *Ctr. for Biological Diversity*, 538 F.3d at 1194 (citations omitted). In particular, it is arbitrary to fail to "provide the necessary contextual information about the cumulative and incremental environmental impacts." *Id.* at 1217. The social cost of carbon provides such information. Courts have warned agencies, for example, that "[e]ven though NEPA does not require a cost-benefit analysis," an agency cannot selectively monetize benefits in support of its decision while refusing to monetize the costs of its action. *High Country Conservation Advocates*, 52 F. Supp. 3d at 1191; *accord MEIC v. Office of Surface Mining*, 274 F. Supp. 3d at 1094-99 (holding it was arbitrary for the agency to quantify benefits in an EIS while failing to use the social cost of carbon to quantify costs, as well as arbitrary to imply there would be no effects from greenhouse gas emissions).

*High Country* and *MEIC v. OSM* were simply the latest applications of a broader line of case law in which courts find it arbitrary and capricious to apply inconsistent protocols for analyzing some effects compared to others, especially when the inconsistency obscures some of the most significant effects. For example, in *Center for Biological Diversity v. National Highway Traffic Safety Administration*, the U.S. Court of Appeals for the Ninth Circuit ruled that, because the agency had monetized other uncertain costs and benefits of its vehicle fuel efficiency standard—like traffic congestion and noise costs—its "decision not to monetize the benefit of carbon emissions reduction was arbitrary and capricious." 538 F.3d 1172, 1203 (9th Cir. 2008). Specifically, it was arbitrary to "assign[ ] no value to *the most significant benefit* of more stringent [vehicle fuel efficiency] standards: reduction in carbon emissions." *Id.* at 1199. Similarly, the U.S. Court of Appeals for the District of Columbia Circuit has chastised agencies for "inconsistently and opportunistically fram[ing] the costs and benefits of the rule [and] fail[ing] adequately to quantify certain costs or to explain why those costs could not be quantified." *Bus. Roundtable v. SCC*, 647 F.3d 1144, 1148-49 (D.C. Cir. 2011). And the U.S. Court of Appeals for the Tenth Circuit has remanded an environmental impact statement

---

[62] 40 C.F.R. § 1502.23 ("[T]he weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis."); *but see e.g.*, *Sierra Club v. Sigler*, 695 F.2d 957, 978-79 (5th Cir. 1983) (holding that NEPA "mandates at least a broad, informal cost-benefit analysis," and so agencies must "fully and accurately" and "objectively" assess environmental, economic, and technical costs); *Chelsea Neighborhood Ass'ns v. U.S. Postal Serv.*, 516 F.2d 378, 387 (2d Cir. 1975) ("NEPA, in effect, requires a broadly defined cost-benefit analysis of major federal activities."); *Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1113 (D.C. Cir. 1971) ("NEPA mandates a rather finely tuned and 'systematic' balancing analysis" of "environmental costs" against "economic and technical benefits"); *Nat'l Wildlife Fed. v. Marsh*, 568 F. Supp. 985, 1000 (D.D.C. 1983) ("The cost-benefit analysis of NEPA is concerned primarily with environmental costs. . . . A court may examine the cost-benefit analysis only as it bears upon the function of insuring that the agency has examined the environmental consequences of a proposed project.").

BLM_0077798

because "unrealistic" assumptions "misleading[ly]" skewed comparison of the project's positive and negative effects. *Johnston v. Davis*, 698 F.2d 1088, 1094–95 (10th Cir. 1983).

Moreover, monetizing one key impact still provides useful information for decisonmakers and the public even when monetizing other impacts is not feasible. The social cost of greenhouse gases enables a more accurate and transparent comparison of alternatives along the dimension of climate impacts even if other costs and benefits cannot be quantified.

