On October 26, 2015, EPA published a final rule to revise the NAAQS for ozone to 70 parts per billion (ppb) from the current 75 ppb. National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65292 (Oct. 26, 2015). This decision was driven by significant recent scientific evidence that the standard of 75 ppb was not adequately protecting public health. *Id.* at 136. In fact, recent studies have documented decreased lung functioning and airway inflammation in young, healthy adults at ozone concentrations as low as 60 ppb. *Id.* at 146.

Additionally, climate change is likely to worsen ozone pollution, offsetting the improvements in air quality and public health that would be expected from reductions in emissions of ozone precursors. As described by the EPA in its recent ozone rulemaking:

> In addition to being affected by changing emissions, future $O_3$ concentrations may also be affected by climate change. Modeling studies in the EPA's Interim Assessment (U.S. EPA, 2009a) that are cited in support of the 2009 Endangerment Finding under CAA section 202(a) (74 FR 66496, Dec. 15, 2009) as well as a recent assessment of potential climate change impacts (Fann et al., 2015) project that climate change may lead to future increases in summer $O_3$ concentrations across the contiguous U.S. While the projected impact is not uniform, climate change has the potential to increase average summertime $O_3$ concentrations by as much as 1-5 ppb by 2030, if greenhouse gas emissions are not mitigated. Increases in temperature are expected to be the principal factor in driving any $O_3$ increases, although increases in stagnation frequency may also contribute (Jacob and Winner, 2009). If unchecked, climate change has the potential to offset some of the improvements in $O_3$ air quality, and therefore some of the improvements in public health, that are expected from reductions in emissions of $O_3$ precursors.

80 Fed. Reg. 65292, 65300 (October 26, 2015). For example, climate change impacts include an increase in the area burned by wildfires, which, in turn are sources of $O_3$ precursors. *Id.* at 65371. While the DEIS acknowledges that climate change can increase the occurrence and severity of wildfires on BLM-administered land, DEIS at 4-18, the DEIS explicitly declines to address this impact of climate change on ozone pollution, DEIS at 4-24.

Venting from methane drainage wells from coal mines in the North Fork Valley may release significant amounts of volatile organic compounds (VOCs). As described in comments on a recent proposal to expand the West Elk mine, VOC emissions at Arch's West Elk mine are in violation of Colorado air quality regulations, according to data obtained by state regulators.[289] BLM must disclose these VOC emissions, address them in any air quality analysis, and acknowledge that any planning decision that permits these mines to continue mining will result in violations of the Clean Air Act due to the mines' continue refusal to obtain required permits.

---

[289] Letter of E. Zukoski, Earthjustice to S. Armentrout, Supervisor, GMUG National Forest (Apr. 12, 2016) at 63-68 (exhibit omitted) (attached as Exhibit 239).

BLM_0077949

### 4.      Hazardous Air Pollutant Impacts

The UFO should look at additional hazardous air pollutant impacts from the proposed development, including the impacts from 1,3-butadiene and secondary formaldehyde that will result from the proposed development. The BLM has completed a more comprehensive analysis of HAPs in other recent NEPA actions which resulted in significant impacts from HAPs. Specifically, the Gasco EIS in Utah evaluated short-term and long-term impacts from numerous HAPs, including methanol, chlorinated solvents and acrolein.[290] The Gasco EIS analysis found elevated cancer risks for acetaldehyde, 1,3-butadiene, and ethylene dibromide, none of which are included in the RMP/EIS for the UFO.[291] DEIS, Appendix Q at Q-4 (identifying the HAP emissions that were estimated in the UFO RMP/EIS). The Gasco EIS also reported acrolein emissions that exceeded the acute Reference Exposure Level (REL) and the Reference Concentration for Chronic Inhalation (RfC).[292] Acrolein is also not included in the RMP/EIS assessment. BLM must include a more comprehensive analysis of HAP impacts and, in addition to the HAPs identified above, the BLM should also assess any HAP impacts associated with volatile emissions from hydraulic fracturing fluids. It is important to continue to improve upon the HAP analyses conducted under NEPA in order to ensure there are no significant health impacts from near-field exposure to HAPs from the proposed development in the planning area. *See* 40 C.F.R. §1508.27(b)(2).

### 5.      Visibility and Ecosystem Impacts

Much of air pollution from oil and gas development and operations also degrades visibility. Section 169A of the Clean Air Act ("CAA"), 42, U.S.C. § 7401 *et seq.* (1970) sets forth a national goal for visibility, which is the "prevention of any future, and the remedying of any existing, impairment of visibility in Class I areas which impairment results from manmade air pollution." Congress adopted the visibility provisions in the CAA to protect visibility in "areas of great scenic importance." H.R. Rep. No. 294, 95th Cong. 1st Sess. at 205 (1977). In promulgating its Regional Haze Regulations, 64 Fed. Reg. 35,714 (July 1, 1999), the U.S. Environmental Protection Agency ("EPA") provided:

> Regional haze is visibility impairment that is produced by a multitude of sources and activities which emit fine particles and their precursors and which are located across a broad geographic area. Twenty years ago, when initially adopting the visibility protection provisions of the CAA, Congress specifically recognized that the "visibility problem is caused primarily by emission into the atmosphere of SO2, oxides of nitrogen, and particulate matter, especially fine particulate matter, from inadequate[ly] controlled sources." H.R. Rep. No. 95-294 at 204 (1977). The fine particulate matter (PM) (e.g., sulfates, nitrates, organic carbon, elemental carbon, and soil dust) that impairs visibility by scattering and absorbing light can cause serious health effects and mortality in humans, and contribute to environmental effects such as acid deposition and eutrophication.

---

[290] *See* BLM Gasco Energy Project FEIS, Table 4-12, Table 4-19 and Appendix H. April 2010.
[291] BLM Gasco FEIS Table 4-19.
[292] BLM Gasco FEIS Appendix H, at H-45.

BLM_0077950

The visibility protection program under sections 169A, 169B, and 110(a)(2)(J) of the CAA is designed to protect Class I areas from impairment due to man-made air pollution. The current regulatory program addresses visibility impairment in these areas that is "reasonably attributable" to a specific source or small group of sources, such as, here, air pollution resulting from oil and gas development and operations authorized by the RMP. *See* 64 Fed. Reg. 35,714.

Moreover, EPA finds the visibility protection provisions of the CAA to be quite broad. Although EPA is addressing visibility protection in phases, the national visibility goal in section 169A calls for addressing visibility impairment generally, including regional haze. *See e.g., State of Maine v. Thomas*, 874 F.2d 883, 885 (1st Cir. 1989) ("EPA's mandate to control the vexing problem of regional haze emanates directly from the CAA, which 'declares as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in Class I areas which impairment results from manmade air pollution.' ") (citation omitted).

Here, there are at least 10 Class I areas in or near the planning area that may be impacted by the proposed development, including: the Black Canyon of the Gunnison National Park (inside the planning area); Arches National Park; Canyonlands National Park; Flat Tops Wilderness Area; Eagles Nest Wilderness; Maroon Bells – Snowmass Wilderness Area; West Elk Wilderness; Raggeds Wilderness; La Garita Wilderness; Weminuche Wilderness; and Mesa Verde National Park. *See* DEIS at 4-25.

The UFO provides visibility modeling based on the "projected federal and nonfederal oil and gas emissions throughout the 2.5 mile (4-kilometer) CARMMS domain plus mining on federal lands in Colorado," but provides no information about the contribution of the specific development contemplated by the UFO RMP/EIS. Yet the BLM acknowledges: "For all of the alternatives, the magnitude of emissions from oil and gas and coal and uranium mining development has the potential to impact air quality and air quality-related values (i.e., visibility and atmospheric deposition) within these areas." DEIS at 4-25. The nature and extent of these impacts must be considered and specifically analyzed in the UFO RMP/EIS.

### 6.   Air Quality Impacts on Human Health

Entirely absent from the agency's discussion of air quality impacts is the relationship to human health. Although adherence to air quality mitigation and NAAQS standards will have a positive relationship to human health, poor baseline air quality conditions due to direct, indirect and cumulative impacts in the planning area warrants an independent hard look analysis at human health; and, moreover, such analysis is required by NEPA and CEQ implementing regulations. As the Endocrine Disruption Exchange has noted:

In addition to the land and water contamination issues, at each stage of production and delivery tons of toxic volatile compounds (VOCs), including BETX, other hydrocarbons, and fugitive natural gas (methane), can escape and mix with nitrogen oxides (NOx) from the exhaust of diesel-driven, mobile and stationary equipment, to produce ground-level ozone. One highly reactive molecule of ground level ozone can burn the deep aveolar tissue in the lungs, causing it to age

BLM_0077951

prematurely. Chronic exposure can lead to asthma and chronic obstructive pulmonary diseases (COPD), and is particularly damaging to children, active young adults who spend time outdoors, and the aged. Ozone combined with particular matter less than 2.5 micrometers produces smog (haze) that has been demonstrated to be harmful to humans as measured by emergency room admissions during periods of elevation. Gas field produced ozone has created a previously unrecognized air pollution problem in rural areas, similar to that found in large urban areas, and can spread up to 200 miles beyond the immediate region where gas is being produced. Ozone not only causes irreversible damage to the lungs, it is similarly damaging to conifers, aspen, forage, alfalfa, and other crops commonly grown in the West. Adding to this air pollution is the dust created by fleets of diesel trucks working around the clock hauling the constantly accumulating condensate and produced water to large waste facilities evaporation pits on unpaved roads. Trucks are also used to haul the millions of gallons of water from the source to the well pad.[293]

As discussed, development under the UFO RMP/EIS will increase ozone. The BLM acknowledges: "The magnitude of estimated emissions from BLM-authorized oil and gas activities at the level of development predicted over the life of the RMP in Alternatives A, B, B.1, C, and D have the potential to contribute to increased ambient concentrations of ozone in, adjacent to, and outside and downwind of the planning area." DEIS at 4-20. Research indicates a strong correlation between oil and gas development and increased ozone concentrations – particularly in the summer when warm, stagnant conditions yield an increase in $O_3$ from oil and gas emissions.[294] Particularly in areas of significant existing oil and gas development – such as heavily developed portions of the Piceance Basin, but also the San Juan Basin, which was the subject of this research – summertime "peak incremental $O_3$ concentration of 10 ppb" have been simulated. *Id.* at 1118. This study indicates a "clear potential for oil and gas development to negatively affect regional $O_3$ concentrations in the western United States, including several treasured national parks and wilderness areas in the Four Corners region. "It is likely that accelerated energy development in this part of the country will worsen the existing problem."[295] Additionally, and as mentioned above, oil and gas production in the mountain west has recently been linked to winter ozone levels that greatly exceed the National Ambient Air Quality Standards ("NAAQS").[296]

---

[293] Theo Colburn et al., *Natural Gas Operations from a Public Health Perspective*, available at: http://endocrinedisruption.org/assets/media/documents/GasManuscriptPreprintforweb12-5-11.pdf (attached as Exhibit 151).

[294] Marco A Rodriguez, et al., *Regional Impacts of Oil and Gas Development on Ozone Formation in the Western United States*, JOURNAL OF AIR & WASTE MANAGEMENT ASSOCIATION (Sept. 2009) (attached as Exhibit 152).

[295] *See* Rodriguez at 1118.

[296] *See* Gail Tonnesen and Richard Payton, EPA Region 8. *Winter Ozone Formation: Results from the Wyoming Upper Green River Basin Studies and Plans for the 2012, Uintah Basin Study* (seminar abstract) (Jan. 2012), available at: http://www.esrl.noaa.gov/csd/seminars/2012/TonnesenPayton.html (citing, *inter alia*, Schnell, et. al., *Rapid photochemical production ozone at high concentrations in a rural site during winter*, 2

BLM_0077952

Increases in ground-level ozone not only impact regional haze and visibility, but can also result in dramatic impacts to human health. According to the EPA:

Breathing ground-level ozone can result in a number of health effects that are observed in broad segments of the population. Some of these effects include:

- Induction of respiratory symptoms
- Decrements in lung function
- Inflammation of airways

Respiratory symptoms can include:

- Coughing
- Throat irritation
- Pain, burning, or discomfort in the chest when taking a deep breath
- Chest tightness, wheezing, or shortness of breath

In addition to these effects, evidence from observational studies strongly indicates that higher daily ozone concentrations are associated with increased asthma attacks, increased hospital admissions, increased daily mortality, and other markers of morbidity. The consistency and coherence of the evidence for effects upon asthmatics suggests that ozone can make asthma symptoms worse and can increase sensitivity to asthma triggers.[297]

Ozone is just one air-related byproduct of oil and gas development that may pose serious impacts to human health. Recent studies in Garfield County confirm that air toxics are generated during every stage of oil and gas development and can have potentially significant health impacts even at concentrations below regulatory thresholds.[298] Another recent study undertaken in rural Colorado locations found that women who lived close to gas wells were more likely to have children born with a variety of defects, from oral clefts to heart issues.[299] And, yet another recent study found that people who lived less than half a mile from a gas well had a higher risk of health issues. The research found a small increase in cancer risk and alleged that exposure to benzene was a major contributor to the risk.[300]

---

Nature Geosci. 120-122 (2009) (attached as Exhibit 153); *see also* Detlev Helmig *et al.*, *Highly Elevated Atmospheric Levels of Volatile Organic Compounds in the Uintah Basin, Utah*, ENVIRONMENTAL SCIENCE & TECHNOLOGY (March 13, 2014) (attached as Exhibit 154).

[297] EPA, *Health Effects of Ozone in the General Population,* available at: http://www.epa.gov/apti/ozonehealth/population.html (attached as Exhibit 155).

[298] Theo Colborn et al., *An exploratory study of air quality near natural gas operations*, HUM. ECOL. RISK ASSESS (Nov. 9, 2012) (attached as Exhibit 156).

[299] Lisa M. McKenzie et al., *Birth Outcomes and Maternal Residential Proximity to Natural Gas Development in Rural Colorado*, ENVIRONMENTAL HEALTH PERSPECTIVES (April 2014) (attached as Exhibit 157).

[300] McKenzie *et al.*

BLM_0077953

Oil and gas development is one of the largest sources of VOCs, ozone, and sulfur dioxide emissions in the United States. Nevertheless, the agency's preferred Alternative D leaves available approximately 865,970 surface acres within the planning area for oil and gas leasing and development, accounting for the development of approximately 330 federal wells. DEIS at 2-10, 4-36. The relationship between air quality and human health must be analyzed in the RMP/EIS. The failure of the UFO to do so, here, represents a fundamental shortcoming of the agency's analysis, and must be corrected. "The agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs.*, 463 U.S. at 43 (1983).

### B.   The UFO Has Failed to Take a "Hard Look" at Resource Impacts from Hydraulic Fracturing.

Although advances in oil and gas extraction techniques – namely hydraulic fracturing, or "fracking" – have undoubtedly resulted in a growth of domestic production, the wisdom of these advances with regard to other resource values and human health is still very much in question.[301] As described in detail below, there is a wealth of information and reports stressing the dangers of fracking that must be considered in the agency's subject NEPA analysis. Of course, given the national attention and debate that fracking is generating, significant sources of new information and research are being consistently published warning against the dangers and impacts that fracking can produce, which must also be considered by the agency.

For example, as discussed in more detail below, hydraulic fracturing was identified as one of several causes of methane contamination of drinking water and a subsequent explosion at a home in Bainbridge Township, Ohio. Spills of hydraulic fracturing fluid into the Acorn Fork Creek in Kentucky resulted in a fish kill that affected the threatened Blackside Dace among other species. Also, one study modeled that chemically concentrated fracking fluids can migrate into groundwater aquifers within a matter of years – calling into question industry claims that rock layers separating aquifers are impervious to these pollutants.[302] Claims that there has never been a documented case of groundwater contamination from fracking was challenged by EPA's research in Pavillion, Wyoming. Indeed, a second round of testing in the Pavillion area was recently performed by the U.S. Geological Survey, which supported EPA's preliminary findings that hydraulic fracturing resulted in groundwater contamination.[303] Even in draft form, the Pavillion Report and its troubling findings as well as incidents described above and other evidence of fracking related contamination from around the country underscore the need for

---

[301] *See, e.g.,* A.R. Ingraffea, et. al., *Natural Gas, Hydraulic Fracking and a Bridge to Where?* (April 2011) (attached as Exhibit 158).

[302] *See,* Abrahm Lustgarten, *New Study Predicts Frack Fluids can Migrate to Aquifers Within Years,* PROPUBLICA, May 1, 2012, available at: https://www.propublica.org/article/new-study-predicts-frack-fluids-can-migrate-to-aquifers-within-years (attached as Exhibit 159); Josh Fox, *The Sky is Pink: Annotated Documents* (attached as Exhibit 160).

[303] Peter Wright, et. al., U.S. Geological Survey, *Groundwater-Quality and Quality-Control Data for Two Monitoring Wells near Pavillion, Wyoming,* April and May 2012 (attached as Exhibit 161).

BLM_0077954

thorough analysis to be performed by the UFO, which the agency failed to provide in the RMP and EIS.

The dangers and impacts of fracking can be found at every stage of the oil and gas production process. For example, fracking's waste stream can result in dramatic impacts – requiring onsite waste injection, trucking used frack fluids ("flowback") offsite, and in some cases even the direct release of fracking waste into watercourses – the impacts of which can be compounded by ineffective or nonexistent regulation.[304] As detailed herein, natural gas production itself can be inefficient and wasteful – with practices such as the venting of methane,[305] and the use of vast quantities of water in the fracking process.[306] In addition to being wasteful, these practices can also be quite harmful to human health and the environment.

## 1.    Impacts from Hydraulic Fracturing Are Well Documented.

The potential impacts that may result from hydraulic fracturing are myriad and significant; and include, among others, impacts to water quality and supply, impacts to habitat and wildlife, impacts to human health, as well as impacts on greenhouse gas emissions and air quality.[307] Although industry often asserts that hydraulic fracturing is safe and doesn't result in contamination or harm to people and the environment, the New York Times recently uncovered a 1987 U.S. Environmental Protection Agency ("EPA") report to Congress which found, among other things, that fracking can cause groundwater contamination, and cites as an example a case where hydraulic fracturing fluids contaminated a water well in West Virginia.[308]  The EPA

---

[304] *See* Abrahm Lustgarten, *The Trillion Gallon Loophole: Lax Rules for Drillers that Inject Pollutants Into the Earth,* ProPublica, Sept. 20, 2012, available at: https://www.propublica.org/article/trillion-gallon-loophole-lax-rules-for-drillers-that-inject-pollutants/single#republish (attached as Exhibit 162); Earthworks, *Breaking All the Rules: The Crisis in Oil & Gas Regulatory Enforcement,* September 2012 (attached as Exhibit 163).

[305] Energy Policy Research Foundation, *Lighting up the Prairie: Economic Considerations in Natural Gas Flaring,* Sept. 5, 2012 (attached as Exhibit 164); *see also,* James Hansen, et. al., *Greenhouse gas growth rates,* PNAS, vol. 101, no. 46, 16109-16114, Sept. 29, 2004 (attached as Exhibit 165) (curtailing methane waste is seen as a "vital contribution toward averting dangerous anthropogenic interference with global climate.").

[306] *See* GAO, *Energy-Water Nexus: Coordinated Federal Approach Needed to Better Manage Energy and Water Tradeoffs* (Sept. 2012) (attached as Exhibit 166); Nicholas Kusnetz, *The Bakken oil play spurs booming business – in water,* High Country News, Sept. 5, 2012, available at: http://www.hcn.org/issues/44.13/the-bakken-oil-play-spurs-a-booming-business-in-water/print_view (attached as Exhibit 167).

[307] *See, e.g.,* National Wildlife Federation, *No More Drilling in the Dark: Exposing the Hazards of Natural Gas Production and Protecting America's Drinking Water and Wildlife Habitats* (2011), available at: http://www.nwf.org/News-and-Magazines/Media-Center/Reports/Archive/2011/No-More-Drilling-in-the-Dark.aspx (attached as Exhibit167); *see also* United States Forest Service, Chloride Concentration Gradients in Tank-Stored Hydraulic Fracturing Fluids Following Flowback (Nov. 2010), available at: http://nrs.fs.fed.us/pubs/38533/ (last visited Oct. 27, 2016) (attached as Exhibit 168).

[308] *See* U.S. Environmental Protection Agency, Report to Congress, *Management of Wastes from*

---

BLM_0077955

report was further summarized and reviewed in an Environmental Working Group report,[309] and demonstrates the long-known dangers of employing this technology to extract mineral resources.

A Congressional Report issued in April 2011 reveals that energy companies have injected more than 30 million gallons of diesel fuel or diesel mixed with other fluids into the ground nationwide in the process of fracking to extract natural gas between 2005 and 2009.[310] In Colorado, 1.3 million gallons of fluids containing diesel fuel were used in fracking wells.[311] The EPA has stated that "the use of diesel fuel in fracturing fluids poses the greatest threat" to underground sources of drinking water.[312] According to Congresswoman Diana DeGette of Colorado, fracking with diesel fuel was done without permits in apparent violation of the Safe Drinking Water Act.[313]

Despite the energy industry's explanation that a thick layer of bedrock safely separates the gas-containing rock layer being fractured from ground-water used for drinking and surface water sources, evidence is emerging which warns that contaminants from gas wells are making their way into groundwater. Evidence suggesting contaminants from drilling and fracking operations have contaminated drinking water includes:

- In March 2004, gas was discovered bubbling up in West Divide Creek. The Colorado Oil and Gas Conservation Commission ("COGCC") took samples of the water and

---

*the Exploration, Development, and Production of Crude Oil, Natural Gas, and Geothermal Energy* (Dec. 1987), at Ch. IV, Damages Caused by Oil and Gas Operations (attached as Exhibit 169); *see also* Drilling Down, *Documents: A Case of Fracking Related Contamination*, THE NEW YORK TIMES ONLINE, available at: http://www.nytimes.com/interactive/us/drilling-down-documents-7.html?_r=1& (last visited Oct. 27, 2016).

[309] *See* Environmental Working Group, *Cracks in the Façade: 25 Years ago, EPA Linked "Fracking" to Contamination* (Aug. 2011) (attached as Exhibit 170).

[310] U.S. CONGRESS, HOUSE OF REPRESENTATIVES, COMMITTEE ON ENERGY AND COMMERCE, *Chemicals Used in Hydraulic Fracturing* (April 2011), at 10 (attached as Exhibit 171); *see also* Memorandum from Chairman Henry A. Waxman and Subcommittee Chairman Edward J. Markey, to Committee on Energy and Commerce, Examining the Potential Impact of Hydraulic Fracturing (Feb. 18, 2010) (attached as Exhibit 172).

[311] Karen Frantz, *States probe use of diesel fuel*, DURANGO HERALD, February 5, 2011, available at: http://www.durangoherald.com/article/20110206/NEWS01/702069922/-1/s.

[312] David O. Williams, *U.S. House probe alleges Halliburton, others illegally used diesel in gas fracking*, COLORADO INDEPENDENT, February 1, 2011, available at: http://coloradoindependent.com/73593/u-s-house-probe-alleges-halliburton-others-illegally-used-diesel-in-gas-fracking.

[313] Letter from U.S. CONGRESS, HOUSE OF REPRESENTATIVES, COMMITTEE ON ENERGY AND COMMERCE, Representatives Henry A. Waxman, Edward J. Markey, & Diana DeGette, to Lisa Jackson, Administrator, U.S. ENVIRONMENTAL PROTECTION AGENCY (Jan. 31, 2011), available at: http://degette.house.gov/media-center/press-releases/energy-commerce-committee-fracking-investigation-reveals-millions-of (attached as Exhibit 173); *see also* Environment News Service, *Toxic Diesel Fuel Used Without Permits in Fracking Operations*, February 4, 2011, available at: http://www.ens-newswire.com/ens/feb2011/2011-02-04-092.html.

BLM_0077956

discovered they contained benzene, which was traceable to a seep caused by EnCana while drilling for natural gas. EnCana was subsequently fined $371,000 as a result of contaminating West Divide Creek.[314]

- The COGCC investigated complaints from Weld County, Colorado that domestic water wells were allegedly contaminated from oil and gas development. The COGCC concluded after investigation that the Ellsworth's water well contained a mixture of biogenic and thermogenic methane that was in part attributable to oil and gas development. Ms. Ellsworth and the operator reached a settlement in that case.[315]

- In Pavillion, Wyoming, EPA found 11 of 39 water samples collected from domestic wells were contaminated with chemicals linked to local natural gas fracking operations. The EPA found arsenic, methane gas, diesel-fuel-like compounds and metals including copper and vanadium. Of particular concern were compounds called adamantanes – a natural hydrocarbon found in natural gas – and a little-known chemical called 2-butoxyethanol phosphate, or 2-BEp. 2-BEp is closely related to 2-BE, a substance known to be used in fracking fluids.[316]

- The Pennsylvania Department of Environmental Protection drafted a report that documented cases in two dozen communities where new or operating oil or gas wells led to methane migrating into drinking water wells and streams, as well as more than three dozen more cases where methane contamination of drinking water sources was linked to abandoned wells.[317]

- A house in Bainbridge, Ohio exploded on November 15, 2007. The investigators determined that the well had been improperly constructed, that hydraulic fractures grew out of zone, and pressure was not safely managed after fracturing, allowing gas to migrate into the shallow drinking water aquifer and subsequently into domestic water wells, culminating in the explosion.[318] The faulty cement casing of the well

---

[314] Colo. Oil & Gas Conservation Comm'n, *In the Matter of Alleged Violations of the Rules and Regulations of the Colorado Oil and Gas Conservation Commission by Encana Oil & Gas (USA) Inc., Garfield County Colorado*, Cause No. 1V, Order No. 1V-276 (August 16, 2004), available at: https://cogcc.state.co.us/orders/orders/1v/276.html (attached as Exhibit 196).

[315] Letter from David Neslin, Director, Colorado Oil and Gas Conservation Commission, to Mr. and Mrs. Ellsworth (August 7, 2009) (attached as Exhibit 175).

[316] *See* EPA Draft Report, *Investigation of Ground Water Contamination Near, Pavillion, Wyoming* (Dec. 2011) (attached as Exhibit 87).

[317] Pennsylvania Department of Environmental Protection, Bureau of Oil and Gas Management, *Stray Natural Gas Migration Associated with Oil and Gas Wells*, Draft Report (October 28, 2009), available at: http://www.dep.state.pa.us/dep/subject/advcoun/oil_gas/2009/Stray%20Gas%20Migration%20Cases.pdf (attached as Exhibit 177).

[318] *See, e.g.* Ohio Department of Natural Resources, Division of Mineral Resources Management, *Report on the Investigation of the Natural Gas Invasion of Aquifers in Bainbridge Township of Geauga County, Ohio* (September 1, 2008) (attached as Exhibit 178); Bair, E. S.,

BLM_0077957

developed a crack allowing methane to seep underground and fill a residential basement.

- On January 1, 2009, a water well at a home in Dimock, Township, Susquehanna County, PA, exploded. The Pennsylvania Department of Environmental Protection ("PA DEP") documented elevated levels of methane in numerous drinking water wells near Cabot natural gas wells and concluded that the elevated methane in drinking water was a result of Cabot's failure to properly case and cement several of its gas wells, which allowed methane to migrate from the wells into drinking water.[319]

Other known and suspected adverse effects of drilling and fracking operations include:

- Garfield County, Colorado, Commissioners recently expressed their health and safety concerns regarding natural gas drilling and fracking by stating in a legal filing that, "No agency…can guarantee Garfield County residents that exposures to oil and gas emissions will not produce illness or latent effects, including death." They cited the cases of three people – Chris Mobaldi, Verna Wilson, and Jose Lara – who died after suffering from drilling-related illnesses in Garfield County.[320]

- In April 2008, a nurse at a hospital in Durango, Colorado, became critically ill and almost died of organ failure as a result of second-hand chemical exposure acquired while treating a drill rig worker who had fracking fluid on his clothes.[321]

- In Texas, which now has approximately 93,000 natural-gas wells, up from around 58,000 a dozen years ago, a hospital system in the six counties with some of the heaviest drilling reported in 2010 a 25 percent asthma rate for young children, more than three times the state rate of about 7 percent.[322]

---

Freeman, D. C., & Senko, J. M. (2010, June). *Expert Panel Technical Report, Subsurface Gas Invasion Bainbridge Township, Geauga County, Ohio*, available at: https://oilandgas.ohiodnr.gov/portals/oilgas/pdf/bainbridge/DMRM%200%20Title%20Page,%20 Preface,%20Acknowledgements.pdf (attached as Exhibit 179).
[319] Pennsylvania Department of Environmental Protection. (2009, November 4). Consent Order and Agreement between Cabot Oil and Gas Corporation and the Pennsylvania Department of Environmental Protection, available at: http://files.dep.state.pa.us/oilgas/OilGasLandingPageFiles/FinalCO&A121510.pdf (attached as Exhibit 180) (hereinafter "Cabot Consent Order").
[320] David O. Williams, *GarCo officials blast state gas drilling rules in case requesting more well density*, THE COLORADO INDEPENDENT, January 19, 2011, available at: http://coloradoindependent.com/72246/garco-officials-blast-state-gas-drilling-rules-in-case-requesting-more-well-density.
[321] Eric Frankowski, *Gas industry secrets and a nurse's story*, HIGH COUNTRY NEWS, July 28, 2008, available at: http://www.hcn.org/wotr/gas-industry-secrets-and-a-nurses-story.
[322] Ian Urbina, *Regulations Lax as Gas Well's Tainted Waters Hits Rivers*, THE NEW YORK TIMES, February 26, 2011, available at: http://www.nytimes.com/2011/02/27/us/27gas.html?pagewanted=all.

BLM_0077958

Abrahm Lustgarten, an investigative reporter with ProPublica, who has won the George Polk Award for Environmental Reporting for his work on the dangers of natural gas drilling, writes:

> Dennis Coleman, a leading international geologist and expert on tracking underground migration, says more data must be collected before anyone can say for sure that drilling contaminants have made their way to water or that fracturing is to blame. But Coleman also says there's no reason to think it can't happen. Coleman's Illinois-based company, Isotech Laboratories, has both the government and the oil and gas industry as clients. He says he has seen methane gas seep underground for more than seven miles from its source. If the methane can seep, the theory goes, so can the fluids.[323]

Important evidence of groundwater contamination from hydraulic fracturing is found in an EPA draft report investigating ground water contamination near Pavillion, Wyoming ("Pavillion Report").[324] Among its findings, the Pavillion Report provides:

> Elevated levels of dissolved methane in domestic wells generally increase in those wells in proximity to gas production wells. Pavillion Report, at xiii.

> Detection of high concentrations of benzene, xylenes, gasoline range organics, diesel range organics, and total purgeable hydrocarbons in ground water samples from shallow monitoring wells near pits indicates that pits are a source of shallow ground water contamination in the area of investigation. Pits were used for disposal of drilling cuttings, flowback, and produced water. There are at least 33 pits in the area of investigation. When considered separately, pits represent potential source terms for localized ground water plumes of unknown extent. When considered as whole they represent potential broader contamination of shallow ground water. *Id.* at 33 (emphasis added).

> The explanation best fitting the data for the deep monitoring wells is that constituents associated with hydraulic fracturing have been released into the Wind River drinking water aquifer at depths above the current production zone. *Id.* (emphasis added).

> Although some natural migration of gas would be expected above a gas field such as Pavillion, data suggest that enhanced migration of gas has occurred to ground water at depths used for domestic water supply and to domestic wells. *Id.* at 37 (emphasis added).

