

# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado  81401
**www.blm.gov**



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Town of Sawpit
Michael Kimball, Mayor
31 Hart
Sawpit, CO  81435

Dear Mayor Kimball:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009.  We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the Town of Sawpit to become a Cooperating Agency for the duration of the RMP/EIS process.   The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements.  Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents.  Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities.  Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement.  I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year.  There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the Town of Sawpit is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the Town of Sawpit. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the Town of Sawpit for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide the Town of Sawpit with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with the Town of Sawpit as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU

BLM_0078090



# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

APHIS
Deborah Millis, Program Manager
2150 Centre Ave, Bldg. B, Mail Stop 2E6
Ft. Collins, CO 80526

Dear Ms. Millis:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting APHIS to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process.  While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If APHIS is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov.  We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and APHIS.  Enclosed is a sample MOU (draft) that has been developed for the planning process.  Bruce will need a point of contact to finalize the MOU and the name of the person who will represent APHIS for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation.  Should you choose not to become a Cooperating Agency, be assured that we will still provide APHIS with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands.  We look forward to working with APHIS as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
        1 – Draft MOU



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

US Department of Energy
Ray Plieness, Program Manager
2597 B 3/4 Road
Grand Junction, CO 81503

Dear Mr. Plieness:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting DOE to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

BLM_0078093

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If DOE is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and DOE. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent DOE for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide DOE with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with DOE as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Ouray County Board of Commissioners
PO Box C
Ouray, CO 81427

Dear Chairman:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting Ouray County to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If Ouray County is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and Ouray County. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent Ouray County for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide Ouray County with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with Ouray County as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
        1 – Draft MOU

BLM_0078096



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado  81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Mesa County Board of Commissioners
PO Box 20000
Grand Junction, CO  81502-5010

Dear Chairman:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009.  We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting Mesa County to become a Cooperating Agency for the duration of the RMP/EIS process.   The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements.  Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents.  Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities.  Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement.  I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year.  There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If Mesa County is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and Mesa County. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent Mesa County for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide Mesa County with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with Mesa County as we proceed with this land use planning effort.


Sincerely,



Barbara L. Sharrow
Field Office Manager


Enclosure
        1 – Draft MOU



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado  81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

State Historic Preservation Office
Edward Nichols, SHPO
1300 Broadway
Denver, CO  80203

Dear Mr. Nichols:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009.  We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the State Historic Preservation Office to become a Cooperating Agency for the duration of the RMP/EIS process.  The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements.  Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents.  Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities.  Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement.  I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year.  There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the State Historic Preservation Office is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the State Historic Preservation Office. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the State Historic Preservation Office for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide the State Historic Preservation Office with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with the State Historic Preservation Office as we proceed with this land use planning effort.

Sincerely,


Barbara L. Sharrow
Field Office Manager


Enclosure
        1 – Draft MOU



# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
**Uncompahgre Field Office**
**2465 S. Townsend Avenue**
**Montrose, Colorado  81401**
**www.blm.gov**



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Western Area Power Administration
, Regional Director
PO Box 3700
Loveland, CO  80539-3003

Dear Regional Director:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009.  We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting Western Area Power Administration to become a Cooperating Agency for the duration of the RMP/EIS process.   The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements.  Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents.  Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities.  Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement.  I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year.  There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If Western Area Power Administration is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and Western Area Power Administration. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent Western Area Power Administration for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide Western Area Power Administration with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with Western Area Power Administration as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU



# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
**Uncompahgre Field Office**
**2465 S. Townsend Avenue**
**Montrose, Colorado  81401**
**www.blm.gov**



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

USFS - San Juan National Forest
Mark Stiles, Forest Supervisor
15 Burnett Ct
Durango, CO  81301

Dear Mr. Stiles:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009.  We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting USFS - San Juan National Forest to become a Cooperating Agency for the duration of the RMP/EIS process.   The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements.  Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents.  Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities.  Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement.  I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year.  There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If USFS - San Juan National Forest is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and USFS - San Juan National Forest. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent USFS - San Juan National Forest for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide USFS - San Juan National Forest with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with USFS - San Juan National Forest as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
        1 – Draft MOU



# United States Department of the Interior
### BUREAU OF LAND MANAGEMENT
**Uncompahgre Field Office**
**2465 S. Townsend Avenue**
**Montrose, Colorado  81401**
**www.blm.gov**



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

USFS - GMUG
Charles Richmond, Forest Supervisor
2250 Hwy 50
Delta, CO  81416

Dear Mr. Richmond:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009.  We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting USFS - GMUG to become a Cooperating Agency for the duration of the RMP/EIS process.   The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements.  Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents.  Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities.  Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement.  I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year.  There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If USFS - GMUG is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and USFS - GMUG. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent USFS - GMUG for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide USFS - GMUG with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with USFS - GMUG as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
        1 – Draft MOU



# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
**Uncompahgre Field Office**
**2465 S. Townsend Avenue**
**Montrose, Colorado 81401**
**www.blm.gov**



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

NRCS - Colorado State Office
Allen Green,
655 Parfet St, Room E200C
Lakewood, CO 80217-5517

Dear Mr. Green:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting NCRS - Colorado to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process.  While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If NCRS - Colorado is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov.  We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and NCRS - Colorado. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent NCRS - Colorado for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation.  Should you choose not to become a Cooperating Agency, be assured that we will still provide NCRS - Colorado with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands.  We look forward to working with NCRS - Colorado as we proceed with this land use planning effort.


Sincerely,



Barbara L. Sharrow
Field Office Manager


Enclosure
    1 – Draft MOU

BLM_0078108



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
**www.blm.gov**



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Colorado Department of Transportation
Russell George,
4201 E Arkansas Ave
Denver, CO 80222

Dear Mr. George:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting Colorado Department of Transportation to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If Colorado Department of Transportation is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and Colorado Department of Transportation. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent Colorado Department of Transportation for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide Colorado Department of Transportation with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with Colorado Department of Transportation as we proceed with this land use planning effort.

Sincerely,


Barbara L. Sharrow
Field Office Manager


Enclosure
     1 – Draft MOU



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
**www.blm.gov**



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

NPS - Black Canyon of the Gunnison NP
Connie Rudd, Superintendent
102 Elk Creek
Gunnison, CO 81230

Dear Ms. Rudd:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the NPS - BLCA to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the NPS - BLCA is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the NPS - BLCA. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the NPS - BLCA for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide the NPS - BLCA with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with the NPS - BLCA as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU

BLM_0078112



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado  81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Town of Crawford
, Town Clerk
PO Box 56
Crawford, CO  81415

Dear Town Clerk:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009.  We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting the Town of Crawford to become a Cooperating Agency for the duration of the RMP/EIS process.   The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements.  Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents.  Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities.  Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement.  I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year.  There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process.  While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If the Town of Crawford is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov.  We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and the Town of Crawford.  Enclosed is a sample MOU (draft) that has been developed for the planning process.  Bruce will need a point of contact to finalize the MOU and the name of the person who will represent the Town of Crawford for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation.  Should you choose not to become a Cooperating Agency, be assured that we will still provide the Town of Crawford with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands.  We look forward to working with the Town of Crawford as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
    1 – Draft MOU

BLM_0078114



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

January 23, 2009

Delta County
Susan Hansen, County Administrator
501 Palmer St #227
Delta, CO 81416

Dear Ms. Hansen:

The Bureau of Land Management (BLM), Uncompahgre Field Office, will initiate a major revision of its Resource Management Plan (RMP) in 2009. We anticipate commencing the RMP revision and associated environmental impact statement (EIS) in the spring.

In the spirit of government to government consultation and cooperation, Uncompahgre Field Office (UFO) is inviting Delta County to become a Cooperating Agency for the duration of the RMP/EIS process. The Council on Environmental Quality's regulations implementing the National Environmental Policy Act (NEPA) allow federal agencies (as lead agencies) to invite tribal, state, and local governments, as well as other federal agencies, to serve as Cooperating Agencies in the preparation of environmental impact statements. Cooperating Agency status provides the opportunity for us to work together and to enhance the BLM's planning efforts.

Local and tribal governments, other agencies, and the public have participation opportunities such as attending public meetings, and reviewing and commenting on plan documents. Being a Cooperating Agency provides the opportunity for interested agencies to take on additional roles and responsibilities beyond basic participation opportunities. Cooperating Agencies do have obligations to contribute staff to the RMP/EIS team, assist with analysis for which they have particular expertise, and fund their own participation.

In general, you will be expected to provide a person to attend meetings to accomplish the tasks, as well as to accommodate other time involvement. I anticipate about twelve Cooperating Agency meetings over the first twelve to fifteen months of the planning process, with an additional three to four meetings over the following year. There will also be a time requirement to review documents.

To help you in your decision to accept or deny this invitation, please consult sections V, VI, and VII of the enclosed draft MOU, as well as specific information about Cooperating Agency relationships at the following website: http://www.blm.gov/wo/st/en/info/nepa/cooperating_agencies.html.

If you choose to become a Cooperating Agency, you will work closely with BLM and other agencies throughout the RMP/EIS process. While Cooperating Agency status does not eliminate your rights to protest or appeal the EIS Record of Decision, my expectation is that you would have had sufficient opportunity to work with BLM and others so that a protest or appeal would not be necessary.

If Delta County is interested in becoming a Cooperating Agency please notify Bruce Krickbaum, of my staff, by February 25, 2009 at (970) 240-5384 or bruce_krickbaum@blm.gov. We will need to sign a memorandum of understanding (MOU) that describes the roles and responsibilities of the BLM and Delta County. Enclosed is a sample MOU (draft) that has been developed for the planning process. Bruce will need a point of contact to finalize the MOU and the name of the person who will represent Delta County for the planning process.

We request that agencies declining to accept Cooperating Agency status also respond to this invitation. Should you choose not to become a Cooperating Agency, be assured that we will still provide Delta County with ample opportunity to participate in the planning process.

If you have questions regarding cooperating agency status or want more information concerning opportunities available for your agency to participate in the land use planning process, do not hesitate to call Bruce Krickbaum, the RMP Project Lead, at (970) 240-5384.

Thank you for your interest in the planning process and administration of your public lands. We look forward to working with Delta County as we proceed with this land use planning effort.

Sincerely,

Barbara L. Sharrow
Field Office Manager

Enclosure
1 – Draft MOU

BLM_0078116

Received

APR - 5 2010

Uncompahgre Field Office

March 29, 2009

Bruce Krickbaum
RMP Project Manager
2465 S. Townsend Ave
Montrose, CO  81401

Dear Bruce,

Thank you for the opportunity to comment on the Uncompahgre Field Office (UFO)
Resource Management Plan (RMP). LeValley Ranch, Ltd has worked cooperatively with
the UFO for many years and views this as a mutually beneficial partnership. We graze
our cattle on the Green Mountain and Grizzly Gulch allotments. We provide water to the
guzzlers for the Gunnison Sage Grouse and the pipeline provides water to all wildlife in
the area. We have a deferred rotation in place that is consistently monitored to meet
objectives.  We have participated in treatment projects to benefit the habitat for not only
the Gunnison Sage Grouse but big game also.  All of this has been done in concert with a
multiple use resource plan that acknowledges the livestock industry in the Uncompahgre
area boundaries.

The livestock industry within the boundaries of the UFO contributes millions of dollars to
the Montrose, Mesa, Delta, Ouray and San Miguel counties.  This industry is steady in its
contribution to the economy and is not victim to the boom and bust cycle often
experienced in other sectors of the economy. In addition, ranches associated with public
lands own 24% of the private land in the above mentioned counties.  That is a significant
number of acres of open space, public land buffers and wildlife habitat. Private ranch
lands allows for even greater benefit to be realized from the public lands due to the
economic contribution, open space and buffer zones.

These data are mentioned to stress the importance of the livestock grazing and maintain
economic viable ranches within the UFO.  Livestock grazing is a sustainable use of the
resource and it should be viewed as a program and not a problem.  Too many times,
because livestock grazing is the only controllable variable, it is penalized.  The allotments
have to maintain their economic viability or the entire ranch is in jeopardy.  The credit
crisis that faces this area worsens when the tenure of allotments become questioned.
While we realize that grazing is not being eliminated in this plan, there is constant
movement to reduce livestock grazing and to eliminate its importance on the landscape.
This plan should acknowledge the importance of the constant presence that permittees
have on the allotments, the economic contribution, the tie between the ability to use
public land and open space of private ranch lands, the sustainability of livestock grazing

BLM_0078117

on our grazing evolved ecosystems and the importance of many of the range improvements to wildlife populations./

9 A-PI SSS

The RMP should be written in a manner that allows for flexibility and adaptive management to determine what happens on the ground. Too many times, plans are written that are rigid, and do not allow changes to be made and this opens up the UFO to even more litigation. Specifically, new research is being published regarding the Gunnison Sage Grouse (GSG). To write the RMP with rigid guidelines regarding the GSG would not allow changes to be made on the ground that may benefit the grouse.

10 A-PI LG
11 A-PI SSS

The Green Mountain allotment is home to the Crawford population of the GSG. Monitoring results indicate that the GSG vegetation guidelines are being met under our deferred rotation plan for cattle grazing. Additional permit reductions are not needed to meet guidelines. We are active members of the Crawford Sage Grouse Working Group and have been since the inception. The RMP should be written to acknowledge that livestock grazing is being managed in GSG habitats and objectives are still being met.

Finally, our history of partnership, cooperation and willingness to work with the BLM has benefitted not only our livestock but the wildlife and the resource. This happens because of the commitment to the land and the resource that we have. The RMP should maintain that livestock grazing is an important use of the area; livestock grazing should not always be trumped by all other uses and should not be used as the only management tool that can be controlled.

12 A-PI LG

We look forward to working with you.

Sincerely,

Mark LeValley
LeValley Ranch
P.O. Box 835
Hotchkiss CO 81419

Hank LeValley
LeValley Ranch

Robbie LeValley
LeValley Ranch

**Database Placeholder(file available in native format)**

**File Name:**                    20090514_UFO RMP Cooperating Agencies.accdb

BLM_0078119

# MEMORANDUM OF UNDERSTANDING

## BETWEEN THE

## TOWN OF CEDAREDGE, COLORADO

## AND THE

## BUREAU OF LAND MANAGEMENT

## UNCOMPAHGRE FIELD OFFICE

## I.  INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office, is undertaking a major revision of their Resource Management Plan (RMP) beginning in the spring of 2009. The BLM anticipates that the RMP revision and associated environmental impact statement (EIS) will take approximately four years to complete.

The Town of Cedaredge is eligible to become a Cooperating Agency for the duration of the RMP/EIS process. Cooperating Agency status provides an opportunity for the BLM, the Town of Cedaredge and other Cooperating Agencies to work together to enhance the BLM's planning efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the Cooperating Agencies as agreed upon between the Town of Cedaredge and the Uncompahgre Field Office (UFO) for the purposes of collaborative planning and production of the RMP and EIS.

## II.  PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part 1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM recognizes a compelling need to ensure that the interests of the Town of Cedaredge are accounted for, and that they are meaningfully engaged in the above stated resource management planning effort and associated EIS.

As such, the Town of Cedaredge has requested, and the BLM has agreed to grant, Cooperating Agency Status pursuant to 40CFR 1501.6, 1501.2, and 1501.8. Under the regulations, the BLM recognizes that the Town of Cedaredge has special expertise as it relates to various aspects of the planning effort described above.

BLM_0078120

## III. AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives. Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between the Town of Cedaredge and the BLM during the planning process. An entity may change its representative at any time by providing written notice to the other party. Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV. AUTHORITIES FOR AGREEMENT

Authority for the BLM and the Town of Cedaredge to participate in this agreement is provided by the National Environmental Policy Act, 42 USC 4321 et seq. and 40 CFR 1501.6 – Cooperating Agencies, 1506.2 – Elimination of Duplication with State and Local Procedures, and 1508.5 – Cooperating Agency (CA).

Additional authority comes from the Federal Land Policy Management Act, 43 USC 1712 et seq., which mandates coordination of BLM planning and management efforts with the programs of state and local governments which may be affected by those planning actions.

## V. ROLES AND RESPONSIBILITIES

### A. RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i. To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii. To provide the Town of Cedaredge with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,
- identifying or providing data that is suitable, available and relevant to the planning effort,
- reviewing and commenting on draft sections of the EIS for which the Town of Cedaredge provided input due to its special expertise.

iii. To consider and incorporate information and comments provided by the Town of Cedaredge into EIS documents to the extent possible and where appropriate.

iv. To make all final determinations regarding the content of the EIS document.

BLM_0078121

## B. RESPONSIBILITIES OF THE TOWN OF CEDAREDGE

The Town of Cedaredge has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i.   Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii.  To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii. To provide data of potential relevance and value to the RMP revision/EIS effort. This data may include but is not limited to the following:

   - approved Town of Cedaredge programs, plans and policies potentially affected by the RMP,

   - information regarding planning area resources and current and proposed uses and management actions,

   - environmental analyses on issues for which the Town of Cedaredge has special expertise,

   - socio-economic data such as demographics, activities and values.

iv.  To review and provide comments during specified review periods on preliminary baseline and other technical reports for which the Town of Cedaredge has contributed data or other pertinent information.

v.   To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

   - preliminary range of alternatives to be considered in detail,

   - relevant portions of the "Affected Environment" section (including the socio-economic portion),

   - relevant portions of the "Environmental Consequences" section,

   - relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi.  During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii. To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

BLM_0078122

## VI.   FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.   JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.   IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories.  The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

The Town of Cedaredge or the BLM may terminate this agreement by providing written notice of termination to the other party.  If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of the Town of Cedaredge or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either the Town of Cedaredge or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.   SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding.  Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

BLM_0078123

## X.   SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates shown below.

BUREAU OF LAND MANAGEMENT

_Barbara L. Sharrow_

Barbara L. Sharrow, Field Manager
Uncompahgre Field Office, BLM

6-8-09
Date

TOWN OF CEDAREDGE, COLORADO

Anthony Sluski/Mayor
Town of Cedaredge

4-04-09
Date

BLM_0078124

APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:        **TOWN OF CEDAREDGE, COLORADO**

Anthony Sluski

Mayor

Town of Cedaredge

PO Box 398

Cedaredge, CO  81413

Phone: (970) 856-~~8425~~ 3123

Fax: (970) 856-7292

Email: ~~clerk@cedaredgecolorado.com~~
tony@cedaredgecolorado.com

REPRESENTING:        **BUREAU OF LAND MANAGEMENT**
**UNCOMPAHGRE FIELD OFFICE**

Bruce Krickbaum

RMP Project Manager

Uncompahgre Field Office

2465 South Townsend Avenue

Montrose, CO  81401

Phone: (970) 240-5384

Fax: (970) 240-5367

Email: bruce_krickbaum@blm.gov

BLM_0078125



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

May 18, 2009

Anthony Sluski, Mayor
Town of Cedaredge
Post Office Box 398
Cedaredge, Colorado 81413

Dear Mr. Sluski:

The Bureau of Land Management (BLM), Uncompahgre Field Office (UFO) is in the beginning stages of revising the Uncompahgre Resource Management Plan (RMP) and associated environmental impact statement (EIS). We anticipate that this effort will take approximately four years to complete.

In the spirit of agency consultation and cooperation, the BLM has invited, and the Town of Cedaredge has accepted, an invitation to serve as a Cooperating Agency for the duration of the land use planning process. The attached Memorandum of Understanding (MOU) confirms your acceptance and outlines the relationship and respective roles of our organizations during the RMP effort.

The role of the Town of Cedaredge will include attending public meetings, as well as reviewing and commenting on plan documents. There is a time requirement associated with these reviews. In addition, the Town of Cedaredge will have an obligation to contribute staff time to an estimated twelve to twenty meetings, assist with analysis for which you have particular expertise, and fund your own participation.

Please read over the MOU, sign page 5, and return the original signed document to the UFO for my signature. We will then mail you a signed copy for your records. If you have not already designated an agency representative to represent the Town of Cedaredge during the planning effort, please provide the name and contact information for this key individual on page 6.

2

If you have questions regarding cooperating agency status or would like more information regarding the land use planning process, do not hesitate to call RMP Project Manager Bruce Krickbaum at (970) 240-5384 or email him at bruce_krickbaum@blm.gov.

Thank you for your interest in the Uncompahgre planning effort and the administration of our public lands.  We look forward to working with the Town of Cedaredge and to your contributions toward producing an RMP that will effectively guide management of BLM lands within the Uncompahgre planning area for the next twenty to thirty years.

Sincerely,

Barbara L. Sharrow
Field Manager

Enclosure
1 – Memorandum of Understanding (6 pp)



P.O. Box 398, 235 W. Main St, Cedaredge, CO 81413
Voice: (970) 856-3123    Fax: (970) 856-7292

June 4, 2009

To: Bruce Krickbaum

From: Darlyn Novakovich

Re: MOU

Bruce:

I have enclosed 2 Town signed originals of the MOU between BLM and the Town of Cedaredge.
Please return 1 fully signed original back to us for our records.

Thank you.

BLM_0078128

**MEMORANDUM OF UNDERSTANDING**

**BETWEEN**

**GUNNISON COUNTY, COLORADO**

**AND THE**

**BUREAU OF LAND MANAGEMENT**

**UNCOMPAHGRE FIELD OFFICE**

## I.   INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office, is undertaking a major revision of their Resource Management Plan (RMP) beginning in the spring of 2009. The BLM anticipates that the RMP revision and associated environmental impact statement (EIS) will take approximately four years to complete.

Gunnison County is eligible to become a Cooperating Agency for the duration of the RMP/EIS process. Cooperating Agency status provides an opportunity for the BLM, Gunnison County and other Cooperating Agencies to work together to enhance the BLM's planning efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the Cooperating Agencies as agreed upon between Gunnison County and the Uncompahgre Field Office (UFO) for the purposes of collaborative planning and production of the RMP and EIS.

## II.   PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part 1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM recognizes a compelling need to ensure that the interests of Gunnison County are accounted for, and that they are meaningfully engaged in the above stated resource management planning effort and associated EIS.

As such, Gunnison County has requested, and the BLM has agreed to grant, Cooperating Agency Status pursuant to 40CFR 1501.6, 1501.2, and 1501.8. Under the regulations, the BLM recognizes that Gunnison County has special expertise as it relates to various aspects of the planning effort described above.

BLM_0078129

## III.  AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives.  Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between Gunnison County and the BLM during the planning process. An entity may change its representative at any time by providing written notice to the other party.  Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV.  AUTHORITIES FOR AGREEMENT

Authority for the BLM and Gunnison County to participate in this agreement is provided by the National Environmental Policy Act, 42 USC 4321 et seq. and 40 CFR 1501.6 – Cooperating Agencies, 1506.2 – Elimination of Duplication with State and Local Procedures, and 1508.5 – Cooperating Agency (CA).

Additional authority comes from the Federal Land Policy Management Act, 43 USC 1712 et seq., which mandates coordination of BLM planning and management efforts with the programs of state and local governments which may be affected by those planning actions.

## V.  ROLES AND RESPONSIBILITIES

### A.  RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i.   To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii.  To provide Gunnison County with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,

- identifying or providing data that is suitable, available and relevant to the planning effort,

- reviewing and commenting on draft sections of the EIS for which Gunnison County provided input due to its special expertise.

iii. To consider and incorporate information and comments provided by Gunnison County into EIS documents to the extent possible and where appropriate.

iv.  To make all final determinations regarding the content of the EIS document.

Page 2 of 6

B. RESPONSIBILITIES OF GUNNISON COUNTY

Gunnison County has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i.   Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii.  To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii. To provide data of potential relevance and value to the RMP revision/EIS effort. This data may include but is not limited to the following:

   • approved Gunnison County programs, plans and policies potentially affected by the RMP,

   • information regarding planning area resources and current and proposed uses and management actions,

   • environmental analyses on issues for which Gunnison County has special expertise,

   • socio-economic data such as demographics, activities and values.

iv.  To review and provide comments during specified review periods on preliminary baseline and other technical reports for which Gunnison County has contributed data or other pertinent information.

v.   To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

   • preliminary range of alternatives to be considered in detail,

   • relevant portions of the "Affected Environment" section (including the socio-economic portion),

   • relevant portions of the "Environmental Consequences" section,

   • relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi.  During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii. To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

BLM_0078131

## VI.   FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.   JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.   IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories.  The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

Gunnison County or the BLM may terminate this agreement by providing written notice of termination to the other party.  If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of Gunnison County or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either Gunnison County or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.   SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding.  Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

BLM_0078132

## X.   SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates shown below.

BUREAU OF LAND MANAGEMENT

_Barbara L. Sharrow_        _6-8-09_

Barbara L. Sharrow, Field Manager     Date
Uncompahgre Field Office, BLM

GUNNISON COUNTY, COLORADO

_Matthew Birnie_        _6-01-09_

Matthew Birnie, County Manager     Date
Gunnison County

Page 5 of 6

BLM_0078133

## APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:          **GUNNISON COUNTY, COLORADO**


Mike Pelletier
Long Range Planner
Gunnison County
200 E. Virginia
Gunnison, CO  81230
Phone: (970) 641-0248
Fax:
Email: mbirnie@gunnisoncounty.org


REPRESENTING:          **BUREAU OF LAND MANAGEMENT
UNCOMPAHGRE FIELD OFFICE**


Bruce Krickbaum
RMP Project Manager
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
Phone: (970) 240-5384
Fax: (970) 240-5367
Email: bruce_krickbaum@blm.gov

BLM_0078134

## MEMORANDUM



Gunnison
County
COLORADO

Received

JUN 0 8 2009

Uncompan...

TO: **UNITED STATES DEPARTMENT OF THE INTERIOR**

   **BUREAU OF LAND MANAGEMENT**

   **UNCOMPAHGRE FIELD OFFICE**

   **ATT: BARARA L. SHARROW, FIELD MANAGER**

   **2465 S. TOWNSEND AVENUE**

   **MONTROSE, COLORADO 81401**

FROM: ADMINISTRATION OFFICE

SUBJECT: MEMORANDUM OF UNDERSTANDING

DATE:      6/4/2009

Please find included two original copies signed by County Manager Birnie: Memorandum of Understanding Between Gunnison County, Colorado and the Bureau of Land Management Uncompahgre Field Office.

Please sign and return an original copy to our office:

Gunnison County Administration

200 E. Virginia Ave, Ste. 104

Gunnison, CO 81230

BLM_0078135

BY:

JUN 0 1 2009

RECEIVED

# MEMORANDUM OF UNDERSTANDING
# BETWEEN THE
# TOWN OF HOTCHKISS, COLORADO
# AND THE
# BUREAU OF LAND MANAGEMENT
# UNCOMPAHGRE FIELD OFFICE

## I.   INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office, is undertaking a major revision of their Resource Management Plan (RMP) beginning in the spring of 2009.  The BLM anticipates that the RMP revision and associated environmental impact statement (EIS) will take approximately four years to complete.

The Town of Hotchkiss is eligible to become a Cooperating Agency for the duration of the RMP/EIS process.  Cooperating Agency status provides an opportunity for the BLM, the Town of Hotchkiss and other Cooperating Agencies to work together to enhance the BLM's planning efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the Cooperating Agencies as agreed upon between the Town of Hotchkiss and the Uncompahgre Field Office (UFO) for the purposes of collaborative planning and production of the RMP and EIS.

## II.   PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part 1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM recognizes a compelling need to ensure that the interests of the Town of Hotchkiss are accounted for, and that they are meaningfully engaged in the above stated resource management planning effort and associated EIS.

