3. Review and, if necessary, modify the Communication Plans. Continue implementation of communication plans at all levels. It is important that this review also be completed during the "continuing assessment" phase.

4. Specifically related to livestock grazing, continue to communicate and refine livestock grazing management practices with affected livestock permittees/lessees. Issuance of letters updating drought conditions, identifying areas of particular concern, emphasizing the need to work closely with field office Rangeland Management Specialists, etc., is recommended.

   Whenever feasible, one-on-one meetings with livestock permittees/lessess and interested publics (as appropriate) to review and discuss drought information, needed management changes, etc., are encouraged. Written agreements are highly recommended to document agreed upon changes in livestock grazing use. The extent of livestock use adjustments (delayed turnout, reduction in numbers and/or duration, total exclusion, etc.) should be based on assessment of all factors including past grazing use, rangeland health, residual cover, precipitation, soil moisture, long-term weather forecasts, and other resources that may be affected.

   Use of a categorical exclusion to authorize placement and use of temporary water troughs for a period not to exceed one month is addressed in 516 Departmental Manual 6, Appendix 5.4(D)(2). Placement and use of temporary water troughs in one location for a period greater than one month should be addressed through the minimum level environmental assessment needed to provide appropriate analysis. If appropriate, troughs may be moved to other locations to facilitate livestock distribution within an allotment.

   If voluntary adjustments needed for proper livestock grazing cannot be reached, issuance of grazing decisions in accordance with 43 CFR 4110.3-3(a) or (b) should be initiated, as appropriate. These decisions may be issued as Final Decisions effective upon issuance or on the date specified in the decision if those measures are needed to provide immediate protection of resources. The decision document should specify the on-the-ground conditions that must be present prior to returning livestock use to the range. Modification or cancellation of grazing permits/leases should not be used to make short-term livestock grazing use adjustments.

5. Field offices are encouraged to work closely with the State Fish and Wildlife Agencies to review wildlife data, including population levels, winter mortality, fawning/calving success, etc. As appropriate, discussions with the State Fish and Wildlife agencies concerning the need for wildlife herd reductions should continue, if necessary.

**Continuing Assessment Phase**

During the grazing season, the following actions are recommended.

BLM_0079137

1. Monitor on-the-ground conditions including precipitation, utilization by all herbivores of key plant species in key areas, plant growth and production, use supervision of livestock grazing, insect infestations, etc. Grazing utilization should be appropriate to provide sufficient vegetative cover for other resources such as wildlife, fisheries, special status species, and watershed following conclusion of livestock grazing. If field office staff capability is limited, consider exploring partnership opportunities and focusing monitoring to priority watersheds and critical emphasis areas[3] such as allotments that have failed to meet rangeland health standards, or areas with reduced vegetation production.

   If assessment of monitoring information determines adverse impacts are occurring on the ground resulting from livestock grazing, affected grazing permittees/lessess should be notified immediately to move or remove livestock within a designated period of time. As appropriate, consultation and communication with interested publics should also take place. If livestock normally use public land year-round, identify when the decision to eliminate livestock will be reconsidered (i.e., during or following the normal peak plant growth period). Field offices with year-round grazing should also review the pre-season assessment stage prior to the next peak plant growth period. If the livestock are not moved or removed timely, issuance of a grazing decision based on 43 CFR 4110.3-3(b) should be initiated.

2. Continue coordination efforts with State Fish and Wildlife Agencies concerning wildlife herd reductions where they pose a threat to rangeland health and; therefore, their own long-term habitat requirements.

**Post Drought Phase**

The importance of achieving or maintaining the health of the rangeland cannot be over emphasized as consideration is given to returning uses to the public lands following the end of drought. When drought conditions ease, an assessment of all on-the-ground conditions (soil, vegetative, water supply, etc.) should be completed prior to the consideration of returning appropriate levels of use including livestock to the range. It is recommended an interdisciplinary team approach be used to establish site-specific criteria required to be present on-the-ground before livestock use would be returned to permitted levels. Involvement of the livestock grazing permittees/lessees and other interested publics in discussions addressing the return of authorized uses to the public land is recommended. Adequate time will need to be allowed for the vegetative resource to restore the vigor of the plant to a level where the plant can sustain grazing use.

**Other Considerations**

1. The use of salt, minerals, and certain mineral supplements as necessary to overcome natural shortages of minerals in rangeland forage may be authorized to provide for proper range management.

2. Maintenance feeding due to drought is generally prohibited. If an application for maintenance feeding permit is sought because of poor forage conditions

BLM_0079138

associated with drought, the application should be denied and livestock removed or not allowed. Exceptions for special or emergency situations are allowed. An example of a special exception would be the continuation of a historical practice of overnight maintenance feeding of sheep being trailed over several days.

3. Mid-season grazing applications to modify existing authorizations to request non-use should be processed promptly. Field/District Managers are authorized to waive the application processing service charge and to refund previously paid unused grazing fees.

The Bureau, in cooperation with other partners also affected by drought, will be developing a long-term management strategy to better prepare the Agency to address future droughts. In general terms, the strategy will focus toward effective communication between partners and accurate, timely assessment of drought conditions to trigger effective mitigation and emergency response activities.

**Timeframe:** This IM is effective upon receipt.

**Budget Impacts:** Implementation of this IM may affect the ability of field offices in accomplishing targeted AWP workload measures.

**Manual/Handbook Sections Affected:** None

**Coordination:** Opportunity to review draft versions of this IM were given to a BLM interdisciplinary Drought Task Force, State 1020 program leaders; WO 170; WO 210; WO 220; WO 230; WO 260; WO 610; Western States Water Council.

**Contact:** Contact Michael R. Holbert at 202-452-5191 (mike-holbert@blm.gov)

---

[1]Emphasis areas may be defined as grazing allotments, geographic management areas, herd management areas, priority watersheds or any other area that meets the needs of the local field office or state.
[2]Close coordination with adjacent BLM offices and other federal government agencies (e.g. U.S. Forest Service, U.S. Fish and Wildlife Service, Bureau of Indian Affairs, Bureau of Reclamation, National Park Service) that manage lands adjacent to public lands is important to maintaining consistent approaches.
[3]Refer to Item 2 in the **Early Assessment Phase**

| Signed by: | Authenticated by: |
|---|---|
| Edward Shepherd | Robert M. Williams |
| Acting, Assistant Director | Policy and Records Group, WO-560 |
| Renewable Resources and Planning | |

1 Attachment

1 –Drought-Related Websites (1 p)

RLH DEIS Appendix 2 –page 8

BLM_0079139

**An Economic Review of the Fishlake National Forest's Rejection
of the Sustained Multiple Use Grazing Alternative for the
Tushar Range Grazing Allotments**

**Prepared for the
Grand Canyon Trust
by**

**Thomas Michael Power
Professor and Chair
Economics Department
University of Montana
Missoula, Montana**

**February 2007**

BLM_0079140

**An Economic Review of the Fishlake National Forest's Rejection
of the Sustained Multiple Use Grazing Alternative for the
Tushar Range Grazing Allotments**

**SUMMARY**

In its Record of Decision on the Tushar Range grazing allotments, the Fishlake National Forest rejected the citizen-proposed Sustained Multiple Use Grazing Alternative (SMU-G) even though the Forest Service agreed that the SMU-G Alternative was environmentally superior. The justification for rejecting SMU-G was that it would "not maintain high standards of living" in the local economy because, the Forest Service alleged, the SMU-G would have a significant negative economic impact on the Beaver and Piute County area due to reduced grazing on the Tushar Range allotments.

The Forest Service, however, made serious conceptual and factual economic errors in estimating the local economic impact of the SMU-G Alternative. Those errors include:

- Attributing all of the value of the calf crop to the 20 percent of cattle feed obtained from the U.S. Forest Service grazing leases. This not only ignored the other 80 percent of feed obtained elsewhere but also all other inputs to ranching including the base ranch, management, labor, equipment, and supplies.

- Double-counting several times over the local impacts of reductions in beef production by counting (1) the value of the reduced calf crop, (2) the decline in the capitalized value of the grazing leases, and (3) losses associated with erroneously-assumed increases in operating costs.

- Exaggerating the ripple effects by using a local multiplier at least twice that appropriate for a rural area with no major regional trade center.

- Ignoring the local economic impact associated with the decline in AUMs associated with the Forest Service's own Proposed Action, thus exaggerating the local impact of the SMU-G Alternative compared to the Proposed Action.

- Using beef prices from the early 1970s to evaluate current impacts and ignoring the 2.5 fold change in beef prices since then.

When these errors are corrected, the actual impact of adopting the SMU-G Alternative is approximately $333,000 per year. This estimate is based on an updating of the 1974 study (Heady et al.) on which the FEIS relied for one of its two economic impacts analyses, and which the FEIS praised as the most objective analysis available.[1] The Forest Service's own error-ridden estimate of the local impact is $6.2 million per year, almost 19 times larger. The actual $333,000 per year impact represents two-tenths of

---

[1] FEIS p. 3-57 and footnote 18.

1

BLM_0079141

one percent of the total personal income in the two-county area. At the average growth rate of real personal income over the last 10 years in the two-county area, the $333,000 per year impact represents only an 11 day pause in the historical rate of expansion of local personal income. This does <u>not</u> represent a significant reduction in local standards of living.

Much of the Forest Service's socio-economic analysis is focused on the impacts any reduction in grazing levels would have on the 21 permittees who use the 8 allotments at issue. The Forest Service may have been focused on the impact of the SMU-G Alternative on just these permittees when the ROD concluded that SMU-G would not maintain high standards of living. However, these 21 permittees represent less than one percent of all the households in the two-county economic area. It would be inappropriate to focus the socio-economic analysis primarily on those 21 households while effectively ignoring the other 99-plus percent of local families. But that <u>is</u> exactly what the Forest Service does. For instance, it pays considerable attention to how livestock use of these Forest Service lands by the 21 permittees contributes to the ranch families' lifestyle and quality of life. The Forest Service, however, completely ignores the way these National Forest lands could contribute to the quality of life of the other 99-plus percent of local families if managed differently.

These factual and conceptual errors render the economic analysis in the FEIS and ROD useless in informing the public and Forest Service decision-makers about the actual socio-economic impacts associated with the SMU-G Alternative relative to the Proposed Action.

2

BLM_0079142

**An Economic Review of the Fishlake National Forest's Rejection
Of the Sustained Multiple Use Grazing Alternative for the
Tushar Range Grazing Allotments**

## 1. The Basis of the Decision to Renew the Leases

The Record of Decision (ROD) explained the rejection of Alternative C, the Sustained Multiple Use Grazing Alternative (SMU-G), in the following manner:

> …However, consideration will also have to be weighed with regard to the magnitude of social and economic factors. Although social and economic factors are significantly important to the rural structure of the affected counties, the direct impact is to a relatively few ranchers. Alternative C (SMU-G) provides for increased rates of ecosystem improvement and allows for continued cattle grazing, but at <u>a significantly reduced level that will not maintain high standards of living.</u> (p.24; emphasis added)

Earlier in the ROD, a summary of the information provided in the Final Environmental Impact Statement (FEIS) on how the alternatives would affect "standards of living" or socio-economics was provided (p. 15). It quantified the impact of the SMU-G Alternative on the local standard of living as a $6.3 million annual loss to the two-county economy ("Annual Co. Loss"). The details of that calculation were provided in the FEIS, Tables 4-21 through 4-23 and pages 4-53 and 4-54.

A review of the data used, the calculations carried out, and the US Forest Service's interpretation of the results indicate that this quantification of the impact of the SMU-G Alternative on local standards of living is based on consistent and serious errors. Because of that, the Record of Decision was based on the same errors.

## 2. Estimating Local Economic Impacts

Almost every environmental analysis of a federal agency public policy decision requires at least some discussion of the likely impact of that decision on the local economy. For that reason, the U.S. Forest Service began developing the IMPLAN economic impact model in the 1970s.[2] The U.S. Forest Service has used that model on countless occasions over the last three decades to systematically and professionally estimate local economic impacts. Although the application of IMPLAN and the interpretation of its results can be inappropriate and controversial, that local economic impact tool does provide a widely accepted approach to quantifying the impact of public policy decisions on local economies.

There are, of course, other tools available for local impact analysis. The Fishlake National Forest along with the Dixie and Manti-La Sal National Forests, in preparation for developing their new forest plans, contracted with the Utah Governor's Office of

---

[2] http://www.implan.com/greg.html

BLM_0079143

Planning and Budget (GOPB) to provide a socio-economic overview of the local areas associated with those National Forests.[3] The GOPB developed a specific economic tool to measure the economic linkages between the National Forests and local communities, the Regional Economic Model, Inc. (REMI).[4]

Despite the fact that the Fishlake National Forest had access to these conventional tools with which to measure the impacts of its grazing decisions on local standards of living, it chose not to use them. Instead it cobbled together its own local economic impact analysis, making its own assumptions, picking and choosing information from a variety of different sources, and carrying out its own calculations. <u>The result, as will be detailed below, was a long series of errors that generated alleged local economic impacts that are erroneous; that have no credible factual basis.</u>

### 3. The Range of Socio-Economic Impacts Estimated by the FEIS

The FEIS actually provided two quite different estimates of the impact of alternative management scenarios on local standards of living. One was labeled the "Annual Loss Calculation" and the other was labeled the "Contribution to Local Economy." The "Contribution to Local Economy" was calculated in terms of the change that the alternative would make relative to the current or base case situation. In that sense, it was also intended to measure the economic loss to the local economy ("standard of living") as a result of that alternative being adopted.

This presented the decision maker with two measures of the impact of a choice among the alternatives on the local standard of living. For the SMU-G Alternative, for instance, the FEIS estimated the impact on local standards of living to be either $6.2 million per year or $291,000 per year (Tables 4-22 and 4-23). These two estimates differ by a factor of 21. Put differently, the lower estimate is only 4.7 percent of the larger estimate.

These are dramatically different estimates of impacts on local standards of living. The $6.2 million annual impact would represent a per person decline in annual income for people living in Beaver and Piute Counties of about $829, or a decline of about 3.2 percent in per capita income. The $291,000 per year estimate, on the other hand, would represent a per person decline of only $39, or a 0.15 percent decline in per capita income. The former would likely be noticed by residents; the latter almost certainly would not. Over the last 35 years, for instance, the annual changes in real per capita income, both positive and negative, were often greater than $800 (19 of the 35 years). Thus, even the larger of the impacts was within the annual fluctuation in local incomes. The smaller estimate of the impact was a tiny fraction of the annual variation in local incomes.

---

[3] http://governor.utah.gov/planning/usfscountyprofiles_c4.htm. Also see FEIS p. 3-45.
[4] http://governor.utah.gov/planning/usfs/2BEconomicLinkages.pdf

BLM_0079144

Put somewhat differently, a $291,000 per year impact represents about 10 days of normal growth in total real income the Beaver and Piute County area.[5] That is, this local impact would be the equivalent of real income growth pausing for 10 days and then continuing at its relatively rapid historical rate of growth. The larger estimated impact would represent a seven month pause in growth before returning to that "normal" growth path. It is not clear that either impact could be described as a significant impact on local standards of living, but the smaller impact certainly could not be described in those terms.

The ROD and FEIS provide no indication as to which of these measures of the impact of the SMU-G Alternative on local standards of living was used by the decision maker. In fact, the ROD and FEIS do not discuss which of these is a more accurate measure of the actual impact of the SMU-G Alternative on local standards of living and which guided the decision maker in rejecting environmentally preferable Alternative C as incompatible with "high standards of living."

### 4. The Errors in the FEIS Estimates of Local Economic Impacts

The FEIS quantified the impact of the three alternative management scenarios considered (Alternatives A, B, and C) by estimating a variety of changes in the local economy that would be triggered by the adoption of each alternative. For the SMU-G Alternative (Alternative C), the local economic impacts included in the analysis included all of the following:

i. The ultimate dollar value of the calf crop that was associated with the permitted cows that grazed seasonally on the federal leases, or, alternatively
ii. The value of the meat produced by the forage consumed during the permitted grazing season, and
iii. The market value of the federal grazing permits and
iv. The increase in the cost of grazing on the federal leases due to the reduction in the number of permitted cows, and
v. The "multiplier" impact of these changes on the local economy.

Below we will discuss the errors associated with the quantification of each of these alleged impacts on the local economy and local standards of living if the SMU-G Alternative had been adopted.

### *i. The "Loss" of 70 Percent of the Calf Crop*

The FEIS estimates that if the SMU-G Alternative were to be adopted, it would require a 70 percent reduction in the number of cows permitted to graze on these allotments. The number of permitted cows would fall by 1,772. Based on the assumption of an 85 percent calf crop, the calf crop would fall by 1,506. A May 2005 market value for a calf of $658.88 was applied to this decrease in calf production to come up with a "loss" of

---

[5] The average annual growth rate in total personal income in the two county areas between 1994 and 2004 was 5.6 percent. BEA-REIS data.

BLM_0079145

$999,237 due to the 70 percent reduction in AUMs associated with the SMU-G Alternative.

In general, the Tushar Range leases at issue are used during the months of June through mid-October The cows are maintained and calf off of the Forest Service leases and the calves continue to develop after they are taken off these leases. They are weaned and sold in October or November. The Forest Service leases at issue only provide about 30 percent of the Animal Unit Months (AUMs) needed to support the cow herd and its annual calf crop.[6] If the SMU-G Alternative actually reduces AUMs by 70 percent, this would mean that the current source of about a fifth (70 percent of 30 percent = 21 percent) of the feed that currently supports the herd would no longer be available.

Clearly the calf crop is not produced solely by the forage obtained on the Tushar Range leases. They are the source of only a minority of the feed. But it is equally true that feed is not the only input that is needed to produce a calf crop. The owners of the cattle herd also need a base ranch and other sources of feed and forage. The owners also must provide management and supervision. The total cow-calf operation also requires out-buildings and equipment. Fuel, electricity, veterinary services, medicine, and a broad range of other inputs are also required.

The calf crop is the product of *all* of these inputs, not just the minority of the herd's feed that comes from the Tushar Range leases. To attribute the entire value of the calves to a minority part of the animals' feed is not economically accurate..

In a market economy the economic contribution of each input to a production process tends to be indicated by the market price of that input. If the FEIS is correct that the capitalized market value of a Forest Service AUM is $80[7], that market value can be used to estimate the annual economic value that the market and the ranch placed on the contribution that forage made to the total value produced by the cattle raising operation. If the ranch has a 20 year time horizon in valuing a grazing lease and a discount rate of 8 to 10 percent, the capitalized $80 value represents an annual contribution of each AUM to the total value of the cattle operation of $8 to $9. That value is not a guess or the result of speculation. That value is based on what the market and the ranch itself estimated the annual contribution was that each AUM of Forest Service forage made to the financial productivity of its cow-calf operation.

The FEIS, however, has estimated that each Forest Service AUM creates $118 in economic value each year through the calf crop. [8] But if the FEIS is correct about the capitalized value of an AUM (i.e, $80), ranchers are indicating that each AUM contributes <u>less than $10</u> of economic value. One can test the reasonableness of the FEIS estimate of $118 annual value for each AUM by asking what profit for the ranch that $118 per year of benefits implies is associated with the use of Forest Service lands

---

[6] FEIS 3-44 and 3-50.
[7] FEIS p. 4-52.
[8] FEIS, Table 3-40: $1,416,592 divided by 12,009 AUMs = $118 per AUM.

6

BLM_0079146

for cattle raising. The FEIS estimates the cost of using each AUM to raise cattle to be $15.61. If that cost is subtracted from a supposed $118 in annual economic value created per AUM, each AUM, according to the FEIS, produces $102 in profit for the ranch each year.[9] If that were true and, again, the ranch had a 20 year time horizon and a 10 percent discount rate, the capitalized value of a Forest Service AUM would be $872, not $80. Grazing permits would exchange at $872 per AUM instead of $80. There is absolutely no evidence that that is true. Clearly the FEIS has grossly exaggerated the contribution its AUMs actually make to both the ranches and the local economy.

### ii. The FEIS's Alternative Estimate of the Economic Contribution of an AUM

The FEIS provides a second estimate of the economic contributions the Tushar Range AUMs make to the local economy. According to the FEIS, that second estimate was based on a report "prepared by a task force of the Council for Agricultural Science and Technology consisting of 15 top range scientists in the United States and represents the work of knowledgeable scientists who are not involved in the administration or management of federal lands."[10] In this second approach, the FEIS looked at the "estimated amounts of meat produced by the forage consumed during the permitted grazing seasons."[11] The FEIS cites Utah-specific data that indicated that cattle produce an average of 28.5 pounds of meat per AUM used. Note that this approach looks specifically at the contribution that the forage associated with the Forest Service leases makes to the value of the calf that is ultimately marketed. It does not assume that *all* of the value of the calf is associated with just the Forest Service forage. A market value is then assigned to this incremental gain in weight from the use of the federal AUMs to obtain the gross production value of an AUM. The FEIS used a <u>gross</u> production value per AUM grazed on federal rangelands of $9.89, citing the expert report mentioned above.[12]

In the FEIS tables in which the $9.89 per AUM value is repeatedly reported and used, it is labeled a "<u>net value</u>" even though the text and cited report clearly label it as the <u>gross production value</u> associated with the use of the AUMs. Those FEIS tables, including the summary table reproduced in the ROD, however, also clearly label it as the (net) "contribution to local economy."[13]

Note that the FEIS's estimate of $9.89 per AUM is close to the $8 to $9 per AUM estimated above from the capitalized value of an AUM and is only one-twelfth (8 percent) of the $118 per AUM that the FEIS assigns as each AUM's contribution to the local economy.

---

[9] FEIS Table 3-40: $1,416,592 divided by 12,009 AUMs = $118 per AUM per year. The same table lists the costs of annual calf production to be $15,61 per AUM.
[10] FEIS, p. 57, footnote 18.
[11] FEIS, p. 3-57.
[12] FEIS, p. 3-58.
[13] FEIS Tables 3-38, 3-39, 4-17, 4-20, 4-23, 4-.24, and ROD p. 15. A multiplier of 3.5 is applied to the $9.89 to convert it to the "contribution to the local economy" in the FEIS.

7

Although the FEIS uses the $9.89 per AUM contribution to the local economy throughout its socioeconomic analysis, that value comes from a study published in 1974 which used data from the early 1970s. That is, this economic information is about 35 years old, yet it was used by the FEIS to indicate the current impact of changes in grazing levels on contemporary standards of living in Beaver and Piute Counties. The FEIS admits that the source study and data values are "stale" because of their age, but argues that since this information is only being used to compare the alternatives to each other, accurate relative values still result even though very outdated economic information is being used.[14] This is clearly not true. Since the alternatives being compared include elimination of grazing on these leases as well as a 70 percent reduction in grazing, "relative" values are not being compared. Under Alternative 2 no grazing takes place and the full absolute value of the impact of the grazing on the local economy is reported. The ROD refers to these numbers in coming to the conclusion that the SMU-G Alternative "will not maintain high standards of living" in the local economy. A decision-maker cannot conclude that for the year 2007 using data from 1972.

Between 1972 and the beginning of 2007 the consumer price index rose almost 5 fold (4.82 times), cutting the purchasing power of a 2007 dollar to five cents compared to a 1972 dollar. The local economies also have changed significantly since 1972. For instance, in Beaver County real per capita income has increased 70 percent, population 60 percent, employment 72 percent, and aggregate real income 166 percent.[15] Using 1972 economic information expressed in 1972 dollars to measure an impact on the local economy 35 years later is simply a gross economic error.

More specifically, the average price paid for calves in October and November of 1972 was $46.93 per hundred-weight while the average price in October and November of 2006 was $123, 2.5 times greater.[16] This national data is consistent with the beef prices implicit in the data used by the FEIS. The assumption that an AUM produced 28.5 pounds of beef in Utah in the early 1970s (p. 3-57) and that the gross production value of that AUM was $9.89 implies a $34.70 per hundred-weight price. The FEIS valuation of a 500-550 pound calf being worth $659 in May of 2005 (p. 3-58) implies a $132 per hundred-weight price. Clearly the reliance by the FEIS on economic data from the early 1970s when agricultural prices were dramatically different to represent economic impacts today is seriously misleading.

### iii. The Inclusion of the Capitalized Value of the Federal Leases in the Estimate of Annual Local Economic Impacts

The FEIS, when calculating the **annual** local economic impact of the SMU-G Alternative, includes the loss of the capitalized value of the Forest Service grazing leases which it assumed to be $80 per AUM. For the assumed 70 percent reduction in grazing, the 8,406 AUMs that are assumed to be eliminated were calculated to be worth

---

[14] FEIS p. 3-57, footnote 19.
[15] Bureau of Economic Analysis, Regional Economic Information System, U.S. Department of Commerce.
[16] U.S. Department of Agriculture, National Agricultural Statistics Service, **Agricultural Prices, November 15, 1972 and November 30, 2006.**

8

BLM_0079148

$672,480 to which a multiplier of 3.5 was applied. With the multiplier impact included, the FEIS estimates the economic impact of this particular measure of "loss" to be $2.4 million per year indefinitely into the future.

Forest Service permits have a capitalized market value because their annual contribution to ranch operations is greater than what the Forest Service charges for their annual use. The difference between the annual benefit to the ranch operation and the annual Forest Service charge for that grazing represents a future stream of benefits for which potential permit holders are willing to pay. The capitalized market value of the permit to graze is simply the present value of that stream of future benefits. If the annual benefit of using the permit is $10 per AUM and the rancher's discount rate is 8 percent and the benefits are expected to continue indefinitely into the future, the capitalized ("present") value would be $125. On the other hand, if the rancher's time horizon was only 20 years and the discount rate was 10 percent, the capitalized value of those future benefits would be $85,[17] which is near the current price of a Forest Service permit for an AUM.

The FEIS makes three serious errors by including this as an annual economic impact associated with the SMU-G Alternative:'
1.     Loss of permitted AUMs is a one-time-only impact. That is, a permit for an AUM is bought and lost once.
2.     Loss of AUMs is already included in the calculation of the calf crop lost. In that sense it is double counting of an impact already accounted for. '
3.      A multiplier cannot be applied to this loss of a capitalized expected future value.

It should be pointed out that when the FEIS calculated the contribution that the grazing allotments at issue made to the local economy, it did not include the capitalized value of the grazing leases. Instead it correctly included only its estimates of the annual value associated with the use of the Forest Service leases (pp. 3-58 and 3-59, Tables 3-39 and 3-40). If the capitalized value of the grazing lease had no positive impact on the local economy to begin with, it is unclear how a reduction in that value could have a negative impact on the local economy. One or the other of the calculations in the FEIS has to be in error.

The capitalized value of the Forest Service leases is reduced as a result of a reduction in AUMs only once. The capitalized value does not fall by $672,000 each and every year into the future. Since the leases are only worth $672,000, their value can fall by

---

[17] Author's calculations. The stream of future benefits does not have to be entirely financial. If ranchers value the lifestyle benefits of operating a ranch, the "consumption" benefits of running an operating ranch may well add to both the value of the ranch and the value of any below market value federal leases associated with the ranch. See "New Faces and the Changing Value of Rangeland," L. Allen Torell, et al., in *Current Issues in Rangeland Resource Economics*, Proceedings of a Symposium Sponsored by Western Coordinating Committees 55 and 40, Society For Range Management, Rangelands in Transition 2004, 57th Annual Meeting, January 24-30, 2004, L. Allen Torell, et al. editors. Utah Agricultural Experiment Station, College of Agriculture, Utah State University, Logan, UT, Research Report 190, June 2004.

9

that amount only once. That "loss" is a one-time-only event. It cannot be listed as an *annual* cost the way the value of the reduced *annual* calf production can.

Equally important, the capitalized value of the Forest Service lease is due to the annual benefits associated with using those federal AUMs to raise a calf crop. But the value of using those AUMs is already included in the estimate of the annual value of the calf crop lost. These are not two different impacts. The annual value of the lost calf crop already includes the value of the forage the lease provided. Including both is a straight-forward double counting error.

Finally, a multiplier cannot be applied to the capitalized value of the retired AUMs. That capitalized value is not money or income injected into the local economy. Its loss does not represent income withdrawn from the local economy. It is an asset value that has declined. The estimated decline in calf production and marketing are the changes that have a direct impact on income injected into the local economy. To account for that impact again is an error.

### iv. Cost Confusion

One of the negative impacts on the local economy associated with the SMU-G Alternative is an assumed increase in the costs associated with the permitted grazing that would continue, which was assumed to be 30 percent of the current grazing level. The FEIS reasons that at least some of the costs associated with using the Forest Service AUMs are fixed and would not be reduced as a result of eliminating 70 percent of the AUMs. If that is true, the cost *per AUM* would necessarily rise because the fixed cost component would have to be spread over a much smaller number of continuing AUMs.

But the FEIS and ROD report in the summary table only the estimated cost increase associated with a rather extreme assumption: That the total cost of making use of all of the currently permitted AUMs would not change at all if 70 percent of those AUMs were eliminated and the herd that had to be moved on to the allotment and managed there was reduced to 30 percent of its previous size. That is, the FEIS assumes that none of the costs associated with the use of the allotments are variable costs that vary with herd size; that they are all fixed costs. That extreme assumption simply is not plausible.

This extreme assumption assumes that the total costs associated with using the allotment are unchanged as the number of AUMs associated with it is reduced. This is important since the FEIS concludes that the total costs associated with using the allotment actually increase. As the FEIS puts it: "…a total **cost increase** for the 8-allotment area (assuming **no decrease in costs**) was $116,161…"[18] But total costs cannot both remain constant and increase; that is a contradiction.

The FEIS has simply confused costs *per AUM*, which do rise, and total costs associated with all AUM, which do not rise. Because all costs are assumed to be fixed, as the

---

[18] FEIS, p. 4-54, emphasis added.

10

number of AUMs decline, the costs per AUM rise. But the FEIS calculates that as the number of AUMs declines by 70 percent, the cost per AUM rises from $13.82 to $46.06. That $32.24 increase in costs per AUM is then multiplied by the remaining AUMs to arrive at a cost "increase" of $116,151. But the total costs, by explicit assumption, have **not** increased because they are all fixed! If the new cost per AUM of $46.06 is multiplied by the remaining AUMs (3,603), the total cost is the same $165,964 that existed when all 12,009 AUMs were used at an average cost of $13.82. That is because that is exactly what the FEIS assumed, namely that total costs did not change. The FEIS has confused per-unit costs with total costs and made a consequential error in the process.[19]

The FEIS also ignores some costs that we know <u>do</u> decline when AUMs fall, namely the annual payment per AUM to the Forest Service. For some reason that cost decline was ignored.

It should be pointed out that although one might make the case that some of the costs associated with making use of a Forest Service grazing allotment are fixed in the short run, adjustments in how those allotments are used by ranchers would, over time, reduce those fixed costs. For instance, one could argue that if the ranch usually moved 500 cows and calves onto the allotment but the number permitted on the allotment dropped to 150, it might take the same personnel to move and manage the cattle on the allotment. It is highly likely, however, that faced with these new economic circumstances the grazing allotments would be effectively consolidated among ranches so as to reduce those average fixed costs. Ranches and the Forest Service would not have to proceed as they did before the 70 percent reduction in permitted grazing. They would adapt to the new circumstances to realize the full economic potential of that new situation. That would bring the average costs back down although, with the lower density of grazing on the Forest Service lands, average costs per AUM might be higher than they had been before the reduction.

The FEIS is also confused as to exactly what role costs play within the local economy. Typically the costs incurred by local ranchers as they raise their calves and cattle are treated as the indirect local economic **benefits** associate with their operation. That is, when the ranch buys fuel, equipment, veterinary services, seed, fertilizer, etc. those expenditures, that is those costs, flow through local businesses generating additional

---

[19] There might be concern that since costs per AUM have gone up, profits associated with grazing the allotment will have gone down disproportionately and that that is what the FEIS is trying to get all. But since all of the costs are assumed fixed, the change in the amount of grazing has no impact on costs and therefore cost changes do not affect profits. Profits are simply proportional to the level of grazing and decline as the level of grazing is reduced. But that is already reflected in the loss in the value of the calf crop. There is no additional impact to take into account that is associated with costs. From a long run point of view, the revenues from grazing have to be able to at least cover those fixed costs of grazing. If grazing levels are reduced to such an extent that the fixed costs cannot be covered, the ranch will cease using the grazing allotment or will seek to reorganize its use of Forest Service forage so as to reduce the fixed costs. Given the FEIS's average fixed cost of $13.82 per AUM, the grazing fee of $1.79, and average revenue of $118 per AUM, as long as at least 12 percent of current grazing levels are allowed, the use of Forest Service for forage would continue to be profitable.

BLM_0079151

income and employment. That is one of the things the "multiplier" is supposed to be measuring. A decrease in ranch expenditures that is not offset by some other increase in spending would usually be treated as a "loss" to the local economy Thus, when the FEIS applies a multiplier to the full value of the reduced calf crop in estimating the loss to the local economy, it is treating the reduced costs associated with the ranching operation as a reduction in local benefits. But in its discussion of changes in ranch costs, the FEIS does not take this conventional position. Instead it treats its erroneously estimated cost increase as a loss to the local economy. Thus the FEIS simultaneously treats cost decreases and cost increases as having a negative impact on the local economy. That is not logically or economically possible. Cost changes in opposite directions cannot have the same impact on the local economy. The FEIS is confusing the impact of a cost change on a ranch's finances with the impact that a change in local ranch spending has on the local economy.

### iv. Multiplier Impacts

The FEIS multiplies by 3.5 all of the changes that are estimated to impact the local economy in order to represent the "ripple" effects of the changes in ranching activity as those changes impact both suppliers (the "indirect" impacts) and the income and spending of those employed in ranching activities (the "induced" impacts).

The FEIS cites a 1991 Utah State University extension report in support of its use of a 3.5 multiplier and also the brief 2002 testimony of the State of Utah Department of Agriculture and Food in support of the Utah dairy producers in which it was asserted that multipliers greater than 5 were appropriate for the Utah dairy industry.[20]

Clearly the choice of a multiplier can transform an impact that is modest to an impact that is major. A direct impact that represented 2.5 percent of the local economy would become almost a 14 percent impact if the multiplier were 5.5.

It is important to understand that the size of the multiplier is determined by the ability of the local economy to trap and hold dollars within it. It is the leakage of income out of the local economy to finance the importation of goods and services that limits the multiplier impact. The more sophisticated, diverse, and complete a local economy is, the higher will be the multiplier. Put slightly differently, the more self-sufficient the local economy is in the sense of not having to import lots of goods and services into the area to satisfy residents' needs, the higher will be the multiplier.

For that reason, as the geographic scope of the regional economy that is being considered expands to include more and larger trade centers, the larger will be the multiplier. Thus the multiplier for an economic region including the urbanized belt along the Wasatch Front will be much larger than a multiplier calculated for just Nephi. Similarly, a multiplier calculated for the State of Utah as a whole will be larger than that for just the Salt Lake City area and a multiplier calculated for the United States will be larger than one calculated for only Utah.

---

[20] FEIS p. 3-56, footnote 17.

BLM_0079152

Beaver and Piute Counties are rural counties. In terms of population, Piute County is the second smallest of Utah's 29 counties and Beaver County is the sixth smallest. The largest settlement in Piute County has less than 500 residents and the largest town in Beaver County has about 2,500 people. Rural counties with only small towns and cities cannot support diverse and relatively complete economies simply because there are not enough residents to support a broad array of businesses. Because of that, the appropriate multipliers for the Beaver-Piute economic area are much smaller than the appropriate multipliers for the state of Utah. Most of the money spent in Beaver City or Circleville leaks out of the areas very quickly to pay for the importing of the goods and services. In addition, much of the income earned by residents of that two county rural area does not get spent within these two counties. Instead, it is spent in the larger trade centers such as Cedar City and St. George. Other parts of local income flow fairly quickly to the dominant regional trade centers of Las Vegas or Salt Lake City.

As a recent *Salt Lake Tribune* profile of Beaver County put it[21]:

> ...Passenger trains no longer run on the line that passes through Milford. And its residents, like those in Beaver City and Minersville, now make a 52-minute drive to Cedar City to shop for clothes, see movies or get something to eat besides Chinese and diner burgers.
>    The locals put it this way: "You can't even buy a pair of men's socks or underwear in town anymore."

This high rate of income leakage out of rural counties like Beaver and Piute drastically reduces the multiplier impacts.

When the **IMPLAN** and other input-output local economic impact models are applied to agricultural operations in rural counties, including cattle raising, the output multiplier is typically less than 2. The more rural the area, the lower the output multiplier; it can be as low as 1.2 in relatively isolated areas.[22] If one expands the economic area to include

---

[21]Exploring Utah One County at a Time, http://extras.sltrib.com/counties/detail.asp?CTY=Beaver
[22] See, for instance, Economic Impact Analysis of Reduced Irrigated Acreage in Four River Basins in Colorado, J. Thorvaldson and James Pritchett, Colorado State University, 2006. The output multipliers for irrigated agriculture varied from 1.78 to 1.22 depending on how densely settled the river basin was (p. 34). An analysis of the economic impact of grazing allotments in the Mojave National Preserve and Death Valley National Park estimated IMPLAN output multipliers of 1.34 (p. 35); Northern and Eastern Mojave Planning Area: Economic Impact Analysis, prepared for the Northern and Eastern Mojave Planning Team, National Park Service, June 1998. In "Estimated Economic Impacts of the Cattle Ranching and Farming Sector of the White Pine County [NV] Economy", T. Harris and J. Wright of the University of Nevada-Reno, estimated an impact multiplier of 1.73 (p. 18); Cattlemen's Update 2006, University of Nevada. A study of "Economic Impacts from Agricultural Production in Arizona" by J. Mortensen of the University of Arizona in 2004 estimated IMPLAN output multipliers for range fed cattle of 1.877 (p. 18). The "Economic Impact Analysis Methodology" prepared by the BLM for the Casper (WY) Draft RMP and EIS calculated that the IMPLAN output multiplier for cattle grazing was 1.88 ( Appendix V, p. V-6). The Montana BLM in its environmental analysis of the proposed Missouri River Breaks National Monument Resource Management Plan estimated a ranch fed cattle IMPLAN output multiplier of 1.9 (p. 192). A1998 IMPLAN analysis of range fed cattle operations in rural southeastern Oregon calculated <u>personal income</u>

13

BLM_0079153

the entire state and its metropolitan areas, the output multiplier can be as high as 3.[23]
The FEIS chose a multiplier that is inappropriately large for the very rural area adjacent
to the Tushar Range grazing allotments. The citation to statewide multipliers for dairy
farming is inappropriate for range-fed cattle in a very rural area. It should be pointed out
that the Heady et al. study of the impact of federal-lands grazing on the Utah and other
Western state's economies that the FEIS emphasizes as the most expert and objective
used a multiplier for federal grazing allotments of 2.25, not the 3.5 the FEIS chose to
impose on that study's results.[24] It is likely that the Heady et al. multiplier of 2.25 was a
state-wide multiplier and was also too large for application to the Beaver and Piute
County economies.

The FEIS, by choosing a state-wide multiplier, used a multiplier that was at least twice
what was appropriate (3.5 versus 1.75 or lower). This in itself doubled the apparent
negative impact of the SMU-G Alternative on the local economy.

> ### v. Understating the Impact of the Proposed Action (A) Alternative

The FEIS adopted a worst-case approach to the evaluation of the SMU-G Alternative,
estimating that it would require a 70 percent reduction in grazing on the allotments at
issue. The FEIS repeatedly indicated that many of the objectives of the SMU-G
Alternative could be reached through the Proposed Action because it authorizes
adaptive management including the future closing of areas to grazing when and if that is
required to reach the environmental objectives. In that sense the FEIS is admitting that
reductions in grazing may be needed under the Proposed Action. However, the FEIS
does not estimate any reduction in the calf crop as a result of those reductions in
grazing AUMs under the Proposed Action.

The FEIS does not even attempt to estimate the reductions in grazing that will be
required to meet most of the environmental objectives of the Proposed Action. For the
periodic early closing of the grazing season, however, it does provide an estimate: cattle
may have to leave the allotments early in 33 percent of the years, shortening the
grazing season by 15 percent in those years. That implies a 5 percent reduction in
AUMs associated with the Proposed Action. The FEIS, however, simply asserts that this
loss of AUMs will have no impact on calf production: "No significant impacts on the
calving operation are anticipated."[25] Despite that assertion, the FEIS assumes that the
capitalized value of the Forest Service leases declines proportionately with the AUMs.
That would imply that the productivity of the leases for calf production declined. The

---

coefficients for range fed livestock operations of about 1.0, meaning that a million dollars of additional
range fed beef production resulted, after all direct, indirect, and induced impacts are accounted for, in a
total increase of $1 million in personal income to residents; Economic Study of Implementing the
Proposed Oregon High Desert Protection Act, Oregon Natural Desert Association, August, 1998, p. V-2.
[23] For the whole state of Utah, the direct effects multiplier for range fed cattle estimated by the Governor's
Office of Planning and Budget was 3.12 in 2001. See Multipliers for Utah, Utah State and Local
Government Fiscal Impact Model, Working Paper Series 2001-1.
[24] FEIS, p. 3-57.
[25] FEIS p. 4-52.

BLM_0079154

only conclusion that can be reached is that ranches adjusted their operations to the reduced federal forage and proceeded to produce the same sized calf crop.

There are many other restrictions that the Proposed Action indicates may have to be placed on grazing in order to reach Forest Service environmental objectives. For instance "complete rest or reductions in the duration and concentration of grazing may be required on degraded sites" in order to:

- Restore desired riparian characteristics (Table 4-1)
- Restore health vegetative communities with deep, dense, rooting characteristics (Table 4-2)
- Restore channel and floodplain roughness by attaining taller stubble heights with deep, dense, rooting characteristics (Table 4-3)
- Restore the ability to filter and store upland sediments in riparian area (Table4-4)
- Restore woody vegetation (Table 4-6)
- Reduce problematic nutrient loading and/or bacteria input from livestock use (Table 4-7)
- Reduce evident soil compaction and decreased infiltration rates in riparian and upland areas with decreased vegetation cover and fully restore the sponge and filter process that health watersheds and riparian areas provide (Table 4-8)

All of these protective measures under the Proposed Action will require that grazing be reduced or eliminated for an indeterminate time period. Apparently, according to the FEIS, it is possible for the ranches that are using the allotments at issue to adapt their cattle operations to absorb both the higher level of costs and lower levels of AUMs projected by the FEIS for the Proposed Action without significant impacts on either the ranches' finances or the adjacent communities' economies. As the FEIS says: "Under the Proposed Action there would not be adverse social or economic effect to either permittees or rural community economies."[26]

These assertions by the FEIS implicitly acknowledge the adaptability of ranches to changes in the terms under which Forest Service forage is available when evaluating the Forest Service's own Proposed Action. The FEIS, however, expects no such adaptability when it comes to the SMU-G alternative. This asymmetric treatment of the impact of measures to protect the Tushar Range's productivity under the two alternatives biased the quantitative information on local economic impacts that was provided to the decision maker.

*vi. The Cumulative Impact of the FEIS Errors in Estimating Local Impacts*

The FEIS's calculation of the local economic impact of the Tushar Range grazing leases clearly involves multiple cases of double-counting. The FEIS impact calculations are not even consistent with each other. When the FEIS calculated the contribution of all of these grazing leases to the local economy in Chapter 3 of the FEIS, its high estimate was $4.3 million (p. 3-58). When it calculated the impact of reducing grazing by 70

---

[26] FEIS p. 4-51.

BLM_0079155

percent by implementing the SMU-G Alternative in Chapter 4, its high estimate of the cost to the local economy was $6.2 million, 44 percent higher than the total contribution of all of the grazing to the economy to begin with even though 30 percent of the grazing would continue. (p. 4-54)

The errors in the estimation of the local economic impact of the SMU-G Alternative can largely be corrected by using the methods contained in the study the FEIS most highly praised, the Heady et al. study. The "Heady Formula" was laid out in Tables 3-38 and 3.39 and applied to the Proposed Action and SMU-Grazing Alternatives in Tables 4-17 and 4-23.

As pointed out above, however, the Heady value per AUM was based on prices paid to ranchers for their beef in the early 1970s. If that value of $9.89 per AUM is updated based on the change in prices paid to ranchers for their beef between 1972 and 2006, the local impact per reduced AUM would be $25.91. A 70 percent reduction would represent a decline in 8,406 AUMs or a loss of $217,822.

As discussed above, the Proposed Action would also reduce AUMs even though the FEIS did not try to quantify that reduction. The impact of adopting the SMU-G Alternative is the difference between it and the Proposed Action. We know that the Proposed Action will reduce AUMs at least 5 percent but have listed above the reasons to expect even greater reductions. For illustrative purposes we assume that the actual reduction in AUMs under the Proposed Action will be 15 percent. Alternatively, that assumption is the equivalent of the Proposed Action reducing AUMs by 7.5 percent and the FEIS over-estimating the reductions in the SMU-G Alternative by 7.5 percentage points. In either case the local impact of the SMU-G would be 15 percent lower or $185,149.

Even though Heady used a state-wide 2.25 multiplier, the FEIS chose to use a 3.5 multiplier. As discussed above, for a small rural area without significant trade centers, an output multiplier of 1.8 or lower is appropriate. That would turn the $185,149 direct impact into a $333,268 total impact on the local economy.

We have not included the loss in the asset value of the grazing permits or any total cost increases (despite a 70 percent decline in grazing) for the reasons discussed earlier.

This estimated impact on the local economy can be compared to the FEIS Heady estimate for the SMU-G of $290,973 (Table 4-23) which, if also adjusted for the lower AUMs associated with the Proposed Action would be $247,327. Our estimate of the impact on the local economy is about 35 percent *higher* than that FEIS "Heady" value.

## 5. The Forest Service's Interpretation of Its Estimated Local Economic Impacts

*The Relative Size of the Impacts: Do They Threaten "High Standards of Living"?*

16

BLM_0079156

Based on its socio-economic analysis, the Forest Service ROD concluded that the SMU-G alternative had to be rejected because, despite its positive impacts on range and other natural landscape values, it would "not maintain high standards of living" locally (ROD, p. 24).

It is not clear how the Forest Service arrived at this conclusion. The ROD and the FEIS both argue the opposite.

The ROD states:

> "The FEIS recognizes the relatively minor economic benefit derived from public land ranching in Beaver and Piute Counties... (p. 10)

> "Although social and economic factors are significantly important to the rural structure of the affected counties, the direct impact is to a relatively few ranchers. (p. 24, emphasis added)

The economic analysis done by the Utah Governor's Office of Planning and Budget for the U.S. Forest Service's forest plan revisions estimated that the economic connections between the Fishlake National Forest and the agricultural sector of the surrounding economy was responsible for about 7.6 percent of total agricultural employment. That is, over 90 percent of the agricultural employment was not related to the Fishlake National Forest.[27] Of course, agricultural jobs make up only a small percentage of total jobs. In the Beaver and Piute economic area, agricultural employment makes up less than 20 percent of total employment. So the Fishlake NF contribution to the local economy through agricultural jobs is only a little over 1 percent of total jobs.

The FEIS, after applying the "Heady formula" to estimate the total impact of the eight Forest Service grazing leases at issue concluded: "Therefore the $415,692 yield to the economy figure [from the 12,009 AUMs at issue] represents only 0.2% of income in the two counties. Cattle grazing [on the leases at issue] appears to contribute only a small portion of the total economy of the area." (p. 3-58)

Then the FEIS developed its higher estimate, which, as demonstrated above involves multiple double-counting and other errors. In presenting those results the FEIS commented: "These calculations yield considerably greater figures than those determined by the Heady formula. None-the-less, a calf-production induced contribution value of $4,301,962 is still only 2% of the total income in the two counties of $172,297,000." (pp. 3-58 and 3-59)

Our analysis above, largely based on updating the Heady approach used in the FEIS, concluded that the direct impact of choosing the SMU-G Alternative rather than the Proposed Action would be a $185,149 loss in agricultural production. That would

---

[27]Chapter 2B, Economic Linkages, Figure 2B-13, p. 15, http://governor.utah.gov/planning/usfs/2BEconomicLinkages.pdf

17

BLM_0079157

represent one-tenth of one percent of the $170.4 million in agricultural production in the two counties in 2002 and eight-tenths of one percent of cow-calf sales.[28]

With multiplier affects accounted for, the total impact of the SMU-G Alternative associated with our estimate would be $333,268, which represented two-tenths of one percent of the total personal income in the two-county area in 2004. At the average growth rate of real personal income in the two-county area between 1994-2004, the $333,000 per year impact would represent an 11 day pause in the normal rate of expansion of local personal income.

On a per capita basis, the impact would be $45 per person or about two-tenths of one percent of the 2004 $26,063 average income in the two-county area.

It is unclear how the ROD could assert that this level of impact would "not maintain" local standards of living. The FEIS's own numbers and conclusions contradict that assertion. These results clearly indicate that the SMU-G Alternative is as compatible with local "high standards of living" as the Proposed Action is. The ROD (at 15) estimates their Proposed Action (Alternative A) will cause an annual loss to the counties of $231,889, an estimate 70% as high as the $330,000 loss attributable to the SMU-G Alternative C using accurate economic accounting. The Forest does not indicate that the $231,889 county loss will not maintain "high standards of living" in the counties.

As will be discussed later, in a future context of a dynamic and changing economy, the SMU-G Alternative's focus on repairing the damage done by past grazing and restoring natural landscape values is likely to be more consistent with ongoing economic vitality than a focus on supporting the historic grazing operations at the expense of the environmental services that natural landscape is capable of providing.

*The Duration of the Local Economic Impacts*

When interpreting the local economic impacts projected by economic base models, it is important to understand the limitations of those models. Such models and their ripple or multiplier impacts are most useful in projecting the impacts in the relatively near-term before ranchers, farmers, local businesses, and markets can adjust to the changes. Economic base models implicitly assume that markets and entrepreneurs are paralyzed by change and cannot adapt to minimize the negative and maximize the positive aspects of the changes that are constantly taking place. Although that may well be true in the short run, that is not how markets behave once economic actors have time to adjust.

For instance, the FEIS and the ROD estimate their larger local economic impacts on the basis of the assumption that if part of a minority source of the herd's feed, about 20 percent of the total, were no longer available, the ranch operations would have to be abandoned and the ranchers would have to move from the area.[29] Implicit in this worst

---

[28] FEIS p. 3-52.
[29] ROD, p. 10.

18

BLM_0079158

case scenario is the assumption that the resources currently committed to raising cattle: land, labor, management, equipment, building, and all of the other inputs to a ranching operation will become permanently unemployed. But these are valuable resources that will not simply be abandoned to sit idle because one source of supply for one of the inputs of a production process is no longer available. Ranch families are flexible and adaptable entrepreneurs who regularly adjust successfully to changing weather, market conditions, technologies, off-farm economic opportunities etc.

As will be discussed in the next section, the base ranches and their agricultural capacities are unlikely to be abandoned. The ranch families' work discipline, managerial abilities, skills, experience, and energy will not disappear. The equipment and out-buildings will not simply be left to decay. The fuel, electricity, veterinary services, medicines, fertilizer, etc. will not go un-utilized. Valuable and productive resources get redeployed in slightly different or dramatically different new ways as economic conditions change. When faced with new constraints on one particular input into a ranch's production process, the ranch does not just passively and fatalistically give up and the businesses that in the past have supplied and served the ranch do not respond in that manner either. That is not how businesses, entrepreneurs, and market economies work. That is not how the Beaver and Piute economies have been adjusting to change either.

The FEIS, by assuming that under the SMU-G Alternative the total value of 70 percent of the calf crop will be permanently lost to the local economy is, in effect, assuming that all of the valuable and productive resources that combined to create that calf crop will also be permanently lost to the local economy. There is no reason to believe that would be the case. As will be discussed later, the basic economic data provided in the FEIS on the economies of Beaver and Piute Counties also do not suggest that those local economies are rigid and incapable of continuing to adapt to changing economic circumstances.

## 6. The Impact of the Reduced Grazing on the Individual Ranches Using the Allotments

"Socio-economic" analysis does not usually focus primarily on a very small number of economic actors. Its focus is on the larger community and economy. However, this FEIS deals with eight grazing leases that directly affect, at most, 21 permittees (ROD, p. 3) and thus possibly 21 households out of the 2,500 households in Beaver and Piute Counties. This is the "relatively few ranchers" referred to in the ROD (p. 24). An accurate and relevant socio-economic analysis cannot focus primarily on such a tiny part, less than one percent, of the local counties and economy and expect to draw conclusions that inform the larger public or decisionmakers. The number of affected ranches is small even compared just to the number of agricultural operations. In 2002 there were 364 farms and ranches in those two counties, 209 of which raised cattle.[30]

---

[30] 2002 Census of Agriculture.

19

BLM_0079159

The FEIS, however, does focus considerable attention on the 21 permittees who currently use the Forest Service leases at issue. It is possible that the ROD's concern with "maintaining high standards of living" was not directed at the residents, communities, and economy of Beaver and Piute Counties but at the "relatively few" ranchers who are currently making use of those grazing allotments. As inappropriate as such a focus would be for a socio-economic analysis, it is important to understand the errors in the FEIS's estimate of the impacts of changes in the number of authorized Forest Service AUMs on even this small number of permittees.

*The ROD and FEIS Description of the Dilemma Faced by Allottees*

Both the ROD (p. 10) and the FEIS (p. 3-59) describe in identical words the plight of ranchers that currently graze cattle on the Tushar Range but would face reduced grazing opportunities if the SMU-G Alternative were to be adopted.

> While individual ranch calf sales information may indicate significant values, studies indicate that most ranchers in the area rely on some type of second off-farm income to round out their economic livelihood. The impact on individual ranchers by any significant reductions in grazing use could be devastating, resulting in some ranchers having to "give up" ranching. Some ranchers would have to relocate elsewhere to obtain sufficient employment.

> Undoubtedly, grazing on public lands is an integral part of ranch operations in south-central Utah. For several generations, many of the local ranches have been dependent upon the National Forest for summer forage to round out year-long operations. The high percentage of Federal land ownership in south-central Utah, averaging approximately 75% for the two-county area, emphasizes the importance to local ranchers of Federal rangelands in maintaining viable local livestock ranching operations.

The FEIS used a study of Wayne County, just to the east of Piute County, to characterize the way in which residents rely on cattle raising and grazing on federal lands:

> Godfrey and Bagley (1994) conducted a study of livestock dependency on federal lands in Wayne County, Utah. Wayne County is 85% federal lands and is the poorest county in the State. It lies along the eastern edge of the Fishlake National Forest and has many rural similarities to Piute and Beaver Counties. This study would appear to represent the most federal land-dependent county in the State. The data from their study indicates that even in a community which is dominated by agriculture and public lands, only two families were solely dependent on livestock production for

20

their livelihood, and neither of these operations obtained more than 50% of the feed for their livestock operation from public lands.

The most common pattern of employment and income for families in Wayne County involved livestock raising with some type of off-farm employment. While data were not available that indicated the total income of any single household in Wayne County, the income and employment data available suggest that few families could survive on the basis of their livestock or their off-farm employment. Both sources of income are commonly necessary. This suggests that if reductions in grazing on public lands result in the loss of livestock operations, some individuals in Wayne County would move elsewhere because the income obtained from off-farm employment was not sufficient to sustain these families. It should also be noted that many of these operators would also be forced to "give up" ranching if they lost their off-farm source(s) of income. Thus, the loss of either farm (ranch) or nonfarm income in Wayne County could cause both the farm and nonfarm sectors to decline. (FEIS, p. 3-51)

These quotes from the FEIS and ROD make two important points about the ranches in Beaver and Piute Counties including those that make use of Forest Service grazing leases:

    i.      Cattle raising is often not the only job held by the rancher nor the only or, even, the primary source of income for the rancher and ranch family. Off-ranch economic activities and income sources are crucial to the ongoing operation of the ranch.

    ii.     Most ranches making use of Forest Service leases obtain the majority of the feed for their livestock operation from other sources.

The FEIS and ROD, however, then speculate about the meaning of these facts. In particular, the Forest Service concludes that it is the income earned on the grazing operations and, in particular, on the grazing operations on Forest Service land, that is the crucial determinant of the viability of ongoing ranching activities. If that cattle raising income falls due, for instance, to reductions in Forest Service grazing AUMs,

    i.      Ranchers and ranches would be devastated,

    ii.     Ranchers would have to give up ranching, and

    iii.    Those ex-ranchers would have to move out of the area.

It is important to note that no analysis or data (other than reference to some opinion polls) is provided in support of these conclusions. They are simply asserted.

*The Importance of Off-Ranch Income to the Survival of Ranches*

For many farms and ranches in Beaver and Piute Counties, cattle raising and other agricultural activities provide **no** net income to the farm and ranch family. The farm and ranch activities actually impose a loss on the household.

21

The 2002 Agricultural Census, for instance, indicated that 45 percent of all farm and ranch operations in Beaver and Piute County economic area lost money, an average of about $14,000 per year.[31] The FEIS points out that ranch and farm families continue in agriculture despite the low incomes or losses because they value the lifestyle and quality of life associated with ranching and living in a rural community. As the ROD said: "What appears most apparent is the importance of values placed on 'quality of life' and 'way of life'. The illustrations in this socio-economic discussion clearly indicate agriculture producers are willing to continue in business despite the relatively low economic returns." (p. 10).

As the FEIS points out, Western ranch owners' decisions to operate a ranch is not tied to a profit maximizing motivation. "Consumptive and quality of life values are the most important reasons for owning and operating a ranch enterprise." (p. 3-51) "Consumptive" refers to the fact that what ranch families are partly doing is purchasing, through the losses or low returns associated with ranch activities, the ability to personally enjoy the ranching experience. Ranching is not just a work activity aimed at producing income. It is also a "consumption" activity pursued for the value of the experience itself.

This is something that has developed over the last several decades as rural economies have diversified and begun to provide off-ranch employment and income opportunities to ranch families. Those off-ranch employment opportunities provided ranch families with an alternative to simply abandoning ranching because of the low returns associated with it. Instead, ranch family members, including the primary ranch operator, could protect ranch family total income and standard of living by working off the ranch while continuing to operate the ranch. In effect, the ranch family was increasingly subsidizing the ranch operation through off-ranch work. In the Beaver and Piute County economic area, 57 percent of ranch and farm operators worked off the farm. Ranch and farm operators in those two counties were so involved in the off-ranch economy that a third of them, when asked to identify their primary occupation, did not mention ranching or farming.[32]

Note that it is the off-ranch economy to which ranch families turn to supplement their family income and make continued ranch operation feasible. It is not a matter of rural residents turning to ranch and farm activities to supplement their non-agricultural incomes. Almost half of them could not possibly do that since they are losing thousands of dollars on their ranch and farm activities.

The point is that ranch families have been systematically diversifying their "family economy" by adding increasingly larger and important off-ranch sources of income. If the experience of the last several decades is any indication, ranch families will continue to do this.

---

[31] Table 4, Net Cash Farm Income of the Operations and Operators.
[32] 2002 Census of Agriculture, Table 40.

22

The FEIS reverses this and argues that if ranch family revenues declines for any reason, including a decline in the amount of Forest Service grazing available, ranch families will simply have to quit ranching and leave the area. But that is not what ranch families have been doing. They have been doing the opposite: finding more off-ranch sources of income to sustain their ranch operations.

The FEIS explicitly suggests that "the income obtained from off-farm employment [would] not [be] sufficient to sustain these families. (p. 3-52) The ROD explicitly opines that "ranchers would have to relocate elsewhere to obtain sufficient employment." (p. 10) The Forest Service, apparently, sees a local economy with a fixed and inadequate number of jobs available where, unlike in the past if ranch income declines, ranch families will not be able to offset that decline through non-ranch activities.

But that assumption about the local economy is clearly contradicted by what has actually been happening in Beaver and Piute Counties. Over the last decade and a half, non-farm employment and income have been growing steadily. See the figure below. Both Beaver and Piute Counties have seen their economies steadily evolve, creating new employment and income opportunities in the process.



**Non-Farm Jobs, Real Labor Income, and Real Personal Income: Beaver and Piute Counties, UT**

The most dramatic change in Beaver County has been the growth in hog production and the supply network required for those operations. With the proposed expansion in 2006 of another 10,000 sows, Beaver County has been projected to become the largest

23

agriculture-producing county in the state of Utah.[33] Beginning in 1993, Circle Four Farms has contracted with 60 individual farm sites for the production of hogs. In total about 450 people work in that extended operation.

Tourism is also an important source of employment in Beaver County. The state government estimates that 25 percent of total employment is directly or indirectly tourism-related. Only six Utah counties have a higher percentage of their jobs linked to tourism.[34]

The Piute County economy is also evolving, generating new sources of non-farm employment and income in the process. Construction of new homes and subdivisions has been triggered by the influx of retirees. In addition, recreational activities centered on all-terrain-vehicle trails have been bringing an increasing number of visitors. The state estimates that 14 percent of Piute County jobs are recreation-related.[35]

Across the two-county economic area, as jobs and aggregate income and payroll have expanded, so have average real income and pay per job. See the figure below. In the twelve year period of 1992-2004, average income and pay rose 40 to 50 percent in real terms, that is, after inflation had been subtracted out. Much of that increase is associated with the very high average income in the hog farming enterprises and the above average pay for employees in the hog production activities in Beaver County. But real per capita income and real pay rose significantly in Piute County, too.[36]

---

[33] 2006 Economic Report to the Governor, p. 129.
[34] Figures 2B-5 and 2B-6, Chapter 2B, Economic Linkages, USFS Forest Plan Revision, Governors Office of Planning and Budget.
[35] Ibid.
[36] US Dept of Comm, BEA, REIS.

24



**Real Per Capita Income and Pay Per Job: Beaver and Piute County Economic Area, UT**

Clearly the non-ranching local economy adjacent to the Tushar Range has continued to expand, creating a growing range of employment and income opportunities from which ranch families can supplement the income they receive from cattle raising. Those opportunities are not fixed or shrinking as the FEIS suggests.

It is important to note that it is the diversification of the local economy away from sole reliance on cattle raising that is creating these economic opportunities that in turn allow ranch families to be able to afford to stay in ranching. If the local economy were to stay centered primarily on cattle raising operations, there would be fewer and fewer ranches because ranch families would be solely dependent on the relatively low incomes ranching provides. Ranches would consolidate into larger and larger units operated by a shrinking workforce and the area would support a smaller and smaller population. That is what has been happening in those parts of rural America that have remained primarily dependent on agricultural for employment and income.[37]

---

[37] Mark Drabensott, **Main Street Economist,** Center for the Study of Rural America, Kansas City Federal Reserve Bank" "Rural America in a New Century," October 1999, and "New Directions for U.S. Rural Policy, June 2000. Also Drabenstott, Mark and Tim Smith, "Finding Rural Success: The New Rural Economic Landscape and its Implications." *In* The Changing American Countryside: Rural People and Places, Emery Castle, ed. University Press of Kansas: Lawrence, KS. 1995.

25

Note that an effort to freeze the economy in its historic form, e.g. cattle raising, so that the culture associated with ranching can be preserved will, in the end, undermine both the viability of the local economy and that ranching culture. It is the ability of rural areas to attract and hold new people and businesses that generate the off-ranch employment opportunities that allow ranch families to stay on the land. Although it may sound contradictory, diversifying the local economy away from ranching is crucial to the survival of ranching because it is that diversification that allows ranch families to diversify their own household economy, protect family income, and maintain their ranching way of life.

One of the important sources of rural diversification is the attractiveness of those rural areas to both visitors and new permanent residents. High quality natural landscapes can be central to this. Recreational visitors inject income into the local economy, expanding the non-ranch economy. Retirees bring their "footloose" income with them, stimulating home construction as well as the expansion of retail trade and services. That also expands the non-ranch economy. Working age in-migrants attracted to an area often seek to create jobs for themselves by offering for sale things that previously had been imported into the area. This import substitution also expands the non-ranch economy and boosts the multiplier impact of all other spending.

Protecting and rehabilitating degraded natural landscapes can enhance the local economic base by making the area more attractive to existing residents, new residents, and visitors. People are increasingly looking for landscapes that are not entirely human-dominated. Such high quality natural landscapes have to be looked upon as an important part of the future economic base of any area that wishes to compete successfully with other areas for new jobs and businesses. Ranch operators have a direct interest in this type of amenity-driven diversification of the local economy since it expands the range of off-ranch economic opportunities. Local ranchers and farmers may have a direct positive economic interest in natural landscape protection and rehabilitation.

*Ranch Adaptation to Changing Economic Conditions*

The FEIS and ROD assume that any significant reduction in the 20 percent of total cattle feed that the Forest Service now provides to ranches with grazing allotments will have a devastating impact on ranches, forcing them out of cattle raising in particular and agriculture in general.

The FEIS mixes sweeping statements about the ranches having to abandon cattle-raising if Forest Service grazing levels are reduced with more reasonable statements about how ranches currently using Forest Service forage would have to adapt.

> Cattle grazing would be phased out in the short term. As all of the permittees are dependent on the National Forest for summer forage, they would have to go out of business, *or significantly change their operation, or find forage somewhere else*. It is unlikely that operators

26

would find sufficient forage within a reasonable distance to maintain existing permitted livestock. Those that go out of business would most likely sell their base property *or shift more into farming*. Those that retain some cattle would most likely reduce their operations to a significantly lower level. This would move counties further away from traditional uses associated with agriculture. Ranching is the dominant agricultural activity in Utah, where livestock production constitutes about 75% of the gross agricultural product (Power 2003). Thus, without grazing, not only would the ranchers suffer, but also would the economy of the state. (p. 4-56, emphases added)

Note the mixing of projections that ranchers will just quit with the alternative projection that they will adapt their operations to the new reality. It is surprising to find the Forest Service asserting that alternative sources of cattle feed are unlikely to be available locally. Beaver County farms grow alfalfa that is shipped to California dairy farmers as well as winter wheat for the Circle Four hog operations. Meanwhile 50 to 75 unit-trains arrive in Beaver County each week carrying soybeans, corn and mixed grain for the same hog operations.[38] Using the Forest Service's view of non-adaptable ranches and farms, one would have concluded that a hog industry could not possibly have developed in Beaver County because there was not sufficient feed to support it. That would have been factually wrong just as the assertions that ranch failure is the only outcome if the Forest Service does not provide the same number of AUMs as it has historically.

The assertion that the state economy will suffer if federal lands are not grazed as intensely as they currently are is also <u>factually</u> confused. "Livestock production" is not only or primarily "range-fed" cattle operations. In Beaver County in 2002 only 13.5 percent of the sales value of "livestock" was cattle and calves and only a fraction of that 13.5 percent of agricultural value was tied to federal forage.[39] The dominant livestock operations in the local economy are **not** range-fed cattle operations and the dominant feed for the cattle herds is **not** Forest Service forage.

Finally, the Forest Service's suggestion that if ranches adapt to reduced level of federal forage "this would move counties further away from traditional uses associated with agriculture" is also factually wrong. There are many alternative agricultural uses of ranch and farm land in Beaver and Piute Counties. One only has to look at the growth of irrigated farming and hog production over the last several decades to see how broad the range of agricultural possibilities is locally. The Forest Service, again, has frozen its gaze on that small part of local agriculture and the local economy that makes use of Forest Service resources.

Interestingly, one of the sources that the FEIS cites as demonstrating that "many rural economies and societies would be devastated by such curtailment [of grazing on federal

---

[38] *Salt Lake Tribune*, http://extras.sltrib.com/counties/detail.asp?CTY=Beaver
[39] 2002 Census of Agriculture, Table 2.

BLM_0079167

lands]" actually does not analyze or document that claim.[40] Instead it explores one way in which base ranches that are no longer able to get as much forage from federal leases might change the base ranch operations so that they could remain profitable. The cited study developed an intensive regime that allowed a base ranch with 250 irrigated acres and 250 cows to be a viable family ranch without federal forage.[41] In Beaver County there are over 200 agricultural operations with irrigated land; the average irrigated acreage is 174 acres per farm. In Piute County the average irrigated acreage on the approximately 80 irrigated farms is 163 acres.[42]

The adaptation of base ranch utilization studied by Wiedmeier (2003) may or may not be appropriate in Beaver and Piute Counties. That is not the point. The point is that agriculture and ranching are adaptable processes. There is not only one way to productively use the land, labor, and other resources of a base ranch. There is not just one way to raise cattle is Beaver and Piute Counties. American agriculture has been remarkable in its ability to adapt. That same flexibility is dramatically apparent in the agricultural economy of Beaver County where the expansion of hog farming has changed significantly the range of agricultural opportunities found there. An analysis that assumes the opposite, that ranches and farms cannot adapt, ignores the history of Utah and American agriculture and is not very useful.

Faced with a decline in access to Forest Service forage, ranches in Beaver and Piute Counties will reorganize and adapt the use of their resources to minimize the impact on their operations. That may involve changing how the calf crop is raised and/or a shift in the intensity of the crops grown on the base ranch. It may involve consolidation of base ranch lands into more economically viable units. Such consolidation, of course, has been going on in American agriculture for almost a century and is partly responsible for both rising agricultural productivity as well as rising labor productivity across the total American economy.

The "doom and gloom" scenario that the FEIS and ROD paints of any change in Forest Service grazing intensity is simply asserted without any attempt at analysis or reference to any data other than opinion polls. It is an empirically unsupported worst case scenario based on the assumption of a passive and helpless set of economic actors who in the face of economic change simply give up and call it quits. That is an insulting characterization of the local economic area and its residents.

---

[40] FEIS, p. 50. The FEIS accurate quote this study, but the quote comes from the introduction in which the authors are trying to explain the importance of studying alternative ways to organize and use base ranches in the face of declining federal grazing AUMs. In that sense, the FEIS completely missed the relevance of the very article it cited.

[41] Wiedmeier, R.D. et. al. 2003. Biological and Economical Aspects of an Accelerated, Value-Added Cow-Calf Production System Utilizing Improved, Irrigated Pastures. Proceedings, Western Section, American Society of Animal Science. Utah State University, Logan, UT. http://www.asas.org/western03/data/1000702.pdf .

[42] 2002 Census of Agriculture, Irrigate Land, Table 10.

28

BLM_0079168

**7. Comparing Benefits and Costs**

The ROD justified the rejection of the SMU-G Alternative on the grounds that it would "not maintain high standards of living." The ROD cited Section 101(5) of the National Environmental Policy Act (NEPA) for support for the idea that NEPA established a "requirement for maintaining high standards of living." (p. 24) However, that section reads:

> (5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities;

Note that this broadly stated goal calls for a "balancing" of the pressure the population puts on natural resource use. Also the reference to "life's amenities" that are to be "broadly shared" certainly would include natural landscape amenities of the Fishlake National Forest, including hunting, fishing, and wildlife-viewing. That makes it a bit difficult to read into this section of NEPA a "requirement" that "high standards of living" take priority over environmental protection. After all, Section 101 also "recognized" "the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man" (emphasis added).

The National Environmental Policy Act and the Environmental Impact Statement process it requires can be interpreted, at a minimum, as an "environmental full disclosure" act: Before a federal official makes a decision that has significant environmental consequences, all of the positive and negative consequence (the "benefits" and "costs") are to be laid out so that a balanced and informed decision can be made. Since it is usually commercially motivated activities that cause environmental damage, the commercial and market consequences are usually well documented and quantified. The Environmental Impact Statement process seeks to assure that the same is true of the environmental consequences so that the full range of benefits and costs can be considered.

The socio-economic analysis that usually is a part of an Environmental Impact Statement also provides an opportunity to directly address the full range of benefits and costs. Doing so does not require that all benefits and costs be quantified in dollar terms or even quantified at all. All that is required is that the positive and negative impacts be laid out for the decision maker in a clear and accessible manner. That way an informed and balanced decision can be made.

The Tushar Range Grazing ROD, however, never actually brings the benefits and costs together in this manner. In fact, the ROD hardly

29

mentions the environmental benefits of the SMU-G Alternative that were developed in the FEIS. The FEIS in fact discussed the environmental advantage of the SMU-G Alternative in all of the following areas:

Protecting Riparian Areas to Provide Food, Nutrients, and Habitat [Table 4-1]
Appropriate Stream Channel Width, Depth, Bank Stability, and Meander Patterns [Table 4-2]
Dissipating Stream Energy and Storing Water and Sediment [Table 4-3]
Filtering and Preventing Sedimentation [Table 4-4]
Ability of the Riparian System to Resist and Recover from Disturbance [Table 4-5]
Controlling Water Temperatures: Woody Vegetation [Table 4-6]
Controlling Nutrient Loading and Bacteria Input [Table 4-7]
Water Quality [Table 4-8]
Improving Habitat for Management Indicator Species [Table 4-11]
    Elk
    Mule Deer
    Northern Goshawk
    Cavity Nesters
    Sage Nesters
    Riparian Guild birds
    Migratory Birds
    Bonneville Cutthroat Trout
    Resident Trout
    Macroinvertebrates
    Migratory Birds
Improving Habitat for Sensitive Wildlife Species [Table 4-13]
    Northern Goshawk
    Great Sage Grouse
    Pygmy Rabbit
Improving Habitat for Sensitive Fish Species [Table 4-14]
    Bonneville Cutthroat Trout

Given the FEIS's detailed discussion of both the environmental damage done by current levels of grazing and the environmental benefits associated with reducing that level of grazing, including those associated with the SMU-G Alternative, a reasoned decision would have to compare the perceived negative socio-economic effects against the positive environmental improvements in the landscape values of the Tushar Range. The ROD provides no evidence that weighing of the landscape environmental benefits and socio-economic losses (let alone accurately-estimated socio-economic losses or socio-economic benefits of improved wildlife habitat and water quality) ever took place.

The socio-economic discussions in both the ROD and FEIS heavily emphasize the quality of life aspects of 21 permittees continuing to have access to grazing on Forest Service lands. Because of the long history of cattle-raising in the region, that economic activity also supports the perpetuation of certain social and cultural values in the surrounding communities. As the FEIS put it:

30

BLM_0079170

> What appears most apparent is the importance of values placed on "quality of life" and "way of life". The illustrations in this socio-economic discussion clearly indicate agriculture producers are willing to continue in business despite the relatively low economic returns. In the communities immediately surrounding the Tushar Range, rural lifestyles, historic landscapes, and cultural traditions related to the Forests are an important component of their quality of life.
>
> The Fishlake National Forest recognizes that livestock ranchers are an important thread to communities' social fabric, and that livestock grazing is one of many multiple uses permitted by the Forest Plan. In a formal "desired condition" statement, the Forest Plan direction is to manage for sustainable forage production and the quality of rural life. (p. 3-59)

This description of the connection between the Fishlake National Forest and its natural landscapes and the surrounding communities, residents, and quality of life is strangely narrow. Apparently it is only the quality of life of the ranchers who graze on those public landscapes that matter. In this description, there is a spill-over into adjacent communities but only because of the economic connections of those communities with cattle-raising and the passive cultural connections of residents admiring the ranching way of life.

But the most prevalent uses of the Fishlake NF are not agricultural or other commercial uses. The largest number of users of the Fishlake NF is simply citizens visiting their public lands. The Fishlake NF National Visitor Use Monitoring survey results issued in August 2003 indicated almost 550,000 annual site-specific visits. Visitors enjoyed relatively long stays, averaging about 45 hours with almost 40 percent of the visitors staying overnight. The top five recreational activities of visitors were viewing natural features, viewing wildlife, relaxing, fishing, and driving for pleasure. [43] These 550,000 annual visits contrast dramatically with the 243 active grazing permits on the Fishlake NF. [44]

The FEIS also indicates considerable concern about "preserving open space" (pp. 4-55 to 4-57). The expressed concern is that base ranches will be forced out of business by reductions in federal grazing levels and those ranches will be subdivided for residential purposes. Given that nearly 90 percent of Beaver and Piute Counties is in public ownership, this region is not seriously threatened with most its land being converted to residential use. [45]

There is something inverted about the Fishlake NF rejecting a proposal to begin or accelerate rehabilitation of part of its 1.4 million acres on the grounds that allowing the

---

[43] Chapter 2E, Use Linkages, p. 101. http://governor.utah.gov/planning/usfs/2EUseLinkages.pdf Utah Governor's Office of Planning and Budget.
[44] Ibid. p. 243.
[45] Table 2C-1, p. 72, Utah Governor's Office of Planning and Budget, Dixie, Fishlake, and Manti-La Sal National Forests: Social-Economic Assessment 2003.

31

ongoing degradation of those <u>public</u> lands due to inappropriate livestock grazing will help "preserve" <u>private</u> open space. Again the Forest Service's focus is startlingly narrow and inappropriate.

In addition, <u>protecting the profitability of agricultural operations has not proven to be an effective way of protecting agricultural land from conversion to residential or commercial use.</u> As has been proven over and over again across Utah and the nation, when residential demand for land is high, agricultural uses cannot compete and, unless someone purchases the development rights for preservation purposes, the agricultural land will be converted to residential and commercial uses regardless of the profitability of the agricultural operation. On the other hand, where residential demand for land is not high, low returns on agricultural land do not lead those lands to be converted to residential use. Instead, the typical pattern has been the ongoing consolidation of ranches and farms into more profitable units.

The reason there is increasing controversy over the management of federal lands is that citizens' demands on federal lands are shifting. Fewer and fewer Americans rely on federal lands for commercial purposes while more and more Americans see those public lands as natural areas that are over the source of valuable environmental services upon which their quality of life increasingly depends. Those environmental services include open space, scenic beauty, wildlife, outdoor recreation, solitude, and connections with their historical, cultural, and natural heritages.

As discussed above, for many rural areas, those federal lands are the source of the landscape amenities that make their communities attractive places to live, work, and do business. In the U.S. Department of Agriculture's categorization of rural counties, the second fastest growing group of counties during the 1990s was counties with high concentrations of federal lands. High quality natural landscapes give rural communities a competitive advantage as they compete to hold and attract residents and businesses.[46]

Most citizens in Beaver and Piute Counties have a direct interest in protecting the environmental services that flow from the Fishlake NF. It is not just 21 permittees that graze cattle on the Tushar Range whose quality of life and cultural values are tied to those lands. The economic connection between those National Forest lands increasingly is a natural amenity, recreation, and tourism connection, not the ranching connection on which the FEIS almost exclusively focuses. It certainly is true that in the future those federal lands will make a much greater contribution to local quality of life through the active engagement of residents with those lands and the environmental service they provide rather than through the passive admiration of less than two dozen

---

[46]"This factual positive relationship between the presence of federal lands and local economic vitality contrast with the suggestion in the FEIS that high concentrations of federal land are associated with poverty. "Wayne County is 85% federal lands and is the poorest county in the State. It lies along the eastern edge of the Fishlake National Forest and has many rural similarities to Piute and Beaver Counties. This study would appear to represent the most federal land-dependent county in the State." FEIS p. 3-51.

BLM_0079172

families who obtain a small part of the feed for their cattle from those lands. In that sense, <u>the FEIS has taken an unreasonably narrow view of who relies on those public lands, how those lands are connected to the local economy, and how important the rehabilitation of those lands will be to the future of these rural areas</u>.

33

**Appendix 2**

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240
http://www.blm.gov

January 28, 2003

In Reply Refer To:
4100 (220) N

EMS TRANSMISSION 01/28/2003
Instruction Memorandum No. 2003-074
Expires: 09/30/2004

To:        All Field Officials

From:      Assistant Director, Renewable Resources and Planning

Subject:   FY 2003 General Drought Management Direction        DD: 02/14/2003

**Program Area:** Drought Management

**Purpose:** The purpose of this Instruction Memorandum (IM) is to provide general guidance/direction to the field relating to drought management over the course of the next year. More specific livestock grazing guidance/direction is also provided.

**Policy/Action:** When dealing with drought conditions and issues, the principle focus of our actions should be to maintain the long-term health and productivity of the Nation's rangelands. Likewise, a conscious awareness needs to be maintained that every action taken may and often does place a hardship on those who use or rely on the public lands for their livelihood. Balancing these two priorities is not an easy task. Although the focus of this guidance is directed toward the biological resource programs (i.e., rangeland management, wildlife, wild horses and burros) that have direct impact on the long-term health of rangelands, much of the guidance is applicable to many of BLM's other resource programs (i.e., recreation, wilderness).

Several years of extended drought in many areas of the West has impacted vegetative vigor and stand composition; created conditions suitable for invasion by exotic plants; reduced both surface and subsurface water quantities and qualities; and created economic hardship for many users of the public land. Projections for the end of the multi-year drought in the near future are not promising. Prolonged drought impacts resource conditions long after rainfall and snowmelt have recharged soil moisture. The following guidance is offered to:

1. Promote a consistent, Bureau-wide approach to managing drought situations.

BLM_0079174

2.  Serve to increase communication internally within BLM as well as with our external partners, stake holders, other users of the public lands, Resource Advisory Councils (RACs), industry and conservation organizations, other Federal agencies and local, Tribal and State governments, including Governors' Drought Task Forces.

3.  Assure managers are provided the most current information and data for making timely decisions consistent with the standards for rangeland health.

The following guidelines and recommendations are intended to provide data, flexibility and direction for line management and public land users as they work cooperatively to develop local, regional or national level drought management strategies and make critical decisions during drought conditions. Success of this policy hinges on promoting constant communication, consultation and coordination between Field Offices, State Offices, the Washington Office and the Department as well as with livestock operators, RACs, wild horse and burro constituents, conservation organizations, industry and professional organizations, local, State, and Tribal governments, other Federal agencies, and the public.

Mike Holbert (WO-220) has been designated to serve as the BLM's Drought Coordinator. Each State Office is asked to designate a drought coordinator to serve as the State's liaison with the Washington Office. The States are asked to notify Mike Holbert of the selected State drought coordinator no later than February 14, 2003.

A four-phased approach to detection and management of drought is outlined in this policy. The "early assessment" phase outlines actions and tools recommended four or more months prior to livestock turnout and/or the peak plant growth period to determine the potential for, extent and severity of drought. The "pre-season assessment" phase, which occurs within 3 months of livestock turnout and/or the peak plant growth period, supplements and builds upon the actions taken during the "early assessment" phase. The "continuing assessment" phase outlines actions that are recommended during the grazing season. The "post drought" phase emphasizes the importance of assessing on-the-ground conditions and using an inter-disciplinary approach to establish site-specific criteria required to be present before livestock use is returned to permitted levels.

**Early Assessment Phase**

The following actions and tools are provided for consideration as early assessments are being made.

1.  Standardized indices based on the Standard Precipitation Index, the U. S. Drought Monitor and other data are available from the Predictive Services program at the National Interagency Coordination Center (NICC), and at the local Geographic Coordination Centers for projecting short-term, broad-scale assessment of drought conditions as well as forecasts on continued drought conditions. This information may be useful at the State and National scales. The frequency and need for these

BLM_0079175

reports will vary by region or state. As appropriate, these reports should be shared with the Field Offices, RACs, other partners, stakeholders, etc.

2. Field Offices are encouraged to utilize an inter-disciplinary approach to (1) identify natural resources of highest vulnerability to being adversely impacted by drought and (2) prioritize emphasis areas[1] to focus monitoring, assessment and allocation of scarce labor and operational resources. It is also recommended that the information and decisions resulting from the inter-disciplinary approach be shared with the State Office drought coordinator to facilitate consistency across the State, working with other State level partners (as referenced in Item 5 below) and coordinating with the Washington Office.

Information and data that could be considered during this process includes the information provided in Item 1 above, data available from partners, stakeholders and others; remote automated weather stations; previous years' monitoring results (plant growth, utilization and/or stubble height, livestock and wild horse actual use, occurrence of insect infestations, use of "rest" pastures, etc.); severity of drought conditions; presence of significant or sensitive resources; priority watershed assessments; allotments that have failed to meet standards for rangeland health; available GIS, remote sensing information and other forms of electronic data and available scientific information. A determination should be made as to the adequacy of existing data to support decisions that will need to be made. Site-specific data is recommended, if available, to support the decisions. If additional data is needed, an assessment of the types of data and the capability to collect such data will need to be made.

In areas of concern due to vegetative conditions, soil moisture may be measured in representative areas using techniques found in agency manuals/handbooks and professional literature. The Crop Moisture Index may also be referenced at http://www.cpc.ncep.noaa.gov/products/analysis_monitoring/regional_monitoring/cmi.gif.

3. Websites with information pertinent to drought are listed in Attachment 1.

4. The Washington Office will develop a communications plan to address (1) release of drought-related information to national media sources and (2) coordination with national Non-Government Organizations (NGOs), key Congressional contacts, the Department of the Interior and other Federal agencies at the national level. The communication plan will be shared with the State Offices and other National Program offices.

5. Similarly, State and Field Offices are encouraged to develop communication plans addressing release of drought-related information to appropriate media sources and coordination with RACs, County Extension Agents, State/local NGOs, State/local drought task forces, Congressional delegations, local, county, State and Tribal governments, other Federal government agencies[2], etc. Informal

BLM_0079176

interaction with as many groups/people as possible to gather their thoughts and ideas is also encouraged. Close coordination between the field offices, the State Offices and the Washington Office is critical to assure a consistent message is provided.

Relating specifically to livestock grazing, as appropriate, livestock permittees/lessees within projected drought areas should, at a minimum, be notified through written correspondence of current and projected conditions, the potential of livestock grazing use being affected during the upcoming grazing season, etc. Permittees/lessees should be encouraged to make needed changes in their grazing operations, which might include adjusting the number of livestock and/or the season-of-use, applying for non-use and to work closely with their Rangeland Management Specialist. Although adjusting both numbers and season-of-use may be used, adjusting the number of animals may provide the most flexibility during the grazing season.

If livestock normally graze public land year-round, follow the guidance identified for the Continuing Assessment Phase.

If on-the-ground conditions at the end of the previous grazing season are known based on monitoring information to warrant changes in livestock grazing use, early consultation and coordination with the affected permittees/lessees and interested publics should be initiated. Whenever feasible, on-the-ground tours to discuss conditions, concerns and possible solutions are recommended. Written agreements are recommended to document agreed upon changes in use. If agreement cannot be reached, the use of Alternative Dispute Resolution techniques is encouraged. As necessary, issuance of a grazing decision(s) in accordance with 43 CFR 4110.3-3 (a) or (b) should be initiated. Issuance of grazing decision(s) should be considered the option of "last resort" only after consultation, coordination and communication has taken place and should not "come as a surprise" to the affected permittee(s)/lessee(s). Whether these changes are implemented with written agreements, or a decision, it should be emphasized that the changes are designed to allow recovery of the long-term rangeland health and may be necessary even if precipitation improves and vegetation production increases during the next growing season.

6. Use of checklists is recommended to ensure all critical resources and issues are addressed when making drought-related decisions. Checklists should be tailored to meet local needs but could include resources such as areas of special concern (i.e., wild horse herd management areas, riparian pastures, critical habitat), special status species, and areas of fragile soils (i.e., Mancos shale). The checklist could be used to document coordination with all parties, interdisciplinary involvement, etc. Several states (Oregon, Arizona and Utah) have already developed checklists to use in drought-related situations.

BLM_0079177

7. As appropriate, Field offices should assess their current situation against Emergency Gather Criteria released by the National Wild Horse and Burro Program Office. If the assessment determines an emergency gather is appropriate, notification through appropriate management channels should be immediately initiated. It is important that this assessment also be completed during the "pre-season assessment" and "continuing assessment" phases.

8. As appropriate, Field and/or State Offices should initiate early discussions with the State Fish and Wildlife agencies concerning the potential need for wildlife herd reductions, if necessary. Any information available on the drought effects on local wildlife populations should be acquired.

9. Field Offices should complete an assessment of their capability to accomplish projected AWP workload measures in light of the projected drought workloads. As appropriate, notification through appropriate management channels should be initiated. This assessment should also be completed during the "pre-season assessment" and "continuing assessment" phases.

**Pre-season Assessment Phase**

For reference purposes, the timeframe for the pre-season assessment phase would be within 3 months of livestock turnout and/or the peak plant growth period. The following actions are recommended.

1. Updated information from the Predictive Services program at the National Interagency Coordination Center (NICC) and Geographic Coordination Centers should be obtained. Precipitation, snow pack and soil moisture records for the winter and early spring should be reviewed.

2. On-the-ground conditions (e.g., residual vegetation (height, vigor, amount), snow pack influence on available water, soil moisture) should be assessed to determine the effects and appropriateness of continued grazing use. Recognizing that wildlife, wild horses and burros and aquatic dependent resources will also be stressed by drought, close coordination and consultation between resource program professionals is critical. Working closely with the State Drought Coordinators, the Washington Office will develop a format for summarizing drought-related adjustments.

   Soil moisture measurements may need to be continued where problems are apparent or in areas of concern. Measurements in the root zone to determine available water for plants will be especially important during this period. If the capability of the office staff to either collect or interpret information becomes an issue, consider partnering opportunities with other agencies or groups (e.g., NRCS, Conservation Districts, etc.).

RLH DEIS Appendix 2 –page 5

BLM_0079178

3. Review and, if necessary, modify the Communication Plans. Continue
implementation of communication plans at all levels. It is important that this
review also be completed during the "continuing assessment" phase.

4. Specifically related to livestock grazing, continue to communicate and refine
livestock grazing management practices with affected livestock
permittees/lessees. Issuance of letters updating drought conditions, identifying
areas of particular concern, emphasizing the need to work closely with field office
Rangeland Management Specialists, etc., is recommended.

Whenever feasible, one-on-one meetings with livestock permittees/lessess and
interested publics (as appropriate) to review and discuss drought information,
needed management changes, etc., are encouraged. Written agreements are highly
recommended to document agreed upon changes in livestock grazing use. The
extent of livestock use adjustments (delayed turnout, reduction in numbers and/or
duration, total exclusion, etc.) should be based on assessment of all factors
including past grazing use, rangeland health, residual cover, precipitation, soil
moisture, long-term weather forecasts, and other resources that may be affected.

Use of a categorical exclusion to authorize placement and use of temporary water
troughs for a period not to exceed one month is addressed in 516 Departmental
Manual 6, Appendix 5.4(D)(2). Placement and use of temporary water troughs in
one location for a period greater than one month should be addressed through the
minimum level environmental assessment needed to provide appropriate analysis.
If appropriate, troughs may be moved to other locations to facilitate livestock
distribution within an allotment.

If voluntary adjustments needed for proper livestock grazing cannot be reached,
issuance of grazing decisions in accordance with 43 CFR 4110.3-3(a) or (b)
should be initiated, as appropriate. These decisions may be issued as Final
Decisions effective upon issuance or on the date specified in the decision if those
measures are needed to provide immediate protection of resources. The decision
document should specify the on-the-ground conditions that must be present prior
to returning livestock use to the range. Modification or cancellation of grazing
permits/leases should not be used to make short-term livestock grazing use
adjustments.

5. Field offices are encouraged to work closely with the State Fish and Wildlife
Agencies to review wildlife data, including population levels, winter mortality,
fawning/calving success, etc. As appropriate, discussions with the State Fish and
Wildlife agencies concerning the need for wildlife herd reductions should
continue, if necessary.

**Continuing Assessment Phase**

During the grazing season, the following actions are recommended.

BLM_0079179

1. Monitor on-the-ground conditions including precipitation, utilization by all herbivores of key plant species in key areas, plant growth and production, use supervision of livestock grazing, insect infestations, etc. Grazing utilization should be appropriate to provide sufficient vegetative cover for other resources such as wildlife, fisheries, special status species, and watershed following conclusion of livestock grazing. If field office staff capability is limited, consider exploring partnership opportunities and focusing monitoring to priority watersheds and critical emphasis areas[3] such as allotments that have failed to meet rangeland health standards, or areas with reduced vegetation production.

   If assessment of monitoring information determines adverse impacts are occurring on the ground resulting from livestock grazing, affected grazing permittees/lessess should be notified immediately to move or remove livestock within a designated period of time. As appropriate, consultation and communication with interested publics should also take place. If livestock normally use public land year-round, identify when the decision to eliminate livestock will be reconsidered (i.e., during or following the normal peak plant growth period). Field offices with year-round grazing should also review the pre-season assessment stage prior to the next peak plant growth period. If the livestock are not moved or removed timely, issuance of a grazing decision based on 43 CFR 4110.3-3(b) should be initiated.

2. Continue coordination efforts with State Fish and Wildlife Agencies concerning wildlife herd reductions where they pose a threat to rangeland health and; therefore, their own long-term habitat requirements.

**Post Drought Phase**

The importance of achieving or maintaining the health of the rangeland cannot be over emphasized as consideration is given to returning uses to the public lands following the end of drought. When drought conditions ease, an assessment of all on-the-ground conditions (soil, vegetative, water supply, etc.) should be completed prior to the consideration of returning appropriate levels of use including livestock to the range. It is recommended an interdisciplinary team approach be used to establish site-specific criteria required to be present on-the-ground before livestock use would be returned to permitted levels. Involvement of the livestock grazing permittees/lessees and other interested publics in discussions addressing the return of authorized uses to the public land is recommended. Adequate time will need to be allowed for the vegetative resource to restore the vigor of the plant to a level where the plant can sustain grazing use.

**Other Considerations**

1. The use of salt, minerals, and certain mineral supplements as necessary to overcome natural shortages of minerals in rangeland forage may be authorized to provide for proper range management.

2. Maintenance feeding due to drought is generally prohibited. If an application for maintenance feeding permit is sought because of poor forage conditions

BLM_0079180

associated with drought, the application should be denied and livestock removed or not allowed. Exceptions for special or emergency situations are allowed. An example of a special exception would be the continuation of a historical practice of overnight maintenance feeding of sheep being trailed over several days.

3. Mid-season grazing applications to modify existing authorizations to request non-use should be processed promptly. Field/District Managers are authorized to waive the application processing service charge and to refund previously paid unused grazing fees.

The Bureau, in cooperation with other partners also affected by drought, will be developing a long-term management strategy to better prepare the Agency to address future droughts. In general terms, the strategy will focus toward effective communication between partners and accurate, timely assessment of drought conditions to trigger effective mitigation and emergency response activities.

**Timeframe:** This IM is effective upon receipt.

**Budget Impacts:** Implementation of this IM may affect the ability of field offices in accomplishing targeted AWP workload measures.

**Manual/Handbook Sections Affected:** None

**Coordination:** Opportunity to review draft versions of this IM were given to a BLM interdisciplinary Drought Task Force, State 1020 program leaders; WO 170; WO 210; WO 220; WO 230; WO 260; WO 610; Western States Water Council.

**Contact:** Contact Michael R. Holbert at 202-452-5191 (mike-holbert@blm.gov)

---

[1]Emphasis areas may be defined as grazing allotments, geographic management areas, herd management areas, priority watersheds or any other area that meets the needs of the local field office or state.
[2]Close coordination with adjacent BLM offices and other federal government agencies (e.g. U.S. Forest Service, U.S. Fish and Wildlife Service, Bureau of Indian Affairs, Bureau of Reclamation, National Park Service) that manage lands adjacent to public lands is important to maintaining consistent approaches.
[3]Refer to Item 2 in the **Early Assessment Phase**

Signed by:                          Authenticated by:
Edward Shepherd                     Robert M. Williams
Acting, Assistant Director          Policy and Records Group, WO-560
Renewable Resources and Planning

1 Attachment

1 –Drought-Related Websites (1 p)

RLH DEIS Appendix 2 –page 8

BLM_0079181

[ BACK ]

**APPENDIX A:  A SCIENCE-BASED TOOL FOR DETERMINING WHETHER GRAZING IS THE CAUSE OF FAILURE TO MEET RANGELAND HEALTH STANDARDS**

A tool provided to the Monument range staff by
the Southern Utah Land Restoration Project

September, 2003

**SECTION 1:  INTRODUCTION**

This document presents a process, based on the best available science, that will help the Grand Staircase-Escalante National Monument (Monument) determine whether grazing is the cause of degradation when rangeland fails to meet Bureau of Land Management (BLM) rangeland health standards.  The method presented here offers a systematic, repeatable, and legally defensible tool to assist BLM in meeting its obligations under the Fundamentals of Rangeland Health (Fundamentals) and Standards and Guidelines for Grazing Administration (Standards and Guidelines), 43 CFR § 4180.  To this end, we draw upon expert experience and peer-reviewed science to outline a procedure for determining whether current grazing use and management is a significant factor that causes specific allotments or pastures to be classified as non-functioning or functioning at risk with a downward trend, and therefore not meeting BLM's rangeland health standards.

The determination method described here relies, to the greatest extent possible, on existing data, requires few agency resources, can be consistently replicated, is based on simple, observable evidence, and requires technical expertise common to land managers and experienced members of the public.

In keeping with the structure and approach common to other BLM ecological assessment processes, the determination method presented here uses the same indicators used in BLM's upland and riparian rangeland health assessment methods that describe livestock-related indicators of habitat health.  Based on how many of these livestock-related indicators are indicating non-functioning conditions, the determination that grazing is the cause of an area not meeting rangeland health standards is based on a preponderance of evidence.

The need for a repeatable and quantitative method to make determinations on whether livestock grazing is causing impairment is relevant to the BLM beyond the borders of the Monument.  The BLM promulgated the Fundamentals and Standards and Guidelines in meeting its obligations under the Fundamental state of the public lands subject to livestock grazing.  The environmental impact statement (EIS) that analyzed the regulations revealed that 68.5 million acres, or 43% of BLM uplands assessed, were in non-functioning condition or were functioning at risk.  According to BLM's most recently published data, 54% of riparian areas are functioning at risk or non-functional[1] – notwithstanding the Bureau's goal, established in 1989, of having 75% of riparian areas in "proper functioning condition" (BLM 1991).

This analysis echoes the findings of previous studies.  In 1989, published land use plan information revealed that 94.7 million acres or 68.9% of BLM lands were in poor or fair condition, while only 43.8 million acres or 31.6% were in good or excellent condition (Wald and Alberswerth 1989).  In 1988, the U.S. General Accounting Office concluded that many publicly owned riparian areas "are in degraded condition, largely as a result of poorly managed livestock grazing." (GAO 1988, pg.2).  In 1990, the U.S. Environmental Protection Agency (EPA) similarly concluded that "extensive field observations in the late 1980's suggest riparian areas throughout much of the West were in the worst condition in history" (EPA 1990, pg. 2).

The above studies and agency data present a compelling need to identify the cause behind these rangeland conditions.  That is where this guidance document will come in handy.

This document is organized as follows.  First, we set the stage for our analysis, describing the statutory framework that guides BLM in making determinations that livestock is a significant factor in causing an area to fail to meet rangeland health standards (Section 2.0).  We explain the statutory and regulatory foundations for the implementation of the Fundamentals of Rangeland Health and Standards and Guidelines, focusing on the critical determination of whether grazing management practices need to be changed to achieve healthy and sustainable ecosystems.  We cite the BLM Handbook for preliminary guidance on this inquiry.

Second (Section 3.0), we present (1) indicators that present evidence of grazing use and overuse and its known impact to resources, as well as (2) specific habitat attributes tiered directly to BLM's rangeland health assessments that can be used to reach a determination.  These indicators include utilization monitoring, grazing stocking levels and distribution, season of use, BLM upland and riparian rangeland health assessments, and other observations.  In terms of this last suite of indicators (those based on actual on-the-ground conditions revealed in rangeland health assessments), we feature those where the literature supports that failure to meet these key indicators can be attributed to livestock grazing.  At the close of Section 3.0, we explain how to use the preponderance of evidence in determining that livestock grazing is a significant factor explaining why an allotment fails to meet the rangeland health standards

Third (Section 4.0), we explain how the relevant scientific literature generally rules out other possible factors that might be responsible for impairment in semi-arid and arid lands grazed by livestock in the intermountain West.

**SECTION 2:  LEGAL FRAMEWORK FOR DETERMINATION OF WHETHER LIVESTOCK GRAZING IS A SIGNIFICANT FACTOR FOR AN AREA FAILING TO MEET RANGELAND HEALTH STANDARDS**

The ailing condition of public lands outlined above confirms that, in failing to achieve healthy and sustainable ecosystems on the public lands, the BLM is violating the dictates of the Federal Land Management Policy Act (FLPMA).  FLPMA, the core authority for BLM's management duties, requires the agency to manage the public lands to "protect the quality of" various values including ecological, environmental, and water resources. 43 U.S.C. § 1701 (a)(8).  The statute also mandates that BLM manage the lands to provide food and habitat for fish and wildlife.  Id.  The BLM must also balance resources on the public lands to reflect the long-term interests of the American people, 43 U.S.C. § 1702(c), manage the lands to achieve high annual out put, 43 U.S.C. § 1702(h), and avoid "permanent impairment of the productivity of the land."  43 U.S.C. § 1702(c).

By allowing the condition of much of the public land to become impaired, the BLM is failing to fulfill FLPMA's promise of fruitful lands characterized by well functioning ecological processes and ecosystem values.  Thus, FLPMA requires a prompt response to the ailing state of the public lands and mandates that the conditions envisioned by the Fundamentals and Standards and Guidelines are realized on the public lands.

The Fundamentals of Rangeland Health and Standards and Guidelines, 43 CFR § 4180, are binding regulations which require the BLM to "promote healthy sustainable rangeland ecosystems," and ensure these ecosystem components are "properly functioning." 43 CFR § 4100.0-2.  By adhering to the regulations, the BLM will both protect and restore ecosystem values on the public lands and provide for the "sustainability of the western livestock industry and communities that are dependent upon productive, healthy public rangelands."  Id.

The Fundamentals of Rangeland Health, which apply nationally, describe the ecological conditions that must exist on BLM public lands. 43 CFR § 4180.1.  The Standards and Guidelines, which were developed specifically for BLM lands in Utah and explain, with more specificity, those conditions.  These rangeland health standards dictate that on public lands, 1) upland soils allow water infiltration that sustain or improve productivity; 2) riparian and wetlands areas are in properly functioning condition; 3) Wildlife including, special status species, are maintained an appropriate level.; and 4) water quality standards be met (Department of the Interior 1977).

To implement its regulatory duties, BLM must first determine whether a particular area is characterized by healthy and sustainable ecosystems – and specifically the

conditions outlined by the Fundamentals and Standards and Guidelines[2].  40 C.F.R. § 4180.  If one or more of these conditions does not exist, BLM must ask itself if current livestock grazing practices need to be changed to achieve the desired conditions.  From another angle, BLM must determine whether current grazing management is a significant factor in the failure to realize the various ecosystem values outlined by the regulations.

The BLM Handbook H-4180-1 – Rangeland Health Standards ("Handbook") – confirms that BLM must undertake this inquiry and provides basic guidance as how the agency should proceed.  Initially, the Handbook notes that "[w]hen one or more Standards is not achieved nor making significant progress toward achievement,[3] or there is a lack of conformance with guidelines, the causes for the deviation need to be identified."  BLM Handbook 4180-1, III-12.  To do this, the BLM must list the standard(s) not achieved, review ancillary data, list suspected significant causes, and review both site-specific and landscape-level causes.  Id.

As part of the determination process, the BLM must determine if existing grazing management practices or levels are significant factors in failing to achieve the Standards or failing to conform to the Guidelines.[4]  The agency also must determine whether existing grazing management needs to be modified to ensure that the Fundamentals of Rangeland Health are met, or make significant progress toward being met.  Id. at III-14.  To determine which activity or activities are "significant factors resulting in failure to meet the Standards," the BLM is commanded to "use the best data and resource information available," including "watershed assessments, quantitative data from monitoring and inventories, qualitative information, professional knowledge, and information provided by State agencies, public land users and others."  Id. at III-13.

The Handbook appropriately recognizes that current grazing practices need not be the **sole** factor creating undesirable condition – only that it be a significant factor – before triggering the need for remedial action.  BLM Handbook 4180-1, I-7 ("To be a significant factor, a use may be one of several factors contributing to less-than-healthy conditions; it need not be the sole causal factor inhibiting progress towards the standards").

To implement the federal regulations found in the Fundamentals of Rangeland Health, each state published standards and guidelines for healthy rangelands (Utah BLM 1997).  The standards establish ecological standards.  The guidelines describe grazing management practices based on meeting these standard.  In the case where BLM determines that a standard is not met and ecological conditions are moving toward the rangeland health standards, "grazing may be allowed to continue."  The Utah rangeland health guidelines continue, "[o]n lands where a standard is not met, conditions are not improving toward meeting the standard or other management objectives, and livestock is deemed responsible, administrative action with regard to livestock will be taken by the Authorizing Officer pursuant to CFR 4180.2(c)"

Helping Monument staff determine whether current grazing practices are significantly responsible for the deteriorated condition of various ecosystem values is the focus of this document.  We build upon the foundation laid by the regulations and BLM Handbook 4180-1 to produce a science-based checklist for objectively determining whether current grazing practices are the cause of assessment areas failing to meet rangeland health standards.

## SECTION 3:  FACTORS USED TO DETERMINE THAT LIVESTOCK GRAZING IS A SIGNIFICANT FACTOR FOR LANDS THAT FAIL TO MEET RANGELAND HEALTH STANDARDS

Indicators in determining livestock grazing as the significant cause:

***Livestock use indicators***
1. Livestock Utilization
2. Livestock Stocking Rates
3. Grazing in Growing Season
4. Livestock Distribution
5. Livestock Grazing in Riparian Areas
6. Field Observations that Livestock Use is Dominant Herbivory
7. Livestock Grazing During Drought

***Habitat indicators***
8. Bare Ground [Upland Rangeland Health (URH) Attribute 4]
9. Soil Compaction [URH Attribute 11]
10. Upland Erosion [URH 1, 3 and 8; Riparian PFC Item (RD 5]
11. Stream Morphology Alteration and Erosion [RI Item 11]
12. Plant Community Vigor, growth and Productivity [URH Attributes 13, 15, 17; RI Items 4, 14]
13. Litter [URH Attribute 14]
14. Plant Community Structure, Function, Composition [URH Attributes 12, RI Items 6 and 7]
15. Invasive Plants [URH Attribute 16]
16. Cryptobiotic Soils [URH Attribute8]

**Figure 1. Indicators used in proposed method**

This section describes 16 indicators that we suggest be used to determine whether livestock grazing is a significant factor leading to an area not meeting rangeland health standards.  This assessment method draws both from general information on livestock impacts related to utilization and stocking rates, season of use, livestock distribution and grazing in riparian areas; as well as individual habitat attributes used in the BLM's upland (TR 1734-6) and riparian (TR 1737-9) health assessment procedures.

Using these two suites of indicators provides for a qualitative determination procedure that is based on current observable conditions, ecological health assessments, monitoring, and other quantitative measures.  This determination process has been designed for use by trained rangeland health assessors, and is designed to be repeatable regardless of who performs the original upland and riparian health assessments on which this determination method is based.

This determination method should be used on an allotment basis.  We recommend that 16 indicators be used in making the determination that livestock is a significant reason that an area fails to meet the rangeland health standards.  These indicators are grouped in two sets: livestock use indicators and habitat condition indicators (Table 1).  The first set of indicators presents evidence of the degree or intensity of livestock grazing use for a specific allotment, and establishes whether livestock is a significant factor influencing habitat degradation.  The second set of indicators assesses habitat conditions measured against the ecological potential of a specific allotment.  As you can see, the habitat indicators are taken directly from BLM's upland and riparian rangeland health assessment checklists (TR 1734-6 and TR 1737-9), and are those indicators that have been shown in the ecological literature to be most affected by grazing.

As described at the end of this section, this determination method calls for a rating of one to five points to be assigned to each of our proposed indicators in Figure 1.  These scores indicate the degree that livestock grazing is evident at or impacting the site (for livestock use indicators), or the degree that conditions depart from the potential conditions found in an ecological reference site (for the habitat indicators).  Table 1 illustrates a conceptual framework of how livestock use indicators and habitat indicators are scored in our proposed determination procedure.  The final determination is based on a preponderance of evidence, where the final determination is based on the scores received by the majority of the 16 indicators.

### 3.1.  Indicators that Grazing Use is a Significant Factor in Impairment

Several indicators, gleaned from the management of any allotment or pasture, are highly relevant to determining whether livestock grazing practices are the cause of areas being out of compliance with the standards and guidelines.  These indicators are:  (1) utilization rates – Section 3.1.1;  (2) stocking rates – Section 3.1.2;  (3) seasons of use – Section 3.1.3;  (4) livestock distribution – Section 3.1.4; (5) whether riparian areas are being grazed – Section 3.1.5; (6) whether areas are grazed during drought – Section 3.1.6, and (7) whether there is sign that cattle are the primary herbivore in an area – Section 3.1.7.  In other words, the inquiry into to the cause of resource degradation should be undertaken in the context of current grazing practices on the allotment or pasture in question.  Where utilization levels are too high – either because they were set too high or because there is a history of over utilization – it is almost certain that livestock grazing is the cause of damage to plant communities, wildlife habitat and soils.  Similarly, where stocking rates are too high or seasons of use are inappropriate, all indications are that livestock use is a significant factor in the failure to achieve compliance with the Fundamentals and Standards and Guidelines.

BLM_0079183

Table 1.  Conceptual framework of how livestock use indicators and habitat indicators are scored in our proposed determination procedure.

| Degree of livestock grazing | | | | |
|---|---|---|---|---|
| Extreme | Moderate to Extreme | Moderate | Slight to Moderate | Slight to None |
| Livestock use over a longer period of time has lead to 80% or more reduction in annual productivity of the area. Strong primary evidence of heavy livestock use. | Short term intense grazing use or sustained long term moderate use exceeds carrying capacity of forage production. | Continuing grazing use occurs as a level that sustains dominant perennial grasses.  Little direct evidence of livestock trailing and scat. | Grazing use occurs at a level where the forage that remains at the end of the grazing season is 60-80% of potential forage biomass. | Grazing use occurs where the forage that remains at the end of the grazing season is 80% or better of potential plant biomass |
| Degree that habitat condition departs from potential (ecological site description) | | | | |
| Extreme | Moderate to Extreme | Moderate | Slight to Moderate | Slight to None |
| Ecological indicators 20% or less of potential. | Ecological indicators between 20 to 40% of potential | Ecological indicators are between 40 to 60% of potential. | Ecological indicators are between 60 and 80% of their potential. | Ecological indicators are 80% or more of their potential. |
| Score 1 | 2 | 3 | 4 | 5 |
| Grazing is a significant factor | | | Grazing is not a significant factor | |

We address each of these factors in two ways.  First, we speak generally about these factors and their relationship to resource damage, citing the relevant ecological literature.  Second, we consider current grazing practices specifically in the Monument and discuss the connection between these specific practices and livestock-caused impairment.

**3.1.1 Indicator 1:  Livestock Utilization**  According to widely accepted range studies, typical utilization levels – of 50% to 60% – are responsible for significant resource damage in the Colorado Plateau.  Specifically, in the Monument, BLM has typically set utilization levels at 50% to 60%.  Actual utilization data recorded by BLM shows that actual utilization levels routinely reach and often significantly exceed these permitted levels.  The conclusion must be, therefore, that in the Monument, where there is resource damage and utilization rates are or have been 50% to 60% or more, the resource damage is caused by livestock grazing practices.

As an initial matter, the standard 50% utilization standard, developed from research on root-growth stoppage as a result of grazing (Crider 1955) and sometimes known as the "take half and leave half" policy, is inappropriate for the Colorado Plateau.  Crider grew several Midwestern perennial grasses under ideal precipitation conditions and monitored root growth changes due to clipping over a period of two months.  Crider concluded that root growth at the end of the growing season was not impaired when a single clipping removed 50% or less of the above ground biomass.  The concept of "take half and leave half" is further elaborated in a report by Harland Dietz, a Soil Conservation Service scientist (Dietz 1989).  He emphasized the link between Crider's root growth research and the concept of "take half and leave half."

The results of Crider's research do not reflect a number of factors that come into play on BLM lands in the arid West, including the applicability to the broad diversity of rangeland plants, grazing practices commonly found on BLM lands, semiarid or arid conditions, plant regeneration, soil nutrient recycling, litter generation, plant community composition, and wildlife habitat structure, and others.  As a result, range scientists have concluded that there is no scientific basis behind BLM's policy for utilization (Caldwell 1984).  Still, allowable utilization rates of 50% seem to dominate AMPs in the Intermountain West.

Moreover, even within Crider's narrow area of research, current grazing utilization policy does not actually follow his recommendations.  Crider was only looking at root growth of perennial grasses under ideal growing conditions.  Under those conditions, he concluded that up to 50% of the aboveground biomass could be clipped once without root growth being significantly impaired.  He further concluded that repeated clipping (which more accurately represents multi-month grazing periods common on BLM allotments) would significantly inhibit plant growth when a total of 50% of the biomass is removed.  BLM was incorrect to apply the take half and leave half conclusions where grazing leads to numerous clippings and does not take into consideration arid conditions with its varying precipitation patterns.

That utilization levels of 50% to 60% will cause significant damage to ecosystem values is borne out by the scientific literature.  For example, in their well-respected range management text, Holechek et al. (1998), summarize multiple long-term studies analyzing utilization, or grazing intensity, and its impact on forage production.  Holechek and his colleagues determine, that while acceptable use ranged from 40% to 60% on productive rangelands, acceptable rates ranged from just **30% to 40%** on more arid rangelands, such as those found on the Colorado Plateau.  Moreover, the authors caution that only "[r]anges in good condition and/or grazed during the dormant season can withstand the higher utilization level [of 40%]" while those "in poor condition or grazed during active growth should received the lower utilization level [of 30%].  Holechek et al. (1998, p. 206).  In yet another meta-analysis of grazing studies, Holechek concludes that "moderate" utilization levels of 50% "results in rangeland deterioration in semi-arid grasslands, desert and coniferous forest rangelands" and heavy utilization rates of 57% "consistently cause a downward trend in ecological condition" in all areas. Holechek et al. (1999, p. 13).

Galt et al. (2000) recommend a lower or utilization rate of 35% for arid areas.  Importantly, they also point out that actual measured use is generally higher than the intended use.  For example, on New Mexico rangelands, actual measured use was 10-15% higher than intended due to livestock trampling, wildlife use and weathering.  Ultimately, the authors recommend assigning 25% of forage to livestock, 25% to wildlife and natural disappearance and 50% to site protection, concluding that the 25% utilization rate is the "surest way to avoid chronic forage deficits and land degradation" for aris areas.

Holechek et al. (1999) define moderate stocking rates in terms of use, or the "degree of herbage utilization that allows the palatable species to maintain themselves[,] but usually does not permit improvement in herbage producing ability." Holechek, et al. (1999, p. 12).  When all grazing studies were averaged, the authors found that moderate stocking was defined as 43% utilization.  However, as stated above, Holechek and his colleagues ultimately defined moderate stocking levels for arid and semiarid climes as between 30% and 40%, with the proviso that the higher level is only appropriate where the range is in good condition and grazing is occurring during the dormant season.

In arid and semi-arid areas such as the Colorado Plateau, higher utilization rates cannot be justified by reliance on deferred-rotation or rest rotation grazing schemes.  Again in his range management text, Holechek and his colleagues explain that neither system has been found to have an appreciable benefit to resource conditions when compared to continuous grazing.  In analyzing the former grazing scheme, the authors note that on flat sage brush and shortgrass rangelands, the scheme results in no vegetation benefits when compared to continuous or season-long grazing.  Along the same vein, the authors also conclude that "[o]n flat arid and semiarid rangelands, deferred-rotation grazing has shown no advantages over continuous grazing." Holechek et al. (1998, p. 238).[5]

The authors take a similarly cautious view of rest-rotation grazing schemes pointing out that "[t]he problem with rest-rotation grazing is that the benefits from rest may

BLM_0079184

be nullified by the extra use that occurs on the grazed pastures." Holechek et al. (1998, p. 244). In any case, Holechek et al. explain that in semiarid and arid climes, successful rest-rotation scheme cannot include heavy stocking rates or heavy use. This is because "[i]t is well established that for most plants in arid areas, 1 [one] or more years of rest will not compensate for 1 [one] year of severe defoliation during the growing season." Holechek et al. (1998); *see also* p. 246 ("A 10-year Nevada study showed that rest-rotation did not overcome the effects of heavy use (65%) during the growing season"). This conclusion is echoed in subsequent work, where the authors noted: "In the semi-arid and desert range types, rotation grazing systems generally showed no advantage over continuous or season-long grazing." Holechek et al. (1999, p. 13).

Moreover, while rest periods arguably may allow the marginal recovery of individual plants, rotation schemes cannot mitigate the loss of soil protection, thermal regulation, or water absorption and retention, or the alteration of plant competition that results from removal of biomass by grazing. These conclusions are echoed in a 1989 Forest Service paper which concludes that short duration livestock grazing has no different effect on hydrologic performance and soil characteristics than any other grazing system. "[H]eavy stocking would result in downward trend in hydrologic characteristics and [ ]vegetation growth response in a short-duration grazing system is similar to that expected from any other grazing system." Clary and Webster (1989, pg 6). In sum, they noted, "no grazing system can counteract the negative impacts of overstocking on a long-term basis."

As evidenced above, in the Monument, utilization rates – typically at 50%-60% – are set well above appropriate levels. Moreover, these rates do not take into consideration critical factors such as grazing during the growing season, the condition of the range, or that actual use is higher than intended use. Therefore, as Holechek concludes, current grazing management practices are causing a deterioration of the resources and a downward trend in ecological conditions.

Examples bear this out. The 1983 AMP for the Upper Cattle Allotment, which implements a deferred rotation grazing scheme, allows utilization levels to reach 60% from November 1 to January 21, 50% during the growing season from April 16 to June 15, and 60% from January 22 to April 15. The AMP allows these high utilization levels despite BLM determination that 72% of the allotment was in poor to fair condition, and findings of soil erosion, overstocking, and poor cattle distribution. Recent BLM records show that high utilization of the Upper Cattle Allotment has continued – often exceeding 50% to 60% levels. Thus, utilization levels on this allotment not only exceed the 30% levels Holechek recommends for poor condition range or range grazed in the growing season, but also surpass the 40% utilization levels he considers appropriate for only lands in good condition, grazed in the dormant season.

Management of the Lake Allotment similarly allows an untenable utilization level of 60%. This level was set in 1989 despite findings that 58% of the allotment was in poor condition, 17% in fair condition, 24% unsuitable for livestock and only 1% in good condition. The BLM also found riparian areas being utilized on average 85-90%, active erosion throughout the allotment, poor livestock distribution, and poor condition of wildlife habitat. Again, record data shows excessive utilization levels on this allotment. BLM's 1997 allotment evaluation notes indicate that riparian vegetation had disappeared from some areas, and from1989 to 1996, utilization of riparian areas was 95%. More recent data establishes that significant overuse of uplands and riparian areas on this allotment have continued. Thus, both the permitted utilization and the actual utilization on Lake Allotment greatly exceeds Holechek's recommendations and fails to take into consideration growing season and the condition of the range.

Across the Monument, the story is the same. As a rule, the BLM does not condition permitted utilization levels based on Holechek's findings and does not accommodate growing season or the condition of the particular allotment. Moreover, actual utilization data confirms that the Monument is routinely overgrazed. Out of 1,943 records showing recent utilization levels on key plants, 946 (or 48.6%) of these show utilization levels of 50% or greater, with many cases of utilization rates of 85% and above.

In sum, because much of the Monument has been significantly overgrazed, because permitted utilization levels are too high, and fail to reflect the condition of the allotment and whether grazing is occurring during the growing season, and because actual utilization levels often even higher than permitted levels, range science and study confirms with almost certainty, that grazing is the cause of resource degradation. On a site-specific level, BLM should examine permitted and actual use data and compare it to Holechek's recommendations. Where ecosystem values are impaired and where Holechek's recommendations are exceeded, and where use does not reflect factors such as allotment condition and the growing season, the conclusion must be that grazing is the cause, or significant factor in the failure of the site to exhibit the desired conditions. As a result, grazing management must be changed in a meaningful way to guarantee that in the near future, these conditions are achieved.

Table 2 illustrates how, when using the proposed determination method, one should score the utilization indicator (Indicator 1). Choose the score that best fits the circumstances found in the allotment undergoing a determination assessment. Enter this score for Indicator 1 on the *Determination that Grazing is the Cause* checklist (Appendix A).

**Table 2. Recommended method for scoring the utilization indicator (Indicator 1) when using our proposed method for making determinations.**

| Livestock utilization scoring | | | | |
|---|---|---|---|---|
| Extreme | Moderate to Extreme | Moderate | Slight to Moderate | Slight to None |
| Utilization is or has been between 60-100% on the allotment | Utilization is or has been between 40-60% on the allotment | Utilization is or has been between 20-40%. | 5-20% grazing utilization | Utilization 5% or less. |
| Score 1 | 2 | 3 | 4 | 5 |

**3.1.2 Indicator 2: Livestock density.** Inappropriate stocking levels, much like high utilization levels (which are of course the most common outcome of overly high stocking rates), are almost certainly the cause of a failure to achieve desired ecosystem conditions on the public lands. As Holechek recently concluded "[h]eavy stocking consistently caused a downward trend in ecological condition, light stocking caused an upward trend, and slight improvement occurred under moderate stocking." Holechek, et al. (1999, pg. 13). Grazing management in the Monument consistently allows heavy stocking rates. Moreover, where the ailing condition of the land requires light stocking rates to allow for recovery, the Monument fails to reduce stocking rates and therefore forestalls any improvement in resource conditions.

As mentioned in the previous section, according to Holechek et al. (1999) stocking rates in the semiarid and arid climate of the Colorado Plateau that result in utilization rates or grazing intensity of more than 40% are considered heavy and therefore will "consistently" degrade ecological conditions. According to Holechek, if these conditions are to be improved, light stocking – or use of less than 30% – is most appropriate.

Yet, the Monument sets stocking rates to allow for grazing intensities that are much too high for: 1) the semiarid and arid conditions of the Colorado Plateau; 2) the many allotments where conditions are less than good; and 3) the many allotments that are grazed during the growing season. Therefore, where ecosystem values are not properly met and utilization is inappropriate and fails to account for resource conditions and whether grazing occurs during the growing season, the likely cause of this degradation is over-stocking, which in turn, is characterized by high moderate use.

Table 3 illustrates how, when using our new proposed determination method, one should score the livestock density Indicator (Indicator 2). Select the score that best fits the circumstances found in the allotment undergoing a determination assessment. Enter this score for Indicator 2 on the *Determination that Grazing is the Cause* checklist (Appendix A).

**Table 3. Recommended method for scoring the livestock density indicator (Indicator 2) when using our proposed method for making determinations.**

| Livestock densities and scoring* | | | | |
|---|---|---|---|---|
| Extreme | Moderate to Extreme | Moderate | Slight to Moderate | Slight to None |
| Stocking density is above 0.5 acre/AUM | Stocking density is between 0.5 and 1.5 | Stocking density is between 1.5 and 2.5 | Stocking density is between 2.5 and 4 acres/AUM | Stocking density is less than 4 acres/AUM |

BLM_0079185

|  | acre/AUM | acre/AUM |  |  |
|---|---|---|---|---|
| Score 1 | 2 | 3 | 4 | 5 |

*Livestock density thresholds obtained from Jones 2000

**3.1.3 Indicator 3: Livestock grazing during the growing season.** As with high use, the scientific literature generally concludes that allowing livestock to graze during the growing season is detrimental to the vegetation and soil communities of arid and semiarid climes, such as that of the Colorado Plateau. Moreover, as explained above, where grazing is allowed during the growing season, use levels or stocking levels must be reduced appropriately. However, in the Monument, BLM more often than not allows spring grazing to occur, and does so without reducing use or stocking levels. Thus, where resource values are damaged and spring grazing is allowed, particularly at high levels, the conclusion must be that the relevant ecological damage is caused by livestock grazing practices.

The scientific literature establishes that livestock grazing during the growing season is deleterious to the range ecosystems of the arid West (Holechek et al. 2001). Grazing up to the period of flowering may prevent plant recovery and seed generation (Heady 1984). While there is evidence that grazing during the growing season can lead to some compensatory growth in plants that co-evolved with large, hooved ungulates, grazing is damaging to low-elevation vegetation of the intermountain west, especially during the growing season (Painter and Belsky 1993, and references therein). For example, spring grazing has been shown to increase mortality of certain species of sagebrush (i.e. *Artemisia spinescens*) (Chambers and Norton 1993).

The dominant grasses in the sagebrush-grassland, being cool-season types, complete their growth during spring when soil moisture is highest from the over-winter accumulation of snow. These plants are susceptible to grazing damage during their active spring growing period due to depletion of carbohydrate reserves, loss of seed pools and ultimately loss of the plant entirely. In lower elevation salt-desert shrub communities with little vegetation growth during dry years, spring grazing can deplete the herbaceous plants and without summer precipitation, no regrowth can occur. In pinyon-juniper communities, with a mixture of warm and cool-season grasses, spring grazing has been detrimental to the cool-season grasses. This results in increased juniper canopy with loss of the perennial grasses and forbs (Holechek et al. 2001).

A study carried out 1963 by Cook and Stoddart studies the effects of intensity and season of use on the vigor of desert range plants. The authors studied the effects of different times and intensities of simulated grazing on desert forage species, concluding that desert ranges are best adapted for winter grazing, with springtime being the worst time to graze(Cook and Stoddart, 1963).

These determinations are echoed by BLM in the Management Framework Plan for the Escalante Resource Area. The agency found that "[t]he most damage [from grazing] occurs when plants are grazed during the growing season[,] which reduces the amount of food made and stored by the plant." (MFP, Recommendation RM-1.1). Indeed, the agency confirmed that "[c]ontinued grazing each year during the growing season can severely weaken or kill the plants." Id. As a result, BLM recommended that, with some exceptions, that the period of use on the Escalante allotments be changed so that grazing is not permitted during the growing season. *See also* Recommendation RM-2.6.

By far the most compelling reason to foreclose grazing in the spring is the damage that livestock cause to moist and wet soils. The pressure from livestock hooves, especially cattle, easily compacts soil in the spring when the soil is wet and most vulnerable to compaction (Brady 1984, Warren 1987). Fine textured soils or those with inorganic crusts are particularly susceptible when wet (Webb and Wilshire 1983).

Of even more concern is the effect of livestock trampling on the rare and ecologically important cryptobiotic soil crusts in the arid West. Crusts are only metabolically active when wet (Belnap et al. 2001). Winter use by livestock has been shown to have less of an impact on crust cover and species composition than spring use (Belnap et al. 2001). In a study of livestock grazing impacts on cryptogamic crust communities, Marble and Harper (1989) found that grazing in late winter and into spring reduced cryptogamic cover and species richness.

Spring grazing can also be deleterious for various soil-related variables such as streambank morphology and erosion potential. Grazing stream banks during spring when soils are wet or saturated can lead to hoof shear and compaction, resulting in greater stream bank erosion and sedimentation (Trimble and Mendel, 1995; Clary and Leininger 2000). Lusby (1979) demonstrated that in western Colorado, early winter grazing results in less runoff and erosion than continuing grazing into spring.

Despite consistent findings that grazing during the growing season degrades various ecosystem values, grazing practices in the Monument do not sufficiently curtail spring grazing. Currently, 46 out of 76 allotments (over 60%) are grazed during some part, or all, of the growing season. Moreover, as stressed above, the Monument does not predicate spring use on light utilization level, contrary to the recommendations of Holechek and others. Thus, where spring use occurs, particularly where utilization levels are moderate or heavy, and plant communities, soil stability, and soil nutrition are compromised, the conclusion must be that livestock grazing is almost certainly the cause of a failure to achieve desired ecosystem health and sustainability.

Table 4 illustrates how, when using our proposed determination method, one should score the spring grazing Indicator (Indicator 3). Select the score that best fits the circumstances found in the allotment undergoing a determination assessment. Enter this score for Indicator 3 on the *Determination that Grazing is the Cause* checklist (Appendix A).

**Table 4. Recommended method for scoring the spring grazing indicator (Indicator 3) when using our proposed method for making determinations.**

| Livestock grazing during the growing season | | | | |
|---|---|---|---|---|
| Extreme | Moderate to Extreme | Moderate | Slight to Moderate | Slight to None |
| Grazing use occurs during more than one month of the growing season | Livestock grazing occurs during the first month of the growing season | Grazing use occurs only during the last month of the growing season | Grazing occurs for no more than one week at end of growing season | No grazing use during the growing season |
| Score 1 | 2 | 3 | 4 | 5 |

**3.1.4 Indicator 4: Livestock distribution.** The relevant literature makes plain that where livestock are poorly distributed, resource damage in the places they do use is most likely attributable to grazing management practices. At the same time, livestock grazing in the Monument is plagued with poor livestock distribution, most often because water sources are scarce and cattle will not travel far from water. In addition, in the heat, cattle are also reluctant to leave the shade and relative coolness of riparian areas. The Monument is characterized by rugged terrain, steep slopes and other features which force and encourage cattle to use only limited areas of an allotment.

As Holechek and his colleagues establish, "cattle make little use of areas farther away than 3.2 km (2 miles) from water." Holechek (1998, pg. 209). Particularly in a climate such as that of the Colorado Plateau, ignoring this critical fact, the authors conclude, has been highly detrimental to resource conditions: "Failure to adjust stocking rates for travel distance to water has resulted in considerable range degradation, particularly in the hot, arid rangelands of the southwestern United States . . . ." Holechek (1998, pg. 209). Only in the winter, when there is snow on the ground or water in pot holes, will water availability cease to be a limiting factor in livestock distribution.

Similar adjustments must be made on the basis of terrain because cattle prefer "convenient" flat areas, such as valley bottoms, riparian zones and ridge tops, over rough, steep or rugged areas. Holechek et al. (1998).

In a recent study, Holechek et al. (2001) quantified their analysis, providing recommendations for adjusting the stocking rate for cattle in order to account for distance from water and steepness of slope. These recommendations are found in Table 5. Galt et al. (2000) indicate that the Natural Resources Conservation Service has adopted these guidelines for slope adjustments.

**Table 5. Adjustments for distance to water and slope for cattle**

BLM_0079186

(Holechek et al 2001).

| Distance from Water miles | Percent Reduction in Grazing Capacity |
|---|---|
| 0 – 1 | 0 |
| 1 – 2 | 50 |
| >2 | 100 |
| Slope % | |
| 0 – 10 | 0 |
| 11 – 30 | 30 |
| 31 – 60 | 60 |
| >60 | 100 |

In sum, proper livestock distribution is a function of terrain, and in semiarid and arid climes, water availability. Particularly in the Monument, cattle cannot be expected to travel far from water, except for immediately after snowfall or rain. In addition, they will use convenient areas heavily and forego steep slopes and otherwise rough terrain. If stocking rates do not reflect these realities, as Holechek asserts, the result will be "considerable range degradation." Thus, where ecosystem values are damaged in convenient areas and stocking levels do not accurately reflect water availability and terrain, more than likely, grazing management is the cause of the resource damage and grazing practices must be changed so that the desired conditions are reached.

Table 6 illustrates how, when using our proposed determination method, one should score the livestock distribution Indicator (Indicator 4). Two factors are presented in this scoring system. The first is the amount of the suitable grazing lands that are within 2 miles of a water source (the more range near water, the better grazing distribution). The second factor considers the average slope of the allotment, based on Holechek's work. Select the score that best fits the circumstances found in the allotment undergoing a determination assessment. Enter this score for Indicator 4 on the *Determination that Grazing is the Cause* checklist (Appendix A).

**Table 6. Recommended method for scoring the livestock distribution indicator (Indicator 4) when using our proposed method for making determinations.**

| Livestock distribution scoring | | | | |
|---|---|---|---|---|
| Extreme | Moderate to Extreme | Moderate | Slight to Moderate | Slight to None |
| Most of the allotment's suitable range is more than 2 miles from water, and/or average slopes are above 45% | Half of the suitable range is more than 2 miles from water, and/or average slopes are between 35% and 45% | Most of suitable range lands are within 2 miles of water, and/or average slopes are between 20% and 35% | Almost all suitable range is within 2 miles of water, and/or average slopes are between 10% and 20% | All suitable range is within 2 miles of water, and/or average slopes are between 0% and 10% |
| Score 1 | 2 | 3 | 4 | 5 |

**3.1.5  Indicator 5: Livestock grazing in riparian areas**. Various riparian/wetland indicators required to meet the Standards and Guidelines include adequate "vegetative cover to protect stream banks, [dissipate floods], protect against accelerated erosion, capture sediment, and provide for groundwater recharge," and "vegetation reflecting… soil moisture,…diverse age structure and composition, ….and providing food, cover and other habitat needs for dependent animal species."

Because livestock spend a disproportionate amount of their time in riparian communities, which are the most productive habitats in arid lands generally, and in the Colorado Plateau specifically, the ecological stakes are highest here, and many of the adverse impacts of grazing are magnified. Life forms relying on western aquatic habitats include invertebrates, reptiles, amphibians, fish, birds, and mammals. Birds are often referenced as one of the significant suites of species relying on healthy riparian zones. The stability of populations of various avian species has been used to determine the effects of grazing on riparian vegetation (Knopf et al. 1988, Fitch and Adams 1998). Participants in studies at the High Desert Ecological Research Institute state that "the loss of riparian habitats has been suggested as the most important cause of population decline among landbird species in western North America" (Dobkin et al. 1998).

The negative impacts of cattle grazing on wildlife in riparian zones is manifested through impacts to the animals' habitats (i.e. riparian vegetation). Grazing can reduce or totally eliminate vegetation bordering a stream (Szaro and Pase 1983, Platts 1991). Numerous studies have found greater riparian species richness in ungrazed as compared to grazed riparian zones (USGAO 1988a, Armour et al. 1994, Popolizio et al. 1994, Green and Kaufman 1995). Other studies have found that grazed riparian areas suffer increases in exotics, upland species, and sub-dominant species that are released from competition when dominant wetland plants are grazed down (Great Basin-Schulz and Leininger 1990, eastern Oregon-Green and Kauffman 1995). The spread of wetland exotics, namely tamarisk, has been aided by grazing throughout the west (Ohmart and Anderson 1982, Hobbs and Huennecke 1992). Furthermore, prevention of seedling establishment due to grazing and trampling has transformed a variety of southwest riparian systems into even-aged, non-reproducing vegetative communities (Fleischner 1994). The combination of these influences on vegetation structure and composition is detrimental to wildlife. A review by Skovlin (1984) concluded that grazing results in adverse impacts to both small mammals and birds within riparian areas.

The most well documented effects of grazing on riparian zones are reviewed by Platts (1982), Fleischner 1994, Ohmart (1996), and a most extensive analysis by Belsky et al. (1999) who reviewed over 150 separate studies on grazing effects on western riparian areas. In a survey of 15 experiments, Platts and Wagstaff (1984) concluded "when the riparian and stream habitats are fenced to exclude grazing, riparian habitats improve quickly and stream morphology improves slowly." Platts and Wagstaff, 1984 at 269. Belsky et al. report that they found no systematic investigations showing positive impacts or ecological benefits that could be attributed to livestock activities when grazed reaches were compared to protected areas. In a different forum, Administrative Law Judge Rampton concluded that no factor other than livestock grazing as currently practiced could explain the drastic difference in condition between degraded riparian areas in grazed canyons draining into Comb Wash and superior riparian areas in Grand Gulch, from which cattle had been removed twenty years earlier. National Wildlife Federation v. BLM, No. UT-06-91-1 (U.S. Dep't of Interior, OHA, Hearings Div.) (Dec. 20, 1993).

The National Park Service has also concluded that livestock grazing as currently practiced adversely impacts and impairs water quality and riparian areas (GCNRA, 1999). The agency states that livestock overgrazing reduces plant cover, which results in erosion. Erosion, in turn, leads to an increased sediment load in streams, blocking light penetration and otherwise adversely impacting aquatic life and habitat. Livestock use also deteriorates water quality because cattle trample springs, streams and streambanks. Indeed, as the Park Service notes, "[s]ome springs in the Glen Canyon NRA, such as those on the Kaiparowits Plateau, have been severely damaged by livestock trampling, with in some cases almost total elimination of riparian vegetation" (GCNRA 1999,pg.19). At the same time, the agency points out that cattle feces in water can cause unnecessary beach closures in Glen Canyon (GCNRA 1999, pg 20).

While the BLM touts overall rangeland health improvements over the last century, the U.S. Department of the Interior (in its DEIS: "Rangeland Reform '94") clarifies that these asserted rangeland improvements have for the most part occurred only in upland areas, not in riparian areas. The DEIS further concedes that western riparian areas "have continued to decline and are considered to be in their worst condition in history." Livestock grazing as currently practiced is identified in the DEIS as the chief cause of this deteriorated condition. The reason that riparian zones continue to degrade while upland areas improve is simple; cattle spend anywhere from 5 to 30 times longer in riparian habitats than upland habitats (Skovlin 1984). Moreover, most BLM allotments operate under management plans that were designed to meet the phenological growth requirements of uplands (Ohmart 1996). In fact, one of the more recent manuals on inventorying and monitoring rangelands (NRC 1994) only devoted five sentences to riparian areas. Simply reducing overall livestock numbers on an allotment has proven in multiple cases not to be a solution to riparian degradation (Dahlem 1979, Olson and Armour 1979). Unless fencing, cattle removal or other profound management changes are made, riparian habitats will continue to be degraded under most of the current BLM RMPs.

In sum, livestock grazing has a disproportionately adverse impact on riparian areas – given the chance, cattle will spend most of their time in these cooler, more lush

BLM_0079187

areas, particularly in the spring and summer, and particularly in the hot, dry conditions found on the Colorado Plateau. Much of the Monument is highly susceptible to livestock abuse of riparian areas. Water and shade is scarce, temperatures are hot and snowfall and rain infrequent. These factors combine to encourage cattle to concentrate their use on riparian areas to a significant degree. Therefore, in the Monument, where cattle are allowed access to riparian zones and these areas are damaged, it is more than likely that the damage is attributable to grazing practices which: 1) allow access to riparian areas, and 2) fail to account for severely limited water availability in setting stocking rates. In summary, range science and study confirms with almost certainty, that grazing is the cause of resource degradation in riparian zones.

Table 7 illustrates how, when using our new proposed determination method, one should score the livestock distribution Indicator (Indicator 5). Select the score that best fits the circumstances found in the allotment undergoing a determination assessment. Enter this score for Indicator 5 on the *Determination that Grazing is the Cause* checklist (Appendix A).

Table 7. Recommended method for scoring the livestock in riparian areas indicator (Indicator 5) when using our proposed method for making determinations.

| Livestock grazing in riparian areas | | | | |
|---|---|---|---|---|
| Extreme | Moderate to Extreme | Moderate | Slight to Moderate | Slight to None |
| Grazing occurs in all riparian areas during growing season | Grazing occurs in most riparian areas outside the growing season | Grazing occurs for less than one month in riparian areas. | Grazing excluded from most riparian areas or grazing occurs for less than a week | Grazing does not occur in riparian areas |
| Score 1 | 2 | 3 | 4 | 5 |

**3.1.6 Indicator 6: Livestock grazing during drought conditions.** Decisions on the AUMs that a permittee can run are normally made a few months in advance of the start of the season of use described in the grazing permit. For many of the allotments in the Monument, this decision occurs before the growing season starts. For this reason, stocking rate is usually set too high for the first year of a drought. Normal stocking rates, which are set with the expectation of a normal precipitation year, lead to grazing in excess of the forage capacity of the range during the first year of a drought.

BLM does not have current records in the allotment files for multi-year records of stocking levels compared to or tiered to precipitation totals over the years. Wild Utah Project has compiled such a record for the Upper Hackberry Allotment that could serve as an example. The precipitation measurement nearest to the Upper Hackberry Allotment is located three miles north of the allotment in Kodachrome State Park. Using BLM records of grazing use found in BLM's allotment file, we assembled a history of the amount of grazing that occurred in the grazing season, along with the annual precipitation for a period of twenty years. The grazing season for this allotment begins in the first of November and ends in the middle of June. The precipitation year is from the first of January to the end of December. The average annual precipitation for this area is 12 inches a year. Drought conditions are defined for this allotment as 8 inches of annual precipitation or less.

The precipitation history and grazing chronology for the Upper Hackberry Allotment indicate that three droughts have occurred in the past twenty years. In 1989, 1996, and 1999 precipitation levels indicated drought conditions. As figure 2 shows, grazing levels at the start of two of these drought periods remained near average stocking levels despite low precipitation and the resulting low forage production. Stocking levels did respond in advance to low precipitation in the 1999 drought.



Figure 2 History of precipitation and Grazing, Upper Hackberry Allotment

Drought tolerance among plants varies. Those most tolerant to drought tend to have slow growth rates and low productivity (Low et al. 1984). Plants less drought tolerant with low reserves may only recover over long periods of time, if at all. The length of time for recovery for upland plants can be seven years or more (Caldwell 1984).In addition, long-term competitive interactions of plant species may in some circumstances be determined during relatively short periods of drought or limited moisture (Caldwell, 1984). Caldwell concluded "[o]ne must question whether management recommendations can be based only on the years of normal precipitation."

Precipitation does not fall uniformly during the year. Again using the Upper Hackberry Allotment example, the late summer and early fall period sees the heaviest precipitation on average (Figure 3). Another lesser period occurs in the late winter at the start of the growing season. Unfortunately, BLM does not factor in seasonal precipitation variation as part of recommending a stocking level for the upcoming grazing. If we had a record such as this, we could more accurately correlate grazing levels with plant productivity in the Monument.

Figure 3. Seasonal Average Precipitation, Kodachrome Basin, UT



The score given for this indicator (Table 8) is based on the studies of growth and recovery of range plants during times of reduced production. To ensure recovery, appropriate levels of grazing during drought periods must leave a greater fraction of standing biomass at the end of the grazing period than can be accommodated during a normal precipitation period. Enter the score for Indicator 6 on the *Determination that Grazing is the Cause* checklist (Appendix A).

Table 8. Recommended method for scoring the grazing during drought indicator (Indicator 6) when using our proposed method for making determinations.

| Livestock grazing During drought periods. | | | | |
|---|---|---|---|---|
| Extreme | Moderate to Extreme | Moderate | Slight to Moderate | Slight to None |
| Grazing occurs at the normal stocking rate during the drought. | Grazing occurs at half or more of the normal stocking rate during the | Grazing occurs during the start of a drought but is then discontinued. | Stocking levels are reduced during the drought to leave 75% of forage | No grazing occurs during any drought period. |

BLM_0079189

| | drought. | | growth in tact. | |
|---|---|---|---|---|
| Score 1 | 2 | 3 | 4 | 5 |

**3.1.7 Indicator 7:  field observations that livestock are the dominate herbivore**.  A combination of on the ground observation, BLM records on grazing use, and habitat monitoring are used in making the observation of whether livestock are the dominate herbivore in the allotment where the determination of impairment is being made.  The BLM data records should be supplemented with field observations, especially when records for an allotment lack key information.  BLM's monitoring practices, for example, do not capture herbivore feces density or cowpie densities.

The field observations for this indicator need to answer a number of questions relating to the manner and degree of livestock use in an allotment:

1.   Based on livestock trails and hoof evidence, how much of the ground shows evidence of livestock use?
2.   Based on transects that assess the mass of scat, are livestock the dominate herbivore in this allotment?
3.   Based on the topography and condition of fences, does livestock use appear to match the management prescription?
4.   Based on field counts, does livestock use numbers and season of use match data in the allotment file?

Scoring for Indicator 7 is a simple binary method.  This indicator uses field observations supplemented with agency data on use to verify that livestock use is (1 point) or is not (5 points) the dominate ungulate use in the area.

## 3.2.  Specific Habitat Indicators that Livestock Use is a Significant Factor in Impairment

The previous section describes indicators that generally identify the level and intensity of grazing use in an impaired area.  In this section, we present indicators that specifically relate to habitat variables that have already been assessed for upland (using *Interpreting Indicators of Rangeland Health*, Tech. Ref. TR 1734-6) and riparian (using Tech Ref. 1737-9) PFC assessments carried out by the BLM.

In order to give this guidance on how to carry out determinations to the Monument, our team of scientists,[6] in collaboration with other scientists[7] with expertise in livestock grazing impacts and riparian and/or upland health assessments, has reviewed all of the indicators on the BLM field checklists for assessing PFC of riparian zones and uplands.  For each indicator, we asked ourselves, "**If this indicator receives a failing score, AND IF** other causes of failure for this indicator can be ruled out (i.e. drought, fire suppression,[8] ORV abuse, etc.), **and if** livestock are known to graze this area and signs of livestock are present (i.e. feces, trailing, hoofprints, etc.), **does it follow that, based on our field experience and knowledge of the grazing literature, the failure to meet the Standards and Guidelines for this indicator can be attributed to livestock grazing?**

The answers that our team, with assistance from outside scientists, gave to these questions are based on our collective expert opinion, field experience and knowledge of the literature.  Below, we cluster the key indicators into groupings based on similarities of indicators (soil-related variables, etc.).  For each set, we provide examples from the literature to bolster our argument that if a riparian or upland site fails the overall PFC assessment conducted by the BLM, and if the assessor finds that many of the indicators below are not meeting standards and other rule out other causes, then the assessor can conclude that the degradation present at the assessment site CAN BE ATTRIBUTED TO LIVESTOCK GRAZING.[9]

**3.2.1 Indicator 8: PFC indicators relating to bare soils: Upland Rangeland Health Attribute (URHA) 4 (Bare ground)**.  Based on our field experience and the literature cited below, we argue that if the above indicator relating to bare soils is failing to meet the Standards and Guidelines, and other causes can be ruled out, then grazing is the cause of these assessment sites failing to meet the standards for healthy uplands.

Numerous studies have shown livestock grazing results in reduced ground cover and increased instances of bare ground in arid systems.  In fact, measurements and comparisons of bare ground, or (inversely) total vegetative cover between grazed and ungrazed areas are some of the most common variables measured in grazing effect studies.  A large number of researchers working in the arid West have found increased amounts of bare ground on grazed sites compared to ungrazed sites or lightly grazed sites (Rauzi 1963, Rich and Reynolds 1963, Meeuwig 1965, Pearson 1965, Rauzi and Hanson 1966, Brown and Schuster 1969, Robertson 1971, Byrant et al. 1972, Rauzi and Smith 1973, grant et al. 1982, Brotherson et al. 1983, Kauffman et al. 1983, Johansen and St. Clair 1986, Rasmussen and Brotherson 1986, Brady et al. 1989, Naeth et al. 1991).

Use the same score from the original field checklist for Upland Rangeland Health Attribute 4 for the scoring for Indicator 8.  Enter this score on the *Determination that Grazing is the Cause* checklist (Appendix A).

**3.2.2 Indicator 9: PFC indicators relating to soil compaction : Upland Rangeland Health Attribute (URHA) 11 (Soil compaction)**.  Based on our field experience and the literature cited below, we argue that if the above indicator relating to soil compaction is failing to meet the Standards and Guidelines, and other causes can be ruled out, then grazing is the cause of the site failing to meet the standards for healthy uplands.

The role of domestic livestock grazing in increasing soil bulk density is not disputed.  We know of no scientific study that compared grazed areas to ungrazed areas and found greater soil bulk density in the ungrazed area.  Similarly, we know of no studies that have compared lightly grazed areas to heavily grazed areas and found greater soil bulk density in the lightly grazed sites.  Rather, a large number of researchers working in the arid West have found increased soil bulk densities on grazed sites compared to ungrazed sites or lightly grazed sites (Knoll and Hopkins 1959, Orr 1960, Rhoades et al. 1964, Meeuwig 1965, Laycock and Conrad 1967, Thompson 1968, Brown and Schuster 1969, Byrant et al. 1972, Van Harren 1983, Warren et al. 1985, Orodho et al. 1990).

Another measurement of soil compaction is infiltration rates – more compacted soils with higher bulk densities uniformly display lower infiltration rates.  A number of studies in the western United States have found greater soil compaction and thus decreased soil infiltration caused by trampling in grazed areas (Knoll and Hopkins 1959, Branson et al. 1962, Rauzi 1963, Rhoades et al. 1964, Meeuwig 1965, Brown and Schuster 1969, Rauzi and Smith 1973, Buckhouse and Gifford 1976, Gifford et al. 1976, Wood 1982, Achouri and Gifford 1984, Gamougoun et al. 1984, Orodho et al. 1990).

Use the same score from the original field checklist for Upland Rangeland Health Attribute 11 for the scoring for Indicator 9.  Enter this score on the *Determination that Grazing is the Cause* checklist (Appendix A).

**3.2.3 Indicator 10: PFC indicators relating to upland erosion: Riparian Item (RI) 5 (Upland watershed not contributing to degradation), Upland Rangeland Health Attribute (URHA) 1 (Presence of rills), URHA 3 (Pedestals/terraces), URHA 8 (Soil surface stability and resistance to erosion)**.  Various conditions indicating that the physical structure of an ecosystem is in compliance with the Standards and Guidelines, include "sufficient cover and litter to protect the soil surface from…erosion," and "the absence of indicators of excessive erosion such as rills, soil pedestals, and actively eroding gullies."  Based on our field experience and the literature cited below, we argue that if the above indicators relating to soil erosion are failing to meet the Standards and Guidelines, and if other causes can be ruled out, then grazing is the cause of these assessment sites failing to meet the standards for healthy riparian zones/uplands.

Livestock grazing as typically practiced contributes to the deterioration of soil stability in deserts (Warren et al. 1985), thus leading to increased soil erosion.  Soil erosion is exacerbated by increased surface runoff triggered by the loss of vegetative cover and litter (Ellison 1960), both of which have been shown to be reduced by cattle grazing.  As soils take 5,000 to 10,000 years to naturally re-form in arid regions such the Colorado Plateau (Webb 1983), accelerated soil loss caused by grazing is an irreversible loss.  Steep slopes with little to no vegetal cover underlain by highly erodible rock – common in the rugged landscape of southern Utah – are particularly susceptible to cattle-induced erosion.

One of the chief hydrological impacts attributed to grazing in the arid west is increased storm runoff caused by an interaction of two chief factors: (1) greater soil compaction and thus decreased soil infiltration caused by trampling (Colorado-Rauzi and Smith 1973,southeastern Utah-Gifford et al. 1976, central Utah-Achouri and Gifford 1984, Four Corners region-Orodho et al. 1990), and (2) less vegetation, litter, and cyptobiotic soils on the surface to absorb rain (Ellison 1960). Evidence of increased storm-runoff on grazed versus ungrazed watersheds is considerable (Lusby 1979, Meehan and Platts 1978, Stevens et al. 1992). Increased storm runoff indirectly triggered by grazing can, in turn, cause further soil erosion, and flooding (Ohmart and Anderson 1982). These same conclusions are reached in a number of good reviews that describe, indisputably, that livestock grazing leads to significant soil compaction, infiltration and runoff (*see* Gifford and Hawkins 1978, Kauffman and Krueger 1984, Fleischner 1994, Trimble and Mendel 1995, Jones 2000, and Carter 2000).

Numerous studies have also observed severe erosion when comparing heavily grazed to ungrazed sites in the arid west(Cooperrider and Hendricks 1937, Croft et al. 1943,Gardner 1950,Kauffman et al. 1983). In a particularly well-designed study (Lusby 1979), a federal inter-agency committee chose Badger Wash, just over the border from Utah in western Colorado, as a representative Colorado Plateau site to assess grazing effects on erosion. BLM was one of the five agencies cooperating in this 20-year study, initiated in 1953, which compared four entire ungrazed watersheds to four others left open to grazing. The findings indicated that runoff was reduced by 40%, and sediment yield by 63%, on ungrazed watersheds compared to grazed watersheds. These conclusions are echoed by a number of good reviews that describe the conclusive, adverse impact of livestock grazing on soil stability (*see* Gifford and Hawkins 1978, Fleischner 1994, Trimble and Mendel 1995, and Jones 2000).

BLM has repeatedly emphasized that grazing has tremendous adverse impacts on soil stability. For example, the agency determined that "[i]mpacts to soils are often secondary to surface disturbing activities or grazing." San Juan Draft EIS at 4-11. In laying out its underlying assumptions and alternative management scenarios in the San Juan Resource Area, the agency concluded that "[t]he major cause of soil loss and sediment yield would be grazing though licensing livestock at the past 5 years average use." Draft EIS at 4-11 (assumptions); Final EIS at 1-105 (no changes). Moreover, the BLM determined that in implementing "Alternative E", soil loss would decrease, but still continue – totaling 8,729,625 tons from 1985 to 2000. Final EIS at 1-127. Importantly, "the major reductions in soil loss" achieved by implementing Alternative E, "would result from the exclusion of livestock from 138,120 acres of land" and from reductions in range treatments. *Id.* Indeed, excluding livestock from a tiny fraction of the resource area would result in a reduction of 34,000 tons per year of soil loss – or 510,000 tons by 2000. *Id.* In turn, with decreases in sedimentation, water quality would improve. Id.[10]

For the scoring of Indicator 10, use the original scores from the completed field checklist for Upland Rangeland Health Attributes 1, 3 and 8, and the original PFC checklist score for Riparian Item 5. The original attribute scores for all four of these attributes will need to be averaged. Use the original (1-5 pt) scores for the upland attributes, and translate "yes" or "no" ratings from the PFC checklist into either a score of "5" or "1" for the riparian checklist item. Then average these four scores together. Enter this average score on the *Determination that Grazing is the Cause* checklist (Appendix A).

**3.2.4 Indicator 11: PFC indicators relating to stream morphology alternation and erosion: Riparian Item (RI) 11 (Adequate cover present to protect banks/dissipate energy).** Based on our field experience and the literature cited below, we argue that if the above indicator relating to stream erosion is failing to meet the Standards and Guidelines, and other causes can be ruled out, grazing is the cause of these assessment sites failing to meet the standards for healthy riparian zones/uplands.

One of the fundamental sources of augmentation of streambanks is trampling by livestock and removal by livestock of supporting vegetation that anchors the banks. Once streambanks are trampled and devoid of vegetation, they quickly lose their shape and are unable to support the vegetation that is critical to protect banks from high flows and dissipate the energy form these flows.

Cattle grazing eliminates over-hanging banks (Behnke and Zarn 1976, Duff 1979, Hubert et al. 1985), which can be important to maintain streambank integrity and function. Grazing also leads to loss of shrub cover on streambanks (Kovalchic and Elmore 1992, Chaney et al. 1993), which further serves to anchor banks and stave off erosion triggered by high flows. Overgrazing by livestock can eventually lead to profound changes in stream morphology through the addition of sediment through bank degradation and off-site soil erosion (Armour et al. 1991).

Because of cattle grazing, bank stability along stream channels is reduced due to fewer plants and roots to anchor the soil, less plant cover to protect the soil from wind and rain erosion, and direct trampling of banks (Carter 2000). Studies that have shown that grazing reduces streambank stability include Behnke and Zarn (various locations - 1976), Winget and Reichert (UT – 1976), Duff (UT – 1983), Kauffman et al. (OR – 1983), and Stuber (CO - 1985).

Because of the effects of cattle grazing on bank stability, banks essentially "retreat" back, (Platts 1991), thus leading to channel widening (Duff 1979, Kauffman et al. 1983, Stuber 1985). Grazing can also lead to "gullying" (Winegar 1977) and channel incision (Kovalchik and Elmore 1992), due to a combination of bank instability and downcutting from higher flood energy. The water table is effectively lowered in an incised channel, with associated negative impacts such as a distinct narrowing of the riparian zone. Most reviewers conclude that livestock have been a contributing factor to the entrenching of stream channels in the southwest (Leopold 1951, Hereford and Webb 1992, Betancourt 1992).

Use the score from the original field checklist for Riparian PFC Checklist Item 11 for the scoring of Indicator 11. A "yes" on the PFC checklist equals five points under our determination system; a "no" on the PFC checklist translates into a score of 1. Enter this score on the *Determination that Grazing is the Cause* checklist (Appendix A).

**3.2.5 Indicator 12: PFC indicators relating to plant community vigor, growth, and productivity: Riparian Iteam (RI) 4 (Riparian zone widening), RI 14 (Point bars are revegetating), Upland Rangeland Health Attribute (URHA) 13 (plant mortality/recruitment), URHA 15 (Annual production), URHA 17 (Reproductive capability of perennial plants).** Based on our field experience and the literature cited below, we argue that if the above indicators relating to vegetative growth and productivity are failing to meet the Standards and Guidelines, and other causes can be ruled out, then grazing is the cause of these assessment sites failing to meet the standards for healthy riparian zones/uplands.

Assuming that estimates of total vegetative cover is a measure of productivity, numerous studies have found increased total vegetative cover, or annual production, on ungrazed or lightly grazed sites compared to grazed sites (Rauzi 1963, Rich and Reynolds 1963, mceuwig 1965, Pearson 1965, Rauzi and Hanson 1966, Brown and Schuster 1969, Robertson 1971, Byrant et al. 1972, Rauzi and Smith 1973, grant et al. 1982, Brotherson et al. 1983, Kauffman et al. 1983, Johansen and St. Clair 1986, Rasmusson and Brotherson 1986, Brady et al. 1989, Naeth et al. 1991). The impact of livestock grazing on overall growth and productivity of riparian areas has also been documented. Grazing can reduce or totally eliminate vegetation bordering a stream (Szaro and Pase 1983, Platts 1991). A study by Schultz and Linnegar in Colorado found that 29 years after an exclosure was built in a riparian zone, canopy cover of willows was 8.5 times higher inside the exclosure than outside, and total herbaceous standing crop was 50% greater than that outside of the exclosure.

If a riparian zone is narrowing (as in Riparian Health indicator 4), this too is usually attributable to overgrazing. Because of the effects of cattle grazing on bank stability, banks essentially "retreat" back, (Platts 1991), thus leading to channel widening (Duff 1979, Kauffman et al. 1983, Stuber 1985). Grazing can also lead to "gullying" (Winegar 1977) and channel incision (Kovalchik and Elmore 1992), due to a combination of bank instability and downcutting from higher flood energy. The water table is effectively lowered in an incised channel, with associated negative impacts such as a distinct narrowing of the riparian zone. Most reviewers conclude that livestock have been a contributing factor to the entrenching of stream channels in the southwest (Leopold 1951, Hereford and Webb 1992, Betancourt 1992).

For the scoring of Indicator 12, use the original scores from the completed field checklist for Upland Rangeland Health Attributes 13, 15 and 17, and the original PFC checklist score for Riparian Checklist Items 4 and 14. The original attribute scores for all five of these attributes will need to be averaged. Use the original (1-5 pt) scores for the upland attributes, and translate "yes" or "no" ratings from the PFC checklist into either a score of "5" or "1" for the riparian items. Then average these four scores. Enter this average score on the *Determination that Grazing is the Cause* checklist (Appendix A).

**3.2.6 Indicator 13: PFC indicators relating to amount of litter: Upland Rangeland Health Attribute (URHA) 14 (Amount of litter).** Based on our field experience and the literature cited below, we argue that if the above indicator relating to litter presence is failing to meet the Standards and Guidelines, and other causes can be ruled out, then grazing is the cause of these assessment sites failing to meet the standards for healthy uplands.

BLM_0079191

Cattle grazing removes soil litter from arid systems, with negative repercussions for nesting wildlife, and protection of desert soils from erosion.  A large number of researchers working in the arid West have found decreased litter abundance on grazed sites compared to ungrazed sites or lightly grazed sites (Knoll and Hopkins 1959, Branson et al. 1962, Rauzi 1963, Rhoades et al. 1964, Reardon and Merrill 1976, Rasmussen and Brotherson 1986, Orodho et al. 1990, Willey 1994, Rosenstock 1996).

Use the same score from the original field checklist for Upland Rangeland Health Attribute 14 for the scoring for Indicator 13.  Enter this score on the *Determination that Grazing is the Cause* checklist (Appendix A).

**3.2.7 Indicator 14: PFC indicators relating to plant community structure, function, composition: Riparian Item (RI) 6 (Diverse age structure), RI 7 (Diverse composition), Upland Rangeland Health  Attribute(URHA) 12 (Functional/ structural groups).**  Various conditions indicating that the vegetative component of an ecosystem is in compliance with the Standards and Guidnes, include"sufficient cover and litter [to prevent erosion and promote soil moisture], an appropriately diverse plant community that "sustains…properly functioning ecological conditions," and "diverse age structure and composition."  As outlined below, each of these indicators can be severely affected by cattle grazing.  Based on our field experience and the literature cited below, we argue that if the above indicators relating to plant community structure, function, and composition are failing to meet the Standards and Guidelines, and other causes can be ruled out, then grazing is the cause of these assessment sites failing to meet the standards for healthy riparian zones/uplands.
Scientific studies show that livestock grazing as currently practiced has adverse impacts on both the composition and structure of the vegetative community.  Decreases in native plant species diversity, cover, and density as a result of traditional and existing livestock grazing practices have been observed in a wide variety of arid ecosystems in the western United States.  Moreover, these alterations to the vegetative community can, in turn, lead to significant repercussions for successional trajectories, the abiotic environ-ment, and wildlife.

*Community composition*:  Grazing affects species composition of plant communities in two ways: first, active selection by herbivores for or against a specific plant taxon, and second, differential vulnerability of plant taxa to grazing.  Grazing can also delay plant phenology, which, in turn, can have dramatic effects on communities of pollinators and seed dispersers (Fleischner 1994), thereby further disrupting the composition of a vegetative community.  Studies that have documented significantly greater native plant species richness in ungrazed areas compared to those that are grazed include Brady et al. (Arizona - 1989), and Floyd-Hanna et al. (New Mexico - 2000).

While cattle grazing has been shown to decrease species richness in arid communities, it similarly affects species evenness, with considerable secondary effects.  Long-term cattle grazing has been shown to decrease the abundance of perennial grasses and forbs and increase the amount of annual grasses and weeds in western deserts (in northern Arizona-Schmutz et al. 1967; the Great Basin-Rice and Westoby 1978; central Utah-Brotherson and Brotherson 1981; California-Hanley and Page 1981; and Nevada-Medin and Clary,1990).  Studies that have focused chiefly on impacts to species richness in these grasses to be significantly decreased by grazing (in central Utah-Cottam and Evans 1945; New Mexico-Gardner 1950; Arizona-Blydenstein et al. 1957;Capitol Reef N.P.-Rosenstock 1996). Studies that have shown shrub cover to significantly decrease due to cattle grazing include Bock et al. (Arizona - 1984) and Jones (Nevada -1999).  Any significant grazing-induced changes in cover, densities or relative abundances of certain plant species or guilds can have profound implications at the community level, as these changes can translate into major conversions of community organization, for example, transforming grassland to desert (Schlesinger et al.1990).

What is true for uplands is true for riparian areas.  Numerous studies have found greater riparian species richness in ungrazed areas compared to grazed riparian zones (USGAO 1988a, Armour et al. 1994, Popolizio et al. 1994, Green and Kaufman 1995).

While it is useful to document various studies that demonstrate the deleterious effects of cattle grazing on arid plant communities, previously completed literature reviews comprise the strongest evidence of the impacts cattle have on vegetation in xeric environments.  For example, in a quantitative literature review involving 50 independent grazed/ungrazed comparisons from 41 different studies performed in arid environments of the western United States, Jones (2000) found significant negative impacts of cattle grazing on shrub cover, grass cover, vegetation biomass, and seedling survival.  Another extensive literature review by Fleischner (1994) cites numerous cases where grazing was shown to have deleterious effects on vegetative communities.

*Vegetation structure*:  Intact physical structure of arid ecosystems is very important to native wildlife on large and small scales.  Because of grazing, shrub components have appeared where none were before (Archer 1989, Schlesinger et al. 1990), and extensive willow stands have been removed from stream systems (Oregon - Kovalchik and Elmore 1992), with profound effects on native wildlife.  Grazing structurally changes habitat for ground-dwelling vertebrates, such as snakes and lizards, through the loss of low-height vegetation (Jones 1981, Szaro et al. 1985).  Grazing similarly affects shrub and woodland riparian forest structure, with impacts on birds that require diverse habitat structure (Taylor1986, Knopf et al 1988).

Prevention of seedling establishment due to grazing and trampling has transformed a variety of southwest riparian systems into even-aged, non-reproducing vegetative communities (Fleischner 1994).  The combination of these influences on vegetation structure and composition is detrimental to riparian wildlife.  A review by Skovlin (1984) concluded that grazing results in adverse impacts to both small mammals and birds within riparian areas.

*Special consideration of URHI 12 – Functional/Structural Groups*:  Indicator 12 deserves extra scrutiny, especially if the assessment site is failing to meet standards for this indicator.  This special scrutiny draws from Part c of Standard 1 and Part b of Standard 2 and Part d of Standard 3 in the Standards and Guidelines which state that the presence of the "desired plant community" identified in the land use plan is a pertinent indicator for evaluating these Standards.  It follows logically from the Monument plan decision VEG-00 (plan, at page 22) that the desired plant community is the "potential natural community" reflected in the appropriate NRCS Ecological Site Description for that area.  The Clark Bench EA and other permit-buyout EAs provide precedent for this interpretation of VEG-00.  Moreover, the Functional-Group indicator is useful as a stand-alone measure because it is one of the few RLH indicators that is quantitative, and so it can be tied to the Management Plan objectives for vegetation (i.e. the Potential Natural Community as specified in NRCS Ecological Site Descriptions).

*Scoring Indicator 14 (indicators relating to plant community structure, function, composition)*:    For the scoring of Indicator 14, use the original scores from the completed field checklist for Upland Rangeland Health Attribute 12, and the original PFC checklist score for Riparian Checklist Items 6 and 17.  The original attribute scores for all three of these attributes will need to be averaged.  Use the original (1-5 pt) score for the upland attribute, and translate "yes" or "no" ratings from the PFC checklist into either a score of "5" or "1" for the riparian items.  Then average these four scores together.  Enter this average score on the *Determination that Grazing is the Cause* checklist (Appendix A).

**3.2.8 Indicator 15: PFC indicators relating to exotic weeds: Upland Rangeland Health Attribute(URHA) 16 (invasive plants).**  Based on our field experience and the literature cited below, we argue that if the above indicator relating to exotic weeds is failing to meet the Standards and Guidelines, and other causes can be ruled out, then grazing is the cause of these assessment sites failing to meet the standards for healthy uplands.

One particularly insidious result of cattle grazing in arid western ecosystems is the spread of exotic grasses and weeds.  Grazing aids the spread and establishment of alien species in three ways: 1) dispersing seeds in fur and dung; (2) opening up habitat for weedy species; and, 3) reducing competition from native species by eating them (Fleischner 1994).  Studies that have found increased densities, cover or biomass of exotic plant species in grazed versus ungrazed sites include Green and Kaufman (Oregon - 1995), Drut (Oregon - 1994) and Harper et al. (Utah - 1996).

Once they are established (often assisted by cattle grazing), weeds negatively impact western arid ecosystems in numerous ways.  Weed infestations reduce biodiversity (Randall 1996), increase fire frequency (Esque 1999, Brooks et al. 1999), disrupt nutrient cycling (Vitousek 1990), alter soil microclimate (Evans and Young 1984), reduce effectiveness of wildlife habitat  (Davidson et al. 1996,  Knick and Rotenberry 1997), and can expedite loss of topsoil in xeric environments (Lacy et al. 1989).

The ability of cattle to increase a site's susceptibility to invasion has received the most attention from the scientific community.  Sites become invasible due to increased bare soils as a result of grazing, which offer greater opportunity for weed establishment, with less competition (Gelbard and Belsky, in prep, and references within).  Evans and Young (1972) found that increased soil erosion [caused by grazing] also loosens surface soils and helps bury seeds.  Exotic seeds adapted to more erosion-prone environments will benefit from this while natives likely will not.  Deposition of nitrogen-rich livestock dung also increases invasion of nitrophilous weeds such as cheatgrass by stimulating germination and enhancing growth over that of native plants (Evans and Young 1975,Smith and Nowak 1990, Trent et al. 1994, and Young and Allen 1997).  Finally, cattle grazing can further compound the above impacts by creating warmer and drier soil microclimates, through soil compaction, and loss of plant, microbiotic crust

BLM_0079192

and litter cover. The resulting warmer, drier microclimate reduces the competitive vigor of many native grasses (Piemeissal 1951, Archer and Smeins 1991), thus further increasing viability of aggressive exotics.

Other studies have found that grazed riparian areas suffer increases in exotics, upland species, and sub-dominant species that are released from competition when dominant wetland plants are grazed down (Great Basin-Schulz and Leininger 1990, eastern Oregon-Green and Kauffman 1995). The spread of wetland exotics, namely tamarisk, has been aided by grazing throughout the west (Ohmart and Anderson 1982, Hobbs and Huenneke 1992).

The Park Service agrees that livestock grazing as currently practiced promotes weed infestation. In assessing Glen Canyon National Recreation Area, the Park Service concluded that "[m]ost studies done on the Colorado Plateau and adjacent parts of the Great basin are in general agreement on the effects of livestock grazing on arid and semi-arid vegetation." Glen Canyon EA at 8 (citations omitted). Based on these studies, the Park Service determined that grazing results in a general decline of native palatable bunchgrasses, especially needle-and-thread and Indian ricegrass, while sod grasses, and undesirable native species thrive. *Id.* at 8-9. Where grazing pressure is more intense, the Park Service found that livestock use can "completely eliminate" bunchgrasses, cause decline in sod grasses and result in the invasion and even domination of exotic plants such as cheatgrass. *Id.* at 9. The BLM also admits that livestock are one of the "spreading agents" for noxious weeds, and that "[l]ivestock can bring in noxious weeds and invasive plants from other areas or spread these species within allotments." *E.g.* Bluff Bench EA at 6; Church Rock EA at 6; Stevens EA at 6; and Summit EA at 11.

*Special consideration of URHI 16 – Invasive plants:* Indicator 16 also deserves extra scrutiny, especially if the assessment site is failing to meet standards for this indicator. Somewhat similar to the case made above for RLH indicator 12 (F/S Groups), this is also a quantitative indicator and can be linked to a presumed quantitative standard of zero (as laid out in both the Management Plan objectives, and E.O. 11312).

*Scoring Indicator 15 (Invasive plants):* Use the same score from the original field checklist for Upland Rangeland Health Attribute 16 for the scoring for Indicator 15. Enter this score on the *Determination that Grazing is the Cause* checklist (Appendix A).

**3.2.9 Indicator 16: PFC indicators relating to cryptobiotic soils: Upland Rangeland Health Attribute(URHA) 8 (soil surface resistance to erosion) and URHA 18 (biological soil crusts).** While the *Interpreting Indicators of Rangeland Health* manual does not include the words "biological soil crust" in the title of the indicator, the technical reference manual makes clear that this indicator is indeed meant to measure soil crusts. Based on our field experience and the literature cited below, we argue that if the above indicator relating to cryptobiotic soils is failing to meet the Standards and Guidelines, and other causes can be ruled out, grazing is the cause of these assessment sites failing to meet the standards for healthy uplands.

Cryptobiotic crusts, which were historically widespread in western arid lands, are being rapidly depleted across rangelands today. These crusts increase the stability of otherwise easily erodible soils, increase water infiltration in a region that receives limited precipitation, and increase fertility of xeric soils often limited in essential nutrients su as Nitrogen and Carbon (Johansen 1993, Belnap et al. 1994).

Cattle are highly destructive to the fragile cryptobiotic crusts that exist on many BLM lands on the Colorado Plateau. Cryptibiotic crusts are only prominent componen of ecosystems in which large-bodied herbivores have been absent from recent evolutionary history; such as in the Colorado Plateau and other regions of the arid west. Under these circumstances, cryptobiotic crusts are easily damaged by livestock (Navajo National Monument, AZ – Johansen et al. 1981 and Brotherson et al 1983; Utah - Anderson e al. 1982;northern AZ - Beymer and Klopatek 1992;northwest New Mexico - Floyd-Hanna et al. 2000).

While the previously cited studies were conducted on the Colorado Plateau, the majority of studies that have investigated the impacts of cattle grazing and other disturbances on cryptobiotic soils have actually been conducted in southern Utah. These studies paint a vivid picture of the damage done to biological soil crusts. For example heavy grazing reduced crusts by 98.5% and light grazing reduced crusts by 52.3% at the Desert Experimental Range in southern Utah (Marble 1990). Cryptobiotic crust cover was seven times greater in an ungrazed part of Canyonlands National Park than in a grazed area (Kleiner and Harper 1972). Nitrogenase activity levels in cryptobiotic crusts decreased anywhere from 30% to 100% in disturbed plots relative to undisturbed plots, and that threshold friction velocities (the force required to detach soil particles from the surface) were significantly higher in undisturbed cryptobiotic crusts than in disturbed plots (Moab area - Belnap 1996, Belnap and Gillette 1997). Relict, never-grazed site in th Kaiporwits Basin had significantly more cryptobiotic crust cover than both a light-moderately winter grazed site and a site that had not been grazed for 10 years (Jeffries and Klopatk 1987). Cryptobiotic crust cover more than doubled over a ten year period of rest from grazing in Canyonlands National Park (Kleiner 1983). Lastly, Jayne Belnap, a respected authority on cryptobiotic soils, reports that cattle grazing has greatly impacted cryptobiotic crust integrity within the Grand Staircase-Escalante National Monument (Belnap 1997).

The deleterious effects of cattle on cryptobiotic crusts are not easily repaired or regenerated. The recovery time for the lichen component of crusts has been estimated a about 45 years (Belnap 1993). At this time the crusts may appear to have regenerated to the untrained eye. However, careful observation will reveal that the 45 year-old crust will not have recovered their moss component, which will take an additional 200 years to fully come back (Belnap and Gillette 1997).

There are numerous secondary effects once crusts are trampled by cattle. Disruption of crusts increases wind and water erosion of surface soils that were previously protected by the crusts (Howard Wilshire). This can trigger rapid loss of the underlying topsoil (Webb 1983). The destruction of cryptobiotic soils by cattle can reduce nitroge fixation by cyanobacteria, and set back the nitrogen economy of these nitrogen-limited arid ecosystems decades. A severe loss of nitrates to plants is a significant threat in typically nitrogen poor arid environments, and may even eventually lead to desertification (Belnap 1995). Once crusts are destroyed, ecosystem structure can be furthered alter when bare ground is available for colonization by exotic weeds (*see* Gelbard, in review, and references within). In addition, the breaking up of physical and microbiotic soil cru increases surface roughness, which favors cheatgrass germination (Tisdale and Hironaka 1981, Stohlgren, in press). The relationship of crust destruction and weeds is further supported by evidence that intact cryptobiotic crusts reduce or prohibit weed establishment by preventing weed seed germination (Eckert et al. 1986, Mack 1989). Even small reductions in crusts can lead to diminished productivity and health of the associated plant community, with cascading effects on plant consumers (Davidson et al. 1996).

The BLM has noted that "[m]uch of the literature acknowledges that mircophytic crusts do increase water infiltration, provide soil stability, and increase nutrient availability." Bluff Bench EA at 16; Summit EA at 18; Stevens EA at 14; Church Rock EA at 17. The agency also admits, "livestock grazing will impact microphytic crusts to some extent through trampling/destruction." *Id.* In assessing Glen Canyon National Recreation Area, the Park Service also found that grazing adversely affects soil crusts, stating that "[h]eavy or intense, long-term grazing activity has a negative affect on soil productivity by altering soil horizon development and nutrient cycling." Glen Canyon E at 15.

Use the same score from the original field checklist for Upland Rangeland Health Attribute (URHA) 8 and URHA 18 for the scoring for Indicator 16. Enter this score o the *Determination that Grazing is the Cause* checklist (Appendix A).

**3.3 Scoring the Livestock Use Indicators and Specific Habitat Indicators**

In order to make a final determination using the proposed method herein, the user should gather all existing information on utilization, stocking rate, season of use, and trend. Maps depicting riparian areas, water sources, and topography (slope) are also needed. Perhaps most importantly, both upland rangeland health assessments (using *Interpreting Indicators of Rangeland Health*), and riparian PFC assessments (Using Tech. Ref. 1737-9) would have had to be already completed by the BLM.

For the first five indicators (the suite of Livestock Use Indicators), the user should assign a score of 1-5 based on the information provided above (Tables 2-4, 6 and 7). For the next 9 indicators (the Specific Habitat Use Indicators) the user should follow a different course of action depending on whether the area at issue is an upland or riparian zone. In the case of the upland rangeland health indicators, the assessor should assign the same score that that indicator received from the original upland range assessment usi *Interpreting Indicators of Rangeland Health*. The individual riparian PFC indicator scores, on the other hand, did not receive numerical ratings when they were originally assessed in the completed riparian PFC assessment. Rather, these indicators simply receive a "yes" or a "no" rating. To use those ratings in our proposed determination metho translate "yes" scores in a 5 and "no" scores into a 1.

We invoke a simple strategy using the "preponderance of evidence"[11] to make the final determination of whether current livestock grazing practices are the cause of

BLM_0079193

failure to meet the Standards and Guidelines on an allotment or pasture. Appendix A explains the process in more detail, but simply put, many more scores of "1" and "2" on t *Determination that Grazing is the Cause* checklist (Appendix A), and very few scores of "4" and "5" would lead the user to conclude that "grazing is the cause" of resource impairment.

### 3.4 Other factors that can help make the determination that livestock grazing causes impairment

There are a few other factors that are important in the determination process, but are not included directly into our proposed determination procedure, chiefly because these factors are either harder to directly tie to livestock use, or they are not one of the specific habitat indicators included in BLM's upland and riparian PFC assessments. However, it is important that the Monument staff keep the below factors in mind as they carry out determinations, as there are many indications that the below factors are also seriously impacted by livestock grazing

**3.4.1 Failure of RMP/AMP to achieve ecological goals.** BLM uses resource management plans (RMP) and livestock grazing allotment management plans (AMP) to establish goals for livestock management. Goals can include measurable ecological conditions that BLM uses to assess grazing practices. For example, the Upper Hackberry AMP states as a goal that a key forage species, Indian rice grass should cover 6% of the ground. Trend monitoring uses permanent plots to measure the ground cover of this key species. Other goals may set measurable goals for shrubs, wildlife species, or specific grazing prescriptions.

As one undertakes the determination process, its important to review the goals BLM set for the allotment in past planning efforts to see if monitoring shows achievement of goals related to habitat condition and grazing use. By putting such goals into planning documents relevant to grazing management, the agency is asserting that changes in grazing practices will lead to the attainment of these goals. The conclusion must be, therefore, that where these goals are not met, it more than likely because grazing practices have not be changed, or have not been changes sufficiently, to achieve the goal.

**3.3.2 Wildlife habitat function.** In order to maintain viable populations of expected wildlife species in an allotment, habitats must function to meet the needs of those species. While we do not undertake an exhaustive literature review to outline the connection between livestock grazing and the ability of native habitats to function for native species (chiefly because we do not include this factor as a primary indicator in our proposed determination method necessarily because the connection is hard to directly make) it is demonstrated frequently that livestock grazing can degrade habitats for native wildlife (see Kraussman 1996, and many references therein). While the upland rangeland health assessment process does include some indicators for habitat structure, most of the habitat function needed for wildlife is not captured in either the upland or riparian assessments BLM currently conducts.

We suggest two additional data sources to assist in evaluating the function of habitat for wildlife on Monument grazing allotments. The first looks at species at risk as indicators of habitat function. Monitoring and survey data for these species, especially those species listed as endangered or threatened,[12] provide better information on functioning habitat than that available for most other wildlife species. The second data source relies on the riparian PFC assessment process developed by team of independent scientists and presented to the BLM last year (Appendix B). This biological riparian assessment includes a section specifically suited to judging the function of wildlife habitat.

In sum, as functioning wildlife habitat is often deleteriously affected by livestock grazing, any information that the Monument has on native and sensitive wildlife viability and habitat could prove helpful during the determination process on an allotment. If habitat for native wildlife on the impaired allotment or pasture is found to be non- functioning or at risk, livestock grazing is likely the cause.

## SECTION 4: OTHER POSSIBLE CAUSES FOR AN AREA FAILING TO MEET THE RANGELAND HEALTH STANDARDS

Section 3 references an overwhelming body of literature demonstrating that livestock grazing as currently practiced has myriad impacts to a broad array of ecosystem components; this section references scientific studies that demonstrate that other possible causes – such as wildlife, historic grazing, drought, and poor soils – are unlikely to be major factors contributing to impairment.

### 4.1 Wildlife Herbivory Is Unlikely To Be A Significant Cause Of Impairment

According to the literature, there are few situations where wild herbivores are a significant factor leading to an area failing to meet rangeland health standards. In those past instances where the BLM has suggested that wildlife is the cause of impairment, the agency does not invoke any scientific literature that demonstrates that wildlife are the most likely source of impairment. Below are relevant references to literature that demonstrate, when livestock and native, wild ungulates are both present in an area, a solid majority of grazing-related impacts are attributable to the domestic, non-native grazers.

Wild grazers and browsers do not utilize forage in the same manner as domestic livestock, and wild grazers and browsers use riparian areas and water sources in a different manner than do domestic livestock. An intensive study of riparian and stream health in the Apache-Sitgreaves National Forest in Arizona found that impacts to riparian areas were generally low, even though it was known that these riparian areas were used quite heavily by elk (Rocky Mountain Research Station 2002).

In another study in Oregon, researchers examined the effects of wild ungulates (deer and elk) and domestic sheep browsing on the growth, structure, and reproductive effort of willows (Brookshire et al. 2002). With the use of exclosures, large herbivore effects on willows were studied in an area browsed by native mammals only and an adjacent area in which domestic sheep also lightly grazed during summer months. Willows inside exclosures responded with pronounced increases in height, crown area, and basal stem diameters while the stature of browsed plants outside exclosures stayed constant or declined. In the area browsed by both sheep and wild herbivores, the size of browsed plants remained at pre-treatment levels for the duration of the study.

The only wildlife species that are likely to have a significant impact on riparian areas are elk, moose, bison, and beaver (personal communication, Robert Ohmart). Moose and bison are largely absent from southern Utah rangelands, and therefore cannot be responsible for impairment. Impacts of beaver are limited to the harvest of cottonwoods, willows, and the bulbs of some herbaceous species of vegetation; they do not cause widespread trampling, nor do they cause a general reduction in herbaceous vegetation. Because the impacts caused by beaver are so distinct, it should be easy for BLM to identify situations where beaver are causing impairment, and it should be easy for the agency to provide information to support their conclusions. Elk may sometimes be a significant factor in causing ecosystem impairment in southern Utah, but this is unlikely in most instances. The number of elk in a riparian area and the amount of time they spend there are critical variables. The relative impacts of elk and cattle grazing can be estimated by comparing cow pies and elk pellet groups. If BLM contends that elk are causing impairment, the agency should be required to provide concrete evidence to support its assertion.

Studies that focus on competition and behavioral interactions between livestock and wild ungulates usually find that deer in particular, but elk as well, are less frequent in areas used by livestock (Dusek 1975, Bowyer and Bleich 1984, Loft et al.1993). The fact that wild ungulates use areas grazed by livestock less frequently can both be attributed to behavioral avoidance (Loft et al.1993), and to the fact that deer and cattle have very different diets (Mackie 1970, Dusek 1975, Austin and Urness 1986, Kie 1996). If wild ungulates generally avoid areas used frequently by cattle, then it would be reasonable to conclude that grazing impacts found in those areas would be caused by livestock.

Wild grazers and browsers are also more evenly distributed across the land and thus do not cause the same type of concentrated, severe impact as livestock do (Willers 2002). Wild, grazing herbivores in expansive, unfenced grazing systems tend not to remain stationary, migrating instead towards optimal grazing conditions. Defoliation caused by native grazers passing through an area removes older plant tissues and promotes the growth of new shoots, a co-evolved situation allowing for rapid recovery of habitat. Fenced lands and management for maximum yields of sedentary domestic livestock inhibit such recovery. Confining native grazers in such fenced-in situations has a similar negative effects (Frank 1998). A study conducted in the Henry Mountains looked at the different grazing patterns of cattle and bison (Van Vuren1982). Rangelands close to streams and lakes were especially prone to overgrazing because cattle congregate in areas close to water. Bison distributed grazing pressure more widely because they grazed steep slopes and areas distant from water. Since bison are nomadic, the plants they forage on have more time to recover.

In a more general sense, many of the scientific papers cited above in other sections lend credence to the notion that impacts from livestock grazing as currently

BLM_0079194

practiced far exceed any possible impacts from wildlife. These studies often allege a comparison between livestock-grazed lands and "ungrazed" lands. However, the "ungrazed lands" in the studies were most likely subject to grazing from wildlife. Therefore, the studies actually compare livestock-grazed areas to wildlife-grazed areas. The studies overwhelmingly show much more damage to natural resources in those areas grazed by domestic livestock.

Because of the conclusive evidence, the BLM must bear the burden of proof that wildlife are a significant factor leading to a low rangeland health assessment. The studies just describe present the kinds of field data collection needed. In order to establish that wildlife are a significant factor, BLM will need to have evidence that large numbers of elk, bison, and (in the case of riparian areas) beavers are in the area. Field transects of habitat use (browse, grazing, tracks, scat) should be coupled with wildlife population surveys to demonstrate this. Vegetation monitoring should include relevant ecological reference sites and relict sites where wildlife may have access but not livestock. If wildlife is a significant cause of impairment, then those sites inaccessible to wildlife but accessible to cattle should not be impaired and areas accessible to wildlife and not cattle should be impaired.

## 4.2 Historic Overgrazing Is Not The Cause Of Contemporary Problems

Alone, resource impairment should not be blamed on "historic" grazing practices, as distinguished from "current" grazing practices. In other words, the literature does not support the idea that historic grazing practices are responsible for damage to ecosystem values, while current grazing practices are not – **unless** current grazing practices are designed specifically for recovery and differ radically from historic practices. Thus, to say that current grazing practices need not be changed because resource damage was caused by past grazing practices is not supportable unless current grazing practices include elements such as cessation of grazing, light stocking and utilization rates, grazing during non-growing seasons only, and removal of cattle from riparian areas.

Areas do recover from livestock grazing if grazing is drastically reduced or eliminated. In the context of forage production, Holechek and his colleagues make clear that light utilization and light stocking rates allow overgrazed areas to recover: "In the more arid shrubland ranges of the Southwest and intermountain regions, light grazing can be a useful means of improving forage production . . . ." Holechek 1998, pg. 191. Indeed, Holechek goes so far as to define light stocking rates as those that allow forage recovery: "Light grazing means a degree of herbage utilization that allows palatable species to maximize their herbage producing ability. Holechek 1999, pg. 12. The authors concluded that while "heavy stocking" consistently caused a downward trend in ecological condition, "light stocking" resulted in an upward trend. Holechek, et al. (1999, pg. 13). As explained above, Holechek and his colleagues recommend utilization levels of less than 30% to allow for recovery of productivity.

Importantly, Holechek and his colleagues are concerned only with the recovery of forage or productivity, not the recovery of ecosystem values. Where these resources are to be recovered, the literature confirms that total, long term rest is effective. Potter, L.D., and J.C. Krenetsky (1967) found that grass densities and total ground cover tripled following 25 years of non-grazing. Blydenstein, et al (1957) similarly determined that perennial grass densities and the palatable shrub Krameria grayi increased in a Sonoran desert grassland protected from grazing for 50 years, and were most taken by the notable increase in overall plant cover and density. More recently, Anderson, et al. (2001) found landscape-scale changes in plant species abundance and biodiversity of a sagebrush steppe over 45 years of rest. Analyzing riparian areas, Platts and Nelson determined that herbaceous vegetation can recover within several growing seasons and woody vegetation within 5-10 years if grazing stress is removed from a deteriorated riparian area

At the same time, others have concluded that short-term rest from grazing may not be sufficient to allow for recovery of ecosystem values. McPherson et al. (1990) concluded that "[t]he effects of long-term continuous cattle grazing persisted 5 years after removal of livestock" and that the "succession following grazing will proceed slowly or will be unpredictable." In a study of the Kaiparowits Basin, Jeffires and Klopatek (1987) compared heavily grazed sites, a site10 years into recovery from heavy grazing, and a relict, never-before grazed site. The authors found that the relict site had significantly more herbaceous cover (comprised mostly of perennial grasses) than all other sites. There were no significant differences between the heavily grazed site and the recovering site for any of the measured parameters, leading the authors to conclude that recovery from grazing can take a very long time indeed.

Thus, where the temptation is to blame resource degradation on "past" grazing practices, rather than current practices, BLM must establish that current practices are sufficiently light and long lasting to allow for recovery of ecosystem values. Otherwise, current grazing practices must be implicated as causing resource impairment – even though less invasive than previous strategies, these practices are not protective enough to allow the area to heal. Where minimal grazing levels do not allow for significant resource improvement, elimination of livestock grazing for long periods of time is warranted. Moreover, BLM Handbook 4180-1 states that current practices do not necessarily have to be the cause of failure to meet Standards to justify a management change (BLM Tech. Manual H-4180-1, pg III-16).

## 4.3 Drought Is Not The Cause Of Impairment

Current knowledge leads to the conclusion that drought and is not, by itself, a significant factors for certain areas failing to meet the Standards and Guidelines. The vegetative communities of the Monument have undergone countless droughts over the past few thousand years, many of them severe, yet these past droughts did not serve to change species composition or structure dramatically, as numerous scientific studies have found livestock grazing to do in the arid West.

The precipitation data we have for the Monument tells us that droughts are very common in this part of Utah. Below we feature data from three locations with long-term precipitation records in the vicinity of the Monument. These include, from southwest to northeast – the town of Kanab, Kodachrome Basin State Park, and the town of Escalante. Table 9 provides a summary of annual precipitation statistics for these locations.[13] The statistics were calculated for years of record with no more than one day of missing data in any given month. Drought is considered to follow the definition of the Society of Range Management (SRM 1989), which defines drought as years with less than 75% of the average annual precipitation.

BLM_0079195

**Table 9.  Precipitation Statistics for GSENM from Western Regional Climate Center**

| Description | Kanab | Kodachrome | Escalante |
|---|---|---|---|
| Period of Record | 1903 – 2002 | 1980 – 2001 | 1909 - 2001 |
| Years of Record | 86 | 22 | 65 |
| Average, inches | 13.4 | 12.3 | 10.9 |
| Range, inches | 5.43 – 26.61 | 8.74 – 17.49 | 5.49 – 21.46 |
| Year below average | 46 | 12 | 39 |
| Percent years below average | 53.4 | 54.5 | 60.0 |
| Drought threshold, inches | 10.0 | 9.2 | 8.2 |
| No. Drought Years | 21 | 3 | 13 |
| Percent years below drought threshold | 24.4 | 13.6 | 20.0 |

During the 89 years records were kept, drought occurred for at least one station in 27 years, or 30.3% of the time.  Figure 4 provides graphs for each location and shows the extreme variations in annual precipitation experienced across the Monument.  From inspection of Figure 4, it is evident that there were many more years when the annual precipitation was very near the drought threshold.  For example, at Kanab there were 30/86 years, or 34.8% of the time when the drought threshold was either approached or exceeded.  Kodachrome experienced these conditions in 5/30 years or 16.6% of years and at Escalante, 39/65 years or 60% of years approached or exceeded the drought threshold.

Figure 4 (below and following page) shows annual precipitation for the period of record in the GSENM region.







above data tells us that drought is a normal occurrence in southern Utah, at least for the past 100 years.  Paleological records help recount about normal patterns and cycles for southern Utah over an even greater time period.  A study in Capitol Reef National Park (Cole et al. 1997) used packrat middens to describe vegetation changes in the region.  The authors found that pre-settlement middens contained abundant macro-fossils of plant species palatable to livestock, such as winterfat (*Ceratoides lanata*) and Indian

ricegrass. Their midden analysis demonstrated that drastic vegetation changes, unprecedented during the last 5,000 years, occurred in this part of southern Utah between roughly 1800 and the present. Species typical of overgrazed range, such as snakeweed, rabbitbrush (*Chrysothamnus nauseosus*), and Russian thistle (*Salsola iberica*) were not recorded in middens prior to the introduction of grazing animals. These changes occurred against a background of regular droughts, yet these droughts were not severe enough to change the entire nature of the vegetation; these droughts did not nearly represent the level of disturbance that the advent of livestock grazing did almost 200 years ago.

In yet another relevant study, actually recently conducted in the Monument, Harris and Asner (2003) used field measurements and remotely senses hyperspectral imagery to identify a grazing gradient (of decreasing amounts of bare soil) that radiates out 1.4 km from the water source. Important to our discussion on grazing and drought, this grazing gradient was confirmed during a period of above-average rainfall.

Six out of the last 10 years have been drought years on the Monument. But it must be underscored once again that drought is not in and of itself the reason for resource degradation. Rather, it is drought combined with land management that is "not prepared" for severe drought. A prime example of this problem is the disastrous situation that ensued over the past few years on 50-mile mountain.

This part of the Monument received only 30% of the average annual precipitation in 2000. On September 25 of that year the Monument's Rangeland Management Specialist flew over the entire Lake Allotment and stated: "the uplands have been depleted of grass and much of the browse has been eaten. The riparian areas are in deplorable condition! They have been trampled into oblivion. It will take more than one year for them to heal. Conditions grow worse each year" (Allotment Supervision Record, 1. Lake Allotment, 2000). The 2000 forage utilization records for the Lake Allotment demonstrate that average utilization levels for all pastures in the allotment in 2000 were a shocking 90% for uplands and 99% for riparian areas. The Rock Creek-Mudholes allotment was in similarly alarmingly poor condition; during the 2000 grazing season, average utilization levels in this allotment were from 73% to 90% in the uplands and 90% in the riparian areas. These data provide convincing evidence that the Monument is not prepared for extreme drought situations, and that BLM is unable to respond to the problem until it is too late.

In sum, drought, an almost ever-present "background" condition in the Monument and across the arid intermountain West, will rarely ever be the sole cause of impairment when resources are degraded.


**SECTION 5: CONCLUSION**

In this paper, we provide BLM with scheme for determining when livestock grazing is a significant factor in the failure of an area to comply with the Fundamentals and Standards and Guidelines. The procedure is based on sound science, field work and extensive experience analyzing livestock grazing and the impacts it has on ecosystem values. We begin with factors tied to livestock use that are highly indicative of grazing as the cause of resource damage. We next focus on many of the same indicators BLM uses in its upland and riparian rangeland health assessment, using these to discover the connection between damage to ecosystem values and livestock grazing. We then suggest that other factors are rarely the cause of undesirable conditions, and recommend means for documenting the few cases in which these factors may lead to non-functioning ecosystems. Finally, we have attached a sample checklist that implements our recommended analysis.

Whether or not this checklist ultimately proves useful, we are confident in our analysis and citation to the literature, which overwhelmingly concludes that in almost all cases where livestock grazing occurs, particularly as grazing is practiced in the Monument, this use is a significant factor in the failure of an area to support healthy and sustainable ecosystems. Given this reality, the BLM must fully explain and provide evidence for any conclusion it makes that livestock grazing is not the cause of damage to uplands and riparian areas in the Monument. Indeed, the Monument is saddled with the burden of proof in this determination process. The published literature already suggests that grazing causes harm, thus the burden of proof is on GSENM to show it does not. Hence, the Monument should assume grazing has caused impairment unless the BLM can produce positive proof that another factor is to blame. That other factors contribute to impairment is undoubted; the BLM has the burden of proof to show that ONLY those other factors and NOT grazing is the cause of not meeting Standards.

**\*\*LITERATURE CITED is included in Literature Cited Section**
**of Guidance Document\*\***

**Attachment for Appendix A: the Determination that Grazing is the Cause Checklist**

The indicators relevant to the determination process describe the level of livestock grazing and specific habitat conditions for an area failing to meet one or more rangeland health standards. In this section, we describe a systematic way to use these indicators to arrive at a consistent determination for the impaired allotment or pasture, using BLM data for that allotment. At the end of each section describing the 16 determination checklist indicators in the determination guidance document, we briefly explain the "scoring system" we recommend. Below, we provide the summary Determination Checklist and give detailed instructions on how to use it..

The determination that livestock grazing in an allotment is a significant factor leading to the deteriorated condition is based on the propensity of evidence reflected in the scoring system. The evidence gathered may show several indicators that provide convincing evidence that the level and kind of grazing in the allotment are the cause of the habitat conditions described on the determination checklist.

Here is the sequence of steps to take in assessing the values marked on the determination checklist (following page) for a specific allotment:

1.      Are livestock the dominant herbivore in the allotment?
If the answer to this question is "yes" continue to the next question. If the answer is "no," management actions will be needed to address both livestock use and the impacts caused by significant use by other herbivores.

2.      Is livestock grazing occurring in riparian areas functioning at risk?
If BLM determined that the riparian area is NF or FAR with downward trend, livestock are the dominate herbivore, and grazing occurs in riparian areas; the evidence is sufficient to determine that grazing is a significant factor in failing to meet one or more rangeland health standards. If "yes" then mark the determination box "yes" at the end of the checklist. If "no," continue to 3.

3.      Does the preponderance of evidence show that livestock grazing is at an intensity sufficient to cause the failure of an area to meet the rangeland health standards? If the checklist shows that most of the scores are in the range of 1 to 3, mark the determination check box "yes" grazing is a significant factor.

This determination process was designed to determine in a short period of time with minimal data collection whether livestock are a significant factor that has lead to an area not meeting its required standard. The data collected in this process can be used with subsequent assessments to judge if conditions have changed on the impaired allotment or pasture.


**Determination Indicator Checklist**

*(Determination of whether livestock is a significant factor in the failure of an allotment to meet the Rangeland Health Standards)*

Allotment Name _____   Allotment number _____
Field Office _____
Season of use _____
Permitted use: _____   Average of five years livestock use: _____

1. Upland Rangeland Health Summary (from *Interpreting Indicators of Rangeland Health* - TR 1734-6): place an X, indicating summary findings on soil/site stability, hydrologic function, and biotic integrity for each assessment site in the pasture/allotment in the box below.

| | Extreme | Moderate to Extreme | Moderate | Slight to Moderate | None to Slight | Comments |
|---|---|---|---|---|---|---|
| Soil/site stability | | | | | | |
| Hydrologic function | | | | | | |
| Biotic integrity | | | | | | |

Comments transcribed from the Upland Rangeland Health field checklist that discuss potential role of grazing in degraded conditions at site:_____

2. Put an X in the appropriate box for the ratings on riparian and wetland PFC assessments (TR 1737-9) performed in the pasture/allotment

| Not functioning | Functioning at Risk | Properly functioning condition |
|---|---|---|
| | | |

Comments transcribed from the riparian PFC field checklist that discuss potential role of grazing in degraded conditions at site:
_____

3. Determination Checklist Livestock Use Indicators (see text from guidance document, pages 8-23 with accompanying Tables 2-4, 6-7) on how to score these livestock use indicators

| Indicator | Description | Rating range | Rating |
|---|---|---|---|
| 1 | Livestock Utilization | 1-5 | |
| 2 | Livestock stocking rates | 1-5 | |
| 3 | Grazing during the growing season | 1-5 | |
| 4 | Livestock distribution | 1-5 | |
| 5 | Livestock grazing in riparian areas | 1-5 | |
| 6 | Field observations, livestock are the dominate herbivore | Yes or no | |
| 7 | Livestock grazing during droughts | 1-5 | |

Summary of livestock grazing indicators

| Extreme | Moderate to Extreme | Moderate | Moderate to Slight | Slight to None |
|---|---|---|---|---|
| | | | | |
| 1 | 2 | 3 | 4 | 5 |

Below, mark an "X" for each of the above ratings (ranging from 1-5) in the appropriate boxes. A preponderance of evidence (i.e. most "X's" in the 1-3 or yes boxes) will tell you if livestock grazing is the (or one of the) principle causes of impairment.

4. Specific Habitat indicators tiered to BLM rangeland health assessments

| Indicator | Description | Score | Rating |
|---|---|---|---|
| 8 | Bare ground (Upland Range Health Attribute 4, URHA 4) | 1-5 | |
| 9 | Soil compaction (URHA 11) | 1-5 | |
| 10a | Upland erosion (URHA 1,3, 8) | 1-5 | |
| 10 b | Upland erosion, (Riparian Item 5, RI 5) | Y / N | |
| 11 | Stream morphology and erosion (RI 11) | Y / N | |
| 12a | Plant community vigor, growth and productivity (URHA 13, 14, 17) | 1-5 | |
| 12b | Plant community vigor, growth and productivity (RI 4, 14) | Y / N | |
| 13 | Litter (URHA 14) | 1-5 | |
| 14a | Plant community structure, function, composition (URHA 12) | 1-5 | |
| 14b | Plant Community structure, function, composition (RI 6,7) | Y/N | |
| 15 | Invasive Plants (URHA 16) | 1-5 | |
| 16 | Cryptobiotic Soils  (URHA 8, 18) | 1-5 | |

Below, mark an "X" for each of the above ratings (ranging from 1-5) in the appropriate boxes. A preponderance of evidence (i.e. most "X's" in the 1-3 pt., or "no," boxes) will tell you if livestock grazing is the (or one of the) principle causes of impairment.

BLM_0079198

| Summary of habitat indicators | | | | | Determination that livestock is a significant factor for this area failing to meet one or more rangeland health standards |
|---|---|---|---|---|---|
| Extreme | Moderate to Extreme | Moderate | Moderate to Slight | Slight to none | |
| | | | | | YES ☐ |
| 1 | 2 | 3 | 4 | 5 | NO ☐ |

Rationale:

_____

Date _____         Signature _____

---

[1] Public Land Statistics (2001), Table 2-2 ("Lower 48 Totals").

[2] This involves performing an assessment to see if the standards are met. BLM relies on assessment tools described in a number of technical references: *Interpreting Indicators of Rangeland Health* (TR 1734-6) for upland areas (Pellant et al 2000), the Lentic PFC assessment method (TR 1737-9) for riparian areas and the Lotic PFC assessment method for ponds, marshes, and lakes).

[3] The Standards define "significant progress towards achievement" as either Functioning Properly (PFC), or Functioning at Risk with an upward trend. Non-functioning conditions, or Functioning at Risk with a downward trend convey failure to meet the Standards.

[4] The Handbook defines "Significant Factor" as a "[p]rincipal causal factor in the failure to achieve the land health standard(s) and conform with the guidelines. A significant factor would typically be a use that, if modified, would enable an area to achieve or make significant progress toward achieving the health standard(s)." (BLM Handbook 4180-1, I-7).

[5] Deferred-rotation may have a benefit where various areas are more convenient to livestock than others and therefore are more regularly used.

[6] Jim Catlin, Allison Jones, and John Carter.

[7] Elizabeth Painter, Peter Stacey

[8] Fire suppression is sometimes itself a cause of livestock grazing.

[9] Of course – its important for Monument staff working to review the actual PFC dataforms used in the assessment process for clues to whether grazing is the cause of areas failing to be in compliance with the standards. Out of the combined 119 wetland (lotic and lentic) PFC assessments that resulted in NF or FAR with downward trend, 70 of them (59%) include assessor comments that implicate cattle grazing as the primary cause (or one of a few primary causes) resulting in the degradation of these wetland areas.

[10] Again in assessing Glen Canyon National Recreation Area, the Park Service agreed that livestock grazing as currently practiced adversely impacts soil stability. The Park Service stated: "[r]esearchers have recognized that higher grazing levels contribute to deterioration of soil stability and porosity, cause an increase in erosion and soil compaction, and can remove beneficial soil litter which can improve the physical and biological aspects of the soil ecosystem." Glen Canyon EA at 15 (citations omitted).

[11] This standard comes from BLM itself. It is fairly easy to meet the "preponderance of the evidence" standard. For example, in the context of a civil trial, where this standard is applied, the jury is instructed to find for the party that, on the stronger evidence, however slight the edge may be. Black's Law Dictionary (7th Ed. 1999). In other words, the preponderance of the evidence will show that grazing is a significant factor in the non-compliance where the greater weight of the evidence suggests that it is, even if there remains some reasonable doubt that grazing is a significant factor.

[12] Grazing in endangered species habitat is particularly problematic. BLM must pay particular attention to degraded resource conditions in potential or existing habitat for special status species. The Fundamentals and Standards and Guidelines require that habitats for special status species, including species listed under the Endangered Species Act, be restored and maintained. At the same time, researchers have documented that livestock grazing has a significant adverse effect on various special status species, including Mexican spotted owl, southwestern willow flycatcher, and several plant species, including Townsend's aprica (*Townsendia aprica*), Wright's fishook cactus (*Sclerocactus wrightii*), and Winkler's pincushion (*Pediocactus winkleri*) cactus (see Jones 2001, and references therein). Thus, in the Monument, where these species or their habitat exists, or could exist, and this habitat is not in a desirable condition, more likely than not, livestock grazing is directly or indirectly responsible for habitat degradation.

[13] The data was obtained from the Western Regional Climate Center database which can be found on line at http://www.wrcc.dri.edu/index.html.

http://www.publiclandsranching.org/htmlres/economicscows.htm

# Economic Facts Of Public Lands Grazing

Public lands grazers are a minority of livestock producers in the West and throughout the country…1

- Number of livestock producers with federal grazing permits: **27,000**. 2
- Percentage of livestock producers with federal grazing permits in the United States: **3%**. 3
- Percentage of livestock producers with federal grazing permits in eleven Western states: **22%**. 4
- Number of livestock producers without federal grazing permits: **880,000**. 5

Subsidized by taxpayers, public lands grazers pay far less than market value for federal forage and grazing fees on comparable state and private lands…

- Fee to graze one cow and calf for one month (AUM) on federal public lands (2001): **$1.43**. 6
- Average fee per AUM on state lands in the West (excluding Texas) (1998): **$12.30**. 7
- Average fee per AUM on private lands in eleven Western states (1999): **$11.10**. 8

The forage provided, and the beef produced from federal public lands is insignificant…

- Percentage of total feed for livestock (cattle and sheep) in the United States supplied from federal lands: **2%**. 9
- Percentage of American beef produced from federal rangelands: **less than 3%**. 10
- 

Federal grazing programs contribute very little to Western states' economies…

| Aggregate Federal Grazing Statistics for Eleven Western States 11 | |
| --- | --- |
| Federal grazing jobs | 17,989 |
| Federal grazing jobs as percentage of total employment | 0.06 |
| Federal grazing income as percentage of total income | 0.04 |
| Days of normal job growth to replace all federal grazing jobs | 11 |
| Days of normal income growth to replace all federal grazing jobs | 6 |

- In Nevada (the state with more federal land than any other outside of Alaska), federal public lands grazing provides 1,228 jobs. 12 By comparison, one casino in Las Vegas employs 37,000 people. 13
- Alternative uses of federal public lands contribute much more income to local and regional economies than livestock grazing. In the Central Winter Ecosystem Management Area in the Kaibab Plateau, Arizona, dispersed recreation is worth $200,000 annually to the local and regional economies; fuelwood is worth $48,984; livestock grazing is worth $45,988; and deer and turkey hunting is worth $1,324,259. 14
- As part of his research on public lands grazing economics, Dr. Thomas Powers produced two tables of data that are widely cited to refute the contention that public lands grazing is essential to western state economics.

---

1.  The vast majority of "livestock producers" on public lands are beef growers.
    2. Grazing permits for BLM and Forest Service allotments; includes sheep growers; accounts for permittees who operate on both BLM and Forest Service allotments. USDI-BLM. USDA-Forest Service. 1995. Rangeland Reform '94 Final Environmental Impact Statement. USDI-BLM. Washington, DC: 3; see also Rogers, P. 1999. Cash cows. San Jose Mercury News (Nov. 7, 1999): 2S (reporting 26,300 permittees on BLM and Forest Service allotments).
    3. USDI-BLM, USDA-Forest Service. 1995. Rangeland Reform '94 Final Environmental Impact Statement. USDI-BLM. Washington, DC: 26.
    4. USDI-BLM, USDA-Forest Service. 1995. Rangeland Reform '94 Final Environmental Impact Statement. USDI-BLM. Washington, DC: 26.
    5. See USDI-BLM, USDA-Forest Service. 1995. Rangeland Reform '94 Final Environmental Impact Statement. USDI-BLM. Washington, DC: 26.
    6. Wyoming BLM. 2002. 2002 Federal Grazing Fee Announced. Wyoming BLM News (BLM Wyoming News release). Available at http://www.wy.blm.gov/newsreleases/2002/feb/2-14grazingfee.htm
    7. USDA-National Agricultural Statistics Service. 1998. Agricultural graphics-17 state grazing fees adjusted AUM. USDA-NASS. Washington, DC. Available at http://www.usda.gov/nass/aggraphics/graphics.htm.
    8. Rogers, P. 1999. Cash cows. San Jose Mercury News (Nov. 7, 1999): 2S.

9. USDI-BLM. 1992. Grazing fee review and evaluation: update of the 1986 final report. USDI-BLM. Washington, DC: 2.

10. Rogers, P. 1999. Cash cows. San Jose Mercury News (Nov. 7, 1999): 1S; Jacobs, L. 1992. THE WASTE OF THE WEST: PUBLIC LANDS RANCHING. Lynn Jacobs, P.O. Box 5784, Tucson, AZ: 354.

11. T. Power. 1996. LOST LANDSCAPES AND FAILED ECONOMIES: THE SEARCH FOR A VALUE OF PLACE. Island Press. Washington, DC: 184-185 (table 8-2).

12. T. Power. 1996. LOST LANDSCAPES AND FAILED ECONOMIES: THE SEARCH FOR A VALUE OF PLACE. Island Press. Washington, DC: 184 (table 8-2).

13. Greenhouse, S. 2001. Behind Las Vegas's glitter, heavy losses and layoffs. New York Times (Oct. 19, 2001).

14. Souder, J. 1997. How does livestock grazing fit into the larger societal uses of wildlands?, in PROC. SYMP. ON ENVIRONMENTAL, ECONOMIC, AND LEGAL ISSUES RELATED TO RANGELAND WATER DEVELOPMENTS. Arizona St. Univ. Tempe, AZ: 305.

**********************************************************************************************

8

http://www.fguardians.org/tmpower.htm

# THE ECONOMIC IMPORTANCE OF FEDERAL GRAZING TO THE ECONOMIES OF THE WEST

by Thomas Michael Power

## Abstract

Close examination of the economic importance of livestock grazing, or the lack thereof, is critical to anyone concerned with determining the appropriateness of grazing on our wild lands. Thomas Michael Power is professor and chairman of the Economics Department at the University of Montana in Missoula. In the following paper, Dr. Power concludes that agriculture is not the mainstay of any of the Western states economies. In fact, agriculture has continued to shrink in relative economic importance as the non-agricultural economy in the West has expanded briskly. Dr. Power points out that ranching, despite its colorful association with the old West is not a dominant part of the contemporary Western economies. Ranching directly provides less than a half of one percent of all of the income received by Westerners, and ranching on public lands is responsible for even less economic activity. In fact, agriculture is a subsidiary activity supported by the vitality of the non-agricultural economy. Due to its small economic significance, impacts of grazing must be compared to the environmental impact of the current level of public land grazing.

### Thomas Michael Power

**Professor and Chairman**
**Economics Department**
**University of Montana**
**Missoula, MT 59812**
**406/243-4586**
(**photo** of Dr. Power)

## TABLE OF CONTENTS

Section I. Introduction
Section II. Measuring the Relative Importance of Agriculture in a State's Economy
Section III. Measuring the Relative Economic Importance of Grazing on Federal Lands
Section IV. The Increasing Reliance of Farm Families on the Non-Farm Economy
Section V. Conclusion
Endnotes
Figure 1. Inflating the Farm-Related Sector

BLM_0079202

Figure 2. Shrinking the Economy to Enhance the Relative Size of Agiculture
Figure 3. Inflating the Role of Agriculture: Utah Income, 1987-1989
Figure 4. The Direct Importance of Agriculture: Utah Personal Income, 1987-1989
Table 1. Measuring Dependence on Federal Grazing
Table 2. Employment and Income from Federal Grazing
Table 3. The Importance of Off-Farm Income: Beef Cattle (Except Feedlots)
Table 4. The Importance of Off-Farm Income

# THE ECONOMIC IMPORTANCE OF FEDERAL GRAZING TO THE ECONOMIES OF THE WEST

## by Thomas Michael Power

### Introduction

This paper briefly looks at the economic importance of federal grazing lands to the economies of the Western states. It concludes that that contribution is very modest and that substantial reductions in grazing on federal lands would not have a significant negative impact on those economies.

It is important to understand that to say that a particular economic activity represents a relatively small part of the total economy is not to attack or criticize that sector. In a diverse, healthy economy, no one industry would dominate in the sense of providing an unusually large fraction of either employment or income. Diversification and economic development tend to systematically reduce the relative importance of primary production: agriculture, mining, forestry, etc. That is not an alarming sign but the opposite: A sign that economic development is reducing dependence upon a few unstable industries.

This paper begins with a discussion of the ways in which the relative importance of agriculture to the overall economy is often exaggerated. It then turns to an estimation of the economic importance of federal public lands grazing. Finally it discusses the increasing reliance of the agricultural sector on the vitality of the non-agricultural sectors for economic survival.

### Measuring the Relative Importance of Agriculture in a State's Economy

All of us like to believe that what we do is important. Industries are no different. Commercial businesses have an additional reason for wanting to be able to demonstrate how important they are: The more others believe that they rely upon a particular business or set of businesses, the easier it is to wrap their private commercial interests in the mantel of the public interest. That, of course, increases the political clout of the business or industry.

Industries that rely upon public subsidies or government favors have an even greater need to demonstrate their relative importance. Their stature often is the basis upon which they lay claim to the public support or subsidies. It is not

BLM_0079203

surprising, then, to find the truth stretched a bit in industry-oriented analyses of the relative economic importance of mining,agriculture, or timber industries.

The usual measure of relative economic importance is a straight ratio: Relative Economic Importance = Contribution of Agriculture/Size of the Total Economy. This ratio will be exaggerated if either the numerator, the actual size of the contribution the agricultural sector makes to the economy, is exaggerated or if the denominator, the measure of the size of the total economy, is understated.

A study of the contribution of the agricultural sector to the economy of Utah done by the Agricultural Experiment Station at Utah State University provides a good example of how such measures of relative importance can get inflated.[1]

When measuring the relative importance of agriculture, the Utah study adds together all food-related activities and labels them agricultural-related.Some of this linking of off-farm economic activity with on-farm economic activity is more plausible than others. For instance, the Utah study counted employment and income in restaurants, supermarkets, other food stores, and wholesale food distributors as agricultural-related. There is a primitive logic to this. If food were not produced, restaurants could not sell meals. But it is not plausible to argue that if agricultural products were not produced in Utah, these restaurants and food stores would not be able to obtain food. Many areas that are totally urban in nature manage to import food and successfully operate restaurants and food stores. The people of Utah would not starve if food products were not produced in Utah. Figure 1 shows how this claim that Utah restaurants and food stores depend upon Utah farms and ranches dramatically increases the apparent economic importance of agriculture above its direct contribution to incomes: Inclusion of this retail and wholesale food activity increases the apparent importance of agriculture by almost 250 percent or agriculture's direct importance!

The Utah study also claims as agricultural-related a variety of economic activities of questionable relevance. For instance, the salaries and employment provided by schools of agricultural are counted as agricultural-related. But these schools are primarily supported by tax funds that flow directly from other Utah citizens and businesses. That is, a burden is imposed upon other economic activities in Utah in order to fund these schools. That cannot be treated as merely contribution to the economy. It is a benefit that is largely offset by the cost of the taxes collected. State taxing and spending does not usually create significant net new jobs or income. The study also counts as agricultural the urban nurseries and green-houses that supply our yards and homes. Fur farms are also counted. These too involve a broad stretch of questionable legitimacy in an effort to inflate the agricultural sector. Figure 1 shows the impact of this on the apparent importance of agriculture. This stretching adds 60 percent over the direct impact of agriculture.

The Utah study also assumes that all food processing in Utah that uses Utah agricultural products exists only because those products are grown in Utah. But this too may not be the case. Food processing activities are spread very widely across our nation. Foods are processed in areas where those foods are not produced by simply importing the raw food. Almost all areas, regardless of the level of local agricultural operations have some food processing: bakeries, breweries, processed meats, beverages, snack foods, etc. If food production in Utah were to be reduced, it would not necessarily mean that all food processing would be similarly reduced. See Figure for the inflating impact of this assumption. Counting food processing adds fifty percent over the direct importance of agriculture.

Farmers and ranchers rely upon the services of accountants, lawyers, banks, real estate agents, etc. The part of these service providers who are supported by their agricultural clients can be seen as agricultural-related. Similarly, those businesses that supply goods to Utah's farms and ranches: fuel, electricity, equipment, buildings, etc. can be seen as dependent upon agriculture. If these farm and ranch suppliers are counted as part of agriculture, Figure 1 shows the impact in expanding the apparent importance of agriculture. Including these suppliers triples the size of

BLM_0079204

the agricultural sector compared to its direct impact. There is some plausibility in
counting these suppliers¿ ¿ economic activities as agriculture-related. But the
implicit assumption behind doing so is certainly questionable from a historical point
of view. That assumption is that if agricultural activity did not take place the
people supplying the services and goods would otherwise not be employed within the
Utah economy. They would either have to move out or, if they stayed, they would be
permanently unemployed.

From a historical point of view this assumption is certainly questionable. It has been
the shift of population off of the farm and away from serving farm activities that has
allowed economic development to take place in Utah and elsewhere. Shifting our
work force from less productive activities to more productive activities is what has
allowed our standard of living to improve. Certainly very few people would support
the proposition that we would all be better off if 50 percent of our population was
still involved in agriculture rather than five percent. People who are no longer
engaged in agriculture or the support of agriculture do not become permanently
unemployed. In general they shift to jobs that are more productive and higher
paying. That is not a drag on Utah's or the nation's economy.

Figure 1 shows the dramatic inflation in the apparent size of the agricultural sector
that one can get if one is creative in moving away from the direct contribution
agriculture makes to include as many links as possible with other economic
activities. Whether this sort of inflation represents information or knowledge is
highly questionable.

The adjustments summarized in Figure 1 represent increases in the numerator of
the fraction that is used to measure the relative importance of agriculture. One can
also creatively operate on the denominator to make the size of the total economy
appear smaller than it actually is. The Utah study focused only upon wage and
salary income. This meant that both the income received by the self-employed and
the income received that is not associated with current activity in the labor market
(e.g. retirement income) got ignored. These non-wage sources of income represent
almost 40 percent of total income. Ignoring these income sources means that a
significant part of the total economy gets ignored. In addition, the Utah study
assumed that total wage and salary income was 13 percent smaller than the federal
statistics indicate. As a result of these two adjustments, the denominator used in the
Utah study to measure the size of the economy was more than cut in half. That by
itself, of course, doubled the apparent importance of agriculture. See Figure 2

The result of this way of measuring the relative importance of agriculture is shown
in Figure 3.

Agriculture appears to represent about 13 percent of the total Utah economy. That
does not show an overwhelming dependence on agriculture but does suggest that
agriculture is one of the larger sources of economic activity in Utah. But if one backs
up and looks only at the direct contribution that Utah agriculture makes to income
and employment, one sees something quite different. Agriculture directly generates
only about one percent of total income. Figure 4 shows this and the additional 5.4
percent that could be counted if one accepts the linkages to other economic activities
that the Utah study assumed. Figure 4 also more accurately reflects the rest of the
total economy by counting all sources of income. It certainly may make a difference
to public policy whether agriculture is responsible for one out of every eight dollars
earned in Utah or one out of every hundred.

The Utah study is not alone in exaggerating agriculture's importance in this way.
Most other states have produced similar studies, as has the federal government. In
fact, the federal government's analysis of the American economy as a whole
suggested that agriculture was significantly more important than agriculture in
Utah: about 20 percent of economic activity was found to be agriculturally-related
as opposed to the 15 percent calculated in the Utah study.[2] When the federal
methods of estimating the relative economic importance of agriculture are applied
to Utah, they increase agriculture's apparent importance by a third. The Utah study

obviously did not press the limits of the exaggeration that is possible.[3]

# Measuring the Relative Economic Importance of Grazing on Federal Lands.

One of the more emotionally debated issues of public policy over the last decade and a half has been the level of grazing on federal lands in the West and the appropriate grazing fee to charge for those animals that are allowed to graze. Much of the emotion is tied to the perception that these federal lands are relied upon by most ranching operations in the West and that without access to the forage these federal lands provide, many Western ranches would cease to be economically viable. Since, it is usually assumed, ranching is the economic backbone of the Western economies, such a loss would have a devastating impact of the Western states. Arguments of this sort have successfully forestalled almost all significant reforms of federal grazing policies through the mid-1990s.

These economic claims about the relative importance of federal grazing to the economies of the Western states can be simply analyzed in three steps: a) What portion of livestock feed in each state is provided by grazing on federal lands? b) What part of total agricultural production is provided by cattle and sheep operations? c) What is the direct contribution that agricultural operations make to the state economy?

For many of the Western states, federal lands provide only a small percentage of the total forage needed to support livestock herds. Montana, for instance, obtains only about 7 percent of its forage from federal lands. Washington, California, and Colorado get only two to six percent of their forage from this source. Overall, the eleven western states obtain only an eighth of their forage from federal lands.[4] See Table 1. From a national perspective the reliance on Western federal lands is dramatically lower: Only two percent of the feed consumed by beef cattle in the contiguous states is provided by grazing federal lands.[5]

This direct calculation of the degree of ranching dependence on federal lands is to be contrasted with the method used in other studies. A recent New Mexico study defined all ranches that obtained more than five percent of their forage needs from federal lands as federal grazing dependent. Using this definition, even though Washington ranches only get two percent of their feed from federal lands, they are classified as 45 percent dependent upon federal lands.[6] This twenty-fold exaggeration of the degree of dependence follows entirely from an arbitrary and nonsensical definition.

Table 2 calculates the contribution federal grazing makes to the economies of eleven Western states. The percentage reliance on federal forage is multiplied by the percent of agricultural economic activity represented by cattle and sheep operations. This in turn is multiplied by the direct contribution agriculture makes to the economy in terms of both income and employment. For instance, for Montana, federal forage represents 7 percent of total livestock forage. Cattle and sheep operations are responsible for about 50 percent of the dollar value of all agricultural sales. Finally, agricultural is responsible for about 7 percent of total income. As a result, federal grazing is responsible for about one quarter of one percent of all income in Montana.[7]

Table 2 provides a similar calculation of the employment associated with federal lands grazing. It should be kept in mind that livestock is not synonymous with cattle in the West. In many Western states poultry raising is the dominant form of livestock production. For instance, in Arizona, the livestock work force is not primarily cowboys but chicken-raisers. Almost 80 percent of Arizona and California livestock marketings are not cattle or sheep. In Washington, Oregon, and Utah only about half of the livestock are cattle or sheep. In the eleven Western states, only 60 percent of the livestock activity is associated with cattle or sheep.

BLM_0079206

Table 2 shows that only about one dollar out of every $2,500 in income received in the eleven Western States is directly associated with grazing on federal lands. In employment terms, one out of every 2,000 jobs are directly tied to federal lands grazing. All grazing on federal lands, of course, is not threatened by changes in federal policy. Only some fraction is. Thus the impact of any change in federal grazing policy is only a fraction of these maximum impacts.

Thus, potential job and income losses can be expressed in terms of the time it would take for the economies to replace these jobs through the normal expansion of the economy. If economic growth since 1980 is taken as the reference point, the loss of all federal grazing would cause income growth in the eleven Western states to pause for six days. To make up for the lost jobs, economic growth would pause for a week and a half. That is, even the worst case scenario where all grazing on federal lands is eliminated, the income and job losses could be made up in a matter of a few days by the normal expansion of the economy.

# Who Depends upon Whom:
# The Increasing Reliance of Farm Families on the Non-Farm Economy

Cattle raising operations are increasingly made financially feasible only because operators and other family members have access to non-farm employment and income. Nationally, almost 80 percent of the income received by beef-raising operations comes from non-farm sources. [8] Table 3. The Census of Agriculture does not provide a state-by-state break down of the importance of non-farm income to cattle ranches, but it does provide this information for agriculture as a whole. Table 4 provides that information. For urban states like Utah, Nevada, and Oregon, off-farm income provides 67 to 80 percent of farm family income. In other states the importance of off-farm income is not as great but in general it provides the majority of farm family income.

This suggests that arguments about how urban economies really depend upon agricultural activity taking place on the rural landscape have the relationship reversed. It is not that towns depend upon agriculture but that agriculture increasingly depends upon the vitality of urban and non-agricultural rural economies to provide the non-farm income that keeps the farm operations alive. Agriculture is a subsidiary activity supported by the vitality of the non-agricultural economy. It is the growth in non-basic jobs and income during the last decade that has kept the agricultural sector from shrinking significantly. Not the other way around.

# Conclusion

Agriculture is not the mainstay of any of the Western states economies. Agriculture has continued to shrink in relative economic importance as the non-agricultural economy in the West has expanded briskly while the farm sector has fluctuated erratically but declined. This is not frightening news for the West. This is a characteristic of economic development. Our farms have been giving up their work force to non-farm activities for almost two centuries. It is the transfer of that labor force from a relatively low productivity undertaking to jobs of higher productivity that made possible our modern standard of living. What is happening in the West has happened in all other areas of the country.

Ranching, despite its colorful association with the old West is not a dominant part of the contemporary Western economies. Ranching directly provides less than a half of one percent of all of the income received by Westerners. Ranching on federal lands is responsible for even less economic activity: one out of every $2,500 of income received. Changes in federal grazing regulations would not eliminate all of this

federal lands grazing. Thus, the actual impact of federal grazing reform on Western economies will be minuscule. The impact is likely to represent a pause of a few days in the ongoing expansion of the Western economies. This is hardly a catastrophic economic impact. This very minor impact needs to be compared to the environmental impact of the current level of public land grazing.

Finally, in the West as elsewhere, our towns and cities are less and less dependent upon farm and ranch activity. Increasingly, the relationship is the other way around: It is expanding non-farm activities that provide farm and ranch families with the jobs and income that allow them to continue to pursue the farm and ranch lifestyle. It is urban life that makes farm life possible. This suggests a mutually productive relationship rather than an urban dependence on basic economic activity in rural areas.

# Endnotes.

1.  The Size and Role of Agriculture in Utah, Donald L. Snyder and W. Chris Lewis, Research Report 129, Utah Agricultural Experiment Station, Utah State University, Logan, Utah, October 1989.
2.  Measuring the Size of the U.S. Food and Fiber System, Agriculture Economic Report No. 566, Economic Research Service, U.S.D.A., Washington, D.C., March 1987.
3.  See Snyder and Lewis, op. cit., p. 19. 4.
4.  The percent of cattle feed coming from federal lands was taken from Table 5 in E. Bruce Godfrey and C. Arden Pope III, The Trouble with Livestock Grazing on Public Lands, in Current Issues in Rangeland Resource Economics, Oregon State University Extension Service, February, 1990, Special Report. The data is for the year 1988. The percent of forage from federal lands given by Godfrey and Pope are significantly lower than those estimated in a recent New Mexico study. Table 6 in The Importance of Public Lands to Livestock Production in the U.S., College of Agriculture. New Mexico State University, Range Improvement Task Force, Agricultural Experiment Station, Cooperative Extension Service, RITF Report 32, June, 1992. Most of this difference can be explained by the failure of the NMSU study to include all of the cattle inventory in its analysis. When the full cattle inventory reported by USDA NASS is included and their feed needs are weighted following the Forest Service An Analysis of the Range Forage Situation in the US: 1989-2040 (p. 49) the Godfrey and Pope results for 1985 can be largely reproduced for 1989.
5.  Grazing Fee Review and Evaluation Update of the 1986 Final Report, Report of the Secretaries of Agriculture and The Interior, April 30, 1992, Department of Agriculture, Forest Service, and Department of the Interior, Bureau of Land Management, P. 2. Note the distinction between forage requirements and feed requirements. Forage includes pasture, rangelands, and crop aftermath. Total feed, however, is likely to include fed hay and grain as well as forage. Since the cattle herd depends upon all sources of feed for survival and weight gain, the other sources of feed should not be ignored in calculating dependence of those cattle herds on federal grazing lands.
6.  The Importance of Public Lands to Livestock Production in the U.S., College of Agriculture, New Mexico State University, Range Improvement Task Force, Agricultural Experiment Station, cooperative Extension Service, RITF Report 32, June, 1992.
7.  The employment, income, and agricultural sales data came from the Regional Economic Information Service (REIS) CD-ROM, Bureau of Economic Analysis, U.S. Department of Commerce. It was assumed that the

percentage of total agricultural income and employment that was associated with livestock operations was directly proportional to the share of total agricultural marketings that is livestock. This probably over-states the relative importance of livestock operations. In calculating the relative importance of federal grazing as a source of income, the income data was deflated using the consumer price index and the average relative importance of agriculture for the period 1980-1991 was used rather than the latest year. For employment, the data for 1991 were used since agricultural employment fluctuates much less than agricultural income.

8.    1987 Census of Agriculture.

# TABLE 1

## Measuring Dependence on Federal Grazing

| State | % of Ranches "Dependent" on Federal Grazing | % of Feed from Federal Grazing | Percent Exaggeration "Dependent" |
|---|---|---|---|
| Arizona | 66% | 24% | 275% |
| California | 94% | 4% | 2350% |
| Colorado | 53% | 6% | 883% |
| Idaho | 97% | 14% | 693% |
| Montana | 43% | 7% | 614% |
| Nevada | 100% | 43% | 233% |
| New Mexico | 51% | 20% | 255% |
| Oregon | 74% | 11% | 673% |
| Utah | 99% | 24% | 413% |
| Washington | 45% | 2% | 2250% |
| Wyoming | 76% | 16% | 475% |
| 11 W. States | 69% | 12% | 575% |

"Dependent" = more than 5% of forage from federal grazing

Sources:

The Importance of Public Lands to Livestock Production in the U.S., RITF Report 32, New Mexico State Univ., 1992

The Trouble with Livestock Grazing on Public Lands, E.B. Godfrey and C.A. Pope III.

# TABLE 2

# Employment & Income from Federal Grazing

| | Arizona | Calif. | Colo. | Idaho | Mont. | NewMex | Nevada | Oregon | Utah | Wash. | Wyom | 11 West. States |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Employment** | | | | | | | | | | | | |
| Agricultural jobs as a % of total | 1.07% | 1.63% | 1.0% | 6.18% | 7.01% | 2.54% | 0.65% | 3.83% | 1.89% | 2.74% | 4.55% | 2.06% |
| Cattle & Sheep jobs as a % of total | 0.10% | 0.09% | 1.18% | 2.11% | 3.53% | 1.40% | 0.38% | 0.91% | 0.81% | 0.51% | 3.47% | 0.53% |
| Federal grazing jobs as a % of total | 0.11% | 0.00% | 0.07% | 0.30% | 0.25% | 0.28% | 0.16% | 0.10% | 0.19% | 0.01% | 0.56% | 0.06% |
| Days of normal job growth to replace ALL federal grazing jobs | 14 | 1 | 14 | 72 | 93 | 53 | 18 | 23 | 30 | 2 | *** | 11 |
| Federal Grazing Jobs | 2,132 | 603 | 1,456 | 1,636 | 1,085 | 2,129 | 1,228 | 1,630 | 1,805 | 291 | 1,503 | 17,989 |
| **Income** | | | | | | | | | | | | |
| Agricultural income as a % of total | 1.01% | 1.02% | 1.0% | 4.8% | 3.8% | 1.60% | 0.37% | 1.71% | 0.7% | 1.4% | 2.0% | 1.19% |
| Cattle & Sheep income as a % of total | 0.10% | 0.06% | 0.65% | 1.66% | 1.95% | 0.88% | 0.21% | 0.41% | 0.34% | 0.28% | 1.59% | 0.31% |
| Federal grazing income as a % of total | 0.11% | 0.00% | 0.04% | 0.23% | 0.14% | 0.18% | 0.09% | 0.04% | 0.08% | 0.01% | 0.25% | 0.04% |
| Days of normal income growth to replace ALL federal grazing jobs | 18 | 0 | 6 | 57 | 30 | 25 | 8 | 10 | 9 | 1 | *** | 6 |

## Source:

- Income and Employment: REIS CD-ROM, BEA, U.S. Dept. of Commerce. Incomes deflated using CPI.
- Employment impact based on 1991 data; income data base on average 1980-1991 data.
- Relative importance of federal grazing land for feed from Table 5 of Godfrey and Bruce, The Trouble with Livestock Grazing on Public Lands, in Current Issues in Rangeland Resource Economics, Oregon State University, Special Report, February, 1990.

# TABLE 3

# The Importance of Off-Farm Income
# Beef Cattle (except feedlots)

| | # of Farms | Income ($ bil.) |
|---|---|---|

| | | |
|---|---|---|
| Net Farm-Related Income | 626,366 | $4.2 |
| Off-Farm Income | 477,000 | $16.1 |
| non-farm jobs | | $9.8 |
| self-employment | | $1.3 |
| retirement | | $1.9 |
| interest & dividends | | $1.6 |

| | |
|---|---|
| Percent of Total Income from Farm Operations | 21% |
| Percent of total Income from Non-Farm Ops | 79% |

**Source: Census of Agriculture**

# TABLE 4

# The Importance of Off-Farm Income

| State | net cash farm-related income | | off-farm income | | |
|---|---|---|---|---|---|
| | # of farms | income (million $) | # of farms | income (millions $) | Off-Farm Income as % of On-Farm |
| Montana | 22,989 | $244 | 15,313 | $329 | 135% |
| Idaho | 22,586 | $377 | 16,765 | $439 | 116% |
| Wyoming | 7,776 | $136 | 5,612 | $157 | 116% |
| Colorado | 22,737 | $339 | 18,114 | $560 | 165% |
| New Mexico | 11,969 | $668 | 8,509 | $263 | 39% |
| Arizona | 5,346 | $248 | 3,498 | $206 | 83% |
| Utah | 13,750 | $117 | 10,669 | $343 | 294% |
| Nevada | 3,098 | $40 | 2,188 | $96 | 237% |
| Washington | 27,834 | $868 | 20,996 | $594 | 68% |
| Oregon | 28,744 | $159 | 22,636 | $788 | 497% |
| California | 72,791 | $1,861 | 53,330 | $2,551 | 136% |
| 11 W. States | 239,620 | $5,076 | 177,630 | $6,325 | 125% |

**Source: 1987 Census of Agriculture**

BLM_0079211

Effects of Drought on Rangelands

Water availability is probably the most important environmental factor affecting the growth and survival of range plants (Brown 1977). Water is required by plants for photosynthesis, nutrient transport, cell growth, and other important processes (Brown 1977). When water is not available in sufficient quantities, photosynthesis declines or stops. Because photosynthesis is the process by which the plant manufactures food, growth of roots and shoots ceases after photosynthesis stops, and the plant enters dormancy.

Roots make up over half of most range plants (Bedell 1992). Extensive and healthy root systems are essential even in an average year (Reece and others 1991). Roots function to securely anchor the plant and to absorb moisture and nutrients from the soil. They also store carbohydrates that were produced before photosynthesis stopped. These carbohydrate reserves are the sole energy sources for respiration during dormant periods and for initial growth of shoots and leaves when dormancy breaks. When one or more summer droughts occur, the reserves must be large enough to sustain the plant through the prolonged dormancy stage (Stern 1985, Briske and Richards 1994).

During winter dormant periods in years of normal rainfall, blue grama (Bouteloua gracilis) may lose over 50% of its root mass (Dormaar and others 1981). When drought extends the dormant period into what would normally be the growing season, more substantial root losses can occur (Reece 1991). Consequently, the

plant may have an impaired ability to extract soil moisture and be uprooted easily. In addition, short flushes of growth terminated by drought may deplete stored carbohydrates to the point that very small reserves exist to support initial growth after the drought ends (Reece 1991).

All of these factors can cause death to the plant, or at minimum, can result in reduced forage production during and after the drought (Reece 1991). Plants with shallow roots are affected much more than those with deep roots. Therefore, annual plant production may be severely decreased compared to non-drought years (Bedell 1992).

Drought can also affect the number of tillers produced by a grass. Reduced plant growth under drought conditions before grasses head may reduce or eliminate formation of buds, which are responsible for producing new tillers. This is another way that drought reduces forage production (Reece and others 1991).

Drought can cause dramatic shifts in plant species composition, and lead to an increase in non-native species, shrubs, annuals, and poisonous plants (Martin 1975, Panter and James 1987). Although deep-rooted perennials are relatively protected from drought, they can be killed if the drought is severe enough. The resulting bare ground and lack of competition for water and nutrients may provide ideal conditions for growth and establishment of unwanted species after the drought ends (Robinette 1992, Martin 1975).

Drought-induced plant death can have other implications to rangeland health as well. Reduction in vegetative ground cover

can lead to increased soil erosion, increased rainwater runoff, and decreased infiltration rates of water into the soil. All of these factors contribute to decreasing rangeland health and forage production (Young 1956, Pieper 1994).

RECOVERY

Drought causes long-term effects, and recovery is a long-term process. The most effective way to minimize the impacts of drought on rangeland health is through proper management before a drought occurs (Reece and others 1991). Ranges in good condition before a drought show less impacts and recover quicker after a drought than do ranges in poor condition (Bedell 1992, Lacey 1992, Young 1956).

During a drought, rangelands should be de-stocked, or at minimum, stocked at reduced numbers from pre-drought periods. Areas that previously sustained heavy grazing should be deferred from use to prevent further deterioration of rangeland health (Bedell 1992). The combination of drought and heavy grazing can cause severe reductions in forage production, plant vigor, and perennial plant cover (Reece and others 1991, Bedell 1992, Lacey 1992).

Sufficient rest after a drought is essential to full recovery. Re-stocking should not occur until the range has recovered (Lacey 1992). This may take two years after one year of drought, as the growth of many species (including perennial grasses) in the arid southwest is dependent on the previous year's precipitation as well from the current year's (Martin 1973, Cable 1975, Neff 1978). Other factors also support a minumum of two

BLM_0079214

years in recovery.  Grasses that spread by runners (for example, black grama) require two favorable growing seasons: one for new plants to get started, and the next for the plants to become rooted and firmly established as individuals.  Excessive trampling by livestock may break off runners before they become rooted (Campbell and Crafts 1956).

   Although the effects of drought may have dramatic implications to rangeland health, proper livestock management can mitigate some of the potential problems.  It is extremely important that we maintain proper stocking and utilization levels before, during, and after a drought.


Cara Staab, Wildlife Biologist

Chino Valley RD, Prescott National Forest

14 June 1996

BLM_0079215

LITERATURE CITED


Bedell, T. E.  1992.  Range management: dealing with drought. Cooperative Extension System Cattle Producer's Library CL560. Univ. Idaho, Moscow.


Briskie, D. and J. Richards.  1994.  Physiological responses of individual plants to grazing: current status and ecological significance.  Pages 147-176 in Ecological implications of livestock herbivory in the west.  Society for Range Management. Denver, Colo.  297pp.


Cable, D.  1975.  Influence of precipitation on perennial grass production in the semidesert southwest.  Ecology 56:981-986.


Campbell, R. and E. Crafts.  1956.  How to keep and increase black grama on southwestern ranges.  U.S. Dept. Agric. Leaflet No. 180.


Dormaar, J., S. Smoliak, and A. Johnston.  1981.  J. Range Manage. 34:62-64.


Lacey, J.  1992.  Tips for dealing with drought in range. Cooperative Extension System Cattle Producer's Library CL1110. Univ. Idaho, Moscow.


Martin, S. C.  1973.  Responses of semidesert grasses to seasonal rest.  J. Range Manage. 26:165-170.

_____. 1975. Ecology and management of southwestern semidesert grass-shrub ranges: the status of our knowledge. USDA Forest Service Research Paper RM-156. Fort Collins, Colo.

Neff, D. 1978. Effect of simulated use on the vigor of browse plants. Federal Aid in Wildlife Restoration Project W-78-R, Arizona Game and Fish Dept, Research Division.

Pieper, R. 1994. Ecological implications of livestock grazing. Pages 177-211 in Ecological implications of livestock herbivory in the west. Society for Range Management. Denver, Colo. 297pp.

Reece, P., J. Alexander III, and J. Johnson. 1991. Drought management on range and pastureland: a handbook for Nebraska and South Dakota. Nebraska Cooperative Extension E091-123.

Robinette, D. 1992. Lehmann lovegrass and drought in southern Arizona. Rangelands 14:100-103.

Stern, K. 1985. Introductory plant biology, third edition. W.C. Brown, Dubuque, IA.

Young, V. 1956. The Effect of the 1949-1954 drought on the ranges of Texas. J. Range Manage. 9:139-142.

BLM_0079217

# Valuation of Ecosystem Services of Rangeland Resources

**John B. Loomis**

**Department of Agricultural and Resource Economics, Colorado State University, Ft. Collins**

**Thomas C. Brown**
**Rocky Mountain Research Station, U.S. Forest Service Fort Collins, Colorado**

**John C. Bergstrom**

**Department of Agricultural and Applied Economics, University of Georgia, Athens**

BLM_0079218

# Popular books



1997

2000

2002

2003

BLM_0079219

# Our effort covers three facets of ecosystem services:

- **<u>Definition</u>**
  - (rangeland examples to general principles)
- Economic Valuation to Humans
- Provision & Revenue Capture

BLM_0079220

# Possible Ecosystem Goods and Services from Properly Managed Rangelands

| Ecosystem goods | Ecosystem services |
|---|---|
| Plants (livestock and wildlife forage, fuel) | Dispersal of seeds, Maintenance of plant biodiversity, Existence values for rare plants |
| Wildlife & fish (food, related products) | Maintenance of fauna biodiversity, fishing, hunting, viewing Existence values for rare fish/wildlife |
| | |
| Water flows | Mitigation of floods & droughts |
| | |
| Soil Conservation (w/proper mgmt) | |
| | Recreation opportunities (e.g., mtn biking) |
| | |

BLM_0079221

# An Ecosystem Service is

**A good or service flowing from an ecosystem that is of value to humans and occurs naturally**

$$E_j = r \; (N)$$

$E_j = j^{th}$ **ecosystem service**

$N =$ **natural capital (ecosystem structure)**

$r \;\; =$ **ecosystem function or process**

Example:

Instream flow = r (precipitation, terrain, soils, aquifers, biota)

BLM_0079222

# Relation of Ecosystem to the Human System



# Economic Valuation of ecosystem services

- **<u>Economic Valuation to Humans</u>**
  - **Ecosystem services have value to humans because they are:**
    - **SCARCE**
    - **PROVIDE UTILITY**
  - **Valuation Methods start with Utility**

BLM_0079224

# How Ecosystem Services provide Utility

$$U_i = u\left[ \mathbf{E}^1, \mathbf{Q}\left( \mathbf{E}^2, \mathbf{L}, \mathbf{K} \right) \right]$$

- U = utility to humans
- $E^1$ = ecosystem goods and services of direct utility (require no other inputs)
- $E^2$ = ecosystem goods and services requiring other inputs (labor and capital) for consumption
- L = labor
- K = built capital

# Economic Valuation of Ecosystem Services

- Definition
- <u>**Economic Valuation to Humans**</u>
  - Valuation Methods
    - Market: prices, charges
    - Production Function Approaches
      - Shadow price of unpriced natural capital in firms/ranchers production function
    - Replacement cost/cost saving:
      - built alternatives that may be more costly than protecting natural capital
    - non-market

BLM_0079226

# Examples of ecosystem G&S and substitutes

| Ecosystem stock | Ecosystem service | Substitute |
|---|---|---|
| *Renewable raw materials* | | |
| Animals | Harvestable wild elk | Domestic elk |
| | Range livestock | Pasture/Feedlot livestock |
| Plants | Wild plants | Cultivated plants |
| | | |
| Watershed | Soil water storage | Water reservoir |
| | Clean water | Clean water (via treatment) |
| | | |
| | | |

BLM_0079227

# Total Economic Value of Ecosystem Services:

# Use & Non Use



A, On-site, current use expenditures

B, On-site, current use consumer's surplus

C, Off-site, current use expenditures

D, Off-site, current use consumer's surplus

E, Off-site, future use expenditures

F, Off-site, future use consumer's surplus

G, On-site, future use expenditures

H, On-site, future use consumer's surplus

I, Non-use, existence activity expenditures

J, Non-use, existence activity consumer's surplus

BLM_0079228

# Techniques for Measuring Use Values of Ecosystem Services

- **Recreation Use Values:**
  - **Revealed Preference: Travel Cost Method of Estimating Recreation Demand**
  - **Maczko's dissertation applied TCM to estimate value of rangeland recreation using NVUM data**
  - **Stated Preference Contingent Valuation Method-Simulated Market**

BLM_0079229

# Shift in Demand Curve w/Improved Ecosystem Services (WQ, Fish)



BLM_0079230

# Techniques for Measuring Other Use Values of Ecosystem Services

**Residential Amenity Values**

  – House Price Differentials (Hedonic Property Method)

- **Other Ecosystem Service Values**

  – **Cost savings, contingent valuation method**

BLM_0079231

# Techniques for Measuring Total Economic Value & Non Use Values of Ecosystem Services

- **<u>Contingent Valuation Method</u>**
  - Survey of general public regarding whether they would vote to pay higher taxes or fees, or water bill or electric bill for maintaining or improving specific ecosystem services

BLM_0079232

# Elements of Contingent Valuation Method (CVM) For Measuring Total Economic Value

- **Describe the Ecosystem Services At Risk**
  - Maps, drawings, graphs, photos
- **WTP Question**
  - Would you Pay $X (per trip, per year) for Improvement
    - $X varies across the sample.

BLM_0079233

# Downward Sloping Willingness to Pay Function:
## Higher the Price, the less likely people will pay



BLM_0079234

# Techniques for Measuring Total Economic Value & Non Use Values of Ecosystem Services

- <u>Contingent Valuation Method</u>

- **<u>Choice Experiment/Conjoint Analysis</u>**
  - **Survey asking about multiple attribute trade-offs involving higher levels of higher ecosystem services for tax payment**

BLM_0079235

# Financing Provision of ecosystem services

- **Positive Net Economic Benefits (B>C) is a necessary condition for economically efficient provision**

- **Sufficient Condition is that public and private landowners are able to obtain funds/revenues to protect and continue to provide ecosystem services**

BLM_0079236

# Provision of ecosystem services is enabled by making people pay

- **<u>For ecosystem services that previously were  free:</u>**
  - buying conservation easements
  - buying open space
  - paying land owners to continue certain management practices
  - charging for recreation on public land
- **To offset the reduction in ecosystem services they used to affect without payment**
  - pollution taxes
  - permit trading
- **Markets are one way for people to pay**

BLM_0079237

# Necessary Conditions of market exchange

*Conditions that allow exchange*
>   Scarcity
>   Non-attenuated property rights
>>   Clear definition and precise measurement
>>   Consistent and reliable enforcement
>>   Excludability
>>   Transferability
>   Low transaction costs
>>   Ready market information
>>   Inexpensive measurement, monitoring, and enforcement

*Conditions that lead to a competitive market solution*
>   Many buyers and sellers
>   Lack of third-party environmental effects
>   Rivalness
>   Ample identical units
>   Perfect information

*Conditions that further improve the likelihood of exchange*
>   Perceived fairness of transactions
>   Institutions aiding exchange (e.g., customs, brokers, banks)

BLM_0079238

# Examples of ecosystem services by Rivalry & Exclusivity

| | **Exclusive** | **Nonexclusive** |
|---|---|---|
| **Rival** | •**PURE PRIVATE GOODS**<br>•**Renewable goods harvested from contained ecosystems**<br>•**Services the effects of which are contained within a property ownership** | •**COMMON PROPERTY**<br>•Renewable goods harvested from uncontained ecosystems (migratory)<br>• Downstream Services realized in the quality of rival goods (downstream water quality, viewscapes on nearyby houses)<br>• Natural animal & plant pest control & pollination |
| **Non-rival** | | •**PURE PUBLIC GOODS**<br>• **Temperature maintenance via carbon storage**<br>• **Biodiversity**<br>•**Natural water storage** |

BLM_0079239

# With Common Property & Public Goods Other Payment Mechanisms Besides Markets are Needed

BLM_0079240

## Provision and payment mechanisms for ecosystem goods and services

| | | Sellers | |
|---|---|---|---|
| | | **Individuals*** | **Governments** |
| **Buyers** | **Individuals*** | • Markets for privately-held ecosystem goods (e.g., timber, gems, fee hunting)<br>• Private land trust conservation easements (e.g., Nature Conservancy)<br>• Private environmental quality incentive payments (e.g., Perrier-Vittel, Trout Unlimited)<br>• Consumption-based donations (e.g., green certification, wind power rate premium, organically-grown coffee)<br>• Cap and trade markets (e.g., wetland credits, $SO_2$ credits, carbon seq.) | • Public goods and services financed by taxes (e.g., national parks, national forests, national wildlife refuges, county or city open space, conservation easements)<br>• Fees to government agencies for access to ecosystem goods (e.g., timber harvesting, mineral extraction, grazing)<br>• Fees (taxes or charges) for license to discharge (e.g., pollution taxes) |
| | **Govern-ments** | • Incentives to private parties for provision of ecosystem services (e.g., CRP, Wetlands Reserve Program, Grassland Reserve Program) | • Federal grants for environmental protection (e.g., U.S. EPA water quality protection grants to local governments) |

* Firms and NGOs are categorized as individuals.

BLM_0079241

# Ecosystem goods and services on public lands

| *A fee commonly is charged* | *A fee commonly is not charged* |
| --- | --- |
| Mineral and fossil fuel extraction | Watershed protection |
| Wood products (timber harvest, fuel wood gathering, Christmas tree cutting) | Wildfire suppression |
| Livestock grazing | Wildlife and fish habitat protection |
| Easements and rights of way (e.g., roads, dams, power lines) | Biodiversity of plants and animals |
| Developed recreation use (e.g., campgrounds) | Carbon sequestration |
| Access to national parks and monuments | Dispersed recreation on national forests |

BLM_0079242

**<u>Payment options on Public Lands:</u>**
**<u>1.</u>** Government Charges really need to reflect Fair Market Value as required by FLPMA
2. Charge for **<u>enhancements</u>** to existing ecosystem services
(e.g., fuels reduction, watershed protection)

BLM_0079243

# Questions?

BLM_0079244





# Caribou National Forest Riparian Grazing Implementation Guide Version 1-2

Riparian Process Paper
By R.L. Leffert
Forest Hydrologist, Caribou/Targhee National Forest
7/03/2002
Updated 12/28/2005



1

BLM_0079245

# Table of Contents

|  | Page |
|---|---|
| Introduction………………………………………………………. | 4 |
| Streamside Vegetation and Channel Morphology……………………….. | 6 |
| Grazing Strategies in Riparian Areas…………………………………. | 9 |
| Monitoring Parameters……………………………………………… | 12 |
| Stubble Height…………………………………………………... | 12 |
| Percent Plant Utilization…………………………………………… | 16 |
| Bank Disturbance………………………………………………….. | 19 |
| Soil Disturbance…………………………………………………… | 24 |
| Riparian Zone ground cover and plant utilization……………… | 27 |
| Factors and Techniques that Affect the Distribution Of Livestock and Resource Impacts…………………………………… | 30 |
| Table A – Management Practices and Expected Benefits……………… | 34 |
| Water Quality and Aquatic Habitat………………………………… | 36 |
| Table B - Grazing Strategies and Stream/Riparian Habitats…………… | 38 |
| Impact Guidelines…………………………………………………… | 39 |
| Goal……………………………………………………………… | 40 |
| Implementation…………………………………………………….. | 41 |
| Similarity………………………………………………………... | 41 |
| Resiliency………………………………………………………… | 42 |
| Table 1 – Greenline Key Species Forage Utilization……………... | 45 |
| Table 2 - Woody/Shrubby Species Utilization ……………………. | 45 |
| Table 3 –Greenline Stubble Height ………………………………… | 46 |
| Table 4 - Riparian Zone Soils Disturbance ………………………… | 46 |

BLM_0079246

**Table 5/5A - Bank Alteration/Stability….. ……………………………** **47**

**Table 6/6A – Riparian Zone Utilization and Stubble Heights……….** **48**

**Key to Determine Allowable Use Parameters…………………………........** **49**

**Figure 1 - Succession of States for Alluvial/Nongraded Valley Bottom Types .** **59**

**Ecological Status of Riparian Vegetation……………………………………** **60**

**Table 7 - Stream Channel Characteristics……………………………………** **61**

**Figure 2 - Rosgen Channel Classification Table………………………………...** **62**

**Table 8 - Riparian/Stream Channel Morphology Objectives……………….** **63**

**Monitoring………………………………………………………………………** **66**

**Field Guide for Measuring Riparian Area Impacts………………………..** **69**

**Streambank Alteration…………………………………………........** **72**

**Stubble Height……………………………………………………** **74**

**Forage Utilization…………………………………………………** **75**

**Willow Utilization…………………………………………………** **76**

**Woody Species Regeneration………………………………………** **77**

**Riparian Soil Disturbance………………………………………..** **78**

**Glossary…………………………………………………………………………** **80**

**References………………………………………………………………………** **83**

BLM_0079247

# Riparian Monitoring Parameters and Management Systems

## Introduction

Riparian areas are those lands adjacent to water bodies that are considered to be the transition between water bodies (aquatic systems) and uplands (terrestrial systems). They have distinct vegetation and soil characteristics that are influenced by high water tables or the presence of near-surface water. Riparian ecosystems are characterized by a combination of high species diversity and densities and high productivity. Continuous interactions occur between riparian, aquatic and adjacent terrestrial ecosystems through exchanges of energy, nutrients and species (Windell, *et al*, 1986).[1]

Stream systems develop a dynamic equilibrium with the variables of climate, geology, vegetation and surrounding land uses. Any change in any one of these variables can evoke an adjustment response in streams and their valleys (Fitch and Adams, 1998). Nelle (2004) found that a properly functioning creek, along with its riparian floodplain can help ameliorate and buffer irregular pulses of water over space and time and can help keep water more evenly distributed on the land longer. He stated that the essence of riparian function is to efficiently catch, store and release floodwaters, while capturing sediment and improving water quality. Even though these lands may make up a minor (1%-2%) portion of the landscape, they are important for a variety of reasons (Chaney, *et al* 1991, US GAO 1988). Vegetation found within these areas not only provides habitat for wildlife species but exercises important controls over physical and biological conditions and functions in the stream environment.

Vegetation acts as a roughness element that reduces the velocity and erosive energy of water flowing down the channel, reducing not only channel erosion, but assisting in reducing peak flow levels and improving low flows (Fitch and Adams, 1998). Riparian vegetation produces the bulk of the detritus that provides up to 90 percent of the organic matter and 99 percent of the energy necessary to support headwater stream communities. Large woody debris and other obstructions assist in the detention and concentration of organic matter locally, rather than being washed downstream, and serve as substrates for microbial and invertebrate organisms.

Riparian vegetation also provides shade that moderates water temperature fluctuations. The roots of trees, shrubs and herbaceous vegetation assist in stabilizing streambanks, provide cover for wildlife and act as a filter to reduce or prevent upslope sediment from entering the stream system (Kaufman *et al* 1984).

Cattle may spend from five to thirty times the amount of time in riparian areas as in adjacent xeric upland areas. Factors for this disproportionate time include: higher forage volume and relative palatability of riparian plant species; distance to available water; distance upslope to upland grazing sites; and microclimatic features (Clary & Webster 1989).

---

[1] In Mosley, Jeffrey C., Philip S. Cook, Amber J. Griffis, and Jay O'Laughlin, *Guidelines for Managing Cattle Grazing in Riparian Areas to Protect Water Quality: Review of Research and Best Management Practices Policy*, Report No. 15, Idaho Forest, Wildlife and Range Policy Analysis Group, University of Idaho, 1997, pg.6.

BLM_0079248

This is not to say that grazing is totally incompatible with riparian areas. In fact, proper grazing may co-exist with sustainable riparian systems (Larsen *et al* 1998; Elmore & Kauffman, 1994[2]; Buckhouse 2000; Armour, *et al*, 1994), or even in some cases is beneficial for plant density and vigor, which assists in stabilizing soil, slowing erosion and decreasing in-stream sediment (WDEQ 1997). Leonard *et al* (1997) also found that livestock grazing can be a compatible use in riparian areas when managed in harmony with land management objectives, and when the function, capability, and potential of the site and the needs of the riparian vegetation guide the development of the grazing management prescription.

For example, in a Kentucky bluegrass meadow peak production occurred after six years of rest then declined until production was similar to that in an adjacent area grazed season-long (Clary & Webster 1989). In other studies, removal of apical dominance in grass tillers caused more shoots to grow, resulting in a thickening of the grass stand (Mosley *et al* 1997). Hayes (1978)[3] found that in the absence of livestock utilization, species richness and species diversity decreased in dry and moist meadow communities. In "brittle" environments, especially those in low rainfall areas, Savory (1999) found that lack of grazing actually had a worse impact on some upland watersheds than grazing. Under certain circumstances he found the grassland vegetation either shifts toward woody vegetation and "weeds" or to algae and lichens if not grazed.

Laycock (1994)[4] suggested that many vegetation types on public lands are currently in a stable state condition and even if livestock were completely removed, overall watershed condition would change little. Green and Kauffman (1995) found that after ten years of non-grazing in dry meadows, bluegrass remained the most dominant species while the abundane of other species declined. In moist meadows, they found *Carex rostrata* to remain dominant, while other species declined.

However, literature suggests that if **excessive** disturbances are allowed to continue through improper management, detrimental impacts may outweigh benefits (Clary & Webster 1989). Mathews (1996) found that trout density and biomass per unit area were significantly higher in ungrazed than in grazed areas in three of four comparisons. She found that ungrazed areas consistently had greater canopy shading, stream depths and bankfull heights and smaller stream widths than grazed areas. Effects of adverse grazing impacts can be long lasting, requiring a channel system to evolve through an evolutionary process that may take a significant period of time (Rosgen 1996).

The effects of livestock grazing on riparian areas, including stream channel stability, aquatic habitat, and water quality, have been studied and documented by numerous authors. Most agree that livestock can and do have impacts if improperly managed and can adversely affect the general characteristics and functions of riparian areas (Chaney *et al* 1991; Fitch and Adams 1998). Belsky *et al* (1999) concluded there were no positive effects of grazing and, at best, grazing had neutral effects. He found that livestock grazing negatively affects water quality and seasonal quantity, stream channel morphology, hydrology, riparian zone soils,

---

[2] In Vavra, Martin, William A. Laycock and Red D. Pieper eds. 1994. Ecological Implications of Livestock Herbovory in the West. Society for Range Management, Denver, CO.
[3] In Green, DM. and Boone Kauffman. 1995. Succesion and livestock Grazing in a Northeastern Oregon Riparian Ecosystem. Journal of Range Management. 48:307-313.

---

[4] Ibid

BLM_0079249

instream and streambank vegetation, and aquatic and riparian wildlife.

Effects include:

- Higher stream temperatures from lack of sufficient streamside cover;
- Excessive sediment in the channel from bank and upland erosion;
- High coliform bacteria counts from upper watershed sources;
- Channel widening from hoof-caused bank sloughing and later erosion by water;
- Change in the form of the water column and the channel it flows in;
- Change, reduction or elimination of vegetation;
- Elimination of riparian areas by channel degradation and lowering of the water table;
- Gradual stream channel trenching or braiding depending on soils and substrate composition with concurrent replacement of riparian vegetation with more xeric plant species (Clary 1989).

In addition Winegar (1977)[5] found severe icing conditions existed on a stream in Oregon within a reach grazed by livestock, but observed only light channel icing conditions within an adjacent ungrazed reach containing ungrazed riparian vegetation. He also observed that streamflows in an ungrazed stream reach changed from ephemeral to perennial conditions. Similar changes in flow conditions from intermittent to perennial have also been observed in

Goodheart Creek, located on the Caribou National Forest after a reach was protected from grazing by fencing (Leffert, 2000).

EPA (1994) has also summarized grazing effects on riparian areas, as well as Chaney, *et al*, 1991; Myers (no date); Platts, *et al*, 1984, 1985 and 1991; Hall & Bryant 1995; and others.

Vegetation and ecosystem responses can be highly site-specific. No single formula or template can be used to anticipate or evaluate success or failure in all situations (Elmore & Kauffman 1994). The interacting factors that drive change, desired future vegetation and channel structure and condition, and how ungulates interact with the entire system should be the foundation of any practical grazing management strategy or restoration effort (Larsen *et al* 1998).

Riparian areas cannot be looked at as an entity in itself. A fundamental interdependence exists between upper watershed condition and riparian health and function (Chaney *et al* 1991; Elmore & Kauffman 1994)). Livestock grazing in the upland, for example, can increase soil compaction, decrease plant cover and soil surface litter that can reduce water infiltration capacities, which in turn, can increase overland flows and the volume of eroded material moving into riparian areas. Reduced conditions of the surrounding uplands may act to increase sediment-laden streamflows and increase stream erosive power, which can greatly impact riparian areas (Clary *et al* 1996a).

## Streamside Vegetation and Stream Morphology

Streamside vegetation serves many ecological roles. These include reducing surface water flows, increasing water

---

[5]In Platts, William S. and Fred J. Wagstaff, *Fencing to Control Livestock Grazing on Riparian Habitats Along Streams: Is it a Viable Alternative?* North American Journal of Fisheries Management 4:266-272, 1984.

BLM_0079250

infiltration, decreasing erosion, capturing sediments, moderating soil and water temperatures, moderating seasonal stream flows, and facilitating nutrient cycling and energy flows (McInnis 1997). Riparian vegetation can have a significant influence on the stability of certain stream types (Rosgen 1996).

For many stream channels, a combination of riparian vegetation with woody root systems, deep rooted grasses and other vegetation provides a physical barrier to the effects of high water velocities and stream energy, which can control channel shape and function (Fitch and Adams 1998). The controlling influence of riparian vegetation can vary from low to high, depending on the stream type. Changes in the composition, vigor, and density of riparian vegetation produce corresponding changes in rooting depth, rooting density, shading, water temperature, physical protection from bank erosion processes, terrestrial insect habitat and contribution of detritus to the channel.

Water quality and aesthetic values are also affected by changes in riparian vegetation (Rosgen 1996). Where excessive livestock impacts occur, there is often a lowering of the surrounding water table (Clary *et al* 1996).

Summer solar radiation accounts for about 95 percent of the heat input into Rocky Mountain streams during midday. The presence of streamside vegetation can substantially reduce the amount of solar radiation reaching a stream, which serves to moderate summertime stream temperatures. Conversely, the same streamside vegetation can act as an insulator and preserve wintertime heat. Clary, *et al,* (1997) observed thick buildups of anchor ice in a reach of an Oregon stream where streamside

vegetation was reduced by grazing, where an ungrazed reach had only light icing.[6]

The potential for change within a riparian system is related to the amount and kind of stress it receives. For example, a stream system with highly erodible banks has a high degree of potential natural stress. In this situation, management induced stresses (e.g. heavy livestock grazing) should be limited to avoid adjustments by the stream system into a lower or less stable successional state (McInnis 1997).

Indicators of stress include widening channel, channel downcutting, more than 10 percent eroding banks, increasing frequency of new streambars, noxious weeds or unvegetated streambanks, encroaching upland shrub species, lack of shrub and tree regeneration, and/or hedged shrubs (Harper *et al* 2000).

Conversely, stream morphology can have a direct influence on the type and densities of vegetation that may grow along a streambank. Knowing the stream type can assist in determining the potential succession of riparian vegetation communities (Overton *et al* 1995). The understanding of this interrelationship is critical to the proper management of livestock.

For example, when deep-rooted woody species are converted to shallower rooted grass/forb communities, the ability of plants to protect the bank from flow sheer stress changes, and a series of channel adjustments can take place. This can include an increase in sediment deposition, bank erosion, sediment supply, changes in channel shape, and channel slope, and decreases in meander

---

[6]In Platts, William S. and John N. Rinne, *Riparian and Stream Enhancement Management and Research in the Rocky Mountains*, North American Journal of Fisheries Management, Vol. 5, No. 2A, 1985.

BLM_0079251

length ratios and sinuosity. The resultant channel instability is often followed by a degradation of fish habitat (Rogsen 1996). Rosgen (1996) has described channel sensitivity to disturbance, recovery potential, streambank erosion potential and vegetation controlling influence by channel type (See Table 7, page 61)

Recent studies have indicated that the contribution of streambank erosion to total sediment yields has been greatly underestimated (Rosgen 1996). Rosgen (1996) identified five basic variables that influence the amount of potential bank erosion:

- Bank Height/Bankfull Height ratio;
- Root Depth/Bank Height ratio;
- Root Density;
- Bank Angle; and
- Surface Protection.

Of these five variables, three either directly or indirectly relate to the species and density of plants growing along the stream. Once a streambank begins to erode, two basic kinds of stream system adjustment responses occur in terms of erodibility characteristics: vertically and laterally (USDI 1990).

Vertically unstable streams will cut down causing an incised channel and lowered water tables. Henszey (1993)[7] explored the relationship of riparian plant communities to depth-to-groundwater. He found that the Wet Meadow type supported mostly a tall sedge plant community, where a Moist-Wet

Meadow type supported tall and short growing sedges and tufted hairgrass. A Moist meadow consisted of mostly tufted hairgrass and Kentucky bluegrass, where a Dry Meadow contained mostly bluegrass. All communities were flooded about the same, but the Moist-Wet, Moist and Dry Meadows had increasingly longer periods of sub-surface water below the rooting depth of the plants. This suggests that depth to groundwater, rate of drainage, and availability of water to plants may cause a change in plant species composition along stream channels as they evolve through a successional sequence from mature to degraded.

Laterally unstable streams will not cut down, because of a restriction, such as rock, but can expand laterally through bank erosion (McInnis 1997). Lateral migration rates of the stream channel can be accelerated when variables, such as vegetation, are altered, especially those variables affecting detachment of bank material and flow stresses in the near-bank region (Rosgen, 1996). Some channel types are naturally armored and have an inherent ability to resist erosion and corresponding channel adjustment (Rosgen 1996; Elmore & Kauffman 1994). Channels containing bedrock or boulder substrate are examples.

However, in most stream types, the ability of streambanks to resist erosion is determined by:

- The ratio of streambank height to bankfull stage;
- The ratio of riparian vegetation rooting depth to streambank height;
- The degree of rooting density; the composition of streambank materials;
- Streambank angle;
- Bank material; and

---

[7] In Heitschmidt, Rod, Kenneth D. Sanders, E. Lamar Smith, W.A. Laycock, G Allen Rasmussen, Quentin D. Skinner, Frederick C. Hall, Richard Lindenmuth, Larry W. Van Tassell, James W. Richardson, et. al., *Stubble Height and Utilization Measurements, Uses and Misuses*, Agricultural Experiment Station, Oregon State University, Station Bulletin 682, May, 1988.

8

BLM_0079252

- Bank surface protection afforded by debris and vegetation.

If any of these variables are altered, a corresponding adjustment in the channel may be initiated (Rosgen 1996). The response of a given channel to stress depends on the inherent level of resilience of the system and how much stress is placed on the system (Elmore & Kauffman 1994).

Several methods of rating riparian and channel condition, stability, and stress have been developed. These include: Channel Stability (Pfankuch) Evaluation and Stream Classification Summary (Level III) (Rosgen 1996); Bank Erosion Hazard Index (BEHI) (Rosgen 1996); and the Properly Functioning Condition assessment procedure (Prichard 1998). Table 8 (page 63) describes desirable channel features. These features are designed after INFISH Riparian Management Objectives (RMOs).

# Grazing Strategies in Riparian Areas

Stream channels, in association with adjacent riparian zones, adopt forms and modes of function that allow efficient transport of water and sediment (Leopold and Langbein, 1962).[8] Stream and channel form, in turn, contributes to the physical and biological makeup of the riparian system (Brussock, *et al*, 1985).[9] Channels continuously respond to changes in controlling factors such as

discharge, sediment delivery, or changes in channel bed and/or bank conditions (BLM 1990). Increased channel sediment reduces channel capacity, increases width/depth ratios and induces bank erosion and other instabilities. Alternatively, excessive water reaching a stream system without additional sediment loading can erode the channel bottoms, thus incising the channel (Clary *et al* 2000). These adjustments can be rapid or evolve over a long period of time. Adjustments can also be nominal or severe, depending on a variety of factors (BLM 1990).

Riparian areas should be managed within the context of the entire watershed. A balance exists between health, diversity and productivity of riparian communities and the watershed conditions where they are contained. All tributary effects accumulate to influence riparian health and stability. Upland watersheds in satisfactory condition absorb storm energies, provide stormflow regulation through the soil mantle and contribute stability to the entire watershed. In contrast watershed that have experienced past abuse often have developed channel systems, including gully networks, throughout the watershed in response to the increased surface flows. These gully networks cause rapid, concentrated surface runoff with increased peak flows and sediment loads. In general, small streams are more affected by hillslope activities than larger streams and, as adjacent slopes become steeper, the likelihood of disturbance from in-stream effects increases (Clary *et al* 2000).

In general, channel adjustments are characterized by either downcutting or widening. Excessive downcutting may not directly remove vegetation from the riparian zone, but may lower the water table, effectively de-watering the riparian zone,

---

[8] In Bureau of Land Management. 1990. *Riparian Management and Channel Evolution*, Course Number SS1737-2, Phoenix Training Center.
[9] Ibid

BLM_0079253

which effects the vegetation. A second scenario is channel widening, which can directly affect riparian vegetation through the loss of the channel bank and flood plain (Leffert 2000).

Throughout the western United States, deeply downcut channels are widespread and frequently occur in fine-grained, deep alluvial deposits where streambeds are unconstrained and non-resistant. These downcut channels result from either downstream base-level lowering or localized gullying initiated by changes in runoff rates or lowered resistance to erosion. Advancing gully systems may increase peak discharges, making the stream more efficient at scouring channel beds and banks (Wallace and Lane, 1976)[10]. Channel bed degradation produces a corresponding drop in the local water table, which imposes a subsequent water stress on the riparian vegetation (Groeneveld and Griepentrog 1985). A loss of riparian vegetation in turn lowers the resistance to flow, allowing higher flow velocities which increases scouring, which perpetuates the cycle (Schumm and Meyer 1979)[11].

In comparison, coarse alluvial channels or channels with structurally controlled beds tend to respond to direct riparian impacts by becoming wider and shallower with less-steep banks (Kauffman, *et al*, 1983, Duff 1977). In addition to providing poor aquatic habitat attributes (Kauffman & Krueger 1984), channels impacted by lateral scouring may become less capable of properly transporting high flows and may directly impact riparian areas through bank cutting or channel realignment during high flow periods. Riparian area problems caused by this type of channel condition are aggravated by increased in-stream sediment loads resulting from upstream erosion (Jackson

1984)[12] which may cause further channel adjustments, perpetuating the cycle.

Management options will vary depending on the type of channel adjustment (downcutting vs. channel widening). Deep, narrow downcut channels, especially those still active that have not reached a firm or resistant bed level, are the least responsive to various management options. Designed structures can be very expensive to install and the probability of improving the overall condition is minimal. Removing or reducing livestock impacts also provides minimal response. Once in this condition, the channel must be allowed to progress through the evolutionary process to the next phase or stage (BLM 1990; Rosgen 1996).

On the other hand, channels that have bed controls and adjust laterally tend to respond directly to riparian vegetation conditions. Stream banks and floodplains generally can be rehabilitated relatively rapidly, provided the water table has not been affected by excessive channel downcutting. In this scenario, elimination or reduction of livestock grazing in the riparian zone generally results in quick recovery (Platts and Rinne 1985). The need to understand the cause of stream/riparian degradation, and work with the natural recovery process operating in a stream system needs to be emphasized (Cairns, *et al*, 1979)[13].

Rehabilitation should emphasize establishing the physical and biological conditions that favor rapid recovery by natural processes. Stream systems undergoing major channel adjustments should not be treated with extensive habitat improvements until the channel has reached a new dynamic equilibrium (BLM 1990). Dynamic

---

[10] In BLM 1990
[11] Ibid

[12] Ibid
[13] Ibid

BLM_0079254

equilibrium has been described by Rosgen (1996), Prichard (1998), and others.

For example, Magilligan and McDowell investigated four gravel-bedded, steep alluvial streams in eastern Oregon, with cattle exclosures greater than 14 years old. Results indicated that significant changes occurred, with reductions in bankfull dimensions and increases in pool area being the most common and identifiable changes. At the four sites, bankfull widths narrowed by 10% to 20%, and the percentage of the channel area occupied by pools increased by 8% to 15%. Increase in pool area was offset by a reduction in the percent glide area. However, they also stated that not all channel properties demonstrated adjustment, indicating that not all variables may show a significant change in that time period. Platts and Nelson (no date) noted a substantial difference in stream morphology between grazed and ungrazed pastures, as did Clifton (no date). Platts and Nelson (no date) also noted channel improvements were observed after 4 years of removing livestock from the pasture. Kondolf (1993) noted that channel adjustment to grazing pressure may lag behind plant changes because of the time required to erode and deposit sediment along the banks of a stream channel.

Strategies for grazing in riparian areas vary somewhat between authors, but most have a common theme. These themes include: Limit grazing intensity, frequency, and/or season of use, thereby providing sufficient rest to encourage plant vigor, regrowth and energy storage and minimize compaction of soil; control the timing of grazing to prevent damage to streambanks when they are most vulnerable to trampling; and ensure sufficient vegetation during periods of high flow to protect streambanks, dissipate energy and trap sediments (Leonard *et al* 1997; Platts &

Nelson 1985; Ehrhart & Hansen 1998; Chaney, *et al*, 1991; Mosley, *et al*, 1997).

Reduction or elimination of negative livestock impacts to streambanks within western riparian zones requires an understanding of the interaction between climatic patterns, riparian zone soils and livestock behavior (Marlow 1987). Before a specific grazing strategy is implemented in response to an observed channel condition, several items must be known to properly apply the most beneficial and cost/effective management approach. Normal channel adjustments associated with water/sediment processes may actually serve to enhance or rejuvenate riparian conditions. Excessive adjustments, however, associated with rapid responses to changes may temporarily or permanently impair normal stream channel and riparian conditions (BLM 1990). Management responses or strategies in turn require: a) a description or classification of riparian area degradation; and b) an identification of the cause(s) of impaired riparian conditions (BLM 1990).

Passive, continuous grazing rarely improves deteriorated riparian areas or maintains riparian areas in good condition. Grazing must provide an adequate cover and height of vegetation on streambanks and overflow zones to promote natural stream functions (sediment filtering, bank stability, aquifer recharge and water storage) (Leonard, *et al*, 1997).

Platts (1991)[14] highlights three major considerations for maintaining or restoring riparian areas. First, grazing management must consider the needs of those plant species that establish riparian function.

---

[14] In Meehan 1991. Influences of Forest and Rangeland Management on Salmonid Fishes and their Habitats. AFS Spec. Publ. 19, Bethesda, MD. p. 289-423

BLM_0079255

Species with deep fibrous roots provide sod mats, plant diversity provides multi-layered vegetation cover, and woody species provide roots and large woody debris.  Second, there must be adequate plant cover and residue to attenuate high flows.  Third, protection from grazing is required during vulnerable periods when banks are saturated and easily damaged or in autumn when woody species are most vulnerable to browsing.

Perry (2005) suggested several ways to manage livestock impacts within riparian areas.  He emphasized that fencing must remain as a possible alternative, but it should be the **last** choice, after every other management option has been considered.  Other options include:

- Develop off-stream watering in as many places as possible.
- Create "hardened crossings" where there are steep banks which are vulnerable to livestock damage, or during muddy conditions.
- Provide culverts or bridges as an easy way for cattle to cross a stream without needing to ford the stream.
- On wooded or densely brushed streams, a physical barrier made up of felled trees or logs may work in places where animals are causing damage.
- Graze in the spring in areas susceptible to bank damage.
- Locate salt and nutrient blocks well away from the riparian zone.
- Riding to move animals away from water, works well in many cases.
- Burn, mow or intensively graze or in some other way remove some old, un-grazed forage on suitable sites away from streams, making palatable re-growth more accessible.
- Remove animals from the herd that habitually hang in the riparian zone,

and conversely, keep older animals that do not.

Davison & Newfield (2005) suggested that constructing off-riparian shade structures in rangelands lacking shade would also assist in reducing livestock impacts in riparian zones.

## Monitoring Parameters

In order to assess the condition and use of riparian areas by livestock and other users and impacts, various authors have suggested several parameters that could be effectively monitored.  Stocking rates, percent utilization of plants and stubble heights have all been used to describe grazing intensity.  Each measurement has its purpose, benefits, and shortcomings (Mosley *et al* 1997).  Rosgen (1996) and others have suggested other parameters, such as bank stability and soil disturbance.  The following section details the most popular parameters.

### *Stubble Height*

The height of grassy and herbaceous vegetation on a site has been termed "stubble height" (Heitschmidt *et al* 1998).  Stubble height is a surrogate for plant vigor and streambank and riparian protection/rebuilding capabilities.  It is not only a way to measure utilization by grazing, but it also has value in evaluating how well vegetation and grazing management meets channel stability goals and objectives.  Several researchers have advocated specific residual stubble heights following grazing to maintain plant vigor and protect or improve stream banks (Heitschmidt *et al* 1998).

Plant growth occurs from meristematic tissue.  The growing points of grasses are located in the crown of the plant close to the ground, until the culm elongates to produce a seedhead.  During the seedhead stage, the growing point is elevated and is exposed to

BLM_0079256

grazing animals. When a grass is grazed without removing the growing point, leaf growth will continue so long as there is adequate soil moisture and nutrients. When grazing removes the growing point, growth of that tiller stops and the plant must begin growth from a new bud. Development of these tillers will be slower than ungrazed tillers. Growth, form, palatability and vigor of these tillers may be different between grazed and ungrazed plants.

Some grasses, such as Kentucky bluegrass do not elevate their growing points until just before the reproductive phase. These plants are more resistant to close grazing than other species that elevate their growing point earlier in their development (McInnis 1997). As a result, different plants may require different grazing strategies to maintain plant health and vigor (Marlow 2001).

Plant vigor can be measured or evaluated in many different ways. One common way is to measure the change in the relationship or the ratio of underground biomass to above-ground biomass over time. Studies show that grazing can alter above-ground biomass to such an extent that undergound biomass is reduced. Not only is the photosynthesizing capacity of the plant diminished, but the carbohydrate root reserves that support growth and regrowth are reduced. Research offers strong support for measuring stubble height to monitor grazing effects on plant vigor (Heitschmidt *et al* 1998).

Clary & Webster (1989) recommended that a minimum herbage stubble height be present on all streamside areas at the end of the growing season, or at the end of the grazing season if grazing occurs after frost in the fall, to maintain plant vigor and health. They suggest residual stubble or regrowth should be at least four to six inches to provide sufficient herbaceous forage biomass to meet the requirements of plant vigor maintenance, bank protection and sediment entrapment. The stubble height criterion should be adhered to regardless of the grazing system used (Clary & Webster 1989). Clary & Webster (1995) suggested that a stubble height of ten centimeters (four inches), or about 30 percent utilization, appears to be required to ensure full biomass production in high mountain meadow (greater than 1,900 meters) sedge communities.[15]

Clary (1999) found that most measurements of streamside variables moved closer to those beneficial for salmonid fisheries when pastures were grazed to a ten centimeter (four inches) graminoid stubble height, while virtually all measurements improved when pastures were grazed to fourteen centimeters (six inches) stubble height.

The Rocky Mountain Region, Watershed Conservation Handbook, (September 1996) advocates removal of livestock from riparian areas when average stubble height on key species reaches four inches in early-use pastures and six inches or more in late-use pastures. Hockett and Roscoe (1993) advocate greenline end-of-season stubble heights of at least twenty centimeters (eight inches) and ten to fifteen centimeters (four to six inches) for riverine systems of high to low sensitivity levels, respectively, and more than 75 percent and 35-50 percent of ungrazed plant height for high and low sensitivity level palustrine systems,

---

[15]In Clary, WP, *Vegetation and soil responses to grazing simulation on riparian meadows*, J. Range Management 48, 18-25, 1995; in USDI, BLM, List of References on the Use of Utilization Guidelines and on the Effects of Lower Stocking Rates on the Recovery of Rangelands, 17 September, 1997.

BLM_0079257

respectively, in southwest Montana that are designed to comply with State of Montana water quality standards.

Caution should be used when working with different plant communities. Existing Forest Service guidelines (Clary & Webster 1989) are based largely on minimum stubble heights in communities dominated by Kentucky bluegrass. If the riparian area is dominated by taller grass species, like timothy, mountain brome, streambank wheatgrass, tufted hairgrass, fowl Mannagrass for fowl bluegrass, adherence to the recommended stubble heights will lead to 80 percent or more utilization. In these situations, eight to nine-inch stubble heights equate to about 50 percent utilization (Marlow 2001).

If the channel has been degraded and streambanks need to be rebuilt, a key element for the restoration process is the entrapment and retention of sediment at or below bank top. Sediment deposition in a degraded stream system is an essential building material for the natural recovery of channel form (Clary *et al* 1996). Streambank vegetation has been shown to increase channel roughness. Increased channel roughness, in turn, dissipates energy and promotes sediment deposition (Heitschmidt *et al* 1998). Total sediment retention appears to be at or near maximum for flexible stubble heights up to six inches during the depositional phase (when sediment is being deposited) of the hydrograph, although longer length vegetation appears to retain a larger portion of the sediment deposited during the flushing phase (when sediments are being flushed through the system) of the hydrograph (Clary *et al* 1996).

In addition to the physical attributes of stubble height, palatability of vegetation species also changes as stubble height is lowered. Because of their preferred eating habits, cattle prefer vegetation greater than three inches high. As stubble heights are grazed below three inches for the most palatable species, vegetation preference will change, forcing cattle onto less desirable areas or eating less desirable species, such as changing from grass to sedges to shrubs (Hall & Bryant 1995).

Other researchers found a shift in preference from herbaceous vegetation to shrubs below a stubble height of four to six inches, or about 45 percent utilization. Stubble heights below two to four inches induced excessive browsing of willows (Mosley *et al* 1997, Pelster *et al* in press). This in turn can influence the vigor and distribution of riparian vegetation, which in turn can directly affect channel stability. Therefore, stubble height not only has a direct correlation to physical channel stabilizing attributes but reflects a point at which livestock may change from consuming grassy and herbaceous species to other species such as sedges and willows. This switch may not be preferable in relation to channel maintenance features, water quality and/or fisheries habitat (Hall & Bryant 1995).

Platts (1991)[16] suggests that trees, brush, grasses and forbs each play an important role in building and maintaining productive stream ecosystems. Grasses and grass-like plants, especially sod-forming types, help build and bind bank materials, and reduce erosion. As well-sodded banks erode, they create the undercuts important as hiding cover for fish. Even though he does not suggest specific stubble heights, he emphasizes the importance of streamside

---

[16]In Meehan, William R., *Influences of Forest and Rangeland Management on Salmonid Fishes and Their Habitats*, American Fisheries Society Special Publication 19, Bethesda, MD, 1991

BLM_0079258

vegetation for cover. This suggests that one-inch or even six-inch stubble heights may not be enough to provide needed protection, but longer stubble heights that bend over the bank may be needed for cover and protection as well as provide thermal moderation in smaller streams.

In 2004, the University of Idaho issued "Stubble Height Study Report". In responding to requests of both the Forest Service and Bureau of Land Management, the University put together a team to review the use of stubble height and make recommendations on its use. The 33 page report thoroughly examined 10 questions: 1) What agency objectives are we trying to achieve with stubble height? 2) What is the appropriate use of stubble height? 3) How are the agencies in fact using it? 4) What are the limitations of its use? 5) How appropriate is it to use to address annual long-term management strategies? 6) What additional research might be needed, if any, to affirm or refine this measure? 7) What other measures might be used in its place? 8) What other measures might be needed to achieve management objectives in riparian areas? 9) How much rest or change in management is needed when stubble height objectives are not met? and 10) Can we adjust the stubble height objective if a grazing management system is in place? Conclusions of the report are as complex as the questions.

## Conclusion

Stubble height appears to be an appropriate parameter to monitor potential effects on plant vigor, bank stability and regeneration, and movement of livestock to other plant types and species. Maintaining a minimum stubble height helps preserve forage plant vigor, retain sufficient forage to reduce cattle browsing of willows, stabilize sediments, indirectly limit streambank trampling, maintain cattle gains and provide an easily communicated management criterion (Clary and Leininger 2000).

It appears that stubble heights less than two to three inches is an indicator of detrimental effects to plant vigor, movement to other plant species, bank stability and bank building. Maintenance of plant vigor, which includes roots, is extremely important for bank stability. High elevation (greater than 1,900 meters) mountain meadow sedge communities appear to require at least four inches residual to ensure full biomass production. Other species at lower elevations with longer growing seasons could withstand clipping down to two inches and still maintain vigor depending on the regrowth from the end of the grazing period to the end of the growing season. Changes in palatability and preference begin to appear below six inches and appears to be profound below two inches. Clary and Leininger (2000) recommend a four-inch stubble height be a minimum starting point. Monitoring should be conducted to determine if adjustments are needed.

Bank sediment holding capacity is diminished below two inches and maximized during the sediment deposition phase of the hydrograph at six inches. Therefore, two inches appears be an absolute minimum allowable stubble height under any circumstances, no matter what the channel type or overall riparian condition. For most applications, four to six inches residual appears to be all that is necessary to maintain bank-building process and reduce livestock migration to less palatable species. As a result, a range in stubble heights between two inches and six inches appears to be appropriate to maintain bank stability, plant vigor and riparian plant integrity, with a medium range of four to six inches being appropriate for most circumstances.

BLM_0079259

However, Clary and Leininger (2000) also found that stubble heights may have little application where streambanks are naturally stabilized by coarse substrates, or where the channels are deeply incised.

In some situations, such as fish cover, water quality protection and thermal moderation, stubble heights in excess of six inches may be needed. This may be especially important along smaller or non-forest streams where overhead shrub and tree cover may be lacking. Hockett and Roscoe (1993) appeared to recognize this and advocated an end-of-season stubble height of at least eight inches on sensitive streams.

Stubble height is NOT an appropriate performance standard to be used as a management standard as a desired condition, end-point or trend. It can be used, however, as a guideline or indicator for evaluating and/or changing annual management in Annual Operating Instructions. Stubble height is appropriately used as a short-term indicator of grazing effects on meeting long-term riparian management objectives, such as channel stability or vegetation composition. Stubble height criteria can vary depending upon local environmental variables, condition and trend of the stream, species composition on the greenline and the season, frequency and duration of livestock use. Stubble height criteria not only can but should be adjusted through adaptive management, based on riparian conditions and trend (University of Idaho 2004).

### Percent Plant Utilization

The impact of grazing on plant communities may be estimated in two ways: by estimating the height of vegetation that remains after grazing (stubble height), or by the amount of vegetation that has been consumed (utilization) (Heitschmidt *et al* 1998). Some authors argue that individual plants differ in physiology and have different inherent growing heights. For example, 35 percent utilization might result in a 5-inch stubble height for Agsp (bluebunch wheatgrass), a 2-inch stubble height for Feid (Idaho fescue) and Pose (sandberg bluegrass), and a 2.5-inch stubble height for Koer (junegrass) (USDA 1999). A 50 percent utilization of taller grasses like timothy, mountain brome, streambank wheatgrass, etc. will equate to an eight- to nine-inch stubble height (Marlow 2001). Further, during some seasons or periods with low moisture levels, some plants may not achieve a specific stubble height. Therefore, in these situations, the percent of the plant used may be a better indicator of use than the physical height of the plant remaining (Clary & Webster 1989) unless specific on-site correlations can be made.

Determining percent utilization can be a time-consuming process and subject to error, depending on a variety of factors. By definition, measuring utilization requires knowing the total production for the year for the species in question. This requirement makes a true measurement of utilization difficult. Total yearly production cannot be effectively measured before the end of the growing season. The best that can be done in a one-time effort prior to that time is to estimate peak standing crop of current-year production. Measurement before the point of peak standing crop results in a low estimate of total biomass, because annual production has not been completed. Low estimates can occur after peak growth due to losses from weathering, insects and decay (Heitschmidt *et al* 1998). Because of these factors, it is difficult for the manager to use percent utilization as an accurate and effective tool during the growing season to indicate allowable conditions have been achieved and livestock should be moved.

BLM_0079260

Nevertheless, some researchers and authors have suggested specific utilization standards. Clary & Webster (1989) suggested a maximum utilization of riparian herbaceous vegetation during spring, summer and fall grazing periods not to exceed 65 percent, 40-50 percent, and 30 percent respectively, within riparian pastures in good to high ecological status. Clary & Webster (1995) also found that if utilization guidelines are used, those rates that do not exceed 30 percent of the annual biomass production in mountain meadow sedge communities will likely maintain production the following year. Clary (1999) found that light grazing (20-25 percent) utilization, and medium grazing (35-50 percent) during late June, improved stream channel width/depth ratios and channel bottom embeddedness over conditions resulting from past traditional heavier use rates. The Rocky Mountain Region's (R-2) Water Conservation Practices Handbook advocates a maximum use of 40-45 percent of annual production in riparian areas (USDA 1996). Hockett and Roscoe (1993) advocate allowable utilization levels of less than 30-45 percent along high sensitivity streams, lakes and wetlands and 45-60 percent utilization along moderate and low sensitivity waterbodies. Fitch and Adams (1998) state that recommended utilization levels reviewed in literature tend to fall in the range of 25-65 percent, but levels should be set to maintain herbaceous productivity, leave adequate protective cover during high runoff periods to protect banks, filter or trap sediment and dissipate stream energy. Clary (1999) equated light grazing to 20-25 percent utilization and medium intensity grazing to 35-50 percent utilization during late June. Both the light and moderate grazing intensities resulted in improved riparian and stream channel conditions that resulted from past heavy grazing.

Upland utilization levels have been well documented. For example, Beale (1984) tested the effects of various sheep utilization levels on animal production per unit area in semi-arid rangelands west of Queensland, Australia. They found the optimum utilization rate appeared to be about 30 percent. Gray (1968) concluded that net returns on rangelands are highest when the grazing rate is moderate (30-50 percent). Holechek (1988) summarized acceptable stocking rates as those that resulted in utilization of 30-40 percent within semi-desert grasslands and shrublands, coniferous forests, mountain shrublands and oak woodlands.

Higher utilization levels can be allowed on ranges in good condition, while lower utilization levels should be used on poorer rangeland conditions. Holechek (1994)[17] suggested that moderate (40-45 percent) utilization appears more profitable and less risky than heavy (60-65 percent) on shortgrass ranges in New Mexico. Houston (1966)[18] concluded that utilization of both western wheatgrass and needle-and-thread grass should not exceed 33-37 percent by weight for optimum productivity. Hyder (1951)[19] argued for utilization levels of 30-40 percent for most sagebrush-grass rangelands. Johnson (1953)[20] found that average herbage production decreased with heavy grazing (greater than 50 percent), while production increased with light to moderate grazing (less than 40 percent) in central Colorado. Klipple

---

[17] In Willoughby, John, Letter and enclosed *List of References of Utilization Guidelines and on the Effects of Lower Stocking Rates on the Recovery of Rangelands*, to Dr. Jerry Holechek, College of Agriculture and Home Economics, Department of Animal and Range Sciences, Las Cruces, NM, USDI, BLM, Sacramento, CA., Sept. 25, 1997.
[18] Ibid
[19] Ibid
[20] Ibid

BLM_0079261

(1960)[21] concluded that 60 percent utilization was too heavy, either for maintaining satisfactory range condition or making best gains by the cattle, while 40 percent utilization maintained or improved range condition and maintained the cattle in thrifty condition. Vallentine (1990)[22] suggested proper use of 35-45 percent for western mountain grasslands, shrublands and coniferous forests. Holechek (1988) found percent use of key species for moderate grazing ranges between 30-40 percent in semidesert grass and shrublands, sagebrush grasslands, coniferous forests, mountain shrublands, and oak woodlands. He also suggests a percent reduction of grazing capacity based on slope. For example, slopes ranging from 31-60 percent should have grazing capacity reduced by 60 percent. Lacey (1988) suggested most plants can maintain vigor if no more than 30-50 percent of their growth is removed during the growing season. Although plants may tolerate 60-65 percent utilization during non-growth periods, sufficient litter and stubble must be left to reduce evaporation, protect growth buds, catch snow, protect plant crowns from freezing and retard soil erosion. He suggests overall range condition will usually improve or be maintained under a moderate (31-60 percent) degree of grazing use.

Several authors have described the relationship between stubble height and percent utilization. Clary & Webster (1989) described an approximate relationship between percentage utilization and stubble height of riparian graminoids based on a 1988 study from the Stanley Creek (mountain meadow ecosystem) and Pole Creek (sagebrush ecosystem) studies. These data suggest that average utilization levels of 24-32 percent were obtained when riparian

---

[21] Ibid
[22] Ibid

graminoids were grazed to a six-inch stubble height, use levels of 37 to 44 percent equated to a four-inch stubble height, and use levels of 47-51 percent were obtained at a three-inch stubble height. Heitschmidt, *et al*, (1998) found that 50 percent utilization of Kentucky bluegrass, tufted hairgrass and Nebraska sedge equated to 3 inches, 2 inches and 6 inches respectively.

The reason for the differences is the physiology of the plants. Herbage weight of leaves and shoots of Nebraska sedge is somewhat evenly distributed from the plant's crown to its top. In contrast, most herbage weight of Kentucky bluegrass and tufted hairgrass is near the ground surface as leaves and only a small portion of the overall biomass is elevated as stems and flowers. Forest Service Handbook 2209.21 (1993) describes average utilization levels of riparian graminoids of 24-32 percent equated to a six-inch stubble height, 37-44 percent equates to a four-inch stubble height, and 47-51 percent equates to a three-inch stubble height.

## Conclusion

Percent utilization, as stubble height, is a surrogate for plant vigor and streambank protection/rebuilding capabilities. The inherent difficulties of measuring percent utilization aside, the literature appears to support utilization rates less than 50 percent for most riparian herbaceous vegetation types in most climatic and geographic areas. The better the range site condition, the more allowable utilization. Acceptable utilization rates appear to be somewhat higher across-the-board in riparian areas than on some upland ranges, primarily because of the available moisture that supports regrowth. In riparian areas, because of the increased

BLM_0079262

moisture levels, it appears that utilization rates can be adjusted by season of use (early, mid, late) that allows for plant regrowth potential following use. Clary & Webster (1989) suggested a maximum utilization of spring, summer and fall grazing periods not to exceed 65 percent, 40-50 percent, and 30 percent respectively, within riparian pastures in good to high ecological status.   He does not specifically suggest any use rates for areas in less than acceptable condition, other than citing other researchers such as Ratliff.

Ratlif, *et al*, (1987) suggested utilization rates for site protection should be 35-45 percent on excellent condition meadows, down to 20-30 percent on poor condition meadows (condition descriptions for 'excellent' and 'poor' are undefined).  Hockett and Roscoe (1993) suggested utilization levels between 30 percent and 60 percent, depending on the system and sensitivity level. Clary (1999) suggested that riparian and stream condition improved with light to moderate utilization with levels ranging from 20-50 percent. Burkhardt (1997), suggested that proper season of use and just plain rest are far more effective for dealing with most riparian grazing problems than are utilization use limits.

Several authors have described the relationship between percent utilization and stubble height.  The relationship between percent utilization and stubble height shows continuity between recommendations of 30-50 percent utilization and recommendations of leaving three to six inches stubble height for maintenance of plant vigor.

For example, Kovalchik, *et al* (1992)[23] equated 45 percent riparian herbaceous vegetation utilization to four- to six-inch stubble height, and two to four inches to 65 percent utilization.  Schmutz (1978) described the relationship between southwestern upland species using photographic guides to compare portions of plant remaining to percent utilization.  Lacey (1988) also evaluated upland range grass stubble height to percent utilization.  Forty-five percent utilization (moderate use) had corresponding stubble heights ranging from two inches (Blue grama) to nine inches (Indian Ricegrass), depending on the species and site.  However, most evaluated species had corresponding moderate use stubble heights in the five-inch to six-inch range.  As is the situation with stubble height, it should be used as a short-term indicator, not as an end-point, condition or trend.

## Bank Disturbance (Alteration) and Stability

The cornerstone for proper stream function is stability (Kaufman 1984; Marcuson 1977; Platts *et al* 1983).  Various stream types have different inherent channel stabilities which must be considered when determining potential effects of livestock grazing or any other uses or activities on water quality or aquatic habitat (Rosgen 1996).  Consideration must not only be given to damage potential but to the recovery potential of affected channels.  Overgrazing can cause bank slough-off creating false setback banks and accelerated sedimentation

---

[23] In Mosley, Jeffrey C., Philip S. Cook, Amber J. Griffis, and Jay O'Laughlin, *Guidelines for Managing Cattle Grazing in Riparian Areas to Protect Water Quality: Review of Research and Best Management Practices Policy*, Report No. 15, Idaho Forest, Wildlife and Range Policy Analysis Group, University of Idaho, 1997.

BLM_0079263

and subsequent silt degradation of spawning and food producing areas. This can result in decreased fish biomass and percent of salmonid fishes in the total fish composition (Kaufman, *et al* 1984, Platts 1990).

Myers and Swanson (1992) found that bank damage from ungulates had different effects on different stream types and even on different parts of their cross-sections. Vegetation is more important for stability on certain stream types than on other types. Streams with non-cohesive sand and gravel banks are most sensitive to livestock grazing. They concluded that range managers should consider the stream type when setting local standards, writing management objectives or determining riparian grazing strategies.

High forage removal, high amounts of foraging time along banks, and heavy uses of palatable sedges along the bank have been shown to significantly increase the probability of bank slough-off occurring during the grazing season (Kaufman *et al* 1984). Duff (1979)[24] found the stream channel width in a grazed area was 173 percent greater than the stream channel not grazed for eight years.

Platts & Rinne (1985) found that streamside grazing probably does as much or more damage through bank alteration than through changes in vegetative biomass. Further, he suggested that bank conditions do not improve during a single rest period, but rather, regrowth of vegetation tends to mask unstable reaches. He found that prolonged use of streamside vegetation not only will alter a bank but will also retard the rehabilitation of previously altered banks.

Similar conclusions have been reported by other authors, where overgrazing and excessive trampling caused a decrease in bank undercuts, increases in channel widths, and a general degradation of fish habitat (Kaufman *et al* 1984). For example, VanVelson (1979)[25] found rough fish made up 88 percent of a fish population before relief from grazing and only 1 percent of the population after eight years of rest. Kaufman *et al* (1984) had similar observations.

Geomorphologists, such as Rosgen (1996), have determined sensitivity to disturbance, streambank erosion potential, and vegetation controlling influences for each major channel type. Rosgen determined that bank erosion is a factor of physical bank features such as bank angle, percent surface protection and plant root depth/bank height ratios, and near-bank sheer stresses. This information can in turn be used to determine potential short-term and long-term implications of various impacts, such as grazing, on stream channels.

Platts & Rinne (1985) found that rest-rotation grazing in Idaho had a higher use rate in the stream-side zone than on the remainder of the allotment. He also observed that stream-bank alteration occurred soon after cattle were turned into ungrazed meadows. Clary *et al* (1996) found that vegetation protection potential of some streambanks is extremely important, and lack of rhizomatous grass-like species left streambanks poorly protected. As a result, all grazing intensities, except no grazing, under these conditions, experienced an increase in stream channel width-depth ratios. He concluded that recovery of the degraded riparian zone of the subject study

---

[24] In Kaufman, J. Boone and W.C. Krueger, *Livestock Impacts on Riparian Ecosystems and Streamside Management Implications Review*, Journal of Range Management 37(5), Sept. 1984, pg 430-438.

[25] In Kaufman, J. Boone and W.C. Krueger, *Livestock Impacts on Riparian Ecosystems and Streamside Management Implications Review*, Journal of Range Management 37(5), Sept. 1984, pg 430-438.

BLM_0079264

area would require many years, if not decades to recover. Further, simply resting an area may or may not be sufficient to restore more natural conditions.

One study showed that existing herbaceous plant species increased in growth and vigor under reduced grazing (ungrazed and moderate grazing) but there was no measurable increase in occurrence of bank protecting rhizomatous wetland species (Clary *et al* 1996). Therefore, if a species is not on site, at least in limited numbers, or if there is no seed source, one cannot expect to reestablish desirable deep-rooted species simply by resting. However, if the species is already on site, the presence of wetland species can be expected to increase through resting (Clary *et al* 1996).

The Beaverhead National Forest (USDA BNF, undated) conducted a thorough review of livestock impacts on streams. They concluded that a number of researchers recognize that livestock can have an effect on streambank stability. For example, Clifton (1989) stated "Livestock impacts can be divided into impacts on streamside vegetation and impacts on the adjacent channel. Impacts on the stream channel include increased channel bank instability, channel shape adjustments and changes in sediment and discharge volumes."

Platts, *et al*, (1989) stated "Considerable [streambank] structural difference was observed between grazed sites and sites where grazing had been suspended or greatly reduced..." Platts (1990) stated "Streambank effects are trampling, shearing and overhanging bank caving." Trimble, *et al*, (1995) stated "The net results of grazing in riparian areas... can be: 1) direct modification of stream channels and banks; and 2) reduction of resistance to higher flows which promotes channel erosion. Trampling in the

stream may break up armored layers and expose the substrate. When resistance is breached by grazing, it is conceivable that such reaches may degrade even with no change in streamflow regime."[26]

The inherent stability of stream banks has not been thoroughly explored in the literature. Rosgen (1996) describes sensitivity levels of various channel types, but does not define inherent stability. Overton *et al* (1995) described bank stability for streams representing natural conditions within the Salmon River basin by gross channel type as defined by Rosgen (1996) and others (e.g. A, B, C, etc.), but did not further define channel type by substrate, though geological descriptors were included. They found the mean inherent stability for "A" channel types was 97 percent; for "B" channels was 87 percent, and "C" channels 85 percent.

The Beaverhead National Forest (BNF, 1997) developed allowable disturbance founded on existing vegetation communities and sensitivity levels based on soil/vegetation biodiversity, fisheries, recreation, wildlife and water considerations. A table determines an allowable percentage of natural stability that should be maintained to ensure a stable system persists. Natural stability is based on vegetation communities present along the streambank, ranging from 20 percent to 100 percent (Bengeyfield and Svoboda, 2000).

INFISH (1995) states as a Riparian Management Objective that all non-forested streams, regardless of the geographic setting or channel type, should have banks greater than 80 percent stable. No bank stability objective is set for forested systems.

---

[26] In USDA Forest Service, *Allowable Streambank Alteration and the Beaverhead Riparian Guidelines*, Beaverhead National Forest, USFS R-1, undated.

BLM_0079265

Riparian Management Objectives can be modified through a site-specific analysis. Harper (2000 b) agrees that at least 80 percent of the streambank should be in stable condition, though total vegetative cover can be as little as 50 percent of the total stream area. Bauer and Ralph (1999) advocate 90 percent bank stability to maintain water quality and aquatic habitat. Again, these are generic values, without regard to any specific geophysical features.

Forest Service Region Two (USDA-FS R2, 1996) has a Standard that states: "Maintain the extent of stable banks in each stream reach at 80 percent or more of reference conditions. Limit cumulative stream bank alteration (soil trampled or exposed) at any time to 20-25 percent of any stream reach." Forest Service Regions 1 and 4 Soil and Water Conservation Practices Handbook states: "The appropriate percent stream bank disturbance to be allowed for each riparian area is established using vegetation condition and soils information coordinated with stream types (Rosgen), to estimate the amount of streambank that should be stable under ungrazed conditions. The percent will vary, depending on site-specific conditions. An example of the percent disturbance that might be identified may be a range from as low as 10 percent above what occurs naturally on the areas with most sensitivity to 40 percent disturbance on areas of least sensitivity" (USDA-FS, 1995).

The Handbook further states: "The overriding concept behind measuring bank disturbance is making sure that the integrity of the streambank remains." "Physical alteration of the bank by trampling results in widening of the stream channel, and leads to a scenario that eventually results in a loss of riparian functions." "Bank alteration should be approached not only by asking, 'Is it causing erosion?' but 'is it preventing recovery'?"

Hockett and Roscoe (1993) advocate maximum allowable bank disturbance standards of 10 percent or less for sensitive streams and 10-25 percent for moderate to low sensitivity streams. Rosgen (1996) does not advocate any specific standards, only that "Grazing standards should focus... on percentage allowable bank damage seasonally..." and "... allowable annual bank damage by hoof shear by stream type."

Channel adjustment will occur if sufficient channel modifications and disturbances occur. These modifications include changes in: the ratio of streambank height to bankfull stage; the ratio of riparian vegetation rooting depth to streambank height; the degree of rooting density; the composition of streambank materials; streambank angle; and bank surface protection afforded by debris and vegetation (Rosgen, 1996).

Besides the physical attributes of bank stability, Williams *et al* (2004) studied the economic benefits of bank stabilization. They concluded that net gains are realized from the value of hectares not lost erosion. Conversely, it would follow that economic gains would be realized by not having to clean out downstream diversion facilities and reservoirs that serve as a depository for upstream erosion.

## Conclusion

Streambank "stability" and streambank "disturbance/alteration", though two different concepts, have been used interchangeably by many authors and managers. The two parameters, however, are substantially different. Streambank "stability" is an indicator of the effectiveness of management in achieving **long-term** goal and objectives for stream, riparian and aquatic resources. It is usually defined in four to six categories, evaluated as a percentage: Covered Stable;

BLM_0079266

Uncovered Stable; Covered Unstable; Uncovered Unstable; and may include False Bank and Unclassified, or Other.  The "stability" is the result of all or cumulative impacts to a stream, not just livestock.  Bank "disturbance/ alteration", on the other hand, is used for annual or **short-term** monitoring that may be used to make annual adjustments to livestock grazing management practices to meet long-term stability goals and objectives. It describes the linear percentage of a streambank that is altered by animals walking along the streambank.  Hoof sheering is the most obvious form of alteration.  Shearing exposes bare soil, which increases the risk of erosion to the streambank (Cowley and Burton 2005).

Little specific research was found in reference to inherent natural bank stability by channel type or the amount of acceptable or allowable bank disturbance to maintain overall channel stability.

The Beaverhead National Forest found a correlation between vegetation communities and inherent stability. Stream types are used in the determination of Sensitivity Levels. Using their information, desirable deep-rooted carex and salix communities can be 80-100 percent stable under unimpaired conditions.  Overton *et al* (1995) found A, B, and C reference channel types to be 97 percent, 87 percent and 85 percent stable respectively within the study area. Observations by Leffert (2000) found that if an adjustable channel is more than about 20-30 percent disturbed, channel adjustment processes begin to occur.  This is not an 'instantaneous' or specific threshold-induced adjustment, rather it initiates a more continuous series of channel adjustments over time to accommodate changes in channel dimension, sediment loading and/or flow changes (Rosgen 1996).

INFISH advocates greater than 80 percent of any channel type should be stable, while R-2 states that a channel should be within 80 percent of reference conditions.  R1/R4 states that possible allowable disturbance could range between 10 percent and 40 percent, depending on sensitivity. Hockett and Roscoe (1993) advocate allowable levels between 10 percent or less to 25 percent, depending on stream sensitivity.

Monitoring on the Beaverhead National Forest found that channel disturbance criteria were normally met before other parameters, such as stubble height or percent utilization (Dallas 1997).  For example, with only a minor exception noted in a meadow complex with a C (low gradient) stream channel, the streambank disturbance guideline was found to be the limiting factor across the entire Upper Rubby allotment.  The allotment riders have become so adept at managing streambank disturbance, other parameters, such as stubble height, were discontinued. Maintaining the bank disturbance guideline resulted in stream improvement, and in some cases, significant improvement of streams throughout the allotment.

It appears that inherent, undisturbed bank stability of channels functioning at full potential ranges from about 70 percent to near 100 percent, depending on the type of channel and streamside vegetation.  The literature suggests that allowable disturbances may range from less than 10 percent to as much as 40 percent, depending on the type of channel and residual vegetation.  Streams that contain smaller bank particle sizes (gravels, sands, silts/clays) are more sensitive to disturbance than banks containing larger materials (Rosgen 1996). Therefore, banks consisting of smaller particle sizes may not tolerate as much disturbance as banks containing larger particle sizes.  Further, banks that have only a

23

BLM_0079267

few plants with shallow root systems cannot protect banks as well as many plants with deeper and denser rooting systems. Banks having fewer plants with shallow roots may need more protection from impacts than banks containing many, deeper rooted plants. Therefore, a range of disturbances, based on channel type and residual vegetation may be appropriate. Platts & Meehan (1977) suggested the following guidelines:

1) Most stream surfaces should have 80 percent or more canopy cover to prevent unacceptable water temperatures;
2) Streambanks should be well vegetated to hold soil in place, and to keep livestock trampling damage to a minimum; and
3) Overhanging vegetation (within one to two feet of the stream surface) should be available on 50 percent or more of the streambank to provide fish cover.

This is especially important on the outside bends of streams. Though this doesn't specifically address the morphology of a stream channel, it suggests a minimum range of physical conditions needed to support aquatic dependent species and it roughly coincides with the range of desired morphological conditions described above.

As is the situation with stubble height, bank disturbance/stability should be used as a short-term indicator, not as an end-point, condition or trend.

## Soil Disturbance

The condition of the soils within the riparian area is a key for plant vigor and density, as well as hydrologic processes that occur through the soil profile. Changes in the soil structure can adversely affect plant condition and distribution, as well as stream/riparian area interactions and functions.

Trampling of the soil surface by grazing animals can impact soil properties by:

1) Reducing vegetative cover and decreasing soil surface protection;

2) Churning or tilling the soil by hoof action;

3) Degrading surface crusts (both physical and biological); and

4) Compacting the surface and sub-surface soils (Kaufman, *et al,* 1984).

Gosz (no date) found trampling may seriously affect the productivity and nutrient uptake capability of upper soil layers under an aspen canopy. Soils under an aspen canopy are more nutrient rich than that under conifers. Disturbance of aspen-influenced soils often cause significant losses of nutrients. This resulted in a marked difference in the density and composition of the understory vegetation and highly significant reductions in total understory biomass. Soil compaction decreases water infiltration and hydraulic conductivity, and increases erosion rates by decreasing macropore space.

Rauzi and Hanson (1966)[27] found soil compaction increased linearly with increases in grazing intensity, and after twenty-two years of grazing, found soil properties had been changed. Willatt and Pullar (1984) found that grazed pastures with various stocking rates showed increases in bulk

---

[27]In Kaufman, J. Boone and W.C. Krueger, *Livestock Impacts on Riparian Ecosystems and Streamside Management Implications..A Review*, Journal of Range Management 37(5), Sept. 1984, pg 430-438.

BLM_0079268

density and bearing capacity of the soil, and decreases in hydraulic conductivity occurred with increased stocking rates. They also found pasture plant composition was also changed over time. Coarse-textured soils are least susceptible to bulk density increases, while fine-textured soils appear to be most susceptible.

Trampling of moist or wet soils may produce surface crusts, which can further impede infiltration (USDA DNF, 1995). Valentine (1970)[28] suggested that maintenance of stubble height and seedstalks remaining after grazing relate directly with maintenance and reproduction of the plants and protection of the soil. Thurow (1988)[29] concluded that pastures that had moderate continuous and high-intensity, low frequency grazing were able to recover from drought and maintain initial infiltration rates and interrill erosion. In contrast, infiltration rates decreased and interrill erosion increased on heavily stocked pastures, both continuous and short duration. The stocking rate, rather than grazing strategy, is a major factor influencing hydrological responses. Yong-Zhong (2005) found that continuous grazing resulted in a considerable decrease in ground cover, which accelerates soil erosion, leading to further coarsening in surface soil, loss of soil organic C and N, and a decrease in soil biological properties.

Residual litter is important both to promote infiltration and to protect against rill erosion.[30] Bare ground in riparian areas is exposed to water erosion in two ways. The first is channel erosion. The second, which affects all rangelands, is rain-splash. The top layer of soil is usually the most permeable and fertile and often the most resistant to detachment. Loss of this layer reduces fertility and infiltration. This results in a downward trend in plant productivity and increases overland flows, which leads to accelerated erosion (Warren et al 1986; Holechek no date). The closer the impact is to the steam channel, the less distance detached soil particles have to travel before entering a water way and adding to the sediment loading of the stream.

Significant amounts of sediment can cause a channel to adjust, which in turn can create more streambank erosion, which can cause more channel adjustments. Scholl (1989) concluded that all soil textural classes except sand show significant compaction from trampling in both spring and fall, with a tendency for spring trampling to cause greater compaction. Compaction altered bulk density and macroporosity in all textures but sand and sandy loam, and hydraulic conductivity was substantially reduced on sandy loam and loam sites. Warren et al (1986) concluded that short-term, high intensity livestock trampling on silty clay soil had a negative effect on physical properties, with negative effects increasing with increasing stocking rates. Trampling on dry soil caused disruption of naturally occurring aggregates and compaction of the surface soil layer. Trampling on moist soil deformed existing aggregates and led to the creation of a flat, comparatively impermeable surface layer composed old dense, unstable clods.

Region 4 has developed soil quality standards for Forests in Idaho, Utah, Nevada and portions of Wyoming (USDA FS R4, 1995). One standard deals with soil disturbance.

---

[28]In Willoughby, John, Letter and enclosed *List of References of Utilization Guidelines and on the Effects of Lower Stocking Rates on the Recovery of Rangelands*, to Dr. Jerry Holechek, College of Agriculture and Home Economics, Department of Animal and Range Sciences, Las Cruces, NM, USDI, BLM, Sacramento, CA.,Sept. 25, 1997.
[29]Ibid
[30]Ibid

BLM_0079269

"Detrimentally disturbed soil is soil that has been detrimentally displaced, compacted, puddled, or severely burned. At least 85 percent of the total area within an activity area must have soil that is in satisfactory condition." An activity area can be interpreted as a riparian area.

Forest Service Handbook 2209.21 also describes effects of livestock on soils. The handbook describes two major effects: disturbance of litter, and compaction. Some results of compaction are reduced infiltration capacity and slower water movement in the soil, an increase in surface runoff, accelerated soil erosion and reduced pore space which restricts air circulation, resulting in poor aeration of the plant roots. Researchers Kaufman *et al* (1984), Willoughby (1997), and Scholl (1989) have shown that the main factors related to declines in soil productivity are losses in site organic matter and soil porosity. Livestock have been observed to adversely affect both factors (Scholl 1989; Warren *et al* 1986).

Noble (1963) researched potential soil erosion along the Wasatch range in Utah. He concluded that in the Intermountain West, a minimum of 60-70 percent ground cover[31] is needed to effectively control surface runoff of water and erosion associated with summer storms. He found that when ground cover was reduced to less than 60 percent, overland flow and soil losses increased at extremely increased rates. For example, in watersheds containing "good" ground cover (greater than 60 percent), only 2 percent of an intense rainfall resulted in surface runoff, and soil loss was about 0.05 tons per acre. Conversely, watersheds with "poor" ground cover (about 90 percent bare ground) had over 70 percent of the rainfall become

overland flow, with a 5.5 ton per acre soil loss.

Hervivory is also thought to influence the mycorrhizal associations between plants and their fungal symbionts by limiting the amount of photosynthate available to the fungus. Klironomis *et al* (2004) found that previous studies of the herbivory/mycorrhizal relationship have not yielded consistent results. They studied this relationship in Canada and concluded the same findings found in the literature – that it is difficult to generalize the effects of herbivory on plant and fungal responses, even when dealing with the same plant species.

## Conclusion

It appears livestock can, and in certain situations, do have negative impacts on soil properties and hydrologic function. R-4 soil quality standards limit the amount of an area that can have detrimental soil disturbance in order to protect the overall integrity and function of the soils. If these standards are exceeded it appears that degraded soil properties could result. Different soil types and moisture conditions appear to play important roles on determining the amount of detrimental impacts to the soils within the riparian area.

For example, Scholl (1989) concluded that all soil textural classes except sand show significant compaction from trampling in both spring and fall, with a tendency for spring trampling to cause greater compaction. However, coarse-textured soils appear to be least susceptible to bulk density increases, while fine-textured soils appear to be most susceptible. Therefore riparian areas containing fine-textured soils should have limited wet-season grazing. Grazing impacts on other soils should be limited to the capacities of the soils and associated

---

[31] Ground cover is defined as basal vegetation, litter, moss lichen or rock greater than ¾ inch diameter (O'Brien *et al* 2003)

BLM_0079270

vegetation to withstand the influences of trampling and compaction. The R4 guidelines offer such limitations.

At least 60 percent ground cover appears to be needed to control runoff and soil loss. If grazing reduces ground cover below 60 percent through foraging and trampling (either on the uplands or within the riparian area), erosion and runoff rates increase exponentially. Therefore, it appears that maintaining at least a 60 percent ground cover within and adjacent to the riparian area is essential to maintain riparian health and channel stability.

### Riparian Zone Ground Cover and Plant Utilization

To this point, literature has concentrated on impacts and utilization in the "near-bank" area – that is that area directly adjacent to the stream channel. Impacts of livestock within a "zone of influence" have not been thoroughly explored. This zone is extremely important and has been recognized as a critical area by some.

For example, INFISH (1995) establishes a Riparian Habitat Conservation Area (RHCA) that has specific established Goals, Objectives, Standards and Guidelines. The intent is to recognize the importance of these areas and control land management activities that could reduce the important associated values. INFISH identifies specific widths or boundaries based on the kind of waterbody and the presence or absence of fish. However, INFISH is silent on specific criteria that must be maintained within RHCAs, such as vegetation utilization or ground cover. Rather, the focus is on stream channel habitat features and generic Goals for the RHCA address water quality, stream channel integrity, instream flows, water

tables and overall plant productivity and diversity (INFISH, 1995).

Geomorphologists, such as Leopold (1994, 1997) and Rosgen (1996) have long known how streams develop and the value of the flood prone area adjacent to the stream channel. Different kinds of streams have different kinds of floodplains of varying widths, characteristics and importance (Rosgen 1996). The shape of any stream is a function of the flow, the amount of sediment in motion through the channel, and the character or composition of the materials (including vegetation) that make up the bed and banks of the channel. When flows exceed the capacity of the channel, water overflows into the floodplain (Leopold 1994). If the floodplain is unprotected or damaged, the channel can respond quickly, sometimes with undesirable results (Leopold 1994).

The health, vigor, density and diversity of vegetation within the streamside zone holds the key to maintaining channel stability and providing quality water for aquatic species and human uses (Brinson et al 1981). The hydrology of riparian systems can have an effect on the metabolism and growth of vegetation in three basic ways. First is water supply. Second, is nutrient supply, and third is facilitation of soil ventilation and gaseous exchange such as oxygen, carbon dioxide and methane (Brinson et al 1981). Implications for removal of riparian vegetation include the disruption of coarse particulate matter input, which in turn shifts energy flows and balances, accompanied by changes in channel hydrology, sediment and nutrient loading and physical water quality changes, such as temperature. The shift to a higher energy, more eutrophic environment will produce conditions to which only a few of the existing species of aquatic invertebrates and fishes may be adapted. Leaving a protective buffer

BLM_0079271

of riparian vegetation will help to maintain the integrity of at least some of the energy sources and organic matter processing mechanisms (Brinson *et al* 1981).

Maintaining a healthy streamside zone will also serve to buffer sediment and other pollutants from upland sources. Belt *et al* (1992) discussed five functions of effective buffer areas. These include:

- Trapping sediment or nutrients;
- moderating stream temperatures;
- Providing food and cover for wildlife;
- Providing large organic debris for channel processes and aquatic habitat; and
- Moderating cumulative watershed effects.

These characteristics are essentially echoed by Lawrance *et al* (1985). Cited benefits include streambank stabilization, sediment filtering, temperature regulation, and uptake and long-term storage of nutrients. Braun (1986) added increased groundwater recharge, near-bank water exchange, and bank cover that provides habitat, food and cover for aquatic species

The literature is relatively silent on the effects of livestock grazing on the characteristics and effectiveness of buffers. Most of the available literature deals with logging activities and associated roads (e.g. Belt *et al* 1992; Swift 1986; Ketcheson and Megehan 1996). Observations and findings of these authors can be applied to grazing activities.

For example, Belt *et al* (1992) found that as surface roughness increased, filtering capacities of buffers for non-channelized surface flows also proportionally increased. This can be applied to grazing. In general, the more vegetation left on-site, the greater

the buffering ability. As vegetation is consumed or trampled, the roughness coefficient can be reduced, reducing the capability of the area to provide desired functions and processes.

Pfankuch (1978) characterized channel stability based on several features. One feature is what he terms the "upper bank," which is described in general terms as the floodplain zone and adjacent landforms. Vegetation is one component of the evaluation. "Excellent" is defined as trees, shrubs, grass and forbs combined cover more than 90 percent of the ground. "Good" has 70-90 percent ground cover. "Fair" has 50-70 percent ground cover, and "Poor" has less than 50 percent ground cover.

A standard in the Targhee National Forest Land Management Plan specifies that within the riparian zone, away from the direct streamside, at least three inches of stubble will be left for key riparian plant species at the end of the grazing period (Targhee NF 1997).

In 1993, FS Region 4 issued Range Management Standards for the Region. Standards for key species grass and herbaceous plants in riparian rangeland ecosystems were divided into season-long grazing and rotation grazing schemes, and subdivided with standards for satisfactory and unsatisfactory range conditions for each of the systems. For pastures that have season-long grazing, unsatisfactory condition standards are 30 percent utilization and a six-inch stubble height. For satisfactory range conditions, 55 percent utilization and four-inch stubble height. Pastures with rotation grazing have 50 percent/four-inch, and 65 percent/four-inch for unsatisfactory and satisfactory range conditions, respectively. If there is a conflict between percent utilization and stubble height, stubble height prevails.

BLM_0079272

Holechek (1999) researched "classic" grazing studies and provided a brief synopsis of findings. When averaging all the studies, they found that "heavy" grazing averaged 57 percent use of the primary forage species. "Moderate" grazing averaged 43 percent use, and "Light" grazing averaged 32 percent. They defined "heavy" as a degree of herbage utilization that does not permit desirable forage species to maintain themselves. "Moderate" grazing is a degree of herbage utilization that allows the palatable species to maintain themselves, but usually does not permit them to improve in herbage producing ability. "Light" grazing allows palatable species to maximize their herbage producing ability. Heavy stocking consistently caused a downward trend in ecological condition, light stocking caused an upward trend and moderate stocking maintained or slightly improved condition.

FSH 2209.21-93-1, R4 Amendment Effective 5/18/93 describes six classes of herbaceous utilization. They are: No Use – 0-5 percent; Slight – 6-20 percent; Light – 21-40 percent; Moderate – 41-60 percent; Heavy – 61-80 percent; and Severe – 81-100 percent. The Handbook states that removal of half or more of the foliage during the growing season upsets the functioning of the root system and the plant as a whole. The reduction of growth in grass plants after cutting or grazing is due partly to the inability of defoliated plants to absorb water.

**Conclusion**

Relatively little information is available concerning the needs of the entire riparian zone. The literature, however, is clear that this zone is extremely important for a variety of functions and processes needed for aquatic habitat, channel integrity, water quality, wildlife and so forth. Without healthy riparian zones, these functions and processes can be jeopardized, reduced, or even eliminated.

The width of these influence zones to provide needed functions is also in question. Fixed widths are relatively easy to define and administer (Belt *et al* 1992) but may not provide adequate protection in some situations and may be too comprehensive in others. INFISH defines variable widths depending on several factors including channel and floodplain characteristics, actual extent of riparian vegetation, or a minimum fixed width, which ever is greater.

For controlling the influence of livestock grazing within these influence zones, it appears as a buffer zone using the actual extent of riparian vegetation would be in order, along with some kind of minimal ground cover and/or vegetation utilization that could equate to stubble height. However, depending on the channel type, the actual extent and influence of riparian vegetation can be and is highly variable (Rosgen 1996). The extent of riparian vegetation can vary greatly along the same stream and even vary on either side of the channel.

For example, a C-type channel (Rosgen 1996) can be cutting into a terrace on one side and have a well-developed point bar on the other. On the terrace side, it is possible that no riparian vegetation will exist at all. On the point bar side, riparian vegetation could be well developed, extending well away from the side of the channel. Potential ground cover on the upland terrace side may not exceed 60 percent, while potential ground cover on the point bar may be 100 percent. Potential stubble height of un-grazed grasses on the terrace may not exceed six inches, with moderate grazing utilization stubble heights residuals only an inch or two (See Percent Utilization section). On the other

BLM_0079273

side of the channel, potential stubble height may be several feet, with moderate utilization stubble heights exceeding six inches. Further, a deeply downcut channel may have no associated riparian vegetation on either side of the channel, whereas an E-type channel (Rosgen 1996) or an extended beaver complex could have associated riparian vegetation extending hundreds of feet on either side of the channel.

It appears as variable criteria for zone width, and disturbance limitations, such as ground cover, and plant utilization is appropriate. Variable zone widths as defined in INFISH for the different waterbody types and the presence or absence of fish appears to be suitable and sufficient to maintain the integrity of this zone and protect associated values of aquatic habitat and water quality. Even though channel types vary in their ability to promote and sustain riparian vegetation, there are too many physical and biological variables to try to isolate zone widths to specific channel types.

Plant stubble heights and allowable utilization rates, along with ground cover requirements, should vary according to plant community types. For ease of management and monitoring, these community types can be subdivided into two main categories – riparian and upland.

For riparian plant communities, allowable utilization and stubble heights should not exceed those normally associated with light to moderate grazing. The literature generally supports utilization rates less than 50 percent for riparian vegetation. Clary & Webster (1989) suggest a maximum streamside utilization of 65 percent for spring, 40-50 percent for summer and 30 percent for fall grazing, which allows for regrowth. Clary (1999) defined "moderate" grazing as up to 50 percent use. Ratlif *et al* (1987) suggests

maximum allowable use up to 45 percent for meadows in "good" condition and 20-30 percent for areas in poor condition. Therefore, a maximum allowable use of 50 percent for spring grazing in areas in "good" condition may be appropriate, reduced to 20 percent for late season grazing on areas in poorer condition. Kovalchik & Elmore (1992)[32] equated 45 percent utilization to four- to six-inch stubble height, depending on the plant species.

Upland plant utilization should follow similar levels as riparian vegetation. Holechek (1988) found percent use of key species for moderate grazing ranges between 30-40 percent (FSH equivalent is "Light"). Lacy (1988) found that most upland plants can maintain vigor if no more than 50 percent of their growth is removed during the grazing period, and should not exceed 60 percent (FSH equivalent is "Moderate). FSH 2209 states that plant function is upset with utilization levels greater than 50 percent, which falls into the FSH definition of "Moderate" grazing. Unlike riparian vegetation, the potential for regrowth of upland vegetation following grazing is reduced, depending on the plant species and available moisture. Therefore, a utilization rate by season is probably not appropriate.

## Factors and techniques that affect the distribution of livestock and resource impacts

The use of forage by livestock is dependent on a number of factors. These include: season of use; physical conditions of forage and relative palatability; distance to water and salt; sideslope steepness and microclimatic features. In riparian areas, the biomass of wet meadow herbage is often ten

---

[32] In W.P. Clary, ED. Proceedings – Symposium on Ecology and Management of Riparian Shrub Communities. USDA Forest Service General Technical Report INT-289. Ogden, Ut.

BLM_0079274

to twenty times higher than that of surrounding uplands; the distance to water is minimal, the terrain is flatter and summertime temperatures can be cooler. Therefore, animals expend less time and energy in obtaining their daily intake in riparian areas than on adjacent upland range (Skovlin 1984).

Even though riparian meadows often cover only 1-2 percent of the range area, they may produce up to 20 percent of the available forage, and in some areas 80 percent of the forage consumed within a pasture may come from these meadows (Clary & Webster 1980).

There are also seasonal differences in the way livestock utilize their environments. Cattle tend to be more widely distributed early in the grazing season compared to later when they may concentrate in riparian areas (McInnis 1997); although it has been found that cattle will also distribute themselves during the latter, cooler, portion of the grazing season as well (WDEQ 1997). Clary & Webster (1990) found that cattle may consume most of the forage in the riparian zone in the first four weeks (30 days) of the grazing season. However, even when a majority of the forage has been consumed, cattle traditionally will not voluntarily venture up the slopes, away from the riparian zone during the warmer portion of the grazing season. Clary & Booth (1993) also observed that spring grazing of riparian areas may be a good management strategy because of a reduced tendency for cattle to concentrate along streams during that season. Streamside graminoid utilization averaged about 24 percent (4.5- to 5-inch stubble height) under light stocking, and about 37 percent (3- to 4-inch stubble height) under medium intensity grazing. Parsons *et al* (2003) found that during early summer, cattle were further from the stream than during late summer. Cows were observed closer to the stream when ambient air temperatures were higher. Forage quality varied between seasons, with early summer forages having lower dry matter, greater crude protein, lower fiber and greater in situ dry matter disappearance compared with late summer forages. Utilization of riparian vegetation was lower and use of upland vegetation was greater during early summer than late summer.

Some studies show that livestock distribution combined with timing, duration and frequency of grazing are often the main factors in utilization patterns within riparian areas. Stocking rate problems are usually not a factor, and simply reducing total numbers is usually not a solution for proper riparian management.

Cattle form family groups and like to stay together. When they are split up forcibly for better distribution, they tend to return to a place of gathering, which more likely than not is in the riparian area. Leonard *et al* (1997) suggested successful grazing strategies that protect or improve riparian condition include techniques that:

1) Attract, not force, livestock away from riparian areas, including stock water developments, alternate or improved forage, and careful salt and supplement placement outside of riparian areas;

2) Restrict livestock use in riparian areas, which includes fencing, barriers such as thickets or brush wind rows, water gaps in erosion resistant stream reaches and relocation of bed grounds and management facilities; and

BLM_0079275

3) Provide herd management and animal husbandry practices that promote mobility, including herding and culling practices and managing the kind and class and breed of livestock.

Platts (1991)[33] suggested five strategies:

1) Control of animal distribution and access to water;
2) Control of grazing intensity (forage utilization);
3) Control of grazing frequency and rest periods;
4) Control of timing of grazing use (season); and
5) Total exclusion of grazing.

Studies of cattle behavior in riparian zones during summer grazing in mountain pastures in east central Oregon found that 80 percent of the herbage used under moderate stocking came from streamside meadows that constituted 2 percent of the unit area.   In heavier, more dissected terrain, even salting and additional alternate watering contributed little to draw cattle away from riparian meadows (Skovlin 1984).  Roath (1980)[34] found that cattle exhibited distinctive home range patterns in which certain groups of cattle preferred upland sites, and other groups preferred riparian sites.  As forage became limiting on stream bottoms, some cattle actually decrease intake rather than move away from the riparian zone.  Roath (1980)[35] also suggested selective culling of these cattle and replacing them with those that prefer uplands may be beneficial for the

livestock operator as well as for the riparian zone.  He also found that herding livestock on a somewhat daily basis has been successful in limiting the number of livestock that visit stream bottoms, while improving utilization of upland areas.

Skovlin (1984) suggested ten options available to range managers for restoring riparian and stream habitats:

1) Do nothing;
2) Improve animal distribution;
3) Change season of use;
4) Implement specialized grazing seasons and strategies;
5) Rest entire grazing units for five years or longer until recovery occurs;
6) Fence the entire riparian zone;
7) Fence the streamside corridor;
8) Combinations of the above;
9) Revegetate with woody cover; and
10) Eliminate grazing.

Grazing strategies, such as rest rotation, are not an answer in themselves.  Several authors have reported rest-rotation grazing systems increased vigor and increases in upland vegetation quality and quantity (Platts & Rinne 1985).  However, Hughes (1979)[36] found no corresponding improvement in riparian conditions.  One study found that streamside forage was 8-12 percent more heavily used than adjacent range forage on all studied allotments.

For example, Platts & Rinne (1985) found forage utilization along streams was about 50 percent greater during the late season than during the early season under similar grazing conditions.  Consequently, if the allotment were managed for moderate (26-50 percent)

---

[33] In Fitch and Adams 1998. *Can Cows and Fish Co-Exist?* Canadian Journal of Plant Science; Vol 78, No. 2. Ibid p. 191-198.

[34] In Kaufman, J. Boone and W.C. Krueger, *Livestock Impacts on Riparian Ecosystems and Streamside Management Implications. A Review*, Journal of Range Management 37(5), Sept. 1984, pg 430-438

[35] Ibid

[36] In Platts, William S. and Rodger Loren Nelson, *Impacts of Rest-Rotation Grazing on Stream Banks in Forested Watersheds in Idaho*, North American Journal or Fisheries Management 5:547-556, 1985.

BLM_0079276

grazing intensity throughout the allotment, the streamside zone could easily accommodate heavy grazing (51-75 percent) utilization (Platts & Rinne 1985). It was suggested that measures such as placing salt away from the riparian area, or the timing of grazing appeared to influence the use of streamside vegetation and would help in balancing vegetation uses.

Platts (1981, 1985) found that streamside grazing probably does as much or more damage through bank alteration than through changes in vegetative biomass. Further, he suggested that bank conditions do not improve during a single rest period, but rather, regrowth of vegetation tends to mask unstable reaches. He found that prolonged use of streamside vegetation not only will alter a bank but will also retard the rehabilitation of previously altered banks. He suggests that land managers "should give serious consideration to using special riparian pastures"... to "encourage a more equitable use of all available forage and would allow the intensity of use to be carefully controlled"...without the need for expensive fencing.

Even though fencing has been shown to provide the maximum protection and the best chance for rehabilitation in the shortest amount of time (with the exception of eliminating grazing), it has been estimated that the cost of fencing fish-bearing streams on BLM lands throughout the west would cost $90 million dollars and another $9.4 million for maintenance over a twenty-year period. Because of this, it has been suggested that the cost-effectiveness of management actions, such as fencing, be evaluated and the most valuable stream reaches be identified and necessary management strategies implemented that those streams deserve (Platts & Wagstaff 1984).

Rosgen (1996) suggested that channel types requiring the presence of deep-rooted plants to maintain channel stability (e.g. C3-6 stream types) should have grazing limited to early season, especially for large riparian pastures. He cited plant palatability, water availability, temperatures, nuisance insects, impacts to woody species, and post-grazing rest and plant regrowth as reasons.

Fitch and Adams (1998) suggest that proper riparian grazing strategies can improve wildlife habitat, help stabilize channels, improve water quality and shift intermittent streamflows to perennial flows. They state that the obvious primary benefit of a successful riparian grazing strategy is that the livestock operator can retain access to a dependable and productive forage supply, which will improve both the quality and quantity of forage for livestock. Improved riparian management may more than double forage availability over those riparian areas in poorer conditions. In short, if proper strategies are applied, cows and fish can co-exist.

Management strategies should be based on range type and condition, range site potential and soil type, plant growth rates, seasons of use, precipitation, stocking rates and type and class of livestock (WDEQ 1997). The FAO (2003) identified four world-wide grazing priorities. One priority was effective drought management policies. They found that land degradation in arid zones originates as a result of high stocking rates during droughts. They suggest managers de-stock as rapidly as possible during these periods, rather than seeking to maintain normal stock numbers and durations. Rosgen (1996) also recommended that channel type and inherent channel stability be factored into the equation. Some grazing management

BLM_0079277

practices recommended by Clary and Webster (1990) include:

1) Grazing practices provide for regrowth of riparian plants after use, or should leave sufficient vegetation at the time of grazing for maintenance of plant vigor and streambank protection.  A minimum herbage stubble height of four to six inches is recommended.
2) Springtime grazing of herbaceous vegetation should not exceed 65 percent and livestock should be removed when the primary forage plants are still in the vegetative state.
3) Summertime pastures should be used cautiously, as livestock tend to concentrate in riparian areas during the hot months.  Forage utilization should not exceed 50 percent.

4) Fall grazing should be monitored carefully to ensure utilization standards are not exceeded, since there will be little if any regrowth.  A four- to six- inch stubble height is recommended which equates to 30-40 percent utilization on most riparian herbaceous plants.
5) Limit season long grazing to situations where grazing can be strictly monitored and stubble heights can be met.
6) Special situations where critical fisheries habitat or streambanks are easily eroded, stubble heights greater than six inches may be appropriate.
7) The length of rest required to initiate a recovery process will depend on vegetative composition and streambank condition.  It may take as little as one year or fifteen years or more.  Degraded streambanks usually require more time to recover than vegetation.
8) Ensure **all** livestock are removed at the end of the specified use period.  Recovery and/or maintenance of riparian ecosystems are not likely if even a few animals remain after the use period.

Other practices recommended by Meyers (no date) include:

1) Limit total time in pasture to 30 days or less; limit time in pasture during the hot season to less than 15 days.
2) Allow 30 or more days for plant regrowth.
3) Where deciduous woody species are important in the composition, limit the frequency of fall grazing to about 1 year in four.  Limit duration of fall grazing to 21 days or less.

The following is a summary of suggested management practices described above and the anticipated functions or processes those practices are trying to address, as interpreted by this author.

### Table A.  Management Practices and Expected Benefits

| Practice | Expected Benefit |
| --- | --- |
| Provide for regrowth of riparian plants after use, or leave sufficient vegetation at the time of grazing for maintenance of plant vigor and streambank protection.  A minimum herbage stubble height of 4-6 inches is recommended | 1) Increased plant vigor/health composition. 2) Improved streambank stability/rebuilding |

34

BLM_0079278

| Practice | Expected Benefit |
|---|---|
| Springtime grazing of herbaceous vegetation should not exceed 65 percent and livestock should be removed when the primary forage plants are still in the vegetative state. | 1) Increased plant vigor/health/ composition. |
| Summertime pastures should be used cautiously, as livestock tend to concentrate in riparian areas during the hot months.  Forage utilization should not exceed 50 percent. | 1) Increased plant health/vigor/ composition<br>2) Improved bank condition<br>3) Improved soil condition |
| Fall grazing should be monitored carefully to ensure utilization standards are not exceeded, since there will be little, if any, regrowth.  A 4-6 inch stubble height is recommended which equates to 30-40 percent utilization on most riparian herbaceous plants. | 1) Increased plant health/vigor/ composition |
| Special situations where critical fisheries habitat or streambanks are easily eroded, stubble heights greater than 6 inches may be appropriate. | 1) Decreased streambank erosion and improved stability<br>2) Aquatic habitat protection |
| The length of rest required to initiate a recovery process will depend on vegetative composition and streambank condition.  It may take as little as one year or fifteen years or more.  Degraded streambanks usually require more time to recover than vegetation. | 1) Increased plant health/vigor/ composition;<br>2) Reduced soil compaction;<br>3) Improved streambank stability/protection;<br>4) Improved aquatic habitat<br>5) Improved water quality |
| Ensure all livestock are removed at the end of the specified use period.  Recovery and/or maintenance of riparian ecosystems is/are not likely if even a few animals remain after the use period. | 1) Increased plant health/vigor/ composition;<br>2) Decreased soil compaction;<br>3) Improved streambank stability/protection;<br>4) Improved aquatic habitat<br>5) Improved water quality |
| Limit total time in pastures to 30 days or less; limit time in pastures during the hot season to less than 15 days. | 1) Increased plant health/vigor/ composition;<br>2) Reduced soil compaction;<br>3) Improved streambank stability/protection;<br>4) Improved aquatic habitat<br>5) Improved water quality |
| Allow 30 or more days for plant regrowth. | 1) Increased plant health/vigor/ composition |
| Where deciduous woody species are important in the composition, limit the frequency of fall grazing to about one year in four. | 1) Increased woody species health/vigor/ composition |
| Limit duration of fall grazing to 21 days or less. | 1) Increased plant health/vigor/ composition;<br>2) Reduced soil compaction;<br>3) Improved streambank stability/protection;<br>4) Improved aquatic habitat<br>5) Improved water quality |
| Allow grazing on riparian vegetation only before July 1. | 1) Increased plant health/ vigor/ composition;<br>2) Increased streambank protection |
| Implement stubble height standards. | 1) Increased plant health/vigor/ composition;<br>2) Improved streambank protection |
| Implement utilization standards | 1) Improved plant health/vigor/ composition;<br>2) Improved streambank protection |
| Implement streambank disturbance standards | 1) Improved streambank protection;<br>2) Improved water quality;<br>3) Improved aquatic habitat |
| Close stream to grazing for up to five years. | All factors |
| Begin moving livestock before required standards are achieved so that by the time the standards are met, the last | All factors |

35

| Practice | Expected Benefit |
|---|---|
| animal is moved from the pasture. | |

Additionally, besides the physical implications, economics also come into play. Stillings *et al* (2003) used a multi-period bioeconomic model to evaluate the long-term economics of management practices within a riparian zone. They found that restricting utilization to 35% for a 300 calf-cow operation, the cattle distributed more evenly and gained more weight. The economic impacts of this were increased annual net returns to the ranch in addition to improved riparian quality.

## Water Quality and Aquatic Habitat

Maintenance of riparian areas is not necessarily an end in itself. Stable, healthy riparian areas are a means to other values, such as clean water that meets designated beneficial uses and high quality aquatic habitat that is capable of sustaining a variety of water-dependent species, including insects, fish and amphibians.

Livestock can affect several water quality parameters. Most noted are sediment, bacteria and nutrients, primarily nitrates and phosphates (Buckhouse 2000). Braun (1986) concluded that cattle are the cause or source of several types of water pollution. On uplands, cattle accelerate erosion when removing vegetation and trampling soil. Through runoff, eroded soil eventually finds its way into streams leading to sedimentation and turbidity. Sediment destroys stream habitat in at least two ways. Suspended sediment reduces light penetration causing reduction in aquatic plant photosynthesis and dissolved oxygen levels. Sediment clogs gravel areas used by spawning fish for egg deposition and can entomb various aquatic life forms that are major sources of food for fish. In addition,

cattle discharge urine and manure, which produce chemical and biological pollution.

George *et al* (2004) surmised that in general, streams flowing through areas partly or fully covered with pastures were more contaminated than those flowing through forest and cultivated areas. Rainfall increased the suspended solid content of small streams as well as their fecal contamination, as bacteria are adsorbed on particles. In a study by Coltharp and Darling (1973)[37], three pastures were studied with different combinations of animals grazing and browsing: wildlife only, wildlife and sheep and wildlife and cattle. Highest concentrations of bacteria were found in the wildlife-cattle pasture. Carter (1999) in a study conducted on the Cache National Forest in Idaho and Utah, found elevated concentrations of fecal coliform bacteria within days of cattle entering a pasture. Immediately following removal of cattle, fecal coliform counts declined t much lower levels and eventually declined to zero. He also found that during the spring and early summer, prior to the introduction of livestock into the pasture, the numbers of fecal coliform bacteria gradually increased in response to runoff and increasing water temperatures. He concluded that organisms residing in the watershed and stream sediments since the previous grazing season contributed to the source. Biske and others (1988)[38] found that 90 percent of bacteria that reaches a stream channel precipitated to the steam bottom and attached to sediments. Sediment samples collected over a period of several weeks found that 90 percent that had lodged into the sediment died within forty days.

---

[37] In Buckhouse (2000)
[38] Ibid

BLM_0079280

Johnson (1978) studied two adjacent pastures in central Colorado and found that bacterial contamination significantly increased in the grazed pasture. Following removal of cattle from the grazed pasture bacterial counts dropped to levels similar to those in the ungrazed pasture. Platts (1981) also attributes high concentrations of coliform bacteria in study streams to livestock grazing. He concluded that bacterial concentrations did not directly affect the suitability of habitat for fish; they are nonetheless important indicators of water quality. This typifies the dynamic nature of the quality of surface water, particularly from nonpoint sources. Leffert (2000) sampled surface water quality in Arizona within a variety of grazing pastures. He observed that base streamflows contained very little fecal coliform bacteria content the majority of the time when samples were collected. However, during runoff flows, when rainstorms generated overland flow to the stream channels, fecal coliform levels increased exponentially, well in excess of state water quality standards. Following the runoff event, when the stream hydrograph returned to base flow rates, bacteria concentrations quickly returned to pre-event levels.

Vinten *et al* (2004) described the potential risk of coliform bacteria contamination from farm management practices. They summarized agricultural practices to mitigate the risk. They found that buffer strips, off-stream watering, grassed surface drainage channels, controlled walkways, etc, have potential for reducing coliform inputs to watercourses, all being related more to animal access to streams than to overall stocking densities within a pasture. This was echoed by Collins and Rutherford (2004). In upland situations, it was postulated that stream bed entrainment quickly exhausts the burden of stream bed E. *coli* bacteria and found no significant sedimentation of E. *coli* in water samples. They also found that transport through the soils is not the dominant route of E. *coli* transport at high flows.

Other water quality parameters that may be affected by livestock include suspended solids, temperature, dissolved oxygen, total dissolved solids, specific conductance, ammonia, orthophosphates, and nitrate nitrogen (Johnson *et al* 1978). Johnson *et al* (1978) in a Colorado study did not find any significant increases in any of these other parameters directly attributable to livestock grazing. Buckhouse (2000) cited a nutrient study on the Wood River in Oregon. There was a concern that nutrient loading would be increased when water flowed through grazed land due to fecal contamination. The data refuted this hypothesis, in fact, phosphate and nitrate levels actually decreased. It was speculated that the wetlands in the system acted as a natural nutrient sink, reducing the amount of free nitrate and phosphate concentrations in the water.

Platts (1981) cited studies by Clarie and Storch (1977) and others that found that removal of streamside vegetation contributed to increases in water temperatures in small headwater streams as well as influencing suspended sediment concentrations. Increased sediments have been found to diminish total productivity of the aquatic system, decrease water permeability of channel materials used by fish for spawning, smother fish embryos, and deplete the food supply for fish by filling channel interstices.

Harper (2000) suggested several riparian and channel conditions that contribute to optimum aquatic habitat:

1) At least 60 percent of the stream is shaded between 10:00 am and 4:00 pm during summer months;
2) At least 80 percent of the streambank is in stable condition;

BLM_0079281

3) Not more than 15 percent of the gravel/rubble substrate is covered by inorganic sediment;
4) At least 80 percent of the site potential for grass-forb, shrub, and trees is achieved;
5) Instream cover should be about 50 percent of the total stream area; and
6) Overhanging banks occur on at least 50 percent of the streambanks.

It should be noted that the ability of any specific stream to achieve one or more of these values depends on the channel type, geological and physiographic setting, riparian community type and serial stage (Leffert, 2000). Marcuson (1977) found floristic composition and density of herbaceous vegetation were markedly different between grazed and un-grazed pastures in Montana. The un-grazed area had a better soil profile and 80 percent less stream channel alteration. This resulted in a 256 pound per acre decrease of fish in the grazed pasture stream as compared to fish densities in the un-grazed area stream.

Platts (no date), discussed "Compatibility of Livestock Grazing Strategies with Fisheries". He evaluated and rated various common grazing strategies based on personal observations as related to stream-riparian habitats. The following summarizes those observations:

**Table B: Grazing Strategies and Stream/Riparian Habitats**

| Strategy | Common Utilization Levels | Stream Bank Stability | Seasonal Plant Regrowth | Rehab Potential |
|---|---|---|---|---|
| Continuous Season Long (cattle) | Heavy | Poor | Poor | Poor |
| Short Duration/ High Intensity (cattle) | Heavy | Poor | Poor | Poor |
| Three Herd/ Four Pasture (cattle) | Heavy to Moderate | Poor | Poor | Poor |
| Holistic (cattle or sheep) | Heavy to Light | Poor to good | Good | Poor to excellent |
| Deferred (cattle) | Moderate to Heavy | Poor | Fair | Fair |
| Seasonal Suitability (cattle) | Heavy | Poor | Fair | Fair |
| Deferred Rotation (cattle) | Heavy to Moderate | Fair | Fair | Fair |
| Stuttered deferred rotation (cattle) | Heavy to Moderate | Fair | Fair | Fair |
| Winter (sheep or cattle) | Moderate to Heavy | Good | Fair to Good | Good |
| Rest Rotation (cattle) | Heavy to Moderate | Fair to Good | Fair to Good | Fair |
| Double Rest Rotation (cattle) | Moderate | Good | Good | Good |
| Riparian Preference (cattle or sheep) | Moderate to Light | Good | Fair | Fair |
| Corridor Fencing (cattle or sheep) | None | Good to Excellent | Good to Excellent | Excellent |

BLM_0079282

Saunders and Fausch (2005) studied livestock grazing influence on terrestrial invertebrate prey for trout in Wyoming rangeland streams. Two grazing types were observed: high-intensity/ short-duration (HISD) and season-long grazing (SLG). They found there was both greater vegetative production and vegetation cover at sited under HISD management than at sites under SLG management and the biomass of terrestrial invertebrates falling into streams with HISD was 70% greater and more variable than that entering streams under SLG in June and July. Measurements of fish abundance during summer in rangeland streams suggested that sites under HISD supported higher density and biomass of trout than sites managed for SLG.

The Clean Water Act addresses water quality in streams and requirements to "restore and maintain the chemical, physical and biological integrity of the Nations waters." Section 303(d) of the act addresses water quality standards to support designated beneficial uses of waterbodies. Each state is required to sample all waterbodies within its boundaries and develop protocols for maintaining those waterbodies in good condition and improve those that are degraded. The development and application of Total Maximum Daily Loads (TMDLs) is required for all streams for which beneficial uses are not attained. The Forest is required, as are all other landowners, to comply with TMDL requirements. Depending on established requirements, action plans need to be developed that will specify specific actions taken to comply with the regulations and TMDL requirements. These requirements may override all other standards and requirements developed by the Forest, if TMDLs are more stringent than Forest Standards and Guidelines.

Similarly, the Endangered Species Act may dictate allowable activities within a watershed and specifically within a riparian area or waterbody. Currently there are no listed endangered or threatened aquatic or riparian dwelling species within the Caribou or Targhee National Forests.

The Yellowstone and Bonneville cutthroat trout have both been petitioned to be listed as threatened under the Act. The U.S. Fish and Wildlife Service dismissed the petitions stating, at the present time, listing is not warranted. However if these fish species, or other aquatic or riparian-oriented species are listed some time in the future, specific allowable standards would be established by the U.S. Fish and Wildlife Service, or other agencies, which could override any standards and guidelines established by the Forest.

## Impact Guidelines

If interdisciplinary efforts and cooperation occur, reasonable approaches can be developed and implemented to provide forage for domestic livestock while improving and maintaining habitat for fish and wildlife (Armor *et al* 1991).

Grazing systems can be used without intractable damage to riparian ecosystems if key riparian plant species are monitored as indicators of forage production and use. This would allow plant vigor and density to be maintained, which, in turn, wildlife, fish and habitat abundance could be sustained and unstable streambanks and poor soils would be able to recover (Armor *et al* 1991). This is strengthened by Bengeyfield (in press). Through paired measurements of physical channel parameters at permanent sites over 5 to 7 years, he showed that moving livestock between pastures based on prescribed levels of annual streambank alteration led to channel improvement. Streams became less entrenched, had smaller width/depth ratios and lower levels of fine sediment.

BLM_0079283

Numerous management strategies are available to implement the following guidelines. Fencing, various rotation systems, riding, watering, salting, or other methods can all have an effect on resources within the riparian zone. How these guidelines are achieved are left to the manager and must be determined for individual situations and conditions. An alternative to these guidelines is non-use. For example, if a channel is in State B or E, complete rest for one or more years may be appropriate to restore a B State to an A State or accelerate improvement of an E State to an F State. Cowin (no date), based on his experience, concluded that it may take twenty or more years for a channel to reach Properly Functioning Condition if the channel is vertically unstable, more than 70 percent of the streambanks are actively eroding, and/or stabilizing herbaceous plants are limited in density or distribution.

Deferred or delayed use can also have other positive effects. For example, when willows are being affected by livestock, limiting or eliminating access to the riparian zone during the fall may reduce impacts on these woody species. Pelster *et al* (no date) suggested that spring grazing of riparian pastures was preferable to late-season use to minimize browsing on willows. They found that willow consumption increased substantially as herbaceous stubble height was reduced to 10 and 18 cm during the spring and early-summer grazing periods, respectively. Herbaceous stubble heights greater than 20 cm were needed to reduce willow consumption when they were most preferred during the late-summer and fall grazing periods in a tall sedge/willow riparian community. Conversely, if banks or riparian soils are being damaged during the early season, when banks and soils are saturated from the spring runoff, delaying grazing until the fall when the banks and soils are dry and less susceptible to sheering and compaction may be useful. If

plant density and vigor are a problem, removing livestock early, while the plants are still growing and allowing adequate time for regrowth before dormancy may be an option.

## Goal

Maintain or move toward desired riparian, stream channel, aquatic and water quality conditions. The desired condition is to preserve the function (both physical and biological) of riparian areas and stream channels, associated water quality and aquatic habitat, considering the inherent characteristics of the riparian areas and stream channels and their existing conditions and capabilities*. Additional desired conditions may be developed for specific watersheds or landscapes. This could include the preservation/restoration of native fish habitat or the maintenance/improvement of water quality in imperiled water bodies.

*Protection and enhancement of the resource is the primary goal. However, cost efficiency and practicability may have to be considered in the overall analysis process.*

## Explanation

Standards are necessary to maintain or restore the function of riparian areas and stream channels. These standards are designed to protect or improve the integrity of water quality and aquatic habitat through the protection of riparian areas, stream channels and associated flood plains; to restore or enhance water flows, bank water storage and water table interchange, and sediment controlling functions; and maintain or increase the number and kind of riparian plant species, which reflect a variety of natural communities that would be expected to grow within a site, reach, watershed or landscape.

BLM_0079284

These riparian standards are based on inherent characteristics and capabilities as well as the exiting condition of the different stream types across the Forest as suggested by Myers and Swanson (1991). Stream type aggregates provide a context to integrate historical, existing and foreseeable future valley bottom features and associated stream and riparian characteristics and desired conditions.

## Implementation

These riparian standards have five measurable parameters to monitor impacts in riparian areas. The parameters are bank disturbance, soil disturbance, grass/sedge stubble height, woody vegetation utilization and key vegetation species utilization. Allowable disturbance levels are tailored to specific stream-type groups depending on both similarity ratings and resiliency. Additionally, a time-related feature is provided for situations when monitoring time or intensity may be less than that needed to assure assigned parameters are fully met. This feature is intended to provide a reasonable and prudent alternative to situations or circumstances when time, personnel and/or monetary constraints restrict or preclude effective monitoring.

*It needs to be emphasized that stubble height, streambank disturbance, woody stem use, etc. are all short-term indicators of grazing effects on meeting long-term management objectives. Each can be used in the appropriate situation, as indicators of good management, and as a target to achieve in the annual operating plan, with the objective of achieving the long-term riparian management goals.*

**Similarity** **refers to how similar the riparian area and stream channel are to desired conditions.**

*High Similarity:*

Those areas that reflect characteristics within a natural range of variation. The soils reflect inherent properties and processes. The plant communities are generally those within a desired condition or trending toward a desired seral stage, ecological status or condition (See page 60 for a method of determining plant ecological status/similarity). The channels should be within the range of variation of the desired channel type as defined by Rosgen (1996). Aquatic habitat should reflect the capabilities of the desired channel type, as measured by percent fines in spawning gravel, pool habitat quantity and quality, cobble embeddedness, stream bank stability, particle size distribution, etc.

This can be equated with *Properly Functioning Condition* (Prichard 1998*).* This process considers hydrology, vegetative and erosion deposition components of riparian areas and stream channels. When all these components are in place and functioning, the system is considered to be in properly functioning condition.

*Moderate Similarity***:**

Those riparian areas that are midway between High Similarity and Low Similarity and may have characteristics of both. These areas may include areas that were disturbed at one time but are trending toward high similarity or the reverse.

*This can be equated to the Functional-at-Risk category.* This is described as areas that may be in a functional condition, but an existing, soil, water or vegetation attribute makes them susceptible to degradation, or an attribute is in less than a

BLM_0079285

desirable condition, but not in degraded (low similarity) condition.

### *Low Similarity:*

Those riparian areas that reflect characteristics below a natural range of variation. These areas have usually been disturbed and provide less than desirable characteristics. These characteristics include soils, vegetation, channel stability, floodplain condition and so forth. Detrimental soil disturbance can be evidenced by extensive puddling, compaction, trails and wallows, hummocky soils, topsoil displacement and bare ground. Plant communities have limited flora, which may contain weedy species. Shrub communities are often absent even where the site historically supported them, or are comprised of decadent individuals of species adapted to constant disturbance. Streams would display characteristics outside the range of variation normally associated with a particular channel type. Adverse stream features may include high width/depth ratios, shifted particle size distribution, trampled banks, increased percent fines in spawning gravel, pool habitat missing or shifted outside the natural range for desired channel type, raw or deteriorating stream banks, etc.

*This can be equated to Functional-at-Risk, to Non-Functional, depending on the degree of disturbance.* A Non-Functional system is one that clearly does not provide adequate vegetation, landform, or large woody debris to dissipate stream energy associated with high flows and thus are not reducing erosion, improving water quality, etc. There is an absence of certain physical attributes such as a floodplain where one should be.

*Caveat - If the channel has deeply downcut and is evolving to another state of channel development (e.g. between state C and D as defined in Prichard (1998), standards for High Similarity may be applied).*

This is because the time required for a channel to evolve from one state to another may take several decades, or more, to complete. Even if livestock are completely removed from the site, there may be no effect, either positively or negatively, on the evolution process. In this situation, since livestock grazing will not have any real impact on the evolution process, they may as well graze the site to the fullest extent allowable by the standards.

**Resiliency is the ability of the riparian area/stream channel to resist impacts or to recover once disturbed. It is a factor of parent material soils, existing vegetation and stream characteristics.**

Stream characteristics have been defined by channel type (Rosgen 1996). These include sensitivity to disturbance, recovery potential, sediment supply potential, streambank erosion potential and vegetation controlling influence. Each Stream type has been consolidated into groups containing like characteristics (See Table 6). These groups have been further consolidated into a High, Moderate or Low Resiliency rating. For example: The B2 stream type is within Stream Group 4 (See Table 6). Stream Group 4, by definition, has a High Resiliency to disturbance.

Measurement of the parameters described herein, except Riparian Disturbance, will usually be within the bankfull flow floodplain zone between the edge of the water and the riparian area, depending on the channel type, vegetation type and composition and the

BLM_0079286

amount of protection needed.  Three values are given for early, mid and late grazing seasons.

Movement of livestock within a pasture or to the next pasture will occur when a selected parameter level within these tables is reached. If, for example, the streambank disturbance parameter is reached before the stubble height parameter, livestock must be moved because one parameter has been attained.  However, if livestock can be kept out of the stream area where a parameter has been reached, they may stay in the grazing pasture or unit until upland utilization is reached, but only if no other riparian parameters are exceeded.

Standards are set to either maintain the site in a high similarity situation or reverse the downward trend if in a low similarity situation.  This in turn will protect water quality/wildlife values in those areas where they presently meet or exceed required or needed values, or improve degraded areas to meet those values.  Those areas with low resiliency and low similarity have more conservative values for the parameters to be measured than high resiliency, high similarity areas.  This is because once low resiliency areas are damaged they may take longer to recover.  The speed at which a riparian area will recover depends on the resiliency of the site, the overall condition, and the magnitude and duration of impacts that continue to influence the site.

To use the following tables, determine the stream group (See Table 7) and the similarity rating for each stream or segment of interest. In the utilization and stubble height tables, three figures are shown for each combination of similarity and resiliency. (e.g. 40/30/20) These are in reference to the timing and use. The first number is early season use (normally the beginning of the growing season to mid July), the second is mid season (usually mid July to mid August), and the third is late season (normally mid August to the end of the growing season).  Seasonal climatic and elevational variations will affect the exact dates or time periods of each of the seasons.

For instance, some observers of vegetation in Southeastern Idaho state that most of the cool season vegetation growth occurs during the first six weeks of the growing period, slowing in early to mid-July in "normal" years, followed by the growth of warm season vegetation.  Late season (late August to the end of the grazing season) is normally when upland plants stop growing, through some riparian species may continue growing until hard freeze.  As such, greater utilization is allowed for those plants grazed earlier in the season because of the re-growth potential. Those plants grazed in mid-season have a reduced re-growth potential and, therefore have a reduced amount of allowable utilization.  Plants grazed in the late season have the least potential for re-growth, thus have the least allowable utilization.  However, this rule-of-thumb should be used with caution.  Smith (2001) studied sedge re-growth in a small spring-fed stream in southeastern Idaho.  He found variability in plant re-growth even on the same stream. Two plots experienced over 10 inches re-growth, while two plots had no re-growth at all.  He also concluded that consistent re-growth cannot be expected after mid-July and that managers should be cautions when prescribing early season stubble height criteria because of the variability in re-growth responses.

Some literature suggests that standards should be different depending on the socio-political class or sensitivity of the stream, or the kind of grazing, i.e. season-long vs. rest rotation. In these situations, stream classes or sensitivities are based on risk, the presence of certain uses, such sensitive species, and so

BLM_0079287

forth.  These concepts have merit.  The purpose of the standards listed below is to protect all riparian areas and stream channels from degradation.  However, socio-political factors, such as the presence of threatened or endangered species, or listing of the stream under section 303(d) of the Clean Water Act may warrant additional protection or accelerated restoration.  As such, more restrictive standards may be justified than those advocated within the tables.  For example Forest Service Handbook 2209.21 (1993) states that stubble heights of greater than 6 inches may be necessary to protect special riparian ecosystem functions, such as critical fisheries.  FSH 2209.21 further states that where riparian and fishery habitats as well as other sensitive areas are involved, grazing animals must be totally removed from the grazing unit when proper use has been attained.  Failure to do so could negate the objectives of the grazing system.

44

## Table 1.  Greenline - Key Species Forage Utilization (Percent).

| Stream Group | Properly Functioning Condition | Functioning at Risk (High to Moderate) | Functioning at Risk (Low) to Non Functioning | Non Functioning (States C & D) |
|---|---|---|---|---|
| 0,1,2,3,4, 12,16 | 55/45/35 | 45/40/30 | 40/30/20 | 45/40/30 |
| 5,6,9,10 13,14,15 | 50/40/30 | 40/30/25 | 30/25/20 | 40/30/25 |
| 7,8,11 17 | 40/30/20 | 30/25/20 | 20/20/20 | 30/25/20 |

**Key Species Utilization:**

This is the percent of total weight of **greenline** key species utilized by livestock while grazing the affected riparian area.  In some areas of high similarity (PFC) it will be forage species, such as *Carex aquatilis*.  Under lower similarity (Functioning at Risk to Non Functioning) the focus may be on all grass species present, since one would not expect to find an abundance of desired species if the area has been over-utilized by ungulates.

## Table 2.  Woody/Shrubby Species Utilization (Percent).

| Stream Group | Properly Functioning Condition | Functioning at Risk (High to Moderate) | Functioning at Risk (Low) to Non Functioning | Non Functioning (States C & D) |
|---|---|---|---|---|
| 0,1,2,3,4, 12,16 | 50/50/50 | 50/50/40 | 50/40/35 | 50/50/40 |
| 5,6,9,10 13,14,15 | 50/50/45 | 50/45/40 | 50/40/30 | 50/40/30 |
| 7,8,11 17 | 40/40/35 | 40/35/30 | 30/20/15 | 40/35/30 |

**Woody/Shrubby Species Utilization:**

This is the utilization of the annual growth of woody species such as willows, aspen, dogwood, etc. by livestock **and** wildlife within the riparian area. Emphasis will be on individual plants closest to the stream bank.  Utilization is compared to a similar plant, or a portion of the same plant, that has not been browsed.  Lower utilization rates for lower resiliency/similarity segments are not particularly based on plant physiology, or the ability of plants to withstand grazing pressures, but rather on emphasizing plant regeneration and/or reestablishment.

BLM_0079289

## Table 3.  Greenline - Stubble Height (Inches).

| Stream Group | Properly Functioning | Functioning at Risk (High to Moderate) | Functioning at Risk (Low) to Non Functioning | Non Functioning (states C & D) |
|---|---|---|---|---|
| 0,1,2,3,4, 12,16 | 2/3/5 | 3/4/5 | 4/5/6 | 3/4/5 |
| 5,6,9,10 13,14,15 | 3/4/5 | 4/5/6 | 5/6/8 | 4/5/6 |
| 7,8,11,17 | 4/6/6 | 5/6/8 | 6/8/8 | 5/6/8 |

**Stubble Height:**

This is the height of standing **greenline** herbaceous vegetation at the time of measurement.  These values take into consideration any anticipated regrowth. Measurement can be in one of two ways.  It can be an average of all the forage within the bankfull zone, or it can focus on one or several Key species within the bankfull zone.  The bankfull zone is normally associated with the so-called "greenline", which is the first perennial vegetation from the water's edge.  It is realized that some species may not naturally grow to a desired length, or natural conditions such as a drought may stagnate growth.  If this occurs, percent utilization may be a better parameter than stubble height.

## Table 4.  Riparian Zone Soils Disturbance (Percent)*

*These parameters are appropriate where ground cover (a combination of vegetation, litter and rock fragments (larger than ¾ inch in diameter) protect, and are in contact with the soil.  If total ground cover within the riparian emphasis area is less than **80%,** use the next lower resiliency or similarity parameter.

| Stream Group | Properly Functioning | Functioning at Risk (High to Moderate) | Functioning at Risk (Low) to Non Functioning | Non Functioning (states C & D) |
|---|---|---|---|---|
| 0,4,6,10 | 15% | 15% | 10% | 15% |
| 1,2,5,7, 12,16 | 15% | 15% | 10% | 15% |
| 3,8,9,11, 13,14,15, 17 | 10% | 10% | 5% | 10% |

**Riparian Soils Disturbance:**

This refers to detrimental soil disturbance within the riparian area.  This differs from bank disturbance in that the entire riparian area is assessed, rather than just the stream bank.  Characteristics of detrimental soil disturbance include puddling (results in hummocky soils), compaction and displacement.  It can be associated with high amounts of bare soil.  Soil disturbance will not necessarily be measured exclusively within bankfull zone, but will be measured in the larger floodplain area or sensitive low terrace, depending on the channel type.  Soil is considered bare if not protected by vegetation, moss, litter or rock.  Other soil factors, such as displacement, compaction, and/or puddling, in addition to burning and on-site organic matter (litter and large woody debris), may also be considered per FSH 2509.18 – Soil Management Handbook, Region 4 Supplement No. 2509.18-95-1 and other appropriate Regional standards and guidelines.

46

BLM_0079290

**Table 5.  Bank Disturbance/Alteration - One Year (Percent)**

| Stream Group | Properly Functioning | Functioning at Risk (High to Moderate) | Functioning at Risk (Low) to Non Functioning | Non Functioning (States C & D) |
|---|---|---|---|---|
| 0,3,4,6,12,16 | 25% | 20% | 15% | 20% |
| 1,2,5,13 | 20% | 15% | 15% | 15% |
| 7,8,9,10,11,14,15,17 | 15% | 10% | 10% | 10% |

**Table 5A.  Bank Stability - Cumulative (Percent)**

| Stream Group | Properly Functioning Condition | Functioning at Risk (High to Moderate) | Functioning at Risk (Low) to Non Functioning | Non Functioning (States C & D) |
|---|---|---|---|---|
| 0,3,4,6,12,16 | 85% | 80% | 75% | 80% |
| 1,2,5,13 | 80% | 75% | 70% | 75% |
| 7,8,9,10,11,14,15,17 | 75% | 70% | 65% | 70% |

**Bank Disturbance/Alteration** refers to short-term (annual) physical disturbance of alteration of the bank by livestock trampling.  Characteristics of bank disturbance/alteration are bare soil exposed to running water, bank erosion or sloughing.  Bank disturbance is measured from the low water line to the top of the bank and as far away from the shoreline as necessary to properly assess conditions that may lead to a section of the bank eroding or falling into the stream during higher flows.

**Bank Stability** refers to long-term bank structure, expresses as a percentage of the streambank in one of six stability classes.  It is intended for long-term trend monitoring and should be read on 3-5 year intervals.  It includes damage from natural processes, such as floods, and human caused impacts, such as mining or recreation vehicle crossings, as well as from livestock.

Other socio-political requirements or constraints may supersede these parameters.  For example, Total Maximum Daily Load (TMDL) requirements for a Clean Water Act, Section 303(d) stream may require 80% of the banks to be in a stable condition.  This requirement would supersede the above parameters, unless they are more stringent than the TMDL requirement.

BLM_0079291

**Table 6.  Riparian Zone Forage Utilization and Stubble Heights (*Riparian\** Vegetation).**

| Season of Use | Properly Functioning Condition (%/Stubble Height) | Functioning at Risk (High to Moderate) (%/Stubble Height) | Functioning at Risk (Low) to Non Functioning (%/Stubble Height) | Non Functioning (States C & D) (%/Stubble Height) |
|---|---|---|---|---|
| Spring | 65/2 | 55/3 | 45/4 | 55/3 |
| Summer | 55/3 | 45/4 | 35/5 | 45/4 |
| Fall | 45/4 | 35/5 | 20/6+ | 35/5 |

**Table 6A.  Riparian Zone Forage Utilization and Stubble Heights (*Upland\** Vegetation).**

These parameters are appropriate where ground cover (a combination of vegetation, litter and rock fragments (larger than ¾ inch in diameter) protect, and are in contact with the soil.  If total ground cover within the riparian emphasis area is less than **60 percent,** use the next lower resiliency or similarity parameter.

| Properly Functioning Condition (% Utilization) | Functioning at Risk (High to Moderate) (% Utilization) | Functioning at Risk (Low) to Non Functioning (% Utilization) | Non Functioning (States C & D) (% Utilization) |
|---|---|---|---|
| 50% | 40% | 30% | 40% |

\*       ***Riparian*** vegetation is considered those grasses and sedges normally associated with wet or anerobic soil conditions.  ***Upland*** vegetation consists primarily of grasses normally associated with dryer soil conditions.

<u>Percent Utilization</u>:
The percent of total weight of key species within the Riparian Zone utilized by livestock while grazing the affected riparian area.

<u>Stubble Height</u>:
The height of standing herbaceous vegetation at the time of measurement.  Measurement can be in one of two ways.  It can be an average of all the upland forage within the Riparian zone, or it can focus on one or several Key Species within the Riparian zone.  It is realized that some species may not naturally grow to a desired length, or natural conditions such as a drought may stagnate growth.  If this occurs, percent utilization may be a better parameter than stubble height.

Only a percent utilization is given since residual stubble heights associated with utilization rates can be highly variable depending on the plant species and growing conditions.

BLM_0079292

**Key To Determine Allowable Use Parameters Within Riparian/Wetland Areas**

A managerial dilemma is deciding what monitoring parameter to apply to a particular situation. Two basic schools-of-thought polarize the issue. One school-of-thought is based on a simplistic one-size-fits-all concept that loosely reasons that if one component of the system is in satisfactory condition, the rest of the components will follow accordingly. Stubble height is one parameter that seems to have defaulted, in some areas, to this universal status; reasoning that stubble height is relatively easy to measure and it provides a somewhat accurate picture of grazing impacts. Depending on actual on-the-ground situations, the one-size-fits-all stubble height parameter, in itself, may not represent a true picture of impacts to riparian vegetation, channel stability, water quality and aquatic habitat.

The opposite school-of-thought lies in the camp of intensively monitoring a multitude of parameters, on a regular basis throughout the entire affected area. Though this methodology may reflect a more accurate picture of actual impacts and effects, the time and effort required to conduct such monitoring is prohibitive on any large-scale landscape. The answer lies somewhere in the middle.

Clary and Leininger (2000) suggest that no single management approach is best for all situations and no management tool serves all purposes. Other 'experts' assert that application of specific parameters depends on the type of landscape and intensity of impacts, but cannot offer any substantial suggestions without "looking on-the-ground" with a full interdisciplinary team. Again, this concept is well intended, but, in practice, the time and effort required for such intensive reviews on every area is impractical.

There is a need to adapt monitoring parameters to physical conditions found on the ground. Rather than instituting a universal, one-size-fits-all parameter, such a stubble height, the manager needs to be able to key in on the cause of any problems, rather than monitoring the symptom.

This concept is reinforced by Clary and Leininger (2000). They suggest that many managers tend to look at short-term impacts in the form of single monitoring parameters (such as stubble height), rather than looking at long-term management objectives such as the concepts of Potential Natural Community, Desired Future Condition or Properly Functioning Condition. They suggest that a manager should have a clear picture of the desired long-term structure and function of a riparian and channel system before setting any specific standards, such as stubble height. This is also emphasized in the University of Idaho, Stubble Height Study Report (2004)

Leonard *et al* (1997) stressed that regardless of other differences in management objectives, grazing must be compatible with achieving or maintaining "Properly Functioning Condition" (PFC) to be considered to be sustainable. PFC is achieved when adequate vegetation, landform, and/or large woody debris is present to:

- o Dissipate stream energy associated with high waterflows, theregy reducing erosion and improving water quality
- o Filter sediment, capture bedload, and aid floodplain development
- o Improve flood-water retention and ground-water recharge
- o Develop root masses that stabilize streambanks against cutting action
- o Develop diverse ponding and channel characteristics to provide the habitat and water depth, duration and

49

BLM_0079293

temperature necessary for fish production, waterfowl breeding and other uses
  o  Support greater biodiversity

They go on to say that livestock grazing may not always be entirely compatable with other resource uses or values.  In some of these situations, excluding livestock grazing may be the most logical and responsible course of action.  The compatibility of grazing in riparian areas depends on the extent to which grazing management considers and adapts to certain basic ecological relationships.  Prior to developing grazing management prescriptions, the manager should have some understanding of grazing effects on ecosystem functions such as soils, water quality and hydrologic/ geomorphic conditions and processes.

The following key is designed to help the manager focus in on the parameter or parameters that may be monitored in an effort to obtain a more efficient and accurate reflection of short-term impacts, while maintaining or moving toward desired riparian and channel conditions over the long term. Use of the key can be accomplished in a relatively short amount of time without requiring the need of large interdisciplinary teams.  However, the use of ID teams is still encouraged when and where possible.

Use of the key requires a basic knowledge of the Properly Functioning Condition[39] concept. The quasidichotomous key is subdivided into three parts.  The first part consists of socio-political factors.  These factors attempt to address the human values placed on a certain riparian area or reach of stream.  The second part addresses the resource values themselves.

These values are developed using the Properly Functioning Condition assessments.  Beaver change the natural conditions of a stream channel and riparian area and are addressed separately.

Again, it is emphasized that a short-term or annual monitoring parameter (i.e., five-inch greenline stubble height, etc.) is NOT the desired condition.  It is merely a surrogate for achieving long-term goals and desired conditions.  These desired conditions are determined by the manager.  They can be Properly Functioning Condition, some seral state or stage of vegetative communities, some state or stage of channel stability, water quality, aquatic habitat and so forth.  These can and should be set by an ID team prior to establishing standards.

Once a parameter, or parameters is/are established, monitoring is required to determine if the parameter(s) is sufficient to attain the desired goal or condition.  If not, parameters can and should be adjusted so that long-term conditions are achieved and maintained.

Use of the key is a several-step process.  First, a desired condition must be determined. Secondly, the existing condition must be known.  The key is based on a desired future condition of Properly Functioning Condition. To this end, the 17 checklist questions (USDI 1998)[40] must be answered.  The third step is to go through the key, answering the yes-no questions until the suggested parameter or parameters are determined.

To use the tables, channel type must be known.  To determine Stream Group used in the tables, go to Table 7 in this guide.  The channel type is found in the extreme left column, the associated Stream Group is found in the adjacent column to the right.  Find the

---

[39] USDI, Bureau of Land Management, 1998. Riparian Area Management, A User Guide to Assessing Proper Functioning Condition and the Supporting Science for Lotic Areas, TR 1737-15, National Applied Resource Sciences Center, Denver, Co.

[40] Ibid

BLM_0079294

appropriate stream group along the extreme left side of the parameter table(s), locate the existing condition along the top of the table(s) and at the intersection of the Stream Group row and the existing condition column are the suggested parameter(s).

For example, using Table 3 (Greenline Stubble Height) the numbers at the intersection of Stream Group 4 and Function At Risk-High to Moderate are the numbers 3/4/5. This means key species greenline vegetation can be grazed **Socio-political Factors:**

to 3 inches in the early season, to 4 inches in the mid-season, and to 5 inches if grazed in the late season. The exact dates or times of "early", "mid" and "late" can vary between Forests or even between years, therefore are not specified. However, for the Caribou National Forest, "early" is usually defined as the beginning of the growing season to mid July, "mid" season from mid July to mid August, and "late" season from mid August to the end of the growing season (see Impact Guidelines section for more detail).

1) **AIZ\* contains TE species and/or stronghold for Sensitive Species**
   \*These parameters are appropriate where ground cover (a combination of vegetation, litter and rock fragments (larger than ¾ inch in diameter) protect, and are in contact with the soil. If total ground cover within the riparian emphasis area is less than **60 percent,** use the next lower resiliency or similarity parameter.

   *YES*   Control grazing to protect species habitat. Increase protection at least one Resiliency or Similarity Level: e.g. area is determined to be PFC/High Similarity, use guidelines for Functional-at-Risk/Moderate Similarity; If already at Low Resiliency/Similarity, rest the area for one or more years until condition reaches Moderate Similarity; go to 2

   *NO*   Go to 2

2) **AIZ contains a 303(d) stream**

   *YES*   Increase protection at least one Resiliency or Similarity level(i.e. high to moderate or moderate to low); If already at Low Resiliency/Similarity, rest the area for 1 or more years until condition reaches Moderate Similarity; go to 3

   *NO*   Go to 3

3) **A 303(d) stream or Riparian/Aquatic TES species is immediately below (within 1 mile) Forest boundary**

   *YES*   Consider increasing protection one Resiliency or Similarity Level; If already at Low Resiliency/Similarity, rest the area for 1 or more years until condition reaches Moderate Similarity; go to 3a

   *NO*   Go to 3a

   3a)   **A 303(d) stream or Riparian/Aquatic TES species is one to ten miles below Forest boundary and within 1 stream order**

   *YES*   Consider increasing protection one Resiliency or Similarity Level; If already at Low Resiliency/Similarity, consider resting the area for 1 or more years until condition reaches Moderate Similarity; go to 3b

BLM_0079295

       *NO*     Go to 3b

**3b)**     **A 303(d) stream or Riparian/Aquatic TES species is greater than 10 miles below Forest boundary or is two or more stream orders greater than the stream order at the Forest boundary.**

       *YES*    Use evaluated Similarity Level; go to 4

       *NO*     Go to 4

**Physical Factors:**

**4)**  **AIZ is at Properly Functioning Condition (PFC)**

    *YES*    Go to 5

    *NO*     Go to 4a

**4a)**     **AIZ is Functioning At Risk (FAR)**

       *YES*    Go to 6

       *NO*     Go to 4b

**4b)**     **AIZ is Non Functioning (NF)**

       Go to 6

**5)**  **If AIZ is at PFC, are there any rated factors within control rated "No"?**

    *YES*    Go to 6

    *NO*     Maintain current grazing scheme; great work!!

**6)**  **Are any "Hydrology" factors rated "No"?**

    *YES*    Go to 7

    *N0*     Go to 6a

**6a)**     **Are any "Vegetation" factors rated "No"?**

       *YES*    Go to 10b

       *NO*     Go to 6b

**6b)**     **Are any "Erosion/Deposition" factors rated "No"?**

       *YES*    Go to 8

       *NO*     Go to 7

BLM_0079296

**Floodplain and Channel Characteristics**

7) **Is floodplain inundated in relatively frequent (1 to 3 years) events?**

*YES*   Go to 8

*NO*   Go to 7a

    7a) **Is the channel Type F or G? (See page 60, Figure 2)**

        *YES*   Go to 7b

        *NO*   Go to 8

    7b) **Is the channel in State B or E? (See page 57, Table 1)**

        *YES*   Go to 8

        *NO*   Go to 7c

    7c) **Is the channel in State C or D? (see page 57, Table 1)**

        *YES*   Use "High Similarity/High Resiliency guidelines, go to 8

        *NO*   Go to 8

8) **Are the floodplain and channel characteristics adequate to dissipate energy?**

*YES*   Go to 9

*NO*   Go to 8a

    8a) **Are channel characteristics changing (i.e. widening, deepening, bank cutting)?**

        *YES*   Go to 8b

        *NO*    Go to 9

    8b) **Are Stream Type Groups 05, 07, 08, 09, 11, 13, 14, 15 or 17?**

        *YES*   Go to 8c

        *NO*    Go to 9

    8c) **Is adequate vegetative cover present to protect banks and dissipate energy during high flows?**

        *YES*   Go to 9

        *NO*    Go to 8d

BLM_0079297

**8d)**     Is bank soil structure, texture and cohesive strength such that extensive root and surface mass is needed to maintain bank stability (i.e. silty alluvial soils)(e.g. C3-C6, DA4-DA6 and E3-E6 Channel Types)?

     _**YES**_     Go to 8e

     _**NO**_     Go to 9

**8e)**     Are livestock suppressing vegetative cover?

     _**YES**_     <mark>Use stubble height guidelines (Table 3);</mark> go to 9

     _**NO**_     Go to 9

**9)**     **Are channels in balance with the landscape setting?**

   _**YES**_     Go to 10

   _**NO**_     Go to 9a

**9a)**     Is sinuosity within acceptable parameters for the channel type?

     _**YES**_     Go to 9d

     _**NO**_     Go to 9b

**9b)**     Has the channel been artificially straightened or meanders being cut off?

     _**YES**_     Go to 9c

     _**NO**_     Go to 9d

**9c)**     Are livestock aggravating channel straightening?

     _**YES**_     <mark>Use bank disturbance, vegetation and/ or woody/shrubby species utilization guidelines (Tables 1, 2, and/or 5/5A);</mark> go to 10

     _**NO**_     Go to 9d

**9d)**     Are overhanging banks present in good condition?

     _**YES**_     Go to 9f

     _**NO**_     Go to 9e

**9e)**     Is overhanging bank sheering aggravated by livestock?

     _**YES**_     <mark>Use bank disturbance guidelines (Table 5/5A);</mark> go to 10

     _**NO**_     Go to 9f

BLM_0079298

**9f)**   **Is width/depth ratio greater than normal for the Channel Type?**

   ***YES***   Go to 9g

   ***NO***   Go to 9h

**9g)**   **Is bank sheering/instability aggravated by livestock?**

   ***YES***   Use bank disturbance, forage utilization, stubble height and/or woody/shrubby species guidelines (Tables 1, 2, and/or 5/5A); go to 10

   ***NO***   Go to 9h

**9h)**   **Is lateral movement of stream channels within natural ranges?**

   ***YES***   Go to 9k

   ***NO***   Go to 9i

**9i)**   **Are stream banks eroding excessively?  (Greater 30 percent)**

   ***YES***   Go to 9j

   ***NO***   Go to 9k

**9j)**   **Are livestock contributing to excessive lateral migration?**

   ***YES***   Use bank disturbance, vegetation utilization and/or woody/shrubby species guidelines (Tables 1, 2, and/or 5/5A); go to 10

   ***NO***   Go to 9k

**9k)**   **Is the stream channel vertically stable?**

   ***YES***   Go to 10

   ***NO***   Go to 9l

**9l)**   **Is the channel downcutting or aggrading at an accelerated rate? (e.g. headcutting or excessive sediment buildup)**

   ***YES***   Go to 9m

   ***NO***   Go to 10

**9m)**   **Are livestock aggravating the condition?**

   ***YES***   Use stubble height, bank disturbance, soil disturbance and/or woody/shrubby species utilization guidelines (Tables 2, 3, 4, and/or 5/5A); go to 10

BLM_0079299