

# Uncompahgre RMP Planning Unit #1

The Uncompahgre RMP decision area excludes the Gunnison Gorge and Dominguez-Escalante NCAs. Separate plans have and/or will be made for those areas.

*The Colorado Wilderness Act of 1993 protects the wilderness characteristics of the Roubideau and Tabeguache Areas but does not label them as Wilderness. They are illustrated on this map as Wilderness.

| | |
|---|---|
| Bureau of Land Management | BLM Wilderness Study Areas |
| National Park Service | BLM Wilderness* |
| Other Federal | Forest Service Wilderness |
| Private | National Park Service Wilderness |
| State | Dominguez Escalante National Conservation Area |
| State, County, City Areas | Gunnison Gorge National Conservation Area |
| US Forest Service | Area of Critical Environmental Concern |
| | Special Recreation Management Area |

Uncompahgre RMP Boundary
Uncompahgre Field Office Boundary
Planning Unit
Major Road
County Road
River
County Boundaries

Projection NAD 1983, UTM Zone 13
February 2010

No alleged warranty is made on the accuracy, reliability and completeness of these data for individual use or aggregate use with other data. Spatial data may not meet National Map Accuracy Standards. This information may be updated without notification.

N
W   E
S

10
Miles

BLM_0081402



# Uncompahgre RMP Planning Unit #2

| | |
|---|---|
| Bureau of Land Management | BLM Widerness Study Areas |
| National Park Service | BLM Wilderness* |
| Other Federal | Forest Service Wilderness |
| Private | National Park Service Wilderness |
| State | Dominguez Escalante National Conservation Area |
| State, County, City Areas | Gunnison Gorge National Conservation Area |
| US Forest Service | Area of Critical Environmental Concern |
| | Special Recreation Management Area |

Uncompahgre RMP Boundary
Uncompahgre Field Office Boundary
Planning Unit
Major Road
County Road
River
County Boundaries

The Uncompahgre RMP decison area excludes the Gunnison Gorge and Dominguez-Escalante NCAs. Separate plans have and/or will be made for those areas.

*The Colorado Wilderness Act of 1993 protects the wilderness characteristics of the Roubideau and Tabeguache Areas but does not label them as Wilderness. They are illustrated on this map as Wilderness.

N
W E
S

10
Miles

Projection NAD 1983, UTM Zone 13
February 2010

No alleged warranty is made on the accuracy, reliability and completeness of these data for individual use or aggregate use with other data. Spatial data may not meet National Map Accuracy Standards. This information may be updated without notification.



# Uncompahgre RMP Planning Unit #3

The Uncompahgre RMP decison area excludes the Gunnison Gorge and Dominguez-Escalante NCAs. Separate plans have and/or will be made for those areas.

*The Colorado Wilderness Act of 1993 protects the wilderness characteristics of the Roubideau and Tabeguache Areas but does not label them as Wilderness. They are illustrated on this map as Wilderness.

- Bureau of Land Management
- National Park Service
- Other Federal
- Private
- State
- State, County, City Areas
- US Forest Service
- BLM Wilderness Study Areas
- BLM Wilderness*
- Forest Service Wilderness
- National Park Service Wilderness
- Dominguez Escalante National Conservation Area
- Gunnison Gorge National Conservation Area
- Area of Critical Environmental Concern
- Special Recreation Management Area
- Uncompahgre RMP Boundary
- Uncompahgre Field Office Boundary
- Planning Unit
- Major Road
- County Road
- River
- County Boundaries

N
W E
S

10
Miles

Projection NAD 1983, UTM Zone 13
February 2010

No alleged warranty is made on the accuracy, reliability and completeness of these data for individual use or aggregate use with other data. Spatial data may not meet National Map Accuracy Standards. This information may be updated without notification.



# Uncompahgre RMP Planning Unit #4

**U.S. DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**

Planning Unit #3

Planning Unit #4

The Uncompahgre RMP decision area excludes the Gunnison Gorge and Dominguez-Escalante NCAs. Separate plans have and/or will be made for those areas.

*The Colorado Wilderness Act of 1993 protects the wilderness characteristics of the Roubideau and Tabeguache Areas but does not label them as Wilderness. They are illustrated on this map as Wilderness.

| | | | |
|---|---|---|---|
| Bureau of Land Management | BLM Wilderness Study Areas | Uncompahgre RMP Boundary | |
| National Park Service | BLM Wilderness* | Uncompahgre Field Office Boundary | |
| Other Federal | Forest Service Wilderness | Planning Unit | |
| Private | National Park Service Wilderness | Major Road | |
| State | Dominguez Escalante National Conservation Area | County Road | |
| State, County, City Areas | Gunnison Gorge National Conservation Area | River | |
| US Forest Service | Area of Critical Environmental Concern | County Boundaries | |
| | Special Recreation Management Area | | |

N
W    E
S

Projection NAD 1983, UTM Zone 13
February, 2010

No alleged warranty is made on the accuracy, reliability and completeness of these data for individual use or aggregate use with other data. Spatial data may not meet National Map Accuracy Standards. This information may be updated without notification.

10
Miles

BLM  0081405



Uncompahgre RMP Planning Unit #5
Planning Unit #5
Planning Unit #3
Gunnison Gorge NCA
Not included in RMP Revision
DELTA
MONTROSE
Olathe
Montrose
MONTROSE
MESA
OURAY
Utah
Colorado
Paradox
Dolores River
San Miguel River
Uncompahgre River
Nucla
Naturita
Redvale
Norwood
MONTROSE
SAN MIGUEL
SAN MIGUEL
OURAY
348
90
The Uncompahgre RMP decison area excludes the Gunnison Gorge and Dominguez-Escalante NCAs. Separate plans have and/or will be made for those areas.
*The Colorado Wilderness Act of 1993 protects the wilderness characteristics of the Roubideau and Tabeguache Areas but does not label them as Wilderness. They are illustrated on this map as Wilderness.
Bureau of Land Management
National Park Service
Other Federal
Private
State
State, County, City Areas
US Forest Service
BLM Wilderness Study Areas
BLM Wilderness*
Forest Service Wilderness
National Park Service Wilderness
Dominguez Escalante National Conservation Area
Gunnison Gorge National Conservation Area
Area of Critical Environmental Concern
Special Recreation Management Area
Uncompahgre RMP Boundary
Uncompahgre Field Office Boundary
Planning Unit
Major Road
County Road
River
County Boundaries
N
W
E
S
10
Miles
Projection NAD 1983, UTM Zone 13
February 2010
No alleged warranty is made on the accuracy, reliability and completeness of these data for individual use or aggregate use with other data. Spatial data may not meet National Map Accuracy Standards. This information may be updated without notification.



# United States Department of the Interior
**BUREAU OF LAND MANAGEMENT**
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, Colorado 81401**
**www.co.blm.gov**



IN REPLY REFER TO:
1610 (CO-S05)

March 10, 2010

Shelby Bear
DMEA
PO Box 910
Montrose, CO  81402

Dear Ms. Bear,

Thank you for applying to be on the subgroup of the Southwest Resource Advisory Council for the Uncompahgre Field Office Resource Management Plan revision.  The Southwest Resource Advisory Council met on Friday, March 5 and voted for you to be a member on the new seven person subgroup.

The group will be meeting monthly beginning Thursday, May 27, 2010 from 9am – noon at the Montrose Public Lands Center.  Future meetings are planned for June, July, August and September.  We will get you the specific meeting dates at or before the May meeting.  Your involvement at each meeting will be critical.

Again, thank you for your interest and willingness to volunteer your time and talents.  We look forward to working with you on the Resource Management Plan Revision.

If you have any questions regarding the subgroup meetings, please contact Bruce Krickbaum at 970-240-5300 or at Bruce_Krickbaum@blm.gov.

Sincerely,

Barbara L. Sharrow
Field Office Manager

cc:  Kathy Welt, Chair, Southwest RAC

BLM_0081407



# United States Department of the Interior
### BUREAU OF LAND MANAGEMENT
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, Colorado 81401**
**www.co.blm.gov**



IN REPLY REFER TO:
1610 (CO-S05)

March 10, 2010

Richard Durnan
PO Box 2065
Ridgway, CO  81432

Dear Mr. Durnan,

Thank you for applying to be on the subgroup of the Southwest Resource Advisory Council for the Uncompahgre Field Office Resource Management Plan revision.  The Southwest Resource Advisory Council met on Friday, March 5 and voted for you to be a member on the new seven person subgroup.

The group will be meeting monthly beginning Thursday, May 27, 2010 from 9am – noon at the Montrose Public Lands Center.  Future meetings are planned for June, July, August and September.  We will get you the specific meeting dates at or before the May meeting.  Your involvement at each meeting will be critical.

Again, thank you for your interest and willingness to volunteer your time and talents.  We look forward to working with you on the Resource Management Plan Revision.

If you have any questions regarding the subgroup meetings, please contact Bruce Krickbaum at 970-240-5300 or at Bruce_Krickbaum@blm.gov.


Sincerely,



Barbara L. Sharrow
Field Office Manager


cc:  Kathy Welt, Chair, Southwest RAC



# United States Department of the Interior
### BUREAU OF LAND MANAGEMENT
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, Colorado 81401**
**www.co.blm.gov**



IN REPLY REFER TO:
1610 (CO-S05)

March 10, 2010

Steven Weist
Oxbow Mining
PO Box 535
Somerset, CO  81434

Dear Mr. Weist,

Thank you for applying to be on the subgroup of the Southwest Resource Advisory Council for the Uncompahgre Field Office Resource Management Plan revision.  The Southwest Resource Advisory Council met on Friday, March 5 and voted for you to be a member on the new seven person subgroup.

The group will be meeting monthly beginning Thursday, May 27, 2010 from 9am – noon at the Montrose Public Lands Center.  Future meetings are planned for June, July, August and September.  We will get you the specific meeting dates at or before the May meeting.  Your involvement at each meeting will be critical.

Again, thank you for your interest and willingness to volunteer your time and talents.  We look forward to working with you on the Resource Management Plan Revision.

If you have any questions regarding the subgroup meetings, please contact Bruce Krickbaum at 970-240-5300 or at Bruce_Krickbaum@blm.gov.

Sincerely,

Barbara L. Sharrow
Field Office Manager

cc:  Kathy Welt, Chair, Southwest RAC



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
www.co.blm.gov



IN REPLY REFER TO:
1610 (CO-S05)

March 10, 2010

Robbie LeValley
Colorado State University Extension
525 Dodge Street
Delta, CO  81416

Dear Ms. LeValley,

Thank you for applying to be on the subgroup of the Southwest Resource Advisory Council for the Uncompahgre Field Office Resource Management Plan revision.  The Southwest Resource Advisory Council met on Friday, March 5 and voted for you to be a member on the new seven person subgroup.

The group will be meeting monthly beginning Thursday, May 27, 2010 from 9am – noon at the Montrose Public Lands Center.  Future meetings are planned for June, July, August and September.  We will get you the specific meeting dates at or before the May meeting.  Your involvement at each meeting will be critical.

Again, thank you for your interest and willingness to volunteer your time and talents.  We look forward to working with you on the Resource Management Plan Revision.

If you have any questions regarding the subgroup meetings, please contact Bruce Krickbaum at 970-240-5300 or at Bruce_Krickbaum@blm.gov.

Sincerely,

Barbara L. Sharrow
Field Office Manager

cc:  Kathy Welt, Chair, Southwest RAC



# United States Department of the Interior
### BUREAU OF LAND MANAGEMENT
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, Colorado 81401**
**www.co.blm.gov**



IN REPLY REFER TO:
1610 (CO-S05)

March 10, 2010

John Reams
Western Small Miner's Assoc.
PO Box 644
Naturita, CO  81422

Dear Mr. Reams,

Thank you for applying to be on the subgroup of the Southwest Resource Advisory Council for the Uncompahgre Field Office Resource Management Plan revision.  The Southwest Resource Advisory Council met on Friday, March 5 and voted for you to be a member on the new seven person subgroup.

The group will be meeting monthly beginning Thursday, May 27, 2010 from 9am – noon at the Montrose Public Lands Center.  Future meetings are planned for June, July, August and September.  We will get you the specific meeting dates at or before the May meeting.  Your involvement at each meeting will be critical.

Again, thank you for your interest and willingness to volunteer your time and talents.  We look forward to working with you on the Resource Management Plan Revision.

If you have any questions regarding the subgroup meetings, please contact Bruce Krickbaum at 970-240-5300 or at Bruce_Krickbaum@blm.gov.

Sincerely,

Barbara L. Sharrow
Field Office Manager

cc:  Kathy Welt, Chair, Southwest RAC

BLM_0081411



# United States Department of the Interior
### BUREAU OF LAND MANAGEMENT
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, Colorado 81401**
**www.co.blm.gov**



IN REPLY REFER TO:
1610 (CO-S05)

March 10, 2010

Walt Blackburn
1751 Clearview Dr
Delta, CO  81416

Dear Mr. Blackburn,

Thank you for applying to be on the subgroup of the Southwest Resource Advisory Council for the Uncompahgre Field Office Resource Management Plan revision.  The Southwest Resource Advisory Council met on Friday, March 5 and voted for you to be a member on the new seven person subgroup.

The group will be meeting monthly beginning Thursday, May 27, 2010 from 9am – noon at the Montrose Public Lands Center.  Future meetings are planned for June, July, August and September.  We will get you the specific meeting dates at or before the May meeting.  Your involvement at each meeting will be critical.

Again, thank you for your interest and willingness to volunteer your time and talents.  We look forward to working with you on the Resource Management Plan Revision.

If you have any questions regarding the subgroup meetings, please contact Bruce Krickbaum at 970-240-5300 or at Bruce_Krickbaum@blm.gov.

Sincerely,

Barbara L. Sharrow
Field Office Manager

cc:  Kathy Welt, Chair, Southwest RAC

BLM_0081412



# United States Department of the Interior
### BUREAU OF LAND MANAGEMENT
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, Colorado 81401**
**www.co.blm.gov**



IN REPLY REFER TO:
1610 (CO-S05)

March 10, 2010

Bill Day
28478 Hwy 92
Hotchkiss, CO  81419

Dear Mr. Day,

Thank you for applying to be on the subgroup of the Southwest Resource Advisory Council for the Uncompahgre Field Office Resource Management Plan revision.  The Southwest Resource Advisory Council met on Friday, March 5 and voted for you to be a member on the new seven person subgroup.

The group will be meeting monthly beginning Thursday, May 27, 2010 from 9am – noon at the Montrose Public Lands Center.  Future meetings are planned for June, July, August and September.  We will get you the specific meeting dates at or before the May meeting.  Your involvement at each meeting will be critical.

Again, thank you for your interest and willingness to volunteer your time and talents.  We look forward to working with you on the Resource Management Plan Revision.

If you have any questions regarding the subgroup meetings, please contact Bruce Krickbaum at 970-240-5300 or at Bruce_Krickbaum@blm.gov.

Sincerely,

Barbara L. Sharrow
Field Office Manager

cc:  Kathy Welt, Chair, Southwest RAC



# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
### Uncompahgre Field Office
### 2465 South Townsend Avenue
### Montrose, Colorado 81401
### www.co.blm.gov



IN REPY REFER TO:
1610 (CO-S05)

March 10, 2010

Frank Swancara
24251 Cedar Mesa Road
Cedaredge, CO 81413

Dear Mr. Swancara,

Thank you for applying to be on the subgroup of the Southwest Resource Advisory Council for the Uncompahgre Field Office Resource Management Plan revision. The Southwest Resource Advisory Council met on Friday, March 5 and decided on a seven person subgroup. Unfortunately, you were not selected.

We appreciate your interest in public lands management and encourage you to apply for a position on the Southwest Resource Advisory Council or one of their subgroups in the future. Information regarding Colorado BLM's Councils can be found at: http://www.blm.gov/co/st/en/BLM_Resources/racs.html.

Again, thank you for your interest and willingness to volunteer your time and talents.

Sincerely,

Barbara L. Sharrow
Field Office Manager

BLM_0081414



**United States Department of the Interior**
**BUREAU OF LAND MANAGEMENT**
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, Colorado 81401**
**www.co.blm.gov**



IN REPY REFER TO:
1610 (CO-S05)

March 10, 2010

Kerry Kalarney
PO Box 750
Olathe, CO  81425

Dear Mr. Kalarney,

Thank you for applying to be on the subgroup of the Southwest Resource Advisory Council for the Uncompahgre Field Office Resource Management Plan revision.  The Southwest Resource Advisory Council met on Friday, March 5 and decided on a seven person subgroup. Unfortunately, you were not selected.

We appreciate your interest in public lands management and encourage you to apply for a position on the Southwest Resource Advisory Council or one of their subgroups in the future. Information regarding Colorado BLM's Councils can be found at: http://www.blm.gov/co/st/en/BLM_Resources/racs.html.

Again, thank you for your interest and willingness to volunteer your time and talents.

Sincerely,

Barbara L. Sharrow
Field Office Manager



# United States Department of the Interior

**BUREAU OF LAND MANAGEMENT**
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, Colorado 81401**
**www.co.blm.gov**



IN REPY REFER TO:
1610 (CO-S05)

March 10, 2010

Billy Pease
286 SE Greenwood Ave
Cedaredge, CO  81413

Dear Mr. Pease,

Thank you for applying to be on the subgroup of the Southwest Resource Advisory Council for the Uncompahgre Field Office Resource Management Plan revision.  The Southwest Resource Advisory Council met on Friday, March 5 and decided on a seven person subgroup. Unfortunately, you were not selected.

We appreciate your interest in public lands management and encourage you to apply for a position on the Southwest Resource Advisory Council or one of their subgroups in the future. Information regarding Colorado BLM's Councils can be found at: http://www.blm.gov/co/st/en/BLM_Resources/racs.html.

Again, thank you for your interest and willingness to volunteer your time and talents.

Sincerely,

Barbara L. Sharrow
Field Office Manager

BLM_0081416



# United States Department of the Interior
### BUREAU OF LAND MANAGEMENT
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, Colorado 81401**
**www.co.blm.gov**



IN REPY REFER TO:
1610 (CO-S05)

March 10, 2010

Michael Thompson
18050 Road G
Cortez, CO  81321

Dear Mr. Thompson,

Thank you for applying to be on the subgroup of the Southwest Resource Advisory Council for the Uncompahgre Field Office Resource Management Plan revision.  The Southwest Resource Advisory Council met on Friday, March 5 and decided on a seven person subgroup. Unfortunately, you were not selected.

We appreciate your interest in public lands management and encourage you to apply for a position on the Southwest Resource Advisory Council or one of their subgroups in the future. Information regarding Colorado BLM's Councils can be found at: http://www.blm.gov/co/st/en/BLM_Resources/racs.html.

Again, thank you for your interest and willingness to volunteer your time and talents.

Sincerely,

Barbara L. Sharrow
Field Office Manager



**United States Department of the Interior**
**BUREAU OF LAND MANAGEMENT**
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, Colorado 81401**
**www.co.blm.gov**



IN REPY REFER TO:
1610 (CO-S05)

March 10, 2010

James Riddell
21448 Uncompahgre Rd.
Montrose, CO  81403

Dear Mr. Riddell,

Thank you for applying to be on the subgroup of the Southwest Resource Advisory Council for the Uncompahgre Field Office Resource Management Plan revision.  The Southwest Resource Advisory Council met on Friday, March 5 and decided on a seven person subgroup. Unfortunately, you were not selected.

We appreciate your interest in public lands management and encourage you to apply for a position on the Southwest Resource Advisory Council or one of their subgroups in the future. Information regarding Colorado BLM's Councils can be found at: http://www.blm.gov/co/st/en/BLM_Resources/racs.html.

Again, thank you for your interest and willingness to volunteer your time and talents.

Sincerely,

Barbara L. Sharrow
Field Office Manager

BLM_0081418



# United States Department of the Interior

**BUREAU OF LAND MANAGEMENT**
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, Colorado 81401**
**www.co.blm.gov**



IN REPY REFER TO:
1610 (CO-S05)

March 10, 2010

Douglas Kullen
641 S 12th Street, Apt 5
Montrose, CO  81401

Dear Mr. Kullen,

Thank you for applying to be on the subgroup of the Southwest Resource Advisory Council for the Uncompahgre Field Office Resource Management Plan revision.  The Southwest Resource Advisory Council met on Friday, March 5 and decided on a seven person subgroup. Unfortunately, you were not selected.

We appreciate your interest in public lands management and encourage you to apply for a position on the Southwest Resource Advisory Council or one of their subgroups in the future. Information regarding Colorado BLM's Councils can be found at: http://www.blm.gov/co/st/en/BLM_Resources/racs.html.

Again, thank you for your interest and willingness to volunteer your time and talents.

Sincerely,

Barbara L. Sharrow
Field Office Manager

BLM_0081419



# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, Colorado 81401**
**www.co.blm.gov**



IN REPY REFER TO:
1610 (CO-S05)

March 10, 2010

Wayne Quade
704 S. 12th Street
Montrose, CO  81401

Dear Mr. Quade,

Thank you for applying to be on the subgroup of the Southwest Resource Advisory Council for the Uncompahgre Field Office Resource Management Plan revision.  The Southwest Resource Advisory Council met on Friday, March 5 and decided on a seven person subgroup. Unfortunately, you were not selected.

We appreciate your interest in public lands management and encourage you to apply for a position on the Southwest Resource Advisory Council or one of their subgroups in the future. Information regarding Colorado BLM's Councils can be found at: http://www.blm.gov/co/st/en/BLM_Resources/racs.html.

Again, thank you for your interest and willingness to volunteer your time and talents.

Sincerely,

Barbara L. Sharrow
Field Office Manager

IN

PO Box 1291
Paonia, CO.
March 10, 2010

*Received
MAR 2 3 2010
Uncompahgre Field Office*

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado  81401

Re:  Revised Management Plan

Dear Mr. Krickbaum:

**1 A-PI NRED**

I am aware that this recent 'boom' in natural gas drilling has leapt ahead of the science, the technology, and the common sense needed to insure that we humans do everything possible to maintain a sustainable planet. Therefore, I am sending some information that comes from independent sources, with no connection to oil and gas money. It is imperative that this information becomes common knowledge; that the free rein given to these industries in recent years be seriously reevaluated. It is imperative that the BLM recognize the seriousness of decisions made in leasing mineral rights to gas, oil, and mining industries.

