Regarding motorized recreation:

**2 A-PI TM**

Since there is likely to be a serious amount of lag time between the announcement of "limited to existing" and specification of designated routes, the BLM should actively close all damaging routes in sensitive ecological and riparian areas, as well as sign, close and barricade any new user created routes in the Field Office jurisdiction which have come into existence since the initial announcement

**3 A-PI TM**

Preserve the less roaded areas of the UFO which can serve as intact and undisturbed wildlife refuges especially those which are adjacent to already established Wilderness Study Areas (WSA) and Special Management Areas (SMA). Specifically areas adjacent to Dominguez Canyon Wilderness, the Adobe Badlands, the Dolores River Canyon SMA, as well as Norwood Canyon.

**4 A-PI REC**

Drainages north of Tabeguache Creek SMA including Shavano, Campbell, Spring Creek and Burro Creek should be managed as non motorized and non mechanized. Additionally, the management of Tabeguache SMA itself should continue to exclude all mechanized vehicles from within its boundaries. These lands in their totality, combined with the large adjacent Forest Service roadless area, would create a large expanse of intact wildlife habitat. This would provide protection to big game in Management Unit 61, one of Colorado's most prized hunting areas.

**5 A-PI WSA**

The BLM should identify other areas within the UFO which are worthy of being managed as roadless or nonmechanized, non motorized, and designate them for wildlife habitat. Looking at topo maps of the area, Saucer Basin on the north side of Paradox Valley has this quality and could be extended to include the CNHP Potential Conservation Area below; Saw Tooth Ridge on the southern end of Long Mesa could provide an unfragmented wildlife refuge if kept non motorized between Highway 90 to the south and where the roads begin; Similarly Skein Mesa and Wild Steer Mesa west of the Dolores River SMA have the same less roaded qualities; Nyswonger Mesa on the south side of Paradox as well as the less roaded portions of Dry Creek Basin extending south into San Miguel County might also deserve such treatment;

**6 A-PI TM**

The RMP should mitigate the effects of noise pollution from OHV so as not to impact wildlife and quiet users. When establishing OHV routes consideration should be given to the effects of vehicle noise pollution in adjacent areas set aside for wildlife habitat, hiking, birding and horseback riding.

6. Signage and enforcement should be priorities for any budget requests.

**7 B-NP**

8 A-PI REC   dispersed camping, off road game and shed antler retrieval.

Dispersed camping should be limited to established campgrounds as well as adjacent to established roadways no more than one vehicle length .

9 A-PI REC

Off road game retrieval should be prohibited by OHVs.

Shed antler collection should be by permit, allowed by foot only off road, and prohibited in the spring months when big game are at their weakest and least able to deal with the stress associated with antler harvest techniques.

10 A-PI REC

11 A-PI REC   permits for competitive events.

Events such as extreme Jeep crawls which occur in the Dry Creek area should be managed to have low impact or be disallowed. Permits without the ability for followup monitoring and enforcement should not be issued.

Thank you for your consideration of the above comments during your scoping process.

Sincerely,

Andrew Goldman

970 275 9815

BLM_0081697

IN

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **To:** | uformp@blm.gov |
| **Subject:** | Fw: deep gas well problems |
| **Date:** | Monday, April 05, 2010 3:24:55 PM |

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 04/05/2010 08:41 AM
-----

rp haynes
<robert@silentcen
ter.org>                                        To
                         bruce_krickbaum@blm.gov
03/26/2010 09:39                                cc
AM
                                       Subject
          deep gas well problems

1 A-PI NRED

Dear Mr. Krickbaum;
After attending the wserc gas symposium on 3/20, we were led to believe
that all is safe with 8000' wells. Please look at this article, if you
haven't already done so. "...examination of the methane problem in western
Colorado is offering a strong scientific repudiation of that argument.
Released in December by Garfield County, one of the most intensely drilled
areas in the nation, the report concludes that gas drilling has degraded
water in dozens of water wells (PDF).
The three-year study used sophisticated scientific techniques to match
methane from water to the same rock layer where gas companies are drilling
-- a mile and a half underground"
http://www.propublica.org/feature/officials-in-three-states-pin-water-woes-on-gas-drilling-426

2 A-PI NRED

In populated areas and agricultural areas, particularly here in the North
Fork valley with it's high number of organic food growers, contamination of
the water WILL cause irreversible consequences.

With many places to extract natural gas - away from population and
agricultural areas - why take the chance of damaging environmental,
property, and human health?

Sincerely,

Robert Haynes

Officials in Three States Pin Water Woes on Gas Drilling - ProPublica

## PRO PUBLICA
journalism in the public interest

Receive our top stories daily

E-mail
Zi  C  e    optional

**Quick Links:**   New Orleans Cops   Gas Drilling   Bailout Guide   Stimulus   Calif. Nurses   Loan Mods   Blog   Detention Dilemma

Home

Breaking
on the Web

Business

Justice

Government &
Politics

Health &
Science

Media &
Technology

National
Security

### Who We Are

ProPublica is an
independent, non-profit
newsroom that produces
investigative journalism in
the public interest. We
strive to foster change
through exposing
exploitation of the weak
by the strong and the
failures of those with
power to vindicate the
trust placed in them.

More...

ENERGY & ENVIRONMENT

# Officials in Three States Pin Water Woes on Gas Drilling

by Abrahm Lustgarten, ProPublica - April 26, 2009 7:00 am EDT

Update 6/9: **Congress Introduces Twin Bills to Control Drilling and Protect Drinking Water**



Pat Farnelli, top left, Ronald Carter, bottom left, Richard Seymour, top right, and Norma Fiorentino, bottom right, live in Dimock, Pa. A year after Cabot Oil & Gas landmen knocked on their doors to sign drilling leases, they are finding that their drinking water now contains methane, the largest component of natural gas. (Abrahm Lustgarten/ProPublica)

Norma Fiorentino's drinking water well was a time bomb. For weeks, workers in her small northeastern Pennsylvania town had been plumbing natural gas deposits from a drilling rig a few hundred yards away. They cracked the earth and pumped in fluids to force the gas out. Somehow, stray gas worked into tiny crevasses in the rock, leaking upward into the aquifer and slipping quietly into Fiorentino's well. Then, according to the state's working theory, a motorized pump turned on in her well house, flicked a spark and caused a New Year's morning blast that tossed aside a concrete slab weighing several thousand pounds.

Fiorentino wasn't home at the time, so it's difficult to know exactly what happened. But afterward, state officials found methane, the largest component of natural gas, in her drinking water. If the fumes that built up in her well house had collected in her basement, the explosion could have killed her.

Dimock, the poverty-stricken enclave where Fiorentino lives, is ground zero for drilling the Marcellus Shale, a prized deposit of natural gas that is increasingly touted as one of the country's most abundant and cleanest alternatives to oil. The drilling here -- as in other parts of the nation -- is supposed to be a boon, bringing much-needed jobs and millions of dollars in royalties to cash-strapped homeowners.

But a string of documented cases of gas escaping into drinking water -- not just in Pennsylvania but across North America -- is raising new concerns about the hidden costs of this economic tide and strengthening arguments across the country that drilling can put drinking water at risk.

### Complete Gas Drilling Coverage



**Buried Secrets:** Gas Drilling's Environmental Threat

### Multimedia



Slideshow: The Faces of Dimock



Graphic: Anatomy of a Gas Well

### Your Experience

Want to tell us about your own experience? Click here. Or want to contact the reporter directly? Click here.

### Our Partners

A version of the original *Pittsburgh Post-Gazette* investigation was co-published with the *Pittsburgh Post-Gazette* and appeared in that newspaper on Sunday, April 26, 2009.

A version of the original **timesunion.com** investigation was co-published with the *Albany Times Union* and appeared in that newspaper on Monday, April 27, 2009

A version of the original **DENVERPOST** investigation was co-published with the *Denver Post* and appeared in that newspaper on Wednesday, April 22, 2009.

### The Garfield County Study

Study's Conclusion: Review of Phase II Hydrogeologic Study, Prepared for Garfield County, by Geoffrey Thyne, Dec. 20, 2008

BLM_0081699

Near Cleveland, Ohio, an entire house exploded in late 2007 after gas seeped into its water well. The Ohio Department of Natural Resources later issued **a 153-page report** (PDF) that blamed a nearby gas well's faulty concrete casing and **hydraulic fracturing** -- a deep-drilling process that shoots millions of gallons of water, sand and chemicals into the ground under explosive pressure -- for pushing methane into an aquifer and causing the explosion.

In Dimock, several drinking water wells have exploded and nine others were found with so much gas that one homeowner was told to open a window if he planned to take a bath. Dishes showed metallic streaks that couldn't be washed off, and tests also showed high amounts of aluminum and iron, prompting fears that drilling fluids might be contaminating the water along with the gas. In February, the Pennsylvania Department of Environmental Protection charged Cabot Oil & Gas with two violations that it says caused the contamination, theorizing that gas leaked from the well casing into fractures underground.

Industry representatives say methane contamination incidents are statistically insignificant, considering that 452,000 wells produced gas in the United States last year. They also point out that methane doesn't necessarily come from gas wells -- it's common in nature and can leak into water from biological processes near the surface, like rotting plants.



**An underground gas line in Dimock, Pa. (Abrahm Lustgarten/ProPublica)**

The industry also defends its construction technology, saying it keeps gas and drilling fluids -- including any chemicals used for hydraulic fracturing -- safely trapped in layers of steel and concrete. Even if some escapes, they say, thousands of feet of rock make it almost impossible for it to migrate into drinking water aquifers. When an accident happens, the blame can usually be traced to a lone bad apple -- some contractor who didn't follow regulations, they say. Those arguments helped the gas drilling industry win rare exemptions from the Safe Drinking Water Act and the Clean Water Act when Congress enacted the **2005 Energy Policy Act**.

But now an exhaustive examination of the methane problem in western Colorado is offering a strong scientific repudiation of that argument. Released in December by Garfield County, one of the most intensely drilled areas in the nation, the report concludes that **gas drilling has degraded water in dozens of water wells** (PDF).

The three-year study used sophisticated scientific techniques to match methane from water to the same rock layer where gas companies are drilling -- a mile and a half underground. The scientists didn't determine which gas wells caused the problem or say exactly how the gas reached the water, but they indicated with more clarity than ever before that a system of interconnected natural fractures and faults could stretch from deep underground gas layers to the surface. They called for more research into how the industry's practice of forcefully fracturing those deep layers might increase the risk of contaminants making their way up into an aquifer.

"It challenges the view that natural gas, and the suite of hydrocarbons that exist around it, is isolated from water supplies by its extreme depth,"

Phase I Hydrogeologic Characterization of the Mamm Creek Field Area in Garfield County (PDF), Prepared for Board of County Commissioners, Garfield County, Colo., March 23, 2006

Phase II Hydrogeologic Characterization of the Mamm Creek Field Area, Garfield County, Colorado (PDF), S.S. Papadopulos & Associates, Inc., Boulder, Colo., September 2008

Appendix A: Garfield County Hydrogeologic Characterization Study -- Phase II Field, Sampling Plan for Task 1 (PDF)

Appendix C: Task 1 and 2 Groundwater Sample Laboratory Analytical Reports (PDF)

Appendix D: Task 1 and 2 Gas Composition and Methane Isotope Laboratory Analytical Reports (PDF)

### Document Dive

Update on the Ongoing Investigation of the Presence of Methane Gas in Water Wells in Laramie/Fox Hill Aquifer (PDF), From Colorado Oil & Gas Commission's David S. Neslin to the Weld County Commission, April 13, 2009

Notice of Violation, to Cabot Oil & Gas Corporation, from the Pennsylvania Department of Environmental Protection, Feb. 27, 2009

Report on the Investigation of the Natural Gas Invasion of Aquifers in Bainbridge Township in Geauga County, Ohio (PDF), Ohio Department of Natural Resources, Division of Mineral Resources Management, Sept. 1, 2008

Methane Gas and Your Water Well (PDF), Department of Environmental Protection, Pennsylvania

Natural Gas Migration Problems in Western Pennsylvania (PDF), The Pittsburgh Geological Society

Methane Explainer (PDF), Information on Toxic Chemicals, State of Wisconsin

Low-Cost Apparatus for On-Site Monitoring of Methane in Ground Water (PDF), by Samuel S. Harrison, Spring 1986

Contamination of Aquifers by Overpressuring the Annulus of Oil and Gas Wells (PDF), by Samuel S. Harrison, May/June 1985



PROPUBLICA
REPORTING NETWORK
Sign up to be notified of reporting opportunities.
E-mail:
ZIP code:

said Judith Jordan, the oil and gas liaison for Garfield County, who has worked as a hydrogeologist with DuPont and as a lawyer with Pennsylvania's Department of Environmental Protection. "It is highly unlikely that methane would have migrated through natural faults and fractures and coincidentally arrived in domestic wells at the same time oil and gas development started, after having been down there ... for over 65 million years."

The Garfield County analysis comes as Congress considers legislation that would toughen environmental oversight of drilling and reverse the exemptions enjoyed by the gas companies. Colorado has already overhauled its own oil and gas regulations, despite stiff resistance from the energy industry. The new rules, which went into effect earlier this month, strengthen protections against, among other things, methane contamination.

Drinking water with methane isn't necessarily harmful. The gas itself isn't toxic -- the Environmental Protection Agency doesn't even regulate it -- and it escapes from water quickly, like bubbles in a soda.

But the gas becomes dangerous when it evaporates out of the water and into people's homes, where it can become flammable. It can also suffocate those who breathe it. According to the Agency for Toxic Substances and Disease Registry, a part of the U.S. Department of Health and Human Services, as the concentration of gas increases it can cause headaches, then nausea, brain damage and eventually death.

**Under Pressure**

The carefully documented accident in Ohio in December 2007 offers a step-by-step example of what can happen when drilling goes wrong.

A spark ignited the natural gas that had collected in the basement of Richard and Thelma Payne's suburban Cleveland home, shattering windows, blowing doors 20 feet from their hinges and igniting a small fire in a violent flash. The Paynes were jolted out of bed, and their house lifted clear off the ground.

Fearing another explosion, firefighters evacuated 19 homes in the small town of Bainbridge. Somehow, gas had seeped into the drinking water aquifer and then migrated up through the plumbing.

Gas had shown up in water in this part of Ohio in the past. In 2003, the U.S. Department of Health and Human Services investigated nearby residents' complaints of "dizziness," "blacking out," "rashes," "swelling of legs" and "elevated blood pressure" related to exposure to methane through bathing, dishwashing and drinking. That study concluded that gas in the area could migrate through underground fractures and said that "combustible gases, including methane, in private well water present an urgent public health hazard."

According to Scott Kell, deputy chief of Ohio's Division of Natural Resources, those earlier instances were determined to have had nothing to do with drilling activity. But by the time the Paynes' house exploded four years later, the Natural Resources Department had begun to aggressively monitor for gas, and this time it suspected a clearer link to drilling. It all had to do with how a well was constructed.

To reach natural gas, a well bore is
drilled into the earth through

BLM_0081701



**Called GEsford 3, this well is adjacent to Dimock resident Pat Farnelli's house. There have been complications in drilling that well, including a drill bit that clogged the well for weeks, forcing them to have to drill a new hole. That is one of the possible causes being considered for the contamination in Farnelli's drinking water. (Abrahm Lustgarten/ProPublica)**

dozens of geologic formations stacked like layers in a cake, until the bore reaches the layer holding gas. In Ohio, gas is produced from almost 3,700 feet, or three-quarters of a mile, below. In Colorado or Pennsylvania, wells can be a mile or two deep -- far below drinking water aquifers.

In many geologic regions, the deeper gas-bearing layers are under extraordinary pressure from the weight of earth and water above, but that pressure normally is contained by thousands of feet of leakproof rock that separate the gas from the surface. When a drill bit sinks down, though, the tight seal of each geologic layer is broken and the pressure is released, forcing water, gas or oil into the newly opened pathway. That's how an oil well can become a gushing geyser.

To keep the gas and drilling fluids from leaking into the natural environment, drilling companies insert as many as three concentric rings of steel pipes inside the well bore to isolate what flows through them. When the bore passes through areas where extra protection is needed -- such as drinking water aquifers -- concrete is pumped into the gap between the rings of pipe to ensure an impenetrable seal. Most states, including Ohio, require these measures in part to protect drinking water.

"That's pretty much the holy grail, good and proper cementing and casing," said Michael Nickolaus, former director of Indiana's Department of Natural Resources, Oil and Gas Division, and special projects director for the Ground Water Protection Council, a group of scientists and state regulators that studies industries' impacts on water. Nickolaus added that if these zones are properly isolated from one another, the issue of groundwater contamination, whether from gas or hydraulic fracturing, goes away.

The investigation into the explosion at the Paynes' home found that a drilling company working nearby had failed to properly build that protective concrete casing and had continued to process the well despite warning signs that should have alerted it to stop. Six weeks before the explosion, the company, Ohio Valley Energy Systems, pumped concrete into the well casing. But it couldn't fill the gap, evidence that somewhere a crack was allowing the concrete to seep into the space between the pipes, and probably out into the surrounding earth.

If the concrete could leak, then so could drilling fluids -- or the gas itself.

A week later, "despite the fact that the cement behind the casing was insufficient by standard industry practice," according to **the state's report** (PDF), the company began hydraulic fracturing. More than 46,000 gallons of water, sand and chemicals were pumped into the well bore with enough force to crack the rock and release the gas.

Again, the drillers saw signs of a leak in the well. The company tried to recover as much of the leaking fluid as possible, but the state report said at least 1,000 gallons of fracturing fluid, including about 150 gallons of

BLM_0081702

oil, disappeared into the space between the well pipes and possibly out into the ground.

Finally, the company shut down the well. But the underlying pressurized gas formation had already been punctured, and its contents were trying to escape. The gas collected inside the well for the next 31 days, until 360 pounds of pressure built against the valve at the top. It was enough, state investigators wrote, to force the gas out of the well bore by any means it could find.

"This overpressurized condition resulted in invasion of natural gas from the annulus of the well into natural fractures in the bedrock below the base of the cemented surface casing," the report states, adding that it was the first time anything like this had been confirmed in Ohio.

Ohio Valley Energy Systems did not return calls for comment on the state's findings.

On Dec. 12, three days before the Paynes' house exploded, methane was detected in the Bainbridge Police Department's water well, 4,700 feet from the gas well in question. Two days later, nearby residents reported sediment in their water and artesian conditions in their wells, meaning the water was spurting out under pressure. By the next morning the gas -- still seeking an outlet -- had forced its way into Richard Payne's basement, where it reached a flammable concentration. All it needed was a spark.

### Science Blames Drilling

As regulators in Ohio struggled to reconcile what was happening there, officials in Garfield County, Colo., were waiting for the results of the three-part, three-year study examining the connections between methane leaks and drilling there.



Dimock resident Norma Fiorentino's drinking water well was a time bomb. On New Year's morning, her well exploded. After the blast, state officials found methane in her drinking water. (Abrahm Lustgarten/ProPublica)

The report is significant because it is among the first to broadly analyze the ability of contaminants to migrate underground in drilling areas, and to find that such contamination was in fact occurring. It examined over 700 methane samples from 292 locations and found that methane, as well as wastewater from the drilling, was making its way into drinking water not as a result of a single accident but on a broader basis.

As the number of gas wells in the area increased from 200 to 1,300 in this decade, the methane levels in nearby water wells increased too. The study found that natural faults and fractures exist in underground formations in Colorado, and that it may be possible for contaminants to travel through them.

Conditions that could be responsible include "vertical upward flow" "along natural open-fracture pathways or pathways such as well-bores or hydraulically-opened fractures," states **the section of the report done by S.S. Papadopulos and Associates** (PDF), a Maryland-based environmental engineering firm specializing in groundwater hydrology.

BLM_0081703

The researchers did not conclude that gas and fluids were migrating directly from the deep pockets of gas the industry was extracting. In fact, they said it was more likely that the gas originated from a weakness somewhere along the well's structure. But the discovery of so much natural fracturing, combined with fractures made by the drilling process, raises questions about how all those cracks interact with the well bore and whether they could be exacerbating the groundwater contamination.

"One thing that is most striking is in the area where there are large vertical faults you see a much higher instance of water wells being affected," said Geoffrey Thyne, the hydrogeologist who wrote **the report's summary and conclusion** (PDF). He is a senior research scientist at the University of Wyoming's **Enhanced Oil Recovery Institute**, a pro-extraction group dedicated to tapping into hard-to-reach energy reserves.

The report, referred to as the Garfield County Hydrogeologic Study, has been met with cautious silence by the industry and by its regulators.

The Colorado Oil and Gas Conservation Commission, the state's regulatory body, would not respond to questions from ProPublica because it hasn't thoroughly analyzed the data behind the December report, said its director, David Neslin.

Neither the Colorado Oil and Gas Association nor Encana, the Canadian energy company that drills in the study area, would comment on the Garfield County report. Both referred questions to Anthony Gorody, a Houston-based geochemist who specializes in oil and gas issues and frequently is employed by the energy industry.

Gorody dismissed the report's conclusions as "junk science."

"This is so out of whack. There are a handful of wells that have problems. These are rare events," said Gorody, president of Universal Geosciences Consulting. "They are like plane crashes -- the extent tends to be fairly limited. I do not see any pervasive impact."

Most of the methane in the study area, Gorody said, came from decaying matter near the surface -- not from the deep gas produced by the energy industry. He criticized the report's methodology, saying the way that researchers linked the stray gas with the deep gas formations was speculative at best.



**To Dimock resident Pat Farnelli, seen here pointing to the drilling rig in her backyard, the promise of making money off her family's land came at just the right time. But perhaps not at the right price. Now she spends more than $100 of her monthly food stamp allotment to buy plastic jugs of drinking water. (Abrahm Lustgarten/ProPublica)**

Thyne, standing by his report, said researchers had traced the origin of the gas by conducting the equivalent of a forensic investigation, analyzing its isotopic signature, or molecular fingerprint. The molecular structure showed that most of it was thermogenic, meaning it matched the deeply buried deposit where gas was being drilled, called the Williams Fork Formation. A minority of the samples were difficult to identify by this method, so Thyne used another scientific process to study them. He is confident they, too, were thermogenic in origin.

BLM_0081704

In most cases, the study couldn't pinpoint the exact pathway the contaminants had used to travel a mile and a half up into the drinking water aquifer. So Thyne could only reason the possibilities.

The methane could be seeping into water wells through natural fractures, he said, or through leaks in the well casings or concrete, or from the well heads.

When a pipe extends 8,000 feet below the earth's surface, he said, "there are numerous potential leak points along the way. So is it leaking at 8,000 feet and coming up a well bore, a natural fault or fracture? Or is it leaking 500 feet from the surface? We don't know."

The most plausible explanation, Thyne said, is that the same type of well casing and cementing issues that had proved problematic in Ohio were presenting problems in Colorado too.

"The thesis is that because of the way the wells are designed they could be a conduit," said Garfield County's Jordan, who commissioned the report.

Jordan worries that the methane leaks could be a sign of worse to come.

"We suspect the methane would be the most mobile constituent that would come out of the gas fields. Our concern is that it's a sort of sentinel, and there are going to be worse contaminants behind it," she said. "It's not just sitting down there as pure CH4 (methane). It's in a whole bath of hydrocarbons," she said, and some of those "can be problematic."

**'You Can't Buy a Good Well'**

When landmen from Cabot Oil & Gas came knocking on doors along the rutted dirt grade of Carter Road in Dimock, Pa., last year, they sold a promise many residents in the farming community were eager to hear: Sign a gas lease and the land might finally pay for itself.

Many of Dimock's 1,300 residents had fallen on hard times. Approximately one in seven were out of work, and more than a few homes were perched on the precipice of foreclosure.

Cabot offered $25 an acre for the right to drill for five years, plus royalties when the gas started flowing. To outsiders it might seem a small amount, but it would make an immediate difference to people who owned fields but few other assets.

"It seemed like God's provenance," said Pat Farnelli, whose husband, a farmer, had taken a job as a night chef at a diner on the interstate to pay one more month's mortgage. The day Cabot's man showed up -- with a wide-brim hat and a Houston drawl -- the Farnellis mistook him for a debt collector. "We really were having a rough time right then -- that day. We thought it was salvation. Any ray of hope here is a big deal."

That was more than a year ago, and since then Cabot -- which earned close to a billion dollars in revenue last year -- has drilled 20 wells and is producing $58 million worth of gas there annually. In its annual report, Cabot bullishly called the Dimock field **a once-in-a-**

BLM_0081705

Officials in Three States Pin Water Woes on Gas Drilling - ProPublica



**lifetime "game-changing event"** (PDF) for the company and announced it would drill 63 more wells there next year.

Richard Seymour, seen here with his wife Wendy, runs a certified natural farm that ships produce across the state. His well is now running red and turbid and bubbles with so much gas that he fears he'll lose his agricultural certification. (Abrahm Lustgarten)

The wealth has begun trickling down to the residents of Dimock. A few will earn more than a half-million dollars this year, and bimonthly checks for $6,000 are not uncommon. Cabot and its contractors also support the local economy by hiring local labor and patronizing hotels and restaurants in nearby towns.

But the water contamination is forcing the people who live there to accept a difficult compromise.

"You have to evaluate which is more important, the money or the water," said a Dimock resident who declined to be named because he doesn't want to antagonize Cabot, which he says will pay him more than $600,000 this year for the wells on his property. "The economy is so tough. Suppose you could stop drilling -- no one wants Cabot to go away."

For some, though, the benefits can be easily erased.

Norma Fiorentino, whose well exploded on New Year's morning, got just $97 in royalties in February. Now a part of her monthly $646 Social Security check goes to buy water. "You can't buy a good well," she said.

Down the road, Pat Farnelli spends more than $100 of her monthly food stamp allotment to buy plastic jugs of drinking water. Next door, Ronald Carter paid $7,000 to install two water treatment systems for his family, then learned they won't remove the gas.

Cabot has begun voluntarily supplying water to at least five homes in Dimock, a gesture the company says does not mean it has acknowledged fault. "For now Cabot is simply trying to do the right thing while studies are being performed and data is being obtained," said Kenneth Komoroski, Cabot's spokesman.

Others have yet to get any aid.

"This isn't something that people should be living with," said Craig Lobins, the regional oil and gas manager for Pennsylvania's Department of Environmental Protection. "It's serious."

Pennsylvania's DEP places responsibility for the contamination squarely on Cabot.

In January the DEP blamed the company for polluting one water well. Then in late February it sent Cabot **a list of violations** (PDF) it said led to methane seepage in other area wells. Investigators think the seepage was caused by a weakness in the well casing or an improper cementing

BLM_0081706

job, much like what had been reported in Colorado and Ohio. The good news was that they found no evidence that any of the hydraulic fracturing fluids had leaked into well water.

Komoroski, the Cabot spokesman, said it's too early to conclude the company is responsible for contaminating Dimock's wells.

He said Cabot has hired an expert who is still investigating exactly what happened in the case.

"The DEP's letter was premature," Komoroski said, "It is possible that Cabot is responsible. It's possible it is not. That's what we hired a hydrogeologist to help us determine."

Cabot has since cemented the entire length of its well casings in Dimock -- a safeguard similar to what has been prescribed in Ohio and Colorado -- and believes that measure, which is more extensive than state regulations require, will solve the problem.

Yet the DEP sees no need to require such precautions at all the state's wells, because what is happening in Dimock is "an anomaly."

"Last year we permitted 8,000 wells, and this may be the only incident that occurred," said the DEP's Lobins. "You can't cover every possible scenario that you could encounter out there, so when the regulations are crafted it addresses the ones that will be most protective of 99.9 percent of the wells."

Industry spokesmen also oppose making the precautionary cementing practices mandatory.

"For one thing it is very costly," said Lee Fuller, vice president of government relations at the Independent Petroleum Association of America. "At the same time if you try to put in too much cement you can risk collapsing the well. So it's drawing a balance between protecting the groundwater" and "protecting the well that you are constructing."

At the bottom of the hill on Carter Road, Richard Seymour runs a certified natural farm that ships produce across the state. His well is running red and turbid, and bubbles with so much gas that he fears he'll lose that agricultural certification. If there's a technology, like cementing, that can protect his water, then shouldn't it be required in every case, he asks?

"We feel pretty alone on this, pretty frustrated," Seymour said. "I assumed the DEP, EPA, the state -- the government -- would protect our land. We didn't know that as a landowner the burden was on us."

**Want to tell us about your own experience? Click here.**

**Want to contact the reporter directly? Click here.**

**Write to Abrahm Lustgarten at
Abrahm.Lustgarten@propublica.org .**

**Want to know more? Follow ProPublica on Facebook and
Twitter, and get ProPublica headlines delivered by e-mail every
day.**

**Tags: Drilling, Hydraulic Fracturing, Methane, Methane Emissions, Natural
Gas**

BLM_0081707

Officials in Three States Pin Water Woes on Gas Drilling - ProPublica

**16** retweet     **f** Share   19     **1 diggs** digg it     **b** **Buzz up! (1)**

Print     Email     **Comment** (0)

About Us     Staff     Contact     Jobs     Sign In     Privacy Policy and Other Terms

© Copyright 2010 Pro Publica Inc.

