Concern, G4T3S2B; 1 unranked 1994 record, 1 C-ranked 1999 record)

- banded physa (Colorado Species of Greatest Conservation Need, G2S1; historical 1914 record)
- box elder/river birch community (G1G2S1; B-ranked 1999 record)
- canyon treefrog (BLM Sensitive, Colorado Species of Greatest Conservation Concern, G5S2; 3 historical undated records, 1 E-ranked 1999 record)
- coyote willow/mesic graminoid community (G5S5; AB-ranked 1991 record)
- Eastwood monkeyflower (BLM Sensitive, G3S1; 1 B-ranked 1999 record, 1 D-ranked 1999 record)
- foothills riparian shrubland community (G1G2S1; A-ranked 1999 record)
- gray vireo (Colorado Species of Greatest Conservation Concern, G4S4B; three historical records, 1992, 1993, 1994)
- hanging gardens community (G2G3S2S3; D-ranked 1999 record)
- helleborine (FS Sensitive, G3G4S2; 3 B-ranked 1999 records, 1 C-ranked 1999 record)
- kachina daisy (BLM Sensitive, G2S1; A-ranked 1999 record)

- little penstemon (G3S2; 2 unranked 1982 records, 1 historical 1949 record)
- Naturita milkvetch (BLM Sensitive, G2G3S2S3; 1 unranked 1982 record, 1 C-ranked 1999 record, 1 historical 1978 record)
- Paradox breadroot (BLM Sensitive, G3S2; 1 D-ranked 1986 record, 1 E-ranked 1992 record, 1 historical 1949 record)
- Payson lupine (BLM Sensitive, G2S2; historical 1912 record)
- plateau striped whiptail (G5S4; B-ranked 1999 record)
- sage sparrow (FS Sensitive, Colorado Species of Greatest Conservation Need, G5S3B; historical 1993 record, historical 1994 record)
- smooth cliff-brake (G5T4?S2; B-ranked 1994 record)
- southern maiden-hair (G5S2; unranked 2004 record)
- spike pappusgrass (G5S1; E-ranked 1995 record)
- spotted bat (FS Sensitive, BLM Sensitive, Colorado Species of Greatest Conservation Need, G4S2; E-ranked 1994 record)
- tree lizard (G5S4; 2 B-ranked 1999 records)
- Western Slope grasslands community (G2G4S2; 4 A-ranked 1980 records, 1 B-ranked 1980 record)
- white-throated woodrat ssp. brevicauda (G5T2S1; historical 1908 record)

## CONCLUSION

The Dolores River Canyon Citizens' Wilderness Proposal has wilderness characteristics and should be managed to maintain and protect that character. The CWP expansions are roadless, natural, and add to the overall offering of outstanding opportunities for solitude and primitive and unconfined recreation. Including upper Bull Canyon, Anderson Mesa, upper Coyote Wash, Nsywonger Mesa, Skein Mesa, and the unnamed bench to the south of Davis Mesa make sense when considering the overall landscape and management of the unit.

*October 2005*



BLM_0081811

**Spreadsheet Placeholder(file available in native format)**

**File Name:**                     UFO_ Dolores Basin PCA Species.xls

IN

**From:** Bart Eller
**To:** uformp@blm.gov
**Subject:** Comments for RMP
**Date:** Monday, March 29, 2010 12:55:32 PM

1 A-PI REC

Thanks for your cosideration.

name is Bart Eller.  I am a Colorado native and do most of my recreating on public lands.  I currently sit on the board of directors of the north fork pool park and rec district.

My primary public land uses are hiking, mountainbiking, motorcycle/ohv, and camping.

In order of use of BLM land I use the Hotchkiss dobies, Jumbo Mountain trail system, North Delta OHV area, and Paonia/Crawford dobies primarily.

2 A-PI REC

I did not realize that the deadline for comments was already here so the opinions expressed are my own but I will try to have the rec district board create an official position of cooperation at the next meeting.  As we recently did a survey for our own Master Plan that some what supprisingly found BLM/public lands as the primary place that our residents recreate.  The residents overwhelmingly wanted us to develop trails as the top priority. The rec district owns aprx. 160 acres at our Cross Roads Park which is adjacent to BLM-Hotchkiss Dobies.

My primary public land uses are hiking, mountainbiking, motorcycle/ohv, and camping.

3 A-PI PH

In order of use of BLM land I use the Hotchkiss dobies, Jumbo Mountain trail system, North Delta OHV area, and Paonia/Crawford dobies primarily.

The general problems are the dumping of household trash in these areas, (which has slowed down but there is little or no removal) and lack of trail maintainence/erosion control.  It is my opinion that if directed by the BLM, local orginizations such as our own or others, could garner and manage plenty of volunteer labor to clean trash and maintain trails and control erosion.  I think this might also inspire more local pride in these areas.

4 A-PI WSA

Also I do not support these areas even being considered as wilderness.

For clarity I will try to comment on each area concisely below.

Hotchkiss dobies-

5 A-PI REC

Superb close motorcycle, ATV, and OHV area. Could use a designated shooting "range" to reduce danger to other users.  Little or no value for bicycles due to soft dirt and steep hills.  The large numbers of trails / open riding = big family fun.  Simply regrading the most used trails every 3-5 years would keep them from getting ever wider as people try to avoid big bumps. Might be nice to have a couple of single track only trails.

Jumbo trails-

6 A-PI REC

The best mountain bike trail system in the region.  A true gem. Great for hiking
also.  The powerline road(really the whole area)is good for OHV use

but I don't ride my motorcycle there for fear of hitting a cyclist. I support this being a non-open riding area if a good trails plan was in place.  I would support trails development in this area though. Live stock does the most trail damage in this area.

**7 A-PI REC**

North Delta OHV-
World class motorcycle/OHV area. I've met people from Denver who come there with 20+ people and have been coming for 22 years.  The power lines are a major scenery bummer but the dobies are probably the best place for them. Once again the freedom of open riding is a rare experience, although 99% of the time I'm on an existing trail.  The parking area could use gravel. The big bumps need fixed every 3-5 years. I don't totally understand the point of The Adobe Badlands study area but it blocks a number of the best loop trails.

**8 A-PI REC**

Paonia/Crawford dobies-
Good multi use area. It would be nice if the powerline road could more easily connect with the Crawford Youngs Peak area. Would also be great if there was a connection to the Hotchkiss dobies, which on a map of BLM lands seems almost possible.

**9 A-PI TM**

The valley wants more connecting/destination trails. I share this view. I don't want to close trails. I don't support drilling in these areas. I would like there to be more cooperation with. I think what is happening in Utah is a model of what not to do.

**10 A-PI ED**

Thanks in advance for your hard work.

--
Regards,

Bart Eller
Wired Right Inc.
http://getwiredright.com
Member-Board of Directors, North Fork Pool Park and Rec District
970-527-6756 ex 133

BLM_0081814



# ENERGY FUELS RESOURCES CORPORATION

To: Uncompahgre Field Office, BLM
Re: Comments on Wild and Scenic River Eligibility Study

From: Energy Fuels Resources Corporation
       Richard White, V.P. Exploration
       Certified Professional Geologist #08792

General Comments:
Energy Fuels Resources Corporation (EFRC) welcomes the opportunity to comment on the Draft Wild and Scenic River Eligibility Report. Our main concern stems from the fact that any stream segments deemed "eligible" will be afforded protection during evaluation for "suitability".  We believe a few of the segments should not be considered eligible for a variety of reasons.  The main reason for most of these segments not qualifying, in our opinion, is they lack Outstandingly Remarkable Values (ORV).  Even though we appreciate the scenic aspects of the area and our employees enjoy recreation in the region, we do not agree that the segments in question meet the criteria of _unique, rare, or exemplary_, nor are they _significant within the region of comparison_. Furthermore, we notice numerous inconsistencies in the reasoning for the classification used from one segment to another. We ask that BLM reconsider including the segments listed below, for the reasons listed:

Specific Comments:
- Segment 15-Dry Creek: This 10.4 mile section is too long to include. There is nothing unique (scenic or geologic), except only 2 miles (where it crosses the anticline).  Even though the full segment "may provide" habitat, that does not make it unique.
- 19-San Miguel River Segment 1: This section certainly does not qualify as Scenic, being highly impacted by numerous houses, roads, and power lines.  It does not need "designation" to allow for the current level of recreation.  This segment is already included for protection in the San Miguel ACEC, therefore it does not need designation for vegetation. The geologic description of the Morrison Formation is poor resulting in overstating the paleontological significance-this outcropping is not unique nor have any significant fossils been found.
- 21 San Miguel River Segment 3: No need for designation here since it is already protected in the Cottonwood Creek Conservation Area.  It does not meet the criteria of "scenic" since it has roads, power lines, irrigation diversions, and it becomes nearly dry during summer.

Energy Fuels Resources Corporation
www.energyfuels.com

44 Union Blvd., Suite 600
Lakewood, Colorado 80228
Phone: 303-974-2140
Fax: 303-974-2141

BLM_0081815

 **ENERGY FUELS RESOURCES CORPORATION**

- 22 San Miguel River Segment 5: Land ownership of this segment is so fragmented it will make management impractical. The "historic" aspect is no longer a qualifying criteria since the entire "historic" value has been completely reclaimed-there is nothing left to see. The Hanging Flume historic evidence is all downstream of Atkinson Creek. Although vegetation is mentioned in the study, the noxious tamarisk is not. There are historic and active uranium mining properties on the cliffs above this segment on both sides. Remaining reserves and the U.S. need for increasing its reliance on domestic supplies of uranium for nuclear power generation should make the mineral value of this and other similar segments more important than the non-unique scenic value. The fishes listed are all non-game species, therefore of limited recreational value.
- 23 San Miguel Segment 6: The rationale for designation here is sound. However, designation must not lead to any road closures. Same mining aspect as Segment 5.
- 26 Dolores River: The description of this segment does not include any mention of the past gravel mining, nor the uranium-vanadium mining obvious along the banks and adjacent cliffs. All these deposits have the potential to resume production. This needs considered in connection to the scenic designation. The geology here is not unique in that the incised meanders continue for many miles downstream and the exposed stratigraphy covers many hundreds of square miles in the region of comparison.
- 27 North Fork of Mesa Creek: The road near the stream for much of this segment is the only truck route for ore haulage from mines in the upper part of this and adjacent basins (Blue Mesa, Outlaw Mesa, Calamity Mesa, and Tenderfoot Mesa) as well as a few in the lower part of the Mesa Creek. Any designation here cannot preclude this access.
- 28 Dolores River Segment 2: When discussing scenic values, the BLM mentions "exceptional views of the adjacent scenery" for this and other segments throughout the report. Our concern (also mentioned above in #22) is the possible restriction of future mining on the mesa edges outside the designation (i.e. greater than ¼ mile) if they can be seen from the segment. The stratigraphy is not unique within the region. From the recreation standpoint, boaters-use in this reach is extremely rare because of the slow flow and their use will be unaffected, regardless of designation. The vegetation is not unique, as the report mentions similar vegetation on most segments discussed.
- 29 Ice Lake Creek: An access road to uranium mines is less than ¼ mile from the stream for part of this segment. The scenic aspect is impacted by mines on the cliffs easily visible across La Sal Creek, to the south.

Energy Fuels Resources Corporation
www.energyfuels.com

44 Union Blvd., Suite 600
Lakewood, Colorado 80228
Phone: 303-974-2140
Fax: 303-974-2141

BLM_0081816



# ENERGY FUELS RESOURCES CORPORATION

This classified as scenic is inconsistent with similar segments (#30 and #34 being recreation while #33 is classified as scenic, but for different reasons).

- 30 La Sal Creek Segment 1: The fishes listed are mostly not game fish, so they do not impart the recreation aspect mentioned. Almost the entire length of this segment is private land; this fragmentation makes it unmanageable if classified recreation. The scenic aspects are not mentioned, as with Ice Lake Creek, with or without respect to the uranium mines.

- 31 La Sal Creek Segment 2: This is the only access to the Cashin Mine on private land. The rest of La Sal Creek downstream has all the same criteria mentioned for this segment and is already protected in the Dolores WSA.

- 33 Lion Creek: The only ORV is vegetation, yet is classified scenic, in spite of the area being impacted by past uranium mining. As mentioned above, this area is likely to see renewed mining activity soon.

- 34 Spring Creek: Again, there seems to be a stretch in the search for qualifying criteria and inconsistencies with similar areas in an attempt to include this and other small segments. The description is almost the same as Lion Creek (#33) but the classification is recreation rather than scenic.

To summarize, EFRC requests the BLM to reconsider the inclusion of the above listed segments as "eligible". It is believed they do not meet the requirements of "suitability". Since they will be managed as if already designated during the suitability review, there is concern that other legitimate activities will be unnecessarily limited or prohibited.

Thank you again for the opportunity to comment.

Respectfully,

Richard White
March 29, 2010

Energy Fuels Resources Corporation
www.energyfuels.com

44 Union Blvd., Suite 600
Lakewood, Colorado 80228
Phone: 303-974-2140
Fax: 303-974-2141

BLM_0081817



Received

MAR 3 0 2010

Uncompahgre Field Office

March 29, 2010

**Via email (uformp@blm.gov) and overnight mail (with attachments)**

BLM Uncompahgre Field Office
RMP Project Manager
2465 S. Townsend Ave.
Montrose, CO 81401

Re:     Scoping Comments – Uncompahgre Resource Management Plan Revision

Please accept and fully consider these scoping comments on behalf of the organizations identified
below. The membership of these organizations includes hundreds of thousands of members and
supporters in Colorado and nationally who care deeply about the management of our public lands.  We
appreciate this opportunity to comment and appreciate the Bureau of Land Management's commitment
to addressing the circumstances and values related to management of the public resources within the
Uncompahgre Resource Area. These comments are submitted in addition to our detailed proposals for
designation of special management areas and comments on the Wild & Scenic Rivers evaluation, which
are being submitted separately.

**Planning Issues and Management Concerns Addressed:**                    **Page:**

1.  **General Considerations**
a.  Public Participation Opportunities..............................................     2
b.  Cooperating Agencies...............................................................     3
c.  Protection of Natural Resources................................................     3
d.  Special Management Area Proposals...........................................     5
e.  Analysis of Environmental Consequences...........................…..     6
f.  Land Tenure Decisions..............................................................     6
2.  **Protection of Lands with Wilderness Characteristics**
a.  Inventory and Protection...........................................................     7
b.  New WSAs................................................................................     11
c.  Management Alternatives.........................................................     12
d.  Specific Areas to be Protected..................................................     16
e.  Dolores River Corridor..............................................................     17
3.  **Health impact Assessment**................................................…..     18
4.  **Wildlife Viability** .....................................................................     19
5.  **Special Status Species/Plants**.............................................…     21
a.  ACEC Designation....................................................................     22
b.  Special Status Species Management.........................................     22
c.  Rare Plant Habitat....................................................................     26
d.  Imperiled Species in the Planning Area.....................................     29
6.  **Travel Management**...............................................................     30
7.  **Recreation and Special Recreation Management Areas**.................     36
a.  Opportunities for Quiet Recreation...........................................     36
b.  Special Recreation Management Areas......................................     42
c.  Areas Needing Special Attention to Recreation Management..........     46
8.  **Natural Soundscapes**.............................................................     47

1

| | | |
|---|---|---|
| 9. | Forest Resources……………………………………………………… | 48 |
| 10. | Cultural Resources……………………………………………….. | 54 |
| 11. | Wild & Scenic Rivers……………………………………………… | 55 |
| 12. | Oil and Gas Management | |
| a. | Scope of Oil and Gas Leasing……………………………………. | 57 |
| b. | Additional Impacts of Oil and Gas Leasing………………………. | 60 |
| c. | Best Management Practices………………………………………. | 61 |
| 13. | Air Quality………………………………………………………… | 61 |
| 14. | Uranium…………………………………………………………… | 63 |
| 15. | Fugitive Dust……………………………………………………… | 65 |
| 16. | Renewable Energy………………………………………………… | 67 |
| 17. | Energy Corridors…………………………………………………… | 68 |
| 18. | Climate Change…………………………………………………… | 69 |
| 19. | Socioeconomic Analysis…………………………………………… | 73 |

List of Attachments ………………………………………………………… 77

References …………………………………………………………………… 78

## 1.  General Considerations

### a.  Public Participation Opportunities

1- A-PI-G

We encourage BLM to maximize public involvement in preparation of the revised Uncompahgre RMP. In addition to the public comment periods required by the National Environmental Policy Act (NEPA) and BLM's regulations, there are other opportunities throughout the planning process for public involvement, which are used by many BLM offices. Public involvement allows the public to provide useful information and bring concerns to BLM's attention throughout the planning process. In its scoping notice, the Uncompahgre Field Office already stated its intent to make public participation and collaboration an integral part of the planning process and we commend BLM on this approach. However, we would also encourage the BLM to provide for public input into the management situation analysis and identification of planning issues, and on a preliminary range of alternatives prior to preparing the Draft RMP, steps other BLM offices have taken to expand opportunities for public comment.

The Uncompahgre Field Office will need to ensure sufficient data is available in preparation of the RMP. In this context, we would also note that other BLM offices have made inventory data available to the public to assist in identifying new data needs and also made base data available for public use, and encourage the Uncompahgre Field Office to take similar action. By way of example, along with its release of the Draft RMP, the BLM's Arizona Strip Field Office provided zipped GIS files for all data layers needed to create the maps contained in the Draft RMP (and can be viewed on-line at http://www.blm.gov/az/GIS/files.htm#strip). The server space required for this operation is minimal and without this information, effective public participation in this process is severely hampered. This type of public participation is also consistent with the BLM's Land Use Planning Handbook (H-1601-1), which states that, "Documentation supporting the AMS [analysis of the management situation] should be maintained in the field office for public review" (Section III.A.4) and that, "Alternatives should be developed in an open, collaborative manner, to the extent possible" (Section III.A.5).

2

Making analyses available before issuing the Draft RMP is another excellent way to increase public understanding of and participation in the RMP revision. The Kemmerer (Wyoming) Field Office, for example, made their analysis of comments submitted on the Draft RMP and their ACEC evaluations public by posting them on their website months before they issued the Proposed RMP/FEIS[1]. Making such analyses available to the public before the publication of the Draft RMP will better prepare participants to understand the complex analyses and large amounts of data in the Draft RMP and increase the relevance and usefulness of comments and other public participation. We hope to see these types of opportunities provided to the many members of the public who are interested in the development of the Uncompahgre RMP.

*Recommendation*: The BLM should make every attempt to encourage the public to participate in the RMP revision including holding workshops, making a preliminary range of alternatives available for public comment prior to preparing a Draft RMP, providing interim information regarding inventories of routes and visual resources, posting GIS files, and posting analyses such as ACEC evaluations and analysis of comments submitted on the Draft RMP to the RMP revision website.

b.   Cooperating Agencies

2-A-PI-G

Based on the BLM's current regulations governing cooperating agencies (43 C.F.R. Part 1600), cooperating agencies will have a very strong presence throughout the Uncompahgre RMP planning process. In order to permit the public to better understand the roles of these agencies, we request that BLM identify those agencies and tribal and local government entities that have been granted cooperating agency status, and disclose the areas of expertise or other qualifications that form the basis of their cooperating agency status.

*Recommendation*: The BLM should identify the agencies and tribal and local government entities granted cooperating agency status and post this information on the RMP revision website.

c.   Protection of Natural Resources

3-A-PI-G

The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, imposes a duty on BLM to identify and protect the many natural resources found in the public lands governed by the Uncompahgre RMP. FLPMA requires BLM to inventory its lands and their resource and values, "including outdoor recreation and scenic values." 43 U.S.C. § 1711(a). FLPMA also obligates BLM to take this inventory into account when preparing land use plans, using and observing the principles of multiple use and sustained yield. 43 U.S.C. § 1712(c)(4); 43 U.S.C. § 1712(c)(1). Through management plans, BLM can and should protect wildlife, scenic values, recreation opportunities and wilderness character in the public lands through various management decisions, including by excluding or limiting certain uses of the public lands. See 43 U.S.C. § 1712(e). This is necessary and consistent with the definition of multiple use, which identifies the importance of various aspects of wilderness characteristics (such as recreation, wildlife, natural scenic values) and requires BLM's consideration of the relative values of these resources but "not necessarily to the combination of uses that will give the greatest economic return." 43 U.S.C. § 1702(c).

Under FLPMA, BLM is also obligated to "give priority to the designation and protection of areas of critical environmental concern [ACEC]." 43 U.S.C. § 1712(c)(3). ACECs are areas "where special management is required (when such areas are developed or used or where no development is required)

---

[1] http://www.blm.gov/rmp/kemmerer/docs.htm

3

to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes." 43 U.S.C. § 1702(a). For potential ACECs, management prescriptions are to be "fully developed" in the RMP. Manual 1613, Section .22 (Develop Management Prescriptions for Potential ACECs). ACECs also include Research Natural Areas (RNAs), established for their significant biological and physical features, including plant or animal species or geological, soil or water features. RNAs have "ecological or other natural history values of scientific interest" and are managed for research and educational purposes. Outstanding Natural Areas (ONAs) are another type of ACEC, established to preserve scenic values and natural wonders. ONAs contain unusual natural characteristics and are managed primarily for educational and recreational purposes.

The resources in the Uncompahgre planning area include many values that merit protection through special designations. Protection of existing ACECs and due consideration of proposed ACECs, including RNAs and ONAs, must be a priority in the Uncompahgre RMP planning process.

In addition, there is no *per se* bar to managing and protecting the many values of these lands through overlapping designations, such as Wilderness Study Areas (WSAs) and ACECs or Special Recreation Management Areas (SRMA) and Wild and Scenic River Segments. For example, BLM's Jarbidge RMP (and subsequent amendments) in southern Idaho designated the Bruneau/Jarbidge River ACEC and the Salmon Falls Creek ACEC, which overlap the Bruneau River-Sheep Creek WSA, Jarbidge River WSA, and Lower Salmon Falls Creek WSA, and includes the Salmon Falls Creek, deemed eligible for inclusion in the National Wild and Scenic Rivers System. *See* BLM, Jarbidge Field Office, Idaho, Analysis of the Management Situation for the Jarbidge Resource Management Plan: Resource Management Plan/Environmental Impact Statement at 212-216 and Figure 39 (Locations of Current ACECs) (July 2007), *available at* http://www.blm.gov/pgdata/etc/medialib/blm/id/plans/jarbidge_rmp/documents/analysis_of_the_ma nagement.Par.59385.File.dat/part13.pdf; Figure 40: Wilderness Study Areas, *available at* http://www.blm.gov/pgdata/etc/medialib/blm/id/plans/jarbidge_rmp/documents/analysis_of_the_ma nagement.Par.18048.File.dat/part14.pdf (excerpts attached to these comments). These overlapping designations ensure that BLM protects both the relevant and important values associated with the ACECs and the wilderness character of the WSAs, both through current management and in the event WSAs are released during the life of the plan. In certain situations, overlapping designations are needed to fully protect the resources, for example IMP management of WSAs might differ greatly from the special management attention envisioned for the relevant and important values of a particular ACEC or in the event of congressional WSA release.

In addressing objections to "layering" of designations (through "establishment of ACECs or SRMAs over WSAs and Wild and Scenic Rivers") raised in connection with the Monticello (Utah) RMP, the BLM responded, appropriately:

> "Layering" is planning. Under FLPMA's multiple use mandate, BLM manages many different resource values and uses on public lands. Through land use planning BLM sets goals and objectives for each of those values and uses, and prescribes actions to accomplish those objectives. Under the multiple use concept, BLM doesn't necessarily manage every value and use on every acre, but routinely manages many different values and uses on the same areas of public lands. The process of applying many individual program goals, objectives, and actions to the same area of public lands may be perceived as "layering". BLM strives to ensure that the goals and objectives of each program (representing resource values and uses) are consistent and compatible for a particular land area. Inconsistent goals and objectives can lead to resource

4

conflicts, failure to achieve the desired outcomes of a land use plan, and litigation. Whether or not a particular form of management is restrictive depends upon a personal interest or desire to see that public lands are managed in a particular manner. All uses and values cannot be provided for on every acre. That is why land use plans are developed through a public and interdisciplinary process. The interdisciplinary process helps ensure that all resource values and uses can be considered together to determine what mix of values and uses is responsive to the issues identified for resolution in the land use plan. Layering of program decisions is not optional for BLM, but is required by the FLPMA and National BLM planning and program specific regulations.

FLPMA directs BLM to manage public lands for multiple use and sustained yield (Section 102(a)(7)). As a multiple-use agency, the BLM is required to implement laws, regulations and policies for many different and often competing land uses and to resolve conflicts and prescribe land uses through its land use plans. BLM's Land Use Planning Handbook requires that specific decisions be made for each resource and use (Planning Handbook "H-1601-1"). Specific decisions must be included in each of the alternatives analyzed during development of the land use plan. As each alternative is formulated, each program decision is overlaid with other program decisions and inconsistent decisions are identified and modified so that ultimately a compatible mix of uses and management prescriptions result.

Monticello Proposed RMP, Response to Comments, comment no. 007-48 (attached).

As clarified by the BLM, because different designations serve different purposes, and management is often limited to protect only those values relevant to those particular designations, the fact that an ACEC may lie within a WSA does not justify failing to designate the ACEC and the fact that a proposed SRMA may overlap with an ACEC does not obviate the need for the SRMA.

***Recommendation***: The BLM must uphold its responsibility to protect the abundant natural values present in the Uncompahgre planning area when developing management alternatives in the Uncompahgre RMP and evaluating their environmental consequences, as required by both FLPMA and NEPA, 42 U.S.C. § 4321 *et seq.*

d.   Special Management Proposals

4-A-PI-SDA

As noted above, the BLM has a variety of tools for protecting natural values.  Included with these scoping comments is an inventory of areas suitable for wilderness designation (citizens' wilderness proposal -- or CWP), which we have proposed for protection as new WSAs and/or through management of their wilderness characteristics.  We also encourage the BLM to use designation of special recreation management areas and areas of critical environmental concern to protect natural values as part of an overall management approach to creating, enhancing, and protecting quiet recreation experiences, protecting critical species habitats, and providing needed expansions of protections around current WSAs, ACECs, and SRMAs.

In addition to our CWPs, we will submit expanded proposals, including more detailed descriptions and management prescriptions, in the near future and look forward to discussing these proposals with you.

5

e. Analysis of Environmental Consequences

NEPA requires federal agencies to assess the direct, indirect and cumulative environmental impacts of proposed actions, taking a "hard look" at environmental consequences and performing an analysis commensurate with the scale of the action at issue. 42 U.S.C. § 4321 et seq; 40 C.F.R. § 1508.8; *see also* Metcalf v. Daley, 214 F.3d 1135, 1151 (9th Cir. 2000); Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348 (1989). NEPA defines "cumulative impact" as:

the impact on the environment which results from the incremental impact of the action **when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.** Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. (emphasis added). Throughout these comments, we have identified analyses required to evaluate the direct, indirect and cumulative impacts of decisions made in the RMP, such as health impact assessments and air quality modeling.

***Recommendation***: The analyses discussed in these scoping comments must be completed prior to authorizing activities that will contribute to these impacts, such as oil and gas leasing, in order to determine whether and under what conditions they can be approved, such that significant impacts on the environment can be prevented. To the extent that the BLM defers any of the recommended analyses, we request that the RMP commit to a time period for completion and confirm that they will be completed prior to approval of contributing activities.

f. Land Tenure Decisions

6-A-PI-LR

BLM has identified land tenure decisions as an issue to be addressed in the Uncompahgre RMP revision. In light of present circumstances, BLM should review the previous plans and decisions and look at future land tenure decisions with an eye towards providing adequate open space for the growing public, maintaining key viewsheds and taking into consideration new proposals for open space and trails and special management areas. Section 102(a)(1) of FLPMA requires that BLM-managed lands be retained in federal ownership unless BLM determines through the land use planning process that disposal of a particular parcel will serve the national interest. 43 U.S.C. 1701. Land tenure decisions must achieve the goals, standards, and objectives outlined in the land use plan.

With the growing population has come a desire to develop more land, some of which may be appropriate. However, the BLM must retain land near sensitive and ecologically important areas, including those within existing or proposed ACECs or other special management areas, and including specifically citizen-proposed special management areas. Lands identified in new citizen proposals for open space and/or other special management that include lands not owned by BLM should be given priority for acquisition. BLM should only pursue land tenure decisions if they will serve the national interest by supporting key values and resources, such as protecting ecologically important areas and providing open space. In addition, disposal or exchange may be appropriate where the BLM determines that lands will be dedicated to renewable energy development, if those lands are already degraded, closest to the load served for siting development, and can be sold or exchanged with a commitment to obtain lands with higher conservation values (such as wildlife corridors).

6

BLM_0081823

Given the current population trends within the region, BLM should reconsider all previous decisions in the Uncompahgre RMP for disposal of public lands and re-evaluate whether or not those decisions still meet the needs of the public. As the agency moves forward it will be crucial that consideration be given to providing adequate open space and trails on public lands. Furthermore, as local entities are in the process of developing plans for such uses, the relationship between the RMP and these plans will be important, since BLM's decisions can affect local open space, parks and trail plans. Particular care should be taken to prevent sale or exchange of BLM parcels highly valued by local communities for the open space, wildlife habitat, and recreation opportunities they provide.

***Recommendations***: The BLM should work with local governments and Tribes when identifying areas where disposal of public lands may be appropriate. However, BLM should identify areas such as ACECs, citizen wilderness proposals, or sensitive species habitat for retention and acquisition. BLM should not dispose of parcels valued by local communities for their open space, wildlife habitat, and recreation opportunities.

2. **Lands with Wilderness Characteristics**

6-A-PI-WC

    a.   BLM must inventory for wilderness character and consider protecting wilderness characteristics in the RMP.

The lands governed by the Uncompahgre RMP contain pristine wildlands, including those identified in Congresswoman Diana DeGette's Colorado Wilderness Act. Section 201 of FLPMA mandates that BLM inventory the resources of the public lands, their resources and values. 43 U.S.C. § 1711. In the land use planning process, including revision of RMPs, Section 202 of FLPMA requires that BLM take into account the inventory and determine which multiple uses are best suited to which portions of the planning area. 43 U.S.C. § 1712. BLM's mandate of multiple use and sustained yield, as well as other relevant law and BLM's current guidance, provides for inventory and protection of wilderness values.

Wilderness character is a resource for which BLM must keep a current inventory. As the U.S. Court of Appeals for the Ninth Circuit recently held:

> wilderness characteristics are among the 'resource and other values' of the public lands to be inventoried under § 1711. BLM's land use plans, which provide for the management of these resources and values, are, again, to "rely, to the extent it is available, on the inventory of the public lands, their resources, and other values." 43 U.S.C. § 1712(c)(4).

Oregon Natural Desert Ass'n v. Bureau of Land Management, 531 F.3d 1114, 1119 (9th Cir. 2008). Therefore, BLM is required to consider "whether, and to what extent, wilderness values are now present in the planning area outside of existing WSAs and, if so, how the Plan should treat land with such values." *Id.* at 1143. These obligations also apply to WSAs released by Congress, which BLM found to have wilderness characteristics. As the court stated: "wilderness characteristics are a value which, under the FLPMA, the Bureau has the continuing authority to manage, even after it has fulfilled its 43 U.S.C. § 1782 duties to recommend some lands with wilderness characteristics for permanent congressional protection." *Id.* at 1142.

Nationally, BLM has acknowledged the need for new guidance on inventorying for and managing lands with wilderness characteristics and committed to releasing such guidance in the near future. An inter-disciplinary DOI review team released its final report and recommendations on the 77 contested leases

7

issued in Utah BLM's December 2008 lease sale[2] ("Stiles Report") in October 2009. The Stiles Report noted the lack of national guidance on managing lands with wilderness characteristics and found that this lack of guidance contributes to uninformed oil and gas leasing decisions, and recommended the guidance be issued soon. The report further recommended that "BLM-Utah review the [recently-completed RMPs] in light of this new guidance and make necessary modifications." (pp. 32-33).

The Stiles Report includes significant recommendations regarding additional protections that should be considered, including not leasing at all, based on the presence of wilderness characteristics. Specific recommendations include: "Adding an NSO stipulation could allow both mineral development and protection of the wilderness characteristics this land has in common with the contiguous Natural Area" (p. 6); "This parcel should be reviewed using the soon-to-be-released new Wilderness Characteristics Inventory Manual...Additional stipulations may be found necessary after completion of a revised inventory of wilderness characteristics" (p. 7); and "The team recommends deferral to reconsider the impacts on documented wilderness characteristics" (p. 9).

**Per FLPMA and BLM's current guidance, and in light of the Stiles Report and upcoming guidance, BLM is obligated to inventory for and consider a range of alternatives to protect lands with wilderness characteristics.**

7-A-PI-WC

1. <u>Wilderness character is a valuable resource and important multiple use of the lands governed by the Uncompahgre RMP.</u>
As discussed above, wilderness is a resource to be inventoried and managed under BLM's multiple use mandate. BLM has identified "wilderness characteristics" to include naturalness or providing opportunities for solitude or primitive recreation. *See,* Instruction Memoranda (IMs) 2003-274 and 2003-275. Through this planning process, BLM should recognize the wide range of values associated with lands with wilderness characteristics:

(a) <u>Scenic values</u> – FLPMA specifically identifies "scenic values" as a resource of BLM lands for purposes of inventory and management (43 U.S.C. § 1711(a)), and the unspoiled landscapes of lands with wilderness characteristics generally provide spectacular viewing experiences. The scenic values of these lands will be severely compromised if destructive activities or other visual impairments are permitted.

(b) <u>Recreation</u> – FLPMA also identifies "outdoor recreation" as a valuable resource to be inventoried and managed by BLM. 43 U.S.C. § 1711(a). Lands with wilderness characteristics provide opportunities for primitive recreation, such as hiking, camping, hunting and wildlife viewing. Most, if not all, primitive recreation experiences will be foreclosed or severely impacted if the naturalness and quiet of these lands are not preserved.

(c) <u>Wildlife habitat and riparian areas</u> – FLPMA acknowledges the value of wildlife habitat found in public lands and recognizes habitat as an important use. 43 U.S.C. § 1702(c). Due to their unspoiled state, lands with wilderness characteristics provide valuable habitat for wildlife, thereby supporting additional resources and uses of the public lands. As part of their habitat, many species are also dependent on riparian and other wetland habitats, especially during either seasonal migrations or seasons and years when surrounding habitats are dry and unproductive. Wilderness quality lands support biodiversity, watershed protection and overall healthy ecosystems. The low route density, absence of development activities and corresponding dearth of motorized vehicles, which are integral to wilderness character,

---

[2] The report can be found at http://www.doi.gov/documents/BLM_Utah77LeaseParcelReport.pdf.

BLM_0081825

also ensure the clean air, clean water and lack of disturbance necessary for productive wildlife habitat and riparian areas (which support both wildlife habitat and human uses of water).

Further, inventorying lands with wilderness characteristics will also provide important data on existing large blocks of habitat and how BLM can restore these blocks of habitat to better match the historic range of variability. Swanson et al. (1994) contend that managing an ecosystem within its range of variability is appropriate to maintain diverse, resilient, productive, and healthy ecosystems for viable populations of native species. Using the historical range of variability, they believe, is the most scientifically defensible way to meet society's objective of sustaining habitat. Patrick Daigle and Rick Dawson, Extension Note 07; Management Concepts for Landscape Ecology (Part 1 of 7). October 1996. http://www.for.gov.bc.ca/hfd/pubs/docs/en/en07.pdf; *citing* Swanson, F. J.; Jones, J. A.; Wallin, D. O.; Cissel, J. H. 1994. Natural variability--implications for ecosystem management. In: Jensen, M. E.; Bourgeron, P. S., tech. eds. Eastside Forest Ecosystem Health Assessment--Volume II: Ecosystem management: principles and applications. Gen. Tech. Rep. PNW-GTR-318. Portland, OR: U.S. Dept. of Agriculture, Forest Service, Pacific Northwest Research Station: pp 89-106.

Identifying, restoring and protecting substantial roadless areas in the lands governed by the Uncompahgre RMP can provide crucial benefits to wildlife, especially to endangered and sensitive species.

