The Nature Conservancy's Southern Rocky Mountains Ecoregional Plan
Heart of the West Conservation Plan

Roadless areas, Citizens' Proposed Wilderness, wildlife corridors identified by Southern Rockies Ecosystem Project, and Colorado Natural Heritage Program Networks of Conservation Areas not mentioned above are also important resources that the BLM should consider in this round of planning.

**The BLM should retain existing ACECs and consider strengthening the protective management attached to them.**
BLM should carefully review existing management of ACECs, ensure that the agency is meeting its obligations under the BLM Manual, and strengthen protections in these areas if necessary.  Again, ACEC protection is one of the main tools at the BLM's disposal to conserve imperiled species, and the agency must take this responsibility seriously.

c.  Rare Plant Habitat

The BLM is a partner of the Center for Native Ecosystems in the Colorado Rare Plant Initiative, which recently finalized a set of best management practices for oil and gas drilling in rare plant habitat. Those BMPs can be accessed at http://conserveonline.org/workspaces/corareplantinitiative/documents/recommended-best-management-practices-for-plants/view.html. We also encourage the BLM to adopt the following prescriptions in ACECs designated because of their rare plant values, and to consider applying these in other rare plant habitats as well:

Fluid-Mineral Development (including but not limited to oil and gas development):
- Make all areas that have not yet been leased throughout the entire ACEC unavailable for fluid mineral leasing, or apply No Surface Occupancy (NSO) stipulations to all such areas, with no opportunity for modification, waiver, or exception under any circumstances.
- Make all existing fluid-mineral leases within the ACEC unavailable for future leasing following expiration; or, when existing fluid-mineral leases expire, apply NSO stipulations (with no opportunity for modification, waiver, or exception under any circumstances) prior to reissue of such leases.
- Apply right-of-way exclusion throughout the entire ACEC.
- Consider buying back existing fluid-mineral leases within the ACEC.

Site Inventories:
- When surface disturbing projects are proposed within the ACEC, site specific inventories should be conducted prior to NEPA analysis, and prior to initiation of any project activities.
- These site-specific surveys should be required in any known or potential habitats, and must take place when the plants can be detected, for example, during the flowering period.
- Surveys should document both individual plant locations and suitable habitat distributions.
- All surveys should be conducted by qualified individuals.
- Survey data should also be reported to the Colorado Natural Heritage Program.

26

Monitoring:

- Surface disturbing activities should be monitored throughout the duration of the project, and measures designed to minimize impacts should be evaluated to ensure that desired results are being achieved.

Project design:

- Establish a buffer of a minimum of 300 feet between individuals or groups of rare plants/lichens and any ground disturbing activities.
- Translocation of rare plants/lichens shall not be used as a substitute for avoidance.
- Construction should occur down slope of rare plants/lichens, and all project activities should be designed to avoid concentrating water flows or sediments into rare plant/lichen occupied habitat.
- Visibly identify areas that are to be avoided during and post-construction with temporary fencing and flagging
- For surface pipelines use a 300 foot buffer from any rare plant/lichens locations.  If on a slope, use stabilizing construction techniques to ensure the pipelines don't move toward the population.
- Ensure that water extraction or disposal practices do not result in change of surface or subsurface hydrologic regime.
- Limit disturbances to and within suitable habitat by staying on designated routes
- Limit new access routes created by the project, minimize the length and environmental impact of new roads constructed to service well locations, and utilize existing roads to the maximum degree possible.
- Place signing to limit motorized travel in sensitive areas.
- Require implementation of dust abatement practices near occupied rare plant/lichen habitat.
- For interim reclamation, either require that all disturbed areas be revegetated with native species comprised of species indigenous to the area (ideally from local genetic stock), or if there are major problems with preventing establishment of noxious weeds, require that disturbed areas be revegetated with either sterile F1 hybrids or with locally appropriate early successional native species capable of outcompeting weeds while also seeding for indigenous natives at the same time.
- For final reclamation, require that the area be revegetated with native species indigenous to the area and that vegetative structure, species composition, and percent cover have returned to baseline conditions (or improved, for sites in poor condition to begin with).
- Require post construction monitoring for invasive species, and specific measures for the control of noxious weeds.  Enforce these measures through use of fines and suspension of activities when failure to control noxious weeds is documented.
- Require use of directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in rare plant/lichen habitat.  Ensure that such directional drilling does not intercept or degrade alluvial aquifers.

27

- Restrict the total area of each pad to the least amount of acreage required to drill the wells planned for that pad.
- Close and reclaim roads as soon as they are no longer needed, and gate them to prevent unauthorized use.
- Use busing or van transportation of crews and remote monitoring of wells to minimize truck traffic and associated dust.
- Identify rare plant pollinators, and develop mitigation and minimization measures that provide adequate protection to pollinator species.
- Conduct routine site visits for permit compliance, set timelines for fixing permit violations, and issue fines for not meeting requirements.
- In addition to requiring the above as conditions of approval for APDs, ask operators to undertake any additional voluntary measures that would further minimize or mitigate the negative impacts of their activities on rare plant populations and the ecological integrity of the ACEC.

Other ground-disturbing activities:
- Apply a No Ground Disturbance restriction to the entire ACEC with specific authorization for an exception only for management activities that are necessary to conserve the ecological integrity of the ACEC and that further conservation goals for the values for which the ACEC was designated.  For example, an exception could be made for construction of fencing/exclosures when needed to further rare plant conservation goals.
- Designate the entire ACEC as a right-of-way Exclusion Area.

Non-fluid mineral development:
- Withdraw the ACEC from mineral entry.
- Apply the No Ground Disturbance restriction discussed above to existing non-fluid mineral leases.

Travel management:
- Limit use of roads to designated routes.
- Close routes that affect important habitat for these rare plants/lichens in order to limit dust, invasion of habitat by noxious weeds, and illegal off-road vehicle (ORV) use.
- Close the entire ACEC to ORV use.

Non-motorized recreation:
- Encourage those engaging in non-motorized recreation to use designated roads and trails, and to avoid important habitat for these rare plants.
- Prohibit overnight camping and campfires within 300 feet of rare plant/lichen populations.

Grazing:
- Retire grazing allotments within the ACEC whenever possible
- Prohibit treatments designed to increase forage for livestock, including seeding and irrigation.
- If trampling by livestock is identified as a concern where grazing allotments exist, create cattle exclosures around rare plant/lichen populations, and include a 300 foot buffer within the exclosure to minimize indirect effects of grazing on rare plant populations.

28

BLM_0081925

- Manage livestock grazing within occupied or potential habitat for rare plants/lichens to promote plant health, maintain sufficient residual vegetation, minimize potential for trampling, minimize potential for invasion of non-native plant species, and sustain overall watershed functions.

Lands and realty:
- Work towards acquisition of private inholdings.
- Apply right-of-way exclusion to entire ACEC.
- Establish memorandums of understanding with willing landowners to encourage private land management actions that enhance protection of ACEC values on and adjacent to private inholdings (*e.g.*, control of noxious weeds).

Management of noxious weeds:
- Promote natural processes and healthy native plant/lichen communities to deter noxious weeds.
- Minimize fragmentation of habitat and associated risk of invasion by noxious weeds and other aggressive non-native species.
- Develop an integrated weed management program that emphasizes prevention, inventory, detection and monitoring, and includes control techniques (*e.g.*, mechanical and hand-applied herbicides) that will not damage rare plant/lichen species, or other non-target species.
- Where practicable, eliminate any existing human-caused disturbance that is contributing to the spread of noxious weeds.
- Continue and expand public education.

Other:
- Prohibit collection of plants, plant materials and seeds, except for scientific or research purposes.  Such collection must have no detrimental impact on long-term survival and reproduction of rare species or significant communities.
- Where practicable, restore to a naturally functioning state any existing human-caused disturbance that is impairing natural ecosystem processes affecting habitat for rare plant species or significant plant communities.
- Cooperate with the Colorado Natural Heritage Program to develop and carry out a plan to inventory and monitor plant/lichen species, unique natural communities, and to monitor the overall ecological integrity of the ACEC.
- Cooperate with the Colorado Natural Heritage Program and other entities to allow for and facilitate additional research on rare and imperiled species and unique natural communties.
- If monitoring identifies new threats or suggests that the management recommended above is not adequately protecting rare plant/lichen populations and/or unique natural communities from significant negative impacts (including indirect or cumulative impacts), take appropriate action to prevent such negative impacts.

d.   Rare and Imperiled Species and Watchable Wildlife in the Planning Area

The Center for Native Ecosystems is submitting detailed comments regarding rare and imperiled species, big game and watchable wildlife in the Uncompahgre planning area that would benefit from ACEC designations and/or special management. We herein reference and support those comments.

29

## 6.  Travel Management

Travel management decisions should be made in the RMP.

BLM's internal guidance states that "each RMP will divide planning areas into OHV area designations that are open, limited or closed." IM No. 2004-005; *see also* 43 C.F.R. § 8342.2(b). This internal guidance was also incorporated into the updated version of BLM's *Land Use Planning Handbook*. H-1601, Appendix C, Section II.D (Comprehensive Trails and Travel Management). The *Land Use Planning Handbook* states that BLM should:

> Complete a defined travel management network (system of areas, roads and/or trails) during the development of the land use plan, to the extent practical. If it is not practical to define or delineate the travel management network during the land use planning process, a preliminary network must be identified and a process established to select a final travel management network. (emphasis added)

Furthermore, Colorado IM No. CO-2007-020 directs Colorado BLM Field Offices to complete comprehensive travel management plans as part of the RMP process:

> Nationally, BLM is moving towards a system of limiting use to designated roads, primitive roads and trails/areas and not encouraging extensive cross-country travel by motorized and mechanized vehicles. Current planning guidance (H-1601-1, Land Use Planning Handbook – Appendix C, Section D, attachment 2) requires identifying a defined travel management network system of areas, roads, primitive roads and trails, in all Land Use Plans. It is our expectation that each RMP Record of Decision will include a system of designated routes for those areas in the limited category.

The *Land Use Planning Handbook* (Appendix C, Section II.D) also sets out requirements for travel management at both the land use and implementation planning levels:

- At the land use plan level, BLM must identify areas for use based on program goals and objectives, primary users, reason for "allowing travel" into an area, setting character to be maintained (including Visual Resource Management and Recreation Opportunity Spectrum classifications), and primary means of travel appropriate to meet objectives and keep setting character; and
- At the implementation level, BLM must define a detailed travel management network, "establish a process" to identify roads, trails, etc. with criteria for selections, guidelines for management, monitoring and maintenance, and indicators for future plan maintenance.

We understand that BLM is not planning to complete comprehensive travel management planning as part of the Uncompahgre RMP revision. We also note that the Dry Creek area has a travel plan in place, and the Field Office-wide travel plan for the remainder of the field office is in progress. In this context, we would like to provide comments for travel planning to be incorporated in the RMP, as well as comments for the future comprehensive travel plan.

30

BLM_0081927

The Land Use Planning Handbook provides guidelines for addressing travel planning in the RMP even if comprehensive travel planning is deferred. Appendix C, pp 18-19 states:

> If the final travel management network is to be deferred in the RMP, then the RMP should document the decision-making process used to develop the initial network, provide the basis for future management decisions, and help set guidelines for making road and trail network adjustments throughout the life of the plan. The identification of the uncompleted travel management networks should be delineated in the land use plan and the following tasks completed for each area:
> 1) Produce a map of a preliminary road and trail network;
> 2) define short-term management guidance for road and trail access and activities in areas or sub-areas not completed;
> 3) outline additional data needs, and a strategy to collect needed information;
> 4) provide a clear planning sequence, including public collaboration, criteria and constraints for subsequent road and trail selection and identification;
> 5) provide a schedule to complete the area or sub-area road and trail selection process; and
> 6) identify any easements and rights-of-ways (to be issued to the BLM or others) needed to maintain the preliminary or existing road and trail network.
>
> If the decision on delineating travel management networks is deferred in the land use plan to the implementation phase, the work normally should be completed within 5 years of the signing of the ROD for the RMP.

Colorado IM 2007-020 further instructs that:

> "Limited to existing roads, primitive roads and trails" designations should be used only as an interim measure prior to your next scheduled RMP revision. Where the Field Offices choose an **interim** designation of "limited to existing roads, primitive roads and trails", a map showing the existing travel and transportation network is required.
> - An inventory and map of roads, primitive roads and trails is necessary to assess and evaluate the need for individual routes as part of the travel and transportation network.
> - Without baseline inventory the Field Offices will not be able to confirm and document when new routes have been created or adequately monitor resource conditions. Baseline inventory maps are essential to effectively respond to the issue of user created route proliferation.
> - Inventory and baseline data is needed to provide supporting rationale to justify management actions such as closures and rehabilitation of routes created after the interim designation is made.
> - The BLM needs to provide the public clear and consistent information regarding access opportunities and provide a map showing the location of existing roads, primitive roads and trails that are available for public use and access.

The Uncompahgre RMP must set out the process that will be used to complete a comprehensive field office-wide travel management plan. The RMP should also provide a baseline route inventory and use that data to institute road closures that cannot wait until the full travel plan is completed. The RMP should also set travel management prescriptions for special management areas, such as lands with wilderness characteristics and ACECs.

31

The Little Snake Field Office did not complete comprehensive travel planning as part of its recent RMP revision; however, the RMP (available online at http://www.co.blm.gov/lsra/rmp/index.htm) identified priorities for sub-regions to receive comprehensive travel management planning, which can also be useful for guiding implementation. Appendix F of the Little Snake Draft RMP (attached) sets out criteria for prioritizing areas to receive comprehensive travel management planning, including:

- Special management areas
- Areas identified as "limited to designated roads and trails"
- Areas that meet fragile soil criteria
- User and resource conflicts
- Excessive complaints
- Wildlife/wild horse population trends
- Evidence of trail/road proliferation
- Areas with high road densities
- Impacts on cultural resources
- Unacceptable erosion
- Degradation of water quality
- Impacts on visual resources
- Loss of trail integrity
- Habitat fragmentation and damage
- Impacts on sensitive plants
- Need to provide a variety of user experiences

We encourage the Uncompahgre RMP to prioritize areas in this manner. One additional type of sub-region that should be prioritized for travel planning is areas with low road densities that have the potential to be managed as primitive, backcountry, nonmotorized wildlife or quiet use areas. The RMP should identify **specific** areas that will be prioritized for travel planning and establish time commitments for completing each specific area, in addition to the 5-year deadline for completing travel planning for the entire field office.

Travel and recreation planning are inextricably linked, and recreation planning decisions affect travel planning (and vice versa). The comprehensive travel plan for the Uncompahgre Field Office must be coordinated with recreation planning efforts in this RMP.

***Recommendations***:  The Uncompahgre RMP should establish the methodology for comprehensive travel planning, establish interim travel management, and identify priorities for completing travel management planning. Special management areas, such as ACECs, special recreation management areas and citizen-proposed wilderness, will include travel designations within their boundaries. The RMP must identify not only areas for use, but also reasons for permitting travel into an area and appropriate criteria for determining routes that will be made available for different uses, taking into account such factors as undeveloped recreation opportunities available and natural settings.

2. Landscape level planning.

Travel planning requires the agency to manage human travel across the landscape.  The land use planning process, which addresses the broader landscape within a planning area, provides one of the best opportunities to make travel planning decisions in the appropriate context.  While we understand that BLM does not have authority to close or relocate highways, major roads, or County roads, BLM must include these routes when analyzing the transportation network as they have a great impact on

32

habitat fragmentation and reduction in core area size (discussed in length later in these comments and in Appendix 1).  The placement and design of travel routes defines which areas will remain or become roadless, and which areas will be disturbed and how.  In other words, route decisions determine the fragmentation of the landscape, and, thus, how naturally or unnaturally a landscape will behave in terms of water flow and quality, wildlife migration, and species composition and function.

NEPA requires federal agencies to assess the direct, indirect and cumulative environmental impacts of proposed actions, taking a "hard look" at environmental consequences and performing an analysis commensurate with the scale of the action at issue.   42 U.S.C. § 4321 et seq; 40 C.F.R. § 1508.8; see also Metcalf v. Daley, 214 F.3d 1135, 1151 (9th Cir. 2000); Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348 (1989).  Travel planning affects the entire landscape and can only be thoroughly and properly assessed by considering potential impacts and making decisions at a comparable level.  In terms of how to evaluate the potential impacts of travel management decisions, NEPA's definition of "cumulative impact" is instructive:

> the impact on the environment which results from the incremental impact of the action **when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions**.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. (emphasis added).  BLM must account for the direct, indirect, and cumulative impacts of all roads in the Uncompahgre Field Office when completing a comprehensive travel management plan.

**_Recommendation_**:  BLM should address travel management on a landscape-wide basis by addressing the impacts of all roads in the planning area and accounting for the landscape-wide impacts of these roads.

3.  Mapping of routes.

As part of comprehensive travel management planning, we anticipate that BLM will produce route maps to illustrate a base travel network, to generate various route designation proposals, and for purposes of receiving public comments.  In these contexts, it is vital that the agency clearly mark on all maps or proposed maps areas with existing restrictions on motorized use, such as:  wilderness areas, WSAs, primitive non-motorized designations, Wild and Scenic Rivers, and ACECs.  Depicting existing restrictions will ensure that public comments are informed by the knowledge that additional routes will not be permitted in certain areas.  Further, maps should indicate resources that could be affected by motorized use, such as wilderness characteristics and wildlife habitat.  Public comments will then be informed by the potential resource conflicts and the best opportunities for designating areas for non-motorized recreation.

Route maps should also distinguish user-created routes from roads that were created and are maintained by the BLM to serve planned transportation needs. Also, user-created routes in areas that have motorized restrictions should only be shown as closed and/or for prioritizing restoration.  To be added to the transportation system, user-created routes must go through NEPA analysis to ensure they are not damaging resources and comply with BLM regulations, such as the minimization criteria for ORV use discussed in these comments.

33

In addition, as part of designating routes, BLM should use consistent definitions of roads, primitive roads, and trails. IM 2006-173 ("Implementation of Roads and Trails Terminology Report"), sets out and defines these terms, and includes a definition of a road as:

> A linear route declared a road by the owner, managed for use by low-clearance vehicles having four or more wheels, and maintained for regular and continuous use.

It is important that BLM use these terms to distinguish both the types of routes and the appropriate types of motorized use.

**_Recommendations_**:  BLM should identify both existing restrictions on motorized access and other areas that can be damaged by motorized use on all maps used in travel planning. User-created routes should be distinguished from legitimate roads on travel planning maps, and, where they were created illegally, should be excluded from the baseline inventory.


4.  Habitat fragmentation.

As mentioned in the beginning of this section of our comments, BLM must address travel management on a landscape level to ensure that BLM meets its responsibility as stewards of the public land and mitigates against habitat fragmentation.  We have included The Wilderness Society's recent Science and Policy Brief, "Habitat Fragmentation from Roads:  Travel Planning Methods to Safeguard BLM Lands" (Appendix 1).  Also included in Appendix 1 are four scientific reports prepared by TWS and discussed in the habitat fragmentation report.  These include _Fragmenting Our Lands: The Ecological Footprint from Oil and Gas Development, Protecting Northern Arizona's National Monuments: The Challenge of Transportation Management, Wildlife at a Crossroads:  Energy Development in Western Wyoming,_ and _Ecological Effects of a Transportation Network on Wildlife._  In addition to summarizing the four reports included, "Habitat Fragmentation from Roads:  Travel Planning Methods to Safeguard BLM Lands" provides a summary of available scholarly and government reports and studies on the impact of habitat fragmentation on wildlife, provides methods for calculating habitat fragmentation, and provides recommendations on how to integrate fragmentation analysis into travel management.

We also recommend you look at the travel planning criteria set out in the Record of Decision for the Dillon (MT) RMP (relevant sections attached and also available on-line at: http://www.mt.blm.gov/dfo/rod/contents.htm), as an example of criteria that incorporate key aspects of BLM's ORV regulations as well as ecological metrics.  This field office did not complete a comprehensive travel management plan as part of its RMP revision; however, it included road density targets and included an appendix outlining the principles it will use when completing a comprehensive travel management plan during implementation. The Uncompahgre Field Office should adopt a similar approach.

**_Recommendation_**:  BLM should use the information provided in Appendix 1 to measure habitat fragmentation, conduct a thorough fragmentation analysis, and inform decisions regarding road closure and other limitations on use in the Uncompahgre RMP. Specific fragmentation analysis can be done as part of the future comprehensive travel plan; route density targets and roads in need of immediate closure should be addressed in the RMP.

BLM_0081931

5.  Principles of travel management.

When completing a comprehensive travel management plan, it is vital to complete it in a systematic and transparent manner.

***Key principles of travel planning***

(1)  Travel management is part of land use planning and should address both recreation and transportation needs from a landscape perspective; therefore, travel planning must be coordinated with recreation management planning.

(2)  Prior to conducting an inventory or designation of routes, BLM should assess the present resources, requirements for protection, and which uses for recreation and development are compatible with these resources, requirements and other users.

(3)  BLM should use a legal definition of "road" when designating routes.

(4)  BLM's consideration of ORV use should take into account its potential damage to resources and other uses, including exclusion of other users.

(5)  Where BLM presents a baseline travel system, it must present route maps in a responsible manner that does not legitimize or misrepresent the official status of the existing network of unauthorized ways/routes routes.

(6)  BLM should include a detailed closure and restoration schedule in the plan.

(7)  BLM should include and implement a monitoring plan.

(8)  BLM should include and implement education and outreach in the plan.

Furthermore, Colorado IM No. CO-2007-020 instructs Field Offices to select roads and trails based on comprehensive travel management goals:

> Design a travel system with RMP and transportation network goals in mind rather than just choosing from inherited roads, primitive roads and trails. Instead of a decision-making process to only decide which individual routes should be closed or left open, design a travel system with a desired goal of sustainable routes that meet patrons' needs (i.e. loops) and varying levels of difficulty. Also, consider a broader range of management options that include reroutes, reconstruction or new construction, as well as closures.

The RMP revision and future comprehensive travel plan provide opportunities for BLM to evaluate its travel system goals and whether the current system of roads and trails is furthering or hampering these goals. BLM should create a travel network that best serves the many resources which the agency is tasked with managing and does not inadvertently do a disservice to any other resource or public land visitor.

The Wilderness Society and the Colorado Mountain Club have developed a template for conducting travel management planning, including a detailed discussion of these key principles of travel planning, which we have attached and recommend that the BLM incorporate into the RMP as the process for future travel planning.

BLM_0081932

***Recommendations***:  BLM should follow the eight travel planning principles detailed above to ensure that only routes which truly serve a valid purpose for the public remain open. BLM should also create comprehensive travel and recreation management goals and designate routes accordingly.

## 7.   Recreation and Special Recreation Management Areas

Using the language of Benefits Based Management, which emphasizes user "experience" rather than recreation "activity" or "resources," we would like to identify ourselves as representing a range of Quiet Use organizations whose hundreds of thousands of members are passionate about preserving traditional forms of recreation such as hiking, backpacking, non-motorized hunting, angling, horseback riding, and birdwatching.

On BLM lands we and our members want to experience naturalness, quiet natural soundscapes, undeveloped scenery, an undisturbed natural landscape, the timelessness and geological sweep of the BLMs remote and rugged landscapes, a low level of facilities and management presence, and opportunities for uncrowded and solitary experiences. We want to be able to recreate in primitive, undeveloped, natural appearing settings. The experiences we are looking for are closeness to nature, a contemplative relationship with the natural world, savoring the total sensory experience of a natural landscape, escape from crowds, quieting our minds by escaping urban traffic and crowding, and a sense of humanity's place in the larger universe, as well as improved outdoor knowledge, independence, self-reliance and a sense of adventure.

We and our members are whole-hearted participants in these types of experiences with a keen interest in preserving for future generations these time-honored traditional experiences of the outdoors.

### a.   Preservation, creation and enhancement of opportunities for quiet recreation.

The recreation resource on public lands is becoming increasingly valuable: more people want to recreate on a finite amount of public land.  As mentioned above, the vast majority of recreationists and other public land visitors desire solitude, clean air, clean water, vast undeveloped landscapes, and a place to witness healthy natural systems thriving with native plants and wildlife. The Uncompahgre Resource Area can provide a wealth of these types of experiences, encompassing many natural and scenic landscapes. The RMP should accommodate those desires as they are consistent with BLM Colorado's strategy for recreation management and the national BLM publication "Priorities & Goals for Recreation & Visitor Services."

**FLPMA and Off-Road Vehicle (ORV) Regulations Applicable to Noise**: As discussed above, FLPMA requires the BLM to manage the multiple uses and resources of the public lands, which include fish and wildlife, watersheds, scenic values, recreation opportunities, scientific and historic values, and other natural values, such as wilderness characteristics. FLPMA also provides for the agency to do so by excluding or limiting certain uses of these lands.  BLM's regulations relating to management of off-road vehicles, similarly acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, *taking into account noise and other factors*." 43 C.F.R. § 8342.1 (emphasis added). Providing a "quiet" recreation experience, as also discussed in reference to opportunities for primitive, unconfined recreation and for solitude provided by lands with wilderness characteristics, also requires

36

BLM_0081933

thoughtful management to provide for a quiet soundscape.  Much research exists on the importance of natural sound to public land visitors. Noise impacts on the recreational experience have become a looming issue in today's noisy urban world.  A recent study by the National Park Service showed that 91% of park visitors consider enjoyment of natural quiet and the sounds of nature as compelling reasons for visiting National Parks (McDonald, Baumgartner, and Ichan 1995).**We recommend the UFO conduct a soundscape analysis to guide formulation of intended user experiences**, for example by analyzing how canyon topography and vegetation might reflect or propagate vehicular sound and how that might affect quiet users, neighboring homeowners and wildlife habitat effectiveness. We ask that the alternatives specifically compare impacts of, and the potential for the increase of ORV noise on natural sound and other resources, consistent with the BLM's regulations. We have included a more detailed discussion on soundscape management later in these comments.

The BLM's ORV regulations also provide for protection of other values that are critical parts of not only a healthy ecosystem on BLM lands, but also of enjoying quiet recreation activities, such as hunting, photography and bird-watching, requiring that management minimize "damage to soil, watershed, vegetation, air, or other resources of the public lands" and harassment of wildlife or disruption of habitat; and to prevent impairment of wilderness suitability or adverse affects on natural areas. 43 C.F.R. § 8342.1.  Landscape level planning, including through use of the travel planning template attached to these comments and assessing road density, as described in more detail above, is another important tool for ensuring that quiet recreation opportunities are preserved.

**National Visitor Use Monitoring Program:** The Moab Field Office completed a National Visitor Use Monitoring Program (NVUM) as a pilot project for visitor use monitoring on BLM lands. The NVUM for the Moab Field Office was developed through an interagency agreement with the Forest Service to be useful, in part, for making decisions during the planning process.  BLM's website on the program explains the NVUM's relevance and applicability:

> Such visitor monitoring information enables BLM to incorporate statistically valid visitor use monitoring information into planning and management decisions as well as long-term monitoring assessment.  The FS NVUM system provides BLM with accurate data with high confidence levels for reporting to Congress and constituents, thereby building credibility and establishing legal protection in decision-making.

BLM, Visitor Use Surveys & Research, http://www.blm.gov/wo/st/en/prog/Recreation/national_recreation/visitor_use_surveys.html.

The information provided from the NVUM shows that motorized use is a small portion of recreation activity on public lands in the Moab Field Office. The NVUM states: "In terms of total participation, the top five recreation activities of the visits to the Moab Field Office were viewing natural features, hiking/walking/trail running, relaxing (hanging out, escaping heat and noise), viewing wildlife and driving for pleasure (Table 16)."

**The Uncompahgre Field Office should conduct a similar survey in preparation of the RMP**. If the UFO also finds that quiet-use recreation is the most prevalent type of activity on public lands within the field office, it should ensure the RMP reflects that finding and adequately accommodates quiet users.

**Colorado BLM Instruction Memorandum CO-2007-020**:  This guidance acknowledges the importance of comprehensive recreation and ORV management to "facilitate attainment of management objectives

37

and maintain prescribed setting character—which is also essential to achieving Benefits-Based Management objectives."  The IM also restates BLM's commitment to generally limiting motorized use to designated roads and trails, such that "open areas will be limited to a size that can be realistically managed and geographically identifiable" and "expansive open areas allowing cross-country travel, without a corresponding and identified user need/demand, will not be designated in RMP revisions."

Further, the guidance provides for designating routes to dispersed camping and day use sites and limiting use of motorized vehicles to these routes, only providing for use off of these routes where "needed" and "appropriate," and then subject to specified distances and time periods; in this context the IM refers to being "consistent with the policies of the United States Forest Service OHV Rule."  Since the Forest Service has been updating its guidance, we wanted to clarify the manner in which dispersed camping should be handled to be both consistent with this policy and with BLM's other goals for management of the public lands in the Uncompahgre Field Office.  The Forest Service Travel Management Rule (36 C.F.R. § 212.51(b)) provides, in relevant part:

> The responsible official may include in the designation the limited use of motor vehicles within a specified distance of certain designated routes *solely for the purposes* of dispersed camping or big game retrieval. Such designations represent *site-specific decisions* associated with specific roads and trails or road or trail segments, rather than a blanket exception to the rule. Designations under 36 CFR 212.51(b) will be applied sparingly to avoid undermining the purposes of the rule and to promote consistency in implementation.  (emphasis added).

The Forest Service Travel Management Directives, proposed March 9, 2007, and finalized December 8, 2008, reinforces that the allowance for dispersed camping is a designation of motorized use, as opposed to a blanket exception to designation of motorized use.  FSM 7715.64 provides, in relevant part:

> 2. [This authority] should be used sparingly to avoid undermining the purposes of the travel management rule and to promote consistency in its implementation.
> . . . .
> 4. Responsible officials should consider providing designating [sic] routes to dispersed camping sites as an alternative to authorizing off-route use...

Accordingly, as stated in the rule and directives, any dispersed camping allowance must be treated as a specific designation and consistent with other travel planning regulation and guidance, which is also consistent with the provisions of Colorado IM CO-2007-020.  The Southern Rockies Conservation Alliance recommendations on application of the Forest Service approach are similarly applicable here:

BLM should allow visitors to disperse camp generally, but restrict motor vehicle travel *for the purposes of dispersed camping* according to a combination of the following options, as dictated by resource, safety, and private property concerns:

> a) Forest visitors may park a motor vehicle within one vehicle length from the edge of the road surface when it is safe to do so and without causing damage to the resources of the public lands (campers walk to access a backcountry camp of their choosing), and/or
> b) Motor vehicles may access signed campsites via designated camp spur routes that are signed and demarcated on a travel management map.

38

BLM_0081935

In certain places or certain times, the BLM may need to restrict dispersed camping altogether. These provisions should be incorporated in the Uncompahgre RMP.

We recognize that the Uncompahgre Field Office has recently become a leader on this issue and we commend the UFO for the dispersed camping policy established in 2009 in the Dry Creek TMP. The Dry Creek EA seemed to describe the situation clearly and due to this established a very strong and well supported policy. For example, page 184 of the EA stated:

> **Off-Route Parking, Camping, and Game Retrieval Policy**: For BLM Public Lands and National Forests the distance that OHVs are currently permitted to drive off existing or designated routes for parking, camping and game retrieval is 300 feet. This regulation applies generally to most BLM and Forest Service-managed lands, with the exception of developed recreation facilities and other areas of concentrated use where parking or camping is restricted to designated parking areas and camping spurs. Due to higher levels of public use on the Public Lands and National Forests, BLM and Forest Service managers are concerned that the long-standing 300 foot regulation is outdated and no longer provides adequate protection of vegetation and other resources. One of the major concerns with the 300 foot regulation is that new routes are often created through repeated use, and these new routes in turn become the starting points for additional 300-foot long or longer extensions. As a result of these concerns, both the Forest Service and BLM are revising their regulations to decrease or eliminate the distance that motor vehicles can legally drive off routes to park, camp, and retrieve game.)

The Dry Creek Record of Decision CO-150-2008-33 EA, Page 3, states:

> ***Parking*** *In order to minimize resource impacts and help prevent new user-created routes, users are allowed to park motorized or mechanized modes of travel immediately adjacent and parallel to available designated routes for any purpose. Parking is limited to one vehicle-width from the edge of the route. Users are encouraged to park motorized or mechanized modes of travel in already disturbed areas whenever possible, consider safety, and keep routes passable for other users.* ***Camping*** *Short spur routes leading to popular dispersed campsites are designated and identified. Dispersed camping is allowed in other areas, consistent with parking requirements described above.*

We fully support this policy and therefore request that this policy be carried over on the entire Uncompahgre Field Office in this RMP. The Dry Creek EA acknowledges the many impacts to resources associated with routes created for dispersed camping. The RMP should not ignore those impacts which BLM already found to be significant and lasting; the RMP should assess those impacts field office-wide and take comparable steps to mitigate them.

**Land Health Standards:** Healthy lands are a critical part of recreation experience, and it is equally important that recreation not degrade the quality of the public lands, as acknowledged by FLPMA and the regulations discussed above. **We recommend that the recreation portion of the RMP take as one of its primary objectives to meet or exceed the 1996 Colorado BLM Land Health Standards (approved in February 1997 by the Secretary of Interior ) pertaining to "Upland Soils and Riparian Systems," "Healthy Plant and Animal Communities," "Special Status and Threatened and Endangered Species," and "Water Quality."** The Colorado BLM's Recreation  Management Guidelines, issued in December of 2000 by the Resource Advisory Councils of Colorado in partnership with the agency, commit to management of recreation "while at the same time minimizing and preventing adverse impacts to land

39

BLM_0081936

health, ecosystems, and cultural or natural resources" and specifically incorporate and attach the Land Health Standards.

**Colorado BLM Recreation and Visitors' Strategy**:  The 2007 Colorado BLM Recreation and Visitors' Strategy directs managers to consider impacts on "land health standards" (p. 4) and the need to "uphold our [BLM's] fundamental duty to meet or exceed land health standards" (p. 6).  This strategy also provides an approach that will maintain the open spaces on the lands managed by the Uncompahgre Field Office.  Many portions of Uncompahgre BLM lands, not just WSAs and proposed wilderness, fall into the more primitive category of BLM lands that are at particular risk for losing their naturalness. The 2007 Colorado BLM Recreation Strategy emphasizes the importance of maintaining the "distinctive character" and "wide open spaces" of Colorado BLM lands (p.3). The Strategy emphasizes the "need to maintain the distinctively undeveloped and open space character of its [BLM's] recreation settings" (p. 7).  **The BLM should commit to actively managing these lands to protect and enhance the primitive, backcountry experience**.

**Guidelines for Managing Access between BLM and Private Lands:**  Attached to these comments are guidelines that have been adopted by the Royal Gorge Field Office and endorsed by the BLM's Front Range Resource Advisory Council.  The guidelines provide generally that: "Other than for foot and horse uses, entry to public lands from private lands must comply with the designated transportation system and be limited to the same means of travel that the general public uses from public access points." These guidelines were developed to address a substantial increase in user-created motorized roads and trails leading from private lands onto the adjoining public lands that did not comply with federal management. **These guidelines should be incorporated into the Uncompahgre RMP.**

**Standards for Issuance of Special Recreation Permits**:  BLM should adopt unambiguous, protective criteria for issuance of special recreation permits (SRPs) in order to effectively manage the increase in commercial and competitive group activities that can have a significant impact on the lands in the Uncompahgre Field Office.  The BLM Handbook on Recreation Permit Administration (H-2930-1) clearly states that field offices can and should develop guidelines for issuing SRPs. The Handbook states: "Field Offices are encouraged to develop thresholds through land use planning for when permits are required for organized groups and events for specific types of recreation activities, land areas, or resource settings" H-2930-1 at 13. On the issue of Special Area Permits, the Handbook states: "Applications for Special Area Permits issued to individuals are processed according to the area-specific land use and/or business plan, or guidelines approved by the State Director." H-2930-1 at 17. The Uncompahgre Field Office therefore must provide clear guidelines for processing Special Area Permits, because in this situation the Handbook directs that permit issuance will tier to the RMP.[13]

The Price Field Office Draft RMP, Appendix 14, (attached to these comments) provides an excellent example for evaluating SRP applications and issuing such permits.  It classifies SRPs into four distinct classes, ranging from least intensive to most intensive, based on specific factors such as type of equipment, size of area used, number of participants, etc.  These factors are defined and then compared in a simple permit classification matrix consisting of Classes I through IV (with I being for smaller and less impacting events and IV being for larger, more impacting events).  Each Class also has an example of the type of event that may fit into the category. After the Class is determined, the BLM can then look to see

---

[13] Analysis of the impacts of permits on a cumulative basis is also best accomplished in the RMP, since it will provide for a more comprehensive, informed analysis that can look at both cumulative and site-specific environmental consequences, as required by NEPA.

