| | |
|---|---|
| **From:** | Site Administrator on behalf of Shar Brodbelt |
| **To:** | uformp@blm.gov |
| **Subject:** | Dolores River Basin Conservation- Please help! |
| **Date:** | Monday, March 29, 2010 10:42:20 PM |

Mar 29, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection.  Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity;
*prove that the long-term ecological health of the area will not be jeopardized;
*have viable reclamation plans in place before permits can be

granted; and
*have an adequate bonding mechanism in place sufficient enough to
cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Ms. Shar Brodbelt
1045 Holland St
Lakewood, CO 80215-4717
(303) 906-5011

IN

| | |
|---|---|
| **From:** | Site Administrator on behalf of Steve Bremner |
| **To:** | uformp@blm.gov |
| **Subject:** | Dolores River Basin Conservation |
| **Date:** | Thursday, March 25, 2010 8:32:50 PM |

1 A-PI WSA

Mar 25, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

As someone who has spent some time recreating in the Dolores River Basin I value this area and want to keep it as pristine as possible. Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection. Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update. Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor. BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity;
*prove that the long-term ecological health of the area will not

BLM_0103976

be jeopardized;
*have viable reclamation plans in place before permits can be granted; and
*have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Mr. Steve Bremner
626 Ruxton Ave
Manitou Springs, CO 80829-1924

BLM_0103977

IN

| | |
|---|---|
| **From:** | Site Administrator on behalf of Hal Brill |
| **To:** | uformp@blm.gov |
| **Subject:** | Lets get water back in the Dolores River... please! |
| **Date:** | Thursday, March 25, 2010 10:03:12 PM |

Mar 25, 2010

1 A-PI WR

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

My wife and I love to go rafting, but as you know the Dolores has been mostly a trickle since McPhee was completed. We would like to see water returned to this important ecosystem.

Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection. Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update. Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor. BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water

BLM_0103978

quality and quantity;
*prove that the long-term ecological health of the area will not
be jeopardized;
*have viable reclamation plans in place before permits can be
granted; and
*have an adequate bonding mechanism in place sufficient enough to
cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Mr. Hal Brill
PO Box 747
Paonia, CO 81428-0747

BLM_0103979

IN

**From:** Site Administrator on behalf of Kristina Capps
**To:** uformp@blm.gov
**Subject:** Dolores River Basin
**Date:** Friday, March 19, 2010 2:24:12 PM

Mar 19, 2010

1 A-PI WSA

                    of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

A few years ago, my husband and I went on a boating trip down the
Dolores River and had a great time.  Our only problems were difficult
access sites for our drift boat and an upset orchard grower/land owner
we met on our quest to find a put in.

The trip was one of the most memorable ones for us because of the
amazing scenery and peace of the river.  I encourage you to protect the
quality of the water, the pristine air quality itself, and the
surrounding natural formations.

2 B-NP

If possible, enhance the experience for boaters by creating accessible
put ins and take outs along with clear signs as to how to get there.
We ended up winching  our boat with several cables under a train bridge
which I doubt many have done before or since.

Please prioritize protecting the wilderness characteristics of the
Dolores River Basin when developing the new resources management plan
for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon
Wilderness Study Area and citizen recommended additions -- with
towering colorful sandstone cliffs, river otter, peregrine falcon, and
outstanding opportunities for remote wilderness experience -- must be
managed for the protection of the area's vast wilderness
characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within
the Uncompahgre field office, including Carpenter Flats and Beehive
Canyon, help to define a cohesive landscape of diverse canyon
ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich
wildlife and cultural resources, should be managed in close cooperation
with adjacent BLM Field Offices and private land owners. It is
important that the river ecosystem be considered as a whole in order to
institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive
immediate, thorough, and enduring protection.  Previous findings of
wild and scenic suitability for the Dolores River should be reaffirmed
in the plan update.  Few streams boast the unique natural values--and
extent of threats to those values--as are found along the Dolores
River.
* Oil and gas leasing should be prohibited in the Dolores River
Corridor, or should at a minimum maintain No Surface Occupancy
Stipulations. Impacts of development within the corridor are not

consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity;
*prove that the long-term ecological health of the area will not be jeopardized;
*have viable reclamation plans in place before permits can be granted; and
*have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best regards,

Best

Kristina Capps
1278 Aspen Dr
Evergreen, CO 80439-4804

BLM_0103981

IN

| | |
|---|---|
| **From:** | Site Administrator on behalf of Carole Chowen |
| **To:** | uformp@blm.gov |
| **Subject:** | Dolores River Basin |
| **Date:** | Wednesday, March 24, 2010 8:00:19 PM |

Mar 24, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the
Dolores River Basin when developing the new resources management plan
for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon
Wilderness Study Area and citizen recommended additions -- with
towering colorful sandstone cliffs, river otter, peregrine falcon, and
outstanding opportunities for remote wilderness experience -- must be
managed for the protection of the area's vast wilderness
characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within
the Uncompahgre field office, including Carpenter Flats and Beehive
Canyon, help to define a cohesive landscape of diverse canyon
ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich
wildlife and cultural resources, should be managed in close cooperation
with adjacent BLM Field Offices and private land owners. It is
important that the river ecosystem be considered as a whole in order to
institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive
immediate, thorough, and enduring protection.  Previous findings of
wild and scenic suitability for the Dolores River should be reaffirmed
in the plan update.  Few streams boast the unique natural values--and
extent of threats to those values--as are found along the Dolores
River.
* Oil and gas leasing should be prohibited in the Dolores River
Corridor, or should at a minimum maintain No Surface Occupancy
Stipulations. Impacts of development within the corridor are not
consistent with protection of outstandingly remarkable values or the
existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium
mining in the area will occur to ensure proper protections and prohibit
leasing within the river corridor.  BLM must ensure that all state and
federal laws are applied to any permitted mines. The BLM must also
ensure that a viable long-term plan for dealing with any radioactive or
contaminated materials as well as any other waste products is securely
in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water
quality and quantity;
*prove that the long-term ecological health of the area will not
be jeopardized;
*have viable reclamation plans in place before permits can be

1 A-PI WSA

granted; and
*have an adequate bonding mechanism in place sufficient enough to
cover the entire cost of reclamation.

Wilderness lost cannot be regained!

Thank you for this opportunity to participate!

Best

Ms. Carole Chowen
PO Box 2741
Grand Junction, CO 81502-2741

BLM_0103983

| | |
|---|---|
| **From:** | Site Administrator on behalf of James Dryer |
| **To:** | uformp@blm.gov |
| **Subject:** | Considerations for the Doiores River Basin |
| **Date:** | Friday, March 26, 2010 6:35:06 PM |

Mar 26, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection.  Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity;
*prove that the long-term ecological health of the area will not be jeopardized;
*have viable reclamation plans in place before permits can be

1 A-PI MI

granted; and
*have an adequate bonding mechanism in place sufficient enough to
cover the entire cost of reclamation. This last point is so important
after CO citizens have been saddled with a billion dollars in clean-up
due to past inadequate bonding.

I am part of a large group of CO citizens that believes there is NO
viable long-term plan for materials taken from radioactive geologic
strata, and that allowing more such mining to occur is very unwise.

2 A-PI MI

Thank you for this opportunity to participate in the uses of our public

Best

Mr. James Dryer
336 N Main St
Mancos, CO 81328-9091

BLM_0103985

IN

| | |
|---|---|
| **From:** | Site Administrator on behalf of John Eakins |
| **To:** | uformp@blm.gov |
| **Subject:** | Protect the Dolores River Basin |
| **Date:** | Monday, March 29, 2010 11:42:34 PM |

Mar 30, 2010

Bureau of Land Management Uncompahgre Field Office

1 A-PI WSA

Dear Uncompahgre Field Office,

I live in Grand Junction Co. and am quite familiar with the Dolores River and the danger and ruin of uranium and its processing and mining. This must not happen to this region. Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection.  Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity;

*prove that the long-term ecological health of the area will not
be jeopardized;
*have viable reclamation plans in place before permits can be
granted; and
*have an adequate bonding mechanism in place sufficient enough to
cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Mr. John Eakins
2030 Poplar Dr
Grand Junction, CO 81505-7044
(970) 270-3615

IN

| | |
|---|---|
| **From:** | Site Administrator on behalf of Gin Fonte |
| **To:** | uformp@blm.gov |
| **Subject:** | Please Protect the Dolores River Basin |
| **Date:** | Sunday, March 28, 2010 9:08:23 AM |

Mar 28, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection.  Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity;
*prove that the long-term ecological health of the area will not be jeopardized;
*have viable reclamation plans in place before permits can be

granted; and
*have an adequate bonding mechanism in place sufficient enough to
cover the entire cost of reclamation.

**1 A-PI MI** ...u for this opportunity to participate!

PS: Western Colorado is an important area for me as a hiker and
camper. I have recently visited the old uranium mining area south of
the current area in question. It was horrifying to me to see the state
of the land left by the miners in SW Colorado. Once beautiful country
is now torn up by the miners and their vehicles. This damage will take
millenia to heal.

**2 A-PI REC** The ORV's obviously enjoy recreating in this area, and they add to the
upheaval.

As someone seeking the beauty nature provides, I do not find solace
here. Nor can I walk anywhere without worrying about radiation
exposure. PLEASE do not turn more of Colorado's beautiful land into
another disaster zone. Can you not see how irreplacable it is????

**3 A-PI MI**

Ms. Gin Fonte
405 E Sutton Cir
Lafayette, CO 80026-1019

IN

| | |
|---|---|
| **From:** | Site Administrator on behalf of Shar Brodbelt |
| **To:** | uformp@blm.gov |
| **Subject:** | Dolores River Basin Conservation- Please help! |
| **Date:** | Monday, March 29, 2010 10:42:20 PM |

Mar 29, 2010

**1 A-PI WSA**

of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

**2 A-PI WSA**

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

**3 A-PI WR**

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.

**4 A-PI WSR**

* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection.  Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.

**5 A-PI NRED**

* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

**6 A-PI MI**

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity;
*prove that the long-term ecological health of the area will not be jeopardized;
*have viable reclamation plans in place before permits can be

granted; and
*have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Ms. Shar Brodbelt
1045 Holland St
Lakewood, CO 80215-4717
(303) 906-5011

BLM_0103991



| | |
|---|---|
| **From:** | Site Administrator on behalf of lucas franze |
| **To:** | uformp@blm.gov |
| **Subject:** | Conservation of the Dolores River Basins |
| **Date:** | Friday, March 19, 2010 6:52:52 PM |

Mar 19, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection.  Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity;
*prove that the long-term ecological health of the area will not be jeopardized;
*have viable reclamation plans in place before permits can be

granted; and
*have an adequate bonding mechanism in place sufficient enough to
cover the entire cost of reclamation.

1 A-GE                     for this opportunity to participate!

The above letter is obvious.Its amazing to me though how easy it is to
be swayed by lobbiest perswasive desires. I remind you there is only
one earth so please take utmost care to see that its FOREVER useful.
Not just temporaraly exploited for short term energy gone quickly
leaving behind a scar that lasts much longer.

Thanks again for caring.

Best

Mr. lucas franze
PO Box 2633
Aspen, CO 81612-2633
(970) 920-9508

BLM_0103993

| | |
|---|---|
| **From:** | Site Administrator on behalf of Donna Gilmore |
| **To:** | uformp@blm.gov |
| **Subject:** | Protect the Conservation of the Dolores River Basin |
| **Date:** | Friday, March 19, 2010 10:22:09 AM |

Mar 19, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

As an avid outdoorswoman, long-time resident of Colorado and mother to three native sons, I ask that you please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection. Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update. Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor. BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity;
*prove that the long-term ecological health of the area will not

BLM_0103994

be jeopardized;
*have viable reclamation plans in place before permits can be granted; and
*have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Ms. Donna Gilmore
2760 S Forest St
Denver, CO 80222-6843
(303) 880-9151

BLM_0103995

| | |
|---|---|
| **From:** | Site Administrator on behalf of Susan Halabrin |
| **To:** | uformp@blm.gov |
| **Subject:** | Protecting the Dolores River Basin |
| **Date:** | Sunday, March 28, 2010 7:08:19 AM |

Mar 28, 2010

**1 A-GE**

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

I understand the Public Lands mission of multiple use.  However, it is equally important to weight use of resources with the ultimate loss of resources.  Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection.  Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity;
*prove that the long-term ecological health of the area will not

BLM_0103996

be jeopardized;
*have viable reclamation plans in place before permits can be granted; and
*have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Ms. Susan Halabrin
PO Box 157
Chromo, CO 81128-0157

BLM_0103997

IN

| | |
|---|---|
| **From:** | Site Administrator on behalf of barbara hill |
| **To:** | uformp@blm.gov |
| **Subject:** | Doloes River Basin Resources Managemnt Plan |
| **Date:** | Wednesday, March 24, 2010 2:59:35 PM |

Mar 24, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

1 A-PI WSA

I am writing to urge you to protect the wilderness characteristics of the Dolores River Basin as you develop the new resources management plan for the Uncompahgre Field Office (UFO).

I feel the Dolores River Canyon Wilderness Study Area and citizen recommended additions should be managed for the protection of the area's wilderness characteristics.  The area offers great scenic beauty, wildlife and opportunities for remote wilderness experience.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection.  Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity;
*prove that the long-term ecological health of the area will not be jeopardized;
*have viable reclamation plans in place before permits can be granted; and
*have an adequate bonding mechanism in place sufficient enough to

BLM_0103998

cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Ms. barbara hill
2935 El Torro Rd
Grand Junction, CO 81503-2925

BLM_0103999

| | |
|---|---|
| **From:** | Site Administrator on behalf of jon johansson |
| **To:** | uformp@blm.gov |
| **Subject:** | protect the Doiores River Basin |
| **Date:** | Thursday, March 25, 2010 11:03:16 PM |

Mar 26, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection.  Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity;
*prove that the long-term ecological health of the area will not be jeopardized;
*have viable reclamation plans in place before permits can be

granted; and
*have an adequate bonding mechanism in place sufficient enough to
cover the entire cost of reclamation.

Thank you for this opportunity to participate!
This area is irreplaceable!

Best

jon johansson
PO Box 95
Redvale, CO 81431-0095

BLM_0104001

| | |
|---|---|
| **From:** | Site Administrator on behalf of Tracy Korb |
| **To:** | uformp@blm.gov |
| **Subject:** | Please prioritize protection on the Dolores River Basin |
| **Date:** | Monday, March 29, 2010 12:41:28 PM |

Mar 29, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the
Dolores River Basin when developing the new resources management plan
for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon
Wilderness Study Area and citizen recommended additions -- with
towering colorful sandstone cliffs, river otter, peregrine falcon, and
outstanding opportunities for remote wilderness experience -- must be
managed for the protection of the area's vast wilderness
characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within
the Uncompahgre field office, including Carpenter Flats and Beehive
Canyon, help to define a cohesive landscape of diverse canyon
ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich
wildlife and cultural resources, should be managed in close cooperation
with adjacent BLM Field Offices and private land owners. It is
important that the river ecosystem be considered as a whole in order to
institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive
immediate, thorough, and enduring protection.  Previous findings of
wild and scenic suitability for the Dolores River should be reaffirmed
in the plan update.  Few streams boast the unique natural values--and
extent of threats to those values--as are found along the Dolores
River.
* Oil and gas leasing should be prohibited in the Dolores River
Corridor, or should at a minimum maintain No Surface Occupancy
Stipulations. Impacts of development within the corridor are not
consistent with protection of outstandingly remarkable values or the
existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium
mining in the area will occur to ensure proper protections and prohibit
leasing within the river corridor.  BLM must ensure that all state and
federal laws are applied to any permitted mines. The BLM must also
ensure that a viable long-term plan for dealing with any radioactive or
contaminated materials as well as any other waste products is securely
in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water
quality and quantity;
*prove that the long-term ecological health of the area will not
be jeopardized;
*have viable reclamation plans in place before permits can be

granted; and
*have an adequate bonding mechanism in place sufficient enough to
cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Mrs. Tracy Korb
55 Choke Cherry Cir
Durango, CO 81303-7535

IN

**From:** Site Administrator on behalf of Nic Korte
**To:** uformp@blm.gov
**Subject:** Please protect the Dolores River Basin
**Date:** Monday, March 22, 2010 11:59:02 AM

Mar 22, 2010

1 A-PI WSA

of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Protecting the Dolores River basin is important to my and my family. One of our pursuits is birdwatching and this river corridor has many interesting species such as the Black Phoebe which until the past ten years are so was not common in Colorado.
In addition, we are hikers and wilderness backpackers.  So many areas we used to hike near Grand Junction are now too crowded. Specifically, ORV use in the area is already too high. Please do not permit more ORV use and control existing use to maintained trails.

2 A-PI TM

prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection.  Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and

federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity;
*prove that the long-term ecological health of the area will not be jeopardized;
*have viable reclamation plans in place before permits can be granted; and
*have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Mr. Nic Korte
1946 Clover Ct
Grand Junction, CO 81506-4172
(979) 242-3779

| | |
|---|---|
| **From:** | Site Administrator on behalf of Dave Krupa |
| **To:** | uformp@blm.gov |
| **Subject:** | Dolores River Basin |
| **Date:** | Thursday, March 18, 2010 1:20:08 PM |

Mar 18, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

This land is so special, so please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection.  Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity;
*prove that the long-term ecological health of the area will not be jeopardized;
*have viable reclamation plans in place before permits can be

granted; and
*have an adequate bonding mechanism in place sufficient enough to
cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Mr. Dave Krupa
3714 Delaware Ave
Flint, MI 48506-3171
(810) 743-4037

BLM_0104007

IN

**From:**  Site Administrator on behalf of Jacqueline Lang
**To:**  uformp@blm.gov
**Subject:**  Regarding the Dolores River Basin and it"s protection
**Date:**  Wednesday, March 24, 2010 7:00:12 PM

Mar 24, 2010

1 A-PI WSA

f Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

I have never seen the Dolores River Basin, but one of my friends has. He wrote and told me about it's beauty and when I heard that it is in danger from mining and other activities, I had to write and add my voice to those asking for its preservation. I would like to see the beauty my friend spoke of some day.

Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection. Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update. Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely

in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity;
*prove that the long-term ecological health of the area will not be jeopardized;
*have viable reclamation plans in place before permits can be granted; and
*have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Miss Jacqueline Lang
3250 15th Ave S Apt 20
Fargo, ND 58103-4554

BLM_0104009

IN

| | |
|---|---|
| **From:** | Site Administrator on behalf of Norm Mullen |
| **To:** | uformp@blm.gov |
| **Subject:** | Scoping for the Dolores River area |
| **Date:** | Saturday, March 20, 2010 3:54:47 PM |

Mar 20, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection.  Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity;
*prove that the long-term ecological health of the area will not be jeopardized;
*have viable reclamation plans in place before permits can be

1 A-PI WSA

granted; and
*have an adequate bonding mechanism in place sufficient enough to
cover the entire cost of reclamation.

I have rafted the Dolores three times, and have hiked in the Coyote
Wash area.  I have also visited Sewemup and Granite Creek. I urge BLM
to evaluate protecting all of these areas from mineral leasing and
development, and from motorized recreation.

Thank you,

Norm Mullen
Thank you for this opportunity to participate!

