# Wilderness Characteristics
# Wilderness Act 1964, §2(c)

## Definition of Wilderness

- Natural conditions
- Outstanding opportunity for solitude
- Outstanding opportunity for primitive and unconfined recreation
- Sufficient Size
- May contain other values
- §4(c) no permanent or temporary roads



BLM_0106430

# CHARACTER vs. CHARACTERISTICS?

"**Character**" refers to:

- Untrammeled
- Natural
- Undeveloped, and
- Solitude *or* Primitive and Unconfined Recreation.
- *Unique or Supplemental values are* *optional*.

"**Wilderness characteristics**" are the characteristics we inventoried for when we were identifying the Wilderness Study Areas:

- Roadless areas of sufficient size,
- Naturalness,
- Outstanding opportunities for solitude or primitive and unconfined recreation, and
- Sometimes supplemental values.

BLM_0106431

# Lands with Wilderness Characteristics

**Must Have <u>All</u> of These:**

- Roadless area of sufficient Size

- Natural character

- Outstanding opportunities for solitude  *or* primitive and unconfined recreation

- May have "supplemental values"

# Definitions

**Sufficient Size/Roadless**

- Roadless areas of at least 5000 acres of contiguous public land, or of sufficient size as to make practicable their use in an unimpaired condition.

- Areas may be less than 5000 acres and still possess wilderness characteristics if they are adjacent to other public lands with wilderness characteristics, such as WSAs.

- The word "roadless" refers to the absence of roads which have been improved and maintained by mechanical means to insure relatively regular and continuous use.  A route maintained solely by the passage of vehicles does not constitute a road.

BLM_0106433

# Definitions (continued)

**Natural Conditions**     Lands and resources exhibit a high degree of naturalness when affected primarily by the forces of nature and where the imprint of human activity is substantially unnoticeable.

**Solitude *or* Primitive and Unconfined Recreation**     Sights, sounds, and evidence of other people are rare or infrequent. Visitors can be isolated, alone or secluded from others, and the use of the area is through non-motorized, non-mechanical means.  No or minimal developed recreation facilities are encountered.

**Unique/Supplemental (*Optional*)**     Ecological, geological, or other features of scientific, educational, scenic, or historical value.

BLM_0106434

# Public Wilderness Inventory

- BLM's original baseline wilderness inventory process ended in 1980.  Some inventory findings were protested and appealed.

- The inventories that determined that lands outside of WSAs do not have wilderness characteristics are now 29+ years old.

- Citizens are now providing BLM with new wilderness inventory information (e.g. Citizen Wilderness Plans, DeGette Bill, etc.).

# Inventory Update Parameters

- As we update our old inventory information for lands that didn't become WSAs or Wilderness Areas, we look at our old inventory information for these characteristics, and <u>determine if anything has changed, or if we missed something the first time around</u>.

BLM_0106436

# More Clarification

- We are just updating our existing files.

- We set up the system in 1978 to key in on roadless areas of sufficient size, naturalness, sol/pr, and supp. values when present.

- We didn't focus on untrammeled and undeveloped per se.

- Therefore untrammeled and undeveloped are not being reviewed.

BLM_0106437

# Lands with Wilderness Characteristics

When we find that an area has changed so that we now conclude wilderness characteristics are present, refer to them as "***lands with wilderness characteristics***".

BLM_0106438

# Updating Our Inventory

- Consult maps (GIS and aerial photography)
- Review information submitted by the public
- Ground truth as necessary
- Review of public inventory input and rationale
- Document the findings
- Document the process



BLM_0106439

# No Wilderness Characteristics?

- <u>When the wilderness resource is absent, don't analyze</u>.

- We do not analyze non-existent resources in RMPs.

- Address it as an issue considered but not analyzed.

- Single  characteristics may be associated with other resources analyzed.

BLM_0106440

# Punchline

- There is:
  - no Interim Management Plan (IMP)...
  - no requirement to protect lands with wilderness character at all...
  - no report to Congress...
  - no recommendation for wilderness designation.
- However, on-going inventory and analysis are required.
- If lands with wilderness characteristics are present in the planning area, they will be addressed in the RMP.

BLM_0106441

# Questions???



BLM_0106442



1

BLM_0106443



2

BLM_0106444

# Areas of Critical Environmental Concern (ACEC)

## What is an ACEC?

An Area of Critical Environmental Concern (ACEC) is an area of BLM-administered lands where special management attention is needed to protect its relevant and important values from irreparable damage.

ACECs are an administrative designation made by BLM through a land use plan. It is unique to BLM in that no other agency uses this form of designation.

"Special management attention" refers to management prescriptions developed during preparation of a RMP expressly to protect the important and relevant values of an area from the potential effects of actions permitted by the RMP. These are management measures that would not be necessary or prescribed if the critical and important features were not present.

## How are ACECs selected?

ACECs must meet at least one relevance criterion <u>and</u> at least one importance criterion; each area meeting relevance and importance must be identified as a <u>potential</u> ACEC.

Each potential ACEC must be considered as RMP alternatives are developed.

Each potential ACEC must be proposed for designation in <u>at least one</u> alternative in the Draft RMP.

As RMP alternatives are developed, management prescriptions for each ACEC are fully developed. Management prescriptions may (not must) vary across the alternatives.

## How many areas were evaluated?

A BLM interdisciplinary team reviewed twenty-two proposals for special designation as Areas of Critical Environmental Concern (ACECs).
>Eleven nominations are from external sources (made by other agencies or the public),
>Seven are internal (made by BLM specialists),
>Four are existing ACECs.

>Nineteen areas are found to meet the relevance and importance criteria.

Areas found to meet the relevance and importance criteria are identified as potential ACECs and will be fully considered for designation and management in the RMP.

1

BLM_0106445

# Relevance and Importance

ACECs must meet at least one relevance criterion <u>and</u> at least one importance criterion.

Areas meeting the <u>relevance criterion</u> possess "significant historic, cultural, or scenic value; a fish or wildlife resource or other natural system or process; or natural hazard".

An area meets the relevance criterion if it contains *one or more* of the following:

1. A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archeological resources and religious or cultural resources important to Native Americans).

2. A fish and wildlife resource (including but not limited to habitat for endangered, sensitive, or threatened species or habitat essential for maintaining species diversity).

3. A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities that are terrestrial, aquatic, or riparian; or rare geological features).

4. Natural hazards (including but not limited to areas of avalanche, dangerous flooding, landslides, unstable soils, seismic activity, or dangerous cliffs). A hazard caused by human action may meet the relevance criteria if it is determined through the resource management planning process that it has become part of a natural process.

To meet the <u>importance criterion</u>, the value, resource, system, process or hazard resource must "have substantial significance and value".

An area meets the importance criterion if it meets *one or more* of the following:

1. Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.

2. Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change.

3. Has been recognized as warranting protection to satisfy national priority concerns or to carry out the mandates of the Federal Land Policy and Management Act (FLPMA).

4. Has qualities that warrant highlighting to satisfy public or management concerns about safety and public welfare.

5. Poses a significant threat to human life and safety or to property.

BLM_0106446

# Existing and Proposed ACECs Considered

The table shows ACECs that are BLM is considering; those existing under the current RMPs, and those that are proposed by BLM and by the public.  The table also shows if the existing or proposed ACEC meet the relevance and importance criteria.

Refer to the draft ACEC report (available on the BLM web site soon) for details about each proposed ACEC.

| ACEC Name | Status | Relevant and Important? | Relevance Criteria | Importance Criteria | Notes |
|---|---|---|---|---|---|
| Needle Rock ONA/ACEC | Existing | Yes | 1, 3 | 1, 2, 3 | |
| Adobe Badlands ONA/ACEC | Existing | Yes | 1, 2, 3 | 1, 2, 3 | |
| Salt Desert Shrub Ecosystem RNA/ACEC | Proposed (BLM) | Yes | 2, 3 | 1, 2, 3 | Includes the existing Adobe Badlands ONA/ACEC |
| Fairview RNA/ACEC | Existing | Yes | 3 | 1, 2, 3 | |
| South Fairview RNA/ACEC | Proposed (BLM) | Yes | 2, 3 | 1, 2, 3 | Includes the existing Fairview RNA/ACEC |
| South Fairview RNA/ACEC, with CNHP Expansion | Proposed (External) | Yes | 2, 3 | 1, 2, 3 | Includes the existing Fairview RNA/ACEC |
| Roubideau Corridors ACEC | Proposed (BLM) | Yes | 1, 2, 3 | 1, 2, 3 | |
| Roubideau-Potter-Monitor ACEC | Proposed (External) | Yes | 1, 2, 3 | 1, 2, 3 | |
| Lower Uncompahgre Plateau Cultural ACEC | Proposed (External) | Yes | 1 | 1, 2 | |
| San Miguel River ACEC | Existing | Yes | 1, 2, 3 | 1, 2, 3 | |
| San Miguel River ACEC with Addition | Proposed (BLM and External) | Yes | 1, 2, 3 | 1, 2, 3 | Includes the existing San Miguel River ACEC |

BLM_0106447

| | | | | | |
|---|---|---|---|---|---|
| Gunnison Sage Grouse Sites San Miguel ACEC | Proposed (External) | Yes | 2 | 1, 2, 3 | |
| Gunnison Sage Grouse Sites West Montrose County ACEC | Proposed (External) | No | 2 | 1, 2, 3 | |
| Gunnison Sage Grouse, Sims Mesa and Cerro Sites ACEC | Proposed (External) | Yes | 2 | 1, 2, 3 | |
| Dolores River Slickrock Canyon ACEC | Proposed (BLM) | Yes | 1, 2, 3 | 1, 2, 3 | |
| La Sal Creek ACEC | Proposed (External) | Yes | 2, 3 | 1, 2, 3 | |
| Coyote Wash ACEC | Proposed (External) | | | | Within the proposed Dolores River Slickrock Canyon ACEC. Therefore, not considered. |
| East Paradox ACEC | Proposed (BLM) | Yes | 2, 3 | 1, 2, 3 | |
| West Paradox ACEC | Proposed (BLM) | Yes | 2, 3 | 1, 2, 3 | |
| Paradox Long Valley (West Paradox Rock Art) | Proposed (External) | Yes | 1 | 1, 2 | |
| Tabeguache Pueblo and Tabeguache Caves | Proposed (External) | Yes | 1 | 1, 2 | |
| Young Egg Locality | Proposed (External) | | | | This proposal is in the Dominguez-Escalante NCA, which in not within the planning area. Therefore, not considered. |

BLM_0106448

# Areas of Critical Environmental Concern

# (ACEC)

BLM_0106449

# What is an ACEC?

- An area of BLM-administered lands where special management attention is needed.

- ACECs are an administrative designation made by BLM through a land use plan

- "Special management attention" refers to management prescriptions developed to protect the important and relevant values of an area.

BLM_0106450

# How is an ACEC designated?

- Must meet at least one relevance criterion <u>and</u> at least one importance criterion

- Each potential ACEC must be proposed for designation in <u>at least one</u> alternative

- As RMP alternatives are developed, management for each ACEC is developed.

BLM_0106451

# How many areas were evaluated?

- BLM reviewed 22 proposals
  11 nominations were from external sources
  7 were internal
  4 were existing ACECs.

  19 areas were found to meet the relevance and importance criteria.

- Areas that meet relevance and importance criteria are identified as potential ACECs



**USDI, Bureau of Land Management – Uncompahgre Field Office**
**Resource Management Plan – Overview of the Alternatives Devleopment Process**







June 2010



BLM_0106453




**USDI, Bureau of Land Management – Uncompahgre Field Office**
**Resource Management Plan – Overview of the Alternatives Deviedopment Process**

# What decisions will be made in the RMP?

- Land use plan decisions are broad-scale multiple use decisions that will guide future management actions.
- Decisions establish goals & objectives for resource management.
- Decisions identify lands that are open or closed for certain uses.
- Decisions provide comprehensive management direction for and allocate use of resources.



June 2010





**USDI, Bureau of Land Management – Uncompahgre Field Office**
**Resource Management Plan – Overview of the Alternatives Devleopment Process**







June 2010






**USDI, Bureau of Land Management – Uncompahgre Field Office**
**Resource Management Plan – Overview of the Alternatives Devleopment Process**

## Definitions

Issues and Opportunities

**Planning Issues**: Concerns or controversies about resources uses or allocations and associated management practices that are discovered during scoping, pre-planning, and AMS development

- *"There should be better access to backcountry areas"*

---

## Issues Statements provide focus to the RMP…



June 2010





**USDI, Bureau of Land Management – Uncompahgre Field Office**
**Resource Management Plan – Overview of the Alternatives Devleopment Process**



## Definitions

Issues and Opportunit Defined geographic
Management Units areas with similar issues,
Goals uses, or resources

**Goals –** Broad, usually non-quantifiable statements of desired outcomes that apply to all alternatives

*"Maintain healthy, productive plant and animal communities of native and otherwise desirable species at viable population levels."*

## Definitions



Issues and Opportunities
Management Units
Goals
Objectives

**Objectives –** Identify specific, quantified desired outcomes for resources that may or may not be different between alternatives.

Objectives are SMART: Specific, Measurable, Achievable, Realistic, Time-fixed

*"By 2010 hikers and mountain bikers on _____ Mesa will realize a moderate level (3) of the targeted recreational experiences (visitor study results - 3 on a scale of 1 to 5)."*





**USDI, Bureau of Land Management – Uncompahgre Field Office**
**Resource Management Plan – Overview of the Alternatives Devleopment Process**





## Definitions

Issues and Opportunities
Management Units
Goals
Objectives
Allocations
Mgmt. Actions
Monitoring Actions

- Identify uses that are allowable, restricted, or prohibited.
- Identify administrative designations (e.g., ACECs, WSR suitability, land tenure zones).
- Include measures to guide future day to day activities.
- Include project design features (e.g., stipulations, BMPs).

## Alternatives

- All alternatives must meet the purpose of and need for the RMP and address the issue statements
- Goals provide the basis for addressing the issue statements
- Goals are the same across all alternatives
- Alternative themes provide different ways to meet the goals
- Objectives, allocations, and actions may vary across alternatives
- If it ain't broke, don't fix it = Common to all alternatives

June 2010





**USDI, Bureau of Land Management – Uncompahgre Field Office**
**Resource Management Plan – Overview of the Alternatives Develoment Process**





# Hints

- Apply objectives and actions to the appropriate program
  - Example: No ROWs (rights-of-way) in a designated ACEC
- Stipulations: Should be uniform in design, but can vary in implementation between alternatives
  - Example: NSO (no surface occupancy) in a more protective alternative; CSU (controlled surface use) in a more development-oriented alternative
- Planning- vs. implementation-level actions

June 2010



BLM_0106459



**USDI, Bureau of Land Management – Uncompahgre Field Office**
**Resource Management Plan – Overview of the Alternatives Devleopment Process**



# Tools

- Planning Criteria
- Planning Issue Statements
- Public Scoping Comments
- Appendix C – Land Use Planning Handbook
- Alternative Matrix

---

## Alternative Development Process

The Box       You

June 2010



BLM_0106460



**USDI, Bureau of Land Management – Uncompahgre Field Office**
**Resource Management Plan – Overview of the Alternatives Development Process**





## Alternative Development Process

- BLM Interdisciplinary Team meetings in June–October 2010
- Capture input using a matrix
- BLM Interdisciplinary Team homework
- Resources or geographic priorities
- Provide summary presentations at Cooperating Agency/RAC Subgroup meetings to determine if we are missing anything

June 2010





# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
Montrose, Colorado



TAKE PRIDE
IN AMERICA

## COOPERATING AGENCY MEETING #2

### Thursday, June 24, 2010 (1:00 – 4:00 PM)

**Meeting Location:**
**Holiday Inn Express**
**1391 S. Townsend Avenue, Montrose, CO**

| Last Name | First Name | Initial | Organization | Address | E-Mail | Phone |
|---|---|---|---|---|---|---|
| Adams | Angie | RWWR | EMPSi | 3775 Iris Ave, Ste 1A Boulder, CO 80301 | angie.adams@empsi.com | 303-446-7160 |
| Armstrong | Lori | | BLM, Southwest Colorado District Manager | 2465 S. Townsend Ave. Montrose, CO 81401 | valori_armstrong@blm.gov | 970-240-5336 |
| Brauneis | George | | Town of Hotchkiss | PO Box 369 Hotchkiss, CO 81419 | mse1047096@aol.com | 970-872-3663 |
| Coates | Jen | | Town of Ridgway | PO Box 10 Ridgway, CO 81432 | jcoates@town.ridgway.co.us | 970-626-5308 ext. 15 |
| DelPiccolo | Renzo | | Colorado Department of Natural Resources, Southwest Region | 2300 S. Townsend Ave. Montrose, CO 8401 | renzo.delpiccolo@state.co.us | 970-252-6000 |
| Ewing | Collin | | US Fish & Wildlife Service Western Colorado Ecological Services Field | 764 Horizon Drive South Annex A – Bldg. B Grand Junction, CO 81506 | collin_ewing@fws.gov | 970-243-2778 ext. 18 |
| Hansen | Susan | SBH | Delta County Board of County Commissioners | 501 Palmer St, #227 Delta, CO 81416 | shansen@deltacounty.com | 970-874-2102 |
| Harold | Scott | | Town of Olathe | PO Box 789 Olathe, CO 81425 | sharold@ci.olathe.co.us | 970-323-5601 |
| Kauffman | Dave | | BLM, Uncompahgre Field Office | 2465 S. Townsend Ave. Montrose, CO 81401 | dave_kauffman@blm.gov | 970-240-5340 |

BLM_0106462

Cooperating Agency Meeting #2                                                                                Thursday, June 24, 2010

| Last Name | First Name | Initial | Organization | Address | E-Mail | Phone |
|---|---|---|---|---|---|---|
| Jensen *Boley* | Kerwin *Gary* | | City of Montrose *City of Montrose* | 433 South First Street<br>Montrose, CO 81401 | kjensen@ci.montrose.co.us<br>g baker @cityofmontrose.og | 970-240-1478<br>970-240-1425 |
| Krickbaum | Bruce | | BLM, Uncompahgre Field Office | 2465 S. Townsend Ave.<br>Montrose, CO 81401 | bruce_krickbaum@blm.gov | 970-240-5384 |
| Long | William | | Town of Nucla | PO Box 486<br>554 Main Street<br>Nucla, CO 81424 | segfahlt@gmail.com | 970-497-2707 |
| Means | Patricia | | Town of Cedaredge | PO Box 398<br>Cedaredge, CO 81413 | pat@cedaredgecolorado.com | 970-856-5001 |
| Padgett | Lynn | | Ouray County Board of County Commissioners | PO Box C<br>Ouray, CO 81427 | lpadgett@ouraycountyco.gov<br>lynn@mtngeogeek.com | 970-417-9901 |
| Pelletier | Mike | | Gunnison County | 200 E. Virginia Ave.<br>Gunnison, CO 81230 | mpelletier@gunnisoncounty.org | 970-641-7645 |
| Peterson | Barbara | | Town of Paonia | PO Box 460<br>Paonia, CO 81428 | townofpaonia@tds.net | 970-527-4101 |
| Randall-Parker | Tamera K. | | US Forest Service – Grand Mesa, Uncompahgre, & Gunnison National Forests | 2250 Highway 50<br>Delta, CO 81416 | tkrandallparker@fs.fed.us | 970-240-5415 |
| Reagan | Joe | | Town of Norwood | PO Box 528<br>Norwood, CO 81423 | mjreagan@fone.net<br>norwoodparker@centurytel.net | 970-327-4873<br>970-327-4288 |
| Schneck | Dave | | San Miguel County Board of County Commissioners | PO Box 1170<br>Telluride, CO 81435 | daves@sanmiguelcounty.org | 970-728-0447 |
| Schroeder | Alan | *AMP* | Bureau of Reclamation, Western Colorado Area Office | 2764 Compass Drive, Ste 106<br>Grand Junction, CO 81506 | aschroeder@usbr.gov | 970-248-0692 |
| Sharrow | Barb | | BLM, Uncompahgre Field Office | 2465 S. Townsend Ave.<br>Montrose, CO 81401 | barbara_sharrow@blm.gov | 970-240-5315 |
| Sparks | Greg | | Town of Mountain Village | 455 Mountain Village Blvd, Ste A<br>Mountain Village, CO 81435 | gsparks@mtnvillage.org | 970-369-6404 |
| Varley | David | | Town of Orchard City | 9661 2100 Road<br>Austin, CO 81410 | davidvarley@kaycee.net | 970-835-3403 |

