APPENDIX B - UFO RMP SCOPING ACEC DISPLAY PANEL

*Appendix B: UFO RMP Scoping ACEC Display Panel*



Draft Evaluation of Proposed and Existing
**AREAS OF CRITICAL ENVIRONMENTAL CONCERN**
for the Uncompahgre Planning Area

84

BLM_0106618



**Draft Evaluation of Proposed and Existing
AREAS OF CRITICAL ENVIRONMENTAL CONCERN
for the Uncompahgre Planning Area**

BLM_0106619

 U.S. DEPARTMENT OF THE INTERIOR    **BUREAU OF LAND MANAGEMENT NEWS RELEASE**

**Release Date:** 07/19/10
**Contacts:** Bruce Krickbaum 970-240-5384
Vanessa Delgado 303-239-3681

## BLM Uncompahgre Resource Management Plan Advisory Group to Meet (07-15-10)

MONTROSE, Colo. — A public advisory group that will provide recommendations to the Bureau of Land Management Uncompahgre Field Office as it revises its Resource Management Plan will meet for the third time on July 23.

The subgroup of the BLM's Southwest Colorado Resource Advisory Council will meet on Friday, July 23, at the Holiday Inn Express Jordan Room in Montrose at 1391 South Townsend Avenue.

The meeting will begin at 9 a.m. and is scheduled to adjourn at noon. The meeting is open to the public, with a public comment period scheduled for 11 a.m.

The Southwest Colorado RAC subgroup is composed of area residents representing diverse interests within the Uncompahgre Field Office. The seven-member subgroup will provide recommendations to the BLM Southwest Colorado RAC regarding development and implementation of the public lands within the field office.

The Southwest Colorado RAC is one of three advisory councils to BLM Colorado. Composed of 15 members appointed by the Secretary of the Interior, individuals serving in each RAC represent a broad range of public land interests, ranging from environmental to local government to commercial activity. For more information on Colorado RACs, go to www.blm.gov/co and select Resources, then Resource Advisory Councils.

The BLM manages more land - more than 245 million acres - than any other Federal agency. This land, known as the National System of Public Lands, is primarily located in 12 Western states, including Alaska. The Bureau, with a budget of about $1 billion, also administers 700 million acres of sub-surface mineral estate throughout the nation. The BLM's multiple-use mission is to sustain the health and productivity of the public lands for the use and enjoyment of present and future generations. The Bureau accomplishes this by managing such activities as outdoor recreation, livestock grazing, mineral development, and energy production, and by conserving natural, historical, cultural, and other resources on public lands.
--BLM--

2465 South Townsend Avenue    Montrose, CO 81401

Last updated: 07-19-2010

http://www.blm.gov/co/st/en/BLM_Information/newsroom/2010/blm_uncompahgre_resource0.html[8/13/2010 9:43:13 AM]

BLM_0106620



United States Department of the Interior
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
www.co.blm.gov



TAKE PRIDE®
IN AMERICA

IN REPLY REFER TO:
1610 (COS050)

July 16, 2010

Dear Interested Party:

The Bureau of Land Management (BLM) Uncompahgre Field Office (UFO) is in the beginning stages of revising it Resource Management Plan (RMP). The UFO received nominations for potential Areas of Critical Environmental Concern (ACEC) from the public and BLM staff during the scoping period for the RMP, which ended March 29, 2010.

An ACEC is an area of BLM-administered public land where special management attention is needed to protect its relevant and important values from irreparable damage. The UFO has evaluated all nominated and existing ACECs and has completed a draft report, which shows that nineteen areas meet the relevance and importance criteria. Any area that meets the criteria is identified as a potential ACEC, and must be considered for designation during the development of RMP alternatives.

We are not requesting additional nominations at this time. The purpose of this letter is to invite you to review the *Draft Evaluation of Proposed and Existing Areas of Critical Environmental Concern*, as well as to provide the BLM with information regarding the significance and values of the proposed areas. In addition, individuals and organizations that nominated areas should consider whether the boundaries shown in the report are as you envisioned.

The draft report is available on the Uncompahgre RMP planning web page at: www.uformp.com. Please provide written comments regarding the report by **August 20, 2010.** You may submit comments via email to uformp@blm.gov, or mail to: BLM UFO, Attention: RMP Revision, 2465 South Townsend Avenue, Montrose, CO 81401.

The BLM thanks you for your interest and welcomes your review of our draft report on ACECs, as well your comments. Please contact our office at (970) 240-5300 if you have additional questions.

Sincerely,

Barbara L. Sharrow

Barbara L. Sharrow
Field Manager

BLM_0106621

## James Bode

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **Sent:** | Monday, July 19, 2010 9:02 AM |
| **Subject:** | Uncompahgre RMP: documents available for review |
| **Attachments:** | Suitability Public Letter Signed 071310.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Dear Interested parties and stakeholders,

You are receiving this email because you have expressed an interest in receiving information regarding the
Uncompahgre RMP revision.
We have recently posted several items to our planning web page.

Among the items posted are the
 - Final Wild and Scenic River Eligibility Report (please see the attached letter),
 - Scoping Summary Report
 - Recreation Focus Group Report
 - Analysis of the Management Situation (AMS)

We are accepting comments regarding the suitability determination phase of the Wild and Scenic River process.  The
attached letter explains how to make comments.

Please visit the Uncompahgre planning web site via the shortcut at:
www.uformp.com, or at
http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html to see the reports and for information regarding the
RMP revision.

You can also see the Wild and Scenic River Eligibility report and information at:
http://www.blm.gov/co/st/en/fo/ufo/wild_and_scenic_river.html .

Thank you for your interest in the revision of the Uncompahgre RMP.

--Bruce

 (See attached file: Suitability Public Letter Signed 071310.pdf)

 Keep us informed of changes in your contact information if you want to continue to receive information regarding the
Uncompahgre RMP.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Bruce Krickbaum
Planner and RMP Project Lead
Uncompahgre Field Office
Montrose, CO  81401
uformp@blm.gov

BLM_0106622

2

BLM_0106623



**United States Department of the Interior**

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
www.co.blm.gov



TAKE PRIDE®
IN AMERICA

IN REPLY REFER TO:
1610(COS050)                     July 13, 2010

Dear Interested Party:

As a required component of the Uncompahgre Resource Management Plan (RMP) revision, the Bureau of Land Management (BLM) Uncompahgre Field Office (UFO) is evaluating rivers and streams within its jurisdiction for potential inclusion in the National Wild and Scenic Rivers System[1]. The Wild and Scenic River study process consists of assessing both the *eligibility* and *suitability* of rivers within the study area. This letter serves to notify you of the recently completed ***Final Wild and Scenic River Eligibility Report for the BLM Uncompahgre Planning Area*** and opportunities to participate in the current determination of suitability phase.

All rivers and streams with a perennial or intermittent flow within the Uncompahgre planning area and the portion of the newly designated Dominguez-Escalante National Conservation Area (NCA) within the UFO boundary were inventoried. The BLM identified 174 river segments for study, of which 34 were found to possess the free-flowing character and outstandingly remarkable values required for eligibility. Table 1 on attachment page 1 lists all eligible UFO river segments by hydrologic unit, while Table 2 on attachment page 4 includes five additional Dominguez-Escalante NCA segments evaluated by the Grand Junction Field Office as part of their planning effort. Each table includes the web address where the corresponding eligibility report may be reviewed.

The current determination of suitability phase focuses on jurisdictional and manageability issues affecting eligible waterways. Criteria developed by the BLM and the Interagency Wild and Scenic Rivers Council will be used to evaluate the suitability of eligible river segments. To assist in making these evaluations, the BLM is requesting input related to the criteria regarding any segment about which you have specific knowledge or concerns. Comments pertaining to suitability that were submitted during the public scoping period for eligibility will be carried forward and integrated into the suitability evaluation.

---

[1] In 1968, Congress enacted the Wild and Scenic Rivers Act to preserve and protect the free-flowing condition, water quality, and outstandingly remarkable values of selected waterways for the benefit and enjoyment of present and future generations. The Act safeguards the special character of these rivers, while allowing for their appropriate use and development.

Segment suitability comment forms and instructions are available at BLM UFO headquarters in Montrose and online at www.blm.gov/co/st/en/fo/ufo/wild_and_scenic_river.html, or can be mailed to you upon request. **Please include your name, address, and phone number** on each page so that we may contact you if necessary to clarify your comment. **Submit comment forms by August 16, 2010** via email to: uformp@blm.gov or mail to: BLM UFO, Attention: RMP Revision, 2465 South Townsend Avenue, Montrose, Colorado 81401.

A public stakeholder group will assist the BLM in determining which segments are suitable for inclusion in the National Wild and Scenic River System and in developing the range of suitability alternatives. The Southwest District BLM Resource Advisory Subcommittee will facilitate a stakeholder group focusing their efforts on the San Miguel and Dolores river basins. Direct questions to subcommittee members Peter Mueller at (970) 728-5291 or email: pmueller@tnc.org and Robbie LeValley at (970) 874-2195 or email: Robbie.levalley@colostate.edu.

In addition, the Colorado River Water Conservation District will be convening a broad-based stakeholders' group to offer recommendations regarding river segments for the Gunnison River Basin within the RMP planning areas for both the UFO and Dominguez-Escalante National Conservation Area. For more information and inclusion in the initial stakeholders' meeting, contact stakeholder group coordinator Chris Treese of the Colorado River District at (970) 945-8522 or email: ctreese@crwcd.org.

Public and stakeholder group participation will provide a critical foundation to effectively manage UFO rivers and streams for years to come. The BLM thanks you for your interest and welcomes your review of our final eligibility report, as well as your comments on suitability issues pertaining to the jurisdiction and manageability of eligible river segments. Please contact our office at (970) 240-5300 if you have additional questions.

Sincerely,

Barbara L. Sharrow
Field Manager

Attachment:

Two tables showing 1) eligible river segments evaluated by the UFO and 2) eligible Dominguez-Escalante NCA river segments evaluated by the BLM Grand Junction Field Office

TABLE 1 - ELIGIBLE RIVER SEGMENTS EVALUATED BY THE BLM UFO

The Final Wild and Scenic River Eligibility Report for the BLM Uncompahgre Field Office is available to view and download at:
www.blm.gov/co/st/en/fo/ufo/wild_and_scenic_river.html

| SEGMENT NAME | SEGMENT LOCATION | TOTAL SEGMENT LENGTH (IN MILES) | SEGMENT LENGTH ON BLM LANDS (IN MILES) |
|---|---|---|---|
| HYDROLOGIC UNIT:  LOWER GUNNISON *Segment is within the Dominguez-Escalante National Conservation Area | | | |
| *Cottonwood Creek | Uncompahgre NF boundary to downstream UFO boundary in T51N/ R12W/Sec 14 NMPM | 18.27 | 18.27 |
| *Dry Fork Escalante Creek Segment 2 | Tatum Draw to mouth | 2.89 | 2.43 |
| *Escalante Creek Segment 1 | Uncompahgre NF boundary to upstream Colorado State land boundary in T51N/R13W/ Sec 15 NMPM | 8.45 | 5.75 |
| *Escalante Creek Segment 2 | Upstream of Colorado State land boundary in T51N/R13W/Sec 15 NMPM to Gunnison River | 8.48 | 0.90 |
| Gunnison River Segment 2 | Upstream boundary to downstream boundary of BLM land in T15S/R95W/ Sec 5 6th PM | 0.41 | 0.41 |
| *Gunnison River Segment 3 | Upstream UFO boundary in T15S/R97W/Sec 24 6th PM to boundary between UFO and Grand Junction Field Office | 17.46 | 8.43 |
| Monitor Creek | Uncompahgre NF boundary to Potter Creek | 9.42 | 9.42 |
| Potter Creek | Uncompahgre NF boundary to Roubideau Creek | 9.82 | 9.82 |
| *Rose Creek | Confluence of Barkley Cabin Gulch and Corral Gulch to UFO boundary | 3.90 | 3.90 |
| Roubideau Creek Segment 1 | Uncompahgre NF boundary to downstream Camelback WSA boundary | 10.74 | 10.00 |

BLM_0106626

| Segment Name | Segment Location | Total Segment Length (in miles) | Segment Length on BLM Lands (in miles) |
|---|---|---|---|
| Roubideau Creek Segment 2 | Downstream Camelback WSA boundary to upstream Colorado State land boundary in T15S/ R96W/Sec 32 6th PM | 7.59 | 3.45 |
| **HYDROLOGIC UNIT:  NORTH FORK** | | | |
| Deep Creek | Gunnison NF boundary to Paonia Reservoir | 2.55 | 0.58 |
| West Fork Terror Creek | Grand Mesa NF boundary  to confluence with East Fork Terror Creek | 1.21 | 0.47 |
| **HYDROLOGIC UNIT:  SAN MIGUEL** | | | |
| Beaver Creek | Uncompahgre NF boundary to San Miguel River | 14.25 | 14.19 |
| Dry Creek Segment 1 | Upstream UFO boundary to downstream UFO boundary in T46N/R6W/ Sec 34 NMPM | 10.49 | 10.42 |
| Naturita Creek | Uncompahgre NF boundary to San Miguel River | 24.97 | 9.99 |
| Saltado Creek | Upstream UFO boundary in T43N/R11W/Sec 18 NMPM to San Miguel River | 5.56 | 4.14 |
| San Miguel River Segment 1 | UFO boundary just downstream of Deep Creek to UFO boundary 1.25 miles (est.) downstream from Clay Creek | 27.23 | 17.34 |
| San Miguel River Segment 2 | UFO boundary 1.25 miles (est.) downstream from Clay Creek to immediately above Horsefly Creek | 4.01 | 3.64 |
| San Miguel River Segment 3 | Immediately above Horsefly Creek to Colorado State Highway 90 Bridge at Piñon, CO | 7.31 | 5.30 |
| San Miguel River Segment 5 | Calamity Draw to Atkinson Creek | 14.00 | 2.59 |
| San Miguel River Segment 6 | Atkinson Creek to Dolores River | 3.23 | 2.25 |

| SEGMENT NAME | SEGMENT LOCATION | TOTAL SEGMENT LENGTH (IN MILES) | SEGMENT LENGTH ON BLM LANDS (IN MILES) |
|---|---|---|---|
| Tabeguache Creek Segment 1 | Uncompahgre NF boundary to west boundary of Tabeguache Area | 3.61 | 3.61 |
| Tabeguache Creek Segment 2 | West boundary of Tabeguache Area to San Miguel River | 11.57 | 7.89 |
| **HYDROLOGIC UNIT: LOWER DOLORES** | | | |
| Dolores River | San Miguel River to BLM Grand Junction Field Office boundary | 10.53 | 6.93 |
| North Fork Mesa Creek | UFO boundary to Mesa Creek | 8.53 | 5.81 |
| **HYDROLOGIC UNIT: UPPER DOLORES** | | | |
| Dolores River Segment 1 | UFO boundary downstream to Highway 90 Bridge at Bedrock, CO. | 11.80 | 9.56 |
| Dolores River Segment 2 | Highway 90 Bridge to San Miguel River | 11.50 | 5.42 |
| Ice Lake Creek Segment 2 | Knickpoint in T47N/ R20W/Sec 11 NMPM to La Sal Creek | 0.58 | 0.31 |
| La Sal Creek Segment 1 | Colorado State line to Sharp Canyon | 4.82 | 0.62 |
| La Sal Creek Segment 2 | Sharp Canyon to Dolores River Canyon WSA boundary | 4.52 | 3.82 |
| La Sal Creek Segment 3 | Dolores River Canyon WSA boundary to Dolores River | 3.37 | 3.37 |
| Lion Creek Segment 2 | Knickpoint in T47N/ R20W/Sec 1 NMPM to La Sal Creek | 1.57 | 1.26 |
| Spring Creek | Headwaters of Spring Creek to La Sal Creek | 2.65 | 1.49 |

BLM_0106628

**TABLE 2 - ELIGIBLE DOMINGUEZ-ESCALANTE RIVER SEGMENTS EVALUATED BY THE BLM GRAND JUNCTION FIELD OFFICE**

The Final Wild and Scenic River Eligibility Report for the BLM Grand Junction Field Office is available to view and download at: www.blm.gov/co/st/en/fo/gjfo/rmp/Wild_Scenic_River.html

| SEGMENT NAME | SEGMENT LOCATION | TOTAL SEGMENT LENGTH (IN MILES) | SEGMENT LENGTH ON BLM LANDS (IN MILES) |
|---|---|---|---|
| **HYDROLOGIC UNIT:  LOWER GUNNISON** | | | |
| Big Dominguez Creek, Segment 1 | Big Dominguez Creek boundary with the Uncompahgre National Forest in the southern portion of the planning area to the confluence with Little Dominguez Creek (near Bridgeport) | 15.86 | 15.86 |
| Big Dominguez Creek, Segment 2 | Confluence with Little Dominguez Creek to the confluence with the Gunnison River near Bridgeport. | 0.78 | 0.78 |
| Little Dominguez Creek, Segment 1 | Little Dominguez Creek boundary with the Uncompahgre National Forest to the Dominguez WSA boundary approximately two miles from the confluence with Big Dominguez Creek. | 13.14 | 13.14 |
| Little Dominguez Creek, Segment 2 | Boundary of the Dominguez WSA to the confluence with Big Dominguez Creek. | 2.45 | 2.45 |
| Gunnison River, Segment 1 | Sections of the Gunnison River west of Highway 50 on BLM land from the southern planning area boundary near Bridgeport to Whitewater. | 15.73 | 13.45 |

BLM_0106629

| FY 2008-09 | CHEVRON TEXACO NW 35% | SHELL SW 5% | SUNCOR NE 40% | VALERO SE 20% | COLORADO WEIGHTED AVERAGE COMPOSITE INDEX | WEST TEXAS INTER (WTI) | COLO LESS WTI |
|---|---|---|---|---|---|---|---|
| JULY | 122.92 | 129.85 | 115.08 | 129.47 | **121.44** | 130.82 | -9.38 |
| AUGUST | 104.31 | 112.15 | 106.11 | 111.86 | **106.93** | 113.21 | -6.28 |
| SEPTEMBER | 90.87 | 99.82 | 91.64 | 99.50 | **93.35** | 100.85 | -7.50 |
| OCTOBER | 62.22 | 72.19 | 56.96 | 71.88 | **62.55** | 73.23 | -10.69 |
| NOVEMBER | 42.54 | 52.96 | 45.44 | 52.70 | **46.25** | 54.05 | -7.80 |
| DECEMBER | 25.63 | 36.62 | 33.04 | 36.36 | **31.29** | 37.71 | -6.42 |
| JANUARY | 26.75 | 37.40 | 32.91 | 37.01 | **31.80** | 38.36 | -6.56 |
| FEBRUARY | 25.25 | 34.82 | 35.76 | 39.90 | **32.86** | 41.25 | -8.39 |
| MARCH | 35.17 | 43.57 | 40.66 | 43.24 | **39.40** | 44.59 | -5.19 |
| APRIL | 38.98 | 45.90 | 42.12 | 45.58 | **41.90** | 46.93 | -5.02 |
| MAY | 48.57 | 54.72 | 57.31 | 54.40 | **53.54** | 55.75 | -2.21 |
| JUNE | 58.69 | 65.15 | 60.89 | 64.80 | **61.11** | 66.15 | -5.04 |
| AVERAGES | | | | | | | |
| J-S 2008 | 106.03 | 113.94 | 104.28 | 113.61 | **107.24** | 114.96 | -7.72 |
| O-D 2008 | 43.47 | 53.92 | 45.15 | 53.65 | **46.70** | 55.00 | -8.30 |
| J-M 2009 | 29.06 | 38.60 | 36.44 | 40.05 | **34.69** | 41.40 | -6.71 |
| A-J 2009 | 48.75 | 55.26 | 53.44 | 54.93 | **52.19** | 56.28 | -4.09 |
| | | | | | | | |
| **FY 2008-09** | 56.83 | 65.43 | 59.83 | 65.56 | **60.20** | 66.91 | -6.71 |
| **CY 2008** | 87.03 | 95.16 | 89.59 | 94.87 | **90.03** | 96.22 | -6.19 |
| **CY 2009** | 50.01 | 57.23 | 54.47 | 54.58 | **50.87** | 55.93 | -5.06 |
| | | | | | | | |
| FY = Fiscal Year | | | | | | | |
| CY = Calendar Year | | | | | | | |

**COLORADO OIL PRICE COMPOSITE INDEX $/Bbl**

BLM_0106630

# COGIS - Production Data Inquiry

| You requested production by: | county |
|---|---|
| Maximum records are limited to: | 10 |
| Year range: | 2005 to 2010 |
| For monthly detail: | Click on year |

| Annual Production by County - 5 record(s) returned. | | | | | | |
|---|---|---|---|---|---|---|
| County | Year | Oil Production (barrels) | Oil Sales (barrels) | Gas Production (MCF) | Gas Sales (MCF) | Water Production (barrels) |
| DELTA | 2005 | 857 | 516 | 401,055 | 353,108 | 677 |
| DELTA | 2006 | 74 | 108 | 64,774 | 47,261 | 9,234 |
| DELTA | 2007 | 149 | | 19,345 | 9,756 | 15,616 |
| DELTA | 2008 | 8 | | 15,683 | 9,899 | 17,471 |
| DELTA | 2009 | 7 | | 5,314 | 4,998 | 179 |

BLM_0106631

# COGIS - Production Data Inquiry

| You requested production by: | county |
|---|---|
| Maximum records are limited to: | 10 |
| Year range: | 2005 to 2010 |
| For monthly detail: | Click on year |

| Annual Production by County - 5 record(s) returned. | | | | | | |
|---|---|---|---|---|---|---|
| County | Year | Oil Production (barrels) | Oil Sales (barrels) | Gas Production (MCF) | Gas Sales (MCF) | Water Production (barrels) |
| GUNNISON | 2005 | 86 | | 7,122 | 3,624 | 34 |
| GUNNISON | 2006 | 2,239 | 1,437 | 556,228 | 519,621 | 65 |
| GUNNISON | 2007 | 1,809 | 1,384 | 1,174,675 | 1,065,891 | 350,416 |
| GUNNISON | 2008 | 1,926 | 1,323 | 1,353,266 | 1,197,793 | 640,435 |
| GUNNISON | 2009 | 979 | 972 | 947,426 | 871,717 | 543,233 |

Case No. 1:20-cv-02484-MSK    Document 59-5    filed 04/28/21    USDC Colorado    pg 16 of 282

# COGIS - Production Data Inquiry

| You requested production by: | county |
|---|---|
| Maximum records are limited to: | 10 |
| Year range: | 2005 to 2010 |
| For monthly detail: | Click on year |

| Annual Production by County - 5 record(s) returned. | | | | | | |
|---|---|---|---|---|---|---|
| County | Year | Oil Production (barrels) | Oil Sales (barrels) | Gas Production (MCF) | Gas Sales (MCF) | Water Production (barrels) |
| MESA | 2005 | 20,194 | 16,700 | 10,594,996 | 10,281,151 | 408,559 |
| MESA | 2006 | 38,437 | 35,629 | 15,404,396 | 15,040,053 | 702,169 |
| MESA | 2007 | 64,719 | 60,903 | 28,823,945 | 27,766,466 | 949,069 |
| MESA | 2008 | 120,933 | 119,379 | 38,192,320 | 36,948,815 | 2,334,589 |
| MESA | 2009 | 88,553 | 87,474 | 26,090,694 | 25,518,586 | 1,558,098 |

BLM_0106633

Case No. 1:20-cv-02484-MSK    Document 59-5    filed 04/28/21    USDC Colorado    pg 17 of 282

# COGIS - Production Data Inquiry

| You requested production by: | county |
|---|---|
| Maximum records are limited to: | 10 |
| Year range: | 2005 to 2010 |
| For monthly detail: | Click on year |

| Annual Production by County - 4 record(s) returned. | | | | | | |
|---|---|---|---|---|---|---|
| County | Year | Oil Production (barrels) | Oil Sales (barrels) | Gas Production (MCF) | Gas Sales (MCF) | Water Production (barrels) |
| MONTROSE | 2005 | | | | | |
| MONTROSE | 2007 | | | | | |
| MONTROSE | 2008 | | | | | |
| MONTROSE | 2009 | | | | | |

BLM_0106634

# COGIS - Production Data Inquiry

| You requested production by: | county |
|---|---|
| Maximum records are limited to: | 10 |
| Year range: | 2005 to 2010 |
| For monthly detail: | Click on year |

| Annual Production by County - No Records Found | | | | | |
|---|---|---|---|---|---|
| County | Year | Oil Production (barrels) | Oil Sales (barrels) | Gas Production (MCF) | Gas Sales (MCF) | Water Production (barrels) |

BLM_0106635

# COGIS - Production Data Inquiry

| You requested production by: | county |
|---|---|
| Maximum records are limited to: | 10 |
| Year range: | 2005 to 2010 |
| For monthly detail: | Click on year |

| Annual Production by County - 5 record(s) returned. | | | | | | |
|---|---|---|---|---|---|---|
| County | Year | Oil Production (barrels) | Oil Sales (barrels) | Gas Production (MCF) | Gas Sales (MCF) | Water Production (barrels) |
| SAN MIGUEL | 2005 | 13,583 | 12,721 | 20,776,947 | 20,502,980 | 100,639 |
| SAN MIGUEL | 2006 | 9,673 | 7,007 | 24,489,329 | 24,255,780 | 108,989 |
| SAN MIGUEL | 2007 | 5,629 | 5,247 | 17,775,357 | 17,568,928 | 110,667 |
| SAN MIGUEL | 2008 | 5,249 | 4,667 | 14,034,237 | 13,851,523 | 106,452 |
| SAN MIGUEL | 2009 | 3,027 | 4,107 | 8,399,433 | 8,249,140 | 102,656 |

BLM_0106636

![NATIONAL SYSTEM OF PUBLIC LANDS] U.S. DEPARTMENT OF THE INTERIOR                **BUREAU OF LAND MANAGEMENT NEWS RELEASE**

**Release Date:** 01/29/10
**Contacts:** Tom Gorey (BLM)            , (202) 912-7420
Becky Rine (Forest Service), (202) 205-1083

## BLM and Forest Service Announce 2010 Grazing Fee

The Federal grazing fee for 2010 will be $1.35 per animal unit month (AUM) for public lands administered by the Bureau of Land Management and $1.35 per head month (HM) for lands managed by the Forest Service.   The 2010 fee is the same as it was in 2009.

An AUM or HM – treated as equivalent measures for fee purposes – is the occupancy and use of public lands by one cow and her calf, one horse, or five sheep or goats for a month. The newly calculated grazing fee, determined by a congressional formula and effective on March 1, applies to nearly 18,000 grazing permits and leases administered by the BLM and more than 8,000 permits administered by the Forest Service.

The formula used for calculating the grazing fee, which was established by Congress in the 1978 Public Rangelands Improvement Act, has continued under a presidential Executive Order issued in 1986.  Under that order, the grazing fee cannot fall below $1.35 per AUM, and any increase or decrease cannot exceed 25 percent of the previous year's level.

The annually determined grazing fee is computed by using a 1966 base value of $1.23 per AUM/HM for livestock grazing on public lands in Western states. The figure is then calculated according to three factors – current private grazing land lease rates, beef cattle prices, and the cost of livestock production.  In effect, the fee rises, falls, or stays the same based on market conditions, with livestock operators paying more when conditions are better and less when conditions have declined.

The $1.35 per AUM/HM grazing fee applies to 16 Western states on public lands administered by the BLM and the Forest Service.  The states are Arizona, California, Colorado, Idaho, Kansas, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Utah, Washington, and Wyoming.  The Forest Service applies different grazing fees to national grasslands and to lands under its management in the Eastern and Midwestern states and parts of Texas.

The BLM, an agency of the U.S. Department of the Interior, manages more land – 253 million surface acres – than any other Federal agency.  Most of this public land is located in 12 Western states, including Alaska.

The Forest Service, an agency of the U.S. Department of Agriculture, manages 193 million acres of Federal lands in 44 states, Puerto Rico, and the Virgin Islands.

.

--BLM--

Last updated: 01-29-2010

BLM_0106637

Land Status and Mineral Estate within the Uncompahgre Planning Area

| Surface in the Planning Area | Approximate Acres (in planning area) |
|---|---|
| BLM | 675,677 |
| Forest Service | 1,249,066 |
| National Park Service | 27,127 |
| State (including Division of Wildlife) | 18,413 |
| City | 885 |
| Private | 1,126,330 |
| Total Within Planning Area | 3,097,498 |
| | |
| **Counties within the Planning Area** | |
| Montrose | 1,182,852 |
| Delta | 598,761 |
| Mesa | 111,651 |
| Gunnison | 426,779 |
| Ouray | 344,386 |
| San Miguel | 429,793 |
| Insignificant parts of other counties | 3,276 |
| | |
| **BLM within Counties** | |
| Montrose | 447,988 |
| Delta | 120,696 |
| Mesa | 11,936 |
| Gunnison | 13,352 |
| Ouray | 24,461 |
| San Miguel | 57,231 |
| Insignificant parts of other counties | 14 |
| | |
| **Mineral Estate in the Planning Area** | |
| No Federal Minerals | 862,836 |
| [1]All Federal Minerals | 2,140,718 |
| Coal Only | 55,577 |
| Oil and Gas Only | 10,996 |
| Oil, Gas and Coal Only | 8,965 |
| [2]Other | 18,406 |
| | |
| Total Federal Minerals | 2,234,662 |
| | |
| Acres of BLM with Federal Minerals | 669,309 |
| Acres of Federal Minerals other federal Lands (USFS, NPS) | 1,270,401 |
| Acres of Federal Minerals under private, state or city lands | 294,952 |

[1] All Federal Minerals. The federal government owns rights to all minerals (e.g. coal, oil, gas, Uranium, gravel, sand, moss rock, and all others).

[2] Other. The federal government owns rights to other minerals, either singly or a combination of other minerals. Other minerals includes uranium, moss rock, gravel, sand, and other minerals not listed in this table.

BLM_0106638

**CALENDAR YEAR 2008**

**UFO CO-S050**

| MINE | FEDERAL ROYALTIES | FEDERAL PRODUCTION TONS | FEE PRODUCTION TONS | TOTAL TONS PRODUCED |
|---|---|---|---|---|
| Bowie | $ 4,902,805 | 2,735,541 | 0 | 2,735,541 |
| Elk Creek | $ 14,269,535 | 4,953,199 | 274,019 | 5,227,218 |
| West Elk | $ 13,741,612 | 4,623,232 | 1,256,517 | 5,879,749 |
| **TOTAL** | **$ 32,913,952** | **12,311,972** | **1,530,536** | **13,842,508** |

BLM_0106639

**Zoe Ghali**

| | |
|---|---|
| **From:** | olivia_martinez@blm.gov |
| **Sent:** | Friday, April 16, 2010 10:29 AM |
| **To:** | Zoe Ghali |
| **Subject:** | RE: FO receipts data request |

Hi Zoe,

Here are the figures for FY2008:

     Mineral Material (Rock)  $13,792.00
     Vegetative Material (Forestry)  $6,252.86

Thanks and have a good weekend.

Olivia Martinez
Accounting Tech
Uncompahgre Field Office
2465 S. Townsend
Montrose, CO  81401
Fax:  970-240-5368
Phone: 970-240-5430


        "Zoe Ghali"
        <zoe.ghali@empsi.
        com>                               To
                        <olivia_martinez@blm.gov>
        04/16/2010 09:42                     cc
        AM
                             Subject
                RE: FO receipts data request


Hi Olivia,

Thanks for getting this to me. Would it be possible to also get these numbers for FY2008?
If it is too much trouble just let me know,

Thanks,

Zoe Ghali

EMPSi  Environmental Management and Planning Solutions, Inc.

3775 Iris Avenue, Suite 1A

Boulder, CO  80301

tel:  303-447-7160     fax:  866-625-0707

1

BLM_0106640

www.EMPSi.com      Bringing clarity to the complex (tm)

GSA Contract GS10F-0412S         HUBZone-certified

Denver      Reno        San Francisco        Washington, DC


PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

-----Original Message-----
From: olivia_martinez@blm.gov [mailto:olivia_martinez@blm.gov]
Sent: Friday, April 16, 2010 9:37 AM
To: Zoe Ghali
Subject: RE: FO receipts data request

Hi Zoe,

The following is a list of FY2009 receipts for forestry sales and saleable minerals:

        Mineral Material (Rock)  $3,488.00
        Vegetative Material (Forestry)  $7,037.90

I am not able to provide you with oil and gas royalties.  Thane Stranathan, of this office will be in contact with you regarding this information.

Thanks for being so patient.

Olivia Martinez
Accounting Tech
Uncompahgre Field Office
2465 S. Townsend
Montrose, CO  81401
Fax:  970-240-5368
Phone: 970-240-5430



            "Zoe Ghali"

            <zoe.ghali@empsi.

            com>
To
                                    <olivia_martinez@blm.gov>

            04/15/2010 04:35
cc
            PM


Subject
                                    RE: FO receipts data request

BLM_0106641

Hi Olivia,

Hope that your week is going well, I am checking in to see if you'd had any luck accessing receipts and royalties data for the FO for any recent FYs. I know when we spoke last there was a problem with your system. If you could please let me know the status that would be great.

Thanks again for your help,


Zoe Ghali
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite 1A
Boulder, CO  80301
tel:  303-447-7160    fax:  866-625-0707

            www.EMPSi.com      Bringing clarity to the complex (tm)
            GSA Contract GS10F-0412S        HUBZone-certified
    Denver          Reno        San Francisco      Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

From: Zoe Ghali
Sent: Tuesday, April 06, 2010 3:35 PM
To: 'olivia_martinez@blm.gov'
Subject: FO receipts data request

Hi Olivia,

I am helping to gather data for the socioeconomic baseline report for the RMP revision and Bruce Krickbaum recommended that contact you for FO receipts data.
Specifically I am interested in receipts for the FO for the most recent fiscal year for forestry sales and saleable minerals (ie sand and
gravel)
as well as oil and gas royalties. We already have grazing fees, ROW, rec fee receipts, and coal royalties so we don not need those, but if you have receipts for any other important areas please let me know.

Feel free to contact me with any questions,

Thanks for your help.

Zoe Ghali
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite 1A
Boulder, CO  80301
tel:  303-447-7160    fax:  866-625-0707

            www.EMPSi.com      Bringing clarity to the complex (tm)
            GSA Contract GS10F-0412S        HUBZone-certified
    Denver          Reno        San Francisco      Washington, DC

3

BLM_0106642

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

BLM_0106643

## Zoe Ghali

**From:**       olivia_martinez@blm.gov
**Sent:**       Friday, April 16, 2010 9:37 AM
**To:**         Zoe Ghali
**Subject:**    RE: FO receipts data request

Hi Zoe,

The following is a list of FY2009 receipts for forestry sales and saleable
minerals:

        Mineral Material (Rock)  $3,488.00
        Vegetative Material (Forestry)  $7,037.90

I am not able to provide you with oil and gas royalties.  Thane Stranathan, of this office
will be in contact with you regarding this information.

Thanks for being so patient.

Olivia Martinez
Accounting Tech
Uncompahgre Field Office
2465 S. Townsend
Montrose, CO  81401
Fax:  970-240-5368
Phone: 970-240-5430


            "Zoe Ghali"
            <zoe.ghali@empsi.
            com>                                              To
                            <olivia_martinez@blm.gov>
            04/15/2010 04:35                                  cc
            PM
                                                         Subject
                        RE: FO receipts data request




Hi Olivia,

Hope that your week is going well, I am checking in to see if you'd had any luck accessing
receipts and royalties data for the FO for any recent FYs. I know when we spoke last there
was a problem with your system. If you could please let me know the status that would be
great.

Thanks again for your help,


Zoe Ghali
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite 1A
Boulder, CO  80301
tel:  303-447-7160     fax:  866-625-0707

1

```
        www.EMPSi.com      Bringing clarity to the complex ™
        GSA Contract GS10F-0412S          HUBZone-certified
Denver          Reno          San Francisco          Washington, DC
```

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

From: Zoe Ghali
Sent: Tuesday, April 06, 2010 3:35 PM
To: 'olivia_martinez@blm.gov'
Subject: FO receipts data request

Hi Olivia,

I am helping to gather data for the socioeconomic baseline report for the RMP revision and Bruce Krickbaum recommended that contact you for FO receipts data. Specifically I am interested in receipts for the FO for the most recent fiscal year for forestry sales and saleable minerals (ie sand and gravel) as well as oil and gas royalties. We already have grazing fees, ROW, rec fee receipts, and coal royalties so we don not need those, but if you have receipts for any other important areas please let me know.

Feel free to contact me with any questions,

Thanks for your help.

Zoe Ghali
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite 1A
Boulder, CO  80301
tel:  303-447-7160    fax:  866-625-0707

```
        www.EMPSi.com      Bringing clarity to the complex ™
        GSA Contract GS10F-0412S          HUBZone-certified
Denver          Reno          San Francisco          Washington, DC
```

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

BLM_0106645

Report # 19                                                          Page 1 of 4

**Visitor Days and Participants**
**by Office, Activity Group and Activity**

**Fiscal Year Range**

Oct 01, 2008  -   Sep 30, 2009

Bureau of Land Management
Recreation Management Information System

7 April 2010

# Colorado

## CO150 - Uncompahgre Field Office

| Visitor Use Activity Groupings | Number of Participants | Visitor Days |
|---|---|---|
| **Boating/Motorized** | | |
| Boat Launching | 5,727 | 520 |
| Power Boating | 694 | 116 |
| **Boating/MotorizedTotals:** | 6,421 | 636 |
| **Boating/Non-Motorized** | | |
| Canoe/Kayaking | 8,286 | 2,822 |
| Row/Float/Raft | 32,462 | 13,999 |
| **Boating/Non-MotorizedTotals:** | 40,748 | 16,821 |
| **Camping & Picnicking** | | |
| Camping | 57,097 | 57,084 |
| Picnicking | 10,409 | 615 |
| **Camping & PicnickingTotals:** | 67,506 | 57,699 |
| **Driving For Pleasure** | | |
| Driving For Pleasure | 83,243 | 19,772 |
| **Driving For PleasureTotals:** | 83,243 | 19,772 |
| **Fishing** | | |
| Fishing - Freshwater | 18,734 | 7,718 |

Prepared by: CO150
FY Date Range: Oct 1,2008- Sept 30, 2009
State: CO
Office: CO150

BLM_0106646

Report # 19                                                              Page 2 of 4

**Visitor Days and Participants**
**by Office, Activity Group and Activity**

**Fiscal Year Range**

Oct 01, 2008  -   Sep 30, 2009

Bureau of Land Management
Recreation Management Information System

7 April 2010

## Colorado

**CO150 - Uncompahgre Field Office**

| Visitor Use Activity Groupings | Number of Participants | Visitor Days |
|---|---|---|
| **FishingTotals:** | 18,734 | 7,718 |
| **Hunting** | | |
| Hunting - Big Game | 77,759 | 50,838 |
| Hunting - Small Game | 23,214 | 5,601 |
| Hunting - Upland Bird | 123 | 45 |
| Hunting - Waterfowl | 4 | 2 |
| **HuntingTotals:** | 101,100 | 56,486 |
| **Interpretation, Education & Nature Study** | | |
| Environmental Education | 7,801 | 376 |
| Nature Study | 1,001 | 149 |
| Viewing - Cultural Sites | 1,387 | 107 |
| Viewing - Other | 2,245 | 136 |
| Viewing - Scenery/Landscapes | 3,711 | 613 |
| Viewing - Wildlife | 2,768 | 247 |
| Viewing -Interpretive Exhibit | 26,663 | 827 |
| **Interpretation, Education & Nature StudyTotals:** | 45,576 | 2,455 |
| **Non-Motorized Travel** | | |
| Backpacking | 502 | 502 |

Prepared by: CO150
FY Date Range: Oct 1,2008- Sept 30, 2009
State: CO
Office: CO150

BLM_0106647

Report # 19                                                                 Page 3 of 4

**Visitor Days and Participants**
**by Office, Activity Group and Activity**

**Fiscal Year Range**

Oct 01, 2008  -   Sep 30, 2009

Bureau of Land Management
Recreation Management Information System

7 April 2010

## Colorado

**CO150 - Uncompahgre Field Office**

| Visitor Use Activity Groupings | Number of Participants | Visitor Days |
|---|---|---|
| Bicycling - Mountain | 43,145 | 18,771 |
| Hiking/Walking/Running | 14,052 | 2,136 |
| Horseback Riding | 14,087 | 3,971 |
| **Non-Motorized TravelTotals:** | 71,786 | 25,380 |
| **Off-Highway Vehicle Travel** | | |
| OHV - ATV | 82,040 | 39,502 |
| OHV - Cars/Trucks/SUVs | 113,775 | 37,922 |
| OHV - Motorcycle | 38,895 | 12,981 |
| **Off-Highway Vehicle TravelTotals:** | 234,710 | 90,405 |
| **Snowmobile & Other Motorized Travel** | | |
| Snowmobiling | 10,855 | 5,350 |
| **Snowmobile & Other Motorized TravelTotals:** | 10,855 | 5,350 |
| **Specialized Motor Sports, Events & Activities** | | |
| Rock Crawling-4WD | 10,394 | 6,929 |
| **Specialized Motor Sports, Events & ActivitiesTotals:** | 10,394 | 6,929 |
| **Specialized Non-Motor Sports, Events & Activities** | | |
| Archery | 6,340 | 3,127 |
| Climbing - Mountain/Rock | 9,799 | 3,966 |

Prepared by: CO150
FY Date Range: Oct 1,2008- Sept 30, 2009
State: CO
Office: CO150

BLM_0106648

Report # 19

**Visitor Days and Participants**
**by Office, Activity Group and Activity**

**Fiscal Year Range**

Oct 01, 2008  -   Sep 30, 2009

Bureau of Land Management
Recreation Management Information System

7 April 2010

## Colorado

**CO150 - Uncompahgre Field Office**

| Visitor Use Activity Groupings | Number of Participants | Visitor Days |
|---|---|---|
| Hang-Gliding/Parasailing | 173 | 72 |
| Photography | 18,803 | 1,891 |
| Racing - Foot | 38 | 25 |
| Rockhounding/Mineral Collection | 115 | 38 |
| Social Gathering/Festival/Concert | 23,394 | 9,907 |
| Staging/Comfort Stop | 441 | 18 |
| Target Practice | 23,360 | 3,826 |
| **Specialized Non-Motor Sports, Events & ActivitiesTotals:** | 82,463 | 22,870 |
| **Swimming & Other Water Based Activities** | | |
| Swimming/Water Play | 14,594 | 4,865 |
| **Swimming & Other Water Based ActivitiesTotals:** | 14,594 | 4,865 |
| **Winter/Non-Motorized Activities** | | |
| Skiing - Cross Country | 10,486 | 3,480 |
| **Winter/Non-Motorized ActivitiesTotals:** | 10,486 | 3,480 |
| **Uncompahgre Field OfficeTotals:** | | 320,866 |
| **Total Matched In Colorado** | | 320,866 |
| **Total:** | | 320,866 |

Prepared by: CO150
FY Date Range: Oct 1,2008- Sept 30, 2009
State: CO
Office: CO150

BLM_0106649

## Zoe Ghali

| | |
|---|---|
| **From:** | Julie_Jackson@blm.gov |
| **Sent:** | Wednesday, April 07, 2010 10:46 AM |
| **To:** | Zoe Ghali |
| **Cc:** | karen_tucker@blm.gov; bruce_krickbaum@blm.gov; Amy_Sharp@blm.gov; Edd_Franz@blm.gov; Joseph_Treadway@blm.gov |
| **Subject:** | Re: Recreation data request for socioeconomic report |
| **Attachments:** | Visits and Visitor Days by RMA Report for FY2009.rtf; Visitor Days and Participants by Office and Activity FY2008.rtf; Visitor Days and Participants by Office and Activity FY2009.rtf; Visitor Days and Participants by Office, Activity Group and Activity FY2008.rtf; Visitor Days and Participants by Office, Activity Group and Activity FY2009.rtf; Visits and Visitor Days by Office FY2008.rtf; Visits and Visitor Days by Office FY2009.rtf; Visits and Visitor Days by RMA Report for FY2008.rtf |

      

Visits and Visitor Days by RMA...   Visitor Days and Participants ...   Visitor Days and Participants ...   Visitor Days and Participants ...   Visitor Days and Participants ...   Visits and Visitor Days by Off...   Visits and Visitor Days by Off...



Visits and Visitor Days by RMA...

```
        Hey Zoe

I have printed out some reports from our Recreation Management Information System (RMIS)
however please do not go off of the visitor days numbers only the participant or visit
numbers.  All these numbers are estimates and are not 100% accurate but they are the only
numbers that we have available right now.  I have provided two years (our Fiscal Year 2008
and 2009) of reports with several variations in how they are reported.  If you need more
information or need clarification on any of these please don't hesitate to get a hold of
me or if I am not available you may speak with Amy Sharp or Edd Franz.

(See attached file: Visits and Visitor Days by RMA Report for FY2009.rtf) (See attached
file: Visitor Days and Participants by Office and Activity FY2008.rtf)(See attached file:
Visitor Days and Participants by Office and Activity FY2009.rtf)(See attached file:
Visitor Days and Participants by Office, Activity Group and Activity FY2008.rtf) (See
attached file: Visitor Days and Participants by Office, Activity Group and Activity
FY2009.rtf)(See attached file: Visits and Visitor Days by Office FY2008.rtf)(See attached
file: Visits and Visitor Days by Office FY2009.rtf)(See attached file: Visits and Visitor
Days by RMA Report for
FY2008.rtf)


Thanks
Julie Jackson
Outdoor Recreation Planner
2465 S. Townsend Ave
Montrose, CO  81401
(970) 240-5310
Julie_Jackson@blm.gov

"To the world you might be one person, but to one person, you just might be the world."
"The happiest people don't have the best of everything. They just make the best of
everything."



        "Zoe Ghali"
```

1

BLM_0106650

```
        <zoe.ghali@empsi.
        com>                                                      To
                                    <Julie_Jackson@blm.gov>
        04/06/2010 03:41                                           cc
        PM
                                                              Subject
                                    Recreation data request for
                                    socioeconomic report
```

Hi Julie,
I am helping to gather data for the socioeconomic baseline report for the RMP revision and
Bruce Krickbaum recommended that contact you for FO recreation data.
Specifically I am interested in any visitor use data you may have available, such as
visitor days.
Please let me know what information you have available, and feel free to contact me with
any questions.

Thanks for your time,

Zoe Ghali
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite 1A
Boulder, CO  80301
tel:  303-447-7160     fax:  866-625-0707

            www.EMPSi.com     Bringing clarity to the complex ™
                GSA Contract GS10F-0412S        HUBZone-certified
     Denver          Reno          San Francisco        Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential
and/or inside information. Any distribution or use of this communication by anyone other
than the intended recipient is strictly prohibited and may be unlawful. If you are not the
intended recipient, please notify the sender by replying to this message and then delete
it from your system.

BLM_0106651

# 6.2

## BLM UNCOMPAHGRE FIELD OFFICE
## RMP PLANNING FACT SHEET
### *Managing For Livestock & Against Weeds*

Barbara Sharrow, UFO Field Manager
2465 S. Townsend Ave, Montrose, CO  81401
Office hours are 8:00 am to 4:30 pm
Phone: (970) 240-5300 | TDD (970) 240-5366
FAX (970) 240-5367

The BLM Uncompahgre Field Office (UFO) is revising the Resource Management Plan (RMP) for the Uncompahgre planning area.  The Uncompahgre RMP will provide detailed information about the current state of resources on public lands within the planning area, and set forth a plan of action for managing those resources for the next twenty or so years under the BLM's dual mandate of *multiple use* and *sustained yield*.

## LIVESTOCK GRAZING IN THE PLANNING AREA

Currently 628,754 acres (93%)  of BLM-administered public land within the Uncompahgre planning area are allocated for livestock grazing.  The public range is permitted at a level of 43,491 AUMs of forage.  This figure includes 38,200 active AUMs and 5,291 AUMs of suspended use.  Permittees paid to use 29,219 AUMs of forage in 2008.

> **Animal Unit Month (AUM)**
> *The amount of forage needed to sustain one cow, five sheep, or five goats for a month*

Over the past five years, billed use has averaged 65% of total permitted use.  This difference can be attributed to a number of variables.  Seasonal variations in precipitation and temperature result in more or less available forage from one year to the next.  Drought conditions have required a reduction in grazing use in order to maintain good range conditions.  Permittees may also opt for voluntary non-use for a variety of reasons, resulting in AUMs that are available but not used.  In addition, grazing is typically deferred in an area for two years following land treatments and fire rehabilitation projects, accounting for lower use levels.



There are 46,923 acres (7%) of BLM-administered public land within the planning area not allocated for livestock use.  In addition, there are a small number of allotments where permits have been voluntarily relinquished and are considered vacant.

Within the planning area, there are 203 allotments and 135 permittees.  The allotments vary in size from 40 to 92,198 acres, with grazing allocations ranging from one to 4,800 AUMs in each allotment.  In 2009, 85% of the allotment permits were for cattle, with sheep and horse grazing accounting for the remaining 15%.  Individual operators graze animals on 188 allotments, while the remaining fifteen are common allotments grazed by two or more operators.

Grazing within the planning area occurs throughout the year, with much of the use concentrated during spring and fall months.  Spring and fall allotments are typically located adjacent to U.S. Forest Service land, and are utilized for short periods prior to "on" dates and after "off" dates for higher elevation summer allotments on national forest land.  Summer use allotments are commonly found at higher elevations in the North Fork of the Gunnison River area.  Winter use allotments are primarily located in the west end of Montrose and San Miguel Counties, at lower elevations associated with a semi-arid climate.



BLM

6.2—Managing For Livestock & Against Weeds

## MANAGING FOR GRAZING

All grazing permits include terms and conditions regarding management of the allotment. In some cases, allotment management plans (AMPs) have been developed, which provide greater detail about the location, amount, and timing of permitted grazing use, and incorporate allotment-specific planned grazing systems.

Most allotments in the planning area contain portions which are only slightly used or not used at all by livestock due to topography, distance from water, limitations caused by natural barriers, or for other reasons. Rangeland improvement projects, water developments in particular, have been implemented within the UFO to better distribute livestock grazing.

Within UFO grazing allotments there are many other uses such as recreation, wildlife, energy development, mining, and utility easements. Resources such as threatened and endangered species, Special Recreation Management Areas, wilderness areas, and Areas of Critical Environmental Concern also occur within grazing allotments, and require special management attention.

### The BLM wants your input...

- Which, if any, unallotted or vacant allotments should be permitted for livestock use? Are there any allotments that should be unallotted, and why?
- Which weed management or control practices should or should not be used ?

---

> **Integrated Weed Management (IWM)**
>
> *The use of all suitable weed control methods to keep weed populations below the economic/ ecological injury level*

## CONTROLLING NOXIOUS WEEDS IN THE PLANNING AREA

Preventing the introduction of noxious and invasive species is the first line of defense against noxious weed establishment. The UFO applies Integrated Weed Management principles and Early Detection/Rapid Response strategies to curtail damage to ecosystems by noxious weeds.

IWM utilizes a combination of control strategies which will hopefully result in the most effective control of target noxious species. IWM methods include cultural practices, use of biological, physical, and the selective use of herbicides. Following the use of control measures, monitoring is conducted to determine which treatments are working, and on which species.



Early detection and rapid response efforts increase the likelihood that invasions will be addressed successfully while populations are still localized and population levels are not beyond that which can be contained and eradicated. Once populations are widely established, all that might be possible is the partial mitigation of negative impacts. In addition, the costs associated with such efforts are typically far less than those of long-term invasive species management programs.

Surveying for noxious species is important and is focused on high-priority targets, such as high-risk locations, high-value resources, important pathways, and populations and species of specific concern. More remote backcountry areas are also surveyed and monitored, although at longer intervals.

---

**UFO Planning Webpage:**
www.UFORMP.com

**Mail comments to:**
Bruce Krickbaum,
RMP Project Manager
2465 S. Townsend Ave
Montrose, CO 81401

**Email comments to:**
UFORMP@blm.gov

UFO 1/2010

BLM_0106653





# US Department of the Interior
## Bureau of Land Management
## Uncompahgre Field Office, Colorado

Resource Management Plan Revision and
Environmental Impact Statement

## COAL RESOURCE AND
## DEVELOPMENT POTENTIAL REPORT

## APRIL 2010



Town of Somerset and Elk
Creek Mine loadout. *Photo
courtesy Desty Dyer, BLM.*

**Prepared by:**
Buckhorn Geotech
www.buckhorngeo.com



Civil, Structural & Geotechnical Engineers

222 South Park Ave. • Montrose, CO 81401
Ph.: (970) 249-6828 • FAX: (970) 249-0945

**TABLE OF CONTENTS**

I.  Introduction ................................................................................................................ 1
    Purpose and Scope................................................................................................... 1
    Acknowledgments ................................................................................................... 1
    Uncompahgre RMP Planning Area .......................................................................... 1
II.  Geologic Setting/Coal Geology.............................................................................. 4
III.  Coal Regions and Coal Fields................................................................................ 9
    Nucla-Naturita Coal Field ........................................................................................ 9
    Tongue Mesa Coal Field ........................................................................................ 13
    Somerset Coal Field............................................................................................... 15
    Grand Mesa Coal Field .......................................................................................... 17
IV.  Coal Stratigraphy ................................................................................................19
    Dakota Sandstone.................................................................................................. 20
    Fruitland Formation ............................................................................................... 24
    Mesaverde Group and Mesaverde Formation........................................................ 25
V.  Historic Mining and Production............................................................................33
    Historic Mining ..................................................................................................... 33
    Historic Production ................................................................................................ 37
VI.  Current Mining Operations and Production..........................................................39
    Nucla-Naturita Coal Field ...................................................................................... 39
    Somerset Coal Field............................................................................................... 41
VII.  Coal Resource Potential (Geologic Occurrence)..................................................43
    Coal Resource Potential of the Dakota Sandstone.................................................. 45
    Coal Resource Potential of the Fruitland Formation............................................... 47
    Coal Resource Potential of the Mesaverde Formation............................................ 50
VIII.  Areas with Potential for Coal Development during Plan Life and Reserve Estimates ........58
    Identification of Areas with Potential for Coal Development during Plan Life............... 58
    Reserve Estimates for Area with Development Potential............................................ 61
IX.  Compliant and Super-Compliant Coal Reserves ..................................................64
X.  Production Estimates............................................................................................65
XI.  Summary..............................................................................................................67
XII.  References............................................................................................................68

BLM_0106655

# LIST OF FIGURES

Figure 1.  Uncompahgre Planning Area .............................................................................. 3
Figure 2.  Location of Major Geologic Structural Features.......................................... 6
Figure 3.  General Geology of the Planning Area ...................................................... 7
Figure 4.  Coal-bearing Geologic Formations in the Planning Area ........................... 8
Figure 5.  Location of Coal Regions and Coal Fields in the Planning Area ............... 11
Figure 6.  Coal Rank and Depth in the Planning Area............................................. 12
Figure 7.  Stratigraphic Relationship of Coal-bearing Formations in Planning Area ................. 19
Figure 8.  Stratigraphic Column of Dakota Sandstone in Nucla-Naturita Coal Field ................ 21
Figure 9.  Generalized Stratigraphic Column Showing Coal Beds in the Somerset, Colorado,
    Area.......................................................................................................... 26
Figure 10.  Stratigraphic Section of Mesaverde Group and Mesaverde Formation in the
    Southern Piceance Basin ............................................................................ 27
Figure 11.  Isopach Map of Net Coal in the Mesaverde Coal-bearing Units ............................. 29
Figure 12.  Isopach Map of Net Coal in the Mesaverde A, B, and C Seams ............................. 29
Figure 13.  Isopach Map of Net Coal in the Mesaverde D and E Seams.................................. 30
Figure 14.  Isopach Map of Net Coal in the Mesaverde F Seam .............................................. 30
Figure 15.  Isopach Map of Net Coal in Mesaverde in Eastern Intrusive Area.......................... 31
Figure 16.  Historic Coal Mines in the Nucla-Naturita Coal Field ............................................ 34
Figure 17.  Historic Coal Mines in the Tongue Mesa Coal Field .............................................. 35
Figure 18.  Historic Coal Mines in the Grand Mesa and Somerset Coal Fields ......................... 36
Figure 19.  Location of Active Coal Leases in the Planning Area............................................. 40
Figure 20.  Depth of Overburden within the Planning Area.................................................... 44
Figure 21.  Coal Resource Potential of the Dakota Sandstone................................................ 46
Figure 22.  Coal Resource Potential of the Fruitland and Mesaverde Formations..................... 49
Figure 23.  Isopach Map of Overburden on Base of Mesaverde A, B, and C Seams.................. 50
Figure 24.  Isopach Map of Overburden on Base of Mesaverde D and E Seams....................... 51
Figure 25.  Isopach Map of Overburden on Base of Mesaverde F Seam .................................. 51
Figure 26.  Isopach Map of Overburden on Mesaverde Formation in Eastern Intrusive Area.... 52
Figure 27.  Known Potential Coal Resource in the Planning Area ........................................... 54
Figure 28.  Potentially Developable Coal in the Somerset Coal Field....................................... 60

# LIST OF TABLES

Table 1. Mineral Estate in the Planning Area ........................................................... 2
Table 2. Summary of Cretaceous Strata in the Planning Area .................................... 5
Table 3. Original Coal Resources in the A, B, and C Seams (Area 1) ....................... 55
Table 4. Original Coal Resources in the D and E Seams (Area 1) ........................... 56
Table 5. Original Coal Resources in the F Seam (Area 1) ....................................... 56
Table 6. Original Coal Resources in the Mesaverde of the Eastern Intrusive Area (Area 1) ...... 56
Table 7. Summary of Original, Mined, and Available Coal Resources within the Somerset
    7.5′ Quadrangle as of 1998........................................................................ 62

BLM_0106656

## ACRONYMNS

| | |
|---|---|
| BLM | Bureau of Land Management |
| Btu | British Thermal Unit |
| FBC | Fluidized Bed Combustion |
| LDx | lower Dakota x |
| RMP | Resource Management Plan |
| UD1 | upper Dakota 1 |
| UFO | Uncompahgre Field Office |
| US | United States |
| USFS | United States Forest Service |
| USGS | United States Geological Survey |

BLM_0106657

# I. Introduction

## *Purpose and Scope*

The goal of this report is to summarize the known coal resources for the United States (US) Bureau of Land Management (BLM) Uncompahgre Field Office (UFO) planning area, and to assess the geographic areas where potential coal resource development may occur in the next 20 years in support of the UFO Resource Management Plan (RMP) process.  This report includes current published and publically available information on the geologic units that contain coal, current coal quality data, reserve estimates, and current production data, as well as identifying areas in the Uncompahgre RMP planning area with coal development potential for the 20-year time period.

## *Acknowledgments*

Throughout the preparation of this Coal Resource and Development Potential report, the primary author, Laurie Brandt of Buckhorn Geotech, interacted with geologists and coal mining specialists from the BLM, the Colorado Geological Survey, the US Forest Service (USFS), and the US Geological Survey (USGS), who provided input on coal resource data and activity forecasts. Much of the specific coal resource information for the Grand Mesa and Somerset coal fields came directly from two sources: 1) the 2006 Grand Mesa, Uncompahgre, and Gunnison National Forests Coal Resource and Development Potential report (USFS 2006); and 2) the USGS report prepared for the Grand Mesa, Uncompahgre, and Gunnison National Forests entitled, "Coal Resources and Coal Resource Potential" (Hettinger et al. 2004), which is Chapter M of USFS Bulletin 2213 (Bankey 2004).   Permission was granted by Ryan Taylor (USFS) to use the structure and content, as needed, of the Grand Mesa, Uncompahgre, and Gunnison National Forests Coal Resource and Development Potential report, of which he was a primary author (USFS 2006). The USGS Professional Paper 1625-B (Kirschbaum et al. 2000), which studied coal deposits of the Colorado Plateau, was also an invaluable resource.

Electronic data for map production was supplied by Mark Kirschbaum (USGS), Chris Carroll (Colorado Geological Survey), and David Sinton (BLM), and on various disc and online sources listed in Section XIII, References.  Most maps were produced by David Sinton (BLM) unless otherwise noted.  George O'Hara of Western Fuels Association provided valuable information on the Nucla-Naturita coal field, Dakota coal, and coal industry standards.  Regarding the Somerset and Grand Mesa coal fields and Mesaverde coal, the following coal industry representatives also provided valuable information: Steve Weist (Oxbow Mining, LLC), James Kiger (Oxbow Mining, LLC), Wendell Koontz (Mountain Coal  Company), and Joe Brinton (Bowie Resources).

## *Uncompahgre RMP Planning Area*

The Uncompahgre RMP planning area encompasses 675,677 acres of public (BLM-administered) land in six Colorado counties: Montrose, Delta, Mesa, Gunnison, Ouray and San Miguel (Figure 1).   It excludes the Gunnison Gorge and Dominguez-Escalante National Conservation Areas. The planning area includes 2.2 million acres of federal (subsurface) mineral estate, including coal (Table 1).  This report considers the coal resource underlying all lands identified in Table 1, including under all BLM-administered surface lands, as well as the federal (BLM) minerals under other surface ownership (such as USFS, private, or State lands).

April 2010    *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*                1
Final Coal Resource and Development Potential Report

BLM_0106658

**Table 1. Mineral Estate in the Planning Area**

| | |
|---|---:|
| Acres of BLM Surface with Federal Minerals | 669,309 |
| Acres of Federal Minerals under Other Federal Surface | 1,270,401 |
| Acres of Federal Minerals under Private, State or City Lands | 294,952 |
| Total Acres of Federal Minerals | 2,234,662 |

The UFO currently manages several active federal coal leases related to three coal mines in the North Fork Valley near Paonia. The Bowie #2, West Elk and Elk Creek mines are actively producing underground (longwall, continuous) coal mines with a combined annual production of 13,950,859 tons in 2008 and 11,801,437 tons in 2009 (Colorado Division of Recalmation Mining and Safety 2010b). A fourth active mine within the planning area, the New Horizon Mine located near Nucla, is strip mining coal from privately owned mineral estate. Annual production from the New Horizon Mine in 2008 and 2009 was 403,230 and 373,758 tons, respectively (Colorado Division of Recalmation Mining and Safety 2010b). The four mines in the planning area produced 44.4% of the coal in Colorado in 2008 and 42.6% of the coal in 2009.

A comprehensive coal resource and development potential report has not been completed to date for the Uncompahgre RMP planning area. A Known Recoverable Coal Resource Area (KRCRA) map was created by the USGS in the 1970s, but there is no associated report or other documentation (Lewis 2010). This map had been used for management of coal resources in the planning area, as documented in the San Juan/San Miguel and Uncompahgre Basin RMPs and Environmental Impact Statements (BLM 1984, 1988). This report has been written to assist in evaluating areas with coal lease potential under the revised RMP for the planning area.

April 2010    *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*    2
*Final Coal Resource and Development Potential Report*

BLM_0106659



**Figure 1.  Uncompahgre Planning Area**

BLM_0106660

## II.  Geologic Setting/Coal Geology

The planning area contains several major structural features that contain and control coal resources, such as the Piceance Basin, Uncompahgre Uplift, and San Juan Volcanic Field (Figure 2).  Most of the rocks underlying the planning area are Mesozoic Era in age (Triassic, Jurassic and Cretaceous Periods), with smaller areas of Cenozoic Era aged rocks (Tertiary and Quaternary Periods, also known as Paleogene and Neogene Periods), and minor areas of older rocks (Paleozoic Era and Precambrian Eon) (Figure 3).  Coal resources in the planning area are found primarily in the Upper Cretaceous Dakota Formation, Fruitland Formation, and Mesaverde Formation/Group (Figure 4).  These rock units were deposited in continental and nearshore marine settings along the western margin of an ancient interior seaway, the Cretaceous Sea.

The Dakota Sandstone has a wide distribution throughout the planning area and is the caprock associated with the Uncompahgre Uplift.  The Mesaverde Formation and Mesaverde Group are located the northern portion of the planning area in an east-west band near the base of Grand Mesa.  This area is at the southern end of the Piceance Basin.  The Fruitland Formation is confined to an isolated area along Cimarron Ridge southeast of Montrose.  This area has been impacted by both the Sawatch/Gunnison Uplifts and the San Juan Volcanic Field, resulting in extensive faulting and disruption of the coal seams.  Figure 2 shows the major structural features of the region, Figure 3 is the general geology of the planning area, Figure 4 shows the locations of coal-bearing formations, and Table 2 provides information on stratigraphic position, thickness, and a brief description of the Upper Cretaceous and coal-bearing rock units within the planning area.

The Dakota Formation consists of conglomerate, sandstone, mudstone, carbonaceous shale, and coal deposited in alluvial and coastal plain settings during the initial incursion of the Western Interior seaway during the Cenomanian Age of the Cretaceous Period (98 to 93 million years ago).  The Dakota Formation is about 30 to 200 feet thick (Young 1960) and is overlain by the Mancos Shale.  The Mancos Shale, which is barren of coal, consists of about 4,000 to 5,000 feet of material deposited in an offshore marine environment that persisted from the Cenomanian through Campanian in the study area (93 to 71 million years ago), when the shoreline was located in Utah.  The Mesaverde Formation was formed as the shoreline moved back into the area during the late Campanian (83 to 71 million years ago).  In the southern part of the Piceance Basin within the planning area, about 2,100 to 5,600 feet of strata has been assigned to the Mesaverde Group and Mesaverde Formation.  The Mesaverde consists of sandstone, mudstone, carbonaceous shale, and coal deposited in a complex system of continental, coastal plain, and shoreface environments.  The Fruitland Formation has a similar environment of deposition and is essentially contemporaneous with the Mesaverde Formation (Haun and Weimer 1960).  In the Cimarron Ridge area near the southeast edge of the planning area, about 200 feet of Upper Cretaceous coal-bearing strata is assigned to the Fruitland Formation (Dickinson 1987a, 1987b, 1988; Hornbaker et al. 1976).

Methane ($CH_4$) is a natural component of coal stored in the micropore structure of coal seams, and is typically referred to as coalbed methane when produced in association with coal (Colorado Geological Survey 2000).  It is a highly explosive gas and is considered a hazard in coal mining.  As a safety precaution, ventilation (degasification) systems are required in mines that have detectable levels of methane, but the Mine Safety and Health Administration currently

April 2010   *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*   4
Final Coal Resource and Development Potential Report

BLM_0106661

does not allow for flaring of methane from mines.  Although coalbed methane is both a hazard and a potential resource, the quantification, management and/or mitigation of methane gas is beyond the scope of this coal resource assessment.

**Table 2. Summary of Cretaceous Strata in the Planning Area**

| Age | Group or Formation | Thickness (feet) | Description |
|---|---|---|---|
| Late Creta-ceous | Mesaverde Group and Mesaverde Formation<br><br>and | 2,150–5,600 | Sandstone, mudstone, siltstone, carbonaceous shale, and coal.  Upper Ohio Creek Member is barren of coal and consists of fine- to coarse-grained sandstone and conglomerate as it grades into the overlying Tertiary Wasatch Formation with lenticular, interbedded mudstone and shale.  Coal-bearing member contains 6 to 8 coal beds and zones in the Bowie Shale and Paonia Shale Members.  Basal unit is massive Rollins Sandstone Member that overlies the Mancos Shale.  Sandstone is very fine grained to medium grained, and locally coarse grained.  Cozzette Member (sandstone and siltstone) locally intertongues between Rollins Sandstone and Mancos Shale.  The Mesaverde Group/Formation underlies the Grand Mesa and is exposed in the Grand Mesa and Somerset coal fields within the Uncompahgre RMP planning area. |
| | Fruitland Formation | 200 | White to yellow fine-grained sandstone interbedded with subbituminous coal, brown carbonaceous shale, and olive to black shale.  The Fruitland Formation is present as isolated exposures in the Tongue Mesa coal field within the planning area. |
| | Mancos Shale | 4,000–5,000 (maximum) | Dark gray, olive to black shale with minor sandstone and siltstone; includes thin lenses of limestone, sandy limestone, and limey shale.  The Mancos intertongues with the lower part of the Mesaverde and Fruitland Formations.  It does not contain coal.  Mancos Shale is extensive throughout the planning area, but has been eroded from the upper surface of the Uncompahgre Plateau in the western half of the planning area. |
| | Dakota Sandstone | 30–200 | Light gray and tan, fine- to coarse-grained sandstone or quartzite; minor interbeds of dark gray and carbonaceous shale, shaly sandstone, conglomeratic sandstone, and up to three thin and lenticular beds of coal.  Massive sandstone in upper portion of formation forms caprock of Uncompahgre Plateau and mesas west of US Highway 550. |

Source: modified from Hettinger et al. 2004; Dunrud 1989

BLM_0106662



**Figure 2.  Location of Major Geologic Structural Features**
Source: USFS 2006; Hettinger et al. 2004

BLM_0106663



**Figure 3.  General Geology of the Planning Area**

BLM_0106664



**Figure 4.  Coal-bearing Geologic Formations in the Planning Area**

BLM_0106665

## III.  Coal Regions and Coal Fields

The planning area contains two coal regions, the Uinta coal region that is associated with the Piceance Basin, and the San Juan River coal region associated with the Colorado Plateau physiographic province (Figure 5).  Within or adjacent to the planning area are seven coal fields within these coal regions (Figure 5).  The planning area includes the Grand Mesa and Somerset coal fields, which are within the Uinta coal region, and the Tongue Mesa and Nucla-Naturita coal fields, which are within the San Juan River coal region.  Only the Somerset and Nucla-Naturita coal fields are currently being mined.  Located in close proximity to the planning area are the Book Cliffs coal field to the northwest, the Carbondale coal field to the northeast, and the Crested Butte coal field to the east (Figure 5).  The Carbondale coal field extends into the northeast corner of the planning area.  Where this coal field is not located in the Raggeds Wilderness, it has been mostly mined out; access to the coal outcrop in this region is outside the planning area and within an area where the surface is mostly managed by the USFS (Dyer 2010a).  Consequently, the coal resource in this area is either outside the planning area or inaccessible due to wilderness status. Therefore, the coal resource potential for the Carbondale coal field is not further analyzed in this report.  The coal region and coal field boundaries are explained by Landis (1959), Hornbaker et al. (1976), Murray (1980a), and Carroll (2010).  The general characteristics of each coal field within the planning area are discussed below.

### *Nucla-Naturita Coal Field*

The Nucla-Naturita coal field is near the southwest corner of the Uncompahgre RMP planning area in the vicinity of the towns of Nucla and Naturita (Figure 5).  The San Miguel River Canyon bisects the field into a northern and a southern lobe.  Highway 145 also passes through the field, which is roughly 18 miles long and 4 to 12 miles wide.  The field is mostly in Montrose County, but the southern edge extends into San Miguel County.  The northern portion of the field (Figure 5) includes mesas called First Park (containing the town of Nucla), Second Park, and Third Park, progressing from southeast to the northwest.  The southern portion of the field is mostly on the south side of the San Miguel River and extends south towards Dry Creek Basin along Naturita Ridge.  Although not included in the Nucla-Naturita coal field, Wrights Mesa (the mesa containing Redvale and Norwood [Figure 4]) has had historic coal mining and has a similar geologic setting as the mesas around Nucla (Williams 1983).

Although there are 24 historic surface and underground coal mines in the Nucla-Naturita coal field, the only active coal mine is at the New Horizon Mine, operated by Western Fuels Association, and currently located on private land with private mineral estate.  This is a strip mining operation that supplies coal by truck (because no rail line is available in this area) to the Nucla Station, a 100-megawatt power plant owned by Tri-State Generation & Transmission Association.  This power plant is a Fluidized Bed Combustion (FBC) type plant that removes sulfur in the combustion process with the addition of limestone (Eakins 1986).  Nitric oxides are also reduced due to the lower combustion temperature.  Byproducts of this process include gypsum, lime, and other compounds in the fly ash.  According to O'Hara (2009), these waste products are currently disposed of in cells south of Naturita on private land.  The Nucla plant can burn lower-grade coals, requiring coal with a minimum of 8,000 British Thermal Units (Btu) per pound.  Coals higher in sulfur, ash, and rock material can be more efficiently burned in this

BLM_0106666

process, which would be otherwise too "dirty" for combustion in a conventional coal power plant (Eakins 1986).

## Stratigraphy

The coals in the Nucla-Naturita coal field are in the Middle Carbonaceous Shale Member of the Dakota Sandstone Formation. The Upper and Lower Sandstone Members contain massive sandstone, while the Middle Carbonaceous Shale Member contains coal, carbonaceous shale, and siltstone. Coal beds within the Middle Member are lenticular, discontinuous, and difficult to correlate across the field (Speltz 1976). In the Nucla-Naturita area, however, there are three beds of mineable thickness ranging from 1 to 5 feet (Landis 1959). Due to the weak nature of Mancos Shale, most of it has been eroded from above the Dakota Sandstone. The Burro Canyon Formation, which underlies the Dakota Sandstone, is a massive sandstone and conglomerate that is often mapped as part of the lower member of the Dakota Sandstone. The rock types and thickness of formation within the coal field are as follows.

| Stratigraphic Units | Depositional Environment | Rock Types | Thickness (feet) |
|---|---|---|---|
| Mancos Shale | Marine | Shale and mudstone with thin sandstone, limestone, and bentonite beds; barren | Remnant outliers |
| Dakota Sandstone | Coastal plain | Sandstone above and below middle coal member with three coal beds and interbedded carbonaceous shale and siltstone | 330 |
| Burro Canyon | Alluvial plain | Massive sandstone and conglomerate; barren | Not recorded |

Source: Lee 1912; Eakins 1986; Speltz 1976; Kirschbaum and Biewick 2000

Within the Middle Carbonaceous Shale Member of the Dakota Sandstone Formation, there are three coal beds. In ascending order, they are the Drott #3 or Nucla Seam (Western Fuels Association nomenclature), which is 1 to 4 feet thick and lies at the base of this Middle Member; the Oberding #2 or lower Dakota x (LDx) coal seam (Western Fuels Association nomenclature), which is the main seam that ranges from 3 to 8 feet thick; and the #3 or upper Dakota 1 (UD1) coal seam (Western Fuels Association nomenclature), that is typically 1 to 3 feet thick (Landis 1959; Murray 1980a). This is typical of what is found at the New Horizon Mine (O'Hara 2009). Drill hole data obtained by the USGS in 1977 at Peabody Coal Company's Nucla Strip lease application on Second Park indicated the upper coal bed averaged 6.3 feet thick under 20 feet of overburden, there was 29 feet of interburden, and the lower seam was split by 2.5 feet of rock into a 1.4- to 1.9-foot seam and a 1- to 1.3-foot seam (Haines 1978). These variations in bed thickness when compared to the New Horizon Mine, which is on nearby First Park, show the lateral variability of the coal seams within the Dakota Formation in the Nucla-Naturita coal field.

## Quality and Rank

The apparent rank of the coal (Figure 6) is high-volatile A to C bituminous (George 1937; Murray 1981; Eakins 1986) to low-volatile B bituminous (O'Hara 2009). According to O'Hara (2009), the middle LDx seam is the thickest seam with the highest quality (low sulfur and ash),

BLM_0106667



**Figure 5.  Location of Coal Regions and Coal Fields in the Planning Area**

BLM_0106668



**Figure 6.  Coal Rank and Depth in the Planning Area**

BLM_0106669

while the upper UD1 seam is often oxidized, producing a lower Btu coal, and it is higher in sulfur and ash. As a consequence, coal from these two seams is blended as they are fed into the FBC power plant at Nucla in order to maximize the capacity of the coal. The following table includes the coal quality data from a range of samples acquired from different mines and seams over the years within the Nucla-Naturita coal field.

| Ash Content (percent) | Sulfur Content (percent) | Moisture content (percent) | Heating Value (Btu/pound) |
|---|---|---|---|
| 6.1–12.8 | 0.5–1.1 | 2.5–13.5 | 10,010–13,380 |

Source: George 1937; Kirschbaum and Biewick 2000; Hettinger et al. 2000; Hornbaker et al. 1976; Murray 1981; Ambrose et al. 2001; Carroll 2010

The lenticular and discontinuous nature of Dakota coal in the Nucla-Naturita field, as well as the presence of partings (thin interbeds of impurities) and clastic dikes, has limited the quality and economic viability of this coal. In addition, thickness of overburden plays a role in coal quality and accessibility. If the overburden is too thin, the coal is oxidized and the Btu content is low. If the overburden is too thick and the seams are too thin, it is not cost-effective to strip the excess overburden to obtain coal from thin beds. According to O'Hara (2009), if the overburden thickness is less then 20 feet, the coal is too oxidized and wet (called "bug dust" by industry), but if it is greater than 100 to 120 feet, the coal is not economically feasible to extract. The optimum overburden thickness to effectively strip mine high-quality coal for the Western Fuels Association's New Horizon Mine is currently around 35 to 40 feet. O'Hara (2009) adds that the cost-effectiveness of strip mining is based on a "stripping ratio," which is the thickness of overburden divided by the thickness of coal expressed in cubic yards per ton. Optimum stripping ratios are on the order of 8:1 to 10:1; however, the maximum acceptable ratio is 20:1.

Coal quality tests performed during the 1977 drilling on Second Park, indicated an average Btu of 7,373 in the upper 6-foot coal seam and 9,667 to 11,546 in the lower 1.4- to 1.9-foot seams (Haines 1978). The upper seam was ranked as subbituminous C coal, while the lower split seams were ranked as high-volatile A bituminous coal.

### *Tongue Mesa Coal Field*

The Tongue Mesa coal field is along Cimarron Ridge, a prominent ridge southeast of Montrose between the Uncompahgre River and Cimarron Creek (Figure 5). It extends from south of Cerro Summit (Highway 50) in the vicinity of Coal Hill, south along the Cimarron Ridge to Owl Creek Pass east of Ridgway. Most of the historic mining in this field was on the west side of Cimarron Ridge from Buckhorn Lakes south to the Lou Creek drainage, but no active mining has occurred since 1950. It is roughly 18 miles long from north to south and generally 2 to 3 miles wide. The field spans Montrose, Ouray, and Gunnison Counties.

### Stratigraphy

The Fruitland Formation is the primary coal-bearing formation in the Tongue Mesa coal field. It is poorly consolidated, typically forming side slopes, and is exposed mostly in landslide scarps (Dickinson 1987a, 1987b). It is a white to yellowish-gray, fine-grained sandstone interbedded with subbituminous coal, brown carbonaceous shale, and green to black shale (Dickinson 1965, 1987b). The base of the formation, where it lies on the Pictured Cliffs Sandstone, is placed at the lowest coal bed. Below the Pictured Cliffs Sandstone is the Mancos Shale, a thick marine

BLM_0106670

shale formation that does not contain coal.  In the Tongue Mesa coal field, most of the Kirtland Shale, which overlies the coal-bearing Fruitland Formation, has been stripped off of the area by erosion.  The rock types and thickness of the formations within the coal field are shown below.

| Stratigraphic Units | Depositional Environment | Rock Types | Thickness (feet) |
|---|---|---|---|
| Kirtland Shale | Alluvial plain | Shale interbedded with sandstone, siltstone, carbonaceous shale; barren | 1,000 |
| Fruitland Formation | Coastal plain | Sandstone interbedded with coal, carbonaceous shale, and shale | 200 |
| Pictured Cliffs Sandstone | Nearshore marine | Massive sandstone interbedded with siltstone and shale; barren | 50–250 |
| Mancos Shale Formation | Marine | Shale and mudstone with thin sandstone, limestone, and bentonite beds; barren | 3,000+ |

Source: Lee 1912; Dickinson 1988; Kirschbaum and Biewick 2000

The Fruitland Formation contains one extensive coal bed that ranges in thickness from 20 to 40 feet.  The formation contains additional coal beds that are about 5 to 13 feet thick.  The coal beds in the northern portion of the field are typically 3 feet thick, subbituminous, and bony (Dickinson 1965).  "Bone" is impure coal.  In the middle of the field, there is one coal bed 26 to 40 feet thick and three to five coal beds 5 to 13 feet thick (Dickinson 1987a, 1987b).  In the southern end of the field, three abandoned coal mines reported coal seam thicknesses of 30 to 40 feet (Dickinson 1988).

Coal-bearing strata are located in the lower 200 feet of the Fruitland Formation (Murray 1981) and correlate with the Fruitland-Kirtland Formation of the San Juan Basin section (south of Durango, Colorado) and with the Paonia Shale section in the Grand Mesa area (Hornbaker et al. 1976).  Early USGS geologic quadrangle mapping by Dickinson (1965) identified the coal-bearing units as belonging to the Fruitland Formation, which was carried into the more recent mapping (Dickinson 1987a, 1987b, 1988).  However, others include the Tongue Mesa coal field as being in the Uinta Coal Region and consider the units to be the Mesaverde Formation (Hornbaker et al. 1976).  The Cimarron Ridge area is an outlier of Upper Cretaceous age coal-bearing rocks capped and protected by Upper Cretaceous and early Tertiary volcanic and volcaniclastic rocks (Murray 1980a).  Due to the proximity of the Tongue Mesa coal field to the Somerset and Grand Mesa coal fields, it is likely more closely associated with the stratigraphy and local variations of the Uinta Coal Region.  For the purposes of this report, it is included in the San Juan River Coal Region.

**Quality and Rank**
The apparent rank of the coal (Figure 6) is high-volatile B subbituminous (George 1937; Murray, 1980a; Carroll 2010) and subbituminous C (Dickinson 1987a, 1987b, 1988).  Some of the coal is reported to be considerably oxidized and bony (Hornbaker et al. 1976; Dickinson 1965; Murray 1980a).  As with most Cretaceous coal in western Colorado, the coal is of high quality, with typically low ash and sulfur content and moderately high to high energy value, as seen in the following table, which includes a range of samples acquired from different mines and seams within the Tongue Mesa coal field.

BLM_0106671

| Ash Content (percent) | Sulfur Content (percent) | Moisture content (percent) | Heating Value (Btu/pound) |
|---|---|---|---|
| 6.7–8.4 | 0.5–0.9 | 14.2–16.0 | 9,350–10,220 |

Source: George 1937; Kirschbaum and Biewick 2000; Hettinger et al. 2000; Hornbaker et al. 1976; Murray 1981; Ambrose et al. 2001; Carroll 2010

### Somerset Coal Field

The Somerset coal field is located on the lower, southeastern flank of Grand Mesa, extending from the east side of the Leroux Creek drainage (where it abuts the Somerset coal field to the west), past Paonia and Somerset, and east to drainages near Paonia Reservoir in the North Fork of the Gunnison Valley (Figure 5).  Many historic mines are distributed throughout this field; currently there are three active mines: Bowie #2 Mine (operated by Bowie Resources), Elk Creek Mine (operated by Oxbow Mining, LLC), and West Elk Mine (operated by Mountain Coal Company).  Highway 133 passes through the eastern end of this field.  The field is roughly 38 miles long and 2 to 10 miles wide.  Most of this field is in Delta County, with the eastern portion extending into Gunnison County.

Early work by Lee (1912) separated the Coal Creek district from the Somerset district; both were located in the Grand Mesa coal field.  The Coal Creek district included the coal beds that were accessible from Coal Creek canyon south of Paonia Reservoir.  These coal beds underlie Coal Creek Mesa to the west and Snowshoe Mesa to the east.  At least four historic coal mines were located in this area (Carroll and Bauer 2002), but there is no recent mining, primarily due to the lack of a rail spur.  Toenges et al. (1952) studied the coal quality, reserves, and coking properties of the Coal Creek district.  Later work by Landis (1959) redefined the coal fields and districts in the area and combined the Coal Creek with the Somerset district, renaming it the Somerset coal field.  The Grand Mesa district became the Grand Mesa coal field, and the region was renamed the Uinta Coal Region.  Although some literature refers to the Coal Creek field or district, for the purposes of this report, it is included in the Somerset coal field (Figure 5).

Detailed studies of the Somerset coal field were performed by many authors including Dyni and Gaskill (1980), Eakins et al. (1998a, 1998b), George (1937), Hettinger et al. (2004), Landis (1959), Lee (1912), Schultz et al. (2000), Toenges (1949, 1952), and USFS (2006).  In addition to the band of Mesaverde along the southern flank of Grand Mesa that is defined by the east-west upper northern portion of the Somerset coal field, there are extensive areas on the south side of the North Fork of the Gunnison River that have proven coal resource and are also within the Somerset coal field.  These area include the Minnesota Creek basin (including the Dry Fork and Lion Mesa) east of Paonia (Toenges 1949), Coal Creek Mesa and east to Snowshoe Mesa (Toenges et al. 1952), and the area east of Jumbo Mountain where the Mountain Coal Company is operating the West Elk Mine.

**Stratigraphy**
The coals in the Somerset coal field are in the Paonia Shale and Bowie Shale Members of the Mesaverde Formation.  The alluvial plain deposits of the Barren and Ohio Creek Members overlie the coal-bearing members.  The Rollins Sandstone Member, a tan, massive sandstone unit, underlies the coal-bearing members and overlies the Mancos Shale Formation.  The rock types and thickness of the formations within the coal field are shown below.

BLM_0106672

| Stratigraphic Units | Depositional Environment | Rock Types | Thickness (feet) |
|---|---|---|---|
| **Mesaverde Formation** | | | |
| Ohio Creek Member | Alluvial plain | Interbedded sandstone (fine to coarse grained), mudstone, and shale | 500–900 |
| Barren Member | Alluvial plain | Interbedded fine-grained sandstone, mudstone, and shale; lenticular; some thin, noncommercial coal beds | 750–1,000 |
| Paonia Shale and Bowie Shale Member | Coastal plain | Interbedded sandstone, mudstone, shale, and siltstone with coal beds and zones as thick as 30 feet | 250–650 |
| Rollins Sandstone Member | Nearshore marine | Massive sandstone, finer at base with gradational contact with Mancos Shale | 80–200 |
| **Mancos Shale Formation** | Marine | Shale and mudstone with thin limestone beds | 4,000–4,500 |

Source: Lee 1912; Dunrud 1989a, 1989b; Kirschbaum and Biewick 2000

According to Hornbaker et al. (1976), coals from the Bowie Shale Member are mined from beds ranging from 8.5 to 18 feet thick, and coals from the Paonia Shale Member are mined from beds ranging in thickness from 12 to 13 feet.  Individual coal beds can reach a maximum thickness of 25 to 30 feet (Murray 1980a).  The six major coal seams are named A through F in ascending order.

**Quality and Rank**

The apparent rank of the coal in the Somerset coal field (Figure 6) is high-volatile B and C bituminous (Carroll 2010; Hornbaker et al. 1976; Landis 1959).  In the eastern portion of the field where the coal has been exposed to laccoliths and other intrusions, the rank of coal is marginal to premium high-volatile A and B bituminous, and some are of good coking quality (Goolsby et al. 1979).  In 1977, four mines (Bear, Hawk's Nest #2 and #3, and Somerset) in the Somerset coal field produced coking coal (Murray 1980b).  In several places in the southeastern part of the field, igneous intrusions have metamorphosed the coal to semi-anthracite, but this is a minor component of the overall coal and is included in reserve estimates as bituminous (Landis 1959).  As with most Cretaceous coal in western Colorado, the coal is of high quality, with typically low ash and sulfur content and moderately high to high energy value, as shown in the following table, which includes a range of samples acquired from different mines and seams within the Somerset coal field.  Because this is a large and active coal field, coal quality data were provided from a variety of sources due to the volume of available data.

BLM_0106673

| Ash Content (percent) | Sulfur Content (percent) | Moisture content (percent) | Heating Value (Btu/pound) |
|---|---|---|---|
| 2.0–13.9 | 0.3–0.9 | 2.3–22.4 | 8,160–13,900 |

Source: Hornbaker et al. 1976

| Ash Content (percent) | Sulfur Content (percent) | Moisture content (percent) | Heating Value (Btu/pound) |
|---|---|---|---|
| 3.2–11.4 | 0.5–0.8 | 3.2–13.6 | 10,040–13,453 |

Source: Murray 1981; Ambrose et al. 2001; Carroll 2010

| Ash Content (percent) | Sulfur Content (percent) | Moisture content (percent) | Heating Value (Btu/pound) |
|---|---|---|---|
| 2.4–29.9 | 0.3–3.2 | 2.3–10.7 | 8,160–14,380 |

Source: Kirschbaum and Biewick 2000; Hettinger et al. 2000, Murray et al. 1977; Toenges 1949, 1952

### *Grand Mesa Coal Field*

The Grand Mesa coal field is located as a narrow band on the lower flanks of Grand Mesa from the Leroux Creek drainage on the east (where it abuts the Somerset coal field), through the town of Cedaredge, and west and north to the town of Palisade, where it abuts the Book Cliffs coal field (Figure 5).  Most of the historic mining in this field was centered west of Cedaredge (Highway 65), but no active mining has occurred since 1984.  The field is roughly 55 miles long and 1 to 3 miles wide with a total of 96 square miles.  The field spans Delta and Mesa Counties.

**Stratigraphy**

The coals in the Grand Mesa coal field are in the Mt. Garfield Formation of the Mesaverde Group.  The coal is found in the Paonia Shale and Bowie Shale Members.  The Rollins Sandstone Member, which is a whitish, massive sandstone unit, underlies the coal-bearing members and overlies the Mancos Shale Formation, a marine shale and mudstone that forms the Adobe badlands on the lowest slopes of Grand Mesa.  The rock types and thickness of the formations within the coal field are shown below.

| Stratigraphic Units | Depositional Environment | Rock Types | Thickness (feet) |
|---|---|---|---|
| **Mesaverde Group** | | | |
| Undifferentiated | Alluvial plain | Sandstone and shale, barren | 1,000 |
| Paonia Shale Member | Coastal plain | Coal, carbonaceous shale, sandstone | 400 |
| Bowie Shale Member | Coastal plain | Major coal, carbonaceous shale, sandstone | 400 |
| Rollins Sandstone Member | Nearshore marine | Massive sandstone, shale, barren | 100 |
| **Mancos Shale Formation** | Marine | Shale and mudstone with thin bentonite beds | 3,000+ |

Source: Lee 1912; Kirschbaum and Biewick 2000

Coal is present in a zone roughly 200 feet above the Rollins Sandstone Member (Kirschbaum and Biewick 2000).  The six to eight coal beds are in the Bowie Shale and Paonia Shale Members of the Mesaverde Group and are named A through F in ascending order.  Generally, only two or three of the seams are of mineable thickness (i.e., 4 to 14 feet thick) at any one locality, with the lowest seams the most persistent and productive (Hornbaker et al. 1976; Murray 1981).  Review of isopach maps produced by Grand Mesa Coal Company for their Red Canyon Mine #1 and #2, located in the vicinity of Colby and Brimstone Corner (northwest of

BLM_0106674

Cedaredge), indicates coal thicknesses of 3.4 to 7.6 feet in the E seam (Grand Mesa Coal Company 1984).  At the Red Canyon Mine #2, the D and E seams were the thickest, and the beds dip 5 to 6 degrees to the northwest.

**Quality and Rank**
The apparent rank of coal in the Grand Mesa coal field (Figure 6) grades from high-volatile C bituminous to subbituminous A (Hornbaker et al. 1976; Murray 1981).  Lee (1912) indicated that the Grand Mesa coal field (known at that time as the Rollins District of the Grand Mesa coal field) produced coal that was typically subbituminous and had lower energy than the bituminous coal in the "Somerset District" to the east.  As with most Cretaceous coal in western Colorado, the coal is of high quality, with typically low ash and sulfur content and moderately high energy value, as seen in the following table, which includes a range of samples acquired from different mines and seams within the Grand Mesa coal field.

| Ash Content (percent) | Sulfur Content (percent) | Moisture content (percent) | Heating Value (Btu/pound) |
|---|---|---|---|
| 2.1–23.3 | 0.4–2.2 | 9.8–20.0 | 8,300–13,490 |

Source: George 1937; Kirschbaum and Biewick 2000; Hettinger et al. 2000; Hornbaker et al. 1976; Murray 1981

| Ash Content (percent) | Sulfur Content (percent) | Moisture content (percent) | Heating Value (Btu/pound) |
|---|---|---|---|
| 2.1–17.9 | 0.5–2.2 | 3.1–19.5 | 8,298–13,489 |

Source: Ambrose et al. 2001; Carroll 2010

April 2010    *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*    18
Final Coal Resource and Development Potential Report

BLM_0106675

## IV.  Coal Stratigraphy

Coal in the Uncompahgre RMP planning area is found in three Upper Cretaceous formations (Figure 7).  From oldest to youngest, they are the Dakota Sandstone Formation, the Mesaverde Formation and Mesaverde Group, and the Fruitland Formation.  The Mancos Shale Formation lies between the Dakota Sandstone and the Mesaverde/Fruitland Formations.  The following generalized stratigraphic column shows the relationship of the three formations and the coal regions found in the planning area.



**Figure 7.  Stratigraphic Relationship of Coal-bearing Formations in Planning Area**
Source: modified from Landis 1959

BLM_0106676

### *Dakota Sandstone*

The Dakota Sandstone Formation underlies the entire planning area.  The Dakota in the region is divided into an upper sandstone unit, a middle carbonaceous shale and coal-bearing unit, and a lower conglomeratic sandstone unit.  Although coal beds can occur throughout the Dakota, the thicker seams are concentrated in the middle unit.  The sandstone units are predominately fine to medium grained; light brown to dark gray; thin-bedded to massive; and generally cross-bedded, friable to quartzitic fluvial sandstone and conglomeratic sandstone (Eakins 1986; Williams 1983).  The upper sandstone unit grades conformably and gradationally into the Mancos shale with alternating sandstone and carbonaceous shale beds.  The lower sandstone unit disconformably overlies either the Brushy Basin Shale Member (green mudstones) of the Morrison Formation or the conglomeratic sandstones of the Burro Canyon Formation (Eakins 1986).

The thickness of the Dakota varies, but it is generally 150 to 200 feet thick.  The Dakota is best exposed on canyon rims, where it forms one to two resistant ledges and a weak side slope composed of the weaker middle unit of carbonaceous shale and coal.  The following photograph shows a typical outcrop of the Dakota Sandstone Formation.



Typical outcrop of Dakota Sandstone near Nucla, Colorado.  Note the upper and lower resistant sandstone ledges.  The coal is located in the 20- to 30-foot sloping hillside below the sandstone outcrop at the top of the photograph.  Due to the weakness of the coal, it can only be seen darkening the surface soils.  *Photo courtesy of Western Fuels Association.*

April 2010   *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*   20
Final Coal Resource and Development Potential Report

BLM_0106677

Coal beds in the Dakota Formation are generally thin, lenticular, and discontinuous, and contain numerous partings of sandstone, mudstone, carbonaceous shale, and shaly coal.  Coal beds as thick as 7.7 feet are found locally in the Nucla-Naturita coal field, but they also contain many partings (Eakins 1986).   The three coal seams, discussed in the Nucla-Naturita coal field section, are shown in Figure 8.  The middle (LDx) seam is the thickest seam with the highest quality.  The New Horizon Mine is currently strip mining the upper two seams (UD1 and LDx). The lowest (Nucla) seam is too deep and thin to be effectively strip mined.  Eakins (1986), Haines (1978), and Speltz (1976) all discuss borehole logs, water well logs, and outcrop data that document the presence and thickness of coal seams within the Dakota Formation throughout the Uncompahre planning area. The photograph following the stratigraphic column shows the nature of Dakota coal on outcrop.



**Figure 8.  Stratigraphic Column of Dakota Sandstone in Nucla-Naturita Coal Field**
Source: Western Fuels Association

April 2010     *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*     21
Final Coal Resource and Development Potential Report

BLM_0106678



Outcrop of Dakota coal near Nucla. Note the ledge-forming sandstone bed overlying the LDx coal seam that is roughly 4 to 5 feet thick in this outcrop. The coal is oxidized and bony. Note also the cross bedding in the sandstone and joints. *Photo courtesy Western Fuels Association.*

The Nucla-Naturita coal field sits astride the Nucla Syncline (Figure 3), a structural feature that strikes northwest and extends from east of Norwood to near Gateway, northwest of Nucla (Williams 1983). This trough-like feature sits between the Uncompahgre Plateau to the northeast and the Paradox Basin anticline to the southwest (Figure 2). This linear basin explains the trapping of Quaternary eolian (wind-blown) deposits on the mesas around Nucla, Redvale, and Norwood. Although the regional folding post-dated the coal deposition within the Dakota Sandstone, it has impacted the depth of coal and local dip of the beds. At the margins of the Paradox Basin anticline, for example, Dakota beds are steeply dipping and eroded along the lower flanks, with coal diving steeply underground. Along the axis of the syncline between Nucla and Norwood, the beds are almost level with the ground surface.

In addition to thin, lenticular, discontinuous, and low-quality coal with partings, clastic dikes are another characteristic of Dakota coal that adds to difficulty in mining this resource (O'Hara 2009). Clastic dikes are a specific type of sandstone parting that was emplaced or injected during the coalification process and at relatively shallow burial depths (Hardie 1999). The dike material migrates laterally and vertically for distances of over 500 feet in some places. Of the three types of clastic dikes, Hardie (1999) indicates that by far the most common type are joint-sourced dikes. These dikes follow fractures or joints created in the young, poorly consolidated floor and roof sediments that enclosed the peat beds and commonly penetrate entire coal seams. Dewatering of the overlying or underlying shale provides a medium to carry the clastic

BLM_0106679

sands into the coal beds along joints.  The joint-sourced dikes can be up to 10 feet thick and often intersect at right angles.  Clastic dikes are hard, well-cemented, and often continuous through the coal seam.  Consequently, they are problematic for mining, causing slowed production, increased wear on or damage to coal excavation equipment, and increased ash and impurities in the mined coal.

In the northeast portion of the planning area in the vicinity of Grand Mesa and the North Fork of the Gunnison River, the Dakota Sandstone is only exposed at the surface southwest of Highway 92, Crawford, and Hotchkiss (Figures 1 and 4).  This is in the area of Fruitland and Scenic Mesa, where portions of the Smith Fork and North Fork have incised deep canyons, exposing the hard Dakota Sandstone caprock.  This is an area with primarily private subsurface mineral estate. Coal in this area has not been exploited on a commercial level.  Coal seams can be seen within the Dakota Sandstone Formation in the vicinity of Pleasure Park, located downstream of the town of Lazear in the North Fork of the Gunnison Canyon (within the Gunnison Gorge National Conservation Area), but this is excluded from the Uncompahgre RMP planning area.  This indicates that coal may be present in the nearby Fruitland and Scenic Mesa areas, but the isolated federal subsurface rights would make mining the resource unviable.

Speltz (1976) discusses an area of Dakota coal called the Montrose Deposit.  This area is shown on the west side of the city of Montrose on Figure 6.  Based on six water well logs, there is 10 feet of coal from 90 to 97 feet deep and a "coal zone" from 121 to 156 feet deep.  However, Speltz (1976) is careful to say that water well logs can be very unreliable indicators of coal presence, as the water well loggers often identify carbonaceous shale as coal, partings are not recorded, and they are not generally logged by a geologist or with coal identification in mind. Speltz (1976) adds that no other supporting data could be found and that even if coal is found in this area, he would not expect the coal beds to be of significant thickness or laterally extensive.  Later work by Eakins (1986) in the Montrose area, which was based on water well and borehole logs, indicate typical seams of 0.4 to 1.1 feet at depths of 45 to 80 feet, with some very deep 5- to 7-foot seams at depths of greater than 460 feet.  Many seams are split with multiple partings of 0.3 to 0.6 feet thick.  Partings are interbeds of impurities such as carbonaceous shale, impure coal, pyrite, and mineral-rich layers such as sandstone and shale. The only mine in Dakota coal on the east side of the Uncompahgre Plateau was the Happy Canyon underground coal mine southwest of Montrose, which mined a 2.3-foot coal seam from 1923 to 1928 (Carroll and Bauer 2002).  Other areas where Eakins (1986) evaluated logs and outcrops east of the Uncompahgre Plateau, he found 0.2- to 2-foot seams with partings from 70 to 95 feet west and northwest of Delta (Figure 6) and 0.5- to 1.7-foot seams with partings to 152 feet in the Ridgway/Colona area.  Woodruff (1912) also evaluated the coal potential of the Dakota Formation west and northwest of Delta and found the coal to be in thin seams with partings, lenticular and limited in extent, high in ash and sulfur, and impure with poor combustion qualities.

Due to the Dakota Sandstone's deep burial under Mancos Shale and the Mesaverde Formation in the Somerset and Grand Mesa coal fields, the Dakota Sandstone is not considered a coal resource in that region.  According to the USFS (2006), most of the Dakota is buried at depths greater than 4,000 feet, based on its stratigraphic position below younger units within the Grand Mesa National Forest.  Dakota coals crop out between the cities of Grand Junction and Delta, outside of the planning area, but work by Lee (1912) indicated only thin and poor quality coal in this area.  The presence of Dakota coal in the planning area north and northeast of

BLM_0106680

Delta is unknown, but any coal that might be present is likely to be of similar poor quality, quantity, and character.  Similarly, the Dakota Sandstone is deeply buried under the Mancos Shale southeast of Montrose in the Tongue Mesa coal field (Figures 4 and 5) and is not considered a coal resource in that region.

For much of the remainder of the planning area, west of Highway 50 and 550, the Dakota Sandstone is extensively exposed near the surface.  The Dakota Sandstone forms the caprock of the Uncompahgre Plateau, the dominant structure of the western half of the planning area, and the caprock of many mesas west of Telluride and on the flanks of the Paradox Valley anticline.  It is gently dipping where it is exposed along the flanks of the Uncompahgre Plateau and where it abuts the Tertiary San Juan volcanic field to the south and the Tertiary intrusions of the West Elk Mountains, east of Highways 50, 92, and 133 (Figure 3).  Hogbacks and cuestas are formed by the Dakota where it is more steeply dipping, such as along salt anticlines in the Paradox Valley and other similar structures in the region (Eakins 1986).  As shown on Figure 4, the Dakota is extensively exposed on the Uncompahgre Plateau and western mesas, but according to the USFS (2006), it is generally poorly exposed, concealed by thick vegetation, or covered by Quaternary land-slide deposits within the Uncompahgre National Forest.   No published reports list precise thicknesses of Dakota coal in that forest; however, a 2.1-foot-thick coal bed was measured on the Uncompahgre Plateau about 12 miles northeast of the town of Nucla.   Landis (1959) evaluated the Dakota coal, and his generalized maps and descriptions indicate that Dakota coal beds in the Uncompahgre National Forest are likely to be thin, impure, and discontinuous.  However, minable reserves might be found locally.  Although the Dakota Sandstone is exposed extensively throughout the western half of the planning area, the only area with proven coal resource is in the vicinity of the towns of Nucla and Naturita.

### Fruitland Formation

**Tongue Mesa Coal Field (Montrose, Gunnison, and Ouray Counties)**
Approximately 200 feet of coal-bearing strata is present at the Tongue Mesa coal field, an isolated erosional remnant of upper Cretaceous strata capped by late Cretaceous to early Tertiary volcanic rocks (Figures 2 and 3) (Murray 1981).  The coal-bearing rocks were assigned to the Fruitland Formation by Hornbaker et al. (1976) and Dickinson (1965, 1987a, 1987b, 1988). They are part of a 900-foot-thick interval that was originally thought to be equivalent to the Mesaverde Formation by Landis (1959).  These coal-bearing strata correlate to the Paonia Shale in the Grand Mesa area (Hornbaker et al. 1976).  Both Landis (1959) and Dickinson (1965, 1987a, 1987b, 1988) described the coal-bearing interval as being concealed by heavy vegetation, landslides, talus, and glacial deposits.   In his 1:24,000-scale USGS geologic quadrangles, Dickinson (1965, 1987a, 1987b, 1988) mapped the Fruitland Formation cropping out at only a few small and widely spaced localities, primarily at landslide scarps.  Depth to the top of the formation ranges from 0 to 2,500 feet within the field.

The Fruitland Formation contains one principal and persistent coal seam that is 8 to 40 feet thick, referred to as the Cimarron or Lou Creek seam, which has been mined on both sides of the ridge and three to five stratigraphically higher coal seams that are about 5 to 13 feet thick (Hornbaker at al. 1976).  The beds of coal are gently inclined and disrupted by numerous faults; however, the precise location and displacement of the faults cannot be determined from surface mapping because the area is extensively covered by landslide deposits.

BLM_0106681

**Mesaverde Group and Mesaverde Formation**

The Mesaverde has been assigned group status in the Book Cliffs, Grand Hogback, and Carbondale coal fields, but is considered a formation in the Crested Butte, Grand Mesa, and Somerset coal fields.  For the purposes of this report, they will be considered one in the same.  The Mesaverde is located in the southern Piceance Basin (Figure 2), which is in the northeastern portion of the planning area on the flanks of Grand Mesa (Figure 4) and is the source of coal mined in the Grand Mesa and Somerset coal fields (Figure 5).  The Mesaverde is essentially divided into upper barren sandstone and shale members, the coal-bearing Paonia and Bowie Shale Members, and the lower Rollins Sandstone Member.  The upper barren members consist of interbedded sandstone, mudstone, and shale.  The basal Rollins Sandstone Member is a tan to very light gray, massive sandstone, and fine to very fine grained, becoming coarser and more quartzose in the upper part and grading into the Mancos Shale in the lower part (Dunrud 1989b).  The Paonia and Bowie Shale Members contain six to eight coal seams or zones, named A through F in ascending order.  These members range in thickness from 250 to 650 feet.  Total thickness of the Mesaverde ranges from 2,000 to 2,700 feet.  The following photograph is of a hillside near the town of Paonia where distinctive sandstone units and coal seams are visible due to disturbance of the hillside.



Exposure of Mesaverde Formation near Paonia, including the Rollins Sandstone Member at the base and the Paonia and Bowie Shale (coal-bearing) Members above it.  This photographic was taken looking northeast from Steven's Gulch Road.  The prominent coal seams near the middle of the photograph are of the B seam coal. *Photo courtesy Desty Dyer, BLM.*

BLM_0106682

As seen in the previous photograph, the more-resistant sandstone beds of the Mesaverde form distinctive vertical ledges or cliffs on the canyon walls above the North Fork of the Gunnison River Valley.  The coal-bearing strata form vegetated sideslopes, and the coal is rarely seen cropping out due to its weak nature.

In the Grand Mesa and Somerset coal fields, the geologic literature and mining industry label the coal beds as six major units.  These coal beds, as previously discussed and as labeled in the above photograph, are labeled A through F, with A being the lowest (oldest) bed in the stratigraphic section and F being the highest (youngest).  The location of the six coal seams within the Mesaverde Formation are shown in the generalized stratigraphic column (Figure 9).



**Figure 9.  Generalized Stratigraphic Column Showing
Coal Beds in the Somerset, Colorado, Area**
Source: Rohrbacher et al. 2000

Studies of the Piceance Basin have further categorized these coal seams into groups that can be generally correlated across the basin and between coal fields.  The A through F seams are within the Cameo-Fairfield coal group, which is further divided into three coal zones: Cameo-Wheeler Coal Zone (A, B, and C seams), South Canyon Coal Zone (D and E seams), and Coal Ridge Coal Zone (F seam), as shown in Figure 10.  According to the USFS (2006), these

BLM_0106683

correlations were made by examining cross-sections developed from drill holes throughout the region.  They qualify this information considering that coal seams and interburden thickness can vary dramatically over a relatively short lateral extent, and the best correlations were made when comparing available non-proprietary data.   This report conforms to the coal industry convention of referring to the seam names rather than the coal zones and the Mesaverde rather than the Cameo-Fairfield coal group.   It is understood that when the report refers to the Mesaverde, it refers to the coal-bearing members above the Rollins Sandstone, and when referring to the Mesaverde Formation or Group, it refers to the entire column defining that formation.



**Figure 10.  Stratigraphic Section of Mesaverde Group and Mesaverde Formation in the Southern Piceance Basin**
Source: modified from Hettinger et al. 2000

BLM_0106684

The coal-bearing Mesaverde Group and Mesaverde Formation extend throughout the subsurface of the Piceance Basin and are exposed in the Book Cliffs, Carbondale, Crested Butte, Grand Hogback, Grand Mesa, and Somerset coal fields (Figure 5).  In the Somerset coal field, the Mesaverde is generally dipping to the northeast. Consequently, the coal seams are getting deeper under Grand Mesa as elevations increase on the mesa.  According to Carroll (2005), the coal beds at the West Elk Mine dip 3 to 5 degrees to the northeast, and the seams at both Bowie #2 and Elk Creek Mines dip 2 to 5 degrees to the northeast.  Numerous mines have produced from these coal fields in the Southern Piceance Basin since the late 1800s.  Some of the coal is also considered to be an important source for natural gas (Johnson 1989; Murray 1977).  Methane is a hazard for underground mining due to its explosive potential, so gas is currently ventilated rather than recovered.

The coal-bearing portion of the Mesaverde (above the Rollins Sandstone Member) contains the thickest and most extensively mined coals in the Piceance Basin (Murray 1977).  According to work by Hettinger et al. (2000) that focused on "Area 1," which contained parts of the Grand Mesa and Gunnison National Forests, net coal in the Mesaverde ranges from about 50 to 97 feet in a 20- to 30-mile-wide belt that extends north to south across the central part of Area 1 (Figure 11).  Area 1 includes the Grand Mesa and Somerset coal fields within the planning area.  Net coal decreases to less than 50 feet in the remaining parts of Area 1.  Coal distribution in the A through F coal seams is shown in a series of net coal isopach maps in Figures 12, 13, 14, and 15.  Coal distribution and thickness for each of the seams, based on Hettinger et al. (2000), are discussed below.

**A, B, and C Seams**
The A, B, and C seams underlie a 925 square mile area that includes all parts of Area 1 west of longitude 107°15′ W.  This coal zone overlies the Rollins Sandstone Member and is about 100 to 400 feet thick.  The A, B, and C seams have approximately 5 to 80 feet of net coal, and net coal exceeds 50 feet throughout the central part of Area 1 (Figure 12).  Near the southern boundary, in the Grand Mesa and Somerset coal fields, the A, B, and C seams have 10 to 70 feet of net coal in as many as 15 beds that are 1 to 30 feet thick.

**D and E Seams**
The D and E seams underlie a 530 square mile region in Area 1 (Figure 13).  This coal zone overlies and intertongues with the middle sandstone of the Bowie Shale Member of the Williams Fork Formation (Figure 10).  The coal zone is 1 to 200 feet thick and contains 1 to 30 feet of net coal.  Net coal exceeds 20 feet along a 5- to 10-mile-wide belt that trends N. 20° W. throughout the central part of Area 1.  In the Somerset coal field, the D and E seams have 15 to 35 feet of net coal in 2 to 5 beds that are 1 to 25 feet thick.

**F Seam**
The F seam overlies and intertongues with the upper sandstone in the Bowie Shale Member of the Williams Fork Formation (Figure 10). The F seam (Figure 14) occupies about the same area as the underlying D and E seams.  The F seam coal zone is 100 to 400 feet thick near the line of longitude 107°15′ W., is less than 100 feet thick throughout most of its west half, and pinches out near the same line as the underlying D and E seams (Figure 13).  The F seam generally has less than 10 feet of net coal, although a small area with about 20 feet of net coal is located near the Somerset coal field.  In the Somerset coal field, the F seam contains 10 to 26 feet of net coal in 2 to 7 beds that are 1 to 10 feet thick.

April 2010   *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*   28
Final Coal Resource and Development Potential Report

BLM_0106685



**Figure 11.  Isopach Map of Net Coal in the Mesaverde Coal-bearing Units**
Net coal represents all beds over 1 foot thick (Source: Hettinger et al. 2004)



**Figure 12.  Isopach Map of Net Coal in the Mesaverde A, B, and C Seams**
Net coal represents all beds over 1 foot thick (Source: Hettinger et al. 2004)

BLM_0106686



**Figure 13.  Isopach Map of Net Coal in the Mesaverde D and E Seams**
Net coal represents all beds over 1 foot thick (Source: Hettinger et al. 2004)



**Figure 14.  Isopach Map of Net Coal in the Mesaverde F Seam**
Net coal represents all beds over 1 foot thick (Source: Hettinger et al. 2004)

BLM_0106687



**Figure 15.  Isopach Map of Net Coal in Mesaverde in Eastern Intrusive Area**
Net coal represents all beds over 1 foot thick (Source: Hettinger et al. 2004)

## Mesaverde in Eastern Intrusive Area

East of longitude 107°15' West, the Mesaverde is divided into the lower, middle, and upper coal zones.  The collective coal zones have about 1 to 30 feet of net coal (Figure 15) in 1 to 5 beds, and individual beds are 1 to 25 feet thick.  The Mesaverde is often covered, poorly exposed, steeply included, displaced by faults, and intruded by sills, dikes, and laccoliths throughout the West Elk Mountains (Hettinger et al. 2000).  As a consequence, the coal zones are difficult to correlate.  Murray et al. (1977) indicate that the complex of Tertiary intrusions played a role in the genesis of the coking-grade coals and associated methane gas found in this region of the Piceance Basin.  As seen in Figure 15, the Mesaverde coal is concentrated in the extreme eastern portion of Hettinger's study area (Hettinger et al. 2000) in the vicinity of the Crested Butte coal field, which is outside of the planning area.

Coal partings are common occurrences in the mining of all Cretaceous coals, including Dakota and Mesaverde coals.  The following is a photograph of a parting of sandstone in one of the underground mines in the Somerset area.

April 2010    *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*    31
*Final Coal Resource and Development Potential Report*

BLM_0106688



Parting of sandstone in the Mesaverde Formation.  This photo was taken in an underground mine in the Somerset area.  The wire mesh and bolts are used to secure the coal in this area prior to covering with a coating of lime to control dust. *Photo courtesy Desty Dyer, BLM.*

Just as clastic dikes are an issue in the Dakota Sandstone Formation, they are also an issue in the Mesaverde Formation.  Hardie (1999) studied clastic dikes in the Palisade and Somerset areas and found that joint-source dikes are very common in the southern Piceance Basin.  He found that the predominant orientation of dikes in the West Elk Mine near Somerset is N35°W, with a secondary orientation of dikes being N65°E.  The dominant orientation is perpendicular to the general dip of the Mesaverde Formation, which is 2 to 5 degrees to the northeast.  As previously mentioned in the Dakota Sandstone Formation, these dikes are hard and well-cemented, making mining through them challenging.  Igneous intrusive dikes are also present in the Somerset coal field.  These are hard and continuous features much like clastic dikes, and provide an impediment to mining operations.  In addition to the issues discussed for strip mining when clastic dikes are encountered, underground mining operations also can experience unstable roof conditions, infiltration of mine water or methane, and roof vibration when cut (Hardie 1999).

April 2010   *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*   32
Final Coal Resource and Development Potential Report

BLM_0106689

## V.  Historic Mining and Production

### *Historic Mining*

Historic coal mining in the planning area occurred in five coal fields: Nucla-Naturita, Tongue Mesa, Somerset, Grand Mesa, and Carbondale (Figure 5).  Historic mines are shown relative to the coal fields on Figures 16, 17, and 18.  The history of coal mining in each of the coal fields is discussed below.  The Carbondale coal field produced mainly coking coals, but it is not discussed because the former Mid-Continent Mine and other historic workings depleted the accessible known reserves or the coal is inaccessible due to either Wilderness status (refer to Section III) or thick overburden.

### Nucla-Naturita Coal Field

The earliest mining of Dakota coals in the Nucla-Naturita coal field was in the 1880s, but the peak period for mining was from about 1920 to 1950 (Eakins 1986; Carroll and Bauer 2002). All Dakota coal mines in this region were underground mines with the exception of the Nucla Strip Mine (operated by Peabody Coal Company intermittently from 1959 to 1988), the Hamilton Strip Mine (operated by Honeywood Coal Company from 1992 to 1993), and the New Horizon Mine (operated by Western Fuels Association from 1993 to present).  The New Horizon Mine is the only mine currently in operation. It supplies coal to the FBC power plant in Nucla (Section III).

As seen in Figure 16, most of the mines (including the currently active New Horizon Mine) are northwest of the town of Nucla, locally known as First Park and Second Park.  Another cluster of historic underground mines is located southwest of Nucla (northwest of Naturita) along the outcrop of the Dakota Sandstone in the San Miguel River Canyon.  Mine adits in the canyon slopes followed gently-dipping beds of coal under First Park.  A few other mines were located upstream of Naturita in the San Miguel Canyon.  On Wrights Mesa, just west of Norwood, 10 historic mines were located in the upper slopes of Naturita Canyon.  Again, these were underground mines that followed coal seams under Wrights Mesa and operated in the 1920s and 1930s.  A lone mine that operated in the 1930s was located near Redvale.  These older mines supplied coal for a smelter in Norwood, coke ovens, local power, industrial needs, and household heating (Eakins 1986).

### Tongue Mesa Coal Field

According to Carroll and Bauer (2002), there were eight historic coal mines in the Tongue Mesa coal field (Figure 17).  The earliest mines, Lou Creek and Economy, which started production in 1917 and 1919, respectively, were in the Lou Creek drainage northeast of Ridgway.  The other mines operated between the 1920s and 1950.  There have also been a few small abandoned "dog hole" mines at outcrop locations located in landslide scarps (Dickinson 1987a, 1987b). The mostly subbituminous coal that came out of this field was used for local heating for nearby ranches and homes.  In 1987, the BLM issued a license to mine on private surface with federal minerals in the field that was used by a charitable organization having a 100 ton annual production ceiling and the license was terminated in 2001 (Dyer 2010b).  No commercial mining has occurred in the Tongue Mesa coal field since 1950.

BLM_0106690



**Figure 16. Historic Coal Mines in the Nucla-Naturita Coal Field**

BLM_0106691



**Figure 17. Historic Coal Mines in the Tongue Mesa Coal Field**

BLM_0106692



**Figure 18. Historic Coal Mines in the Grand Mesa and Somerset Coal Fields**

BLM_0106693

**Somerset Coal Field**

Coal mining has occurred in the North Fork Valley since the late 1800s.  According to Carroll and Bauer (2002), there have been 37 underground coal mines and numerous prospects but no surface mining in the Somerset coal field.  The Denver and Rio Grande Railroad constructed a spur from Delta to Somerset and in 1902 established the town of Somerset (Schultz et al. 2000).  Volcanic dikes, sills, and laccoliths of the Elk and West Elk intrusive complexes to the south and southeast of the Somerset coal field locally increased the rank of the bituminous coals in the southern portion of the field to coking coals, which made them very desirable for metallurgical uses (Murray et al. 1977; Schultz et al. 2000).  Three commercial mines began operation as early as 1903: Cooperative Mine operated until 1910 by the Paonia Coal Company, King Mine operated until 1974 by Adolph Coors Company, and Somerset Mine operated until 1985 by US Steel Corporation.  Many of the 37 mines were very productive and operated for 10 to 50 years.

As seen on Figure 18, most of the mines are concentrated in the Somerset area, but they also extend to the west towards Cedaredge and the Grand Mesa coal field at an elevation of roughly 7,000 feet.  Historic mines are also found to the southwest and southeast of Somerset in the Little Coal Creek, Minnesota Creek, and Coal Creek drainages.  By 1977, there were 10 active mines:  West Elk, Bear #3, Hawks Nest East, Sanborn Creek, Somerset, Blue Ribbon, Bowie, Bowie #1, Orchard Valley, and Cyprus Orchard Valley (Hettinger et al. 2004).  Currently, there are three active mines:  West Elk (operated by Mountain Coal Company, Inc.), Elk Creek (operated by Oxbow Mining, LLC), and Bowie #2 (operated by Bowie Resources).

**Grand Mesa Coal Field**

Historic underground coal mining started in the Grand Mesa coal field in the 1880s, and many of these mines operating through the 1930s.  Without a railroad spur to this area, the coal was hauled by wagon or trucked to Cedaredge, Delta, and other local communities for use as domestic fuel mostly during the winter months (Lee 1912).  According to Carroll and Bauer (2002), there were 34 mines in this coal field, most of which were underground mines.  Five of the 34 mines were surface strip mines.  As seen on Figure 18, most of the mines were concentrated in the area northwest of Cedaredge in the Ward Creek and Cottonwood Creek basins near the town of Colby (Dunrud 1989a).  However, a few mines extended to the east near Leroux Creek (north of Hotchkiss) and the Somerset coal field. A few mines were located southwest of Cedaredge along the Mesaverde outcrop containing basal coal lying on top of the Rollins Sandstone (i.e., the Paonia Shale Member) (Lee 1912).  The larger mines were the Winton/Tomahawk (1914-1982), Red Canyon #1 and #2 (1923-1984), Green Valley #2 (1949-1972), Top (1938-1970), and States (1914-1951).  By 1977, there were two active mines: Tomahawk and Red Canyon (Hettinger et al. 2004).  There have been no active mines in the Grand Mesa coal field since 1984.

*Historic Production*

**Nucla-Naturita Coal Field**

Most mines in the Nucla-Naturita coal field produced less than 10,000 tons of coal.  Only four underground mines exceeded 100,000 tons of production.  Three historic mines (US Vanadium, Liberty Bell, and Fiddling Bill), located in the San Miguel Canyon northwest of Naturita, produced a combined total of about 375,000 tons of coal from 1919 to 1950 (Eakins 1986; Carroll and Bauer 2002).  The Nucla Strip Mine produced 2,071,766 tons of coal from 1959 to

BLM_0106694

1988.  The New Horizon Mine produced a total of 4,176,510 tons as of 2004 (Carroll 2005) and had a production of 403,230 tons in 2008 and 373,758 tons in 2009 (Colorado Division of Recalmation Mining and Safety 2010b).  The New Horizon Mine typically produces about 400,000 tons of coal annually, which is trucked to the FBC power plant in Nucla.

**Tongue Mesa Coal Field**
The eight mines in the Tongue Mesa coal field that operated between 1917 and 1950 were all small-scale, commercial underground mining operations that produced a total of 14,831 tons (Carroll and Bauer 2002).  The largest mine, the Kennedy Mine (in the Lou Creek basin northeast of Ridgway), produced a total of just over 3,000 tons of coal.  Although some of the coal seams in this field are 30 to 40 feet thick, the Fruitland Formation along Cimarron Ridge is highly faulted with extensive landslides; therefore, the coal seams are discontinuous and disrupted, producing relatively small amounts of coal.  The area is also remote and without a rail line, so accessing and transporting the coal is not viable on a commercial scale.

**Grand Mesa and Somerset Coal Fields**
Historic production of coal from the Grand Mesa and Somerset coal fields is often lumped into coal produced for the entire Southern Piceance Basin.  A summary of mining activity in the southern Piceance Basin prior to 1977 was compiled by Murray et al. (1977).  Their study indicates that about 84 million short tons of coal were mined from the Mesaverde in the southern Piceance Basin from 1864 through 1976.  From 1977 to 1997, another 94.2 million short tons of coal (1.9 to 8.6 million short tons of coal annually) has been produced from 31 mines in the Southern Piceance Basin (USFS 2006).  In the Grand Mesa coal field, much of the early coal mined was hand dug and hauled by wagon to surrounding communities during the winter months to supply domestic fuel (Lee 1912).  Most mines produced a few hundred to a few thousand tons per month in the winter.  Of the 34 mines in this field, only 6 mines produced a total of more than 100,000 tons.  The largest mines were the Tomahawk and Red Canyon Mines, which produced a combined 1.01 million short tons of coal.  A railway spur was never extended to this district, so the coal mined since the 1940s had to be trucked for local domestic use.  No mines have operated commercially in this field since 1984.

In the Somerset coal field, there were 18 mines that each produced at least 100,000 short tons of coal (Schultz et al. 2000).  Of these 18 mines, 15 were concentrated in the Somerset Quadrangle, and 12 produced over 1 million short tons of coal each.  The high quality and large volume of coal in this field was recognized early on with the development of a rail line in 1894.  Therefore, coal has been hauled by rail for metallurgical uses and steam production for over 100 years.  Three mines currently operate in the Somerset coal field:  Bowie #2, Elk Creek, and West Elk Mines.  Their current production figures are described in Section VI.

BLM_0106695

## VI. Current Mining Operations and Production

Current coal-mining operations within the Uncompahgre RMP planning area include one mine in the Nucla-Naturita coal field (New Horizon Mine) and three mines in the Somerset coal field (Bowie #2, Elk Creek, and West Elk Mines) (Figure 19).

### *Nucla-Naturita Coal Field*

The New Horizon Mine in Nucla is a relatively small surface-mining operation (927 permitted acres) (Colorado Division of Recalmation Mining and Safety 2010a) that produced 403,230 tons of coal in 2008 and 373,758 tons in 2009 from the upper two seams of the Dakota Sandstone (Colorado Division of Recalmation Mining and Safety 2010b). This was 1.2 percent of the coal produced in Colorado in 2008 and 3.1% in 2009. The coal is trucked to the Nucla Station FBC power plant. The New Horizon Mine reclaims about 25 acres per year (Cappa et al. 2007). The following photograph shows nature of the surface mining and associated reclamation.



Oblique aerial photograph looking southwest at the New Horizon Mine in Nucla. The mine pit face is oriented north-south and is 3,400 feet long. Mining is advancing to the right (west), and seeding in the reclaimed area can be seen to the left. *Photo courtesy Western Fuels Association.*

According to Carroll (2005), the New Horizon Mine operated by Western Fuels Association, extracts coal from the upper (UD1) seam that is 0.8 to 1.5 feet thick and the middle (LD1) seam that is 5 to 7.5 feet thick. Interburden thickness is 6 to 10 feet, and overburden thickness is 15 to 100 feet. In 2006, the average heating value of the coal shipped was 11,680 Btu (Cappa et al. 2007). According to O'Hara (2010a), the surface overburden (topsoil, shale, and some sandstone) is excavated with hydraulic shovels (excavator) and trucks as well as blast casting and dozer pushed in the pit floor. When harder material is encountered than cannot be

BLM_0106696



**Figure 19.  Location of Active Coal Leases in the Planning Area**

BLM_0106697

ripped, it is blast casted.  The sandstone of the Dakota is typically a well-cemented sandstone to quartzite, which is very hard and must be drilled and blasted.  Coal is loaded with a rubber-tired loader into belly dump highway trucks and hauled to the local power plant.  The thin, lower-quality UD1 coal is blended with the thicker, higher-quality LDx coal at the plant to create the optimum burn.

### Somerset Coal Field

In 2009, the Elk Creek Mine (operated by Oxbow Mining, LLC) produced 5,702,879 tons of coal, the Bowie #2 Mine (operated by Bowie Resources) produced 1,212,977 tons of coal, and the West Elk Mine (operated by Mountain Coal Company) produced 4,885,581 tons of coal (Colorado Division of Recalmation Mining and Safety 2010b).  This is a total of 11,801,437 short tons of coal, which was 41.3 percent of Colorado's coal production in 2009.  The West Elk Mine is the seventh largest underground coal mine in the US and the second largest underground mine in Colorado based on production (Carroll 2005).  The Elk Creek Mine is the 18th largest underground coal mine in the US.  According to the Colorado Division of Recalmation Mining and Safety (2010a), the permitted acreages for the Somerset coal mines, shown in Figure 19, are: Bowie #1 (8,670 acres), Bowie #2 (5,864 acres), Elk Creek (13,429 acres), and West Elk Mine (17,155 acres).  All three mines in the Somerset coal field ship the coal by rail, and it is primarily used as steam coal.

In 2005, due to the demand for Colorado's high-quality (low sulfur, low ash, low mercury, high Btu) coal, 67 percent of the coal produced was shipped out of state by rail to 28 other states, mostly to the east where it is blended with high-sulfur coals to reduce pollution at minimally-compliant steam power plants (Cappa et al. 2007).  Of those states, Tennessee, Kentucky, and Texas together received almost one-third of the total coal shipped out of Colorado.  Somerset coal is highly desirable for blending with high-sulfur coals for electricity production.  For example, in 2006, over 15.5 million tons of coal from the Somerset coal field was shipped to the Front Range and further east.  The Tennessee Valley Authority uses North Fork coal from all three mines.  Although a small percentage of coal from Colorado is used for commercial and industrial plants, no coking coal from Somerset was used for that purpose.

The three active mines in the Somerset coal field are mining coal from the Paonia Shale Member of the Mesaverde.  The West Elk Mine mined the F seam of the Mesaverde Formation until 1991 and mined the B seam until recently, but is currently mining the 10- to 11-foot-thick E seam (Carroll 2005; Cappa et al. 2007).  Average interburden between the B and E seams is 120 to 130 feet.  Although the average overburden depth of the B seam is 1,200 feet, the West Elk Mine has the maximum mining depth in Colorado at 2,300 feet (Carroll 2010).  Prior to 2003, Oxbow mined the B and C seams from their Sanborn Creek Mine located east of their currently active Elk Creek Mine, which is in the 14-foot-thick D seam.  The Elk Creek Mine workings are above the historic US Steel B and C seam workings.  Prior to 2004, Bowie mined the 9- to 12-foot-thick D seam then transitioned to the B seam beneath their D seam workings, having mined-out the D seam in 2007.  The Bowie No. 2 Mine currently extracts coal from the 10- to 12-foot-thick 'upper' B seam split.  According to Cappa et al. (2007), the average energy value of coal shipped from these three mines was 11,650 Btu for Bowie #3, 12,375 Btu for Elk Creek, and 11,650 Btu for West Elk.  All three mines primarily use longwall mining methods with some use of continuous miners.  Longwall mining equipment is shown in the following photograph.

BLM_0106698



Longwall mining operation in Elk Creek Mine.   This wall is 825 feet long and produces 10,000 tons of coal per day.   *Photo courtesy Oxbow Mining, LLC.*

BLM_0106699

## VII.  Coal Resource Potential (Geologic Occurrence)

A coal resource is where concentrations of coal exist in such forms that economic extraction is currently or may become feasible (US Bureau of Mines and USGS 1976).  The coal needs to be in thick enough seams without significant partings or other impurities and needs to meet quality standards (i.e., within acceptable ranges of Btu, sulfur, ash, and moisture content) for the market to be supplied.   The Uncompahgre RMP planning area is considered to have coal resource potential in areas where (1) underlying strata are likely to have accumulated in a coal-forming environment, and (2) the potential coal-bearing rocks are less than 3,500 feet deep for coals to be extracted by underground mining methods (i.e., Mesaverde or Fruitland coals) or less then 150 feet for coals to be surface mined (i.e., Dakota coals).  As discussed in this report, coal-bearing strata are known or are likely to be in the Dakota Formation, Fruitland Formation, or Mesaverde Formation/Mesaverde Group.  Since overburden depth is an important factor in determining coal potential once a coal-bearing formation is known, overburden was used as a selection criteria.   Figure 20 shows the overburden depths of the three formations in the planning area.

The resource potential was evaluated separately for areas with Dakota coal and Mesaverde/Fruitland coal because they require different mining methods (i.e., surface versus underground) and represent a different kind of resource (e.g., thin-seam, lower-quality coal of the Nucla-Naturita coal field requiring consumption by a local power plant versus thick-seam, high-quality coal of the Somerset coal field).  The coal resource potential is shown on Figure 21 (Dakota Formation) and Figure 22 (Mesaverde and Fruitland Formations).   The criteria for determining low, low to moderate, and high coal resource potential, based on geologic occurrence is described below for each formation.  For this analysis, areas of high coal resource potential have nearby outcrop, mining, or drill hole data that substantiate the presence of coal.  Areas of low to moderate coal resource potential do not have drill hole or outcrop data to substantiate the presence of coal; however, data in adjacent areas indicate that coal is likely present.  Areas of low coal resource potential have no information to substantiate the presence of coal; however, the presence of coal is inferred from regional data.

Once the coal potential was assessed for the planning area based on geologic factors, a map was generated that removed mined-out and currently leased areas because these areas have no future leasing or permitting coal potential (Figure 27).  This Known Potential Coal Resource map (Figure 27) also only includes coal with federal mineral estate.  In other words, all private subsurface ownership was removed as being a coal resource, as the purpose of this report is to identify the areas of potential exploration and mining for coal on lands with federal (BLM) mineral ownership and management.  It should be mentioned that in mined-out areas in the Somerset coal field, it is likely that not all (six) coal seams may have been removed.  Other seams in a lease could have coal potential, but these are in areas with existing leases and no new area would be involved.  Areas with pending leases (Figure 19) are shown on Figure 27 as a potential coal area because they have not yet been mined.  In the Grand Mesa coal field, no mined-out areas were removed, as none of the mines were very deep (many were only 100 to 300 feet deep) or extensive laterally.

BLM_0106700



**Figure 20.  Depth of Overburden within the Planning Area**

BLM_0106701

*Coal Resource Potential of the Dakota Sandstone*

**Methods for Dakota Sandstone Resource Evaluation**
Coal thickness isopach maps have not been compiled for the Dakota Sandstone because the lenticular coals cannot be correlated on a regional scale (Eakins 1986).  Consequently, the evaluation was based on an assessment of coal resource based on overburden thickness (Figure 20), areas adjacent to existing mines, and areas with drill hole data substantiating the presence (or lack) of viable coal seams.

**Previously Estimated Coal Resources**
The Nucla-Naturita coal field is the primary area with coal potential within the Dakota Sandstone.  In the main part of the Nucla-Naturita coal field (15 square miles), in the vicinity of the New Horizon Mine, Landis (1959) estimated an original resource of about 114 million short tons of coal.  Hornbaker et al. (1976) estimated a total of 1.375 billion short tons of Dakota coal in the Nucla-Naturita coal field at a depth of less than 3,000 feet within the 50 square miles of explored area.  Using water well logs and assuming a 3-foot thickness of coal where no information exists, Speltz (1976) calculated strippable resources of 2.9 billion short tons of coal within 502,000 acres of southwest Colorado (includes the Cortez and Dove Creek areas).  He did not separate out the Nucla-Naturita coals from those in Dolores and Montezuma Counties, but the area defined as having strippable coal in the Dakota Sandstone near Nucla was about one-fifth the size of the more-extensive Cortez-Dove Creek region.  With this rough estimate, the strippable Dakota coals in the Nucla region would have about 0.58 billion short tons of coal.

**Current Coal Resource Potential**
Determining the coal resource potential of the Dakota Sandstone is problematic for at least three reasons.  The first reason is that drill hole data is concentrated in some areas of the Nucla-Naturita coal field but is lacking in other areas.  The presence of coal in the Dakota must, therefore, be inferred from adjacent areas where the Dakota coal has been described.  The second reason is that the Dakota Sandstone is often mapped as including the Burro Canyon Formation, which is barren of coal.  Showing areas all of Dakota (including Burro Canyon) would therefore overestimate the extent of the true Dakota Sandstone and its coal-bearing units.  The third reason is that the coal seams in the Dakota Sandstone are typically lenticular, discontinuous, and often bony (i.e., impure coal or mineral partings).  Because the seams are laterally so variable, it is difficult to accurately calculate the volume of the resource.  In addition, even if an area has well less than 120 feet of overburden, which is the current industry limit for strippable coal, the coal could be highly oxidized and of poor quality (O'Hara 2009).  The closer the coal is to the surface, the greater the exposure to air and oxidation/degradation of the coal.  Therefore, shallow coal is not necessarily a good thing in terms of maintaining quality of the coal.

The criteria used for determining levels of recoverable coal potential in the Uncompahgre RMP planning area mapped as Dakota Sandstone are as follows (Figure 21):

    (1.)   **High potential** – Dakota Sandstone in Nucla-Naturita and Wrights Mesa (Redvale and Norwood) regions with overburden less than 150 feet (Figure 20), but excluding Third Park (north of Coal Creek) and mined-out (or current lease) areas.  This represents the strippable coal resource, such as what is being currently mined.

BLM_0106702



**Figure 21.  Coal Resource Potential of the Dakota Sandstone**

BLM_0106703

(2.) **Low to moderate potential** – Dakota Sandstone in Nucla-Naturita region outside of the high-potential area with overburden of less than 150 feet, Dakota Sandstone with overburden 150 to 3,000 feet west of Uncompahgre Plateau, and Third Park near Nucla.  This represents coal that can either be stripped if drilling confirms viable coal seams or limited underground mining for thicker seams. This resource would still require trucking to the Nucla FBC power plant.

(3.) **Low potential** – This includes all other Dakota Sandstone outside of the Nucla-Naturita region with an overburden of less than 3,000 feet, such as in the Uncompahgre and North Fork Valleys.

Although underground mines have operated in the region in the past, it would require significant infrastructure development that does not currently exist in order to resume this activity.  However, there is the potential for thicker seams (on the order of 7 to 9 feet, based on historic mining records), which could warrant the resumption of underground mining if drilling data supports the presence of these types of seams.

All other areas of Dakota Sandstone in the planning area are regarded as having low potential because the formation in these areas appears to have mostly carbonaceous shale or bony coal and not thick, pure, or continuous coal seams.  In the northern portion of the planning area, the resource potential is also low for Dakota coals because either the formation is buried by 5,000 to 6,000 feet of overburden or it is isolated and not proven with borehole data. Any deep Dakota coal that might be present in the planning area would not have current mining (development) potential because it is at depths that exceed the physical or economic limits of present-day mining techniques.

Areas showing coal potential do not account for private or federal coal estate or any other limitations such as proximity to roads or homes.  It is purely a representation of potential coal underlying the surface.

### *Coal Resource Potential of the Fruitland Formation*

**Methods for Fruitland Formation Resource Evaluation**
Coal thickness isopach maps have not been compiled for the Fruitland Formation in the planning area because the coal seams are broken by numerous faults and landslides, so they cannot be correlated on a regional scale.  Consequently, the evaluation is based on an assessment of coal resource based primarily on overburden thickness (Figure 20) and geologic mapping because there are few historic mines and a lack of drill hole data.

**Previously Estimated Coal Resources**
The Tongue Mesa coal field is the primary area with coal potential for the Fruitland Formation. Landis (1959) reported an estimated 2.355 billion tons of coal originally in place, but Hornbaker et al. (1976) estimated it as high as 4.000 billion short tons.  However, since underground mining would only be feasible in the thicker seams, only one-sixth to one-quarter of this coal is recoverable (Hornbaker et al. 1976).  This would indicate a recoverable resource of 0.670 to 1.00 billion short tons.  Speltz (1976) indicated that, given the geology, topography, and discontinuous nature of the coal seams, there is no strippable coal resource in the Tongue Mesa coal field.

BLM_0106704

**Current Coal Resource Potential**
According to the USGS, the planning area has a moderate to high resource potential for coal where it is underlain by the Fruitland Formation in the Tongue Mesa coal field (Hettinger et al. 2004).  The area is given a high resource potential because it is known to contain thick beds of subbituminous coal, some of which are 30 to 40 feet thick (Carroll and Bauer 2002).  The area is also assigned a moderate resource potential because coal bed continuity could not be determined, owing to poor exposure and structural complexities.  Some exploratory and evaluation drilling was carried out in the mid-1970s (Hornbaker et al. 1976).  For example, Kemmerer Coal explored the potential for coal resources of the Fruitland coal in the 1970s but did not pursue mining due to a lack of supporting data (Sharrow 2005).  The few outcrops of the Fruitland Formation are surrounded by landslide deposits that are potentially unstable and steep, thus making access difficult.  Although the area has a moderate to high resource potential, Hornbaker et al. (1976) concluded that the coal in the Tongue Mesa area could not compete with better coal in the Somerset field.

The following criteria were used for determining levels of recoverable coal potential in the planning area in the Tongue Mesa coal field (Figure 22).  Due to the similar age/type of coal and underground mining techniques needed to extract the coal, the potential for both the Fruitland and Mesaverde coals are shown on the same map (Figure 22).

(1.)  **High potential** – All of the Fruitland coal with high potential has been mined-out, is too small (isolated), or is too inaccessible to be a viable resource. Consequently, none of the coal resource in the Fruitland Formation within the planning area is considered to have high potential.

(2.)  **Low to moderate potential** – Areas with Mesaverde or Fruitland Formation outcrops in the Cimarron Ridge (Tongue Mesa) area.  This represents the underground mining coal resource, such as the type of coal that was previously mined in the Tongue Mesa coal field.

(3.)  **Low potential** – Includes all Mesaverde or Fruitland Formations within the Cimarron Ridge area with an overburden of less than 3,000 feet.

According to the BLM's letter to the Grand Mesa, Uncompahgre, and Gunnison National Forest Supervisor, which included comments from their review of the Grand Mesa, Uncompahgre, and Gunnison National Forest's draft Coal Resource and Development Potential of 2004, the BLM indicated that the Fruitland coal in the Tongue Mesa field is difficult to access and heavily faulted (Sharrow 2005).  In addition to the discontinuous nature of the formation due to faults and landslides in the Tongue Mesa area, there are no railway lines to transport the coal. Without a rail line, this resource would require trucking to the rail line in Montrose or to a currently nonexistent power plant constructed for the specific purpose of burning that local coal, similar to what is being done in the Nucla area.  Due to difficult access, the marginal and dispersed nature of the coal resource, and lack of a nearby power plant to the Tongue Mesa coal field, it is not likely that large-scale mining development could be justified over the next 20 years.  In fact, even small-scale mining development of this resource would not be expected.

April 2010    *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*    48
Final Coal Resource and Development Potential Report

BLM_0106705



**Figure 22.  Coal Resource Potential of the Fruitland and Mesaverde Formations**

BLM_0106706

*Coal Resource Potential of the Mesaverde Formation*

## Methods for Mesaverde Coal Resource Evaluation

The resource potential of the Somerset coal field has been studied in much more detail than any of the other coal field in the planning area (Boreck and Murray 1979; Eakins et al. 1998a, 1998b; Hettinger et al. 2000, 2004; Hornbaker et al. 1976; Landis, 1959; Rohrbacher et al. 2000; Schultz et al. 2000; Toenges et al. 1949, 1952; USFS 2006).  Gross coal resources were estimated using a modified methodology based on that of Wood et al. (1983) by which all coal in the ground in beds greater than 1 foot thick and under less than 3,500 feet of overburden are reported.  The term "original resource" refers to coal in the ground prior to mining.  More deeply buried coal is reported as other occurrences of non-resource coal.  **This report does not estimate coal reserves that are the subset of the resource that can be economically produced at the present time**.  Coal resources for Mesaverde coal were estimated by multiplying the volume of coal by the average density of coal (Wood et al. 1983).

Hettinger et al. (2000) performed an analysis on the Mesaverde coals in the southern Piceance Basin, which includes the Somerset coal field.  Maximum overburden thicknesses on the A, B, C, D, E, and F seams are shown in Figures 23, 24, and 25.  The maximum overburden thickness on the base of the Mesaverde Formation east of Somerset in the intrusive area (east of longitude 107°15′ West) is shown on Figure 26.



**Figure 23.  Isopach Map of Overburden on Base of Mesaverde A, B, and C Seams**
Source: Hettinger et al. 2004

BLM_0106707



**Figure 24.  Isopach Map of Overburden on Base of Mesaverde D and E Seams**
Source: Hettinger et al. 2004



**Figure 25.  Isopach Map of Overburden on Base of Mesaverde F Seam**
Source: Hettinger et al. 2004

April 2010   *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*   51
Final Coal Resource and Development Potential Report

BLM_0106708



**Figure 26.  Isopach Map of Overburden on Mesaverde Formation in Eastern Intrusive Area**
Source: Hettinger et al. 2004

For the analysis by Hettinger et al. (2000), an average density of 1,800 short tons per acre-foot for bituminous coal was used.  Coal tonnages are reported within overburden categories of 0– 500, 500–1,000, 1,000–2,000, and 2,000–3,000 feet.   Overburden was determined by subtracting elevations at the base of the specified coal interval from surface elevations.  The difference represents the maximum overburden on the specified coal interval.  Elevations at the base of the A, B, and C seams were determined from a structure contour map of the top of the Rollins Sandstone Member.  Similarly, elevations at the base of the D, E, and F seams were determined from structure contour maps that represent the base of those respective seams and their associated zones.  These overburden thicknesses are shown in Figures 23–26.

**Previously Estimated Coal Resources**
The Grand Mesa and Somerset coal fields are the primary areas with coal potential for the Mesaverde Formation. About 150 million short tons have been produced since the late 1800s from this region (USFS 2006).  The Mesaverde has six regionally extensive coal seams or zones; they contain as much as 97 feet of net coal and have individual coal beds as thick as 30 feet within the USFS areas (Hettinger et al. 2000).   According to Landis (1959), a total of 3.348 billion short tons of bituminous coal are estimated to have been originally present in the 133 square miles of the Somerset coal field.  He estimates that an additional 87 square miles of land may contain mineable coal reserves with less than 3,000 feet of overburden and could add around 2.19 billion short tons of coal to the resources.  Hornbaker et al. (1976) adds that roughly one-half of the original coal in 133 square miles was high-volatile B bituminous and of coking quality.  If coal could be mined with an overburden depth of 6,000 feet, Hornbaker et al.

BLM_0106709

(1976) estimates 8 billion short tons of coal over an additional 100 square miles.  Landis (1959) determined that the Grand Mesa coal field contained 1.6 billion short tons of mineable coal, with less than 9 percent being high-volatile C bituminous and the remainder being subbituminous A rank.  He indicated that if the overburden depth was increased to 3,000 feet, there should be an additional 184 square miles of coal with possibly 3.1 billion short tons of coal.  Hornbaker et al. (1976) estimated 8.6 billion short tons of coal resource in beds greater than 5 feet thick and underlying up to 6,000 feet of overburden with 9 percent being high-volatile C bituminous and the remainder being subbituminous A rank.

**Current Coal Resource Potential**
The Known Potential Coal Resource map is shown as Figure 27.  The USFS (2006) analyzed in detail the Grand Mesa and Gunnison National Forests in the southern Piceance Basin.  They found that the area of high coal resource potential in the two forests within the basin is estimated to contain about 38 billion short tons of coal in the Mesaverde Formation.  This large resource figure does not represent mineable reserves, which are a subset of the resource that could be economically produced at the present time.  Coal in the Mesaverde would have to be mined using underground methods, and technological and geologic restrictions preclude much of the resource from being economically mined.  For example, only 37 percent (14 billion short tons) of the coal resource is at depths favorable for longwall mining (i.e., less than 3,000 feet). Some coal would be precluded from mining because the beds are too thin, thick, or steeply inclined.  Additional coal would also be restricted from mining because the beds might be discontinuous, left in the ground as pillars for roof support, or bypassed due to mining of adjacent coal seams.

Specific to the recoverable coal potential for Mesaverde coal in the Grand Mesa and Somerset coal fields within the planning area, the following criteria were used for determining levels of potential (Figure 22).

(1.) **High potential** – All Mesaverde in the vicinity of Grand Mesa with an overburden of less than 3,000 feet except for mined-out areas and current leases.  It does not include pending leases.  High-potential areas include much of the Grand Mesa and Somerset coal fields within the planning area.

(2.) **Low to moderate potential** – All Mesaverde with overburden of 3,000 to 3,500 feet.  This is continuous band spanning both coal fields that is known to exist but is at the margin of current mining capabilities.

(3.) **Low potential** – Includes the Deep Piceance coal (Mesaverde with overburden greater than 3,500 feet).

Areas mined-out or under current leasing are excluded from having coal resource potential even if some seams within a lease have not been mined.  This is because those seams could be mined under the current leases and require no exploration on new (not previously leased) land.  In other words, exploration and mining of these unexploited seams could occur, but these activities would occur within areas of existing leases.

Although the Grand Mesa coal field has not had an active mine since 1984, this was not due to an exhaustion of the coal resource; rather, it was due to a lack of a rail line to export the coal to more-distant markets.  Grand Mesa is within the Piceance Basin and is underlain by the

BLM_0106710



**Figure 27.  Known Potential Coal Resource in the Planning Area**

BLM_0106711

Mesaverde. As such, coal underlies the entire landform, and the coal potential is significant if it could be accessed by deep-mining methods (Haun and Weimer 1960; Hornbaker et al. 1976; Landis 1959; Murray 1980a).

More detailed information about the coal resource potential of each of the six Mesaverde seams is offered below as a summary of work by Hettinger et al. (2000) and the USFS (2006).

**Coal Resource Breakdown of the Mesaverde A to F seams**
Based on information from the USGS (Hettinger et al. 2000), Area 1 (defined as the Grand Mesa and Gunnison National Forest within the Piceance Basin) has an original coal resource of about 14 billion short tons in the Mesaverde Formation and Mesaverde Group.  This total represents coal beds more than 1 foot thick and under less than 3,500 feet of overburden.  The resource figure does not include coal folded over the flanks of laccoliths (dome-shaped igneous intrusions) or buried beneath laccoliths.  Approximately 20 percent of the resource is in the Grand Mesa National Forest, and 80 percent is in the Gunnison National Forest.

Area 1 also contains about 58 billion short tons of <u>non-resource</u> coal in the Mesaverde that is covered by 3,000 to 11,500 feet of overburden (Figure 20).  Non-resource coal is defined by coal seams that are too thin or of such quality (low Btu or high sulfur/mercury) to make them uneconomical to mine.  Approximately 76 percent of the non-resource coal is in the Grand Mesa National Forest, and 24 percent is in the Gunnison National Forest.  Coal tonnages are reported by reliability and overburden categories for each coal zone in the Mesaverde where it is located west of longitude 107°15' West (Tables 3, 4, and 5, respectively), and tonnages are reported for the entire Mesaverde where it is located east of longitude 107°15' West (Table 6).

**Table 3. Original Coal Resources in the A, B, and C Seams (Area 1)**
**(in millions of tons)**

| National Forest | Reliability[1] | Overburden | | | | Total |
|---|---|---|---|---|---|---|
| | | 0–500 | 500–1,000 | 1,000–2,000 | 2,000–3,000 | |
| Grand Mesa | Identified | 140 | 130 | 420 | 940 | 1,600 |
| | Hypothetical | 78 | 94 | 290 | 440 | 900 |
| **Grand Mesa Subtotal** | | **210** | **220** | **710** | **1,400** | **2,700** |
| Gunnison | Identified | 940 | 820 | 2,200 | 2,600 | 6,900 |
| | Hypothetical | 80 | 15 | 0 | 200 | 300 |
| **Gunnison Subtotal** | | **1,000** | **830** | **2,200** | **2,800** | **7,100** |
| **Total** | | **1,200** | **1,100** | **2,900** | **4,100** | **10,000** |

[1] "Identified" resources are located less than 3 miles from a coal measurement (data point from an exploration drill hole), and "Hypothetical" resources are located more than 3 miles from a coal measurement.

BLM_0106712

**Table 4. Original Coal Resources in the D and E Seams (Area 1)**
**(in millions of tons)**

| National Forest | Reliability[1] | Overburden | | | | Total |
|---|---|---|---|---|---|---|
| | | 0–500 | 500–1,000 | 1,000–2,000 | 2,000–3,000 | |
| Grand Mesa | Identified | 0 | 0 | 0 | 0 | 0 |
| | Hypothetical | 0 | 0 | 0 | 0.47 | 0.47 |
| **Grand Mesa Subtotal** | | **0** | **0** | **0** | **0.47** | **0.47** |
| Gunnison | Identified | 180 | 350 | 840 | 740 | 2,100 |
| | Hypothetical | 0.20 | 2.5 | 20 | 59 | 80 |
| **Gunnison Subtotal** | | **180** | **350** | **860** | **790** | **2,200** |
| **Total** | | **180** | **350** | **860** | **790** | **2,200** |

[1] "Identified" resources are located less than 3 miles from a coal measurement (data point from an exploration drill hole), and "Hypothetical" resources are located more than 3 miles from a coal measurement.

**Table 5. Original Coal Resources in the F Seam (Area 1)**
**(in millions of tons)**

| National Forest | Reliability[1] | Overburden | | | | Total |
|---|---|---|---|---|---|---|
| | | 0–500 | 500–1,000 | 1,000–2,000 | 2,000–3,000 | |
| Grand Mesa | Identified | 0 | 0 | 0 | 0.27 | 0.27 |
| | Hypothetical | 0 | 0 | 0.18 | 5.80 | 6 |
| **Grand Mesa Subtotal** | | **0** | **0** | **0.18** | **6.1** | **7** |
| Gunnison | Identified | 170 | 230 | 670 | 540 | 1,600 |
| | Hypothetical | 0.96 | 0.82 | 0.22 | 38 | 40 |
| **Gunnison Subtotal** | | **170** | **230** | **670** | **580** | **1,600** |
| **Total** | | **170** | **230** | **670** | **586** | **1,607** |

[1] "Identified" resources are located less than 3 miles from a coal measurement (data point from an exploration drill hole), and "Hypothetical" resources are located more than 3 miles from a coal measurement.

**Table 6. Original Coal Resources in the Mesaverde of the Eastern Intrusive Area**
**(Area 1)**
**(in millions of tons)**

| Reliability[1] | Overburden | | | | Total |
|---|---|---|---|---|---|
| | 0–500 | 500–1,000 | 1,000–2,000 | 2,000–3,000 | |
| Identified Subtotal | 160 | 160 | 63 | 51 | 434 |
| Hypothetical Subtotal | 160 | 64 | 160 | 100 | 484 |
| Total | 320 | 224 | 223 | 151 | 918 |

[1] "Identified" resources are located less than 3 miles from a coal measurement (data point from an exploration drill hole), and "Hypothetical" resources are located more than 3 miles from a coal measurement.

BLM_0106713

**The large gross coal resource figures reported for Area 1 (Grand Mesa and Gunnison National Forests in the Piceance Basin) must be regarded with caution because they do not reflect economic, land use, environmental, technological, and geologic restrictions that affect the availability and recoverability of coal.** The coal would have to be mined using underground methods, and technological and economical constraints generally limit current longwall mining to (1) depths of less than 3,000 feet, (2) beds more than 3.5 feet thick, and (3) strata inclined by less than 12 degrees (USFS 2006). Additionally, only about 14 feet of coal can be mined even if the bed is of greater thickness due to limitations of the longwall mining equipment.

An estimated 14 billion short tons of coal in Area 1 meets favorable underground mining criteria regarding depth of burial (less than 3,000 feet), and only a fraction of that coal could be mined economically because many beds are either less than 3.5 feet thick or more than 14 feet thick, and because many localities in the vicinity of the Crested Butte and Carbondale coal fields are steeply inclined. Additional coal would also be restricted from mining because it might be in beds that are discontinuous, left in the ground as pillars for roof support, or bypassed due to mining of adjacent coal seams. The following summarizes the findings:

*Area 1, A, B, and C Seams*—The A, B and C seams have an original coal resource of 10 billion short tons in Area 1 (Table 3) where the coal is covered by less than 3,000 feet of overburden (Figure 23). Approximately 5.2 billion short tons are under less than 2,000 feet of overburden.

*Area 1, D and E Seams*—The D and E seams have an original coal resource of approximately 2.2 billion short tons in Area 1 (Table 4) where the coal is covered by less than 3,000 feet of overburden (Figure 24). Approximately 1.4 billion short tons are under less than 2,000 feet of overburden. The D and E seams contain an additional 3.8 billion short tons of non-resource coal (3,000 to 11,500 feet of overburden) in Area 1.

*Area 1, F Seam*—The F seam has an original coal resource of approximately 1.6 billion short tons in Area 1 (Table 5) where the coal is covered by less than 3,000 feet of overburden (Figure 25). Approximately 1.1 billion short tons are under less than 2,000 feet of overburden. The F seam contains an additional 1.8 billion short tons of non-resource coal in Area 1.

*Area 1, Coal Resources of the Mesaverde in Eastern Intrusive Area*—Area 1 has an original resource of 918 million short tons of coal in the Mesaverde where it is located east of longitude 107°15' West (Table 6). The coal resource is distributed across the lower, middle, and upper coal zones. This resource figure is tenuous because of the complex geology and lack of coal measurements in the area. Additionally, the resource figure does not include coal that is folded over the flanks of laccoliths or that which is buried beneath laccoliths in the region. Maximum overburden on the Mesaverde east of longitude 107°15' West is shown in Figure 26. Approximately 767 million short tons are under less than 2,000 feet of overburden.

BLM_0106714

## VIII.  Areas with Potential for Coal Development during Plan Life and Reserve Estimates

This report was prepared to aid in identifying areas with coal development potential in the planning area in support of the RMP revision underway in 2010.  The following development potential estimates are for the plan life of 20 years beginning in approximately 2013, and are based on the most current available resource and development information.  The coal resource potential was discussed in Section VII, which is the potential for the presence of coal based on geologic factors.  Coal development potential is the economic feasibility of the coal actually being extracted.  Factors such as remoteness, rugged terrain, market demand for the type or quality of coal, and availability of suitable transportation (i.e., rail line) or coal-handling infrastructure all contribute to the development potential of coal.

### *Identification of Areas with Potential for Coal Development during Plan Life*

The coal development potential within the planning area was evaluated separately for the Dakota Sandstone Formation and the Mesaverde/Fruitland Formations.  In the case of Dakota coals, the seams are relatively thin, lenticular, and near the surface, making them more suitable to strip mining and local marketing.  For the Mesaverde Formation, the coal is relatively thick with multiple, continuous seams, and is deep, requiring underground mining methods.  The Fruitland Formation would also require underground mining and has potentially thick seams, but they are fragmented by faults.  Only the Mesaverde coals in the Somerset coal field are accessible with a rail line via the North Fork Valley, while all other areas with coal potential would require trucking.  The following criteria were taken into account when assessing the potential for coal development:

   a.  Areas with high potential for coal resource occurrence;
   b.  Existing coal mining activity occurring nearby;
   c.  Areas where the overburden is 3,500 feet or less in the Somerset Field and 150 feet or less for Dakota coal in the Nucla-Naturita-Norwood area;
   d.  Advances in mining technology could occur;
   e.  Coal prices and high-coal quality will continue the demand for area coal; and
   f.  Areas with private subsurface estate and Wilderness are excluded.

### Nucla-Naturita Coal Field Potential Development

Coals in the Dakota Formation occur within the Nucla-Naturita coal field and several adjacent areas.  Current mining at the New Horizon Mine will likely extend to the north on First and Second Parks.  Also, mining potential exists on other areas of First and Second Parks (i.e., New Horizon Mine North), Wrights Mesa (southeast of Nucla and Naturita in the Redvale and Norwood areas), and south of the San Miguel River towards Naturita Ridge and Dry Creek Basin.  Although Eakins (1986) indicated through borehole, water well, and outcrop data that Third Park had coal resource potential, exploratory work by Western Fuels Association found mostly carbonaceous shale, low-quality coal (around 8,000 Btu), and the main LDx coal seam was thin with multiple partings, making it undesirable for current strip mining methods (O'Hara 2009).  If mining extends into these additional areas in the vicinity of the Nucla-Naturita coal field, supplying coal to the Nucla FBC power plant is expected for the next 20 years.

BLM_0106715

Regarding coal potential for other Dakota coals outside of the Nucla-Naturita area, borehole logs, water well logs, and outcrop data all suggest that coal does exist in this formation over a broad area, but it is too deep for strip mining, too thin with many partings, and/or of too poor quality to be a desirable coal resource. The main reason that the Nucla-Naturita coal field is still operating is the proximity of a specialized (FBC) coal power plant that can efficiently process the relatively thin, dirty seams of coal typical of Dakota coal in western Colorado. Because there are no other similar power plants in the planning area, developing Dakota coal outside of the Nucla area is not anticipated over the next 20 years.

**Tongue Mesa Coal Field Potential Development**

Coals in the Fruitland Formation occur within the Tongue Mesa coal field. Small "dog hole" mines have been used along the coal outcrop for local residential heating, but no commercial mines have operated since 1950 (Carroll and Bauer 2002). The Tongue Mesa field is heavily faulted, is covered with extensive landslide deposits, has no rail line or coal-handling facilities, and is in a remote area with limited access. Therefore, no commercial mining activity is expected in this area over the next 20 years.

**Grand Mesa Coal Field Potential Development**

The Grand Mesa coal field, located west of Leroux Creek, has significant potential to provide bituminous coal resource, as shown in Figure 22. However, due to the lower coal quality (i.e., lower Btu), deep overburden, and inaccessibility to coal-handling and transportation facilities, coal mining activity in this field has limited potential during the next 20 years (Sharrow 2005). Some exploration may be anticipated in the portions of this field with an overburden of less than 3,000 feet overlying the Mesaverde, but actual mining on a commercial scale is not likely due to a lack of a rail line and related infrastructure, as well as the proven higher-quality coal in the adjacent Somerset coal field. Additionally, the Somerset coal field contains a rail line, loadouts, and other coal handling facilities to accommodate future mining in the vicinity of Paonia and Somerset that do not exist in the Cedaredge area. Consequently, no commercial mining activity is expected in this area over the next 20 years.

**Somerset Coal Field Potential Development**

The Somerset coal field has the greatest potential for continuing to produce the largest amount of coal in the planning area. Projections by the US Department of Energy's Energy Information Administration (US Department of Energy 2010b) indicate that demand for Somerset's compliant to super-compliant coal will remain high and will likely continue to provide around 40 percent of Colorado's coal. In addition to the areas shown in Figure 28, which is the projection of the areas of recoverable coal resource based on the previously discussed criteria, the USFS (2006) produced a more detailed evaluation of potentially developable coal of the Mesaverde in the Somerset coal field within the Grand Mesa and Gunnison National Forests (Figure 28). The areas labeled A, B, and C (shown in purple on Figure 28) are the areas they determined should be considered for coal leasing in the Grand Mesa and Gunnison National Forests. This area surrounds the currently active coal operations in the North Fork Valley, including the Somerset coal field, and extends to the west into the Grand Mesa coal field (Area A), north of Somerset and Oxbow's lease (Area B), and east and south of Mountain Coal's lease (Area C). Area C is constrained by the North Fork of the Gunnison River on the north, Coal Creek on the east, the West Elk Wilderness boundary on the south, and the coal outcrop on the west. The estimated

BLM_0106716



**Figure 28.  Potentially Developable Coal in the Somerset Coal Field**
Source: USFS 2006

BLM_0106717

area on the Grand Mesa and Gunnison National Forests having a high potential for coal development is 45,280 acres, with Area A containing 24,780 acres, Area B containing 4,675 acres, and Area C containing 15,825 acres.

The limits of developable coal for Areas A, B, and C (Figure 28) have an overburden cut-off at 3,500 feet (rather than the 3,000 feet cited by USGS). This increased overburden limit is considered to allow for improvements in technology and mining techniques. As new equipment and techniques are employed, the depths to which longwall operations are safe and manageable are likely to increase (USFS 2006).

For the deeper coal seams that are currently inaccessible by current underground mining techniques, either conventional gas drilling methods in sandstone reservoirs interbedded with the coal in the Mesaverde or Underground Coal Gasification, also known as in-situ gasification of coal beds, may be an option to obtain energy from the coal beds without removing the coal (Wikipedia 2009). Underground Coal Gasification technology could be used to extract methane from the Piceance Deep coals in the planning area, which are those with an overburden of greater than 3,500 feet (Figure 5). In the Underground Coal Gasification process, wells inject oxidants into coal seams igniting them, and production wells collect the resultant gases to be used as a chemical feedstock or as fuel for power generation. Murray et al. (1977) found that the southeastern part of the Piceance Creek Basin, which includes the Somerset coal field, contains the gassiest coal mines in Colorado as well as the western US. Murray's work indicated that there are multiple thick (approximately 20- to 50-foot) coal beds in the basin at depths of 3,000 to 7,000 feet. Underground Coal Gasification technology has been used in the Appalachian region since the 1970s and could be a viable deep energy resource for this region of Colorado. Neither conventional gas drilling nor Underground Coal Gasification methods could be used close to an active or planned underground coal mine due to the fire and explosion potential within the mines.

Coal potential for other Mesaverde coals in the Somerset coal field outside of the currently leased areas includes Snowshoe Mesa and areas east of Coal Creek (east of Area C on Figure 28) and Coal Creek Mesa west of Coal Creek. Literature suggests the potential for coking and anthracite coal resources in these areas. Other areas of coal potential are Oak Mesa and the Leroux Creek basin near the western edge of the Somerset coal field, areas north to east of Paonia (Terror, Elk, and Minnesota Creek basins), and the area locally known at the Raggeds Field (east of Highway 133 and north of Paonia Reservoir on Figure 22). Viability of these reserves needs further evaluation.

### *Reserve Estimates for Area with Development Potential*

**Gross Reserve Estimates**
Detailed analyses of coal reserves for the sum of all coal fields within the planning area are not available. There are many estimates of reserves on a per-mine basis, but none are projected beyond the scope of their operation. However, the USGS and others have calculated reserve estimates for the Somerset area coals. Because the majority of the currently active coal operations within the planning area are within the Somerset Quadrangle, data derived from their activities are useful to evaluate the potential coal resource in that area. In 2000, the USGS published a report on the coal reserves within the Somerset 7.5' Quadrangle (Rohrbacher et al. 2000) that was based on work by Eakins et al. (1998a). These reports are summarized in

BLM_0106718

Table 7, which provides a gross estimate of the coal reserves in the vicinity of the West Elk, Elk Creek, and Bowie #2 mines.

**Table 7. Summary of Original, Mined, and Available Coal Resources within the Somerset 7.5′ Quadrangle as of 1998**

| Resource Category | Seam* | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | Lower B | B | C | Lower D | D | E | |
| Original coal resource | 95.2 | 1,202.5 | 417.6 | 280.7 | 666.4 | 425.4 | 3,087.8 |
| Coal Mined or lost during mining | 0.0 | 222.6 | 25.6 | 0.0 | 5.3 | 21.9 | 275.4 |
| Remaining coal | 95.2 | 979.9 | 392.0 | 280.7 | 661.1 | 403.5 | 2,812.4 |
| Land use restrictions | 0.0 | 0.1 | 0.2 | 0.9 | 0.4 | 0.3 | 1.9 |
| Technological restrictions | 36.4 | 198.3 | 0.9 | 175.9 | 72.8 | 0.3 | 484.6 |
| **Available coal resource** | **58.8** | **781.5** | **390.9** | **103.9** | **587.9** | **402.9** | **2,325.9** |

Source: Rohrbacher et al. 2000; Eakins et al. 1998a
*numbers are in millions of tons

Given that Table 7 reflects data as of 1998, it would be a fair estimate that available coal resources within the Somerset 7.5′ Quadrangle are still over 2.2 billion short tons. However, these numbers are total for all coal beds greater than 2.3 feet thick. **The USFS (2006) indicates that "only a fraction of that coal could be mined economically because many beds are either less than 3.5 feet thick or more than 14 feet thick (range favorable for longwall mining operations)."** Additional coal would also be restricted from mining because of discontinuous beds, coal left in the ground as pillars for roof support, or coal bypassed due to mining of adjacent strata.

**Refined Reserve Estimates**
Although the USGS has published many reports calculating the reserves in and around the planning area, a more refined reserve estimate is needed to reflect the reserves within the areas highlighted in Figure 28.

In Hettinger et al. (2000), the USGS included spreadsheet data containing lithologic logs of explorations hole in the Somerset 7.5′ Quadrangle. Also included in this report were Geographic Information System layers showing thickness of net coal and overburden. This coal resource data was clipped to the area having a high potential for coal development. Using Geographic Information System allowed the summation of coal reserves only for the area with high potential for coal development. When totaled, the amount of coal reserves for all coal beds (any thickness) is approximately 3.025 billion tons (USFS 2006). However, this estimate, because it contains all coal beds and has no land use restrictions, is not realistic. Since the USGS typically studies large regions with dispersed exploration logs, they typically extrapolate coal bed thickness over large areas. Therefore, their estimates of coal reserves are typically high.

BLM_0106719

As such, an estimation of recoverable and mineable coal reserves for the area identified in Figure 28 was performed assuming a thickness of mineable coal for the area to be 20 feet (to account for multiple seams of mineable thickness), a value of 1,830 tons per acre per foot of height.  Using these parameters, the area in Figure 28 contains an estimated 1.65 billion tons of mineable coal, equating to 829 million tons of recoverable coal (USFS 2006).

April 2010    *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*    63
Final Coal Resource and Development Potential Report

BLM_0106720

## IX.  Compliant and Super-Compliant Coal Reserves

The existing coal production from mines operating on federal leases within the planning area produce Clean Air Act compliant and super-compliant coal.  This means that coal quality meets or exceeds Clean Air Act standards for clean-burning coal (i.e., compliant coal contains between 1.0 and 1.2 pounds of sulfur dioxide per million Btu, and super-compliant coal contains less than 1.0 pound of sulfur dioxide per million Btu).  The Energy Policy Act of 2005 contains provisions (Section 437) for the Secretary of Interior, in consultation with the Secretary of Agriculture, to inventory coal resources, including identifying areas where resources of compliant and super-compliant coal exist.  Some areas in the US have been inventoried since 2005 for evaluating the presence of compliant and super-compliant coal.  However, this level of inventory has not yet been performed by the Secretary of Interior for the planning area.

Recognizing that currently developed coal resources within the planning area meet Clean Air Act standards, available coal quality data were reviewed to generally assess where compliant and super-compliant coal resources may exist in the planning area.  According to data presented by Affolter (2000) and summarized in Section III, the four coal fields in the planning area contain the range of non-compliant to super-compliant coals.  All of the coal fields contain some coal that would at least be compliant.  Colorado is second only to Illinois in bituminous coal reserves, but it is by far the leader in bituminous Clean Air Act-compliant coal reserves (Cappa et al. 2007).  For example, coal produced in 2006, including coal from the Somerset coal field, ranges between 0.4 and 0.8 percent sulfur, which is two the three times lower than average eastern bituminous coal.

April 2010    *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*    64
*Final Coal Resource and Development Potential Report*

BLM_0106721

## X.  Production Estimates

In 2009, according to the Colorado Division of Minerals and Geology (Colorado Division of Reclamation Mining and Safety 2010b), the Bowie mines, Elk Creek Mine, and West Elk Mine collectively produced a total of 11,801,437 tons of coal, which was over 41.3 percent of coal produced from all Colorado coal mines.  The New Horizon Mine produced 373,758 tons of coal in 2009, which was 3.1 percent of the State's coal production that year.

According to the Energy Information Administration's (Department of Energy) *2010 Annual Energy Outlook* with Projections from 2008 to 2035, the demand for low-sulfur bituminous and subbituminous coal from the Rocky Mountain Region is likely to increase annually by 0.2 percent and 0.7 percent, respectively (US Department of Energy 2010b).  This is the type of coal produced in the Somerset coal field.  The US Department of Energy projects that, on a Btu basis, 60 percent of domestic coal production will originate from states west of the Mississippi River in 2035, which is up from 50 percent in 2008.  This is due to lower prices for western mining operations and the low sulfur content of western coals.  The population is projected to increase by 0.9 percent per year with the demand for electric power from coal increasing 0.4 percent annually.  The difference is projected to be made up by an increased use of renewable energy and natural gas supplies due to lower gas prices, as well as a decline in per capita consumption of electricity due to conservation measures triggered by higher energy prices and environmental concerns (US Department of Energy 2010b).  Although there will be fewer new coal-fired power plants constructed in the next 25 years, coal will remain the dominant energy source for electricity generation according to the US Department of Energy's projections.

The BLM forecasts that 5 to 10 percent of coal reserves in the Somerset coal field will be recovered over the next 10 to 15 years (USFS 2006).  The USFS report projects that, although demand for coal is projected to increase, yearly production at the mines in the Somerset coal field is likely to remain close to the existing rate of approximately 14 to 16 million tons per year due to several limiting factors.  One limiting factor to the amount of coal produced is the capacity of the railway line or spur off of the main line in Delta, operated by Union Pacific, which hauls the coal.  This spur's sole purpose is to support the three mines in the Somerset area, but mine production is directly related to the number of coal trains that can move in and out of the one-way valley (Cappa et al. 2007).  Currently, due to train availability, it is unlikely that the rail line could support an increase in mine production.  According to Oxbow Mining, LLC, each train set typically contains 105 cars, each carrying roughly 108 tons per car, which is a total of 11,400 tons of coal per train (Kiger 2010).  This is an average of 2.84 trains per day leaving the valley.  Other limiting factors to production include physical bottlenecks at the mine facilities such as conveyor and train load-out capacities, as well as the amount of coal that can be stockpiled at the individual mine sites.

For the Grand Mesa, Tongue Mesa, and Nucla-Naturita coal fields, no rail line spur currently exists to transport coal outside of the fields.  The Nucla-Naturita coal field is successful due to the presence of a FBC power plant less than 10 miles from the single strip mine operating in the area.  This plant is well suited to use low-quality coal, and the process removes sulfur during combustion.  The 100 megawatt Nucla FBC plant can burn up to 420,000 tons of coal per year, with a minimum criteria of 8,000 Btu coal with no limits on ash and sulfur content (Eakins 1986; O'Hara 2010b).  According to O'Hara (2010b), as long as this coal can be mined locally, with a

BLM_0106722

maximum trucking distance of 10 miles from the Nucla power plant, production of around 400,000 tons of coal per year can be expected for the next 10 to 20 years. The New Horizon Mine is expected to deplete currently permitted mine reserves in 2013, so other areas will need to be permitted to meet Nucla power plant demand. O'Hara (2010b) indicated that the New Horizon Mine North (currently under review for permitting) would provide seven years of coal similar to the current rate to the Nucla power plant. Beyond 2020, other areas in the Nucla-Naturita coal field will need to be mined, but he is confident, based on their exploratory work, that these resources exist in the Nucla-Naturita coal field for an additional 18 years of production.

Production from the <u>Grand Mesa and Tongue Mesa coal fields</u> is primarily limited by haulage costs, which are currently cost prohibitive to truck coal to a loading station in the Delta or Montrose areas to access the exiting rail lines. An FBC power plant, similar to that which is used in Nucla, could be constructed in these areas, but this would require significant development costs. In addition, substantial costs would be associated with the development of transportation and surface infrastructure to deliver coal to a new plant. These factors make the Grand Mesa and Tongue Mesa coal fields unlikely coal resources to be developed in the next 20 years.

BLM_0106723

# XI. Summary

The planning area contains several geologic formations that contain coal or have a high potential for the geologic occurrence of coal within four coal fields: the Somerset, Grand Mesa, Tongue Mesa, and Nucla-Naturita.  The primary coal-bearing rocks are the Upper Cretaceous Dakota Formation, Mesaverde Formation and Group, and the Fruitland Formation.  Due to the relatively thin coal seams and thin overburden, the Dakota coals are being strip mined in the Nucla-Naturita area at the New Horizon Mine.  Maximum overburden thickness is typically approximately 100 to 120 feet for strip mining of Dakota coal.  Due to multiple thick coal seams and thick overburden, the Mesaverde coals are mined underground in the Somerset coal field of the North Fork Valley.  The active mines in that field are the Bowie #2, Elk Creek, and West Elk Mines.  The current industry overburden limit is around 3,000 feet, but the USGS regards areas of coal potential up to 6,000 feet deep, which is the Piceance Deep coal underlying Grand Mesa.

The BLM estimates that coal development would occur in an area generally surrounding existing operations in the Somerset coal field and into eastern portions of the Grand Mesa coal field in the next 20 years.  This area encompasses about 45,280 acres and contains an estimated 829 million tons of recoverable coal reserves (USFS 2006).

Currently, the three mines in the Somerset area collectively produce 12 to 16 million tons of coal per year.  This production rate will likely remain stable and could increase slightly over the next 20 years.  The demand for the high quality (i.e., high Btu, low sulfur, and low ash) of Somerset coal will likely continue for this coal both within and outside Colorado.  The active strip mine in the Nucla-Naturita area will exhaust its current permit in 2013, but if other areas in the region with known coal resource are available for mining, the rate of 350,000 to 420,000 tons of coal per year could be mined for the next 20 years to continue to feed the Nucla Station FBC power plant.

April 2010   *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*   67
*Final Coal Resource and Development Potential Report*

BLM_0106724

## XII. References

Affolter, R.H.  2000.  Quality Characterization of Cretaceous Coal from the Colorado
     Plateau Coal Assessment Area. Chapter G of Geological Assessment of Coal in the
     Colorado Plateau:  Arizona, Colorado, New Mexico,  and Utah.  USGS Professional Paper
     1625-B, CD-ROM Discs 1 and 2, Version 1.0, 136 p.

Ambrose, C.T., W. Eakins, J.E. Schultz, and B.S. Kelso.  2001.  Colorado Coal Quality Data.
     Colorado Geological Survey IS-58, CD-ROM.

Ayers, W.B. and W.R. Kaiser.  1994.  Coalbed Methane in the Upper Cretaceous Fruitland
     Formation, San Juan Basin, New Mexico and Colorado.  New Mexico Bureau of Mines
     and Mineral Resources Bulletin 146.

Bankey, V.  2004.  Resource Potential and Geology of the Grand Mesa, Uncompahgre, and
     Gunnison National Forests and Vicinity, Colorado.  USGS Bulletin 2213, 276 p.

BLM (US Bureau of Land Management).  1984.  San Juan/San Miguel Resource Management
     Plan and Environmental Impact Statement, Final.

_____.  1988.  Uncompahgre Basin Resource Management Plan and Environmental Impact
     Statement, Final.

_____.  2010.  Red Cliff Mine Draft Environmental Impact Statement.  Internet Web site:
     www.blm.gov/co/st/en/BLM_Programs/land_use_planning-rmp-red_cliff_mine.html.
     Accessed February 24, 2010.

Boreck, D.L. and D.K. Murray.  1979.  Colorado Coal Reserves Depletion Data and Coal Mine
     Summaries.  Colorado Geological Survey OFR 79-1.

Cappa, J.A., G. Young, J.R. Burnell, C. Carroll and B. Widmann.  2007.  Colorado Mineral and
     Energy Industry Activities, 2006. Colorado Geological Survey IS-75, 55 p.

Carroll, C.J.  2003.  Coal Geology of Colorado.  2003.  Keystone Coal Industry Manual, published
     by Primedia Business Magazines and Media, Chicago, IL.  p. 490-502.

_____.  2004.  2003 Summary of Coal Resources in Colorado, Colorado Geological Survey
     SP-54.

_____.  2005.  Colorado Coal Directory, 2005.  Colorado Geological Survey IS-71.  68 p.

_____.  2006.  Coal Resource Maps of Colorado.  Colorado Geological Survey MS-43.  CD-ROM.

_____.  2010.  Coal Geology of Colorado.  2010 Keystone Coal Industry Manual,
     published by Primedia Business Magazines and Media, Chicago, IL.  p. 427-439.

BLM_0106725

Carroll, C.J. and M.A. Bauer.  2002.  Historic Coal Mines of Colorado.  Colorado Geological Survey Information Series 64, CD-ROM.

Colorado Division of Reclamation Mining and Safety.  2010a.  County Operator Mining Data.                              Internet                 Web               site: http://mining.state.co.us/County%20Operator%20Mining%20Data.htm. Accessed January 8, 2010.

_____.    2010b.    Monthly    Coal    Summary    Reports.    Internet    Web    site: http://mining.state.co.us/Coal%20Reports.htm. Accessed February 17, 2010.

Colorado Geological Survey.  2000.  Coalbed Methane – Colorado's World Class Commodity, in Rock Talk Vol. 3, No. 3, July 2000.  12 p.

_____.   2005.   Colorado Coal: Energy Security for the Future, in Rock Talk Vol. 8, No. 2, Summer 2005.  12 p.

Dickinson, R.G.  1965.  Geologic Map of the Cerro Summit Quadrangle, Montrose County, Colorado.  USGS Map GQ-486.

_____.   1987a.   Geologic Map of the Buckhorn Lakes Quadrangle, Gunnison, Montrose and Ouray Counties, Colorado.  USGS Map GQ-1642.

_____.   1987b.   Geologic Map of the Washboard Rock Quadrangle, Gunnison, Montrose and Ouray Counties, Colorado.  USGS Map GQ-1643.

_____.  1988.  Geologic Map of the Courthouse Mountain Quadrangle, Gunnison, Hinsdale, and Ouray Counties, Colorado.  USGS Map GQ-1644.

Dunrud, C.R. 1989a. Geologic Map and Coal Stratigraphic Framework of the Cedaredge Area, Delta County, Colorado. Coal Investigation Map. USGS Map C-116.

_____.  1989b. Geologic Map and Coal Stratigraphic Framework of the Paonia Area, Delta Area, Delta and Gunnison Counties, Colorado. USGS Coal Investigations Map C-115.

Dyer, D. 2010a. Personal communication between Laurie Brandt, Buckhorn Geotech, and Desty Dyer, Mining Engineer, BLM UFO. January 11, 2010.

_____.   2010b. Personal communication between Laurie Brandt, Buckhorn Geotech, and Desty Dyer, Mining Engineer, BLM UFO. January 21, 2010.

Dyni, J.R. and D.L. Gaskill.  1980.  Relation of the Carbon/Oxygen Ratio in Coal to Igneous Intrusions in the Somerset Coal Field, Colorado.  USGS Bulletin 1477-A.

Eakins, W.  1986.  Coal Resources of the Dakota Sandstone, Southwestern Colorado.  Colorado Geological Survey OFR 86-1A.

BLM_0106726

Eakins, W. and M.M. Coates.  1998.  Focus:  Colorado Coal, in Colorado Geological Survey Rock Talk, v. 1, no. 3, 6 p.

Eakins, W., C.M.T. Ambrose, D.C. Scott, and D.D. Teeters.  1998a.  Availability of Coal Resources in Colorado:  Somerset Quadrangle, West-Central Colorado.  Colorado Geological Survey RS-36, 87 p.

Eakins, W., C.M.T. Ambrose, R.C. Phillips, and M.L Morgan.  1998b.  Demonstrated Reserve Base for Coal in Colorado Somerset Coal Field.  Colorado Geological Survey OFR 98-5.

Ellis, M.S. and V.L Freeman.  1984.  Geologic Map and Cross Sections of the Carbondale 30′ x 60′ Quadrangle, West-Central, Colorado.  USGS Coal Investigations Map C-97-A.

Ellis, M.S., D.L. Gaskill and C.R. Dunrud.  1987.  Geologic Map of the Paonia and Gunnison Area, Delta and Gunnison Counties, Colorado.  USGS Coal Investigations Map C-109.

Ellis, M.S., V.L. Freeman, and J.R. Donnell.  1988.  Cross Sections Showing Correlation of Coal Beds and Coal Zones in the Mesaverde Formation in the Carbondale 30′ x 60′ Quadrangle, West-Central Colorado.  USGS Coal Investigations Map C-97-B.

Ellis, M.S. and V. Gabaldo.  1989.  Geologic Map and Cross Sections of Parts of the Grand Junction and Delta 30′ x 60′ Quadrangles, West-Central Colorado.  USGS Coal Investigations Map C-124.

Fender, H.B., D.C. Jones and D.K. Murray.  1978.  Bibliography and Index of Publications Related to Coal in Colorado 1972-1977.  Colorado Geological Survey Bulletin 41.

George, R.D.  1937.  Analyses of Colorado Coals.  US Bureau of Mines Technical Paper 574. 327 p.

Goolsby, S.M., N.S. Reade, and D.K. Murray.  1979.  Evaluation of Coking Coals in Colorado. Colorado Geological Survey RS-7.

Grand Mesa Coal Company.  1984.  Application for a Permit to Conduct coal Mining in Colorado for Red Canyon Mine #1 and #2, Mining Plan, and Exploration Data, Volumes 1-3.

Hail, W.J.  1972a.  Reconnaissance Geologic Map of the Cedaredge Area, Delta County, Colorado.  Scale 1:48,000.  USGS Map I-697.

_____.  1972b.  Reconnaissance Geologic Map of the Hotchkiss Area, Delta and Montrose Counties, Colorado.  Scale 1:48,000.  USGS Map I-698.

Haines, D.V.  1978.  Core-Hole Drilling and Coal Analysis Report for nine Holes Drilled During 1977 in the Nucla coal Field, Montrose County, Colorado.  USGS Open-File Report 78-899, 37 p.

Hardie, J.K.  1999.  Clastic Dikes Intruding Cretaceous Coals of Western Colorado.  Colorado Geological Survey Bulletin 53.

BLM_0106727

Haun, J.D. and R.J. Weimer.  1960.  Cretaceous Stratigraphy of Colorado, in Weimer, R.J. and J.D Haun, eds., Guide to the Geology of Colorado:  Geological Society of America, Rocky Mountain Association of Geologists, and Colorado Scientific Society Guidebook, p. 58-65.

Hettinger, R.D, L.N.R. Roberts, T.A. Gognat.  2000.  Investigations of the Distribution and Resources of Coal in the Southern Part of the Piceance Basin, Colorado.  Chapter O of Geologic Assessment of Coal in the Colorado Plateau: Arizona, Colorado, New Mexico, and Utah.  USGS Professional Paper 1625-B Discs 1 and 2, Version 1.0 (CD ROM).

Hettinger, R.D, L.N.R. Roberts, M.A. Kirschbaum.  2004.  Coal Resources and Coal Resource Potential.  Chapter M of Resource Potential and Geology of the Grand Mesa, Uncompahgre, and Gunnison National Forests and Vicinity, Colorado.  USGS Bulletin 2213-M, p. 191-223.

Hodgson, H.E.  1978.  Proceedings of the Second Symposium on the Geology of Rocky Mountain Coal – 1977.  Colorado Geological Survey RS-4.

Hornbaker, A.L. and R.D. Holt.  1973.  1972 Summary of Coal Resources in Colorado.  Colorado Geological Survey SP-3.

Hornbaker, A.L., R.D. Holt, and K. Murray.  1976.  1975 Summary of Coal Resources in Colorado.  Colorado Geological Survey SP-9.

Johnson, R.C., 1989, Geologic History and Hydrocarbon Potential of Late Cretaceous-age, Low-Permeability Reservoir, Piceance Basin, Western Colorado: USGS Bulletin 1787-E, p. E1–E51.

Jones, D.C. and J.E. Schultz.  1978.  Coal Resource and Development Map of Colorado.  Colorado Geological Survey MS-9, digital TIF image in Coal Resource Maps of Colorado by Carroll (2006).

Khalsa, N.S. and L.R. Ladwig.  1981.  Colorado Coal Analyses 1976-1979.  Colorado Geological Survey IS-10.

Kiger, J. 2010. Personal communication between Laurie Brandt, Buckhorn Geotech, and Jim Kiger, Oxbow Mining, LLC. February 18, 2010.

Kirschbaum, M.A.  2000.  Introduction: Geologic Assessment of Coal in the Colorado Plateau. Chapter A of Geological Assessment of Coal in the Colorado Plateau:  Arizona, Colorado, New Mexico, and Utah.   USGS Professional Paper 1625-B, CD-ROM Discs 1 and 2, Version 1.0.

Kirschbaum, M.A., L.N.R. Roberts, and L.R.H. Biewick.  2000.  Geologic Assessment of Coal in the Colorado Plateau:  Arizona, Colorado, New Mexico, and Utah.  USGS Professional Paper 1625-B, CD-ROM Discs 1 and 2, Version 1.0, Geographic Information System Shapefiles and metadata.

BLM_0106728

Kirschbaum, M.A. and L.R.H. Biewick.  2000.  A Summary of the Coal Deposits in the Colorado Plateau:  Arizona, Colorado, New Mexico, and Utah.  Chapter B of Geological Assessment of Coal in the Colorado Plateau:  Arizona, Colorado, New Mexico, and Utah.  USGS Professional Paper 1625-B, CD-ROM Discs 1 and 2, Version 1.0.

Landis, E. R.  1959.  Coal Resources of Colorado. USGS Bulletin 1072-C, p. 131-232.

Lee, W.T.  1912.  Coal Fields of Grand Mesa and the West Elk Mountains, Colorado.  USGS Bulletin 510, 237 p.

Lewis, L. 2010. Personal communication between Laurie Brandt, Buckhorn Geotech, and Lynn Lewis, former Geologist, BLM UFO. February 24, 2010.

Murray, D.K.  1980a.  Coal in Colorado, in Kent, H.C. and K.W. Porter, eds., Colorado Geology: Rocky Mountain Association of Geologists, p. 205-216.

_____.  1980b.  Coal Resources in Colorado.  Colorado Geological Survey Special Publication 13, 24 p.

_____.  1981.  Upper Cretaceous (Campanian) Coal Resources of Western Colorado.  New Mexico Geological Society Guidebook, 32nd Field Conference, Western Slope Colorado, p. 233-239.

Murray, D.K., H.B. Fender, and D.C. Jones.  1977.  Coal and Methane Gas in the Southeastern Part of the Piceance Creek Bain, Colorado, in Veal, H.K., ed., Exploration Frontiers of the Central and Southern Rockies: Rocky Mountain Association of Geologists, 1977 Symposium, p. 379-405.

Morse, J.G.  1979.  Energy Resources in Colorado:  Coal, Oil Shale, and Uranium.  Westview Press, 396 p.

O'Hara, G. 2009. Personal communication between Laurie Brandt, Buckhorn Geotech, and George O'Hara, Geologist, Western Fuels Association. December 16, 2009.

_____. 2010a. Personal communication between Laurie Brandt, Buckhorn Geotech, and George O'Hara, Geologist, Western Fuels Association. February 8, 2010.

_____. 2010b. Personal communication between Laurie Brandt, Buckhorn Geotech, and George O'Hara, Geologist, Western Fuels Association. February 18, 2010.

Rohrbacher, T.J., C.L. Molnia, L.M. Osmonson, M.D. Carter, W. Eakins, G.K. Hoffman, D.E. Tabet, J.E. Schultz, D.C. Scott, D.D. Teeters, G.E. Jones, J.C. Quick, B.P. Hucka and J.A. Hanson.  2000.  Coal Availability, Recoverability, and Economic Evaluations, of Coal Resources in the Colorado Plateau: Colorado, New Mexico, and Utah.  Chapter F of Geological Assessment of Coal in the Colorado Plateau:  Arizona, Colorado, New Mexico, and Utah.  USGS Professional Paper 1625-B, CD-ROM Discs 1 and 2, Version 1.0.

April 2010    *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*    72
Final Coal Resource and Development Potential Report

BLM_0106729

Rushworth, P., B.S. Kelso, M.E. Brownfield, and E.A. Johnson.  1988.  Selected References on the Geology and Coal Resources of Central and Western Colorado Coal Fields and Regions.  Colorado Geological Survey IS-25.

Schultz, J.E., W. Eakins, D.C. Scott and D.D. Teeters.  2000.  Availability of Coal Resources in Colorado:  Somerset Coal Field, West-Central Colorado. Colorado Geological Survey RS-38, 84 p.

Schweinfurth, S.P.  2002.  Coal – A Complex Natural Resource:  An Overview of Factors Affecting Coal Quality and Use in the United States.  USGS Circular 1143.

Sharrow, B.  December 14, 2005.  Letter from BLM Uncompahgre Field Office Manager (B. Sharrow) to USFS Forest Supervisor (C. Richmond) regarding formal input on the 2004 Grand Mesa, Uncompahgre, and Gunnison National Forests Coal Resource and Development Potential Report.  3 p.

Smith, S.M., A.B. Wilson, and M.J. Crane.  2001.  Cited References and Additional Selected Bibliography for the Grand Mesa, Uncompahgre, and Gunnison National Forests Greater Study Area.

Speltz, C.N.  1976.  Strippable Coal Resources of Colorado:  Location, Tonnage, and Characteristics of Coal and Overburden.  US Bureau of Mines Info Circular 8713.

Streufert, R.K.  1999.  Geology and Mineral Resources of Gunnison County, Colorado.  Colorado Geological Survey RS-37.

Toenges, A.L., J.J. Dowd, L.A. Turnbull, J.D. Davis, H.L. Smith, and V.H. Johnson.  1949. Reserves, Petrographic and Chemical Characteristics, and Carbonizing Properties of Coal Occurring South of Dry Fork of Minnesota Creek, Gunnison county, near Paonia, Colorado, and the Geology of the Area.  US Bureau of Mines Technical Paper 721, 48 p.

Toenges, A.L., L.A. Turnbull, J.D. Davis, D.A. Reynolds, B.C. Parks, H.M. Cooper, and R.F. Abernethy.  1952.  Coal Deposit, Coal Creek District, Gunnison County Colorado: Reserves, Coking Properties, and Petrographic and Chemical Characteristics.  US Bureau of Mines Bulletin 501, 83 p.

US Bureau of Mines and USGS.  1976.  Coal Resource Classification System of the US Bureau of Mines and USGS.  USGS Bulletin 1450-B, 9 p.

US Department of Energy.  2010a.  Energy Information Administration Annual Coal Report, 2008.  Internet Web site: http://www.eia.doe.gov/cneaf/coal/page/acr/acr_sum.html. Accessed January 8, 2010.

_____.  2010b.  Energy Information Administration Annual Energy Outlook, 2010.  Internet Web site: http://www.eia.doe.gov/oiaf/aeo/page/overview.html. Accessed February 18, 2010.

BLM_0106730

_____.   2010c.   Energy Information Administration Colorado Profile.   Internet Web site: http://www.eia.doe.gov/cneaf/coal/statepro/imagemap/co.htm.   Accessed January 8, 2010.

_____.   2010d.   Energy Information Administration Quarterly Coal Report, July – September 2009.   Internet Web site: http://www.eia.doe.gov/cneaf/coal/quarterly/qcr_sum.html. Accessed January 8, 2010.

USFS.  2006.  Coal Resource and Development Potential Report: Grand Mesa, Uncompahgre, and Gunnison National Forests, 44 p.

USGS and Colorado Geological Survey.  1977.  Energy Resources Map of Colorado.  Scale 1:500,000.  USGS Map I-1039.

Wikipedia.  2009.  Underground Coal Gasification.  Internet Web site: http://en.wikipedia.org/wiki/Underground_coal_gasification.   Accessed December 17, 2009.

Williams, P.L.  1983.  Geology, Structure, and Uranium Deposits of the Moab Quadrangle, Colorado and Utah.  Scale 1:250,000.  USGS Map I-360.

Wood, G.H. Jr., T.M. Kehn, M.D. Carter and W.C. Culbertson.  1983.  Coal Resource Classification System of the USGS, USGS Circular 891, 81 p.

Woodruff, E.G.  1912.  Coal Resources of Gunnison Valley, Mesa and Delta Counties, Colorado in Contributions to Economic Geology, Part II – Mineral Fuels, ed. M.R. Campbell.  USGS Bulletin 471.  P.565-573.

Wray, L.L.  2000.  Late Cretaceous Fruitland Formation Geologic Mapping, Outcrop Measured Sections, and Subsurface Stratigraphic Cross Sections, Northern La Plata County, Colorado.  Colorado Geological Survey OFR 00-18.

Wray, L.L. and J.E. Schultz.  2001.  Coal and Coalbed Methane in Colorado.  Colorado Geological Survey SP-51.  CD-ROM.

Young, R.G.  1960.  Dakota Group of Colorado Plateau:  American Association of Petroleum Geologists Bulletin, v. 44, no. 2, p. 156-194.

Zook, J.M. and C.M. Tremain.  1997.  Directory and Statistics of Colorado Coal Mines with Distribution and Electric Generation Map, 1995-96.  Colorado Geological Survey RS-32.

BLM_0106731





# US Department of the Interior
## Bureau of Land Management
## Uncompahgre Field Office, Colorado

Resource Management Plan Revision and
Environmental Impact Statement

*RENEWABLE ENERGY POTENTIAL REPORT*

*DRAFT*

**FEBRUARY 2010**



BLM_0106732

BLM_0106733

# CONTENTS

Chapter                                                    Page

1. **INTRODUCTION** .......................................................................................... 1-1
   1.1   Purpose of this Report ....................................................................... 1-1
   1.2   Renewable Energy-Related BLM Policies and Regulations.............. 1-1
   1.3   How to Read This Document ............................................................ 1-4

2. **GEOTHERMAL ENERGY** ............................................................................ 2-1
   2.1   What is Geothermal Energy?.............................................................. 2-1
   2.2   How is Geothermal Energy Developed?............................................ 2-2
   2.3   What BLM Actions are Involved in Geothermal Energy Development?.........2-4
        2.3.1   Geothermal Leasing Laws and Regulations ....................... 2-4
        2.3.2   Available and Unavailable Lands for Geothermal Leasing.............. 2-4
        2.3.3   Leasing Process, Rights, and Limitations ........................... 2-5
   2.4   How are Potential Levels Defined for Geothermal Energy? ............ 2-8
   2.5   Geothermal Potential ......................................................................... 2-8
        2.5.1   Data Sources..................................................................... 2-8
        2.5.2   Geothermal Potential Data Used in this Report.............. 2-9
   2.6   High-potential Areas within the Uncompahgre RMP Planning Area............ 2-9
   2.7   Reasonable Foreseeable Development Scenario ............................... 2-9

3. **SOLAR ENERGY** ........................................................................................... 3-1
   3.1   What is Solar Energy?......................................................................... 3-1
   3.2   How is Solar Energy Developed?........................................................ 3-1
        3.2.1   Photovoltaic Systems ....................................................... 3-2
        3.2.2   Concentrating Solar Power Systems.................................. 3-3
        3.2.3   Thermal Energy Storage ................................................... 3-4
   3.3   What BLM Actions are Involved in Solar Energy Development?.......... 3-5
   3.4   How are Potential Levels Defined for Solar Energy?........................ 3-6
   3.5   Solar Potential ................................................................................... 3-6
        3.5.1   Data Sources..................................................................... 3-6
        3.5.2   Solar Potential Data Used in This Report......................... 3-8
   3.6   High-potential Areas within the Uncompahgre RMP Planning Area............ 3-9
   3.7   Reasonable Foreseeable Development Scenario ............................... 3-9

4. **WIND ENERGY** ............................................................................................. 4-1
   4.1   What is Wind Energy?........................................................................ 4-1
   4.2   How is Wind Energy Developed?....................................................... 4-1
   4.3   What BLM Actions are Involved in Wind Energy Development?........ 4-2
   4.4   How are Potential Levels Defined for Wind Energy?........................ 4-3
   4.5   Wind Potential ................................................................................... 4-4
        4.5.1   Data Sources..................................................................... 4-4
        4.5.2   Wind Potential Data Used in this Report......................... 4-6
   4.6   High-potential Areas within the Uncompahgre RMP Planning Area............ 4-7
   4.7   Reasonable Foreseeable Development Scenario ............................... 4-7

5. **BIOMASS**........................................................................................................ 5-1
   5.1   What is Biomass?................................................................................ 5-1

BLM_0106734

## TABLES (continued) Page

1   5.2   How is Energy Produced from Biomass? ...................................................................5-1
2   5.3   What BLM Actions are Involved in Biomass Projects?...........................................5-2
3   5.4   How are Potential Levels Defined for Biomass-producing Areas? ....................5-3
4   5.5   Biomass Productivity...................................................................................................5-3
5         5.5.1   Data Sources.................................................................................................5-3
6         5.5.2   Biomass Productivity Data Used in this Report......................................5-4
7   5.6   Biomass Productivity within the Uncompahgre RMP Planning Area...............5-6
8   5.7   Reasonable Foreseeable Development Scenario ...................................................5-6
9   **6.   REFERENCES** ....................................................................................................................... **6-1**

## FIGURES
Page

14   Figure 1-1   Uncompahgre RMP Planning Area.........................................................................1-3
15   Figure 2-1   Geothermal Energy ..................................................................................................2-11
16   Figure 3-1   Solar Potential ..........................................................................................................3-10
17   Figure 3-2   Developable Areas for Concentrating Solar Power...........................................3-11
18   Figure 4-1   Wind Potential .........................................................................................................4-8
19   Figure 5-1   Biomass Productivity................................................................................................5-5

## TABLES
Page

24   Table 4-1 Classes of Wind Power Density at 10 Meters and 50 Meters .......................................4-5

BLM_0106735

## ACRONYMS AND ABBREVIATIONS                                   Full Phrase

| | |
|---|---|
| BLM | United States Department of the Interior, Bureau of Land Management |
| CFR | Code of Federal Regulations |
| DOE | Department of Energy |
| EIS | Environmental Impact Statement |
| GIS | Geographic Information System |
| kWh/m²/day | kilowatt-hour per square meter per day |
| NDVI | normalized difference vegetation index |
| NREL | National Renewable Energy Laboratory |
| ROW | right-of-way |
| UFO | Uncompahgre Field Office |
| US | United States |

BLM_0106736

1
2
3

This page intentionally left blank.

# 1. INTRODUCTION

BLM_0106738

THROW THIS PAGE AWAY & DELETE FROM PDF

BLM_0106739

# CHAPTER 1

# INTRODUCTION

## 1.1   PURPOSE OF THIS REPORT

The purpose of this report is to identify the potential for development and potential location of renewable energy on lands administered by the United States (US) Department of the Interior, Bureau of Land Management (BLM) within the Uncompahgre Field Office (UFO) Resource Management Plan planning area. The planning area encompasses 675,677 acres of public (BLM-administered) land in six Colorado counties: Montrose, Delta, Mesa, Gunnison, Ouray and San Miguel (Figure 1-1). It excludes the Gunnison Gorge and Dominguez-Escalante National Conservation Areas. Renewable energy addressed in this report includes geothermal, solar, wind, and biomass. In the case of solar, wind, and biomass energy, lands considered are all BLM-administered public lands in the planning area (675,677 acres). In the case of geothermal energy, lands considered are both BLM-administered public lands , as well as additional lands under other surface ownership (such as US Forest Service, private, or State lands) where the BLM controls the mineral estate ("split estate" lands). In total, lands considered for geothermal energy include 2.2 million acres of federal (subsurface) mineral estate.

## 1.2   RENEWABLE ENERGY-RELATED BLM POLICIES AND REGULATIONS

The BLM's renewable energy policy is directed by the following regulations and executive orders:

- The Geothermal Steam Act of 1970, as amended, designates the BLM as being responsible for leasing Federal lands and reviewing permit applications for geothermal development. This authority encompasses about 570 million acres of BLM land, National Forest System lands (with concurrence of the Forest Service), and other Federal lands, as well as private lands where the mineral rights have been retained by the Federal Government.

BLM_0106740

1
2
3

4
5
6

7
8
9

10
11
12

- The Energy Policy Act of 2005 (Title II, Sec. 211), which requires the US Department of the Interior to approve at least 10,000 megawatts of renewable energy on public lands by 2015;

- The Energy Policy Act of 2005 (Title II, Sec. 222(d)), which requires that all future forest plans and RMPs in areas of geothermal resource potential consider geothermal leasing and development;

- The Energy Policy Act of 2005 (Title II, Sec. 223), which gives the Secretary of Interior authority to identify areas that could be leased exclusively for direct use of geothermal resources;

- Executive Order 13212, Actions to Expedite Energy-Related Projects, which requires federal agencies to expedite review of energy project applications; and

BLM_0106741

Figure 1-1        Uncompahgre RMP Planning Area

*Uncompahgre Resource Management Plan Revision and EIS*
Draft Renewable Energy Potential Report

BLM_0106742

- Secretarial Order 3285, which requires the US Department of the Interior to identify and prioritize specific locations best suited for large-scale renewable energy production.

Additionally, the BLM has specific guidance for certain types of renewable energy. These are discussed in the respective energy-specific sections of this report. The main Instruction Memoranda are summarized here:

- 43 CFR 3200, provides the Geothermal Resource Leasing Rules and Regulations for the BLM.

- Instruction Memorandum 2009-022, Geothermal Leasing under the Energy Policy Act of 2005 (BLM 2009a), provides guidance for geothermal leasing.

- Instruction Memorandum 2007-097, Solar Energy Development Policy (BLM 2007), establishes policy for the processing of right-of-way (ROW) applications for solar energy development projects on BLM-administered lands and evaluating the feasibility of installing solar energy systems on BLM administrative facilities and projects.

- Instruction Memorandum 2006-216, Wind Energy Development Policy (BLM 2006), provides guidance on implementing the Record of Decision for the Programmatic Environmental Impact Statement (EIS) on Wind Energy Development (BLM 2005) and processing ROW applications for wind energy projects on BLM-administered lands; Instruction Memorandum 2009-043, Wind Energy Development Policy (BLM 2009b), provides updated guidance on processing ROW applications for wind energy projects on BLM-administered lands.

- Instruction Memorandum 2004-227, Biomass Utilization Strategy (BLM 2004), updated in July 2005, provides sets of goals to help focus and increase utilization of biomass from BLM lands. In June 2005, the final rule in the *Federal Register* revised the authority of 48 Code of Federal Regulations (CFR) Part 1452 by adding 1452.237-71, which is a new contract clause for removal and utilization of woody biomass generated as a result of land management service contracts whenever ecologically and lawfully appropriate. The BLM issued Instruction Memorandum 2009-120 in May 2009, which updated the contract clause for utilization for woody biomass.

## 1.3   HOW TO READ THIS DOCUMENT

This report contains separate chapters for each of the four types of renewable energy considered: geothermal, solar, wind, and biomass. Each chapter contains a flow of information designed to provide a basic understanding of the energy type, the technologies used to harness that energy, the process of developing (making use of) that energy, and the BLM action involved. Each chapter then

BLM_0106743

describes how potential levels are commonly defined for each energy type, including an overview of scientific terminology and units. Each chapter explains the major resource assessments that are commonly used to assess potential within an area and defines which source data is used for conducting the assessment in this report. Each chapter provides an overview of the potential energy levels across planning area lands (and, for geothermal, on split-estate lands) and estimates where development is likely to occur in the next 10 to 15 years through the presentation of a reasonable foreseeable development scenario.

BLM_0106745

## 2.    GEOTHERMAL ENERGY

BLM_0106746

THROW THIS PAGE AWAY & DELETE FROM PDF

BLM_0106747

# CHAPTER 2
# GEOTHERMAL ENERGY

## 2.1    WHAT IS GEOTHERMAL ENERGY?

Geothermal energy is energy derived from the natural heat of the earth. Geothermal resources are typically underground reservoirs of hot water or steam created by heat from the earth, but geothermal resources also include subsurface areas of dry hot rock. In cases where the reservoir is dry hot rock, the energy is captured through the injection of cool water from the surface, which is then heated by the hot rock and extracted as fluid or steam. Geothermal steam and hot water can naturally reach the earth's surface in the form of hot springs, geysers, mud pots, or steam vents. Geothermal reservoirs of hot water are also found at various depths beneath the earth's surface. By drilling wells down into a geothermal reservoir, heat can be brought to the surface and be used either directly (direct use) for heating applications or indirectly (indirect use) to produce electricity.

According to the 43 CFR 3200, Geothermal Resource Leasing Rules and Regulations, the BLM is allowed to lease "geothermal steam and associated geothermal resources," which are defined as 1) all products of geothermal processes, including indigenous steam, hot water, and hot brines; 2) steam and other gases, hot water and hot brines resulting from water, gas, or other fluids artificially introduced into geothermal formations; 3) heat or other associated energy found in geothermal formations; and 4) any byproducts.

### Direct Use

Geothermal reservoirs of low- to moderate-temperature water—68 degrees Fahrenheit to 302 degrees Fahrenheit (20 degrees Celsius to 150 degrees Celsius)—provide numerous opportunities for direct use. Direct use means utilization of geothermal resources for commercial, residential, agricultural, public facilities, or other energy needs other than the commercial production of electricity (43 CFR 3200.1). Direct use includes using heat energy from naturally occurring hot water or using other technology to capture the heat from the

BLM_0106748

1　earth (e.g., heat pumps). Modern hot water direct-use systems access
2　geothermal reservoirs by drilling into them from the surface to develop a steady
3　stream of hot water. The water is brought up through the well, and a
4　mechanical system consisting of piping, a heat exchanger, and controls delivers
5　the heat directly for its intended use. A disposal system then either injects the
6　cooled water underground or disposes of it on the surface.

### Indirect Use

7
8　Commercial electrical generation from geothermal resources is also called
9　indirect use. Electrical generation uses geothermally heated fluid to produce
10　steam, which turns a turbine connected to a generator. As discussed below, the
11　fluid may be the naturally occurring steam or water in the geothermal reservoir
12　or another fluid that has the geothermal heat transferred through a heat
13　exchange system.

## 2.2　HOW IS GEOTHERMAL ENERGY DEVELOPED?

14
15　Geothermal power plants can be small (300 kilowatts to 10 megawatts),
16　medium (10 to 50 megawatts) or large (50 megawatts and higher). Generation
17　capacity is guided by the number of turbines within a plant. In general,
18　commercial electrical generation requires hot geothermal reservoirs with a
19　water temperature above 200 degrees Fahrenheit (93 degrees Celsius);
20　however, new technologies have proven that lower-temperature water (e.g.,
21　165 degrees Fahrenheit [74 degrees Celsius]) can also be used for electrical
22　generation.

23　Three types of geothermal power plant systems—flash steam, binary-cycle, and
24　dry steam—are commonly used to generate electricity depending on
25　temperature, depth, and quality of the water and steam in the area. These plants
26　can also be hybridized by including elements of the different technologies at a
27　single location. All three methods re-inject the remaining geothermal fluid back
28　into the ground to replenish the reservoir and recycle the hot water.

### Flash Steam Power Plants

29
30　Flash steam power plants use hot water above 360 degrees Fahrenheit (182
31　degrees Celsius) from geothermal reservoirs. The high pressure underground
32　keeps the water in the liquid state, although it is well above water's boiling point
33　at standard atmospheric pressure. As the water is pumped from the deep,
34　pressurized reservoir to the power plant at atmospheric pressure, the drop in
35　pressure causes the water to convert, or "flash," into steam to power the
36　turbine. Any water not converted into steam is injected back into the reservoir
37　for reuse. Flash steam plants, like dry steam plants, emit small amounts of gases
38　and steam.

### Binary-cycle Power Plants

39
40　Binary-cycle power plants typically use cooler fluids than flash steam plants (165
41　to 360 degrees Fahrenheit [74 to 182 degrees Celsius]). The hot fluid from
42　geothermal reservoirs is passed through a heat exchanger, which transfers heat
43　to a separate pipe containing fluids with a much lower boiling point. These fluids,

BLM_0106749

1 usually isobutane or isopentane, are vaporized to power the turbine. The
2 advantage of binary-cycle power plants is their lower cost and increased
3 efficiency. These plants do not emit any excess gas and, because they use fluids
4 with a lower boiling point than water, are able to use lower-temperature
5 geothermal reservoirs, which are much more common.

6 ***Dry Steam Power Plants***
7 Dry steam power plants use very hot (greater than 455 degrees Fahrenheit [235
8 degrees Celsius]) geothermal reservoirs that exist primarily in the form of
9 steam. The steam is routed to the surface via a well and used to turn a turbine.
10 The turbine drives a generator that produces electricity. While this is the rarest
11 form of power plants, it was both the first type of geothermal reservoir used to
12 produce electricity (at Lardarello, Italy, in 1904) and is the reservoir type being
13 used at the world's largest geothermal production site, The Geysers in northern
14 California. Dry steam power plants emit only excess steam and very minor
15 amounts of gases. Geothermal sources with dry steam generation capability are
16 very rare.

17 ***Emerging Technologies***
18
19 *Geothermal Energy from Oil and Gas Production*
20 Oil and gas wells are typically thousands of feet deep and often produce very
21 hot fluid. Along with the oil and gas, wells produce water that must be
22 separated from the oil and gas and usually reinjected deep below domestic
23 aquifers. The Rocky Mountain Oilfield Testing Center, located in the Teapot
24 Dome Oilfield near Casper, Wyoming, is demonstrating the use of warm
25 reservoir fluids from oil and gas production to produce electricity that can be
26 used to power the oil and gas pumps (Rocky Mountain Oilfield Testing Center
27 produced water cut (NREL 2006). Because the electricity is used on site, there
28 is no need to purchase additional electricity, which eliminates the need for
29 power lines to be run to oil and gas facilities. This technology could be applied
30 at many oil and gas facilities throughout the West.

31 *Enhance Geothermal Systems*
32 Enhanced geothermal systems are engineered reservoirs created to produce
33 energy from geothermal resources deficient in water and/or permeability (US
34 Department of Energy 2006, 2007). With enhanced geothermal systems, a
35 developing reservoir is targeted within a volume of rock that is hot and
36 tectonically stressed. Through a combination of hydraulic, thermal, and chemical
37 processes, the reservoir can be stimulated, causing fractures to open, extend,
38 and interconnect. This creates a fluid-conductive fracture network and an
39 interconnected reservoir system. The process can extend the margins of
40 existing geothermal systems or can create entirely new ones wherever optimal
41 thermal and tectonic conditions exist (University of Utah Energy and
42 Geoscience Institute 2007). Enhanced geothermal systems technology is
43 relatively new in the geothermal field and has been found to have great potential
44 for providing electrical power; one study found the potential for 100 gigawatts
45 of power (US Department of Energy 2006). Until recently, lack of research and

BLM_0106750

development funding, government policies, and lack of incentives had not favored the growth of enhanced geothermal systems, with most development occurring outside of the United States (US Department of Energy 2006). It is anticipated that there may be applications for research and development drilling on public and NFS lands in the future. Until it becomes a technically and economically proven technology, it is unlikely that it will be applied at a large scale in the western US within the next 20 years.

## 2.3   WHAT BLM ACTIONS ARE INVOLVED IN GEOTHERMAL ENERGY DEVELOPMENT?

### 2.3.1   Geothermal Leasing Laws and Regulations

A geothermal lease is for the heat resource of the earth where there is federal mineral estate. Unless specifically owned in fee, the federal government does not own the hot water commonly associated with the heat; this falls under state water laws. Geothermal developers must obtain the appropriate water rights and state permits in addition to the federal lease for the resource.

The BLM has the delegated authority to issue geothermal leases on federal lands. It is the policy of the federal government, consistent with Section 2 of the Mining and Mineral Policy Act of 1970 and Sections 102(a)(7), (8), and (12) of the Federal Land Policy and Management Act of 1976 (43 US Code 1701 et seq.), to encourage the development of mineral resources, including geothermal resources, on federal lands. The Geothermal Steam Act of 1970 (30 US Code Section 1001, et seq.), which was amended and supplemented by the Energy Policy Act of 2005, provides statutory guidance for geothermal leasing by the BLM. New federal geothermal development regulations (43 CFR Parts 3000, 3200, and 3280: Geothermal Resource Leasing and Geothermal Resources Unit Agreements) were made effective June 1, 2007 (72 *Federal Register* 24358, May 2, 2007) as a result of a directive provided in the Energy Policy Act of 2005. These statutes and regulations delineate lands that are available and unavailable for leasing.

### 2.3.2   Available and Unavailable Lands for Geothermal Leasing

In accordance with the Geothermal Steam Act of 1970, as amended (30 US Code 1001) and the Geothermal Resources Leasing Rule (43 CFR 3201.10), the BLM may issue leases on the following "available" lands:

- Lands administered by the US Department of the Interior, including public and acquired lands not withdrawn from such use;
- Lands administered by the US Department of Agriculture with its concurrence;
- Lands conveyed by the US where the geothermal resources were reserved to the US; and
- Lands subject to Section 24 of the Federal Power Act, as amended (16 US Code 818), with the concurrence of the Secretary of Energy.

BLM_0106751

Conversely, the BLM is prohibited from issuing leases on the following statutorily closed federal lands as defined in the Geothermal Resources Leasing Rule (43 CFR 3201.11). Other lands administered directly by the BLM and US Department of Agriculture, Forest Service may also be closed through other authorities.

- Lands where the Secretary of the Interior has determined that issuing the lease would cause unnecessary or undue degradation of public lands and resources;

- Lands contained within a unit of the National Park System or that are otherwise administered by the National Park Service;

- Lands where the Secretary of the Interior determines after notice and comment that geothermal operations, including exploration, development, or utilization of lands, are reasonably likely to result in a significant adverse effect on a significant thermal feature within a unit of the National Park System;

- Lands within a National Recreation Area;

- Fish hatcheries or wildlife management areas administered by the Secretary of the Interior;

- Indian trust or restricted lands within or outside the boundaries of Indian reservations;

- The Island Park Geothermal Area (in Idaho and Montana); and

- Lands where Section 43 of the Mineral Leasing Act (30 US Code 226-3) prohibits geothermal leasing, including:

  - Wilderness areas or Wilderness Study Areas administered by the BLM or other surface-management agencies;

  - Lands designated by Congress as Wilderness Study Areas, except where the statute designating the study area specifically allows leasing to continue; and

  - Lands within areas allocated for wilderness or further planning in Executive Communication 1504, Ninety-sixth Congress (House Document 96-119), unless such lands are allocated to uses other than wilderness by a land and resource management plan or are released to uses other than wilderness by an act of Congress.

### 2.3.3  Leasing Process, Rights, and Limitations

The BLM grants access to geothermal resources through a formalized leasing process based on the end use. For direct uses, an applicant can apply noncompetitively for a lease. For indirect use, such as commercial electrical generation, the BLM awards leases through a competitive bidding process. Historically, certain lands were designated as known geothermal resource areas. All lands designated within known geothermal resource areas were leased

BLM_0106752

through a competitive bidding process. Until the passage of the Energy Policy Act of 2005, lands outside of known geothermal resource areas could be leased noncompetitively. Section 222 of the Energy Policy Act of 2005 modified the Geothermal Steam Act of 1970 to allow only competitive lease sales for all federal geothermal resources and their associated lands. The geothermal leasing regulations provide for four types of lands available for noncompetitive leasing:

- Parcels of land that did not receive bids in a competitive sale;
- Lands available exclusively for direct use;
- Lands subject to mining claim and a current plan of operation; and
- Lands for which a lease application was pending on August 8, 2005, if the applicant so chooses.

Lease areas are nominated by the public for a lease sale. When the BLM receives a nomination, it is adjudicated and configured into lease parcels by the respective BLM state office. Lease parcels are then forwarded to the appropriate BLM field office where the appropriate environmental analysis and review is conducted.

The four stages of geothermal resource development within a lease are exploration, drilling operations, utilization, and reclamation and abandonment. Each stage requires a permit from the BLM. Leasing geothermal resources by the BLM vests with the lessee a non-exclusive right to future exploration and an exclusive right to produce and use the geothermal resources within the lease area, subject to existing laws, regulations, formal orders, and the terms, conditions, and stipulations in or attached to the lease form or included as conditions of approval to permits. Lease issuance alone does not authorize any ground-disturbing activities to explore for or develop geothermal resources without site-specific approval for the intended operation. Such approval could include additional environmental reviews and permits. Also at each stage, the BLM can issue site-specific conditions of approval to protect resource values.

A lease is issued for a primary term of ten years and may be extended for two five-year periods. Each of these extensions is available provided the lessee meets the work commitment requirements or the lessee made payment in lieu of the minimum work requirements of each year. At any time a lease may receive a five- year drilling extension. Once commercial production is established, the lease may receive a production extension of up to 35 years and a renewal period of up to 55 years. The lease must continue to produce to remain in effect. The BLM may grant a suspension of operations and production on a lease when justified by the operator (refer to 43 CFR 3207).

Geothermal exploration and production on federal land conducted through leases is subject to terms and stipulations to comply with all applicable federal and state laws pertaining to various considerations for tribal interests, sanitation, water quality, wildlife, safety, cultural resources, and reclamation.

*Exploration*

The exploration phase focuses on finding potential sources of geothermal energy. The goal of geothermal exploration is to locate sites that can be used consistently into the future for the purpose of energy generation, and to evaluate the suitability of such sites for geothermal development.

There are various ways to conduct exploration, including satellite and air photo mapping, geologic and structural mapping, volcanological studies, gravity, magnetics, geochemical sampling, seismic exploration, and temperature gradient well creation.

During exploration, geologists must find areas that are consistently geologically active to justify the expense of establishing a power plant, and they must consider the environmental impact of the energy production. In areas with limited water supplies, for example, dedicating water to geothermal production may not be feasible. Likewise, injecting water into the earth's crust can cause instability in the soil, which is not a desirable outcome. These factors all need to be taken account in geothermal exploration.

*Drilling Operations*

Drilling operations, which would include flow-testing wells that are drilled, would characterize the geothermal resources within the leased area to determine whether future development of geothermal resources would be feasible, and would determine whether drainage of the geothermal resource may be occurring.

If deep exploration encounters a geothermal resource, well testing would be conducted to define resource characteristics. The proponent would test each well to evaluate fluid flow and temperature and determine the potential for production as a viable geothermal energy resource. Flow testing involves using specialized equipment to measure temperature and flow rate.

*Utilization*

Once geothermal resources have been identified and deemed viable, the next phase focuses on building the power plant and ancillary facilities to both produce electricity and move it to the electrical power grid. This phase includes construction of the actual electrical generation facilities (power plant), roads, and transmission lines; developing the wells; and setting up the well field. This includes connecting wells to the power plant via pipelines and setting up pumping, where needed, to bring the geothermal resources to the surface and to re-inject cooled fluids.

*Reclamation and Abandonment*

Reclamation and abandonment activities occur after production ceases. During this phase, the site would be restored (reclaimed) to approximate its original condition or to some standard that results in stable environmental conditions. Typical activities during the reclamation phase include closure of all facilities and wells; removal of aboveground components and gravel from well pads, access roads (if not maintained for other uses), and other ancillary facility sites; recontouring the surface; and revegetation.

*Uncompahgre Resource Management Plan Revision and EIS*
*Draft Renewable Energy Potential Report*

BLM_0106754

## 2.4   HOW ARE POTENTIAL LEVELS DEFINED FOR GEOTHERMAL ENERGY?

Geothermal potential is difficult to determine without site-specific exploration activities. Even in areas of supposed high potential, many exploration wells result in no viable resource. A viable resource requires high enough temperatures, the presence of water at that depth, and a sufficiently fractured geology so that the hot water can move through the rocks to the well.

At sufficient depth, sufficient heat can be found from any location on earth; however, because technical challenges and the cost of drilling increase with depth, economically and technically viable resources are those that occur closer to the earth's surface. High-potential areas are those identified on potential maps. Potential maps take data on known geothermal resources, such as bottom-hole temperatures and hot springs, and extrapolate to areas that have no data. These extrapolations are highly speculative.

Heat flow maps are a type of geothermal potential map that show heat flow values. Heat flow values are a measure of the heat flux moving from the earth's interior to the earth's surface. High heat flow values often indicate a high potential for geothermal development and are the result of various geologic situations such as: 1) an area of relatively thinner crustal rock above the mantle, 2) presence of an igneous pluton at depth, 3) resident heat from geologically recent volcanism or plutonic activity, or 4) upwelling of deep, heated groundwater.

## 2.5   GEOTHERMAL POTENTIAL

### 2.5.1   Data Sources

There are two main sets of geothermal resource data available: the Southern Methodist University-produced Heat Flow Map of North America (Blackwell and Richards 2004) and the Interpretive Geothermal Heat Flow Map of Colorado (Colorado Geological Survey 2008). Additionally, the Geothermal PEIS includes a Reasonably Foreseeable Development scenario (RFD) for Colorado, which drew from the 2006 Western Governors' Association Geothermal Task Force Report. The 2006 report identified a total of 20 megawatts of anticipated near-term geothermal capacity over an estimated 9 sites across Colorado (Western Governors' Association 2006).

***Heat Flow Map of North America***
This map (Blackwell and Richards 2004) was developed using heat flow values. The map was produced from a compilation of various data sets of bottom-hole temperature data collected from oil, gas, geothermal, and water wells. Approximately 4,000 data points were used to create the map. Hot springs data were also included.

Heat flow data are not evenly distributed throughout Colorado. Small areas with clustered data surrounded by wide areas containing sparse data are characteristic of the heat flow map. As such, the contours are well constrained in areas of clustered data and more interpretive in areas of sparse data.

BLM_0106755

***Interpretive Geothermal Heat Flow Map of Colorado***

The Interpretive Geothermal Heat Flow Map of Colorado (Colorado Geological Survey 2008) was developed by the Colorado Geological Survey in 2007. The map shows areas of direct use or electrical power potential for Colorado. This map includes the area of all known hot spring locations along with oil and gas basins that have potential for geothermal resources by virtue of bottom-hole temperatures. Colorado geothermal heat flow and gradient data were also considered in creating the map. The Colorado Geological Survey produced a Geographic Information System (GIS) shape file boundary to define the area of geothermal potential for the Final Programmatic EIS for Geothermal Leasing in the Western US (Colorado Geological Survey 2007).

### 2.5.2   Geothermal Potential Data Used in this Report

The Colorado Geological Survey shape file for the Interpretive Geothermal Heat Flow Map of Colorado was used for this report because it is the most recent Colorado-specific assessment available, was produced in-state by State of Colorado geologists, and combines data from both bottom-hole temperatures and hot springs. The RFD from the Geothermal PEIS, as based on the 2006 Western Governors' Association report, was also considered in this report.

## 2.6   HIGH-POTENTIAL AREAS WITHIN THE UNCOMPAHGRE RMP PLANNING AREA

The Uncompahgre RMP planning area has 593,640 acres with geothermal potential. Aside from the westernmost portion, the entire planning area is considered to have geothermal potential. This is shown in Figure 2-1. Additionally, Orvis Hot Spring and Ouray Hot Spring are 2 of the 9 locations identified within the 2006 Western Governors' Association report and both are located within the Uncompahgre Field Office boundary (Western Governors' Association 2006). Neither of these hot springs are located on BLM-administered lands, although such lands are nearby.

## 2.7   REASONABLE FORESEEABLE DEVELOPMENT SCENARIO

The likelihood of future development of geothermal projects in the Uncompahgre RMP planning area and BLM split-estate lands in the UFO can be estimated by considering the extent of existing geothermal resources and projects in the area, the number of pending lease applications within the UFO, the quality of geothermal resources in the UFO compared with other areas in the region, and expressions of interest by geothermal companies.

Three hot springs are in the southern part of the Uncompahgre RMP planning area; none are on BLM-administered lands:

- Orvis Hot Springs (126 degrees Fahrenheit) located approximately two miles south of the town of Ridgway on US Highway 550;

- Ouray Hot Spring (Radium Hot Spring) (156 degrees Fahrenheit) located less than one mile north of the city of Ouray on US Highway 550; and

BLM_0106756

1
2

- Lemon Hot Spring (91 degrees Fahrenheit) in the town of Placerville.

*Uncompahgre Resource Management Plan Revision and EIS*
Draft Renewable Energy Potential Report

BLM_0106757

Figure 2-1      Geothermal Energy

BLM_0106758

1   There are no geothermal facilities or pending applications for geothermal
2   facilities in the UFO. Additionally, there are no geothermal leases on BLM-
3   administered lands anywhere in Colorado. Geothermal companies express
4   interest in developing lands by nominating lands for lease sales. Because no lands
5   have been nominated for geothermal leasing within the UFO, interest in the
6   development of geothermal resources by geothermal companies is considered
7   low. Additionally, while BLM-administered lands are close to existing hot
8   springs, industry tends to prefer to development on private lands, where that
9   option exists, since there are fewer regulatory hurdles, such as NEPA.

10   The UFO is close to the Great Basin geologic unit, which extends from the
11   western half of Utah, west to California, north into Idaho, and south into
12   Mexico. The Great Basin is recognized as having some of the best geothermal
13   resources in the world, and many projects are already operating or in various
14   phases of planning of development in this region. Geothermal companies tend to
15   develop in areas where the resources are well understood and where
16   exploration will render the highest likelihood of finding a viable resource. This
17   consideration further reduces the likelihood that a geothermal company would
18   choose to invest in exploration funds in areas such as the UFO where resources
19   are not proven.

20   Given the lack of existing geothermal power plants in Colorado, the lack of
21   lease holdings in Colorado, the lack of nominated lands within the UFO, the lack
22   of industry interest in Colorado, and the UFO's proximity to excellent
23   geothermal resources in the Great Basin, no geothermal power plants are
24   expected to be developed on BLM-administered lands or BLM split-estate lands
25   within the UFO by year 2025.

26

BLM_0106759

3. **SOLAR ENERGY**

BLM_0106760

THROW THIS PAGE AWAY & DELETE FROM PDF

*Uncompahgre Resource Management Plan Revision and EIS*
Draft Renewable Energy Potential Report

BLM_0106761

# CHAPTER 3

# SOLAR ENERGY

## 3.1   WHAT IS SOLAR ENERGY?

Solar energy is the energy produced in the sun's core through nuclear fusion. This energy reaches the earth in form of electromagnetic radiation, mostly in the visible and near-visible (ultraviolet and near-infrared) bands. The intensity of radiation striking the top of earth's atmosphere is 1,367 watts per square meter. This value varies by plus or minus three percent as the earth orbits the sun on an elliptical orbit (University of Oregon 2002). The amount of solar radiation that reaches earth's surface is known as insolation or "incident solar radiation." Insolation values are affected by location (latitude and elevation), season, time of day, local landscape, and local weather.

As solar radiation passes through the atmosphere, some of it is scattered, absorbed, and reflected by air molecules, water vapor, clouds, ozone, and other agents in the atmosphere. On a clear day at Noon, only about 25 percent or 1,000 watts per square meter of the incident direct radiation reaches the earth's surface. The solar radiation that reaches earth's surface directly without being scattered is called direct normal irradiance. The radiation that has been scattered before reaching the earth's surface is called diffuse solar radiation. The total solar radiation (sum of direct normal irradiance and diffuse solar radiation) projected onto a horizontal surface is called global radiation, which is sometimes referred to as global horizontal irradiance.

## 3.2   HOW IS SOLAR ENERGY DEVELOPED?

Solar radiation may be harnessed through various technologies and transformed to usable energy such as heat and electricity. It has small-scale applications such as powering solar vehicles and generating electricity or heating water for residences. It may also be used for large-scale commercial applications such as generating electricity in solar power plants.

Two basic solar energy technologies that produce electrical power are photovoltaic systems and concentrating solar power systems. These can be combined with natural gas or other fossil-fueled power technologies to form hybrid systems.

### 3.2.1   Photovoltaic Systems

Photovoltaic systems use solar cells, which are semiconductor materials similar to those used in computer chips, to capture the energy in sunlight and convert it directly into electricity. Photovoltaic systems must be scaled over a very large area in order to be effective for utility-scale applications. Due to the high cost of photovoltaic cell productions, large photovoltaic electrical generating systems are less likely to be used in commercial utility application. Photovoltaic systems are generally used to provide power to individual homes and small buildings. They are also found in rural areas on communication towers, water pumps, and road and traffic signs.

The process by which a photovoltaic cell converts sunlight into electricity is called the photoelectric effect. Through this process, the sunlight absorbed by the semiconductor material knocks electrons loose from their atoms, allowing them to flow through the material and generate electric current.

There are three main types of materials used for solar cells. Traditional solar cells are made from silicon. These cells are usually flat-plate and are the most efficient. The second type is thin-film solar cells made from amorphous silicon or non-silicon materials such as cadmium telluride. The third and newest type of solar cells is made from a variety of new materials besides silicon, including solar inks, solar dyes, and conductive plastics. Some new solar cells use plastic lenses or mirrors to concentrate sunlight onto high-efficiency photovoltaic materials. These systems are cost effective for use in utility-scale applications because they use less of more-efficient and expensive materials (National Renewable Energy Laboratory [NREL] 2009a).

Photovoltaic cells are connected together to form photovoltaic modules, which in turn are combined to make photovoltaic arrays. The size of an array depends on the amount of sunlight and the needs of the customer. For utility-scale electricity generation, hundreds of arrays are interconnected to form a single large system. Modules and arrays are often combined with other components such as those that convert the current within the cell material to usable electricity, batteries to store some of the electricity, and mounting structures that point them toward the sun. These components, referred to as the balance-of-system components, combined with modules and arrays create a complete photovoltaic system. There are two types of photovoltaic systems in use today: flat-plate systems and concentrated photovoltaic systems.

### Flat-plate Photovoltaic Systems

The most common array designs use flat-plate photovoltaic panels, which can either be fixed in place or allowed to track the sun. These panels respond to both diffuse and direct solar radiation, making them useful even on cloudy days when the diffuse radiation accounts for nearly 100 percent of the total radiation.

BLM_0106763

3. Solar Energy

On a sunny day, an estimated 10 to 20 percent of the total solar radiation comes from the diffuse component of sunlight.

Generally, flat-plate photovoltaic panels are mounted on stationary structures with a tilt at a fixed angle determined by the latitude of the site, the requirement of the load, and the availability of sunlight. The fixed arrays are advantageous in that they are simple, inexpensive, and lightweight. However, because their orientation to the sun is fixed and at an angle often less than optimal, they receive less energy per unit area compared with a tracking array. The flat-plate tracking arrays are primarily mounted on one-axis tracking structures, which are designed to track the sun from east to west.

***Concentrated Photovoltaic Systems***

Concentrated photovoltaic systems use lenses or mirrors to concentrate sunlight on solar cells. The concentration of sunlight allows for greater efficiency and reduction in size and number of cells. These systems must track the sun to keep light focused on the photovoltaic cells. They are primarily mounted on two-axis tracking structures, which are designed to track the sun's daily and seasonal course. One-axis tracking systems are also sometimes used.

Both reflectors and lenses have been used to concentrate light for photovoltaic systems. The most promising lens for concentrated photovoltaic application is the Fresnel lens, which uses a miniature sawtooth design to focus incoming light. The best lenses, however, can transmit only 90 to 95 percent (and in practice even less) of incident light. In addition, lenses cannot focus diffuse sunlight, which makes up nearly 10 to 20 percent of the radiation on a clear day.

While concentrated photovoltaic systems lower costs by reducing photovoltaic material needs, they require sophisticated tracking devices and expensive concentrating optics. High concentration ratios also introduce an excessive heat, which can decrease cell efficiencies and damage solar cells.

### 3.2.2   Concentrating Solar Power Systems

Concentrating solar power technologies use mirrors to concentrate sunlight onto receivers that convert it to heat. The thermal energy is then used to drive a generator via a steam turbine or heat engine to produce electricity. Concentrating solar power technologies are the most suitable solar technologies for large utility-scale applications. The three main types of concentrating solar power technologies are linear concentrator, dish/engine, and power tower systems.

***Linear Concentrator Systems***

Linear concentrating solar power systems use a large field of long, rectangular, U-shaped mirrors tilted toward the sun that capture and focus solar energy onto linear receiver tubes that run along the length of the mirrors. The receiver contains a fluid (oil or water/steam) that is heated by the sunlight and used to boil water in a steam-turbine generator to produce electricity.

The two major types of linear concentrating solar power systems are parabolic trough systems and linear Fresnel reflector systems. Parabolic trough systems

BLM_0106764

1    are the predominant concentrating solar power systems currently in operation
2    in the US. They use collectors in which the receiver tube is positioned along the
3    focal line of each parabolic mirror. Currently the largest individual trough
4    systems generate 80 megawatts of electricity.

5    In linear Fresnel reflector systems, the receiver tube is positioned above several
6    flat or slightly curved mirrors that are mounted on tracking structures.
7    Sometimes a small parabolic mirror may be added atop the receiver to further
8    focus the sun's rays.

9    ***Dish/Engine Systems***
10   The dish/engine system produces relatively small amounts of electricity (3 to 25
11   kilowatts) compared to other types of concentrating solar power technologies.
12   It uses a parabolic mirrored dish similar to a large satellite to concentrate
13   sunlight onto a thermal receiver. The thermal receiver, mounted at the focal
14   point of the dish, absorbs and transfers the heat to an engine or generator. The
15   most common type of heat engine used today in dish/engine systems is the
16   Stirling engine. A Stirling engine uses the fluid heated by the receiver to move
17   pistons and create mechanical power. Mechanical work turns a crankshaft,
18   which drives a generator and produces electricity. To maximize the amount of
19   solar energy captured by the dish/engine collectors, the dish assembly is
20   mounted on a tracking structure that follows the sun across the sky.

21   ***Power Tower Systems***
22   Power tower systems use a large field of flat, sun-tracking mirrors, known as
23   heliostats, to focus sunlight onto a receiver, which is located atop a tower. A
24   fluid in the receiver, either water/steam or molten nitrate salt, is heated and
25   used to generate steam, which, in turn, is used in a conventional turbine
26   generator to produce electricity. The molten nitrate salt has heat-transfer and
27   energy-storage capabilities, which allows for production of electricity during
28   cloudy weather and at night.

29  **3.2.3   Thermal Energy Storage**
30   Sunlight is an intermittent resource. No solar radiation is available at night, and
31   cloud cover, smog, or haze can further limit generation from a solar power
32   plant. In a concentrating solar power system, fossil fuel hybridizations provide a
33   means to produce power during periods of low or non-existent solar radiation.
34   In addition, heat energy storage is viable for power tower and parabolic trough
35   technologies in which oil or molten salt is used as the heat-transfer medium.

36   Thermal energy storage technologies include two-tank indirect systems, two-
37   tank direct systems, and single-tank thermocline systems. A two-tank direct
38   thermal energy storage system stores the thermal energy in the same fluid that
39   was used to collect it. A two-tank indirect thermal energy storage system uses
40   different fluids to collect and store the heat. Both systems store the fluid in two
41   separate tanks—one at high temperature and the other at low temperature. A
42   single-tank thermocline system stores the thermal energy in a solid medium,
43   most commonly silica sand, located in a single tank.

BLM_0106765

## 3.3   WHAT BLM ACTIONS ARE INVOLVED IN SOLAR ENERGY DEVELOPMENT?

Solar energy development on BLM-administered lands is managed through ROW authorization under Title V of the Federal Land Policy and Management Act of 1976, 43 CFR 2800, and current applicable IMs. A ROW grant is an authorization that allows for specific use of a piece of public land for a certain project. A solar energy development ROW authorizes all facilities on public lands including solar collectors, tower, turbine generator, fossil-fuel fired generator for hybrid systems, thermal storage, access roads, electrical and transmission facilities, and other testing and support facilities. Installation of a photovoltaic system as part of another authorized facility or use does not require a separate authorization. The ROW authorization contains appropriate stipulations relating to all aspects of project development including, but not limited to, road construction and maintenance; vegetation removal; natural, cultural, and biological resources mitigation and monitoring; and site reclamation. In addition, an approved plan of development for construction and operation of the solar facility must be completed prior to beginning construction.

Right-of-way application for solar energy development on BLM lands must be accompanied by a processing fee as set forth in 43 CFR 2804.14. Right-of-way applications for solar energy development are generally accepted and processed on a first-come, first-served basis. The ROW regulations (43 CFR 2804.23[c]) provide authority for offering public lands under competitive bidding procedures for solar energy ROW authorizations. The BLM initiates a competitive process if a land use planning decision has specifically identified an area for competitive leasing. The BLM may also consider other public interest and technical factors in determining whether to offer lands for competitive leasing. Competitive bidding follows procedures required by 43 CFR 2804.23(c).

Right-of-way applications for solar energy development projects are identified as a high-priority BLM Field Office workload, consistent with the President's National Energy Policy of 2001 and the Energy Policy Act of 2005. The term length of the authorization is not limited by regulation; however, it should recognize the overall costs and useful life of solar energy facilities (43 CFR 2805.10[a][3]). The term of the solar energy authorization for a commercial facility should not exceed the design life of the project, typically 30 years. The authorization may be renewed consistent with the provisions of the regulations (43 CFR 2807.22[a]). Other compatible uses may be authorized but are unlikely due to the intensive use of the site for photovoltaic or concentrating solar power facility equipment. All solar energy ROW authorizations are subject to annual rent, as established by the BLM, unless they are specifically exempt from rent by statute or regulation.

In addition, the solar energy development policy requires that all solar energy project ROW applications be subjected to environmental review in accordance with the requirements of the National Environmental Policy Act of 1969. The scope of the National Environmental Policy Act analysis and compliance requirements of the Endangered Species Act, Migratory Bird Treaty Act,

1  National Historic Preservation Act, and other laws for a solar energy
2  development ROW application should address the installation, maintenance and
3  reclamation of solar collectors, water for steam generation and cooling
4  purposes, oil or gas used by backup generators, thermal or electrical storage,
5  turbines or engines, access roads, electrical inverters, and transmission facilities.

## 3.4  HOW ARE POTENTIAL LEVELS DEFINED FOR SOLAR ENERGY?

7  Solar energy potential is determined using solar insolation values measured in
8  kilowatt-hours per square meter per day (kWh/m²/day). Concentrating solar
9  power solar resource potential is based on direct normal solar radiation values.
10  Photovoltaic solar insolation values represent the resource available to a flat-
11  plate collector, oriented due south, at an angle from horizontal equal to the
12  latitude of the collector location.

13  In addition to solar insolation values, factors such as slope of the land, proximity
14  to roads, transmission lines, water resources, and population centers, as well as
15  average wind speeds and vegetation concentration must be considered when
16  determining a site's potential for solar development.

## 3.5  SOLAR POTENTIAL

### 3.5.1  Data Sources

20  The main source of solar potential data in the US is available through the US
21  Department of Energy's (DOE) NREL. The NREL offers national 10-kilometer
22  and 40-kilometer resolution maps of photovoltaic and concentrating solar
23  power resources. The maps provide annual and monthly average daily totals for
24  each resource type. For photovoltaic solar radiation, the insolation values
25  represent the resource available to a flat-plate collector, oriented due south, at
26  an angle from horizontal equal to the latitude of the collector location. The
27  concentrating solar power solar radiation maps represent direct normal
28  radiation values for receptors that track the sun throughout the day. In addition
29  to direct normal irradiance maps, typical for concentrating solar power, and
30  Latitude Tilt maps, typical for photovoltaic solar, the NREL provides global
31  horizontal irradiance data, which represents total solar radiation (the sum of
32  direct, diffuse, and ground-reflected radiation).

33  The 10-kilometer resolution maps are based on the State University of New
34  York data, which use a model that incorporates hourly radiance images from
35  geostationary weather satellites, daily snow cover data, and monthly averages of
36  atmospheric water vapor, trace gases, and the amount of aerosols in the
37  atmosphere to calculate the hourly total insolation falling on a horizontal
38  surface. The 40-kilometer resolution maps are based on the Climatological Solar
39  Radiation model, which used information on cloud cover, atmospheric water
40  vapor and trace gasses, and the amount of aerosols in the atmosphere to
41  calculate daily total insolation falling on a horizontal surface.

BLM_0106767

The NREL also provides a Dynamic Solar Atlas that provides resource information for any location in the US. It provides access to spreadsheets giving average monthly radiation values for 14 different types of solar collectors. Data for individual collectors are also available for fixed, flat-plate photovoltaic collectors on five different orientations. The dynamic map also accesses the monthly average Photovoltaic Watts calculator, a software program that calculates electrical energy produced by grid-connected photovoltaic systems.

The NREL provides additional concentrating solar power resource maps for the southwest on its Concentrating Solar Power Research page of its website (NREL 2010a). These maps of direct-normal solar radiation are filtered by solar resource and land availability and identify the most economically suitable lands available for deployment of large-scale concentrating solar power plants. There are two types of maps provided for each state: maps that exclude lands with slopes greater than one percent, and those that exclude lands with slopes greater than three percent. Major urban areas, potentially sensitive environmental lands, water features, and areas with less than one square kilometer are excluded from these maps.

The 10–kilometer resolution maps provide a higher level of detail on solar irradiance than the 40–kilometer resolution maps. Given the size of the planning area being considered in this assessment, a higher resolution data set was considered more appropriate. Thus, the 10-kilometer State University of New York data were used for this analysis.

There are two major existing BLM assessments addressing solar resource potential on public lands in the US that utilize the NREL solar potential data. These include the BLM and DOE's Renewable Potential Energy Assessment (BLM and DOE 2003) and the Draft Solar Energy Development Programmatic EIS (BLM and DOE 2010).

***BLM/DOE Renewable Potential Energy Assessment***
In 2003, the BLM, in collaboration with the NREL, conducted an assessment (BLM and DOE 2003) of renewable energy resources including solar, biomass, geothermal, water, and wind energy on BLM lands in the western US. The objective of this assessment was to identify BLM lands with highest potential for renewable energy development.

This assessment used NREL 40-kilometer resolution solar data and developed screening criteria in order to analyze and assess the potential solar energy resources on public lands. The screening criteria for the concentrating solar power central generation technology were (in order of importance):

- Direct normal radiation of at least 5 kWh/m²/day;

- Slope of the land less than 5 percent;

- Transmission availability within 50 miles (within the 69- to 435-kilovolt range) and transmission capacity availability;

- Minimum parcel size of 40 acres;

BLM_0106768

1    • Within 50 miles of roads or railroads; and
2    • BLM-compatible land use.

3    The screening criteria for large-scale photovoltaic development included:

4    • Direct normal radiation of at least 5 kWh/m²/day;

5    • Transmission availability within 50 miles of transmission lines within
6      the 115- to 345-kilovolt capacity range; and

7    • BLM-compatible land use.

8    ***Solar Energy Development Programmatic EIS***
9    The Solar Energy Development Programmatic EIS (BLM and DOE 2010) is being
10   prepared by the DOE's Energy Efficiency and Renewable Energy Program and
11   the BLM to assess environmental impacts associated with the development of
12   utility-scale solar energy in six western states (Arizona, California, Colorado,
13   New Mexico, Nevada, and Utah). The Programmatic EIS will analyze potential
14   impacts associated with utility-scale solar projects that can generate 10
15   megawatts or more of electricity to be put directly into the transmission grid.
16   Trough, dish, and tower concentrating solar power, as well as flat-panel and
17   concentrating photovoltaic technologies, will be included in the Programmatic
18   EIS analysis.

19   Maps representing low, moderate, and high potential for concentrating and
20   photovoltaic solar resources on BLM lands for the six states included in the
21   analysis are included. The data for this analysis was obtained from the NREL 10-
22   kilometer resolution database.

23   In the Programmatic Environmental Impact Statement, lands with excellent solar
24   resources, suitable slope, proximity to roads and transmission lines, and
25   containing at least 2,000 acres of BLM-administered lands were considered for
26   solar energy study areas. Sensitive lands, wilderness, and other high-
27   conservation-value lands, as well as lands with conflicting uses, were excluded.
28   Solar energy study areas in Colorado include Antonio Southeast, De Tilla Gulch,
29   Fourmile East, and Los Mogotes East. None of the study areas are in the
30   Uncompahgre RMP planning area.

31   The Programmatic EIS has also committed to analyze lands with solar insolation
32   levels greater than 6.5 kWh/m²/day and slopes of less than 5 percent that
33   exclude Wilderness Study Areas, National Conservation Areas, Areas of Critical
34   Concern, and other sensitive lands. These areas must also be larger than one
35   square kilometer to be considered for solar energy development. The maps for
36   these areas are not yet available.

37   **3.5.2   Solar Potential Data Used in This Report**
38   All of the available assessments on solar radiation, including the solar
39   Programmatic EIS, used either the 10-kilometer resolution State University of
40   New York data or the 40- kilometer resolution Climatological Solar Radiation
41   model data, are available through the NREL GIS database. Both data sets include

maps of resource potentials for photovoltaic and concentrating solar power solar radiation nationwide, which were integrated into the US Atlas of Renewable Resources (NREL 2010b). In this interactive resource map, layers representing 10-kilometer resource data from 1998 through 2005 for Direct Normal, Global Horizontal, and Latitude Tilt data are available. The 40-kilometer resolution solar layer representing data sets gathered from 1961 to 1990 only for flat-plate tilted south at latitude are available.

This report uses 10-kilometer resolution data, direct normal for concentrating solar power and Latitude Tilt for photovoltaic available in the NREL's GIS database.

## 3.6   HIGH-POTENTIAL AREAS WITHIN THE UNCOMPAHGRE RMP PLANNING AREA

As shown in Figure 3-1, on BLM-administered lands within the Uncompahgre RMP planning area, 557,041 acres have good concentrating solar power resource potential (6 to 7 kWh/m²/day), and 118,407 acres have moderate (5 to 6 kWh/m²/day) concentrating solar power resource potential. Photovoltaic solar potential is very good on all 675,449 acres of BLM-administered land within the Uncompahgre RMP planning area (Figure 3-1). The identified high-potential areas for both concentrating solar power and photovoltaic solar resources are predominantly found in the western and central regions of the Uncompahgre RMP planning area.

## 3.7   REASONABLE FORESEEABLE DEVELOPMENT SCENARIO

The likelihood of future solar project development in the Uncompahgre RMP planning area can be estimated by considering the quality of solar resources, the acreage of lands with slope less than five percent (which is required for Central Generation Technology), existing solar projects in the area, the number of pending ROW applications within the UFO, the quality of solar resources in the UFO compared with other areas in the region, and expressions of interest by solar companies.

As described in Section 3.6, all planning area lands have very good potential for photovoltaic applications and 557,041 acres have good potential for concentrating solar power applications. As shown in Figure 3-2, of the area with good (6 to 7 kWh/m²/day) potential for concentrating solar power applications, there are 163,496 acres with slopes of less than five percent, and of the area with moderate (5 to 6 kWh/m²/day) potential for concentration solar power applications, there are 18,367 acres with slopes of less than five percent. No commercial-scale solar projects currently exist within the UFO on BLM-administered lands or otherwise, and there are no solar installation projects on BLM-administered lands anywhere in Colorado. There are no pending ROW applications within Colorado.

BLM_0106770

Figure 3-1      Solar Potential

BLM_0106771

1
2

Figure 3-2        Developable Areas for Concentrating Solar Power

BLM_0106772

1    Given the lack of existing projects, ROW applications, low-slope lands, and
2    interest by the solar industry, no commercial-scale solar projects are likely to
3    occur on lands within the Uncompahgre RMP planning area in the near future;
4    however, given the potential for changes in technology and the potential shift in
5    trend toward smaller commercial or community scale solar facilities, there may
6    be a limited level of development of solar energy projects by year 2025.
7

BLM_0106773

**4.  WIND ENERGY**

BLM_0106774

THROW THIS PAGE AWAY & DELETE FROM PDF

BLM_0106775

# CHAPTER 4

# WIND ENERGY

## 4.1   WHAT IS WIND ENERGY?

Wind is a form of solar energy. Solar radiation causes uneven heating of the atmosphere, producing regions of high and low pressure. This pressure gradient results in movement of air from high-pressure to low-pressure regions, creating wind. Wind flow patterns are modified by the earth's terrain, bodies of water, and vegetative cover. This wind flow when harvested by modern wind turbines can be used to generate electricity.

The terms wind energy or wind power describe the process by which the wind is used to generate mechanical power or electricity. Because air has mass, moving air carries with it kinetic energy. Wind turbines convert the wind's kinetic energy into mechanical power. This mechanical power can be used for specific tasks such as grinding grain, pumping water, or producing electricity.

## 4.2   HOW IS WIND ENERGY DEVELOPED?

A wind turbine is a mechanical assembly that converts the energy of wind into electricity. A wind turbine consists of a blade or rotor, a drive train (usually including a gearbox and a generator), a tower, and other equipment including controls, electrical cables, ground support equipment, and interconnection equipment. The blades turn in the moving air and power an electric generator that supplies an electric current. The blades act much like an airplane wing. When the wind blows, a pocket of low-pressure air forms on the downwind side of the blade, causing the blade to be pulled toward that pocket. This force causes the rotor to spin like a propeller and turn a shaft. The rotational energy of the shaft turns the generator and makes electricity. Wind turbines are mounted on a tower to enable them to capture the most energy. Tower height affects the amount of power that can be extracted by a given wind turbine. At 30 meters or more above ground, wind turbines can take advantage of the faster and less-turbulent wind.

BLM_0106776

Wind turbines fall into two basic groups, which include the horizontal-axis variety (propeller-style) like traditional farm windmills and the vertical-axis design like the eggbeater-style Darrieus model. The horizontal-axis type turbines are the most common, constituting nearly all the utility-scale turbines. These typically have either two or three blades. The three-blade turbines are operated upwind with their blades facing into the wind.

Wind turbines are available in a variety of sizes, and therefore power ratings. Utility-scale wind turbines for land-based wind farms have rotor diameters ranging from 40 to about 120 meters, and towers of roughly 40 to 130 meters high. Wind turbines can also be installed offshore, where the wind speeds are generally higher and larger turbines can be incorporated. The size and design of offshore wind turbines are variable and depend on many factors, including the water depth and distance to shore of the installation site. Small wind turbines intended for residential or small business typically have rotors between 2 and 8 meters in diameter and are mounted on towers 30 to 40 meters above ground.

Utility-scale turbines range in power rating from 100 kilowatts to as large as several megawatts. Larger turbines are grouped together into wind farms, which provide bulk power to a utility power grid. Wind power plants are modular, which means they consist of small individual modules (turbines) and, depending on electricity demand, can easily be made larger or smaller.

Single small turbines, below 100 kilowatts, are used for homes, telecommunications, or water pumping. Small wind systems also have potential as distributed energy resources. These systems, called hybrid wind systems, operate in connection with diesel generators, batteries, and photovoltaic systems in remote, off-grid locations where a connection to the utility grid is not available.

## 4.3   WHAT BLM ACTIONS ARE INVOLVED IN WIND ENERGY DEVELOPMENT?

Wind energy development on BLM-administered lands is managed through ROW authorization in accordance with the terms and conditions of BLM's Wind Energy Development Policy (Instruction Memorandum 2009-043 [BLM 2009b]). This policy provides guidance on processing ROW applications for wind energy site testing and monitoring facilities, as well as applications for wind energy development projects on BLM-administered lands. Under this policy, all wind energy applications are processed in accordance with the requirements of Title V of the Federal Land Policy and Management Act of 1976 and 43 CFR 2800, "Right-of-Way under the Federal Land Policy Management Act." Under this policy, developers may apply for the following three types of wind energy ROW grants:

- A site-specific grant for testing and monitoring;
- A project-area grant for testing and monitoring; and
- A development grant.

A site-specific grant is used to authorize individual meteorological towers and instrumentation facilities. The area authorized for these facilities is the minimum area required for construction and maintenance of the temporary facility (including access roads). The term of this grant is limited to three years from the date of issuance and may not be renewed. The BLM may allocate numerous site-specific grants to various ROW holders in the same area without any exclusive rights regarding future wind energy development. In addition, the BLM retains the right to authorize other compatible uses of public lands in the area.

A project-area grant with provisions for renewal beyond the three-year term authorizes wind energy site testing and monitoring facilities for a project area. The project area describes an area of land where wind resource information is being collected to determine the area's wind energy resource potential. The holder of the project area grant retains an interest in the site testing and monitoring project area, which precludes other wind energy ROW applications during the three-year term of the grant. However, it is required that for any future wind energy development proposals, the holder of the grant submit a separate ROW application and plan of development to the BLM for review.

A development grant authorizes all facilities related to a commercial wind energy development project on public lands. This authorization includes the wind turbine facilities, onsite access roads, electrical and distribution facilities, and other support facilities authorized by the wind energy development ROW grant. The lands involved in the development grant are defined by aliquot legal land descriptions and configured to minimize the amount of land involved, while still allowing an adequate distance between turbine positions and reasonable ROW boundaries. In the absence of any specific local zoning and management issues, no turbine will be positioned closer than five rotor-diameters from the center of the wind turbine to the ROW boundary in the dominant upwind or downwind direction to avoid potential wind turbulence interference issues with adjacent wind energy facilities, unless it can be demonstrated that site conditions, such as topography, natural features, or other conditions (e.g., offsets of turbine locations) warrant a lesser distance. Further, for safety reasons, no turbine on public land will be positioned closer than 1.5 times the total height of the wind turbine to the ROW boundary.

In addition, the wind energy development policy requires that all wind energy project ROW applications, whether for site testing and monitoring or for commercial development, be subjected to environmental review in accordance with the requirements of National Environmental Policy Act of 1969 and that such development be in compliance with the requirements of the Endangered Species Act, Migratory Bird Treaty Act, National Historic Preservation Act, and other appropriate laws.

## 4.4   HOW ARE POTENTIAL LEVELS DEFINED FOR WIND ENERGY?

Wind speed is a crucial element in projecting turbine performance, and a site's wind speed is measured through wind resource assessment prior to a wind system's construction. The power available in the wind is proportional to the

BLM_0106778

cube of its speed, which means that a slightly higher wind speeds will produce a significantly higher power. Generally, an annual average wind speed greater than four meters per second (nine miles per hour) is required for small wind electric turbines. Less wind is required for water-pumping operations. Utility-scale wind power plants require minimum average wind speeds of 6 meters per second (13 miles per hour). Wind resources are characterized by wind power density classes, which range from Class 1 (the lowest) to Class 7 (the highest).

While the technical characteristics of the wind in a specific location are very important, many other factors also contribute to siting decisions. A location far removed from the power transmission grid might be uneconomic, as new transmission lines would be required to connect the wind farm to the grid. Soil conditions and the terrain must be suitable for the construction of the towers' foundations. Surface roughness is another determining factor because it determines the amount of turbulence a turbine will experience. Turbulent winds put greater stresses on the rotor and tower, reducing the turbine's lifespan as a result.

## 4.5   WIND POTENTIAL

### 4.5.1   Data Sources

The main source of data on wind potential in the US is available through the DOE's NREL. The NREL's GIS offers a national wind resource assessment of the US as well as high-resolution wind data. The national wind resource assessment was developed in 1986 for the DOE by the Pacific Northwest Laboratory, which is documented in the Wind Energy Resource Atlas of the US (DOE 1986). The NREL website (NREL 2009b) provides a dynamic map based on the Wind Energy Resource Atlas of the US (NREL 2010c). In this assessment, the conterminous US was divided into grid cells one quarter of a degree of latitude by one third of a degree of longitude. Each grid cell was assigned a wind power class ranging from 1 (the lowest) to 7 (the highest), representative of the range of wind power densities. The wind power density limits for each wind power class are shown in Table 4-1, below.

Table 4-1, the wind power classes represent different wind power densities at different heights above ground (10 and 50 meters). The data depicted in the NREL's wind resource potential map represents wind power densities at 50 meters above ground, which is typical for utility-scale wind turbine application. Estimates at the 30-meter level are useful for identifying small wind turbine opportunities; however, such data are yet to be developed. In the NREL's assessment, areas designated class 3 or greater are considered suitable for utility-scale applications, while class 2 areas are marginal, and class 1 areas are generally not suitable for utility-scale uses. According to the NREL's assessment, wind power class 2 may be suitable for rural applications, and wind power class 1 in a few locations such as exposed hilltops (not shown on the map) may be adequate for wind turbine applications.

BLM_0106779

**Table 4-1**
**Classes of Wind Power Density at 10 Meters and 50 Meters**

| Wind Power Class | Resource Potential (Utility Scale) | Wind Power Density (watts per square meter) at 10 Meters Above Ground | Speed (miles per hour) at 10 Meters Above Ground | Wind Power Density (watts per square meter) at 50 Meters Above Ground | Speed (miles per hour) at 50 Meters Above Ground |
|---|---|---|---|---|---|
| 1 | Poor | 0–100 | 0–9.8 | 0–200 | 0–12.5 |
| 2 | Marginal | 100–150 | 9.8–11.5 | 200–300 | 12.5–14.3 |
| 3 | Moderate | 150–200 | 11.5–12.5 | 300–400 | 14.3–15.7 |
| 4 | Good | 200–250 | 12.5–13.4 | 400–500 | 15.7–16.8 |
| 5 | Excellent | 250–300 | 13.4–14.3 | 500–600 | 16.8–17.9 |
| 6 | Outstanding | 300–400 | 14.3–15.7 | 600–800 | 17.9–19.7 |
| 7 | Superb | 400–1000 | 15.7–21.1 | 800–2000 | 19.7–26.6 |

Source: NREL 2009b

High-resolution data are separated into two groups: NREL-produced and TrueWind-produced/NREL validated. The NREL-produced map data apply to areas of low surface roughness (e.g., grasslands) and areas with slopes less than 20 percent, while the TrueWind-produced estimates factor in surface roughness and include all slopes. The data produced by TrueWind were obtained in cooperation with the DOE's Wind Powering America program and have been validated by NREL and other wind energy meteorological consultants.

The Wind Powering America program provides a nationwide wind resource map, which is a combination of high-resolution and low-resolution databases for the US. The map shows the annual average wind power estimates at a height of 50 meters. The areas unlikely to be developed onshore due to land use or environmental issues have been excluded from this assessment. Only moderate- and high-potential areas (wind power class 3 and above) are represented in this assessment.

The Wind Powering America program also provides high-resolution data at 50 meters for individual states (when such data are available). The data represent low-, moderate-, and high-potential areas for wind development. According to this assessment, wind power class 4 or higher is sufficient for generating wind power with utility-scale turbines. Particular locations in class 3 areas could have higher wind power class values at 80 meters than values at 50 meters.

There are two major existing BLM assessments addressing wind resource potential on public lands that utilize the NREL wind potential data. These include the BLM/DOE Renewable Potential Energy Assessment (BLM and DOE

BLM_0106780

2003) and the Wind Energy Development Programmatic Environmental Impact Statement (BLM 2005).

***BLM/DOE Renewable Potential Energy Assessment***

In 2003, the BLM, in collaboration with the NREL, conducted an assessment (BLM and DOE 2003) of renewable energy resources including solar, biomass, geothermal, water, and wind energy on BLM lands in the western US. The objective of this assessment was to identify BLM lands in the western US with highest potential for renewable energy development. The assessment used NREL's high-resolution data, when such data were available, and the 1987 low-resolution data, also available through the NREL. The following screening criteria (in order of importance) were developed for targeting high-potential wind resource potential areas:

- Wind power class 3 and above;
- Within 25 miles of transmission lines with capacity in the range of 69 to 345 kilovolts;
- Within 50 miles of a major road or railroad; and
- BLM-compatible land use.

***Wind Energy Development Final Programmatic EIS***

The Wind Energy Development Final Programmatic EIS (BLM 2005) evaluates the potential impacts associated with wind energy development on BLM-administered lands in the western US, excluding Alaska. For this Programmatic EIS, the NREL developed a maximum potential development scenario in order to define the potential for future wind energy development on BLM-administered lands. The NREL utilized the same methodology and screening criteria that was employed in the BLM's 2003 Renewable Potential Energy Assessment (BLM and DOE 2003) discussed above. In addition to the maximum potential development scenario, the NREL used a different model (the Wind Deployment System) to project the amount of wind power that might be generated over the next 20 years in the study area.

Maps depicting BLM-administered lands with low, medium, and high potential for wind energy development are available for 11 western states (BLM 2005). Wilderness Areas, Wilderness Study Areas, National Monuments, and National Conservation Areas were excluded from the maps. Lands categorized as having low potential fall in wind power classes 1 and 2. Lands with wind power class 3 are considered medium potential, while wind resources of class 4 and above are economically developable with current technology. Most of the BLM lands in the UFO have only low potential for wind energy development.

### 4.5.2   Wind Potential Data Used in this Report

For this analysis, the available high-resolution data created by TrueWind Solutions were used, as was done in the Wind Energy Development Final Programmatic EIS (BLM 2005). These data have been verified by the NREL and

BLM_0106781

are also utilized in the assessment done by the Wind Powering America program.

## 4.6   HIGH-POTENTIAL AREAS WITHIN THE UNCOMPAHGRE RMP PLANNING AREA

Within the Uncompahgre RMP planning area, wind potential is generally marginal to poor. Outstanding wind potential areas (class 6) have been identified on 36 acres, while 49 acres have excellent (class 5) wind potential, and an additional 56 acres have good (class 4) wind potential. The identified high-potential areas are located on the eastern side of the planning area and are shown with these potential classes in Figure 4-1.

## 4.7   REASONABLE FORESEEABLE DEVELOPMENT SCENARIO

The likelihood of future development of wind projects in the Uncompahgre RMP planning area can be estimated by considering the quality of wind resources, existing wind projects in the area, the number of pending ROW applications within the UFO, the quality of wind resources in the UFO compared with other areas in the region, and expressions of interest by wind companies.

Wind energy potential is generally marginal to poor in the planning area, and only small areas (areas of 49 acres or smaller) have been identified as having high potential (class 4 or higher) for wind energy development. The planning area has one 36-acre area of outstanding wind resource, one 49-acre area of excellent wind resource, and three areas (26 acres, 20 acres, and 10 acres) of good wind resource. All of these areas are along the Cimarron Ridge near Slagel Pass along the border of Ouray and Gunnison Counties, except for the 10-acre good area, which is approximately 2 miles to the north, also along the Cimarron Ridge, along the border of Ouray and Montrose Counties near Storm King Mountain and Castle Rock. Potential transmission connections could be made to any power lines running along Highway 550 approximately 7 miles to the west-southwest, or along Highway 50 approximately 10 miles to the north-northeast.

No major wind projects exist within the UFO or anywhere in western Colorado. There are no existing wind ROWs or pending wind ROW applications within the UFO. A number of ROWs are authorized or pending for wind testing sites across Colorado, as follows: 1 authorized (Grand Junction), 3 pending (Royal Gorge), 1 pending (White River). Two additional ROWs are pending for wind test sites in the nearby Vernal Field Office in Utah.

The closest ROW authorization is located near Palisade, Colorado, in the Grand Junction Field Office and is for Wazee Energy, LLC, which is seeking to determine the feasibility of developing a wind farm. This application was

Figure 4-1      Wind Potential

*Uncompahgre Resource Management Plan Revision and EIS*
Draft Renewable Energy Potential Report

BLM_0106783

approved in September 2009. Wazee Energy erected a single meteorological tower to test wind speed at the end of 2009 and expressed an intention to install up to three more towers if results were favorable.

Superb wind resources are located along the Front Range of Colorado, running north-south through central Colorado. Fair to good wind resources are located in Colorado's eastern plains.

The UFO has received no expressions of interest in developing wind resources within the planning area from wind developers. Attempts to contact the wind energy companies with pending or existing ROW authorizations in Colorado yielded no results.

Due to the limited size of plots of BLM-administered land with good-quality wind resources, the lack of wind projects in the UFO or western Colorado, the lack of pending ROW applications in the UFO, and the fact that much better wind resources occur in other parts of the state, it is not expected that many, if any, commercial-scale wind energy projects would be developed within the planning area by year 2025. If such development were to occur, it is expected it would be along Cimarron Ridge in the area described above.

This page intentionally left blank.

BLM_0106785

## 5.   BIOMASS

*Uncompahgre Resource Management Plan Revision and EIS*
*Draft Renewable Energy Potential Report*

BLM_0106786

THROW THIS PAGE AWAY & DELETE FROM PDF

*Uncompahgre Resource Management Plan Revision and EIS*
Draft Renewable Energy Potential Report

BLM_0106787

# CHAPTER 5

# BIOMASS

## 5.1   WHAT IS BIOMASS?

Biomass energy or bioenergy is the energy from plants and plant-derived materials. These include food crops, grassy and woody plants, residues from agriculture or forestry, and the organic component of municipal and industrial wastes. Even the fumes from landfills such as methane and natural gas can be used as a biomass energy source.

Biomass can be converted to liquid fuels (biofuels), such as ethanol and biodiesel, and used to meet transportation fuel needs. It can also be developed for power production to generate heat and electricity. In addition to biofuels and biopower, biomass can be converted into chemicals for making plastics and other products that would otherwise be made from fossil fuels. Using biomass for fuels, power productions, and products has the potential to greatly reduce greenhouse gas emissions and dependence on foreign oil, and to increase support of US agricultural and forest-product industries.

## 5.2   HOW IS ENERGY PRODUCED FROM BIOMASS?

Biopower, or biomass power technologies, convert biomass to heat and electricity using processes similar to that used with fossil fuels. Biopower system technologies include direct-firing, co-firing, gasification, pyrolysis, and anaerobic digestion. All of these technologies may be employed in small, modular systems that would be more applicable to villages, farms, and small industry.

### Direct-firing

Most biopower plants use direct-firing, the burning of bioenergy feedstocks in a boiler to produce high-pressure steam. The steam rotates a turbine, which then turns a generator that produces electricity. The direct-fired power plants' efficiencies are limited (in the low 20-percent range). In some biomass industries, the spent steam from the power plant is used for manufacturing

BLM_0106788

processes or heating buildings. Such combined heat and power systems greatly
increase overall energy efficiency.

***Co-firing***
Co-firing involves mixing biomass with fossil fuels, typically coal, in an existing
power plant furnace. Because much of the existing power plant equipment can
be used without major modification, co-firing is the most economic near-term
option for introducing new biomass power generation. Such plants can
significantly reduce sulphur dioxide, nitrogen oxides, and other air emissions.
Adding biomass results in little or no loss of efficiency. Such power plants allow
biopower production with 30 to 37 percent efficiency.

***Gasification***
Gasification is a thermo-chemical process that converts biomass into a
combustible, synthetic gas using high temperatures and an oxygen-starved
environment. This synthetic gas, also called syngas, contains hydrogen, carbon
monoxide, water vapor, carbon dioxide, tar vapor, and ash particles. The syngas
retains 70 to 80 percent of the energy originally present in the biomass
feedstock and can be chemically converted to other fuels or products, burned in
a conventional boiler, or used instead of natural gas in a gas turbine.

Using syngas offers advantages over directly burning the biomass. Syngas can be
cleaned and filtered to remove tar and particulate matter from the gas. It can
also be used in more-efficient power-generation systems called combined cycles,
which combine gas and steam turbines to produce electricity with efficiencies up
to 60 percent.

***Pyrolysis***
Pyrolysis systems use a similar thermo-chemical process as in gasification but an
oxygen-free environment to convert biomass into liquid. The pyrolysis oil can
be burned to generate electricity or used for making plastics, adhesives, or
other bioproducts.

***Anaerobic Digestion***
Anaerobic digestion refers to a biochemical process in which particular kinds of
bacteria digest biomass in an oxygen-free environment and produce a gas
composed primarily of methane and carbon dioxide. Methane, a combustible
gas, is filtered and cleaned, then burned to produce electricity. Anaerobic
digestion may be used to produce biogas from animal manure and organic
biomass solids in municipal sewage. This process also occurs naturally in
underground landfills. In such cases, wells can be drilled in order to release and
capture the biogas that is produced.

## 5.3   WHAT BLM ACTIONS ARE INVOLVED IN BIOMASS PROJECTS?
Biomass resources are a byproduct of BLM actions on public lands and are not
specifically cultivated for feedstock production. The BLM defines woody biomass
as "the woody plants and portions of the trees, including limbs, tips, needles,
leaves, and other woody parts, or rangeland environment, that are the
byproducts of the management, restoration, and/or hazardous fuel reduction

*Uncompahgre Resource Management Plan Revision and EIS*   February 2010
*Draft Renewable Energy Potential Report*

BLM_0106789

1    treatment." Biomass can be collected and harvested from BLM lands through
2    timber sales, stewardship, and hazardous fuels reduction.

## 5.4    HOW ARE POTENTIAL LEVELS DEFINED FOR BIOMASS-PRODUCING AREAS?

3
4    Potential levels for biomass-producing areas are generally calculated based on
5    biomass feedstock yield. Biomass feedstocks include crop residues, forest
6    residues, primary and secondary mill residues, urban wood waste, and methane
7    emissions from manure management, landfills, and domestic wastewater
8    treatment.

9    Another biomass resource data that may be used in defining potential levels is
10    the normalized difference vegetation index (NDVI), which computes surface
11    vegetation using visible and near-infrared satellite data.

## 5.5    BIOMASS PRODUCTIVITY

12
13
14 ### 5.5.1    Data Sources
15    There are two main sets of biomass resource data available for the US. These
16    include NREL's biomass resource potential maps of the US available through US
17    Atlas of Renewable Resources (NREL 2010b) and NDVI values computed from
18    NASA's Advanced Very High Resolution Radiometer Land Pathfinder Satellite
19    program (US Department of Agriculture 2009).

20    ***Biomass Resource Maps***
21    The NREL offers GIS layers showing biomass resources of the US by county,
22    through the interactive US Atlas of Renewable Resources (NREL 2010b). The
23    data represented here include crop residues, forest residues, primary and
24    secondary mill residues, urban wood waste, and methane emissions from
25    manure management, landfills, and domestic wastewater management. The
26    NREL also offers static US maps of biomass resources measured in thousands of
27    tons per county per year. Additionally, the NREL offers separate static maps for
28    each biomass resource. There are separate analyses for crop residues, forest
29    residues, primary mill residues, secondary mill residues, urban wood waste,
30    methane emissions from landfills, methane emissions from manure management,
31    and methane emissions from domestic wastewater treatment.

32    In the NREL maps and analyses, biomass resource values less than 50,000 tons
33    per county per year are considered low potential, while values of greater than
34    500,000 tons per county per year are considered high potential. According to
35    the data presented here, , Montrose County BLM lands in the planning area
36    have biomass resources of 50,000 to 100,000 tons per county per year, while
37    BLM lands in the remaining Uncompahgre RMP planning area all have biomass
38    resources that are less than 50,000 tons per county per year.

39    ***Normalized Difference Vegetation Index***
40    The NDVI computed from NASA's Advanced Very High Resolution Radiometer
41    Land Pathfinder Satellite program (US Department of Agriculture 2009)
42    measures vegetation vigor caused by chlorophyll activity. The NDVI has been

BLM_0106790

shown to be highly correlated to surface vegetation and is derived from the visible and near-infrared channel reflectances. Very low values of NDVI (0.1 and below) correspond to barren areas of rock, sand, and snow. Moderate values (0.2 to 0.3) represent shrub and grassland, while high values (0.6 to 0.8) indicate temperate and tropical rainforests. NDVI values can theoretically range from -1 to +1.

The BLM/DOE's Renewable Potential Energy Assessment (BLM and DOE 2003) utilized NDVI values for the western US and developed screening criteria in order to identify high-productivity areas on public lands. The screening criteria used for this assessment were (in order of importance):

- NDVI of 0.4 or greater for at least 4 months between April and September 2000;

- Terrain slope of less than 12 percent;

- Site within 50 miles of a town with at least 100 people; and

- BLM-compatible land use.

These data include only areas that maintained the minimum NDVI of 0.4 for at least 4 months; such lands are present within the Uncompahgre RMP planning area.

### 5.5.2   Biomass Productivity Data Used in this Report

While NDVI data were considered the most appropriate for this assessment, NDVI data are not available in GIS format. As a proxy, BLM vegetation GIS data were used to indicate areas where biomass may be harvested.

Because biomass is a byproduct of other land management activities, such as fire management and stewardship, biomass does not require lands to be designated as open or closed for biomass collection. The information in this assessment will serve as an informational tool so that BLM staff can keep biomass in mind as a potential useful byproduct when they are planning other actions and can arrange for its sale to biomass processors.

BLM_0106791

Figure 5-1        Biomass Productivity

BLM_0106792

## 5.6   BIOMASS PRODUCTIVITY WITHIN THE UNCOMPAHGRE RMP PLANNING AREA

Figure 5-1 shows the vegetation types within the Uncompahgre RMP planning area. Biomass productivity attributes were not associated with the vegetation types because biomass productivity from the lands supporting these vegetation types depends on how the BLM is managing the vegetation (i.e., how much of the vegetation is removed and how often).

## 5.7   REASONABLE FORESEEABLE DEVELOPMENT SCENARIO

A reasonable foreseeable development scenario is not applicable in the case of biomass because biomass energy production involves the collection of materials from BLM lands as the byproduct of other actions. The location of a biomass energy facility is not dependent upon the location of biomass resources (i.e., resources are typically hauled to a biomass energy facility from various sources). Therefore, the presence of biomass resources on BLM-administered lands does not increase the likelihood that a private energy developer would seek to locate a biomass energy facility on BLM-administered lands. Biomass energy facilities are likely to be located on private land because there are fewer regulatory challenges and environmental compliance requirements (e.g., compliance with the National Environmental Policy Act is not required).

Given the flexibility in siting a power plant and the likelihood that a developer would prefer private lands over public lands, it is not expected that any biomass energy facilities would be developed in the planning area by year 2025. Biomass materials are likely to be produced from lands within the planning area during certain BLM activities such as stewardship and fire management actions.

BLM_0106793

**6.    REFERENCES**

BLM_0106794

THROW THIS PAGE AWAY & DELETE FROM PDF

*Uncompahgre Resource Management Plan Revision and EIS*
Draft Renewable Energy Potential Report

BLM_0106795

# CHAPTER 6

# REFERENCES

BLM (US Department of the Interior, Bureau of Land Management). 2004. Instruction Memorandum 2004-227, Biomass Utilization Strategy. August 16, 2004. Internet Web site: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins /national_instruction.html. Accessed on February 20, 2010.

_____. 2005. Record of Decision for the Programmatic Environmental Impact Statement on Wind Energy Development. December 2005. Internet Web site: http://windeis.anl.gov/documents/docs/WindPEISROD.pdf. Accessed on February 20, 2010.

_____. 2006. Instruction Memorandum 2006-216, Wind Energy Development Policy. August 24, 2006. Internet Web site: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins /national_instruction/2006/2006-216___.html. Accessed on February 20, 2010.

_____. 2007. Instruction Memorandum 2007-097, Solar Energy Development Policy. April 4, 2007. Internet Web site: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins /national_instruction/2007/im_2007-097___.html. Accessed on February 20, 2010.

_____. 2009a. Instruction Memorandum 2009-022, Geothermal Leasing under the Energy Policy Act of 2005. October 9, 2008. Internet Web site: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins /national_instruction/2009/IM_2009-022.html. Accessed on February 20, 2010.

_____. 2009b. Instruction Memorandum 2009-043, Wind Energy Development Policy. December 19, 2008. Internet Web site: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins /national_instruction/2009/IM_2009-043.html. Accessed on February 22, 2010.

BLM_0106796

_____. 2010. Geographic Information System. Unpublished Data. BLM, Uncompahgre Field Office, Colorado.

BLM (US Department of the Interior, Bureau of Land Management) and DOE (US Department of Energy). 2003. Renewable Potential Energy Assessment. Available at Internet Web site: http://www.nrel.gov/docs/fy03osti/33530.pdf.

_____. 2010. Solar Energy Development Programmatic EIS Information Center. Internet Web site: http://solareis.anl.gov/. Accessed on February 22, 2010.

Blackwell, D. D., and Richards, M. 2004. Geothermal Map of North America. American Assoc. Petroleum Geologist (AAPG), 1 sheet, scale 1:6,500,000.

Colorado Gap Analysis Project. 1999. Vegetation data. Accessed through the UFO BLM GIS server.

Colorado Geological Survey. 2007. Geographic Information System (GIS) shape file boundary to define the area of geothermal potential for the Final Programmatic EIS for Geothermal Leasing in the Western US. Provided by Matt Sares of the Colorado Geological Survey to EMPSi. November 28, 2007.

_____. 2008. Interpretive Geothermal Heat Flow Map of Colorado. November 14, 2008.

DOE (US Department of Energy). 1986. Wind Energy Resource Atlas of United States. Internet Web site: http://rredc.nrel.gov/wind/pubs/atlas/atlas_index.html. Accessed on February 23, 2010.

_____. 2010. Solar Energy Technologies Program. Internet Web site: http://www1.eere.energy.gov/solar/technologies.html. Accessed on January 15, 2010.

First Solar Inc. 2009. Personal communication between Leilah Krohn of First Solar and Amanda Davila of EMPSi. December 9, 2009.

NREL (US Department of Energy, National Renewable Energy Laboratory). 2006. Geothermal – The Energy Under our Feet: Geothermal Resource Estimates for the United States. Technical Report NREL/TP-840-40665. By Bruce Green and Gerald Nix. November 2006.

_____. 2009a. Data Analysis and Tools: download data and tools. Internet Web site: http://www.nrel.gov/gis/data_analysis.html. Accessed on November 2, 2009.

_____. 2009b. Dynamic Maps, GIS Data, and Analysis Tools. Wind Maps. Internet Web site: http://www.nrel.gov/gis/wind.html. Accessed on December 9, 2009.

_____. 2010a. Concentrating Solar Power Resource Maps. Internet Web site: http://www.nrel.gov/csp/maps.html. Accessed on February 23, 2010.

BLM_0106797

_____. 2010b. United States Atlas of Renewable Resources. Internet Web site: http://mapserve2.nrel.gov/website/Resource_Atlas/viewer.htm. Accessed on February 23, 2010.

_____. 2010c. United States Annual Wind Resource Potential. Internet Web site: http://mapserve2.nrel.gov/website/wind_resource1/viewer.htm. Accessed on February 23, 2010.

University of Utah Energy and Geoscience Institute. 2007. Enhanced Geothermal Systems. Available at: http://egs.egi.utah.edu/home/main2.htm. Website accessed on December 18, 2007.

US Department of Agriculture. 2009. Vegetation Condition from AVHRR NDVI Data. National Agricultural Statistics Service. Research and Development Division. Internet Web site: http://www.nass.usda.gov/research/avhrr/avhrrmnu.htm. Accessed on December 16, 2009.

US Department of Energy. 2006. The Future of Geothermal Energy: Impact of Enhanced Geothermal Systems (EGS) on the United States in the 21st Century. Prepared for the US DOE and Idaho National Laboratory by the Massachusetts Institute of Technology.

_____. 2007. Enhanced Geothermal Systems Technology. Available at: http://www1.eere.energy.gov/geothermal/egs_technology.html. Website accessed on December 18, 2007.

University of Oregon. 2002. Solar Radiation Monitoring Laboratory. Internet Web site: http://solardat.uoregon.edu/SolarRadiationBasics.html. Accessed on January 15, 2010.

Western Governors' Association. 2006. Geothermal Task Force Report. January 2006.

BLM_0106798

1
2                      This page intentionally left blank.

**Final Report**

Sept 26, 2008

# The Economic Impacts of Hunting, Fishing and Wildlife Watching in Colorado

**Prepared for**

Colorado Division of Wildlife

**Prepared by**

BBC Research & Consulting
3773 Cherry Creek N. Drive, Suite 850
Denver, Colorado  80209-3827
303.321.2547  fax 303.399.0448
www.bbcresearch.com
bbc@bbcresearch.com



BLM_0106800

# Table of Contents

**Executive Summary**

Background ........................................................................................................... 1

Overview of Statewide Economic Impacts of Hunting and Fishing ................................................. 1

Overview of Statewide Economic Impacts of Wildlife Watching Activities ....................................... 2

**I.    Introduction**

Background ........................................................................................................... 3

Objectives ............................................................................................................ 3

Process ............................................................................................................... 4

Model Capabilities ................................................................................................... 4

**II.   Model Overview**

**III.  Statewide Results**

Statewide Economic Impacts of Hunting and Fishing ...................................................... 9

Statewide Economic Impacts of Hunting and Fishing by Residents and Non-Residents ................ 11

Statewide Economic Impacts of Wildlife Watching Activities ........................................... 13

**IV.   County-Level Results**

**V.    Comparison with Previous Impact Estimates**

BLM_0106801

# EXECUTIVE SUMMARY

## Background

In 1988, the Colorado Division of Wildlife (CDOW) selected BBC Research & Consulting (BBC) to build a model that estimated the economic effects of hunting and fishing in Colorado. CDOW used and maintained this model, and provided periodic updates of economic effects as new information became available. State and local government officials and CDOW personnel regularly used the model's results to help them educate the public, consider policy choices and allocate resources.

BBC last revised and updated the model in 2004, using 2002 data. In early 2008, CDOW asked BBC to complete a new update, based on the most recently available data. In addition to desiring a more current set of economic impact estimates, CDOW recognized that, due to circumstances in 2002 including drought, wildfires and a poor economy, estimates for 2002 may not accurately reflect the prevailing economic impact of hunting, fishing and wildlife watching in Colorado.

The estimates presented here are based on data from a number of different sources, including CDOW game harvest information for 2007, a survey of Colorado anglers conducted by CDOW in early 2008, CDOW expenditure data for Fiscal Year 2007 and the U.S. Fish and Wildlife Service's (USFWS) 2006 National Survey of Fishing, Hunting and Wildlife-Associated Recreation.

## Overview of Statewide Economic Impacts of Hunting and Fishing

Hunting and fishing are an important part of Colorado's tourism economy. During 2007, the most recent year for which hunting and fishing data are available, there were roughly 12.7 million hunting and fishing activity days in Colorado. An activity day consists of one hunter or angler spending at least part of one day hunting or fishing. Colorado residents account for approximately 91 percent of hunting and fishing activity days.

**Direct expenditures.** Excluding purchases of hunting and fishing licenses (captured in CDOW expenditures), hunters and anglers spent an estimated $1.0 billion on trip expenses and sporting equipment in Colorado during 2007. In addition, CDOW spent $58 million on operations that directly support hunting and fishing in the state. (Information about the CDOW budget categories involved in this estimate are provided on page 10 of the main report.) Combining these, total direct expenditures in support of hunting and fishing were approximately $1.1 billion.

**Total impact.** The total economic impact of hunting and fishing is the sum of new dollars injected into the economy (trip expenses, sporting equipment purchases and CDOW expenditures that support hunting and fishing) and the secondary impact of the dollars that are re-spent within the economy. The secondary economic impact of hunting and fishing dollars during 2007 is estimated at $767 million, yielding a total impact of just over $1.8 billion.

BLM_0106802

**Jobs.** This level of economic activity supports an estimated 21,000 full-time jobs in Colorado. These jobs are located across the state, representing an important part of the economic base, particularly in some rural counties.

**Residents and non-residents.** Colorado residents provided 82 percent of statewide hunting and fishing trip and equipment expenditures. Non-resident hunters and anglers also provided an important boost for local economies:

- Non-resident hunters and anglers typically spent more money per day than residents did. For example, non-resident big game hunters spent an estimated $216 per day, while resident big game hunters spent about $106 per day.

- Non-resident hunters and anglers contributed $186 million, or 18 percent, of the statewide trip and equipment expenditures.

- Non-resident hunters and anglers brought money into the Colorado economy that would probably have gone to another state if not for Colorado's variety of hunting and fishing opportunities.

**Comparison with 2002.** Adjusting for inflation, hunters and anglers spent 17 percent more on trips and sporting equipment in 2007 than in 2002. Fishing activity days increased by 30 percent between 2002 and 2007 and hunting activity days increased by 6 percent. The total economic impact of these activities increased by 11 percent, with a similar number of jobs being supported statewide in each year. A more detailed comparison of 2002 and 2007 is presented in Section V of this report.

### Overview of Statewide Economic Impacts of Wildlife Watching Activities

Estimates for wildlife watching activities in Colorado use a slightly different methodology to the hunting and fishing estimates. Estimates of trip and equipment expenditures and activity days for wildlife watching more than one mile from home are based on the wildlife watching sample of the 2006 USFWS national survey.

**Total impact.** During 2006, the most recent year for which wildlife watching expenditure data are available, trip and equipment expenditures that are primarily for wildlife watching activities more than one mile from home are estimated at $703 million. The secondary economic impact of these expenditures is estimated at $515 million, yielding a total estimated economic impact of $1.2 billion. This level of spending supports roughly 12,800 jobs in Colorado's economy.

**Residents and non-residents.** Wildlife watching by Colorado residents amounts to 41 percent of the total economic impact, with the remaining 59 percent coming from non-residents. Although non-residents represented roughly one-quarter of all activity days in 2006, non-residents spent considerably more money per day, on average, than residents when watching Colorado's wildlife.

**People who watch wildlife and hunt or fish.** Many people who watch wildlife in Colorado also hunt or fish in the state. Based on the 2006 USFWS survey, 12 percent of those who engaged in wildlife watching in Colorado in 2006 hunted or fished in the state in 2006. Among Colorado residents the figure is 20 percent; among non-residents the figure is 2 percent.

BLM_0106803

# SECTION I.
# Introduction

## Background

In 1988, the Colorado Division of Wildlife (CDOW) selected BBC Research & Consulting (BBC) to build a model that estimated the economic effects of hunting and fishing in Colorado. The Division used and maintained this model and provided periodic updates of economic effects as new information became available. State and local government officials and CDOW personnel regularly used the model's results to help them educate the public, consider policy choices and allocate resources.

BBC last completed a model update in October 2004, providing estimates of the economic impact of hunting and fishing in 2002 and of wildlife watching in 2001. BBC's estimates and CDOW data both showed a decline in hunting and fishing activity as well as expenditures in 2002 relative to previous years. It was recognized that lower activity and total expenditures may have resulted from unfavorable conditions in 2002, including drought, wildfires and a weak economy. By providing a new set of estimates based on the most recently available data, BBC has been able to provide an assessment that more accurately reflects the prevailing economic impact of hunting, fishing and wildlife watching in Colorado.

## Objectives

CDOW specified several objectives for this update.

- Work with CDOW personnel to integrate the most recently available information and refine working assumptions;

- Provide statewide and individual county estimates of the economic effects of elk hunting, deer hunting, other big game hunting, small game hunting and fishing;

- Distinguish between resident and non-resident impacts; and

- Provide a statewide estimate of the economic effects of wildlife watching, using a methodology similar to that for hunting and fishing.

BLM_0106804

## Process

BBC completed six tasks in order to update the model. These tasks included:

- **Project initiation** — BBC met with CDOW staff at the beginning of this project to assemble the data needed from CDOW and to review data sources and model assumptions.

- **Data collection** — BBC obtained the most recent available data from CDOW, the U.S. Fish and Wildlife Service, the U.S. Bureau of the Census, the Colorado State Demographer's Office, and the IMPLAN Group, Inc.

- **Core model implementation** — BBC updated the CDOW economic impact model with new data inputs and made adjustments to the model implementation where necessary to accommodate changes such as new Game Management Units, revised survey questions and new data sources.

- **Hunting and fishing results** — BBC developed estimates of the economic impacts of hunting and fishing for the most recent available year (2007).

- **Wildlife watching results** — BBC developed estimates of the economic impacts of wildlife watching in 2006.

- **Final report** — BBC summarized the results of the model in a report delivered to CDOW staff.

Section II of this report provides an overview of the economic impact model.

## Model Capabilities

The model provides estimates of the annual economic impacts of hunting and fishing activity for each county and statewide for the 2007 hunting and fishing seasons. All economic impact results are reported in 2007 dollars. Economic impacts are reported in terms of activity days, trip and equipment expenditures, total economic impacts (measured in terms of output/sales) and jobs.

Hunting impacts can be further broken down into impacts related to hunting several key species, including elk, deer, other big game and small game. Economic impacts are further divided into impacts resulting from Colorado resident hunting and fishing activity and those resulting from non-resident activity.

Economic impacts associated with wildlife watching activities are available for residents and non-residents, but only at the statewide level. The model reports the economic impacts resulting from wildlife watching in 2006, the most recent year for which data are available.

Section III of this report describes statewide results and Section IV of this report describes county-level results. Section V of this report compares results of this updated model with the 2002 hunting and fishing estimates from the last model update.

BLM_0106805

# SECTION II.
# Model Overview

The updated economic impact model developed for CDOW combines the most recently available information from a variety of sources to generate estimates of the impacts of hunting, fishing and wildlife watching in Colorado. This section of the report provides an overview of the model.

**General model structure.** The overall structure of the economic impact model is shown in Exhibit II-1, on the next page. The model begins with information about resident and non-resident participants in Colorado. Estimates of equipment expenditures and per-visitor day direct expenditures for trip costs come from the U.S. Fish and Wildlife Service and U.S. Bureau of the Census "2006 National Survey of Fishing, Hunting, and Wildlife Associated Recreation." Estimates of the number of hunting and fishing activity days, along with their location, come from CDOW surveys and license sales.

The model then estimates direct expenditures, by type of visitor and activity, based on estimated expenditures per visitor day and per trip (specific to each type of activity and each type of visitor), combined with data on CDOW expenditures that support hunting and fishing activities. The location of sales depends on the type of expenditure, the locations where hunting and fishing activities take place and where equipment or trip support services are purchased.

Secondary expenditures, reflecting the re-spending of hunting and fishing dollars within Colorado, are estimated using the IMPLAN input-output model originally developed by the U.S. Forest Service. The model then combines the direct and secondary expenditures to produce total economic impact estimates and estimates of total employment related to hunting and fishing activities.

The wildlife watching component of the model follows a similar structure. However, due to data limitations, there is no county-level detail available for wildlife watching impacts. Economic effects of wildlife watching are only provided at a statewide level.

BLM_0106806

**Exhibit II-1.**
**Overall Economic Impact Model Structure**



Source:     BBC Research & Consulting.

---

BLM_0106807

**Inputs to the model.** Data for the model come from a variety of sources and are depicted in Exhibit II-2:

■ CDOW provided data on hunting and fishing activity levels by location and species, direct CDOW expenditures and license agent commissions, and the geographic and economic relationship between Game Management Units and county boundaries;

■ Colorado-specific information in the U.S. Fish and Wildlife Service and U.S. Bureau of the Census "2006 National Survey of Fishing, Hunting, and Wildlife Associated Recreation" provides estimates of hunting, fishing and wildlife watching expenditures in Colorado per visitor and per visitor day;

■ Data from the U.S. Census County Business Patterns was used to apportion equipment expenditures based on the locations of retail outlets for hunting, fishing and wildlife watching equipment;

■ Data from the U.S. Department of Commerce, Bureau of Economic Analysis was used to convert all dollar figures into 2007 dollars; and

■ The IMPLAN economic impact model was used to estimate secondary economic impacts ("re-spending" effects) and total employment impacts.

**Exhibit II-2.**
**Inputs to the Model**



Source:     BBC Research & Consulting.

BLM_0106808

**Model outputs.** Apart from producing overall statewide estimates of the total economic impact of hunting, fishing and wildlife watching activities, the model is able to produce a variety of more specialized results. As summarized in Exhibit II-3, the model can show results for hunting and fishing impacts at both the state and county levels, as well as results for wildlife watching impacts at the state level. The model can also generate impact results for more specific activities, such as elk hunting or small game hunting. A variety of economic measures are available from the model, including direct expenditures, total output and jobs.

**Exhibit II-3.**
**Available Model Results**

Source:
BBC Research & Consulting.

**Geography**
- County-level
- State-level

**Residency**
- Colorado
- Non-resident

**Activity**
- Elk hunting
- Deer hunting
- Other big game hunting
- Small game hunting
- Fishing
- Wildlife watching

**Economic Impacts**
- Direct expenditures
- Secondary spending
- Total impact (direct and secondary)
- Jobs
- Employee earnings

**Direct expenditure categories**
- Trip expenses
- Equipment purchases
- CDOW expenditures

BLM_0106809

# SECTION III.
# Statewide Results

## Statewide Economic Impacts of Hunting and Fishing

Hunting and fishing are an important and sizable portion of Colorado's tourism economy.

Exhibit III-1 summarizes direct expenditures, total economic impacts and total jobs in Colorado related to hunting and fishing in 2007. Overall, the economic impacts of fishing were greater than those of hunting, reflecting the fact that fishing activity days represented more than 80 percent of all activity days. However, the economic impact of each hunting day is nearly twice that of an individual fishing day, on average. Among the major game species hunted in Colorado in 2007, the economic impacts of elk hunting were the largest, followed by deer hunting.

**Exhibit III-1.**
**Statewide Economic Impacts of Hunting and Fishing in 2007**

| Activity | Direct expenditures[1] ($ in thousands) | Total impact[2] ($ in thousands) | Total[3] jobs |
|---|---|---|---|
| Elk hunting | $172,700 | $295,500 | 3,400 |
| Deer hunting | 58,300 | 99,900 | 1,160 |
| Other big game hunting | 4,700 | 8,300 | 100 |
| Fishing | 725,200 | 1,259,400 | 14,610 |
| Small game hunting | 56,900 | 98,700 | 1,350 |
| CDOW expenditures | 58,500 | 81,500 | 730 |
| **Total** | **$1,076,300** | **$1,843,300** | **21,350** |

Note:    Measured in 2007 dollars.

   1. Trip and equipment expenditures and CDOW expenditures in support of these activities.
   2. Direct expenditures plus secondary spending by businesses and households (multiplier effects).
   3. Includes job creation from direct and secondary expenditures.

Source:    BBC Research & Consulting, based on data from CDOW and USFWS 2006 national survey.

BLM_0106810

**Direct expenditures.** Hunters and anglers spent an estimated $1.0 billion on trip expenses[1] and sporting equipment[2] (direct expenditures) in Colorado during 2007. Expenditures by Colorado residents made up about 82 percent of this total. Expenditures per day were greater, on average, for non-residents than for Colorado residents. In addition, CDOW spent an estimated $58 million on items that directly support hunting and fishing activities in the state. (For a description of included CDOW budgetary groups, see below.[3]) When combined, total direct expenditures are estimated to equal $1.1 billion.

**Total economic impacts.** Businesses receive revenue from hunter and angler purchases and use a portion of this money to pay employees and purchase goods and services that support business operations. Thus, the hunter and angler expenditures re-circulate in the local economy — providing an economic impact beyond just the original expenditures. This additional re-spending impact is often termed a "multiplier" effect or secondary impact.

The total economic impact of the hunting and fishing industry consists of both new dollars injected into the economy from hunter and angler trip expenses and sporting equipment purchases (direct expenditures) and the secondary impact as these dollars are re-spent within the economy. The secondary economic impact of hunting and fishing dollars during 2007 is estimated at $767 million. Adding this figure to the trip and equipment purchases, the total estimated impact is $1.8 billion.

**Jobs.** A portion of the direct expenditures of hunters and anglers and the subsequent re-spending of these revenues pay for wages and salaries that currently support an estimated 21,000 full-time jobs in Colorado. These jobs, located across Colorado, form an important component of the local economic base, particularly in certain rural counties.

**Activity days**. During 2007, the most recent year for which data are available, there were about 12.7 million hunting and fishing activity days. An activity day consists of one hunter or angler spending at least part of one day hunting or fishing. Resident hunter and angler activity days comprised approximately 91 percent of the total hunting and fishing activity days in Colorado. Non-resident hunter and angler activity days were 9 percent of the total. The portion of non-resident activity days varied considerably for different activities: non-residents were responsible for less than 5 percent of fishing activity days but more than one-third of big game activity days. Exhibit III-2 on the next page shows these results.

---

[1] Includes expenditures on the following goods and services: food, lodging, public transportation, private transportation, guide fees, public land access fees, private land access fees, equipment rental, boat fuel, other boating costs, and heating and cooking fuel. Excludes expenditures on hunting and fishing licenses as these are represented by CDOW expenditures.

[2] Includes some or all of the expenditures on the following items: guns and rifles, ammunition, other hunting equipment, fishing gear, camping equipment, binoculars, clothing, taxidermy, boats, trucks, campers, recreational vehicles, magazines and books, membership dues and contributions, film, bird food, and food for other wildlife.

[3] CDOW expenditures include the following expenditure groups: operating (i.e. instate travel, supplies, motor vehicles, etc.), capital (IT, equipment, etc.), and all other expenditures in direct support of fish and wildlife management.

BLM_0106811

**Exhibit III-2.**
**Hunting and Fishing Activity Days, 2007**

| Activity | Resident activity days (thousands) | Non-resident activity days (thousands) | Total activity days (thousands) |
|---|---|---|---|
| Big game hunting | 1,005 | 596 | 1,601 |
| Small game hunting | 582 | 23 | 605 |
| Fishing | 9,995 | 471 | 10,466 |
| **Total** | **11,582** | **1,090** | **12,672** |

Source:    BBC Research & Consulting, based on fishing and hunting activity data provided by CDOW.

## Statewide Economic Impacts of Hunting and Fishing by Residents and Non-Residents

Resident and non-resident hunters and anglers provide an important boost for local economies and bring money into the Colorado economy that may well be spent in another state if not for Colorado's unique outdoor experience. Residents contributed approximately $832 million, or 82 percent of the statewide trip and equipment expenditures (excluding direct CDOW expenditures). Non-residents contributed $186 million, or 18 percent, of these direct expenditures.

**Daily expenditures.** Non-residents typically spent more money per day than residents. For example, non-resident big game hunters spent an estimated $216 per day in 2007, while resident big game hunters spent about $106. Exhibit III-3 shows additional information about average per day expenditures.

**Exhibit III-3.**
**Average Expenditures per Hunter and Angler per Day, 2007**

| Activity | Resident $ per day | Non-resident $ per day |
|---|---|---|
| Big game hunting | $106 | $216 |
| Small game hunting | $94 | $87 |
| Fishing | $67 | $118 |

Note:    Measured in 2007 dollars.
Source:    BBC Research & Consulting, based on 2006 USFWS national survey.

**Expenditure type.** Exhibits III-4 and III-5, on the next page, show how hunters and anglers spent their trip and equipment expenditures in Colorado. For both residents and non-residents, the primary trip expenditures – food, lodging and transportation – represented a sizable portion of total direct expenditures. These trip expenditures made up approximately 40 percent of the total for residents and 62 percent of the total for non-residents. Guide and membership fees were a much larger share of non-resident than resident expenditures, while equipment expenditures (for sporting goods purchased in Colorado) were a much greater share of resident expenditures.

BLM_0106812



**Exhibit III-4.**
**Direct Expenditures by Expenditure Type for Residents**

Source:
BBC Research & Consulting, based on 2006 USFWS national survey.

Other (8%)
Food and lodging (21%)
Boating (16%)
Guide and membership fees (2%)
Transportation (19%)
Sporting goods (34%)

**Exhibit III-5.**
**Direct Expenditures by Expenditure Type for Non-residents**

Source:
BBC Research & Consulting, based on 2006 USFWS national survey.

Sporting goods (3%)
Other (4%)
Transportation (27%)
Food and lodging (35%)
Guide and membership fees (31%)

**Expenditures by activity.** Exhibit III-6 shows additional detail for expenditures by place of residence and hunting or fishing activity. Non-residents were responsible for more than one-half of all direct expenditures relating to deer and elk hunting. Residents contributed more than 90 percent of fishing-related direct expenditures.

**Exhibit III-6.**
**Hunting and Fishing Trip and Equipment Expenditures by Residents and Non-Residents, 2007**

| Activity | Resident ($ in thousands) | Non-resident ($ in thousands) | Total direct expenditures ($ in thousands) |
|---|---|---|---|
| **Hunting** | | | |
| Deer | $29,600 | $28,700 | $58,300 |
| Elk | 73,200 | 99,500 | 172,700 |
| Other big game | 4,100 | 600 | 4,700 |
| Small game | 54,900 | 2,000 | 56,900 |
| **Subtotal** | **$161,800** | **$130,800** | **$292,600** |
| **Fishing** | 669,700 | 55,500 | 725,200 |
| **Total** | **$831,500** | **$186,300** | **$1,017,800** |

Note:     Measured in 2007 dollars.
Source:   BBC Research & Consulting, based on CDOW hunting and fishing activity data and 2006 USFWS national survey.

BLM_0106813

## Statewide Economic Impacts of Wildlife Watching Activities

Estimates for wildlife watching activities in Colorado use a slightly different methodology to the hunting and fishing estimates. Hunting and fishing figures are based on a combination of estimates of per-day expenditures from the 2006 USFWS national survey and CDOW estimates of activity days for 2007. For wildlife watching, all estimates are based on the wildlife watching sample of the 2006 USFWS national survey as CDOW does not collect activity day data for wildlife watching. All estimates provided here are for wildlife watching activities that take place at least one mile from home.

**Total economic impacts**. Trip and equipment expenditures that are primarily for wildlife watching activities more than one mile from home are estimated at $703 million for calendar year 2006 (the most recent year available). The secondary economic impact of these expenditures is estimated at $515 million, yielding a total estimated impact of $1.22 billion. Direct and secondary expenditures at this level are estimated to support approximately 12,800 jobs in Colorado.

Wildlife watching by Colorado residents made up about $498 million, or 41 percent of the total economic impact of wildlife watching in 2006. Non-residents watching wildlife in Colorado contributed an estimated $720 million to the Colorado economy. Exhibit III-7 shows the total economic impacts of wildlife watching in Colorado.

**Exhibit III-7.**
**Economic Impact of**
**Wildlife Watching in**
**Colorado, 2006**

Note:   Measured in 2007 dollars.
1. Trip and equipment expenditures in support of wildlife watching.
2. Direct expenditures plus secondary spending by businesses and households (multiplier effects).
3. Includes job creation from direct and secondary expenditures.

Source:  BBC Research & Consulting, based on 2006 USFWS national survey.

| | Direct expenditures[1] ($ in thousands) | Total impact[2] ($ in thousands) | Total[3] jobs |
|---|---|---|---|
| Non-resident | $417,400 | $720,300 | 7,220 |
| Resident | 285,800 | 497,900 | 5,560 |
| **Total** | **$703,200** | **$1,218,200** | **12,780** |

**Expenditures per day**. Although residents were responsible for approximately three-quarters of all wildlife watching activity days, non-residents spent considerably more per day, on average, than residents. Estimates of total activity days and daily expenditures for residents and non-residents are shown in Exhibit III-8.

**Exhibit III-8.**
**Activity Days and Daily**
**Direct Expenditures for**
**Wildlife Watching, 2006**

Note:   Per day expenditures measured in 2007 dollars.
Source:  BBC Research & Consulting, based on 2006 USFWS national survey.

| | Activity days (thousands) | Per day expenditure |
|---|---|---|
| Non-resident | 2,394 | $174 |
| Resident | 7,010 | $41 |
| **Total** | **9,404** | **N/A** |

BLM_0106814

**People who watch wildlife and hunt or fish.** Many people who watch wildlife in Colorado also hunt or fish in the state. Based on the wildlife watching sample of the 2006 USFWS survey, 12 percent of the individuals who watched wildlife in Colorado in 2006 also hunted or fished in the state in that year. Among Colorado residents, the figure was 20 percent; among non-residents the figure was 2 percent.

BLM_0106815

# SECTION IV.
# County-Level Results

The hunting and fishing portion of the model also estimates the economic effects of these activities for individual counties. In absolute terms, the largest impacts on business output and employment from hunting and fishing take place in the Colorado counties with the largest populations and economies. This occurs because a large portion of the equipment expenditures occurs where hunters and anglers live. Consequently, urban areas can see large economic contributions from hunting and fishing, even though urban areas have little or no local hunting and fishing activity. Three counties in the Denver Metropolitan Area, as well as El Paso, Larimer and Boulder County, have more than 1,000 jobs supported by hunting and fishing.

In relative terms, hunting and fishing activity has a greater economic impact in some of Colorado's rural counties. Exhibit IV-1 shows the counties that are most dependent on hunting and fishing activity. In Jackson County, hunting and fishing activities directly or indirectly support more than 12 percent of all local jobs.

**Exhibit IV-1.**
**Colorado Counties with Largest Proportion**
**of Employment Related to Hunting and Fishing, 2007**

| County | Jobs from hunting and fishing | Total jobs in county | Percent of total jobs |
|--------|-------------------------------|----------------------|-----------------------|
| Jackson | 144 | 1,192 | 12.1% |
| San Juan | 39 | 580 | 6.7% |
| Mineral | 51 | 813 | 6.3% |
| Rio Blanco | 305 | 5,224 | 5.8% |
| Grand | 566 | 11,186 | 5.1% |
| Gunnison | 615 | 13,402 | 4.6% |
| Lake | 140 | 3,150 | 4.4% |
| Moffat | 325 | 8,036 | 4.1% |
| Hinsdale | 26 | 690 | 3.7% |
| Chaffee | 385 | 10,849 | 3.5% |

Source:   BBC Research & Consulting. Total county employment from U.S. Department of Commerce, Bureau of Economic Analysis estimates for 2006.

Exhibit IV-2 shows direct expenditures (i.e., hunting and fishing trip and equipment expenditures and estimated CDOW expenditures) for each of Colorado's 64 counties. This exhibit also shows the estimated total economic impacts and the number of jobs sustained by these activities.

BLM_0106816

**Exhibit IV-2.**
**Estimated Hunting and Fishing Economic Impacts by County, 2007**

| County | Direct Expenditures[1] ($ in thousands) | Total Impact[2] ($ in thousands) | Jobs[3] |
|---|---|---|---|
| Adams | $37,090 | $64,270 | 681 |
| Alamosa | 11,960 | 20,330 | 215 |
| Arapahoe | 62,860 | 109,390 | 1,344 |
| Archuleta | 11,300 | 19,170 | 206 |
| Baca | 1,070 | 1,610 | 15 |
| Bent | 1,460 | 2,320 | 21 |
| Boulder | 50,460 | 87,900 | 1,099 |
| Broomfield | 5,870 | 10,050 | 127 |
| Chaffee | 20,840 | 35,620 | 385 |
| Cheyenne | 590 | 800 | 7 |
| Clear Creek | 3,400 | 5,620 | 63 |
| Conejos | 2,590 | 4,290 | 46 |
| Costilla | 860 | 1,270 | 9 |
| Crowley | 500 | 640 | 5 |
| Custer | 3,160 | 5,220 | 53 |
| Delta | 16,310 | 27,840 | 297 |
| Denver | 77,670 | 131,570 | 1,176 |
| Dolores | 1,640 | 2,570 | 26 |
| Douglas | 34,370 | 59,940 | 668 |
| Eagle | 38,860 | 67,640 | 908 |
| El Paso | 57,470 | 99,190 | 1,120 |
| Elbert | 9,500 | 16,670 | 197 |
| Fremont | 9,650 | 16,350 | 169 |
| Garfield | 31,700 | 54,420 | 579 |
| Gilpin | 470 | 610 | 6 |
| Grand | 28,680 | 49,270 | 566 |
| Gunnison | 31,180 | 53,140 | 615 |
| Hinsdale | 1,820 | 3,000 | 26 |
| Huerfano | 4,220 | 7,010 | 71 |
| Jackson | 9,710 | 14,020 | 144 |
| Jefferson | 67,110 | 116,340 | 1,420 |
| Kiowa | 690 | 960 | 8 |
| Kit Carson | 2,470 | 3,980 | 35 |
| La Plata | 25,170 | 43,340 | 477 |
| Lake | 6,730 | 11,480 | 140 |

Note:   Measured in 2007 dollars.
        1. Trip and equipment expenditures and CDOW expenditures in support of these activities.
        2. Direct expenditures plus secondary spending by businesses and households (multiplier effects).
        3. Includes job creation from direct and secondary expenditures.

Source:  BBC Research & Consulting, based on hunting and fishing activity data from CDOW and 2006 USFWS national survey.

BLM_0106817

**Exhibit IV-2 (Continued).**
**Estimated Hunting and Fishing Economic Impacts by County, 2007**

| County | Direct Expenditures[1] ($ in thousands) | Total Impact[2] ($ in thousands) | Jobs[3] |
|---|---|---|---|
| Larimer | $89,070 | $154,830 | 1,739 |
| Las Animas | 6,800 | 11,470 | 118 |
| Lincoln | 1,940 | 3,090 | 26 |
| Logan | 7,470 | 12,620 | 134 |
| Mesa | 43,980 | 76,100 | 813 |
| Mineral | 2,660 | 4,430 | 51 |
| Moffat | 18,450 | 31,170 | 325 |
| Montezuma | 12,230 | 20,790 | 221 |
| Montrose | 17,150 | 29,180 | 320 |
| Morgan | 3,940 | 6,540 | 52 |
| Otero | 3,090 | 5,020 | 54 |
| Ouray | 2,110 | 3,440 | 37 |
| Park | 10,450 | 17,790 | 207 |
| Phillips | 990 | 1,500 | 11 |
| Pitkin | 14,250 | 24,850 | 327 |
| Prowers | 3,350 | 5,500 | 53 |
| Pueblo | 38,270 | 65,990 | 697 |
| Rio Blanco | 17,890 | 30,040 | 305 |
| Rio Grande | 7,880 | 13,350 | 136 |
| Routt | 27,980 | 45,630 | 528 |
| Saguache | 2,280 | 3,350 | 23 |
| San Juan | 2,390 | 3,970 | 39 |
| San Miguel | 10,090 | 17,380 | 227 |
| Sedgwick | 1,190 | 1,850 | 14 |
| Summit | 29,710 | 51,800 | 708 |
| Teller | 5,330 | 8,960 | 107 |
| Washington | 1,050 | 1,600 | 11 |
| Weld | 22,480 | 39,210 | 372 |
| Yuma | 2,410 | 4,020 | 34 |
| **Total** | **$1,076,310** | **$1,843,310** | **20,614** |

Note:   Measured in 2007 dollars. Values may not sum due to rounding.
        1. Trip and equipment expenditures and CDOW expenditures in support of these activities.
        2. Direct expenditures plus secondary spending by businesses and households (multiplier effects).
        3. Includes job creation from direct and secondary expenditures.

Source:   BBC Research & Consulting, based on hunting and fishing activity data from CDOW and 2006 USFWS national survey.

BLM_0106818

Exhibit IV-3 provides additional detail regarding the county-level economic impacts of hunting and fishing. In this exhibit, total economic impacts are shown in five categories: resident and non-resident hunting impacts, resident and non-resident fishing impacts, and impacts from expenditures by CDOW.

**Exhibit IV-3.**
**Economic Impacts by County, Activity and Residence, 2007**

| County | Hunting ($ in thousands) | | Fishing ($ in thousands) | | CDOW[1] | Total Impact |
|---|---|---|---|---|---|---|
| | Resident | Non-Resident | Resident | Non-Resident | ($ in thousands) | ($ in thousands) |
| Adams | $6,540 | $2,220 | $53,630 | $1,660 | $220 | $64,270 |
| Alamosa | 2,490 | 4,490 | 7,250 | 5,320 | 790 | 20,330 |
| Arapahoe | 19,950 | 4,750 | 79,260 | 5,210 | 210 | 109,390 |
| Archuleta | 2,670 | 9,040 | 4,720 | 1,840 | 890 | 19,170 |
| Baca | 370 | 240 | 790 | 40 | 160 | 1,610 |
| Bent | 270 | 110 | 1,540 | 20 | 380 | 2,320 |
| Boulder | 16,280 | 2,410 | 66,610 | 2,460 | 140 | 87,900 |
| Broomfield | 2,000 | 280 | 7,420 | 260 | 90 | 10,050 |
| Chaffee | 3,970 | 2,910 | 25,600 | 2,240 | 900 | 35,620 |
| Cheyenne | 290 | 160 | 170 | 10 | 170 | 800 |
| Clear Creek | 880 | 410 | 4,100 | 150 | 80 | 5,620 |
| Conejos | 480 | 120 | 1,760 | 1,480 | 460 | 4,290 |
| Costilla | 180 | 220 | 410 | 20 | 440 | 1,270 |
| Crowley | 160 | 40 | 270 | 10 | 160 | 640 |
| Custer | 600 | 630 | 3,180 | 390 | 410 | 5,220 |
| Delta | 3,360 | 7,990 | 14,980 | 1,220 | 300 | 27,840 |
| Denver | 13,450 | 7,860 | 76,740 | 9,370 | 24,150 | 131,570 |
| Dolores | 300 | 1,560 | 490 | 130 | 90 | 2,570 |
| Douglas | 6,690 | 1,400 | 48,430 | 3,300 | 120 | 59,940 |
| Eagle | 18,840 | 9,820 | 35,670 | 3,150 | 160 | 67,640 |
| El Paso | 14,840 | 4,420 | 72,820 | 4,830 | 2,270 | 99,190 |
| Elbert | 2,600 | 1,060 | 11,500 | 760 | 750 | 16,670 |
| Fremont | 1,850 | 940 | 12,370 | 320 | 880 | 16,350 |
| Garfield | 8,430 | 16,390 | 24,670 | 1,230 | 3,700 | 54,420 |
| Gilpin | 330 | 110 | 80 | 0 | 70 | 610 |
| Grand | 7,220 | 6,690 | 32,490 | 1,680 | 1,190 | 49,270 |
| Gunnison | 7,230 | 12,270 | 25,550 | 7,200 | 890 | 53,140 |
| Hinsdale | 280 | 210 | 1,070 | 660 | 780 | 3,000 |
| Huerfano | 860 | 1,220 | 4,050 | 350 | 530 | 7,010 |
| Jackson | 1,660 | 4,350 | 6,690 | 600 | 730 | 14,020 |
| Jefferson | 18,950 | 3,670 | 89,200 | 4,250 | 260 | 116,340 |
| Kiowa | 200 | 110 | 460 | 30 | 160 | 960 |
| Kit Carson | 720 | 300 | 2,180 | 70 | 710 | 3,980 |
| La Plata | 5,780 | 9,510 | 19,010 | 6,050 | 2,980 | 43,340 |
| Lake | 1,970 | 940 | 7,770 | 720 | 80 | 11,480 |

Note:   Measured in 2007 dollars.

Total economic impacts include direct expenditures plus secondary spending by business and households (multiplier effects).

1. Total impacts from CDOW in support of hunting and fishing.

Source:   BBC Research & Consulting, based on hunting and fishing activity data from CDOW and 2006 USFWS national survey.

BLM_0106819

**Exhibit IV-3 (continued).**
**Economic Impacts by County, Activity and Residence, 2007**

| County | Hunting ($ in thousands) | | Fishing ($ in thousands) | | CDOW[1] | Total Impact |
|---|---|---|---|---|---|---|
| | Resident | Non-Resident | Resident | Non-Resident | ($ in thousands) | ($ in thousands) |
| Larimer | $20,580 | $5,900 | $117,430 | $4,090 | $6,820 | $154,830 |
| Las Animas | 930 | 1,340 | 8,020 | 670 | 510 | 11,470 |
| Lincoln | 570 | 230 | 1,490 | 60 | 750 | 3,090 |
| Logan | 1,820 | 310 | 9,890 | 80 | 520 | 12,620 |
| Mesa | 9,790 | 10,410 | 51,060 | 2,110 | 2,720 | 76,100 |
| Mineral | 760 | 600 | 1,710 | 1,020 | 340 | 4,430 |
| Moffat | 6,190 | 16,650 | 6,570 | 490 | 1,280 | 31,170 |
| Montezuma | 2,380 | 5,860 | 9,100 | 2,570 | 890 | 20,790 |
| Montrose | 3,680 | 7,830 | 14,390 | 2,500 | 790 | 29,180 |
| Morgan | 1,290 | 360 | 3,010 | 170 | 1,710 | 6,540 |
| Otero | 1,020 | 380 | 3,290 | 160 | 170 | 5,020 |
| Ouray | 410 | 690 | 1,930 | 180 | 240 | 3,440 |
| Park | 2,310 | 1,150 | 13,710 | 520 | 90 | 17,790 |
| Phillips | 290 | 110 | 560 | 30 | 510 | 1,500 |
| Pitkin | 6,350 | 2,040 | 13,640 | 2,150 | 670 | 24,850 |
| Prowers | 1,010 | 290 | 3,330 | 160 | 710 | 5,500 |
| Pueblo | 5,400 | 1,670 | 55,860 | 1,770 | 1,280 | 65,990 |
| Rio Blanco | 4,870 | 20,970 | 2,670 | 350 | 1,180 | 30,040 |
| Rio Grande | 1,360 | 1,680 | 5,050 | 3,750 | 1,510 | 13,350 |
| Routt | 8,380 | 14,190 | 19,560 | 2,710 | 780 | 45,630 |
| Saguache | 630 | 880 | 640 | 50 | 1,150 | 3,350 |
| San Juan | 570 | 800 | 1,690 | 140 | 780 | 3,970 |
| San Miguel | 4,410 | 4,280 | 7,710 | 730 | 250 | 17,380 |
| Sedgwick | 420 | 100 | 800 | 20 | 510 | 1,850 |
| Summit | 12,730 | 1,480 | 34,830 | 2,050 | 720 | 51,800 |
| Teller | 1,780 | 530 | 6,420 | 130 | 90 | 8,960 |
| Washington | 240 | 90 | 730 | 30 | 510 | 1,600 |
| Weld | 7,130 | 1,460 | 23,080 | 860 | 6,680 | 39,210 |
| Yuma | 1,010 | 240 | 1,640 | 70 | 1,050 | 4,020 |
| **Total** | **$281,000** | **$221,370** | **$1,162,740** | **$96,650** | **$81,510** | **$1,843,310** |

Note:   Measured in 2007 dollars.

Total economic impacts include direct expenditures plus secondary spending by business and households (multiplier effects).

1. Total impacts from CDOW support of hunting and fishing.

Source:   BBC Research & Consulting, based on hunting and fishing activity data from CDOW and 2006 USFWS national survey.

BLM_0106820

# SECTION V.
# Comparison with Previous Impact Estimates

When updating an economic impact model, it is informative to compare the results of the new model and most recent information with prior economic impact estimates. CDOW updated the original model estimates in 1997 using 1996 data and BBC updated the model in 2004 using 2002 data. As there were substantial methodological changes made to the model after 1997, comparisons are only made here between the 2002 and 2007 estimates.

**Comparison with 2002 results.** Exhibit V-1 compares the direct expenditures and total economic impact for the 2007 hunting and fishing season with estimates for the 2002 hunting and fishing seasons. After adjusting for inflation, both the total direct expenditure on hunting and fishing and the total economic impact of these activities in Colorado increased from 2002 to 2007.

**Exhibit V-1.**
**Comparison of Hunting and Fishing Expenditures and Impacts, 2002 and 2007**

|  | Direct Expenditures[1] ($ in thousands) | | Total Impact[2] ($ in thousands) | |
|---|---|---|---|---|
|  | 2002 | 2007 | 2002 | 2007 |
| Big game hunting | $276,300 | $235,700 | $491,500 | $403,700 |
| Small game hunting | 93,000 | 56,900 | 168,000 | 98,700 |
| Fishing | 501,000 | 725,200 | 896,000 | 1,259,400 |
| CDOW expenditures | 53,400 | 58,600 | 99,700 | 81,500 |
| **Total** | **$923,700** | **$1,076,300** | **$1,655,200** | **$1,843,300** |

Note:    Measured in 2007 dollars.
1. Trip and equipment expenditures and CDOW expenditures in support of these activities.
2. Direct expenditures plus secondary spending by businesses and households (multiplier effects).

Source:    BBC Research & Consulting, based on CDOW data and USFWS national surveys.

The year of the last update, 2002, was recognized to be a poor year for hunting and fishing in Colorado due to a number of factors, such as drought and wildfires. The increased economic impact of hunting and fishing in 2007 can partly be explained by an increase in total activity days, particularly for fishing. There were a total of 10.5 million fishing activity days in 2007, compared to 8.05 million in 2002. Big game activity days also increased between these two periods, although small game activity days declined. Exhibit V-2 compares the total activity days for 2002 and 2007.

BLM_0106821

**Exhibit V-2.**
**Hunting and Fishing**
**Activity Days, 2002 and**
**2007**

Source: BBC Research & Consulting, based on
CDOW data.

|  | Total activity days (in thousands) | |
|---|---|---|
|  | 2002 | 2007 |
| Big game hunting | 1,421 | 1,607 |
| Small game hunting | 672 | 605 |
| Fishing | 8,054 | 10,466 |
| **Total** | 10,147 | 12,672 |

Despite the overall increase in activity days, the total number of non-resident activity days has declined between 2002 and 2007. As non-residents tend to spend more per day than residents, this has resulted in the increase in direct expenditures and total impacts being small relative to the increase in total activity days. Between 2002 and 2007, hunting and fishing direct expenditures increased by approximately 17 percent, while total activity days increased by approximately 25 percent.

Exhibit V-3 compares the per-day expenditures for hunting and fishing in 2002 and 2007. Although the figures for Colorado residents are broadly similar for both years, average hunting expenditures per day have declined for non-residents while average per-day fishing expenditures for non-residents have increased. Note that methodological differences between the two study periods may account for some of the differences in expenditures and that sample sizes in the 2006 USFWS national survey for some non-resident activities were small.

**Exhibit V-3.**
**Per-day Expenditures, 2002 and 2007**

|  | Resident $ per day | | Non-resident $ per day | |
|---|---|---|---|---|
|  | 2002 | 2007 | 2002 | 2007 |
| Big game hunting | $112 | $106 | $351 | $216 |
| Small game hunting | $124 | $94 | $201 | $87 |
| Fishing | $60 | $67 | $68 | $118 |

Note:    Measured in 2007 dollars.
Source:    BBC Research & Consulting from 2001 and 2006 USFWS national surveys.

The estimated total number of jobs supported by hunting and fishing is roughly the same in 2007 as in 2002. At the county level, the individual counties with the highest percentage of jobs supported by hunting and fishing are largely the same. Of the ten counties with the highest percentage of jobs supported by hunting and fishing in 2002, nine are also in the top ten in 2007.

**Wildlife watching.** Exhibit V-4 on the next page compares the economic impact of wildlife watching in 2001 and 2006. After adjusting for inflation, both direct expenditures and the total impact of wildlife watching were greater in 2006 than in 2001. In both years, non-residents spent more money and had a greater economic impact than residents. Wildlife watching supported a similar number of jobs in 2006 and 2001.

BLM_0106822

**Exhibit V-4.**
**Comparison of Wildlife Watching Expenditures and Impacts, 2001 and 2006**

| | Direct Expenditures ($ in thousands) | | Total Impact[1] ($ in thousands) | |
|---|---|---|---|---|
| | 2001 | 2006 | 2001 | 2006 |
| Resident | $184,700 | $285,800 | $336,800 | $497,900 |
| Non-resident | 390,700 | 417,400 | 690,800 | 720,300 |
| Total | $575,400 | $703,200 | $1,027,600 | $1,218,200 |

Note:   Measured in 2007 dollars.
         1. Direct expenditures plus secondary spending by businesses and households (multiplier effects).
Source:   BBC Research & Consulting from 2001 and 2006 USFWS national surveys.

**Comparability of models.** Slight methodological differences between model years may also contribute to changes in estimates of economic impacts. In addition, BBC model results are primarily based on estimates derived from surveys, including the national U.S. Fish and Wildlife Service survey. Due to this being a nationwide survey, samples sizes specific to Colorado in some categories were small, requiring BBC to use alternative methods for estimating expenditures.

For these reasons, caution should be used when making comparisons between years, particularly for individual categories (such as small game hunting and non-resident activities) where the total number of activity days is small.

BLM_0106823

# Colorado Division of Reclamtion, Mining and Safety
## Monthly Coal Detail Report
Period    1/2008    through    12/2008

| # | Mine Name | Operator | County | Twn | Rng | Mine Type | Mine Status | # Miners | Days Worked | Production (tons) | Injuries | Fatalities | Monthly Record |
|---|-----------|----------|--------|-----|-----|-----------|-------------|----------|-------------|-------------------|----------|------------|----------------|
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergroun | Producing | 274 | 31 | 262,201 | 0 | 0 | 1/2008 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergroun | Producing | 266 | 29 | 411,843 | 1 | 0 | 2/2008 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergroun | Producing | 266 | 31 | 48,408 | 0 | 0 | 3/2008 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergroun | Producing | 262 | 30 | 104,506 | 1 | 0 | 4/2008 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergroun | Producing | 266 | 31 | 80,703 | 1 | 0 | 5/2008 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergroun | Producing | 260 | 30 | 61,373 | 0 | 0 | 6/2008 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergroun | Producing | 259 | 31 | 99,131 | 1 | 0 | 7/2008 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergroun | Producing | 251 | 31 | 436,155 | 0 | 0 | 8/2008 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergroun | Producing | 259 | 30 | 450,368 | 1 | 0 | 9/2008 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergroun | Producing | 264 | 31 | 479,323 | 1 | 0 | 10/2008 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergroun | Producing | 263 | 30 | 271,897 | 2 | 0 | 11/2008 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergroun | Producing | 263 | 31 | 156,030 | 2 | 0 | 12/2008 |
| | | | | | | **MINE TOTALS :** | | | 366 | 2,861,938 | 10 | 0 | |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface | Producing | 264 | 30 | 359,626 | 1 | 0 | 1/2008 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface | Producing | 264 | 29 | 330,582 | 1 | 0 | 2/2008 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface | Producing | 263 | 31 | 418,488 | 1 | 0 | 3/2008 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface | Producing | 264 | 30 | 417,696 | 0 | 0 | 4/2008 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface | Producing | 263 | 31 | 373,209 | 0 | 0 | 5/2008 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface | Producing | 260 | 30 | 384,272 | 0 | 0 | 6/2008 |

Date of Report:   Monday, February 09, 2009

BLM_0106824

| # | Mine Name | Operator | County | Twn | Rng | Mine Type | Mine Status | # Miners | Days Worked | Production (tons) | Injuries | Fatalities | Monthly Record |
|---|-----------|----------|--------|-----|-----|-----------|-------------|----------|-------------|-------------------|----------|------------|----------------|
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface | Producing | 254 | 31 | 438,872 | 0 | 0 | 7/2008 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface | Producing | 253 | 31 | 451,079 | 0 | 0 | 8/2008 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface | Producing | 265 | 30 | 388,822 | 0 | 0 | 9/2008 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface | Producing | 270 | 31 | 444,159 | 0 | 0 | 10/2008 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface | Producing | 270 | 30 | 527,088 | 0 | 0 | 11/2008 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface | Producing | 286 | 31 | 380,470 | 0 | 0 | 12/2008 |
| | | | | | | | **MINE TOTALS :** | | 365 | 4,914,363 | 3 | 0 | |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergroun | Producing | 135 | 9 | 39,760 | 1 | 0 | 1/2008 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergroun | Producing | 139 | 21 | 153,999 | 1 | 0 | 2/2008 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergroun | Producing | 145 | 23 | 184,478 | 1 | 0 | 3/2008 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergroun | Producing | 152 | 19 | 195,343 | 2 | 0 | 4/2008 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergroun | Producing | 163 | 23 | 301,520 | 0 | 0 | 5/2008 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergroun | Producing | 157 | 24 | 351,071 | 1 | 0 | 6/2008 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergroun | Producing | 162 | 25 | 336,123 | 3 | 0 | 7/2008 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergroun | Producing | 151 | 23 | 119,345 | 2 | 0 | 8/2008 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergroun | Producing | 153 | 24 | 12,778 | 2 | 0 | 9/2008 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergroun | Producing | 152 | 23 | 968 | 2 | 0 | 10/2008 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergroun | Producing | 155 | 18 | 176,479 | 0 | 0 | 11/2008 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergroun | Producing | 151 | 17 | 195,145 | 0 | 0 | 12/2008 |
| | | | | | | | **MINE TOTALS :** | | 249 | 2,067,009 | 15 | 0 | |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergroun | Producing | 304 | 30 | 616,372 | 0 | 0 | 1/2008 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergroun | Producing | 304 | 29 | 505,997 | 0 | 0 | 2/2008 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergroun | Producing | 309 | 30 | 357,195 | 3 | 0 | 3/2008 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergroun | Producing | 311 | 30 | 492,310 | 4 | 0 | 4/2008 |

BLM_0106825

| # | Mine Name | Operator | County | Twn | Rng | Mine Type | Mine Status | # Miners | Days Worked | Production (tons) | Injuries | Fatalities | Monthly Record |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergroun | Producing | 316 | 30 | 425,689 | 1 | 0 | 5/2008 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergroun | Producing | 310 | 30 | 136,409 | 0 | 0 | 6/2008 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergroun | Producing | 311 | 30 | 463,421 | 1 | 0 | 7/2008 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergroun | Producing | 314 | 31 | 740,122 | 5 | 0 | 8/2008 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergroun | Producing | 313 | 29 | 455,861 | 1 | 0 | 9/2008 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergroun | Producing | 313 | 31 | 367,658 | 1 | 0 | 10/2008 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergroun | Producing | 310 | 28 | 360,646 | 1 | 0 | 11/2008 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergroun | Producing | 308 | 28 | 305,537 | 2 | 0 | 12/2008 |
| | | | | | | **MINE TOTALS :** | | | 356 | 5,227,217 | 19 | 0 | |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergroun | Producing | 460 | 31 | 780,391 | 1 | 0 | 1/2008 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergroun | Producing | 462 | 29 | 430,913 | 2 | 0 | 2/2008 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergroun | Producing | 466 | 30 | 726,551 | 2 | 0 | 3/2008 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergroun | Producing | 464 | 30 | 838,472 | 3 | 0 | 4/2008 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergroun | Producing | 465 | 31 | 349,032 | 1 | 0 | 5/2008 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergroun | Producing | 482 | 30 | 1,001,297 | 0 | 0 | 6/2008 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergroun | Producing | 482 | 31 | 805,118 | 2 | 0 | 7/2008 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergroun | Producing | 470 | 31 | 407,703 | 5 | 0 | 8/2008 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergroun | Producing | 468 | 30 | 603,748 | 2 | 0 | 9/2008 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergroun | Producing | 485 | 31 | 935,798 | 0 | 0 | 10/2008 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergroun | Producing | 498 | 30 | 699,586 | 0 | 0 | 11/2008 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergroun | Producing | 515 | 30 | 425,567 | 0 | 0 | 12/2008 |
| | | | | | | **MINE TOTALS :** | | | 364 | 8,004,176 | 18 | 0 | |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergroun | Producing | 74 | 29 | 41,952 | 0 | 0 | 1/2008 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergroun | Producing | 72 | 29 | 18,426 | 0 | 0 | 2/2008 |

Date of Report:   Monday, February 09, 2009

Page 3 of 7

BLM_0106826

| # | Mine Name | Operator | County | Twn | Rng | Mine Type | Mine Status | # Miners | Days Worked | Production (tons) | Injuries | Fatalities | Monthly Record |
|---|-----------|----------|--------|-----|-----|-----------|-------------|----------|-------------|-------------------|----------|------------|----------------|
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergroun | Producing | 61 | 25 | 26,313 | 0 | 0 | 3/2008 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergroun | Producing | 55 | 24 | 21,860 | 0 | 0 | 4/2008 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergroun | Producing | 59 | 21 | 19,180 | 0 | 0 | 5/2008 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergroun | Producing | 59 | 21 | 17,751 | 0 | 0 | 6/2008 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergroun | Producing | 52 | 22 | 12,833 | 0 | 0 | 7/2008 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergroun | Producing | 53 | 21 | 9,164 | 1 | 0 | 8/2008 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergroun | Producing | 52 | 21 | 12,105 | 1 | 0 | 9/2008 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergroun | Producing | 55 | 22 | 18,828 | 0 | 0 | 10/2008 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergroun | Producing | 47 | 18 | 15,026 | 2 | 0 | 11/2008 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergroun | Producing | 46 | 20 | 23,244 | 0 | 0 | 12/2008 |
| | | | | | | | **MINE TOTALS :** | | 273 | 236,683 | 4 | 0 | |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergroun | Producing | 8 | 18 | 4,115 | 0 | 0 | 1/2008 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergroun | Producing | 10 | 21 | 5,693 | 0 | 0 | 2/2008 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergroun | Producing | 15 | 20 | 1,637 | 0 | 0 | 3/2008 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergroun | Producing | 26 | 22 | 19,835 | 0 | 0 | 4/2008 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergroun | Producing | 27 | 22 | 18,198 | 0 | 0 | 5/2008 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergroun | Producing | 28 | 21 | 11,135 | 1 | 0 | 6/2008 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergroun | Producing | 44 | 22 | 14,027 | 0 | 0 | 7/2008 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergroun | Producing | 40 | 22 | 21,792 | 0 | 0 | 8/2008 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergroun | Producing | 42 | 21 | 16,479 | 0 | 0 | 9/2008 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergroun | Producing | 39 | 22 | 15,584 | 2 | 0 | 10/2008 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergroun | Producing | 45 | 18 | 10,871 | 0 | 0 | 11/2008 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergroun | Producing | 44 | 20 | 16,300 | 1 | 0 | 12/2008 |
| | | | | | | | **MINE TOTALS :** | | 249 | 155,666 | 4 | 0 | |

Date of Report:    Monday, February 09, 2009

BLM_0106827

| # | Mine Name | Operator | County | Twn | Rng | Mine Type | Mine Status | # Miners | Days Worked | Production (tons) | Injuries | Fatalities | Monthly Record |
|---|-----------|----------|--------|-----|-----|-----------|-------------|----------|-------------|-------------------|----------|------------|----------------|
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergroun | Producing | 22 | 23 | 19,130 | 0 | 0 | 1/2008 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergroun | Producing | 22 | 19 | 23,390 | 0 | 0 | 2/2008 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergroun | Producing | 23 | 19 | 26,890 | 0 | 0 | 3/2008 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergroun | Producing | 23 | 17 | 24,870 | 0 | 0 | 4/2008 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergroun | Producing | 23 | 22 | 23,390 | 0 | 0 | 5/2008 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergroun | Producing | 25 | 22 | 24,170 | 0 | 0 | 6/2008 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergroun | Producing | 25 | 19 | 20,160 | 0 | 0 | 7/2008 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergroun | Producing | 21 | 22 | 22,260 | 0 | 0 | 8/2008 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergroun | Producing | 22 | 18 | 23,580 | 1 | 0 | 9/2008 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergroun | Producing | 23 | 19 | 26,880 | 0 | 0 | 10/2008 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergroun | Producing | 23 | 17 | 24,310 | 0 | 0 | 11/2008 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergroun | Producing | 23 | 16 | 24,060 | 0 | 0 | 12/2008 |
| | | | | | | | **MINE TOTALS :** | | 233 | 283,090 | 1 | 0 | |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 22 | 34,207 | 0 | 0 | 1/2008 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 22 | 39,277 | 0 | 0 | 2/2008 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 21 | 34,593 | 0 | 0 | 3/2008 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 21 | 37,184 | 0 | 0 | 4/2008 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 23 | 32,447 | 0 | 0 | 5/2008 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 21 | 31,687 | 0 | 0 | 6/2008 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 22 | 27,029 | 0 | 0 | 7/2008 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 23 | 36,426 | 0 | 0 | 8/2008 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 12 | 20,636 | 0 | 0 | 9/2008 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 23 | 40,469 | 0 | 0 | 10/2008 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 21 | 31,754 | 0 | 0 | 11/2008 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 22 | 37,521 | 0 | 0 | 12/2008 |

Date of Report:    Monday, February 09, 2009

BLM_0106828

| # | Mine Name | Operator | County | Twn | Rng | Mine Type | Mine Status | # Miners | Days Worked | Production (tons) | Injuries | Fatalities | Monthly Record |
|---|-----------|----------|--------|-----|-----|-----------|-------------|----------|-------------|-------------------|----------|------------|----------------|
| | | | | | | **MINE TOTALS :** | | | 253 | 403,230 | 0 | 0 | |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 154 | 30 | 211,481 | 0 | 0 | 1/2008 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 151 | 28 | 225,427 | 0 | 0 | 2/2008 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 150 | 31 | 184,276 | 0 | 0 | 3/2008 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 149 | 30 | 187,120 | 3 | 0 | 4/2008 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 149 | 31 | 177,780 | 0 | 0 | 5/2008 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 146 | 30 | 194,972 | 0 | 0 | 6/2008 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 147 | 30 | 182,446 | 1 | 0 | 7/2008 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 146 | 31 | 190,169 | 0 | 0 | 8/2008 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 152 | 29 | 145,022 | 1 | 0 | 9/2008 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 152 | 31 | 277,254 | 1 | 0 | 10/2008 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 152 | 28 | 160,260 | 1 | 0 | 11/2008 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 152 | 29 | 184,245 | 2 | 0 | 12/2008 |
| | | | | | | **MINE TOTALS :** | | | 358 | 2,320,452 | 9 | 0 | |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergroun | Producing | 362 | 31 | 594,541 | 0 | 0 | 1/2008 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergroun | Producing | 366 | 29 | 293,189 | 2 | 0 | 2/2008 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergroun | Producing | 370 | 31 | 834,809 | 4 | 0 | 3/2008 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergroun | Producing | 369 | 30 | 648,729 | 0 | 0 | 4/2008 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergroun | Producing | 372 | 31 | 702,998 | 0 | 0 | 5/2008 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergroun | Producing | 378 | 30 | 702,959 | 1 | 0 | 6/2008 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergroun | Producing | 387 | 31 | 203,157 | 1 | 0 | 7/2008 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergroun | Producing | 384 | 31 | 285,586 | 2 | 0 | 8/2008 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergroun | Producing | 375 | 30 | 648,220 | 0 | 0 | 9/2008 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergroun | Producing | 377 | 31 | 652,470 | 0 | 0 | 10/2008 |

Date of Report:   Monday, February 09, 2009

BLM_0106829

| # | Mine Name | Operator | County | Twn | Rng | Mine Type | Mine Status | # Miners | Days Worked | Production (tons) | Injuries | Fatalities | Monthly Record |
|---|-----------|----------|--------|-----|-----|-----------|-------------|----------|-------------|-------------------|----------|------------|----------------|
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergroun | Producing | 378 | 30 | 89,246 | 0 | 0 | 11/2008 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergroun | Producing | 382 | 31 | 205,800 | 0 | 0 | 12/2008 |
| | | | | | | | MINE TOTALS : | | 366 | 5,861,704 | 10 | 0 | |
| | | | | | | | GRAND TOTALS : | | 3,432 | 32,335,527 | 93 | 0 | |

Date of Report:    Monday, February 09, 2009

BLM_0106830

# Colorado Division of Reclamtion, Mining and Safety
## Monthly Coal Detail Report
Period     1/2009     through     12/2009

| # | Mine Name | Operator | County | Twn | Rng | Mine Type | Mine Status | # Miners | Days Worked | Production (tons) | Injuries | Fatalities | Monthly Record |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergrou | Producing | 308 | 31 | 30,697 | 1 | 0 | 1/2009 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergrou | Producing | 294 | 28 | 46,726 | 0 | 0 | 2/2009 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergrou | Producing | 287 | 31 | 69,327 | 1 | 0 | 3/2009 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergrou | Producing | 308 | 30 | 35,263 | 1 | 0 | 4/2009 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergrou | Producing | 308 | 31 | 24,597 | 0 | 0 | 5/2009 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergrou | Producing | 299 | 31 | 22,198 | 2 | 0 | 6/2009 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergrou | Producing | 292 | 31 | 131,342 | 1 | 0 | 7/2009 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergrou | Producing | 302 | 31 | 124,265 | 3 | 0 | 8/2009 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergrou | Producing | 293 | 30 | 190,711 | 0 | 0 | 9/2009 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergrou | Producing | 285 | 31 | 132,131 | 0 | 0 | 10/2009 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergrou | Producing | 291 | 30 | 140,393 | 0 | 0 | 11/2009 |
| 387 | Bowie #2 Mine | Bowie Resources, Limited | Delta | 13S | 91W | Undergrou | Producing | 301 | 31 | 265,327 | 1 | 0 | 12/2009 |
| | | | | | | **MINE TOTALS :** | | | 366 | 1,212,977 | 10 | 0 | |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface/UG | Producing | 287 | 31 | 230,762 | 0 | 0 | 1/2009 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface/UG | Producing | 283 | 28 | 227,962 | 0 | 0 | 2/2009 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface/UG | Producing | 288 | 31 | 411,168 | 0 | 0 | 3/2009 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface/UG | Producing | 287 | 30 | 343,279 | 0 | 0 | 4/2009 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface/UG | Producing | 288 | 31 | 118,889 | 0 | 0 | 5/2009 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface/UG | Producing | 285 | 30 | 363,007 | 0 | 0 | 6/2009 |

BLM_0106831

| # | Mine Name | Operator | County | Twn | Rng | Mine Type | Mine Status | # Miners | Days Worked | Production (tons) | Injuries | Fatalities | Monthly Record |
|---|-----------|----------|--------|-----|-----|-----------|-------------|----------|-------------|-------------------|----------|------------|----------------|
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface/UG | Producing | 270 | 30 | 206,968 | 0 | 0 | 7/2009 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface/UG | Producing | 300 | 31 | 315,169 | 0 | 0 | 8/2009 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface/UG | Producing | 299 | 30 | 396,137 | 0 | 0 | 9/2009 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface/UG | Producing | 305 | 31 | 301,950 | 0 | 0 | 10/2009 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface/UG | Producing | 274 | 30 | 373,404 | 0 | 0 | 11/2009 |
| 171 | Colowyo Coal Mine | Colowyo Coal Company, L.P. | Moffat | 3N | 93W | Surface/UG | Producing | 268 | 30 | 201,464 | 0 | 0 | 12/2009 |
| | | | | | | | **MINE TOTALS :** | | 363 | 3,490,159 | 0 | 0 | |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergrou | Producing | 165 | 20 | 177,133 | 0 | 0 | 1/2009 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergrou | Producing | 160 | 20 | 220,567 | 3 | 0 | 2/2009 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergrou | Producing | 168 | 18 | 192,222 | 2 | 0 | 3/2009 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergrou | Producing | 158 | 20 | 254,739 | 2 | 0 | 4/2009 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergrou | Producing | 176 | 25 | 226,062 | 0 | 0 | 5/2009 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergrou | Producing | 176 | 26 | 227,012 | 1 | 0 | 6/2009 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergrou | Producing | 172 | 24 | 166,155 | 0 | 0 | 7/2009 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergrou | Producing | 175 | 27 | 180,423 | 0 | 0 | 8/2009 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergrou | Producing | 175 | 25 | 123,534 | 3 | 0 | 9/2009 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergrou | Producing | 168 | 26 | 136,842 | 0 | 0 | 10/2009 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergrou | Producing | 170 | 21 | 172,379 | 1 | 0 | 11/2009 |
| 187 | Deserado | Blue Mountain Energy | Rio Blanco | 2N | 101 | Undergrou | Producing | 169 | 23 | 137,360 | 0 | 0 | 12/2009 |
| | | | | | | | **MINE TOTALS :** | | 275 | 2,214,428 | 12 | 0 | |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergrou | Producing | 313 | 30 | 290,853 | 3 | 0 | 1/2009 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergrou | Producing | 322 | 28 | 610,481 | 0 | 0 | 2/2009 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergrou | Producing | 323 | 31 | 783,056 | 3 | 0 | 3/2009 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergrou | Producing | 319 | 29 | 633,976 | 2 | 0 | 4/2009 |

Date of Report:   Wednesday, February 24, 2010

BLM_0106832

| # | Mine Name | Operator | County | Twn | Rng | Mine Type | Mine Status | # Miners | Days Worked | Production (tons) | Injuries | Fatalities | Monthly Record |
|---|-----------|----------|--------|-----|-----|-----------|-------------|----------|-------------|-------------------|----------|------------|----------------|
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergrou | Producing | 319 | 30 | 336,488 | 0 | 0 | 5/2009 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergrou | Producing | 324 | 30 | 480,028 | 0 | 0 | 6/2009 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergrou | Producing | 334 | 30 | 529,963 | 3 | 0 | 7/2009 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergrou | Producing | 333 | 31 | 380,685 | 0 | 0 | 8/2009 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergrou | Producing | 338 | 28 | 628,660 | 0 | 0 | 9/2009 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergrou | Producing | 334 | 31 | 67,024 | 3 | 0 | 10/2009 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergrou | Producing | 334 | 28 | 503,405 | 0 | 0 | 11/2009 |
| 1040 | Elk Creek Mine | Oxbow Mining LLC | Gunnison | 13S | 90W | Undergrou | Producing | 333 | 28 | 458,260 | 0 | 0 | 12/2009 |
| | | | | | | | **MINE TOTALS :** | | 354 | 5,702,879 | 14 | 0 | |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergrou | Producing | 539 | 31 | 708,863 | 4 | 0 | 1/2009 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergrou | Producing | 561 | 28 | 751,045 | 2 | 0 | 2/2009 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergrou | Producing | 553 | 31 | 850,960 | 5 | 0 | 3/2009 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergrou | Producing | 561 | 30 | 975,794 | 1 | 0 | 4/2009 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergrou | Producing | 564 | 31 | 603,839 | 7 | 0 | 5/2009 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergrou | Producing | 561 | 30 | 652,148 | 0 | 0 | 6/2009 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergrou | Producing | 546 | 30 | 907,612 | 1 | 0 | 7/2009 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergrou | Producing | 524 | 31 | 786,524 | 3 | 0 | 8/2009 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergrou | Producing | 523 | 30 | 737,081 | 0 | 0 | 9/2009 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergrou | Producing | 516 | 31 | 528,625 | 2 | 0 | 10/2009 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergrou | Producing | 511 | 29 | 213,165 | 2 | 0 | 11/2009 |
| 214 | Foidel Creek Mine | Twenty Mile Coal Company | Routt | 5N | 86W | Undergrou | Producing | 503 | 31 | 111,423 | 2 | 0 | 12/2009 |
| | | | | | | | **MINE TOTALS :** | | 363 | 7,827,079 | 29 | 0 | |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergrou | Producing | 18 | 21 | 2,019 | 0 | 0 | 1/2009 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergrou | Producing | 8 | 20 | 0 | 0 | 0 | 2/2009 |

Date of Report:   Wednesday, February 24, 2010

BLM_0106833

| # | Mine Name | Operator | County | Twn | Rng | Mine Type | Mine Status | # Miners | Days Worked | Production (tons) | Injuries | Fatalities | Monthly Record |
|---|-----------|----------|--------|-----|-----|-----------|-------------|----------|-------------|-------------------|----------|------------|----------------|
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergrou | Producing | 9 | 18 | 0 | 0 | 0 | 3/2009 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergrou | Idle | 6 | 20 | 0 | 0 | 0 | 4/2009 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergrou | Idle | 4 | 19 | 0 | 1 | 0 | 5/2009 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergrou | Idle | 0 | 0 | 0 | 0 | 0 | 6/2009 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergrou | Idle | 0 | 0 | 0 | 0 | 0 | 7/2009 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergrou | Idle | 0 | 0 | 0 | 0 | 0 | 8/2009 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergrou | Idle | 0 | 0 | 0 | 0 | 0 | 9/2009 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergrou | Idle | 0 | 0 | 0 | 0 | 0 | 10/2009 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergrou | Idle | 0 | 0 | 0 | 0 | 0 | 11/2009 |
| 120 | King Coal Mine | National King Coal Inc. | La Plata | 35N | 11W | Undergrou | Idle | 0 | 0 | 0 | 0 | 0 | 12/2009 |
| | | | | | | | **MINE TOTALS :** | | 98 | 2,019 | 1 | 0 | |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergrou | Producing | 71 | 30 | 36,079 | 0 | 0 | 1/2009 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergrou | Producing | 64 | 20 | 46,658 | 0 | 0 | 2/2009 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergrou | Producing | 62 | 18 | 34,903 | 1 | 0 | 3/2009 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergrou | Producing | 68 | 17 | 33,093 | 1 | 0 | 4/2009 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergrou | Producing | 75 | 19 | 41,001 | 0 | 0 | 5/2009 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergrou | Producing | 84 | 26 | 55,890 | 0 | 0 | 6/2009 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergrou | Producing | 87 | 30 | 60,897 | 0 | 0 | 7/2009 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergrou | Producing | 92 | 31 | 58,910 | 2 | 0 | 8/2009 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergrou | Producing | 87 | 30 | 51,119 | 0 | 0 | 9/2009 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergrou | Producing | 76 | 31 | 24,666 | 0 | 0 | 10/2009 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergrou | Producing | 57 | 15 | 25,985 | 0 | 0 | 11/2009 |
| 1046 | King II Mine | National King Coal LLC | La Plata | 35N | 12W | Undergrou | Producing | 56 | 15 | 33,011 | 1 | 0 | 12/2009 |
| | | | | | | | **MINE TOTALS :** | | 282 | 502,212 | 5 | 0 | |

Date of Report:   Wednesday, February 24, 2010

BLM_0106834

| # | Mine Name | Operator | County | Twn | Rng | Mine Type | Mine Status | # Miners | Days Worked | Production (tons) | Injuries | Fatalities | Monthly Record |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergrou | Producing | 23 | 16 | 24,410 | 0 | 0 | 1/2009 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergrou | Producing | 24 | 18 | 27,190 | 0 | 0 | 2/2009 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergrou | Producing | 24 | 18 | 26,330 | 0 | 0 | 3/2009 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergrou | Producing | 24 | 17 | 23,270 | 0 | 0 | 4/2009 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergrou | Producing | 24 | 17 | 18,370 | 0 | 0 | 5/2009 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergrou | Producing | 24 | 20 | 23,980 | 0 | 0 | 6/2009 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergrou | Producing | 24 | 14 | 17,970 | 0 | 0 | 7/2009 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergrou | Producing | 24 | 17 | 22,780 | 0 | 0 | 8/2009 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergrou | Producing | 24 | 20 | 23,380 | 0 | 0 | 9/2009 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergrou | Producing | 24 | 17 | 21,680 | 0 | 0 | 10/2009 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergrou | Producing | 24 | 17 | 13,250 | 0 | 0 | 11/2009 |
| 168 | McClane Canyon | Central Appalacia Mining | Garfield | 7S | 102 | Undergrou | Producing | 24 | 13 | 17,770 | 0 | 0 | 12/2009 |
| | | | | | | | **MINE TOTALS :** | | 204 | 260,380 | 0 | 0 | |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 21 | 38,593 | 0 | 0 | 1/2009 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 21 | 30,844 | 0 | 0 | 2/2009 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 23 | 27,989 | 0 | 0 | 3/2009 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 22 | 29,534 | 0 | 0 | 4/2009 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 20 | 34,549 | 0 | 0 | 5/2009 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 22 | 22 | 37,955 | 1 | 0 | 6/2009 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 21 | 22 | 34,003 | 0 | 0 | 7/2009 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 21 | 21 | 30,627 | 0 | 0 | 8/2009 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 22 | 21 | 13,669 | 0 | 0 | 9/2009 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 22 | 32,793 | 0 | 0 | 10/2009 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 19 | 30,580 | 0 | 0 | 11/2009 |
| 122 | New Horizon Mine | Western Fuels-Colorado, ALLC | Montrose | 46N | 15W | Surface | Producing | 23 | 21 | 32,622 | 0 | 0 | 12/2009 |

Date of Report:   Wednesday, February 24, 2010

BLM_0106835

| # | Mine Name | Operator | County | Twn | Rng | Mine Type | Mine Status | # Miners | Days Worked | Production (tons) | Injuries | Fatalities | Monthly Record |
|---|-----------|----------|--------|-----|-----|-----------|-------------|----------|-------------|-------------------|----------|------------|----------------|
| | | | | | | **MINE TOTALS :** | | | 255 | 373,758 | 1 | 0 | |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 151 | 29 | 212,170 | 0 | 0 | 1/2009 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 151 | 27 | 199,717 | 0 | 0 | 2/2009 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 150 | 31 | 208,900 | 1 | 0 | 3/2009 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 149 | 29 | 210,084 | 1 | 0 | 4/2009 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 153 | 30 | 173,587 | 1 | 0 | 5/2009 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 158 | 30 | 193,751 | 2 | 0 | 6/2009 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 160 | 30 | 171,135 | 2 | 0 | 7/2009 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 154 | 31 | 121,433 | 2 | 0 | 8/2009 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 156 | 29 | 140,729 | 0 | 0 | 9/2009 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 156 | 31 | 126,154 | 1 | 0 | 10/2009 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 157 | 28 | 134,258 | 1 | 0 | 11/2009 |
| 172 | Trapper Strip | Trapper Mining, Inc | Moffat | 6N | 91W | Surface | Producing | 162 | 29 | 219,036 | 2 | 0 | 12/2009 |
| | | | | | | **MINE TOTALS :** | | | 354 | 2,110,954 | 13 | 0 | |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergrou | Producing | 381 | 31 | 313,633 | 0 | 0 | 1/2009 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergrou | Producing | 384 | 28 | 437,277 | 0 | 0 | 2/2009 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergrou | Producing | 384 | 31 | 414,619 | 0 | 0 | 3/2009 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergrou | Producing | 382 | 30 | 456,588 | 0 | 0 | 4/2009 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergrou | Producing | 391 | 31 | 406,690 | 0 | 0 | 5/2009 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergrou | Producing | 364 | 30 | 338,076 | 0 | 0 | 6/2009 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergrou | Producing | 323 | 31 | 271,879 | 0 | 0 | 7/2009 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergrou | Producing | 320 | 31 | 422,511 | 0 | 0 | 8/2009 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergrou | Producing | 320 | 30 | 332,664 | 1 | 0 | 9/2009 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergrou | Producing | 317 | 31 | 646,178 | 0 | 0 | 10/2009 |

Date of Report:   Wednesday, February 24, 2010

BLM_0106836

| # | Mine Name | Operator | County | Twn | Rng | Mine Type | Mine Status | # Miners | Days Worked | Production (tons) | Injuries | Fatalities | Monthly Record |
|---|-----------|----------|--------|-----|-----|-----------|-------------|----------|-------------|-------------------|----------|------------|----------------|
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergrou | Producing | 316 | 29 | 398,450 | 2 | 0 | 11/2009 |
| 197 | West Elk Mine | Mountain Coal Company | Gunnison | 13S | 90W | Undergrou | Producing | 314 | 29 | 447,016 | 0 | 0 | 12/2009 |
| | | | | | | | **MINE TOTALS :** | | 362 | 4,885,581 | 3 | 0 | |
| | | | | | | | **GRAND TOTALS** | | 3,276 | 28,582,426 | 88 | 0 | |

Date of Report:   Wednesday, February 24, 2010

Page 7 of 7

BLM_0106837

August 31, 2009                    **Federal Mineral Lease Distribution - by County / Municipality**                    SOLENE
                                              **FY2009**

| County / Municipality | Total $ |
|---|---|
| Adams County | 140,860.75 |
| Aguilar, Town of | 8,399.02 |
| Akron, Town of | 5,649.01 |
| Alamosa County | 1,026.09 |
| Alamosa, City of | 574.61 |
| Alma, Town of | 31.50 |
| Antonito, Town of | 937.70 |
| Arapahoe County | 46,182.83 |
| Archuleta County | 11,899.06 |
| Arriba, Town of | 10.76 |
| Arvada, City of | 44,832.13 |
| Aspen, City of | 682.18 |
| Ault, Town of | 7,004.60 |
| Aurora, City of | 98,442.19 |
| Avon, Town of | 391.36 |
| Baca County | 1,921.16 |
| Basalt, Town of | 245.85 |
| Bayfield, Town of | 28,694.88 |
| Bennett, Town of | 2,319.33 |
| Bent County | 610.08 |
| Berthoud, Town of | 6,193.83 |
| Bethune, Town of | 433.34 |
| Black Hawk, City of | 344.44 |
| Blue River, Town of | 765.62 |
| Bonanza City, Town of | 4.77 |
| Boone, Town of | 30.44 |
| Boulder County | 27,097.57 |
| Boulder, City of | 13,224.82 |
| Bow Mar, Town of | 305.31 |
| Branson, Town of | 1,069.89 |
| Breckenridge, Town of | 1,914.29 |
| Brighton, City of | 68,038.99 |
| Brookside, Town of | 205.22 |
| Broomfield, City and County of | 20,881.45 |
| Brush, City of | 21,562.00 |
| Buena Vista, Town of | 6,536.54 |
| Burlington, City of | 6,182.19 |
| Calhan, Town of | 596.82 |
| Campo, Town of | 52.66 |
| Canon City, City of | 29,221.52 |
| Carbondale, Town of | 514,695.58 |
| Castle Pines North, City of | 445.48 |
| Castle Rock, Town of | 8,302.61 |
| Cedaredge, Town of | 54,137.64 |
| Centennial, City of | 31,556.79 |

BLM_0106838

August 31, 2009

## Federal Mineral Lease Distribution - by County / Municipality
## FY2009

SOLENE

| County / Municipality | Total $ |
|---|---:|
| Center, Town of | 1,385.32 |
| Central City | 895.98 |
| Chaffee County | 18,874.23 |
| Cheraw, Town of | 9.53 |
| Cherry Hills Village, City of | 1,890.05 |
| Cheyenne County | 14,008.22 |
| Cheyenne Wells, Town of | 7,380.59 |
| Clear Creek County | 50,856.48 |
| Coal Creek, Town of | 617.19 |
| Cokedale, Town of | 3,270.77 |
| Collbran, Town of | 14,185.95 |
| Colorado Springs, City of | 38,768.36 |
| Columbine Valley, Town of | 353.10 |
| Commerce City, City of | 33,243.81 |
| Conejos County | 2,278.26 |
| Cortez, City of | 586,585.31 |
| Craig, City of | 1,107,757.15 |
| Crawford, Town of | 16,185.23 |
| Creede, City of | 388.95 |
| Crested Butte, Town of | 64,795.08 |
| Crestone, Town of | 30.13 |
| Cripple Creek, City of | 16,868.03 |
| Crook, Town of | 411.59 |
| Crowley County | 893.35 |
| Crowley, Town of | 16.10 |
| Custer County | 1,373.19 |
| Dacono, City of | 15,113.31 |
| De Beque, Town of | 26,213.35 |
| Deer Trail, Town of | 759.98 |
| Del Norte, Town of | 1,202.40 |
| Delta County | 814,078.88 |
| Delta, City of | 212,056.83 |
| Denver, City And County of | 204,798.79 |
| Dillon, Town of | 922.22 |
| Dinosaur, Town of | 46,010.97 |
| Dolores County | 396,545.56 |
| Dolores, Town of | 43,182.42 |
| Douglas County | 40,034.10 |
| Dove Creek, Town of | 173,220.54 |
| Durango, City of | 105,020.83 |
| Eads, Town of | 523.07 |
| Eagle County | 4,628.59 |
| Eagle, Town of | 356.05 |
| Eaton, Town of | 21,034.34 |
| Eckley, Town of | 4,603.41 |

BLM_0106839

August 31, 2009      **Federal Mineral Lease Distribution - by County / Municipality FY2009**      SOLENE

| County / Municipality | Total $ |
|---|---|
| Edgewater, City of | 1,919.70 |
| El Paso County | 28,390.30 |
| Elbert County | 5,879.15 |
| Elizabeth, Town of | 146.22 |
| Empire, Town of | 9,224.70 |
| Englewood, City of | 14,031.22 |
| Erie, Town of | 22,618.26 |
| Estes Park, Town of | 2,756.45 |
| Evans, City of | 121,708.89 |
| Fairplay, Town of | 98.93 |
| Federal Heights, City of | 5,461.84 |
| Firestone, Town of | 26,275.01 |
| Flagler, Town of | 731.81 |
| Fleming, Town of | 1,274.52 |
| Florence, City of | 4,601.73 |
| Fort Collins, City of | 53,488.09 |
| Fort Lupton, City of | 63,640.46 |
| Fort Morgan, City of | 52,285.73 |
| Fountain, City of | 2,297.51 |
| Fowler, Town of | 52.96 |
| Foxfield, Town of | 374.63 |
| Fraser, Town of | 3,888.95 |
| Frederick, Town of | 32,097.01 |
| Fremont County | 54,625.75 |
| Frisco, Town of | 2,002.75 |
| Fruita, City of | 259,370.18 |
| Garden City, Town of | 2,356.92 |
| Garfield County | 7,074,402.29 |
| Genoa, Town of | 8.24 |
| Georgetown, Town of | 11,621.81 |
| Gilcrest, Town of | 7,678.54 |
| Gilpin County | 5,184.64 |
| Glendale, City of | 757.41 |
| Glenwood Springs, City of | 775,897.20 |
| Golden, City of | 11,408.11 |
| Granada, Town of | 1,178.66 |
| Granby, Town of | 9,298.02 |
| Grand County | 51,367.54 |
| Grand Junction, City of | 1,029,263.54 |
| Grand Lake, Town of | 1,261.62 |
| Greeley, City of | 421,683.53 |
| Green Mountain Falls, Town of | 245.60 |
| Greenwood Village, City of | 5,107.72 |
| Grover, Town of | 720.22 |
| Gunnison County | 822,154.97 |

BLM_0106840

August 31, 2009

**Federal Mineral Lease Distribution - by County / Municipality FY2009**

SOLENE

| County / Municipality | Total $ |
|---|---|
| Gunnison, City of | 139,507.34 |
| Gypsum, Town of | 1,636.01 |
| Hartman, Town of | 68.44 |
| Haswell, Town of | 59.32 |
| Haxtun, Town of | 2,674.17 |
| Hayden, Town of | 27,222.05 |
| Hillrose, Town of | 2,008.23 |
| Hinsdale County | 403.10 |
| Holly, Town of | 830.32 |
| Holyoke, City of | 5,094.59 |
| Hooper, Town of | 5.56 |
| Hot Sulphur Springs, Town of | 6,086.18 |
| Hotchkiss, Town of | 37,556.48 |
| Hudson, Town of | 11,075.44 |
| Huerfano County | 35,920.64 |
| Hugo, Town of | 304.19 |
| Idaho Springs, City of | 23,009.17 |
| Ignacio, Town of | 10,808.10 |
| Iliff, Town of | 509.73 |
| Jackson County | 53,512.94 |
| Jamestown, Town of | 66.65 |
| Jefferson County | 127,840.36 |
| Johnstown, Town of | 37,348.96 |
| Julesburg, Town of | 2,493.48 |
| Keenesburg, Town of | 9,046.35 |
| Kersey, Town of | 11,310.46 |
| Kim, Town of | 1,070.25 |
| Kiowa County | 2,156.94 |
| Kiowa, Town of | 325.45 |
| Kit Carson County | 9,444.67 |
| Kit Carson, Town of | 2,316.26 |
| Kremmling, Town of | 19,319.56 |
| La Jara, Town of | 143.15 |
| La Junta, City of | 594.25 |
| La Plata County | 441,235.42 |
| La Salle, Town of | 16,260.33 |
| La Veta, Town of | 4,351.11 |
| Lafayette, City of | 5,737.61 |
| Lake City, Town of | 400.03 |
| Lake County | 13,851.75 |
| Lakeside, Town of | 17.02 |
| Lakewood, City of | 56,902.42 |
| Lamar, City of | 10,205.93 |
| Larimer County | 58,923.76 |
| Larkspur, Town of | 42.76 |

BLM_0106841

August 31, 2009

## Federal Mineral Lease Distribution - by County / Municipality
## FY2009

SOLENE

| County / Municipality | Total $ |
| --- | ---: |
| Las Animas County | 291.437.48 |
| Las Animas, City of | 167.97 |
| Leadville, City of | 11.045.36 |
| Limon, Town of | 96.18 |
| Lincoln County | 383.76 |
| Littleton, City of | 31.581.42 |
| Lochbuie, Town of | 17.486.15 |
| Log Lane Village, Town of | 2.833.65 |
| Logan County | 35.748.53 |
| Lone Tree, City of | 1.439.28 |
| Longmont, City of | 32.438.48 |
| Louisville, City of | 3.669.67 |
| Loveland, City of | 50.144.98 |
| Lyons, Town of | 1.118.14 |
| Manassa, Town of | 174.81 |
| Mancos, Town of | 77.328.37 |
| Manitou Springs, City of | 325.38 |
| Manzanola, Town of | 23.06 |
| Marble, Town of | 3.559.12 |
| Mead, Town of | 12.179.41 |
| Meeker, Town of | 672.161.76 |
| Merino, Town of | 1.377.82 |
| Mesa County | 2,323.553.55 |
| Milliken, Town of | 27.724.27 |
| Mineral County | 414.19 |
| Minturn, Town of | 68.18 |
| Moffat County | 1,133.884.44 |
| Moffat, Town of | 27.69 |
| Monte Vista, City of | 928.03 |
| Montezuma County | 1,885.746.73 |
| Montezuma, Town of | 16.70 |
| Montrose County | 113.947.23 |
| Montrose, City of | 45.270.96 |
| Monument, Town of | 843.91 |
| Morgan County | 88.426.54 |
| Morrison, Town of | 386.47 |
| Mountain View, Town of | 126.86 |
| Mountain Village, Town of | 30.226.73 |
| Mt. Crested Butte, Town of | 22.334.16 |
| Naturita, Town of | 5.179.77 |
| Nederland, Town of | 612.58 |
| New Castle, Town of | 390.362.91 |
| Northglenn, City of | 21.980.84 |
| Norwood, Town of | 65.372.48 |
| Nucla, Town of | 3.837.22 |

BLM_0106842

August 31, 2009

### Federal Mineral Lease Distribution - by County / Municipality
### FY2009

SOLENE

| County / Municipality | Total $ |
|---|---|
| Nunn, Town of | 1,952.81 |
| Oak Creek, Town of | 11,016.21 |
| Olathe, Town of | 5,409.51 |
| Olney Springs, Town of | 298.91 |
| Ophir, Town of | 3,369.18 |
| Orchard City, Town of | 89,067.15 |
| Ordway, Town of | 372.33 |
| Otero County | 1,509.57 |
| Otis, Town of | 3,203.56 |
| Ouray County | 234.55 |
| Ouray, City of | 33.10 |
| Ovid, Town of | 280.86 |
| Pagosa Springs, Town of | 2,872.93 |
| Palisade, Town of | 55,270.32 |
| Palmer Lake, Town of | 173.76 |
| Paoli, Town of | 57.40 |
| Paonia, Town of | 66,217.70 |
| Parachute, Town of | 727,473.25 |
| Park County | 6,433.70 |
| Parker, Town of | 8,358.52 |
| Peetz, Town of | 281.14 |
| Phillips County | 6,125.11 |
| Pierce, Town of | 4,075.27 |
| Pitkin County | 1,974.37 |
| Pitkin, Town of | 3,514.83 |
| Platteville, Town of | 20,961.97 |
| Poncha Springs, Town of | 787.89 |
| Pritchett, Town of | 43.94 |
| Prowers County | 10,723.65 |
| Pueblo County | 18,893.75 |
| Pueblo, City of | 8,639.26 |
| Ramah, Town of | 16.73 |
| Rangely, Town of | 972,828.40 |
| Raymer, Town of | 507.33 |
| Red Cliff, Town of | 21.53 |
| Rico, Town of | 28,287.91 |
| Ridgway, Town of | 40.19 |
| Rifle, City of | 1,504,450.93 |
| Rio Blanco County | 2,023,811.45 |
| Rio Grande County | 2,613.94 |
| Rockvale, Town of | 1,324.05 |
| Rocky Ford, City of | 188.88 |
| Romeo, Town of | 68.38 |
| Routt County | 107,529.88 |
| Rye, Town of | 546.19 |

BLM_0106843

August 31, 2009

# Federal Mineral Lease Distribution - by County / Municipality
## FY2009

SOLENE

| County / Municipality | Total $ |
| --- | --- |
| Saguache County | 2,527.65 |
| Saguache, Town of | 127.53 |
| Salida, City of | 5,123.50 |
| San Juan County | 267.49 |
| San Miguel County | 334,132.02 |
| Sanford, Town of | 413.36 |
| Sawpit, Town of | 810.70 |
| Sedgwick County | 3,271.98 |
| Sedgwick, Town of | 153.89 |
| Seibert, Town of | 140.18 |
| Severance, Town of | 10,844.71 |
| Sheridan Lake, Town of | 597.16 |
| Sheridan, City of | 1,167.26 |
| Silt, Town of | 337,309.43 |
| Silver Cliff, Town of | 138.24 |
| Silver Plume, Town of | 860.61 |
| Silverthorne, Town of | 3,126.90 |
| Silverton, Town of | 535.64 |
| Simla, Town of | 74.24 |
| Snowmass Village, Town of | 1,808.46 |
| South Fork, Town of | 101.53 |
| Springfield, Town of | 494.06 |
| Starkville, Town of | 1,653.16 |
| Steamboat Springs, City of | 48,238.06 |
| Sterling, City of | 24,763.07 |
| Stratton, Town of | 759.64 |
| Sugar City, Town of | 25.57 |
| Summit County | 19,361.15 |
| Superior, Town of | 1,973.12 |
| Swink, Town of | 31.14 |
| Teller County | 138,114.76 |
| Telluride, Town of | 54,282.64 |
| Thornton, City of | 76,272.57 |
| Timnath, Town of | 579.52 |
| Trinidad, City of | 219,107.34 |
| Two Buttes, Town of | 22.20 |
| Vail, Town of | 311.97 |
| Victor, City of | 7,203.95 |
| Vilas, Town of | 35.21 |
| Vona, Town of | 68.70 |
| Walden, Town of | 22,660.29 |
| Walsenburg, City of | 16,352.37 |
| Walsh, Town of | 246.69 |
| Ward, Town of | 58.07 |
| Washington County | 10,956.32 |

BLM_0106844

August 31, 2009

**Federal Mineral Lease Distribution - by County / Municipality FY2009**

SOLENE

| County / Municipality | Total $ |
|---|---|
| Weld County | 702,845.93 |
| Wellington, Town of | 6,057.15 |
| Westcliffe, Town of | 897.97 |
| Westminster, City of | 54,423.25 |
| Wheat Ridge, City of | 12,144.04 |
| Wiggins, Town of | 8,622.11 |
| Wiley, Town of | 544.04 |
| Williamsburg, Town of | 972.81 |
| Windsor, Town of | 44,901.28 |
| Winter Park, Town of | 2,473.30 |
| Woodland Park, City of | 43,235.62 |
| Wray, City of | 46,571.13 |
| Yampa, Town of | 5,382.99 |
| Yuma County | 153,345.16 |
| Yuma, City of | 44,120.11 |
| **Totals:** | **33,082,175.20** |

BLM_0106845

THE IMPACT OF PARKS AND OPEN SPACE ON PROPERTY VALUES
AND THE PROPERTY TAX BASE

by

John L. Crompton

BLM_0106846

BLM_0106847

## *CONTENTS*

**Preface** i

**Executive Summary** 1

**Chapter 1** **The Basic Principles** 5

**Context of the Issue** 7

**The Basic Principle** 9

**Potential Negative Influences of Parks on Property values** 12

    Conclusions 14

**Vehicles for Capturing Enhanced Property Increments to Pay for Park Cost** 16

    Excess Purchase / Condemnation 16

    Spatial Assessment Districts 18

    Tax-Increment Financing Districts 20

**Chapter 2** **The Early Empirical Studies** 25

**The Impact of Parks on Proximate Property Values** 27

**The Impact of Parkways on Proximate Property Values** 34

**The Impact of Playgrounds on Proximate Property Values** 35

**Conclusions** 40

BLM_0106848

| | | |
|---|---|---|
| **Chapter 3** | **The Later Empirical Studies** | **43** |
| | **Results from Urban Studies** | 46 |
| | The Influence of Different Park Design and Use Characteristics | 50 |
| | **Findings from Non Urban Studies** | 55 |
| | The Impact of Large Federal or State Park or Open Space Areas on the Local Tax Base | 58 |
| | **Findings Not Supportive of the Proximate Principle** | 59 |
| | **Conclusions** | 61 |
| **Chapter 4** | **The Relative Service Cost Efficiencies of Parks and Open Spaces: Findings from Cost of Community Services Analyses** | **65** |
| | **Introduction** | 67 |
| | **The "New" Municipal Math** | 69 |
| | **Cost of Community Services Analysis Procedures** | 71 |
| | **Review of Empirical Studies** | 75 |
| | Park and Open Space Implications | 80 |
| | **Conclusions** | 83 |
| **Chapter 5** | **The Evidence Relating to Greenway Trails** | **87** |
| | **Review of Empirical Studies** | 91 |
| | **Discussion** | 97 |
| **Chapter 6** | **The Analogous Case of Golf Courses** | **99** |
| | **The Analogy with Parks** | 101 |
| | **Planning and Design Strategies** | 102 |
| | Alternative Configurations | 102 |
| | The "Windows" Principle | 104 |
| | **The Bottom Line** | 106 |
| **Appendix 1** | **The Three "Public" Benefits that may accrue from Park and Recreation Services** | **109** |
| **Appendix 2** | **Bibliography of Empirical Articles Addressing the Impact of Coastal or Inland Waters on Proximate Property Values** | **113** |

BLM_0106849

*PREFACE*

There are two ways to measure the economic value of urban parks and open spaces. The first type of measure captures the capitalization worth of parks by measuring their impact on the value of land and property in their immediate catchment zone. The second type of measure is the economic value which residents in the urban area receive from visitors, and from businesses and retirees, whose decisions to come to the area are at least in part predicated on the availability of parks and open space. However, the use of both measures will provide only a *minimum* estimate of the economic value of parks and open space because the measures are not able to capture some dimensions of the benefits these amenities provide to a whole urban area. Such benefits include air cleansing, ground water storage, flood control, elimination of waste, alleviation of environmental stress and pleasing vistas.

This publication focuses on the first type of measure and addresses the economic contributions of parks and open space through their impact on property values. A previous monograph in this series reported the economic contribution made by park and recreation agencies through their role in attracting visitors.[1] A future publication will review the role of park and recreation facilities and services in encouraging businesses and retirees to relocate to a community. These other economic contributions are briefly described in Appendix 1.

The monograph reviews the principles and empirical evidence relating to the economic impact of parks, open spaces, greenways, and golf courses on property values. In the context of this publication, the economic contributions of public park land and open space derive from two premises. First, they often increase the value of proximate properties, and the resultant incremental increase in revenues that governments receive from the higher property taxes is frequently sufficient to pay the acquisition and development costs of the amenities. This view was widely articulated in the early years of the parks field, but in recent decades it appears to have disappeared from the lexicon of advocates. Few park professionals today appear to espouse it, and the author has *never* heard it articulated by an elected official!

BLM_0106850

The second premise is that public expenditures increase with development, because the costs to a community of servicing residential sub-divisions usually exceed the tax revenues that accrue from them. Thus, the conversion of open space to housing often results in an increased tax burden on existing residents.

Many of the sources used in this monograph were "fugitive" documents. That is, the material had not appeared in scientific journals or other mainstream publication outlets and, thus, was difficult to find and access. Much of this literature has been produced by graduate students for theses or dissertations, land trusts, park advocacy groups, or planners and consultants for the narrow purpose of making or evaluating the case for parks or open space in specific local contexts. The scientific quality of this work varies widely, but the volume of material and the remarkable consistency of findings reporting the positive impact of parks and open space on property values is sufficiently striking that concerns over methodological issues are unlikely to affect the conclusions emanating from this body of literature.

The first chapter discusses the basic principle that explains how increases in proximate property values around a park can be sufficient to pay for the park's acquisition and development. A discussion of excess condemnation, special assessment districts, and tax-increment financing districts is included since these are all financing mechanisms embracing this principle that have been used by communities to fund park developments.

In Chapters 2 and 3, the empirical evidence that validates the principles described in Chapter 1 is reviewed. The early studies presented in Chapter 2 are likely to be considered "naïve" today, because they did not use the statistical tools available to more contemporary researchers. Nevertheless, they constitute part of the body of knowledge in this area. They also document the rich historical pedigree and tradition of the principle, and its effectiveness in persuading decision-makers to invest in parks. The later studies reviewed in Chapter 3 tend to use more sophisticated research designs and statistical techniques to control for variables other than park land and open space that may influence property values, which enhances the credibility and acceptance of their findings.

A corollary proposition to the positive impact of parks on property values is that the net cost to a community of maintaining and servicing parks and open space is less than the net cost of maintaining and servicing residential real estate development. This corollary is considered in Chapter 4 which reviews the principles of fiscal impact analysis and summarizes the results from approximately 60 of them. The chapter consistently documents the negative fiscal impacts incurred by a community when open space or potential parkland is usurped for residential development and provides strong evidence of support for the corollary.

The evidence relating to developments proximate to greenway trails is reviewed in Chapter 5. There was some evidence that greenway trails had a positive impact on the saleability and value of proximate property, but the dominant sentiment was ambivalence indicating they had no impact on these issues.

The discussion in Chapter 6 indicates developers incorporate golf courses into property developments because they have found that proximate lot land values in a development increase sufficiently to ensure an enhanced profit margin, even after the substantial costs of acquisition and development of a golf course have been met. The high visibility and success of these golf course developments demonstrates by analogy the probable economic viability of community investments in park land and open space.

All studies that pertained to the issues discussed in the monograph are reported, irrespective of their conclusions. An effort was made

BLM_0106851

to be comprehensive, rather than selective, and to avoid the review becoming only an advocacy treatise. Thus, results from all studies that were found which do not support the case made by park and open space advocates are included. However, there were relatively few of these. While this suggests strong empirical support for advocates' positions, it is recognized that there may be a lesser probability of research which is not supportive of these positions being reported in the literature. Unfortunately, negative findings sometimes are viewed as being unexciting and not as worthy of publication as positive findings.

This publication was commissioned by the National Recreation and Park Association with funding provided by the National Recreation Foundation. It is a component of the National Recreation and Park Association's commitment to documenting the scientific knowledge base pertaining to the contribution made by park and recreation services and amenities to a community's economic development.

The impact on proximate property of oceans, lakes or rivers, or changes in the water quality of these bodies, was defined as being outside the scope of this monograph and is not reviewed in it. Nevertheless, it is recognized that results from such studies may be of interest to some readers of this publication. For this reason, a bibliography of them is included in Appendix 2.

The prime motivating force behind this publication was Ms. Terry Hershey, the redoubtable doyenne of the conservation movement in Texas. She heard me discuss these issues over a period of several years and invariably commented: "When are you going to write it all down? This is important information for those of us fighting to protect the critters, open space and parks." Ms. Hershey is a board member of the National Recreation Foundation. When Dean Tice, the executive-director of NRPA proposed to the Recreation Foundation that this monograph be funded, she enthusiastically endorsed the proposal. So, Terry, thanks for all the pushing and support.

The author is grateful for the assistance of Ms. Jennifer Dempsey and Ms. Melissa Adams with American Farmland Trust who provided much of the material included in Chapter 4. He is also very appreciative of the assistance provided by Ms. Marguerite M. Van Dyke who typed the manuscript drafts of this publication, and Mr. Seokho Lee who prepared the illustrations and formatted the narrative.

## References

1. Crompton, John L. (1999). *Measuring the economic impact of visitors to sports tournaments and special events*. Ashburn, Virginia: The National Recreation and Parks Association.

BLM_0106852

BLM_0106853

*EXECUTIVE SUMMARY*

The real estate market consistently demonstrates that many people are willing to pay a larger amount for a property located close to parks and open space areas than for a home that does not offer this amenity. The higher value of these residences means that their owners pay higher property taxes. In effect, this represents a "capitalization" of park land into increased property values of proximate land owners.

This process of capitalization is termed the "proximate principle." It means that in some instances if the incremental amount of taxes paid by each property which is attributable to the presence of a nearby park is aggregated, it will be sufficient to pay the annual debt charges required to retire the bonds used to acquire and develop the park. In these circumstances, the park is obtained at no long-term cost to the jurisdiction.

In an illustrative hypothetical scenario a city council may invest $90,000 a year for 20 years (annual debt charges on a $1 million bond) to construct or renovate a park; which causes the values of properties proximate to the park to increase; leading to higher taxes paid by the proximate property owners to the council; that are sufficient to fully reimburse the $90,000 annual investment made by the council.

In most contexts where parks enhance property values, the increments of property tax which accrue go into the general fund along with all other property taxes. However, three vehicles are discussed which directly capture the incremental gains and use them to pay for park acquisition and development costs by retaining the increments in a separate account for that purpose. These vehicles are excess purchase / condemnation, special assessment districts, and tax-increment financing districts.

The proximate principle was first promulgated and empirically verified in the parks field by Frederick Law Olmsted in the context of Central Park in New York City. The documented evidence from Central Park established the proximate principle as conventional wisdom among elected officials and planners as well as park advocates in the late nineteenth and early twentieth centuries. As a result, it

BLM_0106854

was used to justify major early park invest-ments in many U.S. cities. Other early empiri-cal studies undertaken in two New Jersey County Park Systems also endorsed the legiti-macy of the proximate principle.

In the first third of the twentieth century, developments of parkways and playgrounds were considered to be as central economic, so-cial and political issues, as the development of parks. Hence, studies on their impacts on proximate property were also undertaken. Al-though these studies showed substantial gains in proximate property values associated with parkway developments, historical perspective suggests that much of the value increase was attributable to more effective and efficient ac-cess for traffic and transit, rather than to the parkways' aesthetics. Early conventional wis-dom held that playgrounds were likely to de-preciate land values in their vicinity, but the evidence from empirical studies in the 1920s suggested this concern was generally un-founded.

These early studies were fairly naive, re-flecting the underdeveloped nature of the sta-tistical tools and research designs available in the first third of the twentieth century. All property value increases were attributed to the proximity of a park and the potential influences of other factors were ignored, such as house age and size; lot size; distance to city center or major shopping center; and access to other amenities such as schools and health care fa-cilities. Although historical perspective sug-gests that the findings reported by these studies may have been exaggerated because of their design failings, they illustrate the rich histori-cal pedigree and tradition of the proximate principle, and its effectiveness in persuading decision-makers to invest in parks.

The limitations of the early studies were much better controlled in the later empirical studies which were all undertaken after 1960, except for one pioneering pathfinding study

completed in the late 1930s. These later studies were designed to address three key questions. The *first* question asked whether parks and open space contributed to increasing proximate property values. Results from 25 studies that investigated this issue were reviewed and in 20 of them the empirical evidence was supportive.

The support extended beyond urban areas to include properties that were proximate to large state parks, forests and open space in ru-ral areas. The rural studies offered empirical evidence to support not only the proximate principle, but also to refute the conventional wisdom that creating large state or federal park or forest areas results in a net reduction in the value of an area's tax base.

Six of the supportive studies further inves-tigated whether there were differences in the magnitude of impact among parks with differ-ent design features and different types of uses. The findings demonstrated that parks serving primarily active recreation areas were likely to show much smaller proximate value increases than those accommodating only passive use. However, even with the noise, nuisance and congestion emanating from active users, in most cases proximate properties tended to show increases in value when compared to properties outside a park's service zone. Im-pacts on proximate values were not likely to be positive in those cases where (i) a park was not well maintained; (ii) a park was not easily visi-ble from nearby streets and, thus, provided op-portunities for anti-social behavior; and (iii) the privacy of properties backing on to a linear park was compromised by park users.

Examination of the five studies that did not support the proximate principle suggested that in four of those cases the ambivalent find-ings may be attributed to methodological limi-tations.

The *second* question that the later empiri-cal studies sought to answer related to the magnitude of the proximate effect. A definitive

BLM_0106855

generalizable answer is not feasible given the substantial variation in both the size, usage and design of park lands in the studies, and the disparity in the residential areas around them which were investigated. However, some point of departure based on the findings reported here is needed for decision-makers in communities who try to adapt these results to their local context. To meet this need, it is suggested that a positive impact of 20% on property values abutting or fronting a passive park area is a reasonable starting point guideline. If the park is large (say over 25 acres), well-maintained, attractive, and its use is mainly passive, then this figure is likely to be low. If it is small and embraces some active use, then this guideline is likely to be high. If it is a heavily used park incorporating such recreation facilities as athletic fields or a swimming pool, then the proximate value increment may be minimal on abutting properties but may reach 10% on properties two or three blocks away.

The diversity of the study contexts also makes it non-feasible to offer a generalizable definitive answer to the *third* question addressed by the empirical studies which concerned the distance over which the proximate impact of park land and open space extends. However, there was convincing evidence that it is likely to have substantial impact up to 500 feet and that in the case of community sized parks it is likely to extend out to 2,000 feet. Few studies tried to identify impacts beyond that distance because of the compounding complexity created by other potentially influencing variables which increases as distance from a park increases. Nevertheless, in the case of these larger parks there was evidence to suggest impact extended beyond this artificial peripheral boundary, since the catchment area from which users came usually extended beyond it.

It is often argued that in addition to acquisition and development costs, and operating and maintenance costs, there is a substantial opportunity cost associated with allocating land for public parks. Because park land is publicly owned it is exempt from property taxes. Hence, the opportunity cost is the loss of property tax income that jurisdictions would have received if the land had been developed for other purposes. The conventional wisdom which prevails among many decision-makers and taxpayers is that development is the "highest and best use" of vacant land for increasing municipal revenues. This conventional wisdom is reinforced by developers who claim their projects "pay for themselves and then some." They exhort that their developments will increase a community's tax base and thereby lower each existing resident's property tax payments.

However, in recent years some communities have commissioned fiscal impact analyses. Findings from these analyses have challenged conventional wisdom. They have consistently shown that the public costs associated with new residential development exceed the public revenues that accrue from it. This is because people who reside in developments require services. In contrast, natural parks and open space require few public services -- no roads, no schools, no sewage, no solid waste disposal, no water, and minimal fire and police protection.

A review of over 60 fiscal impact studies clearly indicated that preserving open space is likely to be a less expensive alternative for communities than residential development. On average, for every $1 million received in revenues from residential developments, the communities had to expend $1.15 million to service them. This suggests that if the area of land on which a development generating $1 million in revenues is located was used as a park instead, then if the park's operation and maintenance costs did not exceed $150,000 the community would financially benefit.

BLM_0106856

In the 1990s, there was an explosion of interest in developing greenways. The rationale underlying the proposition that greenway trails may positively influence property values is different from that associated with parks. Unlike parks, any added property value is not likely to come from the views of nature or open space which a property owner enjoys because in most cases, especially in urban trail contexts, there are no such vistas. Rather, any added value derives from access to the linear trail. It is a trail's functionality or activity potential that is likely to confer added value, not the panorama of attractive open space.

The literature investigating the proximate principle in the context of greenways is sparse, but a consistent pattern emerges from it. There is broad consensus that trails have no negative impact on either the saleability of property (easier or more difficult to sell) or its value. There is a belief among some, typically between 20% and 40% of a sample, that there is a positive impact on saleability and value. However, the dominant sentiment is that the presence of a trail has no impact on these issues.

Almost 1,000 golf courses incorporated as central features of real estate developments were constructed in the U.S. in the 1990s. De-velopers include golf courses to increase the land values in their projects and to accelerate the absorption of real estate, i.e. to sell their lots more quickly.

Contemporary golf courses exemplify the important role of "edge" in maximizing real estate values. Traditional, almost rectangular shaped courses similar to the shape of traditional parks, have been discarded in favor of linear courses which can accommodate much more real estate frontage. Lots and houses throughout a golf-course community bring substantial premiums over comparable lots/units in non-golf developments.

The developers' strategy mirrors that which has been advocated by supporters of public parks and open space for over a century, i.e. parks are an investment not a cost because they generate more property taxes for a city than it costs to service the annual debt charges incurred in creating the amenities. The high visibility, large number, and success of these golf course developments demonstrates by analogy to governmental stakeholders and decision-makers the viability of the proximate principle in the context of park land and open space.

BLM_0106857

# CHAPTER 1

# The Basic Principles

**CONTEXT OF THE ISSUE**

**THE BASIC PRINCIPLE**

**POTENTIAL NEGATIVE INFLUENCES OF PARKS ON PROPERTY VALUES**

*Conclusions*

**VEHICLES FOR CAPTURING ENHANCED PROPERTY INCREMENTS TO PAY FOR PARK COSTS**

*Excess Purchase/Condemnation*

*Special Assessment Districts*

*Tax-Increment Financing Districts*

BLM_0106858

BLM_0106859

**CHAPTER 1**

*THE BASIC PRINCIPLES*

## CONTEXT OF THE ISSUE

The rationale for this monograph is summarized by the following observation:

> Too many community leaders feel they must choose between economic growth and open space protection. But no such choice is necessary. Open space protection is good for a community's health, stability, beauty, and quality of life. It is also good for the bottom line (p. 3).[1]

Parks and open spaces are equally as productive contributors to a local economy as roads, utilities and other infrastructure elements. The cost of investing in these elements is justified by the economic value that derives from their availability. Unfortunately, many communities which are experiencing growth lack the foresight to set aside land for inclusion in a parks system in the same way as they do for other infrastructure elements. They frequently claim there is a lack of resources for what they regard as a discretionary investment.

Public parks and open spaces traditionally have not been evaluated in economic terms, because there are many other appealing and rational justifications for acquiring and providing them. These may include: (1) enhancement of a community's quality of life, which embraces its livability, "feel", and aesthetic integrity, and the role of parks and open spaces in creating a sense of place or community; (2) ecological and environmental reasons relating to issues such as biological diversity, improving water quality, air cleansing, aquifer recharge and flood control; and (3) scenic vistas and places for engaging in active or passive recreation activities.

Although the primary purpose of acquiring park land or encouraging the preservation of open space may not be financial, financial justification for these actions is nearly always required. The difficult fiscal environment that prevails in many cities, and the escalation of urban land values, have made the economic justification of park land and open space increasingly necessary in order to rebut the per-

BLM_0106860

suasive rhetoric of those who say: "I am in favor of parks and open space but we cannot afford either the capital acquisition and development costs because of more pressing priorities, or the loss of operational revenue that will accrue if the land is removed from the tax rolls." If the flaws in this economic shibboleth are exposed and nullified, then the likelihood of winning the argument for more investments in parks and open space using the traditional justifications noted in the previous paragraph is enhanced.

The challenge for park advocates is to achieve widespread recognition of the economic contribution of parks and to measure it, so it is adequately represented in the planning, social, and political calculus of community infrastructure decisions. If park and open space advocates are limited when making their case to general statements like, "We know the presence of parks has a beautiful and beneficial effect on our community even though we cannot place a specific value on it," then they are likely to lose contests with developers for land. In contrast to such subjective generalities from conservationists, developers are likely to cite the specific increase in dollar value of the tax base that will accrue if the site is developed.

Although real estate sections of newspapers are replete with advertisements proclaiming the virtues of "leisure living" and stressing proximate recreational and open space amenities, contemporary conventional wisdom among many elected officials and decision makers is that open space and park land is a costly investment from which a community receives no economic return. The social merit of such investment is widely accepted, but social merit amenities frequently are regarded as being of secondary importance when budget priorities are established.

Government officials frequently seek to enhance the tax bases of their communities by encouraging development. There is a wide-spread belief that this strategy is the most effective way to raise the additional revenues from property taxes, which then can be used to improve community services without increasing the taxes of existing residents. The conventional wisdom that development brings prosperity is deeply embedded in the American psyche.

In contrast to the enhanced tax revenues accruing from development, community investments in parks and open spaces often are perceived to offer no financial return to the city. This view was expressed, for example, in an Army Corps of Engineers' environmental impact statement on Ft. Sheridan, Illinois. This base was scheduled for closure and park and recreation advocates wanted to secure assets from the base for recreational use by the local community. The Army's view was that it had no obligation to consider potential recreation use for land because recreation offers "no support for the local tax base."[2]

The lack of perceived return is exacerbated in the eyes of some elected officials by the costs they perceive to be incurred if parks are created. Three types of costs associated with providing parks are usually identified: (1) acquisition and development costs; (2) operating and maintenance costs; and (3) the opportunity cost of loss of property tax income that jurisdictions would have received if the land had been developed for other purposes. The third cost is cited by people who point out that because park land is publicly owned, it is exempt from property taxes. In contrast, if it were commercially developed, then it would generate property taxes and, thus, reduce the amount assessed on all other property owners in the jurisdiction to pay for local public services.

Advocates of park and open space provision view this economic conceptualization of parks as flawed. They exhort the adage that much of the value of properties on the tax roll is acquired from amenities that are off the tax

roll, and that the contributions of these amenities to the tax base are likely to be at least as substantial as those forthcoming from residential real estate developments. This monograph reviews a convincing body of evidence dating back almost 150 years to pioneering work by Frederick Law Olmsted which suggests the conventional wisdom that park amenities offer no economic return is wrong.

The generalizable insights that accrue from multiple studies which have reported positive findings relating to the proximate impact of parks on property values, provide data that should facilitate better integration of parks and open space into urban planning and development decisions. Further, it has been suggested that better data on economic benefits is a key to promoting public-private development partnerships. For example, improved awareness by private developers about the value of park and open space amenities is likely to give public agencies a stronger negotiating position for securing such amenities when dealing with private proposals.[3]

## THE BASIC PRINCIPLE

The premise that parks and open space have a positive impact on property values derives from the observation that people frequently are willing to pay a larger amount of money for a home located close to these types of areas, than they are for a comparable home further away. Over 30 years ago, the National Recreation and Park Association in an early edition of its *Outdoor Recreation Space Standards* handbook commented:

> Real estate dealers have always drawn attention to parks and playgrounds near their properties for sale or rent. Many of them know that properly located and planned recreation areas have definite dollars and cents effect

on the values of surrounding property. Comprehensive figures have never been brought together but a number of studies and observations show that recreational features contribute to increased valuations for property near parks and playgrounds (p. 28).[4]

If this observation is consistently verified by research findings, then elected officials can be assured that owners of the enhanced property are likely to pay higher property taxes to governments because of the increase in the property's appraised value. In effect, this represents a "capitalization" of park land into increased property values for proximate land owners. Conceptually, it is argued that the competitive market will bid up the value of property just equal to the capitalized value of the benefits that property owners perceive they receive from the presence of the park or open space. Economists refer to this approach as "hedonic pricing." It is a means of inferring the value of a non-market resource (a park) from the prices of goods actually traded in the market place (surrounding residential properties).

In some instances if the incremental amount of taxes paid by each property that is attributable to the presence of the park or open space is aggregated, it will be sufficient to pay the annual debt charges required to retire the bonds used to acquire and develop the park. In these circumstances, the park is obtained at no long-term cost to the jurisdiction.

This principle is illustrated by the hypothetical 50 acre park shown in Figure 1-1. It is a natural, resource oriented park with some appealing topography and vegetation. The cost of acquiring and developing it (fencing, trails, supplementary planting, some landscaping) is $20,000 an acre, so the total capital cost is $1 million. The annual debt charges for a 20 year general obligation bond on $1 million at 5% are approximately $90,000.

BLM_0106862

**Figure 1-1**   Layout of a 50 acre Natural Park and the Proximate Neighborhood Area

A projected annual income stream to service the bond debt was calculated as follows:

- If properties around the park are 2,000sq ft homes on half-acre lots (40 yd x 60 yd) with 40 yd frontages on the park, then there would be 70 lots in Zone A (30 lots along each of the 1,210 yd perimeters and 5 lots along each of the 200 yd perimeters).
- Assume total property taxes payable to city, county, and school district are 2% of the market value of the property.
- Assume the market value of similar properties elsewhere in the jurisdiction beyond the immediate influence of this park is $200,000.
- Assume the desire to live close to a large natural park creates a willingness to pay a premium of 20% for properties in Zone A; 10% in Zone B; and 5%, in Zone C, and that there are also 70 lots in Zones B and C.

Table 1-1 shows that, given the above assumptions, the annual incremental property tax payments in the three zones from the premiums attributable to the presence of the park amount to $98,000. This is sufficient to pay the $90,000 annual bond debt charges.

The flows of this investment cycle are shown in Figure 1-2: (i) the council invests $90,000 a year for 20 years (annual debt charges on a $1 million bond) to construct or renovate a park; (ii) which causes the values of properties proximate to the park to increase; (iii) leading to higher taxes paid by the proximate property owners to the council; (iv) that are sufficient to fully reimburse the $90,000 annual financial investment made by the council.

There are three additional points worth noting which may further strengthen the economic case. First, this illustration assumes no state or federal grants are available to aid in the park's acquisition and development. If they were available to reduce the community's capital outlay, then the incremental property tax

BLM_0106863

**Table 1-1**   Property Taxes Pay the Annual Debt for Acquisitions and the Development of the Park

| Zone | Market value of each home | Incremental value attributed to the park | Total property taxes at 2% | Incremental property taxes attributed to the park | Aggregate amount of property tax increments given 70 home sites |
|---|---|---|---|---|---|
| Outside the park's influence | $200,000 | $0 | $4,000 | $0 | $0 |
| A (20% premium) | $240,000 | $40,000 | $4,800 | $800 | $56,000 |
| B (10% premium) | $220,000 | $20,000 | $4,400 | $400 | $28,000 |
| C ( 5% premium) | $210,000 | $10,000 | $4,200 | $200 | $14,000 |
| | | | | | $98,000 |

income stream would greatly exceed that required to service the debt payments. Second, the incremental property tax income will continue to accrue to the community after the 20-year period during which the debt charges will be repaid, at which time the net return to the community will be substantially enhanced.

Third, there is evidence to suggest that investment in parks affects the comparative advantage of a community in attracting future businesses and desirable residential relocators such as retirees.[5] However, the proximate capitalization approach does not capture the secondary economic benefits attributable to park provision that accrue from such sources.

Finally, a park of the size shown in Figure 1-1 is likely to improve the quality of life and, thus, have some economic value to urban residents living beyond Zone C. In all the studies reviewed, the capitalization of benefits ceased at a selected distance, usually somewhere between 500 feet and 3000 feet away from the park perimeter in urban contexts. However, it is unlikely that park users and beneficiaries will be restricted only to those individuals lo-

cated within such a narrowly defined service area.[6] The underestimation of economic benefit that occurs because some park users live outside a specified perimeter was demonstrated in a study of four parks containing a total of 219 acres in Worcester, Massachusetts.[7] The parks' zones of influence were terminated at 2000 feet because the influence of the parks could not be clearly separated from numerous other elements influencing property values beyond that distance. However, when on-site interviews in the parks were conducted, it was found that between 51% and 75% of the parks' users lived beyond the 2000-foot radius cut-off. The benefits accruing to these users were not represented in the economic benefit capitalization calculations.

A determining factor of the magnitude of a park's impact on the property tax base is the extent of the park's circumference or edge.[8] If a 100 acre park is circular in shape, then it has a relatively small circumference. If the 100 acres is distributed more linearly, then the amount of edge increases substantially. The principle is illustrated by the calculations in

BLM_0106864

Case No. 1:20-cv-02484-MSK   Document 59-5   filed 04/28/21   USDC Colorado   pg 248 of 282



**Figure 1-2**   The Investment Cycle Associated with a Local Government's Investment in a Park

Figure 1-3. The increased amount of edge means that more property can be sited adjacent to the park and the aggregate enhancement value of the property tax base is likely to be larger. This edge principle has been widely embraced in the design of golf courses which are incorporated into residential real estate developments. These are discussed in Chapter 6.

The research evidence validating and supporting the hypothetical scenario used to illustrate the proximate principle is reviewed in Chapters 2 and 3. The results of any single study are easily challenged. The cumulative insights gained from multiple studies, however,

reduce such skepticism. Their acceptance is increased in situations like this where the studies have been carried out for more than a 100 year period, in varied settings, by researchers from different disciplines, using a variety of techniques.

## POTENTIAL NEGATIVE INFLUENCES OF PARKS ON PROPERTY VALUES

It is important to recognize that some types of parks are more desirable than others as places to live nearby. For example, there is convincing evidence that large flat open spaces

BLM_0106865

**Figure 1-3**   Illustrating the Edge Effect

A circular park that is 100 acres in area will have a radius of 1,177.8 feet. Given that the circumference of a circle is two times pi, times the radius (2πr), the amount of edge will be 7,396.7 feet.

Assume this park is unpeeled into a long strip of green which is one square acre in width -- in effect, laying one acre next to another in a line. To find the length of the edge of 100 acres in this configuration 209 feet is multiplied by 100 times two, since there are two sides to this strip. The result is 41,800 linear feet, 5.65 times as much edge compared with a circular park of the same number of acres. That is the edge effect.

Source: Charles E. Little (1990) <u>Greenways for America</u>. Baltimore: Johns Hopkins University Press.

which are used primarily for athletic activities and large social gatherings, are much less preferred than natural areas containing woods, hills, ponds or marsh.[9] Further, it must be recognized that there are contexts in which parks exert a negative image on property values. A useful analogy is with a well-groomed front lawn which is likely to increase the value of a home, but if it is overgrown with weeds then the property value is likely to be diminished.[10]

Adverse impacts may result from nuisances such as: congestion, street parking, litter and vandalism which may accompany an influx of people coming into a neighborhood to use a park; noise and ballfield lights intruding into adjacent residences; poorly maintained, or blighted derelict facilities; or undesirable groups congregating in a park engaging in morally offensive activities. Some of these negatives were articulated in a landmark court case, *City of College Station vs Turtle Rock Corp. 666 S.W.2d 318 (TX 1984)*. The case concerned the legality of a jurisdiction using its police powers to impose exactions for parks on developers. In this intermediate level appellate court decision Mr. Justice Sears wrote:

A required dedication of land for streets and waterworks clearly "bears

a substantial relation to the safety and health of the community" while a required dedication for park land does not. In reference to this holding, we note that parks are not necessarily beneficial to a community or neighborhood. Unfortunately, in some neighborhoods, parks serve as gathering places for derelicts and criminals, and are unsafe for use by law abiding citizens. We disagree with Appellant's suggestion that neighborhood parks necessarily benefit the general public.

While most reasonable people would not accept this view as an accurate representation of most parks in most communities, (and subsequently it was rejected by the *Texas Supreme Court 68 S.W. 2nd 802*), unfortunately it does accurately describe the status of some parks especially in some major cities. The following commentary made some time ago in the context of New York City illustrates that point:

In many congested neighborhoods with almost no available park space, the few parks to be found often lie all but unused by local residents. In recent years community groups have

marched to City Hall as often to oppose proposed park construction as they have to appeal for it. For many people a park is no longer an amenity: It represents a threat to their safety and a liability to the value of their own property. In a quarter of a century, a long-established philosophy has been overturned. The image of a greensward decorated with a monument to a national hero or a playground filled with happy children has been replaced by visions of acres of weeds interrupted by vandalized statues, or playgrounds barren of any usable equipment occupied by the social dregs of the community.

From the most prosperous to the most squalid neighborhood, the cry is the same: The parks are not properly maintained and are often inhabited by undesirables. Even in the high-population-density areas, the few parks remain unused while children play amidst parked and moving cars and adults lounge on building stoops (p. 29).[11]

Writing in 1920, one commentator stated: "Experience in the east has shown that it is ordinarily impossible to assess special benefits within 200 feet of a playground" because of "the throng of children which it attracts and the attendant noise and stir." However, he went on to note that while the property directly adjacent is not enhanced in value to the same extent as results from a landscape park, "it does diffuse a special benefit throughout the district which it serves"(p.250).[12] This early observation that properties adjacent to neighborhood parks with playgrounds and lights may decrease in value, while properties located a block or two further away in the parks' service areas increase in value has been consistently verified in subsequent studies. These are reviewed in Chapter 3.

Two court cases in the 1990s illustrated the continuing contemporary concern about the potential negative impacts of some parks.[13] In Fox Mill, Virginia, neighbors sued the Fairfax County Park Authority, challenging the authority's plans to install lights at a youth baseball complex. In Vidor, Texas, an individual donated land adjacent to his house to the city with the understanding that the land would be used for a parking lot. When the city built a youth baseball field on it, he went to court and forced the city to move the baseball field further away from his house.

In rural contexts, the proximate presence of undeveloped public park or open space is likely to be regarded by many landowners as an asset. However, in some contexts it may be viewed negatively because of trespass concerns. Hence, many proximate landowners in rural areas post and fence their land against trespassing.[14]

Finally, it should be noted that appreciation of property values is not always perceived by homeowners to be positive. Its corollary is that their property taxes are higher. Residents who have lived in a location for a long time and have no interest in selling their property, may see no personal benefits accruing to them from development or major renovation of a nearby park. Nevertheless, they are required to pay higher taxes because the appraised value of their property has increased.

## Conclusions

Two conclusions emerge from the discussion in this section. First, irrespective of the type of park or the amenities offered negative impacts will emerge if the park is not well designed, landscaped and maintained. In 1998, the deputy director of the Parks Council, a nonprofit advocacy organization in New York City reinforced the point when she observed:

We have many poor neighborhoods in the South Bronx near parks. But the parks are not helping them. If you put money into a park, chances are that you will improve one portion of the neighborhood. But if the park does not have proper security and maintenance, it becomes a liability for nearby homes (p. 9).[15]

The second conclusion is summarized in Figure 1-4 which recognizes that both positive and negative impacts on property values are possible. The top half of Figure 1-4a indicates that property value benefit increments associated with proximity and accessibility will decay as distance from the park increases. The lower half of Figure 1-4a suggests that any negative values are likely to be limited to prop-erties in close proximity to the park and these will decay more rapidly than positive impacts as distance from the park increases -- that is, the positive curve is likely to be flatter than the negative curve.[16] Thus, in the negative scenario property in the park's service area but beyond (say) 500 feet is still likely to experience an increase in value, since some benefits of access to the park's amenities accrue to these homeowners but they avoid the nuisance costs inflicted on those who live close to it.

Figure 1-4b illustrates the net effect of a situation where there is a positive impact on the value of properties abutting the park, but it is lower than that on properties a block or two away which are not subjected to the nuisance costs associated with access and egress to the park.



**Figure 1-4 (a)**   The Positive and Negative Impacts of Parks on Residential Property Values

BLM_0106868



**Figure 1-4 (b)**

## VEHICLES FOR CAPTURING ENHANCER PROPERTY INCREMENTS TO PAY FOR PARK COSTS

Open space can be purchased in fee simple, donated, created through the acquisition of development rights, or preserved by the exercise of the police power function which involves implementing conservancy zoning on open spaces without compensating the affected landowners. In the latter two cases, the land remains in private ownership but it offers most of the amenity value associated with publicly owned land.

Conservancy zoning is likely to be politically controversial. Landowners who are subjected to it will see their land decline in value, while the owners of proximate developable land will received a windfall gain from the open space designation so the value of their land will increase. It has been suggested that some recapture mechanism based on the property tax system should be used to return to owners of open space land some of the value increment that owners of developable land re-

alize from the open space designation.[17] A compensation effort of this nature is likely to lend additional support for establishing and maintaining open space zoning in the long term. Such a mechanism may adapt some of the principles used in the vehicles that have been developed to fund fee simple acquisition that are described in this section.

In most contexts where parks enhance property values, the increments of property tax which accrue go into the general fund along with all other property taxes. However, three vehicles have been used which directly capture the incremental gains and use them to pay for park acquisition and development costs by retaining the increments in a separate account for that purpose. These vehicles are excess condemnation, special assessment districts and tax-increment financing districts.

### Excess Purchase / Condemnation

The principle involves purchasing more land than is needed for the park project; disposing of the remainder on a commercial basis; and applying the income derived to pay

and applying the income derived to pay for the original investment. In short, the governmental jurisdiction acts in a role similar to that of a developer. Some agencies may lack the enabling legislative authority to do this and private developers are likely to strenuously oppose any action of this type. Nevertheless, four early examples in Fort Worth, Lorain, Prescott and Huron-Clinton, and a more contemporary action in Burlington illustrate how it could work:

- In Fort Worth, Texas, the city purchased a tract of land for $12,500. Lots from the tract were sold for a total of $18,750 and a seven acre playing fields park remained the property of the city. Thus, acquisition of land for the park cost the city nothing and $6,250 was available to finance improvements on the park.[18]
- In Lorain, Ohio, a group of public spirited residents purchased a large tract of land, and after reserving 100 acres for a large park, sold the remainder for a sum sufficient to cover the entire cost of the original tract. The park was then deeded to the city.[18]
- In Prescott, Arizona, the city built a golf course on land valued at $25 an acre, then sold adjacent lots to developers for an average of $2,777 per acre. It was anticipated that the development of that land would add over $3 million to the city=s tax base in the next ten years.[19]
- The director of the Huron-Clinton Metropolitan Parks Authority reported the following after a large park was opened contiguous to a fair sized village: "During the period of land acquisition a number of large tracts were acquired en bloc. It was later determined after the park had been opened that some portions should be returned to the tax rolls as being in excess of park needs. This acreage was sold by competitive bids at a considerably higher

price than the initial acreage purchase price" (P. 47).[20]
- Burlington, Vermont purchased a 20 acre property that when developed as park land (at the time of purchase it was a tank farm) would complete its waterfront (Lake Champlain) park system, which was seen as a primary catalyst in the city's future economic development. The city also purchased an adjoining 25-acre property that it planned to hold as an 'urban reserve' for which a future generation of Burlington citizens would determine the appropriate development, probably a combination of residential and commercial. This property was purchased with city pension fund money. The idea was that the property would appreciate dramatically in value as the new waterfront park was fully developed (the tank farm had a five year lease). This purchase exemplified a long-term vision of how parks could stimulate surrounding property values and new investment.[21]

The Lorain example illustrated how the principle of excess purchase could be applied in contexts where there was no legal authority for a public agency, or where elected officials were unwilling to face the controversy such an action would generate. Indeed, because statutory hurdles make it difficult for public agencies to engage in such actions, contemporary transactions of this kind tend to be handled by 501(c)(iii) organizations acting on behalf of public agencies. Non-profits, such as the Trust for Public Land or The Nature Conservancy, often purchase tracts from which they convey to a public agency the land it wants for parks or open space. The other parcels are then resold to developers, using profits to finance future conservation transactions.

A variation of the excess purchase principle is emerging in golf residential develop-

ments where some developers now donate land to a municipality for a golf course, while retaining the property around it. The land donation is paid for by the increased property value the course creates, while the developer receives a tax write-off for the donation and avoids the costs associated with constructing a course and subsequently owning and managing it.

The excess condemnation principle is sometimes used by River Authorities responsible for flood control and dam projects. Often when they purchase or condemn land for projects, they have to acquire more than they need. For example, if 100 acres of a 150 acre farm is to be flooded, they may have to purchase the full 150 acres because the remaining 50 acre tract which is out of the flood plain is no longer viable for farming. Twenty years later after the dam is constructed, that 50 acres may be a highly desirable site for second homes, a marina, or other recreational amenities. Its value is likely to be substantially enhanced as a result of the dam project and the River Authority captures that gain when it sells the tract.

**Special Assessment Districts**

The lively controversy which invariably accompanies excess condemnation led others to suggest that special assessments offered a more feasible method of securing the enhancement increment. An early commentator observed, "Special assessments are apt to arouse less antagonism since, unlike excess condemnation, the amount of the increment taken is limited to the cost of the improvement"[22] (p. 42).

The city of Minneapolis has one of the finest park systems in the country and it was developed primarily through the use of special assessments. When the city was growing rapidly in the first half of the 20th century, there was a belief that improvements should not be paid for by the city as a whole, but by special assessments levied solely against the properties that benefited. The Elwell law passed by the state legislature in 1911 provided the enabling legislation to accomplish this:

> In a typical case, a new park costing $3,000,000 would be planned to serve one square mile of the city containing 3000 lots, all within five or 6 blocks of the site. The average assessment in such a case would be $1000 per lot, payable at $50 a year for 20 years, plus 5% interest. Lots nearest the park may have to pay as much as $75 per year while those five blocks away may pay $25 a year.[23]

This graduated system of park taxes in which the highest taxes were paid by properties closest to the park was practical public recognition of the enhanced value that parks provide. However, it was noted that, "Spreading the assessment costs over the parcels of land in the local district according to proportionate benefits is a matter of considerable technical difficulty. So is the problem of determining the limits of the area benefited" (p. 37).[23] For the assessment to be levied and the park built, 51% of property owners had to sign a petition agreeing to it. Special assessments could be used for renovation as well as acquisition and development. When the city was growing, the process was expedited by developers who offered to donate land if the park board agreed to landscape it, since this enabled them to sell lots at higher prices.

A similar system operated in Kansas City, Missouri, where "park benefit districts" were established and the costs of parks were divided among the lots in the district. George E. Kessler was appointed in 1892 to develop a system of parks in Kansas City but his plans were opposed because of the high cost. The Park Board initially considered financing the

plan by raising property taxes, but major land-owners opposed this. An alternative solution was to establish special park assessment districts, where property values would increase as real estate values adjacent to the improved parks increased. In 1895, this plan passed in a referendum of Kansas City by a majority of seven to one.[10]

Similarly, in Denver, Colorado, the city was divided into four park districts where:

> The assessments were graded according to the distance from the park or parkway acquired. In one district they varied from $2.98 for each 25' x 125' lot near the facility to $1.16 for the more remote lots. In another district they ran from $5.09 to $1.25 a lot; in a third from $33 to 50 cents a lot; while in the fourth district covering the central part of the city and containing the civic center where the expenditure for this purpose was almost $3 million, the assessments ran from $1000 to $3 a lot (p. 181).[24]

Special assessments do not work well in areas where the cost of land is high and the surrounding homes are poor, and this caused Minneapolis to abandon this arrangement for financing parks in the 1960s. There was concern that heavy reliance on special assessment districts was creating a two-tier system of parks. The superintendent of the Minneapolis Park and Recreation Board commented: "It totally disenfranchised the folks who couldn't afford parks...The system became so imbalanced between rich and poor that there were uprisings by communities demanding their rights."[25] Minneapolis scrapped this system and reverted to a citywide charge on each property that was dedicated to park use.

Nevertheless, there are many contemporary examples where special assessment districts have been used to finance parks that convey benefits only to those in a selected geographical area. In some enabling legislation, special assessment districts are also termed enhancement districts, benefit assessment districts, improvement park districts, special services districts, or business improvement districts. Local governments form them because most property owners within the district's boundaries want a higher level of service than the standard that the city provides. Hence, the property owners agree to assess themselves an additional property or sales tax to pay for this higher level of service. The tax is apportioned according to a formula designed to reflect the proportion of benefits that accrue to each property owner. For example, people whose property is located on the fringe of the district may be assessed less than people whose property abuts the park or facility. The special assessment district tax is identified separately on tax bills.

Where the higher level of service that taxpayers desire refers to acquisition and development of new facilities, rather than to higher standards of operation and maintenance, special assessment bonds may be issued to finance the capital improvements. Because the benefit is confined to a carefully defined area of the community, only those people who will benefit from the improvement bear the cost. The director of parks and recreation in New York City observed: "It's like upgrading an airline ticket to first-class."[25]

It has been argued that special district funding creates a stronger bonding and emotional connection between the park and residents in the district. An early president of the American Association of Park Superintendents, drawing on his experience as superintendent of parks in Kansas City, stated:

> The advantage of acquiring park lands by special assessment rather

than by bond issues is that by adopting the plan of assessments on benefited areas, you at once make the owner of those lands a partner in your work. He says my land is assessed a certain amount for the park improvements in this district, I will see what it means; he takes a keen interest in all of the plans when you assess his lands directly for a definite park improvement -- He has a proprietary feeling in all your plans that may be entirely lacking were those plans being executed under a plan of general taxation (p. 32).[26]

Government agencies usually provide the additional level of service which is paid for by special assessment districts, but in many large cities it has been initiated by business leaders and such areas are termed business improvement districts. There are more than 1000 business improvement districts in the United States and Canada. Business improvement districts frequently elect their own boards that take responsibility for the annual budget, hire staff, let contracts, and generally oversee operations. Much of their effort goes into cleaning up, landscaping, maintaining trees and flowers, and enhancing security. An illustration of the effectiveness of business improvement districts is given in Figure 1-5.

**Tax-Increment Financing Districts**

A majority of states have enabling legisla-

**Figure 1-5**   Using a Business Improvement District to Resuscitate Bryant Park

Bryant Park beside the New York Public Library was a neglected, vandalized facility that by the late 1970s had become a haven for drug dealers in the city of New York. A business improvement district was formed to maintain the nine-acre park and make on-going park improvements. The park has been restored with tall shade trees, lush green grass, flower beds, pagodas and a thriving restaurant, and is now considered a model park. At its summer peak, there are 55 employees working in Bryant Park in security, sanitation, gardening, and special events. All of them work for the business improvement district. On some days, the park attracts more than 4,000 office workers and tourists, and more than 10,000 people attend some special events.

The city paid one-third of the $18 million restoration costs, and foundations, philanthropists, and surrounding businesses financed the rest through the business improvement district. The businesses assess themselves $1.2 million of Bryant Park's $2 million annual maintenance bill, while the remainder of the bill is raised in rental and concession fees from restaurants and special events held in the park. Businesses recognized that property values and hence, lease rentals, were closely tied to conditions in the park. Rents in nearby buildings increased dramatically after the park was redesigned and secured. To a primary organizer of the Bryant Park effort, the lesson was clear: "If building owners and the agents help protect urban open space they will be more than paid back for their efforts, both in increased occupancy rates and in increased rent- -all because their building has this attractive new front yard."

Source:   Lucia Mouat (1992) Some green in New York's concrete. The Christian Science Monitor, July 31, p. 7.
Steve Lerner and William Poole (1999) The Economic Benefits of Parks and Open spaces. San Francisco: Trust for Public Land.

BLM_0106873

tion authorizing tax-increment financing. Although the rules and limitations associated with it differ among the states, the basic concept is the same. The first stage is to designate an area as a tax-increment financing district.

The local development authority or city then issues tax-increment bonds and uses the proceeds to acquire land, and to develop parks, recreation facilities, infrastructure, or other public improvements on it.



**Figure 1-6**   Tax Increment Financing *a*, Stage A: Freezing the Tax Base (The Initial Stage); *b*, Stage B: Growth in the Tax Base after Redevelopment

Tax-increment bonds are secured only by projected increases in revenues from existing and new development in the tax-increment financing district. Repayment is contingent upon increases in the taxable value of the property in the district. From the time that the tax-increment financing district is created, two sets of property tax records are maintained for it. The first set reflects the value of property up to the time that the district is formed, and the second set of records reflect any growth in assessed property value after the enhancements have been made. The second incremental portion of tax revenues is used to pay for the cost of the enhancements.

The distinctive feature of tax-increment financing districts is that they rely on property taxes that the projects within the district directly create. The projects pay for redevelopment costs not the general taxpayers. The tax base of the property in the designated area is frozen at its current level before redevelopment. All, or some, of the entities that have taxing authority, such as cities, counties, and school districts, agree to this freeze. (Remember that only the tax base, and not the tax rate is frozen.).

Because rejuvenation of the district is likely to increase the value of their assets, landowners and residents have every reason to support the district's establishment. Jurisdictions, such as school districts, cities, and counties, do not lose revenue by agreeing to freeze assessed property values because without rejuvenation this assessed value would not increase over time.

While state laws vary, all include a provision that enables each of the taxing jurisdictions to continue receiving the share of the taxes that they had collected in the past from the frozen tax base (see Figure 1-6a). Each taxing jurisdiction first applies its tax rate to the frozen value then to a new property value. The revenues accruing from the difference between the two is the tax-revenue increment available that year for repaying capital debts that the project accumulated (see Figure 1-6b). These incremental dollars go to the special district that issued the bonds. As assessed value in the district increases above the frozen tax base level, greater increments become available for retiring the district's debts.

## References

1.  Rogers, Will (1999). in the Introduction to *The economic benefits of parks and open space by Steve Lerner and William Poole*. San Francisco: The Trust for Public Land.

2.  Dateline (1990). Military base closings. *Dateline NRPA*, September, p. 8.

3.  The President's Commission on Americans Outdoors (1987). *Americans outdoors: The legacy, the challenge*. Washington, DC: Island Press.

4.  National Recreation and Park Association (1966). *Outdoor Recreation Space Standards*. New York, NY: National Recreation and Park Association.

5.  Crompton, John L., Lisa L. Love and Thomas A. More (1997). Characteristics of companies that considered recreation/parks/open space to be important in (re)location decisions. *Journal of Park and Recreation Administration,* 15 (1), 37-58.

6.  Lyon, David W. (1972). *The spatial distribution and impact of public facility expenditures*. Berkeley: University of California, Department of City and Regional Planning, Ph.D. dissertation.

7.  Allen, P. Geoffrey, Thomas H. Stevens,

and Thomas A. More (1985). Measuring the economic value of urban parks: A caution. *Leisure Sciences,* 7 (4), 467-477.

8.  Little, Charles E. (1990). *Greenways for America.* Baltimore: John Hopkins University Press.

9.  Kaplan, Rachel and Stephen Kaplan (1990). *The experience of nature.* New York: Cambridge University Press.

10. Fox, Tom (1990). *Urban open space: An investment that pays.* New York, NY: Neighborhood Open Space Coalition.

11. Simon, Donald E. (1976) A prospect for parks. *The Public Interest,* 44 (Summer), 27-39.

12. Chandler, H.P. (1920). Financing public parks. *Park International,* November, 250.

13. Berg, Rich (1996). N.I.M.B.Y. suits threaten rec. sports sites. *Athletic Business,* April, 26.

14. Gartner, William C., Daniel E. Chappelle and T. C. Giraud (1996). The influence of natural resource characteristics on property value: A case study. *Journal of Travel Research,* Summer, 64-71.

15. Tibbets, John (1998). *Open space conservation: Investing in your community's economic health.* Cambridge, MA: Lincoln Institute of Land Policy.

16. Li, Mingche M. and H. James Brown (1980). Micro-neighborhood externalities and hedonic housing prices. *Land Economics,* 56 (2), 125-141.

17. Nelson, Arthur C. (1986). Using land markets to evaluate urban containment programs. *American Planning Association Journal,* Spring, 156-171.

18. Weir, L.H. (1928). *Parks: A manual of municipal and county parks.* New York: A.S. Barnes and Co.

19. Little, Charles E. (1969). *Challenge of the land.* New York: Pergamon Press.

20. Daane, Kenneth E. (1964). *The economic implications of the Regional Park System in Maricopa County.* Tempe, Arizona: Bureau of Business Services, Arizona State University.

21. Cook, Ernest (1994). A Trust for Public Land memorandum to Rand Wentworth, April 7. Cited in Steve Lerner and William Poole (1999). *The economic benefits of parks and open spaces.* San Francisco: Trust for Public Land.

22. Huus, Randolph O. (1935). *Financing municipal recreation.* Menasha, Wisconsin: George Bante Publishing Co.

23. Brecher, Roth and Edward Brecher (1963). Space for everybody. *National Civic Review,* October, 478-481, 488.

24. Lewis, Nelson P. (1923). *The planning of the modern city.* New York: John Wiley.

25. Martin, Douglas (1994). Trying new ways to save decaying parks. *The New York Times,* November 15, A16.

26. Dunn, W. H. (1912). The effect of park and boulevard improvements on property values. *Proceedings of the Fourteenth Annual Convention of the American Association of Park Superintendents,* 30-34.

BLM_0106876

BLM_0106877

# CHAPTER 2

# The Early Empirical Studies

THE IMPACT OF PARKS ON PROXIMATE PROPERTY VALUES

THE IMPACT OF PARKWAYS ON PROXIMATE PROPERTY VALUES

THE IMPACT OF PLAYGROUNDS ON PROXIMATE PROPERTY VALUES

CONCLUSIONS

BLM_0106878

BLM_0106879

## CHAPTER 2

# *THE EARLY EMPIRICAL STUDIES*

### THE IMPACT OF PARKS ON PROXIMATE PROPERTY VALUES

*Our parks [in Kansas City] have enhanced values and the proof is incontestable, that the construction of our park and boulevard system has been a profitable industry for the taxpayer...Whenever this work has been properly executed and maintained it should be considered an investment and not a tax(p. 31).*[1] (Superintendent of Parks, Kansas City, 1912.)

*It has been fully established that...a local park of suitable size, location and character, and of which the proper public maintenance is reasonably assured, adds more to the value of the remaining land in the residential area which it serves than the value of the land withdrawn to create it (p. 14).*[2] (Frederick Law Olmsted, Jr., 1919.)

*After the park is established the land abutting it is increased in value, which value comes back to the city in increased taxes; and in addition to this localized increase in values on account of the visible and obvious advantages which accrue to the abutting property, there will also be a general rise in value because the park has raised the tone of the city as a whole (p. 12).*[3] (Henry Hubbard, Professor of Landscape Architecture, Harvard University, 1924.)

These early quotes are representative of the conventional wisdom that prevailed among park professionals, landscape architects and urban planners in the early years of the twentieth century. Given his legendary, inspirational role in the architecture, design and popularization of parks in the United States, it should come as no surprise that this conventional wisdom emerged from the work of Frederick Law Olmsted.

In espousing the proximate principle, Olmsted was adopting the theory of rent that had previously been articulated by Riccardo

BLM_0106880

who argued:

> Land of superior fertility would earn a rent since it would yield a greater quantity of output for a similar quantity of seed and labor, and this rent would be capitalized into a higher selling price when the land changed ownership. This implies that the change in the fertility of the soil resulting from an irrigation project will be reflected in the change in the market price. Using this technique, several studies were made of irrigation projects. [Others] showed that rent could be earned by land not only through differences in fertility but also because of locational differences; land nearer the market where produce was sold would command a higher rent than land further away, reflecting the saving in travel costs (p. 76).[4]

In the context of parks, Olmsted perceived that savings in travel costs were supplemented, and often likely to be exceeded, by the benefits of a pleasant view and a sense of spaciousness for which people were also prepared to pay a locational premium. This premium was similarly captured in the additional price individuals were willing to pay for property offering easy access to these benefits. When the site for Central Park was acquired, most city residents lived more than three miles to the south.[5] Thus, one of the four objectives of Central Park was that it should be a strategic public investment that would encourage real-estate development in the surrounding blocks.

Before funding for Central Park was committed, Olmsted explained how the proximate principle would result in the park being self-financing and his argument convinced key decision-makers. Thus, the New York City Comptroller, writing in 1856 shortly after the city acquired title to the land for Central Park, said, "the increase in taxes by reason of the enhancement of values attributable to the park would afford more than sufficient means for the interest incurred for its purchase and improvement without any increase in the general rate of taxation" (p. 12).[6]

Olmsted consolidated the initial conceptual acceptance of the proximate principle for Central Park by subsequently providing empirical verification of it. He was responsible for the earliest documentation of the relationship between public parks and real estate values. A summary of his data is given in Figure 2-1.[7] This documentation was widely disseminated and was a powerful weapon in the armory of early public and open space advocates seeking to persuade communities to commit new investments into these amenities.

**Figure 2-1**   Frederick Law Olmsted's Documentation of the Impact of Central Park on the Property Tax Base of the Three Proximate Wards

The earliest documented relationship between public parks and real estate values was developed by Frederick Law Olmsted at New York City's Central Park. The data were an important element in stimulating creation of the entire New York City park system, and they supported the evolution of the public park movement in many other American cities in the late 19th century.

BLM_0106881

Olmsted was aware that many in the City of New York were skeptical of spending so much money on land acquisition and park construction. To justify the expenses in 1856, Olmsted began tracking the value of real estate in the three wards surrounding the park, comparing the higher tax revenue from this adjacent property to the debt charges the city was paying on the bonds used to acquire the land and build the park. The results of his tracking and the conclusions he derived from it are shown below:

| Ward | 1856 | 1857 | 1858 | 1859 | 1860 | 1861 |
|---|---|---|---|---|---|---|
| Twelfth | $8,149,360 | $8,134,013 | $8,476,890 | $10,062,725 | $11,857,114 | $12,454,375 |
| Nineteenth | 8,041,183 | 8,558,624 | 10,971,775 | 12,621,894 | 16,830,472 | 16,986,152 |
| Twenty-second | 10,239,022 | 10,489,454 | 11,563,506 | 13,261,025 | 14,775,440 | 17,666,866 |
| Total | $26,429,565 | $27,182,091 | $31,012,171 | $35,954,644 | $43,463,026 | $47,107,393 |

| Ward | 1862 | 1863 | 1864 | 1865 | 1866 | 1867 |
|---|---|---|---|---|---|---|
| Twelfth | $13,100,385 | $14,134,825 | $15,493,575 | $18,134,805 | $18,381,650 | $24,940,737 |
| Nineteenth | 17,903,137 | 19,003,452 | 20,462,607 | 23,070,890 | 37,636,050 | 46,249,340 |
| Twenty-second | 18,041,857 | 18,281,222 | 18,756,276 | 19,824,265 | 24,052,715 | 30,915,240 |
| Total | $49,045,379 | $51,419,499 | $54,712,458 | $61,029,960 | $80,070,415 | $102,105,317 |

| Ward | 1868 | 1869 | 1870 | 1871 | 1872 | 1873 |
|---|---|---|---|---|---|---|
| Twelfth | $28,143,005 | $42,648,865 | $48,869,700 | $50,362,925 | $54,568,885 | $62,457,680 |
| Nineteenth | 53,608,040 | 59,608,040 | 71,319,633 | 77,771,930 | 91,283,545 | 110,519,305 |
| Twenty-second | 36,175,185 | 47,663,245 | 53,146,920 | 57,666,340 | 60,185,820 | 63,104,530 |
| Total | $117,926,230 | $150,224,743 | $173,336,040 | $185,801,195 | $206,038,250 | $236,081,515 |

| | |
|---|---|
| Assessed value in 1873 | $236,081,515.00 |
| Assessed value in 1856 | 26,429,565.00 |
| Showing an increased valuation of | $209,651,950.00 |

| | |
|---|---|
| The total expenditure for construction, from May 1st, 1857 to January 1st, 1874, is | $8,873,671.50 |
| The cost of land of the Park to the city is | 5,028,844.10 |
| The cost of the Park to the city is | $13,902,515.06 |

The rate of tax for the year 1873 is 2.50, yielding on the increase of valuation as above stated, increase of tax amounting to $5,241,298.75.

| | | |
|---|---|---|
| Total increase of tax in three wards | | $5,241,298.75 |
| The annual interest on the cost of land and improvement of the Park, up to this time, at six percent | $834,150.94 | |
| Deduct one percent, on $399,300 of stock, issued at five percent | 3,933.00 | |
| | | 830,157.94 |
| Excess of increase of tax, in three wards, over interest on cost of land and improvements | | $4,411,140.81 |

When it was only half complete, Central Park began to generate revenue. Olmsted documented a $55,880 net return in annual tax from the park in 1864. By the end of 1873, Central Park had cost the City of New York $13.9 million. Land acquisition had cost $5.0 million, and capital improvements to the property came to $8.9 million. In his 1875 report to the Board of Commissioners, Olmsted presented the total cost for Central Park and the increase in tax revenue from the surrounding properties. His chart displayed the values of property in the wards adjacent to the park, which he then compared to the average increases in property value in the city's other wards during the same period.

Olmsted suggested that without Central Park, the property values in the three wards surrounding the park would have appreciated at the same rate as property in other city wards, which was 100%. At that rate the properties in the Twelfth, Nineteenth and Twenty-Second Wards would have been worth $53 million in 1873—but their appraised value was $236 million. Olmsted proposed that the tremendous increase in property value and tax revenue, was directly attributable to Central Park. In 1873 alone, income from property tax in the three wards, minus the interest on the cost of the land and its improvements, was $4.4 million.

Source:   Tom Fox (1990) *Urban open space: An investment that pays*. New York, New York: Neighborhood Open Space Coalition, pgs. 9-11.

By the 1890s, the homes of many of America's richest families including the Astors, Vanderbilts and Rockefellers were located on Fifth Avenue from 46th street to 72nd street.[7] Soon after Central Park was completed, the New York Parks Commission was able to assert that before the park was developed, the three wards adjacent to the park paid one dollar in every thirteen the city received in taxes; but after its development they paid one-third of the entire expenses of the city, even though acquiring the land for Central Park removed 10,000 lots from the city's tax roll.[6]

Attributing all the high increase in the property values in these three wards to the park, as Olmsted (Figure 2-1) and the New York Parks Commission claimed, was probably inappropriate and an exaggeration of the park's influence. It is likely that natural growth in the city's population which caused a northerly movement of people would have created increased property values in these wards without the park. Indeed, the average values in

other parts of the city increased approximately 100% during this time period. However, if this average rate of increase had been applied to the three wards contiguous to Central Park then their property value would have been about $53 million; whereas it was actually $236 million. Thus, even when this is considered, the park's influence remained considerable. A commentator writing in 1923 noted:

The assumption that this increase was entirely due to the acquisition and development of this park would be unwarranted. As property changes from acreage to city lots the percentage of increase in value is greater than during any other period of development. Much of this advance in value may be speculative, but that there is a real increase due to the land having become marketable cannot be questioned. During the period covered by the increase in taxable values about Central

Park, the great northward movement in population and improvement began, and there would undoubtedly have been a marked advance in value even if Central Park had not been bought and improved; but it is unreasonable to suppose that it would have been so great. If we cut the figures in two and conclude that values within these three wards were quadrupled as a result of this improvement, it is likely that we would not be far wrong (p. 177).[8]

The highly publicized financial success of Central Park generated calls for the scenario to be replicated elsewhere in the New York City area. For example, in a letter to the New York Times in 1882 a correspondent noted that Central Park "has not only paid, but it has been a most profitable investment, and regarded in the light of a real estate transaction alone, it has been a great success"(p. 3).[9] He went on to observe that "those who want a reduction in the tax rate and those who favor the movement for its effect on real estate" were now "certain" to support development of future parks. As a result of the Central Park success, the letter writer advocated a proposal to acquire and develop two new 2,000 acre parks on the periphery of the city before its expanding population reached those areas. He argued:

> Four or five millions of dollars at the utmost will be sufficient and, as experience has proved, the City will not only be reimbursed for the outlay, but will receive in the increased tax income collected on the enhanced value of land contiguous to the proposed parks much more than will be required for maintenance and other accounts, leaving, as in the case of Central Park, a handsome profit on the

investment(p. 3).[9]

Similar arguments were used in many other locales, as local governments realized that large public parks encouraged new residential development on the periphery of a city which they believed expanded and strengthened the tax base.[7] Land on the fringes was inexpensive and there was general acceptance of the principle that the increased tax revenue fully reimbursed the initial investment required to acquire and develop the land.

The documented evidence from Central Park had established the proximity principle as conventional wisdom among planners and park advocates, and resulted in it being used to justify major park investments in many other communities, most notably in nearby Brooklyn, in Boston and in Kansas City. In Brooklyn it was a prime factor in stimulating development of the 526 acre Prospect Park, which Olmsted and his partner Calvert Vaux also designed and built. One of the main purposes of the plan was to stimulate new real estate development.[7]

To demonstrate the influence of the Central Park data in Boston, Fox cites an 1890 report,[7] published under the authority of the Metropolitan Park Commissioners which stated:

> The citizens of Boston had examples before them, in the parks of neighboring American cities, which assured them that, while the cost of necessary open spaces would be great, the returns in taxes from the enhanced value of real estate in the vicinity of the new parks, as well as the income from betterments, would ensure them a strong financial support. (p.7).[10]

In 1900, the Boston Metropolitan Park Commissioners reported:

Franklin Park has cost for land and construction, to the present time, $3,800,000, while the cost of maintenance for the year 1899 amounted to $36,700. The increase in valuation of lands in the vicinity of the park, which were assessed for betterment, was $1,230,000 between 1883 and 1890 (p. 11).[10]

The first county park system in the U.S. was the Essex County Park Commission in New Jersey which was established in 1895. Much of its early justification for park investment was based on the proximate property principle. In 1915, the Commission engaged a consultant to assess the impact on land values of four Newark parks -- Eastside, Westside, Weequahic, and Branch Brook.[3] An extract

**Figure 2-2**   The Impact of Four Newark Parks on Adjacent Property Values

The property immediately adjoining the four parks named was assessed in 1905 for $4 million and in 1916 for $29.2 million, an increase of $25.1 million, or 606 per cent. Property in these same taxing districts, perhaps not wholly outside the 'park influence,' was assessed in 1905 at 36.6 million, and in 1916 at $111.5 million, a gain of $74.9 million or 204 per cent. Thus, while the property adjoining the park increased more than six times in value, property in the remainder of the same taxing districts about doubled in value. The following table shows the dramatic increases in adjacent properties associated with each of the four park sites:

RATE OF INCREASE IN PROPERTY VALUES

| Park | Property adjacent to parks | Rest of same taxing district | Adjacent taxing districts |
|---|---|---|---|
| Eastside | 9 times | 2¼ times | 2½ times |
| Westside | 15 times | 3    times | 3    times |
| Weequahic | 14 times | 7    times | 3    times |
| Branch Brook | 5 times | 2½ times | 3²ᐟ³ times (part adjoins park) |

If the increase in valuations adjoining these parks has been the same as in other property in the same taxing districts, and no more, it would have been $8.4 million, leaving an increase as a result of the parks of $16.6 million. The fortunate owners of this property have been enriched by this large sum beyond what they would have been had the parks not been established.

But this was not all. The cost of these four parks was $4.2 million. The increase is enough to pay for them four times. The cost of all the parks in the county was $6.9 million -- say $7 million. The increased value of adjoining property alone, beyond what it would have been if the parks had not been constructed, was sufficient to pay for all the parks in the county 2.4 times. The Commission stated that "the increased revenue to the county was sufficient to pay the interest and sinking fund charges on the bonds issued for park construction, and meet almost the entire cost of the annual maintenance."

Source:   A 1916 issue of the *Newark Sunday Call* cited in L.H. Weir, *Parks: A manual of municipal and county parks.* New York: A.S. Barnes (1928), p. 12.

BLM_0106885

from a summary of the report published in the *Newark Sunday Call* is shown in Figure 2-2. The results showed that over a 12 year period, the increased taxes paid to the county by adjacent property owners, which were attributable to the four parks, were sufficient to pay all debt charges and almost all of the maintenance costs.

Similar results were reported in a study undertaken by a firm of accountants for the neighboring Union County Park System in New Jersey in 1928.[11] The study focused on property adjacent to Warinanco Park in both the City of Elizabeth and the Borough of Roselle, for the years 1922 and 1927. For comparative purposes, the study reported assessed values of the City of Elizabeth; the Tenth Ward of that city in which the park was located; and of the balance of the taxing district of Roselle, for the same years. Results of the study are summarized in Table 2-1.

The consultants reported that the increase in assessed values in the Elizabeth Tenth Ward outside the area adjoining the park in this period was 64.1%. If the area adjoining the park had increased in value at that rate since 1922, then its assessed value would have been only $450,000, giving a total for 1927 of $1.15 million instead of the $3.77 million shown in Table 2-1. The difference of $2.62 million they believed was attributable directly to the influence of the park.

A similar situation was evident on the Roselle side of the park where the rate of increase for the Borough property beyond the park area was 34.5%. If this rate were applied to the park area property, then the increase in assessment values from 1922 to 1927 would have been $370,000 giving a total of only $1.44 million instead of the actual total of $2.65 million shown in Table 2-1. Again, the difference of $1.21 million was attributed by the consultants to the influence of the park.

A subsequent update of this study reviewed the 17 year period from 1922 to 1939.[12] It reported that there was a 632% increase in assessed valuations on properties adjacent to Warinanco Park during this period. This was nearly 14 times the average increase of 46% for the entire city during the same period of years. The property in Elizabeth adjacent to the park which was assessed at $703,000 in 1922, rose to $5.1 million in 1939. A similar, though less spectacular, increase was shown on lands adja-

**Table 2-1**   The Influence of Warinanco Park on Adjacent Land Values in the City of Elizabeth and the Borough of Roselle 1922-1927

|  | City of Elizabeth | Tenth Ward in Elizabeth | Adjacent to Park on Elizabeth side | Borough of Roselle | Adjacent to Park in Roselle |
|---|---|---|---|---|---|
| 1922 Assessed Value* | 83.90 | 16.10 | 0.703 | 7.10 | 1.07 |
| 1927 Assessed Value* | 125.13 | 29.05 | 3.770 | 11.57 | 2.65 |
| % Increase | 49.1% | 80.4% | 436.1% | 62.8% | 147.0% |

* Values are in $ millions.
Source: County parks increase property values. *The Playground* March 1928: 633-634.

cent to the park in Roselle where valuations on land adjacent to the park increased by 257%.

In the first third of the twentieth century, developments of parkways and playgrounds were considered to be as central economic, social, and political issues, as the development of parks. Hence, the remaining discussion in this chapter separately reviews the results of studies that investigated how each of these two land uses impacted proximate property values.

## THE IMPACT OF PARKWAYS ON PROXIMATE PROPERTY VALUES

Parkways were first introduced by Olmsted and Vaux in their design of Prospect Park in Brooklyn. They were broad, tree-lined boulevards that characterized the major approaches to the park and were intended to extend the park out to surrounding farmlands.[7] The idea was subsequently adopted by many other cities. The main difference between parkways and highways was that "highways place a greater emphasis upon convenience and directness, while the emphasis in parkways is upon agreeableness and pleasure, so that movement becomes in itself a form of recreation. Parkways thus having the motive of recreation are conceived more generously in the matter of space and width" (p. 119).[13]

In contemporary society, the distinction between a highway and a parkway in an urban setting has essentially disappeared since the dominant goal of all main urban arteries today is the efficient movement of traffic, and not their aesthetic appeal. However, in the first third of the twentieth century, development and maintenance of parkways was a major responsibility of many urban park departments and their positive impact on proximate land values was a primary justification for their construction. For example, George E. Kessler, who master-minded the early evolution of the excel-

lent Kansas City park system, made the following observations regarding boulevards (which in his context was a synonym for parkways) in a report to his Board of Park Commissioners in 1910:

> Conservative real estate men [in Kansas City] estimated the present value of the ground frontage on the Kansas City boulevards, less building improvements. They compared this valuation with that of ground fronting on adjacent streets which were not boulevards. They found that the difference in favor of the boulevard real estate was a quarter of a million dollars more than the entire cost to taxpayers of all the parks and boulevards embraced in the system...Real estate men discovered years ago that frontage on boulevard easily doubles the market value of lots on streets two or more blocks distant.[14]

Writing much later in 1937, Nolan and Hubbard reaffirmed that this view was still the prevailing conventional wisdom:

> In most cases where public money has been spent for parkways the assumption has been definitely made that the proposed parkways will show a *provable* financial profit to the city. It has been believed that the establishment of parkways causes a rise in real estate values throughout the city, or in parts of the city, to such a degree that increased proceeds from taxation may equitably be collected, sufficient to meet both the interest charges entailed by the original expenditure and the sinking-fund requirements for discharging the debt (p. 6).[13]

BLM_0106887

The prevailing mind-set was that these recreational parkways were analogous to linear parks and, thus, a similar premium attributable to their aesthetic appeal would be present.

Given the prominence of parkways in the urban landscape, Nolan and Hubbard, who were Harvard University professors, undertook an empirical study of their impacts on land values.[13] Sample sections of three parkways were selected for investigation in Kansas City, Missouri; Boston, Massachusetts; and Westchester County, New York. The methodology used was to compare the value of land before the creation of a parkway with the value of the land near the parkway after it had been in existence for some years. Land values were measured in dollars per square foot based on assessed valuations of the property. The authors drew three general conclusions from their project:

- The increase in land values close to a parkway was greater than that of land unaffected by the parkway.
- Some benefits of parkways were spread generally across the whole city.
- "From all our study we have come to a firm conviction that parkways, properly designed in their relation to all the needs of a considerable population, will be worth their expense and that their value will be reflected in the taxable values of property so that, in truth, the community *as a business* will be better off financially on account of the parkway because it will ultimately be receiving annually in added taxes more than the annual charge to the community for creating and maintaining the parkway" (p. 128).[13]

Some park commissions made extravagant claims for the influence of parkways. For example, in Westchester County, New York, the valuation of taxable land improvements increased 125% from $800 million in 1923 to $1,800 million in 1931. The County Park Commissioners were quick to claim a large proportion of this growth was attributable to their parkways. Nolan and Hubbard, however, observed the "great rise in land value in Westchester County, although it was doubtless increased and hastened by the parkways, would have taken place to a considerable extent if there had been no parkways" (p.127). They pointed to the pressure on land caused by the large population growth of New York City in this period, the growth in automobile use, and the introduction of improved rail services as key factors in stimulating the growth.

Increases in parkways' proximate land values were clear, but there were two reasons why it was naive to attribute the increase to the design of the parkways. First, as the authors noted in the case of Westchester County, there were invariably numerous confounding variables which also contributed to the increases and they commented, "It is quite impossible to segregate accurately...the effect due to the parkway with the effects due to many other causes" (p. 32).

A second factor was the changing role of the automobile in the first third of the century. When Olmsted and Vaux and Kessler originally developed the parkway idea, the automobile was a recreational vehicle for the wealthy, but by the early 1930s, it had become a transit vehicle for the middle classes. The parkways "furnished channels for quick accessibility" (p. 61).[13] Thus, much of the enhanced value of proximate lands was likely to stem from the enhanced accessibility the parkways offered as traffic and transit arteries to these properties, rather than from their aesthetic appeal.

## THE IMPACT OF PLAYGROUNDS ON PROXIMATE PROPERTY VALUES

In most communities today, the distinction

between parks and playgrounds has disappeared. Typically, playground equipment is one of multiple features incorporated into the design of parks. Playgrounds as independent entities are confined primarily to inner city neighborhoods where they are vestiges of a previous planning era. However, in the first third of the twentieth century, independent playgrounds were a common feature in the urban landscape. These entities were defined as, "spaces wholly designed for play, and having little or no park-like qualities" (p. 324).[15]

In 1926, the Metropolitan Conference of city and state park authorities in New York observed: "We have no evidence that neighborhood playgrounds cause that direct and measurable increase in land values which has been proven in the case of major park and parkway extensions" (p. 376).[16] The conventional wisdom of that era on the likely impact of playgrounds was mixed. One commentator observed:

> Some of the opinions that have been expressed as to the effects of playgrounds on land values point out that playgrounds not having a park-like effect decrease land values; that because of the noise and dust caused by a large number of children on the playground the "bordering-on" property value would be decreased; that playgrounds are undesirable in the "better class" residential districts (p. 376).[16]

There was anecdotal evidence to support this view, such as this report from 1926:

> A delegation of citizens from the Tompkins Square neighborhood waited on the Park Commissioner demanding that the playground be taken out- -not because their children

did not attend, but because of the great clouds of dust that were raised on windy days because of the dry weather and the bad surface of the playground. This action certainly indicated an unpleasant state of affairs, which would not make the houses surrounding the playground a desirable place to live in (p. 324).[15]

At the same time, another observer who was a Professor of Landscape Architecture at Harvard University, while acknowledging this viewpoint was prevalent, concluded: "But whenever a playground is necessary, it cannot be denied that its presence raises the value of the whole neighborhood" (p. 376).[16]

In response to these antithetical views and to the lack of empirical evidence relating to playgrounds, two major studies were undertaken in the late 1920s. The first investigation was in New York City and it focused on seven playgrounds in Manhattan and two in Brooklyn.[15] Changes were compared between 1904 and 1926 in the assessed value of land: (1) directly bordering on a playground; (2) adjacent to a playground, which was operationally defined as streets located one, two or three blocks away from it; (3) in the Section in which each playground was located. Sections were large areas, (eight in Manhattan) for which total assessed valuations were given yearly; and (4) on the whole Borough. Data for the study were derived from land value maps and tax reports prepared by the Department of Taxes and Assessments. The results are shown in Table 2-2.

The data in Table 2-2 show that in only three of the nine locations did the bordering land increase at a greater rate than the adjacent land. The increase in the adjacent land was in seven of nine cases greater than the increased assessed values in the Section and in eight of nine cases greater than in the Borough. Also at six of the playgrounds, the bordering values

| | | | | | | Percentage increases in assessed values of land | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Name | Location | Date of ac-quisi-tion | Character of neighbor-hood at time of acquisition | Area in acres | Period of years | Bordering on play-ground | Adjacent to play-ground | Tax section | Borough |
| MANHATTAN Chelsea | 27th Street and 10th Avenue | 1906 | Residential, with scat-tered retail stores and industry | 3.1 | 1904 to 1926 | 24 | 53 | 38 | 27 |
| West 59th St. | West 59th Street between 10th and 11th Avenues | 1906 | Residential and industrial | 0.5 | 1904 to 1926 | 99 | 75 | 32 | 27 |
| St. Gabriel's | 35th Street and 2d Avenue | 1906 | Residential and mixed industrial | 2.9 | 1904 to 1926 | 25 | 33 | 38 | 27 |
| Yorkville | 101st Street be-tween 2nd and 3rd Avenues | 1906 | Residential | 0.9 | 1904 to 1926 | 52 | 42 | 9 | 27 |
| John Jay | East 76th Street to East 78th Street and East River | 1906 | Residential | 3.0 | 1904 to 1926 | 98 | 103 | 45 | 27 |
| Carmansville | 152nd Street and Amsterdam Ave-nue | 1906 | Residential | 0.1 | 1904 to 1926 | 92 | 94 | 51 | 27 |
| St. Catherine | East 67th Street between 1st and 2nd Avenues | 1914 | Residential | 1.4 | 1914 to 1926 | 11 | 13 | 39 | 19 |
| BROOKLYN Betsy Head Memorial | Livonia, Dumont and Hopkinson Avenues | 1912 | Open, near detached residential area | 10.5 | 1911 to 1926 | 163 | 118 | 89 | 55 |
| Graves-end | 18th Avenue and 55th Street | 1917 | Scattered detached residences | 6.9 | 1915 to 1926 | 123 | 125 | 91 | 57 |

**Table 2-2**  Increase in Land Values at Nine Playgrounds Between 1904 and 1926

Sources: (i) Charles J. Storey (1927).  Increase of land values around playgrounds.  *The Playground* September: 324-326.
(ii) Thomas Adams, Harold M. Lewis, Theodore T. McCrosky (1974).  *Population, Land Values and Government. Regional Survey, Volume II.*.  New York: Arno Press p. 178.

increased more than those in the Section and Borough.  These findings suggested that the optimum location was not abutting a play-ground, but was within one, two, or three blocks of it. However, abutting such a facility created larger increases in land values than be-ing outside the service range of a playground.

Other conclusions drawn from this study included:

- In no case was there a decrease in the value of bordering lots in the time period from two years before the land for the playground was acquired by the city to the

BLM_0106890

year 1926. The author noted, "It is quite evident that the acquisition or opening of these playgrounds had no detrimental effect on the land values around them, but rather, as shown in many cases, an immediate upward effect" (p. 325).[15]

- The more "park-like" the playground, the more positive the impact on property values.

- Large sites increased the value of residential property to a greater extent than small sites.

- The location of business and industry near a playground minimized the effect a playground had upon proximate property values. Conversely, the effect was greatest in an exclusively residential neighborhood.

These findings were generally confirmed in a second study reported a year later which focused on nine playgrounds in Brooklyn, New York, and four playgrounds in Orange, New Jersey.[16] Orange was included because it offered a different kind of environment, "a city of houses and very few factories" (p. 378). Two criteria were used to select playgrounds for inclusion in the study. First, all were staffed with a supervisor and were equipped. Second, none were selected where the "bordering on" or "adjacent to" property values were influenced by other public property, such as schools or parks. The selected playgrounds differed in size (12 of the 13 ranged from 0.5 acres to 8.5 acres), type of district in which they were located, and proximate land uses. Some were in "very poor, highly congested tenement and industrial sections, while others were in the high class residential districts of one or two family detached houses with well kept lawns" (p. 378). Thus, the playgrounds were classified as being located in one of three categories of district: high class, middle class, and poorer class. Again, data were derived from land value maps published annually by the cities of New York and

Orange for the 1909-1929 period. The results are summarized in Figure 2-3.

The increase in land values of property surrounding playgrounds was greatest in the "highest class" residential districts. As the residential desirability of a district decreased, the extent of increase in land value diminished, until in some of the "poorest class" districts no change at all occurred in land values in the 1909-1929 period.

In the higher and middle class districts the "bordering on" increases were greater than the "adjacent to" increases, but this pattern was reversed among the poorer class districts. This appeared to reflect a predominance of residential property in the higher and middle class districts and a predominance of industrial property in the poorer class districts.

The findings indicating increases more favorable to residential "bordering on" properties, contrasted with those in the earlier study. Another contrasting finding was that in this study, size of playground did not affect the relative increase in land values. However, the findings of the earlier study were confirmed in since in 12 of the 13 cases there was no decline in land value following the opening of the playground.

A limitation of this second study was that, unlike the first project, it did not offer any basis for comparison in land values in the area beyond the immediate influence zone of the playgrounds. The author concluded that his data demonstrated, "The general opinion that playgrounds are a detriment to land values in a "high class" residential district is not true" (p. 380). However, without comparisons to other areas in high class districts that were outside the influence of the playgrounds' zones this conclusion is challengeable, since there was no basis for assessing whether land values would have increased by an even greater percentage if the playgrounds had not been there.

**Figure 2-3**   Land Value Increases Associated with Playgrounds Located in Different "Classes" of Residential Districts, 1909-1929.

**"HIGH CLASS" DISTRICT**
Three playgrounds were located in high class residential districts, "in which it was very desirable to live, consisting of one and two family detached houses with well kept lawns and yards, and also better types of apartment houses." The increase in land values in percentages for the different playgrounds were:

| Name of Playground | "Bordering On" Per Cent | "Adjacent To" Per Cent |
|---|---|---|
| McKinley | 158.0 | 162.0 |
| Central | 170.8 | 95.8 |
| East 14th St. and Ave. "S" | 102.0 | 88.0 |

**"MEDIUM CLASS" DISTRICT**
This type of residential district was characterized by "the better type of tenement houses and fairly desirable one and two-family houses." Four playgrounds were in these types of areas:

| Name of Playground | "Bordering On" Per Cent | "Adjacent To" Per Cent |
|---|---|---|
| New Lots | 68.0 | 103.0 |
| McLaughlin | 72.7 | 58.99 |
| Metcalf | 60.5 | 40.5 |
| Ropes | 53.0 | 53.8 |

**"POORER CLASS' DISTRICT**
Six playgrounds were in "the district of poorer class tenement houses located in a business and industrial area." The percentage increase in land values associated with these playgrounds were:

| Name of Playground | "Bordering On" Per Cent | "Adjacent To" Per Cent |
|---|---|---|
| City | 72.4 | 87.3 |
| McKibben | 20.6 | 42.4 |
| Colgate | 27.2 | 4.6 |
| McCarren | 9.0 | 51.8 |
| Lindsay | 0.0 | 6.8 |
| Greenpoint | 0.0 | 0.0 |

Source:   Jacob W. Feldman (1929) The effects of playgrounds on land values. *Playground and Recreation* September: 375-384.

BLM_0106892

## CONCLUSIONS

Throughout the time period of the studies reviewed here- -from the earliest days of urban park development in the 1850s, through the 1930s- -there was an insistent, almost inviolate conviction among park and open space advocates of the legitimacy of the proximate principle. It was conventional wisdom among them and was also espoused by elected officials. This review of the early studies emphasizes the long history of the proximate principle and its early effectiveness in persuading decision-makers to invest in parks.

The relatively small number of early studies relating to the impact of parks on property values was supplemented by many subsequent studies in later years. These reflected the continued central role of urban parks in communities throughout the century. In contrast, the role of parkways and stand-alone playgrounds diminished considerably in later years, which explains the subsequent absence of studies measuring their impact.

Although substantial gains in proximate property values were associated with parkway developments, there was no convincing evidence to indicate this was attributable to their park-like qualities. It was not possible to untangle the myriad of influences accounting for the increases. However, historical perspective suggests that much of the value increase was attributable to more effective and efficient access for traffic and transit, rather than to the parkways' aesthetics.

It had been claimed that playgrounds were likely to depreciate land values in their vicinity, but the empirical evidence suggested this concern was generally unfounded, especially in proximate rather than abutting properties. The cases investigated indicated that, for the most part, playgrounds caused no retardation in the natural rise of land values. In residential neighborhoods, playgrounds tended to increase the value of proximate property at a greater rate than in neighborhoods where business and industry were present. These conclusions were based on the results from only two studies. However, both studies were carefully executed and were comprehensive involving 22 different sites in three different communities, and they reached similar conclusions. These characteristics suggested that a reasonable level of confidence could be placed in the generalizability of their findings.

In many ways, these early studies were naive, reflecting the underdeveloped nature of the statistical tools and research designs in the early years of the field. They were limited to simple calculations of increased tax receipts accruing from properties in proximity to parks, parkways and playgrounds.[7] However, this ignored the necessity of unraveling the complicated plexus of factors that may influence property values in addition to parks. It was noted that these "are not merely additive, but react on each other and may react in opposite directions in different cases" (p. 124).[13]

In subsequent eras, substantial improvements were made in methods used for quantifying the impact of parks and open space on real estate values. Statistical techniques, such as regression analysis, and econometric approaches made it possible to identify the relative influence on property values of factors other than parks such as house size, type, and location relative to other amenities such as schools, shopping centers, and the central business district. The emergence of these analytical tools defined the end of the era of "early" empirical studies rather than any specific date, but this tended to occur in the 1930s.

## References

1.   Dunn, W.H. (1911). The effect of park and boulevard improvements on property values. Presidents address. *Proceedings of*

the *National Association of Park Superintendents.*

2.  Olmsted, Frederick Law, Jr. (1919). Planned residential subdivisions. *Proceedings of the Eleventh National Conference on City Planning.* Harvard University Press:14-15.

3.  Weir, L.H. (1928). *Parks: A manual of municipal and county parks.* New York: A.S. Barnes.

4.  Vaughan, Roger J. (1974). *The economics of recreation: A survey.* Chicago: University of Chicago. Unpublished graduate student paper.

5.  Garvin, Alexander (1999). A parks agenda for the 21st century. *The Millennium Vision.* A Supplement to *Parks and Recreation,* October:27-37.

6.  Metropolitan Conference of City and State Park Authorities (1926). *Parks as investments.* New York City. Cited in L.H.Weir (1928) *Parks: A manual of municipal and county parks.* New York: A.S. Barnes.

7.  Fox, Tom (1990). *Urban open space: An investment that pays.* New York, New York: The Neighborhood Open Space Coalition.

8.  Lewis, Nelson P. (1923). *The planning of the modern city.* New York: John Wiley.

9.  More parks for New York. (1882, January 9). Unsigned letter to the editor. *New York Times,* p.3, col.6.

10. Board of Paris Exposition Managers (1900). *A history and description of the Boston Metropolitan Parks.* Boston: Wright & Potter Printing Co.

11. Editorial (1928). County parks increase property values. *The Playground,* March: 633-634.

12. Herrick, Charles (1939). The effects of parks upon land and real estate values. *The Planners Journal,* 5(4): 89-94.

13. Nolen, John and Henry V. Hubbard (1937). *Parkways and land values.* Cambridge, MA: Harvard University Press.

14. Kessler, George E. (1910). *Report of Board of Park Commissioners of Kansas City, MO*: April 18th.

15. Storey, Charles J. (1927). The increase of land values around playgrounds. *The Playground,* September, 324-326.

16. Feldman, Jacob W. (1929). The effects of playgrounds on land values of the "bordering on" and "adjacent to" properties to the playgrounds in Brooklyn, New York and Orange, New Jersey. *Playground and Recreation,* September, 375-384.

BLM_0106894

BLM_0106895

# CHAPTER 3

## The Later Empirical Studies

### RESULTS FROM URBAN STUDIES

*The Influence of Different Park Design and Use Characteristics*

### FINDINGS FROM NON URBAN STUDIES

*The Impact of Large Federal or State Park or Open Space Areas on the Local Tax Base*

### FINDINGS NOT SUPPORTIVE OF THE PROXIMATE PRINCIPLE

### CONCLUSIONS

BLM_0106896

BLM_0106897

## CHAPTER 3

# *THE LATER EMPIRICAL STUDIES*

The chapter is divided into three main sections. The first section chronologically reviews studies reporting results in urban areas. With the exception of a pioneering, pathfinding study completed in the late 1930s, these studies were all undertaken after 1960. The growth in their number after this time was coincident with the increasing capability of computing. Almost all of the later studies used least squares regression analysis as their primary statistical tool. Typically, property prices or assessed valuations were regressed against a measure of distance and a set of "control variables" which measured the contributions of other potential influences on property value as well as parks and open space. The increased sophistication of computing made feasible more complex analyses containing a greater number of control variables. The key questions these analyses addressed were:

(i)     Did parks and open space contribute to increasing property values when other potential influences on those values were also taken into account?

(ii)    How large was the proximate effect?

(iii)   Over what distance does the effect extend?

A sub-section reviews studies that did not treat parks and open spaces as being homogeneous, but which recognized there are qualitative differences among them that are likely to result in different impacts on proximate property values.

Findings emerging from studies of parks and open spaces in urban areas may not be generalizable to state and national level parks because of differences in context, scale or mission. For this reason, results from studies undertaken in those contexts are reviewed separately in the chapter's second main section. However, results from water based parks are not reviewed here because they add a level of complexity to the discussion that was deemed to be outside the scope of this monograph. Readers interested in these studies are referred to the bibliography included in Appendix 2. In the final section of the chapter, studies are reviewed whose findings did not endorse the proximate principle.

### RESULTS FROM THE URBAN STUDIES

The shift from the rudimentary early empirical studies to stronger methodological approaches was initiated by Herrick in 1939.[1] His primary purpose was "to show the possibilities of a simple method of analysis applied to available data" (p. 96).[2] It was 25 years before others emulated his approach which highlighted the pioneering nature of the study. Pioneers of new methods by definition expose themselves to criticism. Colleagues identified what they believed to be significant weaknesses in the mathematical models he developed, but at the same time they acknowledged, "Mr. Herrick's paper is an interesting first approach" (p. 56).[3]

He was the first to use statistical techniques to try and isolate the unique contribution of parks to property value increases vis-à-vis other factors. It was an attempt to rectify the fundamental weakness inherent in the early studies of ascribing all increases to the existence of a park and disregarding the array of other factors that may have contributed to the increases, such as differences in the size, age and quality of residences erected on lots; lot size; proximity to a Central Business District, schools, or shopping centers; and access to other facilities and amenities which generate real estate value. Herrick used regression analysis to identify the impact of park acreage and population density on real estate value in Washington, DC for the 1911-1937 period. He suggested his analyses "made it possible to compute the probable future average real estate and land values for the city of Washington with any assumed percentage of parks and density of population, and so to determine whether the probable increase in values justifies the expenditure necessary to procure any proposed park lands" (p. 91).[1]

The analyses addressed average conditions over the whole city, not the impact of particular parks on specifically defined proximate areas. The results indicated that total taxes collected during the 27 year period on the incremental values created by parks were $69 million. Total expenditures for parks and recreation by the city during the same period was $45 million, "leaving a balance of $24 million, which we might say was contributed by the park system to the maintenance of other municipal services" (p. 92).[1]

In the context of a single year, it was calculated that in 1937 the increase in real estate values attributable to the parks of Washington DC was $339 million. The tax rate was $1.50 per $100 valuation, so the taxes collected on these incremental values exceeded $5 million. In that year, operating and maintenance expenses for Washington's parks were $2 million, so the parks yielded a net income to the city of $3 million.

Herrick concluded that his analyses suggested: "Most cities could afford to have twenty to thirty percent of their areas in parks. The ten percent rule, which has been suggested, is much too low" (p. 92).[1] However, the dramatic findings and conclusions of this study have to be tempered by the reservations expressed by critics about the application of the regression analysis.[3] In the long term, the study's main contribution was its pioneering illustration of the role of statistical tools in investigating this issue.

Although no additional work evaluating the proximate principle was reported after Herrick's study for 25 years, the principle retained its status as the prevailing conventional wisdom through the 1940s and 50s. For example, in their *Home Builders' Manual for Land Development*, the National Association of Home Builders noted: "In the vicinity of park and recreation areas, enhanced values of building sites up to 15% to 20%, with a high level of sustained value over the years, are not uncommon experiences" (p. 85).[4] However, in 1961 the

BLM_0106899