lack of convincing scientific evidence to support such anecdotal and experiential conclusions caused William Penn Mott Jr., who at that time was Superintendent of Parks for the city of Oakland, to write a letter to the Caro Foundation in San Francisco stating the "need for concrete evidence to indicate that parks are good business and that the purchase of park lands for future use is good business for a city." (p. 3)[5]

As a result of that letter, the Caro Foundation sponsored a study focused on two parks in Oakland.[5] The samples were relatively small, but they confirmed the positive impact of parks on the assessed values of proximate properties. The results are summarized in Table 3-1.

Clinton Park was in a relatively affluent area, while the San Antonio Park neighborhood property values were substantially lower. In both locations, the mean assessed values (which were supplied by the Tax Collector's Office) of properties fronting the park were dramatically higher than those of properties located one or two blocks away from the parks.

A third neighborhood relatively close to the San Antonio Park was used as a control area. It mirrored the San Antonio neighborhood in size, type of dwelling units, ethnic composition, median family income, and education level, but was not subject to the influence of a park. Thus, its first zone fronted on to other houses rather than a park. Its aggregate assessed values were substantially lower than those of the San Antonio neighborhood, but all the difference was attributed to properties on the block that immediately fronted the San Antonio Park.

In their 1960s *Plan for the Valleys*, the respected Wallace/McHarg planning firm called for the preservation of 3,000 acres of meadowland in their planning area of the Green Spring and Washington Valleys outside Baltimore. They stated:

It has been calculated that uncontrolled growth develops approximately $33.5 million (in land value) by 1980, and Optimum Land Use residential development produces $40.5 million in the same period. The additional $7 million resulting from concentration would be adequate to pay in excess of $2,300 per acre for title to the 3,000 acres exempted from development [which was higher than the prevailing market price at that time] (p. 86).[4]

The wider availability and greater capacity of computing in the 1970s and 1980s stimu-

**Table 3-1**   The Impact of Two Parks in Oakland on the Assessed Values of Properties in the Surrounding Neighborhoods

| Name of park | Properties fronting the park | Properties one block from the park | Properties two blocks from the park |
|---|---|---|---|
| Clinton Park | $3,416 | $2,300 | $2,355 |
| San Antonio Park | $1,489 | $940 | $932 |
| Control Area* | $876 | $932 | $1,195 |

* In the control area, the first zone fronted on to other houses rather than a park, so these values were not subject to the influence of a park.

lated an increase in the number of empirical studies investigating the issue. A 1972 study in Philadelphia focused on 7 sites, at three parks, three schools, and one school-park combination.[6] During the sample years of the study, 1,725 property sales were recorded in the neighborhoods around the sites. As a percentage of total housing units in each area, the sample size ranged from 12% to 25.5%. In all seven neighborhoods regression analyses indicated that distance from the site had an impact on property values, enabling the author to conclude, "there appear to be locational advantages to school and park facilities, and these advantages have been capitalized in the sale price of nearby property" (p. 126).[6]

The Philadelphia study was one of the few to test for a "net effects" curve (Figure 1-4b) which postulates that while there is a positive impact on the value of properties abutting a park, it may be lower than the impact on properties a block or two away which are not subjected to any nuisance created by access and egress. The polynomial equation used to test for this effect was found to be a good fit on one site -- a junior high school site with an athletic field -- with the maximum impact on property occurring 600 to 800 feet from the site.

Another Philadelphia study in 1974 analyzed the impact on sales price of 336 properties in the vicinity of Pennypack Park.[7] This 1,294 acre stream-valley park is in north-east Philadelphia and was surrounded by residential areas developed at a density of approximately ten dwelling units per acre. The area around the park was comprised of "unimaginative housing, heavy in scale with natural landscaping losing out to concrete and stone" (p.275). Based on their subjective evaluation of the area, the researchers hypothesized that "the residents do not consider natural amenity to be very important" so "public open space would be expected to have a relatively low effect on land values compared to other neighborhoods"

(p. 275).

Despite the authors' pessimistic prognosis, regression analysis indicated that the park accounted for 33% of land value at 40 feet. This dropped to 9% at 1,000 feet and 4.2% at 2.500 feet which was the peripheral limit set for the study. From these data, the authors concluded that a net increase in real estate value of $3.3 million was directly attributable to the park.

The most frequently cited study in this literature examined the effect of greenbelts on property values in three different areas of Boulder, Colorado.[8] A total of 1,382 acres of greenbelt had been purchased adjacent to residential developments in the 10 years prior to the 1978 study. The sample consisted of properties from each area that sold in a selected calendar year which were located within 3,200 feet of the greenbelt (n = 82).

Variables in the regression model that were believed likely to influence the sales price of these single family homes were: (i) walking distance in feet to the greenbelt; (ii) age of each house; (iii) number of rooms in each house; (iv) square footage of each house; (v) lot size; (vi) distance to the city center; and (vii) distance to the nearest major shopping center. The regression results showed that, other things being equal, there was a $4.20 decrease in the price of residential property for every foot one moved away from the greenbelt. This suggested that if other variables were held constant, the average value of properties adjacent to the greenbelt was 32% higher than those located 3.200 walking feet away. These results are shown in Table 3-2.

One of the three neighborhoods had been able to take much greater advantage of the open space amenity in its planning than the other two neighborhoods, so the authors initiated further analyses on it. In this neighborhood, price decreased $10.20 for every foot one moved away from the greenbelt. This resulted in:

| Table 3-2   Value of the Average House and Greenbelt Proximity | |
| --- | --- |
| Walking Distance from Greenbelt | Average Value of House |
| 30 | $54,379 |
| 1,000 | 50,348 |
| 1,283 | 49,172 |
| 2,000 | 46,192 |
| 3,200 | 41,206 |

the aggregate property value for the neighborhood being approximately $5.4 million greater than it would have been in the absence of greenbelt. This increment resulted in an annual addition of approximately $500,000 to the potential neighborhood property tax revenue. The purchase price of this greenbelt for the city was approximately $1.5 million, and thus, the potential property tax revenue alone would allow a recovery of initial costs in only three years. (p. 215)[8]

There is an important caveat to these positive results in that 86% of the $500,000 proximate increment of property tax revenue accrued to taxing entities other than the city, i.e. county, school district, and other independent districts. Thus, the incremental return to the city alone was not sufficient to pay the costs incurred by the city in purchasing the greenbelt. This creates a major policy issue. However, it should not inhibit the purchase of park and open space areas because overall economic benefits accrue to taxpayers whose revenues fund all the governmental entities. Resolution of this conundrum requires one of two actions. The first requires a city to be prepared to accept the inevitable criticism that is likely to occur when it raises taxes to purchase the land, knowing that its taxpayers indeed will benefit when return on the investment is viewed in the broader context of total tax payments to all governmental entities. The alternative strategy is to persuade the other taxing entities to jointly fund purchase of the open space areas, since all will reap proximate tax revenue increments deriving from them.

A study undertaken in Worcester, Massachusetts, in the early 1980s examined the relationship between four parks and the values of all properties sold within a 4,000 foot radius of each park during the preceding five years (n = 170).[9] The multiple listing service from which the study's data were derived recorded actual sale price of a house, along with information on other characteristics that might effect the sale price including lot size, number of rooms, age, garage, taxes paid and condition. Distance to the park in feet was added to this set of variables.

The results showed that, on average, a house located 20 feet from a park sold for $2,675 more than a house located 2,000 feet away. However, 80% of the aggregate increase in value derived from properties located within 500 feet of the parks. Effects could not be traced beyond 2,000 feet from the parks. Using these data, it was estimated that the aggregate

BLM_0106902

property value increase attributable to these parks was $3.5 million.

The impact of two parks on the values of proximate residential developments in Dayton and in Columbus, Ohio was reported in 1985.[10] The 170 acre Cox Arboretum in Dayton was a wooded open space containing specialized herb, ornamental and other plant gardens. Its impact on an adjacent fairly new sub-division of 300 properties was assessed. The 152 acre Whetstone Park in Columbus, contained ballfields, trails, natural areas and a 13 acre rose garden, and it was adjacent to an older residential area. In both cases, samples of approximately 100 residences were used in the study.

The regression analyses indicated that for every additional foot of distance a property was located away from Cox Arboretum and Whetstone Park, the selling price decreased $3.83 and $4.87, respectively. The average distance of properties in the study areas were 814 feet and 973 feet from Cox Arboretum and Whetstone Park, respectively, and these properties yielded proximate premiums of $3,100 and

$4,700. Given the average selling prices of properties in the residential areas were $58,800 and $64,000, the park premium represented 5.13% in the Cox Arboretum subdivision and 7.35% at the Whetstone Park residential area. In neither case was an assessment made of how this average premium varied between properties immediately abutting the parks and those located (say) 2,000 feet away, which presumably were much less impacted by the parks.

An empirical investigation in Salem, Oregon, in 1986 reported that open space in the form of greenbelt at the fringe of the urban area exerted an influence on urban land values that extended inward from the urban boundary about 5,000 feet.[11] The researcher concluded that urban land adjoining farmland zoned exclusively for agriculture was worth $1,200 per acre more than similar land 1,000 feet away.

### The Influence of Different Park Design and Use Characteristics

While the above studies consistently re-

**Table 3-3**   The Impact of Different Types of Parks on Residential Property Values

| | Active Recreation Areas | Combined Active and Passive Recreation Areas | Passive Recreation Areas |
|---|---|---|---|
| % change in adjoining lots relative to average value of their census tracts | +10% | +33% | +70% |
| % change in residential blocks surrounding the parks relative to the average value of their census tracts | +7% | +14% | +63% |

ported that parks and open space had a substantial positive impact on proximate property values, other studies have refined this conclusion by identifying differences in the magnitude of this impact based on a park's attributes. These differences pertained to (i) whether a park was designed to service active recreation users or to offer users a more passive, contemplative experience; and (ii) whether a park was easily visible from adjacent streets or was sufficiently obscured from public view that it encouraged anti-social behavior.

Results from an early study undertaken in the city of Spokane, Washington, are shown in Table 3-3.[12] This was a relatively naive study devoid of sophisticated statistical controls, but it was the first to identify a continuum of effect between active and passive parks. Parks were classified into the three categories of active, combined active and passive, and passive. The values of residential properties adjacent to or surrounding parks were positively impacted regardless of the type of park, and magnitude of the impact declined with distance from the parks. However, there were substantial differences in impact along the active/passive continuum with active parks exercising the least positive impact and passive parks the most positive impact.

A more detailed study with better controls

**Table 3-4**  A Comparison of Mean Assessed Values of Properties Within 500 feet and Beyond 500 feet of 10 Parks in Dallas, Texas

| Type of Park | Properties Within 500 Feet | | Properties Over 500 Feet | | Ratio: Under 500 Over 500 |
|---|---|---|---|---|---|
| | Mean Assessed Value ($) | Number of Properties | Mean Assessed Value ($) | Number of Properties | |
| **Playground Parks** | | | | | |
| Casa View | 3,637.00 | 128 | 3,778.00 | 485 | .96 |
| Beckley Heights | 3,390.00 | 141 | 4,197.00 | 760 | .81 |
| Hattie Rankin Moore | 1,372.00 | 179 | 1,528.00 | 301 | .90 |
| Sleepy Hollow | 2,683.00 | 39 | 2,556.00 | 55 | 1.05 |
| Preston Hollow | 9,039.00 | 154 | 11,207.00 | 516 | .81 |
| **Playfield Parks** | | | | | |
| Harry Stone | 5,058.00 | 195 | 5,040.00 | 707 | 1.00 |
| Pleasant Oaks | 6,980.00 | 171 | 5,879.00 | 505 | 1.19 |
| Beckley-Saner | 3,436.00 | 250 | 2,742.00 | 494 | 1.25 |
| Martin Weiss | 3,335.00 | 262 | 3,258.00 | 741 | 1.02 |
| Exline | 2,382.00 | 113 | 2,254.00 | 594 | 1.06 |

Source: Hendon, Kitchen and Pringle 1967.

pertaining to this issue was undertaken in Dallas and reported in 1967.[13] Ten parks were selected for study. The impact on properties within 500 feet of each park was compared with that on properties which were beyond 500 feet but still within the park's service area and zone of influence. In half of the parks the main feature was a playground, while the other five parks were larger and featured community playing fields.

The data in Table 3-4 show that properties within 500 feet of a playground park were of lesser value than other properties beyond 500 but within the park's service area. However, the inner area values were higher than those of properties that were outside the playground parks' service areas. In contrast, properties around the larger playing field parks were of higher value than properties that were more distant in the service area. The authors of the study stated:

> In conclusion, it appears that the community playfield park, because of its large size, generally acts to increase property values of properties immediately adjacent to it while the playground generally decreases the values of similar properties (p. 74).

The authors attributed the reasons for the adverse impact on nearby property of the playground parks not only to noise and the flow of additional people into the area, but to their quality. For example, in the Preston Hollow neighborhood, the park's adverse impact was relatively strong (20%). In this area property values were high, $9,039 within 500 feet compared to $11,207 in the rest of the service area (Table 3-4). The authors offered the following explanation for the adverse effect:

> The detrimental character of the park appears to lie in its appearance rela-

tive to the rest of the neighborhood. Probably if the appearance were improved, by plantings or some form of redesign, the adverse effect would be diminished.

It seemed to be true in all cases, that the aesthetically pleasing park (one which had an attractive design, was well maintained, and highly landscaped) caused an increase in property values of properties around the park, relative to other properties...The parks which were well shaded, well designed and were of pleasing appearance had a positive impact, while those which were poorly designed had an adverse effect upon property values (p. 74).

Added dimensions to these findings were reported in a 1974 study which employed sophisticated statistical controls.[14] It focused on five parks in Columbus, Ohio: Audubon, Kenlawn and Linden parks were on the north side of the city, while Hauntz and Westgate were on the west side. All were located in neighborhoods comprised predominately of single family homes. However, the spatial relationships between the parks and adjacent residential properties differed in two ways. First, at Hauntz, Linden and Westgate, houses faced the park with a street between them; while at Audubon and Kenlawn, houses backed on to the parks separated from them only by a fence. Second, most houses had a view of open space, trees, grass etc., but those around Linden Park, and part of Audubon Park looked out on intensively used recreation facilities.

Prices of properties which had been sold in the previous five years that were immediately adjacent to these neighborhood parks constituted the dependent variable. The regression analysis controlled for house age, number of rooms, year of sale and lot size.

The study differentiated between property (1) facing a park across a street; (ii) backing on to a park; and (iii) facing a heavy recreation use area or park building. The first category was comprised of properties facing Westgate and Hauntz Parks. These homes sold for approximately 7% more than identical properties located away from the park.

In contrast, there was no proximate premium associated with homes in the second category around Audubon and Kenlawn which backed on to the parks, since they sold for a similar price to those beyond the parks' view zones. Further investigation seeking an explanation of this finding revealed that the city's parks department received frequent complaints from neighborhood residents of drinking and other disturbing activities at night in Kenlawn and Audubon Parks. Kenlawn Park was almost completely surrounded by private residences, so it was almost invisible from the street. Therefore, it was an excellent gathering place for people who wanted to be undisturbed whether for legal or illegal purposes. Audubon Park contained a heavily-used baseball diamond, which meant that homeowners had strangers very close to their backyard for substantial time periods. This lack of privacy may have accounted for the lack of positive impact on property values.

Properties around Linden Park fell into the third category since the park consisted mainly of heavily used recreation facilities, such as baseball diamonds and a children's playground, rather than of passive open vistas. These homes sold for approximately 8% less than identical properties away from the park.

The authors conjectured that the adverse impact on single family residences backing on to a park or exposed to intensive use recreation facilities would be unlikely to occur if the adjacent residences were high-rise apartments rather than single family homes. They reasoned:

Whether the [high-rise] building faces or backs on to a park, the apartment resident has about the same view of the park, and has the same amount of privacy. Also this view will typically encompass more of the park than the area immediately adjacent to the building; it will probably include both recreational facilities and scenery. We therefore do not believe that our results for Audubon, Kenlawn and Linden Parks are likely to be valid for parks surrounded by apartment buildings; we would expect positive externalities in all three cases (p. 102).[14]

Another study reported in 1973 sought to identify the differential effects of four kinds of open space on property values: (1) public open space with recreation facilities (e.g. playgrounds, athletic fields; (2) public open space without recreational facilities (e.g. parks, arboretums, cemeteries); (3) private open space (e.g. large estates); and (4) institutional open space (e.g. colleges, private schools, country clubs).[15] The analysis was undertaken in a large area of northwest Philadelphia. The study compared the value of properties in census blocks that adjoined one of these open space categories with other census blocks. A total of 1.955 census blocks were included in the analysis and they contained 300,000 inhabitants.

The regression analysis included a large number of other variables that could influence property values, and it identified separately the park impacts on blocks comprised mainly of homeowners and those on which renters predominated. Among both of these groups, access to public open space without recreation facilities was important. Accessibility to private and institutional open space impacted homeowner blocks but not rental blocks, while there was a positive relationship with open

space containing recreation facilities and rental blocks but not homeowner blocks.

Table 3-5 summarizes the implications of the study's findings relating to public open space with no recreation facilities. Based on the average number of dwelling units per acre and the average housing unit value given in the table footnote, the incremental value attributable to three hypothetical different sized open space parks is computed using the analysis results. Computations are made for both individual dwelling units and for their aggregation in the four distance zones.

The percentage increment attributable to the park, increases markedly with the size of the park. Thus, in the case of a 25 acre park, increments range from an average of 9.9% within 1,000 feet of the park, down to 0.17% in the 5,000 to 10,000 feet radius. Despite the low percentage increment in the outer bands, their aggregate incremental contribution to the tax base is substantial because the larger radi and greater width of the outer distance bands means that they embrace a quantumly greater number of properties than the closer bands.

One of these authors also was involved with the Pennypack Park study in Philadelphia in 1974, the results from which were discussed earlier in the chapter.[7] The overall findings strongly supported the proximate principle, but there was one exception in that an anomalous negative impact occurred on properties which backed directly on to the park. The authors attributed this to:

abutting owners feeling vulnerable from park users, who may cross over their land and cause annoyance to the owners or even physical damage to their properties. In an attitude survey carried out concurrently with this study, 21% of respondents rated the park poor or bad from the point of view of safety from crime, and an additional 45% rated it only fair (p.277).

Finally, results from the study of four parks in Worcester, Massachusetts discussed earlier strongly supported the proximate principle.[9] However, the authors also reported that

**Table 3-5**   Effect on Property Value of Public Open Space with No Recreation Facilities*

| Distance to Residence (feet) | TOTAL Size of Park | | | PER DWELLING UNIT Size of Park | | |
|---|---|---|---|---|---|---|
| | 1-Acre Park | 5-Acre Park | 25-Acre Park | 1-Acre Park | 5-Acre Park | 25-Acre Park |
| 0-1,000 | $51,904 | $205,788 | $498,513 | $83.31 | $349.98 | $1,207.05 |
| 1,000-2,500 | 43,057 | 215,258 | 1,076,290 | 12.97 | 64.86 | 324.28 |
| 2,500-5,000 | 37,148 | 185,740 | 928,699 | 3.13 | 15.67 | 78.34 |
| 5,000-10,000 | 39,246 | 196,258 | 981,292 | 0.83 | 4.14 | 20.69 |
| | $171,355 | $803,044 | $3,484,794 | | | |

* Assuming 8.8 dwelling units per acre, and base value of average housing unit is $12,185.

BLM_0106907

parks with natural landscapes created the highest values in adjacent property, while property next to active recreation facilities had slightly lower values which were attributed to noise and pedestrian traffic. Following the models described in Figure 1-4, these negative influences quickly dissipated and property values one block away from the active parks showed a positive proximate increment.

The empirical literature reviewed in this section offers convincing evidence to support the proximate value curves shown in Figure 1-4. Properties that face or directly abut parks which primarily serve active recreation users are likely at best to show only a small positive value increment attributable to the park. This is attributable to the noise, nuisance and congestion emanating from the influx and egress of traffic and people. However, values are likely to rise substantially, and negative amounts are unlikely to be present, on properties located beyond the first block adjacent to the park. In contrast, the value of properties close to parks offering users a passive experience generally follow a classic distance decay curve with those closest to the park exhibiting the highest increments of value.

There is some evidence in these studies that parks in which there is anti-social behavior may create a negative impact on properties facing or abutting them. The probability of this type of behavior increases if parks are not easily visible from nearby streets. Again, however, any negative impact is likely to dissipate beyond the first block.

## FINDINGS FROM NON-URBAN STUDIES

Most studies measuring impact of the proximate principle have been undertaken in urban settings. Their findings may not be useful for those whose focus is at the state or national level. For this reason, studies that have been undertaken in those contexts are dis-cussed in this separate section of the chapter. State and national parks typically are not established and operated primarily to provide benefits to local residents. Their mandate is much broader so their economic contributions are likely to arise from visitor expenditures in the area, rather than be captured in proximate real estate values. Nevertheless, it seems likely that the proximate principle will apply, at least in some cases, even though such an impact may be perceived as incidental to the mission of these parks.

An indication of the impact of a major new outdoor recreation facility on property values in rural areas was given in a study assessing the effect of the Pearl River Reservoir, near Jackson, Mississippi on the area's suburban farm land.[16] The prices of recorded land sales in the proximity of the reservoir project were compared with the sale prices of similar farm land at a comparable distance from Jackson on the other side of the city away from the reservoir's influence. The study's time period was from 1950 to 1963. This time span included the period leading up to final voter approval for the project in 1958 and the subsequent initiation of its construction.

Figure 3-1 shows the impact on the land of the 1958 official approval by voters that confirmed the project would proceed. The trend line of the median per acre sale price of properties in the control area did not change after this announcement. In contrast, the sale prices of reservoir impacted properties increased dramatically after 1958. The average yearly increase in the reservoir area from 1950 to 1958 was 9% per year.  In 1959, the annual increase was 116% or 107% above normal! Increases of similar magnitude occurred in subsequent years.

An empirical analysis of determinants of land values in the Airondack Forest Preserve in New York State was reported in 1978.[17] The Preserve is a region within which privately-



**Figure 3-1**   Comparison of the Median Per Acre Sale Price in the Pearl River Reservoir and Control Areas 1950-1963.

owned land and state-owned land are interspersed. Of its 6 million acres, 42% are owned publicly and one purpose of this study was to test whether the state-owned land which will remain undeveloped impacted the price of privately-owned land that was adjacent to it. The data consisted of the sale prices of 284 vacant land parcels during a three year period which did not contain buildings and were not waterfront properties. The regression analysis indicated that being adjacent to state land had a large positive impact on price. The price of such parcels was about $20 per acre higher than similar parcels that were not adjacent to state land. Given that the mean price for all sites in the sample was $114 per acre, this represented a 17.5% incremental increase in value.

A 1983 study of the impact of six New York State parks on surrounding property values reported that in four cases there was no impact.[18] The authors suggested two reasons which may explain these findings. First the areas lacked intense development and were characterized by predominantly mixed rural land

uses, so proximate open space had little additional appeal. Second, in areas that were developed around these four parks, the lots were large incorporating backyard pools and other amenities which effectively discounted or nullified the importance of recreational opportunities offered by a nearby state park when the houses were sold.

At the remaining two parks, the analyses showed there was an impact. At Watkins Glen State Park for each 100 feet closer to the park a residence was located, its selling price increased by $50, while at Keewaydin State Park the increase was $72 per 100 feet. The authors used Keewaydin State Park to illustrate the magnitudes of these incremental increases on properties in the three local communities of Town of Alexandria Bay, Village of Alexandria Bay and Town of Orleans where the in-

crements represented 4%, 16% and 16% of the tax base respectively. Table 3-6 shows the impact of these incremental increases on the tax revenues accruing to the three communities (in 1983 dollars).

A Maryland study reported in 1993 that the preservation of a significant tract of forest land accounted for at least 10% of the value of a house within one mile of the site in Baltimore County: at least 8% in Carroll County; and at least 4% in Howard County.[19] When the radius was reduced to a quarter mile open space farm land accounted for a minimum of 15% of the value of a house in Baltimore County and 6% in Carroll County, but it depressed home values by at least 7% in Howard County.

Generally, findings from the non-urban studies mirror those from the urban studies in supporting the proximate principle. Despite the

**Table 3-6**   The Influence of Keewaydin State Park on the Property Tax Base and the Property Tax Revenue of Three Local Communities*

| | Town of Alexandria Bay | Village of Alexandria Bay | Town of Orleans |
|---|---|---|---|
| Average sale price of properties | $44,272 | $41,257 | $40,296 |
| Number of properties | 557 | 600 | 476 |
| Average enhanced assessed value of each property attributable to Keewaydin State Park | $1,703 | $6,780 | $6,302 |
| Total enhanced assessed value | $948,482 | $4,067,820 | $2,999,638 |
| Taxes paid attributable to incremental park values (town, village, fire/light district, school district, etc) | $117,981 | $633,237 | $70,911 |

* 1983 dollar values
Source: Brown, Tommy L. and Nancy A Connelly (1983). State parks and residential property values in New York. Ithaca, New York: Cornell University, Department of Natural Resources

BLM_0106910

concerns of rural landowners relating to adjacent public lands facilitating access to trespassers,[20] these findings suggest that properties proximate to public park, forest or open-space land are likely to receive positive increments of value.

### The Impact of Large Federal or State Park or Open Space Areas on the Local Tax Base

The conventional wisdom among many elected officials, especially in rural areas, is that public acquisition of land for outdoor recreation adversely effects the revenue generating capacity of local jurisdictions. The belief is that since publicly owned land is exempt from taxation, its removal from the tax rolls increases the burden on other taxpayers, and in some instances may lead to the demise of communities. This position was articulated in 2000 in a minority report submitted to the US House of Representatives by nine members of the House Resources Committee who disapproved of the Committee's support for the Conservation and Reinvestment Act (CARA) which would provide federal money for the acquisition and development of new outdoor recreation facilities. The minority report attacked the private property impacts of the bill stating:

> As the government or a non-profit buys land in a small community, people are forced out of their homes. There is less business to keep a retail store running, a smaller congregation to keep a church's doors open, and less reasons to justify keeping a school or post office in the area. After a point, government land acquisition causes a community to lose critical mass, and it ceases to be a community.

As the statement notes "at some point" this scenario may emerge, but it represents an extreme position. It may be applicable, for example, in Nevada where over 85% of the state is in public ownership. It would be absurd to suggest that the absence of this huge proportion of land from the tax rolls had no adverse impact on local tax bases. However, such cases are extreme and the more common context in which controversy on this issue arises is the acquisition and development of new state park sites. In these situations, the scenario postulated by the minority report is improbable.

The cumulative research findings of the studies reported in this chapter to this point suggest that developing outdoor recreation amenities is likely to lead to a rise in proximate property values which will generate more revenue than is lost by removing the land from the tax base. Two empirical studies were identified which specifically addressed this controversial issue. In both cases, the findings offered support for the proximate principle and did not support the conventional wisdom.

A 1971 study reported the impact of 15 park land acquisitions made in Pennsylvania by the U.S. Corps of Engineers or Pennsylvania State Parks.[21] The aggregate property values of the township in which each park was located were compared with the values of the rest of the county which were not subject to the park's immediate influence. Data were derived from assessed values. The values for both areas were tracked for an 11-year period, starting five years before acquisition of park land began. It was assumed that the control sites, comprised of the rest of the county, gave a good approximation of the land values that would have prevailed if the park sites had not been acquired.

In 12 of the 15 park sites, the total value of each township's taxable real estate was higher the year after acquisition began than it was in the previous year. At the other three sites, township land values recovered in the second,

fourth and fifth years. The author concluded that these results indicated the increase in the value of land remaining on the tax rolls more than offset the loss of taxable land caused by acquisition, so the revenue base of school districts and other local government entities was not adversely affected.

To facilitate comparison between the park sites and the control areas, a dollar value index was developed which established the market value in the year the land was acquired at 100. In the five years before acquisition commenced the value index of land on average across the 15 park site townships was 84, while the value in the rest of the counties was 90. For the five years after acquisition the average values for the park townships and control areas were 115 and 108, respectively. Thus, as a group, the 15 park townships moved from 6% below the control areas values before acquisition, to 7% above them after acquisition. The study's author concluded, "It seems likely that public acquisition of recreational land in amounts up to 60,000 acres does not reduce the real property tax base"(p.26).

Results of this study suggested that the proximate principle is likely to apply to state and federal parks, even though much of the evidence reviewed in this monograph refers to parks under the control of local governments. However, in addition to proximate principle benefits, federal and state lands often bring additional revenue benefits to local governments because in some cases they receive payments in lieu of taxes from the federal and state governments.

The compensatory impacts of such payments on local government revenues were believed to explain the findings reported in a 1970 study.[22] The authors used multiple regression analysis to test the hypothesis that state or federal land ownership in a forested three county area of north-western Pennsylvania adversely affected the fiscal capacity of local government through removal of part of the property tax base. The hypothesis was rejected because it was found that neither higher tax rates on private lands, nor reduced levels of per capita local government expenditures (i.e. counties, townships and school district) were associated with large amounts of public land, indicating that local governments were not placed at an economic disadvantage by public land programs. Indeed, the data "appeared to indicate the reverse" (p. 370).

In the three counties comprising the study area, the proportions of state and federal land were 51%, 48% and 17%. The consequences of the loss of local tax base were recognized by the federal government and the Pennsylvania State government which both provided payments in lieu of taxes on these lands to local jurisdictions. The authors believed these payments explained their results, concluding that "the payments in lieu of taxes effectively substitute for foregone tax revenues" (p. 370).

These detailed findings were consistent with those reported by the National Park Service on the impact of two of its facilities.[23] In Dare County, North Carolina, near Cape Hatteras National Seashore Area, the National Park Service reported that total assessed valuation within the county more than doubled soon after the area was opened. At the same time, tax rates were reduced from $1.00 to 80 cents per $100. Similar conclusions were reported after the expansion of Grand Teton National Park in Teton County, Wyoming.

## FINDINGS NOT SUPPORTIVE OF THE PROXIMATE PRINCIPLE

Five studies were located which reported findings that did not unequivocally support the proximate principle. A 1966 study used multiple regression to evaluate the relative influence of a combination of 14 independent variables on urban growth patterns, including distance to

BLM_0106912

a playground or recreation area. However, this was not one of the four variables that had a significant influence on land values.[24]

Two studies undertaken in the late 1960s that were directed by the same researcher reported mixed results in that they offered only partial support for the proximate principle. The first site was a two and a half block area of housing (which equated to a depth of five lots) around a 10 acre park in Lubbock, Texas.[25] The area was characterized as being "homogeneous" and this was used as justification for not measuring the influence of other potential influencing variables. There were 550 properties within this zone of influence of the park, and data were available for 480 of them. Correlation analysis was used to test for a relationship between distance from the park and (i) assessed value of the property; (ii) sale price of properties that had been sold in the previous five years; and (iii) assessed value of the land. There was a significant correlation only with the last of these three measures, and it was a fairly small correlation (-.17).

The second study focused on three parks in the city of Forth Worth.[26] They were: (i) Eastover Park, which was 13.5 acres surrounded by low to middle income residential property primarily occupied by African-Americans; (ii) Marine Park, which was 12 acres with a surrounding population characterized as low to middle income and predominantly white; and (iii) Rosemont Park, a community park of 30 acres bordering a large boulevard. Results are summarized in Table 3-7. In Marine and Rosemont Parks, the mean values of properties within 500 feet of the parks were of significantly greater value than properties more distant from the park. However, this support for the proximate principle was partially offset by the findings at Eastover Park where the direction of the significant relationship was the antithesis of that which was anticipated.

Findings from a large scale study involving 18 park sites in 13 municipalities in Westchester County, New York were reported in 1986. Community parks of 25 acres or more were selected through a systematic process based on a number of pre-established criteria.[27] The neighborhoods around the selected parks were characterized as being relatively homogeneous. The 18 sites generated approximately 2,500 individual house price/park relationship quantifiable data points.

The impact of the park on three zones (termed tiers) was evaluated. Residential properties in Tier 1 were immediately adjacent to a park. Tier 2 comprised the next two rows of residential properties directly behind Tier 1.

**Table 3-7**   Comparison of Mean Value of Properties within 500 Feet and Over 500 Feet at Three Fort Worth Parks

|  | Mean value over 500 feet | Number of Properties | Mean value 500 feet and under | Number of Properties | Difference significant at .01 |
|---|---|---|---|---|---|
| Rosemont Park | $5,729 | 184 | $6,562 | 59 | Yes |
| Marine Park | 4,565 | 162 | 5,571 | 48 | Yes |
| Eastover Park | 7,358 | 165 | 6,419 | 29 | Yes |

Tier 3 consisted of the two rows of residential home plots lying behind Tier 2, that is, four and five rows from the park. Tiers 2 and 3 were perceived to be "control areas."

It was anticipated that the findings would endorse the proximate principle, but the regression analyses showed no difference in value between those properties adjacent to a community park and similar properties located in the other two tiers. The study's design may account for the unexpected result because it was different from the design used in most of the other studies reviewed. Given that fairly large community parks (at least 25 acres in size) were used in the study, the lack of a relationship may have reflected the proximity of all three tiers to the park. It seems possible that the adjacent properties of Tier 1 may have experienced a nuisance factor which depressed any incremental value increase to the level of that accruing to properties located 2-5 blocks away in Tiers 2 and 3. This would be consistent with the principle explaining the "net effect in Figure 1-4b. There was no measure of how well the prices of properties in these three tiers compared to those a greater distance away. Thus, it seems reasonable to postulate that if a control area had been established 6-10 blocks away from the parks, instead of 2-5 blocks away, then a distance decay impact on residential properties may have emerged.

Methodological limitations may also have accounted for the findings of a 1982 study which failed to validate the proximate principle.[28] Using 566 randomly selected residential properties located in several communities in Du Page County, Illinois, the study's objectives were to test for a significant relationship between the value of residential property and (i) per capita expenditures for parks and recreation in those communities; and (ii) the acreage of land per 1,000 population. The regression analysis indicated no evidence of a relationship in either case. It was subsequently suggested

that inappropriate statistical procedures may have contributed to the findings of no relationship,[29] but the author rejected this criticism.[30]

Both of the variables used in this study are inadequate surrogates for capturing the value of parks in residential property values. The failure of any other researchers working in this area to adopt these operationalizations is suggestive of their fundamental weakness. Per capita expenditure is an input measure not an output measure, whereas the proximate principle relates to quantity and quality of output in the form of parks and open space. It is the tangible output assets which influence the sale price of proximate properties, not dollar inputs.

Both per capita expenditures and acres per 1,000 population are gross aggregate measures which do not relate proximity of residence and park. Any evaluation of the effect of the proximate principle must by definition include a measure of distance decay between park and residence, and this is absent when these gross measures are used.

In conclusion, one of the five studies reviewed in this section reported mixed results, but in two of the three parks which were investigated in it the proximate principle was supported. In three of the remaining studies, failure to verify the proximate principle may be attributed to unorthodox and flawed measurement measures that were used. These involved failure to control for other influencing variables, an inappropriate control area against which proximate value increments could be measured, and measures which failed to embrace the control element of distance decay.

## CONCLUSIONS

Three key questions were posed in the introduction to the chapter. The first question asked whether parks and open space contributed to increasing proximate property values. Results from 25 studies that investigated this

issue were reviewed and in 20 of them the empirical evidence was supportive.

The support extended beyond urban areas to include properties that were proximate to large state parks, forests and open space in rural areas. The rural studies offered empirical evidence to support not only the proximate principle, but also to refute the conventional wisdom that creating large state or federal park or forest areas results in a net reduction in the value of an area's tax base.

Six of the supportive studies further investigated whether there were differences in the magnitude of impact among parks with different design features and different types of uses. The findings demonstrated that parks serving primarily active recreation areas were likely to show much smaller proximate value increases than those accommodating only passive use. However, even with the noise, nuisance and congestion emanating from active users, in most cases proximate properties tended to show increases in value when compared to properties outside a park's service zone. Impacts on proximate values were not likely to be positive in those cases where (i) a park was not well maintained; (ii) a park was not easily visible from nearby streets and, thus, provided opportunities for anti-social behavior; and (iii) the privacy of properties backing on to a linear park was compromised by park users.

Examination of the five studies that did not support the proximate principle suggested that in four of those cases the ambivalent findings may be attributable to methodological limitations.

The second question posed in the introduction related to the magnitude of the proximate effect. A definitive generalizable answer is not feasible given the substantial variation in both the size, usage and design of park lands in the studies, and the disparity in the residential areas around them which were investigated. However, some point of departure based on the findings reported here is needed for decision-makers in communities that try to adapt these results to their local context. To meet this need, it is suggested that a positive impact of 20% on property values abutting or fronting a passive park area is a reasonable starting point guideline. If the park is large (say over 25 acres), well-maintained, attractive, and its use is mainly passive, then this figure is likely to be low. If it is small and embraces some active use, then this guideline is likely to be high. If it is a heavily used park incorporating such recreation facilities as athletic fields or a swimming pool, then the proximate value increment may be minimal on abutting properties but may reach 10% on properties two or three blocks away.

The diversity of the study contexts also makes it nonfeasible to offer a generalizable definitive answer to the final question posed in the introduction concerned with the distance over which the proximate impact of park land and open space extends. However, there appeared to be wide agreement that it had substantial impact up to 500 feet and that in the case of community sized parks it extended out to 2,000 feet. Few studies tried to identify impacts beyond that distance because of the compounding complexity created by other potentially influencing variables, which increases as distance from a park increases. Nevertheless, in the case of these larger parks there was evidence to suggest impact beyond this artificial peripheral boundary, since the catchment area from which users came extended beyond it.

## References

1.   Herrick, Charles (1939). The effects of parks upon land real estate values. *The Planners Journal,* 5 (4), 89-94.

2.   Herrick, Charles (1940). The effects of parks upon land and real estate values:

Concluding discussion. *The Planners Journal,* 6 (4), 94-98.

3.  Ackerman, Frederick L. and Ernest P. Goodrich (1940). The effects of parks upon land and real estate values: Discussion. *The Planners Journal,* 6 (2), 53-56.

4.  Little, Charles E. (1969). *Challenge of the land.* New York: Pergamon.

5.  Wonder, Robert L. (1965). *An analysis of the assessed valuation of private properties in proximity to public parks.* San Francisco: Caro Foundation. Unpublished paper.

6.  Lyon, David W. (1972). *The spatial distribution and impact of public facility expenditures.* Berkeley, California: University of California, Department of City and Regional Planning. Ph.D. dissertation.

7.  Hammer, Thomas R, Robert E. Coughlin, and Edward T. Horn, IV (1974). Research report: The effect of a large park on real estate value. *Journal of the American Institute of Planners,* 40 (July), 274-277.

8.  Correll, Mark R., Jane H. Lillydahl, and Larry D. Singell (1978). The effect of greenbelts on residential property values: Some findings on the political economy of open space. *Land Economics,* 54 (2), 207-217.

9.  More, Thomas A., Thomas H. Stevens, and P. Geoffrey Allen (1982). The economics of urban parks: A benefit/cost analysis. *Parks and Recreation,* August, 31-33, and

    More, Thomas A., Thomas H. Stevens, and P. Geoffrey Allen (1988). Valuation of urban parks. *Landscape and Urban Planning,* 15, 139-152, and

    Hagerty, John, Thomas H. Stevens, P. Geoffrey Allen, and Thomas A. More (1982). Benefits from open space and recreational parks: A case study. *Journal of the Northeastern Agricultural Economics Council,* 11 (1), 13-20.

