# Wild and Scenic River Process Tentative Classification

- A *Wild* river is free of impoundments, with shorelines or watersheds essentially primitive, and with unpolluted waters.

- A *Scenic* river may have some development, and may have road and railroad access points.

- A *Recreational* river may have more extensive development along its shoreline, including transportation routes, and may have undergone some impoundment or diversion.

BLM_0107846

## WILD AND SCENIC RIVER ELIGIBILITY PROCESS

**Identify** river segments for initial **WSR** consideration

**Evaluate**: Is the segment **free-flowing**? — NO → **Drop** segment from further **WSR** consideration

YES

**Evaluate**: Does the segment have one or more **Outstandingly Remarkable Values**? — NO → **Drop** segment from further **WSR** consideration

YES

**Document** segment's **ORVs** and basis for determination of **WSR** eligibility

**Assign** a preliminary classification of **Wild**, **Scenic**, or **Recreational** — **Evaluate** river segment for **WSR suitability**

BLM_0107847

# Final Eligibility Report available July 2010

## Available online at:
## http://www.blm.gov/co/st/en/fo/ufo/wild_and_scenic_river.html



- **Wild and Scenic page now a separate link**
- **Table  and maps of all eligible segments**
- **Preliminary Eligible classifications and ORV's identified**
- **List of  suitability criteria**
- **Link to  suitability comment document**
- **Link to GJFO and Wild and Scenic information**

BLM_0107848

# ELIGIBILITY RESULTS

• During the inventory phase, 174 river segments were identified for review

• 22 rivers were separated into 33 segments and determined to be free-flowing and possessed one or more outstandingly remarkable values necessary for Wild and Scenic River eligibility

• In addition, the San Juan Public Lands Draft Land Management Plan identifies a segment of the Dolores River as eligible. The northernmost 11.8-mile downstream portion of this segment is managed by the Uncompahgre Field Office and will be evaluated by the field office during the suitability phase, resulting in a total of 34 eligible river segments.

BLM_0107849



BLM_0107850



## Eligible River Segments: 11

1. Cottonwood Creek
2. Dry Fork Escalante Creek, Segment 2
3. Escalante Creek, Segment 1
4. Escalante Creek, Segment 2

5. Gunnison River, Segment 2
6. Gunnison River, Segment 3
7. Monitor Creek
8. Potter Creek

9. Rose Creek
10. Roubideau Creek, Segment 1
11. Roubideau Creek, Segment 2

BLM_0107851



## HYDROLOGIC UNIT 2 - NORTH FORK OF THE GUNNISON

### *Eligible Segments:* 2

12. Deep Creek
13. West Fork Terror Creek

BLM_0107852



# HYDROLOGIC UNIT 3 - SAN MIGUEL

## *Eligible River Segments:* 11

14. Beaver Creek
15. Dry Creek, Segment 1
16. Naturita Creek
17. Saltado Creek

18. San Miguel River, Segment 1
19. San Miguel River, Segment 2
20. San Miguel River, Segment 3
21. San Miguel River, Segment 5

22. San Miguel River, Segment 6
23. Tabeguache Creek, Segment 1
24. Tabeguache Creek, Segment 2

BLM_0107853



# HYDROLOGIC UNIT 4 - LOWER DOLORES

## *Eligible River Segments:* 2

25. Lower Dolores River
26. North Fork Mesa Creek

BLM_0107854



## HYDROLOGIC UNIT 5 – UPPER DOLORES

### Eligible River Segments: 8

27. Dolores River, Segment 2
28. Ice Lake Creek, Segment 2
29. La Sal Creek, Segment 1

30. La Sal Creek, Segment 2
31. La Sal Creek, Segment 3
32. Lion Creek, Segment 2

33. Spring Creek
*34. Dolores River, Segment 1

* Please refer to the San Juan Public Lands Draft RMP for the Dolores River, Segment 1 eligibility determination

# Wild & Scenic River Process

## Suitability Determination

**Suitability recommendations are developed by the BLM using input from stakeholders during the alternatives formulation process of the resource management plan.**

BLM_0107856

# Interagency WSR Coordinating Council (1999), suitability evaluations should answer three questions:

• Should the river's free-flowing character, water quality, and ORVs be protected, or are one or more other uses important enough to warrant doing otherwise?

• Will the river's free-flowing character, water quality, and ORVs be protected through designation? Is it the best method for protecting the river corridor? In answering these questions, the benefits and impacts of WSR designation must be evaluated, and alternative protection methods considered.

• Is there a demonstrated commitment to protect the river by any nonfederal entities that may be partially responsible for implementing protective management?

BLM_0107857

# CRITERIA USED IN SUITABILITY EVALUATION

• BLM Manual 8351 identifies factors to be considered when examining jurisdictional and management constraints:

1. Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.

2. Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.

3. Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation

4. Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.

BLM_0107858

# CRITERIA USED IN SUITABILITY EVALUATION

5.  Compatibility or incompatibility of designation with current land and water uses and development.

6.  Reasonably foreseeable potential land and water development and uses that could be affected by designation.

7.  Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.

8.  Consistency of designation with other BLM plans, programs, and policies and regional objectives

9.  Issues that might make administering this segment difficult.

10. Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.

BLM_0107859

# STAKEHOLDER GROUPS

TWO DIFFERENT  PUBLIC STAKEHOLDER GROUPS WILL BE FORMED TO DETERMINE SUITABILITY AND ASSIST IN DEVELOPING THE RANGE OF SUITABILITY ALTERNATIVES

1.  ONE GROUP WILL BE FORMED FOR THE GUNNISON RIVER BASIN, INCLUDING DOMINGUEZ - ESCALANTE SECTIONS DETERMINED ELIGIBLE BY THE GRAND JUNCTION FIELD OFFICE.  FACILITATED BY THE COLORADO RIVER DISTRICT CONTACT CHRIS TREESE AT 970-945-8522 OR EMAIL:  CRTREESE @ CRWCD.ORG

2.  SECOND GROUP FOR SAN MIGUEL AND DOLORES RIVER SEGMENTS WILL BE FACILITATED BY THE SOUTHWEST DISTRICT BLM RESOURCE ADVISORY SUBCOMMITTEE CONTACT PETER MUELLER AT 970-728-5291 OR  EMAIL: PMUELLER @ TNC.ORG AND ROBBIE LEVALLEY AT 970-874-2195 OR EMAIL:  ROBBIE.LEVALLEY @ COLOSTATE.EDU

BLM_0107860

# Wild & Scenic River Process: Designation

- *Eligibility → Suitability → Designation*

- Only Congress or the Secretary of Interior can designate a Wild and Scenic River!

- Once designated the managing agencies, with public input, develop a management plan to protect and enhance the ORVs

BLM_0107861

# Wild & Scenic River Process: Water Rights

- **Designation has historically included a federal reserved water right.**

- **The managing agency quantifies the amount and timing of water necessary to support ORVs.**

- **The water rights are adjudicated in state court.**

- **The federal water right receives a priority equal to the date of designation.**

BLM_0107862

**For More Information on the Wild and Scenic Rivers Act see:**

# http://www.rivers.gov/

BLM_0107863

# The End



BLM_0107864

 

# United States Department of the Interior

### BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401

## Highlights of the Resource Management Planning Process to Date
### July 23, 2010

- Notice of Intent (NOI) – 2/25/2010

- Scoping period – 12/23/2009 to 3/29/2010

- Scoping report – draft completed 5/25/2010

- Tribal consultation – initiated 2009 (ongoing)

- Community Assessment – report completed 2/2009

- Visual Resource Inventory – report completed 9/2009

- Migratory bird status literature review – report completed 10/2009

- Analysis of Management Situation (AMS) – report completed 6/10/2010

- Economic workshops (6 communities) – held 3/2010

- Socioeconomic baseline assessment – draft report completed 4/26/2010

- Class I paleontological resources – report completed 2/2010

- Oil & Gas Reasonable Foreseeable Development (RFD) Scenario – draft report anticipated 6/2010

- Mineral potential report (excluding coal) – anticipated 7/2010

- Coal potential report – final report completed 4/26/2010

- Renewable energy potential report – final report completed 5/31/2010

- Class I cultural resources overview – draft report completed 4/2010

- Coordination with Cooperating Agencies – invitations sent 1/23/2009; meetings planned from 5/27/2010 forward

- ACEC evaluation report – underway; draft report anticipated 6/2010

- Wilderness characteristics report – draft report anticipated 7/2010

- Air quality report – anticipated 10/2010

- Wild and scenic rivers – draft eligibility report 12/2009; final eligibility report anticipated 6/2010; suitability report to follow

- Recreation focus groups – completed 3/2010; report completed 6/2010

- Alternatives development – anticipated 6/2010 through approximately 3/2011

---

BLM_0107865



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
Montrose, Colorado



## RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #3

### Friday, July 23, 2010 (9:00 AM – 12:00 PM)

**Meeting Location:**
**Holiday Inn Express**
**1391 S. Townsend Avenue, Montrose, CO**

| Last Name | First Name | Initial | Address | E-Mail | Phone |
|---|---|---|---|---|---|
| Adams | Angie | | EMPSi<br>3775 Iris Ave, Ste 1A<br>Boulder, CO 80301 | angie.adams@empsi.com | 303-446-7160 |
| Armstrong | Lori | | BLM, Southwest Colorado<br>District Manager<br>2465 S. Townsend Ave.<br>Montrose, CO 81401 | valori_armstrong@blm.gov | 970-240-5336 |
| Bear | Shelby | | DMEA<br>PO Box 910<br>Montrose, CO 81402 | sbear@dmea.com | w: 970-240-1238 |
| Baird-LeValley | Robbie | | Colorado State Univ. Extension<br>525 Dodge Street<br>Delta, CO 81416 | robbie.levalley@colostate.edu | w: 970-874-2195 |
| Blackburn | Walt | | | | |
| Day | Bill | | | | |
| Durnan | Richard | | | | |
| Ela | William | | | | |
| Kauffman | Dave | | BLM, Uncompahgre Field Office<br>2465 S. Townsend Ave.<br>Montrose, CO 81401 | dave_kauffman@blm.gov | 970-240-5340 |
| Krickbaum | Bruce | | BLM, Uncompahgre Field Office<br>2465 S. Townsend Ave.<br>Montrose, CO 81401 | bruce_krickbaum@blm.gov | 970-240-5384 |
| Mueller | Peter | | PO Box 3140<br>Telluride, CO 81435 | pmueller@tnc.org | w: 970-728-5291 |
| Reams | John | | Western Small Miner's Assoc.<br>31527 Hwy 141<br>PO Box 644<br>Naturita, CO 81422 | john@reams-construction.com | w: 970-865-2886 |

BLM_0107866

| Last Name | First Name | Initial | Address | E-Mail | Phone |
|-----------|------------|---------|---------|--------|-------|
| Sharrow | Barb | | BLM, Uncompahgre Field Office 2465 S. Townsend Ave. Montrose, CO 81401 | barbara_sharrow@blm.gov | 970-240-5315 |
| Weist | Steven D. | | Oxbow Mining 3737 Hwy 133 PO Box 535 Somerset, CO 81434 | steve.weist@oxbow.com | w: 970-929-6461 |
| Welt | Kathy | | | | |
| Wynant | Kate | | EMPSi 3775 Iris Ave, Ste 1A Boulder, CO 80301 | kate.wynant@empsi.com | 303-446-7160 |
| Jeff Rilten | | | VFO/BLM | | |
| Clade Hardy | | | BLM | | |
| Charlie Sharp | | | " | | |

BLM_0107867

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **To:** | Barbara_Sharrow@blm.gov; dave_kauffman@blm.gov; Deborah_Magee@blm.gov; Angie Adams; Kate Wynant; bbott68@gmail.com; Aschroeder@usbr.gov; kjensen@ci.montrose.co.us; renzo.delpiccolo@state.co.us; shansen@deltacounty.com; MPelletier@gunnisoncounty.org; swhite@montrosecounty.net; lpadgett@ouraycountyco.gov; lynn@mtngeogeek.com; joanm@sanmiguelcounty.org; pat@cedaredgecolorado.com; MSe1047096@aol.com; gsparks@mtnvillage.org; mjreagan@fone.net; norwoodparker@centurytel.net; sharold@ci.olathe.co.us; davidvarley@kaycee.net; townofpaonia@tds.net; jcoates@town.ridgway.co.us; Collin_Ewing@fws.gov; tkrandallparker@fs.fed.us; lbroyles@fs.fed.us; segfahlt@gmail.com; Bruce_Krickbaum@co.blm.gov; UFO AR |
| **Subject:** | RMP Documents for Review, and "Homework" |
| **Date:** | Tuesday, July 27, 2010 11:57:05 AM |
| **Attachments:** | DraftCh1&3_CA-SG-Cmts_071610.doc |
| | UncRMP_Glossary_072610.doc |
| | Acronyms.doc |

Hello Cooperating Agency Representatives,

As promised during last week's meeting, attached are representative acronyms and glossary
terms used during BLM planning that may help you decipher the code.  These are draft lists
and will be refined and updated throughout the process.

Also as discussed last week, several reports are now available on the RMP website (www.uformp.com):
- Final Wild and Scenic River Eligibility Report
- Draft Areas of Critical Environmental Concern (ACEC) report, which is available for public
        comment until August 20, 2010
- Scoping Summary Report
- Recreation Focus Group Report
- Analysis of the Management Situation (AMS)

In addition, as discussed at last week's meetings, the BLM welcomes your input on three internal
draft (non-public) items, as follows.  Please note that, as internal draft material, these are only
intended for review by Cooperating Agency representatives and are not intended for public
release in any way.

1) Internal draft alternatives Themes.  Please submit your comments on the draft alternatives
themes handed out during last week's meeting to kate.wynant@empsi.com  no later than
Friday, August 13, 2010.   For example, is the range reasonable, too wide, or not wide enough?
Should BLM consider three or four action alternatives (in addition to the no action/current
management alterative, Alternative A)?  Your feedback wiil be discussed with the full BLM
interdisciplinary team during the following week's alternatives-development workshop.
(If you were not at the meeting, and would like to comment on the draft themes, please email
Kate for a copy of the draft themes).

2) Internal draft alternatives Goals.  Please submit your comments on the

BLM_0107868

draft goals  handed
out during last week's meeting to kate.wynant@empsi.com by Friday, August
13, 2010.
Your feedback will be shared with the BLM specialists.  (If you were not at
the meeting, and
would like to comment on the draft goals, please email Kate for a copy of
the draft goals).

3) Internal draft Chapters 1 (Introduction) and 3 (Affected Environment).
If you choose to review
these chapters, please do the following:

    (a) Save the attached MS Word comment matrix
(DraftCh1&3_CA-SG-Cmts_071610.doc) to
        your computer.  Rename the file to include your last name,
such as
        "DraftCh1&3_CA-SG-Cmts_071610_Jones.doc."

    (b) Open the MS Word comment matrix and follow the directions.  It
indicates where to find the
        internal draft chapters on the FTP site, how to make
constructive comments, etc.
        Again, please do not distribute these internal draft
chapters.

    c) Complete your review and email your comment matrix to
kate.wynant@empsi.com no later
        than Friday, August 20, 2010 (see comment matrix
instructions)

Once again, if you review items 1 and 2, you must submit comments to Kate
no later than Friday
August 13, 2010.
If you review Chapters 1 and 3, you must submit comments to Kate no later
than Friday
August 20, 2010.

Thank you,  Bruce

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

.(See attached file: DraftCh1&3_CA-SG-Cmts_071610.doc)(See attached file:
UncRMP_Glossary_072610.doc)(See attached file: Acronyms.doc)

PLEASE NOTE: This message, including any attachments, may include
privileged, confidential and/or inside information. Any distribution or use
of this communication by anyone other than the intended recipient is
strictly prohibited and may be unlawful. If you are not the intended
recipient, please notify the sender by replying to this message and then
delete it from your system.

> ## *Draft Chapters 1 (Introduction) and 3 (Affected Environment) for Field Office, Cooperating Agency, and RAC Subgroup Review*

**To BLM Interdisciplinary Team:**

Draft Chapters 1 (Introduction) and 3 (Affected Environment) are intended for internal review by Uncompahgre Field Office interdisciplinary team members, as well as the Cooperating Agencies and RAC Subgroup for the Uncompahgre RMP Revision and EIS. The review period for Cooperating Agencies and the RAC Subgroup is from Monday, July 26 to Friday, August 20, 2010. Please complete the MSWord comment matrix (provided at the end of these instructions) and e-mail all comments to Kate Wynant (kate.wynant@empsi.com) by **Friday, August 20, 2010**:

**Draft Chapters 1 and 3.** The draft document is available for review electronically from an FTP site. To access the document, click the following link. You will be able to review the document on the screen and provide comments in this comment matrix.

      https://backup.filesanywhere.com/fs/v.aspx?v=896a648b5f62727ba0ae

**Comment Matrix** (provided at the end of these instructions). This is the comment matrix you should use to capture your comments on the draft document. Please save the file with a new file name including your last name (e.g., DraftCh1&3_CA-SG-Cmts_071610_Adams.doc), and then fill out your comments on the document.

Contact Bruce Krickbaum (970-240-5384) with questions. After receiving your feedback, Draft Chapters 1 and 3 will be revised.

> ## *How to Provide Valuable Feedback*

**Commenting:**

For each comment, please fill in the following information under the appropriate column heading in the comment matrix:

✓ Page number, line number, or table number on which you are commenting. **The page number is in the bottom corner of each page.**

✓ **Your comments must be specific and provide exact changes to the text.** Please be unambiguous, clear, and directive, with exact wording changes stated. Ambiguous comments, such as "What?," "Poor," or "Is this right?," are not helpful and will not be considered.

✓ If you have the same comment more than once, <u>do not refer back to a previous comment number</u>. Instead, please copy and paste your comment to a new row in the matrix and provide the specific page number, etc.

An example has been provided below.



BLM_0107870

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Draft Chapters 1 and 3 for Field Office, Cooperating Agency, and RAC Subgroup Review (July 16, 2010)

| Cmt # | Page # | Line #, Figure #, or Table # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 1. | 3-3 | 14 | B. Krickbaum | Please replace "…below measurable limits …" with "below ambient standards …" | A. Adams: Change made. |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |
| 9. | | | | | |
| 10. | | | | | |
| 11. | | | | | |
| 12. | | | | | |
| 13. | | | | | |
| 14. | | | | | |
| 15. | | | | | |
| 16. | | | | | |
| 17. | | | | | |
| 18. | | | | | |
| 19. | | | | | |
| 20. | | | | | |
| 21. | | | | | |
| 22. | | | | | |
| 23. | | | | | |
| 24. | | | | | |
| 25. | | | | | |
| 26. | | | | | |
| 27. | | | | | |
| 28. | | | | | |
| 29. | | | | | |
| 30. | | | | | |
| 31. | | | | | |
| 32. | | | | | |
| 33. | | | | | |



BLM_0107871

# Glossary

**Acquired Lands**. Acquired lands, as distinguished from public lands, are those lands in federal ownership which have been obtained by the government by purchase, condemnation, or gift, or by exchange for such purchased, condemned or donated lands, or for timber on such lands.

**Adaptive Management**. A type of natural resource management in which decisions are made as part of an ongoing science-based process. Adaptive management involves testing, monitoring, and evaluating applied strategies, and incorporating new knowledge into management approaches that are based on scientific findings and the needs of society. Results are used to modify management policy, strategies, and practices.

**Air Pollution**. The contamination of the atmosphere by any toxic or radioactive gases and particulate matter as a result of human activity.

**Air Quality Classes**. Classifications established under the Prevention of Significant Deterioration portion of the Clean Air Act, which limits the amount of air pollution considered significant within an area. Class I applies to areas where almost any change in air quality would be significant; Class II applies to areas where the deterioration normally accompanying moderate well-controlled growth would be insignificant; and Class III applies to areas where industrial deterioration would generally be insignificant.

**Allotment**. An area of land in which one or more livestock operators graze their livestock. Allotments generally consists of BLM lands but may include other federally managed, state-owned, and private lands. An allotment may include or more separate pastures. Livestock numbers and periods of use are specified for each allotment.

**Allotment Management Plan**. A concisely written program of livestock grazing management, including supportive measures if required, designed to attain specific, multiple-use management goals in a grazing allotment.

**Allowable Cut**. The amount of timber, which can be harvested on an annual or decadal basis consistent with the principle of sustained yield. The allowable cut includes all planned timber harvest volumes exclusive of such products as Christmas trees, branches, and cones.

**Allowable Sale Quantity**. The quantity of timber that may be sold from an area covered by a land management plan during a period specified by the plan, usually expressed as the average annual allowable sale quantity.

**All-terrain Vehicle**. A motorized vehicle that is less than 50 inches in width and is capable of operating on roads, trails, or designed areas that are not maintained.

**Alluvial Soil**. A soil developing from recently deposited alluvium and exhibiting essentially no horizon development or modification of the recently deposited materials.

**Alluvium**. Clay, silt, sand, gravel, or other rock materials transported by moving water. Deposited in comparatively recent geologic time as sorted or semi-sorted sediment in rivers, floodplains, lakes, and shores, and in fans at the base of mountain slopes.

BLM_0107872

**Ambient Air Quality**. The state of the atmosphere at ground level as defined by the range of measured and/or predicted ambient concentrations of all significant pollutants for all averaging periods of interest.

**Amendment**. The process for considering or making changes in the terms, conditions, and decisions of approved Resource Management Plans or management framework plans. Usually only one or two issues are considered that involve only a portion of the planning area.

**Animal Unit Month (AUM)**. The amount of forage necessary for the sustenance of one cow or its equivalent for a period of one month.

**Area of Critical Environmental Concern (ACEC)**. Areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes, or to protect life and safety from natural hazards (BLM Manual 1613, Areas of Critical Environmental Concern).

**Assets**. Term utilized to describe roads, primitive roads, and trails that comprise the transportation system. Also the general term utilized to describe all BLM constructed "Assets" contained within the Facility Asset Management System.

**Atmospheric Deposition**. Air pollution produced when acid chemicals are incorporated into rain, snow, fog, or mist and fall to the earth. Sometimes referred to as "acid rain" and comes from sulfur oxides and nitrogen oxides, products of burning coal and other fuels and from certain industrial processes. If the acid chemicals in the air are blown into the area where the weather is wet, the acids can fall to earth in the rain, snow, fog, or mist. In areas where the weather is dry, the acid chemicals may become incorporated into dust or smoke.

**Attainment Area**. A geographic area in which levels of a criteria air pollutant meet the health-based National Ambient Air Quality Standard for that specific pollutant.

**Attenuation**. The reduction of sound intensity and energy as a function of distance traveled.

**Avoidance Area.** An area designated to be avoided due to some resource value that may become damaged or detracted from if development activities were allowed. Examples of an avoidance area may be a recreation site or known cultural site. An area may also be an avoidance area if some hazard exists such as a landslide area. The area may not totally unavailable but should be avoided if possible.

**Backcountry Byways**. Vehicle routes that traverse scenic corridors using secondary or backcountry road systems. National backcountry byways are designated by the type of road and vehicle needed to travel the byway.

**Beneficial Outcomes**. Also referenced as "recreation benefits;" improved conditions, maintenance of desired conditions, prevention of worse conditions, and realization of desired experiences.

**Best Management Practice (BMP)**. A practice or usually a combination of practices that are determined by a State or a designated planning agency to be the most effective and practicable means

BLM_0107873

(including technological, economic, and institutional considerations) of controlling point and nonpoint source pollutants at levels compatible with environmental quality goals.

**Big Game**. Indigenous, ungulate (hoofed) wildlife species that are hunted, such as elk, deer, bison, bighorn sheep, and pronghorn antelope.

**Biodiversity (biological diversity)**. The variety of life and its processes, and the interrelationships within and among various levels of ecological organization. Conservation, protection, and restoration of biological species and genetic diversity are needed to sustain the health of existing biological systems. Federal resource management agencies must examine the implications of management actions and development decisions on regional and local biodiversity.

