## A COMPARISON OF ERMAS AND SRMAS

| | ERMAs | SRMAs |
|---|---|---|
| **Management** | *Unstructured*<br><br>No identifiable market demand for structured recreation | *Structured*<br><br>Tied to identified market demand for structured recreation (i.e., activities, experiences, benefits, and the maintenance of recreation setting character) |
| **Objectives** | *Reactive & Custodial*<br><br>Directed at taking care of dispersed recreation-tourism activities | *Proactive*<br><br>Directed at producing specific recreation opportunities/ outcomes |

## DEVELOPED RECREATION FACILITIES

In certain locations, the BLM has constructed recreation sites and facilities in order to enhance recreation opportunities, protect resources, manage activities, and reduce user conflicts. These infrastructure developments range from campgrounds to simple bulletin boards at trailheads.

Developed recreation sites occur mainly along the San Miguel River SRMA and in the Dolores River SRMA. There are several campsites along the San Miguel River corridor which have boat ramps, changing rooms, cabanas and picnic tables, grills, kiosks, parking areas, and toilets. The Dolores River SRMA has picnic tables, cabanas, parking area, boat ramp and a visitor informational kiosk site.

There are other dispersed staging areas and trailheads in the planning area that consist of kiosks, picnic tables and parking areas as well as one developed site along the Uncompahgre River with cabanas and picnic tables, informational signs, benches, toilet and non-motorized paved trail.

## SPECIAL RECREATION PERMITS

The BLM requires special recreation permits (SRPs) for commercial uses, competitive events, organized groups, and recreation use within certain special areas in the UFO, including rivers, backcountry, and camping areas. Most SRPs issued by the UFO are for river activities and upland hunting outfitting.

The UFO currently has approximately fifty commercial permits issued, which include guided fishing, white water rafting, vehicle shuttles, big and small game hunting, mountain lion hunting, horseback trail rides, jeep and motorcycle tours, camping, archery tournaments and mountain bike rides. Fifteen percent of SRP fees are expended on program administration, with the remainder going toward visitor services, monitoring, and maintenance.

## *The BLM wants your input...*

The BLM designates SRMAs when recreational demands require that a particular recreation setting be maintained, or where structured opportunities for specific activities and recreational experiences are desired.

- **What areas should be designated and managed as SRMAs (rather than custodially managed for dispersed recreation as ERMAs)?**

- **Should the BLM develop recreation facilities and improve access to recreational opportunities?  If so, where?**

- **Should the BLM charge fees for recreational use?  If so, for which uses and/or in which geographic areas?**

- **Should the BLM prohibit target shooting in specific areas? If so, where?**

---

**UFO Planning Webpage:**
**www.UFORMP.com**

**Mail comments to:**
**Bruce Krickbaum,**
**RMP Project Manager**
**2465 S. Townsend Ave**
**Montrose, CO  81401**

**Email comments to:**
**UFORMP@blm.gov**

**UFO 1/2010**

BLM_0108527



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
Montrose, Colorado



## RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #4

### Friday, August 20, 2010 (9:00 AM – 12:00 PM)

#### Meeting Location:
Holiday Inn Express
1391 S. Townsend Avenue, Montrose, CO

| Last Name | First Name | Initial | Address | E-Mail | Phone |
|-----------|-----------|---------|---------|--------|-------|
| Adams | Angie | | EMPSi<br>3775 Iris Ave, Ste 1A<br>Boulder, CO 80301 | angie.adams@empsi.com | 303-446-7160 |
| Armstrong | Lori | | BLM, Southwest Colorado<br>District Manager<br>2465 S. Townsend Ave.<br>Montrose, CO 81401 | valori_armstrong@blm.gov | 970-240-5336 |
| Bear | Shelby | | DMEA<br>PO Box 910<br>Montrose, CO 81402 | sbear@dmea.com | w: 970-240-1238 |
| Baird-LeValley | Robbie | | Colorado State Univ. Extension<br>525 Dodge Street<br>Delta, CO 81416 | robbie.levalley@colostate.edu | w: 970-874-2195 |
| Blackburn | Walt | | 1751 Clearview Drive<br>Delta, CO 81416 | | c: 970-260-4181 |
| Day | Bill | | 28478 Highway 92<br>Hotchkiss, CO 81419 | | 970-872-3216 |
| Durnan | Richard | | PO Box 2065<br>Ridgway, CO 81432 | | w: 970-316-2580 |
| Ela | William | | 30507 L Road<br>Hotchkiss, CO 81419 | | |
| Kauffman | Dave | | BLM, Uncompahgre Field Office<br>2465 S. Townsend Ave.<br>Montrose, CO 81401 | dave_kauffman@blm.gov | 970-240-5340 |
| Krickbaum | Bruce | | BLM, Uncompahgre Field Office<br>2465 S. Townsend Ave.<br>Montrose, CO 81401 | bruce_krickbaum@blm.gov | 970-240-5384 |
| Mueller | Peter | | PO Box 3140<br>Telluride, CO 81435 | pmueller@tnc.org | w: 970-728-5291 |
| Reams | John | | Western Small Miner's Assoc.<br>31527 Hwy 141<br>PO Box 644<br>Naturita, CO 81422 | john@reams-construction.com | w: 970-865-2886 |

BLM_0108528

Resource Advisory Council Subgroup Meeting #4                                                August 20, 2010

| Last Name | First Name | Initial | Address | E-Mail | Phone |
|-----------|-----------|---------|---------|--------|-------|
| Sharrow | Barb | BB | BLM, Uncompahgre Field Office 2465 S. Townsend Ave. Montrose, CO 81401 | barbara_sharrow@blm.gov | 970-240-5315 |
| Weist | Steven D. | SDW | Oxbow Mining 3737 Hwy 133 PO Box 535 Somerset, CO 81434 | steve.weist@oxbow.com | w: 970-929-6461 ▮ |
| Welt | Kathy | KHW | 36320 Highway 92 Hotchkiss, CO 81419 | tkctew@yahoo.com | w: 970-929-2238 ▮ |
| Wynant | Kate | KW | EMPSi 3775 Iris Ave, Ste 1A Boulder, CO 80301 | kate.wynant@empsi.com | 303-446-7160 |
| Litteral | Jeff | | BLM/UFO | | |
| Edd | Franz | | BLK/UFO | | |
| Amanda | Clements | | BLM/UFO | | |

BLM_0108529

**James Bode**

| | |
|---|---|
| **From:** | Barbara Hawke <barbara_hawke@tws.org> |
| **Sent:** | Monday, August 23, 2010 12:33 PM |
| **To:** | UFORMP@BLM.GOV |
| **Cc:** | bruce_krickbaum@blm.gov; Barbara_Sharrow@blm.gov; Juli Slivka; Steve Smith; Josh Pollock |
| **Subject:** | ACEC Comments - Final Version |
| **Attachments:** | BLM UFO ACEC Comments - TWS CNE and Partners FINAL.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

We submitted ACEC comments on Friday, and it appears I had attached a version that was not a clean, final version. The version attached now has exactly the same text, but is in a clean, final version. Please use this version for the record. My apologies for my oversight.

Barbara Hawke
Dolores River Basin Wildlands Coordinator
The Wilderness Society
Montrose, Colorado
970-596-6697 (cell)

BLM_0108530

The Wilderness Society
Center for Native Ecosystems
Sheep Mountain Alliance
Western Colorado Congress
Rocky Mountain Recreation Initiative
San Juan Citizens Alliance
Wilderness Workshop

August 20, 2010

Bureau of Land Management
Uncompahgre Field Office
Attention: RMP Revision
 2465 South Townsend Avenue
Montrose, Colorado  81401


Sent via electronic mail to:

UFORMP@BLM.GOV

To whom it may Concern:

Thank you for the opportunity to comment on the Uncompahgre Field
Office's (UFO) draft report addressing areas of critical environmental concern
(ACECs) in the planning area. We recognize that the Bureau of Land
Management (BLM) is not required to seek public comments on the draft
report, and appreciate that BLM is soliciting information from the public
regarding the preliminary evaluation of proposed ACECs.

Areas of Critical Environmental Concern are an essential tool by which the
BLM can fulfill its obligations to conserve and recover special status species.
Under FLPMA, BLM is obligated to "give priority to the designation and
protection of areas of critical environmental concern [ACEC]." 43 U.S.C. §
1712(c)(3).  ACECs are areas "where special management is required (when
such areas are developed or used or where no development is required) to
protect and prevent irreparable damage to important historic, cultural, or scenic
values, fish and wildlife resources, or other natural systems or processes."  43
U.S.C. § 1702(a).  For potential ACECs, management prescriptions are to be
"fully developed" in the RMP.  Manual 1613, Section .22 (Develop
Management Prescriptions for Potential ACECs). For very special natural

1

resource values, ACECs can prioritize preservation of those resources in management decisions. This clarity can serve both the BLM and public in managing and using the diversity of lands and resources encompassed by BLM lands.

We appreciate the extensive and thorough analysis evidenced in the UFO Draft ACEC report. We agree with many of the assessments found in the report. Because it appears that the UFO has thoughtfully documented the relevance and importance criteria for the potential ACECs described in the report, we strongly recommend that areas found to meet the relevance and importance criteria be carried forward as recommended ACECs in multiple alternatives in the Draft Resource Management Plan Revision, including in the Preferred Alternative. These potential ACECs have a sound basis for the need for special resource protection, and can provide the UFO with an important management tool.

ACECs may be a particularly important tool in the face of rapid future change at local, regional, and global scales. Many changes will dramatically affect our natural environments and resources - from residential development to expanding recreation, and from energy needs to global climate change. Thus protected areas such as ACECs comprise an important reserve to provide sustainability for resources and people.

It is important to note that the key to successful resource management through an ACEC designation is both identification and implementation of meaningful management prescriptions. In many cases, resource protection will require strong measures such as mineral withdrawals, no new oil and gas leasing, and excluded or very limited vehicular travel. Such measures are justified in the special cases identified in the BLM's draft ACEC report.

Following are additional comments on individual potential ACECs. Although we have not provided detailed comment on each potential ACEC described in the report, we do support all of the potential ACECs found in the draft report. In addition, please refer to all the earlier comments submitted by The Wilderness Society and Center for Native Ecosystems regarding ACECs and sensitive species management, incorporated herein by reference.

Salt Desert Shrub Ecosystem:
        We strongly recommend the proposed area for ACEC designation. The BLM documentation well represents the multiple and significant values supported by this area, ranging from a federally threatened plant to other BLM

2

sensitive wildlife species. As indicated in the BLM documentation, ecosystems based on highly erodible Mancos Shale not only support globally imperiled species, but also are extremely sensitive and vulnerable to human impacts. Once damaged by recreational use or other human impacts, the systems are very difficult to restore. Such areas are also highly prone to system shifts caused by introduction of nonnative species arising from human and vehicular activity.

An additional set of values is present within this proposed ACEC that merit protection with the assistance of ACEC designation. The Adobe Badlands portion of the proposed Salt Desert Shrub has been found to have wilderness character through the Colorado Canyon Country Wilderness Proposal (CCCWP) inventory. The undulating shale hills and pastel hues of the Adobe Badlands area offer outstanding opportunities for solitude and unconfined recreation in a unique setting, punctuated by the landmark "Devils's Thumb" formation. This primitive and unusual scenic character reinforces the relevant and important natural values of the existing and proposed ACEC area. Continued and expanded ACEC designation as proposed for the Salt Desert Shrub Ecosystem ACEC would greatly assist in preserving these values.

Several additional benefits would accrue to designation of this expanded area as an ACEC. The new proposed boundary should aid the BLM in effective access management from the more public areas near the highway into the more remote areas to the east. Additionally, comprehensive opportunities to respond to selenium and salinity issues through entire drainages from east to west will benefit not only fish and wildlife, but also local community efforts to address these significant water quality issues. Finally, the noted possible use of the ACEC as a demonstration area for species recovery is very appealing. Such an effort could engender proactive approaches that might attract funding and community support around species recovery and water quality goals.

Roubideau-Potter-Monitor ACEC:
        We recommend the Roubideau-Potter-Monitor proposal area for ACEC designation, which encompasses connectivity for the complex system of three arid-land canyons with perennial streams. We believe this alternative is preferable to the Roubideau Corridors ACEC alternative, because the Roubideau-Potter-Monitor alternative includes slopes, canyon rims, and some upland area necessary to support wildlife movement and the healthy natural function of the canyon riparian systems.

3

BLM_0108533

We appreciate the BLM's attention to the significant natural resource values supported by this riparian canyon system. As the BLM's documentation states in the BLM's proposal, "BLM sensitive species including Grand Junction milkvetch, desert bighorn sheep and northern leopard frog are found there. *The canyons form important movement corridors from the desert and Gunnison River up to the forest on the Uncompahgre Plateau. The uplands afford protection to the integrity of the canyons below, and offer additional habitat for bighorn sheep.*" (emphasis added).

Consequently, to preserve the special values of this area, it is necessary to include within the ACEC the slopes and some portions of the canyon rims and uplands, in addition to canyon bottoms. Preservation of the slopes is important to maintaining a natural balance of erosion and sedimentation in order to sustain riparian vegetation communities, and to maintain water quality in the streams. In addition, healthy natural streams are particularly important to maintain in a region strongly affected by the human impacts of recreation, expanding residential development, and agricultural use. The health and natural function of the entire gradient of the canyon systems, from uplands to canyon bottoms, is important to support the BLM sensitive species of Desert Bighorn Sheep and Northern Leopard Frog. Further, comprehensive management for the entirety of the canyon system is necessary to manage human impacts such as diminishment of water quality and dissemination of invasive species (potentially including nonnative amphibians) that may be introduced from adjacent land use.

The BLM documentation notes that peregrine falcon and golden eagle nests are in the area. Mapped raptor nests also include a bald eagle nest nearby (see attached map based on recent Colorado Division of Wildlife data). The nesting presence of several sensitive raptor species reflects the significant ecological value of the area, and underscores the importance of establishing certainty in management that will limit human impacts. Several of these raptor species maintain a number of nesting sites within a larger area, alternating use of individual sites from year to year. In addition, several of these raptor species are very sensitive to human disturbance during their nesting cycle. Given all these factors, comprehensive management as an ACEC for the full canyon system, including a portion of the uplands to limit disturbance to up-gradient raptor nests, is indicated.

Designation of the Roubideau-Potter-Monitor area as an ACEC also would support management of the area as an excellent quiet recreational use alternative near the expanding communities of Montrose, Olathe and Delta. While the Dry Creek Travel Management plan provides for a broad spectrum

4

of recreational opportunities in the vicinity, it is important to preserve exceptional areas such as the Roubideau-Potter-Monitor proposed ACEC area as an area of limited impact, managed to preserve its high biodiversity.

Furthermore, in addition to including the existing Camelback Wilderness Study Area (WSA), the broader Roubideau-Potter-Monitor area has been found to have wilderness character through the Colorado Canyon Country Wilderness Proposal (CCCWP) inventory. The Roubideau-Potter-Monitor area's roadless, natural character, boasting deep hidden canyons, provides outstanding opportunities for solitude and unconfined recreation. This primitive character reinforces the relevant and important natural and scenic values, and this undisturbed character should be protected as well. An ACEC designation would greatly assist in preserving these multiple values, and would compatibly support a WSA area.

South Fairview RNA/Proposed ACEC Expansion:
        We recommend the proposed expansion of this ACEC. This would promote preservation and recovery of the federally endangered Clay-loving Wild Buckwheat. The expanded ACEC would also support additional imperiled and BLM sensitive species, and aid the BLM in effectively managing access for sensitive areas. The significance of this CLWB population, along with the sensitivity and vulnerability of highly erodible Mancos Shale habitats, calls for such an expanded preservation effort.

Designation of an expanded ACEC would provide the UFO with an opportunity to make a significant contribution to preservation of a federally endangered species, given that *Erioginum pelinophilum* is only found in Montrose and Delta counties in the world. The BLM documentation regarding imminent threats to the plant is well evidenced, as new street infrastructure and earthmoving is currently occurring just north of the Fairview South area.

San Miguel River ACEC with Expansion:
        We recommend the proposed expansion of the ACEC. The increasing importance of the San Miguel River corridor as a relatively natural, free-flowing stream in the west, with very high biodiversity values, is identified in the BLM documentation. The biodiversity significance of the area is reflected in the range of sensitive species supported by the area, from ranging from riparian vegetation, to avian species, to lynx. The ACEC expansion area would

5

BLM_0108535

additionally support and complement the generally roadless and primitive character of the Norwood Canyon Citizens' Wilderness Proposal area.

An expanded ACEC designation would also enhance previous preservation investments made by multiple partners, including the BLM and other federal agencies, The Nature Conservancy and other private and public partners. Of note are the considerable investments in time and funding made to remove invasive species in the San Miguel River corridor, and to preserve habitats and trails. ACEC protections would help to ensure that the value of these considerable investments is sustained over the long term for the benefit of the natural environment and local communities.

Gunnison Sage Grouse ACECs:

Generally, we recommend designation of ACECs as a tool to protect the extremely imperiled Gunnison Sage Grouse; however, for ACECs to provide effective protection for this species, robust management prescriptions must be in place that strictly limit all surface disturbance. We further recommend additional administrative protections to support maintenance and recovery of the Gunnison Sage Grouse. This species is one of the most rare in the world, and consequently deserves extraordinary action to support its preservation. The details of actions that will truly support this highly sensitive species are complex. We recommend additional consultation with experts in the recovery of this species and with area wildlife biologists, along with further review of the San Miguel Basin Gunnison Sage Grouse Conservation Plan, revised as of December, 2009.

In March 2010, BLM issued IM 2010-071[1], which addresses Gunnison and Greater sage-grouse management considerations for energy development. The IM provides a wide range of actions to be taken when evaluating and approving RMPs and energy projects, including oil and gas, oil shale, wind, solar, geothermal, and transmission. One such action identified is analyzing one or more alternatives in preparing RMPs that would exclude priority habitat from energy development and transmission. The IM states:

> The Gunnison sage-grouse and greater sage-grouse are BLM sensitive species that are to be managed to promote their conservation and to minimize the need for listing under the ESA, in accordance with the BLM's special status species policy (BLM Manual 6840).

---

[1] http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2010/im2009-071.print.html

6

BLM_0108536

BLM has an obligation and a commitment to protecting Gunnison sage-grouse from impacts of oil and gas development and other disturbing activities.

Because this species has very specific habitat and vegetation needs through its life cycle, and because it is highly sensitive to a variety of human impacts - including but not limited to lek disturbance, infrastructure that creates barriers or perceived predator perching locations, altered predation patterns, and oil and gas activity – further assessment of exactly how and where ACECs can best protect this species is indicated. Beyond identification of boundaries for potential ACECs for Gunnison Sage Grouse, we recommend that no new oil and gas leasing occur in areas that may adversely impact the recovery of Gunnison Sage Grouse.

Additionally, private land conservation potential and other supplemental tools should be considered in evaluating the merit of potential ACECs for Gunnison Sage Grouse. For example, a combination of ACEC designation on BLM land and assistance for private land conservation in the Cerro Summit area might provide substantive results.

A separate sub-plan for the potential contribution of the UFO to recovery of the Gunnison Sage Grouse may be warranted. Such a focused subplan would permit consideration of the role of occupied, historic and potential habitat for subpopulation connectivity and translocation efforts.

Dolores River Slickrock ACEC and La Sal Creek ACEC:
       We strongly recommend designation of the Dolores River Slickrock ACEC, along with the La Sal Creek ACEC. The BLM documentation reflects the extraordinary extent and variety of conservation values in need of protection found in portion of the Dolores River corridor. As noted in the BLM documentation, the area supports rare plants and riparian plant communities, beautiful western scenery, notable geology, rich human history, and important habitat for sensitive wildlife and raptor species. Desert riparian systems are both critically important in the ecological and human landscape, and especially at risk in the face of expanding human resource use and global climate change. Consequently, an ACEC will help to preserve the area's uncommon and rare resources for the future health of human and ecological systems.

The BLM has previously recognized the outstanding qualities of the Dolores River Slickrock area through its designation as a Wilderness Study Area (WSA).

7

BLM_0108537

ACEC designation would reinforce and assist in the special management necessary to preserve the area's outstanding natural, scenic, geologic, cultural and recreational values of the area.

We support the further designation of the La Sal Creek area as an ACEC to protect the significant canyon system, including both rare plants found on slopes and uplands, and to preserve water quality and hydrologic function. La Sal Creek is an important constituent of the overall Dolores River ecological and hydrological system. Preservation of the broader La Sal Creek area is important to maintaining the valuable wilderness characteristics of the Dolores River WSA, and the additional Dolores River Citizens' Wilderness Proposal area, which encompasses La Sal Creek and Nyswonger Mesa. The upland area of Nyswonger Mesa supports exceptional opportunities for primitive, quiet recreation.

East and West Paradox ACECs:
We strongly recommend designation of these two areas as ACECs. As identified in the BLM documentation, these areas host a number of unique, rare, and sensitive species, ranging from rare plants to peregrine falcon. Designation of the areas as ACECs would aid in management of a very special region that hosts values ranging from wilderness qualities to diverse recreation potential. The presence of multiple additional conservation values, including cultural and historical resources, further emphasizes the need for special protections in these areas. ACEC designation would support and complement any adjacent special-designation areas, such as WSAs and Special Recreation Management Areas.

Tabeguache Pueblo/Tabeguache Caves ACEC:
In addition to the valuable cultural resources identified in the report, this area also encompasses lands with a primitive character, and designation as an ACEC would support and complement the adjacent Special Management Area. Designation of this area could foster consistent management between BLM land and adjacent U.S. Forest Service land managed for wilderness characteristics, offering continuity of primitive recreational opportunities. ACEC designation could also support preservation of the significant natural values found down-drainage along the San Miguel River, Tabeguache Creek, and Coal Creek.

8

BLM_0108538

Thank you for your careful consideration of our comments. We would be happy to provide additional information, maps, or field trips with community groups to aid in your review.

Sincerely,

Steve Smith, Assistant Regional Director
The Wilderness Society
1660 Wynkoop, #850
Denver, Colorado  80202
303-650-5818 x106

Barbara Hawke, Dolores River Basin Wildlands Coordinator
The Wilderness Society
1617 American Way
Montrose, Colorado 81401
970-596-6697

Josh Pollock, Conservation Director
Center for Native Ecosystems
1536 Wynkoop, Suite 303
Denver, Colorado 80202
 (303) 546-0214 x2

Hilary White, Director
Sheep Mountain Alliance.
PO Box 389
Telluride, CO 81435
970-728-3729

Amy Montano, Public Lands Organizer
Western Colorado Congress
128 North Sixth Street
Grand Junction, CO 81502

Rosalind McClellan
Rocky Mountain Recreation Initiative
1567 Twin Sisters Road
 Nederland, Colorado 80466
(303) 447-9409

9

Aaron Kimple
Dolores River Campaign Coordinator
San Juan Citizens Alliance
PO Box 2461
Durango, CO 81301
970-259-3583

Peter Hart
Conservation Analyst/Staff Attorney
Wilderness Workshop
PO Box 1442
Carbondale, CO 81623
(970)963-3977

Peggy Lyon, Western Slope Botanist
Ridgway, Colorado

10



**Elk Winter Range**

ELK Winter Range

BLM Uncompahgre Resource Management Plan

Miles
0 2.5 5   10   15   20

N

No warranty is made by the Bureau of
Land Management as to the accuracy,
reliability, or completeness of these
data. Original data were compiled from
various sources. This information may
not meet National Map Accuracy
Standards. This project was developed
through digital means and may be
updated without notice. Map produced
by Uncompahgre Field Office, Bureau
of Land Management, Montrose, CO.

BLM_0108541



# Areas Closed to Fluid Mineral Leasing

BLM Uncompahgre Resource Management Plan

BLM_0108542



Mule Deer Winter Range

**Mule Deer Winter Range**

BLM Uncompahgre Resource Management Plan

Miles
0 2.5 5   10   15   20

N

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This project was developed through digital means and may be updated without notice. Map produced by Uncompahgre Field Office, Bureau of Land Management, Montrose, CO.

BLM_0108543

**James Bode**

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **Sent:** | Wednesday, August 25, 2010 12:01 PM |
| **To:** | uformp@blm.gov |
| **Subject:** | Fw: Possible typo in ACEC report |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 08/25/2010 12:00 PM -----

Barbara Hawke
<barbara_hawke@tw
s.org>                                    To
                              "bruce_krickbaum@blm.gov"
08/14/2010 06:54        <bruce_krickbaum@blm.gov>
PM                                         cc
                              "amanda_clements@blm.gov"
                              <amanda_clements@blm.gov>
                                       Subject
                        Possible typo in ACEC report

Hello Bruce,
We appreciate the thorough attention BLM has applied to the draft ACEC report. Several of the conservation groups are reviewing this, and may have some additional comments and suggestions by the 20th.

I think there might be a couple typos:
Page 24: Under the "Significance" paragraph, adobe beardtongue is listed as Erioginum pelinophilum, and I think it should be Penstemon retrorsus.
Page 25: mentions Co Desert Parsley, but not adobe beardtongue?
Page 27: The penstemon is again notedd as Erioginum pelinophilum in the Significance paragraph.

And I do realize it is pretty pathetic that this is what I'm doing on a Saturday evening.

