

# Coal Fields of the UFO

**SOMERSET**

**GRAND MESA**

**PICEANCE DEEP**

**PICEANCE DEEPER**

**TONGUE MESA**

**NUCLA-NATURITA**

Montrose

**Coal Regions**
- San Juan River
- Uinta
- Uncompahgre Field Office Planning Area

source: Carroll 2006

**Coal Fields**
- Somerset
- Grand Mesa
- Piceance Deep
- Piceance Deep (>3500 foot overburden)
- Tongue Mesa
- Nucla-Naturita

**Adjacent Coal Fields**
- Book Cliffs
- Carbondale
- Crested Butte
- Other Dakota

sources: Bankey 2000, Kirschbaum et al 2000, U.S. Forest Service 2006

Miles
0    25

Map produced by Bureau of Land Management, Uncompahgre Field Office, January 2010
Projection: UTM, Zone 13, Datum: NAD 1983

BLM_0108661

# Mesa Verde Formation Coal in the Somerset and Grand Mesa Coal Fields

## Existing Coal Resources/Production

- Three existing mines operate between Paonia and Somerset. West Elk, Oxbow and Bowie Mines.

- Production totals could range from 12 to 18 million tons per year.

- Federal Production can be from 80% - 100% of the total production.

- Royalty payments for the total federal coal production could range from $25 to $60 million per year.

- Existing leased federal coal could be depleted by the end of 2020.

BLM_0108662

# Mesa Verde Formation Coal in the Somerset and Grand Mesa Coal Fields

## Projected Coal Resources/Production

- Coal resources extend west from existing federal coal leases on the south flank of the Grand Mesa past the town of Cedaredge and on to the western extent of the planning area.

- No current applications have been made for exploration licenses, lease applications, permits, or mine plans.

- Federal coal comprises about 80% of those resources, also.

- If mining progressed into the remaining coal resources, *at least* another 20 years of 12 to 18 million tons per year of coal production could be sustained.

BLM_0108663

# Coal within the Dakota Sandstone Formation in the Nucla-Naturita Coal Field

## Existing Coal Resources/Production

- One existing surface mine operates west of Nucla entirely on privately held lands and could be depleted by the end of 2014.

- Production totals average about 350,000 tons per year.

BLM_0108664

# Coal within the Dakota Sandstone Formation in the Nucla-Naturita Coal Field

## Projected Coal Resources/Production

- Coal resources exist in every direction from Nucla, but are considered highest potential to the south and east.
- No current applications have been made for exploration licenses, lease applications, permits, or mine plans requiring federal coal.
- Federal coal comprises about 40% of high potential resources.
- If mining progressed into the remaining coal resources at current production rates, *at least* another 20 years of mining could be sustained.

BLM_0108665

# Fruitland Formation Coal in the Tongue Mesa Coal Field

## Existing Coal Resources/Production

- There are no existing mines and only the very minimal historic production has been derived from this coal field.

- An exploration license that was exercised in the 1970's provided data that revealed the coal resource included one very thick seam but indicated faulting that would hamper longwall mining.

BLM_0108666

# Fruitland Formation Coal in the Tongue Mesa Coal Field

## Projected Coal Resources/Production

- Coal resources exist under the Cimarron Ridge Area, southeast of Montrose in an area roughly 18 miles long from north to south and generally 2 to 3 miles wide.

- No current applications have been made for exploration licenses, lease applications, permits, or mine plans requiring federal coal.

BLM_0108667



# Fluid Leasable Minerals



BLM_0108668

# Rules and Regulations – Oil and Gas

- Federal Regulations at 43 CFR 3100 for Oil & Gas Leasing and 43 CFR 3160 for Onshore Oil & Gas Operations for BLM Administered Lands

- BLM Handbook Direction, Instructional Memoranda

- Federal Regulations at 36 CFR Part 228 – Subpart E – Oil and Gas Resources for Forest Service Lands

- Forest Service Manual and Handbook Direction

- Federal Onshore Orders 1 through 7

- The Gold Book

BLM_0108669

# Land Use Planning

- Resource Management Plans (RMPs) establish:
  - areas that are **open** to oil & gas leasing, subject to:
    – Lease Notices (LN), and;
    – Lease Stipulations (No Surface Occupancy (NSO), Controlled Surface Use (CSU), and Timing Limitations (TL);
  - and areas which are **closed** to oil and gas leasing.

- Of the nearly **2,234,680** acres of federal mineral estate managed by the Uncompahgre Field Office, **2,160,680** acres, or about 97% are available for Oil and Gas Leasing.

- An oil and gas (O&G) reasonable foreseeable development scenario (RFD) report will be prepared as part of the RMP revision process to identify the areas with O&G potential and the degree of development that could be expected throughout the life of the RMP.

BLM_0108670

Subsurface Mineral Estate Lands for Oil & Gas

Identified in **Blue**



# Oil and Gas Lease Stipulations
## No Surface Occupancy   (NSO)

- Stipulations modify standard lease rights and are attached to and made a part of the lease sales contract.  A NSO prevents the use or occupancy of the land surface for fluid mineral exploration or development for the purpose of protecting RMP identified resource values.

BLM_0108672

# Oil and Gas Lease Stipulations
## Controlled Surface Use   (CSU)

- A CSU stipulation manages the specific surface use and occupancy related to an O&G lease for RMP identified resource values that require special operational constraints.

- A CSU is used for operating guidance, such as location of facilities, and not as a substitute for other stipulations.

- Waivers, exceptions, or modifications are allowed for a CSU.

BLM_0108673

# Oil and Gas Lease Stipulations
## Timing Limitations  (TL)

- This stipulation provides for seasonal timeframe restrictions that prohibits surface use during a specified time period to protect RMP identified resource values, especially wildlife.  This stipulation is developed in conjunction with the Colorado Division of Wildlife (DOW).

- In general, this stipulation does not apply to the operation and maintenance of production facilities.  Timing Limitation's could be applied if environmental conditions change.

BLM_0108674

# Waivers, Exceptions, or Modifications

- RMPs and/or other NEPA docs also establish the guidelines for granting future waivers, exceptions, or modifications.

BLM_0108675

# Lease Notice
# (LN)

- A Lease Notice is attached to the Lease prior to the lease sale, and provides general information and guidance concerning limitations that already exist, in law, in another Lease's terms, in federal regulations, or from operational orders.

- A lease notice does not impose new or additional restrictions or requirements.

BLM_0108676

# Split Estate Lands

In split estate situations, the surface rights and subsurface rights (such as the rights to develop minerals) for a piece of land are owned by different parties.  In these situations, mineral rights are considered the dominant estate, meaning they have primacy over those associated with owning the surface. However, the mineral owner must show due regard for the interests of the surface estate owner and occupy only those portions of the surface that are reasonably necessary to develop the mineral estate.

BLM_0108677

# Solid Leasable Minerals - Non – Energy

Including minerals such as sodium (trona) and potassium (potash) have potential in Paradox Valley where the Paradox Member of the Hermosa Group Formation is exposed at the surface.

Trona
Mine
(California)



BLM_0108678

Paradox Member of the Hermosa Group Formation, Paradox Valley

Map X. Geology 2-1. Geology

Anaysis of the Management Situation

The Bureau of Land Management attempts to use the most current and complete geospatial data available. No warranty is made by the BLM as to the accuracy, reliability, or completeness of this data. Using this map for other than their intended purpose may yield inaccurate or misleading results.

# Salable Minerals

Includes sand, gravel, rip-rap, building stone, landscape rock and others, are located at numerous locations throughout the planning area.  The UFO has one commercial gravel operation and eight free use permits to three different counties.

A Commercial
Gravel
Operation

Delta County



BLM_0108680

# Affects of RMP Decisions

Locatable minerals as governed under the 1872 Mining Law, are <u>not discretionary</u>, they are a legal mineral right given to all legal citizens that meet the Law's requirements.

The salable and leasable minerals, both solid and fluid, energy or non-energy alike, <u>are discretionary</u>. There is no legal right to these materials.

For locatable minerals, alternatives in the RMP can stipulate that certain designated areas be withdrawn from mineral entry by recommending that the Secretary of the Interior be petitioned to issue a Public Land Order that removes these lands from the jurisdiction of the 1872 Mining Law.

For leasable and salable minerals, alternatives in the RMP can stipulate that these areas are closed and not available for leasing or disposal sales contracts.

How are locatable mineral rights <span style="color:red">withdrawn</span>?

1. An ACT of Congress

   • Wilderness Act

   • Wild and Scenic River designation Act

2. By Public Land Order issued by the Secretary of the Interior.

BLM_0108683

# Land Designations That Affect Mineral Operations



Adobe
Badlands
WSA

Wilderness Study Areas (WSA's): until they are designated as Wilderness in a Congressional Act, are <u>not</u> withdrawn and mining claims are allowed. However, a mining plan of operations is required and the area is managed to protect it's unique wilderness characteristics.  RMP decisions can close these areas to salable and leasable mineral activities.

BLM_0108684

Needle Rock
ACEC



Area of Critical Environmental Concern (ACEC): are not withdrawn from mineral entry and location, but a mining plan of operation is required.  However, the Secretary of the Interior can be petitioned to withdraw these areas from mineral entry and location. RMP decisions can close these areas to salable and leasable mineral activities.



Dolores
River
Canyon

Wild and Scenic Rivers (W&SR):  until they are designated as
<u>WILD</u> in a Congressional Act, are <u>not</u> withdrawn and mining
claims are allowed. Segments designated as scenic or
recreational are not by law withdrawn from mineral entry
and location, but are managed for their unique characteristic
protections. RMP decisions can close these areas to salable
and leasable mineral activities.

BLM_0108686

# SUMMARY

- Minerals are where you find them.  Their location is fixed and set by geologic conditions and actions.

- The 1872 Mining Law bestows its legal citizens rights to mineral ownership, and various U.S. Federal regulations manage the access and extraction of these hard rock, locatable minerals.

BLM_0108687

- Other minerals and geologic materials are discretionarily managed depending upon land use planning decisions and regulations that govern them.

- Land use planning decisions can recommend the withdrawal of mineral rights of entry and location granted under the 1872 Mining Law, and can close areas to leasable minerals and to the disposal of salable mineral materials.

BLM_0108688

- Either an Act of Congress or a Public Land Order issued by the Secretary of the Interior is required for lands to be withdrawn from mineral entry and location as granted by the 1872 Mining Law

BLM_0108689



# Visual Resource Management

**BLM Uncompahgre Field Office**

**RMP Planning**

BLM_0108690

# <u>What is</u>
# <u>Visual Resource Management (VRM)?</u>

It is a system that provides a way to inventory and analyze scenic values to determine appropriate levels of management

– Helps identify visual (scenic) values

– Minimize visual impacts to landscape character of public lands

– Ensures that actions taking place today will benefit the visual qualities associated with BLM landscapes, while protecting those visual resources for the future

BLM_0108691



Oil and Gas



Coal

# **The Changing West**



Communication Sites

Right of Ways

Range Improvements

BLM_0108692



# The Changing West



BLM_0108693



# The Changing West

BLM_0108694

# <u>Legal Obligations/Authority/Policy</u>

## The National Environmental Policy Act of 1969 (NEPA)

– Section 101 (b). Requires measures be taken to ".... assure for all American...esthetically pleasing surroundings..."

– Section 102. Requires agencies to "Utilize a systematic, interdisciplinary approach which will ensure the integrated use of ....Environmental Design Arts in the planning and decision making.."

BLM_0108695

# **Legal Obligations/Authority/Policy**

**The Federal Land Policy and Management Act of 1976 (FLPMA)**

- Section 102 (a)(8). State that "..the public lands be managed in a manner that will protect the quality of the…scenic…values…"
- Section 103 (c). Identifies "scenic values" as one of the resources for which public land should be managed.
- Section 201 (a). States that "The Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resources and other values (including…scenic values)…"
- Section 505 (a). Requires that "Each right-of-way shall contain terms and conditions which will…minimize damage to the scenic and esthetic values…"

BLM_0108696

# **Legal Obligations/Authority/Policy**

## **BLM Policy: Manual Section 8400 – Visual Resource Management**

– The Bureau has a basic stewardship responsibility to identify and protect visual values on public lands

– Each program involved in resource development work is responsible for protecting visual values.

– Visual management objectives (classes) are developed through the RMP process for all Bureau lands.

– The approved VRM objectives (classes) provide the visual management standards for the design and development of future projects and for rehabilitation of existing projects.

BLM_0108697

# **VRM Process Overview**

- Step One
  - Complete a Visual Resource Inventory
    - The inventory consist of
      - a Scenic Quality Evaluation,
      - a Sensitivity Level Analysis
      - a Delineation of Distance Zones
    - BLM lands are assigned a Class I, II, III, or IV based on these three components.
  - September 2009 - Uncompahgre Field Office completed an inventory
    - Available for review at the Montrose Public Lands Center

BLM_0108698

# **VRM Process Overview**

- Step Two
  - Establish Management Objectives
    - Management classes are assigned based upon the visual resource inventory, as well as consideration for other land uses
    - Visual values are important however they will not be the only element considered when establishing management direction
    - VRM objectives and boundaries will result from and reflect resource allocation decisions made in the Resource Management Plan.

BLM_0108699

# **Objectives**

- **Class I**

  – Preserve the existing character of the landscape

  – Level of change to the landscape should be very low; but must not attract attention

- **Class II**

  – To retain the existing character of the landscape

  – Level of change to the landscape should be low

BLM_0108700

# **<u>Objectives</u>**

- **Class III**
  - To partially retain the existing character of the landscape
  - Level of change to the landscape could be moderate

- **Class IV**
  - To provide for activities that require major modification of the landscape
  - Level of change to the landscape can be high



BLM_0108702

10/1/2010

**Wm. M. Ela**

*Ret. Senior Judge*

970-872-3334

30507 BOSFL Road

Hotchkiss, Colorado 81419

Comments to the Uncompahgre Gore Field Office in the matter of reviews & revision of the existing Resource Management Plan - RMP:

I strongly feel there is inefficient & insufficient focus on the long term environmental sustainability I desire for the management of public lands.

I so feel that lack of focus; with compliance with Federal legislation like NEPA, Endangered Species Act, & more Acts of State, County & Municipalities; with attempts to follow the 5 BLM Colorado Standards for Public Lands; with many CO. State Courts water rights decisions; & with Federal Court interpretations of lower courts & various laws & regulations.

I do recognize: (a) the near-impossibility restoration of much damage already done (non native invasive species of plants, fish & invertibrates & animals). (b) inevitable population growth in the West ever impacting damaging pressure on public lands (c) inevitable damaging impact from some viewed needs for all of energies aspects (oil, gas + electric) (d) ineffective man made fire & logging plans (e) Outdated & anachronistic mining laws.

Please keep the focus on environmental sustainability of your decisions for management processes. It can be done in the new RMP in many small choices of alternatives that I understand are being prepared by your UFO Staff currently. Many will be achieved even though strongly opposed by selfish interested groups or individuals without the needed focus.

Respectfully

Wm (Bill) M. Ela



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
Montrose, Colorado



## RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #5
### Friday, October 1, 2010 (9:00 AM – 12:00 PM)
### Meeting Location:
### Holiday Inn Express
### 1391 S. Townsend Avenue, Montrose, CO

| Last Name | First Name | Initial | Address | E-Mail | Phone |
|-----------|-----------|---------|---------|--------|-------|
| Adams | Angie | | EMPSi 3775 Iris Ave, Ste 1A Boulder, CO 80301 | angie.adams@empsi.com | 303-446-7160 |
| Armstrong | Lori | | BLM, Southwest Colorado District Manager 2465 S. Townsend Ave. Montrose, CO 81401 | valori_armstrong@blm.gov | 970-240-5336 |
| Bear | Shelby | | DMEA PO Box 910 Montrose, CO 81402 | sbear@dmea.com | w: 970-240-1238 ███████ |
| Baird-LeValley | Robbie | | Colorado State Univ. Extension 525 Dodge Street Delta, CO 81416 | robbie.levalley@colostate.edu | w: 970-874-2195 ███████ |
| Blackburn | Walt | | ████████ | | |
| Day | Bill | | | | |
| Durnan | Richard | | | | |
| Ela | William | | | | |
| Kauffman | Dave | | BLM, Uncompahgre Field Office 2465 S. Townsend Ave. Montrose, CO 81401 | dave_kauffman@blm.gov | 970-240-5340 |
| Krickbaum | Bruce | | BLM, Uncompahgre Field Office 2465 S. Townsend Ave. Montrose, CO 81401 | bruce_krickbaum@blm.gov | 970-240-5384 |
| Mueller | Peter | | PO Box 3140 Telluride, CO 81435 | pmueller@tnc.org | w: 970-728-5291 ███████ |
| Reams | John | | Western Small Miner's Assoc. 31527 Hwy 141 PO Box 644 Naturita, CO 81422 | john@reams-construction.com | w: 970-865-2886 ███████ |

| Last Name | First Name | Initial | Address | E-Mail | Phone |
|-----------|-----------|---------|---------|--------|-------|
| Sharrow | Barb | BB | BLM, Uncompahgre Field Office 2465 S. Townsend Ave. Montrose, CO 81401 | barbara_sharrow@blm.gov | 970-240-5315 |
| Weist | Steven D. | SDW | Oxbow Mining 3737 Hwy 133 PO Box 535 Somerset, CO 81434 | steve.weist@oxbow.com | w: 970-929-6461 ▮▮▮▮▮ |
| Welt | Kathy | KW | 36320 Highway 92 Hotchkiss, CO 81419 | ▮▮▮▮▮ | w: 970-929-2238 ▮▮▮▮▮ |
| Wynant | Kate | KW | EMPSi 3775 Iris Ave, Ste 1A Boulder, CO 80301 | kate.wynant@empsi.com | 303-446-7160 |
| Stranathan | Thane | TS | BLM 2465 S. Townsend Ave. Montrose, CO. 81401 | thane_stranathan@blm.gov | (970) 240-5304 |
| Jackson | Julie | JJ | " " | Julie_Jackson@blm.gov | 970-240-5310 |
| Linda Reed | | LR | " | linda_reed@blm.gov | 970 240 5322 |
| Pauline Adams | | PA | " " | pauline_adams@blm.gov | c: 749-9583 |
| Desty Dyer | | DD | " | desty_dyer@blm.gov | 240-5302 |
| Robert Ernst | | RE | " | robert_ernst@blm.gov | 240 5305 |
| Barbara Hawke | | BH | 1617 American Wy Montrose | barbara-hawke@ tws.org | 970 596 - 6692 |

**Kate Wynant**

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **Sent:** | Thursday, October 07, 2010 4:31 PM |
| **To:** | sbear@dmea.com; Steve.weist@oxbow.com; billday@paonia.com; rich@richdurnanphoto.com; Robbie.levalley@colostate.edu; Wblack8709@msn.com; pmueller@tnc.org; silvers1@tds.net; tkctew@yahoo.com; Barbara_Sharrow@blm.gov; Bruce_Krickbaum@co.blm.gov; Angie Adams; Kate Wynant; UFO AR |
| **Subject:** | Draft Minutes: Uncompahgre RMP RAC Subgroup Meeting #5 |
| **Attachments:** | UFO-SG_2010-10-01_DraftMinutes.doc |

Hello RAC Subgroup members,

I have attached draft minutes of the Uncompahgre RMP RAC Subgroup meeting held on October 1. Please review the draft minutes and let me know of any errors or omissions by Friday, October 15.  We will then revise and submit the minutes to all group members and the administrative record.

Reminder:  the November 5 meeting has been cancelled - we will most likely reschedule for January (date undetermined).

Thank you,  Bruce

<><><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

(See attached file: UFO-SG_2010-10-01_DraftMinutes.doc)

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

BLM_0108706



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401



# RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #5
## Friday, October 1, 2010 (9:00 AM – 12:00 PM)

### Meeting Location:
### Holiday Inn Express (Jordan Room)
### 1391 South Townsend Avenue, Montrose, CO

# Meeting Minutes

**Attendees:** Angie Adams (EMPSi), Robbie Baird-LeValley, Shelby Bear, Walt Blackburn, Bill Day, Richard Durnan, Desty Dyer (BLM Uncompahgre Field Office), William Ela, Robert Ernst (BLM Uncompahgre Field Office), Barbara Hawke, Julie Jackson (BLM Uncompahgre Field Office), Bruce Krickbaum (BLM Uncompahgre Field Office), Peter Mueller, Linda Reed (BLM Uncompahgre Field Office), Barb Sharrow (BLM Uncompahgre Field Office), Thane Stranathan (BLM Uncompahgre Field Office), Steven Weist, Kathy Welt, Kate Wynant (EMPSi)

**Handouts:** Agenda; Highlights of the Resource Management Planning Process to Date; RMP Planning Fact Sheet 7.2: Uranium and Other Mineral Resources; RMP Planning Fact Sheet 7.1: Coal, Oil & Gas Resources; Locatable, Solid and Fluid Leasable, and Salable Minerals PowerPoint presentation; RMP Planning Fact Sheet 8.1: Land Tenure; Lands and Realty PowerPoint Presentation; RMP Planning Fact Sheet 3.3: Visual Resource Management; Visual Resource Management PowerPoint Presentation

1. **Welcome** (Bruce Krickbaum)

2. **Introductions** (All Present)

3. **Planning Process to Date** (Angie Adams)
   - See handout: Highlights of the Resource Management Planning Process to Date.
   - Gray highlighting indicate changes from last meeting.
   - Class I cultural resource overview is a collection of existing data and info on cultural resources in the planning area. It includes a sensitivity model that tells us where they would expect resources based on several things.
   - There are not many changes to the final Areas of Critical Environmental Concern (ACEC) Evaluation Report based on comments received on the draft report. There was a boundary change to one ACEC and some description changes but nothing major. The draft report is on the Web site and the final report will be available soon. The report studies areas nominated by the public and also internally for resources or values of a high nature. The areas have to meet certain criteria: rare plants, soils, cultural/historic, scenic, recreational, wildlife, etc., that is very unique to the area. Areas either make the cut or not and those that make the cut have to be analyzed in the RMP under at least one alternative. It doesn't automatically make them an ACEC, just means we have to consider them.

---

BLM_0108707

- The Draft Lands with Wilderness Characteristics report will be finished in a few weeks. BLM can't designate Wilderness Study Areas but they can look for areas that have wilderness characteristics and decide whether or not to manage for them. BLM is not mandated to protect those wilderness characteristics outside of Wilderness Study Areas, they just have to consider them.
- The wild and scenic river (WSR) suitability process is still underway.
- *Question:* Do I understand that the air quality report is going on? *Answer:* We say that it will happen this winter but the BLM Colorado State Office is still making some decisions on timing. What happens is that a comprehensive model is run on the alternatives so it can't be done in advance of the alternatives being pretty complete. It will happen sometime after the draft alternatives are prepared.

## 4. Resource/Resource Use Discussions

- Visual Resources (Julie Jackson)
  - See handouts: RMP Planning Fact Sheet 3.3: Visual Resource Management; Visual Resource Management PowerPoint Presentation
  - *Action:* BLM will e-mail Visual Resource Inventory map to group.
  - *Question:* When you did the visual resource inventory process, how did you incorporate distance zone? *Answer:* The process is very specific. The person doing the inventory stands at key observation points and then take into account foreground, middle ground, and background. *Question:* So you can see it but you can't travel there? *Answer:* No, the key observation points are taken from places where people would travel or see the view, so usually they're taken from a road.
  - The decision space in our RMP is by alternative so based on the actions in that alternative we'll come up with proposed visual resource management (VRM) classes. So each alternative might have a different VRM Class. We have the decision space to determine the VRM Class based on that alternative. The whole field office won't be one VRM Class, it'll vary throughout the field office. ACECs might be higher and areas where we want to concentrate development it might be lower.
  - *Question:* Are there limitations in policy based on class? *Answer:* Yes. In Class I we have more limitations.
    - *Question:* So no range treatments in Class I? *Answer:* It would be more difficult but maybe not precluded. There would be more stipulations and mitigation measures involved in Class I areas.
  - Often times projects can be moved a little or painted a certain color in order to mitigate visual impacts.
  - *Question:* Can you provide us more detail on the classes? What would be allowed and not allowed? *Answer:* There isn't a list of what would be precluded because it doesn't outright preclude anything. As long as you can meet the objectives of the class a project would be ok. *Action:* We can come up with some more examples and beefed up descriptions of the objectives and will send with the map.
  - *Question:* Do you base the classes based on daylight? *Answer:* Yes, but we'll be dealing with some night time visual impacts in the RMP.
  - *Question:* What if there are cows or something in the area? *Answer:* The livestock themselves don't impact the landscape in terms of visual, but developments such as barns or corrals or other structures would have to be considered.
- Lands and Realty (Linda Reed)
  - See handouts: RMP Planning Fact Sheet 8.1: Land Tenure; Lands and Realty PowerPoint Presentation
  - *Question:* Do we know of lands identified for disposal or acquisition? *Answer:* We received very few scoping comments that identified specific tracts of lands for disposal. For retention people have requested that we keep land near public access points.

