CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

(DARG). The Southern Ute Tribe did not participate. A complete participant list is attached in Appendix A.

Participants toured field office areas for two full days viewing areas not previously visited by Ute representatives. During the afternoon of September 9 the group visited ███████ sites and Ute heritage areas located along ██████████ n the Bookcliffs nea███████ The challenges of mitigating human disturbances on cultural resources located in proximity to roads and highways was discussed, as well as the inevitability of natural deterioration of ███████

On September 10, during the morning, the group travelled to the ███████ area for an overview of the McInnis Canyons National Conservation Area and to view the ███████ ███████ which passes through the NCA. Participants then visited the ███████ and discussed its relationship in proximity to Colorado National Monument areas the Utes had previously visited as part of an earlier ethnobotany project. During the afternoon participants travelled to the southern field office boundary on the Dolores River to view███████ then on to Sinbad Valley to view ███████ the importance of maintaining these heritage resources to keep them accessible and usable. Participants also noted the relative abundance in Sinbad Valley of plant resources which are used for traditional basketry, and discussed the challenges of private land access in areas such as Sinbad Valley.

During the morning on September 11 the group drove to the ███████ rea on the ███████ to view a ███████ and other sites of interest along the ███████ project, and discussed the relationship of modern roads and historic trails. Participants met at BLM offices in Grand Junction during the afternoon for a brief close-out meeting with the GJFO field office manager and RMP project manager to discuss the RMP process and topics of concern and interest to the Utes. Forthcoming activities for the Ethnohistory Project were reviewed, and long-range possibilities for improving the tribal consultation process were discussed. The importance of conducting consultation meetings, on location in the field, was emphasized by the Utes.

No further field visits were conducted during the Ethnohistory Project.

14  *Perspectives on Ute Ethnohistory in West Central Colorado*

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

## Archival Research

This project attempted to extend the archival research conducted and reported in previous Ute ethnohistorical studies. Discussion at the general planning meeting in Gateway, and subsequently, centered primarily on the collections held by the Ute Mountain Ute tribe and new research data from DARG's Colorado Wickiup Project. A workgroup meeting with DARG associates and Ute Mountain Ute representatives was tentatively scheduled for early 2008, but weather and later on-going scheduling problems prevented that activity from occurring.

During the project, DARG research associate Carol Patterson began assisting Clifford Duncan with cataloging for his private archives, which include a wide variety of materials collected over many years. That work is continuing.

DARG is also currently preparing a complete set of results from the Colorado Wickiup Project, comprising five volumes to date, for distribution this fall to all the Ute Tribes as well as the BLM field offices. Future results will be similarly shared.

During the early stages of work on this project, DARG also reviewed and compared catalogs of archival materials held at the Denver Public Library's Western History Collections and the Colorado Historical Society in Denver, the Center of Southwest Studies at Fort Lewis College in Durango, and the Ute Indian Museum in Montrose.

The project also focused on digital historical archives, which have proliferated online in recent years as a multitude of public and university libraries, museums, historical societies, and other organizations — in this country and abroad — have launched on-going digitization programs for collections including historical government records, photographs, maps, scholarly books and journals, newspapers and other materials. Repeated surveys of a number of these online repositories indicated that many of them are regularly adding new materials. Opportunities for online research in both primary and secondary sources are likely to continue to expand in the future. A bibliography of online digital sources identified during research for this project, selected for particular relevance to Ute studies, is presented in Appendix E.

*"In order to have a future, we have to have a past."*

— Terry Knight (2007)

BLM_0108813

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE



**Figure 15:** Detail of Alexander von Humboldt's *Map of the Kingdom of New Spain* first published in 1809 (Humboldt 1811). The area shown includes the project area. The Great Basin was the "least explored and most poorly understood" region of Spain's northern frontier (Francaviglia 2005:41), and Humboldt's map includes numerous geographic errors. Nevertheless, in this detail, Humboldt's identifies the "Yamparica" and "Tabeguachi" Ute bands, which can be traced forward to the present day White River and Uncompahgre Bands of the Northern Utes, respectively. The "Raguapui" may be antecedent to the "Mowataviwatsiu" (Figure 33) or "Sabuagana" (Figures 35-36) bands, who also merged with one or both of the northern Colorado Ute bands (Baker et al., 2007 and Simmons, 2000).

BLM_0108814

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

## LITERATURE REVIEW AND RESEARCH CONTEXT

A primary goal of this project was to integrate Ute perspectives into the land management planning activities of the three BLM field offices comprising the study area, insofar as they relate to cultural resources management (CRM) and Ute heritage needs. Identifying a meaningful context within which to place those points of view was the chief objective of the project's literature review. This process required consideration not only of Ute perspectives, but also how and to what degree those perspectives variously contrast and conform to the legal, regulatory and policy frameworks under which BLM conducts its cultural resource management responsibilities.



Further, a significant majority of the cultural resources on BLM lands — over 90% nationally — are prehistoric Native American or archeological sites according to estimates by the National Trust for Historic Preservation (NTHP 2006). In many respects, "cultural resources" and "archaeological sites" have come to be virtually synonymous in practice, at least on the western public lands that BLM manages, including those in our project study area. As one long-time CRM practitioner phrased it, "most people involved in Section 106 review are archeologists, who tend to mean 'archeological site' when they say 'cultural resource,' and who think of CRM as an endeavor in applied archeological research" (King 2004). There is rather more to say about this later.

Given these factors, the literature review for the project was approached from three angles of view: 1) Ute perspectives; 2) the social science perspectives of archaeology, anthropology, ethnohistory, and history; and 3) the cultural resources management perspectives of BLM and other public land management agencies, and historic preservation and cultural heritage communities.

One of our specific tasks stated in the scope of work (BLM 2007) was to "synthesize existing ethnographic or archaeological data (relevant to the study area), using a combination of historical

**Figure 16:** Unidentified Ute woman, ca. 1870-1890, posing for a studio portrait (DPL).

BLM_0108815

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

*"Indian history is no mere curiosity or sideshow in the drama of the American past. The two remain interwoven."*

— Ned Blackhawk (2006:3)

and anthropological approaches". In our review we included a look at some of the theoretical underpinnings of these disciplines in order to identify themes and issues of relevance to the broader integrative objectives of the project. Along the way we also attempted to historicize these themes to the degree necessary to point out relevant relationships to the other perspectives we discuss.

Discussions in this section focus on the broad contextual issues and themes outlined above. Discussion of specific ethnohistorical and archaeological information relevant to the study area and the objectives of this project follow later.

### Ute perspectives

During the past decade or so a variety of materials have been published which explicitly approach Ute history and culture from a *Ute* perspective. Notable examples of such work include Forrest S. Cuch's (2000) *A History of Utah's American Indians*, William Wroth's (2000) *Ute Indian Arts & Culture: From Prehistory to the New Millennium*, Fred Conetah's (1982) *A History of the Northern Ute People*, and Clifford Duncan's (n.d.) online essay, *The Northern Utes of Utah*. A recent television documentary, part of *A Native History of Utah,* produced in conjunction with the national PBS series *We Shall Remain* (Green 2009), features Northern Utes sharing some of their personal and tribal stories, and describing their deep emotional and spiritual connections to ancestral Colorado homelands.

Several recent ethnographic and ethnohistorical studies, conducted mainly for federal agencies responsible for public lands in Colorado, have also focused strongly on Ute perspectives. These include: *The Ute relationships to the lands of West Central Colorado: An ethnographic overview prepared for the U.S. Forest Service* (Burns 2004); *Native American Oral History and Cultural Interpretation in Rocky Mountain National Park* (McBeth 2007); *Ethnographic Assessment and Documentation of Rocky Mountain National Park* (Brett 2003); *Traditional Plant Use Study: Bent's Old Fort National Historic Site and Sand Creek Massacre National Historic Site* (Campbell 2007); and *The Ute Ethnobotany Project (2007).*

The compilations edited by Cuch (2000) and Wroth (2000) include contributions by two of the Ute consultants who participated in this project. Clifford Duncan, Elder and NAGPRA Representative for the Ute Indian Tribe of the Uintah and Ouray Reservation, tells the story of "The Northern Utes of Utah" in Cuch (pp. 167-224). (He also appears in the PBS documentary video,

BLM_0108816

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

previously noted.) Terry G. Knight, Sr., Animas-LaPlata Project Cultural Resources and NAGPRA Liaison for the Ute Mountain Ute Tribe, contributed his views on "Ute Leaders of the Past" in Wroth (pp. 21-25). Both volumes also include contributions from other writers — Indian and White — who point out ways of looking at Ute history that challenge a variety of "mainstream" concepts of who the Utes are and what their role has been in American history.

A consistent theme is evident in all these examples. Forrest Cuch (2000:xii), executive director of the Utah Division of Indian Affairs, summed it up this way:

> For the most part, the histories of Utah's American Indian tribes have not been considered a viable and integral part of the history of the state of Utah (and Colorado). They have been treated as addenda or commentary rather than official textbook documentary. To quote Will Numkena (Cuch's predecessor as director of the Utah Division of Indian Affairs), 'Non-Indian authors have traditionally been the writers of Indian history. Therefore, it is their perceptions, understandings and views reflected in those writings. The reader is given a one-sided perspective without presentation of the Indian experience.' In other words, until this time, Indian history has been written by the conqueror, with little or no regard for those conquered.

The Utes are not alone in their call for a more balanced perspective on their tribal history. During the past several decades an "exponential expansion of Native American history offerings" has occurred in the history curriculums of American universities (Wunder 2007:603), and Indigenous challenges have stirred the waters within the domains of anthropology and archeology as well. One of the more notable examples of scholars working from this perspective is Ned Blackhawk, a Western Shoshone and Associate Professor of History and American Indian Studies at the University of Wisconsin. His (2006) *Violence Over the Land: Indians and*



**Figure 17:** Ute horsemen, photographed by H.S. Poley in 1899, as they crossed the Los Pinos River in LaPlata County. (Poley 1899).

BLM_0108817

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

*Empires in the Early American West* has won a number of ethnohistorical and historical literature awards, and in that work, as well as in several recent essays (2007a, 2007b), he has significantly raised the bar for anthropologists, ethnohistorians, archeologists and others who purport to know and understand Ute culture history.  His perspective on the Utes, and their complex and adaptive relationships with Euroamericans during four hundred years of shared history, will undoubtedly make an important contribution to "reconciling the dispossession of millions (of Indigenous people) and the making of America (Blackhawk 2006:3)."



**Figure 18:**  Utes in the Uintah Valley, photographed by J.K. Hillers of the Powell Expedition in 1873 or 1874. (Hillers 1873).

BLM_0108818

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

## Archaeological, anthropological and ethnohistorical perspectives

Europeans first became aware of Ute territory when Spanish explorers pushed their frontier northward into New Mexico in the sixteenth century. The Utes were "apparently engaged in trade with the sedentary Indians of New Mexico long before the arrival of the Spanish" (Tyler, 1954:345). "Yutas," as the Spanish came to call them, are mentioned repeatedly in early Spanish expedition and administrative records beginning as early as 1626 (Blackhawk, 2006:22), although such early references may have also included Southern Paiute and Chemehuevi groups because of their close language affiliation with the Utes (Tyler, 1954:345). It is clear, nevertheless, that Spanish explorers and colonists had knowledge of the Utes from the outset, and the Utes, in turn, had knowledge of the Spaniards' presence in New Mexico.

In 1765 Juan María Antonio Rivera led the first two recorded expeditions into western Colorado. Journals from these forays, however, remain unpublished. In earlier years other New Mexicans had travelled as "far north as the Gunnison River and as far west as the Colorado River" (Sanchez, 1997:x) seeking trade with the Utes, but they left no known records. Following Rivera, in 1776, Fathers Dominguez and Escalante led an expedition from New Mexico that circumnavigated the Utes' Colorado and Utah territories, retracing much of Rivera's earlier western Colorado route (Figures 19, 20 and 32). The Dominguez and Escalante expedition produced the first known map of Colorado Ute territory and the expedition's journal has provided a widely referenced documentary baseline of the Utes' presence in eighteenth century western Colorado (Chavez and Warner, 1976; Bolton 1950).

The Spaniards who went north from Santa Fe to western Colorado were "generally unconcerned with the cultural landscapes through which they traveled." Their agendas depended largely on their particular mission: "Missionaries proselytized; traders searched for hides, horses, and slaves; and armies and colonial authorities attempted to enforce imperial decrees." The documentary records they created along the way, as a consequence, offer only a fragmented and partial beginning to Ute ethnohistory — although they are "littered" with "narrow but critical" details about the Utes and other Great Basin people they encountered. (Blackhawk 2006:19).



**Figure 19:** First page from the Dominguez-Escalante Journal and one of several manuscript map copies showing a portion of the expedition's route (Library of Congress 2009).

BLM_0108819

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE



**Figure 20:** Detail of one of the earliest known maps of western Colorado and the project study area, drawn by Miera y Pacheco who traveled through the area with the Dominguez and Escalante expedition in 1776 (Bolton, 1950). Several Colorado Ute bands are located on the map, and along with the written descriptions of Ute encounters in the expedition's journal, provide the earliest baseline picture of historic Ute territory.

BLM_0108820

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE



**Figure 21:** (Above) Location of Numic tribes and linguistic groups as depicted by Fowler and Fowler (1971:6)

(Right) Numic is a member of the Uto-Aztecan language family that extends from the Great Basin to Central America (Wroth 2000:53). Pre-contact distribution map from Mithun (1999).



BLM_0108821

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

| Date of field work | Author(s) | Description |
|---|---|---|
| 1866 - 1877 | Edward Palmer (Palmer 1876, 1878; Heizer 1954, 1962; Fowler and Matley 1978) | Collected miscellaneous ethnographic data on the Northern Ute. |
| 1868-1880 | John Wesley Powell (Fowler and Fowler 1971; Fowler and Matley 1979) | Large corpus of work throughout the Great Basin, including linguistic and ethnographic data from the Northern Utes. |
| 1900 | Alfred Louis Kroeber (Kroeber 1901, 1908) | Brief ethnographic work with the Northern Ute. |
| 1910 | Edward Sapir (Sapir and Bright 1992) | Worked briefly with the Uintah Ute of Northern Utah. |
| Early 1900s | Ralph V. Chamberlin (Chamberlin 1909) | Collected materials on Ute ethnobiological nomenclature and toponyms. |
| 1930s | Julian H. Steward (Steward 1938) | Basin-wide, long-range studies. Some Northern Ute material culture and mythology. |
| 1937-1938 | Omer Stewart (Stewart 1942) | Culture element distribution study, including Northern Ute informants. |
| Early 1950s | Gottfried Lang (1953, 1954) | Studies in psychological anthropology of the Northern Ute. |
| Began 1957-58 | Joseph G. Jorgensen (1959, 1964, 1972) | Extended study of various facets of Northern Ute culture and society. |

**Table 1:** Some of the main legacy sources for Northern Ute ethnography, from Fowler's (1980) overview of Great Basin anthropology and individual sources.

BLM_0108822

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

By the early nineteenth century, scientists — mostly surveyors and map-makers in service to Spanish, British, French and later American colonial interests — began to join European expeditions into the western interior of the country. In the beginning, many of the physiographic features they mapped, particularly the hydrography, were erroneously charted, yet they had no trouble laying their precise cartographic graticule on the landscape; projecting, in the process, the scientific and economic values of the European Enlightenment they perceived there. (Francaviglia 2005, Carter 1999). As with their predecessors, their interests in cultural landscapes were largely tangential to primary concerns: finding routes through "empty" lands and inventorying the natural resources that were the great attractors of European expansion. Explicit ethnographic work in western Colorado did not begin until the second half of the nineteenth century.



**Figure 22:** Ute camp, unknown location, probably eastern Utah, ca. 1870-1880 (Utah State History [USH] 2008).

In 1868, John Wesley Powell began his "pioneering" ethnographic fieldwork among the Indigenous peoples of the Great Basin and the Colorado Plateau, including the Utes in northwestern Colorado. Powell worked during the "formative period of American anthropology" and his linguistic and ethnographic observations of the Utes and other Great Basin groups led him to conclude (Fowler and Fowler 1971:5):

> This desolate land is the home of a great family of tribes speaking different dialects or languages of the same stock. They call themselves Nu-mes, Nu-intz, Nu-mas, Nu-mos, Shi-ni-mos, Nunas, etc., all doubtless, variations of the same word. We will call them Nu-mas.

Powell's term, now simply spelled "Numa," was superseded in the first part of the twentieth century by Alfred Kroeber's term "Plateau Shoshonean," which he defined as a division of the Uto-Aztecan stock. More recently there has been a return to Powell's terminology and Numic tribes are generally thought of as divided into three groups (Figure 21) called "Western, Central and Southern Numic" (Fowler and Fowler 1971:5-6)

Powell's nineteenth century ethnographic work was only one of his many objectives — which included recording accurate data on climate, soils, water, and mineral resources — but his agenda

BLM_0108823

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

did include "systematic statements about demography, Indian affairs, and recommendations toward the resolution of the 'Indian Problem' in the Numic area (Fowler and Fowler 1971). Powell's fieldwork began in the period following the Civil War when American expansion in the West began to pick up steam, and when the applied concept of "Indian Reservations" began to change things for the Utes in new significant ways (Blackhawk 2006:177). In 1874, in collaboration with George W. Ingalls, Powell produced the "first systematic survey of Great Basin Indian demography and political organization" and it continues be a "baseline document for Great Basin aboriginal demography (Powell and Ingalls 1874; reprinted in Fowler and Fowler 1971:97-119).

Powell's fieldwork between 1868 and 1880 focused in large part on Numic groups in the western and southern areas of the Great Basin, but he did spend time with some of the Northern Utes on the White River in Colorado and later in Utah on the Uintah Reservation. His linguistic collections include vocabularies from Northern Ute groups he identified as Tabuats, Yampaats, and Uintah (Fowler and Fowler 1971). His fieldwork also included perhaps the earliest photographs taken of Utes in their daily lives and homelands, notably the work of J.K. Hillers (Figure 18).





Figure 23: (Top) White River (Yampa) Ute quirt made from antler, leather and metal rivets. Collection history unknown, ca. 1860-1880 (National Museum of the American Indian, Smithsonian Institution [NMAI-SI], 2/3344).
.

(Above) Ute pipe bag made from buffalo hide, glass beads and sinew, collected in 1869 by John Wesley Powell (NMAI-SI, 24/4225).

Between 1880 and 1900 not much systematic ethnographic work was carried out in the Great Basin, although Alfred Louis Kroeber, one of the first to achieve the Doctor of Philosophy in American anthropology, conducted brief ethnographic work with the Northern Utes in 1900 (Fowler 1980). But ensuing years in the twentieth century saw several flourescences of ethnographic work in the Great Basin. In the 1930s, the University of California at Berkeley conducted a Culture Element Survey of Native Western American groups, with the immediate objective to "develop lists of comparable culture elements or traits" from more than 200 tribes in the West. The ultimate goal was "to develop sets of data which could be statistically manipulated in hopes of... determining cultural relationships between and among tribes.

BLM_0108824

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

Those for Great Basin groups each include several hundred "elements" or traits, with extensive annotation. Surveys of Great Basin groups were conducted principally by Julian Steward and by Omer Stewart who went on, respectively, to study sociopolitical organization (Steward 1938) and band organization (Stewart 1962).

Fowler (1980) has characterized work in the Great Basin in the first half of the twentieth century as "consonant with the tenets of the historicalist paradigm of American anthropology after 1900" and its effort "to 'reconstruct' the 'ethnographic present.' That is, to describe aboriginal cultures as they were, in effect, the day before initial White contact." He also points out that in the "eastern Great Basin-Plains transition area (including our study area), this approach was complicated by the fact that horses had spread to several Ute and Shoshoni groups long before any actual face-to-face White-Indian contact. In that area, the post-horse, pre-White cultures came to be baselines for the "ethnographic present."

New approaches developed within American anthropology by the 1950s (Fowler 1980), notably "psychological anthropology (then generally called 'culture and personality'), and medical anthropology." Fowler cites works by Scotch and Scotch (1963) and Lang (1953, 1954) as representative of this approach, and goes on to note "a shift to concerns with present-day communities, with problems of acculturation and those of ethnoscience" as reflected in works by Houghton (1973), Mordy (1966), Shimkin and Reid (1970), Lynch(1971, 1978), Hittman (1973), Fowler and Leland (1967), Goss (1972b), and Clemmer (1978).

In her (1969) bibliography of Great Basin Anthropology, Catherine Fowler lists 2000 references on archaeology, 1650 references to ethnohistorical sources, and over 2700 published and unpublished items on linguistics and ethnography. Don Fowler (1980), however, characterized this large body of work as having "serious gaps in knowledge of Great Basin aboriginal cultures and peoples," particularly with respect to Great Basin sociopolitical organization. Fowler also commented that "although the Great Basin is sometimes called a 'laboratory' for anthropology, such a designation may be overrated. In cultural anthropology, with one exception, no new ideas, concepts, or methods were produced in the 'laboratory' — rather, research was carried out within paradigmatic and methodological frameworks developed elsewhere. The exception is Steward's (1936, 1938, 1972) concept of cultural ecology, which developed out of his

BLM_0108825

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

Great Basin data and which has had wide applicability throughout the world (Murphy 1970)."

Julian Steward became recognized as one of the more prominent figures among Great Basin anthropologists and in 1996 the Great Basin Anthropological Conference organized a "Steward retrospective" symposium which acknowledged his influence on anthropology as a discipline as well as the extent to which his ideas shaped anthropological "definitions of who (Great) Basin people are and what we call them" (Clemmer et al. 1999;xvii). The symposium led to a recent appraisal and critique of Steward's work and influence that place his ideas in a more contemporary perspective (Clemmer et al. 1999). In that volume James Goss' contribution, *Yamparika — Shoshones, Comanches, or Utes — or Does It Matter?* (Chapter 6, pp. 74-85), is particularly relevant to questions surrounding the labels and designations that have been assigned by non-Indian scholars to the Utes and their Numic-speaking neighbors in the Great Basin. Goss concludes by saying, "We have better information from The (Numu) People themselves to begin the reinterpretation (of their history) from their point of view... The anthropological models have started at the wrong place and are upside down and backwards. We have a new generation of Basin anthropologists that now includes historians and cultural consultants that are members of the Numu community. Therefore, Basin anthropology can make a real new beginning and have a bright future" (Clemmer et al.:83).

Also in that volume, Ned Blackhawk (Chapter 13, pp. 203-219) notes the framework of colonial power relationships in which Stewart's work was situated, a perspective that "placed virtually all anthropologists as unilaterally authoritative interpreters of Native American cultures." Blackhawk (Clemmer et al.:218) concluded:

> With his study of the Great Basin, Steward began an entire new field of anthropological study. His theory of cultural ecology paved the way for numerous other researchers and positioned Steward to dominate the study of the Great Basin as well as much of American anthropology for over a generation. However, this theory remains predicated on problematic assumptions about the nature of Great Basin society. Scholars who critique problems of ethnographic authority need to recognize not only how such representations serve to exclude and silence their objects of study, but also how these studies themselves can potentially shape the conditions in which native peoples must operate.

BLM_0108826

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

Steward's texts produced fixed, categorical understandings of the Great Basin Indians and reduced vibrant, resilient, and infinitely complex peoples to static, materially and ecologically determined generalizations. Such generalizations fundamentally obscure the innumerable ways in which these Indian peoples express and represent themselves. The meanings, beliefs, and values they give to themselves, their lands, and their histories never enter into Steward's works. Their philosophy, cosmology and hermeneutics are thus denied both contemporaneity and past as well as future existence. Interpreting how Steward accomplishes this does not warrant the same attention as what it is he silences. Although they are the subject of literally hundreds of sentences, the Great Basin Indians do not speak in Steward's texts.

In archaeology, much of the work in Colorado has been directed toward either Puebloan studies in the southwestern part of the state, or on Formative, Archaic and Paleoindian studies elsewhere in the state. A number of archaeologists working in western Colorado have commented on the dearth of Ute-focused studies (Baker 1995; Baker et al. 2007; Reed and Metcalf 1984; and Nickens 1988).  That void has been filled in part, at least for the historical period, by the Colorado Council of Professional Archaeologists (CCPA) with their *Colorado History: A Context for Historical Archaeology* (Church et al. 2007). In that volume, Steve Baker and his cohorts (Baker et al. 2007) have compiled a thorough synthesis of archaeological and ethnohistorical perspectives on the Utes, as well as other Tribes that played a role in Colorado history. Taken as a whole, and given the relative paucity of similar studies in the past, this volume is a valuable contribution to our baseline knowledge of historic Ute archaeology, particularly in light of the fact the Utes are the "only Indigenous people to reside within the state from prehistory into their Late Contact phase" (Baker et al. 2007:31). Baker summarizes the current state of Ute archaeology this way:

At the advent of routine cultural resource management (CRM) work in the 1970s, studies of the Ute archaeological context were very much still in their infancy. The only guidelines for investigators, other than those of the Huschers (Huscher and Huscher 1939a), were those of Bill Buckles (1968; 1971), and eventually Buckles and Buckles (1984). To date there have been few other guidelines to assist them, and there has been some considerable ongoing discussion about how to go about such work (Baker 1988, 1991, 1993, 1996, 2003b, 2004b,

BLM_0108827

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

2005a; Buckles 1988; Horn 1988, 1999; Nickens 1988; Reed 1984, 1988, 1994; Reed and Metcalf 1999; Reed and Gebauer 2004). This context document was expressly planned to provide such assistance to students and nonspecialists from the professional perspectives of historical archaeology and ethnohistory. For the Utes in particular this chapter is an attempt to answer Baker's (1995) and Nickens' calls (1988:4), as well as those made by Buckles (1971:218; 1988) and Jennings (1990), for Colorado's archaeologists to move Ute archaeology beyond the first halting steps attempted in 1988 at the first symposium on Eastern Ute archaeology (Nickens 1988) and allow it to take its rightful place alongside the better known prehistory of our state.

Dominquez Archaeological Research Group (DARG) launched its Colorado Wickiup Project in 2004 with the express intention of beginning to fill in some of the gaps Baker (Baker et al. 2007) described. The primary objective of the project's work so far has been to compile known information on (predominantly) Ute wickiup sites in Colorado, and to thoroughly document their wooden archaeological features and other surface evidence, before they disappear from natural and human causes (O'Neil et al. 2004; Martin and Conner 2007; Martin et al. 2005a, 2005b, 2006, 2007a, 2007b, 2010; Martin and Ott 2007a, 2007b, 2009). To date, the Colorado Wickiup Project has compiled baseline data on more than 381 Colorado sites with more than 1000 aboriginal wooden features, including: wickiups, teepees, tripods and other small utilitarian structures, tree platforms, ramadas, hunting blinds, brush fences, and corrals. Most if not virtually all of these archaeological features are thought to be of Ute origin. Planning efforts have been underway to expand the research design for the project to include a much broader and deeper framework of inquiry. DARG's participation in this ethnohistory project is a beginning step in that direction.

Moving beyond archaeology, the situation is somewhat better in regard to Ute ethnohistorical studies, at least with respect to the number and variety of materials that have been written. Extensive bibliographies by Omer Stewart (1971) and Lyman Tyler (1964) list several hundred primary and secondary sources for Ute studies, and a number of ethnographic studies have provided a baseline framework for describing Ute lifeways, notably including works by Powell (Fowler and Fowler 1970), Smith (1938, 1974),



The Colorado Wickiup Project has compiled baseline data on more than 381 Colorado sites with more than 1000 aboriginal wooden features, including: wickiups, teepees, tripods and other small utilitarian structures, tree platforms, ramadas, hunting blinds, brush fences, and corrals. Most if not virtually all of these archaeological features are thought to be of Ute origin.

BLM_0108828

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

Opler (1943, 1963, 1971), Stewart (1941, 1952, 1962, 1966a, 1973, 1976), and Goss (1961, 1972a, 1972b, 1999, 2000).

A number of recent historical works have contributed to our specific knowledge of Ute history and have added depth to our understanding of the ways tribal histories, including the Utes', have been misrepresented in the past. Virginia McConnell Simmons' (2000) *The Ute Indians of Utah, Colorado, and New Mexico* achieved a depth of detail not seen previously and provides tribal historians with a solid framework on which to build. Peter Drucker's (2004) *The Utes Must Go* adds a broadening political perspective on nineteenth century events that shaped both Ute and Colorado history, and Ned Blackhawk, in his (2006) *Violence Over the Land,* (described above) has added a significant new perspective on the Utes earliest relations with European colonizers and how the Utes, as active and adaptive agents, engaged in the complex economic, political and military dynamics that shaped the history of the American West.



**Figure 25:** Ute teepee in western Colorado. Photo taken by William Henry Jackson, probably in 1871 (DPL).

David Rich Lewis' (1994) *Neither Wolf Nor Dog: American Indians, Environment, and Agrarian Change* looks at the particular experiences of the Northern Utes under the weight of United States Indian Policy and its attempts to "civilize and assimilate Native Americans along agrarian lines." His work takes an interdisciplinary approach and provides both a succinct ethnographic overview of the Northern Utes as well as an historiographic analysis of cultural change during and after their removal from Colorado homelands to reservation lands in Utah. Lewis has also contributed a useful synthesis of recent trends in writing about American Indian history in his (2004) "Native Americans in the Nineteenth-Century American West."

Ethnohistory, once predominantly considered a "sub-branch of ethnology" or "sub-discipline of cultural anthropology" has been joined by increasing numbers of historians in recent decades, particularly "frontier historians and practitioners of the 'new' Social History" (Axtell 1979). As a result, ethnohistorical studies have been enriched by the integration of more diverse temporal, theoretical, and qualitative perspectives and practices than earlier works demonstrated. Recent trends in the broader domain of Native American history have also produced significant changes of perspective.

BLM_0108829

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

*"If we are to understand the contemporary Indian we must first understand the historic Indian. That means giving him an historic voice — his own this time, not the ventriloquist's."*

— Calvin Martin (1987:33)

A central issue confronting this project, as described in the Preface — i.e. the core differences that separate Ute and White perspectives — was addressed by Calvin Martin in his (1987) compilation of essays, *The American Indian and the Problem of History*. In his own contributions to that volume, he reaches the crux of the matter, pointing out how White historians have misrepresented and misunderstood the Indian side of the equation, as well as failing to recognize their own Euroamerican, ethnocentric bias:

> European-Americans have in truth fashioned and imposed a new reality, a new thought pattern, a new perception on this continent which in many ways is the antithesis of the traditional mythic reality perceived by the Amerindian... The fact is there is a powerful, dual metaphysics — one Indian, one White — inherent in the writing of Indian-White history. To ignore the Indian thoughtworld is to continue writing about ourselves to ourselves.  (pp. 32-33).

A number of Indigenous writers, equipped with the requisite academic credentials, have also begun to add their voices to the increasingly diverse perspectives surrounding Indigenous, tribal histories.

In addition to Ned Blackhawk, noted above, Linda Tuhiwai Smith has also emerged as a widely recognized and influential voice expressing Indigenous perspectives on European and American colonial histories. Smith is associate professor and director of the International Research Institute for Maori and Indigenous Education at the University of Auckland. In the introduction to her (2006:1) book, *Decolonizing Methodologies: Research and Indigenous Peoples*, she writes:

> From the vantage point of the colonized, a position from which I write, and choose to privilege, the term 'research' is inextricably linked to European imperialism and colonialism. The word itself, 'research', is probably one of the dirtiest words in the indigenous world's vocabulary. When mentioned in many indigenous contexts, it stirs up silence, it conjures up bad memories, it raises a smile that is known and distrustful. It is so powerful that indigenous people even write poetry about research. The ways in which scientific research is implicated in the worst excesses of colonialism remains a powerful remembered history for many of the world's colonized peoples. It is a history that still

BLM_0108830

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

offends the deepest sense of our humanity... It galls us that Western researchers and intellectuals can assume to know all that it is possible to know of us, on the basis of their brief encounters with some of us. It appalls us that the West can desire, extract and claim ownership of our ways of knowing, our imagery, the things we create and produce, and then simultaneously reject the people who created and developed those ideas and seek to deny them further opportunities to be creators of their own culture and own nations. It angers us when practices linked to the last century, and the centuries before that, are still employed to deny the validity of indigenous peoples' claim to existence, to land and territories, to the right of self-determination, to the survival of our languages and forms of cultural knowledge, to our natural resources and systems for living within our environments...

This collective memory of imperialism has been perpetuated through the ways in which knowledge about indigenous peoples was collected, classified and then represented in various ways back to the West, and then, through the eyes of the West, back to those who have been colonized.

Smith's book is aimed primarily toward Indigenous people who are now conducting their own scholarly research, but it also provides a framework for understanding the formation of knowledge — a key purpose of research — which will lead non-Indigenous researchers towards more ethically responsible, efficient, and appropriate research.

## Cultural resource management perspectives

A significant degree of reassessment and reappraisal has also occurred in recent literature concerning cultural resource management. A recent publication by the National Trust for Historic Preservation (NTHP 2006) comprised an assessment and needs analysis of CRM on Bureau of Land Management public lands, looking at a number of critical factors that shape the policy and actions of BLM with regard to cultural resources. Several recommendations from that study are of particular interest to our project:

- BLM needs to encourage NPS to establish a new way to nominate to the National Register typical prehistoric CR sites that occur on BLM lands. A landscape-scale "prehistory" category is needed that avoids the property-

BLM_0108831

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE



**Figure 26:** Signers of Treaty of 1880. Left to Right: Galoto, Otto Mears (interpreter), Savero, Shavanoux, Col. H. Page, Jocknick. (UHS).



**Figure 27:** Utes and Indian agent Colonel Arny, Uintah Reservation, 1867 (UHS).

BLM_0108832

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

by-property detailed analysis that is so labor intensive and costly.

- BLM should expand and strengthen tribal consultation so that culturally associated tribes are engaged at the earliest stages of land use planning and decision-making. A comprehensive study should be undertaken across the BLM lands to identify TCPs, before conflicting land uses are authorized.
- As an alternative funding mechanism for comprehensive landscape surveys of all public lands, BLM should seek, perhaps, to have a pool of funds donated by land use applicants, perhaps augmented by donations from gaming tribes, that would be used exclusively for landscape-scale, proactive CR surveys of the public lands, again with the goal of complete public land inventories, early identification of Traditional Cultural Properties, and of sites eligible for nomination to the National Register.

Another recent publication, from the National Association of Tribal Historic Preservation Officers (NATHPO 2005), presented the results of a study to identify a best practices model for consultation between Federal Agencies and Tribes on Section 106 consultation. The project surveyed the consultation experiences of actual participants, and all Federal Preservation Officers and federally-recognized Tribes were contacted by the project and asked to identify successful consultations, the participants, and the aspects of the enterprise that they deemed led to a successful result. Their findings included:

- consultation must occur early in the project planning process,
- both sides must plan ahead for meetings and be informed of the project scope and effect prior to attempting consultation,
- the parties must engage in a dialogue predicated on mutual respect and understanding of the priorities of the other and the challenges that each face,
- having a THPO and an Agency Tribal Liaison involved in the process contributes to success,
- as does having adequate funding for Tribal parties to travel to meetings,
- and for Agency and Tribal participants to view the site together,
- reaching a Memorandum of Agreement (MOA) was rarely seen as the indicator of success,

BLM_0108833

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

- both Tribes and Agencies agreed that building relationships is the goal of a successful consultation and that funds and time spent in consultation reap ongoing benefits and efficiencies for future projects,
- although congenial personalities make consultation pleasant, the process is bigger than an individual interaction and can indeed be institutionalized and replicated over time.

Another publication appeared in our literature review that also speaks to the collaborative aspects of this project. In 2000 the BLM Tucson Field Office and the Sonoran Institute hosted a workshop to discuss the need for partnerships between public land managers and neighboring communities. *A Desktop Reference Guide to Collaborative, Community-Based Planning* (BLM-SI 2000) resulted from that effort and included "Seven Principles of Successful Collaboration:"

1. Build Lasting Relationships
2. Agree Upon the Legal Sideboards Early On
3. Encourage Diverse Participation and Communication
4. Work at an Appropriate Scale
5. Empower the Group
6. Share the Resources and the Rewards
7. Build Internal Support

The BLM Ute Ethnohistory project was in most respects a grass-roots or "from the ground up" effort. As noted in the Acknowledgements, most of the project participants have years of "front-line" experience in cultural resource management fieldwork and its associated follow-up activities. That experiential base of knowledge formed the foundation of our work together and, frankly, the publications just described were unknown to us throughout most of our work to this point. We are encouraged to see that many of our approaches, shared observations, and recommendations, which will be discussed later, conform in many important respects to the findings of these other efforts.

Our review of CRM literature also revealed sources of informative materials on some of the "nuts and bolts" issues that usually inform the identification, assessment and determination of eligibility of cultural resource sites and other properties. We have discussed in preceding sections how ethnocentric and academic biases have stymied meaningful integration of Ute perspectives into the CRM process, and we now turn to discussion of some factors that we believe have an undesirable impact on the ways Section 106 implementation has been missing the mark — relative

BLM_0108834

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

not only to Ute heritage concerns and perspectives, but for archaeologists as well. In brief, these concerns include:

- issues around NRHP definitions and criteria (NPS 1993, 1995, 1996, 1997a, 1997b, 1997c, 1998, 1999) for eligible properties, particularly as they relate to historical, cultural or ethnographic landscapes, in contrast to archaeological sites and districts;

- constraints imposed on field archaeologists by rigid site type categories, as defined by the OAHP database design; and

- significant and persistent data gaps that influence both the Utes' and archaeologists' ability to fulfill their responsibilities in Section 106 processes.

The first of these concerns, definitions and criteria for determining TCP eligibility, has addressed recently by Thomas King, an anthropologist, and a leading consultant in cultural resources management in this country. He has been in heritage management for four decades and teaches numerous workshops on preservation of cultural and natural heritage. He has written a number of books (2000, 2002, 2003, 2005, 2007, 2008, 2009) on the subject, was a former staff member of the Advisory Council on Historic Preservation (ACHP), and helped write some of the NRHP guidelines, including the *Guidelines for Evaluating and Documenting Traditional Cultural Properties* (King and Parker 1998). He had this to say (King 2008b) regarding a discussion that took place at a recent NATHPO conference:

> One of the sessions was put on by the Advisory Council on Historic Preservation. The Council's representatives accurately noted that some federal agencies have trouble understanding what tribes are talking about when they insist on respect for the landforms and landscapes that figure in their cultural traditions. To remedy this problem, the Council staff suggested that tribes consider using the language and concepts employed by the landscape architects who have made cultural landscapes the latest fad in the National Park Service.
>
> I'm all in favor of recognizing the importance of cultural landscapes, whatever you call them – though I think that calling a landscape "ethnographic" puts the wrong spin on its significance. Landscapes are often significant to communities; their significance to ethnographers is

BLM_0108835

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

*"Also I think it is our responsibility to educate (non-Indians) on our history ... I really think a lot of people are ignorant about that. If you went to Colorado, some people would be surprised that there's a Ute Tribe in Utah that was moved out of Colorado..."*

— Betsy Chapoose (2003)

rather beside the point. At the same time, a lot of the concepts employed by NPS and its ilk in the evaluation of landscape strike me as overly architectural and insufficiently ethnographic. But for all that, the move toward greater recognition of landscapes as cultural phenomena is, I think, a very good thing.

But the question I asked the Council at the end of their session was this, more or less verbatim:

*Why should a sovereign Indian tribe that wants the U.S. government to respect places important in the tribe's history and culture have to document that significance using terms and concepts dreamed up by non-indigenous landscape architects?*

...And, the (Council) was quick to point out, "our (the Council's) regulations are pretty clear in saying they don't have to." ...I think that's a very important but widely misunderstood fact. But if it's true – if the regulations don't demand any particular sort of eligibility documentation, then why in the world is the Council acting like documentation IS required and encouraging tribes to try another way of providing it? Particularly a way that involves terms and precepts developed by specialists without an iota of tribal expertise in and around the U.S. government? Why doesn't the Council ... make it real, really clear to agencies that the regulations do NOT require that tribal cultural places be documented by ethnographers or anyone else, or at all...?

King, it should by now go without saying, is a self-styled "curmudgeon," and he goes on, with equal relish, to kibitz Tribal representatives at the conference:

You're sovereign governments, right? Then why should you have to prove the significance of your special places – be they landscapes, ancestral cemeteries and living sites, or big pointy rocks – to the United States government? Using methods that the United States Government approves? More to the point, perhaps, why do you let Washington get away with demanding such proof? France wouldn't. Russia wouldn't. The Republic of Kiribati wouldn't. Why should you?

Instead, why don't you adopt policies that say something like:

*"We (name of Tribe) have the sovereign right to define what constitutes our cultural heritage, including what constitutes a place that is*

BLM_0108836

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

*significant as a part of that heritage. We decide such things based on our own beliefs and practices, and document such places to the extent and in the manner we determine to be correct and justified. We expect the U.S. government to consult with us about any action proposed or under consideration that may affect land, water, or air within, on, or over the territory used and occupied by our ancestors (See attached map). We further expect the U.S. government to treat as eligible for its National Register of Historic Places and as a significant cultural place any location, landscape, water body, or other area that we identify as culturally significant to our tribe, and consider it accordingly under its environmental, historic preservation, and religious freedom laws."*

And then focus your efforts on getting agencies to respect this policy, rather than on documenting your cultural places in ways that non-indigenous specialists – be they landscape architects, mainstream historians, archaeologists or U.S. government officials – want you to.

Not to put too fine a point on it – are you sovereigns, or are you not?

We quote King here, not to be provocative for the sake of it, but because he directly addresses questions many of us expressed during the course of our project. How, within the existing constraints of authority (which rests entirely within BLMs statutory purview and regulatory discretion) can we recognize, preserve and protect Ute heritage resources that they themselves deem important? (Not to mention growing numbers of archaeologists, anthropologists and ordinary citizens, who also think they are important: as will be discussed later.)

We recognize that King's point of view cuts to the quick, so to speak. But even from a place more comfortably within the status quo framework surrounding CRM, other stakeholders and practitioners are pushing for inclusions of more permeable perspectives regarding landscape-scale cultural and heritage resources.

In recent years a multitude of books, papers and conferences have emerged around issues concerning cultural and heritage landscapes, and the often intangible cultural values that inhabit them. The scope of this work is global, and includes perspectives from heritage resource stakeholders on all scales: community-level citizen groups, non-governmental organizations, and governmental agencies.

BLM_0108837

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

*"There are really three factors. The legal, the ecological and the spiritual. They are all aspects of the same thing. When you talk about cultural resources it's not just the legal."*

— Clifford Duncan (2007)

David Harmon (2004), writing in the journal published by the George Wright Society (GWS) — an inter-disciplinary, cross-cultural research and education organization dedicated to the protection, preservation, and management of cultural and natural parks and reserves — summarized his views regarding *Intangible Values of Protected Areas: What Are They? Why Do They Matter?*

What are these values? The (World Commission on Protected Areas) task force has classified eleven major kinds, all of which spring from particular qualities of protected areas (list adapted from Putney 2003):

1. Recreational values, those qualities that interact with humans to restore, refresh, or create anew through stimulation and exercise of the mind, body, and soul (i.e., recreation).

2. Therapeutic values, those that create the potential for healing, and for enhancing physical and psychological well-being.

3. Spiritual values, those that inspire humans to relate with reverence to the sacredness of nature.

4. Cultural values, those that are ascribed to natural, cultural, and mixed sites by different social groups, traditions, beliefs, or value systems. These values, whether positive or negative, fulfill humankind's need to understand, and connect in meaningful ways, to the environment of its origin and the rest of nature.

5. Identity values, those that link people to their landscape through myth, legend, or history.

6. Existence values, those that embody the satisfaction, symbolic importance, and even willingness to pay, derived from knowing that outstanding natural and cultural landscapes have been protected so that they exist as physical and conceptual spaces where forms of life and culture are valued.

7. Artistic values, those that inspire human imagination in creative expression.

8. Aesthetic values, those that carry an appreciation of the beauty found in nature.

9. Educational values, those that enlighten the careful observer with respect to humanity's relationships with the natural environment, and by

BLM_0108838

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

extension, humanity's relationships with one another, thereby creating respect and understanding.

10. Scientific research and monitoring values, those that contribute to the function of natural areas as refuges, benchmarks, and baselines that provide scientists and interested individuals with relatively natural sites less influenced by human-induced change or conversion.

11. Peace values, those that contribute to the function of protected areas as a means of fostering regional peace and stability through cooperative management across international land or sea boundaries (transboundary protected areas), as "intercultural spaces" for the development of understanding between distinct cultures, or as places of "civic engagement" where difficult moral and political questions can be constructively addressed.

Lisa Prosper (2007), in another essay in the GWS journal wrote:

There are several reasons that can help to explain the cultural sector's emphasis on materiality in its approach to cultural landscapes as a form of heritage:

- First, the field of heritage conservation has traditionally been informed by a European preoccupation with artifacts, architecture, and ruins (Cleere 2001, Harvey 2001, Hardy 1988);

- Second, the problematic wedge often driven between "natural" and "cultural" in heritage conservation supports a conceptual paradigm that equates cultural heritage with tangible cultural artifacts or relics such as buildings and monuments, and equates natural heritage with their absence;

- Third, according to Carl Sauer's original definition of the term, a "cultural landscape" is "the material expression of the (seemingly unified) cultural group who live in [a specific] region" (Cresswell 2003). Sauer privileges vision

*"Any landscape is composed not only of what lies before our eyes but what lies within our heads"*

— (Meinig 1979, in Eugster 2003:50)



**Figure 28:** Cultural resources hold many kinds of intangible values: emotional, aesthetic, psychological, artistic, religious and spiritual.

BLM_0108839

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

and visible forms as the primary way of identifying and studying cultural landscapes.

- Fourth, according to English and Lee (2003), Western scientific approaches to protected area management are often based on the notion that "if we can understand the physical properties and relationships of natural resources, we can manage them sustainably. The assumption lying behind this approach is that the values of these resources lie purely in their physical nature.

Charles W. Smythe, in his (2009) *The National Register Framework for Protecting Cultural Heritage Places*, looks at these issues from the view point of the National Register of Historic Places criteria (Smythe 2009:16-22):

> ...These TCP (Traditional Cultural Property) guidelines were developed in response to narrow interpretations of the NHPA (National Historic Preservation Act) by federal and state agencies, which put a primary emphasis on the "built" environment and did not adequately meet the need for documenting and considering the cultural significance of places in planning documents and administrative manuals. The need to prepare the guidelines was first articulated in a 1983 Department of the Interior (DOI) report entitled *Cultural Conservation*, which in turn was developed in response to 1980 amendments to the NHPA directing the DOI to study and recommend ways to "preserve, conserve and encourage the continuation of the diverse traditional prehistoric, historic, ethnic and folk cultural traditions that underlie and are a living expression of our American heritage" (Parker and King 1990:2, also see King 2003:21–44). The guidelines did not focus on the preservation of intangible cultural customs and traditions themselves, but instead situated the process within the framework of the National Register as the preservation of tangible cultural properties that have historical and ongoing significance to living communities, as evidenced in their traditional cultural practices, values, beliefs, and identity. In this way, a more inclusive and localized procedure to protect the diverse cultural resources of the country, extending beyond the nationally significant Euroamerican historic structures and landscapes that had been the focus of the National Register, was integrated into the process.

BLM_0108840

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

The guidelines describe a type of cultural significance for which properties may be eligible for inclusion in the National Register. A property with traditional cultural significance will be found eligible for the National Register because it is associated with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuity of the cultural identity of the community. This type of significance is grounded in the cultural patterns of thought and behavior of a living community, and refers specifically to the association between their cultural traditions and a historic property.

Bulletin 38 utilizes an abbreviated definition of culture as "the traditions, beliefs, practices, lifeways, arts, crafts and social institutions of any community." Although readers are cautioned that this is a "shorthand" definition, and are referred to a more in-depth definition provided in Appendix I, the bulletin unintentionally and through continued use gives the impression that culture can be equated to a list of traits (customs, practices, beliefs, etc.).



**Figure 29:** Cultural resources cannot be defined by simplistic polemics of "cultural" vs. "natural" characteristics.

Culture is more than this, however. As presented in Appendix I, "Culture [is] a system of behavior, values, ideologies, and social arrangements. These features, in addition to tools and expressive elements such as graphic arts, help humans interpret their universe as well as deal with features of their environments, natural and social. Culture is learned, transmitted in a social context, and modifiable."

This more complex definition is important to understand and apply in relation to TCPs, since the people themselves, the community members, determine the cultural significance of the property in their own terms; they are the "definers" of significance. Furthermore, their expert knowledge about the site is the reason they are, by definition, consulting parties in relation to the identification and consideration of potential effects on the property. To identify whether a property may have traditional cultural significance, the agency will

BLM_0108841

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

most likely need to conduct a detailed field study. A cultural anthropologist or other specialist with expertise in conducting ethnographic and ethnohistorical research, and preferably with knowledge of and experience with the cultural community or ethnic group for which the property is significant, would in most cases be the best qualified expert to carry out documentation research for TCPs.

Traditional cultural significance is simultaneously historical and contemporary, and continuing significance is critical, *whether or not the place has gone unused for a period of time* (emphasis added). Bulletin 38 provides additional guidance on the meaning of the term: "'Traditional' in this context refers to those beliefs, customs, and practices of a living community of people that have been passed down through the generations, usually orally or through practice. The traditional cultural significance of a historic property, then, is significance derived from the role the property plays in the community's historically rooted beliefs, customs and practices."

...Another topic that has arisen is the nature of "boundary" around sacred spaces. In order to be identified and listed in the National Register, a property has to have a specified boundary. This has posed difficulties for Indian tribes, in particular, for which boundary lines around domains of thought and behavior, particularly with regard to spiritual matters (sacred sites), are not defined in Euroamerican terms.

...As groups such as Indian tribes seek the protections afforded through the National Register, the issue of making public what they regard as culturally privileged knowledge is a crucial one. Quite often the religious and spiritual practices of a tribe are maintained through the activities of specialists who hold, sustain, and preserve extensive and specialized information about the tribe's religious practices and beliefs. Document-ation of such cultural domains requires the release of confidential and culturally sensitive information to outsiders, and also might mean that the information is subject to the Freedom of Information Act. While there are certain protections available to the National Register, this topic continues to be a concern to tribal groups.

...In considering which (National Registeria) criteria may apply to a TCP, it is crucial to interpret them from the cultural perspective and point of view of the group to which the property may have

BLM_0108842

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

traditional cultural significance. That is, the phrases "our history" and "our past" must be understood to refer to the group's own view of themselves, their history, and their culture, which provides the context within which the traditional cultural significance will be evaluated. Bulletin 38 provides additional discussion of each of these criteria.

We note particularly Smythe's comment that continuing significance is critical even if a "place has gone unused for a period of time." In other words, the critical factor of continuity in cultural significance is not whether a traditional community has visited an area for traditional culture practices (within some wholly non-specific time frame), but that their traditional cultural practices have continuously relied on such traditional cultural values that may be inherent in a place. This is especially relevant for the White River and Uncompahgre Utes who were completely disenfranchised from their ancestral homelands in Colorado when they were removed to reservation lands in Utah some some three or four generations ago. The trauma experienced by the Utes in those events persists to the present day, and it has, in fact, been the chief reason the original Colorado Utes have not returned to their ancestral homelands more frequently and in greater numbers.



**Figure 30:** The White River Utes returned to Meeker, Colorado in July 2009 for the first Smoking River Pow Wow. Events at the White River Indian Agency in 1879 led to the forced removal of the Northern Utes from their ancestral homelands to reservation lands in Utah. Many of the Utes attending the pow wow in Meeker had never been to Colorado before.

Loya Arrum, a Ute Elder and educator, spoke quite directly to this issue in July 2008 on the occasion of her return to Meeker, Colorado with other White River Utes for the first Smoking River Pow Wow, seen by many observers as a move toward reconciliation and healing of old wounds:

> "Well, our people said don't tell, don't talk about this (removal of White River Utes). It was such a horrendous, had such a horrendous effect, physically, psychologically, on them. We're still in that psychological trauma today. When I fear to drive off and come over into this valley, I have great fear of it. Although we knew our ancestors loved this land. And when they were taken out by gunpoint by the military they cried, out of this

BLM_0108843

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

valley. They walked out crying. So that's what I feel when I come over here. I feel that loss and that hurt.

But, myself, I want to tell what happened here, and that, I guess, would mean that I have to come back here. And I'll do it for the children. And I guess we need to have a healing from this, and having a pow wow is not really a healing. It just says we're here. We're dancing." (Arum 2009)

Clifford Duncan, speaking at that same event, said:



"For hundreds of years our people have been here. ██████████████ that's why we find it's always a good feeling to come back home, to our homeland. So I want to say this to my ancestors. 'I did not forget you. We did not forget you. We returned. We're back here. Now, we're here.'"

These issues strike deep chords. The statements by Clifford and Loya certainly apply not just to the White River

**Figure 31:** This brush fence in northwestern Colorado, one example of many such features known to exist, has typically been identified as historic "Euroamerican" by field



homelands but to all the Colorado Ute territories, including the lands within the project area. While the CRM issues involved are complex (King 2009), the importance and the authenticity of the Utes' connection to their ancestral lands seems clear.

As noted previously, Section 106 processes in the past have been largely dependent on archaeological information. Unfortunately, the general lack of baseline data for Ute archaeology, also discussed previously, is likely to have negatively impacted recognition and recording of some types of Ute archaeological sites in the project area.

For example, most "isolated finds" and "open lithic" or "lithic scatter" sites are routinely discounted by archaeologists, agency staff, and Utes alike. But in view of the weak baseline data for Ute archaeology, a question is raised: how many, if any, isolated

BLM_0108844

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

finds and "non-diagnostic" sites might in fact be of Ute origin? Many Ute sites contain only sparse material assemblages (Baker et al., 2007) and any wickiups which may have at one time been present may have disappeared from natural deterioration (Simms et al., 2006), leaving scant surface evidence of the site's original character. However, as more wickiup sites and other Ute sites are recorded and tested in the future, and baseline knowledge of Ute archaeology grows, such "ineligible" and "of no concern" sites, on reexamination and testing, may possibly yield significant archaeological information on both historic and prehistoric Ute culture.

Another potential gap in the Ute archaeological record relates to possible misattribution of brush fences and "horse trap" corrals, which have been found in the project area and surrounding regions (Figure 31). In Colorado, seemingly in contrast to Utah and Wyoming, these types of sites have routinely been characterized as "Euroamerican historic features." However, evidence exists in the literature that these historic wooden structures may, in fact, be of Ute origin, at least in some cases (Baily 2004, 2005a, 2005b; Keyser and Poetschat 2008; Loosle, 2007; Martin and Ott 2007). Future consultation with the Utes, as well as additional archaeological work, will be needed to evaluate and possibly confirm the cultural origin of such wooden structures in the project area. Such structures, if they do prove to be Ute, could add significantly to our understanding of Ute horse culture and its spread northward from New Mexico during early contact years.

## OVERVIEW OF UTE ETHNOHISTORICAL THEMES RELEVANT TO THE PROJECT AREA

The "only Indigenous people to reside within the state from prehistory into their Late Contact phase" were the Utes (Baker et al. 2007:31) and they play a central role in the culture history of northwestern Colorado.

The Utes, or "Nuuciyu" (Goss 1999:79), are a "culturally self-identifying group" (Lewis 1994:22) of people affiliated by shared language, lifeways, and history. The Ute language, a member of the Numic branch of the Uto-Aztecan language family, is "affiliated most closely with the Southern Paiute in the Colorado River drainage to the west, less closely with the Comanche and Northern Shoshone in the Plains and Plains-Plateau to the east and north respectively, and least closely to the Northern Paiute in the Great Basin area of western Nevada and Oregon" (Jorgensen

BLM_0108845

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

1965:9). Although there is disagreement regarding the earliest prehistory of Numic speakers, it is generally agreed that during the last thousand years they expanded from the southwest Great Basin to reach their historically known territory in Utah and western Colorado (Madsen and Rhode 1994). Brown ware ceramics and increasing numbers of Desert Side-notched and Cottonwood Triangular projectile points began to appear in the archaeological record of eastern Utah and western Colorado at approximately AD1100 (Reed 1994:196), and they may represent the earliest known prehistoric markers of Numic-speaking people in western Colorado. Nevertheless, archaeological evidence definitively establishing a prehistoric Ute presence in western Colorado has yet to be widely accepted.

David Rich Lewis (1994:30, 191), drawing on the work of fellow anthropologists Smith, Steward, Stewart, Jorgensen and others, summarizes Ute social organization as it may have existed in the Early Contact phase as follows:

> Ute society centered around the extended bilateral family, and periodic congregation of related or affinal kindreds to form local residence groups of from twenty to one hundred persons. These groups frequently traced relations through the matriline and resided matrilocally, but membership was fluid and flexible enough to adjust to personal and local environmental realities. Local leaders were older men who, through persuasion, influence, and proven ability, achieved a level of consensus for their plans. Most groups recognized specialized leaders who directed specific activities (hunting, moving camp, dances, or raiding) and had little or no authority over the group in other matters.

> Larger "band" organization was limited to periodic congregations for defense, for spring Bear dances, or for summer hunting or fishing camps. Such summer congregations especially around Utah Lake, could number a thousand people. Bands consisted of local residence groups linked by bilateral kinship networks and their common territorial range — specific features usually reflected in their band name. Local groups and even extended family groups remained relatively autonomous, because most bands lacked formal political organization. Local leaders in band councils (which could include women) decided necessary matters subject to community approval. Dominant groups often provided the most influential leaders — leaders who ultimately came to the attention of white officials looking to negotiate with a single "chief." Ute bands recognized their larger group identity in custom,

BLM_0108846

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

language, and territory, and remained united through kinship, trade, and defense against common enemies, but there was no larger Ute "nation" with long-lasting political allegiances or tribal councils.

The identities and territorial ranges of Ute social groups have long been of interest to archaeologists, ethnohistorians and other parties with a stake in Ute history. The Utes were highly mobile in the historical period and the shifting synonymies and inconsistent spellings (Callaway et al. 1986:338, 364) used to describe their social groups in historical records reveal the complexity of this ethnohistorical theme. Literature on the theme reflects deeply divergent opinions spanning a range of conceptual, theoretical and practical issues. Goss (1999:77) goes so far as to raise the fundamental question of whether the very idea of "bands" as ascribed to the Utes and other "Numu People" is even usefully meaningful, or merely a "false model of reality" representing an artificial, ethnocentric construct. Nevertheless, practicing archaeologists and ethnohistorians faced with the task of evaluating sites and describing cultural histories continue, by default, to rely on commonly used "band" designations for Ute groups.

The regional setting of the project area is within the historic territories of the "Uncompahgre," "White River," and "Weenuche" Utes living today mostly on designated reservation lands in eastern Utah and southwestern Colorado (Figure 3). The Uncompahgre and White River appellations began to appear in documents in the 1860s (Baker et al, 2007:49) and were widely adopted after the U.S. government established agencies for the Utes on the Uncompahgre River south of Montrose in 1875 and on the White River near Meeker in 1868 (Burns 2004). The names persist today in the political structure of the Northern Utes (Constitution and By-laws of the Ute Indian Tribe of the Uintah and Ouray Reservation 1937) and are widely used by contemporary Utes. The Weenuche (Weeminuche) were assigned to the Southern Ute Agency created in 1877 along with the Capote and Muache Bands. During the 1890s, the provisions of the General Allotment Act of 1887 were applied to the Southern Utes and the Weenuche were reassigned to an unalloted western portion of the Consolidated (Southern) Ute Reservation (Burns, 2004), now known as the Ute Mountain Ute Reservation. The Muache and Capote Bands elected to accept allotments in the eastern portion of the reservation, and that area is now known as the Southern Ute Reservation.

Ethnohistorical descriptions of the Indigenous people occupying central and northwestern Colorado prior to the 1860s

BLM_0108847

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

are sketchy, at best, and include shifting and inconsistent names for Ute subgroups (Jorgensen 1965; Callaway et al, 1986:338). The Uncompahgre and White River Bands were nineteenth century amalgamations of earlier Ute groups which had become increasingly mobile with the widespread adoption of equestrian lifeways during the Middle Contact period. During this time Eastern Utes expanded their territory "becoming important middlemen in the intertribal horse trade... [while clashing] more frequently with the Cheyenne, Arapaho, Lakota, and Comanche" (Lewis 1994:30-31).

The full geographic extent of Ute territory at its apex (Figure 3) is generally considered to have reached from western Utah to the eastern slope of the Rocky Mountains in Colorado, and from northern New Mexico to the northernmost reaches of western Colorado (Callaway et al, 1986:337; Jorgensen 1965). Recent investigations (Keyser and Poetschat 2008) cite evidence — rock art, wickiups and brush fences —suggesting that the Utes ranged as far northward as Wyoming's Upper Powder Springs Basin during the Late Contact phase. Jorgensen (1972) extends his ca. 1880 "Yamparka" Ute territory to the northern reaches of Colorado's Sand Wash Basin, and ascribes lands beyond to the Wind River Shoshone. Baker and his colleagues (2007) appear to concur with Jorgensen, but only for the earliest contact phase years (Figure 33), arguing that the "Sabuagana" Utes encountered by Dominguez and Escalante in 1776 represented the northern limit of core Ute territory at that time (Figure 34). They (Baker et al. 2007) further ascribe the area north of the Sabuaganas as Eastern Shoshone, during ca. AD1540-1600 (Figure 33), and Comanche during the late eighteenth century (Figure 34).

No less than twelve (perhaps as many as thirteen or more) distinct names — many with widely varying spellings and multiple synonyms — for Ute "bands" appear in commonly cited ethnohistorical records. In his study of the Northern Utes, Jorgensen (1965:17) goes so far as to claim that "perhaps 70 or more variously named Ute 'bands' were reported between about 1634 — when Euro-Americans first began recording the names and locations of Ute bands — until the post 1860s — when all Utes were corralled onto reservations in Utah and Colorado." Of primary interest for our purposes herein are the Ute groups that are likely to have occupied or frequented areas within the Colorado River drainage in the vicinity of Grand Mesa and Battlement Mesa, on the south, and the Roan Plateau, on the north. These have been variously identified as the Parianuche (Parusanuch), Grand River, Sabuagana, and Uncompahgre Bands. Figure 36  represents a relatively recent interpretation (Simmons

BLM_0108848

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE



**Figure 32:** The Dominguez-Escalante Expedition circumnavigated a large portion of Ute territory in 1776.

2000:18) of the Ute ethnohistorical record showing the distribution of Ute bands, designated by commonly-used names, in the Early and Middle Contact phases. Another widely cited map (Callaway, 1986:337) is shown in Figure 35.

The earliest known records of European contact with Indigenous inhabitants in west-central Colorado are attributed to Juan Maria de Rivera, who explored parts of the region during two expeditions in 1765 (Sánchez 1997) reaching as far north as the Colorado River valley (Sánchez 1997; Vandenbusche and Smith 1981:16; Simmons 2005:35; Husband 1984:IV-12). In the

BLM_0108849

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

following decade Fray Francisco Antanasio Dominguez and his junior partner Escalante traveled even farther north into Colorado, reaching the White River near the present town of Rangely in 1776, then west as far as central Utah (Figures 20 and 33).

The Dominguez-Escalante journal mentions various encounters with "Sabuagana Yutas" in the areas immediately north and south of the Colorado River near Grand Mesa and the Roan Plateau. The Uncompahgre Plateau, lying to the southwest, was referred to as "La Sierra de los Tabehuachis", apparently named in reference to the "Tabehuachi" Utes inhabiting that area (Chavez and Warner 1976). Baker (2005, 2007) contends that the Sabuaganas — first recorded by Rivera in 1765 — were the same group that later came to be called the "Uncompahgres," in reference to the Uncompahgre River, which the Utes called "Ancapagari" (Chavez and Warner 1976:29). He also presents a strong case for the view that the Uncompahgres, as they came to be known in the Late Contact Phase, were in fact an amalgamation of the earlier, and geographically distinct, Sabuagana and Tabeguache Bands (Baker 2005,2007).

Baker (2005) ascribes the home range of the Uncompahgre/ Sabuagana Band to "the north flank of the San Juan Mountains... (generally including) the area to the west of the Continental Divide in the headwaters of the Gunnison and Uncompahgre Rivers and south of the Colorado River... (and also including) the high Grand Mesa and the eastern portion of the Uncompahgre Plateau." The original home territory of the Tabeguache Band, in Baker's (2005) view, was to the west of the Uncompahgre Band, abutting the west side of the Uncompahgre Plateau, including the headwaters of the San Miguel and Dolores Rivers, and delimited on the west by the La Sal Mountains of Utah.

Utes groups inhabiting areas north of the Colorado River and west of the Continental Divide in the nineteenth century were variously described in historical records as the Parusanuch (Parianuche), Grand River, Yampa, and Uintah subgroups (Callaway et al. 1986:339; Baker 2005). The original core territory of the Uintahs is generally thought to have ranged from Utah Lake east through the Uinta Basin to the Tavaputs Plateau in the Green and Colorado River systems (Callaway et al. 1986:339), although some Uintahs may have affiliated with the White Rivers during the Late Contact agency years (Baker 2005), and Smith (1938) stated that "their hunting parties frequently followed the White River into Colorado." The Yampas, also known as the Yampatikas or Yamparikas, were the northernmost of the Eastern Ute bands, inhabiting areas north of the White River, ranging from the Yampa

BLM_0108850

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

River drainage into southern Wyoming on the Little Snake River, eastward into Colorado's Middle and North Parks, and westward into the Uintah Basin (Simmons 2000:20).

The "exact relationships of the Parusanuch and Grand Rivers are not well understood at all and the ethnohistories of these subgroups have not been well summarized anywhere" (Baker 2005:2.9). Simmons (2000:20-21) suggests that the Parasanuch (Parianuche, Parianuc, Pahdteeahnooch) — the "elk people" — were the same group identified in early records as the Sabuaganas, and were "later called the Grand River Utes... [whose] territory extended into eastern Utah and up the Colorado River (formerly called the Grand River) to their winter resort at Glenwood Springs, onto Grand Mesa and the Flattops, up the Roaring Fork... and into the mountains to the headwaters." The views of Simmons and Baker with regard to the Sabuaganas' eventual Late Contact phase affiliations are obviously at odds, and the discrepancy serves to illustrate the difficulty of reconciling discontinuous ethnohistorical records in the search for a seamless, fine-grained culture history of the Utes.

In the decades following the Dominguez-Escalante expedition, until the 1820s, there were few direct incursions into west-central and northwestern Colorado by Euro-American interests. The Early Contact lifeways of the Eastern Utes, however, was increasingly transformed by the acquisition of horses and trade items introduced by the Spanish (Baker et al. 2007; Simmons 2005; Lewis 1994), and by the 1820s the Eastern Utes were widely enjoying an equestrian lifeway. Jorgensen (1972) describes them as "fine horsemen with vast herds of horses" living "parts of the springs and summers in large encampments of 200 or more lodges." In his description of changes in Ute society sparked by the appearance of horses, Lewis (1994:30) notes their "accumulation of more material goods and ... an elaboration of Ute material culture", adoption of certain Plains cultural traits, expansion of their territory as "noted [horse] raiders", and their role as "important middlemen in the intertribal horse trade."

The Utes, however, were not the only Indigenous people in the region who were adopting equestrian lifeways during this period. The Eastern Shoshones, mounted on horses, occupied lands north of the Utes in western Colorado and appear in the regional ethnohistories of the Yampa and Green Rivers (Jorgensen 1972; Baker et al 2007). The Comanches held similar status on the east, along with other plains groups — namely the Cheyenne, Arapaho, and Lakota. The Shoshones and Comanches, even though they share language affinities with the Utes, have distinct

BLM_0108851

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE



**Figure 33:** The general cultural landscape in Colorado and surrounding regions, ca. A.D. 1540-1600 (Baker et al. 2007:35).



**Figure 34:** Map showing the "distribution of Native American peoples in the late eighteenth century and end of regional protohistory" (Baker et al. 2007:47).

BLM_0108852

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE



**Figure 35:** Early 19th century territory and modern town locations. Underlined band names are in approximate 18th century locations; those not underlined are pre-reservation (Callaway 1986:337).



**Figure 36:** Distribution of Ute Indian bands: 1. Pahvant, 2. Moanunt, 3. Sanpits, 4. Timpanogots, 5. Uintah, 6. Seuvarits, 7. Yampa, 8. Parianuche, 8a. Sabuagana, 9.  Tabeguache, 10. Weenuche, 11. Capote, 12. Muache  (Simmons 2000:18).

BLM_0108853

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE



**Figure 37:** Distribution of Ute bands as surmised from (top) Dominguez and Escalante Expedition journal, route indicated by dotted line, and (above) interviews of Ute informants in 1938 (Stewart 1942).

56  *Perspectives on Ute Ethnohistory in West Central Colorado*

BLM_0108854

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

ethnographic profiles, and their presence in northwestern Colorado is pointed to by both archaeological (Cole 1987) and ethnohistorical evidence (Hämäläinen 2008).

In northwestern Colorado, in historic periods, local ethnic groups appear to have shifted repeatedly in the Yampa and White River drainages. As shown in Figure 34, the northern boundary of Ute occupation in west central Colorado late in the eighteenth century probably did not reach beyond the local northern extent of the Colorado River drainage (Baker et al. 2007:46-49). This supposition, based largely on the Dominguez and Escalante journal from 1776 (Chavez and Warner 1976), is supported to

In the early decades of the nineteenth century the fur trade rush (Figure 38) heralded the beginning of "revolutionary transformation" of Ute life (Husband 1984:IV-12). Trading posts and Euro-American trade goods became a part of the Ute landscape, and the American success in the Mexican War in 1848 marked the "beginning of the end for Ute sovereignty in the region" (Husband 1984:IV-12). In 1849, with the signing of the Calhoun Treaty by seven Ute bands, the Utes irretrievably entered the sweep of American political history and expansionist policies. Ute homelands in western Colorado were subsumed first by Utah Territory in 1851, then Colorado Territory in 1861, and finally by the State of Colorado in 1876. The treaty of 1849 was followed by a series of subsequent treaties, agreements and land cessions which constrained the Utes into ever smaller territories, and by the late 1870s the Eastern Utes were "among the last free roaming Native Americans in the United States" (Baker et al, 2007:74). Ute Reservation boundaries were repeatedly reduced during the period, as increasing numbers of Americans flooded into Colorado. Finally, in 1881, the White River and Uncompahgre Utes were forcibly removed to reservation lands in eastern Utah (Figure 39).

Ute history and ethnohistory for the Late Contact period have been enhanced in recent years by historical archaeological evidence from throughout western Colorado. The Colorado Wickiup Project (O'Neil et al. 2004; Martin and Conner 2007; Martin et al. 2005a, 2005b, 2006, 2007a, 2007b, 2010; Martin and Ott 2007a, 2007b, 2009) has documented nearly fifty aboriginal

BLM_0108855

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

wooden feature sites in central and northwestern Colorado which
are reliably dated to as late as 1915 (Figure 40). Despite the
official "removal" of the Utes from their traditional northern
Colorado homelands, they clearly continued to exert a presence
in western Colorado well into the twentieth century. Some
northern Utes may have remained in western Colorado (Stewart,



**Figure 38:** Many fur trappers trails in western Colorado followed historic
Ute trails (O'Rourke 1980).

BLM_0108856

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE



**Figure 39:** Progressive reductions in Ute territory ocurred during the nineteenth century reservation period, resulting in the present Ute reservations (Wroth, 2000:2).

*Perspectives on Ute Ethnohistory in West Central Colorado*  59

BLM_0108857

BLM_0108858

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

unpublished comments at the Symposium of the Archaeology of the Eastern Ute, Grand Junction, Colorado, 1988), off-reservation, after the 1881 expulsion. Utes are known to have been counted in the census records of various communities in the area (for example Collbran, Colorado) as late as the 1920s. Historical newspaper accounts describe almost annual Ute hunting forays into many areas of northwestern Colorado from 1881 to as late as 1909 (Martin et al., 2009).

The quality of baseline historical Ute archaeological data has begun to somewhat improve in recent years. The Colorado Wickiup Project (O'Neil et al. 2004; Martin and Conner 2007; Martin et al. 2005a, 2005b, 2006, 2007a, 2007b, 2010; Martin and Ott 2007a, 2007b, 2009) has documented nearly fifty aboriginal wooden feature sites in central and northwestern Colorado — including sites located in the Yellow Creek and the Douglas Creek drainages  which are reliably dated to as late as 1915 (Figure 40). Despite the official "removal" of the Utes from their traditional northern Colorado homelands in 1881, they clearly continued to exert a historical presence in western Colorado well into the twentieth century. Some northern Utes may have remained off-reservation in western Colorado after 1881 and Utes are known to have been counted in the census records of various communities in the area (for example Collbran, Colorado) as late as the 1920s (Martin et al. 2006:8; Martin and Ott 2009:92). Historical newspaper accounts describe almost annual Ute hunting forays into areas of northwestern Colorado from 1881 to as late as 1909 (Table 2). The Utes, of course, continue to hold deep emotional and spiritual connections to their ancestral homelands in Colorado (Green, 2009).

**Table 2 (below and following):**  Examples of post-1881 historical newspaper reports of Ute activities in western Colorado (Colorado Historical Newspaper Collection).

| Year | Description | Historical Source | Source Date |
|------|-------------|-------------------|-------------|
| 1881 | Utes encamped "about 20 miles below the post" (Meeker Cantonment) | Fort Collins Courier | 31 March, 1881 |
| 1883 | Utes, lead by Colorow, continue to camp "on the White River and its tributaries" and declare "they will not live on the reservation." White settlers petition Sec. of Interior to keep military in Meeker. | Montezuma Millrun | 12 May, 1883 |

*Perspectives on Ute Ethnohistory in West Central Colorado*   61

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

| Year | Description | Historical Source | Source Date |
|---|---|---|---|
| 1893 | Utes hunting in Blue Mountain region and on the head of Snake River. | Aspen Weekly Times | 11 November, 1893 |
| 1894 | 300 Ute deer hunters, reportedly "scattered over winter feeding grounds about forty miles east of Rangely." | The New Castle News | 15 December, 1894 |
| 1896 | Over 400 Northern Utes "in the White River country slaughtering deer and elk and defying county authorities." Governor threatens to send troops. | The Aspen Tribune | 29 October, 1896 |
| 1896 | Game wardens deter Utes from annual hunt. Utes were "found camped on water holes where wood, water and grazing were abundant." Game wardens visited water holes on Douglas, Yellow, Piceance, Box Elder and Willow Creeks,  Three Springs on Blue Mountains, and other points on the Lower White River and the Blue Mountain country. | The Steamboat Pilot | 25 November, 1896 |
| 1897 | Utes killing game in Rio Blanco County. | The Steamboat Pilot | 18 August, 1897 |
| 1897 | "Great numbers" of Utes in White River and Bear (Yampa) River country for "annual hunt." Utes killed in gunfight with game wardens "seven miles below Maybell." | The Steamboat Pilot | 27 October, 1897 |
| 1897 | 80 Utes hunting deer in Lily Park, west of Maybell on the Bear (Yampa) River. Eight Utes killed by game wardens in gunfight. | The New Castle News | 5 November, 1897 |
| 1889 | Utes seen at the head of Elk Creek, reportedly traveling to the "old hunting ground up near the head of White River." | San Luis Valley Courier | 14 August, 1899 |
| 1899 | 300 Utes hunting deer on Yellow Creek "since the latter part of October." Estimated 2000 deer killed. | Aspen Weekly Times | 25 November, 1899 |
| 1899 | 150 Utes encamped on Yellow Creek | The Steamboat Pilot | 15 November, 1899 |

BLM_0108860

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

| Year | Description | Historical Source | Source Date |
|------|-------------|-------------------|-------------|
| 1900 | "Great numbers" of Utes making "usual fall raid on the game of Rio Blanco County." | The Steamboat Pilot | 24 October, 1900 |
| 1900 | "A large number of Utes passed Rangely... headed for Spring Creek and Yellow Creek... believed to be killing deer in that section... Two large bands encamped in Coyote Basin." | (Boise City) Idaho Daily Statesman | 30 November, 1900 |
| 1907 | 79 Utes, in four parties , one led by Atchee and one by Johnny P.R., hunting in head of Douglas Creek and Cathedral Spires section. Game wardens order them back to Utah. 20 game wardens authorized to patrol White River country, including Douglas Creek and Blue Mountain. | The Yampa Leader | 9 October, 1907 |
| 1909 | 100 Utes, divided into four bands led by Shavano, Atchee, McCook and Monk, camped in the "vicinity of Douglas Creek" for "annual hunt." Game warden persuades them to return to Ft. Duchesne . | The Routt County Sentinel | 26 November, 1909 |

BLM_0108861

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

## SUMMARY OF KNOWN UTE SITES AND HERITAGE AREAS IN THE PROJECT AREA

Data on known Ute sites and heritage areas in each of the field offices were prepared by BLM cultural resources staff and shared with participating Ute representatives during the course of the project. BLM archeologists in each field office directed searches in SHPO and BLMFO databases for their respective areas. Sites were selected based on confirmed or suspected Ute cultural affiliation, site type, impact risk assessment, and other management concerns. Information was prepared for presentation to Ute participants at field office planning meetings and for reference during field visits, including maps, site forms, photographs and other data on sites and cultural landscapes thought to be of Ute cultural affiliation and significance.

Within the project area a total of 372 recorded archaeological sites believed to be culturally affiliated with the Utes were initially identified. A generalized map of these resources is presented in Figure 4, above. Work is continuing in each field office on refining and clarifying these data, and improving methods for sharing and analyzing shared information. Regular on-going consultation with the Utes, for both research and compliance-driven projects, will be necessary to fully develop baseline datasets that allow for integration of archaeological, ethnographic and ethnohistorical information in a form that is equally meaningful to the Utes and Agency cultural staff and managers.

### Site types

In general terms, site types identified by Ute representatives as having important cultural heritage values include:

*"The Utes consider the air, the water, the view, all those things, the whole environment, as cultural resources."*

— Betsy Chapoose (2007)



64  *Perspectives on Ute Ethnohistory in West Central Colorado*

BLM_0108862

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE



This list has not been formalized in any sense, and is synthesized here only to indicate the range of site types that represent potentially important Ute heritage resources.

Throughout the project, Ute participants consistently stressed the importance of looking beyond narrowly defined "site boundaries" determined by a purely material or artifactual (archaeological) view of cultural resources. As Betsy Chapoose succinctly expressed it at the project's general planning meeting, "The Utes consider the air, the water, the view, all those things, the whole environment, as cultural resources." Similar landscape-scale perspectives were reiterated by Ute participants throughout the course of the project.

During several meetings and field trips, Clifford Duncan spoke at some length of the Utes' religious and spiritual connections to places and sites. Such "feelings of place" are recognized within the frameworks of NEPA and NHPA (Koyiyumptewa and Colwell-Chanthaphonh, in press) as important qualities for identifying and evaluating "traditional cultural properties" (TCPs). Designation of areas as TCPs, however, carries the risk of increasing public pressure on areas. BLM has previously utilized ACEC designations to protect senstive heritage areas, and project participants indicated general  agreement in recommending this approach going forward. Discussions of how to integrate Ute traditional religious and spiritual concerns with agency processes in a more meaningful way are continuing.

## SUMMARY AND RECOMMENDATIONS

The quality of Late Historic Ute archaeological data and ethnohistorical documentation within the project area has significantly improved in recent years. Moreover, based on recent reports from investigators leading currently active, long-term research projects within the region, it is likely that baseline contexts for Ute historical archaeology and ethnohistory will continue to improve as new sites are recorded, new synthetic studies are written, new interdisciplinary research projects are conducted, and more tribal consultation process improvements are adopted (personal communication, October 2010: Carl Conner, Curtis Martin, Clifford Duncan, Betsy Chapoose, Terry Knight).

BLM_0108863

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

Ute ethnohistorical perspectives are likely to be increasingly important in future research designs for historical archaeology; and analysis and evaluation of the full range of Ute archaeological sites and ethnographic landscapes for CRM purposes are likely to increase. Nevertheless, Ute perspectives on sacred and ethnographic landscapes have yet to be fully and practically integrated into cultural resource management frameworks.

In some important respects, baseline contexts for Ute historic archaeology and ethnohistory have improved beyond the design capacities of data models currently used by BLM and OAHP. Much of the new data now available to researchers and cultural resource mangers have yet to be synthesized, and archaeological data continue to flow into CRM archives and out of easy reach of future researchers.

During the course of the project, as discussed above, a broad range of Ute issues and concerns that impact on BLM's planning and cultural resource management activities were examined. Key themes identified by participants are summarized below:

**Foundational principles of collaboration**

- Legal, social, scientific and religious points of view attach to cultural resources on public lands. Each of those perspectives must be considered, in good faith, in land management planning, policy and programs.

- The Utes' traditional and historical culture is based in nature and places deeply-held values on the still living landscapes that were home to their ancestors. Their spiritual and emotional connections to their Colorado homelands are still strong, and growing.

- Fragmented and compartmentalized archaeological data, such as that resulting from compliance projects, is not a sufficient baseline for evaluating Ute cultural heritage concerns on the public lands. Landscape-scale inventories which integrate ethnohistorical, ethnographic and archaeological information are needed, and these should be developed in on-going consultation and collaboration with the Utes.

- Partnership and collaboration requires information parity. Efficient flow of mutually meaningful information between tribal and agency cultural resources departments is critically important to all parties.

- Administrative protocols and communications must be consistent across agency and tribal domains for successful tribal consultation. All parties benefit from practical, efficient and mutually agreed upon administrative procedures.

BLM_0108864

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

## Application of new models

- Programs that include Ute young people interacting on the land together with Ute elders and families are of great benefit in preserving Ute culture. The BLM-USFS Ute Ethnobotany Project is a worthy beginning in this direction and other similar projects and activities should be explored. A project focusing on Ute trails, for example, might lead to new approaches to recreation and travel management within BLM districts as well as acquiring new archaeological data.

- New models and methods in many of the disciplines that contribute to our shared understanding of the Ute's cultural heritage should be appropriately tested and applied. Approaches that emphasize Ute perspectives, collaborative methods of study, and environmental or ecological perspectives offer both scientific and cultural heritage preservation benefits.

- Exclusive reliance on a "site approach" to cultural resource management cannot adequately address Ute cultural heritage concerns. Landscape-scale inventories and regional context studies are needed for meaningful and efficient cultural resource consultation.

## Consulting process improvements

- Consensus is needed on communication protocols among all parties. Differences in local office protocols and customs, within both the Ute and the BLM domains, need to be identified and resolved, perhaps with programmatic agreements. Practical and specific guidance is needed for phone, email and hard copy correspondence.

- The quality of shared information has significant impact on consultation outcomes. Site data, maps and other information, including descriptions of management concerns, need to be clear, relevant and presented with adequate context. Work should continue on development of GIS databases, and efforts made to coordinate and standardize database designs across field office boundaries. The Ute tribes should be consulted regarding information sharing protocols and standards as they develop, and the tribes should pursue development of their own GIS databases.

- Regular, face to face meetings between agency and tribal cultural program staff, conducted outside the normal course of Section 106 consultation activities, are important for furthering the underlying goals of this project. All parties should continue to seek additional funding and other partners to support future research and collaboration.

- Research field trips and site visits, like those conducted for this project, are valuable opportunities for deepening

BLM_0108865

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

working relationships and helping to broaden baseline knowledge of Ute heritage.

- New approaches to consultation should be considered. For example, field activities that include participation by both agency managers and tribal leaders, though difficult to arrange, might help to soften long-standing barriers that impede meaningful consultation and productive collaboration.

### Recommendations for future ethnohistorical research

The following recommendations for future research have good potential for helping to fill current gaps in ethnohistorical and historical archaeological databases for the project area and surrounding regions, and for more fully integrating indigenous perspectives into cultural resource management processes.

- BLM should proactively initiate large block surveys and landscape scales inventories to improve the quality and scope of the baseline knowledge of Ute cultural resources in the project area. High quality, horizontally integrated databases will help to significantly increase the efficiency of tribal consultation projects.

- More high-level synthesis is needed within and across the scientific disciplines and cultural domains that associate with Ute history, cultural resources, and traditional culture. BLM should proactively support more frequent and meaningful Ute consultation and collaboration within both compliance processes and research programs.

- Until such time that consultation with the Ute tribes results in systematic and mutually agreed upon guidelines for identifying and evaluating Ute cultural and heritage resources, BLM should consider all of the site types listed above (p. 64) as potentially significant Ute heritage concerns.

- For the appropriate protection of Ute religious and sacred places, BLM should continue to consider and apply all available resource management designations and allocations allowed under legislative and executive mandates — such as ACECs and other specially designated "heritage areas," for example.

- BLM should continue efforts begun in this project, and the on-going Ute Ethnobotany Project, to secure funding and participatory partners for collaborative Ute heritage research. Partner and for landscape-scale inventories and studies.

- BLM, in consultation with the Utes, should continue to develop place-based cultural research programs that actively engage and include Ute participants, including young people, families, and elders.

BLM_0108866

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

- BLM should continue its support for research projects and CRM programs that include active Native American participation.  On-going programs based on well-planned and regularly scheduled activities are likely to yield the most significant results. Recent ethnohistorical projects conducted in collaboration with the Ute Tribes have included the active participation of significant numbers of tribal members working in the field with BLM cultural resource staff, research archaeologists, and ethnohistorians. Many of the recent improvements in Ute historical archaeology and ethnohistorical databases for the study area have resulted directly from such efforts. Archaeologists and resource managers have gained new perspectives from tribal participants on a range of Ute archaeological sites — notably including aboriginal wooden features and rock art, both of which are arguably the cultural resources most at-risk from natural and human causes. In turn, Ute connections to their historic territories have strengthened, and their active collaboration and information sharing with archaeologists and resource managers have revealed new avenues for future research initiatives that are likely to continue producing positive and significant results.

- Previous Native American consultation efforts in the study area have been conducted in large part with members of the Northern Ute and Ute Mountain Ute Tribes. However, historical and ethnohistorical records, as well as several rock art sites in the project area and surrounding regions, suggest that other Numic-speakers, notably Eastern Shoshone and Comanche groups, were probably present in the area during several historic time frames. BLM's future Native American consultation activities should be extended to include participants from these tribes.

- Temporal and geographic gaps in Ute ethnographic and ethnohistorical databases should be addressed through funding and support of projects focused on compilation of understudied historical Ute records in government and private archives, including archival materials in the collection of the Ute Tribes that may be available for study. Syntheses of pre-1850 ethnohistorical information on Utes inhabiting locales north of the Colorado River within the study area are particularly lacking.  Related studies focusing on the movements and consolidations of Numic-speaking groups occupying the Little Snake, Yampa, and White River basins may be especially valuable.

- Efforts should be expanded to identify and record Native American trails and trail networks within the project area. Systematic study of such archaeological markers has the

BLM_0108867

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

potential to yield important insights into the distribution patterns of Ute archaeological sites, and could also extend basic knowledge of Ute spiritual beliefs and practices related to seasonal cycles of movement.

- New methods and conceptual frameworks for modeling cultural and cognitive landscapes using GIS-based spatial-statistical analysis techniques should be examined for potential applicability in the study area. For example, the preliminary conceptual model developed and tested by Diggs and Brunswig (2006a, 2006b) in Rocky Mountain National Park — using representations of elevation, viewsheds of known sacred landmarks, local relief, north facing slopes, and nearness to known prehistoric and early historic trails — applies a weights of evidence technique to model patterns of distribution for sacred sites and individual feature types. Importantly, their methodology involves ethnographic consultation with Native Americans for identifying sacred landmarks and for establishing the spiritual or religious aspects of certain archaeological and natural features. A similar method, appropriately adapted, may be productive if applied to ethnographic landscapes in the study area.

- Similarly, new protocols and approaches proposed by Native American cultural resource managers and organizations should be examined for applicability. One such approach has been proposed by the Hualapai Tribe for its monitoring program in the Colorado River Corridor in Arizona. It offers a theoretical perspective as well as a pragmatic framework for recording resources of traditional value. Based on principles of Traditional Ecological Knowledge (TEK), the Hualapai program emphasizes a holistic approach to cultural resource management, and its indigenous cultural knowledge base integrates broad spectrum of environmental, biological, and geological factors with traditional cultural and spiritual values (Jackson-Kelly, 2007). This model appears to be a good fit with traditionally important Ute cultural values, and has the potential for addressing some of the systemic conceptual differences that have limited the practical integration of Ute perspectives into CRM processes in the project area. The Hualapai TEK model, however, was developed within the context of the Glen Canyon Adaptive Management Program, and will need to be evaluated within the framework of BLM management programs.

BLM_0108868

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

- Several recently published studies (Bailey 2004, 2005a, 2005b; Loosle 2007; Keyser 2008) have presented evidence that historic brush fences and corrals found in association with wickiup sites in eastern Utah and southwestern Wyoming were constructed by Utes for managing the large herds of horses they were thought to have possessed in the Late Historic period. Similar animal control structures are known to exist in significant numbers throughout central and northwestern Colorado, including areas within the project area. A number of these Colorado sites contain associated wickiups, yet many, if not most, of the recorded brush fences and corrals have been identified in previous archaeological surveys as being of Euro-American origin. If in fact these wooden structures are of Ute origin, they contain potentially significant archaeological data that are likely to provide important new insights into equestrian Ute cultural practices.  Such sites in the project area should be thoroughly investigated.

BLM_0108869

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE



**Figure 42:** Utes participants toured portions of the newly designated Dominguez-Escalante National Conservation Area and Dominguez Canyon Wilderness, located on the eastern flank of the Uncompahgre Plateau. Many Ute cultural resources and heritage areas, including ███████████ are located within the NCA, and Ute consultation will be important for cultural resources planning for the area.

*"Nothing is real until it happens."*

— Clifford Duncan (2007)

BLM_0108870

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

# REFERENCES CITED

Arum, Loya
>    2009    Interview in "The Utes," in "We Shall Remain: A Native History of Utah." DVD, produced by Nancy Green, published by KUED, University of Utah, Salt Lake City.

Axtell, James
>    1979    Ethnohistory: An Historian's Viewpoint. *Ethnohistory*, Vol. 26, No. 1 (Winter, 1979), pp. 1-13. Duke University Press.

Bailey, Christina
>    2004    Preston Nutter.  Ashley National Forest, USFS. Electronic document, http://www.fs.fed.us/ r4/ashley/heritage/histories/preston-nutter.pdf.  Accessed 01/15/09.

>    2005a    Ute Corrals. Ashley National Forest, USFS. Electronic document, http://www.fs.fed.us/r4/ ashley/heritage/ethnography/ute-corrals.pdf. Accessed 01/15/09.

>    2005b    Ute Horse. Ashley National Forest, USFS. Electronic document, http://www.fs.fed.us/r4/ ashley/heritage/ethnography/ute-horse.pdf. Accessed 01/15/09.

Baker, Steven G.
>    1988    Historic Ute Culture Change in West-Central Colorado. In *Archaeology of the Eastern Ute: A Symposium*, edited by Paul R. Nickens, pp. 157-189. CCPA Occasional Paper No. 1. Colorado Council of Professional Archaeologists, Denver.

>    1991    The Uncompahgre Valley Historic Ute Project: First Interim Report and Executive Summary with Preliminary Excavation Reports on Chief Ouray's Homes at Montrose (5MN847) and Ouray (5OR965). Uncompahgre Valley Historic Ute Project, Report Series No.2. Prepared by Centuries Research, Inc., Montrose, Colorado. Prepared for the Colorado Historical Society, State Historical Fund, Denver, and the Montrose Youth and Community Foundation, Montrose, Colorado. Copies available from the Colorado Historical Society, State Historical Fund, Denver.

>    1993    Modeling for Eastern Ute Culture Change. Paper presented at the 1st Biennial Rocky Mountain Anthropological Conference, Jackson, Wyoming.

>    1995    Archaeological Disenfranchisement of the Colorado Utes.  *Southwestern Lore* 61(3):1-9. Colorado Archaeological Society, Denver.

>    1996    Numic Archaeology on the Douglas Creek Arch, Rio Blanco County, Colorado: Ute Rancherías and the Broken Blade Wickiup Hamlet (5RB3182). Chandler Douglas Creek Arch Report Series, No. 79. Prepared by Centuries Research, Inc., Montrose, Colorado. Prepared for Chandler and Associates, Denver. Copies available from the Bureau of Land Management, White River Field Office, Meeker, Colorado.

>    2000a    State Historic Register Nomination for the Chief Ouray Mountain, House and Spring Waters (5OR965). Prepared by Centuries Research, Inc., Montrose, Colorado. Prepared for the Wiesbaden Motel and Spa, Ouray, Colorado. Copies available from the Colorado Historical Society, Office of Archaeology and Historic Preservation, Denver.

>    2003a    Ethnohistorical Perspectives on the Tabeguache Band of O. Stewart's "Eastern Ute." Paper presented at the 6th Biennial Rocky Mountain Anthropological Conference, Estes Park, Colorado.

BLM_0108871

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

2003b   Historic Ute Archaeology: Interpreting the Last Hour Wickiup (5RB3236). *Southwestern Lore* 69(4):1-34.

2004   Utes, Other Utes, Horses and Guns: Ethnohistorical Perspectives on O. Stewart's Post-Contact "Eastern Ute." Paper presented at the Annual Meeting of the Colorado Council of Professional Archaeologists, Colorado Springs, Colorado.

2005   2002-2003 Old Agency Initiative of the Uncompahgre Valley Ute Project, Vol. II, Late Contact Phase Ute Ethnohistory and Archaeology in Association with the 2nd Los Pinos Indian Agency on the Uncompahgre (5OR139). Uncompahgre Valley Ute Project, Report No. 6. Prepared by Centuries Research, Inc., Montrose, Colorado. Prepared for the Colorado Historical Society, State Historical Fund, Denver, and the Montrose Youth and Community Foundation, Montrose, Colorado. Copies available from the Colorado Historical Society, Office of Archaeology and Historic Preservation, Denver.

Baker, Steven G., Richard F. Carrillo, and Carl D. Späth
2007   Chapter 2: Protohistoric and Historic Native Americans. In *Colorado History: A Context for Historical Archaeology*, Church, Minette C., Steven G. Baker, Bonnie J. Clark, Richard F. Carrillo, Honathon C. Horn, Carl D. Späth, David R. Guilfoyle, and E. Steve Cassells, Colorado Council of Professional Archaeologists, Denver.

Berkhofer, Robert F., Jr.
1978   *The White Man's Indian: Images of the American Indian from Columbus to the Present.* Alfred A. Knopf, New York.

Blackhawk, Ned
2006   *Violence Over the Land: Indians and Empires in the Early American West.* Harvard University press.

2007a   The Displacement of Violence: Ute Diplomacy and the Making of New Mexico's Eighteenth-Century Northern Borderlands, *Ethnohistory*, 54:723-755. American Society for Ethnohistory, Duke University Press.

2007b   Swiftly Moving Currents: American Indian History and the Changing Complexity of the Lewis and Clark Expedition. *Ethnohistory* 54:4, p. 583. American Society for Ethnohistory.

Bolton, Herbert E.
1950   Pageant in the Wilderness. *Utah Historical Quarterly*, Vol. XVIII, January, April, July, October, 1950, Numbers 1,2,3,4. Utah State Historical Society.

Brett, John A.
2003   Ethnographic Assessment and Documentation of Rocky Mountain National Park. Electronic document, www.nps.gov/history/history/online_books/romo/ethnography/brett.pdf, accessed March 12, 2009.

Buckles, William G., and Nancy B. Buckles
1984   *Colorado Historical Archaeology Context.* Colorado Historical Society, Denver

Buckles, William G.
1971   The Uncompahgre Complex: Historic Ute Archaeology and Prehistoric Archaeology on the Uncompahgre Plateau in West Central Colorado. Ph.D. dissertation, Department of Anthropology, University of Colorado. University Microfilms, Ann Arbor.

Buckles, William G.
1968   Archaeology in Colorado: Part III. Archaeology in Colorado: Historic Tribes. *Southwestern Lore* 34(3):53-67.

BLM_0108872

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

1971    The Uncompahgre Complex: Historic Ute Archaeology and Prehistoric Archaeology of the Uncompahgre Plateau in West Central Colorado. Unpublished Ph.D. dissertation, Department of Anthropology, University of Colorado, Boulder.

1988    Discussion. In *Archaeology of the Eastern Ute: A Symposium*, edited by Paul R. Nickens, pp. 218-232. CCPA Occasional Papers, No. 1. Colorado Council of Professional Archaeologists, Denver.

Bureau of Land Management and Sonoran Institute (BLM-SI)
2000    *A Desktop Reference Guide to Collaborative, Community-Based Planning*. Electronid document, http://www.nps.gov/partnerships/elec_pub.htm, accessed September 12, 2009.

Bureau of Land Management (BLM)
2009    Colorado Briefing Book. Bureau of Land Management Colorado State Office. Electronic document, http://www.blm.gov/pgdata/etc/medialib/blm/co/information/newsroom/ 2009.Par.71633.File.dat/Briefing Book 2009.pdf, accessed September 2009.

2007    Bureau of Land Management – Ute Ethnohistory Project. Scope of Work. Document on file at BLM Grand Junction Field Office.

Burns, Sam
2004    The Ute relationships to the lands of West Central Colorado: An ethnographic overview prepared for the U.S. Forest Service. Office of Community Services, Fort Lewis College, Durango, Colorado. Electronic document, http://swcenter.fortlewis.edu/inventory/ UteLands.htm, accessed January 6, 2009.

Callaway, Donald G., Joel C. Janetski, and Omer C. Stewart
1986    Ute. In Great Basin, edited by Warren L. D'Azevedo, pp. 336-367. *Handbook of North American Indians*, Vol. 11, William C. Sturtevant, general editor. Smithsonian Institution, Washington, D.C.

Campbell, Greg
2007    Traditional Plant Use Study: Bent's Old Fort National Historic Site and Sand Creek Massacre National Historic Site. Unpublished manuscript for the NPS National Historic Landmarks Program, Intermountain Region, and Rocky Mountain Cluster Parks.

Carter, Edward C.
1999    *Surveying the Record: North American Scientific Exploration to 1930*. American Philosophical Society, Philadelphia.

Chakrabarty, Gargi
2008    Mining claims soar on Colorado public lands. *Rocky Mountain News* 23 January. Electronic document, http://www.rockymountainnews.com/news/2008/jan/23/mining-claims-soar-on-colo-public-lands/, accessed August 18, 2009.

Chamberlain, Ralph V.
1909    Some Plant Names of the Ute Indians. *American Anthropologist* ll(I):27-40.

Chavez, Fray Angelico (translator), and Ted J. Warner (editor)
1976    *The Domínguez-Escalante Journal: Their Expedition Through Colorado, Utah, Arizona, and New Mexico in 1776*. Brigham Young University Press, Provo, Utah.

BLM_0108873

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

Chapoose, Betsy
    2007    Comments at Ute Ethnohistory Project General Planning Meeting in Gateway, Colorado, November 28, 2007. This volume, Appendix B.

    2004    In The Ute relationships to the lands of West Central Colorado: An ethnographic overview prepared for the U.S. Forest Service, by Sam Burns. Office of Community Services, Fort Lewis College, Durango, Colorado. Electronic document, http://swcenter.fortlewis.edu/inventory/UteLands.htm, accessed January 6, 2009.

Church, Minette C., Steven G. Baker, Bonnie J. Clark, Richard F. Carrillo, Honathon C. Horn, Carl D. Späth, David R. Guilfoyle, and E. Steve Cassells
    2007    *Colorado History: A Context for Historical Archaeology*, Colorado Council of Professional Archaeologists, Denver.

Clemmer, Richard O.
    1978    Pine Nuts, Cattle and the Ely Chain: Rip- Off Resource Replacement vs. Homeostatic Equilibrium. *Ballena Press Publications in Archaeology, Ethnology and History* No. 11:61-76.

Clemmer, Richard O., L. Daniel Myers, and Mary Elizabeth Rudden (eds.)
    1999    *Julian Steward & The Great Basin: The Making of an Anthropologist*. University of Utah Press.

Cole, Sally
    1990    *Legacy on Stone: Rock Art of the Colorado Plateau and Four Corners Region*. Johnson Books.

Colorado Historical Newspaper Collection
    n.d.    Online database, http://www.geocommunicator.gov/GeoComm/index.shtm. Accessed 1/15/09.

Colorado Preservation, Inc.
    2003    Endangered Places Program. Electronic document, http:/www.apple.com/www.coloradopreservation.org/epp/sites/epp_03_04.html. Accessed 01/15/09.

Conetah, Fred A.
    1982    *A History of the Northern Ute People*. Published by the Uintah-Ouray Ute Tribe. University of Utah Printing Service, Salt Lake City, Utah.

Cuch, Forrest S. (ed.)
    2003    *A History of Utah's American Indians*. Utah State Division of Indian Affairs, Utah State Division of History, Salt Lake City.

Denver Public Library (DPL)
    (n.d.)    Western History and Geneaology: Digital Image Collection. Online database, http://history.denverlibrary.org/images/index.html. Accessed variously October 2008 - February 2009.

Diggs, David M. and Robert H. Brunswig
    2006a    Modeling Native American Sacred Sites in Rocky Mountain National Park. From Proceedings of the Twenty-Sixth Annual ESRI International User Conference, San Diego, California, August 5-8, 2006.

    2006b    Weights of Evidence Modeling in Archeology, Rocky Mountain National Park. From Proceedings of the Twenty-Sixth Annual ESRI International User Conference, San Diego, California, August 5-8, 2006.

BLM_0108874

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

Duncan, Clifford
  2003a    The Northern Utes. In *A History of Utah's American Indians*. Forrest S. Cuch ed. Pp. 167-224. Utah State Division of Indian Affairs, Utah State Division of History, Salt Lake City.

  2003b    An Ethnographic Conversation held with Sam Burns, tape-recorded at Clifford's home near Roosevelt, Utah, November 6, 2003. In The Ute relationships to the lands of West Central Colorado: An ethnographic overview prepared for the U.S. Forest Service. Office of Community Services, Fort Lewis College, Durango, Colorado. Electronic document, http://swcenter.fortlewis.edu/inventory/UteLands.htm, accessed January 6, 2009.

  2007     Comments at Ute Ethnohistory Project General Planning Meeting in Gateway, Colorado, November 28, 2007. This volume, Appendix B.

  2009     Interview in "The Utes," in "We Shall Remain: A Native History of Utah." DVD, produced by Nancy Green, published by KUED, University of Utah, Salt Lake City.

  n.d.     Chapter Five - The Northern Utes of Utah. In Utah History to Go. State of Utah. Electronic document, http://historytogo.utah.gov/people/ethnic_cultures/the_history_of_utahs_american_indians/chapter5.html.

Eugster, J. Glenn
  2003     Evolution of the Heritage Areas Movement. *The George Wright FORUM*. Volume 20, Number 2. The George Wright Society, Hancock, Michigan.

Fowler, Catherine S., comp.
  1969     Great Basin Anthropology—a Bibliography. Reno; *University of Nevada Desert Research Institute Publications in the Social Sciences and Humanities* No. 5.

Fowler, Catherine S., and Joy Leland
  1967 Some Northern Paiute Native Categories. *Ethnology* 6(4);381-403.

Fowler, Don D.
  1980     History of Great Basin Anthropological Research, 1776-1979. In *Journal of California and Great Basin Anthropology*, Vol. 2, No. 1, pp. 8-36).

Fowler, Don D. and Catherine S. Fowler (eds.)
  1971     *Anthropology of the Numa: John Wesley Powell's Manuscarips on the Numic Peoples of Western North America 1868-1880*. Smithsonian Institution Press, Washington D.C.

Fowler, Don D., and John F. Matley
  1978     The Palmer Collection from Southwestern Utah, 1875. *University of Utah Anthropological Papers* No. 99 (Miscellaneous Paper No. 20).

  1979     Material Culture of the Numa: the John Wesley Powell Collection, 1867-1880. *Smithsonian Contributions to Anthropology* No. 26.

Francaviglia, Richard V.
  2005     *Mapping and Imagination in the Great Basin: A Cartographic History*. University of Nevada Press.

Goss, James A.

  1961     *A Short Dictionary of the Southern Ute Language*. Ignacio, Colorado; Southern Ute Tribe.

BLM_0108875

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

1968    Culture-Historical Inference from Utaztekan Linguistic Evidence. *Occasional Papers of the Idaho State University Museum* No. 22:1-42.

1972a   A Basin-Plateau Shoshonean Ecological Model. *University of Nevada Desert Research Institute Publications in the Social Sciences* No. 8:123-128, Reno, Nevada.

1972b   Ute Lexical and Phonological Patterns. Unpublished Ph.D. dissertation in anthropology. University of Chicago

1999    The Yamparika-Shoshones, Comanches, or Utes--or Does it Matter?  In *Julian Steward and the Great Basin: The Making of an Anthropologist*, edited by Richard O. Clemmer, L. Daniel Myers and Mary Elizabeth Rudden, pp. 74-84.  University of Utah Press, Salt Lake City.

2000    Traditional Cosmology, Ecology, and Language of the Ute Indians In *Ute Indian Arts and Culture*. William Wroth, ed. Colorado Springs: Taylor Museum of the Colorado Springs Fine Arts Center. pp. 27-52.

Green, Nancy (Producer)
2009    The Utes, in We Shall Remain: A Native History of Utah.  DVD published by KUED, University of Utah, Salt Lake City.

Harmon, David
2004    Intangible Values of Protected Areas: What Are They? Why Do They Matter? *The George Wright FORUM*. Volume 21, Number 2. The George Wright Society, Hancock, Michigan.

Heizer, Robert F., ed.
1954    Notes on the Utah Utes by Edward Palmer, 1866-1877. *University of Utah Anthropological Papers* No. 17:1-8.

1962    Notes on the Utah Utes by Edward Palmer, 1866-1877. *Utah Archeology* 8(3);7-14.

Hillers, John K.
1873    Photograph I.D. BAE GN 01535 06690500 from the National Anthropological Archives, Smithsonian Museum Support Center, Suitland, Maryland. Electronic reproduction, http://sirismm.si.edu/naa/baegn/gn_01535.jpg, accessed August 2009.

Hittman, Michael
1973    Ghost Dances, Disillusionment and Opiate Addiction: an Ethnohistory of Smith and Mason Valley Paiutes. Unpublished Ph.D. dissertation in anthropology. University of New Mexico, Albuquerque.

Horn, Jonathon C.
1988    EuroAmerican Goods in the Material Culture of the Ute Prior to 1882. In *Archaeology of the Eastern Ute: A Symposium*, edited by Paul R. Nickens, pp. 54-61. CCPA Occasional Paper No. 1. Colorado Council of Professional Archaeologists, Denver.

1999     Ute Material Culture during the Historic Period as Represented by Sites in the Montrose Area.  Paper presented at the Colorado Council of Professional Archaeologists Annual Meeting, 1999. Electronic document, http://www.alpinearchaeology.com/Horn1999_UteMaterialCulture.pdf.

Houghton, Ruth M.
1973    Adaptive Strategies in an American Indian Reservation Community; the War on Poverty, 1965-1971. Unpublished Ph.D. dissertation. University of Oregon, Eugene.

BLM_0108876

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

Humboldt, Alexander von
  1809    Carte Generale Du Royaume De La Nouvelle Espagne. F. Schoell Paris. Electronic
          document, David Rumsey Collection, Pub List No. 0328.000, http://
          www.davidrumsey.com, accessed April 12, 2002.

  1811    Carte du Mexique et des Pays Limitropher Situres ou Nort et E'est. F. Schoell, Paris.
          Electronic document, University of Texas at Arlington Library, Accession: 00217, http://
          libraries.uta.edu/ccon/mapSearch.shtm, accessed April 12, 2002.

Husband, Michael B.
  1984    *Colorado Plateau Country Historic Context*. Colorado Historical Society, Denver.

Huscher, Betty Holmes, and Harold A. Huscher
  1939a   Unpublished Field Notes for 1939. Manuscripts on file, Colorado Museum of Natural
          History, Denver.

Jackson-Kelly, Loretta
  2007    Traditional Hualapai Ecological Knowledge and the Monitoring Program for the Ecosystem
          in the Colorado River Corridor. Prepared for the Bureau of Reclamation Upper Colorado
          Regional Office, Salt Lake City, UT. Unpublished manuscript. Available at Hualapai Tribe,
          Department of Cultural Resources, Peach Springs, AZ.

Jennings, Calvin
  1990    Review of Archaeology of the Eastern Ute, edited by Paul R. Nickens. CCPA Occasional
          Papers, No. 1. Colorado Council of Professional Archaeologists, Denver (1988). *American
          Antiquity* 55(4):861-862.

Jorgensen, Joseph G.
  1959    The Functions of Ute Folklore. Unpublished M.A. thesis in anthropology. University of
          Utah, Salt Lake City.

  1964    Ethnohistory and Acculturation of the Northern Ute. Unpublished Ph.D. dissertation in
          anthropology. Indiana University, Bloomington.

  1972    *The Sun Dance Religion*. Power for the Powerless. Chicago; University of Chicago Press.

Keyser, James B.
  1977    Writing-On-Stone: Rock Art on the Northwestern Plains. *Canadian Journal of Archaeology*
          no.1, pp.15-80.

  1987    A Lexicon for Historic Plains Indian Rock Art: Increasing Interpretive Potential. *Plains
          Anthropologist* vol.32, no.115, pp.43-71.

Keyser, James B. and George Poetschat, eds.
  2005    *Warrior Art of Wyoming's Green River Basin. Biographic Petroglyphs along the Seekskadee.*
          Oregon Archaeological Society Publication No.15.

  2008    *Ute Horse Raiders on the Powder Rim: Rock Art at Powder Wash, Wyoming.* Oregon
          Archaeological Society Publication #19, Portland.

King, Thomas F. and Patricia L. Parker
  1998    National Register Bulletin: Guidelines for Evaluating and Documenting Traditional Cultural
          Properties. Originally published 1990, revised 1992, 1998. U.S. Department of the Interior,
          National Park Service, National Register of Historic Places, Washington, D.C.

BLM_0108877

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

King, Thomas F.
  2000    *Federal Planning and Historic Places: The Section 106 Process.* AltaMira Press.

  2002    *Thinking About Cultural Resource Management: Essays from the Edge.* AltaMira Press.

  2003    *Places That Count, Traditional Cultural Properties in Cultural Resource Management.* AltaMira Press.

  2005    *Doing Archaeology: A Cultural Resource Management Perspective.* Left Coast Press.

  2007    *Saving Places that Matter: A Citizen's Guide to the National Historic Preservation Act.* Left Coast Press.

  2008a   *Cultural Resource Laws and Practice.* AltaMira Press.

  2008b   Tribal Sovereignty and the National Register of Historic Places. Electronic document, http://crmplus.blogspot.com/2008_09_01_archive.html, accessed February 7, 2009.

  2009    *Our Unprotected Heritage: Whitewashing the Destruction of our Cultural and Natural Environment.* Left Coast Press.

Knight, Terry G., Sr.
  2007    Comments at Ute Ethnohistory Project General Planning Meeting in Gateway, Colorado, November 28, 2007. This volume, Appendix B.

Koyiyumptewa, Stewart B., and Chip Colwell-Chanthaphonh
  In Press "The Past Is Now: Hopi Connections to Ancient Times and Places." In *Changing Histories, Landscapes, and Perspectives: The 20th Anniversary Southwest Symposium*, edited by Margaret C. Nelson and Colleen Strawhacker. University Press of Colorado, Boulder.

Kroeber, Alfred L.
  1901    Ute Tales. *Journal of American Folklore* 14(55);252-285.

  1908    Notes on the Ute Language. *American Anthropologist* 10(l);74-87.

Lang, Gottfried O.
  1953    A Study in Culture Contact and Cukure Change: the Whiterock Utes in Transition. *University of Utah Anthropological Papers* No. 15.

  1954    The Ute Development Program; a Study of Culture Change in an Underdeveloped Area Within the United States. Unpublished Ph.D. dissertation in anthropology, Cornell University, Ithaca.

Lewis, David Rich
  1994    *Neither Wolf Nor Dog*, Oxford University Press.

  2004    Chapter Eight: Native Americans in the Nineteenth-Century American West. In *A Companion to the American West* by William Deverell (Ed.). Wiley-Blackwell.

Library of Congress (LOC)
  2009    Rivers, Edens, Empires: Lewis & Clark and the Revealing of America. Electronic document, http://www.loc.gov/exhibits/lewisandclark/lewis-before.html, accessed September 11, 2009.

Loosle, Byron
  2003    So Delicious They Ate the Bark Off the Trees. Ashley National Forest Heritage Publication. Electronic document, http://www.fs.fed.us/r4/ashley/heritage/ethnography/so-delicious.pdf.

BLM_0108878

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

2007    South Unit Cultural History Overview. Ashley National Forest. Electronic document, http://www.fs.fed.us/r4/ashley/publications/, accessed 01/26/09.

Lynch, Robert N.
1971    Politics in a Northern Paiute Community. Unpublished Ph.D. dissertation in anthropology. University of Minnesota, Minneapolis.

1978    Cowboys and Indians: an Ethnohistorical Portrait of Indian-White Relations on Ranches in Western Nevada. *Ballena Press Publications in Archaeology, Ethnology and History* No. 11:51-60.

Madsen, David B. and David Rhode, (eds.)
1994    *Across the West: Human Population Movement and the Expansion of the Numa.* University of Utah Press, Salt Lake City.

Martin, Calvin (ed.)
1987    *The American Indian and the Problem of History.* Oxford University Press, New York.

Martin, Curtis and Carl E. Conner
2007    A Class III Aboriginal Feature Inventory of Two Parcels in the Black Ridge Area of the McInnis Canyons National Conservation Area in Mesa County, Colorado. Unpublished manuscript on file at the Bureau of Land Management Grand Junction Field Office.

Martin, Curtis, Carl E. Conner, and Nicole Darnell
2005a   The Colorado Wickiup Project Volume II: Gunnison Gulch Reconnaissance Survey in Mesa County, Colorado.  Unpublished manuscript on file at the Office of Archaeology and Historic Preservation, Denver, and the Bureau of Land Management Colorado State Office, Lakewood, Colorado.

Martin, Curtis, Michael J. Brown and Carl E. Conner
2010    The Colorado Wickiup Project Volume V: Test Excavation of The Ute Hunters' Camp (5RB563) and the Documentation of Five Additional Aboriginal Wooden Feature Sites in Rio Blanco County, Colorado.

Martin, Curtis and Richard Ott
2007a   Sand Wash Wickiup Survey Phase I: A Class III Cultural Resources Inventory in Moffat County, Colorado. Unpublished manuscript on file at the Bureau of Land Management Little Snake Field Office, Craig.

2007b   The Little Snake Wickiup Revisits Project, Moffat County, Colorado.  A series of unpublished site descriptions, Cultural Resource Reevaluation forms, and Aboriginal Wooden Features Component forms on file at the Bureau of Land Management Little Snake Field Office, Craig.

2009    The Colorado Wickiup Project Volume IV. Unpublished manuscript on file at the Office of Archaeology and Historic Preservation, Denver, and the Bureau of Land Management Colorado State Office, Lakewood, Colorado.

Martin, Curtis, Richard Ott, and Nicole Darnell
2005b   The Colorado Wickiup Project Volume I: Context, Data Assessment and Strategic Planning. Unpublished manuscript on file at the Office of Archaeology and Historic Preservation, Denver, and the Bureau of Land Management Colorado State Office, Lakewood, Colorado.

BLM_0108879

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

2006     The Colorado Wickiup Project Volume III: Recordation and Re-evaluation of Twelve Aboriginal Wooden Structure Sites in Eagle, Garfield, Mesa, and Rio Blanco Counties, Colorado.  Unpublished manuscript on file at the Office of Archaeology and Historic Preservation, Denver, and the Bureau of Land Management Colorado State Office, Lakewood, Colorado.

2007a    Sand Wash Wickiup Survey Phase I: A Class III Cultural Resources Inventory in Moffat County, Colorado. Unpublished manuscript on file at the Bureau of Land Management Little Snake Field Office, Craig.

2007b    The Little Snake Wickiup Revisits Project, Moffat County, Colorado.  A series of unpublished site descriptions, Cultural Resource Reevaluation forms, and Aboriginal Wooden Features Component forms on file at the Bureau of Land Management Little Snake Field Office, Craig.

McBeth, Sally
2007     Native American Oral History and Cultural Interpretation in Rocky Mountain National Park. Prepared for the: National Park Service Rocky Mountain National Park Intermountain Region Department of the Interior.

Meinig, D.W.
1979.    The beholding eye: Ten versions of the same scene. In The Interpretation of Ordinary Landscapes: Geographical Essays. D.W. Meinig and John Brinckerhoff Jackson, eds. New York: Oxford University Press.

Mithun, Marianne
1999     *The languages of Native North America.* Cambridge: Cambridge University Press.

Mordy, Brooke D.
1966     A Conflict Over Right of Residence [Washo], Unpublished M.A. thesis in Sociology and Anthropology, University of Nevada, Reno.

Murphy, Robert F.
1970     Basin Ethnography and Ecological Theory, In: *Languages and Cultures of Western North America, Essays in Honor of Sven S. Liljeblad*, E. H. Swanson, Jr., ed., pp. 152-171. Pocatello; Idaho State University Press

National Association of Tribal Historic Preservation Officers (NATHPO)
2005     *Tribal Consultation: Best Practices In Historic Preservation.* National Park Service and National Association of Tribal Historic Preservation Officers, Washington, DC.

National Museum of the American Indian, Smithsonian Institution (NMAI-SI)
         Electronic documents, http://americanindian.si.edu/searchcollections/home.aspx, accessed September 10, 2009.

National Park Service (NPS)
1993     Guidelines for Evaluation and Registering Historical Archaeological Sites and Districts. National Register Bulletin. U.S. Government Printing Office, Washington, D.C.

1995     Archaeology and the National Register. CRM, Vol. 18, No. 6, 1995 Supplement. U.S. Department of the Interior, National Park Service, National Register of Historic Places.

1996     Revised Thematic Framework. National Park Service, Washington, D.C.

BLM_0108880

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

1997a   National Register Bulletin: How to Apply the National Register Criteria for Evaluation. U.S. Department of the Interior, National Park Service, National Register of Historic Places, Washington, D.C.

1997b   National Register Bulletin: Guidelines for Completing National Register of Historic Places Forms, Part A: How to Complete the National Register Registration Form. U.S. Department of the Interior, National Park Service, National Register of Historic Places, Washington, D.C.

1997c   National Register Bulletin: Defining Boundaries for National Register Properties. U.S. Department of the Interior, National Park Service, National Register of Historic Places.

1998   National Register Bulletin: Guidelines for Evaluating and Documenting Traditional Cultural Properties. By Patricia L. Parker and Thomas F. King, originally published 1990, revised 1992, 1998. U.S. Department of the Interior, National Park Service, National Register of Historic Places, Washington, D.C.

1999   National Register Bulletin: Guidelines for Completing National Register of Historic Places Forms, Part B: How to Complete the National Register Multiple Property Documentation Form. U.S. Department of the Interior, National Park Service, National Register of Historic Places, Washington, D.C.

National Trust for Historic Preservation (NTHP)
2006   *Cultural Resources on the Bureau of Land Management Public Lands: An assessment and needs analysis.* National Trust for Historic Preservation, Washington, DC.

Nickens, Paul R. (editor)
1988   *Archaeology of the Eastern Ute: A Symposium.* CCPA Occasional Papers, No. 1. Colorado Council of Professional Archaeologists, Denver.

O'Neil, Brian, Carl E. Conner, Barbara J. Davenport, and Richard Ott
2004   Archaeological Assessment of the Rifle Wickiup Village–5GF308 in Garfield County, Colorado. Dominguez Archaeological Research Group, Grand Junction, Colorado. Ms on file at the Glenwood Springs BLM Field Office.

O'Rourke, Paul M.
1980   *Frontier in Transition: A History of Southwestern Colorado.* Bureau of Land Management - Colorado, Cultural Resources Series Number Ten. Electronic document, http://www.nps.gov/history/history/online_books/blm/co/10/index.htm, accessed 12/016/08.

Opler, Marvin K.
1943   The Origins of Comanche and Ute. In *American Anthropologist*, New Series, Vol. 45, No. 1 (Jan. - Mar., 1943), pp. 155-158. Blackwell Publishing on behalf of the American Anthropological Association. Electronic document, http://www.jstor.org/stable/662885, accessed January 11, 2009.

1963   The Southern Ute of Colorado. In *Acculturation in Seven American Indian Tribes*. Ralph Litton. Pp. 119-206. Peter Smith, Gloucester, Massachusetts.

1971   The Ute and Paiute Indians of the Great Basin Southern Rim. In *North American Indians in Historical Perspective*. Elenor Burke Leacock and Nancy Oestreich Lurie eds. Pp. 257-288. Waveland Press, Prospect Height, Illinois.

BLM_0108881

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

Palmer, Edward
    1876    Exploration of a Mound in Utah. *American Naturalist* 10(8);410-414.

    1878    Cave Dwellings in Utah. Eleventh Annual Report of the Trustees of the Peabody Museum of American Archaeology and Ethnology 2(2);269-272.

Parker, Patricia L. and Thomas F. King
    1998    National Register Bulletin: Guidelines for Evaluating and Documenting Traditional Cultural Properties. U.S. Department of the Interior, National Park Service, National Register of Historic Places.

Pekka Hämäläinen
    2008    *The Comanche Empire*. Yale University Press.

Poley, H.S.
    1899    Photograph, Call No. P-51, from Western History/Genealogy Dept., Denver Public Library. Electronic reproduction, http://photoswest.org/cgi-bin/imager?00170051+P-51, accessed May 2008.

Prosper, Lisa
    2007    Wherein Lies the Heritage Value? Rethinking the Heritage Value of Cultural Landscapes from an Aboriginal Perspective. *The George Wright FORUM*. Volume 24, Number 2. The George Wright Society, Hancock, Michigan.

Reed, Alan D.
    1984    West Central *Colorado Prehistoric Context*. Colorado Historical Society, Denver.

    1988    Cultural Chronology. In *Archaeology of the Eastern Ute: A Sympostum*, edited by Paul R. Nickens, pp. 119-203. CCPA Occasional Papers, No. 1. Colorado Council of Professional Archaeologists, Denver.

    1994    The Numic Occupation of Western Colorado and Eastern Utah During the Late Prehistoric and Protohistoric Periods. In *Across the West: Human Population Movement and the Expansion of the Numa*, edited by David B. Madsen and David Rhode, pp. 188-166. University of Utah Press, Salt Lake City.

Reed, Alan D. and Michael D. Metcalf
    1999    *Colorado Prehistory: A Context for the Northern Colorado River Basin*. Colorado Historical Society, Denver.

Reed, Alan D. and Rachel Gebauer
    2004    A Research Design and Context for Prehistoric Cultural Resources in the Uncompahgre Plateau Archaeological Project's Study Area, Western Colorado.  Unpublished manuscript on file at Uncompahgre Plateau Study Project, Montrose, Colorado.

Sánchez, Joseph P.
    1997    *Explorers, Traders, and Slavers: Forging the Old Spanish Trail*, 1678-1850. University of Utah Press.

Sapir, Edward
    1910a   Song Recitative in Paiute Mythology. *Journal of American Folklore* 23(90); 455-472.

    1910b   Two Paiute Myths. *University of Pennsylvania Museum Journal* 1:15-18.

BLM_0108882

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

1913    Southern Paiute and Nahuatl, a Study of Uto-Aztecan. 1. *Journal de la Societe des Americanistes de Paris*. 10:379-425; 11: 443-488.

Sapir, Edward and William Bright
1992    Southern Paiute and Ute: Linguistics and Ethnography. *Collected Works of Edward Sapir* v. 10, de Gruyter Mouton.

Scotch, Norman A., and Freda L. Scotch
1963    Social Factors in Hypertension among the Washo. *University of Utah Anthropological Papers* No. 67:69-76.

Shimkin, Demkri B., and Russell M. Reid
1970    Socio-Cultural Persistence Among Shoshoneans of the Carson River Basin (Nevada). In: *Languages and Cultures of Western North America*, Essays in Honor of Sven S. Liljeblad, E. H. Swanson, Jr., ed., pp. 172-200. Pocatello: Idaho State University Press.

Shindler, A. Zeno
1868    Photographic collections of the National Museum of the American Indian (NMAI), Smithsonian Institution (SI). Electronic reproduction, http://americanindian.si.edu/ searchcollections/results.aspx?catids=4&cultxt=ute&src=1-1, accessed August 4, 2009.

Simmons, Virginia McConnell
2000    *The Ute Indians of Utah, Colorado, and New Mexico.*  University Press of Colorado, Boulder.

Simms, Steve, Buck Benson, Landon Profaizer - Utah State University
2006    Excavations at Two Wickiup Sites: Dugway Proving Ground and West Tavaputs Plateau: Why We Should Look for Structures at Lithic Scatters and Some Tips for Doing So.  Paper presented at the Colorado Council of Professional Archaeologists, March 2006.

Smith, Anne M. (Cooke)
1938    In: *Tribal Distribution in the Great Basin.* Author(s): Willard Z. Park, Edgar E. Siskin, Anne M. Cooke, William T. Mulloy, Marvin K. Opler, Isabel T. Kelly. *American Anthropologist*, New Series, Vol. 40, No. 4, Part 1 (Oct. - Dec., 1938), pp. 622 -638

1974    Ethnography of the Northern Utes. *Papers in Anthropology* No. 17. Museum of New Mexico, Albuquerque.

Smith, Duane and Duane Vandenbusche
1981    *A Land Alone, Colorado's Western Slope*. Pruett Publishing Company.

Smith, Linda Tuhiwai
2006    *Decolonizing Methodologies: Research and Indigenous People*. Originally published 1999. Palgrave, New York.

Smythe, Charles W.
1999    The National Register Framework for Protecting Cultural Heritage Places. In *The George Wright Forum*: THE GWS Journal of Parks, Protected Areas & Cultural Sites, Vol. 26, No. 1, 2009

Stedman, Raymond William
1986    Shadows of the Indian: Stereotypes in American Culture. University of Oklahoma Press.

BLM_0108883

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

Steward, Julian H.

1936    The Economic and Social Basis of Primitive Bands. In: *Essays in Anthropology Presented to Alfred L. Kroeber*, R. H. Lowie, ed., pp. 331-350. Berkeley: University of California Press.

1938    Basin-Plateau Aboriginal Sociopolitical Groups. *Bureau of American Ethnology*, Bulletin No. 120, Washington, D.C.

1972    *Theory of Culture Change: The Methodology of Multilinear Evolution.* Originally published 1955, Illini Books Edition, University of Illinois Press, Chicago.

Stewart, Omer C.

1941    The Southern Ute Peyote Cult. *American Anthropologist.* 43(1941):303-308.

1942    Culture Element Distributions, XVIII: Ute-Southern Paiute, *University of California Anthropological Records.* 6(4):231-356.

1952    Escalante and the Ute. S*outhwestern Lore* XVIII(3):47-51.

1955    Forest and Grass Burning in the Mountains West. *Southwestern Lore* XXI(1):3-9. 567 Stewart, Omer C.

1962    Ute Bands: Early Historical References. *Southwestern Lore*, 28:2, p.31. Colorado Archaeological Society.

1966a Ute Indians: Before and After White Contact. *Utah Historical Quarterly* 34:38-61.

1966b Tribal Distributions and Boundaries in the Great Basin. In *The Current Status of Anthropological Research in the Great Basin: 1964*, edited by Warren L. D'Azevedo, Wilbur A. Davis, Don D. Fowler and Wayne Suttles. Desert Research Institute Technical Report Series, Social Sciences and Humanities Publications No.1, Reno, Nevada.

1971    Ethnohistorical Bibliography of the Ute Indians of Colorado. Series: *University of Colorado Studies: Series in anthropology*, no. 18. University of Colorado Press, Boulder.

1973    Ethnography of the Eastern Ute. Manuscript on file, Department of Anthropology, University of Colorado, Boulder.

1976    Ethnography of the Western Ute. Manuscript on file, Department of Anthropology, University of Colorado, Boulder.

Tyler, Samuel Lyman

1954    The Spaniard and the Ute. *Utah Historical Quarterly*, Vol. XXII, January, 1954, Number 1, pp 343-363. Utah State Historical Society.

1964    *The Ute people: A Bibliographical Checklist*, Samuel Lyman Tyler A publication of the Institute of American Indian Studies, Brigham Young University.

Uintah County Library (UCL)

2004    Regional History Collection. Electronic reproduction, http://205.123.71.5/HistoryPhotos.html.

BLM_0108884

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

Utah State History (USH)
    2008    People of Utah Photograph Collection. Photo No. C-239, P. 1, Box 9. Photo by J.K. Hillers
            of the Powell Expedition, 1873 and/or 1874. Credit to Smithsonian Office of Anthropology.
            Neg. no. 1535. Electronic reproduction, http://history.utah.gov/research_and_collections/
            photos/peoples.html, accessed July 15, 2009.

Ute Ethnobotany Project
    2007    Unpublished project workbook. Sponsored by a partnership between the Ute Indian Tribe;
            Southern Ute Indian Tribe; Ute Mountain Ute Indian Tribe; BLM Grand Junction Field
            Office; Grand Mesa, Uncompahgre and Gunnison National Forests; Museum of Western
            Colorado; Colorado Council on the Arts; and Mesa State College. Manuscript on file at
            Bureau of Land Management, Grand Junction Field Office.

Ute Indian Tribe of the Uintah and Ouray Reservation
    1937    Constitution and By-laws of the Ute Indian Tribe of the Uintah and Ouray Reservation.
            Electronic document, http://www.narf.org/nill/Constitutions/uteconst/uteconsttoc.htm,
            accessed 12/05/08.

Wroth, William, ed.
    2000    *Ute Indian Arts & Culture: From Prehistory to the New Millenium.* Taylor Colorado Springs
            Fine Arts Center, Colorado Springs.

Wunder, John R.
    2007    Native American History, Ethnohistory, and Context. In *Ethnohistory* 54:4, American Society
            for Ethnohistory, Duke University Press.

Wyld, James
    1823    Map of North America from 20 to 80 Degrees North Latitude... James Wyld, Charing Cross,
            England. Electronic document, David Rumsey Collection, Pub List No. 4087.000, http://
            www.davidrumsey.com, accessed April 12, 2002.

BLM_0108885

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

BLM_0108886

BLM_0108887

BLM_0108888

BLM_0108889

BLM_0108890

BLM_0108891

BLM_0108892

BLM_0108893

BLM_0108894

BLM_0108895

BLM_0108896

BLM_0108897

BLM_0108898

BLM_0108899

BLM_0108900

BLM_0108901

BLM_0108902

BLM_0108903

BLM_0108904

BLM_0108905

BLM_0108906

BLM_0108907

BLM_0108908

BLM_0108909

BLM_0108910

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

## APPENDIX E: ETHNOBOTANCIAL FIELD NOTES

Prepared by Lynn Albers, DARG Research Associate

The following botanical notations resulted from ad hoc field observations and discussions with Ute consultants. Most specific epithets have not been verified.  Species reported, however, have been previously documented in the visited areas. Scientific nomenclature is noted only with each plant's initial common name notation.

### Glenwood Springs Field Office (GSFO)

Various sites in the GSFO were visited by project participants in June 2008. Several sites, including a significant Ute wickiup village, were located in ancient pinyon pine (Pinus edulis) and juniper (Juniperus osteosperma syn. Sabina osteosperma) forest.  A variety of special Ute features located throughout the Glenwood BLM district, were also constructed from pinyon pine, juniper and Rocky Mountain juniper (Juniperus scopulorum syn. Sabina scopulorum). Clifford Duncan noted that aspen (Populus tremuloides) and lodgepole pine (Pinus contorta) were sometimes used as construction materials for wickiups.  Cheryl Harrison noted that King Mountain and Black Mountain supported the only two significant lodgepole communities in the GSFO.

Significant amounts of maravilla, also known as wild four o'clock (Mirabilis sp.) were noted at site 5GF303, ██████████████████████████████████ The Nyctaginaceae species was most likely M. multiflora or M. glandulosa, but possibly M. oxybaphoides.  Clifford Duncan mentioned the following Ute plant names (approximated phonetic spellings are given):

| | |
|---|---|
| suh-eee' | flower |
| kuh-suh-eee' | red flower |
| sab-wuuf | sagebrush |
| shur'-vwap | tree |
| wup | juniper |
| pah-wup | pinyon pine |
| turn-up | chokecherry |
| ish | three-leaf sumac |
| tdoo-wimp' | serviceberry |
| ga-soo | hawthorne |

Clifford also mentioned that tanning hides with juniper smoke created a black/dark color and pinyon pine smoke created a yellow hide.  He noted that using brains (deer?) created a white tanned hide.  While crossing Cottonwood Pass (Missouri Heights to Gypsum), we discussed a traditional education center to teach about Ute (and Colorado native) plants, plant processing, traditional uses and so forth.  Ute Cultural Rights & Protection director Betsy Chapoose and Clifford noted the need for buffalo berry (Shepherdia argentea and  S. canadensis) and chokecherry (Prunus virginiana ssp. melanocarpa syn. Padus virginiana ssp. melanocarpa) seed for the reservation, as well as a need to protect those plants for cultural uses.

BLM_0108911

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

It was noted that Prince Creek Road had healthy and fairly bountiful serviceberry (Amelanchier alnifolia) and chokecherry stands.  Betsy discussed bringing the Northern Ute women Elders to an accessible place (which Prince Creek Road is) to collect berries and basket-making materials.

## Uncompahgre Field Office (UFO)

Several canyonlands sites were visited in the UFO August 19-20, 2008,  including locations in



Clifford and Betsy commented that areas of important cultural significance to the Utes were living, fluid and always moving — both spiritually and physically — as reflected in the relationship a particular place may have with animals, plants and people.  Both Ute representatives were clearly distressed at Colorado  canyonlands&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608; where "extreme crawler" recreational vehicles had severely impacted the ancient pinyon-juniper woodland. There was discussion of the disturbed area's close proximity to rock art and the probable destruction of Ute cultural sites.

Native plant resources at the Montrose district sites were abundant.  A few plant genera observed included: Indian ricegrass (Achnatherum hymenoides syn. Oryzopsis hymenoides), spreading dogbane (Apocynum androsaemifolium), big sagebrush (probably Artemisia tridentata syn. Seriphidium tridentatum), silversage (Artemisia frigida), sagewort (Artemisia ludoviciana), saltbush (Atriplex sp.), rabbitbrush (Chrysothamnus sp.), wild licorice (Glycyrrhiza lepidota), gumweed (Grindelia squarrosa), snakeweed (Gutierrezia microcephala or G. sarothrae), golden aster (Heterotheca villosa), juniper (Juniperus osteosperma), winterfat (Krascheninnikovia lanata syn. Eurotia lanata syn. Ceratoides lanata), wolfberry (Lycium pallidum), maravilla, prickly pear cactus (Opuntia polyacantha), western wheatgrass (Pascopyrum smithii syn. Agropyron smithii), pinyon pine, broadleaf cottonwood (Populus deltoides), wild rose (Rosa woodsii), three-leaf sumac (Rhus aromatica ssp. trilobata), greasewood (Sarcobatus vermiculatus), willow (Salix sp.), perky sue (Tetraneuris ivesiana), and yucca (Yucca harrimaniae).

Some alien plant communities were observed in visited areas, including: wienerleaf (Halogetan glomeratus), ironweed (Kochia americana or Bassia sp.) and tamarisk (Tamarix parviflora or T. ramosissima).  Nitrogen-fixing non-native ruderal legumes, alfalfa (Medicago sativa),white melilot (Melilotus albus) and yellow melilot clovers (Melilotus officinale), were also present.

## Grand Junction Field Office (GJFO)

Sites at various locations in the GJFO were visited September 9-11, 2008. Native plants observed in the &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608; areas included: sand verbena (Abronia elliptica or A. nana), Indian ricegrass, wild onion (Allium acuminatum), 2 species of serviceberry (Amelanchier alnifolia & A. utahensis ), sagebrush, saltbush, 2 species of mountain mahogany (Cercocarpus intricatus & C. montanus), rabbitbrush , cryptanth (Cryptantha sp. or possibly Oreocarya sp.), fleabane (Erigeron sp.), gumweed, sunflower (Helianthus annuus), needle-and-thread grass (Hesperostipa comata syn. Stipa comata), golden aster (Heterotheca sp.), winterfat, juniper (Juniperus osteosperma), prickly pear cactus, pinyon pine, bitterbrush (Purshia tridentata or P. stansburiana), scarlet globemallow (Sphaeralcea coccinea), and yucca.

BLM_0108912

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

The group visited a ████████████████████ and found it to be surrounded by a diverse plant community, including: sagewort, sagebrush, saltbush, netleaf hackberry (Celtis reticulata), rabbitbrush, single-leaf ash (Fraxinus anomala), snakeweed, golden eye/sunspots (Heliomeris multiflora), golden aster (Heterothecca sp.), Indian ricegrass, scarlet globemallow, maravilla, prince's plume (Stanleya pinnata), pinyon pine, bitterbrush, three-leaf sumac, and willow. Some Brassicaceae annuals were found, as well as ground cherry (Physalis spp. - tentatively P. virginiana), which Weber says is a possible alien. Dunmire and Tierney report that groundcherry fruits have been eaten by indigenous peoples in the Four Corners region for "at least 1100 years."

Clifford Duncan and Terry Knight noted some traditional Ute plant uses: snakeweed was "good for cleansing"; buffaloberries were cached and eaten in winter; and three-leaf sumac berry infusion was ingested before the Sun Dance Ceremony. Clifford also mentioned that he had talked with Cheyenne elders about the gathering of a water plant tuber, used for food. This was most likely yellow pondlily (Nuphar lutea). A few Ute plant names were mentioned by Clifford and Terry. (approximate phonetic spellings are given):

| | |
|---|---|
| *kah-pee'* | ephedra (Ute tea, Mormon tea, Navajo tea, cowboy coffee) |
| *ah-koo-p'* | buffaloberry |
| *ish* | three-leaf sumac |
| *too-k-pee'* | coffee |
| *dah-goos'* | wild turnip |

Local ranchers John and Inelle Littlejohn (and their son, Logan), met us in ████████████ where we visited several potential culturally significant sites, including a spring and a section of a former Ute trail. Plant life was fairly abundant in the area, with a few additional native species being observed, including: fireweed (Chamerion danielsii syn. Epilobium angustifolium), virgin's bower (Clematis ligusticifolia), yellow bee plant (Cleome lutea), fleabane (Erigeron spp.), Scarlet gilia (Ipomopsis spp.), watercress (Naturtium officinale), locoweed (Oxytropis spp.), gambell oak (Quercus gambelii), watercress, greasewood (Sarcobatus vermiculatus), and cattail (Typha spp.).

Other previously mentioned native species present in ██████████ included: silversage, rabbitbrush, sunflower, juniper, Indian rice-grass, ground cherry, pinyon pine, wild rose, willow, and yucca. A buckbean-looking plant (Menyanthes trifoliata) was noted, but the eco-system was not congruent. Also observed was the alien invasive species Russian-thistle (Salsola spp.), as well as non-native burdock (Arctium minus) and a very healthy "wild" apricot tree (Prunus armeniaca or related species), probably planted by early settlers.

█████████ also had an abundance of three-leaf sumac and looked to be an excellent potential berry and basket-material gathering place for the Ute women Elders. Aline, Alyssa, Betsy and Lynn discussed this possibility, noting the need to secure land-owner permissions.

Old growth juniper woodlands were visited in the ████████████████████████ A large and long-lived juniper at one site was mentioned as a █████████████████ DARG archeologists, based on the significant amount of lithics surrounding it. Clifford Duncan was in general agreement with that determination. A pinyon pine ██████████ was also noted. Roan Plateau, and the ████████████████████ could be viewed across the Colorado River Valley. Its use as

*Perspectives on Ute Ethnohistory in West Central Colorado*   E-3

BLM_0108913

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

a Ute encampment, was discussed.  Terry discoursed regarding Ute camp tripods and cobble usage. A tree with fresh bear claw sharpening activity was observed. Clifford remarked that it reminded him of the Ute story of the coyote's wig (see Figure 14, above).  A Ute taboo toward lightning-struck trees was also mentioned.

███████████████████████████████████████████████████████

area included: greasewood, broadleaf cottonwoods, saltbush, rabbitbrush, three-leaf sumac, big sagebrush, prince's plume, needle-and-thread grass, snakeweed, prickly pear cactus, and a large, unidentified but probably alien grass.

## Sources

Brown, Deni
    2001    The Herb Society of America New Encyclopedia of Herbs & Their Uses.  Originally published 1995. Dorling Kindersley Ltd., New York.

Carter, Jack L.
    2006    Trees & Shrubs of Colorado.  Mimbres Publishing, Silver City, NM.

Dunmire, William W. & Gail D. Tierney
    1995    Wild Plants of the Pueblo Province - Exploring Ancient and Enduring Uses.   Museum of NM Press, Santa Fe.

Shaw, Robert B.
    2008    Grasses of Colorado.  University Press of Colorado, Boulder.

Weber, William A. & Ronald C. Wittman
    2001    Colorado Flora - Western Slope. 3rd ed., originally published 1990. University Press of Colorado, Boulder.

Welsh, Stanley L., Atwood, Goodrich & Higgins
    2003    A Utah Flora. 3rd ed., originally published 1987.  BYU Print Services, Provo.

BLM_0108914

BLM_0108915

BLM_0108916

BLM_0108917

2

CONTAINS PRIVILEGED INFORMATION – DO NOT DISTRIBUTE

## APPENDIX G: ONLINE ARCHIVAL SOURCES

**Brigham Young University C.R. Savage Collection:**
http://www.lib.byu.edu/dlib/savage/

**Brigham Young University Digital Collections:**
http://www.lib.byu.edu/digital/

**Colorado Historic Newspaper Collection:**
http://www.coloradohistoricnewspapers.org

**David Rumsey Map Collection:**
http://www.davidrumsey.com/

**Denver Public Library Western History Collection:**
http://history.denverlibrary.org/images/index.html

**Internet Archive:**
http://www.archive.org/details/texts

**Google Books:**
http://books.google.com/

**Library of Congress Maps:**
http://www.loc.gov/rr/geogmap/

**Mountain West Digital Library:**
http://mwdl.org/

**University of Texas Perry-Castañeda Library Map Collection:**
http://www.lib.utexas.edu/maps/

**University of Alabama Historical Map Collection:**
http://alabamamaps.ua.edu/historicalmaps/index.html

BLM_0108919

BLM_0108920

Date _____ 12/6/10 _____      Location _____ PLACERVILLE _____

**Attendees at BLM Public Meeting re: San Miguel/Dolores Rivers' Wild/Scenic Designation:**

Name                                    Address

Steve Ryken

Lonnie Taylor

Linda Luther

Marshall Pendleton

Steve McComb

Hilary White

April Montgomery

Kelvin Verity

DAVE FOLEY          BOX

BILL BLAKE   P.O.Box

Nate Smith

WSR- Natural14 - 2010120261

Date 12/7/10 _____     Location _Natural_ _____

## Attendees at BLM Public Meeting re: San Miguel/Dolores Rivers' Wild/Scenic Designation:

| Name | Address |
|------|---------|
| Sally & Henry Krahelma | |
| Peter Mueller | |
| Fess Fulbright | |
| Michael Oliver | |
| George F Gay | |
| Bruce Gillies | |
| Jami Lawrance | |
| Jean Pettis | |
| Rex E Case | |
| Ugnoua Benoa | |

Date _____ 12/8/10 _____          Location _____ Placerville _____
                                                      Naturita

**Attendees at BLM Public Meeting re: San Miguel/Dolores Rivers' Wild/Scenic Designation:**

| Name | Address |
|------|---------|
| Zeve Weimer | |
| Lowell Watson | |
| Cathy Bonde + Jim Butler | |
| Ryan Carberry | |
| Don Bennett | |
| George Glasier | |
| Brian Sutherland | |
| Kelly Sutherland | |
| Tyler Stewart | |
| Jim Johnston | |
| Burel Ruhauch | |
| Jay Jensen | |
| Jason Culver | |
| Linda Luther | |
| Patti Grafmyer | |

Date _____ 12/7/10 _____          Location _____ NATURITA _____

### Attendees at BLM Public Meeting re: San Miguel/Dolores Rivers' Wild/Scenic Designation:

| Name | Address |
|---|---|
| Marlin & Debra Littlefield | 3830 |
| Ilene Lewis | 63579 |
| Ron Henderson | |
| STEVE WHITE (Montrose | |
| Dale Osborn | |
| TERRY BOEKHOUT | |
| Glenn Case | |
| LONNIE TAYLO | |
| DUSTIN SMUIN | |
| MARK Welch | |
| BOBBY KEENER | 3 |
| DIANNA REAMS | |
| Tony Lobato | |
| Marge a Nelson | |
| Jerry NELSON | |

# STRATEGY DRAFT

## A DRAFT GUIDE TO
## COLLABORATIVE ENERGY ACTION PLANNING
## FOR OURAY AND SAN MIGUEL COUNTIES
## 2010-2020

BLM_0108925

# TABLE OF CONTENTS

Executive Summary……………………………………………………………...…………………3

1. Background and Opportunities Identified……………….…………………………….……4
1.1 Energy Planning Efforts……………………………………………………………………4
1.2 Energy (Electricity and Natural Gas………………………………………………………5
        Table 1: 2009 Gas and Electricity Use for Ouray and San Miguel Counties……..6
        Figure 1: Energy Use Pie Charts………………………………………………….....7
1.3 Transportation………………………………………………………………………………8
        Table 2: Transportation Data……………………………………………………………8

1.4 Waste………………………………………………………………………………………8
1.5 Water……………………………………………………………………………………9

2. Strategic Energy Plan………………………………………………………………………9
2.1 Mission………………………………………………………………………………………9
2.2 Vision………………………………………………………………………………………9
2.3 Gap Analysis………………………………………………………………………………9
2.4 Targets………………………………………………………………………………………11
2.5 Guiding Principles…………………………………………………………………………12
2.6 Collaboration………………………………………………………………………………13
        Figure 2: Coordination Flow Chart……………………………………………………14
2.7 Financing……………………………………………………………………………………16
2.8 Program Development……………………………………………………………………17
        Table 3: Measure Cost Effectiveness…………………………………………………18
        Table 4: Roger Hudson Scenario 1……………………………………………………19
        Table 5: Roger Hudson Scenario 2……………………………………………………20
        Table 6: Roger Hudson Scenario 3……………………………………………………21
2.8 Strategy for Tracking………………………………………………………………………21

3.0 Objectives, Goals, and Action Plan………………………………………………………22

Acknowledgements……………………………………………………………………………42

Appendix: Important Terms and Acronyms………………………………………………..…43

BLM_0108926

# EXECUTIVE SUMMARY

The STRATEGY is a guide to multi-jurisdictional energy action planning providing a framework to facilitate streamlined, inter-entity collaboration in our region's efforts to effectively manage energy resources, reduce energy costs and meet energy, transportation fuel, water, and waste reduction goals. Our "region," in this document, is defined as Ouray and San Miguel Counties.

The STRATEGY offers a number of related recommendations in the form of a mission, vision, goals, targets, guiding principles, objectives, strategies for achieving objectives and potential action items. Over time, new action items may be generated, using the guiding principles of the STRATEGY. None of these recommendations are binding, and are only intended to guide the initial stages of development of energy-related programs and projects.

The content of the STRATEGY is informed by the findings of regional energy use data from local utilities and regional governments, San Miguel County's 2007 Emissions Inventories, and ideas developed at collaborative planning meetings held throughout 2010 of the Western San Juan Community Energy Board (WSJCEB). Recommendations prioritize the greatest opportunities revealed by our Inventories and regional guiding principles.

The WSJCEB recognizes that there are still gaps in our data gathering.  Our Action Plan (see Section 3) identifies the specific pieces of data that still need to be obtained in order to establish a complete baseline of our region's energy, fuel, and water use and waste production.  While we recognize that our data collection is thus far incomplete, we believe our analysis of priorities to be accurate.  We will continue to gather and update data as is feasible and adjust priorities as needed in order to reach our goals.

The STRATEGY is designed as a reference tool for our region's governments and stakeholders as they implement our jurisdictional Energy Action Plans and develop energy-related programs and policies.

A primary barrier to implementation of energy-related programs in the region is our small and dispersed population. Single jurisdictions typically do not have the financial or human resources or population to leverage economies of scale. By developing partnerships and sharing resources, the communities of the region can build capacity for the implementation of energy programs and projects.

In addition, a great opportunity exists through developing this regional partnership, as we have existing shared resources throughout the region's population.  Many people live in one town, but work in another.  Both counties experience a high commuter rate of people traveling from surrounding counties to work in our region.  Because we have shared impacts (transportation, housing costs, etc.) we must work together to fully understand and address a sustainable future for our economies, environment, and people.

As technology and funding evolve, the STRATEGY will also evolve to reflect the priorities and capabilities of energy conservation policy in the region.

BLM_0108927

# 1. Background and Opportunities Identified

## 1.1 Energy Planning Efforts

The narratives of energy planning in the region are varied. Energy Planning in San Miguel County began with commitments by several jurisdictions in the region to meeting the goals of the Colorado Governor's Energy Office's (GEO) "Climate Action Plan." Ouray County committed to an Energy Planning process in January 2010, with the beginning of the GEO's Community Energy Coordinator program.

After collaborating to create The New Community Coalition (TNCC) in 2007, San Miguel County jurisdictions directed TNCC to develop a Greenhouse Gas Emissions Inventory, which established a community-wide baseline of 2007 $CO_{2e}$ emissions, for government energy use and also for community-wide emissions. The Ouray County jurisdictions began the data-gathering stages of establishing a baseline of energy use for Ouray County governments in the spring of 2010 and are nearly complete. Efforts are underway to find funding for a full GHG emissions inventory for Ouray County.

The San Miguel County Inventory revealed that human activity in San Miguel County in 2007 produced approximately 282,000 tons of "carbon dioxide equivalent" ($CO_{2e}$) emissions. TNCC is looking for funding mechanisms to update this document and have a GHG Inventory performed for Ouray County.

While Ouray and San Miguel counties may be considered relatively small in size and population compared to other regions of the state, with a corresponding smaller contribution to energy consumption and GHG emissions, we understand Western Colorado is poised to grow significantly in population, and we believe the more pristine and rural nature of our region mandates immediate attention in order to optimally sustain the residents and business for the benefit of our communities and the larger Colorado economy.

We recognize that overall sustainability of the region is larger than just direct energy use reduction. Thus, we aim to address the many facets of energy use and GHG emissions reduction, including transportation reduction, water conservation, waste reduction, renewable energy development, local food production and other aspects of sustainability. In addition, implementation of this plan is expected to develop green jobs and establish a more stable local economy for the region.

This process is interdependent of the various entities and people within and without our region, and is very complex requiring support and understanding of diverse demands and resources. The WSJCEB understands that while one jurisdiction may readily appear to be the largest consumer of electricity and natural gas for residential uses, they may also have the greatest resources at hand to address the objectives stated. On the other hand, the jurisdictions in Ouray County may appear to be the smallest consumer but at the same time, Ouray County is also poised to experience rapid growth and may have the fewest resources available to keep up with achieving goals. Short and long-term considerations will be evaluated throughout this process and a regionally-comprehensive viewpoint maintained of how best to collaborate for everyone's success.

BLM_0108928

The plan has identified a number of target goals (listed in Section 2.4 & Section 3) based on 2009 energy use data, the 2007 GHG emissions inventory for San Miguel County and other factors such as anticipated future growth in the region, commuters and the ability of the governments and community to take action.

## 1.2 Energy (Electricity and Natural Gas)

Electricity and natural gas use data for the region for 2009 was obtained with the cooperation and assistance of our local utility companies, San Miguel Power Association (SMPA) and SourceGas. These entities provided the data broken down by jurisdiction and by type of use. Staff members / elected officials in each of the government entities provided the government energy use baseline data. (Ouray County data is from November, 2009 thru October, 2010)

Table 1 and Figure 1 show the relative electricity and gas used by the different jurisdictional areas of Ouray and San Miguel Counties. This data includes building energy use as well as other end users such as the Telluride / Mountain Village gondola, ski area lifts, streetlights, etc.

Residential and Commercial gas and electricity use in Ouray and San Miguel County are large energy consumers. In comparison, energy use by the governments in each jurisdiction is relatively small. Thus, while the governments have identified actions to take to reduce their energy use specifically, the WSJCEB deems it highly important to engage the overall community in the process of implementing actions to achieve energy reduction goals.

Agricultural energy use was also obtained, however the numbers and overall percentage of energy use is negligible in our region.

Propane energy use is not readily available. Some of the governments track their propane use, but obtaining values throughout the region was not feasible for this report. It is anticipated that there is a significant amount of propane used in our region, as many homes and agricultural lands are not served with natural gas. The Governor's Energy Office is working to communicate with propane providers statewide in order to assist in making usage data more available throughout the state.

Note: at the time of completing this draft report, SMPA had not yet provided values of electricity use broken down between residential and commercial use for each jurisdiction. Thus far, it has only been broken down between these sectors for a total county-wide usage number. Therefore, we have temporarily estimated separate residential and commercial values using the same percentage breakdown as the natural gas data represents. Accurate data will be provided in the final report.

BLM_0108929

Ouray & San Miguel County STRATEGY

1. **Table 1**

**2009 Gas and Electricity Use for Ouray and San Miguel Counties**

| | Gas (therms) | Electricity (kWh) |
|---|---|---|
| **Ouray Residential** | 257,288 | 10,072,834 |
| **Ouray Commercial** | 186,171 | |
| **Ouray Government** | 20,000 | 890,000 |
| **Ridgway Residential** | 202,800 | 7,417,920 |
| **Ridgway Commercial** | 187,767 | |
| **Ridgway Government** | 4,267 | 508,251 |
| **Other Ouray County Residential** | 248,889 | 22,706,884 |
| **Other Ouray County Commercial** | 25,840 | |
| **Ouray County Government** | 11,804 | 258,158 |
| **All Ouray County Total** | 1,133,023 | 41,854,047 |
| | | |
| **Mountain Village Residential** | 1,530,588 | 49,878,100 |
| **Mountain Village Commercial** | 921,642 | |
| **Mountain Village Government** | 187,471 | 5,279,158 |
| **Telluride Residential** | 775,581 | 33,754,091 |
| **Telluride Commercial** | 816,295 | |
| **Telluride Government** | 121,690 | 2,670,938 |
| **Other SMC Residential** | 629,358 | 32,806,101 |
| **Other SMC Commercial** | 315,323 | |
| **San Miguel County Government** | 22,754 | 620,953 |
| **Norwood Residential** | 142,041 | 3,663,690 |
| **Norwood Commercial** | 80,119 | |
| **Placerville/Sawpit Residential** | 29,477 | 187,157 |
| **Placerville/Sawpit Commercial** | 8,212 | |
| **Ophir** | 0 | 527,858 |
| **All San Miguel County Total** | **5,393,080** | **124,108,888** |

BLM_0108930

Figure 1: Energy Use Pie Charts                    Ouray & San Miguel County STRATEGY



## 1.3 Transportation

Transportation data for San Miguel County is available for 2007 from the previous GHG Inventory.   The data is fully explained in Appendix A of that study.   In brief, transportation vehicle number studies included: a CDOT traffic survey performed throughout San Miguel County over 48 hr periods from 2003-2008, Town of Telluride and Town of Mountain Village traffic studies, and 2 monitoring stations were set up in Dolores and Montrose Counties to track commuting traffic in/out of the county.   ICLEI software was used to analyze the data and obtain an overall energy consumption value.

For the purposes of this STRATEGY, we have estimated Ouray County transportation numbers using the San Miguel County GHG Inventory value.   A rough estimate was obtained by calculating the total electricity and gas use for each county and applying the same percentage relationship between them to transportation.   Considering that much of the commuter traffic to/from San Miguel County travels through Ouray County from Montrose, this was deemed a fairly reasonable method of estimation for the purposes of this report. Obtaining more accurate transportation data for Ouray County is a stated action item in Action Plan.

Air traffic in/out of the Telluride regional airport was not included in the San Miguel County GHG Inventory. Obtaining accurate air traffic transportation data for the airport is a stated action item in Action Plan.

The governmental jurisdictions are in varying stages of collecting and tracking fleet vehicle fuel use.   All are committed toward establishing a regular tracking of fuel use and implementing actions to reduce usage.

Based on the values listed below, transportation in the region represents a significant challenge.  Managing modes of transportation and demand as our communities grow is a critical component of the region's energy use.

The WSJCEB will ask the Region 10 Transit Authority to include energy conservation and emissions in their transit planning.   Addressing transit is an important aspect of reaching our fuel use reduction goals.

Table 2: Transportation Data

|  | Diesel and Gasoline (MMBtu's) |
|---|---|
| San Miguel County | 664,314 |
| Ouray County | 139,506 |

## 1.4 Waste

Reducing the production of waste is a major component of this sustainability action plan. The standard method of calculating GHG emissions related to waste in GHG Inventories is to estimate the amount of waste put into a landfill, and then to estimate the amount of GHG produced by that waste annually.   Unfortunately, we have not

BLM_0108932

begun tracking volume of waste produced in our counties, and it actually gets hauled outside of our region. In the San Miguel County GHG Inventory, a rough estimate was calculated using standard ICLEI numbers for waste production for a population. This type of estimate would not give us an accurate baseline from which to track reduction. Therefore, we have made it an Action Item to work with waste hauling companies to come up with a method of tracking the volume of trash and recycling collected in the region.

## 1.5 Water

Water consumption in the counties has not been quantified. It will be critical to establish a method of tracking water use per jurisdiction and per house/business/government entity. The jurisdictions with water and/or wastewater treatment plants are committed to developing the methodology to track water use and convey usage to each user as an action item of this STRATEGY. Much of the unincorporated areas are not served on public water systems, so they will not be included in the tracking, however outreach efforts of education and water conservation incentives will include them.

# 2. `Strategic Energy Plan

## 2.1 Mission

The Western San Juan Community Energy Board* will advance the New Energy Economy so that our communities will have economic opportunities related to energy efficiency and renewable energy and will develop and thrive in a sustainable manner.

*The New Community Coalition; Our local governments: San Miguel and Ouray Counties, the Towns of Telluride, Mountain Village, Norwood and Ridgway, and the City of Ouray; Our regional utility providers: San Miguel Power Association and Source Gas.

## 2.2 Vision

The Vision of the Western San Juan Community Energy Board (WSJCEB) is to preserve our clean air, water, and natural environment for future generations. We will achieve this through being a leader in reducing the per capita consumption of valuable natural resources through education, efficiency, and the implementation of renewable energy projects.

## 2.3 GAP Analysis

The WSJCEB went through a process of identifying the strengths, weaknesses, opportunities and threats (SWOT) within our region that will affect the achievement of our mission. From the ideas generated from the SWOT analysis, the WSJCEB performed a GAP analysis to identify the difference between the current status and the ultimate sustainability vision for the region. The following are the identified GAPs that must be bridged in order to reach our vision for the region.

BLM_0108933

<u>Education of People</u>: Everyone, including homeowners, renters, contractors, and governments, needs to be continually informed about what they can do to reduce per-capita energy and water consumption, and how reducing consumption is both money- and environment-saving.  A highly visual, public overall measure of progress needs to be implemented.  The areas of sustainability in which we need to focus are:

- Energy Efficiency
- Renewable Energy
- Waste
- Buying Local
- Water

<u>Transportation</u>: We need a coordinated regional approach to transportation.  Lack of coordinated regional transportation causes:

- Higher overall energy consumption and greenhouse gas production
- Higher individual cost
- Even more wear and tear on our roads
- Decreased efficiency in identifying financial opportunities and resources for success

<u>Leadership</u>:

- We need Baseline Data– need per capita consumption data and a public measure of progress (see Education)
- We need coordination of projects to maximize focus, avoid duplication of effort, and leverage our shared voices to higher authorities (see Utilities, for example)

<u>Utilities</u>:

- Need enabling policies and incentives for utilities for development of renewable energy
- Partnership opportunities for achieving outcomes must be explored
- Tiered rate structure and other opportunities to encourage conservation and the use/support of renewable energy

<u>Economic</u>:

- Funding mechanisms are needed for project implementation to reach all:
  - governments
  - individuals
  - businesses
  - non-profit and independent sectors

BLM_0108934

## 2.4 Targets

In 2009, the Towns of Mountain Village, Norwood, Ophir and Telluride, along with San Miguel County adopted Colorado's Climate Action Plan, setting $CO_{2e}$ emissions reduction targets of 20% below 2005 levels by 2020.

In 2009, San Miguel County signed on to the Cool Counties Initiative, setting a goal to reduce county geographical GHG emissions 80% below current levels (at time of adoption) by 2050.

While Ouray County governments have been collectively working toward energy conservation and renewable energy through development and encouragement of varied renewable energy systems (micro-hydro, geothermal, green building and energy codes, efficient lighting plans and systems, assessing the viability of alternative renewable energy systems, etc.), progress toward targets have remained un-quantified.

All jurisdictions are in different stages of acquiring baseline data and are working toward completing gathering of the data, in order to have a reliable baseline from which to track achievement of the target goals identified by this document.

The WSJCEB adopted the following general targets in development of the Goals and Action Plan in Section 3:
- Decrease per-capita energy consumption in San Miguel and Ouray Counties 20% by 2020 from 2005 levels
- Obtain 20% of the region's electricity from renewable energy by 2020.
- Reduce the overall amount of energy consumed per capita by ground and air travel.
- Decrease overall water consumption community-wide in private and public sectors by 10% below 2005 levels by 2020
- Divert 75% of overall waste from landfills by 2020

The above reduction targets are consistent with those set forth by the State of Colorado[1] Climate Action Plan and the recommendation of the Intergovernmental Panel on Climate Change, and similar to those set forth federally[2]. Throughout the STRATEGY, these targets are referred to by the headings below:

- **2020 Target:** Reduce carbon dioxide equivalent ($CO_{2e}$) emissions 20% below 2005 levels by 2020.

- **Long-Term Target:** Meet other longer-term state, national and global energy goals for the future.

---

[1] The State of Colorado's targets, as stated in the 2007 Climate Action Plan, are to reduce $CO_{2e}$ emissions 20% below 2005 levels by 2020 and 80% below 2005 levels by 2050.

[2] The United State's targets, as submitted to the United Nations Framework Convention on Climate Change Secretariat in December 2009 under the Copenhagen Accord, are to reduce $CO_{2e}$ emissions 17% below 2005 levels by 2020.

BLM_0108935

The 2020 Target is adopted with the realistic understanding that it will be incredibly difficult to achieve. Realizing such significant reductions in $CO_{2e}$ emissions and energy usage in less than a decade in spite of new construction and population growth will necessitate a significant dedication of time, resources and funding to these efforts.

The Western San Juan Community Energy Board and TNCC have chosen to reinforce the adopted 2020 Target despite the challenge it presents due to the facts that: a) this target is recommended by the International Panel on Climate Change (IPCC) in order to avoid damaging effects that would result from the level of emissions in the atmosphere without this level of reduction; and b) this is the target adopted by San Miguel County's municipalities, by the State of Colorado and by numerous other municipalities, counties, states and countries worldwide.

It is important to improve our region's ability to track energy usage in order to accurately track progress toward these targets and report it back to the public. See section 2.8 on Tracking for more on tracking progress.

See section 2.7 on Program Development for target achievement scenarios.

In addition, in May 2009, the Towns of Mountain Village and Telluride mayors put forth a challenge called Telluride Renewed.  The communities are challenged to offset 100% of Telluride's and Mountain Village's electrical needs with new renewable energy sources by 2020.  Telluride and Mountain Village have begun to develop a plan to guide the achievement of this challenge.


## 2.5 Guiding Principles

In developing the STRATEGY, a number of principles guided the WSJCEB and TNCC.

- **Voluntary**: To emphasize voluntary programs which inspire and motivate participation.

- **Education & Understanding**: To accompany or precede all energy actions with appropriate educational efforts.[3]

- **Fiscal Responsibility:** To develop energy actions that are fiscally responsible within the context of each government's budget, reflect the economic circumstances of the region and its citizens, and strive to employ local labor and resources in ways that improve local economies and local government revenues.

- **Commitment:** To commit resources, as available, in order to meet this plan's goals and targets.

- **Autonomy and Interdependence:** To recognize and respect the interdependence of the region as well as the autonomy of each community.

---

[3] In keeping with this guiding principle, educational strategies and action items are positioned at the beginning of the plan, preceding all other recommendations. Educational components are also interspersed throughout the STRATEGY's recommendations.

BLM_0108936

- **Transparency:** To inform the communities regularly regarding the implementation of actions in this STRATEGY and regularly report on progress made toward achievement of goals.  To regularly obtain input and feedback from the community.

## 2.6 Collaboration

The purpose of a collaborative STRATEGY is to bring together interdependent yet diverse communities for the purpose of identifying common goals and unique offerings and to more effectively leverage resources between appropriate governmental and non-governmental entities. Working together on energy planning will help our region to select optimal creative and shared solutions to effectively and efficiently implement energy-related programs, projects and policies. Below is a framework for this regional collaborative relationship. This should not be viewed as mandatory in any way; it is only suggested as an option to facilitate voluntary collaboration.

To facilitate this collaboration our region would create three levels of coordination between regional entities:

- **Centralized coordinating body.**  The WSJCEB and TNCC will continue to serve as a central, community entity facilitating regional energy activities and the network of Energy Action Coordinators (EACs).

- **Network.**  EACs, appointed by and representing individual regional entities, serve as liaisons between the central coordinating body and the entity they represent.

  This is not a new position or a designation necessitating any significant dedication of time. An EAC should be an existing staff person with an interest in energy issues who can allocate adequate time annually to participate in the network and report back to his/her agency.

  This network will facilitate frequent communication between EACs allowing agencies to stay current on jurisdictional and collaborative activities. The network will also give direction to the centralized coordinating body, offering feedback on programming and projects.

- **Reporting back.** EACs will update the board on recent activities and findings relative to the jurisdiction or organization they represent, update and monitor energy consumption data for government and private sectors, prioritize action items for their respective jurisdictions, etc.

BLM_0108937

**Figure 1**



Model of Energy Action Planning Coordination

Some benefits of participation in this network include:

- **Prevention of "reinventing the wheel"**: keeping entities up to date about past and current programs and efforts will allow them to share findings, materials and plans that will help to accelerate program development.

- **Partnership formation**: as entities learn about new projects or programs that neighboring entities are undertaking, they can inquire about joining forces, leveraging resources and forming other symbiotic relationships to strengthen their efforts.

- **A stronger front**: having a network in place and offshoot partnerships demonstrates to potential funders that our region is advanced in its energy planning efforts and works together to implement them, making our region more attractive to funders in jurisdictional and joint applications.

- **Experience**: the designated EACs will be able to gain knowledge and experience in the fast growing field of energy and sustainability planning and clean energy. The individual EAC and the organization will have the value of being able to benefit from and claim this experience.

BLM_0108938

- **Expanded organization**: local governments, colleges, companies and many organizations are creating and expanding Sustainability Departments or Sustainability Coordinator positions within their staffing structures. Designating an EAC is a chance for an organization to begin to join others in formally addressing these issues.

- **Potential for eventual compensation**: The WSJCEB will work with TNCC to identify strategies for continued funding for programs and projects in the region as the EECBG funds for the CEC position come to an end. A recommended plan of action will be adopted by end of 2011.

- And finally, the network needs **widespread participation** for success. It is important to have as many entities at the table as possible to build far-reaching, comprehensive and creative partnerships and involve as many sectors and entities possible.

A comprehensive regional network would span:

- **Local Governments:** County, municipal, elected officials, staff persons
- **Government Agencies:** Governor's Energy Office (GEO), Housing Authorities for Ouray and San Miguel Counties, United States Department of Agriculture (USDA), National Resource Conservation Service (NRCS), Bureau of Land Management (BLM), Forest Service (FS)
- **Educational institutions:** Colorado State University Extension Office (CSU),University Centers of the San Miguel, School Districts (Ouray, Ridgway, Telluride, Norwood), local private schools
- **Commercial Sector:** Mountain Village and Telluride Tourism Board (MTI), Rotary clubs, Telluride Ski & Golf (TSG), industry and banking representatives.
- **Utilities**: San Miguel Power Association (SMPA), SourceGas, Water and wastewater utilities such as municipalities, Tri-County Water
- **Owners Associations**
- **Building Industry**: Building Departments, Contractors, Engineers & Architects, Historic and Architectural Review Committee, Planning & Zoning Commissions, Realtor associations, TMV Design Review Board
- **Transit Groups:** Rural Transportation Authority (RTA), Galloping Goose, GVTPR and local transit advisory committees
- **Waste Groups:** Waste Management (WM), Bruin Waste, Sunrise
- **Non-Profits and Other Groups**: TNCC, non-profit organizations, libraries, faith-based organizations, etc.
- **Citizens At Large / Local Business Owners**
- **Economic Development Organizations**

Several of the above sectors and groups are represented in the WSJCEB, a group that TNCC formed in early 2010. The Board, which has met every 3 weeks throughout the development of the STRATEGY, can support the consolidation of this regional network

BLM_0108939

of EACs, providing a forum for idea-sharing and collaboration. The Board is also responsible for assessing regional programs and maintaining progress of inter-community efforts, particularly funding opportunities.

The Board may develop issue-specific Working Committees as needed, such as:

- **Public Education & Outreach Committee.** To coordinate public education and outreach efforts, public school and college efforts and other education efforts where economy of scale or regional efforts are favorable.

- **Ad-Hoc Committees.** As collaborative projects, programs or funding opportunities occur, committees of EACs should be formed to facilitate their development.

- **Policy and Infrastructure Committee(s).** To facilitate the creation of Region-wide organizations, policies or other structures desirable or necessary to achieve energy efficiency/renewable energy objectives. Examples would be a Regional Renewable Committee.

- **Other Working Committees.** As needed.

As action items move into planning stages, planners should check in with their EACs to see which entities should be included or consulted.

## 2.7 Financing

To finance the implementation of the STRATEGY, the region should consider pooling financial and human resources to build capacity. Financial resources include monies, in-kind contributions and matching funds for grants. By leveraging and consolidating resources throughout the region, communities can achieve greater impact in capital intensive projects.

There are a few basic avenues of financing the implementation of the STRATEGY:

- **Governmental Budgeting.** During budgeting sessions, each government should evaluate whether to earmark a certain amount of funds, staff hours and/or other resources toward the implementation of energy action planning. The WSJCEB will advise government bodies each year during budget development of recommended funding allocations with significant input of the EACs for each jurisdiction and founded on a priority implementation plan, available grant and loan funding, or other available funding sources.   Presentation will include annual report to participants and associated requested funding/assistance.

  In addition, obtaining annual data from utilities may require some funding.   The utilities and governments will discuss this need and establish an agreement and allocate funding for this data update as necessary.

- **Pooled Governmental Budgeting.** Inter-Governmental Agreements (IGA) can combine the resources of interested local governments to fund energy action plan implementation collaboratively when appropriate.

BLM_0108940

- **Private investment.** Energy programs and projects may be achieved through private financing structured to realize energy cost savings.
- **State and Federal Resources.** Federal and State agencies recognize that funding energy projects and programs achieves many co-benefits such as rural development and job creation. Applying for these funds as a region is more attractive than applying as a municipality or county.
- **Continuous Revenue Streams.** To consistently fund the ongoing implementation of the EAPs and the STRATEGY, the jurisdictions could work together to create long-term, dedicated revenue streams from within the region. Obtaining this type of steady funding will be instrumental in sustaining energy programs into the future.
- **Utilities.** Grants, rebates, and other funding opportunities may be available through the utility companies.

## 2.8 Program Development

Energy-related programs should strive to be in keeping with the regional mission and goals and be associated with direct or indirect reductions in energy use. Programs should be developed using the guiding principles expressed in this STRATEGY.

When a program is being developed, planners can consult with appropriate entities by informing the Energy Advisory Board, opening up the opportunity for collaborating with regional EACs. This process will prevent entities from overlapping efforts, ensuring that efforts build upon one another regionally. This will also promote collaboration, allowing entities to stay current on program development and approach planners in the early stages with ideas for collaboration or partnerships. The centralized coordinating body can assist in obtaining funding, identifying partners and acquiring informational and technical resources.

The STRATEGY also presents cost-effectiveness calculations (see table 2) for prevalent measures for decision-makers to refer to when considering recommendations. This method should be used, in conjunction with the STRATEGY's and the jurisdictional EAPs' guiding principles, as a decision-making tool to prioritize the development of programs and the addition of new programs.

The cost-effectiveness calculation combines the projected project cost, projected energy savings, and projected carbon reductions into a single measurement. "Effectiveness" is defined as the net program energy savings ($) in the year 2020 divided by the tons of annual carbon emissions reduction in the year 2020. In other words, "effectiveness" reflects how much money a program saves as compared to how much carbon it reduces.

The higher the positive value of the "Effectiveness", the more effective a program is estimated to be. Positive effectiveness values represent the dollars saved per ton of $CO_{2e}$ reduced. Negative effectiveness values represent the dollars spent per ton of $CO_{2e}$ reduced.

BLM_0108941

Ouray & San Miguel County STRATEGY

These calculations are designed to serve as a decision-making tool and as a basis for comparing action items. Each recommendation requires further analysis to more accurately determine costs and benefits, based on current pricing.

The table was developed by representatives from the jurisdictional Energy Action Planning Committees in Gunnison/Hinsdale Counties to supplement software from ICLEI (Local Governments for Sustainability). The table does not discount future value or attempt to predict potential changes to the cost of energy and technology. The table also uses assumptions (i.e. a constant energy cost per unit) and generalizations to make calculations. However, it can still be used as a tool to gain a general understanding of the "bang for the buck" of these measures. The table below indicates the cost effectiveness of common energy efficiency and renewable energy measures.

The WSJCEB recognizes the following tables of data as valuable information applicable to our region, which is similar in many ways to Gunnison/Hinsdale. The WSJCEB and EACs will discuss the feasibility of utilizing these tables as templates for assembling similar tables specific to our region. We will complete these target numbers and units for our region at some time in the future when feasible. The point of the table is to demonstrate where the greatest savings may be achieved.

**Table 3**

| Action Step No. | Action Step | Target Number of Units by 2020 | Est. Cost of Action per Unit | Total Cost of Action 2010 to 2020 | Est. Annual Tons CO2e Reduction per Unit | Est. Annual Total Tons CO2e Reduction 2020 On | Est. Annual Savings from Action per Unit | Est. Simple Payback Period per unit (Yrs) | Est. 10-Year Total (Cost)/Savings | Est. "Up-Front" Cost per Ton CO2e Reduced | Effectiveness= net savings/tons CO2e |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **WEATHERIZING HOMES** | | | | | | | | | | | |
| | Reducing air transfer (caulking, weatherstrip) | 300 | $400 | $120,000 | 3.6 | 1,087.1 | $430 | 0.9 | $3,900 | $110 | $1,076 |
| | Insulating crawlspace, attic, + R-10 | 300 | $1,200 | $360,000 | 2.0 | 608.9 | $241 | 5.0 | $1,209 | $591 | $595 |
| | Insulating walls | 300 | $1,200 | $360,000 | 1.7 | 519.8 | $203 | 5.9 | $827 | $693 | $477 |
| | Installing insulated windowshades | 300 | $2,000 | $600,000 | 1.1 | 323.6 | $128 | 15.6 | -$720 | $1,854 | -$667 |
| | Installing energy efficient windows | 50 | $10,000 | $500,000 | 0.5 | 26.5 | $63 | 159 | -$9,372 | $18,884 | -$17,698 |
| **WEATHERIZING COMMERCIAL** | | | | | | | | | | | |
| | Reducing air transfer (caulking, weatherstrip) | 30 | $500 | $15,000 | 7.7 | 229.7 | $896 | 0.6 | $8,457 | $65 | $1,104 |
| | Insulating crawlspace, attic, + R-10 | 25 | $4,800 | $120,000 | 18.1 | 452.8 | $1,059 | 4.5 | $5,793 | $265 | $320 |
| | Insulating walls | 10 | $2,400 | $24,000 | 1.7 | 17.3 | $203 | 11.8 | -$373 | $1,385 | -$215 |
| | Installing insulated windowshades | 15 | $1,440 | $21,600 | 0.6 | 9.2 | $72 | 20.0 | -$720 | $2,340 | -$1,170 |
| | Installing energy efficient windows | 5 | $12,384 | $61,920 | 0.6 | 3.1 | $35 | 350 | -$12,031 | $20,300 | -$19,721 |
| **ELECTRIC USE REDUCTION** | | | | | | | | | | | |
| | Replace incandescents - >6 per unit | 500 | $12 | $6,000 | 0.4 | 216.1 | $48 | 0.2 | $473 | $28 | $1,094 |
| | Install motion-sensors, power strips, etc. - >4 | 300 | $70 | $21,000 | 0.7 | 204.9 | $77 | 0.9 | $696 | $102 | $1,019 |
| | Install E-Star refrigerator in home | 300 | $150 | $45,000 | 0.3 | 93.2 | $35 | 4.3 | $199 | $483 | $639 |
| | Install E-Star washer/dryer in home | 300 | $100 | $30,000 | 0.1 | 37.5 | $14 | 7.1 | $40 | $800 | $322 |
| | aggregate | $900 | $320 | $96,000 | 1.1 | | $126 | 4.1 | $935 | #DIV/0! | $836 |
| **HOT WATER HEATING ENERGY** | | | | | | | | | | | |
| | Install E-Star hot water heater | 100 | $550 | $55,000 | 0.3 | 29.2 | $33 | 16.8 | -$222 | $1,881 | -$759 |
| | Install solar hot water system | 100 | $3,000 | $300,000 | 2.4 | 236.2 | $265 | 11.3 | -$350 | $1,270 | -$148 |

BLM_0108942

Ouray & San Miguel County STRATEGY

What does the 2020 Target look like? Another consideration in the development of energy programming should be the "larger picture" of how each planned project or program will play into achieving the 2020 Target.

In his draft paper, *Assessment of the Gunnison Community's 2020 $CO_2$ Emissions Targets*, Western State College Professor Roger Hudson pondered several scenarios that would lead our region to success in reaching the 2020 Target. He played with energy intensity and carbon intensity variables, adjusting penetration levels in the building and transportation sectors, to make the Target. Below are three of these scenarios, which planners might find useful in developing long-term programming in their jurisdictions and in partnership for the region.

**Table 4**

| Exhibit 9:  Scenario A, Bottom Up Parameters and Projections, 2005 - 2020 |
|---|

| | Scenario A | |
|---|---|---|
| | Initial Value | Change Rate |
| Gunnison community population | 14,403 | 0.5% |
| Per Capita Gross Product ($1000) | $ 30.0 | 0.75% |

| Building Assumptions | | |
|---|---|---|
| Number of Building Renovated / Weatherized | 75 | 14.0% |
| Initial Energy Index of Buildings Renovated | 130 | -1.0% |
| % BEI Improvement from Renovation | 30% | 0.0% |
| New Building Construction | 70 | 1.0% |
| BEI for New Buildings | 60 | -1.0% |
| General Building Energy Efficiency Improvement | | 1.0% |
| Percent Electricity from Wind | 0.9% | 21.0% |
| Taylor Dam Hydro Option | | No |
| Geothermal Option | | No |

| Transportation Assumptions | | |
|---|---|---|
| Rate New Vehicles Enter Fleet | 923 | 4.5% |
| Rate Old Vehicles Leave Fleet | 513 | 2.5% |
| MPG of New Vehicles Enter the Fleet | 28 | 2.0% |
| MPG of Old Vehicles Leaving the Fleet | 12 | 2.0% |
| Average Vehicle Miles Per Year | 16,644 | -1.0% |

**Building Energy and CO2 Projections**

By 2020, 3288 of the initial buildings, or about 30% of the initial buildings, will have received upgrades that improve their efficiency by 30%. By 2020, these 'fixed' buildings are 26% more efficient that the average building in 2005 and are being fixed at a rate of 470 per year. By 2020, new buildings use 48% less energy than the average building in 2005 and the average building efficiency has improved by 26% in 15 years. Hydro power generates 15% of total electricity and wind electricity has increased from 1% to 16%. Electricity from coal has dropped from 63% to 49%. Geothermal is at 0%. Building related CO2 emissions have dropped from 196007 tons in 2005 to 164720 tons in 2020, a decrease of 31287 tons, or a 16% decline from 2005.

**Transportation Energy and CO2 Projections**

The average fleet efficiency has increased from 18 MGP in 2005 to 26 MGP in 2020 but the number of vehicles has risen by 32%. Total miles travelled has increased by 16%, from 341 million miles to 395 million miles. The average annual miles per vehicle has dropped from 16644 miles to 14314 miles. 2016 CAFÉ performance for new vehicles is at 34 MPG. Transportation related CO2 emissions have dropped from 179825 tons in 2005 to 135351 tons in 2020, a decrease of 44474 tons, or a 25% decline from 2005.

| Gunnison Community Energy and CO2 Projections | |
|---|---|
| The energy intensity rate of decline from 2005 to 2020 has reached | -2.4% |
| The carbon intensity rate of decline from 2005 to 2020 has reached | -0.34% |
| Total energy consumption has dropped from 3887 B Btu to 3269 B Btu in 2020, a decrease of 619 B Btu, or a 16% decline from 2005. | |
| Total CO2 emissions have dropped from 375832 tons in 2005 to 300070 tons in 2020, a decrease of 75762 tons, or a 20% decline from 2005. | |

BLM_0108943

Ouray & San Miguel County STRATEGY

## Table 5

| Exhibit 10:  Scenario B, Bottom Up Parameters and Projections, 2005 - 2020 |
|---|

| | Scenario B | |
|---|---|---|
| | Initial Value | Change Rate |
| Gunnison community population | 14,403 | 1.5% |
| Per Capita Gross Product ($1000) | $   30.0 | 1.50% |

| Building Assumptions | | |
|---|---|---|
| Number of Building Renovated / Weatherized | 75 | 22.0% |
| Initial Energy Index of Buildings Renovated | 130 | -1.0% |
| % BEI Improvement from Renovation | 40% | 0.0% |
| New Building Construction | 70 | 2.0% |
| BEI for New Buildings | 50 | -1.0% |
| General Building Energy Efficiency Improvement | | 1.0% |
| Percent Electricity from Wind | 0.9% | 21.0% |
| Taylor Dam Hydro Option | | No |
| Geothermal Option | | No |

| Transportation Assumptions | | |
|---|---|---|
| Rate New Vehicles Enter Fleet | 1,128 | 5.5% |
| Rate Old Vehicles Leave Fleet | 615 | 3.0% |
| MPG of New Vehicles Enter the Fleet | 28 | 2.7% |
| MPG of Old Vehicles Leaving the Fleet | 12 | 2.0% |
| Average Vehicle Miles Per Year | 16,644 | -1.0% |

| Building Energy and CO2 Projections |
|---|
| By 2020, 6389 of the initial buildings, or about 58% of the initial buildings, will have received upgrades that improve their efficieny by 40%.  By 2020, these 'fixed' buildings are 42% more efficient that the average building in 2005 and are being fixed at a rate of 1214 per year.  By 2020, new buildings use  57% less energy than the average building in 2005 and the average building efficiency has improved by 42% in 15 years. Hydro power generates 15% of total electricity and wind electricity has increased from 1% to 16%.  Electricity from coal has dropped from 63% to 49%.  Geothermal is at 0%. Building related CO2 emissions have dropped from 196007 tons in 2005 to 169278 tons in 2020, a decrease of 26730 tons, or a 14% decline from 2005. |

| Transportation Energy and CO2 Projections |
|---|
| The average fleet efficiency has increased from 18 MGP in 2005 to 29 MGP in 2020 but the number of vehicles has risen by 41%.  Total miles travelled has increased by 25%, from 341 million miles to 425 million miles.  The average annual miles per vehicle has dropped from 16644 miles to 14314 miles.  2016 CAFÉ performance for new vehicles is at 36 MPG. Transportation related CO2 emissions have dropped from 179825 tons in 2005 to 131973 tons in 2020, a decrease of 47852 tons, or a 27% decline from 2005. |

| Gunnison Community Energy and CO2 Projections | |
|---|---|
| The energy intensity rate of decline from 2005 to 2020 has reached | -4.1% |
| The carbon intensity rate of decline from 2005 to 2020 has reached | -0.31% |
| Total energy consumption has dropped from 3887 B Btu in 2005 to 3265 B Btu in 2020, a decrease of 622 B Btu, or a 16% decline from 2005. | |
| Total CO2 emissions have dropped from 375832 tons in 2005 to 301250 tons in 2020, a decrease of 74582 tons, or a 20% decline from 2005. | |

BLM_0108944

**Table 6**

| Exhibit 11:  Scenario C, Bottom Up Parameters and Projections, 2005 - 2020 | | |
|---|---|---|

| | Scenario C | |
|---|---|---|
| | Initial Value | Change Rate |
| Gunnison community population | 14,403 | 2.0% |
| Per Capita Gross Product ($1000) | $ 30.0 | 2.25% |

| Building Assumptions | | |
|---|---|---|
| Number of Building Renovated / Weatherized | 75 | 26.0% |
| Initial Energy Index of Buildings Renovated | 130 | -2.0% |
| % BEI Improvement from Renovation | 40% | 0.0% |
| New Building Construction | 70 | 3.0% |
| BEI for New Buildings | 50 | -1.0% |
| General Building Energy Efficiency Improvement | | 1.0% |
| Percent Electricity from Wind | 0.9% | 21.0% |
| Taylor Dam Hydro Option | | No |
| Geothermal Option | | No |

| Transportation Assumptions | | |
|---|---|---|
| Rate New Vehicles Enter Fleet | 1,230 | 6.0% |
| Rate Old Vehicles Leave Fleet | 820 | 4.0% |
| MPG of New Vehicles Enter the Fleet | 28 | 2.7% |
| MPG of Old Vehicles Leaving the Fleet | 12 | 2.0% |
| Average Vehicle Miles Per Year | 16,644 | -1.0% |

**Building Energy and CO2 Projections**

By 2020, 8951 of the initial buildings, or about 81% of the initial buildings, will have received upgrades that improve their efficiency by 40%.  By 2020, these 'fixed' buildings are 48% more efficient that the average building in 2005 and are being fixed at a rate of 1907 per year.  By 2020, new buildings use  57% less energy than the average building in 2005 and new average building efficiency has improved by 48% in 15 years.  Hydro power generates 15% of total electricity and wind electricity has increased from 1% to 16%.  Electricity from coal has dropped from 63% to 49%.  Geothermal is at 0%. Building related CO2 emissions have dropped from 196007 tons in 2005 to 182692 tons in 2020, a decrease of 13315 tons, or a 7% decline from 2005.

**Transportation Energy and CO2 Projections**

The average fleet efficiency has increased from 18 MGP in 2005 to 31 MGP in 2020 but the number of vehicles has risen by 32%.  Total miles travelled has increased by 16%, from 341 million miles to 395 million miles.  The average annual miles per vehicle has dropped from 16644 miles to 14314 miles.  2016 CAFÉ performance for new vehicles is at 36 MPG. Transportation related CO2 emissions have dropped from 179825 tons in 2005 to 115256 tons in 2020, a decrease of 64569 tons, or a 36% decline from 2005.

| Gunnison Community Energy and CO2 Projections | |
|---|---|
| The energy intensity rate of decline from 2005 to 2020 has reached | -5.4% |
| The carbon intensity rate of decline from 2005 to 2020 has reached | -0.18% |
| Total energy consumption has dropped from 3887 B Btu in 2005 to 3166.6 Btu in 2020, a decrease of 722.6 B Btu, or a 19% decline from 2005. | |
| Total CO2 emissions have dropped from 375832 tons in 2005 to 297948 tons in 2020, a decrease of 77884 tons, or a 21% decline from 2005. | |

It should be noted that Hudson demonstrates that developing the "Taylor Dam Hydro Option" and the "Geothermal Option" (or some other large-scale renewable energy generation), which are both checked "no" in all three scenarios, would obviate the need for the extensive programming depicted above in the building and transportation sectors.

## 2.9 Strategy for Tracking

The region should work toward consistent tracking and cataloguing of energy usage within all sectors and at all levels. This might be facilitated through the purchasing and distribution of a software program, through a contract with companies offering this type of service (e.g. Planet Footprint) or through incentives and/or disincentives for tracking. Working with utility companies (electricity, natural gas and propane) to track aggregate usage is an important first step to staying on top of our region's emissions.

If this is not possible, energy usage and emissions should be re-inventoried every three to five years to monitor progress toward targets. Jurisdictions should pool human and financial resources to cooperate in data-finding in order to facilitate the process.

It will be important to closely monitor the success of the action items in the plan, with respect to reductions, savings and participation rates. If certain programs are not

BLM_0108945

working effectively, they should be modified or eliminated. If others are working quite well at reducing emissions, they should be expanded or replicated in other jurisdictions.

Other metrics for success include: money saved, energy used, use of renewable energy sources (small and large-scale), water conservation, waste reduction, local food production, levels of community participation, and continued, positive, regional collaboration.

Reporting of the baseline data and the results of actions taken back to the governments and the communities will be determined during the first meetings of the Energy Action Coordinators.  It is likely that the EACs, with approval from jurisdictions, may provide updates annually at a public meeting (e.g. Council meeting, Intergovernmental meeting).

It is important to note that this action plan and goals are a starting point, used to identify and assess baseline measures, based on information and technology we have today generally following national standards for such guidelines.  As such, the plan is a living document, designed to be re-evaluated and reconfigured through time based on current knowledge, findings, resources, technology, and other factors.

# 3. Objectives, Goals, and Action Plan

Below is an index of high-priority sustainability programs and projects identified by the WSJCEB with community member input. Most of the action items are sought after by all of the communities in the region and will require collaboration for success.  Other items, marked by specific jurisdiction, will be the sole responsibility of that municipality.

## I.   Community Engagement (Policy, Research & Education)

**OBJECTIVE 1:** Ensure that policy decisions at all levels (government, business, and individual) advance the New Energy Economy so that our communities will have economic opportunities related to energy efficiency and renewable energy and will develop and thrive in a sustainable manner.  Implement a highly visual, public overall measure of progress.

**I.1.    GOAL: Adopt and implement public policies to increase energy efficiency, use of renewable energy, decrease water consumption, and reduce dependence on fossil fuels.**

**Local Government Action Items**

| All |
| --- |
| 1.) Where appropriate, support mixed-use and affordable housing developments on commercial projects to reduce transportation energy, with context appropriate regulations to mitigate adverse impacts (eg: conflicts between residential and more intensive commercial and industrial uses). |
| 2.) Promote a leadership position and advocate on renewable energy supply and efficiency issues. |
| 3.) Support community efforts to move towards greater energy independence. |
| 4.) Actively work with other communities and any statewide efforts to improve regional, statewide, and national policies and laws influencing energy use. |
| 5.) Review Local codes to ensure they are in line and not in conflict with the community's desire to become more sustainable. |
| 6.) Assess feasibility of implementing a carbon (or energy) tax.  (Use Boulder's Carbon Tax as example.)  Implement if determined feasible and beneficial. |
| 7.) Assess feasibility and possible results of implementing a 'Feed In Tariff' program that establishes a fixed rate for renewable energy power generated.  Engage with SMPA on this topic. |

| Mountain Village |
| --- |
| 1.) Implementation of newly adopted Wildfire and Forest Health regulations; research of biomass energy production with dead wood from forests |
| 2.) Comprehensive Plan is developed around a Sustainability Framework; review and revise LUO/Design Guidelines to allow for better environmental protections and incentives for renewable energy projects; investigate limits for maximum home sizes and energy taxes and incentives for new buildings |

| Ridgway |
| --- |
| 1.) Revisit current rate structure for water consumption such that increasing water demands pay higher rates for increased water consumption (ie: tiered structure) |
| 2.) Revisit landscaping and weed mitigation requirements to insure support of xeriscape low-water landscaping for all uses (residential, commercial, industrial) |
| 3.) Re-evaluate annually the Town's Renewable Energy Sales Tax refund policy and explore complementary opportunities and incentives |

BLM_0108947

to encourage and facilitate the installation and use of renewable energy
4.) Establish formal policies for energy efficiency and conservation in all public buildings

| Telluride |
| --- |
| 1.) Zero Waste Education-what will the net effect be if we become zero waste/Provide check list for businesses and restaurants |
| 2.) Create Festival contract for SMC, TOT and TMV so that resource recovery is locked in at all levels of festivals |

**I.2.    GOAL: Engage and advocate for collaborative, policy and legislative solutions at regional, state and federal levels.**

**Local Government Action Items**

| All |
| --- |
| 1.) Participate in and help develop effective regional, state, and federal solutions to reduce emissions. |
| 2.) Engage utility companies and assist local agencies in achieving greenhouse gas reduction targets. |
| 3.) Enable long-term solutions by investing in science and engineering education. |
| 4.) Actively participate in WSJCEB. |

| Mountain Village |
| --- |
| 1.) Mountain Village presence at SMPA meetings, send letters, have an active role in SMPA renewable energy program |

| San Miguel County |
| --- |
| 1.) Continue to be a strong advocate for such policies and legislation providing they are practical and have viable chance of implementation. |

| Telluride |
| --- |
| 1.) Continue to work with SMPA Mayor's Forum and bring speakers to town to enlighten public related to what other communities are doing |

**I.3.    GOAL: Advocate for programs, policies and legislation to reduce global emissions.**

**Local Government Action Items**

| All |
| --- |
| 1.) Support USA participation in international greenhouse gas reduction efforts. |

2.) Support other organizations that lobby for these goals, such as:
- Alliance for Sustainable Colorado
- CML
- CCI
- Club 20
- Colorado Counties, Inc.
- National Association of Counties

BLM_0108948

- Colorado County Managers Association

| |
|---|
| 3.) Provide letters of support and communications for federal renewable energy policy programs |
| 4.) Support local, state organizations that improve renewable energy policies. |

**I.4.    GOAL: Continue to improve and increase partnerships with utility providers, local/state/federal governments, and private industry, to maximize resources and outreach efforts for Southwest Colorado that ultimately contribute to the realization of the region's goals, inclusive of grant and loan opportunities to finance necessary and desired improvements.**

**Local Government Action Items**

| All |
|---|
| 1.) Assist in promotion of energy efficiency and renewable technology rebate, tax credit, and loan programs offered by local utilities, the GEO, local and federal governments through the building permit process and other community interactions as allowable. |
| 2.) Establish a communications network among the entities listed in the comprehensive regional network of Section 2.6. |
| **Mountain Village** |
| 1.) Familiarize staff with rebate and incentive programs and share with community, provide information, assist with paperwork if possible |
| **Ouray** |
| 1.) Support the completion of local renewable energy projects such as the Ridgway Dam power plant and the Sun Edison PV array. |
| **Ridgway** |
| 1.) Incorporate and update links and resource information on Town website, including links to SMPA, TNCC, GEO Recharge, DSIRE and others, as appropriate |
| **San Miguel County** |
| 1.)  Continue to promote rebate, tax credit and loan programs through Social Services and Commissioner's staff. |
| **Telluride** |
| 1.) Arrange monthly reporting of energy consumption from SMPA and Source Gas at specific levels i.e. Government, Commercial, Residential |
| 2.) Foster working relationships between regional and similar municipalities (i.e. Rico) |

**OBJECTIVE 2:** Improve education of our regional population, both permanent and part-time, so that all are continually informed about actions they can personally take to reduce per-capita energy consumption, and understand the relationships between energy and water conservation, saving money, environmental preservation, and GHG reduction.  Educational topics will include:

- Energy Efficiency – homeowners, renters, contractors, governments
- Renewable Energy
- Transportation

BLM_0108949

- Water Conservation
- Zero Waste
- Buying Local

**I.5.    GOAL: Education and Program Promotion**

    **I.5.a.    Market programs and conduct community outreach to increase participation in energy and water reduction efforts.**

    **I.5.b.    Provide education through a variety of venues.**

    **I.5.c.    Provide data needed by the community to understand the need for action to reduce global warming.**

**Community Action Items**

| All |
|---|
| 1.) Partner with community-based non-profit organizations, such as TNCC, and others, such as libraries and schools, to undertake public outreach and education efforts that broaden community involvement in reducing greenhouse gas emissions.<br>    1. a) TNCC shall develop regular educational topics and host free community education, making topics easily understood and end results easily attainable through:<br>      • TNCC website<br>      • Regular column in the regional newspapers<br>      • KOTO interviews<br>      • Green Business Roundtables<br>      • Field trips and workshops; hands-on activities to educate attendees<br>      • Public equivalent of the Green Business Roundtable (Sustainability Café)<br>      • Develop focus groups to assist in picking topics which will be accepted by and generate interest in the citizens<br>    1. b) Provide energy education for schools and establish a partnership program. |
| 2.) Develop and publish quarterly updates to overall sustainability measures adopted by the CEB<br>  • Make update graphic and interesting-have links from all governmental web pages<br>  • Make sure that the updates continue to point out why each has a different measure and the net positive effect that each measure will achieve. |
| 2.) Market and encourage participation in incentive programs (such as…) that improve energy efficiency, increase renewable energy, reduce water consumption, or increase other sustainability goals. |
| 3.) Foster and build public-private partnerships that help achieve greater energy efficiency and reduce greenhouse gas emissions. |
|     3. a) Educate by showing specific action items (encourage walking vs. driving) Create an online calculator for high altitude driving that reflects the reduction effect |
|     3. b) Educate by having tools that simply point out what specific steps in lowering carbon can mean to individual and community |
|     3. c) Notification to public/private sector of specific programs that will work for them…not just a mass e-mail |
| **Mountain Village** |

BLM_0108950

| 1.) Develop a Mountain Village "green" newsletter, community news with environmental focus |
|---|
|    1.a) Community newsletter Green pages, updates on web site; increased environmental education programs and activities, field trips in community, install interpretive signage at renewable energy project sites |
| 2.) Develop a strategy for reaching the residential sector of our community. |
| 3.) Generate a community contact list of local "do-ers" for volunteer resources. |
| 4.) Identify a staff person as Town contact for local environmental issues |
| **Ridgway** |
| 1.) Incorporate water usage and conservation in monthly billings through town utility |
| 2.) Partner with Green Business Roundtable efforts in Ouray, Telluride and Durango to include businesses in Ridgway and Ouray County |
| 3.) Gather, create and distribute educational materials that promote water and energy conservation and efficiency, and update annually |
| **San Miguel County** |
| 1.) Continue to work on community outreach through the Building, Environmental Health, and Social Service departments specifically. |
| 2.) Provide air quality, climate demographic and GIS data. |
| **Telluride** |
| 1.) Educate the populace on the reasons why government takes action on sustainability issues.  (e.g. Banning Plastic Bags) |
| 2.) Make all goals, especially Telluride Renewed goals, easily understood by the populace, so that they can react and see results at their level |
|    2.a) Promote Energy Efficiency by showing what the quantifiable results can be with participation in specific programs |
| 3.) Have a cleaner focus on issues |

### I.6.   GOAL: Increase participation of public in Carbon Offset programs

**Community Action Items**

| **All** |
|---|
| 1.) Educate public about verifiable, reliable and effective options to offset energy use, and reduce their carbon footprint. |
|    1. a) Promote SMPA's Green Blocks and Green Cents programs |
|    1. b) Educate about and promote the Colorado Carbon Fund |
|    1. c) Educate about and promote TNCC Green Fund – voluntary local option |
| **Mountain Village** |
| 1.) Support and promote local offset funds: clearly define offsets, costs, where money goes, improve understanding and transparency of these programs. |
| 2.) Strategize fundraising options for local TNCC Green Fund, including ads in community newsletter |
| **Ridgway** |
| 1.) Create a local program fund to assist in implementation of Renewable Energy for the Town's utilities (water, sewer) – eg: "round up"/ |

BLM_0108951

> monthly contributions to utility billings; SMPA Green Blocks program

## II.  OVERALL ENERGY CONSUMPTION

**OBJECTIVE:** Decrease per-capita energy consumption in San Miguel and Ouray Counties 20% by 2020 from ==2005== levels, defining "per-capita" as the total number of regional inhabitants, both full-time and part-time, and using Source Gas and SMPA utility data, through a broad-based, multi-sector, multi-disciplined approach that employs education and action focused on energy conservation, energy efficiency and renewable resources.

**Gaps/Needs**
- We need coordination of projects to maximize focus, avoid duplication of effort, and leverage our shared voices to higher authorities
- GHG Inventory for Ouray County needs to be completed and regularly updated, both governmental and community/regional.
- GHG Inventory for San Miguel County needs to be completed and regularly updated, both governmental and community/regional. (SMC government use is tracked annually.)
- SMPA data needed annually – electricity use per jurisdiction, by sector
- SourceGas data needed back to 2005, and annually – gas use per jurisdiction, by sector
- Funding mechanisms are needed for project implementation.  Financing program for people to invest in RE & EE improvements. Statewide PACE program.
- Tiered rate structure – prototype program being tested by SMPA

**EXISTING GOALS:**
- San Miguel County – Cool Counties Initiative – seeks to reduce county geographical GHG emissions 80% below current levels (at time of adoption) by 2050
- San Miguel County and Towns of Telluride, Mountain Village, Ophir, Norwood – Colorado Climate Action Plan – Reduce GHG emissions 20% below 2005 levels by 2020.

**II.1.    GOAL: Reduce energy consumption directly attributable to all governmental facilities and operations by 20% or more by 2020 (or sooner) from ==2005== levels, through increasing energy efficiency in all buildings and operation.**

**Local Government Action Items**

| All |
|---|
| 1.) Explore funding opportunities for assessing and implementing energy efficiency projects on government buildings. |
| 2.) Energy audits will be performed on all municipal buildings to identify opportunities for decreasing energy use and saving money. |

BLM_0108952

3.) The Town/County will invest in energy efficiency improvements on municipal facilities with a reasonable payback period. Other funding mechanisms will be explored for improvements with longer payback time periods.

4.) "Low hanging fruit" energy efficiency items such as lights, computers, and shop heaters will be implemented first.

5.) The Town/County commits to using best practices in energy efficiency and renewable energy in construction of all new buildings and operations.

6.) The Town/County will measure and track annual energy consumption in facilities and track annual progress toward lower emissions. Energy costs and trends will be transparent and reported annually during the annual budget cycle. Staff must see the energy bills associated with their department.

7.) Coordinate regular meetings with jurisdictional energy staff to review challenges, accomplishments and opportunities to collaborate on improvements to government energy efficiency. Explore joint grant opportunities.

8.) Explore feasibility of and potentially implement an energy efficiency / savings contest among or within each jurisdiction with rewards / incentives for achieving energy use reduction.

**Mountain Village**

1.) Collect and establish baseline information and data for each town department/facility; perform energy audits for each

2.) Review existing Greenhouse Gas reports, data and confirm accuracy of data records

**Ouray County**

1.) Establish the necessary baseline by documenting County usage and expenditures for electricity, natural gas, propane, gasoline and diesel during the years 2008 and 2009.  Establish a routine methodology for continued data tracking.

**Ouray**

1.) Establish the necessary baseline by documenting City usage and expenditures for electricity, natural gas, propane, gasoline and diesel during the years 2008 and 2009. Establish a routine methodology for continued data tracking.

2.) Reduce the City's electrical usage by at least 20% by the year 2015 by:
   a) Replacing incandescent and HID lamps in public lighting with CFL and LED lamps where feasible.
   b) Installing VFD units on all large pumps when the payback period is six years or less.
   c) Operating a 20 kW micro-hydro generating facility in the City Park using the Biota pipeline.
   d) Evaluating the feasibility and cost effectiveness of installing one or more micro-hydro generating facilities on the City's incoming water line.

3.) Reduce the City's natural gas usage by at least 20% by the year 2016 by:
   a) Installing a direct-exchange geothermal radiant heating system in the City Shop building using a small percent of the enhanced pool line flow.
   b) Evaluating the Community Center heat-loss sources and remediate where cost effective.
   c) Installing heat-exchanging ventilators in the Filter Building to replace the current and wasteful direct flow-through system.

4.) Reduce the City's Propane usage by at least 20% by the year 2015 by:
   a) Modifying the heating system at Box Canyon such that it can be completely shut down during the winter season.
   b) Evaluating the cost-effectiveness of maintaining a heated and lighted rest room along the north Ouray Corridor Trail during the winter season.

BLM_0108953

| |
|---|
| 5.) Explore the feasibility of utilizing geothermal heating for a Central District Heating system. |

| **Ridgway** |
|---|
| 1.) Establish baseline use levels for all government buildings, facilities, utilities, and transportation fuels (as possible) from 2005 to present. Establish a routine methodology for continued data tracking. |
| 2.) Participate in GEO ESCO program or similar option for retrofit and rehabilitation of all local government buildings including but not limited to Town Hall, the Public Works "Hut" and "Shop", the Post Office, and the Town's Water Treatment Facility. |

| **San Miguel County** |
|---|
| 1.) Share the annual audit data in a meaningful form to individual department heads on a quarterly basis and develop action items for needed EE improvements short, medium and longer term.  Review these improvement goals during the budget process to make sure funding is in place or that grants are explored and applied for. |
| 2.) Review all new county construction projects for maximum EE, RE utilization and use of recycled or green building materials, above and beyond the energy codes. |

**II.2.    GOAL: Encourage and incentivize existing buildings (commercial & residential) to reduce energy consumption 20% below 2009 levels by 2020.**

**Local Government Action Items**

| **All** |
|---|
| 1.) Implement a PACE (or similar) program, making funding available to residential and commercial property owners seeking to improve their properties to conserve energy and water, and to generate solar energy. |
| 2.) Pursue State and Federal funding programs designed to reduce energy demand through conservation and efficiency. |

**Community Action Items**

| **All** |
|---|
| 1.) TNCC – Engage community members, Residential & Small Commercial, in actively tracking and reducing their own energy use and carbon footprint through utilizing the Eco-Audit Software Program |
| 2.) Engage the Lodging & Resort Community in actively reducing their energy use.  Implement an Energy Efficiency contest with Aspen's Resort Community, utilizing the EPA / ENERGY STAR guidelines for Hospitality. |
| 3.) Explore and identify opportunities with the GEO, Housing Resources of Western Colorado, Delta Housing Authority, Rural Development, the Colorado Youth Corps, and other operational and/or financing organizations to market and grow existing weatherization and home rehabilitation programs throughout the region, and to expand these program concepts beyond the current income-restricted categories *(ie: weatherization opportunities for households earning greater than 200% of the Federal Poverty Guidelines, and home rehabilitation opportunities for households earning greater than 80% of the Area Median Income limits).* |

| **Mountain Village** |
|---|
| 1.) Develop outreach and education plan for MV residents; encourage small renewable installations; develop tracking system for |

BLM_0108954

| residential usage |
|---|
| 2.) Engage resort hotels and lodging facilities, study FKL/ Fairmont model and Green Team |
| **Ouray** |
| 1.) Update community resource information on rebates, incentives, programs, etc. on the Town website. |
| **Ridgway** |
| 1.) Update community resource information on rebates, incentives, programs, etc. on the Town website, building permit packets, etc. |
| 2.) Provide incentives for energy use reduction through building permit discounts or other fee reduction |
| **Telluride** |
| 1.) Survey buildings in the commercial core and the government to see what specific additional steps can be taken to lower energy consumption. |

**II.3.   GOAL: Reduce energy demand of new building construction, including all renovations and remodels that require a building permit.**

**Community Action Items**

| **All** |
|---|
| 1.) Require all new construction (commercial & residential) to meet or exceed the energy efficiency of the 2006 (or beyond) International Energy Conservation Code by 2011. |
| 2.) Adopt policies and ordinance changes to reduce energy use by promoting domestic water conservation and requiring water efficient landscape improvements associated with new construction. |
| 3.) Reduce greenhouse gas emissions from buildings and energy use. Require or request discretionary development projects to assess greenhouse gas emissions due to energy use, and to incorporate energy and water conservation measures into projects along with other features or programs. |
| 4.) Encourage reduction of vehicle fuel consumption pertaining to construction projects, through carpooling of contractors/trades, reducing trips of trucks and other vehicles to jobsite, and other creative methods. |
| 5.) Encourage construction schedule to be planned in a manner that eliminates the need for "wrap and heat" of the construction site or heating of the ground during cold months. |
| **Mountain Village** |
| 1.) Investigate energy taxing for large usages, credits, efficiencies, innovative policies of construction; investigate maximum home sizes |
| **Ridgway** |
| 1.)  Review and update Prescriptive Energy and Green Building Code to evaluate payback periods, upfront costs, new technologies |
| 2.)  Seek out rebate/ refund/ cost reduction opportunities to encourage building beyond existing code requirements |
| **Telluride** |
| 1.)Enforce green building code and outdoor heating regulations |
| 2.)Improve mass transportation via additional park and ride lots |

BLM_0108955

**II.4.  GOAL: Work toward region becoming carbon neutral by 2035.**

**Community Action Items**

| All |
| --- |
| 1.) By 2012, find a community willing to set the goal of becoming carbon neutral by 2020, in order to have an example to work from for rest of region. |
| 2.) Conduct feasibility studies for communities in region to become carbon neutral. |
| 3.) Conduct feasibility studies and take actions toward communities going "off-grid". |
| 4.) Calculate current Carbon Footprint of each entity in region. |

| Mountain Village |
| --- |
| 1.) Research carbon-reducing technologies. |

**III. Renewable Energy from Electricity – all sizes of systems, private / public**

**OBJECTIVE:** Obtain 20% of the region's electricity from renewable energy by 2020.  Sources will include a mixture of local small and large-scale renewable energy projects and purchase of RECs for renewable energy produced outside of the region.

**Gaps/Needs**
- Funding mechanisms are needed for project implementation.  Financing program for people to invest in RE & EE improvements. Statewide PACE program.
- Need enabling regulations for utilities for development of renewable energy – i.e. increasing Policy 115 limit from 5% to 10% or greater.
- Need existing RE production within SMPA territory to establish baseline

**EXISTING CHALLENGE:** Telluride Renewed – Towns of Mountain Village and Telluride will use 100% new renewable energy to offset for electricity usage by 2020, through energy efficiency, local/regional renewable energy production, and purchase of renewable energy…

**III.1.  GOAL: Increase the amount of RE produced on governmental facilities/properties to XX% of the total electricity used by 2020.  Purchase remaining electricity through a Renewable Energy or Green Power production program.**

**1.)  Local Government Action Items**

| All |
| --- |
| 1.) Facilitate the development of small or large-scale RE systems on government property. Micro-hydro, geothermal, solar, biomass, wind, etc. |

BLM_0108956

| Mountain Village |
| --- |
| 1.) Produce 5% of government electricity by renewable sources by 2020; establish baselines, research ideas. |
| 2.) Micro-Hydro – Currently engaged in feasibility study for placing turbines in PRV vaults on town water system.  Research, apply for and obtain grant funds to implement in 2011. |

| Ouray |
| --- |
| 1.) Pursue funding for two 20 kW generators employing the City's water supply system. |
| 2.) Actively support the continuing operation of the historic Ouray Hydroelectric Plant. |

| Ridgway |
| --- |
| 1.) Pursue micro-hydro power generation option with the Town's water supply and distribution utility. |
| 2.) Explore opportunities to implement renewable technologies that offset existing and planned energy consumption *(eg: grid-tied solar system on Town Hall for new energy efficient pedestrian lighting in Town Park).* |
| 3.) Explore opportunities and financing mechanisms to convert the Town's Water Treatment facility and WWTP to solar powered utilities |

| San Miguel County |
| --- |
| 1.) SM County existing facilities and new construction commitment to utilize RE through offset purchase programs and through the use of geothermal, solar, and wind resource technology. |

| Telluride |
| --- |
| 1.) Develop a 100 kW solar farm at the Wastewater Treatment Plant |
| 2.) Assess feasibility of and implement micro-hydro power projects at Pandora, Mill Creek, Keystone Hill, and Stillwell Tunnel. Also place mini-hydro turbines in existing pipelines where appropriate. |

**III.2.   GOAL: Increase the amount of non-government owned locally-produced RE in the region to ==XX== MW by 2020.**

**Community Action Items**

| All |
| --- |
| 1.) Encourage / facilitate the development of large-scale systems (over 25 kW), up to a total of 5 MW in SMPA Territory (or higher as utility regulations change). |
| 2.) Support SMPA's efforts to build a community-funded solar farm with completion by 2013, following the currently proposed solar project with Sun Edison. |
| 3.) Encourage development of small-scale residential & commercial systems – through local incentives such as: waived building permits & taxes, financing programs. |
| 4.) Adopt policies and ordinances to remove regulatory impediments and economic disincentives associated with the generation and use of energy from renewable sources. Develop and market policies, incentives and information that encourage the purchase and utilization of renewable energy technologies. |

| Mountain Village |
| --- |
| 1.) Encourage homeowners to install small home systems; provide incentives to residents |

BLM_0108957

2.) Work with Telluride Ski & Golf Resort to improve energy efficiencies, investigate solar, wind, hydro options

| |
|---|
| 3.) Greening the Gondola Campaign. |
| **Ouray County** |
| 1.) Encourage the responsible mining of strategic metals used in renewable energy and battery technology. |
| 2.) Ensure the County Land Use Code accommodates the installation of renewable energy systems and/or farms |
| **Telluride** |
| 1.) Work with MV and SMC to create a renewable energy source within the region or county. |

## IV. Transportation: Ground and Air
**OBJECTIVE:** Reduce the overall amount of energy consumed per capita by ground and air travel.

**Gap:** We need a coordinated regional approach to transportation.
- Lack of coordinated regional transportation causes:
  - Higher overall energy consumption and greenhouse gas production
  - Higher individual cost
  - Even more wear and tear on our roads

**Needs:**
- Develop and publish quarterly updates for (estimated) regional transportation energy usage, including personal, private company, school and public works, public for-hire, contractor vehicles, and air travel for the region.
- Establish baseline fuel consumption per jurisdiction.
- Develop a baseline of "commuter miles traveled" and increase use of pooled transportation by 20% by 2020.
  - Put together a committee focused on accomplishing the district which would include members from all affected counties and municipalities
- Accurate numbers to compare air travel in/out of Montrose combined with driving, to air travel in/out of Telluride airport. Improved "shop local" goal achievement.

**IV.1.**  **GOAL: Reduce fuel use directly attributable to all governmental facilities and operations 20% by 2020 (or sooner) from 2005 levels, through increasing vehicle efficiency and efficiency of vehicle operations.**

**Government Action Items**

| |
|---|
| **All** |
| 1.) Reduce overall fuel consumption for government vehicles, through fewer or more efficient trips, use of fuel efficient vehicles, carpooling to meetings and conferences, and increase pedestrian emphasis to local events and meetings. |
| 2.) Assess feasibility of and build capacity for developing fueling stations for alternative fuel (e.g. biodiesel, compressed natural gas, hydrogen, etc.).  Adopt policies and programs that help governments, businesses and organizations with fossil-fuel powered fleet vehicles |

BLM_0108958

| |
|---|
| switch to vehicles powered by clean, renewable energy sources. |
| 3.) All new government vehicle purchases strive for most fuel-efficient models, using alternative fuel sources when feasible. |
| 4.) The Town/County will make bus passes available to those employees who can commute by bus. |
| 5.) Future Town/County facilities and operations will be sited based on access by transit, walking, biking, and evaluated for encouraging more compact land uses. |
| 6.) Adopt policies and ordinances that encourage car-free tourism. |
| 7.) Work with Region 10, existing RTA, to put a regional transportation district to the voters and facilitate other goals.  (In 2008 Montrose County received a grant to perform a Transit Feasibility Study in conjunction with Delta, San Miguel and Ouray counties.  This study was the basis for the Regional Transit Coordinating Council managed under Region 10 League for Economic Assistance. Subsequently, each county is charged with organizing a Transit Advisory Committee to examine this issue and come up with a work plan. San Miguel County organized its first meeting of this committee scheduled for September 27, 2010.) |
| 8.) Create a Western San Juan Transportation District. |
| 9.) Require that all new development projects have a net decrease in transportation related emissions compared to existing development conditions |
| 10.) The Town/County will encourage employees to make in-town trips on bicycle or by foot when practical |

**Mountain Village**

| |
|---|
| 1.) Reduce fuel consumption 10% by 2020 (TMV already uses hybrid vehicles in fleet). |
| 2.) Use less trucks and more 4-6 wheelers; use biodiesel or alternative fuels when possible; hire more locals |
| 3.) Research and establish baseline data and tracking mechanisms for Town fuel usages, investigate options for more 4-6 wheelers and less full size trucks. |

**Ouray**

**1.)  Reduce the City's fuel consumption by at least 20% from 2010 levels by the year 2020 by:**
   a)  Installing a card-based fuel dispensing system.
   b)  Purchasing vehicles with mpg ratings that exceed the current fleet average by at least 20%.
   c)  Exploring opportunities to convert City vehicles to biodiesel, compressed natural gas, or other alternative fuel supplies.

**Ridgway**

| |
|---|
| 1.) Explore feasibility of Town-owned bicycles, including electric powered bicycles) for town-wide transportation (policing, post office runs, posting properties, hardware store runs, etc.) |

**San Miguel County**

| |
|---|
| 1.) Goal to support and work with the newly formed Transit Advisory Committee & Regional Transit Coordinating Council through Region 10. |
| As mentioned above, the County is working toward a regional public/private transit plan with Montrose, Ouray and Delta county.  It's also safe to say that SM County will continue to support public transit service through the existing Galloping Goose system to the west end of SM County. |
| 4.) Examine options within County Land Use Code to encourage development of public trails and residential/commercial development near or on existing transit lines. |

BLM_0108959

**IV.2.** **GOAL: Reduce demand for fossil fuel by decreasing vehicle miles traveled, improving transit options, and improving the fuel efficiency of vehicles.**

**Community Action Items**

| All |
| --- |
| 1.) Evaluate parking standards in downtown areas to help reduce vehicle miles traveled. |
| 2.) Adopt policies and ordinance changes to reduce vehicle miles traveled by supporting local hiring, food production, farmers markets, and community-based "buy local" campaigns. |
| 3.) Reduce the volume of single occupancy traffic within the region, through educational outreach, promoting energy use reduction programs, and encouraging car-pooling and use of mass-transit. |
| 4.) Improve mass transit transportation in the region. Improve convenience and maintain affordability, with lower emissions per passenger mile than the average private vehicle. |
| 5.) Increase the use of highly fuel-efficient and low emissions-fuel engines and machinery in on-road and off-road vehicles. |
| 6.) Increase the use of walking and bicycles, through expansion of town bike programs, improvement of bike/pedestrian trails, incentivizing bike travel by employers, etc. |
| 7.) Identify, support, finance, and construct an integrated regional transportation and workforce housing program where efficient and affordable housing is built to house XX% of the local workforce, and which decreases the overall percentage of the commuting workforce XX% by 2020 throughout the region. <br> a) Confirm commuting workforce figures for the region and identify targeted household income ranges for the commuting workforce and pursue options for housing development. <br> b) Include affordable housing projects with mandatory energy efficient construction policy. <br> c) Expand the range of targeted alternatives to single-passenger transportation systems (car pool, van pool, etc.) <br> d) Expand and promote existing park and ride transportation *(eg: Ouray County Fairgrounds Parking Lot)* |
| 8.) The Town/County will support efforts to create affordable in-town housing or on public transportation routes for employees, to reduce the need to commute. |

| Mountain Village |
| --- |
| 1.) Review and update Town vehicle efficiency study and examine historical data and reports on regional transportation issues |
| 2.) Support development of additional levels of parking garage. |
| 3.) Identify potential affordable housing development locations through Comprehensive Plan |
| 4.) Work with Telluride to maintain free transportation on the Gondola. |

| Ouray |
| --- |
| 1.) Encourage the use of locally produced products and produce and shopping locally to minimize the transportation component of consumption. |

| Ouray County |
| --- |
| 1.) Encourage the use of locally produced products and produce and shopping locally to minimize the transportation component of |

BLM_0108960

| consumption. |
|---|

| **Ridgway** |
|---|
| 1.) Develop and construct a comprehensive pedestrian and bicycle transportation network focused on connectivity throughout the Town of Ridgway and incorporate the adjoining areas of Ouray County where feasible, including public parking facilities that encourage non-vehicular transport throughout the community.<br>  a) Continue pursuit of grant funding for completion of sidewalks connecting north, south, east, and west aspects of Town.<br>  b) Support the Uncompahgre Riverway Trail to connect pedestrian trails from Montrose to Ouray as well as other trail building efforts within and adjoining the Town.<br>  c) Plan and develop public parking lots for vehicles as well as incorporate bike-parking areas around Town to encourage non-vehicular transport throughout the Town. |
| 2.) Pursue partnership, funding and opportunities to develop a comprehensive trail network between Ouray, SM and Montrose counties |
| 3.) Make improvements to park and ride lot in Town |
| 4.) Work with farmer's market to centralize the location closer to residential areas for pedestrians and bike |

| **Telluride** |
|---|
| 1.) Explore opportunities to make switch over as funds become available to electric cars/trucks instead of fossil fuels |
| 2.) Expand Townie program |
| 3.) Work with Mountain Village to maintain free transportation on the Gondola. |

**IV.3.   GOAL:  Optimize utilization of air travel to decrease overall GHG emissions in region, using a systems-thinking approach toward environmental, economic and social sustainability of San Miguel County.**

**Community Action Items**

| **All** |
|---|
| 1.) Participate in local airport discussions and debates, issues, boards. |
| 2.) Work with TRAA and TMRAO to increase capacity of planes and lower # of flights. |

## V.  Water
**OBJECTIVE:**  Decrease overall water consumption community-wide in private and public sectors (residential, commercial, industrial, and governmental) by *10% below 2005 levels by 2020* through education, conservation, incentives, facilities management, and regulatory structure.

**NEED:** Research and establish baseline data and tracking mechanisms for Town / County water usages with Water Departments

**V.1.   GOAL: Reduce water consumption directly attributable to all governmental facilities and operations by 5-10% by 2020 from 2011 levels**

BLM_0108961

**Government Action Item**s

| All |
|---|
| 1.) Establish a baseline for water use by each jurisdiction, starting in 2011 (or before if already measured).  Install meters to measure use as needed. Focus on significant consumptive users of water if not feasible to measure all. |
| 2.) Increase water efficiency in all buildings and government operations, utilizing reduced flow aerators, lawn-watering management improvement, water saver toilets, water heaters and any other new water efficient technology. |
| 3.) Educate public works and parks personnel about water use reduction and conservation techniques.  Identify training and workshop opportunities as appropriate.  Distribute water savings information to Public Works and Parks crews throughout region. |
| 4.) Assess the Town/County water supply, treatment, and distribution to identify water conservation opportunities, including assessment of evaporation and seepage through reservoir and open ditch systems. Installation of leak detection alarm systems that identify leakage early on and mitigate significant water losses may be an initial step to quantify this issue for all municipalities. |
| 5.) Explore storm-water harvesting opportunities for irrigation of public spaces such as parks and open spaces. |
| 6.) Reduce use of treated water for outdoor irrigation purposes around all Town/County facilities through ditch or piped raw water irrigation systems or other opportunities. |

**V.2.   GOAL: Reduce residential, commercial, agricultural and other non-governmental water consumption per capita 10% by 2020 from 2011 level**s

**Community Action Item**s

| All |
|---|
| 1.) Incorporate water usage figures and water conservation education in the government or water district's water billing scheme that includes average use and range of use within the Town for household comparisons and to create an atmosphere of friendly competition between water users (i.e. incorporate graphs and user friendly data so households and businesses can see how much water they use month to month and seasonally and compared with other users in Town). |
| 2.) Educate community about water use reduction techniques through distribution of information, seminars, workshops, newsletters, etc. In particular, information and incentives to use low-water irrigation techniques for farm and ranching applications, native and low-water landscaping techniques, etc.  Opportunities may exist through the University Extension Offices, the Gunnison Basin Roundtable and other statewide Roundtables, CDPHE, CO Water Conservation District, etc. |
| 3.) Assess the Town water supply, treatment, and distribution to identify water conservation opportunities. |
| 4.) Incorporate water conservation requirements (mandatory water restrictions) into local building codes for new construction. Codify mandatory water restrictions (eg: time of day watering and watering day assignments) |
| 5.) Insure all water distribution systems provide for measuring water consumption and usage for all applications |
| 6.) Explore or re-evaluate rate structure to discourage expansive use of water during the summer watering/ irrigation season. |
| 7.) Adopt landscape ordinances that promote drought resistant plants, and restrict lawns and other high water demand plants unless reclaimed or grey water systems are used. |

BLM_0108962

| 8.) Develop and adopt energy saving and environmentally sound domestic water conservation plans. |
| 9.) Insure water rights acquisition and/or financing are incorporated into land use developments and annexations. |
| 10.) Develop policy for private use of non-potable water sources and/or plan for expansion of non-potable water systems for distribution such that residences and businesses do not irrigate with treated, potable water. |
| 11.) Explore opportunities to remove other discretionary water uses from treated water systems to non-treated systems (eg: fire hydrants, etc.) |

## VI. Landfill: Waste Reduction & Recycling

**OBJECTIVE:** Divert 75% of overall waste from landfills by 2020, by reducing the amount of waste at the source, reusing materials, recycling, and composting.

**NEED:** Research and establish baseline data and tracking mechanisms for Town / County waste.

**VI.1.   GOAL: Divert 75% of overall Town/County Government waste from landfills directly attributable to all governmental facilities and operations by 2020**

**Government Action Items**

| All |
| --- |
| 1.) Decrease the amount of solid waste generated. |
| 2.) Decrease consumption of paper 20% by 2012 from 2010 levels. |
| 3.) Aggressively implement recycling and composting at Town & County -sponsored events. |
| 4.) Distribute recycling options throughout Town to accompany existing trash bins. |
| 5.) Transition to a paperless office at Town/County Buildings:<br>    1.)  Purchase refurbished laptops or tablets for use by elected and appointed officials during public meetings and discontinue distribution of paper packets for meetings;<br>    2.)  Encourage electronic submissions for Town issued permits when feasible (building, encroachment, sign, solid fuel stove, licensing, etc.) |

| Mountain Village |
| --- |
| 1.) Establish baseline data and tracking mechanisms for governmental facilities; strategize educational campaign for Zero Waste, research local opportunities for composting, recycling construction waste, support local facilities and incentives for reuse and recycling. |
| 2.) Consider a small local in-vessel composting unit for town use and education |

| Ouray |
| --- |
| 1.) Initiate a program of commercial cardboard recycling during 2011. |

| Ridgway |
| --- |
| 1.) Transition to paperless/ electronic document system |

BLM_0108963

2.) Ramp up recycling efforts to reduce solid waste stream

| Telluride |
|---|
| 1.) Increase recycling efforts by all government departments, commissions, taskforces, and councils. |
| 2.) Increase composting by all government departments, commissions, taskforces, and councils. |

**VI.2.   GOAL: Divert 75% of overall waste from landfills from residential, commercial, and other non-government entities 75% by 2020.**

**Community Action Items**

| All |
|---|
| 1.) Educate community about waste reduction techniques. Including: Waste reduction at point of purchase through recycling; Composting Education –use of worm bins, back-yard composting techniques |
| 2.) Incentivize reduced volume of waste compared to recycling / composting collection. Encourage home composting of organic waste. |
| 3.) Support the development of recycling centers in the region. |
| 4.) Expand recycling services to commercial properties in region by 2012 (or as contracts are up for renewal). |
| 5.) Support development of regional composting facility that can serve all sectors. |
| 6.) Establish collection services in all communities for segregated food waste from commercial sources. |
| 7.) Increase use of and opportunities for hazardous waste removal. |
| 8.) Improve utilization of recycling & proper disposal of large items, including appliances, electronics, etc. |
| 9.) Enact ordinances and create incentives to achieve organic (food and green) waste diversion of 75% by 2020. |
| 10.) Create and support other programs, such as a Green Business Program, that help achieve the 75% overall waste diversion goal. |
| 11.) Adopt environmentally preferable purchasing policies and explore joint- purchasing agreements with partner agencies, and local jurisdictions and businesses. |
| 12.) Watch the "plastic bag elimination" initiative in Telluride and identify opportunities to implement similar or other programs throughout the region. |
| 13.) Perform a feasibility study to investigate the opportunity to capture methane from waste products to utilize as an alternative fuel source.  Coordinate with Montrose County to study landfill options. |

| Mountain Village |
|---|
| 1.) Establish baseline data and tracking mechanisms for non-governmental waste production; education and outreach to community residential and commercial facilities; require all commercial businesses to recycle and participate in Zero Waste; support local transfer stations and recycling centers. |

| Ridgway |
|---|
| 1.) Identify supplemental funding to facilitate and implement a mandatory commercial recycling program |

| San Miguel County |
|---|
| 1.) Continue to support hazardous waste disposal options throughout the county and increase options for disposal of toxic freon, lead and other materials present in many appliances and electronics. |

BLM_0108964

2.) Improve options for household recycling throughout the county.

3.) Improve options for composting – west end of county has significant opportunity and the space and the right mix of resources for a composting center.

**Telluride**

1.) Implement and enforce a Waste Grease and Oil Ordinance that ensures proper disposal by commercial food service providers and, ideally, connects re-use services to the generators (i.e. biodiesel producers).

2.) Continue to provide for and/or support an annual Town / Regional Clean-up.

3.) Continue to provide for and/or support an annual or semi-annual Electronics Recycling Event.

## VI.3.   GOAL:  Reduce construction waste by at least 75% by 2020.

**Community Action Items**

**All**

1.) Develop a regional recycling and reuse facility for construction materials.

2.) Enact ordinances and create incentives to achieve waste reduction of construction and demolition debris.

3.) Encourage & educate to increase use of reuse stores and facilities.

4.) Decrease amount of complete home demolition through incentivizing remodeling.

**Mountain Village**

1.) Consider requiring new construction to recycle construction items; support the identification of location for local construction recycling center, education and outreach campaign for contractors; % of building permit fees to construction recycling program.

**Telluride**

1.) Create and implement mandatory construction materials recycling specifications to include with all Town/Government Construction projects.

2.) Work collaboratively with the construction community to encourage adoption of these specifications on private projects.

## VII.   Agriculture & Forests

**OBJECTIVE:** to utilize our regional natural resources wisely, increasing local food production utilizing available biomass wisely, and preserving our natural environment for future generations.

## VII.1.   GOAL: To increase food security and elevate regional produced food quantity, quality and availability to residents, visitors, businesses and schools in region.

**Community Action Items**

**All**

1.) Adopt policies and ordinances that support local agriculture, food production, farmer's markets and community gardens. The

BLM_0108965

| |
|---|
| Town/County will strive to use locally grown food for Town/County sponsored functions when practical. |
| 2.) Support efforts by local growers and restaurants to produce and use locally grown food, and remove associated regulatory hurdles as possible. |
| 3.) Encourage responsible and sustainable agricultural and landscaping practices, minimizing toxic chemical use. |
| 4.) Educate government staff and the community on the economic and energy impacts of the industrialized food supply chain and encourage the cultivation and purchase of locally produced foods. |
| 5.) Educate public on local food shed – what it is and why important. |
| 6.) Encourage Farm to School and Farm to Cafeteria programs. |
| 7.) Perform Feasibility study for regional commercial kitchens, meat processing facilities, etc. to enhance the ability of local producers to process and market local food in the region. If appropriate pursue funding for items identified in study. |
| 8.) Host fun food growing and harvesting events. |
| **Mountain Village** |
| 1.) Create Mountain Village Farmer's Market; investigate and propose Community Garden and demonstration garden in Meadows area, identify local volunteer team for project implementation. |
| 2.) Encourage/educate Urban / Vertical Farming opportunities in village core, including businesses and lodging community. |
| **San Miguel County** |
| 1.) County support for local food production through land use, and other permitting options. |
| 2.) Create incentives for safe food production with Environmental Health Department. |
| 3.) Encourage natural livestock option for ranchers through education by those succeeding with these options. |

**VII.2.  GOAL: To utilize available energy resources wisely, protect our forests from harm, and preserve natural beauty.**

**Community Action Items**

| |
|---|
| **All** |
| 1.) Develop forest health and education curricula for regional schools. |
| 2.) Assess the feasibility of and if appropriate, promote development of beneficial biomass projects in the region from forest dead wood. |
| 3.) Support initiatives by Mountain Studies Institute (MSI) related to climate change resiliency & adaptation.  Collaborate when appropriate. |
| **Mountain Village** |
| 1.) Develop Forest Health and Wildfire Mitigation Policy educational efforts that lead to implementation. |
| 2.) Assist landowners with grant possibilities for implementation of CWPP. |
| **San Miguel County** |
| 1.) Work with public land agencies to find remedies and preventions for forest diseases, insects and fungal infestations affecting regional forest health. |
| 2.) Develop either via government or non-profit support a Citizen Scientist program to engage citizens in forest stewardship. |

BLM_0108966

# ACKNOWLEDGEMENTS

The WSJCEB and TNCC would like to thank ORE and the Gunnison/Hinsdale County Community Energy Board for their efforts toward establishing the framework for this collaborative document.

The many authors of the STRATEGY would like to acknowledge the significant efforts of the community members who have contributed their time and energy to the energy-planning process. The creation of this document would not have been possible without the dedicated work, participation, input, and support from the people of this region.

BLM_0108967

# Appendix: Important Terms and Acronyms

| | |
|---|---|
| **AFV** | Alternative-Fueled Vehicle |
| **Btu** | British Thermal Units |
| **CAPPA** | Clean Air and Pollution Planning Assistant (ICLEI Software) |
| **TELSKI** | Telluride Ski & Golf |
| **CCP** | Cities for Climate Protection (ICLEI Program) |
| **CFL** | Compact Fluorescent Light Bulbs |
| **$CH_4$** | Methane |
| **$CO_2$** | Carbon Dioxide |
| **$CO_{2e}$** | Carbon Dioxide Equivalent |
| **DoE** | Department of Energy (US) |
| **DSM** | Demand Side Management |
| **EAP** | Energy Action Plan |
| **EPA** | Environmental Protection Agency |
| **GEO** | Governor's Energy Office (State of Colorado) |
| **GHG** | Greenhouse Gases |
| **GWh** | Gigawatt hour |
| **HARC** | Telluride Historic and Architectural Review Committee |
| **HFCs** | Hydroflourocarbons |
| **ICLEI** | International Council for Local Environmental Initiatives |
| **IPCC** | Intergovernmental Panel on Climate Change |
| **KOTO** | Telluride Community Radio Station |
| **KURA** | Ouray Community Radio Station |
| **kWh** | Kilowatt Hour |
| **MPG** | Miles Per Gallon |
| **$N_2O$** | Nitrous Oxide |
| **PFCs** | Peflourocarbons |
| **PSAs** | Public Service Announcements |
| **PV** | Photovoltaic |
| **REMP** | Renewable Energy Mitigation Program |
| **RTA** | Rural Transportation Authority |
| **SMA** | Sheep Mountain Alliance |
| **SMPA** | San Miguel Power Association |
| **SUV** | Sport Utility Vehicle |
| **TNCC** | The New Community Coalition |
| **UCSM** | University Centers of the San Miguel |

BLM_0108968

## James Bode

| | |
|---|---|
| **From:** | Angie Adams |
| **Sent:** | Monday, December 13, 2010 10:25 AM |
| **To:** | UFO AR |
| **Subject:** | FW: Paonia Watershed Ordinance |
| **Attachments:** | 2003-02_Watershed.doc; townofpaonia.vcf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

-----Original Message-----
From: bruce_krickbaum@blm.gov [mailto:bruce_krickbaum@blm.gov]
Sent: Thursday, December 02, 2010 10:02 AM
To: Angie Adams; Kate Wynant
Subject: Paonia Watershed Ordinance

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 12/02/2010 09:59 AM -----

```
        Town of Paonia
        <townofpaonia@tds
        .net>                          To
                               bruce_krickbaum@blm.gov
        11/02/2010 01:55                cc
        PM
                                      Subject
                        Re: Final Notes: Uncompahgre RMP
                        Cooperating Agency Meeting #5
```

Hi Bruce~

I'm not sure if I ever sent this to you or not, but I have attached a copy of our watershed ordinance for the Town of Paonia.  As a warning, I will be contacting other area clerks to remind them to file their watershed ordinances with BLM as well.

I am enjoying being an active participant in this process.  Thank you for the opportunity.

BLM_0108969

Barbara Peterson
Town Clerk
970/527-4101 tele

On 10/26/2010 4:55 PM, bruce_krickbaum@blm.gov wrote:
> Hello Cooperating Agencies,
>
> I have attached the finalized notes from the November 30 meeting.
>
> As a reminder, we will not meet on November 4.
> The date for the next meeting has not been determined, but I
> anticipate
it
> will be in January.
>
> Regards, Bruce
>
> <><><><><><><><><><><><><><><><><><><><><>
> Bruce Krickbaum
> Planner, Environmental Coordinator
> BLM Uncompahgre Field Office
> 2465 South Townsend Avenue
> Montrose, CO  81401
> 970.240.5384
>
> (See attached file: UFO-CA_2010-09-30_FinalNotes.pdf)
>
> PLEASE NOTE: This message, including any attachments, may include
> privileged, confidential and/or inside information. Any distribution
> or
use
> of this communication by anyone other than the intended recipient is
> strictly prohibited and may be unlawful. If you are not the intended
> recipient, please notify the sender by replying to this message and
> then delete it from your system.
(See attached file: 2003-02_Watershed.doc)(See attached file:
townofpaonia.vcf)

BLM_0108970

## ORDINANCE NO. 2003-02

**AN ORDINANCE ESTABLISHING A WATERSHED DESIGNATION, PROVIDING PROTECTION AGAINST AND REGULATION OF CERTAIN ACTIVITIES WITHIN THE AREA DESIGNATED AS THE WATERSHED OF THE TOWN OF PAONIA, COLORADO, PURSUANT TO C.R.S. 31-15-707(1)(b), AS AMENDED.**

**WHEREAS,** the Board of Trustees of the Town of Paonia, Colorado, has determined that protection of its watershed is justified, desirable and necessary to protect and perpetuate the quantity and quality of the water the Town derives therefrom; and

**WHEREAS,** the Board of Trustees of the Town of Paonia, Colorado, has concluded that it should adopt regulations allowed and authorized under the provisions of C.R.S. 31-15-707(1)(b), as amended.

**NOW, THEREFORE, BE IT ORDAINED** by the Board of Trustees for the Town of Paonia, Colorado, that the Code of the Town of Paonia, Colorado, be amended by the addition of regulations addressing the possible effects of different uses and activities that may occur within the area designated as the watershed of the Town of Paonia, Colorado, from which water is derived for the Town's domestic water service, as follows, to-wit:

## 9-1-1  INTENT OF TOWN WATERSHED DESIGNATION

There is established by the Town of Paonia, Colorado a Watershed Designation ("Watershed") pursuant to C.R.S. 31-15-707(1)(b).  The Watershed is that area in which the Town shall exercise its powers to maintain and protect the Town's waterworks from injury and the Town's water supply from pollution.  This Watershed is created under the authority granted in C.R.S. 31-15-707(1)(b), as amended.  The Watershed and these regulations are created only for the purpose of protecting the Town's waterworks and water supply, and not for the purpose of regulating land use activities, which activities shall continue to be regulated by the County of Delta, State of Colorado, and federal government, and any other authority with jurisdiction over land use activities within the Watershed.  The Town shall implement and enforce

-1-

BLM_0108971

these regulations for the purpose of reviewing and permitting any activity within the Watershed, which creates a foreseeable risk of injury to the Town's waterworks or pollution of the Town's water supply. The Town's review authority within the Watershed shall be exercised concurrently with the authority of Delta County or any other government entity to review and/or permit the same activity as the Town may regulate; provided however, in the event no review, approval or permit requirement exists, the Town's review authority shall occur prior to the commencement of any activity covered herein.

## 9-1-2  JURISDICTION AND MAP

The jurisdiction of the Watershed shall extend over the territory owned or occupied or controlled by easement by the Town waterworks and all reservoirs, streams, trenches, pipes and drains used in and necessary for the construction, maintenance and operation of the waterworks, and over the spring stream or source from which water is taken, and all water sources and drainage areas tributary thereto, for five (5) miles above such points from which water is diverted for use by the Town. The Watershed Map, with all notations, references and other information shown thereon, is incorporated herein as part of this Chapter. The official Watershed Map is located and can be reviewed in the office of the Town Clerk, and copies thereof are available on request at a cost of $15.00 per copy.

## 9-1-3  DEFINITIONS

Whenever the following words or phrases are used in this Chapter 9, they shall have the following meaning:

**A.  "Best Management Practices"** (BMPs) means schedule(s) of activities, prohibitions of practices, maintenance procedures, management procedures, and other management and activity practices to prevent or reduce potential or actual injury to the Town of Paonia waterworks or pollution of the Town of Paonia Water supply. BMPs also include treatment requirements, operating procedures and other practices to control runoff, erosion, drainage, sediment accumulation and similar events.

**B.  "Emergency"** means a situation created by an unforeseen event or events with immediate adverse consequences or conditions.

**C.  "Excavate" or "Excavating"** means the artificial movement of earth leaving any

- 2 -

BLM_0108972

cut bank over three (3) feet in vertical height or a movement of material in excess of two hundred fifty (250) cubic yards.

**D.   "Fill" or "Filling"** means the artificial movement of earth leaving a fill earth bank over two (2) feet in vertical height or filled earth over two (2) feet deep, or artificial addition of earth above a line sloping up at a grade of one 91) vertical to two (2) horizontal from the ground.

**E.   "Foreseeable risk"** means the reasonable anticipation that harm or injury may result from acts or omissions.

**F.   "Grade" or "Grading"** means the artificial movement of over two hundred fifty (250) cubic yards of material; or movement of any earth or material affecting or creating a drainage channel; or pioneering of roads by the artificial movement of soils, trees or shrubbery creating a roadway or driveway in excess of two hundred fifty (250) feet in length; or the use of vehicles or keeping of any animals upon any land that would lead to a movement of one hundred (100) cubic yards of material within one (1) year of the commencement of such use or which use, if continued, would result in the movement of any earth or material affecting or creating a drainage channel.

**G.   "Person"** means any individual, corporation, governmental or governmental subdivision or agency, limited liability company, business trust, estate, trust, partnership, association or any other legal entity.

**H.   "Pollution"** means man-made, man-induced, or artificial alteration of the physical, chemical, biological and radiological integrity of water.

**I.   "Remove vegetation"** means to artificially cut, chemically kill or in any other manner remove any tree greater than fifteen (15) feet in height, any shrubs or trees covering an area of more than 100 square feet, or any grasses covering an area of more than 1,000 square feet.

**J.   "Sewage disposal system"** means an "individual sewage disposal system" as defined in C.R.S. □25-10-103(10), as amended.

**K.   "Surface" or "Surfacing"** means any action resulting in the hardening or covering of the pre-existing ground in an area greater than 100 square feet such that

BLM_0108973

rain or other water striking the area will accumulate or run off the surface to a greater extent than prior to the hardening or covering of the pre-existing ground. Surfacing includes, but is not limited to, such things as compacting the surface of the earth, placing gravel, concrete or like substances on the surface of the earth, or placing of structures upon the ground.

**L.** **"Tributary"** means any watercourse, stream, creek, springs or drainage area which provides a source of supply to the Town's point of potable water diversion, all water sources, drainage areas thereof, and any tributary thereof, from, above and/or affecting such points of diversion or related thereto.

**M.** **"Waterworks"** means any and all man-made or designed components of the Town's water system including, but not limited to, all transmission, storage, treatment and filtration facilities; and all reservoirs, streams, ditches, pipes, drains, and diversion structures used in and necessary for the construction, maintenance, operation, and repair of the Town's water system.

## 9-1-4   PROHIBITED ACTIVITIES AND PERMITTED ACTIVITIES REQUIRING            NOTICE

**A.** It is unlawful for any person to cast, place, dump or deposit in any part of the Town waterworks any substance or material which may injure or obstruct the same or tend to contaminate or pollute the water or obstruct the flow of water through the Town's water facilities. For a distance of five (5) miles upstream from points where the water supply is diverted, no person shall:  (a) throw cast, put or deposit any pollutant or contaminant into or in close proximity to the spring, stream or source from which water is taken, or any of the related tributaries or drainage areas; (b) store or retain any offensive or unwholesome substance on any premises in such position that the substance or drainage therefrom may be carried by natural causes into the spring, stream or source from which water is taken, or any of the related tributaries or drainage areas; or (c) permit to flow into the spring, stream or source from which water is taken, or any of the related tributaries or drainage areas from any place or premises, any foul or contaminating fluid.

**B.** It shall be unlawful for any person to cause injury or damage to the Town waterworks.

**C.** In addition to the general prohibitions contained within the Town of Paonia

-4-

BLM_0108974

Municipal Code, it shall be unlawful for any person to engage in any of the following activities within the Town's Watershed, which activities the Board of Trustees finds pose a potential or threat of injury to the Town's waterworks or pollution to the Town's water supply, unless such person shall, prior to commencement of such activity, receive a permit for such activity under the provisions of this Chapter:

1. Excavation, grading, filling, blasting or surfacing, including rebuilding.
2. Removal of vegetation.
3. Timber harvesting involving one (1) or more acres but excluding the removal of dead or diseased trees for firewood or for noncommercial domestic purposes.
4. Drilling operations.
5. Alteration of water drainage courses.
6. Surface and subsurface mining operations.
7. The out-of-doors spraying or using of herbicides or pesticides unless performed by licensed applicators in compliance with applicable laws, but excepting noncommercial applications for domestic household or gardening purposes.
8. Using, handling, storing or transmitting toxic or hazardous substances, including, but not limited to, radioactive materials, except for noncommercial domestic household purposes as permitted by law.
9. Using, handling, storing, or transmitting flammable or explosive materials, except for domestic purposes, agricultural purposes or within vehicular fuel storage tanks.

**D.** Construction or installation of a sewage disposal system must have a permit pursuant to 9-1-4C., above, unless the Town has been notified and has participated in the process of another appropriate government agency that has issued a permit for same.

**E.** The following activities are permitted, without fee, within the District:

1. Activities performed by or on behalf of the U.S. Forest Service or Bureau of Land Management.
2. Farming activities normal and common within the agricultural community of Delta County, Colorado.
3. Stock grazing.
4. Road maintenance and improvement by governmental entities.

-5-

BLM_0108975

**5.** Maintenance by or on behalf of owners and/or water users' association upon their reservoirs, provided same is approved and permitted by the Bureau of Land Management or U.S. Forest Service.

**6.** Application of herbicides or pesticides, by a licensed applicator, for or on behalf of owners and/or water users' association near their reservoirs, provided same is approved and permitted by the Bureau of Land Management or U.S. Forest Service.

**F.** In the event that any activity not listed in subsection 9-1-4C., above, is being conducted in such a manner that the Board of Trustees finds that there exists a foreseeable risk of injury to the Town's waterworks or pollution to the Town's water supply, the person responsible for such activity shall be notified by the Town of such finding and the Town may require that the activity cease and desist until a permit is obtained for the activity under the provisions of this Chapter.

## 9-1-5  PERMIT AND HEARING PROCEDURE

**A. Application and Fees.**  An applicant for Watershed use permit shall submit the following to the Town Clerk no later than ninety (90) days prior to commencement of a proposed activity:

**1.** A completed application form as prescribed by the Town.  The application shall be completed by the owner of the property on which the proposed activity will occur, or its authorized representative, the latter of whom shall provide evidence satisfactory to the Town of his or her authority to at with respect to the property and who shall also provide a statement setting forth his or her interest in the proposed activity.

**2.** A full and complete description of the proposed activity for which a permit is sought, including, if applicable, a discussion of any future activity anticipated by the applicant with respect to the subject property.

**3.** Two sets of plans and specifications which shall contain the following information:

- 6 -

BLM_0108976

a.   A vicinity sketch map or other data indicating the site location and legal description of the subject property.

b.   Boundary lines of the property for which the permit is sought, if applicable.

c.   Location of any buildings or structures within fifty (50) feet of the proposed activity.

d.   Accurate contours establishing the topography of the existing ground at a minimum of five feet (5') contour intervals for areas with a grade of less than 10%, and at a minimum of twenty feet (20') contour intervals for areas with a grade greater than 10%.

e.   Elevations, dimensions, location, extent and the slopes of all proposed excavating, grading, filling or surfacing shown by contours and/or other means.

f.   Details of all drainage devices in connection with the proposed activity.

g.   A statement of the amount and location of any matter proposed to be deposited in areas other than that shown on the plans.

h.   Nature and location of existing vegetation and a statement as to the effect of the proposed activity on such vegetation.

i.   A vicinity map at a scale of not less than 1" = 2,000' depicting the location of streets, highways, watercourses, and natural drainage courses of streams within one-half (□) mile of the proposed activity site.

j.   The location of the one hundred-year flood plain of any drainage on or adjacent to the site of the proposed activity.

4.   A document identifying any activity that may present or create a foreseeable risk of injury to the Town's waterworks or pollution to the Town's water supply, along with a specific description of the measures,

BLM_0108977

including best management practices, that will be employed by applicant to obviate such risks.

5.   Any and all additional information that may be specifically requested by the Town, including, but not limited to, the following:

    **a.**   A map showing the drainage pattern and estimated runoff of the area of the proposed activity.

    **b.**   Revegetation and reclamation plans and specifications.

    **c.**   A soils analysis, including the nature, distribution and strength of existing soils, and recommendations for earth moving procedures and other design criteria.

    **d.**   A hydrologic geologic analysis of the site and adjacent areas.

    **e.**   An operational and maintenance analysis of the proposed activity.

    **f.**   Water use analysis for the proposed activity, including source, quality, amount of consumptive use, impact on groundwater and discharge characteristics.

6.   An application will not be deemed to be complete until all information required by the Town has been submitted.  The Public Works Director or his/her designee shall have the authority to waive one or more submittal requirements if compliance with the requirement(s) waived is not necessary for proper evaluation of a permit application.

7.   The applicant shall submit the Town a Watershed use permit application fee of $250.00 at the time of filing an application.  The fee set forth in this subsection shall be considered a minimum for each application.  To the extent any application results in the Town paying for outside professional services, including but not limited to engineering, legal, consulting, publication and copying fees associated with the review of the application, the applicant shall pay all such out-of-pocket expenses incurred by the town.  All fees and costs shall be due and payable at the time a statement is presented to the applicant by the Town of Paonia.

BLM_0108978

No Watershed use permit shall be issued until all fees have been paid.

8.     In the event an emergency situation occurs, the responsible party shall contact the Public Works Director or his/her designee with all information available concerning the emergency and the actions taken, planned to be taken or for discussion to determine the appropriate activity for resolving the emergency situation.  Promptly following the response to the emergency situation, the responsible party shall file an application containing all relevant information, with applicable fee, with the Town Clerk.

**B.  Review, Analysis and Classification.**

1.     Within sixty (60) days following receipt of a completed application and site inspection, if necessary as determined by the Town, the Public Works Director or his/her designee shall review the application and prepare an analysis of the proposed activity, including a discussion of any factor that may present or create a foreseeable risk of injury to the Town's waterworks or pollution to the Town's water supply, and including a discussion of the measures, including best management practices, if any, that are proposed by the applicant to obviate such risks.

2.     In undertaking the analysis of any proposed activity, the Public Works Director or his/her designee shall consider the following factors, and any others that may be relevant:

a.     Nature and extent of the proposed activity.

b.     Proximity of the activity to existing water courses, Town water supplies and Town waterworks.

c.     Drainage patterns and control measures.

d.     Soil criteria and erosion potential.

e.     Slope steepness and stability.

f.     Effects of denudation.

-9-

**g.**     Geologic hazards, including, but not limited to, avalanche paths, flood plains, high water tables, fault zones and similar factors.

**h.**     Ambient and non-point source discharges into water.

**i.**      Fire hazard.

**3.**      The Public Works Director or his/her designee may classify in writing an application as "Minor Impact" if the Public Works Director or his/her designee finds, based upon the Public Works Director or his/her designee's analysis, that the proposed activity does not present or create a clear or foreseeable risk of significant injury to the Town's waterworks or pollution to the Town water supply.  If the Public Works Director or his/her designee designates an application as Minor Impact, the Public Works Director or his/her designee shall forward the application, analysis and "Minor Impact" finding to the Board of Trustees and the Board of Trustees shall conduct the hearing required under 9-1-5c, at a regularly scheduled meeting within thirty (30) days of the Public Works Director or his/her designee's determination.  The Board of Trustees shall render a decision regarding the issuance or denial of a District permit to such applicant within the time limits contained in 9-1-5c.  The failure of the Board of Trustees to render such decision within the time limits herein set forth shall be deemed affirmative action on the issuance of the requested permit for any application classified as "Minor Impact".

**4.**      If, upon receipt of an application and review thereof in accordance with the criteria set forth in 9-1-5b, the Public Works Director or his/her designee determines that the proposed activity is of a type or location that will have no negative impact on the Town's waterworks or water supply, the Public Works Director or his/her designee may classify the application as "No Impact".  If such a "No Impact" finding is made, the Public Works Director or his/her designee shall immediately issue a District permit for the proposed activity.  After issuance of said permit, the Public Works Director or his/her designee shall report same to the Board of Trustees at its next regular or special meeting, and shall also keep a record of such "No Impact" permits for the purpose of assessing the cumulative impact of "No Impact" activities.  If the Public Works

-10-

BLM_0108980

Director or his/her designee does not make a "No Impact" determination, that decision may be appealed to and considered by the Board of Trustees at that meeting at which the application is otherwise reviewed. At said meeting the Board of Trustees may, based upon the same standards as set forth above, grant a "No Impact" permit for the proposed activity.

5.    If, upon receipt of an application and review thereof in accordance with the criteria set forth in 9-1-5b, the Public Works Director or his/her designee finds that the proposed activity poses a foreseeable and significant risk of injury to the Town's waterworks or pollution of the Town's water supply, the Public Works Director or his/her designee shall forward the application, analysis, and finding to the Board of Trustees, together with a recommendation that the Board of Trustees deny the permit or issue the permit with conditions. The Board of Trustees shall then review the application and recommendation as provided in 9-1-5c.

**C. Hearing.** Upon receipt of an application, analysis, and finding from the Public Works Director or his/her designee, the Board of Trustees shall conduct a public hearing to review the application and shall render a decision regarding the issuance or denial of waterworks use permit to such applicant within sixty (60) days of receipt of the Public Works Director or his/her designee's analysis. However, if the activity requires approval or a permit from any agency of the county, state or federal government, and the approval time lines for the county, state or federal action exceed that required in this section, the Town shall have until thirty (30) days following the issuance of the county, state or federal permit or approval to render a decision regarding the issuance or denial of a Watershed use permit to such applicant. the Board of Trustees may require additional information from any applicant, in which event the public hearing and decision may be delayed or continued until receipt of such additional information.

**D. Standards for Issuance of Permit.** A Watershed use permit shall be issued when the Board of Trustees finds that the applicant has sustained the burden of proof that the proposed activity, including best management practices, if any, does not present or create a foreseeable risk of injury to the Town's waterworks or pollution to the Town's water supply, or injury or pollution or any water sources tributary thereto for five (5) miles above any point from which water is diverted for use by the Town.

-11-

BLM_0108981

A Watershed use permit shall be denied when the Board of Trustees finds that the applicant has not sustained such burden of proof.

**E.  Permit Conditions.**  The Board of Trustees, in issuing any Watershed use permit, may prescribe any conditions it may deem necessary to effect the intent of this Chapter, including a water augmentation plan acceptable to the Board of Trustees. The Board of Trustees may require any applicant to post a surety bond or cash, based upon the Board of Trustees' analysis of the impact of the proposed activity, in an amount sufficient to ensure compliance with the Watershed use permit, including, but not limited to, the cost of maintenance, operation, revegetation, reclamation, and other requirements intended to further the intent of this Chapter.  The Board of Trustees may release to the applicant portions of any such bond or cash, from time to time, when no longer necessary to ensure compliance with the Watershed use permit.

**F.  Duration of Permit.**  If any proposed activity for which a Watershed use permit is issued is not commenced within twelve (12) months from the date of issuance of such permit, the permit shall expire and become void.

**G.   Notice of Hearing.**   Notice of any public hearing required hereunder shall be given at least ten (10) days in advance of the public hearing by publication in the official newspaper of the Town of Paonia, and by notice to the applicant by registered mail.

**H.   Joint Review Process.**   Any permit required hereunder can be reviewed and issued pursuant to a joint review process with any other government entity or agency charged with the review and approval of the same activity or activities.

## 9-1-6  ENFORCEMENT

**A.   Right of Entry.**   When it is necessary to make an inspection to enforce the provision of this Article or the terms and conditions or any permit, or where reasonable grounds exist to believe that a condition, activity or facility on any premises presents a threat of pollution or injury to any of the Town's water sources, supplies or waterworks, the Public Works Director, or his or her designee, may enter onto such premises at reasonable times to inspect and/or perform such investigation and duties as called for under this Article; provided that if the premises be occupied,

-12-

BLM_0108982

proper identification be shown to the person(s) on the premises and notification of entry made. If the premises are unoccupied, reasonable efforts shall be made to locate and/or provide notice to the owner or operator of the land or facility in question of the desired access.

**B. Stop Work Order.**  Whenever any work or activity is being done contrary to the provisions of this Chapter, or in violation of the terms of any Watershed use permit issued hereunder, the Town or its authorized representatives may order the work stopped by notice in writing served on the applicant or any person engaged in or causing such activity to be done, and such person shall cease such activity until authorized by the Town to proceed. The Town shall reserve the right to revoke or suspend any permit issued hereunder if work is not done in accordance therewith.

## 9-1-7  OTHER REMEDIES

In addition to any other remedies provided by this Chapter, the Town of Paonia Municipal Code, state or federal law, the Town attorney, on behalf of the Town, may commence an action in a court of competent jurisdiction for a temporary restraining order or preliminary or permanent injunctive relief restraining any violation of this Chapter.

## 9-1-8  ACTIVITY IN PROGRESS

The lawful continuance of any activity in progress at the time of the enactment of this Chapter may be continued even though it does not conform to the requirements of this Chapter.  For purpose of this Section, an "activity in progress" is a building, construction, land use or other activity which has been finally permitted by all other governmental agencies having jurisdiction thereover, and which has been physically commenced. Ordinary repairs and maintenance of any existing building, structure or land shall be allowed. Any change, expansion, alteration or enlargement of such existing lawful use shall be subject to all requirements of this Chapter.

## 9-1-9  VIOLATION AND PENALTY

**A.  Offense.**  Any person who violates any of the provisions of this Chapter shall be fined in an amount not to exceed $1,000.00 for each offense. Any person who willfully and wantonly violates any provisions of this Chapter shall be fined not to exceed $1,000.00 for each offense and/or by imprisonment not exceeding one (1) year, or by both. Each day a violation occurs shall be deemed a separate offense.

-13-

**B.  Remedies.**  The remedies herein provided shall be cumulative and not exclusive and shall be in addition to any other remedies provided by law.  Nothing herein shall be construed a waiver of any civil remedies available to the Town.

## 9-1-10  APPEAL

Any person desiring to appeal any decision or determination by the Board of Trustees hereunder must file such appeal within thirty (30) days following such decision or determination with the District Court of the County of Delta, State of Colorado.

## 9-1-11  DISTRICT MAP

The Watershed Map shall be amended in the event any change in the Town's waterworks or diversion points for its water supply materially alter the geographical extent of the Town's jurisdiction under this ordinance.

All other ordinances, resolutions and other provisions of the Town of Paonia, Colorado, or parts thereof, in conflict or inconsistent herewith, and to the extent they are in conflict or inconsistent herewith, are hereby repealed; provided, however, that the repeal of any ordinance, resolution, other provisions of the Town of Paonia, Colorado, or parts thereof, shall not revive any other section of the same heretofore repealed and superseded.

**INTRODUCED, READ, PASSED AND ORDERED PUBLISHED** by the Board of Trustees of the Town of Paonia, Colorado, this 25th day of February, 2003.

Town of Paonia, Colorado
By:
  Mayor

**-14-**

BLM_0108984

**ATTEST:**

Town Clerk

BLM_0108985

Date ___12/14/10___                 Location ___Telluride___

(Approx 35-40 in attendance

**Attendees at BLM Public Meeting re: San Miguel/Dolores Rivers' Wild/Scenic Designation:**

Name

ERIK DALTON

AARON KEMPLE

LONNIE TAYLOR

Linda Luther

Suzanne Sellers

Rusty Scott

Karen Janes

Leigh Sullivan/SMWC

Bob & Chris Newman

Phil Hayden

Mely Whiting

John Duncan        Tell

Cari Mackey    PO BOX

Karen Gonglielmone    291

JOAN MAY

Date 12/15/10 Location Norwood

Approx 90 in attendance

Attendees at BLM Public Meeting re: San Miguel/Dolores Rivers' Wild/Scenic Designation:

| Name | Address |
| --- | --- |
| Connie Cotter | |
| Peter Mueller | |
| Marshall Pendergrass | |
| Nate Smith | |
| Jenny Russell | |
| Tom Kyle | |
| Joe Reagan | |
| Dave Schnee | |
| Jerry Spor | |
| Dave Alexander | |
| Landon Bray | |
| Herb McHarg | |
| Ruth Christensen | |
| Earl Reams II | |

Date  12/15/10                    Location  NORWOOD

**Attendees at BLM Public Meeting re: San Miguel/Dolores Rivers' Wild/Scenic Designation:**

**Name**                    **Address**

Marlin and Debra Lu...

LONNIE TAYLOR

Ilene Lewis

Calvin + Judy nobles

Patty Bennett

Patti Grafmyer

Mike Grafmyer    P.O. Box ll... Norwood

Sally & Henry Kiche...

Cherri Cooper

Kelvin Verity

David Andrews

Bree Richa...

Bobby + Charlene Starks

Bruce K. Irvine

Linda Luther

BLM_0108988

**James Bode**

| | |
|---|---|
| **From:** | Site Administrator <info@cecenviro.org> on behalf of L. Shaffer <the.forest.edge@gmail.com> |
| **Sent:** | Monday, December 20, 2010 8:54 PM |
| **To:** | uformp@blm.gov |
| **Subject:** | Dolores River Basin |

Dec 20, 2010

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection. Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update. Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor. BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity; *prove that the long-term ecological health of the area will not be jeopardized; *have viable reclamation plans in place before permits can be granted; and *have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Ms. L. Shaffer

BLM_0108989

4475 Red Forest Rd
Monument, CO 80132-8287

BLM_0108990

DEPARTMENT OF THE INTERIOR
U.S. GEOLOGICAL SURVEY

# GEOLOGIC MAP OF THE COURTHOUSE MOUNTAIN QUADRANGLE, GUNNISON, HINSDALE, AND OURAY COUNTIES, COLORADO

By Robert G. Dickinson

DICKINSON—GEOLOGY, COURTHOUSE MOUNTAIN QUAD., COLORADO    1:24,000    MAP GQ-1644

Ouray, Hinsdale & Gunnison Counties

GEOLOGIC QUADRANGLE MAP
Published by the U.S. Geological Survey, 1988

BLM_0108991

## James Bode

| | |
|---|---|
| **From:** | Site Administrator <info@cecenviro.org> on behalf of Tiffany Freer <tjoy.freer@gmail.com> |
| **Sent:** | Monday, January 03, 2011 9:56 PM |
| **To:** | uformp@blm.gov |
| **Subject:** | Protect the Dolores River Basin |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |
| | |
| **Categories:** | WSR_to_be_filed |

Jan 3, 2011

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection. Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update. Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor. BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity; *prove that the long-term ecological health of the area will not be jeopardized; *have viable reclamation plans in place before permits can be granted; and *have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.

BLM_0108992

Thank you for this opportunity to participate!

Best

Ms. Tiffany Freer
1000 Golden Park Dr Apt C
Golden, CO 80403-2434

BLM_0108993



A Touchstone Energy® Cooperative

**RECEIVED**

JAN 1 3 2011

**UNCOMPAHGRE FIELD OFFICE**

We energize and serve our communities

January 11, 2011

Ms. Barbara Sharrow
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Subject: Utility Right-of-Way and Related Information for BLM's Suitability Analysis for Wild and Scenic River Segments

Dear Ms. Sharrow,

This letter and attachments contain pertinent information on Delta-Montrose Electric Association's (DMEA) public utilities and activities, which are permitted and/or allowed within the BLM's study areas for river segments under consideration for designation under the Wild and Scenic Rivers Act (WSRA, Public Law 90-542; 16 U.S.C. 1271 et seq.).

As part of the BLM's Stakeholder group for the BLM's update of the Uncompahgre Field Office Resource Management Plan (RMP), DMEA is providing information on DMEA's utility system and access requirements as well as available information on other known regional transmission facilities and major pipelines.

DMEA is a nonprofit electric cooperative, responsible for providing reliable power to nearly 35,000 customers within the Delta and Montrose County service area. Our obligations to our cooperative members/owners require that DMEA retain our rights to operate and maintain our existing utilities and access, and make necessary system improvements in the future.   A description of DMEA's standard construction, operation and maintenance practices is enclosed as ***Attachment 1.***  In summary, DMEA must retain the ability to perform the following critical functions and activities on existing utilities within WSR study areas:

- Access to existing structures, hardware and lines, on a year-round basis for maintenance, repair, and possible upgrade.

- Inspection of existing facilities and rights-of-way for routine maintenance on a yearly basis.

- Maintenance of existing facilities, including the repair or replacement of existing structures, line or hardware on an as needed basis.

- Maintenance of the DMEA right-of-ways, including possible vegetation trimming or clearing, and minor road repair.

BLM_0108994

DMEA has researched the various river segments evaluated in BLM's "Final Wild and Scenic River Eligibility Report", June 2010, to determine where existing DMEA systems are within the BLM's study areas.   River Segments, having existing utilities and related access within the BLM's study areas, include, but may not be limited to the segments listed below.  The location of other known utility infrastructure is also noted.

Hydrologic Unit 1 – Lower Gunnison
- 4 – Escalante Creek, Segment 2 – distribution lines (DMEA) and access roads
- 5 – Gunnison River, Segment 2 – distribution lines (DMEA) and access roads
- 6 – Gunnison River, Segment 3 – distribution lines (DMEA), railroad (Union Pacific), 345kV transmission line (Western/Tri-State/Xcel), 115kV transmission line (Tri-State), gas line (Trans-Colorado Natural Gas Co.), and access roads
- 11 – Roubideau Creek, Segment 2 – 345kV transmission line (Western/Tri-State/Xcel), 115kV transmission line (Tri-State), gas line (Trans-Colorado Natural Gas Co.), distribution lines (DMEA), and access roads serving each utility

Hydrologic Unit 2 – North Fork of the Gunnison
- 12 – Deep Creek – distribution line (DMEA) and access roads
- 13 – West Fork Terror Creek – 230kV transmission line (Western) and access roads

Information on DMEA's utility facilities, rights-of-way, and access are described for each segment in this letter.

DMEA requests that BLM's suitability analysis incorporate the information provided in this submittal, and through the Stakeholder Group meetings, to accurately reflect the degree of public utility access, activities, and developments that are permitted and needed in the future in order to meet the power supplies required by our customers, and electric reliability standards required by WECC.  Based on BLM's "Final Wild and Scenic River Eligibility Report", June 2010, we understand that BLM will use a number of criteria in determining the suitability of each river segment to be designated under the NWSRS, including:

- *Characteristics which do or do not make the area a worthy addition to the NWSRS (Criteria 1)*

- *Status of land ownership, surface and subsurface minerals, area use, including the amount of private land involved and associated or incompatible uses.  Jurisdictional consideration (including administrative role and/or presence) must be taken into account to the extent that management would be affected (Criteria 2)*

- *Reasonably foreseeable potential uses of the land and related waters which would be enhanced, foreclosed or curtailed if the area were included in the NWSRS, and the values which could be foreclosed or diminished if the area is not protected as part of the NWSRS (Criteria 3)*

2

BLM_0108995

- *Federal, public, state, tribal, local or other interests in designation or non-designation of the river (Criteria 4)*

- *Where appropriate, estimated costs associated with acquiring lands or interests in lands, and administering the area if it were to be added to the NWSRS (Criteria 5)*

- *Ability of the agency to manage and/or protect the river area or segments as a WSR, or other mechanisms (existing and potential) to protect identified values other than WSR designation (Criteria 6)*

- *Historical or existing rights which could be adversely affected (Criteria 7)*

*(Source: BLM, Final Wild and Scenic Eligibility Report, June 2010, page 110-111; Note: DMEA has added the criteria numbers for reference purposes)*

DMEA's rights and responsibilities to maintain our electrical system and access roads within these river corridors significantly diminish their suitability for a WSR designation. According to BLM's WSR suitability criteria 2, 3 and 7, the presence of our existing facilities, other major utility facilities, access and maintenance requirements, and future system improvements which may be required would make these segments unsuitable for the WSR designation. Our specific comments and supporting maps are provided below by river segments.

## Hydrologic Unit 1 – Lower Gunnison

### 4 – Escalante Creek, Segment 2 – Existing Distribution Lines (DMEA) and Access

DMEA currently operates and maintains approximately 3.5 miles of distribution line which currently serves 7 customers in Escalante Canyon. The distribution line crosses Escalante Creek several times, and a combination of an unpaved county road, farm roads and trails, and spur roads are used for local access and maintenance of this line. Land ownership is primarily private or state along the creek (8.48 miles), with minimal public lands administered by BLM (less than one mile). (See DMEA distribution line map – Map entitled "Escalante Creek, Segment 2".)

BLM's preliminary classification for this segment is recreational. **DMEA recommends this segment not be designated as recreational, due to the segment and study area not meeting criteria 2, 3 and 7.** BLM's management of lands along the creek segment is very limited; and access to, and maintenance of existing and future improvements to DMEA's system could be jeopardized if designated as recreational, under BLM's Manual 8351 – Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation and Management, Section .51C2i Rights-of-Way.

Section .51C2i states:

*Rights-of-Way.   New transmission lines, natural gas lines, water lines, etc., are discouraged unless specifically authorized by other plans, orders, or laws. Where no reasonable alternate*

3

*location exists, additional or new facilities should be restricted to existing rights-of-way. Where new rights-of-way are unavoidable, locations and construction techniques shall be selected to minimize adverse effects on recreational river area related values and fully evaluated during the site selection process.*

### 5 – Gunnison River, Segment 2 – Existing Distribution Lines (DMEA) and Access

DMEA currently maintains several distribution lines within one-fourth mile of the Gunnison River Segment 2. Although BLM manages all lands along the less than 0.4 mile long river segment, approximately 43% of the BLM corridor study area consists of private lands. DMEA's distribution lines serve several private customer/meters within this area, as shown on map entitled "Gunnison River, Segment 2".)

BLM's preliminary classification for this segment is recreational. **DMEA recommends this segment not be designated as recreational due to the segment and study area not meeting criteria 2, 3 and 7.** BLM's management of study area lands is limited; and the access and maintenance of existing and future improvements to DMEA's electric system could be jeopardized if designated as recreational, under BLM's Manual 8351 – Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation and Management, Section .51C2i Rights-of-Way. (Described above under Escalante Creek, Segment 2).

### 6 – Gunnison River, Segment 3 – Existing Distribution Lines (DMEA), railroad (Union Pacific Railroad), 345kV transmission line (Western/Tri-State/Xcel), 115kV transmission line (Tri-State), gas line (Trans-Colorado Natural Gas Co.), and access

DMEA currently operates and maintains approximately 5.2 miles of overhead distribution line along this river segment. This distribution line is the sole source of electric power to landowners living and working beyond this segment in Escalante Canyon. BLM issued a right-of-way grant (serial number COC-57740) to DMEA in 1995 for a 25 foot wide ROW to construct, operate, and maintain a single phase overhead powerline and a new single phase underground power line on public lands. The distribution line crosses the Gunnison River in several locations, and a combination of unpaved roads, trails and spur roads are used for access and maintenance purposes. In total, there are approximately 1,616 acres of private lands within the BLM's one-half mile wide corridor for which DMEA is responsible to provide power to customers, primarily in the Escalante Canyon area. (See DMEA distribution line map – "Gunnison River, Segment 3".)

The Union Pacific Railroad also provides rail service to Delta & Montrose Counties over tracks located along this river segment.

It should also be noted that on the eastern end of the river segment a major utility corridor is found (345kV & 115kV high voltage transmission lines, and a major gas pipeline). The ROW easements associated with the multiple-utility corridor (infrastructure and access) exist in this area.

BLM's preliminary classification for this segment is recreational. **DMEA recommends this segment not be designated as recreational due to the segment and study area not meeting**

4

criteria 2, 3 and 7 when considering the existing power line and railroad. While BLM manages approximately 80% of the river segment, land ownership within the one-half mile wide study corridor consists of approximately 37% non-federal lands. Access to and maintenance of DMEA's existing facilities, and future system improvements, could be jeopardized if designated as recreational, under BLM's Manual 8351 – Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation and Management, Section .51C2i Rights-of-Way. (Described above under Escalante Creek, Segment 2).

## 11 – Roubideau Creek, Segment 2 – Existing Distribution Lines (DMEA), 115kV (Tri-State) and 345kV (Xcel Energy, Tri-State and Western) Transmission Lines, Gas Line (Trans-Colorado Natural Gas Co.), and access

DMEA currently maintains approximately 2.0 miles of distribution lines, serving 10 customers on private lands, within the BLM's one-half mile wide study corridor. In total, non-federal lands account for 54.5 % of the river segment length and approximately 40% of the landownership within the one-half mile wide corridor. Existing access to DMEA's lines is provided via existing county and private roads and trails.

In addition, Tri-State owns/maintains an existing 115kV transmission line, and Tri-State, Western and Xcel Energy owns/maintains a 345kV transmission line - both of which cross this river segment. Access roads used to operate and maintain this wide utility infrastructure also cross this river segment near its midpoint. (See Existing Utilities Map entitled "Roubideau Creek, Segment 2".)

BLM's preliminary classification for this segment is scenic. DMEA recommends this segment not be designated as scenic, under criteria 2, 3, and 7. Access to, and maintenance of existing and future improvements to DMEA's system could be jeopardized if designated as scenic, under BLM's Manual 8351 – Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation and Management, Section .51CB2i Rights-of-Way.

Section .51B2i states:

*Rights-of-Way.   New transmission lines, natural gas lines, water lines, etc., are discouraged unless specifically authorized by other plans, orders, or laws. Where no reasonable alternate location exists, additional or new facilities should be restricted to existing rights-of-way. Where new rights-of-way are unavoidable, locations and construction techniques shall be selected to minimize adverse effects on scenic river area related values and fully evaluated during the site selection process.*

## Hydrologic Unit 2 – North Fork of the Gunnison

## 12 – Deep Creek – Existing Distribution Lines (DMEA) and Access

On BLM lands in this river corridor, DMEA maintains an overhead distribution line which was authorized by BLM in 1983 under Right-of-Way grant serial number C-3666. This power line is the

5

sole source of power to the 96 DMEA customers (46 miles of line) living north of this area. DMEA's distribution line crosses Deep Creek near BLM's southern boundary and stays within ¼ mile of the creek as it crosses the BLM parcel and back on to private lands. DMEA also uses an existing dirt road on this BLM parcel, which winds from one side of the canyon to the other, to access the distribution line for maintenance and repair activities.

In total, this river segment crosses approximately 2.0 miles of private lands and only 0.6 mile of public lands administered by BLM. Private lands within the 0.5 mile corridor account for more than 84% of the corridor area. (See DMEA distribution line map –entitled "Deep Creek")

BLM's preliminary classification for this segment is scenic. **DMEA believes this segment should not be designated as scenic, under criteria 2, 3, and 7** since BLM manages a small percentage of the land involved, and future improvements to existing lines may not be authorized under BLM's Manual 8351 – Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation and Management - Section .51B2i Rights-of-Way. (Described above under Roubideau Creek, Segment 2).

### 13 – West Fork Terror Creek – Existing 230kV Transmission Line (Western) and access

An existing Western Area Power Administration 230kV high voltage transmission line crosses the West Fork Terror Creek river segment near the BLM/private southern property boundary. Within the 1/2-mile river corridor, Western also uses roads, trails and spur roads to gain access to the transmission line.

In total, private lands account for approximately 61% of the river segment length, and over 52.5% of the landownership within the corridor is non-federal as well. It should also be noted that the private parcel fragments the BLM ownership of the river into two segments.

(See Existing Utilities Map, entitled "West Fork Terror Creek")

BLM's preliminary classification for this segment is scenic. **Again, DMEA recommends this segment not be designated as scenic under criteria 2, 3, and 7.** BLM's management of lands is limited; and access to, and maintenance of existing facilities and future improvements may be jeopardized if designated as scenic, under BLM's Manual 8351 – Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation and Management, Section .51CB2i Rights-of-Way. (Described above under Roubideau Creek, Segment 2).

Also, private land in this area has the potential need of electrical service sometime in the next 20 years. Electric rights-of-way to the private lands should be considered and provided for in the revised RMP.

In conclusion, after review of the utility infrastructure in each of these river corridors and after review of the criteria used to determine the suitability of each river segment under the NWSRS, DMEA requests that BLM not change management designations on any of the river segments mentioned above.

6

DMEA appreciates the opportunity to work with BLM on the Wild and Scenic River suitability evaluations.   Should BLM decide to designate any of the segments discussed in this letter, DMEA requests that appropriate language be included in the RMP and ROD to protect the utility's rights and obligations to maintain our existing facilities and access, and to meet our customers' future needs through maintenance, repair, and upgrade.

Very truly yours,

Steven Metheny
Assistant General Manager

Cc:
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401

Katie Stevens
Manager, McInnis Canyons NCA
Bureau of Land Management
2815 H Road
Grand Junction, CO  81506

Karl Myers
Transmission Environmental Engineer
Tri-State Generation & Transmission Assoc.
PO Box 33695
Denver, CO  80233-0695

7



## Attachment 1 – Summary of DMEA Operation and Maintenance Standards

**Annual Inspections:**  To ensure the safety and reliability of the DMEA's system, inspections may be conducted including inspection of supporting structures, hardware, shield wires, ground wires, guy wires, anchors, and ROW.  On-the-ground inspections may involve the use of 4-wheel drive pickup trucks and/or ATVs. If maintenance or replacements of the insulators, hardware or shield wires is needed, large bucket and boom trucks will be required to access the transmission line using existing authorized access roads. Aerial patrols are also made to inspect power lines if needed.

**Maintenance Activities – Structures and Hardware:**  The long-term maintenance of DMEA's facilities may include the following range of activities:

- Replacing part(s) of an existing structure or rebuilding the structure in its entirety
- Reinforcing a structure with additional braces and supports
- Relocating a structure up or down the line within the ROW
- Inspection and testing of the materials that make up the distribution line
- Increasing the height of a structure(s) to ensure adequate clearances for electrical safety
- Transporting heavy trucks to structures
- Clearing or trimming vegetation within the ROW to protect the lines from damage
- Maintain access roads and trails for heavy truck access, including vegetation management
- Smoothing out excessive ruts with the use of a dozer or blade
- Installing gates and culverts

**Access Roads:**  Maintaining year-round access for maintenance and repairs is required. Maintenance equipment varies depending on the activity.  In general, the types of equipment that may be needed includes bulldozers, tractors, grading crawlers, bucket trucks, flat bed trucks, wire pullers, cranes, snowcats, and full size pickup trucks for crew vehicles.

Access roads are used for routine maintenance and repairs and during emergency electrical outages.  Emergency outages may be caused by lightning strikes, high winds, vandalism, or equipment failure.  DMEA maintains authorized access roads on public lands in accordance with BLM right-of-way grants.  Roads are maintained to enable the safe passage of line maintenance vehicles and equipment to each transmission structure.  Large bucket and boom trucks may need to access each of the structure sites.  Since bucket and boom trucks have a higher than average center of gravity, access roads must be level or flat (5% or less side-to-side grade) for safe passage.  Periodic grading of access roads is performed to accomplish these standards, where necessary.

115KV TLINE

345KV TLINE

GAS LINE

DMEA POWER LINE

ESCALANTE CREEK, SEGMENT2

GUNNISON RIVER, SEGMENT 3

BLM_0109002

DMEA POWER LINES

GUNNISON RIVER, SEGMENT 2

BLM_0109003



ROUBIDEAU CREEK, SEGMENT 2

BLM_0109004



BLM_0109005

230 KV

creek

BLM

WEST FORK TERROR CREEK

BLM_0109006

**James Bode**

| | |
|---|---|
| **From:** | Steven Steinberg <stevensteinberg@earthlink.net> |
| **Sent:** | Tuesday, January 11, 2011 8:43 AM |
| **To:** | UFORMP@BLM.GOV |
| **Subject:** | san miguel |
| **Attachments:** | W&S-BLMComments-FormLetter.doc |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

please see attached comments. Thank you for your consideration.
steven steinberg

1

BLM_0109007

< steven steinberg >
< 22187 highway 145 placerville co 81430 >
< stevensteinberg@earthlink.net >

**January 20, 2011**

Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Sent via email to:

UFORMP@BLM.GOV

**Re: Wild and Scenic Rivers Suitability Determination – Dolores River Basin, including San Miguel and tributaries**

To Whom It May Concern:

I appreciate the efforts of the Bureau of Land Management (BLM) Uncompahgre Field Office (UFO) to carefully assess the irreplaceable values of the Dolores and San Miguel Rivers and to identify administrative protections that can preserve these values for future generations.

I provide the following recommendations regarding Wild and Scenic Suitability:

I have considered the issues and alternatives relevant to the Dolores and San Miguel river basins and tributaries. I did not consider issues and alternatives related to the Lower Gunnison watershed.

- I am a landowner along the San Miguel River. 22187 highway 145.
- I am a San Miguel County Resident and have lived in the region for 20 years.
- I work in San Miguel County as a small business owner.
- I am an avid kayaker and fisherman.
- I am most familiar with the San Miguel from Telluride to Naturita and feel this entire stretch should be considered for wild and scenic status due to the incredible scenic value it affords, as well as the outstanding recreational opportunities it provides.

BLM_0109008

Thank you for your serious consideration of my comments.  The BLM is welcome to contact me if any further discussion is needed.


Sincerely,


**Steven Steinberg**
**22187 highway 145 placerville co 81430**
**stevensteinberg@earthlink.net**

## James Bode

| | |
|---|---|
| **From:** | Kiera Skinner <kiera@visittelluride.com> |
| **Sent:** | Thursday, January 13, 2011 4:28 PM |
| **To:** | UFORMP@BLM.GOV |
| **Subject:** | Letter of Support |
| **Attachments:** | BLM Letter.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hello,

Attached is a letter of support for Wild and Scenic.

Please let me know if you have any questions.

Best Regards,

Kiera Skinner
Director of Sales & Marketing

TELLURIDE TOURISM BOARD
700 West Colorado Avenue | PO Box 1009
Telluride, CO 81435
P. 970.728.3041 | D. 970.369.2112 | F. 970.728.6475
VisitTelluride.com

 Like us    Follow us

BLM_0109010

**Kiera Skinner**
**Telluride Tourism Board**
**700 West Colorado Avenue, Telluride, CO 81435**
kiera@VisitTelluride.com

**January 20, 2011**

Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Sent via email to:

UFORMP@BLM.GOV

**Re: Wild and Scenic Rivers Suitability Determination – Dolores River Basin,**
**including San Miguel and tributaries**

To Whom It May Concern:

The Telluride Tourism Board appreciates the efforts of the Board of Land Management
(BLM) Uncompahgre Field Office (UFO) to carefully assess the irreplaceable values of
the Dolores and San Miguel Rivers and to identify administrative protections that can
preserve these values for future generations.

The San Miguel River is nearly incomparable across the western United States for its
ecological settings, remote and thriving backcountry, naturally varying and flowing river
and streams, contribution to important water systems in several states, and overall scenic
wonder.

Every eligible stream segment in the San Miguel watershed should receive prompt,
extensive, and reliable protection, both through Wild & Scenic Suitability findings and
through clear and firm management prescriptions in the BLM's resource management
plan. Preservation of the San Miguel and its tributaries is extremely important to local
communities such as Telluride – it contributes majorly to the quality of life that our
residents and visitors value so greatly. The Telluride Tourism Board and a number of
businesses from Telluride depend on native fish and scenic appeal from the San Miguel
to thrive – including a number of fly fishing and guiding services. These businesses,
which provide valuable recreational opportunities in a tourism economy, utilize many of
the river reaches within the segments identified. Recreational boating is likewise a
source of river recreation that provides a significant amount of business in our region.

In terms of environmental stewardship, the Telluride Tourism Board and many area
organizations have invested heavily in preserving and promoting the values of the San
Miguel.

BLM_0109011

The San Miguel River system as a whole is inclusive of outstandingly remarkable values
in terms of natural flows, river health, riparian habitat, recreational opportunities and
scenery. Accordingly, the Telluride Tourism Board believes that the majority of stream
segments under consideration by the Uncompahgre Field Office that are found to be
Eligible as Wild and Scenic Rivers would also be best preserved by a determination of
Suitability for Wild and Scenic Rivers.

Thank you for your serious consideration of our comments.

Sincerely,

**Kiera Skinner**
**Telluride Tourism Board**
**700 West Colorado Avenue, Telluride, CO 81435**
**Kiera@VisitTelluride.com**

U.S. DEPARTMENT OF THE INTERIOR   **BUREAU OF LAND MANAGEMENT NEWS RELEASE**

**Release Date:** 01/18/11
**Contacts:** Deanna Masterson,        303-239-3671
            Bruce Krickbaum,        970-240-5384

## BLM Uncompahgre Resource Management Plan Advisory Group to Meet (01-14-11)

MONTROSE, Colo. — The Bureau of Land Management's Southwest Colorado Resource Advisory Council subgroup is scheduled to meet to discuss recommendations for the Uncompahgre Field Office's Resources Management Plan.

The meeting is scheduled from 9a.m. to noon, Jan. 28, at the Holiday Inn Express Jordan Room, 1391 South Townsend Ave., Montrose, CO. The meeting is open to the public, with a public comment period scheduled for 11 a.m.

The Southwest Colorado RAC subgroup is composed of area residents representing diverse interests within the Uncompahgre Field Office. The seven-member subgroup will provide recommendations to the BLM Southwest Colorado RAC regarding development and implementation of the public lands within the field office.

The Southwest Colorado RAC is one of three advisory councils to BLM Colorado. Composed of 15 members appointed by the Secretary of the Interior, individuals serving in each RAC represent a broad range of public land interests, ranging from environmental to local government to commercial activity. For more information on Colorado RACs, go to www.blm.gov/co and select Resources, then Resource Advisory Councils.

The BLM manages more land - more than 245 million acres - than any other Federal agency. This land, known as the National System of Public Lands, is primarily located in 12 Western states, including Alaska. The Bureau, with a budget of about $1 billion, also administers 700 million acres of sub-surface mineral estate throughout the nation. The BLM's multiple-use mission is to sustain the health and productivity of the public lands for the use and enjoyment of present and future generations. The Bureau accomplishes this by managing such activities as outdoor recreation, livestock grazing, mineral development, and energy production, and by conserving natural, historical, cultural, and other resources on public lands.

--BLM--

2465 South Townsend Avenue     Montrose, CO 81401

Last updated: 01-18-2011

USA.GOV  |  No Fear Act  |  DOI  |  Disclaimer  |  About BLM  |  Notices  |  Get Adobe Reader®
Privacy Policy  |  FOIA  |  Kids Policy  |  Contact Us  |  Accessibility  |  Site Map  |  Home

**James Bode**

| | |
|---|---|
| **From:** | jimdj56@aol.com |
| **Sent:** | Monday, January 17, 2011 10:05 AM |
| **To:** | uformp@blm.gov |
| **Subject:** | Comment form wild and scenic river |
| **Attachments:** | 20110117065555.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

    Attached is my comment form for wild and scenic river suitability.
Thank you,
James Johnston

BLM_0109014

# Bureau of Land Management
# Public Meetings re: San Miguel and Dolores Rivers

## COMMENTING ON WILD AND SCENIC RIVER SUITABILITY

Thank you for your interest in providing comments regarding Wild and Scenic River suitability for the BLM Uncompahgre planning effort.

## COMPLETING THE RIVER SEGMENT COMMENT FORM

Comments may be typed or handwritten.

**Submit written comments by January 20, 2011:**

- Scan and email completed forms to: UFORMP@BLM.GOV
- Or mail completed forms to: BLM Uncompahgre Field Office, 2465 South Townsend Avenue, Montrose, Colorado 81401

Please:

- Address only those eligible river segments about which you have specific knowledge or concerns.
- For each segment, address only those Wild and Scenic suitability criteria about which you have specific knowledge or concerns.
- Be factual and as specific as possible regarding issues, locations, dates, and times.

## PROVIDING EFFECTIVE COMMENTS

**Substantive comments do one or more of the following:**

- Raise issues the BLM has not considered and reinforce issues the BLM has already identified
- Present reasonable alternatives
- Present information that can be used when developing alternatives or considering the impacts of alternatives

## TYPES OF COMMENTS TO AVOID

**Comments that are not substantive include:**

- Comments in favor of or against an action without providing a rationale (such as "I don't like...").
- Comments that simply agree or disagree with BLM policy.
- Comments without justification or supporting data (such as "allow more grazing").
- Comments in the form of vague, open-ended questions.

BLM_0109015

## RIVER SEGMENT COMMENT FORM

My comments specifically regard the following river/creek segment:

| | | | |
|---|---|---|---|
| ___ | Beaver Creek | ___ | Tabeguache Creek, Segment 1 |
| ___ | Dry Creek | ___ | Tabeguache Creek, Segment 2 |
| ___ | Naturita Creek | ___ | Lower Dolores River |
| ___ | Saltado Creek | ___ | North Fork Mesa Creek |
| ___ | San Miguel River, Segment 1 | X | Dolores River, Segment 2 |
| ___ | San Miguel River, Segment 2 | ___ | Ice Lake Creek, Segment 2 |
| ___ | San Miguel River, Segment 3 | ___ | La Sal Creek, Segment 1 |
| ___ | San Miguel River, Segment 4 | ___ | La Sal Creek, Segment 2 |
| ___ | San Miguel River, Segment 5 | ___ | La Sal Creek, Segment 3 |
| ___ | San Miguel River, Segment 6 | ___ | Lion Creek, Segment 2 |
| ___ | San Miguel River, Segment 1 | ___ | Spring Creek |

**Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.**

### GENERAL

**1. Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin.**

As a property owner, as long as water rights are retained along private segments of the River, I consider the WSR designation as a positive and appropriate designation for the Dolores & San Miguel Rivers.

**2. Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.**

**3. Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation.**

There are species of plants and animals that would benefit from WSR designation in D.R. Segment 2. There is also potential to enhance + restore habitat that has been adversely effected by land use practices and the flow control of McPhee Reservoir.

BLM_0109016

## LAND OWNERSHIP AND USES

**4. Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.**

**5. Compatibility or incompatibility of designation with current land and water uses and development.**

As a landowner along the Dolores River, Segment 2 (upper portion), I have water rights, which I plan to continue using. I am planning to move my point of diversion to another location on the property for small scale pumping (.25-.50 cfs)/irrigating. Would NWSRS designation effect my ability to file for a point of diversion change? My current point of diversion is in the Dolores R., Segment 1.

**6. Reasonably foreseeable potential land and water development and uses that could be affected by designation.**

## ADMINISTRATION

**7. Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.**

**8. Consistency of designation with other BLM plans, programs, and policies and regional objectives.**

9. **Issues that might make administering this segment difficult.**

10. **Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.**

### ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY

Name (optional): _James D Johnston_

Please contact me to discuss further:   (Yes)      **No**

If yes, contact information: _970 864 7892   Email Jmd3 56@aol.Com_

**James Bode**

| | |
|---|---|
| **From:** | Jean-Pierre Fillebeen <jeanpierrefillebeen@hotmail.com> |
| **Sent:** | Monday, January 17, 2011 8:46 PM |
| **To:** | uformp@blm.gov |
| **Subject:** | saltado creek suitability |
| **Attachments:** | Jan 17,2011.doc |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Please find attached our comments.
Thanks

1

## RIVER SEGMENT COMMENT FORM

My comments specifically pertain to the following stream segment:

| | | | |
|---|---|---|---|
| ___ | Beaver Creek | ___ | Tabeguache Creek, Segment 1 |
| ___ | Dry Creek | ___ | Tabeguache Creek, Segment 2 |
| ___ | Naturita Creek | ___ | Lower Dolores River |
| X | Saltado Creek | ___ | North Fork Mesa Creek |
| ___ | San Miguel River, Segment 1 | ___ | Dolores River, Segment 2 |
| ___ | San Miguel River, Segment 2 | ___ | Ice Lake Creek, Segment 2 |
| ___ | San Miguel River, Segment 3 | ___ | La Sal Creek, Segment 1 |
| ___ | San Miguel River, Segment 4 | ___ | La Sal Creek, Segment 2 |
| ___ | San Miguel River, Segment 5 | ___ | La Sal Creek, Segment 3 |
| ___ | San Miguel River, Segment 6 | ___ | Lion Creek, Segment 2 |
| ___ | San Miguel River, Segment 1 | ___ | Spring Creek |

Please address only the characteristics (below) regarding this segment about which you have specific knowledge, concerns, or comments.

### GENERAL

1. Characteristics which might or might not qualify this segment for WSR designation, including this segment's contribution to the integrity of a river system or basin. *We have specific knowledge / experience of the Saltado Creek as we hiked / shared times along its wild shoreline (shelter for bears and big cats)*

2. Known federal, state, regional, tribal, local, or other public interests in designation or non-designation.

3. Outstandingly remarkable values (ORVs) that could be affected by designation or non-designation. *Unique example of a really wild forest not at all affected by any development or construction. If designation would preserve this outstanding situation.*

BLM_0109020

**LAND OWNERSHIP AND USES**

4. Status of land and mineral ownership for this segment and the associated river corridor, including historical or existing rights that could be adversely affected by designation or lack of designation.

*Current land status ($ 75/80% BLM or Federal) seems ideal for a designation. Any possible construction or mineral activities would threaten the Saltado unique character*

5. Compatibility or incompatibility of designation with current land and water uses and development.

*A designation should not raise any problem as the Saltado corridor is currently not affected by water uses or development but it's key it as it is*

6. Reasonably foreseeable potential land and water development and uses that could be affected by designation.

---

**ADMINISTRATION**

7. Ability to manage and protect this segment as a WSR, including any existing and potential mechanisms for protecting this segment's ORVs other than WSR designation.

8. Consistency of designation with other BLM plans, programs, and policies and regional objectives.

9. Issues that might make administering this segment difficult.

10. Adequacy of local zoning and other land use controls and ability of state/local government to manage and protect this segment's ORVs on nonfederal lands.

_____

ADDITIONAL COMMENTS REGARDING JURISDICTION AND MANAGEABILITY

_____

Name (optional): _VP & I   Tillebeen_____
Please contact me to discuss further:   (Yes)   No  970. 728 8735
If yes, contact information: ___ Wilson Yusac -PoBox 72
180 E Anderson . Placerville, Co 81430.

## James Bode

| | |
|---|---|
| **From:** | FrSyl <frsyl@mymailstation.com> |
| **Sent:** | Monday, January 17, 2011 1:00 PM |
| **To:** | uformp@blm.gov |
| **Subject:** | San Miguel instream flow |

Howdy.

My name is Syl Schoening and my property known as The Hermitage,

1250 Mt View Lane, Norwood, embraces 1/4 mile of the Gurley Creek Canyon. I am in my 80's and have long observed the Gurley and its watershed. I am no longer able to drive after dark nor endure longer meetings. I have always wondered at the attitude of those who control the Gurley system and "all taking out and never putting (investing) back" that seems to be standard procedure on the part of Farmers Water as well as BLM and Forest service (on the whole). The degradation of the watershed, stream embankments, etc. seems to be taken for granted. Algae build-up is increasing. To this is added "use it (even if used badly) or loose it" water policy. I support instream protection flow on the River itself.....as a step in the right overall direction.

Thanks, Syl Schoening.

(should you wish to reply please note that my e-mailstation can receive text mode messages only. My phone is 327-4346.

Mail p.o. box 553, Norwood, 81423.)

May I add that the above e-mail applies to the wild & scenic rivers discussion also.

BLM_0109023

**James Bode**

| | |
|---|---|
| **From:** | Nate Smith <nrsmith83@gmail.com> |
| **Sent:** | Tuesday, January 18, 2011 2:58 PM |
| **To:** | UFORMP@BLM.GOV |
| **Subject:** | Wild and Scenic River Suitability Comment |
| **Attachments:** | WSR Suitability Ltr.doc |
| | |
| **Categories:** | Green Category |

Dear sir or madam:

Please see my attached comment.

Warm Regards,

Nate Smith

1

**Nate Smith**
**350 S. Mahoney Dr. Unit 10B**
**Telluride, CO 81435**
**Nrsmith83@gmail.com**

**January 18, 2011**

Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Sent via email to:

UFORMP@BLM.GOV

**Re: Wild and Scenic Rivers Suitability Determination – Dolores River Basin,**
**including San Miguel and tributaries**

To Whom It May Concern:

I appreciate the efforts of the Bureau of Land Management (BLM) Uncompahgre Field
Office (UFO) to carefully assess the irreplaceable values of the Dolores and San Miguel
Rivers and to identify administrative protections that can preserve these values for future
generations. I fully support a suitability determination on several of the segments under
consideration because the economic benefits and wildlife protections that will arise as a
result.

I provide the following recommendations regarding Wild and Scenic Suitability:

<u>Scope of Comments</u>
I have considered the issues and alternatives relevant to the Dolores and San Miguel river
basins and tributaries. San Miguel River segments 1 through 6 should be determined
suitable because the unique recreational opportunities available on those segments. San
Miguel River segments 5 through 6, the Lower Dolores River segment, Dolores River
segment 2, and La Sal Creek segments 2 and 3 should be determined suitable because the
presence of sensitive fish species. I did not consider issues and alternatives related to the
Lower Gunnison watershed.

I am a San Miguel County Resident and I work in Telluride as an attorney practicing
water and land use law. Hiking, rock climbing, and my work as a water attorney has
exposed me to several of the river segments currently considered for suitability. As one
of the last undammed rivers in Colorado, the San Miguel River is worthy of protection. A
suitability determination or Wild and Scenic River Act designation on the San Miguel
River would help sustain over one million dollars in economic benefits brought to the

region by the river each year. Protection can help move Southwest Colorado further away from the "boom and bust" economic model of the 20th Century. Other segments addressed below should also be designated as suitable because the importance of protecting unique fish populations.

More specifically, there are several segments under review that I believe should be determined as suitable. San Miguel River segments 1 through 6 are suitable because the outstanding recreational values in those areas. Rafters and kayakers utilize snowmelt in high numbers to recreate on the river. This recreational market also contributes to the success of local river guide services and retail shops. Easy access to these segments also makes this portion of the river a target for fishing enthusiasts. A suitability determination or Wild and Scenic River Act designation of these segments would prohibit any new impoundments, which could deteriorate recreational opportunities and economic progress. Designation or suitability on these segments would also have a minimal intrusion on property rights.

Other, lower river segment are also suitable because the presence of sensitive fish species. San Miguel River segments 5 and 6, the Lower Dolores River segment, Dolores River segment 2, and La Sal Creek segments 2 and 3 all have populations of the flannelmouth sucker, bluehead sucker, and roundtail chub. Some of these segments are also spawning waters for the species. Protection of this wildlife value would not only help these species thrive, but could also prevent enforcement of the Endangered Species Act on these segments. While a federal reserve water right under the Wild and Scenic River Act would be junior to existing water rights holders, Endangered Species Act enforcement on the segments would impede upon even the most senior rights. Thus, protection of sensitive fish species under the Wild and Scenic River act could help wildlife while having minimal intrusion into private property rights.

Thank you for your serious consideration of my comments.

Sincerely,

/s/

**Nate Smith, Esq.**
**350 S. Mahoney Dr. Unit 10B**
**Telluride, CO 81435**
**Nrsmith83@gmail.com**

The BLM is welcome to contact me if any further discussion is needed.

**James Bode**

| | |
|---|---|
| **From:** | MJ Schillaci <MJSchillaci@telluride-co.gov> |
| **Sent:** | Tuesday, January 18, 2011 12:34 PM |
| **To:** | UFORMP@BLM.GOV |
| **Subject:** | FW: |
| **Attachments:** | 20110118122723137.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

| | |
|---|---|
| **Categories:** | Green Category |

Please see attached letter from the Town of Telluride. Thank you. Mj

MJ Schillaci
Town Clerk
Town of Telluride
970-728-2157 Telephone
970-728-2496 Fax
mjschillaci@telluride-co.gov

Please consider the environment before printing this e-mail.
-----Original Message-----
From: r ricoh
Sent: Tuesday, January 18, 2011 10:27 AM
To: MJ Schillaci
Subject:

This E-mail was sent from "RNP0188D0" (Aficio MP C5000).

Scan Date: 01.18.2011 12:27:23 (-0500)
Queries to: RicohCopier@telluride-co.gov

BLM_0109027



Box 397  Telluride, CO 81435  (970) 728-3071
FAX (970) 728-3078

January 11, 2011

Bureau of Land Management
Uncompahgre Field Office

Via email:
UFORMP@BLM.GOV

RE:    RMP – Wild and Scenic River Suitability for San Miguel River

To Whom This May Concern:

The Suitability process currently being pursued by the BLM Uncompahgre Field Office is within the framework of the broader Resource Management Plan (RMP). Such management plans, in both their general effects and related to management of streams found to be Wild and Scenic "Suitable", are customized in response to local geography, resource values, and public input. The Town Council for the Town of Telluride ("Telluride") would like to submit its input with respect to the review process now underway.

The National Wild and Scenic Rivers System was created in 1968 (Public Law 90-542; 16 U.S.C. 1271 *et seq.*) to preserve certain rivers with outstanding natural, cultural, and recreational values in a free-flowing condition for the enjoyment of present and future generations. The Act is notable for safeguarding the special character of these rivers, while also recognizing the potential for their appropriate use and development. It encourages river management that crosses political boundaries and promotes public participation in developing goals for river protection. Designated segments need not include the entire river and may include tributaries.

In Colorado, there is only one designated river to date (the Cache La Poudre River), compared to 56 in Oregon, 22 in Idaho and two in Wyoming. While it could be stated that there is remote likelihood that additional Colorado rivers will receive actual designation any time soon, we nevertheless have a unique need to secure a Suitability determination for key streams. The public can comment on the evaluation and management alternatives throughout the Suitability process, and BLM must apply interim protective management to rivers and segments found Suitable for designation. The evaluative process does provide good opportunities for protecting river values.

With this as a backdrop, the Town would like to share its comments with specific regard to the San Miguel River watershed. The San Miguel River is nearly incomparable across the western United States for its ecological settings, remote and thriving backcountry, naturally varying and flowing river and streams, contribution to important water systems in several states, and overall scenic wonder.

BLM_0109028

Every eligible stream segment in the San Miguel watershed should receive prompt, extensive, and reliable protection, both through Wild & Scenic Suitability findings and through clear and firm management prescriptions in the BLM's resource management plan. Specifically, however, the Town of Telluride seeks to comment in favor of Suitability for those segments and tributaries within proximity to the Telluride community -- Segments One, Two and Three of the San Miguel River, with tributaries including Fall Creek, Beaver Creek, Dry Creek, Naturita Creek and Saltado Creek. These tributaries are important contributors to the flows and health of the San Miguel itself and provide essential riparian habitat and geographically important streamflows in their own rights.

Preservation of the San Miguel and its tributaries is extremely important to local communities such as Telluride – it contributes majorly to the quality of life that our residents and visitors value so greatly. A number of businesses from Telluride depend on native fish and scenic appeal from the San Miguel to thrive – including a number of fly fishing and guiding services. These businesses, which provide valuable recreational opportunities in a tourism economy, utilize many of the river reaches within the segments identified. Recreational boating is likewise a source of river recreation that provides a significant amount of business in our region.

In terms of environmental stewardship, the Town and many area organizations have invested heavily in preserving and promoting the values of the San Miguel, as evidenced through the perpetual conservation of the Valley Floor and current planning efforts to restore much of the river corridor within the Valley Floor.

The San Miguel River system as a whole, and certainly those segments and tributaries identified, are inclusive of outstandingly remarkable values in terms of natural flows, river health, riparian habitat, recreational opportunities and scenery. Accordingly, the Town believes that the majority of stream segments under consideration by the Uncompahgre Field Office that are found to be Eligible as Wild and Scenic Rivers would also be best preserved by a determination of Suitability for Wild and Scenic Rivers.

Very Truly Yours,

Stuart Fraser
Mayor of Telluride

## James Bode

| | |
|---|---|
| **From:** | Ma Mere <ssamuelson@wildblue.net> |
| **Sent:** | Tuesday, January 18, 2011 1:06 PM |
| **To:** | uformp@blm.gov |
| **Subject:** | Comments Wild and Scenic Wection one San Miguel River |

To whom it may concern:

I would like to express my concern regarding Segment One of The San Miguel River, as I live and own property on that stretch of the river.

I would like to see the river designated as Wild and Scenic and have sent you photos with comments about the river in support of Wild & Scenic designation.

I am not too thrilled about the R designation for this part of the River and wonder if W or S might be better for the river and the land owners along the river and for the health of the river itself.

Recreational users take great liberty at this time with private property thinking that it is ok to come on private land if they need to because they are on the river and want to "get out" of a kayak, raft, etc. or check out the scenery from fly fishing. Respect for private property is NOT an honored factor in this region.

Enforcement of anything, particularly our public lands and rivers, is scant in this area and aggressive behavior to land owners from river users is all too common (though the users of the river users will always put up a BIG fight over this for their contention is they are always right and have MORE rights than others when it comes to the river...!).

I would not like to see this section of the river decline due to over use of "recreationalists" and there is aggressive recreational people and lack of respect both for the river and for the land owners.

This area is the headwaters of the San Miguel and think that consideration of the river is most important and the health of the river.

Recreational users and private business interests have already tried to put a white water park on the river upstream (using the San Miguel County Park as their white water park!) and the plan they proposed included a place to dump TONS of cement into the river for their "park" justifying doing so in order to support private business endeavors and satisfy very greedy river users who think that they "own the river" and that a white water park would be "good for the whole area" which I totally disagree with and so do and did other people interested in the health of the river.

Please consider the land owners in your decision and realize that enforcement is non-existent with public lands in our area...there are not enough rangers already.

I would like the river Wild and Scenic. I would not like to see this section of the river given over to the recreationalists for it is a beautiful, wonderful gift that needs to be preserved... The San Miguel River...and where there is beauty in nature and availability of a natural resource where a money making business opportunity might be, there always seems to be businesses that are ready to exploit the natural resource and make a profit using natural resources to make a BIGGER BUCK, and totally NOT being interested in the true health of the natural resource!

Respectfully submitted,

S.L. Samuelson

ssamuelson@wildblue.net

BLM_0109030

**James Bode**
_____

| | |
|---|---|
| **From:** | Angie Adams |
| **Sent:** | Tuesday, January 18, 2011 11:31 AM |
| **To:** | UFO AR |
| **Subject:** | FW: Bighorn for UFO RMP |
| **Attachments:** | WSWGManagementofDomesticSheepandGoatsinWildSheepHabitatReport.pdf |

-----Original Message-----
From: msiders@blm.gov [mailto:msiders@blm.gov]
Sent: Tuesday, January 18, 2011 8:38 AM
To: bkrickba@blm.gov
Cc: Kate Wynant; Angie Adams
Subject: Fw: Bighorn for UFO RMP

Bruce,
Documentation of our communications with CDOW re the Bighorn/Domestic Sheep issue. I'll be talking with Renzo, hopefully later this afternoon about key points they would like to see for bighorn management. Note link for more up to date WAFWA bighorn sheep that should get into the project record and make sure our citiation is correct.

-Missy

^v^  ^V^   ^v^    ^V^ ^V^   ^v^ ^v^ ^V^   ^v^   ^v^
Melissa Siders, Biological Staff Supervisor Uncompahgre Field Office
2465 S. Townsend Ave., Montrose CO 81401
970-240-5332 - office  970-596-0550 - cell
e-mail:  Melissa_Siders@blm.gov
^v^  ^V^   ^v^    ^v^ ^V^   ^v^ ^V^   ^v^   ^v^
"In the end, we will conserve only what we love.
We will love only what we understand.
We will understand only what we are taught."
-Baba Dioum, Senegal, West Africa
----- Forwarded by Melissa Siders/MOFO/CO/BLM/DOI on 01/18/2011 08:33 AM -----

|  |  |  |
|---|---|---|
| "Banulis, Brad"<br><Brad.Banulis@sta<br>te.co.us> | | |
| | To | <msiders@blm.gov>, "Delpiccolo, |
| 01/14/2011 05:01<br>PM | Renzo"<br><Renzo.Delpiccolo@state.co.us> | |
| | cc | |
| | Subject | RE: Bighorn for UFO RMP |

Hi Missy-

BLM_0109031

Sorry for not getting back to you quicker.  I know Renzo left you a message, but I just wanted to let you know as well that we think the alternative document for bighorn sheep looks good.  We really appreciate the BLM's effort to develop thorough and wide ranging alternatives.  Our preference, from a Division of Wildlife standpoint, is to manage wildlife populations, for the health of the animals and the benefit of the people of Colorado, however, I understand the BLM's need to manage for multiple resources and interests.

Also, I attached a link to the most recent WAFWA guidelines from this last year that supersedes the 2007 guidelines, by including all of the most recent literature on bighorn and domestic sheep interaction.

Let us know if there is anything more that we can help with or if you have any questions.

http://www.wafwa.org/documents/wswg/WSWGManagementofDomesticSheepandGoat
sinWildSheepHabitatReport.pdf

Cheers,

Brad Banulis
Terrestrial Biologist, Area 18
Colorado Division of Wildlife
2300 S. Townsend Ave.
Montrose, CO  81401
(970)252-6051
http://wildlife.state.co.us/


-----Original Message-----
From: msiders@blm.gov [mailto:msiders@blm.gov]
Sent: Friday, December 17, 2010 10:27 AM
To: Delpiccolo, Renzo; Banulis, Brad
Subject: Bighorn for UFO RMP


Renzo and Brad,
Thank you very much for making time to visit with us earlier this week on Bighorn sheep.  Attached is what we are moving forward with in our Alternatives for Bighorn.  As we discussed, if you could give me some input on what you think would be a preferred, given the need for multiple-use management, it would greatly appreciated.  You have the more detailed knowledge of the local bighorn populations and the disease issues.  Please
get something back to me by January 14, 2011.  Give me a call if you'd
like to discuss more.  My cell will probably be your best bet for the next couple of weeks.
Thanks!
(See attached file: Wildlife-Grazing Bighorn Matrices 20101217.pdf) -Missy

^v^ ^V^  ^v^   ^v^ ^V^  ^v^ ^V^  ^v^  ^v^
Melissa Siders, Biological Staff Supervisor Uncompahgre Field Office
2465 S. Townsend Ave., Montrose CO 81401
970-240-5332 - office  970-596-0550 - cell
e-mail:  Melissa_Siders@blm.gov
^v^ ^V^  ^v^   ^v^ ^V^  ^v^ ^V^  ^v^  ^v^
"In the end, we will conserve only what we love.
We will love only what we understand.
We will understand only what we are taught."
-Baba Dioum, Senegal, West Africa

BLM_0109032

3

BLM_0109033

Saved from Internet on January 18, 2011:
http://www.wafwa.org/documents/wswg/
WSWGManagementofDomesticSheepandGoatsinWildSheepHabitatReport.pdf

Western Association of Fish and Wildlife Agencies (WAFWA)
Wild Sheep Working Group
Recommendations for Domestic Sheep and Goat Management In Wild Sheep Habitat
July 21, 2010

| Name | Agency |
|------|--------|
| Kevin Hurley (Chair) | Wyoming Game & Fish Department |
| Becky Schwanke | Alaska Department of Fish & Game |
| Jim Allen | Alberta Fish & Wildlife Division |
| Jon Jorgenson | Alberta Fish & Wildlife Division |
| Bob Henry | Arizona Game & Fish Department |
| Helen Schwantje | British Columbia Ministry of Environment |
| Tom Stephenson | California Department of Fish & Game |
| Vern Bleich | California Department of Fish & Game (ret.) |
| Janet George | Colorado Division of Wildlife |
| Michael Miller | Colorado Division of Wildlife |
| Dale Toweill | Idaho Department of Fish & Game |
| Tom Carlsen | Montana Department of Fish, Wildlife, & Parks |
| Bruce Trindle | Nebraska Game & Parks Commission |
| Mike Cox | Nevada Department of Wildlife |
| Eric Rominger | New Mexico Department of Game & Fish |
| Brett Wiedmann | North Dakota Game & Fish Department |
| Don Whittaker | Oregon Department of Fish & Wildlife |
| Vic Coggins | Oregon Department of Fish & Wildlife |
| Ted Benzon | South Dakota Department of Game, Fish, & Parks |
| Clay Brewer | Texas Parks & Wildlife Department |
| Anis Aoude | Utah Division of Wildlife Resources |
| Donny Martorello | Washington Department of Fish & Wildlife |
| Jean Carey | Government of Yukon Department of Environment |
| Melanie Woolever | USDA-U.S. Forest Service, Denver, CO |
| Amy Krause | USDI-Bureau of Land Management, Washington, DC |
| Jim Karpowitz (Director Sponsor) | Utah Division of Wildlife Resources |

Executive Summary

Although the risk of disease transmission from domestic sheep or goats to wild sheep is widely recognized by wildlife and land management agencies, a unified set of management recommendations for minimizing this risk has not yet been devised or adopted by responsible agencies. This report has been prepared to assist BLM, USFS, and other land managers with development of a more-unified policy on grazing domestic sheep or goats in wild sheep habitat. We recommend that state, provincial, and territorial wild sheep managers, and federal land management agencies, take appropriate steps to eliminate range overlap, and thereby, opportunities for association and subsequent disease transmission.

We acknowledge that not all disease outbreaks in wild sheep are the result of contact with domestic sheep or goats. Nevertheless, there is sufficient evidence of disease transmission from domestic sheep or goats, followed by substantial mortality, that range overlap and potential association should be prevented. The higher the conservation value (e.g., federally or state listed, "sensitive species" status,

BLM_0109034

native herds, transplant source stock, naïve herds with no previous exposure) of a wild sheep population, and the greater the risk of potential association with domestic sheep or goats, the more aggressive and comprehensive that wild sheep and domestic sheep or goat management strategies should be, commensurate with level of risk.

Practical solutions will be difficult if not impossible to achieve until risk of disease transmission from domestic sheep or goats to wild sheep is widely acknowledged. We recognize that reaching this goal is likely to require additional scientific evidence and further research (Council for Agricultural Science [C.A.S.T.] 2008, U.S. Animal Health Association [USAHA] 2009). Recognition by stakeholders that all parties benefit when disease risk is actively managed is also critical.

Recommendations to WAFWA agencies include:
- Completion of risk assessments in a meta-population context.
- Removal of wild sheep that have likely associated with domestic sheep or goats, as an emergency action. If this action becomes routine, agencies must further examine why conditions lead to frequent association. A policy should be developed by each agency to promptly respond to wandering wild sheep which exhibit movements outside anticipated, occupied wild sheep range.
- Wild sheep translocations should be preceded by thorough disease surveillance; demographic modeling should be used to determine acceptable removals from source populations; and sufficient analyses of habitat suitability and disease risk must be fully explored. Following translocation, agencies should monitor response of source populations, and success of translocated animals.
- WAFWA agencies should coordinate with other agencies and involved stakeholders on management of domestic sheep or goats in wild sheep range within their respective jurisdictions.

Recommendations to land management agencies (e.g., BLM, USFS) include:
- Manage domestic sheep or goat grazing to achieve effective separation, reduce risk of association, and avoid range overlap with wild sheep.
- Ensure annual operating instructions (AOIs) issued to grazing permittees include measures to minimize association and identify strategies to deal with stray domestic sheep or goats.
- Manage wild sheep habitat to promote healthy populations in areas away from where domestic sheep or goats are permitted.
- Require use of Best Management Practices (BMPs) to reduce straying by domestic sheep or goats.

Recommendations to wild sheep conservation organizations include:
- Assist with education efforts about risks of disease from domestic sheep or goats to wild sheep.
- Negotiate alternatives and incentives for domestic sheep or goat permittees to shift operations outside of wild sheep habitat.
- Support research on understanding disease and risk.

Recommendations to domestic sheep or goat grazing or trailing permittees include:
- Implement Best Management Practices to prevent straying by domestic sheep or goats.
- Ensure protocols exist to respond to stray domestic sheep or goats.

Recommendations to private landowners include:
- Support effective separation and minimize range overlap.
- Promptly report observed or imminent association between domestic sheep or goats and wild sheep.

BLM_0109035

Introduction/Overview

In January 2007, the Western Association of Fish and Wildlife Agencies (WAFWA), comprised of 23 state and provincial wildlife agencies from the western U.S. and western Canada, established a Wild Sheep Working Group (WSWG). The first task undertaken by the WSWG was to develop a report (WAFWA WSWG 2007) titled "Recommendations for Domestic Sheep and Goat Management in Wild Sheep Habitat" to which state, federal, and provincial agencies could tier to. This WSWG report was unanimously endorsed by WAFWA Directors on July 16, 2007 in Flagstaff, AZ, then forwarded to the heads of 6 federal agencies (i.e., USFS, BLM, NPS, USFWS, BoR, DoD) in late August 2007, representing the official position of WAFWA.

Throughout significant portions of their range, bighorn sheep (*Ovis canadensis*) experience periods when populations are depressed; those episodes generally are associated with respiratory disease epizootics. Diseases have substantially contributed to the decline of bighorn sheep populations throughout much of western North America (Beecham et al. 2007, C.A.S.T. 2008), with many native herds having declined to less than 10% of historical size. According to historical accounts, epizootics in some locations coincided with the advent of domestic livestock ("livestock" used in original citation) grazing in bighorn ranges (C.A.S.T. 2008). Epizootics in native bighorn herds were reported in various locations following European settlement and establishment of domestic livestock ("livestock" used in original citation) grazing throughout the central and southern Rocky Mountains. This trend may reflect the introduction of novel bacterial pathogens (including some strains of *Pasteurella [Mannheimia]* spp.) into naïve bighorn populations beginning in the late 1800s (Grinnell 1928; Skinner 1928; Marsh 1938; Honess and Frost 1942; Miller 2001).

In Alaska, British Columbia, Yukon, and the Northwest Territories, domestic sheep or goat grazing has not been widespread. "Thinhorn" sheep (*O. dalli*) do not have a history of catastrophic all-age die-offs (C.A.S.T. 2008). Thinhorn sheep are susceptible to pneumonia (Black et al. 1988, Jenkins et al. 2007), and have perished in intentional co-penning trials with domestic sheep (Foreyt et al. 1996). However, the lack of similar epizootics and significant wild sheep die-offs in thinhorn sheep habitats that have not experienced widespread domestic sheep or goat grazing reinforces the need to effectively separate domestic sheep or goats from wild sheep populations.

Over the past 30 years, there has been a steadily increasing body of anecdotal and empirical evidence underscoring potential risk of disease transmission from domestic sheep or goats to wild sheep (McQuivey 1978, Hunt 1980, Jessup 1980, Foreyt and Jessup 1982, Goodson 1982, Coggins 1982, Onderka and Wishart 1984, Jessup 1985, Festa-Bianchet 1988, Onderka and Wishart 1988, Onderka et al. 1988, Schwantje 1988, Callan et al. 1991, Coggins and Matthews 1992, Foreyt 1994, Foreyt et al. 1994, Cassirer et al. 1996, Foreyt and Lagerquist 1996, Martin et al. 1996, Coggins 2002, Rudolph et al. 2003, Rudolph et al. 2007, George et al. 2008, Jeffress 2008).

A number of recent qualitative and quantitative risk assessments (Beecham et al. 2007, Clifford et al. 2007, Epps et al. 2007, C.A.S.T. 2008, Baumer et al. 2009, Clifford et al. 2009, Croft et al. 2009, Croft et al. 2010, USAHA 2009, WAFWA WHC 2009, USDA-FS 2010), workshops (UC-Davis April 2007, Tucson, AZ September 2007, Salt Lake City, UT February 2008, Boise, ID March 2008), conservation strategies and management plans (Colorado Division of Wildlife 2009, Montana Department of Fish, Wildlife, and Parks 2009), and many wildlife biologists and wildlife veterinarians (Gross et al. 2000, Singer et al. 2000, Dubay et al. 2002, Epps et al. 2004, Garde et al. 2005, Jansen et al. 2006, Foreyt et al.

BLM_0109036

2009) have focused on risk associated with contact between wild sheep and domestic sheep or goats. Many authors have recommended complete separation between wild and domestic sheep or goats, in an effort to minimize disease transmission.

British Columbia's "Wild/Domestic Sheep Separation Program" is specifically designed to reduce risk of disease transmission by minimizing or preventing association between wild and domestic sheep or goats in the province, on both private and Crown lands. Legislation in Utah (House Bill 240 Supplement, 2009), Wyoming (Senate Enrolled Act No. 30, 2009), and Idaho (Senate Bill 1232 amended, 2009) addressed agency responses and responsibilities when bighorn sheep and domestic sheep or goats closely associate. A series of recent court rulings (e.g., U.S. District Court, Idaho Case 09-0507-BLW) and legal opinions on bighorn sheep viability have mandated separation between domestic sheep or goats and bighorn sheep, including mandatory non-use of grazing allotments where effective separation could not be assured.

In this 2010 report, we will not review and synthesize all available literature (e.g., both published and unpublished) and other evidence (e.g., letters, reports available in agency files). We do, however, intend to include relevant citations, results, literature, analyses, etc. published since our original report (WAFWA WSWG 2007) was completed. The current report provides what we believe are reasonable and logical recommendations based on the best available science, and that will help achieve effective separation between wild sheep and domestic sheep or goats. We recognize it is impossible to achieve zero risk of contact or disease transmission between wild sheep and domestic sheep or goats ; however, we also recognize there are many ways to work proactively toward minimizing association between these species, to help lower overall risk of epizootics in wild sheep.

The USDI Bureau of Land Management (BLM) and the USDA Forest Service (USFS), the two principal federal land management agencies in the western United States, continue to review, revise, and update their policies on the management of domestic sheep or goats in wild sheep habitat (USDI-BLM 2010, USDA-USFS 2009). Several USFS Regions (e.g., Rocky Mountain Region 2 (Beecham et al. 2007), Intermountain Region 4, California Region 5, Pacific Northwest Region 6) have designated bighorn sheep as a "Sensitive Species", mandating additional review and analysis of USFS management actions that might affect bighorn sheep habitats and populations.

An inter-agency GIS decision-support tool and GIS maps for 14 western states are being finalized. These maps overlay current bighorn sheep distribution with both vacant and active domestic sheep or goat grazing allotments and trailing routes (WAFWA WSWG 2010a). These maps will identify areas where association between domestic sheep or goats and bighorn sheep may occur on or adjacent to public lands managed by BLM and USFS, and will also identify areas that may provide spatial separation. These maps will help provide context for national policy development, and help identify situations where proactive management is necessary and beneficial to minimize risk of association. Although risk of disease transmission from domestic sheep or goats to wild sheep is widely acknowledged by wildlife and land management agencies, a unified set of management guidelines for minimizing this risk has not yet been devised or adopted. This report is written to assist BLM and USFS with development of a more-unified policy for management of domestic sheep or goat grazing in wild sheep habitat.

BLM_0109037

WAFWA defines "Effective Separation" as spatial and/or temporal separation between wild sheep and domestic sheep or goats resulting in, at most, minimal risk of potential association and subsequent transmission of respiratory disease between animal groups. WAFWA collectively believes that effective separation between wild sheep and domestic sheep or goats should be a primary management goal of state, provincial, or territorial agencies responsible for wild sheep management. With respect to domestic sheep or goats, the concept of effective separation is based on the premise that these two domestic species are incompatible with wild sheep, because of potential fatal disease transmission to wild sheep. Domestic sheep or goats should not concurrently share or occupy the same range where conservation of wild sheep is a clearly-stated management goal.

We acknowledge that effective separation does not necessarily require removal of domestic sheep or goats in all cases. However, the option of removing domestic sheep or goats should be included in the array of alternatives available to address this issue. In fact, some collaborative working groups (USAHA 2009) have recommended domestic goats not be allowed to graze in occupied bighorn sheep habitat, due to their gregarious nature and tendency to wander. We acknowledge the continuing debate and discussion (C.A.S.T. 2008, USAHA 2009) between wildlife advocates and some domestic sheep or goat proponents and resource managers regarding credibility and scientific merit of past findings, criticisms of experimental design and rigor, and limitations of drawing inferences about natural disease events versus "controlled" experiments in confined settings. Nevertheless, there is a preponderance of evidence, taken collectively from a wide variety of observations and scientific research that indicates significant risk of disease transmission from domestic sheep or goats to wild sheep. Proof of transmission of *Mannheimia haemolytica* from domestic sheep to bighorn sheep was irrefutably demonstrated via recovery of green fluorescent protein-tagged *Mannheimia haemolytica* bacteria from bighorn sheep, when the only possible source of that pathogen was domestic sheep (Lawrence et al. 2010).

In some cases, consequences of contact between domestic sheep or goats and wild sheep have been severe enough to endanger entire populations of wild sheep. Consequently, we continue to recommend that wild sheep managers take appropriate steps to minimize opportunities for association and potential subsequent disease transmission. Recent legislation (e.g., Idaho Senate Bill 1232 amended, May 2009) mandated collaboration between the Idaho Department of Fish and Game and domestic sheep grazing permittees that identified Best Management Practices (BMPs) to hopefully achieve separation between domestic sheep and wild sheep, on both public and private lands. In specific situations, implementation of BMPs may lead to a reduced risk of association; in particular, BMPs implemented in open, relatively gentle terrain where domestic sheep or goats may be easily controlled and monitored may effectively reduce risk of association (Schommer 2009). It should be further recognized, however, that BMPs that work in one situation may or may not work in other situations (Schommer 2009); BMPs need to be developed for site-specific situations, and evaluated for effectiveness.

Concern about potential disease transmission between domestic livestock and wildlife, and management approaches directed at minimizing such risks, is certainly not unprecedented. An analogous situation presently exists with brucellosis in the Greater Yellowstone Area (GYA): transmission between wild ungulates (i.e., bison, elk) and domestic livestock (i.e., cattle) has occurred, and disease transmission from elk and bison to cattle has been proven in clinical, confined environments. It has been difficult, however, to confirm this transmission under field conditions. The economic and herd management implications of brucellosis are serious, and management of this disease problem has largely focused on

BLM_0109038

temporal and spatial separation of livestock and wildlife to minimize risk. In the GYA, significant, and what some may consider drastic steps (e.g., lethal removal of bison, test-and-slaughter programs for feedground elk) have been undertaken to minimize risk of association and possible transmission of *Brucella* between wild ungulates and domestic livestock. The situation is very similar for pasteurellosis in wild sheep caused by bacteria from the *Pasteurellaceae* (bacteria now classified in the genera *Pasteurella, Mannheimia,* and *Bibersteinia* families (Ward et al. 1990, Ward et al. 1997, Miller 2001): there is cause for concern that is supported by logic, experience, and clinical scientific study. As a result, there is a clear strategy for minimizing risk of disease transmission by separating reservoir and susceptible species. In the case of pasteurellosis between domestic sheep or goats and wild sheep, we believe a sufficient amount of reliable information is available to justify seeking effective separation.

<u>Concept of Risk</u>

Two-way transmission of certain diseases (e.g., paratuberculosis, some enteric pathogens and parasites) between wild sheep and domestic sheep or goats in shared habitats can occur. However, as domestic animals have evolved and have been selected for their ability to live at high densities and for their resilience to infectious diseases (reviewed by Diamond 1997), we believe the most important and ecologically significant transmission in this context is <u>from</u> domestic sheep or goats <u>to</u> wild sheep. It is widely recognized (Garde et al. 2005, C.A.S.T. 2008), but needs to be re-emphasized, that thinhorn sheep (Dall's sheep, Stone's sheep) in Alaska and northwestern Canada are immunologically naïve compared to wild sheep occurring in southern Canada and the remainder of the western U.S. Additional precautions should be taken to ensure that no association occurs between naïve thinhorn sheep and domestic sheep or goats.

We acknowledge that wild sheep die-offs have occurred in the absence of reported association with domestic sheep or goats (Aune et al. 1998, UC-Davis 2007). However, when contact between wild sheep and domestic sheep or goats has been documented, severity of the wild sheep die-off is typically more severe (Onderka and Wishart 1984, Aune et al. 1998, Martin et al. 1996, George et al. 2008).

Winter 2009-2010 bighorn sheep pneumonia die-offs (totaling an estimated 880 dead bighorns) in Montana, Nevada, Washington, Utah, and Wyoming have reduced bighorn numbers in at least 9 herds, either through direct mortality or agency removal (i.e., "culling") of bighorn sheep exhibiting symptoms of respiratory infections (WAFWA WSWG 2010b). Association between wild sheep and domestic sheep or goats is known to have preceded at least one of these aforementioned die-offs, was likely in 2 others, and was possible in 4 more, as domestic sheep or goats were known to occur within or near occupied bighorn sheep ranges, and within normal bighorn movement zones.

Although these recommendations have been developed by a working group comprised of state and provincial wildlife agency personnel, we recognize that cooperation between numerous concerned parties (e.g., state, provincial, territorial wildlife agencies, federal land management agencies, First Nation or tribal representatives, domestic sheep or goat producers and grazing permittees, agricultural industry representatives, wild sheep conservation organizations, environmental groups, academic institutions, and various interested publics) is critically important to deriving on-the-ground solutions (USAHA 2009). It is our hope that collaborative discussions and actions (e.g., British Columbia Wild/Domestic Sheep   Separation Program, Wyoming Statewide Domestic Sheep/Bighorn Sheep Interaction Working Group, Idaho Governor's Bighorn Sheep Collaborative) will take place in each jurisdiction where this issue occurs, and that those discussions yield productive solutions.

BLM_0109039

We recognize there are many human-caused (e.g., displacement/disturbance) and environmental (e.g., predation, climatic) stressors (C.A.S.T. 2008) that also influence dynamics and viability of wild sheep populations. We also acknowledge that some factors affecting wild sheep population performance can be managed, while others cannot. Nevertheless, the guiding principle of our effort has been "to seek effective separation" between wild sheep and domestic sheep or goats. We believe that even though no "cookbook" exists for conducting risk assessments of respiratory disease transmission between wild sheep and domestic sheep or goats, comprehensive risk assessment is a critically important component for managing potential disease transmission.

<div align="center">Management Recommendations</div>

The following recommendations have applicability to state, provincial, or territorial wildlife agencies, federal land management agencies, wild sheep conservation organizations, domestic sheep or goat producers or permittees, and private landowners. These recommendations have been strategically assigned to a category we have judged to be most logical and reasonable. However, it is imperative that readers recognize these recommendations are typically pertinent to multiple parties, and further recognize that a multi-disciplinary and collaborative approach will likely produce the best outcomes for wild sheep and for domestic sheep or goat producers or permittees. We have defined specific, frequently-used terms (e.g., "effective separation") in a glossary (Appendix A).

We recommend that wild sheep managers design and implement management strategies by prioritizing the conservation values (e.g., federal- and/or state-listed status, sensitive species status, native wild sheep herds that have never been extirpated or augmented, naïve wild sheep populations with no previous exposure to domestic sheep or goats) and relative importance of wild sheep populations. The higher the wild sheep conservation value, and the greater the risk of association with domestic sheep or goats, the more aggressive and comprehensive that wild sheep and domestic sheep or goat management strategies should be, commensurate with the level of risk.

## Recommendations to WAFWA Agencies

➢ Historic and suitable but currently unoccupied wild sheep range should be identified, evaluated, and compared against currently-occupied wild sheep distribution by each state, province, or territory within historic range of wild sheep, and also compared to existing and potential areas where domestic sheep or goats are, or may be, authorized.

➢ Risk assessments should be periodically completed (at least once per decade, more often if situations warrant) for existing and potential wild sheep habitat, to specifically identify where and to what extent wild sheep might interface with domestic sheep or goats, and monitor changes in risk along that interface.

➢ Following completion of site-specific risk assessments, wild sheep translocation, population augmentation, restoration, and management strategies should be designed to minimize likelihood of association between wild sheep and domestic sheep or goats.

➢ Wild sheep managers should identify, analyze, and evaluate the implications (i.e., both positive and negative) of connectivity and movement corridors between largely insular herds within a meta-

<div align="center">7</div>

population against the opportunity for increased association with domestic sheep or goats. Analyses should include the relative continuity vs. discrete occurrence (Mack 2008) of occupied wild sheep distribution, and the expected frequency of movement between/within normally-anticipated wild sheep range. Benefits of genetic interchange (and implications for population viability) must be weighed against heightened risks of possible disease transmission (Bleich et al. 1990), especially if dispersing or wandering wild sheep might travel through occupied domestic sheep or goat grazing allotments or trailing routes, or result in the transfer of locally endemic pathogens from an infected wild herd to a naïve herd.

➢ Removal of wild sheep known or suspected to have closely associated with domestic sheep or goats is an effective management tool to address disease transmission concerns, when applied to wild sheep found outside of expected wild sheep range. Although the probability of detecting physical contact is typically low, non-typical movements by wild sheep outside of normal wild sheep ranges can heighten risk of association with domestic sheep or goats. If frequency of suspected association occurs above defined, acceptable levels, additional measures to work toward effective separation should be implemented.

➢ Removal of wild sheep within occupied, normally-anticipated wild sheep range is not always recommended as the preferred, first management option to address disease transmission or maintain effective separation. When domestic sheep or goats are grazed within normally-anticipated wild sheep range, a continuous and frequent risk of association exists during active grazing seasons. High probability of association, coupled with low probability of detection, renders removal of wild sheep ineffective for addressing disease transmission or maintaining separation. In addition, removal of wild sheep within normally-anticipated range does not involve wandering wild sheep, but resident reproductive members of a population whose removal could have substantial negative impacts on population viability. When selected, the option to remove wild sheep should occur only after critical evaluation and further implementation of measures designed to minimize association and enhance effective separation.

➢ Do not translocate wild sheep where there is no reasonable likelihood of achieving effective separation between wild sheep and domestic sheep or goats.

➢ As potential agricultural conflicts, landscape conditions and habitat suitability change, stocking wild sheep onto historic range, particularly on public lands, should be re-evaluated.

➢ Wild sheep populations should be managed to reach pre-determined population objectives, and those populations should be maintained at agreed-upon densities, to minimize wild sheep dispersal. It should be recognized that wild sheep dispersal occurs regardless of population density, so some risk of association is always present, if domestic sheep or goats are within range of dispersing wild sheep.

➢ The higher the risk of association between wild sheep and domestic sheep or goats, the more intensively wild sheep herds need to be monitored and managed. Intensity of monitoring should be commensurate with level of risk and probability of domestic sheep and goat association when considering "new" vs. "augmented" wild sheep populations. If there are anticipated differences in likelihood of association with domestic sheep or goats, a site-specific protocol should be spelled out

BLM_0109041

for "new" vs. "augmented" wild sheep populations. For example, the percentage of translocated wild sheep that should be radio-collared (preferably with GPS collars) should, in part, depend upon subsequent risk of domestic sheep or goat association. Intensive monitoring allows for documenting proximity between wild sheep and domestic sheep or goats, and allows for evaluation of post-release habitat use and movements. Budgets to translocate wild sheep should be adequate to ensure long-term monitoring.

➢ Wild sheep managers should recognize that augmentation of a wild sheep herd from discrete source populations also poses a risk for moving pathogens. Wild sheep management agencies should only use healthy wild sheep herds as source stock for translocations. Source herds should have extensive health histories and be regularly monitored to evaluate herd health. Wild sheep managers should evaluate tradeoffs between anticipated genetic benefits and potential health consequences of mixing wild sheep from various source herds, when conducting translocations.

➢ Prior to conducting a wild sheep translocation, a map of anticipated wild sheep distribution and movement should be developed and compared with domestic sheep and goat distributions. If a wild sheep translocation occurs, and association with domestic sheep or goats is confirmed or is likely to occur beyond an identified timeframe or beyond a mapped geographic area (possibly including historic, suitable wild sheep habitat), domestic sheep or goat producers should be held harmless.

➢ Agencies should develop, adopt, and widely distribute a written strategy to address dispersing or wandering wild sheep (e.g., British Columbia Ministry of Environment, Appendix B; Wyoming Game and Fish Department, Appendix C). These animals may physically contact domestic sheep or goats, and continue traveling, either back to their source herd or to other wild sheep herds, with or without infectious disease. This strategy should clearly identify what and when specific actions are to be taken (e.g., kill and medically evaluate wandering wild sheep), and specify who is authorized to take those actions. Furthermore, this strategy should be openly discussed with affected stakeholders, so there is clear and widespread understanding of subsequent management actions that could be implemented by state, provincial, or territorial wildlife agencies.

➢ Agencies should develop a response protocol for confirmed association between wild sheep and domestic sheep or goats. This strategy should include notification requirements, wildlife health intervention (if appropriate), and post-contact monitoring strategies. Furthermore, state, provincial, or territorial wildlife and agriculture agencies, land management agencies, producers and permittees, grazing industry representatives, and wild sheep advocates should collaborate to develop an effective, efficient, and legal response protocol for errant domestic sheep or goats (e.g., feral, abandoned) for which no owner can be identified and that threaten to associate with wild sheep.

➢ State, provincial, or territorial wildlife agencies should work together to develop a system (possibly internet-based) to report, record, and summarize association between wild sheep and domestic sheep or goats. Once established, the WAFWA WSWG website http://www.wafwa.org/html/wswg.shtml would be a logical place to host this incident reporting system. Furthermore, state, provincial, or territorial wild sheep managers and federal land managers should encourage prompt reporting by the public of observed proximity between wild sheep and domestic sheep or goats.

BLM_0109042

➢ The use of domestic sheep or goats as pack animals by hunters, anglers, and other recreational or commercial users that travel in identified wild sheep habitat should be prohibited. Where legislation or regulations are not already in place, an effective outreach and public education program should be implemented, to inform potential users of the risks associated with that activity and recommend that individuals not use domestic sheep or goats as pack animals in occupied wild sheep habitat.

➢ Wild sheep managers should coordinate with local Weed & Pest Districts or other applicable agencies or organizations involved with weed management to preclude the use of domestic sheep or goats for noxious weed control in areas where association with wild sheep is likely to occur. Agencies should provide educational information and offer assistance to Weed & Pest Districts regarding disease risks associated with use of domestic sheep or goats for weed control. Specific guidelines have already been developed by, and implemented in, British Columbia (http://www.for.gov.bc.ca/hfp/publications/00006/).

➢ Several capture and disease-testing protocols (pre-translocation, post-die-off) have been developed and are available to wild sheep managers (Foster 2004, UC-Davis 2007, WAFWA Wildlife Health Committee (WHC) 2009). Specific protocols for sampling, testing prior to translocation, and responding to disease outbreaks are useful and should be standardized to the extent practical across state and federal jurisdictions. Protocols should be reviewed and updated as necessary by the WHC and presented to WAFWA Directors for endorsement. Once endorsed by WAFWA Directors, wild sheep management agencies should implement the existing protocols, and the WHC should lead the effort to further refine and implement said protocols.

➢ Wild sheep management agencies should coordinate with each other and pool resources to support improvement in laboratory testing methods for important wild sheep diseases. Furthermore, state, provincial, and territorial wild sheep managers should support efforts on data sharing, and development and use of standardized protocols (WAFWA WHC 2009). Inter-agency communication between wildlife disease experts should be encouraged, to synergistically accomplish more than individual agencies or organizations are capable of by themselves.

➢ Wild sheep management agencies should pro-actively develop educational materials and outreach programs identifying and explaining the risk of association between wild sheep and domestic sheep or goat farm flocks and 4-H animals.

**Recommendations to BLM and USFS (and other applicable Land Management agencies)**

➢ Joint federal land management agency guidelines on management of domestic sheep or goats in wild sheep habitat should be developed and included in broad agency policy documents (e.g., USFS Manuals) and in local Forest Plan/Resource Management Plans. Guidelines should be based on the premise of minimizing risk of association and providing effective separation between domestic sheep or goats and wild sheep. Once guidelines have been approved, there should not be an automatic "sunset" provision or expiration date. If there is a specified longevity required by federal policy, and if appropriate and timely review cannot be completed, existing guidelines should remain in effect, rather than becoming obsolete.

BLM_0109043

➢ Land management agencies responsible for domestic sheep or goat grazing allotments, trailing routes, vegetation management (e.g., weed control, enhancement of conifer regeneration), use as pack stock, or any other uses involving domestic sheep or goats should only authorize such use outside of occupied wild sheep range.

➢ Land management agencies should require prompt (i.e., within 24 hours) notification by permittees and their herders of association between wild sheep and domestic sheep or goats. Notification procedures (including phone numbers/contact information for permittees, and use of satellite phones in backcountry settings) should be included in Annual Operating Instructions for grazing allotments and trailing permits.

➢ Land management agencies should map active vs. inactive domestic sheep or goat grazing allotments and trailing routes, including information on dates of use and contact information for responsible grazing or trailing permittees.

➢ Ensure that advance written instructions (such as USFS Annual Operating Instructions) exist, and that they address management, retrieval, and disposition of stray domestic sheep or goats left on public lands prior to or after permitted grazing or trailing dates.

➢ Work collaboratively with state, provincial, or territorial wildlife and agricultural interests, to develop written agreements addressing management, retrieval, and disposition of stray domestic sheep or goats occurring on public lands where there is no permitted use. These agreements should also address feral sheep or goats as well as other exotic breeds (e.g., aoudad, Iranian red sheep, urial, argali) that range on public lands.

➢ Review domestic sheep allotment boundaries or use areas such as trailing routes. Reconfigure allotment boundaries or trailing routes where appropriate and feasible, to avoid or minimize overlap with occupied wild sheep habitat. Where feasible, use strategies and techniques including:
  o geographic/topographic barriers that enhance species separation;
  o seasonal or spatial separation through domestic sheep or goat grazing management.

➢ Undertake habitat enhancements that improve wild sheep habitats (both summer and winter range) outside allotment boundaries to attract wild sheep away from domestic sheep allotments.

➢ Undertake water developments to enhance bighorn sheep distribution or to move domestic sheep or goats away from preferred wild sheep foraging areas.

➢ Annual Operating Instructions should require careful management and vigilant herding to minimize potential association between wild sheep and stray domestic sheep or goats. A count-on, count-off inventory of domestic sheep or goats should be required as a condition of operation.

➢ In areas of high risk of association, trucking should be required, since trailing may result in additional management risks. Trucking of domestic sheep or goats is preferred to trailing, since there is less chance of straying, and thereby less chance of association with wild sheep, particularly when domestic ewes are in estrus.

BLM_0109044

➢ If trailing occurs, on-site compliance monitoring to minimize strays should be conducted by the permittee and/or the land management agency.

➢ Land Use or Resource Management Plans, where relevant, should specifically address the issue of potential for domestic sheep or goat association with wild sheep. Land use plans should evaluate the suitability of permitting activities involving domestic sheep or goats, and determine the best course of action with respect to wild sheep conservation. Plans should address this issue and identify general areas of public land where domestic sheep or goats should not be permitted for weed control, commercial grazing, recreational packing, conifer regeneration, vegetation management, and other management activities.

➢ Land management agencies should coordinate closely with appropriate entities involved in weed control programs (e.g., local Weed & Pest Districts, University Experiment Stations, private landowners) using domestic sheep or goats on public lands, adjoining private lands, or state, provincial, or territorial wildlife habitat management areas.

➢ Where topography, vegetation, and other parameters are suitable, conversion of allotments from domestic sheep or goats to domestic livestock that pose a lower risk of disease transmission to wild sheep should be considered.

➢ Land management agencies should not convert cattle grazing allotments to domestic sheep or goat grazing or allow trailing in areas of suitable, historic wild sheep habitat. In suitable, historic wild sheep habitat not currently stocked with domestic sheep or goats, management strategies should emphasize options for restoring wild sheep populations.

➢ Stocking of allotments not currently under permit to domestic sheep or goats under emergency conditions (e.g., reduced forage availability in permitted allotment areas due to wildfire or drought) should only be permitted after adequate risk assessment has been completed, including documentation and a conclusion that effective separation can be assured. This assessment can be completed via project-level NEPA analysis.

➢ Land management agencies should incorporate state, provincial, or territorial wild sheep management plans either in, or supplemental to, federal Resource or Land Use Management Plans. Land management agencies should collaborate with state, provincial, or territorial wildlife agencies on comprehensive risk assessments (Clifford et al. 2007, Clifford et al. 2009, USDA-FS 2010) of domestic sheep or goat grazing allotments or trailing routes in wild sheep habitat, to assess risk of association with wild sheep. Adequate training (e.g., workshops, manuals) should be provided to agency staff to conduct risk assessments.

➢ Where mandatory buffer zones (frequently cited as a minimum of 9 airline miles [13.5 km]) between domestic sheep or goats and wild sheep have been used to minimize association, it should be recognized that buffer zones apply to herds or populations of wild sheep, rather than individual wandering wild sheep (e.g., most often sub-adult rams).

➢ In some cases, buffer zones have been a very effective strategy to reduce association between wild sheep and domestic sheep or goats. However, in continuous wild sheep habitat, where movements by

12

BLM_0109045

wild sheep may eventually exceed *a priori* expectations, buffer zones may not be effective or practical (Schommer and Woolever 2001).

➢ Topographic features or other natural or man-made barriers (e.g., fenced, interstate highways) can also be effective in minimizing association between wild sheep and domestic sheep or goats. Site-specific risk assessments should be completed, to evaluate efficacy of using natural barriers, defined buffer zones and other preventive actions to minimize risk. Given the wide range of circumstances across jurisdictions, buffer zones may not be needed in all situations; conversely, buffer zones should not be precluded as an effective strategy to address potential association between wild sheep and domestic sheep or goats.

➢ The presence of sick domestic sheep or goats may increase risk of association with wild sheep, as sick domestic animals may be less able to keep up with their bands and may be more prone to straying. Land management agencies, in collaboration with state, provincial, or territorial domestic sheep or goat health agencies, should work with producers and permittees to prevent turnout of sick or diseased domestic sheep or goats on grazing allotments or trailing routes, or use for weed control or as pack stock. Sick or diseased animals observed on the range should be reported to land management agency personnel as soon as possible; after that initial notification, inter-agency coordination should promptly occur. Analogous to requirements to use certified weed-free hay on public lands, or requirements to clean logging or other heavy equipment which have been operating in areas where noxious weed seed might be inadvertently scattered into new areas, domestic sheep or goats should be healthy before being turned out. Alberta and British Columbia (http://www.for.gov.bc.ca/hfp/publications/00006/) have developed specific health certification protocols that must be complied with before domestic sheep are turned out for vegetation management in conifer regeneration efforts. The higher the risk of association between domestic sheep or goats with wild sheep, the higher the certainty of domestic animal health should be. It must be recognized that even healthy domestic sheep or goats may still carry pathogens that can be transmitted to wild sheep, and thus, still pose a significant risk to wild sheep.

➢ Proportional to risk of association between domestic sheep or goats and wild sheep, land management agencies should work with producers and permittees, state, provincial, or territorial wildlife agencies, wild sheep advocates, and others, to implement a variety of management practices (e.g., herders, dogs or other guarding animals trained to repel animals foreign to domestic sheep bands or goat flocks such as wandering wild sheep or various predators, regular counts, removal of sick animals, confinement of domestic sheep or goats at night to minimize strays, adequate fencing configurations, covenants, allotment retirements, conversion of class of livestock, trucking vs. trailing, etc). We recognize that effectiveness of management practices to reduce risk of association are not proven (Baumer et al. 2009, Schommer 2009) and recommend that these practices not be solely relied upon to achieve effective separation. Such practices might, however, help achieve separation when applied outside of occupied wild sheep range, to mitigate impacts of straying domestic sheep or goats and wandering wild sheep.

➢ Land management and state, provincial, or territorial wildlife agencies should cooperatively manage for healthy wild sheep habitat. Agencies should routinely monitor wild sheep habitat to detect changes in habitat quality or condition and, as needed and appropriate, conduct habitat enhancements (e.g., prescribed burning, pre-commercial thinning, salting, mineral supplements,

BLM_0109046

water development, etc.) to encourage wild sheep to remain in wild sheep habitats, away from domestic sheep or goat use areas.

➢ In areas where association between wild sheep and domestic sheep or goats is likely, land management agencies should post advisory signs at trailheads, campgrounds, and other popular, high-use recreational areas, to educate visitors about the issue of interaction, and to encourage prompt reporting of wild sheep association with domestic sheep or goats. Furthermore, individuals accompanied by pets (i.e., dogs) should ensure that dogs remain under their control, and do not disturb or scatter domestic sheep or goats in permitted areas, or chase wild sheep.

➢ Land management agencies should clearly define the process, protocols, and timelines for short-term or emergency management actions when intervention is needed to minimize risk of association between wild sheep and domestic sheep or goats.

➢ Develop programs to foster and recognize compliance, cooperation, and cost-sharing in efforts to prevent commingling of wild sheep and domestic sheep on shared ranges.

➢ In collaboration with state, provincial, or territorial wild sheep management agencies, investigate and implement an option to allow the permittee or producer or appropriate agency representatives to remove commingling wild sheep.

➢ Where not already established, develop or clarify legal authority for removing stray domestic sheep from public lands by lethal means.

➢ Risk assessment should be conducted on an appropriate geographic scale, regardless of jurisdictional boundaries. Recognizing the limits of regulatory authority, land management agencies should consider private lands (i.e., either adjacent to, or inholdings of, federal land) when conducting risk assessments.

➢ Land management agencies should closely evaluate timing of permitted domestic sheep or goat grazing or trailing activities, to reduce disease transmission risk. For example, grazing domestic sheep when ewes are in estrus heightens attraction and increases possibility of association between wild sheep and domestic sheep.

➢ In areas with high risk of association between wild sheep and domestic sheep or goats, agencies and permittees should pursue enhanced monitoring of domestic sheep or goat grazing or trailing patterns via use of Global Positioning System collars or other technology that would provide detailed data on movements and grazing patterns. While enhanced monitoring will not reduce risk of association, it is vital for development of risk assessments and to ensure appropriate management recommendations are taken to achieve effective separation.

## Recommendations to Wild Sheep (and Other ) Conservation Organizations

➢ Recognize and support efforts of wild sheep management agencies.

➢ Assist state, provincial, or territorial wild sheep and federal land management agencies with education efforts to inform those who might enter or utilize wild sheep habitat to not use domestic

BLM_0109047

sheep or goats as pack animals, as they travel in, and through, wild sheep habitat. If use of domestic pack goats is authorized, close control, tethering, or night-penning to reduce strays should be encouraged. Encourage prompt reporting of association between wild sheep and domestic sheep or goats. Help agencies promote a reporting system for monitoring association between wild sheep and domestic sheep or goats.

➢ Assist state, provincial, or territorial wild sheep and federal land management agencies with development of informational, educational brochures and other materials identifying and explaining risk of association between wild sheep and domestic sheep or goat farm flocks and 4-H animals.

➢ Maintain or establish open lines of communication with domestic sheep or goat producers and industry organizations (e.g., woolgrowers associations) to reduce polarization on this issue. Jointly organized and cooperatively-funded workshops on risk assessment, identification of practical strategies to achieve effective separation between wild sheep and domestic sheep or goats, development and distribution of pamphlets or brochures, and public speaking opportunities are tangible examples of a collaborative, multi-disciplinary approach to address potential disease transmission.

➢ Continue to negotiate alternatives or incentives for domestic sheep or goat permittees to shift or move to grazing allotments outside wild sheep habitat; where suitable, convert to a different class of livestock with lower risk of potential disease transmission; or waive permitted domestic sheep or goat use in areas where risk assessment indicates high potential for association with wild sheep.

➢ Encourage and support development and funding of cooperative research on this issue. Encourage state, provincial, and federal agencies and other conservation groups to commit appropriate resources to maintain wild sheep resources.

## Suggested Management Practices for Domestic Sheep and Goat Permittees

(While these suggestions [largely based on C.A.S.T. 2008, Baumer et al. 2009, USAHA 2009] provide a common-sense approach that might reduce risk of association, there is no science-based evidence or evaluation [Schommer 2009] that assesses effectiveness of these actions in reducing risk or enhancing separation).

➢ Support multi-lingual education for, and the need for prompt, accurate reporting of association by, foreign herders working on domestic sheep or goat grazing allotments where proximity between wild sheep and domestic sheep or goats is possible.

➢ Select only highly gregarious breeds of sheep (e.g., Merino, Rambouillet, "Western/white-faced ewes", fine wools and crosses thereof) for grazing shared ranges.

➢ Use pregnant domestic ewes or ewe-lamb pairs for grazing near occupied wild sheep habitats; avoid grazing of open ewes, yearling replacement ewes and ewes that have lost their lambs because ewes in estrus may attract bighorn rams.

BLM_0109048

➢ Maintain a band size of less than 900 ewes with single lambs (1,800 total) or 700-800 ewes with twin lambs (2,100 to 2,400 total); if dry ewes or yearlings are grazed, maintain flock size of less than 1,500 head.

➢ Place more experienced, informed, and responsible sheepherders on allotments located nearest to wild sheep habitats.

➢ Place mature and effective guard dogs and herding dogs with domestic sheep (at least 2 of each per band). Female dogs in heat should not be placed on allotments.

➢ Conduct full counts of all individual ewes when moving onto and off of each allotment.

➢ Maintain an appropriate ratio of marker sheep within bands; depending on local needs and conditions, ratios should be no fewer than 1 marker for every 100 adult sheep. More markers may be required when dictated by local conditions.

➢ Count marker sheep on a regular basis, immediately any time sheep scatter and more frequently (e.g., once or twice per day) if required under local grazing agreements. It is customary to count marker sheep when they are bedded and this should be encouraged. After sheep scatter, complete a full count as soon as reasonably possible.

➢ Place bells on at least 1 in every 100 mature ewes to serve as warning, and for identification and location of sheep relative to other sheep.

➢ Select camp locations and bedding grounds that are acceptable and ensure domestic sheep remain within the bedding grounds.

➢ Select herder's camp, nighttime bedding ground, and midday bedding ground locations that maintain communication between guard dogs and herding dogs by smell, sound (barking) and sight, and to take advantage of differences in the sleep cycles of guard dog and herding dogs. If grazing federal lands, comply with established "bed ground" standards. Construct temporary electric or boundary fences in congregation areas (e.g., bed grounds), where feasible.

➢ Truck in water (if needed) to prevent straying.

➢ In situations where sheep are difficult to observe because of dense vegetation or difficult terrain, always count marker sheep after emerging from such conditions.

➢ Increase sheepherder vigilance on bright moonlit nights because sheep may rise to graze under these conditions.

➢ Truck domestic sheep through "driveway" areas that include occupied wild sheep habitat where interspecies association is considered likely.

➢ Do not trail more than 5 miles per day and stop trailing when sheep or lambs show signs of fatigue. Provide for a "babysitter" or removal of lagging sheep when trailing. Follow all agency guidelines on federal lands.

16

BLM_0109049

➢ Remove sick or physically disabled domestic sheep from the band.

➢ Require that sheepherders use communication equipment such as cellular or satellite phones or two-way radios, and use location equipment such as global positioning system (GPS) receivers to report and record grazing movements and encounters with wild sheep. Seek cost-sharing partnerships for providing electronic and other equipment when an operator changes grazing management practices for the sole purpose of minimizing domestic sheep association with wild sheep; these partnerships could include wildlife management agencies, federal land managers, or private organizations.

➢ Have sheepherders use a log book or other record keeping aids to record GPS locations, counts, losses, and other information as needed or required.

➢ Develop a detection and response protocol that includes the following:
   o reporting wild sheep (including a count and GPS location) that are in proximity to domestic sheep bands;
   o reporting stray or missing domestic sheep to the land management agency;
   o immediate, two-way notification (between permittee and land management agency) of actual commingling;
   o a post turn-off stray domestic sheep removal protocol;
   o a protocol for removing individual commingling wild sheep;
   o where feasible, collect standardized diagnostic samples on stray domestic sheep and commingling wild sheep;
   o instructions for domestic sheep herders to not leave sick domestic sheep behind.

➢ Develop and follow a plan for locating and reacquiring (dead or alive) stray sheep. If a domestic sheep is determined to be missing, the permittee will immediately initiate a comprehensive search and notify the land manager that domestic sheep are missing, or when those strays are located.

➢ Allow and encourage the permittee or producer and appropriate agency representatives to remove any stray domestic sheep in areas where interspecies association is likely to occur.

➢ Allow and encourage the permittee or producer and appropriate agency representatives to haze wild sheep that appear intent on commingling.

➢ Encourage voluntary allotment monitoring by permittees or independent observers in conjunction with federal and state agencies; where used, independent observers should receive prior training from permittees or agency personnel.

➢ Commensurate with risk of association between wild sheep and domestic sheep or goats, and recognizing the differential seasonal likelihood of wandering wild sheep, provide an adequate number of herders and guard animals, and employ other methods (e.g., volunteers, hazing of approaching wild sheep) to monitor and minimize potential association between wild sheep and domestic sheep or goats. Confine domestic sheep or goats at night where feasible, rather than loose herding/bedding, to minimize possible strays.

BLM_0109050

## Suggested Management Practices on Private Lands

➢ Recognize that domestic sheep or goat husbandry on private lands may influence wild sheep population viability on adjacent public lands. Voluntarily participate in comprehensive risk assessments with state, provincial, territorial and federal agencies when private land or farm flocks adjoin public land with wild sheep resources.

➢ Any observed association between wild sheep and domestic sheep or goats on or near private land should be promptly reported to the state, provincial, or territorial wildlife agency.

➢ Participate in cooperative educational efforts to enhance understanding of the issues of disease transmission between domestic sheep or goats and wild sheep.

➢ Do not release or leave unattended domestic sheep or goats in areas where they may seek out, or be sought out by, wild sheep.

➢ Cooperate with the public, state, provincial, territorial, or federal government agencies, agricultural organizations, producer associations, wild sheep conservation organizations, and other interested stakeholders to develop effective, comprehensive risk management approaches to ensure effective separation between wild sheep and domestic sheep or goats, while recognizing private property rights in and near wild sheep habitat. Approaches may include but are not limited to changing species/class of livestock, buyouts of land and/or domestic sheep or goats , use of methods to ensure physical separation (e.g., fencing strategies, use of guarding animals), conservation-based resolutions, bylaws, covenants or legislation.

➢ Develop adequate risk management strategies by private producers on privately-owned land.

➢ Consider alternative domestic livestock management strategies if they can reduce risk of disease transmission without causing economic hardship or reducing profitability.

➢ Consider partnerships with non-governmental organizations and wild sheep advocate groups for cost sharing on fencing or other domestic sheep or goat management that reduces risk of disease transmission from private flocks to public wild sheep.

➢ Support "effective separation" fencing standards whenever feasible, including the options of electric outrigger fences or double fencing methods to reduce transmission of respiratory disease agents. The goal of separation fencing is the physical prevention of nose-to-nose contact, and an adequate physical distance to prevent aerosol transmission. Outriggers of electric wire 2 feet from page-(woven) wire fencing or double fencing consisting of two page-wire fences with a minimum spacing of at least 10 feet are considered effective. A combination of fencing methods may be most effective to ensure that wild sheep do not physically contact domestic sheep or goats on private land.

➢ Participate in cooperative research ventures to enhance understanding of this issue and test mitigation protocols for disease risk management.

BLM_0109051

➢ Carefully consider the use of domestic sheep or goats for weed control on private land areas where association with wild sheep may occur. Work with agencies to consider alternative weed management strategies to reduce risk of association, while adequately managing weed problems.

## **Literature Cited**

http://www.for.gov.bc.ca/hfp/publications/00006/ British Columbia Ministry of Forests and Range: Sheep Vegetation Management Guidelines.

Aune, K., N. Anderson, D. Worley, L. Stackhouse, J. Henderson, J. Daniel. 1998. A comparison of population and health histories among seven Montana bighorn sheep populations. Proc. Bienn. Symp. North. Wild Sheep and Goat Counc. 11:46-69.

Baumer, A., N. East, J. Echnique, M. Haworth, M.F. Leinassar, C. Papouchis, T. Stephenson, D. Weaver, and G. Wilson. 2009. A Process for Identifying and Managing Risk of Contact between Sierra Nevada Bighorn Sheep and Domestic Sheep. 37 pp.

Beecham, J.J. Jr., C.P. Collins, and T.D. Reynolds. 2007. Rocky Mountain Bighorn Sheep (*Ovis canadensis*): a technical conservation assessment. USDA Forest Service, Rocky Mountain Region. http://www.fs.fed.us/r2/projects/scp/assessments/rockymountainbighornsheep.pdf

Black, S.R, I.K. Barker, K.G. Mehren, G.J. Crawshaw, S. Rosendal, L. Ruhnke, J. Thorsen, and P.S. Camran. 1988. An epizootic of *Mycoplasma ovipneumoniae* infection in captive Dall's sheep (*Ovis dalli dalli*). J. Wildl. Dis. 24:627-635

Bleich, V.C., J.D. Wehausen, and S.A. Holl. 1990. Desert-dwelling mountain sheep: conservation implications of a naturally fragmented distribution. Cons. Bio. 4:383-390.

Callan, R.J., T.D. Bunch, G.W. Workman, and R.E. Mock. 1991. Development of pneumonia in desert bighorn sheep after exposure to a flock of exotic domestic sheep. J. Amer. Veter. Med. Assoc. 198(6):1052-1056.

Cassirer, E.F., L.E. Oldenberg, V.L. Coggins, P. Fowler, K.M. Rudolph, D.L. Hunter, and W.J. Foreyt. 1996. Overview and preliminary analysis of a bighorn sheep die-off, Hells Canyon 1995-1996. Proc. Bienn. Symp. North. Wild Sheep and Goat Counc. 10: 78-86.

Clifford, D.L., B.A. Schumaker, T.R. Stephenson, V.C. Bleich, M. Leonard-Cahn, B.J. Gonzales, J.A.K. Mazet. 2007. Modeling risks of disease transmission from domestic sheep to bighorn sheep: implications for the persistence and restoration of an endangered endemic ungulate. Univ. of California-Davis Wildlife Health Center, Department of Fish and Game Resource Assessment Program Final Report. 47 pp.

Clifford, D.L., B.A. Schumaker, T.R. Stephenson, V.C. Bleich, M. Leonard-Cahn, B.J. Gonzales, W.M. Boyce, and J.A.K. Mazet. 2009. Assessing disease risk at the wildlife-livestock interface: a study of Sierra Nevada bighorn sheep. Biol. Cons. 142:2559-2568.

BLM_0109052

Coggins, V.L. 1988. The Lostine Rocky Mountain bighorn sheep die-off and domestic sheep. Proc. Bienn. Symp. North. Wild Sheep and Goat Counc. 6:57-64.

Coggins, V.L. 2002. Rocky Mountain bighorn sheep/domestic sheep and domestic goat interactions: a management perspective. Proc. Bienn. Symp. North. Wild Sheep and Goat Counc. 13:165-174.

Coggins, V.L. and P.E. Matthews. 1992. Lamb survival and herd status of the Lostine bighorn herd following a *Pasteurella* die-off. Proc. Bienn. Symp. North. Wild Sheep and Goat Counc. 8:147-154.

Colorado Division of Wildlife. 2009. Colorado Bighorn Sheep Management Plan: 2009–2019. Denver, CO. 93 pp.

Council for Agricultural Science and Technology (C.A.S.T.). 2008. *Pasteurellosis Transmission Risks between Domestic and Wild Sheep*. C.A.S.T. Commentary QTA 2008-1. C.A.S.T., Ames, IA. 8 pp.

Croft, B., M. Haworth, M. Hennessy, R. Mazur, S. Nelson, R. Perloff, J. Robson, and T. Stephenson. 2009. Application of the Document Entitled A Process for Identifying and Managing Risk of Contact between Sierra Nevada Bighorn Sheep and Domestic Sheep. 12 pp.

Croft, B., A. Fesnock, M. Haworth, R. Mazur, L. Murphy, S. Nelson, R. Perloff, and T. Stephenson. 2010. Application of the Document Entitled A Process for Identifying and Managing Risk of Contact between Sierra Nevada Bighorn Sheep and Domestic Sheep. 19 pp.

Desert Bighorn Council. 1990. Guidelines for management of domestic sheep in the vicinity of desert bighorn habitat. Trans. Desert Bighorn Counc. 34:33-35.

Diamond, J.M. 1997. Guns, Gems, and Steel: The Fates of Human Societies. W.W. Norton, New York, NY. 480 pp.

Dubay, S., H. Schwantje, J. deVos, and T. McKinney. 2002. Bighorn sheep (*Ovis canadensis)* diseases: a brief literature review and risk assessment for translocation. Proc. Bienn. Symp. North. Wild Sheep and Goat Counc. 13:134-152.

Epps, C.W., D.R. McCulloch, J.D. Wehausen, V.C. Bleich, and J.L. Rechel. 2004. Effects of climate change on population persistence of desert-dwelling mountain sheep in California. Cons. Bio. 18:102-113.

Epps, C.W., J.D. Wehausen, V.C. Bleich, S.G. Torres, and J.S. Brashares. 2007. Optimizing dispersal and corridor models using landscape genetics. J. Appl. Ecol.

Festa-Bianchet, M. 1988. A pneumonia epizootic in bighorn sheep, with comments on preventative management. Proc. Bienn. Symp. North. Wild Sheep and Goat Counc. 6:66-76.

Foreyt, W.J. 1994. Effects of controlled contact exposure between healthy bighorn sheep and llamas, domestic goats, mountain goats, cattle, domestic sheep, or mouflon sheep. Proc. Bienn. Symp. North. Wild Sheep and Goat Counc. 9:7-14.

BLM_0109053

Foreyt, W.J. and D.A. Jessup. 1982. Fatal pneumonia of bighorn sheep following association with domestic sheep. J. Wildl. Dis. 18(2):163-168.

Foreyt, W.J., K.P. Snipes, and R.W. Kasten. 1994. Fatal pneumonia following inoculation of healthy bighorn sheep with *Pasteurella haemolytica* from healthy domestic sheep. J. Wildl. Dis. 30(2):137-145.

Foreyt, W.J. and J.E. Lagerquist. 1996. Experimental contact of bighorn sheep (*Ovis canadensis*) with horses and cattle, and comparison of neutrophil sensitivity to *Pasteurella haemolytica* cytotoxins. J. Wildl. Dis. 32:594-602.

Foreyt, W.J., R.M. Silflow, and J.E. Lagerquist. 1996. Susceptibility of Dall sheep (*Ovis dalli dalli*) to pneumonia caused by *Pasteurella haemolytica*. J. Wildl. Dis. 32:586-593.

Foreyt, W.J, E.J. Jenkins, and G.D. Appleyard. 2009. Transmission of lungworms (*Mullerius capillaris*) from domestic goats to bighorn sheep on common pasture. J. Wildl. Dis. 45(2): 272-278.

Foster, C.L. 2004. Wild sheep capture guidelines. Proc. North. Wild Sheep and Goat Counc. 14:211-282.

Garde, E., S. Kutz, H. Schwantje, A. Veitch, E. Jenkins, B. Elkin. 2005. Examining the risk of disease transmission between wild Dall's sheep and mountain goats and introduced domestic sheep, goats and llamas in the Northwest Territories. Northwest Territories Agricultural and Policy Framework and Environment and Natural Resources Government of the Northwest Territories, Canada. 139 pp.

George, J.L, D.J. Martin, P.M. Lukacs, and M.W. Miller. 2008. Epidemic pasteurellosis in a bighorn sheep population coinciding with the appearance of a domestic sheep. J. Wildl. Dis. 4:388-403.

Goodson, N. 1982. Effects of domestic sheep grazing on bighorn sheep populations: a review. Proc. Bienn. Symp. North. Wild Sheep and Goat Counc. 3:287-313.

Grinnell, G.B. 1928. Mountain sheep. J. Mammal. 9:1-9.

Gross, J.E, F.J. Singer, and M.E. Moses. 2000. Effects of disease, dispersal, and area on bighorn sheep restoration. Rest. Ecol. 8(4S):25-37.

Honess, R.F. and N.M. Frost, 1942. A Wyoming bighorn sheep study. Wyoming Game and Fish Department Bull. No. 1.

Hunt, E.G. 1980. Report on Lava Beds National Monument bighorn sheep die-off. California Department of Fish and Game Memorandum. 6 pp.

Jansen, B.D., J.R. Heffelfinger, T.H. Noon, P.R. Krausman, and J.C. deVos, Jr. 2006. Infectious keratoconjunctivitis in bighorn sheep, Silver Bell Mountains, Arizona. J. Wildl. Dis. 42(2):407-411.

Jeffress, J. 2008. Transmission of *Pasteurella haemolytica* between domestic sheep and a free-ranging bighorn ewe. Proc. Bienn. Symp. North. Wild Sheep and Goat Counc. 16:160.

BLM_0109054

Jenkins, E.J., A.M. Veitch, S.J. Kutz, T.K. Bollinger, J.M. Chirino-Trejo, B.T. Elkin, K.H. West, E.P. Holberg, and L. Polley. 2007. Protostrongylid parasites and pneumonia in captive and wild thinhorn sheep (*Ovis dalli*). J. Wildl. Dis. 43:189-205.

Jessup, D.A. 1982. Bighorn sheep and domestic sheep: conflict in Nevada's Granite Mountains. Association of Wildlife Veterinarians Newsletter 14:4-5

Jessup, D.A. 1985. Diseases of domestic livestock which threaten bighorn sheep populations. Trans. Desert Bighorn Counc. 29:29-33.

Lawrence, P.K., S. Shanthalingam, R.P. Dassanayake, R. Subramaniam, C.N. Herndon, D.P. Knowles, F.R. Rurangirwa, W.J. Foreyt, G. Wayman, A.M. Marciel, S.K. Highlander, S. Srikumaran. 2010. Transmission of *Mannheimia haemolytica* from domestic sheep (*Ovis aries*) to bighorn sheep (*Ovis canadensis*): Unequivocal demonstration with green fluorescent protein-tagged organisms. J. Wildl. Dis. [in press].

Mack, C.M. 2008. Wandering Wild Sheep Policy: A Theoretical Review. Proc. Bienn. Symp. North. Wild Sheep and Goat Counc. 16:211-220.

Marsh. H. 1938. Pneumonia in Rocky Mountain bighorn sheep. J. Mammal. 19:214-219.

Martin, K.D., T.J. Schommer, and V.L. Coggins. 1996. Literature review regarding the compatibility between bighorn and domestic sheep. Proc. Bienn. Symp. North. Wild Sheep and Goat Counc. 10:72-77.

McQuivey, R.P. 1978. The bighorn sheep of Nevada. Nevada Dept. of Fish and Game Biol. Bull. No. 6.

Miller, M.W. 2001. Pasteurellosis. Pages 330-339 *in* E.S. Williams and I.K. Barker, editors. Infectious Diseases of Wild Mammals. 3rd edition. Iowa State University Press, Ames, IA.

Montana Department of Fish, Wildlife and Parks. 2009. Montana Bighorn Sheep Conservation Strategy. Helena, MT. 319 pp.

Onderka, D.K. and W.D. Wishart. 1984. A major bighorn sheep die-off from pneumonia in southern Alberta. Proc. Bienn. Symp. North. Wild Sheep and Goat Counc. 4:356-363.

Onderka, D.K. and W.D. Wishart. 1988. Experimental contact transmission of *Pasteurella haemolytica* from clinically normal domestic sheep causing pneumonia in Rocky Mountain bighorn sheep. J. Wildl. Dis. 24(4):663-667.

Onderka, D.K., S.A. Rawluk, and W.D. Wishart. 1988. Susceptibility of Rocky Mountain bighorn sheep and domestic sheep to pneumonia induced by bighorn and domestic livestock strains of *Pasteurella haemolytica*. Can. J. Veter. Res. 52:439-444.

Pybus, M.J., R.A. Fenton, and H. Lange. 1994. A health protocol for domestic sheep used on forest grazing allotments in Alberta and British Columbia. Proc. Bienn. Symp. North. Wild Sheep and Goat Counc. 9:20-24.

BLM_0109055

Rudolph, K.M., D.L. Hunter, W.J. Foreyt, E.F. Cassirer, R.B. Rimler, and A.C.S. Ward. 2003. Sharing of *Pasteurella* spp. between free-ranging bighorn sheep and feral goats. J. Wildl. Dis. 39:897-903.

Rudolph, K.M., D.L. Hunter, R.B. Rimler, E.F. Cassirer, W.J. Foreyt, W.J. DeLong, G.C. Weiser, and A.C. Ward. 2007. Microorganisms associated with a pneumonic epizootic in Rocky Mountain bighorn sheep (*Ovis canadensis canadensis*). J. Zoo. Wildl. Med. 38:548-558.

Ryder, T.J., E.S. Williams, and S.L. Anderson. 1994. Residual effects of pneumonia on the bighorn sheep of Whiskey Mountain, Wyoming. Proc. Bienn. Symp. North. Wild Sheep and Goat Counc. 9:15-19.

Schommer, T. 2009. Evaluation of "Best Management Practices". Appendix F, Payette NF DSEIS. 5 pp.

Schommer, T. and M. Woolever. 2001. A process for finding management solutions to the incompatibility between domestic and bighorn sheep. USDA Forest Service, Washington, DC. 62pp.

Schwantje, H. 1988. Causes of bighorn sheep mortality and die-offs: literature review. Wildlife Working Report No. WR-35. Wildlife Branch, Ministry of Environment, Victoria, BC, Canada. 49 pp.

Singer, F.J., V.C. Bleich, and M.A. Gudorf. 2000. Restoration of bighorn sheep meta-populations in and near western national parks. Restor. Ecol. 8(4S):14-24.

Skinner. M.P. 1928. The elk situation. J. Mammal. 9:309-317.

U.S. Animal Health Association. 2009. Recommendations on best management practices for domestic sheep grazing on public land ranges shared with bighorn sheep. USAHA Joint Working Group Committee on Wildlife Diseases & Committee on Sheep & Goats. 8 pp.

USDA Forest Service. 2009. Briefing Paper on Disease Transmission from Domestic to Bighorn Sheep, presented to Western Association of Fish and Wildlife Agencies, January 9, 2010, San Diego, CA.

USDA Forest Service. 2010. Update to the Draft Supplemental Environmental Impact Statement, Southwest Idaho Ecogroup Land and Resource Management Plans. USDA-FS Intermountain Region, Ogden, UT. 384 pp.

USDI Bureau of Land Management. 1992. Instruction Memorandum 92-264. Guidelines for Domestic Sheep Management in Bighorn Sheep Habitats. USDI-BLM, Washington, DC. 3 pp.

USDI Bureau of Land Management. 1998. Instruction Memorandum 98-140. Revised Guidelines for Management of Domestic Sheep and Goats in Native Wild Sheep Habitats. USDI-BLM, Washington, DC. 6 pp.

USDI Bureau of Land Management. 2010. Briefing Paper on Status of Domestic Sheep and Goat Management in Native Wild Sheep Habitat, presented to Western Association of Fish and Wildlife Agencies, January 9, 2010, San Diego, CA.

University of California-Davis. 2007. Workshop Summary: Respiratory Disease in Mountain Sheep: Knowledge Gaps and Future Research. 80 pp.

BLM_0109056

Ward, A.C.S., M.R. Dunbar, D.L. Hunter, R.H. Hillman, M.S. Bulgin, W.J. Delong, and E.R. Silva. 1990. *Pasteurellaceae* from bighorn and domestic sheep. Proc. Bienn. Symp. North. Wild Sheep and Goat Counc. 7:109-117.

Ward, A.C.S., D.L. Hunter, M.D. Jaworski, P.J. Benolkin, M.P. Dobel, J.B. Jeffress, and G.A. Tanner. 1997. *Pasteurella* spp. in sympatric bighorn and domestic sheep. J. Wildl. Dis. 33(3):554-557.

Western Association of Fish and Wildlife Agencies (WAFWA) Wild Sheep Working Group (WSWG). 2007. Recommendations for Domestic Sheep and Goat Management in Wild Sheep Habitat, June 21, 2007. 27 pp. http://www.wafwa.org/html/wswg.shtml

Western Association of Fish and Wildlife Agencies (WAFWA) Wildlife Health Committee (WHC). 2009. Wild Sheep Herd Health Monitoring Recommendations. 14 pp. http://www.wafwa.org/html/wswg.shtml

Western Association of Fish and Wildlife Agencies (WAFWA). Wild Sheep Working Group (WSWG). 2010a. GIS maps (in prep) for 14 western states, showing bighorn sheep distribution overlain with vacant and active domestic sheep and goat grazing allotments and trailing routes.

Western Association of Fish and Wildlife Agencies (WAFWA) Wild Sheep Working Group. 2010b. June 14, 2010 Summary on 9 bighorn sheep die-offs, winter 2009-2010. 2 pp. http://www.wafwa.org/html/wswg.shtml

## Appendix A.
## Glossary of Terms

Allotment: A portion of a landscape where livestock grazing of a plant community is prescribed according to a specific land use plan or legally defined regulatory authority.

Annual Operating Instructions: Specific language included in a term grazing or trailing permit file; reviewed each year with the permittee, prior to turnout of livestock on a grazing allotment or trailing route.

Association: Close proximity between wild sheep and domestic sheep or goats, potentially leading to direct physical contact and potential disease transmission.

Augment: An intentional introduction of wild sheep from one or more a source populations into another existing wild sheep population, to enhance the recipient population demographically or genetically.

Buffer Zone: A defined and delineated space on a landscape established by wildlife managers to reduce association and prevent possible disease transmission between wild and domestic sheep or goats across that geographic space.

BLM_0109057

Bighorn Sheep: A member of the species *Ovis canadensis* found throughout the mountains of western North America. They occur from the Peace River in Canada to northern Mexico and east to the Badlands of the Dakotas. Eight races are reported if one counts the extinct Audubon's bighorn.

Contact: Direct contact between body parts of two animals during which a disease might be transmitted from one to another. In this document, "contact" typically refers to nose-to-nose or face-to-face interaction that may lead to the transmission of respiratory disease via secretions or aerosols. Synonymous with "Interaction".

Close Management: A specific management prescription that requires intensive monitoring of animals in a population whose long-term persistence is at risk.

Connectivity: Creating or maintaining networks of habitat that connect fragmented habitats, thus linking population segments of wildlife. Connectivity allows gene flow and enhances long-term species survival.

Conservation Incentives: Incentive-based conservation is in direct contrast to regulation-based conservation. Incentive-based conservation provides economic, management or esthetic benefits to individuals or corporations to encourage them to conduct management activities that have positive conservation consequence to wildlife or wildlife habitat.  Examples are: private land conservation easements, direct lease agreements for grazing rights for conservation purposes, or a trade/exchange of equal value grazing rights among various partners to minimize wildlife-domestic livestock conflict.

Die-off: A large-scale mortality event that impacts many animals from a population and may have significant demographic consequence to the long-term persistence of that population. In this report, such mortality events are usually caused by respiratory disease epidemics involving bacterial and/or other pathogens alone or in various combinations.

Disease: The word disease means literally "free of ease". Disease is any impairment that modifies or interferes with normal functions of an animal, including responses to environmental factors such as nutrition, toxicants, and climate. Typically, disease involves transmission of, and exposure to, some infectious agent but it may involve non-infectious causes such as congenital defects.

Dispersal: The process where individuals leave one habitat or landscape to seek another habitat or landscape in which to live.

Double Fencing: Two fences running parallel around a landscape or pasture to prevent contact between animals across the fence line, designed to inhibit disease transmission.

Effective Separation: Spatial and/or temporal separation between wild sheep and domestic sheep or goats, resulting in minimal risk of contact and subsequent transmission of respiratory disease between animal groups.

Feral: An animal of a domestic species that resides in a non-domestic setting and is not presently owned or controlled.

BLM_0109058

Historic habitat: Landscape that at one time (most often at the time of European settlement) provided all necessary habitat requirements to sustain a wild sheep population through time.

Interaction: Direct contact between body parts of two animals during which a disease might be transmitted from one to another. In this document, "interaction" typically refers to nose-to-nose or face-to-face interaction that may lead to the transmission of respiratory disease via secretions or aerosols. Synonymous with "Contact".

Meta-population: An assemblage of populations, or a system of local populations (demes) connected by movement of individuals (dispersal) among various population segments.

Migration or migratory: A term used to refer to the movement of individuals or genes (gene flow) across a landscape; typically refers to movements from one seasonal habitat to another, or between breeding and non-breeding habitats.

Movement corridor: Routes that facilitate movement of animals between habitat fragments.

Occupied habitat: Suitable habitat in which a wild sheep population currently exists (ca. 2007).

Preferred: A specific management action that *should* be chosen over another, whenever possible:

Radio Collars: Transmitters fitted on neckband material to monitor animal locations.

Global Positioning System (GPS): A radio transmitter fitted on neckband material linked with orbiting satellites; animal locations can be precisely triangulated from space, with the location data then electronically stored in a memory chip or transmitted from a satellite system for data retrieval.

Very High Frequency (VHF): Radio instrument fitted to neckband material transmitting in the Very High Frequency range that can be located from the ground and/or aircraft, using a telemetry receiver.

Removal of sheep: Physical extraction of domestic sheep or goats or wild sheep to eliminate (permanently or temporarily) occupancy of that range or habitat.

Required: A specific management action that **must** be chosen over another.

Risk/Risk Assessment/Risk Management: In this context, evaluation of the probability that a wild sheep population could experience a disease event with subsequent demographic impacts. Identification of what factors might contribute to the probability of a disease event. Management actions taken to reduce the probability of exposure and/or infection among, or between, animals. Examples of risk management include separation of infected and non-infected animals, treatment of infected individuals, vaccination, manipulations of the host environment, or manipulations of the host population.

Qualitative Risk Assessment: Interpretation and analysis of factors that cannot necessarily be measured.

26

Quantitative Risk Assessment: Use of tangible data and measurements.

Spatial separation: A defined physical distance between animal populations.

Stray: A domestic sheep or goat physically or temporally separated from its flock or band.

Stressor: A specific action or condition that causes an animal to experience stress and the subsequent physiological results of that stress.

Suitable habitat: Landscape that has all necessary habitat requirements to sustain a wild sheep population through time.

Temporal separation: Segregating animal populations over time to prevent association, such that they may occupy the same physical space but at different times.

Thinhorn sheep: A member of the species *Ovis dalli* ranging from Alaska, the Yukon, Northwest Territories, and northern British Columbia.

Transmission: The physical transfer (direct or indirect mechanisms) of a disease agent from one animal to another, either within an animal population or between animal populations. In some instances, transmission can lead to full expression of disease in individuals or populations.

Transplant: An intentional movement of wild sheep from a source population to other suitable wild sheep habitat, either currently occupied or not. (Also called "translocation" in some documents.)

Trailing: The planned ambulatory movement of domestic sheep or goats across a landscape or within a corridor to reach a destination where grazing or use will be allowed.

Unoccupied habitat: Suitable habitat in which a wild sheep population does not currently exist.

Unsuitable habitat: Landscape that does not provide all necessary habitat requirements to sustain a wild sheep population through time.

Viability: The demographic and genetic status of an animal population whereby long-term persistence is likely.

Wandering Wild Sheep: wild sheep, primarily but not always young, sexually-mature rams, occasionally traveling outside of normally-anticipated or expected wild sheep range and adjacent habitat. Removal of wandering wild sheep typically does not have population-level implications for wild sheep; conversely, failure to respond to wandering wild sheep which may have known, likely, or suspected association with domestic sheep and/or goats may result in significant, adverse population-level impacts on wild sheep herds of origin, or of destination.

27

BLM_0109060

Appendix B.

**British Columbia Domestic-Wild Sheep Separation Project Contact Protocol**
The following protocols outline **the steps to be taken when reports of wild sheep contact with domestic sheep are received by the Ministry of Environment** in one of several ways:

1. **Regular report from public to regional office (Conservation Officer Service or Wildlife Section):**
   - Contact reported to Regional office.
   - Assessment of situation by sheep biologist and COS, in consultation with wildlife veterinarian
   - If close contact is confirmed and is considered a high risk situation, consider the following options:
     a. Kill bighorn and save carcass - sample bighorn and/or domestics in consultation with wildlife veterinarian
     b. Continue to monitor bighorn herd in area – observe and record general signs of health
     c. Do nothing – but keep records
   - If contact is unsubstantiated/considered low risk, continue to monitor bighorn herd in area, alert and encourage mitigation measures with domestic producers in area to ensure separation.

2. **Regular report from public to Call Line.**
   - Contact reported to Call Line; Call Line staff forwards to regional COS.
   - Assessment of situation by COS and sheep biologist, in consultation with wildlife veterinarian
   - If close contact is confirmed and is considered a high risk situation, consider the following options:
     a. Kill bighorn and save carcass - sample bighorn and/or domestics in consultation with wildlife veterinarian
     b. Continue to monitor bighorn herd in area – observe and record general signs of health
     c. Do nothing – but keep records
   - If contact is unsubstantiated/considered low risk, continue to monitor bighorn herd in area, alert and encourage mitigation measures with domestic producers in area to ensure separation.

3. **Out of hours call from public to Call Line.**
   - Contact reported to Call Line; Call Line staff forwards to regional COS officer-on-call.
   - Assessment of situation by COS officer-on-call - contacts sheep biologist and wildlife veterinarian, if possible for consultation
   - **If sheep biologist and wildlife veterinarian cannot be contacted, biologist and veterinarian will support COS decision and action.  COS will inform sheep biologist and wildlife veterinarian by email of the situation and action taken.**
     - If close contact is confirmed and is considered a high risk situation, consider the following options:
     - Kill bighorn and save carcass - sample bighorn and/or domestics in consultation with wildlife veterinarian
     - Continue to monitor bighorn herd in area – observe and record general signs of health
     - Do nothing – but keep records
     - If contact is unsubstantiated/considered low risk, continue to monitor bighorn herd in area, alert and encourage mitigation measures with domestic producers in area to ensure separation.

28

BLM_0109061

Appendix C.



## WYOMING GAME AND FISH DEPARTMENT

5400 Bishop Blvd. Cheyenne, WY 82006

Phone: (307) 777-4600 Fax: (307) 777-4610

Web site: http://gf.state.wy.us

**GOVERNOR**
DAVE FREUDENTHAL

**DIRECTOR**
TERRY CLEVELAND

**COMMISSIONERS**
RON LOVERCHECK – President
BILL WILLIAMS, DVM – Vice President
CLARK ALLAN
LINDA FLEMING
JERRY GALLES
CLIFFORD KIRK
KERRY POWERS

April 5, 2006

<u>MEMORANDUM</u>

TO:          Wildlife Division Employees

FROM:      Jay Lawson, Chief, Wildlife Division

COPY TO:  Terry Cleveland, Gregg Arthur, File

SUBJECT:  **PROTOCOL FOR HANDLING THE COMMINGLING OF
              BIGHORN SHEEP AND DOMESTIC SHEEP/GOATS**

Due to the threat of disease transmission and subsequent bighorn sheep die-offs, the following protocol should be followed.

**<u>Wandering Bighorn Sheep:</u>**
Where there is known, suspected, or likely contact by a wandering bighorn sheep with domestic sheep/goats:

- If possible, that bighorn(s) should be live-captured and transported (one-way) to our Sybille Research Unit.

- If that bighorn(s) cannot be live-captured, that bighorn(s) should be lethally removed (per authority of Chapter 56) and, if possible, transported (either whole or samples) to our Sybille Unit or our WGFD Lab in Laramie.

**<u>Stray Domestic Sheep/Goat:</u>**
Where there is known, suspected, or likely contact by a stray domestic sheep/goat with bighorn sheep:

- The owner of such livestock should be notified and asked to remove the stray sheep/goat to eliminate the threat of disease transmission; however, it will be the owner's prerogative to determine what course of action should be taken.

**<u>Reporting:</u>**
All documented commingling and any actions taken must be reported to the employee's immediate supervisor, Wildlife Administration as well as the Bighorn Sheep Working Group Chairman, presently Kevin Hurley.

*"Conserving Wildlife - Serving People"*

29

BLM_0109062

**James Bode**

| | |
|---|---|
| **From:** | anne hendricks <ravenworks2@mac.com> |
| **Sent:** | Wednesday, January 19, 2011 12:38 PM |
| **To:** | uformp@BLM.gov |
| **Subject:** | san miguel river |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

| | |
|---|---|
| **Categories:** | WSR_to_be_filed |

to who it may concern,
please preserve the san miguel river and its tributaries by giving Wild and Scenic status to the san miguel river.
anne hendricks
p.o. box 1765
telluride co

BLM_0109063

**James Bode**

| | |
|---|---|
| **From:** | Bob Gleason <bootdr1@gmail.com> |
| **Sent:** | Wednesday, January 19, 2011 8:27 AM |
| **To:** | UFORMP@BLM.GOV |
| **Cc:** | Kate Tallerday |
| **Subject:** | San Miguel Wild and Scenic |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |
| | |
| **Categories:** | WSR_to_be_filed |

Sirs and Madames,

Please support inclusion of the San Miguel and Dolores rivers into Wild and Scenic status.  As a river running professional who has spent a large portion of my life on the nations rivers, this river system has unique characteristics which beg for protection.  There are fantastic segments of wilderness along the river corridor that deserve preservation.  The historic characteristics including the Hanging Flume, native anitquities, and homesteads should be supported for the marvels of future generations.  The carved red wall canyons of this southwestern gem are unlike any other river.
The threat of degradation from mining and other forms of development require immediate action to protect this natural treasure.  Along most of its length, development has been light and primitive in nature.  The San Miguel is one of the last free flowing branches of the Colorado River system.  It needs to be kept in tact.  Wild and Scenic protection would provide a level of security to assure the preservation of this system.

Thanks for your consideration.

Bob Gleason
Boot Doctors/Further Adventures
Telluride, Co

1

BLM_0109064

**James Bode**

| | |
|---|---|
| **From:** | Barbara <toadehall@me.com> |
| **Sent:** | Wednesday, January 19, 2011 6:08 PM |
| **To:** | uformp@BLM.gov; S L G |
| **Subject:** | Hughes Ditch |

To Whom It May Concern:

Asa resident of Little Cone Ranch, I am writing to express opposition to any increase in the size of the Hughes Ditch that runs through Little Cone Ranch Subdivision (LCR) in San Miguel County.

I was advised of this second hand.  Although an owner, I did not receive the required  legal notices from Maynes, Bardford, Shipps and Sheftel about water issues and changes to the Hughes ditch.

The impact of depleting waters on Fall Creek will have a major impact on businesses in Telluride that rely on tourism, fishing, etc.  I would assume that an environmental study would be required to proceed.
I am  in opposition to any increase in the size of the Hughes Ditch.  The LCR has 23 parcels of 35 acres that will be affected by a decrease in values and the potential for flooding if the ditch should leak or break.

Sincerely,

Barbara and Stephen Golder
1219 Ft. Stephenson Oval
Lookout Mountain TN 37350

1

BLM_0109065

**James Bode**

| | |
|---|---|
| **From:** | Brenda Wright <coenbrenda@yahoo.com> |
| **Sent:** | Wednesday, January 19, 2011 2:33 PM |
| **To:** | lee@wccongress.org |
| **Cc:** | UFORMP@BLM.GOV |
| **Subject:** | Re: Nucla |
| **Attachments:** | W&S-BLMComments-FormLetter.doc |

Lee,
Most certainly you can stay here!   We have a guest bedroom.  No need for a sleeping bag.
It is about 30 minutes to Norwood from Nucla and about 2 hours from Grand Junction to here.
Attached is my letter.  Hope there is something in there that can help you guys!
Coen
--- On **Wed, 1/19/11, Lee Gelatt <_lee@wccongress.org_**> wrote:

From: Lee Gelatt <lee@wccongress.org>
Subject: Nucla
To: coenbrenda@yahoo.com
Date: Wednesday, January 19, 2011, 12:25 PM

Hi Coen,


It was nice to see you and Brenda again.  Would you have a place I could throw a sleeping
bag tomorrow night?



*Lee Gelatt*

Community Organizer

Western Colorado Congress

Grand Junction, CO

(970) 256-7650

1

BLM_0109066

**Coen Dexter**
**233 East 5th Avenue Nucla, CO 81424**
**coenbrenda@yahoo.com**

**January 20, 2011**

Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado  81401

**Re: Wild and Scenic Rivers Suitability Determination – Dolores River Basin, including San Miguel and tributaries**

To Whom It May Concern:

I appreciate the efforts of the Bureau of Land Management (BLM) Uncompahgre Field Office (UFO) to carefully assess the irreplaceable values of the Dolores and San Miguel Rivers and to identify administrative protections that can preserve these values for future generations.

I provide the following recommendations regarding Wild and Scenic Suitability:  All segments should be considered for protection along the San Miguel River.  The Dolores River has been degraded substantially since McPhee Reservoir and therefore makes it even more important that we protect the San Miguel and its tributaries. I have considered the issues and alternatives relevant to the Dolores and San Miguel river basins and tributaries.  I did not consider issues and alternatives related to the Lower Gunnison watershed.

Brenda and I have lived in the area for over ten years.  I presently am the regional coordinator for Colorado Breeding Bird Atlas II and did the same job in the late 1980s until 1994.  My work walking transects for Rocky Mountain Bird Observatory and doing Breeding Bird Survey Routes have gotten me into nearly every square mile of western San Miguel and Montrose counties.  We do run rivers and have floated nearly all stretches of the San Miguel and Dolores rivers.

I am co-author of Birds of Western Colorado, Plateau and Mesa County, 2004.  In doing research for the book we spent many, many hours in the San Miguel and Dolores river drainage.  Presently there are 175 species of birds that are breeding in the two drainages. Several of the species are restricted range species and therefore require special consideration.  A short list is Gunnison Sage-Grouse, Northern Goshawk, Black Swift, Willow Flycatcher, Loggerhead Shrike, Gray Vireo, Pinyon Jay, Purple Martin, Canyon Wren, American Dipper, Virginia's Warbler, Green-tailed Towhee and Brewer's Sparrow.

Within the last several years a permanent diversion dam has been placed across the San Miguel River.  The concrete structure may completely stop movement of fish at the dam site.  The location of the dam is about 3 miles above the Nucla Generating Power Plant and below Pinyon.  I wonder what process the dam builders went through to completely block the river with a three to four foot high concrete wall which is four to six inches thick at the top and much wider at the base.  The structure is a hazard to boaters, especially in high water.  The dam site is not in a WSR area but could impact aquatic life.

The greatest damage to rivers is done by dewatering them.  A great number of rivers in the west run dry for part of the season.  This practice can kill much of the aquatic life and greatly reduces the food that is required by other animals.  The population of American Dipper depends on a healthy river system and the San Miguel has one of the best anywhere in Colorado.  The San Miguel River also supports a large population of wintering Bald Eagles.

I have heard the argument that during high spring runoff that the water is just wasted.  We need to collect the water somewhere so we can use it when we need it.  However, research has shown that a river needs seasonal high flows to maintain a healthy river bank system, recharge wetlands and keep the riparian habitat from becoming degraded.  One needs to look no further than the Dolores River and compare it with the San Miguel River.  The Dolores River has become choked with tamarisk instead of willows and cottonwoods which are still dominate in the San Miguel River system.  The Dolores River is still healthy above McPhee Reservoir.

Thank you for your serious consideration of my comments.  The BLM is welcome to contact me if any further discussion is needed.

Sincerely,

**Coen Dexter**
**233 East 5th Avenue Nucla, CO 81424**
**coenbrenda@yahoo.com**

BLM_0109068

## James Bode

| | |
|---|---|
| **From:** | cari mackey <carimackey98@hotmail.com> |
| **Sent:** | Wednesday, January 19, 2011 9:12 PM |
| **To:** | uformp@blm.gov |
| **Subject:** | katetallerday@gmail.com |

RE: Wild and Scenic Rivers Suitability Determination – Dolores River Basin, including San Miguel and tributaries.

To Whom It May Concern:

I appreciate the efforts of the BLM and UFO to carefully assess the irreplaceable values of the Dolores and San Miguel Rivers and to identify administrative protections that can preserve these values for future generations.

I am a San Miguel County resident and have lived here for 11 years. I manage the retail store Jagged Edge on Main St. in the town of Telluride.  I have been a kayaker for about 15 years now and have gained my knowledge of the San Miguel and its tributaries from that experience. I have paddled many rivers around the world; each of them has their individual spectacular qualities, as do the San Miguel and Dolores rivers. Over the past 11+ years, I have spent my time on the San Miguel from the town of Telluride all the way down through the canyon to the Nucla power plant. Below that, I have spent some time putting in just above the confluence down about 15miles. On the Dolores, I have spent all of my time from just below Rico all the way down to the town of Dolores. I have spent time mostly for personal recreation, have been down the river with members of the San Miguel Whitewater Assoc (which I am secretary and treasurer), as well as assisted the Telluride Kayak School a few times with instruction.

I believe the following areas should be designated *Scenic* based on the fact that the river has been moved to allow for the highway and also because it follows the highway: The Upper Dolores from Rico to the town of Dolores, the San Miguel from the town of Telluride all the way to the Norwood Bridge.

I believe the following sections should be designated *Wild & Scenic* because of their remoteness, natural beauty, quality of whitewater experience, quality of fishing, bird viewing, outstanding vegetation, and wildlife that inhabit these areas: The San Miguel starting at the Norwood Hill bridge through Norwood canyon all the way to the end of the canyon upstream of the Nucla power plant.  Also deserving of this designation of *Wild & Scenic* is the section of the Dolores River below the dam all the way to Moab, UT.

I feel very passionately that these segments of river obtain the aforementioned designations for many reasons. First of all, we have the chance to protect what we have right now BEFORE we further damage the surrounding ecosystems and the natural experience the river provides for us. Not enough of the Worlds Rivers have had the chance that our rivers do right now. As a result, countless rivers have been destroyed past the point of recovery. The only way to save rivers that are as spectacular as the San Miguel and Dolores is to get more people to experience them for their natural outstanding values. Secondly, by providing these designations of wild and scenic, people will come to these places to experience what nature has to offer.  As a result of more people enjoying the river, the surrounding areas will benefit greatly too. As the manager of a local business in Telluride, I know that river users will come to this area and need what my store has to offer; river gear. My business will thrive as a result of that which also causes more sales tax revenue, jobs, and quality of life for myself as well as my employees.  Lastly, quality of life for the surrounding areas becomes increasingly better for the future. By designating these rivers as wild and scenic, their natural beauty will be protected for future generations. I am not a parent, but I believe that the young ones of today should be able to enjoy a world as

1

beautiful as it is right now and that alone is a very important reason to designate these sections of river in the ways I have recommended.

In closing, whenever discussions arise about trying to save sections of rivers whether it is in my back yard, or a continent in another part of the World, conservationism is rarely the topic of discussion. We all consume water and most of us more than we should. This is the cause of these issues. I understand that we all need water; we need farmers and ranchers to have water because we consume what they grow and nurture. I am not trying to take away from anyone; I want to protect what we have now. By granting the rivers these designations we force ourselves and our neighbors to look at our consumption under a microscope, and learn what we can live with, and what we can live without. Not everyone understands the threat the rivers face because of their overconsumption of resources and what the end cause can be. Unfortunately, this is what it comes down to in order to protect us from ourselves.  It is easier to save what we already have than it is to get back what we've destroyed.

Thank you for your attention to and consideration of my comments. Please contact me for any future questions or comments that you may need.


Sincerely,
Cari Mackey
PO Box 523
Placerville, CO 81430
Carimackey98@hotmail.com

BLM_0109070

**James Bode**

| | |
|---|---|
| **From:** | Cari Mackey\|Jagged Edge <cari@jagged-edge-telluride.com> |
| **Sent:** | Wednesday, January 19, 2011 9:39 PM |
| **To:** | UFORMP@BLM.GOV |
| **Cc:** | katetallerday@gmail.com |
| **Subject:** | Wild and Scenic Comments from SMWA |
| **Attachments:** | Wild and Scenic SMWA.docx |

RE: Wild and Scenic Rivers Suitability Determination – Dolores River Basin, including San Miguel and tributaries.

To Whom It May Concern:

We appreciate the efforts of the BLM and UFO to carefully assess the irreplaceable values of the Dolores and San Miguel Rivers and to identify administrative protections that can preserve these values for future generations.

As a collaborative effort, the San Miguel Whitewater Association is comprised of over 100 river enthusiasts. We represent citizens who enjoy the rivers of the San Miguel and the Dolores River.  We are fishermen, rafters, kayakers, birdwatchers, nature lovers, river conservationists, canoeists, and more. We write to you today to impress upon the you the importance of designating different sections of the San Miguel and Dolores River Wild and/or Scenic.

We believe the following areas should be designated Scenic based on the fact that the river has been moved to allow for the construction of the highway and also because it follows the highway: The Upper Dolores from Rico to the town of Dolores, the San Miguel from the town of Telluride all the way to the Norwood Bridge.  The scenery of the steep canyon walls, the lush cottonwoods and vegetation, the wildlife, and the quality of the whitewater experience on these rivers is amazing. With a designation of scenic, the river corridor and all it has to offer will be there for others to enjoy in the future.  This section of river has been altered due to the construction of the highway however, there is still much to protect.

We believe the following sections should be designated Wild & Scenic because of their remoteness, natural beauty, quality of whitewater experience, quality of fishing, bird viewing, outstanding vegetation, and wildlife that inhabit these areas: The San Miguel starting at the Norwood Hill bridge through Norwood canyon all the way to the end of the canyon upstream of the Nucla power plant.  Also deserving of this designation of Wild & Scenic is the section of the Dolores River below the dam all the way to Moab, UT.

As a local non-profit organization, our goals are many.  We aim to protect our local watershed, foster community involvement as a group who recreates on the river, provide a means for people to get together to enjoy our rivers, and to educate children about the importance of rivers and the enjoyment they provide.  We want to urge you today to provide the protection these rivers deserve by way of designating them either of the aforementioned designations. We serve as a voice for the river that cannot speak up, as well as a voice for the future generations who don't realize what they could lose without the necessary protections we could put in place now.

Thank you for your attention to and consideration of our comments. Please contact us for any future questions or comments that you may need.
The San Miguel Whitewater Association
Via: Cari Mackey
Secretary/Treasurer
PO Box 2256
Telluride, CO 81435
970-728-9307

BLM_0109071

cari@jagged-edge-telluride.com

BLM_0109072