right along the entire segment, structured to protect the natural environment to a reasonable extent.  The instream flow would also provide some protection to sustain the ORVs.

One pump diversion within the segment is located near the lower terminus.  There are no conditional water rights within the segment.

The 2004 Statewide Water Supply Initiative identifies reservoir sites on Beaver Creek and Plateau Creek with flows into McPhee Reservoir that could be operated to increase flow in the Dolores River below McPhee Reservoir.  The reservoir sites are a high priority for the Southwest Basins Roundtable of Colorado Interbasin Compact Committee.  The report also identifies potential dam sites on the Dolores River in Paradox Valley and Slickrock, Colorado.

Flow through the segment is significantly diminished by the operation of McPhee Reservoir upstream.  A large portion of natural water yield entering the reservoir is transferred out of the basin, primarily for agricultural use.  Water rights associated with the reservoir are senior to an instream flow water right downstream.

Most future water demand will come from conservation practices and development of existing water rights, including some existing 141,000 acre-feet of conditional water rights in the basin. (SWSI 2004) Many of these are senior to both the existing instream flow water right and any instream flow associated with WSR designation.

## LAND OWNERSHIP AND USES

Approximately 12% of the corridor includes private land zoned as General Agriculture in the Montrose County Master Plan.  As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit.  Many of the uses are not related to agriculture and have the potential to conflict with the intent of the WSR Act.

### Special Designations

Portions of the segment are within a Special Recreation Management Area.  The majority of the segment is located within the Dolores River Canyon WSA.  The WSA affords some interim protection for the ORVs.  The lower northeast portion outside of the WSA consists of private land.  Neither designation provides the authority to acquire flows necessary for sustaining the Vegetation ORV.

### Rights-of-Way and Withdrawals

ROWs on intermingled BLM lands outside the WSA include access roads serving private lands, utilities, and a pending water pipeline application.

Some lands within the corridor are managed by the Bureau of Reclamation and contain the administrative office building and injection well for the Paradox Basin Unit, Salinity Control Project.

While the entire BLM portion of the segment is within an area classified as a power site, the classification does not preclude WSR designation.

BLM_0109668

*Energy and Mineral Resources*

Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

## ADMINISTRATION

Access is limited on portions of the segment within the WSA.  There is existing development and no land use controls on private portions of the segment.

WSR designation would complement BLM Colorado Public Land Health standards for special status species and wildlife.

Managing the segment to sustain native warm water fish is consistent with actions in the Range-wide Conservation Agreement and Strategy for Roundtail Chub *(Gila robusta)*, Bluehead Sucker *(Catostomus discobolus)*, and Flannelmouth Sucker *(Catostomus latipinnis)*.

*Potential Costs Associated with WSR Designation*

Upon finding a segment suitable, the stream and corridor would be managed to protect the ORVs, with little additional funding needed.  Following formal WSR designation, additional funding would be required for signage, public education, ranger patrols, and maintenance, the amount of which would vary, depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Costs for administering and managing this segment for the Recreational, Scenic, Wildlife, Geologic, Ecologic, and Archeology ORVs would be similar to or slightly higher than current funding levels. The upper portion of this segment is within the Dolores River Canyon WSA, with access limited to a single track non-motorized, non-mechanized trail, factors that assist in protection of the ORVs.

The BLM presently incurs some costs on this area to implement the Interim Management Policy for Lands under Wilderness Review.  However, additional visitor use resulting from WSR designation could generate the need for funding to develop staging facilities to support primitive recreation opportunities.

Lower portions of the segment downstream from the WSA include private lands.  The BLM would pursue acquisition of selected tracts of private land from willing sellers as needed to support increased visitor use, and provide additional protection for the ORVs.

*Alternative Protective Measures Considered*

A portion of the segment is within the proposed Dolores River Slickrock Canyon ACEC, being considered during development of the Uncompahgre RMP.

Portions of the segment are within a Special Recreation Management Area.  The majority of the segment is located within the Dolores River Canyon WSA.  The WSA designation affords some protection for the ORVs in accordance with the Interim Management Policy for Lands Under Wilderness Review (H-8550-1).

Future private water right or ROW applications should include BLM terms and conditions to protect the ORVs.

BLM_0109669



**DENISON MINES**

Denison Mines (USA) Corp.
1050 17th Street, Suite 950
Denver, CO 80265
USA

Tel : 303 628-7798
Fax : 303 389-4125

www.denisonmines.com

*RECEIVED*
*FEB 07 2011*
*BY:*

February 4, 2011

Barbara Sharrow
Field Manager
US Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Dear Barbara Sharrow:

**Re: Comments on the Final Wild and Scenic River Eligibility Report for the BLM Uncompahgre Planning Area**

Denison Mines (USA) Corp. ("Denison") is a stakeholder in the Uncompahgre Field Office Resource Management Area and received a written notice under the name of IUC Exploration LLC for a Notice of Stakeholder Meetings (for the above referenced report) on November 12, 2010. Although Denison has not been able to participate in the stakeholder meetings, we did have an opportunity to review the Final Wild and Scenic River Eligibility Report. Although this report is identified as final, Denison was not provided an opportunity to comment previously on the report and would like to provide the following comments at this time:

Denison understands that the Wild and Scenic Rivers (WST) eligibility report details the results of an evaluation of waters within the Uncompahgre Planning Area and portion of the Dominguez-Escalante National Conservation Area for inclusion in the National Wild and Scenic Rivers System. Denison further understands that River Segments identified as eligible in the Final Report will be further evaluated for suitability during preparation for the Uncompahgre Resource Management Plan. Denison urges that you to consider the multiple use mandate by the Federal Land Policy and Management Act as defined below when making these decisions.

> "(c) The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to pro-vide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output."

Specifically as this mandate relates to private property and active mining claims and Department of Energy Mineral Leases which are existing and approved uses in these subject areas. Specifically, Segments as follows:

- Naturita Creek (map 16) which are estimated at 50 percent private property along this stretch of creek,
- Segments 5 and 6 along San Miguel River (map 22) which are adjacent to DOE leases and Denison Claims as outlined in the DOE Programmatic Environmental Assessment, July 2007,
- Tabequache Creek, Segment 2 (map 24) is an important mining area (with historical impacts) with remaining resources,
- Lower Dolores River (map 25) likely has active claims and leases in the area,
- North Fork of Mesa Creek (map 26) likely has active mining claims and leases in the area,
- La Sal Creek Segments 1, 2 and 3 (maps 29, 30 and 31), has active mining claims and possibly one active mine in the area, and,
- Lion Creek Segments 2 (map 32), has active mining claims in the area.

Please continue to keep Denison informed of your progress and we would greatly appreciate an opportunity to comment on the RMP when it is out for public comment. If you have any questions or comment, feel free to contact myself at cwoodward@denisonmines.com or 303.389.4136 or Terry Wetz at twetz@denisonmines.com or 303.389.4161.

Yours very truly,

**DENISON MINES (USA) CORP.**

Christy Woodward, PE
Environmental Coordinator

Cc:     Denison Mines (USA) Corp., File
        Terry Wetz, Denison Mines (USA) Corp



2

February 8, 2011

RAC Subgroup - WSR Stakeholder Group Meeting

| Signature | Printed Name | E-Mail Organization/Interest | * |
|---|---|---|---|
| Dave Schmeck | David Schmeck | Dschm@sanmiguel/County.org | |
| Marshall Pendergrass | Marshall Pendergrass | | |
| Betty Oglesby | Betty Oglesby | | |
| Lynn Hoyt | Lynn Hoyt | | |
| D. Maggie Magee | D. Maggie Magee | dmagee@BLM.gov | |
| Bill Bottomly | Bill Bottomly | | |
| Andrea Robinson | Andrea Robinson | | |
| Steve White | STEVE WHITE | SWHITE@MONTROSECOUNTY.NET | |
| Jeff Protean | JEFF PROTEAN | jproteanC-tellmoustinesset.com | |
| Dave Foley | DAVE FOLEY | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

* Please indicate (right column) if you want to be added to the RMP mailing list

BLM_0109672

February 7, 2011

RAC Subgroup - WSR Stakeholder Group Meeting

| Signature | Printed Name | Organization/ Interest |
|---|---|---|
| | Jedd Sondergard | BLM |
| | Peter Mueller | TNC |
| | Bill Day | Sub RAC- Wildlife |
| | Barbara Hawke | Gen Public / TWS |
| | Robbie LeValley | Subrac |
| | John Reams | Sub-RAC Western Small Miners |
| | Bill Ela | BLM SubRAC |
| | Bruce Frickbaum | BLM |
| Steven Weist | Steve Weist | Sub Rac Member |
| | WALT BLACKBURN | OHV Community |
| | ILLENE ROGGENSACK | FACILITATOR |
| Barb Sharrow | Barb Sharrow | BLM - UFO |
| Shelby Bear | Shelby Bear | UMEA |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

BLM_0109673

February 7, 2011

RAC Subgroup – WSR Stakeholder Group Meeting

| Signature | Printed Name | Organization/ Interest |
|-----------|--------------|------------------------|
| *[signature]* | Jedd Sondergard | BLM |
| *[signature]* | Peter Mueller | TNC |
| *[signature]* | Bill Day | Sub RAC Wildlife |
| *[signature]* | Barbara Hawke | Gen Public / TWS |
| Robbie LeValley | Robbie LeValley | subrac |
| John Reams | John Reams | Sub-RAC Western Small Miners |
| Bill Ela "Milla" | Bill Ela | BLM Sub RAC |
| *[signature]* | Bruce Krickbaum | BLM |
| Steve Weist | Steve Weist | Sub Rac member |
| Walt B Blackburn | WALT BLACKBURN | OHV Community |
| ILENE ROGGENSACK | *[signature]* | FACILITATOR |
| Barb Sharrow | Barb Sharrow | BLM - UFO |
| Shelby Bear | Shelby Bear | CTMCA |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

RAc Subgroup - WSR Stakeholder Group Meeting

February 8, 2011

| Signature | Printed Name | E-Mail Organization/Interest | * |
|---|---|---|---|
| Dave Schneck | David Schneck | DSchneck@smmthisel/County.org | |
| Marshall Pendergrass | MARSHALL PENDERGRASS | [redacted] | * |
| Betty Oglesby | Betty Oglesby | [redacted] | |
| Lynn Hoyt | Lynn Hoyt | [redacted] | * |
| D. Maggie Magee | D. Maggie Magee | dmagee@BLM.gov | |
| Bill Bottomly | Bill Bottomly | [redacted] | |
| Andrea Robinson | Andrea Robinson | [redacted] | |
| Steve White | STEVE WHITE | SWHITE@MONTROSECOUNTY.NET | |
| JEFF PROTEAN | JEFF PROTEAN | jprotean@tellurideskiresort.com | |
| DAVE FOLEY | DAVE FOLEY | [redacted] | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

* Please indicate (right column) if you want to be added to the RMP mailing list

U.S. DEPARTMENT OF THE INTERIOR   **BUREAU OF LAND MANAGEMENT NEWS RELEASE**

**Release Date:** 02/09/11
**Contacts:** Deanna Masterson, 303-239-3671
Bruce Krickbaum, 970-240-5384

### BLM Uncompahgre Resource Management Plan Advisory Group to Meet (02-08-11)

MONTROSE, Colo. — The Bureau of Land Management's Southwest Colorado Resource Advisory Council subgroup is scheduled to meet to discuss Wild and Scenic River suitability recommendations for the Uncompahgre Field Office's Resources Management Plan.  Specifically, the group will discuss a recommendation for the Dolores River segment within the field office.

The meeting is scheduled from 4 p.m. to 5:30 p.m., Feb. 16, at the Montrose Public Lands Center, 2505 South Townsend Ave., Montrose, Colo. The meeting is open to the public, with a public comment period scheduled for 4:30 p.m.

The Southwest Colorado RAC subgroup is composed of area residents representing diverse interests within the Uncompahgre Field Office. The 11-member subgroup will provide recommendations to the BLM Southwest Colorado RAC regarding suitability for streams to be included in the National Wild and Scenic River System.

The Southwest Colorado RAC is one of three advisory councils to BLM Colorado. Composed of 15 members appointed by the Secretary of the Interior, individuals serving in each RAC represent a broad range of public land interests, ranging from environmental to local government to commercial activity. For more information on Colorado RACs, go to www.blm.gov/co and select Resources, then Resource Advisory Councils.

The BLM manages more land - more than 245 million acres - than any other Federal agency. This land, known as the National System of Public Lands, is primarily located in 12 Western states, including Alaska. The Bureau, with a budget of about $1 billion, also administers 700 million acres of sub-surface mineral estate throughout the nation. The BLM's multiple-use mission is to sustain the health and productivity of the public lands for the use and enjoyment of present and future generations. The Bureau accomplishes this by managing such activities as outdoor recreation, livestock grazing, mineral development, and energy production, and by conserving natural, historical, cultural, and other resources on public lands.

--BLM--

2465 South Townsend Avenue     Montrose, CO 81401

Last updated: 02-16-2011

USA.GOV  |  No Fear Act  |  DOI  |  Disclaimer  |  About BLM  |  Notices  |  Get Adobe Reader®

Privacy Policy  |  FOIA  |  Kids Policy  |  Contact Us  |  Accessibility  |  Site Map  |  Home

BLM_0109676

**Bureau of Land Management**  2465 S. Townsend Ave. • Montrose, Colorado 81401

*BLM UNCOMPAHGRE NEWS*

**For Immediate Release**
**Contact:** Deanna Masterson, 303-239-3671
Bruce Krickbaum, 970-240-5384

### BLM Uncompahgre Resource Management Plan Advisory Group to Meet

MONTROSE, Colo. — The Bureau of Land Management's Southwest Colorado Resource Advisory Council subgroup is scheduled to meet to discuss Wild and Scenic River suitability recommendations for the Uncompahgre Field Office's Resources Management Plan. Specifically, the group will discuss a recommendation for the Dolores River segment within the field office.

The meeting is scheduled from 4 p.m. to 5:30 p.m., Feb. 16, at the Montrose Public Lands Center South Building, 2505 South Townsend Ave., Montrose, Colo. The meeting is open to the public, with a public comment period scheduled for 4:30 p.m.

The Southwest Colorado RAC subgroup is composed of area residents representing diverse interests within the Uncompahgre Field Office. The 11-member subgroup will provide recommendations to the BLM Southwest Colorado RAC regarding suitability for streams to be included in the National Wild and Scenic River System.

The Southwest Colorado RAC is one of three advisory councils to BLM Colorado. Composed of 15 members appointed by the Secretary of the Interior, individuals serving in each RAC represent a broad range of public land interests, ranging from environmental to local government to commercial activity. For more information on Colorado RACs, go to www.blm.gov/co and select Resources, then Resource Advisory Councils.

## BLM ##

-------------------------------------------
Deanna Masterson
BLM Colorado State Office
2850 Youngfield Street
Lakewood, CO 80215
303-239-3671

## James Bode

| | |
|---|---|
| **From:** | bsharrow@blm.gov |
| **Sent:** | Friday, February 11, 2011 4:11 PM |
| **To:** | uformp@blm.gov |
| **Subject:** | Fw: Wild n Scenic comment |
| **Attachments:** | 2011-02-02 comment from Dave Foley 001.tif |

Barbara Sharrow
Uncompahgre Field Office Manager

970-240-5315 - office
970-596-1515 - cell

----- Forwarded by Barbara Sharrow/MOFO/CO/BLM/DOI on 02/11/2011 04:10 PM -----

"Dave Foley"
<skifoley@gmail.c
om>                                       To
              <Barbara_Sharrow@blm.gov>
02/02/2011 04:40                          cc
PM            "'Peter Mueller'"
              <pmueller@tnc.org>
                              Subject
              Wild n Scenic comment

Barb,

Please give me a call at 728-4747. Thanks,

Dave(See attached file: 2011-02-02 comment from Dave Foley 001.tif)

BLM_0109678

J. David Foley
P. O. Box 825, Ophir, CO 81426
Phone 970-728-4747
skifoley@gmail.com

February 2, 2011

Re: Wild and Scenic River -- Naturita Creek

Barb Sharrow
Bureau of Land Management
2465 South Townsend
Montrose, CO 81401

Dear Barb,

I am the landowner who owns 240 acres of private land along a 1.5 mile stretch of upper Naturita Creek in San Miguel County. I recently proposed creating two segments for Naturita Creek, with a division at San Miguel County Road W35.

I just had a conversation with Peter Mueller, a member of the RAC subcommittee, about my proposal to create a segment for the upper portion of Naturita Creek. He believes that the whole 25-mile portion of Naturita Creek will be dropped from Suitability. He indicated that my proposal will not be considered because the current study of Naturita Creek has not identified any ORV's for the upper 4 mile segment that I proposed. This is true, primarily because the BLM field staff never visited this upper portion of Naturita Creek. I know this because at the January 20 meeting in Norwood, I talked with the BLM field biologist who conducted the studies for ORV's, and she told me that she did not visit this portion of Naturita Creek.

I request the BLM to make a study of the upper 4 mile portion of Naturita Creek to determine if there are any ORV's associated with that particular segment. I believe that it is negligent of the BLM to have missed a significant portion of a study area, especially the most undisturbed, wild portion of the creek. I know that area very well, and I am confident that there are ORV's that can be identified. The undisturbed riparian vegetation, the abundant wildlife and the remote scenic beauty have tremendous potential for ORV's, if a field staff would just visit the site. There are many box elder trees along the creek, which may be part of a box elder-river birch Plant Community, newly classified as G1/G2 for rarity. This is not certain, but is worth a visit to the site to be sure.

Thank you for your consideration in this matter.

BLM_0109679

Sincerely,

J. David Foley

BLM_0109680

## James Bode

**From:**          Proteau, Jeff <JProteau@tellurideskiresort.com>
**Sent:**          Tuesday, February 22, 2011 3:28 PM
**To:**            'UFORMP@blm.gov'
**Cc:**            Riley, Dave; Zemke, Daniel
**Subject:**       Wild and Scenic Rivers Suitablility comment letter
**Attachments:**   WSR comment letter 2_22_11 final.pdf

**Categories:**    SS.D.b / 2_Stakeholder_Dolores / Mtgs / WSRMtg_2011-02-07 / New Comment folder?


To whom it may concern,

Please forward attached comment letter to Bruce Krickbaum and Barbara Sharrow. Thank you.

Sincerely,
Jeff Proteau


Jeff Proteau
Executive Director / Planning & Sustainability
TSG Ski & Golf, LLC
565 Mountain Village Blvd
Telluride, CO 81435
970-728-7444 phone
970-728-7368 fax
www.tellurideskiresort.com



BLM_0109681

TELLURIDE

February 22, 2011

Bruce Krickbaum                                          Via facsimile and email
RMP Project Manager                                      Hard copy to follow
2465 S. Townsend Ave.
Montrose, CO

RE: Wild and Scenic River (WSR) Suitability

Dear Mr. Krickbaum:

As a major stakeholder in the San Miguel River watershed and the operator of the Telluride Ski Area and Golf Course, we are providing written comment on the Wild and Scenic River Suitability designations recommended by the Resource Advisory subgroup (RAC) for the San Miguel River segments. We have reviewed the Eligibility Report and the information provided for the Draft Suitability Report. I also attended the RAC meeting in Montrose on February 7, 2011. I provided comment during the public comment portion of the meeting, but wanted to follow up with written comments regarding recommended designations for the San Miguel River segments.

As an owner of surface water rights, storage rights, and groundwater rights in the San Miguel River watershed, we believe that the proposed designations of Wild, Scenic, or Recreation for the San Miguel River segments 1,2,3,5 & 6 can negatively affect the utilization of our current water rights and potential future water right needs. Although our current water rights would be senior to any federal water right that could result from any of these designations, future water rights (ie. changed location, changed use, augmentation, etc.), water facility development or existing water facility repairs or improvements of facilities could be negatively impacted by these designations.

Some of our surface water rights, storage and groundwater rights include locations on private and federal lands (USFS). We are concerned that the WSR designation on the San Miguel River segments would create an additional review, with additional unknown standards for review for water resource development projects located on USFS lands, under the National Environmental Policy Act (NEPA).

Water use from the San Miguel River watershed has, for many years, been managed by the water users to provide water for municipal, agricultural, storage, snowmaking, irrigation, domestic, commercial, and other uses. The Colorado Water Conservation Board (CWCB) has implemented in-stream flows to protect sensitive fish species, and we have operated to respect those in-stream flows. The potential for additional in-stream flow restrictions or quality standards enforced to support any of these WSR designations could harm the ability to operate our water resource facilities as needed in the future.

For these reasons we are opposed to the recommended suitability designations by the RAC subgroup for the San Miguel River segments and believe these segments are "not suitable" for WSR designation.

An acceptable alternative to "not suitable" that we would consider supporting would be to designate these segments as Recreation if the BLM would include in the designation a provision that would exclude our current water rights, future water right applications, development of water resource development facilities

BLM_0109682

(ie diversions, wells, pumping plants, impoundments, etc.) and improvement and repairs of existing or future facilities.

We have been and will continue to be good stewards of the land. We have demonstrated our sensitivity to the environment by being the recipient of recognition through environmental awards that include the following: the National Ski Area Association's Golden Eagle Award for Environmental Excellence, the Regional Forester's Caring for the Land Stewardship Award, and certification in Audubon International's Cooperative Sanctuary System program for golf courses. The Telluride Ski & Golf Company believes in protecting the health of the river and collaborates with the United States Forest Service, the surrounding Telluride and Mountain Village communities as well as San Miguel County, to together find solutions to sustain the region's economic, cultural and environmental health.

In closing we do not believe that the proposed designations are a "good fit" for the San Miguel River for the reasons stated above. Thank you for the opportunity to provide comment.

Sincerely,

Jeff Proteau
Executive Director Planning and Sustainability
Telluride Ski & Golf Company

CC:    Barbara Sharrow, UFO Field Manager, BLM
       Dave Riley, CEO Telluride Ski & Golf Company
       Daniel Zemke, General Council Telluride Ski & Golf Company

RAC Subgroup Meeting                    February 16, 2011

Wild and Scenic River Meeting

RAC Subgroup and BLM Sign-in

| Name | ~~Email~~ |
|------|-----------|
| Bruce Krickbaum | |
| Bill Day | |
| Jedd Sondergard | |
| Bill Ela | |
| LIANE ROGGENBACK | |
| Shelby Brok | |
| Barbara Hawke | |
| John Reams | |
| Kathy Welt | |
| Walt Blackburn | Telephoned in |
| Robbie LeValley | on the conference |
| Peter Mueller | line |
| Maggie Magee | |

BLM_0109684

RAC Subgroup Meeting          February 16, 2011

Wild and Scenic River Meeting

Public Sign-in

| Name | Affiliation | Email | Do you want to be added to the RMP mailing list? |
|---|---|---|---|
| Ilene Lewis | prospector/miner | | |
| Lynn Hoyt | PLP | | |



Bruce
Krickbaum/MOFO/CO/BLM/D
OI

02/15/2011 11:02 AM

To  sbear@dmea.com, Steve.welst@oxbow.com,
    John@reams-construction.com, billday@paonia.com,
    rich@richdurnanphoto.com, Robbie.levalley@colostate.edu,

cc

bcc

Subject  RAC Subgroup Meeting: Wild and Scenic for Dolores #1

Hello RAC Subgroup,

As discussed during our last meeting regarding Wild and Scenic River suitability
recommendations, we will meet again to discuss the Dolores River segment # 1.

We will meet tomorrow (Wednesday) February 16 at 4:00.  The meeting will be held
at the BLM office (Montrose Public Lands Center) at 2505 South Townsend Avenue.

Or, if you prefer not to travel to Montrose, you can telephone in to the meeting.
The telephone number is: 866-756-5802
The passcode is: 5552993

Call me or Barb if you have any questions.

Thanks, Bruce

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384


----- Forwarded by Tim Donovan/COSO/CO/BLM/DOI on 02/04/2011 11:28 AM -----



"confirmations@mymeetings.
com"
<confirmations@mymeetings.
com>

02/04/2011 11:19 AM

To  TIM_DONOVAN@BLM.GOV

cc

Subject  Your Audio Conference Information is Enclosed (Instant
        Meeting)


You have either requested an audio conferencing account or one has been
requested for you.
Your audio conferencing (Instant Meeting) subscription details are below.

Hosting a call:
To invite participants to your conference call, provide them with the
participant passcode and
dial-in number information. The Leader code is for your use only and should
not be shared.

## James Bode

| | |
|---|---|
| **From:** | bsharrow@blm.gov |
| **Sent:** | Sunday, February 20, 2011 2:10 PM |
| **To:** | uformp@blm.gov |
| **Subject:** | Fw: Gunnison WSR final letter |
| **Attachments:** | FINALGunnisonWSRletterSigned.pdf; Final - Deep Creek Chart.pdf; Final - West Fork of Terror Creek Chart.pdf; Final - Gunnison River Segment 2 Chart.pdf; Final - Roubideau Creek Segment 2 Chart.pdf; Final - Monitor Creek Chart.pdf; Final - Potter Creek Chart.pdf; Final - Roubideau Creek Segment 1 Chart.pdf |
| **Categories:** | SS.D.b_Suit / 2_StakeholderGroup_Gunnison / Where? |

Barbara Sharrow
Uncompahgre Field Office Manager

970-240-5315 - office
970-596-1515 - cell

----- Forwarded by Barbara Sharrow/MOFO/CO/BLM/DOI on 02/20/2011 02:09 PM -----

|  |  |  |
|---|---|---|
| Hannah Holm <hiholm@hotmail.com> | To | Barb Sharrow <bsharrow@blm.gov> |
| 02/17/2011 12:54 PM | cc | Callie Hendrickson <calliegj@gmail.com>, Bill Pease <pzpod22@yahoo.com>, Wanda Boyd <lrwkboyd@aol.com>, Mike Wilson <bonbon3472@hotmail.com>, Olen Lund <olund@deltacounty.com>, Betty Oglesby <bsoglesby@yahoo.com>, Tom Alvey <mcf@wic.net>, Chris Treese <ctreese@crwcd.org>, Eric Trommer <trommer@mesa.net>, Con Huishfeld <constantine37@tds.net>, Eugenie McGuire <oogiem@desertweyr.com>, Steve Lewis <steve.lewis@oxbow.com>, Shelby Bear <sbear@dmea.com>, Charles McMurdy <allarea@juno.com>, Dick Steele <gmvhsteele@aol.com>, Art Etter <aetter@bowieresources.com>, Jim & Lynn Graziano <dgflaw@ix.netcom.com>, <tcw@montrose.net>, Mike & Mary Clarke <treemary@aol.com>, Bob Gill |

1

<robert.gill@flcrsi.com>, Richard
Connell <rconnell@colofb.com>, Max
Ungerer <juliek1616@gmail.com>,
Dick Miller <dmiller@revive.com>,
Doug Atchley
<datchley@deltacounty.com>, Anna
Hutchins <w-hutchins@juno.com>,
Hannah Holm <hiholm@hotmail.com>
                        Subject
Gunnison WSR final letter

Ms. Sharrow,

I have attached the final report from the Gunnison Basin Wild & Scenic Rivers Stakeholder Group for the Gunnison Basin segments outside of the Dominguez-Escalante National Conservation Area.  This report is comprised of a letter and 7 supporting charts, one for each eligible stream segment.

I am also sending you paper versions of these documents through conventional mail.

Regards,

Hannah Holm

Co-facilitator, Gunnison Basin Wild & Scenic Rivers Stakeholder Group 970-683-1133(See attached file: FINALGunnisonWSRletterSigned.pdf)(See

attached file: Final - Deep Creek Chart.pdf)(See attached file: Final - West Fork of Terror Creek Chart.pdf)(See attached file: Final - Gunnison River Segment 2 Chart.pdf)(See attached file: Final - Roubideau Creek Segment 2 Chart.pdf)(See attached file: Final - Monitor Creek Chart.pdf) (See attached file: Final - Potter Creek Chart.pdf)(See attached file: Final - Roubideau Creek Segment 1 Chart.pdf)

BLM_0109688

February 16, 2011


Barbara Sharrow
Field Manager, Uncompahgre Field Office
Bureau of Land Management
2465 South Townsend Avenue
Montrose, Colorado 81401


Re: Wild & Scenic River Suitability Evaluation – Gunnison Basin Segments outside of Dominguez-Escalante National Conservation Area


Dear Ms. Sharrow:

The Gunnison Basin Wild and Scenic Rivers Stakeholder Group is a group of diverse stakeholders that has held ten meetings with 25 – 60 people in attendance at each since October 2010 to develop management plans to guide the Bureau of Land Management's suitability determinations for segments in the Gunnison Basin that BLM has found eligible to become part of the National Wild & Scenic Rivers System.

After careful deliberation, the stakeholder group has come to consensus that Deep Creek, the West Fork of Terror Creek, Gunnison River Segment 2 and Roubideau Creek Segment 2 should be found "Not Suitable" for inclusion in the National Wild & Scenic Rivers System. There was no dissent from this final recommendation by participants in the stakeholder group.

Key factors leading to this conclusion for each of these stream segments are listed below; additional information generated by the group's discussion can be found in the attached charts.

Deep Creek:
- The small portion of the creek that is managed by the BLM raised concerns about the BLM's ability to manage it as a Wild & Scenic River.
- Existing management actions by area landowners are protective of the Outstandingly Remarkable Value (ORV).
- The stream segment is frequently dry.
- Sole-source power lines and access roads currently exist that must be used for year-round operations and maintenance. Future development will likely require future upgrades and/or replacement of this infrastructure.

West Fork of Terror Creek:
- The small portion of the creek that is managed by the BLM raised concerns about the BLM's ability to manage it as a Wild & Scenic River.
- The stream segment is frequently dry. Water is diverted from upstream reservoirs to water right holders of the Leroux Creek Water Users Association. Water is only in the stream segment in the

*Gunnison Basin Wild & Scenic Stakeholder Group Report, Page 1 of 5*

BLM_0109689

summer when Terror Ditch and Reservoir Company diverts water through it.
- The stream corridor contains extensive infrastructure related to power lines. A 230 KV transmission line crosses BLM land within the eligible corridor and requires year-round motorized access for operation, maintenance, and repair.
- Potential coal reserves exist in the area, and leases for their development have been issued.

Gunnison River Segment 2:
- The ORV for Gunnison River Segment #2 was endangered fish in the eligibility report; however, this is in error. Therefore there are no ORVs for this segment. Gunnison River Segment #2 is upstream of the Recovery Implementation Program's (for the four endangered fish species of the Upper Colorado River) designated "Critical Habitat" for all of the listed species. Analysis on planned re-operation of the Aspinall Unit is nearing completion with a primary goal of providing adequate flows for recovery of the listed species. The Draft Environmental Impact Statement for the Operation of the Aspinall Unit requires that the Unit be operated to avoid jeopardizing the continued existence of, and assist in the recovery of, the endangered fishes. To avoid jeopardizing means adequate water must continue to flow from the Aspinall Unit through Gunnison River Segment #2 and beyond. Even delisting of all four species would require continued flows deemed adequate for continued self-sustaining populations.
- The small portion of the river corridor that is managed by the BLM raised concerns about the impact on private lands from suitability finding.
- Potential for the river channel to change course exacerbated concerns about impacts to private property and reduced the viability of narrowing the corridor to mitigate concerns (one option discussed).

Roubideau Creek Segment 2:
- The large amount of private land in the corridor raised concerns about the BLM's ability to manage it as a Wild & Scenic River.
- Concerns about the potential impact of a Wild & Scenic suitability finding on grazing permittees' ability to use the area for grazing and transit (critical transit corridor for cattle grazing).
- Utility corridor crossing BLM with power lines and gas pipelines as well as electric distribution service to 10 meters within the corridor.

The stakeholder group held more in-depth discussions on Monitor Creek, Potter Creek and Roubideau Creek Segment 1, including two subcommittee meetings. The group came to unanimous agreement on what conditions need to be maintained in these stream corridors, but did not come to full consensus on what management tools should be applied to maintain these conditions. Additional information collected on each segment by the group can be found in the attached charts.

Conditions to be maintained on Monitor Creek, Potter Creek and Roubideau Creek Segment 1:
- Existing grazing rights, including continued access to important livestock transit corridors to both BLM and Forest Service lands.
- Existing water rights.
- Equipment access for pond maintenance.
- Healthy range and well-managed grazing.
- Healthy vegetation: both vegetation types identified by the BLM as ORV's and other vegetation types, which have improved because of current grazing management practices.
- Diverse and healthy wildlife: both wildlife identified by the BLM as ORV's and other species.

*Gunnison Basin Wild & Scenic Stakeholder Group Report, Page 2 of 5*

BLM_0109690

- A sense of wildness, remoteness and naturalness.
- Existing quiet recreation opportunities:
  - Hiking.
  - Horseback riding.
  - Hunting.
- Protection from over-use for recreation and damaging forms of recreation, including effective means to limit access by motorized vehicles.
- Existing healthy stream flows, which include return flows from irrigation and water facilities.

Management tools:
The group agreed that current management has maintained the values listed above and should be continued. However, there was no consensus on what classifications or management tools should be applied to the areas to ensure that this continues. Management tools discussed included Wild & Scenic Suitability, incorporating the corridors into an area classified as "Lands with Wilderness Characteristics (LWC)," a "Special Recreation Management Area (SRMA)," or "Area of Critical Environmental Concern (ACEC)." Group members expressed a preference for management tools that the local BLM office can reconsider with resource management plan revisions over tools that require the maintenance of particular protections until Congress acts (such as Wilderness Study Areas and Wild and Scenic suitability determinations).

*Wild & Scenic Suitability*
On Wild & Scenic Suitability, the majority of the group (24) indicated that the segments should be found Not Suitable, with two in opposition. Those opposed, which represent environmental advocacy organizations, will submit a separate report detailing why they believe the segments should instead be found Suitable. Key factors in the majority's opinion that the segments should be found Not Suitable include:
- The ORV's are already protected by a combination of current management strategies and the topography of the area. The current management is adequate as evidenced by the ORV's BLM identified in finding the segments eligible
- Concern about potential impacts on water rights.
- Concern about potential impacts on grazing rights.
- On Potter Creek, updated information showed that the vegetation identified by BLM as the segment's sole ORV in the original eligibility report was too common for the vegetation to qualify as an ORV, making the segment ineligible for Wild and Scenic status.
- Roubideau Creek Segment 1 is already contained within the Camelback Wilderness Study Area and therefore already managed to protect its wilderness qualities.

*Alternative Management Tools*
The group did not find consensus on whether classifying the stream segments as part of a LWC, SRMA, or ACEC would be an acceptable alternative to Wild & Scenic Suitability. Concerns raised with all of these management options included:
- The area is already sufficiently protected through current BLM management.
- These tools could affect a broader area than the stream corridors the group has been discussing.
- The full implications of these classifications are not yet sufficiently understood by the group.
- The group has not had time to flesh out what use stipulations they would want to recommend along with any of these classifications.