Finally, BLM argues that "the SCC protocol does not measure the actual incremental impacts of a project on the environment and does not include all damages or benefits from carbon emissions." FEIS at R-183. However, uncertainty over the values or range of values included in the social cost of carbon protocol is not a reason to abandon the protocol's methodologies. *Center for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1200 (9th Cir. 2008) ("[W]hile the record shows that there is a range of values, the value of carbon emissions reductions is certainly not zero."). If anything, uncertainty supports higher estimates of the social cost of carbon, because most uncertainties regarding climate change entail tipping points, catastrophic risks, and unknown unknowns about the damages of climate change. Numerous federal agencies have successfully and usefully applied the social cost of carbon protocol's ranges in their environmental impact statements. Most recently, in August 2017, the Bureau of Ocean Energy Management applied the IWG's range of estimates calculated at three discount rates (2.5%, 3%, and 5%) to its environmental impact statement for an offshore oil development plan, and called this range of estimates "a useful measure to assess the benefits of $CO_2$ reductions and inform agency decisions."[63]

BLM should also consider the social cost of methane protocol. Like the social cost of carbon protocol, the social cost of methane protocol has been adopted by the IWG and provides a standard methodology that allows state and federal agencies to quantify the social benefits of reducing methane emissions through actions that have comparatively small impacts on cumulative global emission levels.

Without rapid and profound reductions in greenhouse gas emissions, the societal losses, both economic and qualitative, will be massive and devastating. Due to the proliferation of extreme weather events, sea level rise, ocean acidification, and the increasing need to adapt to these phenomena to maintain our way of life, future climate change costs will be felt in virtually every arena. The arenas of public health, food and water supply, energy demand and supply, recreation, and built environment are all expected to be adversely impacted by climate change; and those impacts will manifest to levels of cost beyond those already reached. Therefore, prioritizing substantial greenhouse gas emissions reductions would be exceedingly beneficial and have quantifiable returns.

According to a recent IPCC analysis, there are great benefits to gain by keeping warming to 1.5°C rather than 2°C. By only committing to keeping warming to 2°C, we are committing ourselves to: 10 centimeters of additional sea level rise by 2100, exposing 10 million more people to flooding; a greater risk of the collapse of the Greenland and Antarctic ice sheets, resulting in multi-meter sea level rise; doubling the number of vertebrate and plant species losing

---

[63] BOEM, *Liberty Development Project: Draft Environmental Impact Statement*, at 3-129, 4-247 (2017).

BLM_0077799

more than half their range; the virtual elimination of coral reefs; Arctic ice-free summers; doubling of the number of people exposed to climate-change-induced increases in water stress; higher risk of heat-related and ozone related deaths; reduced yields and lower nutritional value of staple crops; and up to several hundred million more people exposed to climate-related risks and susceptible to poverty by 2050.[64]

Multiple studies have quantified the benefits of greenhouse gas emissions reductions using various metrics. One study, similar to the IPCC report in its comparison between 1.5°C and 2°C warming, found that decreased air pollution (primarily $PM_{2.5}$ and ozone) in a 1.5°C scenario would lead to 153 million fewer premature deaths worldwide by 2100, with 40% occurring during the next 40 years. Also, under a 1.5°C warming scenario, more than a million premature deaths would be prevented in many metropolitan areas in Asia and Africa, and greater than 200,000 in individual urban areas on every inhabited continent except Australia.[65]

In another global study, in which risk factors related to water availability, energy demand, food demand, and environmental degradation were analyzed, a positive trend was found between risk exposure metrics and global warming. It was found that the number of people exposed to two or more risk factors, leading to an overall unacceptable risk to well-being, would double between 1.5°C and 2°C warming, and would double again at 3°C. Once again, exposure and vulnerability to risk would be most prevalent in Asian and African countries, but impacts would be felt by the global population.[66]

Two studies quantified emissions reduction impacts using gross domestic product (GDP). One found that every 1°C increase in temperature would lead to a loss of 1.2% of U.S. GDP. This estimate coalesced numerous factors, such as violent crime rates which would increase by 0.88% per 1°C increase; agriculture which would see reducing national yields of 9.1% per 1°C; mortality rates which would rise by 5.4 deaths per 100,000 per 1°C; electricity demand which would rise by 5.3% per 1°C; and labor declines of 0.11% per 1°C.[67] In the second study, it was found that, in response to 1.5°C, 2°C, and 4°C warming, changes in space heating and cooling demand would reduce global GDP in 2100 by 0.05%, 0.19%, and 0.94%, respectively, once again showing how the level of ambition for climate change mitigation will significantly impact societal costs.[68]