---

[323] Abrahm Lustgarten, *Hydrofracked? One Man's Mystery Leads to a Backlash Against Natural Gas Drilling*, PROPUBLICA, February 25, 2011, available at: http://www.propublica.org/article/hydrofracked-one-mans-mystery-leads-to-a-backlash-against-natural-gas-drill/single.

[324] EPA Draft Report, Pavillion (attached above as Exhibit 176).

BLM_0077959

A lines of reasoning approach utilized at this site best supports an explanation that <u>inorganic and organic constituents associated with hydraulic fracturing have contaminated ground water at and below the depth used for domestic water supply</u>…. A lines of evidence approach also indicates that <u>gas production activities have likely enhanced gas migration</u> at and below depths used for domestic water supply and to domestic wells in the area of investigation. *Id.* at 39 (emphasis added).

Although the Pavillion Report was never finalized, EPA shared preliminary data with, and obtained feedback from, Wyoming state officials, EnCana, Tribes, and Pavillion residents, prior to release. Even in draft form, the Pavillion Report and its troubling findings – as well as other evidence of fracking related contamination from around the country – satisfies the low threshold for consideration of the impacts described therein in the NEPA analysis for the UFO RMP.[325]

Historically, BLM has been dismissive of possible impacts to water quality from hydraulic fracturing. However, given the weight of both new and old evidence documenting the risk of water contamination from gas drilling across the country and within the planning area, BLM's approach is becoming increasingly untenable. Indeed, even an industry report prepared for Gunnison Energy Corporation – a major oil and gas developer with leases just south of the UFO – has acknowledged the potential for significant impacts to water resources from fracking.[326] The simple fact of the matter is that natural gas development has the potential for poisoning our water with toxic, hazardous, and carcinogenic chemicals as well as naturally occurring radioactive radium, and BLM has failed to provide a thorough hard look analysis of these potentially significant impacts in its analysis for UFO RMP.

Recent reporting from New Mexico has acknowledged a proliferation of "frack hits," or "downhole communication," where new horizontal drilling for oil is communicating with both historic and active vertical wells.[327] This is a significant development that could result in well blowouts, contamination of resources, and issues over who is responsible for liabilities and costs of such impacts.

---

[325] For the results of a recent investigation of the potential contamination in Pavillion, *see* Dominic DiGiulio and Robert B. Jackson, *Impact to Underground Sources of Drinking Water and Domestic Wells from Production Well Stimulation and Completion Practices in the Pavillion, Wyoming, Field*, Environmental Science and Technology (March 29, 2016), available at: http://pubs.acs.org/doi/pdf/10.1021/acs.est.5b04970.

[326] *See* Gunnison Energy Corporation, *Analysis of Potential Impacts of Four Exploratory Natural Gas Wells to Water Resources of the South Flank of the Grand Mesa, Delta County, Colorado* (March 2003) at 42, 56 (attached as Exhibit 181).

[327] *See, e.g.,* Gayathri Vaidyanathan, *In N.M., a sea of 'frack hits' may be tilting production,* E&E News, (March 18, 2014) (attached as Exhibit 182); Tina Jensen, *Fracking fluid blows out nearby well*, KQRE (October 19, 2013), available at: https://www.earthworksaction.org/media/detail/fracking_fluid_blows_out_nearby_well#.WBJuh MnN6T9 (attached as Exhibit 183).

BLM_0077960

Without implementation of a precautionary approach to these risks, BLM will continue to place the health of our community and our environment at risk.

### 2. The UFO failed to sufficiently consider issues of water supply related to fracking.

In addition to impacts on water quality, mineral development processes, and particularly fracking, may result in significant impacts on water quantity. To frack a single well one time requires 2-8 million gallons of water.[328] Annually, the EPA estimates that 70-140 billion gallons of water are used to frack wells in the United States – enough to supply drinking water to 40-80 cities of 50,000.[329] This massive use of water is of particular concern in states in the interior west, like Colorado, were water supplies are scarce and already stretched.[330] Indeed, as the Department of Energy has recognized, "[a]vailable surface water supplies have not increased in 20 years, and groundwater tables and supplies are dropping at an alarming rate."[331] Because of the chemicals that are added to fracking water, the water may not be reused.[332] Removing water for fracking can stress existing water supplies by lowering water tables and dewatering aquifers, decreasing stream flows, and reducing water in surface reservoirs.[333] This can result in changes to water quality, can alter the hydrology of water systems, and can increase concentrations of pollutants in the water.

There is also potential for the reductions in water quantity to impact aquatic and riverine species and habitat by affecting water flows and natural river processes: this, in turn, could lead to fish declines, changes to riparian plant communities, and alterations to sediment.[334] Further, water resources in Colorado are in many locations stressed or over-allocated, and oil and gas development has already lead to unpermitted and illegal water withdrawals.[335]

Here, in its NEPA analysis BLM must closely assess the direct, indirect, and cumulative impacts of lease development on water supplies. 40 C.F.R. §§ 1508.7, 1508.8. This analysis must consider the potential sources of water in the UFO that would be used for oil and gas

---

[328] J. David Hughes, *Will Natural Gas Fuel America in the 21st Century?*, May 2011, at 23 (attached as Exhibit 184).

[329] *See* U.S. Envtl. Protection Agency, *Draft Plan to Study the Potential Impacts of Hydraulic Fracturing on Drinking Water Resources* (Feb. 2011) at 20 (attached as Exhibit 185).

[330] *See* Western Organization of Resource Councils, *Gone for Good: Fracking and Water Loss in the West* (2013) at 7-8 (attached as Exhibit 186) (noting water scarcity in west and significant water demands of fracking).

[331] U.S. Dep't of Energy, *Energy Demands on Water Resources: Report to Congress on the Interdependency of Energy and Water*, Dec. 2012, at 12 (attached as Exhibit 187).

[332] *See* EPA Draft Plan to Study the Impacts of Hydraulic Fracturing on Drinking Water at 20 (attached as Exhibit 185).

[333] *Id.*

[334] Nat'l Parks Conservation Ass'n, *National Parks and Hydraulic Fracturing: Balancing Energy Needs, Nature, and America's National Heritage* (2013) at 23 (attached as Exhibit 188).

[335] *See* WORC, Gone for Good at 21 (attached as Exhibit 186).

BLM_0077961

development, and the impacts of these water withdrawals on water availability for drinking, agriculture, and wildlife. The analysis must further address the impacts to water quantity at different annual, seasonal, monthly, and daily time scales because the impacts of such water withdrawals could be more acute during times, months, and seasons of scarcity. For example, increased withdrawal and irretrievable contamination of waters will be particularly harmful during times – like the present – when much of the state is experiencing drought conditions.[336] Based on the estimated 1,271 wells to be drilled over the life of the RMP, this will result in *2.5-10.1 billion* gallons of water that will be removed from the hydrologic system. Nowhere does BLM disclose or analyze the impact of this withdrawal on the planning area or resource values.

### 3. The UFO failed to sufficiently consider impacts to surface water related to fracking.

The BLM briefly considers the potential for hydraulic fracturing fluid spills, recognizing that "[h]ydraulic fracturing could disturb surface water and groundwater hydrology and impact water quality." EIS at 4-130. Although Appendix G does contain some best management practices directed at reducing the potential for contaminating water resources with hydraulic fracturing spills, EIS at G-9 to G-10, the UFO has failed to address several fundamental questions that are central to fulfilling the agency's hard look mandate. It is undisputed that millions of gallons of water are needed to frack a single well. This raises several issues which the UFO has failed to fully address in the RMP/EIS. *See State of New Mexico v. BLM*, 656 F.3d 963, 714-15 (10th Cir. 2009) (providing that the EIS failed to take hard look at water quality impacts from proposed oil and gas lease sale where wells would generated significant amounts of waste water). For example:

- What source waters will be used for well development, and what are the direct, indirect, and cumulative impacts of extracting high volumes of these waters from surface or groundwater sources in this area?

- How would the produced water be disposed of? If produced water is returned to the surface as toxic waste for evaporation, where will such wastewater ponds be located? And, if produced water is re-injected in wastewater wells, where will such wells be located?

- What kind of treatment, if any, will be required of the producer for treating fracking wastewater?

- What is the potential footprint and location of the necessary treatment facilities, and what is the direct, indirect, and cumulative impact of such facilities?

- What mitigation measures and best management practices will BLM require, or at least recommend, to ensure that wastewater does not contaminate surface or groundwater resources, or impact threatened and endangered populations and designated critical habitat in the planning area?

---

[336] *See id.* at 8.

The EIS does not adequately address or analyze the risks of water quality contamination from surface storage of fracking fluid and other oil and gas wastes, including produced and flowback water from wells. Surface pits, in particular, are a major source of water pollution. For instance, New Mexico data, as summarized by the Oil and Gas Accountability Project, shows 743 instances of groundwater contamination, almost all of it occurring over the last three decades. Over half of these incidents, totaling 398 instances of contamination, are linked to faulty pits.[337]

The bulk of pit contamination is associated with seeps into shallow groundwater – of the sort that can readily flow into drinking water wells, as the New Mexico data demonstrates – or as spills and runoff. Similar incidents are occurring across the country.[338] For example, in Pennsylvania, state authorities were forced to quarantine cattle after a pit leaked into their field, leaking into a smelly pool that killed the grass.[339] In Colorado, leaky pits with torn liners spilled more than 6,000 barrels of waste.[340] And in Ohio, compromised pit liners and pit wall failures have sent pollution spilling out into the environment.[341]

Likewise, the BLM does not quantify, nor fully address, the risk of potentially catastrophic spills and blowouts at well sites. This is a serious error because such major spills are not uncommon in natural gas drilling. For instance, a major well blowout in Pennsylvania recently sent thousands of gallons of contaminated fluid coursing into a stream feeding the Susquehanna River.[342] In February of 2013, a major spill occurred in Windsor, Colorado where at least 84,000 gallons of water contaminated with oil and chemicals used in hydraulic fracturing spilled from a broken wellhead and into a field.[343] The BLM has failed to demonstrate that such incidents could not occur on the leases that will be approved under this RMP. In 2015, there were 615 spills related to oil and gas activities in Colorado, with 90 spills resulting in water contamination. 268 spills occurred fewer than 50 feet from groundwater.[344]

---

[337] Earthworks, Oil and Gas Accountability Project, *Closed-Loop Drilling Systems: A Cost-Effective Alternative to Pits*, at 5 (attached as Exhibit 195).

[338] *See, e.g.*, Natural Resources Defense Council, *Petition for Rulemaking to Regulate Oil and Gas Waste* (Sept. 8, 2010) (collecting these incidents) [hereinafter "NRDC Petition"] (attached as Exhibit 189).

[339] Nicolas Kusnetz, *A Fracking First in Pennsylvania: Cattle Quarantine*, PRO PUBLICA (July 2, 2010), available at: http://www.propublica.org/article/a-fracking-first-in-pennsylvania-cattle-quarantine (attached as Exhibit 190).

[340] *See* Colorado Oil and Gas Conservation Commission, Inspection/Incident Inquiry, Spill Reports Doc. Nos. 1630424, 1630436, 1630427, 1630428, 1630429, 1630430.

[341] *See* NRDC Petition at 20 (attached as Exhibit 189).

[342] Associated Press, *Crews Stop Flow of Drilling Fluid from PA Well* (Apr. 22, 2011) (attached as Exhibit 198).

[343] Bruce Finely, *Water fouled with fracking chemicals spews near Windsor*, THE DENVER POST (Feb. 14, 2013), available at: http://www.denverpost.com/ci_22586154/water-fouled-fracking-chemicals-spews-near-windsor#ixzz2zpeQUnhK (attached as Exhibit 199).

[344] Center for Western Priorities, Colorado Toxic Release Tracker 2015 Summary, available at: http://westernpriorities.org/colorado-toxic-release-tracker/

BLM_0077963

Other data confirms the risk to surface waters from fracking and fracking-related activities:

> Gas well development of any type creates surface disturbances as a result of land clearing, infrastructure development, and release of contaminants produced from deep groundwater (e.g., brines). However, the use of hydraulic fracturing poses additional environmental threats due to water withdrawals and contamination from fracking fluid chemicals. . . .
>
> Elevated sediment runoff into streams, reductions in stream flow, contamination of streams from accidental spills, and inadequate treatment practices for recovered wastewaters are realistic threats.[345]

### 4.     The UFO failed to sufficiently consider impacts to groundwater related to fracking.

Oil and gas development authorized by the UFO's RMP/EIS will result in a significant potential to contaminate groundwater resources in the planning area. Such contamination may result during the following processes: (1) the state of chemical mixing due to spills, leaks, and transportation accidents; (2) during the fracking process due to well malfunctions, migration of fracking fluids or fluids from the fractured formation to aquifers, and mobilization of subsurface materials to aquifers; (3) during flowback due to releases, leakage of on-site storage, and spills from pits (caused by improper construction, maintenance, or closure); and (4) during wastewater disposal due to discharges of wastewater into groundwater, incomplete treatment, and transportation accidents.[346]   Fracking chemicals and wastewater may also contaminate groundwater supplies as a result of illegal dumping.[347]  As further discussed below, not all chemical used in fracking have been fully disclosed, but many of those that have been disclosed or discovered are toxic, hazardous, or harmful to human health or welfare. Despite a general lack of adequate oversight of fracking operations, various instances of water pollution from fracking operations have been documented.[348]

BLM acknowledges that "[u]se, storage, and transportation of fluids, such as produced water, hydraulic fracturing fluids, and condensate, have the possibility of spills that could

---

[345] *See, e.g.*, Sally Entrekin, *et al.*, *Rapid expansion of natural gas development poses a threat to surface waters*, FRONTIERS IN ECOLOGY, vol. 9, issue 9 (October 2011) at 504, 510 (attached as Exhibit 200).

[346] *See* U.S. Environmental Protection Agency, *Draft Plan to Study the Potential Impacts of Hydraulic Fracturing on Drinking Water Resources* (Feb. 2011) (attached as Exhibit 185).

[347] Nicholas Kusnetz, *North Dakota's Oil Boom Brings Damage Along with Prosperity*, PROPUBLICA, July 7, 2012, available at: http://www.propublica.org/article/the-other-fracking-north-dakotas-oil-boom-brings-damage-along-with-prosperi#.

[348] *See, e.g., id.* (reporting on lack of oversight); Western Organization of Resource Councils, *Gone for Good: Fracking and Water Loss in the West* (2013) at 17-18, 31 (attached as Exhibit 186) (noting lack of state oversight).

BLM_0077964

migrate to surface or groundwater, causing human health impacts," and that "[i]f a groundwater source is contaminated, there are few cost-effective ways to reclaim that water; thus, the long-term impacts of groundwater contamination are considerable." DEIS 4-83. However, BLM says that "no scientific consensus has been reached" regarding the potential for hydraulic fracturing to contaminate shallow groundwater and notes that "[r]igorous well casing protocols can reduce the risk of such contamination." DEIS at 4-83 to -84. As identified above, there are many documented instances where groundwater contamination has, in fact, resulted from the fracking of oil and gas wells. The UFO's brief and dismissive response and analysis of the potential for contamination of groundwater as a result of fracking fails to satisfy the agency's obligation under NEPA to take a hard look at these impacts.

There is evidence that groundwater contamination from oil and gas operations may be significant, and underreported. For example, based on the Denver Post account of the Windsor, Colorado spill, mentioned above, the company responsible for that spill, PDC, reported *two other* spills near Greeley within weeks of the Windsor incident. Both spills contaminated groundwater, according to a state database of spills. A January 22, 2013 spill by PDC released 2,880 gallons of oil and covered 3,900 square feet, leaving groundwater contaminated with benzene at a concentration 128 times higher than the state limit along with toluene and xylene chemicals. About 17 percent of 2,078 oil and gas spills that companies reported in Colorado since January 2008 have contaminated groundwater. Fracking wastewater is one of the most common substances spilled.[349]

BLM's conclusion that the evidence of potential impacts to groundwater from fracking is inconclusive is challenged by existing models. For example, *see* T. Myers, *Potential Contaminant Pathways from Hydraulically Fractured Shale to Aquifers*, GROUND WATER (April 17, 2012) (attached as Exhibit 301):

> Fracking can release fluids and contaminants from the shale either by changing the shale and overburden hydrogeology or simply by the injected fluid forcing other fluids out of the shale. The complexities of contaminant transport from hydraulically fractured shale to near-surface aquifers render estimates uncertain, but a range of interpretative simulations suggest that transport times could be decreased from geologic time scales to as few as tens of years. Preferential flow through natural fractures fracking-induced fractures could further decrease the travel times to as little as just a few years. *Id.* at 9.

*And see*, N.R. Warner, *Geochemical evidence for possible natural migration of Marcellus Formation brine to shallow aquifers in Pennsylvania*, PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES, vol. 109, iss. 30. (July 9, 2012) (attached as Exhibit 302):

> This study shows that some areas of elevated salinity with type D composition in NE PA were present prior to shale-gas development and most likely are unrelated to the most recent shale gas drilling; however, the coincidence of elevated salinity in shallow groundwater with a geochemical signature similar to produced water from the Marcellus Formation suggests that these areas could be at greater risk of

---

[349] *See* Finely (attached above as Exhibit 199).

BLM_0077965

contamination from shale gas development because of a preexisting network of cross- formational pathways that has enhanced hydraulic connectivity to deeper geological formations. *Id.* at 5.

BLM also overlooks the linkage between hydraulic fracturing and water wells. The BLM must recognize these and analyze this risk and impacts. In addition to the studies cited in the health section of this protest, *see e.g.,* S.G. Osborn, *et al.*, *Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing*, PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES, vol. 108, iss. 20. (May 17, 2011) (attached as Exhibit 303):

> Methane concentrations were detected generally in 51 of 60 drinking-water wells (85%) across the region, regardless of gas industry operations, but concentrations were substantially higher closer to natural-gas wells. Methane concentrations were 17-times higher on average in shallow wells from active drilling and extraction areas than in wells from non-active areas. *Id.* at 8173.

> Although dissolved methane in drinking water is not currently classified as a health hazard for ingestion, it is an asphyxiant in enclosed spaces and an explosion and fire hazard. *Id.* at 8173.

> More research is also needed on the mechanism of methane contamination, the potential health consequences of methane, and establishment of baseline methane data in other locations. *Id.* at 8176.

In addition, *see also*, U.S. EPA, Draft Report, *Investigation of ground water contamination near Pavillion, Wyoming* (December 2011) (attached as Exhibit 176):

> The presence of synthetic compounds such as glycol ethers, along with enrichments in K, Cl, pH, and the assortment of other organic components is explained as the result of direct mixing of hydraulic fracturing fluids with ground water in the Pavillion gas field. *Id.* at 27.

And, *see also*, U.S. EPA, Report to Congress, *Management of wastes from the exploration, development, and production of crude oil, natural gas and geothermal energy*. Vol. 1. (December 1987) (attached as Exhibit 169):

> During the fracturing process, fractures can be produced, allowing migration of native brine, fracturing fluid, and hydrocarbons from the oil or gas well to a nearby water well. When this happens, the water well can be permanently damaged and new well must be drilled or an alternative source of drinking water found. *Id.* at IV-22.

> In 1982, Kaiser Gas Co. drilled a gas well on the property of Mr. James Parsons. The well was fractured using a typical fracturing fluid or gel. The residual fracturing fluid migrated into Mr. Parson's water well (which was drilled to a depth of 416 feet), according to an analysis by the West Virginia Environmental Health Services Lab of well water samples taken from the property. Dark and

BLM_0077966

light gelatinous material (fracturing fluid) was found, along with white fibers. (The gas well is located less than 1,000 feet from the water well.) The chief of the laboratory advised that the water well was contaminated and unfit for domestic use, and that an alternative source of domestic water had to be found. *Id.* at IV-22.

### 5.   The UFO failed to sufficiently consider issues of wastewater disposal.

BLM should consider the possibility of using recycled water and decreasing the use of evaporation ponds, as well as address concerns about the safety of injection wells. The UFO has an obligation to take a hard look at wastewater disposal and provide a comparative analysis of the different alternatives for disposal. It is not appropriate to assume that treatment can and will be adequate to take care of the problem. For example, *see* Brian D. Lutz, *et al.*, *Generation, Transport, and Disposal of Wastewater Associated with Marcellus Shale Gas Development*, WATER RESOURCES RESEARCH (February 8, 2013) (attached as Exhibit 304).

> Contrary to current perceptions, Marcellus wells produce significantly less wastewater per unit gas recovered (approximately 35%) compared to conventional natural gas wells. Further, well operators classified only 32.3% of wastewater from Marcellus wells as flowback from hydraulic fracturing; most wastewater was classified as brine, generated over multiple years. *Despite producing less wastewater per unit of gas, developing the Marcellus shale has increased the total wastewater generated in the region by approximately 570% since 2004, overwhelming current wastewater disposal infrastructure capacity.*

*Id.* at 1 (emphasis added).

### 6.   Hydraulic Fracturing Disclosure Rules are Insufficient.

One basic purpose of NEPA is to assure that the public and policy makers are aware in advance of the potential environmental consequences of proposed actions. 40 C.F.R. § 1500.1(a). Furthermore, the presence of uncertain or unknown risks may compel an agency to prepare a more thorough EIS, in lieu of an EA. 40 C.F.R. § 1508.27(b)(5). Currently, there are significant uncertainties about the different chemicals that are being used in hydraulic fracking, though, as mentioned above, it is clear that toxic, hazardous, and carcinogenic chemicals are used throughout the fracking process. Current disclosure of fracking chemicals, via FracFocus, is insufficient to adequately protect the public from potentially toxic, hazardous, and/or carcinogenic chemicals.[350] In its NEPA analysis for the UFO RMP, the agency provides a Best Management Practice that addresses chemicals used in the fracturing process:

> Chemicals used in the fracturing process should be biodegradable, non-toxic, neutral pH, residual free, non-corrosive, non-polluting and non-hazardous in the forms and concentrations being used. The operator should review the material safety data sheets to

---

[350] Kate Konschnik *et al.*, *Legal Fractures in Chemical Disclosure Laws: Why the Voluntary Chemical Disclosure Registry FracFocus Fails as a Regulatory Compliance Tool*, HARVARD LAW SCHOOL, ENVTL. LAW PROGRAM, Apr. 2013 (attached as Exhibit 201).

BLM_0077967

assure the chemicals are not known carcinogens in the methods or concentrations being used.

DEIS at G-10.

While the BLM should be applauded for making strides to prevent the contamination of water resources with this BMP, the BMP fails to address the fact that not all substances that will be used in the fracturing process are made public. Moreover, regardless of the "concentrations being used," BLM should categorize all substances as hazardous, toxic, carcinogenic, or benign.

### 7. The Reasonable Foreseeable Development Scenario Failed to Sufficiently Consider Increased Oil and Gas Development Due to Fracking.

There are significant flaws with the UFO's Reasonable Foreseeable Development Scenario for Oil and Gas ("RFD") which undermine validity of the agency's analysis of resource impacts, and here, impacts due to fracking. The RMP/EIS fails to consider the full potential of recent hydraulic fracturing techniques and vastly underestimates the extent of oil and gas development and its impacts on the environment. For example, BLM estimates that—as projected by the RFD—1,271 wells would be developed under the RMP on all federal minerals and private minerals within the planning area. DEIS at 4-3. However, this estimate does not allow for the likely scenario that advances in hydraulic fracturing technology will increase the number of drilled wells.

The RFD is outdated and underestimates the number of potential wells. Since the RFD is four years old, and based on older data, it fails to consider the full extent of current and future development. The RMP/EIS fails to take into account the most recent trends in well development, which are the most crucial in predicting the extent of development and its likely impacts. All evidence points to increased drilling in relation to historic trends. Many reports have highlighted the recent nationwide growth in hydraulic fracturing and natural gas development, as identified below.

For example, one report notes that "[a]s a result of hydraulic fracturing and advances in horizontal drilling technology, natural gas production in 2010 reached the highest level in decades," and that "[h]ydraulic fracturing, used in combination with horizontal drilling, has allowed industry to access natural gas reserves previously considered uneconomical, particularly in shale formations."[351] Another points out that "[s]ince 1998 unconventional natural gas production [hydraulic fracturing] has increased nearly 65%."[352] The U.S. Department of Energy's Energy Information Administration also forecasts a massive surge in oil and gas

---

[351] U.S. CONGRESS, HOUSE OF REPRESENTATIVES, *Chemicals Used in Hydraulic Fracturing* (April 2011) at 1, 2 (attached above as Exhibit 171).

[352] ALL Consulting, *Hydraulic Fracturing Considerations for Natural Gas Wells of the Marcellus Shale* (Sept. 2008) at 1, available at: http://www.dec.ny.gov/docs/materials_minerals_pdf/GWPCMarcellus.pdf (attached as Exhibit 202).

BLM_0077968

development, in particular shale gas and shale oil from formations like the Monterey Shale.[353] As the EIA explains in a review of shale gas resources dated July 8, 2011, "[t]he use of horizontal drilling in conjunction with hydraulic fracturing has greatly expanded the ability of producers to profitably recover natural gas and oil from low-permeability geologic plays— particularly, shale plays."[354] As the EIA further explains, "only in the past 5 years has shale gas been recognized as a 'game changer' for the U.S. natural gas market." This surge in well development illustrates the impropriety of relying on old data. When new technology enables industry to tap resources it was unable to access a few years ago, it makes historic baselines meaningless under the current landscape.

Of particular note is the agency's failure to provide any information or analysis of substance on the critical issue of hydraulic fracturing. For the most part, the RFD mentions fracking as a technology that is currently used in some areas and may allow for future development of additional plays. For example, the agency provides:

> Only one horizontal well has been drilled to date in the Study Area. New types of horizontal fracturing technology will likely be used to stimulate these types of wells in the future. Development could be similar to that used to stimulate the Bakken Formation Middle Member in North Dakota. For horizontal boreholes, multi-stage fracture stimulations could be used. RFD at 35.

> The combination of horizontal drilling and hydraulic fracturing technologies has made it possible to produce shale gas and tight gas economically. Much of the Study Area oil and gas supply growth is expected to come from production from existing known reservoirs, with most new reservoir discoveries potentially coming from exploration for nonconventional plays in the continuous assessment units (including shale gas and coalbed natural gas) identified by the U.S. Geological Survey in Appendix 1. RFD at 58.

While these statements acknowledge that increased production may "potentially" come from exploration due to fracking and additional horizontal fracturing technology "will likely" be used in the future, there is no quantification of the increase in the number of wells, acres impacted, or required infrastructure. Further, there is no discussion of the increased adverse impacts to human health or the environment. Thus, these statements, which implicitly recognize that the RFD may not account for the full extent of production, provide little in terms of analysis of fracking impacts. Such a void of analysis and consideration of a widely employed technology that not only has the potential, but, in all likelihood, will drastically alter the foreseeable development within the planning area, fails to satisfy the UFO's obligations under NEPA. Notably, BLM also fails to consider analysis from a recent USGS report concerning the development of Mancos Shale in the Piceance Basin—which may significantly affect development projections in the Uncompahgre planning area—wherein USGS concluded: "Using

---

[353] U.S. Energy Information Administration, *Review of Emerging Resources: U.S. Shale Gas and Shale Oil Plays* (July 2011) at 4, available at: http://www.eia.gov/analysis/studies/usshalegas/pdf/usshaleplays.pdf (attached as Exhibit 203).
[354] *Id.*

BLM_0077969

a geology-based assessment methodology, the U.S. Geological Survey assessed technically recoverable mean resources of 74 million barrels of shale oil, 66.3 trillion cubic feet of gas, and 45 million barrels of natural gas liquids in the Mancos Shale of the Piceance Basin in Colorado and Utah."[355]

In sum, while fracking has been around for decades, the magnitude of the modern technique is new. Modern fracking calls for much more water and chemicals than older wells, and enables the drilling of far more wells in new areas than in the past. Conservation Groups request that the BLM update the RFD to account for this reality.

### 8.      Induced Seismicity from Hydraulic Fracturing Remain Unaddressed.

The UFO must take a hard look at the issues of subsidence and the possibility of seismic activity that could result from expanded oil and gas development, wastewater disposal, and coal mining. The Draft RMP/EIS does not consider these issues at all.

Scientists have understood for decades that oil and gas production activities, including underground injection of fluids and the production of oil and gas, can cause earthquakes. Indeed, the USGS freely admits, "earthquakes induced by human activity have been documented."[356] The National Academy of Sciences recently published a comprehensive report on the relationship between energy production and induced seismicity.[357] Researchers at the USGS found that the rate of earthquakes greater than magnitude 3.0 in the central and eastern United States has increased significantly in the past decade, from an average of 21/year from 1967 through 2000 to more than 300 in the years 2010 through 2012, with 188 occurring in 2011 alone. The researchers hypothesize that this increase in activity could be related to oil and gas production activities, including underground injection of wastewater.[358]

Recently, "[a] northeast Ohio well used to dispose of wastewater from oil and gas drilling almost certainly caused a series of 11 minor quakes in the Youngstown area since last spring, a

---

[355] USGS, Assessment of Continuous (Unconventional) Oil and Gas Resources in the Late Cretaceous Mancos Shale of the Piceance Basin, Uinta-Piceance Province, Colorado and Utah (2016) ("USGS 2016"), available at http://pubs.usgs.gov/fs/2016/3030/fs20163030.pdf (attached as Exhibit 197).

[356] See USGS, Earthquakes Hazards Program, FAQs, available at: http://earthquake.usgs.gov/learn/faq/?categoryID=1&faqID=1; see also Craig Nicholson and Robert Wesson, Earthquake Hazard Associated with Deep Well Injection – A report to the U.S. Environmental Protection Agency, U.S. Geological Survey Bulletin 1951 (1990), at 74 (attached as Exhibit 204) (also citing other well-documented examples of seismic activity induced by fluid injection, including: Denver, Colorado; Rangely, Colorado; southern Nebraska; western Alberta and southwestern Ontario, Canada; western New York; New Mexico; and Matsushiro, Japan).
[357] Clarke, D., Detournay, E., Diederich, J., Dillon, D., Green, S., Habiger, R., ... & Smith, J. (2012). Induced seismicity potential in energy technologies. National Academies Press.
[358] William L.Ellsworth, Injection-induced earthquakes, SCIENCE (2013), available at: http://www.sciencemag.org/content/341/6142/1225942.

BLM_0077970

seismologist investigating the quakes said."[359] After the latest and largest quake Saturday, December 31, 2011, which registered at 4.0 magnitude, "state officials announced their beliefs that injecting wastewater near a fault line had created enough pressure to cause seismic activity. They said four inactive wells within a five-mile radius of the Youngstown well would remain closed."[360] As Andy Ware, deputy director of the Ohio Department of Natural Resources, which regulates gas drilling and disposal wells, stated, "the state asked on Friday that injection at the well be halted after analysis of the 10th earthquake, a 2.7-magnitude temblor on Dec. 24, showed that it occurred less than 2,000 feet below the well."[361]  In addition, a recent Ohio study identified seismic activity caused by fracking, not just the re-injection of wastewater.[362]

The events in Youngstown unfortunately don't seem to be isolated. "A string of mostly small tremors in Arkansas, Oklahoma, Texas, British Columbia and other shale-gas-producing areas suggest that [fracking] may lead, directly or indirectly, to a dangerous earthquake."[363] The commonality of circumstances suggests that a strong correspondence between seismic activity and development techniques used by the oil and gas industry does indeed exist. For example, development of the Fayetteville Shale in Arkansas and corresponding development of deep waste injection wells is associated with a massive increase in earthquake activity in that region, including swarms of micro-earthquakes and significant quakes with magnitudes 3.9 and 4.7.[364] "The number and strength of earthquakes in central Arkansas have noticeably dropped since the shutdown of two injection wells in the area."[365] Scott Ausbrooks, the Geohazards Supervisor for the Arkansas Geological Survey, provided, "[w]e have definitely noticed a reduction in the number of earthquakes, especially the larger ones. It's definitely worth noting."[366]

Moreover, the Oklahoma Geological Survey ("OGS") released a report that links a series of earthquakes in Oklahoma, in January 2011, to a fracking operation underway there. The

---

[359] Thomas J. Sheeran, *Ohio Earthquakes Caused by Drilling Wastewater Well, Experts Say*, HUFFINGTON POST, January 2, 2012, available at: http://www.huffingtonpost.com/2012/01/02/ohio-earthquakes-caused-by-wastewater-well-drilling_n_1180094.html.