As such, the Town of Hotchkiss has requested, and the BLM has agreed to grant, Cooperating Agency Status pursuant to 40CFR 1501.6, 1501.2, and 1501.8.  Under the regulations, the BLM recognizes that the Town of Hotchkiss has special expertise as it relates to various aspects of the planning effort described above.

BLM_0078136



RECEIVED

JUN 0 1 2009

BY:

## III. AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives. Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between the Town of Hotchkiss and the BLM during the planning process. An entity may change its representative at any time by providing written notice to the other party. Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV. AUTHORITIES FOR AGREEMENT

Authority for the BLM and the Town of Hotchkiss to participate in this agreement is provided by the National Environmental Policy Act, 42 USC 4321 et seq. and 40 CFR 1501.6 – Cooperating Agencies, 1506.2 – Elimination of Duplication with State and Local Procedures, and 1508.5 – Cooperating Agency (CA).

Additional authority comes from the Federal Land Policy Management Act, 43 USC 1712 et seq., which mandates coordination of BLM planning and management efforts with the programs of state and local governments which may be affected by those planning actions.

## V. ROLES AND RESPONSIBILITIES

### A. RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i. To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii. To provide the Town of Hotchkiss with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,
- identifying or providing data that is suitable, available and relevant to the planning effort,
- reviewing and commenting on draft sections of the EIS for which the Town of Hotchkiss provided input due to its special expertise.

iii. To consider and incorporate information and comments provided by the Town of Hotchkiss into EIS documents to the extent possible and where appropriate.

iv. To make all final determinations regarding the content of the EIS document.

BLM_0078137



RECEIVED

JUN 0 1 2009

BY:

B. RESPONSIBILITIES OF THE TOWN OF HOTCHKISS

The Town of Hotchkiss has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i.   Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii.  To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii. To provide data of potential relevance and value to the RMP revision/EIS effort. This data may include but is not limited to the following:

- approved Town of Hotchkiss programs, plans and policies potentially affected by the RMP,

- information regarding planning area resources and current and proposed uses and management actions,

- environmental analyses on issues for which the Town of Hotchkiss has special expertise,

- socio-economic data such as demographics, activities and values.

iv.  To review and provide comments during specified review periods on preliminary baseline and other technical reports for which the Town of Hotchkiss has contributed data or other pertinent information.

v.   To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

- preliminary range of alternatives to be considered in detail,

- relevant portions of the "Affected Environment" section (including the socio-economic portion),

- relevant portions of the "Environmental Consequences" section,

- relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi.  During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii. To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

BLM_0078138

JUN 0 1 2009

## VI.   FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.   JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.   IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories. The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

The Town of Hotchkiss or the BLM may terminate this agreement by providing written notice of termination to the other party. If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of the Town of Hotchkiss or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either the Town of Hotchkiss or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.   SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding. Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

BLM_0078139

RECEIVED
JUN 0 1 2009
BY:_____

## X.   SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates shown below.

BUREAU OF LAND MANAGEMENT

_Barbara L. Sharrow_                          _6-8-09_

Barbara L. Sharrow, Field Manager            Date
Uncompahgre Field Office, BLM

TOWN OF HOTCHKISS, COLORADO

_Larry Jakubiak_                              _5-27-09_

Larry Jakubiak, Mayor                        Date
Town of Hotchkiss

Page 5 of 6

BLM_0078140

BY:
RECEIVED
JUN 0 1 2009

# APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:      **TOWN OF HOTCHKISS, COLORADO**

George Brauneis
Trustee
Town of Hotchkiss
PO Box 369
Hotchkiss, CO  81419
Phone: (970) 872-3663
Fax: (970) 872-4328
Email: MSe1047096@aol.com


REPRESENTING:      **BUREAU OF LAND MANAGEMENT
UNCOMPAHGRE FIELD OFFICE**

Bruce Krickbaum
RMP Project Manager
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
Phone: (970) 240-5384
Fax: (970) 240-5367
Email: bruce_krickbaum@blm.gov

Page 6 of 6

BLM_0078141

# MEMORANDUM OF UNDERSTANDING
## BETWEEN THE
## CITY OF MONTROSE, COLORADO
## AND THE
## BUREAU OF LAND MANAGEMENT
## UNCOMPAHGRE FIELD OFFICE

## I.   INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office, is undertaking a major revision of their Resource Management Plan (RMP) beginning in the spring of 2009. The BLM anticipates that the RMP revision and associated environmental impact statement (EIS) will take approximately four years to complete.

The City of Montrose is eligible to become a Cooperating Agency for the duration of the RMP/EIS process. Cooperating Agency status provides an opportunity for the BLM, the City of Montrose and other Cooperating Agencies to work together to enhance the BLM's planning efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the Cooperating Agencies as agreed upon between the City of Montrose and the Uncompahgre Field Office (UFO) for the purposes of collaborative planning and production of the RMP and EIS.

## II.   PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part 1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM recognizes a compelling need to ensure that the interests of the City of Montrose are accounted for, and that they are meaningfully engaged in the above stated resource management planning effort and associated EIS.

As such, the City of Montrose has requested, and the BLM has agreed to grant, Cooperating Agency Status pursuant to 40CFR 1501.6, 1501.2, and 1501.8. Under the regulations, the BLM recognizes that the City of Montrose has special expertise as it relates to various aspects of the planning effort described above.

## III.  AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives.  Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between the City of Montrose and the BLM during the planning process.  An entity may change its representative at any time by providing written notice to the other party.  Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV.  AUTHORITIES FOR AGREEMENT

Authority for the BLM and the City of Montrose to participate in this agreement is provided by the National Environmental Policy Act, 42 USC 4321 et seq. and 40 CFR 1501.6 – Cooperating Agencies, 1506.2 – Elimination of Duplication with State and Local Procedures, and 1508.5 – Cooperating Agency (CA).

Additional authority comes from the Federal Land Policy Management Act, 43 USC 1712 et seq., which mandates coordination of BLM planning and management efforts with the programs of state and local governments which may be affected by those planning actions.

## V.  ROLES AND RESPONSIBILITIES

### A.  RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i.  To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii.  To provide the City of Montrose with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,

- identifying or providing data that is suitable, available and relevant to the planning effort,

- reviewing and commenting on draft sections of the EIS for which the City of Montrose provided input due to its special expertise.

iii.  To consider and incorporate information and comments provided by the City of Montrose into EIS documents to the extent possible and where appropriate.

iv.  To make all final determinations regarding the content of the EIS document.

BLM_0078143

B. RESPONSIBILITIES OF THE CITY OF MONTROSE

The City of Montrose has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i.   Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii.  To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii. To provide data of potential relevance and value to the RMP revision/EIS effort. This data may include but is not limited to the following:

   • approved City of Montrose programs, plans and policies potentially affected by the RMP,

   • information regarding planning area resources and current and proposed uses and management actions,

   • environmental analyses on issues for which the City of Montrose has special expertise,

   • socio-economic data such as demographics, activities and values.

iv.  To review and provide comments during specified review periods on preliminary baseline and other technical reports for which the City of Montrose has contributed data or other pertinent information.

v.   To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

   • preliminary range of alternatives to be considered in detail,

   • relevant portions of the "Affected Environment" section (including the socio-economic portion),

   • relevant portions of the "Environmental Consequences" section,

   • relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi.  During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii. To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

BLM_0078144

## VI.   FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.   JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.   IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories.  The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

The City of Montrose or the BLM may terminate this agreement by providing written notice of termination to the other party.  If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of the City of Montrose or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either the City of Montrose or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.   SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding.  Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

BLM_0078145

## X.   SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates
shown below.

BUREAU OF LAND MANAGEMENT

*Barbara L. Sharrow*                    6-8-09

Barbara L. Sharrow, Field Manager       Date
Uncompahgre Field Office, BLM

CITY OF MONTROSE, COLORADO

*Mary H. Watt*                          6-5-09

Mary Watt, City Manager                 Date
City of Montrose

BLM_0078146

# APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:          **CITY OF MONTROSE, COLORADO**

Kerwin Jensen
Community Development
City of Montrose
PO Box 790
Montrose, CO  81402
Phone: (970) 240-1407 ext.478
Fax: (970) 240-1499
Email: kjensen@ci.montrose.co.us

REPRESENTING:          **BUREAU OF LAND MANAGEMENT**
**UNCOMPAHGRE FIELD OFFICE**

Bruce Krickbaum
RMP Project Manager
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
Phone: (970) 240-5384
Fax: (970) 240-5367
Email: bruce_krickbaum@blm.gov

Page 6 of 6

BLM_0078147



# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

May 18, 2009

Mary Watt, City Manager
City of Montrose
Post Office Box 790
Montrose, Colorado 81402

Dear Ms. Watt:

The Bureau of Land Management (BLM), Uncompahgre Field Office (UFO) is in the beginning stages of revising the Uncompahgre Resource Management Plan (RMP) and associated environmental impact statement (EIS). We anticipate that this effort will take approximately four years to complete.

In the spirit of agency consultation and cooperation, the BLM has invited, and the City of Montrose has accepted, an invitation to serve as a Cooperating Agency for the duration of the land use planning process. The attached Memorandum of Understanding (MOU) confirms your acceptance and outlines the relationship and respective roles of our organizations during the RMP effort.

The role of the City of Montrose will include attending public meetings, as well as reviewing and commenting on plan documents. There is a time requirement associated with these reviews. In addition, the City of Montrose will have an obligation to contribute staff time to an estimated twelve to twenty meetings, assist with analysis for which you have particular expertise, and fund your own participation.

Please read over the MOU, sign page 5, and return the original signed document to the UFO for my signature. We will then mail you a signed copy for your records. If you have not already designated an agency representative to represent the City of Montrose during the planning effort, please provide the name and contact information for this key individual on page 6.



2

If you have questions regarding cooperating agency status or would like more information regarding the land use planning process, do not hesitate to call RMP Project Manager Bruce Krickbaum at (970) 240-5384 or email him at bruce_krickbaum@blm.gov.

Thank you for your interest in the Uncompahgre planning effort and the administration of our public lands. We look forward to working with the City of Montrose and to your contributions toward producing an RMP that will effectively guide management of BLM lands within the Uncompahgre planning area for the next twenty to thirty years.

Sincerely,

Barbara L. Sharrow
Field Manager

Enclosure
    1 – Memorandum of Understanding (6 pp)

BLM_0078149

RECEIVED

JUN 0 1 2009

BY:

## MEMORANDUM OF UNDERSTANDING

## BETWEEN THE

## TOWN OF NORWOOD, COLORADO

## AND THE

## BUREAU OF LAND MANAGEMENT

## UNCOMPAHGRE FIELD OFFICE

## I.   INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office, is undertaking a major revision of their Resource Management Plan (RMP) beginning in the spring of 2009.  The BLM anticipates that the RMP revision and associated environmental impact statement (EIS) will take approximately four years to complete.

The Town of Norwood is eligible to become a Cooperating Agency for the duration of the RMP/EIS process.  Cooperating Agency status provides an opportunity for the BLM, the Town of Norwood and other Cooperating Agencies to work together to enhance the BLM's planning efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the Cooperating Agencies as agreed upon between the Town of Norwood and the Uncompahgre Field Office (UFO) for the purposes of collaborative planning and production of the RMP and EIS.

## II.   PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part 1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM recognizes a compelling need to ensure that the interests of the Town of Norwood are accounted for, and that they are meaningfully engaged in the above stated resource management planning effort and associated EIS.

As such, the Town of Norwood has requested, and the BLM has agreed to grant, Cooperating Agency Status pursuant to 40CFR 1501.6, 1501.2, and 1501.8.  Under the regulations, the BLM recognizes that the Town of Norwood has special expertise as it relates to various aspects of the planning effort described above.

JUN 0 1 2009

BY:_____

## III. AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives. Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between the Town of Norwood and the BLM during the planning process. An entity may change its representative at any time by providing written notice to the other party. Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV. AUTHORITIES FOR AGREEMENT

Authority for the BLM and the Town of Norwood to participate in this agreement is provided by the National Environmental Policy Act, 42 USC 4321 et seq. and 40 CFR 1501.6 – Cooperating Agencies, 1506.2 – Elimination of Duplication with State and Local Procedures, and 1508.5 – Cooperating Agency (CA).

Additional authority comes from the Federal Land Policy Management Act, 43 USC 1712 et seq., which mandates coordination of BLM planning and management efforts with the programs of state and local governments which may be affected by those planning actions.

## V. ROLES AND RESPONSIBILITIES

### A. RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i. To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii. To provide the Town of Norwood with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,
- identifying or providing data that is suitable, available and relevant to the planning effort,
- reviewing and commenting on draft sections of the EIS for which the Town of Norwood provided input due to its special expertise.

iii. To consider and incorporate information and comments provided by the Town of Norwood into EIS documents to the extent possible and where appropriate.

iv. To make all final determinations regarding the content of the EIS document.

BLM_0078151



RECEIVED
JUN 0 1 2009

B. RESPONSIBILITIES OF THE TOWN OF NORWOOD

The Town of Norwood has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i.   Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii.  To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii. To provide data of potential relevance and value to the RMP revision/EIS effort. This data may include but is not limited to the following:

  •  approved Town of Norwood programs, plans and policies potentially affected by the RMP,

  •  information regarding planning area resources and current and proposed uses and management actions,

  •  environmental analyses on issues for which the Town of Norwood has special expertise,

  •  socio-economic data such as demographics, activities and values.

iv.  To review and provide comments during specified review periods on preliminary baseline and other technical reports for which the Town of Norwood has contributed data or other pertinent information.

v.   To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

  •  preliminary range of alternatives to be considered in detail,

  •  relevant portions of the "Affected Environment" section (including the socio-economic portion),

  •  relevant portions of the "Environmental Consequences" section,

  •  relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi.  During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii. To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

BLM_0078152

RECEIVED

JUN 0 1 2009

BY:

## VI.   FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.   JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.   IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories.  The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

The Town of Norwood or the BLM may terminate this agreement by providing written notice of termination to the other party.  If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of the Town of Norwood or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either the Town of Norwood or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.   SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding.  Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

BLM_0078153



RECEIVED
JUN 0 1 2009
BY:

## X.  SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates shown below.


BUREAU OF LAND MANAGEMENT

_Barbara L Sharrow_                          _6-8-09_

Barbara L. Sharrow, Field Manager          Date
Uncompahgre Field Office, BLM




TOWN OF NORWOOD, COLORADO

_Kerry Welch_                               _5-28-09_

Kerry Welch, Mayor                          Date
Town of Norwood


Page 5 of 6

BLM_0078154



RECEIVED JUN 0 1 2009

## APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:     **TOWN OF NORWOOD, COLORADO**

Joe Reagan
Town of Norwood
PO Box 528
Norwood, CO  81423
Phone: ( 327-4873 (Joe); 970) 327-4288 (Patti)
Fax: (970) 327-0451
Email: mjreagan@fone.net; norwoodparker@centurytel.net

REPRESENTING:     **BUREAU OF LAND MANAGEMENT**
                  **UNCOMPAHGRE FIELD OFFICE**

Bruce Krickbaum
RMP Project Manager
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
Phone: (970) 240-5384
Fax: (970) 240-5367
Email: bruce_krickbaum@blm.gov

BLM_0078155

RECEIVED

JUN 0 1 2009

BY:_____

# MEMORANDUM OF UNDERSTANDING
## BETWEEN THE
## TOWN OF OLATHE, COLORADO
## AND THE
## BUREAU OF LAND MANAGEMENT
## UNCOMPAHGRE FIELD OFFICE

## I.   INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office, is undertaking a major revision of their Resource Management Plan (RMP) beginning in the spring of 2009. The BLM anticipates that the RMP revision and associated environmental impact statement (EIS) will take approximately four years to complete.

The Town of Olathe is eligible to become a Cooperating Agency for the duration of the RMP/EIS process. Cooperating Agency status provides an opportunity for the BLM, the Town of Olathe and other Cooperating Agencies to work together to enhance the BLM's planning efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the Cooperating Agencies as agreed upon between the Town of Olathe and the Uncompahgre Field Office (UFO) for the purposes of collaborative planning and production of the RMP and EIS.

## II.   PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part 1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM recognizes a compelling need to ensure that the interests of the Town of Olathe are accounted for, and that they are meaningfully engaged in the above stated resource management planning effort and associated EIS.

As such, the Town of Olathe has requested, and the BLM has agreed to grant, Cooperating Agency Status pursuant to 40CFR 1501.6, 1501.2, and 1501.8. Under the regulations, the BLM recognizes that the Town of Olathe has special expertise as it relates to various aspects of the planning effort described above.

## III. AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives. Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between the Town of Olathe and the BLM during the planning process. An entity may change its representative at any time by providing written notice to the other party. Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV. AUTHORITIES FOR AGREEMENT

Authority for the BLM and the Town of Olathe to participate in this agreement is provided by the National Environmental Policy Act, 42 USC 4321 et seq. and 40 CFR 1501.6 – Cooperating Agencies, 1506.2 – Elimination of Duplication with State and Local Procedures, and 1508.5 – Cooperating Agency (CA).

Additional authority comes from the Federal Land Policy Management Act, 43 USC 1712 et seq., which mandates coordination of BLM planning and management efforts with the programs of state and local governments which may be affected by those planning actions.

## V. ROLES AND RESPONSIBILITIES

### A. RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i. To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii. To provide the Town of Olathe with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,
- identifying or providing data that is suitable, available and relevant to the planning effort,
- reviewing and commenting on draft sections of the EIS for which the Town of Olathe provided input due to its special expertise.

iii. To consider and incorporate information and comments provided by the Town of Olathe into EIS documents to the extent possible and where appropriate.

iv. To make all final determinations regarding the content of the EIS document.

BLM_0078157

## B. RESPONSIBILITIES OF THE TOWN OF OLATHE

The Town of Olathe has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i. Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii. To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii. To provide data of potential relevance and value to the RMP revision/EIS effort. This data may include but is not limited to the following:

- approved Town of Olathe programs, plans and policies potentially affected by the RMP,

- information regarding planning area resources and current and proposed uses and management actions,

- environmental analyses on issues for which the Town of Olathe has special expertise,

- socio-economic data such as demographics, activities and values.

iv. To review and provide comments during specified review periods on preliminary baseline and other technical reports for which the Town of Olathe has contributed data or other pertinent information.

v. To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

- preliminary range of alternatives to be considered in detail,

- relevant portions of the "Affected Environment" section (including the socio-economic portion),

- relevant portions of the "Environmental Consequences" section,

- relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi. During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii. To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

BLM_0078158

## VI.  FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.  JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.  IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories. The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

The Town of Olathe or the BLM may terminate this agreement by providing written notice of termination to the other party. If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of the Town of Olathe or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either the Town of Olathe or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.  SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding. Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

BLM_0078159

## X.   SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates
shown below.

BUREAU OF LAND MANAGEMENT

*Barbara L. Sharrow*　　　　　　　　　　　*6-8-09*

Barbara L. Sharrow, Field Manager　　　　　Date
Uncompahgre Field Office, BLM

TOWN OF OLATHE, COLORADO

*Donald E. Perkins*　　　　　　　　　　　　*5-26-2009*

Donald E. Perkins, Mayor　　　　　　　　　Date
Town of Olathe

BLM_0078160

## APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:          **TOWN OF OLATHE, COLORADO**

Scott Harold
Town Administrator
Town of Olathe
PO Box 789
Olathe, CO  81425
Phone: (970) 323-5601
Fax: (970) 323 - 5149
Email:  sharold@ci.olathe.co.us

REPRESENTING:          **BUREAU OF LAND MANAGEMENT**
                       **UNCOMPAHGRE FIELD OFFICE**

Bruce Krickbaum
RMP Project Manager
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
Phone: (970) 240-5384
Fax: (970) 240-5367
Email: bruce_krickbaum@blm.gov

BLM_0078161



# United States Department of the Interior
### BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

May 18, 2009

Donald E. Perkins, Mayor
Town of Olathe
Post Office Box 789
Olathe, Colorado 81425

Dear Mr. Perkins:

The Bureau of Land Management (BLM), Uncompahgre Field Office (UFO) is in the beginning stages of revising the Uncompahgre Resource Management Plan (RMP) and associated environmental impact statement (EIS). We anticipate that this effort will take approximately four years to complete.

In the spirit of agency consultation and cooperation, the BLM has invited, and the Town of Olathe has accepted, an invitation to serve as a Cooperating Agency for the duration of the land use planning process. The attached Memorandum of Understanding (MOU) confirms your acceptance and outlines the relationship and respective roles of our organizations during the RMP effort.

The role of the Town of Olathe will include attending public meetings, as well as reviewing and commenting on plan documents. There is a time requirement associated with these reviews. In addition, the Town of Olathe will have an obligation to contribute staff time to an estimated twelve to twenty meetings, assist with analysis for which you have particular expertise, and fund your own participation.

Please read over the MOU, sign page 5, and return the original signed document to the UFO for my signature. We will then mail you a signed copy for your records. If you have not already designated an agency representative to represent the Town of Olathe during the planning effort, please provide the name and contact information for this key individual on page 6.

2

If you have questions regarding cooperating agency status or would like more information regarding the land use planning process, do not hesitate to call RMP Project Manager Bruce Krickbaum at (970) 240-5384 or email him at bruce_krickbaum@blm.gov.

Thank you for your interest in the Uncompahgre planning effort and the administration of our public lands. We look forward to working with the Town of Olathe and to your contributions toward producing an RMP that will effectively guide management of BLM lands within the Uncompahgre planning area for the next twenty to thirty years.

Sincerely,

Barbara L. Sharrow
Field Manager

Enclosure
   1 – Memorandum of Understanding (6 pp)

BLM_0078163

**MEMORANDUM OF UNDERSTANDING**

**BETWEEN**

**SAN MIGUEL COUNTY, COLORADO**

**AND THE**

**BUREAU OF LAND MANAGEMENT**

**UNCOMPAHGRE FIELD OFFICE**

## I.   INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office, is undertaking a major revision of their Resource Management Plan (RMP) beginning in the spring of 2009. The BLM anticipates that the RMP revision and associated environmental impact statement (EIS) will take approximately four years to complete.

San Miguel County is eligible to become a Cooperating Agency for the duration of the RMP/EIS process. Cooperating Agency status provides an opportunity for the BLM, San Miguel County and other Cooperating Agencies to work together to enhance the BLM's planning efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the Cooperating Agencies as agreed upon between San Miguel County and the Uncompahgre Field Office (UFO) for the purposes of collaborative planning and production of the RMP and EIS.

## II.   PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part 1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM recognizes a compelling need to ensure that the interests of San Miguel County are accounted for, and that they are meaningfully engaged in the above stated resource management planning effort and associated EIS.

As such, San Miguel County has requested, and the BLM has agreed to grant, Cooperating Agency Status pursuant to 40CFR 1501.6, 1501.2, and 1501.8. Under the regulations, the BLM recognizes that San Miguel County has special expertise as it relates to various aspects of the planning effort described above.

## III.  AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives.  Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between San Miguel County and the BLM during the planning process.  An entity may change its representative at any time by providing written notice to the other party.  Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV.  AUTHORITIES FOR AGREEMENT

Authority for the BLM and San Miguel County to participate in this agreement is provided by the National Environmental Policy Act, 42 USC 4321 et seq. and 40 CFR 1501.6 – Cooperating Agencies, 1506.2 – Elimination of Duplication with State and Local Procedures, and 1508.5 – Cooperating Agency (CA).

Additional authority comes from the Federal Land Policy Management Act, 43 USC 1712 et seq., which mandates coordination of BLM planning and management efforts with the programs of state and local governments which may be affected by those planning actions.

## V.  ROLES AND RESPONSIBILITIES

### A.  RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i.   To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii.  To provide San Miguel County with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,
- identifying or providing data that is suitable, available and relevant to the planning effort,
- reviewing and commenting on draft sections of the EIS for which San Miguel County provided input due to its special expertise.

iii.  To consider and incorporate information and comments provided by San Miguel County into EIS documents to the extent possible and where appropriate.

iv.  To make all final determinations regarding the content of the EIS document.

Page 2 of 6

BLM_0078165

B. RESPONSIBILITIES OF SAN MIGUEL COUNTY

San Miguel County has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i.  Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii. To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii. To provide data of potential relevance and value to the RMP revision/EIS effort. This data may include but is not limited to the following:

   • approved San Miguel County programs, plans and policies potentially affected by the RMP,

   • information regarding planning area resources and current and proposed uses and management actions,

   • environmental analyses on issues for which San Miguel County has special expertise,

   • socio-economic data such as demographics, activities and values.

iv. To review and provide comments during specified review periods on preliminary baseline and other technical reports for which San Miguel County has contributed data or other pertinent information.

v. To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

   • preliminary range of alternatives to be considered in detail,

   • relevant portions of the "Affected Environment" section (including the socio-economic portion),

   • relevant portions of the "Environmental Consequences" section,

   • relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi. During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii. To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

BLM_0078166

## VI.   FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.   JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.   IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories. The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

San Miguel County or the BLM may terminate this agreement by providing written notice of termination to the other party. If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of San Miguel County or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either San Miguel County or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.   SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding. Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

BLM_0078167

## X.  SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates shown below.

### BUREAU OF LAND MANAGEMENT

Barbara L. Sharrow, Field Manager
Uncompahgre Field Office, BLM

6-8-09
Date

### SAN MIGUEL COUNTY, COLORADO

Elaine Fischer, Chair
San Miguel County Board of Commissioners

6/3/09
Date

Page 5 of 6

BLM_0078168

## APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:  **SAN MIGUEL COUNTY, COLORADO**

        Dave Schneck
        County Administrator
        San Miguel County
        PO Box 1170
        Telluride, CO  81435
        Phone: (970) 728-0447
        Fax: (970) 728-3718
        Email: daves@sanmiguelcounty.org

REPRESENTING:  **BUREAU OF LAND MANAGEMENT
        UNCOMPAHGRE FIELD OFFICE**

        Bruce Krickbaum
        RMP Project Manager
        Uncompahgre Field Office
        2465 South Townsend Avenue
        Montrose, CO  81401
        Phone: (970) 240-5384
        Fax: (970) 240-5367
        Email: bruce_krickbaum@blm.gov

BLM_0078169

# MEMORANDUM OF UNDERSTANDING
# BETWEEN THE
# BUREAU OF RECLAMATION
# AND THE
# BUREAU OF LAND MANAGEMENT
# UNCOMPAHGRE FIELD OFFICE

## I.   INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office (UFO), is undertaking a
major revision of their Resource Management Plan (RMP) beginning in the spring of 2009.  The
BLM anticipates that the RMP revision and associated environmental impact statement (EIS)
will take approximately four years to complete.

The Bureau of Reclamation (BOR) has agreed to serve as a Cooperating Agency for the
duration of the RMP/EIS process.  Cooperating Agency status provides an opportunity for the
BLM, the BOR and other Cooperating Agencies to work together to enhance the BLM's planning
efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the
Cooperating Agencies as agreed upon between the BOR and the UFO for the purposes of
collaborative planning and production of the RMP and EIS.

## II.   PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act
and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part
1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM
recognizes a compelling need to ensure that the interests of the BOR are accounted for, and
that they are meaningfully engaged in the above stated resource management planning effort
and associated EIS.

As such, the BOR has requested, and the BLM has agreed to grant, Cooperating Agency Status
pursuant to 40 CFR 1501.6 and 1508 et seq.  Under the regulations, the BLM recognizes that
the BOR has jurisdictional responsibilities and special expertise as it relates to various aspects
of the planning effort described above.