**2 A-PI NRED**

I was at a public meeting of the Scenic Byway Committee in Paonia recently. Ms. Sharrow of your office was in attendance, as was Mr. Eric Sanford of SG Interests. While Mr. Sanford was not on the agenda, he did speak and was asked several questions. When a Byway Committee member commented that there were 58 seeps in Garfield County, there was a moment of silence, then Ms. Sharrow intervened and responded with something to the effect, "Out of how many wells?" A statement like this leads me to ask your office: How many seeps are ENOUGH? Does the BLM think that poisoning our water, our air, and our land is acceptable? You will note in the enclosed information that **"Fracking" which is done in about 90% of gas wells across the country finds extremely reputable geologists saying that there is almost no research on fracking, and it is an emerging PROBLEM. Additionally, a leading expert has seen methane seep underground for more than seven miles, and to quote him, "There is no such thing as impossible in terms of migration."** Given this information which I'm sure is contrary to what the industry wants people to believe, I do not see how the BLM can manage the lands OF THE PEOPLE–in their best interests–and allow the gas industry to **inject at least 278 chemicals into the Earth** as well as pollute the air with ground ozone, benzene, and other noxious chemicals. The vast majority of these chemicals **cause harm to the health of humans and other living things.** The ramifications here are so much greater than the boundaries of BLM land. Polluted water and poisonous air do not stop at anyone's boundaries.

**3 A-PI WR**

This industry uses **billions of gallons of water in its production. Where are billions of gallons of water coming from?** In a dry year here in the North Fork Valley, some irrigation ditches are shut down in mid-summer because there is not enough water. How can there be enough water to force down wells to fracture the Earth? And then how are billions of gallons of poisoned water going to be disposed of? What are WE THE PEOPLE supposed to drink and water our crops with?

**4 A-PI NRED**

I know that the oil and gas industry is very powerful and can control and manipulate information. It is also evident that they seem to have little understanding of the ramifications of this all-out assault on the planet and all that inhabit it. It has become

BLM_0081421

quite clear that water is made toxic, air quality is drastically affected, and land is polluted by the processes used in the production of natural gas. **Your agency stands at a crossroads in decision making for a future for humans on this planet. If that sounds fanatical to you, please ask yourself what poisoning one's Home sounds like. To me Poisoning one's Home is certainly one definition of Insanity. If status quo or people higher up the ladder stop you from doing what is right, I implore you to use your common sense to change minds and policies. Our future depends on your just work.**

**5 A-PI NRED**

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live on and around those lands. I believe the only way to do that is to have a moratorium on all natural gas leasing and permitting until the plan revision is completed. It is my understanding that leasing and permitting of natural gas development must be done with an environmental review and public input as called for under the National Environmental Policy Act. So until such environmental reviews show that there is no possibility of contamination of our water, land, or air; ie. that toxic chemicals are not injected into our Earth, that future generations will not be left with a dying planet, I maintain that all areas your office now has open to future leasing should be closed to gas, oil, and mining exploitation.

**6 A-PI NRED**

•In regard to the revised RMP, I believe it must not allow further natural gas leasing and permitting unless and until:

•Once again, that there can be a way to ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

•Air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

•Private property rights can be protected by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

•All natural gas leases and permits protect wildlife habitat from fragmentation.

**7 A-PI WSA**

•Additionally, I personally see many hikers, joggers, and mountain bikers enjoying the Camel Back area, and believe it should forever be protected from gas development and grazing. Additionally, I believe the Adobe Badlands Wilderness Study Area and Tabeguache Area should be designated as "suitable" for wilderness.

Mr. Krickbaum, I know that much has happened in Congress in the last few years to erode Clear Air and Water regulations. I believe it is up to all of us to make the changes necessary to protect these necessities for life on this planet. I also firmly believe that if we have the WILL and make the SHIFT to CARING for all life, we can find other energy solutions. I implore you to do your part.

Thank you,

Phyllis Swackhamer

**8 A-GE**

## The Environmental Working Group  "Drilling Around the Law"
By Dusty Horwitt, Senior Counsel                              Executive Summary

Companies that drill for natural gas and oil are skirting federal and state laws and injecting toxic petroleum distillates into thousands of wells, threatening drinking water supplies from Pennsylvania to Wyoming. Federal and state regulators, meanwhile, largely look the other way.

These distillates include kerosene, mineral spirits and a number of other petroleum products that often contain high levels of benzene, a known human carcinogen that is toxic in water at minuscule levels. Drillers inject these substances into rock under extremely high pressure in a process called "fracking" that energy companies use to extract natural gas and oil from underground formations. The process, known as "fracking," fractures the rock to allow additional gas and oil to flow to the surface. Fracking is currently used in 90 percent of the nation's oil and natural gas wells and has been instrumental in accessing huge new natural gas deposits trapped in shale formations (Carrillo 2005).

In a worst case scenario, the petroleum distillates used in a single well could contain enough benzene to contaminate more than 100 billion gallons of drinking water to unsafe levels, according to drilling company disclosures in New York State and published studies. (NYDEC DSGEIS 2009, Pagnotto 1961) That is more than 10 times as much water as the state of New York uses in a single day. (NYDEC DSGEIS 2009)

Fracking has already been linked to drinking water contamination and property damage in Colorado, Ohio, Pennsylvania, Wyoming and other states. (Lustgarten 2008a, 2008b)

Despite the risks, Congress in 2005 exempted hydraulic fracturing, except fracturing with diesel fuel, from regulation under the Safe Drinking Water Act (SDWA). Diesel is the only substance for which drillers must seek a permit before it is injected underground. (SDWA 2009)

Based on a six-month investigation of chemical disclosure records filed by several of the largest drilling corporations and interviews with regulators in five states, Environmental Working Group (EWG) found that:

1. Companies are injecting natural gas wells with millions of gallons of fracking fluids laced with petroleum distillates that can be similar to diesel and represent an equal or greater threat to water supplies. The distillates typically contain the same highly toxic chemicals as diesel: benzene, toluene, ethylbenzene and xylene. Distillates disclosed in records analyzed by EWG have been found to contain up to 93 times more benzene than diesel but require no authorization prior to use. Although the companies disclosed the distillates in the context of natural gas drilling, at least several of the companies, including Halliburton, Schlumberger Ltd. and B.J. Services Co., also help drill and fracture oil wells, suggesting that at least some of the same distillates may be used in oil drilling, too.

2. State and federal regulatory agencies surveyed in the report are generally not tracking fluids used in fracturing and in some cases appear to misinterpret the federal Safe Drinking Water Act. As a result, companies could easily be fracturing with diesel without a permit. Only one of five state or federal agencies contacted, in Wyoming, reported tracking the chemicals used in fracking operations. But even Wyoming requires companies to disclose trade names of fracking fluids only, not the specific chemical components of the fluids. (The other agencies were in Pennsylvania, New York, Montana, and Texas.)

3. A Wyoming state official reported that companies commonly use diesel in that state and that the state has not issued any permits for fracturing under the SDWA.

## What We Don't Know About Drilling Natural Gas

More than a year of investigation by the independent, non-profit newsroom ProPublica shows that the issues around gas drilling are less settled than the industry contends, and that hidden environmental costs could cut into the anticipated benefits.

### By Abrahm Lustgarten, ProPublica, Guest Writer, 1-05-10

It takes brute force to wrest natural gas from the earth. Millions of gallons of chemical-laden water mixed with sand—under enough pressure to peel paint from a car—are pumped into the ground, pulverizing a layer of rock that holds billions of small bubbles of gas.

The chemicals transform the fluid into a frictionless mass that works its way deep into the earth, prying open tiny cracks that can extend thousands of feet.  The particles of sand or silicon wedge inside these cracks, holding the earth open just enough to allow the gas to slip by.

Gas drilling is often portrayed as the ultimate win-win in an era of hard choices: a new, 100-year supply of cleaner-burning fuel, a risk-free solution to the nation's dependence on foreign energy. In the next 10 years, the United States will use the fracturing technology to drill hundreds of thousands of new wells astride cities, rivers and watersheds. Cash-strapped state governments are pining for the revenue and the much-needed jobs that drilling is expected to bring to poor, rural areas.

Drilling companies assert that the destructive forces unleashed by the fracturing process, including the sometimes toxic chemicals that keep the liquid flowing, remain safely sealed as much as a mile or more beneath the earth, far below drinking water sources and the rest of the natural environment.

More than a year of investigation by ProPublica, however, shows that the issues are far less settled than the industry contends, and that hidden environmental costs could cut deeply into the anticipated benefits.

The technique used to extract the gas, known as hydraulic fracturing, has not received the same scientific scrutiny as the processes used for many other energy sources.

BLM_0081423

For example, it remains unclear how far the tiny fissures that radiate through the bedrock from hydraulic fracturing might reach, or whether they can connect underground passageways or open cracks into groundwater aquifers that could allow the chemical solution to escape into drinking water. It is not certain that the chemicals – some, such as benzene, that are known to cause cancer – are adequately contained by either the well structure beneath the earth or by the people, pipelines and trucks that handle it on the surface. And it is unclear how the voluminous waste the process creates can be disposed of safely.

"This is a field where there is almost no research," said Geoffrey Thyne, a former professor at the Colorado School of Mines and an environmental engineering consultant for local government officials in Colorado. "It is very much an emerging problem."

The lack of scientific certainty about hydraulic fracturing can be traced in part to the drilling industry's success in persuading Congress to leave regulation of the process to the states, which often lack manpower and funding to do complex studies of underground geology. As a consequence, regulations vary wildly across the country and many basic questions remain unanswered.

ProPublica has uncovered more than a thousand reports of water contamination from drilling across the country, some from surface spills and some from seepage underground. In many instances the water is contaminated with compounds found in the fluids used in hydraulic fracturing. ProPublica also found dozens of homes in Ohio, Pennsylvania and Colorado in which gas from drilling had migrated through underground cracks into basements or wells.

But most of these problems have been blamed on peripheral problems that could be associated with hydraulic fracturing – like well failures or leaks – without a rigorous investigation of the entire process.

ProPublica has also found that drilling procedures that can prevent water pollution and sharply reduce toxic air emissions – another frequent side effect—are seldom required by state regulators and are mostly practiced when and where the industry wishes.

Another uncertainty arises from the enormous amounts of water needed for "fracking." The government estimates that companies will drill at least 32,000 new gas wells annually by 2012. That could mean more than 100 billion gallons of hazardous fluids will be used and disposed of each year if existing techniques, which often involve 4 million gallons of water per well, are used.

Proposals for new regulations that might prevent many of these problems almost always lead to a fight. And more often than not, that fight devolves into stark, overdrawn choices between turning on the lights or having clean drinking water; getting rich or staying poor.

Energy lobbyists portray skeptics as hysterical and would-be-regulators as over-reaching. Environmentalists cast the dangers as more proven than is the case, and as unsolvable.

In less contentious settings, even the industry acknowledges the lack of science on key issues.

In a conference call with reporters this spring, American Petroleum Institute senior policy advisor Richard Ranger – an industry expert who has spoken frequently on the fracturing issue—was asked for evidence that fracturing is without environmental risk:

"Have there been any recent studies done on the safety of this?" a reporter asked.

"The issue of where do these fracking fluids go, the answer is based on the geology being drilled," Ranger said. "You've got them trapped somewhere thousands of feet below with the only pathway out being the well bore.

"I'm just not sure that that study is out there," Ranger said.

"To be clear, we are saying this is a totally safe technology but we can't point to any recent studies that say this is a safe technology?" the reporter asked.

"Or that says it is unsafe," Ranger replied.

ProPublica reporters have posed similar questions to more than 40 academic experts, scientists, industry officials, and federal and state regulators. No one has yet provided a more definitive response.

ProPublica's reporting over the last year points to four looming questions:

Where are the gaps in the environmental science and what will it take to address them?

How will the wastewater be safely disposed of?

Are regulations in place to make sure the gas is extracted as safely as possible?

And are state and federal regulatory agencies equipped to keep up with the pace of drilling?

"Most likely there are not a lot of win-win propositions," said David Burnett, a scientist at Texas A&M University's Global Petroleum Research Institute who specializes in industry practices to reduce environmental harm. But, he said, there is opportunity for compromise on enough issues "so that everybody wins sometimes."

What We Think We Know

Drilling industry officials say they use a slew of engineering techniques – from sonar to magnetic resonance imaging - to study the underground explosions and strictly control the reach of hydraulic fracturing.

BLM_0081424

They say that the actual fracturing happens thousands of feet from water supplies and below layers of impenetrable rock that seals the world above from what happens down below.

Yet there are reasons for concern. Even if layers of rock can seal water supplies from the layer where fluid is injected, the gas well itself creates an opening in that layer. The well bore is supposed to be surrounded by cement, but often there are large empty pockets or the cement itself cracks under pressure. In many instances, the high pressure of the fluids being injected into the ground has created leaks of gas – and sometimes fluids – into surrounding water supplies.

A recent regional government study in Colorado concluded that the same methane gas tapped by drilling had migrated into dozens of water wells, possibly through natural faults and fissures exacerbated by hydraulic fracturing.

Dennis Coleman, a geologist in Illinois, has seen an example where methane gas has seeped underground for more than seven miles – several times what industry spokespeople say should be possible. He is a leading international expert on molecular testing whose company, Isotech Laboratories, does scientific research for government agencies, pharmaceutical companies, and the oil and gas industry.

"There is no such thing as impossible in terms of migration," Coleman said. "Like everything else in life it comes down to the probability. It is never a hard and fast thing."

In another case, benzene, a chemical sometimes found in drilling additives, was discovered throughout a 28-mile long aquifer in Wyoming.

"It is common knowledge that the lower layers are full of irregularities and inconsistencies," said Patrick Jacobson, a rig worker who manages drilling fluid pumps and has worked on Wyoming drilling projects for more than 20 years. "I think anybody who works in the oil fields, if they tell you the truth, would tell you the same thing."

Scientists have found it difficult to determine whether hydraulic fracturing is responsible for these problems. In large part that's because the identities of the chemicals used in the fluids have been tightly held as trade secrets, so scientists don't know precisely what to look for when they sample polluted streams and taps.

Drilling companies disclose enough information to comply with labor regulations meant to keep workers safe, but that information normally consists of a product trade name and rarely includes a complete list of the chemicals it contains.

Recently, this has begun to change.

In September, New York State – as part of a lengthy environmental review meant to assess the risks of fracturing – made public a comprehensive list of 260 chemicals used in drilling fluids, which it had compiled from disclosures it required drilling companies to make. And several companies themselves have begun to advocate for more disclosure, in the hope that transparency may quell the public outcry that has kept them from drilling in valuable parts of New York State.

Chesapeake Energy, which last year told ProPublica that the chemicals are kept secret because "it is like Coke protecting its syrup formula," now says that disclosure would bring honest discussion.

"We as an industry need to demystify," Chesapeake's CEO, Aubrey McClendon, said at an industry conference in September, "and be very upfront about what we are doing, disclose the chemicals that we are using, search for alternatives to some of the chemicals."

What is now needed most, according to scientists at the Environmental Protection Agency and elsewhere, is a rigorous scientific study that tracks the fracturing process and attempts to measure its reach into underground water supplies.

In Wyoming EPA scientists with the Superfund program are conducting the first federal investigation of this kind, sampling available water sources and looking for any traces of the chemicals used in drilling. But Colorado's Thyne says a proper study would go a step further.

"The critical thing that has to be done is a systematic sampling of the background prior to drilling activity, during and after drilling activity," Thyne said, "Ideally we would go out, we would put monitoring wells in and surround an area that was going to be fractured as part of normal operations. The budget for that kind of project would run ballpark $10 million. It's a relatively small project for the U.S. Geological Survey or the EPA to undertake."

Where Should the Waste Go?

On the East coast, one of the most important unanswered questions about drilling is how to dispose of the chemically tainted wastewater that hydraulic fracturing produces.

Most drilling wastewater in other parts of the country is stored in underground injection wells that are regulated by EPA under the Safe Drinking Water Act. However the geology in the East makes injection less viable, and less common. In New York and Pennsylvania, millions of gallons of drilling wastewater could eventually be produced each day.

That wastewater will likely be trucked to treatment plants that don't routinely test for most of the chemicals the wastewater contains and that may not be equipped to remove them. Currently, the plants also can't remove the high levels of Total Dissolved Solids found in drilling wastewater – a mixture of salts, metals and minerals – that can increase the salinity of fresh water streams and interfere with the biological treatment process at sewage treatment plants, allowing untreated waste to flow into waterways. High TDS levels also can harm industrial and household equipment and affect the color and taste of water.

BLM_0081425

After the wastewater passes through the treatment plants it is dumped back into public waterways that supply drinking water to at least 27 million Americans, including residents of Philadelphia and New York City. But without identification and routine testing for the problematic chemicals, it will be impossible to know how much of them are making their way to drinking water sources, or how they are accumulating over time. Evolving medical science says low-dose exposure to some of those chemicals could have much greater health effects than the EPA or doctors have previously thought.

"Managing produced water has always seemed like one of the large challenges, because this area geologically doesn't have the extensive network of underground injection wells," said Lee Fuller, vice president of government relations for the Independent Petroleum Association of America. "One challenge that industry has got is looking at developing [treatment] technology, which could be very costly."

All Equal Under the Law

The gas industry, and hydraulic fracturing, is subject to widely different laws in different states. Some of those laws are tough, perhaps burdening the drilling industry unnecessarily. Others are lenient, perhaps leaving much of the country subject to environmental danger.

One thing is certain: There is no national standard for an industrial process that is used prolifically in 32 states and will be used even more in the future.

Gas drillers receive special exemptions from seven federal environmental regulations that apply to countless other industrial activities across the country.

Drilling companies are not required, for example, to report the discharge of toxic chemicals for the Toxics Release Inventory under the Superfund law – including the wastewater that threatens Eastern water supplies. They do not have to comply with the section of the Clean Water Act that regulates pollutants at construction sites. And they don't have to abide by the Clean Air Act, which regulates industrial emissions.

Gas drilling also has its own individual exemption, approved by Congress during the George W. Bush administration, that explicitly prohibits the Environmental Protection Agency from regulating hydraulic fracturing under the Safe Drinking Water Act, the way the agency regulates almost all other types of underground fluid injection, including those injection wells used for wastewater in the West.

The argument behind these exceptions is that state regulations sufficiently protect the environment from drilling. But the result is that drilling regulation is left to a patchwork of state laws.

A recent report by the Ground Water Protection Council, a research group that once had energy executives on its board but now consists mainly of state regulators, revealed that only four of the 31 drilling states it surveyed have regulations that directly address hydraulic fracturing and that no state requires companies to track the volume of chemicals left underground. One in five states don't require that the concrete casing used to contain wells be tested before hydraulic fracturing. And more than half the states allow waste pits that hold toxic fluids from fracturing to intersect with the water table, even though waste pits have been connected to hundreds of cases of water contamination.

Although energy companies have developed many techniques that can reduce the spills and seepages that have occurred across the country, they are usually left to implement them when and if they choose, meaning protections can be entirely different between drilling fields a couple of miles apart.

In northern Pennsylvania, for example, drillers do not have to supply regulators with a complete list detailing every chemical they will pump underground, while 15 miles away, in New York, state authorities have said that such disclosure is a must because it is essential to protecting the water.

Many scientists and members of Congress are arguing for a sturdier national standard that would require minimum environmental protections and ensure that a national energy policy based on natural gas extraction can be pursued without jeopardizing the country's other natural resources.

"What we're talking about is just putting some basic parameters around it," said Rep. Jared Polis, D-Colo. "If companies are able to operate within those parameters... then that's fine. If they can't economically do that, then that is because they are causing more damage than they are creating value, and they probably shouldn't be operating in the first place."

Polis is one of 50 sponsors of the FRAC Act, a bill before Congress that would restore the EPA's authority to regulate hydraulic fracturing under the Safe Drinking Water Act and would require the disclosure of the chemical additives.

Congress also recently asked the EPA to conduct a new peer-reviewed study of hydraulic fracturing's effect on water resources, reassessing its old position.

On Wednesday, the EPA voiced its most explicit concerns in a decade about the environmental risks presented by drilling, in its response to New York State's plan for drilling in the Marcellus Shale, the layer of rock stretching from central New York to Tennessee. The agency said it had "serious reservations" about whether hydraulic fracturing was safe to do inside the New York City watershed and urged the state to consider possible threats to public health.

EPA scientists have also told ProPublica that the study suggested by Congress may soon be underway. If that research is coupled with a congressional reversal of the exemption from the Safe Drinking Water Act, hydraulic fracturing could eventually be regulated like any other injection well in the U.S. That would require, among other things, thorough testing of the rock miles below the surface to confirm that it can safely contain whatever is injected into it – a stipulation that addresses some of the uncertainty and is inconsistently found in state drilling laws.

BLM_0081426

EPA regulation "would essentially create a base level," said Steve Heare, director of the EPA's Drinking Water Protection Division in Washington. Under the Safe Drinking Water Act, states "would basically have to make a showing that their regulations were as effective as ours."

Better Policing

All the laws and protections in the world won't ensure that drilling can be done safely if effective enforcement isn't in place to oversee it.

Yet for all the debate about environmental protections, new laws and national benefits, very little emphasis has been placed on bolstering the agencies that issue drilling permits and go out into the field to make sure the processes are done right.

ProPublica's recent analysis of 22 states that account for the vast majority of the country's drilling found that regulatory staffing has not kept up with the drilling boom, meaning that the nation's ability to enforce rules that provide environmental safeguards is systematically weakening.

New York, one of the hot spots expected to supply this gas-based national energy paradigm, has cut its oil and gas regulatory inspection staff 20 percent since 2003, even while it has approved a 676 percent increase in the number of new wells being drilled each year. Other states have added a few people, but almost none have kept up with the crushing pace of new drilling.

In West Virginia, the third most active gas drilling state in the nation, four new enforcement employees have been hired since 2003, but each inspector is still responsible for some 3,300 wells.

"Crisis management is not the best management in the world and we had to deal with crisis management 90 percent of the time," said Jerry Tephabock, a former head of state oil and gas inspections in West Virginia who retired in 2007. "There were wells out there that had been drilled that have never been inspected in 15 to 20 years."