**FREE REPRINTS**



Unless otherwise noted, you can republish our articles and graphics (but not our photographs or our blog) for free. You just have to credit us and link to us, and you can't edit our material or sell it separately. (We're licensed under Creative Commons, which provides the legal details.)

BLM_0081708

IN

**From:** mikejackson.tds.net
**To:** uformp@blm.gov
**Subject:** Paonia"s Mt. Jumbo area
Friday, March 26, 2010 6:35:09 AM

1 A-PI TM

2 A-PI REC

3 B-NP

As a mountain bike user of the Jumbo area in Paonia I would like to express my interests. I believe that some trails (single-track) should be closed to motorized travel. Hunting should be limited to the area east of the powerline road to keep it a safe distance from houses. Official access points for ATV's and motorcycles need to be developed with signs showing motor approved trails. A group of mountain bikers (Paonia Singletrack Society) have or will be presenting a list of ideas / suggestions and I support those as well.
--
Mike Jackson
Broker / Owner
Coldwell Banker Colorado Realty
Office: 970/527-5109
Cell: 970/234-4427

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **To:** | uformp@blm.gov |
| **Subject:** | Fw: RMP revision comment |
| **Date:** | Friday, March 26, 2010 5:01:09 PM |

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 03/26/2010 05:00 PM -----

Jana
Moe/MOFO/CO/BLM/D
OI                                    To
                        Bruce Krickbaum/MOFO/CO/BLM/DOI@BLM
03/26/2010 04:28                      cc
PM
                                Subject
                        Fw: RMP revision comment

Jana Moe
Administrative Support Assistant
Bureau of Land Management
2465 S. Townsend Ave.
Montrose, CO 81401
970-240-5327
jana_moe@blm.gov
----- Forwarded by Jana Moe/MOFO/CO/BLM/DOI on 03/26/2010 04:28 PM -----

CO Info
Sent by: Merica
Block                                 To
                        UFO Mail@BLM
                                      cc
03/25/2010 09:04
AM                              Subject
                        RMP revision comment(Document link:
                        UFO Mail)

BLM_0081710

colorado_webmaste
r@blm.gov

                                          To
03/24/2010 06:36          co_info@blm.gov
PM                                        cc

                                      Subject
                Internet Inquiry

Name0 = (0: 'mark lopes')
EmailAddress = (0: 'lopes_mark@hotmail.com')
TypeofContact = (0: 'Comment')
FieldOffice = (0: 'Uncompahgre Field Office')
Message = (0: 'Thank you for the opportunity to comment on the Uncompahgre
RMP revision. The Uncompahgre Field Office encompasses some of Colorado's
most beloved wilderness-quality lands, wild rivers, and opportunities for
quiet, backcountry recreation. The resource area is also home to important
and imperiled wildlife, such as Gunnison sage grouse, that rely on large
intact tracts of habitat free from roads and other infrastructure.

I encourage BLM to emphasize resource protection in this RMP, providing
extensive unroaded areas where quiet-use recreationists can experience
solitude and natural soundscapes and viewsheds, and where wildlife and wild
rivers can thrive unimpeded by off-road vehicles or energy development. BLM
should complete a comprehensive travel management plan as part of the RMP
to ensure that planning is done at a landscape level, accounting for
impacts of all uses. Lands with wilderness characteristics should be closed
to motorized and mechanized use. Those lands, as well as potential wild and
scenic river corridors, should be closed to all forms of energy development
and transmission. Protecting these lands has the added benefit of helping
protect wildlife habitat, cultural resources, and mitigating the impacts of
climate change.

BLM should designate zones for renewable energy development in the RMP, and
limit renewable energy projects to those zones. Any oil and gas development
allowed under the RMP should be carefully constrained, subject to phased
development that minimizes damage to unique natural features, essential
wildlife habitat, and other sensitive areas. The RMP should impose strict
limits on uranium and other mining to protect our land, air and water.')

Uncompahgre Resource Management Plan

Brenda Miller                              I would like to be on the mailing list
PO Box 750                                    Affiliation: Roubideau Rim Wildlife Rescue (501c3)
Olathe, CO. 81425                              Green Place Ranch, LLC
970-209-5946        email: RRwildliferehab@gmail.com

UNIT 3, residence and above operations for 6 years. 6 years on Horsefly Mesa.   I live here because of proximity to public lands, remoteness for wildlife rehabilitation efforts and my business of raising grass-fed beef, turkeys and chickens.

What issues or concerns do you have regarding public land resources or uses within the Uncompahgre RMP planning area?

1.   Any time there is private property bordering BLM, and BLM is doing something to the land near this private property, the BLM should notify property owners in advance of any weed spraying, chaining, seeding, mineral extraction, studies of wildlife, plants, erosion, water etc.  Everyone needs to practice neighborly manners.
*2.   The BLM's use of herbicides.   As a licensed wildlife rehabilitator for the CO Div. of Wildlife (CDOW) and US Fish and Wildlife Service (USFWS) I have personally cared for poisoned wildlife.  The majority that have been poisoned are  raptors and songbirds, but raccoons, cottontails, mice, mink, waterfowl, deer, elk, amphibians, reptiles, beneficial insects, and many others can all be poisoned by herbicides.  These creatures come in extremely ill, they smell, have abnormal feces, vomiting, dehydrated.  It is rare that one can be saved.  Herbicides also kill insects= food for many creatures.  Because of my direct experience in dealing with the consequences of poisons, I am not in favor of the massive use of herbicides, pesticides or chemical fertilizers on public or private lands.
   Also, our ranch has a USDA All Natural Grass Fed Beef label.  This label goes on all of our retail cuts sold in stores.  The use of poisons on surrounding grazing allotments conflicts with the sustainability of the ranch and its economic well being.
   Beneficial Bugs can also be used to control noxious weeds.  They have already been proven useful on tamarisk and knapweed.  There are 3 weevils that are known to help control knapweed.
       As much as possible, BLM should use PRISON workers to manually pull or mow weeds. Using prison labor is positive for them.  It puts our tax dollars to work.  It spares the environment and wildlife the severe consequences of using herbicides.  Prison labor can dig, cut or pull cocklebur, burdock, oxeye daisy and others.  I have been very successful on our ranch and grazing allotments (except for Marsh reservoirs 1 & 2) hand pulling cocklebur (annual) and cutting burdock down in its second year (biennial) around all ponds.  Cattle will graze the tops off knapweed in flowering stage.  I would also like to see the use of goats to selectively graze weeds.  There are several people in the Montrose area who already move their goats to different pastures needing weed management, just for the purpose of having pasture to feed them.  Some people hire the herd out.  Americorps also does weed abatement projects.  And, assemble volunteers.  Amazing how many people will show up to do work outdoors if they're provided a free lunch.  How about reinstating the Civilian Conservation Corps?  Selective burning also works on some weeds, such as cocklebur in ponds. * (My comments here also apply to section 6.2 "Managing for Livestock and Against Weeds")

Keeping in mind the issues above, what changes would you make physically to the landscape?

1.   After weeds have been eradicated, native seed  needs planted.  Having read many of the local history books, and speaking to so many ranching families that have been in the area for several generations, I believe there used to be a lot more grass on the plateau.
2.     There are places where roads have caused severe soil erosion.  Many of these roads will eventually be closed, according to the BLM Travel Management Plan, but until then, if ever, the erosion continues.

Keeping in mind the issues above, what changes would you make to administration (such as management

Uncompahgre Resource Management Plan

actions, rules, regs)?

1.  Management actions should always be neighborly towards private property owners adjacent to  BLM
lands.  Being neighborly also includes attitudes towards ranchers with BLM grazing allotments, and any
other party who may have a permit to use BLM lands.  Meeting with people on the land instead of in
offices.
2.  The BLM wants to make more rules for the public, but rarely do I see them being able to enforce them
on the ground.  Staff are bogged down in paperwork in offices, and there is no funding to staff
appropriately for law enforcement.  These are the two main comments I get when I ask personnel why
something hasn't been taken care of, or why something is moving slowly.

Keeping in mind the issues above, what changes would you make to social characteristics (such as # of
users, size of groups, behaviors of users)?

1.  Although no one likes to see a sign in the middle of no where, sometimes its necessary, as sometimes a
sign might change the behavior of a few people.  It  provides a visible regulation, so action can be taken
against someone who violates the rule posted by the sign.
2.  A sign can also protect the health of the user, such as an area that has been sprayed, people then know to
steer clear, and keep their pets away too.  God help the wildlife in the area.
3.  # of users in certain areas need limited, and time spent in an area, and sometimes this needs to change
during certain times of the year.  Someone needs to take a serious look at the impact of rifle hunting
seasons on the Uncompahgre Plateau, the impact to all wildlife, roads/erosion, watersheds, spread of
weeds, overall damage to the forest,  new road closures that are affecting how this massive amount of
people is moving during rifle seasons.
4.  Behavior of users starts by teaching children in the classroom about public lands.  We have to change
the thinking of an entire generation of people.

*3.1*  <u>BLM Recreation &Visitor Services</u>:  I think it is necessary to charge fees in some areas because of
heavy use, and repetitive use by the same people.  Since the BLM cannot keep up with maintenance of
what it already has in place, fees are necessary.  Pay to Play.  Target shooting should be done in very
specific areas, not places that are way out from town, but closer in so they can be more easily monitored--
trash kept up with, facilities, a watchful eye by a volunteer or staff, and hopefully less wildlife is disturbed.
There is a target shooting area at the bottom of the "west transfer rd" at the county rock pile.  Just below it
is a dumping ground.  At the rocks people leave all their trash, and targets along with spent shells.  Another
area like this exists on Hwy 90 in an off road parking area above the Shavano Valley.  It to is littered.
These are the only target shooting areas I know of.  These two places give me the impression that target
shooters don't care much about the land they are using to shoot on, therefore target practicing areas should
require an access fee so someone can be paid to clean up after the shooters.  Users could pay for a permit to
use a specific area= It adheres to their vehicle or they carry it in their wallet.  Or, they volunteer to care for
the area by monitoring its use, picking up trash, maintenance.  In exchange for their services, they get to
use the area free of charge.
         How can the BLM even think about developing facilities and improving access to areas when they
can't keep up with basic maintenance of already existing places?  Trailhead markers, trails,  kiosks, road
signs on Camel Back, Escalante, and lower Roubideau are almost all but gone, haven't been updated in
years!  The only thing that will save the area is not improving access such as roads and trails--it changes the
views, the land, the wildlife when "improvements" for public access are made.
*3.2*  <u>Where should BLM leave areas open to OHV use</u>?  Main routes only.  Poaching has increased
drastically since ATV's have been able to go wherever they want.  Weeds have also spread along
roadways as the seeds are carried on the tires of the ATV and people's clothing, gear and pets.   Although
the travel management plan has been finished, I've seen no one out making road closures.  ATV use should
be limited to certain times of the year, as they cause road damage during muddy seasons in the spring and
fall. Since they are newer on the scene than hiking, they should not be allowed on trails that were originally
just hiked.  They should be kept out of  remote areas--walking only.  They should not be allowed in
canyons or near water, as their bush whacking starts new roads and causes erosion.  They should not be
allowed on grazing allotments when cattle are present.  Too many times we've had to confront people on
ATV's chasing our cattle on public lands.

Uncompahgre Resource Management Plan

*3.3* Views: This information was very interesting, as I had not given this much thought. Thank you for thinking of how people feel about open space in their neighborhoods and the views. This is important to healthy living for humans, and wildlife.

3.4 Cultural & Paleontological Areas & Sites: To manage and protect them, I think areas close to town need supervision, even if this means high fencing with concertina wire and locked gate, open only at specific times of the year. If a civic group took charge of caring for the area on a volunteer basis, they promote its value to others, and it means a great deal to them. People become passionate about something they are caring for. A program similar to the highway cleanup might work---where a family or group of people take responsibility for a section of highway and cleanup trash--they get a sign posted on the highway. There are many sites that are difficult to access by road and then walking, they can stay that way. I have found that these remote/hard to get to areas do not have as many human visitors, and those that make it to these special places tend to treat them with respect.

*4.1* Wilderness and WSAs : I do not know of any specific lands in the planning area that possess wilderness characteristics as the BLM may define them. My own idea of a wilderness is any area that man has hardly touched. But, I also see places that were once a wilderness, but man has left his mark, but by limiting mans disturbance of the area or stopping it all together, it could become a wilderness again. I view the Camel Back area as one such place that if left alone, could be wilderness again. The same for the Roubideau. This would mean ending the grazing leases, closing the numerous roads that criss cross it, and limiting hunting.

*4.2* Wild and Scenic Rivers: Did anyone take a look at the Roubideau and it's tributaries?

*4.3* Areas of Critical Environmental Concern: The Roubideau area contains *historic* places of a couple of old homesteads and cattle trails. *Cultural* places of petroglyphs. *Scenic*, wow, the whole place, stand anywhere along the east rim and look over the canyon to the west, or east to the Uncompahgre River valley. Walk up Roubideau Creek from the end of the road in the bottom of the canyon and stand in awe of the spectacular cliffs on each side of you. Look up at caves, and the erosion by wind. Somewhere in this special drainage there must be plants that need protected. The entire area is abundant with wildlife. There are bears and mountain lions year round. Lots of raptors raise their young in this drainage. Has anyone checked on the fish? Locals tell me 30 years ago there were lots of fish in the Roubideau and Potter Creeks, but now its not worth even trying to fish.

*5.1* Managing Special Status Plant and Wildlife Species: The BLM needs to work closely with CDOW and USFWS and ranchers on wildlife. People doing weed eradication, erosion work, etc. are probably also noticing the wildlife habitat while they're working. Maybe they could keep a daily log of what they see while they're out and about. We ranchers are outside all the time, and many of us notice what's going in certain areas with wildlife and plant life, erosion, etc.

*6.1* Vegetation & Land Health: Areas the BLM allows dispersed collection of vegetation products or public harvest need to be monitored, on the ground during and after a season of harvest is allowed. Currently, no one monitors christmas tree cutting on BLM lands north of the Transfer Road. It is very disheartening to see the beautiful, old juniper and cedar trees that are cut down each year and hauled out. Some of the trees have just been topped, tall stumps left behind and trash. People drive off road, right up to the tree they cut. The Pinion have died from the IPS beetle, is it really necessary to take more trees out? Very few of the trees we see removed have a tag on them, so we assume the cutters do not have a permit.

Many years there are very few pinion nuts. Last year they had a fungus. Maybe 1 in 100 was good. (I took a sampling in to the USFS to find this out) Deer, elk, jays, and rock squirrels are just a few of the creatures who eat them in the late summer and fall, winter too if there's no snow on the ground covering them. Along with acorns, pinion nuts provide fat in the diet of wildlife. It can't be that an area is only monitored every ten years, as nature changes course sometimes in just one season. Deer and elk hang out heavily on lower BLM lands in the winter. These areas are close to town, so they are the places where people go to collect. This consistently takes food away from wildlife year after year. Its OK to bring a halt to harvesting. Yes, some people will scream. Education is crucial to help people understand the necessity of closures. Have to get people to "feel ownership" of public lands, by caring for them.

Waterways should be a priority, as invasive weed seeds are carried by water, and weed growth spreads quickly along the banks. Disturbed areas also need addressed quickly, as in road construction, mineral extraction.

Uncompahgre Resource Management Plan

*6.2  Managing for Livestock and Against Weeds:  My comments to question #2, first page with *2  apply to this section.

7.1 Coal, Oil and Gas Resources:  I have seen how drilling rigs and buildings have been visually "hidden". By doing so a lot of people driving down I-70 never notice the drilling operations, in turn they don't think about the consequences of what's going on.  I do not feel any visual considerations of disguising drilling and mining operations should be done.  "Out of sight, out of mind" is not good for the public.

   There are public lands that should be withdrawn from energy development.  Any place where there is a conflict with wildlife, the safety of drinking water for wildlife and humans could be threatened, biological diversity could be threatened.  Any area that could not be quickly and properly reclaimed back to its natural setting.  Places that are sacred to a majority of people such as Arches, Yellowstone, Native American heritage areas, even the smallest local area that may be special to a majority of people in a community for one reason or another.

   Always there should be conditions /monitoring of  oil and gas development.  Some places may require conditions different from others.  Over all guidelines/regs must be in place.  But each individual site should be monitored.  If any extraction occurs near private property, the owners should be involved.  The use of volunteers to daily monitor an extraction process could be used.  I do not know of any resource conflicts with solar or wind.  Unless solar panels were covering an area that someday someone wanted to drill under. Renewable energy construction would make temporary jobs, but once installed panels require very little monitoring.  The wind genies require more maintenance.

   There are lands that should be excluded from renewable energy development and extraction industries; places that are sacred, cared for, loved by a community or a nation.

7.3  Renewable Energy Resources:  We live completely off the grid with a solar electric system, and a solar thermal system that provides all our domestic hot water and some heat.  My husband, Kerry Kalarney is an expert in this field, please refer to his comments.  My knowledge of large scale renewables is convincing enough to me that there is less impact on the environment than extraction of resources.

8.1 Land Tenure:  An area unsuitable for major utilities and road rights of way is the Roubideau.  This canyon area is a water source, historic site of petroglyphs and other ancient artifacts, heavily used and overgrazed by livestock and contains a very diverse range of wildlife inhabitants up and down the entire ecosystem including bear, mountain lion, numerous year round and migrating raptors, songbirds, reptiles and amphibians, deer, elk, and rodents.  I haven't even begun to look at the amazing plant life.

8.2  Wildland-Urban Interface:  To manage recreation in these areas, we must begin by educating our children in the classroom.  They take info home to their parents furthering the education process.  We must teach an entire generation to care for public lands.  Communities that abut public lands need to take responsibility for the lands.  Getting school children out of the classroom and onto the land to carry out projects is necessary for them to care about their surrounding environment, and feeling ownership.  Civic groups also need to take on projects, even if its as simple as maintaining one sign or a kiosk, a trail, picking up trash, etc.  If people will begin to care for the land, and understand what is going on everyday, they will feel possession of it, and will take action to protect it.  Examples:  an eye out for poachers, trash dumping, dogs chasing wildlife, weed invasion.

   Access to these areas may need to be a maintained trail for walking, or footpath.  Encouraging easy access is  detrimental to the wildlife and vegetation.   Six miles below my ranch is a subdivision that has very easy access to public lands.  Residents drive, ATV and motorcycle at all hours up the numerous roads. They dump their trash, litter out their vehicle windows, dump fireplace ashes, target practice and poach. All because they abut public lands, and access is so easy.   They have never been taught what goes on in the environment while they're not present.  They are not thinking about what the consequences are of their ATV's traveling off road=spreading weeds, others follow their tracks, air and noise pollution, erosion. These people encourage wildlife to come into the subdivision by placing all kinds of food out for creatures.

Closing Comments:  In reviewing all of the information in this project, it is overwhelming.  I wish I had more time to further research  these topics by talking to BLM staff and finding info on the internet.  As it is, I have spent14 hours reading the website and info I picked up at the Pavilion and typing up my comments. This must also be huge to BLM staff, in addition to what they already do.  Why do you take on so much at

Uncompahgre Resource Management Plan

once? Staff cannot do a good job when they have this much on their agenda, and deadlines. You folks push a lot of paper, but not much seems to get done on the ground for all your efforts. Thank you for all the work you are doing to include the public in this project.

Education is the key to changing people's attitudes towards all land. It starts in our schools and within the community.

The Uncompahgre Plateau is my backyard. It is special to me. I cherish the life I live on it everyday. I am fortunate to be completely surrounded by public lands. I want these lands to be around for my children to explore with their children, as I have with mine. I would be devastated if an extraction operation was anywhere near my home. I would notice every change in wildlife movements, erosion, weed spread, the impacts of humans on the land everyday causing a huge disturbance. A lot of stress on myself and the environment.

Tourists from back east are amazed that they can travel all over so freely in the western states on public lands, as we have so much.

I am always willing to talk with any of you about what I see every day out here. I keep a daily log, and compile it the end of every year. Its fascinating to compare one year to the next: when the bluebirds arrived, when the cicadas hatched, when and if cactus bloomed, year of lots of acorns, or none at all, a year of fungus in pine nuts, etc. I know that most BLM staff are making decisions based on what they study for just a short time out in the field. Good decisions regarding land management can not be made from sitting at a desk!

Many places just have to be left alone. People need to do nothing else except walk in and out, NO extraction of minerals, hunting, renewable energy, collecting, harvesting, outfitting, fishing, motor vehicle or boat use, spraying of pesticides or herbicides, livestock grazing. We have to have some places that are sacred!

Brenda Miller                    Roubideau Rim Wildlife Rescue  501c3
PO Box 750                       Green Place Ranch, LLC
Olathe, CO. 81425                 970-209-5946

 **Uncompahgre** ~~IN~~ ~~Resource Management~~ **Plan**

NATIONAL SYSTEM OF PUBLIC LANDS

*Received MAR 2 2010 Uncompahgre Field Office*

We encourage you to provide your comments by filling out and submitting this comment form by February 20, 2010. Email your completed form to UFORMP@blm.gov, or print your completed form and fax it to 1-970-240-5367 or mail it to: BLM UFO, Attn: Bruce Krickbaum, RMP Project Manager, 2465 S. Townsend Avenue, Montrose, CO 81401.

First Name_**kirk**_ Last Name _**morgan**_ Date _**3/26/2010**_

Mailing Address_____**p.o.box 281**_

City__**paonia**_ State_**co**_ Zip _**81428**_

E-mail Address_____

Would you like to be added to the RMP mailing list to receive future project-related information? (Your name will not be shared.) Yes: ❑Email materials   ❑Hard-copy materials ❑x No
Please note that planning materials are also available at our website: www.UFORMP.com

Please indicate your affiliation by checking the following boxes (check all that apply):

x❑Individual (no affiliation)   ❑Citizen's Group   ❑Regulatory Agency
❑Non-profit Organization   ❑Elected Representative   ❑Federal, State or Local Government

*Please answer the following four questions about your relationship to the Uncompahgre Planning Area:*

1. Do you live within the planning area? ❑Unit 1 ❑Unit 2 ❑Unit 3 ❑Unit 4 ❑Unit 5 ❑No *(Refer to map for unit numbers)*

2. If you do not live in the planning area, where do you live: ❑x Colorado (west slope) ❑Colorado (front range or plains) ❑Other State - Which?_____ ❑ Other Country - Which?_____

3. If you live in the planning area, how long have you lived here? Years _**20**_ Months___

4. Why do you live here? x❑Occupation ❑Family x❑Proximity to public lands x❑Recreational Opportunities ❑Other_____

*The BLM wants to hear from you! The Uncompahgre Field Office is committed to listening to and learning from our neighbors, friends, and stakeholders. Your answers to the following questions will be helpful at this point in the planning process, as are any other comments. When answering the following questions, where applicable please reference the planning units in the Planning Unit Map on our Planning webpage. Thank you for taking the time to provide your input.*

What issues or concerns do you have regarding public land uses or resources within the Uncompahgre RMP planning area?

I believe it should be open to mining,logging,ranching&drilling

1 A-PI ED
2 A-PI FR
3 A-PI LG

**Keeping in mind the issues above, what changes would you make physically to the landscape (such as what should it look like, modifications, etc.)?**

jobs

4 A-PI SE

**Keeping in mind the issues above, what changes would you make to administration (such as management actions, rules, regulations, etc.)?**

Inforce rules you all ready have

5 B-NP

**Keeping in mind the issues above, what changes would you make to social characteristics (such as number of users, size of groups, behavior of users, etc.)?**

Support jobs

6 A-PI SE

**Please provide any additional comments that you have regarding this project.**

I live, work, and play in western Colorado next to coal mines,
Where I hunt around minning and drilling there is more game where they have done scedind,roads,ponds, ect

7 A-PI REC



IN

**Uncompahgre**
**Resource Management Plan**



Received
MAR 2 9 2010
Uncompahgre Field Office

We encourage you to provide your comments by filling out and submitting this comment form by February 15, 2010.
Please mail your completed form to the address on the opposite side or fax it to 1-970-240-5367. Comments may also be
submitted via e-mail to uformp@blm.gov. *Please do not disclose my street address or e-mail*

First Name  *Barb*          Last Name  *Poole*          Date  *3/26/10*

Mailing Address  ▮▮▮▮▮▮▮▮▮▮

City  ▮▮▮▮▮▮▮▮▮▮

E-mail Address:  ▮▮▮▮▮▮▮▮▮▮

Would you like to be added to this project's mailing list to receive future project-related information (your name will not be shared)?     Yes: ☐ e-mail materials only  ☑ e-mail and hard-copy materials          ☐ No

Please indicate your affiliation by checking the following boxes (check all that apply):

☑ Individual (no affiliation)          ☐ Non-profit Organization          ☐ Citizen's Group

☐ Federal, State, or Local Government          ☐ Elected Representative          ☐ Regulatory Agency

Name of organization, government, group, or agency (if applicable) _____

*Please answer the following four questions about your relationship to the Uncompahgre RMP Planning Area:*

Do you live within the planning area? ☐ Unit 1 ☐ Unit 2 ☑ Unit 3 ☐ Unit 4 ☐ Unit 5 ☐ No
*(Refer to map for unit numbers)*

If you do not live in the planning area, do you live in: ☐ Colorado (west slope)  ☐ Colorado (front range or plains)

☐ Another State (which): _____  ☐ Another Country (which): _____

If you do live in the planning area, how long have you lived here? Months: _____ Years: *29 yrs.*

Why do you live here? ☐ Occupation ☐ Family ☑ Proximity to public lands ☑ Recreational Opportunities

☐ Other _____

---

*The BLM wants to hear from you! The Uncompahgre Field Office is committed to listening and learning from our neighbors, friends, and stakeholders. Your answers to the following questions will be helpful at this point in the planning process, as are any other comments. When answering the following questions, reference as appropriate the planning units on the map titled Uncompahgre RMP Planning Units. You may attach additional sheets of paper for long comments. Thank you for taking the time to provide your input.*

---

2 A-PI REC          2 A-PI SDA

What issues or concerns do you have regarding public land resources or uses within the Uncompahgre RMP planning area?

1) An alarming increase in motorized use + an increase in the size + carrying capacities of OHV's + their ability to travel terrain regardless of conditions.

2) Lack of protection for areas that are non-motorized and unroaded.

3) Need for seasonal closures to protect big game winter range + provide security areas for wildlife

4) Increasing need to protect lands due to increasing drought + increasing demand and use by OHV's by restricting + limited OHV's + restricting + limiting livestock grazing

3 A-PI FW

Respondents' comments, including their names and street addresses, will be available for public review at the Uncompahgre Field Office during regular business hours from 8:00am to 4:30pm, Monday through Friday, except holidays, and may be published as part of the EIS. Individual respondents may request confidentiality. If you wish to withhold your name or street address from public review or from disclosure under the Freedom of Information Act, you must state this prominently at the beginning of your written comments. Such requests will be honored to the extent allowed by law. All submissions from organizations and businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be available for public review in their entirety.

4 A-PI CC (first part of sentence)
5 A-PI REC
6 A-PI LG (last part of sentence)

**7 A-PI TM**

Keeping in mind the issues above, what changes would you make physically to the landscape (such as what should it look like/ modifications, etc.)?

*I would like to see roads closed permanently – obituated & revegetated. Roads that are not closed permanently could be seasonally closed with gates. Main routes would remain open.*

**8 A-PI TM**

...d the issues above, what changes would you make to administration (such as management actions, rules, regulations, etc.)?

*Priority on improving and protecting wildlife habitat & secure areas by decreasing human activity on public lands by implementing & enforcing motorized & seasonal closures. Promote respect for the land's intrinsic values — wildlife, solitude, clean air & water & encourage recreational users to travel by non-motorized & non-mechanical means.*

**8 A-GE**          **9 A-PI TM**

...ng in mind the issues above, what changes would you make to s... ...such as number of users, size of groups, behavior of users, etc.)?

*Less motorized users, traveling in smaller groups with more respect for the resource by packing out trash, respecting closures & seasonal restrictions & respecting the value of solitude & wild-primitive nature of public lands.*

**10 A-PI TM**

Please provide any additional comments that you have regarding this project.

*I encourage the BLM to make the bold management decisions needed to limit motorized use thereby decreasing the amount of human activity that negatively impacts wildlife.*

**11 A-PI TM**

---

*(Please tri-fold this sheet & tape shut before mailing – Do not staple)*

BLM. Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Place First
Class Stamp
Here

US Bureau of Land Management
Uncompahgre Field Office
Attn: Bruce Krickbaum, RMP Project Manager
2465 S. Townsend Ave.
Montrose, CO 81401

Barb Poole

Received
MAR 2 9 2010
mpahgre Field Office

Bruce Krickbaum – RMP Project Manager
BLM – Uncompahgre Field Office
2465 S. Townsend. Ave.
Montrose, CO 81401

Dear Bruce:

Thank you for the opportunity to comment on the UFO's Resource Management Plan. I am particularly concerned about the alarming increase in year around motorized use on BLM lands by OHVs and the impact it is having on public land. Habitat loss and modification due to human activities are the greatest threats to public land. I urge the BLM to make the tough management decisions needed to rein in and limit motorized use in order to improve and protect wildlife habitat, preserve non-motorized and unroaded areas, and protect sensitive lands.