(d) Cultural resources – FLPMA also recognizes the importance of "historical values" as part of the resources of the public lands to be protected. 43 U.S.C. § 1702(c). The lack of intensive human access and activity on lands with wilderness characteristics helps to protect these resources. The scoping notice for the Uncompahgre RMP identifies managing and protecting cultural, historical and paleontological resources as an issue to be addressed in the RMP. Managing lands to protect wilderness qualities will also help protect cultural and archaeological sites.

(e) Economic benefits – The recreation opportunities provided by wilderness quality lands also yield direct economic benefits to local communities. According to the U.S. Fish & Wildlife Service, in 2006 State residents and non-residents spent $3 billion on wildlife recreation in Colorado. (USFWS 2006, *National Survey of Hunting, Fishing and Wildlife-associated Recreation* - http://www.census.gov/prod/2008pubs/fhw06-co.pdf). In addition, local communities that protect wildlands reap measurable benefits in terms of employment and personal income. For instance, a recent report by the Sonoran Institute (Sonoran Institute 2004, ***Prosperity in the 21st Century West -The Role of Protected Public Lands***) found that:

> Protected lands have the greatest influence on economic growth in rural isolated counties that lack easy access to larger markets. From 1970 to 2000, real per capita income in isolated rural counties with protected land grew more than 60 percent faster than isolated counties without any protected lands.

These findings confirm earlier research, showing that wilderness is in fact beneficial for local economies. Residents of counties with wilderness cite wilderness as an important reason why they moved to the county, and long-term residents cite it as a reason they stay. Recent survey results also indicate that many firms decide to locate or stay in the West because of scenic amenities and wildlife-based recreation, both of which are strongly supported by wilderness areas. (Morton 2000, *Wilderness: The Silent Engine of the West's Economy*). Other "non-market" economic values arise from the ability of wildlands to contribute to recreation and recreation-related jobs, scientific research, scenic viewsheds,

9

biodiversity conservation, and watershed protection. (Morton 1999, *The Economic Benefits of Wilderness: Theory and Practice*; Loomis 2000, *Economic Values of Wilderness Recreation and Passive Use: What We Think We Know at the Turn of the 21st Century*). All of these economic benefits are dependent upon adequate protection of the wilderness characteristics of the lands.

(f) Quality of life – The wildlands located within the Uncompahgre planning area help to define the character of this area and are an important component of the quality of life for local residents and future generations, providing wilderness values in proximity to the burgeoning urban and suburban areas of Montrose and other growing population centers. Their protection enables the customs and culture of this community to continue.

(g) Balanced use – The vast majority of BLM lands are open to motorized use and development. FLPMA recognizes that "multiple use" of the public lands requires "a combination of balanced and diverse resource uses" that includes recreation, watershed, wildlife, fish, and natural scenic and historical values (43 U.S.C. § 1702(c)). FLPMA also requires BLM to prepare land use plans that may limit certain uses in some areas (43 U.S.C. § 1712). Many other multiple uses of public lands are compatible with protection of wilderness characteristics – in fact, many are enhanced if not dependent on protection of wilderness qualities (such as primitive recreation and wildlife habitat). Protection of wilderness characteristics will benefit many of the other multiple uses of BLM lands, while other more exclusionary uses (such as off-road vehicle use and timber harvesting) will still have adequate opportunities on other BLM lands.

8-A-PI-WC

2. BLM must consider alternatives in the Uncompahgre RMP for managing lands to protect their wilderness characteristics.
The range of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. NEPA requires BLM to "rigorously explore and objectively evaluate" a range of alternatives to proposed federal actions. *See* 40 C.F.R. §§ 1502.14(a) and 1508.25(c).

> NEPA's requirement that alternatives be studied, developed, and described both guides the substance of environmental decision-making and provides evidence that the mandated decision-making process has actually taken place. Informed and meaningful consideration of alternatives -- including the no action alternative -- is thus an integral part of the statutory scheme.

Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1228 (9th Cir. 1988), cert. denied, 489 U.S. 1066 (1989) (citations and emphasis omitted).

An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. City of Tenakee Springs v. Clough, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R. § 1502.14). This evaluation extends to considering more environmentally protective alternatives and mitigation measures. *See, e.g.*, Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094,1122-1123 (9th Cir. 2002) (and cases cited therein); *see also* Envt'l Defense Fund., Inc. v. U.S. Army Corps. of Eng'rs, 492 F.2d 1123, 1135 (5th Cir. 1974); City of New York v. Dept. of Transp., 715 F.2d 732, 743 (2nd Cir. 1983) (NEPA's requirement for consideration of a range of alternatives is intended to prevent the EIS from becoming "a foreordained formality."); Utahns for Better Transportation v. U.S. Dept. of Transp., 305 F.3d 1152 (10th Cir. 2002), modified in part on other grounds, 319 F.3d 1207 (2003); Or. Envtl. Council v. Kunzman, 614 F.Supp. 657, 659-660 (D. Or. 1985) (stating that the alternatives that must be considered under NEPA are those that would "avoid or minimize" adverse environmental effects).

10

BLM_0081827

NEPA requires that an actual "range" of alternatives is considered, such that the Act will "preclude agencies from defining the objectives of their actions in terms so unreasonably narrow that they can be accomplished be only one alternative (i.e. the applicant's proposed project)." Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1174 (10th Cir. 1999), citing Simmons v. United States Corps of Engineers, 120 F.3d 664, 669 (7th Cir. 1997). This requirement prevents the EIS from becoming "a foreordained formality." City of New York v. Department of Transp., 715 F.2d 732, 743 (2nd Cir. 1983). See also, Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002).

**Given the broad purpose of the preparation of the Uncompahgre RMP and the information compiled by the public regarding lands with wilderness characteristics, the range of alternatives for these lands should include a number of alternatives to protect their wilderness values.** This range of alternatives is also consistent with BLM's FLPMA obligations to inventory its lands and their resources, which includes wilderness character. FLPMA also obligates BLM to take this inventory into account when preparing land use plans, using and observing the principles of multiple use and sustained yield. 43 U.S.C. § 1712(c)(4); 43 U.S.C. § 1712(c)(1). Through management plans, BLM can and should protect wilderness character and the many uses that wilderness character provides on the public lands through various management decisions, including by excluding or limiting certain uses of the public lands. See, 43 U.S.C. § 1712(e). This is necessary and consistent with the definition of multiple use, which identifies the importance of various aspects of wilderness character (such as recreation, wildlife, natural scenic values) and requires BLM's consideration of the relative values of these resources but "not necessarily to the combination of uses that will give the greatest economic return." 43 U.S.C. § 1702(c).

| 9-A-PI-WC | b. BLM should consider designating new Wilderness Study Areas. |

We are aware of the April 2003 settlement agreement (Utah Settlement) between Secretary of the Interior Norton and the State of Utah in which BLM abdicated its authority to designate any additional WSAs, and we maintain that this agreement is invalid and will ultimately be overturned in pending litigation.

The federal court in Utah revoked its approval of the Utah Settlement, stating that its approval of the initial settlement was never intended to be interpreted as a binding consent decree. Recognizing that the court's decision undermined the legal ground for the Utah Settlement, the State of Utah and the Department of Interior have now formally withdrawn the settlement as it was originally submitted. See, Motion to Stay Briefing and for a Status Conference, September 9, 2005, attached. This casts serious doubt upon BLM's current policy not to consider designating new WSAs. There is no binding consent decree and the BLM has not even issued any updated guidance seeking to continue applying this misguided, and illegal, policy.

In addition, the Utah Settlement is based on an interpretation of FLPMA §§ 201, 202, and 603 that is contrary to FLPMA's plain language. Section 603 did not supersede or limit BLM's authority under § 201 to undertake wilderness inventories, but rather relies explicitly on BLM having exactly that authority under § 201. Nor did § 603 in any way limit BLM's discretion under § 202 to manage its lands as it sees fit, including managing areas as § 202 WSAs in accordance with the Interim Management Policy (IMP). Every prior administration has created WSAs under § 202 and they plainly had authority to do so. This administration has such authority as well, making this a reasonable alternative deserving of consideration in this NEPA process.

11

The Utah Settlement is also illegal because the court in Utah lacked jurisdiction to prohibit designation of new WSAs nationwide, including in Colorado.

*Recommendation*: In light of the most recent ruling and subsequent action of the parties, we emphasize that the BLM can and should continue to designate new WSAs in this planning process, including the areas identified with this submission. Further, if BLM fails to fulfill these obligations, it risks violating both FLPMA and NEPA, and jeopardizing the validity of this entire planning process.

10-A-PI-WC

   c. BLM should also consider other management alternatives for protecting lands with wilderness characteristics.

**The Utah Settlement does not affect BLM's obligation to value wilderness character or, according to BLM directives, the agency's ability to protect that character, including in the development of management alternatives.** BLM's recent acknowledgment of this obligation in the Stiles Report and the related court rulings provide important direction in this regard. Further, in previous guidance, BLM has not only claimed that it can continue to protect wilderness values, but has also committed to doing so. On September 29, 2003, BLM issued IMs 2003-274 and 2003-275, formalizing its policies concerning wilderness study and consideration of wilderness characteristics in the wake of the Utah Settlement. In the IMs and subsequent public statements, BLM has claimed that its abandonment of previous policy on WSAs would not prevent protection of lands with wilderness characteristics. The IMs contemplate that BLM can continue to inventory for and protect land "with wilderness characteristics," such as naturalness or providing opportunities for solitude or primitive recreation, through the planning process. The IMs further provide for management that emphasizes "the protection of some or all of the wilderness characteristics as a priority," even if this means prioritizing wilderness over other multiple uses. This guidance does not limit its application to lands suitable for designation of WSAs; for instance, the guidance does not include a requirement for the lands at issue to generally comprise 5000-acre parcels or a requirement that the lands have all of the potential wilderness characteristics in order to merit protection. IM 2003-274 states that "BLM may continue to inventory public lands for resource or other values, *including wilderness characteristics*" and that the agency can "*manage them using special protections* to protect wilderness characteristics." (emphasis added). Further, IM 2003-275, Change 1, reads:

> The BLM can make a *variety of land use plan decisions* to protect wilderness characteristics, such as establishing Visual Resource Management (VRM) class objectives to guide the placement of roads, trails, and other facilities; establishing conditions of use to be attached to permits, leases, and other authorizations to achieve the desired level of resource protection; and designating lands as open, closed, or limited to Off Highway Vehicles (OHV) to achieve a desired visitor experience. (emphasis added).

Accordingly, administrative protection can and should be considered for lands with wilderness characteristics that are not currently protected. The Draft RMP should also consider management alternatives that provide administrative protection for the wilderness characteristics of those lands currently designated as WSAs if they are not ultimately designated as Wilderness by Congress; their wilderness characteristics are already acknowledged by the BLM. Further, BLM is obligated to evaluate the potential impacts on wilderness values from its management decisions.

In the most recent ruling on the Utah Settlement challenge (State of Utah v. Norton, Case No. 2:96-CV-0870, Order and Opinion (D.Utah September 20, 2006)), Judge Benson found against the Conservation

12

Groups for a number of reasons, including agreeing with the legal interpretation of FLPMA put forth by the State of Utah and the BLM (a finding we continue to dispute). However, the ruling also justifies the court's interpretation by finding that the agency can provide virtually the same protection for lands with wilderness characteristics through administrative decisions as it can through designation of new WSAs, with the only material difference being that, while the agency can alter its own management decisions, only Congress can change a WSA designation. The court stated: "Both Utah and the BLM acknowledge that the BLM has the discretion to manage lands in a manner that is **similar to the non-impairment standard** by emphasizing the protection of wilderness characteristics as a priority over other potential uses." Order and Opinion, p. 41 (emphasis added - excerpt attached).

In a subsequent briefing to the U.S. Court of Appeals for the 10th Circuit, the Department of the Interior and the BLM reiterated that "the settlement does not preclude BLM from **inventorying public lands for wilderness-associated characteristics**" and that "the land management decision obtained through FLPMA § 202 process may **resemble management under FLPMA § 603's non-impairment standard**." In discussing how BLM will manage lands with wilderness characteristics, the brief refers to the "BLM's discretion under FLPMA § 202 to **preserve their wilderness-associated characteristics**." Brief of the Federal Appellees, State of Utah v. Kempthorne, Case No. 06-4240 (February 26, 2007), pp. 40, 43 (emphases added - excerpt attached). Similarly, the Uncompahgre Field Office can and should protect lands with wilderness characteristics from the damage likely to result from energy development and uncontrolled off-road vehicle (ORV) use, both of which the BLM has acknowledged are likely to occur if these activities are permitted to occur on lands with wilderness characteristics.

In addition, the information submitted regarding citizen-proposed wilderness constitutes significant new information that must be addressed in this RMP revision. This information has not yet been analyzed in the existing land use plan, so NEPA requires analysis of the potential environmental direct, indirect and cumulative effects of oil and gas development on these areas and consideration of protection for them. See, 40 C.F.R. § 1502.9(c); Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 374 (1989). In a recent decision, the U.S. District for the District of Utah found that information regarding wilderness characteristics that was not considered in the existing land use plan was:

> a **textbook example of significant new information** about the affected environment (the **wilderness attributes and characteristics** of the Desolation Canyon, Floy Canyon, Flume Canyon, Coal Canyon, and Flat Tops unit) that would be **impacted by oil and gas development**; information that was **not reflected in BLM's existing NEPA analyses**.

Southern Utah Wilderness Alliance v. Norton, 457 F. Supp. 2d 1253 (D. Utah 2006) (attached). A compliant NEPA analysis requires not only assessment of potential impacts but also a consideration of potential mitigation measures, such as protecting lands with wilderness characteristics. 40 C.F.R. §§ 1502.14, 1502.16. The Uncompahgre RMP must consider protective measures tailored specifically to protect lands with wilderness characteristics.

BLM's Arizona State Office has issued guidance that elaborates upon the BLM's national guidance by providing for identification of lands with wilderness characteristics and development of management prescriptions to protect and enhance these values (IM No. AZ-2005-007 – attached). The Proposed RMP for the Arizona Strip includes land use allocations for lands with wilderness characteristics in every alternative and sets out protective management prescriptions (Table 2.10). This RMP also includes a detailed discussion of how BLM identified and assessed wilderness characteristics and the need for protective management (Appendix 3.D). The process is consistent with FLPMA's direction that BLM

13

BLM_0081830

inventory for the many values of the public lands and consider ways to protect them (i.e., not all uses are appropriate in all places) in the RMP. 43 U.S.C. §§ 1711, 1712. The recently-released Records of Decision for this planning area all include protection for lands with wilderness characteristics (available on-line at: http://www.blm.gov/az/st/en/info/nepa/environmental_library/arizona_resource_management.html).

Other RMPs that are being prepared in Colorado, Arizona, New Mexico and Utah include identification of lands with wilderness characteristics and include management of certain areas to maintain and enhance these values in management alternatives under consideration. For example, the Preliminary Draft Alternatives for the TriCounty RMPs (prepared by the BLM's Las Cruces, NM Field Office) also provide for protection of citizen-proposed wilderness, stating that these areas "would be managed to maintain wilderness characteristics." *See*, TriCounty RMPs/EIS Newsletter, p. 3 (available on-line at: http://www.nm.blm.gov/lcfo/tri_county/tricounty.html). The Preliminary Goals and Objectives set out a *management approach specific to lands with wilderness characteristics*, including:

- Goal: Maintain naturalness, outstanding opportunities for solitude, and unconfined recreation.
- Objectives:
  - Manage areas with wilderness characteristics to maintain the natural qualities of the landscape where the imprint of human activity is substantially unnoticeable; where the sights, sounds, and evidence of other people are rare or infrequent; and where visitors can be isolated, alone, or secluded from others.

  - Provide management direction for assessing site specific impacts from proposals that fall within identified areas with wilderness characteristics based on the long-term effect on naturalness, ability to restore the impacted area to its natural state, compatibility with VRM objectives, loss of opportunity for solitude and primitive recreation, and potential for proposed use to be accommodated outside of the area.

In addition, the Draft RMP for the Little Snake Field Office (released February 9, 2007 and available on-line at: http://www.co.blm.gov/lsra/rmp/index.htm) addressed management of lands with wilderness characteristics and/or backcountry characteristics. Most of the lands at issue in the Little Snake Draft RMP were identified as part of a citizens' wilderness proposal, which the BLM re-inventoried and considered for management of their naturalness and/or opportunities for primitive recreation or solitude. The Draft RMP identifies two *specific management approaches*, one for "Lands with Wilderness Characteristics Outside Existing WSAs" and another for "Lands with Backcountry Characteristics Outside Existing WSAs." *See*, Draft RMP, pp. 2-158 – 2-161; 2-199 – 2-201. Management prescriptions include:

Lands with Wilderness Characteristics:
- Objective: "to protect naturalness, opportunities for semiprimitive recreation and solitude";
- closed to oil and gas operations and other minerals activities;
- off-road vehicles (ORVs) limited to designated routes;
- Class II or Class III Visual Resource Management (VRM) classification; and
- Some areas may be managed as a Special Recreation Management Area (SRMA) to "provide quality primitive recreation experiences in a largely natural setting.":
  - closed to oil and gas leasing (or to new oil and gas leasing);
  - closed to ORVs;
  - VRM Class II.

14

BLM_0081831

Lands with Backcountry Characteristics:
- Described as "backcountry areas";
- Objective: "to provide backcountry recreation experience in predominantly natural settings";
- closed oil and gas leasing;
- closed to ORVs; and
- VRM Class II.

11-A-PI-WC **To ensure that wilderness values receive proper and sufficient attention as a critical aspect of land management in preparation of the Uncompahgre RMP, BLM must address wilderness as a separate and unique issue in the planning process** including in its Planning Criteria, in the Analysis of the Management Situation and in each section of the RMP. Protection of lands with wilderness character should be identified as a major issue in the scoping report. This will assist the public in understanding the values of wilderness-quality lands and the potential effects of other multiple uses on wilderness character, as well as in communicating comments or concerns regarding the management of these lands to BLM. Because comments on protection of wilderness values will be clearly identified, BLM will be in a better position to clarify any misconceptions and provide complete responses.

In preparing the revised RMP and accompanying EIS, BLM should clearly present management alternatives in the context of protecting wilderness character and analyze environmental consequences to that character. BLM has been aware of these proposed wilderness areas for some time, and the agency must attend to them. In the "Alternatives" section of the RMP, BLM must include various ways to protect these lands in each of the management alternatives. In addition to considering designation of new WSAs, BLM should propose protective management prescriptions or other protective status (including mineral withdrawals, non-motorized recreation prescriptions, ACEC designations, and prohibitions on new road construction and erection of structures such as cell towers) for these lands. The Alternatives section must also discuss the implications of each alternative for the wilderness-quality lands governed by the Uncompahgre RMP. Finally, BLM must specify the "Environmental Consequences" of the resource management decisions on the wilderness-quality lands in the planning areas. This discussion should include, but not be limited to, an analysis of the cumulative impacts of other activities (including those undertaken by non-federal entities) within the planning areas on these unique lands. In short, in every major section of the RMP, BLM must address wilderness-quality lands and citizen-proposed wilderness areas. BLM should then take appropriate actions to protect wilderness character in the preferred management alternative.

We look forward to seeing inventory for and protection of wilderness qualities comprehensively addressed as the preparation of the Uncompahgre RMP proceeds. Additionally, we realize that the newly-designated Dominguez-Escalante National Conservation Area will not be included in this RMP, but we would like to reiterate that the NCA plan must fully evaluate potential wilderness lands within the NCA. The Uncompahgre RMP should address potential impacts to the adjacent NCA lands, including wilderness-quality lands.

***Recommendations***: BLM should include protection of lands with wilderness characteristics in the RMP's management alternatives and thoroughly analyze this issue throughout the planning process. To ensure that wilderness values receive proper and sufficient attention as a critical aspect of land management in preparation of the RMP, BLM must inventory for lands with wilderness characteristics (including those lands identified below as citizens' proposed wilderness), consider alternatives for protecting lands with

15

BLM_0081832

wilderness characteristics (including for those lands currently designated as WSAs if they are not ultimately designated as Wilderness by Congress) and address wilderness character outside of WSAs as a separate and unique issue in the planning process in each section of the RMP, as described above.

12-A-PI-WC

d.  Specific lands to be protected

We are submitting a map of citizens' wilderness proposals that should be inventoried and considered for management to protect their wilderness characteristics. These lands should be inventoried for wilderness characteristics and management alternatives for protecting the wilderness resource present on these lands should be evaluated, including the opportunities they provide for primitive recreation and otherwise experiencing solitude, naturalness and scenic beauty.

The following areas have been identified as citizen-proposed wilderness. (Acreages are approximate.) We have included more detail on each of these areas with the map in Appendix 3.

### 1)  Roubideau (Camel Back) – 20,059 Acres
This maze of colorful and intricate canyons provides the obvious complement to the national forest Roubideau Area, already designated by Congress to protect its wilderness values. The downstream portion should receive the same protection from the BLM until Congress can complete the watershed's designation.

### 2)  Adobe Badlands – 10,323 Acres
This absolutely unique, sparse landscape northeast of Delta is rare in that it has not been damaged by motor travel. The area is home to an endangered species of cactus, desert reptiles, and geologic wonders. The fragile soils and striking scenery need to be preserved.

### 3)  Sewemup Mesa – 9,253 Acres Within Uncompahgre Resource Area
The majority of this CWP falls within the Grand Junction Field Office; however, nearly 10,000 acres are managed by the Uncompahgre Field Office. Sewemup Mesa is one of the most ecologically pristine areas in western Colorado, having been isolated from development and most human activity throughout history. The Colorado Division of Wildlife has identified the area as suitable habitat for Mexican spotted owl, southwest willow flycatcher, whooping crane, and the western burro owl.

### 4)  Norwood Canyon – 4,867 Acres
This rugged and ecologically vibrant area in the heart of the San Miguel River corridor provides some of the better and more diverse habitat anywhere for mountain lions, hawks, eagles, and both rare and familiar native fish. This riparian area along the river has been classified as one of two most important river systems needing protection in Colorado.

### 5)  Dolores River Canyon – 17,282 Acres
This heart of the stunning and wild Dolores corridor, with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience must gain the highest possible level of protection. We discuss this area in further detail below.

***Recommendations***: The above areas, and any other areas that the Uncompahgre Field Office inventories and finds to possess wilderness characteristics, should be managed to protect their wilderness values. Management prescriptions for these areas should include: closed to motorized vehicles; VRM Class I; closed to all forms of energy development; ROW exclusion areas; and other protective measures.

16

13-A-PI-WC

    e.  Dolores River Corridor

The Dolores River Canyon Wilderness Study Area and surrounding wilderness-quality lands, with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experiences, must gain the highest possible level of protection. The Dolores River Corridor includes the river corridor itself (river, riverbanks and immediately adjacent land alongside the river including to the canyon rims), as well as adjacent wilderness study areas and citizens' wilderness proposal areas.

The RMP should commit to continuing to manage the Dolores River Canyon WSA to protect its wilderness qualities even if it is released by Congress. BLM should also manage the citizen-proposed additions to the WSA so as to protect their wilderness characteristics.

Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the RMP revision. It has been found suitable in the past and still maintains the same qualities. Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River. The river itself, and all its eligible tributaries, should receive immediate, thorough, and enduring protection.

Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area designation. The RMP also needs to prohibit uranium mining within the river corridor. All permitted mines in the resource area must prove that there will be no harm to both surface and ground water quality and quantity; prove that the long-term ecological health of the area will not be jeopardized; have viable reclamation plans in place before permits can be granted; and have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation. BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. These management actions are necessary to protect the Dolores River and the WSA.

The Dolores Corridor should be managed in close cooperation with adjacent BLM Field Offices. For example, the Dolores River Canyon Wilderness Study Area is bisected by the Uncompahgre Field Office and the San Juan Field Office, but requires consistent and close management, especially considering issues with motorized incursions from the Utah state line. The Sewemup Mesa CWP expansions to the existing WSA also overlap the Grand Junction and Uncompahgre Field Offices. Significantly, the river itself crosses boundaries between the San Juan, Uncompahgre, and Grand Junction Field Offices. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities. We urge the Uncompahgre Field Office to adopt a broad vision of the landscape in approaching the cooperative management of these areas.

_**Recommendations:**_ The Dolores River Corridor should be managed as an entire ecosystem with the goal of protecting its outstanding natural, historical, ecological and recreational values. The Dolores River Coalition is submitting detailed scoping comments addressing this area, and we herein reference and support those comments.

17

14-A-PI-PH

### 3. Health Impact Assessment

The BLM Should Conduct a Health Impact Assessment.

In February, 2008, the Environmental Protection Agency provided the BLM with its comments on a revised drilling plan for the Pinedale Anticline in Wyoming, citing concerns about human health issues including elevated ozone levels and groundwater contamination, as well as visibility impacts in nearby Wilderness Areas. Consistent with its responsibilities under Section 309 of the Clean Air Act, EPA reviewed the analysis of impacts and gave the plan its worst possible rating. EPA recommended that BLM revise the plan to correct the problems identified by EPA. In its decision, the EPA stated: "[I]t is of utmost importance that the Revised Draft SEIS identify effective and enforceable mitigation strategies to ensure environmental and public health protection as the proposed 4,399 additional wells on the Pinedale Anticline are developed."[3]

The BLM should do the same in the EIS for the Uncompahgre RMP and any other major decision document where oil and gas operations will have a significant impact on human health. Oil and gas development is acknowledged to have potentially severe impacts on human health, as noted below, and the Draft EIS should incorporate a formal methodology to evaluate all health issues and potential mitigations. We therefore request that the BLM incorporate a Health Impact Assessment (HIA), which is a systematic, comprehensive methodology for assessing human health impacts, as part of the EIS. A HIA looks at all the possible health effects from a decision, including contaminants and air pollutants but also water contamination, accidents and injuries, alcoholism and substance abuse, mental health impacts, and more. Not only is this approach used by U.S. and international health agencies, but it is used by the oil and gas industry itself in overseas operations.[4] Just last year, the BLM incorporated a full HIA into an oil and gas Draft EIS in Alaska.[5] A comparable approach should also be undertaken for oil and gas development for the Uncompahgre Field Office.

The National Environmental Policy Act (NEPA) intends that human health be thoroughly considered in any Environmental Impact Statement. Congress stated that "...it is the continuing responsibility of the Federal Government to use all practicable means...to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may....assure for all Americans safe, healthful, productive and aesthetically and culturally pleasing surroundings.." and "...attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences..."[6] NEPA implementing regulations direct agencies to consider "the degree to which the proposed action affects public health or safety."[7] These regulations also state that Federal agencies shall to the fullest extent possible "Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance

---

[3] Letter from EPA Regional Administrator, Region 8, to State Director, Bureau of Land Management, Wyoming State Office regarding Revised Draft Supplemental Environmental Impact Statement for the Pinedale Anticline Oil and Gas Exploration and Development Project Sublette County, Wyoming (CEQ #20070542), February 14, 2008:
http://www.epa.gov/region8/compliance/nepa/nepadocs/FinalEPACommentsOnPinedaleAnticline14Feb08.pdf
[4] International Petroleum Industry Environmental Conservation Association and the International Association of Oil and Gas Producers, *A Guide to Health Impact Assessments in the Oil and Gas Industry*, (London; 2005):
http://www.ipieca.org/activities/health/health_publications.php
[5] See The Northeast National Petroleum Reserve-Alaska Draft Supplemental Integrated Activity Plan/Environmental Impact Statement, available at : http://www.blm.gov/ak/st/en/prog/planning/npra_general/ne_npra/ne_npra_feis.html
[6] 42 USC § 4331
[7] 40 CFR 1508.27(b)2

18

BLM_0081835

the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment."[8]

Two recent papers authored by environmental health experts at the University of Colorado's School of Public Health recently examined available information regarding the health effects of oil and gas drilling and production. Among their findings is that: "Most of the hazardous chemicals associated with oil and gas production are well documented to produce adverse health effects in individuals."[9] They also looked at information specific to Garfield County, Colorado, which can serve as a model to other western Colorado counties.[10] Some of their conclusions that are specifically relevant to the upcoming RMP revisions include:

- Air and water quality studies conducted to date indicate that potential exposures to hazardous emissions exist.
- Many air toxics are essentially unmeasured in Garfield County and current plans for further air sampling may not be comprehensive enough to enable public health officials to determine the community health impact of oil and gas development.
- Preliminary testing results indicate that ozone levels in some places are exceeding National Ambient Air Quality Standards and may be hazardous to humans.
- There are no plans for comprehensive and systematic monitoring of surface and subsurface waters.
- Environmental monitoring must be relevant to the areas where oil and gas development activity is occurring and the results must be readily available to the public. Unbiased interpretation of the results must occur in a timely manner and be made available to the public.
- It is important not to ignore what is already known. There is an immediate need for specific information on exposures and the impact from oil and gas development on all aspects of human health.
- An adequate monitoring program should be developed through a rigorous scientific process that addresses all currently recognized data gaps and health risks. This process should be developed in a transparent and explicitly unbiased way.
- A Health Impact Assessment (HIA) is a practical tool to evaluate future impacts, alternatives and appropriate strategies to promote and protect human health.

***Recommendation:*** BLM should incorporate a Health Impact Assessment (HIA) into the Draft RMP for the Uncompahgre RMP.



**15-A-PI-FW**

#### 4. Wildlife Viability

Science-based wildlife management

Given the sizable land management challenges of the coming decades— including federal land management agencies' response to climate change and the complex natural resource dilemmas associated with climate change (i.e. species adaptation, extreme variability in natural processes)—it is

---

[8] 40 CFR 1500.2(f)
[9] Witter, R. et al, " Potential Exposure-Related Human Health Effects of Oil and Gas Development: A Literature Review (2003-2008)," August 1, 2008, hea_08091702b.pdf.
[10] Witter, R. et al, "Potential Exposure-Related Human Health Effects of Oil and Gas Development: A White Paper," September 15, 2008, hea_08091702a.pdf.

BLM_0081836

imperative that the BLM, the Uncompahgre Field Office and this RMP employ effective and efficient science-based planning and analysis methods to support robust and legitimate decision-making processes.

The effective application of science to land management planning and decision-making requires three "essential ingredients":

- Well-defined, measurable **standards** (e.g. wildlife population or habitat condition targets), developed via robust public involvement processes
- The employment of science-based **analytical tools** to evaluate compliance with the standards (e.g. population viability analysis, or the spatially explicit Decision Support System recommended by the Western Governors' Association)
- **Consistent implementation** of science-based analysis and decision-making (i.e. dedicated funding for monitoring and science-based adaptive management processes)[11]

The Uncompahgre RMP should consider these essential elements as it moves forward with efforts to respond to the pressing land management challenges of the coming decades.

*Well-defined standards*
Providing functioning habitat for wildlife and ensuring the long-term persistence of wildlife populations are part of the BLM's responsibilities to manage the public lands for multiple use and sustained yield. FLPMA specifically directs that management of public lands "takes into account the long-term needs of future generations" for wildlife, as well as other resources, and is implemented toward "achievement and maintenance in perpetuity" 43 U.S.C. §§ 1712(c)(1); 1702(c) and (h). Achieving these goals for wildlife can best be realized by establishing well-defined, measurable standards. The use of well-articulated concepts and operational planning practices associated with the literature and practice of population viability assessment may provide Uncompahgre land managers with effective and efficient means of applying science-based conservation methods to wildlife planning decisions.

*Science-based analytical tools*
In order to adopt a legitimate, efficient and effective science-based planning framework, the Uncompahgre Field Office should look to the well-established conservation planning and population viability assessment literature, as well as models employed by other BLM units and neighboring agencies.[12] For example, the neighboring Grand Mesa, Uncompahgre and Gunnison (GMUG) National Forests monitor populations of "management indicator species" to measure the effects of management activities on unmeasured species and to provide insights into the integrity of the ecological systems to which they belong. The use of an indicator or focal species approach, in combination with robust knowledge of the link between species and habitats, allows managers an effective means to apply science-based principles to resource management decisions. Species such as the Red-naped sapsucker and northern goshawk (ponderosa pine ecosystems), Brewer's sparrow (sagebrush) and Colorado River cutthroat trout (aquatic) have been identified as key indicator species by the GMUG and have also been identified by Colorado's Comprehensive Wildlife Conservation Strategy and Wildlife Action Plans as

---

[11] Rohlf, D.J. 2004. Science, Law, and Policy in Managing Natural Resources: Toward a Sound Mix Rather than a Sound Bite. Pages 127-142 *In* K. Arabas and J. Bowersox, editors. *Forest futures: science, politics, and policy for the next century.* Rowman and Littlefield, Lanham, Maryland, USA.

[12] See U.S. Department of Agriculture, Committee of Scientists. (March 15, 1999). *Sustaining the People's Lands: Recommendations for Stewardship of the National Forests and Grasslands into the Next Century,* from
http://www.fs.fed.us/emc/nfma/includes/cosreport/Committee%20of%20Scientists%20Report.htm.

BLM_0081837

species of greatest conservation concern.  Indeed, to meet the challenges of 21st century land management and conservation, agencies will need to cooperate on vital management planning activities, including the sharing and co-generation of biological information.

Another example of a comprehensive monitoring approach can be found in Appendix 2 - "Implementation, Monitoring, and Evaluation Process" - of the Jack Morrow Hills Coordinated Activity Plan, prepared by the Wyoming BLM, available at:
http://www.blm.gov/pgdata/etc/medialib/blm/wy/field-offices/rock_springs/jmhcap/rod.Par.76416.File.dat/31apx02.pdf (and attached).  We particularly note the following, as examples of the sort of detail that should be contained in the Uncompahgre RMP:

- Table A17-1 Resource Management Indicators - p. 8
- Table A17-2 Indicator Detail - pp. 9-11
- Table A17-3 Measurement Detail - pp. 12-14
- Figure A17-3 CAP Management Process - p. 16
- Discussion of the JMH CAP - pp. 20-21

*Landscape-level planning*
The adoption of a science-based approach to RMP development is also consistent with the agency's commitments in the Health Lands Initiative (HLI).  HLI is premised on the BLM's recognition of major changes to the landscape arising from population growth, energy development and global warming. The goal of HLI is "to preserve the diversity and productivity of public and private lands across the landscape."  HLI is to be implemented through specific projects, which will "enable and encourage local BLM managers to set priorities across a broader scale and mitigate impacts to an array of resources in ways not previously available to them" and "give managers flexibility to identify lands where a particular resource might be emphasized in order to encourage sustained health and balance across a broader ecosystem or landscape."  *See, generally*, HLI Factsheet at:
http://www.blm.gov/pgdata/etc/medialib/blm/wo/Communications_Directorate/public_affairs/healthy_lands_initiative.Par.80058.File.dat/HLI-National_FY09.pdf .  Implementation of the management approach described above will further support efforts to address habitat fragmentation and climate change, as discussed in later sections of these scoping comments.

***Recommendations***:  The Uncompahgre RMP should adopt planning and decision-making processes (including data collection, analysis, and monitoring) that employ measurable planning objectives at multiple biological scales (i.e. fish and wildlife populations, habitat and ecosystem conditions) to ensure viable wildlife populations. This recommendation is strongly echoed by the Western Governors' Association's *Wildlife Corridor Initiative*
(http://www.westgov.org/index.php?option=com_content&view=article&id=123&Itemid=68) and the Sportsmen for Responsible Energy Development's *Recommendations for Responsible Oil and Gas Development* (www.sportsmen4responsibleenergy.org ).

16-A-PI-SSP

5.  **Special Status Species/Plants**

This section includes recommendations for managing special status species to best protect viable populations and habitats while still adequately managing the other resources in the Uncompahgre Field Office. BLM should manage threatened, endangered, and special status species so as to: 1) maintain healthy ecosystems and native biodiversity, 2) maintain and restore thriving populations of rare and imperiled species, and 3) meet BLM's obligations regarding special status species.