BLM_0081937

how permit types fit into Recreation Opportunity Spectrum Classifications and/or Special Recreation Management Area (SRMA) or Extensive Recreation Management Area. Various SRMAs can be broken into classes and it is easy to see what types of uses and events should be permitted for each area. Because the standards set out in the Price Draft RMP are very specific (for example, surface disturbance of 5-40 acres ranks as "medium intensity"), BLM can easily determine whether to issue an SRP and where, and can better estimate cumulative impacts from such permits. The Uncompahgre RMP should use the model provided by the Price Draft RMP for classification of SRPs to define which uses may be appropriate or inappropriate in specific areas. BLM has not only the discretion to establish SRP guidelines, but also the obligation to do so in order to protect the resources that the RMP is intended to protect and sustain.

**Criteria for Addition of New Motorized Trails:** In order to ensure that priority ORV management is addressed, the BLM should implement a prioritization hierarchy in which new construction is secondary to and incumbent upon successful restoration and prior achievement of other ORV related management goals. Management activities such as restoration and rehabilitation of existing impacts, signage and achieving compliance should take precedence over approving new motorized construction or adding motorized system trails that further increase the agency's management burden and might further retard other resource actions that are critical if not addressed first.

The goal of this priority hierarchy is to 1) take care of the resource impacts from past ORV related activities; 2) establish conditions to prevent new and/or reoccurring ORV related impacts; 3) secure long term commitments, stipulations, and thresholds of new and existing system routes; and (4) once above priorities have been met, new proposals can be considered and reviewed through NEPA.

Thus, in assessing whether additional motorized trails are to be considered, and if appropriate, approved, we recommend the following set of principles which builds upon the Royal Gorge Field Office's criteria set out in the Arkansas River Travel Management Plan Environmental Assessment, Appendix 6 (pp. 225-227).

To provide for appropriate motorized uses, while also protecting the area's resources, the BLM should establish the following criteria for addition of new motorized trails to help guide future management and development of the ORV activities on the Uncompahgre FO:

1. Approve construction of new or additional trails only after the following conditions have been met:
   a. The decision to approve the trail(s) has been authorized under a site specific EA or EIS that analyzes the site specific environmental effects of the proposal.
   b. The proposal would further the goals and desired future conditions (DFCs) identified by the agency.
   c. Priority implementation of effective on-the-ground closures (i.e. barriers, gates, berms) and restoration work (i.e. ripping/seeding, decommissioning, re-countouring, re-vegetation) has been completed and adequate funding and grants, partnerships/volunteer commitments, staff time allocations has been secured and employed.
   d. Implementation of all necessary signage (for closed and open routes) has been fully installed and adequate funding and staff/volunteer time for installment has been committed to.

41

e. The proposal is sponsored under a partnership agreement that includes a plan for securing the necessary funds and/or volunteer commitments to construct and maintain the trail to accepted standards.

f. The proposal is accompanied by long term commitments, and stipulations and thresholds are agreed to that if surpassed, corrective management actions will be taken to protect resource health.

2. A significant factor in approving new trails depends on the ability to maintain existing trails to agreed standards. With the participation of cooperating partners, develop accepted standards and guidelines for constructing and maintaining new and existing trails.

3. With the participation of cooperating partners, establish a system and procedures for monitoring trail conditions and performing necessary maintenance work.

4. Continue and strengthen long-term partnerships with motorized user groups for the purposes of maintaining existing trail networks.

Note that new construction does not include incidental construction in order to reroute, mitigate, and/or prevent resource impacts as this would be included under number 1 (c); rather, this refers to new ORV opportunities that are considerable and are added to the current system and agency burden.

This approach is consistent with the letter and the spirit of BLM's obligation to minimize impacts from ORVs to other users and resources. As discussed previously in these comments, Executive Orders (EO No. 11644 (1972) as amended by Executive Order No. 11989 (1977)) and the BLM's regulations (43 C.F.R. § 8342.1) require BLM to ensure that areas and trails for off-road vehicle use are located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability; to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands; and to minimize distress and other impacts to wildlife.

**_Recommendations_**:  In managing recreation on the lands of the Uncompahgre Field Office, the RMP should ensure that quiet recreation opportunities are given sufficient attention and that management of motorized recreation, in general, is also designed to protect the experiences of other public land visitors. Comprehensive travel management planning, including landscape level planning and road density analysis, as well as compliance with land health standards, will also ensure healthy ecosystems that can support positive recreation experiences. Further, coordinated BLM and Forest Service guidance on management of motorized vehicles and dispersed camping, managing access between public and private lands, issuance of special recreation permits, and strict criteria for addition of motorized trails will also help the agency to maintain the distinctive open space character of Uncompahgre BLM lands.

b. Special Recreation Management Areas

i. General.

In the Uncompahgre RMP we encourage the BLM to use special recreation management areas to reverse the ongoing downslide of recreational settings into more developed categories and preserve or restore settings to the primitive and backcountry category – providing a prescriptive approach to creating, enhancing and protecting quiet recreation experiences on our public lands, using the tools and guidance set out above.

42

The Land Use Planning Handbook (in Appendix C and as further defined in the Glossary) provides for BLM to establish special recreation management areas (SRMAs) in the lands governed by the Uncompahgre RMP.  Depending upon the anticipated use of each SRMA, BLM should adopt different management strategies.  The Handbook identifies the following general types of recreational use:

- Undeveloped – These areas are managed to support dispersed recreation, maintaining their highly-valued, distinctive, undeveloped recreation setting character.  Within the bounds of legal requirements and sound management practices, resource and visitor management actions exercise minimal regulatory constraint and exclude major investments in facilities and visitor assistance to preserve the visitor's freedom to choose where to go and what to do.

- Community – These areas adjoin communities and are managed to provide structured recreation opportunities in response to recreation-tourism demand generated by community and/or tourism growth and development.  The areas are managed to maintain natural resource and/or community setting character, with appropriate restrictions on marketing, administration and other management actions.

- Destination – These areas have distinctive, highly visible, or otherwise outstanding resource attractions that are managed to provide structured recreation opportunities in response to demonstrated national or regional recreation-tourism demand.  The areas are managed to maintain natural resource and/or community setting character, with appropriate restrictions on marketing, administration and other management actions.

In the context of the BLM's Benefits Based Management (BBM) framework, it is critical that the range of SRMAs, including recreation management zones (RMZ), and their management prescriptions are written to enhance the other values that ultimately contribute to the benefits and experiences of the area and provide significant opportunities for primitive recreation experiences.  SRMAs should include those with an "Undeveloped" market and, even though they will not be managed by extensive facilities, require active management to protect their lands from other uses and activities that will destroy the undeveloped recreation setting and experience.

Some of the supporting materials for analysis of recreation settings set out standards for primitive physical settings that appear to unreasonably limit the lands that could be considered to provide a remote, primitive recreation "experience." Accordingly, the BLM should not use those standards as a "bright-line test" to disqualify areas which are or could in the future provide a primitive recreation experience. Rather, the standards should be used as a goal which proper management could help the areas achieve and focus on the experience that can be achieved.

IM CO-2007-020 directs BLM managers to:  "Ensure that travel management decisions...maintain prescribed setting character..." (p. 2).  The IM specifies tools to be used for maintaining settings, stating on page 2 that:  "For areas with Limited and Open categories, managers may impose several different kinds of limitations including vehicle numbers, types, use times or seasons, permitted use......" (emphasis added). The notion of limiting numbers of recreation users needs to be incorporated into the adaptive management measures adopted for all recreation planning in the Uncompahgre Field Office, particularly for portions of the field office where growth in recreation use should not be the goal. Prescriptions to ensure primitive recreation opportunities are provided should also include soundscapes, special recreation permits, and road density.

In this manner and as part of achieving the goals of a BBM system, areas which have primitive character should be managed for that experience and desired future condition, even if they do not currently meet

43

all of the criteria that the BLM has set for primitive physical settings or designation.  By adopting such a prescriptive, or aspirational management approach, as opposed to a more descriptive or reactive approach of just basing the management of the zones on perceived evidence of human presence or an expectation of more people wanting to use the area, the BLM can ensure that some level of existing disturbance does not disqualify areas which do provide a primitive experience from a decision to manage them to protect and enhance such qualities and provide this important experience.

**_Recommendations_**:  BLM should adopt a range of SRMAs and management prescriptions which provide adequate opportunities for non-motorized or quiet recreational experiences and are written to enhance the other values that ultimately contribute to the benefits and experiences of the area.  BLM should use an aspirational approach which allows the agency to ensure that some level of existing disturbance does not disqualify areas which do provide a primitive experience from a decision to manage them to protect and enhance such qualities and provide this important experience.  The SRMA proposals and wilderness inventory submitted under separate cover identify key areas for protecting primitive recreation experiences.

ii.    Preserving the "Backcountry" recreation setting

One of the factors the BLM uses to determine setting prescriptions is "distance from an improved road," or the "remoteness" criterion found in the Settings Classification Matrix. Greater distances from roads will put an area into a less developed setting on the Settings Classification Matrix. The developed or undeveloped character of a physical setting in turn helps determine the level of development a setting will have in the social and managerial settings of the matrix.

We have noticed a tendency for "distance from a road" to be justification for classifying an area as more developed on paper than the actual conditions on the ground warrant.  This in turn makes it easier for social and administrative settings to be similarly skewed toward a more developed management goal.

Like many Colorado BLM lands, the Uncompahgre Resource Area contains historic "constructed" roads that get little or no use and therefore do not interfere with the essential backcountry character and feel of the land. Visitors may experience a remote, backcountry feeling, even in the presence of seldom used roads. Spatially analyzing "distance from a road" and using the criterion for determining a landscape's remoteness does not take into account other subjective qualities of the landscape and does not give the BLM an accurate frame of reference from which to make a decision on the undeveloped and backcountry nature of an area.

Another reason that existing settings may be upgraded to a more developed setting within the matrix may be due to the long lifespan of an RMP.  Managers anticipate increased recreation demand over the life of an RMP, and assign Front Country or Rural settings to areas that are currently Backcountry in character. Upgrading existing settings in this manner becomes a self-fulfilling prophecy. Setting high numbers of encounters and group sizes up front opens up an area to increased use, leading in turn to further setting upgrades down the line.

**_Recommendations_**:  Despite the likelihood of increased demand and the physical proximity of a road, we feel it is important to make every effort to preserve the undeveloped and backcountry experience wherever possible. We recommend that settings, visitor encounters and group sizes be adjusted from less crowded to more crowded settings incrementally over time through adaptive management, rather than up front, before recreation demand has actually materialized.

44

Adaptive management strategies need to be based on comprehensive and statistically rigorous monitoring based on defined levels of acceptable change, as was done in the Jack Morrow Hills plan in Wyoming. This approach can be used to limit use of an area for primitive recreation and to limit facilities unless or until certain criteria are met – such as increased demand and a determination that more visitors can be accommodated without undermining targeted recreation values.  Again, the Jack Morrow Hills plan in Wyoming is a good example of how the BLM could implement adaptive management with specific monitoring of key resources, targets for management, and triggers for action.

We recommend that the RMP include specifics on the monitoring and metrics that will be used to evaluate successful meeting of targets for SRMAs and other recreation areas.

We understand that experiential outcomes and setting retention are the end goals of the Benefits Based Management "Chain of Causality" (experiential outcomes result from settings and activities which result from market demand, user groups, and activities). For this reason the RMP needs to be specific about the metrics to be used for evaluating the attainment of the experiential "Outcomes."

Examples of Adaptive Management responses could be: reduced marketing, smaller trailheads and parking, fewer improved trails, more challenging trails, and other ways of limiting vehicle numbers as referenced previously in the 2007 Colorado BLM IM, p. 2. Setting motorized use levels through permits, in desired but overcrowded settings such as rocking crawling areas and other intensive motorized use areas in Dry Creek, should not be ruled out. This recommendation applies not just to places where motorized use is occurring under a formal Special Recreation Permit, but to areas where general public use is occurring **not** under any permit.

In applying adaptive management, we caution against resorting too quickly to the common solution of dispersing use to other areas. This merely spreads resource impacts more broadly across the land and invites more growth, more off-trail use, more trail maintenance expense and more management and enforcement challenges over a greater expanse of land. It is not the BLM's job to indefinitely absorb an unlimited expansion in recreation demand.  Setting limits on recreational use to protect BLM resources and experience will lead to other providers stepping forward to absorb increased demand.

  iii. <u>Managing promotion and marketing.</u>

A key aspect of implementing SRMAs is marketing (H-1601-1 – Land Use Planning Handbook, Appendix C, pp. 15-17, Recreation and Visitor Services, C, 4). Experience shows that designating new trail systems and other recreation opportunities can lead to unanticipated increases in use, potentially straining BLM resources and shifting less crowded settings into more crowded ones.

The 2007 State Recreation and Visitor Services Strategy points to the inconsistency between the "recreation tourism demand" generated by a "vigorous Colorado Tourism Office promotion budget" and the BLM's "fundamental duty to meet or exceed land health standards" (p.6). The Recreation Strategy goes on to state: "tourism industry promotion... sends increasing numbers of outdoor adventurers to BLM public lands," challenging the BLM's ability to "maintain the distinctively undeveloped and open-space character of its recreation settings" (p. 7).

In response to this problem, both Appendix C of the LUP Handbook and the State Recreation Strategy direct the BLM to manage marketing so as to maintain targeted recreation settings. For example, the

45

SRMA definitions section in Appendix C includes "appropriate restrictions on marketing" as one of several implementation actions to be done on SRMAs.

Objective 2 in the Recreation Strategy similarly calls upon businesses and local governments to "agree" to the BLM's  "approved recreation setting prescriptions and management objectives" and to "market public lands responsibly" (p. 9). For example, the Glenwood Springs Field Office, has obtained an agreement from local government to limit marketing efforts to ensure its Community SRMAs do not evolve into Destination SRMAs.

The Recreation Strategy further directs BLM field offices to "engage the business community and local governments in …..managing….use of public lands that meet or exceed land health standards" (p. 9).

**_Recommendations_**: In accordance with this direction, we recommend that the Uncompahgre RMP be specific about the marketing strategies it will use for each new SRMA and recreation area. The marketing strategies should be designed to hold use levels down to those that are manageable within budgets, and that will maintain the "distinctive, open-space character" of BLM settings referred to above. The BLM should obtain specific agreements/MOUs laying out the nature and extent of the publicity that will be done on each SRMA or other recreation area.

c.   Areas needing special attention to recreation management.

In addition to designating new SRMAs and protecting lands with wilderness characteristics in accordance with our separate proposals, certain areas in the Uncompahgre Field Office merit special attention for management of recreation.  At this time, we would like to highlight the following areas:

**_Adobe Badlands_**:  The lands immediately adjacent to the Adobe Badlands WSA and citizen-proposed wilderness area are severely degraded by intense motorized use, causing noise and dust pollution and impacting the WSA. The revised Uncompahgre RMP should give special attention to managing this area to reduce and minimize impacts to the WSA or the citizen-proposed wilderness from motorized vehicles.

**_Tabeguache_**: The Tabeguache area managed by the Forest Service was congressionally designated to protect its wilderness values. The BLM should close motorized and mechanized routes in the adjacent BLM lands in order to avoid motorized or mechanized intrusions into the Tabeguache area and to otherwise ensure preservation of the wilderness values there. Specifically, the relatively unroaded, unmotorized BLM lands north of the Tabeguache Creek Special Management Area, including the Shavano, Campbell, and Burro Creek drainages, should be closed to motorized recreation.

**_Roubideau_**: The Roubideau Area managed by the Forest Service was congressionally designated to protect its wilderness values. The Uncompahgre Field Office closed a deteriorated jeep trail in the Monitor Creek area, creating a large contiguous area adjacent to the FS Roubideau Area, covering over 20,000 acres on BLM land which includes the Camel Back WSA and citizen-proposed wilderness. The RMP should reaffirm this closure and manage recreation in this area to protect natural values.

46

BLM_0081943

8. **Natural Soundscapes**

Evaluating and protecting natural soundscapes is essential to the land use planning process. As part of providing opportunities for quiet recreation, BLM must consider activities that interfere with the soundscape associated with quiet recreation opportunities. Research shows that for many people, especially quiet recreationists, the primary reason for visiting primitive landscapes is to attain a sense of solitude and tranquility, which are interrupted by non-natural noises. A study performed by psychologists at Colorado State University found that acoustic stressors impact visual landscape quality, meaning non-natural noise actually affects the perceived naturalness of a landscape (Mace 1999). Therefore, in order to preserve the naturalness of an area, BLM must preserve the natural soundscape.

Furthermore, the authors of the study note that "tranquility" and "solitude" are explicitly addressed in the Wilderness Act as values that must be preserved by land management agencies. BLM guidance directs the preservation of "naturalness" in Wilderness Study Areas, Visual Resource Management I zones, and other areas managed to protect wilderness qualities. All of these values are negatively impacted when the natural soundscape is impacted; therefore, BLM must retain the natural soundscape in wilderness-quality lands and primitive recreation areas.

A. BLM's Obligation to Preserve Natural Soundscapes
Executive Order 11644 (1972), as amended by E.O. 11989 (1977), orders the BLM to locate areas and trails to

> Minimize conflicts between off-road vehicle use and other existing or proposed recreation uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

BLM regulations at 43 C.F.R. Sec. 8342.1 reiterate this E.O.

In order to effectively and appropriately achieve this goal, the Colorado BLM issued "A Recreation and Visitor Services Strategy" ("Recreation Strategy") to help field offices provide quality recreation experiences for all users. The Recreation Strategy recognizes that BLM's obligation to provide recreation areas for many user types requires designation of quiet recreation zones. It defines "quiet recreation" as "Outdoor recreation enthusiasts such as hikers, skiers, mountain bikers, equestrians, bird watchers, hunters and anglers *who seek the opportunity to enjoy natural soundscapes*" (P. 17) (Emphasis added).

We encourage the Uncompahgre Field Office to similarly implement BLM guidance for minimizing conflict between user groups by establishing quiet use areas and mitigating potential noise impacts on these areas.

Additionally, courts have upheld the responsibility of federal land management agencies to evaluate noise impacts on the natural soundscape. *See Izaak Walton v. Kimbell*, 516 F. Supp. 2nd 982, 985, 995-96 (D. Minn. 2007). (EA prepared by USDA Forest Service for plan to construct snowmobile trail adjacent to Boundary Waters Canoe Area Wilderness failed to properly analyze noise impacts from snowmobile use, as required by NEPA; EA provided no quantitative evidence of analysis of decibel levels to be projected by snowmobile use of the trail into adjoining wilderness.)

47

B. Effective Soundscape Analysis

In order to effectively preserve the natural soundscape in quiet recreation areas, BLM must quantitatively measure (1) the decibel (dB) levels of the natural soundscape; and (2) ORV dB levels on the natural soundscape. Quantification of ORV traffic volume, duration, and frequency are thus necessary components of soundscape analysis.

There are many tools available to BLM to adequately measure noise impacts and set prescriptions to prevent negative impacts. The Wilderness Society recently created a GIS model based on the System for the Prediction of Acoustic Detectability (SPreAD), a workbook issued by the Forest Service and Environmental Protection Agency for land managers to "evaluate potential ... acoustic impacts when planning the multiple uses of an area." The Wilderness Society adapted the SPreAD model to a GIS environment so that potential noise impacts could be integrated with other variables being considered in the planning process. We believe the Uncompahgre Field Office has an up-to-date version of this software, and we would be happy to provide more information at your request. The SPreAD-GIS model can be implemented in your existing ArcGIS software at no additional cost. The SPreAD-GIS model was developed for the Forest Service, but its applicability extends seamlessly to BLM lands, as the inputs include vegetation and topography.

The Uncompahgre Field Office should use the SPreAD-GIS model to determine what sounds will impact visitors in each segment of the planning area, and what steps must be taken to mitigate these impacts. It is important to note that the original SPreAD operates under the premise that in primitive recreation areas, *no noise should be audible above the natural soundscape*. We envision this model as eventually being used throughout the field office, but at this stage believe BLM should at least apply it to special management areas and/or other strategically prioritized portions of the field office.

**_Recommendations:_** The preservation of natural soundscapes is important to provide visitors with adequate opportunities for quiet recreation. The USGS finds that dissatisfaction with recreational opportunities can "diminish public support for land-management programs" (Douglas xiii). We encourage BLM to utilize the SPreAD-GIS model to analyze and preserve the natural soundscape of the Uncompahgre planning area, especially in special management areas managed for quiet use recreation.

9.   **Retaining and Restoring Natural Forest Ecosystems**

Section 201 of FLPMA mandates that BLM inventory the resources of the public lands, their resources and values.  43 U.S.C. § 1711. The Preparation Plan for the RMP revision states that "[t]he Uncompahgre Field Office manages small areas of spruce/fir forests and ponderosa pine forests, and large areas of pinyon-juniper woodlands." The BLM must carefully inventory its forest resources and evaluate alternatives that do not cause adverse environmental impacts and unnecessary and undue degradation. The RMP should analyze impacts to forest resources and identify ways to minimize and mitigate these impacts for each type of forest ecosystem.

We discuss management recommendations for each forest type in relevant detail below.

48

Pinyon-Juniper Ecosystem

   a.  Ecology

 According to recent research, pinyon-juniper (p-j) forests can be classified as one of the tree types as
follows:

   1) Persistent p-j. Canopy can range from sparse, with only scattered trees, to a fairly dense, closed
canopy. Soils may be rocky and unproductive to deeper and moderately productive, but this type is
more often found on the former. Understory can consist of a variable cover of gasses, forbs, and shrubs,
but in the dense canopied stands, any understory will be sparse. Fires probably varies in frequency, but
rotations were usually quite long (440+ years), and most fires were stand-replacing.

   2) P-j savanna. This type has a low to moderate density and cover of p-j, with a well-developed and
nearly continuous understory of grass, along with some forbs. Shrubs, if they exist, are usually only a
minor component. This type is most often found where summer precipitation constitutes a high
proportion of the average annual total. The natural disturbance regime for this type is not well
understood.

   3) Wooded shrubland. The p-j component in this type varies from sparse to relatively dense. Shrubs
constitute the main portion of the understory, and there are varying amounts of grasses and forbs. This
type is most often found where winter precipitation is dominant. Fires tended to be high intensity
events that killed all or most of the trees and top-killed all of the shrubs.

See Romme et al, 2008, and Romme et al, 2009.

It is not likely that the area covered by the Uncompahgre Field Office has or had much of type 2. See
Romme et al, 2009, at 126. Extensive field research is needed to determine which types exist and what
the disturbance, composition, and structural history is of each stand or area containing p-j.

It is commonly thought that the increase in density and coverage of p-j forests since the beginning of the
20th Century has been caused by fire suppression, i. e., that the lack of low-intensity fire that formerly
burned off young trees has allowed p-j forests to grow much more dense. In reality, the situation is
more complicated than this simple scenario, and in the planning area, it does not appear to be true at
all.

In the persistent p-j type, fire suppression cannot be said to be responsible for any increase in density of
p-j because fire was very infrequent in this type. Romme et al, 2008, 2009. It is also likely that that there
are factors other than fire suppression that are helping to drive increases in p-j densities in all three of
its types, including:  climate change (warming since the end of the little ice age 12,000 years ago) that is
favorable to tree growth; recovery from past disturbances (such as intensive logging, especially during
the mining era[14]; chaining, a common practice in the 1950s and '60s; and periodic, and often intense,
insect-caused mortality in pinyon pine); and livestock grazing, which probably favors tree persistence
and increased tree density[15], as has occurred on the Uncompahgre Plateau[16]. The relative importance of
each of these in shaping our current p-j ecosystems is unknown. Romme et al, 2008. Increased

---

[14] See Young and Svejcar, 1999.
[15] See Goodrich and Reid, 1999.
[16] See Shinneman, 2006.

BLM_0081946

atmospheric carbon dioxide, occurring from human use of fossil fuels, would also favor growth of trees, once established, over other vegetation.

If fire was frequent in any of the p-j types, fire scars and dead trees would likely be easy to find. But, according to Romme et al 2008, they are quite rare or absent in areas where studies have been done. This would tend to indicate that fire may not have been frequent in any of the p-j types.

Shinneman and Baker, in a study on the Uncompahgre Plateau published in 2009 (a), confirmed these findings. These researches found no fire scars on live trees, but they did find charred snags and charcoal in 41 percent of the plots they surveyed. This strongly indicates that low-intensity fires never or seldom occurred (or were so minor in coverage and frequency that any evidence of them has disappeared), while higher-severity, stand-replacement type fires did occur. Based on the data they gathered and analyzed, a fire return interval of 400-600 years in areas with p-j stands on the Plateau is suggested by the researchers. Id.

Shinneman and Baker, id., also found considerable establishment of pinyon following an extended, and often severe, drought in the area that lasted from about 1620 to 1820. In other words, pinyon is responding to more favorable conditions in the last 200 years to reestablish itself on the landscape. It is important to note that the beginning of this period well precedes human settlement, which is said to have begun in earnest around 1880. Pinyon may also be have started recovering from heavy mortality from drought and from attacks of *ips confusus*, a bark beetle that ravaged pinyon pine in Colorado in 2002 through about 2004.

Romme et al, 2008, noted that any net increase in p-j trees may be small when viewed over a long time period, as periods of increasing density are balanced by periods of extensive mortality. In the planning area, this is much more true for pinyon than juniper, as the latter species seemed to maintain a relatively steady density over 500 years. Shinneman and Baker, 2009a.

   b.   Effects From Human Use

While fire suppression does not appear to have affected vegetation in the planning area, other factors have, especially livestock grazing.

Shinneman et al, 2008 found that the semi-arid ecosystems of the Uncompahgre Plateau

> have experienced significant declines in grass and forb cover, biological soil crust cover, native species richness, compositional evenness, and relative species abundance, occurring at both stand- and landscape-levels.

Shinneman et al, 2008, at 223.

This research also found that sites with the heaviest p-j overstory removal via chaining were among the most degraded, while sites that had a light thinning of p-j were less degraded. Shinneman and Baker, 2009b, cite numerous studies linking sites degraded by grazing to cheatgrass invasion.

BLM_0081947

c.   Restoration Needs

Restoration should focus on: a) retaining existing sites with minimal degradation from natural conditions, b) removal or reduction of activities causing degradation, such as livestock grazing, and c) active restoration of some of the most degraded sites by restoring native gasses, forbs, and shrubs and eliminating or reducing non-native species.

Restoring native plant species will not be easy. First, removal of non-native plant species will be necessary, especially cheatgrass (*Bromus tectorum*). However, complete eradication of this species is not likely. See Goodrich and Huber, 1999. See also Goodrich and Rooks, 1999, who stated that cheatgrass is "explosively invading" and "highly competitive" against native species. They recommend use of non-natives to reduce the invasion of cheatgrass, especially after a large fire. However, Shinneman and Baker, 2009b, found no difference in cheatgrass coverage in areas seeded versus those not seeded after fires on the Uncompahgre Plateau.

Introduced, non-native species almost always outcompete native species. See Walker, 1999. See also Erskine and Goodrich, 1999, who found dominance by introduced annuals or seeded species after fire in p-j stands with closed canopies. That means that introduced species will tend to dominate such sites, making it harder, and maybe impossible, to restore native biological diversity.

It may not be possible to completely remove or greatly reduce livestock grazing. If so, other strategies can be employed such as:  exclusion of stock from the most sensitive areas, seasonal closures, reduction of time that grazing is allowed in certain areas, and reduction in the number of animals allowed to graze.

If native plant species are not present, removal of livestock alone will not restore these species. Seeding will be necessary. However, seeding could cause undesirable impacts, if e. g., motorized equipment or even humans walking over large areas destroyed or damaged biological crust while dropping or drilling seed. Therefore, lower-impact methods should be used, such as aerial seeding. The same seed mix should not be used over a large area, even if it consists solely of native species, as this could reduce diversity of native plant over the area seeded. See Shinneman et al, 2008.

Old-growth stands should be retained. Old growth p-j stands are more structurally complex than other stands and provide habitat for many bird species. See Miller et al, 1999. It is hard to say how p-j old growth stands should be defined, but Mehl, 1992 provides a good start. It may be necessary to consider site-specific data on stand history in determining what constitutes p-j old-growth in any location.

d.   Management Recommendations

1. Inventory the planning area's p-j stands. To properly manage p-j, whether that means active management or not, information on the current condition (composition and structure) and the historical disturbance regimes of these areas is essential. A considerable amount of data has already be gathered for the Shinneman and Baker, 2009 study discussed above; this data can be used along with other data that is gathered.

Since there is much uncertainty about the history of most p-j stands, any stands where any manipulation will be allowed should be thoroughly field surveyed. Manipulation includes, but is not limited to: commercial and non-commercial wood cutting, thinning, prescribed fire, fire use (prescribed fire after

51

natural ignitions), extensive and/or heavy livestock grazing, roller chopping, and chaining or cabling of p-j.

The ever present danger is that without site-specific knowledge, any management, no matter how well-intended, could result in the affected areas becoming even further outside the range of historical variability, thus making any future restoration efforts even more difficult or impossible.

2. Collect seed of native grasses, forbs, and shrubs. Use these seeds in restoration projects, or after large fires, as appropriate.

3. Reduction of pinyon and juniper via chaining, cabling, and/or logging is not necessary, and would not in any way aid restoration of native species or historical stand structures and composition. Trees whose origin pre-date human settlement (beginning around 1880) should not be killed for any reason unless they constitute a hazard (such as falling across a road open to public use).

4. Eradicate exotic species to the degree practicable.  Areas open to public motor vehicle use and those that have been heavily and/or persistently grazed by livestock will be the areas most likely to have weeds. Management should be directed to favor establishment and persistence of native plant species over introduced non-natives.

The most important weed to eradicate or control is cheatgrass.

Native species should be used for reseeding to the maximum degree possible.

5. Consider reducing or eliminating livestock grazing in areas where continuation of it:  would further ecologically degrade vegetation, damage soils, damage riparian areas, or hinder active or passive restoration efforts. Grazing must not be allowed in areas with the best representations of native grasses, forbs, and shrubs, i. ., those sits with Rank 1 in Shinneman and Baker, 2009a.

6. Retain old-growth stands. See discussion above under RESTORATION NEEDS.

7. Do not allow large commercial sales of any products from p-j stands. Light activity, such as fuelwood gathering, is acceptable. Any logging should be confined to areas accessible by or very near existing roads.

Logging for any purpose should generally be limited to trees that have established since human settlement, but not all such trees should be cut in any one stand or area.

8. Restore stands toward historical conditions where possible. This would include reestablishment of native vegetation. Where such vegetation is present, prohibiting activities that tend to harm vegetation, such as livestock grazing, motor vehicle use, and commercial logging, may be sufficient to start achieving restoration of native species. In severely degraded areas, reseeding and/or planting will be necessary.

9. Closely monitor all activities, using appropriate control sites for before and after comparisons. Monitoring is particularly necessary to assess the effectiveness of any restoration efforts. It is also very important after fire, to assess cheatgrass invasion, establishment of native species, and soil stability.

BLM_0081949

Ponderosa Pine Ecosystem

Ponderosa pine ecosystems in Colorado were shaped by fire. Fires likely burned at variable intervals and
intensities, i.e., some fires were low-severity, burning ground vegetation and small trees and
maintaining open, park-like tree stands, while others were stand-replacing events.

A study of ponderosa pine and mixed conifer stands on the Uncompahgre Plateau found that fire
suppression over the last 125 years has likely increased the density of ponderosa pine stands somewhat.
See Binkley et al, 2008, but see cautionary note for application on p. 11 of that publication.

    a.   Management Recommendations

1. The Uncompahgre Field Office should inventory its ponderosa pine stands for the following attributes:
tree species composition, tree stand structure and density, old growth characteristics (see Mehl, 1992),
percent of trees with origin after human settlement, evidence of fire (such as scars on live trees), native
versus non-native understory plant composition, and wildlife species' presence.

2. Dense ponderosa pine stands composed primarily of trees of post-settlement origin can be thinned to
reduce the threat of an unnaturally hot stand-replacing fire. Generally, only some (not all – see below)
of the younger (origin after 1879[17]), smaller trees should be removed. This would be most appropriate in
the lower-elevation ponderosa-dominated  stands, as these stands likely had the most frequent fire and
thus likely have been changed the most by fire suppression. At the higher elevations of ponderosa pine,
stands may have historically been dense at times, and if so, they should have minimal to no thinning.[18]

3. Old growth stands must be conserved. A light thinning of young trees may be appropriate in such
stands, if post-settlement trees are dense.

4. Fire should be gradually reintroduced into ponderosa-dominated stands, to the extent feasible, over
time. To avoid a very hot, stand replacing fire in dense stands that would be outside the range of natural
variability, some stands will have to first be thinned. Again, removal should concentrate on smaller-
diameter trees, particularly those that form fire ladders into the crowns of large, older trees. Also,
gambel oak (known as oakbrush) may have to be reduced where it exists with ponderosa pine prior to
any burning to avoid post-fire domination of the sites by oakbrush. See Binkley et al, id., at 10.

5. Large Douglas-fir trees should be retained, as they likely existed prior to fire suppression. Some small
Douglas-fir should also be retained to ensure retention of conifer trees in case ponderosa pine become
infested by bark beetles. Some smaller, younger ponderosa should also be retained for the same
purpose.

6. Results of all activity must be monitored. Items to look for include:  weed infestation and/or spread,
conifer tree regeneration, gambel oak sprouting, effects of any livestock grazing, and ground vegetation
response to activities. Control areas will need to be established prior to any activity to allow before and
after comparisons.

---

[17] This corresponds to the time of settlement of the area by European descendants, and it is also, according to Binkley et al, id.,  the year of a
major fire on the Plateau.
[18] Binkley et al note that the mixed-conifer forests on the Plateau they sampled appear to be largely within the range of historic variability
(HRV). Id. at 9, 13. It thus stands to reason that some of the highest elevation stands dominated by ponderosa pine would also be within the
HRV.

BLM_0081950

<u>Spruce-Fir Ecosystem</u>

This ecosystem occurs at the higher elevations of forested areas in Colorado, generally above about 9,000 feet. These ecosystems have not been affected by fire suppression, as the fire return interval is in the hundreds of years. Due to the short growing season and harsh conditions, recovery from disturbances, natural and human, takes a very long time.

No active management is needed or justified in this ecosystem. The one exception might be after a large, stand-replacement fire, where soil stabilization might be needed in a few areas to help conserve water quality.

## 10. <u>Cultural Resources</u>

FLPMA obligates the BLM to protect cultural, geologic, and paleontologic resource values (43 U.S.C. §§ 1701(a)(8) 1702(c)).  In the context of historical and cultural resources, the National Historic Preservation Act of 1966 ("NHPA") (16 U.S.C. § 470 et seq.) affords heightened protection to these resources, establishing a cooperative federal-state program for the protection of historic and cultural resources.  In particular, the review process set out in Section 106 (16 U.S.C. § 470f) obligates the BLM to consider the effects of management actions on historic and cultural resources listed or eligible for inclusion under NHPA.  Additionally, Section 106 requires the BLM to consider the effects of its management actions on all historic resources and to give the Advisory Council on Historic Preservation an opportunity to comment before the BLM takes action.  Section 110 of the NHPA requires the BLM to assume responsibility for the preservation of historic properties it owns or controls (16 U.S.C. § 470h-2(a)(1)), and to manage and maintain those resources in a way that gives "special consideration" to preserving their historic, archaeological, and cultural values.  Section 110 also requires the BLM to ensure that all historic properties under the jurisdiction of the field office are identified, evaluated, and nominated to the National Register of Historic Places. *Id*. § 470h-2(a)(2)(A).

Further, the President's "Preserve America" initiative (*See* Exec. Order 13287, March 3, 2003) requires the BLM to advance the protection, enhancement, and contemporary use of its historic properties.  The BLM must ensure that "the management of historic properties in its ownership is conducted in a manner that promotes the long-term preservation and use of those properties as Federal assets."