Best

Mr. Norm Mullen
7 Harrison Ave
Helena, MT 59601-6235

BLM_0104011

IN

| | |
|---|---|
| **From:** | Site Administrator on behalf of Megan Powers |
| **To:** | uformp@blm.gov |
| **Subject:** | Protect the Doiores River Basin |
| **Date:** | Thursday, March 18, 2010 5:20:32 PM |

Mar 18, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the
Dolores River Basin when developing the new resources management plan
for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon
Wilderness Study Area and citizen recommended additions -- with
towering colorful sandstone cliffs, river otter, peregrine falcon, and
outstanding opportunities for remote wilderness experience -- must be
managed for the protection of the area's vast wilderness
characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within
the Uncompahgre field office, including Carpenter Flats and Beehive
Canyon, help to define a cohesive landscape of diverse canyon
ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich
wildlife and cultural resources, should be managed in close cooperation
with adjacent BLM Field Offices and private land owners. It is
important that the river ecosystem be considered as a whole in order to
institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive
immediate, thorough, and enduring protection.  Previous findings of
wild and scenic suitability for the Dolores River should be reaffirmed
in the plan update.  Few streams boast the unique natural values--and
extent of threats to those values--as are found along the Dolores
River.
* Oil and gas leasing should be prohibited in the Dolores River
Corridor, or should at a minimum maintain No Surface Occupancy
Stipulations. Impacts of development within the corridor are not
consistent with protection of outstandingly remarkable values or the
existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium
mining in the area will occur to ensure proper protections and prohibit
leasing within the river corridor.  BLM must ensure that all state and
federal laws are applied to any permitted mines. The BLM must also
ensure that a viable long-term plan for dealing with any radioactive or
contaminated materials as well as any other waste products is securely
in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water
quality and quantity;
*prove that the long-term ecological health of the area will not
be jeopardized;
*have viable reclamation plans in place before permits can be

BLM_0104012

granted; and
*have an adequate bonding mechanism in place sufficient enough to
he entire cost of reclamation.

1 A-PI WSA

Thank you for this opportunity to participate!
There should be absolutely no uranium mining allowed in the Dolores
River Basin and motorized vehicles should be kept to a minimum and not
allowed in the the back country at all. We do not need to destroy every
sacred and beautiful landscape we have access to, just for capital
gain.

Best

Megan Powers
12220 Tecumseh Trl
Conifer, CO 80433-6922

| From: | Site Administrator on behalf of Tim Rempie |
|---|---|
| To: | uformp@blm.gov |
| Subject: | The Dolores River Basin must be protected for the Future |
| Date: | Saturday, April 03, 2010 2:12:51 PM |

Apr 3, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Reckless mining for profit has been the standard for far too long.

Please prioritize protecting the wilderness characteristics of the
Dolores River Basin when developing the new resources management plan
for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon
Wilderness Study Area and citizen recommended additions -- with
towering colorful sandstone cliffs, river otter, peregrine falcon, and
outstanding opportunities for remote wilderness experience -- must be
managed for the protection of the area's vast wilderness
characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within
the Uncompahgre field office, including Carpenter Flats and Beehive
Canyon, help to define a cohesive landscape of diverse canyon
ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich
wildlife and cultural resources, should be managed in close cooperation
with adjacent BLM Field Offices and private land owners. It is
important that the river ecosystem be considered as a whole in order to
institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive
immediate, thorough, and enduring protection.  Previous findings of
wild and scenic suitability for the Dolores River should be reaffirmed
in the plan update.  Few streams boast the unique natural values--and
extent of threats to those values--as are found along the Dolores
River.
* Oil and gas leasing should be prohibited in the Dolores River
Corridor, or should at a minimum maintain No Surface Occupancy
Stipulations. Impacts of development within the corridor are not
consistent with protection of outstandingly remarkable values or the
existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium
mining in the area will occur to ensure proper protections and prohibit
leasing within the river corridor.  BLM must ensure that all state and
federal laws are applied to any permitted mines. The BLM must also
ensure that a viable long-term plan for dealing with any radioactive or
contaminated materials as well as any other waste products is securely
in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water
quality and quantity;
*prove that the long-term ecological health of the area will not

BLM_0104014

be jeopardized;
*have viable reclamation plans in place before permits can be
granted; and
*have an adequate bonding mechanism in place sufficient enough to
cover the entire cost of reclamation.

We must demand more accountability from those who pollute.  Uranium has
left a toxic legacy in Colorado, leaving our groundwater contaminated
with toxic metals and radioactive waste.

Thank you for this opportunity to participate in this extremely
important issue.

Best

Mr. Tim Remple
2954 Spinnaker Pl
Longmont, CO 80503-9263

BLM_0104015

| | |
|---|---|
| **From:** | Site Administrator on behalf of Jon Schwedler |
| **To:** | uformp@blm.gov |
| **Subject:** | Request regarding Dolores River Basin |
| **Date:** | Thursday, March 18, 2010 9:20:57 PM |

Mar 18, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

As a sportsman and father, I request you all  prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection.  Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity;
*prove that the long-term ecological health of the area will not be jeopardized;

BLM_0104016

*have viable reclamation plans in place before permits can be granted; and
*have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.

Thank you for this opportunity to participate.

Best

Mr. Jon Schwedler
1137 Columbia Dr NE
Bernalillo
Albuquerque, NM 87106-2601

BLM_0104017

| | |
|---|---|
| **From:** | Site Administrator on behalf of Nancy Stocker |
| **To:** | uformp@blm.gov |
| **Subject:** | Protect the Doiores River Basin |
| **Date:** | Thursday, March 18, 2010 5:20:32 PM |

Mar 18, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

The developing the new resources management plan for the Uncompahgre Field Office (UFO) gives us this opportunity, but also the threat that the Delores River Basin could be forever changed.  Before it's too late, please protect the wilderness characteristics of the Dolores River Basin.

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection.  Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity;
*prove that the long-term ecological health of the area will not

BLM_0104018

be jeopardized;
*have viable reclamation plans in place before permits can be
granted; and
*have an adequate bonding mechanism in place sufficient enough to
cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Mrs. Nancy Stocker
2885 S Gilpin St
Denver, CO 80210-6314
(303) 759-4056

BLM_0104019

IN

**From:** Site Administrator on behalf of Jon U-Ren
**To:** uformp@blm.gov
**Subject:** Conservation of the Doiores River Basin and surrounding areas
**Date:** Tuesday, March 23, 2010 11:56:46 AM

Mar 23, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the
Dolores River Basin when developing the new resources management plan
for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon
Wilderness Study Area and citizen recommended additions -- with
towering colorful sandstone cliffs, river otter, peregrine falcon, and
outstanding opportunities for remote wilderness experience -- must be
managed for the protection of the area's vast wilderness
characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within
the Uncompahgre field office, including Carpenter Flats and Beehive
Canyon, help to define a cohesive landscape of diverse canyon
ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich
wildlife and cultural resources, should be managed in close cooperation
with adjacent BLM Field Offices and private land owners. It is
important that the river ecosystem be considered as a whole in order to
institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive
immediate, thorough, and enduring protection.  Previous findings of
wild and scenic suitability for the Dolores River should be reaffirmed
in the plan update.  Few streams boast the unique natural values--and
extent of threats to those values--as are found along the Dolores
River.
* Oil and gas leasing should be prohibited in the Dolores River
Corridor, or should at a minimum maintain No Surface Occupancy
Stipulations. Impacts of development within the corridor are not
consistent with protection of outstandingly remarkable values or the
existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium
mining in the area will occur to ensure proper protections and prohibit
leasing within the river corridor.  BLM must ensure that all state and
federal laws are applied to any permitted mines. The BLM must also
ensure that a viable long-term plan for dealing with any radioactive or
contaminated materials as well as any other waste products is securely
in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water
quality and quantity;
*prove that the long-term ecological health of the area will not
be jeopardized;
*have viable reclamation plans in place before permits can be

BLM_0104020

granted; and
*have an adequate bonding mechanism in place sufficient enough to
cover the entire cost of reclamation.

1 A-PI WSA   for this opportunity to participate!

I just turned 40 last weekend and my wife and myself took a 4- day trip
in and around the Delores river basin!!  What a magnificent place -
it's beauty and pristine wilderness refreshes the soul and made me feel
like I was a young kid!  Let's make sure that beauty is around for
generations to come.  It is like a fountain of youth in our backyard!!

With the love that fills my heart........Jonny

Best

Mr. Jon U-Ren
507 W Ute Ave
Grand Junction, CO 81501-5654

BLM_0104021

IN

| | |
|---|---|
| **From:** | Site Administrator on behalf of Jim Wolter |
| **To:** | uformp@blm.gov |
| **Subject:** | Dolores River Basin Protection |
| **Date:** | Thursday, March 25, 2010 8:32:53 PM |

Mar 25, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

1 A-PI WSA

protect the wilderness characteristics of the Dolores River Basin as your office moves to develop the next resources management plan for the Uncompahgre Field Office.

The Dolores corridor, the Dolores River Canyon Wilderness Study Area must be managed for the protection of the area's vast wilderness characteristics. We U.S. citizens that value such characteristics recommend that you focus upon these protections as you proceed. Other interests should be considered secondary as far as me and my friends here in Iowa are concerned.

We'll support your plan providing this be the case.

Thanks for your consideration of my/our request.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection. Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update. Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor. BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water

quality and quantity;
*prove that the long-term ecological health of the area will not
be jeopardized;
*have viable reclamation plans in place before permits can be
granted; and
*have an adequate bonding mechanism in place sufficient enough to
cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Jim Wolter
5219 Thackeray Dr
Ames, IA 50014-6913
(515) 296-2650

BLM_0104023

**FedEx Kinko's** ℠
Ship Center

**Fax Cover Sheet**

Received
MAR 3 0 2010
Uncompahgre Field Office

Date __3-30-2010__

Number of pages __15__ (including cover page)

**To:** Attn: Bruce Krickbaum

Name _____

Company __BLM-Uncompahgre FO__

Telephone _____

Fax __970-240-5367__

**From:**

Name __Corey Fisher__

Company __Trout Unlimited__

Telephone __406-546-2979__

Comments __Jane, thanks for accepting these comments a day late given__
__the problem sending them via e-mail yesterday. If Bruce would__
__like the maps emailed, I am happy to do that. Thanks  - Corey Fisher__



Fax - Local Send


Fax - Domestic Send


DOMESTIC Send Add'l Pages


Fax - International Send

fedexkinkos.com 1.800.GoFedEx 1.800.463.3339

© 2006 FedEx Kinko's Office and Print Services, Inc. All rights reserved. Products, services and hours vary by location. fm05.185 1.06          22705

BLM_0104024



**TROUT**
**UNLIMITED**

March 29, 2010

*Sent via email to: uformp@blm.gov*

Bruce Krickbaum
Uncompahgre RMP Project Manager
2465 S. Townsend Ave
Montrose, CO 81401

**RE: Scoping Comments to the Uncompahgre RMP Revision process and Draft Wild
and Scenic Rivers Act Eligibility Report Comments**

**Dear Mr. Krickbaum,**
Thank you for the opportunity to provide scoping comments on the Uncompahgre Field
Office's (UFO) Resource Management Plan (RMP) revision and the and Draft Wild and
Scenic Rivers Act Eligibility Report.   Trout Unlimited (TU) offers these scoping
comments in an effort to identify issues and provide potential solutions for the new
resource management plan.  We understand there is also the opportunity to comment on
the Wild and Scenic River Eligibility Study as the BLM is required to assess the river and
stream segments under its management jurisdiction as part of the RMP revision process.
Finally, we understand that currently the Uncompahgre BLM Field Office is using two
land use plans (Uncompahgre Basin RMP and the San Juan/San Miguel Basin RMP) and
is proposing to combine the two RMPs into one updated RMP.  Our comments will
reflect the need to update several activity plans within both RMPs.

TU is a private, non-profit coldwater conservation organization that has more than
140,000 members nationwide dedicated to conserving, protecting and restoring North
America's trout and salmon fisheries and their watersheds.  Since 1959, TU has dedicated
staff and volunteers toward the protection of sensitive ecological systems necessary to
support robust native and wild trout and salmon populations in their respective range.
TU recognizes that the value of public lands is unparallel in providing habitat to
coldwater fisheries, drinking water and wildlife habitat.  TU's expanding conservation
program includes a sportsmen's conservation project that recognizes the importance of
protecting public lands for the survival and restoration of wildlife and fisheries.

BLM_0104025

In Colorado, TU has over 9,000 members and 20 state chapters whose members actively enjoy and value the resources of the many rivers, lakes and watersheds located on BLM lands in Colorado, including the UFO. Members of our chapters regularly participate in on-the-ground restoration and enhancement projects, including within the Uncompahgre resource area, in an effort to help restore, protect and maintain valuable fisheries habitat.

Attributes of these lands within the Uncompahgre resource area include clean water, clean air, fishing, hunting, secure fish and wildlife habitat and wildlife viewing opportunities. TU knows how important the RMP planning process is for determining the future management of BLM lands and minerals in the UFO. Six issues were identified in the Preparation Plan for the Uncompahgre Resource Management Plan (September 2008). We will address our scoping comments to each of the six issues identified, although the majority of our comments will be directed under Issue 1. Our comments will reflect our organization's mission. We will also propose management standards and restrictions on uses that could compromise not only existing resources, but also opportunities to restore watersheds and maintain critical riparian components of those watersheds in the UFO. TU hopes that these comments are helpful and constructive for the Planning Team.

## Specific Comments to the Planning Issues Identified in the Preparation

*Issue 1. How will vegetative resources, terrestrial and aquatic habitat, water resources, and special management areas be managed, while maintaining biological diversity and native species populations?*

A.    **Soil, Water, Air**

■    Soils: The UFO RMP Preparation Plan identifies sedimentary rocks throughout the planning area that erode into soils containing gypsum and selenium minerals. Dissolved concentrations and loads of these two salts in local rivers can create water quality concerns for humans, animals, and plants.

*1 A-PI GS*

*2 A-PI GS*

TU requests that complete and update soil profiles be included in the new RMP. There is considerable research available that illustrates the negative and long-term impacts sedimentation and erosion have on a resource, whether it is to plants, air quality, riparian areas or streams, rivers, and lakes. In the interest of future energy development in these areas, TU suggests stronger setback implementations using No Surface Occupancy/No Ground Disturbance stipulations (NSO/NGD) and reclamation standards that prevent disturbance to sensitive soils while incorporating stipulations for other less sensitive but erodible areas.

*3 A-PI GS continued on next page*

The presence of coldwater fisheries, including the Colorado River cutthroat trout which occupy this resource area, are vulnerable to soil erosion and sedimentation. Effects on fish include direct and sublethal effects that could threaten the existence of coldwater fisheries. Mortality, disease, reproduction, growth and behavioral impacts, and impacts to the fisheries food supply can be linked to sedimentation issues. The control of sedimentation dynamics is one of the most beneficial services that can occur with successful management of sensitive

*Trout Unlimited Scoping Comments*
*Uncompahgre Draft RMP-March 2010*

2

soil areas.   This includes the management of riparian areas adjacent to coldwater fishery systems (C.F. Rabeni, and M.A. Smale.  1995.   *Effects of Siltation on Stream Fishes and the Potential Mitigating    Role of the Buffering Riparian Zone.* Hydrobiologia. **303**(1-3):p. 211-219). By implementing larger riparian setbacks or buffer zones into the RMP in sensitive areas, the UFO will be able to maintain biological diversity, native species populations, and provide opportunity for the diverse multiple uses which occur within this resource planning area.   Further discussion and suggestions for riparian and stream protection follows.



**4 A-PI ED**

**5 A-PI ED**

TU suggests that the UFO incorporate the latest management strategies for topsoil salvage in energy development areas. Additionally, the current Oil and Gas Plan for this resource area (October 1991. Record of Decision. Oil and Gas Plan Amendment to the San Juan/San Miguel Resource Management Plan/Environmental Impact Statement (EIS) is outdated and should be amended to reflect the significant changes that have occurred with respect to energy development and resource management.

- **Water:** Protecting water quality requires more than the conservation efforts of headwater streams, mainstem conservation efforts, or development avoidance of riparian areas. Climate change discussion and management implications should be included in the revised RMP. In Colorado, air temperatures have already warmed by ~2 degrees F in the past 30 years (Colorado Water Conservation Board. 2008. *Colorado climate change: A synthesis to support water resource management and adaptation.* Climate Change in Colorado. University       of Colorado                        at                        Boulder. http://cwcb.state.co.us/Home/ClimateChange/ClimateChangeInColoradoReport/). By conserving and using water more efficiently, restoring riparian and stream areas, managing water quality, and providing management guidelines for protecting sensitive trout and aquatic species, we will increase the ability to adapt to climate change fluctuations and disruptions (Williams, J.E., A.L. Haak, N.G.Gillespie, H.M. Neville, and W.T. Colyer. 2007. *Healing troubled waters: preparing trout and salmon habitat for a changing climate.* Trout Unlimited, Arlington, Virginia. Available: www.tu.org; Williams, J.E., A.L. Haak, H.M. Neville, and W.T. Colyer. 2009. *Potential consequences of climate change to persistence of cutthroat trout populations.* North American Journal of Fisheries Management 29:533-548. 2009).

**6 A-PI WR**
**7 A-PI CC**

**8 A-PI WR**



Water impacts due to abiotic threats should also be discussed in the revised RMP and include updated management restrictions that protect Colorado's waters. Water quality degradation, flow reduction impacts, grazing, energy development, and impacts from droughts and/or floods should all be part of the discussion under water issues. As an example of industry's affect on water quantity, it is estimated by the Environmental Protection Agency (2002) that for every barrel of oil or gas extracted, an average of 7.5 barrels of water is required. As previously urged, we again request an updated Oil and Gas Plan. Additionally, the use of hydraulic

BLM_0104027



fracking in energy development has significant impacts to water quality. The RMP should contain updated and appropriate management language that incorporates the state of Colorado's oil and gas conservation rules and any new federal guidelines that dictate management prescriptions.



The management for healthy watersheds will directly contribute to other connected resource management successes. Healthy watersheds will be more resistant and resilient to other stressors mentioned above. From TU's perspective and interest, maintaining strong and vibrant watershed systems typically results in healthy fisheries, thus preventing unnecessary population declines, future endangered species listings, and a strong recreational value for the angling public.

River systems within the UFO contain populations (including conservation populations) of the Colorado River cutthroat trout (CRCT). This species has declined in that last century and now occupies less than 14% of its historic habitat and only 8% of the historic habitat range is occupied by unhybridized or ecologically significant populations (CRCT Coordination Team, 2006. *Conservation Strategy for Colorado River cutthroat trout (Oncorhynchus clarkii pleuriticus) in the states of Colorado, Utah, and Wyoming*. Colorado Division of Wildlife, Ft. Collins. 24 pp.; Young, M.K. 2008. *Colorado River cutthroat trout: a technical conservation assessment*. General Technical Report RMRS-GTR-207-WWW. USDA Forest Service, Rocky Mountain Research Station, Ft. Collins, Colorado.). The CRCT Conservation Strategy is very specific in its mandate to manage for the conservation of this species. Strategy 7 under Physical Conservation Activities states:

*Manage entire watersheds: Impacts outside the riparian zone should be considered as part of CRCT management. Land management agencies should work to mitigate adverse impacts of watershed activities on water quality, instream habitat, channel morphology, riparian areas, and population stability* (CRCT Conservation Strategy, page 18).

While No Surface Occupancy (NSO) stipulations within a set distance of a stream occupied by cutthroat trout or a stream suitable for reintroduction are a good start, a "setback" stipulation is limiting in its accountability toward stream integrity. A stream is only as good as the integrity of its watershed, from ridge-top to ridge top. By only protecting streamside zones, we fail to acknowledge that upland land uses – along with surface disturbances along tributary streams – can have serious negative impacts to water quality and in turn aquatic biota in larger, trout bearing streams.

The Beaverhead-Deerlodge National Forest (BHDLNF) in Montana recognized this reality and recently adopted a watershed management approach in its 2009 Revised Forest Plan Revised (Beaverhead-Deerlodge Revised Land and Resource Management Plan, January, 2009). In doing so, the BHDLNF implemented for all

BLM_0104028

Key Watersheds[1] with cutthroat trout, an NSO stipulation that covers the entire drainage. For watersheds containing conservation populations of cutthroat trout outside of Key Watersheds, the BHDLNF put in place a CSU stipulation that requires no net sediment increase over existing conditions.