BLM_0106463

Cooperating Agency Meeting #2                                                                            Thursday, June 24, 2010

| Last Name | First Name | Initial | Organization | Address | E-Mail | Phone |
|-----------|-----------|---------|--------------|---------|--------|-------|
| White | Steve | | Montrose County Board of County Commissioners | 161 S. Townsend Ave. Montrose, CO 81401 | swhite@montrosecounty.net | 970-252-4550 |
| Wynant | Kate | | EMPSi | 3775 Iris Ave, Ste 1A Boulder, CO 80301 | kate.wynant@empsi.com | 303-446-7160 |
| May | Joan | | (BOCC) San Miguel County | PO Box 1170 Telluride 81435 | joanm@ sanmiguelcounty.org | 970-728-3844 |
| Sharp | Amy | AS | BLM | 2465 S Townsend Montrose, CO | Amy_Sharp@blm.gov | 970-964-4247 |

BLM_0106464

# Example of Resource Management Plan Alternative Themes

| | Moab (*final RMP*) | Monticello (*final RMP*) | San Juan Center for Public Lands (*draft RMP*) | Grand Junction (*draft as of June 2010*) | Glenwood Springs/Kremmling (*draft as of April 2009*) |
|---|---|---|---|---|---|
| **ALTERNATIVE** | | | | | |
| **No Action** | Alternative A is referred to as the No Action Alternative. This alternative would have continued present management practices defined in the existing land use plan. Direction contained in existing laws, regulations, and policies would have continued to be implemented, sometimes superseding provisions of the Grand RMP. Alternative A was not selected because it does not meet the purpose and need for the management of public lands in the MPA. The decisions in the 1985 RMP are largely based on outdated information. Equally important, these decisions do not meet changing uses, trends, and conditions that have occurred since that time. The 1985 Grand RMP does not address many recent issues, nor does it address the increased levels of controversy some existing resource issues are facing. Special status species, including threatened and endangered species, are not fully addressed within the parameters of Alternative A. Alternative A designates 1,183,660 acres as open to OHV use. This large open acreage within the planning area (which now receives close to 2 million visitors) results in unacceptable resource damage which is contrary to BLM policy. | Alternative A is referred to as the No Action Alternative. This alternative would have continued present management practices defined in the existing land use plan. Direction contained in existing laws, regulations, and policies would have continued to be implemented, and sometimes supersede provisions of the *San Juan RMP*. Alternative A was not selected because it does not meet the purpose and need for the management of public lands under the jurisdiction of the Monticello Field Office. The decisions in the *San Juan RMP* are largely based on outdated information. Equally as important, these decisions do not meet changing uses, trends, and conditions that have occurred since that time. The existing plan does not address many recent issues, nor does it address the increased levels of controversy some existing issues are facing. This alternative also does not contain adequate management guidelines to prevent adverse impacts associated with these changes in use. Special status species, including threatened and endangered species, are not fully addressed within the parameters of Alternative A. Alternative A designates 611,310 acres as open to OHV use. This large open acreage within the planning area | Alternative A would represent the continuation of existing management under the existing BLM and USFS land management plans (the BLM's San Juan/San Miguel Resource Management Plan (1985) and the San Juan National Forest Land and Resource Management Plan (1983), both as amended). It meets the requirements of the NEPA (40 CFR Part 1502.14) that a No-Action Alternative be considered. ("No- Action" means that existing management practices based on existing land use plans and other management decision documents would continue.) This alternative would serve as a baseline for comparing the impacts of the other alternatives. Direction from existing laws, regulation, and policy would also continue to be implemented. Alternative A is based on reasonably foreseeable actions, available inventory data, existing planning decisions and policies, and existing land use allocations and programs. The current levels of products, services, and outputs based on multiple-use and sustained-yield management of the public lands in the planning area would continue, except for fluctuations due to budget. Alternative A is based more on | The "No Action" alternative, Alternative A, is a continuation of the present management direction and current prevailing conditions based on existing planning decisions and amendments. This alternative meets the requirements of the National Environmental Policy Act of 1969 (NEPA) (40 Code of Federal Regulations [CFR] Part 1502.14) that a no-action alternative be considered. "No action" means that current management practices, based on the existing GJFO RMP (BLM 1987) and other management decision documents, would continue. Goals and objectives for BLM land resources and resource uses would be based on the existing GJFO RMP, RMP amendments, and activity- or implementation-level plans. The emphasis would be on maintaining the existing land management direction for physical, biological, cultural, and historic resource values along with recreational, social, and economic land uses. Direction contained in laws, regulations, and BLM policies superseding provisions of the existing RMP and amendments would be implemented. The appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, | Alternative A is the continuation of the present management situation. Goals and objectives for BLM land resources and resource uses would be based on the existing GSFO and KFO RMPs, RMP amendments, and activity- or implementation-level plans. The emphasis would be on maintaining the existing land management direction for physical, biological, cultural, and historic resource values along with recreational, social, and economic land uses. Direction contained in laws, regulations, and BLM policies superseding provisions of the existing RMPs and amendments would be implemented. The appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, timber harvest, utility corridors, and livestock grazing) would stay the same. There would be no change in goals, objectives, allowable uses, or management actions that are allowed, restricted, or prohibited on BLM lands and mineral estate. The BLM would not establish additional criteria or change present criteria to guide the identification of site-specific use levels for implementation activities. |

BLM_0106465

Example of Resource Management Plan Themes

|  | Moab (*final RMP*) | Monticello (*final RMP*) | San Juan Center for Public Lands (*draft RMP*) | Grand Junction (*draft as of June 2010*) | Glenwood Springs/Kremmling (*draft as of April 2009*) |
|---|---|---|---|---|---|
|  | In addition, the No Action Alternative does not designate ACECs, recommend suitable Wild and Scenic River segments, or consider natural areas to protect and preserve their wilderness characteristics. | results in the occurrence of unacceptable resource damage and is contrary to BLM policy. The No Action Alternative would continue the designation of ten existing ACECs, but would not consider or evaluate new ACECs. In addition, this alternative does not recommend suitable wild and scenic river segments, or consider non-WSA lands with wilderness characteristics to protect and preserve their wilderness characteristics. | historical and expected output levels than on projections of outputs from the earlier land management plans. For example, the San Juan National Forest has only been harvesting about one half as much timber as was estimated in the existing plan. This is due to both budget constraints and to lower demand for wood products. Issues were identified where travel management direction conveyed in the Visitor Map for the planning area and on-the-ground signing was inconsistent with existing plan direction. In those instances, Alternative A would be based on how the area is currently being managed. Alternative A would emphasize allowing a wide variety of uses to occur on any given piece of land, and resolving conflicts on a case-by-case basis as they arise. This alternative would have less separation of potentially conflicting uses of the public lands, and fewer designations of special areas than would any of the other alternatives. | timber harvest, utility corridors, and livestock grazing) would stay the same. There would be no change in goals, objectives, allowable uses, or management actions that are allowed, restricted, or prohibited on BLM lands and mineral estate. The BLM would not establish additional criteria or change present criteria to guide the identification of site-specific use levels for implementation activities. |  |
| **Preferred/ Balanced Use** | This Alternative was selected as the BLM's Preferred Alternative in the Moab Draft RMP/EIS. This alternative represents the mix and variety of management actions, based on BLM's analysis and judgment, which best resolve the resource issues and management concerns while accommodating laws, regulations and policies pertaining to BLM management. | Alternative C was selected as the BLM's Preferred Alternative in the Monticello Draft RMP/DEIS. This alternative represents the mix and variety of management actions, based on BLM's analysis and judgment, which best resolve the resource issues and management concerns while accommodating BLM's values, programs, and policy. All areas were designated | Based on public scoping, Alternative B would represent a balance among the revision issues. This alternative would provide for a mix of multiple-use activities, with a primary emphasis on maintaining most of the large, contiguous blocks of undeveloped lands and on enhancing various forms of recreation opportunities while, at the same time, | Alternative B seeks to balance resources among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining the ecological integrity of certain key habitats for plant, wildlife, and fish species. It emphasizes an intermediate level of protection, restoration, enhancement, and use of | Alternative B seeks to allocate limited resources among competing human interests, land uses, and the conservation of natural and cultural resource values. Goals and objectives would focus on environmental, economic, and social outcomes achieved by strategically addressing demands across the landscape. Management direction |

BLM_0106466

Example of Resource Management Plan Themes

| | Moab (*final RMP*) | Monticello (*final RMP*) | San Juan Center for Public Lands (*draft RMP*) | Grand Junction (*draft as of June 2010*) | Glenwood Springs/Kremmling (*draft as of April 2009*) |
|---|---|---|---|---|---|
| | As a result of public comment, internal review, and cooperating agency coordination on the Draft RMP/EIS, Alternative C was modified to become the Proposed Plan and analyzed in the Final EIS. With minor adjustments and clarification, upon signature of this Record of Decision, it becomes the Approved RMP. | as open, limited, and closed to OHV travel and routes were designated to allow access and protect resources. A balanced use of ACECs and WSRs was used to protect important resource values. As a result of public comment, internal review, and cooperating agency coordination on the Draft RMP/DEIS, Alternative C was modified to become the Proposed RMP and analyzed in the Final EIS. With minor adjustments and clarification, and upon signature of this Record of Decision, it becomes the Approved RMP. | maintaining the diversity of uses and active forest and rangeland vegetation management. This alternative would represent a mix and a variety of actions that would resolve the issues and management concerns raised during public scoping, in consideration of all of the resource values and all of the management programs. Alternative B would incorporate the goals of the Forest Service's Strategic Plan (36 CFR 219.12(f)(6)), the Department of the Interior's Strategic Plan, and the BLM's Annual Operating Plan. The Responsible Officials, the Regional Forester for USFS lands and the State Director for BLM lands, have identified Alternative B as the Preferred Alternative in this DLMP/DEIS. | resources and services to meet ongoing programs and land uses. Goals and objectives focus on environmental, economic, and social outcomes achieved by strategically addressing demands across the landscape. | would generally be broad to accommodate a wide variety of values and uses. |
| Conserva-tion Emphasis | Alternative B emphasizes protection of wildlife habitats, natural resources, ecosystems, and landscapes. Commodity production and human activities would be more constrained than in other alternatives. This alternative provides more opportunities for non-motorized recreation. Compared to all alternatives, Alternative B protects the most land area for sensitive resources, designates all potential Areas of Critical Environmental Concern (ACECs), makes all eligible river segments suitable for inclusion into the National Wild and Scenic River system, and protects, preserves | Alternative B emphasizes protection of wildlife habitats, natural resources, ecosystems, and landscapes. Commodity production and human activities would be more constrained than in other alternatives. This alternative provides more opportunities for non-motorized recreation from other alternatives. With the exception of Alternative E, Alternative B protects the most land area for sensitive resources. It designates all potential Areas of Critical Environmental Concern (ACECs), and finds all the eligible segments suitable for inclusion in the National Wild and Scenic River system. It also restricts | Alternative C would provide for a mix of multiple-use activities, with a primary emphasis on the undeveloped character of the planning area. Production of goods from vegetation management would continue, but might be secondary to other non-commodity objectives. Under Alternative C, production of goods and services would be slightly more constrained than that proposed under Alternatives A, B, and D. And, in some cases and in some areas, uses would be excluded in order to protect sensitive resources. Alternative C identifies more resources and areas as Management Area 2 - | Alternative C emphasizes protecting resources and sustaining the ecological integrity of habitats for all priority plant, wildlife, and fish species, particularly the habitats needed for the conservation and recovery of threatened and endangered plant and animal species. This alternative includes the most special designations with specific measures to protect or enhance resource values within these areas. Goals and objectives focus on environmental and social outcomes achieved by sustaining relatively unmodified physical landscapes and natural and cultural resource values for | Alternative C emphasizes resource protection and sustaining the ecological integrity of habitats for all priority plant, wildlife, and fish species, particularly the habitats needed for the conservation and recovery of threatened and endangered plant and animal species. Goals and objectives focus on environmental and social outcomes achieved by sustaining relatively unmodified physical landscapes and natural and cultural resource values for current and future generations. The appropriate mix of uses on BLM lands and mineral estate would be based on minimizing |

BLM_0106467

Example of Resource Management Plan Themes

| | Moab (*final RMP*) | Monticello (*final RMP*) | San Juan Center for Public Lands (*draft RMP*) | Grand Junction (*draft as of June 2010*) | Glenwood Springs/Kremmling (*draft as of April 2009*) |
|---|---|---|---|---|---|
| | and maintains all non-WSA lands with wilderness characteristics. It is also the most restrictive to OHV use and all surface disturbing activities (including oil and gas leasing). Although Alternative B is the environmentally preferable alternative, there are many uses that are overly restricted by the decisions in this alternative. | OHV use and surface disturbing activities (including oil and gas leasing). | Special Areas and Unique Landscapes than the other alternatives. Management provisions under this alternative would emphasize the undeveloped character of large blocks of contiguous land and non-motorized recreational activities to a greater degree than would any of the other alternatives. | current and future generations. Management direction would generally be ecologically based; existing uses would be recognized but would be limited to ensure the protection of natural and cultural values, including intangible Native American landscape values encompassing plant communities, wildlife, viewsheds, air, and water. The appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, and livestock grazing) are contingent on meeting the essential conditions of natural and heritage resources. | site-specific types and levels of human disturbances to natural and cultural resources. Management direction would generally be ecologically based; existing uses would likely be recognized but would likely be limited to ensure the protection of natural and cultural values, including intangible Native American landscape values encompassing plant communities, wildlife, viewsheds, air, and water. The appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, and livestock grazing) are contingent on meeting the essential conditions of natural and heritage resources. |
| Resource Use Emphasis | Alternative D emphasizes commodity production and human activities. Commodity production and human activities would be less constrained in Alternative D. Alternative D, like Alternative A, designates no areas as ACECs, no suitable Wild and Scenic River segments, and no acres managed as non-WSA lands with wilderness characteristics. Other than Alternative A, Alternative D provides more opportunities for motorized recreation, and is the least restrictive to OHV use and all surface disturbing activities (including oil and gas leasing). Alternative D does not provide sufficient restrictions on uses to protect important natural resources. For these reasons, this | Alternative D emphasizes commodity production and human activities. Commodity production and human activities would be less constrained in Alternative D than in other alternatives. Protection of wildlife habitat was minimized to that required by law, regulation, or policy. Alternative D, like Alternative A, designates no areas as ACECs, designates no eligible Wild and Scenic River segments as suitable, and manages no acres as non-WSA lands with wilderness characteristics. Other than Alternative A, Alternative D provides more opportunities for motorized recreation, is the least restrictive to OHV use and all surface disturbing activities (including oil and gas leasing). | Alternative D would provide for a mix of multiple-use activities, with a primary emphasis on the "working forest and rangelands" concept in order to produce the highest amounts of commodity goods and services when compared with all of the other alternatives. This alternative would allow the greatest extent of resource use within the planning area while, at the same time, maintaining ecosystem management principles in order to protect and sustain resources. Under this alternative, potential impacts to sensitive resource values would be mitigated on a case-by-case basis. | This alternative emphasizes active management for natural resources, commodity production, and public use opportunities. Resource uses such as recreation, livestock grazing, mineral leasing and development would be emphasized. Management direction would recognize and give precedence to existing uses and accommodate new uses to the greatest extent possible, while maintaining resource conditions. The appropriate development scenarios for allowable uses would emphasize social and economic outcomes while protecting land health. | The appropriate mix of uses on BLM lands and mineral estate would be based on making the most of resources that target social and economic outcomes while protecting land health. Management direction would recognize and expand existing uses and accommodate new uses to the greatest extent possible. The appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, communication sites, and livestock grazing) would emphasize maximizing resource production in an environmentally responsible manner while maintaining the basic protection needed to sustain resources. |

BLM_0106468

Example of Resource Management Plan Themes

| | Moab (*final RMP*) | Monticello (*final RMP*) | San Juan Center for Public Lands (*draft RMP*) | Grand Junction (*draft as of June 2010*) | Glenwood Springs/Kremmling (*draft as of April 2009*) |
|---|---|---|---|---|---|
| | alternative did not achieve the balance between resource protection and resource use that provided enhancement of resource use and conditions. The rationale for not selecting Alternative D is outlined below for the major management actions. | Alternative D does not provide sufficient restrictions on uses to protect important natural and cultural resources. For these reasons, this alternative did not achieve the balance between resource protection and resource use that provided enhancement of resource use and conditions. | | | |
| Other | | Alternative E includes the same management prescriptions as Alternative B except that 582,360 acres of non-Wilderness Study Area (WSA) lands would be managed to preserve, protect, and maintain their wilderness characteristics. Other activities consistent with that emphasis would be allowed. Large areas on the west side of the Monticello FO would be difficult to access or to conduct activities involving surface disturbance. Wilderness characteristics would be enhanced as would adjacent wilderness values found in WSAs. | | | |

BLM_0106469



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401



# COOPERATING AGENCY MEETING #2

## Thursday, June 24, 2010 (1:00 – 4:00 PM)

### Meeting Location:
**Holiday Inn Express**
**1391 South Townsend Avenue, Montrose, CO**

# Meeting Notes

**Attendees:** Angie Adams (EMPSi), Gary Baker (City of Montrose), Jen Coates (Town of Ridgway), Renzo DelPiccolo (Colorado Department of Natural Resources, Soutwest Region), Susan Hansen (Delta County BOCC), Bruce Krickbaum (BLM Uncompahgre Field Office), William Long (Town of Nucla), Joan May (San Miguel County BOCC), Patricia Means (Town of Cedaredge), Lynn Padgett (Ouray County BOCC), Mike Pelletier (Gunnison County), Barbara Peterson (Town of Paonia), Tamera Randall-Parker (US Forest Service – GMUG National Forests), Dave Schneck (San Miguel County BOCC), Alan Schroeder (Bureau of Reclamation, Western Colorado Area Office), Amy Sharp (BLM Uncompahgre Field Office), Barb Sharrow (BLM Uncompahgre Field Office), Steve White (Montrose County BOCC), Kate Wynant (EMPSi)

**Handouts:** Agenda, Resource List, Highlights of the Resource Management Planning Process to Date, Summary of Public Comments by Resource Planning Issue Category (excerpt from internal Draft Scoping Report section 3.3), Alternatives Development PowerPoint slides, Areas of Critical Environmental Concern (ACECs), Existing and Proposed ACECs Considered, Figures (Existing and Proposed ACECs, Potential ACECs), RMP Planning Area Fact Sheet 4.3 (Areas of Critical Environmental Concern), Wilderness Characteristics PowerPoint slides, and RMP Planning Area Fact Sheet 4.1 (Wilderness and WSAs)

1. **Welcome** (Barb Sharrow and Angie Adams)
   - This week internally we worked on the No Action alternative from the old Resource Management Plans (RMPs); making sure Geographic Information Systems (GIS) data matches up; etc. so that moving forward with alternatives development we make sure that the baseline is accurate. We have not started developing any alternatives yet.
   - Next time we'll bring back snippets from the alternatives development workshops that occur the same week as the meetings. Next time we'll also bring themes and goals from the alternatives for you to see.
   - Handout: Resource List. It has all of the resources that this field office will cover in the RMP.