10. Kimmel, Margaret M. (1985). *Parks and property values: An empirical study in Dayton and Columbus, Ohio.* Oxford, Ohio: Miami University, Institute of Environmental Sciences, M.S. thesis.

11. Nelson, Arthur C. (1986). Using land markets to evaluate urban containment programs. *American Planning Association Journal,* Spring, 156-171.

12. Sainsbury, James C. (1964). *The impact of urban parks on surrounding residential areas: A case study.* Seattle: University of Washington, M.S. thesis.

13. Hendon, William S., James W. Kitchen, and Bruce Pringle (1967). *The sociological and economic impact of urban parks in Dallas, Texas.* Lubbock, Texas: Texas Tech University Press.

14. Weicher, John C. and Robert H. Zerbst (1973). The externalities of neighborhood parks: An empirical investigation. *Land Economics,* May, 99-105.

15. Coughlin, Robert E. and Tatsuhiko Kawashima (1973). *Property values and open space in Northwest Philadelphia: An empirical analysis.* Philadelphia: University of Pennsylvania, Regional Science Research Institute, Discussion Paper #4.

BLM_0106916

16. Mann, W. Merle and Jack K. Mann (1968). Analysis of the influence of the Pearl River Reservoir on land prices in the area. *The Appraisal Journal,* January, 42-52.

17. Vrooman, David H. (1978). An empirical analysis of determinants of land values in the Adirondack Park. *American Journal of Economics and Sociology,* 37 (2), 165-177.

18. Brown, Tommy L. and Nancy A. Connelly (1983). *State parks and residential property values in New York.* Ithaca, New York: Cornell University, Department of Natural Resources, Unpublished paper.

19. Curtis, Rita E. (1993). *Valuing open space in Maryland: An hedonic analysis.* College Park: University of Maryland, M.S. thesis.

20. Gartner, William C., Daniel E. Chappelle and T. C. Girard (1996). The influence of natural resource characteristics on property value: A case study. *Journal of Travel Research,* 25 (1), 64-71.

21. Epp, Donald J. (1971). The effect of public land acquisition for outdoor recreation on the real estate tax base. *Journal of Leisure Research,* 3 (1), 17-27.

22. Barron, James C. and J. Dean Jansma (1970). Impact of public land programs on local government finances. *American Journal of Agricultural Economics,* 52, 365-371.

23. Division of Recreation Resource Planing, National Park Service (1961). *The economics of establishing National Parks.* Washington, DC: U.S. Government Printing Office.

24. Weiss, Shirley H., Thomas G. Donnelly, and Edward J. Kaiser (1966). Land value and land development influences factors: An analytic approach for establishing policy alternatives. *Land Economics,* 42, 230-233.

25. Kitchen, James W. and William S. Herndon (1967). Land values adjacent to an urban neighborhood park. *Land Economics,* 43, 357-360.

26. Hendon, William S. (1972). The park as a determinant of property values. *The Real Estate Appraiser,* September/October, 73-79.

27. Yoegel, John Allen (1986). *An inquiry into the impact of park land location upon single family residential property values in middle and upper income communities in Westchester County, New York.* New York: New York University, Department of Public Administration, Ph.D. dissertation.

28. Schroeder, Timothy D. (1982). The relationship of local park and recreation services to residential property values. *Journal of Leisure Research,* 14 (3), 223-234.

29. Arthur, Louise M. (1983). Comments on an article, "The Relationship of local park and recreation services to residential property values." *Journal of Leisure Research,* 15 (3), 245-246.

30. Schroeder, Timothy D. (1983). Use of multiple regression in recreation research: A discussion of several issues. *Journal of Leisure Research,* 15 (3), 247-250.

# CHAPTER 4

## The Relative Service Cost Efficiencies of Parks and Open Space:
### Findings from Cost of Community Services Analyses

INTRODUCTION

THE   NEW   MUNICIPAL MATH

COST OF COMMUNITY SERVICES ANALYSIS PROCEDURES

REVIEW OF EMPIRICAL STUDIES

*Park and Open Space Implications*

CONCLUSIONS

BLM_0106918

BLM_0106919

# THE RELATIVE SERVICE COST EFFICIENCIES OF PARKS AND OPEN SPACE:
## Findings from Cost of Community Services Analyses

## INTRODUCTION

The positions espoused in Figure 4-1 by the two sides debating the relative economic merits of using land for development or for park land and open space, are echoed in communities across the country. The conventional wisdom which prevails among many decision-makers and taxpayers is that development is the "highest and best use" of vacant land for increasing municipal revenues. This conventional wisdom is reinforced by developers who claim their projects "pay for themselves and then some." They exhort that their projects will increase the municipal tax base and thereby lower each individual's property tax payments.

This myth resides deep in the American psyche and frequently has thwarted the conservation efforts of park and open space advocates. However, the reduction in financial aid from intergovernmental transfers and the on-going resistance of residents to tax increases has caused some elected officials to scrutinize this conventional wisdom more carefully. This has led to investment in fiscal impact analyses and cost of community services (COCS) analyses.

Fiscal impact analyses are concerned with the future fiscal impacts on a community of a specific proposed development, while cost of community services analyses relate to the current fiscal situation in an entire community. COCS studies do not predict the future impact of decisions, which is the goal of traditional fiscal impact analysis. Rather, they assess current conditions based on existing budgets and real dollars. In this way, they provide hindsight from past land use decisions.[1] The findings from these two types of analyses have challenged the historical view that more development generates more net revenue for municipalities.

COCS analyses consistently report that over a wide range of residential densities, and especially in rapidly growing communities, the public costs associated with residential development exceed the public revenues that accrue from it. The traditional belief that development

**Figure 4-1**   Controversy at City Hall: Open Space or Development

The gavel came down upon the desk with a loud, resonating thump, which immediately brought silence to the small but crowded room. As the din of voices faded into a whisper and ceased altogether the municipal clerk announced, "The meeting of the Hometown City Council will now come to order."

Hesitantly, because he could sense that the meeting would be long and tiresome, the mayor rose to address his fellow councilmen and the anxious crowd. "The purpose of tonight's meeting is to discuss the possible acquisition by this community of property known as the Scenic View Farm.

"As most of you know, this property consists of about 200 acres and includes open fields, woods, a stream and an overlook from which the whole community can be viewed. I realized that the potential acquisition is controversial; therefore, all those who desire to speak will be given an opportunity to be heard."

Immediately a hand rose in the audience. At a gesture from the mayor, a woman rose and stated, "My name is Pauline Smedley. I live on Anderson Road and I am representing the Hometown Citizens Taxpayers Association. We are opposed to the acquisition of the Scenic View Farm, and feel that its acquisition with public funds would not be in the best interest of the community's residents.

"Already our property taxes are unbearable. This acquisition would result in a tax increase since the property would be removed from the tax rolls. On the other hand, if the tract were developed, more homes would produce more tax revenues, which would result in keeping our tax rate from increasing. This community, in all good conscience, can't afford to allow potential taxable property from being constructed. We hope that the council will, in the best interests of the community, vote not to acquire the property." As she sat down members of the taxpayers association applauded loudly.

"Your Honor," a voice from the other side of the room called out. "I'd like to present an opposing ayor. "My name is Joe Tucker," the second speaker said. "I represent the Citizens for a Quality Environment of Hometown, and we fully support the Scenic View Farm acquisition. In our rapidly growing community, the few remaining open spaces should be preserved, not only for scenic and environmental reasons, which are important, but also because it's good business.

"It's not true that more development is the answer to our rising tax rate; in fact, it is often the cause of it. If the farm were to be developed, it would cost the community more to provide services to the development than the community would receive in tax revenues. This deficit would have to be made up by increasing the tax rate.

"Open space, however, doesn't demand municipal services. It costs the community little beyond acquisition expenses but provides many economic benefits. In fact, the projected deficit created by the cost of servicing the development exceeding the taxes received from it, would be adequate in seven years to pay for the farm's acquisition as open space. Open space keeps our taxes low and we urge the council to act in the best interests of the community by acquiring the property."

Having heard diametrically opposed arguments, the council postponed making its decision until its members had sufficient information to fully evaluate the economic aspects of the proposed acquisition.

Source:   Adapted from Darryl F. Caputo (1979) *Open space pays: The socioenvironomics of open space preservation.* Morristown, New Jersey: New Jersey Conservation Foundation

pays its way is being discarded. The emerging prevailing view is that few developments generate sufficient tax payments to pay their way.

BLM_0106921

The people who reside in developments require services. Natural parks and open space require few public services -- no roads, no schools, no sewage, no solid waste disposal, no water, and minimal fire and police protection. This difference in cost of service provision was documented in the city of Boulder, Colorado where it was found that the city's costs of servicing non-open space areas exceeded $2500 per acre, whereas the costs associated with open space in the city were only $75 per acre -- less than 3% the cost of non-open space.[2]

The way in which land is used in a community affects the level of taxes paid by residents and their quality of life:

> It affects the size of the local government, the types of services it offers, the type of equipment it must purchase, and the taxes and tax rates it must levy. It also affects the number of students in the local school district, the size and number of school buildings, the number of teachers, and the taxes and tax rates the school district levies... Identifying the impacts of different land uses helps identify what types of land development and uses should be encouraged in a municipality, and what types should be treated cautiously (p.1).[3]

The purpose of this chapter is to expose the development myth by reviewing the substantial number of empirical findings that have been reported on this issue. The general thesis examined here is that park and open space land is less costly for public agencies to maintain and operate than residential property. This is a long-term benefit of preserving open space which is not usually reflected in market valuations of land, since valuations generally reflect only the short-term benefit of land.

## THE NEW MUNICIPAL MATH

In 1956, Mr. Roland B Greeley, who was a member of the faculty of City and Regional Planning at the Massachusetts Institute of Technology and a private planning consultant, wrote a letter to the Lexington, Massachusetts *Minute Man*. The letter is reproduced in Figure 4-2. It has been suggested that this letter was a benchmark representing the genesis of a "new municipal math" recognizing that the public costs needed to service a development usually exceed the tax income accruing from it.[4] Evidence in that era from other case studies provided momentum for the new municipal math movement:

- The village of Mamaroneck, New York, reported that building a large post-war garden apartment block on vacant land resulted in higher taxes for property owners. The development paid $42,415 in school taxes in 1960. However, based on Board of Education figures, it cost $107,800 to educate the children living in the apartments. The existing taxpayers paid the difference.[5]
- In the town of Yorktown, Westchester County, New York, it was found that each dwelling paid $100 less in real estate taxes than it received in municipal services. The staff calculated that the acquisition of a public park, including the loss of tax revenue from the vacant land, the purchase cost and the maintenance cost, would result in a 15 percent lower annual cost to the Town than if the land were developed with houses.[5]
- When Robert Moses, as Commissioner of Parks for New York, announced his intention to purchase 1,426 acres in Lloyd Harbor, New York for a new state park, many residents complained about the land going

BLM_0106922

off the tax rolls and persuaded the village to hire consultants to assess the fiscal impact. They reported that loss of this land from the tax roll would increase taxes by 20% from $14.33 to $16.91 per hundred dollars assessed valuation. However, if the land were to be used for residential development, which was the most likely alternative scenario, they concluded the tax rate would go up to $21.64, an increase nearly three times greater.[4]

**Figure 4-2**   The Genesis of the "New" Municipal Math:  Mr. Roland Greeley's Letter to the Editor

April 19, 1956

To the Editor:

There seems to be widespread concern about Lexington's rate of growth. I submit below the crude outlines of a process for restraining such growth I wish the Planning Board would consider seriously. Perhaps they already have; or perhaps they will wish to appoint a special committee to study the matter.

Most people come to Lexington because they like, among other things, its "rural atmosphere," its open lands and freedom from urban character. Most people who are now here are concerned about the rate at which that openness is disappearing. Such controls as 30,000 sq. ft. zoning obviously will not preserve the openness which we cherish.

Suppose the Town should decide to buy up, within the next few years, something like 2,000 acres of undeveloped land in the Town (the total area of the Town is about 10,000), selecting the areas which are least accessible, least easy to service, least desirable for residence. What would be the result?

First, it would cost money—possibly a million dollars. However, unless the Town was forced to pay exorbitant prices for the land, the total cost, spread over a twenty year period, should not exceed $75,000 per year, including the loss of tax income from the raw land.

Second, we would derive significant financial savings. Judging from post-war experiences, each new home pays on the order of $400 per year in taxes. If we assume that such homes average only 1-1 ½ school children per family, then the cost of schooling alone is equal to, or exceeds, the taxes paid during the first 15 or 20 years of the dwelling's existence. Thus the costs of school construction, sewers, drainage, street maintenance, and even some health and welfare expenses must all be met by the Town as a whole rather than by taxes on the individual properties concerned. Thus the net cost of servicing these new homes, if they are built, would add up to far more than the $75,000 per year which the Town might have to spend to avoid this cost.

Third, we would lose out to the extent of denying ourselves the addition of many new friends and neighbors such as those who have recently come to Town; and we might open ourselves up to the criticism of being "snobbish" or selfish. On the other hand, in the long run there may be two factors which will offset these arguments. The open spaces may, in their way, become just as great assets in the total Metropolitan area as such large open spaces as Middlesex Falls, Blue Hills and Breakheart Reservations are already proving to be. And the existence of such open spaces may, in the future, make it appear desirable to allow some residential areas in the Town to develop at somewhat higher densities, and thus more efficiently. If this proves to be the case, we could eventually absorb the same amount of additional growth, but at a slower rate and in a more economical and desirable pattern. If not, then we will be fortunate enough to have acted before it was too late.

BLM_0106923

Fourth, we would be guaranteeing the future existence of real open spaces throughout the Town– open spaces which need not be maintained (except for fire protection), but which would count significantly as far as amenity, appearance, and casual use are concerned; and which would count significantly, I believe, in maintaining sound property values in nearby residential areas. If a generation hence, we find such land not to be an asset in public ownership, the chances are overwhelming that it could be disposed of at a profit. Personally I doubt if we would be willing to dispose of it at any price in the future.

If I interpret citizen attitudes correctly, a procedure of buying up open space reserves would obtain for nearly all of us the very pattern of development in the Town which we want most. And at the same time, for an initial expenditure of a million dollars (the cost of one school), we would have a very good chance of making a net profit (through reduction in Town expenses) of at least a quarter million dollars a year.

Sincerely,

Roland B. Greeley

Source:    Reproduced in Charles E. Little (1969) *Challenge of the land*. New York: Pergamon Press.

A review of these types of findings led to this theme being subsequently endorsed and reiterated by the Outdoor Recreation Resources Review Commission in its landmark report in the early 1960s:

The use most often competing for potential park land or open space is residential development, and governments often lose money on such development -- that is, it costs more to provide schools, streets, and other services than is returned in new taxes. Thus, in many instances, placing the land in recreation use may prevent a drain on the community's finances while engineering a long-term rise in surrounding property values (p. 75).[6]

These early observations have been confirmed in recent years by many of the findings reported in the increasingly sophisticated fiscal impact and COCS analyses that have been undertaken by numerous governmental entities.

The ascendancy of this viewpoint has been reinforced by two other factors.[7] First, the climate of fiscal austerity, that is characteristic of many jurisdictions, has made local officials more receptive to techniques which may protect them against new spending and tax pressures. Second, the rise of antigrowth sentiment in a growing number of communities has enhanced the political plausibility of techniques that encourage growth control. These factors are gradually shifting the burdens of fiscal proof from the opponents to the advocates of growth.

## COST OF COMMUNITY SERVICES ANALYSIS PROCEDURES

COCS analysis determines the overall fiscal contribution of current land uses to a community. It assesses the costs incurred by, and

BLM_0106924

the revenues accruing to, a given public jurisdiction from different types of land use in a given time period, usually a year. A premise underlying the commissioning of these analyses is that the past can serve as a prologue for guiding future land use decisions when decision makers review the effects of past actions. COCS and fiscal impact studies have been used as planning tools for over 50 years, but from the perspective of park and open space advocates they had two critical limitations. First, they typically did not include parks and open space. Apparently, it was assumed that undeveloped land had no substantial economic value. Second, they were expensive, costing over $50,000 to commission which made them non-feasible in many small communities.[8]

To address these issues, the American Farmland Trust in the mid-1980s developed a relatively inexpensive procedure for assessing the costs and revenues of community services associated with different land uses which in-

cluded open space. The broad categories of land that are used in evaluations sponsored by the American Farmland Trust are: residential development, commercial/industrial development, and farmland/forestland/open space. The five stages involved in undertaking these analyses are described in the following paragraphs.[9]

*Stage 1. Ascertain the service categories used in the community's budget for the year of interest.* Typical of the service categories into which a municipality's expenditures are grouped are: (1) education; (2) general government; (3) public safety; (4) public works; (5) social services, including health/welfare and recreation/parks/culture; and (6) water/sanitation. An example of how the $31.5 million budget of a municipality in Massachusetts was allocated among these categories is shown in Table 4-1.

**Table 4-1**   Municipal Expenditures by Land Use Category

| Service Area | Residential Expenditures | Commercial / Industrial Expenditures | Farm / Open space Expenditures | Total Expenditures |
|---|---|---|---|---|
| Education | 12,899,906 | 0 | 0 | 12,899,906 |
| General Gov't | 5,326,710 | 787,284 | 53,619 | 6,167,613 |
| Public Safety | 3,535,520 | 851,292 | 37,108 | 4,423,920 |
| Public Works | 3,970,837 | 249,364 | 16,148 | 4,236,349 |
| Social Services | 839,015 | 0 | 0 | 839,015 |
| Water/Sanitation | 2,350,762 | 611,421 | 5,975 | 2,968,158 |
| Total ($) | 28,922,750 | 2,499,361 | 112,850 | 31,534,961 |
| Total (%) | 91.7 | 7.9 | 0.4 | |

*Stage 2.  Allocate total municipal expenditures to the selected land use categories.* This is the most difficult stage in the procedure and is likely to require extensive discussion with municipal officials. Careful definition of the use categories is essential. For example, open space may be defined to include forests, fields, agricultural lands, parks, recreational lands, vacant land of more than (say) two acres, and residentially zoned land not built upon. Table 4-1 shows that in this community, almost 92% of total expenditures were attributable to residential land.

*Stage 3.  Categorize municipal revenues by sources.* The categories most commonly used are property taxes, sales taxes, local receipts, state aid and federal aid. In the Massachusetts community used here to illustrate the fiscal impact analysis procedure, the sales taxes and federal aid categories were subsumed under the heading "other sources" (Table 4-2).

*Stage 4.  Allocate municipal revenues to the*

*land use categories.* Property tax allocations can be derived from the tax assessor's records. In many communities, much of the state aid is associated with schools and is formula based on number of pupils, so it is attributable to residential development. Much of the local receipts revenue will be derived from recreation fees and similar activities attributable to residential development, while sales taxes derive primarily from commercial land uses.

*Stage 5.  Compare revenues to expenditures for each land use category.* A comparison of the data in Tables 4-1 and 4-2 is shown in Table 4-3. The data in this example show a deficit in the residential category of approximately 5%, so for every $1 of income residential development yields, it costs the municipality $1.05 to service it. In contrast, every $1 of revenue accruing from the open space category, requires only 30 cents in cost of service.

A detailed discussion of how the data are collected and analyzed at each of these steps is

**Table 4-2**   Municipal Revenues by Land Use Category

| Source of Revenues | Residential Revenues | Commercial / Industrial Revenues | Farm / Open space Revenues | Total Revenues |
|---|---|---|---|---|
| Property Taxes | 12,843,014 | 4,098,870 | 294,746 | 17,236,630 |
| State Aid | 8,972,932 | 409,676 | 29,656 | 9,412,264 |
| Local Receipts | 2,272,262 | 520,197 | 19,905 | 2,812,364 |
| Other Sources | 3,385,273 | 978,769 | 31,260 | 4,395,302 |
| Total ($) | 27,473,481 | 6,007,512 | 375,567 | 33,856,560 |
| Total (%) | 81.2 | 17.7 | 1.1 | |

BLM_0106926

**Table 4-3**   A Comparison of Revenues and Expenditures

| Source of Revenues | Residential | Commercial / Industrial | Farm / Open space | Total |
|---|---|---|---|---|
| Revenues | 27,473,481 | 6,007,512 | 375,567 | 33,856,560 |
| Expenditures | 28,922,750 | 2,499,361 | 112,850 | 31,534,961 |
| Balance | -1,449,269 | 3,508,151 | 262,717 | 2,321,599 |
| Ratios ($Revenues:$Costs) | 1:1.05 | 1:0.42 | 1:0.30 | |

beyond the scope of this publication. A general description of how to do these studies was provided by the American Farmland Trust in 1993.[10] The methodology is continually being refined, so this initial publication should be read in conjunction with the Trust's most recent report on COCS.[1]

The approach gives a snapshot of the fiscal implications of land use based on current costs and revenues. The procedure is designed to supply enough information for people to recognize the potential positive fiscal impact of parks and open space. One outcome that sometimes emerges from these relatively simple studies is recognition of a need to commission more expensive studies that offer greater sophistication and embrace fiscal impact projections of future built-out scenarios in a community.

A limitation of COCS analyses is that often they do not recognize the interconnectedness of some land uses. For example, the net impact of commercial / industrial land use is invariably shown to be positive in COCS studies, but this ignores any net deficit cost that may be incurred from providing services to additional residences needed to house employees associated with it. Alternatively, a residential

development that shows a fiscal deficit, provides customers for businesses in the area. This is likely to increase business sales, which may enhance the underlying value of their property and result in an increase in property taxes from that source.[11]

There are three major difficulties inherent in COCS analyses which suggest that their results should be viewed with caution. First, the validity of COCS analyses depends on the validity of their methodology and assumptions. It is difficult to "unbundle" or disaggregate costs and revenues so they are accurately allocated to the selected expenditure categories, because municipal records do not allocate revenues and expenditures by land-use. Different allocation decisions may lead to substantially different outcomes. The following report extract illustrates the types of challenges involved:

Of all expenditures, those in Public Works were the toughest to assign. This was especially true of highways. If information was available on the types of vehicles using roads, the frequency of trips and the intensity of travel, these were used. The toll of heavy equipment might be allocated

BLM_0106927

to Commercial or Industrial sectors. Tractors and milk-truck road use were charged to Farm and Open Land. Garbage disposal was treated the same way. Dump permits were evaluated and records searched to determine which sectors received public-waste removal services.[8]

Second, COCS analyses tend to focus on average costs instead of the marginal, or incremental costs and revenues associated with new development.[7] Economists point out that marginal costs and revenues are the more relevant measure and that they may differ widely from average costs and revenues. Thus, for example, "Service expansion may be unusually costly in areas that already are built-up, that are remote, or that have difficult topography. It may be less expensive than average in areas that have excess service capacity or favorable topography" (p.7).[7] Third, the broad allocation of costs among only three or four land-uses produces generalized results that may be misleading:

> For example, elderly housing does not require educational services from the town to the same extent as single-family dwellings normally do. Thus, a retirement community (or a summer community) should have different expense/cost ratios than does a bedroom community. Some classifications are more difficult to make than others. A single-family residence on a lot that exactly meets the minimum zoning requirements is easily classified as residential, but the allocation becomes more difficult if the house is surrounded by 25 acres of land. Even though there is sufficient excess acreage to classify it as an open space parcel, the property is legally a residential parcel (p. 9).[12] [It would be

considered residential in the American Farmland Trust studies]

It has been suggested that the greatest benefit of COCS and fiscal impact analyses:

> may be in prompting a reassessment of the 'conventional wisdom' about the economic consequences of development and conservation. Fiscal impact analysis will not by itself answer the question of whether a particular parcel of land should be preserved as open space or developed. However, it can help frame the discussion and lead to more informed decisions by policymakers, conservationists and the public (p.6).[13]

## REVIEW OF EMPIRICAL FINDINGS

Table 4-4 lists the results of studies that have used the American Farmland Trust's approach to COCS. The studies were undertaken by 26 different research teams in 18 different states. The main commonality among the studies is that most of the selected communities were relatively small and incorporated farmland in their tax base.

Given the diversity of locations and research teams involved, the results are remarkably consistent. They confirm the results reported by more elaborate conventional fiscal impact studies, which consistently document the net deficit of most residential development and recommend attracting commercial and industrial development to offset these deficits. However, they offer the additional dimension of demonstrating the relatively positive fiscal impact of farm and forestland, open space and park land, when compared to residential land use. These elements traditionally have been omitted from fiscal impact analyses.

BLM_0106928

**Table 4-4**   Summary of Cost of Community Services Study Results

| State | Town | Residential including farm houses | Combined Commercial & Industrial | Farm/Forest Open Land |
|---|---|---|---|---|
| Connecticut | Bolton[14] | 1 : 1.05 | 1 : 0.23 | 1 : 0.50 |
| | Durham[12] | 1 : 1.07 | 1 : 0.27 | 1 : 0.23 |
| | Farmington[12] | 1 : 1.33 | 1 : 0.32 | 1 : 0.31 |
| | Hebron[15] | 1 : 1.06 | 1 : 0.47 | 1 : 0.43 |
| | Litchfield[12] | 1 : 1.11 | 1 : 0.34 | 1 : 0.34 |
| | Pomfret[12] | 1 : 1.06 | 1 : 0.27 | 1 : 0.86 |
| Idaho | Canyon County[16] | 1 : 1.08 | 1 : 0.79 | 1 : 0.54 |
| | Cassia County[16] | 1 : 1.19 | 1 : 0.87 | 1 : 0.41 |
| Kentucky | Lexington-Fayette County[1] | 1 : 1.64 | 1 : 0.22 | 1 : 0.93 |
| Maine | Bethel[17] | 1 : 1.29 | 1 : 0.59 | 1 : 0.06 |
| Maryland | Carroll County[18] | 1 : 1.15 | 1: 0.48 | 1 : 0.45 |
| | Cecil County[19] | 1 : 1.12 | 1 : 0.28 | 1 : 0.37 |
| | Frederick County[20] | 1 : 1.14 | 1 : 0.50 | 1 : 0.53 |
| Massachusetts | Agawam[8] | 1 : 1.05 | 1 : 0.44 | 1 : 0.31 |
| | Becket[12] | 1 : 1.02 | 1 : 0.83 | 1 : 0.72 |
| | Deerfield[8] | 1 : 1.16 | 1 : 0.38 | 1 : 0.29 |
| | Franklin[12] | 1 : 1.02 | 1 : 0.58 | 1 : 0.40 |
| | Gill[8] | 1 : 1.15 | 1 : 0.43 | 1 : 0.38 |
| | Leverett[12] | 1 : 1.15 | 1 : 0.29 | 1 : 0.25 |
| | Southborough[21] | 1 : 1.03 | 1 : 0.26 | 1 : 0.45 |
| | Westford[12] | 1 : 1.15 | 1 : 0.53 | 1 : 0.39 |
| | Williamstown[22] | 1 : 1.11 | 1 : 0.34 | 1 : 0.40 |
| Minnesota | Farmington[23] | 1 : 1.02 | 1 : 0.79 | 1 : 0.77 |
| | Lake Elmo[23] | 1 : 1.07 | 1 : 0.20 | 1 : 0.27 |
| | Independence[23] | 1 : 1.03 | 1 : 0.19 | 1 : 0.47 |
| Montana | Gallatin County[24] | 1 : 1.45 | 1 : 0.16 | 1 : 0.25 |
| New Hampshire | Deerfield[25] | 1 : 1.15 | 1 : 0.22 | 1 : 0.35 |
| | Dover[26] | 1 : 1.15 | 1 : 0.63 | 1 : 0.94 |
| | Exeter[27] | 1 : 1.07 | 1 : 0.40 | 1 : 0.82 |
| | Fremont[25] | 1 : 1.04 | 1 : 0.94 | 1 : 0.36 |
| | Stratham[25] | 1 : 1.15 | 1 : 0.19 | 1 : 0.40 |
| New Jersey | Freehold Township[28] | 1 : 1.51 | 1 : 0.17 | 1 : 0.33 |
| | Holmdel Township[28] | 1 : 1.38 | 1 : 0.21 | 1 : 0.66 |

BLM_0106929

|  |  |  |  |  |
|---|---|---|---|---|
|  | Middletown Township[28] | 1 : 1.14 | 1 : 0.34 | 1 : 0.36 |
|  | Upper Freehold Township[28] | 1 : 1.18 | 1 : 0.20 | 1 : 0.35 |
|  | Wall Township[28] | 1 : 1.28 | 1 : 0.30 | 1 : 0.54 |
| New York | Amenia[29] | 1 : 1.23 | 1 : 0.25 | 1 : 0.17 |
|  | Beekman[30] | 1 : 1.12 | 1 : 0.18 | 1 : 0.48 |
|  | Dix[31] | 1 : 1.51 | 1: 0.27 | 1 : 0.31 |
|  | Farmington[32] | 1 : 1.22 | 1 : 0.27 | 1 : 0.72 |
|  | Fishkill[29] | 1 : 1.23 | 1 : 0.31 | 1 : 0.74 |
|  | Hector[31] | 1 : 1.30 | 1 : 0.15 | 1 : 0.28 |
|  | Kinderhook[33] | 1 : 1.05 | 1 : 0.21 | 1 : 0.17 |
|  | Montour[34] | 1 : 1.50 | 1 : 0.28 | 1 : 0.29 |
|  | Northeast[30] | 1 : 1.36 | 1 : 0.29 | 1 : 0.21 |
|  | Reading[34] | 1 : 1.88 | 1 : 0.26 | 1 : 0.32 |
|  | Red Hook[29] | 1 : 1.11 | 1 : 0.20 | 1 : 0.22 |
| Ohio | Madison Village[35] | 1 : 1.67 | 1 : 0.20 | 1 : 0.38 |
|  | Madison Township[35] | 1 : 1.40 | 1 : 0.25 | 1 : 0.30 |
| Pennsylvania | Allegheny Township[36] | 1 : 1.06 | 1 : 0.14 | 1 : 0.13 |
|  | Bedminister Township[36] | 1 : 1.12 | 1 : 0.05 | 1 : 0.04 |
|  | Bethel Township[3] | 1 : 1.08 | 1 : 0.17 | 1: 0.06 |
|  | Bingham Township[37] | 1 : 1.56 | 1 : 0.16 | 1 : 0.15 |
|  | Buckingham Township[38] | 1 : 1.04 | 1 : 0.15 | 1 : 0.08 |
|  | Carroll Township[3] | 1 : 1.03 | 1 : 0.06 | 1 : 0.02 |
|  | Maiden Creek Township[39] | 1 : 1.28 | 1 : 0.11 | 1 : 0.06 |
|  | Richmond Township[39] | 1 : 1.24 | 1 : 0.09 | 1 : 0.04 |
|  | Stewardson Township[37] | 1 : 2.11 | 1 : 0.23 | 1 : 0.31 |
|  | Straban Township[3] | 1 : 1.10 | 1 : 0.16 | 1 : 0.06 |
|  | Sweden Township[37] | 1 : 1.38 | 1 : 0.07 | 1 : 0.08 |
| Rhode Island | Hopkinton[12] | 1 : 1.08 | 1 : 0.31 | 1 : 0.31 |
|  | Little Compton[12] | 1 : 1.05 | 1 : 0.56 | 1 : 0.37 |
|  | West Greenwich[12] | 1 : 1.46 | 1 : 0.40 | 1 : 0.46 |
| Utah | Cache County[40] | 1 : 1.27 | 1 : 0.25 | 1 : 0.57 |
|  | Sevier County[40] | 1 : 1.11 | 1 : 0.31 | 1 : 0.99 |
|  | Utah County[40] | 1 : 1.23 | 1 : 0.26 | 1 : 0.82 |
| Virginia | Clarke County[41] | 1 : 1.26 | 1 : 0.21 | 1 : 0.15 |
|  | Culpepper County[42] | 1 : 1.25 | 1 : 0.19 | 1 : 0.19 |
|  | Northampton County[43] | 1 : 1.13 | 1 : 0.97 | 1 : 0.23 |
| Washington | Skagit County[44] | 1 : 1.25 | 1 : 0.30 | 1 : 0.51 |
| Wisconsin | Dunn[45] | 1 : 1.06 | 1 : 0.29 | 1 : 0.18 |

Source:  American Farmland Trust. Farmland Information Center, Technical Assistance Division, Northampton, MA
01060. Web:www.farmlandinfo.org. March 2000.

BLM_0106930



Source: American Farmland Trust, Farmland Information Center, Technical Assistance Division, Northampton, MA.

**Figure 4-3**   The Median Cost, per Dollar Revenue Raised, to Provide Public Services to Different Land Uses (n=58 Communities)

A summary of the results reported in Table 4-4 is provided in Figure 4-3. It shows the median cost per dollar of revenue raised to provide public services to each of the three different land uses. Thus, for every $1 million in tax revenues these communities received from farm/forest/open space uses and from industrial/commercial uses, the median amount they had to expend was only $370,000 and $290,000, respectively, to provide them with public services. In contrast, for every $1 million received in revenues from residential developments, the median amount the communities had to expend to service them was $1,150,000. The results of these studies indicate that favoring residential development at the expense of open land does not alleviate the financial problems of communities. Indeed, it is likely to exacerbate them.

A more detailed review of the COCS and fiscal impact case studies revealed three useful additional insights. First, communities with larger and rapidly growing populations appeared to experience greater net deficits on their residential land than did communities with smaller, more stable populations. This is exemplified in Figure 4-4 which describes the consequences of rapid growth in the 1980s on the island of Nantucket, Massachusetts.

Bedroom communities, which are characterized as places from which people commute to work to commercial/industrial establishments located elsewhere, are particularly vulnerable to the taxation increases likely to ac-

**Figure 4-4**   The Fiscal Impact of Development on Nantucket

The island of Nantucket in Massachusetts experienced a building boom in the 1980s which caused the town's operating budget to explode, going up more than 26 percent a year. As a result, property taxes more than doubled between 1982 and 1988. Yet town revenues could not keep up with the expenditure growth, because the average cost of servicing a new dwelling unit ($2,925) exceeded the taxes paid by that additional unit ($2,656). Simply stated, new dwellings did not carry their own weight on the tax rolls.

Rapid growth forced the town to borrow money. Nantucket's debt by 1988 was six times what it was in 1982. Each year the town paid $6.5 million on this debt. In fact the biggest item in the town budget was this annual debt payment. By 1988, the town spent more to service its loans than for education.

Furthermore, this situation was expected to worsen, if rapid development continued. By 1988, the town had scheduled more loans and was seeking voter approval for financing an additional $40 million worth of capital projects during the next five years. This increased indebtedness would double the annual debt service costs.

Excessive development was escalating taxes while overburdening town services. Nantucket's taxpayers could not afford to stay on this course. The study which derived these data was commissioned from RKG Associates of Durham, NH and Boston, MA. Their detailed analysis of Nantucket's economy spelled out why the island's growth had to be managed. According to the study's findings, the costs of excessive development outweighed its possible benefits. For example, new construction did not compensate the town for the cost of maintaining its municipal infrastructure. Therefore, the current taxpayers subsidized housing development. The RKG Associates report helped dispel the myth that the town's economy would suffer if more land was put into conservation rather than construction. It showed that an acre of land put into conservation benefited the current taxpayer more than an acre with a new house on it, because the town spent more to provide municipal services to a new dwelling than the tax revenues received from that unit. In the end the excessive development of the 1980s was detrimental to the quality of life; to the natural resources of the island; and to the fiscal well-being of the residents.

Source:   Adapted from Nantucket Land Council Inc. (1989). *Balancing today's development and tomorrow's taxes.* Nantucket, MA: Nantucket Land Council.

company new residential development. Such communities have no commercial/industrial base to mitigate the costs of servicing new residential developments, making substantial tax increases to existing residents almost inevitable.

Second, the use of a broad residential development category which was adopted in all of these studies, often obscures substantial differences within it. Thus, many studies have shown that the more sprawling the growth, the higher the cost.[8] For example, in Wright County, Minnesota, the net annual deficit between taxes paid and the cost of services required was found to be $490 for developed home lots larger than one acre, and $114 for quarter acre lots.[46] Similarly, in a study of Loudoin County, Virginia, which is the fastest growing county in the Washington, D.C. area, it was found that public costs were approximately three times higher ($2,200) per dwelling where the density was one unit per five

BLM_0106932

acres, than where the density was 4-5 units per acre ($700 per dwelling).[47] This reflects the increased costs associated with such services as school buses, emergency service response times, road provision and repairs, garbage pick-up, and utilities when homes are spread out.

While sprawl often contributes to net deficits so, on the other hand, do lower-rent apartments and larger (four and five bedroom) housing units tend to result in a net fiscal deficit. This occurs because the dominant cost centers of local governments are education and social service expenditures. Together these two cost centers on average account for approximately 50% of local government expenditures.[11]

Building on this observation, a third insight was the major role of education in accounting for the residential property deficits. The impact on school costs is especially pernicious because in many states the subsidy that a local school district receives from the state declines as assessed valuations in the district increase. This means that the deficit fiscal impact of residential property is accentuated, because by increasing the tax base it triggers reduction in the revenue that school districts receive from the state.

**Parks and Open Space Implications**

The data from these empirical studies, group publicly owned parks and open space with privately owned agricultural land, forest land and vacant lots. However, the revenue implications associated with this non-developed land are quite different in the public and private sectors. Revenues accruing to the city from publicly owned land are likely to be minimal -- limited to net receipts from admission fees, concessions, grazing rights, or lease income from tenant farmers. In contrast, even if the private lands are protected by conservation easements and taxed at their use or productive value rather than appraised value so property taxes are low, they still yield some tax revenue to the community.

Residential development is the most common alternate use proposed for potential park and open space lands. Thus, because only nominal revenue is likely to accrue from public park and open space lands, the key fiscal impact issue becomes, "Will the net costs of purchasing, maintaining and operating the land as a park or as open space be greater than the net costs associated with servicing a residential development that may be constructed on that

**Figure 4-5**   An Illustrative Comparison of the Net Cost of Serving a Residential Development and a Natural Park Area

On the 50-acre site (Figure 1-1), assume a density of three homes per acre and a property tax rate (school district, city, county et al.) of 2½% of market value on these $200,000 homes. Thus, annual property tax revenue equals $750,000 (50 x 3 x $5,000).

Assume that the cost of servicing these residences is 15% higher than the property taxes received (Figure 4-3). Thus, the annual net loss to the community for servicing this residential development is $112,500 ([(115 ÷ 100) x $750,000] - $750,000).

If the operation and maintenance cost of the 50-acre natural park is lower than $112,500 per year, then it is a less expensive option to service than the housing development on the same site.

BLM_0106933

site?" Evidence in the previous three chapters of this monograph suggests that the purchase cost is likely to be paid for by increases in proximate property values. Hence, the fiscal impact comparison involves only the park or open space land's maintenance and operating expenses.

Figure 4-5 uses the 50 acre natural park site described in Chapter 1 (Figure 1-1) and the data summarized in Figure 4-3, to illustrate how to undertake the comparative fiscal impact analysis. In the context provided, the illustration suggests that if the annual cost of maintaining and operating the natural park is less than $112,500, then it is likely to be less of a financial burden to the community than if the 50 acre site is developed for houses.