**Biological Opinion**. A document prepared by US Fish and Wildlife Service stating their opinion as to whether or not a federal action will likely jeopardize the continued existence or adversely modify the habitat of a listed threatened or endangered species.

**Burned Area Rehabilitation**. Efforts undertaken within three years of containment of a wildfire to repair or improve fire-damaged lands unlikely to recover naturally to management approved conditions, or to repair or replace minor facilities damaged by fire.

**Candidate Species**. Taxa for which the US Fish and Wildlife Service has sufficient information on their status and threats to propose the species for listing as endangered or threatened under the Endangered Species Act, but for which issuance of a proposed rule is currently precluded by higher priority listing actions. Separate lists for plants, vertebrate animals, and invertebrate animals are published periodically in the Federal Register (BLM Manual 6840, Special Status Species Manual).

**Casual Use**. Activities that involve practices that do not ordinarily disturb or damage the public lands, resources, or improvements and, therefore, do not require a right-of-way grant or temporary use permit (43 CFR 2800). Also, any short-term noncommercial activity that does not damage or disturb the public lands, their resources, or improvements and that is not prohibited by closure of the lands to such activities (43 CFR 2920). Casual use generally includes collecting geochemical, rock, soil, or mineral specimens using hand tools, hand planning, and nonmotorized sluicing. It also generally includes use of metal detectors, gold spears, and other battery-operated devices for sensing the presence of minerals, and hand battery-operated dry washers. Casual use does not include use of mechanized earth-moving equipment, truck-mounted drilling equipment, suction dredges, motorized vehicles in areas designated as closed to off-road vehicles, chemicals, or explosives. It also does not include occupancy or operations where the cumulative effects of the activities result in more than negligible disturbance.

**Chemical Vegetation Treatment**: Application of herbicides to control invasive species/noxious weeds and/or unwanted vegetation. To meet resource objectives the preponderance of chemical treatments would be used in areas where cheatgrass or noxious weeds have invaded sagebrush steppe. In these areas, fine fuel loads are extremely high due to cheatgrass dominance of the understory. The effectiveness of chemical treatments increases if they are applied following prescribed or wildland fire.

**Clean Air Act of 1963 and Amendments**. Federal legislation governing air pollution control.

BLM_0107874

**Closed Area**. An area where off-highway vehicle use is prohibited. Use of off-highway vehicles in closed areas may be allowed for certain reasons; however, such use shall be made only with the approval of the authorized officer.

**Collaborative Partnerships**. Refers to people working together, sharing knowledge and resources, to achieve desired outcomes for public lands and communities within statutory and regulatory frameworks.

**Comprehensive Travel Management**. The proactive interdisciplinary planning; on-the-ground management and administration of travel networks (both motorized and non-motorized) to ensure public access, natural resources, and regulatory needs are considered. It consists of inventory, planning, designation, implementation, education, enforcement, monitoring, easement acquisition, mapping and signing, and other measures necessary to provide access to public lands for a wide variety of uses (including uses for recreational, traditional, casual, agricultural, commercial, educational, and other purposes).

**Concession Leases**. Authorize the operation of recreation-oriented services and facilities by the private sector, on BLM-administered lands, in support of BLM recreation programs. The concessionaire is authorized through a concession lease administered on a regular basis. The lease requires the concessionaire to pay fees to the BLM in exchange for the opportunity to carry out business activity. BLM Handbook H-2930-1, Recreation Permit Administration, provides consistent and explicit direction to supplement Manual 2930, Recreation Permit Administration, and regulations set forth in 43 CFR 2930.

**Condition Class (fire regimes)**. Fire regime condition classes are a measure describing the degree of departure from historical fire regimes, possibly resulting in alterations of key ecosystem components, such as species composition, structural stage, stand age, canopy closure, and fuel loadings. One or more of the following activities may have caused this departure: fire suppression, timber harvesting, livestock grazing, introduction and establishment of exotic plan species, introduced insects or disease, or other management activities.

**Conditions of Approval**. Conditions or provisions (requirements) under which an application for a permit to drill or sundry notice is approved.

**Conservation Agreement**. A formal signed agreement between the US Fish and Wildlife Service or National Oceanographic and Atmospheric Administration-Fisheries and other parties that implement specific actions, activities, or programs designed to eliminate or reduce threats to, or otherwise improve the status of, a species. Conservation agreements can be developed at a state, regional, or national level and generally include multiple agencies at both the state and federal level, as well as tribes. Depending on the types of commitments the BLM makes in a conservation agreement and the level of signatory authority, plan revisions or amendments may be required before the conservation agreement is signed or subsequently in order to implement the conservation agreement.

**Conservation Strategy**. A strategy outlining current activities or threats that are contributing to the decline of a species, along with the actions or strategies needed to reverse or eliminate such a decline or threats. Conservation strategies are generally developed for species of plants and animals that are designated as BLM sensitive species or that have been determined by the US Fish and Wildlife Service or

BLM_0107875

National Oceanographic and Atmospheric Administration-Fisheries to be federal candidates under the Endangered Species Act.

**Controlled Surface Use (CSU)**. A stipulation intended for application where standard lease terms and permit-level decisions are deemed insufficient to achieve the level of resource protection necessary to protect the public interest, but where a No Surface Occupancy stipulation is deemed overly restrictive.

**Cooperating Agency**. Assists the lead federal agency in developing an environmental assessment or environmental impact statement. These can be any agency with jurisdiction by law or special expertise for proposals covered by NEPA (40 CFR 1501.6). Any tribe or Federal, State, or local government jurisdiction with such qualifications may become a cooperating agency by agreement with the lead agency.

**Council on Environmental Quality (CEQ)**. An advisory council to the President of the US established by the National Environmental Policy Act of 1969. It reviews federal programs to analyze and interpret environmental trends and information.

**Criteria Pollutant**. The US EPA uses six "criteria pollutants" as indicators of air quality, and has established for each of them a maximum concentration above which adverse effects on human health may occur. These threshold concentrations are called National Ambient Air Quality Standards. The criteria pollutants are ozone, carbon monoxide, nitrogen dioxide, sulfur dioxide, particulate matter and lead.

**Critical Habitat**. An area occupied by a threatened or endangered species "on which are found those physical and biological features (1) essential to the conservation of the species, and (2) which may require special management considerations or protection."

**Cultural Resources**. Locations of human activity, occupation, or use. Cultural resources include archaeological, historic, or architectural sites, structures, or places with important public and scientific uses, and locations of traditional cultural or religious importance to specified social and/or cultural groups.

**Cultural Resources Inventory**. An inventory to assess the potential presence of cultural resources. There are three classes of surveys:

- Class I. An existing data survey. This is an inventory of a study area to (1) provide a narrative overview of cultural resources by using existing information, and (2) compile existing cultural resources site record data on which to base the development of the BLM's site record system.

- Class II. A sampling field inventory designed to locate, from surface and exposed profile indications, all cultural resource sites within a portion of an area so that an estimate can be made of the cultural resources for the entire area.

- Class III. An intensive field inventory designed to locate, from surface and exposed profile indications, all cultural resource sites in an area. Upon its completion, no further cultural resources inventory work is normally needed.

**Cumulative Effects**. The direct and indirect effects of a proposed project alternative's incremental impacts when they are added to other past, present, and reasonably foreseeable actions, regardless of who carries out the action.

**Deferred Rotation**. Rotation grazing with regard to deferring pastures beyond the growing season, if they were used early the prior year, or that have been identified as needing deferment for resource reasons.

**Designated Roads and Trails**. Specific roads and trails identified by the BLM (or other agency) where some type of motorized vehicle use is appropriate and allowed, either seasonally or year-long (BLM Handbook H-1601-1, Land Use Planning).

**Desired Future Condition**. For rangeland vegetation, the condition of rangeland resources on a landscape scale that meet management objectives. It is based on ecological, social, and economic considerations during the land planning process. It is usually expressed as ecological status or management status of vegetation (species composition, habitat diversity, and age and size class of species) and desired soil qualities (soil cover, erosion, and compaction). In a general context, desired future condition is a portrayal of the land or resource conditions that are expected to result if goals and objectives are fully achieved.

**Desired Outcomes**. A type of land use plan decision expressed as a goal or objective.

**Disposal**. Transfer of public land out of federal ownership to another party through sale, exchange, Recreation and Public Purposes Act of 1926, Desert Land Entry or other land law statutes.

**Diversity**. The relative abundance of wildlife species, plant species, communities, habitats, or habitat features per unit of area.

**Easement**. A right afforded a person or agency to make limited use of another's real property for access or other purposes.

**Eligibility**. Qualification of a river for inclusion into the National WSR System through the professional judgment that it is free flowing and, with its adjacent land area, possesses at least one river-related value considered to be outstandingly remarkable (BLM Manual 8351, Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, and Management).

**Emergency Stabilization**. Planned actions to stabilize and prevent unacceptable degradation to natural and cultural resources, to minimize threats to life or property resulting from the effects of a fire, or to repair/replace/construct physical improvements necessary to prevent degradation of land or resources. Emergency stabilization actions must be taken within one year following containment of a wildfire.

**Endangered Species**. Any species that is in danger of extinction throughout all or a significant portion of its range (BLM Manual 6840, Special Status Species).

**Environmental Assessment**. A concise public document prepared to provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no

BLM_0107877

significant impact. It includes a brief discussion of the need for the proposal, alternatives considered, environmental impact of the proposed action and alternatives, and a list of agencies and individuals consulted.

**Environmental Impact Statement (EIS)**. A detailed statement prepared by the responsible official in which a major federal action that significantly affects the quality of the human environment is described, alternatives to the proposed action are provided, and effects are analyzed.

**Evaluation (plan evaluation)**. The process of reviewing the land use plan and the periodic plan monitoring reports to determine whether the land use plan decisions and National Environmental Policy Act of 1969 analysis are still valid and whether the plan is being implemented.

**Exchange**. A transaction whereby the federal government receives land or interests in land in exchange for other land or interests in land.

**Existing Routes**. The roads, trails, or ways that are used by motorized vehicles (jeeps, all-terrain vehicles, motorized dirt bikes, etc.), mechanized uses (mountain bikes, wheelbarrows, game carts), pedestrians (hikers), and/or equestrians (horseback riders) and are, to the best of BLM's knowledge, in existence at the time of RMP/EIS publication.

**Exclusion Areas**. Areas with sensitive resource values where rights-of-way, leases, and easements would not be authorized.

**Extensive Recreation Management Area (ERMA)**. A public lands unit identified in land use plans containing all acreage not identified as an SRMA. Recreation management actions within an ERMA are limited to only those of a custodial nature.

**Federal Land Policy and Management Act of 1976 (FLPMA)**. Public Law 94-579, October 21, 1976, often referred to as the BLM's "Organic Act," which provides most of the BLM's legislated authority, direction policy, and basic management guidance.

**Fire Frequency**. The average number of years between fires.

**Fire Severity**. The effect of the fire on the dominant overstory vegetation—low, mixed, or stand replacement.

**Fire Suppression**. All work activities connected with fire extinguishing operations, beginning with discovery of a fire and continuing until the fire is completely out.

**Fluid Minerals**. Oil, gas, coal bed natural gas, and geothermal resources.

**Forage**. All browse and herbaceous foods that are available to grazing animals.

**Forest Health**. The condition in which forest ecosystems sustain sufficient complexity, diversity, resiliency, and productivity to provide for specified human needs and values.

**Functional/Structural Groups**. A group of species that because of similar shoot or root structure, rooting depth, woody or non-woody stems, plant height, photosynthetic pathways, nitrogen fixing

BLM_0107878

ability, life cycle, etc, perform similar roles or functions in the ecosystem and are grouped together on an ecological site basis.

**Functioning at Risk**. Riparian-wetland areas that are in functional condition, but that have an existing soil, water, or vegetation attribute that makes them susceptible to degradation.

**Geographic Information System (GIS)**. A system of computer hardware, software, data, people, and applications that capture, store, edit, analyze, and display a potentially wide array of geospatial information.

**Geophysical Exploration**. Efforts to locate deposits of oil and gas resources and to better define the sub-surface.

**Geothermal Energy**. Natural heat from within the Earth, captured for production of electric power, space heating or industrial steam.

**Goal**. A broad statement of a desired outcome; usually not quantifiable and may not have established timeframes for achievement.

**Grazing Plan**. A concisely written program of livestock grazing management, including supportive measures, if required, designed to attain specific management goals in a grazing allotment. A grazing plan is prepared in consultation with the permittee(s), lessee(s), and other affected interests. Livestock grazing is considered in relation to other uses of the range and to renewable resources, such as watershed, vegetation, and wildlife. A grazing plan establishes seasons of use, the number of livestock to be permitted, the range improvements needed, and the grazing system.

**Grazing Preference**. A superior or priority position against others for the purpose of receiving a grazing permit or lease.

**Grazing System**. Scheduled grazing use and non-use of an allotment to reach identified goals or objectives by improving the quality and quantity of vegetation.

**Guidelines**. Actions or management practices that may be used to achieve desired outcomes, sometimes expressed as BMPs. Guidelines may be identified during the land use planning process, but they are not considered a land use plan decision unless the plan specifies that they are mandatory. Guidelines for grazing administration must conform to 43 CFR 4180.2.

**Habitat**. An environment that meets a specific set of physical, biological, temporal, or spatial characteristics that satisfy the requirements of a plant or animal species or group of species for part or all of their life cycle.

**Habitat Management Plan**. A written and approved activity plan for a geographical area which identifies habitat management activities to be implemented in achieving specific objectives of planning decisions.

**Hazardous Material**. A substance, pollutant, or contaminant that, due to its quantity, concentration, or physical or chemical characteristics, poses a potential hazard to human health and safety or to the environment if released into the workplace or the environment.

BLM_0107879

**Healthy Aquatic Community**. Varies by species and numbers of target species present, and channel type, and is characterized by: proper amounts of sediment/silt; a diversity of instream habitat complexity; the development/maintenance of undercut bank habitats'; adequate canopy cover; appropriate holding habitat (pools/minimum pools depth) commensurate with the identified Rosgen channel type; reduced diurnal water temperature fluctuations; appropriate width to depth ratios; and represented by a healthy biological community (fish and macroinvertebrate diversity and abundance reflect water quality attaining a biological minimum).

**Herd Management Area**. Public land under the jurisdiction of the BLM that has been designated for special management emphasizing the maintenance of an established wild horse or burro herd.

**Historic Range of Variability**. The range of conditions that are likely to have occurred prior to settlement of the project area by Euro-Americans (approximately the mid-1800's) which would have varied within certain limits over time.

**Historic Resources**. Any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places.

**Impact**. The effect, influence, alteration, or imprint caused by an action.

**Impairment**. The degree to which a distance of clear visibility is degraded by man-made pollutants.

**Implementation Decisions**. Decisions that take action to implement land use planning; generally appealable to Interior Board of Land Appeals under 43 CFR 4.410.

**Implementation Plan**. An area or site-specific plan written to implement decisions made in a land use plan. Implementation plans include both activity plans and project plans.

**Intermittent Stream**. An intermittent stream is a stream that flows only at certain times of the year when it receives water from springs or from some surface sources such as melting snow in mountainous areas. During the dry season and throughout minor drought periods, these streams will not exhibit flow. Geomorphological characteristics are not well defined and are often inconspicuous. In the absence of external limiting factors, such as pollution and thermal modifications, species are scarce and adapted to the wet and dry conditions of the fluctuating water level.

**Invertebrate**. An animal lacking a backbone or spinal column.

**Land Treatment**. All methods of artificial range improvement arid soil stabilization such as reseeding, brush control (chemical and mechanical), pitting, furrowing, water spreading, etc.

**Land Classification**. When, under criteria of 43 CFR 2400, a tract of land has the potential for retention for multiple use management or for some form of disposal or for more than one form of disposal. The relative scarcity of the values involved and the availability of alternative means and sites for realization of those values will be considered. Long-term public benefits will be weighed against more immediate or local benefits. The tract will then be classified in a manner that will best promote the public interest.

BLM_0107880

**Land Tenure Adjustments**. Ownership or jurisdictional changes. To improve the manageability of the BLM lands and their usefulness to the public, the BLM has numerous authorities for repositioning lands into a more consolidated pattern, disposing of lands, and entering into cooperative management agreements. These land pattern improvements are completed primarily through the use of land exchanges but also through land sales, through jurisdictional transfers to other agencies, and through the use of cooperative management agreements and leases.

**Land Use Allocation**. The identification in a land use plan of the activities and foreseeable development that are allowed, restricted, or excluded for all or part of the planning area, based on desired future conditions (BLM Handbook H-1601-1, Land Use Planning).

**Land Use Plan**. A set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of FLPMA; an assimilation of land use plan level decisions developed through the planning process outlined in 43 CFR 1600, regardless of the scale at which the decisions were developed. The term includes both RMPs and management framework plans (BLM Handbook H-1601-1, Land Use Planning).

**Land Use Plan Boundary**. The geographic extent of a resource management plan or management framework plans.

**Land Use Plan Decision**. Establishes desired outcomes and actions needed to achieve them. Decisions are reached using the planning process in 43 CFR 1600. When they are presented to the public as proposed decisions, they can be protested to the BLM Director. They are not appealable to Interior Board of Land Appeals.

**Lease**. Section 302 of the Federal Land Policy and Management Act of 1976 provides the BLM's authority to issue leases for the use, occupancy, and development of public lands. Leases are issued for purposes such as a commercial filming, advertising displays, commercial or noncommercial croplands, apiaries, livestock holding or feeding areas not related to grazing permits and leases, native or introduced species harvesting, temporary or permanent facilities for commercial purposes (does not include mining claims), residential occupancy, ski resorts, construction equipment storage sites, assembly yards, oil rig stacking sites, mining claim occupancy if the residential structures are not incidental to the mining operation, and water pipelines and well pumps related to irrigation and nonirrigation facilities. The regulations establishing procedures for processing these leases and permits are found in 43 CFR 2920.

**Lease Stipulation**. A modification of the terms and conditions on a standard lease form at the time of the lease sale.

**Leasable Minerals**. Those minerals or materials designated as leasable under the Mineral Leasing Act of 1920. They include coal, phosphate, asphalt, sulphur, potassium and sodium minerals, and oil and gas. Geothermal resources are also leasable under the Geothermal Steam Act of 1970.

**Lek**. An assembly area where birds, especially sage-grouse, carry on display and courtship behavior.

**Limited Area**. An area restricted at certain times, in certain areas, and/or to certain vehicular use. These restrictions may be of any type but can generally be accommodated within the following

BLM_0107881

categories: Numbers of vehicles; types of vehicles; time or season of vehicle use; permitted or licensed use only; use on existing roads and trails; use on designated roads and trails; and other restrictions.

**Lithic Site**. An archaeological site containing debris left from the manufacture, use, or maintenance of flaked stone tools.

**Locatable Minerals**. Minerals subject to exploration, development, and disposal by staking mining claims as authorized by the Mining Law of 1872, as amended. This includes deposits of gold, silver, and other uncommon minerals not subject to lease or sale.

**Long-term Effect**. The effect could occur for an extended period after implementation of the alternative. The effect could last several years or more.

**Low Productivity Forest Lands**. Woodlands and forest stands producing less than 20 cubic feet per acre per year.

**Mechanical Vegetation Treatment**. Includes mowing, chaining, chopping, drill seeding, and cutting vegetation to meet resource objective. Mechanical treatments generally occur in areas where fuel loads or invasive species need to be reduced prior to prescribed fire application; when fire risk to resources is too great to use naturally started wildland fires or prescribed fires; or where opportunities exist for biomass utilization or timber harvest.

**Mechanized Uses**. Equipment that is mechanized, including but not limited to mountain bikes, wheelbarrows, and game carts.

**Mineral**. Any naturally formed inorganic material, solid or fluid inorganic substance that can be extracted from the earth, any of various naturally occurring homogeneous substances (as stone, coal, salt, sulfur, sand, petroleum, water, or natural gas) obtained usually from the ground, under federal laws considered as locatable (subject to the general mining laws), leasable (subject to the Mineral Leasing Act of 1920), and salable (subject to the Materials Act of 1947).

**Mineral Entry**. The filing of a claim on public land to obtain the right to any locatable minerals it may contain.

**Mineral Estate**. The ownership of minerals, including rights necessary for access, exploration, development, mining, ore dressing, and transportation operations.

**Mineral Materials (salable minerals)**. Materials such as sand and gravel and common varieties of stone, pumice, pumicite, and clay that are not obtainable under the mining or leasing laws but that can be acquired under the Materials Act of 1947, as amended.

**Mining Claim**. A parcel of land that a miner takes and holds for mining purposes, having acquired the right of possession by complying with the Mining Law and local laws and rules. A mining claim may contain as many adjoining locations as the locator may make or buy. There are four categories of mining claims: lode, placer, millsite, and tunnel site.

**Mining Law of 1872**. Provides for claiming and gaining title to locatable minerals on public lands. Also referred to as the "General Mining Laws" or "Mining Laws."

BLM_0107882

**Mitigation**. Alleviation or lessening of possible adverse effects on a resource by applying appropriate protective measures or adequate scientific study. Mitigation may be achieved by avoidance, minimization, rectification, reduction, and compensation.

**Modification**. A change to the provisions of a lease stipulation, either temporarily or for the term of the lease. Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied.

**Monitoring (plan monitoring)**. The process of tracking the implementation of land use plan decisions and collecting and assessing data necessary to evaluate the effectiveness of land use planning decisions.

**Motorized Vehicles or Uses**. Vehicles that are motorized, including but not limited to jeeps, all-terrain vehicles (all-terrain vehicles, such as four-wheelers and three-wheelers), and trail motorcycles or dirt bikes.

**Multiple-use**. The management of the public lands and their various resource values so that they are used in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output (FLPMA) (BLM Manual 6840, Special Status Species).

**National Environmental Policy Act of 1969 (NEPA)**. Public Law 91-190. Establishes environmental policy for the nation. Among other items, NEPA requires federal agencies to consider environmental values in decision-making processes.

**National Register of Historic Places**. A listing of architectural, historical, archaeological, and cultural sites of local, state, or national significance, established by the Historic Preservation Act of, 1966 and maintained by the National Park Service.

**National Wild and Scenic Rivers System**. A system of nationally designated rivers and their immediate environments that have outstanding scenic, recreational, geologic, fish and wildlife, historic, cultural, and other similar values and are preserved in a free-flowing condition. The system consists of three types of streams: (1) recreation—rivers or sections of rivers that are readily accessible by road or railroad and that may have some development along their shorelines and may have undergone some impoundments or diversion in the past; (2) scenic—rivers or sections of rivers free of impoundments with shorelines or watersheds still largely undeveloped but accessible in places by roads; and (3) wild—rivers or sections of rivers free of impoundments and generally inaccessible except by trails, with watersheds or shorelines essentially primitive and waters unpolluted.

BLM_0107883

**Naturalness**. Refers to an area that "generally appears to have been affected primarily by the forces of nature, with, the imprint of man's work substantially unnoticeable" (Section 2[c] of the Wilderness Act of 1964).

**No Surface Occupancy (NSO)**: A fluid minerals leasing constraint that prohibits occupancy or disturbance on all or part of the lease surface to protect special values or uses. Lessees may exploit the fluid mineral resources under the leases restricted by this constraint through use of directional drilling from sites outside the NSO area.

**Nonfunctional Condition**. Riparian-wetland areas that clearly are not providing adequate vegetation, landform, or woody debris to dissipate energies associated with flow events, and thus are not reducing erosion, improving water quality, etc.

**Objective**. A description of a desired outcome for a resource. Objectives can be quantified and measured and, where possible, have established timeframes for achievement.