Barbara Hawke
Dolores River Basin Wildlands Coordinator The Wilderness Society Montrose, Colorado

1

BLM_0108544

970-596-6697 (cell)

2

BLM_0108545

**Kate Wynant**

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **Sent:** | Wednesday, September 01, 2010 3:34 PM |
| **To:** | Steve.weist@oxbow.com; billday@paonia.com; Robbie.levalley@colostate.edu; Wblack8709@msn.com; pmueller@tnc.org; silvers1@tds.net; tkctew@yahoo.com; Barbara_Sharrow@blm.gov; Bruce_Krickbaum@co.blm.gov; Angie Adams; Kate Wynant; UFO AR |
| **Subject:** | Draft Minutes: Uncompahgre RMP RAC Subgroup Meeting #4 |
| **Attachments:** | UFO-SG_2010-08-20_DraftMinutes.doc |

Hello RAC Subgroup members,

I have attached draft notes of the Uncompahgre RMP RAC Subgroup meeting held on August 20.  Please review the draft notes and let me know of any errors or omissions no later than Wednesday, September **8**.  After that date, the notes will be revised and submitted to all group members and the administrative record.

Thank you, Bruce

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

.(See attached file: UFO-SG_2010-08-20_DraftMinutes.doc)

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system

BLM_0108546



## United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401

# RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #4

## Friday, August 20, 2010 (9:00 AM – 12:00 PM)

### Meeting Location:
### Holiday Inn Express (Jordan Room)
### 1391 South Townsend Avenue, Montrose, CO

# Meeting Minutes

**Attendees:** Angie Adams (EMPSi), Robbie Baird-LeValley, Walt Blackburn, Amanda Clements (BLM Uncompahgre Field Office), Bill Day, William Ela, Edd Franz (BLM Uncompahgre Field Office), Bruce Krickbaum (BLM Uncompahgre Field Office), Jeff Litteral (BLM Uncompahgre Field Office), Barb Sharrow (BLM Uncompahgre Field Office), Steven Weist, Kathy Welt, Kate Wynant (EMPSi)

**Handouts:** Agenda, Highlights of the Resource Management Planning Process to Date, RMP Planning Fact Sheet 6.1: Vegetation and Land Health, RMP Planning Fact Sheet 3.1: Recreation and Visitor Services, RMP Planning Fact Sheet 6.3: Water Quality and Soils, Land Health Assessments and the Uncompahgre Field Office Resource Management Plan Revision PowerPoint slides, Soils PowerPoint slides, Special Recreation Management Areas PowerPoint slides, Preliminary Internal Draft Alternatives for Special Recreation Management Areas and Comprehensive Trails and Travel Management

1. **Welcome** (Bruce Krickbaum)

2. **Introductions** (All present)

3. **Planning Process to Date** (Angie Adams)
   - See handout: Highlights of the Resource Management Planning Process to Date
   - Several reports are complete and are on the Web site.
   - The Wild and Scenic River suitability process is underway and we are gathering data on suitability criteria. Information was due on Monday (August 16). We have received some e-mails regarding Areas of Critical Environmental Concern (ACECs) and Wild and Scenic Rivers.
   - The draft ACEC evaluation report is on the Web site and comments are due today (August 20).
   - If you have comments on suitability criteria or the ACEC report, you can submit them by Friday, August 27 so that we can wrap them up.
   - *Question:* Where are comments to be submitted? *Answer:* All instructions are on the web site (www.uformp.com) but they can be submitted to the RMP e-mail address (uformp@blm.gov) or to Bruce (bruce_krickbaum@blm.gov).
   - *Comment:* The Department of Energy called two days ago saying that they could not access the suitability link and Bruce resent it so the person responsible for reviewing and submitting comments will be submitting comments late. *Response:* That is ok. Just because we receive comments after the deadline doesn't mean the comments are not considered, but it helps our staff stay on schedule. If we receive comments late, we may have to do more work.

BLM_0108547

## 4. Resource/Resource Use Discussions

- Land Health Assessments (Amanda Clements)
  - See handouts: Land Health Assessments and RMP Planning Fact Sheet 6.1: Vegetation and Land Health
  - *Question:* This is the only standard that relates to state of Colorado water quality standards. Does the state have any other input in the standards? *Answer:* Not really. We took data and information from the state and they were aware of the process, but not a large input into developing the standards. They have a robust program for water quality, but not for other standards.
  - *Question:* What about wildlife? *Answer:* We manage the habitat for animals and work with the Colorado Division of Wildlife.
  - *Question:* All these land health assessments and indicators are children of range reforms of 1990, a nationwide thing. What vehicle do we have to get local input into something that might be unique to our area? *Answer:* We invite the public and affected interests to take part in our fieldwork. Anyone is welcome to come with us.
  - *Question:* What about the Colorado Division of Wildlife that might have specifics on a certain species? They can come in? *Answer:* Yes, and we consult with them before we write the report and talk to them to about data.
    - *Question:* Does that happen before the alternatives come out? *Answer:* We work on these on a yearly ongoing basis. We will be finishing some land health assessments before the alternatives come out. What we're doing in the RMP is more of a 50,000 foot level. It will talk about how we'll use the land health assessments and the data on a yearly basis throughout the life of the plan to help us make adaptive management decisions. The RMP won't make any land health assessment decisions; that is done on a yearly basis. The decisions in the RMP will state how to use the data and how to use the information in the future. One alternative might say focus all efforts on restoring lands that are in poor conditions. Another alternative might say focus your efforts on lands that are meeting but at risk of slipping into "not meeting," so the RMP will tell us how to focus our attention. We welcome people who want to learn more about our process to come out with us. Any projects that we would use this data on (refer to the data) would be in an environmental assessment or environmental impact statement and those always have public review so the public has an opportunity to look at the site-specific project and see how the data was used to make a decision on that site-specific project.
    - *Comment:* That's what I was wondering. It seems like we can prevent the public from seeing the alternatives and wondering why certain information was or wasn't addressed.
  - *Question:* The RMP is going to be a platform; it isn't going to say that a piece of land is below standard and that the BLM is mandated to correct it? *Answer:* There will be different alternatives in the RMP that give different direction.
    - *Question:* So the end product is a decision approved by you (Barb) and others above you is a decision on where to put the focus on the land whether it be a substandard piece of land or a piece of land at risk of slipping into substandard? *Answer:* Yes, and you all will have input into that direction. The RMP will be general.
  - *Question:* I am amazed at the number of plans that have amended the RMP or have affected the RMP process. What are we going to accomplish as the RAC Subgroup if the RMP is left to be so flexible and general? Do you think we're going to refine it and make it more specific? *Answer:* You'll see as we progress that we are making allocations, these activities can happen on these pieces of land and you will help with those allocations.
  - The RMP will be a look at where the resources will be spent where and we will have input into these categories.
  - *Question:* What if the RAC doesn't see things the same way we do? *Answer:* The RAC has undertaken these efforts before and they trust the work that the RAC Subgroup does. They

BLM_0108548

know the RAC Subgroup does a lot of work. They will have a lot of questions, but they are generally supportive of the decisions the RAC Subgroup has done.

- ▪ An example is the Canyons of the Ancients. We tried to be informed [as the RAC] but we trusted them that they made the right decision.
- ▪ Another example is similar to what this group is doing for wild and scenic rivers; a similar group did for oil and gas and the RAC trusted what the RAC Subgroup did and passed their recommendations.

- Soils (Jeff Litteral)
  - o See handouts: Soils PowerPoint slides and RMP Planning Fact Sheet 6.3: Water Quality and Soils
  - o *Question*: A lot of the soils stuff was not considered in the initial land health assessments. Is it taken into consideration more? *Answer*: Yes, they are used in making the land health assessment polygons. We also look at soil erosion and document it.
  - o *Question*: What I'm wondering is there are certain soils that are more prone to movement and that wasn't documented initially. Is that documented now? *Answer*: No, I guess we did not document the fragile soils and we still don't document them. Most of them fall into the fragile soils category. We don't treat fragile and non-fragile soils the same in our assessments. We could document them more clearly.
    - ▪ *Comment*: So at least the causal affect is known. You could take your total and show how the soils break down into each category. *Response*: Sometimes the causal affect is just what you see instead of relating it back to soil types to understand why it's causing what you see. You're right, we could probably document this better. With GIS it is getting easier to document these things and overlay data. It's just knowing how to use the technology to answer some of these questions.
  - o *Comment*: Saline and selenium is a big deal. We cannot let these soil types contaminate water quality. *Response*: It will be a big deal in the RMP. It played a large role in the Dry Creek Travel Management Plan. There is a lot of it in the Gunnison drainage.
  - o Because of endangered fish, the US Fish and Wildlife Service told the Bureau of Reclamation that they could not move forward with water projects (relicensing dams, water canals, etc.) unless they developed a long-range plan to protect fish from selenium and salinity issues.
  - o *Question*: What stage is this at? *Answer*: We have a draft Memorandum of Understanding with the US Fish and Wildlife Service (Gunnison River mostly, some Dolores because of natural salt domes and Bureau of Reclamation Reclamation injection wells) that says we will help the Bureau of Reclamation develop a long-range plan to deal with this issue. They are using 8 parts per billion at Whitewater as a gauge for the success for this program.
  - o *Question*: So BLM will be writing a selenium management plan? *Answer*: No, the Bureau of Reclamation will. We are a Cooperating Agency to help them. What they will be looking for in our RMP is that we won't transfer public lands with selenium issues into private ownership. There will be some overlap in the management plan with the RMP but the management plan will be behind the RMP. There will be consistency.
  - o *Question*: What is the difference between salinity and selenium? *Answer*: Selenium has been linked to reproductive health for fish in the rivers. Salinity is a broader problem. Salinity affects irrigated waters, treatment of drinking waters. The soil types that they come from, are they different? They usually go hand-in-hand and are tied to the Mancos shale.
  - o *Question*: Do wetlands hold salinity and selenium or do they tend to leech out? *Answer*: They've done some studies and it appears that the wetland does treat the selenium but they can only do so much and then you're left with the material that you have to dispose of. One thing this group can do is come up with some treatment options.
  - o *Question*: What are stipulations? *Answer*: Common ones are No Surface Occupancy that applies to oil and gas leasing and perhaps other surface-disturbing activities. What it means is if you want to drill for gas in that area (with the No Surface Occupancy stipulation), you will have to directional drill because you can't put the well on that site. It could apply for any

BLM_0108549

resource, not just soils, such as special status species habitat. There are some stipulations in our current RMP.

- o *Question*: So it's not so much mitigation, it's where you can and can't drill because of soils, riparian, rare plants and animals. But those are already in place? *Answer*: Yes that's correct, but we'll have to relook at them. Another type is a timing limitation where you can have activities in that area except during a certain time. One of the things we've had lots of discussion on is looking not just at oil and gas but all sorts of surface-disturbing activities.
- Recreation (Edd Franz)
  - o See handouts: RMP Planning Fact Sheet 3.1: Recreation and Visitor Services, Special Recreation Management Areas PowerPoint slides
  - o *Question*: The Dolores River Canyon and San Miguel River Special Recreation Management Areas (SRMAs) don't have the same level of planning why? *Answer*: Because the Land Use Planning Handbook, with the requirements we have to day, was issued after the two current SRMAs were created.

## 5. Alternatives Development

- SRMAs (Edd Franz)
  - o The Dolores River SRMA is within the Dolores River Wilderness Study Area, so it would fit into the *Undeveloped* SRMA market. It could vary across the alternatives. We could expand the SRMA outside of the Wilderness Study Area and the market in that area would be different than the portion inside the Wilderness Study Area. Protections in SRMAs depend upon the target setting for that SRMA. Some SRMAs might allow for development while others would not.
  - o *Question*: You acknowledge that the San Miguel River has a variety of opportunities so you're looking at different ways to manage the area along the entire stretch of the river? *Answer*: Right now we are just looking at polygons on the map but we recognize that there are exception opportunities for recreation.
  - o *Question*: What about the Gunnison River? *Answer*: That is hard because there isn't much of the Gunnison on BLM within the planning area because much of it is in Dominguez-Escalante National Conservation Area which isn't part of this RMP.
  - o In the Ridgway Trails SRMA we would also be looking at the Uncompahgre Riverway site.
  - o *Question*: There is an area west of Norwood, would that be looked at for mountain biking? *Answer*: I think that is Burn Canyon.
    - ▪ *Question*: Is the part that was burned part of it? *Answer*: Yes. We have not come up with maps yet, once we have maps it'll be easier for people to know what we're talking about. When you see the maps if there is an area that you think we should consider that we missed you can let us know.
  - o We have not talked about the Preferred Alternative yet, we are just focused on the alternatives and we need your help making sure we have identified the correct range of alternatives.
  - o Even though the same names appear in Alternatives B and C, the market strategy would be different under the two alternatives.
  - o When we develop the Preferred Alternative, we can pick and choose from the range of alternatives.
  - o *Question*: Is there a river kayaking play feature, are those conversations taking place? *Answer*: Not yet. We could talk about that down the road. I know that there is talk of a park on the San Miguel River. We'll talk about that later.
  - o That's part of our role is to bring to you ideas that people are talking about. We are sending out an agenda ahead of time so that you can bring ideas that relate to those topics.
  - o *Question*: How were SRMAs established? *Answer*: Through this process, scoping, recreation focus groups, they were proposed by someone.

BLM_0108550

- o *Question:* Who designated open or closed? *Answer:* That is a different thing. Travel Management and SRMA planning are two different things. They are related, but different processes.
- Comprehensive Trails and Travel Management (Edd Franz)
  - o We must designate all BLM lands in the planning area as *Open, Closed,* or *Limited to Designated Routes* (*Limited*). We are not going to designate routes in the *Limited* area as part of this RMP process. We will create the *Limited* polygon, but route designation will be a separate process after the RMP is complete.
  - o Outside of the Dry Creek area, all areas except for the North Delta Off-highway Vehicle (OHV) *Open* area are *Limited to Existing Routes.* You can't go out and make a new route and call that part of the existing network.
  - o *Question:* Is the North Delta OHV area monitored as part of land health assessments and for sedimentation? *Answer:* There was a study done but I am not familiar with the results. That is part of the RMP process; we'll be looking at the soils and plants in coordination with other decisions to come up with our allocations.
  - o We need to know if we've identified the areas that we need to for SRMAs and for Open/Closed/Limited OHV designations. Are there other areas that should be open or closed? *Action* (RAC Subgroup): Let us know by September 17th.
  - o *Question:* You're not looking at the entire acreage of all BLM lands, you're looking at if there are specific areas? *Answer:* Every acre of BLM has to be open, limited, or closed; all open or all closed will not be considered as an alternative.
  - o *Question:* Everything under Comprehensive Trails and Travel Management is for existing trails? *Answer:* Outside of the Dry Creek area, you can think of it as a snapshot. What is out there now are the routes that people are limited to (outside of the open and closed areas).
  - o *Question:* So that's a closed door, there would be no new trails? *Answer:* No.
  - o *Question:* How do we get to new trails? *Answer:* After the RMP. We'll come up with criteria in the RMP for creating new trails.
  - o *Question:* So is the environmental assessment for travel management one of the tools you can use in the RMP as a recreation planning component? *Answer:* The actual route-by-route designations will be done after this RMP through an environmental assessment process. We'll look at smaller polygons, called travel management areas. The RMP will be the guidance document and there will be criteria in the RMP as to how the travel management plans will proceed after the RMP. The criteria for route designation could change by alternative, too.
  - o *Action* (BLM): We will send you the current conditions map showing the existing travel management polygons but we don't have a map for the alternatives yet; staff are working on that. Between now and the next meeting we may be able to send you that map. In the meantime, if there are concepts in your head, please let us know.
  - o This information also includes data from recreation focus groups, scoping, and community assessment, so there has been some community input to get us up to this point.
  - o The travel management polygons will have to be consistent with SRMAs but they are two different things.
  - o *Question:* When will the polygons become set? *Answer:* Between now and the next meeting, we'll be working on it, but they won't be "set" until the Record of Decision for the RMP is signed.
  - o *Question:* When you look at these areas, are you also looking at ACECs? Sims Mesa is here as *Open* but it's also part of a proposed ACEC. *Answer:* That's a good example of all of the layers that we have to look at. Everything has to be consistent and we can't have an open area with an ACEC to protect a resource that would be adversely impacted with cross-country travel.
- Draft Themes (Angie Adams)

BLM_0108551

- o *Comment:* I still don't see the balance. The themes look like either one thing or another and I'm not comfortable with that. It doesn't portray a balance which is what you see on the landscape. *Response:* That is one of the problems when we try to throw up labels but this is the range. The preferred, when we pick from the range, will ultimately be balanced. The BLM will develop the balanced preferred before the public sees this. This field office wanted to look at a range before we choose that balanced preferred alternative. We will develop that alternative as a group with RAC Subgroup and Cooperating Agencies input. They will see that alternative, in addition to these alternatives.
- o *Question:* Is RS2477 trails recognition a big problem or a small problem? *Answer:* RMPs say that it is outside of the scope of the plan because RS2477 they're not settled yet. This hasn't been as big of an issue on BLM as it is on US Forest Service land. We've been agreeing with the counties and cooperating on what should happen with the roads.
- o In light of today's discussion, you can submit more comments on goals and themes until Friday, September 17.
- o *Action* (BLM): We will send you some maps for you to look at, but if there are maps that you'd like to see, let us know.

## 6. Other Items Not on the Agenda (Angie Adams)

- *Comment:* I am concerned because I have not seen information about what this RMP will do for subsurface minerals. *Response:* Next meeting we'll have a presentation and more information about that.
- *Question:* How do you have more mineral subsurface than surface? How does it affect your work? *Answer:* We have to make allocations on subsurface as well as surface. We have more subsurface than surface because way back when, people were allowed to homestead but subsurface minerals were retained by federal government.
- *Question:* How big is that area? *Answer:* It's only subsurface within the planning area; it does not extend beyond the planning area.
- You may submit comments on internal draft Chapters 1 and 3 until Friday, October 22.

## 7. Public Comments / Questions

- *Comment:* In looking at the different alternatives and approaches, think about the long-term. You're thinking about what you're hearing about now and the next 15-20 years, but if you think about 50-100 years, you might find that we all have similar interests for the long-term such as water quality and land health.
- *Question:* How will you deal with cross-cutting issues such as Gunnison sage-grouse. It could involve coordination with the state and with working groups. It doesn't fit into one geographic area. How are you going to address those issues that are more complex? *Answer:* That is one of those things that we are going to keep working on and we expect guidance on sage-grouse specifically before the next meeting.

## 8. Action Items / Next Meeting

- All meetings are at 9:00am at the Holiday Inn Express (1391 South Townsend Avenue), Jordan Room:
  - o Friday, October 1, 2010: Visual Resources, Lands and Realty, Minerals
- *Action* (BLM): Provide current SRMA and OHV map to RAC Subgroup.
- *Action* (RAC Subgroup): Draft SRMAs: give us your feedback by Friday, September 17.
- *Action* (RAC Subgroup): Draft OHV designations: give us your feedback by Friday, September 17.
- *Action* (RAC Subgroup): Draft Goals: give us your feedback by Friday, September 17.
- *Action* (RAC Subgroup): Draft Alternatives Themes: give us your feedback by Friday, September 17.
- *Action* (RAC Subgroup): Draft Chapters 1 and 3: give us your feedback by Friday, October 22.

**Kate Wynant**

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **Sent:** | Wednesday, September 01, 2010 3:27 PM |
| **To:** | Barbara_Sharrow@blm.gov; Angie Adams; Kate Wynant; Aschroeder@usbr.gov; kjensen@ci.montrose.co.us; renzo.delpiccolo@state.co.us; shansen@deltacounty.com; MPelletier@gunnisoncounty.org; swhite@montrosecounty.net; lpadgett@ouraycountyco.gov; lynn@mtngeogeek.com; joanm@sanmiguelcounty.org; pat@cedaredgecolorado.com; mjreagan@fone.net; norwoodparker@centurytel.net; sharold@ci.olathe.co.us; davidvarley@kaycee.net; jcoates@town.ridgway.co.us; Dan_Reinkensmeyer@fws.gov; segfahlt@gmail.com; Bruce_Krickbaum@co.blm.gov; UFO AR |
| **Subject:** | Draft Notes: Uncompahgre RMP Cooperating Agency Meeting #4 |
| **Attachments:** | UFO-CA_2010-08-19_Draft-notes.doc |

Hello Cooperating Agency Reps,

I have attached draft notes of the August 19 Uncompahgre RMP Cooperating Agency meeting.  Please review the draft notes and let me know of any errors or omissions no later than Wednesday, September 8.  After that date, the notes will be revised and submitted to all group members and the administrative record.

Thank you, Bruce

.(See attached file: UFO-CA_2010-08-19_Draft-notes.doc)

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system

BLM_0108553

 

# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401

## COOPERATING AGENCY MEETING #4

### Thursday, August 19, 2010 (1:00 – 4:00 PM)

### Meeting Location:
### Holiday Inn Express (Jordan Room)
### 1391 South Townsend Avenue, Montrose, CO

# Meeting Notes

**Attendees:** Angie Adams (EMPSi), Amanda Clements (BLM Uncompahgre Field Office), Jen Coates (Town of Ridgway), Renzo DelPiccolo (Colorado Department of Natural Resources, Southwest Region), Edd Franz (BLM Uncompahgre Field Office), Patti Grafmyer (Town of Norwood), Susan Hansen (Delta County BOCC), Scott Harold (Town of Olathe), Kerwin Jensen (City of Montrose), Bruce Krickbaum (BLM Uncompahgre Field Office), Jeff Litteral (BLM Uncompahgre Field Office), William Long (Town of Nucla), Joan May (San Miguel County BOCC), Patricia Means (Town of Cedaredge), Lynn Padgett (Ouray County BOCC), Mike Pelletier (Gunnison County), Barbara Peterson (Town of Paonia), Joe Reagan (Town of Norwood), Dan Reinkensmeyer (US Fish and Wildlife Service), Alan Schroeder (Bureau of Reclamation, Western Colorado Area Office), Barb Sharrow (BLM Uncompahgre Field Office), David Varley (Town of Orchard City), Steve White (Montrose County BOCC), Kate Wynant (EMPSi)

**Handouts:** Agenda, Highlights of the Resource Management Planning Process to Date, RMP Planning Fact Sheet 6.1: Vegetation and Land Health, RMP Planning Fact Sheet 3.1: Recreation and Visitor Services, RMP Planning Fact Sheet 6.3: Water Quality and Soils, Land Health Assessments and the Uncompahgre Field Office Resource Management Plan Revision PowerPoint slides, Soils PowerPoint slides, Special Recreation Management Areas PowerPoint slides, Preliminary Internal Draft Alternatives for Special Recreation Management Areas and Comprehensive Trails and Travel Management

1. **Welcome** (Bruce Krickbaum)

2. **Introductions** (All present)

3. **Planning Process to Date** (Angie Adams)
   - See handout: Highlights of the Resource Management Planning Process to Date
   - Several reports are complete and are on the Web site.
   - The draft Areas of Critical Environmental Concern evaluation report is on Web site; comments are due tomorrow (August 20).
   - The Wild and Scenic River suitability process is underway and we are gathering data on suitability criteria. Information was due on Monday (August 16) but if you have anything for us, we will still accept it.

BLM_0108554

- We are taking information from the public on suitability criteria so that we can think about it internally but there will be stakeholder groups as we've talked about in the past and we'll need their input by December 2010. The first meeting for the Gunnison River Basin is September 1 at the Bill Heddles Recreation Center in Delta from 2:00-4:30pm. The meeting for the Dolores and San Miguel River Basins has not been scheduled yet.

## 4. Renewable Energy (Lynn Padgett, Angie Adams)

- At one of the first meetings we talked about the renewable potential for the various renewable resources and there was some concern that it has not been looked at at a local level. I was concerned that our solar potential was rated as "low" in some studies but at the local rural utility level, our solar potential is not low; perhaps this is the same for geothermal and other renewable resources. I wondered how this low potential was going to feed into the RMP and, if the low potential is in the alternatives, how it will shape the plan for the next 25 years. To determine potential, the rating takes into account places that are within 25 miles of a transmission line. If you talk to Delta-Montrose Electric Association, they are required to have five percent of their power from renewable energy, so they are looking at existing transmission lines and substations. There is a project on private that very well could have been on BLM land. In Ridgway, one of the few areas that we have is near a substation on BLM. I don't want the RMP to have to be amended to account for these things that we can incorporate into the RMP now. Can we talk to the local utilities to get a better picture?
- A. Adams: The alternatives do not open or close a type of renewable energy based on potential alone. Just because there is low potential, we can't close an area. The "low potential" in the programmatic documents does not dictate what we put in the alternatives as open or closed. We might close an area because there is an area of critical environmental concern with a special status plant species that would be diminished if a solar development were placed on that site. What we do is go through the planning area and look at resources that would not be compatible with renewable energy development. We do the same thing for other resource uses such as off-highway vehicle use.
- *Question*: So an area will not be close because the potential is so low? The staff will look at it more on a site-specific basis to weigh other resources and impacts to those resources? *Answer*: That is correct. The reason that there might be an RMP amendment is because technology changes and development that today would impact a resource might, in the future, be able to exist in a way that doesn't damage a resource, so areas that we identify as closed in the RMP could be opened if technology changes.
- *Comment*: I talked with local utilities to see if these were issues that needed to be raised and they all felt strongly that there should be alternatives that would allow for local energy development. You are aware that there is a group that would like to allow for alternative energy development at the local level.
- Lynn has looked into wind but if anyone knows something about other types of renewables, such as geothermal, please let us know.
- *Question*: What about hydro power? How come it is not addressed in this plan? *Answer*: The main reason why hydro is not addressed in this plan is because water resources are not managed by BLM; it is not our jurisdiction. We will evaluate some of those things as part of the WSR study.
  - o *Comment*: Even though BLM might not manage water, they manage the pipelines that might go to/from the water.
  - o *Comment*: Solar Energy International has done a hydrology potential study in the North Fork Valley.
- If we know that there are areas for hydro, we should look at decisions in our plan that might preclude it; make sure that our plan would not conflict with reasonably foreseeable future

BLM_0108555

development. We don't want to set direction in the plan that might preclude some activities because we didn't know about it.