- o *Question*: Are there examples of places where people said the BLM should get rid of areas? *Answer*: Yes, some people did identify specific tracts of land and I assume it's because people want to purchase those lands.
- o *Question*: What's our role in looking at a list like that? *Answer*: If you know of a specific tract that you would like us to sell, let us know. The BLM's policy is trending towards land exchanges and not sales. The BLM is still working on the list, but when you see it you can provide us feedback. You have to make sure that we analyze a range of alternatives and that we don't say the same thing across every alternative. We'll analyze different criteria across the alternatives.
- o *Question*: So there will be specific parcels identified? That sounds like a decision and not planning. *Answer*: It's required of us at this time. It doesn't mean it's going to happen. Our old plans have those lists, too and some of those tracts were disposed of and some we still hold. It just sets up the framework for disposal later. We don't mean to say that as soon as the RMP is over we'll selling land.
- o *Question*: If the BLM has an inholding surrounded by private land is it offered to the surrounding landowners? *Answer*: Yes, in that situation, but otherwise we like to go out for competitive bid.
- o Any time we offer land for disposal we have to consider its potential mineral value. For example, there's a parcel we have that we would like to get rid of but it used to be a waste dump. Since it doesn't pass the hazardous materials test, we can't dispose of it.
- o In the RMP, any time we have a list of criteria for certain things, such as land disposal criteria, that is an area that we could use input from this group.
- o *Question*: Does "special designations" mean the same thing as WSR? *Answer*: No, not necessarily lands that have been designated by Congress, but could also include wilderness study areas, ACECs, etc.
- Minerals (Rob Ernst)
  - o See handouts: Locatable, Solid and Fluid Leasable, and Salable Minerals PowerPoint presentation; RMP Planning Fact Sheet 7.2: Uranium and Other Mineral Resources; and RMP Planning Fact Sheet 7.1: Coal, Oil & Gas Resources
  - o *Question*: How are the 1872 mining law and the 1980 law compatible with WSRs? *Answer*: A WSR segment <u>designated</u> [by Congress] as "wild" could withdraw the area from mineral entry. It would impact current claims but it would prevent future claims. Similarly, the Dominguez-Escalante National Conservation Area was withdrawn from mineral entry the date that Act was passed. Any claims filed prior to the date of designation are recognized but future claims are precluded. This only applies to locatable minerals and not to coal, oil and gas, and others.
  - o Stipulations for fluid mineral leasing must be made in the RMP (or amendment); we can't come up with new stipulations for lease sales. Lease notices don't have to be in the RMP as an RMP decision. Stipulations don't retroactively apply to leases that have already been sold, only leases in the future. If leases expire, then stipulations would if released.
  - o Stipulations have been used in the past, they're not new, but we have to relook at them.
  - o *Question*: Where does your information come from to reevaluate the areas available for leasing? *Answer*: Each alternative will have different areas that might not be available or be available with stipulations (ACECs, steep slopes, threatened and endangered species, etc). We can't be arbitrary and capricious; we have to have a reason for restrictions. Timing limitations are developed with the Colorado Division of Wildlife, they give us their recommendations.
  - o *Comment*: So the stipulations rely on all of the information that goes into them such as soils, wildlife, recreation, visual, etc.
  - o Lease stipulations are applied at a higher level, so there are some generalities. At the development stage we ensure that the stipulation is applied correctly and take into account visual resource impacts and other site-specific impacts.

BLM_0108709

- o *Question*: As far as dealing with noise, is that something that should be in a stipulation for a big area in RMP planning? I'm thinking of mostly the compressors. *Answer*: It's not required in RMP-level planning. It does get considered in the impact analysis. For example, in the wildlife section it will say that there might be additional noise from vehicular travel or development, etc. We might be able to address that through best management practices. The State sets the thresholds for levels and are responsible for enforcing the thresholds but the BLM works with the State to get impacts mitigated. At the leasing level it's something that we notify the lesee of the standards and we don't have a standard at the leasing level.
- o *Question*: The RMP decision to close areas to fluid mineral leasing and how it dovetails with WSR… *Answer*: In our land use plan we will make a decision whether areas are closed to fluid mineral leasing or open with stipulations. Locatable minerals would be withdrawn in a wild segment if designated by Congress.
- o If suitable, locatable mineral developers have to submit a mine plan but could still mine. Either way we do surveys for cultural resources, threatened and endangered species, tell them to avoid these areas. With a mine plan we can add more stipulations.
- o For WSR, there is an economic need to drill for oil and gas. In the RMP we can close or limit areas to oil and gas leasing depending upon the outstandingly remarkable value in the area.
- o *Question*: Could you put a stipulation in the lease that there be full disclosure in the event of frac'ing? Like they couldn't lease unless they made that disclosure? *Answer*: We might be able to but it's becoming a standard that at the development stage operators have to disclose that at the Application for Permit to Drill stage. There is legislation that may require us to require operators to disclose that at the lease stage and also in Colorado they are working towards tying frac'ing to safe drinking water. We are finding that, since operators know this is coming, they are disclosing that without us asking for it. Companies are also moving towards using safer materials.
- o *Question*: How are you handling in the alternatives the coal that is not currently being applied for now but is there? *Answer*: We'll look at a range of alternatives from open to closed to leasing if warranted.
- o *Question*: Will the split-estate be disclosed in the RMP? *Answer*: Yes.
- o *Question*: I'm assuming the potential is based on information from industry so as they drill the potential maps could change? *Answer*: Well for coal the potential that info comes from geologists because we know what formations have the potential for coal resources. Coal isn't speculative like oil and gas is.
- o *Question*: How will you differentiate known versus speculative in the RMP? *Answer*: For coal we know based on the geology high, medium, and low potential for coal.
- o *Question*: When is the Reasonably Foreseeable Development Scenario coming out? *Answer*: It's still in draft stages.
- o *Question*: Will the WSA be withdrawn or released from WSA status or designated? *Answer*: It will remain a WSA, that's all we can do. But we will have info on what would happen if released by Congress form wilderness consideration.

## 5. **Alternatives Development** (Barb Sharrow)

- • We spent time this week developing alternatives. In order to get things to a point that you can really provide us meaningful feedback, we are going to cancel the November meeting and reschedule for January.
- • WSR stakeholder meetings.
- o The Gunnison first meeting was held and it was determined that a broader process was needed; a second meeting was held last week. At the end of the second meeting it was determined that a stakeholder process was needed and the next meeting was scheduled for October 12 in the evening at the Delta County Courthouse.
- o *Action*: The BLM Web site will be kept up-to-date with meetings being held.

BLM_0108710

- ○ Meetings regarding the San Miguel and Dolores Rivers systems are sponsored by RAC Subgroup. We (RAC Subgroup) solicited some people to facilitate and design the process and have selected Eileen Rogensack in Grand Junction. We are working with her to come up with a plan of attack to solicit information from the public.
- ○ *Question:* Will the meetings for the San Miguel and Dolores Rivers be in Norwood? *Answer:* We want to make sure we're getting an exchange of dialogue and opinions from all members of the public, not just in certain areas.
- We originally wanted feedback from stakeholder groups by the end of November 2010 but now we are asking for March 2011.

## 6. Other Items Not on the Agenda

- *Question:* What is our homework? *Answer/Action:* Review Chapters 1 and 3 and provide comments by October 22. We had also asked you to comment on travel management (open or closed to off-highway vehicle use) and Special Recreation Management Areas but we didn't have any maps associated with those yet. Open areas mean cross-country is ok. The request was if you had any other areas that you wanted to bring up. Also any comments on goals and themes.
- We sent the group an announcement regarding our land health assessments and we are going out in the field on Monday [October 4]. If you are going to participate, let Barb, Bruce, or Amanda Clements know. They are meeting at the BLM office on Monday at 7:00am.
- The RAC is meeting next week. On Thursday [October 7] we are going to take an auto tour of the upper San Miguel River. We'll be going up to the Ledges site near Pinyon and then driving back stopping at several points along the way. You are welcome to come, let us know.
- Southwest RAC appointments were made. RAC is a three-year appointment; 15 person group, five people are reconsidered each year.
- *Question:* On Monday where will you be going? West Paradox. They'll probably be back around 6:00pm. Next year we'll be doing field work for the Gunnison Gorge area.

## 7. Public Comments / Questions

- *Question:* On the Web site there were some areas not classified for VRM. Are they going to be classified? *Answer:* The old RMPs did not classify all lands so some areas don't have a designation. The visual resource inventory looked at all lands.
- *Question:* Does the class take into account public things like scenic byways? *Answer:* A component of the visual resource inventory does take into account public sensitivity, so the byway was sort of factored in then. During VRM designation, scenic byways will be taken into account.
- *Question:* Does the RMP take into account some national decisions such as instruction memoranda or other info for sage-grouse or other items? *Answer:* Yes, as much as we can, but at some point we have to put our pens down. We'll do the best that we can.

## 8. Action Items / Next Meeting

- The November 5 meeting has been cancelled. We will probably reschedule for January. Very tentatively January 28.
- ○ *Action:* BLM will e-mail Visual Resource Inventory map to group.
- *Action:* We can come up with some more examples and beefed up descriptions of the objectives and will send with the map.
- *Action:* Review Chapters 1 and 3 and provide comments by October 22.
- *Action:* Comment on travel management (open or closed to off-highway vehicle use) and Special Recreation Management Areas per information from meeting on August 20).
- *Action:* Comments on draft goals and themes by October 22.

**Kate Wynant**

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **Sent:** | Tuesday, October 26, 2010 4:52 PM |
| **To:** | sbear@dmea.com; Steve.weist@oxbow.com; John@reams-construction.com; billday@paonia.com; rich@richdurnanphoto.com; Robbie.levalley@colostate.edu; Wblack8709@msn.com; pmueller@tnc.org; silvers1@tds.net; tkctew@yahoo.com; barbara_hawke@tws.org; Barbara_Sharrow@blm.gov; dave_kauffman@blm.gov; Deborah_Magee@blm.gov; Bruce_Krickbaum@co.blm.gov; Angie Adams; Kate Wynant; bbott68@gmail.com; UFO AR |
| **Subject:** | Final Minutes: RMP RAC Subgroup Meeting #5 |
| **Attachments:** | UFO-SG_2010-10-01_FinalMinutes.pdf |

Hello RAC Subgroup,

I have attached the finalized minutes from the October 1 meeting.

As a reminder, we will not meet on November 5.
The date for the next meeting has not been determined, but I anticipate it will be in January.

Regards, Bruce

<><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

(See attached file: UFO-SG_2010-10-01_FinalMinutes.pdf)

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

BLM_0108712



**United States Department of the Interior**

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401



# RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #5
## Friday, October 1, 2010 (9:00 AM – 12:00 PM)

### Meeting Location:
### Holiday Inn Express (Jordan Room)
### 1391 South Townsend Avenue, Montrose, CO

# Meeting Minutes

**Attendees:** Angie Adams (EMPSi), Robbie Baird-LeValley, Shelby Bear, Walt Blackburn, Bill Day, Richard Durnan, Desty Dyer (BLM Uncompahgre Field Office), William Ela, Robert Ernst (BLM Uncompahgre Field Office), Barbara Hawke, Julie Jackson (BLM Uncompahgre Field Office), Bruce Krickbaum (BLM Uncompahgre Field Office), Peter Mueller, Linda Reed (BLM Uncompahgre Field Office), Barb Sharrow (BLM Uncompahgre Field Office), Thane Stranathan (BLM Uncompahgre Field Office), Steven Weist, Kathy Welt, Kate Wynant (EMPSi)

**Handouts:** Agenda; Highlights of the Resource Management Planning Process to Date; RMP Planning Fact Sheet 7.2: Uranium and Other Mineral Resources; RMP Planning Fact Sheet 7.1: Coal, Oil & Gas Resources; Locatable, Solid and Fluid Leasable, and Salable Minerals PowerPoint presentation; RMP Planning Fact Sheet 8.1: Land Tenure; Lands and Realty PowerPoint Presentation; RMP Planning Fact Sheet 3.3: Visual Resource Management; Visual Resource Management PowerPoint Presentation

1. **Welcome** (Bruce Krickbaum)

2. **Introductions** (All Present)

3. **Planning Process to Date** (Angie Adams)
   - See handout: Highlights of the Resource Management Planning Process to Date.
   - Gray highlighting indicate changes from last meeting.
   - Class I cultural resource overview is a collection of existing data and info on cultural resources in the planning area. It includes a sensitivity model that tells us where they would expect resources based on several things.
   - There are not many changes to the final Areas of Critical Environmental Concern (ACEC) Evaluation Report based on comments received on the draft report. There was a boundary change to one ACEC and some description changes but nothing major. The draft report is on the Web site and the final report will be available soon. The report studies areas nominated by the public and also internally for resources or values of a high nature. The areas have to meet certain criteria: rare plants, soils, cultural/historic, scenic, recreational, wildlife, etc., that is very unique to the area. Areas either make the cut or not and those that make the cut have to be analyzed in the RMP under at least one alternative. It doesn't automatically make them an ACEC, just means we have to consider them.

BLM_0108713

- The Draft Lands with Wilderness Characteristics report will be finished in a few weeks. BLM can't designate Wilderness Study Areas but they can look for areas that have wilderness characteristics and decide whether or not to manage for them. BLM is not mandated to protect those wilderness characteristics outside of Wilderness Study Areas, they just have to consider them.
- The wild and scenic river (WSR) suitability process is still underway.
- *Question*: Do I understand that the air quality report is going on? *Answer*: We say that it will happen this winter but the BLM Colorado State Office is still making some decisions on timing. What happens is that a comprehensive model is run on the alternatives so it can't be done in advance of the alternatives being pretty complete. It will happen sometime after the draft alternatives are prepared.

## 4. Resource/Resource Use Discussions

- Visual Resources (Julie Jackson)
  - o See handouts: RMP Planning Fact Sheet 3.3: Visual Resource Management; Visual Resource Management PowerPoint Presentation
  - o *Action*: BLM will e-mail Visual Resource Inventory map to group.
  - o *Question*: When you did the visual resource inventory process, how did you incorporate distance zone? *Answer*: The process is very specific. The person doing the inventory stands at key observation points and then take into account foreground, middle ground, and background. *Question*: So you can see it but you can't travel there? *Answer*: No, the key observation points are taken from places where people would travel or see the view, so usually they're taken from a road.
  - o The decision space in our RMP is by alternative so based on the actions in that alternative we'll come up with proposed visual resource management (VRM) classes. So each alternative might have a different VRM Class. We have the decision space to determine the VRM Class based on that alternative. The whole field office won't be one VRM Class, it'll vary throughout the field office. ACECs might be higher and areas where we want to concentrate development it might be lower.
  - o *Question*: Are there limitations in policy based on class? *Answer*: Yes. In Class I we have more limitations.
    - ▪ *Question*: So no range treatments in Class I? *Answer*: It would be more difficult but maybe not precluded. There would be more stipulations and mitigation measures involved in Class I areas.
  - o Often times projects can be moved a little or painted a certain color in order to mitigate visual impacts.
  - o *Question*: Can you provide us more detail on the classes? What would be allowed and not allowed? *Answer*: There isn't a list of what would be precluded because it doesn't outright preclude anything. As long as you can meet the objectives of the class a project would be ok. *Action*: We can come up with some more examples and beefed up descriptions of the objectives and will send with the map.
  - o *Question*: Do you base the classes based on daylight? *Answer*: Yes, but we'll be dealing with some night time visual impacts in the RMP.
  - o *Question*: What if there are cows or something in the area? *Answer*: The livestock themselves don't impact the landscape in terms of visual, but developments such as barns or corrals or other structures would have to be considered.
- Lands and Realty (Linda Reed)
  - o See handouts: RMP Planning Fact Sheet 8.1: Land Tenure; Lands and Realty PowerPoint Presentation
  - o *Question*: Do we know of lands identified for disposal or acquisition? *Answer*: We received very few scoping comments that identified specific tracts of lands for disposal. For retention people have requested that we keep land near public access points.

BLM_0108714

- o *Question*: Are there examples of places where people said the BLM should get rid of areas? *Answer*: Yes, some people did identify specific tracts of land and I assume it's because people want to purchase those lands.
- o *Question*: What's our role in looking at a list like that? *Answer*: If you know of a specific tract that you would like us to sell, let us know. The BLM's policy is trending towards land exchanges and not sales. The BLM is still working on the list, but when you see it you can provide us feedback. You have to make sure that we analyze a range of alternatives and that we don't say the same thing across every alternative. We'll analyze different criteria across the alternatives.
- o *Question*: So there will be specific parcels identified? That sounds like a decision and not planning. *Answer*: It's required of us at this time. It doesn't mean it's going to happen. Our old plans have those lists, too and some of those tracts were disposed of and some we still hold. It just sets up the framework for disposal later. We don't mean to say that as soon as the RMP is over we'll be selling land.
- o *Question*: If the BLM has an inholding surrounded by private land is it offered to the surrounding landowners? *Answer*: Yes, in that situation, but otherwise we like to go out for competitive bid.
- o Any time we offer land for disposal we have to consider its potential mineral value. For example, there's a parcel we have that we would like to get rid of but it used to be a waste dump. Since it doesn't pass the hazardous materials test, we can't dispose of it.
- o In the RMP, any time we have a list of criteria for certain things, such as land disposal criteria, that is an area that we could use input from this group.
- o *Question*: Does "special designations" mean the same thing as WSR? *Answer*: No, not necessarily lands that have been designated by Congress, but could also include wilderness study areas, ACECs, etc.
- **Minerals (Rob Ernst)**
  - o See handouts: Locatable, Solid and Fluid Leasable, and Salable Minerals PowerPoint presentation; RMP Planning Fact Sheet 7.2: Uranium and Other Mineral Resources; and RMP Planning Fact Sheet 7.1: Coal, Oil & Gas Resources
  - o *Question*: How are the 1872 mining law and the 1980 law compatible with WSRs? *Answer*: A WSR segment <u>designated</u> [by Congress] as "wild" could withdraw the area from mineral entry. It would impact current claims but it would prevent future claims. Similarly, the Dominguez-Escalante National Conservation Area was withdrawn from mineral entry the date that Act was passed. Any claims filed prior to the date of designation are recognized but future claims are precluded. This only applies to locatable minerals and not to coal, oil and gas, and others.
  - o Stipulations for fluid mineral leasing must be made in the RMP (or amendment); we can't come up with new stipulations for lease sales. Lease notices don't have to be in the RMP as an RMP decision. Stipulations don't retroactively apply to leases that have already been sold, only leases in the future. If leases expire, then stipulations would if released.
  - o Stipulations have been used in the past, they're not new, but we have to relook at them.
  - o *Question*: Where does your information come from to reevaluate the areas available for leasing? *Answer*: Each alternative will have different areas that might not be available or be available with stipulations (ACECs, steep slopes, threatened and endangered species, etc). We can't be arbitrary and capricious; we have to have a reason for restrictions. Timing limitations are developed with the Colorado Division of Wildlife, they give us their recommendations.
  - o *Comment*: So the stipulations rely on all of the information that goes into them such as soils, wildlife, recreation, visual, etc.
  - o Lease stipulations are applied at a higher level, so there are some generalities. At the development stage we ensure that the stipulation is applied correctly and take into account visual resource impacts and other site-specific impacts.

- ○ *Question*: As far as dealing with noise, is that something that should be in a stipulation for a big area in RMP planning? I'm thinking of mostly the compressors. *Answer*: It's not required in RMP-level planning. It does get considered in the impact analysis. For example, in the wildlife section it will say that there might be additional noise from vehicular travel or development, etc. We might be able to address that through best management practices. The State sets the thresholds for levels and are responsible for enforcing the thresholds but the BLM works with the State to get impacts mitigated. At the leasing level it's something that we notify the lesee of the standards and we don't have a standard at the leasing level.
- ○ *Question*: The RMP decision to close areas to fluid mineral leasing and how it dovetails with WSR… *Answer*: In our land use plan we will make a decision whether areas are closed to fluid mineral leasing or open with stipulations. Locatable minerals would be withdrawn in a wild segment if designated by Congress.
- ○ If suitable, locatable mineral developers have to submit a mine plan but could still mine. Either way we do surveys for cultural resources, threatened and endangered species, tell them to avoid these areas. With a mine plan we can add more stipulations.
- ○ For WSR, there is an economic need to drill for oil and gas. In the RMP we can close or limit areas to oil and gas leasing depending upon the outstandingly remarkable value in the area.
- ○ *Question*: Could you put a stipulation in the lease that there be full disclosure in the event of frac'ing? Like they couldn't lease unless they made that disclosure? *Answer*: We might be able to but it's becoming a standard that at the development stage operators have to disclose that at the Application for Permit to Drill stage. There is legislation that may require us to require operators to disclose that at the lease stage and also in Colorado they are working towards tying frac'ing to safe drinking water. We are finding that, since operators know this is coming, they are disclosing that without us asking for it. Companies are also moving towards using safer materials.
- ○ *Question*: How are you handling in the alternatives the coal that is not currently being applied for now but is there? *Answer*: We'll look at a range of alternatives from open to closed to leasing if warranted.
- ○ *Question*: Will the split-estate be disclosed in the RMP? *Answer*: Yes.
- ○ *Question*: I'm assuming the potential is based on information from industry so as they drill the potential maps could change? *Answer*: Well for coal the potential that info comes from geologists because we know what formations have the potential for coal resources. Coal isn't speculative like oil and gas is.
- ○ *Question*: How will you differentiate known versus speculative in the RMP? *Answer*: For coal we know based on the geology high, medium, and low potential for coal.
- ○ *Question*: When is the Reasonably Foreseeable Development Scenario coming out? *Answer*: It's still in draft stages.
- ○ *Question*: Will the WSA be withdrawn or released from WSA status or designated? *Answer*: It will remain a WSA, that's all we can do. But we will have info on what would happen if released by Congress form wilderness consideration.

## 5. Alternatives Development (Barb Sharrow)

- We spent time this week developing alternatives. In order to get things to a point that you can really provide us meaningful feedback, we are going to cancel the November meeting and reschedule for January.
- WSR stakeholder meetings.
  - ○ The Gunnison first meeting was held and it was determined that a broader process was needed; a second meeting was held last week. At the end of the second meeting it was determined that a stakeholder process was needed and the next meeting was scheduled for October 12 in the evening at the Delta County Courthouse.
  - ○ *Action*: The BLM Web site will be kept up-to-date with meetings being held.

BLM_0108716

- o Meetings regarding the San Miguel and Dolores Rivers systems are sponsored by RAC Subgroup. We (RAC Subgroup) solicited some people to facilitate and design the process and have selected Eileen Rogensack in Grand Junction. We are working with her to come up with a plan of attack to solicit information from the public.
- o *Question*: Will the meetings for the San Miguel and Dolores Rivers be in Norwood? *Answer*: We want to make sure we're getting an exchange of dialogue and opinions from all members of the public, not just in certain areas.
- We originally wanted feedback from stakeholder groups by the end of November 2010 but now we are asking for March 2011.

## 6.  Other Items Not on the Agenda

- *Question*: What is our homework? *Answer/Action*: Review Chapters 1 and 3 and provide comments by October 22. We had also asked you to comment on travel management (open or closed to off-highway vehicle use) and Special Recreation Management Areas but we didn't have any maps associated with those yet. Open areas mean cross-country is ok. The request was if you had any other areas that you wanted to bring up. Also any comments on goals and themes.
- We sent the group an announcement regarding our land health assessments and we are going out in the field on Monday [October 4]. If you are going to participate, let Barb, Bruce, or Amanda Clements know. They are meeting at the BLM office on Monday at 7:00am.
- The RAC is meeting next week. On Thursday [October 7] we are going to take an auto tour of the upper San Miguel River. We'll be going up to the Ledges site near Pinyon and then driving back stopping at several points along the way. You are welcome to come, let us know.
- Southwest RAC appointments were made. RAC is a three-year appointment; 15 person group, five people are reconsidered each year.
- *Question*: On Monday where will you be going? West Paradox. They'll probably be back around 6:00pm. Next year we'll be doing field work for the Gunnison Gorge area.

## 7.  Public Comments / Questions

- *Question*: On the Web site there were some areas not classified for VRM. Are they going to be classified? *Answer*: The old RMPs did not classify all lands so some areas don't have a designation. The visual resource inventory looked at all lands.
- *Question*: Does the class take into account public things like scenic byways? *Answer*: A component of the visual resource inventory does take into account public sensitivity, so the byway was sort of factored in then. During VRM designation, scenic byways will be taken into account.
- *Question*: Does the RMP take into account some national decisions such as instruction memoranda or other info for sage-grouse or other items? *Answer*: Yes, as much as we can, but at some point we have to put our pens down. We'll do the best that we can.

## 8.  Action Items / Next Meeting

- The November 5 meeting has been cancelled. We will probably reschedule for January. Very tentatively January 28.
- o *Action*: BLM will e-mail Visual Resource Inventory map to group.
- *Action*: We can come up with some more examples and beefed up descriptions of the objectives and will send with the map.
- *Action*: Review Chapters 1 and 3 and provide comments by October 22.
- *Action*: Comment on travel management (open or closed to off-highway vehicle use) and Special Recreation Management Areas per information from meeting on August 20).
- *Action*: Comments on draft goals and themes by October 22.

**James Bode**

| | |
|---|---|
| **From:** | Paul L Noto <noto@waterlaw.com> |
| **Sent:** | Thursday, October 28, 2010 5:13 PM |
| **To:** | barbara_sharrow@blm.gov; uformp@blm.gov |
| **Cc:** | Mark Curley; Rob Gill |
| **Subject:** | Bear Ranch, LLC comments on suitability of Deep Creek in Wild and Scenic River System |
| **Attachments:** | BLM re Suitibility Deep Creek 10-28-10.pdf; deep creek FS fisheries report.docx; BLM_Laterals_ROW_Aerial_Oct2010.pdf; Fillmore_Ditch_Loc_Map.pdf; FWS Greenback Position Paper Final 061209.doc |

Dear Barbara: attached are comments on behalf of Bear Ranch, LLC regarding the suitability of including Deep Creek within the Wild and Scenic River System.