*Gunnison Basin Wild & Scenic Stakeholder Group Report, Page 3 of 5*

BLM_0109691

Please review the attached individual segment sheets for detailed information collected from the stakeholders.

The stakeholder group participants appreciate the support provided by BLM staff to help the participants understand the Wild & Scenic Rivers evaluation process.

Sincerely,
Gunnison Basin Wild & Scenic Rivers Stakeholder Group

| | |
|---|---|
| **Billy L. Pease\*** <br> Western Slope Gold Prospectors Association of America chapter from Olathe | **Constantine Hirschfeld\*** <br> President, Thunder Mountain Wheelers <br> North Fork Snowmobile Club |
| **Larry R. and Wanda K. Boyd\*** <br> Landowners in Roubideau Segment 1 and grazing permitees in Roubideau Segment 1 and 2, and Potter Creek, and Monitor Creek | *signature* <br> Kenyon E. McGuire <br> Terror Ditch and Reservoir Company |
| **Mike Wilson\*** <br> Thunder Mountain Wheelers | *signature* <br> Eugenie M. McGuire <br> Terror Ditch & Reservoir Company |
| **Olen Lund\*** <br> Delta County Commissioner District #3 <br> *Delta County endorses this letter.* | **Steven R. Lewis\*** <br> Concerned citizen, Western Colorado Chapter <br> Gold Prospectors Association of America |
| **Betty Oglesby\*** | **Shelby Bear\*** <br> SCRAC Subgroup |
| **Thomas M Alvey\*** <br> North Fork Water Conservancy District <br> Delta County Director CRWCD | **Charles McMurdy\*** <br> President, Montrose Ouray and San Miguel Farm Bureau <br> Olathe property owner and farmer. |
| *signature* <br> **Chris Treese** <br> Colorado River Water Conservation District | **Dick Steele, DVM\*** <br> Western Colorado Chapter of the Gold Prospectors Association of America <br> Colorado Mule Deer Association <br> Colorado Sportsmens Wildlife Fund <br> Western Colorado Sportsmens Council |
| **Eric Trommer\*** <br> Landowner/farmer on the lower Gunnison and owner of New Leaf Fruit | **Art Etter, Engineer\*** <br> Bowie Resources, LLC |

\*Permission to list as signatory provided via email or phone.

Signatures continued on following page.

*Gunnison Basin Wild & Scenic Stakeholder Group Report, Page 4 of 5*

BLM_0109692

| | |
|---|---|
| **James Graziano\*** <br> Monitor Mesa Ranch | **Max, Julie & Gina Ungerer\*** <br> Landowners and water rights owners |
| **Mike Berry** <br> Tri-County Water Conservancy District | **Dick Miller** <br> My signature represents that of myself, Scott Miller, John and Beth Wool, Kent Davis, Alan Malcolm and Dave Abbott who are all in association with the Escalante Ranch. |
| **Mike Clarke\*** <br> Grazing permittee | |
| **Robert Gill\*** <br> Ranch Manager for Bear Ranch, LLC | **C. Douglas Atchley\*** <br> Landowner |
| **Richard Connell\*** <br> Colorado Farm Bureau | **Roger Bentley\*** <br> Landowner |
| **Chann Fogg\*** <br> Vice President, Delta County Farm & Livestock Bureau  *Delta County Farm & Livestock Bureau endorses this letter.* | **Anna M. Hutchins\*** <br> Landowner |

\*Permission to list as signatory provided via email or phone.

*Gunnison Basin Wild & Scenic Stakeholder Group Report, Page 5 of 5*

BLM_0109693

# Gunnison River Segment 2

**Eligibility Report Information:**
- Classification: Recreational
- ORV: Endangered warm water fish
- Segment Length: .41

**Stakeholder comments & questions on BLM information:**
- Is this a critical habitat reach for the fish, and are they in that segment?
  - DOW response: this segment does not fall in the critical habitat designated by the USFWS.
- Is there spawning habitat or some other special feature for the endangered fish in this segment?
  - None noted
- Is this a natural channel (river splits around an island at this point)?
  - BLM response: Yes
- Arial photos show water in this segment, with the south channel drier.
- Why no recreation ORV – valuable for canoeing & boating.
  - BLM response: not "best of best," usual take-out is above segment because of downstream dam.
- How wide is the island?
  - BLM response: Approx. ¼ mile

| | ORV + Classification Condition, Needs | Current Uses & Values | Potential Future Uses | Current Problems/ Assets | Policy/Mgmt tools – options and impact |
|---|---|---|---|---|---|
| 1 | Fish – flows | Heartland diversion dam downstream. | | Being rebuilt to allow fish passage. | Endangered Species Act already provides protections for the endangered fish. |
| 2 | Fish – other threats | Fishing | | Northern Pike coming will cause problems through predation. | |
| 3 | General | * Electrical services & access roads on south side within ¼ mile. Utility service requires year-round access for operation, maintenance & repair.  Vegetation trimming and/or road repair may be required to maintain t-line and access ROW's.<br>* Hunting waterfowl | Replacement, upgrade or expansion of utilities within corridor. | | |

BLM_0109694

# Roubideau Creek Segment 1

**Eligibility Report Information:**

- Classification: Wild
- ORV: Recreational (non-mechanized), Wildlife (leopard frog, bighorn sheep), Cultural (inscription panel, rock art), Vegetation (~~Fremont cottonwood/skunkbush sumac~~ riparian woodland; skunkbush sumac/sandbar willow riparian shrubland)
- Segment length: 10.74 miles; 93% BLM

**Stakeholder comments & questions on BLM information:**

- How do those landowners feel about the potential for their part of the stream to be determined "suitable" for Wild & Scenic status?
  - Wanda Boyd requests her land be removed from any Wild and Scenic consideration.
- Is there a chunk of private land in the middle of the segment as well? *No – BLM verifies*
- Would BLM seek to swap or acquire private land on a segment if it was determined suitable?  Yes per BLM
- Vegetation ORV Fremont Cottonwood/skunkbush removed per BLM update
- Subgroup agreed on the conditions needed to be maintained in the stream corridor, but did not come to agreement on what management tools should be applied to maintain these conditions.

| | ORV Needs | Current Uses & Values | Potential Future Uses | Current Problems/ Assets | Policy/Mgmt tools – options and impact |
|---|---|---|---|---|---|
| 1 | Wildness | • Hunting<br>• Fishing<br>• Hiking | | | Within Camelback Wilderness Study Area (WSA):<br>• Provides surface disturbance protection.<br>• Does not provide protection specifically for ORV's.<br>• BLM found "not suitable" for designation as Wilderness; no process for revising. |
| 2 | Flows | Large diversion upstream. | | Sometimes stream goes dry in places. | |
| | Habitat quality | | | Russian knapweed problem (most severe among Monitor, Potter & Roubideau). | BLM spraying done on horseback because of WSA restrictions. |
| 3 | Cultural preservation | | | | Nominated for National Register of Historic Places (*would require that any federal or federally funded project take into account potential impacts to places deemed eligible to be on the NRHP & give opportunity to comment by the Advisory Council on Historic Preservation*). |
| 4 | | Access  Roads | | Main road up Roubideau terminates for public use just up from the confluence; good condition. | |
| 5 | | Grazing | | | |

BLM_0109695

# Roubideau Creek Segment 2

**Eligibility Report Information:**
- Classification: Scenic
- ORV: Wildlife (leopard frog, bighorn sheep). ~~Vegetation (Fremont cottonwood/ skunkbush sumac riparian woodland)~~
- Segment Length:  7.59 miles, 45.5% BLM managed

**Stakeholder comments & questions on BLM information:**
- Less than 50% BLM – potential management problems.
- Why does segment go so much on private land?
  o  BLM response: ORV there.
- Frogs may not be so rare – noisy + lots of tadpoles seen locally.
- Bighorn sheep re-introduced; desert bighorn – not mountain; presumed native b/c rock art, but Fremont rock art sometimes depicts game species that weren't local to the are where they were drawn.
- Riparian vegetation not unusual
  o  Vegetation ORV dropped by BLM after information update

**Chart on Following Page**

## Roubideau Creek Segment 2 – Cont.

| | ORV + Classification Condition, Needs | Current Uses & Values | Potential Future Uses | Current Problems/ Assets | Policy/Mgmt tools – options and impact |
|---|---|---|---|---|---|
| 1 | Scenic classification | Utility corridor crossing BLM (345kV & 115kV power lines, and Trans-Colorado Natural Gas pipeline).  Also, electric distribution service to 10 meters within corridor.  All utilities require year-round access for operation, maintenance & repair. Vegetation trimming and/or road repair may be required to maintain t-line and access ROW's. | Replacement, upgrade or expansion of utilities within corridor. | | |
| | | Gas line | Replacement, upgrade or expansion of utilities within corridor. | | |
| 2 | Wildlife/ Vegetation Habitat | | | Wilderness study area (WSA) upstream from segment. | |
| | | Irrigation diversion upstream | | Often no flow in late summer, fall. | |
| | | | | Buttermilk Cr near Roubideau – water for bighorns to drink. | |
| | | | | Springs and runoff provide moisture that supports frogs, vegetation. | |
| | | | | predation – if controlled herons & raccoons, would help. | |
| | General | Cattle grazing in canyon: 1 day spring, 1 day fall; 900 transit canyon to access other grazing areas – vital for access; started 1882. | | Not pleasant for recreation while cattle are going through. | BLM: Scenic classification was made with road considered; suitability with this classification wouldn't close the road. |
| | | | | Cattle don't stay on road; drift through whole canyon. | |
| | | Sheep on top, South + East, in winter. | | | |

BLM_0109697

# West Fork of Terror Creek

**Eligibility Report Information:**
- Classification: Scenic
- ORV: Native Colorado Trout (may be threatened Greenback Cutthroats)
- Segment Length: 1.21 miles, 39.2% managed by BLM

**Stakeholder comments & questions on BLM information:**
- Request for details on when and where trout were found in the creek
  - DOW Response: Sampling records confirm the presence of cutthroat trout as early as 1978 & as recent as 2010
- Fish may be a non-threatened species of Colorado Cutthroat Trout. Most sampling has occurred on USFS land.
- If BLM only manages a broken 39.2% of the segment, could it manage that?  Suggest not considering it b/c of this issue.
- Grand Mesa Canal Headgate #4, mentioned in eligibility report, has never been built – it is a conditional decree.
- Two small impoundments Rex and Holy Terror Reservoirs, are upstream from the reach; their stored water is not released through the West Fork of Terror Creek, but instead the water is diverted into the Leroux Creek drainage for irrigation use by the Leroux Creek Water Users Association.


**Chart on Following Page**

BLM_0109698

## West Fork of Terror Creek – cont.

| | ORV + Classification Condition & Needs | Current Uses & Values | Potential Future Uses | Current Problems/ Assets | Policy/Mgmt tools – options and impact |
|---|---|---|---|---|---|
| 1 | Fish ORV: Flows | Senior water rights:<br>• Above segment: Overland Ditch, Leroux Creek Water Users Association<br>• Below segment: Terror Ditch, Holy Bee, Fawcett | | Several years the creek is dry at the confluence with the East Fork of Terror Creek.  Bowie Resources has data back to 1983 showing flows ranging from spring flood (220 cfs) to 0 in the fall. | Endangered Species Act already provides protections for the endangered fish.<br>**Noted at 1/10 mtg**: ESA is not valid for these fish that are not threatened or endangered. |
| 2 | Scenic Classification | Roads: 1.15 miles unsurfaced, 0.90 single-lane county rd | | Segment can be easily accessed by road.  There is currently no public access to adjacent road system. | 1/10/11 Mtg:<br>Water is diverted to West Fork Terror Creek that is not a natural drainage. |
| | | 230 KV transmission line crosses creek on BLM and requires year-round motorized access for operation, maintenance & repair. Vegetation trimming and/or road repair may be required to maintain t-line and access ROW's. | Replacement, upgrade or expansion of utilities within corridor. | More industrial infrastructure in corridor than indicated in eligibility report. | |
| | | Dilapidated cabin and several small outbuildings located within corridor. | Future permanent and/or seasonal residence within corridor | Existing structures not noted in eligibility report. | |
| | | Roads cross the stream at two locations within the corridor.  The county road crosses the stream over a culvert and the unsurfaced road crosses the steam with an unimproved 'at-grade' ford. | | Stream crossing not noted in eligibility report. | |
| | | Coal exploration drill hole and water quality monitoring wells currently permitted and scheduled to be installed in 2011 | Use of water quality monitoring wells will be required for 10-15 years | Additional industrial use in the corridor not noted in eligibility report. | |
| 3 | General | Cattle grazing | | | All species whether listed as endangered, threatened, or sensitive species are protected under mine permitting processes. |
| | | Fishing | | Stream is narrow and brushy limiting fishing opportunity. | |
| | | Mining – coal exploration drill holes. | Potential coal reserves in corridor; leased. | Significant economic impact to local economy if coal reserves are unable to be mined. | |
| | | Oil & gas leases. | Oil & gas devel. | | |

# Potter Creek

**Eligibility Report Information:**
- Classification:  Wild
- ORV: ~~Vegetation: narrowleaf cottonwood/strapleaf willow-silver buffaloberry riparian forest~~
- Segment Length – 9.82; 100% BLM-managed

**Stakeholder comments & questions on BLM information:**
- Some stakeholders would like to see Recreation and Wildlife added as ORV's. BLM requested scientific data to support these ORVs.
- Does the creek cross private land near the confluence?  *No – BLM verified after the meeting.*
- Grazing permittees utilize the watering ponds in this area and they must have access to maintain the ponds with equipment
- Details on mineral leases – No current leases
- How close is the jeep/ ATV trail? *From Edd Franz, BLM after the meeting: The jeep trail between 7N Mesa and Potter Creek gets within 0.24 mile of Potter Creek. This should not be an issue because the "buffer" lands do not have to be exactly 0.25 mile on each side of the stream. The land just must average to 320 acres per mile.*
- Vegetation ORV removed from eligibility by BLM update.
- Subgroup agreed on the conditions needed to be maintained in the stream corridor, but did not come to agreement on what management tools should be applied to maintain these conditions.

| | ORV Needs | Current Uses & Values | Potential Future Uses | Current Problems/ Assets | Policy/Mgmt tools – options and impact |
|---|---|---|---|---|---|
| 1 | Wildness/ habitat | | | used to be a jeep/ log road; closed 25 years ago at DOW recommendation. | Citizen-proposed wilderness on both sides. CNHP- Roubideau Creek Potential Conservation Area |
| 2 | Flows | Water rights? | | no diversions or impoundments | One individual suggested dividing Potter Creek into two segments because there doesn't appear to be water rights above Monitor Creek. |
| 3 | Habitat quality | | | Russian knapweed problem | BLM sprays to control. |
| 4 | | Grazing | | | |
| 5 | | Hunting | | | |
| 6 | | Hiking/ Recreation | | Jeep/ATV trail | ATV Club has adoption the trail for maintenance |

# Monitor Creek

**Eligibility Report Information:**

- Classification:  Wild
- ORV: Vegetation: Exemplary occurrence of coyote willow riparian shrublands (other ORV's eliminated via updated information on rareness).
- Segment Length – 9.42; 100% BLM-managed

**Stakeholder comments & questions on BLM information:**

- Some stakeholders would like to see Recreation and Wildlife added as ORV's.  BLM requested scientific data to support these ORVs.
- Question how the segment can be "Wild" if an upstream diversion is key to creating its character.
- No current Coal or Oil & Gas leases
- Vegetation ORVs narrowleaf cottonwood/strapleaf willow/silver buffalo berry and Fremont cottonwood/skunk brush sumac were removed through BLM updated information.
- A-ranking occurrence of Sandbar willow (aka Coyote Willow) remains.
- Subgroup agreed on the conditions needed to be maintained in the stream corridor, but did not come to agreement on what management tools should be applied to maintain these conditions.

| | ORV Needs | Current Uses & Values | Potential Future Uses | Current Problems/ Assets | Policy/Mgmt tools – options and impact |
|---|---|---|---|---|---|
| 1 | Wildness | Hunting<br><br>Hiking | Potential for trail | ▪ Deep canyon separates creek from private land. | • Adjacent landowner is in the process of establishing a conservation easement.<br>• Trail compatible with the "Wild" eligibility classification but fails "Wild" criteria for ORV.<br>• CNHP – Potential Conservation Area |
| 2 | Flows | Upstream flows diverted to reservoir (100 yrs old). | Same as now | Reservoir/ irrigation impact:<br>• May benefit ORV by regulating flows, preventing scouring.<br>• Not clear what impact would be if diversion was stopped. | • Suitability could negatively impact irrigation practices and reservoir storage. |
| 3 | | Grazing – there is a permit; | Same as now | | ▪ Suitability would only affect grazing if it was shown to degrade ORV.<br>▪ Would affect range improvements – increasing evidence of human activity could have an impact on the "Wild" eligibility classification.<br>▪ Related trails would be unaffected by suitability with "Wild" eligibility classification. |
| | Habitat quality | | | Russian knapweed problem (least severe of Monitor, Potter, Roubideau). | BLM sprays to control. |
| | General | Water rights? | | | If ORV depends on management of adjacent ranch, that puts BLM in a box. |

# Deep Creek

Information:
- Classification - Scenic
- ORV - Green-back cut-throat trout
- Segment Length – 2.55 mi.;   BLM Admin Length - .58 mi.
- DOW recommended any stream with pure cut-throat be an ORV.  Technique to differentiate greenback cut-throat from Colorado cut-throat… are genetic differences, only recently figured out…  Original paper may have miss-labeled as greenback.
- Viable population upstream on USFS land

| | Key Conditions to Maintain ORV | Current Uses & Values | Potential Future Uses | Current Problems/Benefits with Key Conditions, Uses, Values? | Policy/Mgmt tools – options and impact (list options, raise questions) |
|---|---|---|---|---|---|
| 1 | Fish are there | Limited fishing | | • Only places fish survive is in isolated pools on BLM stretch.<br>• Only occasional hitchhikers make it down to BLM<br>• More viable population upstream. | • If it's not broke, why fix it?<br>• |
| 2 | Limit other species detrimental to Cut-throat | | | • Competition from brook trout | • Consider going downstream to prevent brook trout from going upstream. |

| | Key Conditions to Maintain ORV | Current Uses & Values | Potential Future Uses | Current Problems/Benefits with Key Conditions, Uses, Values? | Policy/Mgmt tools – options and impact (list options, raise questions) |
|---|---|---|---|---|---|
| 3 | Water Quantity – running water for longer period of time | • Irr. Diversion up-stream<br>• Ranch has 1933 decree | Irrigation Diversion changes | • Creek is dried up 3 months of the year.<br>• Water is the limiting factor | • Cost-share a project to build a new, fish-friendly diversion.<br>• A public / private partnership for storage upstream could provide water for irrigation + fish.<br>• Bear Ranch cost-share program with USFS; can BLM participate<br>• BLM & water user agreements<br>• In Stream Flow (ISF) appropriation<br>• WSR Suitability - Permanency is important – uncertainty about future management decisions.<br>• With Suitability, BLM would manage to protect the fish & keep it form slipping from "Scenic" classification but can't do much without water.<br>• With Suitability, BLM mgmt may not be very different but would force agencies to look at any actions that may harm the ORV |
| 4 | | Any pure cut-throat regardless of what kind, DOW considers important to conserve | | Question about if it is greenback cut-throat, and if so, if planted | • FWS "threatened"<br>• Protected under ESA<br>• Broad USFS guidance<br>• Angling regulations<br>• Ranch and water use of local water users are key factors in protection<br>• DOW to summarize regulations |

| | Key Conditions to Maintain ORV | Current Uses & Values | Potential Future Uses | Current Problems/Benefits with Key Conditions, Uses, Values? | and for group |
|---|---|---|---|---|---|
| | | | | | Policy/Mgmt tools – options and impact (list options, raise questions) |
| 5 | | Currently leased for Oil & Gas – per BLM<br><br>No current coal leases – per BLM | | • | • "No surface occupancy" would be easy to directionally drill.<br>• Suitability - would require a buffer around the stream in the case of oil & gas leasing. – Potential for litigation? |
| 6 | | Sole-source power line crosses creek within 200-250' of BLM river segment, and uses an existing access road on BLM for year-round operation, maintenance & repair. Vegetation trimming and/or road repair (approx. 1 mile) may be needed to maintain the t-line and access ROW's. | Additional houses possible that would require more service.<br><br>Future replacement or upgrade of utilities within corridor may be necessary to accommodate load growth. | • | • |
| 7 | | Road crossing Deep Creek/ approx. 1mile of access on BLM | Road maintenance if required to maintain access | • | • |
| 8 | | Livestock Grazing | | • | • |

BLM_0109704

## James Bode

| | |
|---|---|
| **From:** | bsharrow@blm.gov |
| **Sent:** | Thursday, February 17, 2011 2:32 PM |
| **To:** | uformp@blm.gov |
| **Subject:** | Fw: Gunnison Basin Wild & Scenic Rivers Stakeholder Group for the Gunnison Basin |
| **Attachments:** | scan of Jim BLM Letter.pdf |
| | |
| **Categories:** | New folder creation? Gunnison Stakeholder mtg Feb1? |

Barbara Sharrow
Uncompahgre Field Office Manager

970-240-5315 - office
970-596-1515 - cell

----- Forwarded by Barbara Sharrow/MOFO/CO/BLM/DOI on 02/17/2011 02:31 PM -----

"Graziano, James"
<JGraziano@Patton
Boggs.com>                        To
                <bsharrow@blm.gov>
02/17/2011 01:42                        cc
PM
                        Subject
                Gunnison Basin Wild & Scenic Rivers
                Stakeholder Group for the Gunnison
                Basin

Ms. Sharrow,

I received a copy of the final letter sent out by Hannah Holm, but noticed that she failed to include my small group analysis letter as an attachment, as I requested.  Therefore, I have attached a copy of this letter, addressed to you, which explains in more detail the reasoning of the members of the Stakeholder Group in their finding of Not Suitable for the disputed stream segments.

I appreciate the opportunity to express my viewpoints and hope that this letter is informative as well as helpful in your process of developing a management plan.

BLM_0109705

If you have questions, please feel free to e-mail me at this address.

Sincerely,

Jim Graziano
Monitor Mesa Ranch


DISCLAIMER:
This e-mail message contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us (collect) at (202) 457-6000 and ask to speak with the message sender.
Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you.

This e-mail and all other electronic (including voice) communications from the sender's firm are for informational purposes only. No such communication is intended by the sender to constitute either an electronic record or an electronic signature, or to constitute any agreement by the sender to conduct a transaction by electronic means. Any such intention or agreement is hereby expressly disclaimed unless otherwise specifically indicated. To learn more about our firm, please visit our website at http://www.pattonboggs.com.(See attached file: scan of Jim BLM Letter.pdf)

BLM_0109706

Monitor Mesa Ranch
P.O. Box 8
Hotchkiss, CO 81419

6 February 2011

Barbara Sharrow
Field Manager, Uncompahgre Field Office
Bureau of Land Management
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Wild & Scenic River Suitability Evaluation – Potter, Monitor, and Roubideau-1 Segments

Dear Ms. Sharrow:

During the Wild & Scenic River Suitability deliberation process, the Gunnison Basin Wild and Scenic Rivers Stakeholder Group spun off a small group which consisted of a representative for each stakeholder interest. This group met and had intense discussions on February 1st, but failed to reach unanimity of opinion and therefore returned a recommendation of Not-Suitable for these segments to the large group, with majority and minority supporting positions.

The overall group of diverse stakeholders, which has been meeting since October 2010, heard and discussed the findings of the small group at a meeting on February 3rd and again voted overwhelmingly to recommend a finding of Not-Suitable for inclusion in the National Wild & Scenic Rivers System.

The Gunnison Basin Wild and Scenic Rivers Stakeholder Group has produced a summary report, but I would like to address some details of the small group deliberations to convey the rationale behind their findings in more detail.

Key factors leading to this conclusion for each of these stream segments are listed below:

Roubideau Creek - Segment 1
- Covered by the Roubideau/Camel Back Wilderness Study Area.
- Further designation under Wild and Scenic Rivers would be redundant at best.
- Not-Suitable – adequately protected by Wilderness Study Area.

Potter Creek
- Only proposed ORVs were vegetative in nature.
- Both of the Riparian Plant Association Rarity Rankings were changed from G2 to G3, thereby eliminating rare riparian vegetation communities as a qualifying ORV - confirmed by unanimous vote of the small group.
- A wildlife ORV was newly proposed – however, no written or credible data was presented. Absent some valid scientific data from a wildlife biologist, the majority of the small group and large group felt this was not a valid ORV.

BLM_0109707

- Wild and scenic nature of the segment was proposed as an ORV - a sense of wildness, remoteness, and naturalness - quiet recreation opportunities--hiking, horseback riding, and hunting. However, these generic characteristics are found in a multitude of areas in the Gunnison Basin and failed to satisfy the criteria for an ORV. In particular, the Scenic ORV metric under Wild and Scenic Rivers suitability designation requires that the area must have a Scenic Quality Classification of A under BLM's Visual Resource Management Manual H8410-1. However, a review of the published criteria in H8410-1 indicates that it is apparent that an "A" rating is not present and this segment fails to qualify as having a Scenic ORV. There are only infrequent visitors and the sight distance is very short due to the segment being a deep canyon. The majority of both the small group and the large group believed that a finding of Not-Suitable was appropriate for the Scenic category for this segment.

Monitor Creek

- Only proposed ORVs were vegetative in nature.
- Both of the Riparian Plant Association Rarity Rankings were changed from G2 to G3, thereby eliminating rare riparian vegetation communities as a qualifying ORV - confirmed by unanimous vote of the small group.
- A remaining Exemplary (A-Ranked) occurrence of Salix Exigua/Mesic Graminoids was identified as a potentially qualifying ORV. However, a review of the Classification of Riparian Plant Associations published by the Colorado Natural Heritage Program, noted that this grouping was "CNHP Rarity Rank: G5 / S5 -- This is a common association known from Utah to Kansas. This is one of the most common associations in Colorado, with well over 200 stands estimated to occur." Therefore, by unanimous vote of the small group, it was believed to fail to qualify as an ORV, even though it was identified as an Exemplary occurrence.
- A wildlife ORV was newly proposed – however, no written or credible data was presented. Absent some valid scientific data from a wildlife biologist, the majority of the group felt this was not a valid ORV.
- Wild and scenic nature of the segment was proposed as an ORV - a sense of wildness, remoteness, and naturalness - quiet recreation opportunities--hiking, horseback riding, and hunting. However, these generic characteristics are found in a multitude of areas in the Gunnison Basin and failed to satisfy the criteria for an ORV. In particular, the Scenic ORV metric under Wild and Scenic Rivers suitability designation requires that the area must have a Scenic Quality Classification of A under BLM's Visual Resource Management Manual H8410-1. However, a review of the published criteria in H8410-1 indicates that it is apparent that an "A" rating is not present and this segment fails to qualify as having a Scenic ORV. There are only infrequent visitors and the sight distance is very short due to the segment being a deep canyon. The majority of both the small group and the large group believed that a finding of Not-Suitable was appropriate for the Scenic category for this segment.

In addition to these determinations, both the small group and the large group agreed that these segments exhibit the following characteristics:

- healthy range conditions and well managed grazing -- actually improved over recent decades;

    - diverse wildlife;

    - a sense of wildness, remoteness, and naturalness;

    - quiet recreation opportunities--hiking, horseback riding, hunting;

    - need to keep the area from being overrun or damaged by too much recreation or by potentially damaging forms of recreation – requires effective means to prevent access to motorized vehicles on trails closed to motorized access;

    - existing healthy stream flows which include return flows from irrigation and watering facilities operated by landowners and grazers;

    - current BLM management has maintained these values.

The stakeholder group believed that one of the BLM management objectives should be to preserve the natural landscape setting, which does not preclude very limited management activity. The Bureau of Land Management's management plan can be directed to these objectives without a finding of Suitability under the Wild and Scenic Rivers Act. The lack of consensus on these above-identified segments was not unexpected, and those in favor of a finding of Not Suitable were also strongly concerned about the need for the BLM to apply for in-stream water rights under the Wild and Scenic Rivers Act, if these segments were approved by Congress. All of the landowners, water owners, water users, grazing permit holders and local recreational users voted for a finding of Not Suitable (92% of the stakeholders in one vote) based upon the above-noted findings as well as the water issue. I believe that the consensus of the local stakeholder population clearly supports a finding of Not Suitable under the Wild and Scenic Rivers Act.

I appreciate the support provided by the BLM staff to help the participants understand the Wild & Scenic Rivers evaluation process and their dedication to be an unbiased resource to enable us to make our carefully considered determinations.

Sincerely,

James Graziano
for
Monitor Mesa Ranch

BLM_0109709

February 17, 2011

Barbara Sharrow
Field Manager, Uncompahgre Field Office
Bureau of Land Management
2465 South Townsend Ave
Montrose, CO  81401



Dear Ms. Sharrow:

Enclosed is the final report of the Gunnison Basin Wild & Scenic Rivers Stakeholder Group regarding management recommendations for "Wild & Scenic" eligible streams in the Gunnison Basin that are outside the Dominguez-Escalante National Conservation Area.

If you have any questions about this report, please contact either of us.

Regards,

Callie Hendrickson
Lead Facilitator, Gunnison Basin Wild & Scenic Rivers Stakeholder Group
calliegj@gmail.com
970-970-250-6825

Hannah Holm
Co-Facilitator, Gunnison Basin Wild & Scenic Rivers Stakeholder Group
hiholm@hotmail.com
970-683-1133

BLM_0109710

February 16, 2011


Barbara Sharrow
Field Manager, Uncompahgre Field Office
Bureau of Land Management
2465 South Townsend Avenue
Montrose, Colorado 81401


Re: Wild & Scenic River Suitability Evaluation – Gunnison Basin Segments outside of Dominguez-Escalante National Conservation Area


Dear Ms. Sharrow:


The Gunnison Basin Wild and Scenic Rivers Stakeholder Group is a group of diverse stakeholders that has held ten meetings with 25 – 60 people in attendance at each since October 2010 to develop management plans to guide the Bureau of Land Management's suitability determinations for segments in the Gunnison Basin that BLM has found eligible to become part of the National Wild & Scenic Rivers System.


After careful deliberation, the stakeholder group has come to consensus that Deep Creek, the West Fork of Terror Creek, Gunnison River Segment 2 and Roubideau Creek Segment 2 should be found "Not Suitable" for inclusion in the National Wild & Scenic Rivers System. There was no dissent from this final recommendation by participants in the stakeholder group.


Key factors leading to this conclusion for each of these stream segments are listed below; additional information generated by the group's discussion can be found in the attached charts.


Deep Creek:
- The small portion of the creek that is managed by the BLM raised concerns about the BLM's ability to manage it as a Wild & Scenic River.
- Existing management actions by area landowners are protective of the Outstandingly Remarkable Value (ORV).
- The stream segment is frequently dry.
- Sole-source power lines and access roads currently exist that must be used for year-round operations and maintenance. Future development will likely require future upgrades and/or replacement of this infrastructure.


West Fork of Terror Creek:
- The small portion of the creek that is managed by the BLM raised concerns about the BLM's ability to manage it as a Wild & Scenic River.
- The stream segment is frequently dry. Water is diverted from upstream reservoirs to water right holders of the Leroux Creek Water Users Association. Water is only in the stream segment in the

*Gunnison Basin Wild & Scenic Stakeholder Group Report, Page 1 of 5*

BLM_0109711

summer when Terror Ditch and Reservoir Company diverts water through it.
- The stream corridor contains extensive infrastructure related to power lines. A 230 KV transmission line crosses BLM land within the eligible corridor and requires year-round motorized access for operation, maintenance, and repair.
- Potential coal reserves exist in the area, and leases for their development have been issued.

Gunnison River Segment 2:
- The ORV for Gunnison River Segment #2 was endangered fish in the eligibility report; however, this is in error. Therefore there are no ORVs for this segment. Gunnison River Segment #2 is upstream of the Recovery Implementation Program's (for the four endangered fish species of the Upper Colorado River) designated "Critical Habitat" for all of the listed species. Analysis on planned re-operation of the Aspinall Unit is nearing completion with a primary goal of providing adequate flows for recovery of the listed species. The Draft Environmental Impact Statement for the Operation of the Aspinall Unit requires that the Unit be operated to avoid jeopardizing the continued existence of, and assist in the recovery of, the endangered fishes. To avoid jeopardizing means adequate water must continue to flow from the Aspinall Unit through Gunnison River Segment #2 and beyond. Even delisting of all four species would require continued flows deemed adequate for continued self-sustaining populations.
- The small portion of the river corridor that is managed by the BLM raised concerns about the impact on private lands from suitability finding.
- Potential for the river channel to change course exacerbated concerns about impacts to private property and reduced the viability of narrowing the corridor to mitigate concerns (one option discussed).

Roubideau Creek Segment 2:
- The large amount of private land in the corridor raised concerns about the BLM's ability to manage it as a Wild & Scenic River.
- Concerns about the potential impact of a Wild & Scenic suitability finding on grazing permittees' ability to use the area for grazing and transit (critical transit corridor for cattle grazing).
- Utility corridor crossing BLM with power lines and gas pipelines as well as electric distribution service to 10 meters within the corridor.

The stakeholder group held more in-depth discussions on Monitor Creek, Potter Creek and Roubideau Creek Segment 1, including two subcommittee meetings. The group came to unanimous agreement on what conditions need to be maintained in these stream corridors, but did not come to full consensus on what management tools should be applied to maintain these conditions. Additional information collected on each segment by the group can be found in the attached charts.

Conditions to be maintained on Monitor Creek, Potter Creek and Roubideau Creek Segment 1:
- Existing grazing rights, including continued access to important livestock transit corridors to both BLM and Forest Service lands.
- Existing water rights.
- Equipment access for pond maintenance.
- Healthy range and well-managed grazing.
- Healthy vegetation: both vegetation types identified by the BLM as ORV's and other vegetation types, which have improved because of current grazing management practices.
- Diverse and healthy wildlife: both wildlife identified by the BLM as ORV's and other species.

*Gunnison Basin Wild & Scenic Stakeholder Group Report, Page 2 of 5*

BLM_0109712

- A sense of wildness, remoteness and naturalness.
- Existing quiet recreation opportunities:
  - Hiking.
  - Horseback riding.
  - Hunting.
- Protection from over-use for recreation and damaging forms of recreation, including effective means to limit access by motorized vehicles.
- Existing healthy stream flows, which include return flows from irrigation and water facilities.

Management tools:

The group agreed that current management has maintained the values listed above and should be continued. However, there was no consensus on what classifications or management tools should be applied to the areas to ensure that this continues. Management tools discussed included Wild & Scenic Suitability, incorporating the corridors into an area classified as "Lands with Wilderness Characteristics (LWC)," a "Special Recreation Management Area (SRMA)," or "Area of Critical Environmental Concern (ACEC)." Group members expressed a preference for management tools that the local BLM office can reconsider with resource management plan revisions over tools that require the maintenance of particular protections until Congress acts (such as Wilderness Study Areas and Wild and Scenic suitability determinations).