---

[64] IPCC [Intergovernmental Panel on Climate Change], Global Warming of 1.5°C, an IPCC special report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emission pathways, in the context of strengthening the global response to the threat of climate change, sustainable development, and efforts to eradicate poverty (October 6, 2018), http://www.ipcc.ch/report/sr15/ (attached as Exhibit 1).
[65] Shindell, D. et al., Quantified, Localized Health Benefits of Accelerated Carbon Dioxide Emissions Reductions, 8 Nature Climate Change 291 (2018) (attached as Exhibit 14).
[66] Byers, E. et al., Global exposure and vulnerability to multi-sector development and climate change hotspots, 13 Environmental Research Letters 055012 (2018) (attached as Exhibit 15).
[67] Hsiang, S. et al., Estimating economic damage from climate change in the United States, 356 Science 1362 (2017) (attached as Exhibit 16).
[68] Park et al., Avoided economic impacts of energy demand changes by 1.5 and 2°C climate stabilization, 13 Environmental Research Letters 045010 (2018) (attached as Exhibit 17).

BLM_0077800

Another study found that with every metric ton of $CO_2$ emissions, three square meters of September sea-ice area would be lost, meaning that an additional 1000 Gt of $CO_2$ emissions would lead to an ice-free summer in the Arctic. Given an estimate of current emissions of 35 Gt $CO_2$ per year, the limit of 1000 Gt would be reached before mid-century. This would have far-reaching consequences since the amplified warming of the Arctic that would result would adversely affect global weather patterns and wildlife habitats.[69]

In a research endeavor called BRACE (Benefits of Reduced Anthropogenic Climate ChangE), the benefits of lower emissions pathways were quantified. It was found that impacts on certain sectors were significantly less if our emissions pathway tracked closer to RCP4.5 (atmospheric $CO_2$ as high as 550 ppm by 2100) than to RCP8.5 (atmospheric $CO_2$ as high as 935 ppm by 2100). For instance, it was found that the likelihood of currently rare extreme heat events (defined as having just a 5% chance of occurring in a given year today) would increase by a factor of 5 to 20 in RCP8.5, but only by a factor of 2 to 4 in RCP4.5 between 2061 and 2080. Also, under RCP4.5, the number of heat wave days in a given year would be half the amount under RCP8.5. In regards to health, the number of high-mortality heat waves, those that temporarily increase mortality rates by 20% or more, would be reduced by a third under RCP4.5 compared to RCP8.5. Under RCP8.5, an additional 2 billion people (4 billion currently) would live in conditions suitable for the mosquito *A. aegypti*, linked to the transmission of Zika, Chikungunya, and yellow fever viruses, but this number would be reduced by a third under RCP4.5.[70]

In the Fourth National Climate Assessment, it is reiterated how the costs of climate change discussed above will depend upon our ambition in curbing emissions, and those costs are translated to dollar savings. Annual damages under RCP8.5 in 2090 to labor, for example, would be approximately $155 billion, corresponding to a loss of almost 2 billion labor hours, but if our pathway is instead RCP4.5, then 48 percent of this damage would be avoided; extreme temperature mortality would carry an annual cost in 2090 of $141 billion under RCP8.5, but 58 percent of this cost would be avoided under RCP4.5; coastal property damage would carry an annual cost of $118 billion under RCP8.5, but 22 percent of this cost would be avoided under RCP4.5; annual damages from air quality impacts would be $26 billion under RCP8.5, but 31% of this cost would be avoided under RCP4.5. Similar would be the case for damage to roads, railways, and bridges, adverse food supply impacts, and impacts on energy and water supplies, where significantly reducing emissions leads to lower costs.[71] It is important to note that the

---

[69] Notz, D. and Stroeve, J., Observed Arctic sea-ice loss directly follows anthropogenic $CO_2$ emission, 354 Science 747 (2016) (attached as Exhibit 18).

[70] O'Neill, B.C. et al., The Benefits of Reduced Anthropogenic Climate ChangE (BRACE): a synthesis, Climatic Change (2017) (attached as Exhibit 18).

[71] USGCRP [U.S. Global Change Research Program], Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II [Reidmiller, D.R. et al. (eds.)], U.S. Global Change Research Program, Washington, DC (2018), *available at* https://nca2018.globalchange.gov at 1349 (attached as Exhibit 19); Martinich, J. and Crimmins, A., Climate damages and adaptation potential across diverse sectors of the United States, Nature Climate Change (2019), https://doi.org/10.1038/s41558-019-0444-6 (attached as Exhibit 20).

BLM_0077801