[360] *Id.*

[361] Henry Fountain, *Disposal Halted at Well After New Quake in Ohio*, THE NEW YORK TIMES, Jan. 1, 2012, available at: http://www.nytimes.com/2012/01/02/science/earth/youngstown-injection-well-stays-shut-after-earthquake.html?scp=3&sq=fracking%20earthquake&st=cse.

[362] Julie Carr Smyth, *Ohio Geologists Link Small Quakes to Fracking*, ASSOCIATED PRESS (April 11, 2014), available at: http://bigstory.ap.org/article/ohio-regulators-link-seismic-activity-fracking.

[363] *Id.*

[364] *See, e.g.*, Courtney Spradlin, *Earthquakes Increase Friday*, The Log Cabin Democrat (Apr. 8, 2011); Sarah Eddington, *Shutdown of Wells Extended in Arkansas Quake Study*, Bloomberg BusinessWeek (Apr. 20, 2011); Sarah Eddington, *3.9 Magnitude Quake Hits North-Central Arkansas* (Apr. 8, 2011).

[365] Sarah Eddington, *Ark. Quakes Decline Since Injection Well Closures*, HUFFINGTON POST, March 14, 2011, available at: http://www.huffingtonpost.com/huff-wires/20110314/us-arkansas-earthquakes/.

[366] *Id.*

BLM_0077971

USGS determined after analyzing earthquake data that "the character of seismic recordings indicate that they are both shallow and unique."[367] The report continues, providing: "Our analysis showed that shortly after hydraulic fracturing began small earthquakes started occurring, and more than 50 were identified, of which 43 were large enough to be located. Most of these earthquakes occurred within a 24-hour period after hydraulic fracturing operations had ceased."[368]

In August 2011, an earthquake measuring 5.3-magnitude near Trinidad, Colorado, was the largest in more than 40 years.[369] However, seismic activity near Trinidad is not new.  Indeed, a September 2001 swarm of earthquakes near Trinidad prompted a U.S. Geological Survey investigation. The USGS report provided, "In recent years, a large volume of excess water that is produced in conjunction with coal-bed methane gas production has been returned to the subsurface in fluid disposal wells in the area of the earthquake swarm;" and later continues, "Because of the proximity of these disposal wells to the earthquakes, local residents and officials are concerned that the fluid disposal might have triggered the earthquakes."[370] The USGS investigation concluded: "the characteristics of the seismicity and the fluid disposal process do not constitute strong evidence that the seismicity is induced by the fluid disposal, though they do not rule out this possibility."[371]

More recently, in September 2016, Oklahoma officials ordered oil and gas operators to shut down wastewater disposal wells following a 5.6 magnitude earthquake, which tied a record as the strongest in state history.[372]

In the North Fork Valley, earthquakes caused by coal mining are not uncommon.[373] Meanwhile, researchers from the University of Colorado and the U.S. Geological Survey have recognized the risk for earthquakes caused by wastewater injection in Colorado.[374]

---

[367] Austin Holland, Oklahoma Geological Survey, Examination of Possibly Induced Seismicity from Hydraulic Fracturing in Eola Field, Garvin County, Oklahoma (Aug. 2011), at 1 (attached as Exhibit 205).

[368] Id.

[369] Jordan Steffen, *5.3 quake in Trinidad, Colo., area unnerves regions residents*, DENVER POST, August 24, 2011, available at: http://www.denverpost.com/news/ci_18744329.

[370] Mark E. Mermonte, et al., USGS, *Investigation of an Earthquake Swarm Near Trinidad, Colorado, August – October 2001* (2002), available at: http://pubs.usgs.gov/of/2002/ofr-02-0073/ofr-02-0073.html (attached as Exhibit 206).

[371] Id.

[372] Niraj Chokshi and Henry Fountain, *Oklahoma Orders Shutdown of Wells After Record-Tying Earthquake*, The New York Times (September 3, 2016), available at: http://www.nytimes.com/2016/09/04/us/earthquake-ties-record-for-strongest-in-oklahoma-history.html.

[373] *Quake Near Paonia Believed To Be Caused by Coal*, The Denver Post (January 4, 2013), available at: http://www.denverpost.com/2013/01/04/quake-near-paonia-believed-to-be-caused-by-coal/.

BLM_0077972

The threat of seismic activity induced from oil and gas development practices as well as coal mining must be analyzed by the UFO. As noted above, Ohio officials placed a five-mile buffer around waste injection wells. Given the recognized correlation between oil and gas development practices and the inducement of earthquakes, taking such a precautionary approach, here, through required stipulations that would attach to all future oil and gas development in the planning area is prudent and would help stem potential future impacts. At the very least, however, BLM must take a hard look at possible seismicity impacts from the proposed action, which the RMP/EIS has failed to do at all.

9.   **The RMP/EIS and RFD Failed to Consider Impacts Regarding Subsequent Fracturing Treatments, or Re-Fracking Operations.**

Wells are first fracked after they are initially drilled. Subsequently, re-fracking or re-stimulation operations are often conducted during the life of the well. Most or all of the impacts to air, water, habitat, wildlife, vegetation, and other resources are expected to be similar for re-fracking as for the original fracturing jobs. In some cases, there is little additional surface disturbance associated with re-fracking, but in other cases, additional stimulation activities increase the overall footprint of the development, undo the assumptions regarding temporary and long-term reclamation success, and further contribute to such issues as invasive weeds. The UFO's RMP/EIS and RFD focus on initial drilling operations and routine maintenance, while these documents remain silent on the frequency and impacts – direct, indirect, and cumulative – related to re-fracking operations.

The RFD estimates the life of new conventional and coalbed natural gas wells will be at least 20 years. If additional stimulation or re-fracturing takes place every five years on average, then at least 4 such operations could be expected for each well. *See* RFD at 75. Additionally, the water demand and overall impacts of both initial and re-fracking operations could be several orders of magnitude greater for deep wells with horizontal reaches exceeding 5,000 feet, which can be fractured at intervals of 300 feet.

The re-fracking impacts analysis appears to be absent from the EIS and must be conducted for all wells in the field office: private and public, existing and future, existing target formations, and potential new plays. Absent such analysis, BLM has failed to take a hard look at the direct, indirect or cumulative impacts of ongoing and reasonably foreseeable oil and gas development in the UFO.

Water requirements for re-fracking can be expected to be similar to those for the original fracking job, unless cleanout operations require additional water. If re-fracturing includes operations to clean out the wellbore prior to treatment, BLM needs to disclose the volumes of

---

[374] Dennis Webb, *GarCo OKs Injection Well; Court Challenge Is Possible*, The Daily Sentinel (June 23, 2015), available at: http://www.gjsentinel.com/news/articles/garco-oks-injection-well-court-challenge-is-possib.

BLM_0077973

water and other impacts or resource uses associated with such operations.[375] Emissions might be greater or less. Disturbance to wildlife can be highly significant, and re-stimulation activities should be treated like drilling for purposes of seasonal closures and other habitat protections in the RMP. If reclamation projections currently assume that pads will be reclaimed up to the direct footprint of the well, they must be re-calculated to take into account the potential for future operations utilizing a footprint closer to the original drilling pad area if needed for the truck traffic and other activities associated with re-stimulation. Current disturbance estimates and projections are found in the RFD at 75.

BLM sundry notices should allow the agency to track and regulate surface disturbances associated with re-fracking. To the extent sundry notices have not covered these activities, BLM must consider and impose new requirements to allow it to regulate and assess the impacts of these operations. Although COGCC may not have required permits or compiled records for re-fracking jobs or re-stimulation operations when the RFD was prepared, COGCC commenced tracking such information on April 1 2012, the effective date of COGCC Rule 205A, regarding chemical disclosure for hydraulic fracturing treatments. If BLM currently lacks its own records, it can secure such information from COGCC to be incorporated into its analysis of oil and gas impacts. To the extent the UFO currently lacks a comprehensive database of re-fracking operations, it needs to rectify this omission in the new RMP.

Revised analysis must take a hard look at these issues, including whether the potential cumulative impacts associated with all projected oil and gas development could result in unnecessary and undue degradation under FLMPA.

### 10. The UFO Failed to Consider Use of Best Management Practices.

Oil and gas development can result in serious impacts to the environment and human health. The technology used in oil and gas production has evolved rapidly but, unfortunately, regulation has not kept pace. The BLM's and Colorado's current regulations are insufficient to protect public health and the environment. The use of Best Management Practices ("BMPs") can greatly reduce the risks presented by oil and gas development by incorporating processes and technologies that are readily available.

Application of proposed site-specific requirements is not outside the scope of the RMP planning process. For example, in the proposed Land and Resource Management Plan and Final Environmental Impact Statement ("LRMP/FEIS") for BLM public lands in the San Juan Public Lands Planning Area/Tres Rios Field Office ("TRFO"), BLM required the use of BMPs through stipulations, standards, and guidance. Furthermore, it is not necessary for many BMPs to be site-specific; rather they can be applied broadly to all oil and gas operations in the UFO area. For example, near public water supply intakes, the TRFO-LRMP requires the use of pitless drilling systems, tanks to store stimulation and flowback fluids, and non-toxic hydraulic fracturing fluids only, among other requirements.

---

[375] BLM Wyoming State Office, *Hydraulic Fracturing White Paper* (July 2013), available at: http://www.blm.gov/pgdata/etc/medialib/blm/wy/information/NEPA/og/2014/02feb.Par.49324.File.dat/v1AppE.pdf (attached as Exhibit 207).

BLM_0077974

Appendix G contains many important provisions to reduce the risks to the environment and human health from oil and gas operations and the UFO RMP can and should require the use of these BMPs through stipulations, standards, and guidance. However, additional protections are needed, including but not limited to: improved site characterization to look for pathways by which contaminants may reach groundwater; stronger well design and construction standards; stimulation operation monitoring and reporting requirements; and improved waste water handling planning and practices.

NEPA was enacted to promote efforts that will prevent or eliminate damage to the human environment. BMPs help "mitigate" environmental impacts. "Mitigation" is defined in CEQ regulations as measures to help, avoid, reduce or compensate for environmental impacts. 40 CFR 1508.20. BLM's failure to analyze the potential benefits of requiring these BMPs in alternatives does not satisfy NEPA's hard look mandate and frustrates the purpose of preparing an EIS (40 CFR 1502.1 states that the purpose of preparing an EIS is to "…provide full and fair discussion of significant environmental impacts and [ ] inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."). By failing to implement these BMPs in the RMP, BLM has failed to take adequate measures to minimize and mitigate the adverse impacts that will result from the RMP. The following BMPs should be required for all oil and gas operations in the UFO area.

### a.    Site Characterization and Corrective Action

Detailed site characterization and planning and baseline testing prior to any oil and gas development are crucial. Site characterization and planning must take into account cumulative impacts over the life of a project or field.

### i. Geologic Suitability

Operators of wells that will be hydraulically fractured must demonstrate to the satisfaction of the regulator that the wells will be sited in a location that is geologically suitable. In order to allow the regulator to determine suitability, the owner or operator must provide:

1. A detailed analysis of regional and local geologic stratigraphy and structure including, at a minimum, lithology, geologic facies, faults, fractures, stress regimes, seismicity, and rock mechanical properties;
2. A detailed analysis of regional and local hydrology including, at a minimum, hydrologic flow and transport data and modeling and aquifer hydrodynamics; properties of the producing and confining zone(s); groundwater levels for relevant formations; discharge points, including springs, seeps, streams, and wetlands; recharge rates and primary zones, and; water balance for the area including estimates of recharge, discharge, and pumping;
3. A detailed analysis of the cumulative impacts of hydraulic fracturing on the geology of producing and confining zone(s) over the life of the project. This must include, but is not limited to, analyses of changes to conductivity, porosity, as well as permeability, geochemistry, rock mechanical properties, hydrologic flow, and fracture mechanics; and

BLM_0077975

4.  A determination that the geology of the area can be described confidently and that the fate and transport of injected fluids and displaced formation fluids can be accurately predicted through the use of models.

Wells that will be hydraulically fractured must be sited such that a suitable confining zone is present. The operator must demonstrate to the satisfaction of the regulator that the confining zone:

1.  Is of sufficient areal extent to prevent the movement of fluids to USDWs, based on the projected lateral extent of hydraulically induced fractures, injected hydraulic fracturing fluids, and displaced formation fluids over the life of the project;
2.  Is sufficiently impermeable to prevent the vertical migration of injected hydraulic fracturing fluids or displaced formation fluids over the life of the project;
3.  Is free of transmissive faults or fractures that could allow the movement of injected hydraulic fracturing fluids or displaced formation fluids to USDWs;
4.  Contains at least one formation of sufficient thickness and with lithologic and stress characteristics capable of preventing or arresting vertical propagation of fractures; and
5.  The regulator may require operators of wells that will be hydraulically fractured to identify and characterize additional zones that will impede or contain vertical fluid movement.

### ii. Area of Review

Operators must delineate an "area of review," which is the region around a well or group of wells that will be hydraulically fractured where USDWs may be endangered. It should be delineated based on 3D geologic and reservoir modeling that accounts for the physical and chemical extent of hydraulically induced fractures, injected hydraulic fracturing fluids and proppant, and displaced formation fluids and must be based on the life of the project. The physical extent would be defined by the modeled length and height of the fractures, horizontal and vertical penetration of hydraulic fracturing fluids and proppant, and horizontal and vertical extent of the displaced formation fluids. The chemical extent would be defined by that volume of rock in which chemical reactions between the formation, hydrocarbons, formation fluids, or injected fluids may occur, and should take into account potential migration of fluids over time. The model must take into account all relevant geologic and engineering information including but not limited to:

1.  Rock mechanical properties, geochemistry of the producing and confining zone, and anticipated hydraulic fracturing pressures, rates, and volumes;
2.  Geologic and engineering heterogeneities;
3.  Potential for migration of injected and formation fluids through faults, fractures, and manmade penetrations; and
4.  Cumulative impacts over the life of the project.

As actual data and measurements become available, the model must be updated and history matched. Operators must develop, submit, and implement a plan to delineate the area of

BLM_0077976

review. The plan should include the time frame under which the delineation will be reevaluated, including those operational or monitoring conditions that would trigger such a reevaluation. Within the area of review, operators must identify all wells that penetrate the producing and confining zones and provide:

1. A list of all such wells, including but not limited to wells permitted but not yet drilled, drilling, awaiting completion, active, inactive, shut-in, temporarily abandoned, plugged, and orphaned;
2. A description of each well's type, construction, date drilled, location, depth, record of plugging and/or completion, and any additional information the Division may require;
3. An assessment of the integrity of each well identified;
4. A plan for performing corrective action if any of the wells identified are improperly plugged, completed, or abandoned;
5. An assessment to determine the risk that the stimulation treatment will communicate with each well identified;
6. For each well identified as at-risk for communication, a plan for well control, including but not limited to:

   a. A method to monitor for communication;
   b. A determination of the maximum pressure which the at-risk well can withstand;
   c. Actions to maintain well control;
   d. If the at-risk well is not owned or operated by the owner/operator of the well to be stimulated, a plan for coordinating with the offset well operator to prevent loss of well control;

7. The location, orientation, and properties of known or suspected faults, fractures, and joint sets;
8. An evaluation of whether such features may act as migration pathways for injected fluids or displaced formation fluids to reach protected water or the surface;
9. An assessment to determine the risk that the stimulation treatment will communicate with such features; and
10. If such features may act as migration pathways and are at-risk for communication, the stimulation design must be revised to ensure that the treatment will not communicate with such features or the well must be re-sited.

This information should be provided with the stimulation permit application. Communication between offset wells during stimulation is a serious problem, risking blowouts in adjacent wells and/or aquifer contamination during well stimulation. A New Mexico oil well recently experienced a blowout, resulting in a spill of more than 8,400 gallons of fracturing fluid, oil, and water. The blowout occurred when a nearby well was being hydraulically fractured and the fracturing fluids intersected this offset well.[376] The incident led the New Mexico Oil Conservation Division to request information about other instances of communication between

---

[376] Tina Jensen, *Fracking fluid blows out nearby well; Cleanup costs, competing technologies at issue*, KASA.COM. (Oct. 18 2013).

BLM_0077977

wells during drilling, completion, stimulation or production operations.[377] Incidents of communication between wells during stimulation have been documented in British Columbia[378], Pennsylvania,[379] Texas, and other states across the country.[380]

The Alberta Energy Regulator ("AER"), the oil and gas regulator in Alberta, Canada, recognized that communication between wells during fracturing is a serious risk to well integrity and groundwater after a number of spills and blowouts resulted from communication between wells during fracturing. As a result, AER created requirements to address the risk of communication and reduce the likelihood of occurrence.[381] Similarly, Enform, a Canadian oil and gas industry safety association, published recommended practices to manage the risk of communication.[382] We recommend that the BLM review these rules and incorporate similar requirements.

### iii.    Baseline Water Testing

Operators must submit to the regulator a statistically significant sample, as determined by the regulator, of existing and/or new geochemical analyses of each of the following, within the area of review:

1. Any and all sources of water that serve as underground sources of drinking water ("USDWs") in order to characterize baseline water quality. This data must be made publically available through an online, geographically-based reporting system. The sampling methodology must be based on local and regional hydrologic characteristics such as rates of precipitation and recharge and seasonal fluctuations. At a minimum, characterization must include:

    a. Standard water quality and geochemistry;[383]

---

[377] State of New Mexico, Energy, Minerals and Natural Resources Department, *Aztec District III-Request for information*, n.p. (Oct. 22, 2013).

[378] "BC Oil and Gas Commission, *Safety Advisory 2010-03, May 20, 2010: Communication During Fracture Stimulation*, n.p. (May 20 2010).

[379] *See, e.g.* Scott Detrow, *Perilous Pathways: How Drilling Near An Abandoned Well Produced a Methane Geyser,* State Impact Pennsylvania, NPR (October 9, 2012); Pennsylvania Department of Environmental Protection, Bureau of Oil and Gas Management, *Draft Report - Stray Natural Gas Migration Associated with Oil and Gas Wells* (October 28, 2009).

[380] Gayathri Vaidyanathan, *When 2 wells meet, spills can often follow*, ENERGYWIRE (Aug. 5, 2013).

[381] Alberta Energy Board, *Directive 083: Hydraulic Fracturing – Subsurface Integrity* (May 2013) at 15, available at: http://www.aer.ca/documents/directives/Directive083.pdf (attached as Exhibit 208).

[382] Enform Canada, *Interim IRP 24: Fracture Stimulation: Interwellbore Communication; An Industry Recommended Practice For The Canadian Oil And Gas Industry*, Interim Volume 24, 1st Edition (Mar. 27, 2013).

[383] Including: Turbidity, Specific Conductance, Total Solids, Total Dissolved Solids, pH, Dissolved Oxygen, Redox State, Alkalinity, Calcium, Magnesium, Sodium, Potassium, Sulfate,

BLM_0077978

   b.  Stable isotopes;
   c.  Dissolved gases;
   d.  Hydrocarbon concentration and composition. If hydrocarbons are present in sufficient quantities for analysis, isotopic composition must be determined;
   e.  Chemical compounds or constituents thereof, or reaction products that may be introduced by the drilling or hydraulic fracturing process. The use of appropriate marker chemicals is permissible provided that the operator can show scientific justification for the choice of marker(s);

Operators should also consider testing for environmental tracers to determine groundwater age;

2.  Any hydrocarbons that may be encountered both vertically and really throughout the area of review;

3.  The producing zone(s) and confining zone(s) and any other intervening zones as determined by the regulator. At a minimum, characterization must include:
    a.  Mineralogy;
    b.  Petrology; and
    c.  Major and trace element bulk geochemistry.

The site characterization and planning data listed above does not have to be submitted with each individual well application as long as such data is kept on file with the appropriate regulator and the well for which a permit is being sought falls within the designated area of review.

### iv. Water Use and Disposal Planning

Operators must submit to the regulator a plan for cumulative water use over the life of the project. The plan should take into account other activities that will draw water from the same sources, such as agricultural or industrial activities; designated best use; seasonal and longer timescale variations in water availability; and historical drought information. Elements of the plan must include but are not limited to:

1.  The anticipated source, timing, and volume of withdrawals and intended use;
2.  Anticipated transport distances and methods (e.g. pipeline, truck) and methods to minimize related impacts including, but not limited to: land disturbance, traffic, vehicle accidents, and air pollution;
3.  Anticipated on-site storage methods;

---

Chloride, Fluoride, Bromide, Silica, Nitrite, Nitrate + Nitrite, Ammonia, Phosphorous, Total Organic Carbon, Aluminum, Antimony, Arsenic, Barium, Beryllium, Boron, Bromide, Cadmium, Chromium, Cobalt, Copper, Cyanide, Iron, Lead, Manganese, Mercury, Molybdenum, Nickel, Selenium, Silver, Strontium, Thallium, Thorium, Uranium, Vanadium, Zinc, Cryptosporidium, Giardia, Plate Count, Legionella, Total Coliforms, and Organic Chemicals including Volatile Organic Compounds (VOCs).

BLM_0077979

4. A description of methods the operator will use to maximize the use of non-potable water sources including reuse and recycling of wastewater;

5. An evaluation of potential adverse impacts to aquatic species and habitat, wetlands, and aquifers, including the potential for the introduction of invasive species, and methods to minimize those impacts; and

6. Anticipated chemical additives and chemical composition of produced water, with particular attention to those chemicals that would hinder the reuse or recycling of wastewater or pose a challenge to wastewater treatment

Operators must submit to the regulator a proposed plan for handling wastewater, such as flowback and produced fluids. Elements of the plan must include, but are not limited to:

1. Anticipated cumulative volumes of wastewater over the life of the project, reported in three categories: reuse, recycle, and disposal;

2. Anticipated on-site temporary storage methods;

3. Anticipated transport distances and methods (e.g. pipeline, truck) and methods to minimize related impacts including, but not limited to: land disturbance, traffic, vehicle accidents, and air pollution; and

4. An assessment of currently available and anticipated disposal methods, *e.g.* disposal wells, wastewater treatment facilities, etc. This assessment must enumerate the disposal options available and evaluate the ability of those options to handle projected wastewater volumes. In the case of wastewater treatment facilities, the assessment must also evaluate the ability of those facilities to successfully treat the wastewater such that it would not pose a threat to water supplies into which it is discharged.

### v. Well Design and Construction

Proper well construction is crucial to ensuring protection of USDWs. The first step to ensuring good well construction is ensuring proper well drilling techniques are used. This includes appropriate drilling fluid selection, to ensure that the wellbore will be properly conditioned and to minimize borehole breakouts and rugosity that may complicate casing and cementing operations. Geologic, engineering, and drilling data can provide indications of potential complications to achieving good well construction, such as highly porous or fractured intervals, lost circulation events, abnormally pressured zones, or drilling "kicks" or "shows." These must be accounted for in designing and implementing the casing and cementing program. Reviewing data from offset wellbores can be helpful in anticipating and mitigating potential drilling and construction problems. Additionally, proper wellbore cleaning and conditioning techniques must be used to remove drilling mud and ensure good cement placement. Hydraulic fracturing requires fluid to be injected into the well at high pressure and, therefore, wells must be appropriately designed and constructed to withstand this pressure. The casing and cementing program must:

- Properly control formation pressures and fluids;
- Prevent the direct or indirect release of fluids from any stratum to the surface;
- Prevent communication between separate hydrocarbon-bearing strata;
- Protect freshwater aquifers/useable water from contamination;

BLM_0077980

- Support unconsolidated sediments;
- Protect and/or isolate lost circulation zones, abnormally pressured zones, and any prospectively valuable mineral deposits.

Casing must be designed to withstand the anticipated stresses imposed by tensile, compressive, and buckling loads; burst and collapse pressures; thermal effects; corrosion; erosion; and hydraulic fracturing pressure. The casing design must include safety measures that ensure well control during drilling and completion and safe operations during the life of the well. The components of a well that ensure the protection and isolation of USDWs are steel casing and cement. Multiple strings of casing are used in the construction of oil and gas wells, including: conductor casing, surface casing, production casing, and potentially intermediate casing. For all casing strings, the design and construction should be based on Good Engineering Practices ("GEP"), Best Available Technology ("BAT"), and local and regional engineering and geologic data. All well construction materials must be compatible with fluids with which they may come into contact and be resistant to corrosion, erosion, swelling, or degradation that may result from such contact.

1.      **Conductor Casing**

Depending on local conditions, conductor casing can either be driven into the ground, or a hole drilled and the casing lowered into the hole. In the case where a hole is excavated, the space between the casing and the wellbore – the annulus – should be cemented to surface. A cement pad should also be constructed around the conductor casing to prevent the downward migration of fluids and contaminants.

2.      **Surface Casing**

Surface casing setting depth must be based on relevant engineering and geologic factors, but be shallower than any hydrocarbon-bearing zones, and at least 100 feet but not more than 200 feet below the deepest protected water. If shallow hydrocarbon-bearing zones are encountered when drilling the surface casing portion of the hole, operators must notify regulators and take appropriate steps to ensure protection of protected water.

Surface casing must be fully cemented to surface by the pump and plug method. If cement returns are not observed at the surface, remedial cementing must be performed to cement the casing from the top of cement to the ground surface.

3.      **Intermediate Casing**

Depending on local geologic and engineering factors, one or more strings of intermediate casing may be required. This will depend on factors including, but not limited to: the depth of the well, the presence of hydrocarbon-or fluid-bearing formations, abnormally pressured zones, lost circulation zones, or other drilling hazards. Casing setting depth must be based on local engineering and geologic factors and be set at least 100 feet below the deepest protected water, anomalous pressure zones, lost circulation zones, and other drilling hazards. Intermediate casing

BLM_0077981

must be set to protect groundwater if surface casing was set above the base of protected water, and/or if additional protected water was found below the surface casing shoe.

When intermediate casing is installed to protect groundwater, the operator shall set a full string of new intermediate casing to a minimum depth of at least 100 feet below the base of the deepest strata containing protected water and cement to the surface. The location and depths of any hydrocarbon strata or protected water strata that is open to the wellbore above the casing shoe must be confirmed by coring, electric logs, or testing, and shall be reported as part of the completion report.

When intermediate casing is set for a reason other than to protect strata that contain protected water, it must be fully cemented to surface unless doing so would result in lost circulation. Where this is not possible or practical, the cement must extend from the casing shoe to 600 feet above the top of the shallowest zone to be isolated (*e.g.* productive zone, abnormally pressured zone, etc). Where the distance between the casing shoe and shallowest zone to be isolated makes this technically infeasible, multi-stage cementing must be used to isolate any hydrocarbon or fluid-bearing formations or abnormally pressured zones and prevent the movement of fluids. An excess of 25% cement should be mixed unless a caliper log is run to more accurately determine necessary cement volume.

### 4.      Production Casing

If both surface casing and intermediate casing are used as water protection casing, or if intermediate casing is not used, a full string of production casing is required. A production liner may be hung from the base of the intermediate casing and used as production casing as long as the surface casing is used as the water protecting casing, and intermediate casing is set for a reason other than isolation of protected water. When the production string does not extend to the surface, at least 200 feet of overlap between the production string and next larger casing string should be required. This overlap should be cemented and tested by a fluid-entry test at a pressure that is at least 500 psi higher than the maximum anticipated pressure to be encountered by the wellbore during completion and production operations to determine whether there is a competent seal between the two casing strings.

When intermediate casing is not used, production casing must be fully cemented to surface unless doing so would result in lost circulation. If not cemented to the surface, production casing shall be cemented with sufficient cement to fill the annular space from the casing shoe to at least 600 feet above fluid-bearing formations, lost circulation zones, oil and gas zones, anomalous pressure intervals, or other drilling hazards. Where the distance between the casing shoe and shallowest zone to be isolated makes this technically infeasible, multi-stage cementing must be used to isolate any hydrocarbon or fluid-bearing formations or abnormally pressured zones and prevent the movement of fluids. Sufficient cement shall also be used to fill the annular space to at least 100 feet above the base of the freshwater zone, either by lifting cement around the casing shoe or cementing through perforations or a cementing device placed at or below the base of the freshwater zone.

BLM_0077982

### 5.    General

For surface, intermediate, and production casing, at a minimum, centralizers are required at the top, shoe, above and below a stage collar or diverting tool (if used), and through all protected water zones. In non-deviated holes, a centralizer shall be placed every fourth joint from the cement shoe to the ground surface or to within one joint of casing from the bottom of the cellar, or casing shall be centralized by implementing an alternative centralization plan approved by the BLM. In deviated holes, the BLM may require the operator to provide additional centralization. All centralizers must meet API Spec 10D (Recommended Practice for Casing Centralizers – for bow string centralizers), or API Spec 10 TR4 (rigid and solid centralizers) and 10D-2 (Petroleum and Natural Gas Industries, Equipment for Well Cementing, Part 2, Centralizer Placement and Stop Collar Testing).

All cemented casing strings must have a uniformly concentric cement sheath of at least 1" (*i.e.* minimum difference of 2" between wellbore diameter and casing outside diameter). An excess of 25% cement should be mixed unless a caliper log is run to more accurately determine necessary cement volume.

For any section of the well drilled through fresh water-bearing formations, drilling fluids must be limited to air, fresh water, or fresh water based mud, and exclude the use of synthetic or oil-based mud or other chemicals.

In areas where the depth to the lowest protected water is not known, operators must estimate this depth and provide the estimate with the application for a permit to drill. This depth should then be verified by running petrophysical logs, such as resistivity logs, after drilling to the estimated depth. If the depth to the deepest protected water is deeper than estimated, an additional string of casing is required. Surface casing must be of sufficient diameter to allow the use of one or more strings of intermediate casing. All instances of protected water not anticipated on the permit application must be reported, including the formation depth and thickness and water flow rate, if known or estimated.

All cement must have a have a 72-hour compressive strength of at least 1200 psi and free water separation of no more than two milliliters per 250 milliliters of cement, tested in accordance with the current API RP 10B. Cement must conform to API Specification 10A and gas-blocking additives must be used. Cement mix water chemistry must be proper for the cement slurry designs. At a minimum, the water chemistry of the mix water must be tested for pH prior to use, and the cement must be mixed to manufacturer's recommendations. An operator's representative must be on site verifying that the cement mixing, testing, and quality control procedures used for the entire duration of the cement mixing and placement are consistent with the approved engineered design and meet the cement manufacturer recommendations, API standards, and the requirements of this section.

Compressive strength tests of cement mixtures without published performance data must be performed in accordance with the current API RP 10B and the results of these tests must be provided to the regulator prior to the cementing operation. The test temperature must be within 10 degrees Fahrenheit of the formation equilibrium temperature at the top of cement. A better

BLM_0077983

quality of cement may be required where local conditions make it necessary to prevent pollution or provide safer operating conditions.