BLM_0078170

## III.  AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives.  Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between the BOR and the BLM during the planning process.  An entity may change its representative at any time by providing written notice to the other party.  Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV.  AUTHORITIES FOR AGREEMENT

Authority for the BLM and the BOR to participate in this agreement is provided through Council on Environmental Quality (CEQ) regulations implementing the National Environmental Policy Act, 42 USC 4321 et seq., including 40 CFR 1501.6 – Roles of lead and cooperating agencies, 1508.5, Defining eligibility, 1508.15, Jurisidiction by law, and 1508.26, Special expertise.

Additional authority is provided in BLM 43 CFR 1601.0-5, Defining eligibility and 1610.3-1, Inviting participation.

## V.  ROLES AND RESPONSIBILITIES

### A. RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i.   To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii.  To provide the BOR with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,
- identifying or providing data that is suitable, available and relevant to the planning effort,
- reviewing and commenting on draft sections of the EIS for which the BOR provided input due to its jurisdictional responsibilities or special expertise.

iii. To consider and incorporate information and comments provided by the BOR into EIS documents to the extent possible and where appropriate.

iv.  To make all final determinations regarding the content of the EIS document.

BLM_0078171

B.  RESPONSIBILITIES OF THE BUREAU OF RECLAMATION

The BOR has jurisdictional responsibilities and special expertise in a number of areas related to planning, and as such, is responsible for the following:

i.  Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii.  To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii.  To provide data of potential relevance and value to the RMP revision/EIS effort.  This data may include but is not limited to the following:

- approved BOR programs, plans and policies potentially affected by the RMP,
- information regarding planning area resources and current and proposed uses and management actions,
- environmental analyses on issues for which the BOR has jurisdictional responsibilities or special expertise,
- socio-economic data such as demographics, activities and values.

iv.  To review and provide comments during specified review periods on preliminary baseline and other technical reports for which the BOR has contributed data or other pertinent information.

v.  To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

- preliminary range of alternatives to be considered in detail,
- relevant portions of the "Affected Environment" section (including the socio-economic portion),
- relevant portions of the "Environmental Consequences" section,
- relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi.  During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii.  To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

BLM_0078172

## VI.   FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.   JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.   IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories. The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

The BOR or the BLM may terminate this agreement by providing written notice of termination to the other party. If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of the BOR or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either the BOR or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.   SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding. Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

BLM_0078173

## X.  SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates shown below.

BUREAU OF LAND MANAGEMENT

*Barbara L. Sharrow*                          6-10-09

Barbara L. Sharrow, Field Manager        Date
Uncompahgre Field Office, BLM

BUREAU OF RECLAMATION

*Carol DeAngelis*                          6/4/09

Carol DeAngelis, Area Manager           Date
Bureau of Reclamation

BLM_0078174

## APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:   **BUREAU OF RECLAMATION**
**Western Colorado Area Office**

Alan Schroeder
Bureau of Reclamation
2764 Compass Drive
Grand Junction, CO  81506
Phone: (970) 248-0690
Fax: (970) 248-0601
Email: ~~CDEANGELIS@USBR.GOV@BOR~~
ASCHROEDER@USBR.GOV

REPRESENTING:   **BUREAU OF LAND MANAGEMENT**
**UNCOMPAHGRE FIELD OFFICE**

Bruce Krickbaum
RMP Project Manager
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
Phone: (970) 240-5384
Fax: (970) 240-5367
Email: bruce_krickbaum@blm.gov

BLM_0078175

<div align="center">

**MEMORANDUM OF UNDERSTANDING**

**BETWEEN THE**

**TOWN OF RIDGWAY**

**AND THE**

**BUREAU OF LAND MANAGEMENT,**

**UNCOMPAHGRE FIELD OFFICE**

</div>

Received

JUN 1 0 2009

Uncompahgre Field Office

## I.   INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office, is undertaking a major revision of their Resource Management Plan (RMP) beginning in the spring of 2009.  The BLM anticipates that the RMP revision and associated environmental impact statement (EIS) will take approximately four years to complete.

The Town of Ridgway is eligible to serve as a Cooperating Agency for the duration of the RMP/EIS process.  Cooperating Agency status provides an opportunity for the BLM, the Town of Ridgway and other Cooperating Agencies to work together to enhance the BLM's planning efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the Cooperating Agencies as agreed upon between the Town of Ridgway and the Uncompahgre Field Office (UFO) for the purposes of collaborative planning and production of the RMP and EIS.

## II.   PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part 1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM recognizes a compelling need to ensure that the interests of the Town of Ridgway are accounted for, and that they are meaningfully engaged in the above stated resource management planning effort and associated EIS.

As such, the BLM has agreed to grant Cooperating Agency status to the Town of Ridgway pursuant to 40CFR 1501.6, 1501.2, and 1501.8.  Under the regulations, the BLM recognizes that the Town of Ridgway has special expertise as it relates to various aspects of the planning effort described above.

## III. AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives. Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between the Town of Ridgway and the BLM during the planning process. An entity may change its representative at any time by providing written notice to the other party. Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV. AUTHORITIES FOR AGREEMENT

Authority for the BLM and the Town of Ridgway to participate in this agreement is provided through Council on Environmental Quality (CEQ) regulations implementing the National Environmental Policy Act, 42 USC 4321 et seq., including 40 CFR 1501.6 – Roles of lead and cooperating agencies, 1508.5, Defining eligibility and 1508.26, Special expertise.

Additional authority is provided in BLM 43 CFR 1601.0-5, Defining eligibility and 1610.3-1, Inviting participation.

## V. ROLES AND RESPONSIBILITIES

### A. RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i. To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii. To provide the Town of Ridgway with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,
- identifying or providing data that is suitable, available and relevant to the planning effort,
- reviewing and commenting on draft sections of the EIS for which the Town of Ridgway provided input due to its special expertise.

iii. To consider and incorporate information and comments provided by the Town of Ridgwayinto EIS documents to the extent possible and where appropriate.

iv. To make all final determinations regarding the content of the EIS document.

Page 2 of 6

BLM_0078177

B. RESPONSIBILITIES OF THE TOWN OF RIDGWAY

The Town of Ridgway has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i.   Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii.  To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii. To provide data of potential relevance and value to the RMP revision/EIS effort. This data may include but is not limited to the following:

   • approved Town of Ridgway programs, plans and policies potentially affected by the RMP,

   • information regarding planning area resources and current and proposed uses and management actions,

   • environmental analyses on issues for which the Town of Ridgway has special expertise,

   • socio-economic data such as demographics, activities and values.

iv.  To review and provide comments during specified review periods on preliminary baseline and other technical reports for which the Town of Ridgway has contributed data or other pertinent information.

v.   To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

   • preliminary range of alternatives to be considered in detail,

   • relevant portions of the "Affected Environment" section (including the socio-economic portion),

   • relevant portions of the "Environmental Consequences" section,

   • relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi.  During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii. To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

BLM_0078178

## VI.   FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.   JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.   IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories. The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

The Town of Ridgway or the BLM may terminate this agreement by providing written notice of termination to the other party. If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of the Town of Ridgway or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either the Town of Ridgway or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.   SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding. Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

BLM_0078179

## X.   SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates shown below.

BUREAU OF LAND MANAGEMENT

_Barbara L. Sharrow_                              _6-10-09_
Barbara L. Sharrow, Field Manager          Date
Uncompahgre Field Office, BLM


TOWN OF RIDGWAY

_Greg Clifton_                                          _June 4 2009_
Greg Clifton, Town Manager                   Date
Town of Ridgway

Page 5 of 6

BLM_0078180

## APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:        **TOWN OF RIDGWAY**

Greg Clifton, Town Manager
Jen Coats, Town Planner
PO Box 10
Ridgway, CO  81432
Phone: (970) 626-5308
Fax:
Email: gclifton@town.ridgway.co.us

REPRESENTING:        **BUREAU OF LAND MANAGEMENT**
                     **UNCOMPAHGRE FIELD OFFICE**

Bruce Krickbaum
RMP Project Manager
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
Phone: (970) 240-5384
Fax: (970) 240-5367
Email: bruce_krickbaum@blm.gov

BLM_0078181

Received

JUN 1 7 2009

Uncompahgre Field Office

# MEMORANDUM OF UNDERSTANDING
## BETWEEN
## OURAY COUNTY, COLORADO
## AND THE
## BUREAU OF LAND MANAGEMENT
## UNCOMPAHGRE FIELD OFFICE

## I.   INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office, is undertaking a major revision of their Resource Management Plan (RMP) beginning in the spring of 2009. The BLM anticipates that the RMP revision and associated environmental impact statement (EIS) will take approximately four years to complete.

Ouray County is eligible to become a Cooperating Agency for the duration of the RMP/EIS process. Cooperating Agency status provides an opportunity for the BLM, Ouray County and other Cooperating Agencies to work together to enhance the BLM's planning efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the Cooperating Agencies as agreed upon between Ouray County and the Uncompahgre Field Office (UFO) for the purposes of collaborative planning and production of the RMP and EIS.

## II.   PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part 1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM recognizes a compelling need to ensure that the interests of Ouray County are accounted for, and that they are meaningfully engaged in the above stated resource management planning effort and associated EIS.

As such, Ouray County has requested, and the BLM has agreed to grant, Cooperating Agency Status pursuant to 40CFR 1501.6, 1501.2, and 1501.8. Under the regulations, the BLM recognizes that Ouray County has special expertise as it relates to various aspects of the planning effort described above.

BLM_0078182

## III.  AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives.  Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between Ouray County and the BLM during the planning process. An entity may change its representative at any time by providing written notice to the other party.  Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV.  AUTHORITIES FOR AGREEMENT

Authority for the BLM and Ouray County to participate in this agreement is provided by the National Environmental Policy Act, 42 USC 4321 et seq. and 40 CFR 1501.6 – Cooperating Agencies, 1506.2 – Elimination of Duplication with State and Local Procedures, and 1508.5 – Cooperating Agency (CA).

Additional authority comes from the Federal Land Policy Management Act, 43 USC 1712 et seq., which mandates coordination of BLM planning and management efforts with the programs of state and local governments which may be affected by those planning actions.

## V.  ROLES AND RESPONSIBILITIES

### A.  RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i.   To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii.  To provide Ouray County with meaningful opportunities for participation, including involvement in:
   - identifying issues and concerns of relevance to the planning effort,
   - identifying or providing data that is suitable, available and relevant to the planning effort,
   - reviewing and commenting on draft sections of the EIS for which Ouray County provided input due to its special expertise.

iii. To consider and incorporate information and comments provided by Ouray County into EIS documents to the extent possible and where appropriate.

iv.  To make all final determinations regarding the content of the EIS document.

BLM_0078183

B. RESPONSIBILITIES OF OURAY COUNTY

Ouray County has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i.  Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii.  To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii.  To provide data of potential relevance and value to the RMP revision/EIS effort. This data may include but is not limited to the following:

   • approved Ouray County programs, plans and policies potentially affected by the RMP,

   • information regarding planning area resources and current and proposed uses and management actions,

   • environmental analyses on issues for which Ouray County has special expertise,

   • socio-economic data such as demographics, activities and values.

iv.  To review and provide comments during specified review periods on preliminary baseline and other technical reports for which Ouray County has contributed data or other pertinent information.

v.  To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

   • preliminary range of alternatives to be considered in detail,

   • relevant portions of the "Affected Environment" section (including the socio-economic portion),

   • relevant portions of the "Environmental Consequences" section,

   • relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi.  During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii.  To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

BLM_0078184

## VI.    FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.    JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.    IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories. The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

Ouray County or the BLM may terminate this agreement by providing written notice of termination to the other party. If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of Ouray County or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either Ouray County or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.    SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding. Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

Page 4 of 6

BLM_0078185

## X.  SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates
shown below.

BUREAU OF LAND MANAGEMENT

_Dave Kauffman / Assoc. Field Mgr._              June 23, 2009
Barbara L. Sherrow, Field Manager              Date
Uncompahgre Field Office, BLM

OURAY COUNTY, COLORADO

_Heidi M. Albritton_                              06-15-09
Heidi Albritton, Chair                         Date
Ouray Board of County Commissioners

BLM_0078186

## APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:      **OURAY COUNTY, COLORADO**

~~Connie Hunt~~ *LYNN PADGETT*
County ~~Administrator~~ *COMMISSIONER*
Ouray County
PO Box C
Ouray, CO  81427
Phone: (970) 325-~~7263~~ *7320*
Fax: (970) 325-0452
Email: ~~chunt~~@ouraycountyco.gov
*lpadgett*

REPRESENTING:      **BUREAU OF LAND MANAGEMENT**
**UNCOMPAHGRE FIELD OFFICE**

Bruce Krickbaum
RMP Project Manager
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
Phone: (970) 240-5384
Fax: (970) 240-5367
Email: bruce_krickbaum@blm.gov

BLM_0078187

## APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:          **OURAY COUNTY**

Lynn Padgett,
County Commissioner
PO Box C
Ouray, CO  81427
Phone: (970) 325-7320
Fax: (970) 325-0452
Email: lpadgett@ouraycountyco.gov

REPRESENTING:          **BUREAU OF LAND MANAGEMENT**
**UNCOMPAHGRE FIELD OFFICE**

Bruce Krickbaum
RMP Project Manager
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
Phone: (970) 240-5384
Fax: (970) 240-5367
Email: bruce_krickbaum@blm.gov

BLM_0078188

**MEMORANDUM OF UNDERSTANDING**

**BETWEEN THE**

**TOWN OF ORCHARD CITY**

**AND THE**

**BUREAU OF LAND MANAGEMENT,**

**UNCOMPAHGRE FIELD OFFICE**

## I.   INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office, is undertaking a major revision of their Resource Management Plan (RMP) beginning in the spring of 2009.  The BLM anticipates that the RMP revision and associated environmental impact statement (EIS) will take approximately four years to complete.

The Town of Orchard City is eligible to serve as a Cooperating Agency for the duration of the RMP/EIS process.  Cooperating Agency status provides an opportunity for the BLM, the Town of Orchard City and other Cooperating Agencies to work together to enhance the BLM's planning efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the Cooperating Agencies as agreed upon between the Town of Orchard City and the Uncompahgre Field Office (UFO) for the purposes of collaborative planning and production of the RMP and EIS.

## II.   PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part 1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM recognizes a compelling need to ensure that the interests of the Town of Orchard City are accounted for, and that they are meaningfully engaged in the above stated resource management planning effort and associated EIS.

As such, the BLM has agreed to grant Cooperating Agency status to the Town of Orchard City pursuant to 40CFR 1501.6, 1501.2, and 1501.8.  Under the regulations, the BLM recognizes that the Town of Orchard City has special expertise as it relates to various aspects of the planning effort described above.

## III. AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives. Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between the Town of Orchard City and the BLM during the planning process. An entity may change its representative at any time by providing written notice to the other party. Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV. AUTHORITIES FOR AGREEMENT

Authority for the BLM and the Town of Orchard City to participate in this agreement is provided through Council on Environmental Quality (CEQ) regulations implementing the National Environmental Policy Act, 42 USC 4321 et seq., including 40 CFR 1501.6 – Roles of lead and cooperating agencies, 1508.5, Defining eligibility and 1508.26, Special expertise.

Additional authority is provided in BLM 43 CFR 1601.0-5, Defining eligibility and 1610.3-1, Inviting participation.

## V. ROLES AND RESPONSIBILITIES

### A. RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i. To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii. To provide the Town of Orchard City with meaningful opportunities for participation, including involvement in:

   - identifying issues and concerns of relevance to the planning effort,
   - identifying or providing data that is suitable, available and relevant to the planning effort,
   - reviewing and commenting on draft sections of the EIS for which the Town of Orchard City provided input due to its special expertise.

iii. To consider and incorporate information and comments provided by the Town of Orchard Cityinto EIS documents to the extent possible and where appropriate.

iv. To make all final determinations regarding the content of the EIS document.

BLM_0078190

B. RESPONSIBILITIES OF THE TOWN OF ORCHARD CITY

The Town of Orchard City has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i.   Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii.  To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii. To provide data of potential relevance and value to the RMP revision/EIS effort. This data may include but is not limited to the following:

   • approved Town of Orchard City programs, plans and policies potentially affected by the RMP,

   • information regarding planning area resources and current and proposed uses and management actions,

   • environmental analyses on issues for which the Town of Orchard City has special expertise,

   • socio-economic data such as demographics, activities and values.

iv.  To review and provide comments during specified review periods on preliminary baseline and other technical reports for which the Town of Orchard City has contributed data or other pertinent information.

v.   To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

   • preliminary range of alternatives to be considered in detail,

   • relevant portions of the "Affected Environment" section (including the socio-economic portion),

   • relevant portions of the "Environmental Consequences" section,

   • relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi.  During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii. To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

BLM_0078191

## VI.   FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.   JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.   IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories. The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

The Town of Orchard City or the BLM may terminate this agreement by providing written notice of termination to the other party. If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of the Town of Orchard City or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either the Town of Orchard City or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.   SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding. Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

Page 4 of 6

BLM_0078192

## X. SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates shown below.

BUREAU OF LAND MANAGEMENT

Barbara L. Sharrow, Field Manager
Uncompahgre Field Office, BLM

6-30-09
Date

TOWN OF ORCHARD CITY, COLORADO

~~Len Johnson, Town Board of Trustees~~
Town of Orchard City
DoXI SUPPES, MAYOR

6-11-09
Date

BLM_0078193

## APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:          **TOWN OF ORCHARD CITY, COLORADO**

David Varley
Town Administrator
Town of Orchard City
9661 2100 Rd
Austin, CO  81410
Phone: (970) 835-3403
Fax: (970) 835-3330
Email: davidvarley@kaycee.net

REPRESENTING:          **BUREAU OF LAND MANAGEMENT**
**UNCOMPAHGRE FIELD OFFICE**

Bruce Krickbaum
RMP Project Manager
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
Phone: (970) 240-5384
Fax: (970) 240-5367
Email: bruce_krickbaum@blm.gov

BLM_0078194

**MEMORANDUM OF UNDERSTANDING**

**BETWEEN THE**

**U.S. FISH AND WILDLIFE SERVICE**

**AND THE**

**BUREAU OF LAND MANAGEMENT**

**UNCOMPAHGRE FIELD OFFICE**

## I.   INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office (UFO), is undertaking a major revision of their Resource Management Plan (RMP) beginning in the spring of 2009. The BLM anticipates that the RMP revision and associated environmental impact statement (EIS) will take approximately four years to complete.

The U.S. Fish and Wildlife Service (FWS) has agreed to serve as a Cooperating Agency for the duration of the RMP/EIS process. Cooperating Agency status provides an opportunity for the BLM, the FWS and other Cooperating Agencies to work together to enhance the BLM's planning efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the Cooperating Agencies as agreed upon between the FWS and the UFO for the purposes of collaborative planning and production of the RMP and EIS.

## II.  PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part 1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM recognizes a compelling need to ensure that the interests of the FWS are accounted for, and that they are meaningfully engaged in the above stated resource management planning effort and associated EIS.

As such, the FWS has requested, and the BLM has agreed to grant, Cooperating Agency Status pursuant to 40 CFR 1501.6 and 1508 et seq. Under the regulations, the BLM recognizes that the FWS has jurisdictional responsibilities and special expertise as it relates to various aspects of the planning effort described above.

## III.  AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives.  Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between the FWS and the BLM during the planning process.  An entity may change its representative at any time by providing written notice to the other party. Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV.  AUTHORITIES FOR AGREEMENT

Authority for the BLM and the FWS to participate in this agreement is provided through Council on Environmental Quality (CEQ) regulations implementing the National Environmental Policy Act, 42 USC 4321 et seq., including 40 CFR 1501.6 – Roles of lead and cooperating agencies, 1508.5, Defining eligibility, 1508.15, Jurisidiction by law, and 1508.26, Special expertise.

Additional authority is provided in BLM 43 CFR 1601.0-5, Defining eligibility and 1610.3-1, Inviting participation.

## V.  ROLES AND RESPONSIBILITIES

### A.  RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i.  To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii.  To provide the FWS with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,

- identifying or providing data that is suitable, available and relevant to the planning effort,

- reviewing and commenting on draft sections of the EIS for which the FWS provided input due to its jurisdictional responsibilities or special expertise.

iii.  To consider and incorporate information and comments provided by the FWS into EIS documents to the extent possible and where appropriate.

iv.  To make all final determinations regarding the content of the EIS document.

BLM_0078196

B.  RESPONSIBILITIES OF THE U.S. FISH AND WILDLIFE SERVICE

The FWS has jurisdictional responsibilities and special expertise in a number of areas related to planning, and as such, is responsible for the following:

i.   Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii.  To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii. To provide data of potential relevance and value to the RMP revision/EIS effort.  This data may include but is not limited to the following:

- approved FWS programs, plans and policies potentially affected by the RMP,

- information regarding planning area resources and current and proposed uses and management actions,

- environmental analyses on issues for which the FWS has jurisdictional responsibilities or special expertise,

- socio-economic data such as demographics, activities and values.

iv.  To review and provide comments during specified review periods on preliminary baseline and other technical reports for which the FWS has contributed data or other pertinent information.

v.   To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

- preliminary range of alternatives to be considered in detail,

- relevant portions of the "Affected Environment" section (including the socio-economic portion),

- relevant portions of the "Environmental Consequences" section,

- relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi.  During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii. To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

BLM_0078197

## VI.   FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.   JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.   IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories.  The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

The FWS or the BLM may terminate this agreement by providing written notice of termination to the other party.  If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of the FWS or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either the FWS or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.   SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding.  Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

BLM_0078198

## X.   SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates shown below.


BUREAU OF LAND MANAGEMENT

_Barbara L. Sharrow_                _6-30-09_

Barbara L. Sharrow, Field Manager      Date
Uncompahgre Field Office, BLM


U.S. FISH AND WILDLIFE SERVICE

_Allen R Pfister_                 _6/25/09_

U.S. Fish and Wildlife Service      Date

BLM_0078199

RECEIVED

JUN 2 6 2009

BY:

APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:         **U.S. FISH AND WILDLIFE SERVICE**

**Western Colorado Ecological Services Field Office**

Collin Ewing, Fish and Wildlife Biologist

U.S. Fish and Wildlife Service

764 Horizon Drive

South Annex A - Bldg. B

Grand Junction, CO  81506-3946

Phone: (970) 243-2778 ext. 18

Fax:

Email: Collin_Ewing@fws.gov

REPRESENTING:         **BUREAU OF LAND MANAGEMENT**

**UNCOMPAHGRE FIELD OFFICE**

Bruce Krickbaum

RMP Project Manager

Uncompahgre Field Office

2465 South Townsend Avenue

Montrose, CO  81401

Phone: (970) 240-5384

Fax: (970) 240-5367

Email: bruce_krickbaum@blm.gov

BLM_0078200



# United States Department of the Interior



FISH AND WILDLIFE SERVICE
Ecological Services
764 Horizon Drive, Building B
Grand Junction, Colorado 81506-3946

IN REPLY REFER TO:
ES/CO:BLM/UFO
TAILS 65413-2009-FA-0018

June 25, 2009

Memorandum

To:        Field Manager, Bureau of Land Management, Uncompahgre Field Office, Montrose, Colorado

From:      Acting Western Colorado Supervisor, Fish and Wildlife Service, Ecological Services, Grand Junction, Colorado

Subject:   Cooperating Agency Memorandum of Understanding

On May 26, 2009, we received your letter with the attached draft Cooperating Agency Memorandum of Understanding (MOU) for the Uncompahgre Field Office Resource Management Plan (RMP) revision. As you requested, I have signed the MOU and it is attached. We look forward to working with you throughout the RMP revision process.

If you have any further questions please contact Collin Ewing at 970-243-2778, extension 18.

Attachment

CEwingBLM-UFO-RMP-MOU.doc:062509

# MEMORANDUM OF UNDERSTANDING
# BETWEEN THE
# TOWN OF MOUNTAIN VILLAGE, COLORADO
# AND THE
# BUREAU OF LAND MANAGEMENT
# UNCOMPAHGRE FIELD OFFICE

## I.   INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office, is undertaking a major revision of their Resource Management Plan (RMP) beginning in the spring of 2009.  The BLM anticipates that the RMP revision and associated environmental impact statement (EIS) will take approximately four years to complete.

The Town of Mountain Village is eligible to become a Cooperating Agency for the duration of the RMP/EIS process.  Cooperating Agency status provides an opportunity for the BLM, the Town of Mountain Village and other Cooperating Agencies to work together to enhance the BLM's planning efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the Cooperating Agencies as agreed upon between the Town of Mountain Village and the Uncompahgre Field Office (UFO) for the purposes of collaborative planning and production of the RMP and EIS.

## II.   PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part 1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM recognizes a compelling need to ensure that the interests of the Town of Mountain Village are accounted for, and that they are meaningfully engaged in the above stated resource management planning effort and associated EIS.

As such, the Town of Mountain Village has requested, and the BLM has agreed to grant, Cooperating Agency Status pursuant to 40CFR 1501.6, 1501.2, and 1501.8.  Under the regulations, the BLM recognizes that the Town of Mountain Village has special expertise as it relates to various aspects of the planning effort described above.

## III.  AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives.  Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between the Town of Mountain Village and the BLM during the planning process.  An entity may change its representative at any time by providing written notice to the other party.  Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV.  AUTHORITIES FOR AGREEMENT

Authority for the BLM and the Town of Mountain Village to participate in this agreement is provided by the National Environmental Policy Act, 42 USC 4321 et seq. and 40 CFR 1501.6 – Cooperating Agencies, 1506.2 – Elimination of Duplication with State and Local Procedures, and 1508.5 – Cooperating Agency (CA).

Additional authority comes from the Federal Land Policy Management Act, 43 USC 1712 et seq., which mandates coordination of BLM planning and management efforts with the programs of state and local governments which may be affected by those planning actions.

## V.  ROLES AND RESPONSIBILITIES

### A. RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i.  To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii.  To provide the Town of Mountain Village with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,
- identifying or providing data that is suitable, available and relevant to the planning effort,
- reviewing and commenting on draft sections of the EIS for which the Town of Mountain Village provided input due to its special expertise.

iii.  To consider and incorporate information and comments provided by the Town of Mountain Village into EIS documents to the extent possible and where appropriate.

iv.  To make all final determinations regarding the content of the EIS document.