Even if states manage to keep staff levels where they are now – a challenge since 39 states have projected budget deficits for 2010 – the growth that would come from placing more emphasis on natural gas as a part of the nation's energy strategy may still present sizable risks for both the environment and the economy. Either enforcement would have to slacken, or the permitting of new wells would slow so much that it would stifle the economic growth and energy independence that drilling is expected to bring.

Different states are choosing different paths. Texas regulators promise they will issue new permits to drill within 72 hours, even though their regulator-to-well ratio is one of the most demanding in the nation. New York, in contrast, has pledged to bring new drilling to a crawl until its staff can catch up.

Neither approach addresses the scientific or regulatory gaps that represent drilling's long-term threats to the environment, however. And it remains to be seen whether politicians and environmental regulators will make sure precautions are taken at the beginning of this new energy boom, or if they will leave the nation to clean up the mess after the boom goes bust, as it has had to do so many times in the past.

ProPublica reporters Joaquin Sapien and Sabrina Shankman contributed to this report.

BLM_0081427

IN

## TOWN OF RIDGWAY

P.O. Box 10, Ridgway, Colorado     phone (970) 626-5308     fax (970) 626-3962     www.town.ridgway.co.us

March 10, 2010

BLM Uncompahgre Field Office
Attn: Bruce Krickbaum, RMP Project Manager
2465 S. Townsend Avenue
Montrose, CO  81401.

RE:     Uncompahgre Resource Management Plan – Scoping Comments

Dear Mr. Krickbaum,

First, thank you for including the Town of Ridgway as a Cooperating Agency in the URMP process.  We have enjoyed the continuing dialogue and exchange of ideas that has transpired thus far in this planning process.  Having reviewed the Community Assessment and Preparation Plan now posted on your website, we would like to offer a couple of comments as part of the pending scoping process.

**1 A-PI TM**
**2 A-PI WD**

to the Community Assessment, we would like to emphasize the Partnership Opportunities that have been articulated.  The Assessment provides the following:

- *Most groups would like municipal and county governments, community residents, and organizations and clubs to cooperate with BLM on trail planning (including the route designation process) and maintenance, as well as on noxious weeds management.*

- *Some groups would like municipal governments and community residents to work with BLM on improving access from towns to BLM public lands.*

**2 A-PI TM**

These are indeed points raised and supported by the Town of Ridgway.  There are several BLM parcels that lie within close proximity to the Town, and one 40-acre parcel that is surrounded by the Town on three sides.  With regarding to the outlying parcel located on the east side of Hwy 550 and directly adjoining the Bureau of Reclamation property and the Ridgway State Park, the Town would like to see trail connectivity both to and within this particular parcel.  This land is seeing considerable usage for multiple recreational purposes including hiking, mountain biking, horseback riding, hunting and wildlife watching.  The usage of the parcel for single track trail is of particular interest to the Town as the topography is well suited for this activity, the area is connected to this community by the RiverWay Trail, and this would present a recreational opportunity that we feel greatly compliments existing uses at the adjoining Ridgway State Park.

**3 A-PI REC**

The Town recognizes that some motorized use in this particular area is occurring even though there is signage that purports to restrict it.  The Town feels that motorized uses should be limited in a manner that ensures good stewardship of the land and compatibility of these numerous and at times competing

uses.  This may require possible evaluation under a Special Recreation Management Area designation. We encourage good partnerships and collaborative planning to foster these outcomes.

**4 A-PI TM**
**5 A-PI FW**

...gard to the 40-acre tract that straddles the Uncompahgre River and includes the RiverWay Trail, the Town notes the specific importance of this tract in terms of trail connectivity, wildlife (the site is occupied by many species including deer, fox, badger, herons and roosting bald eagles), and passive recreational uses including picnicking, hiking and wildlife viewing.  Notably, the parcel abuts a Town owned park (Dennis Weaver Memorial Park) and trail connectivity and possible pedestrian bridge access may be enhanced between these two parcels.   The Town would like to partner with BLM in meaningful ways to explore these ideas and assist in the needed stewardship of this 40-acre parcel.

**6 A-PI LR**

Finally, one thought should be mentioned here, but please don't misconstrue our underlying intention in doing so.  Because of the small and isolated nature of the 40-acre parcel, its physical connection to the Town, and considering the Town's interest in protecting and enhancing this portion of the river corridor as a contiguous passive use area, the Town would be amenable to discussing possible ownership of the tract if and when BLM should ever elect to dispose of it.  We offer this for consideration only because of the resource constraints that may challenge the federal agency in maintaining such an isolated parcel. Very simply, the municipality may be better positioned to provide the maintenance and stewardship.

Again, we thank you for soliciting our involvement in this important planning process, and look forward to its continued progress.

Very Respectfully,

Greg Clifton, Town Manager

Cc:        Town Council

BLM_0081429

IN

March 10 2010

Us bureau of land management
Uncompahgre field office
ATTN Bruce Krickbaum, RMP project manager
2465 S Townsend Ave.
Montrose, Co. 81401

Planning Team

Thank you for the chance to comment on the Uncomphgre Resource Management Plan .

As a member of Thunder Mountain Wheelers ( an atv club) that has In excess of 400 members I do not want to discriminate against any person or user group. I feel that the polices dictated by Washington national policy is very dicrimenatory . this said I see that as local managers your hands are tied before you begin.

1 A-PI TM

As an avid rider and an environmentalist (unlike the obstructionists ) I want to see and mingle with all users of public land. This said I have found that loop routs have the effect of preventing user produced trails. Also foot traffic and horse back riders do not in most cases need established trails.

2 A-PI TM

3 A-PI REC

The fact that TMW member ship is 55 + years should give the planning team the Idea that we have not always been motorized users. Most of our members ride atvs because we are not able to enjoy public land any other way. This does not mean that we want exclusive use for motorized users. Instead we as a user group want to protect the rite for anyone to use public land as long as they respect and protect the resourses. Further through the availability of grant funds(from registration fees through state parks) the motorized community brings more monetary clout to the table than any other user group.

4 A-PI REC

I have concerns about the methods of control presently used by public land managers in their decisions. Too often it seems that scientific data is often used in misleading ways to reach a desired goal. Example !! motorized use is detrimental to wild life. In my experience and in most studys a man walking with a dog is the most disruptive to wild life. Motorized is in most cases listed quite a ways down the list. Also too often the protection of plant species when used to restrict use is often only a front for the obstruction groups.

5 A-PI REC

BLM_0081430

**6 A-PI REC**

The increase of atv use and extreme Jeeps is on the increase while over night and extended camping is decreasing. This trend needs to be addressed in this planning process

**7 A-PI TM**

On aspect of planning that needs special attention is wild land and urban interface. This phenomenon is being used by special intrest groups to provide themselves with a private playground on public land. Historic use of these lands<until recently, been very diversified. Now through closing access through private routs has led to the defeat of multiple use.

**8 A-PI WSA**

It has come to my attention that the uncomphgre field office seems to agree with extending wilderness into potter basin. TMW put a lot of time and grant money into establishing a new trail through Chriswell basin Forest service land. This trail is totally dependent on an aproxemetly 2 mile BLM access around the north end of 7N mesa . This and the Jeep-atv road through Potter Basin is the link tothis trail loop. Please help us stop this travesty from becoming reality. This rout was part of my comments on the Dry Creek travel plan so I know you were aware of this if you read my comments.

**9 A-PI CR**

Cultural an Paleontological resources have very little meaning if access is denied to view or enjoy these links to our history. This is also true when considering historic travel routs. This is dear to my heart. I like to travel and observe thing from the past. The national plan seems to want to restrict public enjoyment of these kinds of historic sights. What use is preserving this heritage if only special interest groups or people are allowed access.

Thank You for listening to my inept attempt to present my thoughts .

Neil Michael Wilson
Long time user and protector of our public lands
Member Thunder Mountain Wheelers

BLM_0081431

## Zoe Ghali

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **Sent:** | Tuesday, March 23, 2010 5:49 PM |
| **To:** | Zoe Ghali; Kate Wynant |
| **Cc:** | UFO AR |
| **Subject:** | Fw: addendum |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Red |

Additional study from Robin Nicholoff.

--Bruce

<><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 03/23/2010 05:48 PM -----

             Robin Nicholoff
             <robgret@tds.net>
                                                                      To
             03/11/2010 11:55        bruce_krickbaum@blm.gov
             AM                                                        cc

                                                                 Subject
                                     addendum

Here's more, Bruce:
-RN

FW: Economic Model Cites Benefits of "quiet" recreation
http://www.eenews.net/Landletter/2009/10/29/7/

PUBLIC LANDS: Economic model cites benefits of 'quiet' recreation
(10/29/2009)

Eryn Gable, special to E&E
A new economic model developed at Oregon State University has found that "quiet
recreation" -- including hunting, fishing and camping -- provides more economic benefits
than motorized recreation to communities dependent upon public lands tourism.
The model, based on U.S. Forest Service data and tested in a number of Western national
forests, estimates a range of economic impacts from recreational activities, along with
the indirect contributions that come from additional spending in local communities.
The model found that in several forests, quiet recreation generated between two-and-a-half

1

and five times more economic activity, as measured in jobs and revenue, than motorized recreation.

In California's Tahoe National Forest, for example, visits by "quiet" recreationists helped generate 413 jobs and $11.3 million for communities near the forest, while motorized recreation provided 163 jobs and $4.4 million in income. More dramatically, in the Arapaho and Roosevelt national forests in Colorado, nonmotorized recreation provided 1,228 jobs and $37.8 million in income, compared with 244 jobs and $11.7 million for motorized recreation.

"There are economic benefits of quiet recreation that are often overlooked, and the costs of motorized recreation are also often overlooked," said Michelle Haefele, an economist with the Wilderness Society, which has worked to disseminate the findings.

Kreg Lindberg, an OSU tourism and outdoor recreation professor who developed the economic model, known as the "Recreation Economic Impact Tool," said the purpose of his effort "was to document something that hasn't been documented that often in the national forest recreation context," adding that "we know a little bit about motorized recreation's contribution to the economy, but less about nonmotorized recreation."

Lindberg first applied the model to a study of the economic impacts of nonmotorized recreation on Oregon's Wallowa-Whitman National Forest produced for the Wilderness Society in March. The study found that "quiet" recreation accounted for 216 jobs and nearly $4.6 million in income, while motorized recreation accounted for 78 jobs and $2.1 million in income.

A new economic model developed at Oregon State University indicates that quiet recreation activities such as fishing provide greater economic benefits to local communities than motorized recreation. Photo courtesy of Travel Montana.

Just last week, the Wilderness Society and the Upper Gila Watershed Alliance released findings based on the model showing quiet recreation accounts for an estimated 1,234 jobs for New Mexicans who live in the counties near the state's five national forests -- three times the number of jobs attributable to motorized recreation. Additionally, the model found that the state's natural resource-based recreation industries, such as hunting and fishing, generate $31 million in income to those counties, compared with $9.4 million generated by motorized recreation.

The environmental groups that released the model's findings are hopeful that the economic analysis will be taken into account as federal land managers in New Mexico craft long-term plans that will chart the future use of off-highway and all-terrain vehicles on the Gila, Carson, Cibola, Santa Fe and Lincoln national forests.

BLM_0081433

## Zoe Ghali

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **Sent:** | Tuesday, March 23, 2010 5:48 PM |
| **To:** | Kate Wynant; Zoe Ghali |
| **Cc:** | UFO AR |
| **Subject:** | Fw: RMP economics |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Red |

| | |
|---|---|
| **Attachments:** | Ecosytem Services Economic Value & Land Use Planning- WildConnections 2010.pdf; POTENTIAL IMPACTS TO WILDLIFE.doc |

   

Ecosytem Services   POTENTIAL
Economic Val... ACTS TO WILDLIF

Comments from Robin Nicholoff regarding economic studies.  Robin was at the Hotchkiss meeting.

--Bruce


----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 03/23/2010 05:46 PM -----


              Robin Nicholoff
              <robgret@tds.net>
                                                                  To
              03/11/2010 11:51      bruce_krickbaum@blm.gov
              AM                                                   cc

                                                             Subject
                                    RMP economics




Hello Bruce,

          Attached is the report I referred to yesterday at the Hotchkiss RMP workshop.
I hope it proves useful to the BLM in its economics analysis for the RMP.  Also attached
is my study on wildlife economics in Delta County of 2002.

          I must say I was rather disappointed in Mr. Martin's methodology for seeking
our input.  I thought the "Community Potential Evaluation"
was ill-defined, confusing to some participants, and ultimately misrepresents the opinions
of some participants.  I would hardly call the results on some items "consensus".  I will
snail-mail my evaluation  to you and try to expand on some of the more contentious items.

          Thanks for the opportunity to participate and for your consideration,

          Robin Nicholoff
          36295 Sunshine Mesa Rd

1

Hotchkiss, CO  81419
970-527-3997
robgret@tds.net

(See attached file: Ecosytem Services Economic Value & Land Use Planning- WildConnections 2010.pdf)


(See attached file: POTENTIAL IMPACTS TO WILDLIFE.doc)

2

## POTENTIAL IMPACTS TO WILDLIFE-BASED ECONOMY OF DELTA COUNTY FROM GAS DRILLING AND DEVELOPMENT

Wildlife and related resources are a major contributor to the economy of Delta County, both in direct and indirect expenditures as well as the unquantifiable "quality of life" and aesthetic values. The largest wildlife-related economic contributions are from deer hunting, elk hunting, and fishing, three components that would be negatively impacted by coal bed methane/natural gas drilling and development. The Colorado Division of Wildlife's (CDOW) "Hunting and Fishing Industries Economic Impact Model" determined that direct expenditures for Delta County from fishing, deer and elk hunting in 1996 was $9,891,000. When secondary expenditures and CDOW direct expenditures are added, the total was nearly $21,721,000. (Total expenditures related to all hunting and fishing in Delta County was $22,948,000.) In 2002 dollars this amounts to $27,837,000 or just under $1000 per capita. These totals do not include the economic benefits generated by activities such as wildlife viewing, bird watching, wildlife photography, or scientific study. Nor do they include the economic benefits generated by people who choose to live in Delta County primarily for its abundant and varied wildlife.

The negative effects on deer and elk from roads have been well-documented over the past four decades. For mule deer "Roads generally decrease the value of habitat for distances up to 1/2 mile from the road. If roads are to be left open in an area, the combined length of roads should be less than 1 mile per square mile of habitat." (Managing Forested Lands For Wildlife, Colorado Division of Wildlife and USDA Forest Service, 1984) Elk are sensitive to human activity and "should be afforded maximum protection from disturbance... It is important that elk be relatively free from human disturbances. This is particularly true during parturition, young-rearing, and in winter." (Ibid.)

page 1

Parachute Creek Mule Deer Monitoring Report -1982-2000, by Bio-Resources, Inc. is a major long-term study of deer populations near

BLM_0081436

Parachute, Colorado commissioned by energy giant UNOCAL Corporation. It concludes that

> Natural gas drilling operations in the lower valley add another adverse impact that should require mitigation of negative influence on the health of the deer herd. At present, the mule deer herd should be managed with *several years of deferred hunting, and sheep and cattle grazing should be managed to avoid the steep-slope xeric shrub habitat.* Natural gas development operations need to initiate a concerted mitigation program with realistic, measurable, result-oriented habitat and herd management. ...land management in Parachute Creek needs to assist the recovery by decreasing human land use impacts. *Human presence should be controlled while deer occupy winter range.* (emphasis added)

In other words, not only the hunting economy would likely be damaged, but the livestock industry as well. In fact, restoration of deer herd health and numbers from the effects of gas well activity will require the radical measure of controlling mere human presence.

The study found that deer populations declined "most drastically" in areas of gas well drilling:

> Since 1993 mule deer habitat has been reduced by the development of additional gas well installations, well access roads, and the constant traffic associated with ongoing well service personnel. Ongoing natural gas operations should mandate a well-planned and executed mitigation plan with UNOCAL that will measurably demonstrate revegetation and mule deer habitat restoration success.

page 2

Gas well drilling and pipe line construction each require road construction and high levels of truck traffic and heavy machinery operations that will disturb deer and elk. Such disturbance during calving and fawning would likely result in increased calf and fawn mortality.

BLM_0081437

Disruption to migration patterns is another likely detriment. Chronic Wasting Disease may be exacerbated by the increased stress to herds from prolonged disturbance. Some CBM wells would likely be drilled in deer and elk security areas which are a requirement for healthy populations.

The third major component of Delta County's wildlife-related economy is fishing, which currently generates an estimated five million dollars in expenditures per year in the county. The potential damage to the fisheries resource would be from contamination of streams by toxic fracturing compounds, produced water, fuel spills, sediment loading from soil erosion associated with well pad construction and pipe line installation, etc.

In summary, the wildlife resources of Delta County contribute greatly to the economic health of the county and should be protected. Hundreds of gas wells with their attendant thousands of miles of roads and pipelines, high-decibel compressors, vastly increased truck traffic, unavoidable soil erosion, and use of toxic chemicals will result in increased stress to the wildlife resources and could significantly impact the economic benefits derived from those resources.


Prepared by Robin Nicholoff
6/13/02


page 3



Tadini Bacigalupi, Ph.D.



BLM_0081439

Published by Wild Connections
Florissant, Colorado 80816

Copyright ©2010 by Wild Connections

This report was prepared and published with funding from the Wolcott Family Foundation, Denver Colorado.  It is intended as a resource for public land agencies, conservationists and other interested parties for more adequately representing the value of ecosystem services in land management planning. Portions may be reproduced with acknowledgment of the source as Wild Connections.

Available in electronic format (PDF) at www.wildconnections.org/library.html



# Ecosystem Services:

# Their Economic Value and Place in Land Use Planning

By

**Tadini Bacigalupi, Ph.D.**

BLM_0081441

# Table of Contents

**Executive Summary** ............................................................................................................. 1

**Section I- Origins and critique of models**
Introduction ............................................................................................................................. 2
Historical Background .......................................................................................................... 3
Economic Analysis Models ................................................................................................. 5
IMPLAN Bibliography ........................................................................................................ 10

**Section II- Establishing economic value for ecosystem services**
Ecosystem Services .............................................................................................................. 11
Summary Economic Values for Ecosystem Services ................................................. 17
Conclusions and Recommendations ............................................................................... 20

References ................................................................................................................................ 22

Appendix A - Dollar amounts for ecosystem services .............................................. 26
Appendix B - Direct Use ..................................................................................................... 38
Appendix C - Dollar Adjustments and Statistics Used ............................................. 40
Appendix D - Reliability ..................................................................................................... 43

BLM_0081442

# Executive Summary

This study examines the economic value of ecosystem services and their place in public lands management decisions. Ecosystem services are those goods which an ecosystem provides for human use. Among the many services an ecosystem provides are fresh water, the regulation of wastes, the control of climate, the formation of soil, and protection from natural hazards. While the Forest Service describes the importance of ecosystem services, the models to evaluate the economic importance of these same services are flawed and fail to incorporate the economic value of these services.

This paper discusses the origins of the economic models used by management agencies and critiques those models. Flaws in both the assumptions and statistical bases of these models are discussed. One reason ecosystem services have not been included in these models is because the value of these ecosystem services has been difficult to establish, and therefore the loss of those services is difficult to quantify.

Many of the decisions made in land use planning are based on the economic evaluation of a proposed land use change. However the data has not been available to compare the values of an extractive industry versus the potential economic losses associated with the degradation of ecosystem services caused by that new use.

To remedy this problem, this study establishes a conservative but realistic economic value for many ecosystem services in 2008 dollars, so these economic values can be incorporated into the planning process. This study was also able to determine the total value of ecosystem services per acre per year in 2008 dollars. A single acre of land yields approximately $2208 per year in ecosystem services. When the total economic value of ecosystem services is applied to the Pike San Isabel National Forest it can be shown that the PSI contributes approximately $4.6 billion dollars of ecosystems services per year. With economic values this high, it is essential that ecosystem services be fully evaluated when land use management decisions are being made.

BLM_0081443

# Section I- Origins and critique of models

## Introduction

The Forest Service and other public agencies have long used economic analysis to make land use planning decisions. The economic value of any proposed change factors into major land use decisions. A traditional public-agency economic analysis examines familiar concerns such as resource costs, jobs created, jobs lost, plus the potential economic gain or loss for communities and the land use agency.

However, the traditional economic analysis conducted by land use agencies only considers the most visible and easy to measure economic indicators and fails to measure the very important but less visible and more difficult to quantify factors, that is, ecosystem services. Ecosystem services are defined as "the conditions and processes through which natural ecosystems, and the species that make them up, sustain and fulfill human life" (Daily 1997:3 in Alcoma 2003:55).

The traditional economic analysis made sense in an industrializing society where resource extraction was the basis of social well-being, where resources seemed unlimited and where there was little conflict between various land uses. In post-industrial society, a new economic sector has emerged and become more important than manufacturing, that is, the service sector. This sector of the economy is not based in the extraction and use of resources to provide economic well-being for the population; instead, when applied to the natural world it is based on the preservation of those very resources for ecological and recreational activities.

As society grew, changed, and became more complex new social values have been attached to public lands. Some of these values are based on recreation, solitude and quiet, and scenic views. These natural-world values are important to the citizens of society but are difficult to measure, difficult to quantify, and difficult to measure in economic terms. Yet these new values are now more important and must be considered by public land agencies when making land use decisions. Decisions that lead to the loss of these natural-world values mean an economic loss in sectors of society and therefore must be considered as part of the economic value decision-making process.

Additionally, while recreation and its associated values are difficult to measure, even more complex and important are the services that healthy ecosystems provide. Integral to the environment, these ecosystem services benefit humans in a myriad of ways and include services such as the provision of fresh water, natural hazard avoidance, climate regulation, and waste assimilation. These mostly invisible services must also be taken into consideration in land use planning. To do so they need to be economically quantified.

This study focuses on two major aspects of ecosystem services. The first examines traditional economic models, their use and their limitations; and the second examines the ecosystem services that have not been included in the traditional economic analysis of public lands, including the economic value of those services. Where those services have not been measured, the study suggests how those services could be economically quantified. To the extent possible, this study applies the economic value of ecosystems services to the Pike San Isabel National Forest and surrounding lands as a demonstration that the economic values discussed in this paper can actually be defined, measured, and used to give value to the land.