In the 29 years we've lived in Unit 3 of UFO's planning area, we've witnessed an ever-increasing population of OHVs with the marketing of dirt bikes, 3-wheelers, then 4-wheelers, now 6-wheelers and dune buggies converted to "rock-crawlers." We used to live adjacent to the public access road off Cedar Road west of Olathe – BEFORE the access road was built and later improved and signed by the BLM as "Public Access." Early on, motorized use coincided with the big game rifle seasons and consisted of deer hunters in 4-wheel drive trucks and jeeps. There was such limited use that this road did not connect to the road that runs along the rim of Roubideau. Today, this area is used by full sized vehicles, ATVs, UTVs, and people hauling snowmobiles to the snow line along the rim. Motorized use occurs year-round. The road is littered with trash including broken bottles and shell casings left by people target practicing. There's little doubt that the increased use has impacted wildlife and degraded the land's scenic and solitude values.

In the 22 years we've lived up the Transfer Road, we've seen a dramatic increase in and impact from motorized use: *more* OHVs including snowmobiles; *bigger* OHVs increasing the number of people traveling on one OHV; *larger groups* of motorized users traveling together as ATVs have become more common; *extended seasons of use* due to improvements in OHVs (6-wheel UTVs with tracks and "rock-crawlers") and the addition of spring turkey and late big game hunting seasons; and when compared to non-motorized travel, *more miles traveled* per motorized user per day *impacting more habitat*. Without a doubt, all roads accessed from Transfer Road are becoming more heavily traveled. Basically, unless a road or route is physically closed, it gets traveled by a motorized user. Periods of solitude are becoming less, their duration shorter and wildlife secure areas are shrinking. The lower canyon country on the Uncompahgre Plateau is valuable to wildlife, but motorized travel needs to be limited by closures and seasonal restrictions. Such management by the BLM would compliment existing closures and seasonal restrictions on adjacent National Forest lands.

I encourage the BLM to close areas to motorized use and mountain bikes that are adjacent to WSAs including: 1) the upper Little Dominguez, Rose Creek and Open Draw

drainages and the Camp Ridge and Sowbelly Ridge area adjacent to the Dominguez Canyon WSA. The entire Gunnison Trail and McCarty Trail systems should be closed to motorized use and mountain bikes; 2) Winter Mesa, Potter Creek, Monitor Creek and Criswell Creek canyons adjacent to the Camel Back WSA; and 3) BLM lands north of the Tabeguache Creek WSA/SMA including Shavano, Campbell, Burro and 47 Creek drainages. These areas are all important for wildlife habitat and security.

With respect to travel management, I hope the BLM recognizes the need for non-motorized areas where travel is restricted to foot and horse travel only. These areas should be in addition to the five WSAs. Such means of travel have less impact on the resource and it's well documented that these types of human activity have less impact on wildlife. Also, there are safety concerns for horseback riders when they encounter motorized users. Motorized users may not object to sharing roads and trails with hikers and horseback riders, but motorized use is *not compatible* with foot and horse use. In the travel management assessment, the BLM needs to take into account the monopoly motorized users have on areas such as Dry Creek and Cushman Creek. It's commonplace now to see numerous (6 to 10 –sometimes more) vehicles parked at the power line and Transfer Road unloading motorcycles, 4-wheelers and 6 wheelers. Prior to its discovery by the motorized community, these areas were used by hikers and horseback riders. It is rarely frequented by hikers and horseback riders now because of user incompatibility.

I also support continued special management of the 4 ACECs already designated and support the designation of all ACECs recommended by the Colorado Natural Heritage Program within the UFO.

All river segments listed in the draft Wild and Scenic Rivers Eligibility Report should retain their eligibility for inclusion in the National Wild and Scenic Rivers System. Specific segments that need protection include Cottonwood, Monitor, Potter and Roubideau Creeks; Escalante Creek; Tabeguache Creek; as well as the San Miguel, Dolores and Gunnison Rivers.

I support the BLM in retiring or modifying domestic sheep allotments that overlap areas occupied by Rocky Mountain and Desert bighorns. This is long overdue with respect to the Desert bighorns that range between Big Dominguez and Roubideau Creeks and Rocky Mountain bighorns near Deep Creek and Sawpit. Such action by the BLM may prevent a die-off since it is well documented that wild sheep can become infected with various deadly parasites and pathogens when they come in contact with domestic sheep.

If the BLM still allows commercial quarrying of moss rock, I encourage the BLM to prohibit this activity. This practice is very destructive and results in a permanent change to the landscape and its scenic value when large pieces of the Dakota sandstone (70 million years old) are excavated along canyon rims and removed by truck mounted cranes.

Respectfully yours,

Barb Poole

IN

| | |
|---|---|
| **From:** | Site Administrator on behalf of Tim Johnson |
| **To:** | uformp@blm.gov |
| **Subject:** | Why kids deserve to have the Dolores River Basin protected |
| **Date:** | Friday, March 26, 2010 10:04:23 AM |

Mar 26, 2010

1 A-PI WSA

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

2 A-PI MI

in Colorado since 1982--hardly a native, but certainly in love with the state and its beauty. In those years I've also seen gorgeous areas become developed. I'm writing today to ask that you preserve the Dolores basin and the wilderness attributes that it has.

My two dauthers should have the privilidge to experience that wildenress experience, and be able to share it with the children born years from now.

Finally, I'm hoping you'll take a hard look at uranium development in that area, and proctect land, water, wildlife and residents with sensible development.

With appreciation.

Best

Mr. Tim Johnson
1336 S Saint Paul St
Denver, CO 80210-2512
(303) 523-8230

**From:**    Amber Kleinman
**To:**    uformp@blm.gov
**Subject:**    Paonia BLM
**Date:**    Saturday, March 27, 2010 12:44:29 PM

**1 A-PI REC**

Hello,

I wanted to respond to the comment period on Jumbo Ridge in Paonia. I am a home owner in the Pan American subdivision where there is access to the trails. It is such as asset to have hiking and biking trails so close to town. My husband and I go there regularly to enjoy the trails and I see many others from my community there as well. I would like to see the trail system preserved for the use of non motorized traffic. The hikers and mountain bikers seem to coexist well on the single-track.

**2 B-NP**

Being a member of the subdivision I hear and see many off-road motorcycles and ATVs driving on our streets to access the BLM through an unbuilt lot in our subdivision. While I don't like the noise and speed at which they travel our streets I am also dismayed by the damage that they incur on the trails, especially when the trails are muddy and they ride anyway. The access that they use (mostly) is through a cul-de-sac at the top of the subdivision and I don't believe this is a legal access. The trail there keeps getting wider and more eroded by this steep entry. From time to time I see their tracks on the single track walking trails which is dangerous to the non motorized traffic that mostly uses those trails. There are some roads that are established that they could use that already have a double track, but the entry off our subdivision should be cut off.

**3 A-PI TM**

The off-road vehicles are illegal to be using public streets anyway and my neighbors complain about the noise of them screaming up the big hill that leads to the unfortunate access through the unbuilt lot. I would ask you to consider having an access for motorized travel off the Minnesota Creek Road. Maybe a staging area could be built so they could legally trailer the off-road vehicles to a parking lot and start from there. In the interest of coexisting I would give them the ability to ride the Powerline road and the existing double track, But all of the single track should stay motor free.

On the point of hunting. I was surprised to even see hunters there. They should not be able to shoot guns that close to a subdivision. They are above us on a ridge, bullets can travel too close for comfort into our neighborhood and Hawks Haven. Please direct hunting further back from town. It seem ridiculous to me to see hunters that close to houses.

Thanks for helping us finally designate the trails. There are already people who volunteer to maintain those trails and rising interest in their protection.

Amber Kleinman

**4 A-PI REC**



**From:** Brenda Wright
**To:** uformp@blm.gov; bruce_krickbaum@blm.gov
**Cc:** Brenda/Coen Wright/Dexter
**Date:** Sunday, March 28, 2010 9:11:37 AM
**Attachments:** March 24, BLM Lands.docx
Colorado Breeding Bird Atlas II Region 7 Update 2010.docx

Greetings,

Attached is a letter that I am sending to BLM Uncompahgre RMP.  The second attachment is a summary of the first three years of work on Region 7, Colorado Breeding Bird Atlas II.  Due to the fact the atlas II is about finished there is good data available, especially in the west end of Montrose County.

Both Missy Siders and Charlie Sharp have contributed to the atlas database and know how to retrieve info for a particular area.  It is easy to compare present data with data collected twenty years ago when Colorado Breeding Bird Atlas I was worked.

Region 7 coordinator,

Coen Dexter

March 24, 2010

Coen Dexter
233 East 5th Ave
Nucla , CO 81424

Thank you for the opportunity to comment on the Resource Management Plan for the west end of Montrose County.  My interest in this area, foremost, is because I live here.  Brenda, my wife, and I have spent many years in the back county hiking, floating rivers as well as working in this area.  Our work consisted of doing the Colorado Breeding Bird Atlas I from 1987 until 1995 in which Brenda was a paid field worker and I was a regional coordinator.  We are presently working on Colorado Breeding Bird Atlas II which began in 2007. I am the regional coordinator for most of Montrose County and the northern half of San Miguel County.  While I was employed by Rocky Mountain Bird Observatory I walked many transects doing bird studies from 1999 until 2006.  Much of the work was on BLM lands centered in western Montrose County.  Each summer Brenda and I also participate in two Breeding Bird Survey Routes, both of which start near Nucla.

**1 A-PI FW**

I co-authored Birds of Western Colorado, Plateau and Mesa County.  All birds found in western Colorado ⸻⸻⸻⸻ming to New Mexico are covered in the publication.  I also wrote 10 species accounts for Colorado Breeding Bird Atlas I.   I chose species that live primarily on BLM lands; birds that nest in pinyon/juniper woodland, sagebrush and in the numerous canyons that crisscross the region.  The canyons with water often have good riparian habitat where bird density and diversity reaches its highest point anywhere on the Colorado Plateau.

**2 A-PI TT**

There are few places in western Colorado that Brenda and I have not been.  One of the reasons for our complete coverage is the great number of roads.  There are very few areas left that do not have roads.  Of the 48 priority blocks in Region 7, Colorado Breeding Bird Atlas II, in Montrose and San Miguel County there is not one of these approximately 3 mile square areas that does not have a least one road.  In checking out maps it is very difficult to find a location in which there is not a road within four miles.

**3 A-PI TM**

The following describes an area that at the present time does not have any roads.  The Dolores River Canyon is a pristine slickrock desert canyon area.  I bring this area to your attention because on two visits this fall to Coyote Wash we found motorized vehicle tracks at two locations.
We hiked into Coyote Wash from Silvey's Pocket and were surprised to find a vehicle had driven all the way into Coyote Wash and then up the wash.  It may have been a Hummer gauging by tire tracks.  The signs at the wilderness boundary are knocked down.  It may be possible to barricade the side canyon to stop motorized travel.
A second visit to the area was from Wray Mesa.  We walked down a side canyon to Coyote Wash and found tracks from a motor bike.  Access may have been gained via Utah where a road crossed the wash.  Uranium mining in the area may be part of the problem.  Montrose County reopened several of the roads in the area, which had become impassable due to disuse.  The county spent several days doing

**4 A-PI SMA**

road work on Wray Mesa and in other Uranium mining areas.  Dolores River Canyon is a very special area and deserves all the protection possible.  To underscore the point, in our hike down to the wash from Wray Mesa we found a large hanging garden which had lots of the rare Eastwood monkey flower.

Nyswonger Mesa is an area that needs protection.  It is bounded by Paradox Valley on the north, Dolores River on the south and east, and La Sal Creek on the west .  At the present time there is not access for motorized travel to the mesa.  There is an old road, now a pack trail, that was used during the Uranium days.  The track is very, very steep and completely washed out in several places.  This road

**5 A-PI SMA**

BLM_0081726

should be permanently closed as this would limit access except by foot and pack travel. The road is downright dangerous for anyone trying to drive up it at this time. The road is closed at the BLM property line just south of CO-90 and west of Bedrock, however a four-wheeler did drive up to near the top last year. The pinyon/juniper forest and its birds may be the main wildlife values. Hikers can enjoy solitude and great vistas looking down 1500 feet to the Dolores River, Paradox Valley and La Sal Creek below. This is a wonderful, quiet place and will away remain that way unless a road is again constructed to the top. During the past Uranium boom little or no Uranium was found on Nyswonger Mesa. I do not know if there are present claims. I do believe most of Nyswonger Mesa belongs in the Dolores River Canyon Wilderness Study Area.

La Sal Creek drains into the Dolores River below Nyswonger Mesa. A great hike is to drive to Cashin Cooper Mine. From the old mine site begin hiking down La Sal Creek. In about four miles the confluence with the Dolores River is reached. It is about another three miles to the BLM parking lot on the Dolores River near Bedrock. The road to the Cashin Mine is good in dry weather. The La Sal Creek Canyon has abundant wildlife. Some of the riparian plant species are pinyon/junipers, willows, alders, boxelder, sedges, rushes, cottonwoods and yes, tamarisk. I have seen mountain lion, deer, bobcat, bear, gray fox and many other small mammal tracks along the creek. American Dippers nest in the La Sal Creek Canyon.

**6 A-PI FW**

I have a complete list of birds that Brenda and I observed for Colorado Breeding Bird Atlas I that we did twenty years ago. We are currently doing it all over again for Colorado Breeding Bird Atlas II. The bird study area includes parts of Nyswonger Mesa, lower La Sal Creek, part of Dolores Canyon, lower Wild Steer Canyon and the northwest corner of Skein Mesa. Our atlas work is available to anyone that would like the data or can use it. A direct comparison over a twenty year period gives this bird data a particular value.

**7 B-NP**

The trail from the Cashin Mine to the Bedrock Store via La Sal Creek and the Dolores River is the old road from Colorado to Utah. Both ends of the closed road have had motorized travelers lately. They have not been able to get all the way through because of their inability to cross La Sal Creek. Signs need to be posted on the trail heads, one at Cashin Mine and one south of the Bedrock boat ramp. It may take physical barriers to prevent motorized travel.

There are several locations where native art work can be found along La Sal Creek and along the Dolores River. One large rock has a good number of dinosaur tracks near the trail.

I have a difficult time recommending any type of wheel travel in special areas but this is an exception. Bicycling could be made possible if a few small bridges could be placed across the La Sal Creek. Hikers could use these bridges also. Some bridge design would be needed to keep out motorcycles. Many hikers are discouraged because of the stream crossings. Bridges would increase hiker use. Bicyclers could do a round trip. Hikers would need to make other arrangements as a round trip would be nearly 20 miles.

**8 A-PI TM**

Tabequache Creek runs through BLM and private land most of its last 12 miles. The last landowner before the confluence of the San Miguel River has fenced the creek to keep out cattle. Rocky Mountain Bird Observatory has been doing research on bird population and how cattle affect birds when they are allowed to trash out streams. I worked this Tabequache Creek transect several years ago, but never met the landowner.

I am currently collecting data for Colorado Breeding Bird Atlas II in the area just north of where Tabequache Creek exits Uncompahgre National Forest. The Meadows Ranch is a large private parcel of land and is the center of the atlas priority block. Twenty years ago there was a road around the south side of the ranch when I worked on Atlas I. We drove around to the National Forest. That road is now closed, that is, to us because we live by the rules. Last summer I noted several tracks of motorized

BLM_0081727

travelers still driving around the signed area.  I will be back up there this summer to complete my work.  As I hike back to the National Forest as the priority block includes some forest lands I will be able to determine how much motorized travel there has been in the restricted area.

Tabequache Creek, at the point that it leaves forest lands, is somewhat choked with brush.  It is not until further downstream that more potential exists or motorized travel.  I will check the trail to Tabequache Creek that runs along Forty Seven Creek in early June.  Twenty years ago the trail was good and no motorized vehicles were using it.

Saw Tooth Ridge is the eastern most part of Long Park.  It is bounded on the east and north by CO-141 and private land and the San Miguel River.  On the southeast and south it is bounded by CO-90.  Access is via a seldom used 4-wheel drive road off of CO-141.  Long Park runs all the way to the Dolores River and makes up the north rim of Paradox Valley.  There is a road from the south that once was used to

**9 A-PI SMA**

w Tooth Ridge.  This area is accessed via CO-90, then EE-22 Rd which is Long Park Road.

The area is incised with several deep canyons and a lot of exposed slick rock.  There are several stands of ponderosa pines in the canyons and along the rim.  This is the only ponderosa pine for several miles and the only pines on Long Park.

The part of Saw Tooth Ridge that qualifies for consideration is not a large area.  It is valuable for wildlife, mountain lions, bear, western spotted skunk, gray fox and many smaller mammals.  This is the only place in western Colorado that I have seen western spotted skunk.

I have completed the Atlas II priority block.  Other field workers did the work 20 years ago and the data is available.  There were 58 species of birds using the area during Atlas II.

The area lies in the Uranium belt but there are no mines in the area.  I am not sure about claims, however.

Saucer Basin is at the very west end of Long Park.  The upper part has never been mined and there are no roads on this part of the mesa which has a 1500 foot escarpment on two sides.  The cap rock is Keyenta Formation and all the Morrison Formation along with the Uranium has long ago eroded away.  Habitat is pinyon/juniper, mountainous shrubs and some sagebrush.  Most mammals and birds found in other nearby areas are found here as well.

A road gives hikers access from Uravan or CO-90.  A rim hike is quite spectacular looking down into Paradox Valley.  A visitor can walk three miles all the way to a point above the Dolores River and enjoy a view few have ever had.  To access the area take EE-22 Rd either from CO-90 or from Uravan and CO-141.

**11 A-PI TM**
**12 A-PI WR**
**13 A-PI FM**

point on EE-22 Rd park and walk.  There is a track that leads to the
south ut 1 mile.  Once on the rim head right, northwest, and follow the edge.
Belo CO-90, there are several locations of archeological sites.  Below the south
facing rim, most certainly, was a wintering place for Native Americans.

If public lands are going to maintain both animal and plant diversity, management is critically important.  We need to be closing roads not making new ones.  We need to be protecting water sources, springs, streams and rivers.  We need to return to a more natural rhythm in fire control.

Man's impact has not changed significantly in western Montrose County except for off road vehicles.  Where horses were once ridden, now 4-wheelers are used.

Mining and roads are a threat.  If the Uranium mill is not built mining will never return to its former days.  If it is then we need to brace ourselves for a big increase in population, lots more motorized vehicles and a lot more roads, mostly unofficial.  Just look to what has happen in Mesa, Delta and the east end of Montrose counties.  Our saving grace has been little increase in population.   High gasoline prices have kept a lot of off road vehicles a little closer to home and away from western Montrose County.

**14 A-PI ED**
**15 A-PI TM**

Coen Dexter

BLM_0081729

# Colorado Breeding Bird Atlas II    Region 7 Update 2010

This summary includes only Priority blocks.  Many non-Priority blocks have some data of
importance.  We will complete region 7 in the next two years.  Region 7 can become a very
useful tool to compare bird population, Atlas II vs. Atlas I.

## Statistics for Region 7

41 of 48 blocks assigned                 85%
44 of 48 blocks with data posted         92%
31 of 48 blocks completed                65%

## Largest increase in Number of Species, Region 7

41   Norwood         George and Kathey
32   Nucla           Coen and Brenda
22   Gypsum Gap      Coen and Brenda
20   Hamm Canyon   Coen and Brenda

## Largest increase in % of Species, Region 7

100% (20 to 40) Hamm Canyon    Coen and Brenda
100% (22 to 44) Gypsum Gap     Coen and Brenda
 82% (50 to 81) Norwood        George and Kathey
 54% (59 to 91) Nucla          Coen and Brenda

## Highest Percentage Confirmed, Region 7

54%   Barkelew Draw    George and Kathey
52%   Antone Springs   Block Buster
51%   Moore Mesa       Block Buster and Mike Henwood

## Highest Number of Species, Region 7

91   Norwood      George and Kathey
91   Nucla        Coen and Brenda
78   Oak Hill     George and Kathey

BLM_0081730

| 77 | Placerville | Judy and Howard Kennedy |
| 68 | Ute | Coen and Brenda |
| 67 | Big Bucktail | Block Buster |
| 67 | Redvale | George and Kathey |

## Most frequently reported species, Atlas II. Listed are only the 44 priority blocks that have data. Twenty seven more species have between 20 and 30 priority blocks in which they were detected.

| 1 | Violet-green Swallow | 39 blocks; | 4th, 38 blocks in Atlas I |
| 2 | Chipping Sparrow | 39 blocks; | 1st, 41 blocks in Atlas I |
| 3 | Mourning Dove | 38 blocks; | 6th, 37 blocks in Atlas I |
| 4 | Common Raven | 37 blocks; | 2nd, 40 blocks in Atlas I |
| 5 | Blue-gray Gnatcatcher | 36 blocks; | 23rd, 27 blocks in Atlas I |
| 6 | Black-headed Grosbeak | 35 blocks; | 13th, 34 blocks in Atlas I |
| 7 | Northern Flicker | 34 blocks; | 5th, 38 blocks in Atlas I |
| 8 | Plumbeous Vireo | 34 blocks; | 11th, 34 blocks in Atlas I |
| 9 | Mountain Bluebird | 34 blocks; | 3rd, 39 blocks in Atlas I |
| 10 | Spotted Towhee | 34 blocks; | 15th, 31 blocks in Atlas I |
| 11 | American Robin | 33 blocks; | 8th, 35 blocks in Atlas I |
| 12 | White-breasted Nuthatch | 33 blocks; | 27th, 25 blocks in Atlas I |
| 13 | Broad-tailed Hummingbird | 33 blocks; | 14th, 32 blocks in Atlas I |
| 14 | Western Wood-Pewee | 32 blocks; | 18th, 29 blocks in Atlas I |
| 15 | Warbling Vireo | 31 blocks; | 30th, 25 blocks in Atlas I |

## Species in Atlas I that did not make the top 15 in Atlas II.

| Red-tailed Hawk | 28 blocks, 18th; | 35 blocks, 9th in Atlas I |
| American Kestral | 28 blocks, 21st; | 34 blocks, 10th in Atlas I |
| Mountain Chickadee | 26 blocks, 28th; | 34 blocks, 12th in Atlas I |
| Brown-headed Cowbird | 27 blocks, 23rd; | 36 blocks, 7th in Atlas I |

BLM_0081731

## Species listed are those with the greatest % increase, Atlas II verses Atlas I

1 Black Phoebe             300%   4 blocks vs 1 block
2 Cedar Waxwing         300%   8 blocks vs 2 blocks
3 Great Blue Heron       200%   9 blocks vs 3 blocks
4 White-crowned Sparrow   167%   8 blocks vs 3 blocks
5 Canada Goose           150%   10 blocks vs 4 blocks
6 Gray Catbird             100%   6 blocks vs 3 blocks
7 Black-throated Sparrow    100%   8 blocks vs 4 blocks
8 Gray Vireo                67%   15 blocks vs 9 blocks
9 Grace's Warbler         60%   8 blocks vs 5 blocks
10 Bewick's Wren         57%   22 blocks vs 14 blocks
11 Black-throated Gray Warbler 47%   28 blocks vs 19 blocks
12 Bushtit                  46%   22 blocks vs 15 blocks
13 Lark Sparrow          40%   21 blocks vs 15 blocks

## Species recorded in Atlas II not recorded in Atlas I

Blue-winged Teal, Redhead, Ring-necked Duck, Lesser Scaup, Ruddy Duck, Pied-billed Grebe, Eared Grebe, Western Grebe, Snowy Egret, White-faced Ibis, Virginia Rail, Sora, Sandhill Crane(three blocks), Wilson's Phalarope, Eurasian Collared-Dove(four blocks), White-winged Dove(two blocks), Yellow-billed Cuckoo, Burrowing Owl(three blocks), Lesser Nighthawk, Cassin's Kingbird(three blocks), Loggerhead Shrike(five blocks) and Fox Sparrow.  This list includes all blocks, priority and non-priority.

## Species recorded in Atlas I not recorded in Atlas II

Northern Shoveler, Northern Pintail, Green-winged Teal, White-tailed Ptarmigan, Double-crested Cormorant, Swainson's Hawk, Greater Roadrunner, Western Screech-Owl, Scissor-tailed Flycatcher, Marsh

Wren, American Pipit, Lark Bunting and Brown-capped Rosy-Finch.  This list includes all blocks, priority and non-priority.

## Milestones

| Most blocks assigned: | Coen and Brenda | 18 |
|---|---|---|
| | George and Kathey | 12 |

| Most blocks completed: | Coen and Brenda | 15 |
|---|---|---|
| | George and Kathey | 10 |

| Hours in blocks: | Coen and Brenda | 701 hours |
|---|---|---|
| | George and Kathey | 346 hours |
| | Mike Henwood | 128 hours |
| | Judy and Howard | 119 hours |

Many other birders have completed blocks, spent time in blocks gathering data, have driven many miles to get to region 7 and have committed to do yet more work in the next two years.

The following is a list of their names along with **a big thanks**: Bob Bradley, Charlie Sharp, Missy Siders, Ellery McClintock, Steve Boyle, Sue Hirshman, Vic Zerbi, Andrea Robinsong, Lori Brummer, Lynn and John Wickersham, Don Radovich, Frank Coons, Geoff Tischbin and I am sure I missed several.

BLM_0081733

IN

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **To:** | uformp@blm.gov |
| **Subject:** | Fw: Comment BLM Resource Management PLAN |
| **Date:** | Sunday, March 28, 2010 4:43:24 PM |

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 03/28/2010 05:43 PM -----

```
                Rosemary Esty
                <rosemaryesty@gma
                il.com>                              To
                                      bruce_krickbaum@blm.gov
                03/28/2010 04:21                     cc
                PM
                                            Subject
                                Comment BLM Resource Management
                                PLAN
```

Dear Bruce,

1 A-PI WSR

like to comment on the plan that you are developing for the future priorities for the BLM UFO.

Overall, we would ask you to make sure that all potential wild and scenic river corridors in the area be preserved and that any energy related development in those areas be avoided.  We specifically are referring to the San Miguel River corridor, the Dolores River Basin and to Norwood Canyon.

2 A-PI VRM
3 A-PI NO

In general, we would ask that you place the preservation of views and maintenance of silence as very high priorities for lands managed by the BLM.  ORV and other motorized activities should be strictly monitored and encouraged to operate in specifically defined and limited zones.  All efforts should be made to keep the backcountry in a primitive state.  Any lands that have wilderness characteristics should be preserved and closed to future development of any kind including gas, oil, or mineral exploration.  If there is to be any mining or drilling on BLM lands then these developers must meet all local, state, and federal requirements and activities of these operations must be continually monitored to make sure all regulations are complied with.

4 A-PI TM

you very much for the opportunity to comment.

5 A-PI WSA

6 A-PI ED

Jon & Rosemary Esty

1137 Pleasant Point Drive
Ridgway, CO  81432
970-626-3466

BLM_0081735

IN

| | |
|---|---|
| **From:** | James Graziano |
| **To:** | uformp@blm.gov |
| **Subject:** | Scoping Comments for the UFO RMP |
| **Date:** | Sunday, March 28, 2010 6:04:26 PM |

1 A-PI TT

Krickbaum:

Thank you for the opportunity to comment on the Resource Management Plan for the Uncompahgre Field Office lands.

My wife and I own Monitor Mesa Ranch, which is located on Monitor Mesa in the Dominguez-Escalante National Conservation Area on the Uncompahgre Plateau. We are concerned about the use of the public lands which surround our ranch and, in particular, the proposed construction of additional roads into this area.

2 A-PI TM

We have been the victims of trespassing, poaching of elk on our ranch, and motorize traffic tearing up our access roads. A significant amount of private investment, in the form of grading and addition of gravel, was made in this road in 2001 to make the road more passable. Since then the roads have been rendered impassable during wet weather by motorized vehicles gouging tracks and ruining the drainage. In addition, motorized vehicles have failed to stay on the marked roads and have torn up the under-story vegetation on top of Monitor Mesa and near the Lee Bench Reservoirs.

3 A-PI FW

Furthermore, the Monitor Creek drainage is a sanctuary for resident elk herds as well as bear. Any improved access to the Monitor Creek drainage in the vicinity of Monitor Mesa would destroy this habitat.

We are opposed to improving motorize vehicle access in this area and would prefer to close many side roads in this area and limit the access to areas that have been subject to abuse, including Monitor Mesa as well as our irrigation structures, including the Lee Bench Reservoirs.

4 A-PI TM

Thank you for your consideration of my comments. I appreciate this opportunity to be involved in ...ng management practices that will affect Uncompahgre Field Office managed lands.

If you have questions, please telephone us at (970) 872-3773.