21

We ask that BLM make the conservation and preservation of rare and imperiled species, and the habitat and movement corridors necessary to sustain healthy populations of such species, an explicit goal of the revised RMP. We ask that this goal be clearly reflected in the objectives and standards set forth by the new plan. BLM should identify crucial habitat, including movement corridors, necessary to sustain healthy populations of all of the rare and imperiled species present in the Uncompahgre Field Office. Additionally, crucial habitat for rare and imperiled species, and particularly biologically rich areas, should be protected through ACEC designations. ACECs should be managed such that protection of rare and imperiled species and the ecosystems of which they are a part is emphasized above all other uses. Activities that have the potential to negatively impact rare and imperiled species, or degrade ecosystem health, should not be allowed in ACECs. In addition to protecting key habitat with ACEC designations, the RMP should avoid making habitat for rare and imperiled species available to activities, such as oil and gas development, off road vehicle use, and livestock grazing, that have the potential to negatively impact rare and imperiled species. The new plan should also strive to apply minimization and mitigation measures that will clearly ensure that activities authorized on BLM lands through the plan will not contribute to declines of rare and imperiled species.

**16-A-PI-ACEC**

a. ACEC Designation

Both FLPMA and the BLM's ACEC Manual (1613) emphasize the BLM's important duty to designate <u>and protect</u> Areas of Critical Environmental Concern. For example, FLPMA states:

> The Congress declares that it is the policy of the United States that - ...

> regulations and plans for the protection of public land areas of critical environmental concern be promptly developed...FLPMA Title I Sec.102(a) [43 USC 1701]

> The Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern. FLPMA Title II Sec. 201(a) [43 USC 1711]

> In the development and revision of land use plans, the Secretary shall - ...

> give priority to the designation and protection of areas of critical environmental concern....FLPMA Title II Sec. 202(c) [43 USC 1712]

Therefore, ACEC designation and protective management are supposed to be a high priority within the BLM's mission. ACEC designation provides an important mechanism for the BLM to actively conserve and recover imperiled species so that the protections afforded by the Endangered Species Act and the designation of Critical Habitat are less necessary. Choosing not to conserve ACECs may contribute to the need to list species under the Act, and is inconsistent with the BLM's special status species obligations.

**17-A-PI-SSS**

b. Special Status Species Management

We anticipate that the recent changes to the BLM Manual weakening protections for special status species will be overturned by the Obama administration. Therefore we encourage the Uncompahgre Field Office to ensure that it meets the obligations outlined in the special status species portion of the Manual as it appeared before it was weakened and note that these measures are still consistent with the direction of the manual as revised. BLM Manual 6840.06.D set forth the policy for management of Sensitive species:

22

BLM_0081839

State Directors, usually in cooperation with state wildlife agencies, may designate sensitive species. By definition, the sensitive species designation includes species that could easily become endangered or extinct within a state. Therefore, if sensitive species are designated by a State Director, the protection provided by the policy for candidate species shall be used as the minimum level of protection.

Therefore, the BLM must provide Sensitive species with a minimum of candidate-level protection. Candidate species were to be managed as follows:

BLM shall carry out management, consistent with the principles of multiple use, for the conservation of candidate species and their habitats and shall ensure that actions authorized, funded, or carried out do not contribute to the need to list any of these species as threatened/endangered. Specifically, BLM shall:

Determine the distribution, abundance, reasons for the current status, and habitat needs for candidate species occurring on lands administered by BLM, and evaluate the significance of lands administered by BLM or actions in maintaining those species.

For those species where lands administered by BLM or actions have a significant effect on their status, manage the habitat to conserve the species by:

Including candidate species as priority species in land use plans.

Developing and implementing rangewide and/or site-specific management plans for candidate species that include specific habitat and population management objectives designed for recovery, as well as the management strategies necessary to meet those objectives.

Ensuring that BLM activities affecting the habitat of candidate species are carried out in a manner that is consistent with the objectives for those species.

Monitoring populations and habitats of candidate species to determine whether management objectives are being met.

Request technical assistance from FWS/NMFS, and any other qualified source, on any planned action that may contribute to the need to list a candidate species as threatened/endangered. BLM Manual 6840.06.C

During the RMP revision, the BLM must take a hard look at whether it is meeting these obligations, and make any necessary changes to ensure that special status species are being adequately managed so that the agency is complying with the Manual.

The BLM has special duties toward special status species when conducting land use planning. First, BLM must "[i]dentify watersheds that may need special protection from the standpoint of human health concerns, aquatic ecosystem health, or other public uses." BLM Land Use Planning Handbook H-1601-1, Appendix C at 2. For riparian areas within these watersheds, BLM must also identify desired width/depth ratios, streambank conditions, channel substrate conditions, and large woody material characteristics." *Id*. Second, BLM must "[d]esignate priority plant species and habitats, including Special Status Species and populations of plant species recognized as significant for at least one factor such as density, diversity, size, public interest, remnant character, or age." BLM Land Use Planning Handbook H-1601-1, Appendix C at 3. Finally, BLM must "[d]esignate priority species and habitats, including Special Status Species, and populations of fish or wildlife species recognized as significant for at least one factor

23

such as density, diversity, size, public interest, remnant character, or age." BLM Land Use Planning Handbook H-1601-1, Appendix C at 7.

BLM must also identify the measures necessary for protecting each of these priority areas and species:

For priority watersheds and riparian areas, "[i]dentify measures, including filing for water rights under state permit procedures, to ensure water availability for multiple use management and functioning, healthy riparian and upland systems." BLM Land Use Planning Handbook H-1601-1, Appendix C at 2.

For priority plant species and habitats, "[i]dentify the actions and areawide use restrictions needed to achieve desired vegetative conditions." BLM Land Use Planning Handbook H-1601-1, Appendix C at 3.

For priority populations, species, or habitats of fish and wildlife, "[i]dentify actions and areawide use restrictions needed to achieve desired population and habitat conditions while maintaining a thriving natural ecological balance and multiple-use relationships." BLM Land Use Planning Handbook H-1601-1, Appendix C at 7.

Also, BLM must "[i]dentify site-specific actions, such as riparian fencing, guzzler placement, etc., needed to manage ecosystems for all species and habitat for special status species." BLM Land Use Planning Handbook H-1601-1, Appendix C at 7.

Additionally, BLM must:

Identify strategies and decisions to conserve and recover special status species. Given the legal mandate to conserve threatened or endangered species and BLM's policy to conserve all Special Status Species, land use planning strategies and decision should result in a reasonable conservation strategy for these species. Land use plan decisions should be clear and sufficiently detailed to enhance habitat or prevent avoidable loss of habitat pending the development and implementation of implementation-level plans. This may include identifying stipulations or criteria that would be applied to implementation actions. Land use plan decisions should be consistent with BLM's mandate to recover listed species and should be consistent with objectives and recommended actions in approved recovery plans, conservation agreements and strategies, MOUs, and applicable biological opinions for threatened and endangered species.

BLM Land Use Planning Handbook H-1601-1, Appendix C at 5. The BLM Manual's definition of a "Conservation Strategy" states:

A strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threat. Conservation strategies are generally developed for species of plants and animals that are designated as BLM Sensitive species or that have been determined by the Fish and Wildlife Service or National Marine Fisheries Service to be Federal candidates under the Endangered Species Act.

BLM Manual § 1601, Glossary at 2.

18-A-PI-NRED, TM

**BLM must manage oil and gas development in a way that retains special status species and moves them toward recovery.**
As we have noted in our citations of FLPMA and the BLM Manual above, the BLM has a mandate to conserve imperiled species. The agency cannot prioritize oil and gas drilling or recreation at the expense

24

of meeting its duties toward special status species. This includes all aspects of oil and gas development and off-road vehicle use – the BLM must ensure that its authorized activities do not compromise air quality, water quality, opportunities for solitude, plant and wildlife habitat, cultural resources, soil crusts, or any of the other resources that the agency must conserve under its multiple use mandate. The RMP must provide a blueprint for how the BLM will ensure that oil and gas development (all phases, including leasing, exploration, infrastructure construction, drilling, and reclamation) and travel management will be made compatible with the other aspects of its mission. In some cases, this may mean disallowing development activity or motorized vehicle use altogether.

**19-A-PI-WD**

**The RMP revision must address noxious weeds and propose mitigation strategies.**
Noxious weeds are a real threat throughout the West, and this is especially true in areas that may become infested with cheatgrass, and in places where soils are actively being disturbed. The BLM must limit surface disturbance whenever possible and implement Integrated Pest Management strategies in conjunction with all surface-disturbing activities in order to contain noxious weeds. The agency must monitor the efficacy of noxious weed containment after surface disturbance, and use the results of the monitoring to both provide realistic analyses of the effects of disturbance in planning for future projects, and to design projects that are more resistant to noxious weed proliferation. RMP revision should seriously address this threat.

**20-A-PI-ED**

**The BLM must have a proven track record of successful reclamation before considering disturbances to be "temporary."**
The BLM has shown interest lately in phased or rolling development, but this framework assumes that managers are able to successfully reclaim areas that have been disturbed. We consider successful reclamation to consist of a return to baseline conditions, which would mean a return to the pre-disturbance vegetative composition and structure, retention of the original soil type, and recolonization by the animals that used an area prior to disturbance. We remain concerned that these results may be very difficult to achieve here in the arid West, where lack of precipitation and an abundance of invasive species may prevent even the best management practices or Conditions of Approval from being effective. Before the BLM adopts this approach, or even uses it to calculate acres of "temporary" versus "permanent" disturbance, it should be able to point to a proven track record of mature, successful reclamation projects demonstrating that this is possible and that the BLM has the ability (including funding) to make this an outcome with a reasonable expectation of being fulfilled. RMP revision should clearly state reclamation standards including necessary monitoring, and should define success in an ecologically sound way.

**21-A-PI-AQ**

**Dust abatement is a growing concern on BLM lands.**
With the explosion of surface-disturbing activities on BLM lands in Colorado, we are increasingly concerned about indirect effects, including dust deposition. Dust may harm rare species and/or their pollinators, or facilitate the establishment of nonnatives. The RMP should thoroughly address dust abatement requirements, and BLM should actively monitor dust deposition associated with surface disturbance as well as the effects on imperiled species, pollinators, and noxious weed proliferation.

**22-A-PI-G**

**The BLM should consider input from regional conservation plans.**
Several regional conservation plans have been developed which include this field office. The BLM should consult the following sources during the RMP revision:

Southern Rockies Ecosystem Project's Southern Rockies Wildland Network Design
The Nature Conservancy's Colorado Plateau Ecoregional Plan

25

The Nature Conservancy's Southern Rocky Mountains Ecoregional Plan
Heart of the West Conservation Plan

Roadless areas, Citizens' Proposed Wilderness, wildlife corridors identified by Southern Rockies Ecosystem Project, and Colorado Natural Heritage Program Networks of Conservation Areas not mentioned above are also important resources that the BLM should consider in this round of planning.

23-A-PI-ACEC

**The BLM should retain existing ACECs and consider strengthening the protective management attached to them.**
BLM should carefully review existing management of ACECs, ensure that the agency is meeting its obligations under the BLM Manual, and strengthen protections in these areas if necessary.  Again, ACEC protection is one of the main tools at the BLM's disposal to conserve imperiled species, and the agency must take this responsibility seriously.

24-A-PI-SSP

c.  Rare Plant Habitat

The BLM is a partner of the Center for Native Ecosystems in the Colorado Rare Plant Initiative, which recently finalized a set of best management practices for oil and gas drilling in rare plant habitat. Those BMPs can be accessed at
http://conserveonline.org/workspaces/corareplantinitiative/documents/recommended-best-management-practices-for-plants/view.html. We also encourage the BLM to adopt the following prescriptions in ACECs designated because of their rare plant values, and to consider applying these in other rare plant habitats as well:

Fluid-Mineral Development (including but not limited to oil and gas development):
- Make all areas that have not yet been leased throughout the entire ACEC unavailable for fluid mineral leasing, or apply No Surface Occupancy (NSO) stipulations to all such areas, with no opportunity for modification, waiver, or exception under any circumstances.
- Make all existing fluid-mineral leases within the ACEC unavailable for future leasing following expiration; or, when existing fluid-mineral leases expire, apply NSO stipulations (with no opportunity for modification, waiver, or exception under any circumstances) prior to reissue of such leases.
- Apply right-of-way exclusion throughout the entire ACEC.
- Consider buying back existing fluid-mineral leases within the ACEC.


Site Inventories:
- When surface disturbing projects are proposed within the ACEC, site specific inventories should be conducted prior to NEPA analysis, and prior to initiation of any project activities.
- These site-specific surveys should be required in any known or potential habitats, and must take place when the plants can be detected, for example, during the flowering period.
- Surveys should document both individual plant locations and suitable habitat distributions.
- All surveys should be conducted by qualified individuals.
- Survey data should also be reported to the Colorado Natural Heritage Program.

26

BLM_0081843

Monitoring:
- Surface disturbing activities should be monitored throughout the duration of the project, and measures designed to minimize impacts should be evaluated to ensure that desired results are being achieved.

Project design:
- Establish a buffer of a minimum of 300 feet between individuals or groups of rare plants/lichens and any ground disturbing activities.
- Translocation of rare plants/lichens shall not be used as a substitute for avoidance.
- Construction should occur down slope of rare plants/lichens, and all project activities should be designed to avoid concentrating water flows or sediments into rare plant/lichen occupied habitat.
- Visibly identify areas that are to be avoided during and post-construction with temporary fencing and flagging
- For surface pipelines use a 300 foot buffer from any rare plant/lichens locations. If on a slope, use stabilizing construction techniques to ensure the pipelines don't move toward the population.
- Ensure that water extraction or disposal practices do not result in change of surface or subsurface hydrologic regime.
- Limit disturbances to and within suitable habitat by staying on designated routes
- Limit new access routes created by the project, minimize the length and environmental impact of new roads constructed to service well locations, and utilize existing roads to the maximum degree possible.
- Place signing to limit motorized travel in sensitive areas.
- Require implementation of dust abatement practices near occupied rare plant/lichen habitat.
- For interim reclamation, either require that all disturbed areas be revegetated with native species comprised of species indigenous to the area (ideally from local genetic stock), or if there are major problems with preventing establishment of noxious weeds, require that disturbed areas be revegetated with either sterile F1 hybrids or with locally appropriate early successional native species capable of outcompeting weeds while also seeding for indigenous natives at the same time.
- For final reclamation, require that the area be revegetated with native species indigenous to the area and that vegetative structure, species composition, and percent cover have returned to baseline conditions (or improved, for sites in poor condition to begin with).
- Require post construction monitoring for invasive species, and specific measures for the control of noxious weeds. Enforce these measures through use of fines and suspension of activities when failure to control noxious weeds is documented.
- Require use of directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in rare plant/lichen habitat. Ensure that such directional drilling does not intercept or degrade alluvial aquifers.

27

- Restrict the total area of each pad to the least amount of acreage required to drill the wells planned for that pad.
- Close and reclaim roads as soon as they are no longer needed, and gate them to prevent unauthorized use.
- Use busing or van transportation of crews and remote monitoring of wells to minimize truck traffic and associated dust.
- Identify rare plant pollinators, and develop mitigation and minimization measures that provide adequate protection to pollinator species.
- Conduct routine site visits for permit compliance, set timelines for fixing permit violations, and issue fines for not meeting requirements.
- In addition to requiring the above as conditions of approval for APDs, ask operators to undertake any additional voluntary measures that would further minimize or mitigate the negative impacts of their activities on rare plant populations and the ecological integrity of the ACEC.

Other ground-disturbing activities:
- Apply a No Ground Disturbance restriction to the entire ACEC with specific authorization for an exception only for management activities that are necessary to conserve the ecological integrity of the ACEC and that further conservation goals for the values for which the ACEC was designated. For example, an exception could be made for construction of fencing/exclosures when needed to further rare plant conservation goals.
- Designate the entire ACEC as a right-of-way Exclusion Area.

Non-fluid mineral development:
- Withdraw the ACEC from mineral entry.
- Apply the No Ground Disturbance restriction discussed above to existing non-fluid mineral leases.

Travel management:
- Limit use of roads to designated routes.
- Close routes that affect important habitat for these rare plants/lichens in order to limit dust, invasion of habitat by noxious weeds, and illegal off-road vehicle (ORV) use.
- Close the entire ACEC to ORV use.

Non-motorized recreation:
- Encourage those engaging in non-motorized recreation to use designated roads and trails, and to avoid important habitat for these rare plants.
- Prohibit overnight camping and campfires within 300 feet of rare plant/lichen populations.

Grazing:
- Retire grazing allotments within the ACEC whenever possible
- Prohibit treatments designed to increase forage for livestock, including seeding and irrigation.
- If trampling by livestock is identified as a concern where grazing allotments exist, create cattle exclosures around rare plant/lichen populations, and include a 300 foot buffer within the exclosure to minimize indirect effects of grazing on rare plant populations.

28

BLM_0081845

- Manage livestock grazing within occupied or potential habitat for rare plants/lichens to promote plant health, maintain sufficient residual vegetation, minimize potential for trampling, minimize potential for invasion of non-native plant species, and sustain overall watershed functions.

Lands and realty:
- Work towards acquisition of private inholdings.
- Apply right-of-way exclusion to entire ACEC.
- Establish memorandums of understanding with willing landowners to encourage private land management actions that enhance protection of ACEC values on and adjacent to private inholdings (*e.g.*, control of noxious weeds).

Management of noxious weeds:
- Promote natural processes and healthy native plant/lichen communities to deter noxious weeds.
- Minimize fragmentation of habitat and associated risk of invasion by noxious weeds and other aggressive non-native species.
- Develop an integrated weed management program that emphasizes prevention, inventory, detection and monitoring, and includes control techniques (*e.g.*, mechanical and hand-applied herbicides) that will not damage rare plant/lichen species, or other non-target species.
- Where practicable, eliminate any existing human-caused disturbance that is contributing to the spread of noxious weeds.
- Continue and expand public education.

Other:
- Prohibit collection of plants, plant materials and seeds, except for scientific or research purposes. Such collection must have no detrimental impact on long-term survival and reproduction of rare species or significant communities.
- Where practicable, restore to a naturally functioning state any existing human-caused disturbance that is impairing natural ecosystem processes affecting habitat for rare plant species or significant plant communities.
- Cooperate with the Colorado Natural Heritage Program to develop and carry out a plan to inventory and monitor plant/lichen species, unique natural communities, and to monitor the overall ecological integrity of the ACEC.
- Cooperate with the Colorado Natural Heritage Program and other entities to allow for and facilitate additional research on rare and imperiled species and unique natural communties.
- If monitoring identifies new threats or suggests that the management recommended above is not adequately protecting rare plant/lichen populations and/or unique natural communities from significant negative impacts (including indirect or cumulative impacts), take appropriate action to prevent such negative impacts.

d. Rare and Imperiled Species and Watchable Wildlife in the Planning Area

The Center for Native Ecosystems is submitting detailed comments regarding rare and imperiled species, big game and watchable wildlife in the Uncompahgre planning area that would benefit from ACEC designations and/or special management. We herein reference and support those comments.

29

BLM_0081846

6. **Travel Management**

24-A-PI-TM

Travel management decisions should be made in the RMP.

BLM's internal guidance states that "each RMP will divide planning areas into OHV area designations that are open, limited or closed." IM No. 2004-005; *see also* 43 C.F.R. § 8342.2(b). This internal guidance was also incorporated into the updated version of BLM's *Land Use Planning Handbook*. H-1601, Appendix C, Section II.D (Comprehensive Trails and Travel Management). The *Land Use Planning Handbook* states that BLM should:

> Complete a defined travel management network (system of areas, roads and/or trails) during the development of the land use plan, to the extent practical. If it is not practical to define or delineate the travel management network during the land use planning process, a preliminary network must be identified and a process established to select a final travel management network. (emphasis added)

Furthermore, Colorado IM No. CO-2007-020 directs Colorado BLM Field Offices to complete comprehensive travel management plans as part of the RMP process:

> Nationally, BLM is moving towards a system of limiting use to designated roads, primitive roads and trails/areas and not encouraging extensive cross-country travel by motorized and mechanized vehicles. Current planning guidance (H-1601-1, Land Use Planning Handbook – Appendix C, Section D, attachment 2) requires identifying a defined travel management network system of areas, roads, primitive roads and trails, in all Land Use Plans. It is our expectation that each RMP Record of Decision will include a system of designated routes for those areas in the limited category.

The *Land Use Planning Handbook* (Appendix C, Section II.D) also sets out requirements for travel management at both the land use and implementation planning levels:

- At the land use plan level, BLM must identify areas for use based on program goals and objectives, primary users, reason for "allowing travel" into an area, setting character to be maintained (including Visual Resource Management and Recreation Opportunity Spectrum classifications), and primary means of travel appropriate to meet objectives and keep setting character; and
- At the implementation level, BLM must define a detailed travel management network, "establish a process" to identify roads, trails, etc. with criteria for selections, guidelines for management, monitoring and maintenance, and indicators for future plan maintenance.

25-A-PI-TM

We understand that BLM is not planning to complete comprehensive travel management planning as part of the Uncompahgre RMP revision. We also note that the Dry Creek area has a travel plan in place, and the Field Office-wide travel plan for the remainder of the field office is in progress. In this context, we would like to provide comments for travel planning to be incorporated in the RMP, as well as comments for the future comprehensive travel plan.

30

The Land Use Planning Handbook provides guidelines for addressing travel planning in the RMP even if comprehensive travel planning is deferred. Appendix C, pp 18-19 states:

> If the final travel management network is to be deferred in the RMP, then the RMP should document the decision-making process used to develop the initial network, provide the basis for future management decisions, and help set guidelines for making road and trail network adjustments throughout the life of the plan. The identification of the uncompleted travel management networks should be delineated in the land use plan and the following tasks completed for each area:
> 1) Produce a map of a preliminary road and trail network;
> 2) define short-term management guidance for road and trail access and activities in areas or sub-areas not completed;
> 3) outline additional data needs, and a strategy to collect needed information;
> 4) provide a clear planning sequence, including public collaboration, criteria and constraints for subsequent road and trail selection and identification;
> 5) provide a schedule to complete the area or sub-area road and trail selection process; and
> 6) identify any easements and rights-of-ways (to be issued to the BLM or others) needed to maintain the preliminary or existing road and trail network.
> If the decision on delineating travel management networks is deferred in the land use plan to the implementation phase, the work normally should be completed within 5 years of the signing of the ROD for the RMP.

Colorado IM 2007-020 further instructs that:
> "Limited to existing roads, primitive roads and trails" designations should be used only as an interim measure prior to your next scheduled RMP revision. Where the Field Offices choose an **interim** designation of "limited to existing roads, primitive roads and trails", a map showing the existing travel and transportation network is required.
> - An inventory and map of roads, primitive roads and trails is necessary to assess and evaluate the need for individual routes as part of the travel and transportation network.
> - Without baseline inventory the Field Offices will not be able to confirm and document when new routes have been created or adequately monitor resource conditions. Baseline inventory maps are essential to effectively respond to the issue of user created route proliferation.
> - Inventory and baseline data is needed to provide supporting rationale to justify management actions such as closures and rehabilitation of routes created after the interim designation is made.
> - The BLM needs to provide the public clear and consistent information regarding access opportunities and provide a map showing the location of existing roads, primitive roads and trails that are available for public use and access.

The Uncompahgre RMP must set out the process that will be used to complete a comprehensive field office-wide travel management plan. The RMP should also provide a baseline route inventory and use that data to institute road closures that cannot wait until the full travel plan is completed. The RMP should also set travel management prescriptions for special management areas, such as lands with wilderness characteristics and ACECs.

31

BLM_0081848

The Little Snake Field Office did not complete comprehensive travel planning as part of its recent RMP revision; however, the RMP (available online at http://www.co.blm.gov/lsra/rmp/index.htm) identified priorities for sub-regions to receive comprehensive travel management planning, which can also be useful for guiding implementation. Appendix F of the Little Snake Draft RMP (attached) sets out criteria for prioritizing areas to receive comprehensive travel management planning, including:

- Special management areas
- Areas identified as "limited to designated roads and trails"
- Areas that meet fragile soil criteria
- User and resource conflicts
- Excessive complaints
- Wildlife/wild horse population trends
- Evidence of trail/road proliferation
- Areas with high road densities
- Impacts on cultural resources
- Unacceptable erosion
- Degradation of water quality
- Impacts on visual resources
- Loss of trail integrity
- Habitat fragmentation and damage
- Impacts on sensitive plants
- Need to provide a variety of user experiences

We encourage the Uncompahgre RMP to prioritize areas in this manner. One additional type of sub-region that should be prioritized for travel planning is areas with low road densities that have the potential to be managed as primitive, backcountry, nonmotorized wildlife or quiet use areas. The RMP should identify **specific** areas that will be prioritized for travel planning and establish time commitments for completing each specific area, in addition to the 5-year deadline for completing travel planning for the entire field office.

Travel and recreation planning are inextricably linked, and recreation planning decisions affect travel planning (and vice versa). The comprehensive travel plan for the Uncompahgre Field Office must be coordinated with recreation planning efforts in this RMP.

***Recommendations***: The Uncompahgre RMP should establish the methodology for comprehensive travel planning, establish interim travel management, and identify priorities for completing travel management planning. Special management areas, such as ACECs, special recreation management areas and citizen-proposed wilderness, will include travel designations within their boundaries. The RMP must identify not only areas for use, but also reasons for permitting travel into an area and appropriate criteria for determining routes that will be made available for different uses, taking into account such factors as undeveloped recreation opportunities available and natural settings.

26-A-PI-TM

2. Landscape level planning.

Travel planning requires the agency to manage human travel across the landscape. The land use planning process, which addresses the broader landscape within a planning area, provides one of the best opportunities to make travel planning decisions in the appropriate context. While we understand that BLM does not have authority to close or relocate highways, major roads, or County roads, BLM must include these routes when analyzing the transportation network as they have a great impact on

32

habitat fragmentation and reduction in core area size (discussed in length later in these comments and in Appendix 1). The placement and design of travel routes defines which areas will remain or become roadless, and which areas will be disturbed and how. In other words, route decisions determine the fragmentation of the landscape, and, thus, how naturally or unnaturally a landscape will behave in terms of water flow and quality, wildlife migration, and species composition and function.

NEPA requires federal agencies to assess the direct, indirect and cumulative environmental impacts of proposed actions, taking a "hard look" at environmental consequences and performing an analysis commensurate with the scale of the action at issue. 42 U.S.C. § 4321 et seq; 40 C.F.R. § 1508.8; *see also* Metcalf v. Daley, 214 F.3d 1135, 1151 (9th Cir. 2000); Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348 (1989). Travel planning affects the entire landscape and can only be thoroughly and properly assessed by considering potential impacts and making decisions at a comparable level. In terms of how to evaluate the potential impacts of travel management decisions, NEPA's definition of "cumulative impact" is instructive:

> the impact on the environment which results from the incremental impact of the action **when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.** Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. (emphasis added). BLM must account for the direct, indirect, and cumulative impacts of all roads in the Uncompahgre Field Office when completing a comprehensive travel management plan.

***Recommendation***: BLM should address travel management on a landscape-wide basis by addressing the impacts of all roads in the planning area and accounting for the landscape-wide impacts of these roads.

27-A-PI-TM

3. Mapping of routes.

As part of comprehensive travel management planning, we anticipate that BLM will produce route maps to illustrate a base travel network, to generate various route designation proposals, and for purposes of receiving public comments. In these contexts, it is vital that the agency clearly mark on all maps or proposed maps areas with existing restrictions on motorized use, such as: wilderness areas, WSAs, primitive non-motorized designations, Wild and Scenic Rivers, and ACECs. Depicting existing restrictions will ensure that public comments are informed by the knowledge that additional routes will not be permitted in certain areas. Further, maps should indicate resources that could be affected by motorized use, such as wilderness characteristics and wildlife habitat. Public comments will then be informed by the potential resource conflicts and the best opportunities for designating areas for non-motorized recreation.

Route maps should also distinguish user-created routes from roads that were created and are maintained by the BLM to serve planned transportation needs. Also, user-created routes in areas that have motorized restrictions should only be shown as closed and/or for prioritizing restoration. To be added to the transportation system, user-created routes must go through NEPA analysis to ensure they are not damaging resources and comply with BLM regulations, such as the minimization criteria for ORV use discussed in these comments.

33

In addition, as part of designating routes, BLM should use consistent definitions of roads, primitive roads, and trails. IM 2006-173 ("Implementation of Roads and Trails Terminology Report"), sets out and defines these terms, and includes a definition of a road as:

> A linear route declared a road by the owner, managed for use by low-clearance vehicles having four or more wheels, and maintained for regular and continuous use.

It is important that BLM use these terms to distinguish both the types of routes and the appropriate types of motorized use.

***Recommendations***: BLM should identify both existing restrictions on motorized access and other areas that can be damaged by motorized use on all maps used in travel planning. User-created routes should be distinguished from legitimate roads on travel planning maps, and, where they were created illegally, should be excluded from the baseline inventory.

28-A-PI-TM

4. Habitat fragmentation.

As mentioned in the beginning of this section of our comments, BLM must address travel management on a landscape level to ensure that BLM meets its responsibility as stewards of the public land and mitigates against habitat fragmentation. We have included The Wilderness Society's recent Science and Policy Brief, "Habitat Fragmentation from Roads: Travel Planning Methods to Safeguard BLM Lands" (Appendix 1). Also included in Appendix 1 are four scientific reports prepared by TWS and discussed in the habitat fragmentation report. These include *Fragmenting Our Lands: The Ecological Footprint from Oil and Gas Development, Protecting Northern Arizona's National Monuments: The Challenge of Transportation Management, Wildlife at a Crossroads: Energy Development in Western Wyoming,* and *Ecological Effects of a Transportation Network on Wildlife.* In addition to summarizing the four reports included, "Habitat Fragmentation from Roads: Travel Planning Methods to Safeguard BLM Lands" provides a summary of available scholarly and government reports and studies on the impact of habitat fragmentation on wildlife, provides methods for calculating habitat fragmentation, and provides recommendations on how to integrate fragmentation analysis into travel management.

We also recommend you look at the travel planning criteria set out in the Record of Decision for the Dillon (MT) RMP (relevant sections attached and also available on-line at: http://www.mt.blm.gov/dfo/rod/contents.htm), as an example of criteria that incorporate key aspects of BLM's ORV regulations as well as ecological metrics. This field office did not complete a comprehensive travel management plan as part of its RMP revision; however, it included road density targets and included an appendix outlining the principles it will use when completing a comprehensive travel management plan during implementation. The Uncompahgre Field Office should adopt a similar approach.

***Recommendation***: BLM should use the information provided in Appendix 1 to measure habitat fragmentation, conduct a thorough fragmentation analysis, and inform decisions regarding road closure and other limitations on use in the Uncompahgre RMP. Specific fragmentation analysis can be done as part of the future comprehensive travel plan; route density targets and roads in need of immediate closure should be addressed in the RMP.

34

**29-A-PI-TM**

5. Principles of travel management.

When completing a comprehensive travel management plan, it is vital to complete it in a systematic and transparent manner.

### *Key principles of travel planning*

(1) Travel management is part of land use planning and should address both recreation and transportation needs from a landscape perspective; therefore, travel planning must be coordinated with recreation management planning.

(2) Prior to conducting an inventory or designation of routes, BLM should assess the present resources, requirements for protection, and which uses for recreation and development are compatible with these resources, requirements and other users.

(3) BLM should use a legal definition of "road" when designating routes.

(4) BLM's consideration of ORV use should take into account its potential damage to resources and other uses, including exclusion of other users.

(5) Where BLM presents a baseline travel system, it must present route maps in a responsible manner that does not legitimize or misrepresent the official status of the existing network of unauthorized ways/routes routes.

(6) BLM should include a detailed closure and restoration schedule in the plan.

(7) BLM should include and implement a monitoring plan.

(8) BLM should include and implement education and outreach in the plan.

Furthermore, Colorado IM No. CO-2007-020 instructs Field Offices to select roads and trails based on comprehensive travel management goals:

> Design a travel system with RMP and transportation network goals in mind rather than just choosing from inherited roads, primitive roads and trails. Instead of a decision-making process to only decide which individual routes should be closed or left open, design a travel system with a desired goal of sustainable routes that meet patrons' needs (i.e. loops) and varying levels of difficulty. Also, consider a broader range of management options that include reroutes, reconstruction or new construction, as well as closures.

The RMP revision and future comprehensive travel plan provide opportunities for BLM to evaluate its travel system goals and whether the current system of roads and trails is furthering or hampering these goals. BLM should create a travel network that best serves the many resources which the agency is tasked with managing and does not inadvertently do a disservice to any other resource or public land visitor.

The Wilderness Society and the Colorado Mountain Club have developed a template for conducting travel management planning, including a detailed discussion of these key principles of travel planning, which we have attached and recommend that the BLM incorporate into the RMP as the process for future travel planning.

35

BLM_0081852

*Recommendations*:  BLM should follow the eight travel planning principles detailed above to ensure that only routes which truly serve a valid purpose for the public remain open. BLM should also create comprehensive travel and recreation management goals and designate routes accordingly.

**30-A-PI-REC**

7.  **Recreation and Special Recreation Management Areas**

Using the language of Benefits Based Management, which emphasizes user "experience" rather than recreation "activity" or "resources," we would like to identify ourselves as representing a range of Quiet Use organizations whose hundreds of thousands of members are passionate about preserving traditional forms of recreation such as hiking, backpacking, non-motorized hunting, angling, horseback riding, and birdwatching.

On BLM lands we and our members want to experience naturalness, quiet natural soundscapes, undeveloped scenery, an undisturbed natural landscape, the timelessness and geological sweep of the BLMs remote and rugged landscapes, a low level of facilities and management presence, and opportunities for uncrowded and solitary experiences. We want to be able to recreate in primitive, undeveloped, natural appearing settings. The experiences we are looking for are closeness to nature, a contemplative relationship with the natural world, savoring the total sensory experience of a natural landscape, escape from crowds, quieting our minds by escaping urban traffic and crowding, and a sense of humanity's place in the larger universe, as well as improved outdoor knowledge, independence, self-reliance and a sense of adventure.

We and our members are whole-hearted participants in these types of experiences with a keen interest in preserving for future generations these time-honored traditional experiences of the outdoors.

**31-A-PI-REC**

a.  Preservation, creation and enhancement of opportunities for quiet recreation.

The recreation resource on public lands is becoming increasingly valuable: more people want to recreate on a finite amount of public land.  As mentioned above, the vast majority of recreationists and other public land visitors desire solitude, clean air, clean water, vast undeveloped landscapes, and a place to witness healthy natural systems thriving with native plants and wildlife. The Uncompahgre Resource Area can provide a wealth of these types of experiences, encompassing many natural and scenic landscapes. The RMP should accommodate those desires as they are consistent with BLM Colorado's strategy for recreation management and the national BLM publication "Priorities & Goals for Recreation & Visitor Services."

**32-A-PI-REC**

**FLPMA and Off-Road Vehicle (ORV) Regulations Applicable to Noise:** As discussed above, FLPMA requires the BLM to manage the multiple uses and resources of the public lands, which include fish and wildlife, watersheds, scenic values, recreation opportunities, scientific and historic values, and other natural values, such as wilderness characteristics. FLPMA also provides for the agency to do so by excluding or limiting certain uses of these lands.  BLM's regulations relating to management of off-road vehicles, similarly acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, *taking into account noise and other factors*." 43 C.F.R. § 8342.1 (emphasis added). Providing a "quiet" recreation experience, as also discussed in reference to opportunities for primitive, unconfined recreation and for solitude provided by lands with wilderness characteristics, also requires

36

thoughtful management to provide for a quiet soundscape. Much research exists on the importance of natural sound to public land visitors. Noise impacts on the recreational experience have become a looming issue in today's noisy urban world. A recent study by the National Park Service showed that 91% of park visitors consider enjoyment of natural quiet and the sounds of nature as compelling reasons for visiting National Parks (McDonald, Baumgartner, and Ichan 1995).**We recommend the UFO conduct a soundscape analysis to guide formulation of intended user experiences**, for example by analyzing how canyon topography and vegetation might reflect or propagate vehicular sound and how that might affect quiet users, neighboring homeowners and wildlife habitat effectiveness. We ask that the alternatives specifically compare impacts of, and the potential for the increase of ORV noise on natural sound and other resources, consistent with the BLM's regulations. We have included a more detailed discussion on soundscape management later in these comments.