Therefore, the Uncompahgre Field Office must carefully consider the effects of all RMP decisions on the archaeological and cultural values located in the planning area.  Since it will be difficult to evaluate the effect of decisions when the location of cultural resources is unknown, the BLM should undertake an archaeological inventory wherever necessary. One area within the Uncompahgre Field Office with known cultural resources is the northern side of the Paradox Valley west of Bedrock. A number of immense Petroglyph panels can be found on a few boulders and in a small finger canyon of Wingate Sandstone there. BLM should inventory this area, if it hasn't already, and protect these resources in the RMP.

In regards to travel planning, the BLM should consider where motorized and non-motorized routes are directing people, inventory cultural resources along those routes, and carefully consider the potential impacts to those resources. Specifically, BLM should evaluate whether dust from vehicle use, energy development, and other authorized uses is impacting Petroglyph panels. Furthermore, dust

54

suppressants have been shown to impact rock art in Nine Mile Canyon, Utah.[19] These impacts must be analyzed and minimized.

***Recommendations***: BLM's goal should be to protect, conserve, and where appropriate restore archeological and historical sites and landscapes. To that end, BLM should:

- Survey all known or discoverable cultural and historic sites, or those adjacent sites may be adversely affected.
- Determine the sites or areas that are most vulnerable to current and future impact and adopt management actions necessary to protect, conserve, and restore cultural resources.
- Complete a Cultural Resource Management Plan that coordinates with the objectives of the RMP and seeks to provide for an appropriate proactive process of inventorying for cultural resources, making determinations of eligibility for the National Register, and seeking to nominate eligible properties to the National Register. The RMP should establish a timeline for completing the Cultural Resources Management Plan, and prioritize areas to be inventoried for cultural resources.
- Outline specific management actions, such as stabilization, fencing, signing, closures, or interpretative development, to protect, conserve, and where appropriate restore cultural resources.
- Adopt measures to protect cultural resources from artifact collectors, looters, thieves, and vandals.
- Consult with the Native American community to determine whether there are sites or specific areas of particular concern, including sites of traditional religious and cultural significance.

## 11. Wild & Scenic Rivers

We are submitting separate, detailed comments on the Wild and Scenic Rivers Eligibility Report; however, we want to include some general comments on protecting streams and segments within the Uncompahgre Field Office as part of this RMP revision.

Rivers deemed eligible for inclusion in the Wild and Scenic Rivers System must be managed to protect their values until the suitability determination is made, and suitable rivers must be managed so as to protect their qualities until Congress has an opportunity to designate the river as part of the System. Given that water is relatively sparse and that riparian areas are scarce in the study area, each stream is of tremendous value, and the BLM should fully protect these priceless resources via the Wild and Scenic Rivers Act and the Uncompahgre RMP.

### Protect all eligible segments

Whether found suitable or not, all segments found eligible must, under the provisions of the Wild and Scenic Rivers Act and accompanying regulations, be managed in order to preserve the characteristics that make those segments eligible.

### Protective measures must be specific to wild and scenic eligibility and suitability

Protective management prescriptions and requirements—specific to segments' values that prompt findings of wild and scenic eligibility and suitability—must be included the final RMP and so must be carefully analyzed in preparation of the draft plan. Consideration other management prescriptions or

---

[19] Kloor, Keith. "Dust Storm Rising Over Threat to Famed Rock Art in Utah." *Science* 319 (2008): 394. Available online at http://www.ninemilecanyoncoalition.org/ninemilestudy.pdf.

BLM_0081952

designations that could, by coincidence, help protect features that contribute to the segments' eligibility and suitability are helpful (wilderness study areas, areas of critical environmental concern, visual resource management classes, mineral withdrawals, etc.). Those coincidental protections and designations must, in the final RMP and in its implementation, must specifically supplement wild and scenic river purposes, or similar measures must be provided in the final plan exclusively for wild and scenic river purposes.

Similarly, the BLM can protect river values through other special management designations. Such management designations should supplement, and not replace, complete consideration of wild and scenic river values or complete protection under the terms of the Wild and Scenic Rivers Act and its provisions for study and for interim protection.

### Apply available protections specific to wild and scenic

Whatever the ultimate collection of stream segments found to be suitable, BLM should consider the following management options for protecting each segment and apply those that are necessary for adequate protection:

- closed to off-highway vehicle use;
- withdrawn from mineral entry;
- as VRM Class I or Class II areas;
- as right-of-way exclusion areas;
- subject to remedial actions to ensure sensitive species habitat is maintained or enhanced;
- subject to extensive and reliable no-surface-occupancy stipulations for all activities;
- with related ACECs closed to off-highway vehicle use;
- with related ACECs closed to oil and gas exploration and development;
- among other appropriate measures.

### Reconsider and expand eligibility determinations

The criteria for eligibility evaluation are clear. The Department of the Interior's Bureau of Land Management Manual chapter "8351 –Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, and Management (BLM Manual). Section .31A of that manual states:

> Basis for Determination. To be eligible, a river segment must be "free-flowing" and must possess at least one river-related value considered to be "outstandingly remarkable." These factors are summarized in Illustration 1. *No other factors are considered in determining the eligibility of a river segment. All other factors are considered in determining suitability.*" (emphasis added)

Since more detailed management decisions about stream segments would be made later in the suitability determination phase, as part of the current RMP revision or in subsequent amendments, it makes sense to list as eligible *all* segments that have any variation of the primary eligibility criteria, including even one outstandingly remarkable value. When in doubt, include them as eligible.

Further, the BLM must disclose the scope of the outstandingly remarkable values (ORV) inventory process used in the draft eligibility report, and the BLM must extend that analysis to include all stream-related ORVs and study corridors wide enough to incorporate those ORVs. We note that some past wild and scenic have relied too heavily and arbitrarily on a one-quarter-mile "buffer" around identified segments in its initial identification of ORVs.  BLM guidance is clear that such a "buffer" is not the appropriate measure for an ORV's association with a river.  For example, ORVs can "owe their location

56

BLM_0081953

or existence to the presence of the river" (IM 04-196), a standard on which it would be arbitrary for BLM to place a numerical value. We are concerned that if BLM uses this arbitrary buffer, the agency will overlook significant ORVs that are tied to a segment.

Geologic and scenic ORVs, as examples, could easily extend or originate from distances greater than one-quarter-mile from a segment. In an arid western slope climate, important cultural and historic values that are directly tied to segments used as water sources and migration routes for historic human populations are likely to exist a variety of distances from a segment yet "owe their location or existence to the presence of the river." *Id.* With vast amount of BLM land having never undergone formal cultural survey, it is important that BLM employ generous and inclusive boundaries in their inventory.

**_Recommendation_**:  The Uncompahgre RMP must carefully study *all* potentially eligible stream segments, adopt requirements to ensure eligible and suitable rivers are protected pending decisions on their designation, and ensure any designated rivers and river corridors are managed to preserve their values.

## 12. **Oil and Gas Management**

### a.   Scope of Oil and Gas Leasing

BLM must consider the following when deciding which areas to allow fluid mineral leasing and development: 1) the BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for oil and gas development. 43 U.S.C. § 1712(c)(1); 2) BLM must consider a *reasonable* range of alternatives in regards to areas open to oil and gas leasing.  40 C.F.R. § 1502.14; and 3) any decision which leaves the vast majority of the field office open to oil and gas development will preclude the effectiveness or long term viability of any conservation measures as there is always the potential that those conservation measures could be jeopardized by oil and gas development, regardless of how low the potential for development is currently.

1. The BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for oil and gas development.

FLPMA obligates the BLM to abide by the principles of multiple use and sustained yield, especially during the land use planning process.  Specifically, multiple-use is defined as:

> ...the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output. 43 U.S.C. § 1702(c).

The definition of multiple use makes it clear that the BLM is obligated to manage the land for a number of resources other than oil and gas leasing, and states specifically that the BLM should manage some land for less than all of the resources and should not always be concerned with managing the land in order to receive the greatest economic return.  The definition of multiple-use makes it clear that simply because a particular resource exists does not mean that the BLM needs to be able to extract that resource for a profit.  It is well within the realm of BLM's multiple-use mandate to not have a significant

57

portion of the Uncompahgre Field Office open to oil and gas leasing.  Further, BLM should consider alternatives which choose not to re-lease areas formerly leased when those leases expire or are terminated.  Areas where there are specific resource concerns or that are identified as important habitat should be considered for other uses besides oil and gas leasing.  These areas may include, but are not limited to: Areas of Critical Environmental Concern, Special Recreation Management Areas, Potential Conservation Areas, critical habitat, areas with cultural resources, proposed wilderness and lands with wilderness characteristics.

BLM's answer to charges that it is not adequately protecting resources from oil and gas impacts is often to provide leasing with No Surface Occupancy (NSO) stipulations.  While NSO stipulations are a marked improvement over offering leases with standard lease terms, it is important to note that NSO stipulations do not necessarily resolve the wildlife and other resource concerns associated with oil and gas leasing.  There are adverse consequences to wildlife associated with oil and gas development, regardless of whether or not there is an NSO stipulation on the lease.  An example of this, noted by Clait Braun (2006) in *A Blueprint for Sage-grouse Conservation and Recovery*, a copy of which is attached to these comments, is that "oil and gas development influenced the rate of nest initiation of sage-grouse in excess of 3 km of construction activities.  Clearly, the amount and (likely) frequency of noise associated with development has major negative effects on greater sage-grouse."

Further, BLM often offers companies exceptions, modifications or waivers from the application of NSO stipulations.  Having NSO stipulations on a majority of the lands within the field office is better than allowing surface occupancy in terms of wildlife and resource concerns, but that does not supplant the BLM's obligation to manage for a variety of resources, of which oil and gas is only one.

2.    NEPA requires the BLM to consider and evaluate a reasonable range of
       alternatives for oil and gas development.

The range of alternatives is "the heart of the environmental impact statement." 40 C.F.R.  § 1502.14. NEPA requires BLM to "rigorously explore and objectively evaluate" a range of alternatives to proposed federal actions. *See* 40 C.F.R. §§ 1502.14(a) and 1508.25(c). "An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action." Northwest Envtl Defense Center v. Bonneville Power Admin., 117 F.3d 1520, 1538 (9th Cir. 1997). An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. City of Tenakee Springs v. Clough, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R. § 1502.14).  This evaluation extends to considering more environmentally protective alternatives and mitigation measures.  *See, e.g.,* Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094,1122-1123 (9th Cir. 2002) (and cases cited therein).  For this Draft RMP, the consideration of more environmentally protective alternatives is consistent with the requirement of FLPMA to "minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved." 43 U.S.C. §1732(d)(2)(a).

NEPA requires that an actual "range" of alternatives is considered, such that the Act will "preclude agencies from defining the objectives of their actions in terms so unreasonably narrow that they can be accomplished by only one alternative (i.e. the applicant's proposed project)." Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1174 (10th Cir. 1999),  citing Simmons v. United States Corps of Engineers, 120 F.3d 664, 669 (7th Cir. 1997).  This requirement prevents the EIS from becoming "a foreordained formality."  City of New York v. Department of Transp., 715 F.2d 732, 743 (2nd Cir. 1983). *See also*, Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002).

58

In order to comply with NEPA, BLM must consider a broad spectrum of alternatives in regards to which lands will be available for oil and gas leasing.  A Draft RMP which leaves all the lands within the planning area open to oil and gas leasing or only allows for very slight differences between the alternatives in this regard fails to meet the "reasonable range of alternatives" directive.  BLM has an obligation to rigorously explore and evaluate a range of alternatives.

3.  <u>A decision which leaves the vast majority of the Field Office open to oil and gas development necessarily negates the effectiveness or long term viability of any conservation measures as there is always the potential that those conservation measures could be jeopardized by oil and gas development, regardless of how low the potential for development is.</u>

BLM has an opportunity in this RMP to make great strides in conservation and habitat restoration.  However, the long term viability of these strategies, programs and goals could be severely impacted by oil and gas development.  Oil and gas development is known to cause a variety of problems that are detrimental to wildlife, and by leaving nearly the entire planning area open to leasing, the BLM may undermine any conservation efforts or goals it identifies in the RMP.  The West is pockmarked with many places which were left open to oil and gas leasing based on the belief that these areas had low potential for development.  As a result, when an economically recoverable reservoir of oil and/or gas was discovered, the area had insufficient protection measures in place.

This lack of forethought has created many problems for wildlife and other resources.  The impacts from oil and gas development are now well known, as such, areas of high ecological or cultural resource density should simply not be available for leasing.  For example, Clait Braun, a leading researcher on sage grouse in the west, has stressed the impacts that oil and gas development can have on sage grouse populations:

> Road building, well pad construction, and noise disturbance associated with oil and gas development can fragment effective sage grouse habitat and compromise the quality of seasonal use areas. In addition, by creating more linear areas and smaller habitat patches, energy development can boost predation rates on sage grouse. So, for a variety of reasons, major oil and gas development reduces the area useable by sage grouse, which often leads to greater isolation of populations and a reduced ability to handle droughts, severe winters, or other natural disturbances[20]

BLM simply cannot expect to have ecologically effective sage grouse habitat, or any other type of important wildlife habitat, and unlimited oil and gas development in the same area.  A situation arrives in which the goals, programs, and designations BLM uses to protect a valuable resource is only effective until such time that the right technology and/or price of oil and gas reaches a point that a previously non-economically extractable supply becomes economically extractable, or until a previously unknown supply not thought to exist is discovered. History tells us that BLM must consider the impacts of oil and gas development across the planning area and close areas which have important wildlife, cultural, or wilderness values.

---

[20] This paragraph is adapted from detailed scoping comments on Upper Green sage grouse population trends and management issues prepared by Dr. Braun and submitted to the Pinedale BLM in October, 2002. Contact Linda Baker, Upper Green River Valley Coordinator (307-360-7198) to receive a copy of his 14 page comment letter.

59

BLM_0081956

**Recommendations**:  In order for the BLM to comply with FLPMA and NEPA the agency should, at a minimum, consider and "rigorously explore" the possibility and design alternatives which do not leave a significant portion of the Field Office open to oil and gas leasing.  *See* 43 U.S.C. § 1712(c)(1) and 40 C.F.R. §§ 1502.14(a) and 1508.25(c).  We recommend, at a minimum, that the areas identified as having "low" oil and gas potential be removed from consideration for leasing.  Further, BLM must consider a range of alternatives that will address what to do with currently leased lands which are not developed and are either terminated or expire.  Not allowing oil and gas leasing in these areas would help the BLM move towards meeting its goal of managing the federal lands within its jurisdiction for a variety of uses, not primarily for oil and gas leasing.  For lands which area identified as appropriate for leasing, a variety of non-waivable stipulations, conditions of approvals (COAs), and Best Management Practices (BMPs – discussed later) should be developed to protect the many resources present in the planning area.

     b.   Additional Impacts of Oil and Gas Leasing

NEPA requires that federal agencies take a "hard look" at the direct and indirect environmental impacts of oil and gas development <u>before</u> any action that will lead to such development takes place.  *See, e.g., Pennaco Energy, Inc. v. U.S. Department of the Interior*, 377 F.3d 1147 (10th Cir. 2004); *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988); *Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983).  NEPA's regulations further provide that the "effects" on the environment that agencies must consider include those that are "direct, indirect, or cumulative."  40 C.F.R. § 1508.8.  The NEPA regulations define "cumulative impact" as:

> the impact on the environment which results from the **incremental impact of the action when added to other past, present, and reasonably foreseeable future actions** regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  **Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time**.

40 C.F.R. § 1508.7. (emphasis added).  The analysis of impacts included in the FEIS must adequately address the cumulative impacts of oil and gas operations within the region or the impacts inherent in the proposed action.

Federal caselaw amplifies that agencies must disclose the direct and indirect environmental effects a federal action will have on non-federal lands.  <u>*See* *City of Davis v. Coleman*</u>, 521 F.2d 631, 677-81 (9th Cir. 1975) (where federal approval of highway project likely to have impacts on development of surrounding area, agency must analyze development impacts in EIS); *Coalition for Canyon Preservation v. Bowers*, 632 F. 2d 774, 783 (9th Cir. 1980) (same); *Sierra Club v. Marsh*, 769 F.2d 868, 877-89 (1st Cir. 1985) (striking down EA where agency failed to account for private development impacts likely to result from its approval of causeway and port facility); *Mullin v. Skinner*, 756 F.Supp 904, 920-22, (E.D. N.C. 1990) (striking down EA where agency failed to account for private development impacts likely to result from agency approval of bridge).  Such impacts must be disclosed, particularly where facilitating private development may be the project's "reason for being."  <u>*See* *Citizens Comm. Against Interstate Route 675 v. Lewis*</u>, 542 F.Supp. 496, 562 (S.D. Ohio 1982).

BLM must consider impacts of region-wide development and also consider impacts on private lands.  Existing development from neighboring planning areas as well as development within the field office

60

affects the Uncompahgre planning area.  Similarly, although the BLM may not have formal control over adjacent private lands, these lands can also be affected by oil and gas development.  The impacts of oil and gas development do not recognize management boundaries.

***Recommendation***:  In considering the need and ways to manage these lands to protect the many resources of these public lands, the agency must consider the cumulative impacts from regional oil and gas development and the cumulative impacts to adjacent lands from oil and gas development.  This analysis should inform the manner in which BLM allocates lands as available or unavailable for oil and gas development and the conditions under which development may be permitted.

c. Best Management Practices

Significant portions of the Uncompahgre RMP planning area will likely remain open to oil and gas development.  As discussed with respect to the many other values of the lands within the planning area, many of these lands should not be open to leasing and others require non-waivable lease stipulations to protect their resources, such as wildlife habitat, water quality and wilderness characteristics. It is vital that the RMP require the use of best management practices (BMPs) for oil and gas exploration and development, which can drastically reduce the impacts of oil and gas development on the other natural resources of the public lands.

BLM's guidance requires consideration of BMPs for oil and gas development.  BLM's Instruction Memorandum 2004-194 directs consideration of BMPs and both the IM and the recently updated Gold Book provide examples of BMPs that can be applied to both new and existing leases, in order to limit the damage from oil and gas development.  It is critical that the RMPs consider and make BMPs mandatory in order to comply with BLM's guidance and obligations to protect the many natural values of these lands.

***Recommendations***:  The Uncompahgre RMP must identify BMPs and make them mandatory, especially in sensitive areas.  BMPs should include:

- Phased or strategic development - in terms of timing (developing one area, then restoring before moving to another), location (such as staying out of big game corridors), limiting amount of equipment in use at any given time, limiting amount of surface disturbance on a lease at any given time and requiring successful restoration before permitting additional disturbance;
- directional drilling;
- clustered drilling;
- closed loop drilling;
- interim reclamation;
- restoration standards;
- unitization; and
- increased bonding.

## 13. Air Quality

The RMP must thoroughly analyze impacts of each alternative on air quality, especially in the context of oil and gas development. The Environmental Protection Agency is currently proposing to lower the National Ambient Air Quality Standard (NAAQS) to better protect human health. The EPA's proposal

61

would strengthen the 8-hour "primary" ozone standard to a level within the range of 0.060-0.070 parts per million (ppm). EPA is also proposing to establish a seasonal "secondary" standard, designed to protect sensitive vegetation and ecosystems, including forest and wilderness areas, set within the range of 7-15 ppm-hours. Although non-attainment is most frequently expected and witnessed in large urban areas, rural counties with high levels of oil and gas development have experienced startlingly high levels of ozone pollution. The RMP should analyze air quality in the context of the new NAAQS, which should be finalized before the draft RMP is released.

In addition to ozone pollution, oil and gas development activities contribute to CO, $NO_x$, $SO_2$, HAPs and volatile organic compound (VOCs) pollution, through activities like flaring, drilling, processing plants, and wellhead compressors and compressor stations, to name a few. Additionally, recreational ORV use cause fugitive dust emissions, particulate matter and contribute CO, $NO_x$, and hydrocarbon emissions.

Furthermore, deterioration of air quality is shown to have substantial economic costs, and good air quality provides many economic benefits. Attached please find a fact sheet (incorporated into these comments by reference), prepared by The Wilderness Society, entitled, "Assessing Costs Associated with Impacts to Air Quality."

The Wilderness Society reviewed three studies: two Reports to Congress prepared by the EPA and one recent peer-reviewed article whose principal author is a researcher employed by the EPA.[21] These three studies summarize nearly all of the extant epidemiological and economic research related to the health consequences of ozone exposure.[22] The studies, released in 1997, 1999, and 2005, show five patterns clearly:

1. Improvements in air quality result in substantial economic benefits well in excess of economic costs.

2. The range of known and scientifically-valid health consequences from polluted air in general, and elevated ozone levels in particular, is increasing.

3. The increasing breadth and depth of valuation research in economics provides evidence that can be used to quantify and monetize the health-related benefits of reduced air pollution.

4. High levels of inflation for goods and services related to health care suggest that the economic costs of ozone exposure will grow rapidly in the future, even if NAAQS standards are not further tightened.

5. There is a well-stocked tool box available to BLM to use in estimating the economic cost of the increased air pollution likely to result from accelerated oil and gas development and other pollution-generating activities on BLM lands.

In making land use decisions, federal agencies have an obligation under NEPA to take a "hard look" at the environmental consequences of a proposed action, and the requisite analysis "must be appropriate

---

[21] This review was originally conducted by Dr. Joe Kerkvliet as part of his comments on the Final Supplemental Environmental Impact Statement for the Pinedale Anticline Oil and Gas Exploration and Development Project.
[22] The Hubbell, et al., paper is attached to these comments. The EPA reports are too voluminous to attach to this letter, but can be accessed at http://yosemite.epa.gov/EE/epa/eerm.nsf/vwRepNumLookup/EE-0295?OpenDocument and http://www.epa.gov/oar/sect812/1990-2010/fullrept.pdf. Last accessed Mar. 26, 2010.

BLM_0081959

to the action in question." 42 U.S.C. § 4321 et seq.; *Metcalf v. Daley*, 214 F.3d 1135, 1151 (9th Cir. 2000); *Robertson v. Methow Valley Citizens Council, supra.* The impacts and effects of a proposed action, such as oil and gas development, that federal agencies are required to assess include: "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8. Under the Data Quality Act, federal agencies are required to use information that is of high quality and that is objective, useful, and verifiable by others.[23] Agencies must also use "sound statistical and research" methods.[24] In order to complete a sufficient analysis of air quality, the data provided with this fact sheet should be incorporated into the BLM's air quality analysis.

Protecting air quality should be a priority in the Uncompahgre RMP. FLPMA requires BLM to consider the relative value of the various resources, and clean air is quickly becoming (along with undeveloped landscapes) a most valued, yet dwindling resource. Therefore, BLM should take a proactive approach to managing air quality by, among other things: setting aggressive standards (beyond that simply found in existing regulations); requiring any actions on public lands to meet those standards (i.e. no flaring, no two-stroke engine use on public lands, etc); analyzing the cumulative impact of any proposed action with other past, present, and reasonably foreseeable actions; establishing an effective monitoring program; and halting any actions that contribute to air pollution if such monitoring reveals that standards have been exceeded.

Furthermore, NEPA requires BLM to analyze both adverse and beneficial impacts of its decisions. Therefore, the RMP should assess not only negative impacts to air quality from activities such as oil and gas development, but also the potential benefits of controlling those effects.

**_Recommendations_**: BLM should analyze impacts to air quality using the EPA's proposed NAAQS, and include management actions and best management practices in the RMP that minimize and mitigate those impacts. BLM should consider economic and other benefits of protecting air quality.

## 14. Uranium

The history of uranium mining and milling in the United States (and indeed, around the globe) is replete with environmental damage, serious worker safety and health abuses, and harm to entire communities. Many remote and unique landscapes continue to suffer the effects of an industry characterized by several years of speculation-driven booms followed by decades-long periods of inactivity. The affected communities have been both low income and in great measure comprised of rural and indigenous populations, representative of an all too common pattern of environmental injustice. Additionally, most of the environmentally damaged sites have not received adequate stabilization, let alone cleanup of past harms. Where cleanup and decontamination of the radioactive and toxic effects has been carried out, most of the cost has been borne by taxpayers rather than the owners of the largely Canadian-based companies who are engaged in the uranium mining and milling industry, including Energy Fuels Inc, the Canadian based company proposing the Piñon Ridge Uranium Mill in the Paradox Valley. The RMP and NEPA analysis provides the opportunity and duty for BLM to inventory these un-reclaimed mines and contaminated lands and to present the direct, indirect, and cumulative impacts of uranium mining,

---

[23] Treasury and General Government Appropriations Act for Fiscal Year 2001, Pub.L.No. 106-554, § 515. *See also*, Office of Management and Budget "Information Quality Guidelines," available at http://www.whitehouse.gov/omb/inforeg/igg_oct2002.pdf and individual "Agency Information Quality Guidelines," available at http://www.whitehouse.gov/omb/inforeg/agency_info_quality_links.html.

[24] *Ibid.*

BLM_0081960

along with a robust set of alternative courses of action and mitigation measures which will guide the BLM in its ongoing attempts to handle abandoned mines in the Uncompahgre Field Office, while simultaneously attempting to consider and approve the industry's attempts to open new mines.

The boom and bust of the uranium mining industry in the Uravan Mineral Belt has left un-reclaimed, abandoned and mining operations "temporarily on hold" waiting for the next boom. Many of these operations are using these sites as long-term storage for uranium ore, resulting in unnecessary and undue degradation of the land, air, water, and wildlife on which multiple uses of these lands depend. In addition to imposing strict standards for the handling and stockpiling of ore, wasterock, and overburden during actual mining operations, the RMP should impose an outright ban on the ongoing practice of using mine pads for the long-term storage of uranium ore.

The BLM should acknowledge in the RMP that it has the authority to deny mining claims altogether to comply with FLPMA's requirement that, "[i]n managing the public lands the Secretary [of the Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). The requirement to avoid unnecessary or undue degradation is the "heart of FLPMA [and] amends and supersedes the Mining Law." Mineral Policy Center, 292 F. Supp. 2d 30, 33 (D.D.C. 2003). Congress explicitly recognized that this requirement would "impair the rights of any locators or claims under the Act, including, but not limited to, rights of ingress and egress." 43 U.S.C. § 1732(b).

Specifically concerning the Department of Energy Lease Program in the UFO the RMP should recognize that the BLM continues to have management authority over the lease tracts. The RMP must make management decisions in accordance with the public land laws, all of which still apply on uranium lease tracts co-managed by the BLM and DOE. Our review finds no applicable NEPA analysis of the BLM's past decisions or the BLM management duties as they apply to the ongoing activities on these lease tracts.

Because of the unique and significant impacts posed by each of the uranium mines in the Uncompahgre Field Office, the RMP must include specific commitment that, for any proposed uranium mining projects, the BLM will evaluate all necessary, site-specific information within the requirements of an EIS. The process and analyses required in an EIS is necessary to protect the environment and public health, ensure that any recovery minimizes and mitigates negative impacts to sensitive resources like wilderness quality lands, clean air and water, wildlife habitat, cultural resources, and recreation opportunities. No federal agency has prepared a NEPA-compliant analysis of the cumulative impacts – past, present, and future - of the uranium mining and milling activity in the Uncompahgre Field Office, which includes the Uravan Mineral Belt and the area shown by the map published by Energy Fuels to demonstrate the geographic scope of the uranium mining and milling activities in the Uncompahgre region. Such a cumulative impacts analysis should at a minimum include the cumulative impacts of uranium mining and milling on the quantity and quality of regional groundwater supplies, the cumulative impacts on regional airsheds, and the cumulative impacts on regional surface water supplies. Impacts to wildlife, and necessary restrictions and mitigation measures must be considered, especially the impacts to threatened and endangered species, sensitive species, and bats, which are attracted to mine sites. Additionally, in the RMP, the BLM should evaluate and identify practices that can be required to minimize the impacts on the other natural resources of the planning area by limiting water use and surface disturbances. Last, because circumstance may arise at the site-specific level where the impacts cannot be adequately mitigated, the RMP must recognize that field offices must consider a "no action alternative" and may choose to deny a mining or exploration request in such situations.

64

BLM_0081961

***Recommendation***: BLM should protect areas from uranium mining where appropriate, thoroughly analyze the cumulative impacts of any proposed uranium recovery and make every effort to minimize and mitigate negative impacts to sensitive resources.

## 15. Fugitive Dust

Oil and gas development, mining, grazing, and off-road vehicle use are activities managed by the BLM that can destabilize soils and make them susceptible to windborne erosion. The resulting dust can cause impacts to wildlife, air quality, climate, and human health. The Monticello and Richfield (Utah) Proposed RMPs declare that surface disturbing activities such as oil and gas development and motorized vehicles contribute to fugitive dust (see, e.g. Richfield PRMP at 4-6, Monticello PRMP at 4-17, 3-13). The Uncompahgre RMP should also recognize this impact, analyze it in each of the alternatives, and adopt management actions that minimize pollution from fugitive dust emissions.

   a.   Impacts to Ecosystems

Fugitive dust suspended in the air has the potential to impact more total area than any other impact of roads (paved or unpaved), and it can have significant effects on ecosystems and wildlife habitat. Forman *et al*., 2003; Westec, 1979.  Motorized vehicles create fugitive dust by travelling on unpaved roads and through cross country travel; it is then dispersed along roadsides or carried further afield via wind currents.  An example of fugitive dust plumes caused by ORV traffic is documented in 1973 satellite photos. These photos show six dust plumes in the Mojave Desert covering more than 1,700 km$^2$ (656.2 mi$^2$). These plumes were attributed to destabilization of soil surfaces resulting from ORV activities. Nakata et al., 1976; Gill 1996.

Fugitive dust can have serious consequences for plant and animal species.  One study of Alaskan roads heavily traveled by various types of vehicles found that dust had buried mosses and very low-statured vegetation in the 10-m-wide area adjacent to each side of the road; dust blankets measured up to 10 cm (3.9 in) deep. Walker and Everett 1987.  According to the EPA,

> Dust can cause both physical and chemical effects. Deposition of inert PM [i.e., particulate matter] on above-ground plant organs sufficient to coat them with a layer of dust may result in changes in radiation received, a rise in leaf temperature, and the blockage of stomata. Crust formation can reduce photosynthesis and the formation of carbohydrates needed for normal growth, induce premature leaf-fall, damage leaf tissues, inhibit growth of new tissue, and reduce starch storage. Dust may decrease photosynthesis, respiration, and transpiration; and it may result in the condensation and reactivity of gaseous pollutants with PM, thereby causing visible injury symptoms and decreased productivity.

EPA, Draft Integrated Science Assessment for Particulate Matter, at 9-108 to 9-109 (Dec. 2008), *available at* http://oaspub.epa.gov/eims/eimscomm.getfile?p_download_id=485679. The BLM should address the impact of fugitive dust on vegetation in and near the Uncompahgre Field Office, including the disruption of photosynthetic and respiration processes and resulting reduced plant growth, reproduction, and survivorship.  It should also evaluate the impacts of dust on wildlife.

65

BLM_0081962

b.   Climate Change

A hard look at impacts from fugitive dust is also necessary in order to understand and disclose to the public the likely contributions to regional climate change caused by this plan.  In September 2009, Dr. Jayne Belnap of the United States Geological Survey gave a presentation to the Colorado Water Conservancy District.[25]  Dr. Belnap's presentation addressed the connection between increased temperature, disturbance, invasive species and dust.  This presentation focused much attention on the impacts from ORVs and noted the cycle of increasing temperatures, which increases dust, which is exacerbated by ORV use, which increases the effects of climate change (temperature increases), with the key indicator of these problems being earlier snowmelts.  Of particular concern is the amount of dust that results from motorized routes, which settles upon snow pack and alters the melt rate which, in turn, alters the availability of warm season infusion of water into streams and lakes, when such water is critical to wildlife.  For example, in 2005 and 2006, disturbed desert dust melted snow cover 18 to 35 days earlier in the San Juan Mountains.[26] In 2009, disturbed desert dust melted snow cover 48 days earlier in the San Juans.[27]

Neff, et.al, (2008) found that "dust deposition onto snow cover in the western United States has recently been shown to accelerate melt and reduce snow-cover duration by approximately one month, a finding that has broad implications for water resources in mountainous regions of the United States" (citing Painter, T. H. *et al*. The impact of disturbed desert soils on duration of mountain snow cover. *Geophys. Res. Lett.* 24 (2007), attached).

c.   Air Quality

Fugitive dust is also a significant contributor to air quality impairment.  In fact, according to the National Emissions Inventory, road dust is the single greatest source of $PM_{10}$.  EPA, Draft Integrated Science Assessment for Particulate Matter, at 3-171 (Dec. 2008), available at http://oaspub.epa.gov/eims/eimscomm.getfile?p_download_id=485679. Fugitive dust accounts for approximately 50% of primary $PM_{2.5}$, with 40% of that arising from unpaved roads. EPA, Air Quality Criteria for Particulate Matter, at 3-94 (Oct. 2004), available at http://oaspub.epa.gov/eims/eimscomm.getfile?p_download_id=435945. Further, a recent California study clearly demonstrates that ORV activity is a major contributor to high particulate matter concentrations in nearby airsheds because of destruction of soil crusts and vegetation. Craig, Cahill, and Ono 2010, available at http://www.slocleanair.org/pdf/PM2-final_report.pdf . The RMP should discuss impacts the travel system and ORV use can have on air quality in the resource area and airsheds outside the resource area.

d.   Human Health

In addition to the concerns raised above, we are worried that increased levels of particulate matter will have negative effects on human health inside and outside the resource area.  According to the EPA, "[n]umerous scientific studies have linked particle pollution exposure to a variety of problems, including

---

[25] PowerPoint presentation given September 18, 2009 at the Colorado River Water Conservancy District seminar, attached as Appendix C and available online at http://www.crwcd.org/page_305).
[26] Thomas H. Painter et al., Impact of Disturbed Desert Soils on Duration of Mountain Snow Cover, Geophysical Research Letters, Vol. 24, L12502 (June 23, 2007).
[27] Thomas H. Painter, Presentation, Colorado River District Water Seminar, September 18, 2009, Grand Junction, Colorado (Painter Grand Junction Presentation).

66

BLM_0081963

increased respiratory symptoms, such as irritation of the airways, coughing, or difficulty breathing, for example; decreased lung function; aggravated asthma; development of chronic bronchitis; irregular heartbeat; nonfatal heart attacks; and premature death in people with heart or lung disease." http://www.epa.gov/pm/health.html, last accessed March 9, 2010. In fact, recently a group of doctors in Utah cited increased dust due to climate change, which, as noted above, is exacerbated as a result of ORV use on fragile soils, as a top public health concern in the arid West.  (See attached article.)  The BLM should analyze the effects of fugitive dust on human health in the resource area, including the potential for airborne fugitive dust to travel and affect human health beyond the boundaries of the Uncompahgre Field Office.

**_Recommendations_**: BLM should analyze the amount of dust that will be generated from the road system, including for ORV use and energy development, through the use of readily available modeling techniques and sampling for particulate matter generated along a representative sample of routes proposed for designation.  This has been done for BLM projects (the West Tavaputs Plateau Natural Gas Full Field Development Plan, DEIS February 2008 and the Enduring Resources' Saddletree Draw Leasing and Rock House Development Proposal, FEA December 2007), and the models for these projects demonstrate that fugitive dust from vehicular travel on unpaved roads can create significant levels of ambient pollution. The Uncompahgre RMP should complete a similar analysis, which comprehensively inventories and describes fugitive dust emissions and models near-field, far-field, and cumulative effects of fugitive dust. The RMP should limit surface disturbing activities as necessary to reduce windborne soil erosion.

## 16. Renewable Energy

The RMP should identify zones for renewable energy projects and limit all renewable energy development to those zones. Zones should be based on high-resource, low-conflict areas that are on already-degraded lands and near existing infrastructure. The BLM is already taking a similar approach in the ongoing Programmatic Environmental Impact Statement for Solar Energy Development and this RMP should designate zones for all types of renewable energy and then limit development to those zones.  In addition, within the zones, BLM should prioritize lands that are most suitable for development, ensure adequate protective measures are imposed on development, and require both on-site and off-site mitigation of impacts to resources, as well as loss of uses (such as recreation).