13 A-PI SSF

TU stresses the need to protect both existing and potential CRCT habitat. In order to ensure the long term viability of CRCT, it is critical that state wildlife agencies, federal land management agencies, anglers and concerned citizens do not accept the current status of CRCT as "good enough". Recovery of this species requires that it is reintroduced into suitable habitat within the historic range of CRCT. In order to maximize reintroduction opportunities, it is important to ensure that streams meet the habitat requirements of CRCT and that water quality impacts do not occur that would forsake opportunities to reintroduce CRCT. As noted above, the CRCT Conservation Strategy states that "Land management agencies agree to protect existing and potential cutthroat trout waters from adverse effects of other land uses." *(Emphasis added)*

It is important to note that "potential habitat" is not synonymous with "historic habitat". In 2005, the CRCT Conservation Team developed the Range-wide Status of CRCT[2]; the CRCT Conservation Team is the body charged with administering the CRCT Agreement. In Range-wide Status, the CRCT Conservation Team assessed restoration and expansion opportunities in unoccupied historic habitat based on four attributes: 1.) past stocking of non-native trout that would genetically contaminate CRCT; 2.) relative quality of habitat; 3.) significance of existing fisheries within the suitable stream segments; and 4.) relative complexity of removal of non-native fish present within the stream segment. Based upon these attributes and considerations, the CRCT Conservation Team evaluated currently unoccupied "historic habitat" and determined "suitable habitat" (i.e., stream segments that are suitable for reintroduction of CRCT). This information is summarized on pages 53-54 of the Range-wide Status.

Using data from the Range Wide Status, TU has mapped this information and Figures 1 and 2 in the Appendix of our scoping comments shows stream segments currently occupied by conservation populations, historic habitat, and suitable habitat. As these maps show, lands or lands over minerals managed by the UFO only contain a few conservation populations of CRCT, but there are many miles of streams that are suitable for CRCT reintroductions. The Planning Team should ensure that the RMP revision takes into account the need to not only protect

---

[1] BHDL NF 2009 Revised Forest Plan defined Key Watersheds as watersheds selected for focusing of federal funds and personnel for the purpose of protecting, restoring, or maintaining viability of Threatened, Endangered and Sensitive aquatic species or watersheds selected for focusing of federal funds and personnel for the purpose of accelerating improvements in water quality and watershed conditions.

[2] Hirsch, C.L., S.E. Albeke, and T.P. Nesler. 2006. Range-wide status of Colorado River cutthroat trout (*Oncorhynchus clarkii pleuriticus*): 2005. Colorado River Cutthroat Trout Conservation Team, Wyoming Game and Fish Department, Cheyenne.

BLM_0104029

existing populations of CRCT, but also protect potential habitat that is suitable for the reintroduction of CRCT. This is a critical element of the CRCT Conservation Agreement and Strategy. The UFO can ensure that it is protecting suitable habitat for CRCT by restricting activities that would degrade the quality of these habitats so as to ensure that future cutthroat reintroduction efforts are not compromised.

Several supportive examples of management actions that have been implemented to protect potential native trout habitat are provided here. In April 2009 the Butte BLM Field Office in Montana issued an RMP Record of Decision that requires half-mile NSO stipulations for streams with cutthroat trout of 90% or higher genetic purity and a half-mile mile NSO would also be applied for streams with the potential for restoration of cutthroat trout. Additionally, in April of 2009, the BLM's Fillmore Field Office in Utah issued a Decision Record for an Environmental Assessment that specifically excluded leasing in cutthroat trout occupied habitat and historical habitat because they had not analyzed the impacts of oil and gas leasing on reintroduction opportunities for cutthroat trout.



**14 A-PI WR**

Agricultural demands and impacts to water remains high and 92% of the water in Colorado is diverted from streams and aquifers and used for agriculture (Thomas S.2007.*Water under pressure: Colorado's threatened water resources.* Environment Colorado Research and Policy Center, Denver.). By implementing more adaptable and stronger riparian management actions in the RMP revision, livestock grazing impacts to stream habitat would be lessened. Currently it is estimated that livestock grazing is considered a nonpoint source pollution and is known to negatively affect the habitat of 33% of pure CRCT populations(www.fws.gov/mountain-prairie/species/fish/crct/Petition to list.pdf).

**15 A- PI WR**

TU suggests that the RMP revision include strong language that mandates Best Management Practices for stormwater runoff, road construction, agricultural and energy development activities. By incorporating these practices, erosion and pollutants associated with energy and agricultural operations can be minimized.

**16 A-PI WR**

Finally, please include the latest extensive water quality report for southwest Colorado being prepared by the Colorado Oil and Gas Conservation Commission staff (http://cogcc.state.co.us/staffreport)

**17 A-PI WR**

For all the reasons identified above, Colorado TU urges the UFO RMP Planning Team to analyze the benefits and implement a watershed management approach similar to the one taken by the Beaverhead – Deerlodge National Forest, especially within watersheds that contain conservation populations of Colorado River cutthroat trout or watersheds that are suitable for reintroducing Colorado River cutthroat trout and provide protections in the form of NSO/NGD stipulations.

- **Air:** Air quality in Colorado continues to be a challenge. New policy guidelines and practices implemented by the EPA should be included in the RMP revision.



**18 A-PI AQ**

BLM_0104030

This is particularly important as it applies to emission sources in oil and gas fields. Particulate deposition impacts not only air quality but water and land resources as well. These in turn, affect the status of wildlife, fish and human heath. Mitigation options for any potential development plans should include requirements for substantive air quality modeling and visibility plans, implementation parameters and monitoring processes.

19 A- PI AQ

B.  **Special Management Areas (including ACECs, Wild and Scenic Rivers, Wilderness, and Wilderness Study Areas).**

■  **ACEC's:** Six Areas of Critical Environmental Concern (ACEC) exist within the UFO planning area but two to those have been designated National Conservation Areas since the publication of the 2008 Preparation Plan and thus has been removed from the UFO plan revision. The four remaining ACECs are the Adobe Badlands, Needle Rock, Fairview, and San Miguel. The first three contain special management unit designations for their unique characteristics in supporting federally-listed threatened and endangered plant species, recreational importance, and high-value scientific, interpretive and scenic characteristics. The BLM is asking whether these current ACECs should be re-affirmed, expanded, or dropped under the new planning revision process. TU supports the current designation of the three ACECs mentioned above and requests the BLM re-affirm their ACEC status.

20 A-PI ACEC

The fourth and last ACEC currently under designation in the RMP is the San Miguel ACEC. We wish to discuss this a bit more extensively. In February 1993, the BLM Record of Decision (ROD) was published for the San Juan/San Miguel RMP Amendment for the Proposed Area of Critical Environmental Concern and Special Recreation Management Area on the San Miguel River. That decision included the designation of 32,641 acres of public land as Special Recreation Management Area (SRMA) and within that SRMA, 20,964 acres was also designated as an ACEC. TU supports this ACEC designation and wishes to request that the BLM consider the following recommendations: 1) enlarge the ACEC area to equal the SRMA, thereby enlarging the San Miguel ACEC to 32,641 acres; 2) to close the designated ACEC area to oil and gas leasing, place NSO restrictions as Conditions of Approval on those areas that have been leased, and close the area to geothermal leasing; and 3) as described below, include segments of the San Miguel that are deemed appropriate for Wild and Scenic designation.

21 A-PI ACEC

Increasing the ACEC reach to include additional BLM lands in the San Miguel drainage would increase the protection of critical winter range for big game, would further protect fisheries habitat, would help protect bald eagle habitat and would encourage connectivity maintenance and protection of big game migration corridors; these fish and wildlife qualities all meet relevance criteria for ACEC designation.

With regard to importance criteria, expanding the San Miguel ACEC would include in the ACEC stream reaches that have been identified as suitable reintroduction habitat for CRCT populations (Figure 2), helping to preserve opportunities to expand populations of CRCT in the watershed. As noted above on page 5, the CRCT Conservation Strategy that the BLM is a signatory of states that "Land management agencies agree to protect existing and potential cutthroat trout waters from adverse effects of other land uses." This CRCT Conservation Strategy and the associated Conservation Agreement represent multi-party and multi-state efforts to conserve and restore CRCT, and because the BLM is a party to this agreement and strategy, suitable reintroduction habitat for CRCT meets the importance criteria for ACEC designation. Additionally, the San Miguel River is a well-recognized recreational trout fishery that attracts anglers both locally for Telluride and other communities and regionally for tourism, meeting importance criteria for the trout fisheries in the San Miguel.

Considerable interest and activity has occurred in oil and gas development and in geothermal development since the 1993 decision. The entire San Miguel River corridor and adjacent landscape is identified by BLM as high geothermal potential and high oil and gas potential. Though the 1993 ROD indicated low to moderate energy development potential (ROD, page 10), this scenario has arguably changed with a new energy development appetite and new technologies or accessing previously access-challenged reservoirs. In addition to providing important habitat for CRCT, this area also provides significant roosting sites for wintering bald eagles and provides sever winter range for elk and mule deer.

TU believes that the San Miguel River ACEC should not only be reaffirmed based on its unique, high quality riparian vegetation resources, the scenic values of the corridor, the importance of wildlife and fisheries habitat, and the preservation of relic riparian communities, but we recommend that BLM enlarge the San Miguel ACEC to match the boundaries of the SRMA. We strongly believe that enlarging the ACEC will still meet the relevance and importance criterion required to be designated as such.

**Wild and Scenic:** The UFO's Draft Wild and Scenic Rivers Act Eligibility Report identifies 35 segments within BLM's Uncompahgre Planning Area as eligible for Wild and Scenic Rivers Act (WSRA) designation. TU supports the BLM's proposed eligibility determinations for all of these streams. We especially support eligibility findings for Deep Creek, the West Fork of Terror Creek, and Segments 1, 2 and 3 of the San Miguel River. Deep Creek and the West Fork of Terror Creek harbor genetically pure populations of greenback cutthroat trout, a listed threatened species under the Endangered Species Act. Segments 1, 2 and 3 of the San Miguel River support highly prized recreational fisheries. It is our understanding that, though not formally designated, trout fisheries in the lower portions of these segments support Gold Medal quality trout.

22 A-PI WSR

BLM_0104032

In addition to these designations, TU believes Doug Creek should be found eligible for designation as, based on our information, it supports a conservation population of CRCT (see Figures 1 and 2). Taking this step toward additional protection of this conservation population would support the interagency Conservation Strategy (2006).

TU believes these segments are also suitable for designation. We will provide comments regarding suitability once the draft suitability analysis is made available by the UFO.

**23 A-PI VEG**

C.    **Vegetation:** The BLM should include stronger management prescriptions for upland and riparian vegetation management. Due to the sensitive soil regimes that exist within this resource area, increasing the surface management stipulations to minimize erosion, sedimentation, and weed infestation will benefit the sensitive and threatened and endangered fish, wildlife and plant species. Identification of critical habitat and management applications and mitigation parameters will help guide future energy development activities and livestock management activities.

D.    **Special Status Species:** CRCT are native to streams and rivers in the UFO. The state of Colorado has identified the CRCT as a Species of Concern and the BLM has identified the CRCT as a Sensitive Species. Both these status rankings accentuate the importance of this species and they should be included as a Special Status Species in the UFO RMP revision. Conservation and restoration efforts to reduce and eliminate threats that could lead to listing under the Endangered Species Act are being implemented under the Conservation Agreement for Colorado River Cutthroat Trout in Utah, Colorado, and Wyoming (June 2006). Colorado BLM is a signatory of this agreement and a partner in the associated strategy[3]. On page 12 of the Preparation Plan for the UFO, there are several questions listed relative to Special Status Species. With regard to CRCT, most of these questions can be answered by reviewing the CRCT Conservation Strategy and Agreement.

**24 A-PI SSF**

Despite commitments made by BLM in the CRCT Conservation Agreement and Strategy, the Preparation Plan for the UFO RMP does not discuss CRCT in Issue 1, Part D (Special Status Species) or Part E (Fish and Wildlife). Additionally, the Preliminary Planning Criteria section of the Preparation Plan does not list the CRCT Conservation Agreement or Strategy as a planning criterion. TU feels that this is a critical omission. The Preparation Plan states that Planning Criteria are: "constraints or ground rules that are developed to guide and direct the development of the plan and determine how the planning team approaches the development of alternatives and ultimately, selection of a Preferred Alternative."

---

[3] CRCT Coordination Team. 2006. Conservation strategy for Colorado River cutthroat trout (*Oncorhynchus clarkii pleuriticus*) in the States of Colorado, Utah, and Wyoming. Colorado Division of Wildlife, Fort Collins. 24p.

BLM_0104033

Given commitments made in the CRCT Conservation Agreement, and due to the presence of CRCT habitat and potential habitat[4] that could be affected by decisions made in the RMP revision, TU strongly encourages the Planning Team to include the CRCT Conservation Agreement as a Planning Criteria under the Plan.

**E.**    **Fish and Wildlife (Including Migratory Birds):** The Preparation Plan for the UFO RMP does not discuss CRCT in Issue 1, Part E (Fish and Wildlife). Additionally, the Preliminary Planning Criteria section of the Preparation Plan does not list the CRCT Conservation Agreement or Strategy as a planning criterion.


25 A-PI SSF


26 A-PI FW

We have provided specific considerations for native fish habitat (both occupied and potential habitat) management that includes the enhancement, protection and landscape or watershed scale habitat recognition. Incorporating updated mapping scenarios, wildlife and fish data from state resource management agencies, and applying best management practices to energy and livestock development activities all lend themselves to better fish and wildlife management.


27 A-PI FW

Identification of big game migration corridors will be key to protecting the integrity of big game populations and providing the hunting public some measure of assurance for future hunting opportunities. Similarly, by increasing buffers within riparian zones to protect fisheries and associated ecosystems, anglers can expect continued fishing success and quality fishing experiences.

28 A-PI FW

### Issue 2.  How will energy and minerals be managed?

**A. & B.   Coal, Oil and Gas:** On page 16 of the Preparation Plan for the UFO, there are numerous questions relative to oil and gas, including which areas should be open to leasing, closed to leasing, open with moderate constraints, open with major constraints, and which lease stipulations should be employed. These questions should all be answered in a new leasing decision for the UFO.


29 A-PI NRED


30 A-PI NRED

The 1991 Oil and Gas Leasing Decision and accompanying EIS are outdated and in need of revision. A new oil and gas leasing decision should be part of the UFO RMP revision. This new oil and gas leasing decision should make a determination whether specific lands are open or closed to leasing and if specific lands are open to leasing, what leasing stipulations will apply. While these decisions should account for valid existing leases rights, decisions made regarding availability for oil and gas leasing and stipulations should be new decisions and not amendments to the old 1991 Oil and Gas Leasing Decision and EIS. In addition, new Administrative leasing policy has significantly changed to where a new oil and gas leasing decision should be undertaken.

---

[4] See attachments, figures 1 and 2

BLM_0104034



The Preparation Plan also asks "Do constraints identified for new leases also apply to areas currently under lease?" This question needs to be divided into constraints in the form of conditions of approval and constraints in the form of stipulations. Existing leases would not be subject to new stipulations; however, existing leases would be subject to "reasonable"[5] conditions of approval. Constraints in the form of stipulations that are developed as part of a new leasing decision should apply to all new leases considered for sale in the UFO.

The RMP, as part of a new leasing decision, should also make it clear that the same constraints applied to new leases, will be applied to existing leases in the form of conditions of approval unless the authorized officer determines that such as constraint would not be "reasonable" under 43 C.F.R. § 3101.1-2. In doing so, the UFO will ensure that old leases in the FO will be subject to the most current resource information and protections, while still recognizing the rights of lessees.

The Preparation Plan also asks "For each lease stipulation, what are the circumstances for granting an exception, waiver, or modification? What are the general documentation requirements and public notification associated with granting exceptions, waivers, or modifications?" Any lease waiver, exemption, or modification should be subject to an environmental assessment and public comment.



On page 16 of the Preparation Plan questions are asked: "What are the pertinent issues surrounding split-estate lands and impacts to surface owners? What can be done to resolve these issues in the RMP?" The most critical issue surrounding split estate lands is how to balance private property rights of the land owner with rights of the lessee. For new leases, the UFO should consider an approach that recognizes that landowners should have a say how development occurs on their lands by implementing a CSU stipulation requiring that the surface landowner agree to a surface use plan of operations before an application to drill is approved. If this stipulation was included in all <u>new</u> leases, it would be a condition of the leases and as such the rights of the lessee to explore for and extract oil and gas would be encumbered by it. This would level the playing field for the landowner and the lessee and help to ensure that the BLM is able to lease federal minerals while being a good split estate neighbor.





Also with regard to split estate oil and gas, stipulations developed for resource protection should apply to all new leases regardless of who owns the surface. In order to meet the consistency requirements of Federal Land Policy and Management Act (FLPMA), the BLM should apply the same standard of

---

[5] The applicable regulation, 43 C.F.R. § 3101.1-2, subjects lessees' surface use rights to "such reasonable measures as may be required by the authorized officer to minimize adverse impacts to other resource values, land uses or users not addressed in the lease stipulations at the time operations are proposed." <u>Yates</u>, a recent Interior Board of Land Appeals case, illustrates the breadth of BLM's discretion to impose additional measures as conditions of approval "as long as they constitute a reasonable measure to minimize adverse impacts under 43 C.F.R. § 3101.1-2." 176 IBLA 144, 156 (Sept. 30, 2008

> environmental protection to split estate lands as to federal surface. Also, the BLM
> has responsibilities to apply stipulations under the National Environmental Policy
> Act (NEPA) because the issuance of a lease and potential approval of applications
> for permit to drill are federal actions.

## Conclusion

We appreciate this opportunity to offer our comments on the BLM's Uncompahgre Field
Office RMP Revision. We hope that these are constructive for the Planning Team as draft
alternatives are developed. If the Planning Team has any questions or would like to
discuss these comments with Colorado TU, please contact us using the information
provided below.

Sincerely,

Corey Fisher
Energy Field Coordinator
Trout Unlimited
111 North Higgins Ave, Ste. 500
Missoula, MT 59802
406-546-2979
cfisher@tu.org

Attachments:  Figure 1. Colorado River Cutthroat Trout and Minerals Map
Figure 2. Colorado River Cutthroat Trout and Land Status Map
(GIS data for Figures 1 and 2 available upon request)

BLM_0104036



Figure 1: Colorado River Cutthroat Trout and Minerals Map

BLM_0104037



Figure 2: Colorado River Cutthroat Trout and Land Status Map

BLM_0104038

IN

March 27, 2010

RMP Planning
BLM Field Office
2465 So. Townsend
Montrose, CO 81401

Received
MAR 3 0 2010
Uncompahgre Field Office

To Whom it may Concer:n:

I am a home owner on Rim Road in Montrose County just a few miles from Dry Creek Canyon.
I understand that you are working on a plan for this area and are looking for input from local people in this area.

1 A-PI TM

I have lived in this area, close to Dry Creek, since 1981 and have watched with interest the increase in the amount of use this area has been and is currently getting. The Off-Road traffic has really increased in the last ten years.

I t has been my observation living here and hiking here that there is a problem with these vehicles. That problem being that they do not remain on the numerous roads that are available to them, but instead choose to bully their way up the small rocky canyons here. In doing so they are destroying the small amount of vegetation that is present in these areas and they are tearing up the general landscape. We all know that the desert landscape is fragile and the effect of one vehicle driving over the cactus is visible for many years. In addition they camp down near Dry Creek and leave their trash for others who do not consider this land a wasteland to clean up.

I wish I knew the answer for this problem, but I am sorry I don't. Perhaps this planning committee could use the plan that was devised for Peach Valley as a template for Dry Creek Canyon.
Thank you for your attention and intention on this matter.

Nancy Winkler   12700 W Rim Rd. Montrose Co 81401

*Nancy Winkle*

BLM_0104039

IN

| | |
|---|---|
| **From:** | Julie_Jackson@blm.gov |
| **To:** | bruce_krickbaum@blm.gov; uformp@blm.gov |
| **Subject:** | Fw: potential ATV loop |
| **Date:** | Thursday, April 08, 2010 11:38:58 AM |

Here is another one.