2. **Introductions** (All present)

BLM_0106470

3. **Ground Rules** (Angie Adams)
- Let's talk about ground rules for the group. Are there any you'd like to set?
- Representation
  - *Question*: Where are we with representation? Can we have an advisor or proxy (alternate) attend the meetings? *Answer*: Yes. That is fine that someone else from your agency attends. We want to have a place at the table for all of the appointed representatives. Any members from your agency can attend and speak through the designated representative so that we can focus on the issues, otherwise we increase the number of people and the potential for side-conversations. Three hours may seem short, but the more people and discussions, the more meetings we might need. Others are welcome to come and vet ideas through the representative. They can also come to the Resource Advisory Council (RAC) Subgroup meetings and make comments or ask questions during that meeting, which is a public meeting. Does this seem fair to everyone?
    - No comment; inferred that everyone agrees.
  - *Question*: If a designated person can't attend, can they send an alternate to speak? *Answer*: In some cases there are designated alternates (in the Memorandum of Understanding). If someone else is coming (a proxy), we want to know about it in advance and it is the representatives' job to make sure the alternate is up to speed. It's a consistency issue for everyone so we don't have to keep everyone up to speed. In addition, it is fine for someone else from the Cooperating Agency who is neither the designated representative nor the designated proxy to come with the representative and listen to the meeting but not speak.
  - *Question*: Is this a consensus-driven group? Is this an advisory body? How does what comes out of this group get incorporated into the RMP? *Answer*: We're going to strive for consensus; we won't always be able to achieve 100 percent on every issue. Everyone will get their viewpoint documented in the notes which people can review at the end of each meeting. We won't vote on items, but the BLM will take back what you have to say and disseminate it to the team.
    - *Barb*: You all know things about your agency and constituents that we can marry up with our plan so that it isn't in conflict with other things that are going on. This is a critical role that the cooperating agencies play.
- Backtracking: We are not going to spend time at meetings to discuss that happened at past meetings to get people up to speed. If we need to pick up a discussion from the last meeting because there wasn't resolution, we can do that. That is not backtracking. Everyone should read the notes to get up to speed and also to ensure that everything was captured properly in the notes.
- Other ideas from Angie:
  - Everyone has opportunity to equal time to speak if they want it.
  - No personal attacks.
  - No one's idea is nonsense. We'll listen to any ideas that need to be discussed.
  - If we seem to be getting off-track on something, the group can police Angie as the facilitator to let her know that we need to get back on track.
  - Discretion on sensitive issues. What you see is internal, in progress. We would ask that you respect that. We know that you have to go back to your agencies and discuss things but not disseminated.
    - *Comment*: This is a red flag for elected officials. We have strict rules about what can be confidential and what can't and what happens at these meetings doesn't fall into that. If a constituent asks me what happened at the meeting I have to tell them. *Response*: We don't want the newspapers saying, "This is what the BLM has decided to do," or constituents thinking this is where we're going when we may decide to go in a different direction. This is a long process and revisions are probable.

BLM_0106471

- *Comment*: I also have an issue with the expectation that an agency will not protest the plan. I cannot promise that we won't do that. *Response*: The purpose is that there is enough consensus that there won't be a reason for the agency to sue or protest. If so, you can participate outside of this forum.
  - *Question*: What if we don't know? *Answer*: When you do know, please be open with us and *cooperate*. If you get to a point that you do know, then please excuse yourself as a Cooperating Agency.
  - *Question*: What if there is a certain issue that you know you might take legal action on but don't want to give up your right to participate in the other discussions. *Answer*: Please be upfront with us and the other Cooperating Agencies here. We might also be able to come up with a way to avoid legal action. We want to come up with the best plan possible for this region and Cooperating Agency participation is critical.
- *Comment*: I like the fact that the agency with expertise is making the decisions and then the political interests get fought out later. I'm concerned that a lot of us have political interests and not resource interests. *Response*: We have the RAC Subgroup that represents the public and certain viewpoints. That is the real voice of the citizens. We also got over 25,000 scoping comments; the public will also be able to review the draft plan and comment and NEPA requires us to review and respond to those comments when crafting the draft plan. It does boil down to a BLM plan and decisions. They have the opportunity to say this is what's best for the resource and even thought that's what the public or Cooperating Agencies might want, we can't do it because of the sideboards. There are other avenues besides this group.
  - *Comment*: I would hope that the resource management is the primary driver at this stage.
  - *Comment*: We are here as a resource to the BLM. When we start thinking about the values of this plan, we can think about how the plan lines up with the values of our community and the community interests.
- Civility, letting other people talk without interruption, limiting side conversations.
- *Question*: How would you like us to have our dialogue? Raise hands? *Answer*: I'm ok with not raising hands but if we get to a point where people are talking over each other or interrupting we can start raising hands.
  - Group agrees.

## 4. Planning Process to Date (Angie Adams)
- Handout: Highlights of the Resource Management Planning Process to Date.
- The Analysis of the Management Situation (AMS) will be posted on Web site shortly. The document is a baseline report: what's on BLM lands, current management decisions, how those decisions are working (are they working, do they need to change, opportunities for new management).
- Final Wild and Scenic River Eligibility Report will be on Web site shortly.
- Recreation focus groups: results of those meetings held in February and March will be on Web site shortly.
- Areas of Critical Environmental Concern (ACEC) Evaluation Report: the draft report will be online in the next week or two.
- All of these reports are baseline studies, none of which make any decisions.
- Renewable Energy (Barb Sharrow)
  - We are mandated to make decisions in our plan now. We have done some studies on the potential of resources in the area, but if any of the Cooperating Agencies have done studies, it would be helpful to have that information so we can see if there is an opportunity for partnership and incorporate it into our plan.
  - Wind: Not a lot of potential or potential is too far from transmission lines.

BLM_0106472

- Lynn Padgett (Ouray County) knows of study that shows potential for wind energy in various places in the state where they locate a monitoring site for a year and move it around. The data is online with Colorado State University. *Action*: Lynn Padgett will forward Web site information to Bruce.
  - o Solar: We have found that there is low potential for solar in the Field Office.
    - Ouray, San Miguel, and Montrose counties have been approached by Sun Edison about solar projects.
    - Small solar projects on private in San Miguel County for direct use.
    - Solar Energy International located in Carbondale and Paonia would be a good resource for information.
  - o Geothermal: We have found Ouray and San Miguel Counties as the highest potential but this is mostly on private land and probably for direct use, smaller scale. (Bruce showed geothermal maps from renewable report.)
    - *Question*: Any idea at what depth the geothermal gradients were measured? *Action*: EMPSi will let Lynn Padgett know.
  - o *Question*: What about hydro power? *Answer*: Good question. This doesn't fall under the renewable section per se. It's not something we're looking at in our renewable report but if you know of any potential you should let us know so we can incorporate it into the RMP.
    - *B. Peterson*: We (Town of Paonia) are incorporating hydro into a new project that we have to replace our water treatment.
  - o *Question*: Is this going to be considered programmatically or case-by-case basis? *Answer*: We will probably be thinking about criteria for reviewing projects. We can't plan for everything right now.
  - o Biomass: Forest Service is doing a study. There is a research grant from Montana State and Rocky Mountain Research Station to do a supply assessment for the Uncompahgre Plateau including carbon sequestration and other information. The study includes federal and private landowners in San Miguel, Ouray, Montrose, and Delta counties.
  - o Along these lines, any studies that you know of, renewable or otherwise, would be nice to know about.
    - *Comment*: Montrose has a new comprehensive plan that would be something we'd want to look at. It's online. *Action*: EMPSi will download Montrose comprehensive plan.

## 5. Summary of Comments from Draft Scoping Report (Angie Adams)

- Handout: Summary of Public Comments by Resource Planning Issue Category (excerpt from internal Draft Scoping Report section 3.3). The summary is from the internal draft report and gives you a general summary of what the comments were. The final version of the report will be available on the Web site. The issues tie back to the planning issues and subtopics that were handed out at the last meeting. The planning issues are both public and internal issues that need to be addressed in this plan.
- On page 3-5 at the top it talks about special management areas. About 30 percent of comments we received were on this topic and we know this is a big deal. This gives you an idea of what those comments had to say.

## 6. Summary of the Analysis of the Management Situation (Bruce Krickbaum)

- The AMS documents current conditions, current management, opportunities for change. It will help us during the development of the RMP.
- Chapter 2 characterizes planning area and includes trends and forecasts. This chapter folds into Chapter 3 of the RMP, Affected Environment.
- Chapter 3 documents current management decisions which includes old RMPs, RMP amendments, and policy. The current management becomes No Action alternative of the RMP.

BLM_0106473

- Chapter 4 describes management opportunities. Discusses the management now and whether or not it's working and provides some ideas for opportunities for change. The opportunities for change may be made into alternatives in the RMP.
- Wild and Scenic Rivers (Barb Sharrow)
  - There are two river basins – Gunnison River Basin and San Miguel River Basin and tributaries to each. We are mandated to look at two alternatives, all suitable and none suitable, but we want to find a viable alternative in between and get input from the public so that we can make an informed suitability determination.
  - We'll have two processes. For the Gunnison, we've talked to Colorado River District out of Glenwood Springs who has funding and a facilitator and are interested in forming a group to look at the segments on the Gunnison, including those in Dominguez-Escalante National Conservation Area (NCA).
  - For the San Miguel there are a lot of interested groups; we have decided to go with the RAC Subgroup to facilitate the stakeholder meetings.
  - There will be a Wild and Scenic River presentation at the next meeting.
  - *Question:* Is the Gunnison Basin Roundtable part of the stakeholder group? *Answer:* I'm sure they will be.
  - *Comment:* There is not much of the Gunnison that doesn't go through areas like Gunnison Gorge NCA. *Answer:* We'll look at the planning area and the Dominguez-Escalante NCA.
    - The suitability determination for the Gunnison and other tributaries in the Gunnison Gorge NCA were made in the RMP for the Gunnison Gorge NCA.
  - *Question:* How do we fall into that process? *Answer:* The stakeholders will put something together and then give a presentation to this group so you can weigh in on what they think.

## 7. Alternatives Development (Angie Adams)
- PowerPoint presentation on alternatives (refer to handout)
- The RMP planning area is the field office minus the Gunnison Gorge and Dominguez-Escalante National Conservation Areas. Plans for those are separate. Decision area is all BLM lands and Federal mineral estate in the planning area. BLM has to make decisions on the federal mineral estate even where they are not the surface owner.
- Land use level planning is broad scale. Specific details are project level planning which tier to this plan. Project level plans include things like open/closed to mineral development. Think polygons on the landscape.
- There will be three major publications during: 1) Draft RMP/Draft EIS (large document); 2) Proposed RMP/Final EIS (smaller document); 3) Approved RMP/Record of Decision (smallest document).
- Planning criteria are sideboards. They help define the decision space for the BLM and what they can and cannot do.
- Planning issues help focus the alternatives. These come from scoping, including internal (BLM) and external (public). The issues cover most everything that the BLM does. The alternatives have to respond to those issues. They help keep the alternatives focused.
- Management units: After this weeks meeting, the Interdisciplinary Team is shying away from management units because it's just another layer of confusion. We can show graphically using GIS where management actions or allowable uses occur without having to speak in terms of units or emphasis areas.
- Stipulations example: When BLM gets an Application for Permit to Drill, they can use stipulations from RMP that are attached to the lease that say something like No Surface Occupancy because of a bat roost site or Timing Limitation for bald eagle wintering habitat.
- Alternatives Development: This week the Interdisciplinary Team reviewed current management action-by-action so that everyone could ensure that we documented what is actually going on

today. Where managements is different than the old RMPs, we documented why and where those decisions came from to get a picture of what current management is. Going forward, we will develop alternatives to each objective and action in the No Action alternative. New objectives and actions will also be created where new management is needed.

## 8. Resource/Resource Use Discussions

- ACECs (Bruce Krickbaum)
  - ○ PowerPoint presentation on ACECs. Refer to handouts: Areas of Critical Environmental Concern (ACECs), Existing and Proposed ACECs Considered, Figures (Existing and Proposed ACECs, Potential ACECs), and RMP Planning Area Fact Sheet 4.3 (Areas of Critical Environmental Concern).
  - ○ *Question*: ACECs, Wild and Scenic Rivers, oil and gas leasing, all of these components of your RMP will have a comment or scoping or review period for the public? *Answer*: Do you mean the baseline reports? The reason that we decided to send this out is because there are 11 areas that were proposed by the public during scoping so I want to make sure that we have the areas mapped correctly and that we captured their comments correctly. I'm especially hoping that those who proposed will review the report.
  - ○ *Question*: How will you manage ACECs? *Answer*: The management will likely vary by alternative. We might consider the Fairview South ACEC expansion in all alternatives. In one alternative we might say no motorize, no mechanized travel, no oil and gas. In another alternative, we might allow those uses. We want to protect the values but the level of protection could vary across alternative.
  - ○ *Question*: Would comments be valuable from adjacent land managers to let them know what their management is adjacent to those areas and to let the BLM know what type of management would be seamless? *Answer*: Yes, those comments would be valuable for areas where there are non-BLM lands adjacent to these areas. You all in this group can give us comments any time. The comment period for this is to finalize the report. It doesn't finalize any management. The management will go into the alternatives in the RMP. ACECs are different than Wilderness and Wilderness Study Areas (WSAs) because this is an administrative designation [versus legislative designation].
  - ○ *Question*: What information are you going to give the public? Are you going to give them the boundaries? *Answer*: The report will talk about ACECs and background information. Then there will be zoomed-in maps on each area and discuss the relevance and importance criteria of each proposed area and the values considered. A table will detail whether or not it meets any criteria and provide explanation. We want to know from the public if we got the map right, if we got the values right or did we miss anything, did we miss something in our evaluation?
  - ○ *Question*: When was scoping for ACECs? *Answer*: At the same time as scoping for the RMP. At the scoping meetings there was an information board for ACECs and we asked for comments on them.
- Lands with Wilderness Characteristics outside Existing WSAs (Amy Sharp)
  - ○ Lands with wilderness characteristics in this sense are lands outside of existing WSAs and wilderness, not the Tabeguache Area or others.
  - ○ This is not to designate new WSAs or Wilderness; the BLM does not have that authority.
  - ○ If we find an area that has characteristics, we'll look at it under an alternative but we don't have to have it under each alternative. We just need to look at it under one alternative and disclose that the area exists.
  - ○ *Question*: Over the past several years, wilderness bills have been proposed on portions of the Grand Mesa, Uncompahgre, and Gunnison National Forests. Are any areas shown on this map in portions of any of those bills? *Answer*: Yes, the Camel Back area. We will analyze

BLM_0106475

those areas in Diana DeGette's bill [HR 4289, Colorado Wilderness Act of 2009] that are not currently WSAs. There is an area in Norwood Canyon (below Norwood Bridge) that we must look at. We'll ask the Cooperating Agencies for comments on the Lands with Wilderness Characteristics report but we may not ask the public for additional comments.

o *Question*: When someone like DeGette proposes wilderness areas and you have to analyze them, do you get additional funding? *Answer*: It's tracked by our legislative affairs office and local agents have to provide testimony as to what is there, which Barb and others in the Field Office had to do. No funding is received.

## 9. Other Items Not on the Agenda

- None.

## 10. Action Items / Next Meeting

- All meetings are at 1:00pm:
  - o Thursday, July 22, 2010: Wild and Scenic Rivers, Cultural Resource, Paleontological Resources, and Special Status Species
  - o Thursday, August 19, 2010: Recreation, Soils, and Land Health Assessments
  - o Thursday, September 30, 2010: Visual Resources, Lands and Realty, Minerals
- ☐ *Action* (Bruce K.): We'll send out an agenda for the next meeting about a week before the meeting.
- ☐ *Action* (Lynn Padgett): Forward wind energy potential study Web site information to Bruce.
- ☐ *Action* (EMPSi): Let Lynn Padgett know the depth at which the geothermal gradients were measured.
- ☐ *Action* (EMPSi): Download Montrose comprehensive plan.

BLM_0106476



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401



## Highlights of the Resource Management Planning Process to Date
### *June 24, 2010*

- Notice of Intent (NOI) – 2/25/2010
- Scoping period – 12/23/2009 to 3/29/2010
- Scoping report – draft completed 5/25/2010
- Tribal consultation – initiated 2009 (ongoing)
- Community Assessment – report completed 2/2009
- Visual Resource Inventory – report completed 9/2009
- Analysis of Management Situation (AMS) – report completed 6/10/2010
- Economic workshops (6 communities) – held 3/2010
- Socioeconomic baseline assessment – draft report completed 4/26/2010
- Class I paleontological resources – report completed 2/2010
- Oil & Gas Reasonable Foreseeable Development (RFD) Scenario – draft report anticipated 6/2010
- Mineral potential report (excluding coal) – anticipated 7/2010
- Coal potential report – final report completed 4/26/2010
- Renewable energy potential report – final report completed 5/31/2010
- Class I cultural resources overview – draft report completed 4/2010
- Coordination with Cooperating Agencies – invitations sent 1/23/2009; meetings planned from 5/27/2010 forward
- ACEC evaluation report – underway; draft report anticipated 6/2010
- Wilderness characteristics report – draft report anticipated 7/2010
- Air quality report – anticipated 10/2010
- Wild and scenic rivers – draft eligibility report 12/2009; final eligibility report anticipated 6/2010; suitability report to follow
- Recreation focus groups – completed 3/2010; report completed 6/2010
- Alternatives development – anticipated 6/2010 through approximately 3/2011

BLM_0106477

# RESOURCE LIST

## RESOURCES

- Air
- Climate
- Geology
- Soils
- Water Resources
- Vegetation
  - *Forests and Woodlands*
  - *Rangelands*
  - *Riparian and Wetlands*
  - *Weeds*
- Fish and Wildlife
- Special Status Species
- Wild Horses
- Wildland Fire Ecology and Management
- Cultural Resources
- Paleontological Resources
- Visual Resources
- Lands with Wilderness Characteristics outside Existing Wilderness Study Areas

## RESOURCE USES

- Forest and Woodland Products
- Livestock Grazing
- Lands and Realty
  - *Renewable Energy*
  - *Utility Corridors and Communication Sites*
  - *Land Tenure*
  - *Land Use Authorizations*
  - *Withdrawals*
- Recreation and Visitor Services
- Comprehensive Trails and Travel Management
- Energy and Minerals
  - *Coal*
  - *Fluid Minerals (Oil and Gas, Geothermal)*
  - *Locatable Minerals*
  - *Mineral Materials*
  - *Non-energy Leasables*

## SPECIAL DESIGNATIONS

- Areas of Critical Environmental Concern
- Wilderness and Wilderness Study Areas
- Wild and Scenic Rivers
- Watchable Wildlife Areas
- National Trails and Scenic Byways

## SUPPORT

- Cadastral
- Interpretation and Environmental Education
- Transportation Facilities

## SOCIAL AND ECONOMIC CONDITIONS

- Native American Tribal Uses
- Public Health and Safety
- Socioeconomics
- Environmental Justice

BLM_0106478



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401



# COOPERATING AGENCY MEETING #2

## Thursday, June 24, 2010 (1:00 – 4:00 PM)

### Meeting Location:
### Holiday Inn Express
### 1391 South Townsend Avenue, Montrose, CO

# AGENDA

1. **Welcome**

2. **Introductions**

3. **Ground Rules**

4. **Planning Process to Date**

5. **Summary of Comments from Draft Scoping Report**

6. **Summary of the Analysis of the Management Situation**

7. **Alternatives Development**
   - Range of alternatives – review issue statements
   - Goals, objectives, standards, actions, allowable uses

8. **Decisions to be Made in the RMP**

9. **Resource/Resource Use Discussions**
   - Areas of Critical Environmental Concern
   - Lands with Wilderness Characteristics outside Wilderness Study Areas

10. **Other Items Not on the Agenda**

11. **Action Items / Next Meeting**

BLM_0106479



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401



# RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #2
## Friday, June 25, 2010 (9:00 AM – 12:00 PM)

### Meeting Location:
### Holiday Inn Express
### 1391 South Townsend Avenue, Montrose, CO

# AGENDA

1. **Welcome**

2. **Introductions**

3. **Ground Rules**

4. **RAC Subgroup Functions, Charter, and Role**
   - Define quorum

5. **Planning Process to Date**

6. **Summary of Comments from Draft Scoping Report**

7. **Summary of the Analysis of the Management Situation**

8. **Alternatives Development**
   - Range of alternatives – review issue statements
   - Goals, objectives, standards, actions, allowable uses

9. **Decisions to be Made in the RMP**

10. **Resource/Resource Use Discussions**
    - Areas of Critical Environmental Concern
    - Lands with Wilderness Characteristics outside Wilderness Study Areas

11. **Other Items Not on the Agenda**

12. **Public Comments / Questions**

13. **Action Items / Next Meeting**



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401



# RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #2
## Friday, June 25, 2010 (9:00 AM – 12:00 PM)

### Meeting Location:
### Holiday Inn Express
### 1391 South Townsend Avenue, Montrose, CO

# Meeting Minutes

**Attendees:** Angie Adams (EMPSi), Shelby Bear, Robbie Baird-LeValley, Bill Day, Richard Durnan, William Ela, Bruce Krickbaum (BLM Uncompahgre Field Office), Peter Mueller, Amy Sharp (BLM Uncompahgre Field Office), Barb Sharrow (BLM Uncompahgre Field Office), Steven Weist, Kate Wynant (EMPSi)

**Handouts:** Agenda, Resource List, Highlights of the Resource Management Planning Process to Date, Summary of Public Comments by Resource Planning Issue Category (excerpt from internal Draft Scoping Report section 3.3), Alternatives Development PowerPoint slides, Areas of Critical Environmental Concern (ACECs), Existing and Proposed ACECs Considered, Figures (Existing and Proposed ACECs, Potential ACECs), RMP Planning Area Fact Sheet 4.3 (Areas of Critical Environmental Concern), Wilderness Characteristics PowerPoint slides, and RMP Planning Area Fact Sheet 4.1 (Wilderness and WSAs)

## 1. Welcome (Barb Sharrow and Angie Adams)
- This week internally we worked on the no-action alternative from the old Resource Management Plans (RMPs); making sure Geographic Information Systems (GIS) data matches up; etc. so that moving forward with alternatives development we make sure that the baseline is accurate. We have not started developing any alternatives yet.
- Next time we'll bring back snippets from the alternatives development workshops that occur the same week as the meetings. Next time we'll also bring themes and goals from the alternatives for you to see.
- Handout: Resource List. It has all of the resources that this field office will cover in the RMP.