Further, investment in parks and open space does not incur the externality costs that accompany residential development -- traffic congestion, noise, crime, pollution, infrastructure deterioration, and changes in community character. The COCS methodology does not include quantification of the costs of these externalities, but presumably they add to the appeal of using land for open space rather than developing it.

These kinds of analyses have caused some communities to consider purchasing land rather than incurring the losses likely to accrue from development. Examples of this are described in Figures 4-6 and 4-7. Another example occurred in Wayland, Massachusetts where it was found that development of 1,250 acres of open space would cost taxpayers $328,350 a year more than they would receive in added tax revenues from new homes. This represented a $7.75 increase in the tax rate. On the other hand, purchasing the property would only add $4.25 to the tax rate.[48]

**Figure 4-6**   Fiscal Analysis of the Relative Impact for Alternative Land Uses of a 720 Acre Farm in Mansfield Township, New Jersey

When a 720 acre farm property became available for sale, the Mansfield Township's zoning ordinance would have permitted 300 units of small, clustered housing to be developed on the site. The average cost per household to the school district, assuming one student per home, was $5,568. The average residential property tax, excluding county taxes, was $2,172.  Given these data, the Township concluded:

The annual cost to the school district would be approximately $1,670,400 ($5,568 x 300 children).
The anticipated revenue would be approximately $651,600 ($2,172 x 300 homes).
The annual deficit for the school district budget would be $1,018,800 ($1,670,400-$651,600).

The cost of purchasing the development rights of the 720 acre farm was $10.4 million. The public investment for the development rights could be offset in less than 15 years by avoiding the higher costs associated with development of the farm. From then on the town would receive only the positive revenue flow from the farmland, and attain the statewide and municipal goal of farmland preservation. In contrast, the cost of services for a residential development would continue forever.

Source:   Adapted from Association of New Jersey Environmental Commissions (1996).  *Open space is a good investment: The financial argument for open space preservation.*  Menham, New Jersey.

BLM_0106934

**Figure 4-7**   The Pittsford Solution

In 1998, the American Planning Association recognized the innovative conservation action taken by the Town of Pittsford, New York, located seven miles south-east of Rochester, by awarding the town its annual Current Topic Award. Land development in Pittsford was consuming important agricultural landscapes, scenic vistas, and other natural and cultural resources. A comprehensive planning process, involving more than 100 public meetings, workshops, and focus groups sessions, resulted in a community consensus that they wanted to preserve these central features of the town's character. The outcome was development of a precedent-setting plan for permanently protecting its greenspaces that the American Planning Association considered to be "exemplary."

A key element in their decision process was the results of a fiscal impact analysis which predicted future tax rates based upon the costs and revenues associated with future land-use patterns. The fiscal impact analysis revealed the following:

- If the town did nothing, the typical household would pay increased taxes of several hundred dollars per year to support growth.
- The break-even value of a new home was more than $300,000. Break-even occurs when the tax revenue gained from the addition of a house equals the cost of community services attributable to a new home.
- Increased commercial development could decrease future tax increases.
- The break-even cost for the town to purchase development rights on farms and other open space resources in the path of development was about $10,000 per acre. The break-even cost occurs when the cost of financing a bond to purchase the development rights for an acre equals the additional cost to the community of developing an acre for residential use.

The fiscal impact analysis demonstrated that it would be less expensive to implement a revised land-use plan than to follow the current zoning policies. The revised plan included purchase of conservation easements on important farmland and open space resources, coupled with a policy of creating several enhanced economic development sites for commercial and light industrial business expansion.

The fiscal impact analysis showed that protection of open space, including purchase of development rights, would cost taxpayers less per year for support of community services than full build-out of the town. This finding did not mean that there should be no further development. It meant that a fiscal balance could be achieved through a strategy that promoted a variety of housing types, recognized the need for the development of economic land uses, and preserved open space. Using the fiscal model as a planning tool, the targets for land preservation and development were tested, modified, and refined.

The plan protected more than 2,000 acres, which represented about two-thirds of the remaining undeveloped land in the town. Three mechanisms were used:

- Purchase of development rights on 1,200 acres
- Incentive zoning (transfer of development rights) on 200-plus acres
- Mandatory clustering protecting 600-plus acres.

The purchase of development rights program protecting 1,200 acres was directed at seven farms. The average cost to a homeowner of the purchases was approximately $50 per year. In contrast, the fiscal impacts analysis estimated that homeowners would face an average tax increase of $250 per year if the development rights program was *not* implemented and a projected 1,000 plus new homes were built on this land. Avoiding these tax costs saved the average homeowner about $5,000 over the life of the bonds issued to purchase the development rights which were acquired at an average price of $9,000 per acre.

Source:   John J. Behan (1999) Pittsford's Greenprint Initiative *Planners' Casebook* Spring/Summer. Published by the American Institute of Certified Planners

## CONCLUSIONS

It has been suggested that, "Communities striving to reduce the tax burdens on citizens may not fully appreciate the increase in the scope and level of services that will have to be provided to different categories of land use" (p.9)[29] The costs and benefits of parks and open space have largely been ignored by fiscal impact studies in the past. The results reported here provide evidence of the need to include parks and open space in the fiscal and economic discourse.

The procedures used in these studies were intended by the American Farmland Trust to "simplify" the complex and expensive process involved in undertaking traditional fiscal impact analyses. The trade-off using the simpler procedures is some reduction in level of accuracy. However, the consistency of the results, and the magnitude of differences between residential and open space use, is so striking that debate over nuances in the methodology is rendered redundant. The evidence clearly indicates that preserving open space can be a less expensive alternative to development. The conclusion is that a strategy of conserving parks and open space is not contrary to a community's economic health, but rather is an integral part of it.

These types of findings provide park advocates with a credible entré into the economic development discussion and enable them to position parks as being a meaningful component of economic development. By showing their relative fiscal strength compared to residential development, advocates can refute the notion that parklands are a drain on local resources. The results challenge the assumption that development of land is its "highest and best use," which often thwarts park and open space advocates.

Burchell and Listokin, who have been doing fiscal impact analyses for over two decades and have published the most influential materials during this time period, developed a hierarchy of the fiscal impacts of different land uses.[49] It ranged from research office parks at the top (highest net fiscal surplus) to mobile homes at the bottom (highest net fiscal deficit). In this hierarchy, they placed open space and undeveloped or unimproved land in the middle, just above the break-even line for municipal budgets.

The intent in this chapter is not to suggest that one type of development is a superior land use to another, because some combination of all three land uses (residential, commercial/industrial, and open space) is needed in viable communities. Rather, the intent is to point out that using land for parks and open space is relevant to discussions concerned with enhancing a community's fiscal health. The goal is not to prevent growth, but to encourage a balance between development and open space which tends to get lost without these types of analyses. These types of studies moderate the dialog by giving parks and open space a higher profile in the economic development debate.

## References

1.  Adams, Melissa (1999). *The cost of community services in Lexington-Fayette County, Kentucky.* Northampton, Massachusetts: American Farmland Trust.

2.  Crain, James (1988). Cited in *Economic impact of protecting rivers, trails and greenway corridors.* Washington DC: National Park Service, Rivers, Trails and Conservation Assistance.

3.  Kelsey, Timothy W. (1992). *The fiscal impacts of different land uses: The Pennsylvania experience.* State College, Pennsylvania: Cooperative Extension Service.

4.  Little, Charles E. (1969). *Challenge of the land.* New York: Pergamon Press.

5.  Rusch, Ruth (1963). Here's proof that open space can hold down taxes. *Park Maintenance,* February, 24-27.

6.  Outdoor Recreation Resources Review Commission (1962). *Outdoor recreation for America.* Washington, DC: Superintendent of Documents.

7.  Altshuler, Alan A. and José A. Gómez-Ibáñez (1993). *Regulation for revenue: The political economy of land use exactions.* Washington, DC: The Brookings Institution.

8.  Freedgood, Julia (1992). *Does farmland protection pay? The cost of community services in three Massachusetts towns.* Northampton, Massachusetts: American Farmland Trust.

9.  Miller, Stephen (1992). *The economic benefits of open space.* Islesboro, Maine: The Islesboro Islands Trust.

10. American Farmland Trust (1993). *Is farmland a community investment? How to do a cost of community services study.* Northampton, Massachusetts: American Farmland Trust.

11. Black, Thomas J. and Rita Curtis (1993). The local fiscal effects of growth and commercial development over time. *Urban Land,* January, 18-20.

12. Commonwealth Research Group Inc. (1995). *Cost of community services in southern New England.* Chepachet, Rhode Island: Southern New England Forest Consortium Inc.

13. Fausold, Charles J. and Robert J. Lilieholm (1996). *The economic value of open space: A review and synthesis.* Cambridge, MA: The Lincoln Institute of Land Policy.

14. Geisler, K. (1999). *Cost of community services study: Bolton, Connecticut.* Unpublished paper. Keene, New Hampshire: Antioch New England Graduate School.

15. American Farmland Trust (1986). *The Cost of community services in Hebron, Connecticut.* Northampton, Massachusetts: American Farmland Trust.

16. Hartmans, M. and N. Meyer (1997). *Financing services for residential, commercial, and agricultural parcels: The cases of Canyon and Cassia Counties.* Idaho Agricultural Extension Series No. 96-13.

17. Good, T.F. (1994). *The cost of community services in Bethel, Maine.* Keene, New Hampshire: Antioch New England Graduate School.

18. Pyne, S.V.R., J.K. Topper and K.L. Grabill (1994). *Fiscal impacts of residential, commercial/industrial, and agricultural land uses in Carroll County, Maryland.* Carroll County: Department of Management and Budget.

19. Cecil County Office of Economic Development (1994). *Fiscal impacts of residential, commercial/industrial and agricultural land uses in Cecil County, Maryland.*

20. American Farmland Trust (1997). *The cost of community services in Frederick County, Maryland.* Northampton, Massachusetts: American Farmland Trust.

21. Adams, M. and T. Hines (1997). *Assessing land-use costs: A cost of community services study in Southborough, Massachusetts.* Northampton, Massachusetts: American Farmland Trust.

22. Hazler, Kristin, John Kinabrew and William Sullivan (1992). *The cost of community services in Williamstown, Massachusetts.* Williamstown, MA: Williams College, Department of Environmental Planning.

23. Senf, David (1994). *Farmland and the tax bill: The cost of community services in three Minnesota towns.* Northampton, Massachusetts: American Farmland Trust.

24. Haggerty, M. (1996). Fiscal impacts of alternative development patterns: Broadwater and Gallatin Counties. *Montana Policy Review* , Fall:19-31.

25. Auger, P.A. (1994). *Does open space pay?* Durham, NH: University of New Hampshire Cooperative Extension.

26. Kingsley et al. (1993). Cited by American Farmland Trust, Technical Assistance Division on website. www.farmlandinfo.org. March 2000.

27. Niebling, C.R. (1997). *Town of Exeter, New Hampshire cost of community services study.* Concord, NH: Innovative Natural Resource Solutions.

28. Adams, M. and J. Freedgood (1998). *The cost of community services in Monmouth County, New Jersey.* Northampton, Massachusetts: American Farmland Trust.

29. Bucknall, Christopher P. (1989). *The real cost of development.* Poughkeepsie, NY:

Scenic Hudson Inc.

30. Cornell Cooperative Extension of Dutchess County and American Farmland Trust (1989). *Cost of community services study: Towns of Beekman and Northeast Dutchess County, New York*, Milbrook, NY.

31. Schuyler County League of Women Voters (1993). *Fiscal impact of residential, commercial and agricultural land use in the towns of Hector and Dix.* Schuyler County, New York: League of Women Voters.

32. Kinsman, Connie, Lloyd Garrison and Jane Sloan (1991). *Farmington cost of community services study.* Milbrook, New York: Cornell Cooperative Extension Service and American Farmland Trust.

33. Concerned Citizens of Kinderhook (1996). Cited by American Farmland Trust, Technical Assistance Division on website, www.farmlandinfo.org March 2000.

34. Schuyler County League of Women Voters (1992). *Fiscal impact of residential, commercial and agricultural land use in the towns of Montour and Reading.* Schuyler County, New York: League of Women Voters.

35. American Farmland Trust (1994). *The cost of community services in Madison Village and Township, Lake County, Ohio.* Northampton, Massachusetts: American Farmland Trust.

36. Kelsey, Timothy W (1987). *The fiscal implications of alternative land uses.* State College, Pennsylvania: The Pennsylvania State Cooperative Extension.

BLM_0106938

37. Kelsey, Timothy W (1994). *The fiscal implications of alternative land uses.* State College, Pennsylvania: The Pennsylvania State Cooperative Extension.

38. Kelsey, Timothy W (1996). *The fiscal implications of alternative land uses.* State College, Pennsylvania: The Pennsylvania State Cooperative Extension.

39. Kelsey, Timothy W (1998). *The fiscal implications of alternative land uses.* State College, Pennsylvania: The Pennsylvania State Cooperative Extension.

40. Snyder, D.L. and G. Ferguson (1994). *Cost of community services study: Cache, Servier, and Utah Counties.* Logan, Utah: Utah State University, Economics Department.

41. Vance, Tamara (1994). *Fiscal impacts of major land uses in Clarke County.* Piedmont, Virginia: Piedmont Environmental Council.

42. Larson, Arthur B. and Tamara A. Vance (1988). *Fiscal impacts of residential development in Culpepper County, Virginia.* Piedmont, Virginia: Piedmont Environmental Council.

43. Adams. Melissa (1999). *The cost of community services in Northampton County, Virginia.* Northampton, Massachusetts: American Farmland Trust.

44. American Farmland Trust (1999). *The cost of community services in Skagit County, Washington.* Northampton, Massachusetts: American Farmland Trust.

45. Town of Dunn (1994). *Cost of community services in Dunn, Wisconsin.* Dunn, WI: City Planning Department.

46. Thomas, Holly L. (1991). *The economic benefits of land conservation.* Duchess County, New York: Department of Planning and Development, Technical Memo.

47. American Farmland Trust (1986). *Density related public costs.* Northampton, Massachusetts: American Farmland Trust.

48. Bryan, Todd A (n.d.). *Developments and taxes: Facts versus fiction.* Mendham, NJ: Association of New Jersey Environmental Commissions.

49. Burchell, R.W. and D. Listokin (1995). *Land, infrastructure, housing costs and fiscal impacts associated with growth: The literature of the impacts of sprawl versus managed growth.* Cambridge, MA: Lincoln Institute of Land Policy working paper.

BLM_0106939

# CHAPTER 5

# The Evidence Relating to Greenway Trails

REVIEW OF EMPIRICAL FINDINGS

DISCUSSION

BLM_0106940

BLM_0106941

**CHAPTER 5**

## *THE EVIDENCE RELATING TO GREENWAY TRAILS*

In the 1990s, there was an explosion of interest in developing greenways. Greenways are corridors managed for recreation, transportation and conservation purposes. They can be as elaborate as a lengthy, paved hiking-biking-riding route or as simple, natural, and ecologically important as a stretch of stream bank left wild.

Greenways are not new. The concept grew out of the work of Frederick Law Olmsted, who coined the word parkway in 1865 and was the designer of some of the nation's first linear parks. It evolved from the development of the Appalachian Trail in 1921, the urban parkways of the 1930s, and the British concept of green-belt areas around neighborhoods and communities. The term greenway is derived from taking a syllable from the words greenbelt and parkway.[1] The term first appeared in the 1950s, but it was brought into common use and given national prominence in 1987 by the President's Commission on Americans Outdoors.

The commission reported that there was a clamor for outdoor recreational facilities closer to home.[2] Their response was a vision of a sys-

tem of recreational corridors: "fingers of green that reach out from and around and through communities all across America" (p. 142). They called for a "prairie fire of local action" (p. 73) to implement the vision and recommended that "communities establish Greenways, corridors of private and public recreation lands and waters, to provide people with access to open spaces close to where they live, and to link together the rural and urban spaces in the American landscape" (p. 142). The fire was ignited, a ground swell of public support emerged, and greenways have since been developed on public land or on easements across private property in hundreds of communities across the country.

Greenways have multiple purposes, but from a recreation perspective they have two major functions: (1) to link and facilitate hike and bike access between residential areas and parks; and (2) to provide opportunities for the linear forms of outdoor recreation (e.g. hiking, jogging, bicycling, inline skating, horseback riding, cross-country skiing, and ordinary walking) in which many North Americans en-

BLM_0106942

gage today. These recreation roles require the development of trails along the greenways. The studies reviewed in this chapter address the impact of these greenway trails on property values.

The rationale underlying the proposition that greenway trails may positively influence property values is different from that associated with parks. Unlike parks, any added property value would not come from the views of nature or open space which a property owner enjoys because in most cases, especially in urban trail contexts, there are no such vistas. Rather, any added value derives from access to the linear trail. It is a trail's functionality or activity potential that confers added value, not the panorama of attractive open space.

The suggestion that trail access enhances property values is nearly always controversial. Much depends on perceptions of who the users of trails are likely to be. For example, if it is perceived that the trail may facilitate the movement of economically disadvantaged residents through a relatively affluent neighborhood, then the trail may be supported by the former but resisted by some people in the latter area.

Figure 5-1 refers to the Heritage Trail which is featured later in this chapter. It is a typical illustration of the controversies that often erupt when rails-to-trails projects are suggested. In some instances the opposition is too strong to surmount but, after five years of persistent struggle, Heritage Trail was completed. Rather than increasing property values, many argue that greenway trails will cause them to decline because they encourage a flow of non-local people to pass through neighborhoods. The concern is that this will result in a loss of privacy, trespass, litter, noise, increased crime and vandalism, and other problems. Thus, Mayor Sharon Sayles-Belton, the long-term mayor of Minneapolis, who has been a staunch advocate of trails, observed "It has been my experience that after a trail has been put in, the residents abutting it seek to curtail its public use."[3]

Reactions to the widely acclaimed trail around the Inner Harbor area in Baltimore illustrate this point. Town houses on the old

**Figure 5-1**   Controversy over Heritage Trail

The county commissioners held a hearing to take up the question of converting a rail right-of-way into a trail. When they arrived at the meeting, supporters of the trail were surprised to find the auditorium packed with right-of-way neighbors emotionally claiming that a recreation trail would bring "criminal elements" from Dubuque into their rural communities. Many had assumed they owned a reversionary interest in the right-of-way, although their deeds showed otherwise. Moreover, since there had been a history of trespassers and vandals abusing railroad property, the abutting owners and their allies assumed that a trail would compound the problem. Many of the trail neighbors simply wanted some measure of control over the use of the railbed land. Others, more fearful, vowed they would burn the bridges before they would allow the Heritage Trail to be built. They were referring to the wooden trestles that crossed and recrossed the Little Makoqueta River, which the rail-trail followed along part of the proposed twenty-six mile route. All that was needed to scotch the plan, the extremists figured, was a few crucial missing links, since it would be beyond the means of the project to build new bridges. And then the land would be theirs.

Source:   Charles E. Little (1990) Greenways for America. Baltimore: John Hopkins University Press.

wharfs were constructed with large windows so occupants could enjoy the harbor views. These occupants resent people walking on the trail in front of their properties, interrupting their privacy and their views. Controversy of this nature was the stimulus for commissioning all of the studies reviewed in this chapter.

It was anticipated that the research designs of studies commissioned to address this controversy would take one of two forms:

(1) Identify an existing greenway trail running through an area and compare property assessments (available at the assessor's office) before and after the greenway was established to see if there were any differences; or

(2) Identify a control area similar in essential respects to a greenway trail neighborhood but without the trail, and compare the differences in assessed value of comparable properties in the two areas.

These were the approaches commonly used in the studies reviewed in Chapters 3 and 4. However, in the case of trails, research of this nature has not been reported. Instead of examining trends in market transactions, eight of the nine studies reviewed here used attitude and opinion surveys of homeowners, residents, developers, and realtors. It was assumed that these attitudes and opinions reflected residents'

or homeowners' personal experiences, and the professional expertise of developers and realtors. These survey studies are less definitive and convincing than studies which examine trends in market transactions. Nevertheless, until this latter type of research is undertaken, such survey results represent the best available evidence.

## REVIEW OF EMPIRICAL FINDINGS

The earliest trail impact study was undertaken in 1978 by the East Bay Regional Park District in the San Francisco Bay area.[4] The owners of 410 residences were surveyed. They were located in areas adjacent to either the LaFayette-Moraga or the Alameda Creek trails. The former was developed from an abandoned rail line while the latter was part of a flood control project. Results are shown in Table 5-1. Only 7% and 4% of homeowners on the two trails believed their property values had been lowered as a result of the trail's presence.

Almost a decade went by before another trail study was undertaken in 1987 in Seattle to evaluate the effect of the 12 mile Burke-Gilman Trail on property values and crime in residences near and adjacent to the trail.[5] The trail is 8-10 feet wide and follows an abandoned railroad right-of-way. It passes primarily through residential neighborhoods, but also through an industrial area, several neighbor-

**Table 5-1**  Adjacent Residents' Perceptions of Trail Impacts on Their Property Value (n=410)

| Impact of Trail on Property Value | LaFayette-Moraga Trail | Alameda Creek Trail |
| --- | --- | --- |
| Increased Value | 36% | 18% |
| No Affect | 48% | 72% |
| Decreased Value | 7% | 4% |
| No Response | 9% | 6% |

BLM_0106944

hood commercial areas, and the University of Washington. It links six parks and is used by 5,000 people a day, of whom 80% are bicyclists.

The trail was opened in 1979 and it was assumed after 8 years experience with it that stakeholders would have formed fairly clear opinions as to its effect on property. Two groups of stakeholders were surveyed by telephone: residents living adjacent, and within one block of the trail; and real estate agents who bought and sold homes in neighborhoods near the trail.

Results of the residents' survey are summarized in Table 5-2. Three groups of residents were surveyed: owners of single family homes adjacent to the trail; owners of single family homes within one block of the trail; and owners of condominiums adjacent to the trail. They were asked two questions: (1) did the presence of the trail make it easier, more difficult or have no effect on the saleability of their home; and (2) did the trail increase or decrease the selling price of the property. These two ques-

tions were subsequently used by most of the other reported studies reviewed in this chapter that addressed this issue.

The data in Table 5-2 show that relatively few residents perceived the trail to have a negative influence on their property. More of those living a block away from the trail and condominium owners viewed it as a positive influence on their property than did single family homeowners who were adjacent to the trail. However, the dominant feature of these results is the large proportion who perceived the trail to have either a neutral impact or expressed no opinion. On perceptions of the trail's impact on house prices, approximately two-thirds of respondents were in one of these two neutral categories.

A larger proportion of real estate agents than residents perceived a negative impact on residences adjacent to the trail, but they were still outnumbered by those who saw the trail as having a positive impact (Table 5-3). None of the 75 agents surveyed perceived the trail to have a negative impact on properties located

**Table 5-2**   Results of a Survey of Homeowners on the Burke-Gilman Trail

| Type of Homeowner | Impact on Home Saleability | | | | Impact on House Price | | | |
|---|---|---|---|---|---|---|---|---|
| | Positive | Neutral | Negative | No Response | Positive | Neutral | Negative | No Response |
| Single family home owners adjacent to the trail (n=110) | 44% | 27% | 9% | 20% | 22% | 40% | 8% | 30% |
| Single family home owners within one block of the trail (n=159) | 52 | 24 | 9 | 15 | 30 | 48 | 7 | 16 |
| Condominium owners adjacent to the trail (n=100) | 52 | 36 | 1 | 11 | 21 | 51 | 2 | 26 |

**Table 5-3**   Real Estate Agents' Views of the Impact of the Burke-Gilman Trail on Residential Property (n=75)

| Type of Homeowner | Impact on home saleability | | | Impact on house price | | |
|---|---|---|---|---|---|---|
| | Positive | Neutral | Negative | Positive | Neutral | Negative |
| Adjacent to the trail | 43% | 26% | 31% | 33% | 42% | 25% |
| Within 2 blocks of the trail | 75 | 25 | 0 | 43 | 57 | 0 |

within two blocks of the trail but not adjacent to it. Indeed, their consensus view was that these properties sold for an average of 6% more because of the trail.

Not a single resident who was surveyed felt that the trail should be closed, and almost two-thirds of residents believed the trail enhanced the quality of life in the neighborhood. The authors of the report concluded:

> In summary, this study indicates that concerns about decreased property values, increased crime, and a lower quality of life due to the construction of multi-use trails are unfounded. In fact, the opposite is true. The study indicates that multi-use trails are an amenity that helps sell homes, increase property values and improve the quality of life (p. 3).

Table 5-4 shows results of a study which reported adjacent residents' attitudes to the Root River and the Luce Line trails in 1988 in Minnesota.[6] Both these trails were converted from abandoned railroad rights-of-way. The sample was relatively small (n = 74) but only 11% of the sample believed the trails lowered their property values. The survey also reported that landowner concerns prior to trail development were greater than the subsequent problems that they actually experienced.

In 1992, the National Park Service commissioned a study of the impacts of three trails which were formed from rail right-of-ways.[7] They were (1) the 26 mile Heritage Trail in Iowa from Dubuque to Dyersville which was rural; (2) the Tallahassee to St. Marks Historic Railroad State Trail in Florida which runs for 16 miles through a mix of settings, primarily rural but including the town of Woodville and several areas of single family home development; and (3) the 7 mile Lafayette-Moraga Trail which featured in the earlier 1978 East Bay study (Table 5-1), and passes through heavily developed, relatively affluent suburban areas.

Similarly sized samples were drawn of property owners who lived adjacent to the trail and those who resided within quarter of a mile but not adjacent to it. In addition, a survey of 25 realtors and appraisers was undertaken in two of the three trail areas, while 17 were interviewed in the less developed Heritage Trail area.

The property owners' responses shown in

BLM_0106946

**Table 5-4**   Adjacent Residents' Perceptions of the Impacts of Two Trails on Their Property Value (n=74)

| Impact of Trail on Property Value | Root River Trail | Luce Line Trail |
|---|---|---|
| Increased Value | 14% | 58% |
| No Effect | 62% | 32% |
| Decreased Value | 14% | 9% |
| No Response | 10% | 1% |

table 5-5 indicate that there was relatively little difference in the trails' perceived impacts on property values between those living adjacent and those residing nearby. At the generally rural Heritage and St. Marks trails, between 73% and 90% of respondents reported that the trails had no impact on their property values. Along the urban Lafayette/Moraga Trail, a much larger proportion perceived there to be an effect and most thought it was positive. In total, only 7% of adjacent homeowners and 2% of nearby residents thought the trails lowered the value of their property.

Overall, realtors and appraisers believed the trails would have little effect on property values (increases or decreases in value) or sale-ability (home sells faster or slower). Again,

there was more perception of impact on the urban Lafayette/Moraga Trail and, in contrast to property owners, a greater proportion felt it was negative than believed it was positive. Buyers' concerns about possible loss of privacy was given most frequently as the reason for the effect.

The Brush Creek Trail in Santa Rosa, California, is a 1.25 mile, 10 feet wide asphalt hike and bike trail. It had been operating for 9 years when 75 of the 85 homeowners whose properties were adjacent to it were interviewed in 1992.[8] The dominant response to the sale-ability and value questions was "no effect" (49% and 69%, respectively), while 29% and 20%, respectively, reported a "slight" positive effect. Only 17% of the sample perceived the

**Table 5-5**   Adjacent and Nearby Owners' Opinions about How the Presence of a Trail Affects the Resale Value of Their Property

| | Heritage | | St. Marks | | Lafayette/Moraga | | Combined | |
|---|---|---|---|---|---|---|---|---|
| | Adjacent (n=51) | Nearby (n=49) | Adjacent (n=107) | Nearby (n=92) | Adjacent (n=172) | Nearby (n=142) | Adjacent (n=330) | Nearby (n=283) |
| Lower Value | 14% | 2% | 11% | 2% | 3% | 1% | 7% | 2% |
| Increased Value | 14 | 8 | 16 | 21 | 53 | 47 | 35 | 31 |
| No Effect | 73 | 90 | 74 | 77 | 44 | 52 | 58 | 67 |

**Table 5-6**   Realtors Perceptions about the Effect of Three Trails on Their Property

| Type of Impact | Heritage (n=17) | | | St. Marks (n=25) | | | LaFayette/Moraga (n=25) | | |
|---|---|---|---|---|---|---|---|---|---|
| | Positive | Neutral | Negative | Positive | Neutral | Negative | Positive | Neutral | Negative |
| Impact on saleability of homes adjacent to the trail | 6% | 94% | 0% | 20% | 80% | 0% | 20% | 48% | 32% |
| Impact on saleability of homes nearby | 12 | 88 | 0 | 24 | 76 | 0 | 56 | 44 | 0 |
| Impact on resale value of homes adjacent to the trail | 12 | 82 | 6 | 20 | 80 | 0 | 24 | 52 | 24 |
| Impact on resale value of homes nearby | 12 | 88 | 0 | 20 | 80 | 0 | 48 | 52 | 0 |

trail to have a negative impact on saleability and 8% on value.

In 1994, the Maryland Greenways Commission funded an analysis of the impact of the Northern Central Rail Trail.[9] Only 7% of the local brokers, appraisers, developers and tax assessors who were surveyed believed that the trail lowered nearby property values. The 63% who felt it had a positive effect, "guesstimated" that it added on average $2,459 to the value of a typical residence. However, this guesstimate could not be confirmed in an analysis of actual market transactions in the area, because insufficient property exchanges had occurred in the vicinity of the trail since it had been developed for an identifiable pattern to emerge. As was the case in many of the previous studies discussed in this chapter, respondents believed that properties within 1,000 feet of the trail, but not abutting it, generally experienced the greatest positive impacts on value.

Three trails in the metro-Denver area were selected in a 1995 study sponsored by the Conservation Fund and The Colorado State Trails Program.[10] They were: (1) a section of the Highline Canal Trail, which is paved and is the most highly used trail in metro-Denver; (2) the Weir Gulch Trail, which is a small paved footpath that has evolved into a connector path between neighborhood parks; and (3) a section of the Willow Creek Trail, which connects community parks and open space and is also used primarily by neighborhood residents. Since all the trails were more than ten years old, it was assumed that whatever effect they had on property values would have occurred.

Following the precedent of previous studies, data were collected by telephone surveys from: (1) 26 residents who owned or rented property adjacent to the trail; (2) 143 residents living within one block of the trail; and (3) 11 real estate agents who did business in metro-Denver. The results are summarized in Table 5-7. The overall pattern of the data clearly indicate that an insignificant number of respondents perceived the trails to have a negative impact on the saleability or selling price of the property. The results from the residents adjacent to a trail and the realtors' sample should be considered tentative because of the very

BLM_0106948

**Table 5-7**   Residents' and Realtors' Perceptions of the Impact of Three Trails on Residential Property

| Types of Homeowner | Impact on Home Saleability | | | | Impact on House Price | | | |
|---|---|---|---|---|---|---|---|---|
| | Positive | Neutral | Negative | No Response | Positive | Neutral | Negative | No Response |
| Properties adjacent to a trail (n=26) | 46% | 38% | 8% | 8% | 35% | 46% | 4% | 15% |
| Properties within a block of the trail (n=143) | 33 | 50 | 5 | 12 | 33 | 50 | 5 | 12 |
| Realtors (n=11) | | | | | | | | |
| - Adjacent to the trail | 73 | 18 | 9 | 0 | 55 | 36 | 0 | 9 |
| - Within 1 block of the trail | 64 | 36 | 0 | 0 | 9 | 91 | 0 | 0 |

small sample sizes which means that changes in only a few cases cause the percentages to change dramatically. However, the general pattern among both homeowner groups was to favor a neutral impact, while realtors favored a positive impact.

A mail survey undertaken in 1995 of 145 households located in close proximity to three greenways in Cary, which is a rapidly growing city in the Research Triangle region of North Carolina, yielded responses from 109 (75%) of them.[11] The surveyed residences typically were single family homes, and residents in one of the three areas had vociferously opposed development of their greenway. Although respondents reported that the public use of greenways caused some problems for adjacent residents in the form of trespassing, noise, roaming pets, and loss of privacy, the occurrence of these problems was not perceived to negatively impact property values since 55%

believed that the greenways enhanced the resale value of their property. Only 3% reported it decreased as a result of the greenway near their home, while the remaining 42% perceived the greenway to have no effect on their property value.

In 1997, the Green Bay-Brown County Planning Commission in Wisconsin investigated the impact of Brown County's Mountain-Bay Trail on property values.[12] The study focused on the Highridge Estates subdivision in the Village of Howard. The initial phase of the subdivision was developed and a new addition was currently under development. This study was particularly significant because unlike previous studies, it used actual property values rather than residents' perceptions. A comparison of the lots within the original Highridge Estates subdivision indicated that those lots located immediately adjacent to the trail sold for an average of $34,200, while the remaining

lots (of similar size and character) sold for an average of $31,400, a difference of $2,800 or 9 percent. In addition to selling for more, the lots along the trail also sold faster. According to representatives of the realty companies involved in the development, the lots adjacent to the trail sold immediately, while the lots further away did not sell as fast.

Recognizing what had happened, the realty companies decided to restructure the pricing of future lots located along the Mountain-Bay Trail. Thus, in the addition of Highridge Estates, the average lot located along the trail was priced at $44,900, compared to $35,700 for slightly larger lots not located along the trail, a difference of $9,200 or 26 percent.

## DISCUSSION

The sample sizes in many of these studies were small, but the consistent pattern emerging from them and the diversity of milieus in which they were conducted enables a reasonable level of confidence to be placed in generalizations drawn from them. Across the studies there was broad consensus that trails have no negative impact on either the saleability of property (easier or more difficult to sell) or its value. There was a belief among some, typically between 20% and 40% of a sample, that there was a positive impact on saleability and value. However, the dominant prevailing sentiment was that the presence of a trail had no impact on these issues.

It appears that for most people who reside adjacent or close to trails, the advantages of hike and bike access to other amenities and the opportunities for linear outdoor recreation activities that trails provide, are countered by the increased flow of people and reduced privacy that trails bring to a neighborhood. This suggests that the challenge for trail advocates is to design trails to alleviate these concerns. The issue was encapsulated in the following state-ment:

> A home with a trail running very close behind it with no fencing or screening could be affected adversely, while an identical home with private trail access across a well screened yard might be much more desirable as a result. Several professionals discussed the impact of the trails as a "mixed bag," where the benefits of convenient trail access and living near undeveloped open space had to be weighed against some loss of privacy for adjacent properties. They felt the relative importance of these positive and negative impacts depended on the situation of each particular property and the feelings of each potential buyer (p. III-15).[7]

Some potential buyers of a property may have no interest in hike/bike trails or linear recreation activities, so for them there is no positive counterbalance for the potential negative impacts of privacy loss, people flow and noise. For other potential buyers, especially perhaps those with young children, hiking, biking, and linear recreation activities may be a central feature of their lifestyle, so access to trails far outweighs the perceived potential negative outcomes. These dichotomous lifestyles suggest why some are likely to respond positively to trails, while others remain more circumspect.

Most people intuitively accept that proximity to a park or golf course often has a positive impact on property, but this acceptance does not extend to trails where any added value accrues from access rather than vista. Thus, it seems likely that there will be an expanded number of trail impact studies commissioned in the coming years reflecting the growth in greenways development, because some resi-

dents will invariably be concerned about their potential for negative impacts on existing neighborhoods. Commissioning these studies is a necessary defensive strategy that greenway advocates have to support if they are to alleviate the legitimate concerns of neighborhood opponents.

## References

1.  Little, Charles E. (1990). *Greenways for America*. Baltimore: Johns Hopkins University Press.

2.  The President's Commission on Americans Outdoors (1987). *Americans outdoors: The legacy, the challenge*. Washington, DC: Island Press.

3.  Sayles-Belton, Sharon (1999). Discussion comment made at a seminar, The City Parks Forum, New Orleans, LA. October.

4.  East Bay Regional Park District (1978). *A trails study: Neighbor and user viewpoints*. Oakland, California: EBRPD.

5.  Seattle Engineering Department, Office of Planning (1987). *Evaluation of the Burke-Gilman Trail's effect on property values and crime*. Seattle, Washington: Engineering Department.

6.  Mazour, Leonard P. (1988). *Converted railroad trails: The Impact on adjacent property*. Manhattan, Kansas: Kansas State University, M.S. Thesis.

7.  Moore, Roger L., Alan R. Graefe, Richard J. Gitelson, and Elizabeth Porter (1992). *The impacts of rail-trails: A study of the users and property owners from three trails*. Washington, DC: Rivers, Trails and Conservation Assistance Program, National Park Service.

8.  Murphy, Michelle Miller (1992). *The impact of the Brush Creek Trail on property values and crime*. Sonoma State University: Environmental Studies and Planning Dept.

9.  PKF Consulting (1994). *Analysis of economic impacts of the Northern Central Rail Trail*. Annapolis, Maryland: Maryland Greenways Commission, Maryland Department of Natural Resources.

10. Alexander, Leslee T. (1995). *The effects of greenways on property values and public safety*. Denver, Colorado: Colorado State Parks, State Trails Program and The Conservation Fund.

11. Tedder, Lauren Allisen (1995). *Do greenways make good neighbors? Evidence from a survey of adjacent residents in Cary, North Carolina*. Chapel Hill, NC: Center for Urban and Regional Studies, University of North Carolina.

12. Green Bay-Brown County Planning Commission (1997). *Recreation trails, crime, and property values: Brown County's Mountain Trail and the proposed Fox River Trail*. Green Bay, WI: Green Bay-Brown County Planning Commission.

BLM_0106951

# CHAPTER 6

# The Analogous Case of Golf Courses

**THE ANALOGY WITH PARKS**

**PLANNING AND DESIGN STRATEDGIES**

*Alternative Configurations*

*The Windows Principle*

**THE BOTTOM LINE**

BLM_0106952

BLM_0106953

# THE ANALOGOUS CASE OF GOLF COURSES

There are 16,000 golf courses in the United States and approximately 2,000 of them are part of a residential development. However, the trend to incorporate them as central features of real estate developments accentuated in the 1990s when almost 1,000 such courses were constructed, accounting for nearly 50% of all new courses in that decade. The acreage required to make these developments viable varies. The minimum size is about 400 acres (half golf and half residential), but many consider this ratio to be marginal. Larger projects of 800-1500 acres allow the developers to spread the cost of the golf course over a larger number of residential units. However, the disadvantage of larger projects is that the interest costs of the money borrowed to undertake the development escalate as they have to be carried for a longer period of time.

While the overall U.S. real estate industry grew at an annual rate of 2%-3% in the 1990s, the annual growth rate of developments which incorporated golf courses approached 10%, making it one of the hottest sectors in real estate. Demographic and economic indicators suggest this trend will continue. The highest golf participation rates are in the 50-59 age cohort. The baby boomers are now entering this age cohort. They are empty nesters; in their peak earning years; close to retirement; and have the economic security of strong private pension funds boosted by the unprecedented increases in the stock market in the late 1990s.

Some developments have an array of other recreation amenities along with the golf courses, such as nature trails, jogging and biking trails, day care centers, fishing lakes, swimming pools and recreation centers.