**Off-highway Vehicle (off-road vehicle)**. Any motorized vehicle capable of, or designated for travel on or immediately over land, water or other natural terrain, excluding: (1) any non-amphibious registered motorboat; (2) any military, fire, emergency, or law enforcement vehicle while being used for emergency purposes; (3) any vehicle whose use is expressly authorized by the authorized officer, or otherwise officially approved; (4) vehicles in official use; and (5) any combat or combat support vehicle when used for national defense.

**Off-highway Vehicle Area Designations**. BLM-administered lands in the CFO are designated as Open, Limited, or Closed for OHV use.

- Open. Designated areas where all types of motorized vehicles (jeeps, all-terrain vehicles, motorized dirt bikes, etc.) are permitted at all times, anywhere in the area, on roads or cross country, subject to the operating regulations and vehicle standards set forth in 43 CFR subparts 8341 and 8342.

- Limited. Designated areas where motorized vehicles are restricted to designated routes. Off-road, cross-country travel is prohibited in Limited areas, unless an area is specifically identified as an area where cross-country over-snow travel is allowed. Some existing routes may be closed in Limited areas.

- Closed. Designated areas where off-road motorized vehicle travel is prohibited yearlong. Emergency use of vehicles is allowed yearlong.

**Old-growth Forest Stands**. Stands composed of trees that are generally in the late successional stages of development. The desired attributes of old-growth stands are older, large trees for the species and site; signs of decadence (broken or deformed tops or boles and some root decay); multiple layers of canopy; standing and down dead trees; a variation in tree age, size, and spacing; and gaps or patchiness in the canopy and understory.

**Open Area**. An area where all types of vehicle use is permitted at all times, anywhere in the area subject to the operating regulations and vehicle standards set forth in 43 CFR 8341 and 8342.

BLM_0107884

**Ordinary High Water Mark**. That line on the shore established by the fluctuations of water and indicated by physical characteristics such as clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas.

**Outstandingly Remarkable Values**. Values among those listed in Section 1(b) of the Wild and Scenic Rivers Act of 1968: "scenic, recreational, geological, fish and wildlife, historical, cultural, or other similar values...." Other similar values that may be considered include ecological, biological, or botanical.

**Ozone**. A faint blue gas produced in the atmosphere from chemical reactions of burning coal, gasoline, and other fuels and chemicals found in products such as solvents, paints, and hairsprays.

**Paleontological Resources**. The physical remains or other physical evidence of plants and animals preserved in soils and sedimentary rock formations. Paleontological resources are important for correlating and dating rock strata and for understanding past environments, environmental change, and the evolution of life.

**Particulate matter (PM)**. One of the six "criteria" pollutants for which the US EPA established National Ambient Air Quality Standards. Particulate matter is defined as two categories, fine particulates, with an aerodynamic diameter of 10 micrometers ($PM_{10}$) or less, and fine particulates with an aerodynamic diameter of 2.5 micrometers or less ($PM_{2.5}$).

**Passenger Vehicle**. Two-wheel-drive, low-clearance vehicles.

**Patent**. A grant made to an individual or group conveying fee simple tide to selected public lands.

**Patented Claim**. A claim on which title has passed from the federal government to the mining claimant under the Mining Law of 1872.

**Perennial Stream**. A stream that flows continuously. Perennial streams are generally associated with a water table in the localities through which they flow.

**Permit Long**. Grazing for the duration of the permitted time with care taken not to overuse the resource.

**Permitted Use**. The forage allocated by, or under the guidance of, an applicable land use plan for livestock grazing in an allotment under a permit or lease and expressed in AUMs (43 CFR 4100.0-5) (from BLM Handbook H-4180-1, Rangeland Health Standards).

**Permittee**. A person or company permitted to graze livestock on public land.

**Petroglyph**. A form of rock art created by incising, scratching or pecking designs into rock surfaces.

**Physiography**. The study and classification of the surface features of the earth.

**Pictograph**. A form of rock art created by applying mineral based or organic paint to rock surfaces.

BLM_0107885

**Planning Area**. The geographical area for which land use and resource management plans are developed and maintained. The Uncompahgre RMP planning area is composed of BLM; US Department of Agriculture (USDA), National Forest Service (US Forest Service); US DOI; National Park Service (NPS); State of Colorado lands; and private property. It totals approximately 3.1 million acres in Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel counties in southwestern Colorado.

**Planning Criteria**. The standards, rules, and other factors developed by managers and interdisciplinary teams for their use in forming judgments about decision making, analysis, and data collection during planning. Planning criteria streamlines and simplifies the resource management planning actions.

**Planning Issues**. Concerns, conflicts, and problems with the existing management of public lands. Frequently, issues are based on how land uses affect resources. Some issues are concerned with how land uses can affect other land uses, or how the protection of resources affects land uses.

**Potential Fossil Yield Classification System**. A system used by the BLM to classify geologic units based on the relative abundance of vertebrate fossils or scientifically significant invertebrate or plant fossils and their sensitivity to adverse impacts, with a higher class number indicating a higher potential.

**Potential Vegetation Group**. Potential vegetation types grouped on the basis of a similar general moisture or temperature environment.

**Prehistoric Resources**. Any material remains, structures, and items used or modified by people before Euro-Americans established a presence in the region.

**Prescribed Fire Treatments**. A pre-planned, management-ignited fire designed to meet specific resource objectives, such as reducing fuel loads, preparing a site for chemical treatment or seeding, or promoting vegetation regeneration. Prescribed fires are useful for reducing fuel loads and providing or promoting vegetation regeneration. Prescribed fires can be performed anywhere that specific fire prescriptions can be met and fire risks to resources are mitigated after site-specific planning and NEPA analysis.

**Prevention of Significant Deterioration**. An air pollution permitting program intended to ensure that air quality does not diminish in attainment areas.

**Primitive and Unconfined Recreation**. Nonmotorized, nonmechanized (except as provided by law), and undeveloped types of recreational activities. Bicycles are considered mechanical transport, so their use is not considered primitive and unconfined recreation (BLM Handbook H-6310-1, Wilderness Inventory and Study Procedures).

**Primitive Road**. A linear route managed for use by four-wheel drive or high-clearance vehicles. Primitive roads do not normally meet any BLM road design standards.

**Probable Sale Quantity**. The probable sale quantity is the amount of timber, measured in thousand board feet, that could be produced on BLM lands where commercial forest uses are considered appropriate. Calculations are based on species, growth, mortality, land base, and sustainability. The probable sale quantity does not include volume removed for other purposes from other areas (such as

BLM_0107886

recreation sites where hazard trees are removed). The probable sale quantity also is not a commitment to offer for sale a specific level of timber volume.

**Proper Functioning Condition (lentic areas)**. A riparian-wetland areas are functioning properly when adequate vegetation, landform, or debris is present to: dissipate energies associated with wind action, wave action, and overland flow from adjacent sites, thereby reducing erosion and improving water quality; filter sediment and aid floodplain development; improve flood-water retention and ground-water recharge; develop root masses that stabilize islands and shoreline features against cutting action; restrict water percolation; develop diverse ponding characteristics to provide the habitat and the water depth, duration, and temperature necessary for fish production, waterbird breeding, and other uses; and support greater biodiversity.

**Proper Functioning Condition (lotic areas)**. A riparian-wetland area is considered to be in proper functioning condition when adequate vegetation, landform, or large woody debris is present to:

- dissipate stream energy associated with high waterflow, thereby reducing erosion and improving water quality;
- filter sediment, capture bedload, and aid floodplain development;
- improve flood-water retention and ground-water recharge;
- develop root masses that stabilize streambanks against cutting action;
- develop diverse ponding and channel characteristics to provide the habitat and the water depth, duration, and temperature necessary for fish production, waterfowl breeding, and other uses;
- support greater biodiversity.

**Public Land**. Land or interest in land owned by the US and administered by the Secretary of the Interior through the BLM without regard to how the US acquired ownership, except lands located on the Outer Continental Shelf and land held for the benefit of Indians, Aleuts, and Eskimos (BLM Handbook H-1601-1, Land Use Planning).

**Reasonable Foreseeable Development Scenario**. The prediction of the type and amount of oil and gas activity that would occur in a given area. The prediction is based on geologic factors, past history of drilling, projected demand for oil and gas, and industry interest.

**Reclamation**. Returning disturbed lands to a form and productivity that will be ecologically balanced and in conformity with a predetermined land management plan.

**Recreation and Public Purposes Act of 1926**. Provides for the lease and sale of public lands determined valuable for public purposes. The objective of the Recreation and Public Purposes Act is to meet the needs of state and local government agencies and nonprofit organizations by leasing or conveying public land required for recreation and public purpose uses. Examples of uses made of Recreation and Public Purposes Act lands are parks and greenbelts, sanitary landfills, schools, religious facilities, and camps for youth groups. The act provides substantial cost-benefits for land acquisition and provides for recreation facilities or historical monuments at no cost.

BLM_0107887

**Recreation Experiences.** Psychological outcomes realized either by recreation-tourism participants as a direct result of their on-site leisure engagements and recreation-tourism activity participation or by nonparticipating community residents as a result of their interaction with visitors and guests within their community or interaction with the BLM and other public and private recreation-tourism providers and their actions.

**Recreation Management Zones.** Subunits within an SRMA managed for distinctly different recreation products. Recreation products are composed of recreation opportunities, the natural resource and community settings within which they occur, and the administrative and service environment created by all affecting recreation-tourism providers, within which recreation participation occurs.

**Recreation Niche.** The place or position within the strategically targeted recreation-tourism market for each SRMA that is most suitable (i.e., capable of producing certain specific kinds of recreation opportunities) and appropriate (i.e., most responsive to identified visitor or resident customers), given available supply and current demand, for the production of specific recreation opportunities and the sustainable maintenance of accompanying natural resource or community setting character.

**Recreation Opportunities.** Favorable circumstances enabling visitors' engagement in a leisure activity to realize immediate psychological experiences and attain more lasting, value-added beneficial outcomes.

**Recreation Opportunity Spectrum.** One of the existing tools for classifying recreation environments (existing and desired) along a continuum, ranging from primitive, low-use, and inconspicuous administration to urban, high-use, and a highly visible administrative presence. This continuum recognizes variation among various components of any landscape's physical, social, and administrative attributes. Resulting descriptions of existing conditions and prescriptions of desired future conditions define recreation setting character.

**Recreation Setting Character Conditions.** The distinguishing recreational qualities of any landscape, objectively defined along a continuum, ranging from primitive to urban landscapes, expressed in terms of the nature of the component parts of its physical, social, and administrative attributes. These recreational qualities can be both classified and mapped. This classification and mapping process should be based on variation that either exists (for example, setting descriptions) or is desired (for example, setting prescriptions) among component parts of the various physical, social, and administrative attributes of any landscape. The recreation opportunity spectrum is one of the tools for doing this.

**Recreation Settings.** The collective distinguishing attributes of landscapes that influence and sometimes actually determine what kinds of recreation opportunities are produced.

**Recreation Use Permits.** Authorizations for use of developed facilities that meet the fee criteria established by the Land and Water Conservation Fund Act of 1964, as amended or subsequent authority (such as the pilot fee demonstration program). Recreation Use Permits are issued to ensure that US residents receive a fair and equitable return for the use of those facilities to help recover the cost of construction, operation, maintenance, and management of the permits.

BLM_0107888

**Recreational River**. Those rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past.

**Renewable Energy**. Resources that constantly renew themselves or that are regarded as practically inexhaustible. These include solar, wind, geothermal, hydro and wood. Although particular geothermal formations can be depleted, the natural heat in the Earth is a virtually inexhaustible reserve of potential energy.

**Research Natural Area**. A land management status which reserves the area for uses that are compatible with the resource of interest and research for which the area was designated.

**Resource Advisory Council (RAC)**. A council established by the Secretary of the Interior to provide advice or recommendations to BLM management. The Southwest Colorado RAC covers issues within the UFO.

**Resource Management Plan (RMP)**. A land use plan as prescribed by the Federal Land Policy and Management Act that establishes, for a given area of land, land-use allocations, coordination guidelines for multiple-use, objectives, and actions to be achieved.

**Rest Rotation**. Gazing rotation that rests pastures that have been grazed early the prior year or that have been identified as needing rest for resource reasons.

**Restoration**. The continuation of rehabilitation beyond the initial three years or the repair or replacement of major facilities damaged by the fire. Restoration activities must be funded through sources other than the emergency stabilization and restoration subactivities.

**Restore**. To bring back to a former or original or specific desired condition or appearance.

**Revision**. The process of completely rewriting the land use plan due to changes in the planning area affecting major portions of the plan or the entire plan.

**Right-of-Way (ROW)**. Public lands authorized to be used or occupied for specific purposes pursuant to a right-of-way grant, which are in the public interest and which require ROWs over, on, under, or through such lands.

**Riparian Area**. A form of wetland transition between permanently saturated wetlands and upland areas. Riparian areas exhibit vegetation or physical characteristics that reflect the influence of permanent surface or subsurface water. Typical riparian areas include lands along, adjacent to, or contiguous with perennially and intermittently flowing rivers and streams, glacial potholes, and the shores of lakes and reservoirs with stable water levels. Excluded are ephemeral streams or washes that lack vegetation and depend on free water in the soil.

**Riparian/Aquatic System**. Interacting system between aquatic and terrestrial situations. Identified by a stream channel and distinctive vegetation that requires or tolerates free or unbound water.

**Riparian Zone**. An area one-quarter mile wide encompassing riparian and adjacent vegetation.

BLM_0107889

**Road**. A linear route declared a road by the owner, managed for use by low-clearance vehicles having four or more wheels, and maintained for regular and continuous use.

**Roadless**. A linear route declared a road by the owner, managed for use by low-clearance vehicles having four or more wheels, and maintained for regular and continuous use.

**Rock Art**. Petroglyphs (carvings) or pictographs (painting) used by native persons to depict their history and culture.

**Rotation**. Grazing rotation between pastures in the allotment for the permitted time.

**Routes**. Multiple roads, trails and primitive roads; a group or set of roads, trails, and primitive roads that represents less than 100 percent of the BLM transportation system. Generically, components of the transportation system are described as "routes."

**Sale**. Public land sales are managed under the disposal criteria set forth in Section 203 of FLPMA. Public lands determined suitable for sale are offered on the initiative of the BLM and are not sold at less than fair market value. Lands suitable for sale must be identified in the RMP. Any lands to be disposed of by sale that are not identified in the current RMP require a plan amendment before a sale can occur.

**Salinity**. The presence of elevated levels of soluble salts in soils or waters.

**Scenic Byways**. Highway routes that have roadsides or corridors of special aesthetic, cultural, or historical value. An essential part of the highway is its scenic corridor. The corridor may contain outstanding scenic vistas, unusual geologic features, or other natural elements.

**Scenic River**. A river or section of a river that is free of impoundments and whose shorelines are largely undeveloped but accessible in places by roads.

**Scoping**. An early and open public participation process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action.

**Season of Use**. The time during which livestock grazing is permitted on a given range area, as specified in the grazing lease.

**Seeding**. Seeding is a vegetation treatment that includes the application of grass, forb, or shrub seed, either aerially or from the ground. In areas of gentle terrain, ground applications of seed are often accomplished with a rangeland drill. Seeding allows the establishment of native species or placeholder species and restoration of disturbed areas to a perennial-dominated cover type, thereby decreasing the risk of subsequent invasion by exotic plant species. Seeding would be used primarily as a follow-up treatment in areas where disturbance or the previously described treatments have removed exotic plant species and their residue.

**Setting Character**. The condition of any recreation system, objectively defined along a continuum, ranging from primitive to urban in terms of variation of its component physical, social, and administrative attributes.

BLM_0107890

**Short-term Effect**. The effect occurs only during or immediately after implementation of the alternative.

**Significant Fossils**. Any vertebrate fossil remains or site with fossils of exceptional preservation or context.

**Solitude**. The state of being alone or remote from habitations; isolation. A lonely or secluded place. Factors contributing to opportunities for solitude may include size, natural screening, topographic relief, vistas, physiographic variety, and the ability of the user to find a secluded spot.

**Special Recreation Management Area (SRMA)**. A public lands unit identified in land use plans to direct recreation funding and personnel to fulfill commitments made to provide specific, structured recreation opportunities. Both land use plan decisions and subsequent implementing actions for recreation in each SRMA are geared to a strategically identified primary market—destination, community, or undeveloped.

**Special Recreation Permits**. Authorizations that allow for recreational uses of public lands and related waters. Issued as a means to control visitor use, protect recreational and natural resources, and provide for the health and safety of visitors. Commercial Special Recreation Permits also are issued as a mechanism to provide a fair return for the commercial use of public lands.

**Special Status Species**. Includes proposed species, listed species, and candidate species under the Endangered Species Act; also, state-listed species and BLM State Director-designated sensitive species (BLM Manual 6840, Special Status Species Management).

**Split Estate**. Lands on which the mineral estate remains with the federal government (BLM).

**Split Season**. Removing livestock from the allotment and returning them later in the year within the permitted time.

**Standard**. A description of the physical and biological conditions or degree of function required for healthy, sustainable lands (e.g., land health standards). To be expressed as a desired outcome (goal).

**Standard Lease Terms and Conditions**. Areas may be open to leasing with no specific management decisions defined in a Resource Management Plan; however, these areas are subject to lease terms and conditions as defined on the lease form (Form 3100-11, Offer to Lease and Lease for Oil and Gas; and Form 3200-24, Offer to Lease and Lease for Geothermal Resources).

**State Implementation Plan**. A detailed description of the programs a state will use to carry out its responsibilities under the Clean Air Act. State implementation plans are collections of the regulations used by a state to reduce air pollution.

**Stationary Source**. Refers to a stationary source of emissions. Prevention of Significant Deterioration permits are required for major new stationary sources of emissions that emit 100 tons or more per year of carbon monoxide, sulphur dioxide, nitrogen dioxide, ozone, or particulate matter.

**Stipulation**. A condition of lease issuance that provides a level of protection for other resource values or land uses by restricting lease operations during certain times or locations or to avoid unacceptable

BLM_0107891

impacts, to an extent greater than standard lease terms or regulations. A stipulation is an enforceable term of the lease contract, supersedes any inconsistent provisions of the standard lease form, and is attached to and made a part of the lease. Lease stipulations further implement BLM's regulatory authority to protect resources or resource values. Lease stipulations are developed through the land use planning process.

**Stipulation Standards**. The physical and temporal conditions, resources or resource values that must be present and met for application of a specific stipulation to a specific lease

**Strategic Plan (BLM Strategic Plan)**. A plan that establishes the overall direction for the BLM. This plan is guided by the requirements of the Government Performance and Results Act of 1993, covers a 5-year period, and is updated every 3 years. It is consistent with FLPMA and other laws affecting the public lands.

**Streamside Management Zone**. Land adjacent to a waterbody where activities on land are likely to affect water quality.

**Suitable River**. A river segment found, through administrative study by an appropriate agency, to meet the criteria for designation as a component of the National Wild and Scenic Rivers system, specified in Section 4(a) of the Wild and Scenic Rivers Act.

**Sustained Yield**. The achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use.

**Threatened Species**. Any species that is likely to become endangered within the foreseeable future throughout all or a significant portion of its range (BLM Manual 6840, Special Status Species Management).

**Timber**. Standing trees, downed trees, or logs which are capable of being measured in board feet.

**Timing Limitation (TL)**. A leasing stipulation that prohibits surface use during specified time periods to protect identified resource values. The constraint does not apply to the operation and maintenance of production facilities unless analysis demonstrates that such constraints are needed and that less stringent, project-specific constraints would be insufficient.

**Total Dissolved Solids**. Salt, or an aggregate of carbonates, bicarbonates, chlorides, sulfates, phosphates, and nitrates of calcium, magnesium, manganese, sodium, potassium, and other cations that form salts.

**Total Maximum Daily Load**. An estimate of the total quantity of pollutants (from all sources: point, nonpoint, and natural) that may be allowed into waters without exceeding applicable water quality criteria.

**Traditional Cultural Property**. A property that derives significance from traditional values associated with it by a social or cultural group, such as an Indian tribe or local community. A traditional cultural property may qualify for the National Register of Historic Places if it meets the criteria and criteria exceptions at 36 CFR 60.4. See National Register Bulletin 38.

BLM_0107892

**Traditional Use**. Longstanding, socially conveyed, customary patterns of thought, cultural expression, and behavior, such as religious beliefs and practices, social customs, and land or resource uses. Traditions are shared generally within a social and/or cultural group and span generations. Usually traditional uses are reserved rights resulting from treaty and/or agreements with Native American groups.

**Trail**. A linear route managed for human-power (e.g., hiking or bicycling), stock (e.g., equestrian), or off-highway vehicle forms of transportation or for historical or heritage values. Trails are not generally managed for use by four-wheel drive or high-clearance vehicles.

**Transportation Linear Features**. "Linear features" represents the broadest category of physical disturbance (planned and unplanned) on BLM land. Transportation related linear features include engineered roads and trails, as well as user-defined, non-engineered roads and trails created as a result of the public use of BLM land. Linear features may include roads and trails identified for closure or removal as well as those that make up the BLM's defined transportation system.

**Transportation System**. The sum of the BLM's recognized inventory of linear features (roads, primitive roads, and trails) formally recognized, designated, and approved as part of the BLM's transportation system.

**Travel Management Areas**. Polygons or delineated areas where a rational approach has been taken to classify areas open, closed or limited, and have identified and/or designated a network of roads, trails, ways, and other routes that provide for public access and travel across the planning area. All designated travel routes within travel management areas should have a clearly identified need and purpose as well as clearly defined activity types, modes of travel, and seasons or timeframes for allowable access or other limitations (BLM Handbook H-1601-1, Land Use Planning).

**Trespass**. Any unauthorized use of public land.

**Utility Corridor**. Tract of land varying in width forming passageway through which various commodities such as oil, gas, and electricity are transported.

**Valid Existing Rights**. Any lease established (and valid) before a new authorization, change in land designation, or in regulation.

**Vegetation Manipulation**. Planned alteration of vegetation communities through use of mechanical, chemical, seeding and or prescribed fire or wildland fire use to achieve desired resource objectives.

**Vegetation Treatment Methods**. There are five types of vegetation treatments that may be used: wildland fire use, prescribed fire treatments, chemical, mechanical, and seeding.

**Vegetation Type**. A plant community with immediately distinguishable characteristics based upon and named after the apparent dominant plant species.

**Vertebrate**. An animal having a backbone or spinal column.

**Viewshed**. The panorama from a given viewpoint that encompasses the visual landscape, including everything visible within a 360-degree radius.

BLM_0107893

**Visibility (air quality)**. A measure of the ability to see and identify objects at different distances.

**Visitor Day**. Twelve visitor hours that may be aggregated by one or more persons in single or multiple visits.

**Visitor Use**. Visitor use of a resource for inspiration, stimulation, solitude, relaxation, education, pleasure, or satisfaction.

**Visual Resources**. The visible physical features on a landscape, (topography, water, vegetation, animals, structure-s, and other features) that comprise the scenery of the area.

**Visual Resource Management (VRM)**. The inventory and planning actions taken to identify visual resource values and to establish objectives for managing those values, and the management actions taken to achieve the visual resource management objectives.

**Visual Resource Management Classes**. Define the degree of acceptable visual change within a characteristic landscape. A class is based on the physical and sociological characteristics of any given homogeneous area and serves as a management objective. Categories assigned to public lands are based on scenic quality, sensitivity level, and distance zones. Each class has an objective that prescribes the amount of change allowed in the characteristic landscape (from BLM Handbook H-1601-1, Land Use Planning). The four classes are described below:

- Class I provides for natural ecological changes only. This class includes primitive areas, some natural areas, some wild and scenic rivers, and other similar areas where landscape modification activities should be restricted.

- Class II areas are those areas where changes in any of the basic elements (form, line, color, or texture) caused by management activity should not be evident in the characteristic landscape.