- *Comment*: In the Montrose Daily Press there was a cover story on the success of Project 7 Water Authority with DMEA. I am worried about inference and where this plan will end up. It will be used as a source tool for parties that might be interested in developing some of those resources. If this plan uses guidance that there is low potential and we agree but we still have areas open to development, will we be shortening future development? We need all the business that we can get. *Answer*: From a land manager perspective, it doesn't seem to make a difference what our studies say. Based on the price of the commodity and demand, folks are still interested and looking to develop the resource. They are not deterred by studies.
- The broad-scale studies are very general and developers who are interested are going to take that for what it's worth but do their own investigation. Again, we won't be limiting areas based on potential.
- If there are areas that you know of where development is likely to occur, you'll need to see if we have areas "closed" that might preclude such activities.

## 5. Resource/Resource Use Discussions
- Land Health Assessments (Amanda Clements)
  - See handouts: Land Health Assessments and RMP Planning Fact Sheet 6.1: Vegetation and Land Health
  - *Question*: It seems like it took a long time to get this information that might go into the RMP. How is this information utilized on a more practical scale? *Answer*: For a grazing allotment of 5,000 acres we have info that we can go to a permittee and say that there are problems on the allotment with evidence that the livestock are contributing to the problem and work with them to relieve the problem.
  - Some of you are reviewing our environmental assessments and see that we are using the data on almost every project that we're working on.
  - *Question*: How do you address years that we have a drought or a lot of rain. *Answer*: In extreme years we won't be able to address it, but over the past 12 years we've only had one extreme year. We have indicators so that they are not fixed so that even in extreme years, we know that certain plants and communities should be found in certain areas. That's why so much emphasis and research was put into selecting these indicators.
  - *Question*: When you talk about institutionalizing this [Land Health Assessment process], it's more than methodology and standards? *Answer*: Yes, our approach to doing it and how it fits into the other activities.
    - *Question*: I heard you say that you want to institutionalize it so that if people leave, there is the knowledge about the indicators and what to do, not necessarily what the condition is today. *Answer*: Correct, we're not proposing that the conditions stay the same for the next 20 years.
- Soils (Jeff Litteral)
  - See handouts: Soils PowerPoint slides and RMP Planning Fact Sheet 6.3: Water Quality and Soils
- Recreation (Edd Franz)
  - See handouts: Special Recreation Management Areas (SRMAs) PowerPoint slides, RMP Planning Fact Sheet 3.1: Recreation and Visitor Services
  - *Question*: Can you give an example of an existing BLM Special Recreation Management Area (SRMA)? *Answer*: The San Miguel River SRMA, but it was done before the 2005 Land Use Planning Handbook which directed us to identify the target market so it doesn't have that attached to it now. Identifying SRMAs is a new thing and we can also designate an intermediate category called an individual extensive recreation management area, where we are not restricting other uses but managing for an activity that the public has told us about.

BLM_0108556

- o *Question*: Is there a minimum acreage associated with SRMAs? *Answer*: No, but it would have to be something that you could plan for. You probably wouldn't have a 20-acre SRMA, but you might have 500 or 20,000 acres.
- o *Comment*: I spent a week in an area with no signage, old maps, and minimal information. It is one thing to say we're designating this as a recreation area, but if people can't navigate the area, then people end up lost. More signage would be helpful and more of the so-called use maps where there are signs periodically that point out the activities. *Response*: That's what SRMAs are trying to address. Instead of trying to do everything equally throughout the field office, let's concentrate on the areas that people want use so that we can create signs, maps, etc.
  - ▪ *Question*: Would that potential to get lost fit into a sort of SRMA market or would that fit into an ERMA? Would some people like that experience? *Answer*: I was in a large area and would drive for 30 minutes without seeing a road sign than all of a sudden I ended up outside of the park because there wasn't any signage. This area just isn't developed.
- o *Question*: Where does wilderness fall into this? *Answer*: They might. For example we have the Dolores River Canyon Wilderness Study Area as an SRMA currently and we've brought that forward to consider in some of the alternatives now. There can be overlap. It would be for an undeveloped market because we can't develop facilities.
- o *Question*: The SRMAs, do you have studies or are you looking to us to say this is where people like to go? *Answer*: A bit of both. We had Mesa State do visitor studies, collect responses from users, and through that we were able to identify places and settings that people like. Questions asked not only where and why, but what BLM could do to ruin the experience.

## 6. Alternatives Development

- • SRMAs (Edd Franz)
  - o See handout: Preliminary Internal Draft Alternatives for Special Recreation Management Areas and Comprehensive Trails and Travel Management
  - o *Question*: Will we see a list of those areas identified with details? *Answer*: The results of the focus groups are available on the Web site (Click Here).
  - o *Question*: Why would Ridgway Trails SRMA only be identified under high-intensity management alternatives? Why wouldn't that be under low-intensity? *Answer*: Because inherently with SRMAs there is usually a high intensity of management.
  - o *Question*: So the other two [San Miguel River and Dolores River Canyon SRMAs] are grandfathered in? *Answer*: No, the management for those areas doesn't require as much as some of the other SRMAs. Also, the management under Alternative D would be less-intensive than under the high-intensity alternatives.
    - ▪ *Comment*: That doesn't seem very clear. *Response*: This is just a draft and more will be put into this, including describing the setting (how many people you're going to see, how many kiosks or signs, trail system development).
  - o *Question*: Are these already established SRMAs? *Answer*: The Alternative A column shows the two that already exist. The others are ones that we came up with this week and based on the recreation focus groups.
  - o *Question*: Isn't there something east of Olathe? *Answer*: That is the Gunnison Gorge, which is not part of this plan. *Question*: The Adobes? *Answer*: Yes, that is part of that planning area, which is larger than the Gunnison Gorge National Conservation Area; it won't be reconsidered here.
  - o We are looking for your feedback. We can tailor the management of these areas to meet the needs of the communities. If you have something going on that can be addressed through this (improve lifestyle, keep people active), talk to us and we can try to incorporate it this way by marketing and directing people to a certain place.

BLM_0108557

- o *Question*: People in Ridgway would like a bike path that connects San Miguel County. Is this an opportunity to develop a bike path that connects to the San Miguel River or elsewhere? *Answer*: Sure. It would also require county and US Forest Service cooperation. That is a good point; I don't think that idea came up this week. I remember when I first came here that I heard all about this vision to connect communities. This is an example of something in the county plans that should be in this RMP so that when the opportunity arises, we don't have to amend our RMP.
- o *Question*: Would that be an SRMA as opposed to travel management? *Answer*: It could be either place. Maybe it falls into an individual Extensive Recreation Management Area.
- o *Question*: How big are the North and Dry Creeks? *Answer*: Approximately 115,000 acres.
- o *Question*: How large does Kinikin Hills expand? *Answer*: At this point we're not exactly sure what the boundary would be.
- o *Question*: Is the 40 acre parcel in Ridgway included here? The Uncompahgre Riverway site. *Answer*: That is one that we're looking at in Interpretation and Environmental Education. It's also a place that we're considering as a watchable wildlife area. It could also be considered as an SRMA.
  - ▪ *Comment*: That would be consistent with our vision; the community is looking for a way to connect the surrounding areas.
- o *Question*: Does the BLM have land along the Uncompahgre River? *Answer*: No, not really.
- o *Question*: Could you designate areas as potential for land exchange to make some of these opportunities come to fruition? *Answer*: Yes, we have criteria for acquiring lands so that there is framework for such activities. Same goes for areas that we want to retain and areas that we want to dispose of.
- o *Question*: Would the BLM be willing to take land in a riparian area? If someone wanted to donate land, say 10 acres, if the county wasn't interested? *Answer*: We would look at it, but generally if we don't have lands around it, we might not want it. In 1992 we did a land exchange near Telluride and gained a lot of acreage in Leopard Creek. That's an example of how we got a lot of our riparian corridor.
- o *Question*: In this stage, you're developing alternatives based on the alternatives themes, but further down the road you will be able to pick from various alternatives for various programs (e.g., Alternative A for grazing, Alternative D for recreation). *Answer*: Yes, but the each program has to make sense with the management of other programs. We also can only pick from what is in the range. If one alternative says 500 and another says 1,000, we can pick 750 but we can't pick 2,000 if no alternatives looked at something 2,000 or greater.
- o *Action* (Cooperating Agencies): Give us your feedback by Friday, September 17.
- • Comprehensive Trails and Travel Management (Edd Franz)
  - o Route designation: *open, closed*, and *limited* to off-highway vehicle (OHV) use.
  - o In Dry Creek we went from "open" to "limited to designated routes." The rest of the field office is "limited to existing routes" except the North Delta OHV area, which is "open." The legal routes are those that existed at the time that plan was signed.
  - o This plan will draw the polygons (open, limited, and closed) but won't go route-by-route to designate routes in the *limited* area. After this plan, there will be a process to designate each route.
  - o *Question*: Is there a public process to designate those routes? *Answer*: Yes, after this plan there will be an intensive public process to designate routes. We felt like if we tried to do it in this plan, people wouldn't be able to site by site to look at routes.
  - o *Question*: So these travel management designations are different designations than SRMAs? *Answer*: Yes, there is some overlap, but they are different polygons. Every BLM acre has to fall into "open" "limited" or "closed". For SRMAs we only designate certain areas.
  - o *Question*: Those have to match up though. You can't have an SRMA with no access. *Answer*: Well you could. There could be an undeveloped SRMA that is closed to OHV use.

BLM_0108558

- o *Action* (Cooperating Agencies): Look at the areas in each of these polygons and see if anything needs to be added or deleted.
- o *Action* (CDOW): Provide timing limitations and make sure our terminology is correct.
- o *Question*: Is it important for us to know what the current management is? I know some things because I live there but I don't know the other places. *Answer*: Eventually we'll have maps so that you can see where the areas are.
- o *Action* (BLM): Provide current SRMA and OHV map to Cooperating Agencies.
- o *Action* (BLM): Provide link to recreation focus group report.
- o *Question*: How much detail will we get into for each of these SRMAs? Are we going to talk about how they are being managed now? What makes them an SRMA and what doesn't and how will that change under a different alternative? *Answer*: For the purposes of right now we want you to brainstorm areas that might be appropriate as an SRMA so that we can get them on the list. As we develop the market niche, we can bring you those things to compare to what's happening now and talk about how management will be different under different alternatives. We can share that info with the group and get your feedback as we're drafting it.
- o We want your feedback on areas that have certain setting characteristic requirements for a specific market.
- o *Question*: While we're brainstorming, do you have the info on whether or not there's wildlife in the area that we might not know about? *Answer*: Yes, we have those maps and when we're planning we overlay those maps with any proposed project.
- o *Action* (BLM): Send wildlife maps (threatened and endangered species, wintering range), especially of Jumbo Mountain area, to Cooperating Agencies.
- o *Action* (Cooperating Agencies): Give us your feedback by Friday, September 17.
- Draft Themes (Angie Adams)
  - o *Comment*: Alternative B: "active management" might be a better way of saying "lots of rules." Under "grazing" instead of maintain animal unit month base, we might want to say adjust animal unit month base to achieve land health standards. Maintain animal unit month base might not achieve land health standard. Use more specifics for soils stability, species diversity (language from Land Health Standards). Generally more consistent language when describing the alternatives.
  - o *Question*: If we have an idea for an alternative, how should we submit that? *Answer*: You can e-mail a paragraph to either Bruce ([bruce_krickbaum@blm.gov](mailto:bruce_krickbaum@blm.gov)) or Kate ([kate.wynant@empsi.com](mailto:kate.wynant@empsi.com)) and tell us where it fits.
  - o *Question*: As group went through to develop alternatives, did this scheme work? *Answer*: They might not like some of the things that are going in the boxes, but they are filling in different alternatives. What remains to be seen is, when we look up and down the columns, are the alternatives different enough or are they so similar that there isn't value added in analyzing an additional alternative.
- Draft Goals (Angie Adams)
  - o We received one comment from a Resource Advisory Council Subgroup member but no detailed feedback.

## 7. Other Items Not on the Agenda (Angie Adams)

- *Comment*: This is a huge effort and the timeframe seems very short. *Response*: We understand. This process is evolving and once we get things written down and have more details and maps, we'll be able to give it to you. As you're glancing through the stuff that we're giving you, you're probably having a gut reaction and that's what we want your feedback on. You'll be able to review the details when we provide you the information. We are hoping that by going through this process, when you do get the draft document for review, you'll understand what you are reading.

BLM_0108559

- *Comment*: The planning processes are just long and a lot to deal with. I appreciate that this process is concise and a small group. I would rather get the information here than have to attend more and larger meetings.
- Chapters 1 and 3 are very long. We gave the BLM an extension so we will give you the same extension to Friday, October 22. This is not a critical path.
- You can also take more time to comment on the themes and goals (handed out at July meeting) until Friday, September 17.
- *Comment*: I am not so much concerned about time, but more concerned that I miss something in the review. North Delta isn't an SRMA and maybe it should be.
- Our next meeting we'll have more information and we're likely going to be discussing the preferred alternative.
- We tried to bring you a focused question to get your feedback. If we brought you everything we talked about we wouldn't get through everything.
- Are there any topics in particular that you want to see, similar to what we showed you with SRMAs and OHVs? OHV use is one of the hottest topics. Recreation use is big.
- Are there any other maps you want to see? Oil and gas leasing, for example. Let us know if there is anything you want to see and we can provide it. The existing condition maps are also with Chapter 3.

## 8. Action Items / Next Meeting

- All meetings are at 1:00pm at the Holiday Inn Express (1391 South Townsend Avenue), Jordan Room:
  - Thursday, September 30, 2010: Visual Resources, Lands and Realty, Minerals
- ☐ *Action* (Cooperating Agencies): Draft SRMAs: give us your feedback by Friday, September 17.
- ☐ *Action* (Cooperating Agencies): Draft OHV designations: give us your feedback by Friday, September 17.
- ☐ *Action* (CDOW): Provide timing limitations and make sure our terminology is correct.
- ☐ *Action* (BLM): Provide current SRMA and OHV map to Cooperating Agencies.
- ☐ *Action* (BLM): Provide link to recreation focus group report ([Click Here](Click Here)).
- ☐ *Action* (BLM): Send wildlife maps (threatened and endangered species, wintering range), especially of Jumbo Mountain area, to Cooperating Agencies.
- ☐ *Action* (Cooperating Agencies): Draft Chapters 1 and 3: give us your feedback by Friday, October 22.
- ☐ *Action* (Cooperating Agencies): Draft Goals: give us your feedback by Friday, September 17.
- ☐ *Action* (Cooperating Agencies): Draft Alternatives Themes: give us your feedback by Friday, September 17.



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401



# COOPERATING AGENCY MEETING #4

## Thursday, August 19, 2010 (1:00 – 4:00 PM)

### Meeting Location:
### Holiday Inn Express (Jordan Room)
### 1391 South Townsend Avenue, Montrose, CO

# Meeting Notes

**Attendees:** Angie Adams (EMPSi), Amanda Clements (BLM Uncompahgre Field Office), Jen Coates (Town of Ridgway), Renzo DelPiccolo (Colorado Department of Natural Resources, Southwest Region), Edd Franz (BLM Uncompahgre Field Office), Patti Grafmyer (Town of Norwood), Susan Hansen (Delta County BOCC), Scott Harold (Town of Olathe), Kerwin Jensen (City of Montrose), Bruce Krickbaum (BLM Uncompahgre Field Office), Jeff Litteral (BLM Uncompahgre Field Office), William Long (Town of Nucla), Joan May (San Miguel County BOCC), Patricia Means (Town of Cedaredge), Lynn Padgett (Ouray County BOCC), Mike Pelletier (Gunnison County), Barbara Peterson (Town of Paonia), Joe Reagan (Town of Norwood), Dan Reinkensmeyer (US Fish and Wildlife Service), Alan Schroeder (Bureau of Reclamation, Western Colorado Area Office), Barb Sharrow (BLM Uncompahgre Field Office), David Varley (Town of Orchard City), Steve White (Montrose County BOCC), Kate Wynant (EMPSi)

**Handouts:** Agenda, Highlights of the Resource Management Planning Process to Date, RMP Planning Fact Sheet 6.1: Vegetation and Land Health, RMP Planning Fact Sheet 3.1: Recreation and Visitor Services, RMP Planning Fact Sheet 6.3: Water Quality and Soils, Land Health Assessments and the Uncompahgre Field Office Resource Management Plan Revision PowerPoint slides, Soils PowerPoint slides, Special Recreation Management Areas PowerPoint slides, Preliminary Internal Draft Alternatives for Special Recreation Management Areas and Comprehensive Trails and Travel Management

1. **Welcome** (Bruce Krickbaum)

2. **Introductions** (All present)

3. **Planning Process to Date** (Angie Adams)
   - See handout: Highlights of the Resource Management Planning Process to Date
   - Several reports are complete and are on the Web site.
   - ACEC evaluation report on Web site; comments are due tomorrow.
   - WSR suitability process is underway and we are gathering data on suitability criteria. Information was due on Monday but if you have anything for us, we will still accept it.
   - We are taking info from the public on suitability criteria so that we can think about it internally but there will be stakeholder groups as we've talked about in the past and we'll need their input

BLM_0108561

by December. The first meeting for the Gunnison River Basin is September 1 at the Bill Heddles Recreation Center in Delta from 2:00-4:30pm. The meeting for the Dolores and San Miguel River Basins has not been scheduled yet.

## 4. **Renewable Energy** (Lynn Padgett, Angie Adams)

- At one of the first meetings we talked about the renewable potential for the various renewable resources and there was some concern that it has not been looked at at a local level. I was concerned that our solar potential was rated as low in some studies but at the local rural utility level, our solar potential is not low; perhaps this is the same for geothermal and other renewable resources. I wondered how this low potential was going to feed into the RMP and, if the low potential is in the alternatives, how it will shape the plan for the next 25 years. To determine potential, the rating takes into account places that are within 25 miles of a transmission line. If you talk to DMEA, they are required to have 5 percent of their power from renewable energy, so they are looking at existing transmission lines and substations. There is a project on private that very well could have been on BLM land. In Ridgway, one of the few areas that we have is near a substation on BLM. I don't want the RMP to have to be amended to account for these things that we can incorporate into the RMP now. Can we talk to the local utilities to get a better picture.
- A. Adams: The alternatives do not open or close a type of renewable energy based on potential alone. Just because there is low potential, we can't close an area. The "low potential" in the programmatic documents does not dictate what we put in the alternatives as open or closed. We might close an area because there is an area of critical environmental concern with a special status plant species that would be diminished if a solar development were placed on that site. What we do is go through the planning area and look at resources that would not be compatible with renewable energy development. We do the same thing for other resource uses such as off-highway vehicle use.
- *Question*: So an area will not be close because the potential is so low? The staff will look at it more on a site-specific basis to weigh other resources and impacts to those resources? *Answer*: That is correct. The reason that there might be an RMP amendment is because technology changes and development that today would impact a resource might, in the future, be able to exist in a way that doesn't damage a resource, so areas that we identify as closed in the RMP could be opened if technology changes.
- *Comment*: I talked with local utilities to see if these were issues that needed to be raised and they all felt strongly that there should be alternatives that would allow for local energy development. You are aware that there is a group that would like to allow for alternative energy development at the local level.
- Lynn has looked into wind but if anyone knows something about other types of renewables, such as geothermal, please let us know.
- *Question*: What about hydro power? How come it is not addressed in this plan? *Answer*: The main reason why hydro is not addressed in this plan is because water resources are not managed by BLM; it is not our jurisdiction. We will evaluate some of those things as part of the WSR study.
  - o *Comment*: Even though BLM might not manage water, they manage the pipelines that might go to/from the water.
- Solar international has done a hydrology study (get notes from Angie).
- If we know that there are areas for hydro, we should look at decisions in our plan that might preclude it; make sure that our plan would not conflict with reasonably foreseeable future development. We don't want to set direction in the plan that might preclude some activities because we didn't know about it.
- *Comment*: In the Montrose Daily Press there was a cover story on the success of Project 7 water with DMEA. I am worried about inference and where this plan will end up. It will be used

BLM_0108562

as a source tool for parties that might be interested in developing some of those resources. If this plan uses guidance that there is low potential and we agree but we still have areas open to development, will we be shortening future development? We need all the business that we can get. *Answer*: From a land manager perspective, it doesn't seem to make a difference what our studies say. Based on the price of the commodity and demand, folks are still interested and looking to develop the resource. They are not deterred by studies.

- The broad-scale studies are very general and developers who are interested are going to take that for what it's worth but do their own investigation. Again, we won't be limiting areas based on potential.
- If there are areas that you know of where development is likely to occur, you'll need to see if we have areas "closed" that might preclude such activities.

## 5. Resource/Resource Use Discussions

- Land Health Assessments (Amanda Clements)
  - See handouts: Land Health Assessments and RMP Planning Fact Sheet 6.1: Vegetation and Land Health
  - *Question*: It seems like it took a long time to get this information that might go into the RMP. How is this information utilized on a more practical scale? *Answer*: For a grazing allotment of 5,000 acres we have info that we can go to a permittee with and say that there are problems on the allotment with evidence that the livestock are contributing to the problem and work with them to relieve the problem.
  - Some of you are reviewing our environmental assessments and see that we are using the data on almost every project that we're working on.
  - *Question*: How do you address in a 12 year period years that we have a drought or a lot of rain. *Answer*: In extreme years we won't be able to address it, but over the past 12 years we've only had one extreme year. We have indicators so that they are not fixed so that even in extreme years, we know that certain plants and communities should be found in certain areas. That's why so much emphasis and research was put into selecting these indicators.
  - *Question*: When you talk about institutionalizing this, it's more than methodology and standards? *Answer*: Yes, our approach to doing it and how it fits into the other activities.
    - *Question*: I heard you say that you want to institutionalize it so that if people leave, there is the knowledge about the indicators and what to do, not necessarily what the condition is today. *Answer*: Correct, we're not proposing that the conditions stay the same for the next 20 years.
- Soils (Jeff Litteral)
  - See handouts: Soils PowerPoint slides and RMP Planning Fact Sheet 6.3: Water Quality and Soils
- Recreation (Edd Franz)
  - See handouts: Special Recreation Management Areas (SRMAs) PowerPoint slides, RMP Planning Fact Sheet 3.1: Recreation and Visitor Services
  - *Question*: Can you give an example of an existing BLM SRMAs? *Answer*: The San Miguel River SRMA, but it was done before the 2005 Land Use Planning Handbook which directed us to identify the target market so it doesn't have that attached to it now. Identifying SRMAs is a new thing and we can also designate an intermediate category called an individual extensive recreation management area, where we are not restricting other uses but managing for an activity that the public has told us about.
  - *Q*: Is there a minimum acreage associated with SRMAs? *A*: No, but it would have to be something that you could plan for. you probably wouldn't have a 20-acre SRMA, but you might have 500 or 20,000 acres.
  - *Q*: this is an experience I had a couple days ago. I spent a week in an area with no signage, old maps, minimal information. it is one thing to say we're designating this as a recreation

BLM_0108563

area, but if people can't navigate the area, then people end up lost. more signage would be helpful and more of the so-called use maps where there are signs periodically that point out the activities. A: That's what SRMAs are trying to address. instead of trying to do everything equally throughout the FO, lets concentrate on the areas that people want use so that we can create signs, maps, etc.

- o  q: would that potential to get lost fit into a sort of SRMA market or would that fit into an ERMA? would some people like that experience? A: I was in a large area and would drive for 30 minutes without seeing a road sign. then all of a sudden I ended up outside of the park because there wasn't any signage. this area just isn't developed.
- o  q: where does wilderness fall into this? A: They might. For example we have the Dolores River Canyon WSA as an SRMA currently and we've brought that forward to consider in some of the alternatives now. There can be overlap. It would be for an undeveloped market because we can't develop facilities.
- o  Q: The SRMAs, do you have studies or are you looking to us to say this is where people like to go? A: A bit of both. We had Mesa State do visitor studies, collect responses from users, and through that we were able to identify places and settings that people like. Questions asked not only where and why, but what BLM could do to ruin the experience.