Please feel free to contact me with any questions. Thank you.

**Paul L. Noto**
noto@waterlaw.com

730 E. Durant Avenue, Suite 200
Aspen, Colorado 81611
(970) 920.1028 tel
(970) 925.6847 fax
**www.waterlaw.com**



PATRICK | MILLER | KROPF
*A Professional Corporation*

Arizona  •  Colorado  •  Oklahoma  •  Texas  •  Wyoming

This e-mail transmission (and/or the documents accompanying it) may contain confidential information belonging to the sender which is protected by the attorney-client privilege. The information is intended only for the use of the individual or the entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error and are an attorney or law firm, consult Title I of the federal Electronic Communications Privacy Act of 1986 which requires you to refrain from examining these materials. If you have received this transmission in error, please immediately notify us by telephone to arrange for return of the documents.

BLM_0108718



PATRICK | MILLER | KROPF

Attorneys at Law          www.waterlaw.com

Paul L. Noto*
shareholder
noto@waterlaw.com
reply to Aspen office

*licensed in CO

October 28, 2010

Ms. Barbara Sharrow
Field Manager, Uncompahgre Field Office
United States Bureau of Land Management
2475 South Townsend Avenue
Montrose, CO 81401

*Via email and U.S. Mail*

RE:    *Suitability of recommending Deep Creek segment for Wild and Scenic River designation (our file #822C1)*

Dear Ms. Sharrow:

This firm represents Bear Ranch, LLC in water matters.  Bear Ranch is located at the base of the Ragged Mountains and above Paonia Reservoir, and Deep Creek crosses the ranch.  We are writing to provide comments on the suitability of recommending the 0.58 mile BLM segment of Deep Creek for scenic river designation under the Wild and Scenic Rivers Act, 16 U.S.C. § 1271 *et seq.* (the "Act").  We understand that the comment period has closed, but based upon our recent telephone conversation with you, we also understand that you will accept our comments for consideration.  Rob Gill, the ranch manager for Bear Ranch, has been attending your stakeholder group meetings, and will continue to do so.  Our comments below are intended to address the issues that your office's website indicates are of particular concern to the suitability analysis.  We also address other issues that concern the relevant laws on suitability.

1.  *Should the river's free-flowing character, water quality, and ORVs be protected, or are one or more other uses important enough to warrant doing otherwise.*

Under the relevant standards, the BLM segment of Deep Creek will likely not be protected by designation, and therefore does not warrant designation.  Under BLM guidance, to be considered free flowing, "…the volume of flow is sufficient if it is enough to maintain the outstandingly remarkable values identified within the segment…."  BLM Manual, § 8351.31(B).  The outstandingly remarkable value ("ORV") BLM identifies for Deep Creek is fish, specifically, the apparent presence of native cutthroat trout.  However, relevant studies show that designation would not maintain this ORV because Bear Ranch completely dries up Deep Creek with

Main Office:
730 E. Durant Avenue
Suite 200
Aspen, CO 81611
T. 970.920.1028
F. 970.925.6847

Denver Office:
999 18th Street
30th Floor
Denver, CO 80202
T. 303.893.9700
F. 303.893.7900

Phoenix Office:
2415 E. Camelback
Suite 700
Phoenix, AZ 85016
T. 480.921.4044
F. 480.921.8688

Tulsa Office:
7633 E. 63rd Place
Suite 300-18
Tulsa, OK 74133
T. 918.459.4634
F. 970.925.6847

*a professional corporation*



Ms. Barbara Sharrow
Page 2
October 28, 2010

upstream irrigation diversions in the summer and fall months. We attach as Exhibit A a
December 17, 2007 study by the United States Forest Service which is entitled "Fisheries Report
for Deep Creek, with Recommendations for Improvements to Colorado River cutthroat trout
fishery". The report concludes that the Filmore Ditch, located on Forest Service property
upstream from the BLM segment of Deep Creek, diverts 92-98% of Deep Creek stream flow.
The Deer Ditch and Elk Ditch, which are located high on the BLM segment and downstream of
the Filmore Ditch, then divert whatever flow remains. We attach maps of Deep Creek as Exhibit
B so that you can see the relative locations of these ditches. According to the Forest Service,
"[d]ata collected on August 1, 2006 indicated that potential fish habitat was reduced by 86%
between the Filmore Ditch and the Deer Ditch. …Results indicate approximately 1.4 miles of
Deep Creek have significant reduction in fish habitat quantity and quality for [Colorado River
Cutthroat Trout[1]] and other aquatic life in reaches of stream below the Filmore Ditch." Thus, the
BLM segment of Deep Creek cannot be considered "free-flowing" because the volume of water
in this segment is insufficient to support the ORV due to upstream diversions. The segment is
therefore not suitable for designation as scenic, and the existing irrigation uses pose an
irreconcilable conflict with the purpose of designation. Due to this irreconcilable conflict, the
existing irrigation uses of Deep Creek are important enough to warrant forgoing protection.

2.    *Is protection of identified ORVs within management control? River segments with adjacent
      private lands may not be appropriate for WSR designation.*

For the reasons mentioned above, protection of the identified ORV is not within management
control. We also note that this segment is surrounded by private land.

3.    *Will historical or existing rights be adversely affected?*

Bear Ranch, LLC's historical ditch rights-of-way and water rights could be adversely affected by
designation. Bear Ranch owns ditch rights of way under the Act of July 6, 1866 (43 U.S.C. §
661 (2010)) for the Deer Ditch and Elk Ditch which are located within the BLM segment of
Deep Creek. Designation under the Act may result in BLM imposing bypass flow requirements
on these ditches because of BLM's regulatory authority over 1866 Act rights-of-way, if and
when Bear Ranch, LLC must improve headgates, diversion dams, or other diversion works.
Thus, the historical water rights and ditch rights of way for the irrigation ditches within the BLM
segment of Deep Creek may be adversely affected.

4.    *Will the river's free-flowing character, water quality, and ORVs be protected through
      designation? Is it the best method for protecting the river corridor? The benefits and
      impacts of WSR designation must be evaluated, and alternative protection methods
      considered.*

No. Please see the response to question 1 above. In addition, we attach as Exhibit B the U.S.
Fish and Wildlife Service's ("FWS") recent "Position Paper on Lineage GB populations outside

---

[1] We understand that recent genetic testing may show that species of cutthroat trout in Deep Creek is Greenback
Cutthroat. Regardless, the loss of habitat due to upstream diversions is the same regardless of which species are
present.

BLM_0108720



PATRICK | MILLER | KROPF

Ms. Barbara Sharrow
Page 3
October 28, 2010

the historic range of the Greenback Cutthroat Trout." This paper shows that according to FWS, there is substantial uncertainty as to whether the species of cutthroat trout in Deep Creek and other potential populations within Colorado's western slope are in fact Greenback Cutthroats. According to the paper, the FWS Greenback Recovery Team is currently working on two research projects to determine whether any taxonomic revisions to Greenback or Colorado River cutthroat trout should be proposed, especially for potential populations on Colorado's western slope, and the results of these projects are not expected for at least two years. Therefore, there is substantial uncertainty about whether the ORV in the BLM segment of Deep Creek is in fact present, and therefore designation is not warranted at this time.

5.    *Is there a demonstrated commitment to protect the river by any non-federal entities who may be partially responsible for implementing protective management?*

Yes. Bear Ranch and the United States Forest Service entered into a cost share agreement to replace the headgate of the Filmore Ditch with a new fish-friendly diversion. This diversion structure will ensure that cutthroat trout on the Forest Service reach of Deep Creek will no longer make their way into the Filmore Ditch. Bear Ranch, LLC may be amenable to protective management measures such as this within the BLM reach of Deep Creek. For instance, the Forest Service opines that the diversion dam on the Deer Ditch likely inhibits the upstream migration of non-native brook trout into the upstream reach of Deep Creek which hosts the most significant population of cutthroat trout. Bear Ranch, LLC can maintain this structure in place, or replace it with a similar structure in the future to the extent replacement is necessary, to ensure that brook trout cannot migrate upstream on Deep Creek. In addition, Bear Ranch, LLC and the Forest Service intend to construct a migration barrier on lower Deep Creek (near Paonia Reservoir on land owned by Bear Ranch) in order to stop brook trout migration upstream.

6.    *Suitability Criteria.*

We would also like to provide comments on the suitability criteria identified in BLM Manual 8351.33.

A.    *Characteristics which do or do not make the area a worthy addition to the NWSRS.*

Please see response to paragraph 1 and 4 above. In addition, we note that the Fish ORV standard (BLM Manual 8351.31(C)(4)) mandates that the river or segment be one of the nation's or region's "…top producers of resident, indigenous, and/or anadromous fish species…" and that "[t]he river produces exceptionally high quality habitat for fish species indigenous to the region." The Forest Service study attached as Exhibit A shows that the BLM segment of Deep Creek does not meet these standards. The only high quality habitat for native fish on Deep Creek is located above the BLM segment on the Gunnison National Forest.

B.    *Status of land ownership, surface and subsurface minerals, area use, including the amount of private land involved and associated or incompatible uses.*

BLM_0108721



Ms. Barbara Sharrow
Page 4
October 28, 2010

As the attached map shows, the BLM segment comprises a very small portion of Deep Creek. The segment is surrounded by private land to the west and Forest Service land to the east. We have explained the incompatible uses above. As stated in the BLM Manual, due to the incompatible existing uses and surrounding private land, it would "…be difficult to ensure those identified outstandingly remarkable values [i.e. native fish] could be properly maintained and afforded adequate management protection over time." (8351.33(A)(2)).

> C.  *Reasonably foreseeable potential uses of the land and related water which would be enhanced, foreclosed or curtailed if the area were included in the NWSRS, and the values which could be foreclosed or diminished if the area is not protected as part of the NWSRS.*

The water within the eligible reach is already entirely committed to existing irrigation uses. Therefore designation within the NWSRS would not enhance the identified ORV. Since there is already insufficient flow to protect the fish ORV in this reach, inclusion within the NWSRS will not protect or enhance ORV values.

> D.  *Where appropriate, estimated costs associated with acquiring lands or interests in lands, and administering the area if it were to be added to the NWSRS.*

We assume that BLM does not intend to acquire adjacent private lands if Congress includes the segment within the NWSRS. Additionally, as you may know, the BLM segment of Deep Creek is being considered for a proposed land exchange by legislation for several other parcels of particular importance to the United States Department of the Interior, National Park Service located in Gunnison County, Colorado and Uintah County, Utah . This proposed legislation may preclude suitability of this reach because BLM may no longer own the land adjacent to the stream.

> E.  *Ability of the agency to manage and/or protect the river area or segment as a WSR, or other mechanisms (existing and potential) to protect identified values other than WSR designation.*

For the reasons mentioned in paragraphs 1 and 4 above, BLM would not have the ability to manage and protect the segment as a WSR. There are other mechanisms to protect the identified values, such as non-native fish control and maintenance of the diversion dam on the Deer Ditch to prevent upstream migration of non-native fish. If the land exchange moves forward, the segment of Deep Creek proposed for scenic designation will be placed in a conservation easement which will preclude development of land adjacent to this segment.

> F.  *Historical or existing rights which could be adversely affected.*

See paragraph 3 above.

BLM_0108722



PATRICK | MILLER | KROPF

Ms. Barbara Sharrow
Page 5
October 28, 2010

For these reasons, the BLM segment of Deep Creek is not suitable for Wild and Scenic River designation.  We ask that you please consider these comments as part of the public record when drafting the RMP, and when deciding whether to recommend the segment to Congress for designation.

Thank you for your attention to this matter.


Very truly yours,

PATRICK, MILLER & KROPF, P.C.
A Professional Corporation

By: _____
       Paul L. Noto
       noto@waterlaw.com


cc:     Rob Gill
        Mark Curley

W:\Koch, William\822 C(1) Bear Ranch, LLC\Letters\BLM re Suitibility Deep Creek 10-28-10.docx

BLM_0108723

# Fisheries Report for Deep Creek, with Recommendations for Improvements to Colorado River cutthroat trout fishery



Prepared by Chris James, Fisheries Biologist
Grand Mesa, Uncompahgre, and Gunnison National Forests
Montrose, CO 81401
970.240.5421

Version: December 17, 2007

BLM_0108724

**Summary**

Due to recent declines in historic distribution of native Colorado River cutthroat trout (CRCT), a conservation strategy has been initiated by the states of Colorado, Utah, and Wyoming, and the U.S. Forest Service, Bureau of Land Management, and National Park Service to reduce threats to this species, and to stabilize and enhance the distribution and abundance of CRCT throughout its native range (CRCT Agreement 2001; agreement available at *http://wildlife.state.co.us*). The strategy is designed to identify the current distribution, abundance, and genetic integrity of CRCT, and to identify local risks to individual populations of this species. Additionally, the conservation strategy calls for the protection and restoration of watersheds where CRCT currently persist.

Personnel at the Paonia Ranger District have observed CRCT in Deep Creek for several years. Sampling was conducted in 2001 and tissue samples were collected and sent to Brigham Young University for genetic analysis. Since many sub-species of inland cutthroat trout are difficult to identify from visual observations, genetic identification is used to evaluate a population's level of introgression (genetic purity). Genetic results from BYU indicate that the Deep Creek population of CRCT shows no signs of introgression with Yellowstone cutthroat trout and rainbow trout, two species historically stocked in native cutthroat trout waters in Colorado. In 2001 the Deep Creek population of pure-strain CRCT was designated as *Conservation Population. Conservation Populations* have been defined as self-sustaining populations of CRCT with introgression rates of less than 10% (at least 90% genetically pure) (CRCT Task Force 2001). The current distribution of CRCT is a small fraction of their historic distribution in the Colorado River Basin.

Field observations made in 2001, 2003, 2005, and 2006 have determined that three primary threats to the *Conservation Population* of CRCT in Deep Creek were observed. These threats are as follows:

1. The presence of brook trout has been identified in the lower reaches of Deep Creek. Competition with non-native trout is considered to be the biggest threat to CRCT. Brook trout invasions impact the distribution and abundance of CRCT and other native cutthroat, and are well documented in the fisheries research (Peterson et al 2004; Peterson and Fausch 2003; CRCT Task Force 2001; Young 1995).
2. The diversion and conveyance of water at the Filmore Ditch facility significantly reduces the available fish habitat downstream during the late summer irrigation season. Loss of fish habitat is incrementally affected by the Deer and Elk ditches downstream.
3. The Filmore Ditch is not screened to prevent fish loss. CRCT lost to the ditch translate into direct mortality since fish are unable to get back out of ditch.

In 2006 a study plan was developed to evaluate in more detail, the effects of the three threats identified above. Results indicate that brook trout are present in Deep Creek, but abundance appears to be low on National Forest lands. However, additional surveys

indicated that brook trout abundance was much higher on BLM and private land downstream. Investigations also determined that upstream movement of brook trout appears to be halted by the series of man-made headwall and stream stabilization structures located at the Deer Ditch. These barriers are currently an important structure in the conservation of this CRCT population.

The study plan also focused on the effects of water use in Deep Creek. Water yield, water use, and fish habitat were all evaluated. Mean monthly discharge was lowest between August and March. Conflicts between irrigation use and stream flow needs for CRCT were greatest in July-October, when competition over base flows was highest. Water use was highest with the Filmore Ditch facility, where depletion of stream flows from Deep Creek for July and August of 2006 were between 92-98% of the estimated mean monthly discharge. Additional use at the Deer and Elk Ditch accounted for nearly all of the remaining measurable flow. Stream cross sectional area was reduced by 86% during August 2006 in the reach of Deep Creek between Fillmore and Deer Ditches.

Mortality rates for the Filmore Ditch were also evaluated.  Since the number of fish lost to the ditch can vary each year, 2006 data was used to estimate annual mortality associated with the Filmore Ditch. It was determined that approximately 4-6% of the adult CRCT population is annually lost to the Filmore Ditch. Adult fish lost to the ditch represent an important source of recruitment to the Deep Creek CRCT population.

**Watershed Background**

Deep Creek is a 9.14 square mile, 7th level sub-watershed to Paonia Reservoir (Muddy Creek). Elevation ranges between 6,500 and 11,000 feet with mean elevation estimated to be at 8,800 ft. Annual water-yield is estimated at 4,279 acre-feet per year. Based on GIS mapping, 8 miles of perennial streams occur within the Deep Creek watershed. Approximately 6.0 miles of stream are thought to be fish-bearing.  Field review of the stream indicates that Deep Creek is a steep, well confined stream. Stream gradient was estimated between 3-6%. Stream width ranged from 10-15 feet, with larger pools observed infrequently. Substrate was primarily composed of small cobble to large boulder materials. Spawning gravel appeared very limited. Several inner gorge slides were observed between the Raggeds ATV trail down to the Forest boundary. A series of headwalls constructed at the Deer Ditch to stabilize the Deep Creek channel has created a migration barrier for CRCT and other fish species. The lower headwall forms a 3-foot drop, and is likely responsible for the absence of brook trout upstream of this site.

The Forest Service is the primary land owner in the watershed, comprising approximately 60% of the ownership. Private lands occur in the lower 2.3 miles of Deep Creek, with a small piece of BLM lands located adjacent to Forest lands. Access to the upper watershed is limited primarily to ATV, foot and horse. Four active diversions exists on Deep Creek above the Forest boundary, of which, the Filmore Ditch is the largest, and most significant diversion facility. Overall, land management of National Forest lands appear limited, with primary use being water development, livestock use, ATV use, and hunting. Land management activities on nearby private lands are largely ranching related.

BLM_0108726

## Hydrology and Water Use

In the absence of gage data from Deep Creek, a hydrograph was constructed using a natural flow estimation model developed by Kircher et al (1985). An intermittent USGS gage at Minnesota Creek was selected from several local area gages to develop streamflow characteristics for Deep Creek. Mean monthly yield was calculated from 26 years of gage data at the Minnesota Creek site, and the monthly percentage of annual yield was extrapolated to Deep Creek to develop annual and monthly water yield estimates. Monthly water yield estimates were eventually converted to mean monthly discharge numbers to construct an annual hydrograph. Annual yield was estimated at 4,287 acre-feet, with 60% of the annual yield occurring in May and June. Peak flows typically range between 19 and 24 cfs; base flows occur between October and March, ranging near 1-2 cfs (Table 1).

Diversion records for the Filmore Ditch were obtained from the Colorado State Engineer's Division 4 office. Records from 2006 indicate that highest diversion use was recorded in June at 12.0 cfs. Irrigation use ended in October where diversion use was down to 1.5 cfs (Figure 1). However, the Filmore Ditch has a decreed right near 20 cfs, and the ditch has the capacity divert that amount if needed.

Table 1. Hydrology statistics for Deep Creek. Statistics derived from Kircher et al (1985), and USGS (2003).   AF = acre-feet; cfs = cubic feet per second. Hydrograph extrapolated from Minnesota Creek gage (period of use: 1936-47; 1985-2000), near Paonia, CO.

| Month | Percent of flow | AF/Month | AF/Day | Estimated Mean Monthly flow (cfs) |
|---|---|---|---|---|
| Jan | 0.013 | 55.622 | 1.794 | 0.9 |
| Feb | 0.014 | 59.901 | 2.066 | 1.0 |
| Mar | 0.027 | 115.523 | 3.727 | 1.9 |
| Apr | 0.101 | 432.141 | 14.405 | 7.3 |
| May | 0.337 | 1441.896 | 46.513 | 23.5 |
| Jun | 0.265 | 1133.835 | 37.795 | 19.1 |
| Jul | 0.103 | 440.698 | 14.216 | 7.2 |
| Aug | 0.056 | 239.603 | 7.729 | 3.9 |
| Sep | 0.030 | 128.359 | 4.279 | 2.2 |
| Oct | 0.021 | 89.851 | 2.898 | 1.5 |
| Nov | 0.019 | 81.294 | 2.710 | 1.4 |
| Dec | 0.016 | 68.458 | 2.208 | 1.1 |
| Total | 1.00 | 4287.181 | 140.339 | 70.878 |

BLM_0108727



Figure 1. Water use for 2005 and 2006 irrigation season at the Filmore Ditch in cubic feet per second as compared with the synthesized hydrograph for Deep Creek.


**Species Distribution and Abundance for Colorado River cutthroat trout (*Oncorhynchus clarki pleuriticus*)**

DNA analysis from tissue samples collected indicates that Deep Creek contains genetically pure Colorado River cutthroat trout (CRCT). This population of CRCT is one of 29 *Conservation Populations* within the Grand Mesa, Uncompahgre, and Gunnison National Forests (GMUG NF) (James and Speas 2005; James unpublished). However, recent genetic sampling and drought have reduced the number of Conservation Populations to 26. Distribution of these genetically pure CRCT populations is limited to approximately 5-7% of their native distribution on the GMUG NF. Quantitative population monitoring has been conducted on 23 of the 26 streams containing *Conservation Populations* occurring on the Forest, with the number of adult fish ($\geq$150mm) ranging from 32 to 1,080 fish/mile (James and Speas 2005). Nine populations (29%) have 100 or fewer adult fish, 13 (42%) have 100-499 adult fish, one populations has 500-1000 fish, one population (3%) has an estimated adult population greater that 1000. The data indicate that the majority of *Conservation Populations* have fewer than 500 adults (71%) and largely occur in small headwater streams, ranging from 2-4 miles in length.

Since 2005, 31 cutthroat trout populations (conservation and non-conservation populations) have been sampled by electrofishing. Data suggests that most populations on the GMUG NF are composed of four to six age classes and range from 26-365 mm, with a mean length of 128 mm (James, unpublished data). However, 95% of the fish captured were between 61 and 228 mm. Fish larger than 200 mm were observed in only 10% of the fish sampled. Adult fish ($\geq$150mm) composed just 29% of the fish captured.

In 2006, electrofishing was conducted at six sites in Deep Creek. Sites 1-4 were located below the Filmore Ditch; sites 5-7 were located above the Filmore Ditch. However, stream flows were so depleted at site 1 that electrofishing could not occur. Population

estimates of adult CRCT (≥150mm) were estimated at 248 fish per mile below the Filmore Ditch, and 324 fish per mile above the Filmore Ditch. A population estimate for the total number of adult CRCT was made from the U.S. Forest Service (USFS) boundary upstream to the extent of fish present. A population estimate of 836 adult CRCT was estimated for this portion of Deep Creek. Population estimates for CRCT and other species were not made for Deep Creek below the USFS boundary since crews could not gain access to private land.

A total of 155 CRCT were captured at six sample sites in Deep Creek. Total length of CRCT ranged between 52-242mm, with a mean length of 147 mm (Figure 2). Age 3-year old fish comprised the largest group of CRCT sampled (Figure 3). Five-year old fish and older comprised less than 1% of the total fish captured suggesting that some combination of habitat, biological, and environmental factors are limiting the production of older and larger fish. Sub-adult fish (< 150 mm) comprised 50% of the fish CRCT sampled. Fish less than 75 mm were not well represented in the survey. However, fish < 75 mm typically have poor capture rates by electrofishing methods and would be poorly represented in most streams sampled by electrofishing. Additionally, since CRCT spawn in late May and early June, young-of-the-year CRCT may not have fully immerged from the gravel during the time of sampling.

Brook trout were captured in small numbers near the Forest boundary in both 2005 and 2006, representing the first documented presence of brook trout in Deep Creek. However, in 2007 brook trout abundance was observed to be much greater that previously expected. Brook trout comprised over 80% of the trout captured on the BLM land, but just 6% on USFS land upstream to the Deer Ditch. Brook trout have not been captured upstream of Deer Ditch during any previous sampling efforts. Upstream migration of brook trout may currently be blocked by in-channel structures associated with the Deer Ditch facility. Additionally, a series of low flow barriers downstream of the BLM road crossing may be limiting upstream brook trout invasions into the reach below Deer Ditch.



Figure 2. Length distribution of Colorado River cutthroat trout in Deep Creek, 2006.

BLM_0108729



Figure 3. Distribution of age classes for CRCT collected from five locations in Deep Creek, July 2006.

Stocking has occurred in the Deep Creek watershed since 1956 (Table 2). Documented stocking records indicate non-native rainbow and Snake River cutthroat trout have been stocked in both Deep Creek and North Deep Creek Lake. Additionally, brood stock referred to Pikes Peak Native (PPN) has also been stocked in the watershed, which may include greenback cutthroat trout lineage. However, recent genetic testing did not detect rainbow trout DNA in any of the samples tested. Additionally, observations of CRCT captured during 2002-2007 showed no visual signs of Snake River cutthroat trout introgression. Genetic tests for greenback cutthroat trout are pending. No other documented stocking has occurred since 1994.