*Wild & Scenic Suitability*

On Wild & Scenic Suitability, the majority of the group (24) indicated that the segments should be found Not Suitable, with two in opposition. Those opposed, which represent environmental advocacy organizations, will submit a separate report detailing why they believe the segments should instead be found Suitable. Key factors in the majority's opinion that the segments should be found Not Suitable include:

- The ORV's are already protected by a combination of current management strategies and the topography of the area. The current management is adequate as evidenced by the ORV's BLM identified in finding the segments eligible
- Concern about potential impacts on water rights.
- Concern about potential impacts on grazing rights.
- On Potter Creek, updated information showed that the vegetation identified by BLM as the segment's sole ORV in the original eligibility report was too common for the vegetation to qualify as an ORV, making the segment ineligible for Wild and Scenic status.
- Roubideau Creek Segment 1 is already contained within the Camelback Wilderness Study Area and therefore already managed to protect its wilderness qualities.

*Alternative Management Tools*

The group did not find consensus on whether classifying the stream segments as part of a LWC, SRMA, or ACEC would be an acceptable alternative to Wild & Scenic Suitability. Concerns raised with all of these management options included:

- The area is already sufficiently protected through current BLM management.
- These tools could affect a broader area than the stream corridors the group has been discussing.
- The full implications of these classifications are not yet sufficiently understood by the group.
- The group has not had time to flesh out what use stipulations they would want to recommend along with any of these classifications.

*Gunnison Basin Wild & Scenic Stakeholder Group Report, Page 3 of 5*

BLM_0109713

Please review the attached individual segment sheets for detailed information collected from the stakeholders.

The stakeholder group participants appreciate the support provided by BLM staff to help the participants understand the Wild & Scenic Rivers evaluation process.

Sincerely,
Gunnison Basin Wild & Scenic Rivers Stakeholder Group

| | |
|---|---|
| **Billy L. Pease\*** <br> Western Slope Gold Prospectors Association of America chapter from Olathe | **Constantine Hirschfeld\*** <br> President, Thunder Mountain Wheelers <br> North Fork Snowmobile Club |
| **Larry R. and Wanda K. Boyd\*** <br> Landowners in Roubideau Segment 1 and grazing permitees in Roubideau Segment 1 and 2, and Potter Creek, and Monitor Creek | *Kenyon E. McGuire* <br> Kenyon E. McGuire <br> Terror Ditch and Reservoir Company |
| **Mike Wilson\*** <br> Thunder Mountain Wheelers | *Eugenie M. McGuire* <br> Eugenie M. McGuire <br> Terror Ditch & Reservoir Company |
| **Olen Lund\*** <br> Delta County Commissioner District #3 <br> *Delta County endorses this letter.* | **Steven R. Lewis\*** <br> Concerned citizen, Western Colorado Chapter <br> Gold Prospectors Association of America |
| **Betty Oglesby\*** | **Shelby Bear\*** <br> SCRAC Subgroup |
| **Thomas M Alvey\*** <br> North Fork Water Conservancy District <br> Delta County Director CRWCD | **Charles McMurdy\*** <br> President, Montrose Ouray and San Miguel <br> Farm Bureau <br> Olathe property owner and farmer. |
| *Chris Treese* <br> **Chris Treese** <br> Colorado River Water Conservation District | **Dick Steele, DVM\*** <br> Western Colorado Chapter of the Gold Prospectors <br> Association of America <br> Colorado Mule Deer Association <br> Colorado Sportsmens Wildlife Fund <br> Western Colorado Sportsmens Council |
| **Eric Trommer\*** <br> Landowner/farmer on the lower Gunnison and owner of New Leaf Fruit | **Art Etter, Engineer\*** <br> Bowie Resources, LLC |

\*Permission to list as signatory provided via email or phone.

Signatures continued on following page.

*Gunnison Basin Wild & Scenic Stakeholder Group Report, Page 4 of 5*

| | |
|---|---|
| **James Graziano***<br>Monitor Mesa Ranch | **Max, Julie & Gina Ungerer***<br>Landowners and water rights owners |
| **Mike Berry**<br>Tri-County Water Conservancy District | **Dick Miller**<br>My signature represents that of myself, Scott Miller, John and Beth Wool, Kent Davis, Alan Malcolm and Dave Abbott who are all in association with the Escalante Ranch. |
| **Mike Clarke***<br>Grazing permittee | |
| **Robert Gill***<br>Ranch Manager for Bear Ranch, LLC | **C. Douglas Atchley***<br>Landowner |
| **Richard Connell***<br>Colorado Farm Bureau | **Roger Bentley***<br>Landowner |
| **Chann Fogg***<br>Vice President, Delta County Farm & Livestock Bureau  *Delta County Farm & Livestock Bureau endorses this letter.* | **Anna M. Hutchins***<br>Landowner |

*Permission to list as signatory provided via email or phone.

*Gunnison Basin Wild & Scenic Stakeholder Group Report, Page 5 of 5*

BLM_0109715

## James Bode

| | |
|---|---|
| **From:** | Site Administrator <info@ourcolorado.org> on behalf of Phyl Morello <fastphyl1@hotmail.com> |
| **Sent:** | Friday, February 18, 2011 10:37 AM |
| **To:** | uformp@blm.gov |
| **Subject:** | Conservation of the Dolores River Basin...protect this area |
| **Categories:** | 07_ScopingReport / 2.4A_ScopingCmts / After_Deadline |

Feb 18, 2011

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection. Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update. Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor. BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity; *prove that the long-term ecological health of the area will not be jeopardized; *have viable reclamation plans in place before permits can be granted; and *have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

BLM_0109716

Ms. Phyl Morello
984 Harrison Ferry Rd
White Pine, TN 37890-4903

BLM_0109717

RECEIVED

FEB 2 5 2011

BY

**Audubon Colorado • Center for Native Ecosystems**
**Colorado Environmental Coalition • Colorado Mountain Club • Colorado Wild**
**San Juan Citizens Alliance • Sheep Mountain Alliance • The Wilderness Society**
**Western Colorado Congress • NWWSERC/NFRIA/WSERC Conservation Center**

c/o The Wilderness Society
1660 Wynkoop #850
Denver, Colorado 80202

February 22, 2011

Barbara Sharrow, Manager
Uncompahgre Field Office
Bureau of Land Management
Montrose, Colorado

Dear Ms. Sharrow,

The ten undersigned organizations participated in the recently concluded ad hoc stakeholders process reviewing management recommendations and potential suitability of seven stream segments for possible inclusion in the National Wild and Scenic Rivers System (stream segments previously listed by the BLM as eligible for consideration for such protection—*Final Wild and Scenic River Eligibility Report for the BLM Uncompahgre Planning Area, June 2010*). These organizations either participated directly in the stakeholders process or were represented by participants, consulting with and advising those representatives throughout the process.

Our organizations joined this effort in good faith that open and fair consideration would be given, by all participants, to the option of a wild & scenic suitability finding for at least some of the stream segments. While that openness was not broadly forthcoming among the participating stakeholders, our representatives did present detailed information on the values of, and need for protection for, select streams. We hope that information and our perspectives contributed positively to the discussion. We also appreciate very much the efforts of a few stakeholders, outside our delegation, in their pursuit of a greater level of agreement on at least some streams.

In large part because of the refusal of other stakeholders to even consider the possibility of a suitability finding for any stream, the group reached no consensus agreement on recommendations to the Bureau of Land Management (BLM). While a letter signed by some of the stakeholders, opposing any suitability findings, has been sent to the BLM as the so-called majority recommendations, that letter does not represent the full group of stakeholders. **There was no consensus.**

Correspondingly, we respectfully offer our collective recommendations regarding potential suitability findings, and protective management, for the seven stream segments. These recommendations build on suitability comments our organizations submitted to the

BLM_0109718

2

BLM in August 2010. They are supplemented with additional, updated, information and with new perspectives arising from the recent stakeholders discussions.

We thank you for carefully considering the details of these recommendations as you develop the range of alternatives for the pending resource management plan and, ultimately, as you settle on a final management plan.

The BLM's eligibility report was a very helpful starting point in the preparation of our original suitability comments and for our continued discussions of these streams with the BLM and with others. The level of detail provided, the careful research, and the professional presentation of that eligibility report have contributed to thoughtful review and discussion of these important streams.

Meanwhile, it is significant to note that Colorado has only one stream included in the National Wild and Scenic Rivers System. We trust that it is obvious that this is not because of a lack of outstanding streams in this state. Indeed, the BLM's eligibility report confirms that a long list of remarkable streams and stream corridors warrant special consideration and strong protection, whether under provisions of the Wild and Scenic Rivers Act or otherwise.

**Stream segments**
Gunnison River Segment 2
*.41 mile; Recreational; Fish*
This regionally significant river warrants strong and enduring protection as an important recreational opportunity, as the hydrologic heart of unique adjacent public lands, and as essential habitat for at least two endangered species of native fish, along with three other species of ancient native fish that are imperiled, primarily because of loss of habitat or changes in river flows. (All these values are documented in the BLM's eligibility report.)

Federal ownership of the river segment is 100%. While only 66.5% of lands in the river corridor are federally owned, all those lands are on one side of the river, simplifying the implementation of protective management for those lands.

The primary need for the identified outstandingly remarkable values—particularly for the native fish—are reliable and seasonally natural flows of water in the Gunnison River. Other federal programs—primarily the Endangered Species Act—and evolving federal management efforts—including re-operation the Aspinall Unit dams upstream— contribute, or will contribute, to the reliability of those critical-habitat flows.

It therefore is not necessary to apply a finding of wild & scenic suitability to this portion of the Gunnison River, *so long as* those other federal measures are implemented and properly maintained. If those measures are either removed or fail to protect the native fish and their habitat, the BLM should reconsider a finding of suitability in future planning processes.

Monitor Creek
*9.42 miles; Wild; Vegetation (cottonwood/riparian)*
This stream is an important feature flowing through the heart of federal lands with wilderness character and wilderness characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's eligibility report's preliminary classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values identified in the BLM's eligibility report (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Monitor Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and Outstandingly Remarkable Value (ORV)) identified by the BLM for nearby Roubideau Creek (*desert bighorn sheep*). The features, condition, and importance of this wildlife habitat along Monitor Creek are of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Monitor Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), the version found along Monitor Creek is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Monitor Creek are also present in Roubideau Creek, which is included, stream and corridor, in the Roubideau (Camel Back) Wilderness Study Area, thus necessarily defined by those same backcountry recreation opportunities.

Meanwhile, a finding of wild & scenic suitability for Monitor Creek—a finding most directly applicable to the lands in the stream corridor—will provide highly reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*).

4

Federal ownership of 100% of this stream segment, and of 96.2% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 104.9 acres of private land within the stream corridor are actually separate from the stream, further simplifying protective management, especially if that management were applied specifically to the federal lands.

We recommend that the full length of the Monitor Creek segment be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should be expanded to include recreational opportunities and wildlife habitat.

Potter Creek
*9.82 miles; Wild; Vegetation (cottonwood/riparian)*
This stream is an important feature associated with adjacent lands with wilderness character and characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's eligibility report's preliminary classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values originally identified in the BLM's eligibility report (*vegetation*), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Potter Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and ORV) identified by the BLM for adjacent Roubideau Creek (*desert bighorn sheep*). The features, condition, and importance of that wildlife habitat along Potter Creek is of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Potter Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), it is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Potter Creek are also present in Roubideau Creek. Roubideau Creek and its

corridor are included in the Roubideau (Camel Back) Wilderness Study Area, which is necessarily defined by those same backcountry recreation opportunities.

Meanwhile, the BLM's decision to remove the one outstandingly remarkable value originally identified in the agency's eligibility report is in error. The BLM's rather arbitrary distinction between a classification as critically imperiled globally (G1) and vulnerable throughout its range (G2) is not well founded. Glibly stated, rare is rare, and vulnerable is vulnerable.

Stated a bit more thoughtfully, a plant community that is currently vulnerable throughout its range warrants the highest possible level of protection in each of its occurrences, lest damage from human activity, climate change, or other harmful factors translate vulnerable to imperiled. The best way to avoid plant community failures in the future is an active protection in the present. A finding of eligibility, and accompanying protective management, is an appropriate and timely tool for this plant community.

In any case, a finding of wild & scenic suitability for Potter Creek—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*).

Federal ownership of 100% of this stream segment, and of 98.5% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 44.3 acres of private land are located at the far lower end of the stream segment, further simplifying protective management, especially if that management were applied specifically to the federal lands.

We recommend that the full length of the Potter Creek be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should continue to include the highlighted vegetation communities, and they should be expanded to include recreational opportunities and wildlife habitat.


Roubideau Creek Segment 1
*10.71 miles; Wild; Recreational, Wildlife, Cultural, Vegetation*
This stream is an important feature flowing through and enhancing lands with wilderness character and characteristics, both within the long-standing Roubideau (Camel Back) Wilderness Study Area and in the larger citizens' wilderness proposal of the same name. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

6

The BLM's eligibility report's preliminary classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

A finding of wild & scenic suitability for Roubideau Creek Segment 1—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring protection for the continued health of the ORVs identified in the BLM's eligibility report, including: rare plant communities (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*); wildlife (*northern leopard frog, desert bighorn sheep*); cultural; and recreational (*primitive and non-mechanical exploration and exercise*).

Federal ownership of 93% of this stream segment, and of 94.8% of the land in the stream corridor simplifies the effective implementation of protective management.

We recommend that the full length of the Roubideau Creek Segment 1 be found suitable, applicable at least to the federal lands in the corridor.

Roubideau Creek Segment 2
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (45.5%, 60.2%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Roubideau Creek Segment 2.

Deep Creek
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

In particular, the critical rarity of greenback cutthroat trout warrants the highest level of protective management, especially management and cooperative measures to ensure reliable and seasonally natural stream flows.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (22.7%, 15.8%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used

for Deep Creek, *so long as* those other methods continue to successfully protect the trout and its habitat.

West Fork Terror Creek
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (39.2%, 47.5%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for West Fork Terror Creek, *so long as* those other methods continue to successfully protect the trout and its habitat.

**Summary**
The undersigned organizations recommend that the BLM reach a finding of suitability, and implement corresponding strong protective management measures for:
- Monitor Creek
- Potter Creek
- Roubideau Creek Segment 1

The undersigned organizations recommend that the BLM implement the strongest possible protective management measures, other than a finding of wild & scenic suitability for:
- Gunnison River Segment 2
- Roubideu Creek Segment 2
- Deep Creek
- West Fork Terror Creek

Thank you again for your careful consideration of these comments and recommendations, as complement to the thorough research and review the BLM has already applied to these important streams and corridors.

Please let us know any way in which we can clarify these recommendations, expand on them, or assist with securing their implementation in the BLM's protective management of these streams.

Sincerely,

Steve Smith, Assistant Regional Director
The Wilderness Society
for

8

Ken Strom, Director
Audubon Colorado

Becky Long, Water Caucus Coordinator
Colorado Environmental Coalition

Paul Joyce, Conservation Associate
Colorado Wild

Hilary White, Director
Sheep Mountain Alliance

Rob Peters, Executive Director
Andrea Robinson, Conservation Chair
NFRIA/WSERC Conservation Center

Megan Mueller, Senior Staff Biologist
Center for Native Ecosystems

Jay Heeter, Campaigns Coordinator
Colorado Mountain Club

Meghan Maloney, River Program Director
San Juan Citizens Alliance

Gretchen Nicholoff, President
Western Colorado Congress

BLM_0109725

**James Bode**

| | |
|---|---|
| **From:** | bsharrow@blm.gov |
| **Sent:** | Wednesday, February 23, 2011 7:44 AM |
| **To:** | uformp@blm.gov |
| **Subject:** | Fw: wild & scenic unc-gunnison letter |
| **Attachments:** | w&s unc-gunn feb letter FINAL SENT.doc |

Barbara Sharrow
Uncompahgre Field Office Manager

970-240-5315 - office
970-596-1515 - cell

----- Forwarded by Barbara Sharrow/MOFO/CO/BLM/DOI on 02/23/2011 07:43 AM -----

> steve smith
> <steve_smith@tws.
> org>                              To
>                     barbara_sharrow@blm.gov
> 02/22/2011 04:27                  cc
> PM
>                          Subject
>                  wild & scenic unc-gunnison letter

Hello, Barb. Here is the companion letter, arising from the Uncompahgre-Gunnison wild & scenic stakeholders effort, commenting on the suitability of select streams being considered as part of the Uncompahgre Field Office RMP (the so-called minority report).

Please let me know any questions or requests you have regarding this.

Thank you.

Steve
steve_smith@tws.org
(303) 650-5818 x106

(See attached file: w&s unc-gunn feb letter FINAL SENT.doc)

1

BLM_0109726

**Audubon Colorado • Center for Native Ecosystems**
**Colorado Environmental Coalition • Colorado Mountain Club • Colorado Wild**
**San Juan Citizens Alliance • Sheep Mountain Alliance • The Wilderness Society**
**Western Colorado Congress • NWWSERC/NFRIA/WSERC Conservation Center**

c/o The Wilderness Society
1660 Wynkoop  #850
Denver, Colorado  80202                                  February 22, 2011

Barbara Sharrow, Manager
Uncompahgre Field Office
Bureau of Land Management
Montrose, Colorado

Dear Ms. Sharrow,

The ten undersigned organizations participated in the recently concluded ad hoc
stakeholders process reviewing management recommendations and potential suitability of
seven stream segments for possible inclusion in the National Wild and Scenic Rivers
System (stream segments previously listed by the BLM as eligible for consideration for
such protection—*Final Wild and Scenic River Eligibility Report for the BLM
Uncompahgre Planning Area, June 2010*). These organizations either participated
directly in the stakeholders process or were represented by participants, consulting with
and advising those representatives throughout the process.

Our organizations joined this effort in good faith that open and fair consideration would
be given, by all participants, to the option of a wild & scenic suitability finding for at
least some of the stream segments. While that openness was not broadly forthcoming
among the participating stakeholders, our representatives did present detailed information
on the values of, and need for protection for, select streams. We hope that information
and our perspectives contributed positively to the discussion. We also appreciate very
much the efforts of a few stakeholders, outside our delegation, in their pursuit of a greater
level of agreement on at least some streams.

In large part because of the refusal of other stakeholders to even consider the possibility
of a suitability finding for any stream, the group reached no consensus agreement on
recommendations to the Bureau of Land Management (BLM). While a letter signed by
some of the stakeholders, opposing any suitability findings, has been sent to the BLM as
the so-called majority recommendations, that letter does not represent the full group of
stakeholders. **There was no consensus.**

Correspondingly, we respectfully offer our collective recommendations regarding
potential suitability findings, and protective management, for the seven stream segments.
These recommendations build on suitability comments our organizations submitted to the

BLM_0109727

2

BLM in August 2010. They are supplemented with additional, updated, information and with new perspectives arising from the recent stakeholders discussions.

We thank you for carefully considering the details of these recommendations as you develop the range of alternatives for the pending resource management plan and, ultimately, as you settle on a final management plan.

The BLM's eligibility report was a very helpful starting point in the preparation of our original suitability comments and for our continued discussions of these streams with the BLM and with others. The level of detail provided, the careful research, and the professional presentation of that eligibility report have contributed to thoughtful review and discussion of these important streams.

Meanwhile, it is significant to note that Colorado has only one stream included in the National Wild and Scenic Rivers System. We trust that it is obvious that this is not because of a lack of outstanding streams in this state. Indeed, the BLM's eligibility report confirms that a long list of remarkable streams and stream corridors warrant special consideration and strong protection, whether under provisions of the Wild and Scenic Rivers Act or otherwise.


**Stream segments**
Gunnison River Segment 2
*.41 mile; Recreational; Fish*
This regionally significant river warrants strong and enduring protection as an important recreational opportunity, as the hydrologic heart of unique adjacent public lands, and as essential habitat for at least two endangered species of native fish, along with three other species of ancient native fish that are imperiled, primarily because of loss of habitat or changes in river flows. (All these values are documented in the BLM's eligibility report.)

Federal ownership of the river segment is 100%. While only 66.5% of lands in the river corridor are federally owned, all those lands are on one side of the river, simplifying the implementation of protective management for those lands.

The primary need for the identified outstandingly remarkable values—particularly for the native fish—are reliable and seasonally natural flows of water in the Gunnison River. Other federal programs—primarily the Endangered Species Act—and evolving federal management efforts—including re-operation the Aspinall Unit dams upstream—contribute, or will contribute, to the reliability of those critical-habitat flows.

It therefore is not necessary to apply a finding of wild & scenic suitability to this portion of the Gunnison River, *so long as* those other federal measures are implemented and properly maintained. If those measures are either removed or fail to protect the native fish and their habitat, the BLM should reconsider a finding of suitability in future planning processes.

Monitor Creek
*9.42 miles; Wild; Vegetation (cottonwood/riparian)*
This stream is an important feature flowing through the heart of federal lands with wilderness character and wilderness characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's eligibility report's preliminary classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values identified in the BLM's eligibility report (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Monitor Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and Outstandingly Remarkable Value (ORV)) identified by the BLM for nearby Roubideau Creek (*desert bighorn sheep*). The features, condition, and importance of this wildlife habitat along Monitor Creek are of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Monitor Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), the version found along Monitor Creek is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Monitor Creek are also present in Roubideau Creek, which is included, stream and corridor, in the Roubideau (Camel Back) Wilderness Study Area, thus necessarily defined by those same backcountry recreation opportunities.

Meanwhile, a finding of wild & scenic suitability for Monitor Creek—a finding most directly applicable to the lands in the stream corridor—will provide highly reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*).

BLM_0109729

4

Federal ownership of 100% of this stream segment, and of 96.2% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 104.9 acres of private land within the stream corridor are actually separate from the stream, further simplifying protective management, especially if that management were applied specifically to the federal lands.

We recommend that the full length of the Monitor Creek segment be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should be expanded to include recreational opportunities and wildlife habitat.

Potter Creek
*9.82 miles; Wild; Vegetation (cottonwood/riparian)*
This stream is an important feature associated with adjacent lands with wilderness character and characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's eligibility report's preliminary classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values originally identified in the BLM's eligibility report (*vegetation*), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Potter Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and ORV) identified by the BLM for adjacent Roubideau Creek (*desert bighorn sheep*). The features, condition, and importance of that wildlife habitat along Potter Creek is of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Potter Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), it is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Potter Creek are also present in Roubideau Creek. Roubideau Creek and its

BLM_0109730

corridor are included in the Roubideau (Camel Back) Wilderness Study Area, which is necessarily defined by those same backcountry recreation opportunities.

Meanwhile, the BLM's decision to remove the one outstandingly remarkable value originally identified in the agency's eligibility report is in error. The BLM's rather arbitrary distinction between a classification as critically imperiled globally (G1) and vulnerable throughout its range (G2) is not well founded. Glibly stated, rare is rare, and vulnerable is vulnerable.

Stated a bit more thoughtfully, a plant community that is currently vulnerable throughout its range warrants the highest possible level of protection in each of its occurrences, lest damage from human activity, climate change, or other harmful factors translate vulnerable to imperiled. The best way to avoid plant community failures in the future is an active protection in the present. A finding of eligibility, and accompanying protective management, is an appropriate and timely tool for this plant community.

In any case, a finding of wild & scenic suitability for Potter Creek—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*).

Federal ownership of 100% of this stream segment, and of 98.5% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 44.3 acres of private land are located at the far lower end of the stream segment, further simplifying protective management, especially if that management were applied specifically to the federal lands.

<u>We recommend that the full length of the Potter Creek be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should continue to include the highlighted vegetation communities, and they should be expanded to include recreational opportunities and wildlife habitat.</u>


<u>Roubideau Creek Segment 1</u>
*10.71 miles; Wild; Recreational, Wildlife, Cultural, Vegetation*
This stream is an important feature flowing through and enhancing lands with wilderness character and characteristics, both within the long-standing Roubideau (Camel Back) Wilderness Study Area and in the larger citizens' wilderness proposal of the same name. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

6

The BLM's eligibility report's preliminary classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

A finding of wild & scenic suitability for Roubideau Creek Segment 1—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring protection for the continued health of the ORVs identified in the BLM's eligibility report, including: rare plant communities (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*); wildlife (*northern leopard frog, desert bighorn sheep*); cultural; and recreational (*primitive and non-mechanical exploration and exercise*).

Federal ownership of 93% of this stream segment, and of 94.8% of the land in the stream corridor simplifies the effective implementation of protective management.

<u>We recommend that the full length of the Roubideau Creek Segment 1 be found suitable, applicable at least to the federal lands in the corridor.</u>

Roubideau Creek Segment 2
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (45.5%, 60.2%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Roubideau Creek Segment 2.

<u>Deep Creek</u>
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

In particular, the critical rarity of greenback cutthroat trout warrants the highest level of protective management, especially management and cooperative measures to ensure reliable and seasonally natural stream flows.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (22.7%, 15.8%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used

for Deep Creek, *so long as* those other methods continue to successfully protect the trout and its habitat.

<u>West Fork Terror Creek</u>
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (39.2%, 47.5%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for West Fork Terror Creek, *so long as* those other methods continue to successfully protect the trout and its habitat.

**Summary**
The undersigned organizations recommend that the BLM reach a finding of suitability, and implement corresponding strong protective management measures for:
>    - Monitor Creek
>    - Potter Creek
>    - Roubideau Creek Segment 1

The undersigned organizations recommend that the BLM implement the strongest possible protective management measures, other than a finding of wild & scenic suitability for:
>    - Gunnison River Segment 2
>    - Roubideu Creek Segment 2
>    - Deep Creek
>    - West Fork Terror Creek

Thank you again for your careful consideration of these comments and recommendations, as complement to the thorough research and review the BLM has already applied to these important streams and corridors.

Please let us know any way in which we can clarify these recommendations, expand on them, or assist with securing their implementation in the BLM's protective management of these streams.

Sincerely,

Steve Smith, Assistant Regional Director
The Wilderness Society
for

8

Ken Strom, Director
Audubon Colorado

Megan Mueller, Senior Staff Biologist
Center for Native Ecosystems

Becky Long, Water Caucus Coordinator
Colorado Environmental Coalition

Jay Heeter, Campaigns Coordinator
Colorado Mountain Club

Paul Joyce, Conservation Associate
Colorado Wild

Meghan Maloney, River Program Director
San Juan Citizens Alliance

Hilary White, Director
Sheep Mountain Alliance

Gretchen Nicholoff, President
Western Colorado Congress

Rob Peters, Executive Director
Andrea Robinson, Conservation Chair
NFRIA/WSERC Conservation Center

BLM_0109734

## James Bode

| | |
|---|---|
| **From:** | Site Administrator <info@ourcolorado.org> on behalf of Ross Kelman <rosskelman@hotmail.com> |
| **Sent:** | Thursday, February 24, 2011 3:40 PM |
| **To:** | uformp@blm.gov |
| **Subject:** | Please protect the Dolores River Basin |

Feb 24, 2011

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection.  Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity; *prove that the long-term ecological health of the area will not be jeopardized; *have viable reclamation plans in place before permits can be granted; and *have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Mr. Ross Kelman

BLM_0109735

2559 S Gaylord St
Denver, CO 80210-5213

BLM_0109736

## James Bode

| | |
|---|---|
| **From:** | Kate Wynant |
| **Sent:** | Tuesday, March 01, 2011 7:21 PM |
| **To:** | UFO AR |
| **Subject:** | FW: Attached map for comments |
| **Attachments:** | img043.pdf |
| | |
| **Categories:** | SS.D.b / Stakeholder_Dolores / WSRMtg_2011-02-16? |

**Kate Wynant**
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite IA
Boulder, CO  80301
tel: 303-447-7160     fax: 866-625-0707
www.EMPSi.com      Twitter: EMPSInc      Facebook: EMPSi

*Bringing clarity to the complex* ™

*GSA Contract GS10F-0412S        HUBZone-certified*

Denver      Reno      San Francisco      Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

**From:** Barbara Hawke [mailto:barbara_hawke@tws.org]
**Sent:** Monday, February 28, 2011 7:11 PM
**To:** Kate Wynant
**Subject:** Attached map for comments

I mention a "Tabeguache West" area in some of my comments. Attached is a rough map of the general area for consideration. The green highlit area identifies a key area for consideration for preservation as a generally primitive area.

Barbara Hawke
Dolores River Basin Wildlands Coordinator
The Wilderness Society
Montrose, Colorado
970-596-6697 (cell)

BLM_0109737



BLM_0109738

## James Bode

**From:** Kate Wynant
**Sent:** Tuesday, March 01, 2011 7:17 PM
**To:** UFO AR
**Subject:** FW: CDOW Cooperating Agency Comments
**Attachments:** CDOW comments.doc; Statewide Stips Table Final 122010.pdf; BLM Stipulations Letter 12132010.pdf

**Kate Wynant**
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue. Suite 1A
Boulder, CO  B0301
tel:  303-447-7160    fax:  866-625-0707
www.EMPSi.com      Twitter: EMPSInc      Facebook: EMPSi

*Bringing clarity to the complex* ™

*GSA Contract GS10F-0412S*        *HUBZone-certified*

Denver        Reno        San Francisco        Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

**From:** Magee, Brian [mailto:Brian.Magee@state.co.us]
**Sent:** Monday, February 28, 2011 5:00 PM
**To:** bsharrow@blm.gov; bkrickba@blm.gov
**Cc:** Delpiccolo, Renzo; Kate Wynant; Gurzick, Tony
**Subject:** CDOW Cooperating Agency Comments

Barb, Bruce, and Kate-
Attached is the CDOW comments on the range of alternatives that you of the cooperating agencies. In addition,  I've attached the CDOW recommended stipulations letter and matrix that we sent the BLM State Office. This is reference in our comments. Below is a cover e-mail that Renzo wanted to accompany our comments. His computer crashed so he asked me to forward along the letter and comments.

Let me know if you have any questions as you look through the comments. We very much look forward to continuing working with you on the development of RMP.

Thanks,

Brian


Brian Magee
SW Regional Land Use Specialist
Colorado Division of Wildlife
415 Turner Drive
Durango, CO 81303
Office 970-375-6707
Cell 970-759-9587

1

BLM_0109739

**From:** Delpiccolo, Renzo
**Sent:** Sunday, February 27, 2011 10:03 AM
**To:** Magee, Brian
**Cc:** Delpiccolo, Renzo
**Subject:** cover letter

Barb-

I want to thank you for the opportunity to be involved in the development of the RMP. The discussions with you and your staff as of late, as we work through this new and somewhat complicated process of cooperating agencies, have been helpful to the me and my staff in understanding the process the UFO has elected to follow to complete the revision of the RMP. We admire your vision, enthusiasm, and leadership as we move forward through the process.

As we've discussed at length, the DOW is concerned that the cooperating agency timelines are unrealistic in order for my agency to properly analyze the material, then coordinate input from all of my staff experts and formulate comments. Additionally, in reviewing the cooperating agency material we are concerned that there is missing and incomplete information associated with the action items. Specifically, there is no maps for biological core areas, grazing allotments, riparian resources, areas not meeting Land health Standards, ect, many of the terms are missing from the glossary, the acreages associated with action items are incomplete or simply missing. Furthermore, many of the acreages or quantified values seemingly have no context, rational, or methodology as to how they were developed, thus making it difficult or impossible to evaluate if the range of alternatives has adequately been captured. In order for your vision of the development of the preferred alternative to properly function a significant amount of data and analysis are required. We are concerned that as your staff moves further into the process of developing the preferred alternative that there will be major resistance to changing or modifying the preferred should additional analysis and input from cooperating agencies be received.

That said, we are encouraged by your repeated assurances that there will be many opportunities now and in future to provide detailed input and technical assistance to you and your staff in the development of the range of alternatives and subsequently the preferred alternative. It is our understanding that the Feb 28th deadline to submit comments does not affect or limit the DOW's ability to make additional recommendations and comments on the range of alternatives should the range be found inadequate in future discussion or analysis.

We understand that the BLM has a multiple use mandate and the pressure placed on the public lands by development, grazing, recreation, and wildlife has never been greater. We cannot understate the importance of BLM lands and this planning process in the management of wildlife and wildlife habitats. As private lands become more and more developed the importance of un-fragmented functional public land habitat is the key to maintaining viable wildlife populations. In our opinion, the loss and fragmentation of quality transitional and winter range habitats for mule deer and elk should be of highest importance when it comes to planning future uses across the landscape. For instance, the UFO is comprised of approximately 3.1 million acres, of that approximately 10% of the entire resource area is critical elk winter range that largely supports the majority of elk that summer on the Uncompahgre Plateau. As the landscape becomes more and more fragmented and wildlife compete with other uses it becomes increasing import to preserve core areas of habitat. We believe that any time a biological resource is given equal consideration in land use decisions such as with the Desert Bighorn Sheep MOU (1989) that wildlife greatly benefit. While we applauded your staff recommendations for the Core Area concept, the analysis and mythology to designating core areas as we understand it does not have a quantifiable objectives or rational for attempting to preserve and protect areas of high concentration of wildlife that allow for sustainability of populations.

As we continue to work with your staff as a cooperating agency through this process we are assuming that there will be time to fully evaluate and address our concerns in the development of the preferred alternative, and, should we feel like there are issues (goals and action items) that have not been addressed or that we as a cooperating agency have not had

2

BLM_0109740

sufficient time to provide input for, then BLM will be receptive to taking the appropriate amount of time and effort to consider our concerns.

We very much look forward to continuing to work with the BLM to refine this process and how best the DOW can participate in a meaningful way during this important planning process.