Prior to cementing, the hole must be prepared to ensure an adequate cement bond by circulating at least two hole volumes of drilling fluid and ensuring that the well is static and all gas flows are killed. Top and bottom wiper plugs and spacer fluids must be used to separate drilling fluid from cement and prevent cement contamination. Casing must be rotated and reciprocated during cementing when possible and when doing so would not present a safety risk. Cement should be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus. During placement of the cement, operator shall monitor pump rates to verify they are within design parameters to ensure proper displacement efficiency. Throughout the cementing process operator shall monitor cement mixing in accordance with cement design and cement densities during the mixing and pumping.

All surface, intermediate, and production casing strings must stand under pressure until a compressive strength of 500 psi is reached before drilling out, initiating testing, or disturbing the cement in any way. In no case should the wait-on-cement ("WOC") time be less than 8-hours. All surface, intermediate, and production casing strings must be pressure tested. Drilling may not be resumed until a satisfactory pressure test is obtained. Casing must be pressure tested to a minimum of 0.5 psi/foot of casing string length or 1500 psi, whichever is greater, but not to exceed 80% of the minimum internal yield. If the pressure declines more than 10% in a 30-minute test or if there are other indications of a leak, corrective action must be taken.

A formation integrity test ("FIT") must be performed immediately after drilling out of all surface and intermediate casing. The test should demonstrate that the casing shoe will maintain integrity at the anticipated pressure to which it will be subjected while drilling the next section of the well, no flow path exists to formations above the casing shoe, and that the casing shoe is competent to handle an influx of formation fluid or gas without breaking down. If any FIT fails, the operator must contact the BLM and remedial action must be taken to ensure that no migrations pathways exist. The casing and cementing plan may need to be revised to include additional casing strings in order to properly manage pressure.

Cement integrity and location must be verified using cement evaluation tools that can detect channeling in 360 degrees. If fluid returns, lift pressure, displacement and/or other operations indicate inadequate cement coverage, the operator must: (i) run a radial cement evaluation tool, a temperature survey, or other test approved by the Division to identify the top of cement; (ii) submit a plan for remedial cementing to the Division for approval; and (iii) implement such plan by performing additional cementing operations to remedy such inadequate coverage prior to continuing drilling operations. Cement evaluation logging must be performed on all strings of cemented casing that isolate protected water, potential flow zones, or through which stimulation will be performed.

When well construction is completed, the operator should certify, in writing, that the casing and cementing requirements were met for each casing string.

BLM_0077984

### vi.      Well Logs

After drilling the well but prior to casing and cementing operations, operators must obtain well logs to aid in the geologic, hydrologic, and engineer characterization of the subsurface. Open hole logs, *i.e.* logs run prior to installing casing and cement, should at a minimum include:

Gamma Ray Logs:

Gamma ray logs detect naturally occurring radiation. These logs are commonly used to determine generic lithology and to correlate subsurface formations. Shale formations have higher proportions of naturally radioactive isotopes than sandstone and carbonate formations. Thus, these formations can be distinguished in the subsurface using gamma ray logs.

Density/Porosity Logs:

Two types of density logs are commonly used: bulk density logs, which are in turn used to calculate density porosity, and neutron porosity logs. While not a direct measure of porosity, these logs can be used to calculate porosity when the formation lithology is known. These logs can be used to determine whether the pore space in the rock is filled with gas or with water.

Resistivity Logs:

These logs are used to measure the electric resistivity, or conversely conductivity, of the formation. Hydrocarbon and fresh water-bearing formations are resistive, *i.e.* they cannot carry an electric current. Brine-bearing formations have a low resistivity, *i.e.* they can carry an electric current. Resistivity logs can therefore be used to help distinguish brine-bearing from hydrocarbon-bearing formations. In combination with Darcy's Law, resistivity logs can be used to calculate water saturation.

Caliper Logs:

Caliper logs are used to determine the diameter and shape of the wellbore. These are crucial in determining the volume of cement that must be used to ensure proper cement placement.

These four logs, run in combination, make up one of the most commonly used logging suites. Additional logs may be desirable to further characterize the formation, including but not limited to Photoelectric Effect, Sonic, Temperature, Spontaneous Potential, Formation Micro-Imaging ("FMI"), Borehole Seismic, and Nuclear Magnetic Resonance ("NMR"). The use of these and other logs should be tailored to site-specific needs.

### vii.      Core and Fluid Sampling

Operators of wells that will be hydraulically fractured should also obtain whole or sidewall cores of the producing and confining zone(s) and formation fluid samples from the producing zone(s). At a minimum, routine core analysis should be performed on core samples

BLM_0077985

representative of the range of lithology and facies present in the producing and confining zone(s). Special Core Analysis ("SCAL") should also be considered, particularly for samples of the confining zone, where detailed knowledge of rock mechanical properties is necessary to determine whether the confining zone can prevent or arrest the propagation of fractures. Operators should also record the fluid temperature, pH, conductivity, reservoir pressure and static fluid level of the producing and confining zone(s). Operators should prepare and submit a detailed report on the physical and chemical characteristics of the producing and confining zone(s) and formation fluids that integrates data obtained from well logs, cores, and fluid samples. This must include the fracture pressure of both the producing and confining zone(s). This data does not need to be gathered for every well but operators should obtain a statistically significant number of samples.

### viii.    *Mechanical Integrity*

Operators must maintain mechanical integrity of wells at all times. Mechanical integrity should be periodically tested by means of a pressure test with liquid or gas, a tracer survey such as oxygen activation logging or radioactive tracers, a temperature or noise log, and a casing inspection log. The frequency of such testing should be based on-site, with operation specific requirements and be delineated in a testing and monitoring plan prepared, submitted, and implemented by the operator.

Mechanical integrity and annular pressure should be monitored over the life of the well. Instances of sustained casing pressure can indicate potential mechanical integrity issues. The annulus between the production casing and tubing (if used) should be continually monitored. Continuous monitoring allows problems to be identified quickly so repairs may be made in a timely manner, reducing the risk that a wellbore problem will result in contamination of USDWs.

### ix.    *Operations and Monitoring*

Each hydraulic fracturing treatment must be modeled using a 3D geologic and reservoir model, as described in the Area of Review requirements, prior to operation to ensure that the treatment will not endanger USDWs. Prior to performing a hydraulic fracturing treatment, operators should perform a pressure fall-off or pump test, injectivity tests, and/or a mini-frac. Data obtained from such tests can be used to refine the hydraulic fracture model, design, and implementation.

Prior to well stimulation, all casing and tubing to be used by the operator to perform the stimulation treatment must be pressure tested. For cemented completions, the test pressure must be at least 500 psi greater than the anticipated maximum surface pressure to be experienced during the stimulation operation or the life of the completion operation. For non-cemented completions, the test pressure must be a minimum of: (i) 70% of the lowest activating pressure for pressure actuated sleeve completions; or (ii) 70% of formation integrity for open-hole completions, as determined by a formation integrity test. A failed test is one in which the pressure declines more than 10% in a 30-minute test or if there are other indications of a leak.

In the event of a failed test, the operator must:

BLM_0077986

1. Orally notify the authorized officer as soon as practicable but no later than 24 hours following the failed test, and;
2. Perform remedial work to restore mechanical integrity.

Stimulation operations may not begin until a successful mechanical integrity test is performed and the results are submitted to the regulator. If mechanical integrity cannot be restored, the well must be plugged and abandoned.

During the well stimulation operation, the operator must continuously monitor and record the pressures in each well annuli, surface injection pressure, slurry rate, proppant concentration, fluid rate, and the identities, rates, and concentrations of all additives (including proppant).

If during any stimulation operation the annulus pressure:

1. increases by more than 500 pounds per square inch as compared to the pressure immediately preceding the stimulation; or
2. exceeds 80% of the API rated minimum internal yield on any casing string in communication with the stimulation treatment.

The operation must immediately cease, and the operator must take immediate corrective action and orally notify the authorized officer immediately following the incident. Within one week after the stimulation operations are completed, the operator must submit a report containing all details pertaining to the incident, including corrective actions taken.

If at any point during the hydraulic fracturing operation the monitored parameters indicate a loss of mechanical integrity or if injection pressure exceeds the fracture pressure of the confining zone(s), the operation must immediately cease. If either occurs, the operator must notify the regulator within 24 hours and must take all necessary steps to determine the presence or absence of a leak or migration pathways to USDWs. Prior to any further operations, mechanical integrity must be restored and demonstrated to the satisfaction of the regulator and the operator must demonstrate that the ability of the confining zone(s) to prevent the movement of fluids to USDWs has not been compromised. If a loss of mechanical integrity is discovered or if the integrity of the confining zone has been compromised, operators must take all necessary steps to evaluate whether injected fluids or formation fluids may have contaminated or have the potential to contaminate any unauthorized zones. If such an assessment indicates that fluids may have been released into a USDW or any unauthorized zone, operators must notify the regulator within 24 hours, take all necessary steps to characterize the nature and extent of the release, and comply with and implement a remediation plan approved by the regulator. If such contamination occurs in a USDW that serves as a water supply, a notification must be placed in a newspaper available to the potentially affected population and on a publically accessible website and all known users of the water supply must be individually notified immediately by mail and by phone.

The use of diesel fuel and related products, BTEX compounds, and 2-BE in well stimulation fluids should be prohibited.

BLM_0077987

Techniques to measure actual fracture growth should be used, including downhole tiltmeters and microseismic monitoring. These techniques can provide both real-time data and, after data processing and interpretation, can be used in post-fracture analysis to inform fracture models and refine hydraulic fracture design. Tiltmeters measure small changes in inclination and provide a measure of rock deformation. Microseismic monitoring uses highly sensitive seismic receivers to measure the very low energy seismic activity generated by hydraulic fracturing.

Hydraulic fracturing fluid and proppant can sometimes be preferentially taken up by certain intervals or perforations. Tracer surveys and temperature logs can be used to help determine which intervals were treated. Tracers can be either chemical or radioactive and are injected during the hydraulic fracturing operation. After hydraulic fracturing is completed, tools are inserted into the well that can detect the tracer(s). Temperature logs record the differences in temperature between zones that received fracturing fluid, which is injected at ambient surface air temperature, and in-situ formation temperatures, which can be in the hundreds of degrees Fahrenheit.

Operators should develop, submit, and implement a long-term groundwater quality monitoring program. Dedicated water quality monitoring wells should be used to help detect the presence of contaminants prior to their reaching domestic water wells. Placement of such wells should be based on detailed hydrologic flow models and the distribution and number of hydrocarbon wells. Baseline monitoring should begin at least a full year prior to any activity, with monthly or quarterly sampling to characterize seasonal variations in water chemistry. Monitoring should continue a minimum of 5 years prior to plugging and abandonment.

### x.    *Reporting*

At a minimum, operators must report:

- All instances of hydraulic fracturing injection pressure exceeding operating parameters as specified in the permit;
- All instances of an indication of loss of mechanical integrity;
- Any failure to maintain mechanical integrity;
- The results of:
  - Continuous monitoring during hydraulic fracturing operations;
  - Techniques used to measure actual fracture growth; and
  - Any mechanical integrity tests;
- The detection of the presence of contaminants pursuant to the groundwater quality monitoring program;
- Indications that injected fluids or displaced formation fluids may pose a danger to USDWs;
- All spills and leaks; and
- Any non-compliance with a permit condition.

BLM_0077988

The following must be made publically available on a well-by-well basis through an online, geographically based reporting system, a minimum of 30 days prior to a hydraulic fracturing operation:

1. Baseline water quality analyses for all USDWs within the area of review;
2. Proposed source, volume, geochemistry, and timing of withdrawal of all base fluids; and
3. Proposed chemical additives (including proppant coating), reported by their type, chemical compound or constituents, and Chemical Abstracts Service ("CAS") number, and the proposed concentration or rate and volume percentage of all additives.

The following must be made publically available on a well-by-well basis through an online, geographically based reporting system, a maximum of 30 days subsequent to a hydraulic fracturing operation:

1. Actual source, volume, geochemistry and timing of withdrawal of all base fluids;
2. Actual chemical additives used, reported by their type, chemical compound or constituents, CAS number, and the actual concentration or rate and volume percentage of all additives; and
3. Geochemical analysis of flowback and produced water, with samples taken at appropriate intervals to determine changes in chemical composition with time and sampled until such time as chemical composition stabilizes.

### xi.     Emergency and Remedial Response

Operators must develop, submit, and implement an emergency response and remedial action plan. The plan must describe the actions the operator will take in response to any emergency that may endanger human life or the environment – including USDWs – such as blowouts, fires, explosions, or leaks and spills of toxic or hazardous chemicals. The plan must include an evaluation of the ability of local resources to respond to such emergencies and, if found insufficient, how emergency response personnel and equipment will be supplemented. Operators should detail what steps they will take to respond to cases of suspected or known water contamination, including notification of users of the water source. The plan must describe what actions will be taken to replace the water supplies of affected individuals in the case of the contamination of a USDW.

### xii.     Plugging and Abandonment

Prior to plugging and abandoning a well, operators should determine bottom hole pressure and perform a mechanical integrity test to verify that no remedial action is required. Operators should develop and implement a well plugging plan. The plugging plan should be submitted with the permit application and should include the methods that will be used to: determine bottom hole pressure and mechanical integrity; the number and type of plugs that will be used; plug setting depths; the type, grade, and quantity of plugging material that will be used; the method for setting the plugs; and, a complete wellbore diagram showing all casing setting depths and the location of cement and any perforations.

BLM_0077989

Plugging procedures must ensure that hydrocarbons and fluids will not migrate between zones, into USDWs, or to the surface. A cement plug should be placed at the surface casing shoe and extend at least 100 feet above and below the shoe. All hydrocarbon-bearing zones should be permanently sealed with a plug that extends at least 100 feet above and below the top and base of all hydrocarbon-bearing zones. Plugging of a well must include effective segregation of uncased and cased portions of the wellbore to prevent vertical movement of fluid within the wellbore. A continuous cement plug must be placed from at least 100 feet below to 100 feet above the casing shoe. In the case of an open hole completion, any hydrocarbon or fluid-bearing zones shall be isolated by cement plugs set at the top and bottom of such formations, and that extend at least 100 feet above the top and 100 feet below the bottom of the formation.

At least 60-days prior to plugging, operators must submit a notice of intent to plug and abandon. If any changes have been made to the previously approved plugging plan the operator must also submit a revised plugging plan. No later than 60-days after a plugging operation has been completed, operators must submit a plugging report, certified by the operator and person who performed the plugging operation.

After plugging and abandonment, operators must continue to conduct monitoring and provide financial assurance for an adequate time period, as determined by the regulator, that takes into account site-specific characteristics including but not limited to:

- The results of hydrologic and reservoir modeling that assess the potential for movement of contaminants into USDWs over long time scales; and
- Models and data that assess the potential degradation of well components (*e.g.* casing, cement) over time and implications for mechanical integrity and risks to USDWs.

    **C.**    **The Uncompahgre RMP DEIS Inadequately Analyzes Impacts from Colorado River Withdrawals for Fracking and Other Unconventional Drilling Methods on Endangered Fish Populations and Water Supply, in Violation of NEPA and Section 7 of the ESA.**

Cumulative impacts are those impacts on the environment resulting from "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions." 40 C.F.R. § 1508.7. By all accounts, the impacts stemming from future oil and gas leasing and development in the Uncompahgre planning area discussed at length in these comments are cumulative with the impacts from development of neighboring planning areas. *Thomas v. Peterson*, 753 F.2d 754, 759 (9th Cir. 1985) (reasoning that effects of proposed road and of timber sales that road was designed to facilitate were cumulative actions for which comprehensive analysis was required). Indeed, under NEPA, BLM has an obligation to consider the effects of neighboring lease sales and oil and gas development projects as cumulative impacts of any future development stemming from new leasing in the Uncompahgre planning area. 40 C.F.R. §§ 1508.7, 1508.8.

A foreseeable cumulative impact from oil and gas development occurring adjacent to and in the Uncompahgre planning area are Colorado River water withdrawals necessary for fracking

BLM_0077990

and horizontal drilling techniques. Indeed, millions of gallons of water are withdrawn from the Colorado River for oil and gas extraction, potentially impacting endangered fish in the Gunnison River and Uncompahgre Rivers and communities that rely on this water downstream in the North Fork Valley and elsewhere. BLM must analyze the effects of the massive water demand resulting from relatively new horizontal drilling techniques in the Upper Colorado River Basin (the "Upper Basin") which would impact watersheds in the Uncompahgre planning area, including (1) the significant cumulative impacts on local water supplies and the Colorado River endangered fish under NEPA and (2) the cumulative impacts of water depletion effects on the Colorado River endangered fish under Section 7 of the Endangered Species Act. The loss of adequate flows in the endangered fishes' habitat within the Upper Colorado River Basin is so serious that the Service has determined that any depletion of Upper Basin stream flows adversely affects and jeopardizes the endangered fish.[384] The UFO draft RMP and EIS identifies critical habitat of at least two endangered fish populations within the planning area, namely the Colorado Pikeminnow and the Razorback Sucker in the Gunnison and Uncompahgre Rivers. UFO RMP DEIS at 3-75. Therefore, any depletion is subject to Section 7 consultation and review under NEPA.

While the Uncompahgre Field Office has not published a Biological Assessment (BA) as a part of the DEIS process yet, any potential reliance in the UFO BA on the 2008 Programmatic Biological Opinion for Water Depletions Associated with Bureau of Land Management's Fluid Mineral Program within the Upper Colorado River Basin in Colorado (the "Fluid Mineral PBO" or "PBO") (attached as Exhibit 311), is improper. The PBO does not take into account the enormous water depletion effects of horizontal drilling. The PBO is also unreliable in numerous other respects due to significant new information revealing that the Fluid Mineral Program may have effects on the endangered fish in a manner or to an extent not previously considered. This includes new information about (a) the potential for increased Mancos shale play development within the Piceance Basin, much of which would require horizontal drilling and therefore increased water depletions; (b) climate change effects on Upper Colorado River Basin stream flows (which is not even acknowledged in the PBO or the UFO DEIS); (c) long-term drought and increased water demand which has drastically reduced water supplies; (d) mercury and selenium pollution effects on the endangered fish; (e) declining humpback chub and Colorado

---

[384] U.S. Bureau of Land Management, White River FEIS at 3-71 (2015) ("The FWS has determined that any federally authorized depletion from the Upper Colorado River Basin has an adverse effect on listed Colorado River fishes.") (Chapter 3 attached as Exhibit 310); Biological Opinion for BLM Resource Management Plan (RMP), Price Field Office (PFO), 138 (Oct. 27, 2008), available at: http://www.blm.gov/style/medialib/blm/ut/price_fo/Planning/rod_approved_rmp.Par.2742.File.d at/Price%20Biological%20Opinion.pdf (attached as Exhibit 209) ("The USFWS determined that any depletion will jeopardize their continued existence and will likely contribute to the destruction or adverse modification of their critical habitat") (citing USDI, Fish and Wildlife Service, Region 6 Memorandum, dated July 8, 1997); Biological Opinion for BLM Resource Management Plan (RMP), Vernal Field Office (VFO), 113 (Oct. 23, 2008), available at: http://www.blm.gov/style/medialib/blm/ut/vernal_fo/planning/rod_approved_rmp.Par.4719.File.dat/VernalBiologicalOpinion.pdf (attached as Exhibit 210) (same).

BLM_0077991

pikeminnow populations and failure to meet these populations' recovery targets; (f) the Recovery Program's failure to recommend stream flows necessary for recovery of the endangered fish and (g) the failure of BLM to adequately monitor and track actual water use and depletions in the Upper Colorado River Basin, which could result in higher water use and greater depletions in the UFO planning area than anticipated in the PBO.

### 1.  Horizontal Wells Will Require Greater Water Depletions Than Previously Anticipated.

While the 2008 PBO is designed to address any depletions resulting from oil and gas development within the Uncompahgre Field Office and other western Colorado field offices, BLM can no longer rely on that consultation for its Section 7 compliance. The PBO did not consider the likely increase in horizontal drilling and other unconventional drilling practices that deplete enormous amounts of water to develop the Mancos/Mowry and Niobrara shale plays (collectively "Mancos shale play"). Nor did it consider the use of these water-intensive practices throughout the rest of the programmatic action area, including the Grand Junction, Little Snake, Tres Rios, White River, Gunnison and Colorado River Valley Field Offices.[385]

For example, in the White River planning area, the PBO projects that new vertical wells would consume 2.62 acre-feet per well, while in the Grand Junction planning area, vertical wells were estimated to require 0.77 acre-feet of water per well. But BLM water depletion logs indicate that between FY2011 and FY2015, the average depletion for horizontal wells in BLM's western Colorado field offices was 26.45 acre-feet of water per well in the field offices covered by the PBO.[386] Indeed, in FY2015 horizontal drilling in the Grand Junction Field Office resulted in a violation of the PBO's Incidental Take Statement (ITS) water depletion limit in the Colorado River sub-basin—under the ITS, water depletions are a surrogate for take. In FY2015, an operator drilled eight horizontal wells in the Grand Junction Field Office, which consumed a total of 620.87 acre-feet of water.[387] The total amount of water depleted in the Colorado River sub-basin by all horizontal and vertical wells was 691.09 acre-feet of water, which exceeds the 379 acre-feet annual projection for this sub-basin by 1.8 times.[388]

The drastic increase in the use of this water-intensive drilling technique was not considered in the PBO, nor in BLM's consultations over the recent White River, Kremmling, Little Snake, and Grand Junction RMP amendments or revisions, which only relied on the PBO regarding the RMPs' water depletion effects. These increased water depletion impacts throughout the Upper Basin could alter the Service's analysis of the cumulative effects on the

---

[385] BLM Instruction Memorandum CO-2011-022 (April 11, 2011) (attached as Exhibit 211) ("All of the estimates in the PBO were based on using conventional vertical drilling technology.").

[386] *See* Water Depletion Logs (Exhibits 212-218), which are completed, pursuant to requirements within the PBO, on an annual basis by the BLM to estimate water depletion resulting from fluid minerals development on BLM lands in western Colorado.

[387] *Id.*

[388] *Id.*

BLM_0077992

endangered fish, as all BLM-authorized fluid mineral development activity within the Basin is part of a single programmatic action that impacts the endangered fish.

Moreover, recently, on June 8, 2016, the U.S. Geological Survey published a report re-assessing the total technically recoverable reserves in the Mancos shale play in the Piceance Basin, including the Niobrara strata of the play.[389]  According to the report, the Mancos shale play's total technically recoverable natural gas reserves are over 40 times greater than the USGS's 2003 estimate and is the second-largest in the U.S., behind the Marcellus shale.[390]  Specifically, 66.3 trillion cubic feet of natural gas, 74 million barrels of oil and 45 million barrels of natural gas liquids are potentially recoverable.[391]  While tight gas in the younger, shallower Mancos shale intervals is produced primarily from vertical and directional wells in which the reservoirs have been hydraulically fractured, the tight gas and continuous oil and gas in the older and deeper intervals of the Mancos shale are produced mostly from horizontal wells that have been hydraulically fractured.[392]  These reserves underlie large areas of the Grand Junction, White River, Colorado River Valley, Uncompahgre, and Gunnison Field Offices, all of which fall under the PBO.[393]

Increasing interest in the Piceance Basin's Mancos shale play should therefore be expected in the Uncompahgre field office and these other field offices, given its enormous production potential. Indeed, since the 2003 USGS assessment, more than 2,000 wells have already been drilled and completed in one or more intervals of the study area.[394]  A review of BLM oil and gas projects in western Colorado indicates that operators are planning a number of projects involving horizontal drilling, which would most likely target the Mancos shale.[395]

Accordingly, Mancos shale drilling projects could increase within the Upper Basin, including the UFO, but the PBO does not take into account this expansion in new development potential. Because the RMPs for the Uncompahgre Field Office and other Piceance Basin field offices overlapping the Mancos shale play do not limit total new wells that may be drilled, and actually, the UFO draft RMP anticipates greater oil and gas leasing within the planning area, the greater amount and availability of technically recoverable oil and gas reserves could result in the development of many more new wells in the Upper Basin than assumed in the RMPs and the PBO. For example, the RFDs for the Colorado River Valley and White River RMPs did not take into account Mancos shale drilling (other than exploratory wells) and thus such drilling is not

---

[389] Assessment of Continuous (Unconventional) Oil and Gas Resources in the Late Cretaceous Mancos Shale of the Piceance Basin, Uinta-Piceance Province, Colorado and Utah  (2016) ("USGS 2016"), available at http://pubs.usgs.gov/fs/2016/3030/fs20163030.pdf (attached as Exhibit 197).
[390] *See id.*
[391] *Id.*
[392] *Id.*
[393] Exhibit 219 (map showing overlap of Mancos shale with field office boundaries).
[394] *Id.*
[395] *See* Center for Biological Diversity, Spreadsheet of Horizontal Well Projects in Colorado (attached as Exhibit 220) (listing horizontal well projects listed in BLM's NEPA register and projected water use).

BLM_0077993

considered in the PBO.[396]  Further, a substantial portion of new wells would be horizontal wells, as the lower strata of the Mancos formation would likely be accessed via horizontal drilling, but again, the PBO does not take into account the extraordinarily higher water use for horizontal wells. Water depletions in the Gunnison river sub-basin and throughout the entire Upper Colorado River Basin could therefore exceed projected water use estimates in the PBO.

Additionally, the UFO RMP DEIS must analyze cumulative impacts from oil and gas projects moving forward in the Uncompahgre planning area, namely the Bull Mountain Unit Master Development Plan. The Bull Mountain plan's Final Environmental Impact Statement (FEIS) anticipates the development of 146 new gas wells, half of which are assumed shale wells including horizontal drilling in the northwest portion of Gunnison County, within the UFO.[397] The preferred alternative's water use in the Bull Mountain FEIS would exceed levels contemplated in the PBO. The FEIS estimates that construction, drilling, dust abatement, and completion of the 146 gas wells for the preferred alternative would require 2,480.2 acre-feet of water, of which 744.1 acre-feet would be fresh water.[398] Per well fresh water use, then, would amount to just over five acre-feet, nearly five times greater than the PBO's projections for vertical well depletions in the Gunnison River sub-basin.[399] The anticipated life of the project is six years, with an average of 27 wells drilled per year.[400] Total fresh water depletions divided by the six year duration of the project amounts to 124 acre feet of fresh water depleted annually. As noted above, the PBO estimated total *annual* water depletions from the Gunnison sub-basin at 16 acre-feet—given the preferred alternative's proximity to tributaries of the Gunnison River, water would likely be taken from the Gunnison River sub-basin, although the Bull Mountain FEIS fails to clearly state the project's water source.[401] The preferred alternative, then, would likely lead to annual water depletions from the Gunnison River sub-basin of over seven times greater than projected in the PBO. Even if water were drawn from the Colorado River sub-basin, the 124 acre-feet required annually by the preferred alternative alone would amount to nearly one third of

---

[396] *See* White River RMP FEIS at K-358 ("Development of the Mancos and Niobrara outside the Rangely Field in Rio Blanco County in the WRFO are not [] currently well defined and are exploratory in nature. This development is in the initial stages of the exploration phase to determine of the maturity of the reservoir and the potential viability of the Niobrara within the WRFO."); *see also* Colorado River Valley RMP FEIS at 4-576 (attached as Exhibit 221) ("To date, use of horizontal drilling in relation to the deep marine shales [i.e., Niobrara, Mancos, and Eagle Basin formations] has been limited and is considered experimental. As a result, the development intensity, timing, and location of development of the deep marine shales was considered too speculative for quantitative impact analysis in connection with this planning process.").

[397] Bull Mountain Unit Master Development Plan Final Environmental Impact Statement (FEIS) (January, 2015), DOI -BLM-CO-S050-201 3-0022-EIS, at ES-1, available at http://www.blm.gov/style/medialib/blm/co/information/nepa/uncompahgre_field/13-22_bull_mountain.Par.23863.File.dat/Bull_Mtn_DEIS_Jan2015_508_reduced.pdf (attached as Exhibit 222).

[398] Bull Mountain FEIS, at ES-8 Table ES-1, ES-10-11.

[399] *Id.*

[400] *Compare id.* at ES-7 with Exhibits 212-218 (water depletion logs).

[401] FEIS at 3-31, Figure 3-4.

BLM_0077994

all allowable annual depletions for the Colorado River sub-basin under the 2008 PBO. The Uncompahgre DEIS does not contemplate or analyze water depletions from the Bull Mountain project, nor does it address projected future water depletions, in clear violation of NEPA's cumulative impacts analysis requirements. Additionally, to the extent that approval of the Uncompahgre draft RMP would rely on the PBO, such reliance is arbitrary and cannot constitute BLM's section 7 compliance. BLM must either reinitiate consultation on the PBO or initiate section 7 consultation for the UFO draft RMP DEIS.

### 2.      Climate Change Is Reducing Stream Flows in the Upper Colorado River Basin.

The Uncompahgre RMP DEIS and the PBO entirely fails to acknowledge climate change effects on Upper Colorado River Basin stream flows, and related effects on the endangered fish.[402] Anthropogenic climate change is profoundly impacting the Colorado River in ways that are altering temperature, streamflow, and the hydrologic cycle. As detailed below, changes observed to date include rising temperatures, earlier snowmelt and streamflow, decreasing snowpack, and declining runoff and streamflow. Modeling studies project that these changes will only worsen, including continued declines in streamflow and intensification of drought. Climate change is likely to have significant effects on the endangered fish species in the Colorado River basin and the Colorado River ecosystem.

*Rising temperatures*

The Colorado River basin has warmed significantly during the past century, with average increases in surface temperature of 1.6°F (0.9°C) over the Southwest during 1901-2010 (Hoerling et al. 2013).[403] The greatest warming has occurred in spring and summer, and in daytime high temperatures and nighttime low temperatures (Bonfils et al. 2008, Hoerling et al. 2013). Surface temperatures in the Southwest are projected to increase steeply in this century by an average of 4.5 to 7.9° F depending on the emissions scenario, with an average of 2.5 to 3°F of warming projected for 2021-2050 alone (Cayan et al. 2013). In the Colorado River basin, temperatures have increased roughly by 2° F, and "additional decades of warming are 'locked in' regardless of any behavioral changes that may or may not be implemented by the world's governments"—roughly an additional 5° F of warming can be expected in the basin by 2050 (CRRG 2016). As explained below, warming temperatures are having significant effects on

---

[402] In contrast, the Biological Assessment for the Bull Mountain MDP acknowledges that climate change "could impact listed fish species and their habitats by reducing suitable habitat, changing distributions, and altering food webs and water quality, including temperatures. Additional effects of climate change may include severity and frequency of droughts, floods, and wildfires, as well as changes in the timing of snowmelt and peak flows (Isaak et al. 2012; Haak et al. 2010; Rieman and Isaak 2010; Wenger et al. 2011), all of which may impact listed fish species in the analysis area." BLM, Biological Assessment, Uncompahgre Field Office, Bull Mountain Unit Master Development Plan and EIS, 4-9 (2015) (attached as Exhibit 223).

[403] Some of the references in this section are provided as short cites in parentheses. Full citations for these parenthetical references are included in a bibliography at the end of the section.

BLM_0077995

streamflow, drought severity, and the hydrologic cycle in the Southwest (Barnett et al. 2008, Woodhouse et al. 2016).