BLM_0078203

B. RESPONSIBILITIES OF THE TOWN OF MOUNTAIN VILLAGE

The Town of Mountain Village has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i. Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii. To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii. To provide data of potential relevance and value to the RMP revision/EIS effort. This data may include but is not limited to the following:

- approved Town of Mountain Village programs, plans and policies potentially affected by the RMP,

- information regarding planning area resources and current and proposed uses and management actions,

- environmental analyses on issues for which the Town of Mountain Village has special expertise,

- socio-economic data such as demographics, activities and values.

iv. To review and provide comments during specified review periods on preliminary baseline and other technical reports for which the Town of Mountain Village has contributed data or other pertinent information.

v. To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

- preliminary range of alternatives to be considered in detail,

- relevant portions of the "Affected Environment" section (including the socio-economic portion),

- relevant portions of the "Environmental Consequences" section,

- relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi. During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii. To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

BLM_0078204

## VI.   FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.   JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.   IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories. The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

The Town of Mountain Village or the BLM may terminate this agreement by providing written notice of termination to the other party. If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of the Town of Mountain Village or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either the Town of Mountain Village or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.   SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding. Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

BLM_0078205

## X.   SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates shown below.

BUREAU OF LAND MANAGEMENT

*Barbara L. Sharrow*                 7-29-09

Barbara L. Sharrow, Field Manager       Date
Uncompahgre Field Office, BLM

TOWN OF MOUNTAIN VILLAGE, COLORADO

*Greg Sparks*                      7/24/09

Greg Sparks, Town Manager       Date
Town of Mountain Village

BLM_0078206

## APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:        **TOWN OF MOUNTAIN VILLAGE, COLORADO**

Greg Sparks

Town Manager

Town of Mountain Village

455 Mountain Village Blvd, Suite A

Mountain Village, CO  81435

Phone: (970) 369-6404

Fax:

Email: gsparks@mtnvillage.org


REPRESENTING:        **BUREAU OF LAND MANAGEMENT**
**UNCOMPAHGRE FIELD OFFICE**

Bruce Krickbaum

RMP Project Manager

Uncompahgre Field Office

2465 South Townsend Avenue

Montrose, CO  81401

Phone: (970) 240-5384

Fax: (970) 240-5367

Email: bruce_krickbaum@blm.gov

BLM_0078207



# United States Department of the Interior

## BUREAU OF LAND MANAGEMENT
### Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov



IN REPLY REFER TO:
1610 (CO-150)

July 1, 2009

Greg Sparks, Town Manager
Town of Mountain Village
455 Mountain Village Boulevard, Suite A
Mountain Village, Colorado 81435

Dear Mr. Sparks:

The Bureau of Land Management (BLM), Uncompahgre Field Office (UFO) is in the beginning stages of revising the Uncompahgre Resource Management Plan (RMP) and associated environmental impact statement. We anticipate that this effort will take approximately four years to complete.

In the spirit of agency consultation and cooperation, the BLM extended, and the Town of Mountain Village has accepted, an invitation to serve as a Cooperating Agency for the duration of the land use planning process. The attached Memorandum of Understanding (MOU) outlines the relationship and respective roles of our organizations during the RMP effort.

The role of the Town of Mountain Village will include attending public meetings, as well as reviewing and commenting on plan documents. There is a time requirement associated with these reviews. In addition, the Town of Mountain Village will have an obligation to contribute staff time to an estimated twelve to twenty meetings, assist with analysis for which you have particular expertise, and fund your own participation.

Please read over the MOU, sign page 5, and return the original signed document to the UFO for my signature. We will then mail you a signed copy for your records. If you have not already designated an Agency Representative to attend meetings and serve as a point of contact for the Town of Mountain Village during the planning effort, please provide the name and contact information for this key individual on page 6.

BLM_0078208

2

If you have questions regarding cooperating agency status or would like more information regarding the land use planning process, do not hesitate to call RMP Project Manager Bruce Krickbaum at (970) 240-5384 or email him at bruce_krickbaum@blm.gov.

Thank you for your interest in the Uncompahgre planning effort and the administration of our public lands.  We look forward to working with the Town of Mountain Village and to your contributions toward producing an RMP that will effectively guide management of BLM lands within the Uncompahgre planning area for the next twenty to thirty years.

Sincerely,

Barbara L. Sharrow
Field Manager

Enclosure
    1 – Memorandum of Understanding (6 pp)

*FS # 09-mu4/026400-05*

---

# MEMORANDUM OF UNDERSTANDING

# BETWEEN THE

# U.S. FOREST SERVICE – GRAND MESA, UNCOMPAHGRE

# AND GUNNISON NATIONAL FORESTS

# AND THE

# BUREAU OF LAND MANAGEMENT,

# UNCOMPAHGRE FIELD OFFICE

---

## I.   INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office, is undertaking a major revision of their Resource Management Plan (RMP) beginning in the spring of 2009.  The BLM anticipates that the RMP revision and associated environmental impact statement (EIS) will take approximately four years to complete.

The U.S. Forest Service (USFS), Grand Mesa, Uncompahgre and Gunnison National Forests has agreed to serve as a Cooperating Agency for the duration of the RMP/EIS process. Cooperating Agency status provides an opportunity for the BLM, the USFS and other Cooperating Agencies to work together to enhance the BLM's planning efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the Cooperating Agencies as agreed upon between the USFS and the Uncompahgre Field Office (UFO) for the purposes of collaborative planning and production of the RMP and EIS.

## II.   PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part 1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM recognizes a compelling need to ensure that the interests of the USFS are accounted for, and that they are meaningfully engaged in the above stated resource management planning effort and associated EIS.

As such, the USFS has requested, and the BLM has agreed to grant, Cooperating Agency Status pursuant to 40CFR 1501.6, 1501.2, and 1501.8.  Under the regulations, the BLM recognizes that the USFS has special expertise as it relates to various aspects of the planning effort described above.

## III.  AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives.  Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between the USFS and the BLM during the planning process.  An entity may change its representative at any time by providing written notice to the other party. Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV.  AUTHORITIES FOR AGREEMENT

Authority for the BLM and the USFS to participate in this agreement is provided through Council on Environmental Quality (CEQ) regulations implementing the National Environmental Policy Act, 42 USC 4321 et seq., including 40 CFR 1501.6 – Roles of lead and cooperating agencies, 1508.5, Defining eligibility, 1508.15, Jurisidiction by law, and 1508.26, Special expertise.

Additional authority is provided in BLM 43 CFR 1601.0-5, Defining eligibility and 1610.3-1, Inviting participation.

## V.   ROLES AND RESPONSIBILITIES

### A. RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i.   To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii.  To provide the USFS with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,

- identifying or providing data that is suitable, available and relevant to the planning effort,

- reviewing and commenting on draft sections of the EIS for which the USFS provided input due to its special expertise.

iii. To consider and incorporate information and comments provided by the USFS into EIS documents to the extent possible and where appropriate.

iv.  To make all final determinations regarding the content of the EIS document.

BLM_0078211

B. RESPONSIBILITIES OF THE U.S. FOREST SERVICE

The USFS has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i. Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii. To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii. To provide data of potential relevance and value to the RMP revision/EIS effort. This data may include but is not limited to the following:

- approved USFS programs, plans and policies potentially affected by the RMP,

- information regarding planning area resources and current and proposed uses and management actions,

- environmental analyses on issues for which the USFS has special expertise,

- socio-economic data such as demographics, activities and values.

iv. To review and provide comments during specified review periods on preliminary baseline and other technical reports for which the USFS has contributed data or other pertinent information.

v. To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

- preliminary range of alternatives to be considered in detail,

- relevant portions of the "Affected Environment" section (including the socio-economic portion),

- relevant portions of the "Environmental Consequences" section,

- relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi. During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii. To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

Page 3 of 6

BLM_0078212

## VI.   FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.   JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.   IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories.  The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

The USFS or the BLM may terminate this agreement by providing written notice of termination to the other party.  If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of the USFS or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either the USFS or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.   SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding.  Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

BLM_0078213

## X.   SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates shown below.

BUREAU OF LAND MANAGEMENT

*Barbara L. Sharrow*                                      9-3-09

Barbara L. Sharrow, Field Manager                    Date
Uncompahgre Field Office, BLM

U.S. FOREST SERVICE
Grand Mesa, Uncompahgre and
Gunnison National Forests

*Tamera Randall Parker*                                  9-2-09

Tamera K. Randall-Parker, District Ranger           Date
Ouray District, USFS

*Levi Broyles*                                           8/31/2009

Levi Broyles, District Ranger                        Date
Paonia District, USFS

Page 5 of 6

BLM_0078214

## APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:       **U.S. FOREST SERVICE, COLORADO**
**GRAND MESA, UNCOMPAHGRE AND GUNNISON**
**NATIONAL FORESTS**

Tamera K. Randall-Parker, District Ranger; Levi Broyles,
Paonia District Ranger
U.S. Forest Service, Grand Mesa, Uncompahgre and
Gunnison National Forests
2250 Highway 50
Delta, CO  81416
Phone: (970) 240-5415;  970-527-4131
Fax: (970) 240-5367; 970-527-4151
Email: tkrandallparker@fs.fed.us; lbroyles@fs.fed.us;

REPRESENTING:       **BUREAU OF LAND MANAGEMENT**
**UNCOMPAHGRE FIELD OFFICE**

Bruce Krickbaum
RMP Project Manager
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
Phone: (970) 240-5384
Fax: (970) 240-5367
Email: bruce_krickbaum@blm.gov

BLM_0078215



MAY 26 2009

# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, Colorado 81401
www.blm.gov

IN REPLY REFER TO:
1610 (CO-150)

May 20, 2009

Tamera K. Randall-Parker, Ouray District Ranger and
Levi Broyles, Paonia District Ranger
U.S. Forest Service
Grand Mesa, Uncompahgre and Gunnison National Forests
2250 Highway 50
Delta, Colorado 81416

Dear Ms. Randall-Parker and Mr. Broyles:

The Bureau of Land Management (BLM), Uncompahgre Field Office (UFO) is in the beginning stages of revising the Uncompahgre Resource Management Plan (RMP) and associated environmental impact statement. We anticipate that this effort will take approximately four years to complete.

In the spirit of agency consultation and cooperation, the BLM has invited, and the U.S. Forest Service (USFS) has accepted, an invitation to serve as a Cooperating Agency for the duration of the land use planning process. The attached Memorandum of Understanding (MOU) confirms your acceptance and outlines the relationship and respective roles of our organizations during the RMP effort.

The role of the USFS will include attending public meetings, as well as reviewing and commenting on plan documents. There is a time requirement associated with these reviews. In addition, the USFS will have an obligation to contribute staff time to an estimated twelve to twenty meetings, assist with analysis for which you have particular expertise, and fund your own participation.

Please read over the MOU, sign page 5, and return the original signed document to the UFO for my signature. We will then mail you a signed copy for your records. If you have not already designated an agency representative to represent the USFS during the planning effort, please provide the name and contact information for this key individual on page 6.

BLM_0078216

2

If you have questions regarding cooperating agency status or would like more information regarding the land use planning process, do not hesitate to call RMP Project Manager Bruce Krickbaum at (970) 240-5384 or email him at bruce_krickbaum@blm.gov.

Thank you for your interest in the Uncompahgre planning effort and the administration of our public lands. We look forward to working with the USFS and to your contributions toward producing an RMP that will effectively guide management of BLM lands within the Uncompahgre planning area for the next twenty to thirty years.

Sincerely,

Barbara L. Sharrow
Field Manager

Enclosure
   1 – Memorandum of Understanding (6 pp)

Levi attached is the MOU with the BLM for the Uncompahgre Resource Management Plan and associated EIS. Would you please sign, date and forward all four copies to Tammy for her signature.

Tammy when you receive the four copies from Levi would you please sign, date and forward to the BLM for the final signature. We need to have three signed originals, one for your records, one for Levi and one for my file.

If you have any questions or I may be of assistance please give me a call.  thanks

AONIA RANGER DISTRICT
CTION                          DATE

AUG 2 4 2009
DISTRICT RANGER_____
_ERIALS_____
NDS/ENG_____
NC?_____
LDLIFE_____

_BM ASST_____

BLM_0078218



## BLM UNCOMPAHGRE FIELD OFFICE
### INVITES YOU TO VISIT AN
### OPEN HOUSE PUBLIC MEETING

The Bureau of Land Management Uncompahgre Field Office is revising its Resource Management Plan that will provide management direction for the public lands and minerals within the field office for the next two decades. We want to hear from you!

We are holding six open houses to get input from the public as we begin this process. Stop by at any time during the time shown, learn more about the planning process, and share your comments and concerns.

- **Tuesday, January 12**
  Hotchkiss, 4:30 – 7:30 p.m.
  Memorial Hall
  175 N 1st St
- **Wednesday, January 13**
  Delta, 4:30 – 8:00 p.m.
  Bill Heddles Recreation Center
  530 Gunnison River Dr
- **Thursday, January 14**
  Montrose, 4:30 – 8:00 p.m.
  Montrose Pavilion
  1800 Pavilion Dr

- **Tuesday, January 19**
  Ridgway, 4:30 p.m. – 7:30 p.m.
  Ridgway Community Center
  201 N Railroad St
- **Wednesday, January 20**
  Norwood, 4:30 – 7:30 p.m.
  Norwood Town Hall
  1670 Naturita St
- **Thursday, January 21**
  Naturita, 4:30 – 7:30 p.m.
  Naturita Library
  411 W 2nd Ave

**For more information,** or to comment online, please visit the project website www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html, or contact the project manager, Bruce Krickbaum, at (970) 240-5300. **Written comments should be received by February 26, 2010**: Mail to BLM Uncompahgre RMP, 2465 S. Townsend Ave., Montrose, CO 81401; Fax to 1-970-240-5368; or E-mail to uformp@blm.gov.

NATIONAL SYSTEM OF PUBLIC LANDS

**Renewable Energy Information
for Scoping Meetings**

As part of the RMP, a renewable energy potential report is being prepared that identifies the potential for renewable energy development and the potential location of such development on BLM land within the planning area. Renewable energy includes biomass, wind, geothermal, and solar.

## Biomass
### Background Information
- Biomass is: food crops, grassy and woody plants, residues from agriculture or forestry, and organic component of municipal and industrial wastes, utilized to produce energy
- Biomass can be used for biofuels (i.e. ethanol and biodiesel), biopower (electricity generation), and bioproducts (i.e. plat-based plastics)
- DOE provides GIS data evaluating biomass resources for the US in Thousand Tonnes/Year (range is from below 50 (low) to above 500 (high) thousand Tonnes/year): in the UFO area resource fall below 50 (in small areas below 100) thousand Tonnes/year
- Biomass can be collected and harvested from BLM lands through timber sales, stewardship, and hazardous fuels reduction.
### BLM Renewable Energy Assessment (2005)
- Used NASA's NDVI program using visible and near-infrared channel reflectances to estimate amount of vegetation on surfaces.
- BLM/NREL Staff used NDVI of 0.4 or greater that lasted at least 4 months, lands with slopes <12% and areas within 50 miles of a town to determine high potential areas
- Large areas of BLM land in the UFO appear to have high-potential for biomass production (4 to 5 months of NDVI of 0.4 or greater)

## Wind Energy
### Background Information
- Wind is a form of solar energy caused by irregular heating of the atmosphere by the sun.
- Earth's terrain and rotation of the earth also effect wind and modify it.
- Wind power uses wind turbines to harvest the energy of moving air and convert to mechanical energy or electricity.
- It is the world's fastest growing energy source.
- Wind energy developments are granted as right-of-ways.
### Wind Energy Development Final Programmatic EIS (2005)
- Determined potential associated with wind energy development on BLM lands in western US.
- Used data created by TrueWind and validated by the National Renewable Energy Laboratory (NREL).
- The following screening criteria determine high potential areas:
  - Wind power class 3 and above;
  - Within 25 miles of transmission lines (69-345 kV); and
  - Within 50 miles of major roads.
- Developed a maximum potential development scenario on public lands for the next 20 years.
- Maps showed low, medium, and high potential areas.
- Class 1 and 2 areas were considered low-potential, class 3 medium, and class 4 and above were considered economically developable.
- Based on this assessment, no economically developable lands in the UFO area were identified.

BLM_0078220

**Geothermal Energy**
<u>Background Information</u>
➤ Two types of geothermal use:
    ➤ Direct Use- utilization of geothermal resources for commercial, residential, agricultural, public facilities, or other energy needs other than the commercial production of electricity
    ➤ Indirect Use- Commercial electrical generation
➤ Access to geothermal resources is granted through a formalized leasing process.
<u>Geothermal Programmatic EIS (2008)</u>
➤ The Uncompahgre planning area has 593,640 acres identified as having geothermal potential and as being open to leasing. These potential areas are mainly found on the eastern portion of the Uncompahgre planning area.
<u>Existing Activity</u>
➤ There are no geothermal facilities or pending applications for geothermal facilities in the Uncompahgre planning area.
➤ Three existing hot springs are located on the southern part of the Uncompahgre planning area:
    ➤ Orvis Hot Springs located approximately 2 miles south of  Ridgeway, CO on highway 550;
    ➤ Ouray Hot Spring (Radium Hot Spring) located less than one (1) mile north of Ouray, CO on highway 550; and
    ➤ Lemon Hot Spring located in the town of Placerville.

**Solar Energy**
<u>Background Information</u>
➤ Solar radiation is converted to energy through various technologies.
➤ Solar energy is the most abundant source of energy on Earth (the sun radiates more energy in one second than the world has used since time began).
➤ Solar energy developments are granted as right-of-ways.
<u>Solar Programmatic EIS (in progress)</u>
➤ Analyzes environmental impacts of utility-scale solar energy facilities in six western states: Arizona, California, Colorado, Nevada, New Mexico, and Utah.
➤ Maps and data for 24 tracts of BLM-administered lands (lands with excellent solar resources, suitable slope, proximity to roads and transmission lines, and containing at least 2000 acres of BLM lands) were considered for in-depth study of solar development;  in Colorado, four study areas have been identified: Antonito SE, De Tilla Gulch, Fourmile East, and Los Mongotes East. None are located the UFO area.
<u>BLM/DOE Renewable Energy Assessment (2003)</u>
➤ Makes use of available GIS data, and develops screening criteria in order to identify high potential areas in the Western US.
➤ Based on this assessment, no high-potential resource area for concentrating solar power is available in the UFO area; some high-potential photovoltaic resources are available in the UFO area, mainly in the west, in the northwest along the border with the BLM Grand Junction Field Office, and in the south along the border with the Dolores Field Office.

BLM_0078221

## 3.1 — BLM UNCOMPAHGRE FIELD OFFICE
### RMP PLANNING FACT SHEET
### *Recreation and Visitor Services*

Barbara Sharrow, UFO Field Manager
2465 S. Townsend Ave, Montrose, CO  81401
Office hours are 8:00 am to 4:30 pm
Phone: (970) 240-5300 | TDD (970) 240-5366
FAX (970) 240-5367

**The BLM Uncompahgre Field Office (UFO) is revising the Resource Management Plan (RMP) for the Uncompahgre planning area. An RMP provides detailed information about the current state of natural and cultural resources on public lands, and sets forth a plan of action for managing those resources for the next twenty or so years under the BLM's dual mandates of *multiple use* and *sustained yield*.**

### RECREATIONAL ACTIVITIES ABOUND

Public lands within the planning area support a variety of land, water, and snow activities, including camping, hiking, horseback riding, mountain biking, cross-country skiing, rock climbing, off-road vehicle driving, and target shooting.

Local rivers and streams offer ample opportunities for boating and cold water fishing, and attract high visitation from across the state and nationally. Migrating and resident wildlife provide plentiful opportunities for observation, photography, and hunting, when visitation in the area peaks.

### VISITATION AND LAND USE

The greatest number of recreational visits occur on UFO lands adjacent to communities. The towns of Montrose, Delta, Norwood, Paonia, Crawford, Hotchkiss, Cedaredge, Olathe, Ridgway, Telluride, Naturita, and Nucla are all bordered by public lands commonly used as "backyard" recreation areas by local residents.  This use continues to grow exponentially, along with growth in the communities themselves. The communities benefit directly from the visitation and tourism associated with public lands.

In fact, recreation has emerged as the predominant activity on local BLM lands and national forests. Most data on public land use and activities is a statistical approximation, relying heavily on field observations and the professional judgment of recreation staff. It is estimated that the UFO receives 349,000 visits per year.

### RECREATION MANAGEMENT AREAS

BLM land use plans designate *Special Recreation Management Areas* (SRMAs), where recreation is the principle management focus, and funding and personnel are directed toward fulfilling the commitment to provide specific "structured" recreation opportunities. The UFO currently has two SRMAs:

| SRMA NAME | LOCATION | ACRES |
|---|---|---|
| San Miguel River | Deep Creek to Piñon | 32,641 |
| Dolores River | UFO boundary to Bedrock | ? |

Any area not delineated as an SRMA is called an *extensive recreation management area* (ERMA). Recreation in these areas is unstructured and does not require intensive management or significant investments in trails or facilities. This type of custodial or "dispersed" recreation management offers little in the way of visitor services or developed recreational facilities.





## A COMPARISON OF ERMAs AND SRMAs

|  | ERMAs | SRMAs |
|---|---|---|
| **Management** | *Unstructured*<br><br>No identifiable market demand for structured recreation | *Structured*<br><br>Tied to identified market demand for structured recreation (i.e., activities, experiences, benefits, and the maintenance of recreation setting character) |
| **Objectives** | *Reactive & Custodial*<br><br>Directed at taking care of dispersed recreation-tourism activities | *Proactive*<br><br>Directed at producing specific recreation opportunities/ outcomes |

## DEVELOPED RECREATION FACILITIES

In certain locations, the BLM has constructed recreation sites and facilities in order to enhance recreation opportunities, protect resources, manage activities, and reduce user conflicts. These infrastructure developments range from campgrounds to simple bulletin boards at trailheads.

Developed recreation sites occur mainly along the San Miguel River SRMA and in the Dolores River SRMA. There are several campsites along the San Miguel River corridor which have boat ramps, changing rooms, cabanas and picnic tables, grills, kiosks, parking areas, and toilets. The Dolores River SRMA has picnic tables, cabanas, parking area, boat ramp and a visitor informational kiosk site.

There are other dispersed staging areas and trailheads in the planning area that consist of kiosks, picnic tables and parking areas as well as one developed site along the Uncompahgre River with cabanas and picnic tables, informational signs, benches, toilet and non-motorized paved trail.

## SPECIAL RECREATION PERMITS

The BLM requires special recreation permits (SRPs) for commercial uses, competitive events, organized groups, and recreation use within certain special areas in the UFO, including rivers, backcountry, and camping areas. Most SRPs issued by the UFO are for river activities and upland hunting outfitting.

The UFO currently has approximately fifty commercial permits issued, which include guided fishing, white water rafting, vehicle shuttles, big and small game hunting, mountain lion hunting, horseback trail rides, jeep and motorcycle tours, camping, archery tournaments and mountain bike rides. Fifteen percent of SRP fees are expended on program administration, with the remainder going toward visitor services, monitoring, and maintenance.

## The BLM wants your input...

The BLM designates SRMAs when recreational demands require that a particular recreation setting be maintained, or where structured opportunities for specific activities and recreational experiences are desired.

- **What areas should be designated and managed as SRMAs (rather than custodially managed for dispersed recreation as ERMAs)?**
- **Should the BLM develop recreation facilities and improve access to recreational opportunities? If so, where?**
- **Should the BLM charge fees for recreational use? If so, for which uses and/ or in which geographic areas?**
- **Should the BLM restrict target shooting to specific areas? If so, where?**

**UFO Planning Webpage:**
**http://www.blm.gov/co/st/en/fo/ufo/ uncompahgre_rmp.html**

**Email address for public comments:**
**UFORMP@blm.gov**

**Comments can also be mailed to:**
**Bruce Krickbaum,**
**RMP Project Manager**
**2465 S. Townsend Ave**
**Montrose, CO  81401**

**UFO 11/2009**

BLM_0078223

| 1 | **BLM UNCOMPAHGRE FIELD OFFICE**<br>**RMP PLANNING FACT SHEET**<br>***The Planning Process*** | Barbara Sharrow, UFO Field Manager<br>2465 S. Townsend Ave, Montrose, CO  81401<br>Office hours are 8:00 am to 4:30 pm<br>Phone: (970) 240-5300 | TDD (970) 240-5366<br>FAX (970) 240-5367 |

The BLM Uncompahgre Field Office (UFO) is revising the Resource Management Plan (RMP) for the Uncompahgre planning area.  The Uncompahgre RMP will provide detailed information about the current state of resources on public lands within the planning area, and set forth a plan of action for managing those resources for the next twenty or so years under the BLM's dual mandate of *multiple use* and *sustained yield*.

## UNCOMPAHGRE FIELD OFFICE

The BLM Uncompahgre Field Office (UFO) manages over 883,000 acres of public lands and 2,344,844 acres of subsurface mineral estate in six southwestern Colorado counties (Delta, Gunnison, Mesa, Montrose, Ouray and San Miguel).  The field office includes the Gunnison Gorge National Conservation Area (NCA) and Wilderness and portions of the Dominguez-Escalante NCA, Dominguez Canyon Wilderness, as well as four river systems (the Gunnison, San Miguel, Dolores and Uncompahgre).



The varied topography within the UFO ranges from salt desert shrub and lowland riparian (4,701 feet) to red rock desert to piñon-juniper woodland up to sub-alpine forest on Storm King Mountain (11,449 feet).  These lands contain a wealth of resources and opportunities for public use and enjoyment.

Management of the UFO is currently guided by two RMPs: the 1985 San Juan/San Miguel RMP and the 1989 Uncompahgre Basin RMP.  Both RMPs have been amended multiple times in order to reflect changing resource conditions and issues within the UFO and surrounding area.

## UNCOMPAHGRE PLANNING AREA

The Uncompahgre planning area is the portion of the UFO about which the BLM will make decisions during RMP planning.  The planning area is 787,640 surface acres and does not include the Gunnison Gorge NCA or  Dominguez-Escalante NCA, both of which are managed under separate RMPs.

The planning area includes the municipalities of Montrose, Delta and Ouray, and the towns of Cedaredge, Olathe, Bowie, Orchard City, Austin, Paonia, Maher, Telluride, Hotchkiss, Ridgway, Mountain Village, Norwood, Naturita, Crawford, Somerset and Sawpit, and is accessible year-round from a number of these locations.  Typical of many western public lands, the area has experienced increased use and an expanding wildland-urban interface.  In fact, Montrose is one of the nation's fastest -growing counties.

Major ***recreational opportunities*** within the planning area include hiking, horseback riding, camping, rafting, fishing, biking, Nordic skiing, OHV riding, snowmobiling, sightseeing, and hunting.  ***Non-recreational uses*** include livestock and grazing activities, forest resource activities, mineral exploration and development, administrative purposes and rights-of-way.

BLM

1—The Planning Process



## LAND USE PLANNING IN THE BLM

The BLM engages in land use planning in order to ensure that public lands are managed in accordance with the intent of Congress, under the principles of *multiple use* and *sustained yield*. Land use plans are one of the primary tools guiding BLM management activities in support of this dual mandate. In addition, effective planning creates enhanced opportunities for a variety of recreational and non-recreational public land uses.

## PUBLIC INVOLVEMENT IN THE PLANNING PROCESS

The BLM believes that public involvement is central to crafting a land use plan that reflects local, regional, and national values and receives widespread support, and will actively seek the participation of local communities and government agencies in this planning effort.

A *Community Assessment of the Uncompahgre Planning Area* was completed in February 2009 in order to help identify issues and provide baseline data that will be used in the planning effort. The assessment is available on the Uncompahgre planning webpage.

The BLM will hold public scoping open house meetings during January 2010 in Hotchkiss, Delta, Montrose, Ridgway, Norwood, and Naturita.  **It is not necessary to attend a scoping session in order to submit a comment.**

**UFO Planning Webpage:**
http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html

**Email address for public comments:**
UFORMP@blm.gov

**Comments can also be mailed to:**
Bruce Krickbaum,
RMP Project Manager
2465 S. Townsend Ave
Montrose, CO  81401

## MANAGING FOR CHANGE

**The BLM identified the following preliminary issues to be addressed during planning:**

- **Managing vegetative and water resources, terrestrial and aquatic habitat, and special management areas, while sustaining biological diversity and native species populations**
- **Managing mineral and renewable and nonrenewable energy resources**
- **Managing increasing numbers and types of human activities and uses**
- **Managing land tenure adjustments, withdrawals, and utility/energy corridors**
- **Managing and protecting cultural, historical, and paleontological resources and Native American Religious Concerns**
- **Managing public lands and resources, including authorized and permitted land uses, for a growing population and an expanding urban interface, with consideration for community values and needs.**



* Required documents in black

# 4.2

## BLM Uncompahgre Field Office
## RMP Planning Fact Sheet
### *Wild and Scenic Rivers*

Barbara Sharrow, UFO Field Manager
2465 S. Townsend Ave, Montrose, CO  81401
Office hours are 8:00 am to 4:30 pm
Phone: (970) 240-5300 | TDD (970) 240-5366
FAX (970) 240-5367

The BLM Uncompahgre Field Office (UFO) is revising the Resource Management Plan (RMP) for the Uncompahgre planning area.  The Uncompahgre RMP will provide detailed information about the current state of resources on public lands within the planning area, and set forth a plan of action for managing those resources for the next twenty or so years under the BLM's dual mandate of *multiple use* and *sustained yield*.