BLM_0081444

# The Historical Background: Industrialization and Economic Theory

As western society industrialized during the 18th and 19th centuries, classical and neoclassical economics emerged as the foundation for traditional economic analysis. Classical economics is based on a variety of sources from Adam Smith to Karl Marx, but there are several assumptions which underlie these diverse perspectives and provide a framework from which the economic analysis of public land use evolved.

Both Smith in *The Wealth of Nations* (1776) and Karl Marx in *Capital* (1867) essentially agreed that the value of a commodity (product) is based on the value of the labor that went into the production of that commodity. Marx believed a commodity is constructed of two things, material and labor. Therefore a wooden bowl is composed of wood, and the labor to carve the wood into a bowl. The value of the wood would be the labor involved in obtaining the wood. Therefore the value of a tree becomes the labor necessary to cut it down. In such a world, there is no incentive to preserve the tree or the forest for other uses than the wood products they provide.

Smith (1776) also implied there was an "invisible hand" in society that guided people to pursue their own self interest, but that in doing so they would unknowingly work for and promote the good of society. The crux of the invisible hand argument is that people should be free to pursue their own self interest economically, without government intervention, and that government intervention would only hinder the growth of society. Therefore whatever produces economic good for the individual is good for the larger society. And in a land of plentiful resources, this is likely true.

However, as Garret Hardin (1968) pointed out in his classic article, "The Tragedy of the Commons," when people act in their own best interest the result of selfishness is the destruction of any common resource being used by those in society. Hardin noted that when people share a common resource, in his example, ranchers putting cattle on shared rangeland, it was always in the best interest of the individual rancher to keep adding more and more cattle to the rangeland, because the profit went to the individual while the cost of the loss of grasslands was shared by all of the ranchers. Inevitably, the ranchers would keep adding more cattle to the rangeland until the land was overgrazed and was no longer able to provide pasture for anyone. The metaphor applies to all commons; if people share a commons and act in their own best interest they will always use the commons until it is no longer able to function. This would be true of air which is used to absorb the pollution of industries, or water, or the extraction of resources from public lands. Hardin's only solution was public intervention to control the use of the commons.

From the works of Smith, Ricardo, Marx, Malthus and others emerged a generalized view of the social/economic world. This view of the economic world included: "the virtue of selfishness, the benefits of limited a limited role for government, and the idea that the economic systems is independent of the natural world" (Gowdy and O'Hara, 1995:128). The work of the classical economic theorists was followed by the works of neoclassical economists who envisioned the economic world as composed of producers, consumers, resources, the productions of goods, and the relationships between money to produce goods and the cost of a product. The concepts used in the neoclassical perspective largely ignore the value of the natural world (Gowdy and O'Hara, 1995) except when it is valued for raw materials or as a pollution sink (Schnaiberg and Gould 2000 and 2008).

In the industrializing world prior to the late 20th century, most workers were engaged in manual labor for long periods of time, had little time for leisure, and therefore the use of public lands for their extractive resources was not in competition with the use of public lands for

- 3 -

BLM_0081445

recreation or other non-extractive purposes. When Gifford Pinchot (1910, 1947) proposed the idea of conservation in 1908, he explicitly stated "conservation means development now," but with an eye to the future, so resources would be available for the use of future generations. Conservation did not mean preservation. Competition for public land resources was between big companies with specific resource needs, not between industries and the public in general and citizens' desire for a wide variety of recreational uses.

Between World War II and the present, major changes took place as the nature of work changed. Over time the service sector of the economy grew as the manufacturing sector shrank (Bureau of Labor Statistics, US Census Bureau). This led to changes where income increased for most workers, the amount of time for leisure increased, and consequently new recreational activities emerged. The population began to use the public lands for a wide variety of recreational activities which came into conflict not only with extractive industries and also led to conflict between one type of recreational activity and another.

However, resource extraction, pollution sinks, and recreation are not the only goods that the environment provides. As the 20th Century came to a close, new concepts arose as scientists, economists and many others became aware of all of the different services the ecosystem provides for humans. Recognition of this variety of services ecosystems perform emerged from the environmental movement of the 1960s and slowly became recognized as important at the end of the 20th century. The loss of critical habitat due to population growth and development led to reduced biodiversity. With climate change came the recognition that ecosystems maintain atmospheric stability. The ecosystem services previously unrecognized became visible and important. But not in land use planning. These services appeared to be difficult to measure and difficult to incorporate into traditional economic planning models.

In the early 21st century, a transition is being made from the classical and neoclassical economic analysis that valued the environment for primarily extractive uses to a broader perspective that gives economic value to the myriad of other services that are being provided by the ecosystem. This change, however, is slow partly because a common system for economically valuing ecosystem services has not emerged. Numerous studies have been conducted that give economic value to ecosystem services, but the studies have used a variety of methodologies and obtained differing results.

This study, after examining problems with the economic model currently being used in public lands planning, then develops a system to give a specific value to an array of ecosystem services by integrating results from the studies that have been previously conducted.

## Economic Analysis Models

Neoclassical economics focuses on producers, consumers, resources costs, the productions of goods, and the relationships between money to produce goods, and the cost of a product. When these concepts are assumed to be the key ingredients in the economic analysis of public lands use, the models that emerged were entirely consistent with the assumptions of the neoclassical model.

In1978 the Forest Service first developed the basic FORPLAN -- now IMPLAN ™ -- model for the purpose of evaluating the economic impacts of changes in land use management. The model is a basic input/output computer model in which specific information is put in the model, and results are obtained through the use of a variety of formulas. The model is designed to ascertain the number of dollars, jobs, and other positive "goods" that will be generated by

BLM_0081446

changes in land use, an upcoming event, or a new industry being introduced into a community. The IMPLAN model, with its brother SAM ™ (social accounting matrix) has since been widely adopted by other federal agencies and many economists as the accepted model to assess the economic impacts of any change in a variety of public sectors from new forms of agriculture to the placement of public buildings or services in specific areas. IMPLAN and SAM are now privately owned computer models obtained through the Minnesota Implan Group (www.mig.com).  MIG also sells a variety of databases with economic and social information that ranges from the local to the national level.

To understand how IMPLAN works this paper will examine the economic impacts of a new land use, a gold mine on public lands which employs 100 miners. The mine will generate X number of jobs, produce Y number of dollars for the industry and for workers, and result in Z amount of spending on consumer goods by workers. While this is a simple example, IMPLAN is much more complex, and includes many more variables, all of which can be measured in economic terms, i.e. dollars, and jobs. Therefore this simple example can also be expanded to include the amount of materials the gold mine must purchase from other industries in order to produce the gold. This could include mining equipment, electricity to run machinery in the mine, and many others. In this way the gold mine stimulates the industries whose products it uses. Likewise the mine also stimulates a variety of industries because of its existence. The gold mine brings workers into an area which creates new service sector jobs, such as shopkeepers, new teachers for workers' children, as well as stimulating the local government through taxes on the gold mine, real estate taxes on workers new homes, and sales taxes on goods that workers purchase in the local area. Therefore, the gold mine has many positive economic impacts, impacts that go on prior to any gold actually being mined, and positive impacts that result from the gold production.

To estimate the economic effect of the gold mine on the local economy, information from previous studies is needed. Over time a variety of complex databases have been constructed that are readily available to economists to feed data into the IMPLAN model. These databases contain "multipliers" which the economist can use to estimate the effect of the gold mine in the number of jobs or dollars that will be generated.

Table 1, next page, shows how these multipliers work. There are three types of effects that the gold mine can produce: direct, indirect, and induced. Direct effects are those within the industry itself, 100 jobs and from those jobs $5 million dollars in payroll ($50,000 per worker). Indirect effects are jobs created from supplying the gold mine. The hypothetical multiplier for this example is 1.3, that is, 1.3 jobs are needed to support every 1 miner and the multiplier for income, because these jobs are more skilled than mining is, is 1.5. The true multipliers would be found in an IMPLAN database. If our average miner makes $50,000, the workers who support the miner make $75,000. Induced jobs are those that are created from the miners' spending or consumption. This includes service-sector jobs such as sales clerks, school teachers, county government staff and workers, and professionals who serve the community. In this hypothetical example it assumed that it takes 2 people in the service sector to support each miner, but these jobs overall are also assumed to pay less than the miner's $50,000 so the multiplier for income is 0.75. Therefore, the average service worker makes $37,500.

- 5 -

BLM_0081447

**Table 1: IMPLAN As Applied To a Gold Mine**

| New Gold Mine | Direct effects | Indirect | Induced | Total |
|---|---|---|---|---|
| Jobs | 100 | 130 | 200 | 430 |
| Dollars | $5,000,000 | $9,750,000 | $7,500,000 | $22,250,000 |

From this simple example it can be seen that the new gold mine produces a total of 430 jobs and a total payroll of $22,250,000. This is IMPLAN in its simplest form. Numerous layers of information can be added too provide a much more complex picture of economic impacts for planners. For example, the direct and indirect jobs can be broken down into specific categories and specific income amounts for each category.  Or, more than one industry can be added to the model to show the relationships between various industries as they expand and contract, and compete for workers and materials.

## Problems with IMPLAN

While IMPLAN works as it was intended, it has a number of flaws which need to be examined. These problems are especially pernicious for the environmental community. The problems are found in IMPLAN's assumptions, its statistical modeling, and the nature of the inputs allowed in the model.

**IMPLAN Assumptions**

There are four interrelated assumptions that are built into the IMPLAN model which lead to problems with the results the model provides.

### 1) Constant Technology Assumption

IMPLAN assumes that technology remains the same in an industry. This assumption is valid for IMPLAN because the predictions IMPLAN makes are based on the here and now. IMPLAN does not forecast what will go on in the future, but instead shows what is happening in the present. The gold mine produces 430 jobs and has an economic impact of $22,250,000. If mining technology changes at some point in the future, it will change the multipliers, and that will change the number of jobs and dollars produced. However, industries are not static and new technologies are constantly being introduced, therefore there will always be some inaccuracy in IMPLAN results.

### 2) No Supply Constraints

Again because IMPLAN is giving results in the present, it does not take into consideration changes in the supply of the resource. But in reality mines and varieties of other industries use up their available resource. When that occurs, the economic benefit of the mine diminishes and perhaps disappears. All of the abandoned mines from 1800s are evidence of this. Conservation of the resource is not considered in the IMPLAN model.

BLM_0081448

### 3) No Labor Constraints

It is assumed that labor will always be available to run the industry, and that the same amount of labor will always be available. Labor will indeed always be available during times of economic hardship, but during times of economic wellbeing, laborers may choose other occupations in other locations. Farming, as an example, has suffered as children leave the rural life and find steady and higher paying jobs in the urban environment. When there is competition between varieties of industries for labor, the labor market fluctuates and labor may not be available and the price of labor may vary. These considerations are not and cannot be included in the IMPLAN model.

### 4) Present Time Orientation

While the literature clearly states that IMPLAN is producing results about the present, it is frequently misinterpreted as a predictor of the future. Planners and others make the assumption that the economic results found in the present will continue into the future. This in essence is the continuation of the constant technology, continuous supply, and constant labor assumptions. However, the social world is dynamic, and IMPLAN isn't. IMPLAN is only accurate in the very short term.

**Statistical Problems with IMPLAN**

### 1) IMPLAN Is a Linear Model

Linear statistical models are models for predicting the future based on information found in the past and present. For example, if research shows the following information regarding the production of gold (as in the table below), then it is easy to predict that 12 workers will produce 24 ounces of gold.

| Number of workers | Ounces of gold produced |
|---|---|
| 2 | 4 |
| 4 | 8 |
| 8 | 16 |
| 16 | 32 |

If the mine owner wants to produce a specific amount of gold, all the owner needs to do is determine the number of workers it will take to do so.

IMPLAN is a linear model and therefore suffers the limitations of all linear models. First, while they are excellent for describing the present and relatively accurate in describing the very short term future, they quickly lose their ability to predict as the distance into the future increases. In this example, the owner of the mine knows quite accurately how many workers will or should be employed tomorrow, but next week the producing vein may diminish and instead of taking 2 workers to produce 4 ounces of gold, it may take 8 workers to produce those same 4 ounces. Unforeseen variables can continuously undermine linear models.

Second, because IMPLAN is a linear model, it does not include feedback loops, and the results of multiple iterations. In linear models the impacts of the first set of multipliers are

- 7 -

considered the final product, in this case the final economic effect. However, because of the linear nature of the model the first set of results are not fed back into the model to determine the long term effect of some change in public lands use.

The feedback effects in the gold mine example take place over multiple years and include reductions in jobs related to recreation and tourism and ultimately people leaving the town because there is no longer a clean water supply. While the mine is still in operation, the negative feedback in the system leads to fewer available laborers to work in the mine, which then leads to fewer ounces of gold produced, and a downward spiral ensues. Instead of the mine being a positive economic force within the community, over time, it becomes a negative one.

## 2) Negative Multipliers Are Rarely Used In IMPLAN

It has generally been assumed that the multipliers in IMPLAN are positive numbers. This assumption of multipliers being positive is based on the previous assumptions of constant supply of the resource, constant availability of labor, and constant technology. The use of positive numbers makes sense when analyzing one specific event or industry. It even works well for analyzing several mutually supportive industries or events. Where the problems occur is when industries or events are in competition. In the case of the gold mine, it may lead not only to an increase in the number of jobs as discussed above, but it may also lead to the reduction of jobs in recreation, a loss of tourists, and degradation of the nearby town's water supply through pollution.

While some of these issues can be handled by multipliers between 0 and 1.00, negative multipliers come into play when a resource takes on a negative value. Positive multipliers do not allow for the possibility of a truly negative outcome. For example, if the value of the land surrounding the gold mine loses value each year from the effects of the industry in a previously pristine area, a multiplier of .98 could be used. Therefore if the land surrounding the mine was worth $10,000 per acre, then after one year of production the surrounding land would be worth $9,800 and the next year it would be worth .98 x $9,800 or $9,604. Over a long period of time the value of the land would near but never reach $0.

As the example continues, the gold plays out, company has goes bankrupt, pollution from the mine tailings is no longer contained, and the trust fund for land reclamation is not large enough.  The tailings pollute the land and water downstream of the mine. The value of the adjoining land is not just $0 because the land is polluted, but instead, is less than $0 because the land must be reclaimed, just as the mine land must. The land becomes a superfund site. This is the scenario that played out in Summitville, Colorado.

In another example, negative multipliers were used to show the impact of commercial fishing where greater and greater expenditures on fish production led to resource reduction, which lead to more competition for fewer fish, which without government intervention, lead to resource extinction and industry economic collapse (Jin et. al. 2003).

Finally, without negative multipliers, opportunities forgone are not included in the economic analysis of land use change. When a use like a gold mine is permitted, other opportunities are excluded such as hiking, hunting, fishing, OHV use, and birding. Each of these excluded uses may be in need of a negative multiplier in terms of both jobs and income for the community.

BLM_0081450

### 3) Inputs Are Limited

To create the multipliers that are used in the IMPLAN model huge amounts of information must be gathered from the Census Bureau, the Bureau of Labor Statistics, Health and Human Services, the Department of Education and so on. This information is gathered on national, regional, state, city, county and local levels and placed into data bases made available to IMPLAN users. For obvious reasons, this is a time consuming effort and the statistics that are available through government agencies will always be somewhat out of date. Census data is usually available about a year to a year and a half after it was collected. Other statistics are often not available as quickly. In other words there will always be an information lag, and a certain amount of inaccuracy built into the multipliers when government statistics are used.

On top of that, multipliers are limited to the data which is available. Unfortunately, some very important data is not available or even collected. Information for traditional economic analysis is readily available, but the impacts of an economic change are not always economic. Information is not readily available on such impacts as resource depletion, the loss of ecosystem services, and the stress on educational systems and social services. Yet, all are significant impacts that must be included in an economic analysis.

### 4) Potential Inputs Are Ignored

While many inputs are not readily available, others are ignored because they are not just difficult to obtain, but in many cases are even difficult to define. Yet these inputs do exist. When analyzing the gold mine variables such as diminished beauty, loss of habitat or biodiversity due to pollution, loss of quiet, carbon sequestering, and variables that may be important to local residents, visitors and members of the larger society alike are not included in IMPLAN analysis.

## Conclusion

While IMPLAN and its descendants give very accurate pictures of the present and are useful tools for planning purposes, these economic models have limitations that must be taken into consideration when their results are analyzed. Simply discounting the problems with IMPLAN's assumptions, as is frequently seen in the literature, does not overcome those very real limitations. It merely suggests that we ignore them, and that is not a good solution to the very real problems with the IMPLAN model.

BLM_0081451

# IMPLAN Bibliography

Alward, Gregory. "Introduction to the Implan V2.0 Modeling System. Minnesota IMPLAN Group (MIG), Inc. Retrieved 8/13/2009.
www.doleta.gov/regions/reg05/Documents/WIDRE/IMPLAN.pdf

Baker, Rose and David Passmore. 2007. "Economic Impact Analysis with IMPLAN." Penn State University. Retrieved 8/13/2009. www.slideshare.net/davidpassmore/economic-impact-analysis-with-implan

Beacon Hill Institute. 2004. "The Economic Impact of the Democratic National Convention on the Boston Economy: The Final Tally." Suffolk University. Retrieved 8/19/ 2009. www.beaconhill.org/BHIFaxSheetDNCFinal08094.pdf

Broomhall, David. 1993. "The Use of Multipliers in Economic Impact Estimates." *Agricultural Economics.* Cooperative Extension Service: Purdue University. Retrieved 8/16/2009. www.ces.purdue.edu/extmedia/EC/EC-686.html

Department of Community Development and Applied Economics. 2009. "IMPLAN Methodology for the Study of the Impact of Tourism on the Vermont Economy." University of Vermont. Retrieved 8/13/2009.
www.uvm.edu/~snrvtdc/publications/implan_method.pdf

Gret-Regamey and Susanne Kytzia. 2007. "Integrating the Valuation of Ecosystem Services into the Input-Output Economics of the Alpine Region." *Ecological Economics.* 63: 786-798

Jin, Di, Porter Hoagland, Tracey Morin Dalton. 2003. "Linking Economic and Ecological Models for a Marine Ecosystem. *Ecological Economics.* 46: 367-385.

Hughes, David W. 2003. "Policy Uses of Economic Multiplier and Impact Analysis." *Choices: The Magazine of Food, Farm, and Resource Issues. 2nd Quarter. Retrieved 8/19/2009.* www.choicesmagazine.org/2003-2/2003-2-06.htm

Hodges, Alan W. 2007. "Understanding and Using Economic Multipliers (PowerPoint)." Presented to USDA Economists Group. Retrieved 8/13/2009.
http://ideas.repec.org/p/ags/usdags/43793.html

Morton, P. 1999. "The Economic Benefits of Wilderness: Theory and Practice." *University of Denver Law Review.* 76:2:462-518.

Minnesota IMPLAN Group, Inc. 2002. "Elements of the Social Accounting Matrix." MIG IMPLAN Technical Report TR-98002

Mundy, Karen and Wayne Purcell. 2004. "Measuring the 'Ripple Effect': Economic Multipliers." *Horizons.* V16:4:1-3. Retrieved 8/19/2009.
www.reap.vt.edu/publications/horizons/hor%2016-4.pdf

BLM_0081452

## Section II- Establishing economic value for ecosystem services

## Ecosystem Services

## Introduction

The literature is replete with discussions of ecosystem services that are not accounted for when economic analyses are conducted. The main reason these services are not taken into account is that their economic value is difficult to calculate and no common methodology has emerged as the standard for determining the economic value of these services (see Hannon 2001; Boyd and Banzhaf 2007). Additionally, while the literature has identified a large variety of ecosystem services, a common model or organizational structure for these services has only recently emerged (see Brown et. al. 2007; Hassan et. al. 2005).

Studies to establish the value of ecosystem services have also been plagued by other problems including the use of different scales of size (30 sq. meters to large landscapes), different methodologies for establishing values, and studies from different countries. Also, the studies have been conducted at different times so establishing common dollar amounts has been difficult.

In this section the common models will be discussed, methodologies for establishing economic values will be reviewed, and the methods used for establishing the values of ecosystem services in this study will be discussed. This information will then be used to create a set of economic values for many ecosystem services.

### Models

Two definitions give a picture of the scope of ecosystem services. Ecosystem services "…are the benefits people obtain from ecosystems" (Hassan et. al. 2005: 27), and "Ecosystem services are the conditions and processes through which natural ecosystems, and the species that make them up, sustain and fulfill human life" (Brown et. al. 2007: 330). The definitions are straight forward, however establishing all of the services that fit within the definitions has been more difficult.

A variety of models have emerged since the 1980s as a way to classify ecosystem services (see Costanza et. al. 1997; Morton 1999; Alcamo et. al. 2003; Pagiola et. al. 2004; Brown et. al. 2007). While these models were different, over time the major ecosystem services were delineated and expanded to include a set of services that have now been arranged in two commonly accepted models.

The first model for organizing ecosystem services is the Millenium Ecosystem Assessment (MA) working group model (Alcamo et. al. 2003; Hassan et. al. 2005). This model divides ecosystem services into four categories: Provisioning Services, Regulating Services, Cultural Services and Supporting Services. Provisioning services provide resources for human use including food, clothing, medicines, or raw materials. Regulating services are the services the ecosystem provides through climate regulation, water purification, or erosion control. Cultural services range from spiritual and artistic to education and recreation. Finally, supporting services "are all those that are necessary for the production of all other ecosystem services" (Alcamo et. al. 2003: 59) and include soil formation, nutrient cycling, oxygen production and

- 11 -

BLM_0081453

biodiversity. Supporting services generally take place over a long period of time but are services that are vital to a functioning ecosystem.

The second model (Pagiola et. al. 2004) takes the Total Economic Value (TEV) approach and divides ecosystem services into four basic categories: Direct Use, Indirect Use, Option value, and Non-Use or existence value. Direct use services are those "goods and services directly used by human beings" (p. 9) and include everything from resource extraction and agriculture to recreation. Indirect Use services are benefits from the ecosystem that are off-site and could include the generation of knowledge, increased property values, or the attraction of new businesses. Option values result from protection of the ecosystem for future human use such as food production, recreation, and freshwater. Finally, Non-Use or existence value is the value to humans that comes from just knowing that an ecosystem still exists "even if [those people] never expect" to see or use it (Pagiola et. al. 2004:10).