Sincerely,

Jim and Lynn Graziano
Hotchkiss, CO


James Graziano
PO Box 8
31738 Hwy 92
Hotchkiss, CO 81419

IN

**To:** uformp@blm.gov
**Cc:** bruce_krickbaum@blm.gov
**Subject:** resource management plan
**Date:** Sunday, March 28, 2010 8:50:48 AM

1 A-PI REC

Please enter my comments with regards to the Resource management plan. Non motorized quiet use of these areas is preferred.

1.small parcel of land on the east side of Highway 550 and
north of Cutler Creek. My kids have both used this area for rock climbing and it is quite unique geologically.

2 A-PI REC

2.parcel across Highway 550 from the State Park.It is already being used for mountain biking and as a councilman in Ridgway I know that it brings many recreationists. There is a slight problem with Bike/ Horse encounters but that can be worked out with proper signage.

2.McKenzie Butte.          3 A-PI REC

4.Chaffee Creek drainage.      4 A-PI REC

The following areas should be managed as WSA's and preserved as quiet use
1.BLM land immediately adjacent to Canyon Wilderness.
2.Adobe Badlands north east of Delta.
3.Norwood Canyon.                                5 A-PI WSA
4.Roubideau (Camel Back).
5.Potter Canyon/Monitor Creek.
6.The Dolores River Basin

The following areas adjacent to The Tabeguache SMA should be added to the SMA.
Shavano, Campbell, and Burro Creek drainages north of the Tabeguache.
Please consider that any lands with wilderness characteristics should be managed in such a way to preserve those characteristics.
Thank you for your consideration
Paul Hebert

6 A-PI SDA          7 A-PI WSA

BLM_0081737

IN

| | |
|---|---|
| **From:** | Johnholirah |
| **To:** | bruce_krickbaum@blm.gov; uformp@blm.gov |
| **Subject:** | comments |
| **Date:** | Sunday, March 28, 2010 10:17:14 AM |

I forgot to put my name at the end of my letter.

-------- Original Message --------
**Subject:** comments
  **Date:** Sun, 28 Mar 2010 10:12:33 -0600
  **From:** Johnhollrah <johnhollrah@ouraynet.com>
    **To:** bruce_krickbaum@blm.gov, uformp@blm.gov

1 A-PI FW

```
I would like to support any of your efforts that would maintain the
natural habitat of the BLM areas under review.  I think the unfragmented
habitat and ecosystem are important for the wildlife, as well as human
enjoyment.  I say this because just about everyone I know prefers a
quiet soundscape of the remote back-country.  As such, it would be a good
idea to lessen or not increase the use of motorized vehicles.

John Hollrah
3219 Pleasant Point
Ridgway, CO 81432
```

2 A-PI TM

BLM_0081738

IN

| | |
|---|---|
| **From:** | Julia Johnson |
| **To:** | uformp@blm.gov; "bruce Knickbaum"@blm.gov |
| **Subject:** | BLM Uncompahgre RMP |
| **Date:** | Sunday, March 28, 2010 7:46:21 AM |

To Whom it May Concern:

1 A-PI REC

In regard to the BLM Uncompahgre RMP I would like you to consider the following:

I moved to Ridgway because of the magnitude of opportunities for hiking, biking, skiing and enjoying the wildlife that still exists across these magnificent surrounding areas.  Already in the short time that I have been here, three years,  I have seen far less wildlife and more and more motorized vehicles.  This would lead one to conclude that the motorized vehicles need to have their specific areas of use, both summer and winter. I have pasted below two paragraphs written by another concerned citizen which I whole heartedly agree with. LISTEN TO THE PEOPLE your decisions will affect the most, those who live here both human and animal.  Please don't follow Obama's plan to do what he wants and thinks is right.

Someone else has written:
Lands with wilderness characteristics should be closed to motorized and mechanized use. Those lands, as well as potential wild and scenic river corridors, should be closed to all forms of energy development and transmission. Protecting these lands has the added benefit of helping protect wildlife habitat, cultural resources, and mitigating the impacts of climate change.

Manage for the natural soundscapes in the Uncompahgre RMP, crafting a travel plan that incorporates sound management in backcountry, primitive recreation settings. The RMP should include a soundscape policy that acknowledges the impact of off-road vehicle and other noise on wildlife and Quiet Users. The policy should confine noisy uses to selected portions of the field office. Off-road vehicles should be restricted to areas where they will have minimal impacts on wildlife habitat, quiet users and the quiet solitude of BLM back-country. Institute a policy that designated ORVs routes remain open subject to compliance.. If resource damage and off-route use can not be controlled these routes would be closed.

Again, I wholeheartedly agree.

Thank you,

Julia Johnson
13042 Co. Road One
Ridgway, Colorado

BLM Uncompahgre Field Office
Attn: Bruce Krickbaum
Re: RMP Scoping comments

Dear Bruce,
Thank you for the opportunity to comment on the RMP revision.  I have lived adjacent to BLM land for the past 37 years and have participated in land use planning intermittently for most of that time. I have taken the liberty of not using the scoping form from your web site. I hope this is not an inconvenience, but my comments probably make more sense in the format below.  Please add them to my previously submitted comments.

ISSUES and CONCERNS

1. My domestic water source is from springs on BLM land, Sec 4, 14S,92W. My concern is that oil& gas drilling (or any other mineral extraction) on the south flank of Grand Mesa might contaminate these springs.  Ideally, I would like to see a withdrawal of these lands from mineral leasing and development.  If this is not possible, then extraction activities should be located as far as possible, but at the minimum one mile,  from these and other domestic water sources.  Similarly, my irrigation water for my organic farm originates in the headwaters of the North Fork of the Gunnison where oil & gas activity is increasing.  In the early 1980's an "oil slick" was observed on the water in the Paonia Reservoir.  This was at a time when a gas well was active just upstream on the bank of Muddy Creek.  This is precisely the scenario that needs to be avoided by whatever means necessary.

2.  Part of my land and that of neighbors adjoins BLM land.  The 1979 RMP referred to the need for BLM to fence the southern border between BLM and private land to prevent livestock trespass, which is a perennial problem.  When queried about this, then Range Con officer Jim Sasma said there were no funds available to accomplish this goal.  I would like to propose a joint project, perhaps using solar-powered electric fence along this boundary, with cost and maintenance shared by private landowners, the permitee (Jim Patterson), and BLM.

3. Another problem of BLM grazing allotments  is that livestock are damaging riparian areas, specifically, in Jay Creek and Love Gulch.  I'm not sure what can be done about this, short of temporary fencing which also has

BLM_0081740

drawbacks, but would like to discuss with BLM and see alternatives in the RMP.

4.  ATV travel on BLM lands in the area from Jay Creek east past Love Gulch and north onto Oak Mesa needs to be confined to marked routes.  It appears from your website "Route Map" that  there are no routes in this area.  When I try to access the "Existing Road Inventory" maps, I get a message that the requested URL was not found on this server.   I recall seeing a map at the Hotchkiss scoping open house showing this area to have  travel restriction, but do not recall if restriction was to existing routes or designated routes.  At any rate, every year, especially during hunting seasons, there are ATVs in the area, some of which trespass onto private lands.  I believe resource damage is occurring from these vehicles in the form of soil erosion, compaction and rutting when soil is wet and spreading of noxious weeds.  The above mentioned fencing project might help with the trespass situation.  I believe off-road vehicle use on all BLM lands should be restricted to existing or designated routes, though I see no way for adequate enforcement given existing funding levels.

5.  Please continue to manage wilderness study areas as such and maintain them as suitable for inclusion as Wilderness Areas.  However, I question some of the wilderness characteristics of Adobe Badlands because of the noise from air and auto traffic.

6.  I believe all Areas of Critical Environmental concern should be afforded continued protection.  There are probably other areas that should be identified as ACEC,  but I have not yet found the time to locate the them.

7.  Minerals.   There should be no new coal leases unless the land is adjacent to an existing active coal lease.  Capture of methane from coal mines should be strongly encouraged, perhaps as a stipulation of coal leases.
    There should be no leasing of minerals or oil and gas in inventoried roadless areas, nor should roads be allowed to access such on existing leases.
    Uranium mining should not occur near domestic or irrigation water sources or near any flowing or subsurface water.

Thanks again for your consideration of these comments.

Robin Nicholoff
36295 Sunshine Mesa Road, Hotchkiss, Co 81419      robgret@tds.net

BLM_0081742

Ridgway-Ouray Community Council
Air and Water Committee
P.O. Box 1077
Ridgway, CO 81432

BLM Uncompahgre RMP
2465 So. Townsend Ave.
Montrose, CO 81401

Dear BLM RMP Planning Team:

The members composing the ROCC Air and Water Committee are all avid outdoors oriented. We hike, fish, boat, x-country ski, 4-wheel, and generally spend much of our free time recreating in the large area under consideration for a new and revised Resource Management Plan.

A focus for our group these past years has been the health of our Uncompahgre watershed, its tributaries, and the riparian areas with their wildlife. We are familiar with the 35 segments on 23 rivers that the BLM has inventoried for Wild and Scenic eligibility status and we are in full support that all 35 segments qualify. All 35 segments deserve to be evaluated for suitability status. Each segment possesses one or more outstandingly remarkable values including riparian habitat, important native plants, seasonal range for wildlife, characteristics for watershed health, and more.

When looking at the size of the BLM area, these 35 segments constitute a relatively small portion of our waterways. But only with the additional protection that these segments deserve, can we add to the health of our watershed. We urge that all 35 segments be evaluated for suitability status in the next phase of your RMP. As stakeholders, we would be pleased to help with analyzing various management prescriptions and the positive and negative impacts of various designations for each segment. In this manner we hope to be part of a process to consider potential impacts to other values such as water supply.

Thank you.
Sincerely,

Rein van West
Chair, ROCC Air and Water Committee

BLM_0081743

IN

| | |
|---|---|
| **From:** | Barbara_Sharrow@blm.gov |
| **To:** | uformp@blm.gov |
| **Subject:** | Fw: BLM Uncompahgre RMP |
| **Date:** | Tuesday, March 30, 2010 8:54:30 AM |

Barbara Sharrow
Uncompahgre Field Office Manager

970-240-5315 - office
970-596-1515 - cell

----- Forwarded by Barbara Sharrow/MOFO/CO/BLM/DOI on 03/30/2010 08:54 AM
-----

>           "Marv Ballantyne"
>           <marv@blackcanyon
>           appraisal.com>                        To
>                         <Barbara_Sharrow@blm.gov>
>           03/30/2010 12:35                       cc
>           AM
>                                   Subject
>                     FW: BLM Uncompahgre RMP

I sent this to Bruce Krickbaum, then received a reply that he is out of the
office.

Marv Ballantyne
970-249-1346
marv@blackcanyonappraisal.com
-----Original Message-----
From: Marv Ballantyne [mailto:marv@blackcanyonappraisal.com]
Sent: Monday, March 29, 2010 9:22 PM
To: 'bruce_krickbaum@blm.gov'
Subject: BLM Uncompahgre RMP

1 A-PI TM

Sorry for brief comments, but time has gone too quickly.

I'd love it if you could find a way to protect the old Camelback WSA from
motorized and mechanized traffic, including Potter Canyon and Monitor
Canyon.  I don't mind the cows because they are only there occasionally and
are relatively quiet. This area is so convenient to Montrose and Delta, and
is quite beautiful. It also provides an opportunity for hiking in early
spring, late fall, and even winter, when other places are too cold or
inaccessible. With an aging and increasing population, we need more nearby
places for hikers that are easy to access, are attractive and provide
quietness and solitude.

Keep up the good work.

Marv Ballantyne
970-249-1346
marv@blackcanyonappraisal.com

BLM_0081745

ORG



"Preserving Our Natural Resources FOR The Public Instead of FROM The Public"
4555 Burley Drive, Suite A • Pocatello, ID • 83202-1921 • 1-800-258-3742
www.sharetrails.org

BLM, Uncompahgre Field Office
Bruce Krickbaum, Project Manager
Uncompahgre RMP
2465 S Townsend Ave
Montrose, CO 81401
uformp@blm.gov

SENT VIA U.S. AND ELECTRONIC MAIL                    March 29, 2010

RE: Scoping Comments on Uncompahgre Field Office Resource Management Plans (RMP) Revision

Dear Project Manager Krickbaum,

The BlueRibbon Coalition (BRC) is a nationwide organization representing 600,000 motorized recreationists, equestrians, mountain bike enthusiasts and resource users.  We work with land managers to provide recreation opportunities, preserve resources and promote cooperation with other public land users.

Many of our members and supporters live in and/or recreate in Colorado and use motorized vehicles, including off highway vehicles, to access Forest Service managed lands throughout Colorado, including the Uncompahgre Field Office planning area. In addition to access travel itself, BRC members visit the lands mentioned herein for motorized recreation, sightseeing, photography, rockhounding, hunting, wildlife and nature study, camping and other similar pursuits.  BlueRibbon's members and supporter have concrete, definite and immediate plans to continue such activities in the future.

Our members and supporters are interested in and will be directly affected by the revision of the UFO Resource Management Plan. Please incorporate these comments into the record and carefully consider our suggestions.

**A. General Comments:**

1 A-PI REC

1. General Comment:
We briefly polled a few of our members who regularly visit the UFO who live in the Grand Junction, Delta and Montrose areas and they were very specific insofar as what they would like to see in a new Land Use Plan: ***More Single Track Trails (motorized and mountain bike)!!  More ATV trails!! More 4x4 trails!! More Rock Crawling Trails!!***

(They asked me to make that point with BRC's characteristic gusto, so that you folks on the planning team would incorporate this important comment into the decision making process.)

**2 A-PI REC**

2. There is an increasing demand for OHV recreation opportunities:
Clearly, there is an increasing demand for OHV recreation opportunities on public lands and National Forests. BLM's OHV Strategy states, "Motorized off-highway vehicle use on public lands administered by the Bureau of Land Management (BLM) has increased substantially in recent years.  ...  Some of [the factors contributing to growing OHV popularity] are:

- greater public interest in unconfined outdoor recreational opportunities
- rising disposable income ...
- advances in vehicle technology
- the rapid growth of the West's cities and suburbs ...
- a population with an increasing median age with changing outdoor recreational interests

This [growing OHV] popularity is evidenced by the fact that recreational enthusiasts are buying OHVs at the rate of 1,500 units per day nationwide, with nearly one-third of them doing so as first-time buyers."  National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands, U.S. Department of Interior Bureau of Land Management, January 21, 2001, p. 1-2.  "[BLM's OHV] Strategy recognizes, as does policy outlined in BLM Manual 8340 (May 25, 1982), that off-road vehicle use is an 'acceptable use of public land wherever it is compatible with established resource management objectives.'  As established by the Federal Land Policy and Management Act of 1976 (FLPMA), the BLM is required to manage public lands on the basis of multiple-use and sustained yield, while protecting natural values. ... Motorized OHV use is now firmly established as a major recreational activity on BLM-administered public lands."  National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands, U.S. Department of Interior Bureau of Land Management, January 21, 2001, p. 2-3.

At least one Alternative should seek to meet the need to provide for increase motorized recreation experience.

**3 A-PI REC**

3. BLM should take into account the substantial, already existing, non-motorized opportunities:
BLM planning should take into account the substantial already existing non-motorized opportunities in balancing the input from conservation groups who desire that motorized recreation be drastically reduced.  BLM should also take this into consideration when/if the consideration of minimizing recreation conflict is addressed in the revised RMP.

BLM must recognize the abundant opportunities already present for "non-motorized" solitude. Wilderness advocacy groups often assert that there are conflicts in values anywhere and everywhere that involve OHV access.  But BLM must balance the many venues presently available for wilderness experiences and the limited numbers of people who recreate in wilderness areas.  The relative minority cannot be allowed to destroy the recreational opportunities of the majority, especially where they already have abundant non-motorized recreational opportunities.

The Planning Team will, no doubt, get many letters from members of Wilderness advocacy groups indicating the overwhelming need for a non-motorized recreational experience. When considering the input of people who desire an experience away from those who use vehicles for recreational access, the Planning Team must consider the already abundant recreational opportunity available to those persons both within and adjacent to the planning area.

**4 A-PI REC**

All of the Alternatives should focus on educational opportunities to eliminate, minimize or reduce user conflict. The Planning Team should consider management alternatives with a strong public land user educational component.

**5 A-PI TM**

4. BLM planning must recognize and address the need for the "Open" designation where appropriate.

There are areas that have long been used for cross-country OHV activities with no adverse environmental impacts. Chief among these are: some "play areas," sand dunes, mancos shale hill climb areas, and other areas with little or no vegetation. Some open areas are recognized for their high OHV popularity and should be kept available for those who value this type of recreation.

Other examples of valued "open" designated areas are staging areas that provide recreationists to gather before and after traveling on OHV trails. "Tot Lots" where children and young adults can recreate with their friends in an area close to parental supervision are highly valued. Some OHV events, such as trials competitions, require the "open" designation to be viable. Staging areas for competitive and other commercial events are another example.

**6 A-PI TM**

The Planning Team is cautioned not to segregate users who value the "open" designation into smaller and smaller areas. Crowding users who require the "open" areas can increase safety risks to the public as increasing numbers of OHV enthusiasts are compacted into ever-smaller areas.

**7 A-PI REC**

The Planning Team should look for management alternatives that provide for mitigation and management of these "staging areas" or "Tot Lots" instead of closure.

**8 A-PI REC**

The Planning Team should seek input from county and local governments, individuals and OHV clubs for input on where popular play areas are located and how they could be better managed.

**9 A-PI REC**

5. BRC emphasizes the need to provide for trials motorcycle and 4x4 rockcrawling opportunities in the new RMP. Trials motorcycling and rockcrawling are very popular in the area. There are many areas in the UFO where providing this type of use can be provided in a sustainable and manageable manner.

**10 A-PI REC**

6. Permitted and Competitive events should be planned for in the RMP.

In anticipation of Special Recreation Permit requirements for organized recreation activities as well as to streamline the permitting process for mountain bike events and off highway motorcycle races, BRC suggests the UFO consider developing an Alternative that would evaluate certain routes/areas for competitive and permitted events.

**11 A-PI TM**

It would provide a public benefit to all trail users, both motorized and non-motorized, to approve routes for permitted events in the programmatic travel planning process. We also believe this would benefit the agency by helping to reduce the future workload when processing permit applications.

**12 A-PI TM**

7. Need for "point-to-point" recreation opportunity.

Long distance, "point-to-point" recreation is becoming increasingly popular with motorized and mountain bike enthusiasts. The UFO is a key hub for this type of recreation. Several routes exist between Loma and Moab, between Fruita and De Beque and between Clifton and Delta are becoming quite popular. BRC strongly encourages the plan to acknowledge this need and direct activity planning to meet the current and future need.

**13 A-PI TM**

8. Need for connecting existing routes and areas in the UFO and adjacent offices.
Similar to the concern mentioned above, BRC encourages the agency not to "land lock" trails or areas. Long term planning that allows, or at least does not restrict, connecting recreation opportunities within the UFO and beyond should be considered.

**14 A-PI REC**

9. There is a need to provide for commercial motorized tour operators.
Yet another popular activity that is expected to grow, motorcycle and ATV tour operators provide a needed service and economic benefit to adjacent communities. Similar to our recommendations regarding permitted and competitive events, we strongly encourage the BLM to consider evaluating commercial activities, as much as possible, within the programmatic land use plan, thereby streamlining the permitting process and reducing staff workload.

**15 A-PI REC**

**B. BRC emphasizes the need to follow through on existing activity plans**
BRC appreciates the efforts made to implement the existing UFO RMP over the years. All too often, BLM planning seems to be an academic exercise, with little site-specific implementation resulting from the plans.

Where possible, the BLM should consider the RMP revision an opportunity to expedite the implementation of the existing recreation activity plans.

**16 A-PI TM**

**C. BLM should develop a wide range of Alternatives responding to Issues raised by the public.**
BRC supports active recreation management on all public lands and National Forests. Insofar as active management of OHV use, the OHV community generally supports the "travel limited to designated roads, trails and areas" paradigm. The OHV community also supports the need to revise Land Use Plans in response to changing conditions. And the OHV community also understands that not every area is appropriate for OHV use, and areas need to be provided for non-motorized and primitive recreation opportunity.

**17 A-GE**     **18 A-PI REC**

**19 A-PI REC**

What we do not support is being presented with a "range" of management alternatives which all represent a significant reduction in OHV and other recreation opportunity.

NEPA imposes a mandatory procedural duty on federal agencies to consider a reasonable range of alternatives or preferred alternatives analyzed during a NEPA process. 40 C.F.R. § 1502.14; 40 C.F.R. § 1508.9. "[A]gencies shall rigorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14. The alternatives section is considered the "heart" of the NEPA document. 40 C.F.R. § 1502-14 (discussing requirement in EIS context).

There is a need for, and BRC strongly encourages the UFO to develop, an Alternative that focuses on providing a wide range of diverse recreation opportunity, including an Alternative that provides a wide range of diverse opportunity for motorized and mountain bike enthusiasts.

**20 A-GE**

**D. A word about planning criteria and planning issues**
We understand that this is water under the bridge, but the public would benefit by more detailed discussion regarding the difference between a planning criteria and planning issue in the scoping materials.

**E. BLM should not allow redundant planning issues and planning criteria narrow the range of Alternatives and/or diminish the agency's multiple-use/sustained yield mandate.**

**21 A-GE**

Our understanding is that a planning issue is a matter of controversy or dispute over resource management activities or land use that is well defined and entails alternatives among which to choose. Planning issues may be a concern expressed by the public, state/local government or other stakeholder, and may include concerns about potential serious deterioration of public land, significant impacts or conflict, or uses that may not be in the best public interest. Planning criteria are different, usually described as "sideboards" or parameters established by laws, regulation, policy or other planning guidance.

When examining the UFO's preliminary planning issues and planning criteria we find quite a few of them are redundant.  For example, management of native species and protecting cultural and historic resources are directed by existing law, regulation and other planning guidance. The UFO has properly identified the relevant regulations in the planning criteria that address these "issues.". In reality, there are really very few, if any, alternatives from which to choose. Controversy over the management of these issues is moot, at least insofar as the development of the RMP.

The concern our members have is that redundant planning issues and criteria serve to diminish the focus on the agency's multiple-use and sustained yield mandate, and, perhaps more importantly, unlawfully narrow the range of Alternatives.

FLPMA Sec. 202, particularly subsection (c)(1) that specifically requires development and revision of land use plans on the basis of "principles of multiple-use and sustained yield." FLPMA section 102(a)(7) also specifically requires that "goals and objectives be established by law as guidelines for public land use planning, and that management be on the basis of multiple-use and sustained yield unless otherwise specified by law."

43 C.F.R. 1601.0-8 provides, "The development, approval, maintenance, amendment and revision of resource management plans will provide for public involvement and shall be consistent with section 202 of the Federal Land Policy and Management Act of 1976. …"

43 C.F.R. 1610.4-4 states, "The analysis of the management situation shall provide, consistent with multiple-use principles, the basis for formulating reasonable alternatives, including the types of resources for development or protection."  43 C.F.R. 1610.4-5 states: "All reasonable resource management alternatives shall be considered and several complete alternatives developed for detailed study. …"

We know we are droning on a bit here, but we hope the planning team will not let multiple, redundant planning issues and criteria stop them from developing alternatives which embrace the multiple-use sustained yield mandate place upon the Bureau by Congress.

**22 A-GE**

**F. Suggested planning issues**
BRC requests that the UFO consider the following as formal Planning Issues and encourages the BLM to incorporate them into the planning and develop appropriate alternatives addressing each.

**Issue 1:**
Concern over the diminished role the multiple-use sustained yield mandate over current land use plans. [1]

---

1 Important note: Our suggested issue number 1 is based on the assumption that the agency will not amend any of its preliminary planning issues pursuant to our comment in Section E above.

The agency, as well as numerous academic studies have documented the controversy over multiple-use sustained yield mandate and society's increasing value of conservation and preservation of public lands.

In addition, over the last two or three decades, a lot of land has been removed from multiple-use management via land use planning and legislation. Like the amount of routes available for motorized uses, the of lands under true multiple-use management has reached a critical mass. Every single acre that is removed from multiple-use management is extremely important.

And as noted above, many of the preliminary planning issues and planning criteria are redundant and will server to further diminish the agency's multiple-use sustained yield mandate.

We request "The Diminished Role of Multiple-use Sustained Yield Management" be identified as a planning issue and brought forward for analysis. The BLM should briefly discuss the role of multiple-use sustained yield had in the passage of The FLPMA, and its importance to states that are "blessed" with huge amounts of federally managed lands.

In response to this issue, at least one Alternative should seek to enhance multiple-use sustained yield management across the planning area.

23 A-PI REC

**Issue 2:**
Cumulative loss of OHV recreational opportunity

The cumulative loss of OHV related recreational opportunity is a significant issue that should be incorporated into the analysis and into the decision making process. NEPA requires federal agencies to properly analyze the direct, indirect, and cumulative effects of the proposed action. 40 C.F.R. § 1508.8. Cumulative effects include "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably-foreseeable future actions….". 40 C.F.R. § 1508.7.

In NEPA, the term "environment" includes the "human environment" which "shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14. Thus, the agency's duty to analyze impacts does not end with impacts to the physical environment, but includes all of the effects on the human environment, including the effects by vehicle-assisted visitors.

Discussion:
BRC emphasizes the need to provide sustainable travel routes for motorized recreation. This need has resulted from both an increase in the popularity of OHV use and the elimination of OHV opportunities in the area. It is necessary to develop an Alternative that will focus on the designation and development of motorized trails in the UFO.

Motorized recreational opportunity has been and will be drastically reduced throughout the region. Travel management plans on adjacent BLM and National Forest lands have reduced opportunity for motorized recreationists, while at the same time provided additional opportunity for those who prefer a non-motorized experience. Future restrictions, including road and trail closures pursuant to the recently finalized Moab District Office RMP and Travel Plan, as well as adjacent USFS offices in Colorado, will amplify this situation.

It should be noted, and incorporated into the decision-making process, the fact that in recent years much in the way of world class recreational opportunity has been provided for non-motorized public lands visitors. Here are just a few examples:
- ✓ Changes made to Travel Management resulted in the loss of traditional motorized access in order to provide for an increase in popularity of non-motorized recreation.
- ✓ There is a new National Conservation Area with a new management plan.
- ✓ There is a new designated Wilderness Area.
- ✓ New non-motorized emphasis areas near Fruita via the 21 Road route designation plan.
- ✓ New mountain bike trails across the UFO, including the planning area.

The amount of motorized route and area closures has reached a critical mass. Every single mile of motorized route that is open today is extremely important. Further closures will have a larger impact than those in the past.

## F. Comments on identified planning issues
We have a few comments on potential planning issues identified in BLM's Notice of Intent.

24 A-GE

Regarding:
- • Managing vegetative and water resources, terrestrial and aquatic habitat and special management areas, while sustaining biological diversity and native species populations;
- • Managing mineral, renewable and nonrenewable energy resources;
- • Managing and protecting cultural, historical and paleontological resources and Native American religious concerns;

All of the "issues" above are already addressed withing the agency's planning criteria (law, regulation and other planning guidance). Inclusion of these issues only serve to provide "another bite at the apple" for preservationist interests who are unhappy with the BLM's lawful multiple-use sustained yield mandate. These "issues" should be removed.

Regarding:

25 A-PI REC

• Managing land tenure adjustments, withdrawals and utility/energy corridors;
No comment at this time.

Regarding:
- • Managing public lands and resources, including authorized and permitted land uses, for a growing population and expanding urban interface, with consideration for community values and needs.
- • Managing increasing numbers and types of human activities and uses;

In increased population and development adjacent to the planning area and the controversy over how the agency should respond make these excellent planning issues.

We aren't clear as to what exactly the distinction between the two issues are, so it seems logical to recommend the planning team put a bit of effort into better descriptions, or if warranted, combining the two issues.

Like every good planning issue, these come with classic "opportunities and constraints." From the perspective of BRC's members and supporters, regional population growth increase the importance of recreational uses on adjacent public lands. Population growth increases the need to provide a diverse range of recreational opportunities.

BRC's members also understand and support the need to increase management when the adjacent communities are growing. We note that the vast majority of our members supported the recent travel management activities in the UFO, even though they reduced our opportunity for access and recreation.

This has resulted in an interesting conflict. Increased population has increased the need to provide motorized recreation – recent planning process significantly reduced recreation. What to do?

In response, we formally request that at least one Alternative should seek to enhance a diverse range of outdoor recreation opportunities in response to this issue.

26 A-GE

**G. Comment regarding one of the Planning Criteria:**
Regarding:
• Inclusion of adaptive management criteria to deal with future issues.

The public would benefit from a clear understanding of what adaptive management is, and how the criteria is applied, and what changes they may require insofar as future management decisions.

27 A-PI ED

**H. Energy and minerals management.**
BRC supports reasonable development of our natural resources including minerals and oil and gas.

Generally, there is support among our members and supporters for development mineral resources and of oil and gas resources in the planning area. There is a high degree of confidence in BLM's ability to regulate this activity so that it is both economically feasible and environmentally sound.

A significant percentage of our members live in rural areas of Utah and Colorado. The jobs associated with oil and gas development are highly valued. Indeed, many of our members make their living either directly involved in the oil and gas business, or in related "service" businesses.