The BLM's ORV regulations also provide for protection of other values that are critical parts of not only a healthy ecosystem on BLM lands, but also of enjoying quiet recreation activities, such as hunting, photography and bird-watching, requiring that management minimize "damage to soil, watershed, vegetation, air, or other resources of the public lands" and harassment of wildlife or disruption of habitat; and to prevent impairment of wilderness suitability or adverse affects on natural areas. 43 C.F.R. § 8342.1. Landscape level planning, including through use of the travel planning template attached to these comments and assessing road density, as described in more detail above, is another important tool for ensuring that quiet recreation opportunities are preserved.

33-A-PI-REC

**National Visitor Use Monitoring Program:** The Moab Field Office completed a National Visitor Use Monitoring Program (NVUM) as a pilot project for visitor use monitoring on BLM lands. The NVUM for the Moab Field Office was developed through an interagency agreement with the Forest Service to be useful, in part, for making decisions during the planning process. BLM's website on the program explains the NVUM's relevance and applicability:

> Such visitor monitoring information enables BLM to incorporate statistically valid visitor use monitoring information into planning and management decisions as well as long-term monitoring assessment. The FS NVUM system provides BLM with accurate data with high confidence levels for reporting to Congress and constituents, thereby building credibility and establishing legal protection in decision-making.

BLM, Visitor Use Surveys & Research,
http://www.blm.gov/wo/st/en/prog/Recreation/national_recreation/visitor_use_surveys.html.

The information provided from the NVUM shows that motorized use is a small portion of recreation activity on public lands in the Moab Field Office. The NVUM states: "In terms of total participation, the top five recreation activities of the visits to the Moab Field Office were viewing natural features, hiking/walking/trail running, relaxing (hanging out, escaping heat and noise), viewing wildlife and driving for pleasure (Table 16)."

**The Uncompahgre Field Office should conduct a similar survey in preparation of the RMP**. If the UFO also finds that quiet-use recreation is the most prevalent type of activity on public lands within the field office, it should ensure the RMP reflects that finding and adequately accommodates quiet users.

34-A-PI-REC

**Colorado BLM Instruction Memorandum CO-2007-020:** This guidance acknowledges the importance of comprehensive recreation and ORV management to "facilitate attainment of management objectives

37

and maintain prescribed setting character—which is also essential to achieving Benefits-Based Management objectives." The IM also restates BLM's commitment to generally limiting motorized use to designated roads and trails, such that "open areas will be limited to a size that can be realistically managed and geographically identifiable" and "expansive open areas allowing cross-country travel, without a corresponding and identified user need/demand, will not be designated in RMP revisions."

Further, the guidance provides for designating routes to dispersed camping and day use sites and limiting use of motorized vehicles to these routes, only providing for use off of these routes where "needed" and "appropriate," and then subject to specified distances and time periods; in this context the IM refers to being "consistent with the policies of the United States Forest Service OHV Rule." Since the Forest Service has been updating its guidance, we wanted to clarify the manner in which dispersed camping should be handled to be both consistent with this policy and with BLM's other goals for management of the public lands in the Uncompahgre Field Office. The Forest Service Travel Management Rule (36 C.F.R. § 212.51(b)) provides, in relevant part:

> The responsible official may include in the designation the limited use of motor vehicles within a specified distance of certain designated routes *solely for the purposes* of dispersed camping or big game retrieval. Such designations represent *site-specific decisions* associated with specific roads and trails or road or trail segments, rather than a blanket exception to the rule. Designations under 36 CFR 212.51(b) will be applied sparingly to avoid undermining the purposes of the rule and to promote consistency in implementation. (emphasis added).

The Forest Service Travel Management Directives, proposed March 9, 2007, and finalized December 8, 2008, reinforces that the allowance for dispersed camping is a designation of motorized use, as opposed to a blanket exception to designation of motorized use. FSM 7715.64 provides, in relevant part:

> 2. [This authority] should be used sparingly to avoid undermining the purposes of the travel management rule and to promote consistency in its implementation.
> . . . .
> 4. Responsible officials should consider providing designating [sic] routes to dispersed camping sites as an alternative to authorizing off-route use…

Accordingly, as stated in the rule and directives, any dispersed camping allowance must be treated as a specific designation and consistent with other travel planning regulation and guidance, which is also consistent with the provisions of Colorado IM CO-2007-020. The Southern Rockies Conservation Alliance recommendations on application of the Forest Service approach are similarly applicable here:

BLM should allow visitors to disperse camp generally, but restrict motor vehicle travel *for the purposes of dispersed camping* according to a combination of the following options, as dictated by resource, safety, and private property concerns:

> a) Forest visitors may park a motor vehicle within one vehicle length from the edge of the road surface when it is safe to do so and without causing damage to the resources of the public lands (campers walk to access a backcountry camp of their choosing), and/or
> b) Motor vehicles may access signed campsites via designated camp spur routes that are signed and demarcated on a travel management map.

38

In certain places or certain times, the BLM may need to restrict dispersed camping altogether. These provisions should be incorporated in the Uncompahgre RMP.

We recognize that the Uncompahgre Field Office has recently become a leader on this issue and we commend the UFO for the dispersed camping policy established in 2009 in the Dry Creek TMP. The Dry Creek EA seemed to describe the situation clearly and due to this established a very strong and well supported policy. For example, page 184 of the EA stated:

> **Off-Route Parking, Camping, and Game Retrieval Policy:** For BLM Public Lands and National Forests the distance that OHVs are currently permitted to drive off existing or designated routes for parking, camping and game retrieval is 300 feet. This regulation applies generally to most BLM and Forest Service-managed lands, with the exception of developed recreation facilities and other areas of concentrated use where parking or camping is restricted to designated parking areas and camping spurs. Due to higher levels of public use on the Public Lands and National Forests, BLM and Forest Service managers are concerned that the long-standing 300 foot regulation is outdated and no longer provides adequate protection of vegetation and other resources. One of the major concerns with the 300 foot regulation is that new routes are often created through repeated use, and these new routes in turn become the starting points for additional 300-foot long or longer extensions. As a result of these concerns, both the Forest Service and BLM are revising their regulations to decrease or eliminate the distance that motor vehicles can legally drive off routes to park, camp, and retrieve game.)

The Dry Creek Record of Decision CO-150-2008-33 EA, Page 3, states:

> **Parking** In order to minimize resource impacts and help prevent new user-created routes, users are allowed to park motorized or mechanized modes of travel immediately adjacent and parallel to available designated routes for any purpose. Parking is limited to one vehicle-width from the edge of the route. Users are encouraged to park motorized or mechanized modes of travel in already disturbed areas whenever possible, consider safety, and keep routes passable for other users. **Camping** Short spur routes leading to popular dispersed campsites are designated and identified. Dispersed camping is allowed in other areas, consistent with parking requirements described above.

We fully support this policy and therefore request that this policy be carried over on the entire Uncompahgre Field Office in this RMP. The Dry Creek EA acknowledges the many impacts to resources associated with routes created for dispersed camping. The RMP should not ignore those impacts which BLM already found to be significant and lasting; the RMP should assess those impacts field office-wide and take comparable steps to mitigate them. |

**34-A-PI-REC**

**Land Health Standards:** Healthy lands are a critical part of recreation experience, and it is equally important that recreation not degrade the quality of the public lands, as acknowledged by FLPMA and the regulations discussed above. **We recommend that the recreation portion of the RMP take as one of its primary objectives to meet or exceed the 1996 Colorado BLM Land Health Standards (approved in February 1997 by the Secretary of Interior ) pertaining to "Upland Soils and Riparian Systems," "Healthy Plant and Animal Communities," "Special Status and Threatened and Endangered Species," and "Water Quality."** The Colorado BLM's Recreation Management Guidelines, issued in December of 2000 by the Resource Advisory Councils of Colorado in partnership with the agency, commit to management of recreation "while at the same time minimizing and preventing adverse impacts to land

39

health, ecosystems, and cultural or natural resources" and specifically incorporate and attach the Land Health Standards.

**35-A-PI-REC**

**Colorado BLM Recreation and Visitors' Strategy**: The 2007 Colorado BLM Recreation and Visitors' Strategy directs managers to consider impacts on "land health standards" (p. 4) and the need to "uphold our [BLM's] fundamental duty to meet or exceed land health standards" (p. 6). This strategy also provides an approach that will maintain the open spaces on the lands managed by the Uncompahgre Field Office. Many portions of Uncompahgre BLM lands, not just WSAs and proposed wilderness, fall into the more primitive category of BLM lands that are at particular risk for losing their naturalness. The 2007 Colorado BLM Recreation Strategy emphasizes the importance of maintaining the "distinctive character" and "wide open spaces" of Colorado BLM lands (p.3). The Strategy emphasizes the "need to maintain the distinctively undeveloped and open space character of its [BLM's] recreation settings" (p. 7). **The BLM should commit to actively managing these lands to protect and enhance the primitive, backcountry experience.**

**36-A-PI-REC**

**Guidelines for Managing Access between BLM and Private Lands:** Attached to these comments are guidelines that have been adopted by the Royal Gorge Field Office and endorsed by the BLM's Front Range Resource Advisory Council. The guidelines provide generally that: "Other than for foot and horse uses, entry to public lands from private lands must comply with the designated transportation system and be limited to the same means of travel that the general public uses from public access points." These guidelines were developed to address a substantial increase in user-created motorized roads and trails leading from private lands onto the adjoining public lands that did not comply with federal management. **These guidelines should be incorporated into the Uncompahgre RMP.**

**37-A-PI-REC**

**Standards for Issuance of Special Recreation Permits**: BLM should adopt unambiguous, protective criteria for issuance of special recreation permits (SRPs) in order to effectively manage the increase in commercial and competitive group activities that can have a significant impact on the lands in the Uncompahgre Field Office. The BLM Handbook on Recreation Permit Administration (H-2930-1) clearly states that field offices can and should develop guidelines for issuing SRPs. The Handbook states: "Field Offices are encouraged to develop thresholds through land use planning for when permits are required for organized groups and events for specific types of recreation activities, land areas, or resource settings" H-2930-1 at 13. On the issue of Special Area Permits, the Handbook states: "Applications for Special Area Permits issued to individuals are processed according to the area-specific land use and/or business plan, or guidelines approved by the State Director." H-2930-1 at 17. The Uncompahgre Field Office therefore must provide clear guidelines for processing Special Area Permits, because in this situation the Handbook directs that permit issuance will tier to the RMP.[13]

The Price Field Office Draft RMP, Appendix 14, (attached to these comments) provides an excellent example for evaluating SRP applications and issuing such permits. It classifies SRPs into four distinct classes, ranging from least intensive to most intensive, based on specific factors such as type of equipment, size of area used, number of participants, etc. These factors are defined and then compared in a simple permit classification matrix consisting of Classes I through IV (with I being for smaller and less impacting events and IV being for larger, more impacting events). Each Class also has an example of the type of event that may fit into the category. After the Class is determined, the BLM can then look to see

---

[13] Analysis of the impacts of permits on a cumulative basis is also best accomplished in the RMP, since it will provide for a more comprehensive, informed analysis that can look at both cumulative and site-specific environmental consequences, as required by NEPA.

BLM_0081857

how permit types fit into Recreation Opportunity Spectrum Classifications and/or Special Recreation Management Area (SRMA) or Extensive Recreation Management Area. Various SRMAs can be broken into classes and it is easy to see what types of uses and events should be permitted for each area. Because the standards set out in the Price Draft RMP are very specific (for example, surface disturbance of 5-40 acres ranks as "medium intensity"), BLM can easily determine whether to issue an SRP and where, and can better estimate cumulative impacts from such permits. The Uncompahgre RMP should use the model provided by the Price Draft RMP for classification of SRPs to define which uses may be appropriate or inappropriate in specific areas. BLM has not only the discretion to establish SRP guidelines, but also the obligation to do so in order to protect the resources that the RMP is intended to protect and sustain.

**37-A-PI-REC**

**Criteria for Addition of New Motorized Trails:** In order to ensure that priority ORV management is addressed, the BLM should implement a prioritization hierarchy in which new construction is secondary to and incumbent upon successful restoration and prior achievement of other ORV related management goals. Management activities such as restoration and rehabilitation of existing impacts, signage and achieving compliance should take precedence over approving new motorized construction or adding motorized system trails that further increase the agency's management burden and might further retard other resource actions that are critical if not addressed first.

The goal of this priority hierarchy is to 1) take care of the resource impacts from past ORV related activities; 2) establish conditions to prevent new and/or reoccurring ORV related impacts; 3) secure long term commitments, stipulations, and thresholds of new and existing system routes; and (4) once above priorities have been met, new proposals can be considered and reviewed through NEPA.

Thus, in assessing whether additional motorized trails are to be considered, and if appropriate, approved, we recommend the following set of principles which builds upon the Royal Gorge Field Office's criteria set out in the Arkansas River Travel Management Plan Environmental Assessment, Appendix 6 (pp. 225-227).

To provide for appropriate motorized uses, while also protecting the area's resources, the BLM should establish the following criteria for addition of new motorized trails to help guide future management and development of the ORV activities on the Uncompahgre FO:

1. Approve construction of new or additional trails only after the following conditions have been met:
    a. The decision to approve the trail(s) has been authorized under a site specific EA or EIS that analyzes the site specific environmental effects of the proposal.
    b. The proposal would further the goals and desired future conditions (DFCs) identified by the agency.
    c. Priority implementation of effective on-the-ground closures (i.e. barriers, gates, berms) and restoration work (i.e. ripping/seeding, decommissioning, re-countouring, re-vegetation) has been completed and adequate funding and grants, partnerships/volunteer commitments, staff time allocations has been secured and employed.
    d. Implementation of all necessary signage (for closed and open routes) has been fully installed and adequate funding and staff/volunteer time for installment has been committed to.

41

      e. The proposal is sponsored under a partnership agreement that includes a plan for securing the necessary funds and/or volunteer commitments to construct and maintain the trail to accepted standards.

      f. The proposal is accompanied by long term commitments, and stipulations and thresholds are agreed to that if surpassed, corrective management actions will be taken to protect resource health.

2. A significant factor in approving new trails depends on the ability to maintain existing trails to agreed standards. With the participation of cooperating partners, develop accepted standards and guidelines for constructing and maintaining new and existing trails.

3. With the participation of cooperating partners, establish a system and procedures for monitoring trail conditions and performing necessary maintenance work.

4. Continue and strengthen long-term partnerships with motorized user groups for the purposes of maintaining existing trail networks.

Note that new construction does not include incidental construction in order to reroute, mitigate, and/or prevent resource impacts as this would be included under number 1 (c); rather, this refers to new ORV opportunities that are considerable and are added to the current system and agency burden.

This approach is consistent with the letter and the spirit of BLM's obligation to minimize impacts from ORVs to other users and resources. As discussed previously in these comments, Executive Orders (EO No. 11644 (1972) as amended by Executive Order No. 11989 (1977)) and the BLM's regulations (43 C.F.R. § 8342.1) require BLM to ensure that areas and trails for off-road vehicle use are located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability; to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands; and to minimize distress and other impacts to wildlife.

**38-A-PI-REC**

***Recommendations***: In managing recreation on the lands of the Uncompahgre Field Office, the RMP should ensure that quiet recreation opportunities are given sufficient attention and that management of motorized recreation, in general, is also designed to protect the experiences of other public land visitors. Comprehensive travel management planning, including landscape level planning and road density analysis, as well as compliance with land health standards, will also ensure healthy ecosystems that can support positive recreation experiences. Further, coordinated BLM and Forest Service guidance on management of motorized vehicles and dispersed camping, managing access between public and private lands, issuance of special recreation permits, and strict criteria for addition of motorized trails will also help the agency to maintain the distinctive open space character of Uncompahgre BLM lands.

**39-A-PI-REC**

  b. Special Recreation Management Areas

    i. General.

In the Uncompahgre RMP we encourage the BLM to use special recreation management areas to reverse the ongoing downslide of recreational settings into more developed categories and preserve or restore settings to the primitive and backcountry category – providing a prescriptive approach to creating, enhancing and protecting quiet recreation experiences on our public lands, using the tools and guidance set out above.

42

The Land Use Planning Handbook (in Appendix C and as further defined in the Glossary) provides for BLM to establish special recreation management areas (SRMAs) in the lands governed by the Uncompahgre RMP.  Depending upon the anticipated use of each SRMA, BLM should adopt different management strategies.  The Handbook identifies the following general types of recreational use:

- Undeveloped – These areas are managed to support dispersed recreation, maintaining their highly-valued, distinctive, undeveloped recreation setting character.  Within the bounds of legal requirements and sound management practices, resource and visitor management actions exercise minimal regulatory constraint and exclude major investments in facilities and visitor assistance to preserve the visitor's freedom to choose where to go and what to do.

- Community – These areas adjoin communities and are managed to provide structured recreation opportunities in response to recreation-tourism demand generated by community and/or tourism growth and development.  The areas are managed to maintain natural resource and/or community setting character, with appropriate restrictions on marketing, administration and other management actions.

- Destination – These areas have distinctive, highly visible, or otherwise outstanding resource attractions that are managed to provide structured recreation opportunities in response to demonstrated national or regional recreation-tourism demand.  The areas are managed to maintain natural resource and/or community setting character, with appropriate restrictions on marketing, administration and other management actions.

In the context of the BLM's Benefits Based Management (BBM) framework, it is critical that the range of SRMAs, including recreation management zones (RMZ), and their management prescriptions are written to enhance the other values that ultimately contribute to the benefits and experiences of the area and provide significant opportunities for primitive recreation experiences.  SRMAs should include those with an "Undeveloped" market and, even though they will not be managed by extensive facilities, require active management to protect their lands from other uses and activities that will destroy the undeveloped recreation setting and experience.

Some of the supporting materials for analysis of recreation settings set out standards for primitive physical settings that appear to unreasonably limit the lands that could be considered to provide a remote, primitive recreation "experience." Accordingly, the BLM should not use those standards as a "bright-line test" to disqualify areas which are or could in the future provide a primitive recreation experience. Rather, the standards should be used as a goal which proper management could help the areas achieve and focus on the experience that can be achieved.

IM CO-2007-020 directs BLM managers to:  "Ensure that travel management decisions…maintain prescribed setting character…" (p. 2).  The IM specifies tools to be used for maintaining settings, stating on page 2 that:  "For areas with Limited and Open categories, managers may impose several different kinds of limitations including vehicle numbers, types, use times or seasons, permitted use……" (emphasis added). The notion of limiting numbers of recreation users needs to be incorporated into the adaptive management measures adopted for all recreation planning in the Uncompahgre Field Office, particularly for portions of the field office where growth in recreation use should not be the goal. Prescriptions to ensure primitive recreation opportunities are provided should also include soundscapes, special recreation permits, and road density.

In this manner and as part of achieving the goals of a BBM system, areas which have primitive character should be managed for that experience and desired future condition, even if they do not currently meet

43

all of the criteria that the BLM has set for primitive physical settings or designation. By adopting such a prescriptive, or aspirational management approach, as opposed to a more descriptive or reactive approach of just basing the management of the zones on perceived evidence of human presence or an expectation of more people wanting to use the area, the BLM can ensure that some level of existing disturbance does not disqualify areas which do provide a primitive experience from a decision to manage them to protect and enhance such qualities and provide this important experience.

***Recommendations***: BLM should adopt a range of SRMAs and management prescriptions which provide adequate opportunities for non-motorized or quiet recreational experiences and are written to enhance the other values that ultimately contribute to the benefits and experiences of the area. BLM should use an aspirational approach which allows the agency to ensure that some level of existing disturbance does not disqualify areas which do provide a primitive experience from a decision to manage them to protect and enhance such qualities and provide this important experience. The SRMA proposals and wilderness inventory submitted under separate cover identify key areas for protecting primitive recreation experiences.

40-A-PI-REC

    ii.  Preserving the "Backcountry" recreation setting

One of the factors the BLM uses to determine setting prescriptions is "distance from an improved road," or the "remoteness" criterion found in the Settings Classification Matrix. Greater distances from roads will put an area into a less developed setting on the Settings Classification Matrix. The developed or undeveloped character of a physical setting in turn helps determine the level of development a setting will have in the social and managerial settings of the matrix.

We have noticed a tendency for "distance from a road" to be justification for classifying an area as more developed on paper than the actual conditions on the ground warrant. This in turn makes it easier for social and administrative settings to be similarly skewed toward a more developed management goal.

Like many Colorado BLM lands, the Uncompahgre Resource Area contains historic "constructed" roads that get little or no use and therefore do not interfere with the essential backcountry character and feel of the land. Visitors may experience a remote, backcountry feeling, even in the presence of seldom used roads. Spatially analyzing "distance from a road" and using the criterion for determining a landscape's remoteness does not take into account other subjective qualities of the landscape and does not give the BLM an accurate frame of reference from which to make a decision on the undeveloped and backcountry nature of an area.

Another reason that existing settings may be upgraded to a more developed setting within the matrix may be due to the long lifespan of an RMP. Managers anticipate increased recreation demand over the life of an RMP, and assign Front Country or Rural settings to areas that are currently Backcountry in character. Upgrading existing settings in this manner becomes a self-fulfilling prophecy. Setting high numbers of encounters and group sizes up front opens up an area to increased use, leading in turn to further setting upgrades down the line.

***Recommendations***: Despite the likelihood of increased demand and the physical proximity of a road, we feel it is important to make every effort to preserve the undeveloped and backcountry experience wherever possible. We recommend that settings, visitor encounters and group sizes be adjusted from less crowded to more crowded settings incrementally over time through adaptive management, rather than up front, before recreation demand has actually materialized.

44

Adaptive management strategies need to be based on comprehensive and statistically rigorous monitoring based on defined levels of acceptable change, as was done in the Jack Morrow Hills plan in Wyoming. This approach can be used to limit use of an area for primitive recreation and to limit facilities unless or until certain criteria are met – such as increased demand and a determination that more visitors can be accommodated without undermining targeted recreation values. Again, the Jack Morrow Hills plan in Wyoming is a good example of how the BLM could implement adaptive management with specific monitoring of key resources, targets for management, and triggers for action.

We recommend that the RMP include specifics on the monitoring and metrics that will be used to evaluate successful meeting of targets for SRMAs and other recreation areas.

We understand that experiential outcomes and setting retention are the end goals of the Benefits Based Management "Chain of Causality" (experiential outcomes result from settings and activities which result from market demand, user groups, and activities). For this reason the RMP needs to be specific about the metrics to be used for evaluating the attainment of the experiential "Outcomes."

Examples of Adaptive Management responses could be: reduced marketing, smaller trailheads and parking, fewer improved trails, more challenging trails, and other ways of limiting vehicle numbers as referenced previously in the 2007 Colorado BLM IM, p. 2. Setting motorized use levels through permits, in desired but overcrowded settings such as rocking crawling areas and other intensive motorized use areas in Dry Creek, should not be ruled out. This recommendation applies not just to places where motorized use is occurring under a formal Special Recreation Permit, but to areas where general public use is occurring **not** under any permit.

In applying adaptive management, we caution against resorting too quickly to the common solution of dispersing use to other areas. This merely spreads resource impacts more broadly across the land and invites more growth, more off-trail use, more trail maintenance expense and more management and enforcement challenges over a greater expanse of land. It is not the BLM's job to indefinitely absorb an unlimited expansion in recreation demand. Setting limits on recreational use to protect BLM resources and experience will lead to other providers stepping forward to absorb increased demand.

41-A-PI-REC        iii.   Managing promotion and marketing.

A key aspect of implementing SRMAs is marketing (H-1601-1 – Land Use Planning Handbook, Appendix C, pp. 15-17, Recreation and Visitor Services, C, 4). Experience shows that designating new trail systems and other recreation opportunities can lead to unanticipated increases in use, potentially straining BLM resources and shifting less crowded settings into more crowded ones.

The 2007 State Recreation and Visitor Services Strategy points to the inconsistency between the "recreation tourism demand" generated by a "vigorous Colorado Tourism Office promotion budget" and the BLM's "fundamental duty to meet or exceed land health standards" (p.6). The Recreation Strategy goes on to state: "tourism industry promotion... sends increasing numbers of outdoor adventurers to BLM public lands," challenging the BLM's ability to "maintain the distinctively undeveloped and open-space character of its recreation settings" (p. 7).

In response to this problem, both Appendix C of the LUP Handbook and the State Recreation Strategy direct the BLM to manage marketing so as to maintain targeted recreation settings. For example, the

45

SRMA definitions section in Appendix C includes "appropriate restrictions on marketing" as one of several implementation actions to be done on SRMAs.

Objective 2 in the Recreation Strategy similarly calls upon businesses and local governments to "agree" to the BLM's "approved recreation setting prescriptions and management objectives" and to "market public lands responsibly" (p. 9). For example, the Glenwood Springs Field Office, has obtained an agreement from local government to limit marketing efforts to ensure its Community SRMAs do not evolve into Destination SRMAs.

The Recreation Strategy further directs BLM field offices to "engage the business community and local governments in .....managing....use of public lands that meet or exceed land health standards" (p. 9).

***Recommendations***: In accordance with this direction, we recommend that the Uncompahgre RMP be specific about the marketing strategies it will use for each new SRMA and recreation area. The marketing strategies should be designed to hold use levels down to those that are manageable within budgets, and that will maintain the "distinctive, open-space character" of BLM settings referred to above. The BLM should obtain specific agreements/MOUs laying out the nature and extent of the publicity that will be done on each SRMA or other recreation area.

c.  Areas needing special attention to recreation management.

41-A-PI-REC

In addition to designating new SRMAs and protecting lands with wilderness characteristics in accordance with our separate proposals, certain areas in the Uncompahgre Field Office merit special attention for management of recreation.  At this time, we would like to highlight the following areas:

***Adobe Badlands***:  The lands immediately adjacent to the Adobe Badlands WSA and citizen-proposed wilderness area are severely degraded by intense motorized use, causing noise and dust pollution and impacting the WSA. The revised Uncompahgre RMP should give special attention to managing this area to reduce and minimize impacts to the WSA or the citizen-proposed wilderness from motorized vehicles.

***Tabeguache***: The Tabeguache area managed by the Forest Service was congressionally designated to protect its wilderness values. The BLM should close motorized and mechanized routes in the adjacent BLM lands in order to avoid motorized or mechanized intrusions into the Tabeguache area and to otherwise ensure preservation of the wilderness values there. Specifically, the relatively unroaded, unmotorized BLM lands north of the Tabeguache Creek Special Management Area, including the Shavano, Campbell, and Burro Creek drainages, should be closed to motorized recreation.

***Roubideau***: The Roubideau Area managed by the Forest Service was congressionally designated to protect its wilderness values. The Uncompahgre Field Office closed a deteriorated jeep trail in the Monitor Creek area, creating a large contiguous area adjacent to the FS Roubideau Area, covering over 20,000 acres on BLM land which includes the Camel Back WSA and citizen-proposed wilderness. The RMP should reaffirm this closure and manage recreation in this area to protect natural values.

46

BLM_0081863

42-A-PI-NO

## 8. Natural Soundscapes

Evaluating and protecting natural soundscapes is essential to the land use planning process. As part of providing opportunities for quiet recreation, BLM must consider activities that interfere with the soundscape associated with quiet recreation opportunities. Research shows that for many people, especially quiet recreationists, the primary reason for visiting primitive landscapes is to attain a sense of solitude and tranquility, which are interrupted by non-natural noises. A study performed by psychologists at Colorado State University found that acoustic stressors impact visual landscape quality, meaning non-natural noise actually affects the perceived naturalness of a landscape (Mace 1999). Therefore, in order to preserve the naturalness of an area, BLM must preserve the natural soundscape.

Furthermore, the authors of the study note that "tranquility" and "solitude" are explicitly addressed in the Wilderness Act as values that must be preserved by land management agencies. BLM guidance directs the preservation of "naturalness" in Wilderness Study Areas, Visual Resource Management I zones, and other areas managed to protect wilderness qualities. All of these values are negatively impacted when the natural soundscape is impacted; therefore, BLM must retain the natural soundscape in wilderness-quality lands and primitive recreation areas.

### A. BLM's Obligation to Preserve Natural Soundscapes
Executive Order 11644 (1972), as amended by E.O. 11989 (1977), orders the BLM to locate areas and trails to

> Minimize conflicts between off-road vehicle use and other existing or proposed recreation uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

BLM regulations at 43 C.F.R. Sec. 8342.1 reiterate this E.O.

In order to effectively and appropriately achieve this goal, the Colorado BLM issued "A Recreation and Visitor Services Strategy" ("Recreation Strategy") to help field offices provide quality recreation experiences for all users. The Recreation Strategy recognizes that BLM's obligation to provide recreation areas for many user types requires designation of quiet recreation zones. It defines "quiet recreation" as "Outdoor recreation enthusiasts such as hikers, skiers, mountain bikers, equestrians, bird watchers, hunters and anglers *who seek the opportunity to enjoy natural soundscapes*" (P. 17) (Emphasis added).

We encourage the Uncompahgre Field Office to similarly implement BLM guidance for minimizing conflict between user groups by establishing quiet use areas and mitigating potential noise impacts on these areas.

Additionally, courts have upheld the responsibility of federal land management agencies to evaluate noise impacts on the natural soundscape. *See Izaak Walton v. Kimbell*, 516 F. Supp. 2nd 982, 985, 995-96 (D. Minn. 2007). (EA prepared by USDA Forest Service for plan to construct snowmobile trail adjacent to Boundary Waters Canoe Area Wilderness failed to properly analyze noise impacts from snowmobile use, as required by NEPA; EA provided no quantitative evidence of analysis of decibel levels to be projected by snowmobile use of the trail into adjoining wilderness.)

47

B. Effective Soundscape Analysis

In order to effectively preserve the natural soundscape in quiet recreation areas, BLM must quantitatively measure (1) the decibel (dB) levels of the natural soundscape; and (2) ORV dB levels on the natural soundscape. Quantification of ORV traffic volume, duration, and frequency are thus necessary components of soundscape analysis.

There are many tools available to BLM to adequately measure noise impacts and set prescriptions to prevent negative impacts. The Wilderness Society recently created a GIS model based on the System for the Prediction of Acoustic Detectability (SPreAD), a workbook issued by the Forest Service and Environmental Protection Agency for land managers to "evaluate potential ... acoustic impacts when planning the multiple uses of an area." The Wilderness Society adapted the SPreAD model to a GIS environment so that potential noise impacts could be integrated with other variables being considered in the planning process. We believe the Uncompahgre Field Office has an up-to-date version of this software, and we would be happy to provide more information at your request. The SPreAD-GIS model can be implemented in your existing ArcGIS software at no additional cost. The SPreAD-GIS model was developed for the Forest Service, but its applicability extends seamlessly to BLM lands, as the inputs include vegetation and topography.

The Uncompahgre Field Office should use the SPreAD-GIS model to determine what sounds will impact visitors in each segment of the planning area, and what steps must be taken to mitigate these impacts. It is important to note that the original SPreAD operates under the premise that in primitive recreation areas, *no noise should be audible above the natural soundscape*. We envision this model as eventually being used throughout the field office, but at this stage believe BLM should at least apply it to special management areas and/or other strategically prioritized portions of the field office.

***Recommendations:*** The preservation of natural soundscapes is important to provide visitors with adequate opportunities for quiet recreation. The USGS finds that dissatisfaction with recreational opportunities can "diminish public support for land-management programs" (Douglas xiii). We encourage BLM to utilize the SPreAD-GIS model to analyze and preserve the natural soundscape of the Uncompahgre planning area, especially in special management areas managed for quiet use recreation.

43-A-PI-VEG

9. **Retaining and Restoring Natural Forest Ecosystems**

Section 201 of FLPMA mandates that BLM inventory the resources of the public lands, their resources and values. 43 U.S.C. § 1711. The Preparation Plan for the RMP revision states that "[t]he Uncompahgre Field Office manages small areas of spruce/fir forests and ponderosa pine forests, and large areas of pinyon-juniper woodlands." The BLM must carefully inventory its forest resources and evaluate alternatives that do not cause adverse environmental impacts and unnecessary and undue degradation. The RMP should analyze impacts to forest resources and identify ways to minimize and mitigate these impacts for each type of forest ecosystem.

We discuss management recommendations for each forest type in relevant detail below.

48



43-A-PI-VEG

Pinyon-Juniper Ecosystem

  a.  Ecology

 According to recent research, pinyon-juniper (p-j) forests can be classified as one of the tree types as follows:

  1) Persistent p-j. Canopy can range from sparse, with only scattered trees, to a fairly dense, closed canopy. Soils may be rocky and unproductive to deeper and moderately productive, but this type is more often found on the former. Understory can consist of a variable cover of gasses, forbs, and shrubs, but in the dense canopied stands, any understory will be sparse. Fires probably varies in frequency, but rotations were usually quite long (440+ years), and most fires were stand-replacing.

  2) P-j savanna. This type has a low to moderate density and cover of p-j, with a well-developed and nearly continuous understory of grass, along with some forbs. Shrubs, if they exist, are usually only a minor component. This type is most often found where summer precipitation constitutes a high proportion of the average annual total. The natural disturbance regime for this type is not well understood.

  3) Wooded shrubland. The p-j component in this type varies from sparse to relatively dense. Shrubs constitute the main portion of the understory, and there are varying amounts of grasses and forbs. This type is most often found where winter precipitation is dominant. Fires tended to be high intensity events that killed all or most of the trees and top-killed all of the shrubs.

See Romme et al, 2008, and Romme et al, 2009.

It is not likely that the area covered by the Uncompahgre Field Office has or had much of type 2. See Romme et al, 2009, at 126. Extensive field research is needed to determine which types exist and what the disturbance, composition, and structural history is of each stand or area containing p-j.

It is commonly thought that the increase in density and coverage of p-j forests since the beginning of the 20th Century has been caused by fire suppression, i. e., that the lack of low-intensity fire that formerly burned off young trees has allowed p-j forests to grow much more dense. In reality, the situation is more complicated than this simple scenario, and in the planning area, it does not appear to be true at all.

In the persistent p-j type, fire suppression cannot be said to be responsible for any increase in density of p-j because fire was very infrequent in this type. Romme et al, 2008, 2009. It is also likely that that there are factors other than fire suppression that are helping to drive increases in p-j densities in all three of its types, including: climate change (warming since the end of the little ice age 12,000 years ago) that is favorable to tree growth; recovery from past disturbances (such as intensive logging, especially during the mining era[14]; chaining, a common practice in the 1950s and '60s; and periodic, and often intense, insect-caused mortality in pinyon pine); and livestock grazing, which probably favors tree persistence and increased tree density[15], as has occurred on the Uncompahgre Plateau[16]. The relative importance of each of these in shaping our current p-j ecosystems is unknown. Romme et al, 2008. Increased

---

[14] See Young and Svejcar, 1999.
[15] See Goodrich and Reid, 1999.
[16] See Shinneman, 2006.

BLM_0081866

atmospheric carbon dioxide, occurring from human use of fossil fuels, would also favor growth of trees, once established, over other vegetation.

If fire was frequent in any of the p-j types, fire scars and dead trees would likely be easy to find. But, according to Romme et al 2008, they are quite rare or absent in areas where studies have been done. This would tend to indicate that fire may not have been frequent in any of the p-j types.

Shinneman and Baker, in a study on the Uncompahgre Plateau published in 2009 (a), confirmed these findings. These researches found no fire scars on live trees, but they did find charred snags and charcoal in 41 percent of the plots they surveyed. This strongly indicates that low-intensity fires never or seldom occurred (or were so minor in coverage and frequency that any evidence of them has disappeared), while higher-severity, stand-replacement type fires did occur. Based on the data they gathered and analyzed, a fire return interval of 400-600 years In areas with p-j stands on the Plateau is suggested by the researchers. Id.

Shinneman and Baker, id., also found considerable establishment of pinyon following an extended, and often severe, drought in the area that lasted from about 1620 to 1820. In other words, pinyon is responding to more favorable conditions in the last 200 years to reestablish itself on the landscape. It is important to note that the beginning of this period well precedes human settlement, which is said to have begun in earnest around 1880. Pinyon may also be have started recovering from heavy mortality from drought and from attacks of *ips confusus*, a bark beetle that ravaged pinyon pine in Colorado in 2002 through about 2004.