For off-site mitigation, we also direct BLM's attention to IM 2008-204, which describes the broad type of actions that may be taken to address both direct impacts of a project and greater cumulative effects that development is having on a landscape. IM 2008-204 identifies and elaborates on the types of off-site mitigation that can be used, stating:

- Offsite mitigation may include, as appropriate:
  - In-kind: Replacement or substitution of resources that are of the same type and kind as those being impacted.
    - Example: For every acre of new, long-term surface disturbance in important sage-grouse nesting/early brood-rearing habitat in Area (A), (X) acres of unsuitable habitat in Area (B) is reclaimed, treated, or planted to create new or suitable nesting/early brood-rearing sage-grouse habitat.
  - Out-of-kind: Replacement or substitute resources that, while related, are of equal or greater overall value to public lands.

67

BLM_0081964

> - Example: For every acre of new, long-term surface disturbance in important sage-grouse nesting/early brood-rearing habitat in Area (A), the project proponent agrees to bury (Y) miles of existing power lines and remove the power poles used as hunting perches by raptors in Area (B).
>   - In-lieu-fee: Payment of funds to the BLM or a natural resource management agency, foundation, or other appropriate organization for performance of mitigation that addresses impacts of a project.
>     - Example: The applicant may make payment to the BLM or a conservation group based on the amount of acres that will be disturbed in exchange for commitment from the recipient to apply the funds toward local sage-grouse core habitat protection/restoration projects.

In the context of renewable energy development, there may be additional conservation priorities that can be pursued to mitigate the impacts of individual projects and BLM could being discussions with interested stakeholders to identify these potential targets for off-site mitigation efforts or funding.

***Recommendations***: The Uncompahgre RMP should identify zones for all types of renewable energy development that prioritize high potential for energy development areas that contain degraded lands and are in close  proximity to new transmission, while excluding sensitive conservation lands, such as citizen-proposed wilderness areas and ACECs. The RMP should also specifically preclude development outside the designated zones. Within the zones, the RMP should also set out prioritization criteria, which direct development to degraded lands and identifies other areas where  development is more likely to lead to conflict, as well as setting out protective stipulations to safeguard other resources. We have provided a proposed "Sensitivity Based Prioritization for Development Areas Within Renewable Energy Zones" (attached to these comments) to be used by the Uncompahgre Field Office in implementing these recommendations. For off-site mitigation, BLM should provide for addressing a wide range of options to address the cumulative, far-reaching impact of renewable energy development (as set out in IM 2008-204) and should design a process to reach out to stakeholders and develop a set of conservation priorities to target in connection with off-site mitigation.

## 17. Energy Corridors

As part of the process to designate West-wide Energy Corridors mandated by the Energy Policy Act of 2005, the Department of Energy's Final Programmatic Environmental Impact Statement (PEIS) designates several energy corridors for pipelines and powerlines through the Uncompahgre Field Office. Especially of note is corridor 130-131 (S), which intersects the northern edge of our Norwood Canyon CWP. This corridor could have significant and lasting impacts to the area.

Public comments on the Draft PEIS, attendees at public meetings held by the Department of Energy and cooperating agencies, and Congressmen, utility companies, renewable energy experts, and representatives from state and local governments participating in an oversight hearing held by the House Natural Resources Committee, Subcommittee on National Parks, Forests, and Public Lands and Subcommittee on Energy and Minerals all voiced major concerns about the corridor designation process.  These concerns included:
- lack of adequate consultation with Native American tribes, state and local governments and communities, and local citizens;
- lack of access for renewable energy transmission;

68

- failure to analyze the opportunity to reduce transmission need and the need to designate new corridors with increased efficiency, distributed generation, and new technologies;
- lack of analysis of cumulative impacts;
- failure to analyze impacts to non-federal lands;
- and inadequate protection for special places, protected lands, wildlife habitat, cultural resources, and recreation opportunities.

Many of these concerns were largely ignored in the formulation of the Final PEIS. During the RMP revision, BLM should evaluate potential impacts from corridor 130-131 as well as other corridors within the field office to determine if these corridors are found to be compatible with appropriate resource management.

***Recommendation***: To ensure a sustainable and reliable transmission infrastructure while limiting negative impacts, BLM should designate corridor locations and widths that are based on BLM's local expertise, appropriately account for concerns of local communities, and protect field office resources.

## 18. Climate Change

The Uncompahgre planning area will undoubtedly experience real effects of climate change during the 20 year period that the RMP is in effect. The RMP must analyze climate change both in terms of mitigating contributions to climate change from management decisions and adapting to inevitable impacts of climate change.

We strongly encourage BLM to address the impacts of climate change both from land management actions and to the resource area in this planning revision. There is a global scientific consensus that human-induced climate change is currently altering the landscape and ecological functions at an unprecedented rate. According to the U.S. Climate Change Science Program, the Southwest landscape could be greatly transformed due to drought, wildfire, invasive species, and rising temperatures (4°F to 10°F above the historical baseline). It is imperative that BLM, as the primary landowner in the area, consider, analyze, and mitigate the impacts of global climate change in this management plan revision.

1. BLM must take a hard look at climate change impacts

Impacts to the ecosystem from climate change include shrinking water resources; dust-covered snowpack causing earlier, faster snowmelt; invasion of more flammable non-native plant species; soil erosion; loss of wildlife habitat; and larger, hotter wildfires. Many of these impacts have been catalogued in recent studies by federal agencies showing the impacts of climate change specifically in the United States such as the recent report entitled Global Climate Change Impacts in the United States, *available at* http://www.globalchange.gov/publications/reports/scientific-assessments/us-impacts.

On September 14, 2009, Interior Secretary Salazar issued Secretarial Order (S.O.) No. 3289. This order unequivocally mandates all agencies within the Department of Interior to "analyze potential climate change impacts when undertaking long-range planning exercises, setting priorities for scientific research and investigations, developing multi-year management plans, and making major decisions regarding potential use of resources under the Department's purview." S.O. 3289, *incorporating* S.O. 3226 (emphasis added). The Uncompahgre RMP revision falls squarely under this guidance and BLM must

69

BLM_0081966

assess impacts from the proposed actions that may directly, indirectly, or cumulatively result in exacerbating climate change within this document.

The BLM must fully analyze the cumulative and incremental impacts of the proposed decisions in the RMP. Center for Biological Diversity v. National Travel Safety and Highway Administration, 538 F.3d 1172, 1217 (9th Cir. 2008). In CBD v. NTSHA, the NTSHA failed to provide analysis for the impact of greenhouse gas emissions on climate change and was rebuked by the U.S. Court of Appeals for the Ninth Circuit, which observed that "[t]he impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." 538 F.3d at 1217. For example, off-road vehicle designations, oil and gas management stipulations, and renewable energy development may significantly increase or reduced greenhouse gas emissions contributing to climate change and must be analyzed under NEPA.

Further, NEPA regulations require that NEPA documents address not only the direct effects of federal proposals, but also "reasonably foreseeable" indirect effects.  These are defined as:

> Indirect effects, which are caused by the action and are later in time or farther removed in distance, *but are still reasonably foreseeable*. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b).

For example, the U.S. Climate Change Science Program working group published a report on September 11, 2007 which predicts and elaborates on the widespread impact of climate change on public lands arid regions.  *See* U.S. Department of Agriculture, *The effects of climate change on agriculture, land resources, water resources and biodiversity*, *available at* http://www.climatescience.gov/Library/sap/sap4-3/default.php. That report notes that "the climate changes that we can expect are very likely to continue to have *significant effects* on the ecosystems of the United States." *Id*. at 3 (emphasis added).  These significant impacts include:

- Climate effects on disturbances such as fire, insect outbreaks and wind and ice storms are very likely important in shaping ecosystem structure and function;
- Grasslands will transform into woody shrublands with reduced capacity for water absorption and greater vulnerability to channelization and erosion;
- Droughts early in the 21st Century are likely to increase rates of perennial plant mortality in arid lands, accelerate rates of erosion and create opportunities for exotic plant invasions;
- Proliferation of non-native annual and perennial grasses are virtually certain to predispose sites to fire.  The climate-driven dynamics of the fire cycle is likely to become the single most important feature controlling future plant distribution in U.S. arid lands;
- Climate change is likely to result in shrinking water resources and place increasing pressure on montane water sources to arid land rivers, and increase competition among all major water depletions in arid land river and riparian ecosystems;
- Major disturbances like floods and droughts that structure arid land river corridors are likely to increase in number and intensity (with associated increases in erosion and native plant loss);

70

BLM_0081967

- Land use change, increased nutrient availability, increasing human water demand and continued pressure from exotic species will act synergistically with climate warming to *restructure* the rivers and riparian zones of arid lands;
- Climate change will increase the erosive impact of precipitation and wind;
- Surface soils will become more erodible;
- Increases in wind speed and gustiness will likely increase wind erosion.

*Id.* at 9. While these findings are dramatic, the report further notes that "[i]t is likely that these changes will increase over the next several decades in both frequency and magnitude, and it is possible that they will accelerate." *Id.* at 23.

A report released last year by the Bipartisan Policy Center and edited by the Wildlife Management Institute, provides detailed information about the impacts of climate change on fish and game. *See* http://www.seasonsend.com/downloads/SeasonsEnd.pdf. The Season's End report is not only edited by the Wildlife Management Institute,[28] but quotes a number of biologists in various state fish and game agencies. It is clear from this report that it is indeed possible to use modeling to determine losses of stream habitat for various temperature and climate scenarios. *Id.* at 31.

Finally, the BLM should take advantage of the special conditions of the landscape to advance the important study of global climate change. Due to the fact that BLM is the primary landowner in the area, it is well-suited to provide a scientific model in ongoing research on global climate change by regularly monitoring and reporting on the ecological conditions of the area. This RMP revision provides BLM with the opportunity to collect vital data on climate change in the region to inform the global scientific community.

**_Recommendation_**:  Pursuant to agency policy and case law, BLM must address the impacts of climate change from the proposed action. We recommend that the EIS for this plan incorporate a landscape-level analysis of how the proposed management decisions may contribute to or assuage climate change. The BLM must also evaluate how predicted shifts in climate may lead to an altered management regime in the future.

2.   BLM must develop a range of reasonable alternatives minimizing the adverse effects of climate change from the proposed action

In addition to the agencies' duty to take a hard look at the impacts of climate change to and from the proposed vegetation management plan, the agencies must also include a range of alternatives that includes a strategy for mitigating these impacts. CEQ regulations instruct agencies to consider alternatives to their proposed action that will have less of an environmental impact. 40 C.F.R. § 1500.2(e) states that "[f]ederal agencies shall to the fullest extent possible: . . . Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment."

A June 2008 report, prepared by the Environmental Protection Agency, specifically "identifies strategies to address management challenges posed by climate change for a subset of federally protected lands

---

[28] According to its website, the Institute's work is done by  "resource personnel [who] are highly trained and experienced wildlife science and management professionals, typically working away from the public limelight to catalyze and facilitate strategies, actions, decisions and programs to benefit wildlife and wildlife values." http://www.wildlifemanagementinstitute.org/. It has been in existence for nearly 100 years.

BLM_0081968

and waters.  These strategies can also be broadly applied to other lands and waters managed by governmental or nongovernmental entities."  U.S. Climate Change Science Program Final Report, Synthesis and Assessment Product 4.4, "Preliminary Review of Adaptation Options for Climate-Sensitive Ecosystems and Resources" (June 2008), *available at* http://www.epa.gov/ord/npd/pdfs/gcrp-factsheet_SAP-4-4.pdf.  This information should be included in the analysis of the proposed action in order to craft a reasonable range of management alternatives for addressing climate change.

**Recommendations**:  Proposed alternatives for the RMP should include those that help public lands and resources or proposed projects mitigate climate change or build resiliency to the potential effects of climate change. The RMP should incorporate adaptive management solutions that include monitoring of ecosystem conditions and changing strategies in order to protect the resources of the area and ensure the preservation of important ecosystem services in the face of climate change.

3.  BLM must take steps to prevent unnecessary or undue degradation from climate change

In addition to consideration of impacts from climate change, BLM must also minimize adverse impacts from climate change under FLPMA. FLPMA provides that BLM must *"take any action necessary to prevent unnecessary or undue degradation to managed resources."* 43 U.S.C. §1732(b). Intertwined with this provision is a similar responsibility for BLM to manage public lands *"without permanent impairment to the productivity of the land and the quality of the environment."* 43 U.S.C. §1702(c). These provisions combine to necessitate on-the-ground implementation of climate change policies.

**Recommendations**:  Under FLPMA's mandate to prevent unnecessary or undue degradation, BLM must consider how prescriptions in the RMP will minimize adverse impacts of climate change to the resource area.

4.  BLM must develop adequate monitoring strategy to address unforeseen management challenges in the face of climate change

In order to respond to the land management challenges presented by climate change, the agencies must have the best available data as well as a strategy in place to respond to uncertainties as they arise. A vigilant science-based monitoring system should be set out in the RMP in order to address unforeseeable shifts to the ecosystem.

A detailed monitoring approach is also required under the BLM's planning regulations:

> The proposed plan shall establish intervals and standards, as appropriate, for monitoring and evaluation of the plan. Such *intervals and standards shall be based on the sensitivity of the resource* to the decisions involved and shall provide for evaluation to determine whether mitigation measures are satisfactory, whether there has been significant change in the related plans of other Federal agencies, State or local governments, or Indian tribes, or whether there is new data of significance to the plan. The Field Manager shall be responsible for monitoring and evaluating the plan in accordance with the established intervals and standards and at other times as appropriate to determine whether there is sufficient cause to warrant amendment or revision of the plan.

43 C.F.R. § 1610.4-9 (emphasis added).

72

Such vigilant monitoring is absolutely necessary in order to create an effective adaptive management framework in the face of climate change.

**_Recommendation_**:  A vigilant science-based monitoring system should be set out in the RMP in order to address unforeseeable shifts to the ecosystem due to the best available information on climate change. This should include coordination with the DOI's Climate Change Response Council, Regional Climate Change Response Centers, and Landscape Conservation Cooperatives as established in S.O. 3289.

## 19. Socioeconomic Analysis

The BLM must do a full analysis of all of the socioeconomic consequences of each alternative for the Uncompahgre RMP. We previously submitted detailed comments to EMPSi for consideration in the socioeconomic analysis for the Uncompahgre RMP revision. Those comments, which are attached to this letter in Appendix 2, address a wide range of often overlooked socioeconomic issues that the BLM must consider in addition to estimating jobs and income from commodity extraction on the lands in the Uncompahgre Field Office.

The attached comments provide detailed discussions of several socioeconomic issues that must be considered when the BLM does its analysis for the Uncompahgre RMP. These include a discussion of the issues associated with economic-base theory and its application for predicting impacts from land management, recommendations that the BLM look at trends in total personal income and employment in order to see a more complete picture of the Uncompahgre region's evolving economy, a discussion of the importance of using economically recoverable resource estimates for oil and gas in order to avoid overstating the potential impacts of such development, a discussion of the economic benefits of wilderness-quality lands, and a recommendation that the agency do all planning analysis based on realistic budget assumptions. These socioeconomic analyses are necessary for the BLM to adequately and equitably asses the socioeconomic impacts of the Uncompahgre RMP alternatives.

We recommend that the BLM use a total economic value approach that includes the estimation of non-market values for the wildlands and open spaces in the Uncompahgre planning area. BLM recently affirmed its commitment to this approach in draft IM 2010-061, which explicitly directs managers to evaluate non-market values in RMP analyses. We will be submitting comments to BLM on this draft IM, and we will be happy to provide the Uncompahgre Field Office with a copy of our comments because this issue is especially relevant to western Colorado communities. The total economic value analysis should include the full range of non-market values, including use values – such as recreation – as well as non-use values such as existence value (the benefit one gains just knowing wildlands are protected), option values (the benefit of knowing that one can visit a wildland for recreation) and bequest values (the benefit gained from knowing that wildlands are protected for future generations).

Also included in Appendix 2 are two socioeconomic scoping briefs and The Wilderness Society's recent report, _Natural Dividends: Wildland Protection and the Changing Economy of the Rocky Mountain West_. The first scoping brief, entitled "Socio-Economic Framework for Public Land Management Planning: Indicators for the West's Economy," details our expectations for the baseline analysis of the region's economy as well as the analysis of the potential impacts of proposed management alternatives on the area. This brief describes the changing economy of the Rocky Mountain West, and the role that public lands can play in bringing economic diversity to the communities of the Uncompahgre planning area. The second brief, entitled "The Economic and Social Impacts of Oil and Gas Development," describes the

73

significant and often hidden costs associated with oil and gas drilling. The analysis in the RMP must include an assessment of these costs in order to describe net (rather than gross) benefits of any proposed oil and gas leasing. We request that your analysis of socioeconomic considerations in the Uncompahgre Resource Area follow the approach set out in these documents, as well as the more specific considerations detailed in our attached comments.

**Recommendations**: The RMP should evaluate non-market values provided by wildlands, per BLM's commitment set out in draft IM 2010-061. BLM should utilize the materials included in Appendix 2 to inform the RMP's socioeconomic analysis and ensure a full accounting of the costs and benefits of each of the alternatives.

Thank you for your consideration of our scoping comments.  We look forward to seeing these issues addressed as the Uncompahgre RMP revision process continues.

Sincerely,

Steve Smith, Assistant Regional Director
Juli Slivka, BLM Action Center
**The Wilderness Society**
1660 Wynkoop St. Ste. 850
Denver, CO 80202
(303) 650-5818

Bethany Gravell, Executive Director
**Center for Native Ecosystems**
1536 Wynkoop St. Ste. 303
Denver, CO 80202
(303) 546-0214

Hilary White, Director
**Sheep Mountain Alliance**
PO Box 389
Telluride, CO 81435
(970) 729-2321

Roz McClellan
**Rocky Mountain Recreation Initiative**
1567 Twin Sisters Rd.
Nederland, CO 80466
(303) 447-9409

Kate Graham, Public Lands Organizer
**Colorado Environmental Coalition**
546 Main St. #404
Grand Junction, CO 81501
(970) 243-0002

74

BLM_0081971

Amber Kelley, Dolores River Campaign Coordinator
**San Juan Citizens Alliance**
PO Box 2461
Durango, CO 81302
(970) 259-3583

Rocky Smith
**Colorado Wild**
1030 Pearl #9
Denver, CO 80203
(303) 839-5900

Christine Canaly, Director
**San Luis Valley Ecosystem Council**
PO Box 223
Alamosa, CO 81101
(719) 256-4758

Peter Hart, Conservation Analyst/Staff Attorney
**Wilderness Workshop**
PO Box 1442
Carbondale, CO 81623
(970) 963-3977

Mike Chiropolos, Lands Program Director
**Western Resource Advocates**
2260 Baseline, Suite 200
Boulder, CO 80302
(330) 444-1188

Andrea Robinsong, Chair of the Public Lands Committee
**Western Colorado Congress**
PO Box 1931
Grand Junction, CO 81502
(970) 250-8515

Bryan Martin, Director of Conservation
**Colorado Mountain Club**
710 10th Street, Suite 200
Golden, CO 80401
(303) 279-3080

Tom Sobal
**Quiet Use Coalition**
PO Box 1452
Salida, CO 81201
(719) 207-4112

75

Robert Peters, PhD., Executive Director
**Western Slope Environmental Resource Council**
PO Box 1612
Paonia, CO 81428
(970) 527-5307

76

BLM_0081973

**Attachments**

1.  BLM, Jarbidge Field Office, Idaho, Analysis of the Management Situation for the Jarbidge Resource Management Plan: Resource Management Plan/Environmental Impact Statement at 212-216 and Figure 39 (Locations of Current ACECs) and Figure 40 (Wilderness Study Areas), July 2007.

2.  Monticello Proposed RMP, Response to Comments, comment no. 007-48

3.  *State of Utah v. Norton,* Motion to Stay Briefing and for a Status Conference, September 9, 2005.

4.  State of Utah v. Norton, Case No. 2:96-CV-0870, Order and Opinion (D.Utah September 20, 2006)

5.  Brief of the Federal Appellees, State of Utah v. Kempthorne, Case No. 06-4240 (February 26, 2007)

6.  Southern Utah Wilderness Alliance v. Norton, 457 F. Supp. 2d 1253 (D. Utah 2006)

7.  IM No. AZ-2005-007

8.  Appendix 2 - "Implementation, Monitoring, and Evaluation Process" - of the Jack Morrow Hills Coordinated Activity Plan, prepared by the Wyoming BLM.

9.  Little Snake Draft RMP, Appendix F – Criteria for Subsequent Activity Planning

10. Excerpts from the Record of Decision (ROD) for the Dillon Resource Management Area (Montana).

11. Travel Management Planning Template

12. Guidelines for Managing Access between BLM and Private Lands in the Royal Gorge Field Office, incorporated in the Royal Gorge RMP and endorsed by the Front Range Resource Advisory Council (Resolution – FRRAC 06-05).

13. Price Field Office Draft RMP, Appendix 14: Special Recreation Permits.

14. *A Blueprint for Sage-grouse Conservation and Recovery*

15. "Assessing Costs Associated with Impacts to Air Quality"

16. Hubbell, B., A. Halberg, D.R. McCubbin, E. Post. 2005. Health Related Benefits of Attaining the 8-Hour Ozone Standard. Environmental Health Perspectives. 113(1): 73-82.

17. Thomas H. Painter et al., Impact of Disturbed Desert Soils on Duration of Mountain Snow Cover, Geophysical Research Letters, Vol. 24, L12502 (June 23, 2007).

BLM_0081974

18. "Doctors see climate change as dire health threat," Desert News. Oct. 22, 2009.

19. "Sensitivity Based Prioritization for Development Areas Within Renewable Energy Zones"

Appendix 1: Habitat Fragmentation

   a.  *Habitat Fragmentation from Roads:  Travel Planning Methods to Safeguard BLM Lands*, The Wilderness Society, 2006.

   b.  Wilbert, M., Thomson, J., Culver, N. 2008. Analysis of Habitat Fragmentation from Oil and Gas Development and its Impact on Wildlife: A Framework for Public Land Management Planning. The Wilderness Society: Washington, DC. 31 p.

   c.  Weller, C., Thomson, J., Morton, P., Aplet, G. 2002. Fragmenting Our Lands: The Ecological Footprint from Oil and Gas Development. The Wilderness Society: Washington, DC. 24 p.

   d.  Hartley, D. A., Thomson, J. L., Morton, P., Schlenker-Goodrich, E. 2003. Ecological Effects of a Transportation Network on Wildlife. The Wilderness Society: Washington, DC. 27 p.

   e.  Thomson, J. L., Hartley, D. A., Ozarski, J., Murray, K., Culver, N. W. 2004. Protecting Northern Arizona's National Monuments: The Challenges of Transportation Management. The Wilderness Society: Washington, DC. 39 p.

   f.  Thomson, J. L., Schaub, T. S., Culver, N. W. Aengst, P.C. 2005. Wildlife at a Crossroads: Energy Development in Western Wyoming. The Wilderness Society: Washington, DC. 40 p.

Appendix 2: Socioeconomic Analysis

   a.  Socioeconomic Scoping Comments

   b.  Socioeconomic Framework for Public Land Management Planning: Indicators for the West's Economy (2006)

   c.  The Economic and Social Impacts of Oil and Gas Development (2006)

   d.  Haefele, M., Morton, P., Culver, N. 2007. Natural Dividends: Wildland Protection and the Changing Economy of the Rocky Mountain West. Washington, DC. The Wilderness Society.

Appendix 3: Map and Descriptions of Citizen-Proposed Wilderness Areas

## References

Binkley, Dan, Bill Romme, and Tony Cheng, 2008.  Historical Forest Structure on the Uncompahgre Plateau: Informing restoration prescriptions for mountainside stewardship. Colorado Forest Restoration Institute, Ft. Collins, CO.

Britton L. Mace et al., *Aesthetic, Affective, and Cognitive Effects of Noise on Natural Landscape Assessment*, Society & Natural Resources, 12: 225-242, 1999.

78

Douglas S. Ouren et al., USGS, Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources (2007).

Erskine, Ivan, and Sherel Goodrich, 1999. Applying Fire to Pinyon-Juniper Communities of the Green River Corridor, Daggett County, Utah. IN:  Proceedings:  Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9

Goodrich, Sherel, and Chad Reid, 1999.  Soil and Watershed Implications of Ground Cover and Unburned Pinyon-Juniper Sites at Rifle Canyon and Jarvies Canyon [Utah]. IN:  Proceedings:  Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9.

Goodrich, Sherel, and Allen Huber, 1999. Response of A Seed Mix and Development of Ground Cover On Northerly and Southerly Exposures In the Jarvies Canyon Burn, Daggett County, Utah. IN:  Proceedings:  Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9.

Goodrich, Sherel, and Dustin Rooks, 1999.  Control of Weeds at a Pinyon-Juniper Site By Seeding Grasses. IN:  Proceedings:  Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9.

Mehl, Mel S, 1992.  Old-Growth Descriptions For The Major Forest Cover Types in the Rocky Mountain Region.  IN:  Old-Growth Forests in the Southwest and Rocky Mountain Regions:  Proceedings of A Workshop.  USDA Forest Service, Rocky Mountain Research Station, General Technical Report RM-213.

Miller, Rick, Robin Tausch, and Wendy Waichler, 1999. Old-Growth Juniper and Pinyon Woodlands.  IN:  Proceedings:  Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9.

Robin T. Harrison et al., US Forest Service, Project Record: Predicting Impact of Noise on Recreationists (1980).

Romme, William H., Craig D. Allen, John D. Bailey, William L. Baker,
Brandon T. Bestelmeyer, Peter M. Brown, Karen S. Eisenhart, Lisa Floyd-Hanna,
David W. Huffman, Brian F. Jacobs, Richard F. Miller, Esteban H. Muldavin,
Thomas W. Swetnam, Robin J. Tausch, and Peter J. Weisberg, 2008.  Historical and Modern Disturbance Regimes, Stand Structures, and Landscape Dynamics in Piñon-Juniper Vegetation of the Western U.S. Colorado Forest Restoration Institute, Ft. Collins CO.

Romme, William H., Jeffery S. Redders, Lisa Floyd-Hanna, and David D. Hanna, 2009.  Pinyon-Juniper Woodlands.  IN:  Romme, William M., M. Lisa Floyd, and David Hanna. Historical Range of Variability and Current Landscape Condition Analysis:  South Central Highlands Section, Southwestern Colorado & Northern New Mexico. Colorado Forest Restoration Institute, Ft. Collins, CO.

BLM_0081976

Shinneman, D.J. 2006. Determining Restoration Needs for Piñon-Juniper Woodlands and Adjacent Semi-Arid Ecosystems On The Uncompahgre Plateau, Western Colorado. Dissertation. University of Wyoming, Laramie, Wyoming, USA.

Shinneman, D. J., W. L. Baker, and P. Lyon,, 2008.  Ecological Restoration Needs Derived From Reference Conditions For A Semi-Arid Landscape In Western Colorado, USA.  Journal of Arid Environments 72 (2008) 207-227.

Shinneman, Douglas J., and William L. Baker, 2009a.  Historical Fire And Multidecadal Drought As Context For Pinyon–Juniper Woodland Restoration In Western Colorado.  Ecological Applications 19(5), pp. 1231-1245.

Shinneman, D. J., and W. L. Baker, 2009b.  Environmental And Climatic Variables As Potential Drivers Of Post-Fire Cover Of Cheatgrass (*Bromus Tectorum*) In Seeded And Unseeded Semiarid Ecosystems. International Journal of Wildland Fire 2009, *18*, 191–202

Walker, Scott C., 1999. Species Compatibility and Successional Processes Affecting Seeding of Pinyon-Juniper Types.  In:  Proceedings:  Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9.

Young, James A., and T. J. Svejcar, 1999.  Harvesting Energy From the 19th Century Great Basin Woodlands.  IN:  Proceedings:  Ecology and Management of Pinyon-Juniper Communities Within the Interior West.  USDA Forest Service, Rocky Mountain Research Station, Proceedings RMRS P-9.

BLM_0081977

Friends of the River Uncompahgre
PO Box 3592
Montrose CO 81402-3592

March 29, 2010

BLM UFO
Attn: Bruce Krickbaum, RMP Project Manager
2465 S. Townsend Avenue, Montrose, CO  81401
Sent via email to: UFORMP@blm.gov

Dear Mr. Krickbaum:

The Friends of the River Uncompahgre appreciate the efforts of the Bureau of Land Management, Uncompahgre Field Office (UFO), to seek key community input regarding revisions to the UFO Resource Management Plan (RMP). You have undertaken an extensive and diverse effort to obtain public input. As a local nonprofit organization focused on watershed issues in the Uncompahgre River basin, we would like to provide the following comments on the RMP:

1. Assessment of management issues on a watershed basis is important to identify and adequately address conservation needs. Rivers and watersheds cross jurisdictional and political boundaries.  Riparian areas support the vast majority of biological species during some portion of their lifecycle. And rivers are the lifeblood for local communities' health, recreation, and aesthetic enjoyment.
   For these reasons, *we recommend that the Plan include a separate assessment section to consider the conservation needs of rivers and wetlands on a watershed basis*, and to analyze impacts of management decisions on rivers and watersheds as distinct natural systems.

2. Certain types of land use are known to have significant potential to affect water quality, wetlands and riparian systems. *We request that analysis of impacts explicitly consider potential effects on groundwater and riparian systems*, particularly for potential energy exploration and development. Energy development that may have particular impacts on water quality and riparian function include hardrock mining, oil and gas extraction, and large-scale geothermal extraction.
   In addition, we request that the Plan address the potential impacts of recreational use and grazing on water quality and riparian systems.
   Analysis of any such impacts should include the potential for the spread of invasive species along waterways.

BLM_0081978

3. To adequately consider the needs of healthy and naturally functioning riparian and wetland systems, we believe the following perspectives should be incorporated into the RMP Planning Criteria:

   a. Long-term and cumulative effects of management decisions will be considered.
   b. Analysis of impacts will consider potential interaction between management decisions and changes in the larger social and ecological context. In particular, impacts will be analyzed to consider potential interaction with larger-scale dynamics such as climate change; proliferation of invasive species, insects, disease and wildfire; exurban development; changing recreational patterns, and the like.
   c. Analysis of impacts will consider the potential of certain types of land use to shift ecological systems from those that are unique with high biodiversity and healthy natural function, to systems that are poorly functioning, or with common and generalist species and low biodiversity.
      Analysis of impacts on riparian systems will consider aspects of integrated natural function, including factors such as geomorphology, invertebrate and vertebrate species, and vegetation; and the role of riparian areas and wetlands to support movement, migration and reproduction for wildlife and birds.
   d. The planning process and RMP will endeavor to serve as a platform for cross-boundary cooperation. The Plan will provide a foundation for collaborative efforts with many stakeholders that may extend beyond planning to cooperative land management and grant funding.

Thank you for your thoughtful consideration of our comments. We look forward to working with you in future phases of the planning process.

Sincerely,


Elizabeth Roscoe
President, Friends of the River Uncompahgre

9708047522

Mar 29 10 01:33p    Galley

IN



# Uncompahgre
## Resource Management Plan

We encourage you to provide your comments by filling out and submitting this comment form by **March 29** 2010. Please mail your completed form to the address on the opposite side or fax it to 1-970-240-5367. Comments may also be submitted via e-mail to uformp@blm.gov.

First Name **Stan**    Last Name **Galley**    Date **3-29-10**

Mailing Address **Box 631**

City **Nucla**    State **CO**    Zip **81424**

E-mail Address: **Sgalley 96@ hotmail. com**

Would you like to be added to this project's mailing list to receive future project-related information (your name will not be shared)?    Yes: ☒ e-mail materials only  ☐ e-mail and hard-copy materials    ☐ No

Please indicate your affiliation by checking the following boxes (check all that apply):

☒ Individual (no affiliation)    ☐ Non-profit Organization    ☐ Citizen's Group

☐ Federal, State, or Local Government    ☐ Elected Representative    ☐ Regulatory Agency

Name of organization, government, group, or agency (if applicable) _____

Please answer the following four questions about your relationship to the Uncompahgre RMP Planning Area:

Do you live within the planning area? ☐ Unit 1 ☐ Unit 2 ☐ Unit 3 ☐ Unit 4 ☐ Unit 5 ☐ No
*(Refer to map for unit numbers)*

If you do not live in the planning area, do you live in: ☐ Colorado (west slope) ☐ Colorado (front range or plains)
☐ Another State (which): _____ ☐ Another Country (which): _____

If you do live in the planning area, how long have you lived here? Months: _____ Years: **36**

Why do you live here? ☒ Occupation ☐ Family ☐ Proximity to public lands ☐ Recreational Opportunities
☐ Other _____

---

*The BLM wants to hear from you! The Uncompahgre Field Office is committed to listening and learning from our neighbors, friends, and stakeholders. Your answers to the following questions will be helpful at this point in the planning process, as are any other comments. When answering the following questions, reference as appropriate the planning units on the map titled Uncompahgre RMP Planning Units. You may attach additional sheets of paper for long comments. Thank you for taking the time to provide your input.*

---

What issues or concerns do you have regarding public land resources or uses within the Uncompahgre RMP planning area?

I am concern about the San Miguel River being designated a wild & scenic river. This designation would put too much control of the river in the hands of the government and enviromentalists.

1 A-PI WSR

ndents' comments, including their names and street addresses, will be available for public review at the Uncompahgre Field Office during regular business hours from 8:00am to m, Monday through Friday, except holidays, and may be published as part of the EIS. Individual respondents may request confidentiality. If you wish to withhold your name or street s from public review or from disclosure under the Freedom of Information Act, you must state this prominently at the beginning of your written comments. Such requests will be d to the extent allowed by law. All submissions from organizations and businesses, and from individuals identifying themselves as representatives or officials of organizations or s, will be available for public inspection in their entirety.

OVER ▶

BLM_0081980

Keeping in mind the issues above, what changes would you make physically to the landscape (such as what should it look like, modifications, etc.)?

No changes need to be made to the landscape. It should be left as it is.

**2 A-GE**

Keeping in mind the issues above, what changes would you make to administration (such as management actions, rules, regulations, etc.)?

Any decisions about management of the river should be kept away from enviromentalists. People making the decisions should know the area, not some person in an office somewhere that hears a story about a fish or a bush, and thinks they knows what is best for the area.

**3 A-PI WSR** the issues above, what changes would you make to social characteristics (such as number of users, size of groups, behavior of users, etc.)?

Public lands should be just that, "Public". Road closures and limitations on river use should not be controlled by the government. It should be controlled by local groups that know the area.

**4 A-PI WSR** additional comments that you have regarding this project.

A wild and scenic river designation is totally rediculous. This is just another example of people in government trying to control things they know nothing about. This designation would be detrimental to our community and way of life.

**5 A-PI WSR**

*(Please tri-fold this sheet & tape shut before mailing – Do not staple)*

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Place First
Class Stamp
Here

US Bureau of Land Management
Uncompahgre Field Office
Attn: Bruce Krickbaum, RMP Project Manager
2465 S. Townsend Ave.
Montrose, CO 81401

IN

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **To:** | uformp@blm.gov |
| **Subject:** | Fw: Potter and Monitor Canyon |
| **Date:** | Thursday, April 08, 2010 11:48:23 AM |

Scoping comment, received at BLM 3/29/2010.

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 04/08/2010 11:47 AM -----

Julie M
Jackson/MOFO/CO/B
LM/DOI                                                    To
                        Bruce Krickbaum/MOFO/CO/BLM/DOI@BLM
04/08/2010 11:37                              cc
AM                        Karen Tucker/MOFO/CO/BLM/DOI@BLM,
                        Deborah Magee/MOFO/CO/BLM/DOI@BLM
                                        Subject
                        Fw: Potter and Monitor Canyon

Sorry I had this in my travel emails and not sure why they are send them to
this email but here is what looks like a scoping comment.  I couldn't
remember what email address to send it to so I am going to send them to you
instead.

Julie Jackson
Outdoor Recreation Planner
2465 S. Townsend Ave
Montrose, CO  81401
(970) 240-5310
Julie_Jackson@blm.gov

"To the world you might be one person, but to one person, you just might be
the world."
"The happiest people don't have the best of everything. They just make the
best of everything."
----- Forwarded by Julie M Jackson/MOFO/CO/BLM/DOI on 04/08/2010 11:36 AM -----

La Vonne
Glanville
<l.lavonne@gmail.                                    To
com>                        cotmpufo@blm.gov
                                            cc
03/29/2010 03:04
PM                                        Subject
                        Potter and Monitor Canyon

BLM_0081982

**1 A-PI TM**

Please continue to prevent the allowance of an ATV loop in Potter & Monitor Canyons.. We want these areas saved and NOT open to ATV users.