Julie Jackson
Outdoor Recreation Planner
2465 S. Townsend Ave
Montrose, CO  81401
(970) 240-5310
Julie_Jackson@blm.gov

"To the world you might be one person, but to one person, you just might be
the world."
"The happiest people don't have the best of everything. They just make the
best of everything."
----- Forwarded by Julie M Jackson/MOFO/CO/BLM/DOI on 04/08/2010 11:38 AM
-----

           "bonbees@juno.com
           "
           <bonbees@juno.com                          To
           >                    cotmpufo@blm.gov
                                              cc
           03/31/2010 10:51
           AM                                Subject
                      potential ATV loop

1 A-PI TM

To Whom It May Concern:

I am writing to oppose the idea of allowing an ATV loop in Potter & Monitor
Canyons, southwest of Delta, Colorado. As a hiker, I have enjoyed exploring
these areas from the Roubideau Canyon access off of 25 Road, and I can't
imagine---don't want to---the impact of ATV traffic there. From excessive
noise to disruption to wildlife to damage to the land itself, allowing ATVs
and the numerous people who ride them is an all-around bad concept.

Thanks...

Bonnie Beach
61451 V 61 Trail
Montrose, CO 81403
970-240-5969

BLM_0104041

# *Budd-Falen Law Offices, L.L.C.*

Karen Budd-Falen [1]
Franklin J. Falen [1]
Brandon L. Jensen [1,2]
Kathryn Brack Morrow [1,2,3]
Laura C. Rowe [1]
Abigail M. Jones [4,5]

300 East 18th Street
Post Office Box 346
Cheyenne, Wyoming 82003-0346
Telephone 307/632-5105
Telefax 307/637-3891
main@buddfalen.com
www.buddfalen.com

[1] admitted in Wyoming
[2] admitted in Colorado
[3] admitted in New Mexico
[4] admitted in New Jersey
[5] admitted in New York

March 31, 2010

***VIA U.S. MAIL AND E-MAIL (*uformp@blm.gov*)***
Bureau of Land Management
Uncompahgre Field Office
Attn: Bruce Krickbaum, Project Manager
2465 S. Townsend Avenue
Montrose, CO 81401

Re:     Errata to Scoping Comments Regarding Uncompahgre Resource
        Management Plan

Dear Sirs:

On behalf of Mika Ag Corporation d/b/a the Escalante Ranch, the purpose of this letter is to provide an errata to the scoping comments related to the Uncompahgre Resource Management Plan ("RMP") submitted by this firm on March 29, 2010. Two changes to those comments, and one addition should be made.

First, the March 29, 2010 letter erroneously identified the Uncompahgre River. The letter should have correctly noted the Gunnison River.

Second, while 2000 people access the Gunnison River each year, there are approximately 1000 canoes, boats and other water craft.

Third, as the BLM knows, much of this land was designated as wilderness. Such designation has increased tourism and traffic to the wilderness boundaries. That increased traffic is now going through the private lands belonging to the Escalante Ranch. The Uncompahgre RMP should address the issue of increased traffic, tourism and access to the wilderness so as to not impact the Escalante Ranch private lands.

Again, please include the Escalante Ranch and this firm on all future mailings related to this project. Should you have any questions about these scoping comments, please do not hesitate to contact me.

Sincerely,

/s/ Karen Budd-Falen

Karen Budd-Falen
BUDD-FALEN LAW OFFICES, LLC

KBF/hrs

BLM_0104042

IN

| | |
|---|---|
| **From:** | Judith Aftergut |
| **To:** | uformp@blm.gov |
| **Subject:** | Scoping Comments for the UFO RMP |
| **Date:** | Thursday, March 25, 2010 8:47:38 AM |

1 A-PI NRED
2 A-PI WD

Dear Mr. Krickbaum:

Thank you for the opportunity to comment on the Resource Management Plan for the Uncompahgre Field Office lands.   My major concerns are the following:

I am particularly concerned about gas development and pesticide use on public lands.  I live in Oregon, but I use natural gas in my home, and we are being told that we don't liquified natural gas terminals on the Columbia River (I agree with this!) because our gas can come from the Rockies!  However, I'm aware that gas drilling in that area comes with huge potential costs, including water pollution.  Although gas is relatively clean burning, the other costs to drilling are often not paid attention to.  BLM lands are public lands, therefore I request that they be managed in a way that preserves them as much as possible in their natural state and that minimizes effects on climate change.

Special places
?  All places that hold special value should be managed for the future.
?  Work for Wilderness designation for the five Wilderness Study Areas (WSAs) in the UFO: Camelback, Adobe Badlands, Dolores River Canyon, Sewemup Mesa, and Tabeguache Creek Area.
?  Offer maximum protection for all Areas of Critical Environmental Concern (ACECs) and continue to identify and protect other imperiled areas.

Recreation
?  Limit all dispersed camping to existing campsites.
?  BLM should not allow new motorized trails in remote areas that have few or no trails.
?  Jumbo Mountain near Paonia is a popular recreation area. It should be managed exclusively for recreation with trails designated for specific uses.  The BLM should investigate new access points.
?  The North Delta Open Area should remain open to ATVs and should be managed to the standard of the Gunnison Gorge NCA. No new open areas should be created in the UFO.
?  The UFO should continue to manage the Tabeguache Area as wilderness and should not allow mountain bike trails.

Wild and Scenic Rivers:  Please protect as many eligible rivers and tributaries as possible. All of the river segments listed in the BLM's draft Wild & Scenic Rivers Eligibility Report should retain their eligibility for inclusion in the National Wild and Scenic Rivers System, and should be carefully evaluated for the next level of protection.

Coal, Gas, Oil, Uranium
?  The BLM must put the health and safety of the land and people ahead of mineral extraction.
?  The BLM should not allow new coal leases in areas not adjacent to existing mines.
?  The BLM should find a way to ensure that methane vented from coal mines can be captured and used.
?  No roads should be constructed in Forest Service Inventoried Roadless Areas for energy extraction.
?  The BLM must ensure that uranium mining does not jeopardize the surface and ground water quality or the long-term ecological health of the area.

Socio-Economic: There are economic benefits to the community in preserving wild lands.  These benefits need to be evaluated and quantified when considering impacts on present and future generations.

Grazing: The UFO needs to make sure livestock grazing is done with best management practices, improving rather than degrading native ecosystems. Special care needs to be taken in riparian areas that are easily degraded by cattle, for instance Jay Creek and Love Gulch in the North Fork area.

BLM_0104043

Aerial spraying: The RMP should prohibit aerial spraying of pesticides and toxicants on public land. Avoid application of herbicides to broad areas (>80 acre patches) in any single season.

Thank you for your consideration of my comments. I appreciate this opportunity to be involved in determining management practices that will affect UFO lands for the next 20 years.

Sincerely,

Judith Aftergut


Judith Aftergut
PO Box 8676
Portland, OR 97207

BLM_0104044



| | |
|---|---|
| **From:** | Deb Barr |
| **To:** | uformp@blm.gov |
| **Subject:** | Scoping Comments for the UFO RMP |
| **Date:** | Thursday, March 25, 2010 7:56:51 PM |

Dear Mr. Krickbaum:

Thank you for the opportunity to comment on the Resource Management Plan for the Uncompahgre Field Office lands.   My major concerns are the following:

Special places
?  All places that hold special value to the community should be managed for the future.
?  Work for Wilderness designation for the five Wilderness Study Areas (WSAs) in the UFO: Camelback, Adobe Badlands, Dolores River Canyon, Sewemup Mesa, and Tabeguache Creek Area.
?  Offer maximum protection for all Areas of Critical Environmental Concern (ACECs) and continue to identify and protect other imperiled areas.

Recreation
?   BLM should not allow new motorized trails in remote areas that have few or no trails.
?  Jumbo Mountain near Paonia is a popular recreation area. It should be managed exclusively for recreation with trails designated for specific uses.  The BLM should investigate new access points.
?  The North Delta Open Area should remain open to ATVs and should be managed to the standard of the Gunnison Gorge NCA. No new open areas should be created in the UFO.
?  The UFO should continue to manage the Tabeguache Area as wilderness and should not allow mountain bike trails.

Wild and Scenic Rivers:  Please protect as many eligible rivers and tributaries as possible. All of the river segments listed in the BLM's draft Wild & Scenic Rivers Eligibility Report should retain their eligibility for inclusion in the National Wild and Scenic Rivers System, and should be carefully evaluated for the next level of protection.

Coal, Gas, Oil, Uranium
?  The BLM must put the health and safety of the land, people, and wildlife ahead of mineral extraction.
?  The BLM should not allow new coal leases in areas not adjacent to existing mines.
?  The BLM should find a way to ensure that methane vented from coal mines can be captured and used.
?  No roads should be constructed in Forest Service Inventoried Roadless Areas for energy extraction.
?  The BLM must WITHOUT A DOUBT ensure that uranium mining does not jeopardize the surface and ground water quality or the long-term ecological health of the area.

Socio-Economic: There are economic benefits to the community in preserving wild lands. These benefits need to be evaluated and quantified when considering impacts on present and future generations.

Grazing: The UFO needs to make sure livestock grazing is done with best management practices, improving rather than degrading native ecosystems.

Aerial spraying: The RMP should prohibit aerial spraying of pesticides and toxicants on public land.

Predator cotnrol: THE RMP should prohibit live traps and poisons designed to eradicate animals
1 A-GE               ed "varmints," or pests, to avoid inadvertent dangers to the public and to wildlife.

Thank you for your consideration of my comments. I sincerely appreciate this opportunity to be involved in determining management practices that will affect UFO lands for the next 20 years. Our Western lands are very precious, and every effort should be made to protect them, now and for future generations.

Respectfully,

Deb Barr
67979 Ridge Way
Montrose, CO 81403

BLM_0104046

IN

**From:** Jen Coates
**To:** uformp@blm.gov
**Subject:** Scoping Comments for the UFO RMP
**Date:** Saturday, March 27, 2010 8:30:34 AM

Dear Mr. Krickbaum:

Thank you for the opportunity to participate in the Uncompahgre Resource Management Plan Update. I appreciate the responsible stewardship of the BLM to manage our public lands.

I would like to encourage the BLM to pursue wilderness designation for the five Wilderness Study Areas (WSAs) in the UFO: Camelback, Adobe Badlands, Dolores River Canyon, Sewemup Mesa, and Tabeguache Creek Area. Please also insure maximum protection for all Areas of Critical Environmental Concern and continue to identify and protect other sensitive areas.

Please limit camping to existing campsites, preserve non-motorized areas and prohibit new motorized trails in remote areas that currently have few or no trails.

Please protect as many eligible rivers and tributaries as possible. All of the river segments listed in the BLM's draft Wild & Scenic Rivers Eligibility Report should retain their eligibility for inclusion in the National Wild and Scenic Rivers System, and should be carefully evaluated for the next level of protection.

Please prioritize the health, safety, and well-being of the land and people ahead of excessive or poorly managed mineral extraction efforts. This may include prohibiting new coal leases in areas not adjacent to existing mines to limit areas of destruction and also fostering and mandating effective and appropriate reclamation efforts.

1 A-PI MI

It would be really fantastic for the BLM to insure sufficient regulation to encourage miners and companies to also be good stewards of our land, including exploring technologies for re-using and recycling, such as methane capture and re-use, to minimize human impacts relative to resource extraction. Please limit creating additional roads for natural resource mining as well, and look very strongly at water conservation and contamination.

2 A-PI SE

The Town of Ridgway and surrounding community benefits greatly from our open lands and recreation areas, in all respects. Please consider these lifestyle, quality of life, and business/economic impacts and opportunities for our region.

3 A-PI LG

Please manage livestock grazing with great care. When hiking in the wilderness, these impacts are easily seen without effort, and visually appear devastating in a number of areas. Please work to protect these sensitive areas from over-grazing, while being sensitive to and understanding the needs of the ranchers.

Please strongly consider alternatives to aerial spraying.

Again, thank you for the opportunity to participate in the plan update process. These are great resources for us and your efforts are greatly appreciated.

4 A-PI WD

Sincerely,
Jen Coates

Jen Coates
260 South Laura Street
Ridgway, CO 81432

BLM_0104047

IN

| | |
|---|---|
| **From:** | Allen Cockle |
| **To:** | uformp@blm.gov |
| **Subject:** | Scoping Comments for the UFO RMP |
| **Date:** | Saturday, March 27, 2010 9:54:12 AM |

Dear Mr. Krickbaum:

March 26, 2010

Mr. Bruce Krickbaum
BLM Uncompahgre Field Office
Montrose, Co 81401

1A-PI WSA

Dear Mr. Krickbaum:
I am writing to comment on the Resource Management Plan for the Uncompahgre Field Office.   I was born and raised in Ouray and now live in Ridgway.  I have a 50 year perspective on the impact of development in Ouray, Ridgway, Telluride communities; the Uncompahgre Plateau, and the north and western San Juan range.  Also, I have worked as a mining professional on a global basis for 35 years.

Regarding the RMP, I would hope your long range objectives would work toward:

1)  Wilderness designation for the five Wilderness Study Areas:
Camelback, Adobe Badlands, Dolores River Canyon, Sewemup Mesa, and Tabeguache Creek Area.

2) Minimize/eliminate new motorized trails in remote areas that have few or no access points.

In these two comments I think you appreciate the value I place on "wilderness" within our region.  However, I also favor coal, gas, oil, uranium extraction.  But, when managing resource development, I would like the BLM to carefully consider the health and safety of the land and people when considering rates of mineral extraction, lease locations, methane venting, water quality and general development - particularly in roadless areas.

Thank you for your consideration of my comments.

2 A-PI NRED

Sincerely,

Allen Cockle
Ridgway, CO

Allen Cockle
1704 Pleasant Point
Ridgway, CO 81432

**From:** William Crowther
**To:** uformp@blm.gov
**Subject:** Scoping Comments for the UFO RMP
**Date:** Friday, March 26, 2010 9:36:03 PM

IN

Dear Mr. Krickbaum:

1 A-GE

Thank you for the opportunity to comment on the Resource Management Plan for the Uncompahgre Field Office lands.

I am one-half owner of three miles of propery bordering both banks of the Dolores River in Montrose County. It goes without saying that I am intensely concerned about protecting the integrity of the area, its natural beauty and its geological resources.

My concerns are as follows:
?  All places that hold special value should be managed for the future.
?  Work for Wilderness designation for the five Wilderness Study Areas (WSAs) in the UFO: Camelback, Adobe Badlands, DOLORES RIVER CANYON, Sewemup Mesa, and Tabeguache Creek Area.
?  Offer maximum protection for all Areas of Critical Environmental Concern (ACECs) and continue to identify and protect other imperiled areas.

Recreation
?  Limit all camping to existing campsites.
?  BLM SHOULD NOT ALLOW new motorized trails in remote areas.        .  B
?  The North Delta Open Area should remain open to ATVs and should be managed to the standard of the Gunnison Gorge NCA. No new open areas should be created in the UFO.
?  The UFO should continue to manage the Tabeguache Area as wilderness and should not allow mountain bike trails.

Wild and Scenic Rivers:  Please protect as many eligible rivers and tributaries as possible. All of the river segments listed in the BLM's draft Wild & Scenic Rivers Eligibility Report should retain their eligibility for inclusion in the National Wild and Scenic Rivers System, and should be carefully evaluated for the next level of protection.

Coal, Gas, Oil, Uranium
?  The BLM must put the health and safety of the land and people ahead of mineral extraction.
?  The BLM should not allow new coal leases in areas not adjacent to existing mines.
?  The BLM should find a way to ensure that methane vented from coal mines can be captured and used.
?  No roads should be constructed in Forest Service Inventoried Roadless Areas for energy extraction.
?  THE BLM MUST ENSURE THAT URANIUM MINING DOES NOT JEAPORDIZE THE SURFACE AND GROUND WATER QUALITRY OR THE LONG TERM ECOLOGICAL HEALTH OF WILD LANDS!

Thank you for the opportunity to set forth my thoughts concerning management practices that will affect UFO lands for future generations

Sincerely,

William Crowther
76 Orchard Hill Drive
Fairfield, CT 06824

BLM_0104049

| | |
|---|---|
| **From:** | Clee and Mary Sealing |
| **To:** | uformp@blm.gov |
| **Subject:** | Scoping Comments for the UFO RMP |
| **Date:** | Monday, March 29, 2010 10:42:25 AM |

Dear Mr. Krickbaum:

Thank you for the opportunity to comment on the Resource Management Plan for the Uncompahgre Field Office lands.   My major concerns are the following:

Special places
?  All places that hold special value should be managed for the future.
?  Work for Wilderness designation for the five Wilderness Study Areas (WSAs) in the UFO: Camelback, Adobe Badlands, Dolores River Canyon, Sewemup Mesa, and Tabeguache Creek Area.
?  Offer maximum protection for all Areas of Critical Environmental Concern (ACECs) and continue to identify and protect other imperiled areas.

Recreation
?  Limit all dispersed camping to existing campsites.
?  BLM should not allow new motorized trails in remote areas that have few or no trails.
?  Jumbo Mountain near Paonia is a popular recreation area. It should be managed exclusively for recreation with trails designated for specific uses.  The BLM should investigate new access points.
?  The North Delta Open Area should remain open to ATVs and should be managed to the standard of the Gunnison Gorge NCA. No new open areas should be created in the UFO.
?  The UFO should continue to manage the Tabeguache Area as wilderness and should not allow mountain bike trails.

Wild and Scenic Rivers:  Please protect as many eligible rivers and tributaries as possible. All of the river segments listed in the BLM's draft Wild & Scenic Rivers Eligibility Report should retain their eligibility for inclusion in the National Wild and Scenic Rivers System, and should be carefully evaluated for the next level of protection.

Coal, Gas, Oil, Uranium
?  The BLM must put the health and safety of the land and people ahead of mineral extraction.
?  The BLM should not allow new coal leases in areas not adjacent to existing mines.
?  The BLM should find a way to ensure that methane vented from coal mines can be captured and used.
?  No roads should be constructed in Forest Service Inventoried Roadless Areas for energy extraction.
?  The BLM must ensure that uranium mining does not jeopardize the surface and ground water quality or the long-term ecological health of the area.

Socio-Economic: There are economic benefits to the community in preserving wild lands.  These benefits need to be evaluated and quantified when considering impacts on present and future generations.

Grazing: The UFO needs to make sure livestock grazing is done with best management practices, improving rather than degrading native ecosystems. Special care needs to be taken in riparian areas that are easily degraded by cattle, for instance Jay Creek and Love Gulch in the North Fork area.

Aerial spraying: The RMP should prohibit aerial spraying of pesticides and toxicants on public land. Avoid application of herbicides to broad areas (>80 acre patches) in any single season.

Thank you for your consideration of my comments. I appreciate this opportunity to be involved in determining management practices that will affect UFO lands for the next 20 years.

Sincerely,

Clee and Mary Sealing
1670 N 1/2 Rd.
Fruita, CO 81521

BLM_0104051

IN

| | |
|---|---|
| **From:** | Denise Gendreau |
| **To:** | uformp@blm.gov |
| **Subject:** | Scoping Comments for the UFO RMP |
| **Date:** | Saturday, March 27, 2010 4:51:49 PM |

1 A-PI REC

Dear Mr. Krickbaum:

Thank you for the opportunity to comment on the Resource Management Plan for the Uncompahgre Field Office lands. My major concerns are the following:

I live in Ridgway and have enjoyed the area east of Ridgway State Park. I support the local mountain biking group TRED which wishes to manage this area for mountain biking and hiking. Motorized use of this area would be at cross purposes to Ouray County's needs.

Additionally I am interested in the following concerns:
Special places
? All places that hold special value should be managed for the future.
? Work for Wilderness designation for the five Wilderness Study Areas (WSAs) in the UFO: Camelback, Adobe Badlands, Dolores River Canyon, Sewemup Mesa, and Tabeguache Creek Area.
? Offer maximum protection for all Areas of Critical Environmental Concern (ACECs) and continue to identify and protect other imperiled areas.

Recreation
? Limit all dispersed camping to existing campsites.
? BLM should not allow new motorized trails in remote areas that have few or no trails.
? J? The UFO should continue to manage the Tabeguache Area as wilderness and should not allow mountain bike trails.