## 2. Introductions (All present)

## 3. Ground Rules (Angie Adams)
- Are there any ground rules this group would like to set? One is that the public has a chance to speak at 11:00am but they can't participate in discussion.
- *Question*: What type of rules did you come up with for the Cooperating Agencies? *Answer*: Only representatives can be at the table speaking for the agency. Other things such as no one's idea are bad ideas, all ideas are documented in notes and all have the opportunity to review meeting notes before we finalize them for the web, didn't need to raise hands to speak. We don't necessarily need to write these things down.

BLM_0106481

- Group agrees that formal ground rules are not necessary.

## 4. RAC Subgroup Functions, Charter, and Role (Angie Adams)

- The group wanted to table this until this meeting. Are there any thoughts?
- *Question*: What are the types of decisions we'll be making? *Answer*: You'll [RAC Subgroup] be looking at what we've [BLM] been doing to make sure we're on the right track. At some point we'll show you all of the alternatives and we'll be looking for approval that the BLM has covered a range of alternatives and that everyone's interest is captured somewhere in the range. Perhaps small decisions that would lead to that such as are you happy with the themes? Are the goals good to lead to a range of alternatives?
- *Question*: Can you define a quorum? Where do people get in trouble? *Answer*: You get in trouble when people don't come to meetings because a certain number of people have to attend meetings where we are voting on things. We would probably elect one of the non-RAC members to be a representative to run those votes.
  - o *Comment*: My feeling is that we can be informal as long as the RAC members are able to get the full idea of what we are thinking and get a consensus from the group to take back to the RAC.
  - o *Comment*: That makes sense. Are parties that are not here today people that are likely to show up? Were they here last time? *Answer*: Yes, they were here last time. So it seems like we have a good RAC Subgroup. It's important that if people are not going to attend that they let Bruce know so that if only a couple people are going to show up we can make other arrangements.
- *Question* (Bruce K.): In e-mails I send before the meeting, should I ask people to RSVP only if they cannot make it? *Answer*: Yes, if there is no reply then we assume that you are going to make it.
- The informal group process makes sense to me as long as we can get a consensus from the group and take things back to the RAC. We can still put things to vote, we just don't need to have a quorum.
  - o *Comment*: I think Bill and Peter should call for a vote if you are not sure what the consensus of the group is so that you can be sure you understand where the group is leaning.
- There are actually three categories of the RAC and the RAC wanted to make sure that there was a liaison for each of those categories represented.

## 5. Planning Process to Date (Angie Adams)

- Handout: Planning Process to Date.
- *Action*: When the BLM posts documents to the Web site, Bruce will send an e-mail to the group notifying them of its availability.
- Changes from last time:
  - o Wild and Scenic River (WSR) Final Eligibility report is complete and will be on the web in the next couple weeks.
  - o Recreation Focus Groups were held in February and March; the report will be on the web in the next week or two.
  - o Draft ACEC Evaluation Report will be on web in next week or two. This is draft; we welcome your feedback and the feedback from those citizens and groups that made recommendations for ACEC. We want to make sure that we got the boundaries and values right and the area represents what they were intending.
  - o Analysis of the Management Situation (AMS): This will also be on the web in next week or two.
- *Question*: Last time you mentioned coal report going on the Web site but I have not seen it yet. Is it on there? *Answer*: The coal report is not on there yet and won't be available until the draft RMP comes out. The reports that the public has been involved with via public meetings or

BLM_0106482

another way such as scoping will be posted. The reports that are internal for information purposes won't be posted.
- A reminder that none of the studies make any decisions but rather gather information in one place and document the baseline condition.

## 6. Summary of Comments from Draft Scoping Report
- Handout: Summary of Public Comments by Resource Planning Issue Category (excerpt from internal Draft Scoping Report section 3.3). The summary from the internal draft scoping report is a snippet from the internal draft which has just been reviewed by BLM. We [EMPSi] are now going to finalize it and then it will be available on the web. This shows you where the most comments were received and what people had to say. For example, we didn't hear much on livestock grazing and people are generally ok with it.
- On page 3-5 at the top it talks about special management areas. About 30 percent of comments we received were on this topic and we know this is a big deal. This gives you an idea of what those comments had to say.
- There's probably not much in here that you didn't expect as you know what the public has to say on certain issues.
- When the final scoping report comes out, it'll have every unique comment that was received. Over half the report is the comments.
- We got five times more comments than any other field office in the state which is great but it also means that there is lots of discussion out there.

## 7. Summary of the Analysis of the Management Situation (Bruce Krickbaum)
- Bruce passed around AMS, to be posted on web soon.
- Chapter 2 characterizes planning area; discusses what's out there now, what resources look like, what are trends and forecasts for resources and resource uses. This information feeds into chapter 3 of the RMP.
- Chapter 3 describes current management which describes how we're managing lands now and reflects the old RMPS and their amendments as well as other policy that might have replaced our decisions in the RMPs. This forms the basis of the Current Management alternative.
- Chapter 4 takes those decisions from Chapter 3 and asks the question does it work or doesn't it work? Are they still valid or do they need to change? Those that need to change we describe some opportunities for change and document why it doesn't work. Those opportunities for change fold into the alternatives and provide us ideas for some of the alternatives for changing current management.
- The AMS will be on the web site soon.
- All of the pieces get rolled into the RMP/Environmental Impact Statement (EIS). It's all useful and is a good exercise to put all of the current management in one place to get a picture of what that looks like. This is what we've been doing this week with the team to make sure what we have down is correct and is an accurate baseline.

## 8. Alternatives Development (Angie Adams)
- PowerPoint presentation on alternatives (refer to handout).
- The RMP planning area is the field office minus the Gunnison Gorge and Dominguez-Escalante National Conservation Areas. Plans for those are separate. Decision area is all BLM lands and Federal mineral estate in the planning area. BLM has to make decisions on the federal mineral estate.
- Land use level planning is broad scale. Specific details are project level planning which tier to this plan. Project level plans include things like open/closed to mineral development. Think polygons on the landscape.

BLM_0106483

- There will be three major publications during: 1) Draft RMP/Draft EIS (large document); 2) Proposed RMP/Final EIS (smaller document); 3) Approved RMP/Record of Decision (smallest document).
- *Question*: When you get it down to the Proposed RMP, is the RAC Subgroup through? *Answer*: That's for this group to decide. The first mission is to decide whether or not the BLM has covered an adequate range of alternatives. If this group decides you want to continue and help with comment review and response and help BLM select a preferred alternative, then that is an option that this group can think about.
- Planning criteria are sideboards. They help define the decision space for the BLM and what they can and cannot do.
- Planning issues help focus the alternatives. These come from scoping, including internal (BLM) and external (public). The issues cover most everything that the BLM does. The alternatives have to respond to those issues. They help keep the alternatives focused.
- Management units: we talked about the possibility last meeting with this group. This week with the BLM Interdisciplinary Team we got feedback on the usefulness of these units. The group, having worked with two RMPs that have emphasis areas, decided that they didn't think they needed units. The reason is because of GIS which can readily show the areas where we are going to do something or not do something. We can say "open *xx* acres for oil and gas leasing" and then show those areas on a map instead of having to talk about it in terms of management units. We can still do units if BLM, Cooperating Agencies, or RAC Subgroup thinks we should. It doesn't mean there are not going to be geographical differences, we just don't need to have the extra management unit layer. We might still use them for certain resources. Any feedback?
  - o I think just using GIS is a good idea and not adding that extra layer.
  - o The old system seems a bit antiquated (no GIS), so I'm all for simplifying.
  - o Angie: It adds a lot of repetition. The blue blob on the map is going to be the same whether or not you add the units. This does not take away the understanding and importance of the social, economic, etc. of the differences of the communities in this field office. This doesn't minimize those differences.
    - ▪ *Comment*: No, it seems like it actually emphasizes them because you don't have to make one size fit all for a certain planning unit. You can see the differences graphically in the different areas.
    - ▪ *Comment*: Sounds like we can be more effective that way. *Angie*: At least as effective without another layer of confusion.
- Goals are the same for all alternatives. There are goals for a resource and that is the final outcome that the BLM wants to get to. Each resource section has its own goal.
- Objectives are different ways to reach the goal. They may or may not be different between alternative.
  - o *Question*: Has there been some internal guidance? It seems like in some litigation the BLM has gotten in trouble? Is there guidance to make these more bullet-proof? *Answer*: Court cases are increasingly defining what we can do. Methane capture is one thing that is a big issue right now. There is no specific guidance right now, but I hope that soon we are going to get more specific guidance. Air quality is another example. Each plan is different because there is new guidance coming down. We'll take the latest guidance in this plan and go with it. I think where plans really get in trouble is when they disregard guidance from Washington.
- *Question*: My guiding light is sustainability. If you come up with so many animal units per acre, I'd like to see somewhere in this sustainable. It's hard to achieve because population grows, but it's the only way to make sure the land is used properly for the future. Have I missed sustainability anywhere here? *Answer*: It's in BLMs mission (multiple use and sustained yield). Animal Unit Months change over the years and there is space in this plan for change due to adaptive management.

BLM_0106484

- o *Comment*: If the mission changes, I think that's when people get in trouble with law suits. It comes back to sustainability. *Answer*: Sustainability comes up in alternatives often because I think the BLM team realizes the importance of sustainability. This is the sort of feedback that we need when you are reviewing the materials coming up. If that needs to be more of an emphasis, let us know.
- *Comment*: When you narrow the box because of stipulations, it doesn't allow room for new information. I'm thinking specifically on the Gunnison River. We'd like to implement a research project but we can't because under the RMP it would require an additional amount of NEPA work. We were trying to set up a grazing research project for Gunnison sage-grouse. Could we graze prior to mid-may in the project area for a shorter period of time and move off to see what that would do to forbs development. The RMP said that there could be no grazing before mid-May. *Answer*: That's where we need your help to think through some of these scenarios to see if it's going to restrict some of these things down the road. We know that climate change is happening and plants are moving up higher.
  - o *Question*: Have you gotten internal guidance on that? *Answer*: No, but we have flexibility to look at some of those things. We've had examples in the UFO where we had to say no because the RMP didn't allow it. Sometimes it's good, but we also want the flexibility to adapt and change.
- *Question*: Can you talk about the issue statements? *Answer*: There is a handout from last meeting that details the issue statements. The issue statements themselves are the boldface, and there are details below about what the issues entail. You should become familiar with these as we'll be referring to them a lot.
  - o *Question*: Are these a compilation of the BLM and public? *Answer*: Yes. Originally they were authored by the BLM through internal scoping. Then they were refined and added to through public scoping. Most of the things the BLM had already come up with which means the staff are in touch with what is not working out there.
- Current management is the baseline; here's what's happening now and here's how we could change it or not change it. Big question is does current management need to change? Is it broken? This is where the BLM is now, getting current management in top shape and then asking whether or not it needs fixing.
- The range of alternatives can play out in the stipulations. In an example of threatened and endangered species, one alternative could protect the species with No Surface Occupancy, one alternative could protect the species with Controlled Surface Use, and one alternative could protect by doing something else. An alternative that says do whatever you want is not a reasonable alternative because it doesn't meet the goal of protecting the species, nor does it meet the law (Endangered Species Act), which is one of the planning criteria.
- The BLM Land Use Planning Handbook (H-1601-1) Appendix C; tells the BLM what decisions the BLM has to make for each resource.
  - o *Action*: We will provide it as a handout next time and a link to the electronic version for your review prior to the next meeting.
- *Question*: Categorical Exclusions were not considered in the 1985 or 1989 plans, correct? *Answer*: Categorical Exclusions are a type of NEPA document, so they were in existence.
  - o *Comment*: I thought that some plans in the old RMPs were changed by Categorical Exclusions. *Answer*: No. At this level, RMP decisions are only changed by RMP amendments, which is a public process. Only an Environmental Assessment or EIS can amend a plan. A Categorical Exclusion is only used for projects that we've already determined to comply with our plan or is on our list of Categorical Exclusions. If it's not on the list, we have to do an Environmental Assessment or EIS. Every federal agency has a Categorical Exclusion list and the projects on the list have been documented that they would not cause significant environmental effects. They still have to go through a checklist to make sure that the project would not have impacts.

BLM_0106485

- o An example is that they do a Categorical Exclusion to increase the flow on the Dolores to protect species.
- o Another is putting in a cattle guard. We still check to make sure there are no threatened or endangered species or cultural sites, for example.
- *Question*: Do I understand that if there's a need to change current management, do you need to come up with three alternatives? *Answer*: No. Sometimes an action is the same for two or more action alternatives if the actions would meet the objective under each alternative.

## 9. Resource/Resource Use Discussions

- Areas of Critical Environmental Concern (ACECs) (Bruce Krickbaum)
  - o PowerPoint presentation on ACECs. Refer to handouts: Areas of Critical Environmental Concern (ACECs), Existing and Proposed ACECs Considered, Figures (Existing and Proposed ACECs, Potential ACECs), and RMP Planning Area Fact Sheet 4.3 (Areas of Critical Environmental Concern).
  - o Proposed ACECs must meet at least one relevance criterion and at least one importance critierion.
    - ▪ *Question*: Does sensitive mean on the state sensitive list? *Answer*: Yes, it could be threatened or endangered or a BLM sensitive species.
  - o The alternatives can have different sizes of ACECs.
  - o *Question*: Where is Slick Rock Canyon on the Dolores? I thought that was outside of the UFO. *Answer*: No, it's upstream of Bedrock.
  - o The document is going out as a draft to make sure that we captured all of the comments accurately. We are not accepting new ACEC nominations.
    - ▪ *Question*: How are you going to distribute? Will it just be on the website? *Answer*: Yes, we're going to post it on the web site and send an e-mail to everyone on the mailing list for whom we have an e-mail address.
    - ▪ *Question*: Are there protections that are afforded to these areas? *Answer*: Yes, each area will have specific management prescriptions for the area. The management actions could change across alternatives. There is not a specific set of management actions, they are tailored to each area.
    - ▪ For example, Needle Rock (80 acres) is withdrawn from mineral entry and a suite of other actions. Fairview North in the Gunnison Gorge National Conservation Area we had to fence the area to protect the values.
- Lands with Wilderness Characteristics outside Wilderness Study Areas (Amy Sharp)
  - o PowerPoint presentation on Lands with Wilderness Characteristics outside Wilderness Study Areas. Refer to handouts: Wilderness Characteristics PowerPoint slides and RMP Planning Area Fact Sheet 4.1 (Wilderness and WSAs).
  - o *Question*: How many areas were nominated by the public? *Answer*: I don't think we got any that discussed specific areas but rather that we do this project. There were some comments that told us to look at Diana DeGette's bill [HR 4289, Colorado Wilderness Act of 2009] and the Citizens' Wilderness Proposals were the same as those in DeGette's bill. We just got the guidance from Washington so this process is just starting, unlike the ACEC process.
  - o *Question*: When you analyze GIS and aerial photography will you be using current aerial photography? *Answer*: Yes, and our aerial photography is from 2009, pretty current. If it looks like an area meets all of the criteria, we will be ground-truthing. As Amy said, the definition of a road in this instance is different than travel management. It has to be mechanically maintained. Mechanically made does not necessarily mean mechanically maintained.
  - o Actions for other resources might inadvertently protect a single wilderness characteristic. For example, an ACEC might overlap and provide inadvertent protection for a wilderness characteristic.

BLM_0106486

- o *Question:* Is the recreational equivalent to this and ACECs a special recreation management area (SRMA)? *Answer:* An SRMA would be an area that we would intensively manage for recreation. It has its own set of management prescriptions and desired outcomes. The recreation focus group meetings resulted in several SRMA proposals and we will be writing an SRMA report, similar to the ACEC report and Lands with Wilderness Characteristics report. We're finding that most of the SRMAs are located near communities.
- o *Question:* By "if lands with wilderness characteristics are present in the planning area, they will be addressed in the RMP" how will they be addressed? *Answer:* We'll call it out in the RMP as an area that met the characteristics and we'll describe the management prescriptions for that area under one or more alternatives.
- o *Comment:* I can't imagine that you'll find any areas that you didn't find already. *Response:* Probably not but it's something that we're required to look at in the RMP process. Someone might have also discounted something in the old surveys for whatever reason.

## 10. Public Comments/Questions
- No public present.

## 11. Other Items Not on the Agenda
- Wild and Scenic Rivers (Barb Sharrow)
  - o WSR is going to be something big that we have to address in the RMP. Because of all of the RMPs in the state that have gone through the process, there seems to be some confusion and misinformation about what the WSR process entails. I think that it merits extra meetings as water in the West is a big issue. BLM could use your help in conducting these meetings.
  - o In 1930s the Colorado Water Conservation Board (CWCB) was formed by state legislation and is split up into different districts in the state. The Gunnison River Basin is managed by CWCB in Glenwood Springs. The San Miguel River Basin is managed by the CWCB out of Cortez. Stakeholders for each basin don't necessarily care about issues going on for the other basin so I've determined that we need a group for each basin.
  - o The CWCB is willing to lead a group for the Gunnison, including the Uncompahgre Field Office and the Dominguez-Escalante National Conservation Area.
  - o I would like to ask if you'd be willing to sponsor the meetings for the San Miguel. We have a lot of groups that are interested but we need a neutral group. The CWCB out of Cortez is wrapped up with the Dolores as the San Juan RMP found most of the Dolores River suitable so there is a large group of stakeholders for that. Is this something that you'd be willing to take on? I'm thinking there would be three meetings in the area. This would be mostly an educational effort as there seems to be a lot of misinformation. The Upper San Miguel has recreation and Lower San Miguel has mining issues. The BLM would pay for the meetings and a professional facilitator. We'd like a certain number of people in the RAC Subgroup to attend to report back to the group here. Not everyone would have to go.
  - o *Question:* If we didn't do it what would happen? *Answer:* We'd have to find another group.
  - o *Question:* Is there a reason you asked this group and not the public lands partnership? *Answer:* Yes, because I think you can do it and because it's part of your role for this plan to help us come up with alternatives.
  - o *Question:* So the perception wouldn't be that this group is promoting one range over another range? *Answer:* No, it would be to try and educate and try to get the best information from the folks that participate at those meetings.
  - o *Question:* With there being such a wide range of interpretation between the conservancy districts and others, there seems to be a wide range of interpretation let alone misinformation. *Answer:* Right. That's why we need some education. A lot of questions and issues that come up we'll have to document.