## THE ANALOGY WITH PARKS

There are two reasons why developers include golf courses and other amenities in their projects: (1) to increase the land values in their development; and (2) to accelerate the absorption of real estate i.e. to sell their lots more quickly. It has been estimated that the broadening of market appeal and the enhanced image and ambiance that a golf course creates, speeds up overall absorption by 20-30 percent which

BLM_0106954

translates into higher profitability for the developer. The developers are not philanthropists! They incorporate these recreational features because they generate more revenues for the developer than it costs to create them.

The appeal of golf course communities is not confined to golfers. Indeed, only approximately one-third of those who purchase houses in these developments play golf regularly.[1] For the majority of home buyers, the appeal is the open space and park-like ambiance that golf courses provide. A typical response from residents is, "It's like living in the country here, but with access to the city."[2]

The enhanced land value derives from two sources. The first is image: "Golf is a way to dress up the real estate...The golf course tends to elevate the image of the community and people are attracted to image."[2] Golf has connotations of affluence and prestige, and some people may seek to enhance their self-esteem or social standing by buying into a development with this type of image. The second source of enhanced value is the visual and physical access to attractive open space that causes individuals to pay a premium price for their homes. Both of these sources are consistent with the reasons for the enhanced value of land around natural parks and open space.

The developers' strategy mirrors that which has been advocated by supporters of public parks and open space for over a century, i.e. parks and selected recreation features are an investment not a cost because they generate more property taxes for a city than it costs to service the annual debt charges incurred in creating the amenities. The high visibility, large number, and success of these golf course developments demonstrates by analogy to governmental stakeholders and decision-makers that commercial developers implicitly recognize that recreation amenities and park-like

open spaces enhance the surrounding land values sufficiently to offset their costs of acquisition and development.

The linkage between golf courses and parks has been accentuated in recent years by newer courses accepting greater responsibility for protecting the natural environment. There has been growing acknowledgment of the damage golf courses can inflict by denigrating wetlands and other types of sensitive areas and using pesticides, and a recognition that they should be part of the solution to environmental problems, rather than creating them. To this end, the U.S. Golf Association has linked with the Audubon Society in an effort to enhance wildlife habitat through improved resource management practices on golf courses. In short, golf courses are becoming more park-like.

## PLANNING AND DESIGN STRATEGIES

Planning and design strategies used by developers to enhance the value of property around golf courses are reviewed here because they may be adapted by public agencies engaged in planning and designing parks to maximize real estate values if that is an agency goal.

### Alternative Configurations

Five basic golf course configurations are recognized: core; double fairway, continuous; double fairway, returning nines; single fairway, continuous; and single fairway, returning nines. These are shown in Figure 6-1.[3] Their potential for maximizing the value of adjacent real estate varies and Figure 6-1 reinforces the important role of "edge" in maximizing real estate frontage potential.

BLM_0106955

*The Core Golf Course.* In a core course, the holes are clustered together, either in a continuous sequence, leaving the clubhouse at number one and returning to it at number 18, or in two returning nines, with each nine-hole sequence beginning and ending near the clubhouse. Because it consumes the least amount of land, the core course is usually the least expensive to build. However, the only sites it provides for real estate development lie at its perimeter, and the length of lot frontage is ±10,000 feet.



*The Single Fairway, Continuous* is a single, open loop starting from the clubhouse and returning to the clubhouse. It consumes the greatest amount of land and offers the greatest amount of fairway frontage for development sites. It can be designed to wind its way through fairly difficult terrain. Length of available lot frontage is ±47,000 feet.



*The Single Fairway, Returning Nines* configuration consists of two loops of returning nines, with the clubhouse in the center. Most flexible for play, slightly less frontage due to the concentration of tees and greens for holes 1, 9, 10, and 18. Length of available lot frontage is ±44,000 feet.

BLM_0106956



*The Double Fairway, Continuous* configuration consists of a continuous single loop of adjacent, parallel fairways. It offers about 40% less frontage for development sites than a single-fairway course and can result in a boring course design. But the greater distance it provides from building sites on the opposite side of the fairway create a greater sense of spaciousness than does a single fairway lined by development. Length of available lot frontage is ±25,000 feet.



*The Double Fairway, Returning Nines* is characterized by two circuits of nine holes each, which both start and finish at the clubhouse, and both have adjacent parallel fairways. Length of available lot frontage is ±24,000feet.

**Figure 6-1**   The Five Basic Golf Course Configurations

The almost rectangular shape of the core golf course is similar to the shape of traditional parks and has relatively little edge. The single fairway configurations have most edge and can accommodate the most real estate frontage. However, the houses on opposite sides of the course are relatively close together and likely to be in each others' viewlines. In contrast, the core course has least potential for real estate frontage, but the views are likely to be uninterrupted and not likely to include other homes. For this reason, the premium associated with the core course frontage is likely to be greater than that accruing from the single or double fairway options.

The preferred option in most real estate developments is the single fairway returning nines configuration. This yields almost the maximum frontage for real estate, but offers greater flexibility and efficiency in operation over the single fairway continuous configuration by providing two starting holes. Thus, more players can begin a game, and the entire

course can be brought into play in two hours, compared to four hours in a continuous layout with only one starting hole.[3] Further, this layout allows for the option of playing only nine holes.

**The "Windows" Principle[4]**

Creating "windows" is a design strategy used to maximize real estate values in golf course developments. It is a principle that cities may encourage developers to adopt in the vicinity of parks to maximize economic return to both the developer and to the city in the form of increased property taxes.

In traditional golf course developments, lots were placed around the entire perimeter of the course, which locked it off from internal areas of the project. This isolates the internal lots and diminishes their desirability and value. "Windows" are openings in the perimeter of the golf course that, much like a window in the side of a building, provide direct views of the

golf course. They are created by leaving open spaces at key points along the perimeter of the course. Making the golf course visible from interior lots increases the value of portions of the development that are located at a distance from the course.

Figure 6-2 contrasts the impact of creating windows with the traditional lot pattern. Windows are created by locating local interior roads and cul-de-sacs from the window into the interior lots, giving most of the lots on a cul-de-sac views of, and secondary frontage (i.e. across the road) on, the golf course. At the very least, all homeowners have a view of the course as they drive down the cul-de-sac past the window. The effect is to make it feel that the golf course belongs to the whole community and contributes an ambiance that benefits everybody.

Sometimes a developer may have to give up a few frontage lots to create a window. But obtaining premium prices for a larger portion of the interior lots, more than offsets this loss. Roadway windows frequently can be placed at points along the course where it would be difficult to fit in perimeter lots - - at drainage ways, at the outside edges of dogleg golf holes, and at unusually shaped parcel boundaries. Such placements minimize the amount of frontage given up for the window and often lead to greater efficiency in developing lots elsewhere on the site.





TRADITIONAL LOT PATTERN
In the typical layout of golf course communities, interior lots can be walled off from the golf course.

WINDOWS
Creating windows with views of the course and developing roads through them gives residents the feel of truly living in a golf community.

**Figure 6-2**

BLM_0106958

## THE BOTTOM LINE

The magnitude of investment in creating a golf course varies widely according to topography, soil conditions, irrigation needs, drainage requirements, landscaping, the quality of course features such as greens, bunkers and water features, and the costs of labor and materials in the area. However, it is substantial and the cost of constructing an 18-hole course may range from $2 million to $8 million. If all the acreage in a project is suitable for development into lots and no floodplain land is involved, then a developer forfeits the revenue that would be forthcoming from the sale of lots on the 150 acres of land needed for the course. If one-acre lots were sold at $40,000 each, then the loss to the developer of the 150 acres would be $6 million. If the developer paid another $4 million to construct the course on this land, then the total cost would be $10 million.

A larger set of amenities beyond a golf course results in commensurate increases in cost. For example, Del Webb Corporation developed a 5,800 acre master planned subdivision in Phoenix known as Anthem.[5] The rec-reation amenity package cost the corporation $77 million. It included two golf courses, a rock climbing wall, a children's railroad, a skating rink, a roller hockey rink, a 4 acre fishing lake, a water park, 30 acres of soccer and softball fields, and an array of parks.

To justify investment on this scale, there has to be substantial enhanced value of a development's real estate. How much value does a golf course add? Generalizations or averages obscure substantial variations among courses, but results from a study of master-planned golf communities across the United States yielded the averages shown in Table 6-1.[1]

Lots and houses throughout a golf-course community bring premiums over comparable lots/units in nongolf developments (Table 6-1). Prime sites fronting on greens or enjoying water views or fairway and open-space vistas can command twice the average fairway-frontage premium. Nonfrontage property offering views of the golf course and partial vistas also commands a substantial premium. Even interior sites located within the gates of a golf-course community command a slight premium.[1] Although it is difficult to generalize about the

**Table 6-1**   Golf Real Estate Premiums

|  | Lot Value | Housing Value |
| --- | --- | --- |
| Base Homesite[1] | $50,000 | $180,000 |
| Golf-Course Community | | |
| Interior Homesite | $52,000 | $185,000 |
| Golf-View Homesite | 60,000 | 200,000 |
| Fairway Frontage | 75,000 | 225,000 |
| Prime Golf Frontage[2] | 100,000 | 260,000 |

[1] An interior lot in a master-planned community without golf.
[2] Homesites fronting on greens, lakes, and other particularly desirable features of a golf course.
Source: Economics Research Associates cited in J. Richard McElyea, Austin G. Anderson, and Gene P. Krekorian (1991) Golf's Real Estate Value. *Urban Land,* February, 14-19.

magnitude of premiums, in percentage terms golf's enhancement of land values tends to decrease as the base land values rise.

When the averages shown in Table 6-1 are applied to the course configurations shown in Figure 6-1, the difficulty of recouping the costs of a golf course using a core or a double fairway configuration becomes apparent. In Table 6-2 the real estate income accruing from a double fairways returning nines course is compared with that from a single fairways returning nines lay-out. The analysis assumes that 75% of the frontage in both cases in usable for real estate development, and that the premiums for properties with golf course frontages average $25,000 for detached homes, $20,000 for town homes, and $15,000 for garden apartments.

The estimates in Table 6-2 show that the single fairway returning nines yields substantially more income, irrespective of what type of housing is developed. The income estimates in

Table 6-2 are conservative because they do not include the premiums associated with golf-view homesites or interior homesites (Table 6-1). They also do not show the loan cost savings that accrue to the developer from selling the real estate more quickly as a result of the golf course. Nevertheless, these estimates do illustrate why the single fairway returning nines configuration is preferred in golf course developments.

To reduce costs while retaining the real estate premium, some developers have donated the land for a golf course to a city. For example, in response to its request for proposals, Lee County in Florida received offers from six developers willing to donate 150 acres for a golf course, some of whom also offered to contribute $100,000 for the planning and design of the course.[6] In these cases, the municipality develops the course and operates it. When the costs of land acquisition are excluded, the course revenues often are sufficient to cover

| Types of Development | Double fairway returning nines with 18,000 feet available frontage | | Single fairway returning nines with 33,000 feet available frontage | | Differential Premium Bonus |
|---|---|---|---|---|---|
| | Possible Number of Units | Premium Income | Possible Number of Units | Premium Income | |
| Detached houses (100 feet lots) | 180 | $4,500,000 | 330 | $8,250,000 | $3,750,000 |
| Townhouses (38 feet width) | 424 | $9,480,000 | 868 | $17,360,000 | $7,880,000 |
| Three story garden apartment (40 units of frontage per 1000 feet) | 720 | $10,800,000 | 1,320 | $19,800,000 | $9,000,000 |

**Table 6-2**   Income Advantages of the Single Fairway Returning Nines Course

BLM_0106960

operational costs and annual debt charges associated with the construction costs. In addition, the city receives increased property taxes from the homes whose values have been enhanced by their proximity to the course. Indeed, in some instances, it may be feasible to form a tax increment financing district and use the property tax premiums to pay the annual construction debt service costs.

### References

1.  McElyea, J. Richard, Austin G. Anderson and Gene P. Krekorian (1991). Golf's real estate value. *Urban Land,* February, 14-19.

2.  Dugas, Christine (1997). Golf drives housing trend. *USA Today,* November 18, p. 1B.

3.  Murhead, Desmond and Guy L. Rondo (1994). *Golf course development and real estate.* Washington DC: The Urban Land Institute.

4.  Jenson, David (1990). "Windows" and *Urban Land,* August, 26-29.

5.  Fletcher, June (1999). Is this Disneyland? No, the new suburbs–skating rinks, climbing walls are now basic amenities; goodbye, Levittown. *Wall Street Journal,* June 4, p. 12.

6.  Winton, Peter (1994). Developers scramble for shot at public golf course. *Fort Myers News-Press,* August 3, p. 1.

BLM_0106961

# THE THREE COLLECTIVE PUBLIC BENEFITS THAT MAY ACCRUE FROM PARK AND RECREATION SERVICES[1]

The provision of park and recreation opportunities for their own sake still lacks political clout. They have to be shown to solve community problems before politicians see them as being worthy of funding. Many taxpayers are not frequent users of park and recreation services and, thus, have difficulty understanding why they should support them. The prevailing sentiment is often: If only some segments of our community use park and recreation services, then why should the rest of us have to pay for them? To gain the support of non-users, an agency has to provide a convincing answer to the question "What is in it for them?" Broader community support is likely to be dependent on building awareness not only of the on-site benefits that accrue to users, but also of the off-site benefits that accrue to non-users in communities.

There is increased recognition that while benefit driven programs may lead to higher levels of satisfaction among participants and attract increased numbers, such individual "private" benefits have relatively little impact on resource allocation decisions made by elected officials. These benefits are described as individual or "private" because they accrue only to program participants and do not extend to the majority of the population who are only occasional users or non-users. Providing resources to a parks and recreation department so a minority of residents can have enjoyable experiences is likely to be a low priority when measured against the critical economic, health, safety and welfare issues with which most legislative bodies are confronted.

To justify the allocation of additional resources, elected officials have to be convinced that park and recreation agencies deliver collective "public" benefits. These are defined as benefits that accrue to most people in a community, even though they do not participate in

---

[1] An expanded discussion of these benefits can be found in Chapter 5 of a book: John L. Crompton (1999) *Financing and Acquiring Park and Recreation Resources*, Champaign, Illinois: Human Kinetics.

BLM_0106962

an agency's programs or use its facilities. There are just three of these public benefits: **economic development; alleviating social problems; and environmental stewardship.** However, even these three categories of public benefits receive funding support only when they are regarded as being high priority in a community. Hence, the task of a park and recreation agency is to identify which of these public benefits is most prominent on a jurisdiction's political agenda, and to demonstrate the agency's potential contribution to fulfilling that agenda.

## Economic Development

Economic development is viewed as a means of enlarging the tax base. The enlargement provides more tax revenues that governments can use either to improve the community's infrastructure, facilities, and services or to reduce the level of taxes that existing residents pay. It is seen also as a source of jobs and income that enables residents to improve their quality of life. In some communities, park and recreation agencies play a major role in economic development. That role may take the form of:

(i) **Attracting Tourists**: The major factor considered by tourists when they make a decision which communities to visit on a pleasure trip, is the attractions that are available. In most cities, those attractions are dominated by facilities and services operated by park and recreation agencies and their non-profit partners (parks, beaches, events, festivals, athletic tournaments, museums, historical sites, cultural performances, etc.). Without such attractions, there is no tourism.

(ii) **Attracting Businesses:** The viability of businesses in the highly recruited high-technology, research and development, company headquarters, and services sectors, in

many cases is dependent on their ability to attract and retain highly educated professional employees. The deciding factor of where these individual choose to live is often the quality of life in the geographic vicinity of the business. No matter how quality of life is defined, park and recreation opportunities are likely to be a major component of it.

(iii) **Attracting Retirees**. A new clean growth industry in America today is the growing number of relatively affluent, active retirees. Their decisions as to where to locate with their substantial retirement incomes is primarily governed by two factors: climate and recreational opportunities.

(iv) **Enhancing Real Estate Values**. People are prepared to pay more to live close to natural park areas. The enhanced value of these properties results in their owners paying higher property taxes to governments. If the incremental amount of taxes paid by each property that is attributable to the park is aggregated, it is often sufficient to pay the annual debt charges required to retire the bonds used to acquire and develop the park.

## Alleviating Social Problems

(i) **Preventing Youth Crime**. The use of park and recreation programs to alleviate youth crime was a primary political stimulant for much of the early recreation provision in major cities at the beginning of the 20th century. There is strong evidence demonstrating the success of these programs when they are structured to provide: social support from adult leaders; leadership opportunities for youth; intensive and individualized attention to participants; a sense of group belonging; youth input into program decisions; and opportunities for community service. The return on investment of such programs is substantial when it is re-

lated to the costs of incarceration.

(ii) **Healthy Lifestyles**. There is growing recognition that the key to curtailing health care costs lies in prevention of illness so it does not have to be treated by the expensive medical system. Park and recreation services contribute to this end not only by facilitating improvements in physical fitness through exercise, but also by facilitating positive emotional, intellectual and social experiences. People with high levels of wellness have a proclivity to act during their free time, rather than merely be acted on.

(iii) **Environmental Stress.** Environmental stress may involve both psychological emotions, such as frustrations, anger, fear and coping responses, and associated physiological responses that use energy and contribute to fatigue. It is experienced daily by many who live or commute in urban or blighted areas. Parks in urban settings have a restorative effect that releases the tensions of modern life. Evidence demonstrating the therapeutic value of natural settings has emerged in both physiological and psychological studies. The cost of environmental stress in terms of work days lost and medical care is likely to be substantially greater than the cost of providing and maintaining parks, urban forestry programs, and oases of flowers and shrubs.

(iv) **Unemployment and Underemployment**. Basic psychological needs that many people derive from their work are difficult to acquire when unemployed or working in low-level service jobs such as cashiers, janitors and cleaners which are the major growth positions in the economy. Such needs may include self-esteem, prestige accruing from peer group recognition, ego satisfaction of achievement, a desire to be successful, excitement and self-worth. For the growing number of people in low level jobs, these needs will be obtained in their familial or leisure milieus, or they will not be obtained at all.

## Environmental Stewardship

(i) **Historical Preservation**. Without a cultural history, people are rootless. Preserving historical remnants offers lingering evidence to remind people of what they once were, who they are, what they are and where they are. It feeds their sense of history.

(ii) **The Natural Environment**. People turn to the natural environment, preserved by humans as a park, wilderness, or wildlife refuge, for something they cannot get in a built environment. The quality of human life depends on an ecological sustainable and aesthetically pleasing physical environment. The surge of interest in conserving open spaces from people motivated by ecological and aesthetic concerns, is matched by a similar surge from those concerned that the inexorable rise in demands for outdoor recreation is not being matched by a commensurate expansion of the supply base.

BLM_0106964

BLM_0106965

APPENDIX 2

# *BIBLIOGRAPHY OF EMPIRICAL ARTICLES ADDRESSING THE IMPACT OF COASTAL OR INLAND WATERS ON PROXIMATE PROPERTY VALUES[1]*

Anonymous (1980). A rush to redo the water-front. *Business Week*, February 11, 108, 111.

Barrager, Stephen M. (1974). The impact of water resource quality changes on surrounding property values. *Water Resources Bulletin,* 10, 759-765.

Boodt, W.A. (1977). *Effects of reservoir recreation development upon rural residential land values.* Unpublished Doctoral Thesis, Oregon State University.

Brown, Gardner M. and Henry O. Pollakowski (1977). Economic valuation of shoreline. *Review of Economics and Statistics,* 59 (August), 272-278.

Conner, J.R., K. C. Gibbs and J.E. Reynolds (1973). The effects of water frontage on recreational property values. *Journal of Leisure Research,* 5 (2), Spring, 26-38.

Darling, Arthur H. (1973). Measuring the benefits generated by urban water parks. *Land Economics,* 49 (February), 22-34.

David, Elizabeth L. (1968). Lakeshore property values: A guide to public investment in recreation. *Water Resources Research,* 4 (4), 697-707.

David, Elizabeth L. and William B. Lord. (1968). Determination of property value on artificial lakes. *Department of Agricultural Economics Bulletin*, 54. Madison: University of Wisconsin.

Day, J.C. and J.R. Gilpin (1974). The impact of man-made lakes on residential property values: A case study and methodological

---

1 The impact of water bodies on proximate property values was outside the scope of this monograph. However, this bibliography is included because it was recognized that this issue may be of interest to some readers of the publication.

exploration. *Water Resources Research,* 10 (1), 37-113.

Dornbusch, D.M. and S.M. Barrager (1973). *The benefit of water pollution control on property values.* Washington, DC: U.S. Environmental Protection Agency (RPA-600/5-73-005).

Edwards, S.F. and F.J. Gable (1991). Estimating the value of beach recreation from property values: An exploration with comparisons to nourishment costs. *Ocean & Shoreline Management,* 15, 37-55.

Knetsch, J. L. (1964). The influence of reservoir projects on land values. *Journal of Farm Economics,* 46, 231-243.

Knetsch, J.L. and C.J. Parrott (1964). Estimating the influence of large reservoirs on land values. *Appraisal Journal,* 32, 537-546.

Lansford, N.H. (1991). *Recreational and aesthetic value of lakes reflected by housing prices: An hedonic approach.* College Station , TX: Texas A&M University, Ph.D. dissertation.

Mann, W. Merle and J.K. Mann (1968). Analysis of the influence of the Pearl River reservoir on land prices in the area. *The Appraisal Journal,* January, 42-52.

McMillan, Melville (1975). Measuring benefits generated by urban water parks: Comment. *Land Economics,* 51 (November), 379-381.

Michael, H.J., K.J. Boyle and R. Bouchard (1996). Water quality affects property prices: A case study of selected Maine lakes. Maine Agricultural and Forest Experiment Station, Miscellaneous Report 398.

Plattner, R.H. and T.J. Campbell (1978). A study of the effect of water view on site value. *The Appraisal Journal,* January, 20-25.

Rinehart, J.R. and J.J. Pompe (1999). Estimating the effect of a view on underdeveloped property values. *The Appraisal Journal,* 67 (1), 57-61.

Rinehart, J.R. and J.J. Pompe (1994). Adjusting the market value of coastal property for beach quality. *The Appraisal Journal,* October, 604-608.

Schutjer, W.A. and M.C. Hallberg. (1968). Impact of water recreational development on rural property values. *American Journal of Agricultural Economics,* 50 (August), 572-583.

Williams, D.C.,Jr. and D.K. Daniel (1969). *The influence of reservoirs on land values: A case study.* Mississippi State: M.S.U. Water Resources Research Institute.

Young, C.E. and F.A. Teti (n.d.). *Influence of water quality on the value of recreational properties adjacent to St. Albans Bay, Vermont.* Washington, D.C.: Economic Research Service, Natural Resource Economics Division.

BLM_0106968

_____     _____

BLM_0106969

**Spreadsheet Placeholder(file available in native format)**

**File Name:**                20100721_SE_Rpt_Ref_Delta_Measures1.xlsx



Delta Area
Development, Inc.

Developing a
stronger economy
for Delta County.





**File name is /var/www/vhosts/deltaareadevelopment.org/httpdocs/Largestemployersfile.csv
After file exists**

| Business | Industry | Number of Employees |
|---|---|---|
| **BUSINESS NAME**<br>*Address*<br>*City, State Zip*<br>*Phone* | **Industry** | **# of Emps<br>Comment** |
| **U.S. FOREST SERVICE**<br>*2250 Hwy 50*<br>*Delta, CO 81416*<br>*970-874-6600* | Government | 107 |
| **DELTA-MONTROSE ELECTRIC ASSN.**<br>*21191 H75 Rd*<br>*Delta, CO 81416*<br>*970-874-8081* | Utility | 113 |
| **DELTA CORRECTIONAL FACILITY**<br>*1140 E.10 Rd*<br>*Delta, CO 81416*<br>*970-874-7614* | Correctional Facility | 134 |
| **CHACO, INC.**<br>*39955 Hayden Rd*<br>*Paonia, CO 81428*<br>*970-527-4990* | Shoe Manufacturer | 140 |
| **CITY OF DELTA**<br>*360 Main St*<br>*Delta, CO 81416*<br>*970-874-7566* | Government | 185 |
| **WEATHERPORT**<br>*1860 1600 Rd*<br>*Delta, CO 81416*<br>*970-874-6373* | Portable Structure Manufacturer | 190 |
| **DELTA COUNTY**<br>*501 Palmer St*<br>*Delta, CO 81416*<br>*970-874-7566* | Government | 227 |
| **USC, INC.**<br>*320 N Palmer Unit D*<br>*Delta, CO 81416*<br>*970-874-3549* | Mining Labor | 250 |
| **BOWIE RESOURCES, LTD.**<br>*PO Box 1488*<br>*Paonia, CO 81428*<br>*970-527-4135* | Coal Mining | 255 |
| **WAL-MART**<br>*37 Stafford Ln*<br>*Delta, CO 81416*<br>*970-874-1585* | Retail | 260 |
| **SOS STAFFING SERVICES**<br>*326 Main St.* | Temporary Labor | 335<br>**Provides temporary and permanent** |

| | | |
|---|---|---|
| Delta, CO 81416<br>970-874-9334 | | labor within Delta County |
| **WEST ELK MINES**<br>5174 Hwy 133<br>Somerset, CO 81434<br>970-929-5015 | **Coal Mining** | **344**<br>**Located on the Western edge of Gunnison County. Majority of employees live in Delta County.** |
| **DELTA COUNTY MEMORIAL HOSPITAL**<br>1501 E. 3rd St.<br>Delta, CO 81416<br>970-874-7681 | **Hospital & Trauma Center** | **490** |
| **ADULT HOME CARE SERVICES**<br>550 Palmer Ste 102<br>Delta, CO 81416<br>970-874-0136 | **Healthcare** | **50** |
| **SAFEWAY**<br>1550 Hwy 92<br>Delta, CO 81416<br>970-874-9032 | **Grocer** | **54** |
| **MEADOW GOLD DAIRY PRODUCTS**<br>124 W 4th St<br>Delta, CO 81416<br>970-874-4471 | **Dairy Product Distribution** | **60** |
| **RED HAT PRODUCE, INC.**<br>PO Box 37<br>Austin, CO 81410<br>970-835-3704 | **Produce Distributor** | **65** |
| **CITY MARKET, INC.**<br>122 Gunnison River Dr<br>Delta, CO 81416<br>970-874-9718 | **Grocer** | **68**<br>**2 locations in Delta County** |
| **DEL MESA FARMS**<br>11359 2100 Rd<br>Austin, CO 81410<br>970-835-3412 | **Poultry Producer** | **80** |
| **DELTA COUNTY SCHOOL DISTRICT 50J**<br>7655 2075 Rd<br>Delta, CO 81416<br>970-874-4438 | **School System** | **900** |

http://www.deltaareadevelopment.org/major_employers.php                    4/13/2010

BLM_0106972

[DADI] [History of DADI] [Demographics] [Population] [Taxes] [Insurance] [Housing] [Employment] [Sales] [Infrastructure] [Incentives] [Quality of Life] [Investors] [Membership] [Real Estate] [History] [Contact Us] [Links]

Web design by Stillwater Software  © 2009



Delta Area
Development, Inc.

Developing a
stronger economy
for Delta County.

Investor List
Alphabetical or
By Industry



Communities
Education
Medical
Recreation
Churches
Agriculture



**Agriculture has always been a primary industry in Delta County. With over 281,000 acres dedicated to agriculture, an abundance of water and diversity of climate, Delta County has always been a major producer of high quality produce and livestock.**

| Fruit |
|---|

**Delta County is the major apple producing region of Colorado. There are over 346,000 trees that represent nearly 77% of all apple trees in the state. Gala, Golden Delicious, Red Delicious, Fuji and Jonathan apples are the primary varieties grown, but many other varieties are currently being field-tested.**

**Delta County also continues to be the leading producer of pears in Colorado. Over 22,200 trees represent 53% of the state's total production. Bartlett, Red Bartlett, Red Anjou and other Asian varieties make up the bulk of pear production.**



**Delta County produces 71% of the total cherry's grown in Colorado, primarily coming from just 11 orchards. Nearly half of these orchards are considered organic.**



**As of 2002, Delta County is the second-largest grape growing region of Colorado. Approximately 97,000 vines are being grown on 115 acres, with new vines being added all the time. Reisling, Chardonnay, Gewurztraminer, Merlot, Pinot Gris and Pinot noir are the most popular varieties of grapes being grown. Delta County is also the second-largest wine producing region of Colorado, with 14 vineyards and seven wine tasting rooms. Many of the wines produced in this region have won Gold Medals at national and international wine-judging events.**

**Peaches have become the most important fruit crop in terms of value of production in Colorado, and Delta County is the second-largest peach growing region of the state. Delta County presently grows 21% of the total peaches produced. Over 107,000 trees are currently in production.**

| Vegetables and Other Crops |
|---|

**The majority of farming operations in Delta County are family-owned and operated. As of the 1997 Census of Agriculture, there were 1,041 farms and ranches with 281,889 acres in operation.**

BLM_0106974

A wide variety of produce is grown in the area, including organic fruits and vegetables. Presently, the crops that contributing most to the local economy include hay, corn, dry beans, squash, vegetables, and fruits. Sugar beets have been recently tested, and show significant promise as a profitable crop. Total crop sales in 2002 exceeded $16,551,000.

| 2002 Crops Produced in Delta County | | | | | |
|---|---|---|---|---|---|
| Crop | Acres Harvested | Yield | Unit | Production | State Rank |
| Winter Wheat | 300 | 106.5 | Bu. | 32,000 | 35 |
| Corn, Grain | 3,000 | 148.5 | Bu. | 445,000 | 16 |
| Corn, Silage | 2,000 | 21.5 | Ton | 43,000 | N/A |
| Barley | 200 | 100 | Bu. | 20,000 | 13 |
| Oats | 700 | 80.0 | Bu. | 56,000 | N/A |
| Dry Beans | 2,100 | 19.20 | Cwt. | 40,000 | 11 |
| Hay, Alfalfa | 28,000 | 3.10 | Ton | 86,300 | 17 |
| Hay, Other | 7,000 | 2.30 | Ton | 16,100 | 21 |

## Livestock



Dry Haskle Rooster, Courtesy Whiting Farms

Livestock ranchers raise more than just cattle in Delta County. Buffalo, elk, llama and exotic fowl (for both food and feathers) compliment the beef industry

As of January 1, 2003, there were over 37,000 head of cattle and calves. Livestock sales in 2002 exceeded $28,779,000.



Llama; Courtesy Cedar's Edge Bed & mealtime



Bison (Buffalo) raised in Hotchkiss; Courtesy High Wire Ranch

---

[DADI] [History of DADI] [Demographics] [Infrastructure] [Incentives] [Quality of Life] [Communities] [Education] [Medical] [Recreation] [Churches] [Agriculture] [Investors] [Membership] [Real Estate] [History] [Contact Us] [Links]

Web design by Stillwater Software © 2009

BLM_0106975

DIANNA REAMS @GMAIL.COM
865-2886



# Montrose County Socio-Economic Impacts: Community Presentation

*presented to*

## Montrose County Residents

*presented by*

### Andrew Knudtsen
### David Schwartz

### March 10, 2010

Economic & Planning Systems, Inc.
730 17th St., Suite 630, Denver, CO 80202
303.623.3557 • 303.623.9049 fax

Berkeley

Sacramento

Denver

BLM_0106976

# Organization of Analysis

- **Montrose County Economy**
  - Driver Analysis
  - Energy Sector Growth – Coal, O & G, Uranium, Vanadium
  - Demographic and Economic Growth
  - Use of IMPlan to quantify changes under various conditions
  - Purpose: Establish demand targets
- **Evaluate Implications**
  - Fiscal
  - Transportation
  - Land Use

BLM_0106977

# Montrose County Economic System



BLM_0106978

# Applications of the Findings from this Study

- 1.  **Calibrate Demand**
  - Comprehensive understanding of economic relationships
- 2.  **Economic Modeling**
  - Test how the economy responds by expanding various sectors
  - Emphasis has been on the expansion of the energy sector
- 3.  **Fiscal Understanding**
  - Quantify additional costs
  - Compare to additional revenues
  - Identify net resources the County can bring to bear on the challenges
- 4.  **Transportation Assessment**
  - Estimate impacts to existing roads
  - Assess needs and opportunities for new transportation links
  - Define the economic and fiscal benefits derived from new roads -- jobs, greater capture, leakage reduction, additional commerce.
- 5.  **Land Use**
  - What is the magnitude of change expected? Given targeted demand, what supply constraints exist? What resources exist to address these constraints and/or deficits?

BLM_0106979

# Sources for Analysis

- Primary Research
  - Colorado Geological Survey
  - Local Businesses
  - Local Government Services
  - Montrose County Staff
- Secondary Research
  - U.S. Bureau of Labor Statistics
  - Colorado Department of Local Affairs
  - U.S. Department of Energy
  - Recently Completed Impact Studies related to Mill

Economic & Planning Systems, Inc.                                                                                          5

BLM_0106980

BLM_0106981

# I.     Context for Expansion to Energy Sector

# Research -- Estimates of Supply

- Colorado Supply is Significant Source of Uranium

- Key issue in the analysis is the labor force supply

- Geologic patterns do not align with political boundaries



BLM_0106982

# Research -- Estimates of Supply

- Bulk of Mine Locations
  - Montrose County
  - Mesa County
  - San Miguel County
  - San Juan County
  - Grand County



BLM_0106983

# Research – International Supply and Demand

- National and international demand factors affect local potentials

- Chart indicates the proportional 2005 production by geography

- Within US, approximately five percent of uranium used in U.S. originates in U.S.

- Yet 20% of electricity is generated by nuclear power



BLM_0106984

# Research -- Estimates of Demand

- International demand is expected to become more constrained

- Projected price point expected to rise

- Colorado has resources and infra-structure in place



Nuclear Power Plants Worldwide

Proposed
Planned
Constructing
Operating

North America    South America    Europe    Asia    Africa    Middle East

BLM_0106985

# Research -- Estimates of Demand

- **Existing Mills**
  - Some Need Major Upgrade
  - Others Serve Limited Daily Production



Transport Distance
**URAVAN DISTRICT**
to Existing
**Uranium Mills**
(in road miles)

BLM_0106986

BLM_0106987

# II.   Economic Analysis

# Montrose County Economic System



BLM_0106988

# The Montrose County Economic Model

- IMPLAN is recognized nationally and internationally as a highly credible modeling system of regional economies.

- Estimates complex economic relationships within a region based on national and local data.

- A powerful tool when that can be customized for even better portraits of an economy.

BLM_0106989

# The Montrose County Economic Model

- The Model was customized for Montrose County to match 2007 employment data provided by:

  - State of Colorado, Department of Local Affairs-State Demography Office for all industries

  - Newspaper articles and other public sources for important single firms, e.g. Russell Stover Candies, Inc., Intermountain Resources, Inc., and New Horizons mine.

- Economic relationships were adjusted accordingly.

BLM_0106990

# The Montrose County Economic Model

- Economic Drivers
  - Key economic players in Montrose County that generate jobs and income throughout the county because of their export activities.
  - Jobs and income are generated through:
    - ➢ Local supply-chains
    - ➢ Local household spending of wages & salaries paid by the exporter and the supply-chain
  - <u>All</u> Montrose County jobs and income are accounted for within the Drivers.

BLM_0106991

# Montrose County Economic Drivers in 2007

| Reasons for Basic Economic Activity | Direct Jobs | Indirect Jobs | Induced Jobs | Total Contribution |
|---|---|---|---|---|
| Agriculture | 877 | 603 | 169 | 1,649 |
| Power Plant & Mine | 64 | 91 | 74 | 229 |
| Other Mining | 95 | 43 | 54 | 192 |
| Manufacturing | 1,257 | 651 | 388 | 2,296 |
| Overnight Tourism & Travel | 266 | 43 | 43 | 352 |
| Construction | 2,518 | 1,057 | 829 | 4,404 |
| Government Operations | 3,299 | 109 | 722 | 4,130 |
| Regional Services & Other Exports | 3,021 | 754 | 699 | 4,474 |
| Non-Labor Income | 3,007 | 139 | 774 | 3,920 |
| Commuter Income | 77 | 13 | 14 | 104 |
| Total | 14,481 | 3,503 | 3,766 | 21,750 |

BLM_0106992

# Montrose County in 2007 – Total Jobs in the Economy Due to Each Economic Driver



Economic & Planning Systems, Inc.                                                                 19

BLM_0106993

# Multiplier Effect by Sector



BLM_0106994

# Sub-county Factors Affecting Economic Performance

- **Factors to Quantify**
  - Labor Force Location
    - e.g. Existing Under-/Un-employed locals
  - Commuting Tolerances
    - Preferences for one-way commute times
  - Proximity to Services
    - Preferences for presence of commercial services
  - Capacity of Infrastructure
    - Ability of infrastructure to accommodate future growth
  - Housing Stock
    - Availability of decent existing housing

BLM_0106995

# Alternative Scenarios

- Base Case – 2007

- Expanded Economy at Stabilization
  - Assume 50% capture of mining activity within Montrose County
    - With the construction of Transportation Link
    - Without construction of Transportation Link
  - Assume 100% capture of mining activity within the County
    - Assume Transportation Link is constructed

- Purpose is to document conditions using a range of conditions to understand benefits and costs

BLM_0106996

# Net New Jobs

|  | Jobs | | | | |
|---|---|---|---|---|---|
|  | Stab. (No Road) 50% Mining Cap. | Stab. (Road) 50% Mining Cap. | Stab. (Road) 100% Mining Cap. | One-Time Mill Const. | One-Time Road Const. |
| **One-Time Impact Scenarios** | | | | | |
| **Mill Construction** | | | | | |
| Direct Jobs | --- | --- | --- | 202 | --- |
| Indirect Jobs | --- | --- | --- | 48 | --- |
| Induced Jobs | == | == | == | <u>60</u> | == |
| **Total / Average** | --- | --- | --- | 309 | --- |
| **Road Construction** | | | | | |
| Direct Jobs | --- | --- | --- | --- | 885 |
| Indirect Jobs | --- | --- | --- | --- | 272 |
| Induced Jobs | == | == | == | == | <u>277</u> |
| **Total / Average** | --- | --- | --- | --- | 1,433 |
| **Ongoing Impact Scenarios** | | | | | |
| **Mill / Mine Operations** | | | | | |
| Direct Jobs | 208 | 208 | 313 | --- | --- |
| Indirect Jobs | 205 | 205 | 212 | --- | --- |
| Induced Jobs | <u>103</u> | <u>103</u> | <u>124</u> | == | == |
| **Total / Average** | 516 | 516 | 649 | --- | --- |

Source: IMPLAN; Economic & Planning Systems

Economic & Planning Systems, Inc.