- Class III includes areas where changes in the basic elements (form, line, color, or texture) caused by a management activity may be evident in the characteristic landscape. However, the changes should remain subordinate to the visual strength of the existing character.

- Class IV applies to areas where changes may subordinate the original composition and character; however, they should reflect what could be a natural occurrence within the characteristic landscape.

**Visual Sensitivity**. Visual sensitivity levels are a measure of public concern for scenic quality and existing or proposed visual change.

**Volatile Organic Compounds**. Chemicals that produce vapors readily at room temperature and at normal atmospheric pressure. Volatile organic compounds include gasoline, industrial chemicals such as benzene, solvents such as toluene and xylene, and tetrachloroethylene (perchloroethylene, the principal dry cleaning solvent).

**Waiver**. A permanent exemption from a lease stipulation. The stipulation no longer applies anywhere within the leasehold.

BLM_0107894

**Watershed**. Topographical region or area delineated by water draining to a particular watercourse or body of water.

**Watershed Condition Indicators**. An integrated suite of aquatic, riparian, and hydrologic condition measures that are intended to be used at the watershed scale.

**Way**. Roadlike feature used by vehicles having four or more wheels but not declared a road by the owner and which receives no maintenance to guarantee regular and continuous use.

**Wild River**. Those rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and unpolluted. These represent vestiges of primitive America.

**Wild and Scenic Study River**. Rivers identified in Section 5 of the Wild and Scenic Rivers Act of 1968 for study as potential additions to the National Wild and Scenic Rivers System. The rivers will be studied under the provisions of Section 4 of the act (BLM Manual 8351, Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, and Management).

**Wilderness**. A congressionally designated area of undeveloped federal land retaining its primeval character and influence, without permanent improvements or human habitation, that is protected and managed to preserve its natural conditions and that (1) generally appears to have been affected mainly by the forces of nature, with human imprints substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least 5,000 acres or is large enough to make practical its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historic value. The definition contained in Section 2(c) of the Wilderness Act of 1964 (78 Stat. 891) (BLM Handbook H-6310-1, Wilderness Inventory and Study Procedures).

**Wilderness Characteristics**. Wilderness characteristics include size, the appearance of naturalness, outstanding opportunities for solitude, or a primitive and unconfined type of recreation. They may also include ecological, geological, or other features of scientific, educational, scenic, or historical value. However Section 2(c) of the Wilderness Act of 1964 has been updated by Instruction Memorandum 2003-195, dated June 20, 2003. Indicators of an area's naturalness include the extent of landscape modifications, the presence of native vegetation communities, and the connectivity of habitats. Outstanding opportunities for solitude or primitive and unconfined types of recreation may be experienced when the sights, sounds, and evidence of other people are rare or infrequent, in locations where visitors can be isolated, alone or secluded from others, where the use of the area is through nonmotorized, nonmechanical means, and where no or minimal developed recreation facilities are encountered.

**Wilderness Study Area**. A designation made through the land use planning process of a roadless area found to have wilderness characteristics, as described in Section 2(c) of the Wilderness Act of 1964 (BLM Handbook H-6310-1, Wilderness Inventory and Study Procedures).

**Wildland Fire**. Any fire, regardless of ignition source, that is burning outside of a prescribed fire and any fire burning on public lands or threatening public land resources, where no fire prescription standards have been prepared (BLM Handbook H-1742-1, Emergency Fire Rehabilitation).

BLM_0107895

**Wildland Fire Use**. A vegetation treatment that involves taking advantage of a naturally-ignited wildland fire in an area where fire would benefit resources. Wildland fire use would be conducted in specific areas needing treatment after a site-specific plan and NEPA analysis are completed and only if predetermined prescriptive parameters (e.g., weather/fire behavior) can be met. Until this planning and NEPA analysis are accomplished, wildland fires would be suppressed using an appropriate management response.

**Wildland-urban Interface (WUI)**. The line, area or zone where structures and other human development meet or intermingle with undeveloped wildland or vegetative fuels.

**Withdrawal**. An action that restricts the use of public land and segregates the land from the operation of some or all of the public land and mineral laws. Withdrawals are also used to transfer jurisdiction of management of public lands to other federal agencies.

BLM_0107896

| ACRONYMS AND ABBREVIATIONS | Full Phrase |
| --- | --- |
| ACEC | area of critical environmental concern |
| AUM | Animal Unit Month |
| BLM | United States Department of the Interior, Bureau of Land Management |
| BMP | best management practice |
| BSC | biologic soil crust |
| CDOW | Colorado Division of Wildlife |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| CSU | controlled surface use |
| CTTM | comprehensive trails and travel management |
| decision area | public lands managed by the United States Department of the Interior, Bureau of Land Management |
| DOI | United States Department of the Interior |
| EIS | environmental impact statement |
| EPA | United States Environmental Protection Agency |
| ERMA | extensive recreation management area |
| ESA | Endangered Species Act |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| FMP | Fire Management Plan |
| FWS | US Fish and Wildlife Service |
| FWFMP | Federal Wildland Fire Management Policy |
| GIS | Geographic Information System |
| IMPROVE | Interagency Monitoring of Protected Visual Environments |
| LHA | land health assessment |
| NCA | National Conservation Area |
| NEPA | National Environmental Policy Act of 1969 |
| NPS | United States Department of the Interior, National Park Service |
| NSO | no surface occupancy |
| OHV | off-highway vehicle |
| PFC | proper functioning condition |
| PFYC | Potential Fossil Yield Classification |
| $PM_{2.5}$ | Particulate matter much smaller than 2.5 microns in effective diameter |
| $PM_{10}$ | Particulate matter much smaller than 10 microns in effective diameter |
| planning area | Uncompahgre Field Office boundary, including all lands, regardless of land ownership |
| RAC | Resource Advisory Council |
| RMP | resource management plan |

BLM_0107897

| ACRONYMS AND ABBREVIATIONS | Full Phrase |
|---|---|
| ROD | record of decision |
| ROW | right-of-way |
| | |
| SRMA | special recreation management area |
| SRP | special recreation permit |
| | |
| TL | timing limitation |
| | |
| UFO | Uncompahgre Field Office |
| US | United States |
| USC | United States Code |
| USDA | United States Department of Agriculture |
| US Forest Service | United States Department of Agriculture, Forest Service |
| USFWS | United States Department of the Interior, Fish and Wildlife Service |
| | |
| VRM | visual resource management |
| | |
| WSA | Wilderness Study Area |
| WUI | wildland-urban interface |

BLM_0107898

July 29,2010

To: Bruce Krickbaum, Team leader for BLM UFO RMP RAC Subgroup

From: Steve Weist, RAC Subgroup member

Subject: Comments for Internal Draft Goals

After reviewing the Internal draft goals for the Uncompahgre RMP, the only comment I have is on page three the resource called "Transportation Facilities".

I would like to see a better definition of what transportation facilities are. The goal for this resource is "Provide a transportation system that is manageable, maintainable, and meets the needs of resources and resource uses."

It is unclear to me what a "transportation system" is, does that mean roads, trails, etc. or a system whereby the public is bussed or moved through an area to minimize their affect on an environmentally sensitive area.

Other than that it appears that all resource category goals are described appropriately.

BLM_0107899

July 30, 2010

To: Bruce Krickbaum, Team leader for UFO RMP RAC subgroup

From: Steve Weist, RAC Subgroup member UFO RMP

Subject: Comments on Alternative themes for RMP EIS review

After reviewing the alternative themes used by neighboring RMP areas, the following are my comments on the number and range of alternatives that should be used as the BLM UFO, the Southwest RAC, and the RAC subgroup evaluate the opportunities for maximizing public access and resource utilization, while maintaining or improving the opportunities for preservation or our national resources.

It appears to me that each of the other RMP areas used at least 4 alternatives, those being, **No Action**, a **Conservation Alternative** or close off everything to everyone, a **Preferred Balance** or what is the best use of each of the resource areas, and a **4th alternative** which allowed additional activities throughout the resource area, and had less preservation of resources, and appeared to be an alternative no one wanted.

I propose that we use just three options or alternatives: **No Action**, a **Conservation Alternative**, and the **Preferred Balance**, which is a balanced combination of maximizing resources, and public access, while identifying and preserving those resources identified as being sensitive, or of critical importance to maintaining our resources. The 4th alternative, appears to me to be an afterthought which will just take up additional time to develop ideas and thoughts for an alternative that will never be seriously considered.

If N**o Action** is an alternative that is not worth considering, then I propose to leave the **no action** alternative in the group of themes, and still have three basic options to consider. **Options 1** would allow everything to be available to the public, and minimal or no preservation of resources, **Option 2** would be the conservation approach in which nothing is allowed, and preservation is maximized, and **Option 3** would be the correct balance of resource utilization and resource preservation which would allow the public to access these lands, while maximizing our ability to preserve our national resources and heritage. This would be similar to what was used by the surrounding RMP areas, and while it would cause additional work to complete the extra alternative, it would appear to provide a balanced review of all appropriate options or alternatives.

The four options proposed by the UFO, would develop alternatives that would identify usable items for each alternative, however, none of those alternatives would provide an ultimate usable alternative. This would ultimately result in having to develop an additional alternative that summarized the best items from each of the four alternatives, and put it into the final recommended alternative. This I feel would just cause a lot of unnecessary work to arrive at a result that could be reached in three steps by using the **No Action**, **Conservative Alternative**, and **Preferred Balance** alternatives suggested above.

BLM_0107900

## James Bode

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **Sent:** | Tuesday, August 03, 2010 9:56 AM |
| **To:** | Bassi, Linda |
| **Cc:** | Barbara_Sharrow@blm.gov; Charles_Litteral@blm.gov; dave_kauffman@blm.gov; Edd Franz; Melissa_Siders@blm.gov; roy_smith@blm.gov; Valori Armstrong; roy_smith@blm.gov |
| **Subject:** | RE: Wild & Scenic River Issues |
| **Attachments:** | UFO Suitability Public Letter Signed 071310.pdf |

Hello Linda,

I have attached a copy of the letter regarding Wild and Scenic River suitability.

Additional information is available on our web site at:
http://www.blm.gov/co/st/en/fo/ufo/wild_and_scenic_river.html

Let me know if you need any additional information.

--Bruce

      (See attached file: UFO Suitability Public Letter Signed 071310.pdf)

<><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384




        "Bassi, Linda"
        <Linda.Bassi@stat
        e.co.us>                To
                <Barbara_Sharrow@blm.gov>,
        08/02/2010 09:14        <roy_smith@blm.gov>,
        AM            <Charles_Litteral@blm.gov>,
                <Melissa_Siders@blm.gov>,
                <dave_kauffman@blm.gov>, "Valori
                Armstrong"
                <Valori_Armstrong@blm.gov>, "Mr.
                Bruce Krickbaum"
                <bruce_krickbaum@blm.gov>, "Edd
                Franz" <Edd_Franz@blm.gov>

1

BLM_0107901

cc

Subject
RE: Wild & Scenic River Issues

Hi. Thanks for the update on the Wild and Scenic process.  Would it be possible for me to get a copy of the letter that went out to the interested parties?

Regarding this Friday, I think it would be best if the BLM waits to be invited to the meeting by the County.  I asked Com'r Henderson if it would be helpful for BLM to attend and offered to arrange for it.  He wrote back making a somewhat hostile reference to all of us and said he would invite BLM.  It's kind of touchy.  I'm REALLY looking forward to this meeting.  Ummmm, NOT.  Thanks!

Linda

-----Original Message-----
From: Barbara_Sharrow@blm.gov [mailto:Barbara_Sharrow@blm.gov]
Sent: Monday, August 02, 2010 7:16 AM
To: roy_smith@blm.gov; Charles_Litteral@blm.gov; Melissa_Siders@blm.gov; dave_kauffman@blm.gov; Valori Armstrong; Mr. Bruce Krickbaum; Edd Franz
Cc: Bassi, Linda
Subject: Re: Wild & Scenic River Issues

Roy and Linda,

Thanks for giving us a heads up. We have a web page devoted to Wild and Scenic process and issues. We will ensure that questions you have pointed out are answered. We have already sent a letter out to all interested parties describing our process.

I am on vacation through Wed. I'll be back in office on Thursday. I'd be happy to attend meeting with commissioners Friday morning.

Please keep us informed regarding all these issues.  Thank you.


  ----- Original Message -----
  From: Roy Smith
  Sent: 07/30/2010 04:41 PM MDT
  To: Barbara Sharrow; Charles Litteral; Melissa Siders; Dave Kauffman
  Cc: linda.bassi@state.co.us
  Subject: Wild & Scenic River Issues
All -

2

BLM_0107902

1.  I just got off the phone with Colorado Water Conservation Board staff, and I wanted to let you know that Montrose County Commissioner Ron Henderson has requested a meeting with CWCB staff next to discuss the following issues in the San Miguel and Dolores watersheds:

Instream flow protections
Offstream storage projects
Wild & Scenic Rivers
Mitigation of EPA and BLM "taking" of Montrose County water - quote

Linda Bassi has set up a meeting for 9 am next Friday at the commissioner's
offices.   She has told Ron that she doesn't have the background to
discuss
Wild and Scenic Rivers, and sje will ask Ron if he would like for a BLM
representative to be at the meeting.   At this point, we don't know
whether
the meeting is public or not, and we don't know who Ron has invited.
If
Ron seeks BLM attendance, is someone from your office available?

I have cc;d Linda Bassi on this message so you can be in touch with her directly next week while I'm doing field work in the Kremmling Field Office.

2.  Also, from some comments and phone calls I've been receiving, it's apparent that the public isn't yet clear on the exact process that BLM will be utilizing to get further stakeholder input on Wild & Scenic River issues
in the San Miguel and Dolores basins.    Would it be possible to put
together a document for posting on the BLM website that covers the
following topics?   It might also be good to send out a mailing of the
same
document.

Explain the Resource Advisory Council
Explain how this stakeholder group will work under the RAC Explain the roles BLM will and will not take during the discussion process
- independent facilitator, etc.
Explain how interested parties can take part in the stakeholder group Explain how BLM will use the recommendations of the stakeholder group - development of alternatives, etc.
Schedule and Timelines

3.   The CWCB staff and I met with Steve Harris and Bruce Whitehead from
the Southwestern Water Conservation District early this week to discuss the proposed water right that Southwestern wants to file to cover future needs
in the basin.    Here were the key points:

Southwestern will put out a revised future use estimate soon.    It
doesn't
appear that the proposed water volume will be much different from the
earlier estimate, but it will be better supported by data.    We will
get a
chance to comment again on the revised estimate.

If Southwestern pursues a "future use" water right, it will be split into two portions - one portion for San Miguel County and one portion for

BLM_0107903

Montrose County.   It hasn't been decided yet who would actually hold the
water rights.

Southwestern is insistent that the instream flow water right and the future
development water right be linked.   Southwestern is aware that this
approach problems presents serious issues for the CWCB and for other stakeholders as well.

Southwestern is interested in a "negotiated settlement" on instream flow and future water development issues.

BLM_0107904



**United States Department of the Interior**

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
www.co.blm.gov



TAKE PRIDE®
IN AMERICA

IN REPLY REFER TO:
1610(COS050)                    July 13, 2010

Dear Interested Party:

As a required component of the Uncompahgre Resource Management Plan (RMP) revision, the Bureau of Land Management (BLM) Uncompahgre Field Office (UFO) is evaluating rivers and streams within its jurisdiction for potential inclusion in the National Wild and Scenic Rivers System[1]. The Wild and Scenic River study process consists of assessing both the *eligibility* and *suitability* of rivers within the study area. This letter serves to notify you of the recently completed ***Final Wild and Scenic River Eligibility Report for the BLM Uncompahgre Planning Area*** and opportunities to participate in the current determination of suitability phase.

All rivers and streams with a perennial or intermittent flow within the Uncompahgre planning area and the portion of the newly designated Dominguez-Escalante National Conservation Area (NCA) within the UFO boundary were inventoried. The BLM identified 174 river segments for study, of which 34 were found to possess the free-flowing character and outstandingly remarkable values required for eligibility. Table 1 on attachment page 1 lists all eligible UFO river segments by hydrologic unit, while Table 2 on attachment page 4 includes five additional Dominguez-Escalante NCA segments evaluated by the Grand Junction Field Office as part of their planning effort. Each table includes the web address where the corresponding eligibility report may be reviewed.

The current determination of suitability phase focuses on jurisdictional and manageability issues affecting eligible waterways. Criteria developed by the BLM and the Interagency Wild and Scenic Rivers Council will be used to evaluate the suitability of eligible river segments. To assist in making these evaluations, the BLM is requesting input related to the criteria regarding any segment about which you have specific knowledge or concerns. Comments pertaining to suitability that were submitted during the public scoping period for eligibility will be carried forward and integrated into the suitability evaluation.

---

[1] In 1968, Congress enacted the Wild and Scenic Rivers Act to preserve and protect the free-flowing condition, water quality, and outstandingly remarkable values of selected waterways for the benefit and enjoyment of present and future generations. The Act safeguards the special character of these rivers, while allowing for their appropriate use and development.

Segment suitability comment forms and instructions are available at BLM UFO headquarters in Montrose and online at www.blm.gov/co/st/en/fo/ufo/wild_and_scenic_river.html, or can be mailed to you upon request. **Please include your name, address, and phone number** on each page so that we may contact you if necessary to clarify your comment. **Submit comment forms by August 16, 2010** via email to: uformp@blm.gov or mail to: BLM UFO, Attention: RMP Revision, 2465 South Townsend Avenue, Montrose, Colorado 81401.

A public stakeholder group will assist the BLM in determining which segments are suitable for inclusion in the National Wild and Scenic River System and in developing the range of suitability alternatives. The Southwest District BLM Resource Advisory Subcommittee will facilitate a stakeholder group focusing their efforts on the San Miguel and Dolores river basins. Direct questions to subcommittee members Peter Mueller at (970) 728-5291 or email: pmueller@tnc.org and Robbie LeValley at (970) 874-2195 or email: Robbie.levalley@colostate.edu.

In addition, the Colorado River Water Conservation District will be convening a broad-based stakeholders' group to offer recommendations regarding river segments for the Gunnison River Basin within the RMP planning areas for both the UFO and Dominguez-Escalante National Conservation Area. For more information and inclusion in the initial stakeholders' meeting, contact stakeholder group coordinator Chris Treese of the Colorado River District at (970) 945-8522 or email: ctreese@crwcd.org.

Public and stakeholder group participation will provide a critical foundation to effectively manage UFO rivers and streams for years to come. The BLM thanks you for your interest and welcomes your review of our final eligibility report, as well as your comments on suitability issues pertaining to the jurisdiction and manageability of eligible river segments. Please contact our office at (970) 240-5300 if you have additional questions.

Sincerely,

Barbara L. Sharrow
Field Manager

Attachment:

Two tables showing 1) eligible river segments evaluated by the UFO and 2) eligible Dominguez-Escalante NCA river segments evaluated by the BLM Grand Junction Field Office

BLM_0107906

## TABLE 1 - ELIGIBLE RIVER SEGMENTS EVALUATED BY THE BLM UFO

The Final Wild and Scenic River Eligibility Report for the BLM Uncompahgre Field Office is available to view and download at: www.blm.gov/co/st/en/fo/ufo/wild_and_scenic_river.html

| SEGMENT NAME | SEGMENT LOCATION | TOTAL SEGMENT LENGTH (IN MILES) | SEGMENT LENGTH ON BLM LANDS (IN MILES) |
|---|---|---|---|
| HYDROLOGIC UNIT:  LOWER GUNNISON *Segment is within the Dominguez-Escalante National Conservation Area | | | |
| *Cottonwood Creek | Uncompahgre NF boundary to downstream UFO boundary in T51N/ R12W/Sec 14 NMPM | 18.27 | 18.27 |
| *Dry Fork Escalante Creek Segment 2 | Tatum Draw to mouth | 2.89 | 2.43 |
| *Escalante Creek Segment 1 | Uncompahgre NF boundary to upstream Colorado State land boundary in T51N/R13W/ Sec 15 NMPM | 8.45 | 5.75 |
| *Escalante Creek Segment 2 | Upstream of Colorado State land boundary in T51N/R13W/Sec 15 NMPM to Gunnison River | 8.48 | 0.90 |
| Gunnison River Segment 2 | Upstream boundary to downstream boundary of BLM land in T15S/R95W/ Sec 6 6th PM | 0.41 | 0.41 |
| *Gunnison River Segment 3 | Upstream UFO boundary in T15S/R97W/Sec 24 6th PM to boundary between UFO and Grand Junction Field Office | 17.46 | 8.43 |
| Monitor Creek | Uncompahgre NF boundary to Potter Creek | 9.42 | 9.42 |
| Potter Creek | Uncompahgre NF boundary to Roubideau Creek | 9.82 | 9.82 |
| *Rose Creek | Confluence of Barkley Cabin Gulch and Corral Gulch to UFO boundary | 3.90 | 3.90 |
| Roubideau Creek Segment 1 | Uncompahgre NF boundary to downstream Camelback WSA boundary | 10.74 | 10.00 |

BLM_0107907

| SEGMENT NAME | SEGMENT LOCATION | TOTAL SEGMENT LENGTH (IN MILES) | SEGMENT LENGTH ON BLM LANDS (IN MILES) |
|---|---|---|---|
| Roubideau Creek Segment 2 | Downstream Camelback WSA boundary to upstream Colorado State land boundary in T15S/ R96W/Sec 32 6th PM | 7.59 | 3.45 |
| **HYDROLOGIC UNIT:  NORTH FORK** | | | |
| Deep Creek | Gunnison NF boundary to Paonia Reservoir | 2.55 | 0.58 |
| West Fork Terror Creek | Grand Mesa NF boundary  to confluence with East Fork Terror Creek | 1.21 | 0.47 |
| **HYDROLOGIC UNIT:  SAN MIGUEL** | | | |
| Beaver Creek | Uncompahgre NF boundary to San Miguel River | 14.25 | 14.19 |
| Dry Creek Segment 1 | Upstream UFO boundary to downstream UFO boundary in T46N/R6W/ Sec 34 NMPM | 10.49 | 10.42 |
| Naturita Creek | Uncompahgre NF boundary to San Miguel River | 24.97 | 9.99 |
| Saltado Creek | Upstream UFO boundary in T43N/R11W/Sec 18 NMPM to San Miguel River | 5.56 | 4.14 |
| San Miguel River Segment 1 | UFO boundary just downstream of Deep Creek to UFO boundary 1.25 miles (est.) downstream from Clay Creek | 27.23 | 17.34 |
| San Miguel River Segment 2 | UFO boundary 1.25 miles (est.) downstream from Clay Creek to immediately above Horsefly Creek | 4.01 | 3.64 |
| San Miguel River Segment 3 | Immediately above Horsefly Creek to Colorado State Highway 90 Bridge at Piñon, CO | 7.31 | 5.30 |
| San Miguel River Segment 5 | Calamity Draw to Atkinson Creek | 14.00 | 2.59 |
| San Miguel River Segment 6 | Atkinson Creek to Dolores River | 3.23 | 2.25 |

BLM_0107908

| Segment Name | Segment Location | Total Segment Length (in miles) | Segment Length on BLM Lands (in miles) |
|---|---|---|---|
| Tabeguache Creek Segment 1 | Uncompahgre NF boundary to west boundary of Tabeguache Area | 3.61 | 3.61 |
| Tabeguache Creek Segment 2 | West boundary of Tabeguache Area to San Miguel River | 11.57 | 7.89 |
| **HYDROLOGIC UNIT: LOWER DOLORES** | | | |
| Dolores River | San Miguel River to BLM Grand Junction Field Office boundary | 10.53 | 6.93 |
| North Fork Mesa Creek | UFO boundary to Mesa Creek | 8.53 | 5.81 |
| **HYDROLOGIC UNIT: UPPER DOLORES** | | | |
| Dolores River Segment 1 | UFO boundary downstream to Highway 90 Bridge at Bedrock, CO. | 11.80 | 9.56 |
| Dolores River Segment 2 | Highway 90 Bridge to San Miguel River | 11.50 | 5.42 |
| Ice Lake Creek Segment 2 | Knickpoint in T47N/ R20W/Sec 11 NMPM to La Sal Creek | 0.58 | 0.31 |
| La Sal Creek Segment 1 | Colorado State line to Sharp Canyon | 4.82 | 0.62 |
| La Sal Creek Segment 2 | Sharp Canyon to Dolores River Canyon WSA boundary | 4.52 | 3.82 |
| La Sal Creek Segment 3 | Dolores River Canyon WSA boundary to Dolores River | 3.37 | 3.37 |
| Lion Creek Segment 2 | Knickpoint in T47N/ R20W/Sec 1 NMPM to La Sal Creek | 1.57 | 1.26 |
| Spring Creek | Headwaters of Spring Creek to La Sal Creek | 2.65 | 1.49 |

**TABLE 2 - ELIGIBLE DOMINGUEZ-ESCALANTE RIVER SEGMENTS EVALUATED BY THE BLM GRAND JUNCTION FIELD OFFICE**

The Final Wild and Scenic River Eligibility Report for the BLM Grand Junction Field Office is available to view and download at:
www.blm.gov/co/st/en/fo/gjfo/rmp/Wild_Scenic_River.html

| SEGMENT NAME | SEGMENT LOCATION | TOTAL SEGMENT LENGTH (IN MILES) | SEGMENT LENGTH ON BLM LANDS (IN MILES) |
|---|---|---|---|
| HYDROLOGIC UNIT:  LOWER GUNNISON | | | |
| Big Dominguez Creek, Segment 1 | Big Dominguez Creek boundary with the Uncompahgre National Forest in the southern portion of the planning area to the confluence with Little Dominguez Creek (near Bridgeport) | 15.86 | 15.86 |
| Big Dominguez Creek, Segment 2 | Confluence with Little Dominguez Creek to the confluence with the Gunnison River near Bridgeport. | 0.78 | 0.78 |
| Little Dominguez Creek, Segment 1 | Little Dominguez Creek boundary with the Uncompahgre National Forest to the Dominguez WSA boundary approximately two miles from the confluence with Big Dominguez Creek. | 13.14 | 13.14 |
| Little Dominguez Creek, Segment 2 | Boundary of the Dominguez WSA to the confluence with Big Dominguez Creek. | 2.45 | 2.45 |
| Gunnison River, Segment 1 | Sections of the Gunnison River west of Highway 50 on BLM land from the southern planning area boundary near Bridgeport to Whitewater. | 15.73 | 13.45 |

BLM_0107910

*Heritage Partnership, LP*
*104 Royal Oaks Road*
*Kerrville, Texas 78028*
*(830) 896-5951*
*(210) 428-6286 FAX*
*heritagelp@gmail.com*



August 3, 2010

Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado   81401

Attn:  RMP Revision

*Via email*

<u>Re:  1610(COS050)</u>

Dear RMP Revision:

Pursuant to your letter regarding the Uncompahgre Resource Management Plan's Wild and Scenic River study, Heritage Partnership, LP looks forward to working with you on this matter.  BLM is the majority owner of the Beaver Creek watershed; Heritage is the sole private property owner through which Beaver Creek flows.