## 6. Alternatives Development

- • SRMAs and CTTM
  - o  See handout: Preliminary Internal Draft Alternatives for Special Recreation Management Areas and Comprehensive Trails and Travel Management
  - o  Q: Will we see a list of those areas identified with details? A: The results of the focus groups are available on the Web site (Recreation Focus Groups Report).
  - o  Q: Why would Ridgway Trails SRMA only be identified under high-intensity management alternatives? why wouldn't that be under low-intensity? A: Because inherently with SRMAs there is usually a high intensity of management.
  - o  so the other two are grandfathered in? no, the management for those areas doesn't require as much amangement as some of the other SRMAs. also, the management under Alternative D would be less-intensive than under the high-intensity alternatives. that doesn't seem very clear. this is just a draft and more will be put into this, including describing the setting (how many people you're going to see, how many kiosks or signs, trail system development).
  - o  are these already established SRMAs? the Alternative A column are the two that already exist. the others are ones that we came up with this week and based on the recreation focus groups.
  - ▪  isn't there something east of Olathe? That is the Gunnison Gorge, which is not part of this plan. The Adobes? Yes, that is part of that planning area, which is larger than the NCA. it wont be reconsidered here.
  - o  we are looking for your feedback. we can tailor the management of these areas to meet the needs of the communities. if you have something going on that can be addressed through this (improve lifestyle, keep people active), talk to us and we can try to incorporate it this way by marketing and directing people to a certain place. improve business opportunities to local providors, help us by providing that input.
  - o  bike path in San Miguel County. people in Ridgway would like a bike path that connects. this is an opportunity to develop a bike path that connects to the San Miguel River or elsewhere. A: Sure. It would also require county and USFS cooperation. That is a good point, I don't think that idea came up this week. I remember when I first came here that I heard all about this vision to connect communities. this is an example of something in the county plans that should be in this RMP so that when the opportunity arises, we don't have to amend our RMP.
  - o  would that be an SRMA as opposed to travel management? it could be either place. maybe it falls into an individual ERMA.

BLM_0108564

- How big are the north and dry creeks? A: Approximately 115,000 acres.
- How large does Kinikin Hills expand? (Edd)
- Is the 40 acre parcel in Ridgway included here? The Uncompahgre Riverway site. That is one that we're looking at in Interpretation and Environmental Education. It's also a place that we're considering as a watchable wildlife area. It could also be considered as an SRMA.
- That would be consistent with vision, the community is looking for a way to connect the surrounding areas.
- Does the BLM have land along the Uncompahgre River? No, not really.
- Could you designate areas as potential for land exchange to make some of these opportunities come to fruition? Yes, we have criteria for acquiring lands so that there is framework for such activities. Same goes for areas that we want to retain and areas that we want to dispose of.
- Would the BLM be willing to take land in a riparian area? If someone wanted to donate land, say 10 acres, if the county wasn't interested? We would look at it, but generally if we don't have lands around it, we might not want it. In 1992 we did a land exchange near Telluride and gained a lot of acreage in Leopard Creek. That's an example of how we got a lot of our riparian corridor.
- In this stage, you're developing alternatives based on the alternatives themes, but further down the road you will be able to pick from various alternatives for various programs (e.g., Alt A for grazing, Alt D for recreation). Yes, but the whole plan must be consistent with eachother. Each program has to make sense with the management of other programs. We also can only pick from what is in the range. if one alternative says 500 and another says 1,000, we can pick 750 but we can't pick 2,000 if no alternatives looked at something 2,000 or greater.
- Route designation: open, closed, and limited.
- in Dry Creek we went from "open" to "limited to designated routes." The rest of the FO is "limited to existing routes" (except the North Delta OHV area). the legal routes are those that existed at the time that plan was signed.
- This plan will draw the polygons but won't go route-by-route to designate routes in the *limited* area. After this plan, there will be a process to designate each route.
- *Question*: Is there a public process to designate those routes? *Answer*: Yes, after this plan there will be an intensive public process to designate routes. we felt like if we tried to do it in this plan, people wouldn't be able to go site by site to look at routes.
- So these (CTTM) are different designations than SRMAs? Yes, there is some overlap, but they are different polygons. Every BLM acre has to fall into "open" "limited" or "closed". for SRMAs, only certain areas
- those have to match up though. you can't have an SRMA with no access. Answer: Well you could. there could be an undeveloped SRMA that is closed to OHV use.
- CAs: Look at the areas in each of these polygons and see if anything needs to be added or deleted.
- CDOW: Provide TLs, make sure our terminology is correct.
- is it important for us to know what the current management is? I know some things because I live there but I don't know the other places. Answer: Eventually we'll have maps so that you can see where the areas are.
- BLM: Provide current SRMA and OHV map to CAs.
- BLM: Provide link to recreation focus group report.
- how much detail will we get into for each of these SRMAs? Are we going to talk about how they are being managed now? What makes them an SRMA and what doesn't and how will that change under a different alternative? For the purposes of right now we want you to brainstorm areas that might be appropriate as an SRMA so that we can get them on the list. as we develop the market niche, we can bring you those things to compare to what's happening now and talk about how management will be different under different

BLM_0108565

alternatives. we can share that info with the group and get your feedback as we're drafting it.
- o we want your feedback on areas that have certain setting characteristic requirements for a specific market.
- o while we're brainstorming, do you have the info on whether or not there's wildlife in the area that we might not know about? yes, we have those maps and when we're planning we overlay these maps with any proposed project. BLM: send wildlife maps (T&E, wintering range), especially of Jumbo Mountain area.
- Draft Themes
  - o Comment: Alternative B: "active management" might be a better way of saying "lots of rules." under "grazing" instead of maintain AUM base, we might want to say adjust AUM base to achieve land health standards. maintain AUM base might not achieve land health standard. Use more specifics for soils stability, species diversity (language form LHS). Generally more consistent language when describing the alternatives.
  - o If we have an idea for an alternative, how should we submit that? You can email a paragraph to either Bruce or Kate, tell us where it fits.
  - o as group went through to develop alternatives, did this scheme work? they might not like some of the things that are going in the boxes, but they are filling in different alternatives. what remains to be seen is, when we look up and down the columns, are the alternatives different enough or are they so similar that there isn't value added in analyzing an additional alternative.
- Draft Goals
  - o Got one comment from RACSG member but no detailed feedback.
- Other

## 7. Other Items Not on the Agenda

- Comment: This is a huge effort and the timeframe seems very short. Response: We understand. This process is evolving and once we get things written down and have more details and maps, we'll be able to give it to you. As you're glancing through the stuff that we're giving you, you're probably having a gut reaction and that's what we want your feedback on. you'll be able to review the details when we provide you the information. we are hoping that by going through this process, when you do get the draft document for review, you'll understand what you are reading.
- planning processes are just long and a lot to deal with. I appreciate that this process is concise and a small group. I would rather get the information here than have to attend more and larger meetings.
- Chapter 1 and 3 is very long. We gave the BLM an extension so we will give you the same extension to the end of October. This is not a critical path. you can also take more time to comment on the themes and goals (handed out at July meeting) until September 10.
- I am not so much concerned about time, but more concerned that I miss something in the review. North Delta isn't an SRMA and maybe it should be.
- Our next meeting we'll have more information and we're likely going to be discussing the preferred alternative. We're with the ID Team
- We tried to bring you a focused question to get your feedback. if we brought you everything we talked about we wouldn't get through everything.
- Give us your feedback by Friday, September 10.
- we will send maps of existing SRMAs and OHV polygons.

BLM_0108566

- are there any topics in particular that you want to see, similar to what we showed you with SRMAs and OHVs? OHV use is one of the hottest topics. Recreation use is big.
- are there any other maps you want to see? O&G leasing, for example. Let us know if there is anything you want to see and we can provide it. the existing condition maps are also with Chapter 3.

## 8. Action Items / Next Meeting

BLM_0108567



**Department of Energy**
Western Area Power Administration
P.O. Box 281213
Lakewood, CO  80228-8213



Received
SEP 0 3 2010
Uncompahgre Field Office

'SEP 0 1 2010'

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO  81401

Re:  Resource Management Plan and Associated Environmental Impact Statement

Dear Mr. Krickbaum:

Western Area Power Administration (Western) provided comments during the public scoping
process held earlier this year on the Uncompahgre Resource Management Plan (RMP) and
associated Environmental Impact Statement (EIS) being prepared by the Bureau of Land
Management (BLM) for the Uncompahgre Planning Area.  Western has been following the
process as it unfolds on the website set up for this effort and would like to offer the following
additional comments.

Under the preliminary planning criteria, there is a statement that valid existing rights will be
recognized in the RMP.  Western's numerous facilities in the Uncompahgre Planning Area
should be held under a valid BLM grant; however, the roads used by us to operate and maintain
our facilities and access the individual structures may not all be included in the existing
authorizations.  Western may need to amend the current right-of-way grants to include roads.  In
addition, we will need to provide input to the travel management process that will follow the
current RMP/EIS effort to ensure that roads and trails used by us remain open and/or designated
for our use.

Western has reviewed the final wild and scenic river report, draft area of critical environmental
concern report, the analysis of the management situation, as well as other components to be
studied in the planning process and has no comments to add on these topic areas.  In addition, we
accessed the utility corridor maps and can offer no comments relative to the corridors themselves
except that at some future date Western may rebuild or upgrade its facilities to provide for
transmission of new generation in the area.

Finally, Western, in the past, has provided information about its various facilities which traverse
or are fixed sites on public lands within the administrative boundaries of the BLM Uncompahgre
Field Office.  If BLM needs additional information about one or more of our transmission lines
or fixed sites, including substations, communication sites, or switchyards, please let us know.  In
addition to the facilities we own and/or operate, Western can identify the access we use to
continually operate, maintain, and reconstruct, as needed, these facilities.

2

Please continue to provide updated information as it becomes available.  Questions or requests for additional information about any of Western's facilities located on public lands administered by the BLM Uncompahgre Field Office can be directed to Susan Starcevich at (720) 962-7275 or starcevi@wapa.gov.

Sincerely,

Steven W. Webber
Lands Team Lead

BLM_0108569

## James Bode

| | |
|---|---|
| **From:** | Hannah Meyer <hannah_meyer@tws.org> |
| **Sent:** | Wednesday, September 08, 2010 12:03 PM |
| **To:** | uformp@blm.gov |
| **Cc:** | ronni@greatoldbroads.org; broads@greatoldbroads.org; Steve Smith |
| **Attachments:** | ufo w&s suitability comments FINALSENT.doc |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Good afternoon,

   I am writing to notify you that the Great Old Broads for Wilderness has joined in co-signing our Wild and Scenic comments.  Nothing has changed in the actual document except for the addition of their name to the list of co-signers.  Thank you for your attention.

Hannah Meyer
Public Lands Intern
The Wilderness Society
Central Rockies Regional Office
1660 Wynkoop Street, Suite 850
Denver, CO 80202
303-650-5818 Ext. 126

1

**The Wilderness Society**
**Audubon Colorado • Center for Native Ecosystems**
**Colorado Environmental Coalition • Colorado Mountain Club**
**Colorado Trout Unlimited • Colorado Wild • Great Old Broads for Wilderness**
**San Juan Citizens Alliance • Sheep Mountain Alliance • Sierra Club**
**The Nature Conservancy • Western Colorado Congress**
**Western Resource Advocates • Western Slope Environmental Resource Council**

c/o 1660 Wynkoop, #850
Denver, Colorado  80202                                    August 17, 2010

Bureau of Land Management
Uncompahgre Field Office
Attention – RMP Revision
2465 South Townsend
Montrose, Colorado  81401

Greetings,

Thank you very much for the opportunity to comment on the potential suitability, under
provisions of the Wild and Scenic Rivers Act, of certain stream segments in the
Uncompahgre Field Office planning area. Please carefully consider the following
comments and recommendations as part of your deliberation and decisions about these
important streams and stream corridors.

(We will also submit these comments in the comment-form format provided by the
BLM.)

**General comments and recommendations**
The Wild and Scenic Eligibility Report for the Bureau of Land Management (BLM)
Uncompahgre Planning Area (issued as a component of the field office's Resource
Management Plan (RMP) revision process, provides helpful base information about area
streams with potential for inclusion in the National Wild and Scenic Rivers System.

In particular, the draft report's detailed background data, maps, and initial analysis of
flows and values in the streams considered is very helpful.

<u>Coordinated review, planning, and protection</u>
Eligibility determinations for streams flowing through the Uncompahgre Field Office
(UFO) Planning Area *and* through adjacent federal land planning areas should provide
protective status equal to or stronger than that provided in adjacent planning areas. That
is, any UFO streams with segments found suitable in adjacent areas should also be found
suitable. Any stream segments not found suitable in adjacent areas should still be
considered for suitability in the UFO area.

This is especially important in the protection and enhancement of riparian ecosystems that span the various federal land management areas and offices, as decisions in one portion of a stream can have significant impacts on downsteam portions of the same stream. This type of coordination is warranted, even expected, under the terms of the *Unified Federal Policy for a Watershed Approach to Federal Land and Resource Management, October 2000.*

Dolores River

The Dolores River fits this cross-jurisdictional situation. This regionally significant river warrants consistent and coordinated status, management, and protection through its entire public lands reach. Long-existing suitability status for Dolores segments in the Grand Junction Field Office planning area and in the San Juan Public Lands planning area warrant corresponding suitability status and protective management for segments in the UFO planning area.

Related, all tributaries to the Dolores River contributing significant volumes of streamflow or seasonally unique or important streamflow should be determined suitable and correspondingly managed to protect the tributaries' outstandingly remarkable values and the streamflows related to ORVs, both in the tributaries themselves and in the Dolores River downstream.

San Miguel River

The San Miguel River is another regionally significant and iconic stream that flows through the UFO planning area. In addition to the San Miguel's inherent stream-related outstandingly remarkable features, the river also provides an important contribution to stream flows in the Dolores River downstream of the confluence of the two rivers. This contribution to Dolores flows is particularly important when Dolores flows are constricted by operation of the McPhee Dam. With imperiled native fish populations identified as surviving just below the confluence, San Miguel flows reflecting a natural hydrograph (to the greatest extent possible in the context of existing water rights) need to be protected. Suitability determination for the full length of the San Miguel through the UFO planning area, and for significant tributaries to the river, is a key component of protection for the river itself and for unique natural features downstream.

Roc Creek

Current eligibility status for Roc Creek segments in the Manti-La Sal National Forest management plan warrant equal or stronger status and protection for segments in the UFO planning area, where Roc Creek traverses unique and sensitive areas with wilderness characteristics (both as identified by citizen inventory and by the BLM's own wilderness characteristics review) and other unique stream-related features.

The UFO's failure to find Roc Creek even eligible is doubly incongruous, both in light of those remarkable stream-related values and in light of the Manti-La Sal National Forest's determination that its portion of Roc Creek is eligible (with Wild classification and with Scenic and Geologic/Hydrologic Outstandingly Remarkable Values identified). This

BLM_0108572

should be corrected with UFO affirmation of Roc Creek's eligibility, plus determination that it is suitable.

**Specific segments**
Each stream segment included in the final Eligibility Report warrants a BLM finding of suitability and recommendation to Congress for addition to the National Wild and Scenic River System. Each stream segment provides important streamflows and unique values that warrant that additional analysis and related protection. Several stream segments are especially important because of their regional significance, connection and complement to other streams and stream corridors, and connection to other public lands values.

*Lower Gunnison Unit*
<u>Cottonwood Creek</u>
*18.27 miles; Scenic; Vegetation (cottonwood/riparian)*
This stream is an important feature associated with adjacent lands with wilderness character and included in citizen wilderness proposal lands. Those wilderness values should be considered as part of this streams wild and scenic evaluation.

The stream provides support for a thriving diverse riparian community, rare in this otherwise arid landscape, and adding corresponding high-quality water to the private lands downstream and to the Gunnison River.

Federal ownership of lands in the stream corridor is 100%, simplifying manageability and warranting strong protective federal management.

<u>We recommend that the full length of the Cottonwood Creek segment be found suitable.</u>


<u>Escalante Creek, segment 1</u>
*8.45 miles; Scenic, Scenic; Recreational, Geologic, Wildlife, Vegetation*
This stream boasts stunning beauty of its own. It also contributes important streamflows to geographically significant streams and public lands downstream. The uniquely healthy riparian corridor in this segment supports globally unique plant species, as noted in the BLM's Final Eligibility Report.

The mixture of ownership may provide some management challenges, but the important features of the stream and corridor warrant the extra effort that might be necessary to resolve cooperative management, and certainly warrants active protective management for the federally owned portions.

<u>We recommend that the full length—or, at least, the federally owned portions—of this Escalante Creek segment be found suitable.</u>

BLM_0108573

Gunnison River, segment 2
*.41 mile; Recreational; Fish*
This regional significant river warrants careful review and enduring protection as an important recreational opportunity and as the hydrologic heart of unique adjacent public lands.

This river segment, short as it is, provides critical and healthy habitat for endangered native fish, as identified in the BLM's Final Eligibility Report.

Federal ownership of corridor lands along this segment is 100%, simplifying the implementation of protective management.

We recommend that the full length of Gunnison River segment 2 be found suitable.


Gunnison River, segment 3
*17.48 miles; Recreational, Fish, Cultural, Vegetation*
This regional significant river warrants careful review and enduring protection as an important recreational opportunity and as the hydrologic heart of unique adjacent public lands.

This river segment provides critical and healthy habitat for endangered native fish and/or fish species of concern, popular recreational opportunities, and an extensive wealth of cultural features, all as identified in the BLM's Final Eligibility Report.

The mixture of land ownership along this segment may present some challenges to protective management, but its high value warrants the extra effort that might be necessary for success. The predominance of federal ownership (80.2% of the length) makes it possible to effectively manage those portions.


Monitor Creek
*9.42 miles; Wild; Vegetation (cottonwood/riparian)*
This stream is an important feature flowing through the heart of federal lands with wilderness character and characteristics, which are included in citizen wilderness proposal lands. The stream is also associated with congressionally designated national forest lands upstream. Those wilderness values should be considered and protected through strong protective management for this stream and its corridor.

Protection of this stream will benefit private lands downstream and help ensure continued healthy streamflow contribution to the Gunnison River.

Federal ownership of corridor lands along this segment is 100%, simplifying the implementation of protective management.

We recommend that the full length of the Monitor Creek segment be found suitable.

BLM_0108574

Potter Creek
*9.82 miles; Wild; Vegetation (cottonwood/riparian)*
This stream is an important feature associated with adjacent lands with wilderness character and characteristics, which are included in citizen wilderness proposal lands. Those wilderness values should be considered as part of this streams wild and scenic evaluation.

This stream is an important feature flowing through and enhancing lands with wilderness character, which are included in citizen wilderness proposal lands. The stream is also associated with congressionally designated national forest lands upstream. Those wilderness values should be considered and protectively managed as part of this streams wild and scenic evaluation.

Federal land ownership through this segment is 100%, simplifying the effective implementation of protective management.

We recommend that the full length of the Potter Creek be found suitable.


Rose Creek
*3.9 miles; Wild; Scenic*
This is an important tributary of Little Dominguez Creek, which itself flows through the Dominguez Canyon Wilderness. Congressional designation of that wilderness specifically called for effective protection of streamflows and associated natural values in Little Dominguez Creek. Correspondingly, the careful protection of streamflows and healthy riparian corridor along Rose Creek is essentially to the fulfillment of that congressional recognition and mandate.

Federal land ownership along this segment is 100%, simplifying the effective implementation of protective management.

We recommend that the full length of the Rose Creek segment be found suitable.


Roubideau Creek, segment 1
*10.71 miles; Wild; Recreational, Wildlife, Cultural, Vegetation*
This stream is an important feature flowing through and enhancing lands with wilderness character and characteristics, which are included in citizen wilderness proposal lands. The stream is also associated with congressionally designated national forest lands upstream. Those wilderness values should be considered and protectively managed as part of this streams wild and scenic evaluation.

Federal land ownership along this segment is 93%, simplifying the effective implementation of protective management.

<u>We recommend that the full length of the Potter Creek be found suitable.</u>

*San Miguel Unit*
<u>Beaver Creek</u>
*14.25 miles; Scenic; Vegetation (rare cottonwood-spruce-alder community)*
Traversing a narrow corridor of public land, this stream holds important potential for preserving and enhancing stream-related natural values for a broad, otherwise private-land, geography. The creek is also an important contributing tributary to the San Miguel River.

Federal land ownership of nearly 100% will simplify effective implementation of protective management.

<u>We recommend that the full length of Beaver Creek be found suitable.</u>

<u>Dry Creek</u>
*10.49 miles; Wild; Scenic, Geologic*
This stream traverses a uniquely un-roaded landscape, providing important wildlife support and general ecological vibrancy. It is also a seasonally large streamflow contributor to the San Miguel River.

The very distinctive scenery and geology of the area—formed in large part by the creek itself—warrant strong protective management for the stream and corridor.

Nearly 100% federal ownership of land along the stream corridor, and extensive federal land beyond the corridor, simplify effetive implementation of protective management.

<u>We recommend that the full length of Dry Creek segment be found suitable.</u>

<u>Naturita Creek</u>
*24.97 miles; Scenic; Fish*
This rare habitat for exemplary populations of endangered native fish and/or fish species of concern warrants the strongest possible protection, for both streamflows, related corridor vegetation, and water quality.

While the low percentage of federal ownership along the corridor might preclude a finding of suitability or wild & scenic designation, other immediate, effective, and enduring administrative protections—including cooperative measures with landowners

BLM_0108576

and with other government agencies—should be included in the resource management plan and its implementation.

Saltado Creek
*5.56 miles; Wild; Vegetation (rare cottonwood-spruce-alder community)*
Traversing a relatively narrow corridor of public land, this stream holds important potential for preserving and enhancing stream-related natural values for a broad otherwise private-land geography. The creek is also an important and reliable streamflow-contributing tributary to the San Miguel River.

The healthy and remarkably undisturbed nature of this segments riparian vegetation and soils, worthy of strong protection itself, helps ensure clean streamflow in the San Miguel River.

100% federal land ownership along the lower four miles of the segment simplifies effective implementation of protective management.

We recommend that the full length—certainly the federally owned portion—of Saltado Creek segment be found suitable.

San Miguel River, segment 1
*27.23 miles; Recreational; Scenic, Recreational, Wildlife, Historic, Vegetation, Paleontology*
This large, regionally iconic river is inherently significant, and it provides important streamflow contribution to the Dolores River, itself severely diminished above its confluence with the San Miguel. This flow contribution is particularly important for the surviving population of endangered native fish, and/or fish species of concern, inhabiting the portion of the Dolores River just below that confluence. With flows from the upper reaches of the Dolores still highly variable and generally low, the San Miguel flow contribution is critical and must be protected.

This segment includes unparalleled scenery and attendant natural and cultural features.

The patchwork of federal-private land ownership along the segment may complicate protective management, but the segment's features warrant the extra effort that might be necessary to secure a finding of suitability and to implement cooperative measures to protect those features.

We recommend that all of San Miguel River segment 1 be found suitable.

San Miguel River, segment 2
*4.01 miles; Wild; Scenic, Recreational, Wildlife, Vegetation*

This relatively short segment of the San Miguel River contains unusually undisturbed stream and corridor features, warranting the strongest possible protection. The corridor includes stunning geological and landform scenery, much of it formed by the river itself, along with a uniquely undisturbed and vibrant riparian ecosystem.

Federal land ownership along the segment is 100%, simplifying effective implementation of protective management.

<u>We recommend that the full length of San Miguel River segment 2 be found suitable.</u>

<u>San Miguel River, segment 3</u>
*7.31 miles; Scenic; Recreational, Fish, Wildlife, Vegetation*
This segments uniquely wild condition affords recreational experiences important to local economy and to local sense of place. The segment also provides critical habitat for endangered native fish and/or fish species of concern, which must be protected in order to ensure continued local use of the river's flows.

While federal land ownership along the segment is only 72.5%, the bulk of private land is found at one location, facilitating the cooperative measures important for implementing protective measures essential for this segment.

<u>We recommend that the full length of San Miguel River segment 3 be found suitable.</u>

<u>San Miguel River, segment 5</u>
In addition to ensuring strong and enduring protection for the public lands segments of the river traversing primarily federal public lands, the BLM should engage landowners and other land managers in Segment 5 to ensure cooperative measures to a) protect a continuous healthy stream corridor and b) to ensure natural-hydrograph flow contributions to the Dolores River. These and other measures should be undertaken to, among other things, enhance and preserve important habitat for imperiled native fish noted in the BLM's Final Eligibility Report.

<u>San Miguel River, segment 6</u>
*3.23 miles; Recreational, Fish, Historic, Vegetation*
This final segment to the San Miguel River's confluence with the Dolores River is of critical importance to a) preserve the beauty and natural dynamics of the confluence, to ensure a final, reliable, and healthy contribution to streamflows important for imperiled native fish uniquely flourishing in the segment and just downstream from the confluence, and c) to protect and enhance the healthy native riparian vegetation along the segment.

While less than 70% of the land along segment is federally owned, 100% of the final two miles above the confluence is federally owned, facilitating effective implementation of protective management.

BLM_0108578

<u>We recommend that the full length of San Miguel River segment 6—or at least the federal portion—be found suitable.</u>

<u>Tabeguache Creek, segment 1</u>
*3.61 miles; Wild; Vegetation*
This stream traverses a uniquely un-roaded, wild landscape on public lands, providing important wildlife support and general ecological vibrancy along the stream itself, and complementing congressionally designated national forest lands protected upstream.

Reliable protection is also needed for the segment's uniquely and flourishing riparian vegetation communities, and noted in the BLM's Final Eligibility Report.

Federal land ownership along the segment is 100%, simplifying effective implementation of protective management.