Table 2. Stocking records from the Colorado Division of Wildlife records for Deep Creek and Deep Creek Lakes North and South (1952-1999; 2000-2003). Rainbow Trout (RBT), Snake River cutthroat trout (SRN). Pikes Peak Native cutthroat trout brood stock (PPN and N..). Roaring Judy Hatchery (ROJ); Pitkin Hatchery (PKN)

| Hatchery Unit | Stocking Year | CDOW Water Code | Water Name | Species Code | No. of Fish Stocked | Size of Fish Stocked (inches) |
|---|---|---|---|---|---|---|
| | 56 | 39621 | DEEP CR | RBT | 3936 | 1 |
| | 56 | 39621 | DEEP CR | RBT | 8820 | 1 |
| | 67 | 39621 | DEEP CR | RBT | 8160 | 3 |
| | 66 | 89436 | DEEP CR LAKE #2, NORTH | N.. | 2000 | 1 |
| ROJ | 75 | 89436 | DEEP CR LAKE #2, NORTH | PPN | 900 | 2 |
| ROJ | 76 | 89436 | DEEP CR LAKE #2, NORTH | PPN | 1200 | 2 |
| ROJ | 79 | 89436 | DEEP CR LAKE #2, NORTH | PPN | 875 | 2.7 |
| ROJ | 80 | 89436 | DEEP CR LAKE #2, NORTH | SRN | 800 | 2 |
| ROJ | 81 | 89436 | DEEP CR LAKE #2, NORTH | SRN | 600 | 2 |
| ROJ | 82 | 89436 | DEEP CR LAKE #2, NORTH | SRN | 550 | 2 |
| ROJ | 83 | 89436 | DEEP CR LAKE #2, NORTH | SRN | 250 | 3 |
| ROJ | 84 | 89436 | DEEP CR LAKE #2, NORTH | SRN | 1560 | 2 |
| ROJ | 88 | 89436 | DEEP CR LAKE #2, NORTH | SRN | 700 | 2.68 |
| ROJ | 90 | 89436 | DEEP CR LAKE #2, NORTH | SRN | 894 | 3.38 |
| ROJ | 92 | 89436 | DEEP CR LAKE #2, NORTH | SRN | 860 | 3.09 |
| PKN | 94 | 89436 | DEEP CR LAKE #2, NORTH | SRN | 860 | 2.71 |
| | 66 | 89424 | DEEP CR LAKE #1, SOUTH | N.. | 4000 | 1 |
| | 69 | 89424 | DEEP CR LAKE #1, SOUTH | N.. | 2000 | 1 |

**Mortality of CRCT in association with Filmore Ditch**
Site reviews of the Filmore Ditch facility have revealed potential conflicts with operations of the facility and the management of CRCT in Deep Creek. The Filmore Ditch is not screened to prevent fish loss. CRCT have been observed in the Filmore Ditch, and are permanently removed from Deep Creek once they enter the conveyance ditch. During July and August of 2006, the entire Filmore Ditch was walked from the end of FSR 759 (Munsey Cr. Road) to the headgate located at Deep Creek. During July 2006, 50 adult CRCT were observed in the Filmore Ditch; during August 2006, 33 adult CRCT were observed. Observations suggest that most fish enter the ditch during May and June, seeking refuge from spring runoff, and are swept through the flume and into the ditch due to sudden increases in water velocity. Fish were not observed in Deer, Elk, and Elk Stomp Ditches during brief visits made in July and August 2006.

Longitudinal profiles of the flume and headgate were made of the Filmore Ditch to determine if adult CRCT could swim out of the ditch and back into Deep Creek. Data was entered in FishXing version 3, a program developed by the USFS to determine if selected culverts are barriers to fish migration. Results from the program suggest that an excessive drop at the flume outlet prevents fish from moving back into Deep Creek at all stream flows tested. At flows greater than 1.0 cfs, excessive water velocities coming through the flume prevent CRCT from re-entering Deep Creek. Therefore, it was concluded that the current flume located just below the headgate was a barrier to

movement for CRCT, and that fish trapped in the Filmore Ditch could not re-enter Deep Creek.

Since CRCT captured in the Filmore Ditch are unable to return to Deep Creek, these fish are assumed to be killed when the ditch facility is closed at the end of the irrigation season. Based on this review it was determined that 2006 mortality for adult CRCT associated with the Filmore Ditch is 50 adult CRCT. Population estimates for CRCT for Deep Creek were determined to be 836 adult CRCT. Therefore, mortality rates for adult CRCT as a result of an unscreened ditch facility have been estimated at 6% of the total CRCT population in Deep Creek for 2006 (Table 3). Based on these calculations and professional judgment, it is estimated that annual mortality rates could vary between 4-6%.

Table 3. Mortality rate for adult CRCT associated with the Filmore Ditch. Population estimates and number of fish killed based on Deep Creek electrofishing data and visual observations of Filmore Ditch during July and August 2006.

| CRCT Population estimate for Deep Creek* (CRCT >150 mm) | Number of CRCT killed in Filmore Ditch through the irrigation season** | Mortality Rate for CRCT associated with Filmore Ditch 2006 season |
|---|---|---|
| 836 | 50 | 5.9% |

* Population estimate for Deep Creek from USFS boundary upstream; ** Number of fish killed in Filmore Ditch based on visual observations made of ditch in July and August 2006. These fish were not part of the population estimate made for Deep Creek.

Spawning adults were observed building redds within the Filmore Ditch during July 2006. Loss of adult spawners translates into a reduction of recruitment to the population. Fecundity rates for CRCT and other inland cutthroat trout in small mountain streams is low, with studies indicating rates of 60-250 eggs per female (Behnke 1992, Quinlan 1980, May et al. 1978, Snyder and Tanner 1960). Additionally, the majority of eggs do not mature into adult fish. However, spawning fish that are allowed to reproduce in the Filmore Ditch could represent 1,200-6,000 eggs that would not get an opportunity to mature into adult fish because they are eventually killed when ditch operations terminate in the fall. Furthermore, a percentage of these fish survive to spawn another year, which suggests that additional eggs are lost to the following year of reproduction, suggesting that mortality from one year may affect recruitment of CRCT for multiple years. Reduced recruitment rates for CRCT may increase invasion rates for brook trout, allowing this species to more easily invade unoccupied suitable habitat.

**Depleted stream flow downstream of Filmore Ditch**
During the irrigation season (April to October) water is diverted from Deep Creek to irrigate private land to the south of Deep Creek. Observations from 2002 and 2005 suggest that the diversion conveys most of the water from this section of Deep Creek, resulting in a net loss of water to reaches below. During the months of July-October, a substantial amount of the stream flow is diverted from Deep Creek. Field measurements made during the July and August of 2006 field season indicated that 92-98% of the Deep Creek stream flow is diverted into the Filmore Ditch. Additional downstream diversions leave negligible stream flow at the Forest boundary (Table 4). Recharge from springs and near groundwater sources were not apparent in the measured discharges. Unfortunately, measurements of stream flow were not obtained during September and October of 2006

due to weather, road conditions, and other program of work priorities. However, based on previous field observations and annual irrigation use at the Filmore Ditch, the amount of stream flow removed during September and October would likely be similar to the measured depletion estimates made during July and August 2006.

Additional data collected during August 2007 appears to validate 2006 data, and observation made in 2005. Field measurements from August 2007 indicated that 94% of the base flow was removed from the reach of Deep Creek between Filmore Ditch and Deer Ditch, and increased to 97% in the reach below Deer Ditch. The first significant accretion point for stream flow was observed to be located on BLM lands approximately ½ mile from the USFS/BLM boundary in section 35, where a small spring delivered about 0.25 cfs of stream flow to Deep Creek.

Table 4. Discharge data (Q) for selected stream flow measurement sites in Deep Creek, July 6, and August 1, 2006. Italics show discharges based on flume/discharge relationships for Parshall flumes located in ditches. Symbol "n/a" indicates that stream flow was not measured at that site.

| Discharge site | Q (cfs) | Q (cfs) | Location |
|---|---|---|---|
| Deep Creek #1 | 6.66 | 5.24 | Above Filmore Ditch |
| Deep Creek #2 | 0.41 | 0.33 | Below Filmore Ditch |
| Filmore Ditch #3 | *6.56* | *4.84* | In Filmore Ditch (flume measurement) |
| Deep Creek #4 | 0.38 | n/a | Downstream Filmore Ditch |
| Deep Creek #5 | 0.37 | 0.35 | Downstream Filmore Ditch/Upstream Deer Ditch |
| Deep Creek #6 | 0.03 | 0.05 | Below Deer Ditch |
| Deer Ditch #7 | *0.46* | *0.18* | In Deer Ditch (flume measurement) |
| Deep Creek # 8 | n/a | Unmeasurable | Below Elk Ditch |

Windows XSPRO version 3.0 was used to evaluate changes in fish habitat conditions above and below the Filmore Ditch. XSPRO is a software package used in analyzing stream channel cross section data for geometric, hydraulic, and sediment transport processes. It has the ability to predict changes in these processes at various stream flows.

Data collected on August 1, 2006 indicated that potential fish habitat was reduced by 86% between the Filmore Ditch and the Deer Ditch. These calculations were based on mean changes in cross sectional area values developed for Deep Creek #2, #4, and #5, and then compared to the cross sectional area of Deep Creek #1. Results indicate that approximately 1.4 miles of Deep Creek have significant reduction in fish habitat quantity and quality for CRCT during August-October. The reduction in stream flows appear to be limiting production and distribution of CRCT and other aquatic life in reaches of stream below the Filmore Ditch. Given the low productivity of most mountain streams, loss of aquatic insects could represent a major loss of food for CRCT in Deep Creek.

Restrictions in upstream movement were observed in several reaches of stream between Filmore Ditch and Elk Ditch due to depleted flows. Mean cross section depth was estimated to be about 2 inches deep for most riffle habitat, leaving mainly pools and small scour areas as the only suitable habitat remaining. Cross sections were not taken below the Deer Ditch. However, habitat conditions between Deer and Elk ditches were

observed to be worse than those measured in the stream reach between Filmore and Deer ditches.

Based on gradient and water yield patterns in Deep Creek, some discharge loss to the stream may actually be beneficial to some life-history stages of CRCT and other trout. Nehring (1986) compared year class abundances rainbow and brown trout with flow regimes in several Colorado streams. He found a strong positive correlation between year class abundance and lower-than-normal flows during fry emergence periods, and strong negative correlations between abundance and higher-than-normal flows during the same period. This suggests that some water depletion during the periods of May-June may benefit spawning and rearing habitat for CRCT in Deep Creek by reducing water velocity, making fish habitat more suitable during this period. A stream flow protection assessment of West Willow Creek, near Tin Cup, Colorado, suggested that rearing habitat for adult brown trout was maximized at 5 cfs, a flow that is approximately 30% of the mean hydrograph during May and June 2003 (James unpublished).

Additionally, cross sections were used to determine minimum stream flow needs for CRCT in Deep Creek. Four cross sections were established at discharge sites. One cross section was chosen above the Filmore Ditch (Deep Creek #1); the other three sites were downstream of the Filmore Ditch (Deep Creek #2, #4, and #5). Cross sections and discharge measurements were taken at each site. Windows XSPRO version 3.0 (WinXSPRO) was used to determine a minimum stream flow requirement based on mean depth. A minimum depth criterion of 0.3 ft was selected based on cutthroat habitat suitability curves established by Hickman and Raleigh (1982). Staging tables were then used to predict the mean cross sectional depth. Where staging tables predicted a mean depth of 0.3 ft, a corresponding discharge was predicted. Based on an average of four cross sections it was determined that a minimum flow stream flow of 1.73 cfs would suffice for a minimum flow for the protection of CRCT in Deep Creek.

**Suggested Management Recommendations for Improvement of CRCT management in Deep Creek**

Conservation measures and mitigation to offset effects of current operations:

1. Screen diversion to prevent the movement of CRCT into the Filmore Ditch.

   a. A fish screen may completely eliminate mortality of individual fish that are lost to conveyance ditch. Purchase of materials and construction costs of screen could be offset through regularly appropriated Forest Service funds, grants, or other funds to minimize the financial burden to the water user. However, the water user would be responsible for the maintenance of the fish screen such as cleaning and preventative maintenance.

2. Improve stream flow downstream of the Filmore Ditch to improve fish habitat conditions for CRCT low flow conditions.

   a. Analysis of data collected from Deep Creek and evaluated in XSPRO suggests that a minimum instream flow of 1.7 cfs in Deep Creek would

greatly improve late summer/early fall habitat conditions for existing *Conservation Population* of Colorado River cutthroat trout. However, minimum stream flows as low as 1.0 cfs would also benefit CRCT, and may be a compromise point for CRCT habitat needs and the water user's needs for irrigation water.

3.  Work towards eradication brook trout from Deep Creek.

    a.  Construct a fish barrier near the mouth of Deep Creek to prevent additional brook trout from entering Deep Creek.
    b.  There are two options for the removal of brook trout, and include either removal by electrofishing, or chemical reclamation. Both fall under the jurisdiction of the CDOW. Removing brook trout using electrofishing techniques would require a substantial effort that may be spread over multiple years. Furthermore, this technique may never completely remove brook trout. Re-invasions may begin to occur shortly after electrofishing stops.
    **c.**  Another option is to chemically treat Deep Creek using one or more of the EPA registered piscicides such as Rotenone or antimycin. The treatment area would likely start at the Deer Ditch and continue downstream to the mouth of Deep Creek.

**Suggested Implementation Plan for Deep Creek**

Phase 1: Design and construct fish screen improvements Filmore Ditch
Phase 2: Construct in-channel barrier near mouth of Deep Creek to prevent additional brook trout immigration
Phase 3: Chemically treat Deep Creek from Deer Ditch to mouth of stream to remove brook trout and other non-native fish.
Phase 4: Stock chemically treated section of Deep Creek with native CRCT
Phase 5: Increase base flows during July-September to improve fish habitat for CRCT

LITERATURE CITED

Colorado River Cutthroat Trout Task Force 2001. Conservation Agreement and Strategy for Colorado River cutthroat trout in the states of Colorado Wyoming, and Utah. April 2001. http://wildlife.state.co.us/NR/rdonlyres/B31F3257-DADB-4A35-8C3B-DD1791C28223/0/CRCT_Conservation_Agreement_Final_Dec06.pdf

Hickman T. and R. F. Raleigh, 1982. Habitat Suitability Index Models for cutthroat Trout. U.S. Fish and Wildlife Service. FWS/OBS-82/10.5.

James, C. and C. Speas. 2005. Colorado River cutthroat trout Species and Conservation Assessment. Prepared for the GMUG NF, November 2005.

Kircher, J.E., A.F. Choquette, and B.D. Richter. 1985. Estimation of natural streamflow characteristics in western Colorado. Water Resources Investigation Report 85-4086.

May, B.E., J.D. Leppink, and R.S. Wydowski. 1978. Distribution, systematics, and Biology of the Bonneville cutthroat trout. Utah Division of Wildlife Resources Odgen. Publication 78-15.

Peterson, D. P., and K. D. Fausch. 2003. Dispersal of brook trout promotes invasion success and replacement of native cutthroat trout. Canadian Journal of Fisheries and Aquatic Sciences 60:1502-1516.

Peterson, D. P., K. D. Fausch, and G. C. White. 2004. Population ecology of an invasion: effects of brook trout on native cutthroat trout. Ecological Applications 14:754-772.

Quinlan, R.E. 1980. A study of the biology of Colorado River cutthroat trout population in the North Fork of the Little Snake River drainage in Wyoming. Master's Thesis, University of Wyoming, Larimie.

Snyder, G.R. and H.A. Tanner. 1960. Cutthroat trout reproduction in the inlets to Trappers Lake. Colorado Department of Game and Fish, Denver Technical Bulletin 7.

U.S. Geological Suvey 2003. Streamflow characteristics for selected stations in and near the GMUG NF, SW Colorado. Open File Report 02-471.

Young, M. K. 1995. Colorado River cutthroat trout. Chapter 2. In Conservation Assessment for Inland Cutthroat trout. USDA Forest Service, Rocky Mountain Region, General Technical Report RM-GTR-256.



**Approximate Boundaries**

Bear Ranch LLC Property

BLM Property

25 Section Number

Deer Ditch

Deer Creek

Filmore Ditch

26

25

Elk Ditch

L Ranch Lateral

**Irrigation Laterals within BLM Property**

> Elk Ditch = 4,630 feet
> L Ranch Lateral = 3,690 feet
> Finger Ditch = 950 feet

**Township 12 S Range 89 W**

Deep Creek

Finger Ditch

34

35

36

N

0   750   1,500        3,000
Feet

RESOURCE
ENGINEERING, INC
909 Colorado Avenue
Glenwood Springs, CO 81601
(970) 945-6777 Voice (970) 945-1137 Facsimile

**Bear Ranch LLC**

Right of Way for Irrigation Laterals
off of the Filmore Ditch

Date:  10/12/2010
File:   1162-1.4
Drawn by:  RP
Approved by: JMC

BLM_0108737

Jim & Lynn Graziano
Monitor Mesa Ranch
P.O. Box 8
Hotchkiss, CO 81419
dgflaw@ix.netcom.com

November 1, 2010

Ms. Katie Stevens
Conservation Manager
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401

Received

NOV 1 9 2010

Uncompahgre Field Office

Re:   **Wild and Scenic River Eligibility Report**
      **River Segment - Monitor Creek - Hydrologic Unit: Lower Gunnison**

Dear Ms. Stevens:

Since we are unavailable to attend the November 8th meeting to discuss the Final Wild and Scenic River Eligibility Report, we have written an initial Management proposal for the above-noted Monitor Creek River Segment.

My wife and I own Monitor Mesa Ranch (also known as the "Lee Ranch") which extends along a portion of the South Rim of Monitor Canyon. The ranch is an in holding that consists of 360 acres of deeded land, surrounded on three sides by BLM land and on the fourth side by U.S. Forest Service land. This land consists of multiple tiers of benches, located below the crest of Monitor Mesa, which benches drop off into Monitor Canyon. We also own easements to three reservoirs (Lee Bench Reservoirs - aka Big Monitor No. 1, Middle Reservoir, and Big Monitor No. 2) and all associated irrigation structures and ditches located on the U.S. Forest Service land. We own water rights which allow for the storage of 272.50 acre feet of water from Big Monitor Creek in these reservoirs, all of which may be used on the ranch. We also have the right to use additional water (in addition to that stored in the reservoirs) from Big Monitor Creek for irrigation on Monitor Mesa Ranch and for storage in the three large ponds located on Monitor Mesa Ranch. Monitor Mesa Ranch is used for grazing and is also home to resident deer and elk populations, small game, birds, wild ducks, wild turkey, coyotes, occasional bear and mountain lion.

Monitor Creek, as it flows through Monitor Canyon, consists of the confluence of Little Monitor Creek and Big Monitor Creek (confluence is located on BLM Land in Monitor Canyon) and Monitor Creek flows 9.42 miles along the floor of Monitor Canyon from the U.S. Forest Service land down stream to the confluence of Monitor Creek with Potter Creek.

Given these facts, I reviewed the Wild & Scenic Rivers Act, its legislative history, and other related materials. We believe that a relevant portion of the Wild & Scenic Rivers Act, Section 3, notes in part:

> (d) (1) For rivers designated on or after January 1, 1986, the Federal agency charged with the administration of each component of the National Wild and Scenic Rivers System shall prepare a comprehensive management plan for such river segment to provide for the protection of the river values. **The plan shall address resource protection, development of lands and facilities, user capacities, and other**

BLM_0108738

> management practices necessary or desirable to achieve the purposes of this
> Act. {Emphasis added}

Furthermore, Section 10 notes in part:

> (a) Each component of the national wild and scenic rivers system shall be administered in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values. In such administration primary emphasis shall be given to protecting its esthetic, scenic, historic, archaeologic, and scientific features. **Management plans for any such component may establish varying degrees of intensity for its protection and development, based on the special attributes of the area.** {Emphasis added}

Finally, Section 13 notes:

> (c) Designation of any stream or portion thereof as a national wild, scenic or recreational river area shall not be construed as a reservation of the waters of such streams for purposes other than those specified in this Act, or in quantities greater than necessary to accomplish these purposes.
> (d) The jurisdiction of the States over waters of any stream included in a national wild, scenic or recreational river area shall be unaffected by this Act to the extent that such jurisdiction may be exercised without impairing the purposes of this Act or its administration.

The purpose of the Wild and Scenic Rivers Act is stated as being to implement the policy set out in Section I of the act — to preserve rivers "in free-flowing condition to protect the water quality of such rivers and to fulfill other vital national conservation purposes." "Free-flowing" is defined as "existing or flowing in natural condition without impoundment, diversion, straightening, rip-rapping, or other modification of the waterway."

The copy of the Criteria Used in the Suitability Evaluation we received at the last meeting notes that BLM Manual 8351 identifies factors to be considered when determining jurisdictional and management constraints, noting in part:

> 3. Outstandingly Remarkable Values (ORVs) that could by affected by designation or non-designation.
>
> 5. Compatibility or incompatibility of designation with current land and water uses and developments.
>
> 6. Reasonably foreseeable potential land and water development and uses that could be affected by the designation.
>
> 7. Ability to manage and protect the segment as a WSR, including any existing and potential mechanisms for protecting the segment's ORVs other than WSR designation.

With respect to Monitor Creek, the only identified ORVs in the Final Wild and Scenic River Eligibility Report are: Vegetation: narrow leaf cottonwood/strap leaf willow/silver buffalo berry riparian forest; Fremont cottonwood/skunk brush sumac riparian woodland; and common coyote

Forests), No. W-8439-76 (Dist. Ct., Water Division No.1, Feb. 12, 1993) [hereinafter Water Division No.1].} there was a precedent setting decision regarding water rights appropriation under the Wild & Scenic Rivers Act. In the Water Division No.1 adjudication, the Forest Service submitted a brief providing 180 pages of explanation and illustration of the scientific principles on which it relied for its claim of in-stream flows.

The Water Court denied the application for in-stream flow rights, resting its decision on two grounds, each of which was viewed as being independently sufficient to support the decision. First, it concluded that the necessity of reserved rights for in-stream flows had not been shown because the Forest Service's **in-stream flow goals had been met in the past and could continue to be met through the use of the administrative permit system.** Second, **it found the Forest Service's scientific methodology to be inadequate to the task of accurately quantifying minimum in-stream flow needs.**

In this case, an alternative to appropriation of water rights would be for the Water Court to retain continuing jurisdiction for purposes of deciding reserved rights claims in future. The Forest Service could use a claim of reserved rights as a last resort in particular cases where administrative controls proved insufficient and actual harm was demonstrable. Evidence that actual harm was imminent would likely be more persuasive to a court than abstract calculations as to minimum amounts of flow. Ideally, such evidence would be presented in time to forestall any serious effects.

Thus, the appropriation of water rights and more specifically, the appropriation of existing water rights to ensure in-stream flows appear to be problematic and unjustifiable absent demonstrable actual harm. Administrative controls and monitoring are preferable courses of action.

This culminates our analysis of issues, and we conclude that, since the ORVs noted in the Final Wild and Scenic River Eligibility Report have been in existence for an immeasurable period of time, the present BLM Management Plan is adequate to ensure the healthy continuity of the ORVs in Monitor Canyon and designation under the Wild and Scenic River Act is inappropriate. Since the shoreline in Monitor Canyon is essentially primitive and there are no water diversions or impoundments along this river segment, nor are any possible, no interference with the natural conditions is the best course of action as a Management Plan. Any in-stream flow goals have been met in the past and can continue to be met through the use of the administrative permit system. To appropriate additional water rights in Monitor Creek requires a precise determination of seasonal and yearly variable stream flows and any scientific methodology used is likely to be expensive to implement and inadequate to the task of accurately quantifying minimum in-stream flow needs, especially in view of the highly variable flows in this drainage. Such a process is expensive and fails to provide any benefits above those provided by simple monitoring of conditions. Again, designation under the Wild and Scenic River Act fails to benefit Monitor Creek.

If this letter raises issues that need discussion, we are available at (720) 560-9483. I shall be at subsequent meetings, so face-to-face discussions are also possible in that venue.

Respectfully,

Jim & Lynn Graziano

# Gunnison Basin Wild and Scenic Stakeholder Group
## Delta Performing Arts Center
822 Grand Ave., Delta Colorado
November 8, 2010
7:00 p.m. – 9:00 p.m.

# DRAFT NOTES

## Summary
The meeting began with introductions of the new facilitation team (Callie Hendrickson and Hannah Holm) and all the participants, and a discussion of administrative issues such as ground rules, goals and objectives, different approaches to group decision-making, the need to diversify the stakeholder group, and how the process would be funded.

The remainder of the meeting focused on the process the group would use to move forward with assessing the stream segments eligible for "Wild & Scenic" status and developing recommendations to the Bureau of Land Management (BLM) on their suitability for that designation.

The meeting concluded with a decision to begin the assessment process with segments in the North Fork of the Gunnison drainage (Deep Creek and the West Fork of Terror Creek), followed by stream segments in the Roubideau Creek area (Monitor Creek, Potter Creek, and segments 1&2 of Roubideau Creek).  The next meeting will be held November 22 at 7pm in the same location unless otherwise noted.

## Administrative
### Participants
LIST (sign-in sheet will be sent later)

### Accomplishments from prior meetings
Agreed to work together, hired facilitators.

### Roles of facilitators and other parties
Lead facilitator Callie Hendrickson proposed the following roles, which met with understanding and agreement from the group:
- Facilitators: provide process for group to come to achieve its goals.
- Bureau of Land Management (BLM): provide data, information (not guiding)
- Stakeholders: be sure concerns are heard & addressed.