Thanks,

Renzo

BLM_0109741

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 1. | 127 | B | B. Krickbaum | Please replace "…below measurable limits …" with "below ambient standards …" | A. Adams: Change made. |
| 2. | 58 | B | dow | It is not possible to displace native big game species over across the landscape in response to ecological stressors such as drought. Remove reference to big game. | |
| 3. | 68 | all | | Add industrial use and mineral extraction to activities | |
| 4. | 72 | B | | Do not allow the use of non natives even if sterile. Specify UP varieties as preference for native seed. | |
| 5. | 74 | all | | Establish success criteria for reveg efforts to restore ecological functionality of impacted habitat | |
| 6. | 74 | B | | After sensitive species habitat include big game species habitat as part of goal | |
| 7. | 77 | B | | Add new action or incorporate "Maintain productive and diverse vegetation communities, and maximize habitat conditions on winter range to support native ungulate species populations. | |
| 8. | 80 | B,C,D | | Include …"maintain their integrity and functionally for wildlife" | |
| 9. | | | | | |
| 10. | 99 | New action item | | Actively create, enhance, and restore wetland and riparian areas impacted by historic landuse and flow regime modification | |
| 11. | 100 | B | | Reference to BMPs- where are the BMPs? | |
| 12. | 101 | | | Increase NSO NGD to ¼ mile, | |
| 13. | 119 | B,E | | Enforce Mitigation measure (spatial, seasonal, **ADD** *require the replacement of key habitat function and values from the impacted resource*) | |
| 14. | 119 | Objective | | Develop and preservation, enhancement and restoration goals for game and non games species to meet population objectives. Develop a strategic long term comprehensive habitat and vegetation management models and plans to identify spatial and temporal treatments for targeted species. A landscape assessment for the entire UFO is necessary. | |



BLM_0109742

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 15. | 124 | | | See attached: *CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado* for species specific lease stipulations including TL dates and CSU buffers, ect. Most of these stips should apply to other activities besides Oil and Gas. There is one mistake the TL for production area Desert Bighorn sheep should be Feb 1-May 1. Make the date consistent with this recommendation throughout the document. Please note that some stips have CSU for density limitations these should also be added for any Alt B and E. | |
| 16. | 127 | B | | We support Alt B. NSO on SWA. Fluid mineral development on SWA is an incompatible use with the purpose, intent, and management of a SWA. | |
| 17. | 130 | B | | Action item please change to: Designate coldwater sport fishery, cutthroat trout and, warm water native species of concern as priority species. | |
| 18. | 131 | | | Add action: Coordinate aquatic habitat improvement projects with the CDOW to maintain, improve, and enhance priority species and public opportunity for enjoyment and use. | |
| 19. | 132 | ALL | | Included structural and vegetation improvements to the list to achieve restoration. Also, change non-game native species to "priority species". | |
| 20. | 133 | All | | Please change to in consultation with the CDOW remove fish barriers. In some instances as with cutthroat trout, natural and artificial barriers are use to restore cutthroat range. | |
| 21. | 138 | B | | Unclear as to what SECTION2.x is? | |
| 22. | 139 | B | | Need to reference priority aquatic species to improve recreation values. | |
| 23. | | | | | |
| 24. | 142 | B | | Include a NSO within 300ft of OHWM for cutthroat - See attached stip table | |



BLM_0109743

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 25. | 142 | | | Develop a LN or stip about decontamination of equipment to reduce the risk of the spread or introduction of Aquatic nuisance Species when working in or adjacent to riparian habitats. | |
| 26. | 144 | | | It is unclear if this action has been met or address by the objective above with a LN. Need to ensure that impacts to wildlife habitat (including aquatic) are continually evaluated and subsequently avoided, minimized, and mitigated for (including requiring replacement habitat for unavoidable impacts). | |
| 27. | 146 | All | | The list although inclusive of habitat types that are important to wildlife, Fails to identify those patches or block of habitat that are currently functioning for wildlife at this time (ie critical habitats or habitat that are considered limiting factors for populations). Designate the priority habitat types based on the limiting factors for life cycle completion (winter, summer, breeding, ect) for the species that are designated as key priority species (both game and non game species) | |
| 28. | 148 | | | Add Gunnison sage grouse to the list | |
| 29. | 149-150 | | | See comment 14. The habitat acreages have little context. Habitat treatments and enhancements should be based on specific species needs and formulated into a comprehensive landscape habitat management plan. | |
| 30. | 156 | B | | Suggest: Close 100% of the routes that are impacting terrestrial habitats or species. Note: The concern is that once a route is established that the impact has already occurred through fragmentation of habitats and displacement of wildlife. At what scale are impacts evaluated? | |
| 31. | 153 | | | Suggest adding an action: Wildlife will have first priority for all additional forage made available through *wildlife* habitat improvement projects. | |



Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review: January 27, 2011

BLM_0109744

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 32. | 155 | All | | Suggest priority species and priority species habitats in addition to special species and species habitats.  Also include . Avoid critical/priority habitats in future travel management planning both spatially and temporally. | |
| 33. | 162 | | | Currently, the deer population is under objective and the elk populations are at or near objective within the UFO.  Animal distribution across the landscape is not uniform. Big game species, for a variety of reasons, vegetation type, season of use, topography, site fidelity, etc. can concentrate in areas and cause wildlife related conflicts with private lands and game damage. Reduction of the carrying capacity through grazing is irresponsible public land management. We suggest modifying the action to identify areas to conduct habitat treatments and provide seclusion areas to facilitate desired distribution patterns across the landscape. This would tie habitat treatments and wildlife emphasis areas into an over arching habitat model as described in comment #14 band #29. | |
| 34. | 163 | B | | Change 3000 acres to …"improve at lease 15% of the mapped pronghorn habitat over the life of the RMP. New action: Need to coordinate with other Field offices on management efforts when biological resources overlap administrative boundaries. | |
| 35. | 164 | All | | We support the concept of biological core areas. However, given the limited information to review on this topic we do not think that the areas are large enough to "protect critical winter forage in sufficient quantity and quality to support sustainable populations" Suggest expand the areas to include 80% of the critical mule deer winter range and elk winter concentration areas. These areas have the highest densities of wintering animals within the UFO and are paramount in sustain population objectives. | |
| 36. | | | | | |



BLM_0109745

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 37. | 167 | B | | Seasonal closure dates to protect Big Game should be applied to all winter range not just biological core areas unless specifically exempt in some other resource designated area  such as an SRMA, ect. | |
| 38. | 168 | B | | Manage DELETE "the following" Elk Calving area (Production areas) . Should read: *Manage Elk Calving areas (production areas )...* | |
| 39. | 169 | B | | Action item should say Elk production areas are closed to human entry and motorize and mechanized travel within Elk production areas from May 15-June 30. Seasonal closure dates to protect production areas should be applied to all production area unless specifically exempt.  See attached stip letter. | |
| 40. | | | | | |
| 41. | 178 | All | | Terms not in glossary, see date for winter range in attached stips. | |
| 42. | 179 | all | | Make consistent with Comment 39. Including helicopter over flight in Big Horn sheep habitat | |
| 43. | 183 | | | Consider action: Designate 80% of the mule deer critical winter range, and elk winter concentration areas as priority for wildlife in forage allocations. | |
| 44. | | | | | |
| 45. | | | | | |
| 46. | 190 | All | | See stipulations and buffers for raptors in attached. | |
| 47. | 191 | All | | See stipulations and buffers for raptors in attached. | |
| 48. | 192 | all | | See stipulations and buffers for raptors in attached. | |
| 49. | 193 | All | | See stipulations and buffers for raptors in attached. | |
| 50. | 200 | B | | Fine to designate areas, but moving of prairie dogs is primarily up to the County. | |
| 51. | 207 | B | | Also include in the Objective: Require replacement if habitat a ratio that is greater/ functionally equivalent if impacts to the habitat are unavoidable. | |
| 52. | 208 | All | | Include special status species in the list | |
| 53. | 210 | B | | Add: ***Actively*** pursue… | |
| 54. | 212 | B | | Add exception: Unless the animal damage control was part of a research or management project specifically for the T&E species. | |



Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review: January 27, 2011

BLM_0109746

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 55. | 213 | All | | BLM may be required by federal law to not permit any activities that would jeopardize the continued existence of a species. Alternative C and D need to language to address this. | |
| 56. | 215 | B | | "occupied habitats" not in glossary. Action should expand to NSO for all uses in T&E occupied habitats | |
| 57. | 230 | | | Same action item as 132. See comment 19. | |
| 58. | 232 | New action | | In conjunction with USFWS and CDOW developed a brood stock pond for cutthroat genetics. | |
| 59. | 235 | All | | See attached stip recommendations | |
| 60. | 241 | | | Same action item as 156. See comment 30. | |
| 61. | 243 | B | | Make NSO on occupied cuckoo Habitat. Refer action 215 Comment 54. | |
| 62. | 245 | A | | Make NSO. Also add TL dates on other activities. See Stips. | |
| 63. | 248-251 | | | Duplicative actions. See comments 43-45 | |
| 64. | 260-265 | | | CDOW is supportive of the suggestions for stip in GUSG habitat. There are refinements that we would recommend. See stips for NO lease, NSO, CSU (noise and density limitations) and TL for Gunnison Sage grouse | |
| 65. | 267 | | | See stips also attached is CDOW recommend buffers for raptors in Colorado. | |
| 66. | 283 | B | | Expand date: March 1-July 15 | |
| 67. | 285 | B | | Expand CSU to 0.25 mi from Feb 1-may 1 | |
| 68. | 288 | B,E | | Same as recommended in attached stips | |
| 69. | 389 | all | | Make TL date consistent with CDOW Stip recommendations throughout RMP. | |
| 70. | 374 | B | | Should lands with Wilderness Characteristic exclude livestock grazing? | |
| 71. | 409 | All | | Suggest to tie AUM and grazing acreages to Land Health standard 3. | |
| 72. | 411 | All | | Do not allow sheep/goat trailing or allotments this is Desert Big horn sheep habitat. | |
| 73. | 412 | B | | Suggest changing 'periodically' to "Annually evaluate allotments…" | |



BLM_0109747

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 74. | 413 | B | | Add to bullet points Ecological deterioration or competition with priority species, | |
| 75. | 417 | B | | Vacated allotments are also important to wildlife during time of drought. Consider giving equal preference to wildlife on vacated allotments.  Consider retiring vacated allotments when allotment overlaps with priority species habitats. | |
| 76. | 422 | All | | Consider adding this language back in. It is unreasonable should outside monies be available to conduct rangeland improvements designed to improve wildlife habitat that the priority of forage not be given to wildlife. This is key in leveraging funding between agencies, non profits, NGOs. Without some assurance that monies spent on wildlife habitat improvement will allow for wildlife use, willingness to fund projects may be hampered. | |
| 77. | 469 | All | | Un able to comment if range is adequate as there are no values. All areas of the UFO should be closed to motorized and mechanize use unless specifically exempt once a travel management plan is complete. User created roads and trails create "existing routes" and hamper responsible travel management planning. | |
| 78. | 473 | All | | All areas of the UFO should be closed to motorized and mechanize use unless specifically exempt once a travel management plan is complete. User created roads and trails create "existing routes" and hamper responsible travel management planning. | |
| 79. | 474 | All | | User created roads and trails create "existing routes" and hamper responsible travel management planning. | |
| 80. | 478 | All | | Elk calving area seasonal time restirction should apply to all mapped habitats. | |
| 81. | 479 | all | | Winter seasonal travel limitation should  apply to all mapped winter range. Change language to include Other areas may be **OPEN** in the future based on site specific travel analysis. | |
| 82. | 495 | B | | Edit bullet to say "Special species and terrestrial key/priority species habitats" | |



BLM_0109748

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 83. | 504 | B | | Change last sentence to say " Routes *must* follow existing roads, routes, or ROW. | |
| 84. | 509 | B | | Add bullet: Key/priority habitats | |
| 85. | 515 | B | | Add bullet: Key/priority habitats | |
| 86. | 521 | B | | Add bullet: Key/priority habitats | |
| 87. | 562 | B | | Add bullet: Key/priority habitats | |
| 88. | 594 | B | | We are supportive of this ACEC. Refine seasonal closure date for Lekking and brood rearing habitats. Expand to include the overall range. See stip for NSO, CSU, ect.. We look forward to fully developing the concept of the acec. | |



BLM_0109749

STATE OF COLORADO

**Bill Ritter, Jr., Governor**
**DEPARTMENT OF NATURAL RESOURCES**

# DIVISION OF WILDLIFE

AN EQUAL OPPORTUNITY EMPLOYER

Thomas E. Remington, Director
6060 Broadway
Denver, Colorado 80216
Telephone: (303) 297-1192
*wildlife.state.co.us*



*For Wildlife-*
*For People*

December 13, 2010

Helen Hankins
State Director-BLM-Colorado State Office
BLM Colorado State Office
2850 Youngfield St.
Lakewood, CO 80215

Re:   **CDOW Recommendations for Resource Management Plan Revisions and Quarterly Oil and Gas Lease Sales**

Dear Helen,

The Colorado Division of Wildlife (CDOW) would like to thank you for meeting with us regarding quarterly lease sales and the leasing reform process.  We found these meetings to be highly productive.  We continue to appreciate your cooperation.  CDOW values the opportunity for us to work together on issues that will help link the common threads of our missions, including the protection and management of wildlife and wildlife habitat.

As you know, CDOW has statutory authority to protect, preserve, enhance and manage the wildlife of Colorado for the use, benefit, and enjoyment of the people of Colorado and its visitors.  We encourage BLM to develop a standardized approach that will protect wildlife and wildlife habitats across planning area boundaries.

The purpose of this letter is two-fold.  One is to make recommendations for Resource Management Plan (RMP) guidance that will allow appropriate oil and gas exploration and development while also providing for the long-term conservation of wildlife and wildlife habitats across the State of Colorado; the second is to provide our expectations for adequate wildlife stipulations in the quarterly oil and gas lease sale process to improve efficiency.

**Wildlife Protection Considerations in Resource Management Plans**

CDOW is actively participating in the RMP revision process across the State by attending regular meetings with BLM staff and submitting comments through the Department of Natural Resources' Cooperating Agency Agreement.  We appreciate the opportunity to engage with BLM on wildlife and land use issues, and to provide comment during the draft RMP and quarterly oil and gas lease sale processes.  We have also found that engaging early with BLM by attending Notices of Staking has been

DEPARTMENT OF NATURAL RESOURCES, Mike King, Executive Director
WILDLIFE COMMISSION, Tim Glenn, Chair • Robert Streeter, Vice Chair • Mark Smith, Secretary
Members, David R. Brougham • Dennis Buechler • Dorothea Farris • Allan Jones • John Singletary • Dean Wingfield
Ex Officio Members, Mike King and John Stulp

BLM_0109750

effective for exchanging information that results in benefits for operators and wildlife. CDOW also appreciates the opportunity to engage in BLM's new leasing reform process.

CDOW continues to be concerned that mitigating impacts on a site-by-site basis does not result in an effective conservation strategy over the long term. We recommend that the RMPs provide landscape-level analysis and guidance that, in addition to deciding which parcels are made available and under what stipulations, also addresses broader approaches such as phased or clustered development. CDOW requests that these comments be integrated, as appropriate, into relevant chapters and appendices within RMPs that are currently being revised.

As the surface density of development increases beyond one well pad per section, literature sources strongly suggest that avoidance and minimization measures alone are no longer sufficient to address adverse impacts to some species, and compensatory mitigation is necessary to offset the permanent loss of wildlife resources. We would like to see RMPs incorporate avenues to seek compensatory mitigation when surface density exceeds one well pad per section (within the habitats we've identified) or when other development parameters exceed the point where normal operational practices provide sufficient avoidance and minimization of impacts to wildlife. CDOW would also like to highlight the importance of implementing adaptive management and monitoring programs to assess oil and gas development with respect to resulting impacts on the landscape.

**Recommendations for Lease Stipulations**

As you are aware, CDOW has prepared a detailed list of Best Management Practices (BMPs) for oil and gas development, titled *"Actions to Minimize Adverse Impacts to Wildlife Resources."* The first part of the document contains general BMPs and the last part contains species-specific BMPs. The species-specific BMPs include recommendations on protective buffers (grouse, raptors, riparian, etc.), timing information (winter range, breeding periods, etc.), and recommendations on surface density caps (mule deer and grouse). While this document does not cover all wildlife species in Colorado, it does cover the majority of the species that CDOW is concerned about.

As a tool to assist you, we have summarized the information from the species-specific BMPs into a simplified matrix which is attached to this letter. The matrix includes those wildlife species and habitats that would be best protected through BLM's implementation of these recommendations as standard stipulations in RMPs and quarterly lease sales. The matrix lists wildlife species, habitat types, and area or buffer distance recommendations for No Surface Occupancy Stipulations, buffer distance and time periods associated with Timing Limitation Stipulations, and facility density, surface disturbance and noise limitations for Controlled Surface Use Stipulations.

**No Surface Occupancy Stipulations**

**No Surface Occupancy** is recommended at nest and breeding sites for certain species (see attached table for details) including: bighorn sheep, Brazilian free-tailed bat, Townsend's big-eared bat, fringed myotis, Columbian sharp-tailed grouse, cutthroat trout, greater sage-grouse, greater prairie chicken, Gunnison sage-grouse, least tern, lesser prairie chicken, mountain plover, northern leopard frog, piping plover, plains sharp-tailed grouse, Preble's and New Mexico meadow jumping mouse, various raptors, southwest willow flycatcher, western boreal toad, and certain aquatic habitats including 300 feet from the ordinary high water mark.

BLM_0109751

In addition, CDOW recommends **No Lease**, or at a minimum **No Surface Occupancy**, within some categories of wildlife habitat and other special management areas significant to wildlife and wildlife recreation in Colorado, including: State Wildlife Areas, greater sage-grouse core areas, Gunnison sage-grouse occupied habitat, gold medal waters, designated cutthroat trout habitat, roadless areas, and Wilderness Study Areas.

**Timing Limitation Stipulations**

**Timing Limitation** stipulations recommendations are made for certain species (see attached table for details) including: bighorn sheep, black-footed ferret, Columbian sharp-tailed grouse, cutthroat trout, mule deer, elk, greater sage-grouse, greater prairie chicken, Gunnison sage-grouse, kit fox, least tern, lesser prairie chicken, mountain plover, piping plover, plains sharp-tailed grouse, prairie dogs, pronghorn antelope, raptors, southwest willow flycatcher, swift fox, and various aquatic species.

Several species are recommended for **Lease Notices** to require habitat surveys, as appropriate including: bats, black bear, black footed ferret, kit fox, least tern, lynx, mountain plover, northern leopard frog, piping plover, prairie dogs, Preble's and New Mexico jumping mouse, raptors, river otter, southwest willow flycatcher, and swift fox.

**Controlled Surface Use Stipulations**

A **Controlled Surface Use** Stipulation is recommended to restrict density of surface development to one well pad per section (above this level of disturbance, off site and/or on site mitigation is recommended, as appropriate) within select habitats for certain species, including: bighorn sheep, Columbian sharp-tailed grouse, cutthroat trout, mule deer, elk, greater sage-grouse, greater prairie chicken, Gunnison sage-grouse, lesser prairie chicken, plains sharp-tailed grouse, southwest willow fly catcher, western boreal toad, and generally aquatic species.

As a minimum standard for sage grouse, CDOW recommends a **Controlled Surface Use** stipulation which caps disturbance at less than or equal to 1 percent of the total surface area of mapped sage grouse seasonal habitats (located within core areas), or if seasonal habitats are unmapped, within the core area boundary.  Note that for Gunnison sage-grouse, occupied habitat is considered the core area boundary.  For occupied greater sage-grouse habitat outside of core areas, CDOW recommends a 5 percent cap on surface disturbance within mapped seasonal habitats, or if seasonal habitats are unmapped, within the occupied habitat boundary.

CDOW also recommends a **Controlled Surface Use Stipulation** in all mapped sage grouse seasonal habitats and core areas to limit noise emissions from oil and gas facilities consistent with the recommendations in both the Colorado Greater Sage-grouse Conservation Plan and the Gunnison Sage-grouse Rangewide Conservation Plan.  Similar noise limitations within mapped seasonal habitats and core areas (where defined) are likely to benefit Columbian sharp-tailed grouse, plains sharp-tailed grouse, and lesser prairie chickens.

**Lease Notices**

**Lease Notices** are also recommended for several species which may be threatened or endangered or candidates for listing including: black-footed ferret, cutthroat trout, Gunnison sage-grouse, least tern, lynx, piping plover, Preble's and New Mexico jumping mouse, southwest willow fly catcher, and western boreal toad.

CDOW also recommends that **Lease Notices** be applied to any lease issued in habitat where threatened and endangered species exist, within Gunnison and greater sage-grouse production areas, State of Colorado listed sensitive species, migration corridors (where surface density caps may provide the most effective protection), designated cutthroat trout habitat, and critical habitat areas where wildlife species are in decline, and within habitats that are irreplaceable and unique. These Lease Notices should notify lessees that additional restrictions may be applied to protect these key wildlife habitats. Other information contained within the BMPs document could be utilized to formulate Conditions of Approval attached with Applications for Permits to Drill, as BLM deems appropriate.

**Ongoing Coordination**

CDOW's recommendations are based on recent peer-reviewed research of the impacts of development on wildlife and wildlife habitats. Our recommendations are likely to evolve through time as new wildlife science becomes available. This is particularly true for some species, such as greater and Gunnison sage-grouse, where our understanding of development impacts on these species continues to improve. Change in status of species which are petitioned for inclusion as threatened or endangered under the Endangered Species Act may also influence future recommendations.

It is not CDOW's intent to create static recommendations regarding lease stipulations, as species and habitats and their priorities often change. We appreciate that recommendations must remain flexible and these recommendations must reflect current conditions as we know them. However, regular communication between the CDOW and BLM Geospatial Information Systems Departments' should help ensure that stipulations retain sufficient flexibility to be applied to the most appropriate places over time.

We look forward to continuing to work with you in the future and continuing productive dialog on this subject. Please let us know if we can provide any more information that BLM would find helpful.

Sincerely,

Thomas E. Remington
Director

CC:    Sherri Thompson-Denver BLM Office
       Steve Bennett, BLM NW District Office
       Lori Armstrong, BLM SW District Office
       Greg Shoop, BLM Front Range District Office
       Nancy Warren, CDOW
       Ron Velarde, CDOW
       Dan Prenzlow, CDOW
       Tom Speeze, CDOW
       Steve Yamashita, CDOW
       K. Kaal, CDOW
       D. Riggs, CDOW
       B. Petch, CDOW
       J. Holst, CDOW
       C. Greenman, CDOW
       A. Trujillo, CDOW

| CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado | | | | |
|---|---|---|---|---|
| *Wildlife*<br>*Species* | *Habitat*<br>*Types* | *No Surface Occupancy*<br>*Stipulation*<br><br>*(area or buffer distance)* | *Timing Limitation*<br>*Stipulation*<br><br>*(time period  - may be greater than 60 days)* | *Controlled Surface Use*<br>*Stipulation*<br><br>*(potential facility relocate or other operational constraint)* |
| *Bats (Brazilian Free-tailed, Townsend's Big-eared, Fringed Myotis)* | Roost Sites | Within 0.25 Miles of Roost Site | N/A | A bat inventory may be required prior to approval of operations within historic mining complexes. These are areas where bats are suspected or the habitat is deemed suitable but no bats have been documented.  The inventory data will be used to apply conservation measures to reduce the impacts of surface disturbance on bat habitat |
| *Bighorn Sheep* | Production Areas<br>Winter Range | Entire Mapped Production Area<br>Entire Mapped Winter Range Area | (TL for human activities in these habitats including over flights)<br>April 15-June 30 (Rocky Mountain) February 28-May 1 (Desert)<br>November 1-April 15 | N/A<br>N/A |
| *Black Footed Ferret* | Release Areas | N/A | Entire Area March 1-July 15 | N/A |
| *Columbian Sharp-tailed Grouse* | Leks | Within 0.4 Miles of Lek Sites | N/A | N/A |
| | Winter habitat | N/A | Restrict development between Dec 1- March 15 | Limit noise not to exceed 49 dB  measured 30 ft. from source. |
| | Production Areas (Breeding and Nesting habitat | N/A | Within 1.25 Miles of Lek Sites March 15-July 30 | Surface Density Limitation of one pad per section; Relocate compressors > 1.25 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| *Cutthroat Trout* | Designated Cutthroat Habitat | 300-Feet from OHWM | SEE Aquatic Species stip | N/A |
| | Designated Cutthroat Habitat Watershed | N/A | N/A | Surface Density Limitation of one pad per section |
| *Mule Deer* | Crucial Winter Ranges (Severe Winter Range and Winter Concentration Areas) | N/A | December 1-April 15 | Surface Density Limitation of one pad per section or consider off site mitigation |
| *Elk* | Crucial Winter Ranges (Severe Winter Range and Winter Concentration Areas) | N/A | December 1-April 15 | Surface Density Limitation of one pad per section or consider off site mitigation actions |
| | Production Areas | N/A | May 15-June 30 | Surface Density Limitation of one pad per section or consider off site mitigation actions |

BLM_0109754

| *Gunnison/Greater Sage-grouse* | | | | |
|---|---|---|---|---|
| | *Leks [1]* | Within 0.6 Miles of Lek Sites | N/A | N/A |
| | *Core Areas (Occupied Habitat = Core Area for Gunnison sage-grouse)* | No Lease | N/A | Surface Density Limitation of one pad per section; Relocate compressors > 4 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| | *Winter Range* | N/A | December 1-March 15 | Surface Density Limitation of one pad per section; Relocate compressors > 4 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| | *Production Areas (Breeding and Nesting habitat* | N/A | Within 4 Miles of Lek Sites  March 1-June 30 | Surface Density Limitation of one pad per section; Relocate compressors > 4 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| *Greater Prairie Chicken* | | | | |
| | *Leks* | Within 0.6 Miles of Lek Sites | N/A | N/A |
| | *Production Areas (Breeding and Nesting habitat* | N/A | Within 2.2 miles of Lek sites March 1-June 30 | Surface Density Limitation of one pad per section; Limit noise not to exceed 49 dB  measured 30 ft. from source. |
| *Kit Fox* | | | | |
| | *Den Sites* | N/A | Within 0.25 mile of den sites February 1-May 1 | Pre-construction survey for den sites may be required |
| *Least Tern* | | | | |
| | *Production Areas (Breeding and Nesting habitat)* | Within 300 Feet OHWM | 0.5 Miles-No Human Encroachment-April 1-July 31 | N/A |
| *Lesser Prairie Chicken* | | | | |
| | *Leks [2]* | Within 0.6 Miles of Lek Sites | N/A | N/A |
| | *Core Areas* | No Lease | N/A | Surface Density Limitation of one pad per section; Relocate compressors > 2.2 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| | *Production Areas (Breeding and Nesting Habitat)* | | Within 2.2 Miles of Lek Sites March 15-June15 | Surface Density Limitation of one pad per section; Relocate compressors > 2.2 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| *Lynx* | | Consult with DOW regarding Lynx use of the development area | | |
| *Mountain Plover* | *Active Nest Site* | Within 300 Feet of Active Nest | N/A | Pre-construction survey for nest sites may be required |
| *Piping Plover* | *Production Areas (Breeding and Nesting Habitat)* | Within 300 Feet OHWM | Within 0.5-No Human Encroachment-April 1-July 31 | N/A |

BLM_0109755

| | | | | |
|---|---|---|---|---|
| **Plains Sharp-Tailed Grouse** | | | | |
| | *Leks* | Within 0.4 Miles of Lek Sites | N/A | N/A |
| | *Core Areas* | No Lease | N/A | Surface Density Limitation of one pad per section; Relocate compressors > 1.25 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| | *Production Areas (Breeding and Nesting Habitat)* | N/A | Within 1.25 Miles of Lek Sites-March 1- June 30 | Surface Density Limitation of one pad per section; Relocate compressors > 1.25 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| **Prairie Dogs (White-tailed/Gunnison's)** | | | | |
| | *Colonies* | N/A | March 1-June 15 | Pre-construction survey for active colonies may be required; avoid direct disturbance to active colonies when possible |
| **Preble's and New Mexico Meadow Jumping Mouse** | | | | |
| | *Known and Potential Occupied Habitat* | Within 300 ft. of stream centerline | N/A | N/A |
| **Pronghorn Antelope** | | | | |
| | *Winter Concentration Areas* | N/A | January 1-March 31 | N/A |
| **Bald Eagle** | | | | |
| | *Active Nest Site[3]* | Within 0.25 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.5 Miles- No Human Encroachment October 15-July 31 | |
| | *Active Winter Night Roost Sites[4]* | Within 0.25 Miles of Roost Site | N/A | Pre-construction roost surveys may be required |
| | *Active Winter Night Roost Sites* | N/A | 0.5 Miles- No Human Encroachment November 15 1-February 28 | |
| **Ferruginous Hawk** | | | | |
| | *Active Nest Site[3]* | Within 0.5 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.5 Miles- No Human Encroachment February 1-July 15 | |
| **Golden Eagle** | | | | |
| | *Active Nest Site[3]* | Within 0.25 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.5 Miles- No Human Encroachment December 15-July 15 | |
| **Mexican Spotted Owl** | | | | |
| | *Protected Activity Centers (PAC)* | Entire PAC | N/A | Pre-construction nest surveys may be required |
| | *Protected Activity Centers (PAC)* | N/A | Adjacent PAC Areas- No Human Encroachment March 1-August 31 | |
| **Northern Goshawk** | | | | |
| | *Active Nest Site[3]* | Within 0.5 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.5 Miles- No Human Encroachment March 1-September 15 | |
| **Osprey** | | | | |
| | *Active Nest Site[3]* | Within 0.25 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.25 Miles- No Human Encroachment April 1-August 31 | |
| **Peregrine Falcon** | | | | |
| | *Active Nest Site[3]* | Within 0.5 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.5 Miles- No Human Encroachment March 15-July 31 | |

BLM_0109756

| | | | | |
|---|---|---|---|---|
| **Prairie Falcon** | | | | |
| | Active Nest Site [3] | Within 0.5 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | Active Nest Site | N/A | 0.5 Miles-No Human Encroachment March 15-July 15 | |
| **Swainson's Hawk** | | | | |
| | Active Nest Site [3] | Within 0.25 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | Active Nest Site | N/A | 0.25 Miles- No Human Encroachment April 1-July 15 | |
| **Other Raptors Not Listed Above** | | | | |
| | Nesting Habitat | N/A | No Human Encroachment January 1-July 15 | Pre-construction nest surveys may be required |
| | Roost Sites | N/A | No Human Encroachment November 15-April 1 | |
| **Burrowing Owl** | | | | |
| | Active Nest Site | N/A | 300 Foot March 1-August 15 | N/A |
| **River Otter** | | | | |
| | Occupied Habitat | N/A | N/A | Minimize disturbance of riparian vegetation and road development within 300 ft. of occupied habitat |
| **Southwest Willow Flycatcher** | | | | |
| | Active Nest Site | Within 300 Feet of Nest Site | N/A | Pre-construction nest surveys may be required |
| | Suitable habitat (USFWS minimum patch size definition) | | Restrict activities between May 15-Aug 1 | Pre-construction nest surveys may be required |
| **Swift Fox** | | | | |
| | Den Sites | N/A | 0.25 Mile March 15-June 15 | Pre-construction survey for den sites may be required |
| **Northern Leopard Frog** | | | | |
| | Breeding Sites | Within 0.25 Miles of Breeding Site | N/A | N/A |
| **Western Boreal Toad** | | | | |
| | Breeding Sites | Within 0.5 Miles of Breeding Site | N/A | N/A |
| **Aquatic Species** | | | | |
| | Gold Medal Water | 300 Feet from OHWM | N/A | N/A |
| | Rainbow Trout | N/A | March 1-June 15 | N/A |
| | Brown Trout | N/A | October 1-May 1 | N/A |
| | Brook Trout | N/A | August 15-May 1 | N/A |
| | Cutthroat Trout | N/A | June 1-September 1 | N/A |
| | Bluehead Sucker | N/A | May 1-July 15 | N/A |
| | Flannelmouth Sucker | N/A | April 1-July 1 | N/A |
| | Roundtail Chub | N/A | May 15-July 15 | N/A |

[1] Greater and Gunnison sage-grouse lek = any lek active within last 10 years (core area); any lek active within last 5 years (outside core area)

[2] Lesser prairie chicken lek = any lek active within last 3 years

[3] Active Nest Site = any nest that is frequented or occupied by a raptor during the breeding season, or which has been frequented or occupied in any of the five previous breeding seasons

[4] Active Bald Eagle Winter Night Roost = Areas where bald eagles gather and perch overnight, and sometimes during the day in the event of inclement weather.

BLM_0109757

| Alternative A *Current Management (No Action)* | Alternative B *(Preservation / High-Intensity Management)* | Alternative C *(Development / High-Intensity Management)* | Alternative D *(Development / Low-Intensity Management)* | Alternative E *(Preservation / Low-Intensity Management)* | Alternative F *Agency Preferred* |
|---|---|---|---|---|---|
| **Action:** Save 20 fish. | **Action:** Save 80 fish. | **Action:** Save 30 fish. | **Action:** Save 10 fish. | **Action:** Save 60 fish. | **Action:** Save 30 fish. *(same as Alternative C)* |
| **Action:** Eat 2 fruits or veggies every day. | **Action:** Eat 7 fruits or veggies every day and take a multi-vitamin. | **Action:** Eat 6 fruits or veggies every day. | **Action:** Eat 0 fruits or veggies every day. | **Action:** Eat 5 veggies every day and take a multi-vitamin. | **Action:** Eat 8 fruits or veggies every day. |
| **Action:** Knock down 5 bowling pins. | **Action:** Knock down 8 bowling pins. | **Action:** Knock down 7 bowling pins. | **Action:** Knock down 4 bowling pins. | **Action:** Knock down 3 bowling pins. | **Action:** Get a strike! |

Proposed RMP CANNOT BE DON'T GO BOWLING!!!!!!!!!!!!!!