### Earlier snowmelt and streamflow

In much of the Colorado River basin, snowmelt, snowmelt runoff, and streamflow timing have trended earlier since the mid-1950s, in parallel with warming temperatures (Hamlet et al. 2005, Stewart et al. 2005, Barnett et al. 2008, Hoerling et al. 2013, Garfin et al. 2014). The Colorado River basin's spring pulse from 1978-2004 shifted to two weeks earlier compared to flows before 1978 (Ray et al. 2008). Although there are both natural and human influences on these hydrologic trends, studies indicate that anthropogenic greenhouse gases began to impact snow-fed streamflow timing during 1950-1999 (Barnett et al. 2008, Hidalgo et al. 2009, Hoerling et al. 2013). Modeling studies have projected that snowmelt, spring runoff, and streamflow timing will continue to shift earlier across much of the Southwest (Stewart et al. 2004, Rauscher et al. 2008, Dettinger et al. 2015).

### Decreasing snowpack

The Colorado River receives most of its water from winter snowpack from the Rocky Mountains, where 15% of the total basin areas generates 85% of the river flow (Dettinger et al. 2015). Across much of the Colorado River basin, the spring snowpack is decreasing and more winter precipitation is falling as rain instead of snow (Hamlet et al. 2005, Pierce et al. 2008, Das et al. 2009). Approximately half of the observed decline in snowpack in the western United States during 1950-1999 has been attributed to the effects of anthropogenic greenhouse gases, ozone and aerosols (Pierce et al. 2008). Modeling studies project a continued reduction of Southwest mountain snowpack during February through May during this century, largely due to the effects of rising temperatures (Cayan et al. 2013, Dettinger et al. 2015).

### Declining Runoff and Streamflow

Annual runoff in the Colorado River basin appears to be declining (USBR 2011), with significant consequences for reduced streamflow. During 2001–2010, warm temperatures and dry conditions reduced average naturalized flows in the Colorado River (measured at Lees Ferry) to the second-lowest-flow decade since 1901, to12.6 million acre-feet per year compared to the 1901–2000 average of 15.0 million acre-feet per year (Hoerling et al. 2013).

Modeling studies project that runoff and streamflow will continue to decrease substantially in the Colorado River basin during this century (Ray et al. 2008, Das et al. 2011, USBR 2011, Cayan et al. 2013, Georgakakos et al. 2014, Dettinger et al. 2015). Barnett and Pierce (2009) concluded that anthropogenic climate change is likely to reduce runoff in the Colorado River basin by 10-30% by 2050. Projected reductions in runoff range from 6-7% (Christensen and Lettenmaier 2007) to 45% (Hoerling and Eischeid 2007) depending on the models and methods used in each study (see Barnett and Pierce 2009 at Table 2). In the short term, Hoerling and Eischeid (2007) predict streamflow to decrease by 25% during 2006-2030, and by 45% during 2035-2060.

BLM_0077996

Importantly, numerous studies show that warming temperatures alone will cause runoff and streamflow declines in the Colorado River basin. For example, in a recent review, Vano et al. (2014) estimated that future streamflow in the Colorado River basin will be reduced by 5% to 35% due to rising temperature alone. When precipitation change is considered, a 5% decrease in precipitation would further reduce streamflow by 10% to 15% (Vano et al. 2014).

Moreover, warming temperatures will play an increasingly important role in causing runoff to decline in the Colorado River basin, and must be factored into streamflow forecasts (Woodhouse et al. 2016). An empirical study of the influence of precipitation, temperature, and soil moisture on upper Colorado River basin streamflow over the past century found that warmer temperatures have already resulted in flows less than expected based on precipitation levels (Woodhouse et al. 2016). Consistent with past research, the study found that cool season precipitation explains most of the variability in annual streamflow. However, temperature was highly influential in determining streamflow under certain conditions. The study concluded that "[s]ince 1988, a marked increase in the frequency of warm years with lower flows than expected, given precipitation, suggests continued warming temperatures will be an increasingly important influence in reducing future UCRB water supplies." The researchers warned that "streamflow forecasts run the risk of overprediction if warming spring and early summer temperatures are not adequately considered."

According to the study's press release it is the "first to examine the instrumental historical record to see if a temperature effect [on stream flows] could be detected."[404] The study's lead author highlighted its significance: "If we have a warmer spring, we can anticipate that the flows will be less relative to the amount of snowpack[.]....What we're seeing is not just the future – it's actually now. That's not something I say lightly."[405]

*Increasing Drought Severity*

Historically, droughts in the Colorado River basin were primarily driven by precipitation deficits. However, studies indicate that rising temperatures have begun to play a more important role in driving droughts (Hoerling et al. 2013, Vano et al. 2014). Importantly, rising temperature superimposed on natural drought variability is expected to exacerbate the impacts of droughts (Seager et al. 2012, Cook et al. 2015). Modeling studies project that droughts in Southwest will intensify due to longer periods of dry weather and more extreme heat, leading to higher evapotranspiration and moisture loss (Seager et al. 2007, Cayan et al. 2010, Trenberth et al. 2013). In the Colorado River basin, future droughts are projected to be substantially hotter, and drought is projected to become more frequent, intense, and longer lasting than in the historical record (Garfin et al. 2014). Moreover, under a business-as-usual GHG emissions scenario, the risk of mega-drought in the southwest would increase to 70-99% by the end of the century (Ault 2016). This substantial risk of mega-drought would exist regardless of how or whether precipitation changes.

---

[404] American Geophysical Union, *Colorado River Flows Reduced by Warmer Spring Temperatures* (March 9, 2016), available at http://news.agu.org/press-release/colorado-river-flows-reduced-by-warmer-spring-temperatures/ (attached as Exhibit 236).

[405] *Id.*

BLM_0077997

*Reduced reservoir levels and unsustainable demand for water*

Of the more than 90 reservoirs on the river and its tributaries, the two largest are Lake Mead and Lake Powell which together can store up to 85% of the total flow for the basin combined (Christensen et al. 2004). Reservoirs in the Colorado River basin are highly vulnerable to climate change, particularly because the amount of storage in reservoirs is sensitive to runoff changes (Barnett and Pierce 2008). Even small decreases in runoff have caused average reservoir levels to markedly decrease (Christensen et al. 2004). Christensen et al. (2004) predicted that climate change impacts on the hydrology of the Colorado River system would result in water demand (deliveries and evaporation) exceeding reservoir inflows (which would also be decreased), resulting in a degraded system. Likewise, Barnett and Pierce (2008) projected that a 10% reduction in runoff would result in requested water deliveries surpassing sustainable deliveries by 2040, while a 20% reduction in runoff would cause unsustainable water demands by 2025. A greater demand than supply makes the system more prone to long-term sustained droughts, as reservoirs will not have sufficient time to be naturally replenished and more water will be extracted from a dwindling supply than is sustainable (Christensen and Lettenmaier 2007). Reservoirs would spend additional time in a depleted state, weakening the system's buffering ability in years where there is low precipitation (Barnett and Pierce 2009).

A recent Bureau of Reclamation report looks at how climate change will affect water supplies in the West and finds that warming weather will increase the likelihood of shortages, particularly for farmers.[406] In addition to runoff changes, increased temperatures are expected to increase the demand for irrigation water and for Reclamation's hydroelectricity, as well as for water dedicated to maintaining habitat for fish and other river species.[407] Collectively, the impacts of climate change to water resources give rise to difficult questions about how best to operate Reclamation facilities to address growing demands for water and hydropower now and how to upgrade and maintain infrastructure to optimize operations in the future.[408]

*** 

In addition to reducing the overall amount of water in the Upper Colorado River Basin, these climate change effects would worsen effects from toxic spills by increasing the concentration of pollutants and toxic contaminants. Climate change is also likely to further exacerbate mercury and selenium effects on the endangered fish. Mercury deposited into soil from coal burning, or selenium naturally found in Mancos rock outcrops or soil, will increasingly

---

[406] U.S. Department of the Interior Bureau of Reclamation. Secure Water Act Section 9503(c) – Reclamation Climate Change and Water, at 10-13, March 2016 (Chapter 10 attached as Exhibit 237)

[407] Kahn, Debra, Climate change bodes ill for Western supplies, E&E Reporter: The Politics and Business of Climate Change (March 2016) (attached as Exhibit 312).

[408] U.S. Department of the Interior Bureau of Reclamation. Secure Water Act Section 9503(c) – Reclamation Climate Change and Water at 1-10 (Chapter 1 attached as Exhibit 238).

BLM_0077998

run off into streams with increased heavy rainfall events.[409] More frequent and severe wildfire events will result in increased charring of soil, releasing mercury and selenium that can wash off into streams.[410] Warmer water conditions will hasten the conversion of mercury into toxic methylmercury,[411] and reduced flows will increase mercury and selenium concentrations.

Ample evidence, including empirical research, demonstrates that climate change is already reducing stream flows in the Colorado River Basin and that flows will continue to dwindle as Colorado Basin temperatures rise. Accordingly, BLM must either reinitiate consultation on the PBO or initiate section 7 consultation for the UFO draft RMP DEIS.

**References**

Ault, Toby R. et al., Relative Impacts of mitigation, temperature, and precipitation on 21st-century megadrought risk in the American Southwest, Science Advances. 2016;2: e1600873 (attached as Exhibit 193).

Barnett, T. P., et al. 2008. Human-induced changes in the hydrology of the western United States. Science 319: 1080–1083 (attached as Exhibit 329).

Barnett, T.P. and D.W. Pierce. 2008. When will Lake Mead go dry? Water Resources Research 44: W03201 (attached as Exhibit 330).

Barnett, T.P. and D.W. Pierce. 2009. Sustainable water deliveries from the Colorado River in a changing climate. PNAS 106: 7334-7338 (attached as Exhibit 331).

Bonfils, C., et al. 2008. Detection and attribution of temperature changes in the mountainous western United States. Journal of Climate 21: 6404–6424 (attached as Exhibit 332).

Cayan, D.R., T. Das, D.W. Pierce, T.P. Barnett, M. Tyree, and A. Gershunov. 2010. Future dryness in the southwest US and the hydrology of the early 21st century drought. PNAS 107: 21227-21276 (attached as Exhibit 333).

Cayan, D. et al. 2013. Future climate: projected average. Pages 101–125 in G. Garfin, A. Jardine, R. Merideth, M. Black, and S. LeRoy, editors. Assessment of climate change in the southwest United States: a report prepared for the National Climate Assessment. A report by the Southwest Climate Alliance. Island Press, Washington, D.C., USA.

Christensen, N.S., Wood, A.W., Voisin, N., Lettenmaier, D.P., and R.N. Palmer. 2004. The effects of climate change on the hydrology and water resources of the Colorado River basin. Climatic change 62: 337-363 (attached as Exhibit 335).

Christensen, N.S. and D.P. Lettenmaier. 2007. A multimodel ensemble approach to assessment of climate change impacts on the hydrology and water resources of the Colorado River basin. Hydrology and Earth System Sciences 11: 417-1434 (attached as Exhibit 336).

Colorado River Research Group, Climate Change and the Colorado River: What We Already Know (Oct. 2016), available at http://www.coloradoriverresearchgroup.org/uploads/4/2/3/6/42362959/crrg_climate_change.pdf (attached as Exhibit 337).

---

[409] National Wildlife Federation, Swimming Upstream: Freshwater Fish in a Warming World, 19 (2013), available at http://www.nwf.org/~/media/PDFs/Global-Warming/Reports/NWF-Swimming%20Upstream-082813-B.ashx (attached as Exhibit 240).

[410] *Id.*

[411] *Id.*

BLM_0077999

Cook, B.I., T.R. Ault, and J.E. Smerdon. 2015. Unprecedented 21st century drought risk in the American Southwest and Central Plains. Sci. Adv. 1: e1400082–e1400082 (attached as Exhibit 338).

Das, T., H. G. Hidalgo, M. D. Dettinger, D. Cayan, D. W. Pierce, C. Bonfils, T. P. Barnett, G. Bala, and A. Mirin. 2009. Structure and detectability of trends in hydrological measures over the western United States. Journal of Climate 10: 871-892 (attached as Exhibit 339).

Das, T., Pierce, D.W., Cayan, D.R., Vano, J.A., and D.P. Lettenmaier. 2011. The importance of warm season warming to western US streamflow changes. Geophysical Research Letters 38(23) (attached as Exhibit 340).

Dettinger, M., B. Udall, and A. Georgakakos. 2015. Western water and climate change. Ecological Applications 25: 2069-2093 (attached as Exhibit 341).

Garfin, G., G. Franco, H. Blanco, A. Comrie, P. Gonzalez, T. Piechota, R. Smyth, and R. Waskom, 2014: Ch. 20: Southwest. Climate Change Impacts in the United States: The Third National Climate Assessment, J. M. Melillo, Terese (T.C.) Richmond, and G. W. Yohe, Eds., U.S. Global Change Research Program, 462-486 (attached as Exhibit 342).

Georgakakos, A., P. Fleming, M. Dettinger, C. Peters-Lidard, T.C. Richmond, K. Reckhow, K. White, and D. Yates. 2014. Water resources. Pages 69–112 in J. M. Melillo, T. C. Richmond, and G. W. Yohe, editors. Climate change impacts in the United States: the third National Climate Assessment. U.S. Global Change Research Program, Washington, D.C., USA (attached as Exhibit 343).

Hamlet, A., P.W. Mote, M.P. Clark, and D.P. Lettenmaier. 2005. Effects of temperature and precipitation variability on snowpack trends in the western United States. Journal of Climate 18: 4545-4561 (attached as Exhibit 344).

Harding, B. L., Wood, A. W. and J.R. Prairie. 2012. The implications of climate change scenario selection for future streamflow projection in the Upper Colorado River basin. Hydrology and Earth System Sciences 16: 3989-4007 (attached as Exhibit 345).

Hidalgo, H. G., T. Das, M. D. Dettinger, D. Cayan, D.W. Pierce, T. P. Barnett, G. Bala, A. Mirin, A.W. Wood, C. Bonfils, B.D. Santer, and T. Nozawa. 2009 Detection and attribution of streamflow timing changes to climate change in the western United States. Journal of Climate 22: 3838-3855 (attached as Exhibit 346).

Hoerling, M. and J. Eischeid. 2007. Past peak water in the Southwest. Southwest Hydrology 35: 18–19 (attached as Exhibit 347).

Hoerling, M. P., M. Dettinger, K. Wolter, J. Lukas, J. Eischeid, R. Nemani, B. Liebmann, and K. E. Kunkel. 2013. Evolving weather and climate conditions of the Southwest United States. Pages 74–100 in G. Garfin, A. Jardine, M. Black, R. Merideth, J. Overpeck, and A. Ray, editors. Assessment of climate change in the Southwest United States: a report prepared for the National Climate Assessment. Island Press, Washington, D.C., USA (attached as Exhibit 348).

Pierce, D. W., T. P. Barnett, H. G. Hidalgo, T. Das, C. Bonfils, B. D. Santer, G. Bala, M. D. Dettinger, D. Cayan, A. Mirin, A. W. Wood, and T. Nozawa. 2008. Attribution of declining western U.S. snowpack to human effects. Journal of Climate 21: 6425-6444 (attached as Exhibit 349).

Rauscher, S. A., J. S. Pal, N. S. Diffenbaugh, and M. M. Benedetti. 2008. Future changes in snowmelt-driven runoff timing over the western US. Geophysical Research Letters 35: L16703, doi:10.1029/2008GL034424 (attached as Exhibit 350).

BLM_0078000

Ray, A.J., Barsugli, J.J., Averyt, K.B., Wolter, K., Hoerling, M., Doesken, N. Udall, B. and R.S. Webb. 2008. Climate change in Colorado: a synthesis to support water resources management and adaptation. Report for the Colorado Water Conservation Board. University of Colorado, Boulder (attached as Exhibit 351).

Seager, R., M. Ting, I. Held, Y. Kushnir, J. Lu, G. Vecchi, H. Huang, N. Harnik, A. Leetmaa, N. Lau, C. LI, J. Velez, and N. Naik. 2007. Model projections of an imminent transition to a more arid climate in southwestern North America. Science 316: 1181-1184 (attached as Exhibit 352).

Seager, R., M. Tang, C. Li, N. Naik, J. Nakamura, and H. Lui. 2012. Projections of declining surface-water availability for the southwestern United States. Nature Climate Change doi:10.1038/NCLIMATE1787 (attached as Exhibit 353).

Stewart, I. T., D. R. Cayan, and M. D. Dettinger. 2004. Changes in snowmelt runoff timing in western North America under a 'Business as Usual' climate change scenario. Climatic Change 62: 217-232 (attached as Exhibit 354).

Trenberth, K.E., A. Dai, G. van der Schrier, P.D. Jones, J. Barichivich, K.R. Briffa, and J. Sheffield. 2013. Global warming and changes in drought. Nature Climate Change 4: 17-22 (attached as Exhibit 355).

US Bureau of Reclamation and Colorado River Basin Water Supply and Demand Study Team. 2011. Colorado River basin Water Supply and Demand Study: Technical Report B – Water Supply Assessment. Interim Report No. 1 (attached as Exhibit 356).

U.S. Fish and wildlife Service. 2008. Programmatic Biological Opinion for Water Depletions Associated with Bureau of Land Management's Fluid Mineral Program within the Upper Colorado River basin in Colorado. USDC Colorado (attached as Exhibit 311).

Vano, J. A., Udall, B., Cayan, D. R., Overpeck, J. T., Brekke, L. D., Das, T., Hartmann, H. C., Hidalgo, H. G., Hoerling, M., McCabe, G. J., Morino, K., Webb, R. S., Werner, K. & Lettenmaier, D. P. 2014. Understanding uncertainties in future Colorado River streamflow. Bulletin of the American Meteorological Society 95: 59-78 (attached as Exhibit 357).

Woodhouse, C. A., G. T. Pederson, K. Morino, S. A. McAfee, and G. J. McCabe. 2016. Increasing influence of air temperature on upper Colorado River streamflow. Geophys. Res. Lett. 43, doi:10.1002/2015GL067613 (attached as Exhibit 358).

### 3. Persistent Drought Conditions and Increasing Water Demand Have Reduced Water Supply.

Compounding this threat to the endangered fish are persistent drought conditions that have diminished natural flows in the Colorado River Basin and reduced water storage that is needed to supplement Upper Basin flows. The period from 2000 to 2015 was the lowest 16-year period for natural flow in the last century, and one of the lowest 16-year periods for natural flow in the past 1,200 years, according to paleorecords.[412] As a result, water storage in the Colorado

---

[412] Bureau of Reclamation, Managing Water in the West: SECURE Water Act Section 9503(c) Report to Congress, Chapter 3, Colorado River Basin at 3-64 (2016) (Chapter 3 attached as Exhibit 241).

BLM_0078001

River system reservoirs have declined "from nearly full to about half of capacity," and led to local shortages in the Upper Colorado's sub-basins.[413]

Further, population growth will increase water demand for agriculture and municipal uses, making it increasingly difficult to ensure sufficient water availability for the endangered fish, which rely on the release of stored water, especially in dry years.[414] An ever widening gap between water supply and water demand is weakening the Colorado River water supply system's reliability and ability to buffer the system in dry years.[415] According to the U.S. Geological Survey, "increased water demand and declining water availability make the restoration of endangered fish habitat extremely challenging."[416] This growing gap between supply and demand in the Upper Colorado River Basin must be taken into account in a reinitiated consultation.

### 4.    Mercury and Selenium Are Adversely Impacting the Endangered Fish.

New scientific information regarding (a) mercury and selenium effects on fish reproduction and population viability, (b) mercury and selenium concentrations in Upper Colorado and White River fish, (c) the potential role of oil and gas development in mercury contamination levels in the White River, (d) the potential for development of the Mancos shale play to increase selenium pollution, and (e) the relationship between climate change and mercury and selenium toxicity constitutes new information revealing that the Fluid Mineral Program may have effects on the endangered fish to an extent that was not considered in the PBO, and requires reinitiation of consultation over the Fluid Mineral Program.[417]

*Mercury contamination is harming Colorado pikeminnow populations*

The Uncompahgre DEIS and Fluid Mineral PBO's discussion of the environmental baseline for, and threats to, the Colorado pikeminnow and razorback sucker contains no discussion whatsoever of environmental and tissue mercury contamination or the resulting toxicity and reproductive impairment to the endangered fish. Significant new research since the Uncompahgre DEIS and the 2008 PBO has demonstrated that elevated levels of mercury in Colorado pikeminnow muscle tissue, including within the Upper Colorado River Basin, are at concentrations likely to cause reproductive and behavioral impairment to the fish.[418]

---

[413] *Id.*

[414] *See id.* at 3-7, 3-8.

[415] *Id.* at 3-10, 3-12.

[416] USGS, Effects of Climate Change and Land Use on Water Resources in the Upper Colorado River Basin, 5 (2010), available at https://pubs.usgs.gov/fs/2010/3123/pdf/FS10-3123.pdf (attached as Exhibit 242).

[417] 50 C.F.R. § 402.16(b).

[418] USFWS, Upper Colorado River Endangered Fish Recovery Program, Colorado pikeminnow (*Ptychocheilus lucius*), 5-Year Review: Summary and Evaluation 21 (2011) ("[T]he recovery goal revision needs to consider the impacts of mercury. . . the majority (64 %) of Colorado pikeminnow may be experiencing some reproductive impairment through mercury exposure.")

BLM_0078002

Mercury is a potent neurotoxin shown to cause numerous reproductive and endocrine impairments in fish in laboratory experiments, including effects on production of sex hormones, gonadal development, egg production, spawning behavior, and spawning success.[419] Concentrations of mercury in Colorado pikeminnow in the Upper Basin are documented to be well in excess of the thresholds for reproductive impairment and population-level impacts.[420] 2008-2009 muscle tissue averages were 0.60 mg/Kg Hg for Colorado pikeminnow in the Upper Colorado basin and 0.95 mg/Kg Hg for Colorado pikeminnow in the White River – well above the 0.2 mg/kg threshold of concern.[421]

Mercury deposition and accumulation in critical habitat is attributable to a number of local and global factors, including air emissions from coal-fired power plants both in the immediate region and around the world.[422] In addition, because of discrepancies in mercury concentrations between pikeminnow in the Yampa and White Rivers, research suggests that "[i]t is possible that there is some localized sources of mercury contamination into the White River drainage connected with oil and gas exploration and development."[423]

Once mercury is deposited on land or water, it is converted into a biologically available form, methylmercury (MeHg) by bacteria. Methylmercury "bioaccumulates in food chains, and particularly in aquatic food chains, meaning that organisms exposed to MeHg in their food can build up concentrations that are many times higher than ambient concentrations in the environment."[424] Once it accumulates, mercury is a potent neurotoxin, affecting fish in many ways, including brain lesions, reduced gonadal secretions, reproductive timing failures, reduced ability to feed, suppressed reproductive hormones, reduced egg production, reduced reproductive success, and transfer of mercury into developing eggs.[425] Although the precise effects vary with

---

(attached as Exhibit 309) ("Colorado Pikeminnow 5-year Review"); USFWS, Biological Opinion for the Four Corners Power Plant and Navajo Mine Energy Project at 76 & Table 3 (April 8, 2015) ("Four Corners Biological Opinion") (attached as Exhibit 243).
[419] USFWS, Draft 2014-2015 Assessment of Sufficient Progress Under the Upper Colorado River Endangered Fish Recovery Program in the Upper Colorado River Basin, and of Implementation of Action Items in the December 20, 1999, 15-Mile Reach Programmatic Biological Opinion and December 4, 2009, Gunnison River Basin Programmatic Biological Opinion, 10 (Oct. 7, 2015) ("Sufficient Progress Assessment") (attached as Exhibit 244).
[420] See Barb Osmundson and Joel Lusk, Field assessment of mercury exposure to Colorado pikeminnow within designated critical habitat (May 5, 2011) ("Osmundson & Lusk 2011") (attached as Exhibit 245).
[421] See Four Corners Biological Opinion at 76 & Table 3 (attached as Exhibit 243); see generally Beckvar, N., T.M. Dillon, and L.B. Reads, Approaches for linking whole-body fish tissue residues of mercury or DDT to biological effects threshold, Environmental Toxicology and Chemistry 24:2094-2105 (2005) (attached as Exhibit 246).
[422] See Four Corners Biological Opinion at 73-74 (attached as Exhibit 243); Osmundson & Lusk 2011 at 9-10 (attached as Exhibit 245).
[423] Id. at 29.
[424] Four Corners Biological Opinion at 73 (attached as Exhibit 243).
[425] See Lusk, Joel D., USFWS, Mercury (Hg) and Selenium (Se) in Colorado Pikeminnow and in Razorback Sucker from the San Juan River, 17 (2010), available at

BLM_0078003

relative concentrations, mercury and selenium may have synergistic toxic effects at certain ratios.[426]

The Service has acknowledged that its recovery planning for the Colorado pikeminnow needs updating to reflect this new information regarding mercury:

> In addition, the recovery goal revision needs to consider the impacts of mercury. Beckvar et al. (2005) associated studies involving survival, growth, reproduction, and behavior and recommended that 0.2 mg/kg in whole fish be viewed as protective, while adverse biological effects are more likely at higher concentrations. Based on this threshold, the majority (64 %) of Colorado pikeminnow may be experiencing some reproductive impairment through mercury exposure. Management strategies for controlling anthropogenic mercury emissions are necessary as atmospheric pollution can indirectly affect this endangered species, its critical habitat, and its recovery by ambient air exposure, deposition into aquatic habitat and bioaccumulation in diet and in fish tissues.[427]

Moreover, the Service's 2015 Sufficient Progress Assessment for the Recovery Program acknowledges that population viability studies show that mercury- and selenium-related reproductive impairment is likely to influence population levels in the San Juan Basin,[428] but no comparable analysis has yet been done for the higher levels of contamination present in Upper Colorado River Basin fish.

The significant difference in mercury concentrations in fish found in the neighboring Yampa and White Rivers also offers significant new information potentially relevant to the effect of BLM-authorized oil and gas development. Osmundson and Lusk found very high (average 0.95 mg/Kg WW) mercury concentrations in Colorado pikeminnow and in the White River, and lower (0.49 mg/Kg) concentrations in the neighboring Yampa.[429] Based on this discrepancy, they noted:

> The Yampa and White rivers are relatively close geographically in northwestern Colorado. Because of this proximity, it is interesting that the Yampa River had the lowest mercury concentrations in Colorado pikeminnow while the White River had the highest mercury concentrations. If most of the mercury was from aerial wet and dry deposition, the two drainages should be similar. This difference may indicate a localized source/s of mercury contamination into the White River drainage. There are currently >2,600 gas and oil wells in Rio Blanco county. It is

---

https://www.fws.gov/southwest/sjrip/pdf/DOC_Evaluation_Hg_Se_SJR_pikeminnow%20or_razorback_SJRIP_BC_2010.pdf. (attached as Exhibit 247)

[426] Four Corners Biological Opinion at 103 (attached as Exhibit 243).

[427] Colorado Pikeminnow 5-year Review at 21 (attached as Exhibit 309); *see also* Significant Progress Assessment at 10-11 (attached as Exhibit 244).

[428] Sufficient Progress Assessment at 10-11 (attached as Exhibit 244).

[429] Osmundson & Lusk 2011 at 21 & Table 2 (attached as Exhibit 245).

BLM_0078004

possible that there is some localized sources of mercury contamination into the White River drainage connected with oil and gas exploration and development.[430]

Although site-specific information for the Upper Basin planning areas appears scarce, there is scientific as well as circumstantial evidence that oil and gas operations can contribute to mercury contamination.[431] The Fluid Mineral PBO does not consider the effect of oil and gas development within the White River watershed on the threat to Colorado pikeminnow and razorback sucker from mercury toxicity.

Nor does the PBO give any consideration to the multiple ways in which climate change will exacerbate mercury and selenium contamination and toxicity. Climate change can foreseeably be predicted to increase heavy rainfall events and ensuing runoff, increase pollutant concentrations due to reduced flows during low-flow periods, and contribute to increased methylmercury conversion due to higher temperatures.

*Selenium pollution is harming the endangered fish*

The Uncompahgre DEIS acknowledges, without detail or quantitative analysis, that "selenium is a particularly important issue in the Gunnison River Basin, as elevated levels are the suspected cause of reproductive failure of select species of warm water fishes in the Lower Gunnison River. The most widespread impairment to area water quality is excessive selenium. Elevated levels of selenium have been shown to cause reproductive failure and deformities in fish and aquatic birds and are suspected to be the cause of reproductive failures in select species in the Lower Gunnison River." UFO RMP DEIS at 3-31. While the UFO RMP does reference its participation in the Gunnison River Basin Selenium Management Program (SMP) as part of a 2009 programmatic Biological Opinion for selenium in the Gunnison River, the UFO RMP does not address how they are monitoring or minimizing selenium loadings from non-agricultural nonpoint sources in this RMP, especially for potential fossil fuel development.  In fact, in the 2011 "Program Formulation Document" for the SMP, as well as its latest (2014) Annual Progress Report, it stated that BLM will "address selenium in new [Uncompahgre] Resource Management Plan."[432] There is no substantive review of the SMP or requirements within the

---

[430] *Id.* at 29 (citations omitted).
[431] *See* U.S. EPA, National Risk Management Research Laboratory, Mercury in Petroleum and Natural Gas: Estimation of Emissions from Production, Processing, and Combustion, EPA/600/SR-01/066 (Oct. 2001) (attached as Exhibit 248); Visvanathan, C., Treatment and Disposal of Mercury Contaminated Waste from Oil and Gas Exploration Facilities, available at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.549.9515&rep=rep1&type=pdf (attached as Exhibit 249).
[432] U.S. Bureau of Reclamation, Selenium Management Program: Program Formulation Document Gunnison River Basin, Colorado, Prepared by Selenium Management Program Workgroup at 69 (December 2011), available at http://www.usbr.gov/uc/wcao/progact/smp/docs/Final-SMP-ProgForm.pdf (attached as Exhibit 250); U.S. Bureau of Reclamation, Selenium Management Program Annual Report at 23 (2014) available at http://www.usbr.gov/uc/wcao/progact/smp/docs/SMP-2014AnnualRep.pdf (attached as Exhibit 251).

BLM_0078005

SMP referenced anywhere in the draft UFO RMP DEIS. The effects of selenium on endangered fish species in the UFO are extensively documented in the below comments.

Selenium harms the endangered fish and other aquatic species through bioaccumulation in the food chain. Concentrations of 3 µg/g in the food chain have been found to cause gill and organ damage in certain fish and may lead to death.[433] These bioaccumulative effects resulting in direct toxicity to juvenile and adults are known as "Type 1" effects. Moreover, selenium bioaccumulation can result in maternal transfer of selenium to fish egg yolks and lead to developmental abnormalities, known as "Type 2 effects."[434] Waterborne concentrations of selenium in the 1-5 µg/L range can bioaccumulate and lead to Type 1 and/or Type 2 effects.[435]

Recent studies reveal significant exposures of the endangered fish to selenium. In one study analyzing selenium concentrations of 26 fish specimens collected from designated critical habitat in the Gunnison River, one Colorado pikeminnow specimen exhibited concentrations in muscle plugs that exceeded the 8 micrograms per gram dry weight toxicity guideline for selenium in fish muscle tissue.[436] Several species, including the razorback sucker and Colorado pikeminnow, exhibited selenium exposures in excess of the critical concentration at which Type 1 health effects begin to occur.[437]

In the Lower Gunnison River Basin, 2014 data indicated a range of dissolved selenium (chronic values) from 0.97 µg/L to 16.7 µg/L along the Uncompahgre River. Out of 18 sites in the lower Gunnison that were considered, the Colorado water-quality standard for chronic dissolved selenium of 4.6 µg/L was exceeded at two sites.[438] In regards to acute values, the range measured was from 1.1 µg/L for a portion of the Uncompahgre River to 125 µg/L along a portion of Loutzenhizer Arroyo, with 125 µg/L being well in excess of any criteria for instantaneous selenium measurements.[439] In another 2015 study, mean concentrations of selenium in various fish species in the lower Colorado River Basin exceeded the risk for maternal transfer to eggs, while selenium concentrations in various species of macroinvertebrate

---

[433] Lemly, A.D., Appalachian Center for the Economy & the Environment and Sierra Club, Aquatic hazard of selenium pollution from mountaintop removal coal mining, 3 (2009) ("Lemly 2009") (attached as Exhibit 252).