> **WHEN IS A STREAM A RIVER?**
> In WSR parlance, a *river* refers to a flowing body of water or estuary or a section, portion, or tributary thereof, including rivers, streams, creeks, runs, kills, rills, and small lakes.

Congress authorized the National Wild and Scenic Rivers (WSR) Act in 1968 to preserve certain rivers with outstanding natural, cultural, and recreational values in a free-flowing condition for the enjoyment of present and future generations.  The Act safeguards the special character of these rivers, while allowing for their appropriate use and development, and encouraging river management that crosses political boundaries and promotes public participation in river protection.

## What is the WSR study process?

The Act requires the BLM to assess river segments under its management as part of its resource management planning process.  The study and designation of rivers consists of a multi-step process: *eligibility → suitability → congressional action*.  Only Congress or (under certain circumstances) the Secretary of the Interior may designate a river for inclusion in the WSR system.  The UFO currently does not manage any WSR-designated rivers.

## What makes a segment eligible for WSR consideration?

The first step in the WSR study process is to determine which river segments meet eligibility criteria.  To be eligible, a river segment must be *free-flowing* and possess one or more *outstandingly remarkable values* (ORV).  ORVs may be scenic, recreational, geological, fish or wildlife related, historic, cultural, botanical, hydrological, or paleontological. ORVs must be of a quality or scarcity that makes them unique, rare, or exemplary within the region. In addition, rivers must have sufficient water quality to support those values .

## What did the UFO study determine?

During the inventory phase, 174 river segments were identified for review.  After evaluating these segments, 34 segments on 23 rivers were determined to be free-flowing and possessed one or more ORVs necessary to meet WSR eligibility requirements.  In addition, one segment of the Dolores River was deemed eligible by a neighboring field office.  The northernmost portion of this segment is managed by the UFO, and will be evaluated during the suitability phase, resulting in a total of 35 eligible UFO river segments.

> ## PRELIMINARY RIVER CLASSIFICATION GUIDELINES
>
> *Wild:*  Those rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted.
>
> *Scenic:*  Those rivers or sections of rivers that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but  accessible in places by roads.
>
> *Recreational:* Those rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past.



**BLM**

**4.2—Wild and Scenic Rivers**



### How does the BLM manage eligible segments?

BLM policy is to protect ORVs identified in an eligibility study until a decision on suitability can be made. The BLM must protect the free-flowing character, preliminary classification, and ORVs of eligible segments. Future UFO management actions will comply with these interim protective measures until a decision on suitability is made.

### What is meant by "free-flowing"?

Free-flowing means that there are no dams or diversions along a river segment that impound a significant amount of water for extended periods. It is not necessary for a river to have a completely natural flow regime to be considered. Congress has designated WSR segments immediately below major water storage projects.

### What's next?

The final step is to determine *suitability*, which is the basis for recommending rivers to Congress for addition to the national WSR System. During the suitability phase, the BLM will ask for stakeholder help to analyze potentially competing uses, various management prescriptions, and the positive and negative impacts of various designations for each segment, identify how stream-related values can best be protected and enhanced, and consider potential impacts to



other values such as water supply. During this process, federal agencies consider alternative approaches to managing water-related values, fully recognizing that WSR designation may not be the only way to protect them.

---

**Suitability is designed to answer the following questions:**

- **Should the river's free-flowing character, water quality, and ORVs be protected, or are one or more other uses important enough to warrant doing otherwise?**
- **Will the river's free-flowing character, water quality, and ORVs be protected through designation? Is it the best method for protecting the river corridor? In answering these questions, the benefits and impacts of WSR designation must be evaluated, and alternative protection methods considered.**
- **Is there a demonstrated commitment to protect the river by any non-federal entities who may be partially responsible for implementing protective management?**

**How will stakeholder and public involvement be incorporated into the suitability determination?**

Suitability evaluation is designed to be a highly inclusive process, with numerous opportunities for stakeholders and the public to get involved. The first opportunity is during the current RMP scoping period.

**Do the BLM's WSR determinations create any federal water rights to protect the ORVs?**

No. A federal water right is not created unless Congress designates a stream segment as a WSR.

**How would BLM suitability determination affect a future water supply project?**

Once a segment is determined to be suitable, the BLM cannot take any actions that could significantly impact the ORVs, water quality, or free-flowing nature of the stream segment.  If a proposed water supply project is located along a suitable stream segment, the project proponent can request that the BLM amend its RMP to allow the project to go forward.  The BLM may or may not grant that request, based upon an analysis of the importance of the water supply project relative to the impact it would have on the segment's ORVs, water quality, and free-flowing condition.

**Where can I get more in-depth information?**

The website www.rivers.gov is an excellent resource for detailed information related to the National WSR System, including the WSRA, the eligibility and suitability processes, and agency guidance.

---

**UFO Planning Webpage:**
http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html

**Comments can also be mailed to:**
**Bruce Krickbaum,**
**RMP Project Manager**
**2465 S. Townsend Ave**
**Montrose, CO  81401**

**Email address for public comments:**
**UFORMP@blm.gov**

**UFO 12/2009**

BLM_0078227

# BLM UNCOMPAHGRE FIELD OFFICE
## *Providing Comments During Public Scoping*

Barbara Sharrow, UFO Field Manager
2465 S. Townsend Ave, Montrose, CO  81401
Office hours are 8:00 am to 4:30 pm
Phone: (970) 240-5300 | TDD (970) 240-5366
FAX (970) 240-5367

**The BLM Uncompahgre Field Office (UFO) is revising the Resource Management Plan (RMP) for the Uncompahgre planning area. The Uncompahgre RMP will provide detailed information about the current state of resources on public lands within the planning area, and set forth a plan of action for managing those resources for the next twenty or so years under the BLM's dual mandate of *multiple use* and *sustained yield*.**

## PROVIDE EFFECTIVE COMMENTS

Many public land users, organizations, and individuals want to provide comments to help in the Uncompahgre RMP planning effort.  The best and most <u>useful comments are substantive comments</u>; that is, those that have substance.  Try not to provide comments that offer opinion only.

Substantive comments during scoping do one or more of the following:
- Raise issues BLM has not considered; reinforce issues BLM has already identified
- Identify additional planning criteria
- Present information that can be used when developing alternatives
- Present reasonable alternatives
- Present information that can be used when BLM considers impacts of alternatives
- Raise concerns, with reasoning, regarding public land resources within the planning area
- Raise concerns, with reasoning, regarding uses of public lands within the planning area
- Recommend specific changes to the landscape or management actions
- Show where BLM has erred in a report already completed

Comments that are not substantive include:
- Comments in favor of or against an action without any reasoning (such as "I don't like" without providing any rationale)
- Comments that only agree or disagree with BLM policy
- Comments without justification or supporting data (such as "allow more grazing ")
- Comments that don't pertain to the planning area (such as "the government should eliminate all dams throughout the west")
- Comments that take the form of vague, open-ended questions.

Please provide substantive comments, which will be the most useful kind during this planning effort.  Thank you for your interest in the Uncompahgre RMP.

<div style="writing-mode: vertical-rl">BLM</div>

<div style="writing-mode: vertical-rl">Providing Comments During Public Scoping</div>



**UFO Planning Webpage:**
http://www.blm.gov/co/st/en/
fo/ufo/uncompahgre_rmp.html

**Comments can also be mailed to:**
**Bruce Krickbaum,**
**RMP Project Manager**
**2465 S. Townsend Ave**
**Montrose, CO 81401**

**Email address for public comments:**
**UFORMP@blm.gov**

BLM_0078228

| | | |
|---|---|---|
| **3.2** | **BLM UNCOMPAHGRE FIELD OFFICE**<br>**RMP PLANNING FACT SHEET**<br>*Travel Management* | Barbara Sharrow, UFO Field Manager<br>2465 S. Townsend Ave, Montrose, CO  81401<br>Office hours are 8:00 am to 4:30 pm<br>Phone: (970) 240-5300 | TDD (970) 240-5366<br>FAX (970) 240-5367 |

**The BLM Uncompahgre Field Office (UFO) is revising the Resource Management Plan (RMP) for the Uncompahgre planning area. An RMP provides detailed information about the current state of natural and cultural resources on public lands, and sets forth a plan of action for managing those resources for the next twenty or so years under the BLM's dual mandates of *multiple use* and *sustained yield*.**

## A VITAL LINK FOR MANY

Travel and transportation are an integral part of virtually every activity that occurs on BLM-administered public lands. Recreation, management of livestock, wildlife, and commodity resources, rights-of-way, access to private inholdings, maintenance of electronic sites, and the day-to-day management and monitoring of the UFO all rely on effective travel management planning.



Motorized travel in the UFO ranges from standard passenger vehicles driving on maintained roads to off-highway vehicles (OHVs) operating on primitive roads and trails. OHVs include off-road motorcycles, all-terrain vehicles, utility terrain vehicles, jeeps, specialized 4x4 trucks, and snowmobiles. Mountain bikes are the predominant mechanized vehicle, while other  modes of travel include cross-country skiing, snowshoeing, horseback riding, pack animal driving, hiking, boating, hang-gliding, paragliding, ballooning, and wheelchairs.

## OHV AREA DESIGNATIONS

The BLM designates areas within the UFO as **open**, **limited to existing roads and trails**, **limited to designated roads and trails**, and **closed to motorized use.** Approximately _____% of the planning area is designated as open to motorized use; _____% is limited to existing or designated roads and trails or has additional restrictions such as seasonal closures.

## THE CURRENT TRAVEL PICTURE

Primary factors influencing the current state of travel management within the planning area include:

- **Lack of comprehensive travel management planning that considers the relationships between various resources, authorized access, and recreation uses.**

- **Lack of planning for recreational experiences that preceded the construction of historic routes.**

- **Unauthorized uses (including user-created routes) emanating from existing routes and causing impacts to other resources.**

- **Subdivision of private property resulting in the creation of new access points to public lands.**

- **Routes/areas that are open to motorized use, but are accessible only to adjacent landowners.**

- **Conflicts between recreational users.**




## WHAT IS COMPREHENSIVE TRAVEL MANAGEMENT PLANNING?

Comprehensive travel management is the proactive planning and on-the-ground management of road and trail travel networks. It addresses all resource aspects (recreational, traditional, casual, agricultural, industrial, educational, cultural, etc.) and accompanying modes and conditions of travel on the public lands, including motorized, mechanized, and muscle-powered uses.

## WHAT IS COLORADO BLM'S OFF-HIGHWAY VEHICLE POLICY?

Both Executive Order 11644 and the Code of Federal Regulations (43 CFR Part 8340) require the BLM to designate all public lands as **open**, **closed**, or **limited** for OHV use.  It is now Colorado BLM policy (CO-IM-2007-20) to restrict all OHV use within limited areas to **designated routes**, rather than designating areas as limited to existing routes.

As a result, during the RMP revision the BLM will be tasked with identifying specific route designations in the planning area, along with accompanying modes of travel.  If defining or delineating the travel management network during the land use planning process is not practical due to controversy, incomplete data, the size or complexity of the area, or other restraints, a preliminary network must be identified and a process established to select a final travel management network.

There will be no motorized cross-country travel except in areas designated as "open." Open areas will be limited to a size that can be realistically managed and geographically identifiable but large enough in size to offer a high quality motorized riding/driving opportunity for participants.

## HOW WILL COMPREHENSIVE TRAVEL PLANNING BE COMPLETED IN CONJUNCTION WITH THE RMP REVISION?

Due to the size and complexity of the area, controversy, and incomplete data, the UFO will delineate Travel Management Areas for the "limited" designated areas throughout the planning area, and to the extent possible:

- *Produce a map of a preliminary road and trail network*
- *Define short-term management guidance for road and trail access and activities in areas or sub-areas not completed*
- *Outline additional data needs and a strategy to collect needed information*
- *Provide a clear planning sequence, including public collaboration, criteria, and constraints for subsequent road and trail selection and identification*
- *Produce a schedule to complete the limited area or sub-area road and trail selection process. As per BLM's planning handbook guidance, this process should not exceed 5 years*
- *Identify any easements and rights-of-way needed (by the BLM or others) to maintain the preliminary or existing road and trail network.*

## *The BLM wants your input...*

- Should the BLM restrict motorized and/or non-motorized vehicle use on public lands? If so, where?
- Should the BLM leave some areas "open" for OHV use? If so, where?

---

**UFO Planning Webpage:**
http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html

**Email address for public comments:**
UFORMP@blm.gov

**Comments can also be mailed to:**
Bruce Krickbaum,
RMP Project Manager
2465 S. Townsend Ave
Montrose, CO  81401

UFO 11/2009

# RESOURCE MANAGEMENT PLANNING

*Crafting a balanced approach to change...*

## Effective planning:

❖ Ensures that the BLM will manage and protect public lands in accordance with the intent of Congress

❖ Ensures that actions and activities support the dual BLM mandates of multiple use and sustained yield

❖ Creates enhanced opportunities for a variety of land uses.

# The Planning Process

**Prepare to Plan**
- Write a Preparation Plan

**Issue Notice of Intent to prepare RMP/EIS and begin scoping**

**Prepare an Analysis of the Management Situation**
- Document current conditions

**Conduct Scoping**
- Provide minimum 30-day comment period on issues & planning criteria
- Document results in Scoping Report

**Formulate Alternatives**

**Analyze Effects of Alternatives**

**Select Preferred Alternative**

**Prepare Draft RMP/Draft EIS**

**Publish Notice of Availability**
- Provide minimum 90-day public comment period

**Prepare Proposed RMP/Final EIS**

**Publish Notice of Availability**
- Provide 30-day protest period
- Resolve protests

**Provide 60-day Governor's Consistency Review period**

**Prepare Record of Decision/ Approved RMP**

**\* Required documents in black**

**Implement, Monitor and Evaluate Plan Decisions**

# UNCOMPAHGRE RESOURCE MANAGEMENT PLAN

## *A Tool to Guide Us*

**The Uncompahgre RMP will:**

❖ Be dynamic and flexible in order to address changing conditions within and around the planning area over the next two decades

❖ Protect and sustain the land, while allowing for the use and enjoyment of its resources.



**The Uncompahgre planning area:**

❖ Includes 787,640 surface and over two million subsurface acres in six counties

❖ Does not include the Gunnison Gorge National Conservation Area or the Dominguez-Escalante National Conservation Area, which operate under separate plans.

BLM_0078233

| | U.S. DEPARTMENT OF THE INTERIOR | **BUREAU OF LAND MANAGEMENT NEWS RELEASE** |
|---|---|---|

**Release Date:** 12/16/09
**Contacts:** Erin Curtis, Public Information Officer, (970) 244-3097

**Draft Wild and Scenic River Eligibility Report Available for the BLM Uncompahgre Planning Area**

Montrose, Colo. – The Bureau of Land Management (BLM) is seeking public comments on a draft Wild and Scenic River Eligibility Report conducted by the Uncompahgre Field Office.

The report is the first step in a Wild and Scenic River evaluation for the 900,000-acre field office, which is being conducted as the field office revises the Uncompahgre Resource Management Plan. The Draft Eligibility Report provides an inventory of river and stream segments on BLM-administered lands, and identifies those segments that meet the eligibility criteria necessary for federal Wild and Scenic River consideration.

The Wild and Scenic Rivers Act was passed in 1968 to preserve selected rivers or sections in their free-flowing condition in order to protect "the water quality of such rivers and to fulfill other vital national conservation purposes." To be eligible under the Wild and Scenic Rivers Act, a river or stream segment must possess one or more "outstandingly remarkable values," have sufficient water quality to support those values, and be "free-flowing." The BLM evaluated 174 river and stream segments and found 35 to be eligible.

The draft report identifies five segments of the San Miguel River (approximately 55 miles), two segments of the Dolores River (approximately 20 miles), and two segments of the Gunnison River (approximately 18 miles) as eligible. Eligibility review does not take into account potentially conflicting uses or the manageability of a river segment, which will be addressed in the upcoming suitability phase.

At this stage, the BLM is specifically looking for information regarding free-flowing condition and outstandingly remarkable values, including vegetation, wildlife, cultural, recreation, hydrologic, geologic, and scenic. Public comments on the draft report will be accepted through Feb. 26. The report is available at http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.

Comments can be emailed to uformp@blm.gov or mailed to the Uncompahgre Field Office, Attn: RMP Revision, 2645 S. Townsend Ave., Montrose, CO 81401.

"Once the eligibility study has been finalized, we'll be working with stakeholders to look at each eligible segment to determine whether or not it is suitable for Wild and Scenic River consideration," said Uncompahgre Field Manager Barb Sharrow. "Public involvement in this process is essential."

The suitability study will be included in the Resource Management Plan revision, which will analyze a range of possible recommendations. The BLM may or may not actively recommend segments for Wild and Scenic River designation, based on input from stakeholders and the public.

River segments determined to be eligible are afforded interim protective management by the BLM until a suitability study is completed. The Resource Management Plan revision and suitability analysis is scheduled to be completed in 2013.

The Cache La Poudre River is currently the only river in Colorado with segments included in the Wild and Scenic River system. For more information on Wild and Scenic Rivers, visit http://www.nps.gov/rivers/.

The BLM manages more land - 253 million acres - than any other Federal agency. This land, known as the National System of Public Lands, is primarily located in 12 Western states, including Alaska. The Bureau, with a budget of about $1 billion, also administers 700 million acres of sub-surface mineral estate throughout the nation. The BLM's multiple-use mission is to sustain the health and productivity of the public lands for the use and enjoyment of present and future generations. The Bureau accomplishes this by managing such activities as outdoor recreation, livestock grazing, mineral development, and energy production, and by conserving natural, historical, cultural, and other resources on public lands.

--BLM--

2465 South Townsend Avenue    Montrose, CO 81401

Last updated: 12-30-2009

USA.GOV | No Fear Act | DOI | Disclaimer | About BLM | Notices | Get Adobe Reader®
Privacy Policy | FOIA | Kids Policy | Contact Us | Accessibility | Site Map | Home



**NATIONAL SYSTEM OF PUBLIC LANDS**

US Department of the Interior
Bureau of Land Management
Issue 1, December 2009

# The Uncompahgre RMP Newsletter

## Introduction

The Bureau of Land Management (BLM) Uncompahgre Field Office (UFO) is preparing a comprehensive Resource Management Plan (RMP) and associated Environmental Impact Statement (EIS). The RMP will be prepared as a flexible plan to allow evolving management to reflect the changing needs of the planning area over the next two decades. It will replace the current plans that were developed in 1985 and 1989. The BLM requests input from you to help identify issues and concerns within and adjacent to the planning area. Your input is also sought regarding the planning criteria that will be used to evaluate these issues.

## BLM Uncompahgre RMP Planning Area

The BLM is an agency in the US Department of the Interior that administers 258 million surface acres of America's public lands, located primarily in 12 western states. The BLM is separated into state offices and further into district and field offices. The RMP is being prepared by the UFO in southwestern Colorado.

The boundary of the planning area encompasses lands in six Colorado counties (see map insert): Montrose, Delta, Mesa, Gunnison, Ouray, and San Miguel. Management direction outlined in the RMP will apply only to the approximately 675,000 acres of public land (surface) and 2.2 million acres of federal mineral estate (subsurface) within the planning area. The planning area excludes the Gunnison Gorge and Dominguez-Escalante National Conservation Areas.

The BLM-administered lands within the UFO are currently managed in accordance with the decisions in the San Juan/San Miguel RMP (1985) and the Uncompahgre Basin RMP (1989).

Preparation of the Uncompahgre RMP is necessary in order to respond to changing resource conditions, new issues, and federal policies, as well as to prepare a comprehensive framework for managing public lands administered by the UFO. The RMP will establish new land use planning decisions to address issues identified through public scoping and, where appropriate, may incorporate decisions from the existing San Juan/San Miguel and Uncompahgre Basin RMPs, as amended.



Uncompahgre RMP Planning Units

## Newsletter Index

Introduction ....................................................................... 1
BLM Uncompahgre RMP Planning Area ..................... 1
What is an RMP? .............................................................. 2
What is Public Scoping and How Can You
    Participate? ................................................................ 2
Preliminary Planning Issues .......................................... 2
Wild and Scenic Rivers ................................................. 3
Preliminary Planning Criteria ....................................... 3
Planning Process Timeline ........................................... 3
Mark your Calendar ....................................................... 4
How to Contact Us ........................................................ 4

## Commonly Used Acronyms

| | |
|---|---|
| BLM | Bureau of Land Management |
| EIS | Environmental Impact Statement |
| NOI | Notice of Intent |
| RAC | Resource Advisory Council |
| RMP | Resource Management Plan |
| UFO | Uncompahgre Field Office |
| WSA | Wilderness Study Area |

BLM_0078235

# What is an RMP?

An RMP, similar to a county master plan, is a land use plan that describes broad multiple-use guidance for managing public lands administered by the BLM. The Federal Land Policy and Management Act directs the BLM to develop such land use plans and to provide for appropriate uses of public lands. Decisions in land use plans guide future land management actions and subsequent site-specific implementation decisions. The RMP will:

✓ Establish goals and objectives for resource management and the measures needed to achieve them;

✓ Identify lands that are open and available for certain uses, including any restrictions, and lands that are closed to certain uses; and

✓ Provide comprehensive management direction for and/ or allocate use of all resources.

# What is Public Scoping and How Can You Participate?

Public involvement is an integral part of preparing the Uncompahgre RMP. This public scoping period gives the public and interested agencies and organizations the opportunity to provide comments on issues to be addressed and methods to be used in the RMP before BLM begins drafting it. The official scoping period will begin with the publication of the Notice of Intent (NOI) in the *Federal Register* and will continue for 60 days. During the scoping period, the BLM will host six public open houses in Hotchkiss, Delta, Montrose, Ridgway, Norwood, and Naturita. Notices providing information about these meetings will be published in local newspapers; also see page 4 of this newsletter.

The public is formally invited and encouraged to participate in the planning process for the RMP during the public scoping period. Some ways in which you can participate are:

✓ Attending one or more of the open house meetings (see back page) to learn about the project and planning process and to meet BLM representatives;

✓ Reviewing the progress of the RMP on-line at the Uncompahgre RMP Web site: *http://www.blm.gov/co/st/ en/fo/ufo/uncompahgre_rmp.html*. The Web site will be updated with information, documents, and announcements during the initial scoping process and throughout the duration of the RMP preparation; and

✓ Joining the Uncompahgre RMP mailing list in order to receive future mailings and information by:

– Returning the comment form on the insert of this newsletter by mail;

– E-mailing us at uformp@blm.gov; or

– Contacting Bruce Krickbaum at (970) 240-5300.

# Preliminary Planning Issues

A planning issue is a matter of controversy over a resource management topic that is well defined and entails alternative actions or decisions. Based on the lands and resources that we manage, the BLM has identified categories of issues, or issue statements (see box below). We expect most public issues and concerns to fall within one of these statements; however, we do not presume that they are all-encompassing. The issue statements may be revised based on the comments we receive and new issue statements may be added. The BLM requests your comments on these or other issues on BLM-administered lands within the Uncompahgre planning area.

## Issue Statements

*Issue 1.* How will vegetative resources, terrestrial and aquatic habitat, water resources, and special management areas be managed, while maintaining biological diversity and native species populations?

*Issue 2.* How will energy and minerals resources be managed?

*Issue 3.* How will human activities and uses be managed?

*Issue 4.* How will land tenure, withdrawals, and utility/energy corridors be managed or adjusted?

*Issue 5.* How will cultural, historical, and paleontological resources and Native American Religious Concerns be managed and protected?

*Issue 6.* How do population growth and an expanding urban interface affect the management of public lands and resources, including authorized and permitted land uses, while considering community values and needs?



*BLM staff answer questions from the public during a public meeting.*

BLM_0078236

# Wild and Scenic Rivers
## Notice of Availability of the Draft Wild and Scenic River Eligibility Study

Congress authorized the National Wild and Scenic Rivers (WSR) Act in 1968 to preserve certain rivers with outstanding natural, cultural, and recreational values in a free-flowing condition for the enjoyment of present and future generations. The WSR Act requires the BLM to assess river segments under its management as part of its land use planning (RMP) process. The study and designation of rivers consists of a multi-step process: **eligibility, suitability,** and **congressional action.** Only Congress or, in certain circumstances, the Secretary of the Interior, may designate a river for inclusion in the National Wild and Scenic Rivers System.

The first step in the WSR evaluation process is to determine which river segments meet eligibility criteria. A draft WSR Eligibility Study is available for review on the Uncompahgre RMP Web site: *http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.* The eligibility report provides an inventory of the river and stream segments on BLM lands that are eligible for inclusion in the National Wild and Scenic Rivers System.

The draft report found 19 rivers and creeks separated into 28 segments eligible. In addition, the San Juan Public Lands Draft Land Management Plan identifies a segment of the Dolores River as eligible, a portion of which is managed by the UFO and will be evaluated during the suitability phase. Until a suitability study is completed, river segments determined to be eligible for inclusion in the National Wild and Scenic Rivers System are afforded interim protective management measures to protect their free-flowing nature and identified outstandingly remarkable values under BLM authorities.

At this stage, the BLM is specifically looking for information regarding free-flowing condition and outstandingly remarkable values, including vegetation, wildlife, cultural, recreation, hydrologic, geologic, and scenic. Comments are also welcome for segments not considered eligible. Comments on the draft report will be accepted through February 26, 2010, via the comment form included in this newsletter.

The second step in the WSR evaluation process is a suitability study that determines which, if any, of the eligible segments are suitable for inclusion in the National Wild and Scenic Rivers System based on criteria set forth in the WSR Act. The suitability process will begin in Spring 2010 and will involve an interdisciplinary study of each eligible segment. The public may provide the BLM additional information pertaining to the suitability criteria in order for the BLM to make an informed determination on the suitability of the eligible stream segments.

During RMP alternatives development, the BLM will consider alternative approaches to managing water-related values, recognizing that WSR designation may not be the only way to protect these values. The draft suitability study will be included in the Draft RMP/Draft EIS and made available for public comment at that time.