Examination of both models shows categories can overlap. This potential overlap is important as it must be accounted for when calculating the total economic value of ecosystem services at a specific location. Direct use services could easily include categories that are found in Provisioning or Cultural uses. Indirect use includes ecosystem services that could easily include Regulating services. Because Option value is such a broad category, it includes virtually all other ecosystem services that are preserved for future generations. Non-use categories are philosophical and Cultural in nature and are among most difficult when it comes to determining their economic value.

Combining the two models, MA and TEV, provides the best conceptual framework for organizing ecosystem services without creating too many overlapping categories. Table 2 (next page) first uses the MA model to classify a variety of ecosystem services and then uses the TEV model to include ecosystem services that do not fit as easily into the MA model.

- 12 -

BLM_0081454

**Table 2: Ecosystem Services Organized by MA and TEV Model Categories**

| Provisioning | Regulating | Cultural | Supporting |
|---|---|---|---|
| Food(1)[1] | Air Quality(1) | Spiritual and Religious(1) | Soil Formation(1) |
| Fiber (1) | Climate Regulation(1) | Aesthetic values(1) | Photosynthesis(1) |
| Genetic resources(1) | Water Regulation(1) | Inspiration(1) | Oxygen production |
| Medicines(1) | Erosion Control(1) | Knowledge Systems(1) | Primary Production(1) |
| Fresh Water(1) | Disease Regulation(1) | Education(1) | Nutrient Cycling(1) |
| Fuel (2) | Pest Regulation(1) | Sense of Place(1) | Water Cycling(1) |
| Ornamental resources(2) | Natural Hazard(1) | Cultural Heritage(1) | Provisioning of habitat(2) |
| Raw materials(4) | Water Purification(2) | Solitude/quiet | Biodiversity(3) |
| Pollination(1) | Waste Control(2) | Adventure/excitement | Habitat (refugia) (4) |
| | | | |
| **Additional Ecosystem Services Organized by TEV Model Categories** | | | |
| **Direct Use** | **Indirect Use** | **Option** | **Non-Use** |
| Recreation (1) | Science, knowledge(3) | Option value(3) | Intrinsic value(3) |
| Commercial use(3) | Community change(3) | Recreation | Bequest value(3) |
| Hunting | Population(3) | Biodiversity | Existence value(3) |
| Fishing | Income(3) | Habitat | |
| Guiding | Property values(3) | Endangered species | |
| Viewing wildlife(5) | Taxes(3) | Etc., | |
| Horseback Riding | Employment(3) | | |
| Off Highway Vehicle use | Quality of life | | |
| | Business attraction | | |

(1) Hassan et. al. 2005: 7-10, (2) Alcamo et. al. 2003: 56-59, (3) Morton 1999: 3, (4) Castanza et. al. 1997: 254, (5) Brown et. al. 2007: 341

Table 2 shows the difficulty of separating multiple ecosystem goods and services into mutually exclusive categories. Recreation which falls under cultural services also falls under direct use. Additionally, Table 2 is not exhaustive. Other categories could still be added. The services in Table 2 were chosen because they are the most commonly discussed ecosystem services found in the literature.

## Methods Used For Determining Economic Value of Ecosystem Services

The methods used to determine the value of ecosystem services are varied and to date no common methodology has been accepted by all economists. Because of the lack of a standard methodology, studies of the same ecosystem service return different economic values for that service. Therefore, when multiple studies are used the result is a range of values for each ecosystem service. Ingraham and Foster (2008) resolved this problem by taking an average of the values found in the studies they used in order to calculate the economic value of ecosystem services in the U.S. National Wildlife Refuge System. This is a statistically valid approach and is used in this study.

---

[1] Numbers in parentheses indicate the source for this service. Sources are found below this table.

BLM_0081455

The most frequently used methods (see Hassan et. al. 2005; Brown et. al. 2007; Pagiola et. al. 2004, Eppink and van den Bergh 2007) to determine the values of an ecosystem service are:

- Contingent valuation (WTP – willingness to pay; WTA – willingness to accept)
- Changes in productivity
- Replacement of Services
- Cost of Illness; Cost of Human Capital
- Hedonic Analysis
- Travel Cost
- Benefits Transfer

**Contingent Valuation**. Contingent valuation asks consumers how much they are willing to pay (WTP) in order to obtain or maintain an environmental service. Willingness to accept (WTA) instead asks how much compensation consumers expect in order to give up that service. Example: How much are you willing to pay for recreational use of public lands, or be compensated for not being able to use those lands? In studies of this nature people are generally willing to pay less, but want to be paid more for an ecosystem service that they are asked to give up. Contingent Valuation is used primarily when numerical calculations cannot be performed using scientific information to ascertain the value of an ecosystem service. However, the reliability of WTP surveys is questionable as respondents' answers are dependent on the state of the economy and the specific wording of the question. Finally, because respondents are only asked what they would be willing to pay but are not actually asked to pay, their answers should be treated with caution.

**Changes in Productivity.** This method follows the impacts from a change in ecosystem service usage. Example: A reduction in timber allocations may lead to an increase in the price of homes, or the number of homes that could be built. Pollution of a river could lead to increases in the price of clean water.

**Replacement of Services.** This evaluation technique estimates through market analysis the amount necessary to replace the specific service. Example: What are the costs associated with replacing lumber from forests with metal, cement, plastics, or other building products?

**Cost of Illness or Cost of Human Capital.** Changes in ecosystems can impair human health and therefore lead to changes in the ability to work. Human capital is often thought of not only as the ability to do useful work but also to do skilled work. Example: If mercury pollution leads to illness, it not only affects physical ability, but also cognitive ability and a corresponding loss in labor production.

**Hedonic Analysis.** Hedonic analysis determines the effect of being near an ecological good in terms of the economic cost associated with being in proximity to that good. Example: The price of homes near open lands, wilderness areas, or scenic views is compared to the price of similar homes where these amenities are not available.

**Travel Cost.** This method measures the real cost of an ecosystem service by measuring the travel cost, lodging, and equipment necessary for a trip to a specific destination.

**Benefits Transfer**. The value of an ecological amenity that has been studied in one area is transferred or assumed to be similar to that in another area. Obvious adjustments are made based on the fact that no two areas are exactly the same.

BLM_0081456

**Total Economic Value**

      A number of studies have attempted to determine the total economic value of ecosystem services in the world or in a specific location. However, this cannot be done by simply adding together the value of all of the different ecosystem services present on that particular piece of land. This is because some ecosystem services are mutually exclusive, that is, they stand alone and do not overlap with any others. Other services, however, do have values that overlap, that is they contribute to or are a part of another ecosystem service. For example, a piece of open land could have values for recreation, hunting, wildlife viewing, solitude, art, and cultural heritage. If the value per acre for recreation was $10; hunting $12, wildlife viewing $5, solitude $3, art $1, and cultural heritage $2, the addition of these values results in a total ecosystem service value of $33 per acre. However, hunting is recreation as is wildlife viewing. To obtain solitude may involve hiking. Something that a person might want to paint or photograph, perhaps an old mine, is part of America's cultural heritage. Because of these types of overlap ecosystem service values are not simply additive

      This study will assess total economic value through the grouping of ecosystem services into major categories which have little or no overlap in order to overcome this problem.

## Methodology Used To Determine Ecosystem Service Values In This Study

      The first goal of this study was to establish a specific value for each ecosystem service in 2008 United States Dollars (USD). A second goal was to make sure the value of an ecosystem service was not overestimated. For this reason the following methodology was established.

      First, peer reviewed sources were used in order to get a set of values for each ecosystem service. Because the studies were done in a variety of countries, on a variety of scales, using a variety of monetary units, the following steps were taken to create a common set of economic values for each ecosystem service.

      If a study was conducted in a foreign country and the currency amounts were expressed in currency per hectare, the amount was first converted from hectares to acres. Then the exchange rate for the year the study was conducted was used to change foreign currency per acre into dollars per acre. If the date of the study was not presented in the paper, it was assumed the study was conducted the year before the paper was accepted for publication. Finally, dollar amounts were transformed into high and low 2008 USD. High and Low values were calculated because there are many indices that can be used to convert dollars from previous years into present dollars, and the results can be very different. (Appendix C describes the dollar conversion methodologies in greater detail.) Studies conducted in the United States only needed to be converted into 2008 USD.

      After ecosystem service values were obtained from several studies, the mean (average) for the high value and the mean for the low value of the service were calculated. To get a single summary score to represent an ecosystem service, the high and low means were averaged. However, if the economic values were highly skewed, meaning one score was exceptionally high while all the others were rather low then the median, which is the middle score, was used in place of the mean. The advantage of the median in a skewed distribution is that the effect of an extreme score is eliminated or reduced. Appendix C shows the difference between the use of the mean or median. A reliability of each summary economic value was evaluated and can be found in Appendix D.

BLM_0081457

The methodology described above establishes the most conservative yet realistic estimate for the value of an ecosystem service. The specific values obtained from each study used as well as the use of the mean or median is found in Appendix A.

Table 3 from Appendix A (below) demonstrates how studies were compiled to determine the value of an ecosystem service. High and low economic values were calculated for each study. In this table, the median was used because the study by Ingraham and DeGroot skewed the distribution. Finally the two medians ($5.45 and $148.00) were averaged to obtain the summary value of $76.73 per acre per year for general habitat.

**Table 3: Habitat (refugia)**

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---|---|
| Ingraham | US Wildlife Reserve | $220.00 | $239.00 |
| DeGroot | General | $1.55 | $1066.72 |
| Chen | Wetlands | $14.52 | $148.00 |
| Curtis | Forest | $5.45 | $6.32 |
| Troy | Forest | $4.35 | $4.72 |
| **Median** | | $5.45 | $148.00 |

Habitat (refugia): $76.73 per ac/yr

The summary values for each ecosystem services on a per acre and willingness to pay basis are found in the tables that follow. The total economic value of ecosystem services on a per acre per year basis is also calculated and then applied to the Pike San Isabel National Forest.

BLM_0081458

## Summary: Economic Values for Ecosystem Services

Table 4 presents the economic value for each ecosystem service in 2008 USD. The results are presented on a per acre per year basis and where available on a willingness to pay (WTP) pay basis. The information is presented under the larger categories of the MA and TEV models and subcategories have been combined in order to eliminate overlapping categories. It is therefore possible to calculate a total economic value of the ecosystem services on a per acre per year basis. Total economic values are shown by MA and TEV category in Table 5. Table 6 shows the total economic value of the ecosystem services when applied to the Pike San Isabel National Forest. Because WTP studies are based on survey results, and these results are easily biased by how the question was written and by the state of the economy when the survey was conducted, WTP results should be interpreted with caution. Therefore, a creating a total economic value table for ecosystem services is not prudent.

### Table 4: Summary of Ecosystem Services and Economic Values

| Ecosystem Service | 2008 USD |
|---|---|
| **Provisioning** | |
| Food and Fiber | $2.91 per ac/yr |
| Genetic Resources | $22.82 per ac/yr |
|    Wetlands Genetic Resources WTP | $9.89 per household per year |
| Raw Materials | $20.59 per ac/yr |
| Ornamental Resources | $25.47 per ac/yr |
|   WTP | $7.28 per household per year |
| Pollination | $36.69 per ac/yr |
| **Sub-total** | **$108.48 per ac/yr** |
| | |
| **Regulating** | |
| Water Supply, Cycling, Purification | $43.78 per ac/yr |
|   WTP to restore Water Supply, Cycling, Purification | $73.34 per household per year[2] |
| Air Quality, Clean Air, O2 Production | $73.72 per ac/yr |
| Climate Regulation, Carbon Sequestering | $64.64 per ac/yr |
| Water Regulation, Erosion Control, Natural Hazard control | $88.52 per ac/yr |
|   WTP | $73.34 per household per year |
| Disease Regulation | $4.18 per ac/yr |
| Pest Regulation | $23.18 per ac/yr |
| Waste Control | $533.02 per ac/yr |
|   WTP | $73.34 per household per year |
| **Sub-total** | **$831.04 per ac/yr** |
| | |

---

[2] Loomis asked respondents how much they were willing to pay to restore 5 ecosystem services. Because the services were not weighted, it was assumed that the respondents weighted the services equally which accounts for the five services showing up as equal in this study.

BLM_0081459

| Supporting Services | 2008 USD |
|---|---|
| Soil Formation | $3.80 per ac/yr |
| Nutrient Cycling | $1027.30 per ac/yr |
| Provisioning Habitat | $105.09 per ac/yr |
| Biodiversity | $6.57 per ac/yr |
|   WTP for preservation of biodiversity | $24.10 per household per year |
| Healthy Ecosystem | $7.32 per ac/yr |
|   WTP preservation of healthy ecosystems | $82.59 per household per year |
| Habitat (refugia) | $76.73 per ac/yr |
|   WTP to preserve habitat for wildlife | $37.85 per household per year |
| **Sub-total** | **$1226.81 per ac/yr** |
| | |
| **Cultural Services** | |
| Religious/spiritual, aesthetic, inspiration | $8.70 per ac/yr |
|   WTP | $12.40 per year per household |
| Cultural Heritage, Sense of Place | $9.47 per household per year |
| **Sub-total** | **$14.08 per ac/yr** |
| | |
| **Direct Use** | |
| Recreation | $26.68 per ac/yr |
|   WTP | $8.81 per household per year |
| | |
| See Appendix B for Specific Recreation values for Pike San Isabel National Forest | |
| **Sub-total** | **$26.68 per ac/yr** |
| | |
| **Option value** | |
| Value to Future Generations WTP | $13.22 WTP per household per year |
| | |
| **Non-Use Values** | |
| Bequest | $10.68 WTP per household per year |
| Existence | $10.77 WTP per household per year. |
| Non-Use not specified | $1.12 per ac/yr |
|   WTP Non-Use | $9.98 per household per year |
| **Sub-total** | **$1.12 per ac/yr** |
| | |

- 18 -

BLM_0081460

**Table 5: Summary by Category of Non-Overlapping Ecosystem Services by Category**

| Major Category | Total $ per Acre 2008 USD |
|---|---:|
| Provisioning | $108.48 |
| Regulating | $831.04 |
| Supporting | $1226.81 |
| Cultural | $8.70 |
| Direct Use | $26.68 |
| Non-Use | $1.12 |
| Indirect Use; Off-site | --- |
| **Total** | **$2202.83** |
| Option Value = Total[3] | |

**Table 6: Total Economic Value of Ecosystem Services for Pike San Isabel National Forest (2.1 Million Acres not barren rock)[4]**

| Major Category | Total $ per Acre 2008 USD | Pike San Isabel 2008 USD |
|---|---:|---:|
| Provisioning | $108.48 | $227,808,000 |
| Regulating | $831.04 | $1,745,184,000 |
| Supporting | $1226.81 | $2,576,301,000 |
| Cultural | $8.70 | $18,270,000 |
| Direct Use | $26.68 | $56,028,000 |
| Non-Use | $1.12 | $2,352,000 |
| Indirect Use; Off-site | --- | |
| **Total** | **$2202.83** | **$4,625,943,000** |
| Option Value = Total[3] | | |

# Indirect Use, Off-site values

A great deal of literature is available regarding the importance of Indirect/Off-site use values. However, very little literature is available regarding the economic value of these services or even how these services could be measured. In Table 7 (next page) suggestions are made for determining the economic value of these Indirect Use benefits.

---

[3] Option value is equal to the total value as future generations would get the at least the same value from ecosystem services as the present generation if all of these services were available to in the future.  It could be argued the amount should be discounted, but it is equally valid to suggest that the value should be inflated as the supply of land available to provide ecosystem services is likely to be reduced in the future.  However, as option value is not added into the total ecosystem service value, the question is probably moot.

[4] It should be noted, however, that even barren rock contributes to some ecosystem services such as water supply.

BLM_0081461

**Table 7: Indirect Use, Off-site values and possible methods of measurement**

| Indirect Use, Off-site values | Suggestions for Measurement |
| --- | --- |
| Science and knowledge | While professional publications have little economic value, they are indicators of the knowledge being generated by studies of ecosystems and the services they provide. To the extent the accumulation of knowledge leads to social change or produces economic benefits may allow for the determination of the value of this ecosystem service. |
| Population change | Description of population increase, decrease and resulting community income changes. This variable would likely be combined with Employment changes. |
| Income | Income from business related to ecosystem services that are not based on direct use can be calculated. |
| Property Values | Available literature using hedonic analysis suggests proximity to open lands increases property values 8% to 13%. |
| Taxes | Increases and decreases in available tax revenue based on changes in ecosystem services can be ascertained. |
| Employment | Changes in employment based on changes to ecosystem services can be established. The value of labor is readily available through the Bureau of Labor Statistics. |
| Quality of Life | Changes in citizens' quality of life based on changes in ecosystem services can be determined. Quality of Life surveys are frequently conducted and can be correlated against the ecosystem service values found in Table 4. |
| Business Attraction | A survey of businesses and chambers of commerce can be conducted to determine the percent of a decision to be located in an area because of the existent ecosystem services. This percent could then be multiplied by the value of the businesses that relocate to an area. |
| Education | Number of schools and students who use the specific location to study ecosystems and ecosystem services can be found. Travel costs can then be calculated to obtain a value for this ecosystem service. |

BLM_0081462

## Conclusion and Recommendations

In the past, ecosystem services were left out of the economic analyses when land use planning was conducted. There are likely two reasons for this, first, the economic models used were based on neoclassical economic assumptions that gave little value to the environment and the services it provides; and second, ecosystems services were difficult to quantify economically. Over the last thirty years both of these reasons have been challenged and are no longer valid. Numerous studies point to the importance of ecosystem services for human survival and numerous studies have also been conducted to economically quantify the value of these services.

This study has analyzed the problems inherent in the present economic models and has established conservative economic values for a wide range of ecosystem services. These economic values have been applied to the Pike San Isabel National Forest as a demonstration that the value of these services can be established and therefore incorporated into the land use planning process.  It is no longer possible or prudent to ignore the enormous benefits ecosystems provide for humans.

The following conclusions can be reached from the material presented in this paper.
1.  Traditional economic models used in land use planning are flawed and therefore their results should be interpreted with great caution.
2.  The economic value of ecosystem services has been ignored in the land use planning process.
3.  Ecosystem services do have economic value.
4.  The economic value of ecosystem services can be measured and is available in the professional literature (Appendix A).
5.  The total economic value of ecosystem services is substantial (Tables 5 and 6)

Recommendations:
1.  Land use agencies must create new economic models.
2.  These models must deal with the flawed assumptions and statistical problems inherent in input/output models.
3.  The new models must also include the economic value of ecosystem services.
4.  Recursive models are necessary to assess the long term impact of land use change. Models that simply reflect the present, fail to anticipate the long term consequences of land use decisions.
5.  Appropriate negative multipliers must be established and used when they will accurately reflect the long term impacts of land use change.
6.  Models that can result in economic values that are less than $0 are necessary in order to show the possible impacts of land use change on ecosystem services and therefore show the true costs of losing and replacing those services.

The importance of these recommendations cannot be underestimated. Unless the changes outlined above are incorporated in the land use planning process, economic analyses conducted in the future will continue to be inaccurate. These recommendations are not only academically important, they are critical to the decision making process because if ecosystem services are ignored, human survival is compromised.

BLM_0081463

# References

Alcamo, Joseph et. al. 2003. *Ecosystems and Human Well-being: A Framework for Assessment.* Island Press.

Alward, Gregory. "Introduction to the Implan V2.0 Modeling System. Minnesota IMPLAN Group (MIG), Inc. Retrieved 8/13/2009. www.doleta.gov/regions/reg05/Documents/WIDRE/IMPLAN.pdf

Anielski, Mark and Sara Wilson. 2005. *Counting Canada's Natural Capital: Assessing the Real Value of Canada's Boreal Ecosystems.* Pembina Institute.

Ashworth, Lorena, Mauricio Quesada, Alejandro Casas, Ramiro Aguilar and Ken Oyama. 2009. "Pollinator-dependent Food Production in Mexico." *Biological Conservation.* 142: 1050-1057.

Beacon Hill Institute. 2004. "The Economic Impact of the Democratic National Convention on the Boston Economy: The Final Tally." Suffolk University. Retrieved 8/19/ 2009. www.beaconhill.org/BHIFaxSheetDNCFinal08094.pdf

Becker, Nir and Shirra Freeman. 2009 (In Press). "The Economic Value of Old Growth Trees in Israel." *Forest Policy and Economics.*

Berger Group, Lewis. 2009. *Economic Contribution of Off-Highway Vehicle Recreation in Colorado: Executive Summary.* Colorado Off-Highway Vehicle Coalition.

Broomhall, David. 1993. "The Use of Multipliers in Economic Impact Estimates." *Agricultural Economics.* Cooperative Extension Service: Purdue University. Retrieved 8/16/2009. www.ces.purdue.edu/extmedia/EC/EC-686.html

Brown, Thomas C., John C. Bergstrom and John B. Loomis. 2007. "Defining, Valuing, and Providing Ecosystem Goods and Services." *Natural Resources Journal.* 47:329-376.

Boyd, James and Spencer Banzhaf. 2007. "What are Ecosystem Services? The Need for Standardized Environmental Accounting Units." *Ecological Economics.* 63: 616-626

Chen, Z.M., G.Q. Chen, B. Chen, J.B. Zhou, Z.F. Yang, and Y. Zhou. 2009. "New Ecosystem Services Value of Wetland: Environmental Economic Account." *Communication in Nonlinear Science and Numerical Simulation.* 14:2837-2843.

Costanza, Robert, Ralph d'Arge, Rudolf de Groot, Stephen Farberk, Monica Grasso, Bruce Hannon, Karin Limburg, Shahid Naeem, Robert V. O'Neill, Jose Paruelo, Robert G. Raskin, Paul Sutton and Marjan van den Belt. 1997. "The Value of the World's Ecosystem Services and Natural Capital." *Nature.* 387: 253-260.

BLM_0081464

Curtis, Ian A. 2004. "Valuing Ecosystem Goods and Services: A New Approach Using a Surrogate market and the Combination of Multiple Criteria Analysis and a Delphi Panel to Assign Weights to the Attributes." *Ecological Economics*. 50:163-194.

De Groot, Rudolf S. Matthew A. Wilson and Roelof M.J. Boumans. 2002. "A Typology for the Classification, Description and Valuation of Ecosystem Functions, Goods and Services." *Ecological Economics*. 41: 393-408.