Oil and gas development has important social and economic benefits at the national and state level as well. These benefits are reduced or eliminated when natural gas and oil development is prohibited or severely restricted.

BRC believes that oil and gas development are compatible with semi-primitive recreational values and opportunities. We have seen where the oil and gas industry operates with little or no impacts on other resource values.  There is a relatively high tolerance for oil and gas activities among those who enjoy OHV recreation. We do not support a no-lease or no-surface-occupancy stipulation for areas allocated to semi-primitive recreation.

28 A-GE

The BLM has a Congressionally-mandated multiple-use mission, which must be upheld and not compromised by the single-use land management objectives promoted by certain interest groups.

29 A-PI SE

A comprehensive analysis of the socio-economic benefits of natural gas and oil development activities in the area should be included in the analysis.

It may seem counter-intuitive to BLM's planning team, but oil and gas development on public lands actually *improves* the environment in numerous ways. Royalty revenues from oil and gas development underwrite the conservation of wildlife habitat, national parks, refuges and recreation areas.  In fact, the oil, natural gas and mineral programs fund virtually all of the conservation and preservation work of the Department of Interior! The analysis of alternative must include a comprehensive analysis of the **benefits** of oil and gas development.

31 A-PI WSA

**I. Inventory and management for "lands with wilderness character."**

Many stakeholders believe BLM should embed a ongoing inventory and protection of lands with wilderness characteristics. Unlike the US Forest Service, where direction from Congress provides the direction to inventory for wilderness during the revision of each Land Use Plan, this is a very controversial idea for BLM lands.

32 A-PI WSA

Based on an assumption that some stakeholders will encourage the UFO to inventory its lands for wilderness characteristics via this planning effort, we would like to provide the following comments:

1. Comment: Congress gave very specific instructions to the BLM regarding Wilderness.
Those instructions are contained in Section 603 of FLPMA. Congress instructed the agency to inventory all of their lands, identify which were definitely not of wilderness quality and then to begin an intensive inventory and analysis to determine which of the remaining lands would be recommended for inclusion into the National Wilderness Preservation System.

The process was completed in 1991. All stakeholders (including Wilderness Advocacy Groups) have exhausted the protest and appeal options. After 10 years the "603 Process" left Utah with approximately 3.2 million acres designated as Wilderness Study Areas. Of those, approximately 1.9 million acres were deemed "suitable and manageable" and were recommended to Congress for Wilderness designation. Section 603 requires the BLM to manage WSAs in such a manner so as to not impair the suitability of such areas for preservation as Wilderness, subject to existing uses.

There is no justification, no mandate in FLPMA and no process requirement for engaging in an ongoing wilderness inventory and review.  Once the "603 Process" was completed, the agency is done. The question of which lands should be included in the National Wilderness Preservation System is now between Congress and the American People. Other than the management of existing WSAs, the BLM should have no part in this issue. To do so is a tragic loss of management resources.

33 A-PI WSA

2. Comments regarding the potential utilization of the the 1999 Preliminary Wilderness Character Inventory Evaluation.
The BLM may attempt to utilize the 1999 Inventory in this RMP revision. BRC advises caution. The lack of public involvement in formulating the inventory criteria as well as lack of public involvement in the inventory itself, has produced a flawed result. Please see comments below.

34 A-PI WSA

a. It is improper to make decisions based upon an inventory for a single resource value.
BRC acknowledges that the agency can inventory to its heart's delight. This includes inventorying for resources or values associated with Wilderness. Our concern is how the inventory will be used in the decision making process for the Bangs Canyon Implementation Plan.

Whenever making any land use planning decisions, the agency must comply with its congressional mandate to inventory for the "global" range of resources. The agency must not make decisions based on incomplete inventories, or inventories based on a single resource value.

Making a decision to manage an area in a primitive recreation class because the area has been identified to have "Wilderness Character" via the 1999 Inventory is no less appropriate than making a decision to implement a full field development for oil and gas based solely on inventories for mineral and oil and gas resources.

It is improper to make decisions based upon an inventory for a single resource value, in this case 'Wilderness character'. Section 201 directs the Secretary to:

> "*prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern*."

It is clear from this language that all resource and other values on the public lands were to be part of a single inventory. When planning, there is no authorization for the agency to engage in inventories for a small segment (Wilderness) of only part of the spectrum of "resources and other values" (recreation). It is clear from the parenthetical phrase inserted in this section by Congress that Congress wanted the broadest range of resources and values considered, and listed specifically two among the many which were to be included.

35 A-PI WSA

b. Regarding the lack of public involvement in the 1999 inventory.
One serious concern with utilizing the 1999 Inventory has to do with the lack of public involvement in the development of inventory criteria. These are not merely semantic arguments. These concerns are directly related to the agency's Congressional mandates and obligations to the public when developing management plans.

BRC understands that the criteria used in the 1999 Inventory was identical to the "Utah Wilderness Review Procedures." Those procedures were modeled after the original Wilderness inventory, which had a number of requirements for public and local government involvement. In fact, the 1999 Wilderness review process was so closely modeled after the original one that large parts of the original inventory handbook are reproduced verbatim. Yet the term "public involvement" and similar terms have been purged from the review document.

In fact, although the original Wilderness Inventory Handbook acknowledged the importance of public involvement when inventorying for Wilderness characteristics, the 1999 Wilderness inventory criteria and procedures went out of its way to eliminate public involvement.

The original Wilderness Inventory Handbook (The Wilderness Inventory Handbook formulated for the inventory pursuant to FLPMA § 603, hereafter referred to as the WIH) on page 5 notes that:

> "*The wilderness inventory process requires full public involvement.*" This public involvement "*is particularly important because the criteria in the wilderness inventory process call for judgments that can be highly subjective. In recognition of that fact, the BLM wilderness inventory process will be conducted as openly as possible with the broadest opportunity for input from all concerned, in order to arrive at a sound decision.*"

This is precisely correct, and it's also precisely why the 1999 Inventory is fatally flawed. The agency, when formulating inventory criteria during the original Wilderness inventory, understood

that, unlike inventories for plant and animal species, or oil and gas potential, qualities that make up "Wilderness characteristics" are extremely subjective.

The process had become no less subjective and the task of doing a professional inventory no less difficult in 1999. Full public and intergovernmental comment, review and involvement were every bit as necessary as they were in the first inventory.

The BLM's claim that the only section of FLPMA that applied during their re-inventory for "Wilderness character" was section 201, and therefore these important public involvement provisions do not apply, is clearly wrong. Numerous sections of FLPMA and NEPA require full public involvement and participation of State, Local and Tribal officials.

The lack of public involvement in formulating the criteria for the 1999 Inventory has produced a flawed result.

36 A-PI WSA

**c.** The 1999 inventory criteria and procedures contained significant changes from the original WIH, and should have been open for public review and comment. Changing the criteria and procedures without public involvement resulted in a flawed inventory.

Secretary Babbitt stated that his re-inventory team "is explicitly instructed to apply the same legal criteria that were used in the original inventory." The re-inventory procedures document clearly shows that was not done.

The "Utah Wilderness Review Procedures" adopt some of the guidelines and requirements laid out in the original WIH and the Organic Act Directives (OADs). The Interior Department maintains that the re-inventory procedures are the same as the previous ones, thereby fulfilling Secretary Babbitt's commitment to the Utah's Congressional Delegation that the re-inventory team "is explicitly instructed to apply the same legal criteria that were used in the original inventory" to his re-inventory effort.

However, the "Utah Wilderness Review Procedures" selectively adopts certain paragraphs and sentences from the original documents, and even then often changing their arrangement or dropping and adding sentences. Secretary Babbitt had in fact created in the "Utah Wilderness Review Procedures" a new document without any public involvement or opportunity for review and comment.

A fundamental question should be asked of the BLM: if you were committed to using the same legal criteria as in the original inventory, why did you not use the original Wilderness Inventory Handbook? Why come up with something new?

Looking at the new re-inventory document, there appears to be a simple answer. Secretary Babbitt never intended to do the inventory under the same legal criteria used in the first one. These factors, along with handpicking a re-inventory team led by, and heavily loaded with, BLM bureaucrats who are unabashed Wilderness advocates, underscores yet again that the 1999 Inventory was a purely political exercise. It simply was not designed to result in a useful or accurate review of the land being re-inventoried.

Two Examples:
Two examples, one dealing with "naturalness" and the other dealing with "outstanding opportunities for solitude," illustrate the major deficiencies in the 1999 inventory as a result of changing the criteria and procedure without public review and comment:

BLM_0081756

The WIH and OADs misapplied the Wilderness Act by giving emphasis to appearing natural as opposed to being natural, which was the prerequisite condition in the Wilderness Act. In determining naturalness, the WIH focuses on the requirement that it must be possible to "observe the area as being generally natural," This trend away from the intent of the Act is virtually complete with the "clarification" in OAD number 2, page 4, for field personnel to use in determining naturalness:

> "There is an important difference between an area's natural integrity and its apparent naturalness. Natural integrity refers to the presence of absence of ecosystems that are relatively unaffected by man's activities. Apparent naturalness refers to whether or not an area looks natural to the average visitor who is not familiar with the biological composition of natural ecosystems versus man-affected ecosystems in a given area. As reflected in the handbook, the presence or absence of apparent naturalness (i.e., do the works of man appear to be substantially unnoticeable to the average visitor) is the question the inventory must assess."

The re-inventory document continues the move away from the original intent of the Wilderness Act with one significant change. The re-inventory document rewrites the last sentence:

> "The presence or absence of naturalness (i.e., do the works of humans appear to be substantially unnoticeable to the average visitor?) is the question the Wilderness Act directs the review to assess."

At the stroke of a pen, the re-inventory document redefines the general term "naturalness" (as opposed to "apparent naturalness" in the OAD) to be whether "the works of humans appear to be substantially unnoticeable to the average visitor" and then attempts to make it the sole test the Wilderness Act requires for an area to pass the naturalness test.

This evolution (or more properly devolution) in the standard of what is natural has obvious advantages to those wishing to find Wilderness characteristics where the Wilderness Act standard would recognize none.

The subjective problems with determining "naturalness" pale beside those the BLM inventory procedures create for determining whether an area has the required "outstanding opportunities for solitude or a primitive and unconfined type of recreation" as the Wilderness Act requires.

By its nature, the determination of "outstanding" requires some type of comparison. The WIH defines the term "outstanding" as "standing out among others of its kind; conspicuous; prominent; superior to others of its kind; distinguished; excellent."
Yet the Utah review document specifically prohibits comparing areas.
Page 6, 3 (b) of the re-inventory procedures document states:

> Each review unit must be assessed on its own merits as to whether an outstanding opportunity exists; there must be no comparison among units. It is not permissible to use any type of rating system or scale--whether numerical, alphabetical, or qualitative (i.e., high-medium-low)--in making the assessment. Good judgment must be used in determining that outstanding opportunities either do or do not exist in each unit. This is a subjective determination and should be made only after a careful assessment of a unit.

So, in total contradiction of the clear intent of the Wilderness Act, which defines Wilderness as "an area of undeveloped federal land...which...has outstanding opportunities for solitude or a primitive and unconfined type of recreation," the BLM manuals specifically prohibit the comparisons which are the only way to determine if an area truly does offer outstanding opportunities!

BLM_0081757

On p. 5 of the re-inventory document in the section dealing with "naturalness," paragraphs 2 (a) (1) and (2) are reproduced almost word for word. In the original WIH, however, there was a paragraph between these two:

> *Those parts of the inventory unit where the imprint of man's work is substantially noticeable will be eliminated unless the area meets all the other qualifications required and could, under certain conditions, be returned to a natural state. This instance is described later on in these procedures.*

The first sentence in the next paragraph in the WIH reads: "Therefore, to qualify as Wilderness, an area may include some imprints of man's work provided they are substantially unnoticeable."

The re-inventory document presents this sentence as: *"An area may include some human impacts provided they are substantially unnoticeable in the unit as a whole."* Note the addition of the phrase "in the unit as a whole." The closest thing to that in the previous inventory document is a sentence in OAD 2, page 5: *"Minor imprints of man must be evaluated as to whether individually they are substantially unnoticeable in the overall unit."* The sentence, which followed in the OAD, was also omitted from the re-inventory document. However, it offers additional guidance which was used on the first inventory and which unquestionably would make a difference in evaluating an area depending on whether it was part of the re-inventory directive or not. It states: *"Such minor impacts must also be evaluated as to their cumulative affect on an overall unit, both in connection with major impacts or by themselves."*

Clearly, the re-inventory document has a much lower threshold for what qualifies as "natural" than the one applied in the original inventory.

A similar situation is the exclusion of two key paragraphs in the WIH. The re-inventory document reproduces the intent of this paragraph from page 13 of the WIH nearly word for word when it states:

> *Human impacts outside the review unit will not normally be considered in assessing naturalness of a unit. However, if an outside impact of major significance exists, it should be noted in the overall unit description and evaluated for its direct affects on the review unit. Human impacts outside the area should not automatically lead to a conclusion that a review unit lacks wilderness characteristics.*

However, the WIH continues with the following two paragraphs:

> *The number, size and distribution of the imprints of man's work to the overall size of the unit should be considered in making the final naturalness determination. For example, in larger roadless areas, more or greater impacts may be more acceptable than in smaller areas.*
>
> *After all impacts are considered, a determination must be made as to whether their overall impact on the landscape is or is not substantially unnoticeable. Photographs supporting impact descriptions and evaluations will be beneficial.*

The significance of omitting the first of these two paragraphs is that it clearly introduces a "dilution component" to the Wilderness inventory. It states that the size of the unit is a key factor in determining the significance of a human imprint to the over all unit. The corollary is that the outstandingness of an area in terms of offering opportunities for solitude and a primitive and unconfined recreation is also affected by the size of the area, as outlined in the example of the 900 acres of outstanding land in a 1000 acre unit and 100,000 acre unit explained above.

Another example occurs in the re-inventory document on page 8 at 4 (C). The first sentence is taken almost word for word from OAD 2, page 5. It reads in the re-inventory document: "Where

BLM_0081758

substantially noticeable human caused impacts occur within a review unit, reviewers should consider the opportunity to adjust the unit boundary to exclude the human impacts." The OAD goes on to direct that: "Major imprints of man which are substantially noticeable should not be carried forward as part of an inventory unit receiving further Wilderness review." This sentence was dropped from the re-inventory document.

37 A-GE

**J. Data Quality Act**
BLM's preliminary issues are deficient in excluding consideration of the Data Quality Act, Section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001, and related Department of Interior Information Quality Guidelines and BLM Information Quality Guidelines.

The DOI guidelines provide at II.5 that during public comment procedures, requests for correction will be considered and provide at III.4 that a request for correction not made during the draft stage may be considered "to have no merit" if the bureau or office determines that the requester had the opportunity to comment … BLM's Preliminary Planning Issues fail to advise the public of its opportunity to comment regarding data quality.

In order to comply with the Data Quality Act, draft alternatives must be based upon data of "sufficient transparency and methodology." In order for the public to comment on proposed alternatives, it must know the information bases for specific actions proposed therein. Therefore, the agency must, at the draft stage, publicly document the scientific literature or other information upon which it intends to support each alternative, if it is adopted. The public must be allowed to challenge insufficient data before a final alternative is selected.

38 A-PI REC

BRC intends to challenge alternatives, or elements thereof, that are based on junk science or anecdotes. For example, we have observed and documented big horn sheep choosing to pasture immediately next to Highway 91 just north of Moab. We have observed deer choosing to pasture near roads and even residential roads. We are aware of studies that show that wildlife are not disturbed by motorized vehicles but are more likely to be disturbed by walking persons. Therefore, we intend to vigorously challenge any proposed seasonal restrictions on motorized uses of roads and trails.

The agency must document a nexus between any alleged need to protect and any resulting decision to restrict motorized travel. The alternatives and analyses must consider the useless effects of restricting motorized travel. For example, if protection of deer fawning is supposedly an issue, the discussion must acknowledge that humans will still be present who are mountain biking, hiking or horseback riding. By acknowledging the continuation of these activities, the agency will have no quality basis to discriminate against motorized travel.

39 A-PI REC

**K. When developing Alternatives, the BLM should recognize the public's desire to keep existing opportunities open.**
BRC participated in two surveys conducted by Public Opinion Strategies, Inc. Both studies show substantial widespread public support for managing recreational uses, but also for keeping existing roads and trails open, as well as substantial public opposition to proposals made by preservationist groups that would eliminate a vast majority of the motorized access. Although questions were not asked regarding the UFO specifically, we believe the surveys provide some valid information that should be considered as you develop the Final Plan.

<u>PSI Utah Poll Summary:</u>

OHVs are by far the most desired and utilized means to obtain solitude in nature.  A poll conducted in April, 2000 by Public Opinion Strategies, Inc. (POSI), a nationally respected polling firm located in Alexandria, Virginia, found that nearly two-thirds of Utahans use public lands for recreation either "a lot" (27%) or "some" (38%).  Only 13% of Utahans said they never recreated on public lands.  An overwhelming eighty-six per cent (86%) of Utahans said they used motorized vehicles to travel to Utah's federal lands or when they use the lands for recreation.  Of the eighty-six per cent, two-thirds said they utilized a truck or four-wheel drive.

In response to the POSI poll, 82% of Utahans said they "strongly" favored (48%) or "somewhat" favored (34%) maintaining roads and trails to disperse use and address environmental concerns.  Sixty-eight percent (68%) strongly agreed with the statement "Roads and trails on federal lands in Utah which have historically been open to public use should remain open to public use."  An additional 23% somewhat agreed, bringing the total support of the statement to 91%.

BLM must recognize that providing for OHV use and protecting the environment means fully utilizing the inventory of existing roads and trails. In some areas providing that reasonable balance may require additional access and additional recreational opportunities.


PSI Western Slope Summary:

Public Opinion Strategies conducted a survey of 500 registered voters in the eight counties in or surrounding the Grand Mesa, 1.  Those counties are Gunnison, Hinsdale, Montrose, 2Ouray, San Miguel, Delta, and Mesa. Interviews were collected March 21-23, 2006.   The margin of error associated with a sample of this type is ± 4.38%.

**Nearly three-quarter of the region's voters reject Forest Service changes that could limit public access.**

▪       Fully 73% of local voters say the Forest Service should not change the current regulations to reduce public access on the Grand Mesa, Uncompahgre and Gunnison National Forest.  A majority of 58% say they strongly feel this way.

More than six-in-ten in every single county oppose efforts to reduce public access, with opposition most pronounced in Delta County (78% should not change regulations), Mesa (74%), and Montrose (72%).  Opposition is across the political spectrum, as 65% of Democrats, 76% of Independents and 74% of Republicans oppose these proposed changes.  Sportsmen are particularly opposed, as 81% of hunters and 76% of anglers say the Forest Service should not change regulations to reduce access.

▪       Opposition to reducing access is HIGHER among the 45% of the electorate who say they had heard about these proposed changes already.  Fully 78% oppose the Forest Service reducing access among those who have seen "a lot" or "some", as compared to 69% opposition among those who have seen little or nothing about the issue.

▪       Even when voters are provided with greater detail about the potential changes, a majority of resident stand firm in their opposition.  Voters were told that…
*One proposal being considered by the Forest Service would more than double the area that would be closed to residents who choose to use a motorized vehicle to access the back country.  Residents would still be able to hike, bike or horseback ride on trails.*

Having heard this additional information, six-in-ten (59%) continues to believe the Forest Service should not change the current regulations to reduce public access, with 49% strongly feeling this way.  Perhaps

BLM_0081760

most stunning is the fact that a majority (52%) of self-described environmentalists oppose these proposed changes.

**Voters in the GMUG area are much more inclined to support a plan that features a variety of uses and recreation opportunities than the priorities stated in the Mountains to Mesa (M2M) proposal.** [ see:  http://www.hccaonline.org/page.cfm?pageid=2059 ]

✓      Two-thirds of respondents choose a plan that emphasizes balanced uses, while rejecting an exact description of the priorities detailed in the executive summary of the M2M plan.  When asked what the most important priority for the National Forest Service should be, by greater than a two-to-one margin, voters select…

**65%**    Ensure a balanced approach that allows many uses of the land by maintaining access residents have now to the trails, natural areas and streams, and allowing diverse recreation and human uses of the forest

**27%**    Protect and restore the native biological diversity of this area, through stopping the fragmentation of the forest, allowing natural processes like wildfires, and recognizing that recreational and other uses are less important than the primary goal of sustainable ecological management

A plurality of voters in every single county supports the multiple-uses approach. Moreover, a majority of self-described environmentalists side with maintaining access (50%) versus the goals from the M2M plan (40%).

**In addition to access, voters also place personal importance on energy independence and economic vitality.**

✓      The personal importance of maintaining access on National Forest land is 24 points higher than increasing the amount of National Forest land set aside as wilderness.  As seen below, the percentage of the electorate which places strong personal importance on energy and economic issues far exceeds other concerns:

Reducing our nation's reliance on foreign energy imports
*75% very important issue to me personally*

Increasing the number of good-paying year-round jobs in our communities
*74% very important issue to me personally*

Maintaining access to trails, streams, and natural areas on National Forest land owned by the federal government
*65% very important issue to me personally*

Helping small businesses grow and expand, so they can provide more people with good-paying jobs with benefits
*62% very important issue to me personally*

Increasing the amount of National Forest land which is set aside as pristine wilderness with limited access
*41% very important issue to me personally*

**Even when faced with a purely economic rationale for preserving access to public lands, local residents are more likely to side with tourism, energy and economic uses.**

✓      There is very strong agreement with a number of economic reasons for maintaining access, including…

80% agree, 53% strongly agree

*The ability to drive into the back country to hunt and fish is important to the rural economy. Hunters and anglers spend millions of dollars every year in Colorado. We should not risk making changes that could negatively affect many small towns who rely on hunting, fishing and tourism for their local economy.*

62% agree, 35% strongly agree

*The ability to drive on existing roads is necessary for energy companies to explore and produce energy in this area. Imposing these so-called Clinton roadless rules could mean the loss of many good-paying jobs, and a multi-million dollar hit to the area's economy. We should not risk making changes that could negatively affect our regional economy.*

**This is not to say that local voters are anti-conservation - significant numbers take part in outdoor activities. However, the data demonstrates that they believe that access to public lands is an important element in preserving a conservation ethic.**

- The vast majority of respondents take part in outdoor activities, with one-third having engaged in motorized recreation recently.

**79%**     Visited a natural area, forest or park to take part in non-motorized recreation such as hiking, rafting, horseback riding, fishing, or mountain biking in the last year

**70%**     Visited a natural area, forest or park to view wildlife or for bird watching in the last year

**50%**     Purchased a hunting or fishing license in the last three years

**33%**     Visited a natural area, forest or park to take part in motorized recreation, such as riding off road vehicles or snowmobiles

- Thus, it is not surprising that regional voters support encouraging access to the outdoors - not limiting access.

87% agree, 44% strongly agree

*Whether it is from the backseat of a jeep or hiking with their family, the more children get out in the outdoors, the greater their appreciation for nature will be. We should be encouraging people to visit the forest, not limiting access to it.*

72% agree, 44% strongly agree

*The best way to instill a love for our area's natural beauty, wildlife and special places is to encourage people to visit it. Limiting access to over one million acres will backfire in the long run, as people who do not experience the outdoors do not value and want to protect it.*

In summary, voters strongly resist the proposed changes in the GMUG, which could limit public access to National Forest land. Voters in this area are accessing the outdoors for a number of reasons. Voters go so far as to agree that the National Forest Service should be encouraging access instead of contemplating limits on access. In addition, the electorate in this region is more likely to place emphasis on protecting access for industry and energy production, and views those interests as personally important to them.

These results are meaningful for the UFO and are consistent with the documented increase in the popularity of vehicle-based recreation. Please consider this information as you develop Alternatives.

**L. Conclusion**

BRC appreciates the opportunity to comment on this important plan. BRC is eager to assist land managers to formulate balanced and enforceable land use plans and we hope these comments have been helpful in beginning your journey.  We understand comments such as these are not as clear or concise as they could be. Please do not hesitate to contact Brian Hawthorne or Ric Foster at 208-237-1008 ext 102 or 107 if you have any questions or require clarification.

Brian Hawthorne
Public Lands Policy Director
BlueRibbon Coalition

BLM_0081763

IN

**From:** Smyth Boone
**To:** uformp@blm.gov
**Subject:** Jumbo Mountain Area(Paonia)
**Date:** Monday, March 29, 2010 8:53:21 AM

To BLM,

**1 A-PI REC**

Hello I would like to put in my opinion on the uses for the Jumbo Mountain BLM managed area. Paonia area.

I am an avid outdoor enthusiast and would like to see the Jumbo Mountain area become more of a user friendly area for visitors, mountain bikers, hikers, runners and local people walking with their families. I understand that this area has numerous uses and I think that we can manage the area to make everyone happy. A majority of the uses conflict with motor sports and loaded weapons and I think it would be nice if the BLM's assessment/plan reflected this for the safety and enjoyment of everyone.

**2 A-PI REC**

After doing some local research, it appears that the main users in the area are mountain bikers. It makes sense to me that the trails that are already established as singletrack should stay that way. It would be great to have signage and trail specific info that separates the various uses. It would be great to see non-motorized signs on the singletrack trails. The local biking group is interested in managing the area with clean up and trail maintenance days. The mountain bikers are also very helpful when it comes to putting out fires. The fire dept. even uses the singletrack trails to get to the fires!

**3 A-PI REC**

The current accesses do not really encourage motor sports and I would like to see the accesses stay that way.

**4 A-PI REC**

If the current ATV trails stay marked for that specific use, I think all groups using the area will be happy. Hunters use the area in the fall and I think that communication between the hunters and bikers would be easy to facilitate which can create a compromise that all sides can agree on.

**5 A-PI REC**

The main thing is that all groups get represented and have as much use of our public lands as possible with respect for the differing uses amongst us.

In my opinion, we can all accommodate each other and I hope that all of the uses get their proper attention creating a peaceful, many use area that works for everybody.

Thank you,

M. Smyth Boone
381 Price Rd.
Paonia, CO 81428



AF

# United States Department of the Interior

**BUREAU OF RECLAMATION**
Upper Colorado Region
Western Colorado Area Office
2764 Compass Drive, Suite 106
Grand Junction, CO 81506-8785

IN REPLY REFER TO:



TAKE PRIDE®
IN AMERICA

WCG-ASchroeder
LND-8.00

## MEMORANDUM

To:     Mr. Bruce Krickbaum
        RMP Project Manager
        2465 S. Townsend Ave.
        Montrose, CO 81401

From:   Kathleen Ozga
        Lands and Recreation Group Chief

1 A-PI WSR

Subject: Draft Wild and Scenic Rivers Eligibility Report, Uncompahgre Field Office (UFO)

We have no comment or recommendation regarding the proposed eligibility of the various stream segments. However, we will take another look at these segments during the suitability determination phase.

2 A-PI WSR

While the Bureau of Land Management (BLM) has done a good job in the evaluation, the following are comments and/or recommendations that may improve the subject document.

**General**
1. We suggest ranking the vegetative Outstanding Resource Value (ORV) based on the relation of a specific vegetative community to its historic range. That would appear to be more appropriate than the use of global rarity/importance rankings. The use of global rarity/importance rankings for vegetation ORVs seems misleading. In general, all endemic western Colorado vegetation is going to be rare and likely considered imperiled on a global basis primarily because it only exists within a very small portion of the globe. The more specific endemic riparian communities and their components in western Colorado are even more globally rare, because they are an even smaller portion of the general western Colorado riparian classification.

3 A-PI WSR

**Specific segments**
1. Deep Creek (North Fork of the Gunnison Hydrologic Unit)

Page 50, Map 5-11 Deep Creek: The map should be revised to show Bureau of Reclamation's (Reclamation) withdrawn lands at Paonia Reservoir. The current map shows Reclamation's withdrawn land as BLM land. These withdrawn lands are Section 5A lands (Reclamation jurisdiction) pursuant to the 1983 BOR/BLM Interagency Agreement.

2

**4 A-PI WSR**

Page 51, River Segment Ownership and Land Ownership Tables: These tables should be revised to include Reclamation's ownership.

**5 A-PI WSR**

2. Dolores River- Segment 1 (Upper Dolores River Hydrologic Unit)

Page 94, Upper Dolores Hydrologic Unit Map: We recommend that the Dolores River Segment 1 be shown as eligible on this map.

**6 A-PI WSR**

We also recommend that you include a summary of the eligibility determination from the San Juan Public Lands (SJPL) Draft Land Management Plan here. The summary should be only for the 11.8 mile UFO portion of the larger 109 mile long McPhee Dam to Bedrock segment. You should use the same format used in this draft report (i.e., identify the location, length, ownership, ORVs, and preliminary classification). An eligibility summary of this segment in the same format as the rest of this document would help readers to visualize the eligibility of this segment without the clutter of the original SJPL analysis. As a part of this summary, a statement to the fact that the San Juan Public Land Center determined this segment eligible in their Draft RMP would be appropriate.