Romme et al, 2008, noted that any net increase in p-j trees may be small when viewed over a long time period, as periods of increasing density are balanced by periods of extensive mortality. In the planning area, this is much more true for pinyon than juniper, as the latter species seemed to maintain a relatively steady density over 500 years. Shinneman and Baker, 2009a.

   b.   Effects From Human Use

While fire suppression does not appear to have affected vegetation in the planning area, other factors have, especially livestock grazing.

Shinneman et al, 2008 found that the semi-arid ecosystems of the Uncompahgre Plateau

> have experienced significant declines in grass and forb cover, biological soil crust cover, native species richness, compositional evenness, and relative species abundance, occurring at both stand- and landscape-levels.

Shinneman et al, 2008, at 223.

This research also found that sites with the heaviest p-j overstory removal via chaining were among the most degraded, while sites that had a light thinning of p-j were less degraded. Shinneman and Baker, 2009b, cite numerous studies linking sites degraded by grazing to cheatgrass invasion.

50

BLM_0081867

c.   Restoration Needs

Restoration should focus on: a) retaining existing sites with minimal degradation from natural conditions, b) removal or reduction of activities causing degradation, such as livestock grazing, and c) active restoration of some of the most degraded sites by restoring native gasses, forbs, and shrubs and eliminating or reducing non-native species.

Restoring native plant species will not be easy. First, removal of non-native plant species will be necessary, especially cheatgrass (*Bromus tectorum*). However, complete eradication of this species is not likely. See Goodrich and Huber, 1999. See also Goodrich and Rooks, 1999, who stated that cheatgrass is "explosively invading" and "highly competitive" against native species. They recommend use of non-natives to reduce the invasion of cheatgrass, especially after a large fire. However, Shinneman and Baker, 2009b, found no difference in cheatgrass coverage in areas seeded versus those not seeded after fires on the Uncompahgre Plateau.

Introduced, non-native species almost always outcompete native species. See Walker, 1999. See also Erskine and Goodrich, 1999, who found dominance by introduced annuals or seeded species after fire in p-j stands with closed canopies. That means that introduced species will tend to dominate such sites, making it harder, and maybe impossible, to restore native biological diversity.

It may not be possible to completely remove or greatly reduce livestock grazing. If so, other strategies can be employed such as:  exclusion of stock from the most sensitive areas, seasonal closures, reduction of time that grazing is allowed in certain areas, and reduction in the number of animals allowed to graze.

If native plant species are not present, removal of livestock alone will not restore these species. Seeding will be necessary. However, seeding could cause undesirable impacts, if e. g., motorized equipment or even humans walking over large areas destroyed or damaged biological crust while dropping or drilling seed. Therefore, lower-impact methods should be used, such as aerial seeding. The same seed mix should not be used over a large area, even if it consists solely of native species, as this could reduce diversity of native plant over the area seeded. See Shinneman et al, 2008.

Old-growth stands should be retained. Old growth p-j stands are more structurally complex than other stands and provide habitat for many bird species. See Miller et al, 1999. It is hard to say how p-j old growth stands should be defined, but Mehl, 1992 provides a good start. It may be necessary to consider site-specific data on stand history in determining what constitutes p-j old-growth in any location.

d.   Management Recommendations

1. Inventory the planning area's p-j stands. To properly manage p-j, whether that means active management or not, information on the current condition (composition and structure) and the historical disturbance regimes of these areas is essential. A considerable amount of data has already be gathered for the Shinneman and Baker, 2009 study discussed above; this data can be used along with other data that is gathered.

Since there is much uncertainty about the history of most p-j stands, any stands where any manipulation will be allowed should be thoroughly field surveyed. Manipulation includes, but is not limited to: commercial and non-commercial wood cutting, thinning, prescribed fire, fire use (prescribed fire after

BLM_0081868

natural ignitions), extensive and/or heavy livestock grazing, roller chopping, and chaining or cabling of p-j.

The ever present danger is that without site-specific knowledge, any management, no matter how well-intended, could result in the affected areas becoming even further outside the range of historical variability, thus making any future restoration efforts even more difficult or impossible.

2. Collect seed of native grasses, forbs, and shrubs. Use these seeds in restoration projects, or after large fires, as appropriate.

3. Reduction of pinyon and juniper via chaining, cabling, and/or logging is not necessary, and would not in any way aid restoration of native species or historical stand structures and composition. Trees whose origin pre-date human settlement (beginning around 1880) should not be killed for any reason unless they constitute a hazard (such as falling across a road open to public use).

4. Eradicate exotic species to the degree practicable. Areas open to public motor vehicle use and those that have been heavily and/or persistently grazed by livestock will be the areas most likely to have weeds. Management should be directed to favor establishment and persistence of native plant species over introduced non-natives.

The most important weed to eradicate or control is cheatgrass.

Native species should be used for reseeding to the maximum degree possible.

5. Consider reducing or eliminating livestock grazing in areas where continuation of it:  would further ecologically degrade vegetation, damage soils, damage riparian areas, or hinder active or passive restoration efforts. Grazing must not be allowed in areas with the best representations of native grasses, forbs, and shrubs, i. ., those sits with Rank 1 in Shinneman and Baker, 2009a.

6. Retain old-growth stands. See discussion above under RESTORATION NEEDS.

7. Do not allow large commercial sales of any products from p-j stands. Light activity, such as fuelwood gathering, is acceptable. Any logging should be confined to areas accessible by or very near existing roads.

Logging for any purpose should generally be limited to trees that have established since human settlement, but not all such trees should be cut in any one stand or area.

8. Restore stands toward historical conditions where possible. This would include reestablishment of native vegetation. Where such vegetation is present, prohibiting activities that tend to harm vegetation, such as livestock grazing, motor vehicle use, and commercial logging, may be sufficient to start achieving restoration of native species. In severely degraded areas, reseeding and/or planting will be necessary.

9. Closely monitor all activities, using appropriate control sites for before and after comparisons. Monitoring is particularly necessary to assess the effectiveness of any restoration efforts. It is also very important after fire, to assess cheatgrass invasion, establishment of native species, and soil stability.

BLM_0081869



44-A-PI-VEG

Ponderosa Pine Ecosystem

Ponderosa pine ecosystems in Colorado were shaped by fire. Fires likely burned at variable intervals and intensities, i.e., some fires were low-severity, burning ground vegetation and small trees and maintaining open, park-like tree stands, while others were stand-replacing events.

A study of ponderosa pine and mixed conifer stands on the Uncompahgre Plateau found that fire suppression over the last 125 years has likely increased the density of ponderosa pine stands somewhat. See Binkley et al, 2008, but see cautionary note for application on p. 11 of that publication.

   a.  Management Recommendations

1. The Uncompahgre Field Office should inventory its ponderosa pine stands for the following attributes: tree species composition, tree stand structure and density, old growth characteristics (see Mehl, 1992), percent of trees with origin after human settlement, evidence of fire (such as scars on live trees), native versus non-native understory plant composition, and wildlife species' presence.

2. Dense ponderosa pine stands composed primarily of trees of post-settlement origin can be thinned to reduce the threat of an unnaturally hot stand-replacing fire. Generally, only some (not all – see below) of the younger (origin after 1879[17]), smaller trees should be removed. This would be most appropriate in the lower-elevation ponderosa-dominated  stands, as these stands likely had the most frequent fire and thus likely have been changed the most by fire suppression. At the higher elevations of ponderosa pine, stands may have historically been dense at times, and if so, they should have minimal to no thinning.[18]

3. Old growth stands must be conserved. A light thinning of young trees may be appropriate in such stands, if post-settlement trees are dense.

4. Fire should be gradually reintroduced into ponderosa-dominated stands, to the extent feasible, over time. To avoid a very hot, stand replacing fire in dense stands that would be outside the range of natural variability, some stands will have to first be thinned. Again, removal should concentrate on smaller-diameter trees, particularly those that form fire ladders into the crowns of large, older trees. Also, gambel oak (known as oakbrush) may have to be reduced where it exists with ponderosa pine prior to any burning to avoid post-fire domination of the sites by oakbrush. See Binkley et al, id., at 10.

5. Large Douglas-fir trees should be retained, as they likely existed prior to fire suppression. Some small Douglas-fir should also be retained to ensure retention of conifer trees in case ponderosa pine become infested by bark beetles. Some smaller, younger ponderosa should also be retained for the same purpose.

6. Results of all activity must be monitored. Items to look for include:  weed infestation and/or spread, conifer tree regeneration, gambel oak sprouting, effects of any livestock grazing, and ground vegetation response to activities. Control areas will need to be established prior to any activity to allow before and after comparisons.

[17] This corresponds to the time of settlement of the area by European descendants, and it is also, according to Binkley et al, id.,  the year of a major fire on the Plateau.
[18] Binkley et al note that the mixed-conifer forests on the Plateau they sampled appear to be largely within the range of historic variability (HRV). Id. at 9, 13. It thus stands to reason that some of the highest elevation stands dominated by ponderosa pine would also be within the HRV.

53

45-A-PI-VEG

Spruce-Fir Ecosystem

This ecosystem occurs at the higher elevations of forested areas in Colorado, generally above about 9,000 feet. These ecosystems have not been affected by fire suppression, as the fire return interval is in the hundreds of years. Due to the short growing season and harsh conditions, recovery from disturbances, natural and human, takes a very long time.

No active management is needed or justified in this ecosystem. The one exception might be after a large, stand-replacement fire, where soil stabilization might be needed in a few areas to help conserve water quality.

46-A-PI-CR

10. **Cultural Resources**

FLPMA obligates the BLM to protect cultural, geologic, and paleontologic resource values (43 U.S.C. §§ 1701(a)(8) 1702(c)). In the context of historical and cultural resources, the National Historic Preservation Act of 1966 ("NHPA") (16 U.S.C. § 470 et seq.) affords heightened protection to these resources, establishing a cooperative federal-state program for the protection of historic and cultural resources. In particular, the review process set out in Section 106 (16 U.S.C. § 470f) obligates the BLM to consider the effects of management actions on historic and cultural resources listed or eligible for inclusion under NHPA. Additionally, Section 106 requires the BLM to consider the effects of its management actions on all historic resources and to give the Advisory Council on Historic Preservation an opportunity to comment before the BLM takes action. Section 110 of the NHPA requires the BLM to assume responsibility for the preservation of historic properties it owns or controls (16 U.S.C. § 470h-2(a)(1)), and to manage and maintain those resources in a way that gives "special consideration" to preserving their historic, archaeological, and cultural values. Section 110 also requires the BLM to ensure that all historic properties under the jurisdiction of the field office are identified, evaluated, and nominated to the National Register of Historic Places. *Id*. § 470h-2(a)(2)(A).

Further, the President's "Preserve America" initiative (*See* Exec. Order 13287, March 3, 2003) requires the BLM to advance the protection, enhancement, and contemporary use of its historic properties. The BLM must ensure that "the management of historic properties in its ownership is conducted in a manner that promotes the long-term preservation and use of those properties as Federal assets."

Therefore, the Uncompahgre Field Office must carefully consider the effects of all RMP decisions on the archaeological and cultural values located in the planning area. Since it will be difficult to evaluate the effect of decisions when the location of cultural resources is unknown, the BLM should undertake an archaeological inventory wherever necessary. One area within the Uncompahgre Field Office with known cultural resources is the northern side of the Paradox Valley west of Bedrock. A number of immense Petroglyph panels can be found on a few boulders and in a small finger canyon of Wingate Sandstone there. BLM should inventory this area, if it hasn't already, and protect these resources in the RMP.

In regards to travel planning, the BLM should consider where motorized and non-motorized routes are directing people, inventory cultural resources along those routes, and carefully consider the potential impacts to those resources. Specifically, BLM should evaluate whether dust from vehicle use, energy development, and other authorized uses is impacting Petroglyph panels. Furthermore, dust

54

BLM_0081871

suppressants have been shown to impact rock art in Nine Mile Canyon, Utah.[19] These impacts must be analyzed and minimized.

***Recommendations***: BLM's goal should be to protect, conserve, and where appropriate restore archeological and historical sites and landscapes. To that end, BLM should:
- Survey all known or discoverable cultural and historic sites, or those adjacent sites may be adversely affected.
- Determine the sites or areas that are most vulnerable to current and future impact and adopt management actions necessary to protect, conserve, and restore cultural resources.
- Complete a Cultural Resource Management Plan that coordinates with the objectives of the RMP and seeks to provide for an appropriate proactive process of inventorying for cultural resources, making determinations of eligibility for the National Register, and seeking to nominate eligible properties to the National Register. The RMP should establish a timeline for completing the Cultural Resources Management Plan, and prioritize areas to be inventoried for cultural resources.
- Outline specific management actions, such as stabilization, fencing, signing, closures, or interpretative development, to protect, conserve, and where appropriate restore cultural resources.
- Adopt measures to protect cultural resources from artifact collectors, looters, thieves, and vandals.
- Consult with the Native American community to determine whether there are sites or specific areas of particular concern, including sites of traditional religious and cultural significance.

## 11. Wild & Scenic Rivers

47-A-PI-WSR

We are submitting separate, detailed comments on the Wild and Scenic Rivers Eligibility Report; however, we want to include some general comments on protecting streams and segments within the Uncompahgre Field Office as part of this RMP revision.

Rivers deemed eligible for inclusion in the Wild and Scenic Rivers System must be managed to protect their values until the suitability determination is made, and suitable rivers must be managed so as to protect their qualities until Congress has an opportunity to designate the river as part of the System. Given that water is relatively sparse and that riparian areas are scarce in the study area, each stream is of tremendous value, and the BLM should fully protect these priceless resources via the Wild and Scenic Rivers Act and the Uncompahgre RMP.

**Protect all eligible segments**
Whether found suitable or not, all segments found eligible must, under the provisions of the Wild and Scenic Rivers Act and accompanying regulations, be managed in order to preserve the characteristics that make those segments eligible.

**Protective measures must be specific to wild and scenic eligibility and suitability**
Protective management prescriptions and requirements—specific to segments' values that prompt findings of wild and scenic eligibility and suitability—must be included the final RMP and so must be carefully analyzed in preparation of the draft plan. Consideration other management prescriptions or

---

[19] Kloor, Keith. "Dust Storm Rising Over Threat to Famed Rock Art in Utah." *Science* 319 (2008): 394. Available online at http://www.ninemilecanyoncoalition.org/ninemilestudy.pdf.

BLM_0081872

designations that could, by coincidence, help protect features that contribute to the segments' eligibility
and suitability are helpful (wilderness study areas, areas of critical environmental concern, visual
resource management classes, mineral withdrawals, etc.). Those coincidental protections and
designations must, in the final RMP and in its implementation, must specifically supplement wild and
scenic river purposes, or similar measures must be provided in the final plan exclusively for wild and
scenic river purposes.

Similarly, the BLM can protect river values through other special management designations. Such
management designations should supplement, and not replace, complete consideration of wild and
scenic river values or complete protection under the terms of the Wild and Scenic Rivers Act and its
provisions for study and for interim protection.

### Apply available protections specific to wild and scenic

Whatever the ultimate collection of stream segments found to be suitable, BLM should consider the
following management options for protecting each segment and apply those that are necessary for
adequate protection:

- closed to off-highway vehicle use;
- withdrawn from mineral entry;
- as VRM Class I or Class II areas;
- as right-of-way exclusion areas;
- subject to remedial actions to ensure sensitive species habitat is maintained or enhanced;
- subject to extensive and reliable no-surface-occupancy stipulations for all activities;
- with related ACECs closed to off-highway vehicle use;
- with related ACECs closed to oil and gas exploration and development;
- among other appropriate measures.

### Reconsider and expand eligibility determinations

The criteria for eligibility evaluation are clear. The Department of the Interior's Bureau of Land
Management Manual chapter "8351 –Wild and Scenic Rivers – Policy and Program Direction for
Identification, Evaluation, and Management (BLM Manual). Section .31A of that manual states:

> <u>Basis for Determination.</u> To be eligible, a river segment must be "free-flowing" and must possess
> at least one river-related value considered to be "outstandingly remarkable." These factors are
> summarized in Illustration 1. *No other factors are considered in determining the eligibility of a
> river segment. All other factors are considered in determining suitability.*" (emphasis added)

Since more detailed management decisions about stream segments would be made later in the
suitability determination phase, as part of the current RMP revision or in subsequent amendments, it
makes sense to list as eligible *all* segments that have any variation of the primary eligibility criteria,
including even one outstandingly remarkable value. When in doubt, include them as eligible.

Further, the BLM must disclose the scope of the outstandingly remarkable values (ORV) inventory
process used in the draft eligibility report, and the BLM must extend that analysis to include all stream-
related ORVs and study corridors wide enough to incorporate those ORVs. We note that some past wild
and scenic have relied too heavily and arbitrarily on a one-quarter-mile "buffer" around identified
segments in its initial identification of ORVs.  BLM guidance is clear that such a "buffer" is not the
appropriate measure for an ORV's association with a river.  For example, ORVs can "owe their location

56

or existence to the presence of the river" (IM 04-196), a standard on which it would be arbitrary for BLM to place a numerical value. We are concerned that if BLM uses this arbitrary buffer, the agency will overlook significant ORVs that are tied to a segment.

Geologic and scenic ORVs, as examples, could easily extend or originate from distances greater than one-quarter-mile from a segment. In an arid western slope climate, important cultural and historic values that are directly tied to segments used as water sources and migration routes for historic human populations are likely to exist a variety of distances from a segment yet "owe their location or existence to the presence of the river." *Id.* With vast amount of BLM land having never undergone formal cultural survey, it is important that BLM employ generous and inclusive boundaries in their inventory.

***Recommendation***: The Uncompahgre RMP must carefully study *all* potentially eligible stream segments, adopt requirements to ensure eligible and suitable rivers are protected pending decisions on their designation, and ensure any designated rivers and river corridors are managed to preserve their values.

### 12. Oil and Gas Management

48-A-PI-NRED

a.   Scope of Oil and Gas Leasing

BLM must consider the following when deciding which areas to allow fluid mineral leasing and development: 1) the BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for oil and gas development. 43 U.S.C. § 1712(c)(1); 2) BLM must consider a *reasonable* range of alternatives in regards to areas open to oil and gas leasing. 40 C.F.R. § 1502.14; and 3) any decision which leaves the vast majority of the field office open to oil and gas development will preclude the effectiveness or long term viability of any conservation measures as there is always the potential that those conservation measures could be jeopardized by oil and gas development, regardless of how low the potential for development is currently.

1.   The BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for oil and gas development.

FLPMA obligates the BLM to abide by the principles of multiple use and sustained yield, especially during the land use planning process. Specifically, multiple-use is defined as:

> ...the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output. 43 U.S.C. § 1702(c).

The definition of multiple use makes it clear that the BLM is obligated to manage the land for a number of resources other than oil and gas leasing, and states specifically that the BLM should manage some land for less than all of the resources and should not always be concerned with managing the land in order to receive the greatest economic return. The definition of multiple-use makes it clear that simply because a particular resource exists does not mean that the BLM needs to be able to extract that resource for a profit. It is well within the realm of BLM's multiple-use mandate to not have a significant

57

BLM_0081874

portion of the Uncompahgre Field Office open to oil and gas leasing. Further, BLM should consider alternatives which choose not to re-lease areas formerly leased when those leases expire or are terminated. Areas where there are specific resource concerns or that are identified as important habitat should be considered for other uses besides oil and gas leasing. These areas may include, but are not limited to: Areas of Critical Environmental Concern, Special Recreation Management Areas, Potential Conservation Areas, critical habitat, areas with cultural resources, proposed wilderness and lands with wilderness characteristics.

BLM's answer to charges that it is not adequately protecting resources from oil and gas impacts is often to provide leasing with No Surface Occupancy (**NSO**) stipulations. While NSO stipulations are a marked improvement over offering leases with standard lease terms, it is important to note that NSO stipulations do not necessarily resolve the wildlife and other resource concerns associated with oil and gas leasing. There are adverse consequences to wildlife associated with oil and gas development, regardless of whether or not there is an NSO stipulation on the lease. An example of this, noted by Clait Braun (2006) in *A Blueprint for Sage-grouse Conservation and Recovery*, a copy of which is attached to these comments, is that "oil and gas development influenced the rate of nest initiation of sage-grouse in excess of 3 km of construction activities. Clearly, the amount and (likely) frequency of noise associated with development has major negative effects on greater sage-grouse."

Further, BLM often offers companies exceptions, modifications or waivers from the application of NSO stipulations. Having NSO stipulations on a majority of the lands within the field office is better than allowing surface occupancy in terms of wildlife and resource concerns, but that does not supplant the BLM's obligation to manage for a variety of resources, of which oil and gas is only one.

2. <u>NEPA requires the BLM to consider and evaluate a reasonable range of alternatives for oil and gas development.</u>

The range of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. NEPA requires BLM to "rigorously explore and objectively evaluate" a range of alternatives to proposed federal actions. *See* 40 C.F.R. §§ 1502.14(a) and 1508.25(c). "An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action." <u>Northwest Envtl Defense Center v. Bonneville Power Admin.</u>, 117 F.3d 1520, 1538 (9th Cir. 1997). An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. <u>City of Tenakee Springs v. Clough</u>, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R. § 1502.14). This evaluation extends to considering more environmentally protective alternatives and mitigation measures. *See, e.g.*, <u>Kootenai Tribe of Idaho v. Veneman</u>, 313 F.3d 1094,1122-1123 (9th Cir. 2002) (and cases cited therein). For this Draft RMP, the consideration of more environmentally protective alternatives is consistent with the requirement of FLPMA to "minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved." 43 U.S.C. §1732(d)(2)(a).

NEPA requires that an actual "range" of alternatives is considered, such that the Act will "preclude agencies from defining the objectives of their actions in terms so unreasonably narrow that they can be accomplished by only one alternative (<u>i.e.</u> the applicant's proposed project)." <u>Colorado Environmental Coalition v. Dombeck</u>, 185 F.3d 1162, 1174 (10th Cir. 1999), citing <u>Simmons v. United States Corps of Engineers</u>, 120 F.3d 664, 669 (7th Cir. 1997). This requirement prevents the EIS from becoming "a foreordained formality." <u>City of New York v. Department of Transp.</u>, 715 F.2d 732, 743 (2nd Cir. 1983). *See also*, <u>Davis v. Mineta</u>, 302 F.3d 1104 (10th Cir. 2002).

BLM_0081875

In order to comply with NEPA, BLM must consider a broad spectrum of alternatives in regards to which lands will be available for oil and gas leasing. A Draft RMP which leaves all the lands within the planning area open to oil and gas leasing or only allows for very slight differences between the alternatives in this regard fails to meet the "reasonable range of alternatives" directive. BLM has an obligation to rigorously explore and evaluate a range of alternatives.

3. <u>A decision which leaves the vast majority of the Field Office open to oil and gas development necessarily negates the effectiveness or long term viability of any conservation measures as there is always the potential that those conservation measures could be jeopardized by oil and gas development, regardless of how low the potential for development is.</u>

BLM has an opportunity in this RMP to make great strides in conservation and habitat restoration. However, the long term viability of these strategies, programs and goals could be severely impacted by oil and gas development. Oil and gas development is known to cause a variety of problems that are detrimental to wildlife, and by leaving nearly the entire planning area open to leasing, the BLM may undermine any conservation efforts or goals it identifies in the RMP. The West is pockmarked with many places which were left open to oil and gas leasing based on the belief that these areas had low potential for development. As a result, when an economically recoverable reservoir of oil and/or gas was discovered, the area had insufficient protection measures in place.

This lack of forethought has created many problems for wildlife and other resources. The impacts from oil and gas development are now well known, as such, areas of high ecological or cultural resource density should simply not be available for leasing. For example, Clait Braun, a leading researcher on sage grouse in the west, has stressed the impacts that oil and gas development can have on sage grouse populations:

> Road building, well pad construction, and noise disturbance associated with oil and gas development can fragment effective sage grouse habitat and compromise the quality of seasonal use areas. In addition, by creating more linear areas and smaller habitat patches, energy development can boost predation rates on sage grouse. So, for a variety of reasons, major oil and gas development reduces the area useable by sage grouse, which often leads to greater isolation of populations and a reduced ability to handle droughts, severe winters, or other natural disturbances[20]

BLM simply cannot expect to have ecologically effective sage grouse habitat, or any other type of important wildlife habitat, and unlimited oil and gas development in the same area. A situation arrives in which the goals, programs, and designations BLM uses to protect a valuable resource is only effective until such time that the right technology and/or price of oil and gas reaches a point that a previously non-economically extractable supply becomes economically extractable, or until a previously unknown supply not thought to exist is discovered. History tells us that BLM must consider the impacts of oil and gas development across the planning area and close areas which have important wildlife, cultural, or wilderness values.

---

[20] This paragraph is adapted from detailed scoping comments on Upper Green sage grouse population trends and management issues prepared by Dr. Braun and submitted to the Pinedale BLM in October, 2002. Contact Linda Baker, Upper Green River Valley Coordinator (307-360-7198) to receive a copy of his 14 page comment letter.

BLM_0081876

*Recommendations*:  In order for the BLM to comply with FLPMA and NEPA the agency should, at a minimum, consider and "rigorously explore" the possibility and design alternatives which do not leave a significant portion of the Field Office open to oil and gas leasing.  *See* 43 U.S.C. § 1712(c)(1) and 40 C.F.R. §§ 1502.14(a) and 1508.25(c).  We recommend, at a minimum, that the areas identified as having "low" oil and gas potential be removed from consideration for leasing.  Further, BLM must consider a range of alternatives that will address what to do with currently leased lands which are not developed and are either terminated or expire.  Not allowing oil and gas leasing in these areas would help the BLM move towards meeting its goal of managing the federal lands within its jurisdiction for a variety of uses, not primarily for oil and gas leasing.  For lands which area identified as appropriate for leasing, a variety of non-waivable stipulations, conditions of approvals (COAs), and Best Management Practices (BMPs – discussed later) should be developed to protect the many resources present in the planning area.

b.  Additional Impacts of Oil and Gas Leasing

NEPA requires that federal agencies take a "hard look" at the direct and indirect environmental impacts of oil and gas development <u>before</u> any action that will lead to such development takes place.  *See, e.g., Pennaco Energy, Inc. v. U.S. Department of the Interior*, 377 F.3d 1147 (10th Cir. 2004); *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988); *Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983).  NEPA's regulations further provide that the "effects" on the environment that agencies must consider include those that are "direct, indirect, or cumulative."  40 C.F.R. § 1508.8.  The NEPA regulations define "cumulative impact" as:

> the impact on the environment which results from the **incremental impact of the action when added to other past, present, and reasonably foreseeable future actions** regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  **Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time**.

40 C.F.R. § 1508.7. (emphasis added).  The analysis of impacts included in the FEIS must adequately address the cumulative impacts of oil and gas operations within the region or the impacts inherent in the proposed action.

Federal caselaw amplifies that agencies must disclose the direct and indirect environmental effects a federal action will have on non-federal lands.  *See City of Davis v. Coleman*, 521 F.2d 631, 677-81 (9th Cir. 1975) (where federal approval of highway project likely to have impacts on development of surrounding area, agency must analyze development impacts in EIS); *Coalition for Canyon Preservation v. Bowers*, 632 F. 2d 774, 783 (9th Cir. 1980) (same); *Sierra Club v. Marsh*, 769 F.2d 868, 877-89 (1st Cir. 1985) (striking down EA where agency failed to account for private development impacts likely to result from its approval of causeway and port facility); *Mullin v. Skinner*, 756 F.Supp 904, 920-22, (E.D. N.C. 1990) (striking down EA where agency failed to account for private development impacts likely to result from agency approval of bridge).  Such impacts must be disclosed, particularly where facilitating private development may be the project's "reason for being."  *See Citizens Comm. Against Interstate Route 675 v. Lewis*, 542 F.Supp. 496, 562 (S.D. Ohio 1982).

BLM must consider impacts of region-wide development and also consider impacts on private lands.  Existing development from neighboring planning areas as well as development within the field office

49-A-PI-NRED

BLM_0081877

affects the Uncompahgre planning area. Similarly, although the BLM may not have formal control over adjacent private lands, these lands can also be affected by oil and gas development. The impacts of oil and gas development do not recognize management boundaries.

***Recommendation***: In considering the need and ways to manage these lands to protect the many resources of these public lands, the agency must consider the cumulative impacts from regional oil and gas development and the cumulative impacts to adjacent lands from oil and gas development. This analysis should inform the manner in which BLM allocates lands as available or unavailable for oil and gas development and the conditions under which development may be permitted.

50-A-PI-NRED

c.  Best Management Practices

Significant portions of the Uncompahgre RMP planning area will likely remain open to oil and gas development. As discussed with respect to the many other values of the lands within the planning area, many of these lands should not be open to leasing and others require non-waivable lease stipulations to protect their resources, such as wildlife habitat, water quality and wilderness characteristics. It is vital that the RMP require the use of best management practices (BMPs) for oil and gas exploration and development, which can drastically reduce the impacts of oil and gas development on the other natural resources of the public lands.

BLM's guidance requires consideration of BMPs for oil and gas development. BLM's Instruction Memorandum 2004-194 directs consideration of BMPs and both the IM and the recently updated Gold Book provide examples of BMPs that can be applied to both new and existing leases, in order to limit the damage from oil and gas development. It is critical that the RMPs consider and make BMPs mandatory in order to comply with BLM's guidance and obligations to protect the many natural values of these lands.

***Recommendations***: The Uncompahgre RMP must identify BMPs and make them mandatory, especially in sensitive areas. BMPs should include:

- Phased or strategic development - in terms of timing (developing one area, then restoring before moving to another), location (such as staying out of big game corridors), limiting amount of equipment in use at any given time, limiting amount of surface disturbance on a lease at any given time and requiring successful restoration before permitting additional disturbance;
- directional drilling;
- clustered drilling;
- closed loop drilling;
- interim reclamation;
- restoration standards;
- unitization; and
- increased bonding.

51-A-PI-AQ

**13. Air Quality**

The RMP must thoroughly analyze impacts of each alternative on air quality, especially in the context of oil and gas development. The Environmental Protection Agency is currently proposing to lower the National Ambient Air Quality Standard (NAAQS) to better protect human health. The EPA's proposal

61

would strengthen the 8-hour "primary" ozone standard to a level within the range of 0.060-0.070 parts per million (ppm). EPA is also proposing to establish a seasonal "secondary" standard, designed to protect sensitive vegetation and ecosystems, including forest and wilderness areas, set within the range of 7-15 ppm-hours. Although non-attainment is most frequently expected and witnessed in large urban areas, rural counties with high levels of oil and gas development have experienced startlingly high levels of ozone pollution. The RMP should analyze air quality in the context of the new NAAQS, which should be finalized before the draft RMP is released.

In addition to ozone pollution, oil and gas development activities contribute to CO, $NO_x$, $SO_2$, HAPs and volatile organic compound (VOCs) pollution, through activities like flaring, drilling, processing plants, and wellhead compressors and compressor stations, to name a few. Additionally, recreational ORV use cause fugitive dust emissions, particulate matter and contribute CO, $NO_x$, and hydrocarbon emissions.

Furthermore, deterioration of air quality is shown to have substantial economic costs, and good air quality provides many economic benefits. Attached please find a fact sheet (incorporated into these comments by reference), prepared by The Wilderness Society, entitled, "Assessing Costs Associated with Impacts to Air Quality."

The Wilderness Society reviewed three studies: two Reports to Congress prepared by the EPA and one recent peer-reviewed article whose principal author is a researcher employed by the EPA.[21] These three studies summarize nearly all of the extant epidemiological and economic research related to the health consequences of ozone exposure and the economic values of reducing such exposure.[22] The studies, released in 1997, 1999, and 2005, show five patterns clearly:

1. Improvements in air quality result in substantial economic benefits well in excess of economic costs.

2. The range of known and scientifically-valid health consequences from polluted air in general, and elevated ozone levels in particular, is increasing.

3. The increasing breadth and depth of valuation research in economics provides evidence that can be used to quantify and monetize the health-related benefits of reduced air pollution.

4. High levels of inflation for goods and services related to health care suggest that the economic costs of ozone exposure will grow rapidly in the future, even if NAAQS standards are not further tightened.

5. There is a well-stocked tool box available to BLM to use in estimating the economic cost of the increased air pollution likely to result from accelerated oil and gas development and other pollution-generating activities on BLM lands.

In making land use decisions, federal agencies have an obligation under NEPA to take a "hard look" at the environmental consequences of a proposed action, and the requisite analysis "must be appropriate

---

[21] This review was originally conducted by Dr. Joe Kerkvliet as part of his comments on the Final Supplemental Environmental Impact Statement for the Pinedale Anticline Oil and Gas Exploration and Development Project.

[22] The Hubbell, et al., paper is attached to these comments. The EPA reports are too voluminous to attach to this letter, but can be accessed at http://yosemite.epa.gov/EE/epa/eerm.nsf/vwRepNumLookup/EE-0295?OpenDocument and http://www.epa.gov/oar/sect812/1990-2010/fullrept.pdf. Last accessed Mar. 26, 2010.

BLM_0081879

to the action in question." 42 U.S.C. § 4321 et seq.; *Metcalf v. Daley*, 214 F.3d 1135, 1151 (9th Cir. 2000); *Robertson v. Methow Valley Citizens Council, supra*. The impacts and effects of a proposed action, such as oil and gas development, that federal agencies are required to assess include: "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8. Under the Data Quality Act, federal agencies are required to use information that is of high quality and that is objective, useful, and verifiable by others.[23] Agencies must also use "sound statistical and research" methods.[24] In order to complete a sufficient analysis of air quality, the data provided with this fact sheet should be incorporated into the BLM's air quality analysis.

Protecting air quality should be a priority in the Uncompahgre RMP. FLPMA requires BLM to consider the relative value of the various resources, and clean air is quickly becoming (along with undeveloped landscapes) a most valued, yet dwindling resource. Therefore, BLM should take a proactive approach to managing air quality by, among other things: setting aggressive standards (beyond that simply found in existing regulations); requiring any actions on public lands to meet those standards (i.e. no flaring, no two-stroke engine use on public lands, etc); analyzing the cumulative impact of any proposed action with other past, present, and reasonably foreseeable actions; establishing an effective monitoring program; and halting any actions that contribute to air pollution if such monitoring reveals that standards have been exceeded.

Furthermore, NEPA requires BLM to analyze both adverse and beneficial impacts of its decisions. Therefore, the RMP should assess not only negative impacts to air quality from activities such as oil and gas development, but also the potential benefits of controlling those effects.

*Recommendations*: BLM should analyze impacts to air quality using the EPA's proposed NAAQS, and include management actions and best management practices in the RMP that minimize and mitigate those impacts. BLM should consider economic and other benefits of protecting air quality.

### 14. Uranium

52-A-PI-MI

The history of uranium mining and milling in the United States (and indeed, around the globe) is replete with environmental damage, serious worker safety and health abuses, and harm to entire communities. Many remote and unique landscapes continue to suffer the effects of an industry characterized by several years of speculation-driven booms followed by decades-long periods of inactivity. The affected communities have been both low income and in great measure comprised of rural and indigenous populations, representative of an all too common pattern of environmental injustice. Additionally, most of the environmentally damaged sites have not received adequate stabilization, let alone cleanup of past harms. Where cleanup and decontamination of the radioactive and toxic effects has been carried out, most of the cost has been borne by taxpayers rather than the owners of the largely Canadian-based companies who are engaged in the uranium mining and milling industry, including Energy Fuels Inc, the Canadian based company proposing the Piñon Ridge Uranium Mill in the Paradox Valley. The RMP and NEPA analysis provides the opportunity and the duty for BLM to inventory these un-reclaimed mines and contaminated lands and to present the direct, indirect, and cumulative impacts of uranium mining,

---

[23] Treasury and General Government Appropriations Act for Fiscal Year 2001, Pub.L.No. 106-554, § 515. *See also*, Office of Management and Budget "Information Quality Guidelines," available at http://www.whitehouse.gov/omb/inforeg/iqg_oct2002.pdf and individual "Agency Information Quality Guidelines," available at http:/www.whitehouse.gov/omb/inforeg/agency_info_quality_links.html.

[24] *Ibid*.

BLM_0081880

along with a robust set of alternative courses of action and mitigation measures which will guide the BLM in its ongoing attempts to handle abandoned mines in the Uncompahgre Field Office, while simultaneously attempting to consider and approve the industry's attempts to open new mines.