**2 A-PI TM**

Roubideau/Potter/Monitor canyon system west of Delta. Currently Roubideau Canyon has pretty thorough protection as does one side of Potter Canyon (the left side of the stream as you hike up the canyon from below). But flowing into Potter Creek, a mile above where Potter flows into Roubideau is Monitor Creek, and that 10-mile long, mile wide, 750 foot deep canyon is in some ways the wildest of the three. It is currently protected only by road closures. A year ago the BLM UFO completed a Travel Management Plan (TMP) revision, which reaffirmed the road closures in that area, and designated the entire Dry Creek management region "Designated Routes Only," which was a huge step toward keeping vehicles from tearing up fresh terrain. Under pressure from motorized users to build a new ATV loop into Potter and Monitor Canyons, met with opposite pressure from quiet users and wilderness advocates, the office reaffirmed the road closures in 2009 and did not allow new routes to be built. PLEASE CONTINUE TO DISALLOW!!

  Currently Roubideau Canyon has pretty thorough protection as does one side of Potter Canyon (the left side of the stream as you hike up the canyon from below). But flowing into Potter Creek, a mile above where Potter flows into Roubideau is Monitor Creek, and that 10-mile long, mile wide, 750 foot deep canyon is in some ways the wildest of the three. It is currently protected only by road closures. A year ago the BLM UFO completed a Travel Management Plan (TMP) revision, which reaffirmed the road closures in that area, and designated the entire Dry Creek management region "Designated Routes Only," which was a huge step toward keeping vehicles from tearing up fresh terrain. Under pressure from motorized users to build a new ATV loop into Potter and Monitor Canyons, met with opposite pressure from quiet users and wilderness advocates, the office reaffirmed the road closures in 2009 and did not allow new routes to be built. PLEASE CONTINUE TO NOT ALLOW ATV or motorized vehicle use.

Please Do not crumble under the pressure of ATV users.
La Vonne Glanville
l.lavonne@gmail.com

William. D. Hamann   970-257-0721   p.1

IN

235 Arroyo Dr
Grad Junction, CO 81507
March 26, 2010

Received

MAR 2 9 2010

'········ Field Office

UFO Planning Team
BLM Uncompahgre Planning Area
2465 S. Townsend Ave
Montrose, CO 81401

RE: Scoping Comments for the UFO RMP

Dear Planning Team:

Please accept this let [2 A-PI LG] d recommendations for the ongoing revision of the
Uncompahgre Resourc [3 A-PI VEG] ave lived in Colorado since 1967 and on the West
[1 A-PI REC] 8. For n [4 A-PI FR] ave been an active user of public lands in Colorado
and am familiar with th [5 A-PI WR] ng Area and many of its trails, roads, rivers,
canyons, mesas and backcountry. I have been following public land issues in Colorado for about
40 yrs and have served on several citizen advisory committees for BLM. The primary activity I
engage in on BLM lands is hiking, both on-trail and off trail. I hike, in part. for exercise for
myself and my dog. and to experience new areas. Observing wildlife, flowers and trees, geology,
various land forms, and nature in its undisturbed state are a great attraction for me. Perhaps more
important is the opportunity to have a solitary, quiet use experience; a spiritual change of pace.
These are the things I value most while visiting public lands. [6 A-PI TM]

I am cognizant of the fact that BLM manages its public lands under the principle of multiple
use and sustained use, and must provide a balance between usage, and protection of its resources.
It is my observation that BLM is doing a good job in managing livestock grazing, vegetation
management for both logging and wildlife habitat, and in watershed protection. My biggest
concern for the revised Plan is how BLM will handle travel management, particularly motorized
recreation uses, both on trail and off trail. When the Plan had its last revision in 1989, 4 wheel
ATVs and similar OHV vehicles were a relatively minor consideration. Since then, there has been
considerable growth in usage of these machines on public lands. I have observed over the years
substantial increases in resource damage wherever OHVs and particularly ATVs are used- soil
erosion, destroyed vegetation, disturbance of wildlife, air and water pollution, etc. .ATV users
have created hundreds of miles of illegal trails and travel illegally on quiet use trails. They present
a safety concern for other users because of the high speed at which they can travel, and adversely
impact backcountry enjoyment by other users.

[7 A-PI TM]   I recognize that BLM has an obligation to provide a balance between providing recreational
opportunities, and protecting resources from degradation by these users. Certainly, ATVs can
provide a fun, enjoyable excursion into public lands and if used properly can minimize its impact.
There are certainly many responsible ATV users. However, the resource damage created by
many ATV users far exceeds the value of recreation experiences received, particularly when
compared to other users. Much of this can be attributed to the very nature of the design and
operation of the machine- it weighs 5 to 20 times more than a person (500 to 1500 lbs)and it can
generate 100 times more horsepower, all of which is applied to spinning, knobby tires, similar to
a rototiller. Its impact is generally more severe than other types of OHVs (dirt bikes, jeeps,

William. D. Hamann          970-257-0721          p.2

etc)because of its ability to travel over rough country, maneuverability, size and relative stability. There is also the fact that many ATV (and some other OHV uses) are interested primarily in challenging the natural terrain; i.e' can I cut across that switchback or get over that obstacle or beat my buddy down the trail'.(as opposed to going out for a nature ride). If one had set out purposefully to design a machine to create havoc in the backcountry, they could not have done a better job. Sometimes it seems that BLM feels it is obligated to provide recreational opportunities to whatever type travel machine humans can devise; ATVs, rock crawlers, rtc. What will be next: the Dalles D-4 bulldozer club.

**8 A-PI REC** In spite of their significant growth in numbers , ATVs owners are still a relatively small percentage of recreational users on public lands (yet create most of the damage, and usually geberate most of the complaints to BLM about being shut out). Their contribution to the economy of nearby communities is much smaller than quiet-use advocates (Just pick up a tourist promotion brochure from GJ, Delta, Montrose, Ridgeway, Norwood); the emphasis is on encouraging, hiking, fishing, hunting, skiing, and other quiet use activities-I have neveer seen them promote ATV activities.

**9 A-PI TM** All OHVs should be restricted to designated trails approved by BLM, and the number and mileage of ATV trails should be   based on person- user days (not milage traveled) , balanced against the resource damage they create and impacts on other uses. Which would greatly reduce their designated trail mileage).  There is an absolute need for better management of motorized use users; this should be the number one priority in the new Plan

The second priority should be in protecting the integrity of existing WSAs, such as Sewemup Mesa, Adobe Badlands, Delores River Canyon, and Tabaguache Creek Area. And backcountry areas in general.  Also, continued protection is needed for designated ACECs , such as Fairview, Needle Rock, Adobe Badlands, and San Miguel.

I would appreciate your sincere consideration of my comments.

Sincerely

Bill Hamanh

*Bill Hamann*

**10 A-PI WSA**

**11 A-PI ACEC**

BLM_0081985

Transcript of handwritten letter from Tom and Andrea Hanel to the BLM:

We are property owners east of Paonia with 40 acres and BLM access to the Jumbo Mtn area. This access is private and as you know the Jumbo BLM area has very few public access points. It is bisected by the power line road but both ends are on private property. We have lived at this location for 27 years and have seen usage of BLM change from rarely seeing anyone back there to multiple use by – in order of highest number of users – Mountain Bikers, Hikers, Runners, Horses, Hunters, ATV's and Motorcycles.  During the year I'm back there @ 5 times per week from late March thru Nov so I see a lot of users. The system of single track trails has become very special to us and we would like to see certain trails remain single path only with no motor vehicles. The vast majority of BLM users back there are Mtn bikers and hikers with the few ATV's and motorcycles generally staying on the power line road and "The Ridge Of Doom".

We would be agreeable to and have allowed bikers and hikers to access and exit the BLM thru a single trail on our property as long as they stay on the trail and stay out when muddy. Mountain bikers are colorful, quiet and gone in seconds – this is good and bad as a horserider/hiker like my wife may not always see or hear a biker approaching. In general people have been respectful of each other.

There is a group of 100+ people in the Paonia area who want to put signage up and preserve the non-motorized single track experience and we urge the BLM to work with them. This would get it all out in the open to the public and allow for good communication to address trail ethics, trail maintenance, caution signs etc, as well as stop any new unauthorized trails. This group has purchased signs to mark some of the trails "Open to hikers, bikers, horses" but "Closed to ATV's & motorcycles".

I'm 60 and as I get older I would think someday I'd rather be on an ATV than a Mtn bike so I feel for the motorized folks yet don't know how public access for them could be worked out. It seems the best solution for them would be some public access thru or on to the power line road. I understand years ago there was dirt road access from Minnesota Creek Road to the power line road through what is to become Whistling Acres Estates Subdivision, but initially they're saying this would be for lot owners only. Perhaps Arch Coal would give access thru their property off of Minnesota Creek Road.

But for now let's start by preserving the trails that are there and have been since 2000, 2001. The trails allow a person to walk without getting cheat grass in their socks and give good access for firefighting (Mtn Bikers have put out 2 lightening strike fires in the last few years).

BLM_0081986

The part of our property where a BLM trail joins it, is part of a 16 acre conservation easement with a building site on it and then the trail exits onto Hawk Haven Subdivision's property. So, what would enhance our single path places and make for a long-term outstanding recreational opportunity for mountain bikers and hikers would be for BLM management to sign and declare <u>certain</u> trails for non-motorized use and many of is can help this occur.

Tom & Andrea Hanel
41925 Minnesota Creek Rd.
Paonia, CO   81428
527-4656

BLM_0081987

ORG

High Country Citizens' Alliance ♦ Sierra Club – Rocky Mountain Chapter ♦ Colorado Wild ♦ Sheep Mountain Alliance ♦ Biodiversity Conservation Alliance's ♦ Colorado Environmental Coalition ♦ Wilderness Workshop ♦ Colorado Mountain Club

March 29, 2010

US Bureau of Land Management
Uncompahgre Field Office
Attn: Bruce Krickbaum, RMP Project Manager
2465 S. Townsend Ave.
Montrose, CO 81401
uformp@blm.gov

**Re: Uncompahgre Field Office Resource Management Plan Scoping Comments**

Dear Bruce,

Please accept these comments on behalf of High Country Citizens' Alliance and the undersigned organizations (HCCA) regarding the revision of the Uncompahgre Field Office Resource Management Plan (RMP), and in particular the eligibility of river segments under the National Wild and Scenic Rivers Act (WSRA). We would like to thank you for the opportunity to comment on the RMP and the *Draft Wild and Scenic Rivers Eligibility Report* for the BLM Uncompahgre Planning Area (Draft Report). HCCA is a non-profit conservation organization in Gunnison County whose members live, work and recreate in the Gunnison River watershed and across western Colorado. Our mission is to champion the protection, conservation and preservation of the natural ecosystems within the Upper Gunnison River Basin. We promote water conservation, water quality protection and collaborative initiatives to improve the benefits of water for everyone, and feel strongly that appropriate riparian management decisions are a critical part of the land management planning process.

1 A-PI WSR

Introduction
HCCA would like to see effective protection extended to all of the river segments identified in the Draft Report. We support WSRA designation for the permanent security the Act affords to riparian ecosystems, including adjacent habitat, water quality and quantity, and wildlife. The Act has preserved forever in a free-flowing condition some of America's most valued rivers and maintained their outstandingly remarkable values. We feel that it strikes an equitable balance between recreation, water use and environmental concerns, while providing a proven instrument for achieving long-term river sustainability. However, we recognize that WSRA designation may not be necessary for every segment identified in the Draft Report. In light of this, we feel strongly that other protective mechanisms should be applied to non-designated streams to protect their free-flowing character and Outstandingly Remarkable Values (ORVs). We would like to see every river segment identified in the Draft Report protected in one of three ways: (1) eligible, suitable and recommended for WSRA protection; (2) eligible, suitable, not recommended, but given ongoing suitability protections; or (3) eligible, not suitable, and returned to general Resource Management Plan (RMP) administration, but with strong protection mechanisms that maintain eligibility and all ORVs. We hope to see an updated RMP that includes recommendations for Wild and Scenic designations for several segments, as well as management

2 A-PI WSR

1

High Country Citizens' Alliance ♦ Sierra Club – Rocky Mountain Chapter ♦ Colorado Wild ♦
Sheep Mountain Alliance ♦ Biodiversity Conservation Alliance ♦ Colorado Environmental
Coalition ♦ Wilderness Workshop ♦ Colorado Mountain Club

schemes for non-designated segments that incorporate numerous protections contained in the WSRA.

3 A-PI WSR
4 A-PI WSR
5 A-PI WSR

Comments on Draft Eligibility Report

We believe that all of the river segments listed in the BLM's *Draft Wild and Scenic Rivers Eligibility Report* should retain their eligibility for inclusion in the National Wild and Scenic Rivers System (NWSRS). We also support the report being finalized so that evaluation for suitability can commence. During the interim while the rivers are being analyzed for suitability, it is imperative that BLM manage all eligible segments protectively, as mandated under the WSRA and BLM policy. The BLM's *Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, and Management* states:

> When a river segment is determined eligible and given tentative classification . . . its identified outstandingly remarkable values shall be afforded adequate protection, subject to valid existing rights, and until the eligibility determination is superseded, management activities and authorized uses shall not be allowed to adversely affect either eligibility or the tentative classification . . . . (BLM Manual 8351.32(C)).

If necessary, BLM should consider heightened monitoring of river segments to ensure that the values that make them eligible for designation under WSRA are not compromised during this interim period.

6 A-PI WSR

Segments Found Eligible and Suitable that Are Recommended for WSRA Designation

As an initial criterion, a determination of suitability and subsequent recommendation should be encouraged for those segments with continuous and majority BLM surface ownership. Recommendation should also be pursued where there are federally protected lands (i.e. designated wilderness, Wilderness Study Areas, National Conservation Areas, etc.) overlapping or in close proximity to the segment. Other factors that would be conducive to WSRA designation include the presence of endangered fish, wildlife and/or species of concern; the likelihood of establishing an effective buffer zone along the segment; the ability to limit off-highway vehicle (OHV) travel to designated routes only (and to exclude such use in wild segments); the ability to establish No Surface Occupancy (NSO) restrictions; and few or no stream crossings in the segment (except in areas given tentative "recreational" status). If all or a majority of these factors are satisfied, then a suitability determination and recommendation for inclusion in the NWSRS should be seriously considered.

7 A-PI WSR

Segments Found Eligible and Suitable that are Not Recommended for WSRA Designation

For those segments determined to be suitable, but not recommended, HCCA would like the BLM to manage the segment through the RMP in order to maintain the suitability of each segment. Under this strategy, non-recommended segments would be managed so that no action could interfere with eligibility or downgrade suitability standing. We would like to see these segments protectively managed in perpetuity as suitable rivers. Alternative management strategies,

2

BLM_0081989

High Country Citizens' Alliance ♦ Sierra Club – Rocky Mountain Chapter ♦ Colorado Wild ♦
Sheep Mountain Alliance ♦ Biodiversity Conservation Alliance ♦ Colorado Environmental
Coalition ♦ Wilderness Workshop ♦ Colorado Mountain Club

including securing instream flow rights, should be explored as a way to provide realistic protection of the specific ORVs associated with the suitability finding. To establish alternatives, the BLM will be required to request appropriation or acquisition of instream flows that consider all limbs of the natural hydrograph. Where instream flow rights cannot be secured, substantive land management prescriptions should be incorporated into the RMP to ensure long-term protection (i.e. protect the riparian resources without a water right). We encourage the BLM to manage each suitable segment to preserve the river's free-flowing quality, as well as to protect and enhance the values for which it was initially designated.

**8 A-PI WSR**

Segments Found Eligible but Not Suitable for WSRA Designation
For a variety of reasons, it is unlikely that BLM will find every segment suitable for inclusion in the NWSRS. We are especially concerned with what happens to river segments that the BLM determines to be non-suitable. The Draft Report states:

> Once a record of decision is approved, segments identified as not suitable will revert to management according to the prevailing RMP. (4). See also 115.

In broad terms, this reversion policy might not ensure adequate long-term protection of the rivers and their ORVs. To accomplish such protection, we would like the RMP to contain specific management prescriptions that provide protection for every non-suitable segment's free flowing-values and river-related values (i.e. ORVs). We ask that the BLM incorporate directives and land use prescriptions into the RMP that protect and enhance both the segments and their ORVs. This would preclude the BLM from authorizing any use that would substantially degrade the river. We encourage BLM to develop an RMP that maintains and augments each segment's current natural condition. Through thoughtful planning and coordination, this could be accomplished for those rivers that are not found suitable.

**9 A-PI WSR**

The WSRA is valuable not only because it protects the river segment itself, but also because it ensures protection of surrounding habitat. Buffer zones are essential for maintaining the integrity of the eligible river segments. Thus, to accomplish the goals outlined above, RMP guidance should adequately protect not only the river segment, but also the adjacent physical landscape. We would like to see the WSRA's buffer zone protections included in the RMP for non-suitable segments, and we encourage flexible boundaries to accommodate specific features and river values.

> The preliminary boundary (and final boundary, once designated) is generally one-quarter mile from the ordinary high water mark on both sides of the river. This boundary, by section 3(b) of the WSRA, may vary on either side of the river and be narrower or wider so long as the total corridor width averages no more than 320 acres per river mile. (BLM Manual 8351.25(B)).

Any management strategies should maintain or exceed this level of protection to fully safeguard the riparian ecosystem's health and integrity. This is especially true where there are upstream

3

High Country Citizens' Alliance ♦ Sierra Club – Rocky Mountain Chapter ♦ Colorado Wild ♦ Sheep Mountain Alliance ♦ Biodiversity Conservation Alliance ♦ Colorado Environmental Coalition ♦ Wilderness Workshop ♦ Colorado Mountain Club

water quality issues that fall outside of the traditional 320-acre per mile buffer zone, per section 3(b) of WSRA. For example, selenium contamination and oil and gas development are two upstream water quality problems that could negatively impact river segments. The RMP must address these and similar threats and contain proactive management strategies. Examples of selenium mitigation measures that could be included in the RMP are provisions for eliminating unlined ditches and unlined stock ponds. Oil and gas development is another significant threat, especially in the North Fork area. The RMP should mandate that specific Best Management Practices be used in oil and gas development that minimize impacts on watershed health. OHV use within and around river segments is a third concern. Unregulated OHV use damages riparian ecosystems. Because of this, we encourage the BLM in their RMP to restrict OHV travel to designated routes only. Even without suitability determination, permanent protection of river values can be assured through effective measures contained in the RMP.

**10 A-PI WSR**

Suitability
We encourage the BLM to begin the suitability review process. This is the final step in the evaluation procedure, and concludes with a determination of suitability or non-suitability. This phase also results in a suitability report and record of decision (ROD), which must be detailed with maps and consider a number of factors (16 USC § 1275(a); BLM Manual 8351.33(A)). The final report should provide the public with information detailing the criteria that BLM used to determine suitability status. Specifically, we would like to see detailed information explaining the strategies employed in the determination process, as well as the individual resource conditions that led BLM to choose suitability or non-suitability. Factors to consider include, but are not limited to: the need to protect threatened, endangered and sensitive species; status of landownership; reasonably foreseeable potential uses of the water and lands; federal, state, local and public interests; costs of acquiring necessary lands; the ability of the agency to manage the segments and their uses; historical and existing water rights; and instream flow requirements, including state appropriated instream flow rights.

**11 A-PI WSR**

In analyzing instream flow, we ask that the BLM quantify instream flow protection requirements related to ORVs and other resource values identified through the RMP process. Under the WSRA, water rights claimed or asserted are based on the amount of water required to protect the ORVs identified on the particular segments. During suitability study, BLM should "conduct a comprehensive, interdisciplinary, resource value-based assessment in order to delineate resource values, relate flows to resource conditions, and formulate flow protection strategies which incorporate legal, technical and administrative aspects in order to secure instream flows which address values associated with the . . . segment" (BLM Manual 8351.51(B)(2)(K)). As a component of the suitability process, it is essential that the BLM quantify the amount of water necessary to protect the segments and their surrounding riparian habitats.

**12 A-PI WSR**

Alternative Management Strategies
WSRA designation may not be desirable for all river segments. For example, recommendation may not be appropriate where the majority of a segment is under mixed ownership (private/federal). Even where designation is desirable, competing interests and local water user

4

High Country Citizens' Alliance ♦ Sierra Club – Rocky Mountain Chapter ♦ Colorado Wild ♦ Sheep Mountain Alliance ♦ Biodiversity Conservation Alliance ♦ Colorado Environmental Coalition ♦ Wilderness Workshop ♦ Colorado Mountain Club

concerns may preclude a segment from being recommended for the NWSRS. As in other BLM Field Offices, there may be some desire to form a local stakeholder group, out of concerns, questions or interest in exploring all options for protecting eligible streams. If such a group is created, strategies which focus on management efforts that protect selected streams and their associated values should be pursued, rather than an effort which focuses solely on avoidance of federal designation or federally reserved water rights. One option to explore is the State Wild and Scenic Rivers Fund. Enacted in 2008, the fund appropriates $400,000 annually from the Colorado Water Conservation Board's construction fund to develop stakeholder-based management alternatives.

13 A-PI WSR

Another strategy to consider could be designating segments as Areas of Critical Environmental Concern (ACEC). There are currently four ACECs within the Uncompahgre Field Office planning area: Needle Rock, Fairview, Escalante Canyon and Adobe Badlands, each adding an additional layer of environmental protection within the RMP. To be considered a potential ACEC, an area must meet criteria of both relevance and importance (BLM Manual 1613.1.11). ACEC designations highlight areas where special management attention is needed to protect and prevent irreparable damage to important historical, cultural and scenic values, fish or wildlife resources, or other natural systems or processes. This management scheme could be incorporated into the RMP to protect ORVs for non-recommended segments.

14 A-PI WSR

In considering alternatives, it is essential that there be effective stakeholder participation at all levels of the process, from local to state to federal interests, encompassing conservation organizations, water-rights holders, recreational interests, water providers, and state and federal agencies. Diversified participation is necessary to explore a variety of alternatives for protecting ORVs without compromising Colorado's ability to fully use its compact entitlements. We understand the responsibilities that BLM has under the Act and do not want BLM to lose focus on those duties. We ask that any alternative strategies be written into the RMP with clear provisions that BLM can enforce. In addition, any stakeholder plan must run on the same timeline as the RMP process. It is essential that a timeframe be developed with a clear desired outcome and completion date. Finally, given the often directly competing interests of various stakeholders, third-party enforcement of any alternative is necessary.

Inter-Agency Coordination

15 A-PI WR
16 A-PI FW

We encourage BLM coordination with other agencies, including the Forest Service (USFS) and Fish and Wildlife Service (FWS), to ensure protection of the extended riparian ecosystem. A guideline for inter-agency coordination is presented in the *Unified Federal Policy for a Watershed Approach to Federal Land and Resource Management* (UFP). Effective since October 2000, this policy is "intended to provide a framework to enhance watershed management for the protection and the health of ecosystems on Federal lands" (2). The UFP is not a regulation, nor does it establish a regulatory program. However, it does call on inter-agency collaboration to restore and protect water resources within the framework of existing laws and regulations. Because many of the eligible segments originate on USFS lands before flowing through BLM lands, we ask that the two agencies work together to ensure the protection and

5

BLM_0081992

High Country Citizens' Alliance ♦ Sierra Club – Rocky Mountain Chapter ♦ Colorado Wild ♦
Sheep Mountain Alliance ♦ Biodiversity Conservation Alliance ♦ Colorado Environmental
Coalition ♦ Wilderness Workshop ♦ Colorado Mountain Club

enhancement of water resources and aquatic ecosystems. Furthermore, the presence of endangered species in many segments should involve the FWS in the decision-making process. This collaboration would facilitate conservation practices that consider the entire riparian ecosystem, not just the individual BLM-administered segments. The RMP revision process is an opportune time for the BLM, USFS and FWS to work together to better protect and enhance the riparian ecosystems and their wildlife.

17 A-PI WSR

Summary

In conclusion, HCCA and the undersigned organizations ask that the BLM finalize the eligibility report and include all identified segments in the final report. We would like to see each segment classified as either (1) eligible, suitable and recommended, (2) eligible, suitable, not recommended, but given permanent suitability protections, or (3) eligible, not suitable, and returned to RMP management with strong protection mechanisms. For segments where opposition to WSRA designation may exist, please initiate a process to determine if an alternative management strategy would be appropriate. If so, there must be clear guidelines and timelines for developing these alternatives in the RMP.

Thank you for the opportunity to provide input on this component of the management plan. HCCA has a long and collegial relationship with many other potential interested stakeholders,

18 A-PI WSR

anticipate a robust discussion of everyone's concerns. We look forward to working with the BLM and stakeholders on these stream segments to find innovative and exciting approaches to protecting this unique landscape.

Sincerely,

*Matt Reed*

Matt Reed
Public Lands Director
High Country Citizens' Alliance
Crested Butte, CO 81224
(970) 349-7104
matt@hccaonline.org

/for/

Kirk Cunningham
Conservation Co-Chair
Sierra Club - Rocky Mountain Chapter
1526 Wynkoop St., Suite 4-C
Denver, CO 80202
(303) 861-8819

Rocky Smith
Forest Watch Program Director
Colorado Wild
1030 Pearl #9
Denver, CO 80203
(303) 839-5900
rocky@coloradowild.org

6

BLM_0081993

High Country Citizens' Alliance ♦ Sierra Club – Rocky Mountain Chapter ♦ Colorado Wild ♦ Sheep Mountain Alliance ♦ Biodiversity Conservation Alliance ♦ Colorado Environmental Coalition ♦ Wilderness Workshop ♦ Colorado Mountain Club

Hilary White
Executive Director
Sheep Mountain Alliance
Telluride, CO 81435
(970) 728-3729
hilary@sheepmountainalliance.org

Duane Short
Wild Species Program Director
Biodiversity Conservation Alliance
P.O. Box 1512
Laramie, WY 82073
(307) 742-7978
duane@voiceforthewild.org

Becky Long
Water Caucus Coordinator
Colorado Environmental Coalition
1536 Wynkoop St., #5C
Denver, CO 80202
(303) 534-7066
becky@cecenviro.org

Peter Hart
Conservation Analyst
Wilderness Workshop
P.O. Box 1442
Carbondale, CO 81623
peter@wildernessworkshop.org

Bryan Martin
Director of Conservation
Colorado Mountain Club
710 10th St., #200
Golden, CO 80401
(303) 996-2746
bryanmartin@cmc.org

BLM_0081994

IN

**From:**       Roy High
**To:**         uformp@blm.gov
**Subject:**    Scoping Comments for the UFO RMP
**Date:**       Monday, March 29, 2010 1:02:17 PM

1 A-WSA

2 A-PI REC

Dear Mr. Krickbaum:

To whom it may concern:

When considering the Uncompahgre Resource Management Plan, please be mindful that our wild areas are shrinking.  Please make the land, and the animals that inhabit it a priority.  I think that it is essential for the well-being of humankind to be able to experience the beauty of nature without the intrusion of the modern world.

I agree that there need to be places of recreation for people to ride motorized vehicles and mountain bikes, etc.  But many such places already exist.  It is my opinion that we need more places where humanity can experience the beauty of nature without the noise of the modern world.

Regards,

Roy L. High
2821 Columbine Park Court
Grand Junction, CO 81501
(Montehigh@yahoo.com)
(970-245-5267)

Roy High
2821 Columbine Park Court
Grand Junction, CO 81501

BLM_0081995

IN

1 A-PI REC

**From:** carl johnson
uformp@blm.gov
**Subject:** Mountain biking trails on Jumbo mtn.
**Date:** Monday, March 29, 2010 7:29:08 AM

This letter is simply to provide input in favor of a nonmotorized  designation for the singletrack trails located on jumbo mountain. In the interest of safety, as well as in protection of a fantastic community asset, signs should be installed to clearly identify on which trails motorized vehicles are not permitted

2 B-NP

BLM_0081996

IN

| | |
|---|---|
| **From:** | Pete Kolbenschlag |
| **To:** | uformp@blm.gov |
| **Subject:** | scoping comments |
| **Date:** | Monday, March 29, 2010 8:31:04 PM |

Hi,

**1 A-PI SDA**

Thanks for considering these.  In general, I hope that the UFO prioritizes maximum protection for all its natural lands to maintain their natural character—Wilderness Study Areas and other lands with wilderness qualities, in all the places and in whatever combination they exist; roadless lands; non-motorized, quiet used areas; Areas of Critical Environmental Concern;  Outstanding Natural Areas; and other important landscapes.

**2 A-GE**

Since the purpose behind revising land management plans is to account for new inventories, changed circumstances, and new information—all broadly defined at this level of NEPA—and to manage all the public's resources in a manner that promotes sustainability, restores healthy ecosystems, stabilizes and strengthens area wildlife populations, and  safeguards sensitive species, including sensitive plants, BLM must give top priority to these outcomes.

**3 A-PI WSA**

In addition to managing WSAs to preserve the prerogative of Congress and protect wilderness suitability, the agency should manage other lands with wilderness character in a manner that does not jeopardize their consideration for wilderness.

**4 A-PI WSA**

As for WSAs, the Camel Back/Roubideau area deserves special consideration and additional management attention.  This area deserves to be recommended for wilderness protection—and the agency should use its maximum discretion to ensure these lands get the special attention they deserve.  Contiguous with already protected national forest lands above, the Roubideau Canyon system (together with Potter and Monitor) provide critical habitat and undeveloped migration routes from montane forests into desert riparian habitat.  Given the changed status of the USFS lands above the WSA (since the current UFO RMP and the 1991 wilderness recommendations) the matter of how to ensure the entire wild Roubideau system—separate from issues of agency jurisdiction—must be re-visited.

**5 A-PI WSA**

The Adobe Badlands is an incredible landscape that remains as a wild landscape in a developed region of the county.  The opportunities for solitude and backcountry recreation area outstanding.  Even if it were not a WSA—and it is—the agency should be compelled to better protect the area's sensitive soils and rare plants.  It is an WSA, and the BLM is legally obligated to do so.  Damage from illegal ORV use is prevalent in the area, and additional management attention—for the WSA and the ONA—is needed.

**6 A-PI REC**

In addition, the Jumbo Mountain area outside of Paonia should be designated as a Special Recreation Management Area.  All motorized and mechanized use should be on designated trails only.  User-created trails should not be brought into the travel system—even on an interim basis—unless and until they have gone through site-specific NEPA planning.  All unleased lands in the SRMA should be withdrawn from mineral entry, and BLM should impose additional conditions on any future wells permitted for the area on existing leases.

BLM_0081997

7 API ED

Any unleased lands inside municipal, or other culinary, watersheds should be withdrawn from mineral entry, or—at a minimum—placed under No Surface Occupancy stipulations.  Certainly the agency must include an alternative that considers closing some lands to oil and gas development—watersheds, sensitive habitats, natural landscapes, and important recreational and community lands.

Thanks for this opportunity to provide comment.  Please keep me on your mailing list at:

Pete Kolbenschlag, Mountain West Strategies
PO Box 1864
Paonia, CO 81428

BLM_0081998

BS



**USDA Certified Organic**

March 29, 2010

Bruce Krickbaum
BLM Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Resource Management Plan Revision; provisions relating to natural gas exploration

Dear Sir:

1 A-PI NRED

I attended the very informative symposium on natural gas development sponsored by Western Slope Environmental Resource Council on March 20, 2010, in Hotchkiss. While the industry representatives made an effort to minimize the risk, it is irrefutable that accidents and spills do happen. They have happened in Garfield County with devastating results for the people affected. Threats are not just from what occurs, invisibly, deep in the earth: trucks hauling toxic chemicals have run off canyon roads and spilled their loads into surface waters, improper cementing of casings has allowed drilling mud to escape and contaminate ground and surface water.

2 A-PI SE

Any such event in our watershed would be devastating to our private property rights and our agricultural enterprise. My wife and I raise certified organic fruit on 36 acres on Rogers Mesa west of Hotchkiss, in Delta County. Our pristine irrigation water flows from the flanks of Grand Mesa where gas exploration is anticipated. I know we speak for many of our neighbors and other farmers – organic and conventional, fruit, vegetable, and animal. We are all potentially adversely affected by natural gas development on Grand Mesa.

3 A-PI SE

Responsible management of BLM resources includes protecting the needs and interests of private landowners who might be affected by activities occurring on your land. We request that the Resource Management Plan revision protect our right to continue to earn a living from our land; a way of life that, not incidentally, is healthy for the environment, our neighbors, and our community.

The only sure way to protect our property rights and our right to a clean environment is

2 **Mesa Winds Farm**

to prohibit gas exploration in the drainages surrounding the North Fork of the Gunnison River. If, however, this is not politically tenable, then the Resource Management Plan should:

- Provide that activities on BLM land, including those of permittees and licensees and their agents, etc. will result in no detectable reduction in environmental values (air, water, noise, etc.) on private land in the air sheds and water drainage basins in which the activity takes place;

- Require comprehensive, independent and qualified air- and water-quality baseline data collection (for groundwater as well as surface) at the applicant's expense (perhaps through a substantial application fee). Such data should be publicly available. This would enable landowners to obtain redress in the event of loss or damage as well as to put the applicant on notice that we are serious about protecting the quality of our Valley, our property rights, and the viability of our agriculture;

Hold the permittee or licensee strictly liable for any and all loss of environmental quality that occurs during the period of operation, and for a substantial period thereafter, without the aggrieved party being required to prove causation, under the established legal principle of "res ipsa loquitor" (the thing speaks for itself).

Provide that if a private landowner must sue for damages, or to enforce his/her property rights, and wins, that all costs and attorney fees are paid by the permittee in addition to damages;

Require the permittee to provide a bond sufficient to cover all foreseeable damages, including attorney fees, to all private claimants who may be affected by profit-seeking activities on BLM land.

**In our particular case,** Mesa Winds Farm's water comes from the Leroux Creek basin. Our organic certification relies on the quality of this water. Any contamination by drilling mud or "frac-ing" fluids into Leroux Creek or its aquifers, tributaries, or reservoirs would result in the loss of our certification, loss of trust of our customers, and the loss of our established markets. We would be put immediately out of business. My wife and I put everything we have into growing delicious, healthy fruit and building our customer base. For an out-of-region energy speculator to eliminate those years of hard work toward a healthful and sustainable future simply because BLM regulations were too lax would be a tragedy. After-the-fact restitution would be cold comfort.

**Historically significant.** For more than a century, the North Fork Valley has been renowned for our exceptional fruit that was shipped across the Nation. More recently the North Fork has been recognized as a region of national significance for organic agriculture, second only to the entire State of California. The quality of our air, water, and soils, as well as the skill, tenacity, industriousness, and ingenuity of our farmers, are largely responsible for our premier fruit. Nevertheless, agriculture is threatened in the North Fork largely by competing land uses.

**Endangered species protection.** Natural gas exploration on BLM land is yet one more

3 **Mesa Winds Farm**

such threat. Were the farmers of the North Fork "four-leggeds" we might very well be regarded as "endangered" and significant efforts to protect our habitat and survival would be mandated in BLM's process. People are animals, too; we should not be discriminated-against simply because we walk on two legs. I urge you to give protection to the existing, historic, and environmentally compatible land uses of your private-land-owning neighbors.

Sincerely,


Philip (Wink) Davis

BLM_0082001

BS

# Budd-Falen Law Offices, L.L.C.

Karen Budd-Falen
Franklin J. Falen [1]
Brandon L. Jensen [1,2]
Kathryn Brack Morrow [1,2,3]
Laura C. Rowe [1]
Abigail M. Jones [4,5]

300 East 18th Street
Post Office Box 346
Cheyenne, Wyoming 82003-0346
Telephone 307/632-5105
Telefax 307/637-3891
main@buddfalen.com
www.buddfalen.com

[1] admitted in Wyoming
[2] admitted in Colorado
[3] admitted in New Mexico
[4] admitted in New Jersey
[5] admitted in New York

March 29, 2010

**E-MAIL**
uformp@blm.gov

970/240-5300
Bureau of Land Management
Uncompahgre Field Office
Attn: Bruce Krickbaum, Project Manager
2465 S. Townsend Avenue
Montrose, CO 81401

      Re:    Scoping Comments Regarding Uncompahgre Resource Management Plan

Dear Sirs:

On behalf of Mika Ag Corporation d/b/a the Escalante Ranch, the purpose of this letter is to provide scoping comments related to the Uncompahgre Resource Management Plan ("RMP"). Mika Ag Corporation and this firm request that we be specifically added to the RMP mailing list and provided all future information regarding this project. The Escalante Ranch is located within the Uncompahgre Resource Area and its grazing allotments will specifically be impacted by decisions in the Uncompahgre RMP.