Wild and Scenic Rivers: Please protect as many eligible rivers and tributaries as possible. All of the river segments listed in the BLM's draft Wild & Scenic Rivers Eligibility Report should retain their eligibility for inclusion in the National Wild and Scenic Rivers System, and should be carefully evaluated for the next level of protection.

Coal, Gas, Oil, Uranium
? The BLM must put the health and safety of the land and people ahead of mineral extraction.
? The BLM should not allow new coal leases in areas not adjacent to existing mines.
? The BLM should find a way to ensure that methane vented from coal mines can be captured and used.
? No roads should be constructed in Forest Service Inventoried Roadless Areas for energy extraction.
? The BLM must ensure that uranium mining does not jeopardize the surface and ground water quality or the long-term ecological health of the area.

Socio-Economic: There are economic benefits to the community in preserving wild lands. These benefits need to be evaluated and quantified when considering impacts on present and future generations.

Grazing: The UFO needs to make sure livestock grazing is done with best management practices, improving rather than degrading native ecosystems. Special care needs to be taken in riparian areas that are easily degraded by cattle, for instance Jay Creek and Love Gulch in the North Fork area.

Aerial spraying: The RMP should prohibit aerial spraying of pesticides and toxicants on public land. Avoid application of herbicides to broad areas (>80 acre patches) in any single season.

Thank you for your consideration of my comments. I appreciate this opportunity to be involved in determining management practices that will affect UFO lands for the next 20 years.

Sincerely,

BLM_0104052

Denise Gendreau
PO Box 759
Ridgway, CO 81432

BLM_0104053

IN

| | |
|---|---|
| **From:** | Sandra Getter |
| **To:** | uformp@blm.gov |
| **Subject:** | Scoping Comments for the UFO RMP |
| **Date:** | Saturday, March 27, 2010 4:31:02 PM |

Dear Mr. Krickbaum:

Thank you for the opportunity to comment on the Resource Management Plan for the Uncompahgre Field Office lands.   My major concerns are the following:

Special places
?  All places that hold special value should be managed for the future.
?  Work for Wilderness designation for the five Wilderness Study Areas (WSAs) in the UFO: Camelback, Adobe Badlands, Dolores River Canyon, Sewemup Mesa, and Tabeguache Creek Area.
?  Offer maximum protection for all Areas of Critical Environmental Concern (ACECs) and continue to identify and protect other imperiled areas.

Recreation
?  Limit all dispersed camping to existing campsites.
?  BLM should not allow new motorized trails in remote areas that have few or no trails.
?  Jumbo Mountain near Paonia is a popular recreation area. It should be managed exclusively for recreation with trails designated for specific uses.  The BLM should investigate new access points.
?  The North Delta Open Area should remain open to ATVs and should be managed to the standard of the Gunnison Gorge NCA. No new open areas should be created in the UFO.
?  The UFO should continue to manage the Tabeguache Area as wilderness and should not allow mountain bike trails.

Wild and Scenic Rivers:  Please protect as many eligible rivers and tributaries as possible. All of the river segments listed in the BLM's draft Wild & Scenic Rivers Eligibility Report should retain their eligibility for inclusion in the National Wild and Scenic Rivers System, and should be carefully evaluated for the next level of protection.

Coal, Gas, Oil, Uranium
?  The BLM must put the health and safety of the land and people ahead of mineral extraction.
?  The BLM should not allow new coal leases in areas not adjacent to existing mines.
?  The BLM should find a way to ensure that methane vented from coal mines can be captured and used.
?  No roads should be constructed in Forest Service Inventoried Roadless Areas for energy extraction.
?  The BLM must ensure that uranium mining does not jeopardize the surface and ground water quality or the long-term ecological health of the area.

Socio-Economic: There are economic benefits to the community in preserving wild lands.  These benefits need to be evaluated and quantified when considering impacts on present and future generations.

Grazing: The UFO needs to make sure livestock grazing is done with best management practices, improving rather than degrading native ecosystems. Special care needs to be taken in riparian areas that are easily degraded by cattle, for instance Jay Creek and Love Gulch in the North Fork area.

Aerial spraying: The RMP should prohibit aerial spraying of pesticides and toxicants on public land. Avoid application of herbicides to broad areas (>80 acre patches) in any single season.

1 A-PI NRED  you for your consideration of my comments. I appreciate this opportunity to be involved in determining management practices that will affect UFO lands for the next 20 years.

I want to say that I am particularly concern about the oil and gas development and about the chemicals used in the hydraulic fracturing process.  I have worked with Xylene and Toluene before in a laboratory

BLM_0104054

1 A-PI NRED
continued

and the preceedures we used with these chemicals were very stringent.  Now the oil and gas industry states there is no proven harm to wells, air, water, and wildlife.  How stupid do they think we are! Their "studies" I am sure have been skewed as well as the data.  Anyone can do what ever it takes to back a certain desired result.  Someone needs to read CIVIL Action.
Please do what you can to lessen the defilement of my beautiful country.

Sincerely,

sally bedford
parachute


Sandra Getter
68 MEADOW CREEK DR
PARACHUTE, CO 81635

BLM_0104055

| | |
|---|---|
| **From:** | Barbara_Sharrow@blm.gov |
| **To:** | uformp@blm.gov |
| **Subject:** | Fw: BLM letter |
| **Date:** | Monday, March 29, 2010 10:48:34 AM |

Barbara Sharrow
Uncompahgre Field Office Manager

970-240-5315 - office
970-596-1515 - cell

----- Forwarded by Barbara Sharrow/MOFO/CO/BLM/DOI on 03/29/2010 11:47 AM -----

> Julie M
> Jackson/MOFO/CO/B
> LM/DOI                                    To
>                     Bruce Krickbaum/MOFO/CO/BLM/DOI@BLM
> 03/29/2010 11:36                          cc
> AM                  Karen Tucker/MOFO/CO/BLM/DOI@BLM,
>                     Barbara Sharrow/MOFO/CO/BLM/DOI@BLM
>                                     Subject
>                     Fw: BLM letter

Hello Bruce

I believe this comment letter was suppose to go to the scoping comments so
not sure were you would like this to be sent.  I am going to keep a copy in
the UFO TMP Amendment admin record as well since she is discussing travel
in it as well and it came to the tmp email.

Julie Jackson
Outdoor Recreation Planner
2465 S. Townsend Ave
Montrose, CO  81401
(970) 240-5310
Julie_Jackson@blm.gov

"To the world you might be one person, but to one person, you just might be
the world."
"The happiest people don't have the best of everything. They just make the
best of everything."
----- Forwarded by Julie M Jackson/MOFO/CO/BLM/DOI on 03/29/2010 11:34 AM -----

> Shelley Green
> <metawoman86001@y
> ahoo.com>                                 To
>                     cotmpufo@blm.gov

BLM_0104056

03/29/2010 08:12                              cc
AM          Jim Riddell
                 <jriddell@frontier.net>, Regina
                 Sowell <regsowell@montrose.net>
                              Subject
            BLM letter

Thank you for the opportunity to comment on the Resource Management Plan
for the Uncompahgre Field Office lands.   My major concerns are the
following:

Special places
• All places that hold special value should be managed for the future.
• Work for Wilderness designation for the five Wilderness Study Areas
(WSAs) in the UFO: Camelback, Adobe Badlands, Dolores River Canyon,
Sewemup Mesa, and Tabeguache Creek Area.
• Offer maximum protection for all Areas of Critical Environmental
Concern (ACECs) and continue to identify and protect other imperiled
areas.
Recreation
• Limit all dispersed camping to existing campsites.
• BLM should not allow new motorized trails in remote areas that have few
or no trails.
• Jumbo Mountain near Paonia is a popular recreation area. It should be
managed exclusively for recreation with trails designated for specific
uses.  The BLM should investigate new access points.
• The North Delta Open Area should remain open to ATVs and should be
managed to the standard of the Gunnison Gorge NCA. No new open areas
should be created in the UFO.
• The UFO should continue to manage the Tabeguache Area as wilderness and
should not allow mountain bike trails.
Wild and Scenic Rivers:  Please protect as many eligible rivers and
tributaries as possible. All of the river segments listed in the BLM's
draft Wild & Scenic Rivers Eligibility Report should retain their
eligibility for inclusion in the National Wild and Scenic Rivers System,
and should be carefully evaluated for the next level of protection.
Coal, Gas, Oil, Uranium
• The BLM must put the health and safety of the land and people ahead of
mineral extraction.
• The BLM should not allow new coal leases in areas not adjacent to
existing mines.
• The BLM should find a way to ensure that methane vented from coal mines
can be captured and used.
• No roads should be constructed in Forest Service Inventoried Roadless
Areas for energy extraction.
• The BLM must ensure that uranium mining does not jeopardize the surface
and ground water quality or the long-term ecological health of the area.
Socio-Economic: There are economic benefits to the community in preserving
wild lands.  These benefits need to be evaluated and quantified when
considering impacts on present and future generations.

Grazing: The UFO needs to make sure livestock grazing is done with best management practices, improving rather than degrading native ecosystems. Special care needs to be taken in riparian areas that are easily degraded by cattle, for instance Jay Creek and Love Gulch in the North Fork area.

Aerial spraying: The RMP should prohibit aerial spraying of pesticides and toxicants on public land. Avoid application of herbicides to broad areas (>80 acre patches) in any single season.

Thank you for your consideration of my comments. I appreciate this opportunity to be involved in determining management practices that will affect UFO lands for the next 20 years.

Sincerely,

Shelley D. Green
61454 Niagara Road
Montrose, Colorado  81403
(970) 249-8915
metawoman86001@yahoo.com
Montrose, Colorado  81403

| | |
|---|---|
| **From:** | Kenneth Jones |
| **To:** | uformp@blm.gov |
| **Subject:** | Scoping Comments for the UFO RMP |
| **Date:** | Thursday, March 25, 2010 7:00:42 PM |

Dear Mr. Krickbaum:

Thank you for allowing me to comment on the Uncompahgre Resource Management Plan.

The only point I wish to make is that the BLM should not allow new motorized trails in remote areas that have few or no trails.

Sincerely,


Kenneth Jones
189 Orchard Drive
Glenwood Springs, CO 81601

| | |
|---|---|
| **From:** | Shauna Palmer |
| **To:** | uformp@blm.gov |
| **Subject:** | Scoping Comments for the UFO RMP |
| **Date:** | Friday, March 26, 2010 12:16:00 AM |

Dear Mr. Krickbaum:

**1 B-GE** for the opportunity to comment on the Resource Management Plan for the Uncompahgre Field Office lands.

An over-arching concern of mine is that Americans--and the gov't agencies we fund--can't keep allowing the "privatization" if not "corporatization" of the oversight/management of the commons and other public interests. People/entities focusing on short-term privatized financial gain, who don't believe in government and the purpose of government, including the long-term management of the commons.

**2 A-GE** I urge you to seriously consider the comments of Western Colorado Congress and similar citizen advocacy groups, who speak collectively for many of us individual citizens.

Specifically, my major concerns are the following:

Special places
? All places that hold special value should be managed for the future.
? Work for Wilderness designation for the five Wilderness Study Areas (WSAs) in the UFO: Camelback, Adobe Badlands, Dolores River Canyon, Sewemup Mesa, and Tabeguache Creek Area.
? Offer maximum protection for all Areas of Critical Environmental Concern (ACECs) and continue to identify and protect other imperiled areas.

Recreation
? Limit all dispersed camping to existing campsites.
? BLM should not allow new motorized trails in remote areas that have few or no trails.
? Jumbo Mountain near Paonia is a popular recreation area. It should be managed exclusively for recreation with trails designated for specific uses. The BLM should investigate new access points.
? The North Delta Open Area should remain open to ATVs and should be managed to the standard of the Gunnison Gorge NCA. No new open areas should be created in the UFO.
? The UFO should continue to manage the Tabeguache Area as wilderness and should not allow mountain bike trails.

Wild and Scenic Rivers:  Please protect as many eligible rivers and tributaries as possible. All of the river segments listed in the BLM's draft Wild & Scenic Rivers Eligibility Report should retain their eligibility for inclusion in the National Wild and Scenic Rivers System, and should be carefully evaluated for the next level of protection.

Coal, Gas, Oil, Uranium
? The BLM must put the health and safety of the land and people ahead of mineral extraction.
? The BLM should not allow new coal leases in areas not adjacent to existing mines.
? The BLM should find a way to ensure that methane vented from coal mines can be captured and used.
? No roads should be constructed in Forest Service Inventoried Roadless Areas for energy extraction.
? The BLM must ensure that uranium mining does not jeopardize the surface and ground water quality or the long-term ecological health of the area.

Socio-Economic: There are economic benefits to the community in preserving wild lands.  These benefits need to be evaluated and quantified when considering impacts on present and future generations.

Grazing: The UFO needs to make sure livestock grazing is done with best management practices, improving rather than degrading native ecosystems. Special care needs to be taken in riparian areas

BLM_0104060

that are easily degraded by cattle, for instance Jay Creek and Love Gulch in the North Fork area.

Aerial spraying: The RMP should prohibit aerial spraying of pesticides and toxicants on public land. Avoid application of herbicides to broad areas (>80 acre patches) in any single season.

Thank you for your consideration of my comments. I appreciate this opportunity to be involved in determining management practices that will affect UFO lands for the next 20 years.

Sincerely,

Shauna Palmer
PO Box 310
Norwood, CO 81423

| | |
|---|---|
| **From:** | Andrea Robinsong |
| **To:** | uformp@blm.gov |
| **Subject:** | Scoping Comments for the UFO RMP |
| **Date:** | Sunday, March 28, 2010 4:34:33 PM |

Dear Mr. Krickbaum:

Thank you for the opportunity to comment on the Resource Management Plan for the Uncompahgre Field Office lands.

My major concerns are the following:

**1 A-PI WSA** ~~aces~~
? All places that hold special value should be managed for the future.
? Work for Wilderness designation for the five Wilderness Study Areas (WSAs) in the UFO: Camelback, Adobe Badlands, Dolores River Canyon, Sewemup Mesa.
In the past I agreed with the UFO's assessment of Adobe Badlands as unsuitable for wilderness protection because of noise encroachment. I have reversed my thoughts about this small but pristine example of a unique ecosystem complete with endemic species. The BLM needs to reconsider the value of wilderness protection in light of the probability of energy development in the area. Without maximum protection we may lose the Adobe Badlands...the best example left of a disappearing landscape. I urge the UFO to reconsider its recommendation to congress and to give the Adobe Badlands WSA a suitable designation.

**2 A-PI WSA**
I worked for the FS marking timber at the top of the Tabeguache basin. I have climbed and hiked most of the Tabeguache drainage and consider it to be an area deserving of maximum protection. I commend the BLM for protecting this area. and want to see it continued to be off-limits for mechanized as well as motorized travel.

**3 A-PI ACEC**
? Offer maximum protection for all Areas of Critical Environmental Concern (ACECs) and continue to identify and protect other imperiled areas. In an area so vast, the BLM must offer special protection to any sensitive places that might be examples of disappearing landscapes and ecosystems [the whole San Miguel River corridor is an example.] Without the special treatment ACEC designation offers, species that are becoming imperiled will continue to get lost.
I urge the BLM to aggressively search the UFO for special places that will need extra protection in the future and to use the ACEC designation to protect them.

Recreation
? Limit all dispersed camping to existing campsites.
? BLM should not allow new motorized trails in remote areas that have few or no trails.
? Jumbo Mountain near Paonia is a popular recreation area. It should be managed exclusively for recreation with trails designated for specific uses. The BLM should investigate new access points and consider all users' prospectives.
? The North Delta Open Area should remain open to ATVs and should be managed to the standard of the Gunnison Gorge NCA. No new open areas should be created in the UFO.
?

Wild and Scenic Rivers: Please protect as many eligible rivers and tributaries as possible. All of the river segments listed in the BLM's draft Wild & Scenic Rivers Eligibility Report should retain their eligibility for inclusion in the National Wild and Scenic Rivers System, and should be carefully evaluated for the next level of protection.

Coal, Gas, Oil, Uranium
? The BLM must put the health and safety of the land and people ahead of mineral extraction.
? The BLM should not allow new coal leases in areas not adjacent to existing mines.
? The BLM should find a way to ensure that methane vented from coal mines can be captured and used.
? No roads should be constructed in Forest Service Inventoried Roadless Areas for energy extraction.
? The BLM must ensure that uranium mining does not jeopardize the surface and ground water quality

or the long-term ecological health of the area.

Socio-Economic: There are economic benefits to the community in preserving wild lands. These benefits need to be evaluated and quantified when considering impacts on present and future generations.

Grazing: The UFO needs to make sure livestock grazing is done with best management practices, improving rather than degrading native ecosystems. Special care needs to be taken in riparian areas that are easily degraded by cattle, for instance Jay Creek and Love Gulch in the North Fork area.

Aerial spraying: The RMP should prohibit aerial spraying of pesticides and toxicants on public land. Avoid application of herbicides to broad areas (>80 acre patches) in any single season.

Thank you for your consideration of my comments. I appreciate this opportunity to be involved in determining management practices that will affect UFO lands for the next 20 years.

Sincerely,

andrea robinsong

Andrea Robinsong
PO Box 745
Hotchkiss, CO 81410

BLM_0104063

AF



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 8**
1595 Wynkoop Street
DENVER, CO 80202-1129
Phone 800-227-8917
http://www.epa.gov/region08

APR 0 5 2010

Ref: 8EPR-N

Mr. Bruce Krickbaum, Project Manager
Uncompahgre Field Office
Bureau of Land Management
2465 South Townsend Avenue
Montrose, CO 81401

> RE: EPA Scoping Comments on the
> Uncompahgre Field Office
> Resource Management Plan and
> Environmental Impact Statement

Dear Mr. Krickbaum:

This letter is written in response to the Bureau of Land Management (BLM) request for scoping comments as it begins preparation of the Uncompahgre Field Office Resource Management Plan (RMP) and the associated Environmental Impact Statement (EIS). The U.S. Environmental Protection Agency Region 8 (EPA) will review this RMP/EIS in accordance with EPA's responsibilities under the National Environmental Policy Act (NEPA) and Section 309 of the Clean Air Act.

The BLM intends to prepare the RMP and associated EIS for the Uncompahgre Field Office planning area in accordance with NEPA and the Federal Land Policy and Management Act. The planning area is located in the Colorado counties of Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel counties, and encompasses approximately 675,000 acres of public land and 2.2 million acres of subsurface federal minerals. The planning area also includes, or is in

1 A-PI AQ
2 A-PI WET
3 A-PI WR
4 A-PI NRED

proximity to, areas afforded special protection, such as Wilderness Study Areas, Areas of Environmental Concern, areas under consideration for inclusion in the Wild and Scenic system, and areas included in the National Park Service or National Wilderness Area Due to increases in oil, gas and uranium activity, recreation demands, pressures on wildlife and land health, growth in the urban interface, and impacts from population growth, this RMP will replace the existing 1985 San Juan/San Miguel RMP and the 1989 Uncompahgre Basin RMP.

Based on the general information available for review, our initial areas of concern for this upcoming resource management plan include impacts to air quality from energy development, impacts to wetlands, and protection of water resources. We are also concerned with the potential

cumulative effects of the increased energy development in the region. Along with identifying direct impacts, the EIS should include a rigorous analysis of indirect and cumulative impacts. The EIS should disclose the impacts of all reasonably foreseeable actions on environmental resources in a way for decision-makers and any participating counties/municipalities to be able to effectively plan to reduce impacts on such resources as much as possible.