BLM_0106487

- o *Question*: Chris Treese has interpreted information differently than some of the Federal agencies. How would that be presented? *Answer*: We have a lot of information available to us (www.rivers.gov). if there are different interpretations that come up, we would use those resources to see how the law has been interpreted.
- o *Question*: So you're looking for a diverse group to attend these meetings and hear with the locals are saying and distill the misinformation, thoughts, etc. and bring that back here? *Answer*: Yes. That sounds challenging. There is a lot of anxiety around the issue.
- o *Question*: Can you give us an idea how much difference this can make? I'm ok with spending time on something if it'll make a difference, but if the management will be the same I might not be interested in participating. *Answer*: The Glenwood Springs and Kremmling Field Offices stakeholder group has come up with an alternative for the RMP that is an alternative to WSR suitability. They have an actual plan for managing the river to protect the values. The purpose of the act was to prevent damming of the river. The biggest fear is that people won't be able to keep their water rights. People are thinking they might want to sell their right and turn the right into municipal water rights. At that point their water rights would be junior. On the other side there are people who want to protect the river for fish, boating, riparian, etc.
- o *Question*: Does it take an act of Congress to get that? *Answer*: Yes, it takes an act of Congress to designate a WSR. Whatever we find suitable, we have to manage to protect those values. It doesn't prevent a dam going up, but we have to do what is within our authority to protect the values.
- o *Question*: Is this just the San Miguel? *Answer*: It also includes a portion of the Dolores and also the tributaries to it.
- o *Question*: Does this look at the Dolores above the confluence with the San Miguel? *Answer*: Yes, those that are eligible.
- o There will also be BLM staff that are subject matter experts so that you are not there to be in the hot seat.
- o *Question*: Would this replace, similar to the Dolores where they've had monthly meetings, would this be those meetings? *Answer*: We're not as far along as they are, they're only looking at the Dolores within their field office. They've talked to Congressman Salazar and there might be legislation proposed. If there is legislation passed, that would be a done deal and off our plates. They also want to look at the Dolores to the confluence with the Colorado River in Utah. They are also proposing a National Conservation Area and Wilderness. The group isn't unanimous with their desire to look at the stretch all the way to the Colorado River, but it doesn't seem worthwhile to have legislation with just a small piece of the river. So while the legislation might look at the whole thing, the stakeholder group is trying to be more hands off with the lower Dolores and engage the Uncompahgre Field Office and stakeholders here.
- o *Question*: Should we put it to a vote? Barb is trying to get help from a group that can filter the thoughts of folks in an area and I am in support of it.
    - ▪ I would also like to put in a plug for the importance of the two rivers to resources including wildlife. The issue is as important as anything in the UFO. Anything that affects those two rivers is important to the RMP.
    - ▪ I agree. You can see from the comments and ACECs that are proposed, a lot of those areas are along the San Miguel. My interests are recreational and I think it's important.
- o It would probably be nights. The group is to be neutral, there to educate the public. You all represent a variety of interests. It's kind of like scoping for suitability. We have specific criteria that we want to get information on.
- o Group agrees that they would participate.
- o *Question*: Is there someone that can work with Bruce and Barb to get a facilitator and getting the stakeholder group together? Robbie LeValley and Richard Durnan are interested.

o *Question*: Is this something that Mesa State would facilitate? *Answer*: They are a possibility. I [BLM] want a professional facilitator.

## 12. Action Items/Next Meeting

- Friday, July 23, 2010: WSR, Cultural Resource, Paleontological Resources, Special Status Species
- Friday, August 20, 2010: Recreation, Soils, Land Health Assessments
  o Shelby won't be at August meeting.
- Friday, October 1, 2010: Visual Resources, Lands and Realty, Minerals
- Action (Bruce K. and RAC Subgroup members): Bruce will send out meeting reminders prior to the next meeting. Members do not need to RSVP unless they will not be able to attend the meeting.
- Action (Bruce K.): When the BLM posts documents to the Web site, Bruce will send an e-mail to the group notifying them of its availability.
- Action (BLM): We will provide Appendix C of the BLM Land Use Planning Handbook as a handout next time and a link to the electronic version for your review prior to the next meeting.

BLM_0106489



# United States Department of the Interior

## BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
Montrose, Colorado



TAKE PRIDE
IN AMERICA

## RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #2

### Friday, June 25, 2010 (9:00 AM – 12:00 PM)

### Meeting Location:
### Holiday Inn Express
### 1391 S. Townsend Avenue, Montrose, CO

| Last Name | First Name | Initial | Address | E-Mail | Phone |
|---|---|---|---|---|---|
| Adams | Angie | | EMPSi<br>3775 Iris Ave, Ste 1A<br>Boulder, CO 80301 | angie.adams@empsi.com | 303-446-7160 |
| Armstrong | Lori | | BLM, Southwest Colorado<br>District Manager<br>2465 S. Townsend Ave.<br>Montrose, CO 81401 | valori_armstrong@blm.gov | 970-240-5336 |
| Bear | Shelby | | DMEA<br>PO Box 910<br>Montrose, CO 81402 | sbear@dmea.com | w: 970-240-1238 |
| Baird-LeValley | Robbie | | Colorado State Univ. Extension<br>525 Dodge Street<br>Delta, CO 81416 | robbie.levalley@colostate.edu | w: 970-874-2195 |
| Blackburn | Walt | | | | |
| Day | Bill | | | | |
| Durnan | Richard | | | | |
| Ela | William | | | | |
| Kauffman | Dave | | BLM, Uncompahgre Field Office<br>2465 S. Townsend Ave.<br>Montrose, CO 81401 | dave_kauffman@blm.gov | 970-240-5340 |
| Krickbaum | Bruce | | BLM, Uncompahgre Field Office<br>2465 S. Townsend Ave.<br>Montrose, CO 81401 | bruce_krickbaum@blm.gov | 970-240-5384 |
| Mueller | Peter | | PO Box 3140<br>Telluride, CO 81435 | pmueller@tnc.org | w: 970-728-5291 |
| Reams | John | | Western Small Miner's Assoc.<br>31527 Hwy 141<br>PO Box 644<br>Naturita, CO 81422 | john@reams-construction.com | w: 970-865-2886 |
| Sharrow | Barb | | BLM, Uncompahgre Field Office | barbara_sharrow@blm.gov | 970-240-5315 |

BLM_0106490

Resource Advisory Council Subgroup Meeting #2                                          Friday, June 25, 2010

| Last Name | First Name | Initial | Address | E-Mail | Phone |
|-----------|-----------|---------|---------|--------|-------|
| | | | 2465 S. Townsend Ave. Montrose, CO 81401 | | |
| Weist | Steven D. | ⟨signature⟩ | Oxbow Mining 3737 Hwy 133 PO Box 535 Somerset, CO 81434 | steve.weist@oxbow.com | w: 970-929-6461 ▮ |
| Welt | Kathy | | ▮▮▮▮▮▮▮▮▮▮▮ | | |
| Wynant | Kate | VW | EMPSi 3775 Iris Ave, Ste 1A Boulder, CO 80301 | kate.wynant@empsi.com | 303-446-7160 |
| Sharp | Amy | AS | BLM | Amy_Sharp@blm.gov | 970-240-5387 |

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **To:** | Barbara_Sharrow@blm.gov; Angie Adams; Kate Wynant; Aschroeder@usbr.gov; kjensen@ci.montrose.co.us; renzo.delpiccolo@state.co.us; shansen@deltacounty.com; MPelletier@gunnisoncounty.org; swhite@montrosecounty.net; lpadgett@ouraycountyco.gov; lynn@mtngeogeek.com; daves@sanmiguelcounty.org; pat@cedaredgecolorado.com; townofpaonia@tds.net; jcoates@town.ridgway.co.us; tkrandallparker@fs.fed.us; segfahlt@gmail.com; Bruce_Krickbaum@co.blm.gov; joanm@sanmiguelcounty.org; gbaker%cityofmontrose@blm.gov |
| **Subject:** | Draft Minutes; RMP Cooperating Agency |
| **Date:** | Wednesday, July 07, 2010 5:20:37 PM |
| **Attachments:** | Notes CA Mtg2 062410 Draft.doc |

Hello Cooperating Agency Reps,

I have attached draft notes of the June 24 Uncompahgre RMP Cooperating Agency meeting. Please review the draft notes and let me know of any errors or omissions no later than Tuesday July 13. After that date, the notes will be revised and submitted to all group members and the administrative record.

Thank you. Bruce

 (See attached file: Notes_CA_Mtg2_062410_Draft.doc)

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401



# COOPERATING AGENCY MEETING #2

## Thursday, June 24, 2010 (1:00 – 4:00 PM)

### Meeting Location:
### Holiday Inn Express
### 1391 South Townsend Avenue, Montrose, CO

# Meeting Notes

**Attendees:** Angie Adams (EMPSi), Gary Baker (City of Montrose), Jen Coates (Town of Ridgway), Renzo DelPiccolo (Colorado Department of Natural Resources, Soutwest Region), Susan Hansen (Delta County BOCC), Bruce Krickbaum (BLM Uncompahgre Field Office), William Long (Town of Nucla), Joan May (San Miguel County BOCC), Patricia Means (Town of Cedaredge), Lynn Padgett (Ouray County BOCC), Mike Pelletier (Gunnison County), Barbara Peterson (Town of Paonia), Tamera Randall-Parker (US Forest Service – GMUG National Forests), Dave Schneck (San Miguel County BOCC), Alan Schroeder (Bureau of Reclamation, Western Colorado Area Office), Amy Sharp (BLM Uncompahgre Field Office), Barb Sharrow (BLM Uncompahgre Field Office), Steve White (Montrose County BOCC), Kate Wynant (EMPSi)

**Handouts:** Agenda, Resource List, Highlights of the Resource Management Planning Process to Date, Summary of Public Comments by Resource Planning Issue Category (excerpt from internal Draft Scoping Report section 3.3), Alternatives Development PowerPoint slides, Areas of Critical Environmental Concern (ACECs), Existing and Proposed ACECs Considered, Figures (Existing and Proposed ACECs, Potential ACECs), RMP Planning Area Fact Sheet 4.3 (Areas of Critical Environmental Concern), Wilderness Characteristics PowerPoint slides, and RMP Planning Area Fact Sheet 4.1 (Wilderness and WSAs)

## 1. Welcome (Barb Sharrow and Angie Adams)

- This week internally we worked on the No Action alternative from the old Resource Management Plans (RMPs); making sure Geographic Information Systems (GIS) data matches up; etc. so that moving forward with alternatives development we make sure that the baseline is accurate. We have not started developing any alternatives yet.
- Next time we'll bring back snippets from the alternatives development workshops that occur the same week as the meetings. Next time we'll also bring themes and goals from the alternatives for you to see.
- Handout: Resource List. It has all of the resources that this field office will cover in the RMP.

## 2. Introductions (All present)

BLM_0106493

## 3.  Ground Rules (Angie Adams)

- Let's talk about ground rules for the group. Are there any you'd like to set?
- Representation
  - *Question:* Where are we with representation? Can we have an advisor or proxy (alternate) attend the meetings? *Answer:* Yes. That is fine that someone else from your agency attends. We want to have a place at the table for all of the appointed representatives. Any members from your agency can attend and speak through the designated representative so that we can focus on the issues, otherwise we increase the number of people and the potential for side-conversations. Three hours may seem short, but the more people and discussions, the more meetings we might need. Others are welcome to come and vet ideas through the representative. They can also come to the Resource Advisory Council (RAC) Subgroup meetings and make comments or ask questions during that meeting, which is a public meeting. Does this seem fair to everyone?
    - No comment; inferred that everyone agrees.
  - *Question:* If a designated person can't attend, can they send an alternate to speak? *Answer:* In some cases there are designated alternates (in the Memorandum of Understanding). If someone else is coming, we want to know about it in advance and it is the representatives' job to make sure the alternate is up to speed. It's a consistency issue for everyone so we don't have to keep everyone up to speed. It is fine for someone else to come and listen to the meetings and report back to the representative and not speak at the meetings.
  - *Question:* Is this a consensus-driven group? Is this an advisory body? How does what comes out of this group get incorporated into the RMP? *Answer:* We're going to strive for consensus; we won't always be able to achieve 100 percent on every issue. Everyone will get their viewpoint documented in the notes which people can review at the end of each meeting. We won't vote on items, but the BLM will take back what you have to say and disseminate it to the team.
    - *Barb:* You all know things about your agency and constituents that we can marry up with our plan so that it isn't in conflict with other things that are going on. This is a critical role that the cooperating agencies play.
- Backtracking: We are not going to spend time at meetings to discuss that happened at past meetings to get people up to speed. If we need to pick up a discussion from the last meeting because there wasn't resolution, we can do that. That is not backtracking. Everyone should read the notes to get up to speed and also to ensure that everything was captured properly in the notes.
- Other ideas from Angie:
  - Everyone has opportunity to equal time to speak if they want it.
  - No personal attacks.
  - No one's idea is nonsense. We'll listen to any ideas that need to be discussed.
  - If we seem to be getting off-track on something, the group can police Angie as the facilitator to let her know that we need to get back on track.
  - Discretion on sensitive issues. What you see is internal, in progress. We would ask that you respect that. We know that you have to go back to your agencies and discuss things but not disseminated.
    - *Comment:* This is a red flag for elected officials. We have strict rules about what can be confidential and what can't and what happens at these meetings doesn't fall into that. If a constituent asks me what happened at the meeting I have to tell them. *Response:* We don't want the newspapers saying, "This is what the BLM has decided to do," or constituents thinking this is where we're going when we may decide to go in a different direction. This is a long process and revisions are probable.

BLM_0106494

- *Comment*: I also have an issue with the expectation that an agency will not protest the plan. I cannot promise that we won't do that. *Response*: The purpose is that there is enough consensus that there won't be a reason for the agency to sue or protest. If so, you can participate outside of this forum.
  - *Question*: What if we don't know? *Answer*: When you do know, please be open with us and *cooperate*. If you get to a point that you do know, then please excuse yourself as a Cooperating Agency.
  - *Question*: What if there is a certain issue that you know you might take legal action on but don't want to give up your right to participate in the other discussions. *Answer*: Please be upfront with us and the other Cooperating Agencies here. We might also be able to come up with a way to avoid legal action. We want to come up with the best plan possible for this region and Cooperating Agency participation is critical.
- *Comment*: I like the fact that the agency with expertise is making the decisions and then the political interests get fought out later. I'm concerned that a lot of us have political interests and not resource interests. *Response*: We have the RAC Subgroup that represents the public and certain viewpoints. That is the real voice of the citizens. We also got over 25,000 scoping comments; the public will also be able to review the draft plan and comment and NEPA requires us to review and respond to those comments when crafting the draft plan. It does boil down to a BLM plan and decisions. They have the opportunity to say this is what's best for the resource and even thought that's what the public or Cooperating Agencies might want, we can't do it because of the sideboards. There are other avenues besides this group.
  - *Comment*: I would hope that the resource management is the primary driver at this stage.
  - *Comment*: We are here as a resource to the BLM. When we start thinking about the values of this plan, we can think about how the plan lines up with the values of our community and the community interests.
- Civility, letting other people talk without interruption, limiting side conversations.
- *Question*: How would you like us to have our dialogue? Raise hands? *Answer*: I'm ok with not raising hands but if we get to a point where people are talking over each other or interrupting we can start raising hands.
  - Group agrees.

## 4. Planning Process to Date (Angie Adams)
- Handout: Highlights of the Resource Management Planning Process to Date.
- The Analysis of the Management Situation (AMS) will be posted on Web site shortly. The document is a baseline report: what's on BLM lands, current management decisions, how those decisions are working (are they working, do they need to change, opportunities for new management).
- Final Wild and Scenic River Eligibility Report will be on Web site shortly.
- Recreation focus groups: results of those meetings held in February and March will be on Web site shortly.
- Areas of Critical Environmental Concern (ACEC) Evaluation Report: the draft report will be online in the next week or two.
- All of these reports are baseline studies, none of which make any decisions.
- Renewable Energy (Barb Sharrow)
  - We are mandated to make decisions in our plan now. We have done some studies on the potential of resources in the area, but if any of the Cooperating Agencies have done studies, it would be helpful to have that information so we can see if there is an opportunity for partnership and incorporate it into our plan.
  - Wind: Not a lot of potential or potential is too far from transmission lines.

BLM_0106495

- Lynn Padgett (Ouray County) knows of study that shows potential for wind energy in various places in the state where they locate a monitoring site for a year and move it around. The data is online with Colorado State University. *Action*: Lynn Padgett will forward Web site information to Bruce.
- o Solar: We have found that there is low potential for solar in the Field Office.
  - Ouray, San Miguel, and Montrose counties have been approached by Sun Edison about solar projects.
  - Small solar projects on private in San Miguel County for direct use.
  - Solar International in Paonia would be a good resource for information.
- o Geothermal: We have found Ouray and San Miguel Counties as the highest potential but this is mostly on private land and probably for direct use, smaller scale. (Bruce showed geothermal maps from renewable report.)
  - *Question*: Any idea at what depth the geothermal gradients were measured? *Action*: EMPSi will let Lynn Padgett know.
- o *Question*: What about hydro power? *Answer*: Good question. This doesn't fall under the renewable section per se. It's not something we're looking at in our renewable report but if you know of any potential you should let us know so we can incorporate it into the RMP.
  - *B. Peterson*: We (Town of Paonia) are incorporating hydro into a new project that we have to replace our water treatment.
- o *Question*: Is this going to be considered programmatically or case-by-case basis? *Answer*: We will probably be thinking about criteria for reviewing projects. We can't plan for everything right now.
- o Biomass: Forest Service is doing a study. There is a research grant from Montana State and Rocky Mountain Research Station to do an assessment for the Uncompahgre Plateau including carbon sequestration and other information. The study includes private landowners in San Miguel, Ouray, Montrose, and Delta counties.
- o Along these lines, any studies that you know of, renewable or otherwise, would be nice to know about.
  - *Comment*: Montrose has a new comprehensive plan that would be something we'd want to look at. It's online. *Action*: EMPSi will download Montrose comprehensive plan.

## 5. Summary of Comments from Draft Scoping Report (Angie Adams)

- Handout: Summary of Public Comments by Resource Planning Issue Category (excerpt from internal Draft Scoping Report section 3.3). The summary is from the internal draft report and gives you a general summary of what the comments were. The final version of the report will be available on the Web site. The issues tie back to the planning issues and subtopics that were handed out at the last meeting. The planning issues are both public and internal issues that need to be addressed in this plan.
- On page 3-5 at the top it talks about special management areas. About 30 percent of comments we received were on this topic and we know this is a big deal. This gives you an idea of what those comments had to say.

## 6. Summary of the Analysis of the Management Situation (Bruce Krickbaum)

- The AMS documents current conditions, current management, opportunities for change. It will help us during the development of the RMP.
- Chapter 2 characterizes planning area and includes trends and forecasts. This chapter folds into Chapter 3 of the RMP, Affected Environment.
- Chapter 3 documents current management decisions which includes old RMPs, RMP amendments, and policy. The current management becomes No Action alternative of the RMP.

BLM_0106496

- Chapter 4 describes management opportunities. Discusses the management now and whether or not it's working and provides some ideas for opportunities for change. The opportunities for change may be made into alternatives in the RMP.
- Wild and Scenic Rivers (Barb Sharrow)
  o There are two river basins – Gunnison River Basin and San Miguel River Basin and tributaries to each. We are mandated to look at two alternatives, all suitable and none suitable, but we want to find a viable alternative in between and get input from the public so that we can make an informed suitability determination.
  o We'll have two processes. For the Gunnison, we've talked to Colorado River District out of Glenwood Springs who has funding and a facilitator and are interested in forming a group to look at the segments on the Gunnison, including those in Dominguez-Escalante National Conservation Area (NCA).
  o For the San Miguel there are a lot of interested groups; we have decided to go with the RAC Subgroup to facilitate the stakeholder meetings.
  o There will be a Wild and Scenic River presentation at the next meeting.
  o *Question*: Is the Gunnison Basin Roundtable part of the stakeholder group? *Answer*: I'm sure they will be.
  o *Comment*: There is not much of the Gunnison that doesn't go through areas like Gunnison Gorge NCA. *Answer*: We'll look at the planning area and the Dominguez-Escalante NCA.
    ▪ The suitability determination for the Gunnison and other tributaries in the Gunnison Gorge NCA were made in the RMP for the Gunnison Gorge NCA.
  o *Question*: How do we fall into that process? *Answer*: The stakeholders will put something together and then give a presentation to this group so you can weigh in on what they think.