23

BLM_0106997



# Locational Distribution of Residents

|  | A | B | C | D | E | Average |
|---|---|---|---|---|---|---|
| **WITHOUT NEW ROAD** |  |  |  |  |  |  |
| **Residence** |  |  |  |  |  |  |
| Nucla / Naturita | 75% | 67% | 67% | 83% | 80% | 74% |
| Norwood | 10% | 17% | 17% | 8% | 10% | 12% |
| Dove Creek | 5% | 17% | 17% | 8% | 10% | 11% |
| Grand Junction | 5% | 0% | 0% | 0% | 0% | 1% |
| Montrose | 5% | 0% | 0% | 0% | 0% | 1% |
| **Total** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** |
|  |  |  |  |  |  |  |
| **Laborforce Residence** |  |  |  |  |  |  |
| Montrose County | 80% | 67% | 67% | 83% | 80% | 75% |
| Outside County | 20% | 33% | 33% | 17% | 20% | 25% |
| **Total** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** |
|  |  |  |  |  |  |  |
| **Montrose County Residency** |  |  |  |  |  |  |
| Nucla / Naturita | 94% | 100% | 100% | 100% | 100% | 99% |
| Montrose | 6% | 0% | 0% | 0% | 0% | 1% |
|  |  |  |  |  |  |  |
| **WITH NEW ROAD** |  |  |  |  |  |  |
| **Montrose County Residency** |  |  |  |  |  |  |
| Nucla / Naturita | 83% | 75% | 75% | 86% | 83% | 80% |
| Montrose | 17% | 25% | 25% | 14% | 17% | 20% |
| **Total** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** |

Source: EPS

BLM_0106998

# Montrose County Socio-Economic Changes

|  | Stab. (No Road) 50% Mining Cap. | Stab. (Road) 50% Mining Cap. | Stab. (Road) 100% Mining Cap. |
|---|---|---|---|
| **Total Job Creation** | | | |
| Direct Jobs | 208 | 208 | 313 |
| Indirect Jobs | 205 | 205 | 212 |
| Induced Jobs | 103 | 103 | 124 |
| **Total / Average** | **516** | **516** | **649** |
| **County Callibration** | | | |
| Less Existing Capacity | 145 | 145 | 145 |
| Net New Labor Demand | 371 | 371 | 504 |
| Less Out-of-County Commuting | 25% | 19% | 19% |
| Net New Resident Jobs | **279** | **302** | **410** |
| **Net New Resident Jobs** | | | |
| Direct Jobs | 113 | 122 | 198 |
| Indirect Jobs | 111 | 120 | 134 |
| Induced Jobs | 56 | 60 | 78 |
| **Total New Resident Jobs** | **279** | **302** | **410** |
| **Net New Households** | | | |
| Direct Jobs | 75 | 81 | 132 |
| Indirect Jobs | 74 | 80 | 89 |
| Induced Jobs | 37 | 40 | 52 |
| **Total New Households** | **186** | **201** | **273** |

Source: Economic & Planning Systems

BLM_0106999

BLM_0107000

# A.    Fiscal Analysis

# Assumptions for Fiscal Analysis

|  | Value | Source | Year |
|---|---|---|---|
| **Demographics** | | | |
| Population | 41,302 | DOLA | 2008 |
| Households | 16,238 | DOLA | 2008 |
| Housing Units | 17,257 | DOLA | 2008 |
| | | | |
| **Economics** | | | |
| Employment | 15,153 | BLS | 2008 |
| Per Capita Income | $29,040 | BEA | 2007 |
| | | | |
| **Infrastructure** | | | |
| County Lane Miles | 1,378 | County | 2010 |
| | | | |
| **Taxes** | | | |
| **Sales & Use Tax** | | | |
| Public Safety Sales Tax | 0.75% | | |
| Road & Bridget Sales & Use Tax | 1.00% | | |
| **Property Tax Mill** | | | |
| School District | 23.580 | | |
| County | 18.039 | | |
| All Other Entities | 16.432 | | |
| **Total** | **58.051** | | |
| | | | |
| **Assessment Rates** | | | |
| Residential | 7.96% | | |
| Commercial | 29.00% | | |

Source: Montrose County Finance Dept.; Economic & Planning Systems

Economic & Planning Systems, Inc. 27

# Expenditure Factors (I of II)

| Description | Salaries / Benefits | Materials / Supplies | Capital | Other [1] | Budget Gross |
|---|---|---|---|---|---|
| **Other Funds** | | | | | |
| Airport Debt Service Fund | $0 | $0 | $0 | $515,045 | $515,045 |
| Airport Operations Fund | $848,935 | $158,220 | $972,534 | $1,473,112 | $3,452,801 |
| Capital Expenditures Fund | $0 | $0 | $2,424,765 | $0 | $2,424,765 |
| Clerk Technical Fund | $0 | $0 | $0 | $30,500 | $30,500 |
| Conservation Trust Fund | $0 | $0 | $0 | $150,371 | $150,371 |
| Public Safety Sales Tax Fund (Sheriff) | $2,744,595 | $217,842 | $293,300 | $504,801 | $3,760,538 |
| Public Safety Sales Tax Fund (Other Programs) | $110,053 | $9,455 | $0 | $1,184,668 | $1,304,176 |
| Road & Bridge Fund | $3,990,796 | $2,985,581 | $355,771 | $2,857,482 | $10,189,630 |
| Social Services Fund | $4,697,161 | $0 | $0 | $1,618,839 | $6,316,000 |
| Solid Waste Fund | $4,596,393 | $96,915 | $31,340 | $2,315,620 | $7,040,268 |
| **Other Fund Expenditures** | $12,148,202 | $324,212 | $2,749,405 | $5,623,928 | $20,845,747 |
| as % | 58% | 2% | 13% | 27% | 100% |
| **General Fund** | | | | | |
| Assessor | $489,973 | $14,100 | $26,200 | $75,056 | $605,329 |
| Board of County Commissioners | $235,963 | $3,200 | $0 | $50,443 | $289,606 |
| Clerk & Recorder | $962,954 | $20,550 | $12,000 | $226,504 | $1,222,008 |
| Colo State University Extension | $80,113 | $0 | $3,420 | $143,662 | $227,195 |
| County Attorney | $353,716 | $9,135 | $0 | $21,301 | $384,152 |
| County Manager | $394,946 | $13,400 | $2,100 | $37,650 | $448,096 |
| Engineering | $476,713 | $10,500 | $0 | $8,650 | $495,863 |
| Fairgrounds | $290,013 | $72,108 | $158,400 | $83,995 | $604,516 |
| Finance | $492,265 | $9,550 | $85,000 | $138,324 | $725,139 |
| Human Resources | $215,935 | $14,700 | $0 | $61,487 | $292,122 |
| Maintenance & Capital | $690,396 | $152,461 | $248,200 | $898,264 | $1,989,321 |
| Non-Departmental | $0 | $344,225 | $0 | $200,675 | $544,900 |
| Other Administration | $186,249 | $7,375 | $1,500 | $77,782 | $252,906 |
| Public Trustee | $59,542 | $825 | $0 | $514 | $60,881 |
| Sheriff | $4,657,430 | $174,196 | $34,200 | $2,192,157 | $7,057,983 |
| Surveyor | $3,577 | $0 | $0 | $89 | $3,666 |
| Technology Services | $879,024 | $34,797 | $0 | $83,868 | $997,489 |
| Treasurer | $209,784 | $4,915 | $1,200 | $36,102 | $252,001 |
| Weed Management | $167,849 | $57,630 | $0 | $129,990 | $355,469 |
| **Total General Fund Expenditures** | $12,215,569 | $1,140,069 | $571,000 | $4,969,575 | $18,896,213 |
| as % | 85% | 6% | 3% | 26% | 100% |
| **Capital Expenditures [2]** | $690,396 | $152,461 | $3,872,476 | $898,264 | $5,413,597 |

[1] Includes debt service payments, charges for services, internal transactions, intergovernmental
[2] Excludes capital expenditure associated with Road & Bridge Fund, which is a separate case study.

Source: Montrose County Finance Dept.; Economic & Planning Systems

Economic & Planning Systems, Inc.    28

BLM_0107002

# Expenditure Factors ( II of II)

| Less:<br>Fees, Grants, etc. | Budget<br>Net | Estimating<br>Procedure | Allocated Costs<br>$ | %  | Impact Calculation<br>Factor | Impact |
|---|---|---|---|---|---|---|
| $0 | $515,045 | N/A | $0 | 0% | — | — |
| $1,819,019 | $1,633,782 | N/A | $0 | 0% | — | — |
| $0 | $2,424,765 | Case Study | $0 | 0% | — | — |
| $16,800 | $13,700 | N/A | $0 | 0% | — | — |
| $125,000 | $25,371 | N/A | $0 | 0% | — | — |
| $0 | $3,760,538 | Population | $3,760,538 | 100% | 41,302 | $91 |
| $0 | $1,304,176 | Population | $1,304,176 | 100% | 41,302 | $32 |
| $4,635,786 | $5,553,844 | Case Study | $0 | 0% | — | — |
| $59,400 | $6,256,600 | Population | $1,618,839 | 26% | 41,302 | $10 |
| $5,348,374 | $1,691,894 | Population | $1,691,894 | 24% | 41,302 | $10 |
| **$5,407,774** | **$15,437,973** | | **$8,375,447** | | | **$143** |
| **26%** | **74%** | | **40%** | | | |
| | | | | | | |
| $101,256 | $504,073 | Population | $504,073 | 83% | 41,302 | $10 |
| $50,443 | $239,163 | Population | $239,163 | 83% | 41,302 | $5 |
| $238,504 | $983,504 | Population | $983,504 | 80% | 41,302 | $19 |
| $147,082 | $80,113 | N/A | $0 | 0% | — | — |
| $21,301 | $362,851 | Population | $362,851 | 94% | 41,302 | $8 |
| $39,750 | $408,346 | Population | $408,346 | 91% | 41,302 | $9 |
| $8,650 | $487,213 | Population | $487,213 | 98% | 41,302 | $12 |
| $242,395 | $362,121 | Population | $362,121 | 80% | 41,302 | $5 |
| $223,324 | $501,815 | Population | $501,815 | 69% | 41,302 | $8 |
| $61,487 | $230,635 | Population | $230,635 | 79% | 41,302 | $4 |
| $1,146,464 | $842,857 | Case Study | $0 | 0% | — | — |
| $200,675 | $344,225 | Population | $344,225 | 63% | 41,302 | $5 |
| $79,282 | $173,624 | Population | $173,624 | 69% | 41,302 | $3 |
| $514 | $60,367 | Population | $60,367 | 99% | 41,302 | $1 |
| $2,226,357 | $4,831,626 | Population | $4,831,626 | 68% | 41,302 | $80 |
| $89 | $3,577 | N/A | $0 | 0% | — | — |
| $83,668 | $913,821 | Population | $913,821 | 92% | 41,302 | $20 |
| $37,302 | $214,699 | Population | $214,699 | 85% | 41,302 | $4 |
| $129,990 | $225,479 | Population | $225,479 | 63% | 41,302 | $3 |
| **$5,540,576** | **$13,355,638** | | **$10,843,562** | | | **$199** |
| **29%** | **71%** | | **57%** | | | |

BLM_0107003

# Revenue Factors (I of II)

| Description | Revenues | | | | |
| --- | --- | --- | --- | --- | --- |
| | Federal / State | Charges for Services | Internal Resources | Other [1] | Budget Gross |
| **Other Funds** | | | | | |
| Airport Debt Service Fund | $0 | $0 | $500,000 | $15,000 | $515,000 |
| Airport Operations Fund | $1,020,743 | $798,276 | $0 | $1,655,864 | $3,474,883 |
| Capital Expenditures Fund | $0 | $0 | $0 | $0 | $0 |
| Clerk Technical Fund | $0 | $16,800 | $15,000 | $0 | $31,800 |
| Conservation Trust Fund | $125,000 | $0 | $0 | $100 | $125,100 |
| Public Safety Sales Tax Fund (Sheriff) | $0 | $0 | $1,317,386 | $2,698,830 | $4,016,216 |
| Public Safety Sales Tax Fund (Other Programs) | $0 | $0 | $0 | $1,118,700 | $1,118,700 |
| Road & Bridge Fund | $4,115,311 | $22,000 | $3,000 | $6,180,368 | $10,320,679 |
| Social Services Fund [2] | $5,045,275 | $0 | $186,525 | $1,599,892 | $6,831,692 |
| Solid Waste Fund | $0 | $130,000 | $0 | $29,000 | $159,000 |
| **Other Fund Expenditures** | **$5,045,275** | **$130,000** | **$1,503,911** | **$5,446,422** | **$12,125,608** |
| as % | 42% | 1% | 12% | 45% | 100% |
| **General Fund** | | | | | |
| Assessor | $0 | $3,050 | $0 | $0 | $3,050 |
| Board of County Commissioners | $0 | $0 | $0 | $0 | $0 |
| Clerk & Recorder | $0 | $790,000 | $15,350 | $16,000 | $821,350 |
| Colo State University Extension | $0 | $0 | $0 | $0 | $0 |
| County Attorney | $0 | $1,500 | $136,815 | $0 | $138,315 |
| County Manager | $0 | $0 | $0 | $0 | $0 |
| Engineering | $0 | $15,150 | $307,480 | $40,550 | $340,180 |
| Fairgrounds | $0 | $58,500 | $131,600 | $0 | $190,100 |
| Finance | $0 | $0 | $378,387 | $0 | $378,387 |
| Health Department | $968,263 | $142,065 | $124,294 | $117,770 | $1,352,392 |
| Human Resources | $0 | $0 | $117,142 | $0 | $117,142 |
| Intergovernmental | $0 | $0 | $0 | $0 | $0 |
| Planning & Development | $125,000 | $48,550 | $0 | $266,750 | $440,300 |
| Facilities Maintenance | $0 | $0 | $746,823 | $0 | $746,823 |
| Non-Departmental | $2,357,931 | $0 | $0 | $10,199,262 | $12,557,193 |
| Other Administration | $80,444 | $2,175 | $101,954 | $25 | $184,598 |
| Public Trustee | $0 | $75,900 | $0 | $0 | $75,900 |
| Sheriff | $59,000 | $359,250 | $727,075 | $642,076 | $1,787,401 |
| Surveyor | $0 | $0 | $0 | $0 | $0 |
| Technology Services | $0 | $11,000 | $202,351 | $0 | $213,351 |
| Treasurer | $0 | $255,945 | $442,764 | $451,400 | $1,030,209 |
| Weed Management | $109,350 | $20,000 | $51,000 | $109,500 | $289,850 |
| **Total General Fund Expenditures** | **$3,574,988** | **$1,734,535** | **$3,483,035** | **$11,576,583** | **$20,226,241** |
| as % | 18% | 9% | 17% | 57% | 100% |

[1] Includes licenses, permits, funds received from other governments, tax revenue
[2] Assumes net cost to County of $1.6M

BLM_0107004

# Revenue Factors (II of II)

| Less:<br>Fees, Grants, etc. | Budget<br>Net | Estimating<br>Procedure | Allocated Costs | | Impact Calculation | |
|---|---|---|---|---|---|---|
| | | | $ | % | Factor | Impact |
| $500,000 | $15,000 | N/A | $0 | 0% | — | — |
| $1,020,743 | $2,454,140 | N/A | $0 | 0% | — | — |
| $0 | $0 | Case Study | $0 | 0% | — | — |
| $15,000 | $16,800 | Population | $16,800 | 53% | 41,302 | $0 |
| $125,000 | $100 | N/A | $0 | 0% | — | — |
| $1,317,386 | $2,698,830 | Case Study | $0 | 0% | — | — |
| $0 | $1,118,700 | Case Study | $0 | 0% | — | — |
| $4,118,311 | $6,202,368 | Case Study | $0 | 0% | — | — |
| $5,231,800 | $1,599,892 | Population | $0 | 0% | 41,302 | = |
| $0 | $159,000 | Population | $159,000 | 100% | 41,302 | $4 |
| $6,549,186 | $5,576,422 | | $159,000 | | | $4 |
| 54% | 46% | | 1% | | | |
| | | | | | | |
| $0 | $3,050 | Population | $3,050 | 100% | 41,302 | $0 |
| $0 | $0 | Population | $0 | 0% | 41,302 | — |
| $15,350 | $790,000 | Population | $790,000 | 96% | 41,302 | $18 |
| $0 | $0 | N/A | $0 | 0% | — | — |
| $136,815 | $1,500 | Population | $1,500 | 1% | 41,302 | $0 |
| $0 | $0 | Population | $0 | 0% | 41,302 | — |
| $307,480 | $15,150 | Population | $15,150 | 4% | 41,302 | $0 |
| $131,600 | $58,500 | Population | $58,500 | 31% | 41,302 | $0 |
| $378,387 | $0 | Population | $0 | 0% | 41,302 | — |
| $1,092,557 | $142,065 | N/A | $0 | 0% | — | — |
| $117,142 | $0 | Population | $0 | 0% | 41,302 | — |
| $0 | $0 | N/A | $0 | 0% | — | — |
| $125,000 | $48,550 | N/A | $0 | 0% | — | — |
| $746,823 | $0 | N/A | $0 | 0% | — | — |
| $10,199,262 | $0 | Population | $0 | 0% | 41,302 | — |
| $182,398 | $2,175 | Population | $2,175 | 1% | 41,302 | $0 |
| $0 | $75,900 | Population | $75,900 | 100% | 41,302 | $2 |
| $786,075 | $359,250 | Population | $359,250 | 20% | 41,302 | $2 |
| $0 | $0 | N/A | $0 | 0% | — | — |
| $202,351 | $11,000 | Population | $11,000 | 5% | 41,302 | $0 |
| $442,764 | $255,945 | Population | $255,945 | 25% | 41,302 | $2 |
| $160,350 | $20,000 | Population | $20,000 | 7% | 41,302 | $0 |
| $14,899,354 | $1,734,535 | | $1,592,470 | | | $24 |
| 74% | 9% | | 8% | | | |

Economic & Planning Systems, Inc.

31

BLM_0107005

# Case Studies Required for Major Exp/Rev

- **Revenue Case Studies**
  - Property Tax
  - Sales Tax Permanent Pop.
  - Sales Tax Commuters
  - HUTF Lane Mile Allocation

- **Expenditure Case Studies**
  - Road and Bridge, costs to maintain existing network
  - Road and Bridge, costs to maintain proposed Transportation Link
  - Capital Expenditure Fund for County

BLM_0107006

# Sales Tax Case Study – Capture by Store Type

| Store Type | Statewide Retail Expenditure % of TPI | Percent Local Spending | | |
| --- | --- | --- | --- | --- |
| | | Ongoing Conditions at Stabilization [1] | Daytime Expenditure Non-Residents | One-Time Const. Job Expenditure |
| **Convenience Goods** | | | | |
| Supermarkets / Convenience | 6.1% | 50% | 10% | 10% |
| Other Convenience Goods | 2.4% | 50% | 10% | 10% |
| **Total Convenience Goods** | **8.5%** | **50%** | **10%** | **10%** |
| **Shoppers Goods** | | | | |
| General Merchandise | | | | |
| Department Stores | 1.1% | 10% | 2% | 2% |
| Discount Department Stores | 1.6% | 10% | 2% | 2% |
| Whse. Clubs and Supercenters | 3.5% | 10% | 2% | 2% |
| **Total General Merchandise** | **6.2%** | **10%** | **2%** | **2%** |
| Other Shoppers Goods | | | | |
| Clothing & Accessories | 2.1% | 10% | 2% | 2% |
| Furniture and Home Furnishings | 1.6% | 10% | 2% | 2% |
| Sporting Goods, Hobbies, Books, & Music | 1.5% | 10% | 2% | 2% |
| Electronics and Appliances | 1.3% | 10% | 2% | 2% |
| Miscellaneous Retail | 1.5% | 10% | 2% | 2% |
| **Total Other Shoppers Goods** | **8.0%** | **10%** | **2%** | **2%** |
| **Total Shoppers Goods** | **14.2%** | **10%** | **2%** | **2%** |
| **Eating and Drinking** | **5.2%** | **75%** | **10%** | **10%** |
| **Building Material & Garden** | **3.8%** | **25%** | **2%** | **2%** |
| **Total ($000s)** | **31.7%** | **40%** | **6%** | **6%** |

[1] Under the following conditions: a) with the new road or without, and b) with 50% mining capture or 100% mining capture.

Source: 2002 Census of Retail Trade; Claritas; Economic & Planning Systems

BLM_0107007

# Sales Tax -- Expenditure Potential & Revenue

| | Factor | Expenditure Potential | | | One-Time Mill Const. | One-Time Road Const. |
|---|---|---|---|---|---|---|
| | | Stab. (No Road) 50% Mining Cap. | Stab. (Road) 50% Mining Cap. | Stab. (Road) 100% Mining Cap. | | |
| **Personal Income by Job Type** | | | | | | |
| Direct Jobs | | $41,544 | $41,544 | $36,378 | $33,369 | $32,867 |
| Indirect Jobs | | $25,871 | $25,871 | $26,682 | $31,165 | $32,242 |
| Induced Jobs | | $17,133 | $17,133 | $17,798 | $22,174 | $22,184 |
| Montrose County per capita income | | $29,040 | $29,040 | $29,040 | | |
| **Annual Total Expenditure Potential** | | | | | | |
| **Net New Resident Jobs to Montrose County** | | | | | | |
| **Expenditure Potential** | | | | | | |
| Convenience Goods | 4.25% | $809,760 | $874,255 | $1,173,479 | $0 | $0 |
| Shoppers Goods | 1.42% | $270,555 | $292,104 | $392,080 | $0 | $0 |
| Eating and Drinking | 3.90% | $743,074 | $802,257 | $1,076,840 | $0 | $0 |
| Building Material & Garden | 0.95% | $181,005 | $195,422 | $262,307 | $0 | $0 |
| **Total Expenditure Potential** | **10.52%** | **$2,004,395** | **$2,164,037** | **$2,904,706** | **$0** | **$0** |
| Retail Sales Tax Revenues | 1.75% | $35,077 | $37,871 | $50,832 | $0 | $0 |
| **Non-Resident Jobs (Daytime Laborforce)** | | | | | | |
| **Expenditure Potential** | | | | | | |
| Convenience Goods | 0.85% | $61,212 | $55,454 | $60,279 | $81,157 | $373,857 |
| Shoppers Goods | 0.28% | $20,452 | $18,528 | $20,140 | $27,116 | $124,912 |
| Eating and Drinking | 0.52% | $37,447 | $33,925 | $36,877 | $49,649 | $228,713 |
| Building Material & Garden | 0.08% | $5,473 | $4,958 | $5,390 | $7,256 | $33,427 |
| **Total Expenditure Potential** | **1.73%** | **$124,584** | **$112,865** | **$122,686** | **$165,179** | **$760,909** |
| Retail Sales Tax Revenues | 1.75% | $2,180 | $1,975 | $2,147 | $2,891 | $13,316 |

Source: Economic & Planning Systems

BLM_0107008

# Sales Tax Case Study – Supportable Sq. Ft.

| | Factor | Expenditure Potential | | |
| | | Stab. (No Road) 50% Mining Cap. | Stab. (Road) 50% Mining Cap. | Stab. (Road) 100% Mining Cap. |
|---|---|---|---|---|
| **Total Expenditure Potential** | | | | |
| Convenience Goods | | $870,972 | $929,709 | $1,233,758 |
| Shoppers Goods | | $291,007 | $310,632 | $412,220 |
| Eating and Drinking | | $780,521 | $836,182 | $1,113,716 |
| Building Material & Garden | | $186,478 | $200,380 | $267,697 |
| **Total Expenditure Potential** | | **$2,128,979** | **$2,276,902** | **$3,027,392** |
| | | | | |
| **Supportable Square Feet by Retail Expenditure Category** | | | | |
| Convenience Goods | 225 per sqft | 3,871 | 4,132 | 5,483 |
| Shoppers Goods | 200 per sqft | 1,455 | 1,553 | 2,061 |
| Eating and Drinking | 200 per sqft | 3,903 | 4,181 | 5,569 |
| Building Material & Garden | 200 per sqft | 932 | 1,002 | 1,338 |
| **Total** | | **10,161** | **10,868** | **14,452** |

Source: Economic & Planning Systems

BLM_0107009

# Net Fiscal Balance

| | Factor | Ongoing Fiscal Balance | | |
|---|---|---|---|---|
| | | Stab. (No Road) 50% Mining Cap. | Stab. (Road) 50% Mining Cap. | Stab. (Road) 100% Mining Cap. |
| **Residents Generated** | | 643 | 694 | 942 |
| **Daytime Workers (Excluding Resident Workers)** | | 237 | 214 | 239 |
| **Net New Road Miles for County Maintenance** | | 0 | 44 | 44 |
| **Revenues** | | | | |
| Property Taxes [1] | Case Study | $740,998 | $743,768 | $757,199 |
| Sales Taxes (Residents Alone) | Case Study | $35,077 | $37,871 | $50,832 |
| Sales Taxes (Daytime Workers Alone) | Case Study | $2,180 | $1,975 | $2,147 |
| HUTF Tier III Allocation [2] | | $0 | $121,794 | $121,794 |
| General Fund | $24 | $15,486 | $16,719 | $22,701 |
| Miscellaneous Funds | $4 | $2,612 | $2,820 | $3,829 |
| **Total Revenues** | | **$796,353** | **$924,947** | **$958,503** |
| **Expenditures** | | | | |
| Case Study: Road & Bridge | Case Study | $0 | $249,240 | $249,240 |
| Case Study: Increase Usage of 125 Miles of County Roads in Vicinity | Case Study | $228,865 | $228,865 | $228,865 |
| Case Study: Capital Expenditures | Case Study | $84,234 | $90,943 | $123,480 |
| General Fund | $199 | $127,836 | $138,017 | $187,397 |
| Miscellaneous Funds | $143 | $91,588 | $98,882 | $134,260 |
| **Total Expenditures** | | **$532,522** | **$805,947** | **$923,242** |
| **Fiscal Surplus / Deficit** | | **$263,831** | **$118,999** | **$35,260** |

[1] Property taxes based solely on county portion of total mill levy; excludes revenues associated with school district and other uses such as rural fire district.

[2] Based on allocations from previous four calendar years.

BLM_0107010

# Summary of Socio-Economic Impacts

|  | West End | Eastern County | Total County |
|---|---|---|---|
| **Stabilized Conditions, 2015** | | | |
| Split | **99%** | **1%** | |
| Net New Resident Jobs to Montrose County | 366 | 5 | **371** |
| Residents | 635 | 8 | **643** |
| Fiscal Balance | $260,533 | $3,298 | **$263,831** |
| **Stabilized Conditions, 2015 (If Transportation Link Built)** | | | |
| **50 Percent Mining Capture** | | | |
| Split | **72%** | **28%** | |
| Net New Resident Jobs to Montrose County | 266 | 105 | **371** |
| Residents | 498 | 196 | **694** |
| Fiscal Balance | $85,393 | $33,606 | **$118,999** |
| **Stabilized Conditions, 2015 (If Transportation Link Built)** | | | |
| **100 Percent Mining Capture** | | | |
| Split | **72%** | **28%** | |
| Net New Resident Jobs to Montrose County | 361 | 142 | **504** |
| Residents | 676 | 266 | **942** |
| Fiscal Balance | $25,302 | $9,958 | **$35,260** |

Source: IMPLAN; Economic & Planning Systems

BLM_0107011

# Net New Jobs and Wages

|  | Stab. (No Road) 50% Mining Cap. | Stab. (Road) 50% Mining Cap. | Stab. (Road) 100% Mining Cap. |
|---|---|---|---|
| **All Jobs** | | | |
| Direct Jobs | 208 | 208 | 313 |
| Indirect Jobs | 205 | 205 | 212 |
| Induced Jobs | <u>103</u> | <u>103</u> | <u>124</u> |
| **Total** | **516** | **516** | **649** |
| **Wages** | | | |
| Direct Jobs | $41,544 | $41,544 | $36,378 |
| Indirect Jobs | $25,871 | $25,871 | $26,682 |
| Induced Jobs | <u>$17,133</u> | <u>$17,133</u> | <u>$17,798</u> |
| **Average** | **$30,438** | **$30,438** | **$29,659** |

Source: Economic & Planning Systems

H:\19841-Montrose County Socioeconomic Study\Models\[19841-Fiscal Model-030610 with AK changes.xls]WAGES

BLM_0107012

# Future Residential Demand Targets

| | Base 2000 | 2010 | 2015 | 2020 | 2025 | 2030 | 2035 | 2010 - 2020 Total | Ann. # | Ann. % |
|---|---|---|---|---|---|---|---|---|---|---|
| **DOLA Population Forecast** | | | | | | | | | | |
| Population | | 43,218 | 49,417 | 56,638 | 64,010 | 71,042 | 76,710 | 13,420 | 1,342 | 2.7% |
| Households | | 17,150 | 19,610 | 22,475 | 25,401 | 28,191 | 30,440 | 5,325 | 533 | 2.7% |
| | | | | | | | | | | |
| **Building Permit Methodology** | | | | | | | | | | |
| **Total Households** | | | | | | | | | | |
| City of Montrose | 5,244 | 8,131 | 9,424 | 10,716 | 12,009 | 13,302 | 14,595 | 2,586 | 259 | 2.8% |
| Town of Olathe | 520 | 599 | 631 | 663 | 694 | 726 | 758 | 63 | 6 | 1.0% |
| Town of Naturita | 257 | 270 | 275 | 280 | 285 | 290 | 295 | 10 | 1 | 0.4% |
| Town of Nucla [1] | 311 | 324 | 329 | 334 | 339 | 344 | 349 | 10 | 1 | 0.3% |
| Other Areas (including unincorp.) | 6,711 | 7,688 | 8,208 | 8,728 | 9,248 | 9,768 | 10,288 | 1,040 | 104 | 1.3% |
| **Montrose County** | **13,043** | **17,011** | **18,866** | **20,721** | **22,575** | **24,430** | **26,284** | **3,709** | **371** | **2.0%** |
| | | | | | | | | | | |
| **Eastern Portion** | | | | | | | | | | |
| City of Montrose | 5,244 | 8,131 | 9,424 | 10,716 | 12,009 | 13,302 | 14,595 | 2,586 | 259 | 2.8% |
| Town of Olathe | 520 | 599 | 631 | 663 | 694 | 726 | 758 | 63 | 6 | 1.0% |
| Other Areas (including unincorp.) | 6,375 | 7,303 | 7,797 | 8,291 | 8,785 | 9,279 | 9,773 | 988 | 99 | 1.3% |
| **East End** | **12,139** | **16,033** | **17,852** | **19,670** | **21,489** | **23,307** | **25,126** | **3,637** | **364** | **2.1%** |
| | | | | | | | | | | |
| **West End** | | | | | | | | | | |
| Town of Naturita | 257 | 270 | 275 | 280 | 285 | 290 | 295 | 10 | 1 | 0.4% |
| Town of Nucla | 311 | 324 | 329 | 334 | 339 | 344 | 349 | 10 | 1 | 0.3% |
| Other Areas (including unincorp.) | 336 | 384 | 410 | 436 | 462 | 488 | 514 | 52 | 5 | 1.3% |
| **West End** | **904** | **978** | **1,014** | **1,050** | **1,086** | **1,122** | **1,158** | **72** | **7** | **0.7%** |

[1] In absence of building permit records, this rate is assumed same as Naturita.

Source: U.S. Census; Economic & Planning Systems

BLM_0107013

# Household Projection



BLM_0107014

# Demand Targets

- Population
  - Baseline:  43,218 (2010); 49,417 (2015)
  - With Energy Sector Expansion: Between 700 and 950 more by 2015
- Labor Force
  - Baseline:  21,750 (2007); 25,119 (2015)
  - With Expansion: Est. 650 more by 2015
- Households
  - Baseline:  17,011 (2010); 18,866 (2015)
  - With Expansion: Est. 200 to 275 more by 2015
- Percentage Increase
  - West End:
    - ➢ Current Household Base = 650
    - ➢ Local Capture of Net New Households = 31 percent increase

Economic & Planning Systems, Inc.

41

BLM_0107015

# B.    Transportation

- Needs of existing roads
- Potential need for new link between Montrose and Nucla/Naturita
  - Additional Job Generation
    - Construction
    - Stabilized
  - Additional Capture
    - Residential Capture
    - Reduction in retail leakage
  - Potential for Additional Commerce

BLM_0107016

# C.    Land Use – Significant West End Changes

- Schools
- Wet Utilities
  - ➢ Sewage Treatment (governance, scope, capacity, funding)
  - ➢ Water (water rights, availability, treatment capacity)
- Dry Utilities
  - ➢ Communications
- Residential Needs
  - ➢ Demand, supply, land with services, how to complement?
- Commercial Needs
  - ➢ Leverage and opportunity to reinforce existing retail
- Road Conditions
- Dedicated Revenue Streams
- Service Levels
- Governance Structure
- Financing Strategy

BLM_0107017

# Tools to Address Land Use Needs

- Local
  - Permit fees, plan check, impact fees, use tax, improvement districts, bond levies
- County
  - -- Funds to complement local match requirements, dedication of additional increment of revenue
- State
  - DOLA funds, others
- Federal
  - Sustainable programs
- Private Sector
  - Energy Fuels commitment, interests, and motivation

---

BLM_0107018

Case No. 1:20-cv-02484-MSK   Document 59-6   filed 04/28/21   USDC Colorado   pg 120 of
173
The Economic Value of Open Space                                                Page 1 of 3

LINCOLN INSTITUTE
OF LAND POLICY

At Lincoln House Weblog     Pressroom / Information Center     Contact     Calendar     My Profile     Help     Log In

go     advanced search     Quick Links ▼

Economic & Community Development     Planning & Urban Form     Valuation & Taxation     International Studies

About          News & Events          Education & Research          Publications & Multimedia          Resources & Tools

2008-2009 Program     Publications Catalog     Making Sense of Place Film Series     Shifting Ground Radio Series     Search Publications and Multimedia

Search All Publications
and Multimedia

go

> More search options

Land Lines: September 1996, Volume 8, Number 5
**The Economic Value of Open Space (Land Lines Article)**
*Author(s):* Fausold, Charles J. and Robert J. Lilieholm
**Publication Date:** September 1996

Inventory ID LLA960901; English

## Article

Governments have long recognized the need to preserve certain open space lands because of their importance in producing public goods and services such as food, fiber, recreation and natural hazard mitigation, or because they possess important geological or biological features.

New impetus for open space preservation results from the desire to counteract the effects of declining urban cores, suburban sprawl, and the socioeconomic and land use changes now encroaching on high-amenity rural areas. The growing use of habitat conservation plans for reconciling environmental and economic objectives also draws attention to the values of open space, especially in comparison to alternative land uses.

It is likely that most decisions about open space preservation will be made at the local level, due in part to the general trend of devolution of governmental responsibility (with accompanying fiscal responsibility), as well as an increase in the institutional capacity and activism of local land conservation trusts. Since local governments are heavily dependent on the property tax for operating revenue, the fiscal and economic implications of open space preservation decisions are paramount. Conservationists are frequently called upon to demonstrate to local communities the economic value of preserving open space.

While much has been written about the economic value of the environment in general and of open space in particular, the literature is segregated by discipline or methodology. It is therefore difficult to assess the economic value of open space comprehensively. It is even more difficult to apply what is known in a public policy context, where open space holds significant non-monetary value.

Concepts of Value and Public Goods
Like all natural ecosystems, open space provides a variety of functions that satisfy human needs. However, attempting to assign monetary values to these functions presents several challenges. First, open space typically provides several functions simultaneously. Second, different types of value are measured by different methodologies and expressed in different units. Converting to a standard unit (such as dollars) involves subjective judgments and is not always feasible. Third, values are often not additive, and "double counting" is an ever-present problem. Finally, some would argue that it is morally wrong to try to value something that is by definition invaluable. At a minimum, they say, open space will always possess intangible values that are above and beyond any calculation of monetary values.

Open space often plays an important role in the provision of "public goods." Public goods are nonexcludable: once they are produced it is impossible or very costly to exclude anyone from using them. They are also nonconsumptive: one person's enjoyment of the good does not diminish its availability for others. The limited ability of producers to exclude potential users typically precludes the development of market allocation systems for public goods. As a result, easily observed measures of value, like those expressed through market prices, do not exist. Yet land use and resource management decisions imply tradeoffs between marketed and non-marketed goods and services, making it difficult to compare relative values and, through tradeoffs, arrive at socially optimal decisions.

Use and Nonuse Values
Much of the economic value associated with open space activities like recreation can be examined as use value and nonuse value. Use value results from current use of the resource, including consumptive uses (i.e., hunting and fishing), nonconsumptive uses (i.e., hiking, camping, boating and nature photography) and indirect uses (i.e., reading books or watching televised programs about wildlife).

Activities directly or indirectly associated with open space may provide an important source of revenue for businesses and state and local governments. For example, hunting and fishing license fees are a major source of funding for state wildlife agencies. Less direct but perhaps more important from an overall economic perspective are expenditures related to nonconsumptive open space activities that also have income and job multiplier effects and often occur in rural areas with limited commercial potential.

The economic implications of use and nonuse values across society can be very large, and many economists agree that these values should be considered in open space decisionmaking. Measuring use and nonuse values is difficult, however, due to the lack of markets and market prices and the existence of administratively set, quasi-market prices such as hunting and fishing license fees. To arrive at socially meaningful estimates of value for many nonmarket resources, economists use the concept of consumer surplus, or the amount above actual market price that a buyer would theoretically be willing to pay to enjoy a good or service.

Two methods are used to first estimate the demand curve for the resource: contingent valuation or travel cost methods. In the first, a hypothetical market is created in a survey and respondents are asked what they would be

BLM_0107019

willing to pay for some defined activity or resource. In the second, the cost of travel to a site is viewed as an entry or admission price, and a demand curve is derived from observing visitation from various origins with different travel costs. While still controversial, these methods have been used in numerous studies to estimate the willingness to pay in addition to actual expenses for various recreational activities ( see chart 1), as well as for nonuse values such as maintaining populations of certain endangered species or preserving unique bird habitats.

Several types of nonuse values consider the possibility for future use. Option value represents an individual's willingness to pay to maintain the option of utilizing a resource in the future. Existence value represents an individual's willingness to pay to ensure that some resource exists, which may be motivated by the desire to bequest the resource to future generations.

Measuring the Economic Value of Open Space
As a result of decreased intergovernmental transfers of financial aid and increasing citizen resistance to taxes, local officials now scrutinize the fiscal consequences of land use decisions more than ever before. The primary analytic tool available to policymakers for this purpose is fiscal impact analysis, a formal comparison of the public costs and revenues associated with growth within a particular local governmental unit. Fiscal impact analysis is utilized frequently in large communities experiencing growth pressures on the metropolitan fringe, and it is being applied to open space preservation.

A review of fiscal impact studies by Robert Burchell and David Listokin concludes that generally residential development does not pay its own way. They found that nonresidential development does pay for itself, but is a magnet for residential development, and that open space falls at the break-even point. A study of eleven towns by the Southern New England Forest Consortium shows that on a strictly financial basis the cost of providing public services is more than twice as high for residential development as for commercial development or open space. (see chart 2)

Care must be taken when evaluating the results of fiscal impact analyses for several reasons: the choices of methodology and assumptions greatly influence the findings; specific circumstances vary quite widely from community to community; and fiscal impact analyses do not address secondary or long-term impacts. Nevertheless, fiscal impact analysis is a powerful and increasingly sophisticated planning tool for making decisions about land use alternatives at the community level.

The most direct measure of the economic value of open space is its real estate market value: the cash price that an informed and willing buyer pays an informed and willing seller in an open and competitive market. In rural areas, where highest and best use of land (i.e. most profitable use) is as open space, one can examine market transactions. In urban or urbanizing regions, however, where highest and best use (as determined by the market) has usually been development, the open space value of land must be separated from its development value, especially when land is placed under a conservation easement.