We currently protect our portion of this scenic/wild waterway and welcome the elevated designation initiative for inclusion in the National Wild and Scenic Rivers System.  Beaver Creek has perennial flow through the entire Beaver Creek Canyon into the San Miguel River. Beaver Creek and its watershed remain pristine on the Heritage property and I believe it to be ideal for inclusion.

Please include Heritage in the public stakeholder group and notify me of the stakeholders meeting planned by Chris Treese.

Sincerely,

N. Russell Scott
Natural Resources Manager

BLM_0107911

BLM 0107912

*The performance data shown represent past performance, which is not a guarantee of future results. Investment returns and principal value will fluctuate, so that investors' shares, when sold, may be worth more or less than their original cost. Current performance may be lower or higher than the performance data cited. See performance data current to the most recent month-end. Click to view standardized returns, fees, and expenses.*

© 1995-2010 The Vanguard Group, Inc. All rights reserved. Vanguard Marketing Corp., Distrib. Terms & conditions of use | Security Center | Obtain prospectus | Careers | Vanguard.mobi | [+] Feedback | Enhanced Support

the elevated

elevated desig for protection

Heritage Partners owns the only private property through which Beaver Creek flows. We fully protect our part of this scenic/wild drainage and support appropriate designation by BLM and other government entities to elevate protection of the entire Beaver Creek Canyon on BLM lands.

## 14 - BEAVER CREEK WSR SUITABILITY COMMENTS

Received

AUG 1 6 2010

Uncompahgre Field Office

**Preliminary Classification:** Recreational
Vegetation

Your Name: Heritage Partnership, LP (Russell Scott BP) Telephone: 210 326 2932
Address: PO Box 3412 Telluride, CO 81435   E-mail: kitmullen@gmail.com

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

### GENERAL

1. **Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.**

Beaver Creek (and Beaver Creek Canyon) is mostly pristine natural area of native flora along streamside. There is no evidence of streamside degradation by livestock. The canyon is ages-old corridor for elk and mule deer out of higher altitudes of BLM and Forest Service managed acreage. Beaver Creek runs wild — free of dams, irrigation canals and similar man made alterations.

2. **Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.**

3. **Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation.**

### LAND OWNERSHIP AND USES

4. **Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.**

Our, Heritage Partnership, LP, already protects flora and fauna in our privately controlled section of Beaver Canyon upstream of confluence of Goat and Beaver Creeks at road M 44.

BLM_0107913

5. **Compatibility or incompatibility of designation with current land and water uses and development.**

Wild and scenic designation appears compatible with present status of this creek and its canyon.

6. **Reasonably foreseeable potential land and water development and uses that could be affected by designation.**

---

## ADMINISTRATION

7. **Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.**

8. **Consistency of designation with other BLM plans, programs, and policies and regional objectives.**

Heritage Partnership, LP (and myself) has expressed interest in learning BLM plans, programs, policies and objectives in multiple communications to by date BLM over several years regarding this Beaver drainage. One just as well try to get response from a mule as to make efforts to work with BLM.

BLM_0107914

9. **Issues that might make administering this segment difficult.**

10. **Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.**

---

### ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY

To my knowledge Heritage owns the only private acreage fronting Beaver Creek. The other 14± miles of Beaver Creek flows through BLM or National Forest administered lands. Heritage has expressed willingness to work hand in hand with govt entities to manage, and protect this drainage in perpetuity. (Note: the narrow leaf cottonwoods growing in canyon, creekside, are possibly the largest of the species in our region...or anywhere.)

BLM_0107915

**James Bode**

| | |
|---|---|
| **From:** | Rachel.D.Carroll@wellsfargo.com |
| **Sent:** | Tuesday, August 03, 2010 3:22 PM |
| **To:** | uformp@blm.gov |
| **Cc:** | PAT.H.ROBERTSON@wellsfargo.com |
| **Subject:** | Re: Pat Robertson |
| **Attachments:** | Scan_Doc0064.pdf |

*Please let me know if you have any questions.*

*Thank you,*

*Rachel D. Carroll*

*Senior Client Associate*
***Assistant to Pat Robertson***
***Regional Director - Wealth Management/Private Bank***

Wells Fargo Private Bank | 111 Congress Ave., Suite 300| Austin, Texas 78701
MAC T5215-030
Tel 512-344-7405 | Cell 512-820-0740| Fax 866-605-0818

rachel.d.carroll@wellsfargo.com

Wells Fargo Private Bank provides products and services through Wells Fargo Bank, N.A. and its various affiliates and subsidiaries.

This message may contain confidential and/or privileged information. If you are not the addressee or authorized to receive this for the addressee, you must not copy, disclose, or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by reply email and delete this message. Thank you for your cooperation.

1

## COMMENTING ON WILD AND SCENIC RIVER SUITABILITY

Thank you for your interest in providing comments regarding Wild and Scenic River suitability for the BLM Uncompahgre planning effort.

---

### COMPLETING THE RIVER SEGMENT COMMENT FORM

Comments may be typed or handwritten. Please use the segment comment form available at:

www.blm.gov/co/st/en/fo/ufo/wild_and_scenic_river.html

**Submit written comments by August 16, 2010:**

- Email completed forms to:  UFORMP@BLM.GOV
- Or mail completed forms to:  BLM UFO, Attention: RMP Revision, 2465 South Townsend Avenue, Montrose, Colorado  81401

If using the Word version, print the form for mailing or save it as a new document in your local directory before completing.

If using the Adobe Pdf form, print the form for mailing.

For all forms, please:

- Print your name and phone number or email address on each page you complete.
- Address only those eligible river segments about which you have specific knowledge or concerns.
- For each segment, address only those Wild and Scenic suitability criteria about which you have specific knowledge or concerns.
- Be factual and as specific as possible regarding issues, locations, dates, and times.

---

### PROVIDING EFFECTIVE COMMENTS

**Substantive comments do one or more of the following:**

- Raise issues the BLM has not considered and reinforce issues the BLM has already identified
- Present reasonable alternatives
- Present information that can be used when developing alternatives or considering the impacts of alternatives

---

### TYPES OF COMMENTS TO AVOID

**Comments that are not substantive include:**

- Comments in favor of or against an action without providing a rationale (such as "I don't like...").
- Comments that simply agree or disagree with BLM policy.
- Comments without justification or supporting data (such as "allow more grazing").
- Comments in the form of vague, open-ended questions.

BLM_0107917

## 17 - SALTADO CREEK WSR SUITABILITY COMMENTS

*Preliminary Classification:* **Recreational**

ORVs:

**Vegetation**

Your Name: Pat Robertson_____Telephone: 512 / 344-7310____970/369-1278

Address: 3001 Peninsula Drive, Telluride, CO. _____E-mail: pat.h.robertson@wellsfargo.com

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

### GENERAL

**1. Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin. Saltado Creek is a tributary to the San Miguel and originates to the south and in the hills in a series of springs and pools created by snow run-off and rain. Saltado Canyon is a very wild area and is composed mostly of BLM land. Wildlife is abundant.**

**2. Known federal, state, regional, tribal, local, or other public interests in designation or non-designation. Much of Saltado Creek and Saltado Canyon is BLM land.**

NAME:                                       SEGMENT:

BLM_0107918

3. Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation. Non designation could result in development and over-population.

| LAND OWNERSHIP AND USES |
| --- |

4. Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation. Little if any of the Saltado Creek area is private land. Most is BLM land.

5. Compatibility or incompatibility of designation with current land and water uses and development. Designation would be compatible with current situation which is very wild.

6. Reasonably foreseeable potential land and water development and uses that could be affected by designation. Desiganation of Saltado Creek would result in continued free flow of the creek as a tributary to the San Miguel River and use of the creek by wildlife will continue.

| ADMINISTRATION |
| --- |

7. **Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.** Very easy to maintain as the creek is in a rugged and wild area with very limited access except by foot.

8. **Consistency of designation with other BLM plans, programs, and policies and regional objectives.** Saltado Creek mostly runs through BLM land.

9. **Issues that might make administering this segment difficult.** None.

10. **Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.** Area is very wild and hard to access.

---

### ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY

NAME:                                    SEGMENT:

BLM_0107920

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **To:** | Barbara_Sharrow@blm.gov; dave_kauffman@blm.gov; Deborah_Magee@blm.gov; Angie Adams; Kate Wynant; bbott68@gmail.com; Aschroeder@usbr.gov; kjensen@cj.montrose.co.us; renzo.delpiccolo@state.co.us; shansen@deltacounty.com; MPelletier@gunnisoncounty.org; swhite@montrosecounty.net; lpadgett@ouraycountyco.gov; lynn@mtngeogeek.com; joanm@sanmiguelcounty.org; pat@cedaredgecolorado.com; MSe1047096@aol.com; gsparks@mtnvillage.org; mjreagan@fone.net; norwoodparker@centurytel.net; sharold@ci.olathe.co.us; davidvarley@kaycee.net; townofpaonia@tds.net; jcoates@town.ridgway.co.us; Dan_Reinkensmeyer@fws.gov; tkrandallparker@fs.fed.us; lbroyles@fs.fed.us; segfahlt@gmail.com; Bruce_Krickbaum@co.blm.gov; UFO AR |
| **Subject:** | Agenda for August 19 Cooperating Agency Meeting |
| **Date:** | Wednesday, August 04, 2010 12:00:27 PM |
| **Attachments:** | UFO-CA_2010-08-19_Agenda.pdf |

Hello Cooperating Agencies,

I have attached the agenda for our next meeting, which is on August 19
(1:00 - 4:00) at the Holiday Inn Express in Montrose.

We will have a presentation on Land Health Assessments, Soils, and
Recreation.  Please review the fact sheets on Vegetation/Land Health and
Recreation prior to the meeting.  There is not a fact sheet on soils.  The
sheets are on our planning web page at www.uformp.com (they are in a yellow
box toward the bottom of the page).
You will look for:
   6.1 - Vegetation and Land Health
   3.1 - Recreation and Visitor Services
I am hesitant to email the sheets because of their size.

(See attached file: UFO-CA_2010-08-19_Agenda.pdf)


Thanks, Bruce

<><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

BLM_0107921

 **United States Department of the Interior** 

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401

# COOPERATING AGENCY MEETING #4

## Thursday, August 19, 2010 (1:00 – 4:00 PM)

## Meeting Location:
### Holiday Inn Express (Jordan Room)
### 1391 South Townsend Avenue, Montrose, CO

# AGENDA

1. **Welcome**
2. **Introductions**
3. **Planning Process to Date**
4. **Renewable Energy**
5. **Resource/Resource Use Discussions**
   - Land Health Assessments
   - Soils
   - Recreation
6. **Alternatives Development**
   - Draft Themes
   - Draft Goals
   - Other
7. **Other Items Not on the Agenda**
8. **Action Items / Next Meeting**

BLM_0107922

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **To:** | sbear@dmea.com; Steve.weist@oxbow.com; John@reams-construction.com; billday@paonia.com; rich@richdurnanphoto.com; Robbie.levalley@colostate.edu; Wblack8709@msn.com; pmueller@tnc.org; silvers1@tds.net; tkctew@yahoo.com; Barbara_Sharrow@blm.gov; dave_kauffman@blm.gov; Deborah_Magee@blm.gov; Bruce_Krickbaum@co.blm.gov; Angie Adams; Kate Wynant; bbott68@gmail.com; UFO AR |
| **Subject:** | Agenda for August 20 RAC Subgroup Meeting |
| **Date:** | Wednesday, August 04, 2010 11:46:40 AM |
| **Attachments:** | UFO-SG_2010-08-20_Agenda.pdf |

Hello RAC Subgroup,

I have attached the agenda for our next meeting, which is on August 20
(9:00 - 12:00) at the Holiday Inn Express in Montrose.

We will have a presentation on Land Health Assessments, Soils, and
Recreation.  Please review the fact sheets on Vegetation/Land Health and
Recreation prior to the meeting.  There is not a fact sheet on soils.  The
sheets are on our planning web page at www.uformp.com (they are in a yellow
box toward the bottom of the page).
You will look for:
    6.1 - Vegetation and Land Health
    3.1 - Recreation and Visitor Services
I am hesitant to email the sheets because of their size.

                    (See attached file: UFO-SG_2010-08-20_Agenda.pdf)

Thanks, Bruce

<><><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

BLM_0107923

 **United States Department of the Interior** 

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401

# RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #4
## Friday, August 20, 2010 (9:00 AM – 12:00 PM)

### Meeting Location:
### Holiday Inn Express (Jordan Room)
### 1391 South Townsend Avenue, Montrose, CO

# AGENDA

1. **Welcome**

2. **Introductions**

3. **Planning Process to Date**

4. **Resource/Resource Use Discussions**
   - Land Health Assessments
   - Soils
   - Recreation

5. **Alternatives Development**
   - Draft Themes
   - Draft Goals
   - Other

6. **Other Items Not on the Agenda**

7. **Public Comments / Questions**

8. **Action Items / Next Meeting**



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401



# RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #3
## Friday, July 23, 2010 (9:00 AM – 12:00 PM)

### Meeting Location:
### Holiday Inn Express (Jordan Room)
### 1391 South Townsend Avenue, Montrose, CO

# Meeting Minutes

**Attendees:** Angie Adams (EMPSi), Shelby Bear, Robbie Baird-LeValley, Bill Day, Richard Durnan, William Ela, Glade Hadden (BLM Uncompahgre Field Office), Bruce Krickbaum (BLM Uncompahgre Field Office), Jeff Litteral (BLM Uncompahgre Field Office), John Reams, Charlie Sharp (BLM Uncompahgre Field Office), Barb Sharrow (BLM Uncompahgre Field Office), Steven Weist, Kathy Welt, Kate Wynant (EMPSi)

**Handouts:** Agenda, Highlights of the Resource Management Planning Process to Date, RMP Planning Area Fact Sheet 3.4 (Cultural and Paleontological Resources), Archaeology PowerPoint slides, RMP Planning Area Fact Sheet 5.1 (Managing Special Status Plant & Wildlife Species), Threatened, Endangered, and Sensitive Species of the Uncompahgre Field Office PowerPoint slides, RMP Planning Area Fact Sheet 4.2, Wild and Scenic Rivers, Wild and Scenic Rivers PowerPoint slides, Potential Impacts of Wild and Scenic River Suitability Determination or Designation by Congress on Existing and Potential Uses Within River Corridors, Letter to Interested Parties Soliciting Comments on Suitability Criteria for Eligible Segments, Appendix C (Program/Resource-specific Decision Guidance) of BLM Handbook H-1601-1 (Land Use Planning), Uncompahgre RMP Internal Working Draft Goals, Example of Resource Management Plan Alternative Themes, Draft Uncompahgre RMP Action Alternatives Themes

1. **Welcome** (Angie Adams)

2. **Introductions** (All present)

3. **Planning Process to Date** (Angie Adams)
   - Handout: Highlights of the Resource Management Planning Process to Date.
   - The Draft Areas of Critical Environmental Concern evaluation report is on BLM Web site (www.uformp.com). We're accepting comments on the report through August 20. The report is an evaluation of all the special areas that the public nominated or BLM knows about that has a special value (cultural, biological scenic, etc) that warrants protection. The report evaluates whether the areas meet certain criteria. The summary is that there are a handful of areas that do meet the criteria and those areas have to be considered in at least one alternative of the RMP. It doesn't make any decisions, just tells us what met the criteria. It doesn't mean that they'll be designated or not.

BLM_0107925

- The Final Wild and Scenic River (WSR) Eligibility report is available on the RMP Web site (www.uformp.com). Also on the Web is a solicitation for feedback on the suitability criteria, which is the next phase.
- This week we met with the BLM Interdisciplinary Team to talk about alternatives.

## 4. Resource/Resource Use Discussions

- Cultural and Paleontological Resources (Glade Hadden)
  - o Refer to handouts: RMP Planning Area Fact Sheet 3.4 (Cultural and Paleontological Resources) and Archaeology PowerPoint slides.
  - o BLM land in the UFO has over 8,000 archaeological sites.
  - o Paradox Valley Rock Art site will likely be evaluated as an Area of Critical Environmental Concern or a National Register Historic District.
- Special Status Species (Charlie Sharp)
  - o Refer to handouts: RMP Planning Area Fact Sheet 5.1 (Managing Special Status Plant & Wildlife Species) and Threatened, Endangered, and Sensitive Species of the UFO PowerPoint slides.
  - o There are about 400 threatened, endangered, candidate, and proposed species.
  - o *Question*: Is this US Fish and Wildlife Service looking at these? *Answer*: Yes, the US Fish and Wildlife Service is the agency in charge of categorizing the species and planning for their recovery.
  - o *Question*: Can you end up with a "no affect" by mitigation? *Answer*: Yes, or we might have adverse impacts and can mitigate them to "not likely to adversely affect." That might be the most important thing and a lot of project proponents are informed enough to know how to mitigate or locate projects to avoid adverse impacts to sensitive species.
  - o *Question*: Where do you find black-footed ferret? *Answer*: There are none in this area but there is potential habitat and fossil evidence that they were here and you find that mostly South of Paonia and Hotchkiss. You find black-footed ferret mostly in places you find prairie dogs, but in this area we don't have dense enough populations of prairie dogs to support the black-footed ferrets. There is a population in Craig but populations are stronger in Utah.
  - o *Question*: Has there been any discussion about the cessation of tamarisk removal because of the threat to southwestern willow flycatcher? *Answer*: The background is that we've been removing tamarisk (weed) from riparian areas. Flycatchers rely on mostly willow riparian habitat, which have been overtaken by tamarisk. Entities are looking at putting a halt on removing tamarisk not to threaten the flycatcher.
    - ▪ *Comment*: I think most of the concern is south in St. George where there is tamarisk and nothing else. Flycatchers nest a few miles where they are hatched so if they come back and there is only tamarisk, then they'll nest there. Here in the Uncompahgre Field Office we don't have that problem so tamarisk removal is probably not an issue for the flycatcher here.
    - ▪ *Question*: Do flycatchers eat beetles? *Answer*: Maybe but they're not going to impact the number of beetles. The beetles are a Chinese species from the same area as the tamarisk that only feed on tamarisk. They've been brought here to try to control the tamarisk since there is so much of it.
    - ▪ Overall, studies suggest that the flycatchers in the area are not the southwestern willow flycatcher in this area.
    - ▪ *Question*: Where does that come from? I've tried to get them to analyze the DNA of the flycatchers but they won't do it. It's nearly impossible to tell the difference between a southwestern willow flycatcher and other subspecies. *Answer*: I don't think they know for sure. They've done some DNA testing and determined that it's the regular flycatcher in the area, but I have not seen the data, only read the outcomes. The US Fish and

BLM_0107926

Wildlife Service is on the fence about whether this species needs to be on the list for this area. It's on the list as a way for us to keep an eye on it. If we need to start consulting with US Fish and Wildlife Service for removal of tamarisk, impacts to the southwestern willow flycatcher could be a hurdle.

- *Answer*: If we remove tamarisk are we going to have knapweed instead? *Answer*: There are other things that can grow there. When we treat tamarisk we treat all invasive species, not just the tamarisk.

- Wild and Scenic River Studies (Jeff Litteral)
  - Refer to handouts: RMP Planning Area Fact Sheet 4.2, Wild and Scenic Rivers, Wild and Scenic Rivers PowerPoint slides, Potential Impacts of Wild and Scenic River Suitability Determination or Designation by Congress on Existing and Potential Uses Within River Corridors, Letter to Interested Parties Soliciting Comments on Suitability Criteria for Eligible Segments.
  - Information related to suitability criteria is due on Friday, August 16.
  - *Question*: Regarding Deep Creek and West Fork Terror Creek, you're going to portion out a small segment and manage for the small segment? *Answer*: They met the eligibility criteria. Now we'll move forward and see if it meets the suitability criteria.
    - *Question*: I mean how will you manage such a small segment? It seems like a large effort for a small area. *Answer*: That is one of the suitability criteria that will be considered and any segment could drop out of suitability because of manageability.
  - In the alternatives for the RMP, we have to consider all of the eligible segments as suitable in one alternative, all of the eligible segments as not suitable in another alternative, and then something in between. The in-between alternative(s) will be based on the suitability criteria and input from the public, stakeholder groups, Cooperating Agencies, and the RAC Subgroup.
  - The first meeting for the Gunnison River Basin stakeholder group will be sometime towards the end of August or beginning of September.
  - Regarding water rights, there are already some instream flows in segments that are designated and they are sufficient to protect the outstandingly remarkable value(s), we would not go for additional water rights.
  - Regarding the comment form, folks can fill out information only for segments that they're interested in and only for criteria that they have information for. You don't have to fill out every criterion for every segment. The only requirement is that you fill out your name and contact information so that we can contact folks if we have follow-up questions.
  - *Question*: We can make comments just like anyone else? *Answer*: Yes.
  - The comment period for this is going to end before the stakeholder groups start so the group leads will have all of the comments before the meetings start.
  - The due date for input from the stakeholder groups is the beginning of December.
  - Because other field offices are further along in the process, the public is very sensitive to the issue.
  - *Question*: How do you determine the stakeholders? *Answer*: The stakeholders determine themselves. We'll advertise via the mailing list, folks who commented during scoping for the RMP on WSR issues, notices, etc.
  - *Question*: Where will the stakeholder meetings be? *Answer*: We have not had a chance to figure it all out, but Barb is thinking a minimum of three meetings: Placerville area, Norwood, and Naturita. That is still up for discussion, though.
  - We received comments on eligibility that were more related to suitability and we will carry those over and apply them to suitability. The information on comments received on eligibility is in Appendix D of the final eligibility report.