<u>We recommend that the full length of Tabeguache segment 1 be found suitable.</u>

<u>Tabeguache Creek, segment 2</u>
*11.57 miles; Recreational, Cultural, Vegetation*
This segment contributes reliable and significant volume of streamflow to the San Miguel River, and the health of segment should be protected in order to maintain and enhance the quality of the contributed streamflows.

The segment's superior examples of unique stream-dependent riparian vegetation communities should themselves be preserved and enhanced.

Although less than 70% of the land along the segment is federally owned, 100% of the land immediately above the stream's confluence with the San Miguel River is federally owned. This facilitates effective implementation of protective management.

<u>We recommend that the full length of Tabeguache Creek segment 2—or at least the federally owned portion—be found suitable.</u>

*Lower Dolores Unit*
<u>Lower Dolores River</u>
*10.53 miles; Scenic; Scenic, Recreational, Geologic, Fish, Wildlife*
Few rivers in the southwestern United States boast the stunning scenery, distinctive and colorful geology, and outstanding recreation opportunities as those found along the Dolores River. The heart of a broader landscape of ecologically rich public lands (well beyond a one-quarter-mile-each-side wild and scenic study corridor), the Dolores River is an essential element of larger land values and of management decisions affecting those values. Because this iconic river is already significantly diminished and threatened by

river impoundment upstream of the UFO study area, every possible protection must be applied to the river and to its corridor. A decisive finding of suitability is essential to, and appropriate for, that protection.

The esthetically and economically important recreation opportunities provided by the Lower Dolores River segment present sufficient justification for protecting the natural appearance and health of that segment. The existence of healthy populations of regionally imperiled native fish, as noted in the BLM's Final Eligibility Report, make that protection even more important.

In conjunction with a finding of suitability, and protective management, for the San Miguel River segments upstream, corresponding protections for this segment complete an important recognition of the two rivers' importance, locally and nationally.

While just over 65% of the land along the segment is federally own, 100% of the upper portion of the segment is federally owned. This facilitates effective implementation of protective management for that federal portion; it also facilitates—and warrants—cooperative agreements and actions in the lower portions, lined primarily by private land, to help complete that protective management.

<u>We recommend that that full length of Lower Dolores River segment—or at least the upper federally owned portion—be found suitable.</u>

<u>North Fork Mesa Creek</u>
*8.53 miles; Scenic; Vegetation*
This segment warrants the strongest of protective measures for two basic reasons. First is the BLM-recognized presence of globally imperiled narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian woodlands along the segment. Second, and related, the segment contributes perennial, high quality streamflows to Mesa Creek, and thus to the severely depleted Dolores River itself.

A finding of suitability for this segment corresponds to the BLM's separate finding of eligibility for the upstream segment of the North Fork (and, hopefully, finding of suitability for that upper segment). In any case, the Uncompahgre and Grand Junction field offices should confer and protect effective coordinated protective management for both segments.

While just over 68% of the land along the segment is federally owned, 100% of the upper portion of the segment is federal. This facilitates effective implementation of protective management, and facilitates the implementation of cooperative agreements and actions for portions of the segment lined with private land.

<u>We recommend that the full length of North Fork Mesa Creek—or at least the federally owned upper portion—be found suitable.</u>

BLM_0108580

*Upper Dolores Unit*

Dolores River, segment 1

Identified as eligible in the San Juan Public Lands Draft Resource Management Plan, this segment complements and is essentially a component of Dolores River segment 2. As such, its extensive and diverse outstandingly remarkable values and values-related flows, warrant the highest possible protection.

Such protections are described in our comments related to Dolores River segment 2, and we advocated those protections for Dolores River segment 1 as well.

We recommend that the full length of Dolores River segment 1 be found suitable.

Dolores River, segment 2

*11.5 miles; Recreational; Scenic, Recreational, Geologic, Fish, Wildlife, Vegetation*

Few rivers in the southwestern United States boast the stunning scenery, distinctive and colorful geology, and outstanding recreation opportunities as those found along the Dolores River. The heart of a broader landscape of ecologically rich public lands (well beyond a one-quarter-mile-each-side wild and scenic study corridor), the Dolores River is an essential element of larger land values and of management decisions affecting those values. Because this iconic river is already significantly diminished and threatened by river impoundment upstream of the UFO study area, every possible protection must be applied to the river and to its corridor. A decisive finding of suitability is key to that protection.

With the longest and most diverse list of outstandingly remarkable values (seven) recognized in this segment, the segment is eminently qualified for the highest possible protective status and measures.

The healthy presence of regionally imperiled native fish in this segment and downstream, as recognized in the BLM's Final Eligibility Report, the importance of protecting the stream and supportive corridor in this segment is greatly magnified.

Only 47% of land along the segment is federally owned, but 100% of the corridor land in the upper half of the segment is federal. This facilitates the effective implementation of protective measures in that federal portion and facilitates cooperative agreements and measures for providing similar protections to the rest of the segment.

We recommend that the full length of Dolores River segment 2—or at least the federally owned upper portion—be found suitable.

La Sal Creek, segment 2
*4.52 miles; Scenic; Fish, Vegetation*
This stream traverses a distinctive canyon corridor, affording a stunning backdrop to outstanding recreation opportunities. The stream itself provides important streamflow source for the Dolores River, and it includes essential and healthy riparian environment in an otherwise arid area.

The presence of healthy populations of regionally imperiled native fish, and the presence of globally rare riparian ecosystem, provide complete justification for the strongest possible protective status and measures in this segment. In addition, the segment provides essential streamflows and healthy continuity for riparian habitats in the Dolores River Canyon Wilderness Study Area immediately downstream, and to the Dolores River itself.

Federal land ownership along the segment is 84.5%, facilitating effective implementation of protective management, particularly in the upper portion, which is 100% federal.

We recommend that the full length of La Sal Creek segment 2 be found suitable.


La Sal Creek, segment 3
*3.37 miles; Wild; Scenic, Recreational, Fish, Cultural, Vegetation*
If ever a stream segment were suitable under that definition of the Wild and Scenic Rivers Act, this is one. The segment lies wholly within the Dolores River Canyon Wilderness Study Area, supporting regionally rare riparian and scenic vibrancy. That habitat health is reflected in the presence of healthy populations of regionally imperiled native fish.

In addition, La Sal creek is among the more significant streamflow contributors to the severely depleted Dolores River.

Federal ownership of land along the segment is 100%, facilitating—and requiring—the strongest possible form of protective management.

We recommend that the full length of La Sal Creek segment 3 be found suitable.


Lion Creek
This stream traverses important un-roaded geography, including distinctive canyon features on both sides. It also contributes seasonal streamflows to La Sal Creek, which itself is so important to surround wilderness-quality lands and to the Dolores River.

While the length, location and federal ownership percentage of Lion Creek may not warrant a finding of suitability, the segment—and its streamflows—should be protected in other manners to ensure its continuing contribution to the health of the watershed.

BLM_0108582

Spring Creek

This stream traverses important un-roaded geography, including distinctive canyon features on both sides. It also contributes seasonal streamflows to La Sal Creek, which itself is so important to surrounding wilderness-quality lands and to the Dolores River.

While the length, location and federal ownership percentage of Spring Creek may not warrant a finding of suitability, the segment—and its streamflows—should be protected in other manners to ensure its continuing contribution to the health of the watershed.

*Dominguez-Escalante National Conservation Area*

Big Dominguez Creek, segment 1

The stream corridor for this segment has been designated by Congress as a component of the National Wilderness Preservation System. Meanwhile, the State of Colorado has approved the filing of instream-flow protection water rights for this stream segment. So long at those instream-flow rights are sufficient for wilderness purposes, and are actively implemented and protected, wild and scenic protection, including a finding of suitability, might not be necessary.

Big Dominguez Creek, segment 2

The stream corridor for this segment has been designated by Congress as a component of the National Wilderness Preservation System. Meanwhile, the State of Colorado has approved the filing of instream-flow protection water rights for this stream segment. So long at those instream-flow rights are sufficient for wilderness purposes, and are actively implemented and protected, wild and scenic protection, including a finding of suitability, might not be necessary.

Little Dominguez Creek, segment 1

The stream corridor for this segment has been designated by Congress as a component of the National Wilderness Preservation System. Meanwhile, the State of Colorado has approved the filing of instream-flow protection water rights for this stream segment. So long at those instream-flow rights are sufficient for wilderness purposes, and are actively implemented and protected, wild and scenic protection, including a finding of suitability, might not be necessary.

Little Dominguez Creek, segment 2

The stream corridor for this segment has been designated by Congress as a component of the National Wilderness Preservation System. Meanwhile, the State of Colorado has approved the filing of instream-flow protection water rights for this stream segment. So long at those instream-flow rights are sufficient for wilderness purposes, and are actively implemented and protected, wild and scenic protection, including a finding of suitability, might not be necessary.

BLM_0108583

Gunnison River, segment 1

This regionally significant river warrants careful review and enduring protection as an important recreational opportunity and as the hydrologic heart of unique adjacent public lands.

This river segment, short as it is, provides critical and healthy habitat for endangered native fish, as identified in the BLM's Final Eligibility Report.

Federal ownership of corridor lands along this segment is 100%, simplifying the implementation of protective management.

We recommend that the full length of Gunnison River segment 1 be found suitable.


Thank you again for carefully considering and including these comments in your deliberation over suitability determinations for these important streams. Please let us know any questions you have or if you need additional information from us.

Sincerely,


Steve Smith
Assistant Regional Director
The Wilderness Society

Ken Strom
Audubon Colorado

Bryan  Martin
Colorado Mountain Club

Megan Graham
San Juan Citizens Alliance

Steve Glazer
Sierra Club, Rocky Mountain Chapter

Amy Montano
Western Colorado Congress

Rob Peters
Western Slope Environmental Resource Council

David Nickum
Colorado Trout Unlimited

Becky Long
Colorado Environmental Coalition

Josh Pollock
Center for Native Ecosystems

Ryan Demmy Bidwell
Colorado Wild

Hilary White
Sheep Mountain Alliance

Peter Mueller
The Nature Conservancy

Bart Miller
Western Resource Advocates

Veronica Egan
Great Old Broads for Wilderness

BLM_0108584

**James Bode**

| | |
|---|---|
| **From:** | Kate Wynant |
| **Sent:** | Wednesday, September 08, 2010 1:07 PM |
| **To:** | UFO AR |
| **Subject:** | FW: La Sal Creek BLM Feedback form. |
| | |
| **Categories:** | Red Category |

Kate Wynant
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite 1A
Boulder, CO  80301
tel:  303-447-7160    fax:  866-625-0707

www.EMPSi.com    Bringing clarity to the complex ™
GSA Contract GS10F-0412S        HUBZone-certified
Denver        Reno        San Francisco        Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

-----Original Message-----
From: bruce_krickbaum@blm.gov [mailto:bruce_krickbaum@blm.gov] On Behalf Of uformp@blm.gov
Sent: Thursday, September 02, 2010 3:22 PM
To: Mark Goldfogel
Cc: Angie Adams; Kate Wynant
Subject: RE: La Sal Creek BLM Feedback form.

Mark,

"Section 13 (b) of the Wild and Scenic Rivers Act (Act) states that jurisdiction over waters is determined by established principles of law.
Existing, valid water rights are not affected by designation".  This is quoted from the Rivers.gov website.  The citation is at:
http://www.rivers.gov/q-and-a-answers.cfm?id=128

The Rivers.gov website (http://www.rivers.gov/information.html) answers many questions.
Once on the website, click on the information tab (then Q&A Search Engine), which will take you to:
http://www.rivers.gov/information.html
Type in a key word, such as "water rights", and you will see many questions and answers.

I hope this answers your question, as well as many others.

Thanks, Bruce

1

BLM_0108585

<><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5300

"Mark Goldfogel"
<mark@wonder-dog.
net>                          To
              <uformp@blm.gov>
08/24/2010 01:50                    cc
PM
                        Subject
              RE: La Sal Creek BLM Feedback form.

Hi Bruce,
I understand from my neighbors that if the BLM goes through with this I lose my water rights to the Feds.

Forgive me for sounding a bit paranoid, but we out in Paradox kind of feel like the BLM has sailed us down an unfortunate river with this unrestricted Uranium mining and processing and I know they want my water rights.

Is this a legitimate concern?  If so, I would definitely want to change my stance on my support of this program from the BLM.  I have already lost 80% of my property value due to the uranium mill and can't afford to lose my water rights as well.

Please let me know.

Thanks
Mark

Mark Goldfogel

124 E. Pacific, Units A & B
PO Box 3998 Telluride, CO  81435

2

BLM_0108586

Mark@wonder-dog.net
www.wonder-dog.net

970-708-0214 x 5

-----Original Message-----
From: bruce_krickbaum@blm.gov [mailto:bruce_krickbaum@blm.gov] On Behalf Of uformp@blm.gov
Sent: Tuesday, August 24, 2010 1:03 PM
To: Mark Goldfogel
Subject: Re: La Sal Creek BLM Feedback form.

Hello Mark,

We have received your comments.

Thank you, Bruce

                "Mark Goldfogel"
                <mark@wonder-dog.
                net>                        To
                        <uformp@blm.gov>
                08/05/2010 01:42            cc
                PM            <pmueller@tnc.org>
                                Subject
                La Sal Creek BLM Feedback form.

I am submitting my two cents on La Sal Creek Segment 1.  It would be great to know if this is received somewhere.

It is attached.  In a nutshell, I believe it is important, necessary and one of the greatest unprotected spots in Colorado.

Best,
Mark

Mark Goldfogel
(Embedded image moved to file: pic00748.jpg)~ NEWEST wonderdog-logo.jpg

124 E. Pacific, Units A & B
PO Box 3998 Telluride, CO  81435
Mark@wonder-dog.net

3

BLM_0108587

www.wonder-dog.net

970-708-0214 x 5
 [attachment "BLM La Sal Creek Comment.doc" deleted by Bruce Krickbaum/MOFO/CO/BLM/DOI] No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 9.0.851 / Virus Database: 271.1.1/3090 - Release Date: 08/24/10
00:34:00

4

**Kate Wynant**

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **Sent:** | Thursday, September 09, 2010 4:43 PM |
| **To:** | sbear@dmea.com; Steve.weist@oxbow.com; John@reams-construction.com; billday@paonia.com; rich@richdurnanphoto.com; Robbie.levalley@colostate.edu; Wblack8709@msn.com; pmueller@tnc.org; silvers1@tds.net; tkctew@yahoo.com; Barbara_Sharrow@blm.gov; dave_kauffman@blm.gov; Deborah_Magee@blm.gov; Bruce_Krickbaum@co.blm.gov; Angie Adams; Kate Wynant; bbott68@gmail.com; UFO AR |
| **Subject:** | Final Minutes: RMP RAC Subgroup Meeting #4 |
| **Attachments:** | UFO-SG_2010-08-20_FinalMinutes.pdf |

Hello RAC Members,

Attached are the final notes of RAC meeting #4.

Our next RAC meeting will be on October 1 at 9:00 (Holiday Inn Express in Montrose).   Please let me know if you will not be able to attend.

Regards, Bruce

<><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

(See attached file: UFO-SG_2010-08-20_FinalMinutes.pdf)

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

BLM_0108589

 

# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401

# RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #4
## Friday, August 20, 2010 (9:00 AM – 12:00 PM)

### Meeting Location:
### Holiday Inn Express (Jordan Room)
### 1391 South Townsend Avenue, Montrose, CO

# Meeting Minutes

**Attendees:** Angie Adams (EMPSi), Robbie Baird-LeValley, Walt Blackburn, Amanda Clements (BLM Uncompahgre Field Office), Bill Day, William Ela, Edd Franz (BLM Uncompahgre Field Office), Bruce Krickbaum (BLM Uncompahgre Field Office), Jeff Litteral (BLM Uncompahgre Field Office), Barb Sharrow (BLM Uncompahgre Field Office), Steven Weist, Kathy Welt, Kate Wynant (EMPSi)

**Handouts:** Agenda, Highlights of the Resource Management Planning Process to Date, RMP Planning Fact Sheet 6.1: Vegetation and Land Health, RMP Planning Fact Sheet 3.1: Recreation and Visitor Services, RMP Planning Fact Sheet 6.3: Water Quality and Soils, Land Health Assessments and the Uncompahgre Field Office Resource Management Plan Revision PowerPoint slides, Soils PowerPoint slides, Special Recreation Management Areas PowerPoint slides, Preliminary Internal Draft Alternatives for Special Recreation Management Areas and Comprehensive Trails and Travel Management

1. **Welcome** (Bruce Krickbaum)

2. **Introductions** (All present)

3. **Planning Process to Date** (Angie Adams)
   - See handout: Highlights of the Resource Management Planning Process to Date
   - Several reports are complete and are on the Web site.
   - The Wild and Scenic River suitability process is underway and we are gathering data on suitability criteria. Information was due on Monday (August 16). We have received some e-mails regarding Areas of Critical Environmental Concern (ACECs) and Wild and Scenic Rivers.
   - The draft ACEC evaluation report is on the Web site and comments are due today (August 20).
   - If you have comments on suitability criteria or the ACEC report, you can submit them by Friday, August 27 so that we can wrap them up.
   - *Question:* Where are comments to be submitted? *Answer:* All instructions are on the web site (www.uformp.com) but they can be submitted to the RMP e-mail address (uformp@blm.gov) or to Bruce (bruce_krickbaum@blm.gov).
   - *Comment:* The Department of Energy called two days ago saying that they could not access the suitability link and Bruce resent it so the person responsible for reviewing and submitting comments will be submitting comments late. *Response:* That is ok. Just because we receive comments after the deadline doesn't mean the comments are not considered, but it helps our staff stay on schedule. If we receive comments late, we may have to do more work.

BLM_0108590

## 4. Resource/Resource Use Discussions

- Land Health Assessments (Amanda Clements)
  - See handouts: Land Health Assessments and RMP Planning Fact Sheet 6.1: Vegetation and Land Health
  - *Question:* This is the only standard that relates to state of Colorado water quality standards. Does the state have any other input in the standards? *Answer:* Not really. We took data and information from the state and they were aware of the process, but not a large input into developing the standards. They have a robust program for water quality, but not for other standards.
  - *Question:* What about wildlife? *Answer:* We manage the habitat for animals and work with the Colorado Division of Wildlife.
  - *Question:* All these land health assessments and indicators are children of range reforms of 1990, a nationwide thing. What vehicle do we have to get local input into something that might be unique to our area? *Answer:* We invite the public and affected interests to take part in our fieldwork. Anyone is welcome to come with us.
  - *Question:* What about the Colorado Division of Wildlife that might have specifics on a certain species? They can come in? *Answer:* Yes, and we consult with them before we write the report and talk to them to about data.
    - *Question:* Does that happen before the alternatives come out? *Answer:* We work on these on a yearly ongoing basis. We will be finishing some land health assessments before the alternatives come out. What we're doing in the RMP is more of a 50,000 foot level. It will talk about how we'll use the land health assessments and the data on a yearly basis throughout the life of the plan to help us make adaptive management decisions. The RMP won't make any land health assessment decisions; that is done on a yearly basis. The decisions in the RMP will state how to use the data and how to use the information in the future. One alternative might say focus all efforts on restoring lands that are in poor conditions. Another alternative might say focus your efforts on lands that are meeting but at risk of slipping into "not meeting," so the RMP will tell us how to focus our attention. We welcome people who want to learn more about our process to come out with us. Any projects that we would use this data on (refer to the data) would be in an environmental assessment or environmental impact statement and those always have public review so the public has an opportunity to look at the site-specific project and see how the data was used to make a decision on that site-specific project.
    - *Comment:* That's what I was wondering. It seems like we can prevent the public from seeing the alternatives and wondering why certain information was or wasn't addressed.
  - *Question:* The RMP is going to be a platform; it isn't going to say that a piece of land is below standard and that the BLM is mandated to correct it? *Answer:* There will be different alternatives in the RMP that give different direction.
    - *Question:* So the end product is a decision approved by you (Barb) and others above you is a decision on where to put the focus on the land whether it be a substandard piece of land or a piece of land at risk of slipping into substandard? *Answer:* Yes, and you all will have input into that direction. The RMP will be general.
  - *Question:* I am amazed at the number of plans that have amended the RMP or have affected the RMP process. What are we going to accomplish as the RAC Subgroup if the RMP is left to be so flexible and general? Do you think we're going to refine it and make it more specific? *Answer:* You'll see as we progress that we are making allocations, these activities can happen on these pieces of land and you will help with those allocations.
  - The RMP will be a look at where the resources will be spent where and we will have input into these categories.
  - *Question:* What if the RAC doesn't see things the same way we do? *Answer:* The RAC has undertaken these efforts before and they trust the work that the RAC Subgroup does. They

BLM_0108591

know the RAC Subgroup does a lot of work. They will have a lot of questions, but they are generally supportive of the decisions the RAC Subgroup has done.

- An example is the Canyons of the Ancients. We tried to be informed [as the RAC] but we trusted them that they made the right decision.
- Another example is similar to what this group is doing for wild and scenic rivers; a similar group did for oil and gas and the RAC trusted what the RAC Subgroup did and passed their recommendations.

- Soils (Jeff Litteral)
  - See handouts: Soils PowerPoint slides and RMP Planning Fact Sheet 6.3: Water Quality and Soils
  - *Question:* A lot of the soils stuff was not considered in the initial land health assessments. Is it taken into consideration more? *Answer:* Yes, they are used in making the land health assessment polygons. We also look at soil erosion and document it.
  - *Question:* What I'm wondering is there are certain soils that are more prone to movement and that wasn't documented initially. Is that documented now? *Answer:* No, I guess we did not document the fragile soils and we still don't document them. Most of them fall into the fragile soils category. We don't treat fragile and non-fragile soils the same in our assessments. We could document them more clearly.
    - *Comment:* So at least the causal affect is known. You could take your total and show how the soils break down into each category. *Response:* Sometimes the causal affect is just what you see instead of relating it back to soil types to understand why it's causing what you see. You're right, we could probably document this better. With GIS it is getting easier to document these things and overlay data. It's just knowing how to use the technology to answer some of these questions.
  - *Comment:* Saline and selenium is a big deal. We cannot let these soil types contaminate water quality. *Response:* It will be a big deal in the RMP. It played a large role in the Dry Creek Travel Management Plan. There is a lot of it in the Gunnison drainage.
  - Because of endangered fish, the US Fish and Wildlife Service told the Bureau of Reclamation that they could not move forward with water projects (relicensing dams, water canals, etc.) unless they developed a long-range plan to protect fish from selenium and salinity issues.
  - *Question:* What stage is this at? *Answer:* We have a draft Memorandum of Understanding with the US Fish and Wildlife Service (Gunnison River mostly, some Dolores because of natural salt domes and Bureau of Reclamation Reclamation injection wells) that says we will help the Bureau of Reclamation develop a long-range plan to deal with this issue. They are using 8 parts per billion at Whitewater as a gauge for the success for this program.
  - *Question:* So BLM will be writing a selenium management plan? *Answer:* No, the Bureau of Reclamation will. We are a Cooperating Agency to help them. What they will be looking for in our RMP is that we won't transfer public lands with selenium issues into private ownership. There will be some overlap in the management plan with the RMP but the management plan will be behind the RMP. There will be consistency.
  - *Question:* What is the difference between salinity and selenium? *Answer:* Selenium has been linked to reproductive health for fish in the rivers. Salinity is a broader problem. Salinity affects irrigated waters, treatment of drinking waters. The soil types that they come from, are they different? They usually go hand-in-hand and are tied to the Mancos shale.
  - *Question:* Do wetlands hold salinity and selenium or do they tend to leech out? *Answer:* They've done some studies and it appears that the wetland does treat the selenium but they can only do so much and then you're left with the material that you have to dispose of. One thing this group can do is come up with some treatment options.
  - *Question:* What are stipulations? *Answer:* Common ones are No Surface Occupancy that applies to oil and gas leasing and perhaps other surface-disturbing activities. What it means is if you want to drill for gas in that area (with the No Surface Occupancy stipulation), you will have to directional drill because you can't put the well on that site. It could apply for any

BLM_0108592

resource, not just soils, such as special status species habitat. There are some stipulations in our current RMP.
- ○ *Question*: So it's not so much mitigation, it's where you can and can't drill because of soils, riparian, rare plants and animals. But those are already in place? *Answer*: Yes that's correct, but we'll have to relook at them. Another type is a timing limitation where you can have activities in that area except during a certain time. One of the things we've had lots of discussion on is looking not just at oil and gas but all sorts of surface-disturbing activities.
- Recreation (Edd Franz)
  - ○ See handouts: RMP Planning Fact Sheet 3.1: Recreation and Visitor Services, Special Recreation Management Areas PowerPoint slides
  - ○ *Question*: The Dolores River Canyon and San Miguel River Special Recreation Management Areas (SRMAs) don't have the same level of planning why? *Answer*: Because the Land Use Planning Handbook, with the requirements we have to day, was issued after the two current SRMAs were created.