### Ground rules for participation and decision-making
Callie asserted that the following rules are keys to good decision-making, which were accepted by the group:
- Everyone listening
- Everyone showing respect
- Everyone suspending judgment (for just a little bit)
- Everyone speaking up respectfully.

### Reaching for a positive outcome
Callie noted that representatives from various constituencies had all reported feeling that they had "given up" a lot in previous stakeholder processes and spoke of a desire to make this a process where people focus instead on what they achieved together.  A key to achieving this outcome is to create a "shared pool of meaning," where it feels safe for everyone to fully participate – neither "quietly boiling" nor seeking to dominate discussion.

BLM_0108741

**Ways of Making Decisions**

Callie asked the group to discuss different ways of making decisions.  The following options and comments were offered:

- Majority rules
- Loudest voice wins
- Consensus – would like to have 100% - BLM would love it, would make their decisions easier
  - Will settle for reasonable compromise
  - How structure to have focus on "what we got done"?
    - Negotiate a "win-win" – everyone has to be in a position to negotiate, give a little
    - Acknowledge disagreement on points where no consensus was reached (footnote)

Callie proposed the following system for indicating agreement/ disagreement and finding solutions:

- If you like something – thumbs up
- Can live with it – sideways
- Don't like – thumbs down and say what you need.

The point was made that willingness to agree on a given point depends partly on what's happened in the rest of the process – a participant could live with some less than ideal outcomes if whole package is generally favorable.  The group concluded that the "thumbs" system was fine for making decisions tonight, on issues on current agenda.

**Goals and Objectives**

Callie checked in with the group to make sure that the following goal statement from previous meetings was what everyone had in mind:

 *"To develop management plans to guide BLM's suitability determinations for segments in the Gunnison Basin."*

The group agreed, with the added clarification that the guidance would be provided as a <u>recommendation</u> to BLM, not a <u>directive</u>.

Callie then asked the group to discuss the underlying purpose that brought them to the table & what they wanted to get out of the process.  The following responses were provided:

- Protect the Outstandingly Remarkable Values (ORV's) on the stream segments under consideration.
- Assess suitability criteria
- Restore law & order on the Gunnison by addressing problems such as:
  - cars being broken into
  - too few campsites
  - drunk, unknowledgeable and disorderly boaters
  - inadequate launch sites
- Protect private property rights and water rights
- Protect the flexibility to develop water
- Protect public property rights & freedoms
- Protect ability to use and develop public lands
- Verify facts in the eligibility reports (ORV's, acreages reported, etc)

**Diversifying the group**

It was noted that the group at the present meeting was smaller and less diverse than in earlier meetings, and participants agreed that it needed to be diversified.  The following strategies were offered:

- Do more publicity, including radio PSA's.

- Follow up on list of additional stakeholders to be invited that was generated at the group's October 12 meeting.
  - BLM Uncompahgre Field Office did invite all permitted outfitters.
  - Need to check on others.
  - New ideas:
    - other outfitters (those permitted out of BLM's Grand Junction Field Office)
    - Union Pacific Railroad
    - Bureau of Reclamation
    - Audubon Society

It was noted that several environmental organizations stated that they were withdrawing from the stakeholder process at the end of the second meeting.  The group agreed that they would be welcomed back if they changed their minds.

**Incorporating newcomers to the process**
It was noted that while the group needs to diversify, it also needs to move quickly to meet the BLM Uncompahgre Field Office deadline for getting input on suitability by March of 2011.  With that in mind, the group agreed on the following approaches for incorporating new members:

- Avoid spending meeting time on orienting new members by having facilitators orient new members by providing meeting minutes and a summary of the group's charge and process.
- Do not backtrack over issues already covered unless the overall group agrees.

**Communication tools**
Co-facilitator Hannah Holm offered the group the option of a website, with varying options for how public and interactive it would be, as a tool for archiving and sharing minutes and other meeting information.  After some initially mixed opinions, the group agreed that a website was unnecessary and meeting information would be shared by sending meeting notes and announcements via email to those that use it and conventional mail to those that don't.  Newcomers to the process can receive this information from the facilitators.

**Funding**
State funding
Chris Treese from the Colorado River Water Conservation District (River District) noted that a grant request is in preparation to the Colorado Water Conservation Board (CWCB), and that the River District will serve as the fiscal agent for the state contribution as well as stakeholder contributions.

The CWCB has substantially funded similar past stakeholder processes, and that the CWCB had indicated willingness to fund this process as well.  Requirements for CWCB funding are that a broad, inclusive group of stakeholders each make a meaningful financial contribution (as sets of stakeholders, not necessarily as individuals).  The CWCB provided approximately 80% of the funding for the Lower Colorado Wild & Scenic stakeholder group.

Stakeholder funding
The following stakeholders have already made either formal or informal commitments to contributing funding:

- Delta County Farm Bureau
- Delta County Board of County Commissioners
- River District ($2,000)

The River District's requested (not required) contribution levels for different types of stakeholders are:

- landowners - $250-$500
- organizations - $500-$1,000
- conservancy districts & municipalities - $1,000-$2,000

- counties & conservation districts - $2,000-$2,500

Strategy
The following steps were agreed upon for raising and keeping track of funding:
- Email the facilitators' bid/ overall budget along with the contribution request to stakeholder list.
- Each meeting check in and review who has contributed what, the overall balance, and what expenses have been incurred.

**Process**

**Summary table of eligible stream segments**
Hannah presented the summary table of stream segments to be considered by the group, noting how they were geographically clustered and the sources of the information: the eligibility reports for the stream segments prepared by the BLM's Uncompahgre and Grand Junction Field Offices. The following comments were made on the chart and the stream segments the group is charged with assessing:
- The "public/ private" data in the chart is misleading, implying more BLM management control than there really is.
- The updated source information for the segments in the Dominguez-Escalante National Conservation Area (NCA) is the recently developed Wild & Scenic Eligibility Report for the NCA segments, which combines and makes consistent information gathered by both the Grand Junction and Uncompahgre BLM Field Offices: http://www.blm.gov/co/st/en/nca/denca/denca_rmp.html

**How to proceed**
The group was strongly in favor of having the whole group go segment-by-segment through the 18 segments to be considered, grouping them geographically. The discussion touched on several considerations for how to make this work efficiently and effectively.

Working groups – not for now
There was some discussion of having separate working groups on different group of segments meet separately, with or without facilitators present, to develop information.
- If a facilitator is present at the working group meetings, it helps "keep people honest" and not go back on any agreements reached at that level.
- Involving facilitators in working group meetings creates an added expense.
- In the end, the group decided to try going without facilitated working groups meeting separately. Instead, people with particular knowledge and perspectives on the stream segment(s) to be considered will provide this information at the beginning of the meeting and everyone will discuss it together.

How much agreement before moving on?
The group expressed a strong sentiment in favor of reaching agreement on how to address each segment and then moving on to the next one and not going back later to re-negotiate. However, this was balanced by recognition that it would be unrealistic to expect to be able to achieve complete consensus immediately before moving on. To achieve this balance, the following approaches were agreed to:
- Collect key information and agree on a general approach to the segment before moving on, but don't try to draft a final recommendation at that point.
- Watch for common elements to emerge between the different segments the group considers.
- Expect to gain different perspectives as the group proceeds through the whole list.
- Revisit the group's approach to a previously-addressed stream segment if the whole group agrees, but not to appease a newcomer to the process or a smaller group of stakeholders.

Which segments to do first?

The group agreed to start with the segments that were expected to be the least controversial in order have an easier time settling into the assessment process.  BLM Uncompahgre Field Office (UFO) Field Manager Barb Sharrow also requested that UFO segments outside the NCA be addressed first, to help meet the timelines in the UFO's planning process.

With those considerations in mind, the group decided to address the following segments early in the process, in this order:
1. The North Fork Hydrologic Unit segments:
    a. Deep Creek
    b. West Fork of Terror Creek
2. Roubideau drainage segments in the Lower Gunnison Hydrologic Unit:
    a. Monitor Creek
    b. Potter Creek
    c. Roubideau Creek, Segment 1
    d. Roubideau Creek, Segment 2

**Information needs**
The group identified the following information needs for assessing the segments above and increasing understanding the implications of the Wild & Scenic suitability overall:
- Water rights affecting the segments & affected by management of the segments
- Colorado Division of Wildlife and/ or Forest Service biologist to discuss the significance of the presence (or possible presence) of a pure strain of Greenback Trout in the North Fork streams.
- Water Commissioner comments
- Energy locations
    o mine near West Fork of Terror Creek
    o check with Gunnison Energy
    o check Geocommunicator website for claims
    o check Colorado Oil and Gas Conservation Commission website
- Review sections 6&7 of Wild & Scenic Rivers Act in order to better understand potential impacts on private property rights.

**Next meeting dates**
Recognizing that monthly meetings were unlikely to provide enough time to develop recommendations by the BLM UFO's March 2011 target, the group agreed to meet more frequently and scheduled the following two meetings (held in the Delta Performing Arts Center unless otherwise announced):
- November 22, 7-9pm (Monday)
- December 6, 7-9pm (Monday)

**Action Items (for Callie and Hannah)**

Publicity
- radio
- Delta Independent
- High Country Shopper

Individual Outreach
- Trout Unlimited - Hotchkiss
- List from 10/12 meeting
- Environmental groups originally present
- Audubon

Funding
- Circulate request & budget

Contact speakers for next meetings
- Water commissioners
- Sherman Hebine, DOW biologist, Montrose Office, threatened & endangered fish expert
- Colorado Natural Heritage Program - on proposed potential conservation areas
- Expert on Wild & Scenic implications for private property rights

Communication
- circulate 10/12 minutes
- circulate 11/8 minutes + meeting announcements

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Chapter 2 Themes from Cooperating Agency and RAC Subgroup Review

| Cmt # | Page # | Alternative | Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 1. | | General | A. Schroeder CA | I believe that the draft alternative themes are reasonable.  However, getting a feel for how management of the various resources or resource uses might differ by alternative was a bit difficult, at this point, since the alternatives did not always have the same resources or resource uses listed. | |
| 2. | | General | Steve Weist RAC SG | After reviewing the alternative themes used by neighboring RMP areas, the following are my comments on the number and range of alternatives that should be used as the BLM UFO, the Southwest RAC, and the RAC subgroup evaluate the opportunities for maximizing public access and resource utilization, while maintaining or improving the opportunities for preservation or our national resources. It appears to me that each of the other RMP areas used at least 4 alternatives, those being, **No Action**, a **Conservation Alternative** or close off everything to everyone, a **Preferred Balance** or what is the best use of each of the resource areas, and a **4th alternative** which allowed additional activities throughout the resource area, and had less preservation of resources, and appeared to be an alternative no one wanted. I propose that we use just three options or alternatives: **No Action**, a **Conservation Alternative**, and the **Preferred Balance**, which is a balanced combination of maximizing resources, and public access, while identifying and preserving those resources identified as being sensitive, or of critical importance to maintaining our resources. The 4th alternative, appears to me to be an afterthought which will just take up additional time to develop ideas and thoughts for an alternative that will never be seriously considered. If **No Action** is an alternative that is not worth | |



BLM_0108746

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Chapter 2 Themes from Cooperating Agency and RAC Subgroup Review

| Cmt # | Page # | Alternative | Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | considering, then I propose to leave the **no action** alternative in the group of themes, and still have three basic options to consider. **Options 1** would allow everything to be available to the public, and minimal or no preservation of resources, **Option 2** would be the conservation approach in which nothing is allowed, and preservation is maximized, and **Option 3** would be the correct balance of resource utilization and resource preservation which would allow the public to access these lands, while maximizing our ability to preserve our national resources and heritage. This would be similar to what was used by the surrounding RMP areas, and while it would cause additional work to complete the extra alternative, it would appear to provide a balanced review of all appropriate options or alternatives.<br><br>The four options proposed by the UFO, would develop alternatives that would identify usable items for each alternative, however, none of those alternatives would provide an ultimate usable alternative. This would ultimately result in having to develop an additional alternative that summarized the best items from each of the four alternatives, and put it into the final recommended alternative. This I feel would just cause a lot of unnecessary work to arrive at a result that could be reached in three steps by using the **No Action**, **Conservative Alternative**, and **Preferred Balance** alternatives suggested above. | |
| 3. | | General | Bill Day RAC SG (8/8/10) | I am not totally against the four theme grid that we discussed, but I'm starting to lean more towards the conventional three alts plus the required A/do nothing. I am afraid the four theme grid means any Preferred Alt is in an "extreme" corner, meaning more people being really unhappy and wanting to sue, since there is no middle choice.  It would almost require a nine theme grid, even though at least four and maybe six of those choices wouldn't really be viable choices. | |



BLM_0108747

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Chapter 2 Themes from Cooperating Agency and RAC Subgroup Review

| Cmt # | Page # | Alternative | Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | After years of not liking the conventional conservation, Preferred/middle, and O&G/ORV choices, I'm starting to think that it might not make that much difference. There doesn't seem to be a good way to really give people two non-extreme choices when the BLM is required to have a preferred alt. Maybe it is better to have the extra alt development time spent on making the Preferred alt as good as possible and explaining however much wiggle room there really is in adjusting the preferred alt. I don't think it helps to have any more extreme positions in the other (non preferred) alts than we are willing to actually consider. This would make it possible to use some components of B and D, or something in between, without people reading something that they are not going to get in reality. I realize that some things have to be mentioned in one alt. I almost cringe when I read the three alts named conservation, preferred and development. 90% of the people have made up their mind by the time they read that. | |
| 4. | | General | Bill Day RAC SG (8/22/10) | After seeing your alternative chart (at the August 20 sub RAC mtg) and hearing Angie's description of having an additional preferred alt in addition to the other four, I support doing it that way. | |
| 5. | | Alternative B | Joan May CA | Under recreation, I would like to see this referred to as "active management" instead of "lots of rules." I understand that this is just internal draft and the verbiage will change a lot, but I thought that one was important. Also, instead of maintain AUM base, I'd like to suggest that we say something like "adjust AUMs to achieve land health standards and site potential." | |
| 6. | | Alternative D | Joan May CA | I would suggest that the main focus should be to achieve BLM lands to their highest potential, citing specifics like soil stability, species diversity, etc. | |
| 7. | | Alternative D | A. Schroeder CA | Line 4- Delete the word "*less.*" *Rationale:* The word is unnecessary. Management actions will be reactive rather than proactive, but may or may not actually be | |



**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Chapter 2 Themes from Cooperating Agency and RAC Subgroup Review

| Cmt # | Page # | Alternative | Commentor | Comment | Response (To be completed by EMPSi) |
|-------|--------|-------------|-----------|---------|--------------------------------------|
| | | | | "less." | |
| 8. | | Alternative E | A. Schroeder CA | Line 4- Delete the word "less." Rationale: The word is unnecessary. Management actions will be reactive rather than proactive, but may or may not actually be less. | |
| 9. | | General | B. Hawke RAC SG | It will be important that well-founded options are reflected in more than one alternative. For example, good travel management benefits many uses of public lands by providing clarity and reduction of conflict. Thus I would expect that SRMAs, ERMAs and closures would appear in multiple alternatives. | |



Chapter 2 Themes for Cooperating Agency,
and RAC Subgroup Review

BLM_0108749

**James Bode**

| | |
|---|---|
| **From:** | Site Administrator <info@cecenviro.org> on behalf of priscilla sherman <priscilla.sherman@gmail.com> |
| **Sent:** | Wednesday, November 17, 2010 4:29 PM |
| **To:** | uformp@blm.gov |
| **Subject:** | Conservation of the Dolores River |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Nov 17, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection. Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update. Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor. The BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity; *prove that the long-term ecological health of the area will not be jeopardized; *have viable reclamation plans in place before permits can be granted; and *have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.

Thank you for this opportunity to participate!

1

Best

Ms. priscilla sherman
2951 Richard Dr
Durango, CO 81301-4374

BLM_0108751

**BLM – U**NCOMPAHGRE **F**IELD **O**FFICE, **C**OLORADO
**R**ESOURCE **M**ANAGEMENT **P**LAN **R**EVISION AND **E**NVIRONMENTAL **I**MPACT **S**TATEMENT

## Comments on Chapter 2 Goals from Cooperating Agency and RAC Subgroup Review

| ????Cmt # | Page # | Resource | Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 1. | Chapter 2 Goals | General | Bill Day RAC SG | …my personal favorite part of the surrounding Field Offices' plans was the San Juan goal of maintaining large blocks of undeveloped land, which showed up in the Preferred, as well as the conservation alt. That idea would be nice to fit into the Draft Goals, but I didn't really notice a good place to put it.  Otherwise, the Draft Goals looked very good. | Thank you for your comment. This will be considered in the overall themes of the draft alternatives (Chapter 2). |
| 2. | Chapter 2 Goals | General | A. Schroeder CA | I believe the draft goals are reasonable and can be met at various levels through the alternatives. | Thank you for your comment. |
| 3. | Chapter 2 Goals | Transportation Facilities | Steve Weist RAC Subgroup | After reviewing the Internal draft goals for the Uncompahgre RMP, the only comment I have is on page three the resource called "Transportation Facilities". I would like to see a better definition of what transportation facilities are. The goal for this resource is "Provide a transportation <u>system</u> that is manageable, maintainable, and meets the needs of resources and resource uses." It is unclear to me what a "transportation system" is, does that mean roads, trails, etc. or a system whereby the public is bussed or moved through an area to minimize their affect on an environmentally sensitive area. Other than that it appears that all resource category goals are described appropriately. | The Transportation Facilities section/topic and its goal have been incorporated into the Comprehensive Trails and Travel Management section/topic and goal. |
| 4. | Chapter 2 Goals | Vegetation-Uplands (Forests, Woodlands, and Rangeland), | A. Schroeder CA | 2nd Goal, last line- Add, *"and provide for forest and woodland products." Rationale:* Management of forests and woodlands should include forest/woodland products, since you also have a goal for such products. Management may be extensive rather than intensive, depending on the alternative. | Kate Wynant (EMPSi) emailed to Amanda Clements (BLM UFO) on 10/21/2010 for consideration. |
| 5. | Chapter 2 Goals | Special Status Terrestrial Wildlife | A. Schroeder CA | line 1- Insert the word *"wildlife"* between the words *"terrestrial"* and *"species." Rationale:* Clarifies the type of terrestrial species. | Change made. |



**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Chapter 2 Goals from Cooperating Agency and RAC Subgroup Review

| ????C mt # | Page # | Resource | Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 6. | Chapter 2 Goals | Wild Horses | A. Schroeder CA | Mostly questions. What is meant by *"Recognize the historic Naturita Ridge Herd Area."*? Are there wild horses currently in the Naturita Ridge Herd Area or elsewhere in the planning area? If so, what is the management goal for them? If not, are they going to be reintroduced and what will be the management goal after reintroduction? Or, will the Naturita Ridge Herd Area continue to be closed to wild horses? | The Wild Horses section/topic of the alternatives has been deleted. Draft Chapter 3 (Affected Environment) answers your questions about the Naturita Ridge Herd Area. |
| 7. | Chapter 2 Goals | Wildland Fire Ecology and Management | A. Schroeder CA | line 3- Delete the words, "across the landscape." <u>Rationale:</u> The phrase is not necessary. | Change made. |
| 8. | Chapter 2 Goals | Cultural Resources | A. Schroeder CA | line 1- Delete the words "in order" and insert the word "they" between the words "that" and "are." <u>Rationale:</u> The suggested wording change is more concise. | Angie Adams (EMPSi) emailed to Glade Hadden (BLM UFO) on 10/21/2010 for consideration. |
| 9. | Chapter 2 Goals | Paleontological Resources | A. Schroeder CA | line 1- Revise the first part of the sentence prior to the word "paleontological" to read: *"Identify, protect, and manage."* <u>Rationale:</u> The suggested wording is more assertive and is similar to the wording for cultural resources. | Angie Adams (EMPSi) emailed to Glade Hadden (BLM UFO) on 10/21/2010 for consideration. |
| 10. | Chapter 2 Goals | Lands with Wilderness Characteristics outside Existing WSAs | A. Schroeder CA | Action Alternatives, line 1- Revise the first part of the sentence prior to the word "preserve" to read: *"Identify, manage, protect, and."* <u>Rationale:</u> The suggested wording is more assertive and concise. | Angie Adams (EMPSi) emailed to Edd Franz (BLM UFO) on 11/18/2010 for consideration. |
| 11. | Chapter 2 Goals | Forest and Woodland Products | A. Schroeder CA | Suggested simplified re-wording of the goal: *"Provide forest and woodland products on a sustainable basis to meet local needs and in a manner consistent with other resource management goals."* <u>Rationale:</u> The current draft goal description seems a bit complex; could it be simplified? What is meant by, *". . . where such use does not limit the accomplishment of the above mentioned goal. . ."* Which above mentioned goal? The suggested wording is more concise and allows for consistency with <u>all</u> other resource management goals. | The goal has been simplified to: "Provide forest and woodland products on a sustainable basis to meet local needs" (as of 11/18/10). |
| 12. | Chapter 2 Goals | Lands and Realty | A. Schroeder CA | The goals for lands/realty should be broader than just land use authorizations. What about land tenure, land | Change made (goal broadened). |



Chapter 2 Goals for Cooperating Agency, and RAC Subgroup Review

BLM_0108753

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Chapter 2 Goals from Cooperating Agency and RAC Subgroup Review

| ????C mt # | Page # | Resource | Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | disposal, withdrawal management, land or easement acquisition, land classifications, etc.? | |
| 13. | Chapter 2 Goals | Coal | A. Schroeder CA | Why is the clause, "subject to BLM policies, laws, and regulations." used here and not in any other goal description, except *Fluid Minerals*? All of the provided opportunities for land and resource uses are subject to BLM policies, laws and regulations; that is a given. I recommend you delete that clause from these goal descriptions and include it for all land/resource uses in a general background section of the RMP. | Change made (clause deleted). |
| 14. | Chapter 2 Goals | Fluid Minerals | A. Schroeder CA | Why is the clause, "subject to BLM policies, laws, and regulations." used here and not in any other goal description, except *Coal*? All of the provided opportunities for land and resource uses are subject to BLM policies, laws and regulations; that is a given. I recommend you delete that clause from these goal descriptions and include it for all land/resource uses in a general background section of the RMP. | Change made (clause deleted). |
| 15. | Chapter 2 Goals | Renewable Energy | A. Schroeder CA | What is your management goal for renewable energy resources (wind, solar, hydro)? No management goal was listed. | The BLM planning guidance does not provide for goals specific to renewable energy in its RMPs. Renewable energy is part of the larger Lands and Realty program and its goal. There also will be specific action(s) within the Lands and Realty section that address renewable energy. Similarly, geothermal renewable resources are addressed within the larger Fluid Minerals program and its goal, objectives and actions. |
| 16. | Chapter 2 Goals | Hydropower | A. Schroeder CA | Hydropower should be included somewhere in resource management goals as part of this RMP. There are areas within the planning area that are classified and/or withdrawn as potential hydropower sites (mostly river canyon areas which are also identified as SMAs or eligible WSR stretches). They should at least be identified and addressed in the RMP (perhaps similar to the discussion of lands with wilderness characteristics outside of WSAs). | The BLM planning guidance does not provide for goals specific to hydropower in its RMPs. The BLM can include in Chapter 3, Affected Environment, that there are areas within the planning area that are classified and/or withdrawn as potential hydropower sites. Also, because the BLM can permit small hydropower ("microhydropower") projects, these are addressed in Chapter 2 to the extent of BLM's jurisdiction. |
| 17. | Chapter 2 | Areas of Critical | A. Schroeder | line 1- Insert the words, *"Establish and"* at the beginning | Angie Adams (EMPSi) emailed to Bruce Krickbaum |


BLM_0108754

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Chapter 2 Goals from Cooperating Agency and RAC Subgroup Review

| ????C mt # | Page # | Resource | Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | Goals | Environmental Concern | CA | of the sentence. _Rationale:_ I presume some ACECs still need to be established before they can be managed. | (BLM UFO) on 11/18/2010 for consideration. |



Chapter 2 Goals for Cooperating Agency, and RAC Subgroup Review

BLM_0108755

**Travel Management and Alternative Theme Comments
from SubRAC member Hawke**
November 18, 2010

Kate, Angie, Bruce, Julie and all –

   I appreciate the opportunity to share thoughts on travel management and general Alternatives themes. I would like to share general thoughts on organization of the travel management alternatives, and then specific thoughts on management needs for particular geographic areas. In addition, I believe it is critically important that the RMP revision define certain parameters for later detailed travel management planning.

   I had a great and helpful conversation with Julie Jackson yesterday, and appreciate both her openness and knowledge of travel management issues. Please use me as an ongoing resource for additional information, connection to interests in the conservation community and beyond, and help with arranging site visits or small group meetings to work out details for specific issues or geographic areas in the future.

**I.     Detailed Travel Management Planning:**
The RMP Revision should specify the process for later detailed travel management planning. The RMP Revision should include:

   That detailed travel management planning will be completed for all areas of the field office by no later than one year following issuance of the final RMP Revision

   Travel management plans should be prioritized for completion, and priority areas should include the following:

- Wilderness Study Areas, Lands with Wilderness Characteristics, and Citizen Wilderness Proposal Areas
- ACECs
-  Areas of high use or high conflict
- Areas of sensitive habitat, including but not limited to Gunnison Sage Grouse occupied or potential habitat, riparian areas, and rare plant habitat
- Existing or proposed SRMAs and ERMAs

1

BLM_0108756

II.   **Management Planning Framework and Recreation Management Zones**

One of the interesting components of the new recreation Instruction Memorandum's framework is the addition of the "Extended Recreation Management" category. This category may be particularly relevant to certain issues of concern to local residents, quiet recreationists, and conservationists – specifically, by providing an additional tool with which to manage recreational use while preserving existing conditions and  natural resource values.