BLM_0109758

TableofSeasonal(Breeding)IIBuffers.xls

**Table B. 2. Recommended seasonal buffers for breeding raptors**

| Species | | USFWS Region 1 | | | USFWS Region 2 | | | | USFWS Region 6 | | | | | | | | USFWS Region 7 | USFWS Region 8 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Idaho | Oregon | Washington | Arizona | New Mexico | Oklahoma | Texas | Colorado | Kansas | Montana | Nebraska | North Dakota | South Dakota | Wyoming | Utah | Alaska | California | Nevada |
| **Falconiformes** | | | | | | | | | | | | | | | | | | | |
| Osprey | *Pandion haliaetus* | | | | | | | | 4/1-8/31 | | 4/1-8/31 | | | | | 4/1-8/31 | | | |
| Swallow-tailed kite | *Elanoides forficatus* | | | | | | | | | | N/A | | | | | N/A | | | |
| White-tailed kite | *Elanus leucurus* | | | | | | | | | | N/A | | | | | N/A | | | |
| Mississippi kite | *Ictinia mississippiensis* | | | | | | | | | | N/A | | | | | N/A | | | |
| Bald eagle | *Haliaeetus leucocephalus* | | | | | | | | | | 1/1-8/31 | | | | | 1/1-8/31 | | | |
| Northern harrier | *Circus cyaneus* | | | | | | | | | | 4/1-8/31 | | | | | 4/1-8/31 | | | |
| Sharp-shinned hawk | *Accipiter striatus* | | | | | | | | | | 3/15-8/31 | | | | | 3/15-8/31 | | | |
| Cooper's hawk | *Accipiter cooperii* | | | | | | | | | | 3/15-8/31 | | | | | 3/15-8/31 | | | |
| Northern goshawk | *Accipiter gentilis* | | | | | | | | 3/1-7/31 | | 3/1-8/15 | | | | | 3/1-8/15 | | | |
| Common black-hawk | *Buteogallus anthracinus* | | | | | | | | | | N/A | | | | | N/A | | | |
| Harris's hawk | *Parabuteo unicinctus* | | | | | | | | | | N/A | | | | | N/A | | | |
| Red-shouldered hawk | *Buteo lineatus* | | | | | | | | | | N/A | | | | | N/A | | | |
| Broad-winged hawk | *Buteo platypterus* | | | | | | | | | | N/A | | | | | N/A | | | |
| Gray hawk | *Buteo nitidus* | | | | | | | | | | N/A | | | | | N/A | | | |
| Swainson's hawk | *Buteo swainsoni* | | | | | | | | 4/1-7/15 | | 5/1-8/31 | | | | | 3/1-8/31 | | | |
| White-tailed hawk | *Buteo albicaudatus* | | | | | | | | | | N/A | | | | | N/A | | | |
| Zone-tailed hawk | *Buteo albonatus* | | | | | | | | | | N/A | | | | | N/A | | | |
| Red-tailed hawk | *Buteo jamaicensis* | | | | | | | | 2/15-7/15 | | 3/15-8/15 | | | | | 3/15-8/15 | | | |
| Ferruginous hawk | *Buteo regalis* | | | | | | | | 2/1-7/15 | | 3/15-7/15 | | | | | 3/1-8/1 | | | |
| Rough-legged hawk | *Buteo lagopus* | | | | | | | | | | N/A | | | | | N/A | | | |
| Golden eagle | *Aquila chrysaetos* | | | | | | | | 1/1-8/31 | | 1/1-8/31 | | | | | 1/1-8/31 | | | |
| Crested Caracara | *Caracara cheriway* | | | | | | | | | | N/A | | | | | N/A | | | |
| American kestrel | *Falco sparverius* | | | | | | | | | | 4/1-8/15 | | | | | 4/1-8/15 | | | |
| Merlin | *Falco columbarius* | | | | | | | | | | 4/1-8/31 | | | | | 4/1-8/31 | | | |
| Northern aplomado falcon | *Falco femoralis* | | | | | | | | | | N/A | | | | | N/A | | | |
| Gyrfalcon | *Falco rusticolus* | | | | | | | | | | N/A | | | | | N/A | | | |
| Peregrine falcon | *Falco peregrinus* | | | | | | | | | | 2/1-8/31 | | | | | 2/1-8/31 | | | |
| Prairie falcon | *Falco mexicanus* | | | | | | | | year round | | 4/1-8/31 | | | | | 4/1-8/31 | | | |
| **Strigiformes** | | | | | | | | | | | | | | | | | | | |
| Common barn owl | *Tyto alba* | | | | | | | | | | 2/1-9/15 | | | | | 2/1-9/15 | | | |
| Flammulated owl | *Otus flammeolus* | | | | | | | | | | 5/1-9/30 | | | | | 4/1-9/30 | | | |
| Western screech owl | *Megascops kennicottii* | | | | | | | | | | 3/1-8/15 | | | | | 3/1-8/15 | | | |
| Eastern screech owl | *Megascops asio* | | | | | | | | | | 3/1-8/15 | | | | | 3/1-8/15 | | | |
| Whiskered screech-owl | *Megascops trichopsis* | | | | | | | | | | N/A | | | | | N/A | | | |
| Great horned owl | *Bubo virginianus* | | | | | | | | | | 12/1-9/31 | | | | | 12/1-9/31 | | | |
| Snowy owl | *Bubo scandiacus* | | | | | | | | | | N/A | | | | | N/A | | | |
| Northern hawk owl | *Surnia ulula* | | | | | | | | | | N/A | | | | | N/A | | | |
| Northern pygmy owl | *Glaucidium gnoma* | | | | | | | | | | 4/1-8/1 | | | | | 4/1-8/1 | | | |
| Ferruginous pygmy owl | *Glaucidium brasilianum* | | | | | | | | | | N/A | | | | | N/A | | | |
| Elf owl | *Micrathene whitneyi* | | | | | | | | | | N/A | | | | | N/A | | | |
| Burrowing owl | *Athene cunicularia* | | | | | | | | 3/1-7/31 | | 4/1-8/31 | | | | | 3/1-8/31 | | | |
| Spotted owl | *Strix occidentalis* | | | | | | | | | | N/A | | | | | N/A | | | |
| Northern spotted owl | *Strix occidentalis caurina* | | | | | | | | | | N/A | | | | | N/A | | | |
| Mexican spotted owl | *Strix occidentalis lucida* | | | | | | | | | | 3/1-8/31 | | | | | 3/1-8/31 | | | |
| Barred owl | *Strix varia* | | | | | | | | | | N/A | | | | | N/A | | | |
| Great gray owl | *Strix nebulosa* | | | | | | | | | | 3/1-8/31 | | | | | 3/1-8/31 | | | |
| Long-eared owl | *Asio otus* | | | | | | | | | | 2/1-8/15 | | | | | 2/1-8/15 | | | |
| Short-eared owl | *Asio flammeus* | | | | | | | | | | 3/15-8/1 | | | | | 3/1-8/1 | | | |
| Boreal owl | *Aegolius funereus* | | | | | | | | | | 2/1-7/31 | | | | | 2/1-7/31 | | | |
| Northern saw-whet owl | *Aegolius acadicus* | | | | | | | | | | 3/1-8/31 | | | | | 3/1-8/31 | | | |

BLM_0109759

**James Bode**

| | |
|---|---|
| **From:** | bkrickba@blm.gov |
| **Sent:** | Wednesday, March 02, 2011 4:18 PM |
| **To:** | sbear@dmea.com; Steve.weist@oxbow.com; John@reams-construction.com; billday@paonia.com; rich@richdurnanphoto.com; Robbie.levalley@colostate.edu; Wblack8709@msn.com; pmueller@tnc.org; silvers1@tds.net; tkctew@yahoo.com; barbara_hawke@tws.org; bsharrow@blm.gov; dkauffma@blm.gov; dmagee@blm.gov; Bruce_Krickbaum@co.blm.gov; Angie Adams; Kate Wynant; bbott68@gmail.com; UFO AR |
| **Subject:** | Final Minutes: Uncompahgre RMP RAC Subgroup Meeting #6 |
| **Attachments:** | RMP RAC_SG Mtng 6_012811_Minutes.pdf |

Hello RAC Subgroup,

It occurred to me that I have not sent the final minutes from our last meeting.
So, here are the final minutes from the January 28 meeting.  Our next RAC Subgroup meeting will be on April 1 at 9:00 (Holiday Inn Express in Montrose). Please let me know if you will not be able to attend.

 Regards,  Bruce


(See attached file: RMP RAC_SG Mtng 6_012811_Minutes.pdf)

<><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

BLM_0109760



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401



# RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #6
## Friday, January 28, 2011 (9:00 AM – 12:00 PM)

### Meeting Location:
### Holiday Inn Express (Jordan Room)
### 1391 South Townsend Avenue, Montrose, CO

# Meeting Minutes

**Attendees:** Angie Adams (EMPSi), Robbie Baird-LeValley, Shelby Bear, Walt Blackburn, Bill Day, Richard Durnan, William Ela, Barbara Hawke, Bruce Krickbaum (BLM Uncompahgre Field Office), Peter Mueller, John Reams, Barb Sharrow (BLM Uncompahgre Field Office), Steven Weist, Kate Wynant (EMPSi)

**Handouts:** Agenda; Highlights of the Resource Management Planning Process to Date; Comment Form for Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review; Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review; Maps for Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review; Dolores-San Miguel River Basins Supplemental Comment Period

1. **Welcome** (Bruce Krickbaum)

2. **Introductions** (All present)

3. **Planning Process to Date** (Angie Adams)
   - See handout: Highlights of the Resource Management Planning Process to Date.
   - Gray highlighting indicate changes from last meeting.
   - The Class I cultural resources overview has been completed. It's an inventory of cultural resources known on BLM land. It documents the sites and their quality. It's an inventory and will get rolled into the RMP in the alternatives.
   - The wilderness characteristics inventory report is underway and a draft is expected in the spring. In the 1990s the BLM inventoried lands for wilderness characteristics and those lands became wilderness study areas. BLM's authority to do that ended around 1993. Since then, the BLM's authority to inventory and protect wilderness characteristics has changed over time and may continue to do so. Right now, the BLM inventories lands outside of wilderness study areas (WSAs) to see if they have wilderness characteristics. That is what the report is. The alternatives can look at different ways to manage those wilderness characteristics. There is no mandate for BLM to protect lands with wilderness characteristics, unlike WSAs that the BLM must protect until Congress acts on their recommendation. The alternatives will lay out different scenarios for protecting or not protecting the wilderness characteristics. Secretary [of the Interior] Salazar issued a Secretarial Order regarding Wild Lands. As an agency we do not

BLM_0109761

know what that means. It will take time to figure out how to implement Salazar's order. Direction is how we know it today but things may change.

- *Question*: Have you gotten any clarification if decision making comes down to the Field Office level? *Answer*: Yes, we would still make the decisions in the land use plan. We have always been required to inventory. Our office has done what we were supposed to do so I think we can react if things should change.
- *Question*: Do you have a sense of timing on when you'll get written instruction? *Answer*: Generally it takes at least six months for things to trickle down.
- *Question*: Is it in writing? *Answer*: The Secretarial Order is in writing but the interpretation will take some time. Our draft plan is not due to come out until fall of 2012 so we have time to react to whatever the policy will be. The inventory is the biggest piece of the puzzle and we are doing that. Now the question will be whether or not we have to make certain decisions in the plan that we have not yet included.
- *Question*: With the government having concerns over budget, how will that affect the BLM's ability to manage lands as a certain classification? *Answer*: The same as it always has. We didn't know what the budget would be like in the last 20 years and we can't predict the future.
  - ○ *Question*: But what if you determine a stream segment is wild and you can't manage for that? *Answer*: Part of suitability does include manageability and cost, so that will be considered for wild and scenic river (WSR) determinations.

## 4. Internal Draft Alternatives (Angie Adams)

- See handouts: Comment Form for Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review; Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review; Maps for Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review.
- Please note that these are ROUGH DRAFT alternatives. The BLM Interdisciplinary Team has not even seen these all put together. We know there are errors and inconsistencies and we will be working through those things. This is a content review and not an editorial review.
- What we are asking you to do is review these rough draft alternatives for two things. We'll take any feedback but focus on two things.
  - ○ Ensure that we've captured a reasonable range of alternatives. It's not to identify what you like and what is the best decision. Right now we just want to make sure we have the correct range of alternatives. You should be thinking about whether or not what you want to see is somewhere in the range. If it's not, we need to know that.
  - ○ If you think there are concepts or actions among alternatives that seem very similar, you can give us feedback on where alternatives can be combined. It might vary by row (action) or resource, not necessarily whole alternatives being combined.
- Layout:
  - ○ The first page of the Alternatives handout states your mission.
  - ○ Second page of the matrix is the Table of Contents and shows you what page all of the resources start on.
  - ○ The top of each page shows the different alternatives the BLM is considering for resource management. In your notebook you should have a two-page handout that describes the alternatives and a few words. If you don't have that or can't find it, e-mail Kate to get a copy (kate.wynant@empsi.com).
  - ○ At the top of each resource section, it shows us the minimum decisions that should be made per the BLM Land Use Planning Handbook (H-1601-1). The next line for every resource will have the goal for that resource. As we talked about previously, the goals are the same for all alternatives. Objectives and actions are ways to reach that goal.
  - ○ The first map in the map packet shows land status (yellow=BLM; green=US Forest Service; purple=Park Service; white=private; blue=state). Note that the Gunnison Gorge and

Dominguez-Escalante National Conservation Areas are excluded from this plan. Every map is the same color scheme.

o Alternative A is current management and what is happening now. Remember that Alternative A is included in the range of alternatives. Sometimes Alternative A forms one of the "edges" of the range.

o Alternative F is blank because that will be the Agency Preferred alternative which we have not gotten to. The Interdisciplinary Team has just thought of the four action alternative scenarios (Alternatives B, C, D, and E) without focusing on what they want to do (preferred alternative). We want to ensure that we have an adequate range of alternatives before moving to the preferred alternative. In March, the Interdisciplinary Team will get together to develop the preferred alternative.

o *Question*: When we're looking to see if there is an adequate range of alternatives, is there another set of sideboards like what the BLM can legally do? *Answer*: Yes. At one of the first meetings we discussed automatic sideboards or planning criteria. These include the BLM following the law. If it's illegal, we can't consider it so it shouldn't be in the alternatives. Because cultural resources have such strict regulations, the decision space is not very large.
 – *Action*: EMPSi will send planning criteria to the group.

o *Question*: For high-intensity management, can that include written rules, more fences, etc.? *Answer*: It could be more fences, it could be more rules, more police enforcement, more structure to competitive events. It doesn't necessarily mean the BLM has to put more resources on the ground on an on-going basis. In one form or another it means more management inputs.

• We are not near the preferred alternative. The BLM will meet in mid-March to talk about that. The RAC Subgroup and Cooperating Agencies will have an opportunity to review Chapter 2, including the preferred alternative, in May when the Field Office is reviewing Chapter 2. You'll also see it when it goes for public review as the Draft RMP/Draft EIS.

• Note that some sections have acreages and maps made and some sections do not. We know that without acres or maps it will be hard to tell us whether or not there is a good range or a bad range, but we did the best we could for today.

• Areas of Critical Environmental Concern (ACECs): Just because a certain alternative does not list an ACEC for protection as an ACEC doesn't mean that those values won't be protected. It might be inadvertently protected by other actions in that Alternative. For example, ACEC overlapping lands managed to protect wildlife characteristics. Each of the alternatives has to agree with itself. They each need to be implementable as a stand-alone RMP. If you see any inconsistencies within an alternative, let us know. The management for ACECs is divided by each ACEC (there is a row for each ACEC). For some resources, there is a row that shows management common to all (for example, ACECs), and then gets more specific by area or species (in the case of wildlife).

o *Question*: Is there any way to get a map that would have all the designations that exist or proposed? *Answer*: No, you wouldn't be able to see everything. Perhaps in a future meeting we can do live GIS and we can add layers so you can see what overlaps are. As you go through the alternatives, keep a list of what you'd like to look at. Just be aware you might come across inconsistencies. We just want you to be aware that just because something isn't an ACEC, for example, doesn't mean the area isn't receiving protection. A lot of that analysis will come out in the impacts analysis.
 – *Question*: What about clickable PDFs so we can look at all the layers? *Answer*: We can ask the GIS folks but they have a lot of work to do on the alternatives that is very much a priority.

o *Question*: On the top of page 213, it says closed to fluid mineral leasing for the Adobes? *Answer*: That is an example where actions don't all fit on one page for a topic, so that action belongs with Needle Rock ACEC on the previous page.

- o There are certain ACECs where management does really vary by alternative. For example, the Fairview ACEC (page 216) not only do the management prescriptions change, but the size of the ACEC also changes.
  - – *Question*: So Fairview is currently there and you can't get rid of it but you can expand it. *Answer*: Actually, under Alternative D, it goes away. The acreages change across the alternatives and we also consider not managing it as an ACEC. This range looks at everything from zero to 4,250 acres and everything in between.
- "No similar action" means zero or we're not doing anything similar in the other alternatives. Another example on page 48, line 135. Sometimes action alternatives say "no similar action" and it's addressed somewhere else. Perhaps areas are not directly called out but discussed more generally. Also line 137 on page 48, Alternatives C and D say "no similar action" which means we're not specifically managing for river otters under those alternatives.
- A row is a concept and the alternatives vary how to do that concept. A column is an alternative or an implementable RMP. If you're working within a column looking up and down, stay within that column.
- *Comment*: Talking about mixing and matching, it seems like if you look at a geographic area there might be a synergistic way to combine some alternatives. *Answer*: Yes, we'll talk about that in a moment.
- *Question*: Do you want one of our filters to be this is a potential place for litigation? You have it written down here but will you actually be able to do it, that opens you up for litigation. *Answer*: Everything in here needs to be implementable. There might be things that seem really difficult to implement but they are still within the realm of possibility.
- *Question*: Can you look at an option, say it takes too much money for BLM to implement, can you look at an option to work with an environmental group to meet that objective? *Answer*: Yes, most resources talk about coordination. So there will be a piece that talks about coordination and cooperation. You won't see that here, but in the full Chapter 2 you will.
- *Question*: Will any of the other agencies sign a Record of Decision? *Answer*: No, not for any of the decisions in this plan. The Field Office reviews and approves, the State Office reviews and approves, Washington Office reviews and approves, etc. We are not getting specific in this management plan as to who will implement what piece, that is implementation. The BLM can coordinate with other agencies and groups without an RMP decision. That is something else to keep in mind as you're reviewing this.
- When groups come in the door and what to do a project, the first thing we do is look at our land use plan to see what it says about that piece of land. There is usually always further NEPA analysis involved in every project besides what's in the RMP.
- *Question*: What about line 238 on page 87? How do you interpret no similar action? *Answer*: This is an example where probably the resource author didn't do a very good job of cross-referencing where concepts in Alternative A are covered in other actions or objectives in Alternatives B, C, D, and E. Also, this is specific to Emphasis Area D, which under Alternative A is a specific polygon on the map and we have not put that information on a map yet.
- *Question*: Is there anything else that we don't have while we're reviewing this? *Answer*: There is a lot. You'll see a lot of places that just have "xx acres" and no map. We know it'll be hard for you to provide feedback on those places but do the best you can. If you don't have enough information to give us feedback, then don't give us feedback. In the original plans from the 80s there were a lot of decisions made that we don't really need a decision to do those actions. So sometimes where it says no similar action it's because we don't need a decision to do the things from the old RMPs.
  - o If you can't find something and you think it's important, comment on it and then it's incumbent on the Interdisciplinary Team to make sure it's there. If you have any questions, call us!

BLM_0109764

- *Comment*: I read the Secretary Salazar memo to mean that lands with wilderness characteristics would be managed as wilderness unless determined otherwise. *Response*: That's why I said the way we manage might be different than what we're proposing but I don't think it changes what we decide as far as areas to be managed. *Comment*: It sounds like all areas with characteristics have to be managed as wilderness. *Response*: Well we are in a position where we can react to how we implement the Salazar direction.
- Alternative A is the current RMPs as amendments.
- Special Recreation Management Areas. There has been new direction on how to address Special Recreation Management Areas so the "decisions to be made" section of the alternatives matrix has been updated to reflect that new direction.
- *Action*: EMPSi will e-mail group Alternative A OHV map from Chapter 3 maps.
- Off-highway Vehicles (OHVs). Under current management, there are two areas open to OHV use. Open means open to cross-country OHV use (for example, the Flat Tops and North Delta). Closed means closed to OHV use. The rest is limited to existing routes, except in Dry Creek, which is limited to designated routes. In Alternatives B through E, routes in the limited area will be limited to designated routes. All acres will fall into the open, limited, or closed category. After the Record of Decision for the RMP is signed, the BLM will go to the limited areas and do route designation. We will not do that in this plan. This plan just sets up the polygons for route designation.
- Remember that if you have any questions about a program and what's going on now, you can refer to Chapter 3 which gives some background information.
- Visual Resource Management (VRM): The classes don't prohibit development, they just set up requirements for protecting the scenic quality of the area. VRM Class I areas are the most restrictive and include wilderness. VRM Class IV is the least restrictive. In the action alternatives, you'll see purple strips (VRM Class IV), which are mostly designated utility corridors from the West-wide Energy Corridor PEIS.
  - *Action*: EMPSi will send FTP site with Chapter 3 and maps.
  - *Comment*: The colors are very close. Can these be changed? *Answer*: Yes.
- Oil and Gas Leasing. No leasing means no future leasing; it doesn't apply to current leases (valid existing rights). This rule also applies across resources throughout the RMP. Geothermal resources are also a fluid mineral and are treated the same as oil and gas, so the oil and gas map also includes geothermal resources. No surface occupancy (NSO) is a fluid mineral stipulation that says you can't occupy the surface of the land on that lease (or portion of lease). You can get to the resource (oil, gas, geothermal) but you have to get to it from outside of the NSO restriction, which means directional drilling. Controlled surface use is a softer version where you can occupy the surface but you might have to move your operation to avoid a sensitive area. Timing limitation is like an NSO but for a specific time of the year. For example a mating season for a bat.
- Rights-of-way (ROWs). This is part of the Lands and Realty program. The maps show avoidance and exclusion areas. ROWs are pipelines, powerlines, roads, etc. In an oil and gas operation, the lease (polygon) where the drilling occurs is leased through the fluid minerals program. The pipeline to move the oil and gas would require a ROW to get it from the lease to the destination. ROW avoidance means move the ROW if you can. Exclusion has essentially no exceptions, more absolute.
- *Question*: Are our comments public record? *Answer*: Yes. If someone requested them, they would be part of the public record, but we won't publish them.
- *Action*: Your comments are due on February 28th to Kate (kate.wynant@empsi.com). The ID Team is meeting the week of March 14 to discuss the preferred so we will compile your comments and distribute them to the Interdisciplinary Team to incorporate as appropriate. Be specific and direct with your comments. If the range isn't wide enough, tell us why and what needs to be included.

BLM_0109765

- *Question*: Knowing that the sections in a column all interrelate, do you want comments on a section? *Answer*: Do whatever is easiest for you. If your comment applies to several rows, include all the rows to which your comment applies. We'll take all your comments at one time, you don't have to piecemeal them.
- Preferred alternative. There are different ways to pick the preferred. 1) Pick something from Alternative A, B, C, D, or E directly; 2) Pick a combination (something in the middle or range) of A, B, C, D, or E; or 3) Pick something outside of today's range. Options 1 or 2 are optimal. We want to get the range right now so that we can do either 1 or 2. It is possible that option 3 could happen but the later that we find out we missed something, the harder the process becomes.
- *Question*: Will there be any cases where the range seems too wide? Are you interested in us telling you that one end of the range is too extreme for consideration? *Answer*: Yes, you can let us know that you think one edge is too extreme and tell us why and where the edge should be.
- *Question*: I'm still confused where you overlap with the US Forest Service. The US Forest Service is a Cooperating Agency and it is incumbent upon the US Forest Service to review the alternatives and let us know if there are any inconsistencies. *Comment*: Maybe we could comment on areas where we would like to see consistency and coordination with the US Forest Service.
- *Question*: Do you anticipate major changes to the alternatives? For example if we spend a lot of time on something and you've already caught it can you let us know so we don't spend a lot of time on it? *Answer*: I don't think there will be major changes such that your comments would not be applicable when we receive them.

## 5. Other Items Not on the Agenda

- WSR Update (Barb Sharrow) (see handout: Dolores-San Miguel River Basins Supplemental Comment Period). Thank you to everyone for your help in the process. On February 7th the RAC Subgroup will meet and the Dolores/San Miguel leads will give their recommendation to the RAC Subgroup on what the recommendations to the BLM should be. The RAC Subgroup will decide on the final recommendations for the BLM. We decided early on how we would come to consensus, which has been written down and we can review that on February 7th. Barb handed out materials for the group to review and bring with them on February 7th.
  - o Keep in mind the classifications for each segment from the final eligibility report. The classifications can be changed from eligibility to suitability.
  - o The suitability criteria are also in the final eligibility report.
  - o The meeting is scheduled on February 7th from 9:00am-2:00pm at the Holiday Inn Express in the Apex Room.
  - o The meeting is public and they can speak during the allotted public comment time, just like the RAC and RAC Subgroup meetings. We may have to limit the time they can speak depending up on the number of public present. It's critical to have as many RAC Subgroup members present as possible.
  - o WSR alternatives are in the alternatives and we are currently considering all suitable and none suitable, per BLM Manual direction.
  - o If there is time after the WSR discussion is over, the group can ask the BLM any questions that they've come across in their review of the alternatives to that point.
- If there are other issues that you want to meet on specifically, let Barb know. For example, domestic versus wild sheep grazing. We might have meetings with the ranchers about that issue.

## 6. Public Comments: Two members of the public present. No public comments.

BLM_0109766

## 7. Action Items / Next Meeting

- For the RAC Subgroup we have a meeting scheduled for February 7th to discuss WSR. **The meeting will be in the Apex Room at the Holiday Inn Express from 9:00am – 2:00pm.**
- Next RAC Subgroup meeting for the RMP is scheduled for Friday, April 1. We won't have a preferred for you but can talk about your comments, the next steps, WSR, etc. Richard Durnan may not be able to make it (Spring Break).
- If you have questions throughout, don't hesitate to contact Bruce, Angie, or Kate.
- ☐ *Action* (RAC Subgroup): Your comments are due on February 28th to Kate (kate.wynant@empsi.com). Be specific and direct with your comments. If the range isn't wide enough, tell us why and what needs to be included.
- ☐ *Action* (EMPSi): Send planning criteria to the group.
- ☐ *Action* (EMPSi): E-mail group Alternative A OHV map from Chapter 3 maps.
- ☐ *Action* (EMPSi): Send FTP site with Chapter 3 and maps to group.

BLM_0109767

## James Bode

| | |
|---|---|
| **From:** | bkrickba@blm.gov |
| **Sent:** | Wednesday, March 02, 2011 4:54 PM |
| **To:** | bsharrow@blm.gov; dkauffma@blm.gov; dmagee@blm.gov; Angie Adams; Kate Wynant; bbott68@gmail.com; Aschroeder@usbr.gov; kjensen@ci.montrose.co.us; renzo.delpiccolo@state.co.us; shansen@deltacounty.com; MPelletier@gunnisoncounty.org; swhite@montrosecounty.net; lpadgett@ouraycountyco.gov; lynn@mtngeogeek.com; joann@sanmiguelcounty.org; daves@sanmiguelcounty.org; pat@cedaredgecolorado.com; mjreagan@fone.net; norwoodparker@centurytel.net; sharold@ci.olathe.co.us; davidvarley@kaycee.net; townofpaonia@tds.net; jcoates@town.ridgway.co.us; Dan_Reinkensmeyer@fws.gov; charles_sharp@fws.gov; tkrandallparker@fs.fed.us; lbroyles@fs.fed.us; segfahlt@gmail.com; Bruce_Krickbaum@co.blm.gov; UFO AR |
| **Subject:** | Final Notes: Uncompahgre RMP Cooperating Agency Meeting #6 |
| **Attachments:** | RMP CA Mtng 6_012711_Minutes.pdf; winmail.dat |

Hello Cooperating Agencies,

It occurred to me that I did not send the final notes from our last meeting.
So, I have attached the final notes from the January 27 meeting. Our next Cooperating Agency meeting will be on March 31 at 1:00pm (Holiday Inn Express in Montrose). Please let me know if you will not be able to attend.

Regards, Bruce

(See attached file: RMP CA Mtng 6_012711_Minutes.pdf)


<><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 03/02/2011 03:26 PM -----

| | | |
|---|---|---|
| "Kate Wynant" <kate.wynant@empsi.com> | | |
| | **To** | |
| | "Bruce Krickbaum" | |
| 02/18/2011 10:53 AM | <bkrickba@blm.gov> | |
| | **cc** | |
| | <angie.adams@empsi.com> | |
| | **Subject** | |
| | Final Notes: Uncompahgre RMP Cooperating Agency Meeting #6 | |

1

BLM_0109768

Bruce:

Attached is an Adobe (.pdf) file of the final notes of Cooperating Agency meeting #6. Below is text for you to use in the e-mail. No comments were received on the draft notes. These notes are not required to be, and should not be, posted on the RMP website. They should be distributed to all official Cooperating Agency representatives. As always, contact me with any questions or if you need anything else.
Thanks.

In case the attachment does not come through, I have posted the minutes on the FTP site and you may access them in the following location:
09_P2T6_CoopAgencies-RACSC-Mtgs > 2.6.A_CoopAgencies > 2.6.A.b_MtgMaterials-Records\Mtg06_2011-01-27.

Password: Montrose

Kate

Kate Wynant
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite 1A
Boulder, CO  80301
tel:  303-447-7160     fax:  866-625-0707

www.EMPSi.com <http://www.empsi.com/>        Twitter: EMPSInc
Facebook: EMPSi

Bringing clarity to the complex (tm)

GSA Contract GS10F-0412S        HUBZone-certified

2

BLM_0109769

Denver      Reno      San Francisco      Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

(See attached file: winmail.dat)

BLM_0109770

 

# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401

## COOPERATING AGENCY MEETING #6

### Thursday, January 27, 2011 (1:00 – 4:00 PM)

### Meeting Location:
### Holiday Inn Express (Jordan Room)
### 1391 South Townsend Avenue, Montrose, CO

# Meeting Notes

**Attendees:** Angie Adams (EMPSi), Levi Broyles (Grand Mesa, Uncompahgre, Gunnison National Forests), Renzo DelPiccolo (Colorado Department of Natural Resources, Southwest Region), Scott Harold (Town of Olathe), Kerwin Jensen (City of Montrose), Bruce Krickbaum (BLM Uncompahgre Field Office), Joan May (San Miguel County BOCC), Patricia Means (Town of Cedaredge), Barbara Peterson (Town of Paonia), Alan Schroeder (Bureau of Reclamation, Western Colorado Area Office), Charlie Sharp (US Fish and Wildlife Service), Barb Sharrow (BLM Uncompahgre Field Office), David Varley (Town of Orchard City), Steve White (Montrose County BOCC), Kate Wynant (EMPSi)

**Handouts:** Agenda; Highlights of the Resource Management Planning Process to Date; Comment Form for Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review; Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review; Maps for Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review

1. **Welcome** (Bruce Krickbaum)

2. **Introductions** (All present)
   - Charlie Sharp is the new representative for US Fish and Wildlife Service. He was previously with the Bureau of Land Management (BLM), Uncompahgre Field Office.

3. **Planning Process to Date** (Angie Adams)
   - See handout: Highlights of the Resource Management Planning Process to Date.
   - Gray highlighting indicate changes from last meeting.
   - The Class I cultural resources overview is complete. It's just an inventory of what cultural resources the field offices has, their quality, and potential for resources not currently known.
   - We expect a draft wilderness characteristics inventory report in March. The BLM can't designate new wilderness study areas (WSAs) but they can inventory lands for wilderness characteristics (e.g., naturalness, untrammeled, opportunities for solitude and primitive and unconfined recreation). In the alternatives the BLM can decide how to manage those lands from a lot of protection to not protecting them at all.
   - *Question*: There are a few reports that I'd be interested in seeing (such as mineral report), can we get copies of those? *Answer*: They are not in a state to be released to the public but will be

BLM_0109771

available closer to the release of the Draft Resource Management Plan/Draft Environmental Impact Statement.

- *Question*: So the wilderness characteristics report is going to be different from eligible wild and scenic rivers, where if a river is eligible it needs to be managed that way for now, but lands with wilderness characteristics don't have to be managed that way? *Answer*: Right. The Wild and Scenic Rivers Act says once you know a stream segment is eligible you have to protect it in that state. If it's suitable, you have to continue that management until Congress acts on it. Wilderness characteristics doesn't have a congressional act or anything. The BLM say to inventory for them, know about them, and then decide what you want to do. Secretary [of the Interior] Salazar issued a Secretarial Order for Wild Lands and we don't know what that means yet. For lands with wilderness characteristics this is the direction as of today but it may change depending upon national or state direction.
- *Question*: Wild and scenic rivers is specific to rivers but lands with wilderness characteristics could be anywhere? *Answer*: Yes, outside of existing WSAs they could be anywhere.

## 4.   Internal Draft Alternatives

- See handouts: Comment Form for Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review; Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review; Maps for Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review.
- The BLM Interdisciplinary Team has been meeting as a whole and in small groups to fine tune the alternatives over the last several months. These are VERY DRAFT alternatives – this is the first time they've been in one place. Previously they've been in individual files for the Interdisciplinary Team members to work in. There may be some conflicts that we have not yet caught. This draft will be tweaked and we need your help with that.
- Your main job is to ensure that the BLM is considering a reasonable range of alternatives. Don't worry about what column things fall in or whether or not you like it. Worry about whether or not the range wide enough, too wide? Is something that you want to see somewhere in the range?
- Your other job, as you're going through the matrix, is if you think there are places in the matrix where alternatives could be combined (i.e., if Alternatives B and D are really similar and could be in the same box), tell us. That way we don't have to analyze six similar alternatives but can focus on fewer different alternatives. We went from a wide range of alternatives and are narrowing it down, if possible. There is not a single column that will comprise the preferred alternative, but rather across the board.
- *Question*: Are you saying that the BLM has developed four alternatives themes but that they won't always have an alternative that fits that theme? *Answer*: Remember that Alternative A is part of the range, so there are five alternatives. Under the National Environmental Policy Act, unless there is a compelling reason to do so, we don't need to analyze six alternatives if we can come to the same conclusions and analysis by analyzing four alternatives. If you feel strongly that we do need all of the alternatives, tell us that, too.
- *Question*: In each of these different scenarios, is it possible that some scenarios [alternatives] have more actions than others? *Answer*: Yes, it's possible. Where you see "Same as Alternative B" (for example), that means the action is the same as what is described under Alternative B and cells will be combined. This also means that the physical size of the document will be smaller.
- Layout:
  o The first page of the Alternatives handout states your mission.
  o Second page of the matrix is the Table of Contents and shows you what page all of the resources start on.
  o At the top of each resource section, it shows us the minimum decisions that should be made per the BLM Land Use Planning Handbook (H-1601-1). The next line for every

resource will have the goal for that resource. As we talked about previously, the goals are the same for all alternatives. Objectives and actions are ways to reach that goal.
- o The first map in the map packet shows land status (yellow=BLM; green=US Forest Service; purple=Park Service; white=private; blue=state).
- Note that while we had hoped to be able to provide you a map for all allocations for the alternatives, there is not a map for everything. There are also missing acres in some places. A reminder as you're going through the alternatives, there are 675,000 acres of BLM land in the planning area.
- Rows talk about the same idea/decision but the decision may vary by alternative.
- The preferred column is empty because the UFO has not come up with a preferred alternative.
- *Question*: Column A is what is current management. Alternatives B through E are alternatives that are being proposed. So Needle Rock is in multiple columns, so those are the options that you're evaluating? *Answer*: Yes. Alternatives B, C, D, and E are four different alternatives for management instead of managing like we are now. Everything in Alternative B has to agree with itself and be implementable as an alternative. Same for Alternatives C, D, and E. It is possible that we made a mistake and there could be conflicts, so please tell us if you see any.
  - o *Question*: How did you determine what to put in each alternative? *Answer*: At the top of every page is the theme for each alternative in three words. So the alternatives for each action should fit that theme. For example, Alternative B (preservation/high-intensity management) means more of a focus on preservation with a lot of on-the-ground actions, a lot of projects. On the other end of the spectrum is Alternative D (development/low-intensity management) means a focus on resource use and commodities with less on-the-ground work.
- Also see acronym list handed out previously and Chapter 3.
- *Question*: Is this the most recent version of the alternatives? *Answer*: Yes, as of about January 13th; it doesn't include anything from this week.
- *Question*: Are we going to get a copy of the Alternatives electronically? *Answer*: That isn't the intention. Please don't share this, it's a very rough draft. There will be several more iterations of the alternatives before it goes to the public for review in 2012.
  - o *Question*: Why can't we get the alternatives electronically? *Answer*: It's easy for people to forward on to others. We will provide the comment form electronically and comments should be submitted electronically. *Comment*: It's difficult to go through a packet of paper versus an electronic document.
- Keep in mind, for example, that if an area with wilderness characteristics isn't proposed under a certain alternative, it may still receive protection from something else like Areas of Critical Environmental Concern, Wild and Scenic Rivers, etc. We discuss that in the impact analysis. When we get to the preferred alternative we will consider the best tool to manage an area, but there could be overlapping "tools."
- Special Recreation Management Areas: A lot of communities gave us comments so please look at those to make sure we included somewhere in the alternatives what you would like to see.
- Off-highway vehicles (OHVs):
  - o Open: open to cross-country OHV use, play area, Peach Valley, Flat Tops, North Delta; open doesn't mean that's the only place you can go;
  - o Closed: closed to OHV use; and
  - o Limited: route designation, like Dry Creek.
- *Question*: As maps become available, will you send those to us? *Answer*: well for Alternative A (OHV designations), the North Delta is the only place that's open. WSAs are closed to OHV use in all alternatives (that is not a field office decision, it is dictated to us). The Tabeguache Area is a Congressionally designated area, but NOT a Wilderness Area and is closed to OHV use.