[434] Lemly 2009 at 3 (attached as Exhibit 252); Hamilton, S.J., Review of residue-based selenium toxicity thresholds for freshwater fish, Ecotox. Environ. Saf. 56: 201-210 (2003) (attached as Exhibit 253).

[435] *See id.*

[436] May, Thomas W. and Michael J. Walther, USGS, Determination of selenium in fish from designated critical habitat in the Gunnison River, Colorado, March through October, 2012, Open-File Report 2013-1104, 2 (2013) (attached as Exhibit 254).

[437] *Id.*

[438] Henneberg, M.F., 2014 annual summary of the lower Gunnison River Basin Selenium Management Program water-quality monitoring, Colorado: U.S. Geological Survey Open-File Report 2016–1129, 25 p. (2016), http://dx.doi.org/10.3133/ofr20161129 (attached as Exhibit 255).

[439] *Id.*

BLM_0078006

prey exceeded the risk value for larval fishes.[440] Average selenium concentrations in the studied fish species were found to be 2- to 4-fold higher than the risk threshold for piscivorous (fish-eating) wildlife, with samples exceeding this threshold in 81-100% of cases depending on the species.  The risk value for larval fishes, who either absorb selenium via maternal transfer to eggs or through invertebrate diet, was exceeded in 56-100% of cases depending on the adult species (with risk posed to larvae due to maternal transfer), and 86-100% of cases among invertebrates (with risk posed to larval fishes through diet).  Thus, the transfer of selenium toxicity from invertebrates to fish to piscivores is readily observable.[441]

Natural erosion and runoff, as well as selenium leaching into irrigation runoff, are the primary sources of this toxic pollutant. The weathering of Cretaceous marine shales can produce high selenium soils, which are present in many areas of the western U.S.[442] Most notable of these Cretaceous shales is the Mancos Shale, which is found in Colorado, Utah, Wyoming, New Mexico, and Arizona. Irrigation of selenium-rich soils for crop production in arid and semi-arid regions can mobilize selenium and move it off-site in surface water runoff or via leaching into groundwater.  Groundwater in contact with the Mancos Shale is known to have high levels of selenium due to leaching, and irrigation activities on Mancos Shale have led to selenium loading of nearby rivers and streams such as those in the Colorado River Basin.[443] As discussed previously, increased exploitation of the Mancos shale play could also put surface waters and endangered fish at risk. Selenium-laced produced water from oil and gas operations may find a pathway to surface waters via hydraulically induced fractures in Mancos shale rock, or via surface spills.

### 5.    Population Numbers of the Endangered Fish Are Declining.

Colorado pikeminnow populations are in decline throughout the Green River and Colorado River Basin, indicating that the Recovery Plan for the endangered fish has not been effective and that the impacts of water depletions could be more severe than previously anticipated.

According to Fish and Wildlife Service, the latest 2014 Colorado River sub-basin population number of 501 is "cause for great concern," and catch of sub-adults and adults in 2013 and 2014 "were near lowest observed in the history of the project."[444] 2015 catch numbers are within the same range, which suggests that the population estimate for 2015 will be similar to

---

[440] Walters, David M., et al. Mercury and selenium accumulation in the Colorado River food web, Grand Canyon, USA. Environmental Toxicology and Chemistry, 34(10):2385-2394, 2390 (2015) (attached as Exhibit 256).
[441] Id.
[442] Lemly, A.D., Guidelines for evaluating selenium data from aquatic monitoring and assessment studies. Environ. Monitor. Assess. 28(1):83-100 (1993) (attached as Exhibit 257).
[443] Environmental Sciences Laboratory, Natural Contamination from the Mancos Shale, U.S. Department of Energy, Doc. No. S07480 (2011) (attached as Exhibit 258).
[444] Sufficient Progress Assessment at 23, 36 (attached as Exhibit 244).

BLM_0078007

the 2014 estimate.[445] Preliminary data show that the Green River sub-population is "in decline throughout the entire Green River Subbasin" and has fallen under 2,000, below the minimum viable population of 2,600 adults.[446] The Yampa River portion of the sub-basin population also "remains low and may be in further decline."[447] Recent studies show that Colorado pikeminnow declines in the Yampa River are linked to "persistent high densities of nonnative predators (e.g., smallmouth bass and northern pike)," and that northern pike are outnumbering Colorado pikeminnow by three to one.[448]

Humpback chub numbers are also low. Fish and Wildlife Service is "concerned that wild populations of humpback chub in Black Rocks and Westwater Canyon of the Colorado River (near the Colorado-Utah state line) have not recovered from declines detected in the late 1990's. The reason for those population declines is uncertain."[449] After this steep reduction, the Black Rocks/Westwater population continued to decline.[450] In 2008, the population "dropped below the population size downlist criterion (MVP = 2,100 adults) for the first time."[451] In 2011 and 2012, the core population estimates were 1,846 and 1,718, respectively.[452]

The Desolation/Gray Canyons population in the Green River has also not met the population-size downlist criterion, and was observed to be "trending downward" based on 2006-2007 population estimates.[453] This trend has been attributed to "increased nonnative fish abundance and habitat changes associated with dry weather and low river flows."[454] The 2014 estimate is 1,863 adults, substantially below the 2,100-adults recovery criterion.[455]

These declining population numbers are new baseline conditions, such that the endangered fish could be more vulnerable to water depletion and other oil and gas development effects than previously assumed. These downward trends also strongly suggest that the Endangered Fish Recovery Program is not achieving recovery targets nor adequately offsetting water depletion effects as intended.

---

[445] *See* USFWS, Monitoring the Colorado Pikeminnow Population in the Mainstem Colorado River via Periodic Population Estimates, 3 (Nov. 2015), available at http://www.coloradoriverrecovery.org/documents-publications/work-plan-documents/arpts/2015/rsch/127.pdf (attached as Exhibit 259) (showing similar capture rates of pikeminnow in 2014 and 2015).
[446] Sufficient Progress Assessment at 7 (attached as Exhibit 244).
[447] *Id.*
[448] *Id.* at 8.
[449] *Id.* at 36.
[450] *Id.* at 13.
[451] *Id.*
[452] *Id.* at 13-14.
[453] *Id.* at 12.
[454] *Id.* at 23.
[455] *Id.* at 12.

BLM_0078008

**6.      The Recovery Program Is Failing to Meet Recommended Flows.**

A consistent pattern of failing to meet recommended flows in the Colorado River's 15-Mile Reach requires BLM and the Service to reinitiate consultation over the Fluid Mineral Program.

The Recovery Program establishes minimum recommended flows within various segments of the Upper Colorado River Basin that should be maintained to ensure recovery of the endangered fish.[456] The PBO's effects analysis assumes that, at the very least, the minimum recommended flow of 810 cubic feet per second (cfs) for dry years will be maintained within the 15-Mile Reach of the Colorado River within Colorado's Grand Valley in the Grand Junction Field Office.[457] The 15-Mile Reach extends from the confluence of the Gunnison River in Grand Junction to Palisade, Colorado, fifteen miles upstream.[458] According to the Service, when flows drop below 810 cfs, "habitat becomes compromised to the point that adult pikeminnow likely vacate the 15-Mile Reach to points downstream where flows increase either due to tributary input from the Gunnison River or irrigation return flow."[459] The 15-Mile Reach is one of the most important habitats to the Colorado pikeminnow and razorback sucker,[460] providing important spawning grounds for both species and year-round habitat for the Colorado pikeminnow.[461]

In its discussion of the environmental baseline, the Fluid Mineral PBO notes various recommended flows for the Colorado River sub-basins, including minimum flows for wet years, wet-average years, dry-average years, and dry years.[462] The PBO notes that in some recent years, recommended flows have not been met in the 15-Mile Reach.[463] However, the PBO's effects

---

[456] *See id.* at 41; USFWS, Final Programmatic Biological Opinion for Bureau of Reclamation's Operations and Depletions, Other Depletions, and Funding and Implementation of Recovery Program Actions in the Upper Colorado River above the Confluence with the Gunnison River, 54 (Dec. 1999) ("Colorado River PBO"), available at http://www.coloradoriverrecovery.org/documents-publications/section-7-consultation/15mile/FinalPBO.pdf (attached as Exhibit 260).

[457] PBO at 42, 48.

[458] PBO at 4.

[459] *See* Sufficient Progress Assessment at 34-35 (attached as Exhibit 244); Osmundson, Douglas B. & Patrick Nelson, USFWS, Relationships Between Flow and Rare Fish Habitat in the '15 Mile Reach' of the Upper Colorado River Final Report, 6 (1995), available at http://www.coloradoriverrecovery.org/documents-publications/technical-reports/isf/OsmundsonNelson1995.pdf (attached as Exhibit 261) ("Osmundson 1995").

[460] PBO at 36, 42; Colorado River PBO at 25, 32, 45 (attached as Exhibit 260); Osmundson 1995 at 6.

[461] PBO at 36; Colorado River PBO at 31-32.

[462] PBO at 41-44.

[463] *See id.* at 42-44 (e.g., "Since the publication of the spring flow recommendations in 1991, peak 1-day average flows through the 15-mile reach have been below 12,900 cfs approximately one-third of the years through 2006 and these targets have not been met."); *id.* at 42 ("Mean

analysis assumes that the lowest recommended flow for dry years (810 cfs) will be maintained; this minimum flow is the baseline by which the PBO determined the Fluid Mineral Program's depletion effects on the Colorado pikeminnow.[464]

The Endangered Fish Recovery Program's latest Sufficient Progress Assessment indicates that recommended flows for dry years in the 15-Mile Reach of the Colorado River were not met in 2012 and 2013.[465] Flows also fell short of recommended levels in 2015, despite it being a dry-average precipitation year. In April, May, August and October 2015, the 15-Mile Reach missed the recommended minimum average flows for those months for dry-average precipitation years.[466] This average year shortfall (following a "wet-average" year) strongly suggests that minimum recommended flows for later dry years will almost certainly not be met when water will be scarcer, and as declining stream flows overall due to climate change weaken the Recovery Program's ability to supplement natural flows in dry years.[467] Indeed, in the period since the PBO was adopted, between 2009 and 2015, the Recovery Program has failed to meet mean monthly recommended flows in the 15-Mile Reach in over half of all months.[468] This new information strongly suggests that critical habitat within the 15-Mile Reach is likely to be unsuitable for the Colorado pikeminnow and razorback sucker in dry years, and that flow depletions from oil and gas development will only exacerbate these unsuitable conditions and reduce these species' chances of recovery.

The Recovery Program's continuing pattern of failing to meet recommended flows is new information revealing that the Fluid Mineral Program may have effects on the endangered fish to an extent that was not considered in the PBO or in the Uncompahgre RMP DEIS, and requires reinitiation of consultation over the Fluid Mineral Program or more specifically to the Uncompahgre RMP DEIS.

### D. The UFO Failed to Sufficiently Consider Traffic Impacts That Will Result from Increased Oil and Gas Development.

The UFO's NEPA analyses must include analysis of impacts from increases in vehicle traffic that development authorized under the RMP/EIS would induce. For example, cases have required NEPA analyses of proposed casino projects to include impacts of increases in vehicle

---

monthly flows have…dropped below 810 cfs [the minimum flow for drought years] for at least one of the summer-time months during 7 of the last 17 years (1991-2007).").

[464] *Id.* at 48.

[465] *See* Sufficient Progress Assessment at 34 (attached as Exhibit 244) (noting average monthly flows significantly below 810 cfs in 15-mile reach in 2012 and 2013); *id.* at 31 (recognizing need to reduce the amount of time flows drop below 810 cfs in the 15-Mile Reach).

[466] *Compare* Colorado River PBO at 40-41 (recommended mean monthly stream flows for 15-Mile Reach) *with* Exhibit 262 & Email from Tom Chart, FWS, Director, Upper Colorado River Endangered Fish Recovery Program to Wendy Park (July 15, 2016) (attached as Exhibit 263) (chart indicating dry, average, and wet precipitation years).

[467] *See* n. 415 above & accompanying text (noting ability to buffer Colorado River system will become more difficult as streamflows decrease).

[468] *See* Exhibit 264 (spreadsheet showing 15-Mile Reach flows and months with shortfall).

BLM_0078010

traffic the projects would induce. *See Michigan Gambling Opposition v. Kempthorne*, 525 F.3d 23, 29 (D.C. Cir. 2008); *Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 863 (D.C. Cir. 2006).

As noted above, fracking requires huge amounts of water, and consequently a great number of tanker truck trips to transport this water and chemicals to the site and to transport waste from the site. *See* EIS at 4-28 (noting that all alternatives assume that 100 percent of drilling/completion fluids are delivered and disposed of by truck, and 100 percent of produced water and condensate is disposed of by truck). Given that fracking can require thousands of round trips by heavy trucks when developing each well – the impacts of which are compounded exponentially for development of an entire oil and gas field – it is clear that this heavy industrial transport activity will result in dramatic impacts. However, the RMP/EIS underestimates truck traffic and provides an understated and cursory analysis of its impacts, which fails to satisfy the agency's NEPA obligations.

Specifically, the RMP/EIS fails to undertake a substantive analysis of the impacts from oil and gas related traffic. The RMP/EIS acknowledges that oil and gas development will result in increased traffic, *see e.g.,* EIS at 3-206, 4-478. However, the RMP/EIS makes no effort to take a meaningful look at the effects from this significant rise in traffic, merely mentioning generalized impacts from delays, dust, road degradation, and increased vehicle safety concerns as potential negative impacts to the area. *Id.* This type of cursory analysis fails to satisfy the UFO's hard look obligations.

Absent from the RMP/EIS, for example, is any attempt by the agency to estimate increased maintenance demands, consider safety costs for increased roadway use, increased traffic accidents and associated medical impacts and burdens on local hospitals, burdens on first responders and the criminal justice system, or to even project where or how many miles of access roads will be constructed. Moreover, while the RMP/EIS calculates projected emissions caused by oil and gas related traffic, *see* Emission Inventory Technical Support Document Appendix A at A-5, the RMP/EIS underestimates the number of truck trips needed per well associated with the more water-intensive techniques necessary for hydraulic fracturing.

A recent and comprehensive 2013 study by Boulder County, Colorado of the impacts of fracking-related truck traffic (hereafter "Boulder Study"), concluded that the hydraulic fracturing process for a single well would require an average of 1,400 one-way truck trips just to haul water to and from the site. *See* Boulder Study at 8. Using national data, the study also finds that taking into account the full development process (construction, drilling, and completion), the average fracked well requires 2,206 one-way truck trips. *Id.* at 10. This figure does not include production phase trips, which could add an additional 730 truck trips per year depending on various factors including the success of the well and whether it is re-fracked. *Id.*

The Boulder Study serves as an example of what BLM should analyze in its EIS. The Study uses this trip generation data to analyze the impacts of oil and gas development on the county's roadway system and, ultimately, to quantify these impacts in terms of maintenance and safety costs. *Id.* at 4. To establish a baseline, the Study inventoried current roadways including surface conditions, traffic volumes, and shoulder widths. In addition to the number of truck trips,

BLM_0078011

the Study also examined the vehicle classification, load, origin, and destination of the trips. Finally, road deterioration and safety costs are calculated under three development scenarios, resulting in an average cost of $36,800 per well over 16 years. *Id.* at 55. The Boulder Study is just one example of the type of quantitative analysis of oil and gas related traffic that can be completed with currently available information.

### E. The UFO Failed to Consider the Impacts of Unregulated Pipelines.

Furthermore, the BLM did not consult agencies with pipeline safety jurisdiction and did not consider the environmental, public safety, and human health impacts associated with a web of unregulated gas gathering pipelines. EIS 5-5. Rural gas gathering pipelines are exempt from federal pipeline safety regulations and therefore state regulation. 49 CFR § 192. Unregulated gas gathering pipelines are at higher risk of failure than regulated pipelines. *See* PHMSA Notice of Proposed Rulemaking on Gas Transmission and Gathering Lines 68 Fed. Reg. 20728 (April 8, 2016) (amending 49 CFR Parts 191 and 192).

BLM failed to consider the following in its risk analysis:

1. The lack of risk management regulations to ensure public safety when it comes to rural gas gathering pipelines.
   a. Under current federal and state regulations, the BLM and oil and gas operators have no way of assuring the public that rural gas gathering pipelines will be properly constructed to prevent risks of failure. Regulatory agencies do not have specific knowledge of the construction of rural gas gathering pipelines because they are largely non-jurisdictional to federal and state oversight.[469]
   b. Under current federal and state regulations, oil and gas operators do not have an obligation to disclose incremental failures that may occur or may have occurred on unregulated gas gathering pipelines. All oil and gas operators are only required to report gas leaks that necessitate evacuation of people or closure of a public road, or result in a defined incident.[470]
   c. Non jurisdictional pipeline operators are not required to take all practicable measures to protect pipelines from "washouts, floods, unstable soil, landslides, or other hazards that may cause the pipeline to move or to sustain abnormal loads."[471] While Colorado pipeline safety regulators expect "that an operator be able to demonstrate through appropriate documentation that it has addressed its obligations under §192.317... which would include addressing all potential geologic hazards," this is not guaranteed. BLM has not demonstrated that it has taken geologic hazards into consideration from a pipeline safety perspective.
   d. The Pipeline Hazardous Materials and Safety Administration (PHMSA) has exclusive jurisdiction over pipeline safety. Interstate pipelines are delegated to the states via an interagency agreement with PHMSA called a "certification

---

[469] *See* Letter from Joe Molloy, Section Chief, COPUC Pipeline Safety Program, to Natasha Leger (October 17, 2016) (attached as Exhibit 305) ("Molloy Letter").

[470] *Id.*

[471] *See id*; 49 CFR 192.317.

BLM_0078012

agreement."[472]  While BLM consulted the Colorado Oil and Gas Conservation Commission (COGCC) on this draft RMP, COGCC does not have jurisdiction over gas gathering pipelines.

    e.  In the current regulatory environment, state and federal pipeline safety inspectors do not specifically keep records on jurisdictional pipeline operator's contractors. Instead, it is expected that the operators themselves have records regarding work performed on the pipeline by contractors so that they have an adequate ability to trace and remedy any issues associated with the contractor's work. Therefore neither BLM, COGCC, nor the state and federal pipeline safety inspectors have visibility into the qualification of contractors or whether the actual work performed was adequate.[473] In addition, existing federal pipeline safety rules do not address or require accurate mapping of gas gathering pipelines. "Due to the sheer mileage of active pipeline in the United States, regulatory agencies rarely keep detailed operator maps."[474]

2.   The risks to public safety from unregulated rural gas gathering pipelines.

    a.  The BLM did not consider the cumulative impact and environmental risk of a projected 1,271 miles of unregulated gas gathering pipelines based on their estimated 1271 wells for the planning area.[475] This estimate of gas gathering pipeline mileage assumes 1 mile of gathering pipeline per well, a conservative estimate compared to 1.65 miles of gathering pipeline in the Marcellus Shale region.[476] In addition, because the BLM's oil and gas assumptions are based on conventional, not unconventional oil and gas development through hydraulic fracturing and multiwell drilling technologies, these estimates may be significantly underestimated.[477]

    b.  BLM did not consider the impact of extreme weather causing flooding, mudslides and geological instability, which can compromise the integrity of pipelines and result in leaks and potential explosions. The nation's pipeline system faces a greater risk from failure due to extreme weather events such as hurricanes, floods, mudslides, tornadoes, and earthquakes.

        i.  A 2011 crude oil spill into the Yellowstone River near Laurel, MT, was caused by channel migration and river bottom scour, leaving a large span of pipeline exposed to prolonged current forces and debris washing

---

[472] *A Regulatory Review of Liquid and Natural Gas Pipelines in Colorado* at 4 (December 2014) (attached as Exhibit 306).

[473] Molloy Letter at 6.

[474] Molloy Letter at 7.

[475] RMP/EIS 4-2; *Reasonable Forseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office, Colorado, Final Report* at 61 (February 16, 2012) ("UFO RFD") (attached as Exhibit 40).

[476] Nels Johnson, Tamara Gagnolet, Rachel Ralls, and Jessica Stevens, *Natural Gas Pipelines:Excerpt from Report 2 of the Pennsylvania Energy Impacts Assessment* at 3 (December 16, 2011) (attached as Exhibit 307).

[477] RMP/EIS 4-2; UFO RFD at 61 (attached as Exhibit 40).

BLM_0078013

downstream in the river. Those external forces damaged the exposed pipeline.

ii. In October 1994, flooding along the San Jacinto River led to the failure of eight hazardous liquid pipelines and also undermined a number of other pipelines. The escaping products were ignited, leading to smoke inhalation and burn injuries of 547 people.

iii. From 2003 to 2013, there were 85 reportable incidents in which storms or other severe natural force conditions damaged pipelines and resulted in their failure. Operators reported total damages of over $104M from these incidents.

iv. PHMSA has issued several Advisory Bulletins to operators warning about extreme weather events and the consequences of flooding events, including river scour and river channel migration.[478]

c. BLM did not consider the pipeline safety impacts on hikers, campers, hunters, and anglers utilizing the public lands for recreation purposes. On August 19, 2000, a 30-inch-diameter gas transmission pipeline ruptured adjacent to the Pecos River near Carlsbad, NM. The released gas ignited and burned for 55 minutes. Twelve persons who were camping under a concrete-decked steel bridge that supported the pipeline across the river were killed, and their vehicles were destroyed. Two nearby steel suspension bridges for gas pipelines crossing the river were damaged extensively.[479]

d. BLM did not consider forest fire risks from pipeline explosions. On December 11, 2012, a 20-inch-diameter gas transmission line ruptured in a sparsely populated area about 106 feet west of Interstate 77 (I-77) in Sissonville, West Virginia. An area of fire damage about 820 feet wide extended nearly 1,100 feet along the pipeline right-of-way. Three houses were destroyed by the fire, and several other houses were damaged. Reported losses, repairs, and upgrades from this incident totaled over $8.5 million, and major transportation delays occurred. I-77 was closed in both directions because of the fire and resulting damage to the road surface. The northbound lanes were closed for about 14 hours, and the southbound lanes were closed for about 19 hours while the road was resurfaced, causing delays to both travelers and commercial shipping.[480]

e. BLM did not consider lack of pipeline safety inspections. The National Association of Pipeline Safety Representatives, an association representing state pipeline safety officials, produced a compendium of state pipeline regulations showing that most states with delegated authority from PHMSA to conduct intrastate inspections do not have expanded regulations that cover increased

---

[478] *See* Notice of Proposed Rulemaking on Gas Transmission and Gathering Lines, 68 Fed. Reg. 20728 (April 8, 2016) (amending 49 CFR Parts 191 and 192).
[479] *Id.* at 20730.
[480] *Id.* at 20728.

BLM_0078014

oversight of gathering companies building gathering pipelines in rural areas are generally not subject to inspection and do not have to report the location and characteristics of much of the gathering pipelines being installed.[481]

f.    BLM did not consider the risks associated with undisclosed incremental pipeline failures on wildlife, ground water and surface water contamination, grazing cattle, human health, and uptake of oil and gas chemicals by crops.

In this regard the BLM again has not taken a "hard look" at the subject, and given the lack of regulatory oversight in this area it is incumbent upon BLM to explain how it would ensure animal, human, and environmental safety from unregulated pipelines. 40 C.F.R. § 1502.22.

In addition, the RMP/EIS is unclear on whether or what pipelines will be required, whether they would be limited in what they transport, how many barrels per day they would transport, and how much truck traffic this would displace (if any, since the pipelines ultimately are transferring product to trucks). There are no specific estimates of how many pipelines will be constructed, how many miles of pipe will be laid, what their diameter would be, how many water-bodies they would cross, or where they will be located. In this regard the BLM again has not taken a "hard look" at the subject, and if this information is not available it is incumbent upon BLM to explain what would be required to obtain it and why it cannot collect the information. 40 C.F.R. § 1502.22.

Reducing truck traffic through the installation of pipelines introduces different impacts to the environment, but the RMP/EIS provides no treatment of these impacts. Further, while the RMP/EIS acknowledges the potential for contamination of soils, surface water, and groundwater as a result of spills, *see, e.g.,* DEIS at 4-83, there is no discussion of possible spill volumes or consideration of various spill scenarios.

### F.    The BLM Failed to Take a Hard Look at Impacts to Human Health.

As introduced above, emissions from oil and gas development are not limited only to the combustion stage but, rather, occur throughout the chain of production. These emissions not only impact the critical resource values of the UFO – as detailed throughout these Comments – but also can result in serious harm to human health. BLM must fully consider the potential human health impacts that may be caused by oil and gas operations approved under the UFO RMP, as required by NEPA.[482] Congress stated that "…it is the continuing responsibility of the Federal Government to use all practicable means…to attain the widest range of beneficial uses of the environment **without degradation, risk to health or safety**, or other undesirable and unintended consequences…" 42 U.S.C. § 4331 (emphasis added). NEPA implementing regulations direct agencies to consider "the degree to which the proposed action affects public health or safety." 40

---

[481] *See* GAO Report, *Oil and Gas Transportation: Department of Transportation Is Taking Actions To Address Rail Safety, But Additional Actions Are Needed To Improve Pipeline Safety* (August 2014) at 27 (attached as Exhibit 308).

[482] *See* North Fork Resident Declarations (attached as Exhibit 300); Photos (attached as Exhibits 314-322).

BLM_0078015

C.F.R. § 1508.27(b). These regulations also state: "Federal agencies shall to the fullest extent possible…. Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment." 40 C.F.R. § 1500.2(f). The UFO has failed to sufficiently address and analyze these impacts to human health in the RMP/EIS.

The implementation of methane waste mitigation technologies, as discussed above, can not only help spur economic benefit, but can also allay some of the harmful health effects of oil and gas development by reducing emissions of NOX, VOCs and other criteria pollutants. Aside from the direct health impacts of these emissions,[483] they can also result in significant increases in ground-level ozone (i.e., ozone precursors), and, consequently, can have a dramatic impact on human health.[484] For example, ozone has been shown to decrease lung function – particularly in adolescents and young adults – as well as increase the risk of death from respiratory causes.[485]

According to the EPA, the oil and gas industry is "the largest industrial source of emissions of volatile organic compounds (VOCs), a group of chemicals that contribute to the formation of ground-level ozone (smog)."[486] Moreover, "[e]xposure to ozone is linked to a wide range of health effects, including aggravated asthma, increased emergency room visits and hospital admissions, and premature death."[487] The oil and natural gas industry is also "a significant source of emission of methane," as well as an emitter of "air toxics such as benzene, ethylbenzene, and n-hexane," which are "pollutants known, or suspected of causing cancer and

---

[483] *See, e.g.,* Colorado Department of Public Health and Environment, *2010 Air Quality Data Report* (2010) (attached as Exhibit 265).

[484] *See, e.g.,* GAO Report, *Oil and Gas: Information on Shale Resources, Development, and Environmental and Public Health Risks* (Sept. 2012) (attached as Exhibit 266); GAO Report, *Unconventional Oil and Gas Development: Key Environmental and Public Health Requirements* (Sept. 2012) (attached as Exhibit 267); Earthworks, *Natural Gas Flowback: How the Texas Natural Gas Boom Affects Health and Safety* (April 2012) (attached as Exhibit 268); Green River Alliance, *Healthy Air Questionnaire Final Report: Clean Air and Healthy Communities* (2011) (attached as Exhibit 269); Lisa McKenzie, Ph.D., et. al., *Human health and risk assessment of air emissions from development of unconventional natural gas resources* (Feb. 2012) (attached as Exhibit 270); Lisa McKenzie, Ph.D., Testimony on: *Federal Regulation: Economic, job, and energy security implications of federal hydraulic fracturing regulation*, May 2, 2012 (attached as Exhibit 271); Earthworks, *Gas Patch Roulette: How Shale Gas Development Risks Public Health in Pennsylvania*, October 2012 (attached as Exhibit 272).

[485] *See* Ira B. Tager, et. al., *Chronic Exposure to Ambient Ozone and Lung Function in Young Adults*, EPIDEMIOLOGY, Vol. 16, No. 6 (Nov. 2005) (attached as Exhibit 273); Michael Jerrett, Ph.D., et. al., *Long-Term Ozone Exposure and Mortality*, THE NEW ENGLAND JOURNAL OF MEDICINE, 360: 1085-95 (2009) (attached as Exhibit 274).

[486] EPA, *Oil and Natural Gas Pollution Standards: Basic Information, Emissions from the Oil & Natural Gas Industry* (2011), available at: http://www.epa.gov/airquality/oilandgas/basic.html; *see also* Cally Carswell, *Cracking the ozone code – Utah's gas fields*, HIGH COUNTRY NEWS, Sept. 4, 2012 (attached as Exhibit 275).

[487] *See id.*, EPA, *Pollution Standards*.

BLM_0078016

other serious health effects."[488] The EPA reports that the oil and gas industry:

> emits 2.2 million tons of VOCs, 130,000 tons of air toxics, and 16 million tons of greenhouse gases (methane) each year (40% of all methane emission in the U.S.). The industry is one of the largest sources of VOCs and sulfur dioxide emissions in the United States.[489]

The rapid development of high volume/horizontal drilling in conjunction with hydraulic fracturing has driven expansion of new sources resulting in increased emissions – a change that requires consideration in the UFO's RMP analysis.

Many of the impacts to human health have already been documented in communities subject to industrial scale oil and gas development. Of particular note, attached information from North Fork Valley residents describes health impacts and concerns about oil and gas development in their region.[490]

Additionally, in other nearby communities such as Garfield County, Colorado, residents have experienced health effects they believe to be caused from oil and gas development. "Community concerns range from mild complaints such as dizziness, nausea, respiratory problems, and eye and skin irritation to more severe concerns including cancer."[491] Additionally, the community has "environmental concerns related to noise, odors, dust, and 'toxic' chemicals in water and air."[492] After a thorough review of ambient air data across Garfield County, ATSDR determined that, "considering both theoretical cancer risks as well as non-cancer health effects and the uncertainties associated with the available data, it is concluded that the exposures to air pollution in Garfield County pose an indeterminate public health hazard for current exposures."[493] ATSDR further provided that "estimated theoretical cancer risks and non-cancer hazards for benzene [in the community], which is within the oil and gas development area, appear significantly higher than those in typical urban and rural area, causing some potential concern," and later concluded that "[t]hese elevated levels are an indicator of the increased potential for health effects related to benzene exposure … in the oil and gas development area.[494]

---

[488] *Id.*

[489] Letter from American Lung Association, American Public Health Association, American Thoracic Society, Asthma and Allergy Foundation of America, and Trust for America's Health to Lisa Jackson, Administrator, U.S. Environmental Protection Agency (Nov. 30, 2011), at 4 (attached as Exhibit 276).

[490] *See* North Fork Resident Declarations (attached as Exhibit 300).

[491] U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR"), *Health Consultation: Garfield County, Public Health Implications of Ambient Air Exposures to Volatile Organic Compounds as Measured in Rural, Urban, and Oil & Gas Development Areas* (2008), at 1 (attached as Exhibit 277).