For more information on the WSR Act, designation into the National Wild and Scenic Rivers System, and many other management-related issues, visit *http://www.rivers.gov.*



*Two segments of the Gunnison River were found eligible for inclusion in the National Wild and Scenic Rivers System.*

# Preliminary Planning Criteria

During its initial planning sessions, the Uncompahgre BLM staff developed preliminary planning criteria. Planning criteria establish constraints, guidelines, and standards for the planning process. They help planners define the scope of the process and estimate the extent of data collection and analysis. The BLM requests your input and may modify these criteria based on your comments. For a complete list of criteria, please visit the Uncompahgre RMP Web site: *http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.*

| January 2010 | January – February 2010 | Spring 2010 – Fall 2011 | Winter 2011 – 2012 | Fall 2012 | Spring 2013 |
|---|---|---|---|---|---|
| NOI Published in *Federal Register* | Public Scoping | Formulate Alternatives and Prepare Draft RMP/Draft EIS | Draft RMP/Draft EIS Available for 90-day Public Review & Comment | Proposed RMP/Final EIS Available for 30-day Public Review & Protest | Record of Decision & Approved RMP |

BLM_0078237



## *Mark Your Calendar!*
### Upcoming Open Houses

**Tuesday, January 12, 2010**
4:30 to 7:30pm
Memorial Hall
175 N 1st Street, Hotchkiss, Colorado

**Wednesday, January 13, 2010**
4:30 to 8:00pm
Bill Heddles Recreation Center
530 Gunnison River Drive, Delta, Colorado

**Thursday, January 14, 2010**
4:30 to 8:00pm
Montrose Pavilion
1800 Pavilion Drive, Montrose, Colorado

**Tuesday, January 19, 2010**
4:30 to 7:30pm
Ridgway Community Center
201 N Railroad Street, Ridgway, Colorado

**Wednesday, January 20, 2010**
4:30 to 7:30pm
Norwood Town Hall
1670 Naturita Street, Norwood, Colorado

**Thursday, January 21, 2010**
4:30 to 7:30pm
Naturita Library
411 W 2nd Avenue, Naturita, Colorado



*The BLM must plan and manage for multiple uses on public lands.*

To conserve paper, may we e-mail you future newsletters?
If so, please e-mail us at uformp@blm.gov.

Printed on Recycled Paper 

### How to contact us

For more information, visit our Web site: http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html

With questions about the RMP or to be added to or removed from the mailing list, contact:

Mr. Bruce Krickbaum
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
(970) 240-5300
uformp@blm.gov

**BLM Uncompahgre Field Office**
**RMP/EIS Newsletter**

**Official Business**
**Penalty for Private Use, $300**

US Department of the Interior
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401



FIRST-CLASS MAIL
U.S. POSTAGE & FEES PAID
BUREAU OF LAND MANAGEMENT
PERMIT NO. G-76

IN



# Uncompangre
# Resource Management Plan



We encourage you to provide your comments by filling out and submitting this comment form by **February 26, 2010.** Please mail your completed form to the address on the opposite side or fax it to 1-970-240-5367. Comments may also be submitted via e-mail to uformp@blm.gov.

First Name _David_    Last Name _Kuntz_    Date _12/27/09_

Mailing Address _28053 Buffalo Rd_

City _Hotchkiss_    State _CO_    Zip _81419_

E-mail Address: _____

Would you like to be added to this project's mailing list to receive future project-related information (your name will not be shared)?    Yes: ☐ e-mail materials only ☒ e-mail and hard-copy materials    ☐ No

Please indicate your affiliation by checking the following boxes (check all that apply):
☒ Individual (no affiliation)    ☐ Non-profit Organization    ☐ Citizen's Group
☐ Federal, State, or Local Government    ☐ Elected Representative    ☐ Regulatory Agency

Name of organization, government, group, or agency (if applicable) _____

*Please answer the following four questions about your relationship to the Uncompahgre RMP Planning Area:*
Do you live within the planning area? ☒ Unit 1 ☐ Unit 2 ☐ Unit 3 ☐ Unit 4 ☐ Unit 5 ☐ No
*(Refer to map for unit numbers)*

If you do not live in the planning area, do you live in: ☐ Colorado (west slope) ☐ Colorado (front range or plains)
☐ Another State (which): _____ ☐ Another Country (which): _____

If you do live in the planning area, how long have you lived here? Months: _____ Years: _____
Why do you live here? ☒ Occupation ☐ Family ☐ Proximity to public lands ☐ Recreational Opportunities
☐ Other

*The BLM wants to hear from you! The Uncompahgre Field Office is committed to listening and learning from our neighbors, friends, and stakeholders. Your answers to the following questions will be helpful at this point in the planning process, as are any other comments. When answering the following questions, reference as appropriate the planning units on page 1 of the Uncompahgre RMP Newsletter (December 2009) or refer to the project Web site to download the map. You may attach additional sheets of paper for long comments. Thank you for taking the time to provide your input.*

What issues or concerns do you have regarding public land resources or uses within the Uncompahgre RMP planning area?

Must put Multiple use first!
More + more we are forgetting about the
Taylor Grazing Act. Read that and remember
that is why your agency was created.

1 A-PI LG

Respondents' comments, including their names and street addresses, will be available for public review at the Uncompahgre Field Office during regular business hours from 8:00am to 4:30pm, Monday through Friday, except holidays, and may be published as part of the EIS. Individual respondents may request confidentiality. If you wish to withhold your name or street address from public review or from disclosure under the Freedom of Information Act, you must state this prominently at the beginning of your written comments. Such requests will be honored to the extent allowed by law. All submissions from organizations and businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be available for public inspection in their entirety.

**2 A-PI FR**

Keeping in mind the issues above, what changes would you make physically to the landscape (such as what should it look like, modifications, etc.)?

After 100 years of fire supression and the belief of a few that older is better we must start more timber use, fire use, brush control to get back to what is totally natural, ie varying ages of trees.

Keeping in mind the issues above, what changes would you make to administration (such as management actions, rules, regulations, etc.)?

Some how stopping the law suits when a government decision does not give you 100% of what you want. These are compromises.

**3 B-GE**

...d the issues above, what changes would you make to social characteristics (such as number of users, size of groups, behavior of users, etc.)?

4 - wheeler control during hunting seasons.

**4 A-PI REC**

Please provide any additional comments that you have regarding this project.

Stop letting the EPA and "environmental protectionist" groups control what happens.

**5 B-GE**

*(Please tri-fold this sheet & tape shut before mailing – Do not staple)*

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401




US Bureau of Land Management
Uncompahgre Field Office
Attn: Bruce Krickbaum, RMP Project Manager
2465 S. Townsend Ave.
Montrose, CO 81401

DEC 2 9 2009

A140138

BLM_0078240

## Drew Vankat

| | |
|---|---|
| **From:** | Jack Barnett [jbarnett@barnettwater.com] |
| **Sent:** | Monday, December 28, 2009 5:06 PM |
| **To:** | Bruce Krickbaum |
| **Subject:** | Uncompahgre RMP |

Bruce,

I very much appreciate receiving your Issue 1, Uncompahgre RMP Newsletter. I am glad to have a chance to get involved in your process right from the start. I find that your issue statements miss a major issue. Salinity and selenium control in the Uncompahgre drainage is a major issue, and BLM lands are major contributors. None of the issues stated directly address water quality.

The Colorado River Basin Salinity Control Forum is composed of members appointed by the Colorado River Basin States governors. I serve as the Executive Director of that organization. Our organization does not fit into being easily involved in the grass roots open house type of opportunity for exchanges. We often work through state directors or BLM staff in Washington D.C. BLM has been given a charge by Congress to address the salinity issue. There is a full time BLM Salinity Coordinator by the name of Heidi Hadley. Her phone and email are as follows:

(801) 524-3886
Heidi_Hadley@blm.gov

I have written to her asking her help in getting this issue into the study effort. You may want to contact her.

For now I ask you to strongly consider including this issue in your planning effort. Please also keep me on your mailing list. Thanks for the consideration you might give to my request.

**Jack A. Barnett,** P.G.
Executive Director
Colorado River Basin Salinity Control Forum
106 West 500 South, Suite 101
Bountiful, UT 84010
(801) 292-4663
jbarnett@barnettwater.com

1/4/2010

BLM_0078241

MAR 4 2010

IN

Uncompahgre Field Office

March 1, 2010

Hello Bruce Krickbaum and members of the
Bureau of Land Management;

1 A-PI NRED

The proposed (and current) gas drilling is a direct assault on the well-being of citizens of Western Colorado. It is degrading the environment, including the water, air, animal and human habitat. The damage done to roadways and the loss of tourist income pale in comparison to the long term effects of the primitive technologies at work here, thoughtlessly polluting our beautiful land. It would be a shame to ignore scientific evidence for the sake of a quick money grab.

2 A-PI NRED

I ask you to put a stop to gas drilling until (and if) safe technologies are put to use. Do not squander our precious resources. Consider your children and grandchildren. You can make a difference.

Millicent Young

Millicent Young
P.O. 614, Paonia CO, 81428

BLM_0078242




ED

# Uncompahgre
## Resource Management Plan

We encourage you to provide your comments by filling out and submitting this comment form by **February 26, 2010.** Please mail your completed form to the address on the opposite side or fax it to 1-970-240-5367. Comments may also be submitted via e-mail to uformp@blm.gov.

First Name ___Kevin___   Last Name ___Bergstrom___   Date ___1/5/10___

Mailing Address ___502 Lincoln St.___

City ___Lander___   State ___WY___   Zip ___82520___

E-mail Address: ___Kevin_bergstrom@nols.edu___

Would you like to be added to this project's mailing list to receive future project-related information (your name will not be shared)? Yes: ☐ e-mail materials only  ☒ e-mail and hard-copy materials   ☐ No

Please indicate your affiliation by checking the following boxes (check all that apply):
☐ Individual (no affiliation)   ☒ Non-profit Organization   ☐ Citizen's Group
☐ Federal, State, or Local Government   ☐ Elected Representative   ☐ Regulatory Agency

Name of organization, government, group, or agency (if applicable) ___National Outdoor Leadership School (NOLS)___

*Please answer the following four questions about your relationship to the Uncompahgre RMP Planning Area:*

Do you live within the planning area? ☐ Unit 1 ☐ Unit 2 ☐ Unit 3 ☐ Unit 4 ☐ Unit 5 ☒ No
*(Refer to map for unit numbers)*

If you do not live in the planning area, do you live in: ☐ Colorado (west slope) ☐ Colorado (front range or plains)
☒ Another State (which): ___WY___   ☐ Another Country (which): _____

If you do live in the planning area, how long have you lived here? Months: _____ Years: _____

Why do you live here? ☐ Occupation ☐ Family ☐ Proximity to public lands ☐ Recreational Opportunities
☐ Other

> *The BLM wants to hear from you! The Uncompahgre Field Office is committed to listening and learning from our neighbors, friends, and stakeholders. Your answers to the following questions will be helpful at this point in the planning process, as are any other comments. When answering the following questions, reference as appropriate the planning units on page 1 of the Uncompahgre RMP Newsletter (December 2009) or refer to the project Web site to download the map. You may attach additional sheets of paper for long comments. Thank you for taking the time to provide your input.*

What issues or concerns do you have regarding public land resources or uses within the Uncompahgre RMP planning area?

NOLS is a SRP holder for rock climbing in the Uncompahgre RA. One of our primary concerns is continued access to climbing areas, specifically Paradox Valley, Unaweep Canyon, and Escalante Canyon.

1 A-PI REC

*Respondents' comments, including their names and street addresses, will be available for public review at the Uncompahgre Field Office during regular business hours from 8:00am to 4:30pm, Monday through Friday, except holidays, and may be published as part of the EIS. Individual respondents may request confidentiality. If you wish to withhold your name or street address from public review or from disclosure under the Freedom of Information Act, you must state this prominently at the beginning of your written comments. Such requests will be honored to the extent allowed by law. All submissions from organizations and businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be available for public inspection in their entirety.*

BLM_0078243

Keeping in mind the issues above, what changes would you make physically to the landscape (such as what should it look like, modifications, etc.)?

None

Keeping in mind the issues above, what changes would you make to administration (such as management actions, rules, regulations, etc.)?

None

Keeping in mind the issues above, what changes would you make to social characteristics (such as number of users, size of groups, behavior of users, etc.)?

None

Please provide any additional comments that you have regarding this project.

We appreciate the opportunity to operate on public lands.

2 A-REC

*(Please tri-fold this sheet & tape shut before mailing – Do not staple)*

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

US Bureau of Land Managemen
Uncompahgre Field Office
Attn: Bruce Krickbaum, RMP Project Manager
2465 S. Townsend Ave.
Montrose, CO 81401

UNITED STATES POSTAGE
PITNEY BOWES
02 1M     $ 00.44⁰
000 4218183     JAN 07 2010
MAILED FROM ZIP CODE 82520

JAN 11 2010

Ai40i55436 C003



THE
WILDERNESS
SOCIETY

ECOLOGY AND ECONOMICS
RESEARCH DEPARTMENT

**SOCIO-ECONOMIC FRAMEWORK FOR
PUBLIC LAND MANAGEMENT PLANNING:**
INDICATORS FOR THE WEST'S ECONOMY

Michelle Haefele, Ph.D.
Pete Morton, Ph.D.
Nada Culver
March 2, 2006

## I. PURPOSE

This brief is submitted as part of the NEPA process for this land use proposal. It is intended to identify issues that must be analyzed in the plan and offer methodologies to assist agencies responsible for analyzing the socio-economic impacts of proposed land use decisions on Western economies.

In making land use decisions, federal agencies have an obligation under the National Environmental Policy Act (NEPA) to take a "hard look" at the environmental consequences of a proposed action, and the requisite analysis "must be appropriate to the action in question." This brief presents a framework and indicators to be used in analyzing the impact of public land management proposals on the economies of Western communities. Federal agencies cannot evaluate the consequences of proposed decisions or determine how best to avoid or mitigate negative impacts without adequate data and analysis. Through the application of the methodology we have provided below, using data collected from identified sources and measuring potential impacts through key indicators, federal agencies can better fulfill their obligations to evaluate the direct, indirect, and cumulative socio-economic impacts of various alternative decisions.

## II. INTRODUCTION

We have organized this paper to facilitate the identification of key issues related to the impact of federal public land decisions on Western economies, and to provide key indicators for analyzing the impacts of those decisions on the economy of the West. The first section describes the changing economy of the western region, and how public land management planners should evaluate the economic impacts of land management alternatives. Next, we present key economic indicators with which to measure the vigor of the West's economy and discuss the implications of these indicators for the selection and analysis of land management alternatives.[1] The third section presents sources of data that are readily available at the state and county level, to which land managers should refer when preparing economic analyses for public lands. Next we outline the methodology we recommend agencies use to analyze the economies of western communities, in order to fully account for information that is traditionally absent in public land management assessments. Finally we provide a detailed list of our NEPA scoping questions, including specific recommendations for analyzing economic trends and conditions affected by the proposed management decisions.

These analyses and methods provide a necessary, but by no means sufficient, framework for the evaluation of proposed land management decisions. Socio-economic impacts are only one facet of the total impact of such decisions on communities. Western federal public lands belong to all Americans, and in order to fully evaluate the merits of land management decisions a complete benefit-cost analysis, including non-market values, must be made. While the specific methods for benefit-cost analyses are beyond the scope of this brief, we expect the agency to implement benefit-cost analyses in addition to the requested socio-economic impact analyses outlined here.

## III. OVERVIEW OF THE WESTERN ECONOMY

In the last 30 years, the West has evolved from a region largely focused on extractive industries into a much more diverse area with a more diversified economy (Bennett and McBeth 1998, Johnson 2001). Table 1 shows the current proportion of total personal income from resource extraction industries in the Rocky Mountains. Recent research shows that most western counties are not "resource dependent," and have instead developed diversified economies

---

[1] We provide examples of the statistics and data available to analyze each of the key indicators. These examples focus on the five Rocky Mountain states, but the methods and analyses presented apply to other states throughout the region. The states we focus on in this brief are: Colorado, Montana, New Mexico, Utah, and Wyoming. The Western states, especially the Rocky Mountains, are currently facing accelerated development of oil and gas on their federal public lands while at the same time realizing the potential embodied in the amenity-based economy.

SOCIOECONOMIC FRAMEWORK FOR PUBLIC LAND MANAGEMENT PLANNING
INDICATORS FOR THE WEST'S ECONOMY
The Wilderness Society

based on recreation, tourism, knowledge-based industries and the service sector. A recent study examining the impact of public lands on economic well-being in 11 western states found that only 3 percent of western counties could be classified as resource-extraction dependent (Rasker et al. 2004). Figure 1 shows the 30-year trend in resource extractive industry income in the Rocky Mountain Region. Public land management decisions all too often rely on a misconception of a resource-extraction-dependent rural West. Given the changing nature of the western economy, such assumptions exclude important non-extractive economic drivers and may even harm the economy of the region in the long run by depleting the natural capital responsible for the economic growth of Western communities.

Table 1. Extractive Industry Income as a Percentage of Total Personal Income (2003)

|  | Colorado | Montana | New Mexico | Utah | Wyoming | Rocky Mountains |
|---|---|---|---|---|---|---|
| Farming and ranching | 0.77% | 1.19% | 2.52% | 0.73% | 2.11% | 1.14% |
| Mining (excluding oil and gas extraction) | 0.47% | 1.49% | 1.41% | 0.71% | 6.99% | 1.09% |
| Oil and gas extraction | 0.88% | 0.44% | 1.10% | 0.16% | 2.79% | 0.84% |
| Timber industry | 0.25% | 1.40% | 0.19% | 0.39% | 0.23% | 0.35% |
| Total extractive industry income | 2.37% | 4.52% | 5.22% | 1.99% | 12.11% | 3.43% |

*Source: Regional Economic Information System, Bureau of Economic Analysis (http://www.bea.doc.gov)*



*Source: Regional Economic Information System, Bureau of Economic Analysis*
Farming and Ranching: "Farm proprietors' income," "Farm earnings," "Agricultural services," and "Fishing"
Timber Industry: "Forestry," "Lumber and wood products," and "Paper and allied products"
Mining: Includes all segments of Mining sector except "Oil and gas extraction"
Note: The figure is based on SIC data for 1969-2000 in order to show the long-term trend. While not explicitly compatible, NAICS data for 2001-2003 show similar trends for extractive industry income and illustrate the general downward trend, even during the current oil and gas drilling boom in the Rockies.

Figure 1. Resource Extractive Industry Income in the Rocky Mountain Region

As the economies of rural communities in the West diversify, the framework for making public land management decisions must also evolve. Merely counting jobs in resource extraction is not a sufficient way to measure the economic impact of public land management decisions. Many of these communities have diversified economies that

BLM_0078246

SOCIOECONOMIC FRAMEWORK FOR PUBLIC LAND MANAGEMENT PLANNING
INDICATORS FOR THE WEST'S ECONOMY
The Wilderness Society

are no longer solely dependent on the export of fossil fuels or logs. Management plans for public lands need to account for all aspects of the economic and social systems of these communities, including recreation, tourism, and entrepreneurial businesses attracted to scenic locations, when evaluating alternatives.

There is a vast and growing body of research that indicates that the environmental amenities provided by public lands are an important economic driver in the rural West (Rudzitis and Johansen 1989; Johnson and Rasker 1993, 1995; Rasker 1994; Power 1995, 1996; Duffy-Deno 1998; Rudzitis 1999; Rasker et al. 2004; Holmes and Hecox 2004). In a letter to the President and the Governors of the western states, economists from universities and other organizations throughout the United States pointed out that, "The West's natural environment is, arguably, its greatest long-run economic strength" (Whitelaw et al. 2003).

The western United States is growing at a rate faster than any other region (U.S. Census Bureau 2001), and, counter to the norm, population growth has preceded employment growth in the rural West (Vias 1999), indicating that people migrate to the region for its amenity resources. Furthermore, counties with high levels of natural amenities (such as varied topography, access to water bodies, and a pleasant climate) are more likely to experience higher growth than those counties with fewer such amenities (McGranahan 1999). Along with that growth comes demographic change. As Shumway and Otterstrom (2001) point out, "Population change represents more than a simple redistribution of people; it is an indicator and, in many instances an instigator, of a wide range of economic, social, cultural, political/policy, and environmental changes." As more people move from urban areas to rural communities they bring with them expectations about how local public lands ought to be managed. Changing community values must be accounted for in land management planning.

Management plans for the public lands in the West must consider the increasing importance of industries and economic sectors that rely on these public lands, but not necessarily on the extraction of natural resources. As the population of the entire country grows, the presence of undeveloped lands becomes more and more important. Indeed, much recent research has concluded that the presence of protected public lands strengthen western rural economies by meeting growing needs for clean water, wildlife habitat and recreation opportunities (Power 1995, 1996; Rasker 1994; Rasker et al. 2004; Rudzitis 1999; Rudzitis and Johansen 1989; Johnson and Rasker 1993, 1995; Whitelaw et al. 2004).

## IV. KEY ECONOMIC INDICATORS OF THE WEST'S ECONOMY
The West's economy is characterized by many indicators that must be considered in the economic analyses performed by land management agencies; we have selected only a few to focus on in this brief. These include the growing importance of non-labor income from investments and retirement; increasing employment in high technology, knowledge-based, and service industries; the important role that recreation and tourism plays in providing jobs and income; and the rise of small businesses and other entrepreneurial endeavors. Other features of the western economy include the decline in extractive industries, the increase in public awareness and appreciation of the environmental and recreation amenities of their home counties, and the diversification of rural economies. This section describes a concise set of indicators that land use planners should examine as part of the description of the socio-economic profile of an area, and presents example data from the Rocky Mountain states for each indicator.

### A. Non-labor income
A complete analysis of regional economic trends should include an analysis of total personal income, including all sources of income, rather than relying solely on employment. A full accounting of income is necessary to an understanding of the important role that non-labor income — such as retirement income, interest payments, rents, and profits — plays in the regional economy. Investment and retirement income makes up nearly one-quarter of total personal income in the Rockies, which would make it the top "industry" in the region. An economic impact analysis that excludes this income is inadequate and misleading.

Researchers have found that areas with high levels of natural amenities attract residents, many of whom rely on non-traditional sources of income (Duffy-Deno 1998, Nelson 1999, McGranahan 1999, Rudzitis 1999, Shumway and Otterstrom 2001, Lorah and Southwick 2003). When an investor living in a community receives dividends on his or her investments, that money represents an influx of income for the local community. The same thing is true of a retiree's

<div align="center">3</div>

income. Due to the high levels of natural amenities in the coastal and mountain regions of the West, these non-labor sources of income are concentrated in those areas (Nelson 1999).

An influx of retirees in those rural communities has been shown to have positive effects on both income and employment (Deller 1995), with non-labor income fueling increases in income and employment for many other sectors including health, financial and real estate services. Figure 2 shows the trend in total personal income for the five-state Rocky Mountain region. Service sector income has been rising in recent years while extractive industry income has fallen. Non-labor income makes up the largest proportion of total personal income.



*Source: Regional Economic Information System, Bureau of Economic Analsyis, US Department of Commerce*
Extractive industries: "Farm proprietors' income," "Farm earnings," "Agricultural services, forestry, fishing," "Mining,"
"Lumber and wood products," and "Paper and allied products"
Service and professional: "Services," "Eating and drinking places," and "Finance, insurance, and real estate"
Note: The figure is based on SIC data for 1969-2000 in order to show the long-term trend. While not explicitly compatible,
NAICS data for 2001-2003 show similar trends for non-labor, service and professional, and extractive industry income.

Figure 2. Total Personal Income in the Rocky Mountains

Table 2. Non-labor income as a percentage of total personal income (2003)

|  | Colorado | Montana | New Mexico | Utah | Wyoming | Rocky Mountain Region |
|---|---|---|---|---|---|---|
| Investment income [a] | 17% | 19% | 15% | 15% | 23% | 16% |
| Retirement income [b] | 6% | 11% | 10% | 7% | 9% | 7% |
| Income support [c] | 3% | 4% | 7% | 3% | 3% | 4% |
| Other [d] | 0.7% | 1.1% | 1.4% | 1.1% | 0.8% | 0.9% |
| All non-labor income | 26% | 35% | 33% | 26% | 36% | 28% |

*Source: Regional Economic Information System, Bureau of Economic Analysis (http://www.bea.doc.gov)*
[a] Dividends, interest, and rent
[b] Includes veterans' benefits, military benefits, and Medicare
[c] Income Maintenance, Supplemental Security Income, Family Assistance, Food Stamps, Medicaid, Unemployment
[d] Includes federal education and training assistance, settlements between individuals and businesses and transfer payments from non-profit institutions

BLM_0078248

It should be noted that non-labor income also includes income support payments such as Medicaid, welfare and unemployment. However this category is consistently a small portion of total non-labor income and therefore a small portion of total personal income. Income support is less than 4 percent of total personal income and only 14 percent of non-labor income in the Rockies. It is important for a complete analysis of non-labor income to make a distinction between income support and other forms of non-labor income. Table 2 shows non-labor income, broken into its components as a percentage of total personal income for the five Rocky Mountain States. Investment and retirement income is the largest portion of non-labor income for each state, while income support reflects a much smaller portion.

<u>A complete analysis of an area's economy must consider non-labor income, and a thorough evaluation of land management alternatives must consider the impacts of each alternative on non-labor income.</u>

## B. Knowledge-Based, Service Sector and Other Non-Recreation Businesses

Bennett and McBeth (1998) cite the emergence of a trend toward increasing western rural populations as early as the 1970s and state that this trend was partly motivated by the high quality of life in these areas. Johnson (2001) points out the importance of technology in this transition. He credits the advancement of technology with both the downward trend in extractive employment (where improved technology results in reduced labor requirements) and the potential (currently being realized in many communities) for economic growth and stability. Johnson points out that improving technology, especially in information and communication, also mitigates the constraints imposed by remoteness and permits employment in knowledge-based and service industries previously unavailable for rural residents.

Many of the counties in the Rocky Mountain West with economies that are characterized by a predominance of service industries have the highest incomes (Shumway and Otterstrom 2001). Over the past quarter-century, the U.S. economy has seen a shift from extractive and primary manufacturing industries to service oriented businesses. A common misconception about the service sector is that it includes only low paying jobs. This is not the case. The service sector in the West includes several high-paying industries, many of which are linked closely with the increase in non-labor income. Employment and income in the health care services increase as the number of retirees in an area increases. As people with investment income move into a region, the demand for financial, insurance, and real-estate service also increases.



Source: Regional Economic Information System, Bureau of Economic Analysis (http://www.bea.doc.gov)

Figure 3. Service and Professional Employment in the Rocky Mountains (2003)

BLM_0078249

The service sector includes occupations and industries that are classified as "knowledge based," defined by Henderson and Abraham (2004):

> "Knowledge-based activities emerge from an intangible resource that enables workers to use existing facts and understandings to generate new ideas. These ideas produce innovations that lead to increased productivity, new products and services, and economic growth."

Knowledge-based occupations have grown nationwide since 1980, with growth in the Rocky Mountain region being among the highest (Henderson and Abraham 2004). Local amenities that enhance quality of life are among the factors correlated with this growth. Other factors contributing to the growth of knowledge-based occupations are a high quality workforce, colleges and universities, infrastructure in the area, and the size and diversity of the local economy. These factors are likely to be interrelated and in many cases dependent on the quality of the environment and the availability of public lands, as cities and counties in the region leverage scenic amenities to attract high quality workers and knowledge-based industries. Other research confirms the role that amenities, including environmental and recreational amenities, play in attracting businesses to locations in the rural Rocky Mountain West (Whitelaw and Niemi 1989; Johnson and Rasker 1993, 1995). The most recent income data available from the Bureau of Economic Analysis (BEA) include a category called "information," which captures a good deal of the new knowledge-based industry. Land management decision makers should take advantage of these expanded industry classification categories when analyzing the potential impacts of public land management on the diverse economies of western counties.

A complete analysis of an area's economy must take into account the growth in income and employment in the service and professional sectors, and consider the impacts of each alternative on those sectors.

## C. Recreation & Tourism

Many rural communities in the Rocky Mountain region have experienced firsthand the surge in demand for recreation experiences outdoors, especially on federal public lands. Moab, Utah is a good example. This town was once a dying mining center and is now a top destination for recreation seekers of all sorts. Other towns around the West have seen an upswing in migration and economic health as they become "discovered" by recreationists (Rasker, et al. 2003, 2004; Holmes and Hecox 2004).