Department of Community Development and Applied Economics. 2009. "IMPLAN Methodology for the Study of the Impact of Tourism on the Vermont Economy." University of Vermont. Retrieved 8/13/2009. www.uvm.edu/~snrvtdc/publications/implan_method.pdf

Eppink, Florian and Jeroen van den Bergh. 2007. "Ecological Theories and Indicators In Economic Models of biodiversity loss and conservation: A Critical Review." *Ecological Economics* 61: 284-293.

Gallai, Nicola, Jean-Michel Salles, and Bernard E. Vaissiere. 2009. "Economic Valuation of the Vulnerability of World Agriculture Confronted With Pollinator Decline." *Ecological Economics*. 68: 810-821.

Gould, Kenneth A., David N. Pellow, and Allan Schnaiberg. 2008. *The Treadmill of Production: Injustice and Unsustainability in the Global Economy.* Boulder: Paradigm Pub.

Gowdy, John and Sabine O'Hara. 1995. *Economic Theory for Environmentalists.* Boca Raton: St Lucie Press.

Gret-Regamey and Susanne Kytzia. 2007. "Integrating the Valuation of Ecosystem Services into the Input-Output Economics of the Alpine Region." *Ecological Economics*. 63: 786-798

Guo, Zhongwie, Xiangming Xiao, Yaling Gan, and Yuejun Zheng. 2001. "Ecosystem Functions, Services and Their Values – A Case Study in Xingshan County of China." *Ecological Economics*. 38: 141-154.

Ingraham, Molly W. and Shonda Gilliland Foster. 2008. "The Value of Ecosystem Services provided by the U.S. National Wildlife Refuge System in the Contiguous U.S." *Ecological Economics*. 67:608-618.

Jenerette, G. Darrel, Wendy A. Marussich, and Joshua P. Newell. 2006. "Linking Ecological Footprints with Ecosystem Valuation in the Provisioning of Urban Fresh Water." *Ecological Economics*. 59:38-47.

Jim, C.Y. and Wendy Y Chen. 2009. "Ecosystem services and Valuation of Urban Forests in China." *Cities*. 26:187-194.

BLM_0081465

Jin, Di, Porter Hoagland, Tracey Morin Dalton. 2003. "Linking Economic and Ecological Models for a Marine Ecosystem. *Ecological Economics.* 46: 367-385.

Hannon, Bruce. 2001. "Ecological Pricing and Economic Efficiency." *Ecological Economics.* 36: 19-30

Hardin, Garrett. 1968. "Tragedy of the Commons." *Science.* 162(1968):1243-1248

Hassan, Robert M., R J Scholes, Neville Ash (eds). 2005. *Ecosystems and Human Well-being: Current State and Trends: Findings of the Condition and Trends Working Group of the Millennium Ecosystem Assessment.* Island Press.

Hodges, Alan W. 2007. "Understanding and Using Economic Multipliers (PowerPoint)." Presented to USDA Economists Group. Retrieved 8/13/2009. http://ideas.repec.org/p/ags/usdags/43793.html

Hughes, David W. 2003. "Policy Uses of Economic Multiplier and Impact Analysis." *Choices: The Magazine of Food, Farm, and Resource Issues. 2nd Quarter. Retrieved 8/19/2009.* www.choicesmagazine.org/2003-2/2003-2-06.htm

Lindberg, Kreg and John Loomis. 2009. *Economic Impact Decision Support System (DSS). Version 2.0.* Central Oregon Recreation Services.

Loomis, John, Paula Kent, Liz Strange, Kurt Fausch, and Alan Covich. 2000. " Measuring the Total Economic Value of Restoring Ecosystem Services in an Impaired River Basin: Results From a Contingent Valuation Survey." *Ecological Economics.* 33:103-117.

Marx, Karl. [1867]/ 1967. *Capital: A Critique of Political Economy.* Vol 1 New York: International Publishers

Matero, Jukka and Olli Saastamoinen. 2007. "In Search of Marginal Environmental Valuations – Ecosystem Services in Finnish Forest Accounting." *Ecological Economics.* 61:101-114.

Mertz, Tawna. 1999. *Pollination Services: No Food Without Them.* Rand Corporation. Retrieved 8/16/2009. www.rand.org/scitech/stpi/ourfuture/NatureServices/sec1_pollinators.html

Morton, P. 1999. "The Economic Benefits of Wilderness: Theory and Practice." *University of Denver Law Review.* 76:2:462-518.

Mundy, Karen and Wayne Purcell. 2004. "Measuring the 'Ripple Effect': Economic Multipliers." *Horizons.* V16:4:1-3. Retrieved 8/19/2009. www.reap.vt.edu/publications/horizons/hor%2016-4.pdf

Nijkamp, Peter, Gabriella Vindigni, and Paulo A.L.D. Nunes. 2008. "Economic Valuation of Biodiversity: A Comparative Study." *Ecological Economics.* 67:217-231.

BLM_0081466

Nunes, Paulo A.L.D. and Jeroen C.J.M. van den Bergh. 2001. "Economic Valuation of Biodiversity: Sense of Nonsense?" *Ecological Economics*. 39:203-222.

Pagiola, Stefano, Konrad von Ritter and Joshua Bishop. 2004. *How Much is an Ecosystem Worth? Assessing the Economic Value of Conservation*. Paper# 30893. The World Bank.

Patterson, Trista M. and Dana L. Coelho. 2009. "Ecosystem Services: Foundations, Opportunities, and Challenges for the Forest Products Sector." *Forest Ecology and Management*. 257:1637-1646.

Pejchar, Liba and Harold A. Mooney. 2009. "Invasive Species, Ecosystem Services and Human Well-being." *Trends in Ecology and Evolution*. 24:9:497-504.

Pinchot, Gifford. [1910,1947] in Roderick Frazier Nash. 1990. *American Environmentalism: Readings in Conservation History*. New York: McGraw-Hill. Pp73-79.

Ruijgrok, E.C.M. 2006. "The Three Economic Values of Cultural Heritage: A Case Study in the Netherlands." *Journal of Cultural Heritage*. 7:206-213.

Sattout, E.J., S.N. Talhouk, and P.D.S. Caligari. 2007. "Economic Value of Cedar Relics in Lebanon: An application of Contingent Valuation Method for Conservation." *Ecological Economics*. 61:315-322.

Schaniberg, A and K.A. Gould. 2000. *Environment and Society: The Enduring Conflict*. West Caldwell, NJ: Blackburn Press.

Smith, Adam. [1776]/1937. *The Wealth of Nations*. New York: Modern Library

Troy, Austin and Matthew A. Wilson. 2006. "Mapping Ecosystem Services: Practical Challenges and Opportunities in Linking GIS and Value Transfer." *Ecological Economics*. 60:435-449.

Vejre, Henrik, Frank Sondergaard Jensen and Bo Jellesmark Thorsen. 2009 (In Press). "Demonstrating the Importance of Intangible Ecosystem Services From Peri-urban Landscapes." *Ecological Complexity*.

Zhongmin, Xu, Cheng Goudong, Zhang Zhiqiang, Su Zhiyong, and John Loomis. 2003. "Applying Contingent Valuation in China to Measure the Total Economic Value of Restoring Ecosystem Services in Ejina Region." *Ecological Economics*. 44:345-358.

BLM_0081467

# Appendix A

## High and low dollar amounts for ecosystem services

Each table in Appendix A shows the high and low dollar amounts for each ecosystem service. The calculation of the high and low amounts is explained in the Methodology Section of this study (page 16) and in Appendix C. The mean or median high and low values are averaged to obtain the dollar amount shown below each table. This is the dollar amount used to represent each ecosystem service found in Table 4 (page 18).

## Provisioning Services

**Food and Fiber**
Food and Fiber includes the vast range of food products derived from plants, animals, and microbes, as well as materials such as wood, jute, hemp, silk, and many other products derived from ecosystems. (Alcoma 2003:56-60) Food production: That portion of gross primary production extractable as food. Production of fish, game, crops, nuts, fruits by hunting, gathering, subsistence farming or fishing. (Costanza 1997:254)

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---|---|
|  |  |  |  |
| DeGroot | General[5] | 3.11 | 1933.82 |
| Satout | Forest | 1.44 | 1.56 |
| Anielski | Forest | .25 | .29 |
| Chen | Wetlands | 16.60 | 371.41 |
| Curtis | Forests | 1.42 | 1.76 |
| Matero | Forests | 4.65 | 5.31 |
| **Median** |  | 2.28 | 3.54 |

*Food and Fiber = $ 2.91 per ac/yr*

**Genetic Resources**
Genetic resources include the genes and genetic information used for animal and plant breeding and biotechnology. (Alcoma 2003:56-60). Genetic resources: sources of unique biological materials and products. Medicine, products for materials science, genes for resistance to plant pathogens and crop pests, ornamental species (pets and horticultural varieties of plants). (Costanza 1997:254)

---

[5] General refers to non-specified types of land

BLM_0081468

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---:|---:|
| DeGroot | General | 3.11 | 78.45 |
| Curtis | Forest | 4.32 | 5.36 |
| **Mean** | | 3.72 | 41.91 |
| Anielski | Wetlands | 9.19 | 10.59 |

*Genetic Resources: $22.82 per ac/yr*
*WTP Wetlands Genetic Resources: $9.89 per household per year*

**Raw Materials**
Raw materials are that portion of gross primary production extractable as raw materials. [This] includes the production of lumber, fuel or fodder. (Costanza 1997:254) *Fuel:* wood, dung, and other biological materials serve as sources of energy. (Alcoma 2003:56-60)

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---:|---:|
| DeGroot | General | 3.11 | 710.21 |
| Guo | Forest | 28.16 | 38.06 |
| Curtis | Forest | 1.72 | 2.13 |
| **Median** | | 3.11 | 38.06 |

*Raw Materials: $20.59 per ac/yr*

**Ornamental Resources**
Ornamental resources include animal products, such as skins and shells, and flowers are used as ornaments, although the value of these resources is often culturally determined. (Alcoma 2003:56-60) Ornamental: variety of biota in natural ecosystems with feathers, ivory, orchids, butterflies, aquarium resources (potential) ornamental use fish, shells, etc. (DeGroot 2002:396)

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---:|---:|
| DeGroot | General | 1.55 | 101.56 |
| Matero | Forest | .14 | .17 |
| **Mean** | | .07 | 50.87 |
| | | WTP | WTP |
| Satout | Forest | 6.82 | 7.73 |

*Ornamental Resources: $25.47 per ac/yr*
*WTP Ornamental Resources: $7.28 per household per year*

**Pollination**
Pollination includes ecosystem changes that affect the distribution, abundance, and effectiveness of pollinators. (Alcoma 2003:56-60) Pollination [is the] movement of floral gametes [and] the provisioning of pollinators for the reproduction of plant populations. (Costanza 1997:254)

BLM_0081469

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---|---|
| DeGroot | General | 7.26 | 17.51 |
| Mertz | General | 223.00 | 276.00 |
| Curtis | Forest | 2.13 | 2.64 |
| Ashworth | General | 1408.91 | 1408.91 |
| Gallai | General | 37.85 | 39.95 |
| Pejchar | General | 34.48 | 34.48 |
| **Median** | | 36.17 | 37.22 |

*Pollination: $36.69 per ac/yr*

## Regulating Services

**Fresh Water, Water Purification, Water Cycling**
Fresh water is an example of linkages between categories — in this case, between provisioning and regulating services. (Alcoma 2003:56-60) Water regulation: the timing and magnitude of runoff, flooding, and aquifer recharge can be strongly influenced by changes in land cover, including, in particular, alterations that change the water storage potential of the system, such as the conversion of wetlands or the replacement of forests with croplands or croplands with urban areas. (Alcoma 2003:56-60) Water purification and waste treatment: ecosystems can be a source of impurities in fresh water but also can help to filter out and decompose organic wastes introduced into inland waters and coastal and marine ecosystems. (Alcoma 2003:56-60). Water supply: Storage and retention of water: provisioning of water by watersheds, reservoirs and aquifers. (Costanza 1997:254)

BLM_0081470

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---|---|
| Ingraham | US Wildlife Reserves | 2446.00 | 2655.00 |
| DeGroot | General | 1.55 | 5323.08 |
| Guo | Forest water supply | 2.09 | 2.82 |
|  | Water cycling | 46.36 | 61.31 |
| Anielski | Forest water supply | .05 | .06 |
| Sedell in Patterson | Forest water supply | 23.97 | 57.59 |
| Chen | Wetlands | 85.90 | 31000.00 |
| Jenerette | Water sheds | 390.00 | 410.00 |
| Curtis | Forests | 2.54 | 3.16 |
| Troy | Forest | 65.95 | 6.46 |
|  | Grasslands | 1.60 | 1.74 |
| **Median** |  | 29.97 | 57.59 |
|  | WTP | WTP | WTP |
| Loomis | WTP to restore ecosystem service | 64.01 | 82.66 |

*Water Supply, Cycling, Purification: $43.78 per ac/yr*
*WTP to restore Water Supply, Cycling, Purification: $73.34 per household per year*

**Clean Air, $O_2$ production, Air Quality**
Air quality maintenance: ecosystems both contribute chemicals to and extract chemicals from the atmosphere, influencing many aspects of air quality. (Alcoma 2003:56-60) Gas regulation: regulation of atmospheric chemical composition. $CO_2/O_2$ balance,$O_3$ for UVB protection, and $SO_x$ levels. (Costanza 1997:254)

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---|---|
| DeGroot | General (gas reg) | 3.63 | 185.61 |
| Guo | Forest ($O_2$ prod) | 24.58 | 33.22 |
| Chen | Wetlands (gas reg) | 19.92 | 64.74 |
| Curtis | Forest ($O_2$ prod) | 4.08 | 5.07 |
| Jim | Forest ($O_2$ prod) |  | 2070.00[6] |
|  | Air quality |  | 253.50 |
| **Median** |  | 22.25 | 125.18 |

*Air Quality, Clean Air, $O_2$ Production: $73.72 per ac/yr*

---

[6] The values given by Jim et. al, 2009 was placed in either the high or low column according to whether the values were more in line with high or low values. There was not a range of values because the study was conducted using 2008 USD.

BLM_0081471

**Climate regulation, Carbon Sequestering**
Climate regulation: ecosystems influence climate both locally and globally. For example, at a local scale, changes in land cover can affect both temperature and precipitation. At the global scale, ecosystems play an important role in climate by either sequestering or emitting greenhouse Gases (Alcoma 2003:56-60). Climate regulation: regulation of global temperature, precipitation, and other biologically mediated climatic processes at global or local levels. Greenhouse gas regulation: DMS [dimethylsulphide from plankton] production affecting cloud formation. (Costanza 1997:254)

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---:|---:|
| Ingraham | US Wildlife Reserve | 1525.00 | 1656.00 |
| DeGroot | General | 45.60 | 156.19 |
| Guo | Forest | 162.30 | 219.35 |
| Anielski | Forest | 5.74 | 6.61 |
| Lighety in Patterson | Forest | 2.60 | 2.74 |
| Curtis | Forest | 4.02 | 4.99 |
| Troy | Forest | 605.00 | 657.00 |
| | Grassland | 3.74 | 4.08 |
| Matero | Forest | 43.63 | 51.85 |
| | Peat | 6.86 | 8.15 |
| Jim | Forest (climate reg.) | | 9151.00 |
| | Carbon sequestering | | 21154.00 |
| **Median** | | 25.25 | 104.02 |

*Climate Regulation, Carbon Sequestering: $64.64 per ac/yr[7]*

**Water Regulation, Erosion Control, Natural Hazard Control**
Erosion control: vegetative cover plays an important role in soil retention and the prevention of landslides. *Storm protection:* the presence of coastal ecosystems such as mangroves and coral reefs can dramatically reduce the damage caused by hurricanes or large waves. (Alcoma 2003:56-60) Water regulation: regulation of hydrological flows. Provisioning of water for agricultural (such as irrigation) or industrial (such as milling) processes or transportation. Disturbance regulation: capacitance, damping and integrity of ecosystem response to environmental fluctuations. Storm protection, flood control, drought recovery and other aspects of habitat response to environmental variability mainly controlled by vegetation structure. Erosion control and sediment retention: retention of soil within an ecosystem. Prevention of loss of soil by wind, runoff, or other removal processes, storage of stilt in lakes and wetlands. Costanza 1997:254)

---

[7] Loomis asked respondents how much they were willing to pay in new taxes to restore 5 ecosystem services. Because the services were not weighted, it was assumed that the respondents weighted the services equally which accounts for the 5 services showing up as equal in this paper.

BLM_0081472

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---|---|
| Ingraham | US Wildlife Reserve | 2244.00 | 2436.00 |
| DeGroot | Water regulation | 1.04 | 3813.70 |
| | Disturbance regulation | 1.04 | 5070.73 |
| | Soil Retention | 15.03 | 171.60 |
| Guo | Water flow reg | 34.76 | 46.98 |
| | Natural hazard | 1.69 | 2.28 |
| Chen | Water reg wetlands | 103.33 | 2217.65 |
| Curtis | Water flow and reg | 4.97 | 6.17 |
| Troy | Grassland | .54 | .58 |
| Jim | Forest | 5.83 | |
| **Median** | | 5.40 | 171.60 |
| | | WTP | WTP |
| Loomis | South Platte flat lands | 64.01 | 82.66 |

*Water Regulation, Erosion Control, Natural Hazard control: $88.52 per ac/yr*
*WTP for these services: $73.34 per household per year*

## Disease Regulation
Regulation of human diseases: changes in ecosystems can directly change the abundance of human pathogens, such as cholera, and can alter the abundance of disease vectors, such as mosquitoes (Alcoma 2003:56-60)

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---|---|
| Curtis | Forests | 3.73 | 4.63 |

*Disease Regulation: $4.18 per ac/yr*

## Pest Regulation
Biological control: ecosystem changes affect the prevalence of crop and livestock pests and diseases (Alcoma 2003:56-60)

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---|---|
| DeGroot | General | 1.04 | 54.63 |
| Anielski | Forest | 17.74 | 19.30 |
| **Mean** | | 9.39 | 36.97 |

*Pest Regulation: $23.18 per ac/yr*

- 31 -

BLM_0081473

**Waste Control**

Waste treatment: recovery of mobile nutrients and removal or breakdown of excess or xenic nutrients and compounds. Waste treatment, pollution control, detoxification.(Costanza 1997:254)

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---|---|
| Ingraham | US Wildlife Reserves | 1853.50[8] | 2009.50 |
| DeGroot | General | 30.03 | 4689.91 |
| Chen | Wetlands | 2034.00 | 54755.00 |
| Curtis | Forests | 3.02 | 3.75 |
| Troy | Grasslands | 46.29 | 50.24 |
| Matero | Forests | 4.67 | 5.56 |
| **Median** | | 36.16 | 1029.87 |
| | | WTP | WTP |
| Loomis | South Platte flat lands | 64.01 | 82.66 |

*Waste Control: $533.02 per ac/yr*
*WTP for waste control: $73.34 per household per year*

# Supporting Services

**Soil Formation**

Soil formation and formation processes: weathering of rock and the accumulation of organic material. (Costanza 1997:254)

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---|---|
| DeGroot | General | .52 | 7.00 |
| Guo | Forest | 112.62 | 152.21 |
| Curtis | Forest | .59 | .73 |
| **Median** | | .59 | 7.00 |

*Soil Formation: 3.80 per ac/yr*

**Nutrient Cycling**

Nutrient cycling: storage, internal cycling, processing and acquisition of nutrients. Nitrogen fixation: nitrogen, phosphorus and other elemental or nutrient cycles. (Costanza 1997:254)

---

[8] Ingraham combined waste treatment and nutrient cycling, therefore the values were divided equally between the two categories.