**7 A-PI WSR**

3. Dolores River- Segment 2 (Bedrock to San Miguel River confluence)

Pg. 97, 5) Wildlife - The narrative regarding peregrine falcons should be revised to reflect the actual status. How does the statement that peregrine falcon pairs were observed in Escalante Canyon relate to the wildlife Outstanding Resource Value (ORV) for this segment? Are peregrines, in fact, nesting/breeding within this segment?

If you have questions or need additional information, please contact Alan Schroeder at 970-248-0692 or aschroeder@usbr.gov.

March 24, 2010

RMP Project Manager Bruce Krickbaum
BLM Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401

Received
MAR 2 9 2010
Uncompahgre Field Office

RE: Please Emphasize Resource Protection in Uncompahgre RMP Revision

The Uncompahgre Field Office encompasses some of Colorado's most beloved wilderness-quality lands, wild rivers, and opportunities for quiet, backcountry recreation. The resource area is also home to important and imperiled wildlife, such as Gunnison sage grouse, that rely on large intact tracts of habitat free from roads and other infrastructure.

I urge the BLM to emphasize resource protection in this RMP, providing extensive unroaded areas where quiet-use recreationists can experience solitude and natural soundscapes and viewsheds, and where wildlife and wild rivers can thrive unimpeded by off-road vehicles or energy development.

The BLM should complete a comprehensive travel management plan as part of the RMP to ensure that planning is done at a landscape level, accounting for impacts of all uses. Lands with wilderness characteristics should be closed to motorized and mechanized use. Those lands, as well as potential wild and scenic river corridors, should be closed to all forms of energy development and transmission. Protecting these lands has the added benefit of helping protect wildlife habitat, cultural resources, and mitigating the impacts of climate change.

The BLM should designate zones for renewable energy development in the RMP, and limit renewable energy projects to those zones. Any oil and gas development allowed under the RMP should be carefully constrained, subject to phased development that minimizes damage to unique natural features, essential wildlife habitat, and other sensitive areas. The RMP should impose strict limits on uranium and other mining to protect our land, air and water.

The Dolores River Basin of southwest Colorado represents some of the most colorful and spectacular wild lands in the state. Geological formations millions of years in the making, healthy river systems and unspoilt desert all provide a pristine environment for wildlife, including the endangered peregrine falcon, mountain lions and river otters. Much of this land has been identified by Colorado conservationists as prime lands for Wilderness protection. These lands are prized for their outstanding natural values and recreation opportunities by people across the nation. Please help us keep these lands wild and free.

Thank you for your help to ensure that the long-term management plan for the Uncompahgre Plateau of southwest Colorado includes strong provisions for the protection of wild places, wildlife habitat, and wild rivers.

Yours truly,

J. Capozzelli
New York

IN

| | |
|---|---|
| **From:** | Chris Carrier |
| **To:** | uformp@blm.gov |
| **Subject:** | Uncompahgre Resource Management Plan |
| **Date:** | Monday, March 29, 2010 9:09:45 AM |

Chris Carrier

38123 Hwy 133

Paonia, CO 81428

970-361-8914

March 29, 2010


Bruce Krickbaum

RMP Project Manager

2465 S. Townsend Ave

[1 A-PI REC] ...ose, CO 81401

Bruce,

I am writing to encourage the BLM to strongly consider creating a SRMA for the BLM lands adjacent to the Town of Paonia on Jumbo Mtn. This area is has a long historical usage as a recreation area by hikers, runners, hunters, ATV riders and since 2000 by mountain bikers. Its proximity to town make it an ideal recreational area for all these groups. However there are many issues that need to be addressed to avoid resource damage, user conflicts, access issues. Many folks in our community are ready to work with the BLM to make this happen.

Peter clary wrote you a letter yesterday concerning this area and I would like to voice my support for all the things he said in that letter – rather than saying all of [2 A-PI ED] again.

I would also like to express to you the need for very thourogh permitting and oversight of all gas and oil drilling and mining activities. These activities should be permitted in nonrecreational areas only. They should also be permitted only with absolute assurance and proof from the private companies that surface or subsurface waters will not be contaiminated and that all surface damage will be fully restored.

Thanks you for extending the public comment period.

Sincerly

Chris Carrier

Chris Carrier

Carrier Carpentry

PO Box 1533

Paonia, Co 81428

970-361-8914

BLM_0081769

IN

**From:** Michael Cassidy
**To:** uformp@blm.gov
**Cc:** bruce_krickbaum@blm.gov
**Subject:** Uncompahgre Resource Management Plan
**Date:** Monday, March 29, 2010 8:45:29 AM

1 A-PI REC

2 A-PI REC

I have lived in Colorado for 5 years and spend most of my time outdoors in public lands. I urge the plan to protect large undisturbed tracts of land for the quiet activities, I do often such as hiking, backpacking, photography and fishing. My photography focuses on wild landscapes and wildlife. It is crucial that substantial habitat is maintained for our photogenic wildlife species such as the large big game deer, elk, mountain lions as well as the many birds of our area including the sage grouse to have free migration and grazing routes as well as breeding grounds.

3 A-PI REC

I urge you to prioritize these type of uses over the intrusive motorized uses. ATV and snowmobile access should be restricted to existing routes in non-sensitive areas so that significant tracts can be preserved for quiet, solitude and the protection of our wildlife.

4 A-PI REC

I am particularly concerned about the areas near the Domiquez canyon wilderness area, the Norwood canyon area including the San Miquel and the Dolores River Canyon both because of their importance to me as places to photograph and for the two rivers because I am a fly fisherman.

Thank you for your consideration,

Michael Cassidy
11 Canyon DR
Ridgway, CO 81432

AS

# Colorado River District

## *Protecting Western Colorado Water Since 1937*

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401

*VIA E-MAIL*: uformp@blm.gov

March 29, 2010

1 A-PI WSR

Re: *Uncompahgre Resource Management Plan – Wild and Scenic Eligibility Report*

Dear Mr. Krickbaum:

I am submitting comments on the Wild and Scenic River Eligibility Report ("Eligibility Report") of the Resource Management Plan ("RMP") for the Uncompahgre Field Office (UFO) on behalf of the Colorado River Water Conservation District ("River District"). The River District appreciates the opportunity to comment on this important piece of the RMP and, in particular, on feasible management alternatives to the eligibility of segments of the Dolores, Uncompahgre, North Fork of the Gunnison and Gunnison Rivers pursuant to the Wild and Scenic River Act ("WSRA") in the UFO.

The River District is a political subdivision of the State of Colorado, created pursuant to C.R.S. §37-46-101, *et seq.*, and is comprised of all, or parts, of 15 western Colorado counties within the Colorado River basin and its sub basins, including the Yampa, White and Gunnison Rivers. The River District was formed in 1937 with the mission *"to lead in the protection, conservation, use, and development of the water resources of the Colorado River basin for the welfare of the District, and to safeguard for Colorado all waters of the Colorado River to which the state is entitled."* In addition, the River District has a long historical role and was instrumental in the development of water rights in the Uncompahgre and Gunnison River basins, including several important conditional water rights in the basin and and related tributaries to the Uncompahgre and Gunnison Rivers that may be adversely affected by actions arising from determination of ty, suitability or related designations under the WSRA.

2 A-PI WSR

Because the River District is charged with conservation, use and development of the water resources of the State of Colorado, we are concerned about the potential that the Eligibility