The boom and bust of the uranium mining industry in the Uravan Mineral Belt has left un-reclaimed, abandoned and mining operations "temporarily on hold" waiting for the next boom. Many of these operations are using these sites as long-term storage for uranium ore, resulting in unnecessary and undue degradation of the land, air, water, and wildlife on which multiple uses of these lands depend. In addition to imposing strict standards for the handling and stockpiling of ore, wasterock, and overburden during actual mining operations, the RMP should impose an outright ban on the ongoing practice of using mine pads for the long-term storage of uranium ore.

The BLM should acknowledge in the RMP that it has the authority to deny mining claims altogether to comply with FLPMA's requirement that, "[i]n managing the public lands the Secretary [of the Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). The requirement to avoid unnecessary or undue degradation is the "heart of FLPMA [and] amends and supersedes the Mining Law." Mineral Policy Center, 292 F. Supp. 2d 30, 33 (D.D.C. 2003). Congress explicitly recognized that this requirement would "impair the rights of any locators or claims under the Act, including, but not limited to, rights of ingress and egress." 43 U.S.C. § 1732(b).

Specifically concerning the Department of Energy Lease Program in the UFO the RMP should recognize that the BLM continues to have management authority over the lease tracts. The RMP must make management decisions in accordance with the public land laws, all of which still apply on uranium lease tracts co-managed by the BLM and DOE. Our review finds no applicable NEPA analysis of the BLM's past decisions or the BLM management duties as they apply to the ongoing activities on these lease tracts.

Because of the unique and significant impacts posed by each of the uranium mines in the Uncompahgre Field Office, the RMP must include specific commitment that, for any proposed uranium mining projects, the BLM will evaluate all necessary, site-specific information within the requirements of an EIS. The process and analyses required in an EIS is necessary to protect the environment and public health, ensure that any recovery minimizes and mitigates negative impacts to sensitive resources like wilderness quality lands, clean air and water, wildlife habitat, cultural resources, and recreation opportunities. No federal agency has prepared a NEPA-compliant analysis of the cumulative impacts – past, present, and future - of the uranium mining and milling activity in the Uncompahgre Field Office, which includes the Uravan Mineral Belt and the area shown by the map published by Energy Fuels to demonstrate the geographic scope of the uranium mining and milling activities in the Uncompahgre region. Such a cumulative impacts analysis should at a minimum include the cumulative impacts of uranium mining and milling on the quantity and quality of regional groundwater supplies, the cumulative impacts on regional airsheds, and the cumulative impacts on regional surface water supplies. Impacts to wildlife, and necessary restrictions and mitigation measures must be considered, especially the impacts to threatened and endangered species, sensitive species, and bats, which are attracted to mine sites. Additionally, in the RMP, the BLM should evaluate and identify practices that can be required to minimize the impacts on the other natural resources of the planning area by limiting water use and surface disturbances. Last, because circumstance may arise at the site-specific level where the impacts cannot be adequately mitigated, the RMP must recognize that field offices must consider a "no action alternative" and may choose to deny a mining or exploration request in such situations.

64

BLM_0081881

*Recommendation:* BLM should protect areas from uranium mining where appropriate, thoroughly analyze the cumulative impacts of any proposed uranium recovery and make every effort to minimize and mitigate negative impacts to sensitive resources.

53-A-PI-AQ

### 15. Fugitive Dust

Oil and gas development, mining, grazing, and off-road vehicle use are activities managed by the BLM that can destabilize soils and make them susceptible to windborne erosion. The resulting dust can cause impacts to wildlife, air quality, climate, and human health. The Monticello and Richfield (Utah) Proposed RMPs declare that surface disturbing activities such as oil and gas development and motorized vehicles contribute to fugitive dust (see, e.g. Richfield PRMP at 4-6, Monticello PRMP at 4-17, 3-13). The Uncompahgre RMP should also recognize this impact, analyze it in each of the alternatives, and adopt management actions that minimize pollution from fugitive dust emissions.

      a.  Impacts to Ecosystems

Fugitive dust suspended in the air has the potential to impact more total area than any other impact of roads (paved or unpaved), and it can have significant effects on ecosystems and wildlife habitat. Forman *et al.*, 2003; Westec, 1979. Motorized vehicles create fugitive dust by travelling on unpaved roads and through cross country travel; it is then dispersed along roadsides or carried further afield via wind currents. An example of fugitive dust plumes caused by ORV traffic is documented in 1973 satellite photos. These photos show six dust plumes in the Mojave Desert covering more than 1,700 km$^2$ (656.2 mi$^2$). These plumes were attributed to destabilization of soil surfaces resulting from ORV activities. Nakata et al., 1976; Gill 1996.

Fugitive dust can have serious consequences for plant and animal species. One study of Alaskan roads heavily traveled by various types of vehicles found that dust had buried mosses and very low-statured vegetation in the 10-m-wide area adjacent to each side of the road; dust blankets measured up to 10 cm (3.9 in) deep. Walker and Everett 1987. According to the EPA,

> Dust can cause both physical and chemical effects. Deposition of inert PM [i.e., particulate matter] on above-ground plant organs sufficient to coat them with a layer of dust may result in changes in radiation received, a rise in leaf temperature, and the blockage of stomata. Crust formation can reduce photosynthesis and the formation of carbohydrates needed for normal growth, induce premature leaf-fall, damage leaf tissues, inhibit growth of new tissue, and reduce starch storage. Dust may decrease photosynthesis, respiration, and transpiration; and it may result in the condensation and reactivity of gaseous pollutants with PM, thereby causing visible injury symptoms and decreased productivity.

EPA, Draft Integrated Science Assessment for Particulate Matter, at 9-108 to 9-109 (Dec. 2008), *available at* http://oaspub.epa.gov/eims/eimscomm.getfile?p_download_id=485679. The BLM should address the impact of fugitive dust on vegetation in and near the Uncompahgre Field Office, including the disruption of photosynthetic and respiration processes and resulting reduced plant growth, reproduction, and survivorship. It should also evaluate the impacts of dust on wildlife.

65

### b.   Climate Change

A hard look at impacts from fugitive dust is also necessary in order to understand and disclose to the public the likely contributions to regional climate change caused by this plan. In September 2009, Dr. Jayne Belnap of the United States Geological Survey gave a presentation to the Colorado Water Conservancy District.[25] Dr. Belnap's presentation addressed the connection between increased temperature, disturbance, invasive species and dust. This presentation focused much attention on the impacts from ORVs and noted the cycle of increasing temperatures, which increases dust, which is exacerbated by ORV use, which increases the effects of climate change (temperature increases), with the key indicator of these problems being earlier snowmelts. Of particular concern is the amount of dust that results from motorized routes, which settles upon snow pack and alters the melt rate which, in turn, alters the availability of warm season infusion of water into streams and lakes, when such water is critical to wildlife. For example, in 2005 and 2006, disturbed desert dust melted snow cover 18 to 35 days earlier in the San Juan Mountains.[26] In 2009, disturbed desert dust melted snow cover 48 days earlier in the San Juans.[27]

Neff, et.al, (2008) found that "dust deposition onto snow cover in the western United States has recently been shown to accelerate melt and reduce snow-cover duration by approximately one month, a finding that has broad implications for water resources in mountainous regions of the United States" (citing Painter, T. H. *et al*. The impact of disturbed desert soils on duration of mountain snow cover. *Geophys. Res. Lett.* 24 (2007), attached).

### c.   Air Quality

Fugitive dust is also a significant contributor to air quality impairment. In fact, according to the National Emissions Inventory, road dust is the single greatest source of $PM_{10}$. EPA, Draft Integrated Science Assessment for Particulate Matter, at 3-171 (Dec. 2008), available at http://oaspub.epa.gov/eims/eimscomm.getfile?p_download_id=485679. Fugitive dust accounts for approximately 50% of primary $PM_{2.5}$, with 40% of that arising from unpaved roads. EPA, Air Quality Criteria for Particulate Matter, at 3-94 (Oct. 2004), available at http://oaspub.epa.gov/eims/eimscomm.getfile?p_download_id=435945. Further, a recent California study clearly demonstrates that ORV activity is a major contributor to high particulate matter concentrations in nearby airsheds because of destruction of soil crusts and vegetation. Craig, Cahill, and Ono 2010, available at http://www.slocleanair.org/pdf/PM2-final_report.pdf . The RMP should discuss impacts the travel system and ORV use can have on air quality in the resource area and airsheds outside the resource area.

### d.   Human Health

In addition to the concerns raised above, we are worried that increased levels of particulate matter will have negative effects on human health inside and outside the resource area. According to the EPA, "[n]umerous scientific studies have linked particle pollution exposure to a variety of problems, including

---

[25] PowerPoint presentation given September 18, 2009 at the Colorado River Water Conservancy District seminar, attached as Appendix C and available online at http://www.crwcd.org/page_305).

[26] Thomas H. Painter et al., Impact of Disturbed Desert Soils on Duration of Mountain Snow Cover, Geophysical Research Letters, Vol. 24, L12502 (June 23, 2007).

[27] Thomas H. Painter, Presentation, Colorado River District Water Seminar, September 18, 2009, Grand Junction, Colorado (Painter Grand Junction Presentation).

BLM_0081883

increased respiratory symptoms, such as irritation of the airways, coughing, or difficulty breathing, for example; decreased lung function; aggravated asthma; development of chronic bronchitis; irregular heartbeat; nonfatal heart attacks; and premature death in people with heart or lung disease." http://www.epa.gov/pm/health.html, last accessed March 9, 2010. In fact, recently a group of doctors in Utah cited increased dust due to climate change, which, as noted above, is exacerbated as a result of ORV use on fragile soils, as a top public health concern in the arid West. (See attached article.) The BLM should analyze the effects of fugitive dust on human health in the resource area, including the potential for airborne fugitive dust to travel and affect human health beyond the boundaries of the Uncompahgre Field Office.

*Recommendations*: BLM should analyze the amount of dust that will be generated from the road system, including for ORV use and energy development, through the use of readily available modeling techniques and sampling for particulate matter generated along a representative sample of routes proposed for designation. This has been done for BLM projects (the West Tavaputs Plateau Natural Gas Full Field Development Plan, DEIS February 2008 and the Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal, FEA December 2007), and the models for these projects demonstrate that fugitive dust from vehicular travel on unpaved roads can create significant levels of ambient pollution. The Uncompahgre RMP should complete a similar analysis, which comprehensively inventories and describes fugitive dust emissions and models near-field, far-field, and cumulative effects of fugitive dust. The RMP should limit surface disturbing activities as necessary to reduce windborne soil erosion.

## 16. Renewable Energy

54-A-PI-RED

The RMP should identify zones for renewable energy projects and limit all renewable energy development to those zones. Zones should be based on high-resource, low-conflict areas that are on already-degraded lands and near existing infrastructure. The BLM is already taking a similar approach in the ongoing Programmatic Environmental Impact Statement for Solar Energy Development and this RMP should designate zones for all types of renewable energy and then limit development to those zones. In addition, within the zones, BLM should prioritize lands that are most suitable for development, ensure adequate protective measures are imposed on development, and require both on-site and off-site mitigation of impacts to resources, as well as loss of uses (such as recreation).

For off-site mitigation, we also direct BLM's attention to IM 2008-204, which describes the broad type of actions that may be taken to address both direct impacts of a project and greater cumulative effects that development is having on a landscape. IM 2008-204 identifies and elaborates on the types of off-site mitigation that can be used, stating:

- Offsite mitigation may include, as appropriate:
  - In-kind: Replacement or substitution of resources that are of the same type and kind as those being impacted.
    - Example: For every acre of new, long-term surface disturbance in important sage-grouse nesting/early brood-rearing habitat in Area (A), (X) acres of unsuitable habitat in Area (B) is reclaimed, treated, or planted to create new or suitable nesting/early brood-rearing sage-grouse habitat.
  - Out-of-kind: Replacement or substitute resources that, while related, are of equal or greater overall value to public lands.

67

BLM_0081884

- Example: For every acre of new, long-term surface disturbance in important sage-grouse nesting/early brood-rearing habitat in Area (A), the project proponent agrees to bury (Y) miles of existing power lines and remove the power poles used as hunting perches by raptors in Area (B).
  - In-lieu-fee: Payment of funds to the BLM or a natural resource management agency, foundation, or other appropriate organization for performance of mitigation that addresses impacts of a project.
    - Example: The applicant may make payment to the BLM or a conservation group based on the amount of acres that will be disturbed in exchange for commitment from the recipient to apply the funds toward local sage-grouse core habitat protection/restoration projects.

In the context of renewable energy development, there may be additional conservation priorities that can be pursued to mitigate the impacts of individual projects and BLM could being discussions with interested stakeholders to identify these potential targets for off-site mitigation efforts or funding.

*Recommendations*: The Uncompahgre RMP should identify zones for all types of renewable energy development that prioritize high potential for energy development areas that contain degraded lands and are in close proximity to new transmission, while excluding sensitive conservation lands, such as citizen-proposed wilderness areas and ACECs. The RMP should also specifically preclude development outside the designated zones. Within the zones, the RMP should also set out prioritization criteria, which direct development to degraded lands and identifies other areas where development is more likely to lead to conflict, as well as setting out protective stipulations to safeguard other resources. We have provided a proposed "Sensitivity Based Prioritization for Development Areas Within Renewable Energy Zones" (attached to these comments) to be used by the Uncompahgre Field Office in implementing these recommendations. For off-site mitigation, BLM should provide for addressing a wide range of options to address the cumulative, far-reaching impact of renewable energy development (as set out in IM 2008-204) and should design a process to reach out to stakeholders and develop a set of conservation priorities to target in connection with off-site mitigation.

55-A-PI-ED

### 17. Energy Corridors

As part of the process to designate West-wide Energy Corridors mandated by the Energy Policy Act of 2005, the Department of Energy's Final Programmatic Environmental Impact Statement (PEIS) designates several energy corridors for pipelines and powerlines through the Uncompahgre Field Office. Especially of note is corridor 130-131 (S), which intersects the northern edge of our Norwood Canyon CWP. This corridor could have significant and lasting impacts to the area.

Public comments on the Draft PEIS, attendees at public meetings held by the Department of Energy and cooperating agencies, and Congressmen, utility companies, renewable energy experts, and representatives from state and local governments participating in an oversight hearing held by the House Natural Resources Committee, Subcommittee on National Parks, Forests, and Public Lands and Subcommittee on Energy and Minerals all voiced major concerns about the corridor designation process. These concerns included:

- lack of adequate consultation with Native American tribes, state and local governments and communities, and local citizens;
- lack of access for renewable energy transmission;

68

- failure to analyze the opportunity to reduce transmission need and the need to designate new corridors with increased efficiency, distributed generation, and new technologies;
- lack of analysis of cumulative impacts;
- failure to analyze impacts to non-federal lands;
- and inadequate protection for special places, protected lands, wildlife habitat, cultural resources, and recreation opportunities.

Many of these concerns were largely ignored in the formulation of the Final PEIS. During the RMP revision, BLM should evaluate potential impacts from corridor 130-131 as well as other corridors within the field office to determine if these corridors are found to be compatible with appropriate resource management.

***Recommendation***: To ensure a sustainable and reliable transmission infrastructure while limiting negative impacts, BLM should designate corridor locations and widths that are based on BLM's local expertise, appropriately account for concerns of local communities, and protect field office resources.

56-A-PI-CC

**18. Climate Change**

The Uncompahgre planning area will undoubtedly experience real effects of climate change during the 20 year period that the RMP is in effect. The RMP must analyze climate change both in terms of mitigating contributions to climate change from management decisions and adapting to inevitable impacts of climate change.

We strongly encourage BLM to address the impacts of climate change both from land management actions and to the resource area in this planning revision. There is a global scientific consensus that human-induced climate change is currently altering the landscape and ecological functions at an unprecedented rate. According to the U.S. Climate Change Science Program, the Southwest landscape could be greatly transformed due to drought, wildfire, invasive species, and rising temperatures (4°F to 10°F above the historical baseline). It is imperative that BLM, as the primary landowner in the area, consider, analyze, and mitigate the impacts of global climate change in this management plan revision.

57-A-PI-CC

1. BLM must take a hard look at climate change impacts

Impacts to the ecosystem from climate change include shrinking water resources; dust-covered snowpack causing earlier, faster snowmelt; invasion of more flammable non-native plant species; soil erosion; loss of wildlife habitat; and larger, hotter wildfires. Many of these impacts have been catalogued in recent studies by federal agencies showing the impacts of climate change specifically in the United States such as the recent report entitled Global Climate Change Impacts in the United States, *available at* http://www.globalchange.gov/publications/reports/scientific-assessments/us-impacts.

On September 14, 2009, Interior Secretary Salazar issued Secretarial Order (S.O.) No. 3289. This order unequivocally mandates all agencies within the Department of Interior to "analyze potential climate change impacts when underlining long-range planning exercises, setting priorities for scientific research and investigations, developing multi-year management plans, and making major decisions regarding potential use of resources under the Department's purview." S.O. 3289, *incorporating* S.O. 3226 (emphasis added). The Uncompahgre RMP revision falls squarely under this guidance and BLM must

69

BLM_0081886

assess impacts from the proposed actions that may directly, indirectly, or cumulatively result in exacerbating climate change within this document.

The BLM must fully analyze the cumulative and incremental impacts of the proposed decisions in the RMP. Center for Biological Diversity v. National Travel Safety and Highway Administration, 538 F.3d 1172, 1217 (9th Cir. 2008). In CBD v. NTSHA, the NTSHA failed to provide analysis for the impact of greenhouse gas emissions on climate change and was rebuked by the U.S. Court of Appeals for the Ninth Circuit, which observed that "[t]he impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." 538 F.3d at 1217. For example, off-road vehicle designations, oil and gas management stipulations, and renewable energy development may significantly increase or reduced greenhouse gas emissions contributing to climate change and must be analyzed under NEPA.

Further, NEPA regulations require that NEPA documents address not only the direct effects of federal proposals, but also "reasonably foreseeable" indirect effects.  These are defined as:

> Indirect effects, which are caused by the action and are later in time or farther removed in distance, *but are still reasonably foreseeable*. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b).

For example, the U.S. Climate Change Science Program working group published a report on September 11, 2007 which predicts and elaborates on the widespread impact of climate change on public lands arid regions.  *See* U.S. Department of Agriculture, *The effects of climate change on agriculture, land resources, water resources and biodiversity, available at* http://www.climatescience.gov/Library/sap/sap4-3/default.php. That report notes that "the climate changes that we can expect are very likely to continue to have *significant effects* on the ecosystems of the United States." *Id.* at 3 (emphasis added).  These significant impacts include:

- Climate effects on disturbances such as fire, insect outbreaks and wind and ice storms are very likely important in shaping ecosystem structure and function;
- Grasslands will transform into woody shrublands with reduced capacity for water absorption and greater vulnerability to channelization and erosion;
- Droughts early in the 21st Century are likely to increase rates of perennial plant mortality in arid lands, accelerate rates of erosion and create opportunities for exotic plant invasions;
- Proliferation of non-native annual and perennial grasses are virtually certain to predispose sites to fire.  The climate-driven dynamics of the fire cycle is likely to become the single most important feature controlling future plant distribution in U.S. arid lands;
- Climate change is likely to result in shrinking water resources and place increasing pressure on montane water sources to arid land rivers, and increase competition among all major water depletions in arid land river and riparian ecosystems;
- Major disturbances like floods and droughts that structure arid land river corridors are likely to increase in number and intensity (with associated increases in erosion and native plant loss);

BLM_0081887

- Land use change, increased nutrient availability, increasing human water demand and continued pressure from exotic species will act synergistically with climate warming to *restructure* the rivers and riparian zones of arid lands;
- Climate change will increase the erosive impact of precipitation and wind;
- Surface soils will become more erodible;
- Increases in wind speed and gustiness will likely increase wind erosion.

*Id.* at 9. While these findings are dramatic, the report further notes that "[i]t is likely that these changes will increase over the next several decades in both frequency and magnitude, and it is possible that they will accelerate." *Id.* at 23.

A report released last year by the Bipartisan Policy Center and edited by the Wildlife Management Institute, provides detailed information about the impacts of climate change on fish and game. *See* http://www.seasonsend.org/downloads/SeasonsEnd.pdf. The Season's End report is not only edited by the Wildlife Management Institute,[28] but quotes a number of biologists in various state fish and game agencies. It is clear from this report that it is indeed possible to use modeling to determine losses of stream habitat for various temperature and climate scenarios. *Id.* at 31.

Finally, the BLM should take advantage of the special conditions of the landscape to advance the important study of global climate change. Due to the fact that BLM is the primary landowner in the area, it is well-suited to provide a scientific model in ongoing research on global climate change by regularly monitoring and reporting on the ecological conditions of the area. This RMP revision provides BLM with the opportunity to collect vital data on climate change in the region to inform the global scientific community.

***Recommendation***: Pursuant to agency policy and case law, BLM must address the impacts of climate change from the proposed action. We recommend that the EIS for this plan incorporate a landscape-level analysis of how the proposed management decisions may contribute to or assuage climate change. The BLM must also evaluate how predicted shifts in climate may lead to an altered management regime in the future.

58-A-PI-CC

2. BLM must develop a range of reasonable alternatives minimizing the adverse effects of climate change from the proposed action

In addition to the agencies' duty to take a hard look at the impacts of climate change to and from the proposed vegetation management plan, the agencies must also include a range of alternatives that includes a strategy for mitigating these impacts. CEQ regulations instruct agencies to consider alternatives to their proposed action that will have less of an environmental impact. 40 C.F.R. § 1500.2(e) states that "[f]ederal agencies shall to the fullest extent possible: . . . Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment."

A June 2008 report, prepared by the Environmental Protection Agency, specifically "identifies strategies to address management challenges posed by climate change for a subset of federally protected lands

---

[28] According to its website, the Institute's work is done by "resource personnel [who] are highly trained and experienced wildlife science and management professionals, typically working away from the public limelight to catalyze and facilitate strategies, actions, decisions and programs to benefit wildlife and wildlife values." http://www.wildlifemanagementinstitute.org/. It has been in existence for nearly 100 years.

BLM_0081888

and waters.  These strategies can also be broadly applied to other lands and waters managed by governmental or nongovernmental entities."  U.S. Climate Change Science Program Final Report, Synthesis and Assessment Product 4.4, "Preliminary Review of Adaptation Options for Climate-Sensitive Ecosystems and Resources" (June 2008), *available at* http://www.epa.gov/ord/npd/pdfs/gcrp-factsheet_SAP-4-4.pdf.  This information should be included in the analysis of the proposed action in order to craft a reasonable range of management alternatives for addressing climate change.

*Recommendations*:  Proposed alternatives for the RMP should include those that help public lands and resources or proposed projects mitigate climate change or build resiliency to the potential effects of climate change. The RMP should incorporate adaptive management solutions that include monitoring of ecosystem conditions and changing strategies in order to protect the resources of the area and ensure the preservation of important ecosystem services in the face of climate change.

59-A-PI-CC    3.   BLM must take steps to prevent unnecessary or undue degradation from climate change

In addition to consideration of impacts from climate change, BLM must also minimize adverse impacts from climate change under FLPMA. FLPMA provides that BLM must *"take any action necessary to prevent unnecessary or undue degradation to managed resources."* 43 U.S.C. §1732(b). Intertwined with this provision is a similar responsibility for BLM to manage public lands "*without permanent impairment to the productivity of the land and the quality of the environment.*"43 U.S.C. §1702(c). These provisions combine to necessitate on-the-ground implementation of climate change policies.

*Recommendations*:  Under FLPMA's mandate to prevent unnecessary or undue degradation, BLM must consider how prescriptions in the RMP will minimize adverse impacts of climate change to the resource area.

60-A-PI-CC    4.   BLM must develop adequate monitoring strategy to address unforeseen management challenges in the face of climate change

In order to respond to the land management challenges presented by climate change, the agencies must have the best available data as well as a strategy in place to respond to uncertainties as they arise. A vigilant science-based monitoring system should be set out in the RMP in order to address unforeseeable shifts to the ecosystem.

A detailed monitoring approach is also required under the BLM's planning regulations:

> The proposed plan shall establish intervals and standards, as appropriate, for monitoring and evaluation of the plan. Such *intervals and standards shall be based on the sensitivity of the resource* to the decisions involved and shall provide for evaluation to determine whether mitigation measures are satisfactory, whether there has been significant change in the related plans of other Federal agencies, State or local governments, or Indian tribes, or whether there is new data of significance to the plan. The Field Manager shall be responsible for monitoring and evaluating the plan in accordance with the established intervals and standards and at other times as appropriate to determine whether there is sufficient cause to warrant amendment or revision of the plan.

43 C.F.R. § 1610.4-9 (emphasis added).

72

Such vigilant monitoring is absolutely necessary in order to create an effective adaptive management framework in the face of climate change.

***Recommendation***:  A vigilant science-based monitoring system should be set out in the RMP in order to address unforeseeable shifts to the ecosystem due to the best available information on climate change. This should include coordination with the DOI's Climate Change Response Council, Regional Climate Change Response Centers, and Landscape Conservation Cooperatives as established in S.O. 3289.

61-A-PI-SE

### 19. Socioeconomic Analysis

The BLM must do a full analysis of all of the socioeconomic consequences of each alternative for the Uncompahgre RMP. We previously submitted detailed comments to EMPSi for consideration in the socioeconomic analysis for the Uncompahgre RMP revision. Those comments, which are attached to this letter in Appendix 2, address a wide range of often overlooked socioeconomic issues that the BLM must consider in addition to estimating jobs and income from commodity extraction on the lands in the Uncompahgre Field Office.

The attached comments provide detailed discussions of several socioeconomic issues that must be considered when the BLM does its analysis for the Uncompahgre RMP. These include a discussion of the issues associated with economic-base theory and its application for predicting impacts from land management, recommendations that the BLM look at trends in total personal income and employment in order to see a more complete picture of the Uncompahgre region's evolving economy, a discussion of the importance of using economically recoverable resource estimates for oil and gas in order to avoid overstating the potential impacts of such development, a discussion of the economic benefits of wilderness-quality lands, and a recommendation that the agency do all planning analysis based on realistic budget assumptions. These socioeconomic analyses are necessary for the BLM to adequately and equitably asses the socioeconomic impacts of the Uncompahgre RMP alternatives.

We recommend that the BLM use a total economic value approach that includes the estimation of non-market values for the wildlands and open spaces in the Uncompahgre planning area. BLM recently affirmed its commitment to this approach in draft IM 2010-061, which explicitly directs managers to evaluate non-market values in RMP analyses. We will be submitting comments to BLM on this draft IM, and we will be happy to provide the Uncompahgre Field Office with a copy of our comments because this issue is especially relevant to western Colorado communities. The total economic value analysis should include the full range of non-market values, including use values – such as recreation – as well as non-use values such as existence value (the benefit one gains just knowing wildlands are protected), option values (the benefit of knowing that one can visit a wildland for recreation) and bequest values (the benefit gained from knowing that wildlands are protected for future generations).

Also included in Appendix 2 are two socioeconomic scoping briefs and The Wilderness Society's recent report, *Natural Dividends: Wildland Protection and the Changing Economy of the Rocky Mountain West.* The first scoping brief, entitled "Socio-Economic Framework for Public Land Management Planning: Indicators for the West's Economy," details our expectations for the baseline analysis of the region's economy as well as the analysis of the potential impacts of proposed management alternatives on the area. This brief describes the changing economy of the Rocky Mountain West, and the role that public lands can play in bringing economic diversity to the communities of the Uncompahgre planning area. The second brief, entitled "The Economic and Social Impacts of Oil and Gas Development," describes the

73

significant and often hidden costs associated with oil and gas drilling. The analysis in the RMP must include an assessment of these costs in order to describe net (rather than gross) benefits of any proposed oil and gas leasing. We request that your analysis of socioeconomic considerations in the Uncompahgre Resource Area follow the approach set out in these documents, as well as the more specific considerations detailed in our attached comments.

*Recommendations*: The RMP should evaluate non-market values provided by wildlands, per BLM's commitment set out in draft IM 2010-061. BLM should utilize the materials included in Appendix 2 to inform the RMP's socioeconomic analysis and ensure a full accounting of the costs and benefits of each of the alternatives.

Thank you for your consideration of our scoping comments.  We look forward to seeing these issues addressed as the Uncompahgre RMP revision process continues.

Sincerely,

Steve Smith, Assistant Regional Director
Juli Slivka, BLM Action Center
**The Wilderness Society**
1660 Wynkoop St. Ste. 850
Denver, CO 80202
(303) 650-5818

Bethany Gravell, Executive Director
**Center for Native Ecosystems**
1536 Wynkoop St. Ste. 303
Denver, CO 80202
(303) 546-0214

Hilary White, Director
**Sheep Mountain Alliance**
PO Box 389
Telluride, CO 81435
(970) 729-2321

Roz McClellan
**Rocky Mountain Recreation Initiative**
1567 Twin Sisters Rd.
Nederland, CO 80466
(303) 447-9409

Kate Graham, Public Lands Organizer
**Colorado Environmental Coalition**
546 Main St. #404
Grand Junction, CO 81501
(970) 243-0002

74

BLM_0081891

Amber Kelley, Dolores River Campaign Coordinator
**San Juan Citizens Alliance**
PO Box 2461
Durango, CO 81302
(970) 259-3583

Rocky Smith
**Colorado Wild**
1030 Pearl #9
Denver, CO 80203
(303) 839-5900

Christine Canaly, Director
**San Luis Valley Ecosystem Council**
PO Box 223
Alamosa, CO 81101
(719) 256-4758

Peter Hart, Conservation Analyst/Staff Attorney
**Wilderness Workshop**
PO Box 1442
Carbondale, CO 81623
(970) 963-3977

Mike Chiropolos, Lands Program Director
**Western Resource Advocates**
2260 Baseline, Suite 200
Boulder, CO 80302
(330) 444-1188

Andrea Robinsong, Chair of the Public Lands Committee
**Western Colorado Congress**
PO Box 1931
Grand Junction, CO 81502
(970) 250-8515

Bryan Martin, Director of Conservation
**Colorado Mountain Club**
710 10th Street, Suite 200
Golden, CO 80401
(303) 279-3080

Tom Sobal
**Quiet Use Coalition**
PO Box 1452
Salida, CO 81201
(719) 207-4112

75

BLM_0081892

Robert Peters, PhD., Executive Director
**Western Slope Environmental Resource Council**
PO Box 1612
Paonia, CO 81428
(970) 527-5307

BLM_0081893

**Attachments**

1. BLM, Jarbidge Field Office, Idaho, Analysis of the Management Situation for the Jarbidge Resource Management Plan: Resource Management Plan/Environmental Impact Statement at 212-216 and Figure 39 (Locations of Current ACECs) and Figure 40 (Wilderness Study Areas), July 2007.

2. Monticello Proposed RMP, Response to Comments, comment no. 007-48

3. *State of Utah v. Norton,* Motion to Stay Briefing and for a Status Conference, September 9, 2005.

4. State of Utah v. Norton, Case No. 2:96-CV-0870, Order and Opinion (D.Utah September 20, 2006)

5. Brief of the Federal Appellees, State of Utah v. Kempthorne, Case No. 06-4240 (February 26, 2007)

6. Southern Utah Wilderness Alliance v. Norton,  457 F. Supp. 2d 1253 (D. Utah 2006)

7. IM No. AZ-2005-007

8. Appendix 2 - "Implementation, Monitoring, and Evaluation Process" - of the Jack Morrow Hills Coordinated Activity Plan, prepared by the Wyoming BLM.

9. Little Snake Draft RMP, Appendix F – Criteria for Subsequent Activity Planning

10. Excerpts from the Record of Decision (ROD) for the Dillon Resource Management Area (Montana).

11. Travel Management Planning Template

12. Guidelines for Managing Access between BLM and Private Lands in the Royal Gorge Field Office, incorporated in the Royal Gorge RMP and endorsed by the Front Range Resource Advisory Council (Resolution – FRRAC 06-05).

13. Price Field Office Draft RMP, Appendix 14: Special Recreation Permits.

14. *A Blueprint for Sage-grouse Conservation and Recovery*

15. "Assessing Costs Associated with Impacts to Air Quality"

16. Hubbell, B., A. Halberg, D.R. McCubbin, E. Post. 2005. Health Related Benefits of Attaining the 8-Hour Ozone Standard. Environmental Health Perspectives. 113(1): 73-82.

17. Thomas H. Painter et al., Impact of Disturbed Desert Soils on Duration of Mountain Snow Cover, Geophysical Research Letters, Vol. 24, L12502 (June 23, 2007).

77

18. "Doctors see climate change as dire health threat," Desert News. Oct. 22, 2009.

19. "Sensitivity Based Prioritization for Development Areas Within Renewable Energy Zones"

Appendix 1: Habitat Fragmentation
    a. *Habitat Fragmentation from Roads: Travel Planning Methods to Safeguard BLM Lands*, The Wilderness Society, 2006.

    b. Wilbert, M., Thomson, J., Culver, N. 2008. Analysis of Habitat Fragmentation from Oil and Gas Development and its Impact on Wildlife: A Framework for Public Land Management Planning. The Wilderness Society: Washington, DC. 31 p.

    c. Weller, C., Thomson, J., Morton, P., Aplet, G. 2002. Fragmenting Our Lands: The Ecological Footprint from Oil and Gas Development. The Wilderness Society: Washington, DC. 24 p.

    d. Hartley, D. A., Thomson, J. L., Morton, P., Schlenker-Goodrich, E. 2003. Ecological Effects of a Transportation Network on Wildlife. The Wilderness Society: Washington, DC. 27 p.

    e. Thomson, J. L., Hartley, D. A., Ozarski, J., Murray, K., Culver, N. W. 2004. Protecting Northern Arizona's National Monuments: The Challenges of Transportation Management. The Wilderness Society: Washington, DC. 39 p.

    f. Thomson, J. L., Schaub, T. S., Culver, N. W. Aengst, P.C. 2005. Wildlife at a Crossroads: Energy Development in Western Wyoming. The Wilderness Society: Washington, DC. 40 p.

Appendix 2: Socioeconomic Analysis
    a. Socioeconomic Scoping Comments

    b. Socioeconomic Framework for Public Land Management Planning: Indicators for the West's Economy (2006)

    c. The Economic and Social Impacts of Oil and Gas Development (2006)

    d. Haefele, M., Morton, P., Culver, N. 2007. Natural Dividends: Wildland Protection and the Changing Economy of the Rocky Mountain West. Washington, DC. The Wilderness Society.

Appendix 3: Map and Descriptions of Citizen-Proposed Wilderness Areas

<u>**References**</u>

Binkley, Dan, Bill Romme, and Tony Cheng, 2008. Historical Forest Structure on the Uncompahgre Plateau: Informing restoration prescriptions for mountainside stewardship. Colorado Forest Restoration Institute, Ft. Collins, CO.

Britton L. Mace et al., *Aesthetic, Affective, and Cognitive Effects of Noise on Natural Landscape Assessment*, Society & Natural Resources, 12: 225-242, 1999.

78

Douglas S. Ouren et al., USGS, Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources (2007).

Erskine, Ivan, and Sherel Goodrich, 1999. Applying Fire to Pinyon-Juniper Communities of the Green River Corridor, Daggett County, Utah. IN: Proceedings: Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9

Goodrich, Sherel, and Chad Reid, 1999.  Soil and Watershed Implications of Ground Cover and Unburned Pinyon-Juniper Sites at Rifle Canyon and Jarvies Canyon [Utah]. IN: Proceedings: Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9.

Goodrich, Sherel, and Allen Huber, 1999. Response of A Seed Mix and Development of Ground Cover On Northerly and Southerly Exposures In the Jarvies Canyon Burn, Daggett County, Utah.  IN: Proceedings: Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9.

Goodrich, Sherel, and Dustin Rooks, 1999.  Control of Weeds at a Pinyon-Juniper Site By Seeding Grasses. IN: Proceedings: Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9.

Mehl, Mel S, 1992.  Old-Growth Descriptions For The Major Forest Cover Types in the Rocky Mountain Region.  IN: Old-Growth Forests in the Southwest and Rocky Mountain Regions:  Proceedings of A Workshop.  USDA Forest Service, Rocky Mountain Research Station, General Technical Report RM-213.