1 A-PI LG

The issues that the Bureau of Land Management ("BLM") should consider as it prepares its RMP are as follows:

1.    The Escalante Ranch is permitted use of numerous grazing allotments within the Uncompahgre Resource Area. Continued use of these grazing allotments is essential to the stability of the Ranch's operation. The Uncompahgre RMP should ensure that the Ranch's grazing preference rights and permits are fully protected.

2 A-PI LG

2. Along with protecting permitted livestock numbers, the Uncompahgre RMP should ensure that the Ranch has adequate access to its improvements on the federal lands, including fences, water developments, water rights, etc. It is important for the Ranch to be able to maintain these improvements to manage its use of the federal lands.

3 A-PI LR

3. As the BLM knows, the boundary lines between the BLM lands and the Escalante Ranch private lands have not been adequately surveyed. The BLM's RMP should address this issue and should include authorization for the BLM to respond to survey land and boundary corrections through land exchanges, purchases, and other land adjustments.

4 A-PI LR

4. Access to private land surrounded by BLM lands should be protected through the RMP process.

5 A-PI REC

5. General ATV use should be considered and the safety of the traveling public and the Ranch should be considered.

6 A-PI REC

6. As the BLM knows, between 2000 to 3000 canoes, boats and other water craft use the Uncompahgre River for recreation. The Uncompahgre RMP should specifically discuss this use, including the location of where these recreationists can access the River. Currently much of this access includes the railroad right-of-way across from the Escalante Ranch property. That location poses a danger to the recreating public and causes a use of the right-of-way that is not intended.

Again, please include the Escalante Ranch and this firm on all future mailings related to this project. Should you have any questions about these scoping comments, please do not hesitate to contact me.

Sincerely:

/s/

Karen Budd Falen
Budd Falen Law Offices L.L.C.

IN

**From:** STEVE MORRIS
**To:** uformp@blm.gov
**Subject:** Jumbo Mtn. Paonia BLM use
Monday, March 29, 2010 8:27:18 PM

1 A-PI TM

To whom it may concern,

My wife and I are avid users of the single-track trail system known as Jumbo Mtn BLM area near Paonia. We regularly run, hike and mountain bike on theJumbo Mtn. trails almost year-round, and we are concerned about the dangers and impact of allowing motorized vehicles on the bulk of these trails. Due to the terrain in this area, the many of the trails offer very narrow sight lines and little passing space, a situation only exacerbated by allowing motorized use on traditionally non-motorized trails. We are also very concerned about the erosive impact of heavy vehicles too large for narrow, steep trails over loose soil. Some of the double-track areas already show significant signs of erosion. As homeowners in the town of Paonia and very avid outdoor enthusiast and athletes who use the Jumbo Mtn. single-track trails regularly, we ask BLM's support in preventing the further encroachment of motorized vehicles on these single-track trails by clearly designating the existing trails for only non-motorized travel.

Thank you for listening to our needs on this subject. Please feel free to contact us if you have questions.

Sincerely,

Steve and Leah Morris
PO Box 1726
Paonia, CO 81428
970-424-4240

 **Uncompahgre Resource Management Plan** 

We encourage you to provide your comments by filling out and submitting this comment form by March 29, 2010. Email your completed form to UFORMP@blm.gov, or print your completed form and fax it to 1-970-240-5367 or mail it to: BLM UFO, Attn: Bruce Krickbaum, RMP Project Manager, 2465 S. Townsend Avenue, Montrose, CO 81401.

First Name **Ken**          Last Name **Stahlnecker**          Date **3/29/2010**

Mailing Address          **National Park Service, 102 Elk Creek**

City **Gunnison**          State **CO**          Zip **81230**

E-mail Address   ken_stahlnecker@nps.gov

**Would you like to be added to the RMP mailing list to receive future project-related information? (Your name will not be shared.) Yes:** ☑Email materials    ☐Hard-copy materials    ☐No
Please note that planning materials are also available at our website: www.UFORMP.com

**Please indicate your affiliation by checking the following boxes (check all that apply):**

☐Individual (no affiliation)    ☐Citizen's Group    ☐Regulatory Agency
☐Non-profit Organization    ☐Elected Representative    ☑Federal, State or Local Government

*Please answer the following four questions about your relationship to the Uncompahgre Planning Area:*

1. Do you live within the planning area? ☐Unit 1  ☐Unit 2  ☐Unit 3  ☐Unit 4  ☐Unit 5  ☑No
*(Refer to map for unit numbers)*

2. If you do not live in the planning area, where do you live: ☑Colorado (west slope)  ☐Colorado (front range or plains) ☐Other State - Which?_____  ☐ Other Country - Which?_____

3. If you live in the planning area, how long have you lived here? Years_____ Months_____

4. Why do you live here? ☑Occupation  ☐Family  ☐Proximity to public lands  ☐Recreational Opportunities  ☐Other_____

> *The BLM wants to hear from you! The Uncompahgre Field Office is committed to listening to and learning from our neighbors, friends, and stakeholders. Your answers to the following questions will be helpful at this point in the planning process, as are any other comments. When answering the following questions, where applicable please reference the planning units in the Planning Unit Map on our Planning webpage. Thank you for taking the time to provide your input.*

**What issues or concerns do you have regarding public land uses or resources within the Uncompahgre RMP planning area?**

1)  More effort should be expended to protect the Gunnison sage grouse north of Black Canyon of the Gunnison National Park (we realize that this area is outside of the area currently being considered for revision).
2)  Lands within the proposed Curecanti National Recreation Area boundary in areas 2 and 4 should not be authorized for disposal or leased for oil, gas, or mineral development.
3)  The National Park Service and BLM should continue to share information, partner on projects, and otherwise cooperate on issues that affect the lands we administer near our common boundaries. This would include grazing allotments where allotments bleed across our administrative boundaries.
4)  Where appropriate, agencies should work together to identify trail systems where it makes sense to incorporate areas of different jurisdiction, rather than planning such systems only on one agencies jurisdiction.

BLM_0082005

**Keeping in mind the issues above, what changes would you make physically to the landscape (such as what should it look like, modifications, etc.)?**

**Keeping in mind the issues above, what changes would you make to administration (such as management actions, rules, regulations, etc.)?**

1)  Nominate the C-77 Road Gunnison sage grouse habitat as an ACEC to increase protection for this species (we realize that this area is outside of the area currently being considered for revision). This could involve restricting some types of use during critical seasons (such as OHV use).

2)  The lands being proposed for addition to Curecanti National Recreation Area should be appropriately classified so they are not disposed of or otherwise leased until such time as Congress can act (please refer to the Report to Congress for the Curecanti Resource Protection Study).

3)  No specific recommendation at this time; however, should Curecanti NRA be legislatively established, at that time work with NPS to develop/amend agreements.

4)  Seek out other agency comment when considering trail systems near those agency's lands.

**Keeping in mind the issues above, what changes would you make to social characteristics (such as number of users, size of groups, behavior of users, etc.)?**

**Please provide any additional comments that you have regarding this project.**

# NUVEMCO, LLC

March 29, 2010

Mr. Bruce Krickbaum
United States Department of the Interior
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

*Re:*  ***Resource Management Plan For the Uncompahgre Planning Area***

Dear Mr. Krickbaum:

1 A-PI MI
2 A-PI LR

We are a Colorado limited liability company in the uranium and vanadium business with significant property holdings, much of which is mineral rights on BLM-administered lands. We appreciate the opportunity to provide input for your revisions to the RMP.

3 A-PI LR

4 A-PI MI

Our largest concern is the protection of property rights under the laws of the land. We know that many people either choose to ignore legal mineral rights or simply do not understand the laws of our land.  We are confident that the BLM does understand the law and trust that any revisions to the RMP will not be an attempt to take away legally existing and acquired property rights (nor be a defacto takings by making access or development of mineral rights unnecessarily delayed, overly cumbersome or unjustifiably cost prohibitive). We further hope that more time is spent educating the public of the legal rights of mineral rights owners; we suspect an improved understanding will make everyone's life easier and consensus easier to reach when everyone's wishes and unconstrained desires are tempered with reality.

5 B-NP

6 B-GE

As mentioned, we are a uranium company.  Part of our decision to conduct a business central to the ubiquitous natural element is its use as fuel for clean, cost efficient nuclear power. Another part is the reality the U.S. currently generates over 20% of its electrical power via nuclear power plants, yet imports over 90% of the uranium fuel such power plants use.  This obviously cannot continue without undue and unnecessary reliance on foreign sources. Similarly, the current rate of production worldwide is roughly 60% of what is consumed, pointing out the need for increased mining.

7 A-PI LR

As pointed out in your fact sheet, the U.S. Department of Energy (DOE) has 32 lease tracts containing ~25,000 acres located within the Uravan Mineral Belt in southwestern Colorado. There is an obvious reason; the land is uniquely mineralized with uranium and vanadium.  So, while you ask for input via RMP Planning Fact Sheet 7.2 "Are public lands that should be withdrawn from mineral entry because of conflicts with other public land uses?" we candidly wonder why the question isn't "why aren't public lands so uniquely mineralized with such an important resource not withdrawn from other public land uses and reserved solely for mineral extraction?"  We hope this is not a BLM bias against mineral activities. In any event, there is no

8 A-PI MI

*650 Linden Ave, Boulder, CO 80304*
*nuvemco@comcast.net; 303 443-9086 office; 904 216-1041 fax*

# NUVEMCO, LLC

**9 A-PI MI**

other area like this in the rest of the U.S. Given the planned development of the DOE lease blocks, and given the inability to mine uranium where it wasn't deposited (contrasted with many alternatives for most recreation uses), we think it makes sense for BLM to develop a uranium district as the highest and best use of the land in the western end of the RMP and for our entire country.

**10 A-PI SE**          **11 A-GE**

More locally, we know you have heard loud and clear the desire for increased uranium mining from people who actually live in western Montrose and San Miguel counties. Their economic livelihood has been dependent upon uranium for generations. Frankly, there is not anything else that can be reasonably expected to replace the basic "bread and butter" economic activity of uranium. Not that BLM won't hear a thousand great ideas from non-residents of how something else can work or why residents should do something else. We would ask if that such is in fact the case, then why hasn't it happened already? Not to mention just who are they to say how another American should live and what their dreams and aspirations for their families should be? And where is the investment and business plans supporting these great ideas? Clearly, people have and will continue to invest in uranium. The demand realities of today, coupled with the projected doubling of the consumption of electricity worldwide by 2030 and the numerous nuclear plants underway throughout other countries, should clearly soften the peaks and valleys of the boom and bust cycle historically experienced.

**12 A-PI NRED**

**13 A-PI MI**

If BLM wishes facilitate economic growth in the uranium sector, we have a few thoughts that begin and end with anything that streamlines the permitting process. You may be aware that Behre Dolbear Group Inc., a prominent worldwide minerals industry advisory firm founded in 1911, just released their annual ranking of countries for mining investment. The U.S. was dead last in the world for permitting delays (for clarification, "the issue addressed here is not the strength of the regulations but the timeframe involved in obtaining permits"). Any positive change will encourage investment. We would also encourage the BLM and the Colorado Department of Reclamation, Mining and Safety to return to coordinated efforts on permitting. It makes no sense to us to have two sets of standards, two sets of regulations, two sets of approvals, etc. that seems to add little to the process except duplication of everything, costs more than double and the time frame to get anything done more than four-fold. Lastly, we question why there are not fees charged to those who appeal mining permits consistent with the costs of annual assessments and permit applications, or at a minimum of a waiver of such costs when the holders of such claims are prevented from the benefits of their mineral rights.

**14 B-NP**

**15 B-NP**

**16 A-PI VRM**

As for visual considerations you desired input on, much of beauty is in the eye of the beholder. The land where uranium has been mined for a century is rugged country. That said, when this topic is discussed, we would encourage BLM to distinguish between the standards of today and the standards of yesteryear. Clearly, the mining industry was not perfect. Clearly, our government encouraged rapid extraction at any cost when our nation was trying to defeat our enemies and tyranny in WWII and has a great deal of responsibility they assumed then (but which seems to get forgotten now). Clearly the governmental standards were different back when. But we would ask the BLM to add this to its education agenda to blunt the fear mongering and get back to adult discussions framed in reality. We could go as far as saying

**17 A-PI MI**

**18 B-NP (cont'd)**

*650 Linden Ave, Boulder, CO 80304*
*nuvemco@comcast.net; 303 443-9086 office; 904 216-1041 fax*

BLM_0082008

# NUVEMCO, LLC

BLM is asking for input on how things used to be, not on the current remediation requirements; BLM may well be asking for a problem when the solution already is in place.

19 A-GE

Not to mention NIMBY.  We recognize you will hear specious arguments from those who simply desire no such activity to happen here.  While some residents will be amongst the objectors, many will not be area residents whose livelihoods and supper depend upon mining, but rather outsiders who basic needs are more than met and have made this a cause celeb.  We would like to point out that if not mining here, then where?  If not under the stringent BLM regulations and worker protections, then in what country where neither is provided to the level of provided in the U.S.?

20 B-GE

We thank you for the opportunity to share our thoughts.  We would be happy to assist further in this critical undertaking by the Uncompahgre Field Office.  Please contact Paul Szilagyi, Managing Director, for further information and discussion of these comments.

Sincerely,
Nuvemco, LLC

*650 Linden Ave, Boulder, CO 80304*
*nuvemco@comcast.net; 303 443-9086 office; 904 216-1041 fax*

BLM_0082009

# NUVEMCO, LLC

March 29, 2010

Received

APR - 6 2010

Umpahgre Field Office

Mr. Bruce Krickbaum
United States Department of the Interior
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

**Re:     *Resource Management Plan For the Uncompahgre Planning Area***

Dear Mr. Krickbaum:

We are a Colorado limited liability company in the uranium and vanadium business with
significant property holdings, much of which is mineral rights on BLM-administered lands.  We
appreciate the opportunity to provide input for your revisions to the RMP.

Our largest concern is the protection of property rights under the laws of the land.  We know
that many people either choose to ignore legal mineral rights or simply do not understand the
laws of our land.  We are confident that the BLM does understand the law and trust that any
revisions to the RMP will not be an attempt to take away legally existing and acquired property
rights (nor be a defacto takings by making access or development of mineral rights
unnecessarily delayed, overly cumbersome or unjustifiably cost prohibitive).  We further hope
that more time is spent educating the public of the legal rights of mineral rights owners; we
suspect an improved understanding will make everyone's life easier and consensus easier to
reach when everyone's wishes and unconstrained desires are tempered with reality.

As mentioned, we are a uranium company.  Part of our decision to conduct a business central
to the ubiquitous natural element is its use as fuel for clean, cost efficient nuclear power.
Another part is the reality the U.S. currently generates over 20% of its electrical power via
nuclear power plants, yet imports over 90% of the uranium fuel such power plants use.  This
obviously cannot continue without undue and unnecessary reliance on foreign sources.
Similarly, the current rate of production worldwide is roughly 60% of what is consumed,
pointing out the need for increased mining.

As pointed out in your fact sheet, the U.S. Department of Energy (DOE) has 32 lease tracts
containing ~25,000 acres located within the Uravan Mineral Belt in southwestern Colorado.
There is an obvious reason; the land is uniquely mineralized with uranium and vanadium.  So,
while you ask for input via RMP Planning Fact Sheet 7.2 "Are public lands that should be
withdrawn from mineral entry because of conflicts with other public land uses?" we candidly
wonder why the question isn't "why aren't public lands so uniquely mineralized with such an
important resource not withdrawn from other public land uses and reserved solely for mineral
extraction?"  We hope this is not a BLM bias against mineral activities.  In any event, there is no

*650 Linden Ave, Boulder, CO 80304*
*nuvemco@comcast.net; 303 443-9086 office; 904 216-1041 fax*

# NUVEMCO, LLC

other area like this in the rest of the U.S.  Given the planned development of the DOE lease blocks, and given the inability to mine uranium where it wasn't deposited (contrasted with many alternatives for most recreation uses), we think it makes sense for BLM to develop a uranium district as the highest and best use of the land in the western end of the RMP and for our entire country.

More locally, we know you have heard loud and clear the desire for increased uranium mining from people who actually live in western Montrose and San Miguel counties.  Their economic livelihood has been dependent upon uranium for generations.  Frankly, there is not anything else that can be reasonably expected to replace the basic "bread and butter" economic activity of uranium.  Not that BLM won't hear a thousand great ideas from non-residents of how something else can work or why residents should do something else.  We would ask if that such is in fact the case, then why hasn't it happened already?  Not to mention just who are they to say how another American should live and what their dreams and aspirations for their families should be?  And where is the investment and business plans supporting these great ideas?  Clearly, people have and will continue to invest in uranium.  The demand realities of today, coupled with the projected doubling of the consumption of electricity worldwide by 2030 and the numerous nuclear plants underway throughout other countries, should clearly soften the peaks and valleys of the boom and bust cycle historically experienced.

If BLM wishes facilitate economic growth in the uranium sector, we have a few thoughts that begin and end with anything that streamlines the permitting process.  You may be aware that Behre Dolbear Group Inc., a prominent worldwide minerals industry advisory firm founded in 1911, just released their annual ranking of countries for mining investment.  The U.S. was dead last in the world for permitting delays (for clarification, "the issue addressed here is not the strength of the regulations but the timeframe involved in obtaining permits").  Any positive change will encourage investment.  We would also encourage the BLM and the Colorado Department of Reclamation, Mining and Safety to return to coordinated efforts on permitting.  It makes no sense to us to have two sets of standards, two sets of regulations, two sets of approvals, etc. that seems to add little to the process except duplication of everything, costs more than double and the time frame to get anything done more than four-fold.  Lastly, we question why there are not fees charged to those who appeal mining permits consistent with the costs of annual assessments and permit applications, or at a minimum of a waiver of such costs when the holders of such claims are prevented from the benefits of their mineral rights.

As for visual considerations you desired input on, much of beauty is in the eye of the beholder.  The land where uranium has been mined for a century is rugged country.  That said, when this topic is discussed, we would encourage BLM to distinguish between the standards of today and the standards of yesteryear.  Clearly, the mining industry was not perfect.  Clearly, our government encouraged rapid extraction at any cost when our nation was trying to defeat our enemies and tyranny in WWII and has a great deal of responsibility they assumed then (but which seems to get forgotten now).  Clearly the governmental standards were different back when.  But we would ask the BLM to add this to its education agenda to blunt the fear mongering and get back to adult discussions framed in reality.  We could go as far as saying

BLM_0082011

# NUVEMCO, LLC

BLM is asking for input on how things used to be, not on the current remediation requirements; BLM may well be asking for a problem when the solution already is in place.

Not to mention NIMBY. We recognize you will hear specious arguments from those who simply desire no such activity to happen here. While some residents will be amongst the objectors, many will not be area residents whose livelihoods and supper depend upon mining, but rather outsiders who basic needs are more than met and have made this a cause celeb. We would like to point out that if not mining here, then where? If not under the stringent BLM regulations and worker protections, then in what country where neither is provided to the level of provided in the U.S.?

We thank you for the opportunity to share our thoughts. We would be happy to assist further in this critical undertaking by the Uncompahgre Field Office. Please contact Paul Szilagyi, Managing Director, for further information and discussion of these comments.

Sincerely,
Nuvemco, LLC

*650 Linden Ave, Boulder, CO 80304*
*nuvemco@comcast.net; 303 443-9086 office; 904 216-1041 fax*

BLM_0082012

IN

| | |
|---|---|
| **From:** | Jim Riddell |
| **To:** | bruce_krickbaum@blm.gov; uformp@blm.gov; cotmpufo@blm.gov |
| **Subject:** | Uncompahgre Field Office RMP revision comments |
| **Date:** | Monday, March 29, 2010 2:07:41 PM |
| **Attachments:** | Potter Canyon downstream from confluence btw Potter & Monitor C |

2 A-PI CR
3 A-PI VRM

Dear BLM Uncompahgre Field Office,

1 A-PI REC

very much for the opportunity to offer my comments as input to your upcoming revision of the Resource Management Plan for the UFO.

I have lived near Montrose (about 8 miles south of your offices) for 11 years, and a major reason why I live here is to enjoy the natural, open and wild spaces that surround the more developed areas of the Uncompahgre Valley. While I understand that there are many different demands placed on our public lands, my personal use is largely in on- and off-trail  hiking, photography and camping, and to a lesser extent mountain biking and exploring four-wheel drive roads. I am also thrilled with the amazing archaeological remains found in the area, and the spectacular views, and wish to see them preserved as much as possible.

**POTTER AND MONITOR CANYONS:**

4 A-PI WSA

Before I turn to more general comments, let me comment on one particular area which I am especially fond of, which received a lot of attention during the recent Travel Management Plan revision. I refer to the areas adjacent to the Camelback Wilderness Study Area, in Potter and Monitor Canyons and Monitor Mesa.

The Camelback WSA is a little-known treasure which we are so lucky to have in our backyard. It is both beautiful and isolated. Drive a short distance, then walk up Roubideau Creek from the lower end, or descend into the canyon from above, and it is easy to imagine being a hundred miles from civilization. Around each corner is a new gem to discover, whether a rock formation, a bend in the creek, an archeological fragment or petroglyph, an old grazer's cabin, animal or bird footprints in the mud, a beautiful tree or wildflower, a brilliantly colorful lizard or a flock of bighorn sheep. In spite of occasional illegal entry by motorized or mechanized users, this area feels enchanted, and I'm so grateful Congress has protected it, and hope it will someday receive the permanent protection it deserves. I have worked closely with the Uncompahgre Valley Association, the Western Colorado Congress, the Colorado Environmental Coalition, the Colorado Mountain Club, the Friends of Greater Dominguez and the Colorado Wilderness Network on efforts to get legislation passed to make the Camelback area into a permanent wilderness.

Spend any significant time in the Roubideau area, or fly over either by plane or on Google Earth, and it is obvious that the Camelback is only a portion of the area that deserves protection. Roubideau Canyon is really part of a three canyon system that also includes Potter Canyon and Monitor Canyon, and Monitor Mesa in between. When the Camelback WSA was created, a road existed up Potter Canyon, that was closed very soon afterwards at the request of the Division of Wildlife to offer more solitude to bighorn sheep, and has remained closed in the decades since. It is because of that road that the Camelback did not originally include all of Potter and Monitor Canyons. The road has disintegrated in many places, and is still subject to illegal incursions, but clearly all three canyons deserve to be left wild.

5 A-PI WSA

6 A-PI WSA

Potter and Monitor Canyons are still wild and pristine and share all of the same qualities as the more protected portions of the Roubideau Canyon system, and rightfully should be included into the Camelback WSA. To preserve the solitude, I also believe that much of the lower (northern) end of Monitor Mesa should also be kept non-motorized as well. In addition to being special places for human foot and horse travel, these areas also contain at least four ecosystems identified as threatened by the Southern Rockies Ecosystem Project, and contain precious archeological resources like the wikiup site the Boyds showed me on Monitor Mesa, where I believe archeologists identified thirteen separate wikiups.

7 A-PI ACEC

I was relieved and grateful to see in the Travel Management Plan recently adopted, that Potter and Monitor were maintained for foot and horse travel only. This decision should be preserved, and if possible, I encourage the BLM to add a more formal status to the areas, such as designating them Areas of Critical Environmental Concern. For recommended boundaries, I would refer you to maps prepared for the Colorado's Canyon Country Wilderness Proposal: Roubideau Addition ( http://www.canyoncountrywilderness.org/maps/hires/roubideau_0706.jpg ) on which I helped with field reconnaissance and map creation.

## OTHER RECOMMENDATIONS:

8 A-GE

In general, I believe that our public lands should be managed first and foremost for preservation of the resources they contain, and secondly for uses such as recreation, hunting and grazing, and thirdly for extractive uses like mineral extraction and wildlife and timber harvest. Public lands should be a legacy for future generations, and I want them passed on in as good a condition as possible.

The need for nature and natural areas will only grow as our population expands--it will not become obsolete. But nature must not be seen as a collection of specimens to be kept in a museum. Nature is an interconnected web, and as such should be protected in systems. Watersheds, migratory corridors, soundscapes, viewsheds, riparian zones, etc. should be protected as systems. Although many people think the public lands in the UFO are just rocks and bushes, they are rich with life, and in places easily damaged and slow to heal.

Many uses can be compatible with preserving these systems if done carefully. Grazing, hunting and wildlife management should be done with more attention given to the health of the ecosystem than to the size of the "harvest." Camping and travel should be allowed in durable areas, and restricted in more fragile ones. Quiet uses like birdwatching, hiking, horseback riding, skiing, and photography can have minimal impact, but should be restricted if they are causing conditions to deteriorate. Trails and roads can be intrusive, or can funnel impacts away from vulnerable areas to less fragile areas. Maintain the roads and trails that help preserve the resource (including views), and close the others. I encourage the BLM to provide access to visitors which helps people appreciate the natural systems, and create adequate interpretive materials like brochures and signage to help people understand how to minimize their impacts and maximize their enjoyment and the enjoyment of others. **Let me stress: Informing and educating  users and the public should be very high BLM priorities.**

The attitudes of the users is vital to the success of any resource management. In that regard, while I applaud the decision to restrict unlimited travel to a few specially designated areas, I hope the BLM will recognize that a designation of "Limited to

9 A-PI LG
10 A-PI REC
11 A-PI REC

12 A-PI REC

13 A-PI REC

14 A-PI REC

15 A-PI REC

16 B-NP

17 A-PI TM (include beginning of paragraph on previous

Existing Routes" is unenforceable and encourages people to claim, "other people drove there, so it must be existing." I encourage the UFO to move to "Designated Routes Only" as quickly as possible throughout your territory, and to continue to stress informing and educating users about such restrictions. Yes, we all wish we could go wherever we wanted, but that won't work in this populous an area.

18 A-PI SDA

Other precious and fragile areas within the UFO that deserve more protection include the Dolores River Canyon, areas adjacent to the Adobe Badlands WSA near Delta and the Tabeguache Special Management Area near Nucla, and the Uranium-Vanadium belt, especially if mining resumes with construction of a processing mill in the Paradox Valley.

Thank you for helping us pass along to future generations a legacy of beauty, health and enjoyment in excellent condition. Please let me know that you have received this email.


James Riddell
21448 Uncompahgre Rd.
Montrose CO 81403
970-240-8390



BLM_0082016

**ORG**

ROCC Comments_UFO

BLM Uncompahgre Field Office
RMP Project Manager
2465 S. Townsend Ave.
Montrose, CO 81401

**1 A-GE**

Re:    Scoping Comments Ð Uncompahgre Resource Management Plan Revision

Thank you for the opportunity to comment on the Uncompahgre RMP revision. The Uncompahgre Field Office encompasses some of Colorado's most beloved wilderness-quality lands, wild rivers, and opportunities for quiet, backcountry recreation. These scoping comments are being submitted on behalf of the Ridgway Ouray Community Council (ROCC) . The membership of this organization includes hundreds of members  who care deeply about the management of our public lands.  We welcome this opportunity to comment and appreciate the Bureau of Land ManagementÕs

**2 A-PI PH**

t to addressing the issues related to management of the public resources e Uncompahgre Resource Area. Please accept and fully consider our comments.

The initial section of these comments will address the few BLM lands that are within Ouray County.

The first is a small parcel of land on the east side of Highway 550 and north of Cutler Creek. This area has some geologic interest as it contains a large rare rock dike and is an interesting area for a short hike. It has a road that can connect to adjoining forest lands. This area could be of interest to hikers but it has become a de-facto dump and currently has trash (old furniture, tvs, appliances etc) scattered.

**3 A-PI REC**

Another area is the parcel across Highway 550 from the State Park. This is being proposed as a mountain bike and hiking recreation area. ROCC is in support of this proposal and sees this as a possible positive attribute to the economy of the area and as a bonus to campers in the State Park.  We would urge the management of this area to be used as proposed and closed to motorized use to avoid user conflicts. It would also be wise to put a seasonal closure for biking activity to protect wildlife habitat during wildlife calving season.

**4 A-PI REC**

A third area of interest is the McKenzie Butte. This area has some historical significance as well as a recreational possibility. There is an old roadbed, (possibly stagecoach) a railroad bed and some very striking scenic values. Because of the proximity to the State Park it would seem that there are some easily developed recreational possibilities for quiet use activities.

**5 A-PI REC**

Across Highway 550 from McKenzie is the Chaffee Creek drainage that abuts Billy Creek DOW area. This area is reputed to contain a burial tree and may contain some historically and archeologically significant sites. It would also be a suitable area to be developed for quiet uses such as bird and wildlife viewing as well as hiking.

There are many areas in the UFO that many of our members are familiar with and would like to comment on. We would ask the BLM to review and protect  the wilderness characteristics of each of the following areas, and propose as Wilderness Study Areas those that are not WSAs already.

**6 A-PI WSA**

- BLM land immediately adjacent to  Canyon Wilderness, along Camp Ridge and Sowbelly Ridge. These sweeping unroaded uplands provide important wildlife habitat and dramatically scenic views, thus would be an appropriate addition to the existing wilderness.

 - All lands in Uncompahgre Field Office that are also components of Colorado's Canyon Country Wilderness Proposal (the citizen's BLM wilderness inventory), including:

Page 1

**7 A-PI WSA**

ROCC Comments_UFO

**7 A-PI WSA continued**

-- Adobe Badlands--This absolutely unique, sparse landscape northeast of Delta. The fragile soils and striking scenery here, rare in that it has not been damaged by motor travel, needs to be preserved.

-- Norwood Canyon--This rugged and ecologically vibrant area in the heart of the San Miguel River corridor provides some of the better and more diverse habitat anywhere for mountain lions, hawks, eagles, and both rare and familiar native fish. This riparian area along the river has been classified as one of two most important river systems needing protection in Colorado.

-- Roubideau (Camel Back)--This maze of colorful and intricate canyons provide the obvious complement to the national forest Roubideau Area, already designated by Congress to protect its wilderness values. The downstream portion should receive the same protection from the BLM until Congress can complete the watershed's designation.

**8 A-PI TM**   **9 A-PI WSA**

We thank BLM for their decision in the Dry Fork Travel Plan to not accede to a request from the motorized groups to designate an ATV loop trail that would descend into Monitor Creek from the 25 Mesa Road and completely change the character of this now wild canyon and urge the BLM to stick with this decision. The Monitor Creek Canyon is being recommended in the DeGette bill and also by the conservation community to be added to the Camel Back WSA and the Roubideau Special Management Area on FS lands. Altogether these would make a great, large roadless, nonmotorized, rugged, remote wildlife and quiet use area.

**10 A-PI WSA**

Potter Canyon/Monitor Creek--Due to their relatively undeveloped character in a heavily roaded landscape, Subregions A and B lend themselves to a ÒQuiet UseÓ designation and should include horse and hiking trails only, along with places where trails are absent altogether. This will reduce habitat fragmentation and preserve the silence and remoteness of these canyons. We do not believe that introducing ATVs and mountain bikes into this area is appropriate given how difficult it is to contain the spread of these vehicles, how relatively wild the area still is, and the availability of ample motorized and mountain bike opportunities nearby. Potter/Monitor is also prime big horn sheep habitat. A small herd is frequently spotted here. We understand the Potter Creek Road was closed by the DOW in 1991 to protect the sheep.

**11 A-PI WSA**

The Dolores River Basin-- These river lands represent some of the most colorful and spectacular wild lands in the state. Geological formations millions of years in the making, healthy river systems and unspoilt desert all provide a pristine environment for wildlife, including the endangered peregrine falcon, mountain lions and river otters.ÊMuch of this land has been identified by Colorado conservationists as prime lands for Wilderness protection. These lands are prized for their outstanding natural values and recreation opportunities by people across the nation.ÊBut their future is uncertain, threatened by uranium mining, oil and gas development, and growing off road vehicle use which could permanently damage the land's natural character. We urge you to take the necessary steps to protect this area.

**12 A-PI WSA**

Tabequache SMA--We would recommend that the SMA be expanded to add the Shavano, Campbell, and Burro Creek drainages north of the Tabeguache Special Management Area to the SMA.  ThisÊwould be a logical extension of the SMA and, combined with the large roadless area on adjacent Forest Service lands, would create a sizable chunk of unfragmented wildlife habitat.ÊÊClosing a few existing roads and a nonmotorized/nonmechanized prescription would make the area an enjoyable hiking and horse area and provide more security to wildlife. Local mtn. bike groups are pressing for trails inside the Tabequache SMA even though the BLM is activelyÊmanaging it like actual wilderness, with horse/hiking use only. We thank the BLM for their current nonmechanized policy and ask to reinforce them and keep the policy in place.

Sewemup Mesa Ð 9,253 Acres Within Uncompahgre Resource Area. The majority of this

Page 2

**13 A-PI WSA**

BLM_0082018

ROCC Comments_UFO

CWP falls within the Grand Junction Field Office; however, nearly 10,000 acres are managed by the Uncompahgre Field Office. Sewemup Mesa is one of the most ecologically pristine areas in western Colorado, having been isolated from development and most human activity throughout history. The Colorado Division of Wildlife has identified the area as suitable habitat for Mexican spotted owl, southwest willow flycatcher, whooping crane, and the western burro owl.

San Miguel River Corridor--- Has been preserved as a well used recreation corridor for fishing and boating. With the partnering of The Nature Conservancy this river corridor should continue to be protected as it is.

Nyswonger Mesa-- Has remarkable possibilities of archeological importance as well as scenic and quiet recreational opportunities. Energy exploration and OHV activities are real threats to the environmental qualities of the area and the BLM RMP should recognize the importance of keeping such development contained in such a way that possible disturbance is not a threat.

In addition to recognizing areas that we feel are important, we would like to make some general comments regarding resource management.

 Lands with wilderness characteristics should be closed to motorized and mechanized use. Those lands, as well as potential wild and scenic river corridors, should be closed to all forms of energy development and transmission. Protecting these lands has the added benefit of helping protect wildlife habitat, cultural resources, and mitigating the impacts of climate change.

Manage for natural soundscapes in the Uncompahgre RMP, crafting a travel plan that incorporates sound management in backcountry, primitive recreation settings. The RMP should include a soundscape policy that acknowledges the impact of off-road vehicle and other noise on wildlife and Quiet Users. The policy should confine noisy uses to selected portions of the field office. Off-road vehicles should be restricted to areas where they will have minimal impacts on wildlife habitat, quiet users and the quiet solitude of BLM back-country.. Institute a policy that designated ORVs routes remain open subject to compliance.. If resource damage and off-route use can not be controlled these routes would be closed.

Other portions of the field office should be studied and designated as primitive and undeveloped SRMAs (Special Recreation Management Areas) to protect the remote and rugged landscapes the BLM is famous for, as well as the quiet use experience! Keep back country primitive and uncrowded, limit trail densities to reduce habitat fragmentation and maintain open space. No new trail build-up in WSAs and areas that have wilderness or natural character.

Utility corridors should be aligned with respect to ACECs, WSAs and any other environmentally sensitive areas. BLM should designate zones for renewable energy development in the RMP, and limit renewable energy project proposals to those zones. Any oil and gas development allowed under the RMP should be carefully constrained, subject to phased development that minimizes damage to unique natural features, essential wildlife habitat, and other sensitive areas. The RMP should impose strict limits on uranium and other mining to protect our land, air and water.

Grazing allotments should be managed with best range management principles in mind. The Management plan should incorporate ColoradoŌs Standards for Public Land Health and Guidelines for Livestock Grazing Management. Sheep grazing should not occur where the spread of disease could be transmitted to the Bighorn Sheep herds.

We encourage BLM to emphasize resource protection in this RMP, providing extensive unroaded areas where quiet-use recreationists can experience solitude and natural soundscapes and viewsheds, and where wildlife and wild rivers can thrive unimpeded by off-road vehicles or energy development. BLM should complete a comprehensive travel management plan as part of the RMP to ensure that planning is done at a landscape level, accounting for impacts of all uses.

Page 3

ROCC Comments_UFO

Again we thank you for the opportunity to participate in this process and look forward to having further involvement as the planning action goes forward.