**5 A-PI AQ**

### Air Issues

EPA is particularly concerned with air quality impacts associated with emissions from the potential increase in energy development in the planning area, as well as the cumulative impacts that may be occurring as a result of increased energy development in the surrounding western slope area of the state. Planning-level NEPA analyses, such as RMPs, provide direction for broad resource management and may be the basis for future leasing decisions. These plans provide the how, when and where for oil and gas operations. At the resource management level, a quantitative approach which includes air dispersion modeling may be necessary to provide the decision-maker with the level of information necessary to support the decision-making process. The air quality analysis should provide the decision-maker with the information to guide planning decisions, including the following: whether additional leasing (and the likely development associated with such leasing) can proceed without impacting the National Ambient Air Quality Standards (NAAQS), Prevention of Significant Deterioration (PSD) increments, and Air Quality Related Values (AQRVs), such as visibility; the rate of oil and gas leasing or development; appropriate leasing stipulations; and/or necessary mitigation measures to include in drilling permits. The appropriate level of air quality analysis at the management planning stage will help to ensure that proper, proactive steps are taken to minimize adverse impacts to air quality.

**6 A-PI AQ**

In RMPs that plan for significant oil and gas development, EPA maintains that air quality modeling should be conducted to assess the direct and cumulative impacts of projected energy development on air quality within and outside of the planning area. The qualitative emission comparison approach is not specific enough to adequately address and predict air quality impacts from oil and gas development. While the qualitative emission comparison approach provides a means to compare the total predicted emissions of each alternative to a baseline year, it does not provide any indication of the potential for exceedances of the NAAQS or potential adverse impacts on PSD increments or AQRVs (*e.g.*, visibility) in nearby Class I areas. In reviewing planning-level NEPA documents, EPA typically considers the following factors in determining the appropriate level of air quality analysis. These factors, although not exclusive and may vary from project to project, provide some indication of the potential for air quality impacts to occur from management plans that provide for oil and gas leasing and/or development.

- Number of projected oil and gas wells based on estimated energy resources and reasonable well density.
- Distance of the planning area or projected well development areas from Class I airsheds.
- Distance from other sensitive receptors (*e.g.*, National Parks, Class II areas, and population centers).
- Distance from areas approaching an exceedance of a NAAQS. This is particularly

**7 A-PI AQ**

2

important in the West for ozone and fine particulate matter ($PM_{2.5}$).

- Availability of recent, relevant, and comprehensive air quality modeling data prior to preparation of a management planning draft EIS.
- Whether a relevant, comprehensive, and cumulative air quality analysis is *concurrently* completed with a project-specific EIS in the management planning area.
- Potential for cumulative adverse impacts to air quality from projects in adjacent planning areas.

8 A-PI AQ

While energy development appears to be a key issue to be addressed by the RMP, no estimate of the reasonably foreseeable development (RFD) is included. Until the RFD for the RMP is estimated, it is difficult to definitively identify the appropriate level of air quality analysis. As the NEPA analysis proceeds, EPA would like to continue discussions with BLM regarding the air quality analysis planned for this RMP/EIS.

9 A-PI WET

**Wetlands Issues**

EPA believes wetlands should be afforded the highest level of protection, either through closing certain lands to leasing or through the use of No Surface Occupancy (NSO) stipulations. This is especially true for wetlands and riparian areas of Wilderness Study Areas (WSAs), Areas of Critical Environmental Concern (ACECs), and areas under consideration for Wild and Scenic Rivers designation. We suggest that lease stipulations to protect wetlands be strongly considered. In addition, for travel management in the planning area, EPA recommends BLM give preference to routes that do not have sensitive soils, wetlands, stream crossings, critical habitat, meadows, etc.

10 A-PI TM          11 A-PI WET

EPA recognizes the challenges facing BLM in analyzing, understanding, and ultimately managing wetland resources in such a large planning area. However, the RMP/EIS should describe specifically how wetlands will be identified, avoided, or ultimately mitigated at the project-specific level.

12 A-PI WR

**Water Issues**

For areas with significant energy development, water source protection may be a key issue. The RMP/EIS should analyze the potential impacts to surface water, groundwater, existing and potential drinking water, and irrigation waters. Impacts to consider include water quality, water quantity, and any adverse change to current water quality of any rivers, streams, and their tributaries. Water source protection is particularly important for oil and gas development on split estates (federal mineral/private surface) that are used for farming and ranching and where property owners may be reliant on groundwater and/or surface water for drinking and irrigation. The RMP/EIS should identify all relevant, reasonable monitoring and mitigation measures to protect these water sources even if they are outside the jurisdiction of BLM. EPA recommends BLM consider whether NSO lease stipulations would be appropriate to protect current or potential drinking water sources. In un-leased areas, terms and conditions (including NSO lease stipulations as appropriate) should be considered to protect non-mineral

13 A-PI WR

3

resources. For leased areas, Best Management Practices (BMPs) and mitigation measures should be used to protect these resources and designed into the alternatives under consideration.

For more detail on the above issues, as well as other areas of concern, EPA offers the enclosed Detailed Scoping Comments for your consideration as you begin development of the RMP and EIS. We appreciate the opportunity to provide scoping comments at this early stage of the RMP and EIS process. If we may provide further explanation of our comments during this phase of your planning process, please contact Amy Platt, of my staff, at 303-312-6449, or me at 303-312-6004.

Sincerely,

Larry Svoboda
Director, NEPA Program
Ecosystems Protection and Remediation

Enclosure

4

BLM_0104067

**ENCLOSURE**

EPA Region 8 Detailed Scoping Comments
BLM Resource Management Plan and Associated EIS
Uncompahgre Field Office

14 A-GE

**Purpose and Need**

When creating the purpose and need statement for this project, please describe how the resource management issues to be addressed have evolved since the existing 1985 and 1989 plans were developed. The purpose and need statement should remain broad enough to encompass an appropriate range of alternatives to meet a defined project purpose, including the proposed action and other methods available

**Range of Alternatives**

15 A-GE

The EIS should summarize the criteria and process that were used to develop the range of alternatives, including any environmental criteria used to identify and/or screen potential sites involved in the proposed alternatives. The EIS should carefully consider the screening criteria used to eliminate alternatives and also disclose the reasoning used to eliminate alternatives.

*Baseline Environmental Conditions*

16 A-GE

Special attention should be given to the development of the current environmental baseline (as opposed to the No Action alternative). Current environmental conditions need to be described in the document as a baseline so that future changes to environmental resources can be measured for all alternatives, including the No Action alternative.

*Mitigation*

17 A-GE

Each alternative in the EIS should explicitly include identification of appropriate mitigation where impacts are expected. The description should include designation of the entity responsible for implementing the mitigation, the funding source, and specific temporal milestones to meet rehabilitation standards.

18 A-GE

**Analysis/Resource Considerations**

*Direct, Indirect and Cumulative Effects*

The EIS should examine the RMP's direct, indirect and cumulative impacts to the cultural, recreational, and resource characteristics of the Uncompahgre Field Office planning area. Among other things, this review should assess any impacts to airsheds in mandatory Class I Federal areas (*e.g.*, Black Canyon of the Gunnison National Park and Wilderness Area, West Elk Wilderness Area, and Maroon-Bells-Snowmass Wilderness Area), watersheds under special

management considerations (*e.g.*, Wild and Scenic Rivers), and threatened, endangered and/or sensitive species.

19 A-GE

The EIS should examine the cumulative impacts of development. In determining whether a project may have a significant effect on the human environment, it should analyze direct and indirect effects, including past, present, and reasonably foreseeable future activities. The impacts should be analyzed according to airsheds and watersheds, for example, rather than political boundaries. The purpose of a cumulative impacts analysis is to assess the incremental impacts on each resource of concern due to connected and unconnected actions that take place in a geographic area over time (*i.e.*, past, present, and future) no matter which entity (public or private) undertakes the actions. A cumulative analysis aids in identifying the level of significance of those impacts on a particular resource and the appropriate type and level of mitigation required to offset the current proposal's contribution to these impacts. In the analysis of present and reasonably foreseeable future actions, it is appropriate to examine anticipated activity trends in the study area, not just already approved "on-the-ground" projects. Examining activity trends in other areas with similar uses and contributory metrics can be useful in this analysis. Also, the appropriate area of consideration and the time frame to use when assessing cumulative impacts will vary for each resource under consideration.

The cumulative effects analysis should take into account the effects of reasonably foreseeable growth in energy development in the area and its effects on the air and aquatic resources. The indirect impacts of development should also be analyzed. The project may not affect the location of the expected growth, but it may affect the timing and amount of growth.

20 A-PI AQ

*Air Quality*

The current air quality conditions in the area covered by the RMP should be presented. The amount of stationary, mobile and non-road source emission activities should be quantified and disclosed. Then, air quality impacts should be identified for activities addressed under the RMP, including energy development, wildland fire management, and road dust. Particulate emissions from related construction activities should be addressed. Any significant concentrations of hazardous air pollutants (HAPs) should be evaluated, including those that may be emitted during the drilling, completion and production of the oil and gas wells (*e.g.*, formaldehyde, benzene, toluene, ethylbenzene, xylene, n-hexane, and formaldehyde).

This analysis should address and disclose the potential affect on National Ambient Air Quality Standards (NAAQS) and Prevention of Significant Deterioration (PSD) increments across the planning area. Specific pollutants of concern include nitrogen oxides ($NO_x$), sulfur dioxide ($SO_2$), and fine particulate contributions to regional haze, as well as $PM_{10}$ related to road dust emissions. In addition, disclosure should be made of potential impacts to air quality-related values (AQRVs) at any affected Class I Federal areas designated under the Clean Air Act (CAA), including Black Canyon of the Gunnison National Park and Wilderness Area, West Elk Wilderness Area, and Maroon Bells-Snowmass Wilderness Area. Since the State of Colorado is in the process of completing work on its Regional Haze State Implementation Plan (SIP), BLM should ensure that activities addressed under the RMP will not interfere with any requirements of

21 A-PI AQ

2

22 A-PI AQ

the Regional Haze SIP. Finally, the RMP may include areas that have a CAA maintenance plan for particulate matter (*e.g.*, Telluride). Under the General Conformity Rule, federal agencies must work with State governments in nonattainment or maintenance areas to ensure that a federal action conforms to any relevant SIP.

23 A-PI AQ

While EPA understands broad assumptions are made at the RMP stage, the air quality analysis should include reasonable estimates of full development, including wells, compressors, drilling rigs and other surface facilities, as well as associated transportation activities. For most planning-level air quality analyses, estimates of the total number of sources can be made based on geological estimates of the recoverable oil and gas resources. Approximate locations of emission sources may be projected and sited into specific zones of the planning area based on USGS probability maps. Such estimates should be adequate to evaluate potential visibility and AQRV impacts on Class I and Class II areas and the potential impacts to air quality standards, including regional ozone and particulate matter. Site specific impacts can be analyzed when specific development plans are identified in a more detailed, subsequent, project-specific EIS.

24 A-PI AQ

*Recommendations for an Air Quality Workgroup and Air Quality Modeling Protocol*

EPA recommends that BLM form an inter-agency air quality workgroup for this RMP to specifically discuss the planned approach to the air quality analysis, the results of the analysis, and appropriate mitigation measures. An air quality workgroup might include members from EPA, the State, and any other Federal or Tribal agency with management responsibilities in the area. One of the primary purposes of an air quality workgroup would be to provide feedback to BLM at the earliest stages of EIS development. EPA believes stakeholder involvement is important at all stages of the air quality analysis including the emission inventory, the modeling protocol, analysis of results, and if necessary, identification of appropriate mitigation.

25 A-PI AQ

In preparing the EIS, we recommend BLM's approach to analyze and predict air quality impacts should be documented in an Air Quality Modeling Protocol and fully vetted with the air quality workgroup. An Air Quality Modeling Protocol provides a "roadmap" for how the air analysis will be conducted and the results presented. It describes the model that will be used for analysis, including model settings, modeling boundaries, and important model inputs such as meteorology, background data, and emissions inventories. The Protocol also should generally describe the standards to which the air impact results will be compared. EPA recommends that a Draft Air Quality Modeling Protocol be circulated among the air quality workgroup for comment and discussion. As part of this discussion, we recommend workgroup members discuss and reach agreement on the emissions inventories that will be used and the alternatives that will be modeled. If significant disagreements persist, EPA recommends those issues be elevated within the respective agencies for resolution. By discussing the model, emissions inventories, and alternatives up front, BLM may avoid additional costly and time consuming air quality modeling analysis revisions at a later date.

EPA would like to meet with BLM to discuss the air quality impact analysis planned for this RMP/EIS. By proactively working together early in the RMP/EIS process, we hope to assist BLM with the development of an air quality analysis which will adequately address potential air

26 A-PI AQ

3

quality impacts and identify appropriate mitigation measures.

27 A-PI AQ

*Air Quality Modeling and Approaches to Analysis*

The level of air quality analysis may range from a qualitative emission inventory approach to an air quality dispersion model to a full robust photochemical grid model analysis. Until the reasonably foreseeable development for the Uncompahgre Field Office RMP is calculated, it is difficult to definitely identify the appropriate level of air quality analysis.

Qualitative Emissions Inventory Approach: A qualitative emissions inventory approach may be appropriate in some cases to complete the NEPA analysis. For this approach, projected emissions of key pollutants are estimated for each of the alternatives analyzed in the NEPA document. While the emissions inventory approach provides a means of relative comparison between alternatives, it does not provide an estimate of the potential impacts to the NAAQS or AQRVs. This method falls short of predicting the likely air quality impacts associated with these emissions, especially if there is an increasing inventory. Usually, the most appropriate use of the emissions inventory approach is to demonstrate that emission changes will be negligible as a result of the federal action contemplated within the NEPA document.

For NEPA documents that use this approach, we typically recommend the following:

- The emissions inventory should include all criteria pollutants and key hazardous air pollutants, including benzene, formaldehyde, toluene, ethylbenzene, exylenes, n-hexane, and methanol.
- The emissions inventory should include quantifiable pollutant emissions from all activities or sources, including pad construction, drilling, well completion, hydraulic fracturing, production, wellhead abandonment, mobile sources, fugitive volatile organic compounds, and fugitive particulate matter.
- The mobile sources category should include all traffic anticipated during the lifetime of the project, including support vehicles, condensate trucks, and diesel fuel tanker traffic.
- Estimates of emissions are performed using commonly accepted methodologies and assumptions. Methods typically used include actual stack sampling, continuous emission monitoring, AP-42 emissions factors (see http://www.epa.gov/ttn/chief/ap42), calculation programs such as TANKS (see http://www.epa.gov/ttn/chief/software/tanks), and engineering calculations.
- Detailed emissions inventory calculations and assumptions (*e.g.*, drilling time, completions, etc.) should be transparent and provided as an appendix.

28 A-PI AQ

Air Quality Modeling Approaches: To ensure that an adequate level of consistency is met for the various air quality analyses conducted nationally, EPA promulgated a Guideline on Air Quality Models ("Guideline"). See 40 CFR 51, Appendix W. The Guideline recommends air quality modeling techniques that should be applied to SIP revisions for existing sources and to new source reviews, including PSD. Applicable only to criteria air pollutants, it is intended for use by EPA Regional Offices in judging the adequacy of modeling analyses performed by EPA, State, and local agencies and by industry. The Guideline is appropriate for use by other

4

Federal agencies and by State agencies with air quality and land management responsibilities. See 40 CFR 51, Appendix W, Section 1(a). The modeling techniques described in the Guideline are peer reviewed and used commonly to ensure consistency throughout the nation. It is generally understood that regulatory requirements and model technology undergo routine changes which necessitate that the Guideline periodically be reviewed and updated. Accordingly, EPA recommends that modeling techniques described in the Guideline be used whenever determining pollutant impacts for NEPA-related projects.

29 A-PI AQ

For NEPA purposes, air quality impacts are typically determined from project specific impacts coupled with reasonable foreseeable development (RFD) sources then added to a "background" source of data (usually actual monitored data) to obtain the total impacts to the modeling domain. While this method results in accurate project specific impacts, the cumulative results are very dependent on the background data used. Whenever possible, EPA recommends the following:

- Background data should be collected from actual monitoring locations near the modeling domain boundary. Monitored data should represent current background pollutant concentrations and not data impacted from localized sources.
- Modeled background data should be used only when no monitored data is found.

30 A-PI AQ

Near-Field Air Quality Modeling: Industrial Source Complex (ISCST3) was the air dispersion model used nationally for near-field air quality impacts for over 20 years. The discussion in the Guideline, Section 4.1(d), describes advances made to air dispersion modeling since ISCST3 was developed. To better characterize plume behavior, the American Meteorological Society/EPA Regulatory Model Improvement Committee developed its AERMOD model. The AERMOD air dispersion model has the capability to better account for interaction near the earth's surface, which can include complex terrain in the near field and local scale meteorology factors. Accordingly, AERMOD is EPA's preferred method to determine criteria pollutant impacts up to 50 km downwind and is referenced in the Guideline. EPA recommends that AERMOD should generally be used for determinations of criteria pollutant impacts (AERMOD is not applicable for determining ozone concentrations, since it does not contain a photochemical algorithm), hazardous air pollutants, and PSD increments in Class I and II areas. EPA also recommends that meteorological data used in the analysis should be a collection of at least one year's data from an onsite measurement station or three to five years of data from a nearby National Weather Service station or from another nearby meteorological monitoring station conforming to the Meteorological Monitoring Guidance for Regulatory Modeling Applications, February 2000, EPA-454/R-99-005 (http://www.epa.gov.scram001/guidance/met/mmgrma.pdf).

Far-Field Air Quality Modeling: Neither the ISCST3 nor the AERMOD models are capable of determining chemical transformations or particle deposition. It is generally necessary to account for chemical transformations to accurately determine regional haze, visibility, and deposition of aerosol impacts from emissions of $NO_x$, $SO_x$, and volatile organic compounds (VOCs). Further, the near field models do not account for distant pollutant transport longer than 50 km. The Guideline references CALPUFF as the preferred model method to predict pollutant

31 A-PI AQ

5

impacts from long range (more than 200 km) transport from a large number of sources. The CALPUFF model includes chemical transformation and deposition algorithms that enable predictions of visibility and deposition impacts, in addition to criteria pollutants. CALPUFF is not applicable for determining ozone concentrations because the model lacks a photochemical algorithm. For NEPA analyses, EPA believes it is appropriate to use the CALPUFF model to characterize visibility impacts for a group of sources. Meteorological grid spacing should be set to maximize the accuracy of the predicted impacts near the project center. Consideration should be made to the terrain surrounding the project area. More complex terrain may require the higher resolution, such as 4 km grid spacing areas as has been the practice in many of the recent CALPUFF Regional Haze BART modeling applications in the western U.S. It is common to "nest" grid spacing to obtain accurate impact results and minimize computing run times. A typical nesting arrangement may consist of a 36, 12 and 4 km horizontal gridded resolution. When using the CALPUFF model, EPA recommends that monthly ozone monitored data for nitrate conversion calculations should be used from sites located near the modeling domain boundary. EPA also recommends that monthly ammonia ($NH_3$) monitored data for nitrate conversion calculations should be used from sites located near the modeling domain boundary. If no data are available, 1.0 ppb should be used for $NH_3$ as the default value for the western U.S.

A significant level of computing requirements may be needed for CALPUFF, including three-dimensional wind profiling that considerably increases the amount of data preparation, analysis time and computer support necessary. However, in some cases, previously processed wind/meteorology data may be applicable and available for use in the new analysis. Screening models are also available and may be used in appropriate circumstances. A screening version of CALPUFF, known as CALPUFF-Lite, has been successfully utilized to determine visibility and depositions impacts from smaller numbers of sources. To calculate visibility impacts from a very small number of sources in a limited domain area, another screening model, VISCREEN, may be used in lieu of CALPUFF. VISCREEN requires far less data preparation and computer analysis time than the CALPUFF model; however, it is limited in predicted impacts to a range of 50 km. If CALPUFF-Lite or VISCREEN predict air quality impacts, then more refined modeling and/or mitigation measures may be recommended.

**32 A-PI AQ**

Photochemical Grid Modeling: CMAQ and CAMx were designed to have multi-scale capabilities so that separate models were not needed for urban and regional scale air quality modeling. EPA recommends photochemical grid modeling for larger project areas where ozone is of concern and in some applications for AQRVs and visibility. EPA notes that until the reasonable foreseeable development for the Uncompahgre Field Office RMP area is calculated, it is difficult to definitely identify the appropriate level of air quality analysis and whether this approach should include a photochemical grid model.