## 7. Alternatives Development (Angie Adams)

- PowerPoint presentation on alternatives (refer to handout)
- The RMP planning area is the field office minus the Gunnison Gorge and Dominguez-Escalante National Conservation Areas. Plans for those are separate. Decision area is all BLM lands and Federal mineral estate in the planning area. BLM has to make decisions on the federal mineral estate even where they are not the surface owner.
- Land use level planning is broad scale. Specific details are project level planning which tier to this plan. Project level plans include things like open/closed to mineral development. Think polygons on the landscape.
- There will be three major publications during: 1) Draft RMP/Draft EIS (large document); 2) Proposed RMP/Final EIS (smaller document); 3) Approved RMP/Record of Decision (smallest document).
- Planning criteria are sideboards. They help define the decision space for the BLM and what they can and cannot do.
- Planning issues help focus the alternatives. These come from scoping, including internal (BLM) and external (public). The issues cover most everything that the BLM does. The alternatives have to respond to those issues. They help keep the alternatives focused.
- Management units: After this weeks meeting, the Interdisciplinary Team is shying away from management units because it's just another layer of confusion. We can show graphically using GIS where management actions or allowable uses occur without having to speak in terms of units or emphasis areas.
- Stipulations example: When BLM gets an Application for Permit to Drill, they can use stipulations from RMP that are attached to the lease that say something like No Surface Occupancy because of a bat roost site or Timing Limitation for bald eagle wintering habitat.
- Alternatives Development: This week the Interdisciplinary Team reviewed current management action-by-action so that everyone could ensure that we documented what is actually going on

today. Where managements is different than the old RMPs, we documented why and where those decisions came from to get a picture of what current management is. Going forward, we will develop alternatives to each objective and action in the No Action alternative. New objectives and actions will also be created where new management is needed.

## 8. Resource/Resource Use Discussions

- ACECs (Bruce Krickbaum)
  - ○ PowerPoint presentation on ACECs. Refer to handouts: Areas of Critical Environmental Concern (ACECs), Existing and Proposed ACECs Considered, Figures (Existing and Proposed ACECs, Potential ACECs), and RMP Planning Area Fact Sheet 4.3 (Areas of Critical Environmental Concern).
  - ○ *Question*: ACECs, Wild and Scenic Rivers, oil and gas leasing, all of these components of your RMP will have a comment or scoping or review period for the public? *Answer*: Do you mean the baseline reports? The reason that we decided to send this out is because there are 11 areas that were proposed by the public during scoping so I want to make sure that we have the areas mapped correctly and that we captured their comments correctly. I'm especially hoping that those who proposed will review the report.
  - ○ *Question*: How will you manage ACECs? *Answer*: The management will likely vary by alternative. We might consider the Fairview South ACEC expansion in all alternatives. In one alternative we might say no motorize, no mechanized travel, no oil and gas. In another alternative, we might allow those uses. We want to protect the values but the level of protection could vary across alternative.
  - ○ *Question*: Would comments be valuable from adjacent land managers to let them know what their management is adjacent to those areas and to let the BLM know what type of management would be seamless? *Answer*: Yes, those comments would be valuable for areas where there are non-BLM lands adjacent to these areas. You all in this group can give us comments any time. The comment period for this is to finalize the report. It doesn't finalize any management. The management will go into the alternatives in the RMP. ACECs are different than Wilderness and Wilderness Study Areas (WSAs) because this is an administrative designation [versus legislative designation].
  - ○ *Question*: What information are you going to give the public? Are you going to give them the boundaries? *Answer*: The report will talk about ACECs and background information. Then there will be zoomed-in maps on each area and discuss the relevance and importance criteria of each proposed area and the values considered. A table will detail whether or not it meets any criteria and provide explanation. We want to know from the public if we got the map right, if we got the values right or did we miss anything, did we miss something in our evaluation?
  - ○ *Question*: When was scoping for ACECs? *Answer*: At the same time as scoping for the RMP. At the scoping meetings there was an information board for ACECs and we asked for comments on them.
- Lands with Wilderness Characteristics outside Existing WSAs (Amy Sharp)
  - ○ Lands with wilderness characteristics in this sense are lands outside of existing WSAs and wilderness, not the Tabeguache Area or others.
  - ○ This is not to designate new WSAs or Wilderness; the BLM does not have that authority.
  - ○ If we find an area that has characteristics, we'll look at it under an alternative but we don't have to have it under each alternative. We just need to look at it under one alternative and disclose that the area exists.
  - ○ *Question*: Over the past several years, wilderness bills have been proposed on portions of the Grand Mesa, Uncompahgre, and Gunnison National Forests. Are any areas shown on this map in portions of any of those bills? *Answer*: Yes, the Camel Back area. We will analyze

BLM_0106498

those areas in Diana DeGette's bill [HR 4289, Colorado Wilderness Act of 2009] that are not currently WSAs. There is an area in Norwood Canyon (below Norwood Bridge) that we must look at. We'll ask the Cooperating Agencies for comments on the Lands with Wilderness Characteristics report but we may not ask the public for additional comments.

o *Question*: When someone like DeGette proposes wilderness areas and you have to analyze them, do you get additional funding? *Answer*: It's tracked by our legislative affairs office and local agents have to provide testimony as to what is there, which Barb and others in the Field Office had to do. No funding is received.

## 9. Other Items Not on the Agenda

- None.

## 10. Action Items / Next Meeting

- All meetings are at 1:00pm:
  o Thursday, July 22, 2010: Wild and Scenic Rivers, Cultural Resource, Paleontological Resources, and Special Status Species
  o Thursday, August 19, 2010: Recreation, Soils, and Land Health Assessments
  o Thursday, September 30, 2010: Visual Resources, Lands and Realty, Minerals
- ☐ *Action* (Bruce K.): We'll send out an agenda for the next meeting about a week before the meeting.
- ☐ *Action* (Lynn Padgett): Forward wind energy potential study Web site information to Bruce.
- ☐ *Action* (EMPSi): Let Lynn Padgett know the depth at which the geothermal gradients were measured.
- ☐ *Action* (EMPSi): Download Montrose comprehensive plan.

| From: | bruce_krickbaum@blm.gov |
| --- | --- |
| To: | sbear@dmea.com; Steve.weist@oxbow.com; billday@paonia.com; rich@richdurnanphoto.com; Robbie.levalley@colostate.edu; pmueller@tnc.org; silvers1@tds.net; Barbara_Sharrow@blm.gov; Bruce_Krickbaum@co.blm.gov; Angie Adams; Kate Wynant |
| Subject: | Draft Minutes: Uncompahgre RMP RAC Subgroup Meeting #2 |
| Date: | Wednesday, July 07, 2010 5:28:15 PM |
| Attachments: | Minutes_UFO-SG_2010-06-25_Draft.doc |

Hello RAC Sub-group members,

I have attached draft minutes of the June 24 Uncompahgre RMP RAC Subgroup
meeting held on June 25.  Please review the draft minutes and let me know
of
any errors or omissions by Tuesday July 13, after which they will be
revised
and submitted to all group members and the administrative record.

As promised during the meeting, we will hand out Appendix C of the BLM
Land Use Planning Handbook at the next meeting.  In the mean time, you may
view an electronic copy of the full handbook on the BLM's Web site here:
http://www.blm.gov/pgdata/etc/medialib/blm/wo/Information_Resources_Management/policy/blm_handbook.Par.38665.File.dat/h1601-1.pdf
.

Thank you,  Bruce

<><><><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384


 (See attached file: Minutes_UFO-SG_2010-06-25_Draft.doc)


PLEASE NOTE: This message, including any attachments, may include
privileged, confidential and/or inside information. Any distribution or use
of this communication by anyone other than the intended recipient is
strictly prohibited and may be unlawful. If you are not the intended
recipient, please notify the sender by replying to this message and then
delete it from your system.

BLM_0106500



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401

# RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #2
## Friday, June 25, 2010 (9:00 AM – 12:00 PM)

## Meeting Location:
### Holiday Inn Express
### 1391 South Townsend Avenue, Montrose, CO

**Attendees:** Angie Adams (EMPSi), Shelby Bear, Robbie Baird-LeValley, Bill Day, Richard Durnan, William Ela, Bruce Krickbaum (BLM Uncompahgre Field Office), Peter Mueller, Amy Sharp (BLM Uncompahgre Field Office), Barb Sharrow (BLM Uncompahgre Field Office), Steven Weist, Kate Wynant (EMPSi)

**Handouts:** Agenda, Resource List, Highlights of the Resource Management Planning Process to Date, Summary of Public Comments by Resource Planning Issue Category (excerpt from internal Draft Scoping Report section 3.3), Alternatives Development PowerPoint slides, Areas of Critical Environmental Concern (ACECs), Existing and Proposed ACECs Considered, Figures (Existing and Proposed ACECs, Potential ACECs), RMP Planning Area Fact Sheet 4.3 (Areas of Critical Environmental Concern), Wilderness Characteristics PowerPoint slides, and RMP Planning Area Fact Sheet 4.1 (Wilderness and WSAs)

## 1. Welcome (Barb Sharrow and Angie Adams)
- This week internally we worked on the no-action alternative from the old Resource Management Plans (RMPs); making sure Geographic Information Systems (GIS) data matches up; etc. so that moving forward with alternatives development we make sure that the baseline is accurate. We have not started developing any alternatives yet.
- Next time we'll bring back snippets from the alternatives development workshops that occur the same week as the meetings. Next time we'll also bring themes and goals from the alternatives for you to see.
- Handout: Resource List. It has all of the resources that this field office will cover in the RMP.

## 2. Introductions (All present)

## 3. Ground Rules (Angie Adams)
- Are there any ground rules this group would like to set? One is that the public has a chance to speak at 11:00am but they can't participate in discussion.
- *Question*: What type of rules did you come up with for the Cooperating Agencies? *Answer*: Only representatives can be at the table speaking for the agency. Other things such as no one's idea are bad ideas, all ideas are documented in notes and all have the opportunity to review meeting notes before we finalize them for the web, didn't need to raise hands to speak. We don't necessarily need to write these things down.
- Group agrees that formal ground rules are not necessary.

---

BLM_0106501

## 4. RAC Subgroup Functions, Charter, and Role (Angie Adams)

- The group wanted to table this until this meeting. Are there any thoughts?
- *Question*: What are the types of decisions we'll be making? *Answer*: You'll [RAC Subgroup] be looking at what we've [BLM] been doing to make sure we're on the right track. At some point we'll show you all of the alternatives and we'll be looking for approval that the BLM has covered a range of alternatives and that everyone's interest is captured somewhere in the range. Perhaps small decisions that would lead to that such as are you happy with the themes? Are the goals good to lead to a range of alternatives?
- *Question*: Can you define a quorum? Where do people get in trouble? *Answer*: You get in trouble when people don't come to meetings because a certain number of people have to attend meetings where we are voting on things. We would probably elect one of the non-RAC members to be a representative to run those votes.
  - *Comment*: My feeling is that we can be informal as long as the RAC members are able to get the full idea of what we are thinking and get a consensus from the group to take back to the RAC.
  - *Comment*: That makes sense. Are parties that are not here today people that are likely to show up? Were they here last time? *Answer*: Yes, they were here last time. So it seems like we have a good RAC Subgroup. It's important that if people are not going to attend that they let Bruce know so that if only a couple people are going to show up we can make other arrangements.
- *Question* (Bruce K.): In e-mails I send before the meeting, should I ask people to RSVP only if they cannot make it? *Answer*: Yes, if there is no reply then we assume that you are going to make it.
- The informal group process makes sense to me as long as we can get a consensus from the group and take things back to the RAC. We can still put things to vote, we just don't need to have a quorum.
  - *Comment*: I think Bill and Peter should call for a vote if you are not sure what the consensus of the group is so that you can be sure you understand where the group is leaning.
- There are actually three categories of the RAC and the RAC wanted to make sure that there was a liaison for each of those categories represented.

## 5. Planning Process to Date (Angie Adams)

- Handout: Planning Process to Date.
- *Action*: When the BLM posts documents to the Web site, Bruce will send an e-mail to the group notifying them of its availability.
- Changes from last time:
  - Wild and Scenic River (WSR) Final Eligibility report is complete and will be on the web in the next couple weeks.
  - Recreation Focus Groups were held in February and March; the report will be on the web in the next week or two.
  - Draft ACEC Evaluation Report will be on web in next week or two. This is draft; we welcome your feedback and the feedback from those citizens and groups that made recommendations for ACEC. We want to make sure that we got the boundaries and values right and the area represents what they were intending.
  - Analysis of the Management Situation (AMS): This will also be on the web in next week or two.
- *Question*: Last time you mentioned coal report going on the Web site but I have not seen it yet. Is it on there? *Answer*: The coal report is not on there yet and won't be available until the draft RMP comes out. The reports that the public has been involved with via public meetings or another way such as scoping will be posted. The reports that are internal for information purposes won't be posted.

- A reminder that none of the studies make any decisions but rather gather information in one place and document the baseline condition.

## 6. Summary of Comments from Draft Scoping Report

- Handout: Summary of Public Comments by Resource Planning Issue Category (excerpt from internal Draft Scoping Report section 3.3). The summary from the internal draft scoping report is a snippet from the internal draft which has just been reviewed by BLM. We [EMPSi] are now going to finalize it and then it will be available on the web. This shows you where the most comments were received and what people had to say. For example, we didn't hear much on livestock grazing and people are generally ok with it.
- On page 3-5 at the top it talks about special management areas. About 30 percent of comments we received were on this topic and we know this is a big deal. This gives you an idea of what those comments had to say.
- There's probably not much in here that you didn't expect as you know what the public has to say on certain issues.
- When the final scoping report comes out, it'll have every unique comment that was received. Over half the report is the comments.
- We got five times more comments than any other field office in the state which is great but it also means that there is lots of discussion out there.

## 7. Summary of the Analysis of the Management Situation (Bruce Krickbaum)

- Bruce passed around AMS, to be posted on web soon.
- Chapter 2 characterizes planning area; discusses what's out there now, what resources look like, what are trends and forecasts for resources and resource uses. This information feeds into chapter 3 of the RMP.
- Chapter 3 describes current management which describes how we're managing lands now and reflects the old RMPS and their amendments as well as other policy that might have replaced our decisions in the RMPs. This forms the basis of the Current Management alternative.
- Chapter 4 takes those decisions from Chapter 3 and asks the question does it work or doesn't it work? Are they still valid or do they need to change? Those that need to change we describe some opportunities for change and document why it doesn't work. Those opportunities for change fold into the alternatives and provide us ideas for some of the alternatives for changing current management.
- The AMS will be on the web site soon.
- All of the pieces get rolled into the RMP/Environmental Impact Statement (EIS). It's all useful and is a good exercise to put all of the current management in one place to get a picture of what that looks like. This is what we've been doing this week with the team to make sure what we have down is correct and is an accurate baseline.

## 8. Alternatives Development (Angie Adams)

- PowerPoint presentation on alternatives (refer to handout).
- The RMP planning area is the field office minus the Gunnison Gorge and Dominguez-Escalante National Conservation Areas. Plans for those are separate. Decision area is all BLM lands and Federal mineral estate in the planning area. BLM has to make decisions on the federal mineral estate.
- Land use level planning is broad scale. Specific details are project level planning which tier to this plan. Project level plans include things like open/closed to mineral development. Think polygons on the landscape.
- There will be three major publications during: 1) Draft RMP/Draft EIS (large document); 2) Proposed RMP/Final EIS (smaller document); 3) Approved RMP/Record of Decision (smallest document).

BLM_0106503

- *Question*: When you get it down to the Proposed RMP, is the RAC Subgroup through? *Answer*: That's for this group to decide. The first mission is to decide whether or not the BLM has covered an adequate range of alternatives. If this group decides you want to continue and help with comment review and response and help BLM select a preferred alternative, then that is an option that this group can think about.
- Planning criteria are sideboards. They help define the decision space for the BLM and what they can and cannot do.
- Planning issues help focus the alternatives. These come from scoping, including internal (BLM) and external (public). The issues cover most everything that the BLM does. The alternatives have to respond to those issues. They help keep the alternatives focused.
- Management units: we talked about the possibility last meeting with this group. This week with the BLM Interdisciplinary Team we got feedback on the usefulness of these units. The group, having worked with two RMPs that have emphasis areas, decided that they didn't think they needed units. The reason is because of GIS which can readily show the areas where we are going to do something or not do something. We can say "open *xx* acres for oil and gas leasing" and then show those areas on a map instead of having to talk about it in terms of management units. We can still do units if BLM, Cooperating Agencies, or RAC Subgroup thinks we should. It doesn't mean there are not going to be geographical differences, we just don't need to have the extra management unit layer. We might still use them for certain resources. Any feedback?
  - I think just using GIS is a good idea and not adding that extra layer.
  - The old system seems a bit antiquated (no GIS), so I'm all for simplifying.
  - Angie: It adds a lot of repetition. The blue blob on the map is going to be the same whether or not you add the units. This does not take away the understanding and importance of the social, economic, etc. of the differences of the communities in this field office. This doesn't minimize those differences.
    - *Comment*: No, it seems like it actually emphasizes them because you don't have to make one size fit all for a certain planning unit. You can see the differences graphically in the different areas.
    - *Comment*: Sounds like we can be more effective that way. *Angie*: At least as effective without another layer of confusion.
- Goals are the same for all alternatives. There are goals for a resource and that is the final outcome that the BLM wants to get to. Each resource section has its own goal.
- Objectives are different ways to reach the goal. They may or may not be different between alternative.
  - *Question*: Has there been some internal guidance? It seems like in some litigation the BLM has gotten in trouble? Is there guidance to make these more bullet-proof? *Answer*: Court cases are increasingly defining what we can do. Methane capture is one thing that is a big issue right now. There is no specific guidance right now, but I hope that soon we are going to get more specific guidance. Air quality is another example. Each plan is different because there is new guidance coming down. We'll take the latest guidance in this plan and go with it. I think where plans really get in trouble is when they disregard guidance from Washington.
- *Question*: My guiding light is sustainability. If you come up with so many animal units per acre, I'd like to see somewhere in this sustainable. It's hard to achieve because population grows, but it's the only way to make sure the land is used properly for the future. Have I missed sustainability anywhere here? *Answer*: It's in BLMs mission (multiple use and sustained yield). Animal Unit Months change over the years and there is space in this plan for change due to adaptive management.
  - *Comment*: If the mission changes, I think that's when people get in trouble with law suits. It comes back to sustainability. *Answer*: Sustainability comes up in alternatives often because I think the BLM team realizes the importance of sustainability. This is the sort of feedback

BLM_0106504

that we need when you are reviewing the materials coming up. If that needs to be more of an emphasis, let us know.