Open space may also affect the surrounding land market, creating an enhancement value. Casual observers find evidence of enhancement value in real estate advertisements that feature proximity to open space amenities, and it is explicitly recognized by federal income tax law governing the valuation of conservation easements. A number of empirical studies have shown that proximity to preserved open space enhances property values, particularly if the open space is not intensively developed for recreation purposes and if it is carefully integrated with the neighborhood. Enhancement value is important to the local property tax base because it offsets the effects of open space, which is usually tax-exempt or taxed at a low rate.

Open space possesses natural system value when it provides direct benefits to human society through such processes as ground water storage, climate moderation, flood control, storm damage prevention, and air and water pollution abatement. It is possible to assign a monetary value to such benefits by calculating the cost of the damages that would result if the benefits were not provided, or if public expenditures were required to build infrastructure to replace the functions of the natural systems.

An example of this approach is the Charles River Basin in Massachusetts, where 8,500 acres of wetlands were acquired and preserved as a natural valley storage area for flood control for a cost of $10 million. An alternative proposal to construct dams and levees to accomplish the same goal would have cost $100 million. In another study, the Minnesota Department of Natural Resources calculated that the cost of replacing the natural floodwater storage function of wetlands would be $300 per acre foot.

Lands valued for open space are seldom idle, but rather are part of a working landscape vital to the production of goods and services that are valued and exchanged in markets. Often, the production value resulting from these lands is direct and readily measured, as is the case in crops from farms and orchards, animal products from pasture and grazing lands, and wood products from forests. The economic returns from production accrue directly to the landowner and often determine current and future land use alternatives.

Open space lands may also play a less direct but nonetheless important production role for market-valued goods that depend in part on functions provided by private lands. Examples are the role of privately owned wetlands in fish and shellfish production and the role of private lands in supplying habitat for wild game. In addition to providing market-valued goods and services, direct and indirect production from open space lands supports jobs that are valuable to local, regional and national economies.

Conclusions
It will never be possible to calculate completely the economic value of open space, nor should it be. Certain intangible values lose significance when attempts are made to quantify them. Indeed, to incorporate into the real estate market the public values of open space without also developing a means of capturing those values for the public benefit would be counterproductive for conservation purposes.

Land use decisions ranging from the allocation of scarce conservation budgets to the property rights debate will be better informed if there is a more comprehensive understanding of the economic value of open space. Methods for determining and comparing value vary widely in level of sophistication and reliability. Some are based on long-established professional standards, while others continue to evolve. Given the inherent subjectivity of the term, any discussion of value must include a variety of disciplines, methodologies and approaches. The greatest benefit may be in prompting reassessment of the "conventional wisdom" about the economic consequences of development and conservation.

BLM_0107020

Charles J. Fausold is a fellow at the Lincoln Institute of Land Policy. Robert J. Lilieholm is an associate professor at Utah State University and a former visiting fellow at the Lincoln Institute. With partial support from the Boston Foundation Fund for the Preservation of Wildlife and Natural Areas they are reviewing and synthesizing existing information to develop a useful framework for considering the economic value of open space. For further information, email to cfausold@lincolninst.edu or rjl@cc.usu.edu.

FYI
Courses
Land Policy Forum on Vermont Interactive Television, September 21. (First of six monthly sessions at 12 locations around the state.)

Land Use In America: Reflections and Directions. November 20-21, Los Angeles, CA.

Municipal Open Space Acquisition: Preparing and Funding Successful Projects. January 30, Salt Lake City, UT.

Publications
Burchell and Listokin, "Land, Infrastructure, Housing Costs and Fiscal Impacts Associated with Growth: The Literature on the Impacts of Sprawl vs. Managed Growth," 1995. Working Paper. $7 plus shipping and handling.

Diamond and Noonan, Land Use in America, 1996. $26.95 plus shipping and handling.

Endicott, Land Conservation Through Public/Private Partnerships, 1993. $22.95 plus shipping and handling.

Faber, On Borrowed Land: Public Policies for Floodplains, 1996. Policy Focus Report. $14 plus shipping and handling.

Fausold and Lilieholm, "The Economic Value of Open Space," 1996. Working Paper. $7 plus shipping and handling.

Ingerson, Managing Land as Ecosystem and Economy, 1995. Policy Focus Report. $14 plus shipping and handling.

Lilieholm and Kelson, "Buffers and Natural Areas: A Review of Issues Related to Wilderness," 1996. Working Paper. $7 plus shipping and handling.

Home | About | News & Events | Education & Research | Publications & Multimedia | Resources & Tools | Contact | Privacy
Lincoln Institute of Land Policy | 113 Brattle Street, Cambridge, MA 02138-3400 USA

http://www.lincolninst.edu/pubs/PubDetail.aspx?pubid=506                5/7/2009
BLM_0107021

**Spreadsheet Placeholder(file available in native format)**

**File Name:**                    20100721_SE_Rpt_Ref_Gunnison_Measures.xlsx

BLM_0107022



SCIENCE FROM



THE WILDERNESS SOCIETY





# NATURAL DIVIDENDS

## *Wildland Protection and the Changing Economy of the Rocky Mountain West*

MICHELLE HAEFELE, PH.D. • PETE MORTON, PH.D. • NADA CULVER

BLM_0107023



# TABLE OF CONTENTS

# NATURAL DIVIDENDS:

## Wildland Protection and the Changing Economy of the Rocky Mountain West



About The Wilderness Society . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

Preface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

Report Highlights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

Overview of the Rocky Mountain Economy . . . . . . . . . . . . . . . . . . . .7

Key Economic Indicators for Western Communities . . . . . . . . . . .11

Recommendations and Discussion . . . . . . . . . . . . . . . . . . . . . . . . .17

References. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

Appendix. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

## Figures

**Figure 1:**
New Oil and Gas Wells Drilled on Public Lands
in the Six-State Rocky Mountain Region . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

**Figure 2:**
35-Year Trends in Personal Income from Agriculture and
Resource-Extractive Industries in the Rocky Mountain Region . . . . . . . . . . . . . . .7

**Figure 3:**
Income from Professional and Service Sector
Occupations in the Rocky Mountains (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

**Figure 4:**
Trends in Total Personal Income in the Rocky Mountains . . . . . . . . . . . . . . . . . .12

## Tables

**Table 1:**
Agricultural and Extractive-Industry Income as a Percentage of
Total Personal Income in the Rocky Mountain States (2005) . . . . . . . . . . . . . . . . .7

**Table 2:**
Hunting, Fishing and Wildlife Watching
in the Rocky Mountains (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

**Table 3:**
Non-Labor Income as a Percentage of Total Personal Income (2005) . . . . . . . . . .15

## Faces of the Rocky Mountains

Protecting our Natural Treasures in Radium Springs, New Mexico . . . . . . . . . . . . .9

Finding a Place to Work and Play in Boise, Idaho . . . . . . . . . . . . . . . . . . . . . . . . .12

Profiting from the Beauty of Wilderness in Nampa, Idaho . . . . . . . . . . . . . . . . . . .14

Discovering New Economic Springs in Kanab, Utah . . . . . . . . . . . . . . . . . . . . . . .16

Brewing Success in Fort Collins, Colorado . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

Building a Wilderness Business in Choteau, Montana . . . . . . . . . . . . . . . . . . . . . .20

Getting Inspired to Make a Difference in Paonia, Colorado . . . . . . . . . . . . . . . . .22

About the cover photos
(from top):
*Young hikers in Grand*
*Staircase Escalante National*
*Monument, Utah.*

*Alpine vista, Rocky Mountain*
*National Park, Colorado.*

*Every year visitors enjoy*
*the changing colors of the*
*Rockies' quaking aspen.*

Photo this page:
*A hiker enjoying Cold*
*Spring Mountain, a Citizen-*
*Proposed Wilderness Area*
*in northwestern Colorado.*

# ABOUT THE WILDERNESS SOCIETY

## Our Mission

**T**he Wilderness Society is a national conservation group dedicated to science-based advocacy. For more than 70 years, our group has worked to conserve America's unparalleled wildland heritage and ensure the wise and balanced management of our public lands legacy.



*ABOVE: Rafting on the Yampa River through Dinosaur National Monument, Colorado. Americans spend nearly $300 billion annually on gear and services for non-motorized, outdoor recreation and generate an additional $430 billion in spill-over economic activity.*

Headquartered in Washington, D.C., the Society also maintains regional offices throughout the country where our staff address on-the-ground conservation issues linked to local communities. Since spearheading passage of the seminal Wilderness Act in 1964, we have been a leading advocate for every major piece of Wilderness legislation enacted by Congress, work that is supported by an active membership of more than 200,000 committed conservationists. Our effectiveness stems from a team approach to conservation, which links our scientists, policy experts, and media specialists to thousands of grassroots activists—creating a potent force to promote change.

Building the case for land preservation with research and sound science is the key to successful environmental advocacy and policy work. Nearly a quarter century ago, The Wilderness Society helped pioneer strategies that incorporated expert economic and ecological analysis into conservation work. Today, through focused studies, state-of-the-art landscape analysis—and diligent legwork by our many partners who provide us with on-site data—our Ecology and Economics Research Department is able to serve the needs of the larger conservation community.

Legislators, on-the-ground resource managers, news reporters, our conservation partners, and—most importantly—the American people must have the facts if they are going to make informed decisions about the future of this nation's vanishing wildlands. The answers to the pressing legal, economic, social, and ecological questions now at issue are the stepping stones to that understanding and, ultimately, to achieving lasting protection for the irreplaceable lands and waters that sustain our lives and spirits.

### Acknowledgements

We would like to express our deepest gratitude to The Aspenwood Foundation for its generous financial support for this report and of our conservation science program in the Northern Rockies.

We would also like to thank Sarah DeWeerdt for her excellent editing of this report, and Mitchelle Stephenson for her wonderful design and format work. Both of these women possess boundless talent and patience.

Heath Nero produced the map of the Rocky Mountain States' public lands. Dr. Susan Solarz helped guide this project through the initial planning and organization. She also provided invaluable help with the "faces" of the contemporary western economy, as did Chris Mehl, Melissa Kolwaite, Steve Smith and Suzanne Jones. Thanks also to the photographers who have allowed us to use their artwork and to the individuals and businesses featured throughout the report.

Finally, we would like to thank Dr. John Loomis of Colorado State University, and Dr. Ray Rasker and Ben Alexander of Headwaters Economics for their insightful peer reviews of early versions of this report.

This science report is one of a series that stems from conservation research studies conducted by The Wilderness Society's Ecology and Economics Research Department. Other reports in the series that focus on issues relevant to this report include:

- **WILDLIFE AT A CROSSROADS:** Energy Development in Western Wyoming
- **ENERGY & WESTERN WILDLANDS:** A GIS Analysis of Economically Recoverable Oil and Gas
- **DRILLING IN THE ROCKY MOUNTAINS:** How Much and at What Cost?

The entire series is available on The Wilderness Society's web site <www.wilderness.org> and from The Wilderness Society, Communications Department, 1615 M Street, NW, Washington, DC 20036 (202-833-2300 or 1-800-THE-WILD).



BLM_0107026

## Preface

The vast landscapes of the Rocky Mountain West—Colorado, Idaho, Montana, New Mexico, Utah and Wyoming—comprise one of the most unspoiled and fastest growing regions of the United States. New residents, drawn to the clean environment, open spaces and recreation opportunities offered by public land in the Rockies, have brought new money to rural communities and opened the door to high-paying occupations such as computer programmers, doctors, architects and financial advisors. Meanwhile, technology continues to liberate workers from urban settings, allowing them to choose places to live based on other quality-of-life concerns. "Footloose" entrepreneurs who migrate to areas rich in natural amenities have also infused rural economies with new vitality.

Contrary to a common misperception, the economy of the American West no longer depends solely on traditional resource-extractive industries. Mining, logging, oil and gas development, farming and ranching are waning in importance. Instead, economic health and sustainable growth often are tied to the protection of the region's abundant natural resources—a trend that will likely intensify in the coming years. Public lands, particularly protected lands which provide natural amenities and open spaces, are crucial to this economic equation.

At the same time, however, a frenzy of oil and gas development has taken hold with unchecked drilling eroding the quality of life in communities across the region. And as land managers consider the future of our western public lands, they frequently limit their analyses to the number of potential jobs created by fresh opportunities for resource extraction—an approach that is insufficient to predicting either the true economic costs of development or the long-term economic benefits of land protection.

The Wilderness Society's report, *Natural Dividends: Wildland Protection and the Changing Economy of the Rocky Mountain West*, examines these recent economic trends in detail. Synthesizing research on socioeconomic patterns, authors Dr. Michelle Haefele, Dr. Pete Morton and Nada Culver reveal the underlying connections between intact landscapes and growing community, regional and national economies.

Their study demonstrates how maintaining sustainable economies in many areas of the American West is directly linked to preserving natural resources and not exploiting them. While we believe resource-extractive industries, including oil and gas development, have their proper place in the region, some natural areas are simply inappropriate for these activities. Elsewhere, drilling and other types of extraction should only occur in the right location and with appropriate safeguards to protect the region's clean air and water, abundant wildlife and healthy communities.

By working to ensure that sound policies come forth from Washington, D.C., highlighting better alternatives and partnering with local citizens to help plan and monitor development projects, The Wilderness Society believes the Rocky Mountain West can enjoy the benefits of its many resources—and economic stability—without diminishing our nation's unparalleled natural treasures.

William H. Meadows
President

G. Thomas Bancroft, Ph.D.
Vice President
Ecology and Economics Research Department

THE WILDERNESS SOCIETY

To learn more about The Wilderness Society's work in the Rocky Mountain States, call or email:

■ **Michelle Haefele**
303-650-5818 ext. 109
michelle_haefele@tws.org

■ **Pete Morton**
303-650-5818 ext. 105
pete_morton@tws.org

■ **Nada Culver**
303-650-5818 ext. 117
nada_culver@tws.org

3

BLM_0107027

# REPORT HIGHLIGHTS

*ABOVE RIGHT: Sunset skies over the Watchman, Zion National Park, Utah.*

In this report, we synthesize recent research from economists and other scientists to provide a new picture of the economy of the contemporary Rocky Mountain West. This picture—broader and more accurate than the commonly held view that the region's economy is heavily dependent on resource extraction—recognizes the full value of protected public lands in ensuring sustainable economic development. Key findings and conclusions of the report include the following:

- **PROTECTED PUBLIC LANDS** produce measurable benefits in terms of employment and personal income for communities in the Rocky Mountains. Research has shown that real per capita income in isolated rural counties with protected land grows faster than in isolated counties without any protected lands.

- **KEY ECONOMIC INDICATORS** that signal both a change in the West's economy and the health of specific communities include the rapidly expanding professional and service sectors, the increasingly important role that hunting, fishing, recreation and tourism play in the region, the rise of small businesses and other entrepreneurial endeavors, and the growing economic importance of retirees. All of these important economic sectors directly or indirectly benefit from protecting public wildlands, and yet are often ignored in public land management plans.

  - **THE PROFESSIONAL AND SERVICE SECTOR** has been growing in importance in the Rocky Mountains, accounting for over 30 percent of total personal income in 2005. This sector is very diverse, encompassing a wide range of both entry-level and high-wage occupations.

  - **OUTDOOR RECREATION, HUNTING, FISHING AND TOURISM** are important components of western economies. In 2006, hunters, anglers and wildlife watchers spent over $7 billion in the Rocky Mountain States, and non motorized outdoor recreation generated over $22 billion in economic activity.

  - **ENTREPRENEURS** bring jobs and income to the region and have been found to be an important indicator of an area's overall economic health and potential future prosperity.

  - **RETIREES** and other residents with investment income represent one of the top "industries" in the region, with their income making up nearly one-quarter of total personal income in 2005.

Retirees moving to the Rockies are attracted to the natural amenities provided by public land.

- **EXTRACTIVE-INDUSTRY INCOME** in the Rocky Mountain economy has declined in the last 30 years, with oil and gas extraction accounting for just 1.3 percent of total personal income in the region in 2005.

This analysis shows how the West's people and communities have come to depend on the region's natural amenities—the clean air and water, quality outdoor recreation and hunting and fishing opportunities—suggesting a need for a more comprehensive approach to evaluating land management in the American West. Accordingly, we map out an approach that communities can use to encourage the sustainable growth of their economies without destroying the natural amenities on which those economies—and the community's quality of life—have come to depend. Our recommendations include:

- **IMPROVE THE SOCIOECONOMIC IMPACT ANALYSIS** in public land management plans by 1) incorporating an analysis of historic trends in jobs and personal income—including trends in retirement and other non-labor sources of income, 2) addressing the direct and indirect role protected public lands play in the regional economy, 3) accounting for the economic importance of the recreation, hunting and fishing that occurs on public land, 4) using estimates of economically recoverable quantities of oil and gas resources and 5) fully accounting for the hidden costs associated with oil and gas drilling.

- **PLAN FOR AMENITY DEVELOPMENT** by developing strategies to ensure that the scale and pace of amenity development doesn't result in the same negative impacts as the current oil and gas drilling boom.

- **SLOW THE PACE OF OIL AND GAS DRILLING** by implementing phased development of oil and natural gas resources.

We also include detailed information about many sources of economic and demographic data available at both the state and national level to aid in land management planning. We hope that this report will provide citizens, communities and decision makers with better information for balancing the extraction, recreation and amenity values of our public lands in the Rocky Mountains.

BLM_0107028

# INTRODUCTION

**With the economic diversification of the Rocky Mountain West over the past several decades, continued healthy economies in many of the region's communities depend on protecting natural resources rather than only on exploiting them. Resource extraction, such as the current boom in oil and gas drilling in the region, should only happen at the right pace and with appropriate safeguards to protect the West's wildlands, clean air and water, abundant wildlife and healthy communities.**



**T**he western United States is known for its vast expanses of open space and remote wildlands, from broad prairies to sagebrush scrub, twisting canyons and rugged mountain peaks. Most of these wild landscapes are public lands, held in common ownership by all Americans—a status that has helped keep them wild in the face of considerable pressure to develop the natural resources found there. Protecting our western public wildlands[1] provides immense public benefits: recreation opportunities, wildlife habitat, scenic vistas, clean air and water and the preservation of a vital part of our American heritage (Morton 1999).

Yet if the story of the American West is one of unspoiled nature, it is also one of harnessing nature's bounty for human ends. Traditionally, the economy of the western United States has been perceived as one based on the extraction of the region's abundant natural resources—mining, logging, oil and gas drilling, farming and ranching. However, over the last

30 years the West's economy has become much more diversified (Bennett and McBeth 1998, Johnson 2001), with recreation, tourism, the professional and service sector, retirees and entrepreneurs making important contributions to the region's economic well-being. As we will discuss, the diversification and hence the health of our western economy benefit greatly from the protection of public wildlands.

This report provides a snapshot of the economic trends that have shaped the contemporary Rocky Mountain West (Colorado, Idaho, Montana, New Mexico, Utah and Wyoming), and describes key economic indicators associated with the growth and diversification of rural Rocky Mountain economies. Understanding these key economic indicators is particularly important in light of the frenzy of oil and gas development that is currently threatening public wildlands and natural amenities in the Rockies, and hence the competitive economic advantage of the region. Between 2001 and 2006, more than 17,000 gas and oil wells were drilled on

*ABOVE: Frank Church-River of No Return Wilderness Area, in Idaho, designated in 1980, is one of the largest units of the National Wilderness Preservation System.*

5



*ABOVE: A hiker in the Santa Fe National Forest, New Mexico.*

*AT RIGHT: Black-chinned hummingbird.*

public land in the Rockies, with thousands more wells drilled on private land in the region (Figure 1). In contrast, fewer than 9,500 wells were drilled between 1995 and 2000.

Oil and gas development is notorious for resulting in "boom and bust" cycles that can have devastating impacts on nearby communities. Research has indicated that an emphasis on resource extraction results in inherently unstable community economies (Fortmann et al. 1989, Freudenburg 1992, Freudenburg and Gramling 1994), often due to forces such as fluctuations in prices and changes in extraction technology, which are completely outside local control. The current drilling boom is a case in point. Rural communities have had little control over the pace or location of drilling—as the Bureau of Land Management (BLM) continues to ignore widespread local opposition to this development.

The current upsurge in oil and gas drilling is already having negative impacts on communities in the West (Limerick et al. 2002).[2] Recent news accounts document residents leaving areas where drilling has become such a

nuisance that their quality of life and property values have declined (BBC Research and Consulting 2001). Other impacts include damage to rural roads, poaching in and around the gas fields and other crime—especially drug use (Jacquet 2005). The "hidden costs" from the current drilling boom also include air and water pollution, loss and fragmentation of critical wildlife habitat, decline in the quality of hunting and outdoor recreation in general and the potential damage to the region's natural amenities (Morton et al. 2004).

While oil and gas drilling, along with other natural resource development, can contribute to rural economies, the pace and scale of oil and gas booms can have negative impacts on many of the important economic sectors in the Rocky Mountains. Unfortunately, the fast-track energy plans prepared by the BLM to rush these drilling proposals out the door focus almost exclusively on oil and gas jobs, largely ignoring the contribution of other more important sectors of the local and regional economy. As this report makes clear, merely counting jobs in oil and gas drilling is not sufficient to predict the economic impact of proposals to increase this development. Communities and planners must also consider the increasing importance of industries and economic sectors that rely on protected wildlands, which could be harmed by the extraction of natural resources.

We begin our analysis with an overview of economic trends in the Rocky Mountains, before examining key economic indicators for measuring the health of western communities. We end our paper with recommendations for communities and public land managers.



FIGURE 1.

## New Oil and Gas Wells Drilled on Public Lands in the Six-State Rocky Mountain Region

The Rocky Mountain States have become the major focus of natural gas drilling in the United States in recent years, putting at risk the quality of life and natural amenities that are key to sustainable economic growth for western communities.

New Wells Drilled (y-axis, 0 to 18,000)

1995-2000: ~9,500
2001-2006*: ~17,000

Fiscal Year

* Due to an Automated Fluid Minerals Support System (AFMSS) shutdown in FY 2005, data are incomplete for this fiscal year. If these data were included the number of wells drilled in this period would be even greater.

*Sources: U.S. Department of the Interior, Bureau of Land Management, Public Lands Statistics (FY 1995-1997) and Bureau of Land Management, AFMSS (FY 1998-2006).*

BLM_0107030

# OVERVIEW OF THE ROCKY MOUNTAIN ECONOMY

## *Trends in Resource Extraction in the Rocky Mountains*

**D**espite widespread assumptions to the contrary, the timber, mining and oil and gas industries, while important locally to some communities, have never been large contributors to total personal income in the Rocky Mountain region (Figure 2).[3] In fact, the contribution of oil and gas extraction is roughly where it was 30 years ago—about 1.3 percent of total personal income in 2005, a remarkably small percentage given the current drilling boom. Meanwhile, the small contribution of the timber industry has also declined.

In 2005, the percentage of total personal income from extractive industries in the Rocky Mountain region ranged from just over 2 percent in Utah to approximately 14 percent in Wyoming (Table 1). As discussed, most western counties are not "resource dependent," but instead have developed diversified economies that also include recreation, retirees and the professional and service sector. A recent study examining the impact of public lands on economic well-being in 11 western states found that only 3 percent of western counties could be classified as resource-extraction dependent (Rasker et al. 2004). In fact, as we discuss in the following section, protected public lands are playing a more and more important role in the economies of most western communities, including many of the remaining resource-dependent counties.

FIGURE 2.

### 35-Year Trends in Personal Income from Agriculture and Resource-Extractive Industries in the Rocky Mountain Region

Over the past 35 years, the importance of extractive-industry income in the Rocky Mountain States has declined. Even during the current oil and gas drilling boom, this industry contributes less than 2 percent of total personal income in the region.



* In order to show the long-term trend, the figure is based on data collected through the Standard Industry Classification (SIC) system, which was used through 2000, and the North American Industry Classification System (NAICS), which has been used since 2001. (See the Appendix for a discussion of these classification systems.) The switch in classification systems is represented by the break in the graph.

*Source: Regional Economic Information System, Bureau of Economic Analysis, U.S. Department of Commerce (2005 data are the most recent available).*

TABLE 1.

### Agricultural and Extractive-Industry Income as a Percentage of Total Personal Income in the Rocky Mountain States (2005)

The extraction of natural resources represents a relatively small proportion of total personal income in the six Rocky Mountain States. This is true despite the frenzy of oil and gas drilling that has recently been occurring in the region.

|  | Farming & Ranching | Mining | Oil & Gas Extraction | Timber Industry | Total Agriculture & Extractive Income |
|---|---|---|---|---|---|
| Colorado | 0.6% | 0.7% | 1.6% | 0.2% | 3.2% |
| Idaho | 4.0% | 0.4% | NA | 1.9% | 6.3% |
| Montana | 3.0% | 1.8% | 0.8% | 1.2% | 6.8% |
| New Mexico | 2.2% | 1.6% | 1.7% | 0.2% | 5.7% |
| Utah | 0.5% | 0.9% | 0.4% | 0.4% | 2.2% |
| Wyoming | 1.5% | 8.2% | 4.2% | 0.2% | 14.1% |
| Rocky Mountains | 1.4% | 1.3% | 1.3% | 0.5% | 4.5% |
| United States | 1.0% | 0.4% | 0.5% | 0.7% | 2.5% |

*Source: Regional Economic Information System, Bureau of Economic Analysis, U.S. Department of Commerce (2005 data are the most recent available).*

7

## The Role of Protected Public Lands

The population of the rural West has been increasing since the 1970s (Bennett and McBeth 1998). The Rockies are one of the fastest growing regions in the United States (U.S. Census Bureau 2001), and, contrary to the pattern seen elsewhere, population growth has preceded employment growth in the rural West (Vias 1999). People appear to migrate to the region for its amenities (McGranahan 1999), including abundant natural and scenic resources such as varied topography, access to water bodies and a pleasant climate.

Along with population growth comes demographic change (Shumway and Otterstrom 2001). As more people move from urban areas to rural communities they bring with them expectations about how local public lands ought to be managed, and these changing community values must also be accounted for in the management of surrounding public lands.

A large and growing body of research indicates that the natural amenities provided by public lands are an important economic driver in the rural West (Rudzitis and Johansen 1989; Johnson and Rasker 1993, 1995;



### What do we mean by natural amenities?

The natural amenities provided by protected public lands include quality outdoor recreation, hunting and fishing opportunities, clean air and water, scenic beauty, open spaces or natural areas, habitat for fish and wildlife, a clean environment, varied topography and access to water. The natural amenities from public land contribute to the quality of life for local residents. For example, residents of Sublette County in Wyoming cited the beautiful scenery, abundant recreation opportunities and rural lifestyle as the top three reasons they chose to live in the Rockies (McLeod et al. 1998). In addition, natural amenities attract retirees with their investment income, and an educated and talented workforce, which in turns attracts businesses to the region.

Scientists at the Economic Research Service, a branch of the U.S. Department of Agriculture, recognized the economic importance of protecting natural amenities and developed a scale that measures the level of amenities in each county. The Amenity Scale rating is based on six factors: warm winters, plentiful winter sunshine, temperate summers (not too hot), low summer humidity, variation in topography (hilliness) and water area.

The results (right) show that 91 percent of the counties in the Rocky Mountain States have amenity scores higher than the national average, and in New Mexico and Utah every county scores higher than the national average.

| Counties in each state with Amenity Scale scores higher than the national average | |
|---|---|
| Colorado | 95% |
| Idaho | 95% |
| Montana | 72% |
| New Mexico | 100% |
| Utah | 100% |
| Wyoming | 91% |
| All Rockies Counties | 91% |

Source: U.S. Department of Agriculture, Economic Research Service, Natural Amenities Data Base (http://www.ers.usda.gov/Data/NaturalAmenities/).

8

BLM_0107032

Rasker 1994; Power 1995, 1996; Duffy-Deno 1998; Rudzitis 1999; Lorah 2000; Rudzitis and Johnson 2000; Whitelaw et al. 2003; Holmes and Hecox 2004; Rasker et al. 2004). Local communities with protected wildlands reap measurable benefits in terms of employment and personal income. Counties with high levels of natural amenities are more likely to experience both greater population and greater economic growth than counties with fewer such amenities (McGranahan 1999). Protected lands have the greatest influence on economic growth in isolated rural counties that lack easy access to larger markets. From 1970 to 2000, real per capita income in isolated rural counties with protected land grew more than 60 percent faster than in isolated counties without any protected lands (Rasker et al. 2004).

More and more workers in the West, and all over the United States, are able to choose where they live and work. Technology makes it easier for professionals to "telecommute" using electronic communications. Many businesses are able to conduct national or international commerce from any location they choose. Other entrepreneurs simply choose to live in a particular place and build a business in response to local needs. Retirees and others who collect non-labor income are not tied by a job to a specific location. Many of these people seek an attractive place to live. As development

pressures increase, public lands become a backdrop or setting that contributes to or even creates the amenities that will help a community's economy thrive and grow.

Residents of counties with designated Wilderness cite the presence of that Wilderness as an important reason they moved to the county, and long-term residents cite it as a reason they stay (Rudzitis and Johansen 1989). Recent survey results also indicate that many firms decide to locate or stay in the West because of scenic amenities and wildlife-based recreation, both of which are strongly supported by Wilderness Areas (Johnson and Rasker 1995). Resource managers, economic planners and community leaders should be aware of these trends and consider the role that protected public lands play in the community's long-term economic and social health and well-being.

Many rural sociologists and economists have highlighted the role of natural resource protection in economic growth. In a study of the relationships between rural poverty and natural resource development, Freudenburg and Gramling (1994) concluded:

> …it needs to be recognized as a serious empirical possibility that the future economic hope for resource-dependent communities of…the United States could have less to do with

*ABOVE: Collared lizard, Mesa Verde National Park, Colorado.*

*OPPOSITE PAGE: Backpackers hiking along the bottom of a red rock canyon.*

## Protecting our Natural Treasures in Radium Springs, New Mexico

Pat Buls' connection to New Mexico's public lands is both physical and emotional, and a daily experience.   As the owner of Shining Heart Farms, a horse training and riding lesson facility in Radium Springs, Buls "rides the range" almost every day.



**Pat Buls**
*Owner, Shining Heart Farms*

"America is unique in its treasure trove of wild backcountry—public land that belongs to all of us, whether we live in New Mexico, or across the country in New York City," says Buls. "I have spent my life sharing the outdoors with my students, and as a result have witnessed over and over again the healing power of wilderness."

Reflecting on a past student, Buls recalls witnessing a shy, overweight girl blossom into a self-confident, active woman due to the nourishing power of nature. Buls believes that wilderness doesn't just heal the soul, it also serves as an economic driver, especially in southern New Mexico where the area is experiencing a population surge.

"More and more people come here, drawn to this area because of its beauty and our quality of life," says Buls. "As a result, I believe it is our duty to protect our natural treasures because they serve as the backbone for our economy and our community. It is the best we can do for our children."

**9**



*ABOVE: Chetro Ketl Pueblo at Chaco Culture National Historic Park, New Mexico.*

*OPPOSITE PAGE: For many professional and service workers, coffee and internet access are key ingredients for success in the 21st Century western economy.*

the consumption of natural resources than with their preservation.

Deller et al. (2001) echo this finding:

Rural areas endowed with key natural resource amenities can manage those resources to capture growth more effectively. This may entail expansion beyond policies that have historically been focused on extraction of the resource base.

In addition, a letter to the president and the governors of the western states, signed by 100 economists from universities and other organizations throughout the United States, reads in part, "The West's natural environment is, arguably, its greatest long-run economic strength" (Whitelaw et al. 2003).

10

BLM_0107034

# KEY ECONOMIC INDICATORS FOR WESTERN COMMUNITIES

A number of economic indicators signal both a change in the West's economy and the health of specific communities in the West. These indicators include the rapidly expanding professional and service sector, the increasingly important role that recreation and tourism play in the region, the rise of small businesses and other entrepreneurial endeavors and the growing importance of retirees and non-labor income.

We've chosen to highlight this particular set of indicators because they have been shown to be strong drivers of rural economies (Deller 1995, Deller et al. 2001, Henderson 2004, Henderson and Abraham 2004, Low 2004, Rasker et al. 2004, Low et al. 2005). Furthermore, despite their significant role in rural economies, the indicators described here have been largely ignored in recent land management planning documents when assessing the region's relationship with its abundant public lands. We hope this information will be useful for communities where traditional extractive industries have declined, as well as for communities enduring the current oil and gas drilling boom.



## *The Professional and Service Sector*

Over the past quarter-century, the U.S. economy as a whole has seen a shift from extractive and primary manufacturing industries to service-oriented businesses, a trend that is also evident throughout the West. A common misconception about the so-called service sector is that it includes only low-paying jobs. This is not the case; several high-paying professional occupations such as computer programmers, lawyers, financial advisors, engineers and doctors (Figure 3) are classified as part of the service sector. Many of the counties in the Rocky Mountain West with economies that are characterized by a predominance of service industries have the highest incomes (Shumway and Otterstrom 2001).

A diverse economy is important for sustainable economic development and prosperity, and given the growing importance of the professional and service sector, it is also important that this sector remain diverse, not dominated by any single segment.

The growth in these service sector professions in the Rocky Mountain West is linked in many cases with an increase in investment and retirement income. As retirees (discussed in more detail beginning on page 17) and others migrate to rural communities, they contribute to overall income and employment (Deller 1995). Employment and income in the health-care sector may increase as the number of retirees in an area increases. As retirees move into a region, the demand for financial, insurance and real estate services may also increase. In the Rocky Mountain region, non-labor income has risen in concert with professional and service sector income in recent decades, while extractive-industry income has fallen in relative importance (Figure 4, next page).

Over the past three decades, advancing technology has played a key role in transforming the economy of the West. Improved technology results in reduced labor requirements, contributing to the downward trend in extractive-industry employment (Johnson 2001). At the same time, developments in communications and information technology have opened up new economic opportunities in the rural West, by mitigating the constraints imposed by remoteness and permitting

(Figure 4, next page).

FIGURE 3.

### Income from Professional and Service Sector Occupations in the Rocky Mountains (2005)

Contrary to common assumptions, the service sector includes a number of high-paying, knowledge-based occupations, not just entry-level jobs. In fact, in the Rocky Mountain States, some of the largest segments of the service sector, such as Information, Professional & Technical Services and Health Care, are also highly paid. Also significant is the fact that the region has a wide variety of professional and service sector occupations, since economic diversity is important for community prosperity and growth.



*Source: Regional Economic Information System, Bureau of Economic Analysis, U.S. Department of Commerce (2005 data are the most recent available).*

II

BLM_0107035

FIGURE 4.

## Trends in Total Personal Income in the Rocky Mountains

While extractive industries have played a minor role in generating income in the Rocky Mountain States, professional and service sector income has been rising along with non-labor income. These trends highlight a shift in the region's economy as well as the need to ensure that public land management protects the natural amenities that draw high-quality workers and diverse businesses to the region.



* In order to show the long-term trends, professional and service sector income and extractive-industry income are based on SIC data for 1970-2000 and NAICS data for 2001-2005 (see Appendix). While not explicitly compatible, both classification systems show similar trends for income from the professional and service sector and extractive industries. The switch in classification systems is represented by the break in the graph.

*Source: Regional Economic Information System, Bureau of Economic Analysis, U.S. Department of Commerce (2005 data are the most recent available).*

employment in the professional and service sector previously unavailable for rural residents.

Many high-paying professional occupations such as those in health, educational and legal services are often referred to as "knowledge-based," defined by Henderson and Abraham (2004) as follows: "Knowledge-based activities emerge from an intangible resource that enables workers to use existing facts and understandings to generate new ideas. These ideas produce innovations that lead to increased productivity, new products and services, and economic growth."

Knowledge-based industries (such as computer programming, data processing, educational services and even museums) have grown nationwide since 1980, and

## Finding a Place to Work and Play in Boise, Idaho

**Bill Brudenell**
*Production Engineer, Hewlett Packard*

**Ingrid Brudenell**
*Professor of Nursing, Boise State University*



Bill and Ingrid Brudenell moved to Boise in 1980 after a long search for a home with natural beauty, proximity to outdoor recreation and the security of protected lands. The Brudenells wanted to settle in a place where they could be sure that the natural beauty they love so much would not be destroyed.

A life-long nature lover, Bill remembers growing up near the Great Smoky Mountains in Tennessee and being awakened each morning by the singing of the birds. He was disappointed when vast tracts of the Nantahala and Cherokee National Forests were clearcut. "When there aren't any trees, well, there aren't any birds," he says.

The Brudenells lived for a time in Charlotte, North Carolina, but they found that much of the same selling off and destruction of natural lands was occurring there, making it more difficult to access natural areas with room to roam.

Realizing they needed to make a conscious effort to seek out their desired combination of easy access to outdoor recreation and exciting job opportunities, Bill and Ingrid put their heads together and found themselves headed west. They have been very happy in Boise, which has both the kind of rewarding professional work they sought and the effortless access to skiing, hiking, backpacking, mountain biking, fishing and rafting that they needed. With many of Idaho's great places enjoying protected status, the Brudenells no longer worry about losing access to many of their favorite natural areas and recreation sites.

BLM_0107036



rural areas can take advantage of this trend by enhancing the factors that contribute to the growth of these industries. Such factors include a high-quality workforce, colleges and universities, transportation and communication infrastructure and a diversified local economy. These factors are interrelated and often depend on the quality of the environment and the availability of public lands and their associated recreational opportunities. Such amenities play a strong role in attracting workers and businesses which serve to diversify economies in the rural Rocky Mountain West (Whitelaw and Niemi 1989; Johnson and Rasker 1993, 1995).

## Hunting, Fishing & Recreation

According to the Outdoor Industry Foundation, 162 million Americans participate in non-motorized active outdoor recreation each year (OIF 2006a), spending $298 billion on gear and recreation services annually (OIF 2006b). This spending spurs other spending in local economies as well as generating local tax revenues—making the total national

TABLE 2.

### Hunting, Fishing and Wildlife Watching in the Rocky Mountains (2006)

Wildlife recreation is an important part of the cultural heritage of the Rocky Mountain States and an important source of economic activity in rural communities. Over 4 million people participated in hunting, fishing and wildlife watching in the region, spending over $7 billion.

|  | Participation | Expenditures |
|---|---|---|
| Colorado | 1,593,000 | $2,424,196,000 |
| Idaho | 564,000 | $840,267,000 |
| Montana | 511,000 | $910,049,000 |
| New Mexico | 581,000 | $807,618,000 |
| Utah | 794,000 | $1,193,655,000 |
| Wyoming | 230,000 | $904,780,000 |
| Rocky Mountain States Total | 4,273,000 | $7,080,565,000 |

*Source: U.S. Department of the Interior, U.S. Fish and Wildlife Service and U.S. Department of Commerce, U.S. Census Bureau, 2007.*

*TOP: Canoeing in the Upper Missouri River Breaks National Monument, Montana.*

*ABOVE: Rainbow trout are prized by anglers throughout the Rockies, where fishing generated over $2 billon in spending in 2006.*

*BELOW: A fisherman on Snowmass Creek in the Maroon Bells-Snowmass Wilderness Area, Colorado.*



13

BLM_0107037



*ABOVE: A local outfitter leads a pack trip into the spectacular ranges of the Absaroka-Beartooth Wilderness Area of south-central Montana.*

*AT RIGHT: A young camper seizes the day in the San Rafael Swell, Utah.*

*OPPOSITE PAGE: Bull elk. Hunting and wildlife watching bring over $4 billion to the Rocky Mountain States' economies.*

economic contribution of outdoor recreation over $730 billion (OIF 2006b). The total economic contribution of non-motorized recreation in just the six-state Rocky Mountain region was over $22 billion in 2006 (OIF 2007).