BLM_0107927

- The final report also contains a summary of changes from the draft report to the final report.
- *Question*: As far as designated segments, what are the impacts to private landowners adjacent to segments? *Answer*: The BLM cannot tell the landowner what to do but the BLM would try to work with the landowner to encourage stewardship. More information is in the handout *Potential Impacts of Wild and Scenic River Suitability Determination or Designation by Congress on Existing and Potential Uses Within River Corridors*.
- *Question*: From my perspective for utilities, if there is a future need to cross a river, what are the restrictions? *Answer*: It would be based on the outstandingly remarkable value(s) (ORVs) and classification of the segment. If there are impacts to the ORV or classification, it might not be permitted. But if there are no impacts, there wouldn't be a reason from a WSR perspective that the action could not be permitted.
- *Question*: If a segment is designated, does it affect private property? *Answer*: Most designated rivers go through private property, but federal agencies do not have the authority to dictate actions on private lands. The intent of the WSR Act is to keep the most special rivers as free-flowing rivers. Unlike Wilderness, there can be quite a bit of leeway in WSR segments. Wild segments you can't do as much, scenic and recreational classifications you can have more development along the river corridor. For example if the ORV is fish and someone wanted to build a campground, we would evaluate whether building a campground would harm the fish. The answer could be that it doesn't harm the fish and we could go ahead and build the campground if it is also consistent with the classification. This also applies to a project proposed by entities outside of the BLM.
- All existing rights, including existing water rights and existing dams, would continue to exist and be senior to any appropriated rights resulting from designation.
- *Question*: Why designate on private land? *Answer*: Rivers don't stop at the boundary. BLM cannot dictate what goes on on private land, even within the 0.25-mile river corridor. In a power line right-of-way situation, the power line could cross private land and the BLM could not stop it. Only at the point where the power line crosses back onto BLM, then the BLM would have to look at the proposal and see if it meets the classification and would not inhibit the ORVs.
- *Comment*: The public is going to want things black-and-white and know the specific answers to specific questions. *Response*: Maybe what we (BLM) needs to do is put together a more black-and-white list of answers.
- *Comment*: In Moab we were told that we could not build a diversion structure for livestock because of the WSR classification. *Response*: It could have been because of the ORVs or classification.
- *Question*: Does the US Army Corps of Engineers have any authority? *Answer*: They have their own set of regulations. They have a regulatory role.
- An important to remember that there are a lot of things that go into suitability, including manageability.
- *Action*: RAC Subgroup members should send questions to Bruce so that we can start compiling answers to these questions for the public.
- *Comment*: In Grand Junction, there was a different opinion on what would happen for water rights from BLM and the Colorado River District. This needs to be ironed out.
- What is classified as wild now could go to scenic in the alternatives based on suitability criteria and desired future condition of that alternative.
- An appendix to the scoping report also has the actual comments on each resource, including WSRs.
- *Question*: Is much of this water unallocated? *Answer*: We are going to find out for suitability. We have people researching water rights.

BLM_0107928

- ▪ *Comment*: All of the streams are over appropriated.
- ▪ *Comment*: That was my question. Will this make any difference with a junior water right if all of the rivers are over appropriated anyway?

## 5. Internal Draft Chapters 1 (Introduction) and 3 (Affected Environment)
- Internal Draft Chapters 1 and 3 were finished last week and they're ready for review by the BLM Interdisciplinary Team, Cooperating Agencies, and the RAC Subgroup. Chapter 1 is the introduction, a general why the BLM is doing the plan revision. Chapter 3 is the Affected Environment, or existing conditions. It's the baseline of what's on the ground right now for each resource. Neither of these chapters makes any decisions. You are welcome to review. This isn't a perfect document; you'll see highlights and questions for the BLM to review.
- *Action*: We will send you an email on Monday with the site to access the document for you to download and review. Use the comment form (attached in e-mail on Monday) to comment. We are looking for other baseline data, studies, assessments that we might have missed in our baseline. If you're a specialist in a particular topic, you might want to focus your review on that topic. The minerals piece of draft Chapter 3 is blank because the BLM is still working on the Reasonably Foreseeable Development Scenario for energy and minerals so we didn't want to duplicate effort.
- To prioritize your input for various topics, this is number three on the list after WSR suitability and the alternatives information discussed below. Comments are due on August 20.

## 6. Alternatives Development
- Handout: Appendix C of the BLM Land Use Planning Handbook. This is the how-to manual that tells us what decisions that we have to include in the RMP revision. There are two types of decisions, land use planning decisions and implementation-level decisions. The RMP will focus on the land use plan-level decisions and not implementation-level decisions. These can also be thought of as allocations, areas open and closed to leasing, open and closed to grazing, right-of-way exclusion or avoidance areas, areas of critical environmental concern, etc.
- Handout: Uncompahgre RMP Internal Working Draft Goals. These are what the BLM Interdisciplinary Team has come up with to date. Goals are desired future conditions and apply to all alternatives. Please review and provide feedback to Kate Wynant via e-mail by Friday, August 13.
- Handout: Example of Resource Management Plan Alternative Themes. These are themes from other RMPs. We wanted to show you them so you can compare to what the BLM is thinking for the Uncompahgre RMP. Most of the other RMPs around here have looked at an alternative with an emphasis on conservation, an alternative with an emphasis on resource use or development, and an alternative that is a combination of the two. The No Action (Current Management) alternative falls somewhere between the conservation and development alternatives range.
- Handout: Draft Uncompahgre RMP Action Alternatives Themes. The BLM Interdisciplinary Team worked this week on the themes for their alternatives so they can write objectives and actions to fit the themes. The objectives and actions must be a reasonable range of alternatives. We are no where near choosing a preferred alternative, we're thinking about the range. In this case we've come up with four alternatives with preservation and development in high- and low-intensity degrees. The BLM Interdisciplinary Team is still not sure if this is the way to go or if there is another way to look at the alternatives, such as the conservation, development, and something in the middle.
- For example, the Grand Mesa, Uncompahgre, and Gunnison National Forests had a lot of alternatives which means a lot of work for the staff and the public. Do we need a lot of alternatives or can we do fewer and still get to the same place?

- *Question*: Where does current management fall right now? *Answer*: It's different for each resource program, really.
- *Question*: Doesn't that need to be brought into it, especially when you have to think about budget constraints? *Answer*: That is a good point, but the National Environmental Policy Act tells us that we have to look at a reasonable range, which doesn't include finances. We can't exclude something from reasonableness just because the BLM can't afford it.
  - ○ *Comment*: But you can consider that when National Environmental Policy Act documents are being litigated because a preferred alternative isn't reasonable in terms of it could never happen because of funding. *Response*: Sure, but instead of the BLM excluding alternatives based on what can and cannot happen we are considering a reasonable range of alternatives that could be implementable. Once we get to the preferred alternative, we can think about budget constraints. The RMP is potentially one way to get money, although just because it's in the plan doesn't mean the field office will get money, but it provides justification for budget requests.
- Our staff is struggling where some resources don't have a lot of decision space because of laws and regulations (for example, special status species, cultural resources, and minerals), but others do (for example, recreation and vegetation). The specialists with room are wanting four alternatives because they can come up with four alternatives. Other specialists don't want four alternatives because they can't come up with four distinct reasonable alternatives. All alternatives must follow the law. It is our prediction right now that none of the four alternatives themes will be the preferred alternative itself. The preferred will probably a blend of each of the four alternatives.
- *Action*: Send Kate an e-mail with your feedback on the themes by Friday, August 13. Do you think we can analyze three action alternatives, plus the preferred, or do we need more action alternatives, plus the preferred? What is the reasonable range?
- *Question*: Is part of this a question of how many alternatives the public will get? The public doesn't like it when they see three choices and they know which one is going to get chosen already. If it has to be that way, the BLM should emphasize that it could be a blend of any of the alternatives. *Response*: That is what we tried to avoid. We wanted to see a range of alternatives and then pick the preferred. That said, the BLM must, in the Draft RMP, identify their preferred alternative. So by the time all of the public sees the alternatives, the BLM will have to stamp one of the alternatives as their preferred. However, that preferred will probably be a blend of the four alternatives instead of two poles and one in the middle. Hopefully we'll be able to relay to the public how we arrived at that by looking at a range first, and then deciding, instead of being pre-decisional.
- *Action*: We will provide an acronyms list and an abbreviated glossary. Documents for the public will be low on acronyms.

## 7. Other Items Not on the Agenda
- None.

## 8. Public Comments / Questions
- No public present.

## 9. Action Items / Next Meeting
- All meetings are at 9:00am at the Holiday Inn Express (1391 South Townsend Avenue), Jordan Room:
  - ○ Friday, August 20, 2010: Recreation, Soils, and Land Health Assessments
  - ○ Friday, October 1, 2010: Visual Resources, Lands and Realty, Minerals

BLM_0107930

☐ *Action* (RAC Subgroup): Review draft ACECs report and provide comments as appropriate by August 20.

☐ *Action* (RAC Subgroup): Provide BLM information pertaining to the WSR suitability criteria by August 16.

☐ *Action* (Bruce Krickbaum): E-mail group the location of Chapters 1 and 3 files on file transfer protocol site, an electronic comment form, and some instructions.

☐ *Action* (RAC Subgroup): Review internal draft Chapters 1 and 3 and provide comments to Kate Wynant by Friday, August 20.

☐ *Action* (RAC Subgroup): Review the draft goals and e-mail feedback to Kate Wynant by Friday, August 13.

☐ *Action* (RAC Subgroup): Review the draft alternatives themes and e-mail feedback to Kate Wynant by Friday, August 13.

☐ *Action* (BLM): Provide an acronyms list and an abbreviated glossary.

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **To:** | bear@dmea.com; Steve.weist@oxbow.com; John@reams-construction.com; billday@paonia.com; rich@richdurnanphoto.com; Robbie.levalley@colostate.edu; Wblack8709@msn.com; silvers1@tds.net; tkctew@yahoo.com; Barbara_Sharrow@blm.gov; Bruce_Krickbaum@co.blm.gov; Angie Adams; Kate Wynant |
| **Subject:** | Fw: Draft Minutes: Uncompahgre RMP RAC Subgroup Meeting #3 |
| **Date:** | Wednesday, August 04, 2010 9:19:15 AM |
| **Attachments:** | DraftMinutes_UFO-SG_2010-07-23.doc |

Hello RAC Subgroup members,

I have attached draft minutes of the Uncompahgre RMP RAC Subgroup meeting held on July 23.  Please review the draft minutes and let me know of any errors or omissions by Tuesday, August 10, after which they will be revised and submitted to all group members and the administrative record.

Thank you, Bruce


 (See attached file: DraftMinutes_UFO-SG_2010-07-23.doc)


PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **To:** | Barbara_Sharrow@blm.gov; Angie Adams; Kate Wynant; bbott68@gmail.com; Aschroeder@usbr.gov; kjensen@ci.montrose.co.us; renzo.delpiccolo@state.co.us; shansen@deltacounty.com; MPelletier@gunnisoncounty.org; swhite@montrosecounty.net; lpadgett@ouraycountyco.gov; lynn@mtngeogeek.com; joanm@sanmiguelcounty.org; pat@cedaredgecolorado.com; joereagan741@yahoo.com; norwoodparker@centurytel.net; sharold@ci.olathe.co.us; davidvarley@kaycee.net; townofpaonia@tds.net; jcoates@town.ridgway.co.us; Dan_Reinkensmeyer@fws.gov; segfahlt@gmail.com; Bruce_Krickbaum@co.blm.gov |
| **Subject:** | Draft Notes: Uncompahgre RMP Cooperating Agency Meeting #3 |
| **Date:** | Wednesday, August 04, 2010 9:27:05 AM |
| **Attachments:** | DraftNotes_UFO-CA_2010-07-22.doc |

Hello Cooperating Agencies,

I have attached draft notes of the Uncompahgre RMP Cooperating Agency meeting held on July 22. Please review the draft notes and let me know of any errors or omissions by Tuesday, August 10, after which they will be revised and submitted to all group members and the administrative record.

Thank you, Bruce

<><><><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401
970.240.5384

  (See attached file: DraftNotes_UFO-CA_2010-07-22.doc)

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

 

# United States Department of the Interior

### BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401

# COOPERATING AGENCY MEETING #3

## Thursday, July 22, 2010 (1:00 – 4:00 PM)

## Meeting Location:
## Holiday Inn Express (Jordan Room)
## 1391 South Townsend Avenue, Montrose, CO

# Meeting Notes

**Attendees:** Angie Adams (EMPSi), Jen Coates (Town of Ridgway), Renzo DelPiccolo (Colorado Department of Natural Resources, Southwest Region), Collin Ewing (US Fish and Wildlife Service), Patti Grafmyer (Town of Norwood), Glade Hadden (BLM Uncompahgre Field Office), Susan Hansen (Delta County BOCC), Scott Harold (Town of Olathe), Kerwin Jensen (City of Montrose), Bruce Krickbaum (BLM Uncompahgre Field Office), Jeff Litteral (BLM Uncompahgre Field Office), William Long (Town of Nucla), Joan May (San Miguel County BOCC), Patricia Means (Town of Cedaredge), Lynn Padgett (Ouray County BOCC), Mike Pelletier (Gunnison County), Barbara Peterson (Town of Paonia), Joe Reagan (Town of Norwood), Dan Reinkensmeyer (US Fish and Wildlife Service), Alan Schroeder (Bureau of Reclamation, Western Colorado Area Office), Charlie Sharp (BLM Uncompahgre Field Office), Barb Sharrow (BLM Uncompahgre Field Office), Roy Smith (via conference call) (BLM Colorado State Office), David Varley (Town of Orchard City), Steve White (Montrose County BOCC), Kate Wynant (EMPSi)

**Handouts:** Agenda, Highlights of the Resource Management Planning Process to Date, RMP Planning Area Fact Sheet 3.4 (Cultural and Paleontological Resources), Archaeology PowerPoint slides, RMP Planning Area Fact Sheet 5.1 (Managing Special Status Plant & Wildlife Species), Threatened, Endangered, and Sensitive Species of the UFO PowerPoint slides, RMP Planning Area Fact Sheet 4.2, Wild and Scenic Rivers, Wild and Scenic Rivers PowerPoint slides, Potential Impacts of Wild and Scenic River Suitability Determination or Designation by Congress on Existing and Potential Uses Within River Corridors, Letter to Interested Parties Soliciting Comments on Suitability Criteria for Eligible Segments, Appendix C (Program/Resource-specific Decision Guidance) of BLM Handbook H-1601-1 (Land Use Planning), Uncompahgre RMP Internal Working Draft Goals, Example of Resource Management Plan Alternative Themes, Draft Uncompahgre RMP Action Alternatives Themes

1. **Welcome** (Angie Adams)

2. **Introductions** (All present)

3. **Planning Process to Date** (Angie Adams)
   - Handout: Highlights of the Resource Management Planning Process to Date

BLM_0107934

- The draft Areas of Critical Environmental Concern (ACEC) Report is available online. The deadline to submit comments on the draft report is August 20.
- The final Wild and Scenic River (WSR) Eligibility Report is available online.
- The BLM is soliciting comments on the *suitability* criteria for eligible segments. The deadline to submit information related to suitability is August 16.

## 4. Resource/Resource Use Discussions

- Special Status Species (Charlie Sharp)
  - Refer to handouts: RMP Planning Area Fact Sheet 5.1 (Managing Special Status Plant & Wildlife Species) and Threatened, Endangered, and Sensitive Species of the UFO PowerPoint slides.
  - The BLM looks to the US Fish and Wildlife Service for guidance on how to protect threatened and endangered species.
  - Some of the species are not known to occur in the Uncompahgre Field Office; they occur in adjacent areas, but there might be potential for them to occur in the Uncompahgre Field Office.
  - Decisions in the RMP must meet the laws and guidance.
- Cultural and Paleontological Resources (Glade Hadden)
  - Refer to handouts: RMP Planning Area Fact Sheet 3.4 (Cultural and Paleontological Resources) and Archaeology PowerPoint slides.
  - BLM land in the UFO has over 8,000 archaeological sites.
  - Paradox Valley Rock Art site will likely be evaluated as an ACEC or a National Register Historic District.
  - *Question*: How do we keep digging down [in the earth] for different time frames? *Answer*: Because of natural processes, dirt just comes down. In some sites dirt comes down a hill and settles in a certain area. Everything moves; there is no such thing as a stable surface.
  - *Question*: What is site sensitivity and how do you model that? *Answer*: We look at how much survey has been done in a certain area, how many sites are in that area, how many sites are eligible [for listing on the National Register of Historic Places], and that gives you an idea of site density. Then you look at the sensitivity in terms of if they meet certain criteria. Both of these things go into determining the sensitivity model. The site sensitivity model makes sense with instinct.
- Wild and Scenic River Studies (Jeff Litteral)
  - Refer to handouts: RMP Planning Area Fact Sheet 4.2, Wild and Scenic Rivers, Wild and Scenic Rivers PowerPoint slides, Potential Impacts of Wild and Scenic River Suitability Determination or Designation by Congress on Existing and Potential Uses Within River Corridors, Letter to Interested Parties Soliciting Comments on Suitability Criteria for Eligible Segments.
  - The eligibility phase of the process is finished. The BLM is now soliciting comments on the suitability criteria as they relate to the eligible segments. The comment period ends on August 16. We received comments during the eligibility phase that are more related to suitability and they will be carried forward to this phase of the analysis.
  - We are soliciting comments on eligible segments within the Dominguez-Escalante National Conservation Area, including segments studied for eligibility by the Grand Junction Field Office.
  - Stakeholder group meetings will be announced via the project Web site and via e-mail to stakeholders. For the Gunnison River Basin, the first meeting is targeting for August 13 in Delta at the Bill Heddles Recreation Center from 2:00-4:30pm. Meetings for the San Miguel and Dolores Rivers and their tributaries have not yet been determined.

BLM_0107935

- If the BLM determines any segments are suitable, they must implement interim protective management until Congress either designates or dismisses the recommendation. Suitability doesn't mean designation, only Congress can do that.
- *Question*: If a segment is deemed suitable but is not designated, it doesn't lose the status of being suitable so there could be management practices imposed to protect those qualities? *Answer*: Yes, through administrative decisions. If Congress designates a river, any portions not included in the designation are dropped from interim protective management.
- *Question*: So if it's suitable, does that elevate management? *Answer*: We must protect the outstandingly remarkable values (ORVs) for that segment.
- *Question*: So if two years pass and a segment is not designated, that segment is dropped? *Answer*: No. A suitable segment must be protected, within the BLM's authority, until Congress acts on a recommendation or until the BLM revises the RMP again, at which time the segment is reevaluated. Right now there are 34 eligible segments so we are mandated as of this time to protect those ORVs. When you get to suitability a lot more issues come up and some segments drop off.
- *Question*: How are the stakeholder groups identified or chosen? *Answer*: We put together a list, coordinated with Chris Treece [of the Colorado River District] and Katie Stevens, the interim manager of the Dominguez-Escalante National Conservation Area, sending letters, and posting on the Web site. Anyone is welcome to be involved in the stakeholder process.
- *Question*: Are you going to try to get consensus on at the meetings or just whoever shows up? *Answer*: Some questions can be answered better by a stakeholder group and others by Cooperating Agencies because you have that information. Each group may have different processes because each group will decide what their process is for giving information to the BLM.
- *Comment*: Some of these suitability questions seem very objective like what other things can the river be used for. It seems like segments that are determined suitable stay suitable or get designated. It's pretty permanent. *Response*: The Dolores Field Office has been talking about legislation and they are a lot further along in the RMP process. They are at the point that in their 1980s RMP they did a WSR evaluation and are going through it for the second time and deciding it's time for action. We are going through this for the first time; it's the first time we've done the inventory.
- *Roy Smith*: Stakeholder group involvement is a lot of commitment and time. The groups have decided on their own what issues they want to pursue and what issues they want to take on. Groups throughout the state have come to very different places at the end of the process. In the Upper Colorado River Basin, the group focused only on the Colorado River from Kremmling to Glenwood Springs and the group involved several water providers. They focused on flow management issues and what they could do cooperatively to ensure flows to protect the ORVs. They left the land management issues to BLM. In Grand Junction, the stakeholder group went a different way recognizing that they were at the bottom of the streams and didn't control flows so they made recommendations to BLM on ways to promote or enhance the ORVs.
- *Question*: You had mentioned a meeting for the Gunnison River Basin in August. Is there a set meeting for the other group? *Answer*: No not yet.
  - *Question*: But we'll be notified of those meetings? *Answer*: Yes.
- *Question*: Are the water rights holders contacted for each of the specific stakeholder groups? *Answer*: I can't say that that's the case because we don't always know exactly who those are but we will try to advertise so that the water rights holders can be informed and come.
- *Question*: Has the US Forest Service done something like this? *Answer*: Yes, in the final eligibility report you can see what adjacent BLM field offices and agencies have done and what the results are.

- o The comment form, which is available on the web site, can be filled out electronically and submitted via e-mail, printed and mailed, faxed, or hand-delivered. Each segment has its own form in the document. We understand that you might not have comments on each of the criteria so you don't have to fill out everything.
- o *Question*: What has been the experience with how the Cache la Poudre River has been accepted or regulated in the area? The experience for property owners or residences in the area? *Answer*: I'm not familiar with the property owners so I can't speak for them. There isn't a lot of BLM in the area. Chris Treece has talked about getting some representatives from that area to come to the stakeholder meetings here. The river was designated in 1986.
- o *Question*: You mentioned that we are going to help draft an alternative? Two are already set so that only leaves one more? *Answer*: Yes, you can help by providing input on the suitability criteria so the BLM can fill in an alternative between all suitable and none suitable.
- o *Question*: Does someone have to fill out all 80 pages of the suitability criteria comment form or can they just pick a page? *Answer*: No, you can fill out pages for the segments you're interested in and only for the questions that you're interested in. Whatever segments that you do make comments on, please make sure that you tell us who you are so if we have questions we can ask you.
- o *Question*: Why weren't WSRs looked at the last time the RMP was done? *Answer*: The reason is the history of analyzing WSRs in the Department of the Interior. When the first plan was done for this field office, the Department of the Interior thought that WSR analysis was the responsibility of the National Park Service that should only be done on larger rivers. In the late 80s, it was determined that no, this is part of land use planning and this must be done during RMP revision.
- o *Question*: Why did the Grand Junction Field Office eliminate the lands that had private land adjacent to them? Was that for eligibility or suitability? *Answer*: I can't speak for Grand Junction Field Office but for our field office, we looked at the whole river because the ORVs are on the whole river.
- o *Question*: When congress designates a river, is it only the part on public lands? *Answer*: No, congress will usually look at a whole stretch regardless of landownership. In the 80s, a lot of segments were designated in Oregon without having done any preliminary studies. Those went through state lands, federal, private lands. It really varies depending on state. Jeff L: In Kentucky there is a state program called the Wild Rivers Program and there were issues where rivers went through private land and it's manageable. Some people are against it but some people recognize the value of it.
- o The web site www.rivers.gov has lots of information and answers questions you might have or your constituents might have.
- o One of the things that gets confusing is that there is a misconception that once the BLM determines suitability, a federal water right is created which is not true. Only when Congress designates a river is a federal right appropriated. A lot of the segments already have instream flows appropriated.
- o *Question*: Do you have a map of where those water rights are? *Answer*: We will have them in the RMP and will have them at the stakeholder group meetings.
- o *Question*: If there is a wild and scenic designation and it comes with a water right, but some already have instream flows, does the federal right compliment or supersede that instream flow? *Answer*: In the past, a designation has always included a water right even if there is already an instream flow for the stream. The federal right may be the same amount or timing as the state right if the state right meets all of the needs. If there is an instance that the flow doesn't provide enough, say for recreation, the right needed would be quantified and the federal right would include enough for the recreation ORV.