## 5. Alternatives Development
- SRMAs (Edd Franz)
  - ○ The Dolores River SRMA is within the Dolores River Wilderness Study Area, so it would fit into the *Undeveloped* SRMA market. It could vary across the alternatives. We could expand the SRMA outside of the Wilderness Study Area and the market in that area would be different than the portion inside the Wilderness Study Area. Protections in SRMAs depend upon the target setting for that SRMA. Some SRMAs might allow for development while others would not.
  - ○ *Question*: You acknowledge that the San Miguel River has a variety of opportunities so you're looking at different ways to manage the area along the entire stretch of the river? *Answer*: Right now we are just looking at polygons on the map but we recognize that there are exception opportunities for recreation.
  - ○ *Question*: What about the Gunnison River? *Answer*: That is hard because there isn't much of the Gunnison on BLM within the planning area because much of it is in Dominguez-Escalante National Conservation Area which isn't part of this RMP.
  - ○ In the Ridgway Trails SRMA we would also be looking at the Uncompahgre Riverway site.
  - ○ *Question*: There is an area west of Norwood, would that be looked at for mountain biking? *Answer*: I think that is Burn Canyon.
    - ▪ *Question*: Is the part that was burned part of it? *Answer*: Yes. We have not come up with maps yet, once we have maps it'll be easier for people to know what we're talking about. When you see the maps if there is an area that you think we should consider that we missed you can let us know.
  - ○ We have not talked about the Preferred Alternative yet, we are just focused on the alternatives and we need your help making sure we have identified the correct range of alternatives.
  - ○ Even though the same names appear in Alternatives B and C, the market strategy would be different under the two alternatives.
  - ○ When we develop the Preferred Alternative, we can pick and choose from the range of alternatives.
  - ○ *Question*: Is there a river kayaking play feature, are those conversations taking place? *Answer*: Not yet. We could talk about that down the road. I know that there is talk of a park on the San Miguel River. We'll talk about that later.
  - ○ That's part of our role is to bring to you ideas that people are talking about. We are sending out an agenda ahead of time so that you can bring ideas that relate to those topics.
  - ○ *Question*: How were SRMAs established? *Answer*: Through this process, scoping, recreation focus groups, they were proposed by someone.

BLM_0108593

- o *Question*: Who designated open or closed? *Answer*: That is a different thing. Travel Management and SRMA planning are two different things. They are related, but different processes.
- Comprehensive Trails and Travel Management (Edd Franz)
  - o We must designate all BLM lands in the planning area as *Open*, *Closed*, or *Limited to Designated Routes* (*Limited*). We are not going to designate routes in the *Limited* area as part of this RMP process. We will create the *Limited* polygon, but route designation will be a separate process after the RMP is complete.
  - o Outside of the Dry Creek area, all areas except for the North Delta Off-highway Vehicle (OHV) *Open* area are *Limited to Existing Routes*. You can't go out and make a new route and call that part of the existing network.
  - o *Question*: Is the North Delta OHV area monitored as part of land health assessments and for sedimentation? *Answer*: There was a study done but I am not familiar with the results. That is part of the RMP process; we'll be looking at the soils and plants in coordination with other decisions to come up with our allocations.
  - o We need to know if we've identified the areas that we need to for SRMAs and for Open/Closed/Limited OHV designations. Are there other areas that should be open or closed? *Action* (RAC Subgroup): Let us know by September 17th.
  - o *Question*: You're not looking at the entire acreage of all BLM lands, you're looking at if there are specific areas? *Answer*: Every acre of BLM has to be open, limited, or closed; all open or all closed will not be considered as an alternative.
  - o *Question*: Everything under Comprehensive Trails and Travel Management is for existing trails? *Answer*: Outside of the Dry Creek area, you can think of it as a snapshot. What is out there now are the routes that people are limited to (outside of the open and closed areas).
  - o *Question*: So that's a closed door, there would be no new trails? *Answer*: No.
  - o *Question*: How do we get to new trails? *Answer*: After the RMP. We'll come up with criteria in the RMP for creating new trails.
  - o *Question*: So is the environmental assessment for travel management one of the tools you can use in the RMP as a recreation planning component? *Answer*: The actual route-by-route designations will be done after this RMP through an environmental assessment process. We'll look at smaller polygons, called travel management areas. The RMP will be the guidance document and there will be criteria in the RMP as to how the travel management plans will proceed after the RMP. The criteria for route designation could change by alternative, too.
  - o *Action* (BLM): We will send you the current conditions map showing the existing travel management polygons but we don't have a map for the alternatives yet; staff are working on that. Between now and the next meeting we may be able to send you that map. In the meantime, if there are concepts in your head, please let us know.
  - o This information also includes data from recreation focus groups, scoping, and community assessment, so there has been some community input to get us up to this point.
  - o The travel management polygons will have to be consistent with SRMAs but they are two different things.
  - o *Question*: When will the polygons become set? *Answer*: Between now and the next meeting, we'll be working on it, but they won't be "set" until the Record of Decision for the RMP is signed.
  - o *Question*: When you look at these areas, are you also looking at ACECs? Sims Mesa is here as *Open* but it's also part of a proposed ACEC. *Answer*: That's a good example of all of the layers that we have to look at. Everything has to be consistent and we can't have an open area with an ACEC to protect a resource that would be adversely impacted with cross-country travel.
- Draft Themes (Angie Adams)

BLM_0108594

- o *Comment*: I still don't see the balance. The themes look like either one thing or another and I'm not comfortable with that. It doesn't portray a balance which is what you see on the landscape. *Response*: That is one of the problems when we try to throw on labels but this is the range. The preferred, when we pick from the range, will ultimately be balanced. The BLM will develop the balanced preferred before the public sees this. This field office wanted to look at a range before we choose that balanced preferred alternative. We will develop that alternative as a group with RAC Subgroup and Cooperating Agencies input. They will see that alternative, in addition to these alternatives.
- o *Question*: Is RS2477 trails recognition a big problem or a small problem? *Answer*: RMPs say that it is outside of the scope of the plan because RS2477 they're not settled yet. This hasn't been as big of an issue on BLM as it is on US Forest Service land. We've been agreeing with the counties and cooperating on what should happen with the roads.
- o In light of today's discussion, you can submit more comments on goals and themes until Friday, September 17.
- o *Action* (BLM): We will send you some maps for you to look at, but if there are maps that you'd like to see, let us know.

## 6. Other Items Not on the Agenda (Angie Adams)

- *Comment*: I am concerned because I have not seen information about what this RMP will do for subsurface minerals. *Response*: Next meeting we'll have a presentation and more information about that.
- *Question*: How do you have more mineral subsurface than surface? How does it affect your work? *Answer*: We have to make allocations on subsurface as well as surface. We have more subsurface than surface because way back when, people were allowed to homestead but subsurface minerals were retained by federal government.
- *Question*: How big is that area? *Answer*: It's only subsurface within the planning area; it does not extend beyond the planning area.
- You may submit comments on internal draft Chapters 1 and 3 until Friday, October 22.

## 7. Public Comments / Questions

- *Comment*: In looking at the different alternatives and approaches, think about the long-term. You're thinking about what you're hearing about now and the next 15-20 years, but if you think about 50-100 years, you might find that we all have similar interests for the long-term such as water quality and land health.
- *Question*: How will you deal with cross-cutting issues such as Gunnison sage-grouse. It could involve coordination with the state and with working groups. It doesn't fit into one geographic area. How are you going to address those issues that are more complex? *Answer*: That is one of those things that we are going to keep working on and we expect guidance on sage-grouse specifically before the next meeting.

## 8. Action Items / Next Meeting

- All meetings are at 9:00am at the Holiday Inn Express (1391 South Townsend Avenue), Jordan Room:
  - o Friday, October 1, 2010: Visual Resources, Lands and Realty, Minerals
- □ *Action* (BLM): Provide current SRMA and OHV map to RAC Subgroup.
- □ *Action* (RAC Subgroup): Draft SRMAs: give us your feedback by Friday, September 17.
- □ *Action* (RAC Subgroup): Draft OHV designations: give us your feedback by Friday, September 17.
- □ *Action* (RAC Subgroup): Draft Goals: give us your feedback by Friday, September 17.
- □ *Action* (RAC Subgroup): Draft Alternatives Themes: give us your feedback by Friday, September 17.
- □ *Action* (RAC Subgroup): Draft Chapters 1 and 3: give us your feedback by Friday, October 22.

BLM_0108595

**Kate Wynant**

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **Sent:** | Thursday, September 09, 2010 4:19 PM |
| **To:** | Barbara_Sharrow@blm.gov; dave_kauffman@blm.gov; Deborah_Magee@blm.gov; Angie Adams; Kate Wynant; bbott68@gmail.com; Aschroeder@usbr.gov; kjensen@ci.montrose.co.us; renzo.delpiccolo@state.co.us; shansen@deltacounty.com; MPelletier@gunnisoncounty.org; swhite@montrosecounty.net; lpadgett@ouraycountyco.com; lynn@mtngeogeek.com; joanm@sanmiguelcounty.org; daves@sanmiguelcounty.org; pat@cedaredgecolorado.com; MSe1047096@aol.com; gsparks@mtnvillage.org; mjreagan@fone.net; norwoodparker@centurytel.net; sharold@ci.olathe.co.us; davidvarley@kaycee.net; townofpaonia@tds.net; jcoates@town.ridgway.co.us; Dan_Reinkensmeyer@fws.gov; tkrandallparker@fs.fed.us; lbroyles@fs.fed.us; segfahlt@gmail.com; Bruce_Krickbaum@co.blm.gov; UFO AR |
| **Subject:** | Final Notes: Uncompahgre RMP Cooperating Agency Meeting #4 |
| **Attachments:** | UFO-CA_2010-08-19_Final-notes.pdf |

Hello Cooperating Agency Representatives,

Attached are the final notes of Cooperating Agency meeting #4.
Please review the minutes prior to the next meeting, particularly if you did not attend the last meeting.

Our next Cooperating Agency meeting will be on September 30 at 1:00 (Holiday
Inn Express in Montrose).    Please let me know if you will not be able to
attend.

Regards, Bruce

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384


.(See attached file: UFO-CA_2010-08-19_Final-notes.pdf)



PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information.
Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may
be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it
from your system

BLM_0108596



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401



# COOPERATING AGENCY MEETING #4

## Thursday, August 19, 2010 (1:00 – 4:00 PM)

### Meeting Location:
### Holiday Inn Express (Jordan Room)
### 1391 South Townsend Avenue, Montrose, CO

# Meeting Notes

**Attendees:** Angie Adams (EMPSi), Amanda Clements (BLM Uncompahgre Field Office), Jen Coates (Town of Ridgway), Renzo DelPiccolo (Colorado Department of Natural Resources, Southwest Region), Edd Franz (BLM Uncompahgre Field Office), Patti Grafmyer (Town of Norwood), Susan Hansen (Delta County BOCC), Scott Harold (Town of Olathe), Kerwin Jensen (City of Montrose), Bruce Krickbaum (BLM Uncompahgre Field Office), Jeff Litteral (BLM Uncompahgre Field Office), William Long (Town of Nucla), Joan May (San Miguel County BOCC), Patricia Means (Town of Cedaredge), Lynn Padgett (Ouray County BOCC), Mike Pelletier (Gunnison County), Barbara Peterson (Town of Paonia), Joe Reagan (Town of Norwood), Dan Reinkensmeyer (US Fish and Wildlife Service), Alan Schroeder (Bureau of Reclamation, Western Colorado Area Office), Barb Sharrow (BLM Uncompahgre Field Office), David Varley (Town of Orchard City), Steve White (Montrose County BOCC), Kate Wynant (EMPSi)

**Handouts:** Agenda, Highlights of the Resource Management Planning Process to Date, RMP Planning Fact Sheet 6.1: Vegetation and Land Health, RMP Planning Fact Sheet 3.1: Recreation and Visitor Services, RMP Planning Fact Sheet 6.3: Water Quality and Soils, Land Health Assessments and the Uncompahgre Field Office Resource Management Plan Revision PowerPoint slides, Soils PowerPoint slides, Special Recreation Management Areas PowerPoint slides, Preliminary Internal Draft Alternatives for Special Recreation Management Areas and Comprehensive Trails and Travel Management

1. **Welcome** (Bruce Krickbaum)

2. **Introductions** (All present)

3. **Planning Process to Date** (Angie Adams)
   - See handout: Highlights of the Resource Management Planning Process to Date
   - Several reports are complete and are on the Web site.
   - The draft Areas of Critical Environmental Concern evaluation report is on Web site; comments are due tomorrow (August 20).
   - The Wild and Scenic River suitability process is underway and we are gathering data on suitability criteria. Information was due on Monday (August 16) but if you have anything for us, we will still accept it.

BLM_0108597

- We are taking information from the public on suitability criteria so that we can think about it internally but there will be stakeholder groups as we've talked about in the past and we'll need their input by December 2010. The first meeting for the Gunnison River Basin is September 1 at the Bill Heddles Recreation Center in Delta from 2:00-4:30pm. The meeting for the Dolores and San Miguel River Basins has not been scheduled yet.

## 4. Renewable Energy (Lynn Padgett, Angie Adams)

- At one of the first meetings we talked about the renewable potential for the various renewable resources and there was some concern that it has not been looked at at a local level. I was concerned that our solar potential was rated as "low" in some studies but at the local rural utility level, our solar potential is not low; perhaps this is the same for geothermal and other renewable resources. I wondered how this low potential was going to feed into the RMP and, if the low potential is in the alternatives, how it will shape the plan for the next 25 years. To determine potential, the rating takes into account places that are within 25 miles of a transmission line. If you talk to Delta-Montrose Electric Association, they are required to have five percent of their power from renewable energy, so they are looking at existing transmission lines and substations. There is a project on private that very well could have been on BLM land. In Ridgway, one of the few areas that we have is near a substation on BLM. I don't want the RMP to have to be amended to account for these things that we can incorporate into the RMP now. Can we talk to the local utilities to get a better picture?
- A. Adams: The alternatives do not open or close a type of renewable energy based on potential alone. Just because there is low potential, we can't close an area. The "low potential" in the programmatic documents does not dictate what we put in the alternatives as open or closed. We might close an area because there is an area of critical environmental concern with a special status plant species that would be diminished if a solar development were placed on that site. What we do is go through the planning area and look at resources that would not be compatible with renewable energy development. We do the same thing for other resource uses such as off-highway vehicle use.
- Question: So an area will not be close because the potential is so low? The staff will look at it more on a site-specific basis to weigh other resources and impacts to those resources? Answer: That is correct. The reason that there might be an RMP amendment is because technology changes and development that today would impact a resource might, in the future, be able to exist in a way that doesn't damage a resource, so areas that we identify as closed in the RMP could be opened if technology changes.
- Comment: I talked with local utilities to see if these were issues that needed to be raised and they all felt strongly that there should be alternatives that would allow for local energy development. You are aware that there is a group that would like to allow for alternative energy development at the local level.
- Lynn has looked into wind but if anyone knows something about other types of renewables, such as geothermal, please let us know.
- Question: What about hydro power? How come it is not addressed in this plan? Answer: The main reason why hydro is not addressed in this plan is because water resources are not managed by BLM; it is not our jurisdiction. We will evaluate some of those things as part of the WSR study.
  - Comment: Even though BLM might not manage water, they manage the pipelines that might go to/from the water.
  - Comment: Solar Energy International has done a hydrology potential study in the North Fork Valley.
- If we know that there are areas for hydro, we should look at decisions in our plan that might preclude it; make sure that our plan would not conflict with reasonably foreseeable future

BLM_0108598

development. We don't want to set direction in the plan that might preclude some activities because we didn't know about it.

- *Comment*: In the Montrose Daily Press there was a cover story on the success of Project 7 Water Authority with DMEA. I am worried about inference and where this plan will end up. It will be used as a source tool for parties that might be interested in developing some of those resources. If this plan uses guidance that there is low potential and we agree but we still have areas open to development, will we be shortening future development? We need all the business that we can get. *Answer*: From a land manager perspective, it doesn't seem to make a difference what our studies say. Based on the price of the commodity and demand, folks are still interested and looking to develop the resource. They are not deterred by studies.
- The broad-scale studies are very general and developers who are interested are going to take that for what it's worth but do their own investigation. Again, we won't be limiting areas based on potential.
- If there are areas that you know of where development is likely to occur, you'll need to see if we have areas "closed" that might preclude such activities.

## 5. Resource/Resource Use Discussions

- Land Health Assessments (Amanda Clements)
  - o See handouts: Land Health Assessments and RMP Planning Fact Sheet 6.1: Vegetation and Land Health
  - o *Question*: It seems like it took a long time to get this information that might go into the RMP. How is this information utilized on a more practical scale? *Answer*: For a grazing allotment of 5,000 acres we have info that we can go to a permittee with and say that there are problems on the allotment with evidence that the livestock are contributing to the problem and work with them to relieve the problem.
  - o Some of you are reviewing our environmental assessments and see that we are using the data on almost every project that we're working on.
  - o *Question*: How do you address years that we have a drought or a lot of rain. *Answer*: In extreme years we won't be able to address it, but over the past 12 years we've only had one extreme year. We have indicators that they are not fixed so that even in extreme years, we know that certain plants and communities should be found in certain areas. That's why so much emphasis and research was put into selecting these indicators.
  - o *Question*: When you talk about institutionalizing this [Land Health Assessment process], it's more than methodology and standards? *Answer*: Yes, our approach to doing it and how it fits into the other activities.
    - ▪ *Question*: I heard you say that you want to institutionalize it so that if people leave, there is the knowledge about the indicators and what to do, not necessarily what the condition is today. *Answer*: Correct, we're not proposing that the conditions stay the same for the next 20 years.
- Soils (Jeff Litteral)
  - o See handouts: Soils PowerPoint slides and RMP Planning Fact Sheet 6.3: Water Quality and Soils
- Recreation (Edd Franz)
  - o See handouts: Special Recreation Management Areas (SRMAs) PowerPoint slides, RMP Planning Fact Sheet 3.1: Recreation and Visitor Services
  - o *Question*: Can you give an example of an existing BLM Special Recreation Management Area (SRMA)? *Answer*: The San Miguel River SRMA, but it was done before the 2005 Land Use Planning Handbook which directed us to identify the target market so it doesn't have that attached to it now. Identifying SRMAs is a new thing and we can also designate an intermediate category called an individual extensive recreation management area, where we are not restricting other uses but managing for an activity that the public has told us about.

BLM_0108599

- o *Question*: Is there a minimum acreage associated with SRMAs? *Answer*: No, but it would have to be something that you could plan for. You probably wouldn't have a 20-acre SRMA, but you might have 500 or 20,000 acres.
- o *Comment*: I spent a week in an area with no signage, old maps, and minimal information. It is one thing to say we're designating this as a recreation area, but if people can't navigate the area, then people end up lost. More signage would be helpful and more of the so-called use maps where there are signs periodically that point out the activities. *Response*: That's what SRMAs are trying to address. Instead of trying to do everything equally throughout the field office, let's concentrate on the areas that people want use so that we can create signs, maps, etc.
  - ▪ *Question*: Would that potential to get lost fit into a sort of SRMA market or would that fit into an ERMA? Would some people like that experience? *Answer*: I was in a large area and would drive for 30 minutes without seeing a road sign then all of a sudden I ended up outside of the park because there wasn't any signage. This area just isn't developed.
- o *Question*: Where does wilderness fall into this? *Answer*: They might. For example we have the Dolores River Canyon Wilderness Study Area as an SRMA currently and we've brought that forward to consider in some of the alternatives now. There can be overlap. It would be for an undeveloped market because we can't develop facilities.
- o *Question*: The SRMAs, do you have studies or are you looking to us to say this is where people like to go? *Answer*: A bit of both. We had Mesa State do visitor studies, collect responses from users, and through that we were able to identify places and settings that people like. Questions asked not only where and why, but what BLM could do to ruin the experience.

## 6. Alternatives Development
- • SRMAs (Edd Franz)
  - o See handout: Preliminary Internal Draft Alternatives for Special Recreation Management Areas and Comprehensive Trails and Travel Management
  - o *Question*: Will we see a list of those areas identified with details? *Answer*: The results of the focus groups are available on the Web site (Click Here).
  - o *Question*: Why would Ridgway Trails SRMA only be identified under high-intensity management alternatives? Why wouldn't that be under low-intensity? *Answer*: Because inherently with SRMAs there is usually a high intensity of management.
  - o *Question*: So the other two [San Miguel River and Dolores River Canyon SRMAs] are grandfathered in? *Answer*: No, the management for those areas doesn't require as much as some of the other SRMAs. Also, the management under Alternative D would be less-intensive than under the high-intensity alternatives.
    - ▪ *Comment*: That doesn't seem very clear. *Response*: This is just a draft and more will be put into this, including describing the setting (how many people you're going to see, how many kiosks or signs, trail system development).
  - o *Question*: Are these already established SRMAs? *Answer*: The Alternative A column shows the two that already exist. The others are ones that we came up with this week and based on the recreation focus groups.
  - o *Question*: Isn't there something east of Olathe? *Answer*: That is the Gunnison Gorge, which is not part of this plan. *Question*: The Adobes? *Answer*: Yes, that is part of that planning area, which is larger than the Gunnison Gorge National Conservation Area; it won't be reconsidered here.
  - o We are looking for your feedback. We can tailor the management of these areas to meet the needs of the communities. If you have something going on that can be addressed through this (improve lifestyle, keep people active), talk to us and we can try to incorporate it this way by marketing and directing people to a certain place.

BLM_0108600

- o *Question*: People in Ridgway would like a bike path that connects San Miguel County. Is this an opportunity to develop a bike path that connects to the San Miguel River or elsewhere? *Answer*: Sure. It would also require county and US Forest Service cooperation. That is a good point; I don't think that idea came up this week. I remember when I first came here that I heard all about this vision to connect communities. This is an example of something in the county plans that should be in this RMP so that when the opportunity arises, we don't have to amend our RMP.
- o *Question*: Would that be an SRMA as opposed to travel management? *Answer*: It could be either place. Maybe it falls into an individual Extensive Recreation Management Area.
- o *Question*: How big are the North and Dry Creeks? *Answer*: Approximately 115,000 acres.
- o *Question*: How large does Kinikin Hills expand? *Answer*: At this point we're not exactly sure what the boundary would be.
- o *Question*: Is the 40 acre parcel in Ridgway included here? The Uncompahgre Riverway site. *Answer*: That is one that we're looking at in Interpretation and Environmental Education. It's also a place that we're considering as a watchable wildlife area. It could also be considered as an SRMA.
  - ▪ *Comment*: That would be consistent with our vision; the community is looking for a way to connect the surrounding areas.
- o *Question*: Does the BLM have land along the Uncompahgre River? *Answer*: No, not really.
- o *Question*: Could you designate areas as potential for land exchange to make some of these opportunities come to fruition? *Answer*: Yes, we have criteria for acquiring lands so that there is framework for such activities. Same goes for areas that we want to retain and areas that we want to dispose of.
- o *Question*: Would the BLM be willing to take land in a riparian area? If someone wanted to donate land, say 10 acres, if the county wasn't interested? *Answer*: We would look at it, but generally if we don't have lands around it, we might not want it. In 1992 we did a land exchange near Telluride and gained a lot of acreage in Leopard Creek. That's an example of how we got a lot of our riparian corridor.
- o *Question*: In this stage, you're developing alternatives based on the alternatives themes, but further down the road you will be able to pick from various alternatives for various programs (e.g., Alternative A for grazing, Alternative D for recreation). *Answer*: Yes, but the each program has to make sense with the management of other programs. We also can only pick from what is in the range. If one alternative says 500 and another says 1,000, we can pick 750 but we can't pick 2,000 if no alternatives looked at something 2,000 or greater.
- o *Action* (Cooperating Agencies): Give us your feedback by Friday, September 17.
- • Comprehensive Trails and Travel Management (Edd Franz)
  - o Route designation: *open*, *closed*, and *limited* to off-highway vehicle (OHV) use.
  - o In Dry Creek we went from "open" to "limited to designated routes." The rest of the field office is "limited to existing routes" except the North Delta OHV area, which is "open." The legal routes are those that existed at the time that plan was signed.
  - o This plan will draw the polygons (open, limited, and closed) but won't go route-by-route to designate routes in the *limited* area. After this plan, there will be a process to designate each route.
  - o *Question*: Is there a public process to designate those routes? *Answer*: Yes, after this plan there will be an intensive public process to designate routes. We felt like if we tried to do it in this plan, people wouldn't be able to go site by site to look at routes.
  - o *Question*: So these travel management designations are different designations than SRMAs? *Answer*: Yes, there is some overlap, but they are different polygons. Every BLM acre has to fall into "open" "limited" or "closed". For SRMAs we only designate certain areas.
  - o *Question*: Those have to match up though. You can't have an SRMA with no access. *Answer*: Well you could. There could be an undeveloped SRMA that is closed to OHV use.