Looking beyond the specific framework of SRMAs ERMAs, and "other" areas, I recommend that additional categories be considered with which to incorporate positive, even aspirational, goals for managing particular geographic sub-areas. Julie mentioned that management goals would be used for SRMAs, and possibly for ERMAs.

In any case, I think the use of unifying management goals is very important, and may be aided by the use of some additional recreational use goal "categories,"[1] and additionally by the use of overall management zones to synthesize management needs for diverse potential uses. I'll elaborate on these thoughts below.

A.  Recreation Management Categories

To capture the range of interests in recreational use in the UFO area, and to strengthen the ability to manage for a range of proactive recreation goals, I recommend use of recreation management categories to incorporate the following approaches:

1.  ERMAs:

With the addition of this new category, it is important to identify areas that have a goal of maintaining or reducing current levels of recreational use, or where preservation of natural or cultural resource values is important. Such areas may be more appropriate to categorize as ERMAs than SMRAs.[2]

Categorization may be less clear when increased recreational use may be anticipated or desired, yet active recreation management and preservation of sensitive natural features is also needed. In any case, any sensitive resource values should direct the recreation management approach, regardless of category.

---

[1] The Land Use Planning Regulations would support that it is fully appropriate to delineate categories of recreation use in the RMP rather than waiting for travel management. The regs state that a RMP "will delineate Travel Management Areas....[and]..a map of a preliminary road and trail network."

[2] The new ERMA definition in H-1601 – 1 – Appendix C, Attachment 3, describes ERMAs as being managed to "maintain ....relatively unchanged... setting characteristics,"

2

The following areas would generally be recommended for ERMA status:

- Paradox Valley – Saucer Basin, the Paradox Potential Conservation Area and surroundings
- Nucla Northeast – The Big and Little Bucktail Creek drainages are seeing increasing motorized use
- The Burn Canyon area, including Burn Canyon, Hamilton Creek, Callan Draw, McKee Draw and Flatiron.

There may be additional areas that conservation and quiet recreation interests would recommend for ERMA status, after seeing how the new categories may be integrated into the plan.

2. <u>Backcountry Quiet Use Areas:</u>
These areas would be positively managed for the purpose of providing the highly desired, yet ever-more elusive quiet recreation experience with a more remote feeling. Although overall these areas would permit mechanized but no motorized use, some areas should be further designated for primitive, non-mechanized use only.

In most cases, I would think the backcountry quiet use areas would be consistent with the ERMA category, although significant management action might be required to get the area to the desired condition which would then be maintained. For example, an area with a backcountry quiet use goal might need significant reduction in route density, closing and rehabilitation of excessive or redundant routes, and designation and signing of desired routes. In addition, backcountry quiet use areas might often encompass sensitive natural or cultural resources which would need careful survey and planning to ensure that recreational routes and uses were diverted away from areas where natural resources needed special protections.

3. <u>Wilderness-quality areas:</u>
Areas included in Wilderness Study Areas, Lands with Wilderness Characteristics, and Citizen Wilderness Proposal Areas should be closed in the RMP Revision to motorized and mechanized travel (with standard exceptions for agency administrative access, emergency access, existing rights of permittees and lessees, etc.).This travel limitation is important both to preserve the wilderness characteristics of these areas, and to proactively provide areas offering primitive, quiet use.

3

BLM_0108758

These wilderness-quality areas include, but are not necessarily limited to:
- Roubideau/Monitor/Potter Creek
- Adobe Badlands
- Norwood Canyon
- Sewemup Mesa (including the full citizens; wilderness proposal area)
- Dolores River Canyons

4. Additional Categories and Subcategories

Additional sub-categories should be developed for the RMP recreation alternatives to address particular travel management needs. The following types of travel management needs should be delineated and addressed in the RMP revision:

1. Unroaded areas that should be given non-motorized prescriptions
2. Low road-density areas identified for route reductions and/or motorized closures
3. Areas of rapid route proliferation where the "limited to existing" restriction needs to be strongly enforced
4. Heavily roaded areas needing road density reduction targets specified in the RMP, to be implemented in later travel planning

Attached in Appendix A are detailed recommendations of geographic areas that would fall within the categories described above.

B. Management Zones

Although I understand that concern exists that the use of management zones would add a complicating layer to the planning process, a management zone approach might conversely aid in synthesizing different management goals and prescriptions across many planning topics. Management zones have been successfully implemented by other field offices to integrate comprehensive travel and transportation management (CTTM) into the goals of an RMP. Management zones emphasize certain types of management and experiences for the planning area as allocated in the RMP. These broadly-defined landscapes describe the type of uses and experiences that will be expected in the specific areas and other management decisions, such as designated routes for travel, can be made based on the criteria for that zone. Thus, the use of management zones in the RMP revision might form an effective bridge to the subsequent detailed travel management planning.

There are several examples where BLM has defined these types of management zones in RMPs. One is the Grand Staircase-Escalante National Monument Management Plan (MMP). In this plan, BLM described four zones to "provide guidance to help define permitted or excluded activities and any

4

stipulations pertaining to them." These zones included Frontcountry, Passage, Outback, and Primitive Zones.

Another example is the Craters of the Moon National Monument RMP which included the Frontcountry, Passage, Primitive, and Pristine Zones for the entire planning area.. The plan describes the use of zones as a useful way to guide decisions to meet desired conditions. (A table describing these zones is attached to this email).

The exact formulation of management zones would have to be customized for the specific needs and conditions of the UFO, however these examples might prove very informative. I would be happy to provide additional thoughts, details and references to such materials if that's helpful.

C. Specific Recommendations for closures and other special travel management areas

1. Closures:
The following types of areas should be added to the alternatives for closures to motorized travel:
   a. Key habitat areas for sensitive species and wildlife[3], including but not limited to:
      I.   Gunnison sage grouse habitat – occupied; and to the extent possible, also potential habitat; and in any additional areas where potential habitat may be restored, particularly any restorable historic habitat
      II.  Sensitive riparian and wetland areas
      III. Existing and proposed ACEC areas with fragile soils or sensitive habitat, including but not limited to:
           - Salt Desert Shrub
           - Fairview North and South with expansions
           - La Sal Creek
           - Dolores River Slickrock
           - West Paradox
           - San Miguel River ACEC, including expansion
   b. Additional areas identified in the Soils assessment where there are sensitive or highly erodible soils year-round, and where motorized

---

[3] The Center for Native Ecosystems has some interesting and informative methods for screening and ranking areas for habitat sensitivity. CNE would be happy to provide additional information that might be helpful in elaborating these ideas. The Ecoregional Plans of The Nature Conservancy should also be consulted, in addition to CDOW and USFWS habitat mapping.

5

travel is unlikely to be sustainable, given the carrying capacity of the natural resource base

c.  Wilderness-quality Lands:
As described previously in A.3.

2.  <u>Seasonal closures:</u>

Some additional sensitive species and habitat warrant seasonal closures. Protecting sensitive species and habitat from motorized disturbance during key life cycle stages can be critical to the maintenance of such species.

Additional seasonal closures that should be added to support key life stages for sensitive species include:

a.  Raptor nesting:

I.  Closure to motorized (and potentially other) travel around sensitive raptor nesting areas during nesting season. Closures should occur around nesting areas[4] for:

- all BLM sensitive species
- all T&E species
- all state Division of Wildlife species of concern, and
- any additional raptor species with legal protection (such as bald and golden eagles through the Bald and Golden Eagle Protection Act).

I believe that would encompass, but not necessarily be limited to, the following species relevant in the UFO:

- bald eagle, golden eagle, peregrine falcon, ferruginous hawk, northern goshawk, burrowing owl As noted by the U.S. Fish and Wildlife Service in a recent study on recommendations for raptor habitat management, *"We recommend incorporation of habitat management and nest/roost site protection measures into land use and other programmatic plans to ensure project compatibility with the biological requirements of raptors and regulatory statutes."*[5]

---

[4] It should be noted that some of these species maintain a number of individual nest sites within a nesting territory over time, and settle in to one nest some weeks into their breeding season in a particular year. Thus, the full nesting territory should be protected unless and until the final singular nest used for that year ("occupied nest") is identified.

[5] **GUIDELINES FOR RAPTOR CONSERVATION IN THE WESTERN UNITED STATES.** U.S. Fish and Wildlife Service, Region 9 . Division of Migratory Bird Management, Washington DC . February 2008 . Prepared by Diana M. Whittington and George T. Allen. p 3.

6

BLM_0108761

        ii.  Spatial buffers for closures should extend a minimum of one-half mile around nesting areas, up to one mile for select species such as bald eagle, ferruginous hawk, and peregrine falcon

       iii.  Temporal buffers for closures typically extend from approximately February through June, but vary according to species

          The USFWS Raptor Guidelines noted above should be incorporated to guide the spatial and temporal buffers

  b.  Bighorn sheep lambing areas

  c.  The season for closures for sage grouse should be extended to May 30 to comport with best management practices for sage grouse

  d.  Seasonal closures are necessary for the high-stress season of winter for Gunnison sage grouse in their winter habitat, if not already achieved by other restrictions (such as year-round closures)

3.  <u>Open Areas:</u>

Some areas should not be categorized for "open" motorized travel in any circumstance, for example:

Simms Mesa:

      Simms Mesa is shown as an area "open" for motorized travel in alternatives C and E. This area should not be included as "open", because it includes or is near to historic leks and potential habitat for Gunnison Sage Grouse, a candidate species (see also the proposed Simms-Cerro Mesa ACEC in the ACEC report). Gunnison Sage Grouse were observed in the Simms Mesa area as recently as the early 2000's. Where such an extremely imperiled species is involved, management decisions need to take a strong proactive stance to support preservation. It would additionally be advisable to consult with the Colorado Division of Wildlife (Jim Garner) regarding travel limitations in the area that would aid in habitat management.

      Further, Simms Mesa includes soils that do not sustainably support extensive vehicular travel, particularly from winter through about May. The existing routes become extremely rutted with deep mud for a number of months.  I have observed a great deal of soil and vegetation damage in the area due to expanding vehicle travel routes over clay and highly erodible soils.

7

D.  Other Recreation Issues:

A variety of other recreation management issues should be addressed in the RMP revision, to establish parameters for later detailed travel management planning. Such issues include the following:

1.  Functional Natural Systems and Effective Habitat:

The RMP Revision should include parameters and goals to achieve or maintain healthy functional natural systems and effective species habitat that take into account the cumulative and fragmenting effects of roads and travel routes, and that require reductions in route density where necessary to maintain or restore functional habitat.

2.  Route inventory:

Existing routes are noted in the "Alternatives" document as routes identified on the 2009 BLM aerial photography. Using aerial photography as the information baseline for existing travel routes can lead to a number of errors - such as drainages, other landforms, or wildlife trails being identified as travel routes. For this reason, the existing route inventory should be based on current and reasonably ground-truthed information.

3.  Camping areas and access:

Dispersed camping and off-route travel to camping areas should be eliminated in sensitive riparian corridors, Gunnison Sage Grouse habitat, and other sensitive habitat areas.

4.  Winter travel management and over-snow vehicle use:

Winter travel management needs as close management attention as that of other seasons. Among other parameters, the RMP Revision should include a provision for high-snow years, in particular that:

For areas with sporadic, intermittent, and/or shallow average snow coverage, the RMP revision should include direction regarding limiting winter over-snow vehicle (OSV) use to specific designated summer routes where appropriate in all TMPs and RMPs.

This sort of proactive management will create a consistent regulatory framework, avoid gaps and loopholes in management plans, and ensure common expectations for recreational users in areas that occasionally receive snow, but not consistently. Otherwise, during unusually high snow years, OSV use may produce unexpected and unplanned for resource impacts for which no one prepared.

8

BLM_0108763

**III.**     **<u>Alternatives and Themes</u>**

It will be important that well-founded options are reflected in more than one alternative. For example, good travel management benefits many uses of public lands by providing clarity and reduction of conflict. Thus I would expect that SRMAs, ERMAs and closures would appear in multiple alternatives.

9

BLM_0108764

**APPENDIX A**

ADDITIONAL TRAVEL MANAGEMENT CATEGORIES:
SPECIFIC GEOGRAPHIC AREA RECOMMENDATIONS

(Note: Many thanks to Roz McClellan and the Rocky Mountain Recreation Initiative for providing a great deal of information on these areas)

1. **Unroaded areas that should be given non-motorized prescriptions in the RMP; and designated as Backcountry Quiet Use Areas (note: some of these areas, or portions of these areas, should be considered for limitations on mechanized travel as well)**

a. <u>Tabeguache West adjacent</u>
The approximately 5700 acre unroaded area along the northwest boundary of the Tabeguache Special Management Area, including the upper reaches of Shavano and Campbell Creeks.

b. <u>Sawtooth Ridge</u>
Sawtooth Ridge on the southern tip of Long Mesa is virtually unroaded and should be prescribed as nonmotorized. The northern boundary of the nonmotorized area could be drawn along the road that dissects Section 8 to the north. Sawtooth Ridge is in mule deer severe winter range.

c. <u>Saucer Basin</u>
Saucer Basin is essentially roadless and nonmotorized. A nonmotorized prescription could be expanded to include the CNHP Potential Conservation Area at the foot of the cliffs on the north side of Highway 90. The PCA doubles as a cultural site and an elk winter concentration area. The combined areas have a diversity of vegetation and rare plants.

d. <u>Nyswonger Mesa</u>
This unroaded mesa top has stunning views of the Dolores River Canyon and surrounding lands. Nyswonger Mesa should be set aside as nonmotorized by the BLM for its forage and wildlife values and as a rare and needed Quiet Use area. The mesa appears to have few conflicts with Quiet Use due to access problems.

e. <u>Lion Creek</u>
The area between Spring Creek and Lion Creek  north of Route 90 is another roadless area that needs a nonmotorized prescription in the RMP.

f. <u>Campbell Creek</u>

10

BLM_0108765

Recently established OHV use following the Campbell Creek fire should be closed to restore its roadless condition.

g.  <u>Shavano Creek</u>  – Same as above

2.  **Low road density areas identified for route reductions and/or motorized closures**

Some of these areas have only recently established OHV routes or timber roads that should be closed.  Some of these overlap with areas recommended for ERMAs above.

a.  <u>Dry Creek Canyon</u>

South of Sawtooth Ridge there is a less roaded area in the upper reaches of Dry Creek canyon where motorized use should be restricted to minimal routes or closed to motorized altogether. Some of the routes appearing on the RMP inventory map appear to be recent and should be closed. The area contains an elk winter concentration area.

b.  <u>Sharp Canyon</u>

West of Nyswonger Mesa. This area is in an elk winter concentration area.

c.  <u>Wray Mesa</u>

This area is Desert big horn sheep habitat with good condition grasslands. Needs reduced road density targets and a spring seasonal motorized closure, if not year round, to protect big game .

e.  <u>Skein Mesa and Wild Steer Mesa:</u> Same as above

<u>Burn Canyon</u>
<u>Hamilton Creek</u>
<u>Hamilton Mesa</u>
<u>Callan Draw</u>
<u>McKee Draw</u>
<u>Bramiers Draw</u>  – close recent OHV routes
<u>Wickson</u> Draw –  Same
<u>Mailbox Draw</u> –   Same

Interim management for these areas between RMP and travel planning would be:
Halt new user-created routes
Sign and physically close all recently created routes
Close routes causing resource damage or in sensitive areas.

11

3. **Areas of rapid route proliferation where the "limited to existing" restriction needs to be strongly enforced**
   a. <u>Areas where route proliferation is due to vegetative treatment and fire</u>
      - Shavano Creek
      - Campbell Creek
      - BLM parcels west of Norwood, including Spring Draw, Callan Draw,
      - Burn Canyon and        McGee Draw

   b. <u>Areas where route proliferation appears linked to increased antler shed hunting and perhaps other use</u>
      Blue Mesa
      Atkinson Mesa
      Carpenter Ridge
      Spring Creek Mesa
      Hog Point
      Moon Canyon
      Fruitland Mesa (and note significance due to impact on Gunnison sage grouse habitat)

Recommended interim management for these areas prior to travel planning:
   Enforce the "limited to existing" restriction by signs, user education, law enforcement
   Stop user-created routes through user educations, signs etc,
   Sign and physically close all recently created routes
   Enforce seasonal motorized closures, including shed antlering and lion hunting from December 1 to April 15.

4. **Heavily roaded areas needing road density reduction targets specified in the RMP, to be implemented in later travel planning**
The following areas with very high route densities need to be assigned route density reduction targets, no more than 2 miles per square mile, for example ---- targets to be met in upcoming travel plans.
   - The proliferation of routes and spurs SW and NE of the Opera Box Mine on Road DD19
   - The dense concentration of routes branching north off Road EE22, north of Long Park and the Honey Moon Mine
   - Route proliferation east of Hieroglyphic Canyon and west of the canyon in the vicinity of Tramp Mine west
   - The many new routes north and south of the San Miguel River west of Nucla

12

TABLE 1. MANAGEMENT ZONES

| | FRONTCOUNTRY ZONE | PASSAGE ZONE | PRIMITIVE ZONE | PRISTINE ZONE |
|---|---|---|---|---|
| **Basic Concept** | The frontcountry zone is defined by structures and grounds provided for visitor support services such as information, education, and recreation. Access will be easy and convenient, and the encounter rate very high. High maintenance and intervention will be required to accommodate concentrated visitor use. Challenge and adventure is less important compared to other zones. Zone corridor will be 660 feet wide along roads. | The passage zone is intended to accommodate the flow of people and vehicles from one place to another and to provide minimal accommodations such as parking, trailheads, primitive campsites, and information kiosks or signs for people preparing to venture into the Primitive and/or Pristine Zones of the Monument. Where the zone is only a narrow corridor following a road (660 feet wide), the expectation is that a particular road will be maintained to a consistent standard along the length of the corridor, normally a Class B or Class C road from one end of the corridor to the other. | The primitive zone provides an undeveloped, primitive, and self-directed visitor experience while accommodating motorized and mechanized access on designated routes. Facilities will be rare and provided only where essential for resource protection. | The pristine zone includes mostly lava flows, designated Wilderness, and Wilderness Study Areas. This zone provides an undeveloped, primitive, and self-directed visitor experience, generally without motorized or mechanical access. Facilities will be virtually nonexistent. |
| **Visitor Experience** | High chance for encounters with people. | Medium chance for encounters with people. | Low chance for encounters with people. | High chance for solitude. |
| | Travel on paved, improved, or maintained roads. | Travel on higher level of road maintenance than the Primitive Zone. | Travel on low-standard roads with challenging driving conditions. | Travel involves challenging conditions and no roads. |
| | Developed campgrounds. | Rustic, designated campsites. | No developed campsites; dispersed primitive camping. | No developed campsites; dispersed primitive camping. |
| | A high level of interpretation programs; informational exhibits. | Limited interpretation, wayside exhibits. | Minimal on-site interpretation. | No on-site interpretation. |
| | Diverse trail system, some paved. | Multiuse, maintained, and designated trails. | Low-standard multiuse trails with little or no maintenance. | Very few trails. |
| | Low chance for encounters with livestock or associated developments. | High chance for encounters with livestock or associated developments. | Medium chance for encounters with livestock or associated developments. | Low chance for encounters with livestock or associated developments. |
| | High level of contact with agency staff. | Low to moderate level of contact with agency staff. | Very low level of contact with agency staff. | Essentially no contact with agency staff. |
| | Typical visitor activities: sightseeing, driving, bicycling, walking, nature study, ranger-led programs, camping, and picnicking. | Typical visitor activities: driving, sightseeing, hiking, mountain biking, horseback riding, and dispersed camping. | Typical visitor activities require self-sufficiency: hiking, hunting, horseback riding, mountain biking, remote camping, and driving on unimproved roads. | Typical visitor activities require self-sufficiency and involve challenge, risk, and adventure: dispersed camping, backpacking, nature study, and hunting. |
| **Access and Kinds of Development** | Paved roads and high-standard gravel roads. | Class B-D roads. Some arterial roads would be regularly maintained to allow seasonal car, SUV, light truck passage. | Class C-D roads. Dirt roads, accessible seasonally only with high-clearance vehicles and off-highway vehicles. | No roads. |
| | Hardened and maintained pedestrian trails. | Trailheads; maintained motorized and non-motorized trails. | Low standard multiuse trails. | Very few trails; no motorized trails. |
| | Frequent signs for directions, safety, and interpretation. | Signs for directions, safety, resource protection, and interpretation. | Minimal signs for visitor safety and resource protection only. | Very few signs. |
| | Offices, utilities, maintenance facilities, storage areas, visitor center, employee housing, and restrooms. | Minimal administrative structures, vault toilets. | No buildings. | No buildings. |

**James Bode**

| | |
|---|---|
| **From:** | Site Administrator <info@cecenviro.org> on behalf of Bjoern Mannsfeld <bamannsfeld@hotmaikl.com> |
| **Sent:** | Tuesday, November 23, 2010 6:57 AM |
| **To:** | uformp@blm.gov |
| **Subject:** | Please support Wilderness in Colorado! |

Nov 23, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please support the Eagle and Summit County Wilderness Preservation Act recently introduced by Rep. Jared Polis.

This citizen-inspired proposal has undergone years of on-the-ground research and hundreds of meetings with stakeholders and interest groups. The bill now enjoys widespread support in the region and has been endorsed by local governments, numerous business, and thousands of individuals.

I know you are a supporter of wilderness, and I want to let you know how much I value your commitment to this important issue. I hope you will work to protect this vital part of what we love about Colorado and work with Mr. Polis and our other congressional leaders to pass this and future wilderness bills in Colorado.

Best

Dr. Bjoern Mannsfeld
2044 Gaylord St
Denver, CO 80205-5622

BLM_0108769

# SAN MIGUEL COUNTY

## BOARD OF COMMISSIONERS

JOAN MAY        ELAINE FISCHER        ART GOODTIMES

November 23, 2010

Bruce Krickbaum  Planning, Environmental Coordinator
BLM Field Office
2465 South Townsend Ave.
Montrose, CO. 81401

To: Barb Sharrow, Bruce Krickbaum, Angie Adams

Re: RMP Uncompahgre Field Office - Response to BLM documentation of San Miguel County comments.

San Miguel County reviewed the comments the BLM generated based on our November 4th discussions. After reviewing those comments, the following items were either not incorporated by the BLM or may need additional clarification. We believe these comments are appropriate to be included in the RMP revision, and need to be addressed in the chapters we reviewed.

- Page 1-5 states the RMP should include a statement of the management goals and objectives. It is not clear if this would vary from alternative to alternative or if this would be an overarching statement of management guidance incorporated into public lands law. While directed to mange for multiple use and sustained yield, San Miguel County believes the Public Range Improvement Act and the Standards for Public Land Health direct the BLM to manage the public rangelands to move them toward achieving their site potential and meeting the Standards for all five standards to the extent possible. A clear method to measure progress toward meeting these goals and anticipated time lines should also be included.

- The RMP should discuss the relationship between State and Federal and local Oil and Gas Regulations. It should do the same for local Watershed Protection ordinances or regulations.

- Page 3-5 discusses the visibility trends in some locations. There is no discussion of visibility trends in the planning area. San Miguel County is concerned that visibility is degrading in our county, partially influenced by activities on BLM lands. The issue of visibility and how it will be protected in the planning area needs a more detailed discussion in the RMP.

- Table 3-4 identifies nearly 220,000 acres of land in the planning area as "not meeting" or "meeting with problems ". The "meeting with problems " category implies that up to 50% of the lands with this designation had a soil indicator rating of less than satisfactory. The RMP should discuss how BLM will develop and adapt management strategies to improve these lands.

- Table 3-7 on page 3-30 summarizes the waters meeting with a problem or not meeting the water quality standard. The accelerated level of sediment was identified as the most common cause. The relative impact of the causes listed should be identified in the RMP as well as actions that will be taken by BLM to reduce these sources.

BLM_0108770

- Page 3-48 identifies 297, 593 as meeting the vegetation standard but having some vegetation problems and another 100,000 acres as not meeting the vegetation standard. This section should have a table similar to table 3-4 that identifies the areas in these categories. This would help to understand where soils and vegetation problems are concurrent. We would like to see these management priorities in these areas move toward restoring rangeland health as directed by PRIA and the Standards per Rangeland Health. In these areas management priority in these areas needs to be to move these lands toward restoring rangeland health as directed by the PRIA and the Standards for Rangeland Health. The actions BLM will implement to improve these conditions need to be commitments incorporated into the RMP. The causal factors for the vegetation issues shown in table 3-15 need to be identified as well as management policies that will be implemented to address them to ensure resiliency and sustainability of the plant communities over time.

- Trend data needs to be integrated with land health information. It is necessary to assess statistics such as those presented on page 3-57. For example it is important to know if lands in good condition or with problems are declining or if lands are stable in degraded condition and not improving. This information is also necessary to identify appropriate management. Areas that are declining or stable in degraded condition seem to run contrary to management directives incorporated into law that directs management of these lands.