BLM_0109773

- *Question*: In the closed areas, what decision to we have to make? *Answer*: In WSAs and the Tabeguache Area, those have to be closed. But other areas proposed for closure, that is a decision point that we can make. So if it's open in one and closed in another, we've covered the range.
- *Question*: Can we add to the OHV maps a disclaimer that says in areas not open or closed that they are limited to designated routes? *Answer*: Yes. Note that for the UFO, existing routes are what is in our inventory now. If you drive a new route, it doesn't exist. In the future there won't be a "limited to existing" as there is now. Unless it's in an open area where there are no "routes" and you can go anywhere.
- Visual Resource Management (VRM). The classes don't prohibit development, they just set up requirements for protecting the scenic quality of the area. VRM Class I areas are the most restrictive and include wilderness. VRM Class IV is the least restrictive. In the action alternatives, you'll see purple strips (VRM Class IV), which are mostly designated utility corridors from the West-wide Energy Corridor PEIS.
- Oil and Gas Leasing. Note that these stipulations apply to new leases and wouldn't apply to existing leases. No lease means the resource is unavailable for extraction. No surface occupancy (NSO) means you can't be on the surface but the resource is available so you'd have to directionally drill. Controlled surface use means you might have to move the disturbance to avoid something sensitive. Timing limitation is essentially like NSO but for a fixed period of time, usually tied to a species. Note that what doesn't show on these maps is that there can be overlap with stipulations so these maps don't depict that. Pay attention to the difference between the alternatives in terms of more or less NSO versus controlled surface use.
  - *Question*: On the Alternative A map there is a large band of NSO. Why not just call it no leasing? *Answer*: There is private land around there. Also, there's an NSO stipulation for federally leased coal land which essentially means that coal leased before oil and gas, the coal has "first right" if there is a conflict. That needs an explanation.
- Rights-of-way (ROWs). Avoidance means try to avoid the area; exclusion means absolutely no new ROWs.
  - *Question*: What is the definition of a ROW? *Answer*: For example, roads (easements), solar farms, transmission lines, wind, hydroelectric (renewable except for geothermal, which falls under fluid minerals), access to private lands, utility easement.
  - *Question*: So if there's a road in a ROW exclusion area, the road couldn't be expanded? *Answer*: Right, unless the easement was larger than the current footprint.
  - *Question*: Are the corridors [from the West-wide Energy Corridor Programmatic Environmental Impact Statement] worked into this? *Answer*: They should be but may not have been worked into the GIS yet, but they are in the alternatives. The VRM maps do show the corridors, though.
  - *Question*: So a pipeline wouldn't be part of ROW? *Answer*: No, it would. *Question*: So what about geothermal? *Answer*: That is part of fluid minerals, so it is processed under the fluid mineral leasing program. All of the other renewable energies are permitted under the Lands and Realty program.
- *Action*: Comments on the Internal Rough Draft Alternatives are due by February 28th. The BLM Interdisciplinary Team is meeting March 14th, so we'll have time to evaluate your comments before moving into the preferred alternative. Focus comments on the range of alternatives and also if alternatives could be combined. Be specific and direct with comments. Don't worry about editorial comments, please.
- *Action*: EMPSi will e-mail electronic comment form, acronym list, and glossary.
- **The BLM Interdisciplinary Team is meeting on the preferred alternative in March and the range of alternatives play into the preferred. There are three ways to choose the preferred:**
  - Take an alternative straight from one of the boxes (not an entire alternative column).

BLM_0109774

o   Pick something from between two cells in the range.
o   Pick something new from outside the range. The preferred is now part of the range. This method is what we hope to avoid but if something is not in the range now we need to know about it.

5.   **Other Items Not on the Agenda**
- Wild and Scenic Rivers (Barb Sharrow). In December and January there were a number of meetings led by the RAC Subgroup on the Dolores and San Miguel River segments. They will meet on February 7th to decide on their final recommendations for the Southwest RAC. The Feb 7th meeting is a public meeting and will be in the Apex Room at the Holiday Inn Express starting at 9:00am. The meeting will be run like the RAC meetings where anyone part of the group cannot speak except during the specific time period for public comments. On February 25th, the Southwest RAC will meet with the Super RAC (all Colorado RACs) in Salida to present the information to them. On the Gunnison segments, an external stakeholder group is running the meetings. They have made some decisions as to segments they are not recommending. Both groups have a deadline of February 15th. In the alternatives now we are considering all suitable and none suitable and the recommendations will be included in an alternative.
  o   *Comment*: For this group, we won't have as much say in wild and scenic rivers as other groups, such as the RAC. *Response*: They have a lot of input and as a manager I will take their recommendations seriously but this group will have an opportunity to comment. The RAC Subgroup is focusing more on wild and scenic rivers, whereas this group is looking at everything.
  o   *Comment*: I'm thinking about our lack of ability to appeal which we agree to as a Cooperating Agency. We can comment but we are not a big part of the decision.
  o   The next time we meet with you we want to show you what the RAC Subgroup recommendations were before you comment on Chapter 2 during the Field Office review period in May.

6.   **Action Items / Next Meeting**
- The next meeting is scheduled for March 31 to talk about wild and scenic rivers, your comments on the rough draft alternatives and how the ID Team addressed **comments** while developing the preferred alternative.
- On February 7th the RAC Subgroup will meet to decide on their final recommendations for the Southwest RAC. The Feb 7th meeting is a public meeting and will be in the Apex Room at the Holiday Inn Express from 9:00am – 2:00pm.
-   *Action* (Cooperating Agencies): Comments on the Internal Rough Draft Alternatives are due by February 28th to Kate Wynant (kate.wynant@empsi.com). Focus comments on the range of alternatives and also if alternatives could be combined. Be specific and direct with comments. Don't worry about editorial comments, **please.**
-   *Action* (EMPSi): E-mail electronic comment form, acronym list, and glossary.

BLM_0109775

**James Bode**

| | |
|---|---|
| **From:** | Colorado Environmental Coalition <info@ourcolorado.org> on behalf of John Hoffmann <jhof@rof.net> |
| **Sent:** | Thursday, March 03, 2011 8:53 AM |
| **To:** | uformp@blm.gov |
| **Subject:** | Protection in the Dolores River Basin |

Mar 3, 2011

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection.  Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity; *prove that the long-term ecological health of the area will not be jeopardized; *have viable reclamation plans in place before permits can be granted; and *have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Mr. John Hoffmann

BLM_0109776

553 Garfield Ave
Carbondale, CO 81623-2052
(970) 963-1689

BLM_0109777

**James Bode**

| | |
|---|---|
| **From:** | Colorado Environmental Coalition <info@ourcolorado.org> on behalf of Phyl Morello <1432phyl@gmail.com> |
| **Sent:** | Monday, March 21, 2011 6:42 AM |
| **To:** | uformp@blm.gov |
| **Subject:** | Conservation of the Dolores River Basin...protect this area |

Mar 21, 2011

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores river and all its eligible tributaries should receive immediate, thorough, and enduring protection.  Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity; *prove that the long-term ecological health of the area will not be jeopardized; *have viable reclamation plans in place before permits can be granted; and *have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Ms. Phyl Morello

BLM_0109778

984 Harrison Ferry Rd
White Pine, TN 37890-4903

BLM_0109779

**James Bode**

| | |
|---|---|
| **From:** | Kate Wynant |
| **Sent:** | Friday, March 25, 2011 1:08 PM |
| **To:** | UFO AR |
| **Subject:** | FW: Montrose County Call Regarding WSR and Saltado Creek |

Kate Wynant
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite 1A
Boulder, CO  80301
tel:  303-447-7160    fax:  866-625-0707
www.EMPSi.com        Twitter: EMPSInc        Facebook: EMPSi

Bringing clarity to the complex ™

GSA Contract GS10F-0412S        HUBZone-certified

Denver        Reno        San Francisco        Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

-----Original Message-----
From: bkrickba@blm.gov [mailto:bkrickba@blm.gov]
Sent: Thursday, March 24, 2011 11:21 AM
To: Angie Adams; Kate Wynant; bsharrow@blm.gov
Subject: Montrose County Call Regarding WSR and Saltado Creek

Note for the record.

I received a call from Steve White (Montrose County) this morning.  The county has specific concerns with the RAC recommendation regarding suitability of Saltado Creek as a Wild section.  The concern is that it would impact their water rights (future or existing?) for a project they have a desire to do some day.

I suggested to Steve that the county send us a letter prior to April 11 outlining their concerns, as well as recommended solutions (changing the reach, changing the classification, etc).  I told him we would review their concerns when we meet as a group the week of April 11 to discuss our preferred actions.

--Bruce


<><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum

1

Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

BLM_0109781



Received
APR 0 4 REC'D
Uncompahgre Field Office

**MONTROSE COUNTY**
COLORADO

April 1, 2011   BOARD OF COUNTY COMMISSIONERS

Ms. Barbara Sharrow, Field Manager
United States Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

RE:   Wild and Scenic River Suitability Recommendation

Dear Barbara:

We are writing to express our serious concerns with the Wild and Scenic River Analysis and RAC Suitability Recommendations for the Dolores and San Miguel Segments. We do not believe that the RAC Subgroup gave meaningful consideration to the planned development of new water diversion and storage facilities in the San Miguel River basin by Montrose County and other parties. These facilities are necessary to meet the documented future water demands in Montrose County. To the extent that a suitability determination would make it more difficult to finance, permit, and construct projects within or upstream of these segments, the future economic development of the west end of Montrose County would be threatened. As the elected representatives of the citizenry who are responsible for ensuring the welfare of our constituents, we cannot accept that outcome.

As an initial matter, the suitability recommendations completely ignore the process in which Montrose County and others have been engaged for the past several years of evaluating future water demands, identifying new water projects to meet those demands, and filing water court applications to secure the necessary conditional water rights. The Colorado Water Conservation Board deferred its appropriation of new instream flow water rights in the Lower San Miguel River in order to allow water users in the basin, including the County, the Southwestern Water Conservation District, the Norwood Water Commission, and others to take these steps.

In December, 2010, after considerable investigation, the County adopted resolutions of its intent to appropriate conditional water rights and filed six applications in the water court for Water Division No. 4 (in two of these cases jointly with the Towns of Nucla and Naturita) for the following structures:

Case No. 10CW164: joint application by Montrose County and the Towns:

A.   Nucla Pump Site: 3.11 c.f.s., conditional;

B.   Highline Canal (CC Ditch): 3.11 c.f.s., conditional;

BLM_0109782

United States Bureau of Land Management
April 1, 2011
Page 2

C. Nucla Town Reservoir Enlargement: 300 acre-feet, conditional, to be filled via the CC Ditch at a rate of flow of 135 c.f.s. and the Nucla Pump Site at a rate of flow of 3.11 c.f.s., together with a right of successive refills in the cumulative amount of 900 acre-feet, conditional.

Case No. 10CW165:  Paradox Valley Pipeline: 1.0 c.f.s., conditional

Case No. 10CW166:

A. Maverick Draw Reservoir No. 1: 6,700 acre-feet, conditional, on channel, together with a right of successive refills in the cumulative amount of 6,700 acre-feet, conditional;

B. Maverick Draw Reservoir No. 2:  5,600 acre-feet, conditional, on channel, together with a right of successive refills in the cumulative amount of 6,700 acre- feet, conditional;

C. Tuttle Draw Reservoir: 1,200 acre-feet, conditional, on channel and to be filled via the CC Ditch at a rate of flow of 135 c.f.s., together with a right of successive refills in the cumulative amount of 2,400 acre-feet, conditional;

D. Big Bucktail Reservoir: 6,100 acre-feet, conditional, on channel and to be filled via the CC Ditch at a rate of flow of 135 c.f.s., together with a right of successive refills in the cumulative amount of 12,200 acre-feet, conditional.

Case No. 10CW167:

A. Maverick Draw Reservoir No. 1, First Enlargement: 15,000 acre-feet, conditional, together with a right to successive refills in the cumulative amount of 15,000 acre-feet, conditional, to be supplied by diversions from Fall Creek, Trail Creek, Williams Creek, Willow Creek, Little Cone Creek, Hunt Creek, East Fork Painter Creek, Painter Creek, East Specia (Specie) Creek, West Branch Specia (Specie) Creek, Spring Branch Creek, East Saltado Creek, Rock Creek, and Saltado Creek through the J. & M. Hughes Ditch and Beaver Park Ditch at a cumulative rate of flow of 100 c.f.s.. This is an enlargement of the Maverick Draw Reservoir No. 1;

B. Maverick Draw Reservoir No. 2, First Enlargement: 15,000 acre-feet, conditional, together with a right to successive refills in the cumulative amount of 15,000 acre-feet, conditional, to be supplied by diversions from Fall Creek, Trail Creek, Williams Creek, Willow Creek, Little Cone Creek, Hunt Creek, East Fork Painter Creek, Painter Creek, East Specia (Specie) Creek, West Branch Specia (Specie) Creek, Spring Branch Creek, East Saltado Creek, Rock Creek, and Saltado Creek through the J. & M. Hughes Ditch and Beaver Park Ditch at a cumulative rate of flow of 100 c.f.s.. This is an enlargement and relocation of the Maverick Draw Reservoir No. 2;

BLM_0109783

United States Bureau of Land Management
April 1, 2011
Page 3

   C. The Marie Scott Reservoir, the source of which is the channel of Saltado Creek and Fall Creek, Trail Creek, Williams Creek, Willow Creek, Little Cone Creek, Hunt Creek, East Fork Painter Creek, Painter Creek, East Specia (Specie) Creek, West Branch Specia (Specie) Creek, Spring Branch Creek, East Saltado Creek, Rock Creek, and Saltado Creek through the J. & M. Hughes Ditch at a cumulative rate of flow of 100 c.f.s., in the amount of 15,000 acre-feet, conditional, together with a right to successive refills in the cumulative amount of 15,000 acre-feet, conditional.

Case No. 10CW169: Appropriative rights of exchange in the San Miguel River and its tributaries in Montrose County.

Case No. 10CW194: joint application by Montrose County and the Towns:
Change of water rights for the Johnson Ditch and appropriative right of exchange from the historic points of diversion of those water rights.

Copies of these applications, which include maps of the structures, are attached to this letter.

As stated in the County's resolutions and the water court applications, those applications are necessary to meet the water demands of present and future water users in the west end of the County. The County's integrated system of reservoirs, direct-flow rights, changes of water rights, and rights of exchange will supply a total reliable yield of approximately 6,400 acre-feet per year of fully consumable and reusable water, in addition to existing supplies, to help meet those future water demands. In order to provide that yield in a sustained drought, the County requires approximately 25,600 acre-feet of additional storage capacity. The conditional storage rights claimed in the County's applications will be used to meet that requirement and, in addition, to store water that will be available for release for non-consumptive uses to maintain and enhance water quality, recreation, piscatorial values, and for in-reservoir recreational and piscatorial uses.

The County's future water demands were determined based on studies of population trends and water requirements for municipal as well as identified domestic, industrial, recreational, and other water demands. The demands identified by the County are generally consistent with the projections for the west end of the County in the Statewide Water Supply Investigation.

The suitability recommendations utterly fail to take into account either these future water demands or the proposed water supply projects that will be necessary to meet those demands. While in some cases the recommendations refer to other proposed water projects, such as the Norwood Water Commission's pump station and Goat Creek and development of the Naturita Canal, there is no reference to the County's planned projects. This omission seriously undermines the credibility and validity of the recommendations.

Moreover, the recommendations dismiss the potential for upstream water development at existing conditional reservoir sites with the general statements that according to "a draft BLM San Miguel instream flow assessment" and an unattributed "San Miguel legal and institutional

United States Bureau of Land Management
April 1, 2011
Page 4

analysis," such projects are "unlikely to be developed given current costs and concern over environmental impacts." Montrose County strongly disagrees with these statements, which were not based on credible facts and as to which the County was not consulted. The County will pursue further feasibility investigations and develop the projects that are required in order to meet its future water demands.

The Saltado Creek segment and the San Miguel River segment 2 are recommended as "wild" segments by the RAC. Both of these segments are downstream from the Marie Scott Reservoir and the diversion facilities that would fill that reservoir and the enlargements of the Maverick Draw Reservoirs 1 and 2. While the County would plan and operate these projects to meet existing instream flow requirements and to mitigate identified environmental impacts, a finding of suitability for these segments could create unreasonable constraints on the permitting and development of these necessary facilities.

Other identified segments recommended for "recreational" designation are downstream of these and one or more of the other projects for which the County has claimed conditional water rights. The discussion of these segments should recognize that future upstream water development is likely to occur and would affect to some extent the identified values, but that such development would not be inconsistent with the qualified designation.

Accordingly, Montrose County requests the BLM not to accept the suitability recommendations of the RAC as submitted, to include in its consideration of the suitability of these segments a specific recognition of the County's planned projects, and to ensure that any finding of suitability is expressly conditioned on protection of the ability to develop those projects. In particular, the County requests the BLM to consider alternative and less restrictive means of protecting the identified values in these segments, as noted in the planning documents, that would not prevent the water development projects that are so important to the future of our community.

Thank you for your consideration.

Very truly yours,

Gary J. Ellis
Chairman

Ronald D. Henderson
Vice Chairman

David S. White
Commissioner

Enclosures

/bwsn

cc w/encl.:  Bruce Krickbaum

<table>
<tr><td>

**DISTRICT COURT, WATER DIVISION NO. 4,**
**STATE OF COLORADO**
1200 N. Grand Avenue
Bin A
Montrose, CO 81401
(970) 252-4335

</td><td></td></tr>
</table>

| DISTRICT COURT, WATER DIVISION NO. 4, STATE OF COLORADO<br>1200 N. Grand Avenue<br>Bin A<br>Montrose, CO 81401<br>(970) 252-4335 | |
| --- | --- |
| **CONCERNING THE APPLICATION FOR WATER RIGHTS OF THE BOARD OF COUNTY COMMISSIONERS OF MONTROSE COUNTY, TOWN OF NUCLA, AND TOWN OF NATURITA**<br><br>in Montrose County, Colorado | Δ COURT USE ONLY Δ |
| Charles B. White, No. 9241<br>Petros & White, LLC<br>1999 Broadway, Suite 3200<br>Denver, CO 80202<br>Phone: (303) 825-1980<br>Fax: (303) 825-1983<br>E-Mail: cwhite@petros-white.com | **Case No. 10CW___** |
| **APPLICATION FOR CONDITIONAL WATER RIGHTS** | |

1.    Name, address, telephone number of Applicants:

Board of County Commissioners of Montrose County ("Montrose County")
c/o Mr. Brian W. Wilson, P.E.
Director of Public Works
Montrose County, Colorado
161 South Townsend Ave.
Montrose, CO 81401
970-252-7000

Town of Nucla
P.O. Box 219
Nucla, CO 81424

Town of Naturita
222 E Main Street
Naturita, CO 81422

Please direct all correspondence and pleadings to:

Charles B. White, Esq.
Petros & White, LLC

BLM_0109786

Application for Conditional Water Rights
Applicants: Montrose County, Colorado
Towns of Nucla and Naturita
Case No. 10CW___, Water Division No. 4
Page 2

1999 Broadway, Suite 3200
Denver, CO 80202
Telephone: (303) 825-1980

George E. Glasier, Esq.
P.O. Box 98
Nucla, CO 81424
Telephone: (970) 864-2125

Larry B. Beckner, Esq.
Beckner, Achziger, Shaver and Stanley LLC
850 Alpine Bank Bldg
PO Box 220
225 N 5th St
Grand Junction, CO 81501-2611
TELEPHONE: (303) 245-4300

2.    Introduction.  This Application is one of a series of related applications by Montrose County to meet the water demands of present and future water users in the west end of the County.  This Application seeks judicial confirmation of the appropriation by Montrose County and the Towns of Nucla and Naturita (the "Towns") of conditional direct-flow and storage water rights to satisfy the current and future water demands of the Towns, including areas within and outside of the incorporated limits of each Town that are or may be served by the Towns and/or the Mustang Water Authority.  This water demand is a portion of a total additional water demand in the west end of the County of approximately 6,400 acre-feet per year.  The conditional water rights claimed in this Application are intended for the benefit of the Towns and the Authority in order to provide a supplemental water supply in addition to all water rights and conditional water rights that are currently available to meet the foregoing water demands.  Nothing in this Application is intended to alter, diminish, or otherwise affect such existing water rights.

## A.    DIRECT-FLOW WATER RIGHTS

3.    Name of structures:

A.    Nucla Pump Site and Pipeline

B.    Highline Canal (CC Ditch)

4.    Legal description of points of diversion:

A.    The point of diversion of the existing Nucla Pump Site and Pipeline on the San Miguel River is located in the NW ¼ of the NE ¼ of Section 15, Township 46 N., Range 15 W. of the N.M.P.M. at a distance of 1,104 feet from the North section line and 1,452 feet from the East section line, in Montrose County, Colorado.

BLM_0109787

B.      The point of diversion of the existing Highline Canal (CC Ditch) on the San Miguel River is located in the NW ¼ of the SE ¼ of Section 30, Township 46 N., Range 13 W. of the N.M.P.M. at a distance of 2,300 feet from the South section line and 2,320 feet from the East section line, in Montrose County, Colorado.

5.      Source:  San Miguel River.

6.      A.      Date of initiation of appropriation: December 14, 2010.

        B.      How appropriation was initiated: By the concurrence of the formation of an intent to appropriate together with overt acts in the furtherance of that intent, including field investigations by engineering consultants and posting notices of the intended appropriations.

        C.      Date water applied to beneficial use:  n/a.

7.      Amount: 3.11 c.f.s., conditional, from one or a combination of the two structures described in the foregoing paragraph 4, as alternate points of diversion.

8.      Use: Domestic, industrial, and municipal use, enhancement or maintenance of water quality, recreation, piscatorial, and all other beneficial uses, together with the right of reuse, successive use, and disposition to extinction.

## B.      CONDITIONAL WATER STORAGE RIGHTS

9.      Name of Structure:  Nucla Town Reservoir and First Enlargement.

10.     Legal description:

        A.      Place of Storage:  The Nucla Town Reservoir and First Enlargement embankment is located in the SW ¼ of the NE ¼ of Section 10, Township 46 N., Range 15 W. of the N.M.P.M. at a distance of 1,687 feet from the North section line and 1,715 feet from the East section line, in Montrose County, Colorado.

        B.      Name and capacity of ditch or ditches used to fill reservoir, and legal description of each point of diversion:

                (1)      The Nucla Pump Site, as described in the foregoing paragraph 4.A, at a rate of flow of 3.11 c.f.s.

                (2)      The Highline Canal (CC Ditch), as described in the foregoing paragraph 4.B, at a rate of flow of 135 c.f.s.

11.     Source:  San Miguel River.

Application for Conditional Water Rights
Applicants: Montrose County, Colorado
Towns of Nucla and Naturita
Case No. 10CW___, Water Division No. 4
Page 4

12.    A.    <u>Date of initiation of appropriation</u>:  December 13, 2010.

       B.    <u>How appropriation was initiated</u>:  By the concurrence of the formation of an
intent to appropriate together with overt acts in the furtherance of that intent, including field
investigations by engineering consultants and posting notices of the intended appropriations.

       C.    <u>Date water applied to beneficial use</u>:  n/a.

13.    <u>Amount</u>:   300 acre-feet, conditional; together with a right to successive refills in the
cumulative amount of 900 acre-feet, conditional.

14.    <u>Use</u>:    Domestic, industrial, and municipal use, and for the purposes of augmentation and
exchange, enhancement or maintenance of water quality, recreation, piscatorial, and all other
beneficial uses, together with the right to reuse, successive use, and disposition to extinction.

15.    <u>Physical characteristics</u>:

| Structure: | Surface area of high water line: (acres) | Maximum height of dam in feet | Length of dam in feet | Total capacity of reservoir in acre feet | Active capacity in acre feet | Dead storage in acre feet |
|---|---|---|---|---|---|---|
| Nucla Town Reservoir | 10 | 30 | 995 | 135 | 134 | 1 |
| Nucla Town Reservoir First Enlargement | 13 | 35 | 1600 | 300 | 299 | 1 |

16.    <u>Remarks</u>:  The Nucla Pump Site and Pipeline and the Nucla Town Reservoir and First
Enlargement will be used for the benefit of the Towns of Nucla and Naturita and/or the Mustang
Water Authority.  The use of the Highline Canal (CC Ditch) pursuant to this Application will be
subordinate to, and will not interfere with, the use of the Ditch and the capacity thereof by the
Colorado Cooperative Company and its shareholders pursuant to existing water rights.

17.    <u>Map</u>:  A map showing the locations of the Nucla Pump Site and Pipeline, Nucla Town
Reservoir and First Enlargement, and Highline Canal (CC Ditch) is attached hereto as <u>Exhibit A</u>
and incorporated herein by this reference.

18.    <u>Owner of the land upon which any new diversion or storage structure, or modification to
any existing diversion or storage structure is or will be constructed or upon which water is or will
be stored, including any modification to the existing storage pool</u>:

       A.    Nucla Pump Site and Pipeline:

BLM_0109789

Troy A. & Melissa L. Lampshire
P.O. Box 706
Nucla, CO 81424-0706

Bureau of Land Management
Southwest District Office
2465 S. Townsend Ave
Montrose, CO 81401

Naslund & Son Corp
P.O. Box 154
Nucla, CO 81424-0154

Brian R. & Preston W. Carver
P.O. Box 175
Nucla, CO 81424

Brian & Preston Carver
P.O. Box 1819
Ouray, CO 81427-1819

Bobbie Dean Burbridge
P.O. Box 492
Nucla, CO 81424

Curt W. Carver
P.O. Box 812
Nucla, CO 81424

Town of Nucla
P.O. Box 219
Nucla, CO 81424

B.    Highline Canal (CC Ditch):

Bureau of Land Management
Southwest District Office
2465 S. Townsend Ave.
Montrose, CO 81401

Mildred H. Bennett Life Estate
c/o Don Bennett
P.O. Box 52

BLM_0109790

Application for Conditional Water Rights
Applicants: Montrose County, Colorado
Towns of Nucla and Naturita
Case No. 10CW___, Water Division No. 4
Page 6

Naturita, CO 81422

C.      Nucla Town Reservoir and First Enlargement:

Town of Nucla
City Hall Nucla
Nucla, CO 81424

Town of Nucla
P.O. Box 219
Nucla, CO 81424

Mustang Water Authority
P.O. Box 177
Nucla, CO 81424

Bureau of Land Management
Southwest District Office
2465 S. Townsend Ave
Montrose, CO  81401

Colorado Cooperative Ditch Company
Post Office Box 231
Nucla, Colorado 81424

Teresa Lynn Wilson & Lars Eric & Monte Naslund
P.O. Box 154
Nucla, CO 81424-0154

**WHEREFORE,** Montrose County and the Towns of Nucla and Naturita respectfully request that the Court enter a decree granting this Application, awarding the conditional water rights claimed herein, and granting to the Applicants such other relief as the Court deems just and proper.

Dated this 17th day of December, 2010.

PETROS & WHITE, LLC


_____/s/ Charles B. White_____
Charles B. White, No. 9241
ATTORNEYS FOR MONTROSE COUNTY

Application for Conditional Water Rights
Applicants:  Montrose County, Colorado
Towns of Nucla and Naturita
Case No. 10CW___, Water Division No. 4
Page 7

_____ */s/ George E. Glasier* _____ _____
George E. Glasier, No. 1028
ATTORNEY FOR TOWN OF NATURITA

BECKNER, ACHZIGER, SHAVER AND
STANLEY LLC

*/s/ Larry B. Beckner by Charles B. White, No. 9241*
Larry B. Beckner, No. 8090
ATTORNEYS FOR TOWN OF NUCLA

*PURSUANT TO C.R.C.P. 121, THE SIGNED ORIGINAL IS ON FILE IN THE OFFICE OF PETROS & WHITE, LLC*

BLM_0109792

Application for Conditional Water Rights
Applicants:  Montrose County, Colorado
Towns of Nucla and Naturita
Case No. 10CW___, Water Division No. 4
Page 8

## VERIFICATION

STATE OF COLORADO )
                           ) s.s.
COUNTY OF BOULDER )

      I, Daniel V. Ault, water rights consultant for the Board of County Commissioners of Montrose County, state under oath that I have read the foregoing **APPLICATION FOR CONDITIONAL WATER RIGHTS** and that the same is true and correct to the best of my knowledge.

      Subscribed and sworn to before me this _16_ day of December, 2010 by Daniel V. Ault.

My commission expires: _1 / 18 / 2012_

Notary Public

[SEAL]



MONTROSE COUNTY

**Application for Conditional Water Rights**

DEERE & AULT

CONSULTANTS, INC.

EXHIBIT **A**

DATE: 12/16/2010   SCALE: 1:120,000

BLM_0109794

| | |
|---|---|
| **DISTRICT COURT, WATER DIVISION NO. 4, STATE OF COLORADO**<br>1200 N. Grand Avenue<br>Bin A<br>Montrose, CO 81401<br>(970) 252-4335 | |
| **CONCERNING THE APPLICATION FOR WATER RIGHTS OF THE BOARD OF COUNTY COMMISSIONERS OF MONTROSE COUNTY**<br><br>in Montrose County, Colorado | Δ COURT USE ONLY Δ |
| Charles B. White, No. 9241<br>Petros & White, LLC<br>1999 Broadway, Suite 3200<br>Denver, CO 80202<br>Phone: (303) 825-1980<br>Fax: (303) 825-1983<br>E-Mail: cwhite@petros-white.com | **Case No. 10CW___** |

### APPLICATION FOR CONDITIONAL DIRECT FLOW WATER RIGHTS

1.    Name, address, telephone number of Applicant:

Board of County Commissioners of Montrose County ("Montrose County")
c/o Mr. Brian W. Wilson, P.E.
Director of Public Works
Montrose County, Colorado
161 South Townsend Ave.
Montrose, CO 81401
970-252-7000

Please direct all correspondence and pleadings to:

Charles B. White, Esq.
Petros & White, LLC
1999 Broadway, Suite 3200
Denver, CO 80202
Telephone: (303) 825-1980

2.    Introduction:  This Application is one of a series of related applications by Montrose County to meet the water demands of present and future water users in the west end of the County.  The conditional direct-flow water rights claimed in this Application, together with portions of the conditional storage rights, changes of water rights, and rights of exchange that are the subject of the related applications, will meet the demand for fully consumable and reusable

BLM_0109795

water for industrial, domestic, municipal, and irrigation uses in the Paradox Valley area of
Montrose County. This water demand is a portion of a total additional demand for consumptive
water uses in the west end of the County of approximately 6,400 acre-feet per year.

3.      Name of structure: Paradox Valley Pipeline.

4.      Legal description of point of diversion: The point of diversion of the Paradox Valley
Pipeline on the San Miguel River is a point whence the East Quarter Corner of Section 23,
Township 46 North, Range 16 West of the N.M.P.M. bears South 3° East 2,550 feet. This is also
the decreed point of diversion for the Vancorum-San Miguel Ditch and Pipeline. This point is
located in the NE ¼ of the NE ¼ of Section 23, Township 46 N., Range 16 W. of the N.M.P.M.
at a distance of 79 feet from the North section line and 191 feet from the East section line, in
Montrose County, Colorado.

4.      Source: San Miguel River.

5.      A.      Date of initiation of appropriation: December 14, 2010.

        B.      How appropriation was initiated: By the concurrence of the formation of an
intent to appropriate together with overt acts in the furtherance of that intent, including field
investigations by engineering consultants and posting notices of the intended appropriations.

        C.      Date water applied to beneficial use: n/a.

6.      Amount: 1.0 c.f.s., conditional.

7.      Use: domestic, industrial (including mining, milling, water treatment and disposal, and
land reclamation), and municipal uses; augmentation, replacement, and exchange; enhancement
and/or maintenance of water quality; together with the right of reuse, successive use, and
disposition to extinction.

8.      Map: A map showing the location of the Paradox Valley Pipeline is attached hereto as
Exhibit A and incorporated herein by this reference.

9.      Owner of the land upon which any new diversion or storage structure, or modification to
any existing diversion or storage structure is or will be constructed or upon which water is or will
be stored, including any modification to the existing storage pool:

        Patricia L. Smith
        P.O. Box 18
        Naturita, CO 81422-0018

        Daniel B. & Georgia A. Hunt
        P.O. Box 248
        Naturita, CO 81422-0248

Application for Conditional Direct Flow Water Rights
Applicant:  Montrose County, Colorado
Case No. 10CW___, Water Division No. 4
Page 3

Deiaon Anderson Trust
3023 S. Zenobia St.
Denver, CO 80236

Bureau of Land Management
Southwest District Office
2465 S. Townsend Ave
Montrose, CO  81401

Steven A. & Tammy D. Krabbe
728 Stone Mountain Drive
Fruita, CO 81521

Land Appeal Inc.
P. O. Box 381
Paradox, CO 81429

Mila O. Mitchell
P.O. Box 1804
Fulton, TX 78358-1804

Alexander F. & Josephine M. Soinski
601 Horizon PL Apt. 108
Grand Junction, CO 81506

**WHEREFORE,** Montrose County respectfully requests that the Court enter a decree granting this application, awarding the conditional water rights claimed herein, and granting to the Applicant such other relief as the Court deems just and proper.

Dated this 17th day of December, 2010.

PETROS & WHITE, LLC

_/s/ Charles B. White_
Charles B. White, No. 9241
ATTORNEYS FOR MONTROSE COUNTY

*PURSUANT TO C.R.C.P. 121, THE SIGNED ORIGINAL IS ON FILE IN THE OFFICE OF PETROS & WHITE, LLC*

**VERIFICATION**

STATE OF COLORADO )
) s.s.
COUNTY OF BOULDER )

    I, Daniel V. Ault, water rights consultant for the Board of County Commissioners of Montrose County, state under oath that I have read the foregoing **APPLICATION FOR CONDITIONAL DIRECT FLOW WATER RIGHTS** and that the same is true and correct to the best of my knowledge.