[492] *Id.*

[493] *Id.*

[494] *Id.*

BLM_0078017

Unfortunately, impacts to human health are not limited only to natural shale gas emissions, but can result from exposure to chemicals necessary for gas extraction – namely, the hundreds of chemicals used in hydraulic fracturing.[495] Indeed, "[b]etween 2005 and 2009, the 14 oil and gas service companies [analyzed by Congress] used more than 2,500 hydraulic fracturing products containing 750 chemicals and other components. Overall, these companies used 780 million gallons of hydraulic fracturing products – not including water added at the well site – between 2005 and 2009."[496] Chemical components include BTEX compounds – benzene, toluene, xylene, and ethylbenzene – which are hazardous air pollutants and known human carcinogens. The UFO has failed to sufficiently consider the human health impacts associated with these extractive practices in the RMP and DEIS.

Leading doctors and scientists studying these issues recognize the unknown risks inherent to fracking. "We don't know the chemicals that are involved, really; we sort of generally know," Vikas Kapil, chief medical officer at National Center for Environmental Health, part of the U.S. Centers for Disease Control and Prevention, said at a conference on hydraulic fracturing.[497] "We don't have a great handle on the toxicology of fracking chemicals."[498]

The Endocrine Disruption Exchange ("TEDX") has, however, documented nearly 1,000 products and chemicals that energy companies use in drilling, fracturing ("frac'ing," "fracking," or "stimulation"), recovery and delivery of natural gas. Many of these products contain chemicals that are harmful to human health. On its website, TEDX says this:

> To facilitate the release of natural gas after drilling, approximately a million or more gallons of fluids, loaded with toxic chemicals, are injected underground under high pressure. This process, called fracturing (frac'ing or stimulation), uses diesel-powered heavy equipment that runs continuously during the operation. One well can be frac'ed 10 or more times and there can be up to 28 wells on one well pad. An estimated 30% to 70% of the frac'ing fluid will resurface, bringing back with it toxic substances that are

---

[495] *See* Theo Colborn, et. al., *Comments to the Bureau of Land Management, Uncompahgre Field Office*, THE ENDOCRINE DISRUPTION EXCHANGE, April 20, 2012 (attached as Exhibit 278); Theo Colborn, et. al., *Natural Gas Operations from a Public Health Perspective*, HUMAN AND ECOLOGICAL RISK ASSESSMENT, 17: 1039-1056 (2011) (attached as Exhibit 279).

[496] U.S. CONGRESS, HOUSE OF REPRESENTATIVES (attached above as Exhibit 171).

[497] Alex Wayne, *Fracking Moratorium Urged by U.S. Doctors Until Health Studies Conducted*, BLOOMBERG NEWS, January 9, 2012, available at: http://www.bloomberg.com/news/2012-01-09/fracking-moratorium-urged-by-u-s-doctors-until-health-studies-conducted.html; *see also* American Nurses Association 2012 House of Delegates, *Resolution: Nurses' Role in Recognizing, Educating and Advocating for Healthy Energy Choices*, available at: http://www.nursingworld.org/MainMenuCategories/WorkplaceSafety/Healthy-Work-Environment/Environmental-Health/nurses-role-in-recognizing-educating-advocating-healthy-energy-choices.pdf (attached as Exhibit 328).

[498] *Id.*

BLM_0078018

naturally present in underground oil and gas deposits, as well as the chemicals used in the frac'ing fluid. Under some circumstances, nothing is recovered.[499]

According to TEDX:

> In the 980 products identified…[for use during natural gas operations], there were a total of 649 chemicals. Specific chemical names and CAS numbers could not be determined for 286 (44%) of the chemicals, therefore, the health effects summary is based on the remaining 362 chemicals with CAS numbers…Over 78% of the chemicals are associated with skin, eye or sensory organ effects, respiratory effects, and gastrointestinal or liver effects. The brain and nervous system can be harmed by 55% of the chemicals. These four health effect categories…are likely to appear immediately or soon after exposure. They include symptoms such as burning eyes, rashes, coughs, sore throats, asthma-like effects, nausea, vomiting, headaches, dizziness, tremors, and convulsions. Other effects, including cancer, organ damage, and harm to the endocrine system, may not appear for months or years later. Between 22% and 47% of the chemicals were associated with these possibly longer-term health effects. Forty-eight percent of the chemicals have health effects in the category labeled 'Other.' The 'Other' category includes such effects as changes in weight, or effects on teeth or bones, for example, *but the most often cited effect in this category is the ability of the chemical to cause death.*[500] (emphasis added)

Christopher Portier, director of the CDC's National Center for Environmental Health and Agency for Toxic Substances and Disease Registry further provided that "additional studies should examine whether wastewater from wells can harm people or the animals and vegetables they eat."[501] "We do not have enough information to say with certainty whether shale gas drilling poses a threat to public health."[502]

Indeed, a new study demonstrates that animals, especially livestock, are sensitive to the contaminants released into the environment by drilling and by its cumulative impacts.[503] Because animals often are exposed continually to air, soil, and groundwater and have more frequent reproductive cycles, animals can be used to monitor potential impacts to human health – they are natural shale gas drilling's "canary in the coalmine." The study evaluated all available fracking-related reports on sick or dying animals. Although secrecy surrounds the fracking

---

[499] *See* TEDX webpage describing "Chemicals in Natural Gas Operations," available at: http://endocrinedisruption.org/chemicals-in-natural-gas-operations/introduction.

[500] TEDX, *Chemicals In Natural Gas Operations.*

[501] Alex Wayne and Katarzyna Klimasinska, *Health Effects of Fracking for Natural Gas Need Study, Says CDC Scientist*, BLOOMBERG NEWS, January 4, 2012, available at: http://www.bloomberg.com/news/2012-01-04/health-effects-of-fracking-for-natural-gas-need-study-says-cdc-scientist.html.

[502] *Id.*

[503] Michelle Bamberger and Robert E. Oswald, *Impacts of Gas Drilling on Human and Animal Health*, NEW SOLUTIONS, VOL. 22(1) 51-77 (2012) (attached as Exhibit 280).

BLM_0078019

industry, "a few 'natural experiments' have provided powerful evidence that fracking can harm animals."[504]  For example:

> Two cases involving beef cattle farms inadvertently provided control and experimental groups.  In one case, a creek into which wastewater was allegedly dumped was the source of water for 60 head, with the remaining 36 head in the herd kept in other pastures without access to the creek. Of the 60 head that were exposed to the creek water, 21 died and 16 failed to produce calves the following spring. Of the 36 that were not exposed, no health problems were observed, and only one cow failed to breed. At another farm, 140 head were exposed when the liner of a wastewater impoundment was allegedly slit, as reported by the farmer, and the fluid drained into the pasture and the pond used as a source of water for the cows. Of those 140 head exposed to the wastewater, approximately 70 died and there was a high incidence of stillborn and stunted calves. The remainder of the herd (60 head) was held in another pasture and did not have access to the wastewater; they showed no health or growth problems. These cases approach the design of a controlled experiment, and strongly implicate wastewater exposure in the death, failure to breed, and reduced growth rate of cattle.[505]

The health problems and uncertainties that proliferate in communities where oil and gas development takes place warrants the further collection of data and research, as contemplated under NEPA, before such development can be made possible through the authorization of development through the UFO RMP. NEPA requires a hard look at these impacts.

### 1.        The UFO Must Conduct a Health Impact Assessment.

BLM did not conduct a health impact assessment, or equivalent analysis, and, as a result, the agency's RMP/EIS does not satisfy NEPA and its implementing regulations.

NEPA requires that the BLM employ at least the same level of effort to analyze human health impacts as it does to promote industry's interest in development when preparing the RFD and associated analyses regarding projected drilling levels.

A health impact assessment ("HIA") or equivalent analysis would fulfill the regulations governing NEPA, to examine human health impacts "to the fullest extent possible." A HIA would be forward-looking and attempt to identify all of the potential direct, indirect, and cumulative links between a proposed activity and the health and well-being of affected communities, and to develop mitigation measures to minimize harms and maximize benefits. The RMP does not does not include this type of analysis of human health impacts.

---

[504] *See* Peter Montague, *Why Fracking and Other Disasters Are So Hard to Stop*, HUFFINGTON POST, Jan. 20, 2012, available at: http://www.huffingtonpost.com/peter-montague/why-fracking-and-other-di_b_1218889.html (last visited Oct. 29, 2016).
[505] *See* Bamberger at 60 (attached above as Exhibit 280).

BLM_0078020

The U.S. EPA has posted on its website an excellent document on the utility of an HIA as part of the NEPA analysis of federal agencies where public health impacts are at issue.[506] HIA "provides a systematic process and methodology to anticipate and proactively address the potential health consequences of a program or policy in order to maximize the potential benefits and minimize adverse outcomes."[507] Steps in the HIA process include:

1. Screening: Determines whether an HIA is necessary, and whether it is likely to be useful.
2. Scoping: Establish the population to which the HIA applies, the scope of health problems to be analyzed, the HIA team, methods to be used in the assessment, and data sources.
3. Assessment: describe the baseline health status and determinants of health in the population and assess likely impacts through a literature review and qualitative or quantitative analysis.
4. Decision and recommendations to minimize adverse impacts and maximize benefits.
5. Monitoring and reassessment plan: select a set of outcomes likely to be sensitive/accurate indicators of the changes predicted, such as health outcomes and develop a plan to monitor and then reassess if needed.

The BLM did not conduct these steps, and did not analyze the impacts to the population within the planning area, considering how many people might be exposed to health impacts, analyze where development would take place relative to water sources or residences, or assess the likely impacts to the actual population in the area, including particularly vulnerable populations. It also omitted significant potential impacts. For example, the agency did not include any potential impacts from vehicle accidents or other safety issues, or the illness caused by the stress and mental anguish associated with living near intensive oil and gas development.

According to the U.S. Centers for Disease Control, "HIA can be used to evaluate objectively the potential health effects of a project or policy before it is built or implemented. It can provide recommendations to increase positive health outcomes and minimize adverse health outcomes. A major benefit of the HIA process is that it brings public health issues to the attention of persons who make decisions about areas that fall outside of traditional public health arenas, such as transportation or land use."[508]

BLM's section examining health effects, EIS at 4-444 to -451, is cursory, states the obvious, provides only comparative assessments between alternatives, and does not quantify harms. For example, the brief discussion of Alternative D (the agency preferred alternative)

---

[506] *See* EPA, Human Impact Partners, *Frequently Asked Questions About Integrating Health Impact Assessment into Environmental Impact Statement*, available at: http://www.epa.gov/region9/nepa/PortsHIA/pdfs/FAQIntegratingHIA-EIA.pdf (attached as Exhibit 281).

[507] *See* Aaron Wernham, *Inupiat Health and Proposed Alaskan Oil Development: Results of the First Integrated Health Impact Assessment/Environmental Impact Statement for Proposed Oil Development on Alaska's North Slope*, ECOHEALTH, 2007 (attached as Exhibit 282).

[508] Centers for Disease Control, *Health Impact Assessment*, available at: http://www.cdc.gov/healthyplaces/hia.htm (attached as Exhibit 283).

BLM_0078021

states, regarding air quality, that impacts will be the same as under Alternative C, but at a slightly reduced level. EIS at 4-450. In turn, Alternative C merely provides that "[t]his alternative would have the greatest potential to contribute to volatile organic compounds and local increases in hazardous air pollutants and associated risks to human health." *Id.* at 4-449. Regarding air quality, BLM's only other generic observation, unconnected to any analysis of the specific alternatives at issue, is that "[m]anagement actions that maintain or move towards compliance with standards by limiting emissions from BLM managed or permitted activities would improve public health while those that allow for increased emissions and result in non-compliance with standards could impact public health." EIS at 4-445.

Further, no impacts to water resources from fracking are identified by BLM in its examination of health effects, which is unacceptable. Any later, site-specific analysis and application of mitigation measures is no substitute for analysis of impacts and development of alternatives and mitigation measures at the RMP/EIS level. Waiting for the approval of site-specific projects forecloses not only analysis of the true impacts of the agency action that is actually being proposed, but in so doing, forecloses the ability of BLM, other agencies, and the public to identify at an early stage the significant environmental issues that are deserving of study in this EIS. This RMP is a major point in the leasing decision-making process, requiring analysis of all of the impacts at this stage.

## 2.      Health data

In Colorado, symptoms reported in the state's inspection/incident database by residents living within a half mile of well development included headaches, nausea, upper respiratory irritation, and nosebleeds.[509] In Pennsylvania, the following symptoms were reported by over half the people living near gas development who responded to a health survey. They included fatigue (62%), nasal irritation (61%), throat irritation (60%), sinus problems (58%), burning eyes (53%), shortness of breath (52%), joint pain (52%), feeling weak and tired (52%), severe headaches (51%), and sleep disturbance (51%). The survey was completed by 108 individuals (in 55 households) in 14 counties across Pennsylvania.[510]

These and additional recent studies that were not considered by BLM include:

1.  Lisa M. McKenzie et al., *Birth Outcomes and Maternal Residential Proximity to Natural Gas Development in Rural Colorado,* Environmental Health Perspectives (April 2014) (attached above as Exhibit 157).

---

[509] Roxana Z. Witter, *et al., The Use of Health Impact Assessment for a Community Undergoing Natural Gas Development,* FRAMING HEALTH MATTERS (2013) (attached as Exhibit 284).
[510] Nadia Steinzor, *et al., Investigating links between shale gas development and health impacts through a community survey project in Pennsylvania,* NEW SOLUTIONS, vol. 23 iss. 1. (2013) (attached as Exhibit 285).

BLM_0078022

2. Jessica Gilman, *et al., Source signature of volatile organic compounds (VOCs) from oil and natural gas operations in northeastern Colorado*, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2013) (attached as Exhibit 286).

3. John L. Adgate, *et al., Potential Public Health Hazards, Exposures and Health Effects from Unconventional Natural Gas Development*, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2014) (attached as Exhibit 295).

4. Seth Shonkoff, *et al., Environmental Public Health Dimensions of Shale and Tight Gas Development*, ENVIRONMENTAL HEALTH PERSPECTIVES (2014) (attached as Exhibit 287).

5. Christopher W. Moore, *et al., Air Impacts of Increased Natural Gas Acquisition, Processing, and Use: A Critical Review*, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2014) (attached as Exhibit 288).

6. Avner Vengosh, *et al., The effects of shale gas exploration and hydraulic fracturing on the quality of water resources in the United States*, PROCEDIA EARTH AND PLANETARY SCIENCE (2014) (attached as Exhibit 289).

7. Christopher D. Kassotis, *et al., Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region*, Endocrinolgy (2014) (attached as Exhibit 176). (attached above as Exhibit 176).

8. Brian E. Fontenot, *et al., An Evaluation of Water Quality in Private Drinking Water Wells Near Natural Gas Extraction Sites in the Barnett Shale Formation*, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2013) (attached as Exhibit 290).

9. Sherilyn A. Gross, *et al., Analysis of BTEX Groundwater Concentrations from Surface Spills Associated with Hydraulic Fracturing Operations*, JOURNAL OF THE AIR & WASTE MANAGEMENT ASSOCIATION (2013) (attached as Exhibit 291).

10. K.D. Retzer, *et al., Motor vehicle fatalities among oil and gas extraction workers*, ACCIDENT ANALYSIS & PREVENTION (2013) (attached as Exhibit 292).

11. Eric J. Esswein, *et al, Occupational exposures to respirable crystalline silica during hydraulic fracturing*, JOURNAL OF OCCUPATIONAL AND ENVIRONMENTAL HYGIENE (2013) (attached as Exhibit 293).

12. R.Z. Witter, *et al., Occupational exposures in the oil and gas extraction industry: state of the science and research recommendations*, AMERICAN JOURNAL OF INDUSTRIAL MEDICINE (2014) (attached as Exhibit 294).

13. Physicians for Social Responsibility, *Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Oil and Gas Extraction)*, Third Edition (October 14, 2015), available at: http://www.psr.org/assets/pdfs/fracking-compendium.pdf (attached as Exhibit 326).

BLM_0078023

14. Gayathri Vaidyanathan, *Fracking Can Contaminate Drinking Water*, Climate Wire (April 4, 2016), available at: https://www.scientificamerican.com/article/fracking-can-contaminate-drinking-water/ (last visited November 1, 2016).

15. A. Austin, et al., *Associations Between Unconventional Natural Gas Development and Nasal and Sinus, Migraine Headache, and Fatigue Symptoms in Pennsylvania*, Environmental Health Perspectives (July 31, 2016), available at: http://ehp.niehs.nih.gov/wp-content/uploads/advpub/2016/8/EHP281.acco.pdf (attached as Exhibit 327).

EPA is also currently investigating the potential impacts of hydraulic fracturing on drinking water resources due to concerns about its potential environmental and human health impacts. Until such research is completed, there is insufficient information to fully understand the potential impacts on human health, an uncertainty that the BLM failed to take into consideration. The EPA is still in the process of completing this study. Nevertheless, the BLM ignored the uncertainty of the impacts of hydraulic fracturing on drinking water. BLM must consider these studies in any subsequently prepared NEPA document to ensure that it took the required hard look at health impacts.

### 3.      Cumulative impacts on human health

BLM must fully consider cumulative health impacts of different alternatives. Because the BLM will be leasing minerals located directly beneath and adjacent to private property, and because thousands of people live in close proximity to the industrial activity that will be permitted by the agency, BLM has the responsibility to consider potential impacts on human health from all development, and look at them cumulatively. For example, an individual exposed to both air and water pollution will have different health impacts than an individual exposed only to air pollution.

The assessment of cumulative impacts in NEPA documents is required by Council on Environmental Quality (CEQ) regulations. *See* 40 C.F.R. §1508.25 (Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act). Oil and gas development involves multiple sources of pollutants and disturbance caused by connected actions, including the operations of wellpads, trucks, wells, compressors, pipelines, tanks, pits, separators, dehydrators, rigs and more. Oil and gas development also includes hundreds of potential pollutants, both man-made and naturally occurring. When considered together, pollutants emitted with common timing and/or common geography may create additional health impacts that should be assessed. Also, oil and gas development may create health impacts from air pollution, water contamination, soil contamination, or a combination of all three. Due to the multiple variables and factors involved in oil and gas development, it is essential that the BLM ensure a health impact assessment that fully considers all cumulative impacts to comply with federal regulations and to appropriately assess health impacts and inform the public.

If the full cumulative health impacts are not considered by BLM at this stage it is unlikely that BLM would consider them adequately in connection with individual lease sales, or in

BLM_0078024

project-level and site-specific EAs. This type of shell game, whereby the agency avoids an analysis of the cumulative impacts of the entire project (in this case, 15,000 plus wells) is in contravention of NEPA. *See e.g. Blue Mountains Biodiversity Project v. U.S. Forest Service*, 161 F.3d 1208, 1215 (9th Cir. 2008).

### 4.    Ozone

As discussed in Section IV.A.3., above, background concentrations of ozone in the Uncompahgre RMP planning area are already at or exceed the National Ambient Air Quality Standards ("NAAQS"), leaving virtually no room for growth in emissions as contemplated by the Uncompahgre RMP. Several studies that measured and/or modeled natural gas related air emissions in various states have identified significant increases in ground level ozone as a result of natural gas development.[511] Ozone was once a summertime urban phenomenon but is now being seen increasingly in western rural areas during the winter due to the natural gas boom, so much so that some relatively small cities are no longer in compliance with the federal regulations that set allowable ozone levels.[512]

Ozone can cause difficulty breathing, coughing and sore throat. It can also inflame and damage the airways. It aggravates lung diseases like asthma, emphysema, and chronic bronchitis. It can make the lungs more susceptible to infection and it can continue to damage the lungs even when the symptoms have disappeared.[513]

Children are particularly vulnerable because their lungs are still developing until about age 18. As their lungs grow in the presence of ozone, their alveoli production is reduced, and they can end up with smaller, more brittle lungs. Women exposed during pregnancy deliver preterm, low birth weight babies with a high probability of developing asthma. In a letter to former EPA Administrator Lisa Jackson, a group of five national medical and public health groups wrote that the most vulnerable individuals, including children, teens, senior citizens, people who exercise or work outdoors, and people with chronic lung diseases like asthma, COPD, and emphysema, are most in danger of being sickened by ozone and that children who grow up in areas of high ozone pollution may never develop their full lung capacity as adults, which can put them at greater risk of lung disease throughout their lives.[514]

---

[511] *See, e.g.,* Seth Lyman and Howard Shorthill, *Final Report: 2012 Uintah Basin Winter Ozone & Air Quality Study*, UTAH STATE UNIVERSITY, February 1, 2013.

[512] Gabrielle Pétron, *et al., Estimation of emissions from oil and natural gas operations in northeastern Colorado*, Power Point available at: http://www.epa.gov/ttnchie1/conference/ei20/session6/gpetron_pres.pdf (attached as Exhibit 296).

[513] *See* EPA, *Ozone – Good Up High Bad Nearby*, available at: http://www.epa.gov/oar/oaqps/gooduphigh/bad.html#7.

[514] *See* American Lung Association (attached above as Exhibit 276).

BLM_0078025

### 5.    Naturally Occurring Radioactive Materials

Processes used to produce oil and gas often generate radioactive waste containing concentrations of naturally occurring radioactive materials (NORM). Radioactive wastes from oil and gas production can be found in produced water, flowback water from hydraulic fracturing, drilling waste including cuttings and mud, and/or sludge. This material can concentrate in pipes, storage tanks and facilities, and on other extraction equipment, and may be left on site or be emitted into the environment. Some of these materials can penetrate the skin and raise the risk of cancer. The RMP includes no discussion on potential health impacts associated with NORM that may be released into the environment due to oil and gas extraction activities.

### VI.    The BLM Is Required to Suspend All Oil and Gas Development in the Uncompahgre Area for as Long as the Uncompahgre RMP Revision Remains Uncompleted.

The Uncompahgre RMP revision will replace the existing 1985 San Juan/San Miguel Resource Management Plan and the 1989 Uncompahgre Basin Resource Management Plan. These 1985 and 1989 RMPs are completely out-of-date and can no longer serve their intended land use planning function with regard to oil and gas development in the UFO. Due to the insufficiency of BLM's existing management framework, all oil and gas leasing and development decisions, at all stages of BLM's administrative processes, should be suspended until the Uncompahgre RMP revision is complete and these deficiencies can be addressed. An oil and gas moratorium is not only a logical approach to BLM's minerals management responsibilities; it is also required under NEPA and its implementing regulations.

NEPA requires that, until an agency issues a Record of Decision for a pending NEPA document, "no action concerning the proposal shall be taken which would: (1) have an adverse environmental impact; or (2) limit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a)(1), (2). NEPA prohibits agencies from making an "irreversible and irretrievable commitment of resources." 40 C.F.R. §§ 1502.2(f); *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1986); *see also Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1056-57 (9th Cir. 1994), *cert. denied*, 115 S. Ct. 1793 (1995) (interpreting identical language in ESA). "The purpose of an EIS is to apprise decisionmakers of the disruptive environmental effects that may flow from their decisions at a time when they 'retain[] a maximum range of options.'" *Conner*, 848 F.2d at 1446. Taking actions in the interim which could limit those options undermines the purpose and effectiveness of the NEPA process. As provided by CEQ regulations:

> While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action:

> (1) Is justified independently of the program;

BLM_0078026

(2) Is itself accompanied by an adequate environmental impact statement; and

(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

40 C.F.R. §§ 1506.1(c)(1)-(3).

Proceeding with oil and gas leasing and development—including, for example, the activities contemplated in the Bull Mountain Master Development Plan and the Dual Operator Proposal: Development of 25 Federal Natural Gas Wells and Associated Infrastructure on 5 Multi-Well Pads—is impermissible due to the inherent prejudice that any such action would create on the pending revision of the Uncompahgre RMP and EIS. As identified in CHC's earlier comments submitted to BLM UFO, the 1985 and 1989 RMPs and associated documents did not anticipate the pace or scale of oil and gas leasing and development that is now proposed, and therefore, did not analyze the impacts from development which are now facing the communities of the North Fork Valley and beyond. Those documents contain little analysis of oil and gas development generally, much less any analysis of the impacts associated with modern extraction techniques, such as hydraulic fracturing, or the specific areas where current oil and gas development is focused. *See, e.g.,* 1989 RMP at 28, 31. Moreover, and as unambiguously provided in the 1987 Technical Report, any analysis contained therein was inherently limited in its temporal scope – providing that its evaluation of projected development was limited to "the next ten to fifteen years." 1987 Technical Report, at 10-11. Indeed, it has now been over 25 years since the report's release, well beyond the period where its findings are of any utility. Without the foundational land use planning guidance that is only available through a current and up-to-date RMP, it would be impossible for BLM UFO to make the type of fully informed decision that NEPA requires prior to completion of the Uncompahgre RMP revision.

Accordingly, it would serve both the public and industry alike if BLM UFO were to acknowledge that the existing RMP cannot be used to guide oil and gas leasing and development decision-making – and announce a moratorium on all oil and gas activity pending the completion of the Uncompahgre RMP revision.

## VI.     The Uncompahgre DEIS Fails to Take a Hard Look at Reasonably Foreseeable Effects on the Threatened Gunnison Sage-Grouse.

Contrary to the DEIS's characterization of the Gunnison sage-grouse as a candidate species, DEIS at 3-76, the Gunnison sage-grouse was listed as a threatened species under the Endangered Species Act in November 2014. *See* U.S. Fish and Wildlife Service, Threatened Status for Gunnison Sage-Grouse, Final Rule, 79 Fed. Reg. 69,192 (Nov. 20, 2014). Approximately 88 to 93 percent of the species's historical range has been lost since Euro-American settlement, and "[t]his contraction in the birds' range indicates the vulnerability of all the populations to extirpation." Gunnison Sage-Grouse Listing Rule, 79 Fed. Reg. at 69,228. The listing rule found that "the persistence of Gunnison sage-grouse is dependent on large and contiguous sagebrush habitats, that human development and disturbance contribute to the decline of this needed habitat, and that such impacts negatively affect the survival and persistence of

BLM_0078027

Gunnison sage-grouse." *Id.* Numerous activities on BLM land and minerals contribute to loss of these sage-grouse habitats, including road-building, power lines, livestock grazing practices, invasive plants, fire, and leasable minerals (i.e. oil and gas development). Oil and gas development has numerous adverse effects on Gunnison sage-grouse habitat, behavior, and population not acknowledged in the DEIS:

> Energy development impacts sagegrouse and sagebrush habitats through direct habitat loss from well pad construction, seismic surveys, roads, powerlines and pipeline corridors, and indirectly from noise, gaseous emissions, changes in water availability and quality, and human presence. The interaction and intensity of effects could cumulatively or individually lead to habitat degradation and fragmentation (Suter 1978, pp. 6–13; Aldridge 1998, p. 12; Braun 1998, pp. 144–148; Aldridge and Brigham 2003, p. 31; Knick *et al.* 2003, pp. 612, 619; Lyon and Anderson 2003, pp. 489–490; Connelly *et al.* 2004, pp. 7–40 to 7–41; Holloran 2005, pp. 56–57; Holloran *et al.* 2007, pp. 18–19; Aldridge and Boyce 2007, pp. 521–522; Walker *et al.* 2007a, pp. 2652–2653; Zou*et al.* 2006, pp. 1039–1040; Doherty *et al.* 2008, p. 193; Leu and Hanser 2011, pp. 270–271). Increased human presence resulting from oil and gas development can also impact sagegrouse either through avoidance of suitable habitat or disruption of breeding activities (Braun *et al.* 2002, pp. 4–5; Aldridge and Brigham 2003, pp. 30–31; Aldridge and Boyce 2007, p. 518; Doherty *et al.* 2008, p. 194). The development of oil and gas resources requires surveys for economically recoverable reserves, construction of well pads and access roads, subsequent drilling and extraction, and transport of oil and gas, typically through pipelines. Ancillary facilities can include compressor stations, pumping stations, electrical generators and powerlines (Connelly *et al.* 2004, p. 7–39; BLM 2007, p. 2–110). Surveys for recoverable resources occur primarily through loud seismic exploration activities. These surveys can result in the crushing of vegetation. Well pads vary in size from 0.10 ha (0.25 ac) for coal-bed natural gas wells in areas of level topography to greater than 7 ha (17.3 ac) for deep gas wells and multi-well pads (Connelly *et al.* 2004, p. 7–39; BLM 2007, p. 2–123). Pads for compressor stations require 5–7 ha (12.4–17.3 ac) (Connelly *et al.* 2004, p. 7–39). Individually, impacts from well pads, infrastructure, and ancillary features may be small; however, the cumulative impact of such development can be significant.

> The amount of direct habitat loss within an area of oil and gas development is ultimately determined by well densities and the associated loss from ancillary facilities. Roads associated with oil and gas development were suggested as the primary impact to greater sage-grouse due to their persistence and continued use even after drilling and production ceased (Lyon and Anderson 2003, p. 489). Declines in male greater sage-grouse lek attendance were reported within 3 km (1.9 mi) of a well or haul road with a traffic volume exceeding one vehicle per day (Holloran 2005, p. 40). Because of reasons discussed previously, the effects of oil and gas development to Gunnison sage-grouse are expected to be similar to those observed in greater sage-grouse. Sage-grouse also may be at increased risk

BLM_0078028

for collision with vehicles simply due to the increased traffic associated with oil and gas activities (Aldridge 1998, p. 14; BLM 2003, p. 4–222).

Habitat fragmentation resulting from oil and gas development infrastructure, including access roads, may have greater effects on sage-grouse than habitat loss associated with drill sites. Energy development and associated infrastructure works cumulatively with other human activity or development to decrease available habitat and increase fragmentation. Greater sage-grouse leks had the lowest probability of persisting (40–50 percent) in a landscape with less than 30 percent sagebrush within 6.4 km (4 mi) of the lek. These probabilities were even less in landscapes where energy development also was a factor.[515]

The Fish and Wildlife Service found, in considering the adequacy or inadequacy of existing regulatory mechanisms to safeguard Gunnison sage-grouse, that existing BLM RMPs, including the current Uncompahgre RMP, are inadequate as regulatory mechanisms. Existing "RMPs provide only partial protection for Gunnison sage-grouse in terms of land use allocation decisions specific to the species and its habitat and, therefore, are considered inadequate to protect the species." In particular, with regard to fluid mineral development, "Given the already small and fragmented nature of the populations where future oil and gas leases are likely to occur, additional development within occupied habitat would negatively impact those populations by contributing to further habitat decline."[516]

In part in response to this finding of inadequate regulatory mechanisms for BLM lands and minerals, the Colorado and Utah BLM have undertaken a range-wide RMP Amendment process for Gunnison Sage-Grouse habitat, encompassing the UFO, with a draft RMP Amendment and EIS released in August 2016. This amendment process overlaps the UFO RMP Revision: "If the GUSG RMP Amendment is issued prior to the revised Uncompahgre RMP, then it would amend the existing Uncompahgre Basin RMP (as well as the San Juan/San Miguel RMP) for lands in the Uncompahgre RMP planning area. Analysis from the GUSG EIS would be incorporated by reference into the Uncompahgre Proposed RMP/Final EIS, and decisions made in the GUSG Approved RMP Amendment/ROD would be carried forward to the Uncompahgre Approved RMP/Record of Decision. However, if the revised Uncompahgre RMP is issued first, then the GUSG RMP Amendment could require amendment of the Uncompahgre RMP."[517] Yet the UFO DEIS fails to acknowledge or take into account substantial scientific information available in both the Listing Rule and the Gunnison Sage-Grouse Rangewide DEIS.