A 2005 report by the Outdoor Industry Association estimates that 159 million Americans participate in outdoor recreation each year. A 2002 study by the same organization estimates annual spending on outdoor recreation at $18 billion. The public lands provide much of the open space that makes this important economic activity possible.

In 2000, the Forest Service estimated the economic impacts of their program areas. These estimates account for the impact a range of activities exerts on both income and employment. Recreation and protection programs account for a much greater economic impact than do extractive programs (Alward et al. 2003).

Table 3. Economic Significance of Forest Service Program Activities (for 1999)

| | Percentage of Total Value Added (GDP) | Percentage of Total Income | Percentage of Total Wages | Percentage of Total Jobs |
|---|---|---|---|---|
| Recreation and Landscape Protection<br>*Recreation, Heritage & Wilderness; Wildlife, Fish & Rare Plants; Watershed & Air Mgt; Ecosystem Mgt. Coord.; Access & Travel Mgt.* | 70% | 69% | 71% | 76% |
| Extraction of Commercial Resources<br>*Range Mgt.; Forest Mgt.; Minerals & Geology Mgt.* | 22% | 22% | 20% | 17% |
| Other<br>*Lands & Realty Mgt.; Fire & Aviation Mgt.; Law Enforcement; Facilities Mgt., General Admin.; S&P Forestry; R&D* | 9% | 9% | 8% | 7% |

*Source: Alward et al. 2003.*

BLM_0078250

Quality hunting and fishing opportunities require wildlife habitat, which generally means large areas of open land. As the population grows, these are increasingly found only on the federal and other public lands. Pickton and Sikorowski (2004) estimate that the total economic impact of hunting, fishing, and wildlife-watching in Colorado at over $1.8 billion, with corresponding employment at 33,000 full-time jobs. An April 2004 report from the Center for the Study of Rural America calls wildlife recreation "rural America's newest billion-dollar industry" (Henderson 2004), with wildlife-related activities boosting tourism, spurring business growth and contributing to increased property values. The U.S. Fish and Wildlife Service and the Census Bureau jointly track participation and expenditures on wildlife-related recreation. Nationwide these activities generate $108 billion for local economies. Much of these expenditures are in the Rocky Mountain West, with hunters, anglers, and wildlife watchers spending nearly $6 billion in the five-state region alone in 2001 (U.S. FWS and U.S. Census Bureau 2001). Table 4 presents the participation in and expenditures on wildlife recreation for Colorado, Montana, New Mexico, Utah and Wyoming.

Table 4. Participation and expenditures from hunting, fishing, and wildlife-associated recreation in the Rocky Mountains (2001)

|  | Participation | Expenditures |
|---|---|---|
| Colorado | 2.1 million | $2 billion |
| Montana | 871,000 | $943 million |
| New Mexico | 884,000 | $1 billion |
| Utah | 1.1 million | $1.4 billion |
| Wyoming | 662,000 | $634 million |

*Source: U.S. Department of the Interior, U.S. Fish and Wildlife Service, and U.S. Department of Commerce, U.S. Census Bureau. 2001.*

A complete analysis of an area's economy must present data and analysis that fully account for the important role that tourism, recreation, hunting, and fishing play in ensuring a sustainable and diversified economy for rural western communities.

**D. Entrepreneurs**

All of the indicators previously discussed are related to the increasing entrepreneurial activity being experienced West-wide. Entrepreneurs in high technology and knowledge-based industries can often choose their location, and are likely to choose high-amenity locations (Rasker and Glick 1994, Snepenger et al. 1995, Johnson and Rasker 1995, Beyers and Lindahl 1996, Rasker and Hansen 2000, Low 2004, Henderson and Abraham 2004). Recreation- and tourism-oriented businesses are often founded by footloose entrepreneurs seeking to live and work in places rich in amenities. Retirees and others relying on investment income also choose amenity-rich locations that include certain businesses and services. These new migrants bring with them entrepreneurial opportunities for those who can provide the services they seek.



Figure 4. Rocky Mountain Personal Income by Type

7

BLM_0078251

Figure 4 shows personal income by type for the Rocky Mountain region. While wage and salary income is still the largest portion of total personal income, non-farm proprietors' income has shown an upturn in recent years.

As the proportion of total personal income from non-farm proprietors grows, implications for rural communities and for management of the public lands that surround them also grows. As Low (2004) points out: "Entrepreneurs create local jobs, wealth, and growth — and are themselves innovative users of other regional assets and resources." Furthermore, Low notes: "Entrepreneurs bolster a region's quality of life while promoting economic prosperity. Research has found a strong correlation between entrepreneurship and long-term regional employment growth."

Beyers and Lindahl (1996) specifically examine businesses which provide "producer services" and find these businesses are expanding rapidly in rural areas, and that most of them conduct much of their business interregionally or even internationally, bringing outside income into the rural region where they are located. These researchers also found that the decision to locate in rural areas is mostly for quality-of-life reasons, providing further evidence of the importance of such factors to local economies and the need to examine public land management activities and the potential impacts on quality of life.

A complete analysis of an area's economy must take into account the growing role of entrepreneurial businesses, and consider the impacts of each alternative on those businesses attracted by the environmental amenities provided by public lands in those communities.

## E. The Role of Protected Public Lands

More and more people in the West, and all over the US, are able to choose where they live and work. Technology makes it easier for professionals to "telework" using electronic communications. Many businesses are able to conduct national or international commerce from any location they choose. Other entrepreneurs simple choose to live in a particular place and build a business in response to local needs. Retirees and others who collect non-labor income are not tied by a job to a specific location. All of these people seek an attractive place to live. More and more, as development pressures increase, public lands become a backdrop or setting which contributes to or even creates the amenities on which a community's economy will thrive and grow. Research supports the assertion that protected public lands contribute to rural economic health (Rudzitis and Johansen 1989, Rudzitis and Johnson 2000, Rasker et al. 2004).

Local communities with protected wildlands reap measurable benefits in terms of employment and personal income. For instance, the Sonoran Institute (Sonoran Institute 2004b) has found that protected lands have the greatest influence on economic growth in rural isolated counties that lack easy access to larger markets. From 1970 to 2000, real per capita income in isolated rural counties with protected land grew more than 60 percent faster than isolated counties without any protected lands.

These findings confirm earlier research showing that wilderness is in fact beneficial for local economies. Residents of counties with wilderness cite the presence of that wilderness as an important reason why they moved to the county, and long-term residents cite it as a reason they stay. Recent survey results also indicate that many firms decide to locate or stay in the West because of scenic amenities and wildlife-based recreation, both of which are strongly supported by wilderness areas (Morton 2000).

As noted by Freudenburg and Gramling (1994):

"…it needs to be recognized as a serious empirical possibility that the future economic hope for resource-dependent communities of…the United States could have less to do with the consumption of natural resources than with their preservation."

BLM_0078252

This sentiment is reiterated by Deller et al. (2001):

> "Rural areas endowed with key natural resource amenities can manage those resources to capture growth more effectively. This may entail expansion beyond policies that have historically been focused on extraction of the resource base."

Resource managers, economic planners and community leaders must become aware of this potential. We therefore request that the NEPA process fully address the economic importance to local communities of protecting public wildlands from resource extraction.

## V. SOURCES OF DATA

This section presents selected sources of economic, demographic, and recreation data.

### A. Economic and Demographic Data

Data are available for several economic indicators by county from the U.S. Department of Commerce, Bureau of Economic Analysis and the U.S. Department of Labor, Bureau of Labor Statistics. The U.S. Census Bureau also tracks economic trends along with demographic trends, most by county as well. Economic profiles showing these and other trends by state, county, or groups of counties are available from the Sonoran Institute's Economic Profile System.

Federal economic and demographic data sources:

Bureau of Economic Analysis (Department of Commerce): http://www.bea.doc.gov
Date on income, farm income, transfer payments, and employment for states, counties, and regions. Annual data, 1969-2000 (Standard Industry Classification) and 2001-2003 (North American Industry Classification System)

Bureau of Labor Statistics (Department of Labor): http://www.bls.gov
Data on income, wage and salary, employment, unemployment rates by industry, for counties, states, and regions. Monthly data, 1990-2005

Census Bureau (U.S. Department of Commerce): http://www.census.gov
Data on population, demographics, business, and economics for states and counties

The Sonoran Institute Economic Profile System: http://www.sonoran.org
Generates detailed economic profiles, including trends in employment and income, farm income, economic resilience, and demographics for states, counties, or groups of counties. The companion, Economic Profile System — Community, will generate profiles to reflect just the rural or urban areas of a county.

The National Survey of Fishing, Hunting, and Wildlife-Associated Recreation (U.S. Department of the Interior, Fish and Wildlife Service and U.S. Department of Commerce, Census Bureau): http://www.census.gov/prod/www/abs/fishing.html
Data at the state level on participation in and expenditures for wildlife-associated recreation

Selected state economic and demographic data sources:

Colorado Economic and Demographic Information System: http://www.dola.state.co.us/is/cedishom.htm
Montana Census and Economic Information Center (CEIC): http://ceic.commerce.state.mt.us/
New Mexico Labor Market Information: http://www.dol.state.nm.us/dol_lmif.html
New Mexico Economic Development Data Center: http://ww1.edd.state.nm.us/index.php?/data/C31/
Utah Governor's Office of Planning and Development, Demographic and Economic Analysis:
http://www.governor.utah.gov/dea/
Wyoming Department of Administration and Information, Economic Analysis Division:
http://eadiv.state.wy.us/

### B. Recreation Data

Data on recreation use in the area where a land management plan is being developed is critical to making an informed decision. Surveys of users at recreation areas can be utilized to obtain information on the levels and types of

BLM_0078253

recreation use. Information on users' expenditures in the area is also important to learn the overall impact of public lands recreation. Federal land management agencies collect some data on recreation use of public lands. The Bureau of Land Management's Recreation Information Management System (RIMS) and the USDA Forests Service's National Visitor Use Monitoring System (NVUMS) are two examples.

Other information may be obtained through surveys of local residents, recreation visitors and through using existing data on the recreation and tourism revenues to local businesses, and the value of these activities to participants. The lack of complete visitation data does not justify ignoring the jobs and income from recreation. Furthermore, the Data Quality Act requires use of the best available, reliable data on all impacts and affected sectors of the economy.

The National Survey on Hunting, Fishing and Wildlife-Associated Recreation (noted above) is also a source of state-wide data on participation in wildlife recreation that should be used to supplement more specific studies for the location in question. State agencies are also a source of data on fishing and hunting and other wildlife-associated recreation.

Colorado Division of Wildlife: http://wildlife.state.co.us/index.asp
Montana Fish, Wildlife, and Parks: http://fwp.state.mt.us/default.html
New Mexico Game and Fish: http://www.wildlife.state.nm.us/index.htm
Utah Division of Wildlife Resources: http://wildlife.utah.gov/index.php
Wyoming Game and Fish: http://gf.state.wy.us/

## C. Data Gaps and Other Issues

Land managers may encounter gaps in county- or state-level economic data or may notice that data series are not continuous. These are not, however, obstacles to doing a thorough and comprehensive analysis of the trends in the economies of the local area.

### 1. Disclosure Gaps

Some data gaps are due to disclosure restrictions. The Bureau of Economic Analysis and the Bureau of Labor Statistics will suppress data in cases where disclosing it may reveal private information about individuals. For example, if only one business represents a specific industry in a given area, any data on employment and/or income in that industry will not be publicly disclosed since it may make it possible to identify an individual's or business' private information. Disclosure suppression is more likely to be a problem in counties with small populations. The Sonoran Institute suggests several potential techniques to address the issue of data gaps due to disclosure issues. The Economic Profile System will also automatically estimate the data gaps for major industry categories. These are described in detail in the User's Manual for the EPS (Sonoran Institute 2004b.)

### 2. Other Data Gaps

BEA and Bureau of Labor Statistics (BLS) data are sometimes not available for certain industries and/or certain years. Other data are suppressed, but are identified as falling within a range of values. Data gaps where an "L" appears instead of a number are described as follows:

Less than 10 jobs, but the estimates for this item are included in the totals, or
Less than $50,000 (for income data), but the estimates for this item are included in the totals

### 3. Industry Classification Using SIC and NAICS

Income and employment data from the Bureau of Economic Analysis and the Bureau of Labor Statistics for 1969-2000 are classified according to the Standard Industry Classification system (SIC), while the most recent data (2001 and forward) are classified by the North American Industry Classification System (NAICS). NAICS was developed jointly by the U.S., Canada, and Mexico in order to make statistics comparable across all three countries.

The NAICS provides greater detail for the service and professional sectors which are of growing importance in the rural West, and indeed all over the country. This classification scheme also includes some emerging industries such as "information" which includes the growing Internet and information phenomenon. The Bureau of Economic

BLM_0078254

Analysis' Regional Economic Information System (REIS) uses SIC to classify industries and the Sonoran Institute's EPS system uses SIC data from the REIS in order to show trend analyses, along with NAICS data.

## VI. RECOMMENDED METHODS FOR ANALYSIS

In general, it is inappropriate to examine a region's economy solely as a single point in time because economics are dynamic. To the extent that data are available, the economic profile of an area should be developed based on the trends in key economic indicators. This can help guide resource management by showing the likely future situation in an area and can point out periods of economic downturn. It may be instructive to look at other variables during these periods to see if there are correlations between land management activities and economic activity.

Looking at the changes in employment and income (including non-labor income) is important to understanding the overall direction in which an area's economy is moving. Trend analysis will show long-term patterns in income and employment that may be masked when looking at only a point in time. Data on employment and income are available from 1969-2000 from the BEA under the SIC system. The BEA changed to the NAICS in 2001, and reconstructed NAICS data for years prior to 2001 are not yet available. However, one can certainly look at a general picture of the economy over time by using both sets of data. This analysis should be applied to all the segments of the economy over time to see the long-term trends in both extractive and other industries along with non-labor income.

A lack of data on recreation activities on public lands should not be an excuse to avoid analysis of potential impacts of public land management decisions on the recreation sector. Several examples of research on recreation use, values to participants, and expenditures are available (a very limited sample includes: Fix and Loomis 1997, Chakraborty and Keith 2004, Cordell and Tarrant 2002, Kaval and Loomis 2003). Rosenberger and Loomis (2001) present a detailed bibliography of recreation valuation studies and present methods by which analysts can transfer estimates of the value of recreation in one area to other similar areas. Of course, the best way to truly understand the value of recreation in an area is to conduct a survey specifically focused on that area. At a minimum, such a survey should collect information on recreation visitation and expenditures. An estimate of the economic impacts of recreation can be made by multiplying the total number of recreation visitors in an area by the estimated expenditures per visitor day. These data should be collected and analyzed as part of a comprehensive analysis of the socio-economic impacts of land management.

## VII. RECOMMENDED ANALYSES

The preceding sections of this brief have presented the key indicators that must be included in a socio-economic impact analysis, identified data sources for conducting that analysis, and provided methods for completing an analysis that more accurately reflects the West's economy. In making land-use decisions, federal agencies have an obligation under NEPA to take a "hard look" at the environmental consequences of a proposed action, and the requisite analysis "must be appropriate to the action in question." [2] The impacts and effects of a proposed action, such as oil and gas development, that federal agencies are required to assess include: "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." [3] Under the Data Quality Act, federal agencies are required to use information that is of high quality and that is objective, useful, and verifiable by others. [4] The agency must also use "sound statistical and research" methods. [5]

---

[2] 42 U.S.C. § 4321 et seq.; *Metcalf v. Daley*, 214 F.3d 1135, 1151 (9th Cir. 2000); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989).

[3] 40 C.F.R. § 1508.8.

[4] Treasury and General Government Appropriations Act for Fiscal Year 2001, Pub.L.No. 106-554, § 515. *See also*, Office of Management and Budget "Information Quality Guidelines," available at http://www.whitehouse.gov/omb/inforeg/iqg_oct2002.pdf and individual "Agency Information Quality Guidelines," available at http://www.whitehouse.gov/omb/inforeg/agency_info_quality_links.html.

[5] *Ibid.*

BLM_0078255

Federal agencies cannot evaluate the consequences of proposed decisions or determine how best to avoid or mitigate negative impacts without adequate data and analysis. NEPA's hard look at environmental consequences must be based on "accurate scientific information" of "high quality."[6] Essentially, NEPA "ensures that the agency, in reaching its decision, will have available and will carefully consider detailed information concerning significant environmental impacts."[7] The Data Quality Act and the agencies' interpreting guidance expand on this obligation, requiring that influential information or decision-making input be based on "best available science and supporting studies conducted in accordance with sound and objective scientific practices."[8]

Through the application of the methodology, key indicators and data sources we have provided, federal agencies can better fulfill their obligations to evaluate the direct, indirect, and cumulative impacts of various alternative decisions. In this section, we have provided both general recommendations on the scope of the socio-economic impact analysis that should occur and specific inquiries to be made in this analysis. Again we note that completion of the socio-economic analyses outlined in this brief is necessary but not sufficient to fully evaluate a land management decision. A thorough benefit-cost analysis is also required and expected.

## We formally request that the NEPA analysis fully reflect and account for the following scoping comments:

### A. The socio-economic analysis should include an analysis, graphs and discussion of historic personal income trends — including non-labor sources of income.

The analysis of regional economic impacts must include an analysis of all sources of income, including non-labor income. A full accounting of all sources of income is necessary to understand the important role that retirement and investment income — as well as other sources of non-labor income, such as interest payments, rents, and profits — play in the regional economy. An economic impact analysis that excludes non-labor income is inadequate and misleading.

> ➢ **Specific Requests and Requirements for examining the Total Personal Income and the Importance of Non-Labor Income as Part of the NEPA Process:**

For all counties in the planning area, please show the role of non-labor income in the area's economy.

Show the percentage of current total personal income that is non-labor income (excluding income support).

Analyze and discuss the role that retirement and investment income currently plays in the area's economy, including the spillover effects of non-labor income on businesses in the area.

Analyze and discuss the role that amenities, including recreation opportunities and environmental quality, currently play in attracting and retaining non-labor income to the area.

Analyze and discuss the potential impacts that public land management alternatives will have on the level and trend of investment and retirement income in the area.

Show the trend in non-labor income (again excluding income support) as a percentage of total personal income.

---

[6] 40 C.F.R. § 1500.1(b).

[7] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

[8] Treasury and General Government Appropriations Act for Fiscal Year 2001, Pub.L.No. 106-554, § 515. *See also*, Office of Management and Budget "Information Quality Guidelines," available at http://www.whitehouse.gov/omb/inforeg/iqg_oct2002.pdf and individual "Agency Information Quality Guidelines," available at http://www.whitehouse.gov/omb/inforeg/agency_info_quality_links.html.

BLM_0078256

**B. The socio-economic analysis must include an analysis and discussion on the indirect role public lands play in the regional economy in attracting knowledge-based businesses, service sector business, recreation and tourism businesses, and other entrepreneurs.**

Public wildlands often define the character of an area and are an important component of the quality of life for local residents and future generations. Their protection enables the customs and culture of western communities to continue. The socio-economic analysis also must account for these economic benefits.

A growing number of economists are recognizing that protecting the quality of the natural environment is key in attracting new residents and businesses, and that therefore the environment is the engine propelling the regional economy. A letter to President Bush from 100 economists concludes, "The West's natural environment is, arguably, its greatest, long-run economic strength… A community's ability to retain and attract workers and firms now drives its prosperity. But if a community's natural environment is degraded, it has greater difficult retaining and attracting workers and firms" (Whitelaw et. al, 2003). Given these findings, we request that, as part of the economic impact analysis of management alternatives, the socio-economic analysis fully consider the indirect role of public lands in attracting and retaining non-recreational businesses and retirees and encouraging entrepreneurial efforts.

> ➤ **Specific Requests and Requirements for Examining the Role of Protected Public Lands in the Local Economy as Part of the NEPA Process:**

> For all counties in the planning area, please show the role of various industries in the area's economy.
>
> > Show the current distribution of employment and income by industry (for each industry, show employment as a percentage of total jobs and income as a percentage of total personal income).
> >
> > > Discuss the relative importance of each industry.
> > >
> > > Analyze and discuss the impacts that public land management alternatives will have on non-extractive industries if extractive activities are accelerated on public lands in the area.
> >
> > Show a complete analysis of the segments of service and professional employment and income for the area.
> >
> > > Analyze and discuss the potential impacts of land management alternatives on these sectors of the economy.
> >
> > Show trends in employment and income by industry, including a detailed examination of the service and professional sectors.
> >
> > > Discuss the level of diversity in the region's economy. Discuss trends in income and employment that have led to the current mix of industries
> > >
> > > Analyze and discuss the potential impacts of public lands management alternatives on the overall makeup of the economy of the area.
> >
> > Show trends in non-farm proprietor's income as a percentage of total personal income for the area.
> >
> > > Collect data on the various sectors that make up non-farm proprietors. Analyze the sectors where entrepreneurship is growing.
> > >
> > > Analyze and discuss the factors that have attracted new businesses to the area.
> > >
> > > Analyze and discuss the potential impacts that public land management alternatives will have on these sectors and the ability of proprietors to start and grow businesses.

BLM_0078257

SOCIOECONOMIC FRAMEWORK FOR PUBLIC LAND MANAGEMENT PLANNING
INDICATORS FOR THE WEST'S ECONOMY
The Wilderness Society

### C. The socio-economic analysis must account for the economic importance of the recreation, hunting, and fishing that occurs on public land.

The recreation opportunities provided by wilderness-quality lands also yield direct economic benefits to local communities. The socio-economic analysis must include an analysis of the income and jobs associated with recreation, hunting and fishing from each alternative.

> ➤ **Specific Requests and Requirements for Examining the Economic Importance of Recreation, Hunting and Fishing on Public Lands as Part of the NEPA Process:**

> For all counties in the planning area, show the role of recreation, hunting and fishing in the area's economy.
>> Collect data on participation in all recreation activities (hunting, fishing, hiking, camping, backpacking, biking, skiing, wildlife watching, boating, ORV use, etc.)
>> Collect data on expenditures by recreation visitors in the region.
>> Analyze the economic impact of hunters' and anglers' expenditures on area businesses and local economies.
>> Analyze the economic impact of other recreationists' expenditures on area businesses and local economies.
>> Show the impact of lodging taxes, sales taxes, and property taxes in the local economy.
>> Analyze and discuss the impact of public land management alternatives on recreation, hunting, and fishing businesses.

## VIII. REFERENCES

Alward, G.S., J.R. Arnold, M.J. Niccolucci, and S.A. Winter. 2003. Evaluating the Economic Significance of the USDA Forest Service Strategic Plan (2000 Revision): Methods and results for programmatic evaluations. USDA Forest Service Inventory and Monitoring Report No. 6, Fort Collins, CO.

Bennett, K. and M.K. McBeth. 1998. Contemporary Western Rural USA Economic Composition: Potential Implications for Environmental Policy and Research. *Environmental Management* 22(3): 371-381.

Beyers, W.B. and D.P. Lindahl. 1996. Lone Eagles and High Flyers in Rural Producer Services. *Rural Development Perspectives* 11(3): 2-10.

Chakraborty, K. and J.E. Keith. 2000. Estimating the Recreation Demand and Economic Value of Mountain Biking in Moab, Utah: An Application of Count Data Models. *Journal of Environmental Planning and Management* 43(4): 461-469.

Cordell, H.K. and M.A. Tarrant. 2002. Chapter 11: Forest Based Recreation. Pages 269-282 in Wear, D.N., and J.G. Greis, eds. 2002. Southern Forest Resource Assessment. Gen. Tech. Rep. SRS-53. U.S. Department of Agriculture, Forest Service, Southern Research Station. Asheville, NC. Available at: http://www.srs.fs.usda.gov/sustain/report/socio6/socio6.htm

Deller, S.C. 1995. Economic Impacts of Retirement Migration. *Economic Development Quarterly* 9(1): 25-38.

Deller, S.C., T. Tsai, D.W. Marcouiller, and D.B.K. English. 2001. The Role of Amenities and Quality of Life in Rural Economic Growth. *American Journal of Agricultural Economics* 83(2): 352-365.

BLM_0078258

Duffy-Deno, K. T. 1998. The Effect of Federal Wilderness on County Growth in the Intermountain Western United States. *Journal of Regional Science* 38(1): 109-136.

Fix, P. A. and J.B. Loomis. 1997. The Economic Benefits of Mountain Biking at one of its Meccas: An Application of the Travel Cost Method to Mountain Biking in Moab, Utah. *Journal of Leisure Research* 29(3): 342-352.

Freudenburg, W.R. and R. Gramling. 1994. Natural Resources and Rural Poverty: A Closer Look. *Society and Natural Resources* 7: 5-22

Hecox, W.E., F.P. Holmes, and B. Hurlbutt. 2005. State of the Rockies Report Card. Colorado College, Colorado Springs, CO. Available at: http://www.coloradocollege.edu/stateoftherockies/05ReportCard.html.

Henderson, J. 2004. Wildlife Recreation: Rural America's Newest Billion-Dollar Industry. *The Main Street Economist*, April 2004. Center for the Study of Rural America, Federal Reserve Bank of Kansas City. Kansas City, MO.

Henderson, J. and B. Abraham. 2004. Can Rural America Support a Knowledge Economy? *Economic Review*, Third Quarter, 2004: 71-95. Center for the Study of Rural America, Federal Reserve Bank of Kansas City, Kansas City, MO.

Holmes, F.P. and W.E. Hecox. 2004. Does Wilderness Impoverish Rural Regions? *International Journal of Wilderness* 10(3): 34-39.

Johnson, J. and R. Rasker. 1993. The Role of Amenities in Business Attraction and Retention. *Montana Policy Review 3(2).*

Johnson, J., and R. Rasker. 1995. The Role of Economic and Quality of Life Values in Rural Business Location. *Journal of Rural Studies* 11(4): 405-416.

Johnson, T.G. 2001. The Rural Economy in a New Century. *International Regional Science Review* 24(1): 21-37.

Kaval, P. and J.B. Loomis. 2003. Updated Outdoor Recreation Use Values with Emphasis on National Park Recreation. Final Report for Dr. Bruce Peacock, National Park Service under Cooperative Agreement CA 1200-99-009, Project number IMDE-02-0070. Fort Collins, CO.

Loomis, J. 2000. Economic Values of Wilderness Recreation and Passive Use: What We Think We Know at the Turn of the 21st Century. In McCool, S.F., D.N. Cole, W.T. Borrie, and J. O'Loughlin, comps. Wilderness Science in a Time of Change Conference, Volume 2: Wilderness within the context of larger systems, 1999 May 23-27. Missoula, MT. Proceedings RMRS-P-15-VOL 2., U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Ogden, UT.

Lorah, P. 2000. Population Growth, Economic Security and Cultural Change in Wilderness Counties. In McCool, S.F., D.N. Cole, W.T. Borrie, and J. O'Loughlin, comps. Wilderness Science in a Time of Change Conference, Volume 2: Wilderness within the Context of Larger Systems, 1999 May 23-27. Missoula, MT. Proceedings RMRS-P-15-VOL 2., U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Ogden, UT.

Lorah, P. and R. Southwick. 2003. Environmental Protection, Population Change, and Economic Development in the Rural Western United States. *Population and Environment* 24(3): 255-272.

Low, S. 2004. Regional Asset Indicators: Entrepreneurship Breadth and Depth. *The Main Street Economist*, September, 2004. Center for the Study of Rural America, Federal Reserve Bank of Kansas City, Kansas City, MO.