BLM_0081474

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---|---|
| DeGroot | General | 45.09 | 14,788.54 |
| Ingraham | US Refuge System | 1853.50 | 2009.50 |
| Curtis | Forest | 2.31 | 2.86 |
| **Median** | | 45.09 | 2009.50 |

*Nutrient Cycling: $1027.30 per ac/yr*

**Provisioning Habitat**
Nursery function. Suitable reproduction [of] habitat [for] hunting, gathering of fish, game, fruits, Production Functions Provision of natural resources etc. [for] small-scale subsistence farming and aquaculture (DeGroot 2002:396)

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---|---|
| DeGroot | General | 73.59 | 136.58 |

*Provisioning Habitat: $105.09 per ac/yr*

**Biodiversity**
The United Nations Convention on Biological Diversity (UNEP, 1992) defines [biodiversity] as '… the variability among living organisms from all sources, including terrestrial, marine and the ecological complexes of which they are part…' (art. 2, page 5). (Nunes 2001: 204)

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---|---|
| Curtis | Forest | 5.86 | 7.27 |
| | | WTP | WTP |
| Satout | Forest | 10.26 | 11.18 |
| Nunes | General | 6.10 | 281.30 |
| Nijkamp | General | 36.89 | 37.94 |
| **Median** | | 10.26 | 37.94 |

*Biodiversity: $6.57 per ac/yr*
*WTP for preservation of biodiversity: $24.10 per household per year*

**Healthy Ecosystem**
Biological control: Trophic-dynamic regulations of populations. Keystone predator control of prey species, reduction of herbivory by top predators. (Costanza 1997:254)

BLM_0081475

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---|---|
| Curtis | Forest | 3.25 | 4.07 |
| Lead Author | Type of study | WTP | WTP |
| Nunes | Terrestrial | 34.94 | 146.45 |
| | Wetlands | 9.76 | 139.20 |
| **Mean** | | 22.35 | 142.83 |

*Healthy Ecosystem: $7.32 per ac/yr*
*WTP preservation of healthy ecosystems: $82.59 per household per year*

**Habitat (refugia)**
Refugia: habitat for resident and transient populations. Nurseries, habitat for migratory species, regional habitats for locally harvested species, or overwintering grounds. (Costanza 1997:254)

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---|---|
| Ingraham | US Wildlife Reserve | 220.00 | 239.00 |
| DeGroot | General | 1.55 | 1066.72 |
| Chen | Wetlands | 14.52 | 148.00 |
| Curtis | Forest | 5.45 | 6.32 |
| Troy | Forest | 4.35 | 4.72 |
| **Median** | | 5.45 | 148.00 |
| | | WTP | WTP |
| Nijkamp | Wildlife preservation | 2.32 | 2.38 |
| Loomis | South Platte lands | 64.01 | 82.66 |
| **Mean** | | 33.17 | 42.52 |

*Habitat (refugia): $76.73 per ac/yr*
*WTP to preserve habitat: $37.85 per household per year*

## Cultural Services

**Religious/spiritual, aesthetic, inspiration**
Spiritual and religious values: many religions attach spiritual and religious values to ecosystems or their components. Inspiration: ecosystems provide a rich source of inspiration for art, folklore, national symbols, architecture, and advertising. Aesthetic values: many people find beauty or aesthetic value in various aspects of ecosystems, as reflected in the support for parks, "scenic drives," and the selection of housing locations. (Alcoma 2003:56-60)

BLM_0081476

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---|---|
| DeGroot | General | .52 | 17.51 |
| | General | 3.63 | 1232.71 |
| Curtis | Forest | 3.20 | 4.00 |
| Troy | Forest | 3.34 | 3.63 |
| Vejre | Open Lands | | 351674 |
| Lindberg | PSI | 3.32 | 10.64 |
| **Median** | | 3.32 | 14.08 |
| | | WTP | WTP |
| Satout | Forest | 11.93 | 12.99 |
| Becker | Forest | 2.30 | 2.30 |
| Nijkamp | Forest | 74.01 | 76.12 |
| **Mean** | | 11.93 | 12.99 |

Religious/spiritual, aesthetic, inspiration: $8.70 per ac/yr
WTP for these services: $12.46 per year per household

**Cultural Heritage, Sense of Place**
Cultural heritage values: many societies place high value on the maintenance of either historically important landscapes ("cultural landscapes") or culturally significant species. Sense of place: many people value the "sense of place" that is associated with recognized features of their environment, including aspects of the ecosystem. (Alcoma 2003:56-60)

| Lead Author | Type of study | WTP Low 2008 USD | WTP High 2008 USD |
|---|---|---|---|
| Satout | Forest | 8.65 | 9.43 |
| Ruijgrok | Cultural lands | 16.55 | 18.03 |
| Becker | Old Growth Forest | 2.07 | 2.07 |
| **Mean** | | 9.09 | 9.84 |

***WTP to visit and keep cultural heritage sites and sense of place: $9.47 per household per year***

# Direct Use

**Recreation**
Recreation and ecotourism: people often choose where to spend their leisure time based in part on the characteristics of the natural or cultivated landscapes in a particular area. (Alcoma 2003:56-60) Recreation: Providing opportunities for recreational activities. Eco-tourism, sport fishing, and other outdoor recreational activities. (Costanza 1997:254)

- 35 -

BLM_0081477

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---|---|
| Ingraham | US Wildlife Reserves | 1.04 | 4202.43 |
| Guo | Forest | 3.37 | 4.56 |
| Anielski | Forest | 13.95 | 16.08 |
| Curtis | Forest | 1.48 | 1.84 |
| Troy | Forest | 209.00 | 227.00 |
| Lindberg | PSI Forest | 22.63 | 73.32 |
| **Median** | | 8.66 | 44.70 |
| | | WTP | WTP |
| Satout | Forest | 8.43 | 9.18 |
| Ruijgrok | Open land | 1.70 | 1.85 |
| Loomis | South Platte | 64.01 | 82.66 |
| **Median** | | 8.43 | 9.18 |

*Recreation: 26.68 per ac/yr*
*WTP for recreation: $8.81 per household per year*

## Non-Use Values

**Option Value:**
Option value is willingness to pay so ecosystem services are still available for future generations.

| Lead Author | Type of study | WTP Low 2008 USD | WTP High 2008 USD |
|---|---|---|---|
| Satout | Forest | 12.65 | 13.78 |

*WTP Option value: $13.22 per household per year.*

**Bequest value:**
Bequest value is the willingness to pay to give the ecosystem services to future generations.

| Lead Author | Type of study | WTP Low 2008 USD | WTP High 2008 USD |
|---|---|---|---|
| Satout | Forest | 17.67 | 19.25 |
| Becker | Forest (Old Growth) | 2.90 | 2.90 |
| **Mean** | | 10.29 | 11.08 |

*WTP Bequest value: $10.68 per household per year*

BLM_0081478

**Existence value:**
Existence value is willingness to pay to just knowing the ecosystem is there even though the respondent may have no intention to personally use the ecosystem.

| Lead Author | Type of study | WTP Low 2008 USD | WTP High 2008 USD |
|---|---|---:|---:|
| Satout | Forest | 17.79 | 18.73 |
| Becker | Forest: Old Growth | 3.28 | 3.28 |
| **Mean** | | 10.54 | 11.01 |

*WTP Existence value: $10.77 per household per year.*

**Non-use values combined (not specified by type)**
Combined includes option, bequest, and existence values.

| Lead Author | Type of study | Low 2008 USD AC/YR | High 2008 USD AC/YR |
|---|---|---:|---:|
| Anielski | Forest | .04 | .04 |
| Curtis | Forest | 1.95 | 2.42 |
| **Mean** | | 1.00 | 1.23 |
| | | | |
| Lead Author | Type of study | WTP | WTP |
| Becker | Forest: Old Growth | 9.98 | 9.98 |

*Non-Use: $ 1.12 per ac/yr*
*WTP Non-Use values combined: $9.98 per household per year*

BLM_0081479

# Appendix B

# Direct Use

## Recreation

The economic values for recreational activities came from Lindberg and Loomis (2009)[9]. Using an input output model Lindberg and Loomis were able to produce economic values in 2008 dollars for virtually all of the national forests in the United States. The values shown in the table below are in millions of dollars for Employment Income and Output. Output is the inter-industry sales and sales to final demand[10]. Output and Labor Income are separate categories and cannot be added together. Number of jobs is in full and part-time jobs combined.

### Pike San Isabel National Forest: 2008 USD and Number of Jobs

| Activity | Output in Millions | Labor Income in Millions | Number of Jobs | Dollars per ac/yr based on output | Dollars per ac/yr based on Labor |
|---|---|---|---|---|---|
| Camping | 13.1 | 4.3 | 141.8 | 5.24 | 1.72 |
| Backpacking/ hiking/walking | 40.1 | 12.5 | 455.8 | 16.04 | 5.00 |
| Viewing Natural Features | 26.6 | 8.3 | 304.6 | 10.64 | 3.32 |
| Viewing Wildlife | 9.1 | 2.8 | 103.9 | 3.64 | 1.12 |
| OHV, Snowmobiling, and other motorized | 10.7  COHVCO[11] 949 | 3.1  COHVCO 370.5 | 115.7  --- | 4.28  42.18 | 1.24  16.47 |
| Driving for Pleasure | 9.2 | 2.8 | 105.8 | 3.68 | 1.12 |
| Fishing | 12.8 | 3.8 | 139.5 | 5.12 | 1.52 |

---

[9] Lindberg, Kreg and John Loomis. 2009. Economic Impact Decision Support System (DSS). Version 2.0. Central Oregon Recreation Services.

[10] University of Vermont, Department of Community Development and Applied Economics. IMPLAN Methodology for the study of the Impact of Tourism on the Vermont Economy. Prepared for the Vermont Department of Tourism and Marketing. (Date unknown) http://www.uvm.edu/~snrvtdc/publications/implan_method.pdf Retrieved: 8/16/2009. Output includes materials such as: recreational equipment purchases, maintenance costs for equipment, purchases of materials for lodging and restaurants, travel costs to take part in the recreational activity. These would be all direct, indirect and induced dollars (See the IMPLAN section of this paper).

[11] COHVCO. 2009. Louis Berger Group. Economic Contribution of Off-Highway Vehicle Recreation in Colorado. Executive Summary July 2009. http://cohvco. org/?p=229. Retrieved: 11/15/09. 949 represents all 2008 output in Colorado and was divided by 22.5 million acres of public lands in Colorado to get ac/yr. Same process was used for labor income.

BLM_0081480

| Activity | Output in Millions | Labor Income in Millions | Number of Jobs | Dollars per ac/yr based on output | Dollars per ac/yr based on Labor |
|---|---|---|---|---|---|
| Hunting | 12.1 | 3.5 | 128.8 | 4.84 | 1.40 |
| Horseback riding | 2.1 | 0.7 | 23.9 | 0.84 | 0.28 |
| Bicycling | 5.5 | 1.7 | 62.9 | 2.20 | 0.68 |
| Downhill skiing | 11.7 | 3.9 | 127.5 | 4.68 | 1.56 |
| Cross-Country skiing | 1.7 | 0.5 | 20.0 | 0.68 | 0.20 |
| Non-motorized water | 0.6 | .02 | 6.5 | 0.24 | 0.01 |
| Nature Center Activities and Nature Study | 1.5 | .05 | 16.9 | 0.60 | 0.02 |
| Picnicking | 2.6 | 0.9 | 28.3 | 1.04 | 0.36 |
| Resort Use | 0.6 | 0.2 | 7.1 | 0.24 | 0.08 |
| Visiting Historic Sites | 0.6 | 0.2 | 7.1 | 0.24 | 0.08 |
| Relaxing | 9.7 | 3.2 | 106.2 | 3.88 | 1.28 |
| Gathering Forest Products | 2.2 | 0.7 | 23.6 | 0.88 | 0.28 |
| Other Non-Motorized | 10.8 | 3.4 | 123.7 | 4.32 | 1.36 |
| Total[12] | 183.5 | 57.1 | 2049.6 | 73.32 | 22.63 |

---

[12] Total only uses Lindberg and Loomis and does not include COHVCO's higher estimates for motorized recreation.

- 39 -

BLM_0081481

# Appendix C

# Dollar Adjustments and Statistics Used

Varieties of studies have been conducted to assess the value of ecosystem services. These studies began in the 1970s and continue through the present. Similarly, economic evaluations have been done throughout the world. Because of these differences, adjustments to the studies need to be made in order to make the results from different studies similar.

**Conversion to 2008 USD**

In this study, the economic value of ecosystem services is calculated in 2008 US dollars. 2008 dollars are used because data for 2009 conversions are not available yet. Because the studies reviewed were conducted throughout the world, it was also necessary to transform foreign currency into US dollars.  The following sections discuss the processes used in this study.

MeasuringWorth (www.measuringworth.com) was used to convert past into present dollars. While the consumer price index is commonly used in order to convert past into present dollars, it is only one of many indices that can be used.  MeasuringWorth provides the results from six different data sets resulting in a dollar range that can be quite wide. Williamson (2009 MeasuringWorth) describes the differences in the six indices used by MeasuringWorth:

- **"The CPI** is most often used to make comparisons partly because it is the series with which people are most familiar. This series tries to compare the cost of things the average household buys such as food, housing, transportation, and medical services. For earlier years, it is the most useful series for comparing the cost of consumer goods and services. It can be interpreted as how much money you would need today to buy an item in the year in question if its price had changed the same percentage as the average price change.
- **The GDP Deflator** is similar to the CPI in that it is a measure of average prices. The "bundle" of goods and services here includes all things produced in the economy, not just consumer goods and services that are reflected in the CPI.
- **The Consumer Bundle** is the average dollar value of the annual expenditures of a "consumer unit". The consumer unit could be a family or another type of household. The main point is that spending is a joint decision of the members of the unit. The bundle increases over time as household income increases. Unlike the CPI, not only the cost but also the amount of goods and services increases over time.
- **The Unskilled Wage Rate** is good way to determine the relative cost of something in terms of the amount of work it would take to produce, or the relative time it would take to earn its cost. It can also be useful in comparing different wages over time. The unskilled wage is a more consistent measure than the average wage for making comparisons over time.
- **The GDP per capita** is an index of the economy's average output per person and is closely correlated with the average income. It can be useful in comparing different incomes over time.

- 40 -

BLM_0081482

- **The GDP** is the market value of all goods and services produced in a year. Comparing an expenditure using this measure, tells you how much money in the comparable year would be the same percent of all output." (MeasuringWorth: http://www.measuringworth.com[13])

Using the six different indices, $100 in 1998 could be worth from $126 to $164 in 2008 depending on the index used.

CPI =                   $132.09
GDP deflator =          $126.86
Consumer bundle =       $143.52
Unskilled wage rate =   $134.92
GDP per capita =        $148.93
GDP =                   $164.23

An ecosystem service could fit within any of these six indicators as it is something someone could purchase. It also is something that could be reproduced through some type of substitution, or it is a part of the GDP. Therefore, this study will use the highest and lowest conversions to create the highest and the lowest possible value for an ecosystem service.

**Currency Conversions**

Currency conversions were made using the historical currency calculator found at http://www.x-rates.com/calculator.html. This calculator contained conversion statistics from 1990 through 2008.

An example of both the conversion to USD and the conversion to 2008 USD is shown in Figure 1. The following *hypothetical* study was conducted in China in 2002. The complete conversion process is shown in Figure 1 below. Carbon sequestering was found to have: **1)** a high value of 5000 yuan per hectare per year, and **2)** a low value of 1250 yuan per hectare per year. **3)** Hetares are then changed to acres [1 ha = 2.47 ac]. **4)** Yuan were converted to 2002 dollars. **5)** 2002 dollars are converted to their highest value in 2008 dollars by multiplying by 1.36, and **6)** converted to their lowest 2008 dollars by multiplying by 1.18. [The currency conversion rates of 1.18 and 1.36 were found at www.measuringworth.com.]

**Figure 1: Conversion Process for Obtaining Ecosystem Service Values**



| Chinese yuan (2002)/ha/yr | 2002 USD ac/yr | 2008 USD ac/yr |
|---|---|---|

Carbon sequestering

**1) High** = 5000 yuan/ha/yr
**3)** = 2024.49 yuan/acre/yr = 285.14 USD ac/yr   **5)** 285.14 x 1.36 = $387.79 ac/yr
(5000/2.47 = 2024.49)
**4)** 7.1 yuan = 1 USD (2002)
(2024.49/7.1 = 285.14 USD)

**2) Low** = 1250 yuan/ha/yr
= 506.07 yuan/acre/yr    = 71.28 USD ac/yr    **6)** 71.28 x 1.18 = $84.11 ac/yr

---

[13] http://www.measuringworth.com/calculators/uscompare/result.php (retrieved Sept. 14, 2009)

BLM_0081483

Figure 1 shows the value of carbon sequestering from this *hypothetical* study falls somewhere between $84.11 and $387.79 per acre per year. In studies that presented a single value for an ecosystem service or when the study was conducted in the United States, the conversion process was much simpler.

**Statistics Used: Mean vs. Median**

When distributions are skewed with either a very high or very low score, the mean is pulled in the direction of the outlier. This makes the mean a poor descriptor of the skewed distribution. The example below demonstrates the difference between using the mean vs. the median in a skewed distribution.

| $ per acre | |
|---|---|
| 300 | Mean (average) = 455/7 = $65 |
| 50 | |
| 40 | |
| 30 | Median (middle score) = $30 |
| 20 | |
| 10 | |
| 5 | |
| 455 | |

In this situation where six of the scores are $50 or less, and only one score is extremely high, the median score of $30 is a much better representative score for this distribution than the mean of $65.

BLM_0081484

# Appendix D

## Reliability

Reliability is based on the number of studies, consistency of study results, location where studies took place, and whether a logical conservative result could be obtained.  Each ecosystem service table in Appendix A was rated for reliability using the following scoring criteria.

| Number of Studies | Consistency of study results | Location Regions of the World | Logical Result |
|---|---|---|---|
| 1-2 = 1 | Little Similarity = 1 | 1 region = 1 | Overly Liberal = 1 |
| 3-5 = 2 | Very Similar = 2 | 2-3 regions = 2 | Conservative = 2 |
| $\geq$ 6 = 3 | | > 3 regions =3 | |
| | | | |

Composite scores:     8-10 = High Reliability
                    5-7   = Medium
                    1-4   = Low

BLM_0081485

| Category | Number of studies Per/ac yr | Reliability Score Per/ac yr | Number of WTP studies | Reliability Score WTP |
|---|---|---|---|---|
| Food and Fiber | 6 | 10 = High | | |
| Genetic Resources | 2 | 5 = Medium | 1 | 4 = Low |
| Raw Materials | 3 | 6 = Medium | | |
| Ornamental Resources | 2 | 5 = Medium | 1 | 4 = Low |
| Pollination | 6 | 9 = High | | |
| Fresh Water, water purification, water cycling | 9 | 9 = High | 1 | 4 = Low |
| Clean Air, Oxygen production, Air Quality | 5 | 8= High | | |
| Climate Regulation, Carbon Sequestering | 9 | 8 = High | | |
| Water Regulation, Erosion Control, Natural Hazard Control | 7 | 10 = High | 1 | 4 = Low |
| Disease Regulation | 1 | 4 = Low | | |
| Pest Regulation | 2 | 5 = Medium | | |
| Waste Control | 6 | 8 = High | 1 | 4 = Low |
| Soil Formation | 3 | 7 = Medium | | |
| Nutrient Cycling | 3 | 6 = Medium | | |
| Provisioning Habitat | 1 | 4 = Low | | |
| Biodiversity | 1 | 4 = Medium | 3 | 6 = Medium |
| Healthy Ecosystem | 1 | 4 = Low | 1 | 4 = Low |
| Habitat (Refugia) | 5 | 7 = Medium | 2 | 4 = Low |
| Religious, Aesthetic, Inspiration | 6 | 9 = High | 3 | 6 = Medium |
| Cultural heritage/sense of place | | | 3 | 7 = Medium |
| Recreation | 6 | 9 = High | 3 | 7 = Medium |
| Option | | | 1 | 4 = Low |
| Bequest | | | 2 | 4 = Low |
| Existence | | | 2 | 4 = Low |
| Non-use, combined | 2 | 6 = Medium | 1 | 4 = Low |

BLM_0081486

IN

3/11/10

Barbara

Received

MAR 1 2 2010

Umpahgre Field Office

I am writing about the travel management plan 3.2. It is about snowmobiles being put in with the other OHV's. Snowmobile should not be restricted to trails like other OHUS. If you - have never rode a snowmobile and would like to see what it is all about I would gladly go with you so you would see what it is about. If you do not have a snowmobile to ride I have an extra one for you. Thank you for the meeting.

1 A-PI TM

Respectfully
Constantine Hirschfeld

My E-MAil Address
CONSTANTINE 37@TDS.NET

P.S. I represent the north York snowmobile Club, also am president of the thunder Mountain wheelers.
Con.

BLM_0081487

**Drew Vankat**

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov on behalf of uformp@blm.gov |
| **Sent:** | Thursday, March 11, 2010 9:11 AM |
| **To:** | Ashley Krest |
| **Subject:** | Re: Comments on RMP emailed? |

Ashley,

Yes, feel free to email your comments to:  uformp.blm.gov

--Bruce Krickbaum


                    Ashley Krest
                    <ashleyk@fieldflo
                    rals.com>                                    To
                                        UFORMP@blm.gov                      cc
                    03/10/2010 10:34
                    AM                                                  Subject
                                        Comments on RMP emailed?




Can we really email our comments in instead of snail mail?
Ashley
Ashley Krest
Field Florals: seed to design
www.fieldflorals.com
970.527.4541
Celebrate Life with Flowers from the Field!

1

BLM_0081488



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
www.co.blm.gov



IN REPLY REFER TO:
1610 (CO-S05)

March 12, 2010

Kerwin Jensen
Community Development
City of Montrose
PO Box 790
Montrose, CO  81402

Dear Mr. Jensen,

The BLM Uncompahgre Field Office has begun its Resource Management Plan (RMP) revision. You are receiving this letter because your agency has designated you at its representative for Cooperating Agency meetings and associated work.

We have scheduled our first Cooperating Agency meeting for Thursday, May 27 at 1:00 p.m. at the BLM office in Montrose. This is a change from the April date. The meeting will last about four hours. It is important to attend the first meeting. Meetings will be held monthly through September 2010, and less frequently after that.  The meeting list through September is attached.

The goals of the first meeting are to inform Cooperating Agencies about what an RMP is; the RMP process including alternative development, impact analysis, reviews and public comment; discuss and agree on the role of Cooperating Agencies; establish ground rules; and discuss expectations.

You can view information regarding the RMP planning process on the Uncompahgre planning web site at:  http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.  Please contact my RMP Project Manager, Bruce Krickbaum, at 970-240-5300, email: bruce_krickbaum@blm.gov, if you need further information.

Sincerely,

Barbara Sharrow
Field Office Manager

Attachment:  Meeting Schedule

BLM_0081489

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision

# Schedule for Cooperating Agency Meetings

Thursday, May 27, 2010, 1pm – 4pm

Thursday, June 24, 2010, 1pm – 4pm

Thursday, July 22, 2010, 1pm – 4pm

Thursday, August 19, 2010, 1pm – 4pm

Friday, September 30, 2010, 1pm – 4pm

All meetings will take place at the BLM office in Montrose

BLM_0081490



# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, Colorado 81401**
**www.co.blm.gov**



IN REPLY REFER TO:
1610 (CO-S05)

March 12, 2010

Anthony Sluski
Mayor
Town of Cedaredge
PO Box 398
Cedaredge, CO  81413

Dear Mayor Sluski,

The BLM Uncompahgre Field Office has begun its Resource Management Plan (RMP) revision. You are receiving this letter because your agency has designated you at its representative for Cooperating Agency meetings and associated work.

We have scheduled our first Cooperating Agency meeting for Thursday, May 27 at 1:00 p.m. at the BLM office in Montrose.  This is a change from the April date.  The meeting will last about four hours.  It is important to attend the first meeting.  Meetings will be held monthly through September 2010, and less frequently after that.   The meeting list through September is attached.

The goals of the first meeting are to inform Cooperating Agencies about what an RMP is; the RMP process including alternative development, impact analysis, reviews and public comment; discuss and agree on the role of Cooperating Agencies; establish ground rules; and discuss expectations.

You can view information regarding the RMP planning process on the Uncompahgre planning web site at:  http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.  Please contact my RMP Project Manager, Bruce Krickbaum, at 970-240-5300, email: bruce_krickbaum@blm.gov, if you need further information.