BLM_0081771

**Page** 2 of 6
WSRA Eligibility Report Comments
~~~~~ 9, 2010

2 A-PI WSR continued

Report and an eventual WSRA Suitability Report ("Suitability Report") might adversely impact our constituents', ability to put water to beneficial use. Therefore, we urge that great caution be used in the process to potentially designate rivers in the Gunnison River Basins under WSRA, and that management alternatives to WSRA be explored and implemented.

Historically, the WSRA process has been contentious due to potential impacts to private property rights (water and land), water supplies and related facilities. Although the River District recognizes the need to provide protection for the values that Wild and Scenic designation offers on selected rivers and streams, we believe there are better and more cooperative approaches that may be employed.

Our principal concern is that designation, or even eligibility or suitability determination, pursuant to WSRA may be too stringent and restrictive and may reduce critical flexibility to meet future water demands in the Gunnison and Uncompahgre River basins. The Colorado General Assembly and State water users have spent considerable time, effort and money ensuring that Colorado's water law system contains sufficient flexibility. The state's instream flow and recreational in-channel diversion programs are excellent examples of this flexibility. We believe the BLM should employ these approaches first to protect potential Outstandingly Remarkable Values ("ORV") and/or to achieve the desired management objectives.

Because the Gunnison River system is already over-appropriated (meaning there are more demands than naturally available supplies), we cannot afford to lose flexibility in the system. Therefore, we encourage the BLM to act cautiously, by not designating as eligible, nor as suitable, all of the segments included in the Eligibility Report.

3 A-PI WSR

In our opinion, there are **two categories of river segments in the eligibility report**:

1) Those river segments that are not eligible for designation due to a variety of factors (e.g., appropriateness and/or manageability); and
2) Those river segments that have ORVs but where those values should be protected using strategies other than WSRA designation.

In addition, the River District further examined the segments included in the Eligibility Report based on whether the segments are appropriate and manageable for purposes of the WSRA and **divided the segments into the following categories**:

A.) Segments with non-federal water rights that will likely be impacted by designation;
B.) Segments that are too short (one mile or less);
C.) Segments whose flows are predominantly determined by releases from upstream reservoirs;
D.) Segments where private lands predominate; and
E.) Segments that may need some level of protection but for which designation is not appropriate and for which alternative management should be employed.

We have applied these categories to the list of segments of the Eligibility Report and discuss our specific recommendations below.

4 A-PI WSR

**A. Segments with non-federal water rights that will likely be impacted by designation or determination as suitable.**

- Nearly all segments have water rights, both perfected and conditional rights including both direct diversion and storage rights within, or proximal to, the proposed segments. The River District is willing and able to assist with the identification and disclosure of these rights and the associated segments. It is, however, beyond the scope of our resources at this time to identify all such water rights and meet the deadline for comment.

5 A-PI WSR

**B. Segments that are too short.**

Although we recognize that there is no length requirement to designate a river as Wild and Scenic, there are many segments listed in the Eligibility Report that are exceptionally short and non-contiguous. In our opinion, such segments are not manageable and do not meet the goals of the WSRA and therefore should be removed from the Eligibility Report and dropped from further consideration and study. These exceptionally short segments include:

- **Gunnison River, Segment 2 (BLM segment 13.02 miles and private segment 2.59 miles)**
- **Escalante Creek, Segment 1 (BLM 5.75 miles and private 2.69 miles)**
- **Escalante Creek, Segment 2(BLM 0.90 miles and private 5.07 miles)**
- **Deep Creek (BLM 0.58 miles and private 1.97 miles)**
- **West Fork Terror Creek (BLM 0.47 miles and private 0.74 miles)**
- **Dry Fork Escalante Creek, Segment 2 (BLM 2.43 miles and private 0.46 miles)**
- **Rose Creek (BLM 3.9 miles)**
- **North Fork Mesa Creek (BLM 5.81 miles and private 2.72 miles)**

6 A-PI WSR

**C. Segments whose flows are predominantly determined by releases from a reservoir.**

Free-flowing is defined by Section 16(b) of the WSRA as "existing or flowing in natural condition without impoundment, diversion, straightening, rip-rapping, or other modification of the waterway." While the River District understands that the existence of small dams, diversion works, or other minor structures at the time the river segment is being considered does not automatically disqualify a segment, we believe that the dominant influence on flows from large upstream impoundments should disqualify segments from further consideration. Downstream calls and deliveries of water to water users downstream typically control the release schedule of reservoirs in Colorado. These releases are made pursuant to state law and reservoir operators have little discretion about the quantity or timing releases.

The River District urges the BLM to drop such segments from the eligibility report since the BLM will have no control over the releases or flows through these reaches. The following

**Page** 4 of 6
WSRA Eligibility Report Comments
March 29, 2010

segments should be deemed ineligible and not studied for suitability due to the presence of significant upstream water control facilities:

- **Gunnison River Segment 1**
- **Gunnison River Segment 2**

**7 A-PI WSR**

**D. Segments predominantly on, or adjacent, to non-federal, private lands.**
Many of the proposed segments in the Eligibility Report include non-contiguous segments that are adjacent to, or isolated by, large parcels of land that are not owned or managed by the BLM. The River District believes such segments are impractical, if not impossible, for the BLM to manage. Designation of such small, non-contiguous segments will inevitably lead to unnecessary conflicts in federal/non-federal land use and management. Therefore, the River District requests that the following segments not be considered eligible and removed from further study:

- **Escalante Creek, Segment 1**
- **Escalante Creek, Segment 2**
- **Deep Creek**
- **West Fork Terror Creek**
- **Dry Fork Escalante Creek, Segment 2**
- **Gunnison River, Segment 3**
- **Roubideau Creek, Segment 2**
- **North Fork Mesa Creek**

**8 A-PI WSR**

**E. Segments that deserve protection but not Wild and Scenic designation**

Many of the segments identified as eligible may be appropriate for alternative management plans in lieu of designation or determination of suitability. We believe this is particularly true of all segments which lie within the Dominguez-Escalante NCA. In addition there are 4 segments in the Lower Gunnison which would benefit from an alternative management plan.

- **Monitor Creek**
- **Potter Creek**
- **Rose Creek**
- **Roubideau Creek, Segment 14**

While we believe these segments may deserve some level of protection for their ORVs, we strongly recommend that the BLM find alternative mechanisms for this protection.

Such alternative management approaches have been successfully employed on other streams and rivers in Colorado and, in fact, the BLM is actively developing an alternative management program for mainstem reaches on the Colorado River upstream of the Grand Junction area.

Another example of an alternative management is the South Platte Protection Plan ("SPPP") that the U.S. Forest Service created in the Upper South Platte River basin in lieu of Wild and Scenic designation. The SPPP provides benefits and protection while maintaining flexibility for water supply operations and potential future development. The SPPP was developed cooperatively with multiple stakeholders. The River District supports a similar approach on the Gunnison, Dolores and Colorado River mainstems and will be convening a group of stakeholders to explore this possibility.

For these reasons the following segments should be managed outside of WSRA and thereby be removed from the eligibility list and not be considered for suitability:

- **Big and Little Dominguez Creeks**
- **Dry Fork Escalante Creek, Segment 2**
- **Cottonwood Creek**
- **Escalante Creek, Segment 1 & 2**
- **Roubideau Creek**

In summary, due to the success of alternative management processes and the multiple demands and highly regulated nature of most of the segments in the Eligibility Report, the River District strongly recommends the BLM work with local stakeholders to create and adopt alternative [9 A-PI WSR] management strategies, such as the SPPP, to protect the ORVs of the listed segments without the inflexible strictures of the WSRA. As with the Upper Colorado and GJFO stakeholders processes, the River District is committed to participate in such a process for the UFO.

In addition, due to the political sensitivity related to this issue, we recommend that the BLM UFO proceed with caution and keep water users well informed regarding the process as the BLM moves forward with the RMP and WSRA processes.

[10 A-PI TM]
[11 A-PI WR]
[12 A-PI GS]

**Resource Management Plan Comments**

In addition to the Wild & Scenic Rivers eligibility there are several areas within the RMP planning process which warrant additional comment. Travel Management, Water Quality and Soils are of concern to the River District.

[13 A-PI WR (entire paragraph)]    [14 A-PI LR (this sentence only)]

Ongoing and future land use decisions have the ability to exacerbate natural erosion within the UFO. The River District is a cooperator in the Colorado River Basin Salinity Control Program and the Selenium Task Force. As such, the River District supports ongoing and future salinity and selenium control projects. Land use management decisions (including the disposition of, or transfer of federal land ownership) need to carefully be analyzed to prevent increased erosion, sediment transport and/or deep percolation of water that can mobilize salts and selenium. In addition, land disturbance has been linked to increase in dust storms which can directly and adversely affect the timing and amount of snowmelt runoff.

BLM_0081775

**Page** 6 of 6
WSRA Eligibility Report Comments
March 29, 2010

Thank you so much for your important efforts. Please do not hesitate to call Chris Treese, Dave Kanzer or me at (970) 945-8522 if you have questions or would like to discuss our comments and recommendations.

Best regards,

R. Eric Kuhn
General Manager

 **Uncompahgre Resource Management Plan** 

We encourage you to provide your comments by filling out and submitting this comment form by March 29, 2010. Email your completed form to UFORMP@blm.gov, or print your completed form and fax it to 1-970-240-5367 or mail it to:  BLM UFO, Attn: Bruce Krickbaum, RMP Project Manager, 2465 S. Townsend Avenue, Montrose, CO  81401.

First Name __Dave_____     Last Name __Roberts_____     Date __3/29/2010_____

Mailing Address _____West Elk Loop Scenic and Historic Byway, 66141 Juniper Court_____

City __Montrose_____     State __CO_____     Zip __81403_____

E-mail Address   dave81401@bresnan.net

Would you like to be added to the RMP mailing list to receive future project-related information?  (Your name will not be shared.)  Yes:  ☑Email materials     ☐Hard-copy materials     ☐No
Please note that planning materials are also available at our website:  www.UFORMP.com

Please indicate your affiliation by checking the following boxes (check all that apply):

☐Individual (no affiliation)         ☐Citizen's Group              ☐Regulatory Agency
☑Non-profit Organization            ☐Elected Representative        ☑Federal, State or Local Government

*Please answer the following four questions about your relationship to the Uncompahgre Planning Area:*

1. Do you live within the planning area? ☐Unit 1  ☐Unit 2  ☑Unit 3  ☐Unit 4  ☐Unit 5  ☐No
*(Refer to map for unit numbers)*

2. If you do not live in the planning area, where do you live: ☐Colorado (west slope) ☐Colorado (front range or plains) ☐Other State - Which?_____ ☐ Other Country - Which?_____

3. If you live in the planning area, how long have you lived here? Years_____20_____Months_____

4. Why do you live here? ☑Occupation ☐Family ☐Proximity to public lands ☐Recreational Opportunities ☐Other_____

---

*The BLM wants to hear from you! The Uncompahgre Field Office is committed to listening to and learning from our neighbors, friends, and stakeholders. Your answers to the following questions will be helpful at this point in the planning process, as are any other comments. When answering the following questions, where applicable please reference the planning units in the Planning Unit Map on our Planning webpage. Thank you for taking the time to provide your input.*

---

What issues or concerns do you have regarding public land uses or resources within the Uncompahgre RMP planning area?

The BLM should fully recognize the West Elk Loop Scenic and Historic Byway as a state designated Byway that was established with the full support of five counties, several communities, two state agencies, and three federal agencies, including BLM. One of the primary concerns of the Byway is protection of the viewshed and other intrinsic resources for which the Byway was established (i.e., scenic, wildlife, historic, and cultural values). The Byway is located in planning areas 1 and 2.

**Keeping in mind the issues above, what changes would you make physically to the landscape (such as what should it look like, modifications, etc.)?**

Rather than identifying modifications, the Byway requests that the area along the Byway remain relatively natural in appearance. With the exception of the mining developments between Paonia and Somerset (part of the cultural landscape), we request that a ½ mile overlay corridor be identified on the public lands along Highways 92 (east and south of Hotchkiss) and 133 (east and north of Hotchkiss) where development considers the impact to Byway resources, including the viewshed. Thus, the location of developments such as open mines, oil and gas wells, etc. should be sited whereas they are not generally visible to byway travelers. The use of topography and vegetative screening can help reduce the visual impacts.

**Keeping in mind the issues above, what changes would you make to administration (such as management actions, rules, regulations, etc.)?**

Apply an overlay zone ¼ mile on either side of the above referenced highways wherein visual and other resource impacts receive a higher level of scrutiny before development approval. Notify the Byway of planning opportunities where actions might affect Byway resources/travelers.

**Keeping in mind the issues above, what changes would you make to social characteristics (such as number of users, size of groups, behavior of users, etc.)?**

Related to industrial activities (such as oil and gas development), insert in permitting documents restrictions designed to minimize conflicts between lease-related trucking activities and Byway travelers.

**Please provide any additional comments that you have regarding this project.**

The Byway is managed by a Steering Committee made up of representatives from five counties, several communities, and state and federal agencies. It is a quasi-government organization since it functions under CDOT's State Scenic Byway program.

BS



A Touchstone Energy®Cooperative 

**We energize and serve our communities**

March 29, 2010

Mr. Bruce Krickbaum
BLM Uncompahgre RMP
2465 S. Townsend Avenue
Montrose, Co 81401

RE: Bureau of Land Management's Uncompahgre Field Office, Resource Management Plan Revision

**1 A-PI SE**

Delta-Montrose Electric Association (DMEA) is a non-profit electric utility that serves end-use electric customers in all of Delta County (excluding the City of Delta) and in portions of Montrose, Gunnison, Mesa and Ouray Counties. We are owned by the customers we serve. Within this service territory DMEA currently operates and maintains 3,213 miles of energized line (distribution and transmission). In the last ten years alone, the number of active meters has grown nearly 25% from 25,893 to 32,321.

DMEA's basic mission is to purchase and distribute dependable electric service to consumers within our service area. This generally has included an obligation not only to install and maintain distribution lines to serve our members/consumers, but to ensure a reliable source of energy supply, and to arrange for and support transmission sources to supply the local electrical needs.

In our effort to provide reliable, affordable electric service to our members, both now and in the future, we ask BLM to consider the following as you begin drafting the Uncompahgre Resource Management Plan revision.

**2 A-PI LR**

- Tri-State Generation and Transmission Association, Inc (Tri-State), is the wholesale electric power producer/supplier to DMEA. DMEA is adamantly opposed to any restrictions which may result in unnecessary and increased costs to Tri-State, and ultimately DMEA consumers, for the access, maintenance and repair of existing transmission facilities, and unreasonable limitations of siting new facilities on public lands.

**3 A-PI LR**

- DMEA electrical facilities are not depicted on the utility corridor maps provided on the RMP website. DMEA requests that all existing electrical facilities and infrastructure, whether they are distribution, subtransmission or transmission; or owned by DMEA or Tri-State; be mentioned and given consideration in the RMP revision planning process. DMEA can provide system maps of distribution facilities within our service territory for inclusion in the planning process.

**4 A-PI LR**

- Private lands located within the Uncompahgre RMP area have the potential need of electrical service sometime in the next 20 years. Many of these private lands are either adjacent to or surrounded by public lands, and electric utility rights-of-way to the private lands should be considered and provided for in the revised RMP.

DELTA-MONTROSE ELECTRIC ASSOCIATION   P.O. Box 910, Montrose,Colorado 81402-0910   Telephone: 970/249-4572 - Montrose
www.dmea.com                                                                                     Telephone: 970/874-8081 - Read



**5 A-PI TT**

- The revised RMP must recognize the need for safe passage of equipment and personnel performing routine maintenance and repair –and especially the immediate passage of equipment and personnel responding to emergency electric outages—along the length of the existing electrical system located on public lands. Maintaining access rights to all electrical infrastructure within the planning area is critical.

**6 A-PI LR**

- To allow existing ROWs to be used to the greatest extent possible while limiting the proliferation of separate utility ROWs, we request that the revised RMP contain language which allows existing lines and facilities be considered for future upgrade and/or expansion.

**7 A-PI LR**

- DMEA requests that the revised RMP contain language which allows for the consideration of future electric facilities within the boundaries of the revised Plan area. Working with DMEA on both the Delta County Transmission Improvement Project and the East Montrose Electric System Improvement Project, you are aware that the public strongly desires public utilities serving the public good be constructed on public lands wherever possible. Through individual landowner contacts, public communications & meetings, the public has been strongly opposed to providing private property ROW for a public improvement project such as ours when public lands are relatively nearby and available. We request that BLM include provisions in the RMP revision which allows new utility projects be considered with appropriate and reasonable mitigation measures.

**8 A-PI LR**

- DMEA has joint use on numerous communication sites on public land within the Uncompahgre RMP planning area. Communication is vital in providing and maintaining a safe, reliable and secure interconnected electric system. All existing telecom sites must be protected in the revised RMP, along with the access roads getting to those sites. Also, the expansion of existing communication sites, or the addition of communication sites associated with utility facilities, should be open to consideration through the ROW grant application process.

**9 A-PI LR**

- As you know, DMEA is in the preliminary design phase of a hydro-generation facility to be located along the South Canal. When constructed, a transmission/sub-transmission line will be required between this renewable energy resource and the new East Montrose Substation (near Project 7 and Miguel Road). It is too early in the planning and design phase of the project to hold public meetings to site the line, but DMEA requests that this project be given consideration in the Uncompahgre RMP revision process.

**10 A-PI LR**

DMEA also recognizes that other potential renewable energy projects may exist within our service territory, such as wind and solar. DMEA requests that rights-of-way grant consideration be given to connect them to the existing electrical infrastructure.

**11 A-PI LR**

Although long range growth forecasts are available, it is impractical to predict if and when that growth will actually occur, what the power needs will be for businesses coming in to support the growth, and at what locations the growth might actually occur. Therefore, DMEA strongly requests that BLM work closely with all utilities to identify potential energy corridors, to recognize that future energy



requirements can change over time, and that if identified corridors do not meet the actual delivery needs at that time, thoughtful and careful consideration to a more suitable route will be given.

12 A-PI LR

DMEA appreciates the opportunity for comments to be considered and included in the revised Uncompahgre Resource Management Plan.  As the process moves forward, we respectfully request that DMEA be contacted to discuss any potential issues that may directly impact our ability to construct, maintain, and/or repair electric lines to provide safe, reliable service to our members.  We look forward to working with the BLM through the revision of its Resource Management Plan.

Sincerely,

Dan McClendon
General Manager
Delta-Montrose Electric Assocation



**Department of Energy**
Western Area Power Administration
P.O. Box 281213
Lakewood, CO 80228-8213

Received
MAR 2 9 2010
Uncompahgre Field Office

AF

MAR 2 4 2010

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Resource Management Plan and Associated Environmental Impact Statement

Dear Mr. Krickbaum:

The Western Area Power Administration (Western), as a Federal power marketing agency within the Department of Energy, owns and/or operates and maintains transmission lines and related facilities on the National System of Public Lands managed by the Bureau of Land Management (BLM) Uncompahgre Field Office. We are pleased to provide comments during the current public scoping process for the Resource Management Plan (RMP) and associated Environmental Impact Statement, which will replace the existing 1985 San Juan/San Miguel RMP and 1989 Uncompahgre Basin RMP.

1 A-PI ED

A number of Western's facilities, including transmission lines, communications sites, and switchyards, as well as the access to them, are located within the administrative boundaries of the Uncompahgre Field Office. The locations of these various facilities are shown on the enclosed map series. Western asks that the Uncompahgre Field Office recognize these facilities in the RMP as existing valid uses of public lands including the right of ingress and egress, and where the possibility of replacing, upgrading, or reconstructing these facilities will continue to be allowed. As renewable energies are developed and brought to market, some or all of the new generation will require the addition of new or upgraded transmission lines. Western's facilities could be impacted by the growth of this new energy industry, so we want to ensure we can make any upgrades or add new transmission facilities as they are needed.

In addition to the current RMP effort, Western is aware that the Uncompahgre Field Office intends to prohibit "open" travel and require that all motorized travel be limited to designated roads and trails. Western's only concern related to the limitation on off-road travel is that some of our access to the transmission line structures is off designated roads and would be considered off-trail travel. Western needs access to its facilities on a continual basis to properly operate and maintain them. We have geographic data that show the location of our facilities and access routes and can provide shape files so that this information is included in your travel management planning effort. We typically conduct our own road maintenance activities and can assist the Uncompahgre Field Office with the use, repair and maintenance of roads or trails used by Western to access its facilities. We can also work with BLM to identify areas where gates or other types of barriers can be used to restrict access for administrative purposes only.

2 A-PI TM

BLM_0081782

3 A-PI VEG

2

Western is currently conducting tree removal activities along its rights-of-way and within its stationary facilities to ensure we are in compliance with national standards for electric reliability. These standards were established by the North American Electric Reliability Council under provisions of the Energy Policy Act of 2005. Western developed a transmission vegetation management program to address reliability and designed a desired condition where vegetation within the transmission line right-of-way is maintained as a stable, low growth plant community, and the edges of the right-of-way are feathered to blur or diminish the linear characteristic of the right-of-way itself. In addition Western's program provides allowances for taller trees in riparian areas, viewsheds, and as traffic screens. We are available to meet with the Uncompahgre Field Office staff to discuss working together in a collaborative and cooperative manner to achieve outcomes desirable to both agencies. We believe our vegetation management program can support the BLM in reaching its vegetation and resource management goals.

Finally, some of our linear transmission line rights-of-way continue beyond the boundaries of the Uncompahgre Field Office and are subject to the management decisions of other BLM field offices or US Forest Service ranger districts. Western requests that decisions made by the Uncompahgre Field Office be consistent with similar decisions concerning utility rights-of-way and energy corridors made by adjacent field offices or ranger districts. Decisions related to our facilities need to be seamless from one office to the next and local solutions should be integrated as a whole for transmission line rights-of-way or corridors that traverse more than one administrative jurisdiction. The problem is a real one when different field offices/ranger districts do not recognize and manage a transmission line corridor consistently from one jurisdiction to another.

Thank you for the opportunity to provide comments on this planning effort. Any questions about the information provided above can be directed to Ms. Susan Starcevich of my office. Susan can be reached at (720) 962-7275 or starcevi@wapa.gov.

4 A-PI ED

Sincerely,

Steven W. Webber
Lands Team Lead

Enclosures

| | |
|---|---|
| **From:** | Amber Kelley |
| **To:** | uformp@blm.gov |
| **Subject:** | UFO Scoping Comments |
| **Date:** | Monday, March 29, 2010 2:57:06 PM |
| **Attachments:** | Dolores Corridor Comments, UFO Scoping 032910.pdf |
| | ATT4785500.htm |
| | Dolores River Canyon CWP Inventory Report.pdf |
| | ATT4785501.htm |
| | UFO_Dolores Basin PCA Species.xls |
| | ATT4785502.htm |

Greetings,

Please find attached scoping comments for the BLM Uncompahgre RMP revision process submitted on behalf of the Dolores River Coalition and other undersigned organizations.  These comments relate specifically to the Dolores River Corridor portion of the UFO.

Thank you for the opportunity to offer comments.
We are also sending a hard copy in the mail.

Sincerely,
Amber Kelley

attachments:
-Comments
-Dolores River Canyon CWP Inventory Report
-UFO_Dolores Basin PCA Species.xls

-Sewemup Mesa CWP Inventory Report will be send as a separate email because my email to you has bounced back twice.

_____

Amber Kelley
Dolores River Campaign Coordinator
San Juan Citizens Alliance
10 W. Main/PO Box 1513
Cortez, CO 81321
970.565.7191
amber@sanjuancitizens.org

www.sanjuancitizens.org

BLM_0081784

**Dolores River Coalition**
**San Juan Citizens Alliance**
**Colorado Environmental Coalition**
**The Wilderness Society**
**Colorado River Outfitters Association**
**Colorado Riverkeeper**
**Western Colorado Congress**
**Sheep Mountain Alliance**

March 29, 2010

BLM Uncompahgre RMP
2465 S. Townsend Ave.
Montrose, CO 81401

Email: uformp@blm.gov

Re: Scoping comments, BLM Uncompahgre Field Office RMP

To Whom it May Concern:

On behalf of the undersigned organizations and the Dolores River Coalition we offer the following comments on the BLM Uncompahgre RMP revision. The comments herein relate specifically to the Dolores River Corridor portion of the BLM Uncompahgre Field Office. We are also incorporating by reference the extensive comments submitted by some of these and other Colorado conservation organizations.

1-A-PI-WSR

## Introduction: The Dolores River Corridor is a special place in need of special consideration

The Lower Dolores River carves one of America's premier wild river canyons. The 170-mile segment from below McPhee Reservoir to the river's confluence with the Colorado River in Utah traverses some of the most remarkable landscapes in the desert Southwest. Renowned features of the Dolores River include magnificent stands of old-growth ponderosa pine, thrilling whitewater rapids such as Snaggletooth, sheerwalled sandstone canyons, and hidden archeological treasures.

The Dolores River's scenic grandeur and ecological richness have been found suitable for Wild and Scenic designation since 1975. Whitewater enthusiasts, naturalists, and other backcountry users of all stripes value the rugged beauty, wildlife, quiet solitude, and connection to history these canyons offer.  The river's scenery, geology, fish, wildlife, plant communities, and human history are woven into a continuum of ever changing wonders as one travels the 170 miles downriver from McPhee dam to the river's confluence with the Colorado River in Utah.

Here, the geological and biological transformation from Southern Rocky Mountains to Colorado Plateau is compacted and therefore unparalleled among other great rivers of the Southwest. Along the river's journey, four anticlines reveal deep, pristine canyons. Exposed is a nearly complete depositional record of Mesozoic times, from the cream-colored, cross-bedded Dakota Sandstone, to rainbow pastels of Morrison rock, to the oldest cliff forming red rocks of Triassic age. Trees are a prominent feature, and include upland riparian cottonwood, old growth ponderosa pine and Douglas fir mixed with alder and dogwood, high desert pinon and juniper with intervening boxelder, and the willows, privet, wild rose and cactus gardens of Slickrock Canyon. Visitors often are rewarded with sightings of river otter and desert bighorn. The river, too, ranges from meandering Class I water with deep back eddy trout pools to raging Class IV whitewater. A hike to the rim anywhere affords unmarred vistas of westward dipping tablelands framed by snowclad peaks of the La Sal Mountains. On the human side, traces remain of ancient hunter-gatherer and Puebloan societies:  rock art panels, stone granaries, and cave shelters. Few other river segments in the west offer such extraordinary variety.

2- A-PI-WSR

The river supports a variety of economic and recreational activities that benefit nearby communities. Working farms and ranches, professional outfitters anglers, historians, river runners, hikers, archeologists and recreationists all share an interest in preserving the Dolores River Basin.

3-A-PI-WSR

The entire river basin spans numerous BLM and US Forest Service offices and should be cooperatively managed to ensure that the river's serenity and beauty can continue to be enjoyed and explored but never exploited or taken for granted. As more people move into the communities around the Lower Dolores and as more recreationists learn about the area, the potential for increased development, both recreational and commercial, threatens to chip away at and permanently alter the amazing resource we all have in the Dolores Basin. Action needs to be taken now to ensure that the numerous qualities of the Lower Dolores River are sustained into the future, or it will be too late.  Planning processes such as this one are the first step in ensuring that the Lower Dolores will be enjoyed by generation to come.

4-A-PI-WSR

The Dolores River Coalition is committed to finding a long-term solution for protection of this landscape.  To that end we have participated in the RMP revision process for both the San Juan and the Grand Junction Field Offices, as well as river focused processes such as the Wild and Scenic Suitability Stakeholder Process for rivers and streams in the GJFO and the Lower Dolores River Management Plan

BLM_0081786

Working Group process focused on wild and scenic and alternatives to wild and scenic for the portion of the Dolores in the San Juan FO.  While the UFO contains a much smaller swath of the Dolores River Corridor's public lands and a shorter stretch of the river than the other two field offices, it is the core part of the river ecosystem. We therefore urge the UFO to consider the portion of the Dolores River Corridor within its jurisdiction to be an integral part of the larger Dolores River ecosystem as you make management decisions for the area.

5-A-PI-WSA

# Wilderness Quality Lands in the Dolores River Corridor

BLM has both the obligation and the authority to protect lands with wilderness characteristics. The BLM's Uncompahgre Field Office contains portions of one Wilderness Study Area (WSA), the Dolores River Canyon WSA, as well as proposed additions, in the form of Citizen's Wilderness Proposals (CWPs) to both the Dolores River Canyon and Sewemup Mesa WSA.  Both the WSA lands and the proposed additions should managed in order to protect their wilderness characteristics. If managed in this recommended manner, WSAs and CWP lands in the Uncompahgre FO will not only remain available for possible future designation as Wilderness, but will also ensure and expand the opportunities for backcountry recreationists to experience a sense of adventure and discovery. Inventory reports of these areas are attached, which include maps.



- **<u>Dolores River Canyon WSA & CWP Expansions:</u>** This heart of the stunning and wild Dolores corridor, the Dolores River Canyon Wilderness Study Area, with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience must gain the highest possible level of protection. The portion of the Dolores River Canyon Wilderness Study Area within the Uncompahgre Field Office should continue to be managed to protect its wilderness qualities, and BLM should also analyze and manage the Citizen Proposed additions to the WSA so as to protect their wilderness characteristics.

6-A-PI-WSA

In the 1985 San Juan/San Miguel Planning Area Resource Management Plan, the BLM recommended the Dolores River Canyon WSA as suitable for wilderness designation.  The area possesses the same qualities now that led to the suitability finding in the past.  We urge to the BLM to reaffirm the recommendation of the Dolores River Canyon WSA for designation. On page 15 the 1985 RMP states:

" The Dolores River Canyon WSA is being recommended as preliminarily suitable for wilderness designation, primarily because it possesses highly outstanding characteristics for primitive and unconfined recreation, solitude, and naturalness, as well as scenic grandeur and superb wilderness characteristics. It is a nationally unique area and is worthy of preservation in its natural state. The nationally significant values associated with Dolores River Canyon WSA include: (1) Formerly a Wild and Scenic River candidate as

BLM_0081787

recommended by an interagency study report in 1976 and recommended to Congress for protection on several occasions; (2) Outstanding primitive and unconfined recreation opportunities associated with the river, canyons, and mesas; (3) Unique plant and animal communities found within the WSA that contain threatened and endangered species habitat; and (4) Extremely diverse topography and geology that create outstanding scenery, vistas and excellent solitude opportunities. This unique combination of factors, found only in the Dolores River Canyon WSA, creates the specific need and rational for BLM to recommend this area as preliminarily suitable for wilderness designation."

7-A-PI-WSA

**The Sewemup Mesa WSA & CWP Expansions:** The Sewemup Mesa CWP combines the Sewemup Mesa WSA with citizen proposed expansions. While the WSA itself falls in the Grand Junction Field Office, a significant proposed addition crosses into the Uncompahgre FO, including Carpenter Flats and Beehive Canyon. The boundaries have been drawn to exclude significant land impacts and to aid in manageability. While citizens did identify a number of routes (most likely developed by prospectors) within the Carpenter Flats and Beehive Canyon portions of the CWP, it was determined that these routes do not meet the criteria of a road as they are not maintained or regularly used. A detailed account of these routes can be found on pages 10 and 11 of the "Sewemup Mesa Citizens' Wilderness Proposal: Wilderness Inventory Report" which has been previously submitted to your office, and also is included as an attachment. The Sewemup Mesa CWP expansions create a cohesive landscape of diverse canyon systems with smaller systems such as Beehive Canyon offering the most intimate of wilderness experiences.  Portions of this CWP expansion falling within the boundary of the Uncompahgre Field Office should be considered in combination with wilderness quality lands in the Grand Junction FO and be managed for their wilderness characteristics.

In the 1987 Grand Junction Field Office Resource Management Plan, the agency found the majority of the Sewemup Mesa WSA to be suitable for Wilderness designation, including the very small portion in the Uncompahgre Field Office. The area possesses the same qualities now that led to the suitability finding in the past.  We urge the UFO to reaffirm their support of the GJFO's findings that the portions of the Sewemup Mesa WSA with the UFO are suitable for Wilderness designation. On page 37 the 1987 RMP states:

"Sewemup Mesa WSA (18,835 acres) [including acreage in Montrose County] is recommended preliminarily suitable for wilderness designation wilderness because [it] possess outstanding wilderness characteristic including sufficient size, naturalness and outstanding opportunities for both solitude and primitive and unconfined recreation. Additionally, [this] WSA possess high quality ecological, geological, scientific, educational, scenic and cultural values. [This] WSA will be outstanding representatives of the Colorado Plateau Physiographic Province in adding to the landform and ecological diversity of the National Wilderness Preservation System. [The area has] minimal resource

conflicts. Very strong public support, from both the region and nation, has been shown for wilderness designation of [this] WSA. Specific boundaries for this WSA are shown in Appendix I of the draft RMP EIS."

8-A-PI-WSA,REC

## Dolores River Canyon Special Recreation Management Area (SRMA)

The 1985 San Juan/San Miguel Planning Area RMP designated the Dolores River Canyon as a Special Recreation Management Area. The boundary took in the entire corridor from the McPhee Reservoir to Bedrock, and included the Dolores River Canyon WSA. Since BLM management boundaries have since been changed, a portion of the SRMA is now within the San Juan FO and a portion is within the Uncompahgre FO. We recommend that The Dolores River Canyon SRMA retain its special management status, including the portion within the Uncompahgre Field Office. The San Juan Public Lands Draft Land Management Plan released in 2007 maintains a special designation for the portion of the corridor in their jurisdiction.

Pertaining to specific SRMA planning and management procedures we ask the UFO to refer to the broader conservation community's comments we incorporated above regarding "Recreation and Special Recreation Management Areas."

9-A-PI-WSR

## Wild and Scenic River Suitability

As part of the RMP revision process the BLM is required to determine the eligibility and suitability of rivers and streams under the Wild and Scenic Rivers Act. Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update. The Dolores has been found suitable in the past and still maintains the same qualities. Few streams boast the unique natural values as are found along the Dolores River. The river itself, and all its eligible tributaries, should receive immediate, thorough, and enduring protection.

10-A-PI-WSR

## Oil and Gas Leasing and Development

Oil and gas leasing, exploration, and development should be prohibited in the Dolores River Corridor, certainly within visual proximity of the river itself. Any existing or future leases should maintain non-waiveable No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values associated with wild and scenic suitability or the existing Special Recreation Management Area Designation. Not only is the river spectacular from an ecological, scenic, and recreational standpoint, the Dolores has also been found suitable for W&S designation since the 1970s. It has been the practice of the BLM to apply NSO stipulations per the BLM's 1990 Dolores River Corridor Management Plan.

11-A-PI-MI

## Uranium Mining

The revised management plan needs to address conditions that will be placed on future uranium mining in the planning area. There is established federal case law that mining operations must comply with land management plans, and that federal agencies have the authority to restrict or prevent mining based on compliance with land management plans.  We request that the RMP prohibit mining related activities in areas of ecological significance such as river corridors, WSA's and ACEC's as well as SRMA's to protect quiet recreational experiences. All permitted mines must: prove that there will be no harm to both surface and ground water quality and quantity; prove that the long-term ecological health of the area will not be jeopardized; have viable reclamation plans in place before permits can be granted; and have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.  BLM must ensure that all state and federal laws are applied to any permitted mines.  The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place.  The BLM must follow up with a regular inspection and monitoring program to ensure that violations are not occurring or not allowed to occur over a long period of time.

We also urge reclamation and restoration of past uranium mining scars within the planning area.

`12-A-PI-MI`

`13-A-PI-WSR, CR`

## Cultural Resources

There are a number of archeological sites with significant cultural value found within the portion of the Dolores Corridor within the planning area. As an example, a number of immense petroglyph panels can be found on a few boulders and in a small finger canyon of Wingate Sandstone along the northern side of the Paradox Valley west of Bedrock. BLM should inventory this area, if it hasn't already, and should develop management prescriptions designed to protect these resources. The broader conservation group comments we referenced and incorporated earlier contain extensive recommendations on planning and management guidance for cultural resources.

`14-A-PI-WSR`

## Wildlife Habitat & Sensitive Species Management

Given the diversity of flora and fauna range and habitat found in this portion of the Dolores basin – Mule Deer, Elk, and Wild Turkey winter range as well as Gunnison Prairie Dog colonies and the location of three CNHP Potential Conservation Areas (Dolores Canyon South, Dolores River – Slick Rock to Bedrock, and Dolores River - Uravan to Roc Creek) – great care should be taken to follow the planning and management guidance for these resources as outlined in the "Wildlife Viability", "Special Status Species/Plants", and "Travel Management" sections of the broader conservation group comments referenced earlier. We also encourage the incorporation of directives outlined by the Center For Native Ecosystems in their scoping comments.

Please see attached spreadsheet (UFO_Dolores Basin PCA Species.xls) for a list of the species associated with the three CNHP Potential Conservation Areas noted above.



15-A-PI-WSR



## Socioeconomic Analysis

The Socioeconomic comments and studies submitted within the broader conservation group comments should be considered for the relevant portion of the basin within the UFO's jurisdiction.

16-A-PI-WSR

## Cooperation with adjacent BLM Field Offices and Other Agencies

The Dolores Corridor should be managed in close cooperation with adjacent BLM Field Offices. For example, the Dolores River Canyon Wilderness Study Area is bisected by the UFO and the San Juan FO, but requires consistent and close management, especially considering issues with motorized incursions from the Utah. The Sewemup Mesa CWP expansions to the existing WSA also overlap the Grand Junction and Uncompahgre BLM field offices. Significantly, the river itself crosses boundaries between the San Juan, Uncompahgre, and Grand Junction Field Offices.  It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities. We urge the Uncompahgre Field Office to adopt a broad vision of the landscape in approaching the cooperative management of these areas.

We urge the BLM to work with other agencies as well.  Some of the outstandingly remarkable values identified in the Dolores River Corridor – fish species, plant species, and recreational boating – depend on a healthy functioning ecosystem, adequate stream flows, and well managed spills from McPhee Reservoir.  We urge the Uncompahgre Field Office of the BLM to work with water managers (including the Bureau of Reclamation and the Dolores Water Conservancy District) as well as adjacent BLM field offices, The Dolores River Dialogue, conservation groups, boaters (both private and commercial), and other stakeholders to ensure that outstandingly remarkable values of the Dolores are maintained and enhanced and that viable flow regimes are developed for both the benefit of the ecosystem and boating.

This is an outstanding natural landscape, which includes several unique plant and animal communities and provides one of the most spectacular recreational boating experiences in the country. Most of the land bordering the river is under public ownership and river flows are highly regulated by the McPhee Dam. The Dolores River corridor requires coordinated management in order to preserve these resources for the future.

**In conclusion**, we appreciate the opportunity to offer comments on the Uncompahgre RMP revision process. We would be happy to sit down and discuss the Dolores River with the planning team as appropriate.

Attachments:
- Dolores River Canyon CWP inventory report with map
- Sewemup Mesa CWP inventory report with map