Miller, Rick, Robin Tausch, and Wendy Waichler, 1999. Old-Growth Juniper and Pinyon Woodlands.  IN: Proceedings: Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9.

Robin T. Harrison et al., US Forest Service, Project Record: Predicting Impact of Noise on Recreationists (1980).

Romme, William H., Craig D. Allen, John D. Bailey, William L. Baker, Brandon T. Bestelmeyer, Peter M. Brown, Karen S. Eisenhart, Lisa Floyd-Hanna, David W. Huffman, Brian F. Jacobs, Richard F. Miller, Esteban H. Muldavin, Thomas W. Swetnam, Robin J. Tausch, and Peter J. Weisberg, 2008.  Historical and Modern Disturbance Regimes, Stand Structures, and Landscape Dynamics in Piñon-Juniper Vegetation of the Western U.S. Colorado Forest Restoration Institute, Ft. Collins CO.

Romme, William H., Jeffery S. Redders, Lisa Floyd-Hanna, and David D. Hanna, 2009.  Pinyon-Juniper Woodlands.  IN: Romme, William M., M. Lisa Floyd, and David Hanna. Historical Range of Variability and Current Landscape Condition Analysis:  South Central Highlands Section, Southwestern Colorado & Northern New Mexico. Colorado Forest Restoration Institute, Ft. Collins, CO.

BLM_0081896

Shinneman, D.J. 2006. Determining Restoration Needs for Piñon-Juniper Woodlands and Adjacent Semi-Arid Ecosystems On The Uncompahgre Plateau, Western Colorado. Dissertation. University of Wyoming, Laramie, Wyoming, USA.

Shinneman, D. J., W. L. Baker, and P. Lyon,, 2008.  Ecological Restoration Needs Derived From Reference Conditions For A Semi-Arid Landscape In Western Colorado, USA.  Journal of Arid Environments 72 (2008) 207-227.

Shinneman, Douglas J., and William L. Baker, 2009a.  Historical Fire And Multidecadal Drought As Context For Pinyon–Juniper Woodland Restoration In Western Colorado.  Ecological Applications 19(5), pp. 1231-1245.

Shinneman, D. J., and W. L. Baker, 2009b.  Environmental And Climatic Variables As Potential Drivers Of Post-Fire Cover Of Cheatgrass (*Bromus Tectorum*) In Seeded And Unseeded Semiarid Ecosystems. International Journal of Wildland Fire 2009, *18*, 191–202

Walker, Scott C., 1999. Species Compatibility and Successional Processes Affecting Seeding of Pinyon-Juniper Types.  In:  Proceedings:  Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9.

Young, James A., and T. J. Svejcar, 1999.  Harvesting Energy From the 19th Century Great Basin Woodlands.  IN:  Proceedings:  Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9.

BLM_0081897

March 29, 2010

**Via email (uformp@blm.gov) and overnight mail (with attachments)**

BLM Uncompahgre Field Office
RMP Project Manager
2465 S. Townsend Ave.
Montrose, CO 81401

Re:      Scoping Comments – Uncompahgre Resource Management Plan Revision

Please accept and fully consider these scoping comments on behalf of the organizations identified below. The membership of these organizations includes hundreds of thousands of members and supporters in Colorado and nationally who care deeply about the management of our public lands.  We appreciate this opportunity to comment and appreciate the Bureau of Land Management's commitment to addressing the circumstances and values related to management of the public resources within the Uncompahgre Resource Area. These comments are submitted in addition to our detailed proposals for designation of special management areas and comments on the Wild & Scenic Rivers evaluation, which are being submitted separately.

**Planning Issues and Management Concerns Addressed:**                              **Page:**

   **1.**  **General Considerations**
   a.  Public Participation Opportunities…………………………………………      2
   b.  Cooperating Agencies…………………………………………………… ..      3
   c.  Protection of Natural Resources……………………………………………      3
   d.  Special Management Area Proposals………………………………………      5
   e.  Analysis of Environmental Consequences………………………………. ..      6
   f.  Land Tenure Decisions………………………………………………………      6
   **2.**  **Protection of Lands with Wilderness Characteristics**
   a.  Inventory and Protection……………………………………………………      7
   b.  New WSAs…………………………………………………………………      11
   c.  Management Alternatives……………………………………………………      12
   d.  Specific Areas to be Protected……………………………………………      16
   e.  Dolores River Corridor……………………………………………………      17
   **3.**  **Health Impact Assessment**……………………………………………      18
   **4.**  **Wildlife Viability** ………………………………………………………      19
   **5.**  **Special Status Species/Plants**…………………………………………      21
   a.  ACEC Designation……………………………………………………………      22
   b.  Special Status Species Management………………………………………      22
   c.  Rare Plant Habitat…………………………………………………………      26
   d.  Imperiled Species in the Planning Area……………………………………      29
   **6.**  **Travel Management**……………………………………………………      30
   **7.**  **Recreation and Special Recreation Management Areas**……………      36
   a.  Opportunities for Quiet Recreation………………………………………      36
   b.  Special Recreation Management Areas……………………………………      42
   c.  Areas Needing Special Attention to Recreation Management………..      46
   **8.**  **Natural Soundscapes**…………………………………………………      47

BLM_0081898

9.  **Forest Resources**.................................................................. 48
10. **Cultural Resources**.............................................................. 54
11. **Wild & Scenic Rivers**........................................................... 55
12. **Oil and Gas Management**
    a.  Scope of Oil and Gas Leasing................................................ 57
    b.  Additional Impacts of Oil and Gas Leasing............................. 60
    c.  Best Management Practices.................................................. 61
13. **Air Quality**...................................................................... 61
14. **Uranium** ......................................................................... 63
15. **Fugitive Dust**................................................................... 65
16. **Renewable Energy**............................................................ 67
17. **Energy Corridors**.............................................................. 68
18. **Climate Change**................................................................ 69
19. **Socioeconomic Analysis**.................................................... 73

**List of Attachments** ............................................................... 77
**References** ........................................................................... 78

1. <u>**General Considerations**</u>

   a. <u>Public Participation Opportunities</u>

We encourage BLM to maximize public involvement in preparation of the revised Uncompahgre RMP. In addition to the public comment periods required by the National Environmental Policy Act (NEPA) and BLM's regulations, there are other opportunities throughout the planning process for public involvement, which are used by many BLM offices. Public involvement allows the public to provide useful information and bring concerns to BLM's attention throughout the planning process. In its scoping notice, the Uncompahgre Field Office already stated its intent to make public participation and collaboration an integral part of the planning process and we commend BLM on this approach. However, we would also encourage the BLM to provide for public input into the management situation analysis and identification of planning issues, and on a preliminary range of alternatives prior to preparing the Draft RMP, steps other BLM offices have taken to expand opportunities for public comment.

The Uncompahgre Field Office will need to ensure sufficient data is available in preparation of the RMP. In this context, we would also note that other BLM offices have made inventory data available to the public to assist in identifying new data needs and also made base data available for public use, and encourage the Uncompahgre Field Office to take similar action. By way of example, along with its release of the Draft RMP, the BLM's Arizona Strip Field Office provided zipped GIS files for all data layers needed to create the maps contained in the Draft RMP (and can be viewed on-line at http://www.blm.gov/az/GIS/files.htm#strip). The server space required for this operation is minimal and without this information, effective public participation in this process is severely hampered. This type of public participation is also consistent with the BLM's Land Use Planning Handbook (H-1601-1), which states that, "Documentation supporting the AMS [analysis of the management situation] should be maintained in the field office for public review" (Section III.A.4) and that, "Alternatives should be developed in an open, collaborative manner, to the extent possible" (Section III.A.5).

2

BLM_0081899

Making analyses available before issuing the Draft RMP is another excellent way to increase public understanding of and participation in the RMP revision. The Kemmerer (Wyoming) Field Office, for example, made their analysis of comments submitted on the Draft RMP and their ACEC evaluations public by posting them on their website months before they issued the Proposed RMP/FEIS[1]. Making such analyses available to the public before the publication of the Draft RMP will better prepare participants to understand the complex analyses and large amounts of data in the Draft RMP and increase the relevance and usefulness of comments and other public participation. We hope to see these types of opportunities provided to the many members of the public who are interested in the development of the Uncompahgre RMP.

***Recommendation***: The BLM should make every attempt to encourage the public to participate in the RMP revision including holding workshops, making a preliminary range of alternatives available for public comment prior to preparing a Draft RMP, providing interim information regarding inventories of routes and visual resources, posting GIS files, and posting analyses such as ACEC evaluations and analysis of comments submitted on the Draft RMP to the RMP revision website.

b.  Cooperating Agencies

Based on the BLM's current regulations governing cooperating agencies (43 C.F.R. Part 1600), cooperating agencies will have a very strong presence throughout the Uncompahgre RMP planning process. In order to permit the public to better understand the roles of these agencies, we request that BLM identify those agencies and tribal and local government entities that have been granted cooperating agency status, and disclose the areas of expertise or other qualifications that form the basis of their cooperating agency status.

***Recommendation***: The BLM should identify the agencies and tribal and local government entities granted cooperating agency status and post this information on the RMP revision website.

c.  Protection of Natural Resources

The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, imposes a duty on BLM to identify and protect the many natural resources found in the public lands governed by the Uncompahgre RMP. FLPMA requires BLM to inventory its lands and their resource and values, "including outdoor recreation and scenic values." 43 U.S.C. § 1711(a). FLPMA also obligates BLM to take this inventory into account when preparing land use plans, using and observing the principles of multiple use and sustained yield. 43 U.S.C. § 1712(c)(4); 43 U.S.C. § 1712(c)(1). Through management plans, BLM can and should protect wildlife, scenic values, recreation opportunities and wilderness character in the public lands through various management decisions, including by excluding or limiting certain uses of the public lands. See 43 U.S.C. § 1712(e). This is necessary and consistent with the definition of multiple use, which identifies the importance of various aspects of wilderness characteristics (such as recreation, wildlife, natural scenic values) and requires BLM's consideration of the relative values of these resources but "not necessarily to the combination of uses that will give the greatest economic return." 43 U.S.C. § 1702(c).

Under FLPMA, BLM is also obligated to "give priority to the designation and protection of areas of critical environmental concern [ACEC]." 43 U.S.C. § 1712(c)(3). ACECs are areas "where special management is required (when such areas are developed or used or where no development is required)

---

[1] http://www.blm.gov/rmp/kemmerer/docs.htm

3

to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes." 43 U.S.C. § 1702(a). For potential ACECs, management prescriptions are to be "fully developed" in the RMP. Manual 1613, Section .22 (Develop Management Prescriptions for Potential ACECs). ACECs also include Research Natural Areas (RNAs), established for their significant biological and physical features, including plant or animal species or geological, soil or water features. RNAs have "ecological or other natural history values of scientific interest" and are managed for research and educational purposes. Outstanding Natural Areas (ONAs) are another type of ACEC, established to preserve scenic values and natural wonders. ONAs contain unusual natural characteristics and are managed primarily for educational and recreational purposes.

The resources in the Uncompahgre planning area include many values that merit protection through special designations. Protection of existing ACECs and due consideration of proposed ACECs, including RNAs and ONAs, must be a priority in the Uncompahgre RMP planning process.

In addition, there is no *per se* bar to managing and protecting the many values of these lands through overlapping designations, such as Wilderness Study Areas (WSAs) and ACECs or Special Recreation Management Areas (SRMA) and Wild and Scenic River Segments. For example, BLM's Jarbidge RMP (and subsequent amendments) in southern Idaho designated the Bruneau/Jarbidge River ACEC and the Salmon Falls Creek ACEC, which overlap the Bruneau River-Sheep Creek WSA, Jarbidge River WSA, and Lower Salmon Falls Creek WSA, and includes the Salmon Falls Creek, deemed eligible for inclusion in the National Wild and Scenic Rivers System. *See* BLM, Jarbidge Field Office, Idaho, Analysis of the Management Situation for the Jarbidge Resource Management Plan: Resource Management Plan/Environmental Impact Statement at 212-216 and Figure 39 (Locations of Current ACECs) (July 2007), *available at* [http://www.blm.gov/pgdata/etc/medialib/blm/id/plans/jarbidge_rmp/documents/analysis_of_the_management.Par.59385.File.dat/part13.pdf](http://www.blm.gov/pgdata/etc/medialib/blm/id/plans/jarbidge_rmp/documents/analysis_of_the_management.Par.59385.File.dat/part13.pdf); Figure 40: Wilderness Study Areas, *available at* [http://www.blm.gov/pgdata/etc/medialib/blm/id/plans/jarbidge_rmp/documents/analysis_of_the_management.Par.18048.File.dat/part14.pdf](http://www.blm.gov/pgdata/etc/medialib/blm/id/plans/jarbidge_rmp/documents/analysis_of_the_management.Par.18048.File.dat/part14.pdf) (excerpts attached to these comments). These overlapping designations ensure that BLM protects both the relevant and important values associated with the ACECs and the wilderness character of the WSAs, both through current management and in the event WSAs are released during the life of the plan. In certain situations, overlapping designations are needed to fully protect the resources, for example IMP management of WSAs might differ greatly from the special management attention envisioned for the relevant and important values of a particular ACEC or in the event of congressional WSA release.

In addressing objections to "layering" of designations (through "establishment of ACECs or SRMAs over WSAs and Wild and Scenic Rivers") raised in connection with the Monticello (Utah) RMP, the BLM responded, appropriately:

> "Layering" is planning. Under FLPMA's multiple use mandate, BLM manages many different resource values and uses on public lands. Through land use planning BLM sets goals and objectives for each of those values and uses, and prescribes actions to accomplish those objectives. Under the multiple use concept, BLM doesn't necessarily manage every value and use on every acre, but routinely manages many different values and uses on the same areas of public lands. The process of applying many individual program goals, objectives, and actions to the same area of public lands may be perceived as "layering". BLM strives to ensure that the goals and objectives of each program (representing resource values and uses) are consistent and compatible for a particular land area. Inconsistent goals and objectives can lead to resource

4

conflicts, failure to achieve the desired outcomes of a land use plan, and litigation. Whether or not a particular form of management is restrictive depends upon a personal interest or desire to see that public lands are managed in a particular manner. All uses and values cannot be provided for on every acre. That is why land use plans are developed through a public and interdisciplinary process. The interdisciplinary process helps ensure that all resource values and uses can be considered together to determine what mix of values and uses is responsive to the issues identified for resolution in the land use plan. Layering of program decisions is not optional for BLM, but is required by the FLPMA and National BLM planning and program specific regulations.

FLPMA directs BLM to manage public lands for multiple use and sustained yield (Section 102(a)(7)). As a multiple-use agency, the BLM is required to implement laws, regulations and policies for many different and often competing land uses and to resolve conflicts and prescribe land uses through its land use plans. BLM's Land Use Planning Handbook requires that specific decisions be made for each resource and use (Planning Handbook "H-1601-1"). Specific decisions must be included in each of the alternatives analyzed during development of the land use plan. As each alternative is formulated, each program decision is overlaid with other program decisions and inconsistent decisions are identified and modified so that ultimately a compatible mix of uses and management prescriptions result.

Monticello Proposed RMP, Response to Comments, comment no. 007-48 (attached).

As clarified by the BLM, because different designations serve different purposes, and management is often limited to protect only those values relevant to those particular designations, the fact that an ACEC may lie within a WSA does not justify failing to designate the ACEC and the fact that a proposed SRMA may overlap with an ACEC does not obviate the need for the SRMA.

**_Recommendation_**: The BLM must uphold its responsibility to protect the abundant natural values present in the Uncompahgre planning area when developing management alternatives in the Uncompahgre RMP and evaluating their environmental consequences, as required by both FLPMA and NEPA, 42 U.S.C. § 4321 *et seq.*

d.  Special Management Proposals

As noted above, the BLM has a variety of tools for protecting natural values.  Included with these scoping comments is an inventory of areas suitable for wilderness designation (citizens' wilderness proposal – or CWP), which we have proposed for protection as new WSAs and/or through management of their wilderness characteristics.  We also encourage the BLM to use designation of special recreation management areas and areas of critical environmental concern to protect natural values as part of an overall management approach to creating, enhancing, and protecting quiet recreation experiences, protecting critical species habitats, and providing needed expansions of protections around current WSAs, ACECs, and SRMAs.

In addition to our CWPs, we will submit expanded proposals, including more detailed descriptions and management prescriptions, in the near future and look forward to discussing these proposals with you.

5

   e.   Analysis of Environmental Consequences

NEPA requires federal agencies to assess the direct, indirect and cumulative environmental impacts of proposed actions, taking a "hard look" at environmental consequences and performing an analysis commensurate with the scale of the action at issue.  42 U.S.C. § 4321 et seq; 40 C.F.R. § 1508.8; *see also* Metcalf v. Daley, 214 F.3d 1135, 1151 (9th Cir. 2000); Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348 (1989).  NEPA defines "cumulative impact" as:

> the impact on the environment which results from the incremental impact of the action **when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions**.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. (emphasis added).  Throughout these comments, we have identified analyses required to evaluate the direct, indirect and cumulative impacts of decisions made in the RMP, such as health impact assessments and air quality modeling.

***Recommendation***:  The analyses discussed in these scoping comments must be completed prior to authorizing activities that will contribute to these impacts, such as oil and gas leasing, in order to determine whether and under what conditions they can be approved, such that significant impacts on the environment can be prevented.  To the extent that the BLM defers any of the recommended analyses, we request that the RMP commit to a time period for completion and confirm that they will be completed prior to approval of contributing activities.

   f.   Land Tenure Decisions

BLM has identified land tenure decisions as an issue to be addressed in the Uncompahgre RMP revision. In light of present circumstances, BLM should review the previous plans and decisions and look at future land tenure decisions with an eye towards providing adequate open space for the growing public, maintaining key viewsheds and taking into consideration new proposals for open space and trails and special management areas.  Section 102(a)(1) of FLPMA requires that BLM-managed lands be retained in federal ownership unless BLM determines through the land use planning process that disposal of a particular parcel will serve the national interest.  43 U.S.C. 1701.  Land tenure decisions must achieve the goals, standards, and objectives outlined in the land use plan.

With the growing population has come a desire to develop more land, some of which may be appropriate.  However, the BLM must retain land near sensitive and ecologically important areas, including those within existing or proposed ACECs or other special management areas, and including specifically citizen-proposed special management areas.  Lands identified in new citizen proposals for open space and/or other special management that include lands not owned by BLM should be given priority for acquisition.  BLM should only pursue land tenure decisions if they will serve the national interest by supporting key values and resources, such as protecting ecologically important areas and providing open space.  In addition, disposal or exchange may be appropriate where the BLM determines that lands will be dedicated to renewable energy development, if those lands are already degraded, closest to the load served for siting development, and can be sold or exchanged with a commitment to obtain lands with higher conservation values (such as wildlife corridors).

6

BLM_0081903

Given the current population trends within the region, BLM should reconsider all previous decisions in the Uncompahgre RMP for disposal of public lands and re-evaluate whether or not those decisions still meet the needs of the public.  As the agency moves forward it will be crucial that consideration be given to providing adequate open space and trails on public lands.  Furthermore, as local entities are in the process of developing plans for such uses, the relationship between the RMP and these plans will be important, since BLM's decisions can affect local open space, parks and trail plans. Particular care should be taken to prevent sale or exchange of BLM parcels highly valued by local communities for the open space, wildlife habitat, and recreation opportunities they provide.

***Recommendations***:  The BLM should work with local governments and Tribes when identifying areas where disposal of public lands may be appropriate.  However, BLM should identify areas such as ACECs, citizen wilderness proposals, or sensitive species habitat for retention and acquisition.  BLM should not dispose of parcels valued by local communities for their open space, wildlife habitat, and recreation opportunities.

2.  **Lands with Wilderness Characteristics**

   a.  BLM must inventory for wilderness character and consider protecting wilderness characteristics in the RMP.

The lands governed by the Uncompahgre RMP contain pristine wildlands, including those identified in Congresswoman Diana DeGette's Colorado Wilderness Act. Section 201 of FLPMA mandates that BLM inventory the resources of the public lands, their resources and values.  43 U.S.C. § 1711.  In the land use planning process, including revision of RMPs, Section 202 of FLPMA requires that BLM take into account the inventory and determine which multiple uses are best suited to which portions of the planning area. 43 U.S.C. § 1712.  BLM's mandate of multiple use and sustained yield, as well as other relevant law and BLM's current guidance, provides for inventory and protection of wilderness values.

Wilderness character is a resource for which BLM must keep a current inventory.  As the U.S. Court of Appeals for the Ninth Circuit recently held:

> wilderness characteristics are among the 'resource and other values' of the public lands to be inventoried under § 1711.  BLM's land use plans, which provide for the management of these resources and values, are, again, to "rely, to the extent it is available, on the inventory of the public lands, their resources, and other values."  43 U.S.C. § 1712(c)(4).

Oregon Natural Desert Ass'n v. Bureau of Land Management, 531 F.3d 1114, 1119 (9th Cir. 2008). Therefore, BLM is required to consider "whether, and to what extent, wilderness values are now present in the planning area outside of existing WSAs and, if so, how the Plan should treat land with such values."  *Id.* at 1143. These obligations also apply to WSAs released by Congress, which BLM found to have wilderness characteristics. As the court stated: "wilderness characteristics are a value which, under the FLPMA, the Bureau has the continuing authority to manage, even after it has fulfilled its 43 U.S.C. § 1782 duties to recommend some lands with wilderness characteristics for permanent congressional protection."  *Id.* at 1142.

Nationally, BLM has acknowledged the need for new guidance on inventorying for and managing lands with wilderness characteristics and committed to releasing such guidance in the near future. An inter-disciplinary DOI review team released its final report and recommendations on the 77 contested leases

7

issued in Utah BLM's December 2008 lease sale[2] ("Stiles Report") in October 2009. The Stiles Report noted the lack of national guidance on managing lands with wilderness characteristics and found that this lack of guidance contributes to uninformed oil and gas leasing decisions, and recommended the guidance be issued soon. The report further recommended that "BLM-Utah review the [recently-completed RMPs] in light of this new guidance and make necessary modifications." (pp. 32-33).

The Stiles Report includes significant recommendations regarding additional protections that should be considered, including not leasing at all, based on the presence of wilderness characteristics. Specific recommendations include: "Adding an NSO stipulation could allow both mineral development and protection of the wilderness characteristics this land has in common with the contiguous Natural Area" (p. 6); "This parcel should be reviewed using the soon-to-be-released new Wilderness Characteristics Inventory Manual...Additional stipulations may be found necessary after completion of a revised inventory of wilderness characteristics" (p. 7); and "The team recommends deferral to reconsider the impacts on documented wilderness characteristics" (p. 9).

**Per FLPMA and BLM's current guidance, and in light of the Stiles Report and upcoming guidance, BLM is obligated to inventory for and consider a range of alternatives to protect lands with wilderness characteristics**.

1. Wilderness character is a valuable resource and important multiple use of the lands governed by the Uncompahgre RMP.
As discussed above, wilderness is a resource to be inventoried and managed under BLM's multiple use mandate.  BLM has identified "wilderness characteristics" to include naturalness or providing opportunities for solitude or primitive recreation.  *See*, Instruction Memoranda (IMs) 2003-274 and 2003-275.  Through this planning process, BLM should recognize the wide range of values associated with lands with wilderness characteristics:

(a) Scenic values – FLPMA specifically identifies "scenic values" as a resource of BLM lands for purposes of inventory and management (43 U.S.C. § 1711(a)), and the unspoiled landscapes of lands with wilderness characteristics generally provide spectacular viewing experiences.  The scenic values of these lands will be severely compromised if destructive activities or other visual impairments are permitted.

(b) Recreation – FLPMA also identifies "outdoor recreation" as a valuable resource to be inventoried and managed by BLM. 43 U.S.C. § 1711(a).  Lands with wilderness characteristics provide opportunities for primitive recreation, such as hiking, camping, hunting and wildlife viewing.  Most, if not all, primitive recreation experiences will be foreclosed or severely impacted if the naturalness and quiet of these lands are not preserved.

(c) Wildlife habitat and riparian areas – FLPMA acknowledges the value of wildlife habitat found in public lands and recognizes habitat as an important use. 43 U.S.C. § 1702(c).  Due to their unspoiled state, lands with wilderness characteristics provide valuable habitat for wildlife, thereby supporting additional resources and uses of the public lands.  As part of their habitat, many species are also dependent on riparian and other wetland habitats, especially during either seasonal migrations or seasons and years when surrounding habitats are dry and unproductive.  Wilderness quality lands support biodiversity, watershed protection and overall healthy ecosystems.  The low route density, absence of development activities and corresponding dearth of motorized vehicles, which are integral to wilderness character,

---

[2] The report can be found at http://www.doi.gov/documents/BLM_Utah77LeaseParcelReport.pdf.

BLM_0081905

also ensure the clean air, clean water and lack of disturbance necessary for productive wildlife habitat and riparian areas (which support both wildlife habitat and human uses of water).

Further, inventorying lands with wilderness characteristics will also provide important data on existing large blocks of habitat and how BLM can restore these blocks of habitat to better match the historic range of variability.  Swanson et al. (1994) contend that managing an ecosystem within its range of variability is appropriate to maintain diverse, resilient, productive, and healthy ecosystems for viable populations of native species. Using the historical range of variability, they believe, is the most scientifically defensible way to meet society's objective of sustaining habitat.   Patrick Daigle and Rick Dawson, Extension Note 07; Management Concepts for Landscape Ecology (Part 1 of 7). October 1996. http://www.for.gov.bc.ca/hfd/pubs/docs/en/en07.pdf; *citing* Swanson, F. J.; Jones, J. A.; Wallin, D. O.; Cissel, J. H. 1994. Natural variability--implications for ecosystem management. In: Jensen, M. E.; Bourgeron, P. S., tech. eds. Eastside Forest Ecosystem Health Assessment--Volume II: Ecosystem management: principles and applications. Gen. Tech. Rep. PNW-GTR-318. Portland, OR: U.S. Dept. of Agriculture, Forest Service, Pacific Northwest Research Station: pp 89-106.

Identifying, restoring and protecting substantial roadless areas in the lands governed by the Uncompahgre RMP can provide crucial benefits to wildlife, especially to endangered and sensitive species.

(d) Cultural resources – FLPMA also recognizes the importance of "historical values" as part of the resources of the public lands to be protected. 43 U.S.C. § 1702(c).  The lack of intensive human access and activity on lands with wilderness characteristics helps to protect these resources.  The scoping notice for the Uncompahgre RMP identifies managing and protecting cultural, historical and paleontological resources as an issue to be addressed in the RMP. Managing lands to protect wilderness qualities will also help protect cultural and archaeological sites.

(e) Economic benefits – The recreation opportunities provided by wilderness quality lands also yield direct economic benefits to local communities.  According to the U.S. Fish & Wildlife Service, in 2006 State residents and non-residents spent $3 billion on wildlife recreation in Colorado.  (USFWS 2006, *National Survey of Hunting, Fishing and Wildlife-associated Recreation* - http://www.census.gov/prod/2008pubs/fhw06-co.pdf).  In addition, local communities that protect wildlands reap measurable benefits in terms of employment and personal income.  For instance, a recent report by the Sonoran Institute (Sonoran Institute 2004, ***Prosperity in the 21st Century West -The Role of Protected Public Lands***) found that:

> Protected lands have the greatest influence on economic growth in rural isolated counties that lack easy access to larger markets.  From 1970 to 2000, real per capita income in isolated rural counties with protected land grew more than 60 percent faster than isolated counties without any protected lands.

These findings confirm earlier research, showing that wilderness is in fact beneficial for local economies. Residents of counties with wilderness cite wilderness as an important reason why they moved to the county, and long-term residents cite it as a reason they stay.  Recent survey results also indicate that many firms decide to locate or stay in the West because of scenic amenities and wildlife-based recreation, both of which are strongly supported by wilderness areas.  (Morton 2000, *Wilderness: The Silent Engine of the West's Economy*).  Other "non-market" economic values arise from the ability of wildlands to contribute to recreation and recreation-related jobs, scientific research, scenic viewsheds,

9

biodiversity conservation, and watershed protection.  (Morton 1999, _The Economic Benefits of Wilderness: Theory and Practice_; Loomis 2000, _Economic Values of Wilderness Recreation and Passive Use: What We Think We Know at the Turn of the 21st Century_).  All of these economic benefits are dependent upon adequate protection of the wilderness characteristics of the lands.

(f) Quality of life – The wildlands located within the Uncompahgre planning area help to define the character of this area and are an important component of the quality of life for local residents and future generations, providing wilderness values in proximity to the burgeoning urban and suburban areas of Montrose and other growing population centers.  Their protection enables the customs and culture of this community to continue.

(g) Balanced use – The vast majority of BLM lands are open to motorized use and development.  FLPMA recognizes that "multiple use" of the public lands requires "a combination of balanced and diverse resource uses" that includes recreation, watershed, wildlife, fish, and natural scenic and historical values (43 U.S.C. § 1702(c)).   FLPMA also requires BLM to prepare land use plans that may limit certain uses in some areas (43 U.S.C. § 1712).  Many other multiple uses of public lands are compatible with protection of wilderness characteristics – in fact, many are enhanced if not dependent on protection of wilderness qualities (such as primitive recreation and wildlife habitat).  Protection of wilderness characteristics will benefit many of the other multiple uses of BLM lands, while other more exclusionary uses (such as off-road vehicle use and timber harvesting) will still have adequate opportunities on other BLM lands.

2. BLM must consider alternatives in the Uncompahgre RMP for managing lands to protect their wilderness characteristics.
The range of alternatives is "the heart of the environmental impact statement." 40 C.F.R.  § 1502.14. NEPA requires BLM to "rigorously explore and objectively evaluate" a range of alternatives to proposed federal actions. _See_ 40 C.F.R. §§ 1502.14(a) and 1508.25(c).

> NEPA's requirement that alternatives be studied, developed, and described both guides the substance of environmental decision-making and provides evidence that the mandated decision-making process has actually taken place. Informed and meaningful consideration of alternatives -- including the no action alternative -- is thus an integral part of the statutory scheme.

Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1228 (9th Cir. 1988), cert. denied, 489 U.S. 1066 (1989) (citations and emphasis omitted).

An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. City of Tenakee Springs v. Clough, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R. § 1502.14).  This evaluation extends to considering more environmentally protective alternatives and mitigation measures. _See, e.g.,_ Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094,1122-1123 (9th Cir. 2002) (and cases cited therein); _see also_ Envt'l Defense Fund., Inc. v. U.S. Army Corps. of Eng'rs, 492 F.2d 1123, 1135 (5th Cir. 1974); City of New York v. Dept. of Transp., 715 F.2d 732, 743 (2nd Cir. 1983) (NEPA's requirement for consideration of a range of alternatives is intended to prevent the EIS from becoming "a foreordained formality."); Utahns for Better Transportation v. U.S. Dept. of Transp., 305 F.3d 1152 (10th Cir. 2002), modified in part on other grounds, 319 F.3d 1207 (2003); Or. Envtl. Council v. Kunzman, 614 F.Supp. 657, 659-660 (D. Or. 1985) (stating that the alternatives that must be considered under NEPA are those that would "avoid or minimize" adverse environmental effects).

BLM_0081907

NEPA requires that an actual "range" of alternatives is considered, such that the Act will "preclude agencies from defining the objectives of their actions in terms so unreasonably narrow that they can be accomplished be only one alternative (i.e. the applicant's proposed project)." Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1174 (10th Cir. 1999), citing Simmons v. United States Corps of Engineers, 120 F.3d 664, 669 (7th Cir. 1997). This requirement prevents the EIS from becoming "a foreordained formality." City of New York v. Department of Transp., 715 F.2d 732, 743 (2nd Cir. 1983). See also, Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002).

**Given the broad purpose of the preparation of the Uncompahgre RMP and the information compiled by the public regarding lands with wilderness characteristics, the range of alternatives for these lands should include a number of alternatives to protect their wilderness values.** This range of alternatives is also consistent with BLM's FLPMA obligations to inventory its lands and their resources, which includes wilderness character. FLPMA also obligates BLM to take this inventory into account when preparing land use plans, using and observing the principles of multiple use and sustained yield. 43 U.S.C. § 1712(c)(4); 43 U.S.C. § 1712(c)(1). Through management plans, BLM can and should protect wilderness character and the many uses that wilderness character provides on the public lands through various management decisions, including by excluding or limiting certain uses of the public lands. See, 43 U.S.C. § 1712(e). This is necessary and consistent with the definition of multiple use, which identifies the importance of various aspects of wilderness character (such as recreation, wildlife, natural scenic values) and requires BLM's consideration of the relative values of these resources but "not necessarily to the combination of uses that will give the greatest economic return." 43 U.S.C. § 1702(c).

      b.   BLM should consider designating new Wilderness Study Areas.

We are aware of the April 2003 settlement agreement (Utah Settlement) between Secretary of the Interior Norton and the State of Utah in which BLM abdicated its authority to designate any additional WSAs, and we maintain that this agreement is invalid and will ultimately be overturned in pending litigation.

The federal court in Utah revoked its approval of the Utah Settlement, stating that its approval of the initial settlement was never intended to be interpreted as a binding consent decree. Recognizing that the court's decision undermined the legal ground for the Utah Settlement, the State of Utah and the Department of Interior have now formally withdrawn the settlement as it was originally submitted. See, Motion to Stay Briefing and for a Status Conference, September 9, 2005, attached. This casts serious doubt upon BLM's current policy not to consider designating new WSAs. There is no binding consent decree and the BLM has not even issued any updated guidance seeking to continue applying this misguided, and illegal, policy.

In addition, the Utah Settlement is based on an interpretation of FLPMA §§ 201, 202, and 603 that is contrary to FLPMA's plain language. Section 603 did not supersede or limit BLM's authority under § 201 to undertake wilderness inventories, but rather relies explicitly on BLM having exactly that authority under § 201. Nor did § 603 in any way limit BLM's discretion under § 202 to manage its lands as it sees fit, including managing areas as § 202 WSAs in accordance with the Interim Management Policy (IMP). Every prior administration has created WSAs under § 202 and they plainly had authority to do so. This administration has such authority as well, making this a reasonable alternative deserving of consideration in this NEPA process.

11

The Utah Settlement is also illegal because the court in Utah lacked jurisdiction to prohibit designation of new WSAs nationwide, including in Colorado.

_**Recommendation**_:  In light of the most recent ruling and subsequent action of the parties, we emphasize that the BLM can and should continue to designate new WSAs in this planning process, including the areas identified with this submission.  Further, if BLM fails to fulfill these obligations, it risks violating both FLPMA and NEPA, and jeopardizing the validity of this entire planning process.

> c.  BLM should also consider other management alternatives for protecting lands with wilderness characteristics.

**The Utah Settlement does not affect BLM's obligation to value wilderness character or, according to BLM directives, the agency's ability to protect that character, including in the development of management alternatives**.  BLM's recent acknowledgment of this obligation in the Stiles Report and the related court rulings provide important direction in this regard. Further, in previous guidance, BLM has not only claimed that it can continue to protect wilderness values, but has also committed to doing so. On September 29, 2003, BLM issued IMs 2003-274 and 2003-275, formalizing its policies concerning wilderness study and consideration of wilderness characteristics in the wake of the Utah Settlement. In the IMs and subsequent public statements, BLM has claimed that its abandonment of previous policy on WSAs would not prevent protection of lands with wilderness characteristics. The IMs contemplate that BLM can continue to inventory for and protect land "with wilderness characteristics," such as naturalness or providing opportunities for solitude or primitive recreation, through the planning process. The IMs further provide for management that emphasizes "the protection of some or all of the wilderness characteristics as a priority," even if this means prioritizing wilderness over other multiple uses.  This guidance does not limit its application to lands suitable for designation of WSAs; for instance, the guidance does not include a requirement for the lands at issue to generally comprise 5000-acre parcels or a requirement that the lands have all of the potential wilderness characteristics in order to merit protection.  IM 2003-274 states that "BLM may continue to inventory public lands for resource or other values, _**including wilderness characteristics**_" and that the agency can "_**manage them using special protections**_ to protect wilderness characteristics."  (emphasis added).  Further, IM 2003-275, Change 1, reads:

> The BLM can make a _**variety of land use plan decisions**_ to protect wilderness characteristics, such as establishing Visual Resource Management (VRM) class objectives to guide the placement of roads, trails, and other facilities; establishing conditions of use to be attached to permits, leases, and other authorizations to achieve the desired level of resource protection; and designating lands as open, closed, or limited to Off Highway Vehicles (OHV) to achieve a desired visitor experience. (emphasis added).