Denise Gendreau

President, ROCC


Contact:
Jim Stephenson
Chair, ROCC Public Lands Committee
PO Box 272
Ridgway, CO 81432
970/626-5594

Page 4

BLM_0082020

**ROCKY MOUNTAIN RECREATION INITIATIVE**
**1567 Twin Sisters Road, Nederland, Colorado 80466 (303) 447-9409**

RMRI SCOPING LETTER # 1
NOTE: SCOPING LETTER #2 was sent with a map through the post, postmarked March 29, and specifically addressed the identification of less roaded lands.

Uncompahgre BLM RMP Team
Uncompahgre Field Office
Att: Bruce Krickbaum
2465 S. Townsend Ave.
Montrose, CO 81401                                             March 29, 2010

Dear RMP Team,

RMRI would like to thank you for the enormous undertaking represented by this RMP. We appreciate your efforts to involve the public and the opportunity to comment. The Rocky Mountain Recreation Initiative's mission is to promote trail and recreation planning on Colorado public lands that reduces habitat fragmentation and restores landscape integrity.

The UFO RMP is happening at a time when recreation and other pressures on the land are mounting; more intensive management may be necessary to assure protection of the land and even, paradoxically, to maintain the wide open spaces for which BLM lands are principally known.

The Uncompahgre Field Office appears to be leading the charge in creative management of high-impact uses such as off-road vehicles. Based on Peach Valley, we have a high level of confidence that, with adequate resources, the UFO will develop creative approaches for other parts of the field office as well.

RMRI's main perspective in these comments is exploring how recreational trails can be designed to reduce habitat fragmentation for wildlife and restore a sense of wildness to the land.

RMRI is also interested in, but doesn't have a solution to, the dilemma of how to maintain the uncrowded backcountry feeling of UFO lands even as they become more popular. The only obvious solutions we can think of are confining high impact trail uses to contained areas, and leaving trail opportunities unpublicized.

**Maintaining remote backcountry settings**
The 2007 Colorado BLM Recreation and Visitors' Strategy emphasizes the importance of maintaining the "distinctive character" and "wide open spaces" of Colorado BLM lands (p.3). The Strategy emphasizes the "need to maintain the distinctively undeveloped and open space character of [the BLM's] recreation settings" (p. 7). The new Benefits-Based Management approach is intended to retain "more primitive, natural-looking and undeveloped recreation settings" and acknowledges that the traditional "activity-focused approach" has been "diminishing the character of the lands that produced beneficial outcomes to the public" (p. 4).

Some portions of the Uncompahgre FO not just WSAs and Citizen Proposed Wilderness still retain their primitive, undeveloped character but are at risk for losing their naturalness. The BLM should identify and actively manage these lands to protect and enhance their primitive, backcountry character. For example, in the Nucla/Naturita/Paradox Valley area, we encourage the UFO to use the RMP to reverse the downsliding of recreational settings that is occurring with the increased motorized use .

**Tools for maintaining "prescribed" setting character**

The 2007 State BLM Instruction Memorandum directs managers to: "Ensure that travel management decisions...maintain prescribed setting character..." (p. 2). We recommend that the RMP maintains---and even restores---less developed recreation settings wherever they are found. Returning impacted areas to a more natural condition is justified because so much of the ROS downsliding has occurred only in the last 3 – 5 years.

Tools exist for preventing ROS slippage in the future. For example, the 2007 State Director's Instruction Memorandum states on page 2 that: "For areas with Limited and Open categories, managers may impose several different kinds of limitations including vehicle numbers, types, use times or seasons, permitted use......" etc. The notion of limiting numbers of motorized users is new, but it may not be too early to look ahead to this possibility to maintain remote backcountry settings.

Besides setting user thresholds, other ways to maintain open space as mentioned above are:
a)  reducing route densities that take the wildness out of the land
b)  containing and more intensively managing high impact recreation uses such as ORVs and shed antlering
c)  identifying and protecting the last wild places land. RMRI sent a letter separately postmarked March 29, suggesting a method for doing this last.

**Reducing route densities**

UFO wildlife populations in the UFO are increasingly stressed by human access spreading into previously less-used places via ORV and mountain bike proliferation, shed anterling, lion hunting, rock climbing, etc., in combination with mining, grazing and other traditional uses.

Set route density targets

In the uranium zone we also recommend that the BLM use methods recommended by The Wilderness Society (see SRCA letter), setting road density targets based on studies (and observations) of plant and wildlife sensitivities to roads.

Close spurs/duplicate routes

Reducing densities could also be done by examining route maps to identify obvious duplicate routes and spurs for closure. As mentioned in RMRI scoping letter # 2, this should be done in the RMP rather than waiting for the subsequent travel plan. The Land Use Planning Regulations, as repeated in UFO RMP Travel Management Handout, state that a RMP "will delineate Travel Management Areas….[and]..a map of a preliminary road and trail network." In other words the RMP can do a lot to reduce route densities without waiting for the travel plan.

Reduce habitat fragmentation in the west end of UFO

On the West End Route Inventory Map 2, produced with the proposed 2008 RMP Amendment, very high road densities needing reduction appear in the following locations:
•   A proliferation of routes and spurs SW and NE of the Opera Box Mine on Road DD19
•   A dense concentration of routes branching north off Road EE22, north of Long Park and the Honey Moon Mine
•   Route proliferation east of Hieroglyphic Canyon and west of the canyon in the vicinity of Tramp Mine west
•   Comparing the West End Inventory Map with the 1999 BLM topo map, there are many new routes north and south of the San Miguel River west of Nucla, on which more use may have become recently established and which need to be looked at for closure
•   There is also a dramatic increases in route development on the BLM parcels west of Norwood, including Spring Draw, Callan Draw, Burn Canyon and McGee Draw.  While some of this could have been missed in 1991, some routes appear to be new roads built in association with

prescribed burning and vegetation treatments.  Such roads should long since have been closed, let alone being shown on publicly distributed maps. This landscape does not need more roads

There may be a similar high density area south of the Dry Creek travel planning unit but RMRI did not have time to look into it.

**Reducing motorized recreation impacts**
As trail machines get faster and more versatile the land shrinks accordingly. Recreational trail expansion is on a collision course with land health; the land base, vast as it is, is too small to accommodate indefinitely expanding trail systems.  The trick is to accommodate more use and provide satisfying opportunities on less acres and less miles of trails, something the UFO has commendably managed to do in Peach Valley. Other examples that could be studied are the Oregon Dunes, Arizona Strip, and OHV areas in California

Principles for sustainable motorized trail systems
- Concentrate use in a contained areas and corridors near population centers where it can be managed and patrolled
- Make loops, destinations, close or tie together dead end spurs, eliminate parallel routes, avoid tempting off-trail areas
- Use intensive---and expensive—management in the form of signage, fencing, field presence
- Make paper maps and kiosks the basis for enforcement, not signs, as signs are torn down
- Publicize a policy that if a route is not signed or found on a map it is closed---create a "culture of compliance"
- A final tool for maintaining quiet settings is limiting <u>numbers</u> of motorized vehicles, as authorized by the 2007 State Director's IM quoted above.  This is not yet common but is a tool that will become more so as competition for trails increases. Other tools for preserving less crowded, more natural-feeling settings are quotas, or even alternating days for types of use.

Less miles, more saddle time  -  Accommodating more use on fewer miles and acres
The National OHV Conservation Coalition (NOHVCC?) is developing motorcycle trail guidelines to allow more opportunity on fewer miles of trails, in response to closing opportunities everywhere. How can riders obtain an enjoyable day's experience on fewer miles of trail? One way is to retain the difficulty level not just of motorcycle trails, as well as 4WD roads, ATV, and even mountain bike trails. This includes avoiding heavy maintenance on level 2 roads and preventing single track trails from being widened by ATVs.

Land management agencies and counties have a tendency to improve roads and trails that the motorized community prefers keeping rough and rugged to retain the desired challenge/rock crawling experience. When challenge routes get upgraded ORV users forge into new areas to find these opportunities, perpetuating the cycle of route proliferation. For this reason the RMP should include a policy of <u>not</u> widening single track or ATV trails and not upgrading challenge level motorcycle trails and 4WD roads except to address resource damage.

Keeping high challenge levels in motorcycle trails can also reduce user numbers to more manageable levels and even keep shared-use trails with hikers from becoming high traffic motorcycle corridors that displace hikers. Not just remote settings but trails themselves can be kept more natural and less "improved" thereby creating a more natural user experience.

Compliance as a condition for keeping trails open
Use compliance and minimal impacts as conditions for keeping motorized trails open—placing the burden of enforcement on users, which will be helpful in remote areas not frequently patrolled. The Salida Ranger District is exploring an OHV patrol position that would be jointly funded by the Forest

Service and non-profit recreation groups. As an example of a "keeping motorized areas open conditionally" policy, we point to the UFO's closure of a damaging rock crawl area.

Other conditions for opening new trails should be a commitment up front on the part of ORV users for long-term funding for maintenance and patrol. Such conditions are laid out in Appendix 6 of the Royal Gorge BLM's Arkansas River TMP EA as follows:

- The [trail] proposal would further the Desired Future Conditions of the sub area
- The proposal is sponsored under a partnership agreement that includes a plan for securing the necessary funds and/or volunteer commitments to construct and maintain the trail to accepted standards.
- The specific location of the proposed trail has been flagged on the ground
- The decision has been authorized under a site-specific NEPA

RMRI recommends these conditions be in place <u>prior</u> to trail designation, rather than trails being approved with these conditions remaining a mere <u>wish list</u> for the future.

<u>Process for designating motorized and mountain bike trails</u>
The Pikes Peak District of the Forest Service is working with a consulting firm, (EDAW, but has a new name) on mapping decision constraints on motorized trails, such as permitted activities (grazing), topography, private property and other access barriers, WSA, ACECs, PCAs, management on adjacent jurisdictions, and resource constraints such as sensitive wildlife habitat, watersheds or soils. We recommend an approach like this for UFO travel planning. Of course in remote areas enforceability should be the bottom line criterion for new trail locations.

<u>Interim Management</u>
Interim management is a challenge. Below are some ideas on managing motorized use until travel planning can occur:

- Close and sign everything not on the "existing route" inventory
- Physical closures
- Emergency closures of damaging routes where terrain allows
- The Field Office Wide Route Inventory map appearing on the RMP website appears to show recently established user-created trails –in color. Although they are "existing" on the ground, displaying user-created trails publicly will ensure they get more use and will be harder to close in a final decision.

RMRI also supports the interim management recommendations in the SRCA letter.

<u>Capacity</u>
We support the capacity recommendations in the SRCA letter. See Price, Utah, permit process.

<u>Event promotion</u>
There can be a disconnect between the outside world's unfettered promotion of BLM lands and the BLM's ability to accommodate the demand this generates. Widespread publication of new mountain bike and motoized tail systems invites unanticipated increases in use adding to management burdens. Events also attract new attention to an area.

In response to this problem, Appendix C of the LUP Handbook and the State Recreation and Visitors Strategy contain guidance on how to manage marketing so as to maintain targeted recreation settings. For example, the SRMA definitions section in Appendix C includes "appropriate restrictions on marketing" as one of several implementation actions to be done on SRMAs. This can apply to events as well.

Group events should be approved contingent on the BLM's proven ability and resources to manage them, and a formal framework established whereby all the components of a well-managed, low-impact event are in place prior to the event.  The Calamity Pass Enduro in the Parks Ranger District in North Park is an example of a permitted event where the Forest Service set conditions sufficient to allow the agency to keep the initiative in the negotiations and to somewhat protect the land.

Dispersed Camping
Motorized use off roads and trails should be discontinued except for designated parking and pull-out areas.
Dispersed camping should be restricted to designated campgrounds
Off-road parking should be allowed one car-width from a road or motorized trail
Disallow ATV game retrieval

Consistent management with adjacent FS lands
Manage motorized use to be consistent with management on adjacent jurisdictions, for example Tabeguache and Camel Back/Roubideau where management on both sides of the boundary need to match.

Seasonal closures
These are important, follow DOW recommendations

Close vegetation treatment roads
Vegetation treatments should not be done without the necessary resources and a plan to close all new roads. A new policy is urgently needed on this.

Set limits on new technology
As mentioned above, ORV and mountain bike technology is on a collision course with the limits of the land. Long distance, go-anywhere vehicles have out-paced the ability of BLM lands to meet the need. Unlike grazing, mining, and logging, no laws provide a safety net for the land from new trail technologies.

We recommend the RMP include a field office-wide permanent closure to any new technologies that crop up in the future such as rhinos, segways and others, until their impacts can be analyzed under NEPA.  Another example is ATVs wider than 50 inches. These too should be banned until their impacts are studied. In any case they should be limited to full size vehicle roads. The definition of a trail should not be altered to include them.

It is not the BLMs responsibility to accommodate indefinitely the spread of a use that has no upper limit. The BLM needs to establish a threshold for the number of vehicles it can accommodate based on carrying capacity, and for anything more, trust the industry to fall back on itself.

Concentrate, do not disperse trail use
Many arguments have been put forward against closing motorized routes on the theory that dispersing use on more miles of trails reduces crowding, resource damage and user conflict. This would be true if there were an upper limit to growth in motorized use. Since there appears to be no upper limit and since resource damage is already exceeding Land Health standards, motorized use needs to be concentrated in defined, well maintained corridors. The bottom line is the land, not endlessly expanding recreational access. The BLM cannot be expected to accommodate open-ended growth indefinitely.

Protect Natural Soundscapes
The RMP should include a soundscape policy that acknowledges the impact of off-road vehicle and other noise on wildlife and Quiet Users. The policy should confine noisy uses to selected portions of the field office. See new TWS GIS sound analysis methods

BLM_0082025

**Special Recreation Permits  - Outfitter-guides, fund-raising, competitive events**
In granting permits, put the needs of the land and of the general visitor public ahead of the demands of outfitter guides. Retaining remote settings, meeting land health standards, protecting wildlife and non-outfitted activities should come first. Set capacity limits as the Price Utah BLM did to establish limits for commercial outfitter guides and Special Recreation Permits.   Allow competitive recreation events only if they can be managed to have low impacts.

**Mountain bike management**
Much of the above applies to mountain bike trails
We recommend some trails for horse-hiking only
Do not locate mountain bike trails in difficult-to-patrol areas with easy off-trail access/ For example with the Paradox Trail, avoid wildlife areas, sensitive plant communities, grasslands, riparian, cryptogamic soils, etc.
Trails stay open contingent on users staying on trail

**Shed Antlering**
In this activity the ATVs move in a grid pattern going off roads cross-country, disrupting and displacing big game at a critical time in the spring when their body reserves are down and forage is not yet greened up and producing nutrition.

In addition to disturbing animals, antlering damages sage brush, grasses, soils, and causes erosion and other unacceptable resource damage. The RMP is an opportunity to enact strict new regulations; and the use should be permitted like lion hunting, fishing and other highly damaging or depleting activities

Antler hunters should be restricted to existing routes like other motorized users and ATV antler gathering should be prohibited altogether with a March-April seasonal closure. Like anyone else, antler gatherers should park and walk to protect the fragile soils and vegetation.
Even if ATV antlering is restricted to "existing" routes, so many existing routes are out there that further closures are necessary to eliminate the impacts of this damaging activity.

**SRMAs/ ERMAs**
ERMAs are used when there is no perceived "desire" for "structured recreation activities." We believe the Benefits Based Management outlook may be overestimating how much "structured recreation" people want or how universally on the landscape they want it. Mesa State and other studies show that most BLM recreationists want a natural setting and experience. SRMAs, emphasizing "structured recreation," may also be at variance with the 2007 State Recreation and Visitors Strategy that calls for maintaining the BLM's wide open spaces.

SRMAs are appropriate in concentrated areas where high impact recreation threatens to overwhelm the environment, but most places in the UFO more appropriately lend themselves to ERMAs. Undeveloped SRMAs may in rare cases be appropriate for hiking and other low impact uses where these uses need intensive management to prevent incursions and loss of primitive settings.

Setting visitor numbers too high
Because the life of an RMP is 15 to 20 years, there is an incentive to set visitor encounters and group sizes artificially high on the Recreation Settings Matrix to accommodate increased recreation use over time without amending the RMP.
Specifying use numbers higher than those reflecting the current situation can become a self-fulfilling prophecy, especially if a community or destination SRMA is widely advertized.

BLM_0082026

We recommend instead that settings, visitor encounters and group sizes be adjusted from less crowded to more crowded incrementally over time through Adaptive Management as was done in Jack Morrow Hills.

Recreation in balance with natural values

We also question a perception inherent in BBM that BLM lands are primarily for recreation, rather than recreation being presented equally with biodiversity. Mesa State studies that focus on human uses, experience and connections to the land may not have fully teased out the segment of the public who either will never go to remote lands but want to know they are protected, or those who feel that human use is not the only goal of land management but rather that landscape integrity has value in and of itself independent of its use as a recreation experience.

SRMA promotion and advertising

Another contradiction that may be built into the SRMA framework is that the fact of designating a SRMA can potentially attract use that downgrades the very settings the SRMA is intended to protect. Entities such as the Colorado Tourism Bureau may also promote shoulder season" recreation on BLM lands and other opportunities that are not in sync with the BLM's intentions and capabilities.

The 2007 State Recreation Strategy suggests a potential conflict between the high recreation demand generated by a "vigorous Colorado Tourism Office promotion budget" and the BLM's "fundamental duty to meet or exceed land health standards" (p. 6). "Recreation tourism demand" (p. 6) and "tourism industry promotion... sends increasing numbers of outdoor adventurers to BLM public lands," challenging the BLM's ability to "maintain the distinctively undeveloped and open-space character of its recreation settings" (p. 7)

In response to this dilemma, Objective 2 in the Recreation Strategy says the BLM will "Encourage Sustainable Tourism Collaboration" with business and tourism entities. The Recreation Strategy encourages BLM field offices to "engage the business community and local governments in …..managing….use of public lands that meet or exceed land health standards" (p. 9).

We recommend measures that will allow the UFO to implement Objective 2 on page 9 of the Strategy and help outside promoters "understand approved recreation setting prescriptions and management objectives" and "market public lands responsibly." For example, the Glenwood Springs Field Office, has obtained an agreement from local government to limit marketing efforts to ensure its Community SRMAs do not morph into Destination SRMAs.

**MOUs/collaboration**

We understand that recreation partnerships expand management capability and provide higher service delivery levels. However, in the same way that unmanaged promotion can get off track, MOUs with non-BLM entities risk stretching the BLM's land stewardship mission toward that of the partner. RMRI recommends that the BLM's mission always come first.

**Lion Hunting**

While for the most part lion hunter trucks stay on roads this activity is damaging sage grouse habitat and other sensitive resources some parts of the UFO. There are numerous lion hunting permit applications showing on the UFO website. Because lion outfitters cover so much terrain with trucks, dogs and people, up to 200 miles a day, we recommend caution in approving too many new permits on top of existing ones. We recommend that DOW lion quotas be generously accommodated.

**Rock Climbing**

This is yet another sport that impacts plants and wildlife. Cliffs and ridges are concentrated areas for raptors, bats, and a host of bird, plant and other species. The UFO has many cliff and canyon areas and we encourage the BLM to take a strong stand in support of cliff ecosystems and place adequate

constraints and regulations on this increasingly demanding sport.

**Wilderness/WSAs**
**Add Monitor Creek to Camel Back WSA**
RMRI recommends adding Monitor Creek and the rest of Potter Creek Canyon to the Camel Back WSA and Forest Service Roubideau SMA. This interconnected canyon system is one of the wildest, quietest, most untrammeled areas in the region and deserves the highest level of protection. We very much appreciate that Preferred Alternative 2 in the Dry Creek TMP kept these canyons in their wild, unmotorized state and strongly urge you to keep them so, as we believe the highest and best use of these canyons is to retain their silence and solitude as a future wilderness.

**Grazing**
RMRI recommends that the RMP revise standards for grazing allotments to assure that AUMs do not exceed those necessary to meet or exceed Land Health Standards pertaining to vegetation and grasslands, as well as to assure that range is healthy enough to sustain wild ungulates, especially in times of drought.

In a time of increasing climate change-induced drought it is critical that wildlife populations not be sacrificed by livestock overgrazing. Grazing allotments should be adjustable, according to changes in moisture conditions, and rotated if necessary. Cattle should be off the range in winter months.

**Rare plants we encourage the BLM to protect**
      Montane riparian forest
      Narrowleaf cottonwood/skunkbrush
      San Rafael Milkvetch
      Naturita Milkvetch
      Hellebonne
      Sage Sparrow
      Gray Vireo
      Peregrine falcon
      Canyon Treefrog
      Payson lupine
      Mariposa lily

**Climate Change and wildlife corridors**
Among the many intiatives addressing climate we note an interagency Forest Service/BLM effort, focused on the Gunnison Gorge and coordinated by Betsy Neely of the Nature Conservancy. The group is looking at the science and apparently meeting regularly. Wildlife connectivity is being addressed by, among many others, Paul Beier of the University of Arizona.

**BLM Land Health Standards**
The Land Health Standard RMP Handout appeared to indicate the majority of UFO lands meeting standards, which is great if true. We recommend the UFO meet or exceed CO BLM state Land Health Standards for maintaining healthy watersheds, riparian areas, upland vegetation, water quality, soils and functioning habitat. A robust weed program is essential and we appreciate the weeding and restoration of cottonwood and willow riparian ecosystem the UFO has been doing.

**Rock extraction**
We question the advisability of permitting rock operations that extract rocks from Dakota Sandstone rim rocks. Rocks hold soil in place and provide scenic value to these lands that should not be shipped to Aspen.

**Economics**

The SRCA letter cites numerous studies supporting the economic benefits of undeveloped land. It is recognized that recreation opportunities provided by wilderness quality lands yield direct economic benefits to local communities. According to the U.S. Fish & Wildlife Service, in 2006 State residents and non-residents spent $3 billion on wildlife recreation in Colorado. (USFWS 2006, *National Survey of Hunting, Fishing and Wildlife-associated Recreation* - http://www.census.gov/prod/2008pubs/fhw06-co.pdf). In addition, local communities that protect wildlands reap measurable benefits in terms of employment and personal income. For instance, a report by the Sonoran Institute (Sonoran Institute 2004, *Prosperity in the 21st Century West -The Role of Protected Public Lands*) found that:

> Protected lands have the greatest influence on economic growth in rural isolated counties that lack easy access to larger markets. From 1970 to 2000, real per capita income in isolated rural counties with protected land grew more than 60 percent faster than isolated counties without any protected lands.

These findings confirm earlier research, showing that wilderness is in fact beneficial for local economies. Residents of counties with wilderness cite wilderness as an important reason why they moved to the county, and long-term residents cite it as a reason they stay. Recent survey results also indicate that many firms decide to locate or stay in the West because of scenic amenities and wildlife-based recreation, both of which are strongly supported by wilderness areas. (Morton 2000, *Wilderness: The Silent Engine of the West's Economy*). Other "non-market" economic values arise from the ability of wildlands to contribute to recreation and recreation-related jobs, scientific research, scenic viewsheds, biodiversity conservation, and watershed protection. (Morton 1999, *The Economic Benefits of Wilderness: Theory and Practice*; Loomis 2000, *Economic Values of Wilderness Recreation and Passive Use: What We Think We Know at the Turn of the 21st Century*). All of these economic benefits are dependent upon adequate protection of the wilderness characteristics of the lands.

**Conclusion**
With that we would like to once again express appreciation for the opportunity to comment. We look forward to following the RMP as it progresses.

Sincerely,

Roz McClellan

**ROCKY MOUNTAIN RECREATION INITIATIVE**
**1567 Twin Sisters Road, Nederland, Colorado 80466 (303) 447-9409**

SCOPING LETTER # 2

Received

MAR 3 1 2010

Uncompahgre Field Office

Uncompahgre BLM RMP Team
Uncompahgre Field Office
Att: Bruce Krickbaum
2465 S. Townsend Ave.
Montrose, CO 81401

May 29, 2010

Dear RMP Team,
This letter (with enclosures) is one of two scoping letters RMRI is sending. This letter explains an enclosed map that attempts to identify less roaded areas on the UFO landscape. The second letter is being emailed to the UFO on the scoping deadline, March 29, and includes more general recommendations.

**Map explanation**

1 A-PI TM

The areas highlighted in red on enclosed 1999 Nucla BLM topo map (copy) are areas on the west side of the UFO that appear on the topo map to be less roaded than surrounding lands, or to have no roads at all. We also used the Field Office-wide Road Inventory map currently on the RMP website to identify less roaded areas. The boundaries are highly impressionistic and presented as a concept for consideration not as anyting final.

2 A-PI TM
3 A-PI WSA

The boundaries nevertheless show how rare and isolated these less roaded lands are, suggesting in itself that they bear further study as potential wildlife and quiet use areas.

Importance of less-roaded lands

4 A-PI VEG
5 A-PI CR
6 A-PI PR
7 A-PI REC

Due to their less roaded condition these areas may be among the few left on the landscape where vegetation is relatively intact, where forage, soil, water courses, archeologic, paleontologic and historic resources are relatively undisturbed and where wildlife security, silence, solitude, quiet use, hunting, wildlife viewing and other such qualities can still can be found. To underscore the importance of less roaded and trailed land, we trust the UFO has access to the large bibliography of studies that show the negative impacts of roads and trails on wildlife and natural resources----research which applies to mountain bike and hiking trails as well, not just to motorized trails!

8 A-PI REC
9 A-PI TM

The current RMP is a one-time opportunity to set aside these less roaded areas for the uses above, by closing the remaining roads and establishing the areas as unroaded, nonmotorized quiet use or just plain wildlife areas.

10 A-PI TM
11 A-PI SDA

It is especially appropriate that this be done in the RMP rather than waiting for the travel plan because, as the UFO RMP Travel Management Handout states, the RMP "will delineate Travel Management Areas….[and]..a map of a preliminary road and trail network." In other words, the Land Use Planning Regulations mean the RMP needs to identify both motorized and nonmotorized areas as a basis for later motorized trail designations, as well as a preliminary route network where roads and trails will and---presumably---will not go.

12 A-PI TM

Designating these areas nonmotorized is further justified by the fact that these areas have managed to stay roadless for so many decades of mining, grazing and logging that there are likely good reasons

13 A-PI MI
14 A-PI LG
15 A-PI FR

why nonmotorized designations will not preempt other uses. For the most part these areas are mesas or ridge tops with poor access or little uranium potential.

Plus, the overwhelming need on this particular landscape is not for more motorized routes, but for more unroaded, undisturbed backcountry, for wildlife and quiet users alike!

16 A-PI FW
17 A-PI REC

### Next Steps

Identifying less roaded areas like this could be a first step in identifying other values that make these lands worth protecting. As an example, we visually correlated the highlighted areas with maps of deer severe winter range and elk winter concentration areas, to hone in on their wildlife values. Several of the areas for example are used by wintering big game.

18 A-PI FW
19 A-PI REC

We also sketched impressionistic boundaries around several of Colorado Natural Heritage Program Potential Conservation Areas to see if there was any overlap. This showed that in at least two cases PCAs intersect or are adjacent to unroaded areas and could be combined to make a larger protected area.

20 A-PI CR
21 A-PI SDA

We recommend the BLM continue this overlay process, adding cultural and paleontologic layers, visual/scenic resource, soil, slope and vegetation layers, CNHP element occurrences, existing and potential ACECs, big horn sheep and other big game layers, Breeding Bird Atlas layers, first hand observation, and soundscape analysis to identify levels of natural quiet. This analysis will flesh out the values these less roaded areas have that make them worth protecting for future generations.

22 A-PI TM

The overlay process will also help define appropriate and manageable boundaries including whether the areas should be combined with adjoining Special Management Areas, PCAs or other special areas. We would be happy to work with the BLM on further defining logical boundaries, closure points and other planning needs.

23 A-PI SDA

### Final Step

The final step involves management direction, giving the areas nonmotorized and perhaps nonmechanized management prescriptions, identifying levels of protection for plants and wildlife, levels and intensities of quiet use, whether the areas will be identified as ERMAs or SRMAs, finding citizen adopt groups, etc.

24 A-PI TM
25 A-PI FW
26 A-PI REC

### Description of highlighted areas

Moving from Tabeguache Special Management south and west to the Utah border, the highlighted areas are as follows:

Tabeguache Special Management Area

27 A-PI TM

The boundary on the map is drawn so as to capture and add to the SMA the relatively unroaded lands collectively comprised of the Burro Creek, Campbell Creek, and Shavano Creek drainages where they enter BLM lands from roadless Forest Service lands to the east. To create one large nonmotorized area, several routes would need to be closed to motorized use, but at least one of them is apparently recent or at least only recently has seen more use, appearing on Field Office-wide Road Inventory map on the RMP website, but not showing on the 1999 topo map published only 11 years ago. The closures would be well worth the benefit of setting aside a large primitive area for wildlife and quiet uses such as hunting, hiking and horseback riding.

28 A-PI FW
29 A-PI WSA
30 A-PI REC

The area delineated in red on the map forms a needed extension of the Tabeguache SMA because it fills in a corner necessary to connect the SMA with the large Forest Service roadless area to the east. This roadless area was included in a core reserve proposal RMRI helped design in the 1990s in conjunction with the Uncompahgre Travel Plan. A Forest Service map attached here shows this area as clearly unroaded and, thanks to RMRI's and other groups' efforts, the area was designated as a Closed Travel Area" in the final TMP.

31 A-PI TM

BLM_0082031

This Forest Service roadless area in combination with the Tabeguache SMA forms one large, undeveloped wildlife security area that includes Spruce Mountain and a prized big game hunting area adjacent to the SMA on the north. The area is in Game Management Unit 61, one of the most sought-after hunting units in Colorado. And much of the area appears to border an elk winter concentration area on the GIS elk map enclosed.

**32 A-PI WSA**
**33 A-PI REC**

The western boundary drawn on the map has been extended to Long Mesa to incorporate a piece of the Potential Conservation Area. Providing a nonmnotorized/nonmechanized prescription for this entire area represents an important opportunity to safeguard an unusually large and rare chunk of diverse and unroaded land, as BLM and Forest Service lands surrounding Tabeguache are densely roaded everywhere else.

**34 A-PI TM**
**35 A-PI WSA**

*Mountain Bike Management*
The BLM Tabeguache Special Management Area is a wilderness area in everything but name and as such needs to be managed for horse and hiking use only, not for motorized or mountain bike use. We understand the BLM has been actively managing it this way and we would like to thank you and strongly recommend that mountain bikes continue to be disallowed.

**36 A-PI TM**
**37 A-PI REC**

Saw Tooth Ridge
Sawtooth Ridge on the southern tip of Long Mesa is virtually unroaded on the 1999 top map. This map was done only 11 years ago, suggesting that the roads appearing on the Field Office-wide Road Inventory on the website are recent, user-created and, not having a long history of use, can be closed to create an important quiet use and habitat area. Saw Tooth Ridge is in mule deer severe winter range. The northern boundary could be drawn along the road that dissects Section 8 to the north.

**38 A-PI TM (full)**
**39 A-PI FW (excerpt)**
**40 A-PI TM**

Dry Creek Canyon
South of Saw Tooth Ridge there appears to be a less roaded area in the upper reaches of Dry Creek canyon. As with Saw Tooth Ridge, some of the routes appearing on the RMP inventory map appear to be recent incursions and should be closed, as they are not appearing on the 1999 topo map. The area contains an elk winter concentration area according to the enclosed elk map.

**41 A-PI FW**

Saucer Basin
Saucer Basin is across the Paradox Valley to the north. The boundary drawn on the map includes lands that appear roadless on the 1999 topo map even though a few, likely user-created, routes that could be closed, have cropped up on the RMP inventory map.

**42 A-PI TM**

The boundary has been expanded to include the PCA at the foot of the cliffs on the north side of Highway 90. The PCA doubles as an elk winter concentration area according to the enclosed map. The combined areas have a diversity of vegetation and rare plants, and likely many other worthwhile values that could be identified by overlaying GIS resource maps.

**43 A-PI FW**
**44 A-PI VEG**

Altogether, we recommend the BLM give this entire combined area extending from the Dolores River on the north to the vicinity of Honeymoon Mine to the south, a non-mechanized, nonmotorized management prescription.

**45 A-PI TM**

Rock Creek/Carpenter Flats
North of Saucer Basin is a steep southern wall of Rock Creek Canyon that appears to be roadless and worthy of study. Deep canyons and tributaries like these are epicenters of biodiversity on this exposed landscape harboring a rich diversity of birds including cliff-dwelling raptors and unique plant and riparian communities. Regrading biodiversity in western states one estimate is that 98% is found in riparian corridors.

**46 A-PI FW**
**47 A-PI VEG**
**48 A-PI WET**

BLM_0082032

49 A-PI VRM

50 A-PI VEG
51 A-PI FW
52 A-PI REC

### Nyswonger Mesa

South across the valley is another less roaded mesa top that appears to have stunning views of the Dolores River Canyon and surrounding lands. Nyswonger Mesa is an example of an area that should be actively analyzed by the BLM for its forage and wildlife values and for its potential to be set aside as a rare and needed quiet use area. The mesa appears to have few development conflicts likely due to access problems and little uranium potential.

53 A-PI ED

### Sharp Canyon

West of Nyswonger Mesa another roadless area is marked on the map in the vicinity of Sharp Canyon. This area is in an elk winter concentration area and further GIS analysis would likely show other values that would benefit from keeping the area nonmotorized.

54 A-PI FW
55 A-PI TM

### Lion Creek

And just north of Route 90 is another area that is clearly roadless on the RMP inventory map, between Spring Creek and Lion Creek. Like Sharp Canyon, Lion Creek should be studied by the BLM as a unique if small example of roadless land. If these areas are roadless now after so many decades of uranium exploration, that in itself is worthy of note.

56 A-PI TM

### Wray Mesa

While not roadless, we note that this area is Desert big horn sheep habitat with good condition grasslands. It needs to have a spring seasonal motorized closure to protect big game.

57 A-PI FW
58 A-PI TM

### Skein Mesa and Wild Steer Mesa

It is not clear if these areas are inside the UFO boundaries, but like the other areas highlighted on the map, they appear to have potential as nonmotorized, quiet use areas.

59 A-PI REC

60 A-PI WSA

As mentioned, the boundaries sketched on the map are highly impressionistic and conceptual. They are presented merely as a suggestion for how the BLM could set aside less roaded lands as a way of mitigating the severe habitat fragmentation that characterizes this region. Other solutions of course are reducing road densities by setting road density targets, closing spurs and duplicative routes and narrowing motorized use down to a few logical, linked loops and travel ways that provide opportunities without the broad scale cross-country impacts that are now occurring.

61 A-PI TM

THE OTHER ENCLOSURES IN THIS PACKET SUPPORT THE SCOPING RECOMMENDATIONS THAT ARE ATTACHED TO THEM. THESE SCOPING POINTS CAN BE ADDED TO THOSE RMRI MADE IN ITS EMAILED COMMENTS.

The RMP is an important and beneficial project and we appreciate this opportunity to comment.