Since screening-level ozone models are not available, a new modeling analysis for the proposed project would likely be resource intensive. Time and resources could be minimized by tiering off the analysis from a recent ozone study in a nearby area, or including the proposed project in a regional-scale ozone planning study such as those conducted for SIP purposes. Where such analyses are not available, estimates of the proposed project's emissions of ozone precursors should be made and compared to existing local and regional emissions inventories of

**33 A-PI AQ**

6

these pollutants.

34 A-PI AQ

*Results of Air Quality Impact Analysis*

The EIS should disclose the direct, indirect and cumulative impacts of a proposed action to air quality. EPA recommends that predicted impacts from the direct, indirect, and cumulative sources on the surrounding areas be compared against the NAAQS, PSD increments, AQRVs, and HAPs Relative Exposure Limits and chronic inhalation exposure guidelines. Comparisons of modeled impacts to the State air quality standards should also be considered.

*Visibility Analysis*

35 A-PI AQ

The Clean Air Act requires special protection of visibility in the nation's large National Parks and Wilderness Areas (identified as mandatory Class I federal areas) and establishes a national goal for "the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory Class I federal areas which impairment results from man-made air pollution." EPA's implementing regulations require states to submit implementation plans that contain such measures as are necessary to make reasonable progress toward the national goal, including improvement in visibility on the worst days and prevention of visibility degradation on the best days. See 40 CFR 51.300-309. Actions by Federal Land Managers (FLMs) that lack adequate mitigation of potential visibility impacts could interfere with a state's reasonable progress goals and impede ability to meet Clean Air Act requirements.

In addition to its visibility provisions, the Clean Air Act contains general provisions for a PSD program designed to protect Class I areas from air quality degradation. The PSD program places an affirmative responsibility on FLMs to protect air quality from human-caused pollution in Class I federal areas. The Wilderness Act further directs the FLMs to protect the wilderness character of those areas designated as wilderness. Congress recognized the importance of preserving designated areas in their natural condition and declared a policy to "secure for the American people of present and future generations the benefits of an enduring resource wilderness."

For this RMP's air quality analysis to adequately consider impacts to visibility in Class I areas or other sensitive airsheds, EPA recommends the following:

- The analysis should be performed using CALPUFF, at a minimum, with appropriate regulatory methodology using visibility Methods 2 and 6. The recently proposed Method 8 also may be considered.
- The air quality analysis should include predicted impacts at both 0.5 deciview and 1.0 deciview. A 0.5 deciview change in visibility is considered the level at which a proposed action *contributes* to visibility impairment. A 1.0 deciview change in visibility is the level at which a proposed action *causes* visibility impairment.
- Screening-level models such as CALPUFF-Lite or VISCREEN may be used for visibility and deposition analysis for projects where more extensive air quality modeling is not required (*e.g.*, an exploratory well near a Class I area). However, if impacts are shown

7

using these types of screening models, more refined modeling and mitigation may be required to fully disclose the impacts of the proposed action.

These methodologies and impacts should be summarized in the main body of the EIS.

**36 A-PI AQ**

*Air Quality Mitigation*

If this RMP's air quality analysis discloses significant, adverse impacts to air quality, then the EIS should include specific and detailed mitigation measures to address the impacts. The EIS should also include modeled demonstrations that the mitigation measures will be effective. A significant, adverse impact to air quality may include predicted violations of a NAAQS and/or predicted adverse impacts on AQRVs (*i.e.*, visibility impacts to a Class I area). For air quality analyses that predict impacts that approach a NAAQS, it may be prudent to consider and implement appropriate mitigation.

Air quality mitigation measures may include, but are not limited to:

- Tier II or better drilling rig engines (*e.g.*, natural gas drilling rigs);
- Electric drilling rigs;
- Selective catalytic reduction or other secondary emission controls on drilling rig engines;
- Fuel additives;
- Electric or natural gas-fired compression;
- Reduced pace of development;
- Phased development;
- Low or no flow pneumatic valves or solar-electric pumps;
- Centralization of gathering facilities;
- Emission offsets;
- Green completions; and
- Additional EPA Gas Star program measures.

**37 A-PI AQ**

*Greenhouse Gas Emissions*

EPA recommends the EIS include an analysis and disclosure of greenhouse gas emissions and climate change. While methane represents only 8 percent of the U.S. greenhouse gas emissions, it is 23 times more effective as a greenhouse gas than carbon dioxide ($CO_2$). Oil and natural gas systems are the biggest contributor to methane emissions in the U.S., accounting for 26 percent of the total (EPA's Natural Gas Star Program and the U.S. Emissions Inventory 2007: Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2005). For the Draft EIS, EPA suggests a three step approach:

1. Consider the future needs and capacity of the proposed action to adapt to projected climate change effects.
2. Characterize and quantify the expected annual cumulative emissions that would occur as a result of the resource management plan's implementation, and use $CO_2$-equivalent as a metric for comparing the different types of greenhouse gases emitted.

8

3. Briefly discuss the link between GHGs and climate change, and the potential impacts of climate change.
4. Discuss potential means to mitigate plan-related emissions. One voluntary mitigation effort targeted at the oil and gas industry is EPA's GasSTAR program. Through the program, EPA technical experts help identify and promote the implementation of cost-effective technologies and practices to reduce greenhouse gas emissions.

**38 A-PI AQ**

*Dust Suppression from Unpaved Roads and Disturbed Areas*

Dust particulates from construction, vehicle travel on unpaved roads, and ongoing operations are an important concern. Airborne dust may not be only a visual nuisance, but can potentially be dangerous to asthma sufferers. Sedimentation from storm water run-off can also severely impact the aquatic environment. The EIS should include plans for addressing dust control. At a minimum, the plans should include dust suppression methods, inspection schedules, and documentation and accountability processes.

**39 A-PI WET**

*Protection of Wetlands, Streams and Riparian Habitat*

EPA considers the protection, improvement, and restoration of wetlands and riparian areas to be a high priority. Wetlands increase landscape and species diversity and are critical to the protection of designated water uses. Possible impacts on wetlands include damage or improvement to water quality, habitat for aquatic and terrestrial life, channel and bank stability, flood storage, groundwater recharge and discharge, sources of primary production, and recreation and aesthetics. Road and pipeline construction, grazing, land clearing, and earthwork generally include sedimentation and hydraulic impacts which at some level may cause changes to surface and subsurface drainage patterns and, ultimately, wetland integrity and function. Riparian habitats, similar to wetlands, are important ecological areas supporting many species of western wildlife. Riparian areas generally lack the amount or duration of water usually present in wetlands, yet are "wetter" than adjacent uplands. Riparian areas increase landscape and species diversity, and are often critical to the protection of water quality and beneficial uses.

EPA encourages BLM to identify wetlands in the resource management planning area and to plan for appropriate mitigation. We suggest BLM require delineation and marking of perennial seeps, springs and wetlands on maps and on the ground before any activity occurs, so efforts may be made to protect them. We also recommend establishment of wetland and riparian habitat 100-foot buffer zones to avoid adverse impacts to streams, wetlands, and riparian areas. Due to the time it can take to adequately reclaim some disturbed wetlands, EPA suggests that BLM require mitigation of wetland disturbance during the project operating time, and that mitigation for any particular wetland or riparian area begin concurrent with the disturbance, or even prior to project construction, if possible. As studies indicate that traditional mitigation is generally not successful in fully restoring wetland function, BLM should require a minimum of two-to-one mitigation of wetland disturbance. The EIS should specify general mitigation requirements, and require any specific projects to generate a wetland mitigation plan.

**40 A-PI WET**

9

BLM_0104076

**41 A-PI WET**

EPA believes wetlands should be afforded the highest level of protection, either through closing certain lands to leasing or through the use of No Surface Occupancy (NSO) stipulations. This is especially true for wetlands and riparian areas of Wilderness Study Areas (WSAs), Areas of Critical Environmental Concern (ACECs), and areas under consideration for Wild and Scenic Rivers designation. We suggest that lease stipulations to protect wetlands be strongly considered. In addition, for travel management in the planning area, EPA recommends BLM give preference to routes that do not have sensitive soils, wetlands, stream crossings, critical habitat, meadows, etc.

**42 A-PI WET**

EPA recognizes the challenges facing BLM in analyzing, understanding, and ultimately managing wetland resources in such a large planning area. However, the RMP/EIS should describe specifically how wetlands will be identified, avoided, or ultimately mitigated at the project-specific level. The discussion should address situations with private land/federal minerals and federal land/federal minerals. In order to illustrate effects to wetlands in the area, the EIS should specifically include the following analyses or descriptions:

- Clear maps, including wetland delineation and regional water features;
- Wetland delineation and descriptions including wetlands function analysis if there is any potential that the project will cause impacts;
- Detailed analysis of the direct, indirect and cumulative impacts to all wetlands in the system [immediate, directly impacted, or potentially hydrologically impacted but spatially removed from the actual construction footprint (EO 11990, Protection of Wetlands)]. This analysis should also include the cumulative impacts to wetlands from future development scenarios based on population and growth estimates; and
- Potentially adverse impacts to aquatic resources from reasonably foreseeable development should be analyzed.

**43 A-PI WR**

*Water Quality Impacts*

EPA recommends the RMP/EIS include an accurate description of surface and groundwater resources, as both are essential to understanding the potential effects of any management alternative. The RMP/EIS should clearly describe water bodies within the analysis area that may be impacted by resource management activities. Using maps to identifying affected watersheds of the various alternatives helps convey their relationship with project activities.

**44 A-PI WR**

The RMP/EIS should also disclose the extent to which aquatic habitat could be impaired by potential activities, including effects on surface and subsurface water quality and quantity, aquatic biota, stream structure and channel stability, streambed substrate (including seasonal and spawning habitats), stream bank vegetation, and riparian habitats. Particular attention should be directed at evaluating and disclosing the cumulative effects of increased levels of erosion and sedimentation. Water quality parameters such as conductivity, dissolved and suspended solids, metals, pH, temperature, dissolved oxygen and physical aquatic habitat parameters may also be important monitoring indicators for determining stream or lake impairment or stress, as well as its sensitivity to further impacts. Existing water quality standards applicable to the affected

10

water bodies should be presented to provide a basis for determining whether existing uses will be protected and water quality standards met.

**45 A-PI WR**

For areas with significant energy development, water source protection may be a key issue. The RMP/EIS should analyze the potential impacts to surface water, groundwater, existing and potential drinking water, and irrigation waters. Impacts to consider include water quality, water quantity, and any adverse change to current water quality of any rivers, streams, and their tributaries. Water source protection is particularly important for oil and gas development on split estates (federal mineral/private surface) that are used for farming and ranching and where property owners may be reliant on groundwater and/or surface water for drinking and irrigation. The RMP/EIS should identify all relevant, reasonable monitoring and mitigation measures to protect these water sources even if they are outside the jurisdiction of BLM. NSO lease stipulations may be appropriate to protect current or potential drinking water sources. In unleased areas, terms and conditions (including NSO lease stipulations as appropriate) should be considered to protect non-mineral resources. For leased areas, Best Management Practices (BMPs) and mitigation measures should be used to protect these resources and designed into the alternatives under consideration.

**46 A-PI SSS**

*Threatened and Endangered Species*

EPA recommends engaging the Fish and Wildlife Service as early in the analysis as possible, in order to assure that the proposed alternatives responsibly account for, or are in compliance with, the following:

- Endangered Species Act;
- Habitat fragmentation regarding species' habitat requirements;
- Migratory Bird Treaty Act; and
- Special status species management.

**47 A-PI VEG**
**48 A-PI FW**

*Effects on Vegetation, Wildlife Habitats, and Area Hunting/Fishing*

The effects of resource management activities on area ecology, including vegetation, wildlife and its habitats, as well as recreational hunting and fishing activities, should be disclosed and evaluated in the RMP/EIS. This is particularly important for the WSAs and ACECs contained in the planning area. Important vegetative issues include reclamation activities supportive of pre-existing land uses (*e.g.*, wildlife habitat), noxious weed management, and any adverse impacts to BLM State sensitive plants, and/or compliance with executive orders concerning invasive species, flood plains, or wetlands and riparian zones. Important wildlife issues include compliance with BLM, USFWS, or State wildlife management objectives, wildlife mortality, crucial wildlife habitat, adverse impacts to breeding or nesting activities, disruption of migratory routes, increased wildlife harassment, hunting pressure, wildlife displacement, and/or any adverse effects to Endangered Species Act listed threatened or endangered species, USFWS listed or proposed species, or BLM State sensitive wildlife or fish species.

BLM should examine these issues together with cumulative impacts from other

11

development. The RMP/EIS should include mitigation measures that may be undertaken to minimize or eliminate adverse impacts from the alternatives considered. Monitoring and routine inspections of the restored areas should occur. If necessary, watering may temporarily be needed to ensure successful revegetation.

*Noxious Weeds and Invasive Plants*   49 A-PI WD

EPA supports the goal of preventing the introduction and spread of invasive plants and noxious weeds. Among the greatest threats to biodiversity is the spread of noxious weeds and exotic (non-indigenous) plants. Many noxious weeds can out-compete native plants and produce a monoculture that has little or no plant species diversity or benefit to wildlife. Noxious weeds tend to gain a foothold where there is disturbance in the ecosystem. Oil and gas development activities, grazing, and off highway vehicle (OHV) use can cause such a disturbance.

While we support integrated weed management, including the effective mix of education and prevention with biological, mechanical, and chemical management, we encourage prioritization of management techniques that focus on non-chemical treatments first. Reliance on herbicides should be a last resort. Early recognition and control of new infestations is essential to stopping the spread of infestation and avoiding future widespread use of herbicides, which could correspondingly have more adverse impacts on biodiversity and nearby water quality. There are a number of prevention measures available, such as reseeding disturbed areas as soon as possible and cleaning equipment and tires prior to transportation to an un-infested area.

The RMP/EIS should list the noxious weeds and exotic plants that occur in the resource area. In cases where noxious weeds are a threat, EPA recommends the document detail a strategy for prevention, early detection of invasion, and control procedures for each species.

50 A-PI TM

*Travel Management*

Road related problems and environmental impacts are often identified as significant elements that impact aquatic and terrestrial resources and affect water quality, stream and wetland processes, fish and wildlife through erosion, sedimentation, and/or fragmentation of habitat. The travel management analysis for the RMP/EIS should include a structured, systematic road inventory, including identification of the road/trail network needed for management objectives and public access, as well as what can be adequately maintained to address water quality, fish and wildlife concerns. Specific attention should be paid to road density, number of road stream crossings, road drainage and surface erosion, culvert sizing and potential for washout, culvert allowance for fish migration, effects on stream structure and seasonal and spawning habitats, and impacts to riparian habitats.

The popularity of Off-Highway Vehicles (OHVs) has increased dramatically and is expected to continue due to population growth, advances in recreation technology, increased availability of information and improved access to remote areas. OHVs, such as off-road vehicles, trail bikes, all-terrain vehicles, and snowmobiles, are able to access areas much further

12

51 A-PI TM

into isolated public lands than was possible historically. EPA supports the transition from unmanaged motorized recreation to restricted travel. Restricted or limited travel is necessary to ensure that resources are protected and that other non-motorized recreation is accommodated. Unmanaged OHV use on federal lands has resulted in numerous adverse impacts, including: unplanned roads and trails; erosion; spread of noxious weeds; damage to water quality, riparian and wetland habitat, stream channels and fisheries; reduced migration corridors and wildlife habitat; and degradation of recreational experiences such as horseback riding and hunting. The RMP/EIS should provide a thorough analysis of impacts from OHV use. The analysis should include prevention or mitigation of adverse impacts from OHVs to soils, watersheds, vegetation, wildlife habitat, water quality, cultural resources, and other assets of the planning and decision areas.

52 B-NP

EPA supports efforts to address motorized-use resource damage, user conflicts, and enforcement issues. To meet the goals of wildlife protection, vegetation management, erosion and sedimentation minimization, and user satisfaction with the recreational experience, education and enforcement of travel requirements should be a priority. Maps and signage to promote public understanding of travel restrictions can improve compliance.

53 A-PI VRM

*Affect on Visual Character and Scenic Resources*

Visual impacts associated with the resource management activities may affect the visual character and scenic resources of the area, including the aesthetic and/or functional quality of recreational experiences. This may include impacts out of character with the setting, including the visual impact of equipment and crews during construction and operational activities. The severity of these effects depends on a number of factors, including whether the surrounding landscape can integrate visual changes without attracting attention, how far the activities are from sensitive viewing areas and/or roadways, how much disturbance will occur, what mitigation efforts are put forth to integrate activities and structures with the area, and/or the potential to reclaim disturbed landscapes. The RMP/EIS should evaluate these aspects, and detail mitigation steps that will be taken to minimize associated impacts. Interim and final reclamation work should allow disturbed sites to blend into the natural surroundings, to the extent possible.

54 A-PI SE

*Potential Effects on Local Communities from Reasonably Foreseeable Development*

The RMP/EIS should consider socio-economic impacts to the local communities. The reasonably foreseeable development evaluation should address the additional loading that could be placed on local communities' abilities to provide necessary public services and amenities. Such impacts may include housing and school needs for project workers and families, burdening existing waste and wastewater handling facilities, and increased road traffic with associated dust and hazardous material spill potential. Methods to avoid or minimize such impacts should be discussed.

Executive Order 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations," applies to federal agencies that conduct activities that substantially affect human health or the environment. In accordance with this order, the

13

55 A-PI SE

RMP/EIS should disclose and evaluate any environmental justice concerns associated with impacts to rural low-income communities from the resource management activities and the potential build-out for the reasonably foreseeable development analysis. Close coordination with any potentially impacted Native American tribes is encouraged. If there are no applicable environmental justice considerations, then that should be disclosed.

56 A-GE

*Management, Mitigation, and Monitoring*

Energy development, recreational use, grazing, and related activities are among the planning activities requiring management, mitigation, and monitoring. Various impacts can be minimized or potentially eliminated if BMPs and other mitigation measures are properly implemented. Details should be provided for accomplishing these activities in the RMP/EIS. Also, it is important to specifically designate what entity (*e.g.*, BLM, the proponents, resource organizations, or some combination) will be in charge of which activities, and which will have specific and enforceable accountability. In addition, the BMPs, mitigation measures, and other related activities require inspection, documentation, and recordkeeping. A "paper" documentation trail must exist to determine what was monitored, inspected, maintained, and completed. All management, mitigation, and monitoring should be verifiable, and an agency/entity needs to be held accountable for performance oversight, throughout the entire project construction and operating life. It may be appropriate for the proponents to fund an account from which 3rd party contractors can perform inspections and monitoring, and/or the implementation of some of the mitigation measures. Please provide details on these issues in the EIS, preferably in a separate monitoring plan. It may also be appropriate to have commitment for these activities placed in the Record of Decision.

14

**MEMORANDUM OF UNDERSTANDING**

**BETWEEN**

**MONTROSE COUNTY, COLORADO**

**AND THE**

**BUREAU OF LAND MANAGEMENT**

**UNCOMPAHGRE FIELD OFFICE**

## I.   INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office is undertaking a major revision of their Resource Management Plan (RMP), a process that began in the spring of 2009. The BLM anticipates that the RMP revision and associated environmental impact statement (EIS) will take approximately four years to complete.

Montrose County is eligible to become a Cooperating Agency for the duration of the RMP/EIS process. Cooperating Agency status provides an opportunity for the BLM, Montrose County and other Cooperating Agencies to work together to enhance the BLM's planning efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the Cooperating Agencies as agreed upon between Montrose County and the Uncompahgre Field Office (UFO) for the purposes of collaborative planning and production of the RMP and EIS.

## II.   PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part 1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM recognizes a compelling need to ensure that the interests of Montrose County are accounted for, and that they are meaningfully engaged in the above stated resource management planning effort and associated EIS.

As such, Montrose County has requested, and the BLM has agreed to grant, Cooperating Agency Status pursuant to 40CFR 1501.6, 1501.2, and 1501.8. Under the regulations, the BLM recognizes that Montrose County has special expertise as it relates to various aspects of the planning effort described above.