- *Comment*: When you narrow the box because of stipulations, it doesn't allow room for new information. I'm thinking specifically on the Gunnison River. We'd like to implement a research project but we can't because under the RMP it would require an additional amount of NEPA work. We were trying to set up a grazing research project for Gunnison sage-grouse. Could we graze prior to mid-may in the project area for a shorter period of time and move off to see what that that would do to forbs development. The RMP said that there could be no grazing before mid-May. *Answer*: That's where we need your help to think through some of these scenarios to see if it's going to restrict some of these things down the road. We know that climate change is happening and plants are moving up higher.
  - o *Question*: Have you gotten internal guidance on that? *Answer*: No, but we have flexibility to look at some of those things. We've had examples in the UFO where we had to say no because the RMP didn't allow it. Sometimes it's good, but we also want the flexibility to adapt and change.
- *Question*: Can you talk about the issue statements? *Answer*: There is a handout from last meeting that details the issue statements. The issue statements themselves are the boldface, and there are details below about what the issues entail. You should become familiar with these as we'll be referring to them a lot.
  - o *Question*: Are these a compilation of the BLM and public? *Answer*: Yes. Originally they were authored by the BLM through internal scoping. Then they were refined and added to through public scoping. Most of the things the BLM had already come up with which means the staff are in touch with what is not working out there.
- Current management is the baseline; here's what's happening now and here's how we could change it or not change it. Big question is does current management need to change? Is it broken? This is where the BLM is now, getting current management in top shape and then asking whether or not it needs fixing.
- The range of alternatives can play out in the stipulations. In an example of threatened and endangered species, one alternative could protect the species with No Surface Occupancy, one alternative could protect the species with Controlled Surface Use, and one alternative could protect by doing something else. An alternative that says do whatever you want is not a reasonable alternative because it doesn't meet the goal of protecting the species, nor does it meet the law (Endangered Species Act), which is one of the planning criteria.
- The BLM Land Use Planning Handbook (H-1601-1) Appendix C; tells the BLM what decisions the BLM has to make for each resource.
  - o *Action*: We will provide it as a handout next time and a link to the electronic version for your review prior to the next meeting.
- *Question*: Categorical Exclusions were not considered in the 1985 or 1989 plans, correct? *Answer*: Categorical Exclusions are a type of NEPA document, so they were in existence.
  - o *Comment*: I thought that some plans in the old RMPs were changed by Categorical Exclusions. *Answer*: No. At this level, RMP decisions are only changed by RMP amendments, which is a public process. Only an Environmental Assessment or EIS can amend a plan. A Categorical Exclusion is only used for projects that we've already determined to comply with our plan or is on our list of Categorical Exclusions. If it's not on the list, we have to do an Environmental Assessment or EIS. Every federal agency has a Categorical Exclusion list and the projects on the list have been documented that they would not cause significant environmental effects. They still have to go through a checklist to make sure that the project would not have impacts.
  - o An example is that they do a Categorical Exclusion to increase the flow on the Dolores to protect species.
  - o Another is putting in a cattle guard. We still check to make sure there are no threatened or endangered species or cultural sites, for example.

BLM_0106505

- *Question*: Do I understand that if there's a need to change current management, do you need to come up with three alternatives? *Answer*: No. Sometimes an action is the same for two or more action alternatives if the actions would meet the objective under each alternative.

## 9.  Resource/Resource Use Discussions

- Areas of Critical Environmental Concern (ACECs) (Bruce Krickbaum)
  - o PowerPoint presentation on ACECs. Refer to handouts: Areas of Critical Environmental Concern (ACECs), Existing and Proposed ACECs Considered, Figures (Existing and Proposed ACECs, Potential ACECs), and RMP Planning Area Fact Sheet 4.3 (Areas of Critical Environmental Concern).
  - o Proposed ACECs must meet at least one relevance criterion and at least one importance critierion.
    - ▪ *Question*: Does sensitive mean on the state sensitive list? *Answer*: Yes, it could be threatened or endangered or a BLM sensitive species.
  - o The alternatives can have different sizes of ACECs.
  - o *Question*: Where is Slick Rock Canyon on the Dolores? I thought that was outside of the UFO. *Answer*: No, it's upstream of Bedrock.
  - o The document is going out as a draft to make sure that we captured all of the comments accurately. We are not accepting new ACEC nominations.
    - ▪ *Question*: How are you going to distribute? Will it just be on the website? *Answer*: Yes, we're going to post it on the web site and send an e-mail to everyone on the mailing list for whom we have an e-mail address.
    - ▪ *Question*: Are there protections that are afforded to these areas? *Answer*: Yes, each area will have specific management prescriptions for the area. The management actions could change across alternatives. There is not a specific set of management actions, they are tailored to each area.
    - ▪ For example, Needle Rock (80 acres) is withdrawn from mineral entry and a suite of other actions. Fairview North in the Gunnison Gorge National Conservation Area we had to fence the area to protect the values.
- Lands with Wilderness Characteristics outside Wilderness Study Areas (Amy Sharp)
  - o PowerPoint presentation on Lands with Wilderness Characteristics outside Wilderness Study Areas. Refer to handouts: Wilderness Characteristics PowerPoint slides and RMP Planning Area Fact Sheet 4.1 (Wilderness and WSAs).
  - o *Question*: How many areas were nominated by the public? *Answer*: I don't think we got any that discussed specific areas but rather that we do this project. There were some comments that told us to look at Diana DeGette's bill [HR 4289, Colorado Wilderness Act of 2009] and the Citizens' Wilderness Proposals were the same as those in DeGette's bill. We just got the guidance from Washington so this process is just starting, unlike the ACEC process.
  - o *Question*: When you analyze GIS and aerial photography will you be using current aerial photography? *Answer*: Yes, and our aerial photography is from 2009, pretty current. If it looks like an area meets all of the criteria, we will be ground-truthing. As Amy said, the definition of a road in this instance is different than travel management. It has to be mechanically maintained. Mechanically made does not necessarily mean mechanically maintained.
  - o Actions for other resources might inadvertently protect a single wilderness characteristic. For example, an ACEC might overlap and provide inadvertent protection for a wilderness characteristic.
  - o *Question*: Is the recreational equivalent to this and ACECs a special recreation management area (SRMA)? *Answer*: An SRMA would be an area that we would intensively manage for recreation. It has its own set of management prescriptions and desired outcomes. The recreation focus group meetings resulted in several SRMA proposals and we will be writing

BLM_0106506

an SRMA report, similar to the ACEC report and Lands with Wilderness Characteristics report. We're finding that most of the SRMAs are located near communities.
- o *Question*: By "if lands with wilderness characteristics are present in the planning area, they will be addressed in the RMP" how will they be addressed? *Answer*: We'll call it out in the RMP as an area that met the characteristics and we'll describe the management prescriptions for that area under one or more alternatives.
- o *Comment*: I can't imagine that you'll find any areas that you didn't find already. *Response*: Probably not but it's something that we're required to look at in the RMP process. Someone might have also discounted something in the old surveys for whatever reason.

## 10. Public Comments/Questions
- • No public present.

## 11. Other Items Not on the Agenda
- • Wild and Scenic Rivers (Barb Sharrow)
  - o WSR is going to be something big that we have to address in the RMP. Because of all of the RMPs in the state that have gone through the process, there seems to be some confusion and misinformation about what the WSR process entails. I think that it merits extra meetings as water in the West is a big issue. BLM could use your help in conducting these meetings.
  - o In 1930s the Colorado Water Conservation Board (CWCB) was formed by state legislation and is split up into different districts in the state. The Gunnison River Basin is managed by CWCB in Glenwood Springs. The San Miguel River Basin is managed by the CWCB out of Cortez. Stakeholders for each basin don't necessarily care about issues going on for the other basin so I've determined that we need a group for each basin.
  - o The CWCB is willing to lead a group for the Gunnison, including the Uncompahgre Field Office and the Dominguez-Escalante National Conservation Area.
  - o I would like to ask if you'd be willing to sponsor the meetings for the San Miguel. We have a lot of groups that are interested but we need a neutral group. The CWCB out of Cortez is wrapped up with the Dolores as the San Juan RMP found most of the Dolores River suitable so there is a large group of stakeholders for that. Is this something that you'd be willing to take on? I'm thinking there would be three meetings in the area. This would be mostly an educational effort as there seems to be a lot of misinformation. The Upper San Miguel has recreation and Lower San Miguel has mining issues. The BLM would pay for the meetings and a professional facilitator. We'd like a certain number of people in the RAC Subgroup to attend to report back to the group here. Not everyone would have to go.
  - o *Question*: If we didn't do it what would happen? *Answer*: We'd have to find another group.
  - o *Question*: Is there a reason you asked this group and not the public lands partnership? *Answer*: Yes, because I think you can do it and because it's part of your role for this plan to help us come up with alternatives.
  - o *Question*: So the perception wouldn't be that this group is promoting one range over another range? *Answer*: No, it would be to try and educate and try to get the best information from the folks that participate at those meetings.
  - o *Question*: With there being such a wide range of interpretation between the conservancy districts and others, there seems to be a wide range of interpretation let alone misinformation. *Answer*: Right. That's why we need some education. A lot of questions and issues that come up we'll have to document.
  - o *Question*: Chris Treese has interpreted information differently than some of the Federal agencies. How would that be presented? *Answer*: We have a lot of information available to us (www.rivers.gov). if there are different interpretations that come up, we would use those resources to see how the law has been interpreted.

BLM_0106507

- o  *Question*: So you're looking for a diverse group to attend these meetings and hear with the locals are saying and distill the misinformation, thoughts, etc. and bring that back here? *Answer*: Yes. That sounds challenging. There is a lot of anxiety around the issue.
- o  *Question*: Can you give us an idea how much difference this can make? I'm ok with spending time on something if it'll make a difference, but if the management will be the same I might not be interested in participating. *Answer*: The Glenwood Springs and Kremmling Field Offices stakeholder group has come up with an alternative for the RMP that is an alternative to WSR suitability. They have an actual plan for managing the river to protect the values. The purpose of the act was to prevent damming of the river. The biggest fear is that people won't be able to keep their water rights. People are thinking they might want to sell their right and turn the right into municipal water rights. At that point their water rights would be junior. On the other side there are people who want to protect the river for fish, boating, riparian, etc.
- o  *Question*: Does it take an act of Congress to get that? *Answer*: Yes, it takes an act of Congress to designate a WSR. Whatever we find suitable, we have to manage to protect those values. It doesn't prevent a dam going up, but we have to do what is within our authority to protect the values.
- o  *Question*: Is this just the San Miguel? *Answer*: It also includes a portion of the Dolores and also the tributaries to it.
- o  *Question*: Does this look at the Dolores above the confluence with the San Miguel? *Answer*: Yes, those that are eligible.
- o  There will also be BLM staff that are subject matter experts so that you are not there to be in the hot seat.
- o  *Question*: Would this replace, similar to the Dolores where they've had monthly meetings, would this be those meetings? *Answer*: We're not as far along as they are, they're only looking at the Dolores within their field office. They've talked to Congressman Salazar and there might be legislation proposed. If there is legislation passed, that would be a done deal and off our plates. They also want to look at the Dolores to the confluence with the Colorado River in Utah. They are also proposing a National Conservation Area and Wilderness. The group isn't unanimous with their desire to look at the stretch all the way to the Colorado River, but it doesn't seem worthwhile to have legislation with just a small piece of the river. So while the legislation might look at the whole thing, the stakeholder group is trying to be more hands off with the lower Dolores and engage the Uncompahgre Field Office and stakeholders here.
- o  *Question*: Should we put it to a vote? Barb is trying to get help from a group that can filter the thoughts of folks in an area and I am in support of it.
  - ▪  I would also like to put in a plug for the importance of the two rivers to resources including wildlife. The issue is as important as anything in the UFO. Anything that affects those two rivers is important to the RMP.
  - ▪  I agree. You can see from the comments and ACECs that are proposed, a lot of those areas are along the San Miguel. My interests are recreational and I think it's important.
- o  It would probably be nights. The group is to be neutral, there to educate the public. You all represent a variety of interests. It's kind of like scoping for suitability. We have specific criteria that we want to get information on.
- o  Group agrees that they would participate.
- o  *Question*: Is there someone that can work with Bruce and Barb to get a facilitator and getting the stakeholder group together? Robbie LeValley and Richard Durnan are interested.
- o  *Question*: Is this something that Mesa State would facilitate? *Answer*: They are a possibility. I [BLM] want a professional facilitator.

## 12. Action Items/Next Meeting

- •  Friday, July 23, 2010: WSR, Cultural Resource, Paleontological Resources, Special Status Species

- Friday, August 20, 2010: Recreation, Soils, Land Health Assessments
  - Shelby won't be at August meeting.
- Friday, October 1, 2010: Visual Resources, Lands and Realty, Minerals
- Action (Bruce K. and RAC Subgroup members): Bruce will send out meeting reminders prior to the next meeting. Members do not need to RSVP unless they will not be able to attend the meeting.
- Action (Bruce K.): When the BLM posts documents to the Web site, Bruce will send an e-mail to the group notifying them of its availability.
- Action (BLM): We will provide Appendix C of the BLM Land Use Planning Handbook as a handout next time and a link to the electronic version for your review prior to the next meeting.

BLM_0106509

**Kate Wynant**

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **Sent:** | Thursday, October 07, 2010 4:32 PM |
| **To:** | Barbara_Sharrow@blm.gov; Angie Adams; Kate Wynant; Aschroeder@usbr.gov; renzo.delpiccolo@state.co.us; shansen@deltacounty.com; MPelletier@gunnisoncounty.org; swhite@montrosecounty.net; lpadgett@ouraycountyco.gov; lynn@mtngeogeek.com; joanm@sanmiguelcounty.org; daves@sanmiguelcounty.org; pat@cedaredgecolorado.com; mjreagan@fone.net; norwoodparker@centurytel.net; townofpaonia@tds.net; lbroyles@fs.fed.us; segfahlt@gmail.com; Bruce_Krickbaum@co.blm.gov; UFO AR |
| **Subject:** | Draft Notes: Uncompahgre RMP Cooperating Agency Meeting #5 |
| **Attachments:** | UFO-CA_2010-09-30_DraftNotes.doc |

Hello Cooperating Agency Reps,

I have attached draft notes of the September 30 Uncompahgre RMP Cooperating Agency meeting.  Please review the draft notes and let me know of any errors or omissions no later than Friday, October 15.  After that date, the notes will be revised and submitted to all group members and the administrative record.

Reminder:  the November 4 meeting has been cancelled - we will most likely reschedule for January (date undetermined).

Thank you, Bruce

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

(See attached file: UFO-CA_2010-09-30_DraftNotes.doc)

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

BLM_0106510



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401



# COOPERATING AGENCY MEETING #5

## Thursday, September 30, 2010 (1:00 – 4:00 PM)

### Meeting Location:
**Holiday Inn Express (Jordan Room)**
**1391 South Townsend Avenue, Montrose, CO**

# Meeting Notes

**Attendees:** Angie Adams (EMPSi), Brad Banulis (Colorado Division of Wildlife), Levi Broyles (Grand Mesa, Uncompahgre, Gunnison National Forests), Renzo DelPiccolo (Colorado Department of Natural Resources, Southwest Region), Desty Dyer (BLM Uncompahgre Field Office), Robert Ernst (BLM Uncompahgre Field Office), Patti Grafmyer (Town of Norwood), Susan Hansen (Delta County BOCC), Julie Jackson (BLM Uncompahgre Field Office), Bruce Krickbaum (BLM Uncompahgre Field Office), William Long (Town of Nucla), Joan May (San Miguel County BOCC), Patricia Means (Town of Cedaredge), Lynn Padgett (Ouray County BOCC), Mike Pelletier (Gunnison County), Barbara Peterson (Town of Paonia), Joe Reagan (Town of Norwood), Linda Reed (BLM Uncompahgre Field Office), Alan Schroeder (Bureau of Reclamation, Western Colorado Area Office), Barb Sharrow (BLM Uncompahgre Field Office), Thane Stranathan (BLM Uncompahgre Field Office), Steve White (Montrose County BOCC), Kate Wynant (EMPSi)

**Handouts:** Agenda; Highlights of the Resource Management Planning Process to Date; RMP Planning Fact Sheet 7.2: Uranium and Other Mineral Resources; RMP Planning Fact Sheet 7.1: Coal, Oil & Gas Resources; Locatable, Solid and Fluid Leasable, and Salable Minerals PowerPoint presentation; RMP Planning Fact Sheet 8.1: Land Tenure; Lands and Realty PowerPoint Presentation; RMP Planning Fact Sheet 3.3: Visual Resource Management; Visual Resource Management PowerPoint Presentation

1. **Welcome** (Bruce Krickbaum)

2. **Introductions** (All present)

3. **Planning Process to Date** (Angie Adams)
   - See handout: Highlights of the Resource Management Planning Process to Date.
   - Gray highlighting indicate changes from last meeting.
   - There are not many changes to the final Areas of Critical Environmental Concern (ACEC) Evaluation Report based on comments received on the draft report. Reminder: ACECs are those areas that have rare or unique values; could be soils, plants, animals, cultural, etc.

BLM_0106511

Management for these areas is just that necessary to protect the resource; doesn't have to be to the level of Wilderness. Doesn't mean that everything is closed to uses.

- The Lands with Wilderness Characteristics report will be ready soon. The BLM doesn't have the authority to designate Wilderness Study Areas; that authority has expired. It does have the mandate to look at areas that have wilderness values and can choose to protect them or not. BLM just has to inventory them and then choose how to manage them.

- *Question*: Is there an opportunity down the road to say that maybe a certain area deserves more intense management and deserves to be an ACEC? Something in addition to what is identified in the report? *Answer*: It is going to be hard to add anything new, but there might be other mechanisms to protect things. Whatever is considered as an ACEC in the alternatives (whatever meets the relevance and importance criteria in the report) has to be considered under at least one alternative in the RMP. They don't have to be in the preferred alternative, just in one. The report says which ACECs made the cut and then the alternatives will vary those ACECs by alternative. If we're talking about new areas it would be tough to add but not impossible.

- *Comment*: One of the most interesting developments to have happened has just occurred in western San Miguel County, the US Forest Service comprehensive trails plan. Obviously it's not BLM land but has there been thought given to cross-referencing information that is applicable from that plan? If someone picked up this plan it wouldn't say anything about this new trail proposal yet it's a remarkable plan. *Answer*: Are you talking about routes that go to the BLM/US Forest Service boundary and what do those routes do when they get to the BLM boundary or are you talking about science that went into that plan? *Response*: No, just a word or two in this document that cross-references things that occur nearby, but because they're not on BLM are not discussed in this plan. *Answer*: Yes, this plan will acknowledge other efforts that are underway and perhaps applicable to this plan. They are considered in the development of this plan and the BLM tries to make sure that this plan is compatible with other things going on.

## 4. Resource/Resource Use Discussions

- Minerals (Rob Ernst)
  - See handouts: Locatable, Solid and Fluid Leasable, and Salable Minerals PowerPoint presentation; RMP Planning Fact Sheet 7.2: Uranium and Other Mineral Resources; and RMP Planning Fact Sheet 7.1: Coal, Oil & Gas Resources
  - *Question*: How deep do uranium mines go? *Answer*: Generally they are pretty shallow. Operators will drive in on the Morrison formation; in other areas it's within the Dakota sandstone so they'll have to put a shaft down; but generally it's pretty shallow and localized. It's a random deposit, not like other minerals. Generally 300-500 feet below the surface.
  - *Question*: Do individuals need a permit from the BLM to do placer gold mining? *Answer*: They don't need a permit but we require them to tell us what they're doing. There are also mining claims in the area that people can access. We require them to notify us also. We probably have 40-75 people per year come in for placer mining. This year there aren't as many but last year it was pretty busy.
  - *Question*: Is any of the coal reserve in the West End public or is it all private? *Answer*: Some is on BLM. *Question*: Are you going to lease it out? Will it be part of the plan? *Answer*: It'll be part of the plan. I don't know if it'll be leased or not, but it'll be available.
  - *Question*: Uranium mining dislodges uranium on the ore, becomes airborne, travels some distance, and some in our community are convinced this is a dangerous phenomenon and if we don't know any more about it, it's dangerous. Some do not care and just want the jobs. It seems like the airborne risk should be something that someone can answer.

*Answer*: Uranium is one of the biggest (heaviest) atoms so it's not going to blow very far. But there are all sorts of particulates floating in the air.