Outdoor recreation by residents and tourists alike is an important component of western economies. Many rural communities in the Rocky Mountain region have been revitalized as they have been "discovered" by recreationists. Moab, Utah, for example, was once a dying mining center and is now a top destination for recreation seekers of all sorts. Tourism also leads to migration by new residents who may bring new businesses; one study found that a quarter of the business owners in the Yellowstone National Park region first came to the area as tourists (Snepenger et al. 1995).

An April 2004 report from the Federal Reserve Bank of Kansas City's Center for the Study of Rural America calls wildlife recreation "rural America's newest billion-dollar industry" (Henderson 2004). Nationwide, wildlife recreation—hunting, fishing and wildlife watching—generated $120 billion in spending for local economies, boosting tourism, spurring business growth and contributing to increased property values. Hunters, anglers and wildlife watchers spent over $7 billion in the six-state Rocky Mountain region alone in 2006 (U.S. Fish and Wildlife Service and U.S. Census Bureau 2007) (Table 2).

As the nation's population grows, public lands become more and more necessary for providing the open space



and healthy wildlife habitat required for quality hunting, fishing and other outdoor recreation opportunities. The Forest Service has estimated that its recreation and protection programs account for much greater economic benefits than do its resource-extraction programs (Alward et al. 2003). Maintaining habitat for the fish and wildlife sought by anglers and hunters is a wise investment for western communities.

## *Entrepreneurs*

While the previous sections discussed wage earners, this section focuses on the self-employed entrepreneurs in the Rocky Mountains, many of whom work in the professional and service sector and/or recreation-oriented businesses. The Center for the Study of Rural America includes the level of entrepreneurship as a regional asset that indicates economic viability, and notes that entrepreneurs can increase the health of the overall

## *Profiting from the Beauty of Wilderness in Nampa, Idaho*

Tyler Welshimer (right), owner of bicycle repair business Welshimer Wheels, LLC, works on a racer's mountain bike just prior to the annual White Knob Challenge mountain bike race in the Lost River Mountains of eastern Idaho. The race, which starts on Main Street in Mackay, Idaho, attracts about 130 racers and their families from across the West.

Races such as the White Knob Challenge are an important source of income for Welshimer Wheels and other businesses in Idaho. For several days before and after a bicycle race, hotels, eateries, gas stations and campsites enjoy increased business. "When I officiate at races the motel parking lots are usually flooded with bike-laden cars and there are many 'no-vacancy' signs out—I guess I'm not the only one to profit from the beauty of wilderness," observes Welshimer.

He continues, "Mountain bike races are often held just outside of wilderness areas and in places of spectacular natural beauty. Without protected lands, cyclists would not be drawn to the area, and without cyclists I don't have bikes to fix."

**Tyler Welshimer**
*Welshimer Wheels, LLC*



BLM_0107038

TABLE 3.

## Non-Labor Income as a Percentage of Total Personal Income (2005)

Non-labor income in the Rocky Mountain region and the United States as a whole consists mainly of retirement and investment income. Income support is a small portion of total non-labor income and an even smaller portion of total personal income, and for most states in the region income support is lower than in the United States overall.

| | Investment Income [a] | Retirement Income [b] | Income Support [c] | Other Transfer Payments [d] | Total Non-Labor Income |
|---|---|---|---|---|---|
| Colorado | 16% | 7% | 2.8% | 0.7% | 26% |
| Idaho | 18% | 10% | 4.2% | 1% | 33% |
| Montana | 19% | 11% | 4.4% | 1% | 36% |
| New Mexico | 15% | 10% | 6.8% | 11% | 33% |
| Utah | 14% | 7% | 3.3% | 1.07% | 26% |
| Wyoming | 23% | 9% | 3.3% | 0.8% | 36% |
| Rocky Mountains | 16% | 8% | 3.7% | 0.9% | 29% |
| United States | 16% | 9% | 4.9% | 1% | 31% |

[a] Dividends, interest and rent
[b] Includes veterans' benefits, military benefits and Medicare
[c] Income maintenance benefits (Supplemental security income, Family assistance, Food stamps, Other income maintenance benefits), Public assistance medical benefits and Unemployment insurance compensation
[d] Includes federal education and training assistance, settlements between individuals and businesses and transfer payments from non-profit institutions

*Source: Regional Economic Information System, Bureau of Economic Analysis, U.S. Department of Commerce (2005 data are the most recent available).*

economy: "Entrepreneurs create local jobs, wealth, and growth—and are themselves innovative users of other regional assets and resources.…Entrepreneurs bolster a region's quality of life while promoting economic prosperity. Research has found a strong correlation between entrepreneurship and long-term regional employment growth" (Low 2004).

Entrepreneurs in many fields—especially high-technology and knowledge-based fields—are often free to choose their location, and gravitate towards high-amenity areas (Rasker and Glick 1994, Johnson and Rasker 1995, Snepenger et al. 1995, Beyers and Lindahl 1996, Rasker and Hansen 2000, Henderson and Abraham 2004, Low 2004, Low et al. 2005). Recreation- and tourism-oriented businesses are often founded by footloose entrepreneurs seeking to live and work in areas rich in natural amenities and recreation opportunities. Retirees and investors migrating to an area bring with them entrepreneurial opportunities for those who can provide the goods and services they seek.

Entrepreneurs who provide producer services (services sold primarily to other businesses and government) are also expanding in rural areas, and most of these conduct much of their business interregionally or even internationally, bringing outside income into the rural regions where they are located. Producer services are often high-paying occupations such as computer programming and data processing; engineering and architectural services; management consulting; and insurance, legal, financial and accounting services. Most of these businesses are not location dependent and entrepreneurs in these fields can often choose their location based on the amenities available in many rural areas (Beyers and Lindahl 1996).

Although wage and salary income is still the largest portion of total personal income in the Rocky Mountain States, entrepreneurs' income has grown slowly but steadily from less than 10 percent of total personal income in 1970 to nearly 12 percent in 2005. Decisions to locate new businesses in rural areas are often made for quality-of-life reasons, providing further evidence of the importance of natural amenities to local economies (Rasker and Glick 1994, Beyers and Lindahl 1996).

## *Retirees and Non-Labor Income*

In the Rocky Mountain States, investment and retirement income makes up nearly one-quarter of total personal income, making it one of the top "industries" in the region and an important contributor



BLM_0107039

to the economy that must be included in economic impact analyses. Investment and retirement income is by far the largest portion of non-labor income in each of the Rocky Mountain States (Table 3).

Areas with high levels of natural amenities—such as the scenic beauty and abundant recreation opportunities of nearby intact landscapes and Wilderness Areas—attract residents, and many of these residents rely on non-traditional sources of income (Duffy-Deno 1998, McGranahan 1999, Nelson 1999, Rudzitis 1999, Shumway and Otterstrom 2001, Lorah and Southwick 2003). Not bound by their job to any particular location, retirees can choose a place to live based on the amenities it offers. People who rely on retirement and investment income are concentrated in the coastal and mountain regions of the West, precisely because of the natural amenities these areas possess (Nelson 1999). An influx of retirees to rural communities has been shown to have positive effects on both income and employment (Deller 1995). When a person receives dividends on his or her investments or a retiree receives a pension check, the money represents an influx of income for the entire local economy, and in turn fuels increases in employment and income for many of the other sectors discussed in this report.

## Discovering New Economic Springs in Kanab, Utah

"We describe our arrival in southwest Utah 13 years ago as serendipitous. Although we were always drawn to the intimate canyons and vast landscapes, we were somehow surprised to find ourselves living among them. In a sense, the rural West is full of those kinds of unexpected blessings, like when a sudden cloudburst ends a long dry spell.

**Willow Canyon Outdoor**



"Many of our neighbors are struggling through a sort of economic drought—the bust that seems always to be on the heels of the latest boom in extractive industry. Our first year in Kanab, the lumber mill was shut down. It had never been retrofitted to cut the smaller logs of secondary forests, and old growth was getting scarce. You can count the lost jobs and measure the economic impact, but it's harder to reckon with the family and friends that had to leave the community to make a living elsewhere.

"Meanwhile, our local economy has quietly shifted. Our little shop is a reflection of that—'We provide unique goods and services to help people discover, experience, understand, and appreciate the natural and cultural wonders of the Colorado Plateau,' reads our mission statement. We sell outdoor gear, books, and gourmet espresso. Still, it's a bumpy road for entrepreneurs, and ideas that didn't work out roll around like tumbleweeds.

"It doesn't surprise us that so many people are skeptical as they watch the New West evolve. Its development is punctuated with loss and resentment almost as much as with hope and renewal. A flood of change can seem very threatening, even while awash with opportunity.

"Within our community, we're all searching for common ground, for an identity, for a vision of what our town should be. This is the high desert, and you never really know when it's going to rain again."

— Susan Hand and Charlie Neumann, owners

# RECOMMENDATIONS AND DISCUSSION

The preceding sections of this report have presented some key indicators for the western economy in the 21st Century. These indicators should also be included in the socioeconomic impact analysis for land management planning in order to ensure that the decisions affecting our public lands are based on an analysis that accurately reflects the West's economy. This section makes some specific recommendations that citizens in western communities and public land managers can use to improve the land management planning process. An Appendix (pages 26-28) provides further information about some of the sources of the types of data called for here.

## Improve the Socioeconomic Impact Analysis in Public Land Management Plans

The National Environmental Policy Act (NEPA) requires federal agencies to take a "hard look" at the impacts of a proposed action such as oil and gas development. These impacts include ecological, aesthetic, historic, cultural, economic and social impacts. Such impact analysis requires high-quality data on both the current conditions and the potential outcomes of land management actions. Federal agencies cannot evaluate the consequences of proposed decisions or determine how best to avoid or mitigate negative impacts without adequate data and analysis.

By using high-quality data, applying sound scientific methods and examining the key indicators described in this report, we believe that public land management agencies can better fulfill their obligations to evaluate the direct, indirect and cumulative socioeconomic impacts of various alternative decisions. In this section, we provide both general recommendations on the scope of the socioeconomic impact analysis and specific inquiries to be made in this analysis.

RECOMMENDATION 1. The socioeconomic impact analysis for public land management planning should include an analysis and discussion of both the current status of and historic trends in jobs and in personal income—including trends in retirement and investment income, the professional and service sector, jobs and income from hunting, fishing, recreation and tourism and entrepreneurial income.

In general, it is inappropriate to examine a region's economy solely at a single point in time because economies are dynamic. Trend analysis will show long-term patterns in income and employment that may be masked when looking at only one point in time. Trend analysis can help guide resource management by showing the likely future situation in an area and



ABOVE: Spring skiing in Mt. Naomi Wilderness Area, Utah.

pointing out historic periods of economic downturn. It may be instructive to look at other variables during these downturns to see if there are correlations between land management activities and economic activity. Looking at trends in employment and income is important to understanding the overall direction in which an area's economy is moving.

The analysis of regional economic impacts must include an analysis of all sources of income, including entrepreneurial and non-labor income. The analysis should also examine the role that amenities, including recreation opportunities and environmental quality, currently play in attracting and retaining entrepreneurs and non-labor income to the area. Finally, the analysis should examine the potential impacts that public land management alternatives will have on the level and trend of entrepreneurial endeavors and investment and

BLM_0107041



*ABOVE: Protected public lands like the Pike-San Isabel National Forest in Colorado help ensure that streams like this one retain their high water quality.*

*OPPOSITE PAGE, TOP: Serrate Ridge and Scree Lake, Boulder White Clouds Wilderness Area, Idaho.*

*OPPOSITE PAGE, BOTTOM: Agave flower, New Mexico.*

retirement income in the area.

A full accounting of all sources of income is necessary to understand the important role that entrepreneurs and retirement and investment income play in the regional economy. An economic impact analysis that excludes these sources of income is inadequate and misleading.

**RECOMMENDATION 2.** The economic impact analysis for public land management plans should include an analysis and discussion of the indirect role protected public lands play in the regional economy in attracting retirees and entrepreneurs, including those in knowledge-based businesses, service sector businesses, recreation and tourism businesses and other sectors.

Public wildlands often define the character of an area and represent an important component of the quality of life for local residents and future generations. Their protection enables the lifestyles of western communities to continue. The socioeconomic analysis also must account for these economic benefits.

As discussed above, a growing number of economists are recognizing that protecting amenities and the natural environment are key in attracting new residents and businesses to western communities, and that therefore the environment is the engine propelling the regional economy. Researchers have long known that a community's ability to attract and retain a high-quality workforce is key to its prosperity. The natural environment, including the amenities found on or near protected public lands, has been found to be important in attracting such workers and firms. Given these findings, the economic impact analysis of management alternatives for public lands should fully consider the indirect role of these lands in attracting and retaining recreational and non-recreational businesses and retirees, as well as their role in encouraging entrepreneurial efforts.

The potential impacts that public land management alternatives will have on non-extractive industries and on the ability of proprietors to start and grow businesses (especially if extractive activities are accelerated on public lands in the area) should be assessed, including the potential impacts of public land management alternatives on the overall makeup of the economy of the area, as well as the factors that have attracted new businesses to the area.

## Brewing Success in Fort Collins, Colorado

New Belgium Brewing has been committed to sustainable business practices since its inception in 1991. Water is a key ingredient of beer, and water conservation is also an important environmental concern in the western United States. As brewers, New Belgium takes that seriously. New Belgium relies on clean water for its great-tasting beers. That is part of the reason they take it upon themselves to ensure that the watershed in which they reside remains healthy and clear.

New Belgium practices the three "R's" of environmental stewardship—reduce, reuse, recycle. Motion sensors on the lights throughout the building and low-water landscaping reduce energy and water use. New Belgium reuses heat for the brewing process, cleaning chemicals, water and much more. Recycling at New Belgium takes on many forms, from turning "waste" products into something new and useful (like spent grain to cattle feed), to supporting the recycling market in creative ways (like turning keg caps into table surfaces). New Belgium also buys recycled whenever possible.

**Jeff Lebesch and Kim Jordan**
*Founders, New Belgium Brewing*

New Belgium's founders chose the location for their business based on its access and proximity to Colorado's natural beauty. As a business based on ecological responsibility, made up of people concerned about conservation and sustainability, New Belgium recognizes that they rely on a healthy environment to make their delicious brews, and that without protected lands and waters, it may be much more difficult to produce the quality product they now make.

18

BLM_0107042



**RECOMMENDATION 3.** The socioeconomic analysis must account for the economic importance of the recreation, hunting and fishing that occurs on public land. The recreation opportunities provided by Wilderness-quality public lands yield direct economic benefits to local communities. The socioeconomic analysis must include an analysis of the income and jobs associated with recreation, hunting and fishing under each alternative.

The impact analysis should utilize data on participation in all recreation activities (hunting, fishing, hiking, camping, backpacking, biking, skiing, wildlife watching, boating, ORV use, etc.), as well as data on expenditures by recreation visitors in the region. If these are not readily available they should be collected. These data should be used to analyze the economic impact of expenditures by recreationists, hunters and anglers on area businesses and local economies. Also, the analysis should examine the role of lodging taxes, sales taxes and property taxes in the local economy. Finally, the potential impact of public land management alternatives on recreation, hunting and fishing businesses should be examined.

**RECOMMENDATION 4.** The socioeconomic analysis of oil and gas drilling proposals must be based on the oil and gas resources that are economically recoverable, not the resources that are only technically recoverable. The economic analysis of recoverable resources should fully account for the hidden costs to communities and the environment associated with drilling (Morton et al. 2004).

Recent energy-driven land management plans have consistently exaggerated the energy potential of public lands by ignoring the observable economic costs of drilling and production. Such oversight

BLM_0107043

will also exaggerate the importance of the oil and gas industry in the regional economy. In addition, oil and gas drilling is associated with hidden costs—increased road maintenance and law enforcement costs, increased air and water pollution, declining property values, etc.—that must be internalized in the socioeconomic analysis completed in support of decisions affecting public land. For more details on these recommendations see Morton et al. (2004).

## Plan for Amenity Development

Protecting public lands can also lead to development, and managing this development is important to ensure the protection of natural amenities. While amenity development may be a desirable alternative to the boom and bust of an extractive industry-based economy, it does—like any development—have economic and ecological costs (Hansen et al. 2002, Rasker et al. 2004). Ironically, some of these costs are similar to the hidden costs associated with oil and gas drilling. For example, negative ecological effects of amenity development can include loss of native species, changes in natural disturbance regimes (such as wildfires) and the spread of invasive species (Hansen et al. 2002). In addition, areas that grow too quickly, regardless of the drivers of this growth, can experience rising housing costs (Morton 2000, Rasker et al. 2004). This can sometimes squeeze long-time residents out of the area, diminishing the social amenities that drew new residents to the area in the first place. Community planners must prepare for these possibilities and develop strategies to ensure that an "amenity boom" doesn't have the same negative impacts as an oil and gas boom.

The Sonoran Institute (2007) succinctly states the challenges faced by growing communities in the Rockies:

> Ranches and open space are giving way to subdivisions. Homes and jobs are often far apart, and streets are gridlocked. Many rural communities outgrow their small town character. Retirees also look south of the border for affordable, resort-style living. Sources of energy and water are strained.

Communities that take an active role in planning for amenity-driven growth are better able to face these challenges and find a balance between growth and

### Building a Wilderness Business in Choteau, Montana

**Gene Sentz**
*Wilderness Guide*



Gene Sentz first hiked into Montana's Rocky Mountain Front more than 40 years ago. A retired teacher who still works as a mountain guide and mule packer out of Choteau, Montana, Sentz has long known that protected, pristine places provide both a high quality of life and solid economic opportunities.

Reflecting on the Front, Sentz says: "I knew I'd found heaven. The discovery was confirmed when I landed a seasonal job in the mountains and rode horseback into the Bob Marshall Wilderness. The 'Front' has been my home ever since.

"Today more and more Americans are attracted by, and have come to treasure, our national wildlands in the West," continues Sentz. "The intrinsic values of these precious public lands naturally cause citizens to want to live and work near them."

Sentz feels extremely fortunate that the niche he's carved out for his business, guiding hunters and summer guests along the peaks and prairies that make up the Front, enables him to experience some of his favorite wild places daily: "The splendid alpine scenery, unbeatable wildlife resource and unbroken habitat of this special place are the qualities that drew me here to begin with."

He adds, "The more we experience our public lands, the more we want to keep them free from misuse. We learn to love them like part of ourselves."

maintaining their quality of life (Howe et al. 1997). It is also important for communities to make sure that the broadest spectrum of residents participate in the

planning process, and that the process is based on a sound understanding of local resources and utilizes the assets and human capital already existing in the community. Successful communities also take an active role in protecting local amenities by purchasing open space and implementing other strategies, such as conservation easements, which complement the existing management of local public lands. Another land management planning strategy that can help to ensure that the ecological values and amenities of open space and wildlands are protected include integrating private and public land management (Hansen et al. 2002). By employing such strategies, communities can slow down the pace and scale of amenity-based development, ensuring that scenic beauty, small-town character and a sense of community are not sacrificed in the name of growth.

The Rocky Mountain region can capitalize on its wealth of natural amenities and still retain the high quality of life that residents treasure by maintaining a diverse economy (including a diverse service sector), maintaining affordable housing, developing carefully planned growth guided by zoning and protecting open space (including agricultural lands and ranches).

## Slow the Pace of Oil and Gas Drilling

**M**uch of our discussion of the threats to economically important natural amenities has centered on oil and gas drilling. Economic diversity is the key to sustaining healthy communities over the long term, and the oil and gas industry can be a part of a diverse mix of industries in the Rockies. However, when drilling takes place at the rapid pace and over the large expanses of land as seen in recent years, our natural amenities suffer, leaving western communities more vulnerable to the inevitable downturns in the oil and gas industry.

By slowing the pace of oil and gas development, the upheaval and loss of economic diversity can be minimized (Haefele and Morton 2007). While some places are simply too wild to drill and should be protected, in areas where drilling is appropriate we recommend phased development of oil and gas resources. Phased development involves incrementally opening an area for development, limiting the total area developed and/or limiting the percent of the area disturbed at any one time. Phased development

*BELOW: Air pollution from oil and gas operations (such as this compressor station) near Pinedale, Wyoming, has resulted in declining visibility in the nearby Bridger Wilderness Area and Yellowstone National Park.*



BLM_0107045

can also involve: 1) limiting the number of drilling permits that will be granted; 2) limiting the number of rigs permitted to operate in an area at one time; and 3) developing one area at a time, only moving to a new area once the first area is fully restored to baseline conditions.

Collecting baseline data and monitoring socioeconomic and environmental impacts are essential components of phased development. Oil and gas drilling would be initiated at a small scale and expanded only if the monitoring data show no significant environmental or socioeconomic impacts, and show that disturbed areas have been successfully restored to prior conditions. Implementing phased development can help moderate the boom and bust impacts of oil and gas drilling on communities, protect the other values associated with public lands and protect the natural amenities that are the backbone of the western economy.

Extending the period over which the development takes place will allow communities to better absorb the social and economic impacts of oil and gas development. The potential influx of new residents will be dampened. At the same time it may be more likely that local residents will have time to acquire the skills necessary to take advantage of the employment that drilling and

## Conclusion

The Rocky Mountain region is one of the fastest growing in the country. This growth is fueled in part by an abundance of protected public lands and the natural amenities they provide. These trends are likely to continue and even intensify in the future. The current boom in oil and gas drilling, however, is threatening the long-term health of the West's regional and local economies. We hope that this report and the recommendations contained within will provide citizens, communities and decision makers with better information for balancing the extraction, recreation and amenity values of our public lands in the Rocky Mountains.

production may bring. This may reduce many of the negative social impacts of rapid oil and gas drilling and reduce the added costs to communities. Revenue to the local government will be spread out over a longer time, allowing for a longer, more predictable and stable revenue stream (Haefele and Morton 2007).

## Getting Inspired to Make a Difference in Paonia, Colorado

Chaco was founded in 1989 in the small western-Colorado town of Paonia. After rafting the Gunnison River, which flows through town, river guide and custom footwear maker Mark Paigen realized that Paonia's mild climate and slow pace of life made it a great place to live and build a business. He set up shop near the banks of the Gunnison and set out to create a great-fitting river sandal that would outlast the competition—one that could be repaired rather than thrown into a landfill.



**Chaco**
*Casual Footwear Manufacturer*

Now, Chaco employs 143 people, distributes its products in 21 countries, and continues to cultivate a business model and corporate culture inspired by its beautiful natural setting. Chaco donates 10 percent of its profits to organizations dedicated to caring for people and the planet, for example, and pays its employees to bike to work, volunteer their time and advance their education. In a town like Paonia, where bike paths glide past pleasant scenery and opportunities to get involved in the community abound, it's easy for employees to make a difference in these ways.

With a keen understanding of what's at stake, Chaco has watched with concern as the Rocky Mountain region has become ground zero for rapid oil and gas development. In response, the company has become involved in efforts to find a path away from fossil fuels. This year, Chaco purchased 500 megawatt-hours of wind-powered Green Certificates to match 100 percent of the company's electrical usage and reduce its carbon dioxide emissions by nearly 700,000 pounds.

BLM_0107046

# END NOTES & PHOTO CREDITS

## End Notes

1 Wildlands on federal public lands include National Parks, designated Wilderness Areas, Wilderness Study Areas, Citizen-Proposed Wilderness Areas, Roadless Areas, National Monuments, National Wildlife Refuges and public land in the Bureau of Land Management's National Landscape Conservation System.

2 See for example: "Silt couple selling 110-acre ranch," *Grand Junction Daily Sentinel*, 26 February 2007; "Boom hits county roads," *Casper Star-Tribune*, 13 December 2006; "Poachers making a killing in West's oil, gas fields," *USA Today*, 15 February 2007; and "Boomtown Blues," *The New Yorker*, 5 February 2007.

3 It should be noted that while many communities in the Rockies do receive a great deal of income from oil and gas royalties and other taxes, these revenues should be considered in their proper context—compared with the many costs that oil and gas drilling imposes on communities. When these costs are considered, revenue from oil and gas drilling will be less important to the overall economy even in these communities.

## Photo Credits

Cover   Young hikers by Greg Aplet; Alpine vista by Mike Knowles; Aspen by Mike Knowles
Page 1   Hiker by Mark Pearson/TWS
Page 2   Rafting by Ann Morgan
Page 4   Sunset by Steve Glenn/TWS
Page 5   Wilderness by John McCarthy/TWS
Page 6   Hummingbird courtesy Patrick Williams; Hiker by Laurence Parent/TWS
Page 8   Canyon hikers by Pete Morton
Page 10   Chetro Ketl by Mike Knowles
Page 9   Lizard by Michelle Haefele; Pat Buls by Neri Holguin
Page 11   Signs by Pete Morton
Page 12   The Brudenells by Bruce Thomas
Page 13   Canoeing by Bill Cunningham/TWS; Trout illustration courtesy USFWS; Fisherman by Aaron Clark
Page 14   Pack trip courtesy Black Otter Guide Services; Young camper by Pete Morton; Tyler Welshimer by Brian Welshimer
Page 15   Elk courtesy Sue Mathews/USFWS
Page 16   Willow Canyon Outdoor by Allen Gilberg
Page 17   Skiier by Pete Morton
Page 18   Stream by Mike Knowles; Jeff and Kim courtesy New Belgium Brewing
Page 19   Scree Lake by John McCarthy/TWS; Agave by Susan Solarz/TWS
Page 20   Courtesy Gene Sentz
Page 21   Compressor station by Pete Morton
Page 22   Courtesy Chaco
Page 28   Salida by Michelle Haefele
Inside back   Pronghorn by Pete Morton
Back   Campers courtesy Mark Good/WildMontana.org; Mountain goat courtesy USFWS; Hikers by Pete Morton

## Citation

Haefele, M., P. Morton, and N. Culver. 2007. Natural Dividends: Wildland Protection and the Changing Economy of the Rocky Mountain West. Washington, D.C. The Wilderness Society.

Editor: Sarah DeWeerdt

Design/format: Mitchelle Stephenson

23

BLM_0107047

# REFERENCES

Alward, G.S., J.R. Arnold, M.J. Niccolucci, and S.A. Winter. 2003. *Evaluating the Economic Significance of the USDA Forest Service Strategic Plan (2000 Revision): Methods and results for programmatic evaluations.* USDA Forest Service Inventory and Monitoring Report No. 6, Fort Collins, CO.

BBC Research and Consulting. 2001. Measuring the impact of coalbed methane wells on property values. Appendix B of the *La Plata County Impact Report.* Appendix B available from http://co.laplata.co.us/pdf/plan_doc/final_impact rpt/final_ir_appb.pdf. Full report available from http://co.laplata.co.us/publications.htm.

Bennett, K., and M.K. McBeth. 1998. Contemporary western rural USA economic composition: Potential implications for environmental policy and research. *Environmental Management* 22(3): 371-381.

Beyers, W.B., and D.P. Lindahl. 1996. Lone eagles and high flyers in rural producer services. *Rural Development Perspectives* 11(3): 2-10.

Chakraborty, K., and J.E. Keith. 2000. Estimating the recreation demand and economic value of mountain biking in Moab, Utah: An application of count data models. *Journal of Environmental Planning and Management* 43(4): 461-469.

Cordell, H.K., and M.A. Tarrant. 2002. Chapter 11: Forest based recreation. Pages 269-282 in: Wear, D.N., and J.G. Greis, Eds. *Southern Forest Resource Assessment.* Gen. Tech. Rep. SRS-53. U.S. Department of Agriculture, Forest Service, Southern Research Station, Asheville, NC. Available from http://www.srs.fs.usda.gov/sustain/report/socio6/socio6.htm.

Deller, S.C. 1995. Economic impacts of retirement migration. *Economic Development Quarterly* 9(1): 25-38.

Deller, S.C., T. Tsai, D.W. Marcouiller, and D.B.K. English. 2001. The role of amenities and quality of life in a rural economic growth. *American Journal of Agricultural Economics* 83(2): 352-365.

Duffy-Deno, K.T. 1998. The effect of federal wilderness on county growth in the intermountain western United States. *Journal of Regional Science* 38(1): 109-136.

Fix, P.A., and J.B. Loomis. 1997. The economic benefits of mountain biking at one of its meccas: An application of the travel cost method to mountain biking in Moab, Utah. *Journal of Leisure Research* 29(3): 342-352.

Fortmann, L.P., J. Kusel, and S.K. Fairfax. 1989. Community stability: The foresters' fig leaf. Pages 44-50 in: Le Master, D.C., and J.H. Beuter, Eds. *Community Stability in Forest-Based Economies.* Timber Press, Portland, OR.

Freudenburg, W.R. 1992. Addictive economies: extractive industries and vulnerable localities in a changing world economy. *Rural Sociology* 57: 305-332.

Freudenburg, W.R., and R. Gramling. 1994. Natural resources and rural poverty: A closer look. *Society and Natural Resources* 7: 5-22.

Haefele, M., and P. Morton. 2007. Oil and gas drilling in the Rockies: The influence of pace and scale on community socioeconomic impacts. *In review.*

Hansen, A.J., R. Rasker, B. Maxwell, J.J. Rotella, J.D. Johnson, A.W. Parmenter, U. Langner, W.B. Cohen, R.L. Lawrence, and M.P.V. Kraska. 2002. Ecological causes and consequences of demographic change in the New West. *BioScience* 20(2): 151-162.

Henderson, J. 2004. Wildlife recreation: Rural America's newest billion-dollar industry. *The Main Street Economist,* April 2004. Center for the Study of Rural America, Federal Reserve Bank of Kansas City, Kansas City, MO.

Henderson, J., and B. Abraham. 2004. Can rural America support a knowledge economy? *Economic Review,* Third Quarter: 71-95. Center for the Study of Rural America, Federal Reserve Bank of Kansas City, Kansas City, MO.

Holmes, F.P., and W.E. Hecox. 2004. Does wilderness impoverish rural regions? *International Journal of Wilderness* 10(3): 34-39.

Howe, J., E. McMahon, and L. Propst. 1997. *Balancing Nature and Commerce in Gateway Communities.* Island Press, Washington, D.C., and Covelo, CA.

Jacquet, J. 2005. *Index Crimes, Arrests, and Incidents in Sublette County 1995-2004: Trends and Forecasts.* Report prepared for the Socioeconomic Analyst Advisory Committee, Sublette County, Wyoming. Available from http://www.pinedale-online.com/socioeconomic/.

Johnson, J., and R. Rasker. 1993. The role of amenities in business attraction and retention. *Montana Policy Review* 3(2): 11-19.

Johnson, J., and R. Rasker. 1995. The role of economic and quality of life values in rural business location. *Journal of Rural Studies* 11(4): 405-416.

Johnson, T.G. 2001. The rural economy in a new century. *International Regional Science Review* 24(1): 21-37.

Kaval, P., and J.B. Loomis. 2003. *Updated Outdoor Recreation Use Values with Emphasis on National Park Recreation.* Final Report for Dr. Bruce Peacock, National Park Service, under Cooperative Agreement CA 1200-99-009, Project number IMDE-02-0070. Fort Collins, CO.

Leopold, A. 1949. *A Sand County Almanac.* Oxford University Press, London, UK.

Limerick, P.N., W. Travis, and T. Scoggin. 2002. *Boom and Bust in the American West.* Workshop Report, Center of the American West, University of Colorado, Boulder, CO. Available from http://www.centerwest.org/boom_bust.html.

Loomis, J. 2000. Economic values of wilderness recreation and passive use: What we think we know at the turn of the 21st century. Pages 5-13 in: McCool, S.F., D.N. Cole, W.T. Borrie, and J. O'Loughlin, Comps. *Wilderness Science in a Time of Change Conference, Volume 2: Wilderness within the context of larger systems, 1999 May 23-27, Missoula, MT.* Proceedings RMRS-P-15-VOL 2., U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Ogden, UT.

Lorah, P. 2000. Population growth, economic security and cultural change in wilderness counties. Pages 230-237 in: McCool, S.F., D.N. Cole, W.T. Borrie, and J. O'Loughlin, Comps. *Wilderness Science in a Time of Change Conference, Volume 2: Wilderness within the context of larger systems, 1999 May 23-27, Missoula, MT.* Proceedings RMRS-P-15-VOL 2., U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Ogden, UT.

Lorah, P., and R. Southwick. 2003. Environmental protection, population change, and economic development in the rural western United States. *Population and Environment* 24(3): 255-272.

Low, S. 2004. Regional asset indicators: Entrepreneurship breadth and depth. *The Main Street Economist,* September, 2004. Center for the Study of Rural America, Federal Reserve Bank of Kansas City, Kansas City, MO.

Low, S., J. Henderson, and S. Weiler. 2005. Gauging a region's entrepreneurial potential. *Economic Review,* Third Quarter: 61-89. Federal Reserve Bank of Kansas City, Kansas City, MO.

McGranahan, D.A. 1999. *Natural Amenities Drive Rural Population Change.* Agricultural Economics Report No. 781. U.S. Department of Agriculture, Economic Research Service, Food and Rural Economics Division, Washington, D.C.

BLM_0107048

McLeod, D., C. Kruse, and J. Woirhaye. 1998. *Results From a Land Use Survey in Sublette County, Wyoming.* Agricultural Experiment Station Publication B-1067. University of Wyoming, Laramie, WY. Available from http://agecon.uwyo.edu/EconDev/PubStorage/B-1067.pdf.

Morton, P. 1999. The economic benefits of wilderness: theory and practice. *Denver University Law Review* 76(2): 465-518.

Morton, P. 2000. A critique of the Squirrel Meadows Grand Targhee land exchange proposal, Draft Environmental Impact Statement. Appendix G in: *Final Environmental Impact Statement, Squirrel Meadows Grand Targhee Land Exchange Proposal.* USDA Forest Service, Intermountain Region, Caribou-Targhee National Forest.

Morton, P., C. Weller, J. Thomson, M. Haefele, and N. Culver. 2004. *Drilling in the Rocky Mountains: How Much and at What Cost?* Proceedings of the 69th North American Wildlife and Natural Resources Conference, Spokane, WA, March 16-20, 2004. (Also available from http://www.wilderness.org/Library/Documents/upload/Drilling-in-the-Rocky-Mountains-How-Much-and-at-What-Cost.pdf.)

Nelson, P.B. 1999. Quality of life, nontraditional income, and economic growth: New development opportunities for the rural West. *Rural Development Perspectives* 14(2): 32-37.

Outdoor Industry Foundation. 2006a. *Outdoor Recreation Participation Study 8th Edition for the Year 2005 Trend Analysis for the United States.* Outdoor Industry Foundation, Boulder, CO. Available from http://www.outdoor-industryfoundation.org/resources.research.participation.html.

Outdoor Industry Foundation. 2006b. *The Active Outdoor Recreation Economy.* Outdoor Industry Foundation, Boulder, CO. Available from http://www.outdoorindustryfoundation.org/resources.research.recreation.html.

Outdoor Industry Foundation. 2007. *State-Level Economic Contributions of Active Outdoor Recreation—Technical Report on Methods and Findings.* Southwick Associates, Inc., Fernandina Beach, FL.

Power, T. 1995. *Economic Well-Being and Environmental Protection in the Pacific Northwest: A Consensus Report by Pacific Northwest Economists.* University of Montana, Missoula, MT.

Power, T.M. 1996. *Lost Landscapes and Failed Economies.* Island Press, Covelo, CA.

Rasker, R. 1994. A new look at old vistas: The economic role of environmental quality in western public lands. *University of Colorado Law Review* 52(2): 369-399.

Rasker, R., and D. Glick. 1994. Footloose entrepreneurs: Pioneers of the New West? *Illahee* 10(1): 34-43.

Rasker, R., and A. Hansen. 2000. Natural amenities and population growth in the Greater Yellowstone Region. *Human Ecology Review* 7(2): 30-40.

Rasker, R., B. Alexander, and P. Holmes. 2003. *The Changing Economy of the West: Employment and Personal Income Trends by Region, State, and Industry, 1970-2000.* The Sonoran Institute, Tucson, AZ.

Rasker, R., B. Alexander, J. van den Noort, and R. Carter. 2004. *Public Lands Conservation and Economic Well-Being.* The Sonoran Institute, Tucson, AZ. Available from http://www.sonoran.org/programs/prosperity.html.

Rosenberger, R.S., and J.B. Loomis. 2001. *Benefit Transfer of Outdoor Recreation Use Values: A Technical Document Supporting Forest Service Strategic Plan (2000 Revision).* Gen. Tech. Rep. RMRS-GTR-72, U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Fort Collins, CO. Available from http://www.fs.fed.us/rm/pubs/rmrs_gtr72.html.

Rudzitis, G. 1999. Amenities increasingly draw people to the rural West. *Rural Development Perspectives* 14(3): 9-13.

Rudzitis, G., and H.E. Johansen. 1989. *Amenities, Migration, and Nonmetropolitan Regional Development.* Report to National Science Foundation, Department of Geography, University of Idaho, Moscow, ID.

Rudzitis, G., and R. Johnson. 2000. The impact of wilderness and other wildlands on local economies and regional development trends. Pages 14-2 in: McCool, S.F., D.N. Cole, W.T. Borrie, and J. O'Loughlin, Comps. *Wilderness Science in a Time of Change Conference, Volume 2: Wilderness Within the Context of Larger Systems, 1999 May 23-27, Missoula, MT.* Proceedings RMRS-P-15-VOL 2., U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Ogden, UT.

Shumway, J.M., and S.M. Otterstrom. 2001. Spatial patterns of migration and income change in the Mountain West: The dominance of service-based, amenity-rich counties. *Professional Geographer* 53(4): 492-501.

Snepenger, D.J., J.D. Johnson, and R. Rasker. 1995. Travel-stimulated entrepreneurial migration. *Journal of Travel Research* 34(1): 40-44.

Sonoran Institute. 2007. Creating a "civilization to match the scenery" in western North America. *Westword* 7(1):1, The Sonoran Institute, Tucson, AZ.

U.S. Census Bureau (Department of Commerce). 2001. Largest census-to-census population in US history as every state gains, Census Bureau reports. Press release, April 2, available from http://www.census.gov/Press-Release/www/releases/archives/census_2000/000718.html.

U.S. Fish and Wildlife Service (Department of the Interior) and U.S. Census Bureau (Department of Commerce). 2007. *National Survey of Fishing, Hunting, and Wildlife-Associated Recreation.* Available from http://www.census.gov/prod/www/abs/fishing.html.

Vias, A. 1999. Jobs follow people in the rural Rocky Mountain West. *Rural Development Perspectives* 14(2): 14-23.

Whitelaw, E., and E.G. Niemi. 1989. Migration, economic growth, and the quality of life. Pages 36-38 in: *Proceedings of the Twenty-Third Annual Pacific Northwest Regional Economic Conference, Corvallis, OR.*

Whitelaw, E., and 99 others. 2003. A letter from economists to President Bush and the governors of eleven western states regarding the economic importance of the West's natural environment. Available from http://www.econw.com/pdf/120303letter.pdf.

BLM_0107049

# APPENDIX

## *Sources of Data*

High-quality data are important for thorough and accurate assessments of a community's economy and the potential impacts of public land management alternatives. This section presents several sources of data at both the state and national levels that are available for both land managers and community residents.