- o *Question*: Congress designates a segment and applies for a water right, so the water right is junior to the other rights? *Answer*: Correct.
- o *Question*: So if there is an act of Congress and there is a water right with it, I would think that the Colorado Water Conservation Board would have to grant that right? *Answer*: Yes but we work closely with the Colorado Water Conservation Board so if there are flows already in place that are sufficient, we might just go with the instream flow without asking for any additional appropriations.
- o There is a difference here is between WSR and Wilderness. We have to consider the reason the WSR Act exists. When the WSR Act was passed, we were damming rivers in the West so the bill was passed to keep some of our rivers as rivers instead of damming them. These classifications (wild, scenic, and recreational) are levels of development. If a river is recreational, you can have roads, developments, etc. There are designated rivers that flow through towns. It's different than wilderness. The wild classification is more like wilderness. If a project is proposed along a recreational segment within the 0.25-mile buffer, we would look at the ORVs. For example if the ORV is fish and someone wanted to build a campground, we would evaluate whether building a campground would harm the fish. The answer could be that it doesn't harm the fish and we could go ahead and build the campground if it is also consistent with the classification. This also applies to a project proposed by entities outside of the BLM.
- o *Question*: If an action is proposed on private land, does it go through BLM? *Answer*: During eligibility and suitability, the BLM can't do anything. BLM doesn't have a say for private lands. (Refer to handout, Potential Impacts of Wild and Scenic River Suitability Determination or Designation by Congress on Existing and Potential Uses Within River Corridors.)

## 5. Internal Draft Chapters 1 (Introduction) and 3 (Affected Environment) (Angie Adams)
- This is your opportunity to review the internal draft of Chapters 1 and 3. There are no decisions in these chapters, they just document the baseline for all of the resources.
- Because there are no decisions, it isn't a critical piece for Cooperating Agencies to review. However, as Cooperating Agencies, you might have good information that may have been missed. If there are particular topics of interest or in which you have expertise, focus your efforts on those.
- *Action*: We will email you the location of the files on a file transfer protocol site, an electronic comment form, and some instructions. Your comments will be due on August 20. The RAC Subgroup is also reviewing, as well as the BLM, so you're seeing it as they're seeing it. It's an internal draft so we'd ask that you don't distribute it but please provide feedback on sections that are of interest to you or that you have expertise in.
- We are particularly looking for information, studies, trends, etc. that you know of that we might not be aware of and didn't include.

## 6. Alternatives Development (Angie Adams)
- Handout: Appendix C of the BLM Land Use Planning Handbook. This is the "how to do planning for BLM." The handbook is available online, but Appendix C tells us what we have to address for each resource in the alternatives.
- Appendix C identifies land use plan decisions and implementation decisions. The RMP will focus on the land use plan decisions but doesn't get into the implementation decisions.
- *Question*: Looking at livestock grazing, are we going to see a map of what this would look like? *Answer*: Yes, we are not asking you to make the maps, but the BLM will do that as part of the development process and you will review to make sure the BLM has done the right thing in their range of alternatives.

- Handout: Internal Draft Working Goals. These are the draft goals that the BLM Interdisciplinary Team came up with this week. Goals are going to apply for all alternatives. Under each alternative we'll have varying objectives and actions. Please review the goals and e-mail feedback to Kate Wynant by Friday, August 13. Bruce will add a reminder to do this in his e-mail on Monday.
- Handout: Example RMP Alternatives Themes. These are examples of alternatives themes from other plans around the area so you can compare with the draft themes for this plan.
- Handout: Internal Working Draft Themes for the Uncompahgre RMP. The key for you to focus on are the quick descriptors of the themes and not necessarily the examples in each column. This is a result of a brainstorm with the BLM. We need your help with these themes, whether or not these seem reasonable, if there is a good range. Please review the themes and e-mail feedback to Kate Wynant by Friday, August 13. Bruce will add a reminder to do this in his e-mail on Monday.
  - Alternative A is current management (not captured in the handout).
  - Alternatives B through E are different ways to fix or change Alternative A.
  - *Question*: Does BLM get a bigger budget by choosing a high-intensity management option? Does the budget you might get factor in? *Answer*: No, but when we go to the analysis, we might think about that. Another point to make is that none of these are our preferred alternative at this point. This was hard this week because most people find themselves in one of these columns but we have to come up with a range of activities. Between all of the people involved in this plan we should come up with a good range. We'll be looking for the preferred after we've created the alternatives.
  - *Question*: Then it goes out for scoping? *Answer*: Then the Draft RMP/Draft Environmental Impact Statement goes out for public review.
  - Alternatives have to meet laws, standards, policy, etc. Within those sideboards there are lots of things we can do. The preferred action will fall within the range. Think about things that matter to you and would it fit somewhere in this range.
  - As a Field Manager, I would like your input as to whether or not this is a good way to go.
  - *Comment*: It seems like this is somewhat similar to what the Grand Mesa, Uncompahgre, and Gunnison National Forests did. *Response*: Yes. The National Environmental Policy Act tells us that we have to address a reasonable range of alternatives. Going back to the budget, the National Environmental Policy Act doesn't tell us to look at the budget.
  - *Question*: Are you looking for comments from this group on the philosophy of these themes? *Answer*: Yes.
  - *Comment*: I don't understand all of the acronyms.
    - ROW: right-of-way
    - NSO: no surface occupancy. A stipulation that says you can't have a drill rig on that parcel the NSO stipulation applies to.
    - VRM: visual resource management. The way BLM classifies its land on a scale of I (unmodified landscape) to IV (manmade intrusions).
    - T&E: threatened and endangered
    - SSS: special status species (includes threatened and endangered and BLM sensitive species)
    - ACECs: areas of critical environmental concern
    - AUM: animal unit month; livestock forage
    - BMP: best management practice
    - SRMA: special recreation management area, areas focused on recreation of some type, could be motorized or nonmotorized; quiet use, intensive motorized use, etc.

BLM_0107939

- ERMA: extensive recreation management area. Anything not designated as a special recreation management area is part of the extensive recreation management area; leftover BLM land.
- WSR: wild and scenic river
- *Action*: We will provide an acronym list at the next meeting, as well as a glossary.
  - *Question*: Where does Alternative A fall in this spectrum? Where would grazing be, for example? Would it be possible to get a schematic that summarizes that? *Answer*: We can't consolidate where Alternative A is in the spectrum. We could send you alternative A in a very draft form.
    - The old RMPs are available electronically: http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html#RMPs
  - *Comment*: If Alternative A is considered high-intensity and it's not good enough, then you have to do more. So we have to know what Alternative A is.
  - *Comment*: I think the point is not to compare Alternative A with this because Alternative A wasn't developed using this so isn't the point to give feedback on the approach? *Answer*: Yes.
  - *Question*: What you have in these columns isn't set in stone yet, these are just examples, right? *Answer*: Yes, that's correct.
  - *Comment*: Grand Junction Field Office's reasonable range had a conservation alternative, a preservation alternative, and a preferred in between. This seems the same but with an intensity component. *Response*: Yes, and we struggled with going with that approach or looking at other options.
  - We have to look at a reasonable range, though, not just anything. "Utopia" is arguably not reasonable in a country that has a lot of people recreating on and utilizing public lands.

## 7. Other Items Not on the Agenda
- None.

## 8. Action Items / Next Meeting
- All meetings are at 1:00pm at the Holiday Inn Express (1391 South Townsend Avenue), Jordan Room:
  - Thursday, August 19, 2010: Recreation, Soils, and Land Health Assessments
  - Thursday, September 30, 2010: Visual Resources, Lands and Realty, Minerals
- ☐ *Action* (Cooperating Agencies): Review draft ACECs report and provide comments as appropriate by August 20.
- ☐ *Action* (Cooperating Agencies): Provide BLM information pertaining to the WSR suitability criteria by August 16.
- ☐ *Action* (Bruce Krickbaum): E-mail group the location of Chapters 1 and 3 files on file transfer protocol site, an electronic comment form, and some instructions.
- ☐ *Action* (Cooperating Agencies): Review internal draft Chapters 1 and 3 and provide comments to Kate Wynant by Friday, August 20.
- ☐ *Action* (Cooperating Agencies): Review the draft goals and e-mail feedback to Kate Wynant by Friday, August 13.
- ☐ *Action* (Cooperating Agencies): Review the draft alternatives themes and e-mail feedback to Kate Wynant by Friday, August 13.
- ☐ *Action* (BLM): We will provide an acronym list at the next meeting, as well as a glossary.
- ☐ *Action* (Bruce Krickbaum): Send Cooperating Agencies Alternative A in a very draft form.

**James Bode**

| | |
|---|---|
| **From:** | Mark Goldfogel <mark@wonder-dog.net> |
| **Sent:** | Thursday, August 05, 2010 1:43 PM |
| **To:** | uformp@blm.gov |
| **Cc:** | pmueller@tnc.org |
| **Subject:** | La Sal Creek BLM Feedback form. |
| **Attachments:** | BLM La Sal Creek Comment.doc |

*I am submitting my two cents on La Sal Creek Segment 1.  It would be great to know if this is received somewhere.*

*It is attached.  In a nutshell, I believe it is important, necessary and one of the greatest unprotected spots in Colorado.*

*Best,*
*Mark*

**Mark Goldfogel**



124 E. Pacific, Units A & B
PO Box 3998 Telluride, CO  81435
Mark@wonder-dog.net
www.wonder-dog.net

970-708-0214 x 5

1

## 29 - LA SAL CREEK, SEGMENT I WSR SUITABILITY COMMENTS

*Preliminary Classification:* Recreational                                    *ORVs:*
Fish, Vegetation

Your Name:  __Mark Goldfogel__        Telephone:   __970-708-7149_____

Address:  MP 4, Hwy 90, Paradox, CO  81435  PO 8 Bedrock, CO 81411  E-mail:  mark@amyandmark.com

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

| GENERAL |
|---|

**1. Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.**

I own the property adjacent to MP4 and Sharp Canyon on HWY 90.
As a 4th generation Colorado native, I have scoured the state for the cleanest, most natural, most beautiful place I can live and have chosen this property for its natural beauty and wildlife.

We have counted hundreds of species at the property called **www.Geronimo-farms.com** and this is a brief list of some of the animals we have seen on our property.

Birds: Black Phoebe,  House Finch, Robin, Lazuli Bunting, Black Headed Grosbeak, Blue Grosbeak, Crow, Blue Gray Gnatcatcher, Yellow Warbler, Orange Crowned Warbler, Western Kingbird, Brownheaded Cowbird, Spotted Towhee, Rufous Hummingbird,
Black Chinned Hummingbird, Broadtail Hummingbird, Chipping Sparrow, Red Naped Sapsucker, Wild Turkeys

Mammals: Western Spotted Skunk, Ringtail Cat, Kit Fix, Black Bear, Deer, Cows, Stripped Skunk, River Otter, Beaver, Rock Squirrel, Mountain Lion, Rats and Mice and Jack the cat.

**2. Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.**

There is the Cashion Copper Mine at the end of X4 road, 4 miles down La Sal Creek from my property.  That canyon and dirt road is on BLM land and I believe the mine is on private land.  The road itself is a remarkable treasure in Colorado and is frequently camped on.

BLM_0107942

**3.  Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation.**

The abundance of Uranium mining and likely milling in the area, means that most of the natural beauty of the area is at risk.  Most of the environmental value of this remote place and its habitat will be threatened by this development and long term environmental damage from mining and ultimately milling of uranium.

## LAND OWNERSHIP AND USES

**4.  Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.**
I don't know, other than the mine.  Most of the properties around me are farming or vacatant.  Most of e farming has closed as a result of the Uranium Mill threats and property values have dropped to almost nothing. Some BLM protection might actually help those values that suffer so much from the stigma of Uranium.

**5.  Compatibility or incompatibility of designation with current land and water uses and development.**

La Sal creek is small but quite powerful.  The canyon on X-4 road should be testimate to that.  The abundance of River Otter, Beaver, Bear and lots of other mammals attaest to the quality of the natural enrivronment.

**6.  Reasonably foreseeable potential land and water development and uses that could be affected by designation.**

BLM_0107943

**Mining and Milling** See above.

| ADMINISTRATION |
| --- |

**7.  Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.**

**8.  Consistency of designation with other BLM plans, programs, and policies and regional objectives.**

**9.  Issues that might make administering this segment difficult.**
Remote location from Montrose.  We all feel abondaned by the BLM out here anyway, so it would be a nice gesture if the BLM recognized this area for something other than its potential Uranium leases.  I consider this the pretties spot in Colorado and it hurts to think the BLM just considers it waste uranium land.

**10.  Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.**

I am not aware of any land use controls along La Sal Creek.

| ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY |
| --- |

BLM_0107944

I would be very happy to see this area respected as the unique Colorado natural beauty that it is.  I see hundreds of bikers, motorcyclists and tourists enjoying our La Sal Creek corridor every day.  I just don't see any government acceptance that this land is anything but wasteland for Uranium.   And my real estate values show it.

Because of the Uranium Mill proposal, I was able to purchase this beautiful land for less than the cost of wasteland.  A good deal for me, but perhaps the BLM is missing this areas highest and best good.

BLM_0107945

**James Bode**

| | |
|---|---|
| **From:** | Joe Brinton <JBrinton@bowieresources.com> |
| **Sent:** | Friday, August 06, 2010 11:41 AM |
| **To:** | uformp@blm.gov |
| **Subject:** | wild and scenic designation |
| **Attachments:** | WSR Segment Suitability Public Comment Form 072610 Web.pdf |

To Whom It May Concern:

Here are my comments regarding the designation of the West Fork of Terror Creek as a wild and scenic river.

**Joe Brinton**
**Sr. Geologist**
**Bowie Resources, LLC**
**(970)-929-5661**

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

BLM_0107946

## 13 - WEST FORK TERROR CREEK WSR SUITABILITY COMMENTS

*Preliminary Classification:* **Recreational**                                      *ORVs:* **Fish**

**Your Name:** Joe Brinton                                    **Telephone:** 970-929-3882

**Address:** 29 Pan American Ave, Paonia, CO          **E-mail:** jbrinton@bowieresources.com

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

<div align="center">

**GENERAL**

</div>

**I.  Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.**

As listed above, the ORVs for this reach of stream are "fish". I have spent a lot of time in around this creek, and I have never found any "outstanding" fish. For something to be classified as an "outstanding remarkable value", that value should be outstanding and remarkable. This is not the case for the West Fork of Terror Creek.

**2.  Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.**

**3.  Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation.**

As mentioned above, there are no "outstanding" or "remarkable" fish species that would warrant this reach of stream to be classified as having ORVs. It should be NOT be designated.

<div align="center">

**LAND OWNERSHIP AND USES**

</div>

**4.  Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.**

There are mining rights associated with this river corridor that could be adversely affected by Wild and Scenic designation. It is more realistic to say that these rights "will be" adversely affected, rather than "could be".

**5.  Compatibility or incompatibility of designation with current land and water uses and development.**

The current land use associated with underground mining will be adversely affected by Wild and Scenic designation of this river corridor.

**6. Reasonably foreseeable potential land and water development and uses that could be affected by designation.**

> The reasonably foreseeable potential land use (those associated with underground mining) will be adversely affected by this designation.

## ADMINISTRATION

**7. Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.**

**8. Consistency of designation with other BLM plans, programs, and policies and regional objectives.**

**9. Issues that might make administering this segment difficult.**

**10. Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.**

## ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY

> Attempting to designate the 0.47 miles of this creek appears to be nothing more than an estuarine version of a "land grab". Justifying the ORV as "fish" lacks all credibility. Please reserve the Wild and Scenic designation to those rivers that are truly wild and scenic, not just any stream on BLM land.

**NAME:**  Joe Brinton            **SEGMENT:** West Fork of Terror Creek

BLM_0107948

August 8, 2010

RE: RMP Alternatives/ Themes

Kate,

   I've been thinking about the Reasonable Range of Alternatives and I doubt if I am going to understand  what we should do as well as the experts such as you, Angie, Barb and Bruce.  I have a few thoughts on the subject, though, and here they are:

I am not totally against the four theme grid that we discussed, but I'm starting to lean more towards the conventional three alts plus the required A/do nothing.  I am afraid the four theme grid means any Preferred Alt is in an "extreme" corner, meaning more people being really unhappy and wanting to sue, since there is no middle choice.  It would almost require a nine theme grid, even though at least four and maybe six of those choices wouldn't really be viable choices.
After years of not liking the conventional conservation, Preferred/middle, and O&G/ORV choices,  I'm starting to think that it might not make that much difference.  There doesn't seem to be a good way to really give people two non-extreme choices when the BLM is required to have a preferred alt.
Maybe it is better to have the extra alt development time spent on making the Preferred alt as good as possible and explaining however much wiggle room there really is in adjusting the preferred alt.
I don't think it helps to have any more extreme positions in the other (non preferred ) alts than we are willing to actually consider. This would make it possible to use some components of B and D, or something in between, without people reading something that they are not going to get in reality. I realize that some things have to be mentioned in one alt.
I almost cringe when I read the three alts named conservation, preferred and development.  90% of the people have made up their mind by the time they read that.

   On a slightly different point, my personal favorite part of the surrounding Field Offices' plans was the San Juan goal of maintaining large blocks of undeveloped land, which showed up in the Preferred, as well as the conservation alt. That idea would be nice to fit into the Draft Goals, but I didn't really notice a good place to put it.  Otherwise, the Draft Goals looked very good.

   I'll try to get back to you if I have any other ideas this week.

Thanks,

Bill Day

BLM_0107949

**James Bode**

| | |
|---|---|
| **From:** | Bill Day <billday@paonia.com> |
| **Sent:** | Monday, August 09, 2010 8:13 AM |
| **To:** | uformp@blm.gov |
| **Subject:** | RMP ACEC comments |
| **Attachments:** | BLM UFO ACECs.doc |

Dear UFO Planners,

   Attached and copied below are my comments on proposed ACECs.

Thanks,

Bill Day
Hotchkiss

August 7, 2010

RE: RMP ACECs

Thanks for the opportunity to comment on the selections of ACECs in the RMP. All of the proposed ACECs in the Draft Evaluation look like good choices.

More particularly, the following- at a bare minimum-should definitely be included in the Preferred Alternative, and made ACECs:

Salt Desert-Kit fix, prairie dogs and associated species, and rare plants. It is totally different from the Fairview sites, and has potential for being degraded.

San Miguel River Extension-Downstream extension is great, probably upstream ones are too.

Dolores River Slickrock/ LaSal Creek-DRS seems obvious and LaSal Creek is too. They should be combined in some form. All areas with willows, box elders, NM privets and regenerating cottonwoods should be preserved along the Dolores and San Miguel.

Roubideau Corridors/ Roubideau Potter Monitor-I Like all of the areas in both proposals. The northeast corridor certainly should be included, and I think the mesa tops, which the BLM has historically neglected, should be included too.

East and/or West Paradox Valley-This is a nice area and the science seems to support them both.

The three pertaining to Gunnison Sage-Grouse should be decided based on
the best science regarding both where grouse might be able to persist in
the future, and where there is a chance for connectivity between grouse

BLM_0107950

populations and sub-populations. Sims Mesa, for instance might have more value as connecting the San Miguel and Cimarron populations, than as an isolated home for a few birds. The West End historic sites probably have value for future connectivity-which use to exist-between San Miguel and Pinon Mesa. In all cases the UFO should look at future size and connectivity of habitat more than past (or maybe even current) occupancy. Large parcels of good sage habitat in the Sims Mesa or Western Montrose County areas have a lot of wildlife value for other species, while the BLM might not gain much from having to manage numerous small parcels differently.

The Fairview sites should also be judged based purely on science, and it sounds like that means they should be included as ACECs. The Paradox Valley sites sound like they should be included, based on native plant species, too.

Like the biology sites, the archaeological sites should be based on science and the opinions of experts. They all seem good to me. Tabeguache especially sounds good, and is in an area that has other good features too.

Thanks,

Bill Day

BLM_0107951

August 7, 2010

RE: RMP ACECs


Thanks for the opportunity to comment on the selections of ACECs in the RMP. All of the proposed ACECs in the Draft Evaluation look like good choices.

More particularly, the following- at a bare minimum-should definitely be included in the Preferred Alternative, and made ACECs:
Salt Desert-Kit fix, prairie dogs and associated species, and rare plants. It is totally different from the Fairview sites, and has potential for being degraded.
San Miguel River Extension-Downstream extension is great, probably upstream ones are too.
Dolores River Slickrock/ LaSal Creek-DRS seems obvious and LaSal Creek is too. They should be combined in some form. All areas with willows, box elders, NM privets and regenerating cottonwoods should be preserved along the Dolores and San Miguel.
Roubideau Corridors/ Roubideau Potter Monitor-I Like all of the areas in both proposals. The northeast corridor certainly should be included, and I think the mesa tops, which the BLM has historically neglected, should be included too.
East and/or West Paradox Valley-This is a nice area and the science seems to support them both.

The three pertaining to Gunnison Sage-Grouse should be decided based on the best science regarding both where grouse might be able to persist in the future, and where there is a chance for connectivity between grouse populations and sub-populations. Sims Mesa, for instance might have more value as connecting the San Miguel and Cimarron populations, than as an isolated home for a few birds. The West End historic sites probably have value for future connectivity-which use to exist-between San Miguel and Pinon Mesa. In all cases the UFO should look at future size and connectivity of habitat more than past (or maybe even current) occupancy. Large parcels of good sage habitat in the Sims Mesa or Western Montrose County areas have a lot of wildlife value for other species, while the BLM might not gain much from having to manage numerous small parcels differently.

The Fairview sites should also be judged based purely on science, and it sounds like that means they should be included as ACECs. The Paradox Valley sites sound like they should be included, based on native plant species, too.

Like the biology sites, the archaeological sites should be based on science and the opinions of experts. They all seem good to me. Tabeguache especially sounds good, and is in an area that has other good features too.

Thanks,

Bill Day
Hotchkiss, CO

RECEIVED

AUG - 9 2010

Uncompahgre Field Office

## 13 - WEST FORK TERROR CREEK WSR SUITABILITY COMMENTS

**Preliminary Classification:** Recreational

Your Name: David J. Hure

Telephone: 970-527-7788

Address: P.O. Box 773 Paonia, Co 81428-0773

E-mail: dhurr @ bowie resources.com

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

### GENERAL

**1. Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.**

As listed above, the ORVs for this reach of stream are "fish". I have spent a lot of time in around this creek, and I have never found any "outstanding" fish. For something to be classified as an "outstanding remarkable value", that value should be outstanding and remarkable. This is not the case for the West Fork of Terror Creek.

**2. Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.**

**3. Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation.**

As mentioned above, there are no "outstanding" or "remarkable" fish species that would warrant this reach of stream to be classified as having ORVs. It should be NOT be designated.

### LAND OWNERSHIP AND USES

**4. Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.**

There are mining rights associated with this river corridor that could be adversely affected by Wild and Scenic designation. It is more realistic to say that these rights "will be" adversely affected, rather than "could be".