BLM_0108601

- o *Action* (Cooperating Agencies): Look at the areas in each of these polygons and see if anything needs to be added or deleted.
- o *Action* (CDOW): Provide timing limitations and make sure our terminology is correct.
- o *Question*: Is it important for us to know what the current management is? I know some things because I live there but I don't know the other places. *Answer*: Eventually we'll have maps so that you can see where the areas are.
- o *Action* (BLM): Provide current SRMA and OHV map to Cooperating Agencies.
- o *Action* (BLM): Provide link to recreation focus group report.
- o *Question*: How much detail will we get into for each of these SRMAs? Are we going to talk about how they are being managed now? What makes them an SRMA and what doesn't and how will that change under a different alternative? *Answer*: For the purposes of right now we want you to brainstorm areas that might be appropriate as an SRMA so that we can get them on the list. As we develop the market niche, we can bring you those things to compare to what's happening now and talk about how management will be different under different alternatives. We can share that info with the group and get your feedback as we're drafting it.
- o We want your feedback on areas that have certain setting characteristic requirements for a specific market.
- o *Question*: While we're brainstorming, do you have the info on whether or not there's wildlife in the area that we might not know about? *Answer*: Yes, we have those maps and when we're planning we overlay those maps with any proposed project.
- o *Action* (BLM): Send wildlife maps (threatened and endangered species, wintering range), especially of Jumbo Mountain area, to Cooperating Agencies.
- o *Action* (Cooperating Agencies): Give us your feedback by Friday, September 17.
- • Draft Themes (Angie Adams)
- o *Comment*: Alternative B: "active management" might be a better way of saying "lots of rules." Under "grazing" instead of maintain animal unit month base, we might want to say adjust animal unit month base to achieve land health standards. Maintain animal unit month base might not achieve land health standard. Use more specifics for soils stability, species diversity (language from Land Health Standards). Generally more consistent language when describing the alternatives.
- o *Question*: If we have an idea for an alternative, how should we submit that? *Answer*: You can e-mail a paragraph to either Bruce (bruce_krickbaum@blm.gov) or Kate (kate.wynant@empsi.com) and tell us where it fits.
- o *Question*: As group went through to develop alternatives, did this scheme work? *Answer*: They might not like some of the things that are going in the boxes, but they are filling in different alternatives. What remains to be seen is, when we look up and down the columns, are the alternatives different enough or are they so similar that there isn't value added in analyzing an additional alternative.
- • Draft Goals (Angie Adams)
- o We received one comment from a Resource Advisory Council Subgroup member but no detailed feedback.

## 7. Other Items Not on the Agenda (Angie Adams)

- • *Comment*: This is a huge effort and the timeframe seems very short. *Response*: We understand. This process is evolving and once we get things written down and have more details and maps, we'll be able to give it to you. As you're glancing through the stuff that we're giving you, you're probably having a gut reaction and that's what we want your feedback on. You'll be able to review the details when we provide you the information. We are hoping that by going through this process, when you do get the draft document for review, you'll understand what you are reading.

BLM_0108602

- *Comment:* The planning processes are just long and a lot to deal with. I appreciate that this process is concise and a small group. I would rather get the information here than have to attend more and larger meetings.
- Chapters 1 and 3 are very long. We gave the BLM an extension so we will give you the same extension to Friday, October 22. This is not a critical path.
- You can also take more time to comment on the themes and goals (handed out at July meeting) until Friday, September 17.
- *Comment:* I am not so much concerned about time, but more concerned that I miss something in the review. North Delta isn't an SRMA and maybe it should be.
- Our next meeting we'll have more information and we're likely going to be discussing the preferred alternative.
- We tried to bring you a focused question to get your feedback. If we brought you everything we talked about we wouldn't get through everything.
- Are there any topics in particular that you want to see, similar to what we showed you with SRMAs and OHVs? OHV use is one of the hottest topics. Recreation use is big.
- Are there any other maps you want to see? Oil and gas leasing, for example. Let us know if there is anything you want to see and we can provide it. The existing condition maps are also with Chapter 3.

## 8. Action Items / Next Meeting

- All meetings are at 1:00pm at the Holiday Inn Express (1391 South Townsend Avenue), Jordan Room:
  - Thursday, September 30, 2010: Visual Resources, Lands and Realty, Minerals
- *Action* (Cooperating Agencies): Draft SRMAs: give us your feedback by Friday, September 17.
- *Action* (Cooperating Agencies): Draft OHV designations: give us your feedback by Friday, September 17.
- *Action* (CDOW): Provide timing limitations and make sure our terminology is correct.
- *Action* (BLM): Provide current SRMA and OHV map to Cooperating Agencies.
- *Action* (BLM): Provide link to recreation focus group report (Click Here).
- *Action* (BLM): Send wildlife maps (threatened and endangered species, wintering range), especially of Jumbo Mountain area, to Cooperating Agencies.
- *Action* (Cooperating Agencies): Draft Chapters 1 and 3: give us your feedback by Friday, October 22.
- *Action* (Cooperating Agencies): Draft Goals: give us your feedback by Friday, September 17.
- *Action* (Cooperating Agencies): Draft Alternatives Themes: give us your feedback by Friday, September 17.

BLM_0108603

## James Bode

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **Sent:** | Monday, September 20, 2010 7:43 AM |
| **To:** | Steve White |
| **Cc:** | Angie Adams; Kate Wynant; UFO AR |
| **Subject:** | Re: SRMA |
| **Attachments:** | memoblm-srma.doc |

Steve,

Thank you for the comment regarding SRMAs.

There will be maps, and plenty more opportunity for Cooperating Agencies to comment.  We also need to develop specific management for each SRMA.
The SRMA list you saw last month was developed the afternoon before the Cooperating Agency meeting, and there had not been an opportunity to create maps.  We just wanted to share the preliminary list.
  -- Bruce


<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384



| | |
|---|---|
| "Steve White" <swhite@montrosec ounty.net> | To   <bruce_krickbaum@blm.gov> |
| 09/17/2010 03:43 PM | cc |
| | Subject       SRMA |
| Please respond to "Steve White" <swhite@montrosec ounty.net> | |


Bruce, See attached.  Steve White, Montrose County(See attached file: memoblm-srma.doc)

1

**MEMORANDUM**

To:         Bruce Krickbaum, BLM

From:       Steve White, Planning and Development Director, Montrose County

Date:       September 17, 2010

Subject:    Uncompahgre RMP, Draft Alternatives

Montrose County has the following comments in regard to the Uncompahgre RMP Preliminary Internal Draft Alternatives.

The maps should have been available for a more specific review of the alternatives.

Without knowing how the SRMA's are currently managed, Montrose County would support each SRMA segment within the Montrose County boundaries, be managed under Alternative D, which would allow development and low-intensity management.

BLM_0108605

## James Bode

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **Sent:** | Friday, September 17, 2010 9:27 AM |
| **To:** | Kate Wynant; UFO AR |
| **Subject:** | Fw: Wild & Scenic River Stakeholder Process for San Miguel and Dolores River Watersheds within the Uncompahgre Field Office |
| **Attachments:** | UFO RMP Subgroup Bios.docx |

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 09/17/2010 09:26 AM -----

Barbara
Sharrow/MOFO/CO/B
LM/DOI                          To
                      linda.bassi@state.co.us,
09/16/2010 05:18       ted.kowalski@state.co.us,
PM                     rebecca.mitchell@state.co.us,
                      ctreese@crwcd.org,
                      steve_smith@tws.org,
                      april@aprilmconsulting.com,
                      Catherine_Robertson@blm.gov,
                      pmueller@tnc.org,
                      rblevall@coop.ext.colostate.edu,
                      dolores333@msn.com,
                      bruce.whitehead.senate@state.co.us,
                      arobinsong paonia.com, Art
                      Goodtimes, Ron Henderson
                              cc
                      roy_smith@blm.gov,
                      Valori_Armstrong@blm.gov,
                      bruce_krickbaum@blm.gov,
                      angie.adams@empsi.com
                          Subject
                  Wild & Scenic River Stakeholder
                  Process for San Miguel and Dolores
                  River Watersheds within the
                  Uncompahgre Field Office

BLM_0108606

The purpose of this e-mail message is to provide a more detailed description of the proposed Wild & Scenic River stakeholder process for streams located within the boundaries of BLM's Uncompahgre Field Office for the San Miguel River and Dolores River watersheds   Feel free to pass this message along to other parties who seek more information about the proposed process.   If you have any further questions after reading this message, feel free to contact me at this e-mail address or at 970-240-5315.  You may also contact Roy Smith at 303-239-3940 or roy_smith@blm.gov.

BLM's Southwest Resource Advisory Council (RAC) has elected to support the formation of stakeholder group for these watersheds to discuss Wild & Scenic River issues.   BLM's Resource Advisory Councils are authorized under federal law to provide ongoing input to BLM on critical issues affecting the management of public lands. For more information on the Southwest RAC, go to: http://www.blm.gov/co/st/en/BLM_Resources/racs/swrac.html

The Southwest RAC has formed a subcommittee specifically for the purpose of providing input to BLM for updating the Uncompahgre Field Office resource management plan.  The wild and scenic rivers stakeholder process will be supported by this subcommittee.   Membership in the subcommittee occurred via a formal application process and members of the subcommittee were selected by member of the Southwest Resource advisory council.   Members of the subcommittee include:

Shelby Bear - DMEA
Steven D. Weist - Manager, Special Project at Oxbow coal mine, mining interests John Reams - Construction, Tomcat Mining, Rancher Bill Day - Retired Land Surveyor, Seasonal Biological Technician, Environmentalist Richard Durnan - Photographer, Dispersed recreation, Quiet Use Robbie LeValley - Range and Livestock Extension Specialist for CSU Extension, Federal Grazing Permittee Walt Blackburn - Retired Postmaster, OHV, Dispersed Recreation Peter Mueller - Nature Conservancy, BLM Southwest Resource Advisory Committee liaison Kathy Welt - Arch Coal, mining interests, rancher, BLM Southwest Resource Advisory Committee liaison Bill Ela - retired judge, owns orchards in North Fork, BLM Southwest Resource Advisory Committee liaison
    Co-leads for Wild and Scenic effort

(See attached file: UFO RMP Subgroup Bios.docx)

The subcommittee has chosen to sponsor a stakeholder process for two primary reasons.  First, because of the controversy and widely divergent opinion associated with Wild & Scenic Rivers analysis in these two watersheds, a neutral forum in which to discuss issues appears to be needed.   Second, the BLM requires substantial public input in order to formulate Wild & Scenic Rivers alternatives for its plan revision.   BLM's manual guidance requires BLM to have to have a range of wild & scenic river alternatives for suitability, including alternatives in which all, none, and some of the analyzed segments are determined to be suitable for designation.

The RAC subcommittee determined that the need for dialogue to assist in formulation of wild & scenic alternatives for BLM planning was so great that the expense of sponsoring a dialogue was warranted.   The Federal Advisory Committees Act (FACA) prohibits BLM from paying for expenses of stakeholder groups unless they are specifically chartered under FACA, and the Southwest RAC meets this qualification.

The RAC subcommittee has indicated that the stakeholder group will operate under the following general guidelines:

   Any member of the public and any organization may participate in the discussions

2

BLM_0108607

The subcommittee will pay for a neutral facilitator to run the first
eight meetings of the stakeholder group (more meetings will be held if
necessary)
The stakeholder group will be free to set its own agenda and
decision-making processes
The stakeholder group's primary mission will be  to provide specific
input on formulation of a range of W&SR alternatives for BLM's planning
process.
If it chooses to do so, the stakeholder group can work to formulate
options other than W&SR designation for management of the outstandingly
remarkable values found in eligible river segments.  Those options can
be forwarded to BLM for consideration.
All input from the stakeholder group will referred to back to the
subcommittee and the larger Southwest Resource Advisory Council.   The
RAC can choose to forward some, all, or none of the stakeholder group
recommendations to the BLM.
If the stakeholder group decides it wants to work independently of the
RAC process and find its own funding source for facilitation expenses,
it is free to do so.   If that occurs, BLM will accept input from the
stakeholder group as it would from any other party.

A stakeholder group is also in the process of forming within the Gunnison River Basin.  This group is establishing itself
independently of the RAC process, similar to the process used by stakeholders within the Grand
Junction Field Office planning area.   If it continues to meet, this
stakeholder group will discuss all eligible streams within the Gunnison River watershed, including streams within the
Uncompahgre Field Office and Dominguez Escalante National Conservation Area.

Both groups have an extensive mailing list and you will be kept informed of upcoming meetings.  BLM will also keep it's
web page updated with notes and meeting dates.  (Google Wild and Scenic River - UFO).

On behalf of the Southwest Resource Advisory Committee Sub-group and the potential stakeholder group on the
Gunnison watershed - we invite all interested parties to participate in these public processes.


Barbara Sharrow
Uncompahgre Field Office Manager

970-240-5315 - office
970-596-1515 - cell

BLM_0108608

**Uncompahgre Field Office Sub-Group for Resource Management Plan Revision**

**NAME:  Shelby Bear**
**Occupation:** Civil Engineer for DMEA
**Category/Interests:** Energy, ROW's
**Residence Location:  Delta**
Ms. Bear is a civil engineer and project manager with DMEA.  She previously worked for
Western Area Power Administration and the Bureau of Reclamation.  Her involvement with the
county and BLM permitting processes for the Delta County Transmission Improvement Project
and the East Montrose Electric System Improvement Project was integral to project completion.
She participated in scoping, planning of public meetings, meeting with interested parties and
concerned landowners and county representatives.  Ms. Bear grew up in Delta County and enjoys
outdoor recreation in the area.

**NAME:  Steven D. Weist**
**Occupation:**  Manager, Special Project at Oxbow
**Category/Interests:** Energy (mining)
**Residence Location:**  Cedaredge
Mr. Weist is a licensed Professional Engineer and a member of the Society of Mining Engineers
who has worked in the mining industry for more than 30 years.  The majority of that time he has
been involved with coal mining operations across the western United States.  He holds a degree
in Mining Engineering, and a Masters in Business Administration.  He is experienced with all
aspects of engineering and operations, from planning and development of new mines to closure
and reclamation of properties.  He has coordinated with mine management and regulatory
agencies at all levels to streamline operations. His career has focused on achieving balance
between the environment, safety and productivity.

**NAME:  John Reams**
**Occupation:**  Reams Construction, Tomcat Mining, Rancher
**Category/Interests:**  Federal (BLM) Grazing Permitee, minerals (small miner).
**Residence Location:  Naturita**
Mr. Reams is a life long resident of the four corners region and has worked in construction,
mining and ranching.  He is the President of the Western Small Miners Association, on the
Montrose County Airport Advisory Board and a member of the Montrose County Transportation
Committee.

**NAME:  Bill Day**
**Occupation:**  Retired, Land Surveyor.  Presently seasonal biological technician
**Category/Interests:**  Environmental
**Residence Location:**  Hotchkiss
Mr. Day is a retired land surveyor who ran a surveying business in southwestern Colorado.  Prior
to that, he was a seasonal BLM Cadastral Surveyor in Colorado and Oregon.  Since retiring he
has been working as a seasonal bio tech for the Rocky Mountain Bird Observatory in western
Colorado and eastern Utah, doing bird monitoring.  He is the chairman of the Gunnison Sage-
grouse Working Group and has been on the board of the Black Canyon Land Trust and the Black
Canyon Audubon Society.

**NAME:  Richard Durnan**
**Occupation:**  Photographer
**Category/Interest:**  Dispersed recreation, Quiet Use/ROW/OHV
**Residence Location:**  Ridgway
Mr. Durnan is the owner of a local photography company, Richard Durnan Photography.  He has a degree in environmental biology and worked for the Uncompahgre Field Office as a river ranger for four years.  He is the founder and organizer of the Ridgway Trails group in conjunction with COPMOBA and other trail development in Ouray County.  He has lived, worked and recreated in the area since 1997.

**NAME:  Robbie LeValley**
**Occupation:**  Area Range and Livestock Extension Specialist for CSU Extension
**Category/Interest:**  Federal Grazing Permittee
**Residence Location:**  Hotchkiss
Ms. LeValley has been the CSU range and livestock extension specialist in west central Colorado for the past 20 years.  She is a certified rangeland professional and also serves on the Statewide Council for the Colorado Division of Wildlife Habitat Partnership Program.  Ms. LeValley has facilitated meetings between coal mining and environmental groups in the North Fork and helped initiate the Public Lands Partnership.

**NAME:  Walt Blackburn**
**Occupation:**  Retired Postmaster
**Category/Interests:**  OHV, Dispersed Recreation
**Residence Location:**  Delta
Mr. Blackburn is a retired postmaster and has been a member of COHVCO for 12 year.  He has also been a member of the BlueRibbon Coalition for 6 years, and is a founding member of the "Thunder Mountain Wheelers ATV Club".  He was awarded the "Recreation Partner of the Year" from the Regional Office of the Forest Service in Dec. 2009.

**Uncompahgre Field Office Sub-Group for Resource Management Plan Revision**

**NAME:  Shelby Bear**
**Occupation:** Civil Engineer for DMEA
**Category/Interests:** Energy, ROW's
**Residence Location:  Delta**
Ms. Bear is a civil engineer and project manager with DMEA.  She previously worked for Western Area Power Administration and the Bureau of Reclamation.  Her involvement with the county and BLM permitting processes for the Delta County Transmission Improvement Project and the East Montrose Electric System Improvement Project was integral to project completion. She participated in scoping, planning of public meetings, meeting with interested parties and concerned landowners and county representatives.  Ms. Bear grew up in Delta County and enjoys outdoor recreation in the area.

**NAME:  Steven D. Weist**
**Occupation:**  Manager, Special Project at Oxbow
**Category/Interests:** Energy (mining)
**Residence Location:**  Cedaredge
Mr. Weist is a licensed Professional Engineer and a member of the Society of Mining Engineers who has worked in the mining industry for more than 30 years.  The majority of that time he has been involved with coal mining operations across the western United States.  He holds a degree in Mining Engineering, and a Masters in Business Administration.  He is experienced with all aspects of engineering and operations, from planning and development of new mines to closure and reclamation of properties.  He has coordinated with mine management and regulatory agencies at all levels to streamline operations. His career has focused on achieving balance between the environment, safety and productivity.

**NAME:  John Reams**
**Occupation:**  Reams Construction, Tomcat Mining, Rancher
**Category/Interests:**  Federal (BLM) Grazing Permitee, minerals (small miner).
**Residence Location:**  Naturita
Mr. Reams is a life long resident of the four corners region and has worked in construction, mining and ranching.  He is the President of the Western Small Miners Association, on the Montrose County Airport Advisory Board and a member of the Montrose County Transportation Committee.

**NAME:  Bill Day**
**Occupation:**  Retired, Land Surveyor.  Presently seasonal biological technician
**Category/Interests:**  Environmental
**Residence Location:**  Hotchkiss
Mr. Day is a retired land surveyor who ran a surveying business in southwestern Colorado.  Prior to that, he was a seasonal BLM Cadastral Surveyor in Colorado and Oregon.  Since retiring he has been working as a seasonal bio tech for the Rocky Mountain Bird Observatory in western Colorado and eastern Utah, doing bird monitoring.  He is the chairman of the Gunnison Sage-grouse Working Group and has been on the board of the Black Canyon Land Trust and the Black Canyon Audubon Society.

**NAME:  Richard Durnan**
**Occupation:**  Photographer
**Category/Interest:**  Dispersed recreation, Quiet Use/ROW/OHV
**Residence Location:**  Ridgway
Mr. Durnan is the owner of a local photography company, Richard Durnan Photography.  He has a degree in environmental biology and worked for the Uncompahgre Field Office as a river ranger for four years.  He is the founder and organizer of the Ridgway Trails group in conjunction with COPMOBA and other trail development in Ouray County.  He has lived, worked and recreated in the area since 1997.

**NAME:  Robbie LeValley**
**Occupation:**  Area Range and Livestock Extension Specialist for CSU Extension
**Category/Interest:**  Federal Grazing Permittee
**Residence Location:**  Hotchkiss
Ms. LeValley has been the CSU range and livestock extension specialist in west central Colorado for the past 20 years.  She is a certified rangeland professional and also serves on the Statewide Council for the Colorado Division of Wildlife Habitat Partnership Program.  Ms. LeValley has facilitated meetings between coal mining and environmental groups in the North Fork and helped initiate the Public Lands Partnership.

**NAME:  Walt Blackburn**
**Occupation:**  Retired Postmaster
**Category/Interests:**  OHV, Dispersed Recreation
**Residence Location:**  Delta
Mr. Blackburn is a retired postmaster and has been a member of COHVCO for 12 year.  He has also been a member of the BlueRibbon Coalition for 6 years, and is a founding member of the "Thunder Mountain Wheelers ATV Club".  He was awarded the "Recreation Partner of the Year" from the Regional Office of the Forest Service in Dec. 2009.



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401



## COOPERATING AGENCY MEETING #5

### Thursday, September 30, 2010 (1:00 – 4:00 PM)

### Meeting Location:
**Holiday Inn Express (Jordan Room)**
**1391 South Townsend Avenue, Montrose, CO**

# AGENDA

1. **Welcome**

2. **Introductions**

3. **Planning Process to Date**

4. **Resource/Resource Use Discussions**
   - Minerals
   - Lands and Realty
   - Visual Resources

5. **Alternatives Development**

6. **Other Items Not on the Agenda**

7. **Action Items / Next Meeting**
   - Next meeting: Thursday, November 4, 2010, from 1:00–4:00 PM

BLM_0108613



## United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401



# Highlights of the Resource Management Planning Process to Date
### September 30, 2010

- Notice of Intent (NOI) – 2/25/2010

- Scoping period – 12/23/2009 to 3/29/2010

- Scoping report – final report completed 7/7/2010 (on website)

- Tribal consultation – initiated 2009 (ongoing)

- Community Assessment – report completed 2/2009 (on website)

- Visual Resource Inventory – report completed 9/2009

- Migratory bird status literature review – report completed 10/2009

- Analysis of Management Situation (AMS) – report completed 6/10/2010 (on website)

- Economic workshops (6 communities) – held 3/2010

- Socioeconomic baseline assessment – final report completed 7/21/2010

- Class I paleontological resources – report completed 2/2010

- Oil & Gas Reasonable Foreseeable Development (RFD) Scenario – internal draft report completed 7/2010

- Mineral potential report (excluding coal) – internal draft report completed 8/2010

- Coal potential report – final report completed 4/26/2010

- Renewable energy potential report – final report completed 5/31/2010

- Class I cultural resources overview – draft report completed 4/2010; final report anticipated 10/2010

- Coordination with Cooperating Agencies – invitations sent 1/23/2009; meetings planned from 5/27/2010 forward

- ACEC evaluation report – draft report completed 7/15/2010 (on website) – final report underway

- Wilderness characteristics report – draft report anticipated 10/2010

- Air quality report – anticipated Winter 2010-2011

- Wild and scenic rivers – draft eligibility report 12/2009; final eligibility report completed 7/12/2010 (on website); suitability underway

- Recreation focus groups – completed 3/2010; report completed 6/2010 (on website)

- Alternatives development – anticipated 6/2010 through approximately 3/2011

BLM_0108614

# 7.2

## BLM Uncompahgre Field Office
## RMP Planning Fact Sheet
### *Uranium and Other Mineral Resources*

Barbara Sharrow, UFO Field Manager
2465 S. Townsend Ave, Montrose, CO 81401
Office hours are 8:00 am to 4:30 pm
Phone: (970) 240-5300 | TDD (970) 240-5366
FAX (970) 240-5367

The BLM Uncompahgre Field Office (UFO) is revising the Resource Management Plan (RMP) for the Uncompahgre planning area. The Uncompahgre RMP will provide detailed information about the current state of resources on public lands within the planning area, and set forth a plan of action for managing those resources for the next twenty or so years under the BLM's dual mandate of *multiple use* and *sustained yield*.

## Land of Valuable Resources

The BLM's dual mandate of multiple use and sustained yield means that BLM-administered lands are available for the exploration and development of mineral resources. The Mining Law of 1872 provides the legal framework for citizens to acquire mineral rights to a variety of hard rock minerals, including uranium and vanadium. Mining claimants are required to get BLM authorization before conducting any significant surface-disturbing activities. Miners are also required to get various permits from state and local governments in addition to putting in place financial guarantee bonds to insure completion of reclamation to meet various agency standards.



## Major Mineral Resources in the Planning Area

Uranium and placer gold are the primary mineral resources found in the Uncompahgre planning area. The uranium-rich Salt Wash Member of the Morrison Formation outcrops in numerous locations associated with the Uravan Mineral Belt as it passes through western Montrose County. The UFO has over 20 exploration projects currently open, ranging from exploratory drilling to bulk sampling of historic underground mine workings.

Placer gold deposits occur in the San Miguel River where they are often worked by recreational panning and dredging groups on several active placer mining claims after the seasonal spring runoff has a chance to replenish the resource.



BLM

7.2—Uranium and Other Mineral Resources

## OTHER MINERAL RESOURCES

Other mineral resources include the potential for leasable phosphate deposits associated with the Paradox Member of the Hermosa Group Formation in Paradox Valley. The Mineral Leasing Act guides land use planning, leasing, bonding, operations, and reclamation associated with all development of federal non-energy leasable mineral resources. In addition, sand and gravel deposits located throughout the planning area are primarily extracted for use as road base.

## URANIUM LEASING PROGRAM

The U.S. Department of Energy (DOE) Office of Legacy Management currently administers the Department's Uranium Leasing Program (ULP), managing 32 lease tracts containing approximately 25,000 acres, all located within the Uravan Mineral Belt in southwestern Colorado.

These public lands are withdrawn to the DOE for the management of uranium and vanadium resources. DOE has the jurisdiction for these resources, and the surface management of other resources like grazing and recreation is under the BLM jurisdiction. The DOE ULP is managed under the authority and in accordance with Title 10, Code of Federal Regulations, Part 760 in cooperation with the BLM and the State of Colorado.