- The Livestock Grazing section states "BLM must meet or ensure progress is being made toward meeting the Colorado Land Health Standards and Guidelines for Livestock Management. This section also indicates 93% of the BLM lands in the planning area are allocated for grazing. Yet trend studies of native species cited on page 3-57 find 305 of rangeland native species are on the decline. How why these situation can coexist and are consistent with management direction in federal law needs to be discussed in this section.

- You have noted our comment on the need for a more clear description of the Improve, Custodial, and Maintenance designations for allotments. This description also needs to describe how these designations are related to rangeland health. For example, should areas found to be "not meeting" or "meeting with problems" be allowed to stay in the "Maintain" or "Custodial" designations? If so, how is this consistent with meeting the Standards for Public Land Health? With the number of allotments in table 3-28 not meeting Public Land Health Standards, why are so few in the improvement category? There are 125 allotments identified as not meeting standards or meeting the standards with problems for causes other than livestock. These causes need to be identified.

- The RMP on page 3-133 identifies the Dry Creek area as the only part of the planning area to have undergone a travel management process. When are the other areas going to undergo travel planning and what will be the management policy in the interim?

Thank for considering these additional comments and clarifications and responding to them at the appropriate time and place in the RMP.

Sincerely,

Art Goodtimes
Chair

**James Bode**

| | |
|---|---|
| **From:** | bruce_krickbaum@blm.gov |
| **Sent:** | Friday, December 03, 2010 4:24 PM |
| **To:** | uformp@blm.gov |
| **Subject:** | Fw: Uncompahgre RPM Comments |
| **Attachments:** | BLM RMP Comments.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 12/03/2010 04:23 PM -----

      Nina Kothe
      <ninak@sanmiguelc
      ounty.org>             To
                bruce_krickbaum@blm.gov
      11/24/2010 04:14        cc
      PM
                Subject
           Uncompahgre RPM Comments

Bruce,

Attached please find a letter from our County Commissioners regarding the RMP review.

Thank you.
Nina Kothe
San Miguel County Commissioners Office
P.O. Box 1170  Telluride - Colorado 81435
970 728-3844   FAX 970 728-3718
ninak@sanmiguelcounty.org
San Miguel County Website

1

BLM_0108772

(See attached file: BLM RMP Comments.pdf)

BLM_0108773

# SAN MIGUEL COUNTY

## BOARD OF COMMISSIONERS

| JOAN MAY | ELAINE FISCHER | ART GOODTIMES |

November 23, 2010

Bruce Krickbaum  Planning, Environmental Coordinator
BLM Field Office
2465 South Townsend Ave.
Montrose, CO. 81401

To: Barb Sharrow, Bruce Krickbaum, Angie Adams

Re: RMP Uncompahgre Field Office - Response to BLM documentation of San Miguel County comments.

San Miguel County reviewed the comments the BLM generated based on our November 4th discussions. After reviewing those comments, the following items were either not incorporated by the BLM or may need additional clarification. We believe these comments are appropriate to be included in the RMP revision, and need to be addressed in the chapters we reviewed.

- Page 1-5 states the RMP should include a statement of the management goals and objectives. It is not clear if this would vary from alternative to alternative or if this would be an overarching statement of management guidance incorporated into public lands law. While directed to mange for multiple use and sustained yield, San Miguel County believes the Public Range Improvement Act and the Standards for Public Land Health direct the BLM to manage the public rangelands to move them toward achieving their site potential and meeting the Standards for all five standards to the extent possible. A clear method to measure progress toward meeting these goals and anticipated time lines should also be included.

- The RMP should discuss the relationship between State and Federal and local Oil and Gas Regulations. It should do the same for local Watershed Protection ordinances or regulations.

- Page 3-5 discusses the visibility trends in some locations. There is no discussion of visibility trends in the planning area. San Miguel County is concerned that visibility is degrading in our county, partially influenced by activities on BLM lands. The issue of visibility and how it will be protected in the planning area needs a more detailed discussion in the RMP.

- Table 3-4 identifies nearly 220,000 acres of land in the planning area as "not meeting" or "meeting with problems ". The "meeting with problems " category implies that up to 50% of the lands with this designation had a soil indicator rating of less than satisfactory. The RMP should discuss how BLM will develop and adapt management strategies to improve these lands.

- Table 3-7 on page 3-30 summarizes the waters meeting with a problem or not meeting the water quality standard. The accelerated level of sediment was identified as the most common cause. The relative impact of the causes listed should be identified in the RMP as well as actions that will be taken by BLM to reduce these sources.

P.O. BOX 1170 • Telluride, Colorado 81435 • (970) 728-3844 • FAX (970) 728-3718

BLM_0108774

- Page 3-48 identifies 297, 593 as meeting the vegetation standard but having some vegetation problems and another 100,000 acres as not meeting the vegetation standard. This section should have a table similar to table 3-4 that identifies the areas in these categories. This would help to understand where soils and vegetation problems are concurrent. We would like to see these management priorities in these areas move toward restoring rangeland health as directed by PRIA and the Standards per Rangeland Health. In these areas management priority in these areas needs to be to move these lands toward restoring rangeland health as directed by the PRIA and the Standards for Rangeland Health. The actions BLM will implement to improve these conditions need to be commitments incorporated into the RMP. The causal factors for the vegetation issues shown in table 3-15 need to be identified as well as management policies that will be implemented to address them to ensure resiliency and sustainability of the plant communities over time.

- Trend data needs to be integrated with land health information. It is necessary to assess statistics such as those presented on page 3-57. For example it is important to know if lands in good condition or with problems are declining or if lands are stable in degraded condition and not improving. This information is also necessary to identify appropriate management. Areas that are declining or stable in degraded condition seem to run contrary to management directives incorporated into law that directs management of these lands.

- The Livestock Grazing section states "BLM must meet or ensure progress is being made toward meeting the Colorado Land Health Standards and Guidelines for Livestock Management. This section also indicates 93% of the BLM lands in the planning area are allocated for grazing. Yet trend studies of native species cited on page 3-57 find 305 of rangeland native species are on the decline. How why these situation can coexist and are consistent with management direction in federal law needs to be discussed in this section.

- You have noted our comment on the need for a more clear description of the Improve, Custodial, and Maintenance designations for allotments. This description also needs to describe how these are related to rangeland health. For example, should areas found to be "not meeting" or "meeting with problems" be allowed to stay in the "Maintain" or "Custodial" designations? If so, how is this consistent with meeting the Standards for Public Land Health? With the number of allotments in table 3-28 not meeting Public Land Health Standards, why are so few in the improvement category? There are 125 allotments identified as not meeting standards or meeting the standards with problems for causes other than livestock. These causes need to be identified.

- The RMP on page 3-133 identifies the Dry Creek area as the only part of the planning area to have undergone a travel management process. When are the other areas going to undergo travel planning and what will be the management policy in the interim?

Thank for considering these additional comments and clarifications and responding to them at the appropriate time and place in the RMP.

Sincerely,

Art Goodtimes
Chair

Date __Nov 29, 2010__   Location __Norwood, Co__

Attendees at BLM Public Meeting re: San Miguel/Dolores Rivers Wild/Scenic Designation:

**Name**                          Address

Marlin E Littlefield
Debra Ann Littlefield

Calvin + Judy Nobles

Ralph Weaver

David Andrews

Peter Mueller

Joe Reagan

Mike Pinto

Bruce Triplett

Jackie Thompson

Dave Schneck

Hank Williams

Tho___

BLM_0108776

Date _Nov 29, 2010_____    Location _Norwood, Co_____

## Attendees at BLM Public Meeting re: San Miguel/Dolores Rivers' Wild/Scenic Designation:

| Name | Address |
|------|---------|
| Romaine Round | |
| Bill Pease | |
| Ernest B Williams | |
| Earl Reams | |
| Patti Grafmyer | |
| Lonnie Taylor | |
| Mike Grafmyer | |
| Jerrey Spor | |
| Jhsan Culver | |
| Thomas Kyle | |
| Raymond J nyder | |
| Barbara Hawke | |
| Dave Alexan. | |
| | |
| Zandon Bray | |

Date _Nov 30, 2010_                    Location _NATURITA, CO_

**Attendees at BLM Public Meeting re: San Miguel/Dolores Rivers' Wild/Scenic Designation:**

| Name | Address |
|------|---------|
| LONNIE TAYLOR | |
| MARK WELCH | |
| Patty Bennett | |
| Daniel Hunt | |
| Shawn Mode | |
| Bobby Starks | |
| Bobby Farmer | Bo |
| Dianna Reams | B |
| Rick Gersch | |
| Dale Osborn | |
| Ernest R. Williams | |
| Rex E. Case | P.O.B |
| Ol Oull | Box 424 Naturita |
| Allon D. Tody | 11 |
| TED SWAIN | 74 |

BLM_0108778

Date _NOV 30, 2010_____     Location _NATURITA, Co_____

**Attendees at BLM Public Meeting re: San Miguel/Dolores Rivers' Wild/Scenic Designation:**

| Name | Address |
|---|---|
| Don Bennett | |
| WATony Lobato | |
| Bruce Richards | |
| M. H. de Koevend | |
| Nail Cate | |
| Jeff Sonnenberg | |
| Sally O'Henry Kiehlmoe | |
| Sue Sickely | |
| Jay Jensen | |
| Cathy Borde o Jim Butt | |
| Kenevy Hildums | |
| Lene Weimer Wer | |
| Lowell WAT | |
| Tony Bonacquista | |
| Pete Shannon Ru | |

Date _____ Nov 30, 2010 _____    Location _____ NATURITA _____

**Attendees at BLM Public Meeting re: San Miguel/Dolores Rivers' Wild/Scenic Designation:**

| Name | Address |
|------|---------|
| Dan Burns | |
| Kyle Turley | |
| Earlene Antonelli | |
| Callie Hendrickson | |
| Ed Cotter | 24 |
| Kelvin Verity | |
| April Montgomer | |
| Susan Culve | |
| Brien Gaedner | |
| Mike Childress | |
| Earl Reams | |
| Ruth Christens | |
| Tom Loczy | |
| Vicki Phelps | B |
| Cindy Gersch | |

BLM_0108780

WSIC Telluride — MIUISE

Date  12/1/10                              Location   TELLURIDE

**Attendees at BLM Public Meeting re: San Miguel/Dolores Rivers' Wild/Scenic Designation:**

| Name | Address |
|------|---------|
| Jenny Russell | |
| JOAN MAY | |
| Earl Reams | |
| Leigh Sullivan | |
| Angela Mallard | |
| CHRIS MYERS | |

Date __12/1/10__                    Location __TELLURIDE__

**Attendees at BLM Public Meeting re: San Miguel/Dolores Rivers' Wild/Scenic Designation:**

<u>Name</u>                                    <u>Address</u>

Rick Silverman

Steve McComb

Carly Shaw

Bill Janke

Marshall Padoranias

Nate Smith

Linda Luther-Brovd

Kate Tallerday

Lonnie Taylor

Peter Mueller

Clay Wadman

Phil Hayden

Edwin Schlapfer

Molly Galetto

**James Bode**

| | |
|---|---|
| **From:** | Angie Adams |
| **Sent:** | Monday, December 13, 2010 10:25 AM |
| **To:** | UFO AR |
| **Subject:** | FW: Watershed |
| **Attachments:** | Paonia Water System.pdf; townofpaonia.vcf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

-----Original Message-----
From: bruce_krickbaum@blm.gov [mailto:bruce_krickbaum@blm.gov]
Sent: Thursday, December 02, 2010 10:03 AM
To: Angie Adams; Kate Wynant
Subject: Fw: Watershed

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 12/02/2010 10:00 AM
-----

|   |   |
|---|---|
| Town of Paonia | |
| <townofpaonia@tds | |
| .net> | To |
| | bruce_krickbaum@blm.gov |
| 11/18/2010 01:35 | cc |
| PM | |
| | Subject |
| | Watershed |

Hi Bruce,

I did not have a map that was attached to the ordinance, but here is a map of our water system.  I would like to keep it for non-public use only.  I'm only slightly paranoid in having someone have a map to contaminate our water supply.

Let me know if this does not work for you.

1

BLM_0108783

Thanks!

Barbara

On 11/2/2010 3:59 PM, bruce_krickbaum@blm.gov wrote:
> Hello Barbara,
>
> Thank you for sending the watershed ordinance.
> Do you have an electronic version of the map?  That would simplify
> identifying the area designated as the watershed.
>
> Thanks, Bruce
>
> <><><><><><><><><><><><><><><><><><><>
> Bruce Krickbaum
> Planner, Environmental Coordinator
> BLM Uncompahgre Field Office
> 2465 South Townsend Avenue
> Montrose, CO  81401
> 970.240.5384
>
>
>
>
>
>            Town of Paonia
>            <townofpaonia@tds
>            .net>
> To
>                          bruce_krickbaum@blm.gov
>            11/02/2010 01:55
> cc
>            PM
>
> Subject
>                       Re: Final Notes: Uncompahgre RMP
>                       Cooperating Agency Meeting #5
>
>
>
>
>
>
>
>
>
>
> Hi Bruce~
>
> I'm not sure if I ever sent this to you or not, but I have attached a
> copy of our watershed ordinance for the Town of Paonia.  As a warning,
> I will be contacting other area clerks to remind them to file their

2

BLM_0108784

> watershed ordinances with BLM as well.
>
> I am enjoying being an active participant in this process.  Thank you
> for the opportunity.
>
> Barbara Peterson
> Town Clerk
> 970/527-4101 tele
>
> On 10/26/2010 4:55 PM, bruce_krickbaum@blm.gov wrote:
>> Hello Cooperating Agencies,
>>
>> I have attached the finalized notes from the November 30 meeting.
>>
>> As a reminder, we will not meet on November 4.
>> The date for the next meeting has not been determined, but I
>> anticipate
> it
>> will be in January.
>>
>> Regards, Bruce
>>
>> <><><><><><><><><><><><><><><><><><><><>
>> Bruce Krickbaum
>> Planner, Environmental Coordinator
>> BLM Uncompahgre Field Office
>> 2465 South Townsend Avenue
>> Montrose, CO  81401
>> 970.240.5384
>>
>> (See attached file: UFO-CA_2010-09-30_FinalNotes.pdf)
>>
>> PLEASE NOTE: This message, including any attachments, may include
>> privileged, confidential and/or inside information. Any distribution
>> or
> use
>> of this communication by anyone other than the intended recipient is
>> strictly prohibited and may be unlawful. If you are not the intended
>> recipient, please notify the sender by replying to this message and
>> then delete it from your system.
> [attachment "2003-02_Watershed.doc" deleted by Bruce
> Krickbaum/MOFO/CO/BLM/DOI] [attachment "townofpaonia.vcf" deleted by
Bruce
> Krickbaum/MOFO/CO/BLM/DOI]
>
>
(See attached file: Paonia Water System.pdf)(See attached file:
townofpaonia.vcf)

BLM_0108785



BLM_0108786

# General Energy and Minerals Comments
SubRAC member Hawke
December 4, 2010

I would like to share some general comments regarding planning for energy exploration and development within the UFO. This is an extremely critical topic in my mind, both because insufficiently managed energy activity can have irreversible impacts on natural resources and recreation potential, and because BLM lands play an important role in our nation's energy production. My general recommendation is that the RMP revision be assertively, proactively used to identify and plan for appropriate sub-areas toward which certain kinds of energy activity should be directed; other areas where energy activity is only appropriate if phased and/or limited with stipulations, no surface occupancy, or no ground disturbance; and finally, areas with sensitive and valuable resources that should simply not be open to energy activity. If there is anything that I or other partners can do to help provide additional information for such an extensive planning effort, please do let me know. Thanks so much for your consideration.

A. <u>Direction of energy development:</u>
As a first step in guiding energy development toward the most appropriate areas, new energy development for nonrenewable sources should be limited to areas having at least moderate to high potential for that energy resource. Conversely, new development for nonrenewable energy sources should not be permitted in areas of low potential for that energy resource. Part of this planning effort should include research and compilation of information on uranium resource potential and mining claims to provide a more thorough information base for analysis and decision-making.

B. <u>Limitations on new energy development:</u>
Some areas are so ecologically sensitive, or possess other resources (such as recreation, tourism and scenic value) so valuable in comparison, that all forms of future energy development should be prohibited. In order to be meaningful and effective, such a prohibition should extend to all forms of energy development and mineral extraction, including oil and gas, renewable energy, and to the extent possible, hardrock minerals including uranium.

1

Areas in need of such strong protections for no new energy development
would include:

1. Gunnison Sage Grouse habitat:
   o Occupied habitat: no new energy development
   o Potential habitat: preferably, no new oil and gas leasing
   o Historic habitat: efforts should be made to minimize habitat
     disturbance

2. ACECs (existing and proposed) with sensitive resource values,
   including:
   o Salt Desert Shrub/Adobe Badlands – to protect rare plants, kit
     fox and highly erodible soils
   o Fairview North and South with full expansion – to protect the
     federally endangered Clay-Loving Wild Buckwheat and other rare
     plants, and highly erodible soils
   o San Miguel River ACEC with expansion – to protect uncommon
     and very biodiverse riparian systems, water quality, recreation
     resources, and scenic values
   o La Sal Creek – to protect sensitive and relatively undisturbed
     ecological values and riparian systems, along with remote
     recreation value
   o East and West Paradox – to protect rare plants, nesting peregrine
     falcons, nearby burrowing owls, nearby Gunnison prairies dog
     colonies, quiet recreation potential and scenic values
   o Possibly additional areas

3. Other areas of highly sensitive ecological values:
   o Sensitive riparian and wetland areas, including areas that
     support key native fish species
   o Key wildlife migration corridors and key areas of wildlife
     movement patterns
   o Lynx habitat

4. Wilderness Study Areas, Lands with Wilderness Characteristics, and
   Citizen Wilderness Proposal Areas - to preserve wilderness
   characteristics
   o Roubideau/Potter/Monitor (with citizen proposed expansion),
   o Norwood Canyon
   o Sewemup Mesa (with citizen proposed expansion)
   o Dolores River Canyons

2

BLM_0108788

C. Limitations on Disturbance

Additional areas possess very sensitive or valuable conservation values that should protected from disturbance through both No Surface Occupancy and No Ground Disturbance stipulations:

1. Areas of high visual or scenic value
   o VRM 1 ranked areas
   o Areas with public designations recognizing scenic values, such as Needle rock ONA/ACEC and possibly other areas
2. Additional areas with a high potential for pristine quiet recreational experience:
   o Tabeguache roadless area
   o Multiple Paradox Valley areas
   o Sawtooth Ridge
3. Possibly additional types of areas:
   o Areas with low road density and good potential for quiet use
   o Areas with rare plants
   o Areas with raptor nests
   o Key or sensitive wildlife areas, such as Bighorn sheep lambing

In addition, the US Fish and Wildlife Service should be consulted for standard lease stipulations for sensitive species.

Administrative withdrawals for leasable and locatable minerals:

For areas with exceptionally special and sensitive values, the RMP revision should commit to seeking a full administrative minerals withdrawal, including leasable and locatable minerals. Several types of areas would merit this sort of strong, proactive approach to minerals management:

- Wilderness Study Areas, Lands with Wilderness Characteristics and Citizen Proposed Wilderness Areas - to preserve wilderness characteristics pending any future legislative designation
- Any area such as the Thompson Creek area, where a broad spectrum of community partners support minerals withdrawal to protect water quality for headwaters, agriculture and recreation; protect scenic and recreational values; and protect local economic activity such as ranching, agriculture, recreation and tourism.

3

BLM_0108789

# PERSPECTIVES ON UTE ETHNOHISTORY IN WEST CENTRAL COLORADO

PREPARED FOR

Ute Indian Tribe of the Uintah and Ouray Reservation,
Ute Mountain Ute Tribe, and Southern Ute Indian Tribe



AND

Bureau of Land Management Colorado State Office
Glenwood Springs, Grand Junction and Uncompahgre Field Offices





DOMINQUEZ ARCHAEOLOGICAL RESEARCH GROUP

BLM_0108790

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

# PERSPECTIVES ON UTE ETHNOHISTORY
# IN WEST CENTRAL COLORADO

Prepared for

Ute Indian Tribe of the Uintah and Ouray Reservation,
Ute Mountain Ute Tribe, and Southern Ute Indian Tribe

and

Bureau of Land Management Colorado State Office
Glenwood Springs, Grand Junction and Uncompahgre Field Offices

Purchase Order No. L07PX00794

Prepared by
Richard Ott, Project Coordinator, DARG

With contributions by

Betsy Chapoose, Director of Cultural Rights and Protection Department,
Ute Indian Tribe of the Uintah & Ouray Reservation,

Clifford Duncan, NAGPRA Consultant,
Ute Indian Tribe of the Uintah & Ouray Reservation

Terry G. Knight Sr., NAGPRA Liaison,
Ute Mountain Ute Tribe
and
Lynn Albers, Research Associate, DARG
Carol Patterson, Research Associate, DARG

Dominquez Archaeological Research Group, Inc. (DARG)

December 6, 2010

FINAL REPORT

BLM_0108791

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

*Front Cover:* Detail of a map of North America published in 1823 by James Wyld. Compiled from early nineteenth century surveys by Humboldt, Pike, Lewis and Clarke, MacKenzie, and other explorers, the map serves to illustrate then current Euroamerican perspectives on the Utes and their homelands in central and northwestern Colorado. (Wyld 1823).

ii *Perspectives on Ute Ethnohistory in West Central Colorado*

BLM_0108792

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

# TABLE OF CONTENTS

Acknowledgements ...............................................................................v

Preface.................................................................................................vi

Executive Summary .............................................................................1

Introduction .......................................................................................4

    Project Background .......................................................................4

    Project Area ...................................................................................5

    Project Objectives .........................................................................6

    Participants ....................................................................................6

    Project Milestones.........................................................................7

    Archival Research .......................................................................15

Literature Review and Research Context............................................17

    Ute Perspectives .........................................................................18

    Archaeological, Anthropological and Ethnohistorical Perspectives..21

    Cultural Resource Management Perspectives..............................33

Overview of Ute Ethnohistorical Themes..........................................47

Ute Sites in the Project Area ..............................................................64

Summary and Management Recommendations ..................................65

References Cited .................................................................................73

Appendices

    Appendix A: Participants at Meetings and Site Visits...............A-1

    Appendix B: Communications log ...........................................B-1

    Appendix C: Notes from General Planning Meeting................C-1

    Appendix D: Consulting Expense Summary ...........................D-1

    Appendix E: Ethnobotanical Field Notes .................................E-1

    Appendix F: Notes on Colorado Wickiup Project ...................F-1

    Appendix G: Online Archival Sources.......................................G-1

BLM_0108793

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

**Figure 1:** These scenes of Ute people in daily life reflect the time span on which this project was focused — that is, from the earliest written Euroamerican records of the study area to the present day.

(Top)  Utes traveling west on the White River ca. 1900, at the place where Dominguez and Escalante, guided by a Ute, turned west on the same trail in 1776. Their pack horses were probably carrying deer hides harvested upriver, perhaps on Yellow Creek. The photograph was taken at the place where present Rangely Airport is located.

(Middle) A Ute couple, somewhere in eastern Utah, probably on Uintah and Ouray Reservations lands, early 1900s. (Uintah County Library Regional History Center)

(Bottom)  Scene at the first Smoking River Pow Wow in Meeker, Colorado, July 2008.







iv  *Perspectives on Ute Ethnohistory in West Central Colorado*

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

## ACKNOWLEDGEMENTS

From its outset this project was a collaborative effort of people engaged, so to speak, on the "front lines" in on-going efforts to preserve, study and understand Ute cultural connections that run deep in the lands of western Colorado. Many of the participants have dedicated years of professional endeavor toward this end, and they have experienced first-hand the ubiquitous and seemingly intractable difficulties of bridging cultural differences which can be traced back through nearly five hundred years of shared Ute and Euroamerican history. Nevertheless, those who joined this effort acknowledged the importance of helping to bridge these differences by working together on a more fundamental, personal level; recognizing that the land, and the future, connects us all.

Ute tribe representatives, Bureau of Land Management staff, and DARG support staff participating in the project included:

**Representatives of the Ute tribes:**
Betsy Chapoose, Director of Cultural Rights and Protection Department for the Ute Indian Tribe of the Uintah & Ouray Reservation; Clifford Duncan, Ute Elder and NAGPRA Consultant, Ute Indian Tribe of the Uintah & Ouray Reservation; Terry Knight, NAGPRA Representative, Ute Mountain Ute Tribe; Lynn Hartman, Assistant to Terry Knight; and Neil Cloud, NAGPRA Representative, Southern Ute Tribe.

**BLM Field Office Archaeologists:**
Aline LaForge, GJFO; Cheryl Harrison, GSFO; and Glade Hadden, UFO.

**BLM Field Office Managers:**
Jamie Connell, GSFO; Catherine Robertson, GJFO;  and Barbara Sharrow, UFO.

**DARG Research Associates:**
Richard Ott, Project Coordinator; Lynn Albers, Ethnobotany Studies; Carol Patterson, Rock Art Studies and Archival Research; Curtis Martin, Colorado Wickiup Project; and Carl Conner, President.

We gratefully acknowledge the helpful advice and shared experience of USFS archaeologist Sally Crum, who has worked diligently for years on building bridges with the Utes. We also extend our deep appreciation to Western Sky Investments LLC for their generous support in providing accommodations and facilities for the project's general planning meeting at Gateway Canyons Resort.