Subscribed and sworn to before me this 16 day of December, 2010 by Daniel V. Ault.

My commission expires: 1/18/2012

Notary Public

[SEAL]

My Commission Expires 01/18/2012

BLM_0109798



BLM_0109799

<table>
<tr><td>

**DISTRICT COURT, WATER DIVISION NO. 4,**
**STATE OF COLORADO**
1200 N. Grand Avenue
Bin A
Montrose, CO  81401
(970) 252-4335

</td><td rowspan="3"></td></tr>
</table>

| | |
|---|---|
| **DISTRICT COURT, WATER DIVISION NO. 4,** **STATE OF COLORADO** 1200 N. Grand Avenue Bin A Montrose, CO  81401 (970) 252-4335 | |
| **CONCERNING THE APPLICATION FOR WATER RIGHTS OF THE BOARD OF COUNTY COMMISSIONERS OF MONTROSE COUNTY** in Montrose County, Colorado | Δ COURT USE ONLY Δ |
| Charles B. White, No. 9241 Petros & White, LLC 1999 Broadway, Suite 3200 Denver, CO 80202 Phone: (303) 825-1980 Fax: (303) 825-1983 E-Mail: cwhite@petros-white.com | **Case No. 10CW169** |
| **FIRST AMENDED APPLICATION FOR APPROPRIATIVE RIGHTS OF EXCHANGE** | |

1.  <u>Name, address, telephone number of Applicant:</u>

    Board of County Commissioners of Montrose County ("Montrose County")
    c/o Mr. Brian W. Wilson, P.E.
    Director of Public Works
    Montrose County, Colorado
    161 South Townsend Ave.
    Montrose, CO 81401
    970-252-7000

    Please direct all correspondence and pleadings to:

    Charles B. White, Esq.
    Petros & White, LLC
    1999 Broadway, Suite 3200
    Denver, CO  80202
    Telephone: (303) 825-1980

2.  <u>Introduction.</u>   This Application is one of a series of related applications by Montrose County to meet the water demands of present and future water users in the west end of the County. The conditional appropriative rights of exchange claimed in this Application, together

BLM_0109800

with other direct-flow and storage rights and changes of water rights that are the subject of the related applications, will supply a total reliable yield of approximately 6,400 acre-feet per year of fully consumable and reusable water, in addition to existing supplies, to help meet those future water demands. The sources of the replacement water to be used in these rights of exchange are described in the related applications.

3.    <u>Claim of exchanges</u>. Pursuant to C.R.S. §§ 37-80-120, 37-83-104 & 37-92-302(1)(a), C.R.S. (2009), Montrose County has appropriated conditional appropriative rights of exchange (the "Exchanges") whereby water that is available to the County will be released or bypassed to the stream to satisfy the demands of senior water rights and an equivalent volume and rate of flow of water will be diverted or stored at upstream locations within each exchange reach.

4.    <u>Legal descriptions and amounts of exchanges</u>:

    A.    San Miguel River mainstem: at a rate of flow up to 10.0 c.f.s.

Upstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| San Miguel River at Montrose County Line | 45 N | 12 W | 18 | NW | SW | 2,622 S | 686 W |

Downstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| San Miguel River at Uravan Gage | 47 N | 17 W | 2 | SW | SE | 2,015 N | 2,451 E |

This exchange may be exercised by diversions for direct-flow use or storage by structures within this reach or in the reaches of tributaries of the San Miguel River described in the following subparagraphs. The structures at which water may be diverted from the San Miguel River by exchange within this reach include, without limitation, the Nucla Pump Site and Pipeline and Highline Canal (CC Ditch) described in the County's application in Case No. 10CW164, filed contemporaneously with this Application; and the Paradox Valley Pipeline, described in the County's application in Case No. 10CW165, filed contemporaneously with this Application.

    B.    Coal Canyon: at a rate of flow up to 10 c.f.s.

First Amended Application for Appropriative Rights of Exchange
Applicant:  Montrose County, Colorado
Case No. 10CW169, Water Division No. 4
Page 3

Upstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Watershed boundary | 47 N | 14 W | 5 | NW | NW | 1,008 N | 538 W |

Downstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Confluence with San Miguel River | 47 N | 16 W | 20 | SW | SW | 435 S | 899 W |

C.   Tuttle Draw: at a rate of flow up to 4.3 c.f.s.

Upstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Watershed boundary | 47 N | 15 W | 26 | SW | NE | 1,769 N | 1,823 E |

Downstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Confluence with San Miguel River | 46 N | 16 W | 3 | SE | SW | 324 S | 2,195 W |

The structures at which water may be diverted by exchange in this reach include, without limitation, the Tuttle Draw Reservoir described in the County's application in Case No. 10CW166, filed contemporaneously with this Application.

D.   Calamity Draw: at a rate of flow up to 2.3 c.f.s.

BLM_0109802

First Amended Application for Appropriative Rights of Exchange
Applicant: Montrose County, Colorado
Case No. 10CW169, Water Division No. 4
Page 4

Upstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Watershed boundary | 46 N | 15 W | 9 | NE | NW | 1,172 N | 2,314 W |

Downstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Confluence with San Miguel River | 46 N | 16 W | 10 | SE | NE | 1,816 N | 211 E |

E.    Bramiers Draw: at a rate of flow up to 2.7 c.f.s.

Upstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Bramiers Draw at Montrose County Line | 45 N | 15 W | 17 | NE | SW | 2,605 S | 1,676 W |

Downstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Confluence with San Miguel River | 46 N | 15 W | 29 | NW | NW | 695 N | 1,092 W |

F.    Naturita Creek: at a rate of flow up to 10 c.f.s.

Upstream terminus:

First Amended Application for Appropriative Rights of Exchange
Applicant:  Montrose County, Colorado
Case No. 10CW169, Water Division No. 4
Page 5

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Naturita Creek at Montrose County Line | 45 N | 14 W | 15 | NE | SW | 2,639 S | 2,494 W |

Downstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Confluence with San Miguel River | 46 N | 15 W | 20 | SE | SW | 186 S | 1,854 W |

G.      Maverick Draw: at a rate of flow up to 10 c.f.s.

Upstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Maverick Draw at Montrose County Line | 45 N | 13 W | 15 | NW | SW | 2,637 S | 738 W |

Downstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Confluence with Naturita Creek | 46 N | 15 W | 22 | NW | SE | 2,348 S | 2,185 E |

The structures at which water may be diverted by exchange in this reach and the reach of Naturita Creek described above include, without limitation, the Maverick Draw Reservoir No. 1 and Maverick Draw Reservoir No. 2 described in the County's application in Case No. 10CW166, filed contemporaneously with this Application.

H.      Unnamed Creek No. 1:  at a rate of flow up to 1.1 c.f.s.

Upstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Watershed boundary | 45 N | 15 W | 7 | NW | NW | 12 N | 950 W |

Downstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Confluence with San Miguel River | 46 N | 15 W | 30 | NW | NE | 826 N | 1,953 E |

I.      Unnamed Creek No. 2: at a rate of flow up to 1.0 c.f.s.

Upstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Watershed boundary | 46 N | 15 W | 16 | SW | NW | 2,021 N | 133 W |

Downstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Confluence with San Miguel River | 46 N | 15 W | 21 | NW | SW | 2,216 S | 357 W |

J.      Unnamed Creek No. 3: at a rate of flow up to 0.3 c.f.s.

Upstream terminus:

First Amended Application for Appropriative Rights of Exchange
Applicant: Montrose County, Colorado
Case No. 10CW169, Water Division No. 4
Page 7

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Watershed boundary | 46 N | 15 W | 16 | SE | SE | 1,303 S | 827 E |

Downstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Confluence with San Miguel River | 46 N | 15 W | 21 | NE | SW | 2,048 S | 2,198 W |

K.    Unnamed Creek No. 4: at a rate of flow up to 0.2 c.f.s.

Upstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Watershed boundary | 46 N | 15 W | 10 | SE | NE | 1,623 N | 1,123 E |

Downstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Confluence with San Miguel River | 46 N | 15 W | 15 | SW | NE | 2,555 N | 2,192 E |

L.    Unnamed Creek No. 5: at a rate of flow up to 1.7 c.f.s.

Upstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Watershed boundary | 47 N | 15 W | 24 | SE | NW | 1,388 N | 2,232 W |

Downstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Confluence with San Miguel River | 46 N | 15 W | 1 | NE | SE | 2,088 S | 166 E |

M.    Big Bucktail Creek: at a rate of flow up to 11.3 c.f.s.

Upstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Watershed boundary | 47 N | 14 W | 2 | NE | SE | 1,396 S | 1,179 E |

Downstream terminus:

| Location | Township N.M.P.M. | Range | Section | ¼ | ¼ | Feet from section lines | |
|---|---|---|---|---|---|---|---|
| | | | | | | North/South | East/West |
| Confluence with San Miguel River | 46 N | 14 W | 6 | NW | NE | 202 N | 2,304 E |

The structures at which water may be diverted by exchange in this reach include, without limitation, the Big Bucktail Reservoir described in the County's application in Case No. 10CW166, filed contemporaneously with this Application.

5.    Exchange within watersheds of named tributaries: In addition to the specific upstream termini of the exchange reaches described in the foregoing subparagraphs 4 (B) through 4 (M), Montrose County may operate those exchanges from the downstream terminus of each reach to any upstream point within the boundary of the watershed of the named stream and its tributaries. A map showing the location of these watershed boundaries is attached hereto as Exhibit A and incorporated herein by this reference.

6.    Exchange rate cumulative:   The rate of exchange in the mainstem of the San Miguel River described in subparagraph 4 (A) includes exchanges to structures diverting or storing water within that reach and exchanges through that reach to structures located on tributaries of the San Miguel including, without limitation, the tributaries described in the foregoing subparagraphs 4

BLM_0109807

First Amended Application for Appropriative Rights of Exchange
Applicant: Montrose County, Colorado
Case No. 10CW169, Water Division No. 4
Page 9

(B) through 4 (M). The rate of exchange in Naturita Creek described in subparagraph 4 (F) includes exchanges to structures diverting or storing water within that reach and exchanges through that reach to structures located on Maverick Draw and its tributaries under subparagraph 4 (G).

7.    Water and water rights used for substitution/replacement:

A.    Maverick Draw Reservoir No. 1, for which a conditional water storage right is claimed in the County's application in Case No. 10CW166, filed contemporaneously with this Application.

B.    Maverick Draw Reservoir No. 1, First Enlargement, for which a conditional water storage right is claimed in the County's application in Case No. 10CW167, filed contemporaneously with this Application.

C.    Maverick Draw Reservoir No. 2, for which a conditional water storage right is claimed in the County's application in Case No. 10CW166, filed contemporaneously with this Application.

D.    Maverick Draw Reservoir No. 2, First Enlargement, for which a conditional water storage right is claimed in the County's application in Case No. 10CW167, filed contemporaneously with this Application.

E.    Tuttle Draw Reservoir, for which a conditional water storage right is claimed in the County's application in Case No. 10CW166, filed contemporaneously with this Application.

F.    Big Bucktail Reservoir, for which a conditional water storage right is claimed in the County's application in Case No. 10CW166, filed contemporaneously with this Application.

G.    Marie Scott Reservoir, for which a conditional water storage right is claimed in the County's application in Case No. 10CW167, filed contemporaneously with this Application.

H.    The following priorities of the Johnson Ditch, the source of which is the San Miguel River, for which an application for change of water rights will be filed by the County and the Towns of Nucla and Naturita contemporaneously with this Application, and subject to the approval of the changes of water rights requested therein:

(1)    3.80 c.f.s. from the Johnson Ditch, with an appropriation date of April 10, 1891, original decree date of June 3, 1911 in CA1627, Montrose County District Court; priority no. 46 in Water District 60 for irrigation, domestic, industrial and power use.

BLM_0109808

(2)    3.75 c.f.s. from the Johnson Ditch, with an appropriation date of February 16, 1903, original decree date of June 3, 1911 in CA1627, Montrose County District Court; priority no. 104B in Water District 60 for irrigation, domestic, industrial and power use.

(3)    26.20 c.f.s. from the Johnson Ditch, with an appropriation date of February 16, 1903, original decree date of October 31, 1911; priority no. 22 in Water District 60 for irrigation, domestic, industrial, and power use.

(4)    16.80 c.f.s. from the Johnson Ditch, with an appropriation date of July 21, 1913, decree date of September 16, 1920; priority no. 139 in Water District 60 for irrigation, domestic, industrial and power use.

The ditch headgate was originally located on the north side of the San Miguel River in the Southwest ¼ Southeast ¼ of Section 34, Township 48 North, Range 17 West of the New Mexico Principal Meridian.

By decree entered in Case No. 7107 in Montrose County District Court on January 25, 1956, the above described decreed priorities may be diverted from any of the alternative points of diversion described below:

(i)    A point on the North Bank of the San Miguel River from which the Northeast Corner of Section 34, T. 48 N., R. 17 W., N.M.P.M., bears North 33° 22' West a distance of 4830 feet;

(ii)    A point on the North Bank of the San Miguel River from whence the Northeast Corner of Section 34, T. 48 N., R. 17 W., N.M.P.M., bears North 40° 06' West a distance of 5414 feet;

(iii)    A point on the South Bank of the San Miguel River from whence the Northeast Corner of Section 34, T. 48 N., R. 17 W., N.M.P.M. bears North 34° 32' West a distance of 3776 feet

8.    A.    <u>Date of initiation of appropriation</u>:    December 14, 2010.

B.    <u>How appropriation was initiated</u>: By formation of the requisite intent to appropriate and completion of substantial steps in furtherance of such intent, including, but not limited to, approval of a resolution by the Board of County Commissioners of Montrose County evincing Montrose County's intent to appropriate the rights of exchange that are the subject of this Application, field investigations, mapping, and the filing of this Application.

C.    <u>Date water applied to beneficial use</u>: n/a.

9.    Uses: Domestic, industrial, and municipal use; augmentation, replacement, and exchange; enhancement and/or maintenance of water quality; recreation, piscatorial, and all other beneficial uses; together with the right to reuse, successive use, and disposition to extinction.

10.    Remarks: The rights of exchange claimed in this Application will be exercised at points of diversion and places of storage that currently exist as well as additional points of diversion and places of storage that will be constructed in the future to satisfy the anticipated water demands in Montrose County that are described in the foregoing paragraph No. 2. While those aggregate demands are reasonably foreseeable, all of the specific locations at which water will be diverted or stored cannot be identified at this time. Prior to the operation of any exchange, the County will notify the Division Engineer of the name and location of the structure, the specific source and location of replacement water, the rate of exchange, and the anticipated duration of the exchange. The following terms and conditions on the operation of the exchange will prevent injury to other vested water rights:

A.    No exchange will be exercised at a point on any stream or tributary that is upstream of a calling water right with a priority senior to that of the exchange.

B.    A live stream must exist from the point of replacement to the point of diversion or depletion in order for the exchange to operate.

C.    The replacement water must be delivered at a time and location to meet the needs of senior calling water rights.

11.    Owner of the land upon which any new diversion or storage structure, or modification to any existing diversion or storage structure is or will be constructed or upon which water is or will be stored, including any modification to the existing storage pool:    As listed in the County's applications in Case Nos. 10CW164 (Nucla Pump Site and Pipeline and Highline Canal (CC Ditch)), 10CW165 (Paradox Valley Pipeline), 10CW166 (Big Bucktail, Tuttle Draw, Maverick Draw No. 1, and Maverick Draw No. 2 Reservoirs), and 10CW167 (Marie Scott Reservoir, Maverick Draw Reservoir No. 1, First Enlargement, Maverick Draw Reservoir No. 2, First Enlargement, and associated diversion structures), filed contemporaneously with the Application in this case.

**WHEREFORE**, Montrose County respectfully requests that the Court enter a decree granting this Amended Application, awarding the conditional appropriative rights of exchange claimed herein, and granting to the Applicant such other relief as the Court deems just and proper.

Dated this 29th day of December, 2010.

BLM_0109810

First Amended Application for Appropriative Rights of Exchange
Applicant:  Montrose County, Colorado
Case No. 10CW169, Water Division No. 4
Page 12

PETROS & WHITE, LLC.

_/s/ Charles B. White_

Charles B. White, No. 9241
ATTORNEYS FOR MONTROSE COUNTY

*PURSUANT TO C.R.C.P. 121, THE SIGNED ORIGINAL IS ON FILE IN THE OFFICE OF PETROS & WHITE, LLC*

BLM_0109811

First Amended Application for Appropriative Rights of Exchange
Applicant: Montrose County, Colorado
Case No. 10CW*16* Water Division No. 4
Page 13

## VERIFICATION

STATE OF COLORADO    )
                     ) s.s.
COUNTY OF BOULDER    )

I, Daniel V. Ault, water rights consultant for the Board of County Commissioners of Montrose County, state under oath that I have read the foregoing **FIRST AMENDED APPLICATION FOR APPROPRIATIVE RIGHTS OF EXCHANGE** and that the same is true and correct to the best of my knowledge.

Subscribed and sworn to before me this ____ day of December, 2010 by Daniel V. Ault.

My commission expires: *1/18/2012*

Notary Public

[SEAL]



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
www.co.blm.gov



IN REPLY REFER TO:
1610 (COS050)

APR 2 1 2011

Certified Mail – Return Receipt Requested - 7005 0390 0000 4693 1980

Town of Hotchkiss
Mr. Wendell Coontz, Mayor
P.O. Box 369
Hotchkiss, CO 81419

Dear Mr. Coontz

The Bureau of Land Management (BLM) has determined that it would be in the best interest of the agency to terminate the Memorandum of Understanding between the BLM Uncompahgre Field Office and the Town of Hotchkiss, establishing the Town of Hotchkiss as a cooperating agency during development of the BLM Uncompahgre Resource Management Plan (RMP) and associated Environmental Impact Statement.

The Memorandum of Understanding identifies Mr. George Brauneis as the Agency Representative for the town. Six cooperating agency meetings have been held thus far, during which a great deal of planning information has been exchanged between the BLM and cooperating agencies. The BLM has also shared and sought input on draft reports and management alternatives. Although Mr. Brauneis has been sent email notifications, the Town of Hotchkiss has not been represented at any of these meetings.

Missing this critical foundation would make it extremely difficult for a party to become involved as a cooperating agency at this point in the RMP process. In addition, it would require a considerable time commitment by the BLM to prepare a cooperating agency to make a meaningful contribution.

The Memorandum of Understanding states that "the Town of Hotchkiss or the BLM may terminate this agreement by providing written notice of termination to the other party." Please

consider this letter as terminating the agreement signed by the Town of Hotchkiss on May 27, 2009 and by the BLM on June 8, 2009.

It is important to remember that an organization does not have to serve as a cooperating agency in order to provide input during the planning process. There will be opportunities for public comment on the Draft RMP. If you wish to discuss this matter further, please call my planner Bruce Krickbaum, or me, at 970-240-5300. Thank you for your interest in the Uncompahgre RMP.

Sincerely,

Barbara Sharrow
Uncompahgre Field Office Manager

cc:    George Brauneis, Trustee
       UFO RMP Administrative Record



**United States Department of the Interior**
BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
www.co.blm.gov



TAKE PRIDE®
IN AMERICA

IN REPLY REFER TO:
1610 (COS050)
APR 2 1 2011

Certified Mail – Return Receipt - 7005 0390 0000 4693 1973

Town of Mountain Village
Mr. Greg Sparks, Town Manager
455 Mountain Village Blvd, Suite A
Mountain Village, CO 81435

Dear Mr. Sparks,

The Bureau of Land Management (BLM) has determined that it would be in the best interest of the agency to terminate the Memorandum of Understanding between the BLM Uncompahgre Field Office and the Town of Mountain Village, establishing the Town of Mountain Village as a cooperating agency during development of the BLM Uncompahgre Resource Management Plan (RMP) and associated Environmental Impact Statement.

The Memorandum of Understanding identifies you as the Agency Representative for the town. Six cooperating agency meetings have been held thus far, during which a great deal of planning information has been exchanged between the BLM and cooperating agencies. The BLM has also shared and sought input on draft reports and management alternatives. Although you have been sent email notifications, the Town of Mountain Village was only represented at the first meeting.

Missing this critical foundation would make it extremely difficult for a party to become involved as a cooperating agency at this point in the RMP process. In addition, it would require a considerable time commitment by the BLM to prepare a cooperating agency to make a meaningful contribution.

The Memorandum of Understanding states that "the Town of Mountain Village or the BLM may terminate this agreement by providing written notice of termination to the other party." Please consider this letter as terminating the agreement signed by the Town of Mountain Village on July 24, 2009 and by the BLM on July 29, 2009.

It is important to remember that an organization does not have to serve as a cooperating agency in order to provide input during the planning process. There will be opportunities for public comment on the Draft RMP. If you wish to discuss this matter further, please call my planner Bruce Krickbaum, or me, at 970-240-5300. Thank you for your interest in the Uncompahgre RMP.

Sincerely,

Barbara Sharrow
Uncompahgre Field Office Manager

cc:     Mayor Bob Delves
        UFO RMP Administrative Record

| **CONVERSATION RECORD** | **TIME:** 2:35 | | **DATE:** April 25, 2011 | |
|---|---|---|---|---|

| **TYPE:** | | VISIT | | CONFERENCE | X | TELEPHONE | **ROUTING** | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | NAME/SYMBOL | INT |
| **Location of Visit:**    Telephone Conversation | | | | | | INCOMING | | |
| | | | | | | OUTGOING | | |

| Name of Person(s) Contacted or in Contact with you: | Organization (Office, Dept., Bureau) | Telephone Number |
|---|---|---|
| Jim Briscoe, Attorney | Town of Hotchkiss | 970-872-3118 |

Telephone conversation between Mr. Jim Briscoe (attorney for Hotchkiss), Barb Sharrow (Uncompahgre Field Manager), and Bruce Krickbaum (Uncompahgre Planner).

Mr. Briscoe called on behalf of the Town of Hotchkiss, regarding the letter (April 21, 2011) to terminate Cooperating Agency status with BLM (for the RMP).

Mr. Briscoe said the mayor wants to be involved in plans such as these.  Mr. Briscoe asked if there is any alternative to terminating the MOU.

Barb explained that if a community is not a Cooperating Agency, the community can still participate by reviewing and commenting on the draft documents.  The community leaders can also meet with BLM any time if they need to talk about an issue.   One difference is that Cooperating Agencies can also review and comment on the documents before they are released to the public.

Mr. Briscoe indicated we will probably receive a negative response from the mayor.  He said Mr. Brauneis did not keep the town board up to date, and never told the board he did not attend meetings.  Mr. Brauneis is no longer on the town board.

Barb indicated that if the mayor and town board decide they want to continue being Cooperating Agencies, BLM will consider that request.  Bruce said if the request is granted, the Town of Hotchkiss will need to designate a representative, and will need to commit to sending the same representative to each meeting.  Also, BLM will not be able to get the representative completely up to speed on all of the discussions we have held thus far.

| **ACTION REQUIRED:** | | |
|---|---|---|
| SIGNATURE Bruce Krickbaum | Title: Planner | Date: 4/25/20011 |

CONVERSATION RECORD

BLM_0109817

## James Bode

| | |
|---|---|
| **From:** | bkrickba@blm.gov |
| **Sent:** | Tuesday, April 26, 2011 8:28 AM |
| **To:** | bsharrow@blm.gov; tpfifer@blm.gov |
| **Cc:** | Angie Adams; Kate Wynant; UFO AR |
| **Subject:** | Fw: Renewable Energy & Communication Sites |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 04/26/2011 08:23 AM -----

Kerwin Jensen
<kjensen@ci.montr
ose.co.us>                                 To
          bkrickba@blm.gov
04/26/2011 07:37                           cc
AM
                              Subject
          Re: Renewable Energy &
          Communication Sites

Thanks Bruce for the clarificiation.  With that in mind, there are a number of BLM parcels near the city limits of Montrose and we would ask for consideration that wind turbines not be placed on those BLM lands close to the city limits and residential neighborhoods.  Solar panels are less intrusive, but it would be desirable to locate solar panels at prudent locations as well when near the doorsteps of the city limits.

Thanks,

Kerwin Jensen

On Mon, Apr 25, 2011 at 8:40 AM, <bkrickba@blm.gov> wrote:
 Hello Kerwin,

 We are asking for information relative to BLM lands only -- for instance,

1

BLM_0109818

a
project located on BLM lands.

--Bruce

<><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384        Kerwin Jensen
<kjensen@ci.montr        ose.co.us
>
To                      bkrickba@blm.gov
        04/25/2011 08:23
cc
AM
Subject                        Renewable Energy &
Communiciation                      Sites

Bruce:

Last Tuesday you sent an e-mail asking for input relative to potential
renewable energy projects and potential communication sites.  I am
looking
for some clarification and was wondering if you are interested in our
comments only as these uses would relate to BLM lands, or city-owned
properties as well.  For example, the City of Montrose is looking at
placing some solar panels on top of Sunset Mesa on city-owned property,
but
I didn't know if you were only looking at responses on BLM land.  Could
you
please provide some additional clarification.

Thanks,

--
Kerwin Jensen
Community Development Director
City of Montrose
107 South Cascade Avenue
Montrose, Colorado 81401

2

BLM_0109819

Phone: 970-240-1478
FAX: 970-252-4778
e-mail: kjensen@ci.montrose.co.us

--
Kerwin Jensen
Community Development Director
City of Montrose
107 South Cascade Avenue
Montrose, Colorado 81401
Phone: 970-240-1478
FAX: 970-252-4778
e-mail: kjensen@ci.montrose.co.us

BLM_0109820

## James Bode

| | |
|---|---|
| **From:** | bkrickba@blm.gov |
| **Sent:** | Tuesday, May 10, 2011 11:47 AM |
| **To:** | bsharrow@blm.gov; dkauffma@blm.gov; dmagee@blm.gov; Angie Adams; Kate Wynant; bbott68@gmail.com; Aschroeder@usbr.gov; kjensen@ci.montrose.co.us; renzo.delpiccolo@state.co.us; shansen@deltacounty.com; MPelletier@gunnisoncounty.org; swhite@montrosecounty.net; lpadgett@ouraycountyco.gov; lynn@mtngeogeek.com; joanm@sanmiguelcounty.org; daves@sanmiguelcounty.org; pat@cedaredgecolorado.com; mjreagan@fone.net; norwoodparker@centurytel.net; sharold@ci.olathe.co.us; davidvarley@kaycee.net; townofpaonia@tds.net; jcoates@town.ridgway.co.us; Dan_Reinkensmeyer@fws.gov; charles_sharp@fws.gov; tkrandallparker@fs.fed.us; lbroyles@fs.fed.us; segfahlt@gmail.com; bkrickba@blm.gov; UFO AR |
| **Subject:** | Fw: Cooperating Agency Meeting, and Discussion Items |
| **Attachments:** | UFO-CA_2011-05-12_Agenda-.pdf |

Hello Cooperating Agency Representatives,

This is a reminder about our Cooperating Agency meeting this Thursday May 12, 1:00 - 4:00. The meeting will be at the Holiday Inn Express in Montrose.

I have attached an agenda. Also, please think about the questions posed in the following email.

Thanks, Bruce

(See attached file: UFO-CA_2011-05-12_Agenda-.pdf)


<>
<><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384


----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 05/10/2011 11:43 AM -----

| | | |
|---|---|---|
| Bruce Krickbaum/MOFO/CO /BLM/DOI | | To |
| 04/19/2011 02:54 PM | Barbara | Sharrow/MOFO/CO/BLM/DOI@BLM, Dave Kauffman/MOFO/CO/BLM/DOI@BLM, Deborah Magee/MOFO/CO/BLM/DOI@BLM, angie.adams@empsi.com, |

BLM_0109821

kate.wynant@empsi.com,
bbott68@gmail.com,
Aschroeder@usbr.gov,
kjensen@ci.montrose.co.us,
renzo.delpiccolo@state.co.us,
shansen@deltacounty.com,
MPelletier@gunnisoncounty.org,
swhite@montrosecounty.net,
lpadgett@ouraycountyco.gov,
lynn@mtngeogeek.com,
joanm@sanmiguelcounty.org,
daves@sanmiguelcounty.org,
pat@cedaredgecolorado.com,
mjreagan@fone.net,
norwoodparker@centurytel.net,
sharold@ci.olathe.co.us,
davidvarley@kaycee.net,
townofpaonia@tds.net,
jcoates@town.ridgway.co.us,
Dan_Reinkensmeyer@fws.gov,
charles_sharp@fws.gov,
tkrandallparker@fs.fed.us,
lbroyles@fs.fed.us,
segfahlt@gmail.com, Bruce
Krickbaum/MOFO/CO/BLM/DOI@BLM,
ufo-ar@empsi.com
cc

Subject
Cooperating Agency Meeting, and
Discussion Items

Hello Cooperating Agency Representatives,

We have scheduled our next two meetings.  Both meetings will be at the Holiday Inn Express in Montrose.  Please set aside the following times for the meetings:

-May 12 (Thursday) 1:00 - 4:00.
-June 23 (Thursday) 1:00 - 4:00.

We need to discuss several topics at the May 12 meeting.  The following are issues we want your opinions on.  There will most likely be an array of thoughts on each, but the discussion will help us frame the alternatives and potential preferred action.   Please think about these issues and be prepared to discuss during the meeting.  Written information and/or maps would also be welcomed.

2

BLM_0109822

**Renewable Energy.  During several of our initial meetings, we discussed renewable energy and asked for information regarding potential renewable energy sites or projects.  We are at the stage that we need to know if communities, counties or agencies know of any renewable energy projects that are being discussed, or locations that have been identified as having potential over the next 20 - 30 years.  Note:  we can be very general in the decision, and say projects would be allowed throughout the planning area.  However, it would be great to also list specific areas as renewable energy emphasis areas (wind, solar).

**Communications Sites.  Are there any specific areas communities or counties know of that have been discussed as potential communications sites?  If there are known potential sites, it would make the future NEPA analysis less complex if identified in the RMP.

**Utility Corridors.  Are there any specific areas that should be identified as utility corridors?  Are you speaking with the utility companies?  Have you identified places in your master plans that we should emulate?

**Hunting Permits (Outfitters).  We are discussing how to handle the number of permits issued to hunting outfitters.  Should we limit the number of permits, or not?  If we do not limit the number of permits, we would issue a permit to all outfitters that qualify, and let the market and hunting conditions regulate the number that remain in business.  Or, we could limit to number of outfitters permits to improve the chances of a quality hunting experience for the clients.  If we limit the number of permits, one number we are considering is limiting permits to eight (8) big game outfitter permits per game management unit, and to ten (10) mountain lion guide/outfitter permits in the planning area.

**Organized Group Permits.  We are discussing the numbers associated with Special Recreation Permits.  We issue Special Recreation Permits to protect natural and cultural resources, protect recreational and natural resources, and provide for visitor health and safety.  We are considering Special Recreation Permits for organized groups  expecting more than 40 vehicles or
80 people, including spectators.  What are your thoughts?

**Target Shooting.  We would like your thoughts on prohibiting target shooting within 0.25-mile of a residence and developed facilities (e.g., power substations, powerlines, communication sites).  This is primarily for safety concerns.

**North Delta OHV Open Area.   We would like your thoughts regarding
limiting all travel in North Delta OHV Open Area to designated routes, and designating all routes.

**For Ouray County.  What are Ouray County's plans for the gravel pit northeast of Ridgway, and  within the potential Ridgway Trails SRMA?  We would like to know about the County's desires for continuing the pit as it is now permitted, as well as desires for future expansion.  Is the area better suited for a trails system, which could have positive impacts on tourism and economics?  This knowledge will reduce conflict with future trails if the Ridgway Trails SRMA is in the preferred alternative.

**For Colorado State/CDOW (primarily, but others as well).  What are the State's thoughts on having state lands open or closed to oil/gas leasing (where federal minerals underlay the lands)?  What about "No Surface Occupancy"?

BLM would also like to discuss the alternatives-development process since
January 2011.   By the way, thank you to all of you for the great comments
you submitted on the draft alternatives.   Comments have been helpful to
us.

Regards, Bruce

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum

3

BLM_0109823

Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

BLM_0109824



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401



## COOPERATING AGENCY MEETING #7

### Thursday, May 12, 2011 (1:00 – 4:00 PM)

**Meeting Location:**
**Holiday Inn Express (Jordan Room)**
**1391 South Townsend Avenue, Montrose, CO**

# AGENDA

1. **Welcome**

2. **Introductions**

3. **Planning Process to Date**

4. **Internal Draft Alternatives – Group Feedback on:**

   a. **Renewable Energy**

   b. **Communications Sites**

   c. **Utility Corridors**

   d. **Hunting Permits (Outfitters)**

   e. **Organized Group Permits**

   f. **Target Shooting**

   g. **North Delta OHV Open Area**

   h. **Ouray County's plans for gravel pit northeast of Ridgway and potential Ridgway Trails SRMA?**

   i. **Colorado State/CDOW's thoughts on having state lands open or closed to oil/gas leasing and no surface occupancy?**

5. **Other Items Not on the Agenda**

6. **Action Items / Next Meeting**
   - Next meeting: Thursday, June 23, 2011, 1:00–4:00pm, Holiday Inn Express, Montrose

BLM_0109825

**James Bode**

| | |
|---|---|
| **From:** | bkrickba@blm.gov |
| **Sent:** | Tuesday, May 10, 2011 2:33 PM |
| **To:** | sbear@dmea.com; Steve.weist@oxbow.com; John@reams-construction.com; billday@paonia.com; rich@richdurnanphoto.com; Robbie.levalley@colostate.edu; Wblack8709@msn.com; pmueller@tnc.org; silvers1@tds.net; tkctew@yahoo.com; barbara_hawke@tws.org; bsharrow@blm.gov; dkauffma@blm.gov; dmagee@blm.gov; Bruce_Krickbaum@co.blm.gov; Angie Adams; Kate Wynant; bbott68@gmail.com; UFO AR |
| **Subject:** | RAC Subgroup Meeting, and Discussion Items |
| **Attachments:** | UFO-SG_2011-05-13_Agenda-.pdf |

Hello RAC Subgroup Members,

This is a reminder about our RAC Subgroup meeting this Friday May 13, 9:00
- 12:00.  The meeting will be at the Holiday Inn Express in Montrose.

I have attached an agenda.  Also, please think about the questions posed in the following email.