Contrary to the DEIS's assertion, the UFO supports four, not three, of the remaining populations of Gunnison sage-grouse: "the Uncompahgre FO operates . . . provides habitat for four GUSG populations: the Cerro Summit-Cimarron-Sims Mesa Population (with the Sims Mesa sub-population entirely within the Uncompahgre FO), the Crawford Population, the

---

[515] Gunnison Sage-Grouse Final Listing Rule, 79 Fed. Reg. at 69,255-256 (attached as Exhibit 297).

[516] Gunnison Sage-Grouse Listing Rule at 69,284.

[517] BLM, Gunnison Sage-Grouse Rangewide Draft Resource Management Plan Amendment Draft Environmental Impact Statement 1-14 (attached as Exhibit 298)

BLM_0078029

Gunnison Basin Population, and the Piñon Mesa Population."[518] The Crawford population in particular has been classified by the BLM as having "medium potential" for oil and gas development.[519] Although it currently has only a single federal well, additional oil and gas development within the Crawford Population could adversely affect its persistence and chance of recovery.

In addition, an even more recent scientific study confirms the established finding that sage-grouse lek attendance is negatively related to oil and gas density, regardless of sagebrush cover and participation.[520] Green et al. examined greater sage-grouse lek attendance ,oil and gas well, and habitat and precipitation data from Wyoming over the period 1984 to 2008, and, consistent with numerous prior studies, that lek attendance declines are closely associated with the density of oil and gas development:

> Oil and gas development correlates well with sage-grouse population declines from 1984 to 2008 in Wyoming, which is supported by other findings (Doherty et al. 2010b, Harju et al. 2010, Hess and Beck 2012, Taylor et al. 2013, Gregory and Beck 2014). As with other studies, we also found support for 4-year lag effects of oil and gas development on lek attendance (Walker et al. 2007, Doherty et al. 010a, Harju et al. 2010, Gregory and Beck 2014). This result suggests that development likely affects recruitment into the breeding population rather than avoidance of wells by adult males or adult survival. Adult sage-grouse are highly philopatric to lek sites (Dalke et al. 1963, Wallestad and Schladweiler 1974, Emmons and Braun 1984, Dunn and Braun 1985, Connelly et al. 2011a), and males typically recruit to the breeding population in 2–3 years. We would expect a delayed response in lek attendance if development affects recruitment, either by reducing fecundity or avoidance of disturbance by nesting females, as adult males die and are not replaced by young males.

On average, lek attendance was stable when no oil and gas development was present within 6,400m (Fig. 4). However, attendance declined as development increased.[521] Importantly, Green et al. confirmed that declines in sage-grouse populations may continue even within Wyoming's "core areas," where density of wells is limited to one pad per square mile. Yet the UFO DEIS fails to consider any alternative that either prohibits fluid mineral leasing or regulates the density of allowable oil and gas facilities. Althoug the DEIS does consider minimal buffers and seasonal operation restrictions around leks, the DEIS acknowledges that its preferred alternative would "fall short of accepted minimum protection standards to maintain sage-grouse viability:

---

[518] Gunnison Sage-Grouse Rangewide RMP DEIS at 1-13.
[519] Gunnison Sage-Grouse Listing Rule, 79 Fed. Reg. at 69,255.
[520] Green, Adam et al., Investigating Impacts of Oil and Gas Development on Greater Sage-Grouse, Journal of Wildlife Management (2016), DOI: 10.1002/jwmg.21179 (attached as Exhibit 299).
[521] Green et al. at 9.

For Gunnison sage-grouse, stipulations would provide some level of protection from surface occupancy and site disturbance in all seasonal habitats. Breeding habitat would be protected with similar stipulations as Alternative C (NSO-20/SSR-32), and would similarly fall short of accepted minimum protection standards to maintain sage-grouse viability (Knick and Connelly 2011). However, disturbance/disruption would be prohibited during the breeding season within four miles of active leks (CSU-28/SSR-34).[522]

Even with only one operating oil and gas well, the UFO's Crawford Population has been in dramatic decline from 2000 through 2012, and had to be supplemented with birds from the Gunnison Basin in 2011 through 2013.[523] BLM manages approximately 63% of the remaining occupied habitat for this population, as well as 13% of occupied habitat. Despite the precarious status of the Crawford Population in particular, the UFO DEIS fails either to take a hard look at the extensive science showing relationship between oil and gas density and sage-grouse population decline, or to consider any alternative that would either limit density of development or exclude oil and gas entirely from Gunnison sage-grouse occupied and/or suitable habitat. Given that 63% of the Crawford Population's remaining habitat is on BLM land with "moderate" oil and gas decisions, BLM consideration of a no-leasing alternative for the area has the potential to eliminate a significant threat to the extirpation of one of the few remaining populations of Gunnison sage-grouse.

## VII.  FLPMA: Unnecessary and Undue Degradation

Pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, "[i]n managing the public lands," the agency "shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). Written in the disjunctive, BLM must prevent degradation that is "unnecessary" and degradation that is "undue." *Mineral Policy Ctr. v. Norton*, 292 F.Supp.2d 30, 41-43 (D. D.C. 2003). This protective mandate applies to BLM planning and management decisions, and should be considered in light of its overarching mandate that the agency employ "principles of multiple use and sustained yield." 43 U.S.C. § 1732(a); *see also, Utah Shared Access Alliance v. Carpenter*, 463 F.3d 1125, 1136 (10th Cir. 2006) (finding that BLM's authority to prevent degradation is not limited to the RMP planning process). While these obligations are distinct, they are interrelated and highly correlated. The Bureau must balance multiple uses in its management of public lands, including "recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values." 43 U.S.C. § 1702(c). It must also plan for sustained yield – "control [of] depleting uses over time, so as to ensure a high level of valuable uses in the future." *Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 58, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004).

"Application of this standard is necessarily context-specific; the words 'unnecessary' and 'undue' are modifiers requiring nouns to give them meaning, and by the plain terms of the statute, that noun in each case must be whatever actions are causing 'degradation.' " *Theodore*

---

[522] DEIS at 3-77.
[523] *See* Gunnison Sage-Grouse Rangewide RMP DEIS at 3-14.

BLM_0078031

*Roosevelt Conservation Partnership v. Salazar*, 661 F.3d 66, 76 (D.C. Cir. 2011) (citing *Utah v. Andrus*, 486 F.Supp. 995, 1005 n. 13 (D. Utah 1979) (defining "unnecessary" in the mining context as "that which is not necessary for mining" – or, in this context, "for oil and gas development" – and "undue" as "that which is excessive, improper, immoderate or unwarranted.")); *see also Colorado Env't Coalition*, 165 IBLA 221, 229 (2005) (concluding that in the oil and gas context, a finding of "unnecessary or undue degradation" requires a showing "that a lessee's operations are or were conducted in a manner that does not comply with applicable law or regulations, prudent management and practice, or reasonably available technology, such that the lessee could not undertake the action pursuant to a valid existing right.").

Here, that action is the development authorized by the UFO. The inquiry, then, is whether the UFO has taken sufficient measures to prevent degradation unnecessary to, or undue in proportion to, the development the RMP and EIS permits. *See Theodore Roosevelt Conservation Partnership*, 661 F.3d at 76. For example, methane waste and pollution may cause "undue" degradation, even if the activity causing the degradation is "necessary." Where methane waste and pollution is avoidable, even if in the process of avoiding such emissions lessees or operators incur reasonable economic costs that are consistent with conferred lease rights, it is "unnecessary" degradation. 43 U.S.C. § 1732(b).

Therefore, drilling activities may only go forward as long as unnecessary and undue environmental degradation does not occur. This is a *substantive* requirement, and one that the UFO must define and apply in the context of oil and gas development authorized in the planning area. In other words, the UFO must define and apply the substantive unnecessary and undue degradation ("UUD") requirements in the context of the specific resource values at stake.

In fact, the UFO has expressly recognized this mandate in the context of Wilderness Study Areas. *See* DEIS at 3-158 and 4-397. However, the obligation to implement a management regime that sufficiently protects the air, water, lands, and health goes beyond Wilderness Study Areas to encompass the entire planning area. Of critical importance in regard to oil and gas development is the agency's failure to require mitigation measures and best management practices on all future development within the planning area.

These UUD requirements are distinct from requirements under NEPA. "A finding that there will not be significant impact [under NEPA] does not mean either that the project has been reviewed for unnecessary and undue degradation or that unnecessary or undue degradation will not occur." *Ctr. for Biological Diversity*, 623 F.3d at 645 (quoting *Kendall's Concerned Area Residents*, 129 I.B.L.A. 130, 140 (1994)). In the instant case, the UFO's failure to specifically account for UUD in the RMP and EIS – which is distinct from its compliance under NEPA – is also actionable on procedural grounds and must occur before the proposed RMP is approved.

## VIII.   Conclusion

The Conservation Groups appreciate your consideration of the information and concerns addressed herein, as well as the information included in the attached exhibits. This information is critical and must be reflected in the agency's Final Environmental Impact Statement.

BLM_0078032

For the reasons described above, we urge BLM to prepare a supplemental EIS that: (1) fully considers a range of alternatives, including a "no-leasing" alternative; (2) fully considers the problem of methane waste, and takes steps to control methane waste; (3) fully considers current scientific and economic information, especially regarding climate change; and (4) strengthens its "hard look" at impacts to air, water, and human health, including by conducting a Health Impact Assessment.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

Kyle Tisdel, Attorney, Climate & Energy Program Director
Laura King, Staff Attorney
WESTERN ENVIRONMENTAL LAW CENTER
208 Paseo del Pueblo Sur, Unit 602
Taos, New Mexico 87571
575.751.0351
tisdel@westernlaw.org
king@westernlaw.org

*Attorneys for Conservation Groups*

Edward B. Zukoski, Staff Attorney
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO 80202
303.996.9622

*Attorney for Sierra Club*

Nathan Matthews
Nathaniel Shoaff
Staff Attorneys
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
2100 Webster Street, Suite 1300
Oakland, CA 94612
415.977.5695

Diana Dascalu-Joffe, Senior Attorney
CENTER FOR BIOLOGICAL DIVERSITY
1536 Wynkoop Street, Suite 421
Denver, CO 80202
720.925.2521
ddascalujoffe@biologicaldiversity.org

BLM_0078033

Jeremy Nichols
Climate and Energy Program Director
WILDEARTH GUARDIANS
2590 Walnut St.
Denver, CO 80205
303.437.7663
jnichols@wildearthguardians.org

Natasha Léger
Interim Executive Director
CITIZENS FOR A HEALTHY COMMUNITY
303.667.1544
natasha@citizensforahealthycommunity.org

Peter Hart
Staff Attorney/Conservation Analyst
WILDERNESS WORKSHOP
PO Box 1442
Carbondale, CO 81623
970.963.3977 (office)
303.475.4915 (cell)


University of Colorado
Boulder

**Dylan Fixmer <fixmer@colorado.edu>**

---

## Choose North Fork Alternative B1

---

**Dylan D Fixmer** <Dylan.Fixmer@colorado.edu>                                     Tue, Aug 9, 2016 at 3:43 PM
Reply-To: Dylan.Fixmer@colorado.edu
To: ufrmp@blm.gov
Bcc: info@citizensforahealthycommunity.org

Dear Uncompahgre Field Office BLM,

My name is Dylan Fixmer and I am writing to you today to request that you take interest in protecting our North Fork Valley and all of Western Colorado for us and future generations. To do this, you must choose the North Fork Valley Alternative B1 and all other reasonable conservation protections in Alternative B in the upcoming RMP.

I was a resident of Rifle, Colorado for five years and saw first hand what atrocities the oil and gas industry commits against the communities it proposes to keep safe. These companies are out to make money and do not care about the communities they destroy in their wake. Please consider the following when making your decision about the final RMP.

1. The RMP Draft has an inadequate analysis
   ○ The BLM did not consider the uniqueness of the North Fork valley, in that it has the highest concentration of organic farms in Colorado. Neither chapter 2 (Affected Environment) nor chapter 4 (Environmental Consequences) acknowledge the existence of this rare, unique and unrivaled agricultural area containing numerous vineyards, orchards and vegetable growing operations. An analysis of the effects of drilling and all the associated risks to this agricultural area must be assessed in detail.
   ○ The BLM did not consider a reasonable no leasing alternative for the North Fork valley.
   ○ The BLM did not analyze the impact of hydraulic fracturing and multi drilling technologies.
   ○ The BLM did not analyze the cumulative impacts of unregulated gas gathering pipelines.
   ○ The BLM did not consider the impact of extreme weather causing flooding, mudslides, and geological instability which can compromise the integrity of pipelines and resulting leaks and potential explosions.
   ○ The BLM did not analyze the impact of permanently removing water from the hydraulic cycle.
   ○ The BLM did not analyze injection wells and the potential for earthquakes and contamination of aquifers.
   ○ The BLM did not consider community source water protection plans put in place to keep our communities safe.
   ○ The BLM did not consider the decreased recreational value of BOM lands from industrial oil and gas activities which are vital to the tourism economy of western Colorado.
2. Fracking is dangerous and harmful to communities
   ○ This is an inappropriate use of public lands. Private companies have no right to take away public lands from the public to use for profit.
   ○ The current infrastructure in western Colorado was not intended and will not support the influx of gas wells, pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks and an increase in transient population workforce.
   ○ For human, animal, and environmental damage is too high. Gas industry uses chemicals that I've been known to cause cancer and other human health issues. To the Denver Post over 700 oil and gas spills were ported in 2014 and 615 were reported in 2015. These are unacceptable numbers for companies claim they are keeping their community safe. A poisoned watershed is an unacceptable consequence for any community.
3. What the BLM can do to keep us safe
   ○ Avoidance of fracking in the North Fork Valley is the first step of proper mitigation, and one that the BLM must consider and should adopt in appropriate places such as watersheds view sheds and critical wildlife lands.
   ○ Close the North Fork Valley to oil and gas leasing or impose strict no surface occupancy requirements.
   ○ Choose the North Fork Alternative B1 and all other reasonable conversation protections in Alternative B.

I want to spend the rest of my life in Paonia, Colorado, raise a family, and continue my work as a music teacher here because my community understands the importance of our land and how to live harmoniously with it. The oil and gas companies care nothing for this mentality and will not serve our community as stewards of the land or residents. There are no long term economic benefits to developing oil and gas in the North Fork Valley, yet the destruction caused in the wake of gas and oil boom and bust will be felt for generations. Paonia and the North Fork Valley are already leading the

charge with renewable solar energy and will continue to provide clean renewable energy to our state.  Please do not throw our community down the drain by inviting the oil and gas companies to destroy it.  By choosing Alternative B1 and all other reasonable conservation protections in Alternative B you can protect our community for generations to come.

Thank you for your time and hard work.  Please keep me informed of developments and information relating to the final RMP.

Sincerely,

Dylan Fixmer

BLM_0078036



# Uncompahgre IN
## Resource Management Plan



We encourage you to provide your comments by filling out and submitting this comment form by **February 26, 2010.** Please mail your completed form to the address on the opposite side or fax it to 1-970-240-5367. Comments may also be submitted via e-mail to uformp@blm.gov.

First Name _Grady_     Last Name _Harper_     Date _1-12-09_

Mailing Address _10820  3475 RD_

City _Hotchkiss, CO     81419_     State _____     Zip _____

E-mail Address: _grady @ nfria.org_

Would you like to be added to this project's mailing list to receive future project-related information (your name will not be shared)?     Yes: [X] e-mail materials only  [ ] e-mail and hard-copy materials     [ ] No

Please indicate your affiliation by checking the following boxes (check all that apply):

[X] Individual (no affiliation)     [X] Non-profit Organization     [ ] Citizen's Group

[ ] Federal, State, or Local Government     [ ] Elected Representative     [ ] Regulatory Agency

Name of organization, government, group, or agency (if applicable) _North Fork River Improvement Assn_

*Please answer the following four questions about your relationship to the Uncompahgre RMP Planning Area:*

Do you live within the planning area? [X] Unit 1 [ ] Unit 2 [ ] Unit 3 [ ] Unit 4 [ ] Unit 5 [ ] No
*(Refer to map for unit numbers)*

If you do not live in the planning area, do you live in: [X] Colorado (west slope)  [ ] Colorado (front range or plains)
[ ] Another State (which): _____  [ ] Another Country (which): _____

If you do live in the planning area, how long have you lived here? Months: _____ Years: _22_

Why do you live here? [X] Occupation [X] Family [ ] Proximity to public lands [ ] Recreational Opportunities
[ ] Other _____

*The BLM wants to hear from you! The Uncompahgre Field Office is committed to listening and learning from our neighbors, friends, and stakeholders. Your answers to the following questions will be helpful at this point in the planning process, as are any other comments. When answering the following questions, reference as appropriate the planning units on the map titled Uncompahgre RMP Planning Units. You may attach additional sheets of paper for long comments. Thank you for taking the time to provide your input.*

What issues or concerns do you have regarding public land resources or uses within the Uncompahgre RMP planning area?

That irresponsible drilling does not happen similar to Garfield County.

1 A-PI NRED

*Respondents' comments, including their names and street addresses, will be available for public review at the Uncompahgre Field Office during regular business hours from 8:00am to 4:30pm, Monday through Friday, except holidays, and may be published as part of the EIS. Individual respondents may request confidentiality. If you wish to withhold your name or street address from public review or from disclosure under the Freedom of Information Act, you must state this prominently at the beginning of your written comments. Such requests will be honored to the extent allowed by law. All submissions from organizations and businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be available for public inspection in their entirety.*

Keeping in mind the issues above, what changes would you make physically to the landscape (such as what should it look like, modifications, etc.)?

Minimize Physical disturbance.

2 A-PI ED

Keeping in mind the issues above, what changes would you make to administration (such as management actions, rules, regulations, etc.)?

Encourage use of directional drilling to minimize surface disturbance

3 A-PI NRED

Keeping in mind the issues above, what changes would you make to social characteristics (such as number of users, size of groups, behavior of users, etc.)?

Encourage responsible recreation ie leave no trace designated off-road trails

4 A-PI REC

Please provide any additional comments that you have regarding this project.

5 A-PI TM

*(Please tri-fold this sheet & tape shut before mailing – Do not staple)*

_M, Uncompahgre Field Office
165 S. Townsend Ave.
ontrose, CO 81401

Place Firs
Class Stam
Here

US Bureau of Land Management
Uncompahgre Field Office
Attn: Bruce Krickbaum, RMP Project Manager
2465 S. Townsend Ave.
Montrose, CO 81401

BLM_0078038



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

City of Montrose
Mary Watt, City Manager
PO Box 790
Montrose, CO 81402

Dear Ms. Watt:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the City of Montrose to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process.  While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the City of Montrose is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov.  We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the City of Montrose. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the City of Montrose for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation.  Should you choose not to become a Cooperating Agency, be assured that we will still provide the City of Montrose with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands.  We look forward to working with the City of Montrose as we proceed with this land use planning effort.


Sincerely,



Barbara L. Sharrow
Field Office Manager


Enclosure
        1 – Draft MOU

BLM_0078040



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
**www.blm.gov**



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Town of Olathe
Scott Harold, Town Administrator
PO Box 789
Olathe, CO 81425

Dear Mr. Harold:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the Town of Olathe to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

BLM_0078041

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the Town of Olathe is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the Town of Olathe. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the Town of Olathe for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide the Town of Olathe with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with the Town of Olathe as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU

BLM_0078042



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Town of Orchard City
David Varley, Town Administrator
9661 2100 Road
Austin, CO 81410

Dear Mr. Varley:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the Town of Orchard City to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the Town of Orchard City is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the Town of Orchard City. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the Town of Orchard City for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide the Town of Orchard City with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with the Town of Orchard City as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU

BLM_0078044



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado  81401
**www.blm.gov**



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

City of Ouray
Patrick Rondinelli, City Administrator
PO Box 468
Ouray, CO  81427

Dear Mr. Rondinelli:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009.  We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the City of Ouray to become a Cooperating Agency for the duration of the RMP/EIS process.   The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements.  Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents.  Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities.  Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement.  I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year.  There will also be a time requirement to review documents.

BLM_0078045

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process.  While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the City of Ouray is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov.  We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the City of Ouray. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the City of Ouray for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation.  Should you choose not to become a Cooperating Agency, be assured that we will still provide the City of Ouray with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands.  We look forward to working with the City of Ouray as we proceed with this land use planning effort.


Sincerely,



Barbara L. Sharrow
Field Office Manager


Enclosure
    1 – Draft MOU



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado  81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Colorado State Parks
Kurt Mill, Rocky Mtn. Regional Director
1313 Sherman St., #618
Denver, CO  80203

Dear Mr. Mill:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009.  We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting Colorado State Parks to become a Cooperating Agency for the duration of the RMP/EIS process.   The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements.  Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents.  Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities.  Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement.  I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year.  There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process.  While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If Colorado State Parks is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov.  We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and Colorado State Parks. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent Colorado State Parks for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation.  Should you choose not to become a Cooperating Agency, be assured that we will still provide Colorado State Parks with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands.  We look forward to working with Colorado State Parks as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU

BLM_0078048



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Colorado Division of Wildlife
Tom Spezze, SW Regional Director
151 East 16th St.
Durango, CO 81301

Dear Mr. Spezze:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting Colorado Divison of Wildlife to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

BLM_0078049

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process.  While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If Colorado Divison of Wildlife is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov.  We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and Colorado Divison of Wildlife.  Enclosed is a sample MOU (draft) that has been developed for the planning process.  Bruce will need a point of contact to finalize the MOU and the name of the person who will represent Colorado Divison of Wildlife for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation.  Should you choose not to become a Cooperating Agency, be assured that we will still provide Colorado Divison of Wildlife with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands.  We look forward to working with Colorado Divison of Wildlife as we proceed with this land use planning effort.


Sincerely,



Barbara L. Sharrow
Field Office Manager



Enclosure
     1 – Draft MOU



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Montrose County
Joe Kirby, County Manager
161 South Townsend
Montrose, CO 81401

Dear Mr. Kirby:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting Montrose County to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process.  While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If Montrose County is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov.  We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and Montrose County. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent Montrose County for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation.  Should you choose not to become a Cooperating Agency, be assured that we will still provide Montrose County with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands.  We look forward to working with Montrose County as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU

BLM_0078052



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
**www.blm.gov**



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

City of Delta
Larry Sloan, City Manager
360 Main St.
Delta, CO 81416

Dear Mr. Sloan:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the City of Delta to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

BLM_0078053

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the City of Delta is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the City of Delta. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the City of Delta for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide the City of Delta with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with the City of Delta as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU

BLM_0078054



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado  81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Town of Norwood
Gretchen Wells, Town Clerk
P.O. Box 528
Norwood, CO  81423

Dear Ms. Wells:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009.  We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the Town of Norwood to become a Cooperating Agency for the duration of the RMP/EIS process.   The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements.  Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents.  Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities.  Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement.  I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year.  There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the Town of Norwood is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the Town of Norwood. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the Town of Norwood for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide the Town of Norwood with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with the Town of Norwood as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU

BLM_0078056



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Town of Ridgway
Greg Clifton, Town Manager
P.O. Box 10
Ridgway, CO 81432

Dear Mr. Clifton:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the Town of Ridgway to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

BLM_0078057

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process.  While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the Town of Ridgway is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov.  We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the Town of Ridgway.  Enclosed is a sample MOU (draft) that has been developed for the planning process.  Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the Town of Ridgway for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation.  Should you choose not to become a Cooperating Agency, be assured that we will still provide the Town of Ridgway with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands.  We look forward to working with the Town of Ridgway as we proceed with this land use planning effort.

Sincerely,


Barbara L. Sharrow
Field Office Manager


Enclosure
    1 – Draft MOU

BLM_0078058



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Bureau of Reclamation
Carol DeAngelis, Area Manager
2764 Compass Drive, Suite 106
Grand Junction, CO 81506

Dear Ms. DeAngelis:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the US Bureau of Reclamation to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

BLM_0078059

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the US Bureau of Reclamation is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the US Bureau of Reclamation. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the US Bureau of Reclamation for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide the US Bureau of Reclamation with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with the US Bureau of Reclamation as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado  81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

U.S. Fish and Wildlife Service
Patricia Gelatt, Acting Project Leader
764 Horizon Dr. So., Annex A
Grand Junction, CO  81506-3946

Dear Ms. Gelatt:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009.  We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting US Fish and Wildlife Service to become a Cooperating Agency for the duration of the RMP/EIS process.   The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements.  Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents.  Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities.  Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement.  I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year.  There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If US Fish and Wildlife Service is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and US Fish and Wildlife Service. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent US Fish and Wildlife Service for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide US Fish and Wildlife Service with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with US Fish and Wildlife Service as we proceed with this land use planning effort.

Sincerely,


Barbara L. Sharrow
Field Office Manager


Enclosure
    1 – Draft MOU



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
**www.blm.gov**



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Town Cedaredge
Kathleen Sickles, Town Adminsirator
PO Box 398
Cedaredge, CO 81413

Dear Ms. Sickles:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting The Town of Cedaredge to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process.  While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If The Town of Cedaredge is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov.  We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and The Town of Cedaredge.  Enclosed is a sample MOU (draft) that has been developed for the planning process.  Bruce will need a point of contact to finalize the MOU and the name of the person who will represent The Town of Cedaredge for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation.  Should you choose not to become a Cooperating Agency, be assured that we will still provide The Town of Cedaredge with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands.  We look forward to working with The Town of Cedaredge as we proceed with this land use planning effort.


Sincerely,



Barbara L. Sharrow
Field Office Manager



Enclosure
       1 – Draft MOU


BLM_0078064



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
**www.blm.gov**



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Gunnison County
Matthew Birnie, County Manager
200 E Virginia
Gunnison, CO 81230

Dear Mr. Birnie:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting Gunnison County to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

BLM_0078065

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If Gunnison County is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and Gunnison County. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent Gunnison County for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide Gunnison County with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with Gunnison County as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

San Miguel County
Lynn Black, County Administrator
PO Box 1170
Telluride, CO 81435

Dear Ms. Black:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting San Miguel County to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If San Miguel County is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and San Miguel County. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent San Miguel County for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide San Miguel County with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with San Miguel County as we proceed with this land use planning effort.

Sincerely,


Barbara L. Sharrow
Field Office Manager


Enclosure
    1 – Draft MOU

BLM_0078068



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado  81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Town of Telluride
Frank Bell, Town Manager
PO Box 397
Telluride, CO  81435

Dear Mr. Bell:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009.  We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the Town of Telluride to become a Cooperating Agency for the duration of the RMP/EIS process.   The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements.  Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents.  Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities.  Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement.  I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year.  There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the Town of Telluride is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the Town of Telluride. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the Town of Telluride for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide the Town of Telluride with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with the Town of Telluride as we proceed with this land use planning effort.

Sincerely,


Barbara L. Sharrow
Field Office Manager


Enclosure
    1 – Draft MOU

BLM_0078070



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado  81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Town of Mountain Village
Gregg Sparks, Town Manager
455 Mountain Village Blvd, Suite A
Mountain Village, CO  81435

Dear Mr. Sparks:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009.  We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the Town of Mountain Village to become a Cooperating Agency for the duration of the RMP/EIS process.   The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements.  Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents.  Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities.  Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement.  I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year.  There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the Town of Mountain Village is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the Town of Mountain Village. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the Town of Mountain Village for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide the Town of Mountain Village with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with the Town of Mountain Village as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado  81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Town of Paonia
Neal Schwieterman, Mayor
PO Box 460
Paonia, CO  81428

Dear Mayor Schwieterman:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009.  We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the Town of Paonia to become a Cooperating Agency for the duration of the RMP/EIS process.   The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements.  Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents.  Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities.  Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement.  I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year.  There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process.  While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the Town of Paonia is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov.  We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the Town of Paonia. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the Town of Paonia for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation.  Should you choose not to become a Cooperating Agency, be assured that we will still provide the Town of Paonia with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands.  We look forward to working with the Town of Paonia as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Town of Hotchkiss
Town Administrator
PO Box 369
Hotchkiss, CO 81419

Dear Town Administrator:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the Town of Hotchkiss to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process.  While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the Town of Hotchkiss is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov.  We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the Town of Hotchkiss.  Enclosed is a sample MOU (draft) that has been developed for the planning process.  Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the Town of Hotchkiss for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation.  Should you choose not to become a Cooperating Agency, be assured that we will still provide the Town of Hotchkiss with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands.  We look forward to working with the Town of Hotchkiss as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU

BLM_0078076



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Town of Nucla
Dawna Morris, Mayor
PO Box 219
Nucla, CO 81424

Dear Mayor Morris:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the Town of Nucla to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the Town of Nucla is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the Town of Nucla. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the Town of Nucla for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide the Town of Nucla with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with the Town of Nucla as we proceed with this land use planning effort.


Sincerely,



Barbara L. Sharrow
Field Office Manager


Enclosure
        1 – Draft MOU

BLM_0078078

 **United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado  81401
**www.blm.gov** 

IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Town of Naturita
Cameron Riley, Mayor
PO Box 505
Naturita, CO  81422

Dear Mayor Riley:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009.  We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the Town of Naturita to become a Cooperating Agency for the duration of the RMP/EIS process.   The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements.  Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents.  Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities.  Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement.  I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year.  There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the Town of Naturita is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the Town of Naturita. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the Town of Naturita for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide the Town of Naturita with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with the Town of Naturita as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU

BLM_0078080



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Ute Indian Tribe
Betsy Chapoose, Environmental Coordinator
PO Box 190
Fort Duchesne, UT 84026

Dear Ms. Chapoose:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the Ute Indian Tribe to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the Ute Indian Tribe is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the Ute Indian Tribe. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the Ute Indian Tribe for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide the Ute Indian Tribe with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with the Ute Indian Tribe as we proceed with this land use planning effort.


Sincerely,



Barbara L. Sharrow
Field Office Manager


Enclosure
    1 – Draft MOU

BLM_0078082



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Ute Mountain Ute
Lynn Hartman, Cultural Resources Contract Coordinator
PO Box 468
Towaoc, CO 81334

Dear Ms. Hartman:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the Ute Mountain Ute Tribe to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

BLM_0078083

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the Ute Mountain Ute Tribe is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the Ute Mountain Ute Tribe. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the Ute Mountain Ute Tribe for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide the Ute Mountain Ute Tribe with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with the Ute Mountain Ute Tribe as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU

BLM_0078084



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
**www.blm.gov**



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Southern Ute Tribe
Vickie Kujawa, Director of Environmental Programs
PO Box 737
Ignacio, CO 81137

Dear Ms. Kujawa:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the Southern Ute Tribe to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process.  While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the Southern Ute Tribe is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov.  We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the Southern Ute Tribe.  Enclosed is a sample MOU (draft) that has been developed for the planning process.  Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the Southern Ute Tribe for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation.  Should you choose not to become a Cooperating Agency, be assured that we will still provide the Southern Ute Tribe with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands.  We look forward to working with the Southern Ute Tribe as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU

BLM_0078086



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Colorado Dept of Natural Resources
Harris Sherman, Director
1313 Sherman St, Rm 718
Denver, CO 80203

Dear Mr. Sherman:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting Colorado Department of Natural Resources to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

BLM_0078087

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process.  While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If Colorado Department of Natural Resources is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov.  We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and Colorado Department of Natural Resources.  Enclosed is a sample MOU (draft) that has been developed for the planning process.  Bruce will need a point of contact to finalize the MOU and the name of the person who will represent Colorado Department of Natural Resources for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation.  Should you choose not to become a Cooperating Agency, be assured that we will still provide Colorado Department of Natural Resources with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands.  We look forward to working with Colorado Department of Natural Resources as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU

BLM_0078088