BLM_0078259

McGranahan, D.A. 1999. Natural Amenities Drive Rural Population Change. U.S. Department of Agriculture, Economic Research Service, Food and Rural Economics Division. Agricultural Economics Report No. 781.

Morton, P. 2000. Wilderness, the Silent Engine of the West's Economy. The Wilderness Society, Washington, DC.

Nelson, P.B. 1999. Quality of Life, Nontraditional Income, and Economic Growth: New Development Opportunities for the Rural West. *Rural Development Perspectives* 14(2): 32-37.

Outdoor Industry Association. 2002. Outdoor Recreation Participation and Spending: A State-by-State Perspective. Outdoor Industry Association, Boulder, CO. Available at: http://www.outdoorindustry.org/State_by_State_Study.pdf

Outdoor Industry Association. 2005. Outdoor Recreation Participation Study, 7th Edition for the year 2004. Outdoor Industry Association, Boulder, CO. 276 p. Available at: http://www.outdoorindustry.org/pdf/2005_Participation_Study.pdf

Pickton, T. and L. Sikorowski. 2004. The Economic Impacts of Hunting, Fishing, and Wildlife Watching in Colorado. Final Report prepared by BBC Research and Consulting for the Colorado Division of Wildlife. Denver, CO.

Power, T. 1995. Economic Well-Being and Environmental Protection in the Pacific Northwest: A Consensus Report by Pacific Northwest Economists. University of Montana, Missoula, MT.

Power, T. M. 1996. Lost Landscapes and Failed Economies. Island Press, Covelo, CA.

Rasker, R. 1994. A New Look at Old Vistas: the Economic Role of Environmental Quality in Western Public Lands. *University of Colorado Law Review* 52(2): 369-399.

Rasker, R. and D. Glick. 1994. Footloose Entrepreneurs: Pioneers of the New West? *Illahee* 10(1): 34-43.

Rasker, R. and A. Hansen. 2000. Natural Amenities and Population Growth in the Greater Yellowstone Region. *Human Ecology Review* 7(2): 30-40

Rasker, R., B. Alexander, and P. Holmes. 2003. The Changing Economy of the West: Employment and Personal Income Trends by Region, State, and Industry, 1970-2000. The Sonoran Institute, Bozeman MT. Available at: http://www.sonoran.org/programs/socioeconomics/si_se_manual.html

Rasker, R., B. Alexander, J. van den Noort, and R. Carter. 2004. Public Lands Conservation and Economic Well-Being. The Sonoran Institute, Tucson, AZ. Available at: http://www.sonoran.org/programs/prosperity.html.

Rosenberger, R.S. and J.B. Loomis. 2001. Benefit Transfer of Outdoor Recreation Use Values: A Technical Document Supporting Forest Service Strategic Plan (2000 Revision). Gen. Tech. Rep. RMRS-GTR-72. U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Fort Collins, CO. Available at: http://www.fs.fed.us/rm/pubs/rmrs_gtr72.html

Rudzitis, G., and H.E. Johansen. 1989. Amenities, Migration, and Nonmetropolitan Regional Development. Report to National Science Foundation. Department of Geography, University of Idaho, Moscow, ID.

Rudzitis, G. 1999. Amenities Increasingly Draw People to the Rural West. *Rural Development Perspectives* 14(3): 9-13.

Rudzitis, G. and R. Johnson. 2000. The Impact of Wilderness and Other Wildlands on Local Economies and Regional Development Trends. In McCool, S.F., D.N. Cole, W.T. Borrie, and J. O'Loughlin, comps. Wilderness Science in

BLM_0078260

a Time of Change Conference, Volume 2: Wilderness within the Context of Larger Systems, 1999 May 23-27. Missoula, MT. Proceedings RMRS-P-15-VOL 2., U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Ogden, UT.

Shumway, J.M. and S.M. Otterstrom. 2001. Spatial Patterns of Migration and Income Change in the Mountain West: the Dominance of Service-Based, Amenity-Rich Counties. *Professional Geographer* 53(4): 492-501.

Snepenger, D.J., J.D. Johnson, and R. Rasker. 1995. Travel-Stimulated Entrepreneurial Migration. *Journal of Travel Research* 34(1): 40-44

Sonoran Institute. 2004b. Economic Profile System Users Manual. Sonoran Institute, Tucson, AZ. Available at: http://www.sonoran.org/programs/socioeconomics/si_se_manual.html

US Department of Commerce, Census Bureau. 2001. Largest Census-to-Census Population in US History As Every State Gains, Census Bureau Reports (press release, April 2, 2001). Available at: http://www.census.gov/Press-Release/www/releases/archives/census_2000/000718.html

U.S. Department of the Interior, U.S. Fish and Wildlife Service, and U.S. Department of Commerce, U.S. Census Bureau. 2001. National Survey of Fishing, Hunting, and Wildlife-associated Recreation. Available at: http://www.census.gov/prod/www/abs/fishing.html

Vias, A. 1999. Jobs Follow People in the Rural Rocky Mountain West. *Rural Development Perspectives* Vol. 14 (2): 14-23.

Whitelaw, E., and E.G. Niemi. 1989. Migration, Economic Growth, and the Quality of Life. In Proceedings of the Twenty-Third Annual Pacific Northwest Regional Economic Conference, Corvallis, OR, pp 36-38.

Whitelaw, E., et al. 2003. A Letter from Economists to President Bush and the Governors of Eleven Western States Regarding the Economic Importance of the West's Natural Environment. (100 total authors.) Available at: http://www.econw.com/pdf/120303letter.pdf.

**FOR FURTHER INFORMATION:**
Michelle Haefele: (303) 650-5818 ext. 109
Pete Morton: (303) 650-5818 ext. 105
Nada Culver: (303) 650-5818 ext. 117

BLM_0078261

## Zoe Ghali

| | |
|---|---|
| **From:** | Drew Vankat |
| **Sent:** | Friday, March 05, 2010 11:32 AM |
| **To:** | Zoe Ghali |
| **Subject:** | FW: Uncompahgre RMP - Socioeconomics |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Purple |
| **Attachments:** | Econ-Western Economy Scoping Brief.pdf; Econ-Impacts of Oil and Gas Development.pdf; Natural-Dividends-Wildland-Protection.pdf; UFO-PrelimEconComments.pdf |

Zoe,

Received this from TWS this morning.

Drew

**Drew Vankat**

EMPSi  Environmental Management and Planning Solutions, Inc.

3775 Iris Avenue, Suite 1A

Boulder, CO  80301

tel:  303-447-7160    fax:  866-625-0707

**www.EMPSi.com**    *Bringing clarity to the complex* ™

*GSA Contract GS10F-0412S*    *HUBZone-certified*

Denver        Reno        San Francisco        Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

**From:** Juli Slivka [mailto:juli_slivka@tws.org]
**Sent:** Friday, March 05, 2010 10:24 AM
**To:** Drew Vankat
**Cc:** Michelle Haefele
**Subject:** Uncompahgre RMP - Socioeconomics

Hi Drew,

Thank you for the opportunity to provide information on socioeconomic issues and impacts in the Uncompahgre Resource Area prior to the BLM's economics workshops.

Attached please find two briefs by The Wilderness Society: *Socio-Economic Framework for Public Land Management Planning: Indicators for the West's Economy*; and *The Economic and Social Impacts of Oil and Gas Development*. Also attached is our recent economic report, *Natural Dividends: Wildland Protection and the Changing Economy of the Rocky Mountain West*. These papers provide scientific and policy framework for managing public lands in the West to promote sustainable, balanced communities.

3/26/2010

Finally, we have included comments addressing socioeconomic issues that should be considered in development of the resource management plan for the Uncompahgre Field Office.

We further recommend that you utilize the Economic Profile System developed by economists at Headwaters Economics for the BLM. It can be accessed at http://www.headwaterseconomics.org/eps/. They are redesigning the software, but have profiles for counties available.

Please don't hesitate to contact us with any questions, and thank you again for considering our policy briefs and comments.

Sincerely,

Juli Slivka, Outreach Coordinator, BLM Action Center (juli_slivka@tws.org)
Michelle Haefele, Ph.D., Resource Economist (michelle_haefele@tws.org)

The Wilderness Society
1660 Wynkoop St. Ste. 850
Denver, CO 80202
(303) 650-5818

3/26/2010

BLM_0078263



THE
WILDERNESS
SOCIETY

ECOLOGY AND ECONOMICS
RESEARCH DEPARTMENT

THE ECONOMIC & SOCIAL IMPACTS OF OIL AND GAS DEVELOPMENT

June 2006

## I. PURPOSE

This brief is submitted as part of the NEPA process for this public land oil and gas development proposal. It is intended to identify some of the socio-economic issues that must be analyzed as part of the NEPA process. We also offer methodologies to assist agencies responsible for analyzing the impacts of proposed land use decisions on communities and economies. These issues are particularly relevant in the Rocky Mountain West, where current land management priorities have shifted distinctly toward oil and gas extraction. For this reason our analyses and examples in his brief will center on the five states which have been the focus of the current oil and gas development: Colorado, Montana, New Mexico, Utah, and Wyoming.

In making land use decisions, federal agencies have an obligation under the National Environmental Policy Act (NEPA) to take a "hard look" at the environmental consequences of a proposed action, and the requisite analysis "must be appropriate to the action in question." This brief presents issues to be analyzed, and data and methods for use in the analysis of  the impact of oil and gas development proposals on the social and economic health of Western communities. Federal agencies, the public and communities cannot evaluate the consequences of proposed decisions or determine how best to avoid or mitigate negative impacts without adequate data and analysis. Through the examination of the issues and potential costs described below, federal agencies can better fulfill their obligations to evaluate the direct, indirect, and cumulative impacts of oil and gas development on the communities adjacent to Western public lands.

## II. INTRODUCTION

As an agency prepares a management plan or an Environmental Impact Statement for publicly owned lands, it must do a full and accurate accounting of the costs and benefits of each of the alternatives proposed, including both market and non-market values (Loomis, 1993). Historically, analyses by land management agencies of alternatives that emphasize resource extraction alternatives (oil and gas drilling, mining, timber) emphasized the benefits of extraction and ignored the costs. Failure to include all the costs of an oil and gas drilling proposal has two distorting influences on the decision making process. First, the alternatives that emphasize drilling appear more attractive than they actually are, and second, the opportunity costs of conservation-oriented alternatives will appear greater than they really are. Agency planners must provide a full accounting of the costs associated with extraction activities. Only when all the costs and benefits are fully accounted for can a truly informed assessment of the alternatives occur.

We have organized this paper to facilitate the identification of key issues related to oil and gas development on public lands, and the environmental, social, and economic impacts these decisions have on communities in the West. The first section discusses the need to examine economically recoverable resources, the need to correctly assess net benefits by accounting for all impacts and costs, and presents several potential impacts of oil and gas development that are either absent from, or incorrectly represented in, many federal agency oil and gas leasing analyses. We also provide examples of specific analyses or methods for improving the analysis. The next section presents our NEPA scoping comments which include specific costs and impacts that we feel must be analyzed in order to complete a thorough examination of land use plans. These analyses and

BLM_0078264

methods provide a necessary, but not sufficient, analysis of the impacts of oil and gas leasing on public lands and the adjacent communities. We formally request that the agency incorporate these analyses and methods into its planning for, and analysis of, land allocation decisions that lead to oil and gas leasing and drilling proposals and at the project level implementation phase.

## III. CHARACTERIZING OIL AND GAS DEVELOPMENT POTENTIAL

### A. Estimating the Economically Recoverable Volume of Oil and Gas

Technically recoverable oil and gas resources are the subset of the total resource base for which technology currently exists making extraction possible. This definition relies only on technological feasibility without regard to the cost of extraction or the prevailing prices. Economically recoverable oil and gas resources are the subset of technically recoverable resources that would be economic to produce.
Analyses of the benefits of oil and gas development must be made based on accurate and appropriate estimates of the resources that are economically recoverable.

As noted by LaTourrette, et al. (2002), economic constraints are, in most cases, the limiting factor on gas production in the Rocky Mountains, not environmental laws. The majority of undiscovered natural gas currently being proposed for exploitation in the Rocky Mountains are "unconventional" gases (continuous-type, tight sands gas, and coalbed methane). Economic recovery rates for unconventional oil and gas resources are lower than recovery rates for the conventional resources – reinforcing the need to base decisions on estimates of economically recoverable amounts of gas, not estimates of technically recoverable resources.

The Congressional Research Service (Corn, et al. 2001) and most, if not all, economists agree that the policy relevant opportunity cost of an environmental regulation is the economically recoverable amount of gas – not the technically recoverable amounts. It is inappropriate to base energy policy decisions solely on technically recoverable estimates. When economic criteria are considered, the estimates of oil and gas that are actually recoverable drop significantly from the initial estimates of technically recoverable resources (Attanasi 1998, LaTourrete et. al, 2002, 2003).

If economic factors are not considered, the opportunity costs of all forms of environmental protection will be overestimated. The agency will also likely overestimate the cost of lease stipulations, wilderness designation, and other protective measures if technically recoverable estimates are used. If the oil and/or gas are not economical to extract, there is no adverse impact on resource supplies from protecting wildlife, archeological sites, recreation sites and other public resources with leasing stipulations. Further, an EIS that relies on misleading economic information or fails to include all relevant costs in its economic analysis will violate NEPA, because it does not provide decision-makers and the public a valid realistic foundation on which to judge proposed projects.

Recent research by economists at The Wilderness Society indicates that the federal government's assessments of the oil and gas resources on public lands are flawed and consistently over-estimate the energy potential of these lands (Morton, et al. 2002, The Wilderness Society 2004a and b). The oil and gas industry also has a history of exaggerating the amount of gas recoverable and exaggerating the cost of protecting the environment. Rose (2001) states, "Since 1993, most oil companies have acknowledged that their geotechnical staffs persistently overestimate prospect reserves, commonly by about 30% to 80%." Rose goes on to say, "...over optimism is not limited to certain companies -- it appears to be a chronic industry shortcoming that has proved to be difficult to correct." The inherent upward bias in industry estimates of energy potential should eliminate them for use by public land agencies. Shanley et al. (2004), veterans of the oil and gas industry, reinforce this point for public land in the Rockies: "...it is likely that resource volumes are substantially overestimated, while the risks associated with finding and recovering those resources have most certainly been underestimated."

2

BLM_0078265

Exaggeration of the oil and gas resources by relying on technically recoverable estimates, distorts the analysis and increases risks to communities from false promises. For example, relying on estimates of technically recoverable resources will lead the agency to dramatically overestimate the number of new jobs that oil and gas drilling might create in a community. Basing decisions on technically recoverable estimates will exaggerate the potential tax revenues to the federal treasury, as well as state and local tax revenue. In addition, the potential spillover effects in the local economy from drilling will be exaggerated. Such exaggeration of the benefits of an oil and gas drilling project is an inappropriate distortion of the analysis of public land management alternatives and will lead to unrealistic expectations and possibly inappropriate support in local communities.

The agency should not rely exclusively on a deterministic, single value resource estimate due to the high risk and uncertainty with such estimates. According to Rose (2001), "Single-value estimates…predict an outcome that is possible, usually optimistic, and nearly always wrong." A better approach is to base estimates of gas and oil resources on a probabilistic range of values based on different levels of confidence. A probabilistic range of values more accurately portrays the risk and uncertainty inherent in industry estimates of undiscovered gas and oil resources. Reliance on a single value estimate does not comply with NEPA because it fails to use a range of values in order to fully consider the risk and uncertainty inherent in oil and gas estimates.

In addition to a range of probabilistic resource values, estimates of economically recoverable resources must be made based on a realistic range of prices in order to account for the uncertainty in forecasting future prices. Figure 1 shows historic prices for oil and gas in the U.S., and the potential volatility of these prices. To account for price uncertainty, USGS scientists use high and low price scenarios when estimating economically recoverable resources. We recommend a similar approach, including using USGS data for estimating undiscovered oil and gas resources



Source: U.S. Department of Energy, Energy Information Administration (http://www.eia.gov)

Figure 1. US Crude Oil and Natural Gas Prices

Many factors (flow rates, market price, drilling costs, etc.), not just environmental protection will influence whether resources are economic to produce, and economists make these assessments all the time. The price and costs assumptions used to estimate total production under each alternative must be critically examined

3

BLM_0078266

and made clear. To be specific, when estimating the amount of gas recoverable the price or price range that was assumed, and the costs of production that were assumed in the analysis must be spelled out. If a company cannot get the gas out of the ground at a cost less than the assumed wellhead price, then the opportunity costs of protecting the environment are zero. This is just basic economics. To comply with NEPA, all analyses of impacts must be based on estimates of economically recoverable resources.

Please review the RAND Corporation reports (LaTourette, et. al 2002, and 2003; Vidas et. al, 2003) detailing methods to estimate economically recoverable resources. We also request that the agency review Attanasi (1998) which describes methods used by the USGS to estimate economically recoverable resources for all the basins analyzed in the Energy Planning and Conservation Act's (EPCA) 2002 Assessment. It should be noted that the RAND analyses include some environmental cost, however, because they exclude non-market costs, USGS estimates are just the starting point to determine whether undiscovered gas is economically viable to extract. The RAND and USGS documents both demonstrate the feasibility of making estimates of economically recoverable resources and provide useful guidance on methodology.

NEPA requires a realistic assessment of economic impacts, and it is not realistic to assume that 100% of the technically recoverable oil and gas will ever be recovered The potential cost of protecting the environment and the possible benefits of drilling must all be based on estimates of economically recoverable resources. As the management plan and Reasonably Foreseeable Development scenario are developed, we formally request that they be based on economically recoverable amounts of oil and gas, not technically recoverable oil and gas.

## B. Estimating the Employment and Income Benefits from Oil and Gas Development.

The IMPLAN model is an economic model often used by public land management agencies to project jobs and income from proposed actions. While the IMPLAN model can be useful as a tool to develop static analyses of the regional economy, the agency and local communities must be aware of the shortcomings and poor track record of the model as a predictive tool.

In general, models like IMPLAN are grounded in economic base theory, which makes the incorrect assumption that an economy is static (i.e. it does not change). IMPLAN models do not consider the impacts of many important variables that affect regional growth in many rural communities, especially in the West. Such as amenities as high quality hunting, fishing and recreational opportunities, open space, scenic beauty, clean air and clean water, a sense of community, and our overall high quality of life are not measured or accounted for in IMPLAN models. Many of these amenities are associated with attracting new migrants as well as retaining long-time residents.

Many residents of Western communities (both long-time and new) earn retirement and investment income. An analysis of economic trends will show that retirement and investment income is becoming increasingly important to rural economies of the West. A recent letter from 100 economists (Whitelaw, et al. 2003) reinforces the importance of non-labor income to the economy of the West. While it is technically possible, most IMPLAN models completely fail to consider the important economic role of retirement and investment in the economy of a community or region. A more accurate, dynamic, and complimentary approach requires planners to examine regional trends in jobs and income.

In a review of 23 studies that empirically tested the economic base hypothesis, Krikelas (1991) found only four that provided any evidence in support of economic base theory as a long run theory of economic growth -- a dismal track record. Despite dire predictions, history is replete with cases of communities and areas that lost their export base and continued as successful economies with their social capital intact. The local-serving sectors of the economy were the persistent ones, as new exports were substituted for the old. Tiebout (1956) recognized the shortcomings of the economic base theory when he wrote, "Without the ability to develop residentiary activities, the cost of development of export activities will be prohibitive." Krikelas (1992) concludes that economic base theory has severe limitations, especially for economic planning and policy

4

BLM_0078240

analysis. This is a conclusion that community leaders and land management officials and planners can no longer ignore, and one that should be incorporated into public land and community-level planning. As Haynes and Horne (1997) note:

> Where the economic base approach gets into trouble is when it is **used inappropriately as a tool for planning or predicting impact**s (emphasis added) of greater than one year in duration; a snapshot of current conditions tells little about the form a region's future economy may take.

Economists with both the Forest Service (Hoekstra, et. al 1990) and the Office of Technology Assessment (1992) concluded that while IMPLAN is useful for appraising the economic impacts of a management plan, the model is insufficient for evaluating the overall economic impacts for communities. And according to the OTA (1992), IMPLAN has an additional shortcoming for assessing community impacts: the economic data used to construct IMPLAN do not provide comparable details for all resource-based sectors of the economy. While economic data for oil and gas is classified as a separate manufacturing industry, recreation is scattered among a variety of industries generally classified in services and retail, with some in transportation. The ease of data acquisition for estimating oil and gas impacts combined with the difficulty of estimating the impacts of recreation and tourism underscores the potential bias favoring oil and gas development in IMPLAN modeling.

The 25th anniversary issue of the Journal of Regional Science includes an article by H.W. Richardson, a noted regional scientist, who believed that 40 years of research on economic base models "has done nothing to increase confidence in them." In addition, he concluded that it would be hard to "resist the conclusion that economic base models should be buried, and without prospects for resurrection" (Richardson, 1985). He is not alone. Many have suggested that economic base theories be abandoned in favor of other, more comprehensive theories of regional growth and development (Krikelas, 1992; Rasker, 1994; Power, 1995 and 1996). Many of these economists recommend analysis of regional trends in total personal income as a better way to understand where the local economy came from and where it is headed.

Our more specific concerns have to do with the technical assumptions used in most IMPLAN models. These questionable assumptions include: no changes in relative prices, no input substitution or technological change in the production processes, no labor mobility, no change in products or tastes, no regional migration, and no changes in state and local tax laws. The assumption of no labor mobility is particularly important for oil and gas drilling proposals, since it draws into question the issue of local versus non-local job creation. Workers are mobile, especially in the oil and gas industry as crews move from drill site to drill site. There is no guarantee that the oil and gas jobs projected by IMPLAN will be filled by local workers. And in fact, there is considerable evidence that workers in non-local crews fill most, if not all the direct jobs in oil and gas drilling.[1]

Another major assumption used by IMPLAN is the constant technology assumption. Most IMPLAN models, by failing to consider the downward impact of technology on job growth, will exaggerate the job potential from oil and gas drilling. Industries attempting to maximize profits seek to reduce production costs. One way to do this is to replace labor with technology resulting in fewer jobs. The downward trend in resource extraction jobs only becomes apparent if the agency completes a trend analysis showing changes in jobs and income over time.

Laitner, et. al (1998) cite Bureau of Labor Statistics (BLS) data which indicate that in 1988, oil and gas drilling generated about 1.72 jobs per million dollars of spending. By 1998 that number fell to 1.44 jobs per million dollars. Further, BLS (cited by Laitner et al.) estimates that the number of oil-gas jobs will fall to 0.71 jobs per million dollars of spending by 2008. This indicates that the direct jobs estimated with a static model like

---

[1] For example: "Where Will the Workers Come From?" Casper (WY) Star Tribune,  6 October 2005, and "Chinese Labor for Oil Drilling Eyed in Colo." United Press International, 11 July 2005 both discuss the origins of oil and gas workers in the Western U.S.

BLM_0078268

IMPLAN model will be much more than the number actually created from drilling. As a result of this failure to account for technology improvements, input-output models are well known to predict higher multiplier effects than are actually experienced (Hoffman and Fortmann, 1996). A review of government data confirms this downward trend: since 1987 output per worker in the oil and gas industry has been increasing (Figure 2). Investments in technology in the oil and gas industry have resulted in fewer and fewer workers required to drill each well and to produce natural gas and oil. The trends of technology replacing jobs in the oil and gas industry will continue.



Source: Bureau of Labor Statistics (http://www.bea.gov)

Figure 2. Labor Productivity in Oil and Gas Extraction

The concern over the accuracy of models like IMPLAN combined with concern over the use of these models for planning, suggests that it is not only inappropriate but a disservice to rural communities to rely on IMPLAN to estimate the economic impacts of public land management alternatives on rural communities.

We recommend that the agency stop relying on IMPLAN and other models derived from economic base theory.

If planners use IMPLAN, the model must account for non-labor income, as well as income from hunting, fishing, and recreation. If the agency uses IMPLAN, it must also account for the fact that most drilling is completed by non-local crews. If the agency uses IMPLAN, the analysis must account for increasing labor productivity and hence declining jobs per well drilled. We insist that the agency fully discuss the assumptions, the shortcomings, and the risk and uncertainty due to the poor track record of the IMPLAN model in planning efforts. We also request that all data and multipliers used to project local impacts be made public.

We also request that the agency complete a trend analysis of regional jobs and income – to provide a better and more complete understanding of their economic past and their economic future. We formally request and recommend that the agency analyze economic trends using the Economic Profile System model developed by the Sonoran Institute in cooperation with the Bureau of Land Management (available at http://www.sonoran.org).

BLM_0078269

## C. Estimating Gross and Net Revenues from Oil and Gas Production

Oil and gas production results in revenues flowing to federal, state and local governments. To help make better informed decisions, the revenues must be estimated accurately and with full consideration of resource production over time (production curves) and all relevant tax laws.

Furthermore, oil and gas revenues, by themselves, only represent flows of **gross** revenue – while **net** revenue is the policy relevant metric that must be analyzed. In order to estimate the **net** revenues from oil and gas production, the associated costs must be fully accounted for in the analysis (see next section). The costs to local communities from drilling are real and have already been demonstrated to be significant (Western Organization of Resource Councils 1999, Darin 2000, Pedersen Planning Consultants 2001, Pinedale Anticline Working Group, 2005), must be accounted for in the analysis of net revenues from gas production.

### 1. Estimate revenues based on the realities of oil and gas production

As conventional oil and gas fields are developed, production is initially high, before gradually decreasing over time. Production is not linear. This declining production curve for gas and oil wells must be taken into account when estimating tax revenues based on the value of produced resources. In the case of conventional wells this means that communities might enjoy large initial revenues that will decline in later years. The decline in revenues leaves communities with a lower stream of income when the time comes to deal with increasing oil and gas cleanup and remediation costs.

In contrast with production from conventional gas, production of coalbed methane (an unconventional gas) is initially slow due to the "dewatering" phase that may last several years before production can begin. In coalbed methane areas local communities are more likely to experience significant increases in the costs to local governments early without the immediate benefit of corresponding increases in local tax revenues.

We request that the agency make realistic assessments of the likely production curves along with the expected rate of development and production for the type of resources to be produced, and that all estimates of local revenues be made on an annual basis which reflects the expected annual production.

### 2. Estimate revenues based on the realities of Federal, state, and local tax laws

Revenue estimates must also account for variations and exceptions in local tax structures rather than simply estimating the value of the total resource and multiplying by the current or average tax rate. For example, Montana's tax structure encourages exploration and development by taxing the first year of production at a lower rate. In Colorado, producers are able to deduct any local property taxes and ad valorem severances taxes paid from their state severance taxes. Other policies which may reduce overall revenues are lower tax rates for directional drilling and for wells that are considered "marginal" (that is, producing below some minimum daily amount). These exceptions and reductions in the actual taxes paid need to be accounted for and included in the analysis of potential public revenue estimates for oil and gas drilling proposals.

We request that the agency determine all applicable Federal, state and local tax laws (including exceptions and reductions) and that these laws and regulations be used to make realistic and accurate estimates of net tax revenues from oil and gas production. As discussed above, revenue estimates must be made based on economically recoverable resources rather than technically recoverable – and must include the environmental and community costs from drilling and production.

### D. Include a full accounting of the hidden economic costs from oil and gas extraction

As discussed, oil and gas revenues, by themselves, only represent flows of **gross** revenue – while **net** revenue is the policy relevant metric that must be analyzed. In order to estimate the **net** revenues from oil and gas production, the associated costs must be fully accounted for in the analysis. Similarly, oil and gas jobs by

BLM_0078270