Sincerely,

Barbara Sharrow
Field Office Manager

Attachment:  Meeting Schedule

BLM_0081491

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision

# Schedule for Cooperating Agency Meetings

Thursday, May 27, 2010, 1pm – 4pm

Thursday, June 24, 2010, 1pm – 4pm

Thursday, July 22, 2010, 1pm – 4pm

Thursday, August 19, 2010, 1pm – 4pm

Friday, September 30, 2010, 1pm – 4pm

All meetings will take place at the BLM office in Montrose

BLM_0081492



# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
### Uncompahgre Field Office
### 2465 South Townsend Avenue
### Montrose, Colorado 81401
### www.co.blm.gov



IN REPLY REFER TO:
1610 (CO-S05)

March 12, 2010

George Brauneis
Trustee
Town of Hotchkiss
PO Box 369
Hotchkiss, CO  81419

Dear Mr. Brauneis,

The BLM Uncompahgre Field Office has begun its Resource Management Plan (RMP) revision. You are receiving this letter because your agency has designated you at its representative for Cooperating Agency meetings and associated work.

We have scheduled our first Cooperating Agency meeting for Thursday, May 27 at 1:00 p.m. at the BLM office in Montrose. This is a change from the April date. The meeting will last about four hours. It is important to attend the first meeting. Meetings will be held monthly through September 2010, and less frequently after that. The meeting list through September is attached.

The goals of the first meeting are to inform Cooperating Agencies about what an RMP is; the RMP process including alternative development, impact analysis, reviews and public comment; discuss and agree on the role of Cooperating Agencies; establish ground rules; and discuss expectations.

You can view information regarding the RMP planning process on the Uncompahgre planning web site at: http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html. Please contact my RMP Project Manager, Bruce Krickbaum, at 970-240-5300, email: bruce_krickbaum@blm.gov, if you need further information.

Sincerely,

Barbara Sharrow
Field Office Manager

Attachment:  Meeting Schedule

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision

# Schedule for Cooperating Agency Meetings

Thursday, May 27, 2010, 1pm – 4pm

Thursday, June 24, 2010, 1pm – 4pm

Thursday, July 22, 2010, 1pm – 4pm

Thursday, August 19, 2010, 1pm – 4pm

Friday, September 30, 2010, 1pm – 4pm

All meetings will take place at the BLM office in Montrose

BLM_0081494



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
www.co.blm.gov



IN REPLY REFER TO:
1610 (CO-S05)

March 12, 2010

Greg Sparks
Town Manager
Town of Mountain Village
455 Mountain Village Blvd, Suite A
Mountain Village, CO  81435

Dear Mr. Sparks,

The BLM Uncompahgre Field Office has begun its Resource Management Plan (RMP) revision. You are receiving this letter because your agency has designated you at its representative for Cooperating Agency meetings and associated work.

We have scheduled our first Cooperating Agency meeting for Thursday, May 27 at 1:00 p.m. at the BLM office in Montrose.  This is a change from the April date.  The meeting will last about four hours.  It is important to attend the first meeting.  Meetings will be held monthly through September 2010, and less frequently after that.   The meeting list through September is attached.

The goals of the first meeting are to inform Cooperating Agencies about what an RMP is; the RMP process including alternative development, impact analysis, reviews and public comment; discuss and agree on the role of Cooperating Agencies; establish ground rules; and discuss expectations.

You can view information regarding the RMP planning process on the Uncompahgre planning web site at:  http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.  Please contact my RMP Project Manager, Bruce Krickbaum, at 970-240-5300, email: bruce_krickbaum@blm.gov, if you need further information.

Sincerely,

Barbara Sharrow
Field Office Manager

Attachment:  Meeting Schedule

BLM_0081495

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision

# Schedule for Cooperating Agency Meetings

Thursday, May 27, 2010, 1pm – 4pm

Thursday, June 24, 2010, 1pm – 4pm

Thursday, July 22, 2010, 1pm – 4pm

Thursday, August 19, 2010, 1pm – 4pm

Friday, September 30, 2010, 1pm – 4pm

All meetings will take place at the BLM office in Montrose

BLM_0081496



# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
### Uncompahgre Field Office
### 2465 South Townsend Avenue
### Montrose, Colorado 81401
### www.co.blm.gov



IN REPLY REFER TO:
1610 (CO-S05)

March 12, 2010

Joe Reagan
Town of Norwood
PO Box 528
Norwood, CO  81423

Dear Mr. Reagan,

The BLM Uncompahgre Field Office has begun its Resource Management Plan (RMP) revision. You are receiving this letter because your agency has designated you at its representative for Cooperating Agency meetings and associated work.

We have scheduled our first Cooperating Agency meeting for Thursday, May 27 at 1:00 p.m. at the BLM office in Montrose.  This is a change from the April date.  The meeting will last about four hours.  It is important to attend the first meeting.  Meetings will be held monthly through September 2010, and less frequently after that.   The meeting list through September is attached.

The goals of the first meeting are to inform Cooperating Agencies about what an RMP is; the RMP process including alternative development, impact analysis, reviews and public comment; discuss and agree on the role of Cooperating Agencies; establish ground rules; and discuss expectations.

You can view information regarding the RMP planning process on the Uncompahgre planning web site at:  http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.  Please contact my RMP Project Manager, Bruce Krickbaum, at 970-240-5300, email: bruce_krickbaum@blm.gov, if you need further information.

Sincerely,

Barbara Sharrow
Field Office Manager

Attachment:  Meeting Schedule

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision

# Schedule for Cooperating Agency Meetings

Thursday, May 27, 2010, 1pm – 4pm

Thursday, June 24, 2010, 1pm – 4pm

Thursday, July 22, 2010, 1pm – 4pm

Thursday, August 19, 2010, 1pm – 4pm

Friday, September 30, 2010, 1pm – 4pm

All meetings will take place at the BLM office in Montrose



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
www.co.blm.gov



IN REPLY REFER TO:
1610 (CO-S05)

March 12, 2010

Scott Harold
Town Administrator
Town of Olathe
PO Box 789
Olathe, CO  81425

Dear Mr. Harold,

The BLM Uncompahgre Field Office has begun its Resource Management Plan (RMP) revision. You are receiving this letter because your agency has designated you at its representative for Cooperating Agency meetings and associated work.

We have scheduled our first Cooperating Agency meeting for Thursday, May 27 at 1:00 p.m. at the BLM office in Montrose.  This is a change from the April date.  The meeting will last about four hours.  It is important to attend the first meeting.  Meetings will be held monthly through September 2010, and less frequently after that.   The meeting list through September is attached.

The goals of the first meeting are to inform Cooperating Agencies about what an RMP is; the RMP process including alternative development, impact analysis, reviews and public comment; discuss and agree on the role of Cooperating Agencies; establish ground rules; and discuss expectations.

You can view information regarding the RMP planning process on the Uncompahgre planning web site at:  http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.  Please contact my RMP Project Manager, Bruce Krickbaum, at 970-240-5300, email: bruce_krickbaum@blm.gov, if you need further information.


Sincerely,


Barbara Sharrow
Field Office Manager


Attachment:  Meeting Schedule

BLM_0081499

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision

# Schedule for Cooperating Agency Meetings

Thursday, May 27, 2010, 1pm – 4pm

Thursday, June 24, 2010, 1pm – 4pm

Thursday, July 22, 2010, 1pm – 4pm

Thursday, August 19, 2010, 1pm – 4pm

Friday, September 30, 2010, 1pm – 4pm

All meetings will take place at the BLM office in Montrose



# United States Department of the Interior
### BUREAU OF LAND MANAGEMENT
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, Colorado 81401**
**www.co.blm.gov**



IN REPLY REFER TO:
1610 (CO-S05)

March 12, 2010

David Varley
Town Administrator
Town of Orchard City
9661 2100 Rd
Austin, CO  81410

Dear Mr. Varley,

The BLM Uncompahgre Field Office has begun its Resource Management Plan (RMP) revision. You are receiving this letter because your agency has designated you at its representative for Cooperating Agency meetings and associated work.

We have scheduled our first Cooperating Agency meeting for Thursday, May 27 at 1:00 p.m. at the BLM office in Montrose.  This is a change from the April date.  The meeting will last about four hours.  It is important to attend the first meeting.  Meetings will be held monthly through September 2010, and less frequently after that.   The meeting list through September is attached.

The goals of the first meeting are to inform Cooperating Agencies about what an RMP is; the RMP process including alternative development, impact analysis, reviews and public comment; discuss and agree on the role of Cooperating Agencies; establish ground rules; and discuss expectations.

You can view information regarding the RMP planning process on the Uncompahgre planning web site at:  http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.  Please contact my RMP Project Manager, Bruce Krickbaum, at 970-240-5300, email: bruce_krickbaum@blm.gov, if you need further information.

Sincerely,

Barbara Sharrow
Field Office Manager

Attachment:  Meeting Schedule

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision

# Schedule for Cooperating Agency Meetings

Thursday, May 27, 2010, 1pm – 4pm

Thursday, June 24, 2010, 1pm – 4pm

Thursday, July 22, 2010, 1pm – 4pm

Thursday, August 19, 2010, 1pm – 4pm

Friday, September 30, 2010, 1pm – 4pm

All meetings will take place at the BLM office in Montrose



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
www.co.blm.gov



IN REPLY REFER TO:
1610 (CO-S05)

March 12, 2010

Barbara Peterson
Town Clerk
Town of Paonia
PO Box 460
Paonia, CO  81428

Dear Ms. Peterson,

The BLM Uncompahgre Field Office has begun its Resource Management Plan (RMP) revision. You are receiving this letter because your agency has designated you at its representative for Cooperating Agency meetings and associated work.

We have scheduled our first Cooperating Agency meeting for Thursday, May 27 at 1:00 p.m. at the BLM office in Montrose.  This is a change from the April date.  The meeting will last about four hours.  It is important to attend the first meeting.  Meetings will be held monthly through September 2010, and less frequently after that.   The meeting list through September is attached.

The goals of the first meeting are to inform Cooperating Agencies about what an RMP is; the RMP process including alternative development, impact analysis, reviews and public comment; discuss and agree on the role of Cooperating Agencies; establish ground rules; and discuss expectations.

You can view information regarding the RMP planning process on the Uncompahgre planning web site at:  http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.  Please contact my RMP Project Manager, Bruce Krickbaum, at 970-240-5300, email: bruce_krickbaum@blm.gov, if you need further information.

Sincerely,

Barbara Sharrow
Field Office Manager

Attachment:  Meeting Schedule

BLM_0081503

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision

# Schedule for Cooperating Agency Meetings

Thursday, May 27, 2010, 1pm – 4pm

Thursday, June 24, 2010, 1pm – 4pm

Thursday, July 22, 2010, 1pm – 4pm

Thursday, August 19, 2010, 1pm – 4pm

Friday, September 30, 2010, 1pm – 4pm

All meetings will take place at the BLM office in Montrose

BLM_0081504



# United States Department of the Interior

### BUREAU OF LAND MANAGEMENT
### Uncompahgre Field Office
### 2465 South Townsend Avenue
### Montrose, Colorado 81401
### www.co.blm.gov



IN REPLY REFER TO:
1610 (CO-S05)

March 12, 2010

Susan Hansen
County Administrator
Delta County
501 Palmer St, #227
Delta, CO  81416

Dear Ms. Hansen,

The BLM Uncompahgre Field Office has begun its Resource Management Plan (RMP) revision. You are receiving this letter because your agency has designated you at its representative for Cooperating Agency meetings and associated work.

We have scheduled our first Cooperating Agency meeting for Thursday, May 27 at 1:00 p.m. at the BLM office in Montrose.  This is a change from the April date.  The meeting will last about four hours.  It is important to attend the first meeting.  Meetings will be held monthly through September 2010, and less frequently after that.   The meeting list through September is attached.

The goals of the first meeting are to inform Cooperating Agencies about what an RMP is; the RMP process including alternative development, impact analysis, reviews and public comment; discuss and agree on the role of Cooperating Agencies; establish ground rules; and discuss expectations.

You can view information regarding the RMP planning process on the Uncompahgre planning web site at:  http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.  Please contact my RMP Project Manager, Bruce Krickbaum, at 970-240-5300, email: bruce_krickbaum@blm.gov, if you need further information.

Sincerely,

Barbara Sharrow
Field Office Manager

Attachment:  Meeting Schedule

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision

# Schedule for Cooperating Agency Meetings

Thursday, May 27, 2010, 1pm – 4pm

Thursday, June 24, 2010, 1pm – 4pm

Thursday, July 22, 2010, 1pm – 4pm

Thursday, August 19, 2010, 1pm – 4pm

Friday, September 30, 2010, 1pm – 4pm

All meetings will take place at the BLM office in Montrose

BLM_0081506



# United States Department of the Interior
### BUREAU OF LAND MANAGEMENT
**Uncompahgre Field Office**
**2465 South Townsend Avenue**
**Montrose, Colorado 81401**
**www.co.blm.gov**



IN REPLY REFER TO:
1610 (CO-S05)

March 12, 2010

Mike Pelletier
Long Range Planner
Gunnison County
200 E. Virginia
Gunnison, CO  81230

Dear Mr. Pelletier,

The BLM Uncompahgre Field Office has begun its Resource Management Plan (RMP) revision. You are receiving this letter because your agency has designated you at its representative for Cooperating Agency meetings and associated work.

We have scheduled our first Cooperating Agency meeting for Thursday, May 27 at 1:00 p.m. at the BLM office in Montrose.  This is a change from the April date.  The meeting will last about four hours.  It is important to attend the first meeting.  Meetings will be held monthly through September 2010, and less frequently after that.   The meeting list through September is attached.

The goals of the first meeting are to inform Cooperating Agencies about what an RMP is; the RMP process including alternative development, impact analysis, reviews and public comment; discuss and agree on the role of Cooperating Agencies; establish ground rules; and discuss expectations.

You can view information regarding the RMP planning process on the Uncompahgre planning web site at:  http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.  Please contact my RMP Project Manager, Bruce Krickbaum, at 970-240-5300, email: bruce_krickbaum@blm.gov, if you need further information.

Sincerely,

Barbara Sharrow
Field Office Manager

Attachment:  Meeting Schedule

BLM_0081507

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision

# Schedule for Cooperating Agency Meetings

Thursday, May 27, 2010, 1pm – 4pm

Thursday, June 24, 2010, 1pm – 4pm

Thursday, July 22, 2010, 1pm – 4pm

Thursday, August 19, 2010, 1pm – 4pm

Friday, September 30, 2010, 1pm – 4pm

All meetings will take place at the BLM office in Montrose

BLM_0081508



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
www.co.blm.gov



IN REPLY REFER TO:
1610 (CO-S05)

March 12, 2010

Lynn Padgett
County Commissioner
Ouray County, Board of Commissioners
PO Box C
Ouray, CO  81427

Dear Ms. Padgett,

The BLM Uncompahgre Field Office has begun its Resource Management Plan (RMP) revision. You are receiving this letter because your agency has designated you at its representative for Cooperating Agency meetings and associated work.

We have scheduled our first Cooperating Agency meeting for Thursday, May 27 at 1:00 p.m. at the BLM office in Montrose.  This is a change from the April date.  The meeting will last about four hours.  It is important to attend the first meeting.  Meetings will be held monthly through September 2010, and less frequently after that.   The meeting list through September is attached.

The goals of the first meeting are to inform Cooperating Agencies about what an RMP is; the RMP process including alternative development, impact analysis, reviews and public comment; discuss and agree on the role of Cooperating Agencies; establish ground rules; and discuss expectations.

You can view information regarding the RMP planning process on the Uncompahgre planning web site at:  http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.  Please contact my RMP Project Manager, Bruce Krickbaum, at 970-240-5300, email: bruce_krickbaum@blm.gov, if you need further information.

Sincerely,

Barbara Sharrow
Field Office Manager

Attachment:  Meeting Schedule

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision

# Schedule for Cooperating Agency Meetings

Thursday, May 27, 2010, 1pm – 4pm

Thursday, June 24, 2010, 1pm – 4pm

Thursday, July 22, 2010, 1pm – 4pm

Thursday, August 19, 2010, 1pm – 4pm

Friday, September 30, 2010, 1pm – 4pm

All meetings will take place at the BLM office in Montrose

 **United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
www.co.blm.gov


IN REPLY REFER TO:
1610 (CO-S05)

March 12, 2010

Steve White
Planner
Montrose County
161 S. Townsend
Montrose, CO  81401

Dear Mr. White,

The BLM Uncompahgre Field Office has begun its Resource Management Plan (RMP) revision. You are receiving this letter because your agency has designated you at its representative for Cooperating Agency meetings and associated work.

We have scheduled our first Cooperating Agency meeting for Thursday, May 27 at 1:00 p.m. at the BLM office in Montrose.  This is a change from the April date.  The meeting will last about four hours.  It is important to attend the first meeting.  Meetings will be held monthly through September 2010, and less frequently after that.   The meeting list through September is attached.

The goals of the first meeting are to inform Cooperating Agencies about what an RMP is; the RMP process including alternative development, impact analysis, reviews and public comment; discuss and agree on the role of Cooperating Agencies; establish ground rules; and discuss expectations.

You can view information regarding the RMP planning process on the Uncompahgre planning web site at:  http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.  Please contact my RMP Project Manager, Bruce Krickbaum, at 970-240-5300, email: bruce_krickbaum@blm.gov, if you need further information.


Sincerely,


Barbara Sharrow
Field Office Manager


Attachment:  Meeting Schedule

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision

# Schedule for Cooperating Agency Meetings

Thursday, May 27, 2010, 1pm – 4pm

Thursday, June 24, 2010, 1pm – 4pm

Thursday, July 22, 2010, 1pm – 4pm

Thursday, August 19, 2010, 1pm – 4pm

Friday, September 30, 2010, 1pm – 4pm

All meetings will take place at the BLM office in Montrose



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
www.co.blm.gov



IN REPLY REFER TO:
1610 (CO-S05)

March 12, 2010

Dave Schneck
County Administrator
San Miguel County BOCC
PO Box 1170
Telluride, CO 81435

Dear Mr. Schneck,

The BLM Uncompahgre Field Office has begun its Resource Management Plan (RMP) revision. You are receiving this letter because your agency has designated you at its representative for Cooperating Agency meetings and associated work.

We have scheduled our first Cooperating Agency meeting for Thursday, May 27 at 1:00 p.m. at the BLM office in Montrose. This is a change from the April date. The meeting will last about four hours. It is important to attend the first meeting. Meetings will be held monthly through September 2010, and less frequently after that. The meeting list through September is attached.

The goals of the first meeting are to inform Cooperating Agencies about what an RMP is; the RMP process including alternative development, impact analysis, reviews and public comment; discuss and agree on the role of Cooperating Agencies; establish ground rules; and discuss expectations.

You can view information regarding the RMP planning process on the Uncompahgre planning web site at: http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html. Please contact my RMP Project Manager, Bruce Krickbaum, at 970-240-5300, email: bruce_krickbaum@blm.gov, if you need further information.

Sincerely,

Barbara Sharrow
Field Office Manager

Attachment: Meeting Schedule

BLM_0081513

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision

# Schedule for Cooperating Agency Meetings

Thursday, May 27, 2010, 1pm – 4pm

Thursday, June 24, 2010, 1pm – 4pm

Thursday, July 22, 2010, 1pm – 4pm

Thursday, August 19, 2010, 1pm – 4pm

Friday, September 30, 2010, 1pm – 4pm

All meetings will take place at the BLM office in Montrose

BLM_0081514



# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
### Uncompahgre Field Office
### 2465 South Townsend Avenue
### Montrose, Colorado 81401
### www.co.blm.gov



IN REPLY REFER TO:
1610 (CO-S05)

March 12, 2010

Alan Schroeder
Bureau of Reclamation, Western Colorado Area Office
2764 Compass Drive
Grand Junction, CO  81506

Dear Mr. Schroeder,

The BLM Uncompahgre Field Office has begun its Resource Management Plan (RMP) revision. You are receiving this letter because your agency has designated you at its representative for Cooperating Agency meetings and associated work.

We have scheduled our first Cooperating Agency meeting for Thursday, May 27 at 1:00 p.m. at the BLM office in Montrose.  This is a change from the April date.  The meeting will last about four hours.  It is important to attend the first meeting.  Meetings will be held monthly through September 2010, and less frequently after that.   The meeting list through September is attached.

The goals of the first meeting are to inform Cooperating Agencies about what an RMP is; the RMP process including alternative development, impact analysis, reviews and public comment; discuss and agree on the role of Cooperating Agencies; establish ground rules; and discuss expectations.

You can view information regarding the RMP planning process on the Uncompahgre planning web site at:  http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.  Please contact my RMP Project Manager, Bruce Krickbaum, at 970-240-5300, email: bruce_krickbaum@blm.gov, if you need further information.

Sincerely,

Barbara Sharrow
Field Office Manager

Attachment:  Meeting Schedule

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision

# Schedule for Cooperating Agency Meetings

Thursday, May 27, 2010, 1pm – 4pm

Thursday, June 24, 2010, 1pm – 4pm

Thursday, July 22, 2010, 1pm – 4pm

Thursday, August 19, 2010, 1pm – 4pm

Friday, September 30, 2010, 1pm – 4pm

All meetings will take place at the BLM office in Montrose

BLM_0081516



**United States Department of the Interior**

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
www.co.blm.gov



IN REPLY REFER TO:
1610 (CO-S05)

March 12, 2010

Tamera K. Randall-Parker, District Ranger
U.S. Forest Service, Grand Mesa, Uncompahgre and Gunnison NF
2250 Highway 50
Delta, CO  81416

Dear Ms. Randall-Parker,

The BLM Uncompahgre Field Office has begun its Resource Management Plan (RMP) revision.  You are receiving this letter because your agency has designated you at its representative for Cooperating Agency meetings and associated work.

We have scheduled our first Cooperating Agency meeting for Thursday, May 27 at 1:00 p.m. at the BLM office in Montrose.  This is a change from the April date.  The meeting will last about four hours.  It is important to attend the first meeting.  Meetings will be held monthly through September 2010, and less frequently after that.   The meeting list through September is attached.

The goals of the first meeting are to inform Cooperating Agencies about what an RMP is; the RMP process including alternative development, impact analysis, reviews and public comment; discuss and agree on the role of Cooperating Agencies; establish ground rules; and discuss expectations.

You can view information regarding the RMP planning process on the Uncompahgre planning web site at:  http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.  Please contact my RMP Project Manager, Bruce Krickbaum, at 970-240-5300, email: bruce_krickbaum@blm.gov, if you need further information.

Sincerely,

Barbara Sharrow
Field Office Manager

Attachment:  Meeting Schedule

BLM_0081517