- UFO_Dolores Basin PCA Species.xls

Sincerely,

*/signed/*

Amber Kelley
Dolores River Campaign Coordinator
Dolores River Coalition
San Juan Citizens Alliance
PO Box 1513
Cortez, CO 81321
970-565-7191


*for*

Kate Graham
Public Lands Organizer
Colorado Environmental Coalition
546 Main St #404
Grand Junction, CO 81501
970-243-0002

Bill Dvorak
Colorado River Outfitters Association
17921 hwy 285
Nathrop, CO 81236
719-539-6851

John Weisheit
Conservation Director
Colorado Riverkeeper
PO Box 466
Moab, UT  84532
435-259-1063

Steve Smith
Assistant Regional Director
Colorado Regional Office
The Wilderness Society
1660 Wynkoop, Suite 850
Denver, CO 80202
303-650-5818 ext. 102

Andrea Robinsong
Chair, Public Lands Committee
Western Colorado Congress
PO Box 1931
Grand Junction, CO 81502
970-256-7650

Hilary White
Director
Sheep Mountain Alliance
PO Box 389
Telluride, CO 81435
970-729-2321

**Dolores River Coalition**
**San Juan Citizens Alliance**
**Colorado Environmental Coalition**
**The Wilderness Society**
**Colorado River Outfitters Association**
**Colorado Riverkeeper**
**Western Colorado Congress**
**Sheep Mountain Alliance**

March 29, 2010

BLM Uncompahgre RMP
2465 S. Townsend Ave.
Montrose, CO 81401

Email: uformp@blm.gov

Re: Scoping comments, BLM Uncompahgre Field Office RMP

To Whom it May Concern:

On behalf of the undersigned organizations and the Dolores River Coalition we offer
the following comments on the BLM Uncompahgre RMP revision.  The comments
herein relate specifically to the Dolores River Corridor portion of the BLM
Uncompahgre Field Office. We are also incorporating by reference the extensive
comments submitted by some of these and other Colorado conservation
organizations.

## Introduction: The Dolores River Corridor is a special place in need of special consideration

The Lower Dolores River carves one of America's premier wild river canyons. The
170-mile segment from below McPhee Reservoir to the river's confluence with the
Colorado River in Utah traverses some of the most remarkable landscapes in the
desert Southwest. Renowned features of the Dolores River include magnificent stands
of old-growth ponderosa pine, thrilling whitewater rapids such as Snaggletooth,
sheerwalled sandstone canyons, and hidden archeological treasures.

BLM_0081793

The Dolores River's scenic grandeur and ecological richness have been found suitable for Wild and Scenic designation since 1975. Whitewater enthusiasts, naturalists, and other backcountry users of all stripes value the rugged beauty, wildlife, quiet solitude, and connection to history these canyons offer.  The river's scenery, geology, fish, wildlife, plant communities, and human history are woven into a continuum of ever changing wonders as one travels the 170 miles downriver from McPhee dam to the river's confluence with the Colorado River in Utah.

Here, the geological and biological transformation from Southern Rocky Mountains to Colorado Plateau is compacted and therefore unparalleled among other great rivers of the Southwest. Along the river's journey, four anticlines reveal deep, pristine canyons. Exposed is a nearly complete depositional record of Mesozoic times, from the cream-colored, cross-bedded Dakota Sandstone, to rainbow pastels of Morrison rock, to the oldest cliff forming red rocks of Triassic age. Trees are a prominent feature, and include upland riparian cottonwood, old growth ponderosa pine and Douglas fir mixed with alder and dogwood, high desert pinon and juniper with intervening boxelder, and the willows, privet, wild rose and cactus gardens of Slickrock Canyon. Visitors often are rewarded with sightings of river otter and desert bighorn. The river, too, ranges from meandering Class I water with deep back eddy trout pools to raging Class IV whitewater. A hike to the rim anywhere affords unmarred vistas of westward dipping tablelands framed by snowclad peaks of the La Sal Mountains. On the human side, traces remain of ancient hunter-gatherer and Puebloan societies:  rock art panels, stone granaries, and cave shelters. Few other river segments in the west offer such extraordinary variety.

The river supports a variety of economic and recreational activities that benefit nearby communities. Working farms and ranches, professional outfitters anglers, historians, river runners, hikers, archeologists and recreationists all share an interest in preserving the Dolores River Basin.

The entire river basin spans numerous BLM and US Forest Service offices and should be cooperatively managed to ensure that the river's serenity and beauty can continue to be enjoyed and explored but never exploited or taken for granted. As more people move into the communities around the Lower Dolores and as more recreationists learn about the area, the potential for increased development, both recreational and commercial, threatens to chip away at and permanently alter the amazing resource we all have in the Dolores Basin. Action needs to be taken now to ensure that the numerous qualities of the Lower Dolores River are sustained into the future, or it will be too late.  Planning processes such as this one are the first step in ensuring that the Lower Dolores will be enjoyed by generation to come.

The Dolores River Coalition is committed to finding a long-term solution for protection of this landscape.  To that end we have participated in the RMP revision process for both the San Juan and the Grand Junction Field Offices, as well as river focused processes such as the Wild and Scenic Suitability Stakeholder Process for rivers and streams in the GJFO and the Lower Dolores River Management Plan

BLM_0081794

Working Group process focused on wild and scenic and alternatives to wild and scenic for the portion of the Dolores in the San Juan FO.  While the UFO contains a much smaller swath of the Dolores River Corridor's public lands and a shorter stretch of the river than the other two field offices, it is the core part of the river ecosystem. We therefore urge the UFO to consider the portion of the Dolores River Corridor within its jurisdiction to be an integral part of the larger Dolores River ecosystem as you make management decisions for the area.

## Wilderness Quality Lands in the Dolores River Corridor

BLM has both the obligation and the authority to protect lands with wilderness characteristics. The BLM's Uncompahgre Field Office contains portions of one Wilderness Study Area (WSA), the Dolores River Canyon WSA, as well as proposed additions, in the form of Citizen's Wilderness Proposals (CWPs) to both the Dolores River Canyon and Sewemup Mesa WSA.  Both the WSA lands and the proposed additions should managed in order to protect their wilderness characteristics. If managed in this recommended manner, WSAs and CWP lands in the Uncompahgre FO will not only remain available for possible future designation as Wilderness, but will also ensure and expand the opportunities for backcountry recreationists to experience a sense of adventure and discovery. Inventory reports of these areas are attached, which include maps.

- **Dolores River Canyon WSA & CWP Expansions:** This heart of the stunning and wild Dolores corridor, the Dolores River Canyon Wilderness Study Area, with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience must gain the highest possible level of protection. The portion of the Dolores River Canyon Wilderness Study Area within the Uncompahgre Field Office should continue to be managed to protect its wilderness qualities, and BLM should also analyze and manage the Citizen Proposed additions to the WSA so as to protect their wilderness characteristics.

  In the 1985 San Juan/San Miguel Planning Area Resource Management Plan, the BLM recommended the Dolores River Canyon WSA as suitable for wilderness designation.  The area possesses the same qualities now that led to the suitability finding in the past.  We urge to the BLM to reaffirm the recommendation of the Dolores River Canyon WSA for designation. On page 15 the 1985 RMP states:

  " The Dolores River Canyon WSA is being recommended as preliminarily suitable for wilderness designation, primarily because it possesses highly outstanding characteristics for primitive and unconfined recreation, solitude, and naturalness, as well as scenic grandeur and superb wilderness characteristics. It is a nationally unique area and is worthy of preservation in its natural state. The nationally significant values associated with Dolores River Canyon WSA include: (1) Formerly a Wild and Scenic River candidate as

BLM_0081795

recommended by an interagency study report in 1976 and recommended to Congress for protection on several occasions; (2) Outstanding primitive and unconfined recreation opportunities associated with the river, canyons, and mesas; (3) Unique plant and animal communities found within the WSA that contain threatened and endangered species habitat; and (4) Extremely diverse topography and geology that create outstanding scenery, vistas and excellent solitude opportunities. This unique combination of factors, found only in the Dolores River Canyon WSA, creates the specific need and rational for BLM to recommend this area as preliminarily suitable for wilderness designation."

- **The Sewemup Mesa WSA & CWP Expansions:** The Sewemup Mesa CWP combines the Sewemup Mesa WSA with citizen proposed expansions. While the WSA itself falls in the Grand Junction Field Office, a significant proposed addition crosses into the Uncompahgre FO, including Carpenter Flats and Beehive Canyon. The boundaries have been drawn to exclude significant land impacts and to aid in manageability. While citizens did identify a number of routes (most likely developed by prospectors) within the Carpenter Flats and Beehive Canyon portions of the CWP, it was determined that these routes do not meet the criteria of a road as they are not maintained or regularly used. A detailed account of these routes can be found on pages 10 and 11 of the "Sewemup Mesa Citizens' Wilderness Proposal: Wilderness Inventory Report" which has been previously submitted to your office, and also is included as an attachment. The Sewemup Mesa CWP expansions create a cohesive landscape of diverse canyon systems with smaller systems such as Beehive Canyon offering the most intimate of wilderness experiences.  Portions of this CWP expansion falling within the boundary of the Uncompahgre Field Office should be considered in combination with wilderness quality lands in the Grand Junction FO and be managed for their wilderness characteristics.

In the 1987 Grand Junction Field Office Resource Management Plan, the agency found the majority of the Sewemup Mesa WSA to be suitable for Wilderness designation, including the very small portion in the Uncompahgre Field Office. The area possesses the same qualities now that led to the suitability finding in the past.  We urge the UFO to reaffirm their support of the GJFO's findings that the portions of the Sewemup Mesa WSA with the UFO are suitable for Wilderness designation. On page 37 the 1987 RMP states:

"Sewemup Mesa WSA (18,835 acres) [including acreage in Montrose County] is recommended preliminarily suitable for wilderness designation wilderness because [it] possess outstanding wilderness characteristic including sufficient size, naturalness and outstanding opportunities for both solitude and primitive and unconfined recreation. Additionally, [this] WSA possess high quality ecological, geological, scientific, educational, scenic and cultural values. [This] WSA will be outstanding representatives of the Colorado Plateau Physiographic Province in adding to the landform and ecological diversity of the National Wilderness Preservation System. [The area has] minimal resource

conflicts. Very strong public support, from both the region and nation, has been shown for wilderness designation of [this] WSA. Specific boundaries for this WSA are shown in Appendix I of the draft RMP EIS."

## Dolores River Canyon Special Recreation Management Area (SRMA)

The 1985 San Juan/San Miguel Planning Area RMP designated the Dolores River Canyon as a Special Recreation Management Area. The boundary took in the entire corridor from the McPhee Reservoir to Bedrock, and included the Dolores River Canyon WSA. Since BLM management boundaries have since been changed, a portion of the SRMA is now within the San Juan FO and a portion is within the Uncompahgre FO. We recommend that The Dolores River Canyon SRMA retain its special management status, including the portion within the Uncompahgre Field Office. The San Juan Public Lands Draft Land Management Plan released in 2007 maintains a special designation for the portion of the corridor in their jurisdiction.

Pertaining to specific SRMA planning and management procedures we ask the UFO to refer to the broader conservation community's comments we incorporated above regarding "Recreation and Special Recreation Management Areas."

## Wild and Scenic River Suitability

As part of the RMP revision process the BLM is required to determine the eligibility and suitability of rivers and streams under the Wild and Scenic Rivers Act. Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update. The Dolores has been found suitable in the past and still maintains the same qualities. Few streams boast the unique natural values as are found along the Dolores River. The river itself, and all its eligible tributaries, should receive immediate, thorough, and enduring protection.

## Oil and Gas Leasing and Development

Oil and gas leasing, exploration, and development should be prohibited in the Dolores River Corridor, certainly within visual proximity of the river itself. Any existing or future leases should maintain non-waiveable No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values associated with wild and scenic suitability or the existing Special Recreation Management Area Designation. Not only is the river spectacular from an ecological, scenic, and recreational standpoint, the Dolores has also been found suitable for W&S designation since the 1970s. It has been the practice of the BLM to apply NSO stipulations per the BLM's 1990 Dolores River Corridor Management Plan.

## Uranium Mining

The revised management plan needs to address conditions that will be placed on future uranium mining in the planning area. There is established federal case law that mining operations must comply with land management plans, and that federal agencies have the authority to restrict or prevent mining based on compliance with land management plans.  We request that the RMP prohibit mining related activities in areas of ecological significance such as river corridors, WSA's and ACEC's as well as SRMA's to protect quiet recreational experiences. All permitted mines must: prove that there will be no harm to both surface and ground water quality and quantity; prove that the long-term ecological health of the area will not be jeopardized; have viable reclamation plans in place before permits can be granted; and have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.  BLM must ensure that all state and federal laws are applied to any permitted mines.  The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place.  The BLM must follow up with a regular inspection and monitoring program to ensure that violations are not occurring or not allowed to occur over a long period of time.

We also urge reclamation and restoration of past uranium mining scars within the planning area.


## Cultural Resources

There are a number of archeological sites with significant cultural value found within the portion of the Dolores Corridor within the planning area. As an example, a number of immense petroglyph panels can be found on a few boulders and in a small finger canyon of Wingate Sandstone along the northern side of the Paradox Valley west of Bedrock. BLM should inventory this area, if it hasn't already, and should develop management prescriptions designed to protect these resources. The broader conservation group comments we referenced and incorporated earlier contain extensive recommendations on planning and management guidance for cultural resources.


## Wildlife Habitat & Sensitive Species Management

Given the diversity of flora and fauna range and habitat found in this portion of the Dolores basin – Mule Deer, Elk, and Wild Turkey winter range as well as Gunnison Prairie Dog colonies and the location of three CNHP Potential Conservation Areas (Dolores Canyon South, Dolores River – Slick Rock to Bedrock, and Dolores River - Uravan to Roc Creek) – great care should be taken to follow the planning and management guidance for these resources as outlined in the "Wildlife Viability", "Special Status Species/Plants", and "Travel Management" sections of the broader conservation group comments referenced earlier. We also encourage the incorporation of directives outlined by the Center For Native Ecosystems in their scoping comments.

Please see attached spreadsheet (UFO_Dolores Basin PCA Species.xls) for a list of the species associated with the three CNHP Potential Conservation Areas noted above.

## Socioeconomic Analysis

The Socioeconomic comments and studies submitted within the broader conservation group comments should be considered for the relevant portion of the basin within the UFO's jurisdiction.

## Cooperation with adjacent BLM Field Offices and Other Agencies

The Dolores Corridor should be managed in close cooperation with adjacent BLM Field Offices. For example, the Dolores River Canyon Wilderness Study Area is bisected by the UFO and the San Juan FO, but requires consistent and close management, especially considering issues with motorized incursions from the Utah. The Sewemup Mesa CWP expansions to the existing WSA also overlap the Grand Junction and Uncompahgre BLM field offices. Significantly, the river itself crosses boundaries between the San Juan, Uncompahgre, and Grand Junction Field Offices.  It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities. We urge the Uncompahgre Field Office to adopt a broad vision of the landscape in approaching the cooperative management of these areas.

We urge the BLM to work with other agencies as well.  Some of the outstandingly remarkable values identified in the Dolores River Corridor – fish species, plant species, and recreational boating – depend on a healthy functioning ecosystem, adequate stream flows, and well managed spills from McPhee Reservoir.  We urge the Uncompahgre Field Office of the BLM to work with water managers (including the Bureau of Reclamation and the Dolores Water Conservancy District) as well as adjacent BLM field offices, The Dolores River Dialogue, conservation groups, boaters (both private and commercial), and other stakeholders to ensure that outstandingly remarkable values of the Dolores are maintained and enhanced and that viable flow regimes are developed for both the benefit of the ecosystem and boating.

This is an outstanding natural landscape, which includes several unique plant and animal communities and provides one of the most spectacular recreational boating experiences in the country. Most of the land bordering the river is under public ownership and river flows are highly regulated by the McPhee Dam. The Dolores River corridor requires coordinated management in order to preserve these resources for the future.

**In conclusion**, we appreciate the opportunity to offer comments on the
Uncompahgre RMP revision process. We would be happy to sit down and discuss the
Dolores River with the planning team as appropriate.

Attachments:
- Dolores River Canyon CWP inventory report with map
- Sewemup Mesa CWP inventory report with map
- UFO_Dolores Basin PCA Species.xls

Sincerely,

*/signed/*

Amber Kelley
Dolores River Campaign Coordinator
Dolores River Coalition
San Juan Citizens Alliance
PO Box 1513
Cortez, CO 81321
970-565-7191


*for*

Kate Graham
Public Lands Organizer
Colorado Environmental Coalition
546 Main St #404
Grand Junction, CO 81501
970-243-0002

Bill Dvorak
Colorado River Outfitters Association
17921 hwy 285
Nathrop, CO 81236
719-539-6851

John Weisheit
Conservation Director
Colorado Riverkeeper
PO Box 466
Moab, UT  84532
435-259-1063

Steve Smith
Assistant Regional Director
Colorado Regional Office
The Wilderness Society
1660 Wynkoop, Suite 850
Denver, CO 80202
303-650-5818 ext. 102

Andrea Robinsong
Chair, Public Lands Committee
Western Colorado Congress
PO Box 1931
Grand Junction, CO 81502
970-256-7650

Hilary White
Director
Sheep Mountain Alliance
PO Box 389
Telluride, CO 81435
970-729-2321

BLM_0081800

# DOLORES RIVER CANYON

## · WILDERNESS CHARACTER INVENTORY REPORT ·

## OVERVIEW

The Dolores River Canyon Citizens' Wilderness Proposal (CWP) area contains 41,133 acres of federal land. The areas are roadless, retain their natural appearance, and offer outstanding opportunities for solitude and primitive and unconfined recreation. The CWP extends beyond the Bureau of Land Management (BLM) Dolores River Canyon Wilderness Study Area (WSA). These expansions are warranted and based on field research, and they add wilderness quality lands to the existing WSA.


The Dolores River twists and turns.

## AREA DESCRIPTION

Dolores River Canyon is a pristine desert area containing some of the most outstanding canyon scenery in Colorado. It includes bench lands and mesa uplands, portions of five tributary canyons, and a segment of the Dolores River which has been recommended as a Wild river under the Wild and Scenic Rivers Act. The canyon's cliffs rise to benches of bedrock 500 to 700 feet above the river, with the canyon rim rising to 1,100 feet above the river.

Twelve geological formations spanning 160 million years of geologic history are exposed by the river in the gorge;

the predominant formation is red Wingate sandstone. Peregrine falcons nest in nearby Paradox Valley, and likely hunt in the Dolores River Canyon itself. Golden eagles nest there, and bald eagles have been seen; mule deer, mountain lions, and bobcats are common. The canyon is considered prime habitat for reintroduction of both desert bighorn sheep and river otters.

Vegetation varies from pinyon-juniper woodland, oak brush, and sagebrush on the mesa uplands to willows, boxelder, rushes, sedges, and cottonwoods along the river.

The remote areas of Nyswonger Mesa, Bull Canyon, and Skein Mesa have been added to the Citizens' proposal for Dolores River Canyon because of the continuity that they add to wild lands included in the Wilderness Study Area, and because even the minimal traces of human activities that once occurred there are now passing from view.


Stunning side canyons offer outstanding opportunities for recreation.

## INVENTORY HISTORY

The BLM inventoried the Dolores River Canyon for Wilderness character in the late 1970s and established a Wilderness Study Area (WSA) in 1980. In October 1991



BLM_0081801



Dolores River Canyon Proposed Wilderness Area

BLM_0081802

the BLM recommended that 29,415 acres of Dolores River Canyon become designated Wilderness. This recommendation was made because of the area's outstanding natural scenery and opportunities for solitude and primitive and unconfined recreation, as well as its ecological diversity.

Citizens released the Conservationists' Wilderness Proposal (CWP) in 1994. This proposal included expansions to the WSA in the following areas: Davis Mesa, the bench above Spring Canyon, some small additions on the bench to the south of Wild Steer Mesa, Upper Bull Canyon, lands to the south of Andy's Mesa, upper Coyote Wash, and Nyswonger Mesa.

Citizens reinventoried Dolores River Canyon in 2000 and made two adjustments to the CWP boundaries. The northern part of Davis Mesa was removed from the WSA because of an existing county road and Skein Mesa was added because the road on the northern part of the Mesa is no longer needed or maintained.

## WILDENRESS CHARACTER ANALYSIS

### Size

At approximately 41,133 acres, the proposed Dolores River Canyon Wilderness exceeds the traditional minimum standard of 5,000 acres.

### Roadlessness

The BLM found the Dolores River Canyon WSA to be roadless in the late 1970s. The BLM's Initial Inventory report indicates that several areas were excluded from the WSA because of roads created during mining exploration. The mining exploration did not result in development in most places, and claims have not been patented. Citizens included many of these old mining routes in the Citizens' Proposed Wilderness area because they have not been maintained and they are recovering to a natural state via erosion and re-vegetation. Areas excluded from the WSA because of old mining routes and included in the CWP are: Nyswonger Mesa, Skein Mesa, Skein Mesa bench, Bull

Canyon, and Coyote Wash. "Approximately 750 acres have been deleted from Coyote Wash due to the presence of a constructed and maintained road which was previously thought to be a way." (BLM Intensive Wilderness Inventory Final Wilderness Study Areas November 1980 p. 217) Routes include in the WSA have not been inventoried and are not described here.

Citizens extended the boundaries along Coyote Wash to the Utah State line. This is a natural extension of the boundaries and includes an important part of the canyon system. While field visits were not possible, reviews of 1993 aerial photos indicate the route to be unmaintained and relatively unused. On the photos the route disappears or becomes very faint in places indicating lack of maintenance and use.

The Skein Mesa Bench (south of Skein Mesa and north of Spring Canyon) was included by citizens in the proposed wilderness area in the mid 1990s. At the time the routes did not appear to be maintained. During the summer of 2000 the route that branches to the west, DRC10, had recently been maintained.

There is no apparent purpose for the route, and no clear reason why maintenance would be necessary. Citizens feel that it is important to include these bench lands and that the road, once closed, will recover to a natural state. During its 1970s inventories, BLM determined these routes to be ways (BLM Intensive Wilderness Inventory Final Wilderness Study Areas November 1980 p. 217) Unless that road maintenance was authorized by the BLM, the agency should take steps to reclaim the route and maintain the wilderness character that otherwise remains. There are three routes (DRC11, DRC12 and DRC13) that branch off of DRC10. None of these routes are maintained or regularly used.

Skein Mesa itself was excluded by the BLM in the initial inventories because it was surrounded by roads. While the road to the south and west of Skein mesa is maintained and excluded from the Wilderness Proposal via a cherry stem, the road to the north of the mesa has not been maintained



BLM_0081803



Photo kek137_31 shows route DRC10 with recent maintenance.



Photo kek138_19 is toward the end of DRC10; damage to fragile soils is pictured, as well as what appears to be the first pass made by a grader in some time.



Photo kek138_6 shows the beginning of DRC11. This route was clearly not constructed, and has not been maintained.



Photo kek137_34 is of spur DRC12. It shows the route almost completely revegetated and lacking maintenance or regular use.

and is recovering to a natural state via erosion and revegetation. See photos KEK140_2 and KEK140_6. Keeping this unnecessary route closed allows for the inclusion of Skein Mesa in the Wilderness proposal, as it certainly deserves the protection that Wilderness designation affords. Spur route DRC7 is also unmaintained and irregularly used.

Citizens drew the boundaries for Bull Canyon up to the rim of this amazing canyon in the mid-1990s. This boundary location is an identifiable and manageable boundary. The BLM had drawn the boundary instead along the road that runs down the canyon (excluding the road).



Photos KEK140_2 is of the west end of DRC6. It shows no maintenance and only irregular use.



Photo KEK140_6 is of the east end of DRC6. It shows lack of maintenance and little use.

While this route, DRC16, has been maintained part of the way down into the canyon, this should not prevent this beautiful canyon from becoming wilderness. Photos KEK 142_4 and KEK142_10 show the condition of the route at it runs further down the canyon. During the BLM's 1970s inventories they determined this route to be a way (BLM Intensive Wilderness Inventory Final Wilderness Study Areas November 1980 p. 217) This way, only partially maintained, would quickly return to a natural state through erosion and revegetation; its inclusion would not significantly impact the Wilderness character of the CWP.



KEK142_4 shows DRC16 as it enters the CWP. It has been maintained.



KEK142_10 shows the route about 1 mile into the CWP. The route has not seen recent maintenance and does appear to be regularly used.



BLM_0081804

The Citizens' Wilderness Proposal boundary for the Davis Mesa portion of the unit follows the County Road on Davis Mesa and includes the lands to the south of the road. The mesa tops excluded from the WSA do have old seismic routes. The citizen inventory took place in 2000, 20 years after the BLM's inventory. While no photos of the routes condition in the late 70s have been provided by the BLM for comparison, photos KEK 131_12, taken at the intersection with the Davis Mesa County Road, and KEK 131_14, taken in 2000, show routes that have not been maintained and are not being regularly used.



Photo KEK 131_12 shows the beginning of the route accessing the Davis Mesa. The photo shows minimal use and natural recovery of vegetation between the vehicle tracks.



Photo KEK 131_14 shows bare soil contoured by years of erosion, freeze/thaw cycles, and old vehicle tracks and shows no evidence of maintenance.



Photo KEK 131_17 shows tall vegetation growing between the wheel tracks and slow recovery of cryptogrammic soils in route DRC17.

While the vehicle tracks are more visible in this photo, the only access to this part of the route is via parts of the way shown in photo KEK 131_14, suggesting that these tracks are a result of slow crypto soil recovery and not recent use.

The beginning of route (DRC16) accessing the southeast portion of the mesa can also be seen in photo KEK 131_14. Evidence of old vehicle tracks can be seen in the route, but no recent use is evident, nor is any maintenance.

Nyswonger Mesa shows some old scars of exploration. While at one time these routes may have been roads, they are clearly no longer in use. The only route up to the top of the Mesa has not been maintained, and is not passable by passenger vehicle. See photos KEK 133_ 20 and KEK 133_21. Routes on top of the mesa have presumably not been maintained, either, and are similarly not accessible by passenger vehicles other than ATVs.





Photo kek133_20 show the route badly eroded and passable only by ATV (not a legal passenger vehicle).

Photo kek133_21 – taken a little further up the trail – shows a single track cow trial. A skilled ATV driver may be able to pass this

Citizens expanded the WSA boundary on Anderson Mesa. The BLM WSA boundary follows routes on top of the Mesa. CWP boundaries take in more of Anderson Mesa and include routes DRC19 and DRC20 on the mesa. During the BLM's 1970s inventories they determined these routes to be ways (BLM Intensive Wilderness Inventory Final Wilderness Study Areas November 1980 p. 217). In addition, the routes on top of the mesa are not maintained or regularly used. By including the route on top of the mesa in the Wilderness boundary, illegal motorized incursions into the area would be prevented, making for a more manageable boundary.

In general, the lands added to the WSA by conservationists are roadless. The BLM, in most cases, found these lands to be roadless in their 1970s inventories. The few maintained roads in the unit do not serve any purpose and could easily be closed to ensure more manageable boundaries.



BLM_0081805



Photo kek175_18 shows an ATV trail that is barely used and perhaps illegally created during hunting season.



Photo kek175_25 shows an unmaintained and seldom used segment of RC19.

## Naturalness

The Dolores River Canyon CWP retains its natural character. The Dolores River Canyon, associated side canyons, mesas, and bench lands are composed of beautiful scenery where the imprints of man are few and far between. From stunning red and white sandstone formations to pinion-juniper covered mesas, these areas have been affected primarily by the forces of nature.

The BLM found the WSA to be natural:

> This unit centers on the deeply-incised, meandering Dolores River Canyon and includes those tributary canyons and surrounding rim lands that are primarily natural in character. This rugged canyon system is cut down through a series of sedimentary strata resulting in many colorful ledges and massive cliffs interspersed with talus slopes. Approximately 30 miles of the Dolores River are included within the unit. Vegetation varies with terrain and elevation. The rim and mesa area support a pinyon/juniper woodland with occasional sage parks. On the canyon slopes, there is a mixture of desert shrubs such as sagebrush, Mormon tea, squawbush, and buffalo berry, and scattered pinyon/juniper, cottonwoods and occasional ponderosa pine just under the canyon rim. The bottom of the main canyon and some of the tributary canyons support thicker riparian growth. Some small enclaves of aspen and ponderosa pine are found within the unit.
>
> *- BLM Intensive Wilderness Inventory Final Wilderness Study Areas November 1980 p. 217*

In the late 1970s the BLM found the Dolores River Canyon WSA to be to be natural and affected primarily by the forces of nature. The BLM went on to recommend this area for wilderness because of its outstanding natural values.

There are several significant differences between the BLM WSA boundary and the CWP boundary. These differences are the results of the BLM's feeling that Davis Mesa, Skein Mesa Bench, Bull Canyon, and Buck/Anderson Mesas did not qualify for wilderness under the naturalness criteria. In addition, citizens included Skein Mesa, and portions of Davis Mesa and Nsywonger Mesa not inventoried for naturalness by the BLM.

Most of the impacts which resulted in boundary changes can be characterized as ways and mining impacts that no longer affect naturalness. Many of these impacts simply don't represent significant impacts, and others have simply faded away since the BLM's 1970s inventories. Below we will discuss each of the CWP expansions and the associated impacts.

### Davis Mesa

The BLM drew the northwest portion of Davis Mesa out of the WSA because of ways that effected naturalness. "In the northern portion of the unit, 501 acres of mesa top and canyon slopes have been deleted due to the presence of two ways which impair the naturalness of that area." (BLM Intensive Wilderness Inventory Final Wilderness Study Areas November 1980 p. 217)

Most of the ways identified by the BLM in the northern part of the unit have been excluded from the CWP. Citizen boundaries include only two ways in the northern part of the unit not included in the WSA. These ways are barely traveled, well screened, and not of significant density to impact naturalness.



Photo kek132_15 shows one of the two ways in the sagebrush meadow. The sage screens the route effectively.



BLM_0081806

The CWP also includes lands on the southern half of Davis Mesa not inventoried by the BLM. These lands (discussed above in the Roadlessness section) are natural and have been seen little human impact. The human impacts on these two unnamed mesas consist of old seismic testing routes. They are well screened by pinion juniper and seldom traveled by vehicles. Photos of the routes can be seen in the above roadlessness section (see photos KEK 131_12 and KEK 131_14).

### Skein Mesa Bench

The BLM originally excluded the Skein Mesa Bench from the WSA. "Approximately 320 acres of bench land below Skein Mesa have been excluded from the unit due to presence of ways." (BLM Intensive Wilderness Inventory Final Wilderness Study Areas November 1980 p. 217)

Citizens included the Skein Mesa Bench because inventories found the area to be natural and the impacts that do exist are well screened and able to revegetate themselves. There are two maintained roads, each on its own bench to the south of Skein Mesa. The road directly below the mesa has been excluded from the unit via cherry stem. The road on the bench below has been included in the Citizens' Wilderness Proposal since the CWP's inception. BLM's 1980 Inventory reports indicate this route was a way at one time. This route was bladed in 2000, but it appeared that before 2000 it had not seen a blade for decades. Citizens argue that this road should be closed and included in the Wilderness because of the ecological significance of these bench lands, and for easier management. In addition, there does not appear to be any reason for maintaining this route.

The Skein Mesa bench lands also contain some old seismic testing routes. The majority of these routes are no longer locatable on the ground because they are covered in vegetation. Some are visible on aerial photos. Citizens included the bench lands in the original version of the CWP in the early 1990s because the old exploration routes were recovering and did not impact the area's naturalness. When the area was reinventoried by citizens in 2000, a route had been recently maintained. There was no indication of structures or features that require access via a maintained route. Citizens continue to advocate that these bench lands become Wilderness and request that the BLM allow this old mining route to recover. There are several old ways and seismic lines that intersect the maintained route. The photos KEK 138_28 and KEK 138_34 show these routes to be unmaintained and seldom used. There is also an old abandoned mine shaft on the east end of the bench (see photo KEK 137_28). Citizens feel strongly that these old seismic lines and the mine shaft do not impair the area's naturalness and that time will allow them to continue to recover.



Photo kek138_28 shows the old recovering seismic routes.



Photo kek138_34 shows the old recovering seismic routes.



Photo kek137_28 shows the old mine shaft.

Skein Mesa proper was included in the CWP in 2001. It is one of the few mesa tops in the area that escaped seismic and mining exploration activity, making this mesa special and unique. No other impacts are present on the mesa.



BLM_0081807

## Bull Canyon

The BLM excluded Bull Canyon from the WSA. "In Bull Canyon and along the bench west of and below Wild Steer Mesa, approximately 1,800 acres have been deleted from the unit. This area contained portions of a maintained road which had previously been thought to be a way. It also contained waste rock tailings from mines on the rims above the canyon and other evidence of mining activity." (BLM Intensive Wilderness Inventory Final Wilderness Study Areas November, 1980 p. 217)

Upper Bull Canyon was excluded from the WSA partly because of the road that runs down the canyon and partly because of some old mining activity along the rim of the canyon. Citizens feel that the old mining activity does not impair the area's naturalness, and would only add interesting historical context to the Wilderness area.



Photo kek142_5 shows the natural qualities of the area excluded from the WSA.



Photo kek142_11 shows the natural qualities of the area excluded from the WSA.

## Buck Mesa and Anderson Mesa

The BLM excluded portions of Buck Mesa and Anderson Mesa from the WSA because they lacked naturalness. "On Buck Mesa and Anderson Mesa approximately 680 acres have been deleted due to the presence of several ways which are substantially noticeable and which impair the naturalness of the areas" (BLM Intensive Wilderness Inventory Final Wilderness Study Areas, November 1980 p. 217)

Citizen inventories determined that Buck and Anderson Mesas are natural. The impacts (ways) are well screened and not of significant density. In addition, management of this portion of the unit would be significantly easier if vehicle traffic was not allowed on the tops of the mesas. The CWP boundary would limit traffic to below the mesa top.

## Coyote Wash

Coyote Wash is natural. Only one seldom-used and revegetating route runs down Coyote Wash. The impact of this route is negligible and this CWP area expansion is natural.

## Nyswonger Mesa



Photo kek142_3 shows the old mines and the lack of impact on the naturalness of the area.



Photo kek142_14 shows the old mines and the lack of impact on the naturalness of the area.



Photo kek142_7 shows the natural qualities of the area excluded from the WSA.



BLM_0081808

The BLM drew Nsywonger Mesa out of the WSA because of historic seismic and exploration activity. Citizens found these old seismic lines and some other routes to be fading in the early 1990s. In 2000 citizens investigated the access route to the mesa and found it to be a deteriorated and seldom used ATV trial (see photos KEK 133_20 and KEK 133_21 above). Aerial photographs show the area's routes as being insignificant and relatively unused. These deteriorating impacts have little effect on the overall naturalness of the Mesa; they are well screened by pinyon-juniper forests and sagebrush meadows.

## Outstanding Opportunities for Solitude or Primitive and Unconfined Recreation

### Solitude

The Dolores River Canyon CWP offers outstanding opportunities for solitude. The varied topography, mix of vegetation, and blunt landforms offer many places that provide outstanding solitude. The area's incredible canyon system, both the Dolores River Canyon and all of the side canyons (e.g., Wild Steer Canyon, La Sal Canyon, and Bull Canyon) offer intimate canyon settings with sheer walls. The various benches and mesas throughout the unit also offer outstanding opportunities for solitude.

The BLM found the Dolores River Canyon WSA to have outstanding opportunities for solitude:

> The rugged topography and vegetation groupings create settings which allow outstanding opportunities for solitude throughout most of the WSA. The deep, meandering canyons with sheer walls, many rock outcrops, ledges, and talus fields with large boulders, block out sights and sounds and create many secluded settings. The numerous tributary canyons are often very narrow, sheer walled and boulder choked, leading up to hidden grotto pools of clear cool water with hanging ferns and other non-desert vegetation. These side rips from the main river canyon offer even more areas of solitude. Vegetation screening is provided by pinyon-juniper woodlands on the mesa tops and benches and by riparian vegetation along the river.

> *- Wilderness Study Report, Volume Two, Montrose District Study Areas, p. 295.*

Citizens find that the areas the BLM excluded from the proposed Wilderness do offer outstanding opportunities

for solitude. Nsywonger Mesa is remote and seldom visited; views from the mesa are inspiring and create a sense of vastness. Skein Mesa is among the highest places in the proposed Wilderness and offers view that are awe-inspiring. The bench lands to the south of Skein Mesa and north of Bull Canyon offer intimate pinyon-juniper forests with views into side canyons and occasionally the main canyon. Upper Bull Canyon and Coyote Wash offer intimate canyon settings to contemplate the geological history of the area. The unnamed mesas on the southern portion of Davis Mesa are quiet pinyon-juniper forests



Desert blooms show the natural beauty of the area.

where one can sit quietly and hear nothing but pinyon jays hunting for food.

### Primitive and Unconfined Recreation

The Dolores River Canyon CWP offers outstanding opportunities for primitive and unconfined recreation. Opportunities for high quality hiking, backpacking, camping, scenic viewing, photography, and nature study are available within the Dolores River Canyon CWP. The diverse landscape, with the Dolores River Canyon and its many ridges and drainages as its principal feature, provide for ample opportunities to float or hike and explore the unit.

The BLM found the area to offer outstanding opportunities for primitive and unconfined recreation:



BLM_0081809

The Dolores River Canyon WSA provides outstanding opportunities for primitive and unconfined recreation. Historically, the Dolores River has provided scenic white water river opportunities for boating, kayakers and canoeists. The rugged canyon system offers challenging cross-country hiking and backpacking, while numerous high cliffs provide rock climbing opportunities. The view from the rim is of an immense red and buff-colored slick rock maze with sparse contrasting green vegetation and the changing water – a scenic backdrop for camping, sightseeing, nature photography, and geological study.

- *Wilderness Study Report, volume two, Montrose District Study Areas*, p. 295

The BLM found the Dolores River Canyon WSA to have outstanding opportunities for primitive and unconfined recreation. The BLM did not inventory the CWP expansions for primitive and unconfined recreation.

Citizens determined the Dolores River Canyon and the CWP expansions to offer outstanding opportunities for primitive and unconfined recreation. CWP expansions to the Dolores River Canyon WSA provide a variety of recreation opportunities via foot or horse: climbing up to Nyswonger Mesa, Davis Mesa, or Skein Mesa and camping on near the rim to enjoy the beautiful views; hiking the side canyons of Bull Canyon or Coyote Wash and exploring the next bend in the canyon; or exploring the bench lands to the north of Bull Canyon or to the South of Skein Mesa on horseback are all outstanding opportunities for recreation..

## SUPPLEMENTAL VALUES

The Dolores River Canyon CWP is loaded with cultural sites. Tool production areas, rock art panels, and home sites located in alcoves are among the sites that have been found.

Evidence of the area's prehistoric inhabitants can also be found in the form of fossils which include Triassic-age fish and armored crocodiles.

The area's geology is easily discovered due to the extensive canyon systems which have exposed the many geological layers over time. Limestone from the Pennsylvanian Period and Entrada sandstone from the Jurassic period are exposed, representing around 160 million years. Other points of geological interest include: Navajo Sandstone, Cayenta formation, Wingate Sandstone, and the Chinle formation.

The Colorado Division of Wildlife's (CDOW) spatial data was over layed with the Delores River Canyon proposed Wilderness for several species, most of which are popular with hunters and wildlife watchers. Bald eagles use the area for winter range. The area is considered overall range for bats. Bighorn sheep use the area for overall, summer, and winter range. Black bear can be found in the proposed Wilderness area. Elk use the area for overall, severe winter, and winter range. Dolores River Canyon proposed Wilderness area is a production area and winter range for geese. Mountain lions roam throughout the unit. Mule deer use the area for overall, severe winter, winter, and summer range. Otters can be found in the rivers. Peregrine falcons nest in the canyon walls,and turkeys use the area for winter range.

Colorado Natural Heritage Program has identified several Potential Conservation Areas within the Dolores River Canyon CWP. These sites contain important and rare plant species, as well as ecological processes. The sites are:

- La Sal Creek
- Coyote Wash
- Muleshoe Bench
- Dolores River at Anderson Mesa
- Dolores River at Andy's Mesa
- Little Gypsum Valley

The State of Colorado has identified the following Natural Areas within the unit:

- Paradox Valley – Dolores Canyon (identified)
- Coyote Wash (identified)
- Dolores Canyon Meanders (identified)

The Colorado Natural Heritage Program has identified the following Element Occurrences within the proposed Wilderness Area:

- violet milkvetch (G2S1; historical 1913 record)
- peregrine falcon (FS Sensitive, Colorado Species of Concern, Colorado Species of Greatest Conservation



DOLORES RIVER CANYON

BLM_0081810