Accordingly, administrative protection can and should be considered for lands with wilderness characteristics that are not currently protected.  The Draft RMP should also consider management alternatives that provide administrative protection for the wilderness characteristics of those lands currently designated as WSAs if they are not ultimately designated as Wilderness by Congress; their wilderness characteristics are already acknowledged by the BLM.  Further, BLM is obligated to evaluate the potential impacts on wilderness values from its management decisions.

In the most recent ruling on the Utah Settlement challenge (State of Utah v. Norton, Case No. 2:96-CV-0870, Order and Opinion (D.Utah September 20, 2006)), Judge Benson found against the Conservation

12

BLM_0081909

Groups for a number of reasons, including agreeing with the legal interpretation of FLPMA put forth by the State of Utah and the BLM (a finding we continue to dispute).  However, the ruling also justifies the court's interpretation by finding that the agency can provide virtually the same protection for lands with wilderness characteristics through administrative decisions as it can through designation of new WSAs, with the only material difference being that, while the agency can alter its own management decisions, only Congress can change a WSA designation.  The court stated:  "Both Utah and the BLM acknowledge that the BLM has the discretion to manage lands in a manner that is **similar to the non-impairment standard** by emphasizing the protection of wilderness characteristics as a priority over other potential uses."  Order and Opinion, p. 41 (emphasis added - excerpt attached).

In a subsequent briefing to the U.S. Court of Appeals for the 10th Circuit, the Department of the Interior and the BLM reiterated that "the settlement does not preclude BLM from **inventorying public lands for wilderness-associated characteristics**" and that "the land management decision obtained through FLPMA § 202 process may **resemble management under FLPMA § 603's non-impairment standard**."  In discussing how BLM will manage lands with wilderness characteristics, the brief refers to the "BLM's discretion under FLPMA § 202 to **preserve their wilderness-associated characteristics**."  Brief of the Federal Appellees, State of Utah v. Kempthorne, Case No. 06-4240 (February 26, 2007), pp. 40, 43 (emphases added - excerpt attached).  Similarly, the Uncompahgre Field Office can and should protect lands with wilderness characteristics from the damage likely to result from energy development and uncontrolled off-road vehicle (ORV) use, both of which the BLM has acknowledged are likely to occur if these activities are permitted to occur on lands with wilderness characteristics.

In addition, the information submitted regarding citizen-proposed wilderness constitutes significant new information that must be addressed in this RMP revision.  This information has not yet been analyzed in the existing land use plan, so NEPA requires analysis of the potential environmental direct, indirect and cumulative effects of oil and gas development on these areas and consideration of protection for them. See, 40 C.F.R. § 1502.9(c); Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 374 (1989).  In a recent decision, the U.S. District for the District of Utah found that information regarding wilderness characteristics that was not considered in the existing land use plan was:

> **a textbook example of significant new information** about the affected environment (the **wilderness attributes and characteristics** of the Desolation Canyon, Floy Canyon, Flume Canyon, Coal Canyon, and Flat Tops unit) that would be **impacted by oil and gas development**; information that was **not reflected in BLM's existing NEPA analyses**.

Southern Utah Wilderness Alliance v. Norton, 457 F. Supp. 2d 1253 (D. Utah 2006) (attached).  A compliant NEPA analysis requires not only assessment of potential impacts but also a consideration of potential mitigation measures, such as protecting lands with wilderness characteristics.  40 C.F.R. §§ 1502.14, 1502.16.  The Uncompahgre RMP must consider protective measures tailored specifically to protect lands with wilderness characteristics.

BLM's Arizona State Office has issued guidance that elaborates upon the BLM's national guidance by providing for identification of lands with wilderness characteristics and development of management prescriptions to protect and enhance these values (IM No. AZ-2005-007 – attached).  The Proposed RMP for the Arizona Strip includes land use allocations for lands with wilderness characteristics in every alternative and sets out protective management prescriptions (Table 2.10).  This RMP also includes a detailed discussion of how BLM identified and assessed wilderness characteristics and the need for protective management (Appendix 3.D).  The process is consistent with FLPMA's direction that BLM

13

inventory for the many values of the public lands and consider ways to protect them (i.e., not all uses are appropriate in all places) in the RMP.  43 U.S.C. §§ 1711, 1712.  The recently-released Records of Decision for this planning area all include protection for lands with wilderness characteristics (available on-line at: http://www.blm.gov/az/st/en/info/nepa/environmental_library/arizona_resource_management.html).

Other RMPs that are being prepared in Colorado, Arizona, New Mexico and Utah include identification of lands with wilderness characteristics and include management of certain areas to maintain and enhance these values in management alternatives under consideration.  For example, the Preliminary Draft Alternatives for the TriCounty RMPs (prepared by the BLM's Las Cruces, NM Field Office) also provide for protection of citizen-proposed wilderness, stating that these areas "would be managed to maintain wilderness characteristics." *See*, TriCounty RMPs/EIS Newsletter, p. 3 (available on-line at: http://www.nm.blm.gov/lcfo/tri_county/tricounty.html).  The Preliminary Goals and Objectives set out a ***management approach specific to lands with wilderness characteristics***, including:

- Goal:  Maintain naturalness, outstanding opportunities for solitude, and unconfined recreation.
- Objectives**:**
    - Manage areas with wilderness characteristics to maintain the natural qualities of the landscape where the imprint of human activity is substantially unnoticeable; where the sights, sounds, and evidence of other people are rare or infrequent; and where visitors can be isolated, alone, or secluded from others.

    - Provide management direction for assessing site specific impacts from proposals that fall within identified areas with wilderness characteristics based on the long-term effect on naturalness, ability to restore the impacted area to its natural state, compatibility with VRM objectives, loss of opportunity for solitude and primitive recreation, and potential for proposed use to be accommodated outside of the area.

In addition, the Draft RMP for the Little Snake Field Office (released February 9, 2007 and available on-line at:  http://www.co.blm.gov/lsra/rmp/index.htm) addressed management of lands with wilderness characteristics and/or backcountry characteristics.  Most of the lands at issue in the Little Snake Draft RMP were identified as part of a citizens' wilderness proposal, which the BLM re-inventoried and considered for management of their naturalness and/or opportunities for primitive recreation or solitude.  The Draft RMP identifies two ***specific management approaches***, one for "Lands with Wilderness Characteristics Outside Existing WSAs" and another for "Lands with Backcountry Characteristics Outside Existing WSAs." *See*, Draft RMP, pp. 2-158 – 2-161; 2-199 – 2-201. Management prescriptions include:

<u>Lands with Wilderness Characteristics</u>:
- Objective:  "to protect naturalness, opportunities for semiprimitive recreation and solitude";
- closed to oil and gas operations and other minerals activities;
- off-road vehicles (ORVs) limited to designated routes;
- Class II or Class III Visual Resource Management (VRM) classification; and
- Some areas may be managed as a Special Recreation Management Area (SRMA) to "provide quality primitive recreation experiences in a largely natural setting.":
    - closed to oil and gas leasing (or to new oil and gas leasing);
    - closed to ORVs;
    - VRM Class II.

14

Lands with Backcountry Characteristics:
- Described as "backcountry areas";
- Objective: "to provide backcountry recreation experience in predominantly natural settings";
- closed oil and gas leasing;
- closed to ORVs; and
- VRM Class II.

**To ensure that wilderness values receive proper and sufficient attention as a critical aspect of land management in preparation of the Uncompahgre RMP, BLM must address wilderness as a separate and unique issue in the planning process** including in its Planning Criteria, in the Analysis of the Management Situation and in each section of the RMP.  Protection of lands with wilderness character should be identified as a major issue in the scoping report. This will assist the public in understanding the values of wilderness-quality lands and the potential effects of other multiple uses on wilderness character, as well as in communicating comments or concerns regarding the management of these lands to BLM. Because comments on protection of wilderness values will be clearly identified, BLM will be in a better position to clarify any misconceptions and provide complete responses.

In preparing the revised RMP and accompanying EIS, BLM should clearly present management alternatives in the context of protecting wilderness character and analyze environmental consequences to that character. BLM has been aware of these proposed wilderness areas for some time, and the agency must attend to them. In the "Alternatives" section of the RMP, BLM must include various ways to protect these lands in each of the management alternatives.  In addition to considering designation of new WSAs, BLM should propose protective management prescriptions or other protective status (including mineral withdrawals, non-motorized recreation prescriptions, ACEC designations, and prohibitions on new road construction and erection of structures such as cell towers) for these lands. The Alternatives section must also discuss the implications of each alternative for the wilderness-quality lands governed by the Uncompahgre RMP.  Finally, BLM must specify the "Environmental Consequences" of the resource management decisions on the wilderness-quality lands in the planning areas. This discussion should include, but not be limited to, an analysis of the cumulative impacts of other activities (including those undertaken by non-federal entities) within the planning areas on these unique lands. In short, in every major section of the RMP, BLM must address wilderness-quality lands and citizen-proposed wilderness areas.  BLM should then take appropriate actions to protect wilderness character in the preferred management alternative.

We look forward to seeing inventory for and protection of wilderness qualities comprehensively addressed as the preparation of the Uncompahgre RMP proceeds. Additionally, we realize that the newly-designated Dominguez-Escalante National Conservation Area will not be included in this RMP, but we would like to reiterate that the NCA plan must fully evaluate potential wilderness lands within the NCA. The Uncompahgre RMP should address potential impacts to the adjacent NCA lands, including wilderness-quality lands.

***Recommendations***:  BLM should include protection of lands with wilderness characteristics in the RMP's management alternatives and thoroughly analyze this issue throughout the planning process.  To ensure that wilderness values receive proper and sufficient attention as a critical aspect of land management in preparation of the RMP, BLM must inventory for lands with wilderness characteristics (including those lands identified below as citizens' proposed wilderness), consider alternatives for protecting lands with

15

BLM_0081912

wilderness characteristics (including for those lands currently designated as WSAs if they are not ultimately designated as Wilderness by Congress) and address wilderness character outside of WSAs as a separate and unique issue in the planning process in each section of the RMP, as described above.

d.   Specific lands to be protected

We are submitting a map of citizens' wilderness proposals that should be inventoried and considered for management to protect their wilderness characteristics.  These lands should be inventoried for wilderness characteristics and management alternatives for protecting the wilderness resource present on these lands should be evaluated, including the opportunities they provide for primitive recreation and otherwise experiencing solitude, naturalness and scenic beauty.

The following areas have been identified as citizen-proposed wilderness.  (Acreages are approximate.) We have included more detail on each of these areas with the map in Appendix 3.

1)   <u>Roubideau (Camel Back) – 20,059 Acres</u>
This maze of colorful and intricate canyons provides the obvious complement to the national forest Roubideau Area, already designated by Congress to protect its wilderness values. The downstream portion should receive the same protection from the BLM until Congress can complete the watershed's designation.

2)   <u>Adobe Badlands – 10,323 Acres</u>
This absolutely unique, sparse landscape northeast of Delta is rare in that it has not been damaged by motor travel. The area is home to an endangered species of cactus, desert reptiles, and geologic wonders. The fragile soils and striking scenery need to be preserved.

3)   <u>Sewemup Mesa – 9,253 Acres Within Uncompahgre Resource Area</u>
The majority of this CWP falls within the Grand Junction Field Office; however, nearly 10,000 acres are managed by the Uncompahgre Field Office. Sewemup Mesa is one of the most ecologically pristine areas in western Colorado, having been isolated from development and most human activity throughout history. The Colorado Division of Wildlife has identified the area as suitable habitat for Mexican spotted owl, southwest willow flycatcher, whooping crane, and the western burro owl.

4)   <u>Norwood Canyon – 4,867 Acres</u>
This rugged and ecologically vibrant area in the heart of the San Miguel River corridor provides some of the better and more diverse habitat anywhere for mountain lions, hawks, eagles, and both rare and familiar native fish. This riparian area along the river has been classified as one of two most important river systems needing protection in Colorado.

5)   <u>Dolores River Canyon – 17,282 Acres</u>
This heart of the stunning and wild Dolores corridor, with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience must gain the highest possible level of protection. We discuss this area in further detail below.

***Recommendations***: The above areas, and any other areas that the Uncompahgre Field Office inventories and finds to possess wilderness characteristics, should be managed to protect their wilderness values. Management prescriptions for these areas should include: closed to motorized vehicles; VRM Class I; closed to all forms of energy development; ROW exclusion areas; and other protective measures.

16

BLM_0081913

e.   Dolores River Corridor

The Dolores River Canyon Wilderness Study Area and surrounding wilderness-quality lands, with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experiences, must gain the highest possible level of protection. The Dolores River Corridor includes the river corridor itself (river, riverbanks and immediately adjacent land alongside the river including to the canyon rims), as well as adjacent wilderness study areas and citizens' wilderness proposal areas.

The RMP should commit to continuing to manage the Dolores River Canyon WSA to protect its wilderness qualities even if it is released by Congress. BLM should also manage the citizen-proposed additions to the WSA so as to protect their wilderness characteristics.

Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the RMP revision. It has been found suitable in the past and still maintains the same qualities.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River. The river itself, and all its eligible tributaries, should receive immediate, thorough, and enduring protection.

Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy stipulations.  Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area designation. The RMP also needs to prohibit uranium mining within the river corridor.  All permitted mines in the resource area must prove that there will be no harm to both surface and ground water quality and quantity; prove that the long-term ecological health of the area will not be jeopardized; have viable reclamation plans in place before permits can be granted; and have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.  BLM must ensure that all state and federal laws are applied to any permitted mines.  The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. These management actions are necessary to protect the Dolores River and the WSA.

The Dolores Corridor should be managed in close cooperation with adjacent BLM Field Offices. For example, the Dolores River Canyon Wilderness Study Area is bisected by the Uncompahgre Field Office and the San Juan Field Office, but requires consistent and close management, especially considering issues with motorized incursions from the Utah state line. The Sewemup Mesa CWP expansions to the existing WSA also overlap the Grand Junction and Uncompahgre Field Offices. Significantly, the river itself crosses boundaries between the San Juan, Uncompahgre, and Grand Junction Field Offices.  It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities. We urge the Uncompahgre Field Office to adopt a broad vision of the landscape in approaching the cooperative management of these areas.

***Recommendations:*** The Dolores River Corridor should be managed as an entire ecosystem with the goal of protecting its outstanding natural, historical, ecological and recreational values. The Dolores River Coalition is submitting detailed scoping comments addressing this area, and we herein reference and support those comments.

17

BLM_0081914

3. **Health Impact Assessment**

The BLM Should Conduct a Health Impact Assessment.

In February, 2008, the Environmental Protection Agency provided the BLM with its comments on a revised drilling plan for the Pinedale Anticline in Wyoming, citing concerns about human health issues including elevated ozone levels and groundwater contamination, as well as visibility impacts in nearby Wilderness Areas. Consistent with its responsibilities under Section 309 of the Clean Air Act, EPA reviewed the analysis of impacts and gave the plan its worst possible rating. EPA recommended that BLM revise the plan to correct the problems identified by EPA. In its decision, the EPA stated: "[I]t is of utmost importance that the Revised Draft SEIS identify effective and enforceable mitigation strategies to ensure environmental and public health protection as the proposed 4,399 additional wells on the Pinedale Anticline are developed."[3]

The BLM should do the same in the EIS for the Uncompahgre RMP and any other major decision document where oil and gas operations will have a significant impact on human health. Oil and gas development is acknowledged to have potentially severe impacts on human health, as noted below, and the Draft EIS should incorporate a formal methodology to evaluate all health issues and potential mitigations. We therefore request that the BLM incorporate a Health Impact Assessment (HIA), which is a systematic, comprehensive methodology for assessing human health impacts, as part of the EIS. A HIA looks at all the possible health effects from a decision, including contaminants and air pollutants but also water contamination, accidents and injuries, alcoholism and substance abuse, mental health impacts, and more. Not only is this approach used by U.S. and international health agencies, but it is used by the oil and gas industry itself in overseas operations.[4] Just last year, the BLM incorporated a full HIA into an oil and gas Draft EIS in Alaska.[5] A comparable approach should also be undertaken for oil and gas development for the Uncompahgre Field Office.

The National Environmental Policy Act (NEPA) intends that human health be thoroughly considered in any Environmental Impact Statement. Congress stated that "...it is the continuing responsibility of the Federal Government to use all practicable means...to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may....assure for all Americans safe, healthful, productive and aesthetically and culturally pleasing surroundings.." and "...attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences..."[6] NEPA implementing regulations direct agencies to consider "the degree to which the proposed action affects public health or safety."[7] These regulations also state that Federal agencies shall to the fullest extent possible "Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance

---

[3] Letter from EPA Regional Administrator, Region 8, to State Director, Bureau of Land Management, Wyoming State Office regarding Revised Draft Supplemental Environmental Impact Statement for the Pinedale Anticline Oil and Gas Exploration and Development Project Sublette County, Wyoming (CEQ #20070542), February 14, 2008:
http://www.epa.gov/region8/compliance/nepa/nepadocs/FinalEPACommentsOnPinedaleAnticline14Feb08.pdf
[4] International Petroleum Industry Environmental Conservation Association and the International Association of Oil and Gas Producers, *A Guide to Health Impact Assessments in the Oil and Gas Industry*, (London; 2005):
http://www.ipieca.org/activities/health/health_publications.php
[5] See The Northeast National Petroleum Reserve-Alaska Draft Supplemental Integrated Activity Plan/Environmental Impact Statement, available at : http://www.blm.gov/ak/st/en/prog/planning/npra_general/ne_npra/ne_npra_feis.html
[6] 42 USC § 4331
[7] 40 CFR 1508.27(b)2

18

the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment."[8]

Two recent papers authored by environmental health experts at the University of Colorado's School of Public Health recently examined available information regarding the health effects of oil and gas drilling and production. Among their findings is that: "Most of the hazardous chemicals associated with oil and gas production are well documented to produce adverse health effects in individuals."[9] They also looked at information specific to Garfield County, Colorado, which can serve as a model to other western Colorado counties.[10] Some of their conclusions that are specifically relevant to the upcoming RMP revisions include:

- Air and water quality studies conducted to date indicate that potential exposures to hazardous emissions exist.
- Many air toxics are essentially unmeasured in Garfield County and current plans for further air sampling may not be comprehensive enough to enable public health officials to determine the community health impact of oil and gas development.
- Preliminary testing results indicate that ozone levels in some places are exceeding National Ambient Air Quality Standards and may be hazardous to humans.
- There are no plans for comprehensive and systematic monitoring of surface and subsurface waters.
- Environmental monitoring must be relevant to the areas where oil and gas development activity is occurring and the results must be readily available to the public. Unbiased interpretation of the results must occur in a timely manner and be made available to the public.
- It is important not to ignore what is already known. There is an immediate need for specific information on exposures and the impact from oil and gas development on all aspects of human health.
- An adequate monitoring program should be developed through a rigorous scientific process that addresses all currently recognized data gaps and health risks. This process should be developed in a transparent and explicitly unbiased way.
- A Health Impact Assessment (HIA) is a practical tool to evaluate future impacts, alternatives and appropriate strategies to promote and protect human health.

_**Recommendation:**_ BLM should incorporate a Health Impact Assessment (HIA) into the Draft RMP for the Uncompahgre RMP.

## 4. Wildlife Viability

Science-based wildlife management

Given the sizable land management challenges of the coming decades— including federal land management agencies' response to climate change and the complex natural resource dilemmas associated with climate change (i.e. species adaptation, extreme variability in natural processes)—it is

---

[8] 40 CFR 1500.2(f)
[9] Witter, R. et al, " Potential Exposure-Related Human Health Effects of Oil and Gas Development: A Literature Review (2003-2008)," August 1, 2008, hea_08091702b.pdf.
[10] Witter, R. et al, "Potential Exposure-Related Human Health Effects of Oil and Gas Development: A White Paper," September 15, 2008, hea_08091702a.pdf.

19

imperative that the BLM, the Uncompahgre Field Office and this RMP employ effective and efficient science-based planning and analysis methods to support robust and legitimate decision-making processes.

The effective application of science to land management planning and decision-making requires three "essential ingredients":

- Well-defined, measurable **standards** (e.g. wildlife population or habitat condition targets), developed via robust public involvement processes
- The employment of science-based **analytical tools** to evaluate compliance with the standards (e.g. population viability analysis, or the spatially explicit Decision Support System recommended by the Western Governors' Association)
- **Consistent implementation** of science-based analysis and decision-making (i.e. dedicated funding for monitoring and science-based adaptive management processes)[11]

The Uncompahgre RMP should consider these essential elements as it moves forward with efforts to respond to the pressing land management challenges of the coming decades.

*Well-defined standards*
Providing functioning habitat for wildlife and ensuring the long-term persistence of wildlife populations are part of the BLM's responsibilities to manage the public lands for multiple use and sustained yield. FLPMA specifically directs that management of public lands "takes into account the long-term needs of future generations" for wildlife, as well as other resources, and is implemented toward "achievement and maintenance in perpetuity" 43 U.S.C. §§ 1712(c)(1); 1702(c) and (h).  Achieving these goals for wildlife can best be realized by establishing well-defined, measurable standards.  The use of well-articulated concepts and operational planning practices associated with the literature and practice of population viability assessment may provide Uncompahgre land managers with effective and efficient means of applying science-based conservation methods to wildlife planning decisions.

*Science-based analytical tools*
In order to adopt a legitimate, efficient and effective science-based planning framework, the Uncompahgre Field Office should look to the well-established conservation planning and population viability assessment literature, as well as models employed by other BLM units and neighboring agencies.[12]  For example, the neighboring Grand Mesa, Uncompahgre and Gunnison (GMUG) National Forests monitor populations of "management indicator species" to measure the effects of management activities on unmeasured species and to provide insights into the integrity of the ecological systems to which they belong.  The use of an indicator or focal species approach, in combination with robust knowledge of the link between species and habitats, allows managers an effective means to apply science-based principles to resource management decisions.  Species such as the Red-naped sapsucker and northern goshawk (ponderosa pine ecosystems), Brewer's sparrow (sagebrush) and Colorado River cutthroat trout (aquatic) have been identified as key indicator species by the GMUG and have also been identified by Colorado's Comprehensive Wildlife Conservation Strategy and Wildlife Action Plans as

---

[11] Rohlf, D.J. 2004. Science, Law, and Policy in Managing Natural Resources: Toward a Sound Mix Rather than a Sound Bite. Pages 127-142 *in* K. Arabas and J. Bowersox, editors. *Forest futures: science, poiitics, and policy for the next century.* Rowman and Littlefield, Lanham, Maryland, USA.

[12] See U.S. Department of Agriculture, Committee of Scientists. (March 15, 1999). *Sustaining the People's Lands:  Recommendations for Stewardship of the National Forests and Grasslands into the Next Century,* from http://www.fs.fed.us/emc/nfma/includes/cosreport/Committee%20of%20Scientists%20Report.htm.

BLM_0081917

species of greatest conservation concern.  Indeed, to meet the challenges of 21st century land
management and conservation, agencies will need to cooperate on vital management planning
activities, including the sharing and co-generation of biological information.

Another example of a comprehensive monitoring approach can be found in Appendix 2 -
"Implementation, Monitoring, and Evaluation Process" - of the Jack Morrow Hills Coordinated Activity
Plan, prepared by the Wyoming BLM, available at:
http://www.blm.gov/pgdata/etc/medialib/blm/wy/field-
offices/rock_springs/jmhcap/rod.Par.76416.File.dat/31apx02.pdf (and attached).  We particularly note
the following, as examples of the sort of detail that should be contained in the Uncompahgre RMP:

- Table A17-1 Resource Management Indicators - p. 8
- Table A17-2 Indicator Detail - pp. 9-11
- Table A17-3 Measurement Detail - pp. 12-14
- Figure A17-3 CAP Management Process - p. 16
- Discussion of the JMH CAP - pp. 20-21

*Landscape-level planning*
The adoption of a science-based approach to RMP development is also consistent with the agency's
commitments in the Health Lands Initiative (HLI).  HLI is premised on the BLM's recognition of major
changes to the landscape arising from population growth, energy development and global warming.
The goal of HLI is "to preserve the diversity and productivity of public and private lands across the
landscape."  HLI is to be implemented through specific projects, which will "enable and encourage local
BLM managers to set priorities across a broader scale and mitigate impacts to an array of resources in
ways not previously available to them" and "give managers flexibility to identify lands where a particular
resource might be emphasized in order to encourage sustained health and balance across a broader
ecosystem or landscape."  *See, generally*, HLI Factsheet at:
http://www.blm.gov/pgdata/etc/medialib/blm/wo/Communications_Directorate/public_affairs/healthy
_lands_initiative.Par.80058.File.dat/HLI-National_FY09.pdf .  Implementation of the management
approach described above will further support efforts to address habitat fragmentation and climate
change, as discussed in later sections of these scoping comments.

**Recommendations**:  The Uncompahgre RMP should adopt planning and decision-making processes
(including data collection, analysis, and monitoring) that employ measurable planning objectives at
multiple biological scales (i.e. fish and wildlife populations, habitat and ecosystem conditions) to ensure
viable wildlife populations. This recommendation is strongly echoed by the Western Governors'
Association's *Wildlife Corridor Initiative*
(http://www.westgov.org/index.php?option=com_content&view=article&id=123&Itemid=68) and the
Sportsmen for Responsible Energy Development's *Recommendations for Responsible Oil and Gas
Development* (www.sportsmen4responsibleenergy.org ).

## 5.   Special Status Species/Plants

This section includes recommendations for managing special status species to best protect viable
populations and habitats while still adequately managing the other resources in the Uncompahgre Field
Office. BLM should manage threatened, endangered, and special status species so as to: 1) maintain
healthy ecosystems and native biodiversity, 2) maintain and restore thriving populations of rare and
imperiled species, and 3) meet BLM's obligations regarding special status species.

21

We ask that BLM make the conservation and preservation of rare and imperiled species, and the habitat and movement corridors necessary to sustain healthy populations of such species, an explicit goal of the revised RMP. We ask that this goal be clearly reflected in the objectives and standards set forth by the new plan. BLM should identify crucial habitat, including movement corridors, necessary to sustain healthy populations of all of the rare and imperiled species present in the Uncompahgre Field Office. Additionally, crucial habitat for rare and imperiled species, and particularly biologically rich areas, should be protected through ACEC designations. ACECs should be managed such that protection of rare and imperiled species and the ecosystems of which they are a part is emphasized above all other uses. Activities that have the potential to negatively impact rare and imperiled species, or degrade ecosystem health, should not be allowed in ACECs. In addition to protecting key habitat with ACEC designations, the RMP should avoid making habitat for rare and imperiled species available to activities, such as oil and gas development, off road vehicle use, and livestock grazing, that have the potential to negatively impact rare and imperiled species. The new plan should also strive to apply minimization and mitigation measures that will clearly ensure that activities authorized on BLM lands through the plan will not contribute to declines of rare and imperiled species.

a. ACEC Designation

Both FLPMA and the BLM's ACEC Manual (1613) emphasize the BLM's important duty to designate <u>and protect</u> Areas of Critical Environmental Concern. For example, FLPMA states:

> The Congress declares that it is the policy of the United States that - …
>
> regulations and plans for the protection of public land areas of critical environmental concern be promptly developed…FLPMA Title I Sec.102(a) [43 USC 1701]
>
> The Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern. FLPMA Title II Sec. 201(a) [43 USC 1711]
>
> In the development and revision of land use plans, the Secretary shall - …
>
> give priority to the designation and protection of areas of critical environmental concern….FLPMA Title II Sec. 202(c) [43 USC 1712]

Therefore, ACEC designation and protective management are supposed to be a high priority within the BLM's mission. ACEC designation provides an important mechanism for the BLM to actively conserve and recover imperiled species so that the protections afforded by the Endangered Species Act and the designation of Critical Habitat are less necessary. Choosing not to conserve ACECs may contribute to the need to list species under the Act, and is inconsistent with the BLM's special status species obligations.

b. Special Status Species Management

We anticipate that the recent changes to the BLM Manual weakening protections for special status species will be overturned by the Obama administration. Therefore we encourage the Uncompahgre Field Office to ensure that it meets the obligations outlined in the special status species portion of the Manual as it appeared before it was weakened and note that these measures are still consistent with the direction of the manual as revised. BLM Manual 6840.06.D set forth the policy for management of Sensitive species:

22

State Directors, usually in cooperation with state wildlife agencies, may designate sensitive species. By definition, the sensitive species designation includes species that could easily become endangered or extinct within a state. Therefore, if sensitive species are designated by a State Director, the protection provided by the policy for candidate species shall be used as the minimum level of protection.

Therefore, the BLM must provide Sensitive species with a minimum of candidate-level protection. Candidate species were to be managed as follows:

BLM shall carry out management, consistent with the principles of multiple use, for the conservation of candidate species and their habitats and shall ensure that actions authorized, funded, or carried out do not contribute to the need to list any of these species as threatened/endangered. Specifically, BLM shall:
Determine the distribution, abundance, reasons for the current status, and habitat needs for candidate species occurring on lands administered by BLM, and evaluate the significance of lands administered by BLM or actions in maintaining those species.
For those species where lands administered by BLM or actions have a significant effect on their status, manage the habitat to conserve the species by:
Including candidate species as priority species in land use plans.
Developing and implementing rangewide and/or site-specific management plans for candidate species that include specific habitat and population management objectives designed for recovery, as well as the management strategies necessary to meet those objectives.
Ensuring that BLM activities affecting the habitat of candidate species are carried out in a manner that is consistent with the objectives for those species.
Monitoring populations and habitats of candidate species to determine whether management objectives are being met.
Request technical assistance from FWS/NMFS, and any other qualified source, on any planned action that may contribute to the need to list a candidate species as threatened/endangered.  BLM Manual 6840.06.C

During the RMP revision, the BLM must take a hard look at whether it is meeting these obligations, and make any necessary changes to ensure that special status species are being adequately managed so that the agency is complying with the Manual.

The BLM has special duties toward special status species when conducting land use planning.  First, BLM must "[i]dentify watersheds that may need special protection from the standpoint of human health concerns, aquatic ecosystem health, or other public uses."  BLM Land Use Planning Handbook H-1601-1, Appendix C at 2.  For riparian areas within these watersheds, BLM must also identify desired width/depth ratios, streambank conditions, channel substrate conditions, and large woody material characteristics."  *Id*.  Second, BLM must "[d]esignate priority plant species and habitats, including Special Status Species and populations of plant species recognized as significant for at least one factor such as density, diversity, size, public interest, remnant character, or age." BLM Land Use Planning Handbook H-1601-1, Appendix C at 3. Finally, BLM must "[d]esignate priority species and habitats, including Special Status Species, and populations of fish or wildlife species recognized as significant for at least one factor

23

such as density, diversity, size, public interest, remnant character, or age." BLM Land Use Planning Handbook H-1601-1, Appendix C at 7.

BLM must also identify the measures necessary for protecting each of these priority areas and species:
> For priority watersheds and riparian areas, "[i]dentify measures, including filing for water rights under state permit procedures, to ensure water availability for multiple use management and functioning, healthy riparian and upland systems." BLM Land Use Planning Handbook H-1601-1, Appendix C at 2.
> For priority plant species and habitats, "[i]dentify the actions and areawide use restrictions needed to achieve desired vegetative conditions." BLM Land Use Planning Handbook H-1601-1, Appendix C at 3.
> For priority populations, species, or habitats of fish and wildlife, "[i]dentify actions and areawide use restrictions needed to achieve desired population and habitat conditions while maintaining a thriving natural ecological balance and multiple-use relationships." BLM Land Use Planning Handbook H-1601-1, Appendix C at 7.
> Also, BLM must "[i]dentify site-specific actions, such as riparian fencing, guzzler placement, etc., needed to manage ecosystems for all species and habitat for special status species." BLM Land Use Planning Handbook H-1601-1, Appendix C at 7.

Additionally, BLM must:

> Identify strategies and decisions to conserve and recover special status species. Given the legal mandate to conserve threatened or endangered species and BLM's policy to conserve all Special Status Species, land use planning strategies and decision should result in a reasonable conservation strategy for these species. Land use plan decisions should be clear and sufficiently detailed to enhance habitat or prevent avoidable loss of habitat pending the development and implementation of implementation-level plans. This may include identifying stipulations or criteria that would be applied to implementation actions. Land use plan decisions should be consistent with BLM's mandate to recover listed species and should be consistent with objectives and recommended actions in approved recovery plans, conservation agreements and strategies, MOUs, and applicable biological opinions for threatened and endangered species.

BLM Land Use Planning Handbook H-1601-1, Appendix C at 5. The BLM Manual's definition of a "Conservation Strategy" states:

> A strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threat. Conservation strategies are generally developed for species of plants and animals that are designated as BLM Sensitive species or that have been determined by the Fish and Wildlife Service or National Marine Fisheries Service to be Federal candidates under the Endangered Species Act.

BLM Manual § 1601, Glossary at 2.

**BLM must manage oil and gas development in a way that retains special status species and moves them toward recovery.**
As we have noted in our citations of FLPMA and the BLM Manual above, the BLM has a mandate to conserve imperiled species. The agency cannot prioritize oil and gas drilling or recreation at the expense

24

of meeting its duties toward special status species.  This includes all aspects of oil and gas development and off-road vehicle use – the BLM must ensure that its authorized activities do not compromise air quality, water quality, opportunities for solitude, plant and wildlife habitat, cultural resources, soil crusts, or any of the other resources that the agency must conserve under its multiple use mandate. The RMP must provide a blueprint for how the BLM will ensure that oil and gas development (all phases, including leasing, exploration, infrastructure construction, drilling, and reclamation) and travel management will be made compatible with the other aspects of its mission.  In some cases, this may mean disallowing development activity or motorized vehicle use altogether.

**The RMP revision must address noxious weeds and propose mitigation strategies.**
Noxious weeds are a real threat throughout the West, and this is especially true in areas that may become infested with cheatgrass, and in places where soils are actively being disturbed.  The BLM must limit surface disturbance whenever possible and implement Integrated Pest Management strategies in conjunction with all surface-disturbing activities in order to contain noxious weeds.  The agency must monitor the efficacy of noxious weed containment after surface disturbance, and use the results of the monitoring to both provide realistic analyses of the effects of disturbance in planning for future projects, and to design projects that are more resistant to noxious weed proliferation.  RMP revision should seriously address this threat.

**The BLM must have a proven track record of successful reclamation before considering disturbances to be "temporary."**
The BLM has shown interest lately in phased or rolling development, but this framework assumes that managers are able to successfully reclaim areas that have been disturbed.  We consider successful reclamation to consist of a return to baseline conditions, which would mean a return to the pre-disturbance vegetative composition and structure, retention of the original soil type, and recolonization by the animals that used an area prior to disturbance.  We remain concerned that these results may be very difficult to achieve here in the arid West, where lack of precipitation and an abundance of invasive species may prevent even the best management practices or Conditions of Approval from being effective.  Before the BLM adopts this approach, or even uses it to calculate acres of "temporary" versus "permanent" disturbance, it should be able to point to a proven track record of mature, successful reclamation projects demonstrating that this is possible and that the BLM has the ability (including funding) to make this an outcome with a reasonable expectation of being fulfilled.  RMP revision should clearly state reclamation standards including necessary monitoring, and should define success in an ecologically sound way.

**Dust abatement is a growing concern on BLM lands.**
With the explosion of surface-disturbing activities on BLM lands in Colorado, we are increasingly concerned about indirect effects, including dust deposition.  Dust may harm rare species and/or their pollinators, or facilitate the establishment of nonnatives.  The RMP should thoroughly address dust abatement requirements, and BLM should actively monitor dust deposition associated with surface disturbance as well as the effects on imperiled species, pollinators, and noxious weed proliferation.

**The BLM should consider input from regional conservation plans.**
Several regional conservation plans have been developed which include this field office.  The BLM should consult the following sources during the RMP revision:

Southern Rockies Ecosystem Project's Southern Rockies Wildland Network Design
The Nature Conservancy's Colorado Plateau Ecoregional Plan

BLM_0081922