Sincerely,

Roz McClellan
(Roz McClellan)

BLM_0082033



## Sensitive Habitat for Big Game and Watchable Wildlife in the Uncompahgre Field Office

### Species Habitat and Activities

- Black Bear Fall Concentration
- Black Bear Summer Concentration
- Desert Bighorn Production
- Desert Bighorn Summer Concentration
- Desert Bighorn Water Source
- Desert Bighorn Winter Concentration
- Rocky Mtn Bighorn Production
- Rocky Mtn Bighorn Winter Concentration
- Elk Migration Corridor
- Elk Severe Winter Range
- Elk Winter Concentration
- Mule Deer Concentration
- Mule Deer Critical Winter Range
- Mule Deer Severe Winter Range
- Mule Deer Winter Concentration
- Pronghorn Perennial Water
- Pronghorn Winter Concentration
- Pronghorn Winter Range
- Turkey Production Area
- Turkey Roost Site
- Turkey Winter Concentration
- Turkey Winter Range

### Reference Data

- Township Range
- Section
- BLM UFO
- County
- City
- Highway
- Paved Road
- Passenger Vehicle Unpaved
- Motorized Trail
- Unknown
- River

### Land Management

- Wilderness
- Other Congressional Designation
- BLM ACEC
- BLM WSA
- 2009 Colorado Wilderness Act
- Other Citizens Proposed Wilderness

### Land Ownership

- Private
- Federal (BOR, FWS, NPS)
- USFS
- BLM
- State
- Local
- NGO/Land Trust

0   5   10   15   20
Miles

Data sources: BLM, CDOT, USFS, COMaP v 7, CNHP, CDOW, SRCA
Map created by: Alison Gallensky CNE 2010

Map produced for the Southern Rockies Conservation Alliance by the Center for Native Ecosystems

BLM_0082034



## Sensitive Habitat for Big Game and Watchable Wildlife in the Uncompahgre Field Office

### Species Habitat and Activities

- Black Bear Fall Concentration
- Black Bear Summer Concentration
- Desert Bighorn Production
- Desert Bighorn Summer Concentration
- Desert Bighorn Water Source
- Desert Bighorn Winter Concentration
- Rocky Mtn Bighorn Production
- Rocky Mtn Bighorn Winter Concentration
- Elk Migration Corridor
- Elk Severe Winter Range
- Elk Winter Concentration
- Mule Deer Concentration
- Mule Deer Critical Winter Range
- Mule Deer Severe Winter Range
- Mule Deer Winter Concentration
- Pronghorn Perennial Water
- Pronghorn Winter Concentration
- Pronghorn Winter Range
- Turkey Production Area
- Turkey Roost Site
- Turkey Winter Concentration
- Turkey Winter Range

**Reference Data**
- Township Range
- Section
- BLM UFO
- County
- City
- Highway
- Paved Road
- Passenger Vehicle Unpaved
- Motorized Trail
- Unknown
- River

**Land Management**
- Wilderness
- Other Congressional Designation
- BLM ACEC
- BLM WSA
- 2009 Colorado Wilderness Act
- Other Citizens Proposed Wilderness

**Land Ownership**
- Private
- Federal (BOR, FWS, NPS)
- USFS
- BLM
- State
- Local
- NGO/Land Trust

0  5  10  15  20
Miles

Map produced for the Southern Rockies Conservation Alliance by the Center for Native Ecosystems

Data sources: BLM, CDOT, USFS, COMaP v 7, CNHP, CDOW, SRCA
Map created by: Alison Gallensky CNE 2010

BLM_0082035





BLM_0082037

# SAN MIGUEL COUNTY
## BOARD OF COMMISSIONERS

| ELAINE FISCHER | ART GOODTIMES | JOAN MAY |

VIA ELECTRONIC MAIL AND FAX

March 29, 2010

BLM UFO
Attn: Bruce Krickbaum
RMP Project Manager
E:mail UFORMP@blm.gov
Fax: 970-240-5367

Re:    BLM Uncompaghre Field Office Resource Management Plan Revision Scoping
       Comments

Dear Mr. Krickbaum:

Thank you for the opportunity to provide scoping comments on the Uncompahgre Field
Office (UFO) Resource Management Plan (RMP) as the revision process gets underway.
San Miguel County Board of Commissioners (BOCC) also appreciates the time and effort
BLM staff spent to provide local forums to explain the process and gather public input.
By formally requesting Co-operating Agency status, San Miguel County has
demonstrated a commitment to active participation in this process and we hope our input
will be carefully considered.

**1 A-PI SE**

San Miguel County is sixty-two percent public lands, much of which the surface or sub-
surface estate is managed by BLM.  Public lands play a critical role in our economy and
in defining the character of our county.  Our economy is largely dependent on, and
substantially a result of, the public lands in our county.  According to 2003 Region 10
economic data (published in a 2006 Region 10 report by Levy), 23% of our jobs are from
tourism, 13% derived from second home spending, 20% from construction (of which 9%
is second homes), and 21% from services which includes real estate services.  This
constitutes most of our economy.  Our ability to attract tourists, service professionals, and
entrepreneurs that use cyber technology to support their businesses, depends on
maintaining the character of the region. These are the people that support the services,
real estate, and construction industries.  Access to natural amenities is frequently cited as
the reason these people chose to locate in or visit San Miguel County.

**2 A-PI SE**

San Miguel County is committed to working with BLM to maintain the character of our
region.  BLM management policy plays a key role in this endeavor.   We believe a
sustainable economy in San Miguel County is best served by a BLM management policy
the places a priority on maintaining the natural integrity of BLM lands and the lands their
sub-surface ownership has influence over.  Local governments have expended great effort
to protect air quality, water quality, visual character, wildlife, and natural systems where
they have jurisdiction.  We hope BLM will set the same priorities in the management of
their lands.

P.O. BOX 1170  •  Telluride, Colorado  81435  •  (970) 728-3844  •  FAX (970) 728-3718
www.sanmiguelcounty.org

BLM_0082038

3 A-PI AQ

In developing the alternatives for management in the RMP, San Miguel County asks that the following be given special attention:

As a former non-attainment area for National Ambient Air Quality Standards (NAAQS) for Pm 10, air quality is of particular concern to us. Local governments have expended hundreds of thousands of dollars implementing measures to reduce air pollution, which we have been successful in accomplishing. However, activities on BLM lands, such as grazing, oil and gas development, and OHV use have the potential to undermine these gains. In addition, EPA is promulgating a new NAAQS for Ozone. Depending on where the standard is set, areas within the planning region may already exceed the new standard. We therefore believe it is BLM's responsibility to analyze and disclose the potential environmental and economic impacts of management decisions. For example, if BLM is making lands available for leasing for oil and gas development, it needs to consider and disclose the reasonably foreseeable consequences of its development. San Miguel County is already adversely impacted by activity on BLM lands outside our boundaries with regard to ozone and particulate pollution. Recent dust events exacerbated by disturbed soils on public lands have had profound impacts on the timing and duration of the snowmelt in the county. This adversely impacts our skiing dependent tourist economy, our agricultural and municipal water users, and the timing of natural ecosystem processes.

4 A-PI NRED

We believe that BLM should require all oil and gas development to use the best available control technology to minimize Volatile Organic Carbon (VOC) production and require

5 A-PI NRED

drilling equipment that maximizes the number of wells per pad. All development should be required to develop Comprehensive Development Plans that minimize soil disturbance

6 A-PI NRED

and disturbance for infrastructure development. In addition, the demand created for and availability of water, as well as water quality impacts should be considered in BLM's

7 A-PI NRED

planning. An enforceable plan that restores vegetation in impacted areas to pre-disturbance conditions and prevents spread of exotic plant species should be required.

8 A-PI NRED

BLM must create a bonding mechanism to provide for adequate enforcement and develop policy and staffing to ensure compliance. In light of recent disclosures on the nature and

9 A-PI NRED

volume of chemical chemicals used in oil and gas development, BLM needs to monitor the use of and consider the effects of these chemicals on the surface and sub-surface

0 A-PI NRED

environment. The policy of allowing residual well development and production wastes to be disposed of on public lands should be revisited. BLM should require these wastes to be removed from public lands and disposed of in a proper facility consistent with the character of the wastes.

5 A-PI LG

We have reviewed the Norwood Land Health Assessment (LHA), which covers the BLM lands in San Miguel County. We also compared the results of this LHA to the results summarized in the table found on handout 6.1 for vegetation that was distributed at the scoping open houses. We assume the other LHA were done with similar methodologies to those described on page 47 of the Norwood LHA. We recognize BLM's limitations in resources for monitoring the condition of the lands they manage, and in fact these assessments represent a great effort for BLM staff. However, these are very coarse, qualitative evaluations that are extremely subjective. According to the table on RMP Planning Fact Sheet 6.1, the current assessments were done between 1999 and 2009. The next assessments in each unit will not be done until 10 years later. We believe that BLM

BLM_0082039

needs to commit more resources to ongoing monitoring of their lands to ensure achievement of the five Public Rangeland Health Standards. BLM needs better data to be able to make more defensible and timely management and policy decisions. The Norwood LHA was conducted in 2005-2006. There is no reference to when the lands were assessed last and if the same points were evaluated. "Problems" were defined as a score of 1 or 2 for various health indicators. There is no description of how the presence or absence of these indicators results in an area "on balance" meeting a health standard and being classified as "meeting with problems" rather than judged to be "not meeting" the Rangeland Health Standard.



6 A-PI LG

In addition, there is no description of trends in meeting the Rangeland Health Standards. As there has been a requirement for BLM to achieve these standards or modify management practices to move toward their achievement for over 15 years, it seems critical to know if you are moving toward or away from achievement of the standards to appropriately modify land management as required by BLM policy. If there is additional information that is to be the basis of deciding management policy in the RMP revision, its source, indications, and conclusions should be disclosed and discussed in the RMP EIS. However the conclusions on compliance with the Rangeland Health Standard were developed, hundreds of thousands of acres of BLM lands in the planning area have "problems" or are "not meeting" the five Rangeland Health Standards BLM is obligated to manage its lands to achieve. BLM should identify and discuss its conclusions on why lands are not meeting land health standards in the RMP and develop a specific road map to ensure progress toward compliance.

7 A-PI LG

As stated previously, San Miguel County believes the interests of the County and the public at large are best served by BLM lands maintaining their natural ecological integrity. Extractive uses of BLM lands have resulted in boom and bust cycles and left indelible scars on our public lands. Historic, and perhaps current, livestock management practices have also contributed to degrading or perpetuating the degradation of our public lands. These activities, along with travel management, have all contributed to the conditions described in the LHAs.

8 A-PI SE
9 A-PI LG
10 A-PI TM

We agree with the recommendation in the Norwood LHA that BLM "implement grazing practices that leave more litter on the soil surface, prevent grazing on regrowth by limiting the time of use to two weeks or less, and minimize the instances where livestock graze the same areas in both spring and fall seasons". The "most common problems" identified in the LHA involving lack of perennial forbs, low levels of warm and cool season grasses need to be corrected. Also the problems with the presence of noxious weeds, and other invasive alien species, particularly cheatgrass needs to be more actively addressed. We also agree with the recommendation that BLM complete a road and trail map, identify road-caused soil loss, change travel (as you have) from open to limited to existing routes and where necessary, further limit travel to designated routes. As suggested in the LHA, BLM should close and rehab abandoned roads and trails to prevent further erosion.

11 A-PI LG

San Miguel County has a long-standing recognition of the contribution of agriculture and ranching to the traditions and character of our county. This is reflected in our land use policy and taxpayer funded preservation efforts. However, mining and agriculture

12 A-PI TM

13 A-GE

3

BLM_0082040

**13 A-GE continued**

combined account for only 2% of the jobs in San Miguel County according to the study cited earlier. Consequently, we request that BLM include in the alternatives to be considered a true land health and restoration alternative. This alternative should have as its guiding principle that management decisions must result in moving toward the goal of all BLM lands meeting the Rangeland Health Standards for Soils, Riparian Areas, Healthy Communities, Threatened and Endangered Species, and Water Quality. Adherence to this principle should shape and inform other management decisions regarding travel management, requirements placed on oil and gas and mining development, and appropriate levels of use by domestic livestock. Particular attention should be devoted to improving plant communities. Improving plant communities to match site potential protects soils, water quality, visual attributes, wildlife populations and diversity, and air quality. BLM should work to restore biological soils crusts to their historic role in desert ecosystems. BLM needs to develop within this policy a robust monitoring and evaluation system to measure movement in achieving these goals. The system must be able to validate management decisions in a timely manner. BLM must be able to provide defensible justification for changes in management that restore a fully functioning landscape. This alternative should also include provision for assessing the impacts of climate change (as should all alternatives) and identifying what changes in management will be made to mitigate the impacts of these changes on BLM lands. We look forward to working with BLM throughout the process to create such an alternative.

**14 A-PI WSR**

The San Miguel River Corridor is an important natural and economic asset to San Miguel County. The scenic byway, fishing, and rafting use make it one of the most appreciated natural features in the county. The BOCC has reviewed the Wild and Scenic eligibility analysis developed by BLM. We concur with your findings of eligibility as they relate to waters within San Miguel County. We look forward to working with BLM to complete the suitability analysis and develop a management strategy that provides the San Miguel corridor with comprehensive and durable protection. The Norwood LHA finds all the waters analyzed to meet water quality standards. Some sampling data is presented to

**15 A-PI WR**

support this conclusion. There is no discussion of compliance with the other water quality standards that underlie CDPHE Water Quality Control Division use classifications, for example the microbiological standards for Recreation 1a waters. Has BLM determined these standards are consistently met on all the stream segments and through what mechanism?

**16 A-PI SSW**

San Miguel County has been actively involved in conservation efforts for Gunnison Sage Grouse for over 13 years. The Norwood LHA states (pg 35) "These lek counts indicate the trend for the overall population appears stable through this time frame (1992-2005). However, it is believed that the current population is much lower than in historic times". This conclusion needs to be updated as since this time, Gunnison Sage Grouse populations have plummeted. A new listing decision may result in protection for the Gunnison Sage Grouse under the endangered Species Act. In the RMP revision process, BLM should consider special management designation and policies for occupied and historic Gunnison Sage Grouse habitat as Areas of Critical Environmental Concern (ACECs). These policies should maintain and improve this habitat. The recently designated Westwide Energy Corridor may intersect or impact Gunnison Sage Grouse habitat. If so, the RMP should consider and disclose how protection of grouse will be reconciled with uses approved in this corridor.

**17 A-PI ACEC**

**18 A-PI LR**

4

19 A-PI LR

The BOCC has reviewed a map provided by BLM of the parcels identified for disposal in San Miguel County. A review of ownership of some of the disposal parcels by our GIS staff suggests several of these parcels are no longer in BLM ownership. As some of the disposal parcels are in Gunnison Sage Grouse habitat or otherwise may be of interest/concern to the county, we would like to arrange a meeting with your realty staff to confirm the current status of these parcels. This would aid the County in making specific recommendations to the BLM going forward.

Thank you for the opportunity to provide these scoping comments and San Miguel County looks forward to working with BLM throughout the RMP revision process.

Sincerely,

SAN MIGUEL COUNTY, COLORADO
BOARD OF COUNTY COMMISSIONERS

Art Goodtimes, Chair

BLM_0082042

it allowed under the RMP
inimizes damage to unique
he RMP should impose
vater.

no unique comments

o those zones. Any oil and gas developmer
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Tl
 other mining to protect our land, air, and v

renewable energy projects l
should be carefully constrai
natural features, essential w
strict limits on uranium and

Sincerely,

Randall Paske
3958 Warwick Boulevard
Kansas City, MO 64111

BLM_0082043

t allowed under the RMP
inimizes damage to unique
he RMP should impose
vater.

onmental issue.

no unique comments

e these zones. Any oil and gas development
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Tl
other mining to protect our land, air and w

eration and attention to this important envir

renewable energy projects
should be carefully constrai
natural features, essential w
strict limits on uranium and

Thank you for your conside

Sincerely,

Maryann Kirchenbauer
17 Memorial Place
Elmwood Park, NJ 07407

t allowed under the RMP
inimizes damage to unique
he RMP should impose
ater.

no unique
comments

these zones. Any oil and gas developmer
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Tl
other mining to protect our land, air and w

renewable energy projects
should be carefully constrai
natural features, essential w
strict limits on uranium and

Sincerely,

Chad Held
1626 N. Hollywood Way
Burbank, CA 91505

ate change.

e RMP, and limit
it allowed under the RMP
inimizes damage to unique
he RMP should impose
vater.

urces, and mitigating the impacts of clim

es for renewable energy development in the
o those zones. Any oil and gas developmer
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Th
other mining to protect our land, air and w

wildlife habitat, cultural res

BLM should designate zon
renewable energy projects t
should be carefully constrai
natural features, essential w
strict limits on uranium and

Sincerely,

audrey smith
PO Box 196
Wilson, WY 83014

water.

Sincerely,

Barbara Wall
General delivery
Bjursätragatan 120, Bandh
Wheaton, IL 60187

gen, Sweden

No unique
comments

RMP, and limit
nt allowed under the RMP
inimizes damage to unique
he RMP should impose
vater.

s for renewable energy development in an
o those zones. Any oil and gas developmen
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Th
other mining to protect our land, air and w

BLM should designate zon
renewable energy projects t
should be carefully constrai
natural features, essential w
strict limits on uranium and

Sincerely,

John Dubendorff
62 Babylon Drive
Sound Beach, NY 11789

no unique
comments

ent of helping protect
ate change.

e RMP, and limit
at allowed under the RMP
inimizes damage to unique
he RMP should impose
vater.

ame% Thomas Hall

---

. Protecting these lands has the added o
ources, and mitigating the impacts of clim

es for renewable energy development in th
o those zones. Any oil and gas developmer
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Th
other mining to protect our land, air and w

---

development and transmiss
wildlife habitat, cultural res

BLM should designate zon
renewable energy projects t
should be carefully constrai
natural features, essential w
strict limits on uranium and

Sincerely,

Linnea Fronce %pa_first_n
991 Sagamore Wy
Sacramento, CA 95822

BLM_0082049

...t allowed under the RMP
...inimizes damage to unique
...he RMP should impose
...ater.

no unique
comments

...e these zones. Any oil and gas developme...
...ned, subject to phased development that m...
...ildlife habitat, and other sensitive areas. Tl...
...other mining to protect our land, air and w...

...renewable energy projects ...
...should be carefully constrai...
...natural features, essential w...
...strict limits on uranium and...

Sincerely,

JULIE LEVIN
28 EAST 10 ST
NYC, NY 10003

BLM_0082050

t allowed under the RMP
inimizes damage to unique
d restores the land to its
limits on uranium and
its original condition.

A-PI SE

e these zones.]. Any oil and gas developme
ned, subject to phased development that m
ildlife habitat, and other sensitive areas an
exploited. The RMP should impose strict l
land, air and water including restoration to

renewable energy projects
should be carefully constrai
natural features, essential w
original condition once it is
other mining to protect our

Sincerely,

Joseph Armstrong
43081 Coles Dr.
Hollywood, MD 20636

t allowed under the RMP
inimizes damage to unique
he RMP should impose
vater.

unique comments

e these zones. Any oil and gas developmer
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Tl
 other mining to protect our land, air and w

no

renewable energy projects v
should be carefully constrai
natural features, essential w
strict limits on uranium and

Thank you.

Sincerely,

Melissa Brown
3303 Lakeside View Drive
Falls Church, VA 22041

BLM_0082052

t allowed under the RMP
inimizes damage to unique
he RMP should impose
vater.

o these zones. Any oil and gas developmer
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Tl
other mining to protect our land, air and v

renewable energy projects
should be carefully constrai
natural features, essential v
strict limits on uranium and

Sincerely,

M McCarrthy
2927 Spring Harvest
Ft. Collins, CO 80528

o unique comments

n

allowed under the RMP
minimizes damage to unique
he RMP should impose
vater.

ions in mind.

no unique comments

e these zones. Any oil and gas developme
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Tl
other mining to protect our land, air and w

ge this invaluable land with future generat

renewable energy projects
should be carefully constrai
natural features, essential w
strict limits on uranium and

Please do your best to mana

Sincerely,

Donna See
139 Williamsville Rd
Hubbardston, MA 01452

BLM_0082054



io unique comments

Sincerely,

Joseph Kress
Zion Church Rd.
Augusta, WV 26704

BLM_0082055

e RMP, and limit
it allowed under the RMP
inimizes damage to unique
he RMP should impose
vater.

inique comments

es for renewable energy development in the
o those zones. Any oil and gas developmer
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Th
other mining to protect our land, air and w

no u

BLM should designate zon
renewable energy projects t
should be carefully constrai
natural features, essential w
strict limits on uranium and

Sincerely,

kathleen simmons
90 strong st.
Easthampton, MA 01027



BLM_0082057



nique comments

no ur

Bill Carter
2103 Parker Lane
Austin, TX 78741

BLM_0082058

t allowed under the RMP
inimizes damage to unique
he RMP should also
ir and water.

unique comments

e those zones. Any oil and gas developmer
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Th
ium and other mining to protect our land, a

comments seriously.

ne

renewable energy projects
should be carefully constrai
natural features, essential w
impose strict limits on uran

Thank you for taking my

Sincerely,

Abigail van Alstyne
5484 Bull Run Drive
Birmingham, AL 35210

…t allowed under the RMP
…inimizes damage to unique
…he RMP should impose
…ater.

…o these zones. Any oil and gas developmen…
…ned, subject to phased development that m…
…ildlife habitat, and other sensitive areas. Th…
…other mining to protect our land, air and w…

renewable energy projects
should be carefully constrai…
natural features, essential w…
strict limits on uranium and…

Sincerely,

Albert Fecko
8400 Warren Blvd.
Center Line, MI 48015

…o unique comments

t allowed under the RMP
inimizes damage to unique
he RMP should impose
vater.

o these zones. Any oil and gas development
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Th
 other mining to protect our land, air and w

renewable energy projects
should be carefully constrai
natural features, essential w
strict limits on uranium and

Thank you most kindly.

Sincerely,

Jim Hunt
324 Chestnut Hill Avenue
#9
Brighton, MA 02135-6023

no unique comments



...tard be strongly
...ldlife habitat, and other
...ther mining to protect our

...e those zones. Gas and oil development sh...
...age to unique natural features, essential wil...
...hould impose strict limits on uranium and ...

...renewable energy projects ...
discouraged due to it's dam...
sensitive areas. The RMP s...
land, air and water.

Sincerely,

Jillian Sykora
1142 W. Culver St
Phoenix, AZ 85007

no unique comments

t allowed under the RMP
inimizes damage to unique
he RMP should impose
water.

no unique comments

e these zones. Any oil and gas developmer
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Tl
other mining to protect our land, air and w

renewable energy projects
should be carefully constra
natural features, essential w
strict limits on uranium and

Sincerely,

Thomas Carpenter
3646 S. John Hix
Wayne, MI 48184



Sincerely,

ique comments

no un

James McCarthy
1212 Roth Court
Wheeling, IL 60090

reation. The resource area
ge grouse, that rely on

iding extensive unroaded
al soundscapes and
y off-road vehicles or
management plan as part of
ng for impacts of all uses.
nd mechanized use. Those
osed to all forms of energy
enefit of helping protect
ate change.

nd opportunities for quiet, backcountry rec
nd imperiled wildlife, such as Gunnison sa;
free from roads and other infrastructure.

size resource protection in this RMP, prov
ationists can experience solitude and natura
ife and wild rivers can thrive unimpeded b
should complete a comprehensive travel m
uning is done at a landscape level, accounti
acteristics should be closed to motorized a;
rild and scenic river corridors, should be cl
on. Protecting these lands has the added b
ources, and mitigating the impacts of clim;

quality lands, wild rivers, t
is also home to important a:
large intact tracts of habitat

l encourage BLM to empha
areas where quiet-use recre
viewsheds, and where wild
energy development. BLM
the RMP to ensure that plan
Lands with wilderness char
lands, as well as potential w
development and transmiss.
wildlife habitat, cultural res

BLM_0082065

BLM should designate zones for renewable energy development in the RMP, and limit renewable energy projects to those zones. Any oil and gas development allowed under the RMP should be carefully constrained, subject to phased development that minimizes damage to unique natural features, essential wildlife habitat, and other sensitive areas. The RMP should impose strict limits on uranium and other mining to protect our land, air and water.

Sincerely,

Mary Jo Alyanak
311 Watson Street
Lodi, CA 95240

k allowed under the RMP
inimizes damage to unique
he RMP should impose
vater.

evelopment.  These lands

A-PI VRM

e those zones. Any oil and gas developme
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Th
 other mining to protect our land, air and w

of the visual damage done by oil and gas d
se act to protect them.

1

renewable energy projects
should be carefully constrai
natural features, essential w
strict limits on uranium and

BLM should also be aware
are rare and precious.  Plea

Sincerely,

Brooks Kelley
91 Andrews Road
Guilford, CT 06437

nimizes damage to unique
he RMP should impose
vater.

nce, subject to phased development that m
ildlife habitat, and other sensitive areas. Tl
other mining to protect our land, air and w

should be carefully consid
natural features, essential w
strict limits on uranium and

Sincerely,

Ed Loosli
16370 SE Wallace Rd
Dayton, OR 97114

unique comments

no

allowed under the RMP
inimizes damage to unique
he RMP should impose
vater.  Your support is both

no unique comments

e those zones. Any oil and gas developmen
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Tl
 other mining to protect our land, air and w
ted.

renewable energy projects
should be carefully constrai
natural features, essential w
strict limits on uranium and
vital & very much apprecia

Sincerely,

Cort Brumfield
9002 N. E. Webster Street
Portland, OR 97220

BLM_0082069

owed under the RMP
nimizes damage to unique
he RMP should impose
and water.

e these zones. Oil and gas development an
ned, subject to phased development that mi
ildlife habitat, and other sensitive areas. Th
n and other mining to protect our land, air a

renewable energy projects
should be severely constrai
natural features, essential w
very strict limits on uraniun

Sincerely,

Paul Couillard
6176 Beadnell Way #74
San Diego, CA 92117

unique comments

no

...RMP, and limit
...nt allowed under the RMP
...inimizes damage to unique
...he RMP should impose
...vater.

no unique comments

...s for renewable energy development in th...
...o those zones. Any oil and gas developmer...
...ned, subject to phased development that m...
...ildlife habitat, and other sensitive areas. Th...
... other mining to protect our land, air and w...

...BLM should designate zon...
...renewable energy projects t...
...should be carefully constrai...
...natural features, essential w...
...strict limits on uranium and...

Sincerely,

Richard Vincent
2107 Spring Creek Dr
Laramie, WY 82070

t allowed under the RMP
inimizes damage to unique
he RMP should impose
ater.

o uteco zones. Any oil and gas development
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Tl
other mining to protect our land, air and v

renewable energy projects
should be carefully constrai
natural features, essential w
strict limits on uranium and

nique comments

no ur

Sincerely,

Yuko Nakajima
63 Oakvale Ave.
Berkeley, CA 94705-2403

BLM_0082072

allowed under the RMP
inimizes damage to unique
he RMP should impose
vater. There are places too

those zones. Any oil and gas developmen
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Tl
other mining to protect our land, air and w

renewable energy projects
should be carefully constrai
natural features, essential w
strict limits on uranium and
special to spoil!

2

ael Mains PO Box 169 Van Wert, IA 5026

Sincerely, Phyllis and Mich

Sincerely,

unique comments

Michael Mains

nc

Phyllis %pa_first_name% l
PO Box 169
20545 130th St.
Van Wert, IA 50262

BLM_0082073

ever change places like

2 A-PI NRED
3 A-PI TM

vative when making decisions that will for

Please be extremely conser
this.

Sincerely,

Mark Wilson
5314-2 Ross Neck Rd.
Cambridge, MD 21613

e RMP, and limit
it allowed under the RMP
inimizes damage to unique
he RMP should impose
/ater.

es for renewable energy development in the
o those zones. Any oil and gas developmer
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Tl
other mining to protect our land, air and v

good you can do!

BLM should designate zon
renewable energy projects t
should be carefully constrai
natural features, essential w
strict limits on uranium and

Thank you again for all the

Sincerely,

MaryJo Matheny
3738 N. Denny St.
Indianapolis, IN 46218122

t allowed under the RMP
inimizes damage to unique
he RMP should impose
vater.

no unique comments

e those zones. Any oil and gas developmer
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Tl
other mining to protect our land, air and w

renewable energy projects
should be carefully constrai
natural features, essential w
strict limits on uranium and

Sincerely,

Richard Engelmann
4622 Hampshire Street
Boulder, CO 80301

BLM_0082076

MP, and limit
nt allowed under the RMP
inimizes damage to unique
he RMP should impose
vater.

o unique comments

s for renewable energy development in th
o those zones. Any oil and gas developmer
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Th
other mining to protect our land, air and w

BLM should designate zone
renewable energy projects t
should be carefully constrai
natural features, essential w
strict limits on uranium and

Sincerely,

Dennis Wingle
311 Fourth Street
Shoemakersville, PA 19555

...inimizes damage to unique
...he RMP should impose
...ater.

...otect our wild lands and
...' ourselves away from

R
SA

...ned, subject to phased development that m...
...ildlife habitat, and other sensitive areas. Th...
...other mining to protect our land, air and w...

...grows, it will be ever more important to pro...
...e have clean water and space to "recharge"



1 A-PI W
2 A-PI W

...should be carefully consid...
natural features, essential w
strict limits on uranium and...

As our nation's population g...
watersheds, to insure that w...
populated areas.

Sincerely,

Lyn Miller
7265 W. Center Ave.
Unit 419
Lakewood, CO 80226

e RMP, and limit

d be carefully constrained,
al features, essential
rict limits on uranium and

no unique comments

es for renewable energy development in the
o those zones.

evelopment allowed under the RMP shoul
ent that minimizes damage to unique natur
ensitive areas. The RMP should impose str
land, air and water.

BLM should designate zon
renewable energy projects t

✔Any oil and gas d
subject to phased developm
wildlife habitat, and other s
other mining to protect our

Sincerely,

Alan McCann-Sayles
1696 Ocean Drive
McKinleyville, CA 95519



BLM_0082080

allowed under the RM
inimizes damage to unique
he RMP should impose
ater.

e those zones. Any oil and gas developmer
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Tl
other mining to protect our land, air and w

renewable energy projects
should be carefully constrai
natural features, essential w
strict limits on uranium and

Sincerely,

Charles Jones
10220 3rd Ave. SE, #816
Everett, WA 98208

nique comments

no u

allowed under the RMP
imizes damage to unique
he RMP should impose
nd water.

these zones. Any oil and gas developmen
ed, subject to phased development that min
ildlife habitat, and other sensitive areas. Tl
and other mining to protect our land, air an

renewable energy projects
should be strictly constrain
natural features, essential w
stringent limits on uranium

Sincerely,

Natalie Houghton
775 Angelita Dr
Prescott, AZ 86303

unique comments

no

BLM_0082082



no unique comments

1719 ROCKY RIDGE
AUSTIN, TX 78734-1021

BLM_0082083



he RMP  should impose
ater.

...ine habitat, and other sensitive areas. P
other mining to protect our land, air and w

...natural features, essential w
strict limits on uranium and

Sincerely,

Linda Rossi
250 Tareyton Dr
Langhorne, PA 19047

no unique comments



...he RMP should impose ...ater.

...rare habitat, and other sensitive areas. ... other mining to protect our land, air and w...

...natural features, essential w... strict limits on uranium and...

Sincerely,

Susan Posner
63 Lenox Ave.
Westbury, NY 11590

...omments

no unique c...

BLM_0082085

ate change.

e RMP, and limit
nt allowed under the RMP
inimizes damage to unique
he RMP should impose
vater.

urces, and mitigating the impacts of clim

es for renewable energy development in the
o those zones. Any oil and gas developmen
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Tl
 other mining to protect our land, air and w

wildlife habitat, cultural res

BLM should designate zon
renewable energy projects t
should be carefully constra
natural features, essential w
strict limits on uranium and

Sincerely,

James Herron
463 South Joanne Ave.
Ventura, CA 93003-4727

202-429-3945

## anne jackson

po box 516 , morgantown, PA 19543

March 27, 2010   6:31 PM

BLM Uncompahgre Field Office RMP Project Manager Bruce Krickbaum

Subject: Emphasize resource protection in Uncompahgre RMP Revision

Dear Mr. Krickbaum:

Please take this request very seriously.  Because I forward on this form letter to you does not mean that I am any less serious about asking for protection of this earth of ours:

Thank you for the opportunity to comment on the Uncompahgre RMP revision. The Uncompahgre Field Office encompasses some of Colorado's most beloved wilderness-quality lands, wild rivers, and opportunities for quiet, backcountry recreation. The resource area is also home to important and imperiled wildlife, such as Gunnison sage grouse, that rely on large intact tracts of habitat free from roads and other infrastructure.

I encourage BLM to emphasize resource protection in this RMP, providing extensive unroaded areas where quiet-use recreationists can experience solitude and natural soundscapes and viewsheds, and where wildlife and wild rivers can thrive unimpeded by off-road vehicles or energy development. BLM should complete a comprehensive travel management plan as part of the RMP to ensure that planning is done at a landscape level, accounting for impacts of all uses. Lands with wilderness characteristics should be closed to motorized and mechanized use. Those lands, as well as potential wild and scenic river corridors, should be closed to all forms of energy development and transmission. Protecting these lands has the added benefit of helping protect wildlife habitat, cultural resources, and mitigating the impacts of climate change.

BLM should designate zones for renewable energy development in the RMP, and limit renewable energy projects to those zones. Any oil and gas development allowed under the RMP should be carefully constrained, subject to phased development that minimizes damage to unique natural features, essential wildlife habitat, and other sensitive areas. The RMP should impose strict limits on uranium and other mining to protect our land, air and water.

Sincerely,

anne jackson
po box 516
morgantown, PA 19543

BLM_0082087

910 Dogwood Rd.
Bolinas, CA 94924

BLM_0082088

allowed under the RMP
inimizes damage to unique
he RMP should impose
ater.

e care for them wisely.

ique comments

e these zones. Any oil and gas developme
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Tl
other mining to protect our land, air and w

merican people; they are our future. Pleas

no un

renewable energy projects
should be carefully constrai
natural features, essential w
strict limits on uranium and

These lands belong to the A

Sincerely,

Gail and John Richardson
5263 Cimmeron Drive
Bozeman, MT 59715



allowed under the RMP
inimizes damage to unique
he RMP should impose
water.

these zones. Any oil and gas development
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Th
other mining to protect our land, air and w

renewable energy projects
should be carefully constrai
natural features, essential w
strict limits on uranium and

Sincerely,

Scott Bowler
12295 NW Sunningdale Dr
Portland, OR 97229

unique comments

ive

no

BLM_0082090

allowed under the RMP
inimizes damage to unique
he RMP should impose
vater.

those zones. Any oil and gas developmen
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Tl
other mining to protect our land, air and w

renewable energy projects
should be carefully constrai
natural features, essential w
strict limits on uranium and

Sincerely,

Helen T Mosley
2820 214 Street
Bayside, NY 11360

o unique comments

n

Lawrence Thompson
1069 Felicia Court
Livermore, CA 94550

BLM_0082092

...t allowed under the RMP
...inimizes damage to unique
...he RMP should impose
...water./ Please, don't allow
...mpanies say they don't

-A-PI WR

...o these zones. Any oil and gas developmer
...ned, subject to phased development that m
...ildlife habitat, and other sensitive areas. Th
... other mining to protect our land, air and w
...te the ground water and streams.  Many co
...llow through on that promise.



...renewable energy projects
should be carefully constrai
natural features, essential w
strict limits on uranium and
development that can  pollu
cause pollution but don't fo

Sincerely,

Gayle Spencer
2603 Alpine Road
Menlo Park, CA 94025

BLM_0082093

t allowed under the RMP
inimizes damage to unique
he RMP should impose
vater.

o unique comments

e those zones. Any oil and gas development
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Th
other mining to protect our land, air and w

no

renewable energy projects
should be carefully constrai
natural features, essential w
strict limits on uranium and

Sincerely,

K.K. Robertshaw
6284 Grand Vista Ave.
Cincinnati,, OH 45213

ient of helping protect
ate change.

e RMP, and limit
t allowed under the RMP
inimizes damage to unique
he RMP should impose
vater.

on. Protecting these lands has the added of
ources, and mitigating the impacts of clima

es for renewable energy development in th
o those zones. Any oil and gas developmen
ned, subject to phased development that m
ildlife habitat, and other sensitive areas. Th
other mining to protect our land, air and w

development and transmiss
wildlife habitat, cultural res

BLM should designate zon
renewable energy projects t
should be carefully constrai
natural features, essential w
strict limits on uranium and

Sincerely,

Ann Saunders
626 So. Colorado Ave.
Haxtun, CO 80731

BLM_0082095

habitat, cultural

in the RMP and limit
it allowed under the RMP
inimizes damage to unique

g to protect our land, air

or recreation who often
r vital contribution to the

no unique comments

added benefit of helping protect wildlife
e impacts of climate change.

zones for renewable energy development i
o those zones. Any oil and gas developmen
ned, subject to phased development that m
ildlife habitat, and other sensitive areas.

se strict limits on uranium and other minin

my input. As an avid, active lover of outdo
wild places like the Uncompahgre for thei
dividuals and the country as a whole.

Protecting these lands has
resources, and mitigating th

BLM should also designate
renewable energy projects t
should be carefully constrai
natural features, essential w

The RMP should also impo
and water.

Thank you for considering
vacations out West, I value
health and well-being of ind



BLM_0082097

e R.M.P. should be
nique natural features,
l forbid uranium and other

oil and gas development allowed under d
development that minimizes damage to un
d other sensitive areas. The R.M.P. should
and water.

projects to these zones. An
inflexibly subject to phased
essential wildlife habitat, an
mining to protect land, air,

e comments

no uniqu

Sincerely,

Siddharth Mehrotra
3230 Orange Drive
Camarillo, CA 93010-1322