BLM_0104082

## III.  AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives.  Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between Montrose County and the BLM during the planning process. An entity may change its representative at any time by providing written notice to the other party.  Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV.  AUTHORITIES FOR AGREEMENT

Authority for the BLM and Montrose County to participate in this agreement is provided by the National Environmental Policy Act, 42 USC 4321 et seq. and 40 CFR 1501.6 – Cooperating Agencies, 1506.2 – Elimination of Duplication with State and Local Procedures, and 1508.5 – Cooperating Agency (CA).

Additional authority comes from the Federal Land Policy Management Act, 43 USC 1712 et seq., which mandates coordination of BLM planning and management efforts with the programs of state and local governments which may be affected by those planning actions.

## V.  ROLES AND RESPONSIBILITIES

### A. RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i.   To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii.  To provide Montrose County with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,

- identifying or providing data that is suitable, available and relevant to the planning effort,

- reviewing and commenting on draft sections of the EIS for which Montrose County provided input due to its special expertise.

iii. To consider and incorporate information and comments provided by Montrose County into EIS documents to the extent possible and where appropriate.

iv.  To make all final determinations regarding the content of the EIS document.

BLM_0104083

B. RESPONSIBILITIES OF MONTROSE COUNTY

Montrose County has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i.  Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii.  To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii.  To provide data of potential relevance and value to the RMP revision/EIS effort.  This data may include but is not limited to the following:

- approved Montrose County programs, plans and policies potentially affected by the RMP,

- information regarding planning area resources and current and proposed uses and management actions,

- environmental analyses on issues for which Montrose County has special expertise,

- socio-economic data such as demographics, activities and values.

iv.  To review and provide comments during specified review periods on preliminary baseline and other technical reports for which Montrose County has contributed data or other pertinent information.

v.  To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

- preliminary range of alternatives to be considered in detail,

- relevant portions of the "Affected Environment" section (including the socio-economic portion),

- relevant portions of the "Environmental Consequences" section,

- relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi.  During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii.  To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

BLM_0104084

## VI.   FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.   JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.   IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories.  The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

Montrose County or the BLM may terminate this agreement by providing written notice of termination to the other party.  If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of Montrose County or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either Montrose County or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.   SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding.  Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

BLM_0104085

## APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:    **MONTROSE COUNTY, COLORADO**

Steve White, Director of Planning
Montrose County
161 S. Townsend
Montrose, CO  81401
Phone: 970-252-4510
Fax: (970) 249-7761
Email: jsmith@montrosecounty.net
Alternate: Brian Wilson, Director of Public Works
Phone: 970-209-7046


REPRESENTING:    **BUREAU OF LAND MANAGEMENT**
**UNCOMPAHGRE FIELD OFFICE**

Bruce Krickbaum
RMP Project Manager
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
Phone: (970) 240-5384
Fax: (970) 240-5367
Email: bruce_krickbaum@blm.gov

BLM_0104086

## X.   SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates shown below.

BUREAU OF LAND MANAGEMENT

_Barbara L. Sharrow_                                           4-6-10

Barbara L. Sharrow, Field Manager                 Date
Uncompahgre Field Office, BLM

MONTROSE COUNTY, COLORADO

_Jesse Smith_                                                     3/10/2010

Jesse Smith, County Manager                          Date
Montrose County Commissioners

Page 5 of 6

BLM_0104087

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **To:** | Kate Wynant |
| **Subject:** | Comment |
| **Date:** | Wednesday, April 07, 2010 8:48:17 AM |

Kate,

The following email is somewhat regarding the socio-economic workshops (I have forwarded to Zoe).
However, I would also like to treat it as a scoping comment.
The first three paragraph have thoughts I would like to capture as scoping comments.

Thanks, Bruce


<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 04/07/2010 08:44 AM -----

> Linda
> Luther-Broderick
> <lindal@sanmiguel                          To
> county.org>              bruce_krickbaum@blm.gov
>                                            cc
> 04/06/2010 05:52
> PM                                    Subject
>               Re: Follow-up to BLM Economic
>               Workshop




Sorry for the late response. I have been out of town.

Regarding how use of public lands fit into the community or county objectives, I can offer the following/it is very important to San Miguel County residents and government programs to be able to work with BLM to plan and hopefully build recreational trails. It is a long standing goal to connect San Miguel County to Ouray County and beyond via a trail for hiking and bicycling over Dallas Divide. Parts of the trail are in place on the San Miguel side. This trail would connect to the regional Galloping Goose Trail which connects Telluride and Lizard Head Pass. /

1 A-PI TM
2 A-PI REC

Recently, the County Open Space program began exploring the concept of connecting Norwood/Wrights Mesa to the Placerville area. The idea was to try to utilize the old mine roads on the north side of Colorado 145 and the mesa top in some places.

**3 A-PI TM**

In addition, the Norwood Rec District is interested in developing a mtn biking trail system in an area near Naturita Creek west of Norwood. All of these trail concepts would depend on a partnership with BLM.

**4 A-PI REC**

Although it has been weeks now, I did leave the economic session somewhat alarmed. For example, all the groups rated agriculture as highly important to the community. However, speaking for myself, I dont think such a response should be interpreted by BLM as justifying grazing on the public lands to the detriment of wildlife and other natural values. The same would be true of recreation etc. I think BLM's first responsibility is maintaining the public lands as best you can in a healthy natural state for the benefit of wildlife and natural values.

Thanks

Linda Luther-Broderick
San Miguel County
Open Space & Recreation Coordinator
PO Box 1170
Telluride, CO 81435
Phone (970) 369-5469
Fax (970) 728-3718


--- On Tue, 3/16/10, bruce_krickbaum@blm.gov <bruce_krickbaum@blm.gov> wrote:

From: bruce_krickbaum@blm.gov <bruce_krickbaum@blm.gov>
Subject: Follow-up to BLM Economic Workshop
To: lindal@sanmiguelcounty.org
Date: Tuesday, March 16, 2010, 10:19 AM


Ms. Luther,

The BLM Uncompahgre Field Office staff appreciates your attendance at last Tuesday's Social-Economic workshop. We value your time and truly regret that we did not achieve all the stated workshop objectives.

I am soliciting information on two important agenda items/objectives that we missed in order to obtain a complete picture of socio-economics in the Montrose vicinity of the planning area. Would you please take a few minutes to reply to this message with your input on the following questions?

1) How does the BLM fit in with your community/county?
   --How does the use of public land fit into community, county, or organization objectives?  What is the value of having BLM lands?
   --What can BLM do to partner with your community, county, or organization to reach its potential?

2) Do you know of any important sources of information regarding social and economic issues that BLM should consider?

Economic information and social aspects of the area are an important part of planning, developing alternatives, impact analysis, and decision making as we progress through our Resource Management Plan. I, and the rest of the Uncompahgre Field Office staff, sincerely hope that you remain an interested and active participant throughout the planning process, as your involvement is critical to a successful Resource Management Plan.

Thank you again for your time. Please contact me at 240-5300 or e-mail bruce_krickbaum@blm.gov with any questions or to further discuss these topics.

Thank you, Bruce

<><><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

# MEMORANDUM OF UNDERSTANDING
# BETWEEN THE
# COLORADO DEPARTMENT OF NATURAL RESOURCES
# AND THE
# BUREAU OF LAND MANAGEMENT
# UNCOMPAHGRE FIELD OFFICE

## I.   INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office (UFO), is undertaking a major revision of their Resource Management Plan (RMP) beginning in the spring of 2009.  The BLM anticipates that the RMP revision and associated environmental impact statement (EIS) will take approximately four years to complete.

The Colorado Department of Natural Resources (DNR) has agreed to serve as a Cooperating Agency for the duration of the RMP/EIS process.  Cooperating Agency status provides an opportunity for the BLM, the Colorado Department of Natural Resources and other Cooperating Agencies to work together to enhance the BLM's planning efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the Cooperating Agencies as agreed upon between the DNR and the UFO for the purposes of collaborative planning and production of the RMP and EIS.

## II.   PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part 1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM recognizes a compelling need to ensure that the interests of the DNR are accounted for, and that they are meaningfully engaged in the above stated resource management planning effort and associated EIS.

As such, the DNR has requested, and the BLM has agreed to grant, Cooperating Agency Status pursuant to 40 CFR 1501.6 and 1508 et seq.  Under the regulations, the BLM recognizes that the DNR has jurisdictional responsibilities and special expertise as it relates to various aspects of the planning effort described above.

## III.  AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives. Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between the DNR and the BLM during the planning process. An entity may change its representative at any time by providing written notice to the other party. Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV.  AUTHORITIES FOR AGREEMENT

Authority for the BLM and the DNR to participate in this agreement is provided through Council on Environmental Quality (CEQ) regulations implementing the National Environmental Policy Act, 42 USC 4321 et seq., including 40 CFR 1501.6 – Roles of lead and cooperating agencies, 1508.5, Defining eligibility, 1508.15, Jurisidiction by law, and 1508.26, Special expertise.

Additional authority is provided in BLM 43 CFR 1601.0-5, Defining eligibility and 1610.3-1, Inviting participation.

## V.  ROLES AND RESPONSIBILITIES

### A. RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i.  To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii.  To provide the DNR with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,

- identifying or providing data that is suitable, available and relevant to the planning effort,

- reviewing and commenting on draft sections of the EIS for which the DNR provided input due to its jurisdictional responsibilities or special expertise.

iii.  To consider and incorporate information and comments provided by the DNR into EIS documents to the extent possible and where appropriate.

iv.  To make all final determinations regarding the content of the EIS document.

BLM_0104092

B. RESPONSIBILITIES OF THE COLORADO DEPARTMENT OF NATURAL RESOURCES

The DNR has jurisdictional responsibilities and special expertise in a number of areas related to planning, and as such Is responsible, to the extent possible, for the following:

i.   Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii.  To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii. To provide data of potential relevance and value to the RMP revision/EIS effort. This data may include but is not limited to the following:

   • approved DNR programs, plans and policies potentially affected by the RMP,

   • information regarding planning area resources and current and proposed uses and management actions,

   • assist with environmental analyses on issues for which the DNR has jurisdictional responsibilities or special expertise,

iv. To review and provide comments during specified review periods on preliminary baseline and other technical reports for which the DNR has contributed data or other pertinent information.

v.  To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

   • preliminary range of alternatives to be considered in detail,

   • relevant portions of the "Affected Environment" section (including the socio-economic portion),

   • relevant portions of the "Environmental Consequences" section,

   • relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi. During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii. To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

BLM_0104093

## VI.   FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.   JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.   IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories.  The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

The DNR or the BLM may terminate this agreement by providing written notice of termination to the other party.  If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of the DNR or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either the DNR or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.   SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding.  Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

Page 4 of 6

BLM_0104094

## X. SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates shown below.


BUREAU OF LAND MANAGEMENT

_Barbara L. Sharrow_                    _4-13-10_

Barbara L. Sharrow, Field Manager      Date
Uncompahgre Field Office, BLM


COLORADO DEPARTMENT OF NATURAL RESOURCES

_M. K._                                _6/01/09_

Mike King, Deputy Director             Date
Colorado Department of Natural Resources


Page 5 of 6

BLM_0104095

## APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:       **COLORADO DEPARTMENT OF NATURAL RESOURCES**
**SOUTHWEST REGION**

Renzo DelPiccolo
Area Wildlife Manager
Colorado Department of Natural Resources
2300 South Townsend Ave
Montrose, CO  81401
Phone: (970) 252-6000
Fax:
Email: renzo.delpiccolo@state.co.us

REPRESENTING:       **BUREAU OF LAND MANAGEMENT**
**UNCOMPAHGRE FIELD OFFICE**

Bruce Krickbaum
RMP Project Manager
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
Phone: (970) 240-5384
Fax: (970) 240-5367
Email: bruce_krickbaum@blm.gov

BLM_0104096

# STATE OF COLORADO



**OFFICE OF THE EXECUTIVE DIRECTOR**
Department of Natural Resources
1313 Sherman Street, Room 718
Denver, Colorado 80203
Phone: (303) 866-3311
TDD: (303) 866-3543
Fax: (303) 866-2115

COLORADO

DEPARTMENT OF
NATURAL
RESOURCES

June 9, 2009

Bruce Krickbaum
RMP Project Manager
Uncompahgre Field Office
Bureau of Land Management
2465 S. Townsend Avenue
Montrose, Colorado 81401

Bill Ritter, Jr.
Governor

Harris D. Sherman
Executive Director

Re:    *Cooperating Agency Memorandum of Understanding*

Dear Mr. Krickbaum,

Enclosed is a signed Memorandum of Understanding (MOU) outlining the relationship and respective roles of the Colorado Department of Natural Resources (DNR) and the Bureau of Land Management (BLM), Uncompahgre Field Office (UFO) in the revision of the UFO Resource Management Plan (RMP).

DNR will be represented in the UFO RMP revision process by the Colorado Division of Wildlife, Southwest Region, until further notice. If DNR wishes to change its representative, it will provide written notice to the BLM UFO. Additionally, DNR may involve other specialists in Cooperating Agency discussions when warranted.

After the BLM has signed the MOU, please return a signed copy for our records. In addition, please let me know if I can be of any assistance in developing a framework for information exchange and feedback under the MOU, as provided in Section VIII.

Thank you for your assistance in this matter. We look forward to participating in the revision of the UFO RMP to provide effective management of BLM lands in the area.

Sincerely,

Bob Randall
Federal Lands Coordinator

---

Board of Land Commissioners• Division of Reclamation, Mining & Safety• Colorado Geological Survey
Oil & Gas Conservation Commission• Colorado State Parks• Division of Forestry
Water Conservation Board• Division of Water Resources •Division of Wildlife



# United States Department of the Interior
### BUREAU OF LAND MANAGEMENT
**Uncompahgre Field Office**
**2465 S. Townsend Avenue**
**Montrose, Colorado 81401**
**www.blm.gov**



IN REPLY REFER TO:
1610 (CO-150)


Dan Birch, Deputy General Manager
Colorado River Water Conservation District
Post Office Box 1120
Glenwood Springs, Colorado 81602


Dear Mr. Birch:

The Bureau of Land Management (BLM), Uncompahgre Field Office (UFO) is in the beginning stages of revising the Uncompahgre Resource Management Plan (RMP) and associated environmental impact statement. We anticipate that this effort will take approximately four years to complete.

In the spirit of agency consultation and cooperation, the BLM extended, and the Colorado River Water Conservation District accepted, an invitation to serve as a Cooperating Agency for the duration of the land use planning process. The attached Memorandum of Understanding (MOU) outlines the relationship and respective roles of our organizations during the RMP effort.

The role of the Colorado River Water Conservation District will include attending public meetings, as well as reviewing and commenting on plan documents. There is a time requirement associated with these reviews. In addition, the Colorado River Water Conservation District will have an obligation to contribute staff time to an estimated twelve to twenty meetings, assist with analysis for which you have particular expertise, and fund your own participation.

Please read over the MOU, sign page 5, and return the original signed document to the UFO for my signature. We will then mail you a signed copy for your records. In addition, please ensure that the contact information on page 6 for the Agency Representative (who will attend meetings and serve as a point of contact for the Colorado River Water Conservation District during the planning effort) is correct, and update if necessary.

BLM_0104098

2

If you have questions regarding cooperating agency status or would like more information regarding the land use planning process, do not hesitate to call RMP Project Manager Bruce Krickbaum at (970) 240-5384 or email him at bruce_krickbaum@blm.gov.

Thank you for your interest in the Uncompahgre RMP planning effort and the administration of our public lands.  We look forward to working with the Colorado River Water Conservation District and to your contributions toward producing an RMP that will effectively guide management of BLM lands within the Uncompahgre planning area for the next twenty to thirty years.

Sincerely,

Barbara L. Sharrow
Field Manager

Enclosure
    1 – Memorandum of Understanding (6 pp)

# MEMORANDUM OF UNDERSTANDING

# BETWEEN

# COLORADO RIVER WATER CONSERVATION DISTRICT

# AND THE

# BUREAU OF LAND MANAGEMENT

# UNCOMPAHGRE FIELD OFFICE

## I.   INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office is undertaking a major revision of their Resource Management Plan (RMP), a process that began in the spring of 2009. The BLM anticipates that the RMP revision and associated environmental impact statement (EIS) will take approximately four years to complete.

The Colorado River Water Conservation District is eligible to become a Cooperating Agency for the duration of the RMP/EIS process.  Cooperating Agency status provides an opportunity for the BLM, the Colorado River Water Conservation District and other Cooperating Agencies to work together to enhance the BLM's planning efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the Cooperating Agencies as agreed upon between the Colorado River Water Conservation District and the Uncompahgre Field Office (UFO) for the purposes of collaborative planning and production of the RMP and EIS.

## II.   PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part 1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM recognizes a compelling need to ensure that the interests of the Colorado River Water Conservation District are accounted for, and that they are meaningfully engaged in the above stated resource management planning effort and associated EIS.

As such, the Colorado River Water Conservation District has requested, and the BLM has agreed to grant, Cooperating Agency Status pursuant to 40CFR 1501.6, 1501.2, and 1501.8. Under the regulations, the BLM recognizes that the Colorado River Water Conservation District has special expertise as it relates to various aspects of the planning effort described above.

## III.  AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives.  Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between the Colorado River Water Conservation District and the BLM during the planning process.  An entity may change its representative at any time by providing written notice to the other party.  Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV.  AUTHORITIES FOR AGREEMENT

Authority for the BLM and the Colorado River Water Conservation District to participate in this agreement is provided by the National Environmental Policy Act, 42 USC 4321 et seq. and 40 CFR 1501.6 – Cooperating Agencies, 1506.2 – Elimination of Duplication with State and Local Procedures, and 1508.5 – Cooperating Agency (CA).

Additional authority comes from the Federal Land Policy Management Act, 43 USC 1712 et seq., which mandates coordination of BLM planning and management efforts with the programs of state and local governments which may be affected by those planning actions.

## V.   ROLES AND RESPONSIBILITIES

### A.  RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i.   To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii.  To provide the Colorado River Water Conservation District with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,
- identifying or providing data that is suitable, available and relevant to the planning effort,
- reviewing and commenting on draft sections of the EIS for which the Colorado River Water Conservation District provided input due to its special expertise.

iii. To consider and incorporate information and comments provided by the Colorado River Water Conservation District into EIS documents to the extent possible and where appropriate.

IV.  To make all final determinations regarding the content of the EIS document.

BLM_0104101

## B. RESPONSIBILITIES OF COLORADO RIVER WATER CONSERVATION DISTRICT

The Colorado River Water Conservation District has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i.   Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii.  To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii. To provide data of potential relevance and value to the RMP revision/EIS effort.  This data may include but is not limited to the following:

- approved Colorado River Water Conservation District programs, plans and policies potentially affected by the RMP,

- information regarding planning area resources and current and proposed uses and management actions,

- environmental analyses on issues for which the Colorado River Water Conservation District has special expertise,

- socio-economic data such as demographics, activities and values.

iv.  To review and provide comments during specified review periods on preliminary baseline and other technical reports for which the Colorado River Water Conservation District has contributed data or other pertinent information.

v.   To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

- preliminary range of alternatives to be considered in detail,

- relevant portions of the "Affected Environment" section (including the socio-economic portion),

- relevant portions of the "Environmental Consequences" section,

- relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi.  During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii. To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

BLM_0104102

## VI.   FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.   JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.   IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories.  The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

The Colorado River Water Conservation District or the BLM may terminate this agreement by providing written notice of termination to the other party.  If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of the Colorado River Water Conservation District or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either the Colorado River Water Conservation District or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.   SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding.  Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

BLM_0104103

## X.   SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates shown below.

BUREAU OF LAND MANAGEMENT

_____          _____
Barbara L. Sharrow, Field Manager          Date
Uncompahgre Field Office, BLM

COLORADO RIVER WATER CONSERVATION DISTRICT

_____          _____
Dan Birch, Deputy General Manager          Date
Colorado River Water Conservation District

BLM_0104104