- *Question*: Who is the agency that deals with this? *Answer*: The state of Colorado monitors and enforces air quality but we will look at air quality in this plan.
- *Comment*: As I understand it it's the extraction and not the mining itself that is harmful. *Response*: there is natural uranium occurring on the surface that was there before uranium started to be mined and it doesn't seem to have impacted wildlife. It is my opinion that mining uranium isn't going to cause more environmental impacts than these. These are issues that have come up in relation to the uranium mill, which is on private so we have nothing to do with that, but there are concerns whether to lease or not lease, and that will be covered in this plan. Uranium is a locatable mineral so we don't have as much control over it as we do over coal and oil and gas.
- *Comment*: It seems like this group has the choice to skirt the issue or get some answers. The larger community  is deeply divided over the issue. A little bit of good science could go a long way to answering questions if we would just address it. *Response*: The Colorado Department of Public Health and Environemnt has a division that is responsible for air quality control at the uranium mill. One of the concerns is if more mines will open up if the mill is approved. Our decision space when it comes to uranium mining is small. The law tells us that it's all available for mining. The only thing we can do in this plan, is if we want it to not be available, is petition the Secretary of the Interior to withdraw it from locatable mineral entry.
- All existing claims would not be affected due to prior existing rights. In the West End there are a lot of uranium mining claims. As far as the number of mines, we don't know. We don't know if there will be a mill, if any of the existing mines still have ore, and if the ones that do have ore have enough to make it profitable.

o *Question*: If there is an ACEC and someone stakes a claim in that area can the BLM do anything? *Answer*: The BLM has to work with them because of the 1872 mining law. We just don't have the flexibility. In ACECs, folks have to submit a mine plan and in an ACEC they are restricted to a plan of operation.

o *Comment*: In Ouray County next week several members of state and federal government agencies will discuss who regulates what and how the process goes. The meeting is next Tuesday [October 5] at the 4-H Center at 9:00am.

o *Comment*: With mining, it isn't really if but how. The 'if' is already there, but we can' figure out some of the 'how' to manage some of the surface access.

o If you look at the way coal is dealt with, coal is more apt to make dust than uranium. Coal mines must have plans of operation to deal with this.

o Coal is a leasable mineral; not subject to 1872 mining law, so areas can be closed to coal leasing. The RMP makes those decisions, like oil and gas. We can't close areas because we want to close it or because of the potential of the resource. We have to have a good reason to close it. For example, in an area of a sensitive soil crust, we might want to close the area to coal leasing to protect the soil crust because mining would disturb it.

o *Question*: How much coal are we talking? *Answer*: In a year, the North Fork provides about six and a half days of energy to the nation.

o *Question*: Is the Tongue Mesa [coal area] federal? *Answer*: It's mostly on US Forest Service.

o Lease stipulations have to be in the RMP; we can't make them up for each lease sale. Lease notices are more like "buyer beware" and we can add those at any time and have been adding more so that people know what they're getting into. For example, for

BLM_0106513

leases in the unexploded ordinance area, we told them that there would be more involved than leasing elsewhere. Stipulations also do not retroactively apply to current leases. Stipulations won't apply until the record of decision is signed. If the lease expires and is up for resale, then the stipulations would apply at that time. Stipulations also apply to geothermal, which has generally low potential for federal minerals.

o *Question*: One of the concerns in our area is to protect our watersheds. Is this the time if we have a watershed ordinance, should we get the plan to BLM? *Answer*: Yes!

o *Question*: When protests are files against leases, does the lesee see that? *Answer*: Yes, it's public information. *Question*: So it's sort of like a lease notice. *Answer*: We look at new information before every sale because there is new science coming up all of the time.

o *Question*: Will we be able to look at the stipulations and provide input? *Answer*: Yes, we have been talking about when to do that and we think the time is when we have more to show you.

o *Question*: What is the timeframe on the Reasonably Foreseeable Development Scenario? *Answer*: We have a draft but there is still some work to be done on it.

o *Question*: What lands are closed to oil and gas leasing now? *Answer*: ACECs, Wilderness Study Areas, and the Tabeguache Area.

o For mining we can attach timing limitations similar to those applied to oil and gas leases at the time of the EA for the plan of development.

o *Question*: How did it all come to be that some of the minerals are federal and some are private? *Answer*: Homesteading. People homesteaded the surface but the government kept the subsurface. The law of the land at the time the land was homesteaded.

o Leases under US Forest Service land are held by BLM but US Forest Service administers the surface and has their own process. BLM does not get involved with locatable minerals, though.

o *Question*: The Thompson Creek Coalition is asking to have leasable lands withdrawn? *Answer*: The leasable lands would be closed. *Comment*: But they're asking for an act of Congress to suggest that mineral owners and operators relinquish their rights. *Response*: Congress could do that, but it would be a suggestion and probably not mandatory.

o *Question*: Has any land been withdrawn from locatable mineral entry? *Answer*: Yes, the Grand Junction Field Office, Dolores Field Office, and the Uncompahgre Field Office petitioned for the withdrawal of three different uranium mines that contained endangered bats but the withdrawal is only for 20 years. It's a total of 20 acres or so for all three mines.

• Lands and Realty (Linda Reed)

o See handouts: RMP Planning Fact Sheet 8.1: Land Tenure; Lands and Realty PowerPoint Presentation

o *Question*: What kind of land would come up as not suitable for BLM management so that you would want to get rid of it? *Answer*: See slides.

o *Question*: How are you discussing/handling withdrawals? *Answer*: Lands that are withdrawn would not be conveyed without consultation with the appropriate agency.

o *Question*: Are only lands identified for disposal subject to legislative disposals? *Answer*: Congress can do what they want.

o *Question*: If there is a piece you know you want to acquire do you actively pursue it or just keep an eye on it? *Answer*: Land exchanges take a long time so generally we're not very proactive; people come to us.

o *Question*: When you do land exchanges and lands have to have roughly the same value, how do you do that? *Answer*: We get the land appraised either by the federal government or an appraiser, the appraisal would be reviewed by the federal appraising

BLM_0106514

agency. The appraiser looks at current highest and best use to determine the value. The minerals also have to have a value attached.

o *Comment*: It would be nice to have fast-track procedures for land trades so it didn't take 5-7 years for land exchanges. *Response*: Agreed, but that's beyond our scope. Talk to Washington. We have to do the surveys, hazardous materials surveys, do an environmental analysis, notify the public, etc., so the process takes a long time.

o *Question*: Do you know if your appraisal guidelines are different than the US Forest Service? *Answer*: The US Forest Service does their own appraisals.

- Visual Resources (Julie Jackson)
o See handouts: RMP Planning Fact Sheet 3.3: Visual Resource Management; Visual Resource Management PowerPoint Presentation

o *Question*: Can you give specific examples of visual resource management (VRM) Class II and III areas? *Answer*: VRM Class II includes ACECs and Class III is probably the most common on our lands right now; the North Delta OHV area is Class IV.

o *Question*: Is the visual resource inventory map available? *Response/Action*: BLM will send it out to the group.

o *Question*: What is the BLM looking for from us for input? *Answer*: When you look at the draft RMP, that would be the most appropriate time to look at it. If you know of a proposal for a recreation area or something that would not be permitted in a certain VRM class, we want to know about those.

o The visual resource inventory boundaries are what they are. The boundaries can change for VRM.

o *Question*: There can be a parking lot in a Class II area, though, right? *Answer*: Yes, there would just be more design input to make it comply with the objectives.

o *Question*: How does this work with oil and gas leasing? *Answer*: Leasing and development would be permitted anywhere; they would just be required to meet the VRM class objectives. The oil and gas program spends a lot of time explaining this to developers, including all aspects of reclamation, paint colors, etc.

o *Question*: How was the visual resource inventory created? *Answer*: We took key observation points throughout the field office, got public input for sensitive areas to the public.

o *Comment*: The US Forest Service has something where you can change the visual for two years and then it must go back.

o *Question*: How does this affect scenic byways? *Answer*: This specific example is split-estate so the rig will go up, but we will try to work within our limits to mitigate the visual resources as much as possible.

o *Question*: Does your current RMP have VRM objectives associated with the scenic byway? *Answer*: No, the byway came after the old RMP. We have holes in our old RMP where some areas don't have a VRM Class associated with them so we're working with the operators to mitigate visual impacts but we don't have a lot of teeth to fall back on.

## 5. Alternatives Development (Barb Sharrow)

- We received a lot of comments on wild and scenic rivers and as far as the public goes, it's one of the biggest concerns.
- We divided the planning area into two areas, the Gunnison River system which has six segments, and the San Miguel and Dolores River systems.
- We met with a stakeholder group along the Gunnison River and they decided they do want to have a larger stakeholder process in conjunction with Dominguez-

Escalante National Conservation Area so they are looking for a facilitator for that group.

- Our Resource Advisory Council Subgroup has taken on the San Miguel and Dolores River systems and they have a facilitator. Those meetings will probably starting up soon. The role of the Resource Advisory Council Subgroup will be to listen and make recommendations to the BLM.

## 6. Other Items Not on the Agenda
- None.

## 7. Action Items / Next Meeting
- We will not be having the meeting in November that was tentatively scheduled. Our alternatives development process is a little behind and we would like to be able to bring more information to you. We will let you know when the next meeting will be scheduled, which will probably be sometime in January. We will probably set the date for the next meeting in November.
- ☐ *Action* (BLM): Send the Visual Resource Inventory map out to the group.
- ☐ *Action* (Bruce): Add the November meeting cancellation to the follow-up e-mail to the group.

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **To:** | Barbara_Sharrow@blm.gov; dave_kauffman@blm.gov; Deborah_Magee@blm.gov; Angie Adams; Kate Wynant; bbott68@gmail.com; Aschroeder@usbr.gov; kjensen@ci.montrose.co.us; renzo.delpiccolo@state.co.us; shansen@deltacounty.com; MPelletier@gunnisoncounty.org; swhite@montrosecounty.net; lpadgett@ouraycountyco.gov; lynn@mtngeogeek.com; joanm@sanmiguelcounty.org; pat@cedaredgecolorado.com; MSe1047096@aol.com; gsparks@mtnvillage.org; mjreagan@fone.net; norwoodparker@centurytel.net; sharold@ci.olathe.co.us; davidvarley@kaycee.net; townofpaonia@tds.net; jcoates@town.ridgway.co.us; Collin_Ewing@fws.gov; tkrandallparker@fs.fed.us; lbroyles@fs.fed.us; segfahlt@gmail.com; Bruce_Krickbaum@co.blm.gov; UFO AR |
| **Subject:** | Agenda for Cooperating Agenda Meeting |
| **Date:** | Tuesday, July 13, 2010 2:53:28 PM |
| **Attachments:** | UFO-CA_2010-07-22_Agenda.pdf |

Hello Cooperating Agencies,

The next Cooperating Agency meeting is Thursday July 22, 1:00 to 4:00, at the
Holiday Inn Express (Jordan Room) in Montrose.  Please let me know if you are
not able to attend.

I have attached the agenda for the meeting.  You will note that we will have a
discussion on Cultural Resources, Special Status Species, and Wild and Scenic
River Studies.  You can find Fact Sheets for these topics on the planning web page
at  www.uformp.com,  or
http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.
(Combined, the size of the three sheets may cause problems with some mailboxes).
Please review the facts sheets prior to the meeting to familiarize yourself with these
topics.

Thank you, Bruce

<><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384


(See attached file: UFO-CA_2010-07-22_Agenda.pdf)

PLEASE NOTE: This message, including any attachments, may include
privileged, confidential and/or inside information.
Any distribution or use of this communication by anyone other than the
intended recipient is strictly prohibited and
 may be unlawful. If you are not the intended recipient, please notify the
sender by replying to this message and then
delete it from your system.

BLM_0106518



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401



## COOPERATING AGENCY MEETING #3

### Thursday, July 22, 2010 (1:00 – 4:00 PM)

### Meeting Location:
**Holiday Inn Express (Jordan Room)**
**1391 South Townsend Avenue, Montrose, CO**

# AGENDA

1. **Welcome**
2. **Introductions**
3. **Planning Process to Date**
4. **Resource/Resource Use Discussions**
   - Cultural and Paleontological Resources
   - Special Status Species
   - Wild and Scenic River Studies
5. **Alternatives Development**
6. **Internal Draft Chapters 1 (Introduction) and 3 (Affected Environment)**
7. **Other Items Not on the Agenda**
8. **Action Items / Next Meeting**

BLM_0106519

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **To:** | sbear@dmea.com; Steve.welst@oxbow.com; John@reams-construction.com; blllday@paonla.com; rich@richdurnanphoto.com; Robbie.levalley@colostate.edu; Wblack8709@msn.com; pmueller@tnc.org; sllvers1@tds.net; tkctew@yahoo.com; Barbara_Sharrow@blm.gov; dave_kauffman@blm.gov; Deborah_Magee@blm.gov; Bruce_Krickbaum@co.blm.gov; Angie Adams; Kate Wynant; bbott68@gmail.com; UFO AR |
| **Subject:** | Agenda for RAC Subgroup Meeting |
| **Date:** | Tuesday, July 13, 2010 2:52:11 PM |
| **Attachments:** | UFO-SG_2010-07-23_Agenda.pdf |

Hello RAC Sub-group,

The next RAC sub-group meeting is Friday July 23, 9:00 to 12:00, at the Holiday Inn Express (Jordan Room) in Montrose.  Please let me know if you are
not able to attend.

I have attached the agenda for the meeting.  You will note that we will have a
discussion on Cultural Resources, Special Status Species, and Wild and Scenic
River Studies.  You can find Fact Sheets for these topics on the planning web page
at  www.uformp.com,  or
http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html.
(Combined, the size of the three sheets may cause problems with some mailboxes).
Please review the three facts sheets prior to the meeting to familiarize yourself with
these topics.

Thank you, Bruce

<><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384


(See attached file: UFO-SG_2010-07-23_Agenda.pdf)

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information.
Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and
 may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then
delete it from your system.

BLM_0106521



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401

# RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #3
## Friday, July 23, 2010 (9:00 AM – 12:00 PM)

### Meeting Location:
### Holiday Inn Express (Jordan Room)
### 1391 South Townsend Avenue, Montrose, CO

# AGENDA

1. **Welcome**
2. **Introductions**
3. **Planning Process to Date**
4. **Resource/Resource Use Discussions**
   - Cultural and Paleontological Resources
   - Special Status Species
   - Wild and Scenic River Studies
5. **Alternatives Development**
6. **Internal Draft Chapters 1 (Introduction) and 3 (Affected Environment)**
7. **Other Items Not on the Agenda**
8. **Public Comments / Questions**
9. **Action Items / Next Meeting**

BLM_0106522



**United States Department of the Interior**

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
www.co.blm.gov



TAKE PRIDE®
IN AMERICA

IN REPLY REFER TO:
1610(COS050)                                     July 13, 2010

Dear Interested Party:

As a required component of the Uncompahgre Resource Management Plan (RMP) revision, the Bureau of Land Management (BLM) Uncompahgre Field Office (UFO) is evaluating rivers and streams within its jurisdiction for potential inclusion in the National Wild and Scenic Rivers System[1]. The Wild and Scenic River study process consists of assessing both the *eligibility* and *suitability* of rivers within the study area. This letter serves to notify you of the recently completed ***Final Wild and Scenic River Eligibility Report for the BLM Uncompahgre Planning Area*** and opportunities to participate in the current determination of suitability phase.

All rivers and streams with a perennial or intermittent flow within the Uncompahgre planning area and the portion of the newly designated Dominguez-Escalante National Conservation Area (NCA) within the UFO boundary were inventoried. The BLM identified 174 river segments for study, of which 34 were found to possess the free-flowing character and outstandingly remarkable values required for eligibility. Table 1 on attachment page 1 lists all eligible UFO river segments by hydrologic unit, while Table 2 on attachment page 4 includes five additional Dominguez-Escalante NCA segments evaluated by the Grand Junction Field Office as part of their planning effort. Each table includes the web address where the corresponding eligibility report may be reviewed.

The current determination of suitability phase focuses on jurisdictional and manageability issues affecting eligible waterways. Criteria developed by the BLM and the Interagency Wild and Scenic Rivers Council will be used to evaluate the suitability of eligible river segments. To assist in making these evaluations, the BLM is requesting input related to the criteria regarding any segment about which you have specific knowledge or concerns. Comments pertaining to suitability that were submitted during the public scoping period for eligibility will be carried forward and integrated into the suitability evaluation.

---

[1] In 1968, Congress enacted the Wild and Scenic Rivers Act to preserve and protect the free-flowing condition, water quality, and outstandingly remarkable values of selected waterways for the benefit and enjoyment of present and future generations. The Act safeguards the special character of these rivers, while allowing for their appropriate use and development.

BLM_0106523

Segment suitability comment forms and instructions are available at BLM UFO headquarters in Montrose and online at www.blm.gov/co/st/en/fo/ufo/wild_and_scenic_river.html, or can be mailed to you upon request. **Please include your name, address, and phone number** on each page so that we may contact you if necessary to clarify your comment. **Submit comment forms by August 16, 2010** via email to: uformp@blm.gov or mail to: BLM UFO, Attention: RMP Revision, 2465 South Townsend Avenue, Montrose, Colorado 81401.

A public stakeholder group will assist the BLM in determining which segments are suitable for inclusion in the National Wild and Scenic River System and in developing the range of suitability alternatives. The Southwest District BLM Resource Advisory Subcommittee will facilitate a stakeholder group focusing their efforts on the San Miguel and Dolores river basins. Direct questions to subcommittee members Peter Mueller at (970) 728-5291 or email: pmueller@pnc.org and Robbie LeValley at (970) 874-2195 or email: Robbie.levalley@colostate.edu.

In addition, the Colorado River Water Conservation District will be convening a broad-based stakeholders' group to offer recommendations regarding river segments for the Gunnison River Basin within the RMP planning areas for both the UFO and Dominguez-Escalante National Conservation Area. For more information and inclusion in the initial stakeholders' meeting, contact stakeholder group coordinator Chris Treese of the Colorado River District at (970) 945-8522 or email: ctreese@crwcd.org.

Public and stakeholder group participation will provide a critical foundation to effectively manage UFO rivers and streams for years to come. The BLM thanks you for your interest and welcomes your review of our final eligibility report, as well as your comments on suitability issues pertaining to the jurisdiction and manageability of eligible river segments. Please contact our office at (970) 240-5300 if you have additional questions.

Sincerely,

Barbara L. Sharrow
Field Manager

Attachment:

Two tables showing 1) eligible river segments evaluated by the UFO and 2) eligible Dominguez-Escalante NCA river segments evaluated by the BLM Grand Junction Field Office

BLM_0106524

### TABLE 1 - ELIGIBLE RIVER SEGMENTS EVALUATED BY THE BLM UFO

The Final Wild and Scenic River Eligibility Report for the BLM Uncompahgre Field Office is available to view and download at:
www.blm.gov/co/st/en/fo/ufo/wild_and_scenic_river.html

| SEGMENT NAME | SEGMENT LOCATION | TOTAL SEGMENT LENGTH (IN MILES) | SEGMENT LENGTH ON BLM LANDS (IN MILES) |
|---|---|---|---|
| HYDROLOGIC UNIT: LOWER GUNNISON<br>*Segment is within the Dominguez-Escalante National Conservation Area | | | |
| *Cottonwood Creek | Uncompahgre NF boundary to downstream UFO boundary in T51N/ R12W/Sec 14 NMPM | 18.27 | 18.27 |
| *Dry Fork Escalante Creek Segment 2 | Tatum Draw to mouth | 2.89 | 2.43 |
| *Escalante Creek Segment 1 | Uncompahgre NF boundary to upstream Colorado State land boundary in T51N/R13W/ Sec 15 NMPM | 8.45 | 5.75 |
| *Escalante Creek Segment 2 | Upstream of Colorado State land boundary in T51N/R13W/Sec 15 NMPM to Gunnison River | 8.48 | 0.90 |
| Gunnison River Segment 2 | Upstream boundary to downstream boundary of BLM land in T15S/R95W/ Sec 6 6th PM | 0.41 | 0.41 |
| *Gunnison River Segment 3 | Upstream UFO boundary in T15S/R97W/Sec 24 6th PM to boundary between UFO and Grand Junction Field Office | 17.46 | 8.43 |
| Monitor Creek | Uncompahgre NF boundary to Potter Creek | 9.42 | 9.42 |
| Potter Creek | Uncompahgre NF boundary to Roubideau Creek | 9.82 | 9.82 |
| *Rose Creek | Confluence of Barkley Cabin Gulch and Corral Gulch to UFO boundary | 3.90 | 3.90 |
| Roubideau Creek Segment 1 | Uncompahgre NF boundary to downstream Camelback WSA boundary | 10.74 | 10.00 |

BLM_0106525