### Economic and Demographic Data

Data are available for several economic indicators by county from the U.S. Department of Commerce, Bureau of Economic Analysis, and the U.S. Department of Labor, Bureau of Labor Statistics. The U.S. Census Bureau also tracks economic trends along with demographic trends, most by county as well. Economic profiles showing these and other trends for selected states and counties are available at The Wilderness Society's website, www.wilderness.org.

#### Selected National Level Economic and Demographic Data Sources:

Bureau of Economic Analysis (U.S. Department of Commerce): *http://www.bea.doc.gov*

Data on income, farm income, transfer payments and employment for states, counties and regions. Annual data, 1969-2000 (Standard Industry Classification) and 2001-forward (North American Industry Classification System).

Bureau of Labor Statistics (U.S. Department of Labor): *http://www.bls.gov*

Data on income, wages and salaries, employment and unemployment rates by industry, for counties, states and regions. Monthly data, 1990-2005.

Census Bureau (U.S. Department of Commerce): *http://www.census.gov*

Data on population, demographics and businesses for states and counties.

Regional Asset Indicators, Federal Reserve Bank of Kansas City: *http://www.kc.frb.org/RuralCenter/Indicators/Indicators_main.htm*

Indicators for every county in the United States covering entrepreneurship, wealth, creative workers, amenities and other attributes.

U.S. Department of Agriculture, Economic Research Service: *http://www.ers.usda.gov/Data/*

Data on natural amenities, the creative workforce, the level of urbanization and other attributes for every county in the United States.

The Sonoran Institute Economic Profile System: *http://www.sonoran.org*

Generates detailed economic profiles, including trends in employment and income, farm income, economic resilience and demographics for states, counties or groups of counties. The companion, Economic Profile System—Community (EPSC), will generate profiles to reflect just the rural or urban areas of a county.

Rasker et al. (2003) show trends in income and employment for the entire western United States, using output from the Economic Profile System.

See the EPS users manual for more information: Sonoran Institute. 2004. *Economic Profile System Users Manual.* Sonoran Institute, Tucson, AZ. Available from *http://www.sonoran.org/programs/socioeconomics/si_se_manual.html.*

#### Selected State Economic and Demographic Data Sources:

Colorado Economic and Demographic Information System: *http://www.dola.state.co.us/is/cedishom.htm*

State of Idaho, Division of Financial Management: *http://dfm.idaho.gov/*

Montana Census and Economic Information Center (CEIC): *http://ceic.commerce.state.mt.us/*

New Mexico Labor Market Information: *http://www.dol.state.nm.us/dol_lmif.html*

New Mexico Economic Development Data Center: *http://www1.edd.state.nm.us/index.php?/data/C31/*

Utah Governor's Office of Planning and Development, Demographic and Economic Analysis: *http://www.governor.utah.gov/dea/*

Wyoming Department of Administration and Information, Economic Analysis Division: *http://eadiv.state.wy.us/*

### Recreation Data

Data on recreation use in the area where a land management plan is being developed are critical to making an informed decision. Surveys of users at recreation areas can be utilized to obtain information on the levels and types of recreation use. Information on users' expenditures in the area is also important to learn the overall economic impact of public lands recreation. Federal land management agencies collect some data on recreation use of public lands. The Bureau of Land Management's Recreation Information Management System (RIMS) and the USDA Forests Service's National Visitor Use Monitoring System (NVUMS) are two examples.

The Outdoor Industry Foundation has also done research on active recreation participation (OIF 2006a) and on the economic impacts of this participation (OIF 2006b). These and other reports are available from *http://www.outdoorindustryfoundation.org/resources.research.html.*

Other information may be obtained through surveys of local residents and recreation visitors, and by using existing data on the recreation and tourism revenues to local businesses and the value of these activities to participants. The lack of complete visitation data does not justify ignoring the jobs and income from recreation. Furthermore, the Data Quality Act requires use of the best available, reliable data on all impacts and affected sectors of the economy.

Several examples of research on recreation use, values to participants and expenditures are available (a very limited sample includes: Fix and Loomis 1997, Chakraborty and Keith 2000, Loomis 2000, Cordell and Tarrant 2002, Kaval and Loomis 2003). Rosenberger and Loomis (2001) present a detailed bibliography of recreation valuation studies and present methods by which analysts can transfer estimates of the value of recreation in one area to other similar areas.

#### Data on Hunting, Fishing and Wildlife Watching:

The National Survey of Fishing, Hunting, and Wildlife-Associated Recreation: *http://www.census.gov/prod/www/abs/fishing.html*

Data at the state level on participation in and expenditures for wildlife-associated recreation from the U.S. Department of the Interior, Fish and Wildlife Service and U.S. Department of Commerce, Census Bureau.

The link above contains detailed reports for each state from the 2001 report. A more recent (2007) preliminary national summary is available from *http://library.fws.gov/nat_survey2006.pdf.*

Colorado Division of Wildlife: *http://wildlife.state.co.us/index.asp*

Idaho Fish and Game: *http://fishandgame.idaho.gov/*

Montana Fish, Wildlife, and Parks: *http://fwp.state.mt.us/default.html*

New Mexico Game and Fish: *http://www.wildlife.state.nm.us/index.htm*

Utah Division of Wildlife Resources: *http://wildlife.utah.gov/index.php*

Wyoming Game and Fish: *http://gf.state.wy.us/*

BLM_0107050

## Industry Classification Using SIC and NAICS

Over the years there have been changes in the way that government agencies classify various industries. Income and employment data from the Bureau of Economic Analysis and the Bureau of Labor Statistics for 1969-2000 are classified according to the Standard Industry Classification system (SIC), while the most recent data (2001 and forward) are classified by the North American Industry Classification System (NAICS). NAICS was developed jointly by the United States, Canada and Mexico in order to make statistics comparable across all three countries.

NAICS provides greater detail for the service and professional sectors, which are of growing importance in the rural West and indeed all over the country. This classification scheme also includes some emerging industries such as "information," which includes the growing Internet and information phenomenon. The Bureau of Economic Analysis's Regional Economic Information System (REIS) uses SIC to classify industries and the Sonoran Institute's Economic Profile System uses SIC data from the REIS in order to show trend analyses, along with NAICS data.

We have used both SIC and NAICS data to show long-term trends in this report. In Figure 2, Farming and Ranching includes the following SIC categories for 1970-2000:
Farm proprietors' income
Farm earnings
Agricultural services
Fishing
The NAICS categories included for 2001-2005 are:
Farm proprietors' income
Farm earnings
Fishing, hunting and trapping
Agricultural and forestry support activities

Also in Figure 2, the Timber Industry includes the following SIC categories (1970-2000):
Forestry
Lumber and wood product manufacturing
Paper and allied products manufacturing
The NAICS categories included for 2001-2005 are:
Forestry and logging
Wood product manufacturing
Paper manufacturing

In Figure 4, Professional & Service Sector Income includes the following SIC categories (1970-2000):
Eating and drinking places
Finance, insurance and real estate
Services
The NAICS categories included for 2001-2005 are:
Finance and insurance
Real estate and rental and leasing
Professional and technical services
Management of companies and enterprises
Administrative and waste services
Educational services
Health care and social assistance
Arts, entertainment and recreation
Accommodation
Food services and drinking places
Other services, except public administration

Also in Figure 4, Extractive-Industry Income includes the following SIC categories (1970-2000):
Farm proprietors' income
Farm earnings
Agricultural services, forestry, fishing
Mining
Lumber and wood products manufacturing
Paper and allied products manufacturing
The NAICS categories included for 2001-2005 are:
Farm proprietors' income
Farm earnings
Forestry, fishing, related activities
Mining
Wood product manufacturing
Paper manufacturing

Total Non-Labor Income consists of transfer payments plus dividends, interest and rent. (There is no difference in non-labor income between the two classification systems; a break was included in this line in order to avoid obscuring the break in the Professional and Service Sector Income line.)

Despite incompatibilities between these classification systems, one can certainly look at a general picture of the economy over time by using both sets of data. This analysis should be applied to all the segments of the economy to see the long-term trends in both extractive and other industries along with non-labor income.

## Protected Public Lands

In 1964 Congress passed the Wilderness Act which allowed for certain areas of public lands to be protected from development as part of a National Wilderness Preservation System. Described by Aldo Leopold (1949) as "…a resource which can shrink but not grow," designated Wilderness comprises 107 million acres nationwide.

Wilderness Areas are designated by Congress, and defined by the Wilderness Act as places "where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." Designation is aimed at ensuring that these lands are preserved in their natural condition. Wilderness Areas offer outstanding opportunities for solitude or a primitive and unconfined type of recreation; such areas may also contain ecological, geological or other features that have scientific, scenic or historical value.

Other types of protected public wildlands include National Parks, National Monuments, National Conservation Areas, Wilderness Study Areas, Citizen-Proposed Wilderness Areas, Forest Service Roadless Areas, National Wild and Scenic Rivers, National Scenic Trails and National Historic Trails. While many of us are familiar with National Parks, some of the other designations are less well known. These are defined below.

National Monuments are established by the president (under the authority of the Antiquities Act of 1906) or Congress to protect objects of scientific and historical interest that are located on federal land.

National Conservation Areas are designated by Congress to provide for the conservation, use, enjoyment and enhancement of certain natural, recreational, paleontological and other resources, including fish and wildlife habitat.

Wilderness Study Areas are designated by the managing agency (for example, the Bureau of Land Management or the Forest Service) as having potential wilderness characteristics, thus making it worthy of consideration by Congress for Wilderness designation.

*Continued on next page*

BLM_0107051

**Citizen-Proposed Wilderness Areas** also have wilderness characteristics that have been identified through on-the-ground inventories conducted by citizens, who consider the areas to be worthy of Congressional designation as Wilderness and have brought them to the attention of the federal land management agency.

**Forest Service Roadless Areas** represent additional wild lands in the National Forests which have wilderness characteristics and are also expected to merit Congressional designation as Wilderness.

**National Wild and Scenic Rivers** are designated by Congress, under the authority of the Wild and Scenic Rivers Act, to protect remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural or other similar values and to preserve the river or river section in its free-flowing condition.

**National Scenic Trails and National Historic Trails** are designated by Congress under the National Trails System Act, and offer exceptional outdoor recreation along trails that have scenic, historical, natural or cultural values. Designation protects the routes and their artifacts for public use and enjoyment.



*ABOVE: Salida, Colorado was named one of America's best towns by* Outside *(August, 2004), in part because of the access to abundant outdoor recreation on nearby public lands.*

BLM_0107052



*THIS PAGE: Wildlife — like these pronghorn in Wyoming's Upper Green River Valley — are an important factor in attracting economic activity throughout the West.*

*BACK COVER, TOP: Public lands in the Rockies provide many places for family camping, such as alongside this Montana river.*

*MIDDLE: Mountain goats are found only in North America and are the largest animals to inhabit the high alpine regions of the Rockies.*

*BOTTOM: Breaking camp in Utah's canyon country.*

BLM_0107053







# THE WILDERNESS SOCIETY

### Main Office

1615 M Street, NW
Washington, DC 20036
Tel: 202-833-2300
Fax: 202-454-4337

www.wilderness.org

### Central Rockies Regional Office

1660 Wynkoop Street, Ste 850
Denver, CO 80202
303-650-5818

### Northern Rockies Regional Office

503 W Mendenhall
Bozeman, MT 59715
406-586-1600

### Idaho Regional Office

350 N 9th Street, Ste 302
Boise, ID 83702
208-343-8153

### Southwest Regional Office

600 Central Avenue SE, Ste 237
Albuquerque, NM 87102
505-247-0834

Printed in the
United States of America
by Todd Allan Printing
on recycled paper using soy inks.

© The Wilderness Society
September 2007





**HEADWATERS ECONOMICS**

www.headwaterseconomics.org

# A SocioEconomic Profile

## Delta County, Colorado

Produced by the
**Economic Profile System (EPS)**
February 13, 2009

BLM_0107055

**Delta County, Colorado**                                    <span style="color:darkred">**About EPS**</span>

## About The Economic Profile System (EPS)

This profile was produced using the 2008 version of the Economic Profile System (EPS), last updated in February 2009. EPS is designed to allow users to produce detailed socioeconomic profiles automatically and efficiently at a variety of geographic scales using the spreadsheet program Microsoft Excel.

Profiles contain tables and figures that illustrate long-term trends in population; employment and personal income by industry; average earnings; business development; retirement and other non-labor income; commuting patterns; agriculture; and earnings by industry.

Databases used for EPS profiles are from: Bureau of the Census including County Business Patterns; Bureau of Labor Statistics; and the Regional Economic Information System (REIS) of the Bureau of Economic Analysis, U.S. Department of Commerce.

EPS was developed in partnership with the Bureau of Land Management by Ray Rasker, Jeff van den Noort, Ben Alexander and Patty Gude.

EPS and Acrobat files (.pdf) of completed profiles for the West are available for free download at www.headwaterseconomics.org.

For technical questions about EPS, contact Jeff van den Noort at jeff@headwaterseconomics.org.



www.headwaterseconomics.org

**Headwaters Economics** is a high-tech nonprofit organization that offers a unique blend of research skills and on-the-ground experience based on over 20 years of work with communities, landowners, public land managers and elected officials. Our mission is to improve community development and land management decisions in the West.



www.blm.gov

**The Bureau of Land Management (BLM),** an agency within the U.S. Department of the Interior, administers 262 million surface acres of America's public lands, located primarily in 12 Western States. The BLM sustains the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.

BLM_0107056

**Delta County, Colorado**

# Table of Contents

**About the Economic Profile System**
**Table of Contents**
**Read This First**
**Demographics, Employment and Income**
    Demographics, Employment and Income — 1
    Population Trends — 2
    Population — 3
    Age and Gender — 4
    Income Distribution & Housing — 5
    Employment — 6
    Employment — 7
    Personal Income — 8
    Proprietors — 9
    Non-labor Income — 10
    Transfer Payments — 11
    Personal Income — 12
    Government Employment — 13
    Earnings Per Job — 14
    Per Capita Income — 15
    Firms by Industry — 16
    Firms by Industry in 2001 (NAICS) — 17
    Firms by Size — 18
    Unemployment Trends — 19
    Commuting — 20
    Agriculture (Business Income) — 21
**Relative Performance Comparisons**
    Relative Performance Comparisons — 22
    Specialization — 23
    Stability — 24
    Performance Comparisons — 25
**Employment and Personal Income by Industry**
    Employment and Income by Industry — 26
    Read This First — 27
    Employment (SIC) — 28
    Employment (NAICS) — 29
    Personal Income (SIC) — 30
    Personal Income (NAICS) — 31
    Wages and Employment — 32
    Data Sources — Data Sources
    Methods — Methods
    Glossary — Glossary

BLM_0107057

## Delta County, Colorado

# Read This First

There are two related systems for producing socioeconomic profiles: this one, the Economic Profile System (EPS) and the Economic Profile System Community (EPSC). For best results, use both profile systems. Below is a table highlighting how the two systems complement each other.

| | EPS | EPSC |
|---|---|---|
| Geographic level of detail | Nation<br>Region (metro, non-metro, total)<br>State (metro, non-metro, total)<br>County | Nation, Region, Division, States, Counties, County Subdivisions, Places (Towns), Indian Reservations, Congressional Districts |
| Databases used | Bureau of the Census (Census)<br>County Business Patterns (CBP)<br>Bureau of Labor Statistics (BLS)<br>Bureau of Economic Analysis (BEA), Regional Economic Information System (REIS) | Bureau of the Census, Decennial Census of Population and Housing, 1990, 2000. (1990 to 2000 comparisons at the county level only) |
| Time series used | Continuous data from 1970 to the most recent data available. | 2000. At the county level only 1990 to 2000 comparisons can be made to show changes in age and household income distribution. |
| Advantages | Long-term trend analysis including trends in employment and personal income by sector, the number of businesses establishments by type and size, and non-labor sources of income such as retirement and age-related income.<br>Wages by Industry.<br>Counties are compared to states and nation. Key indicators of performance are benchmarked against the US medians. | Age distribution, race, housing costs, housing affordability, education rates, poverty.<br><br>Finer geographic detail. |
| Disadvantages | For some counties employment and personal income data may be suppressed for some industries and for some years. EPS includes a system for estimating these data gaps. | Census data is never suppressed, but it is less useful than REIS data used in EPS to see long-term trends by industry; it is only available only for 2000 with limited comparisons to 1990. |

## Important notes:

1) Total employment figures from the Regional Economic Information System (used in most of EPS) and the other sources can differ for the following reasons:
   - Census employment figures are reported by place of residence, while BEA REIS and the other sources are by place of work.
   - BEA REIS counts all jobs, regardless of whether part-time or whether a person has several jobs. For example, if a person has three part-time jobs, they count it as three jobs.
   - In some areas seasonality may play a role: the census is taken in the spring, a shoulder season for many "resort" areas, while BEA REIS data is an annual average.
   - BEA REIS includes sole proprietors and government employment while County Business Patterns and BLS Wages do not.
   - Earnings from BEA REIS on pages 14 and 25 include the value of benefits while the wages on page 32 from the BLS do not.

2) Tables and charts may be copied from Excel into any other program, like Word or PowerPoint: highlight the selection, choose copy from the edit menu, then open Word or PowerPoint and insert by choosing "Paste Special" in the Edit Menu. We recommend that you paste charts as a picture.

3) This profile also shows business cycles, represented as vertical bars on selected charts.

4) EPS is updated every year with the latest figures.

5) All income figures in this profile (except for the graph on the top of page 5) are adjusted for inflation reported in 2006 dollars.

Introduction

BLM_0107058

**Delta County, Colorado**       <span style="color:darkred">**Demographics, Employment and Income**</span>

The following pages (2-25) contain long-term trends in demographics, employment and income.  No disclosure restrictions occur in this section.

## In this section you will learn about:

1. Changes in population, age distribution, household income distribution and housing affordability.
2. Comparisons of the county to the state and the nation.
3. Employment and income by type: proprietors versus wage and salary.
4. Personal income by type: labor versus non-labor income.
5. The role of transfer payments.
6. How well does this area recover from recessions?
7. Trends in government employment.
8. Earnings per job versus per capita income.
9. Growth in firms by size and industry type.
10. Unemployment rates.
11. Cross-county flow of dollars via commuting.
12. Trends in agricultural businesses.

## Highlights - In Delta County, Colorado:

These highlights are based on how this area compares to the distribution of all of the counties in the United States.  See the methodology section at the end for more information.
- Population Growth (Annualized rate, 1970-2006) was somewhat fast.
- Employment Growth (Annualized rate, 1970-2006) was somewhat fast.
- Personal Income Growth (Adjusted for Inflation, Annualized rate, 1970-2006) was somewhat fast.
- Non-labor Income Share of Total in 2006 was somewhat high.
- Median Age* was old.
- Per Capita Income (2006) was somewhat low.
- Average Earnings Per Job (2006) was somewhat low.
- Education Rate* (% of population 25 and over who have a college degree) was somewhat high.
- Education Rate* (% of population 25 and over who have less than a high school diploma) was roughly average.
- Employment Specialization* was roughly average.
- Rich-Poor Ratio* (for each household that made over $100K, how many households made less than $30K) was roughly average.
- Housing Affordability in 2000 (100 or above means that the median family can afford the median house)* was less affordable.
- Government share of Total employment was roughly average.
- Unemployment Rate in 2007** was somewhat low.

* from 2000 US Census  ** from Bureau of Labor Statistics

BLM_0107059

## Delta County, Colorado

# Population Trends

## Population

- From 1970 to 2006 population grew by 14,594 people, a 95% increase in population.

- At an annual rate, this represents an increase of 1.9%.



The vertical shaded bars on the figure below represent the last five recession periods: November 1973 to March 1975; January 1980 to July 1980; July 1981 to November 1982; July 1990 to March 1991; March 2001 to November 2001.  More information about recessions is available on the next page.

## Population Growth Compared to the State and the Nation

- Over the last 36 years population growth in Delta County, Colorado has been slower than Colorado and faster than the nation.

- Population growth is not generally impacted by national recessions.

- Data is indexed by dividing by the value in 1970 times 100.  A value of 100 indicates that it has not changed since 1970.



**Source: BEA REIS 2006 Table CA30**

Demographic, Employment and Income Trends

BLM_0107060

**Delta County, Colorado**

# Population

## How well do we recover from recessions?

An important indicator of economic performance is the ability to recover quickly from recessions.

A recession is defined by the National Bureau of Economic Research as "a significant decline in activity spread across the economy, lasting more than a few months, visible in industrial production, employment, real income, and wholesale-retail sales."

The graph below shows how well we have recovered from the last five recessions. The recovery periods are from the end of one recession (the trough) to the beginning of the next recession (the peak).

This type of graph is repeated throughout the profile to show how the area recovers from recessions compared to the state and the nation.

See www.nber.org/cycles.html for more information about business cycles.

- in the latest recovery (2001 to 2006), population growth in Colorado (up 1.5%) outpaced Delta County, Colorado and the United States.

- Similarly, in the last recovery (1991 to 2001), Colorado (up 2.7%) grew the fastest.

- In the recovery from 1982 to 1990, Colorado (up 1.0%) grew the fastest.



Population Growth During Recent Recoveries - Annualized % Change from Trough to Following Peak

**Source: BEA REIS 2006 Table CA30**

BLM_0107061

## Delta County, Colorado

# Age and Gender

**(From EPSC)**

| Population by Age and Sex | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | | Under 20 years | | 40 - 54 (Baby Boom in 2000) | | 65 years and over | | Median Age | Density (Pop. per sq. mi.) |
| | Number | | Number | Share | Number | Share | Number | Share | | |
| **Total Population** | | | | | | | | | | |
| 2000 | 27,834 | | 7,291 | 26% | 6,221 | 22% | 5,473 | 20% | 42.3 | 24.4 |
| 1990 | 20,980 | | 5,571 | 27% | 3,662 | 17% | 4,691 | 22% | 40.7 | 18.4 |
| 10 Yr. Change | 6,854 | | 1,720 | 0% | 2,559 | 5% | 782 | -3% | 1.6 | 6.0 |
| 10 Yr. % Change | 33% | | 31% | | 70% | | 17% | | 4% | 33% |
| **2000 Sex Breakout** | | | | | | | | | | |
| Male | 13,972 | | 3,785 | 27% | 3,095 | 22% | 2,510 | 18% | 41.0 | |
| Female | 13,862 | | 3,506 | 25% | 3,126 | 23% | 2,963 | 21% | 43.9 | |
| Male/Female Split | 50% / 50% | | 52% / 48% | | 50% / 50% | | 46% / 54% | | | |

2000 Table SF1 - P12 & 1990 SF1 Table P05 & P12

- The population has gotten older since 1990. The median age in 2000 is 42.3 years, up from 40.7 years in 1990.

- The largest age category is 45 to 49 years old (2,116 people or 7.6% of the total).

- Total Population in 2000 was 27,834 people, up 33% from 20,980 in 1990.

- The age group that has grown the fastest, as a share of total, is 45 to 49 years , up 976 people. Their share of total rose by 2.2%

In the graphs below, changes in population by age are shown two ways. The "Change in Population" graph illustrates how each age bracket has changed in the last 10 years. The "Change in Share" graph illustrates how each category has changed as a share of total. Note that an age bracket can have an increase in population while declining as a share of total. The "Change in Share" graph usually demonstrates how the baby boom has caused a demographic shift in the population (growth in the 40-60 age brackets).

Note: In aggregated profiles, medians are interpolated.



**Source: Census 2000 and Census 1990**

Demographic, Employment and Income Trends

BLM_0107062

**Delta County, Colorado**

# Income Distribution & Housing
**(From EPSC)**

## Income Distribution - Households

- In 1999, for every household that made over $100K, there were 9.1 households that made under $30K. 10 years earlier, for every household that made over $100K, there were 78.1 households that made under $30K.

- Please note that the income distribution is not adjusted for inflation so some of the changes are due to inflation.



Household Income Distribution (Not adjusted for inflation)



## Housing Affordability - Owner Occupied

- The housing affordability index is 116, which suggests that the median family can afford the median house. *

- Housing has become less affordable in the last decade, from 127 in 1990 to 116 in 2000.

| Owner Occupied Housing Affordability | 1990 | 2000 |
|---|---|---|
| Specified owner-occ. housing units: Median value (2000 $'s) | $ 68,511 | $ 115,500 |
| % of median income necessary to buy the median house | 20% | 22% |
| Income required to qualify for the median house | $ 23,107 | $ 32,637 |
| Housing Affordability Index: (100 or above means that the median family can afford the median house.)* | 127 | 116 |

Universe: Specified owner-occupied housing units     Census SF3 - H76

| Income in: | 1989 | 1999 |
|---|---|---|
| Per capita income | | $ 17,152 |
| Median household income (Adj. for Inflation in 2000 $) | $ 24,416 | $ 32,785 |
| Median family income  (Adj.for Inflation in 2000 $) | $ 29,245 | $ 37,748 |

Universe: Total population, Households, Families     Census SF3 - P82,P53,P77

\* Note: The housing affordability figures assume a 20% down payment and that no more than 25% of a family's income goes to paying the mortgage. It is based on an interest rate of 10.01% in 1990 and 8.03% in 2000. Use this statistic as a comparative, rather than absolute, measure.

**Source: Census 2000 and Census 1990**

BLM_0107063

## Delta County, Colorado

# Employment

### Long term trend



- From 1970 to 2006, 9,991 new jobs were created.

- From 1970 to 2006, the majority of job growth, 62% of new jobs, was in wage and salary employment (people who work for someone else).

- Wage and salary employment (people who work for someone else) contributed 62% of new employment from 1970 to 2006, and 57% of new employment since 1995.

- In 1970, proprietors represented 44.0% of total employment; by 2006, they represented 40.4%.



━━━ Wage and salary jobs ━ ━ ━ Number of proprietors

| Wages and Salaries vs. Proprietors Changes from 1970 to 2006 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1970 | % of Total | 1995 | 2006 | % of Total | New Employment (70-06) | % of New Employment | New Employment (95-06) | % of New Employment |
| Total full-time and part-time employment | 5,803 | | 11,167 | 15,794 | | 9,991 | 100.0% | 4,627 | 100.0% |
| Wage and salary jobs | 3,248 | 56.0% | 6,793 | 9,413 | 59.6% | 6,165 | 61.7% | 2,620 | 56.6% |
| Number of proprietors | 2,555 | 44.0% | 4,374 | 6,381 | 40.4% | 3,826 | 38.3% | 2,007 | 43.4% |
| Number of nonfarm proprietors 5/ | 1,800 | 31.0% | 3,315 | 5,265 | 33.3% | 3,465 | 34.7% | 1,950 | 42.1% |
| Number of farm proprietors | 755 | 13.0% | 1,059 | 1,116 | 7.1% | 361 | 3.6% | 57 | 1.2% |

**Proprietors** include sole proprietorships, partnerships, and tax-exempt cooperatives. A sole proprietorship is an unincorporated business owned by a person. A partnership is an unincorporated business association of two or more partners. A tax-exempt cooperative is a nonprofit business organization that is collectively owned by its members.

*Wage and salary* employment refers to employees.

**Source: BEA REIS 2006 Table CA30**

BLM_0107064

**Delta County, Colorado**  <span style="color:darkred">**Employment**</span>

## How well do we recover from recessions?

- In the latest recovery (2001 to 2006), employment growth In Delta County, Colorado (up 3.0%) has outpaced Colorado and the United States.

- Similarly, in the last recovery (1991 to 2001), Delta County, Colorado (up 4.3%) grew the fastest.

- In the recovery from 1982 to 1990, the United States (up 2.5%) grew the fastest.



Employment During Recent Recoveries -
Annualized % Change from Trough to Following Peak

## Job Growth Compared to the State and the Nation

- Over the last 36 years population growth in Delta County, Colorado has been slower than Colorado and faster than the nation.

- Some areas can experience employment gains even during recessions.  If so, check to see how much is due to migration and population changes.



Jobs Compared to the State and the Nation

**Source: BEA REIS 2006 Table CA30**

Demographic, Employment and Income Trends                    Page 7

BLM_0107065

## Delta County, Colorado

# Personal Income

## Long term trend

- From 1970 to 2006, personal income added $517 million in real terms.

- The annualized growth rate was 3.2%.



Total Personal Income

## Importance of Proprietors

- In the last 36 years, wage and salary disbursements grew at an annual rate of 3.4%, outpacing proprietors' income which was roughly unchanged.



Wage and salary disbursements ▪▪▪▪ Proprietors' income

## Wages and Salaries vs. Proprietors

| All income in millions of 2006 dollars | 1970 | 1970 % of Labor | 1995 | 1995 % of Labor | 2006 | 2006 % of Labor | New Income 70-06 | % of New Income |
|---|---|---|---|---|---|---|---|---|
| Labor Sources | 161 | 100% | 257 | 100% | 431 | 100% | 270 | 100.0% |
| Wage and salary disbursements | 78 | 48% | 167 | 65% | 256 | 59% | 179 | 66.1% |
| Proprietors' income | 67 | 42% | 37 | 14% | 47 | 11% | (20) | NA |
| Nonfarm proprietors' income | 62 | 38% | 40 | 16% | 59 | 14% | (3) | NA |
| Farm proprietors' income | 5 | 3% | (3) | -1% | (12) | -3% | (17) | NA |

**Wage and salary** is monetary remuneration of employees, including employee contributions to certain deferred compensation programs, such as 401(K) plans.

**Proprietors'** income includes income from sole proprietorships, partnerships and tax-exempt cooperatives. A sole proprietorship is an unincorporated business owned by a person. A partnership is an unincorporated business association of two or more partners. A tax-exempt cooperative is a nonprofit business organization that is collectively owned by its members.

**Source: BEA REIS 2006 Table CA05N and CA30**

Demographic, Employment and Income Trends

BLM_0107066

## Delta County, Colorado     # Proprietors

### Definitions:
"Proprietors" refers to employment and income from sole proprietorships, partnerships, and tax-exempt cooperatives.
"Wage and salary" refers to employees; people who work for someone else.

### Are proprietors an important indicator of economic health?
Growth of proprietor employment and income can be a healthy sign that opportunities for entrepreneurship exist.  Another way to gauge the health of small business growth is to look at changes in businesses by type and size of establishment (pages 16-18).

Growth of proprietors can also mean that a rising number of people in the community want to (or need to)  have side jobs in addition to their wage and salary jobs.  When this is the case, earnings from second jobs can pull down average wages. To see if this is a sign of stress, look for other potential stress indictors in this profile: unemployment rates over time and changes in earnings per job.

### Proprietors' Share of Total (Income vs. Employment)

- In 2006, proprietors' share of total employment (40%) was  higher than proprietors' share of total income (6%) .

- From 1970 to 2006, proprietors' income share of total fell by 77.5%, while proprietors' employment share of total fell by 8.2%.



— Employment  — Income

### How are Proprietors Doing?

- From 1970 to 2006, average wage and salary disbursements grew at an annualized rate of 0.4% (adjusted for inflation), faster than average nonfarm proprietors' income which fell by 3.1%.

- In 2006, average wage and salary disbursements were $27,227 (adjusted for inflation), more than average nonfarm proprietors' income ($11,124).

- In 1970, it was the other way around. Average nonfarm proprietors' income was $34,251 (adjusted for inflation), more than average wage and salary disbursements ($23,891).

- If these shares vary widely, it suggests that proprietors and wage earners have different earnings.



— Average wage and salary disbursements
—■— Average nonfarm proprietors' income

**Source: BEA REIS 2006 Table CA30**

BLM_0107067

## Delta County, Colorado

# Non-labor Income

The term "Non-Labor Income" is also referred to by some economists as "Non-Earnings Income".  It consists of:

- Dividends, Interest and Rent (collectively often referred to as money earned from investments).
- Transfer Payments (payments from governments to individuals such as Medicare, Social Security, unemployment compensation, disability insurance payments and welfare).  See the next page for a breakout of transfer payments.

- In the last 36 years, non-labor sources grew at an annual rate of 3.9%, outpacing labor sources which grew at a 2.8% rate.

- 43.4% of total personal income in 2006 was from non-labor sources.

- 47.7% of new income from 1970 to 2006 was from non-labor sources.



Non-labor income under estimates retirement income because it does not include pensions (401Ks).

## Labor vs. Non-Labor

| All income in millions of 2006 dollars | 1970 | 1970 % of Total | 1995 | 1995 % of Total | 2006 | 2006 % of Total | New Income 70-06 | % of New Income | % Chg Ann. Rate 70-06 | % Chg Ann. Rate 95-06 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Personal Income | 245 | 100% | 536 | 100% | 762 | 100% | 517 | 100.0% | 3.2% | 3.2% |
| Labor Sources | 161 | 66% | 257 | 48% | 431 | 57% | 270 | 52.3% | 2.8% | 4.8% |
| Non-Labor Sources | 84 | 34% | 280 | 52% | 331 | 43% | 247 | 47.7% | 3.9% | 1.5% |
| Dividends, interest, and rent | 44 | 18% | 144 | 27% | 145 | 19% | 101 | 19.5% | 3.4% | 0.0% |
| Personal current transfer receipts | 40 | 16% | 135 | 25% | 186 | 24% | 146 | 28.2% | 4.3% | 2.9% |

Percentages do not add to 100 because of adjustments made by BEA, such as residence, social security, and others.

**Source: BEA REIS 2006 Table CA30**

BLM_0107068

## Delta County, Colorado

# Transfer Payments

### Components of Transfer Payments

| All figures in millions of 2006 dollars | 1970 | % of Total TP | 2006 | % of Total TP | New Payments 1970 to 2006 | % of New Pay-ments | Change in Share of Total (1970 - 2006) |
|---|---|---|---|---|---|---|---|
| Total transfer payments | 40.2 | | 186.0 | | 145.8 | | |
| | | | | | | | |
| Government payments to individuals | 38.0 | 95% | 180.2 | 97% | 142.2 | 97.5% | |
| Retirement & disab. insurance benefit payments | 20.6 | 51% | 78.0 | 42% | 57.5 | 39.4% | |
| Medical payments | 4.1 | 10% | 80.3 | 43% | 76.2 | 52.2% | |
| Income maintenance benefit payments ("welfare") | 7.5 | 19% | 13.6 | 7% | 6.1 | 4.2% | |
| Unemployment insurance benefit payments | 1.2 | 3% | 1.9 | 1% | 0.8 | 0.5% | |
| Veterans benefit payments | 4.5 | 11% | 5.6 | 3% | 1.1 | 0.7% | |
| Federal educ. & trng. asst. pay. (excl. vets) | 0.1 | 0.3% | 0.7 | 0.4% | 0.5 | 0.4% | |
| Other payments to individuals | - | 0.0% | 0.2 | 0.1% | 0.2 | 0.1% | |
| Payments to nonprofit institutions * | 1.3 | 3% | 4.3 | 2% | 3.0 | 2.0% | |
| Business payments to individuals | 0.8 | 2% | 1.5 | 1% | 0.6 | 0.4% | |
| | | | | | | | |
| Age-related (Retirement, Disability & Medicare) | 22.5 | 56% | 121.0 | 65% | 98.5 | 67.6% | |

## Trends in Non-Labor Income by Type

- The largest components of Non-Labor Income are from Dividends, Interest & Rent (i.e., money earned from past investments).

- In 2006 welfare represented 7.3% of transfer payments, and 1.8% of total personal income. This is down from 1970 and down from 1980.

## Components of Transfer Payments

- In 2006, 65% of Transfer Payments were from age-related sources (retirement, disability, insurance payments, and Medicare), while 7.3% was from welfare.



Trends in Non Labor Income

Dividends, Interest & Rent
Age-related (Retirement, Disability & Medicare)
Income Maintenance (Welfare)

**Source: BEA REIS 2006 Table CA35**

BLM_0107069

## Delta County, Colorado

# Personal Income

## How well do we recover from recessions?

- In the latest recovery (2001 to 2006), income growth in Delta County, Colorado (up 2.3%) outpaced the United States and Colorado.

- Alternatively, in the last recovery (1991 to 2001), Colorado (up 5.6%) grew the fastest.

- In the recovery from 1982 to 1990, the United States (up 3.3%) grew the fastest.



Income During Recent Recoveries - Annualized % Change from Trough to Following Peak

☐ Delta County, Colorado - Income  ☐ Colorado - Income  ☐ United States - Income

## Income Growth Compared to the State and the Nation

- Over the last 36 years income growth in Delta County, Colorado has been slower than Colorado and faster than the nation.

- Some areas can experience income gains even during the recessions. If so, check to see how much of the change is due to changes in earnings per job, employment, migration and population changes.



Income Compared to the State and the Nation

National Recessions   Delta County, Colorado
Colorado   United States

**Source: BEA REIS 2006 Table CA30**

Demographic, Employment and Income Trends

BLM_0107070

**Delta County, Colorado**                                    <span style="color:darkred">**Government Employment**</span>

- The majority of the growth in government employment since 1970 has been in state and local government (1,339 jobs).



- Is the size of government getting bigger? One way to answer this is to look at whether government employment has grown. If so, what type of government employment, and how does it compare to population growth?



**Source: BEA REIS 2006 Table CA25 and CA25N**

BLM_0107071

## Delta County, Colorado

# Earnings Per Job

$$\text{Average Earnings per Job} = \frac{\text{Total Wages Earned}}{\text{Total \# of Workers}}$$

- Average earnings per job, adjusted for inflation, have fallen from $26,218 in 1970 to $23,145 in 2006.

- In 2006, Average earnings per job in Delta County, Colorado ($23,145) were lower than the state ($47,832) and the nation ($47,286).



Earnings Per Job & Per Capita Income

### How well do we recover from recessions?

- In the current recovery (2001 to 2006), earnings per job growth in the United States (up 0.7%) have outpaced Delta County, Colorado and Colorado.

- Alternatively, in the last recovery (1991 to 2001), Colorado (up 2.3%) grew the fastest.

- In the recovery from 1982 to 1990, the United States (up 0.9%) grew the fastest.



Earnings Per Job

### Reasons why earnings per job may change over time:

1) Average earnings per job statistics include full and part-time employment. In some counties only a portion of the eligible workforce works full-time, driving down wage statistics. Run an EPSC profile to see the percentage of people working full-time.

2) Communities with an increase in tourism may see a decline in earnings due to a rise in seasonal (part-time) workers.

3) Communities that have established themselves as regional retail trade centers may see a decline in wages due to the low wages paid in retail trade.

4) Structural changes may have resulted in the loss of relatively high-wage occupations. Look at the long-term trends in employment, by industry, and compare to the nation and other counties. Are the changes local, or part of nation-wide trends?

5) More women have entered the workforce, and because of relatively lower pay, or because of fewer hours worked (depending on the region both may occur), earnings may decline over time. For a comparison of male versus female income run an EPSC profile.

6) Earnings will decline if job growth is primarily from low-wage services industries. Look at the breakdown of different industrial sectors to see the type of service industries that are growing. Does the community have what it takes (education, airports, amenities, etc.) to attract the high-wage service industries (engineering, finance, etc.)?

7) People may be choosing to live in some communities for quality of life reasons. In some areas the increase in population can outpace the rate of job creation, thereby flooding the labor market and causing a downturn in wages. Look at the growth rates of population relative to growth in jobs and personal income.

**Source: BEA REIS 2006 Table CA30**

Demographic, Employment and Income Trends

BLM_0107072