**5. Compatibility or incompatibility of designation with current land and water uses and development.**

The current land use associated with underground mining will be adversely affected by Wild and Scenic designation of this river corridor.

BLM_0107953

**6. Reasonably foreseeable potential land and water development and uses that could be affected by designation.**

The reasonably foreseeable potential land use (those associated with underground mining) will be adversely affected by this designation.

## ADMINISTRATION

**7. Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.**

**8. Consistency of designation with other BLM plans, programs, and policies and regional objectives.**

**9. Issues that might make administering this segment difficult.**

**10. Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.**

## ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY

Attempting to designate the 0.47 miles of this creek appears to be nothing more than an estuarine version of a "land grab". Justifying the ORV as "fish" lacks all credibility. Please reserve the Wild and Scenic designation to those rivers that are truly wild and scenic, not just any stream on BLM land.

**NAME:** David J. Hurr         **SEGMENT:** West Fork of Terror Creek

BLM_0107954

## James Bode

| | |
|---|---|
| **From:** | Matt Reed <matt@hccaonline.org> |
| **Sent:** | Tuesday, August 10, 2010 2:07 PM |
| **To:** | uformp@blm.gov |
| **Subject:** | Wild and Scenic Suitability Comments |
| **Attachments:** | SuitabilityForm.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |
| | |
| **Categories:** | Red Category |

Please find attached comments from High Country Citizens' Alliance on the suitability stage of Wild and Scenic River analysis. In addition to the attached pdf, we will also be mailing a hard copy of the suitability comments.

Thank you.

Matt Reed
Public Lands Director
High Country Citizens' Alliance
PO Box 1066
Crested Butte, CO 81224
(970) 349-7104
(970) 349-0164 (fax)
http://www.hccaonline.org/

1

BLM_0107955

# COMMENTING ON WILD AND SCENIC RIVER SUITABILITY

Thank you for your interest in providing comments regarding Wild and Scenic River suitability for the BLM Uncompahgre planning effort.

## COMPLETING THE RIVER SEGMENT COMMENT FORM

Comments may be typed or handwritten. Please use the segment comment form available at: www.blm.gov/co/st/en/fo/ufo/wild_and_scenic_river.html

**Submit written comments by August 16, 2010:**

- Email completed forms to:  UFORMP@BLM.GOV
- Or mail completed forms to:  BLM UFO, Attention: RMP Revision, 2465 South Townsend Avenue, Montrose, Colorado  81401

If using the Word version, print the form for mailing or save it as a new document in your local directory before completing.

If using the Adobe Pdf form, print the form for mailing.

For all forms, please:

- Print your name and phone number or email address on each page you complete.
- Address only those eligible river segments about which you have specific knowledge or concerns.
- For each segment, address only those Wild and Scenic suitability criteria about which you have specific knowledge or concerns.
- Be factual and as specific as possible regarding issues, locations, dates, and times.
- Be thorough but concise. Use as much space as needed to adequately state your point.

## PROVIDING EFFECTIVE COMMENTS

**Substantive comments do one or more of the following:**

- Raise issues the BLM has not considered and reinforce issues the BLM has already identified
- Present reasonable alternatives
- Present information that can be used when developing alternatives or considering the impacts of alternatives

## TYPES OF COMMENTS TO AVOID

**Comments that are not substantive include:**

- Comments in favor of or against an action without providing a rationale (such as "I don't like...").
- Comments that simply agree or disagree with BLM policy.
- Comments without justification or supporting data (such as "allow more grazing").
- Comments in the form of vague, open-ended questions.

BLM_0107956

# TABLE OF CONTENTS

Completing the River Segment Comment Form

Providing Effective Comments

Types of Comments to Avoid

1 - Cottonwood Creek WSR Suitability

2 - Dry Fork Escalante Creek, Segment 2 WSR Suitability

3 - Escalante Creek, Segment 1 WSR Suitability

4 - Escalante Creek, Segment 2 WSR Suitability

5 - Gunnison River, Segment 2 WSR Suitability

6 - Gunnison River, Segment 3 WSR Suitability

7 - Monitor Creek WSR Suitability

8 - Potter Creek WSR Suitability

9 - Rose Creek WSR Suitability

10 - Roubideau Creek, Segment 1 WSR Suitability

11 - Roubideau Creek, Segment 2 WSR Suitability

12 - Deep Creek WSR Suitability

13 - West Fork Terror Creek WSR Suitability

14 - Beaver Creek WSR Suitability

15 - Dry Creek WSR Suitability

16 - Naturita Creek WSR Suitability

17 - Saltado Creek WSR Suitability

18 - San Miguel River, Segment 1 WSR Suitability

19 - San Miguel River, Segment 2 WSR Suitability Comments

20 - San Miguel River, Segment 3 WSR Suitability

21 - San Miguel River, Segment 5 WSR Suitability

22 - San Miguel River, Segment 6 WSR Suitability

23 - Tabeguache Creek, Segment 1 WSR Suitability

24 - Tabeguache Creek, Segment 2 WSR Suitability

25 - Lower Dolores River WSR Suitability

26 - North Fork Mesa Creek WSR Suitability

27 - Dolores River, Segment 2 WSR Suitability

28 - Ice Lake Creek, Segment 2 WSR Suitability

29 - La Sal Creek, Segment 1 WSR Suitability

30 - La Sal Creek, Segment 2 WSR Suitability

31 - La Sal Creek, Segment 3 WSR Suitability

32 - Lion Creek, Segment 2 WSR Suitability

33 - Spring Creek WSR Suitability

*34 - Dolores River, Segment 1 WSR Suitability

**35 - Big Dominguez Creek, Segment 1 WSR Suitability

**36 - Big Dominguez Creek, Segment 2 WSR Suitability

**37 - Little Dominguez Creek, Segment 1 WSR Suitability

**38 - Little Dominguez Creek, Segment 2 WSR Suitability

**39 - Gunnison River, Segment 1 WSR Suitability

**\*Evaluated for eligibility by the San Juan Public Lands Center**
**\*\*Evaluated for eligibility by the Grand Junction Field Office**

BLM_0107957

## I - COTTONWOOD CREEK WSR SUITABILITY COMMENTS

*Preliminary Classification:* **Recreational**                    *ORVs:* **Vegetation**

**Your Name:** S. Matt Reed                    **Telephone:** 970.349.7104

**Address:** PO Box 1066, Crested Butte, CO 81224 **E-mail:** matt@hccaonline.org

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

| GENERAL |
|---|

**1. Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.**

**2. Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.**

**3. Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation.**

| LAND OWNERSHIP AND USES |
|---|

**4. Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.**

**5. Compatibility or incompatibility of designation with current land and water uses and development.**

BLM_0107958

**6. Reasonably foreseeable potential land and water development and uses that could be affected by designation.**

| ADMINISTRATION |
| --- |

**7. Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.**

**8. Consistency of designation with other BLM plans, programs, and policies and regional objectives.**

We encourage BLM coordination with other agencies, including the USFS and FWS, to ensure protection of the extended riparian ecosystem. A guideline for inter-agency coordination is presented in the "Unified Federal Policy for a Watershed Approach to Federal Land and Resource Management". Effective since October 2000, this policy is intended to provide a framework to enhance watershed management for the protection and health of ecosystems on Federal lands.

**9. Issues that might make administering this segment difficult.**

**10. Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.**

| ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY |
| --- |

Because the upper terminus of this segment is the BLM boundary with the Uncompahgre National Forest, we urge BLM to work with the Forest Service to see whether the eligible/suitable segment could be extended into the National Forest. Choosing a terminus at an administrative boundary is arbitrary. Hydrological and topographical features should determine boundary lines for Wild and Scenic designation. We recommend that this segment be designated suitable.

**NAME:**                                              **SEGMENT:**

BLM_0107959

## 3 - ESCALANTE CREEK, SEGMENT I WSR SUITABILITY COMMENTS

*Preliminary Classification:* **Recreational**                              *ORVs:* **Vegetation**

**Your Name:** S. Matt Reed                                     **Telephone:** 970.349.7104

**Address:** PO Box 1066, Crested Butte, CO 81224     **E-mail:** matt@hccaonline.org

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

| GENERAL |
|---|

**1. Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.**

**2. Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.**

**3. Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation.**

| LAND OWNERSHIP AND USES |
|---|

**4. Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.**

**5. Compatibility or incompatibility of designation with current land and water uses and development.**

BLM_0107960

**6.  Reasonably foreseeable potential land and water development and uses that could be affected by designation.**

## ADMINISTRATION

**7.  Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.**

**8.  Consistency of designation with other BLM plans, programs, and policies and regional objectives.**

**9.  Issues that might make administering this segment difficult.**

**10.  Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.**

## ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY

```
Scenic suitability should not affect historic water uses. Any historic water
uses should be grandfathered. We recommend that this segment be designated
as suitable.
```

**NAME:**                                         **SEGMENT:**

BLM_0107961

**4 - ESCALANTE CREEK, SEGMENT 2 WSR SUITABILITY COMMENTS**

*Preliminary Classification:* **Recreational**                                  *ORVs:* **Vegetation**

**Your Name:** S. Matt Reed                      **Telephone:** 970.349.7104

**Address:** PO Box 1066, Crested Butte, CO 81224   **E-mail:** matt@hccaonline.org

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

<div align="center">GENERAL</div>

1. **Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.**

2. **Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.**

3. **Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation.**

<div align="center">LAND OWNERSHIP AND USES</div>

4. **Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.**

5. **Compatibility or incompatibility of designation with current land and water uses and development.**

BLM_0107962

**6. Reasonably foreseeable potential land and water development and uses that could be affected by designation.**

**ADMINISTRATION**

**7. Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.**

**8. Consistency of designation with other BLM plans, programs, and policies and regional objectives.**

We encourage BLM coordination with other agencies, including the USFS and FWS, to ensure protection of the extended riparian ecosystem. A guideline for inter-agency coordination is presented in the "Unified Federal Policy for a Watershed Approach to Federal Land and Resource Management". Effective since October 2000, this policy is intended to provide a framework to enhance watershed management for the protection and health of ecosystems on Federal lands.

**9. Issues that might make administering this segment difficult.**

**10. Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.**

**ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY**

BLM needs to coordinate management strategies for this segment with the Colorado Division of Wildlife. In addition, the upper portion of this segment should be merged with Escalante Creek Segment 1 until it hits private interests. We recommend a suitability designation for this segment.

**NAME:**                                        **SEGMENT:**

## 6 - GUNNISON RIVER, SEGMENT 3 WSR SUITABILITY COMMENTS

*Preliminary Classification:* **Recreational**                              *ORVs:* **Vegetation**

**Your Name:** S. Matt Reed                              **Telephone:** 970.349.7104

**Address:** PO Box 1066, Crested Butte, CO 81224   **E-mail:** matt@hccaonline.org

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

| GENERAL |
|---|

**1.  Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.**

**2.  Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.**

**3.  Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation.**

Because of this segment's outstanding critical habitat and recreational opportunities it should be managed as a recreational Wild and Scenic River, but emphasizing riparian corridor management to protect habitat and stream flows.

| LAND OWNERSHIP AND USES |
|---|

**4.  Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.**

**5.  Compatibility or incompatibility of designation with current land and water uses and development.**

BLM_0107964

**6. Reasonably foreseeable potential land and water development and uses that could be affected by designation.**

| ADMINISTRATION |
|:---:|

**7. Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.**

**8. Consistency of designation with other BLM plans, programs, and policies and regional objectives.**

We encourage BLM coordination with other agencies, including the USFS and FWS, to ensure protection of the extended riparian ecosystem. A guideline for inter-agency coordination is presented in the "Unified Federal Policy for a Watershed Approach to Federal Land and Resource Management". Effective since October 2000, this policy is intended to provide a framework to enhance watershed management for the protection and health of ecosystems on Federal lands.

**9. Issues that might make administering this segment difficult.**

**10. Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.**

| ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY |
|:---:|

BLM needs to coordinate with the Grand Junction Field Office and make sure any management is compatible with that office's Dominguez management plan. We recommend that this segment be designated suitable.

NAME:                                    SEGMENT:

## 7 - MONITOR CREEK WSR SUITABILITY COMMENTS

*Preliminary Classification:* **Recreational**                              *ORVs:* **Vegetation**

**Your Name:** _S. Matt Reed_                    **Telephone:** _970.349.7104_
**Address:** _PO Box 1066, Crested Butte, CO 81224_   **E-mail:** _matt@hccaonline.org_

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

| GENERAL |
|---|

**1. Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.**

**2. Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.**

**3. Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation.**

| LAND OWNERSHIP AND USES |
|---|

**4. Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.**

**5. Compatibility or incompatibility of designation with current land and water uses and development.**

BLM_0107966

**6.  Reasonably foreseeable potential land and water development and uses that could be affected by designation.**

| ADMINISTRATION |
|---|

**7.  Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.**

**8.  Consistency of designation with other BLM plans, programs, and policies and regional objectives.**

We encourage BLM coordination with other agencies, including the USFS and FWS, to ensure protection of the extended riparian ecosystem. A guideline for inter-agency coordination is presented in the "Unified Federal Policy for a Watershed Approach to Federal Land and Resource Management". Effective since October 2000, this policy is intended to provide a framework to enhance watershed management for the protection and health of ecosystems on Federal lands.

**9.  Issues that might make administering this segment difficult.**

**10.  Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.**

| ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY |
|---|

BLM should coordinate with the Forest Service because the upper terminus of this segment is the boundary with the Uncompahgre National Forest. We encourage the BLM to analyze the possibility of extending the segment onto National Forest lands. We recommend that this segment be designated as suitable.

**NAME:**                                        **SEGMENT:**

BLM_0107967

## 8 - POTTER CREEK WSR SUITABILITY COMMENTS

*Preliminary Classification:* **Recreational**                    *ORVs:* **Vegetation**

**Your Name:** S. Matt Reed                    **Telephone:** 970.349.7104

**Address:** PO Box 1066, Crested Butte, CO 81224   **E-mail:** matt@hccaonline.org

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

| GENERAL |
|---|

**1. Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.**

**2. Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.**

**3. Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation.**

| LAND OWNERSHIP AND USES |
|---|

**4. Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.**

**5. Compatibility or incompatibility of designation with current land and water uses and development.**

**6. Reasonably foreseeable potential land and water development and uses that could be affected by designation.**

| | |
|---|---|

## ADMINISTRATION

**7. Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.**

**8. Consistency of designation with other BLM plans, programs, and policies and regional objectives.**

We encourage BLM coordination with other agencies, including the USFS and FWS, to ensure protection of the extended riparian ecosystem. A guideline for inter-agency coordination is presented in the "Unified Federal Policy for a Watershed Approach to Federal Land and Resource Management". Effective since October 2000, this policy is intended to provide a framework to enhance watershed management for the protection and health of ecosystems on Federal lands.

**9. Issues that might make administering this segment difficult.**

**10. Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.**

## ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY

BLM should coordinate with the Forest Service because the upper terminus of this segment is the boundary with the Uncompahgre National Forest. We recommend that this segment be designated as suitable.

**NAME:**                    **SEGMENT:**

BLM_0107969

## 9 - ROSE CREEK WSR SUITABILITY COMMENTS

*Preliminary Classification:* **Recreational**                         *ORVs:* **Vegetation**

**Your Name:** __S. Matt Reed__                    **Telephone:** __970.349.7104__

**Address:** __PO Box 1066, Crested Butte, CO 81224__   **E-mail:** __matt@hccaonline.org__

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

| GENERAL |
|---|

**1. Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.**

**2. Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.**

**3. Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation.**

| LAND OWNERSHIP AND USES |
|---|

**4. Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.**

**5. Compatibility or incompatibility of designation with current land and water uses and development.**

**6. Reasonably foreseeable potential land and water development and uses that could be affected by designation.**

**7. Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.**

**8. Consistency of designation with other BLM plans, programs, and policies and regional objectives.**

**9. Issues that might make administering this segment difficult.**

**10. Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.**

**ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY**

Because there is a carve-out for 100 acre feet for wells, BLM must acknowledge this with a management strategy that incorporates the future diminution of flows for this segment. We recommend that this segment be designated as suitable.

**NAME:**                                    **SEGMENT:**

BLM_0107971

## 10 - ROUBIDEAU CREEK, SEGMENT 1 WSR SUITABILITY COMMENTS

*Preliminary Classification:* **Recreational**                                              *ORVs:* **Vegetation**

**Your Name:** S. Matt Reed                              **Telephone:** 970.349.7104
**Address:** PO Box 1066, Crested Butte, CO 81224    **E-mail:** matt@hccaonline.org

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

| GENERAL |
|---|

**1. Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.**

**2. Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.**

**3. Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation.**

| LAND OWNERSHIP AND USES |
|---|

**4. Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.**

**5. Compatibility or incompatibility of designation with current land and water uses and development.**

ument 59-13   filed 04/28/21   USDC Colorado   pg 128 of
137

**6. Reasonably foreseeable potential land and water development and uses that could be affected by designation.**

STRATION |
|---|

**7. Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.**

**8. Consistency of designation with other BLM plans, programs, and policies and regional objectives.**

```
We encourage BLM coordination with other agencies, including the USFS and
FWS, to ensure protection of the extended riparian ecosystem. A guideline for
inter-agency coordination is presented in the "Unified Federal Policy for a
Watershed Approach to Federal Land and Resource Management". Effective since
October 2000, this policy is intended to provide a framework to enhance watershed
management for the protection and health of ecosystems on Federal lands.
```

**9. Issues that might make administering this segment difficult.**

**10. Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.**

| ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY |
|---|

```
BLM should coordinate with the Forest Service and consider extending the
southern reaches of this segment into the adjacent Forest Service lands. We
recommend that this segment be designated suitable.
```

**NAME:**                                     **SEGMENT:**

7973

## 12 - DEEP CREEK WSR SUITABILITY COMMENTS

*Preliminary Classification:* **Recreational**                                          *ORVs:* **Vegetation**

**Your Name:** ___S. Matt Reed___                        **Telephone:** ___970.349.7104___

**Address:** ___PO Box 1066, Crested Butte, CO 81224___ **E-mail:** ___matt@hccaonline.org___

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

| GENERAL |
|---|

**1. Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.**

**2. Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.**

**3. Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation.**

| LAND OWNERSHIP AND USES |
|---|

**4. Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.**

**5. Compatibility or incompatibility of designation with current land and water uses and development.**

BLM_0107974

**6. Reasonably foreseeable potential land and water development and uses that could be affected by designation.**

ADMINISTRATION

**7. Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.**

**8. Consistency of designation with other BLM plans, programs, and policies and regional objectives.**

We encourage BLM coordination with other agencies, including the USFS and FWS, to ensure protection of the extended riparian ecosystem. A guideline for inter-agency coordination is presented in the "Unified Federal Policy for a Watershed Approach to Federal Land and Resource Management". Effective since October 2000, this policy is intended to provide a framework to enhance watershed management for the protection and health of ecosystems on Federal lands.

**9. Issues that might make administering this segment difficult.**

**10. Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.**

**ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY**

BLM must coordinate with the Forest Service and Colorado Division of Wildlife to protect the Greenback cutthroat trout and their habitat.

**NAME:**                                    **SEGMENT:**

## 13 - WEST FORK TERROR CREEK WSR SUITABILITY COMMENTS

*Preliminary Classification:* Recreational                                    *ORVs:* Vegetation

**Your Name:** S. Matt Reed                      **Telephone:** 970.349.7104

**Address:** PO Box 1066, Crested Butte, CO 81224   **E-mail:** matt@hccaonline.org

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

### GENERAL

1. **Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.**

2. **Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.**

3. **Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation.**

### LAND OWNERSHIP AND USES

4. **Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.**

5. **Compatibility or incompatibility of designation with current land and water uses and development.**

6. **Reasonably foreseeable potential land and water development and uses that could be affected by designation.**

| ADMINISTRATION |
| --- |

7. **Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.**

8. **Consistency of designation with other BLM plans, programs, and policies and regional objectives.**

9. **Issues that might make administering this segment difficult.**

10. **Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.**

| ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY |
| --- |

We do not recommend suitability for this segment. However, because of the presence of Greenback cutthroat trout, there must be strong management prescriptions that protect the fish and their riparian habitat.

NAME:                                    SEGMENT:

BLM_0107977

## 14 - BEAVER CREEK WSR SUITABILITY COMMENTS

*Preliminary Classification:* **Recreational**                    *ORVs:* **Vegetation**

**Your Name:** S. Matt Reed                    **Telephone:** 970.349.7104

**Address:** PO Box 1066, Crested Butte, CO 81224   **E-mail:** matt@hccaonline.org

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

| GENERAL |
|---|

**1. Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.**

**2. Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.**

**3. Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation.**

| LAND OWNERSHIP AND USES |
|---|

**4. Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.**

**5. Compatibility or incompatibility of designation with current land and water uses and development.**

**6. Reasonably foreseeable potential land and water development and uses that could be affected by designation.**

**7. Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.**

**8. Consistency of designation with other BLM plans, programs, and policies and regional objectives.**
We encourage BLM coordination with other agencies, including the USFS and FWS, to ensure protection of the extended riparian ecosystem. A guideline for inter-agency coordination is presented in the "Unified Federal Policy for a Watershed Approach to Federal Land and Resource Management". Effective since October 2000, this policy is intended to provide a framework to enhance watershed management for the protection and health of ecosystems on Federal lands.

**9. Issues that might make administering this segment difficult.**

**10. Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.**

**ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY**

BLM should coordinate with the Forest Service because of the shared boundary. We recommend that this segment be designated suitable. BLM should consider extending the segment into the Forest Service lands rather than making the terminus an arbitrary administrative boundary. We also recommend downgrading the designation from scenic to recreational because of trail crossings, roads, power lines and other obtrusive man-made structures that run across and adjacent to the segment.

**NAME:**                               **SEGMENT:**

## 15 - DRY CREEK WSR SUITABILITY COMMENTS

*Preliminary Classification:* **Recreational**                    *ORVs:* **Vegetation**

**Your Name:** S. Matt Reed                    **Telephone:** 970.349.7104
**Address:** PO Box 1066, Crested Butte, CO 81224    **E-mail:** matt@hccaonline.org

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

<div align="center">GENERAL</div>

**1. Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.**

**2. Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.**

**3. Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation.**

<div align="center">LAND OWNERSHIP AND USES</div>

**4. Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.**

**5. Compatibility or incompatibility of designation with current land and water uses and development.**

BLM_0107980

**6.  Reasonably foreseeable potential land and water development and uses that could be affected by designation.**

| ADMINISTRATION |
|---|

**7.  Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.**

**8.  Consistency of designation with other BLM plans, programs, and policies and regional objectives.**

We encourage BLM coordination with other agencies, including the USFS and FWS, to ensure protection of the extended riparian ecosystem. A guideline for inter-agency coordination is presented in the "Unified Federal Policy for a Watershed Approach to Federal Land and Resource Management". Effective since October 2000, this policy is intended to provide a framework to enhance watershed management for the protection and health of ecosystems on Federal lands.

**9.  Issues that might make administering this segment difficult.**

**10.  Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.**

| ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY |
|---|

We recommend that this segment be designated suitable. BLM should consider extending the upper extent of the segment beyond the administrative boundary of the the Uncompahgre Field Office.

**NAME:**                                              **SEGMENT:**

BLM_0107981

## 16 - NATURITA CREEK WSR SUITABILITY COMMENTS

*Preliminary Classification:* Recreational                                    *ORVs:* Vegetation

**Your Name:** S. Matt Reed                    **Telephone:** 970.349.7104

**Address:** PO Box 1066, Crested Butte, CO 81224   **E-mail:** matt@hccaonline.org

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

| GENERAL |
|---|

**1. Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.**

**2. Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.**

**3. Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation.**

| LAND OWNERSHIP AND USES |
|---|

**4. Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.**

**5. Compatibility or incompatibility of designation with current land and water uses and development.**

BLM_0107982