**For more information on the Uranium Leasing Program, please visit the following website:**
**http://www.lm.doe.gov**



### *The BLM wants your input...*

- **How should mineral development, including pipelines and other infrastructure, be managed to minimize resource conflicts?**

- **Are there public lands that should be withdrawn from mineral entry because of conflicts with other public land uses?**

- **Should special conditions of approval be placed on mineral development? If so, what are they and where should they be applied?**

- **What are the visual considerations relating to management of mineral resources, and how should BLM's Visual Resource Management play a role?**

- **What are the potential social and economic effects associated with mineral development. How would planning decisions affect communities in southwest Colorado?**

---

**UFO Planning Webpage:**
**www.UFORMP.com**

**Mail comments to:**
**Bruce Krickbaum,**
**RMP Project Manager**
**2465 S. Townsend Ave**
**Montrose, CO  81401**

**Email comments to:**
**UFORMP@blm.gov**

**UFO 1/2010**

BLM_0108616

# 8.1

## BLM Uncompahgre Field Office
## RMP Planning Fact Sheet
## *Land Tenure*

Barbara Sharrow, UFO Field Manager
2465 S. Townsend Ave, Montrose, CO 81401
Office hours are 8:00 am to 4:30 pm
Phone: (970) 240-5300 | TDD (970) 240-5366
FAX (970) 240-5367

The BLM Uncompahgre Field Office (UFO) is revising the Resource Management Plan (RMP) for the Uncompahgre planning area. The Uncompahgre RMP will provide detailed information about the current state of resources on public lands within the planning area, and set forth a plan of action for managing those resources for the next twenty or so years under the BLM's dual mandate of *multiple use* and *sustained yield*.

In managing nearly 700,000 surface acres of public land within the planning area, the BLM provides for land use, purchase, exchange, donation, and sale, determines federal land boundaries, and maintains historic records for these ownership transactions.

### LAND TENURE ADJUSTMENTS

Land ownership transfer is an important component of the BLM's land management strategy. The BLM completes ownership transactions involving land and interests in land when such transactions are in the public interest and consistent with publicly-approved land use plans.

### LAND TENURE PROGRAM GOALS

The BLM's Land Tenure program is designed to:

- Improve management of natural resources through consolidation of federal, state and private lands
- Increase recreational opportunities and preserve open space
- Secure key property necessary to protect endangered species and promote biological diversity
- Preserve archaeological and historical resources
- Implement specific acquisitions authorized by Acts of Congress
- Allow for expansion of communities and consolidation of non-federal land ownership.

BLM

8.1—Land Tenure





BLM_0108617

## LAND TENURE ADJUSTMENT TOOLS

The Federal Lands Policy Management Act provides the BLM with the following land tenure adjustment tools:

*Exchanges:* Land exchanges are considered on a case-by-case basis. An exchange must be in the public interest, and lands proposed for acquisition must contain higher resource or public values than the public lands being disposed.

*Acquisitions:* Acquisitions, including access easements, can be completed through purchases, including Land and Water Conservation Fund purchases, and donations or receipts from Federal Land Transaction Facilitations Act (FLTFA) sales. FLTFA acquisitions are limited to lands adjacent to public lands with special designations, such as National Monuments and National Conservation Areas.



*Sales:* Public lands have potential for disposal when they are isolated and difficult to manage. Land sales are typically accomplished through competitive bid at fair market value. Lands must be identified for disposal in the RMP prior to being offered for sale.

*Recreation and Public Purposes (R&PP):* The R&PP Act of 1926 provides a means for state or local governments or non-profit organizations to acquire public lands at reduced or no cost, subject to BLM approval. The conveyed land must be used for a specific public need or recreational purpose such as a hospital, school, or park.

## UTILITY CORRIDORS

Utility corridors for oil, gas, and hydrogen pipelines and electricity transmission facilities on federal lands were approved in January 2009 in the *Resource Management Plan Amendments/Record of Decision for Designation of Energy Corridors on Bureau of Land Management Administered Lands in the 11 Western States.*

## The BLM wants your input...

- Is there BLM-administered land in the planning area that you think should be purchased, sold, or exchanged for land with greater public value? If so, which land and why? What criteria should be used to make such decisions?

- Is legal access to public land needed anywhere within the planning area?

- Should additional utility corridors and communication sites be designated in the planning area? If so, where? Are there areas that should be designated as unsuitable for major utility and road rights-of-way?

---

**UFO Planning Webpage:**
**www.UFORMP.com**

**Mail comments to:**
Bruce Krickbaum,
RMP Project Manager
2465 S. Townsend Ave
Montrose, CO  81401

**Email comments to:**
UFORMP@blm.gov

**UFO 1/2010**

BLM_0108618

| **3·3** | **BLM UNCOMPAHGRE FIELD OFFICE**<br>**RMP PLANNING FACT SHEET**<br>*Visual Resource Management* | Barbara Sharrow, UFO Field Manager<br>2465 S. Townsend Ave, Montrose, CO  81401<br>Office hours are 8:00 am to 4:30 pm<br>Phone: (970) 240-5300 \| TDD (970) 240-5366<br>FAX (970) 240-5367 |
|---|---|---|

The BLM Uncompahgre Field Office (UFO) is revising the Resource Management Plan (RMP) for the Uncompahgre planning area. The Uncompahgre RMP will provide detailed information about the current state of resources on public lands within the planning area, and set forth a plan of action for managing those resources for the next twenty or so years under the BLM's dual mandate of *multiple use* and *sustained yield*.

## WHAT IS VISUAL RESOURCE MANAGEMENT?

The BLM's **visual resource management** (VRM) system provides a way to inventory and analyze scenic values in order to determine appropriate levels of management. VRM serves as a tool to identify and map essential landscape settings in line with public preferences and recreation-related experiences now and in the future. The VRM system helps to ensure that actions taking place today will benefit the visual qualities associated with BLM landscapes, while protecting those visual resources for the future.

Management classes are assigned based upon the visual resource inventory, as well as  consideration for other land uses.

### BLM VISUAL RESOURCE INVENTORY CLASS OBJECTIVES

<u>Class I</u>:  Preserve existing character of landscape; level of change to characteristic landscape should be very low and must not attract attention.

<u>Class II</u>:  Retain existing character of landscape; level of change to characteristic landscape should be low.

<u>Class III</u>: Partially retain existing character of landscape; level of change to characteristic landscape should be moderate.

<u>Class IV</u>:  Provide for management activities which require major modification of existing character of landscape. Level of change to characteristic landscape can be high.

The inventory consists of 1) a Scenic Quality Evaluation, 2) a Sensitivity Level Analysis, and 3) a Delineation of Distance Zones.  BLM lands are assigned one of four classes based on these three components.



### THE LAY OF THE LAND

The planning area falls within two physiographic provinces (the Colorado Plateau and Southern Rocky Mountains), and as a result, has diverse topography, geology, soil, flora, and fauna.  The topography ranges from lowland riparian along the Dolores River (4,706 feet) to red rock desert to pinyon- juniper woodland up to sub-alpine forest on Storm King Mountain (11,449 feet).

The area features extensive stretches of rugged terrain, deep canyons, spectacular river valleys, dramatic cliffs and mesas, and other prominent geologic features, and supports a variety of vegetative communities, including desert scrub, riparian, sagebrush parks, pinyon-juniper woodlands, mountain shrub, and ponderosa pine and fir-spruce forests.



BLM

3.3—Visual Resource Management



## AN INCREASE IN VISUAL IMPACTS

Impacts to visual resources in the planning area are increasing due to an outdated and incomplete VRM tool and increased use of the planning area's resources. Growing pressure is being placed on visual resources as a result of activities such as fire management, utility corridors, roads and trails, communication sites, pipelines, mineral development, livestock grazing, water tanks, and subdivisions. Public concern is also on the rise regarding preservation of visual and scenic qualities for open space, recreation, and as a backdrop for residential areas.



## VISUAL RESOURCE ASSESSMENT

In response to increasing concerns from local communities, as well as with outdated and incomplete data in the existing RMPs, a VRM inventory and assessment of the planning area has been completed with input from adjacent communities and local, state, and federal agencies. The assessment is currently available to review at the Montrose Public Lands Center.

## MANAGEMENT ADEQUACY

Current visual resource classes were prescribed in the 1985 and 1989 UFO RMPs. The classes are now insufficient to be used as a management tool because of data inconsistencies and the outdated nature of the class designations. With increases in land use and tourism, scenic values and visual open space has become more important. Current VRM objectives have been maintained in some areas, while other areas are experiencing degradation. Preservation of sensitive viewsheds will continue to compete with other land use allocations and impacts, including urban and energy development, infrastructure needs, recreation, and various other surface activities.

## THE PLANNING PROCESS

Because of the Uncompahgre RMP revision, all land within the planning area was reevaluated and assigned a Visual Resource Inventory Class. While visual values are important, they will not be the only element considered when establishing management direction. Final VRM objectives and boundaries will result from and reflect resource allocation decisions made in the RMP.

All resource allocation decisions will be weighed so as not to create conflicts managing values which the RMP seeks to promote. For example, when land use is not discretionary, such as in areas with valid existing rights, the use must be allowed, but its effect on visual quality can be minimized through mitigating measures.

In accordance with the BLM Land Use Planning Handbook (H-1601-1), VRM classes should correspond to recreation management objectives and setting prescriptions for recreation management zones within Special Recreation Management Areas. In addition, the RMP revision will need to address BLM guidance requiring all wilderness study areas to be managed as VRM Class I areas.

### The BLM wants your input...

- **How should the BLM manage sensitive viewsheds and corridors?**

---

**UFO Planning Webpage:**
**www.UFORMP.com**

**Mail comments to:**
**Bruce Krickbaum,**
**RMP Project Manager**
**2465 S. Townsend Ave**
**Montrose, CO  81401**

**Email comments to:**
**UFORMP@blm.gov**

**UFO 1/2010**

BLM_0108620



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
Montrose, Colorado



## COOPERATING AGENCY MEETING #5

### Thursday, September 30, 2010 (1:00 – 4:00 PM)

**Meeting Location:**
**Holiday Inn Express**
**1391 S. Townsend Avenue, Montrose, CO**

| Last Name | First Name | Initial | Organization | Address | E-Mail | Phone |
|-----------|-----------|---------|--------------|---------|--------|-------|
| Adams | Angie |  | EMPSi | 3775 Iris Ave, Ste 1A Boulder, CO 80301 | angie.adams@empsi.com | 303-446-7160 |
| Armstrong | Lori | | BLM, Southwest Colorado District Manager | 2465 S. Townsend Ave. Montrose, CO 81401 | valori_armstrong@blm.gov | 970-240-5336 |
| Brauneis | George | | Town of Hotchkiss | PO Box 369 Hotchkiss, CO 81419 | mse1047096@aol.com | 970-872-3663 |
| Coates | Jen | | Town of Ridgway | PO Box 10 Ridgway, CO 81432 | jcoates@town.ridgway.co.us | 970-626-5308 ext. 15 |
| DelPiccolo | Renzo | | Colorado Department of Natural Resources, Southwest Region | 2300 S. Townsend Ave. Montrose, CO 8401 | renzo.delpiccolo@state.co.us | 970-252-6000 |
| Hansen | Susan | Signed on back | Delta County Board of County Commissioners | 501 Palmer St, #227 Delta, CO 81416 | shansen@deltacounty.com | 970-874-2102 |
| Harold | Scott | | Town of Olathe | PO Box 789 Olathe, CO 81425 | sharold@ci.olathe.co.us | 970-323-5601 |
| Kauffman | Dave | | BLM, Uncompahgre Field Office | 2465 S. Townsend Ave. Montrose, CO 81401 | dave_kauffman@blm.gov | 970-240-5340 |
| Jensen | Kerwin | | City of Montrose | 433 South First Street Montrose, CO 81401 | kjensen@ci.montrose.co.us | 970-240-1478 |
| Krickbaum | Bruce | | BLM, Uncompahgre Field Office | 2465 S. Townsend Ave. Montrose, CO 81401 | bruce_krickbaum@blm.gov | 970-240-5384 |

BLM_0108621

September 30, 2010

| Last Name | First Name | Initial | Organization | Address | E-Mail | Phone |
|---|---|---|---|---|---|---|
| Long | William | ML | Town of Nucla | PO Box 486<br>554 Main Street<br>Nucla, CO 81424 | segfahlt@gmail.com | 970-497-2707 |
| May | Joan | | San Miguel County Board of County Commissioners | PO Box 1170<br>Telluride, CO 81435 | joanm@sanmiguelcounty.org<br>daves@sanmiguelcounty.org | 970-728-3844 |
| Means | Patricia | | Town of Cedaredge | PO Box 398<br>Cedaredge, CO 81413 | pat@cedaredgecolorado.com | 970-856-5001 |
| Padgett | Lynn | | Ouray County Board of County Commissioners | PO Box C<br>Ouray, CO 81427 | lpadgett@ouraycountyco.gov<br>lynn@mtngeogeek.com | 970-417-9901 |
| Pelletier | Mike | | Gunnison County | 200 E. Virginia Ave.<br>Gunnison, CO 81230 | mpelletier@gunnisoncounty.org | 970-641-7645 |
| Peterson | Barbara | | Town of Paonia | PO Box 460<br>Paonia, CO 81428 | townofpaonia@tds.net | 970-527-4101 |
| Randall-Parker | Tamera K. | | US Forest Service – Grand Mesa, Uncompahgre, & Gunnison National Forests | 2250 Highway 50<br>Delta, CO 81416 | tkrandallparker@fs.fed.us | 970-240-5415 |
| Reagan | Joe | | Town of Norwood | PO Box 190<br>Norwood, CO 81423 | joereagan741@yahoo.com<br>norwoodparker@centurytel.net | 970-327-4873<br>970-327-4288 |
| Reinkensmeyer | Dan | | US Fish & Wildlife Service Western Colorado Ecological Services Field | 764 Horizon Drive<br>South Annex A – Bldg. B<br>Grand Junction, CO 81506 | dan_reinkensmeyer@fws.gov | |
| Schroeder | Alan | | Bureau of Reclamation, Western Colorado Area Office | 2764 Compass Drive<br>Grand Junction, CO 81506 | aschroeder@usbr.gov | 970-248-0690 |
| Sharrow | Barb | | BLM, Uncompahgre Field Office | 2465 S. Townsend Ave.<br>Montrose, CO 81401 | barbara_sharrow@blm.gov | 970-240-5315 |
| Sparks | Greg | | Town of Mountain Village | 455 Mountain Village Blvd, Ste A<br>Mountain Village, CO 81435 | gsparks@mtnvillage.org | 970-369-6404 |
| Varley | David | | Town of Orchard City | 9661 2100 Road<br>Austin, CO 81410 | davidvarley@kaycee.net | 970-835-3403 |
| White | Steve | | Montrose County Board of County Commissioners | 161 S. Townsend Ave.<br>Montrose, CO 81401 | swhite@montrosecounty.net | 970-252-4550 |

BLM_0108622

Cooperating Agency Meeting #5                                                                September 30, 2010

| Last Name | First Name | Initial | Organization | Address | E-Mail | Phone |
|---|---|---|---|---|---|---|
| Wynant | Kate | WW | EMPSi | 3775 Iris Ave, Ste 1A Boulder, CO 80301 | kate.wynant@empsi.com | 303-446-7160 |
| Broyles | Levi | LB | USFS | 403 Rio Grande Ave Paonia, CO 81428 | lbroyles@fs.fed.us | 970 527 4131 |
| Reed | Linda | LR | BLM | 2465 S Townsend Montrose | linda_reed@blm.gov | 970-240-5322 |
| Ernst | Robert | RE | " | " | robert_ernst@blm.gov | 970 240 5305 |
| Dyer | Dusty | DD | " | " | dusty-dyer@blm.gov | 970-240-5302 |
| Stranathan | Thane | TS | BLM | " | thane_stranathan@blm.gov | 970 240 5304 |
| Jackson | Julie | JS | BLM | " | julie_jackson@blm.gov | 970-240-5310 |
| Hansen | Susan | | Delta county | 501 Palmer, Ste 227 Delta, CO | shansen@deltacounty.com | 874-2102 |
| Banulis | Brad | A. | CDOW | 2300 S. Townsend Ave. Montrose, CO | brad.banulis@state.co.us | 252-6051 |
| Patti Grafmyer | | | Town of Norwood | P.O. Box 528 Norwood CO | norwoodparker@centurytel.net | 970-327-4288 |

# Lands and Realty Presentation

BLM_0108624

# Land Use Authorizations or Right-of-Ways (ROWs)

- BLM issues grants, leases or permits for use or development of facilities on public lands



BLM_0108625

# Land Use Authorizations or Right-of-Ways (ROWs)

- Typical types of ROWs: roads, powerlines, telephone lines, pipelines, communication sites



BLM_0108626

# Land Use Authorizations or Right-of-Ways (ROWs)

- Renewable energy projects such as solar or wind are also authorized under ROWs





BLM_0108627

# Land Use Authorizations or Right-of-Ways (ROWs)

- ROWs are issued to private individuals, corporations and local, state or federal governments

- BLM will make every reasonable attempt to authorize primary access and utilities to private landowners

BLM_0108628

# Land Use Authorizations or Right-of-Ways (ROWs)

**ROWs can range in size and scope of project from very minor i.e. a very short driveway to access private property**

**vs. a major project such as an interstate highway, transmission powerline or pipeline**





BLM_0108629

# Land Use Authorizations or Right-of-Ways (ROWs)

- ROWs are designed and sited to minimize impacts to natural resources and surrounding lands

- ROW authorizations contain stipulations (mitigation measures) to protect natural resources during the construction, operation, maintenance and reclamation of the project

BLM_0108630

# Land Use Authorizations

## Decisions to be made during the RMP process

- ROW Exclusion Areas:
  - for example Wilderness Study Areas

- ROW avoidance areas:
- Examples might include:
  - Special designation areas such as Areas of Critical Environmental Concern,
  - Wild and Scenic Rivers,
  - Lands with wilderness characteristics
  - Visual Resource Management Class 1 areas,
  - Areas such as riparian, developed recreation sites, or sites with steep slopes

BLM_0108631

# Land Use Authorizations

## Decisions to be made during the RMP process

- Identify potential additional areas for wind or solar projects (areas not already ID'd by BLM)
- Identify potential new communication site locations
- Identify potential new utility corridors and type of utilities allowed [BLM is primarily relying on stakeholders input]

BLM_0108632

# Potential Constraints of RMP Decisions on Land Use Authorizations

- Special designation areas may prohibit future land use authorizations or impose strict constraints and stipulations such as:
  - No Surface Occupancy Stipulation
  - Controlled Surface Use Stipulation
- Consider designating buffer zones along boundaries or perhaps adjacent to existing county roads or highways in special designation areas

- Wild and Scenic River recommendations could prevent development of hydroelectric facilities, dams, impoundments, or major diversions

BLM_0108633

# LAND TENURE ADJUSTMENTS

- Land tenure (or ownership) adjustments are typically accomplished through acquisitions, exchanges or sales

- Public lands are generally retained in federal ownership unless it is determined disposal will serve the national interest

- When deemed to be in the national interest, the surface and mineral estate are conveyed together (avoid creation of split estate)

BLM_0108634

# LAND TENURE ADJUSTMENTS
## Acquisitions

- Lands are typically acquired through purchase, exchange, easements or donation
- Acquisition must be consistent with the mission of the bureau and current Resource Management Plan
- Acquisition must be in the public interest and criteria may include:   provides resource protection, improves management efficiency, or provides recreational or access opportunities

BLM_0108635

# LAND TENURE ADJUSTMENTS
## Disposal

- The preferred disposal method is through land exchange; however, lands may be sold
- Lands may **NOT** be disposed of through Sale, unless they are first identified for disposal in the Resource Management Plan
- Sales are typically accomplished through a competitive bid process and cannot be sold for less than fair market value
- Disposal must be in the public interest
- Parcels, typically near communities, that would better serve the public by providing a specific use through community ownership, may be transferred through the Recreation and Public Purposes Act (R&PP)

BLM_0108636

# LAND TENURE ADJUSTMENTS
## Retention

- Lands not identified for disposal will be retained

- However, they may be considered on a case-by-case basis for exchange or disposal, but they cannot be sold.

BLM_0108637

# LAND TENURE ADJUSTMENTS
## Land Exchange

- A land exchange must be in the public interest
- Approval from BLM's National Lands Exchange Team is required
- It must be determined that the values and objectives of the lands being acquired are greater than the values of the federal lands being conveyed

BLM_0108638

# LAND TENURE ADJUSTMENTS
## Access Easements

- Acquisition of easements is a tool BLM may use to provide administrative or public access to Public Lands

BLM_0108639

# LAND TENURE ADJUSTMENTS
## Decisions to be made during the RMP process

- Disposal
  - Identify specific parcels that may be disposed
  - Identify criteria to use in determining if lands should be disposed, examples might include:
    - Parcels that are small, isolated, and uneconomic to manage
    - Parcels with no legal access
    - Parcels that would serve urbanizing areas with expanding community needs
    - Parcels that contain no significant resource values or are needed to protect resource values

BLM_0108640

# LAND TENURE ADJUSTMENTS
## Decisions to be made during the RMP process

- Acquisition
  - Identify criteria to use in determining if lands (or access easements) should be acquired, examples might include:
    - Lands within or adjacent to areas with special designation
    - Lands with significant resource values
    - Lands that would provide public access or recreational opportunities

BLM_0108641

# LAND TENURE ADJUSTMENTS
## Decisions to be made during the RMP process

- Retention
  - Identify criteria to use in determining if lands should be retained, examples might include:
    - Lands within or adjacent to areas with special designation
    - Lands with significant resource values

BLM_0108642

# LAND TENURE ADJUSTMENTS
## Potential Constraints of RMP Decisions

- Lands not identified for disposal in the new Resource Management Plan, can NOT be disposed of through sales (unless the new Resource Management Plan were to be amended)

BLM_0108643

# You're input is a valuable part of the process!



BLM_0108644





# BLM
# Uncompahgre
# Field Office

# RMP Revision

# Locatable, Solid and Fluid Leasable, and Salable Minerals Presentation

# September   2010

BLM_0108645

# Locatable Minerals

The 1872 Mining Law, gives all citizens the <span style="color:red">right</span> to locate a lode (hard rock) or placer (gravel) mining claim on <span style="color:red">federal lands open to mineral entry</span>.

Locatable minerals include but are not limited to mostly metals such as:  gold, silver, copper, and uranium.





BLM_0108646

# The two main types of mining claims:

## Lode                                             Placer





BLM_0108647

# Federal Surface Management Regulations for 1872 Mining Law Operations on BLM Lands

In 1981, the 43 CFR 3809 regulations for surface management  of mining activities were enacted. These regulations require mining operators to submit mining related plans, provide reclamation bonding and complete reclamation to BLM standards.

Uravan

Town Site



BLM_0108648

# Locatable Mineral Resources

Last Chance Mine Portal



## Uranium

Located in the Uravan Mineral Belt area of western Montrose County and parts of San Miguel and Mesa Counties

BLM_0108649



Map of Uravan Mineral Belt

(Redrawn from Motica, 1970, Geology and Uranium-Vanadium Deposits in the Uravan Mineral Belt, Southwestern, Colorado).

# Map of the Uravan Mineral Belt

BLM_0108650

BLM_0108651

# Placer Gold

## Located in the San Miguel and Dolores Rivers





# San Miguel River Location Map

Placer gold occurs within the UFO planning area in the river bed from above Telluride to the Dolores River and on downstream.

BLM_0108652

# Leasable Minerals Management

## Applicable Leasable Minerals Statues

- The Act of July 17, 1914 and Stock Raising Homestead Act 1916

- Mineral Leasing Act of 1920, as amended (MLA)

- Mineral Leasing Act for Acquired Lands (1947)

- Mining & Minerals Policy Act (1970)

- Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA)

- Federal Onshore Oil & Gas Leasing Reform Act 1987 (FOOGLRA)

- Energy Policy & Conservation Act (2002)

- Energy Policy Act (2005)

BLM_0108653



Existing Coal
and O&G Leases

Coal in Blue

O&G in Red

# Solid Leasable Minerals - Energy
# Coal



Bowie
No. 2 Mine

BLM_0108655

# The Mineral Leasing Act of 1920 as amended, initiated the leasing of federally owned coal in the U.S.



5/11/10

North
Fork
Coal
Train

BLM_0108656

# Resource  Management  Plan

The resource management plan is the chief process by which public land is reviewed to assess whether there are areas suitable for leasing or unsuitable for all or certain types of coal mining operations under Section 522(b) of the Surface Mining Control and Reclamation Act.



US Department of the Interior
Bureau of Land Management
Uncompahgre Field Office, Colorado

Resource Management Plan Revision and
Environmental Impact Statement

DRAFT CHAPTERS 1 (INTRODUCTION) AND
3 (AFFECTED ENVIRONMENT)
JULY 2010

# Land Use Decisions to be Made

- Identify areas that have development potential for coal.  To accomplish this, a coal potential report has been prepared as part of the RMP revision process.

- For acceptable coal potential lands, areas will be identified as suitable for development either by all mining methods, or only by certain stipulated mining methods (such as only by surface mining methods or only by underground mining methods).

BLM_0108658

- Identify un-leased coal lands that are acceptable or un-acceptable for further consideration for coal leasing and development.

- Identify areas un-suitable for surface mining of coal.

- Identify any special conditions that must be met during more detailed planning, lease sale, or post-lease activities, including measures required to protect other resource values.

BLM_0108659

- Estimate of the amount of coal recoverable by either surface or underground mining operations or both. Only those areas that have development potential may be identified as acceptable for further consideration for leasing.

- Identify areas to be closed from further consideration for leasing to protect other resource values and land uses that are locally, regionally or nationally important or unique and that have not been classified as unsuitable.