*"When people try to do something together, their attitude is the most important thing."*

— Clifford Duncan (2008)

BLM_0108795

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

## PREFACE

*We have crossed many bridges already. And the last bridge is this: that we are in same house, wearing the same clothes, talking the same language. We can't go back over the bridge. That's gone. But we can look back.*

*But then let's talk about something that we're trying to save today, that's going to make it to that next bridge. If we don't, we are going to destroy that too. So we're both going to be walking separate paths to that same bridge. Cause when that bridge collapses, we're both going to lose.*

— Clifford Duncan (2003b)

In the Ute language there is no word for ethhnohistory, archaeology, or anthropology.

In the English language countless reports, articles, books, government policies and even laws have been written about those things, with diverse and often conflicting ideas about what they mean, why they matter, and how they should inform our relationships with one another.

This project tried to operate in the middle ground of these strikingly different perspectives, seeking to identify mutual interests and shared values attached to the land and life of west central Colorado. Our hope was and is to participate in a meaningful and effective way in decisions that will shape those lands in the future

In our first planning meeting discussions Ute participants asked: Who are you? What are you trying to do? and Why are you doing this?

BLM participants asked: What are your "cultural heritage needs"? What areas should we work to protect from other uses? Why are those areas important to the Utes? How can we work together more effectively?

This report is a beginning attempt to answer those questions.

BLM_0108796

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE






**Figure 2:** Members of the Ute treaty delegation in Washington, D.C. March 2, 1868 (Shindler 1868). These **images** are among the earliest photographs taken of Utes.

It was customary for Indians visiting Washington, invariably for the purpose of treaty negotiations and land cessation agreements, to be photographed for the Smithsonian Institution. Such images were often reproduced commercially and were widely popular in Europe and America, helping to reinforce stereotypic White attitudes towards Indians. Both imaginary and ideological, these attitudes in turn fed the polemics of America's nineteenth century "manifest destiny" to colonize, and Christianize, the West (Berkhofer 1978, Stedman 1986).

Left to right, top to bottom: Chippin (Always Riding); Nick-a-a-god (Green Leaf), White River (Yampa) Ute; Suriap, White River (Yampa) Ute, and Pe-ah (Black Tail Deer), Grand River Ute.

BLM_0108797

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE



| | | |
|---|---|---|
| ▨ Uintah and Ouray Reservation | ▨ Ute Mountain Ute Reservation | ▨ Southern Ute Reservation |
| ▨ Historic Ute homelands * | ⟠ Ute hunting, raiding and trading territory * | ▨ Project study area and BLM field office boundaries |

0 — 50 — 100 Miles

\* Approximate extent of core territory and areas of economic forays generalized from Simmons (2000), Callaway et al. (1986), Jorgensen (1972), and Stewart (1971).

**Figure 3:** The project study area included BLM's Glenwood Springs, Grand Junction and Uncompahgre (Montrose) Field Offices. These administrative units are located entirely within the Utes' historical homelands.

The Glenwood Springs Field Office (GSFO) manages 559,849 surface acres in Garfield, Mesa, Eagle, Pitkin, Routt and Rio Blanco Counties. The Grand Junction Field Office (GJFO) manages 1,346,832 million surface acres in Mesa, Garfield, Montrose and Delta Counties, and the Uncompahgre Field Office (UFO), headquartered in Montrose, manages 926,655 surface acres in Montrose, Ouray, Delta, Gunnison, San Miguel and Mesa Counties (BLM 2009).

BLM_0108798

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

## EXECUTIVE SUMMARY

During 2008 the Bureau of Land Management's (BLM) Glenwood Springs (GSFO), Grand Junction (GJFO), and Uncompahgre (UFO) Field Offices in Colorado conducted a Ute Ethnohistory Project in collaboration with the three Ute Tribes that traditionally lived on lands within the field offices' administrative boundaries. The project brought together representatives of the Ute Indian Tribe of the Uintah and Ouray Reservation (Northern Utes), the Ute Mountain Ute Tribe, and the Southern Ute Indian Tribe with BLM field office cultural resource staff and managers.

The project was intended to support agency plans for future cultural resource management in the three participating BLM field offices by documenting current Ute heritage needs. Project activities included site visits by Ute tribal representatives and BLM staff on public lands managed by the BLM in each of the three field offices, and a review and synthesis of existing historical, ethnographic and archaeological data pertaining to Ute heritage in the study area. Dominquez Archaeological Research Group (DARG), a non-profit cultural resources research consortium headquartered in Grand Junction, provided research support, project coordination, and report preparation.

The project area, which comprises the three participating BLM field office administrative areas (Figure 3), has experienced rapidly increasing energy development and recreational impacts in the past decade. Although only approximately 15% of BLM-managed public land within the field offices' administrative boundaries has been inventoried for cultural resources, hundreds of archaeological sites have been recorded in the project area, a significant number of which are thought to be of Ute cultural affiliation (Figure 4). Most of the previous cultural program work in the project area was completed in compliance-driven response to potential direct impacts from identified projects. Systematic Native American consultation in the project area, on both a programmatic and project-specific basis, began only within the past decade. As a consequence, archaeological and ethnohistorical databases for the project area, though improving, lack sufficient depth and reliability to fully inform BLM planners regarding Ute cultural heritage concerns.

The Ute Ethnohistory Project was conceived as a long-term partnership and research project among the Ute Tribes, BLM, and professional cultural heritage specialists. The broad goals of the project are to identify areas and sites of cultural and religious importance to the Ute people, to preserve and protect Ute cultural heritage values that are embedded in public lands, and to encourage and support the Utes' traditional use of those lands.

A number of key themes relevant to the project goals were identified in the course of the project:

- Legal, social, scientific and religious points of view attach to cultural resources on public lands. Each of those perspectives must be considered, in good faith, in land management planning, policy and programs.
- The Utes' traditional and historical culture is based in nature and places deeply-held values on the living landscapes that were home to their ancestors. Their spiritual and emotional connections to their Colorado homelands remain strong, and are growing.

BLM_0108799

BLM_0108800

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

- Consultation and partnership with the Utes is vitally important to BLM's planning and cultural resources management decisions in its efforts to keep pace with increasing development and population pressures on public lands in the project area.

- Cultural programs that provide opportunities for Ute people — including elders, families and young people — to widely participate in and contribute to cultural resources research and preservation efforts are of immense benefit to all heritage stakeholders.

- Partnership and collaboration requires information parity. Much work is needed to improve information flow between tribal and agency cultural resources departments.

- Meaningful and effective tribal consultation, as well as informed land management decision-making, requires more than narrowly focused archaeological site information. Landscape-scale inventories, including environmental, ethnohistorical and ethnographic contexts, are generally lacking in the project area.

- Consultation processes are inconsistent across both tribal and agency cultural programs. Past efforts to clarify and improve communication and procedural protocols, including those undertaken in the course of this project, should be continued and expanded.

- A number of recent trends in cultural heritage preservation and cultural resources management, and within the disciplines of archaeology, anthropology and history, are beginning to address past short-comings in regard to Native American cultural and history. This project is a good beginning toward integrating and applying these new ways of understanding to the challenges of preserving and protecting Ute heritage on the public lands of Colorado.

This report examines these themes in some detail, looks at how they may apply to BLM's current and future planning activities, and recommends future actions that BLM can take to more fully integrate Ute heritage concerns into their cultural programs.

BLM_0108801

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

## INTRODUCTION

### Project background

The concept for a regional ethnohistoric overview began in early 2005 when archaeologists from the United States Forest Service (USFS), Bureau of Land Management (BLM), and National Park Service (NPS) met in a series of meetings to discuss the possibility of completing an interagency ethnohistory overview of the Ute in Western Colorado, expanding on a draft ethnohistory completed for the USFS-Grand Mesa, Uncompahgre, Gunnison Forest Plan Revision to include the NPS Colorado National Monument and two adjacent BLM Field Offices where upcoming landscape level plans were scheduled. The BLM submitted a funding proposal to the Washington Office in May 2005 based on a partnership proposal but by 2006 the NPS had decided to move forward on their ethnographic overview separately and the overview plans were put on hold.  At the same time the USFS Grand Mesa Ranger District and BLM Grand Junction Field Office archaeologists were working locally to create a more meaningful relationship with the Ute Tribes and in June 2006  the first Ute Ethnobotany Project field workshop was held, bringing elders and students from the Northern Ute Tribe to visit heritage sites on federal and private land around the Grand Junction area.  This hands-on project, first conceived of by the Northern Ute Cultural Rights and Protection Department Director, Mrs. Betsy Chapoose, continues to this day, holding two field workshops a year and the project was expanded in 2009 to include the creation of the Ute Learning Garden in partnership with the Northern Ute and Colorado State University Cooperative Extension Service.

The ethnohistory overview covering three BLM Field Offices was approved for funding in 2007.  BLM managers and staff went before the three Ute Councils to present the project and ask for their commitment to the project by designating a project participant from their cultural staff who would come to meetings and field trips.  Early on the challenge of travel distance, Colorado's terrain and unpredictable weather were recognized as



**Figure 5:**  Many historic Ute ▮▮▮▮s have been found throughout the study area. BLM and the Colorado Historical Fund have supported recent efforts by the Colorado Wickiup Project to record such sites before they disappear.

BLM_0108802

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

potential barriers to having all participants attend all meetings. A quorum was not met by the Northern Ute Business Committee February 26, 2007 but the results of the Ethnobotany project were presented and a comment by Mr. Arrowchis, Vice-Chairman present at that consultation, is very pertinent to the project. He said that projects like this "could create ties that were lost" and "bring closer involvement with our sister tribes". Because the quorum was not met follow-up letters were sent to the Business Committee later in 2007.   Mr. Clifford Duncan discussed he and Mrs. Chapoose's participation in the project with the Chairman in September 2007 and  Mr. Cesspooch approved their participation. The project was presented to the Southern Ute Council May 30, 2007.  Although the Chairman at the time, Mr. Clement Frost was present, a quorum was not met by the Council. Again follow-up letters were sent in the summer resulting in the commitment of Mr. Neil Cloud and Vice-Chairman Matthew Box to attend at least the initial planning meetings.  The final Council meeting was with the Ute Mountain Ute Tribe on August 20, 2007, where a quorum was met.  Mr. Terry Knight and Mrs. Lynn Hartman were designated as the representatives.



**Figure 6:** Members of the project workgroup walking ███████████ ███████████ during the GJFO field visits. The project study area encompasses hundreds of miles ████ used by the Utes' ancestors.

## Project Area

The three participating BLM field offices are located entirely within Ute ancestral homelands (Figure 3), and contain significant numbers of prehistoric and historic archaeological sites (Figure 4). Many of these sites contain a wealth of information and are eligible for the National Register of Historic Places, and many extant landscapes hold the potential for recognition as Ute traditional religious and cultural heritage areas.

The Glenwood Springs Field Office (GSFO) manages 559,849 surface acres in Garfield, Mesa, Eagle, Pitkin, Routt and Rio Blanco Counties. The Grand Junction Field Office (GJFO) manages 1,346,832 million surface acres in Mesa, Garfield, Montrose and Delta Counties, and the Uncompahgre Field Office (UFO), headquartered in Montrose, manages 926,655 surface

BLM_0108803

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

acres in Montrose, Ouray, Delta, Gunnison, San Miguel and Mesa Counties.

### Project Objectives

The Ute Ethnohistory project was intended to meet data gathering and management action development for Resource Management Plans now in development in each of the three BLM field offices. The project was tasked with creating documentary materials, as well as synthesizing existing ethnographic and archaeological data, using a combination of historical and anthropological approaches, to study and describe Ute cultural processes in the study area.



Project goals included bringing Ute tribal members to lands managed by the BLM in the three field offices, to document the current heritage needs of the tribes in both narrative reports and maps, and to synthesize information that can be brought forward into the agency plans for future heritage resource management.

**Figure 7:** McInnis Canyons National Conservation Area and Black Ridge Wilderness, located within GJFO boundaries on the northern flanks of the Uncompahgre Plateau, include numerous Ute cultural resources, including ██████████████ ████████████ and seasonal camps, and ethnographic landscapes. The NCA lies immediately west of Colorado National Monument.

The project was also charged with providing management recommendations for addressing Native American Religious Concerns; proposing approaches for future agency-tribal projects; identifying opportunities for developing management strategies with Ute participants for managing for traditional uses, suggesting ways for conducting more meaningful consultation to protect Ute Heritage on BLM lands, and identifying other issues or concerns revealed in the course of the project.

### Participants

The project variously included participation by BLM cultural resources staff, RMP staff and Field Office mangers, along with cultural affairs representatives from each of the three Ute tribes. Additionally, research associates from Dominquez Archaeological Research Group (DARG) participated as appropriate at several levels including project coordination and logistics, research support, and report preparation. Individual participants are identified in the Acknowledgments section of the report (page v) and in the participant details listed in Appendix A.

BLM_0108804

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

## Project Milestones

BLM staff began the project in late summer/fall 2007 with presentations to each of the three Ute Tribal Councils, explaining the goals and objectives of the project and requesting support for the project. On completion of these initial meetings, scheduling began for the first general planning meeting to discuss broad issues and set a specific agenda for the project.

### Gateway Planning Meeting

The first general meeting was held in Gateway, Colorado on November 28, 2007. Representatives of all invited organizations were in attendance, with the exception of Southern Ute Tribe representatives who were unable to attend due to weather concerns. A complete list of attendees appears in Appendix A.



**Figure 8:** A late spring snow, as seen on the way up ▮▮▮▮▮▮▮ south of Glenwood Springs, greeted the project workgroup during site visits in GSFO in June, 2008. A portion of the itinerary included Ute heritage areas not previously visited by Ute consultants.

Discussions were wide-ranging and productive and addressed all of the main goals of the meeting. Areas of discussion included: review and clarification of the project scope of work; general discussion of Ute issues and concerns related to the project; information and procedural needs required by the Ute Tribes to participate in a meaningful way; BLM field office needs and goals for the project; goals and sources for archival literature research; preliminary scoping and planning for BLM field office visits during early Spring 2008, and identification of tasks necessary to prepare for and schedule field office visits and subsequent site visits.

General consensus was expressed by all participants regarding several broad goals and objectives for the project: 1) the project should be for the benefit of all Utes, not just certain tribes or bands; 2) the project should recognize that Ute culture is a living heritage, and cultural resource protection and preservation is a way to connect past and future; 3) the project should recognize that Ute cultural resources include not just archaeological sites, but also their relationship to land and natural resources; 4) the project should seek ways to include Ute young people working on the land together with Ute elders and families; and 5) the project should consider and fully explore all appropriate resource

BLM_0108805

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

management designations in developing management recommendations for the project report.

It was recognized that the Ute Ethnohistory Project is primarily focused on the Resource Management Plan needs of the BLM field offices, which are largely concerned in fulfilling legal, government to government obligations and responsibilities in the revision of these land use planning level documents. All participants expressed their commitment in their professional capacity to the protection and preservation of cultural resources, and further acknowledged the importance of also trying to work together on a more fundamental, personal level that might bridge differences between organizations and individual viewpoints.



Participants generally agreed that the project scope of work met the goals of the group and no new issues were identified that would require any major deviations from the planned work. Specific tasks and actions were agreed upon in order to move the project forward.

**Figure 9:** During site visits in GSFO, project members toured areas in Garfield County which are experiencing dramatic impacts from natural gas development activities.

Since 1999, drilling permits issued in the state have increased sixfold, and the Bureau of Land Management (BLM) has leased 5.2 million acres of federal land in Colorado for new energy exploration (NYT 2009).

Ute representatives identified several specific, practical information needs required for their meaningful participation in the project, beginning with the need for clear, simple maps showing project study areas and focused cultural resource data points. DARG support staff was tasked with production coordination for such materials by BLM GIS and cultural resources staff.

A workgroup session focusing on archive and bibliographic research was tentatively scheduled with Ute Mountain Ute representatives and DARG support staff. Goals included scoping and planning for integrating meaningful archive research into the project, and to avoid duplication of past efforts.

DARG support staff was also tasked with budgeting, scheduling and other planning activities in support of field office visits. Consensus of the group was to arrange for visits to all three

BLM_0108806

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

field offices in a consolidated schedule to include Glenwood Springs, Grand Junction and Montrose over a two day period during early Spring 2008.

## Field Office Meetings

Field Office Meetings for the Project were held at Glenwood Springs, Grand Junction and Uncompahgre Field Offices March 11-13, 2008. Representatives from the Ute Mountain Ute Tribe, the Ute Tribe of the Uintah & Ouray Reservation, and the Southern Ute Tribe attended all three meetings with Bureau of Land Management personnel and project support staff from Dominquez Archaeological Research Group. A complete attendance list is attached in Appendix A.



Discussions at the meetings were productive and achieved targeted planning tasks. Ute heritage locations were reviewed using maps and documentary materials compiled by BLM and DARG staff. Discussions included summary overviews by DARG research associates in the fields of Ute ethnobotany, Ute wickiup studies, and Ute rock art.

**Figure 10:** Site visits in the GSFO included a distant view

A number of sites in the GSFO are located near rapidly growing population centers and BLM faces a difficult challenge managing sites near urban interfaces.

Ute heritage sites and general areas of Ute cultural interest were identified in each field office. Scope and quality of maps and documentation prepared for the meetings were reviewed and standards for future information sharing were identified. Information gaps were identified and tasks were assigned for compiling and distributing documentation for follow-on planning tasks. Scheduling and logistics issues for subsequent field visits were discussed.

Scheduling windows were identified in Summer and early Fall 2008 for reconnaissance field trips in each field office for Ute and BLM representatives and support staff. Field trips were planned to tour specific areas and sites and to share information in context.

During field office reviews of Ute heritage locations, Neil Cloud, representative for the Southern Ute Tribe, expressed his

BLM_0108807

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

view that Ute heritage resources in the project area are not of direct cultural interest to members of the Southern Ute Tribe. Pending consultation with his tribal council and other tribal members, he felt that the Southern Utes were unlikely to participate in subsequent site visits. BLM staff were to consult with the Southern Ute Tribal Council in this regard.

At the conclusion of the meetings, Ute representatives suggested that a presentation on the results of the project to date be made to the Tri-Ute Meeting scheduled for June 2008 in Towaoc, CO. BLM staff and Ute representatives planned to follow-up with their respective organizations in that regard.



### Site Visits—Glenwood Springs Field Office (GSFO)

A field visit to Ute heritage areas in the GSFO was conducted for the Project June 10-12, 2008. Representatives from the Ute Tribe of the Uintah & Ouray Reservation participated with Bureau of Land Management staff and support staff from Dominguez Archaeological Research Group (DARG). Representatives from the Ute Mountain Ute Tribe were scheduled to participate, but late-breaking schedule conflicts prevented their travel. The Southern Ute Tribe declined to participate. A complete participant list is attached in Appendix A.

Tribal representatives were provided with maps and other documentation of cultural resources within the GSFO, with supporting materials that provided context relevant to special BLM management areas of concern and areas of Native American concern.

Participants toured field office areas for two full days, June 10 and 11, traveling over 500 miles through the Lower Colorado, Roaring Fork, and Eagle sub-areas of the GSFO. A portion of the itinerary covered areas of Native American concern not previously visited by Ute representatives. BLM mitigation approaches were reviewed at sites, and broad mitigation strategies for preserving traditional cultural landscape values were discussed. The itinerary

**Figure 11:** Site visits in the UFO included this view of the south flanks of the Uncompahgre Plateau, above



Dominguez and Escalante's 1776 route led them through this area, where they encountered several groups of Utes.

was photographed. A wildfire burned about 800 acres in this same area in July 2009.

BLM_0108808

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

provided numerous opportunities for participants to observe and discuss ethnographically important plants in spring bloom. Future, follow-up programs for harvesting traditional plants by Ute tribal members were also discussed. The tour route primarily ranged from urban interface areas in river valleys, through riparian areas, pinyon-juniper woodlands, and Gambel Oak and mountain shrub lands. Plans for visiting higher elevation montane and aspen woodlands were canceled due to impassable roads resulting from persistent snowpack and spring melt.

On June 12 participants met at BLM offices in Glenwood Springs with the GSFO RMP project leader and the field office manager to discuss scheduling and process issues for incorporating concerns of the Ute Tribes into the GSFO and Kremmling Field Office (KFO) RMP/EIS. Ute participants expressed interest in including traditional Native American cultural landscape values in the subheadings and other structural language in the RMP. Also discussed was the possibility of using a risk-analysis model for cultural resource and Native American RMP/EIS alternative analysis.



**Figure 12:** Workgroup participants discuss rock art interpretation and protection in the UFO with Field Office Manager Barbara Sharrow during site visits in ███████ ██████ scene of intense uranium activities in recent years.

The relationship of the Kremmling Field Office (KFO) RMP to the BLM Ute Ethnohistory project was discussed. Ute participants expressed concerns regarding tribal input and consultation for the Kremmling portion of the RMP without the opportunity to visit KFO areas of Native American concern, and the need to consult with other Native American tribes who may have cultural interests in the KFO.

The following action items were agreed upon:

• GSFO staff were to continue to work with Ute representatives to develop recommendations for including traditional Native American cultural landscape values in the draft RMP. Due to RMP scheduling, specific recommendations needed to be submitted by late July 2008 to be included in the draft document.

BLM reported 10,730 new filings for uranium mining claims on the Western Slope in 2007. In 2006, 5,205 claims were filed for the uranium rich region (mostly in Montrose and Mesa counties). These numbers are up dramatically from the 120 claims filed in 2003 (Chakrabarty 2008).

BLM_0108809

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

• It was recommended that KFO staff explore possibilities for scheduling a field office visit for tribal representatives. Representatives from the Uintah & Ouray Ute Tribe indicated their availability for a KFO field visit September 15-19, 2008. That suggested activity was beyond the scope of the current BLM Ute Ethnohistory Project and would need to be conducted independently.



**Figure 13:** Site visits in the GJFO included a tour of areas near Gateway where a major tourist resort is being developed on private land. The scenic and recreational values present on surrounding public lands are attracting increasing numbers of visitors, and the need for cultural resource conservation and interpretation is growing as well.

• Maps and documentation prepared for this visit and a report of activities and discussions were to be delivered to Ute Mountain Ute tribal representatives who were unable to attend. A field visit to the GSFO by Ute Mountain Ute representatives was tentatively scheduled during the week of August 11-15, 2008, if needed.

• The next field visits were scheduled for August 19-20, 2008 in the Uncompahgre Field Office and September 8-10, 2008 in the Grand Junction Field Office.

Site Visits—Uncompahgre Field Office (UFO)

UFO staff arranged an extra-curricular site visit for members of the project workgroup during April 29-30, 2008. Funding for the event was not charged to the Ute Ethnohistory Project budget. Betsy Chapoose and Clifford Duncan from the Northern Utes participated, along with Terry Knight from Ute Mountain Utes. A number of BLM staff, including Barbara Sharrow, Field Office Manager, and several fire management staff members not directly affiliated with the Ethnohistory Project also participated. The itinerary for the visit included Ute heritage areas in the Norwood vicinity to observe Ute sites within a natural gas development and fuels reduction zone, as well as the ███████████ area which is experiencing dramatically increased uranium activity, including a proposed uranium mill.

The scheduled project field visit in the UFO was conducted August 19-20, 2008. Representatives from the Ute Tribe of the Uintah & Ouray Reservation participated with Bureau of Land Management staff and support staff from Dominquez Archaeological Research Group (DARG). Mr. Terry Knight, representative from the Ute Mountain Ute Tribe was scheduled to

BLM_0108810

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

attend, but an unexpected loss of a family member prevented his participation. The Southern Ute Tribe did not participate. A complete participant list is attached in Appendix A.

Participants toured field office areas for two full days viewing areas not previously visited by Ute representatives. On August 19 the group travelled via ███████████ on the eastern flanks of the Uncompahgre Plateau to areas with ██████ sites and other Ute heritage resources. The group hiked to several ████████████████████ the boundaries of the proposed Dominguez-Escalante National Conservation Area and Dominguez Canyon Wilderness Area. Current archaeological and ethnohistorical research on ████████ in western Colorado was discussed during the visit to the ██████████████████. Bad road conditions on ████████████████



**Figure 14:** During the GJFO ███████████████████████ project members spotted a bear-scratched juniper adjacent to an early Ute site. Clifford Duncan remarked that it reminded him of the Ute story of the coyote's wig.

August 20 participants travelled to the Dry Creek area and visited ████████████ and locales with plant species of Ute traditional use. The area is of special travel management concern and participants were given an overview of conditions and shown examples of impacts in locales containing archaeological resources.

At the conclusion of field travel on August 20, participants met at BLM offices in Montrose for general discussion of the RMP process and topics of concern and interest to the Utes. Upcoming activities for the Ethnohistory Project were reviewed, and long-range ideas for continuing more meaningful consultation were discussed. The next field visit for the project was scheduled for September, 2008 in the Grand Junction Field Office.

### Site Visits—Grand Junction Field Office (GJFO)

Ute heritage areas in the GSFO were conducted during September 9-11, 2008. Representatives from the Ute Indian Tribe of the Uintah & Ouray Reservation and the Ute Mountain Ute Tribe participated with Bureau of Land Management staff and support staff from Dominquez Archaeological Research Group

BLM_0108811