Regards, Bruce

(See attached file: UFO-SG_2011-05-13_Agenda-.pdf)


<><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384



-----Original Message-----
From: bkrickba@blm.gov [mailto:bkrickba@blm.gov]
Sent: Tuesday, April 19, 2011 3:06 PM
To: sbear@dmea.com; Steve.weist@oxbow.com; John@reams-construction.com; billday@paonia.com;
rich@richdurnanphoto.com; Robbie.levalley@colostate.edu; Wblack8709@msn.com; pmueller@tnc.org;
silvers1@tds.net; tkctew@yahoo.com; barbara_hawke@tws.org; bsharrow@blm.gov; dkauffma@blm.gov;
dmagee@blm.gov; Bruce_Krickbaum@co.blm.gov; Angie Adams; Kate Wynant; bbott68@gmail.com; UFO AR
Subject: RAC Subgroup Meeting, and Discussion Items


Hello RAC Subgroup Members,

We have scheduled our next two meetings.  Both meetings will be at the Holiday Inn Express in Montrose.  Please set
aside the following times for the meetings:

BLM_0109826

-May 13 (Friday) 9:00 - 12:00.
-June 24 (Friday) 9:00 - 12:00.

We need to discuss several topics at the May 13 meeting.  The following are issues we want your opinions on.  There will most likely be an array of thoughts on each, but the discussion will help us frame the alternatives and potential preferred action.   Please think about these issues and be prepared to discuss during the meeting.  Written information and/or maps would also be welcomed.

**Renewable Energy.  During several of our initial meetings, we discussed renewable energy and asked Cooperating Agencies (communities, counties and agencies) for information regarding potential renewable energy sites or projects.  We are at the stage that we need to know of any renewable energy projects that are being discussed, or locations that have been identified as having potential over the next 20 - 30 years.  Note:  we can be very general in the decision, and say projects would be allowed throughout the planning area.  However, it would be great to also list specific areas as renewable energy emphasis areas (wind, solar).  So, any thoughts you have will be appreciated.

**Communications Sites.  Are there any specific areas that you know of that have been discussed as potential communications sites?  If there are known potential sites, it would make the future NEPA analysis less complex if identified in the RMP.

**Utility Corridors.  Are there any specific areas that should be identified as utility corridors?

**Hunting Permits (Outfitters).  We are discussing how to handle the number of permits issued to hunting outfitters.  Should we limit the number of permits, or not?  If we do not limit the number of permits, we would issue a permit to all outfitters that qualify, and let the market and hunting conditions regulate the number that remain in business.  Or, we could limit to number of outfitters permits to improve the chances of a quality hunting experience for the clients.  If we limit the number of permits, one number we are considering is limiting permits to eight (8) big game outfitter permits per game management unit, and to ten (10) mountain lion guide/outfitter permits in the planning area.

**Organized Group Permits.  We are discussing the numbers associated with Special Recreation Permits.  We issue Special Recreation Permits to protect natural and cultural resources, protect recreational and natural resources, and provide for visitor health and safety.  We are considering Special Recreation Permits for organized groups  expecting more than 40 vehicles or 80 people, including spectators.  What are your thoughts?

**Target Shooting.  We would like your thoughts on prohibiting target shooting within 0.25-mile of a residence and developed facilities (e.g., power substations, powerlines, communication sites).  This is primarily for safety concerns.

**North Delta OHV Open Area.   We would like your thoughts regarding limiting all travel in North Delta OHV Open Area to designated routes, and designating all routes.

**We have asked Ouray County for their plans for their existing gravel pit northeast of Ridgway, which is also  within the proposed/potential Ridgway Trails SRMA.  We would like to know the County's desires for continuing the pit as it is now permitted, as well as desires for future expansion.  Or, is the area better suited for a trails system, which could have positive impacts on tourism and economics?  This knowledge will reduce conflict with future trails if the Ridgway Trails SRMA is in the preferred alternative.

**We have asked CDOW (as a Cooperating Agency) what are the State's thoughts are on having state lands open or closed to oil/gas leasing (where federal minerals underlay the lands), as well as thoughts on "No Surface Occupancy".

BLM would also like to discuss the alternatives-development process since

BLM_0109827

January 2011.   By the way, thank you to all of you for the great comments you submitted on the draft alternatives.   Comments have been helpful to us.

Regards, Bruce

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

BLM_0109828



United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401



# RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #7

## Friday, May 13, 2011 (9:00 AM – 12:00 PM)

### Meeting Location:
Holiday Inn Express (Jordan Room)
1391 South Townsend Avenue, Montrose, CO

# AGENDA

1. **Welcome**

2. **Introductions**

3. **Planning Process to Date**

4. **Internal Draft Alternatives – Group Feedback on:**

   a. **Renewable Energy**

   b. **Communications Sites**

   c. **Utility Corridors**

   d. **Hunting Permits (Outfitters)**

   e. **Organized Group Permits**

   f. **Target Shooting**

   g. **North Delta OHV Open Area**

   h. **Ouray County's plans for gravel pit northeast of Ridgway and potential Ridgway Trails SRMA?**

   i. **Colorado State/CDOW's thoughts on having state lands open or closed to oil/gas leasing and no surface occupancy?**

5. **Other Items Not on the Agenda**

6. **Action Items / Next Meeting**
   - Next meeting: Friday, June 24, 2011, 9:00am–12:00pm, Holiday Inn Express, Montrose

BLM_0109829

**James Bode**

| | |
|---|---|
| **From:** | bkrickba@blm.gov |
| **Sent:** | Tuesday, May 17, 2011 3:26 PM |
| **To:** | Angie Adams; Kate Wynant |
| **Cc:** | UFO AR |
| **Subject:** | Fw: Additional Information/Clarification Coop Meeting Discussion 5/12/11 |

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 05/17/2011 03:25 PM -----

| | | |
|---|---|---|
| "Schroeder, Alan M" <ASchroeder@usbr. gov> | To | "Krickbaum, Bruce" <bkrickba@blm.gov> |
| 05/16/2011 10:09 AM | cc | |
| | Subject | Additonal Information/Clarification Coop Meeting Discussion 5/12/11 |

Bruce,

Regarding the nine subjects we discussed at the 5/12/11 Cooperating Agency Meeting, I am providing additional clarification on some of my comments. If you want, I can provide more specific information on Bureau of Reclamation projects, lands, etc..

Renewable Energy
 § Bio-mass: if bio-mass energy is being addressed as part of this revision, several things should be considered. These things include, but are not limited to: sustainability (enough bio-mass to keep things going long term), and will we be reducing or losing carbon sink potential (forests, woodlands, and brush lands) that may help mitigate global warming by reducing atmospheric $CO_2$?
 § Hydropower- hydropower should be addressed in the RMP Revision:
    § Potential projects currently being considered or of which we are aware: Southside canal, Ridgway Dam, and AB Lateral (the AB Lateral project was previously proposed, but is not actively being pursued at

1

this time)

§ Additional potential hydropower project sites (we are currently actively looking for additional potential sites) include but are not limited to the following:

   § Crawford and Paonia Dams (project purpose, CRSP)

   § Uncompahgre Project Canals (Shavano Falls, several additional sites on South Canal, etc.)

§ Dam-site and Power-site Withdrawals: The Gunnison River has (or had) some withdrawals for dam and/or power sites, particularly along gorges and canyons. Similar withdrawals may exist on some of the other rivers within the planning area, particularly those with narrow canyons (Dolores, San Miguel, etc.) Those withdrawals constitute a reservation of those lands for those potential purposes. The potential for hydro-power at these sites should be addressed as part of the RMP revision.

§ Ancillary facilities- the above sites may need right-of-way or lease options for hydro-power related facilities (transmission lines, substations, penstocks, roads, etc.) on adjacent BLM lands. Therefore, we need to keep BLM lands in these general areas available for such rights-of-way, leases, etc.


State Lands with Federal Minerals-

 § State Parks (Crawford, Paonia, Ridgway)

   § Land Status- These three reservoir areas are, in fact, Bureau of Reclamation (BOR) lands, related to the Smith Fork, Paonia, and Dallas Creek Projects, respectively. These areas are managed for recreation by State Parks under an agreement with BOR. These areas include both acquired and withdrawn lands. Our withdrawn lands are generally not withdrawn from mineral leasing, however, the actual degree of withdrawal is dependent on the specific withdrawal order(s). Also, we may not have acquired all private minerals on our acquired lands; we sometimes acquired only certain minerals, but subordinated to the interests of our project those mineral rights retained by the seller. Those subordinations are usually similar, but actual wording may vary according to the land purchase contract or deed.

   § Administrative Jurisdiction (1983 BOR/BLM IA)

     § Sec. 5 Management of Reclamation Withdrawn and Acquired Lands- these areas are Section 5A lands as defined by the IA; they fall under BOR's management jurisdiction.

     § Sec. 6H Mineral and Geothermal Leases- ". . . BLM will not issue permits, leases, or licenses on acquired or withdrawn lands under Reclamation's management without Reclamation's consent and concurrence on all conditions and stipulations. . . ." While BLM generally has administrative jurisdiction for the leasing of and development of mineral leases on 5A lands, BOR determines whether leasing is permissible and, if so, provides any stipulations necessary to protect the interest of the US.

   § Range of Alternatives

     §  Preferred Alternative- We prefer that leasable federal minerals underlying the above State Parks be designated "No Lease." These areas are relatively small and narrow with little room for mineral development; plus, mineral development is usually not compatible

2

BLM_0109831

with recreational interests or State Park objectives.
§ Leasing of oil/gas underlying the above State Parks with a "No Surface Occupancy" (NSO) could be included within one of the alternatives.
§ Stipulations and Conditions of Approval-
  § If federal leasable minerals or geothermal resources underlying BOR lands are leased, at a minimum, the conditions in Reclamation's Manual, Directives and Standards LND 06-01 Land Acquisition; Part 3, I Conditions Applying to Mineral Operations, should be applied to said leases.
  § On oil/gas or geothermal leases in close proximity to Reclamation dams or other permanent structures the following conditions should be applied:
    § No drilling shall be allowed within 1500 feet, both horizontally and vertically, of a Reclamation dam or its appurtenant structures in order to protect the integrity of these structures.
    § No drilling shall be allowed within 200 feet of the boundary of the right-of-way of any canal, tunnel, aqueduct, pipeline, lateral or drain. Of concern within this Planning Area are the various features of the Uncompahgre Project (particularly the Gunnison Tunnel), the Fruitgrowers Dam Project, the Paonia Project, the Smith Fork Project, and the Dallas Creek Project, the Bostwick Park Project.
    § Use or crossings of Reclamation facilities must be approved by Reclamation in writing prior to such use or crossing.
§ State Wildlife Areas
  § No Surface Occupancy- BOR supports the CDOW's position of "No Surface Occupancy" (NSO) for leasing of federal minerals in its State Wildlife Areas (SWA)
  § Land Status: Portions of several State Wildlife Areas within the Planning Area (Billy Creek, Cimarron, possibly others) are BOR wildlife mitigation lands (withdrawn or acquired) for various BOR projects (Dallas Creek, Aspinall Unit). These mitigation lands were transferred to the State of Colorado to be managed for wildlife purposes. The transfers included a reversionary clause; if not managed for wildlife purposes, the land would revert back to the US.

Federal Leasable Minerals underlying BOR lands within other Federal land management Units (This is a situation similar to the BOR lands within State Parks)
 § Curecanti National Recreation Area  (CNRA) and some BOR withdrawn lands  currently outside of the CNRA
    §  preferred alternative, "No Lease" (same rationale as for State Parks)
    § Again, another alternative for oil/gas might consider leasing, with a "No Surface Occupancy" stipulation.
    § Requires coordination with the National Park Service  § GMUG National Forest (two BOR reservoir areas within the Forest  boundaries may be within the UFO Planning Area)
      § Silver Jack Reservoir (Bostwick Park Project)- preferred No Lease (same rationale as for State Parks); also requires coordination with USFS
      § Taylor Park Reservoir- (Uncompahgre Valley Project)- preferred No

3

BLM_0109832

Lease (same rationale as for State Parks) ; also requires coordination
with USFS
§ Again, another alternative for oil/gas might consider leasing, with a
"No Surface Occupancy" stipulation for these reservoir areas.
§ Stipulations and Conditions of Approval- see listings under "State  Parks."

Right of Way Corridors- In addition to the Westwide Energy Corridors, BLM should consider right-of-way corridors along the following features:
§ US Highways 50 and 550
§ State Highways 92 and 133
§ Major oil/gas pipelines (KinderMorgan TransColorado, etc.)  § WAPA and other major electrical transmission lines

If you have any questions or need additional information, please contact me.

Alan

BLM_0109833



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401



# COOPERATING AGENCY MEETING #7

## Thursday, May 12, 2011 (1:00 – 4:00 PM)

### Meeting Location:
**Holiday Inn Express (Jordan Room)**
**1391 South Townsend Avenue, Montrose, CO**

# AGENDA

1. **Welcome**

2. **Introductions**

3. **Planning Process to Date**

4. **Internal Draft Alternatives – Group Feedback on:**

    a. **Renewable Energy**

    b. **Communications Sites**

    c. **Utility Corridors**

    d. **Hunting Permits (Outfitters)**

    e. **Organized Group Permits**

    f. **Target Shooting**

    g. **North Delta OHV Open Area**

    h. **Ouray County's plans for gravel pit northeast of Ridgway and potential Ridgway Trails SRMA?**

    i. **Colorado State/CDOW's thoughts on having state lands open or closed to oil/gas leasing and no surface occupancy?**

5. **Other Items Not on the Agenda**

6. **Action Items / Next Meeting**
    - Next meeting: Thursday, June 23, 2011, 1:00–4:00pm, Holiday Inn Express, Montrose

BLM_0109835



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401



## Highlights of the Resource Management Planning Process to Date
### *May 12, 2011*

- Notice of Intent (NOI) – 2/25/2010

- Scoping period – 12/23/2009 to 3/29/2010

- Scoping report – final report completed 7/7/2010 (on website)

- Tribal consultation – initiated 2009 (ongoing)

- Community Assessment – report completed 2/2009 (on website)

- Visual Resource Inventory – report completed 9/2009

- Migratory bird status literature review – report completed 10/2009

- Analysis of Management Situation (AMS) – report completed 6/10/2010 (on website)

- Economic workshops (6 communities) – held 3/2010

- Socioeconomic baseline assessment – final report completed 7/21/2010

- Class I paleontological resources – report completed 2/2010

- Oil & Gas Reasonable Foreseeable Development (RFD) Scenario – internal draft report completed 7/2010

- Mineral potential report (excluding coal) – internal draft report completed 8/2010

- Coal potential report – final report completed 4/26/2010

- Renewable energy potential report – final report completed 5/31/2010

- Class I cultural resources overview – draft report completed 4/2010; final report completed

- Coordination with Cooperating Agencies – invitations sent 1/23/2009; meetings planned from 5/27/2010 forward

- ACEC evaluation report – draft report completed 7/15/2010 (on website) – final report underway

- Wilderness characteristics report – draft report postponed

- Air quality report – anticipated Winter 2011-2012

- Wild and scenic rivers – draft eligibility report 12/2009; final eligibility report completed 7/12/2010 (on website); suitability underway

- Recreation focus groups – completed 3/2010; report completed 6/2010 (on website)

- Alternatives development – anticipated 6/2010 through approximately 10/2011

---

BLM_0109836



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
Montrose, Colorado



## COOPERATING AGENCY MEETING #7

### Thursday, May 12, 2011 (1:00 – 4:00 PM)

**Meeting Location:**
**Holiday Inn Express**
**1391 S. Townsend Avenue, Montrose, CO**

| Last Name | First Name | Initial | Organization | Address | E-Mail | Phone |
|---|---|---|---|---|---|---|
| Adams | Angie | AMA | EMPSi | 3775 Iris Ave, Ste 1A Boulder, CO 80301 | angie.adams@empsi.com | 303-446-7160 |
| Armstrong | Lori | | BLM, Southwest Colorado District Manager | 2465 S. Townsend Ave. Montrose, CO 81401 | vaarmstrong@blm.gov | 970-240-5336 |
| Broyles | Levi | | US Forest Service – Grand Mesa, Uncompahgre, & Gunnison National Forests | 403 Rio Grande Paonia, CO 81428 | lbroyles@fs.fed.us | 970-527-4131 |
| Coates | Jen | JC | Town of Ridgway | PO Box 10 Ridgway, CO 81432 | jcoates@town.ridgway.co.us | 970-626-5308 ext. 15 |
| DelPiccolo | Renzo | RDP | Colorado Department of Natural Resources, Southwest Region | 2300 S. Townsend Ave. Montrose, CO 8401 | renzo.delpiccolo@state.co.us | 970-252-6000 |
| Hansen | Susan | | Delta County Board of County Commissioners | 501 Palmer St, #227 Delta, CO 81416 | shansen@deltacounty.com | 970-874-2102 |
| Harold | Scott | | Town of Olathe | PO Box 789 Olathe, CO 81425 | sharold@ci.olathe.co.us | 970-323-5601 |
| Jensen | Kerwin | | City of Montrose | 433 South First Street Montrose, CO 81401 | kjensen@ci.montrose.co.us | 970-240-1478 |
| Kauffman | Dave | | BLM, Uncompahgre Field Office | 2465 S. Townsend Ave. Montrose, CO 81401 | dkauffma@blm.gov | 970-240-5340 |

BLM_0109837

| Last Name | First Name | Initial | Organization | Address | E-Mail | Phone |
|---|---|---|---|---|---|---|
| Krickbaum | Bruce | | BLM, Uncompahgre Field Office | 2465 S. Townsend Ave. Montrose, CO 81401 | bkrickba@blm.gov | 970-240-5384 |
| Long | William | | Town of Nucla | PO Box 486 554 Main Street Nucla, CO 81424 | segfahlt@gmail.com | 970-497-2707 |
| May | Joan | | San Miguel County Board of County Commissioners | PO Box 1170 Telluride, CO 81435 | joanm@sanmiguelcounty.org daves@sanmiguelcounty.org | 970-728-3844 |
| Means | Patricia | | Town of Cedaredge | PO Box 398 Cedaredge, CO 81413 | pat@cedaredgecolorado.com | 970-856-5001 |
| Padgett | Lynn | | Ouray County Board of County Commissioners | PO Box C Ouray, CO 81427 | lpadgett@ouraycountyco.gov lynn@mtngeogeek.com | 970-417-9901 |
| Pelletier | Mike | | Gunnison County | 200 E. Virginia Ave. Gunnison, CO 81230 | mpelletier@gunnisoncounty.org | 970-641-7645 |
| Peterson | Barbara | | Town of Paonia | PO Box 460 Paonia, CO 81428 | townofpaonia@tds.net | 970-527-4101 |
| Randall-Parker | Tamera K. | | US Forest Service – Grand Mesa, Uncompahgre, & Gunnison National Forests | 2250 Highway 50 Delta, CO 81416 | tkrandallparker@fs.fed.us | 970-240-5415 |
| Reagan | Joe | | Town of Norwood | PO Box 190 Norwood, CO 81423 | joereagan741@yahoo.com norwoodparker@centurytel.net | 970-327-4873 970-327-4288 |
| Schroeder | Alan | | Bureau of Reclamation, Western Colorado Area Office | 2764 Compass Drive, Ste 106 Grand Junction, CO 81506 | aschroeder@usbr.gov | 970-248-0692 |
| Sharp | Charlie | | US Fish & Wildlife Service Western Colorado Ecological Services Field | 764 Horizon Drive South Annex A – Bldg. B Grand Junction, CO 81506 | charles_sharp@fws.gov | 970-243-2778 |
| Sharrow | Barb | | BLM, Uncompahgre Field Office | 2465 S. Townsend Ave. Montrose, CO 81401 | bsharrow@blm.gov | 970-240-5315 |
| Varley | David | | Town of Orchard City | 9661 2100 Road Austin, CO 81410 | davidvarley@kaycee.net | 970-835-3403 |
| White | Steve | | Montrose County Board of County Commissioners | 161 S. Townsend Ave. Montrose, CO 81401 | swhite@montrosecounty.net | 970-252-4550 |

BLM_0109838

| Last Name | First Name | Initial | Organization | Address | E-Mail | Phone |
|-----------|-----------|---------|--------------|---------|--------|-------|
| Wynant | Kate | *kw* | EMPSi | 3775 Iris Ave, Ste 1A<br>Boulder, CO 80301 | kate.wynant@empsi.com | 303-446-7160 |

BLM_0109839

*Walt Blackburn*
*1751 Clearview Dr*
*Delta Co. 81416-3007*

Barbara Sharrow
Manager BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401

Ms. Sharrow:

Please find my thoughts on the various subjects annotated in RED below.

**Renewable Energy. During several of our initial meetings, we discussed
renewable energy and asked Cooperating Agencies (communities, counties and
agencies) for information regarding potential renewable energy sites or
projects. We are at the stage that we need to know of any renewable energy
projects that are being discussed, or locations that have been identified
as having potential over the next 20 - 30 years. Note: we can be very
general in the decision, and say projects would be allowed throughout the
planning area. However, it would be great to also list specific areas as
renewable energy emphasis areas (wind, solar). So, any thoughts you have
will be appreciated.

The Forest Service is doing extensive work with Bio-Mass renewable energy. There are a
few areas on BLM lands that this possibly could be an option.  Please see Additional
information below.

**Dear Woody Biomass Working Group Members:**
We are hosting several up-coming events in support of our Uncompahgre Plateau Woody
Biomass Supply and Feasibility Assessment.

· **UP Woody Biomass Public Meeting in Montrose: Wednesday, June 8, 7 –
8:30 pm** at the DMEA Office, 11925 6300 Road, Montrose, CO.

- o  The purpose of the meeting is to provide general information to local community members on the woody biomass feasibility study with the Rocky Mountain Research Station.  Everyone is welcome to attend!

  · **UP Woody Biomass Public Meeting in Delta: Thursday, June 9, 7 – 8:30 pm** at the Performing Arts Center, 822 Grand Ave., Delta, CO.

  - o  The purpose of the meeting is to provide general information to local community members on the woody biomass feasibility study with the Rocky Mountain Research Station.  Everyone is welcome to attend!

- **UP Woody Biomass Working Group Meeting: Thursday, June 9, 9 am – 12 pm** at the Delta Forest Service Office, 2250 Highway 50, Delta, CO.
  - Dr. Nate Anderson, RMRS, will present an update on the woody biomass feasibility study.  Everyone is welcome to attend but the content of the meeting will be more technical.
- **UP Woody Biomass Public Field Trip: June 10, 9 am – 5 pm.**
  - Meet at the Montrose Public Lands Center.   We will tour several on-going fuels treatments on the Uncompahgre Plateau and discuss biomass utilization.  Please bring your own lunch
  - 
  - \*\*Communications Sites. Are there any specific areas that you know of that have been discussed as potential communications sites? If there are known potential sites, it would make the future NEPA analysis less complex if identified in the RMP.
  - It is my understanding that there will be more need for cell phone towers in the area as demand for better service continues to force the providers to install more towers. I would suggest that contact be made with the different providers for such discussions of future plans and needs.

  - \*\*Utility Corridors. Are there any specific areas that should be identified as utility corridors?
  - Specifically, power lines in and around Air Port facilities on BLM lands should have written in planning options.


    \*\*Hunting Permits (Outfitters). We are discussing how to handle the number of permits issued to hunting outfitters. Should we limit the number of permits, or not? If we do not limit the number of permits, we would issue a permit to all outfitters that qualify, and let the market and hunting

conditions regulate the number that remain in business. Or, we could limit to number of outfitters permits to improve the chances of a quality hunting experience for the clients. If we limit the number of permits, one number we are considering is limiting permits to eight (8) big game outfitter permits per game management unit, and to ten (10) mountain lion guide/outfitter permits in the planning area.

- Outfitting is a very competitive business.  The market and success ratio will regulate the number that remains in business.  The BLM is not in the business of being concerned about a quality hunting experience for paid outfitter clients.

  It appears to me that we are entering into an area that is not in call for correction.  This has the potential to open a real can of worms.

  **Organized Group Permits. We are discussing the numbers associated with Special Recreation Permits. We issue Special Recreation Permits to protect natural and cultural resources, protect recreational and natural resources, and provide for visitor health and safety. We are considering Special Recreation Permits for organized groups expecting more than 40 vehicles or 80 people, including spectators. What are your thoughts?

  **Target Shooting. We would like your thoughts on prohibiting target shooting within 0.25-mile of a residence and developed facilities (e.g., power substations, powerlines, communication sites). This is primarily for safety concerns.

- It appears we are trying to create a solution for a problem that does not exist. Impossible to enforce. If there is a problem, it would fall under the law enforcement of the County Sheriff. BLM is not a safety patrol agency. A $\frac{1}{4}$ mile corridor on power lines? That would mean you couldn't target shoot about anywhere on BLM lands. There are power lines servicing most commercial target shooting sites. Most residences of commercial target shooting ranges live nearby on the property much close that $\frac{1}{4}$ mile. Communications sites would include cell towers, repeater towers, telephone lines etc.

- **North Delta OHV Open Area. We would like your thoughts regarding limiting all travel in North Delta OHV Open Area to designated routes, and designating all routes.

WHY???  That is the whole premise of the area and has been since it was created.  It is even more important now that Homeland Security has forced the GJ airport to fence off a big chunk of OHV open BLM land.  The North Delta OHV open area is very family orientated riding place.  Many OHV families use this area to train & teach the younger

OHV enthusiast to ride. Remember that riding OHV's is potentially risky by nature of the sport.  Each individual takes that responsibility on himself when participatating.  Isn't there verbiage in the original decision notice on the North Delta OHV area to keep it open?

**We have asked Ouray County for their plans for their existing gravel pit northeast of Ridgway, which is also within the proposed/potential Ridgway Trails SRMA. We would like to know the County's desires for continuing the pit as it is now permitted, as well as desires for future expansion. Or, is the area better suited for a trails system, which could have positive impacts on tourism and economics? This knowledge will reduce conflict with future trails if the Ridgway Trails SRMA is in the preferred alternative.

**We have asked CDOW (as a Cooperating Agency) what are the State's thoughts are on having state lands open or closed to oil/gas leasing (where federal minerals underlay the lands), as well as thoughts on "No Surface Occupancy".

 What difference does it make to CDOW unless there are wildlife issues? It is my understanding that present law covers wildlife concerns.   Sounds like the BLM is butting into something that is none of their business.  Let the state (COGC) decide if and when it becomes an issue. Having a "No surface Occupancy" would only enhance the access of a much needed resource.



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401

# RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #7

## Friday, May 13, 2011 (9:00 AM – 12:00 PM)

### Meeting Location:
### Holiday Inn Express (Jordan Room)
### 1391 South Townsend Avenue, Montrose, CO

# AGENDA

1. **Welcome**

2. **Introductions**

3. **Planning Process to Date**

4. **Internal Draft Alternatives – Group Feedback on:**

    a. **Renewable Energy**

    b. **Communications Sites**

    c. **Utility Corridors**

    d. **Hunting Permits (Outfitters)**

    e. **Organized Group Permits**

    f. **Target Shooting**

    g. **North Delta OHV Open Area**

    h. **Ouray County's plans for gravel pit northeast of Ridgway and potential Ridgway Trails SRMA?**

    i. **Colorado State/CDOW's thoughts on having state lands open or closed to oil/gas leasing and no surface occupancy?**

5. **Other Items Not on the Agenda**

6. **Action Items / Next Meeting**
    - Next meeting: Friday, June 24, 2011, 9:00am–12:00pm, Holiday Inn Express, Montrose

BLM_0109844

BLM_0109845



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401

## Highlights of the Resource Management Planning Process to Date
### *May 12, 2011*

- Notice of Intent (NOI) – 2/25/2010

- Scoping period – 12/23/2009 to 3/29/2010

- Scoping report – final report completed 7/7/2010 (on website)

- Tribal consultation – initiated 2009 (ongoing)

- Community Assessment – report completed 2/2009 (on website)

- Visual Resource Inventory – report completed 9/2009

- Migratory bird status literature review – report completed 10/2009

- Analysis of Management Situation (AMS) – report completed 6/10/2010 (on website)

- Economic workshops (6 communities) – held 3/2010

- Socioeconomic baseline assessment – final report completed 7/21/2010

- Class I paleontological resources – report completed 2/2010

- Oil & Gas Reasonable Foreseeable Development (RFD) Scenario – internal draft report completed 7/2010

- Mineral potential report (excluding coal) – internal draft report completed 8/2010

- Coal potential report – final report completed 4/26/2010

- Renewable energy potential report – final report completed 5/31/2010

- Class I cultural resources overview – draft report completed 4/2010; final report completed

- Coordination with Cooperating Agencies – invitations sent 1/23/2009; meetings planned from 5/27/2010 forward

- ACEC evaluation report – draft report completed 7/15/2010 (on website) – final report underway

- Wilderness characteristics report – draft report postponed

- Air quality report – anticipated Winter 2011-2012

- Wild and scenic rivers – draft eligibility report 12/2009; final eligibility report completed 7/12/2010 (on website); suitability underway

- Recreation focus groups – completed 3/2010; report completed 6/2010 (on website)

- Alternatives development – anticipated 6/2010 through approximately 10/2011

---

BLM_0109846



## United States Department of the Interior

### BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
Montrose, Colorado



TAKE PRIDE
IN AMERICA

## RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #7
### Friday, May 13, 2011 (9:00 AM – 12:00 PM)
### Meeting Location:
**Holiday Inn Express**
**1391 S. Townsend Avenue, Montrose, CO**

| Last Name | First Name | Initial | Address | E-Mail | Phone |
|---|---|---|---|---|---|
| Adams | Angie | AMA | EMPSi 3775 Iris Ave, Ste 1A Boulder, CO 80301 | angie.adams@empsi.com | 303-446-7160 |
| Armstrong | Lori | | BLM, Southwest Colorado District Manager 2465 S. Townsend Ave. Montrose, CO 81401 | vaarmstrong@blm.gov | 970-240-5336 |
| Baird-LeValley | Robbie | RBL | Colorado State Univ. Extension 525 Dodge Street Delta, CO 81416 | robbie.levalley@colostate.edu | w: 970-874-2195 ▉ |
| Bear | Shelby | SRB | DMEA PO Box 910 Montrose, CO 81402 | sbear@dmea.com | w: 970-240-1238 ▉ |
| Blackburn | Walt | WB | | | |
| Day | Bill | WD | | | |
| Durnan | Richard | | | | |
| Ela | William | WME | | | |
| Hawke | Barbara | BH | The Wilderness Society, ~~Central Rockies Regional Office 1660 Wynkoop St, Ste 850 Denver, CO 80202~~ 1617 American Way Montrose CO 81401 | barbara_hawke@tws.org | w: ~~303-650-5818~~ 970-249-4830 |
| Kauffman | Dave | | BLM, Uncompahgre Field Office 2465 S. Townsend Ave. Montrose, CO 81401 | dkauffma@blm.gov | 970-240-5340 |
| Krickbaum | Bruce | | BLM, Uncompahgre Field Office 2465 S. Townsend Ave. Montrose, CO 81401 | bkrickba@blm.gov | 970-240-5384 |
| Mueller | Peter | | PO Box 3140 Telluride, CO 81435 | pmueller@tnc.org | w: 970-728-5291 ▉ |

BLM_0109847

Resource Advisory Council Subgroup Meeting #7                                              May 13, 2011

| Last Name | First Name | Initial | Address | E-Mail | Phone |
|---|---|---|---|---|---|
| Reams | John | | Western Small Miner's Assoc. 31527 Hwy 141 PO Box 644 Naturita, CO 81422 | john@reams-construction.com | w: 970-865-2886 ████ |
| Sharrow | Barb | | BLM, Uncompahgre Field Office 2465 S. Townsend Ave. Montrose, CO 81401 | bsharrow@blm.gov | 970-240-5315 |
| Weist | Steven D. | | Oxbow Mining 3737 Hwy 133 PO Box 535 Somerset, CO 81434 | steve.weist@oxbow.com | w: 970-929-6461 ████ |
| Welt | Kathy | via phone | ████████████ | | w: 970-929-2238 ████ |
| Wynant | Kate | | EMPSi 3775 Iris Ave, Ste 1A Boulder, CO 80301 | kate.wynant@empsi.com | 303-446-7160 |
| Gdatt | Lee | | PO Box 1931 GJ CO 81502 Western CO Congress | lee@wccongress.org | 970 256-7650 |
| Paul W Gibbs | | | ████████████████ | | |

Add to mailing list

BLM_0109848

| 5-20-11 |

① Core Travel Meeting w/ CDOW
Brad Banulus, Brian Magee
Barb Sharrow, Dave Kauffman, Julie
Jackson

Dec. 1 - April 30 ± 30 days. They are
uncomfortable w/ 60 days

Add CDOW concurrence

(Jumbo Mtn + Ridgway Trails are — (Zone 3)
Dec 1 - April 30. Not Cores.

Core in Preferred

*Update Matrix (Cores) + Kickoff Angle*

Question the validity of core concept for
Jumbo Mtn in the area close to Paonia
where Mnt Bikes proposal.

Zone 1, 10, 2, 9, 4, 5, 6 Core + 8 Travel only

Tabeguache — add Northern non core
to travel closure (Shavano)

*Core in Naturita should be same as Burn: Comp Zones in Matrix allow these.*

√ Burn Canyon/Naturita make sure timing
limitation for winter range
Want Travel Closure in larger
old core area

√ San Miguel — Saltado closed
Seasonal Closure only Beaver
part - (Zone 2+1) Zone 3 no timing



✓ Billy Creek — Should not be in ~~~~ for Core [Ridgeway 1&2 Core]
Seasonal Closures yes.

✓ Spring Creek —
Seasonal closure
At implementation close to dog walkers.

✓ Dry Creek [Zone 1,2,3] — Keep Dry Creek Travel areas for closure.
Dry Creek Core no travel closure, stay core. Date all same

✓ Roubideau — ok [Core w/ Admin 1,2,10] [Core 3-9,11]

✓ Adobe — ok [Zone 1,3,4]
North end — check boundary to follow wells gulch road /
Add area to west to core & travel. [Core Travel 1+4. Core only 3]

✓ Tenor Creek — Brian will on this one [No travel yes core]

✓ Jumbo — super critical for Deer All 4 species.

Area CDOW would like:
Sims / Gout Springs area

*Kate: Add Zone 4 to Adobe Preferred + Travel. Preferred Mimic Zone 1 Preferred Mimic Zone 2 other alts

*Kate: Add Zone 5 to Jumbo (Remove SRMA) yes Seasonal Zone 5 not core, restriction Zone 1-4 Core + travel

- Highest desity of deer in this area.
  Important migration area

- Add Sims/Gov Springs to Core; no
  travel closure.
  Preference for some kind of closure.

  * Try to figure out how to do closures
    in area.

- Atkinson Mesa: would be good for
  travel.

- Seasonal Closure: Atkinson
  Mesa. Maybe also Moon Mesa
  Brad will get back to us.

- Once shapefiles are fixed send copy
  to Brian.

- See if Joe/David are available
  will for edits.

5-25-11
① David
Ask Brian McGee CDOW data that would
helped.

② 4H youth Shooting Range.
RMPP — give public lands to govt or nonprofit
Give to Delta County.