

"Magee, Brian"
<Brian.Magee@state.co.us>
05/23/2011 08:57 AM

To  <msiders@blm.gov>, <Julie_Jackson@blm.gov>

cc  "Banulis, Brad" <Brad.Banulis@state.co.us>,
<Barbara_Sharrow@blm.gov>, "Madariaga, Kirk"
<Kirk.Madariaga@state.co.us>, "Delpiccolo, Renzo"

bcc

Subject  Terror Creek BCA _travel

Missy-

I spoke with the DWM Kirk Madariaga, he does not feel that a travel restriction in the Terror Creek
Biological Core Area would be all that important to wintering wildlife for two reasons: 1) public access
to terror creek is difficult due to the private lands on either end of the creek, and 2) most of the wildlife
(big game anyway) winter down at lower elevations. He did emphasis that it is an important area for
wildlife and see a lot of migrating animals.

Let me know if you all have additional questions.

Thanks,

Brian

Brian Magee
SW Regional Land Use Specialist
Colorado Division of Wildlife
415 Turner Drive
Durango, CO 81303
Office 970-375-6707
Cell 970-759-9587

BLM_0109852

| | |
|---|---|
| **From:** | Barbara Hawke |
| **To:** | bkrickba@blm.gov |
| **Cc:** | Angie Adams; Kate Wynant; Barbara_Sharrow@bim.gov |
| **Subject:** | Criteria for Renewable Energy Emphasis Areas |
| **Date:** | Saturday, May 21, 2011 5:01:02 AM |
| **Attachments:** | Sensitivity Based Prioritization for Development Areas within Renewable Energy Zones AD Spring 2011 Example.docx |

Following up on the SubRAC discussion last week, attached are some sample criteria for renewable energy emphasis areas. Such criteria would need to be customized a bit for UFO, however there's lots of good material in the attached, I think.

Barbara Hawke
Dolores River Basin Wildlands Coordinator
The Wilderness Society
Montrose, Colorado
970-596-6697 (cell)

BLM_0109853

**Sensitivity Based Prioritization for Development Areas
Within Renewable Energy Zones\***

**Level 1 – Areas to be Prioritized for Development:** These areas do not contain the sensitive resources and values which Level 2 and 3 areas do, and have already been impaired by other uses.  Further, proximity to existing roads, designated transmission corridors, and other infrastructure makes these sites more economically developable, while minimizing impacts by limiting the need for additional associated infrastructure. Development in these areas will be required to complete on-site mitigation measures and use to Required Operating Procedures to protect resources and values within.  However, off-site mitigation and additional restrictions which apply to development in Level 2 and 3 areas will be much lower for projects in Level 1 areas.  Developers will also be provided incentives for developing within these areas.

Areas Include
    Hazardous material sites
    Brownfields
    Abandoned mines
    Former landfills, mineral sites or gravel pits
    Developed oil and gas fields
    Sites damaged or disturbed to the extent that restoration potential is limited
    Sites that otherwise have very limited productivity due to a disruption of natural
        processes

Development Stipulations Include
    On-site mitigation and mandatory Required Operating Procedures (ROP), including
        USFWS Wind Turbine Guidelines Advisory Committee ROPs and ROPs being
        contemplated in the Solar PEIS
    Off-site mitigation for lost resources, uses, and experiences on the project site

Incentives Include
    Prioritization of BLM resources for permitting, including Renewable Energy
        Coordination Office resources

**Level 2 – Resource Protection Required:** These areas include sensitive resources with potential for conflict and controversy.  Restrictions will be placed on development in these areas to protect the important resources and values within.  The density and importance of resources and values will vary within Level 2 lands; there will be greater restrictions on development in areas with resources and values of high density and/or importance.  Developers are strongly encouraged to prioritize development in Level 1 lands or low-conflict Level 2 lands to minimize conflicts and increase the likelihood of project success and timely completion.

Resources and Values to be Protected Include
    Stream and Lake buffer areas (1/4 mile)
    Audubon Important Bird Areas

\*Note that there may be additional resources and values which need to be protected, additional incentives which could be used to prioritize development in Level 1 areas, and additional development stipulations necessary for protection of the resources and values listed here.

USFWS Habitat Conservation Plans (HCP)
USFWS Proposed HCPs and NCCPs
WCS Wolverine Habitat Model
Areas with high densities of cultural resources
Colorado Natural Heritage Program Potential Conservation Areas – Biodiversity
    Significance of lower than B3
Colorado Natural Heritage Program Element Occurrence Records for all species
    ranked G3 or higher or S4 or higher, including historical records
Wetland habitats (CDOW)
Various Occupied and Potential Habitats for key species
- prairie dog (Gunnison's and white-tailed) occupied habitat
- burrowing owl potential habitat (CDOW)
- greater sage-grouse winter range
- black bear concentration areas
- pronghorn concentration areas, severe winter range and perennial water sites (CDOW)
- Bighorn migration corridors and concentration areas
- Mule deer concentration areas, migration corridors, and critical winter range
- White-tailed deer concentration areas and critical winter range
- BLM-USFS Lynx Analysis Units
- peregrine falcon potential nesting sites
- occupied habitat for flannelmouth sucker, bluehead sucker, and roundtail chub
- heron nest sites (CDOW)

Development Stipulations Include
    Surface disturbance limitations
    Timing limitations, for both construction and operation
    Phased development
    Water use limitations
    On-site mitigation and mandatory Required Operating Procedures (ROP), including
        USFWS Wind Turbine Guidelines Advisory Committee ROPs and ROPs being
        contemplated in the Solar PEIS
    Off-site mitigation for lost resources, uses, and experiences on the project site

**Level 3 – Avoid Areas:** These areas contain extremely sensitive resources and serious potential for conflict and controversy. Significant restrictions would be placed on any development in these areas to protect the important resources and values within. They should effectively be considered exclusion areas because of the burden projects in such areas would face in getting approved.

Resources and Values to be Protected Include
Level 2 resources and values, plus:
    Units of the National Landscape Conservation System
    Citizens' Wilderness Proposal areas
    USFWS Designated Critical Habitat
    USFWS Occupied and Potential Habitat for Federally Listed, Proposed and Candidate
        Species

SREP priority wildlife linkages

CNHP Potential Conservation Areas (PCAs) – Biodiversity Significance B3 and higher

ACECs

BLM Visual Resource Management class I and II

Colorado Natural Areas Program designated Natural Areas

Colorado State Wildlife Areas

SRCA Inventoried Roadless Areas

BLM and USFS-identified lynx linkages and CDOW-identified lynx denning habitat

Colorado Natural Heritage Program Element Occurrence Records for all species
ranked G2 or higher and S3 or higher (unless global precision rank is "very poor"
or lower)

Various High Priority Occupied Habitats for key species:

- raptor active and inactive nest sites and roost sites (all species) plus FWS recommended buffers (from FWS raptor guidelines)
- greater sage-grouse brood, production areas (if outside of core areas), severe winter range, and areas within 4 miles of a lek on private land
- greater sage-grouse core areas (CDOW)
- Gunnison sage-grouse occupied habitat (all types)
- Boreal toad breeding sites and field sightings with buffer (CDOW)
- Colorado River cutthroat trout occupied habitat
- kit fox occupied and potentially occupied habitat (CDOW)
- roosting areas (day roosts and maternity roosts) with ¼ mile buffer for Brazilian freetail bat, Townsend's bigeared bat, fringed myotis
- northern leopard frog occupied habitat with 200 meter buffer (CDOW)

<u>Development Stipulations Include</u>

Surface disturbance limitation

Timing limitations, for both construction and operation

Phased development

Water use limitations

On-site mitigation and mandatory Required Operating Procedures (ROP), including
USFWS Wind Turbine Guidelines Advisory Committee ROPs and ROPs being
contemplated in the Solar PEIS

Off-site mitigation for lost resources, uses, and experiences on the project site

BLM_0109856

## James Bode

| | |
|---|---|
| **From:** | bkrickba@blm.gov |
| **Sent:** | Thursday, May 26, 2011 5:08 PM |
| **To:** | Angie Adams; Kate Wynant |
| **Cc:** | UFO AR |
| **Subject:** | Fw: Terror Creek BCA _travel |

Forwarded.

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 05/26/2011 05:07 PM -----

Melissa
Siders/MOFO/CO/BL
M/DOI                                    To
          Bruce Krickbaum/MOFO/CO/BLM/DOI@BLM
05/25/2011 08:01                         cc
AM
                    Subject
          Fw: Terror Creek BCA _travel

FYI ... for project record.
-Missy

^v^  ^V^  ^v^   ^v^ ^V^  ^v^ ^v^  ^V^   ^v^  ^v^
Melissa Siders, Wildlife Biologist
Uncompahgre Field Office
2465 S. Townsend Ave., Montrose CO 81401
970-240-5332 - office  970-596-0550 - cell
e-mail:  Melissa_Siders@blm.gov
^v^  ^V^  ^v^   ^v^ ^V^  ^v^ ^v^  ^V^   ^v^  ^v^
"In the end, we will conserve only what we love.
We will love only what we understand.
We will understand only what we are taught."
-Baba Dioum, Senegal, West Africa
----- Forwarded by Melissa Siders/MOFO/CO/BLM/DOI on 05/25/2011 08:01 AM
-----

1

BLM_0109857

"Magee, Brian"
<Brian.Magee@stat
e.co.us>                              To
                          <msiders@blm.gov>,
05/23/2011 08:57          <Julie_Jackson@blm.gov>
AM                                    cc
                          "Banulis, Brad"
                          <Brad.Banulis@state.co.us>,
                          <Barbara_Sharrow@blm.gov>,
                          "Madariaga, Kirk"
                          <Kirk.Madariaga@state.co.us>,
                          "Delpiccolo, Renzo"
                          <Renzo.Delpiccolo@state.co.us>
                                   Subject
                          Terror Creek BCA _travel

Missy-

I spoke with the DWM Kirk Madariaga, he does not feel that a travel restriction in the Terror Creek Biological Core Area
would be all that important to wintering wildlife for two reasons: 1) public access to terror creek is difficult due to the
private lands on either end of the creek, and
2) most of the wildlife (big game anyway) winter down at lower elevations.
He did emphasis that it is an important area for wildlife and see a lot of migrating animals.

Let me know if you all have additional questions.

Thanks,

Brian

Brian Magee
SW Regional Land Use Specialist
Colorado Division of Wildlife
415 Turner Drive
Durango, CO 81303
Office 970-375-6707
Cell 970-759-9587

BLM_0109858

## James Bode

| | |
|---|---|
| **From:** | bkrickba@blm.gov |
| **Sent:** | Thursday, May 26, 2011 11:46 AM |
| **To:** | bsharrow@blm.gov; Angie Adams; Kate Wynant; Aschroeder@usbr.gov; renzo.delpiccolo@state.co.us; shansen@deltacounty.com; MPelletier@gunnisoncounty.org; swhite@montrosecounty.net; joanm@sanmiguelcounty.org; daves@sanmiguelcounty.org; pat@cedaredgecolorado.com; townofpaonia@tds.net; jcoates@town.ridgway.co.us; charles_sharp@fws.gov; segfahlt@gmail.com; Bruce_Krickbaum@co.blm.gov; UFO AR |
| **Subject:** | Draft Notes: Uncompahgre RMP Cooperating Agency Meeting #7 |
| **Attachments:** | UFO-CA_2011-05-12_DraftNotes.pdf |

Hello Cooperating Agency Representatives,

I have attached draft notes of the May 12 Uncompahgre RMP Cooperating Agency meeting.  Also refer to the comments taken at the meeting, which are attached to the notes.  The "response" column is filled in where an immediate response was given at the meeting.

Please review the draft notes and let me know of any errors or omissions by Wednesday, June 1, after which they will be revised and submitted to all group members and the administrative record.

Thank you, Bruce

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384


 (See attached file: UFO-CA_2011-05-12_DraftNotes.pdf)

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

BLM_0109859



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401



# COOPERATING AGENCY MEETING #7

## Thursday, May 12, 2011 (1:00 – 4:00 PM)

### Meeting Location:
**Holiday Inn Express (Apex Room)**
**1391 South Townsend Avenue, Montrose, CO**

# Meeting Notes

**Attendees:** Angie Adams (EMPSi), Jen Coates (Town of Ridgway), Renzo DelPiccolo (Colorado Department of Natural Resources, Southwest Region), Susan Hansen (Delta County BOCC), Bruce Krickbaum (BLM Uncompahgre Field Office), William Long (Town of Nucla), Joan May (San Miguel County BOCC), Patricia Means (Town of Cedaredge), Mike Pelletier (Gunnison County), Barbara Peterson (Town of Paonia), Alan Schroeder (Bureau of Reclamation, Western Colorado Area Office), Charlie Sharp (US Fish and Wildlife Service), Barb Sharrow (BLM Uncompahgre Field Office), Steve White (Montrose County BOCC), Kate Wynant (EMPSi)

**Handouts:** Agenda; Highlights of the Resource Management Planning Process to Date

1. **Welcome** (Bruce Krickbaum)
   - Going through alternatives we've come up with some questions so we called this meeting to get your help and feedback from you.
   - Reminder that CA meetings are not open to the public but RAC Subgroup meetings are. Those meetings are the same meeting as this one; we talk about the same things, but those meetings are open to the public. We have a public comment period at 11:00am at those meetings so they can speak at those meetings. Another reason these meetings are not open to the public is so the CAs can talk freely without the public being present.

2. **Introductions** (all present)

3. **Planning Process to Date** (Angie Adams, Kate Wynant)
   - See handout: Highlights of the Resource Management Planning Process to Date.
   - Air quality report is anticipated this winter.
   - Alternatives development moved into fall of 2011.
   - The wilderness characteristics report is on hold because of the federal funding bill that had specific language not to do wilderness characteristics inventory. Report is on hold until we get guidance from Secretary Salazar on how to carry out FLPMA within the budget parameters.
   - Next meeting we will provide the draft chapter 2 for you to review. It will have maps and acreages filled out. You will be reviewing it at the same time the field office reviews the full

BLM_0109860

chapter 2. Please plan on spending some time to review that and provide input in June/July. Again, as a reminder, as a Cooperating Agency, please do not share Chapter 2.

- o *Question*: Montrose County wants to move from Cooperating Agency to coordinating agency. Will get that in writing. How does that work? *Answer*: We can meet with you as the county and those will be public meetings. However we (BLM) will not be sharing everything with you. Montrose County can bring comments to the BLM. Suggest that the county sets up a meeting with the BLM.
- o *Question*: Is there any reason that you can't do both? Be a cooperating agency and provide comments in a public forum? *Answer*: Yes, you can do both, but we won't talk about all of the in-progress details with the public.
- o *Comment*: I think the Montrose commissioners feel like they won't be heard or won't be part of the process. *Response*: All they need to do is request a meeting with BLM (Barb) and she'll meet with them. We can put together a timeline so they can see when they will get a chance to be involved.

## 4. Internal Draft Alternatives – Group Feedback on:

See attachment: Internal Rough Draft Alternatives – Feedback from Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19, 2011).

a. **Renewable Energy**

b. **Communications Sites**

c. **Utility Corridors**

d. **Hunting Permits (Outfitters)**

e. **Organized Group Permits**

f. **Target Shooting**

g. **North Delta OHV Open Area**

h. **Ouray County's plans for gravel pit northeast of Ridgway and potential Ridgway Trails SRMA?**

i. **Colorado State/CDOW's thoughts on having state lands open or closed to oil/gas leasing and no surface occupancy?**

## 5. Other Items Not on the Agenda

- *Comment*: The more we can get a roadmap so we know what we're going to be able to comment on, the better. *Response*: June 23rd is when you'll get the draft Chapter 2. When you get Chapter 2 for review, there will be four alternatives instead of six. At that point you'll be able to give us feedback on the range but also on the preferred alternative. Once we get feedback from cooperating agencies, RAC Subgroup, and the Field Office, we'll refine alternatives and send it to the Colorado State Office; get feedback; revise. Then we'll start the impact analysis which may result in more tweaks to the alternatives. Throughout that process you'll see the full draft document including alternatives (which will look different than what you see in June because it'll have been tweaked based on comments), affected environment (which you've already seen), impact analysis, etc. You'll review that document; we'll tweak; the Colorado State Office will review; we'll tweak; Washington Office will review; we'll tweak; and then publish for public comment.
- *Action*: Between now and the next meeting we will give you a roadmap for between now and the Draft RMP.
- If today brought up other questions, let us know. We can add them to the agenda for next time and discuss those items.

BLM_0109861

- *Action:* We'll send response to comments on the January internal rough draft alternatives to send out to the groups before the June meeting.

## 6. Action Items / Next Meeting

- Next meeting: Thursday, June 23, 2011, 1:00–4:00pm, Holiday Inn Express, Montrose
- ☐ *Action:* Jen Coates will e-mail the plan to BLM (Bruce) information on San Miguel and Ouray Counties plan to generate 20% of energy from renewable in the next 20 years.
- ☐ *Action:* Between now and the next meeting we will give you a roadmap for between now and the Draft RMP.
- ☐ *Action:* We'll send response to comments on the January internal rough draft alternatives to send out to the groups before the June meeting.

BLM_0109862

**Uncompahgre RMP/EIS**                                                April 19, 2011

*April 19, 2011, email from Bruce Krickbaum, BLM UFO, to all Cooperating Agency Representatives and RAC Subgroup Members:*

…We need to discuss several topics at the May 12/13 meeting.  The following are issues we want your opinions on.  There will most likely be an array of thoughts on each, but the discussion will help us frame the alternatives and potential preferred action.  Please think about these issues and be prepared to discuss during the meeting.  Written information and/or maps would also be welcomed.

**Renewable Energy.  During several of our initial meetings, we discussed renewable energy and asked for information regarding potential renewable energy sites or projects.  We are at the stage that we need to know if communities, counties or agencies know of any renewable energy projects that are being discussed, or locations that have been identified as having potential over the next 20 - 30 years.  Note:  we can be very general in the decision, and say projects would be allowed throughout the planning area.  However, it would be great to also list specific areas as renewable energy emphasis areas (wind, solar).

**Communications Sites.  Are there any specific areas communities or counties know of that have been discussed as potential communications sites?  If there are known potential sites, it would make the future NEPA analysis less complex if identified in the RMP.

**Utility Corridors.  Are there any specific areas that should be identified as utility corridors?  Are you speaking with the utility companies?  Have you identified places in your master plans that we should emulate?

**Hunting Permits (Outfitters).  We are discussing how to handle the number of permits issued to hunting outfitters.  Should we limit the number of permits, or not?  If we do not limit the number of permits, we would issue a permit to all outfitters that qualify, and let the market and hunting conditions regulate the number that remain in business.  Or, we could limit to number of outfitters permits to improve the chances of a quality hunting experience for the clients.  If we limit the number of permits, one number we are considering is limiting permits to eight (8) big game outfitter permits per game management unit, and to ten (10) mountain lion guide/outfitter permits in the planning area.

**Organized Group Permits.  We are discussing the numbers associated with Special Recreation Permits.  We issue Special Recreation Permits to protect natural and cultural resources, protect recreational and natural resources, and provide for visitor health and safety.  We are considering Special Recreation Permits for organized groups  expecting more than 40 vehicles or 80 people, including spectators.  What are your thoughts?

**Target Shooting.  We would like your thoughts on prohibiting target shooting within 0.25-mile of a residence and developed facilities (e.g., power substations, powerlines, communication sites).  This is primarily for safety concerns.

**North Delta OHV Open Area.   We would like your thoughts regarding limiting all travel in North Delta OHV Open Area to designated routes, and designating all routes.

**For Ouray County.  What are Ouray County's plans for the gravel pit northeast of Ridgway, and  within the potential Ridgway Trails SRMA?  We would like to know about the County's desires for continuing the pit as it is now permitted, as well as desires for future expansion.  Is the area better suited for a trails system, which could have positive impacts on tourism and economics?  This knowledge will reduce conflict with future trails if the Ridgway Trails SRMA is in the preferred alternative.



January 27, 2011

**For Colorado State/CDOW (primarily, but others as well).  What are the State's thoughts on having state lands open or closed to oil/gas leasing (where federal minerals underlay the lands)?  What about "No Surface Occupancy"?

BLM would also like to discuss the alternatives-development process since January 2011.   By the way, thank you to all of you for the great comments you submitted on the draft alternatives.   Comments have been helpful to us.

Regards, Bruce

Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384



January 27, 2011

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 1. | Kerwin Jensen (City of Montrose, Cooperating Agency, via email 4/26/2011) | … there are a number of BLM parcels near the city limits of Montrose and we would ask for consideration that wind turbines not be placed on those BLM lands close to the city limits and residential neighborhoods. Solar panels are less intrusive, but it would be desirable to locate solar panels at prudent locations as well when near the doorsteps of the city limits. | |
| 2. | Alan Schroeder (Bureau of Reclamation, Cooperating Agency, via e-mail 5/16/2011) | Renewable Energy<br>Bio-mass: if bio-mass energy is being addressed as part of this revision, several things should be considered. These things include, but are not limited to: sustainability (enough bio-mass to keep things going long term), and will we be reducing or losing carbon sink potential (forests, woodlands, and brush lands) that may help mitigate global warming by reducing atmospheric CO2? | |
| 3. | Alan Schroeder (Bureau of Reclamation, Cooperating Agency, via e-mail 5/16/2011) | Renewable Energy<br>Hydropower- hydropower should be addressed in the RMP Revision:<br>• Potential projects currently being considered or of which we are aware: Southside canal, Ridgway Dam, and AB Lateral (the AB Lateral project was previously proposed, but is not actively being pursued at this time)<br>• Additional potential hydropower project sites (we are currently actively looking for additional potential sites) include but are not limited to the following:<br>  o Crawford and Paonia Dams (project purpose, CRSP)<br>  o Uncompahgre Project Canals (Shavano Falls, several additional sites on South Canal, etc.)<br>• Dam-site and Power-site Withdrawals: The Gunnison River has (or had) some withdrawals for dam and/or power sites, particularly along gorges and canyons. Similar withdrawals may exist on some of the other rivers within the planning area, particularly those with narrow canyons (Dolores, San Miguel, etc.) Those withdrawals constitute a reservation of those lands for those potential purposes. The potential for hydro-power at these sites should be addressed as part of the RMP revision. | |



Page 1

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109865

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | • Ancillary facilities- the above sites may need right-of-way or lease options for hydro-power related facilities (transmission lines, substations, penstocks, roads, etc.) on adjacent BLM lands. Therefore, we need to keep BLM lands in these general areas available for such rights-of-way, leases, etc. | |
| 4. | Alan Schroeder (Bureau of Reclamation, Cooperating Agency, via e-mail 5/16/2011) | State Lands with Federal Minerals-<br>State Parks (Crawford, Paonia, Ridgway)<br>• Land Status- These three reservoir areas are, in fact, Bureau of Reclamation (BOR) lands, related to the Smith Fork, Paonia, and Dallas Creek Projects, respectively. These areas are managed for recreation by State Parks under an agreement with BOR. These areas include both acquired and withdrawn lands. Our withdrawn lands are generally not withdrawn from mineral leasing, however, the actual degree of withdrawal is dependent on the specific withdrawal order(s). Also, we may not have acquired all private minerals on our acquired lands; we sometimes acquired only certain minerals, but subordinated to the interests of our project those mineral rights retained by the seller. Those subordinations are usually similar, but actual wording may vary according to the land purchase contract or deed.<br>• Administrative Jurisdiction (1983 BOR/BLM IA)<br>   ○ Sec. 5 Management of Reclamation Withdrawn and Acquired Lands- these areas are Section 5A lands as defined by the IA; they fall under BOR's management jurisdiction.<br>   ○ Sec. 6H Mineral and Geothermal Leases- ". . . BLM will not issue permits, leases, or licenses on acquired or withdrawn lands under Reclamation's management without Reclamation's consent and concurrence on all conditions and stipulations. . . ." While BLM generally has administrative jurisdiction for the leasing of and development of mineral leases on 5A lands, BOR determines whether leasing is permissible and, if so, provides any stipulations necessary to | |



Page 2

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109866

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | protect the interest of the US. | |
| | | • Range of Alternatives | |
| | | o Preferred Alternative- We prefer that leasable federal minerals underlying the above State Parks be designated "No Lease." These areas are relatively small and narrow with little room for mineral development; plus, mineral development is usually not compatible with recreational interests or State Park objectives. | |
| | | o Leasing of oil/gas underlying the above State Parks with a "No Surface Occupancy" (NSO) could be included within one of the alternatives. | |
| | | • Stipulations and Conditions of Approval- | |
| | | o If federal leasable minerals or geothermal resources underlying BOR lands are leased, at a minimum, the conditions in Reclamation's Manual, Directives and Standards LND 06-01 Land Acquisition; Part 3, I Conditions Applying to Mineral Operations, should be applied to said leases. | |
| | | o On oil/gas or geothermal leases in close proximity to Reclamation dams or other permanent structures the following conditions should be applied: | |
| | | ▪ No drilling shall be allowed within 1500 feet, both horizontally and vertically, of a Reclamation dam or its appurtenant structures in order to protect the integrity of these structures. | |
| | | ▪ No drilling shall be allowed within 200 feet of the boundary of the right-of-way of any canal, tunnel, aqueduct, pipeline lateral or drain. Of concern within this Planning Area are the various features of the Uncompahgre Project (particularly the Gunnison Tunnel), the Fruitgrowers Dam Project, the Paonia Project, the Smith Fork Project, and the Dallas Creek Project, the Bostwick Park Project. | |
| | | ▪ Use or crossings of Reclamation facilities must be | |



Page 3

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109867

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | approved by Reclamation in writing prior to such use or crossing. | |
| 5. | Alan Schroeder (Bureau of Reclamation, Cooperating Agency, via e-mail 5/16/2011) | State Lands with Federal Minerals-<br>State Wildlife Areas<br>• No Surface Occupancy- BOR supports the CDOW's position of "No Surface Occupancy" (NSO) for leasing of federal minerals in its State Wildlife Areas (SWA)<br>• Land Status: Portions of several State Wildlife Areas within the Planning Area (Billy Creek, Cimarron, possibly others) are BOR wildlife mitigation lands (withdrawn or acquired) for various BOR projects (Dallas Creek, Aspinall Unit). These mitigation lands were transferred to the State of Colorado to be managed for wildlife purposes. The transfers included a reversionary clause; if not managed for wildlife purposes, the land would revert back to the US. | |
| 6. | Alan Schroeder (Bureau of Reclamation, Cooperating Agency, via e-mail 5/16/2011) | Federal Leasable Minerals underlying BOR lands within other Federal land management Units (This is a situation similar to the BOR lands within State Parks)<br>Curecanti National Recreation Area (CNRA) and some BOR withdrawn lands currently outside of the CNRA<br>• preferred alternative, "No Lease" (same rationale as for State Parks)<br>• Again, another alternative for oil/gas might consider leasing, with a "No Surface Occupancy" stipulation.<br>• Requires coordination with the National Park Service § GMUG National Forest (two BOR reservoir areas within the Forest boundaries may be within the UFO Planning Area)<br>• Silver Jack Reservoir (Bostwick Park Project)- preferred No Lease (same rationale as for State Parks); also requires coordination with USFS<br>• Taylor Park Reservoir- (Uncompahgre Valley Project)- preferred No<br>• Lease (same rationale as for State Parks); also requires | |



Page 4

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109868

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | coordination with USFS <br> • Again, another alternative for oil/gas might consider leasing, with a "No Surface Occupancy" stipulation for these reservoir areas. <br> • Stipulations and Conditions of Approval- see listings under "State Parks." | |
| 7. | Alan Schroeder (Bureau of Reclamation, Cooperating Agency, via e-mail 5/16/2011) | Right of Way Corridors- In addition to the Westwide Energy Corridors, BLM should consider right-of-way corridors along the following features: <br> • US Highways 50 and 550 <br> • State Highways 92 and 133 <br> • Major oil/gas pipelines (KinderMorgan TransColorado, etc.) <br> • WAPA and other major electrical transmission lines | |
| | | *Via Cooperating Agency Meeting (5/12/2011)* | |
| | | *Renewable Energy* | |
| 8. | Alan Schroeder (Bureau of Reclamation) | We are interested in adding to Ridgway Dam and South Canal. | |
| 9. | Steve White (Montrose County) | When someone comes forward with a solar or wind proposal, is there another process? *Answer*: Yes, we have to go through NEPA for all projects. But if we can tier the assessment to our plan, it makes the process much easier. <br> If that's the case, I would think it would be better to say not where you want it but where you don't want it. <br> BLM: There will be some areas that are excluded. Exclusion means no rights-of-way (ground disturbance). Things that fall under ROWs: roads, renewable energy, transmission lines, reservoirs. In exclusion areas, this means no renewable energy. The exclusion areas are not random, but if we know that there is interest in renewable development, we want to make sure we look closely at that area to see if restriction is really warranted. We also want to know if there is anything in other plans so that we can try to be consistent. <br> Steve White (Montrose County): Montrose County plan will likely say it's allowed everywhere and then each project would be | |



BLM_0109869

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | evaluated individually. BLM: right now the verbiage is something to the effect of "If wind or solar applications are brought up, they would be allowed unless otherwise restricted." It's very flexible. Other plans are identifying "emphasis areas" where they know there is interest in such development. | |
| 10. | Joan May (San Miguel County) | One of the things that is difficult with these projects is that they are highly visible, you have to build roads to get to them, and they have to be close to existing transmission lines. | |
| 11. | Renzo DelPiccolo (Colorado Division of Wildlife) | I think we should consider making this a non-issue because DOE did an assessment for wind and this area falls into the marginal category. For solar, one of the big issues is water. It's hard to imagine a situation where we would put a solar plant on BLM… where would we get the water? Would it be private water? | |
| 12. | Susan Hansen (Delta County) | Could it just be an acknowledgment that in 30 years things could change but right now we can't identify any specific areas. | |
| 13. | Alan Schroeder (Bureau of Reclamation) | Is anyone discussing biomass? | In the forestry section we talk about biomass. It's not specific to carbon sinks. It guides to certain areas in the field office that might be appropriate. biomass also has constraints like solar on how far it is from who is using it, etc. |
| 14. | Alan Schroeder (Bureau of Reclamation) | On Gunnison Gorge, there are powersite withdrawals and they said no new facilities there. | |
| 15. | Jen Coates (Town of Ridgway) | San Miguel and Ouray Counties have a plan to generate 20% of energy from renewable in the next 20 years. The biggest issue with the renewable projects was visibility. We decided that it was a good idea but didn't want it to be so highly visible so we started looking at other options. The County has supported the Tri-County (Ridgway) hydro project. Action Item: Jen will e-mail the plan to BLM (Bruce). | |
| | | *Communication Sites (e.g., cell towers, radio stations, law enforcement communication, etc. most of what we have right now is "low power.")* | |



Page 6

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109870

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 16. | Pat Means (Town of Cedaredge) | Around Cedaredge area we have some holes in cell phone communication. There's also some plans to increase broadband. | |
| 17. | Susan Hansen (Delta County) | There's an initiative that started in San Juan called Operation Uplink to increase broadband access. | |
| 18. | Jen Coates (Town of Ridgway) | As part of statewide initiative, broadband is generally a top goal of most communities. | |
| 19. | Mike Pelletier (Gunnison County) | Working on getting DSL in Sommerset, don't know exactly where they are. Also getting cell service on Hwy 33. | |
| | | *Utility Corridors: Right now we don't have any designated corridors except for the West-wide Energy Corridor which was a nation-wide effort.* | |
| 20. | Barbara Peterson (Town of Paonia) | Is this going to go to the utility companies? | DMEA is on the RAC Subgroup, so they will know. Our realty specialist has also been in touch with Western Area Power Administration. |
| 21. | Barbara Peterson (Town of Paonia) | Is Source Gas on any committees? | No. |
| 22. | Steve White (Montrose County) | Have you looked at old O&G wells? Knowing that they could be produced if they could get access. | |
| 23. | Susan Hansen (Delta County) | Is railroad considered a utility? Oxbow considering new mines that would require railroad expansion. Don't want to preclude that. | |
| | | *Hunting Permits: In our current plans, it's pretty open. We evaluate the person to make sure they're going to follow the rules and such and then we issue a permit. We are thinking of limiting the number of permits. This would mean that the people who get permits wouldn't have to compete with other permitees. On the one hand, leaving it open, it makes the permitees have to compete with each other (free market). If you have a limit of 8, the 9th person is out of luck. On the other hand, if we limit the number, the value of their business goes up because the number of businesses allowed to is limited* | |
| 24. | Renzo DelPiccolo (Colorado Division of Wildlife) | The USFS does limit the number of permits and they give the permitee a specific area that they can outfit in and also limits the number of days they can be out. The BLM gives them a wider area, sometimes the whole Field Office. The BLM doesn't give a specific number of days, they just have to report back to BLM. They also | |


Page 7

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109871

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | hunt the lands differently. Outfitters on BLM tend to use vehicles more, stay in lodges, etc, where USFS is more tents, camping, and vehicles. We feel that setting limits makes sense. The quality might be better. Public hunters tend to maybe have conflicts (perceived?) with outfitters. | |
| 25. | Pat Means (Town of Cedaredge) | It seems to me that the more people who are out there create more of a safety hazard. Is that something to consider? | Renzo DelPiccolo (Colorado Division of Wildlife): That probably wouldn't change because the number of hunters wouldn't change. Everyone still has to get a permit. Whether you hire an outfitter or go on your own, it's still the same number of guns. |
| 26. | Charlie Sharp (US Fish and Wildlife Service) | Is there a higher success rate with outfitters versus private? | Renzo DelPiccolo (Colorado Division of Wildlife): Not really. Most people do it because of the conveniences. |
| 27. | Bill Long (Town of Nucla) | How would the businesses be better if there are a limited number of permits? There isn't competition. | Renzo DelPiccolo (Colorado Division of Wildlife): The cream rises to the top over the long-term. |
| 28. | Susan Hansen (Delta County) / Joan May (San Miguel County) | Is there a problem right now? | BLM (Barb): I don't perceive this as a problem right now. |
| 29. | Alan Schroeder (Bureau of Reclamation) | Where do the permittees go now? | They can go anywhere. |
| 30. | Alan Schroeder (Bureau of Reclamation) | How big is a game management unit? | CDOW: This largest is about half of the Plateau. The smallest is a couple thousand acres. |
| 31. | Joan May (San Miguel County) | Given limited resources, does BLM need one more thing to manage? The number might make it more difficult for BLM staff. | There are a few things. One is how we decide what the number is. Once we get there, it might make it easier on the staff. |
| 32. | Renzo DelPiccolo (Colorado Division of Wildlife) | One thing to consider is that for lions there is a quota so once a GMU meets the quota, they have to go somewhere else. So in that case we are less compelled to limit the number of permits. Most people who hunt lion use guides. | |



Page 8

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109872

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 33. | Susan Hansen (Delta County) | The way the Colorado system works, some people are waiting to see how they come out with lotteries in other states to see if they'll get a tag in Colorado. | |
| 34. | Pat Means (Town of Cedaredge) | If it's not a problem, why do you need to change it now? Unless it would be a problem to limit later. | |
| 35. | Charlie Sharp (US Fish and Wildlife Service) | Maybe instead of a set number for all GMUs you could have different numbers for different GMUs. | |
| 36. | Alan Schroeder (Bureau of Reclamation) | And it would seem that if you're not having a problem now and you limit it, it may become a problem. | |
| 37. | Jen Coates (Town of Ridgway) | Have other field offices done this? | BLM: other FOs have. Charlie Sharp: Little Snake doesn't have a cap per se, but they do look at it informally to direct outfitters to certain areas. |
| 38. | Pat Means (Town of Cedaredge) | Who does the count of how many animals are out there? | DOW. |
| 39. | Susan Hansen (Delta County) | I think let free-enterprise take care of it. | |
| | | *Organized Group Permits: In our SRP program, in order to protect certain resources, we can set thresholds for when permits would be required for groups. Right now there are no thresholds. For example, we know that there is a "group" that will be coming to BLM over Memorial Day to do some extreme Jeeping. To clarify, these are not across-the-board restrictions. Certain places might have different restrictions.* | |
| 40. | Joan May (San Miguel County) | Yes, a limit is needed. There are of impacts that can happen. | |
| 41. | Barbara Peterson (Town of Paonia) | Agree. Plus with a group permit you have set areas you can be in and requirements. | |
| 42. | Steve White (Montrose County) | I think the vehicle numbers are a little high. The vehicle number should be lower. | |
| 43. | Steve White (Montrose County) | How do you know who organized the event and who would you give a citation to if they didn't get the permit? | Well sometimes it would be difficult but most people would good about it, probably. |



Page 9

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109873

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 44. | Steve White (Montrose County) | The biggest issue is noise. We don't have a noise ordinance. | We can put those requirements in the permit such as be quiet by 10:00. |
| 45. | Steve White (Montrose County)/ Joan May (San Miguel County) | A number is good but they need to be more restrictive than what is proposed. | |
| 46. | Jen Coates (Town of Ridgway) | What does a permit do for you? | There is a charge which is set nationally, I think $5 per person. Essentially we would be able to ask the permit holder to have toilets, make them park in a certain area, etc. These would be requirements so if they don't have a permit there could be legal recourse. |
| 47. | Bill Long (Town of Nucla) | You could have some areas with no limits. | |
| | | *Target Shooting: This is different than hunting. We have to provide public safety and in some areas there is currently, perhaps, a safety issue. We couldn't post it everywhere, but we'd post it on the Web site, in rec sites, kiosks, etc. It would also give recourse to property owners to call law enforcement.* | |
| 48. | Joan May (San Miguel County) | It seems like a good idea. You should show the areas where you can go target shoot. | |
| 49. | Alan Schroeder (Bureau of Reclamation) | Safety is a major issue so if you can find some places with a good backstop so people can't come up from behind, that would be good. Also having requirements that people have to clean up their shells and trash. | |
| 50. | Steve White (Montrose County) | I have no problem with residences, that makes sense. But perhaps from powerlines from facilities. It seems like you're trying to regulate people that have no common sense and people who don't have common sense are still going to be doing those things and not picking up after themselves. From a Montrose County perspective, I think you'd get some pushback for this. | |
| 51. | Susan Hansen (Delta County) | How are you going to enforce this? | Well it would be enforceable if you saw it. |



Page 10

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109874

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 52. | Jen Coates (Town of Ridgway) | Did you consider designating specific areas for target shooting? | Our policy now nationally is that if a community wants to have a target shooting area, the BLM will work with that group to lease the land and if the area worked out we might transfer the land to them. The BLM is not in the business of running businesses, we manage land. Because of the hazardous waste that it creates, it becomes more of a cleanup process and safety issue. |
| 53. | Renzo DelPiccolo (Colorado Division of Wildlife) | You wonder if having a range would funnel people to those areas so there wouldn't be problems elsewhere. Probably not. There are also some laws about public safety. The reality is that there are few shooting accidents. It's more of an annoyance. | |
| 54. | Barbara Peterson (Town of Paonia) | It should be "manned" locations, not just any developed facility. | |
| 55. | Joan May (San Miguel County) | Maybe it should be greater than 0.25-mile. Noise travels far and you could be not on the edge of BLM land and still be bothered by it. | |
| | | *North Delta OHV Open Area: There is an "open" area just north of Delta. There is a federally threatened plant (cactus) in the area. We're not sure if we could get through the consultation process with USFWS leaving it open. In the last plan we said we'd survey for plants but never did. There are a lot of routes out there. One of our options is to limit travel in the area to designated routes. There are a lot of routes out there already, fewer in the northern area. Open means you can go anywhere you want (cross-country).* | |
| 56. | Pan Means (Town of Cedaredge) | What is the economic impact? | It's local day-use. |
| 57. | Susan Hansen (Delta County) | Do you have many open areas in the FO? Except for the cactus it's a good place to go. | There are two areas in the Gunnison Gorge NCA and the North Delta area. So in this planning area it's just North Delta. The other issue there [besides cactus] is selenium. There is a very high selenium content in the area which can negatively impact fish. We are under a mandate to protect listed species that could be impact by the runoff. |


Page 11

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109875

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 58. | Steve White (Montrose County) | Have they studied it to see if the shale is on the top? We are putting the issue on hold in our plan because the science doesn't seem to be conclusive. The issues we saw didn't seem to be enough to create a problem. We found that septic systems even have a limited impact on percolation. If there are areas that are undisturbed that you could leave undisturbed and maybe around the cactus, you could do that. Maybe limit the facilities. | |
| 59. | Alan Schroeder (Bureau of Reclamation) | What about sediment retention ponds below the open area. | |
| 60. | Mike Pelletier (Gunnison County) | Is dust an issue? | Don't know. |
| 61. | Jen Coates (Town of Ridgway) | Is it feasible to map the trails? | Yes. |
| 62. | Pan Means (Town of Cedaredge) | So what is the problem? | Well one problem is the cactus and by saying it's open, you could be going contrary to federal law. The other issue is that federal land managers are moving towards a designated roads system, so do you want to say designated roads everywhere except here. In the GGNCA we've had success designating routes and improving the safety. |
| 63. | Steve White (Montrose County) | How would you manage for designated routes? | In GGNCA we put up a lot of fences and marked all of the routes. We've found that people generally stay on the routes. The routes provide challenges. |
| 64. | Susan Hansen (Delta County) | Is there a perception that there is a choice and if you take the choice away, people won't like it. | |
| 65. | Charlie Sharp (US Fish and Wildlife Service) | We know there are plants there, but it's probably lower density and not very good habitat. As far as consultation goes, there probably won't be much of a difference between designation vs. open because we'd require a 100-meter buffer survey from all routes. Doing route-by-route designation would be preferable. | |
| | | *Ouray County's plans for gravel pit northeast of Ridgway and within* | |



Page 12

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109876

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | *potential Ridgway Trails SRMA:* | |
| 66. | Barb Sharrow (BLM Field Manager) | There is an existing gravel pit and in the same area we've had a group proposing a trail system. Barb met with Ouray County and we are going to try to do both (gravel pit and trail system). Because of laws, some existing routes will have to be closed immediately. This is an issue that came up in RMP planning that will have to be resolved more immediately. | |
| | | *Colorado State/CDOW lands open or closed to oil/gas leasing, or having No Surface Occupancy on those lands:* *Note:* For lands that are already leased, this plan will not affect those leases. The restrictions in this plan would be applied to new leases or leases that expire. | |
| 67. | Alan Schroeder (Bureau of Reclamation) | On State Parks, they're Reclamation lands operated by state parks. I would say a range of alternatives. Our preference would be No Lease. With NSO a lot of the areas are so narrow and small that the visual aspect will come into play and be difficult. Water quality may become an issue. We would also like protection of our facilities so no drilling within 1500 feet of our facilities from any direction. | |
| 68. | Barbara Peterson (Town of Paonia) / Jen Coates (Town of Ridgway) | I know my people would not want to see any occupancy at all either above or below. | |
| 69. | Barbara Peterson (Town of Paonia) | We also need protection for source water protection areas. | |
| 70. | Renzo DelPiccolo (Colorado Division of Wildlife) | For DOW lands (e.g., Billy Creek, Dry Creek Basin) we have asked for NSO. The state has purchased those lands for hunting and such and O&G is not compatible. So we would ask for NSO. For occupied Gunnison sage-grouse (regardless of surface ownership) we would ask for no leasing. San Juan RMP is considering this for all federal mineral estate. | |
| 71. | Charlie Sharp (US Fish and Wildlife Service) | You might consider historical habitat as well in some cases. | |


Page 13

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109877

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 72. | Bruce Krickbaum (BLM) | What about school board lands? | Renzo DelPiccolo (Colorado Division of Wildlife): In my experience they would lease the lands to generate money. |



BLM_0109878

**James Bode**

| | |
|---|---|
| **From:** | bkrickba@blm.gov |
| **Sent:** | Thursday, May 26, 2011 10:14 AM |
| **To:** | Angie Adams; Kate Wynant |
| **Cc:** | UFO AR |
| **Subject:** | Fw: Bighorn sheep/domestic sheep alternative |
| **Attachments:** | DBC_TransactionsVolume34 39.pdf; BLM_Bighorns_1992.pdf |

FYI.


----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 05/26/2011 10:11 AM -----

Melissa
Siders/MOFO/CO/BL
M/DOI                              To
                  Dave Kauffman/MOFO/CO/BLM/DOI,
05/25/2011 07:54          Barbara
AM                  Sharrow/MOFO/CO/BLM/DOI@BLM, Bruce
                  Krickbaum/MOFO/CO/BLM/DOI@BLM
                                      cc
                  Lynae Rogers/MOFO/CO/BLM/DOI@BLM,
                  Heidi Plank/GJFO/CO/BLM/DOI@BLM,
                  Benjamin Z
                  Blom/GJFO/CO/BLM/DOI@BLM, Katie A
                  Stevens/GJFO/CO/BLM/DOI@BLM
                                  Subject
                  Fw: Bighorn sheep/domestic sheep
                  alternative




FYI ... I need to read through this all more carefully, but this should go into the RMP project record, and we'll have to have discussion (next week?) about where to go from here.  I've highlight the key points.

Katie, Blen, and Heidi,
This is for your information for the DE RMP.

-Missy

^v^  ^V^  ^v^   ^v^ ^V^  ^v^ ^V^  ^v^  ^v^

1

BLM_0109879

Melissa Siders, Wildlife Biologist
Uncompahgre Field Office
2465 S. Townsend Ave., Montrose CO 81401
970-240-5332 - office  970-596-0550 - cell
e-mail:  Melissa_Siders@blm.gov
^v^  ^V/^  ^v^   ^v^ ^V^  ^v^ ^V^  ^v^  ^v^
"In the end, we will conserve only what we love.
We will love only what we understand.
We will understand only what we are taught."
-Baba Dioum, Senegal, West Africa
----- Forwarded by Melissa Siders/MOFO/CO/BLM/DOI on 05/25/2011 07:30 AM
-----

          "Banulis, Brad"
          <Brad.Banulis@sta
          te.co.us>                          To
                              <msiders@blm.gov>,
          05/20/2011 05:40         <lbroger@blm.gov>
          PM                                cc


                              Subject
                          FW: Bighorn sheep/domestic sheep
                          alternative




Hi Lynae and Missy-

I'm sending this again, as the first time I sent it the email attachments were too big.  So, I will be sending you a series of emails with the attachments.  This includes the first 2 attachments.

Cheers,

Brad Banulis
Terrestrial Biologist, Area 18
Colorado Division of Wildlife
2300 S. Townsend Ave.
Montrose, CO  81401
(970)252-6051
http://wildlife.state.co.us/

From: Banulis, Brad
Sent: Friday, May 20, 2011 5:36 PM
To: 'msiders@blm.gov'; 'lbroger@blm.gov'
Cc: Watson, Garett; Swygman, Ryan; Delpiccolo, Renzo; Wait, Scott

BLM_0109880

Subject: Bighorn sheep/domestic sheep alternative

Hi Lynae and Missy-

I wanted to follow up with our discussion about the "Domestic Sheep/Goats and Bighorn Preferred Alternative" that Lynae presented to Garret Watson, Ryan Swygman, and I.  I appreciate the time invested in trying to develop a preferred alternative for a topic that is garnering national attention for the conservation and preservation of bighorn sheep as well as the preservation of a way of life for the domestic sheep producer.  However, it is our opinion that the draft alternative, and in particularly the "Criteria for Risk Levels" table, does not fully reflect the actions needed to preserve desert bighorn sheep.

The Colorado Desert Bighorn Sheep Management Plan developed and signed by the BLM and CDOW states that "It is Colorado BLM policy that management for desert bighorn sheep will be given equal consideration with all other uses of the public land as issued in the land use decision-making documents".
Therefore, the conservation of bighorn sheep should have equal standing to domestic sheep grazing and all actions should be implemented to maintain desert bighorn sheep populations alongside domestic sheep grazing operations.
The problem, as has been agreed upon in BLM-MOU-CO-482, is that bighorn sheep and domestic sheep should not intermingle as there is a significant threat for disease transmission from domestic sheep to bighorn sheep that can have fatal consequences for bighorn sheep as well as long term poor recruitment post epidemic for the bighorns that survive.
Multiple memorandums and guidelines (Desert Bighorn Council 1990, BLM Instruction Memorandum No. 92-264 and 98-140, WAFWA 2010) suggest that "no domestic sheep or goat grazing should occur within 9 miles surrounding desert bighorn habitat, except where topographic features or other barriers prevent physical contact".  Therefore, evaluating the risk of interaction between domestic sheep and bighorn sheep should be evaluated as if there is overlap of grazing area and bighorn sheep habitat you have a "high" risk of interaction and disease transmission, if domestic sheep grazing occurs within the buffer zone (corrected for topography and natural barriers) then a medium risk level could be given, and finally if domestic sheep grazing occurs outside the buffer zone you have a low risk for transmission.
Furthermore, desert bighorn sheep within S-62 do not appear to be migratory, therefore they should be considered to be using the mapped habitat year round.  As far as "Timing/Season of Use" in relation to sheep grazing, the desert bighorns' (in S-62 and S-56) primary breeding season appears to be between late July and mid November based on observed lambs; however, desert bighorn sheep across their entire range have been documented to breed year round.

I have provided copies of the referenced MOU's and guidelines for your files if you have not seen them.  We really appreciate the opportunity to meet with you and discuss this alternative development as well as all elements related the development of the new Resource Management Plans.  We hope this is helpful in the refinement and development of a final preferred alternative that protects and ensures the health of bighorn sheep within the boundary of the Uncompahgre Field Office and Dominguez-Escalante National Conservation Area boundaries.  Also, I am still in the process of getting a meeting set up with our Wildlife Veterinarian to give us (CDOW staff and BLM staff) an update on what is going on in the state and throughout the west on bighorn sheep/domestic sheep research, so I will be sure to contact you with available dates as soon as possible.

Regards,


Brad Banulis
Terrestrial Biologist, Area 18
Colorado Division of Wildlife
2300 S. Townsend Ave.
Montrose, CO  81401
(970)252-6051
http://wildlife.state.co.us/
 (See attached file: DBC_TransactionsVolume34 39.pdf)(See attached file: BLM_Bighorns_1992.pdf)

BLM_0109881

# GUIDELINES FOR MANAGEMENT OF DOMESTIC SHEEP IN THE VICINITY OF DESERT BIGHORN HABITAT

Technical Staff
Desert Bighorn Council

The Bureau of Land Management (BLM) requested that the Technical Staff (Tech Staff) of the Desert Bighorn Council (DBC) prepare management guidelines for domestic sheep in the vicinity of desert bighorn habitat. Desert bighorn habitat includes all geographic areas that would provide for the life requisites of desert bighorn sheep, as defined by state wildlife and/or land management agencies. This request followed a meeting of BLM biologists concerned with problems resulting from interactions between bighorn sheep (Ovis canadensis ssp.) and domestic sheep (O. aries).

The Tech Staff understands that 2 additional factors should be considered. First, the BLM has prepared, or is preparing, land use planning documents in several western states (Nev., Ariz., Colo., and Ut.) that would allow reintroduction of desert bighorns (O. c. nelsoni, O. c. mexicana, and O. c. cremnobates) into suitable historic habitat. Several potential bighorn reintroductions in Nevada have been contested by the livestock industry; e.g., woolgrowers and cattlemen. They contend that bighorn reintroductions will seriously hamper their ability to graze livestock of their choice on public lands. Second, in 1989, the BLM issued a "Rangewide Plan for Managing Habitat of Desert Bighorn Sheep on Public Lands," which states "Livestock grazing on desert bighorn habitats will be managed via land-use or activity plans to mitigate impacts to desert bighorns and their habitats to ensure objectives for desert bighorn are achieved."

The DBC is comprised of state fish and game and federal agency biologists, private research organizations, academia, and the public. The 4 primary objectives of the DBC are to: provide for the exchange of information on the needs and management of desert bighorns; stimulate and coordinate studies in all phases of the life history, ecology, management and protection, recreational, and economic uses of desert bighorns; provide a clearinghouse for information among all agencies, organizations, and individuals professionally engaged in work on the desert bighorn; and function in a professional advisory capacity, where appropriate, on local, national, and international questions involving the management and protection of desert bighorn.

The DBC's Tech Staff is comprised of 7 elected members. One of the functions of the Tech Staff is to answer requests from agencies and organizations such as the BLM, regarding desert bighorn management.

This document describes problems associated with domestic sheep and bighorn interactions, with emphasis on diseases. Recommendations are then provided to minimize interaction, especially physical contact between domestic and bighorn sheep.

The Tech Staff appreciates the opportunity to consider the problems and develop these guidelines, with the underlying goal of eliminating domestic sheep and bighorn conflicts on public lands.

## BACKGROUND

Current bighorn numbers are <2% of what they were prior to the coming of European man and his livestock and firearms (Wagner 1978). Following enormous population declines in the late 1800s and early 1900s, bighorn populations did not recover, in contrast to other wildlife species such as mule deer (Odocoileus hemionus) and elk (Cervus elaphus). Bighorns have demonstrated much less tolerance than other na-

tive North American ungulates to poor range conditions, interspecific competition, overhunting, and stress caused by loss of habitat. Furthermore, they have shown a much greater susceptibility to diseases (Goodson 1982).

Bighorns have died from a wide variety of diseases that they have contracted from domestic sheep. These include scabies (a major cause of mortality in the 1800s and as late as the 1970s in New Mexico), chronic frontal sinusitis, internal nematode parasites (worms), pneumophilic bacteria, footrot, parainfluenza III, bluetongue, and soremouth (contagious echthyma) (Jessup 1985). Documented bighorn die-offs were recorded as early as the mid-1800s and have continued up to the present (Jessup 1985, Goodson 1982, Foreyt and Jessup 1982, Sandoval 1988, Weaver 1988). Die-off documentation covers not only desert bighorns, but also California bighorns (O. c. californiana) and Rocky Mountain bighorns (O. c. canadensis). Bighorn die-offs have occurred in every state in the western United States.

In broad perspective, when there has been contact between apparently healthy bighorns and domestic sheep, the bighorns die within a few days to a few weeks. While many diseases or stress factors may be involved, bighorns exposed to domestic sheep almost invariably die from pneumonia.

Little is known about the actual mechanism(s) that lead to the demise of bighorns after they have come into contact with domestic sheep. In all of the cases of bighorn die-offs following direct contact with domestic sheep or overlap of grazing in bighorn ranges, 2 things are apparent.

1. There is a preponderance of evidence (Table 1) strongly linking the presence of domestic sheep with the subsequent loss of part or all of the affected bighorn population. Of the 25 documented cases (Table 1) 4 of the situations were in controlled laboratory experiments in 3 states, and 2 were in situations where bighorns were penned in large paddocks.

2. The effects have all been 1 way—bighorns have died, while domestic sheep never have suffered ill effects because of coming into contact with bighorn. The prevailing theory on why this has occurred can be summed up as follows: New World sheep (bighorns) are so susceptible to diseases of Old World sheep (domestics) because the bighorns did not co-evolve with the above-listed diseases, as did domestic sheep. Bighorns have not developed effective immunity against these diseases. Domestic sheep are inoculated or, through natural selection over hundreds of years, have developed a resistance against some of these diseases, but carry blood titers for most of them. When there is contact between bighorns and domestic sheep, the bighorns have little defense. This theory is analogous to the accepted explanation for the transmission of human diseases carried to the Native Americans by Europeans. The Native American populations had no immunity to Old World diseases and suffered many documented die-offs.

## RECOMMENDATIONS

The DBC Tech Staff has reviewed the bighorn sheep problem and developed recommendations for eliminating domestic and bighorn sheep conflicts on public lands. They consist of 1 general recommendation and 4 specific recommendations dealing with buffer strips, livestock supervision, trailing, and reintroductions. Each recommendation is preceded by a statement of the issue, followed by a justification.

### General Recommendation

Issue.—Desert bighorn that come into contact with domestic sheep die as a result of the contact.

Recommendation.—Domestic sheep in the vicinity of desert bighorn ranges should be managed so that desert bighorn never come into contact with domestic sheep nor the disease organisms that domestic sheep carry.

Justification.—Evidence (Table 1) indicates that contact with domestic sheep is almost invariably lethal to desert bighorn. The recommendations that follow deal with methods to minimize interaction, especially physical contact between domestic and bighorn sheep.

BLM_0109882

**34   GUIDELINES**

*Table I.   Bighorn declines and die-offs resulting from contracts with domestic sheep.*

| Location | Cause of die-off | Results | Year(s) | Source |
|---|---|---|---|---|
| Sun River, Mont. | | >70 died | 1910–35 | Goodson (1982) |
| Upper Rock Ck., Mont. | | All died | 1965–70s | Goodson (1982) |
| Thompson Falls, Mont. | | All died | 1940–60 | Goodson (1982) |
| Kootenay National Park, B.C., Can. | Pneumonia | | 1939 | Goodson (1982) |
| Bull River, B.C., Can. | Pneumonia | 96% died | 1965 | Bandy (1968) in Goodson (1982) |
| MacQuire Creek, B.C., Can. | Pneumonia | | 1981–82 | Davidson in Goodson (1982) |
| Lava Beds National Monument, Calif.[a] | Pneumonia | All died | 1980 | Blaisdell (1982) |
| Mormon Mts., Nev. | Pneumonia | 50% died | 1980 | Jessup (1981) |
| Dinosaur National Monument, Colo. | | All died | 1950 | Barmore (1962) in Goodson (1982) |
| Rock Creek, Mont. | | 8 left | 1900–20 | Goodson (1982) |
| Rocky Mtn. National Park, Colo. | Pneumonia | All died | 1917–30 | Packard (1939a, 1939b) in Goodson (1982) |
| Methow Game Range, Wash.[a] | Pneumonia | 13 of 14 died | 1979–81 | Foreyt and Jessup (1982) |
| Warner Mt., Calif. | Pneumonia | All died | 1988 | Weaver (1988) |
| Oregon | Scabies | | 1936 | Lange (1980) |
| California | Scabies | | 1870–79, 1898 | Jones (1900) in Lange (1980) |
| Grey Bull River, Wyo. | | | 1881 | Honess and Frost (1942) in Lange (1980) |
| Wyo., Mont. | | | 1885 | Hornaday (1901 in Lange (1980) |
| Colo. | Scabies | | 1859–31 | Packard (1946) in Lange (1980) |
| Rocky Mtn. National Park, Colo. | Scabies | | 1878–1903 | Lange (1980) |
| Latir Parks, N.M. | Pneumonia | All died | 1978–82 | Sandoval (1988) |
| Utah St. Univ., Utah[b] | Pneumonia | All died | 1970s | Spillett in Goodson (1982) |
| Univ. B.C., Can.[b] | Pneumonia | All died | 1970s | Hebert in Goodson (1982) |
| Colorado St. Univ., Colo.[b] | Pneumonia | All died | 1970s | Hibler in Goodson (1982) |
| Utah St. Univ., Utah[b] | Pneumonia | 4 of 5 died | 1988 | T. D. Bunch (Utah State Univ., pers. commun.) |

[a]Large pen or paddock.
[b]University controlled conditions.

## Specific Recommendation 1: Buffer Strips

Issue.—Desert bighorn and domestic sheep must be spatially separated to minimize the possibility of these 2 species coming into contact.

No domestic sheep grazing should be authorized or allowed within buffer strips ≥13.5 km wide surrounding desert bighorn habitat, except where topographic features or other barriers prevent any interaction.

*Justification.*—Armentrout and Brigham (1988) recommended a 13.5-km-wide separation strip as optimum, based on 9 cited literature sources. Bighorn and domestic sheep separation distances cited in the literature range from 3.2 to 32 km. The California Department of Fish and Game (1983), in its discussion of conflicting land uses, recommended that domestic sheep grazing be eliminated within 3.2 km of bighorn habitat where feasible. The 3.2-km buffer strip also is included in the Mina Habitat Management Plan in Nevada (U.S. Dep. Interior, BLM 1988a) in ≥1 land-use plan in the Boise, Idaho BLM District (Goodson 1982); and in the Winnemucca, Nevada BLM 1978 grazing Environmental Impact Statement for the Sonoma-Gerlach Resource Area. A 9.6-km-wide buffer strip was recommended in the Lahontan Resource Management Plan (RMP) and the Stillwater Habitat Management Plan in Nevada (U.S. Dep. Interior, BLM 1985, 1986b). The widest recommended buffer (32 km) was used in Arizona. A 32-km buffer was agreed upon in the original Memorandum of Understanding (MOU) between the BLM and Arizona Game and Fish Department. However, when the master MOU was redrafted in 1976, the section relating to domestic sheep grazing in bighorn habitat was not included (Gallizioli 1980). Situations involving potential bighorn and domestic sheep conflicts in Arizona now are handled on a case-by-case basis.

The reason for the 32-km buffer strip was concern over the chronic frontal sinusitis in desert bighorn. This disease occurs when bot fly (*Oestrus*) ovis) larvae enter the sinus cavities of bighorns, grow too large to get out, and die, thus infecting the bighorn (Bunch 1978). Sinus cavities in desert bighorns are much larger than those in domestic sheep. The major unanswered question asked by biologists in the 1970s was "what is the range of the bot fly?" Although the U.S. Department of Agriculture has investigated this question, there is no definitive answer, as it depends upon variables such as temperature, precipitation, and wind. The 32-km buffer strip, however, was felt to be adequate (Gallizioli 1980).

Another problem when considering buffer strips is that young (3–4 yr old) desert bighorn, especially rams, tend to travel extensively (≤64 km). Extensive travel by bighorns increases the potential for nose-to-nose contact with domestic sheep. Nose-to-nose contact and resultant transmission of disease(s) was blamed for the catastrophic loss of penned bighorns at the Lava Beds National Monument, California in 1980 (Blaisdell 1982) and in the total population loss of transplanted bighorns in the Warner Mountains, California, in 1988 (Weaver 1988).

Considering all the evidence presented above and cited in Armentrout and Brigham (1988), the Tech Staff feels that buffer strips of ≥13.5-km are needed to minimize the potential of disease transmission, including chronic frontal sinusitis, and to avert nose-to-nose contact between wandering bighorns and domestic sheep.

## Specific Recommendation 2: Livestock Supervision

Issue.—Domestic sheep must be closely and carefully herded to prevent them from straying into desert bighorn range.

Recommendation.—Domestic sheep that are trailed or grazed outside the 13.5-km buffer, but in the vicinity of desert bighorn ranges, should be closely supervised by competent, capable, and informed herders.

*Justification.*—There is virtually no practical way to control movements of young bighorns, but control of domestic sheep is possible. The key to minimizing impacts by domestic sheep upon bighorns is very close supervision of domestic bands by herding, both while trailing and grazing. Both the Warner Mountains and Lava Beds bighorn die-offs were attributed to stray domestic sheep. Had domestic sheep herding been more intensive, neither of these catastrophes probably would have occurred.

Sheep herders and their control of domestic sheep bands vary considerably. Many herders come to the United States from other countries,

BLM_0109883

especially South America. Many have never herded sheep before their am val in the U.S. Permittees who graze domestic sheep on public lands should ensure that their herders are competent and capable and that herders understand the potential problems that may be caused by straying domestic sheep.

The Tech Staff recognizes that the BLM's grazing regulations may need modification to further implement this recommendation. Existing regulations provide that the authorized officer can require herders. The regulations also could be strengthened to allow impoundment of stray domestic sheep, whenever they are found in occupied bighorn habitat. This recommendation could be partially implemented by directives requiring that BLM area managers, range conservationists, and wildlife biologists meet with the permittees and their herders to explain the importance of close supervision by the herders and what could result if domestic sheep are allowed to stray.

**Specific Recommendation 3: Trailing**

Issue.—Domestic sheep being trailed near desert bighorn range are likely to transmit diseases to bighorns, especially when ewes are in estrus.

Recommendation.—Domestic sheep should be trucked rather than trailed, when trailing would bring sheep closer than 13.5 km to bighorn range. Trailing should never occur when domestic ewes are in estrus.

Justification.—Many domestic sheep are still trailed between grazing allotments. The Tech Staff recommends that domestic sheep be trucked whenever possible to minimize possible contact with bighorns. Close supervision by herders is essential. The time of trailing also is important. When domestic ewes are in estrus, they will attract bighorn rams from distances >3.2 km. The Tech Staff recommends, therefore, that domestic sheep not be trailed closer than 13.5 km to occupied bighorn habitat. Domestic sheep also should not be trailed when ewes are in estrus, to reduce potential for bighorn sheep contact. This prescription should be included in BLM grazing regulations as part of the supervision and husbandry requirements.

**Specific Recommendation 4: Reintroduction**

Issue.—Ranges formerly occupied by domestic sheep can harbor diseases detrimental to desert bighorn.

Recommendation.—Bighorn sheep should not be reintroduced into areas where domestic sheep have grazed during the previous 4 years.

Justification.—Our concern involves bighorn reintroductions into habitats formerly occupied by domestic sheep. The Tech Staff does not advocate the co-use of bighorn habitat by both bighorn and domestic sheep. Two diseases that could be transmitted to bighorn after domestic sheep have been removed are footrot and soremouth (Jessup 1985, Kistner 1982). Both of these diseases can lie in the soil and, when conditions are right, be transmitted to bighorns. The soremouth virus can remain viable in the soil for 10 to 20 years (Jessup 1985, Lance 1980).

*SUMMARY*

The DBC Tech Staff herein has identified some of the problems associated with bighorn and domestic sheep interactions, and has rec-

ommended procedures that should eliminate or reduce contact between domestic and desert bighorn sheep. These recommendations include: no nose-to-nose contact between bighorn and domestic sheep; a minimum of a 13.5-km-wide buffer strip between ranges used by domestic sheep and bighorns; trucking of domestic sheep in preference to trailing, and no trailing when domestic ewes are in estrus; and no bighorn reintroductions onto areas that have been grazed by domestic sheep during the previous 4 years.

*REFERENCES CITED*

Armentrout, D. J. and W. R. Brigham. 1988. Habitat suitability rating system for desert bighorn sheep in the Basin and Range Province. U.S. Dep. Interior, Bur. Land Manage. Tech. Note 384. 18pp.

Blaisdell, J. A. 1982. Lava beds wrap-up—what did we learn? Desert Bighorn Counc. Trans. 26:32–33.

Bunch, T. D., S. R. Paul, and H. Crutchen. 1978. Chronic sinusitis in the desert bighorn (Ovis canadensis nelsoni). Desert Bighorn Counc. Trans. 22:16–20.

California. 1983. A plan for bighorn sheep in California. Calif. Dep. Fish and Game. 11pp.

Foreyt, W. J. and D. A. Jessup. 1982. Fatal pneumonia of bighorn sheep following association with domestic sheep. J. Wildl. Diseases 18:163–168.

Gallizioli, S. 1980. Memo from the Arizona Game and Fish Dep. to Clair M. Whitlock, BLM State Director, Arizona. 3pp.

Goodson, N. 1982. Effects of domestic sheep grazing on bighorn sheep populations: a review. Northern Sheep and Goat Counc. 3:287–313.

Jessup, D. A. 1981. Pneumonia in bighorn sheep: effects on populations. Transactions of Cal-Neva Wildlife (Annual meeting of the Western Section of the Wildlife Society and California-Nevada Chapter of the American Fisheries Society). 72–78pp.

———. 1985. Diseases of domestic livestock which threaten bighorn sheep populations. Desert Bighorn Counc. Trans. 29:29–33.

Kistner, T. P. 1982. Letter to Josh Warburton, BLM, Burns, Oregon. 11pp.

Lance, W. E. 1980. Implications of contagious echthyma in bighorn sheep. Northern Sheep and Goat Counc. 2:16–18.

Lange, R. E., Jr. 1980. Psoroptic scabies in wildlife in the United States and Canada. Desert Bighorn Counc. Trans. 24:18–20.

Sandoval, A. V. 1988. Bighorn sheep die-off following association with domestic sheep : case history. Desert Bighorn Counc. Trans. 32:36–37.

U.S. Dep. Interior, BLM. 1985. Lahontan resource management plan, Carson City District, Nevada. 150pp.

———. 1988a. Mina habitat management plan, Carson City District, Nevada. 60pp.

———. 1988b. Stillwater habitat management plan, Carson City District, Nevada. 40pp.

Wagner, F. H. 1978. Western rangeland: troubled American resource. Trans. North Amer. Wildl. Conf. 43:453–461.

Weaver, R. A. 1988. Status of bighorn sheep in California, 1987. Desert Bighorn Counc. Trans. 31:20.

BLM_0109884



*Jim Alterman*
*SWRO*  *FYI*
*PDO*

# United States Department of the Interior

BUREAU OF LAND MANAGEMENT

WASHINGTON, D.C. 20240

June 18, 1992   *ajLythe +*
*Kahn*

IN REPLY REFER TO.

6630 (240/220)

*cc - Gill*
*: Miller*

EMS TRANSMISSION 6/24/92
Instruction Memorandum No. 92-264
Expires 9/30/93

To:      AFO's, SCD

From:    Director

Subject: Guidelines for Domestic Sheep Management in Bighorn
         Sheep Habitats

Attached is a copy of the revised guidelines for domestic sheep
management in bighorn sheep habitats which replace those issued via
Information Bulletin No. 92-212. These guidelines were prepared by
representatives of the organizations listed below at a meeting in
Denver, Colorado, on May 22-23, 1992. The guidelines represent
consensus among the participants and should be followed in current
and future bighorn/domestic sheep use areas.

- Foundation for North American Wild Sheep;
- Desert Bighorn Council;
- American Sheep Industry Association;
- Western Association of Fish and Wildlife Agencies;
- Veterinarians from California (Dr. Dave Jessup), Idaho
  (Dr. Dave Hunter), and Wyoming (Dr. Tom Thorne);
- An Immunobiologist from Idaho (Dr. Alton Ward);
- BLM - Division of Rangeland Resources; and
- BLM - Division of Wildlife and Fisheries.

Please note that these guidelines will be reviewed every 3 years.
Should you have any questions on these guidelines, please contact
Jim Fox (202/653-9193) or Dave Almand (202/653-9202).

Mike Penfold
Assistant Director, Land and
Renewable Resources

1 Attachment
   1 - Guidelines for Domestic Sheep Management in Bighorn Sheep
       Habitats, (3 pp)

*CC: Towry*
*Oondio*
*Mott*
*Masden*
*Clark*

BLM_0109885

Guidelines
for
Domestic Sheep Management in Bighorn Sheep Habitats

The Bureau of Land Management desires progressive bighorn sheep management compatible with appropriate grazing on public lands by domestic sheep.

It is recognized by State and Federal agencies, bighorn sheep organizations, and the domestic sheep industry that:

- There appears to be some diseases that are shared by domestic and bighorn sheep. There is evidence that if bighorn and domestic sheep are allowed to be in close contact, health problems and die offs may occur. Some diseases may be transmitted between both species;

- There are bighorn sheep die offs that occur with no apparent relationship to contact with domestic sheep;

- The above two observations are both valid and not mutually exclusive;

- Bacterial pneumonias are not the only diseases of concern, although perhaps they are the most catastrophic;

- The risks of disease transmission are often unknown; they may, however, be site specific, and;

- Reasonable efforts must be made by domestic sheep permittees and wildlife and land management agencies to minimize the risk of disease transmission, and to optimize preventive medical and management procedures, to ensure healthy populations of bighorn sheep and domestic sheep.

In recognition of the above factors, the guidelines set forth below should be followed in current and future bighorn/ domestic sheep use areas.

1.   State wildlife and Federal land management agencies, bighorn interests groups, and domestic sheep industry cooperation and consultation are necessary to maintain and/or expand bighorn sheep numbers.

2.   When agency and industry agreement has been reached to maintain and/or expand bighorn sheep numbers, the agencies and the domestic sheep industry will be held harmless in the event of disease impacting either bighorns or domestic sheep.

BLM_0109886

3.   Domestic sheep grazing and trailing should be discouraged in the vicinity of bighorn sheep ranges.

4.   Bighorn sheep and domestic sheep should be spatially separated to discourage the possibility of coming into physical contact with each other.

5.   Buffer strips surrounding bighorn sheep habitat should be encouraged, except where topographic features or other barriers prevent physical contact between bighorn and domestic sheep. Buffer strips could range up to 13.5 kilometers (9 miles), depending upon local conditions and management options.

6.   Domestic sheep should be closely managed and carefully herded where necessary to prevent them from straying into bighorn sheep areas.

7.   Trailing of domestic sheep near or through occupied bighorn sheep ranges may be permitted when safeguards can be implemented to adequately prevent physical contact between bighorns and domestic sheep.

8.   Unless a cooperative agreement has been reached to the contrary, bighorn sheep should only be reintroduced into areas where domestic sheep grazing is not permitted, and the allotment(s) in which bighorns are to be reintroduced should not have been used for domestic sheep grazing for two or more years prior to the bighorn release.

9.   In certain special circumstances, extraordinary precautions will be followed to protect federally listed threatened or endangered subspecies; State listed subspecies; federal candidate subspecies; and BLM Category II populations (BLM Rangewide Plan for Managing Habitat of Desert Bighorn Sheep).

10. For desert bighorn sheep, (Ovis canadensis nelsoni, O.c. mexicana, and O.c. cremnobates), the following additional guidelines are recommended:

   a.   No domestic sheep grazing should be allowed within buffer strips less than 13.5 kilometers (9 miles) surrounding desert bighorn habitat, except where topographic features or other barriers prevent physical contact.

   b.   Domestic sheep trailed and grazed outside the 13.5 kilometers (9 mile) buffer and in the vicinity of desert bighorn ranges should be closely managed and carefully herded.

   c.   Unless a cooperative agreement has been reached to the contrary, domestic sheep should be trucked rather than

BLM_0109887

trailed, when trailing would bring domestic sheep
closer than 13.5 kilometers (9 miles) to occupied
desert bighorn sheep ranges, especially when domestic
ewes are in estrus.

11.    These guidelines will be reviewed every 3 years by a work
group comprised of representatives from the livestock industry,
State wildlife agencies, BLM and bighorn sheep organizations.

BLM_0109888

## James Bode

| | |
|---|---|
| **From:** | bkrickba@blm.gov |
| **Sent:** | Thursday, May 26, 2011 12:01 PM |
| **To:** | sbear@dmea.com; Steve.weist@oxbow.com; John@reams-construction.com; billday@paonia.com; Robbie.levalley@colostate.edu; Wblack8709@msn.com; pmueller@tnc.org; silvers1@tds.net; tkctew@yahoo.com; barbara_hawke@tws.org; bsharrow@blm.gov; Bruce_Krickbaum@co.blm.gov; Angie Adams; Kate Wynant; UFO AR |
| **Subject:** | Draft Minutes: Uncompahgre RMP RAC Subgroup Meeting #7 |
| **Attachments:** | UFO-SG_2011-05-13_DraftMinutes.pdf |

Hello RAC Subgroup members,

I have attached draft minutes of the Uncompahgre RMP RAC Subgroup meeting held on May 13. Note that the minutes contain the comments from the RAC Subgroup meeting to the notes. The "response" column is filled in where an immediate response was given at the meeting.

Please review the draft minutes and let me know of any errors or omissions by Wednesday, June 1, after which they will be revised and submitted to all group members and the administrative record.

Our next meeting will be June 24.

Thank you, Bruce

<><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

 (See attached file: UFO-SG_2011-05-13_DraftMinutes.pdf)

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

BLM_0109889



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401



# RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #7
## Friday, May 13, 2011 (9:00 AM – 12:00 PM)

**Meeting Location:**
**Holiday Inn Express (Jordan Room)**
**1391 South Townsend Avenue, Montrose, CO**

# Meeting Notes

**Attendees:** Angie Adams (EMPSi), Robbie Baird-LeValley, Shelby Bear, Walt Blackburn, Bill Day, William Ela, Barbara Hawke, Bruce Krickbaum (BLM Uncompahgre Field Office), Peter Mueller, John Reams, Barb Sharrow (BLM Uncompahgre Field Office), Steven Weist, Kathy Welt (via phone), Kate Wynant (EMPSi)

**Handouts:** Agenda; Highlights of the Resource Management Planning Process to Date

1. **Welcome** (Bruce Krickbaum)
   - We've been working on alternatives and it's taken longer than we thought which is why we had to delay the last meeting.

2. **Introductions** (all present)

3. **Planning Process to Date** (Angie Adams and Kate Wynant)
   - The bulk of what BLM has been doing is working on alternatives. *Action:* We will send you an email with a roadmap of what's to come in the next year and when you'll be involved. The next thing for you is Draft Chapter 2 for your review which we'll provide at the June 24 meeting. At that meeting we'll talk about the alternatives and how you can provide comments. You'll have three weeks to review and provide comments. Your review is concurrent with the cooperating agencies review and BLM interdisciplinary team review. The BLM has not seen all of the alternatives together in one package even though they've been working on it, so you'll see it when they see it. This one will have maps and acreages so you have context for the alternatives. This will be the first crack at a solid draft but it's still a draft and an internal draft. We're not ready for it to be released to the public. We wanted to give you some insights into it so you can provide feedback so when it's at the public draft stage it's in the best shape it can be.
   - *Action:* Before the June 24 meeting we'll give you response to comments you provided on the January rough alternatives. What you reviewed in January was a range of five alternatives from current management with no discussion of the preferred alternative. Since then the BLM has developed the preferred alternative and then combined/condensed some of the alternatives so there are now four alternatives, current management plus three action alternatives (including the preferred alternative). So it'll look a little different but we kept the range of alternatives so that the "edges" are still there.

BLM_0109890

- *Question:* Some of us had wanted to see the preferred mixed and matched. I have a concern that when you combine the alternatives is that they become polarized extremes. How are you trying to avoid that? *Answer:* Well we developed the preferred from the range of alternatives so it's a mixture of everything, not just exactly in the middle. Some things are the same as existing situation and some are on the other side. Each alternative will have a theme because the whole alternative has to fit together. It that sense, the challenge is to create alternatives that all make sense together. However because we developed the preferred alternative after developing a good range of alternatives, the preferred is hopefully a better outcome.
- *Question:* Once you come out with the preferred, that will go to Barb Sharrow for the Record of Decision (ROD)? You have not lost your independence at that point have you? *Answer:* There will not be a ROD just based on the alternatives. The ROD won't come for three or so years. Barb makes the recommendations to the state director and she's actually the signatory on the ROD. We'll lay out that general process in an e-mail so you can see it all in writing.
- Air quality report is now expected in winter 2011/2012
- The wilderness characteristics report is on hold because of the federal funding bill that had specific language not to do wilderness characteristics inventory. Report is on hold until we get guidance from Secretary Salazar on how to carry out FLPMA within the budget parameters.
- *Question:* Where does wild and scenic come in? *Answer:* Wild and scenic rivers is a separate topic from wilderness, wilderness study areas, national conservation areas. The eligibility and draft suitability studies have been done and those outcomes will be part of the range of alternatives. The BLM is mandated to consider an alternative that considers all eligible segments as suitable, one that considers all eligible segments as not suitable, and the preferred is whatever the suitability study actually finds, and this group was a large part of that.

## 4. Internal Draft Alternatives – Group Feedback on:

See attachment: Internal Rough Draft Alternatives – Feedback from Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19, 2011).

   **a. Renewable Energy**

   **b. Communications Sites**

   **c. Utility Corridors**

   **d. Hunting Permits (Outfitters)**

   **e. Organized Group Permits**

   **f. Target Shooting**

   **g. North Delta OHV Open Area**

   **h. Ouray County's plans for gravel pit northeast of Ridgway and potential Ridgway Trails SRMA?**

   **i. Colorado State/CDOW's thoughts on having state lands open or closed to oil/gas leasing and no surface occupancy?**

## 5. Public Comments

- Shannon Borders (BLM): Consider fiber optic needs in utilities.
- Lee Gelatt (Western Colorado Congress):
  - Renewable energy: Consider putting in already disturbed areas and protect areas.

BLM_0109891

o   North Delta OHV Open Area: Probably okay as long as it does not bleed into the adobe badlands.

## 6. Other Items Not on the Agenda

## 7. Action Items / Next Meeting

- Next meeting: Friday, June 24, 2011, 9:00am–12:00pm, Holiday Inn Express, Montrose
- ☐ *Action:* Shelby Bear will send rough maps showing the areas of potential future transmission corridors (Doughspoon substation to Cedaredge and East Montrose substation along South Canal).
- ☐ *Action:* BLM will send you an email with a roadmap of what's to come in the next year and when you'll be involved.
- ☐ *Action:* Before the June 24 meeting BLM will give you response to comments you provided on the January rough alternatives.

BLM_0109892

**Uncompahgre RMP/EIS**                                                    **April 19, 2011**

*Internal Rough Draft Alternatives – Feedback Received from*
*Cooperating Agency and RAC Subgroup Members on Specific Topics*

*April 19, 2011, email from Bruce Krickbaum, BLM UFO, to all Cooperating Agency Representatives and RAC Subgroup Members:*

…We need to discuss several topics at the May 12/13 meeting. The following are issues we want your opinions on. There will most likely be an array of thoughts on each, but the discussion will help us frame the alternatives and potential preferred action. Please think about these issues and be prepared to discuss during the meeting. Written information and/or maps would also be welcomed.

**Renewable Energy. During several of our initial meetings, we discussed renewable energy and asked for information regarding potential renewable energy sites or projects. We are at the stage that we need to know if communities, counties or agencies know of any renewable energy projects that are being discussed, or locations that have been identified as having potential over the next 20 - 30 years. Note: we can be very general in the decision, and say projects will be allowed throughout the planning area. However, it would be great to also list specific areas as renewable energy emphasis areas (wind, solar).

**Communications Sites. Are there any specific areas communities or counties know of that have been discussed as potential communications sites? If there are known potential sites, it would make the future NEPA analysis less complex if identified in the RMP.

**Utility Corridors. Are there any specific areas that should be identified as utility corridors? Are you speaking with the utility companies? Have you identified places in your master plans that we should emulate?

**Hunting Permits (Outfitters). We are discussing how to handle the number of permits issued to hunting outfitters. Should we limit the number of permits, or not? If we do not limit the number of permits, we would issue a permit to all outfitters that qualify, and let the market and hunting conditions regulate the number that remain in business. Or, we could limit to number of outfitters permits to improve the chances of a quality hunting experience for the clients. If we limit the number of permits, one number we are considering is limiting permits to eight (8) big game outfitter permits per game management unit, and to ten (10) mountain lion guide/outfitter permits in the planning area.

**Organized Group Permits. We are discussing the numbers associated with Special Recreation Permits. We issue Special Recreation Permits to protect natural and cultural resources, protect recreational and natural resources, and provide for visitor health and safety. We are considering Special Recreation Permits for organized groups expecting more than 40 vehicles or 80 people, including spectators. What are your thoughts?

**Target Shooting. We would like your thoughts on prohibiting target shooting within 0.25-mile of a residence and developed facilities (e.g., power substations, powerlines, communication sites). This is primarily for safety concerns.

**North Delta OHV Open Area. We would like your thoughts regarding limiting all travel in North Delta OHV Open Area to designated routes, and designating all routes.

**For Ouray County. What are Ouray County's plans for the gravel pit northeast of Ridgway, and within the potential Ridgway Trails SRMA? We would like to know about the County's desires for continuing the pit as it is now permitted, as well as desires for future expansion. Is the area better suited for a trails system, which could have positive impacts on tourism and economics? This knowledge will reduce conflict with future trails if the Ridgway Trails SRMA is in the preferred alternative.



January 27, 2011

BLM_0109893

**For Colorado State/CDOW (primarily, but others as well).  What are the State's thoughts on having state lands open or closed to oil/gas leasing (where federal minerals underlay the lands)?  What about "No Surface Occupancy"?

BLM would also like to discuss the alternatives-development process since January 2011.   By the way, thank you to all of you for the great comments you submitted on the draft alternatives.   Comments have been helpful to us.

Regards, Bruce

Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384



January 27, 2011

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 1. | Walt Blackburn, RAC Subgroup member, via letter | Renewable Energy.<br>The Forest Service is doing extensive work with Bio-Mass renewable energy. There are a few areas on BLM lands that this possibly could be an option. Please see Additional information below.<br><br>Dear Woody Biomass Working Group Members:<br>We are hosting several up-coming events in support of our Uncompahgre Plateau Woody Biomass Supply and Feasibility Assessment.<br><br>**UP Woody Biomass Public Meeting in Montrose: Wednesday, June 8, 7-8:30 pm** at the DMEA Office, 11925 6300 Road, Montrose, CO.<br>• The purpose of the meeting is to provide general information to local community members on the woody biomass feasibility study with the Rocky Mountain Research Station. Everyone is welcome to attend!<br><br>**UP Woody Biomass Public Meeting in Delta: Thursday, June 9, 7- 8:30 pm** at the Performing Arts Center, 822 Grand Ave., Delta, CO.<br>• The purpose of the meeting is to provide general information to local community members on the woody biomass feasibility study with the Rocky Mountain Research Station. Everyone is welcome to attend!<br><br>**UP Woody Biomass Working Group Meeting: Thursday, June 9, 9 am - 12 pm** at the Delta Forest Service Office, 2250 Highway 50, Delta, CO.<br>• Dr. Nate Anderson, RMRS, will present an update on the woody biomass feasibility study. Everyone is welcome to attend but the content of the meeting will be more technical. | |



Page 1

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109895

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | **UP Woody Biomass Public Field Trip: June 10, 9 am - 5 pm.**<br>• Meet at the Montrose Public Lands Center. We will tour several on-going fuels treatments on the Uncompahgre Plateau and discuss biomass utilization. Please bring your own lunch | |
| 2. | Walt Blackburn, RAC Subgroup member, via letter | Communications Sites.<br>It is my understanding that there will be more need for cell phone towers in the area as demand for better service continues to force the providers to install more towers. Would suggest that contact be made with the different providers for such discussions of future plans and needs. | |
| 3. | Walt Blackburn, RAC Subgroup member, via letter | Utility Corridors<br>Specifically, power lines in and around Air Port facilities on BLM lands should have written in planning options. | |
| 4. | Walt Blackburn, RAC Subgroup member, via letter | Hunting Permits (Outfitters)<br>Outfitting is a very competitive business. The market and success ratio will regulate the number that remains in business. The BLM is not in the business of being concerned about a quality hunting experience for paid outfitter clients. It appears to me that we are entering into an area that is not in call for correction. This has the potential to open a real can of worms. | |
| 5. | Walt Blackburn, RAC Subgroup member, via letter | Target Shooting.<br>It appears we are trying to create a solution for a problem that does not exist.<br>Impossible to enforce. If there is a problem, it would fall under the law enforcement of the County Sheriff . BLM is not a safety patrol agency. A :} mile corridor on power lines? That would mean you couldn't target shoot about anywhere on BLM lands. There are power lines servicing most commercial target shooting sites. Most residences of commercial target shooting ranges live nearby on the property much close that -1- mile.<br>Communications sites would include cell towers, repeater towers, telephone lines etc. | |
| 6. | Walt Blackburn, | North Delta OHV Open Area | |


Page 2
Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109896

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

### Internal Rough Draft Alternatives – Feedback Received from
### Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | RAC Subgroup member, via letter | WHY??? That is the whole premise of the area and has been since it was created. It is even more important now that Homeland Security has forced the GJ airport to fence off a big chunk of OHV open BLM land. The North Delta OHV open area is very family orientated riding place. Many OHV families use this area to train & teach the younger OHV enthusiast to ride. Remember that riding OHV's is potentially risky by nature of the sport. Each individual takes that responsibility on himself when participatating. Isn't there verbiage in the original decision notice on the North Delta OHV area to keep it open? | |
| 7. | Walt Blackburn, RAC Subgroup member, via letter | Re: State's thoughts are on having state lands open or closed to oil/gas leasing (where federal minerals underlay the lands), as well as thoughts on "No Surface Occupancy".<br><br>What difference does it make to CDOW unless there are wildlife issues? Itis my understanding that present law covers wildlife concerns. Sounds like the BLM is butting into something that is none of their business. Let the state (COGC) decide if and when it becomes an issue. Having a "No surface Occupancy" would only enhance the access of a much needed resource. | |
| | *Via RAC Subgroup Meeting (5/13/2011)* | | |
| | | *Renewable Energy: These issues weren't in our old plan but they're getting more and more important every year. In this plan there is an option to leave the FO open to renewable energy unless it's excluded to protect certain resources or we can identify specific areas for development. This is not to say that if there is a wind emphasis area wind is excluded everywhere else. If we don't designate emphasis areas, we can still get proposals but if we know of areas now we can overlay those areas with what we have now and make sure it would be compatible with what we're proposing. If you know if any areas where local governments or companies are interested in developing for renewable energy development, let us know.* | |
| 8. | Walt Blackburn | Would biomass production be allowed? | Yes, it's an option but this plan doesn't identify |



BLM_0109897

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

### Internal Rough Draft Alternatives – Feedback Received from
### Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | | specific areas to be set aside for biomass production. The BLM does not have very high potential for good biomass production. We do have language in the plan that would make biomass possible if there was a proposal. It's not included. |
| 9. | Walt Blackburn | A lot of the burn areas would be good for cleanup. | When we have those type of projects we do permit interested people to utilize the biomass. In the past we've encouraged people to use the product before the treatment and that will continue. There just isn't much interest. The Forest Service has a lot of trees that they're waiting for people to take away and if you're in that business you're more interested in those trees. There was some discussion about the coal plant in Nucla using some of the product but nothing has come of it. |
| 10. | Shelby Bear | What about solar? There's been discussion of solar in Ridgway. | John Reams: It's just been difficult and there isn't much interest in industry building a solar field where it isn't very feasible. BLM (Barb Sharrow): We had a representative from Ridgway and there was some controversy over the project because people don't want it in the viewshed. |
| 11. | Barbara Hawke | If there is any way for the BLM to coordinate with local governments to use BLM and non-BLM land together to make some of these projects more feasible. If people are concerned about viewscape, that is important on public land, so maybe we can put some pieces of land together to make such projects more feasible. I would encourage the use of emphasis areas and maybe taking it further. I think there are benefits of looking at the zoning concept like they did on the national level. It's going to be different for each resource. There's also geothermal, such as in Ouray County. | |



Page 4

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109898

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 12. | Shelby Bear | We've been looking at a hydro project on the South Canal with the BLM. | |
| 13. | Bill Ela | When we went out on a field trip they were using a hydro axe under the transmission line. If there is enough hydro there, could it be suitable for biomass? | Shelby Bear: I'm not sure about biomass, but we're working on it. The Tri-County project is working on the dam which is a huge project. I think the more emphasis we place on renewable energy the more projects we'll have, so more general language might be better. |
| 14. | Walt Blackburn | Is the reason this is on the agenda because there have been inquiries? | No, actually it's been silent so we just don't know where people might be interested in developing. |
| 15. | Bill Day | In the GJFO when they had comments about this at least one front range environmental group wanted to put solar panels where there are kit fox and burrowing owls. I don't think we should do that. | When an application comes in requesting a solar ROW, the BLM has to do NEPA review and look at the resources, including T&E species, and screen all of that. So the RMP just sets the stage. The RMP could say that renewable would be available where there is not ROW exclusion and would be discouraged in ROW avoidance. At the application level there is site-specific NEPA. |
| 16. | Robbie Baird-LeValley | If that was put in there, does that give the latitude to the BLM, in the future, to develop projects even if they are not identified now? | Yes. When we get applications we'll go to our RMP and see what it says. |
| 17. | Barbara Hawke | Another way to go about it would be to have criteria. What are some places that would have good potential and would be suitable. Some would be suitable and some would be not as suitable.<br><br>Shelby Bear: Sometimes it's hard to do that because it requires so much study. We don't know what the politics of the future is going to be. | |
| | | *Communication Sites: We have a few existing communication sites for radio transmission for emergency correspondence, radio stations, internet, cell towers. If you know of any areas that might need more towers or if there is interest in them.* | |
| 18. | John Reams | The northern portion of UFO near the border with GJFO needs cell reception. | |



Page 5

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109899

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 19. | Bill Ela | There was a lot of activity about drilling in that area, south of Whitewater, and there's a utility line. If you put up a drill site can you put solar panels in between them? North of Delta on Highway 50. | Shelby Bear: You don't really want to put anything under a transmission line in a ROW, but adjacent to that would be ok. |
| 20. | Robbie Baird-LeValley | Ouray CC (Alan Staley) showed a map of sites for emergency preparedness. It would be a good idea to get with the emergency people at each of the counties. | |
| 21. | Shelby Bear | We don't know of any new sites that we need but you might check with WAPA. Check with sheriff's office. | |
| | | *Utility Corridors: Right now we just have West-wide.* | |
| 22. | Shelby Bear | What we do is dependent upon load growth. Right now growth in the area is slow. Doughspoon substation to Cedaredge. East Montrose substation along South Canal. Action Item: Shelby will send rough maps showing the areas. | |
| 23. | Barbara Hawke | I've been told that part of the West-wide Energy Corridor goes through sage-grouse habitat. Is there any opportunity to fix it so that there isn't such resource conflict. | BLM (Barb Sharrow): We had to verify the corridors that were selected at the national level. We kept the corridors out of the sage-grouse leks by a certain distance. I can't remember what the exact distance is right now. The West-wide Energy Corridor is a wide corridor, a mile or so, so there is room in the corridor for siting. |
| 24. | Bill Day | Grouse move several miles away from the lek so you could have a transmission line a mile away from a lek and that's where the population are raising their young. | Missy Siders has put that information in the plan so there is a lot of protection for sage-grouse. |
| | | *Hunting Permits (Outfitters): Limiting permits per DAU would require more enforcement by BLM.* | |
| 25. | Walt Blackburn | Seems like we are looking for solution to non-existing problem. Outfitting business tends to limit itself. Need to take a hard look at this before putting numbers on it. | BLM (Barb Sharrow): Some outfitters have requested limiting permits (would increase value of their existing permits). |
| 26. | Steve Weist | Do not put limit on permits. | |
| 27. | Peter Mueller | Do not put limit on permits. Are there tools BLM has to evaluate permits annually? As private hunter, experience can be either enhanced or diminished by outfitters. | BLM (Barb Sharrow): BLM does have annual permit evaluation process. Permits are issued/re-issued every year. If outfitter has good standing for two years, then they are awarded five-year |



Page 6                                    Internal Rough Draft Alternatives – Feedback Received from
                                          Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109900

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | | permit. |
| 28. | Peter Mueller | Could RMP put limit on numbers with annual growth rate so numbers of permits could grow over time? | |
| 29. | Robbie Baird-LeValley | If permits limited by game management unit, need to consider existing outfitters who work in specific unit; do not want to disrupt business. Consider having range of outfitter permit numbers. | |
| 30. | Shelby Bear | Do not limit outfitter numbers. | |
| 31. | Bill Ela | Would be challenging to enforce limiting permits. | |
| 32. | Bruce Krickbaum (BLM) | Cooperating Agencies suggested yesterday that BLM consider having criteria for limiting the number of future permits rather than specifying numbers in the RMP. | |
| 33. | John Reams | Let CDOW manage numbers; do not limit number of permits. | |
| | | *Organized Group Permits:* | |
| 34. | Barbara Hawke | Use criteria instead of specific numbers. For example, the season may determine numbers because of potential resource damage. See Price, Utah, RMP as example. *(note: Barbara sent example from Price, Utah via e-mail on 5/13/2011)* | |
| 35. | John Reams | If everything is regulated, then BLM cannot enforce everything. | BLM (Barb Sharrow): Organized group permit would require group to have insurance. |
| 36. | Peter Mueller | 40 vehicles and 80 people seems like a lot of impact; number should be smaller. | |
| 37. | Barbara Hawke | Are there other examples for State Parks, etc. that we could consider? | BLM (Barb Sharrow): BLM staff looked at other BLM Field Offices for examples. |
| 38. | Bill Ela | Range of numbers look good. | |
| 39. | Bill Day | 40 vehicles is a lot; would limit it to something like 25. | |
| 40. | Shelby Bear | Consider criteria. | |
| 41. | Robbie Baird-LeValley | Some range tours (including CDOW) have up to 40 or 50 vehicles. | |
| 42. | John Reams | Some contractor tours may have too many vehicles too. | BLM (Barb Sharrow): Businesses could be excepted from permit requirements. |
| 43. | Peter Mueller | Criteria could include duration of event, number of vehicles, etc. so that group has to then find support facilities such as toilets. | |



Page 7

Internal Rough Draft Alternatives – Feedback Received from Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109901

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | *Target Shooting* | |
| 44. | Steve Weist | Have designated target shooting areas and prohibit target shooting everywhere else. | BLM (Barb Sharrow): There are problems with setting up target shooting areas on public lands because of hazardous waste issues associated with lead, etc., and because BLM is not in the business of managing and enforcing shooting areas. If outside entities want to set up such areas, then BLM could work with them on recreation leases or agreements. |
| 45. | Robbie Baird-LeValley | How does BLM address residences adjacent to BLM land who want to target shoot in their backyard? | Barb: Those landowners would have to be more than 0.25-mile (or whatever distance is in RMP) from their residences to target shoot. |
| 46. | Peter Mueller | 0.25-mile seems reasonable. 1 mile is too far. | |
| 47. | Walt Blackburn | 0.25-mile is not enforceable; there would still be issues outside that 0.25-mile buffer. How would BLM enforce it? | Barb: Would be complaint driven. |
| 48. | Shelby Bear | There has been damage to insulators from target shooting. Do not want to force a lot of target shooters into smaller areas. | |
| 49. | Kathy Welt | 0.25-mile buffer from residences in residential areas makes sense. But for some residences abutting BLM lands in more-remote areas, it does not make sense. | |
| 50. | Barb Sharrow (BLM) | Does it make sense to have buffers around developed recreation sites such as trailheads and boat ramps? | RAC Subgroup: Yes. |
| | | *North Delta OHV Open Area:* | |
| 51. | Peter Mueller | Has BLM consulted with OHV community in Delta? | Barb: That is what Walt Blackburn is here for. |
| 52. | Walt Blackburn | This is one of the only Open areas in the state. There are millions of acres that are restricted to OHV travel, such as wilderness, other quiet use areas, etc. It is very concerning to OHV community. Open areas are where families go for outings. People from all over the state come to North Delta OHV Open Area. Could OHV community help BLM with public education, such as signing area with educational information, such as environmental concerns? Could post signs in specific parts of overall area to restrict travel for resource concerns. Do not want the Open area changed. | |



Page 8

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109902

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 53. | Shelby Bear | During transmission projects, we have found that cactus moves. | Barb: During route-designation process, biologists would survey cactus locations. |
| 54. | Bill Day | What is magnitude of selenium in this area? | Barb: Selenium is big issue in UFO and this area in general. US Geological Survey just completed two- or three-year selenium study. Big way that selenium gets into waterways is via irrigation on non-public lands. |
| 55. | Robbie Baird-LeValley | North Delta is 8-inch precipitation zone. | |
| 56. | Barbara Hawke | If keeping area Open helps preserve and protect adjacent or other areas, then that is worth considering. OHV recreation needs its place. | |
| 57. | Shelby Bear | If we have to close this area, is there another area we can open? | |
| 58. | John Reams | Is selenium contribution small in the larger scope of total areas contributing to selenium? Do not close area. | |
| 59. | Walt Blackburn | Does not seem like limiting area would solve the problem. | |
| 60. | Robbie Baird-LeValley | The selenium issue does not warrant closing or limiting the area; keep it open. | |
| 61. | Bill Day | With current high density of roads, it does not seem like it would get much worse/roaded if left open. Okay to leave it open. | |
| 62. | Peter Mueller | Seems like we are trying to make decisions without all the information. Need to do surveys to work with OHV community to develop necessary education to mitigate potential impacts. | |
| 63. | Bill Ela | Preservation is important in BLM; support preservation as sustainable objective. Need some form of erosion control. RMP needs to have more focus on sustainability, especially in North Delta OHV Open Area more than remainder of planning area because of erosion from trails. | |
| 64. | Bill Ela | In many retention ponds, mother nature creates spillway so ponds fail, which creates other issues. | |
| 65. | Kathy Welt | In North Delta, annual precipitation is very low. To rule out a retention pond in that area because of fear of it not being able to contain runoff is probably not substantiated if pond is properly | |

Page 9

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)



BLM_0109903

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | engineered. Selenium is predominant in Mancos Shale, which is what North Delta OHV Area is. Regardless of how OHV area is managed, selenium will be an issue. Agree with other comment questioning if restrictions would have any effect on overall selenium issues/contributions. | |
| | | *Ouray County's plans for gravel pit northeast of Ridgway and within potential Ridgway Trails SRMA:* | |
| 66. | Barb Sharrow (BLM) | Gravel pit was permitted by BLM in 2003. Mountain bike user group in Ridgway area would like mountain bike trail system in vicinity of gravel pit. Gravel pit permit has expired and needs to be renewed before RMP is complete. BLM is working on with Ouray County and Ridgway on solution to permit gravel pit and to also develop trail system of some sort, but not through pit itself (which is prohibited). | |
| 67. | Bill Ela | Pit should be far from streams. | Barb: It is. |
| 68. | Peter Mueller | Makes sense to develop an impacted area for two different uses. | |
| 69. | Barbara Hawke | Good idea to connect area to trails. | |
| 70. | Barb Sharrow (BLM) | Ouray County indicated that both uses are vital to their economy. | |
| | | *Colorado State/CDOW lands open or closed to oil/gas leasing, or having No Surface Occupancy on those lands:* | |
| 71. | Angie Adams, Barb Sharrow, and Kate Wynant (background info) | Angie: CDOW suggested most wildlife areas be NSO. Barb: Applies to Ridgway and Paonia State Parks, as well as wildlife area (portions of Billy Creek and Escalante). Kate: CDOW suggested that occupied sage-grouse habitat be closed to leasing. Barb: Governor's office will review the RMP. | |
| 72. | Bill Day | Miramonte should be closed to leasing. | |
| 73. | Peter Mueller | Agreed that mapped occupied habitat be closed to leasing. | |
| 74. | John Reams | Consider NSO on State lands with a buffer outside of State lands. Need to carefully consider viewshed. | |
| 75. | Barbara Hawke | Need to also consider stipulations for riparian and wetland areas. | |
| 76. | Kathy Welt | Do not necessarily need to close State Parks because there are other protections for resources, such as riparian and wetlands. | |



Page 10

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109904

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | Minerals are also a resource that belongs to the US, in addition to natural resources. Consider State lands and parks on a case-by-case basis rather than globally applying certain closures or stipulations to all areas. | |



BLM_0109905

**Sensitivity Based Prioritization for Development Areas
Within Renewable Energy Zones\***

**Level 1 – Areas to be Prioritized for Development:** These areas do not contain the sensitive resources and values which Level 2 and 3 areas do, and have already been impaired by other uses. Further, proximity to existing roads, designated transmission corridors, and other infrastructure makes these sites more economically developable, while minimizing impacts by limiting the need for additional associated infrastructure. Development in these areas will be required to complete on-site mitigation measures and use to Required Operating Procedures to protect resources and values within. However, off-site mitigation and additional restrictions which apply to development in Level 2 and 3 areas will be much lower for projects in Level 1 areas. Developers will also be provided incentives for developing within these areas.

Areas Include
   Hazardous material sites
   Brownfields
   Abandoned mines
   Former landfills, mineral sites or gravel pits
   Developed oil and gas fields
   Sites damaged or disturbed to the extent that restoration potential is limited
   Sites that otherwise have very limited productivity due to a disruption of natural
      processes

Development Stipulations Include
   On-site mitigation and mandatory Required Operating Procedures (ROP), including
      USFWS Wind Turbine Guidelines Advisory Committee ROPs and ROPs being
      contemplated in the Solar PEIS
   Off-site mitigation for lost resources, uses, and experiences on the project site

Incentives Include
   Prioritization of BLM resources for permitting, including Renewable Energy
      Coordination Office resources

**Level 2 – Resource Protection Required:** These areas include sensitive resources with potential for conflict and controversy. Restrictions will be placed on development in these areas to protect the important resources and values within. The density and importance of resources and values will vary within Level 2 lands; there will be greater restrictions on development in areas with resources and values of high density and/or importance. Developers are strongly encouraged to prioritize development in Level 1 lands or low-conflict Level 2 lands to minimize conflicts and increase the likelihood of project success and timely completion.

Resources and Values to be Protected Include
   Stream and Lake buffer areas (1/4 mile)
   Audubon Important Bird Areas

\*Note that there may be additional resources and values which need to be protected, additional incentives which could be used to prioritize development in Level 1 areas, and additional development stipulations necessary for protection of the resources and values listed here.

USFWS Habitat Conservation Plans (HCP)
USFWS Proposed HCPs and NCCPs
WCS Wolverine Habitat Model
Areas with high densities of cultural resources
Colorado Natural Heritage Program Potential Conservation Areas – Biodiversity
    Significance of lower than B3
Colorado Natural Heritage Program Element Occurrence Records for all species
    ranked G3 or higher or S4 or higher, including historical records
Wetland habitats (CDOW)
Various Occupied and Potential Habitats for key species
- prairie dog (Gunnison's and white-tailed) occupied habitat
- burrowing owl potential habitat (CDOW)
- greater sage-grouse winter range
- black bear concentration areas
- pronghorn concentration areas, severe winter range and perennial water sites (CDOW)
- Bighorn migration corridors and concentration areas
- Mule deer concentration areas, migration corridors, and critical winter range
- White-tailed deer concentration areas and critical winter range
- BLM-USFS Lynx Analysis Units
- peregrine falcon potential nesting sites
- occupied habitat for flannelmouth sucker, bluehead sucker, and roundtail chub
- heron nest sites (CDOW)

Development Stipulations Include
Surface disturbance limitations
Timing limitations, for both construction and operation
Phased development
Water use limitations
On-site mitigation and mandatory Required Operating Procedures (ROP), including
    USFWS Wind Turbine Guidelines Advisory Committee ROPs and ROPs being
    contemplated in the Solar PEIS
Off-site mitigation for lost resources, uses, and experiences on the project site

**Level 3 – Avoid Areas:** These areas contain extremely sensitive resources and serious potential for conflict and controversy. Significant restrictions would be placed on any development in these areas to protect the important resources and values within. They should effectively be considered exclusion areas because of the burden projects in such areas would face in getting approved.

Resources and Values to be Protected Include
Level 2 resources and values, plus:
Units of the National Landscape Conservation System
Citizens' Wilderness Proposal areas
USFWS Designated Critical Habitat
USFWS Occupied and Potential Habitat for Federally Listed, Proposed and Candidate
    Species

SREP priority wildlife linkages

CNHP Potential Conservation Areas (PCAs) – Biodiversity Significance B3 and higher

ACECs

BLM Visual Resource Management class I and II

Colorado Natural Areas Program designated Natural Areas

Colorado State Wildlife Areas

SRCA Inventoried Roadless Areas

BLM and USFS-identified lynx linkages and CDOW-identified lynx denning habitat

Colorado Natural Heritage Program Element Occurrence Records for all species
ranked G2 or higher and S3 or higher (unless global precision rank is "very poor"
or lower)

Various High Priority Occupied Habitats for key species:

- raptor active and inactive nest sites and roost sites (all species) plus FWS recommended buffers (from FWS raptor guidelines)
- greater sage-grouse brood, production areas (if outside of core areas), severe winter range, and areas within 4 miles of a lek on private land
- greater sage-grouse core areas (CDOW)
- Gunnison sage-grouse occupied habitat (all types)
- Boreal toad breeding sites and field sightings with buffer (CDOW)
- Colorado River cutthroat trout occupied habitat
- kit fox occupied and potentially occupied habitat (CDOW)
- roosting areas (day roosts and maternity roosts) with ¼ mile buffer for Brazilian freetail bat, Townsend's bigeared bat, fringed myotis
- northern leopard frog occupied habitat with 200 meter buffer (CDOW)

Development Stipulations Include

Surface disturbance limitation

Timing limitations, for both construction and operation

Phased development

Water use limitations

On-site mitigation and mandatory Required Operating Procedures (ROP), including
USFWS Wind Turbine Guidelines Advisory Committee ROPs and ROPs being
contemplated in the Solar PEIS

Off-site mitigation for lost resources, uses, and experiences on the project site

BLM_0109908

# James Bode

| | |
|---|---|
| **From:** | bkrickba@blm.gov |
| **Sent:** | Thursday, June 09, 2011 5:08 PM |
| **To:** | bsharrow@blm.gov; dkauffma@blm.gov; dmagee@blm.gov; Angie Adams; Kate Wynant; bbott68@gmail.com; Aschroeder@usbr.gov; kjensen@ci.montrose.co.us; renzo.delpiccolo@state.co.us; shansen@deltacounty.com; MPelletier@gunnisoncounty.org; swhite@montrosecounty.net; lpadgett@ouraycountyco.org; lynn@mtngeogeek.com; joanm@sanmiguelcounty.org; daves@sanmiguelcounty.org; pat@cedaredgecolorado.com; joereagan741 @yahoo.com; norwoodparker@centurytel.net; sharold@ci.olathe.co.us; davidvarley@kaycee.net; townofpaonia@tds.net; jcoates@town.ridgway.co.us; Dan_Reinkensmeyer@fws.gov; charles_sharp@fws.gov; tkrandallparker@fs.fed.us; lbroyles@fs.fed.us; segfahlt@gmail.com; Bruce_Krickbaum@co.blm.gov; UFO AR |
| **Subject:** | Final Notes: Uncompahgre RMP Cooperating Agency Meeting #7 |
| **Attachments:** | UFO-CA_2011-05-12_FinalNotes.pdf; Milestones-thru-DRMP_05192011.docx |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hello Cooperating Agency Representatives,

Thank you to everyone who attended the May 12 meeting.  We appreciate the good discussion on various topics for consideration in the draft alternatives.
I have attached the final notes from the May 12 meeting.

Also, at your request, I have attached a timeline that provides a road map of Cooperating Agency and RAC Subgroup involvement from now through the public Draft RMP/EIS.  It includes the specific points at which your review and comment will be requested on parts of the internal draft document before it is released to the general public.  Dates are subject to change.

The schedule for the next two meetings is:
June 23 (Thursday) 1:00 - 4:00 (Holiday Inn Express, Jordan Room), August 11 (Thursday) 1:00 - 4:00

At  our June 23 meeting, we will give you the draft alternatives for your
review.   The field office staff will be reviewing this document at the
same time.

Please let me know if you will not be able to attend the June 23 meeting.

Regards,  Bruce

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

1

BLM_0109909

(See attached file: UFO-CA_2011-05-12_FinalNotes.pdf)      (See attached file: Milestones-thru-DRMP_05192011.docx)

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

BLM_0109910

 

# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401

## COOPERATING AGENCY MEETING #7

### Thursday, May 12, 2011 (1:00 – 4:00 PM)

### Meeting Location:
### Holiday Inn Express (Apex Room)
### 1391 South Townsend Avenue, Montrose, CO

# Meeting Notes

**Attendees:** Angie Adams (EMPSi), Jen Coates (Town of Ridgway), Renzo DelPiccolo (Colorado Department of Natural Resources, Southwest Region), Susan Hansen (Delta County BOCC), Bruce Krickbaum (BLM Uncompahgre Field Office), William Long (Town of Nucla), Joan May (San Miguel County BOCC), Patricia Means (Town of Cedaredge), Mike Pelletier (Gunnison County), Barbara Peterson (Town of Paonia), Alan Schroeder (Bureau of Reclamation, Western Colorado Area Office), Charlie Sharp (US Fish and Wildlife Service), Barb Sharrow (BLM Uncompahgre Field Office), Steve White (Montrose County BOCC), Kate Wynant (EMPSi)

**Handouts:** Agenda; Highlights of the Resource Management Planning Process to Date

1. **Welcome** (Bruce Krickbaum)
   - Going through alternatives we've come up with some questions so we called this meeting to get your help and feedback from you.
   - Reminder that CA meetings are not open to the public but RAC Subgroup meetings are. Those meetings are the same meeting as this one; we talk about the same things, but those meetings are open to the public. We have a public comment period at 11:00am at those meetings so they can speak at those meetings. Another reason these meetings are not open to the public is so the CAs can talk freely without the public being present.

2. **Introductions** (all present)

3. **Planning Process to Date** (Angie Adams, Kate Wynant)
   - See handout: Highlights of the Resource Management Planning Process to Date.
   - Air quality report is anticipated this winter.
   - Alternatives development moved into fall of 2011.
   - The wilderness characteristics report is on hold because of the federal funding bill that had specific language not to do wilderness characteristics inventory. Report is on hold until we get guidance from Secretary Salazar on how to carry out FLPMA within the budget parameters.
   - Next meeting we will provide the draft chapter 2 for you to review. It will have maps and acreages filled out. You will be reviewing it at the same time the field office reviews the full

BLM_0109911

chapter 2. Please plan on spending some time to review that and provide input in June/July. Again, as a reminder, as a Cooperating Agency, please do not share Chapter 2.

- o *Question*: Montrose County wants to move from Cooperating Agency to coordinating agency. Will get that in writing. How does that work? *Answer*: We can meet with you as the county and those will be public meetings. However we (BLM) will not be sharing everything with you. Montrose County can bring comments to the BLM. Suggest that the county sets up a meeting with the BLM.
- o *Question*: Is there any reason that you can't do both? Be a cooperating agency and provide comments in a public forum? *Answer*: Yes, you can do both, but we won't talk about all of the in-progress details with the public.
- o *Comment*: I think the Montrose commissioners feel like they won't be heard or won't be part of the process. *Response*: All they need to do is request a meeting with BLM (Barb) and she'll meet with them. We can put together a timeline so they can see when they will get a chance to be involved.

## 4. Internal Draft Alternatives – Group Feedback on:

See attachment: Internal Rough Draft Alternatives – Feedback from Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19, 2011).

a. **Renewable Energy**

b. **Communications Sites**

c. **Utility Corridors**

d. **Hunting Permits (Outfitters)**

e. **Organized Group Permits**

f. **Target Shooting**

g. **North Delta OHV Open Area**

h. **Ouray County's plans for gravel pit northeast of Ridgway and potential Ridgway Trails SRMA?**

i. **Colorado State/CDOW's thoughts on having state lands open or closed to oil/gas leasing and no surface occupancy?**

## 5. Other Items Not on the Agenda

- *Comment*: The more we can get a roadmap so we know what we're going to be able to comment on, the better. *Response*: June 23rd is when you'll get the draft Chapter 2. When you get Chapter 2 for review, there will be four alternatives instead of six. At that point you'll be able to give us feedback on the range but also on the preferred alternative. Once we get feedback from cooperating agencies, RAC Subgroup, and the Field Office, we'll refine alternatives and send it to the Colorado State Office; get feedback; revise. Then we'll start the impact analysis which may result in more tweaks to the alternatives. Throughout that process you'll see the full draft document including alternatives (which will look different than what you see in June because it'll have been tweaked based on comments), affected environment (which you've already seen), impact analysis, etc. You'll review that document; we'll tweak; the Colorado State Office will review; we'll tweak; Washington Office will review; we'll tweak; and then publish for public comment.
- *Action*: Between now and the next meeting we will give you a roadmap for between now and the Draft RMP.
- If today brought up other questions, let us know. We can add them to the agenda for next time and discuss those items.

BLM_0109912

- *Action:* We'll send response to comments on the January internal rough draft alternatives to send out to the groups before the June meeting.

## 6. Action Items / Next Meeting

- Next meeting: Thursday, June 23, 2011, 1:00–4:00pm, Holiday Inn Express, Montrose
- ☐ *Action:* Jen Coates will e-mail the plan to BLM (Bruce) information on San Miguel and Ouray Counties plan to generate 20% of energy from renewable in the next 20 years.
- ☐ *Action:* Between now and the next meeting we will give you a roadmap for between now and the Draft RMP.
- ☐ *Action:* We'll send response to comments on the January internal rough draft alternatives to send out to the groups before the June meeting.

BLM_0109913

Uncompahgre RMP/EIS                                                                April 19, 2011

*April 19, 2011, email from Bruce Krickbaum, BLM UFO, to all Cooperating Agency Representatives and RAC Subgroup Members:*

…We need to discuss several topics at the May 12/13 meeting.  The following are issues we want your opinions on.  There will most likely be an array of thoughts on each, but the discussion will help us frame the alternatives and potential preferred action.  Please think about these issues and be prepared to discuss during the meeting.  Written information and/or maps should also be welcomed.

**Renewable Energy.  During several of our initial meetings, we discussed renewable energy and asked for information regarding potential renewable energy sites or projects.  We are at the stage that we need to know if communities, counties or agencies know of any renewable energy projects that are being discussed, or locations that have been identified as having potential over the next 20 - 30 years.  Note:  we can be very general in the decision, and say projects would be allowed throughout the planning area.  However, it would be great to also list specific areas as renewable energy emphasis areas (wind, solar).

**Communications Sites.  Are there any specific areas communities or counties know of that have been discussed as potential communications sites?  If there are known potential sites, it would make the future NEPA analysis less complex if identified in the RMP.

**Utility Corridors.  Are there any specific areas that should be identified as utility corridors?  Are you speaking with the utility companies?  Have you identified places in your master plans that we should emulate?

**Hunting Permits (Outfitters).  We are discussing how to handle the number of permits issued to hunting outfitters.  Should we limit the number of permits, or not?  If we do not limit the number of permits, we would issue a permit to all outfitters that qualify, and let the market and hunting conditions regulate the number that remain in business.  Or, we could limit to number of outfitters permits to improve the chances of a quality hunting experience for the clients.  If we limit the number of permits, one number we are considering is limiting permits to eight (8) big game outfitter permits per game management unit, and to ten (10) mountain lion guide/outfitter permits in the planning area.

**Organized Group Permits.  We are discussing the numbers associated with Special Recreation Permits.  We issue Special Recreation Permits to protect natural and cultural resources, protect recreational and natural resources, and provide for visitor health and safety.  We are considering Special Recreation Permits for organized groups  expecting more than 40 vehicles or 80 people, including spectators.  What are your thoughts?

**Target Shooting.  We would like your thoughts on prohibiting target shooting within 0.25-mile of a residence and developed facilities (e.g., power substations, powerlines, communication sites).  This is primarily for safety concerns.

**North Delta OHV Open Area.   We would like your thoughts regarding limiting all travel in North Delta OHV Open Area to designated routes, and designating all routes.

**For Ouray County.  What are Ouray County's plans for the gravel pit northeast of Ridgway, and  within the potential Ridgway Trails SRMA?  We would like to know about the County's desires for continuing the pit as it is now permitted, as well as desires for future expansion.  Is the area better suited for a trails system, which could have positive impacts on tourism and economics?  This knowledge will reduce conflict with future trails if the Ridgway Trails SRMA is in the preferred alternative.



January 27, 2011

**For Colorado State/CDOW (primarily, but others as well).  What are the State's thoughts on having state lands open or closed to oil/gas leasing (where federal minerals underlay the lands)?  What about "No Surface Occupancy"?

BLM would also like to discuss the alternatives-development process since January 2011.   By the way, thank you to all of you for the great comments you submitted on the draft alternatives.   Comments have been helpful to us.

Regards, Bruce

Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384



January 27, 2011

BLM_0109915

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 1. | Kerwin Jensen (City of Montrose, Cooperating Agency, via email 4/26/2011) | … there are a number of BLM parcels near the city limits of Montrose and we would ask for consideration that wind turbines not be placed on those BLM lands close to the city limits and residential neighborhoods. Solar panels are less intrusive, but it would be desirable to locate solar panels at prudent locations as well when near the doorsteps of the city limits. | |
| 2. | Alan Schroeder (Bureau of Reclamation, Cooperating Agency, via e-mail 5/16/2011) | Renewable Energy<br>Bio-mass: if bio-mass energy is being addressed as part of this revision, several things should be considered. These things include, but are not limited to: sustainability (enough bio-mass to keep things going long term), and will we be reducing or losing carbon sink potential (forests, woodlands, and brush lands) that may help mitigate global warming by reducing atmospheric $CO_2$? | |
| 3. | Alan Schroeder (Bureau of Reclamation, Cooperating Agency, via e-mail 5/16/2011) | Renewable Energy<br>Hydropower- hydropower should be addressed in the RMP Revision:<br>• Potential projects currently being considered or of which we are aware: Southside canal, Ridgway Dam, and AB Lateral (the AB Lateral project was previously proposed, but is not actively being pursued at this time)<br>• Additional potential hydropower project sites (we are currently actively looking for additional potential sites) include but are not limited to the following:<br>  o Crawford and Paonia Dams (project purpose, CRSP)<br>  o Uncompahgre Project Canals (Shavano Falls, several additional sites on South Canal, etc.)<br>• Dam-site and Power-site Withdrawals: The Gunnison River has (or had) some withdrawals for dam and/or power sites, particularly along gorges and canyons. Similar withdrawals may exist on some of the other rivers within the planning area, particularly those with narrow canyons (Dolores, San Miguel, etc.) Those withdrawals constitute a reservation of those lands for those potential purposes. The potential for hydro-power at these sites should be addressed as part of the RMP revision. | |



Page 1

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109916

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | • Ancillary facilities- the above sites may need right-of-way or lease options for hydro-power related facilities (transmission lines, substations, penstocks, roads, etc.) on adjacent BLM lands. Therefore, we need to keep BLM lands in these general areas available for such rights-of-way, leases, etc. | |
| 4. | Alan Schroeder (Bureau of Reclamation, Cooperating Agency, via e-mail 5/16/2011) | State Lands with Federal Minerals-<br>State Parks (Crawford, Paonia, Ridgway)<br>• Land Status- These three reservoir areas are, in fact, Bureau of Reclamation (BOR) lands, related to the Smith Fork, Paonia, and Dallas Creek Projects, respectively. These areas are managed for recreation by State Parks under an agreement with BOR. These areas include both acquired and withdrawn lands. Our withdrawn lands are generally not withdrawn from mineral leasing, however, the actual degree of withdrawal is dependent on the specific withdrawal order(s). Also, we may not have acquired all private minerals on our acquired lands; we sometimes acquired only certain minerals, but subordinated to the interests of our project those mineral rights retained by the seller. Those subordinations are usually similar, but actual wording may vary according to the land purchase contract or deed.<br>• Administrative Jurisdiction (1983 BOR/BLM IA)<br>    o Sec. 5 Management of Reclamation Withdrawn and Acquired Lands- these areas are Section 5A lands as defined by the IA; they fall under BOR's management jurisdiction.<br>    o Sec. 6H Mineral and Geothermal Leases- ". . . BLM will not issue permits, leases, or licenses on acquired or withdrawn lands under Reclamation's management without Reclamation's consent and concurrence on all conditions and stipulations. . . ." While BLM generally has administrative jurisdiction for the leasing of and development of mineral leases on 5A lands, BOR determines whether leasing is permissible and, if so, provides any stipulations necessary to | |

Page 2

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)



BLM_0109917

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | protect the interest of the US.<br>• Range of Alternatives<br> ○ Preferred Alternative- We prefer that leasable federal minerals underlying the above State Parks be designated "No Lease." These areas are relatively small and narrow with little room for mineral development; plus, mineral development is usually not compatible with recreational interests or State Park objectives.<br> ○ Leasing of oil/gas underlying the above State Parks with a "No Surface Occupancy" (NSO) could be included within one of the alternatives.<br>• Stipulations and Conditions of Approval-<br> ○ If federal leasable minerals or geothermal resources underlying BOR lands are leased, at a minimum, the conditions in Reclamation's Manual, Directives and Standards LND 06-01 Land Acquisition; Part 3, I Conditions Applying to Mineral Operations, should be applied to said leases.<br> ○ On oil/gas or geothermal leases in close proximity to Reclamation dams or other permanent structures the following conditions should be applied:<br> ▪ No drilling shall be allowed within 1500 feet, both horizontally and vertically, of a Reclamation dam or its appurtenant structures in order to protect the integrity of these structures.<br> ▪ No drilling shall be allowed within 200 feet of the boundary of the right-of-way of any canal, tunnel, aqueduct, pipeline lateral or drain. Of concern within this Planning Area are the various features of the Uncompahgre Project (particularly the Gunnison Tunnel), the Fruitgrowers Dam Project, the Paonia Project, the Smith Fork Project, and the Dallas Creek Project, the Bostwick Park Project.<br> ▪ Use or crossings of Reclamation facilities must be | |



Page 3

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109918

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | approved by Reclamation in writing prior to such use or crossing. | |
| 5. | Alan Schroeder (Bureau of Reclamation, Cooperating Agency, via e-mail 5/16/2011) | State Lands with Federal Minerals- State Wildlife Areas<br>• No Surface Occupancy- BOR supports the CDOW's position of "No Surface Occupancy" (NSO) for leasing of federal minerals in its State Wildlife Areas (SWA)<br>• Land Status: Portions of several State Wildlife Areas within the Planning Area (Billy Creek, Cimarron, possibly others) are BOR wildlife mitigation lands (withdrawn or acquired) for various BOR projects (Dallas Creek, Aspinall Unit). These mitigation lands were transferred to the State of Colorado to be managed for wildlife purposes. The transfers included a reversionary clause; if not managed for wildlife purposes, the land would revert back to the US. | |
| 6. | Alan Schroeder (Bureau of Reclamation, Cooperating Agency, via e-mail 5/16/2011) | Federal Leasable Minerals underlying BOR lands within other Federal land management Units (This is a situation similar to the BOR lands within State Parks)<br>Curecanti National Recreation Area (CNRA) and some BOR withdrawn lands  currently outside of the CNRA<br>• preferred alternative, "No Lease" (same rationale as for State Parks)<br>• Again, another alternative for oil/gas might consider leasing, with a "No Surface Occupancy" stipulation.<br>• Requires coordination with the National Park Service  § GMUG National Forest (two BOR reservoir areas within the Forest boundaries may be within the UFO Planning Area)<br>• Silver Jack Reservoir (Bostwick Park Project)- preferred No Lease (same rationale as for State Parks); also requires coordination with USFS<br>• Taylor Park Reservoir- (Uncompahgre Valley Project)- preferred No<br>• Lease (same rationale as for State Parks); also requires | |

Page 4

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)



BLM_0109919

**BLM – U**NCOMPAHGRE **F**IELD **O**FFICE, **C**OLORADO
**R**ESOURCE **M**ANAGEMENT **P**LAN **R**EVISION AND **E**NVIRONMENTAL **I**MPACT **S**TATEMENT

### Internal Rough Draft Alternatives – Feedback Received from
### Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | coordination with USFS | |
| | | • Again, another alternative for oil/gas might consider leasing, with a "No Surface Occupancy" stipulation for these reservoir areas. | |
| | | • Stipulations and Conditions of Approval- see listings under "State Parks." | |
| 7. | Alan Schroeder (Bureau of Reclamation, Cooperating Agency, via e-mail 5/16/2011) | Right of Way Corridors- In addition to the Westwide Energy Corridors, BLM should consider right-of-way corridors along the following features: <br>• US Highways 50 and 550 <br>• State Highways 92 and 133 <br>• Major oil/gas pipelines (KinderMorgan TransColorado, etc.) <br>• WAPA and other major electrical transmission lines | |
| | | *Via Cooperating Agency Meeting (5/12/2011)* | |
| | | *Renewable Energy* | |
| 8. | Alan Schroeder (Bureau of Reclamation) | BOR is moving forward with hydropower facilities at Ridgway Dam and on the South Canal, Uncompahgre Project (near Montrose). | |
| 9. | Steve White (Montrose County) | When someone comes forward with a solar or wind proposal, is there another process? *Answer*: Yes, we have to go through NEPA for all projects. But if we can tier the assessment to our plan, it makes the process much easier. <br> If that's the case, I would think it would be better to say not where you want it but where you don't want it. <br> BLM: There will be some areas that are excluded. Exclusion means no rights-of-way (ground disturbance). Things that fall under ROWs: roads, renewable energy, transmission lines, reservoirs. In exclusion areas, this means no renewable energy. The exclusion areas are not random, but if we know that there is interest in renewable development, we want to make sure we look closely at that area to see if restriction is really warranted. We also want to know if there is anything in other plans so that we can try to be consistent. <br> Steve White (Montrose County): Montrose County plan will likely say it's allowed everywhere and then each project would be | |


Page 5

Internal Rough Draft Alternatives – Feedback Received from Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109920

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | evaluated individually. BLM: right now the verbiage is something to the effect of "If wind or solar applications are brought up, they would be allowed unless otherwise restricted." It's very flexible. Other plans are identifying "emphasis areas" where they know there is interest in such development. | |
| 10. | Joan May (San Miguel County) | One of the things that is difficult with these projects is that they are highly visible, you have to build roads to get to them, and they have to be close to existing transmission lines. | |
| 11. | Renzo DelPiccolo (Colorado Division of Wildlife) | I think we should consider making this a non-issue because DOE did an assessment for wind and this area falls into the marginal category. For solar, one of the big issues is water. It's hard to imagine a situation where we would put a solar plant on BLM… where would we get the water? Would it be private water? | |
| 12. | Susan Hansen (Delta County) | Could it just be an acknowledgment that in 30 years things could change but right now we can't identify any specific areas. | |
| 13. | Alan Schroeder (Bureau of Reclamation) | Is anyone discussing biomass? | In the forestry section we talk about biomass. It's not specific to carbon sinks. It guides to certain areas in the field office that might be appropriate. biomass also has constraints like solar on how far it is from who is using it, etc. |
| 14. | Alan Schroeder (Bureau of Reclamation) | On Gunnison Gorge, there are powersite withdrawals and they said no new facilities there. | |
| 15. | Jen Coates (Town of Ridgway) | San Miguel and Ouray Counties have a plan to generate 20% of energy from renewable in the next 20 years. The biggest issue with the renewable projects was visibility. We decided that it was a good idea but didn't want it to be so highly visible so we started looking at other options. The County has supported the Tri-County (Ridgway) hydro project. Action Item: Jen will e-mail the plan to BLM (Bruce). | |
| | | *Communication Sites (e.g., cell towers, radio stations, law enforcement communication, etc. most of what we have right now is "low power.")* | |


Page 6
Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109921

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 16. | Pat Means (Town of Cedaredge) | Around Cedaredge area we have some holes in cell phone communication. There's also some plans to increase broadband. | |
| 17. | Susan Hansen (Delta County) | There's an initiative that started in San Juan called Operation Uplink to increase broadband access. | |
| 18. | Jen Coates (Town of Ridgway) | As part of statewide initiative, broadband is generally a top goal of most communities. | |
| 19. | Mike Pelletier (Gunnison County) | Working on getting DSL in Sommerset, don't know exactly where they are. Also getting cell service on Hwy 33. | |
| | | *Utility Corridors: Right now we don't have any designated corridors except for the West-wide Energy Corridor which was a nation-wide effort.* | |
| 20. | Barbara Peterson (Town of Paonia) | Is this going to go to the utility companies? | DMEA is on the RAC Subgroup, so they will know. Our realty specialist has also been in touch with Western Area Power Administration. |
| 21. | Barbara Peterson (Town of Paonia) | Is Source Gas on any committees? | No. |
| 22. | Steve White (Montrose County) | Have you looked at old O&G wells? Knowing that they could be produced if they could get access. | |
| 23. | Susan Hansen (Delta County) | Is railroad considered a utility? Oxbow considering new mines that would require railroad expansion. Don't want to preclude that. | |
| | | *Hunting Permits: In our current plans, it's pretty open. We evaluate the person to make sure they're going to follow the rules and such and then we issue a permit. We are thinking of limiting the number of permits. This would mean that the people who get permits wouldn't have to compete with other permitees. On the one hand, leaving it open, it makes the permitees have to compete with each other (free market). If you have a limit of 8, the 9th person is out of luck. On the other hand, if we limit the number, the value of their business goes up because the number of businesses allowed to is limited* | |
| 24. | Renzo DelPiccolo (Colorado Division of Wildlife) | The USFS does limit the number of permits and they give the permitee a specific area that they can outfit in and also limits the number of days they can be out. The BLM gives them a wider area, sometimes the whole Field Office. The BLM doesn't give a specific number of days, they just have to report back to BLM. They also | |



BLM_0109922

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO
RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | hunt the lands differently. Outfitters on BLM tend to use vehicles more, stay in lodges, etc, where USFS is more tents, camping, and vehicles. We feel that setting limits makes sense. The quality might be better. Public hunters tend to maybe have conflicts (perceived?) with outfitters. | |
| 25. | Pat Means (Town of Cedaredge) | It seems to me that the more people who are out there create more of a safety hazard. Is that something to consider? | Renzo DelPiccolo (Colorado Division of Wildlife): That probably wouldn't change because the number of hunters wouldn't change. Everyone still has to get a permit. Whether you hire an outfitter or go on your own, it's still the same number of guns. |
| 26. | Charlie Sharp (US Fish and Wildlife Service) | Is there a higher success rate with outfitters versus private? | Renzo DelPiccolo (Colorado Division of Wildlife): Not really. Most people do it because of the conveniences. |
| 27. | Bill Long (Town of Nucla) | How would the businesses be better if there are a limited number of permits? There isn't competition. | Renzo DelPiccolo (Colorado Division of Wildlife): The cream rises to the top over the long-term. |
| 28. | Susan Hansen (Delta County) / Joan May (San Miguel County) | Is there a problem right now? | BLM (Barb): I don't perceive this as a problem right now. |
| 29. | Alan Schroeder (Bureau of Reclamation) | Where do the permittees go now? | They can go anywhere. |
| 30. | Alan Schroeder (Bureau of Reclamation) | How big is a game management unit? | CDOW: This largest is about half of the Plateau. The smallest is a couple thousand acres. |
| 31. | Joan May (San Miguel County) | Given limited resources, does BLM need one more thing to manage? The number might make it more difficult for BLM staff. | There are a few things. One is how we decide what the number is. Once we get there, it might make it easier on the staff. |
| 32. | Renzo DelPiccolo (Colorado Division of Wildlife) | One thing to consider is that for lions there is a quota so once a GMU meets the quota, they have to go somewhere else. So in that case we are less compelled to limit the number of permits. Most people who hunt lion use guides. | |



Page 8

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109923

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

### Internal Rough Draft Alternatives – Feedback Received from
### Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 33. | Susan Hansen (Delta County) | The way the Colorado system works, some people are waiting to see how they come out with lotteries in other states to see if they'll get a tag in Colorado. | |
| 34. | Pat Means (Town of Cedaredge) | If it's not a problem, why do you need to change it now? Unless it would be a problem to limit later. | |
| 35. | Charlie Sharp (US Fish and Wildlife Service) | Maybe instead of a set number for all GMUs you could have different numbers for different GMUs. | |
| 36. | Alan Schroeder (Bureau of Reclamation) | And it would seem that if you're not having a problem now and you limit it, it may become a problem. | |
| 37. | Jen Coates (Town of Ridgway) | Have other field offices done this? | BLM: other FOs have. Charlie Sharp: Little Snake doesn't have a cap per se, but they do look at it informally to direct outfitters to certain areas. |
| 38. | Pat Means (Town of Cedaredge) | Who does the count of how many animals are out there? | DOW. |
| 39. | Susan Hansen (Delta County) | I think let free-enterprise take care of it. | |
| | | *Organized Group Permits: In our SRP program, in order to protect certain resources, we can set thresholds for when permits would be required for groups. Right now there are no thresholds. For example, we know that there is a "group" that will be coming to BLM over Memorial Day to do some extreme Jeeping. To clarify, these are not across-the-board restrictions. Certain places might have different restrictions.* | |
| 40. | Joan May (San Miguel County) | Yes, a limit is needed. There are of impacts that can happen. | |
| 41. | Barbara Peterson (Town of Paonia) | Agree. Plus with a group permit you have set areas you can be in and requirements. | |
| 42. | Steve White (Montrose County) | I think the vehicle numbers are a little high. The vehicle number should be lower. | |
| 43. | Steve White (Montrose County) | How do you know who organized the event and who would you give a citation to if they didn't get the permit? | Well sometimes it would be difficult but most people would good about it, probably. |

Page 9

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)



BLM_0109924

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 44. | Steve White (Montrose County) | The biggest issue is noise. We don't have a noise ordinance. | We can put those requirements in the permit such as be quiet by 10:00. |
| 45. | Steve White (Montrose County)/ Joan May (San Miguel County) | A number is good but they need to be more restrictive than what is proposed. | |
| 46. | Jen Coates (Town of Ridgway) | What does a permit do for you? | There is a charge which is set nationally, I think $5 per person. Essentially we would be able to ask the permit holder to have toilets, make them park in a certain area, etc. These would be requirements so if they don't have a permit there could be legal recourse. |
| 47. | Bill Long (Town of Nucla) | You could have some areas with no limits. | |
| | | *Target Shooting: This is different than hunting. We have to provide public safety and in some areas there is currently, perhaps, a safety issue. We couldn't post it everywhere, but we'd post it on the Web site, in rec sites, kiosks, etc. It would also give recourse to property owners to call law enforcement.* | |
| 48. | Joan May (San Miguel County) | It seems like a good idea. You should show the areas where you can go target shoot. | |
| 49. | Alan Schroeder (Bureau of Reclamation) | Safety is a major issue so if you can find some places with a good backstop so people can't come up from behind, that would be good. Also having requirements that people have to clean up their shells and trash. | |
| 50. | Steve White (Montrose County) | I have no problem with residences, that makes sense. But perhaps from powerlines from facilities. It seems like you're trying to regulate people that have no common sense and people who don't have common sense are still going to be doing those things and not picking up after themselves. From a Montrose County perspective, I think you'd get some pushback for this. | |
| 51. | Susan Hansen (Delta County) | How are you going to enforce this? | Well it would be enforceable if you saw it. |



Page 10

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109925

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 52. | Jen Coates (Town of Ridgway) | Did you consider designating specific areas for target shooting? | Our policy now nationally is that if a community wants to have a target shooting area, the BLM will work with that group to lease the land and if the area worked out we might transfer the land to them. The BLM is not in the business of running businesses, we manage land. Because of the hazardous waste that it creates, it becomes more of a cleanup process and safety issue. |
| 53. | Renzo DelPiccolo (Colorado Division of Wildlife) | You wonder if having a range would funnel people to those areas so there wouldn't be problems elsewhere. Probably not. There are also some laws about public safety. The reality is that there are few shooting accidents. It's more of an annoyance. | |
| 54. | Barbara Peterson (Town of Paonia) | It should be "manned" locations, not just any developed facility. | |
| 55. | Joan May (San Miguel County) | Maybe it should be greater than 0.25-mile. Noise travels far and you could be not on the edge of BLM land and still be bothered by it. | |
| | | *North Delta OHV Open Area: There is an "open" area just north of Delta. There is a federally threatened plant (cactus) in the area. We're not sure if we could get through the consultation process with USFWS leaving it open. In the last plan we said we'd survey for plants but never did. There are a lot of routes out there. One of our options is to limit travel in the area to designated routes. There are a lot of routes out there already, fewer in the northern area. Open means you can go anywhere you want (cross-country).* | |
| 56. | Pan Means (Town of Cedaredge) | What is the economic impact? | It's local day-use. |
| 57. | Susan Hansen (Delta County) | Do you have many open areas in the FO? Except for the cactus it's a good place to go. | There are two areas in the Gunnison Gorge NCA and the North Delta area. So in this planning area it's just North Delta. The other issue there [besides cactus] is selenium. There is a very high selenium content in the area which can negatively impact fish. We are under a mandate to protect listed species that could be impact by the runoff. |

Page 11

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)



BLM_0109926

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 58. | Steve White (Montrose County) | Have they studied it to see if the shale is on the top? We are putting the issue on hold in our plan because the science doesn't seem to be conclusive. The issues we saw didn't seem to be enough to create a problem. We found that septic systems even have a limited impact on percolation. If there are areas that are undisturbed that you could leave undisturbed and maybe around the cactus, you could do that. Maybe limit the facilities. | |
| 59. | Alan Schroeder (Bureau of Reclamation) | What about sediment retention ponds below the open area. | |
| 60. | Mike Pelletier (Gunnison County) | Is dust an issue? | Don't know. |
| 61. | Jen Coates (Town of Ridgway) | Is it feasible to map the trails? | Yes. |
| 62. | Pan Means (Town of Cedaredge) | So what is the problem? | Well one problem is the cactus and by saying it's open, you could be going contrary to federal law. The other issue is that federal land managers are moving towards a designated roads system, so do you want to say designated roads everywhere except here. In the GGNCA we've had success designating routes and improving the safety. |
| 63. | Steve White (Montrose County) | How would you manage for designated routes? | In GGNCA we put up a lot of fences and marked all of the routes. We've found that people generally stay on the routes. The routes provide challenges. |
| 64. | Susan Hansen (Delta County) | Is there a perception that there is a choice and if you take the choice away, people won't like it. | |
| 65. | Charlie Sharp (US Fish and Wildlife Service) | We know there are plants there, but it's probably lower density and not very good habitat. As far as consultation goes, there probably won't be much of a difference between designation vs. open because we'd require a 100-meter buffer survey from all routes. Doing route-by-route designation would be preferable. | |
| | | *Ouray County's plans for gravel pit northeast of Ridgway and within* | |



Page 12

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109927

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | *potential Ridgway Trails SRMA:* | |
| 66. | Barb Sharrow (BLM Field Manager) | There is an existing gravel pit and in the same area we've had a group proposing a trail system. Barb met with Ouray County and we are going to try to do both (gravel pit and trail system). Because of laws, some existing routes will have to be closed immediately. This is an issue that came up in RMP planning that will have to be resolved more immediately. | |
| | | *Colorado State/CDOW lands open or closed to oil/gas leasing, or having No Surface Occupancy on those lands:* *Note:* For lands that are already leased, this plan will not affect those leases. The restrictions in this plan would be applied to new leases or leases that expire. | |
| 67. | Alan Schroeder (Bureau of Reclamation) | On State Parks, they're Reclamation lands operated by state parks. I would say a range of alternatives. Our preference would be No Lease. With NSO a lot of the areas are so narrow and small that the visual aspect will come into play and be difficult. Water quality may become an issue. We would also like protection of our facilities so no drilling within 1500 feet of dams and associated facilities extending both horizontally and vertically. | |
| 68. | Barbara Peterson (Town of Paonia) / Jen Coates (Town of Ridgway) | I know my people would not want to see any occupancy at all either above or below. | |
| 69. | Barbara Peterson (Town of Paonia) | We also need protection for source water protection areas. | |
| 70. | Renzo DelPiccolo (Colorado Division of Wildlife) | For DOW lands (e.g., Billy Creek, Dry Creek Basin) we have asked for NSO. The state has purchased those lands for hunting and such and O&G is not compatible. So we would ask for NSO. For occupied Gunnison sage-grouse (regardless of surface ownership) we would ask for no leasing. San Juan RMP is considering this for all federal mineral estate. | |
| 71. | Charlie Sharp (US Fish and Wildlife | You might consider historical habitat as well in some cases. | |



Page 13

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109928

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
|  | Service) |  |  |
| 72. | Bruce Krickbaum (BLM) | What about school board lands? | Renzo DelPiccolo (Colorado Division of Wildlife): In my experience they would lease the lands to generate money. |



BLM_0109929

US Bureau of Land Management, Uncompahgre Field Office
Uncompahgre Resource Management Plan (RMP) & Environmental Impact Statement (EIS)
**BLM Cooperating Agency and Resource Advisory Council (RAC) Subgroup Milestone Tasks
through Publication of Draft RMP/EIS**
*May 19, 2011*

| Applicable Group | Start Date[1] | Finish / Due Date[1] | Item for Cooperating Agency and RAC Subgroup Review / Comment[2] | Applicable Chapter of Draft RMP/EIS |
|---|---|---|---|---|
| Cooperating Agencies | 6/23/2011 | 6/23/2011 | Hold Meetings to:<br>• Discuss the alternatives-development process since January 2011, including Cooperating Agency and RAC Subgroup comments on the January 2011 internal rough draft alternatives<br>• Kickoff Cooperating Agency and RAC Subgroup review of Internal Draft Chapter 2 (Alternatives) | 2 (Alternatives) |
| RAC Subgroup | 6/24/2011 | 6/24/2011 | | |
| Cooperating Agencies & RAC Subgroup | 6/23/2011 | 7/15/2011 (3 weeks) | Review Internal Draft Chapter 2 (Alternatives) (concurrent with BLM Uncompahgre Field Office review of chapter) | 2 (Alternatives) |
| *BLM Uncompahgre Field Office[2]* | *7/18/2011* | *8/19/2011* | *BLM Uncompahgre Field Office revises Draft Chapter 2 (Alternatives) for submission to BLM Colorado State Office based on Cooperating Agency, RAC Subgroup, and BLM Uncompahgre Field Office comments on Internal Draft Chapter 2 (Alternatives)* | *2 (Alternatives)* |
| Cooperating Agencies | 8/11/2011 | 8/11/2011 | Hold Meetings to:<br>• Discuss Cooperating Agency, RAC Subgroup, and BLM Uncompahgre Field Office comments on Internal Draft Chapter 2 (Alternatives) and any resulting changes to the alternatives to be provided to the BLM Colorado State Office for review<br>• Discuss Cooperating Agency and RAC Subgroup recommendations regarding whether range of alternatives is reasonable | 2 (Alternatives) |
| RAC Subgroup | 8/12/2011 | 8/12/2011 | | |
| *Southwest RAC[2]* | *8/26/2011* | *8/26/2011* | *Southwest RAC meeting to hear RAC Subgroup recommendations regarding whether range of alternatives is reasonable* | *2 (Alternatives)* |
| *BLM Colorado State Office[2]* | *8/22/2011* | *9/2/2011* | *BLM Colorado State Office reviews Draft Chapter 2 (Alternatives)* | *2 (Alternatives)* |
| *BLM Uncompahgre Field Office[2]* | *9/6/2011* | *10/18/2011* | *BLM Uncompahgre Field Office finalizes Draft Chapter 2 (Alternatives) for impact analysis (Chapter 4, Environmental Consequences), changes based on COSO comments.* | *2 (Alternatives)* |
| *BLM Uncompahgre Field Office[2]* | *10/19/2011* | *1/11/2012* | *BLM Uncompahgre Field Office prepares Draft Chapter 4 (Environmental Consequences)* | *4 (Environmental Consequences)* |
| Cooperating Agencies | 1/12/2012 | 1/12/2012 | Hold Meetings to:<br>• Kickoff Cooperating Agency and RAC Subgroup review of Internal Draft Chapter 4 (Environmental Consequences) | *4 (Environmental Consequences)* |
| RAC Subgroup | 1/13/2012 | 1/13/2012 | | |

BLM_0109930

| Applicable Group | Start Date[1] | Finish / Due Date[1] | Item for Cooperating Agency and RAC Subgroup Review / Comment[2] | Applicable Chapter of Draft RMP/EIS |
|---|---|---|---|---|
| Cooperating Agencies & RAC Subgroup | 1/12/2012 | 2/2/2012 (3 weeks) | Review Internal Draft Chapter 4 (Environmental Consequences) (concurrent with BLM Uncompahgre Field Office review of chapter) | 4 (Environmental Consequences) |
| *BLM Uncompahgre Field Office[2]* | *2/3/2012* | *3/7/2012* | *BLM Uncompahgre Field Office revises Chapter 4 (Environmental Consequences) based on Cooperating Agency, RAC Subgroup, and BLM Uncompahgre Field Office, and prepares remainder of internal Draft RMP/EIS* | *4 (Environmental Consequences) & Internal Draft RMP/EIS* |
| Cooperating Agencies | 3/8/2012 | 3/8/2012 | Hold Meetings to:<br>• Kickoff Cooperating Agency and RAC Subgroup review of Internal Draft RMP/EIS (all chapters) | Internal Draft RMP/EIS |
| RAC Subgroup | 3/9/2012 | 3/9/2012 | | |
| Cooperating Agencies & RAC Subgroup | 3/8/2012 | 3/30/2012 (3 weeks) | Review Internal Draft RMP/EIS (all chapters) (concurrent with BLM Uncompahgre Field Office review of document) | Internal Draft RMP/EIS |
| *BLM Uncompahgre Field Office[2]* | *4/2/2012* | *4/20/2012* | *BLM Uncompahgre Field Office revises Internal Draft RMP/EIS for submission to BLM Colorado State Office based on Cooperating Agency, RAC Subgroup, and BLM Uncompahgre Field Office comments* | *Internal Draft RMP/EIS* |
| *BLM Colorado State Office[2]* | *5/14/2012* | *6/4/2012* | *BLM Colorado State Office reviews Internal Draft RMP/EIS* | *Internal Draft RMP/EIS* |
| *BLM Uncompahgre Field Office[2]* | *6/5/2012* | *6/29/2012* | *BLM Uncompahgre Field Office revises Internal Draft RMP/EIS for submission to BLM Washington Office based on BLM Colorado State Office comments* | *Internal Draft RMP/EIS* |
| Cooperating Agencies | 6/14/2012 | 6/14/2012 | Hold Meetings to:<br>• Discuss Cooperating Agency, RAC Subgroup, and BLM Colorado State Office comments on Internal Draft RMP/EIS and any resulting changes to the document to be provided to the BLM Washington Office for review | Internal Draft RMP/EIS |
| RAC Subgroup | 6/15/2012 | 6/15/2012 | | |
| *BLM Washington Office[2]* | *7/2/2012* | *9/24/2012* | *BLM Washington Office reviews Internal Draft RMP/EIS* | *Internal Draft RMP/EIS* |
| *BLM Uncompahgre Field Office[2]* | *9/25/2012* | *11/9/2012* | *BLM Uncompahgre Field Office revises Internal Draft RMP/EIS based on BLM Washington Office comments and prepares public Draft RMP/EIS* | *Public Draft RMP/EIS* |
| Cooperating Agencies | 10/4/2012 | 10/4/2012 | Hold Meetings to:<br>• Discuss BLM Washington Office comments on Internal Draft RMP/EIS and any resulting changes to the document to be published as public Draft RMP/EIS | Public Draft RMP/EIS |
| RAC Subgroup | 10/5/2012 | 10/5/2012 | | |
| *BLM Uncompahgre Field Office[2]* | *11/9/2012* | *11/9/2012* | *Publish public Draft RMP/EIS for 90-day public review period* | *Public Draft RMP/EIS* |
| Public Review Period | 11/9/2012 | 2/7/2013 | 90-day public review period on Draft RMP/EIS | Public Draft RMP/EIS |

[1] Dates are subject to change

[2] *Italicized* items would not require involvement of the Cooperating Agencies or RAC Subgroup

BLM_0109931

## James Bode

| | |
|---|---|
| **From:** | bkrickba@blm.gov |
| **Sent:** | Thursday, June 09, 2011 5:00 PM |
| **To:** | sbear@dmea.com; Steve.weist@oxbow.com; John@reams-construction.com; billday@paonia.com; rich@richdurnanphoto.com; Robbie.levalley@colostate.edu; Wblack8709@msn.com; pmueller@tnc.org; silvers1@tds.net; tkctew@yahoo.com; barbara_hawke@tws.org; bsharrow@blm.gov; dkauffma@blm.gov; dmagee@blm.gov; Bruce_Krickbaum@co.blm.gov; Angie Adams; Kate Wynant; bbott68@gmail.com; UFO AR |
| **Subject:** | Final Minutes: Uncompahgre RMP RAC Subgroup Meeting #7 |
| **Attachments:** | UFO-SG_2011-05-13_FinalMinutes.pdf; Milestones-thru-DRMP_05192011.docx |

Hello RAC Subgroup,

Thank you to everyone who attended the May 13 meeting.  We appreciate the good discussion on various topics for consideration in the draft alternatives.
I have attached the final minutes from the May 13 meeting.

Also, at the request of  Cooperating Agencies, I have attached a timeline that provides a road map of Cooperating Agency and RAC Subgroup involvement from now through the public Draft RMP/EIS.  It includes the specific points at which your review and comment will be requested on parts of the internal draft document before it is released to the general public.  Dates are subject to change.

The schedule for the next two meetings is:
June 24 (Friday) 9:00 -  12:00 (Holiday Inn Express, Jordan Room), August 12 (Friday) 9:00 -  12:00

At  our June 24 meeting, we will give you the draft alternatives for your
review.   The field office staff will be reviewing this document at the
same time.

Please let me know if you will not be able to attend the June 24 meeting.

Regards,
Bruce

 (See attached file: UFO-SG_2011-05-13_FinalMinutes.pdf)       (See
attached file: Milestones-thru-DRMP_05192011.docx)

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

BLM_0109932



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401



# RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #7
## Friday, May 13, 2011 (9:00 AM – 12:00 PM)

### Meeting Location:
### Holiday Inn Express (Jordan Room)
### 1391 South Townsend Avenue, Montrose, CO

# Meeting Notes

**Attendees:** Angie Adams (EMPSi), Robbie Baird-LeValley, Shelby Bear, Walt Blackburn, Bill Day, William Ela, Barbara Hawke, Bruce Krickbaum (BLM Uncompahgre Field Office), Peter Mueller, John Reams, Barb Sharrow (BLM Uncompahgre Field Office), Steven Weist, Kathy Welt (via phone), Kate Wynant (EMPSi)

**Handouts:** Agenda; Highlights of the Resource Management Planning Process to Date

1. **Welcome** (Bruce Krickbaum)
   - We've been working on alternatives and it's taken longer than we thought which is why we had to delay the last meeting.

2. **Introductions** (all present)

3. **Planning Process to Date** (Angie Adams and Kate Wynant)
   - The bulk of what BLM has been doing is working on alternatives. *Action:* We will send you an email with a roadmap of what's to come in the next year and when you'll be involved. The next thing for you is Draft Chapter 2 for your review which we'll provide at the June 24 meeting. At that meeting we'll talk about the alternatives and how you can provide comments. You'll have three weeks to review and provide comments. Your review is concurrent with the cooperating agencies review and BLM interdisciplinary team review. The BLM has not seen all of the alternatives together in one package even though they've been working on it, so you'll see it when they see it. This one will have maps and acreages so you have context for the alternatives. This will be the first crack at a solid draft but it's still a draft and an internal draft. We're not ready for it to be released to the public. We wanted to give you some insights into it so you can provide feedback so when it's at the public draft stage it's in the best shape it can be.
   - *Action:* Before the June 24 meeting we'll give you response to comments you provided on the January rough alternatives. What you reviewed in January was a range of five alternatives from current management with no discussion of the preferred alternative. Since then the BLM has developed the preferred alternative and then combined/condensed some of the alternatives so there are now four alternatives, current management plus three action alternatives (including the preferred alternative). So it'll look a little different but we kept the range of alternatives so that the "edges" are still there.

BLM_0109933

- *Question:* Some of us had wanted to see the preferred mixed and matched. I have a concern that when you combine the alternatives is that they become polarized extremes. How are you trying to avoid that? *Answer:* Well we developed the preferred from the range of alternatives so it's a mixture of everything, not just exactly in the middle. Some things are the same as existing situation and some are on the other side. Each alternative will have a theme because the whole alternative has to fit together. It that sense, the challenge is to create alternatives that all make sense together. However because we developed the preferred alternative after developing a good range of alternatives, the preferred is hopefully a better outcome.
- *Question:* Once you come out with the preferred, that will go to Barb Sharrow for the Record of Decision (ROD)? You have not lost your independence at that point have you? *Answer:* There will not be a ROD just based on the alternatives. The ROD won't come for three or so years. Barb makes the recommendations to the state director and she's actually the signatory on the ROD. We'll lay out that general process in an e-mail so you can see it all in writing.
- Air quality report is now expected in winter 2011/2012
- The wilderness characteristics report is on hold because of the federal funding bill that had specific language not to do wilderness characteristics inventory. Report is on hold until we get guidance from Secretary Salazar on how to carry out FLPMA within the budget parameters.
- *Question:* Where does wild and scenic come in? *Answer:* Wild and scenic rivers is a separate topic from wilderness, wilderness study areas, national conservation areas. The eligibility and draft suitability studies have been done and those outcomes will be part of the range of alternatives. The BLM is mandated to consider an alternative that considers all eligible segments as suitable, one that considers all eligible segments as not suitable, and the preferred is whatever the suitability study actually finds, and this group was a large part of that.

## 4. Internal Draft Alternatives – Group Feedback on:

See attachment: Internal Rough Draft Alternatives – Feedback from Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19, 2011).

a. **Renewable Energy**

b. **Communications Sites**

c. **Utility Corridors**

d. **Hunting Permits (Outfitters)**

e. **Organized Group Permits**

f. **Target Shooting**

g. **North Delta OHV Open Area**

h. **Ouray County's plans for gravel pit northeast of Ridgway and potential Ridgway Trails SRMA?**

i. **Colorado State/CDOW's thoughts on having state lands open or closed to oil/gas leasing and no surface occupancy?**

## 5. Public Comments

- Shannon Borders (BLM): Consider fiber optic needs in utilities.
- Lee Gelatt (Western Colorado Congress):
  - Renewable energy: Consider putting in already disturbed areas and protect areas.

BLM_0109934

    o   North Delta OHV Open Area: Probably okay as long as it does not bleed into the adobe badlands.

## 6. Other Items Not on the Agenda

## 7. Action Items / Next Meeting



- Next meeting: Friday, June 24, 2011, 9:00am–12:00pm, Holiday Inn Express, Montrose
- *Action:* Shelby Bear will send rough maps showing the areas of potential future transmission corridors (Doughspoon substation to Cedaredge and East Montrose substation along South Canal).
- *Action:* BLM will send you an email with a roadmap of what's to come in the next year and when you'll be involved.
- *Action:* Before the June 24 meeting BLM will give you response to comments you provided on the January rough alternatives.

**Uncompahgre RMP/EIS**                                                                            **April 19, 2011**

*April 19, 2011, email from Bruce Krickbaum, BLM UFO, to all Cooperating Agency Representatives and RAC Subgroup Members:*

…We need to discuss several topics at the May 12/13 meeting.  The following are issues we want your opinions on.  There will most likely be an array of thoughts on each, but the discussion will help us frame the alternatives and potential preferred action.  Please think about these issues and be prepared to discuss during the meeting.  Written information and/or maps would also be welcomed.

**Renewable Energy.**  During several of our initial meetings, we discussed renewable energy and asked for information regarding potential renewable energy sites or projects.  We are at the stage that we need to know if communities, counties or agencies know of any renewable energy projects that are being discussed, or locations that have been identified as having potential over the next 20 - 30 years.  Note:  we can be very general in the decision, and say projects would be allowed throughout the planning area.  However, it would be great to also list specific areas as renewable energy emphasis areas (wind, solar).

**Communications Sites.**  Are there any specific areas communities or counties know of that have been discussed as potential communications sites?  If there are known potential sites, it would make the future NEPA analysis less complex if identified in the RMP.

**Utility Corridors.**  Are there any specific areas that should be identified as utility corridors?  Are you speaking with the utility companies?  Have you identified places in your master plans that we should emulate?

**Hunting Permits (Outfitters).**  We are discussing how to handle the number of permits issued to hunting outfitters.  Should we limit the number of permits, or not?  If we do not limit the number of permits, we would issue a permit to all outfitters that qualify, and let the market and hunting conditions regulate the number that remain in business.  Or, we could limit to number of outfitters permits to improve the chances of a quality hunting experience for the clients.  If we limit the number of permits, one number we are considering is limiting permits to eight (8) big game outfitter permits per game management unit, and to ten (10) mountain lion guide/outfitter permits in the planning area.

**Organized Group Permits.**  We are discussing the numbers associated with Special Recreation Permits.  We issue Special Recreation Permits to protect natural and cultural resources, protect recreational and natural resources, and provide for visitor health and safety.  We are considering Special Recreation Permits for organized groups  expecting more than 40 vehicles or 80 people, including spectators.  What are your thoughts?

**Target Shooting.**  We would like your thoughts on prohibiting target shooting within 0.25-mile of a residence and developed facilities (e.g., power substations, powerlines, communication sites).  This is primarily for safety concerns.

**North Delta OHV Open Area.**  We would like your thoughts regarding limiting all travel in North Delta OHV Open Area to designated routes, and designating all routes.

**For Ouray County.**  What are Ouray County's plans for the gravel pit northeast of Ridgway, and  within the potential Ridgway Trails SRMA?  We would like to know about the County's desires for continuing the pit as it is now permitted, as well as desires for future expansion.  Is the area better suited for a trails system, which could have positive impacts on tourism and economics?  This knowledge will reduce conflict with future trails if the Ridgway Trails SRMA is in the preferred alternative.



BLM_0109936

**For Colorado State/CDOW (primarily, but others as well).  What are the State's thoughts on having state lands open or closed to oil/gas leasing (where federal minerals underlay the lands)?  What about "No Surface Occupancy"?

BLM would also like to discuss the alternatives-development process since January 2011.   By the way, thank you to all of you for the great comments you submitted on the draft alternatives.   Comments have been helpful to us.

Regards, Bruce

Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384



January 27, 2011

BLM_0109937

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 1. | Walt Blackburn, RAC Subgroup member, via letter | Renewable Energy.<br>The Forest Service is doing extensive work with Bio-Mass renewable energy. There are a few areas on BLM lands that this possibly could be an option. Please see Additional information below.<br><br>Dear Woody Biomass Working Group Members:<br>We are hosting several up-coming events in support of our Uncompahgre Plateau Woody Biomass Supply and Feasibility Assessment.<br><br>**UP Woody Biomass Public Meeting in Montrose: Wednesday, June 8, 7-8:30 pm** at the DMEA Office, 11925 6300 Road, Montrose, CO.<br>• The purpose of the meeting is to provide general information to local community members on the woody biomass feasibility study with the Rocky Mountain Research Station. Everyone is welcome to attend!<br><br>**UP Woody Biomass Public Meeting in Delta: Thursday, June 9, 7- 8:30 pm** at the Performing Arts Center, 822 Grand Ave., Delta, CO.<br>• The purpose of the meeting is to provide general information to local community members on the woody biomass feasibility study with the Rocky Mountain Research Station. Everyone is welcome to attend!<br><br>**UP Woody Biomass Working Group Meeting: Thursday, June 9, 9 am - 12 pm** at the Delta Forest Service Office, 2250 Highway 50, Delta, CO.<br>• Dr. Nate Anderson, RMRS, will present an update on the woody biomass feasibility study. Everyone is welcome to attend but the content of the meeting will be more technical. | |



Page 1

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109938

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

### Internal Rough Draft Alternatives – Feedback Received from
### Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | **UP Woody Biomass Public Field Trip: June 10, 9 am - 5 pm.**<br>• Meet at the Montrose Public Lands Center. We will tour several on-going fuels treatments on the Uncompahgre Plateau and discuss biomass utilization. Please bring your own lunch | |
| 2. | Walt Blackburn, RAC Subgroup member, via letter | Communications Sites.<br>It is my understanding that there will be more need for cell phone towers in the area as demand for better service continues to force the providers to install more towers. Would suggest that contact be made with the different providers for such discussions of future plans and needs. | |
| 3. | Walt Blackburn, RAC Subgroup member, via letter | Utility Corridors<br>Specifically, power lines in and around Air Port facilities on BLM lands should have written in planning options. | |
| 4. | Walt Blackburn, RAC Subgroup member, via letter | Hunting Permits (Outfitters)<br>Outfitting is a very competitive business. The market and success ratio will regulate the number that remains in business. The BLM is not in the business of being concerned about a quality hunting experience for paid outfitter clients. It appears to me that we are entering into an area that is not in call for correction. This has the potential to open a real can of worms. | |
| 5. | Walt Blackburn, RAC Subgroup member, via letter | Target Shooting.<br>It appears we are trying to create a solution for a problem that does not exist.<br>Impossible to enforce. If there is a problem, it would fall under the law enforcement of the County Sheriff . BLM is not a safety patrol agency. A :} mile corridor on power lines? That would mean you couldn't target shoot about anywhere on BLM lands. There are power lines servicing most commercial target shooting sites. Most residences of commercial target shooting ranges live nearby on the property much close that -1- mile.<br>Communications sites would include cell towers, repeater towers, telephone lines etc. | |
| 6. | Walt Blackburn, | North Delta OHV Open Area | |



Page 2

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109939

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | RAC Subgroup member, via letter | WHY??? That is the whole premise of the area and has been since it was created. It is even more important now that Homeland Security has forced the GJ airport to fence off a big chunk of OHV open BLM land. The North Delta OHV open area is very family orientated riding place. Many OHV families use this area to train & teach the younger OHV enthusiast to ride. Remember that riding OHV's is potentially risky by nature of the sport. Each individual takes that responsibility on himself when participatating. Isn't there verbiage in the original decision notice on the North Delta OHV area to keep it open? | |
| 7. | Walt Blackburn, RAC Subgroup member, via letter | Re: State's thoughts are on having state lands open or closed to oil/gas leasing (where federal minerals underlay the lands), as well as thoughts on "No Surface Occupancy". <br><br> What difference does it make to CDOW unless there are wildlife issues? Itis my understanding that present law covers wildlife concerns. Sounds like the BLM is butting into something that is none of their business. Let the state (COGC) decide if and when it becomes an issue. Having a "No surface Occupancy" would only enhance the access of a much needed resource. | |
| | *Via RAC Subgroup Meeting (5/13/2011)* | | |
| | | *Renewable Energy: These issues weren't in our old plan but they're getting more and more important every year. In this plan there is an option to leave the FO open to renewable energy unless it's excluded to protect certain resources or we can identify specific areas for development. This is not to say that if there is a wind emphasis area wind is excluded everywhere else. If we don't designate emphasis areas, we can still get proposals but if we know of areas now we can overlay those areas with what we have now and make sure it would be compatible with what we're proposing. If you know if any areas where local governments or companies are interested in developing for renewable energy development, let us know.* | |
| 8. | Walt Blackburn | Would biomass production be allowed? | Yes, it's an option but this plan doesn't identify |



Page 3

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109940

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | | specific areas to be set aside for biomass production. The BLM does not have very high potential for good biomass production. We do have language in the plan that would make biomass possible if there was a proposal. It's not included. |
| 9. | Walt Blackburn | A lot of the burn areas would be good for cleanup. | When we have those type of projects we do permit interested people to utilize the biomass. In the past we've encouraged people to use the product before the treatment and that will continue. There just isn't much interest. The Forest Service has a lot of trees that they're waiting for people to take away and if you're in that business you're more interested in those trees. There was some discussion about the coal plant in Nucla using some of the product but nothing has come of it. |
| 10. | Shelby Bear | What about solar? There's been discussion of solar in Ridgway. | John Reams: It's just been difficult and there isn't much interest in industry building a solar field where it isn't very feasible. BLM (Barb Sharrow): We had a representative from Ridgway and there was some controversy over the project because people don't want it in the viewshed. |
| 11. | Barbara Hawke | If there is any way for the BLM to coordinate with local governments to use BLM and non-BLM land together to make some of these projects more feasible. If people are concerned about viewscape, that is important on public land, so maybe we can put some pieces of land together to make such projects more feasible. I would encourage the use of emphasis areas and maybe taking it further. I think there are benefits of looking at the zoning concept like they did on the national level. It's going to be different for each resource. There's also geothermal, such as in Ouray County. | |



Page 4

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109941

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 12. | Shelby Bear | We've been looking at a hydro project on the South Canal with the BLM. | |
| 13. | Bill Ela | When we went out on a field trip they were using a hydro axe under the transmission line. If there is enough hydro there, could it be suitable for biomass? | Shelby Bear: I'm not sure about biomass, but we're working on it. The Tri-County project is working on the dam which is a huge project. I think the more emphasis we place on renewable energy the more projects we'll have, so more general language might be better. |
| 14. | Walt Blackburn | Is the reason this is on the agenda because there have been inquiries? | No, actually it's been silent so we just don't know where people might be interested in developing. |
| 15. | Bill Day | In the GJFO when they had comments about this at least one front range environmental group wanted to put solar panels where there are kit fox and burrowing owls. I don't think we should do that. | When an application comes in requesting a solar ROW, the BLM has to do NEPA review and look at the resources, including T&E species, and screen all of that. So the RMP just sets the stage. The RMP could say that renewable would be available where there is not ROW exclusion and would be discouraged in ROW avoidance. At the application level there is site-specific NEPA. |
| 16. | Robbie Baird-LeValley | If that was put in there, does that give the latitude to the BLM, in the future, to develop projects even if they are not identified now? | Yes. When we get applications we'll go to our RMP and see what it says. |
| 17. | Barbara Hawke | Another way to go about it would be to have criteria. What are some places that would have good potential and would be suitable. Some would be suitable and some would be not as suitable. As long as all the effort was going in to the RMP, pre-planning should be done for renewable emphasis areas. (Barbara sent sample criteria for Renewable Energy Zones via e-mail 5/21/11)<br><br>Shelby Bear: Sometimes it's hard to do that because it requires so much study. We don't know what the politics of the future is going to be. | |
| | | *Communication Sites: We have a few existing communication sites for radio transmission for emergency correspondence, radio stations, internet, cell towers. If you know of any areas that might need more towers or if* | |



Page 5

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109942

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | *there is interest in them.* | |
| 18. | John Reams | The northern portion of UFO near the border with GJFO needs cell reception. | |
| 19. | Bill Ela | There was a lot of activity about drilling in that area, south of Whitewater, and there's a utility line. If you put up a drill site can you put solar panels in between them? North of Delta on Highway 50. | Shelby Bear: You don't really want to put anything under a transmission line in a ROW, but adjacent to that would be ok. |
| 20. | Robbie Baird-LeValley | Ouray CC (Alan Staley) showed a map of sites for emergency preparedness. It would be a good idea to get with the emergency people at each of the counties. | |
| 21. | Shelby Bear | We don't know of any new sites that we need but you might check with WAPA. Check with sheriff's office. | |
| | | *Utility Corridors: Right now we just have West-wide.* | |
| 22. | Shelby Bear | What we do is dependent upon load growth. Right now growth in the area is slow. Doughspoon substation to Cedaredge. East Montrose substation along South Canal. Action Item: Shelby will send rough maps showing the areas. | |
| 23. | Barbara Hawke | I've been told that part of the West-wide Energy Corridor goes through sage-grouse habitat. Is there any opportunity to fix it so that there isn't such resource conflict. | BLM (Barb Sharrow): We had to verify the corridors that were selected at the national level. We kept the corridors out of the sage-grouse leks by a certain distance. I can't remember what the exact distance is right now. The West-wide Energy Corridor is a wide corridor, a mile or so, so there is room in the corridor for siting. |
| 24. | Bill Day | Grouse move several miles away from the lek so you could have a transmission line a mile away from a lek and that's where the population are raising their young. | Missy Siders has put that information in the plan so there is a lot of protection for sage-grouse. |
| | | *Hunting Permits (Outfitters): Limiting permits per DAU would require more enforcement by BLM.* | |
| 25. | Walt Blackburn | Seems like we are looking for solution to non-existing problem. Outfitting business tends to limit itself. Need to take a hard look at this before putting numbers on it. | BLM (Barb Sharrow): Some outfitters have requested limiting permits (would increase value of their existing permits). |
| 26. | Steve Weist | Do not put limit on permits. | |
| 27. | Peter Mueller | Do not put limit on permits. Are there tools BLM has to evaluate | BLM (Barb Sharrow): BLM does have annual |


Page 6

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109943

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

### Internal Rough Draft Alternatives – Feedback Received from
### Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | permits annually? As private hunter, experience can be either enhanced or diminished by outfitters. | permit evaluation process. Permits are issued/re-issued every year. If outfitter has good standing for two years, then they are awarded five-year permit. |
| 28. | Peter Mueller | Could RMP put limit on numbers with annual growth rate so numbers of permits could grow over time? | |
| 29. | Robbie Baird-LeValley | If permits limited by game management unit, need to consider existing outfitters who work in specific unit; do not want to disrupt business. Consider having range of outfitter permit numbers. | |
| 30. | Shelby Bear | Do not limit outfitter numbers. | |
| 31. | Bill Ela | Would be challenging to enforce limiting permits. | |
| 32. | Bruce Krickbaum (BLM) | Cooperating Agencies suggested yesterday that BLM consider having criteria for limiting the number of future permits rather than specifying numbers in the RMP. | |
| 33. | John Reams | Let CDOW manage numbers; do not limit number of permits. | |
| | | *Organized Group Permits:* | |
| 34. | Barbara Hawke | Use criteria instead of specific numbers. For example, the season may determine numbers because of potential resource damage. See Price, Utah, RMP as example. *(note: Barbara sent example from Price, Utah via e-mail on 5/13/2011)* | |
| 35. | John Reams | If everything is regulated, then BLM cannot enforce everything. | BLM (Barb Sharrow): Organized group permit would require group to have insurance. |
| 36. | Peter Mueller | 40 vehicles and 80 people seems like a lot of impact; number should be smaller. | |
| 37. | Barbara Hawke | Are there other examples for State Parks, etc. that we could consider? | BLM (Barb Sharrow): BLM staff looked at other BLM Field Offices for examples. |
| 38. | Bill Ela | Range of numbers look good. | |
| 39. | Bill Day | 40 vehicles is a lot; would limit it to something like 25. | |
| 40. | Shelby Bear | Consider criteria. | |
| 41. | Robbie Baird-LeValley | Some range tours (including CDOW) have up to 40 or 50 vehicles. | |
| 42. | John Reams | Some contractor tours may have too many vehicles too. | BLM (Barb Sharrow): Businesses could be |



Page 7

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109944

### BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO
#### RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT

#### Internal Rough Draft Alternatives – Feedback Received from
#### Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | | excepted from permit requirements. |
| 43. | Peter Mueller | Criteria could include duration of event, number of vehicles, etc. so that group has to then find support facilities such as toilets. | |
| | | *Target Shooting* | |
| 44. | Steve Weist | Have designated target shooting areas and prohibit target shooting everywhere else. | BLM (Barb Sharrow): There are problems with setting up target shooting areas on public lands because of hazardous waste issues associated with lead, etc., and because BLM is not in the business of managing and enforcing shooting areas. If outside entities want to set up such areas, then BLM could work with them on recreation leases or agreements. |
| 45. | Robbie Baird-LeValley | How does BLM address residences adjacent to BLM land who want to target shoot in their backyard? | Barb: Those landowners would have to be more than 0.25-mile (or whatever distance is in RMP) from their residences to target shoot. |
| 46. | Peter Mueller | 0.25-mile seems reasonable. 1 mile is too far. | |
| 47. | Walt Blackburn | 0.25-mile is not enforceable; there would still be issues outside that 0.25-mile buffer. How would BLM enforce it? | Barb: Would be complaint driven. |
| 48. | Shelby Bear | There has been damage to insulators from target shooting. Do not want to force a lot of target shooters into smaller areas. | |
| 49. | Kathy Welt | 0.25-mile buffer from residences in residential areas makes sense. But for some residences abutting BLM lands in more-remote areas, it does not make sense. | |
| 50. | Barb Sharrow (BLM) | Does it make sense to have buffers around developed recreation sites such as trailheads and boat ramps? | RAC Subgroup: Yes. |
| | | *North Delta OHV Open Area:* | |
| 51. | Peter Mueller | Has BLM consulted with OHV community in Delta? | Barb: That is what Walt Blackburn is here for. |
| 52. | Walt Blackburn | This is one of the only Open areas in the state. There are millions of acres that are restricted to OHV travel, such as wilderness, other quiet use areas, etc. It is very concerning to OHV community. Open areas are where families go for outings. People from all over the state come to North Delta OHV Open Area. Could OHV community help BLM with public education, such as signing area with | |


Page 8

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109945

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | | educational information, such as environmental concerns? Could post signs in specific parts of overall area to restrict travel for resource concerns. Do not want the Open area changed. | |
| 53. | Shelby Bear | During transmission projects, we have found that cactus moves. | Barb: During route-designation process, biologists would survey cactus locations. |
| 54. | Bill Day | What is magnitude of selenium in this area? | Barb: Selenium is big issue in UFO and this area in general. US Geological Survey just completed two- or three-year selenium study. Big way that selenium gets into waterways is via irrigation on non-public lands. |
| 55. | Robbie Baird-LeValley | North Delta is 8-inch precipitation zone. | |
| 56. | Barbara Hawke | My greatest concern is about the adjacent area, the Adobe Badlands and ACEC area. There are very sensitive and important resources there. If keeping North Delta area open. If keeping area Open helps preserve and protect adjacent or other areas, then that is worth considering. OHV recreation needs its place. | |
| 57. | Shelby Bear | If we have to close this area, is there another area we can open? | |
| 58. | John Reams | Is selenium contribution small in the larger scope of total areas contributing to selenium? Do not close area. | |
| 59. | Walt Blackburn | Does not seem like limiting area would solve the problem. | |
| 60. | Robbie Baird-LeValley | The selenium issue does not warrant closing or limiting the area; keep it open. | |
| 61. | Bill Day | With current high density of roads, it does not seem like it would get much worse/roaded if left open. Okay to leave it open. | |
| 62. | Peter Mueller | Seems like we are trying to make decisions without all the information. Need to do surveys to work with OHV community to develop necessary education to mitigate potential impacts. | |
| 63. | Bill Ela | Preservation is important in BLM; support preservation as sustainable objective. Need some form of erosion control. RMP needs to have more focus on sustainability, especially in North Delta OHV Open Area more than remainder of planning area because of erosion from trails. | |



Page 9

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109946

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| 64. | Bill Ela | In many retention ponds, mother nature creates spillway so ponds fail, which creates other issues. | |
| 65. | Kathy Welt | In North Delta, annual precipitation is very low. To rule out a retention pond in that area because of fear of it not being able to contain runoff is probably not substantiated if pond is properly engineered. Selenium is predominant in Mancos Shale, which is what North Delta OHV Area is. Regardless of how OHV area is managed, selenium will be an issue. Agree with other comment questioning if restrictions would have any effect on overall selenium issues/contributions. | |
| | | *Ouray County's plans for gravel pit northeast of Ridgway and within potential Ridgway Trails SRMA:* | |
| 66. | Barb Sharrow (BLM) | Because of a gravel pit moving forward, the area will no longer be considered as an SRMA. Gravel pit was permitted by BLM in 2003. Mountain bike user group in Ridgway area would like mountain bike trail system in vicinity of gravel pit. Gravel pit permit has expired and needs to be renewed before RMP is complete. BLM is working on with Ouray County and Ridgway on solution to permit gravel pit and to also develop trail system of some sort, but not through pit itself (which is prohibited). | |
| 67. | Bill Ela | Pit should be far from streams. | Barb: It is. |
| 68. | Peter Mueller | Makes sense to develop an impacted area for two different uses. | |
| 69. | Barbara Hawke | This area is important to trail planning for single-track, quiet recreation potential; and there is lots of potential in the area as a key connector trail. The goals of a planned and managed recreation area should go forward as much as possible, even when working with the gravel pit operation. | |
| 70. | Barb Sharrow (BLM) | Ouray County indicated that both uses are vital to their economy. | |
| | | *Colorado State/CDOW lands open or closed to oil/gas leasing, or having No Surface Occupancy on those lands:* | |
| 71. | Angie Adams, Barb Sharrow, and Kate | Angie: CDOW suggested most wildlife areas be NSO. Barb: Applies to Ridgway and Paonia State Parks, as well as wildlife | |



Page 10

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109947

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Internal Rough Draft Alternatives – Feedback Received from**
**Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)**

| Cmt # | CA / RACSG Commentor | Comment | Response (To be completed by EMPSi/BLM) |
|---|---|---|---|
| | Wynant (background info) | area (portions of Billy Creek and Escalante). Kate: CDOW suggested that occupied sage-grouse habitat be closed to leasing. Barb: Governor's office will review the RMP. | |
| 72. | Bill Day | Miramonte should be closed to leasing. | |
| 73. | Peter Mueller | Agreed that mapped occupied habitat be closed to leasing. | |
| 74. | John Reams | Consider NSO on State lands with a buffer outside of State lands. Need to carefully consider viewshed. | |
| 75. | Barbara Hawke | Need to also consider stipulations for riparian and wetland areas. | |
| 76. | Kathy Welt | Do not necessarily need to close State Parks because there are other protections for resources, such as riparian and wetlands. Minerals are also a resource that belongs to the US, in addition to natural resources. Consider State lands and parks on a case-by-case basis rather than globally applying certain closures or stipulations to all areas. | |



Page 11

Internal Rough Draft Alternatives – Feedback Received from
Cooperating Agency and RAC Subgroup Members on Specific Topics (April 19–May 11, 2011)

BLM_0109948

US Bureau of Land Management, Uncompahgre Field Office
Uncompahgre Resource Management Plan (RMP) & Environmental Impact Statement (EIS)
**BLM Cooperating Agency and Resource Advisory Council (RAC) Subgroup Milestone Tasks through Publication of Draft RMP/EIS**
*May 19, 2011*

| Applicable Group | Start Date[1] | Finish / Due Date[1] | Item for Cooperating Agency and RAC Subgroup Review / Comment[2] | Applicable Chapter of Draft RMP/EIS |
|---|---|---|---|---|
| Cooperating Agencies | 6/23/2011 | 6/23/2011 | Hold Meetings to:<br>• Discuss the alternatives-development process since January 2011, including Cooperating Agency and RAC Subgroup comments on the January 2011 internal rough draft alternatives<br>• Kickoff Cooperating Agency and RAC Subgroup review of Internal Draft Chapter 2 (Alternatives) | 2 (Alternatives) |
| RAC Subgroup | 6/24/2011 | 6/24/2011 | | |
| Cooperating Agencies & RAC Subgroup | 6/23/2011 | 7/15/2011 (3 weeks) | Review Internal Draft Chapter 2 (Alternatives) (concurrent with BLM Uncompahgre Field Office review of chapter) | 2 (Alternatives) |
| *BLM Uncompahgre Field Office[2]* | *7/18/2011* | *8/19/2011* | *BLM Uncompahgre Field Office revises Draft Chapter 2 (Alternatives) for submission to BLM Colorado State Office based on Cooperating Agency, RAC Subgroup, and BLM Uncompahgre Field Office comments on Internal Draft Chapter 2 (Alternatives)* | *2 (Alternatives)* |
| Cooperating Agencies | 8/11/2011 | 8/11/2011 | Hold Meetings to:<br>• Discuss Cooperating Agency, RAC Subgroup, and BLM Uncompahgre Field Office comments on Internal Draft Chapter 2 (Alternatives) and any resulting changes to the alternatives to be provided to the BLM Colorado State Office for review<br>• Discuss Cooperating Agency and RAC Subgroup recommendations regarding whether range of alternatives is reasonable | 2 (Alternatives) |
| RAC Subgroup | 8/12/2011 | 8/12/2011 | | |
| *Southwest RAC[2]* | *8/26/2011* | *8/26/2011* | *Southwest RAC meeting to hear RAC Subgroup recommendations regarding whether range of alternatives is reasonable* | *2 (Alternatives)* |
| *BLM Colorado State Office[2]* | *8/22/2011* | *9/2/2011* | *BLM Colorado State Office reviews Draft Chapter 2 (Alternatives)* | *2 (Alternatives)* |
| *BLM Uncompahgre Field Office[2]* | *9/6/2011* | *10/18/2011* | *BLM Uncompahgre Field Office finalizes Draft Chapter 2 (Alternatives) for impact analysis (Chapter 4, Environmental Consequences), changes based on COSO comments.* | *2 (Alternatives)* |
| *BLM Uncompahgre Field Office[2]* | *10/19/2011* | *1/11/2012* | *BLM Uncompahgre Field Office prepares Draft Chapter 4 (Environmental Consequences)* | *4 (Environmental Consequences)* |
| Cooperating Agencies | 1/12/2012 | 1/12/2012 | Hold Meetings to:<br>• Kickoff Cooperating Agency and RAC Subgroup review of Internal Draft Chapter 4 (Environmental Consequences) | 4 (Environmental Consequences) |
| RAC Subgroup | 1/13/2012 | 1/13/2012 | | |

BLM_0109949

| Applicable Group | Start Date[1] | Finish / Due Date[1] | Item for Cooperating Agency and RAC Subgroup Review / Comment[2] | Applicable Chapter of Draft RMP/EIS |
|---|---|---|---|---|
| Cooperating Agencies & RAC Subgroup | 1/12/2012 | 2/2/2012 (3 weeks) | Review Internal Draft Chapter 4 (Environmental Consequences) (concurrent with BLM Uncompahgre Field Office review of chapter) | 4 (Environmental Consequences) |
| *BLM Uncompahgre Field Office[2]* | *2/3/2012* | *3/7/2012* | *BLM Uncompahgre Field Office revises Chapter 4 (Environmental Consequences) based on Cooperating Agency, RAC Subgroup, and BLM Uncompahgre Field Office, and prepares remainder of Internal Draft RMP/EIS* | *4 (Environmental Consequences) & Internal Draft RMP/EIS* |
| Cooperating Agencies | 3/8/2012 | 3/8/2012 | Hold Meetings to: <br> • Kickoff Cooperating Agency and RAC Subgroup review of Internal Draft RMP/EIS (all chapters) | Internal Draft RMP/EIS |
| RAC Subgroup | 3/9/2012 | 3/9/2012 | | |
| Cooperating Agencies & RAC Subgroup | 3/8/2012 | 3/30/2012 (3 weeks) | Review Internal Draft RMP/EIS (all chapters) (concurrent with BLM Uncompahgre Field Office review of document) | Internal Draft RMP/EIS |
| *BLM Uncompahgre Field Office[2]* | *4/2/2012* | *4/20/2012* | *BLM Uncompahgre Field Office revises Internal Draft RMP/EIS for submission to BLM Colorado State Office based on Cooperating Agency, RAC Subgroup, and BLM Uncompahgre Field Office comments* | *Internal Draft RMP/EIS* |
| *BLM Colorado State Office[2]* | *5/14/2012* | *6/4/2012* | *BLM Colorado State Office reviews Internal Draft RMP/EIS* | *Internal Draft RMP/EIS* |
| *BLM Uncompahgre Field Office[2]* | *6/5/2012* | *6/29/2012* | *BLM Uncompahgre Field Office revises Internal Draft RMP/EIS for submission to BLM Washington Office based on BLM Colorado State Office comments* | *Internal Draft RMP/EIS* |
| Cooperating Agencies | 6/14/2012 | 6/14/2012 | Hold Meetings to: <br> • Discuss Cooperating Agency, RAC Subgroup, and BLM Colorado State Office comments on Internal Draft RMP/EIS and any resulting changes to the document to be provided to the BLM Washington Office for review | Internal Draft RMP/EIS |
| RAC Subgroup | 6/15/2012 | 6/15/2012 | | |
| *BLM Washington Office[2]* | *7/2/2012* | *9/24/2012* | *BLM Washington Office reviews Internal Draft RMP/EIS* | *Internal Draft RMP/EIS* |
| *BLM Uncompahgre Field Office[2]* | *9/25/2012* | *11/9/2012* | *BLM Uncompahgre Field Office revises Internal Draft RMP/EIS based on BLM Washington Office comments and prepares public Draft RMP/EIS* | *Public Draft RMP/EIS* |
| Cooperating Agencies | 10/4/2012 | 10/4/2012 | Hold Meetings to: <br> • Discuss BLM Washington Office comments on Internal Draft RMP/EIS and any resulting changes to the document to be published as public Draft RMP/EIS | Public Draft RMP/EIS |
| RAC Subgroup | 10/5/2012 | 10/5/2012 | | |
| *BLM Uncompahgre Field Office[2]* | *11/9/2012* | *11/9/2012* | *Publish public Draft RMP/EIS for 90-day public review period* | *Public Draft RMP/EIS* |
| Public Review Period | 11/9/2012 | 2/7/2013 | 90-day public review period on Draft RMP/EIS | Public Draft RMP/EIS |

[1] Dates are subject to change

[2] *Italicized* items would not require involvement of the Cooperating Agencies or RAC Subgroup

BLM_0109950

*Draft Air Resources Impact Assessment Protocol for*
*the BLM GJFO, UFO and D-E NCA RMPs*

*National Park Service Air Resources Division*
*Comments*
*June 13, 2011*

We have reviewed the Draft Air Resources Impact Assessment Protocol for the Bureau of Land Management's (BLM) Grand Junction and Uncompahgre Field Offices (GJFO and UFO) and Dominiguez-Escalante National Conservation Area (D-E NCA) Resource Management Plan revisions (RMP). We are pleased to see that the BLM is proposing to utilize CAMx to assess air quality and Air Quality Related Value (AQRV) impacts in Class I and sensitive Class II areas from potential air emissions associated with land use designations authorized by the three RMPs. CAMx represents a state-of-the-science photochemical grid model that is well established and has been applied in many previous air quality and AQRV analyses for various purposes. Generally, the modeling methods outlined in the draft protocol represent a comprehensive and robust analysis, and we do not have concerns with the proposed modeling methods, inputs or parameters. However, we have several comments regarding the post-processing assessments, namely the Class I and sensitive Class II area AQRV assessments.

The intent of our comments is to ensure that National Park Service (NPS) units are adequately considered and protected through the planning process. The process and agreements set forth in the interagency Memorandum of Understanding Among the U.S. Department of Agriculture, U.S. Department of the Interior and U.S. Environmental Protection Agency Regarding Air Quality Analyses and Mitigation For Federal Oil and Gas Decisions Through the National Environmental Policy Act Procedures (hereafter referred to as MOU), finalized June 23, 2001, provide relevant guidance for conducting AQRV analyses. The purpose of this MOU is to "set forth expectations and agreements for addressing air quality analyses," including, among other things, improving collaboration and transparency when conducting these analyses. Section V.E.6. (a-c) discusses expanded procedures for assessing impacts to AQRVs. Recognizing the various roles and responsibilities of all signatory agencies, the intent of this section is to resolve discrepancies in analysis techniques among the agencies, and ensure that NEPA documents adequately disclose and address impacts to areas outside of the lead agency's jurisdiction. This ensures that the lead agency's analysis considers impacts to lands administered by other agencies in the context of enabling legislation that designated those lands for public use. In the case of the GJFO, UFO and D-E NCA RMPs, this section applies to all NPS Class I and Class II units within the modeling domain[1].

In section V.E.6. of the MOU, the signatory agencies acknowledge and agree that differnt impact thresholds may apply to areas administered by the various agencies. When this is the case, as in

---

[1] This is with the exception of Rocky Mountain National Park. Although this park is included within the eastern edge of the modeling domain, we concur that it does not need to be included in the analysis.

BLM_0109951

the RMPs, the lead agency will apply the appropriate threshold(s), such as the NPS/FWS/USFS FLAG thresholds, for the area under consideration[2].   The section goes on in V.E.6.C to state that the lead agency will "identify, consider, and discuss in the body of the NEPA document" the "analysis results for the threshold values assessed" and the "Agencies' views about the nature of impacts to AQRVs on the affected agencies' land".  It is in light of these agreements that we request the following changes to the modeling protocol.

*Visibility Analysis*

Section 5.7.2.1 of the modeling protocol describes the visibility assessment procedures.  The section notes that the FLAG 2010 method for calculating visibility impacts will be used in addition to the BLM visibility method.  However, it suggests using methods and metrics that differ somewhat from the FLAG guidance, or does not specify that particulars of the FLAG guidance will be followed.  We request that BLM apply the FLAG guidance, as described below, and revise or where necessary, clarify the protocol to reflect these changes.

Consistent with FLAG 2010, section 5.7.2.1 explicitly states that the new IMPROVE algorithm and monthly f(RH) will be applied in the analysis for calculating visibility impacts in Class I areas and sensitive Class II areas.  Conversely, although the method is acknowledged as the preferred FLAG approach, this section does not explicitly state that natural background (NB) visibility conditions will be used when calculating change in the Deciview Haze Index (DHI) in NPS areas.   While the protocol authors may have intended that by referencing the FLAG approach, it was inherent that it would be applied, the protocol lacks a specific commitment to using NB values, whereas other pieces of the analysis are explicitly stated.  Given the lack of specificity regarding its use, and the fact that other areas of the analysis deviate from the FLAG approach, we question whether NB values will be used.  The protocol should be clarified to confirm that *natural* background visibility estimates found in tables 5 and 6[3] of the FLAG document will be used when calculating change in the DHI at the Class I and sensitive Class II park units included in the analysis.  Per agency mandates in our Organic Act[4], and associated management policies, notably our statutory responsibility to leave National Park System units "*unimpaired for the enjoyment of future generations,*" we apply NPS AQRV analysis metrics and thresholds uniformly across all NPS units, regardless of the unit's status under the Clean Air Act.  The 1978 "Redwood Amendment" to the Organic Act, clarified the Service's responsibility to protect all units of the National Park System . . . "*that these areas, though distinct in character, are united through their inter-related purposes and resources into one national park*

---

[2] MOU V.E.6.a. - When the BLM is the Lead Agency, the BLM will apply: V.E.6.a.2 – the threshold values and methodology in the FLAG guidance assessing impacts to AQRVs on FS, FWS, NPS administered lands, or other guidance accepted by FS, FWS, or NPS.

[3] The BLM should consult with CDPHE to determine whether the estimated natural background conditions for the 20% best visibility days or the annual averages should be used, consistent with Colorado's determinations for BART sources.

[4] (16 USC 1)

2

BLM_0109952

*system as cumulative expressions of a single national heritage; that, individually and collectively, these areas derive increased national dignity and recognition of their superlative environmental quality through their inclusion jointly with each other in one national park system preserved and managed for the benefit and inspiration of all the people of the United States; and that it is the purpose of this Act to include all such areas in the System and to clarify the authorities applicable to the system[5]."* Accordingly, NB estimates for the nearest Class I area can be applied to sensitive Class II NPS areas.

The protocol also states that "the 98[th] percentile (8[th] highest day) for each of the GJFO, UFO and D-E NCA alternatives alone will be compared to the 1.0 dv change in light extinction". The BLM should modify each of these pieces of the analysis when evaluating impacts in NPS areas. First, the protocol only proposes to use the 1.0 dv threshold; the FLAG approach applies the 0.5 dv threshold. The FLAG visibility threshold of 0.5 dv should be included in the analysis; we request that BLM revise the protocol to reflect this. Comparison to the 0.5 dv threshold is an appropriate piece of information to consider when evaluating the individual contribution to visibility impacts from potential air pollutant emitting activities within each Field Office planning area. Second, the 98th percentile approach was developed through the regional haze BART modeling guidelines, which recommended the 98th percentile be applied to *CALPUFF* modeling results. As stated on page 23 in our FLAG (2010) guidance, "using the 98[th] percentile of CALPUFF modeled impacts the sources that contribute 0.5 dv to regional haze visibility impairment in a Class I area would effectively be captured, while minimizing the likelihood that the highest modeled visibility impacts might be caused by conservative assumptions in the model". This approach was designed specific to the BART modeling procedures for the CALPUFF modeling system, which included the use of three years of meteorological data. The approach was intended to account for known conservative assumptions in the CALPUFF model. FLAG adopted these procedures to maintain consistency with the BART guidelines for regional haze, assuming they would be applied to CALPUFF results. Because the CO RMP analyses will rely on CAMx results for only one metrological year, the maximum modeled impacts in each Class I area should be used. This is consistent with recent modeling approaches for BART sources which used a photochemical grid model, rather than CALPUFF.

As outlined in our FLAG guidance, visibility analysis results that exceed the 0.5 dv or 1.0 dv impact thresholds do not automatically imply that the FLM/NPS would consider those effects adverse, in either the NEPA or CAA sense. Rather, the NPS would consider the magnitude, frequency and duration of those impacts, as well as the context, timing and intensity (per NEPA language), prior to determining whether the environmental effect is adverse. We request that the BLM perform the visibility analysis using the FLM recommendations outlined above and then consult with NPS regarding the severity of those predicted impacts prior to releasing a draft analysis for review. This would allow the BLM to determine how the NPS views the severity of the predicted impacts, and if necessary or appropriate, identify any mitigation that may alleviate

---

[5] (16 USC 1a-1)

BLM_0109953

adverse effects.  We recognize that this requires additional upfront consultation between our agencies, but we believe it reflects the process and spirit of increased collaboration outlined in the new MOU.

***Deposition***

Section 5.7.2.2 outlines the atmospheric deposition analysis.  We agree that it is appropriate to use the maximum annual Sulfur and Nitrogen deposition values modeled for each Class I and sensitive Class II area.  However, the protocol recommends comparing the total modeled deposition values to outdated threshold values published by Fox et. al (Fox 1989) for Forest Service areas.  The protocol acknowledges that the Forest Service "no longer considers these levels of concern to be protective, but in the absence of alternative FLM-approved values, comparisons with these values are made."  This statement is incorrect, as NPS approved values exist both in the FLAG Deposition Analysis Threshold (DAT) values for project specific deposition, and additional critical loads information that is available in the recently published USFS critical loads synopsis for the U.S., as described below.  Additionally, the proposed deposition thresholds presented in the protocol do not consider nitrogen deposition impacts in arid ecosystems.  The BLM should include NPS thresholds and applicable critical loads values in the NEPA document, as provided for in the MOU agreement, including use of the NPS DAT. We stress that the DAT is meant to be used as a screening threshold for determining when a sources' contribution to deposition is "insignificant".  In other words, if the individual contribution of each project area (GJFO, UFO and D-E NCA) to deposition is less than the applicable DATs, then the deposition impacts would be considered insignificant.  Modeled exceedances of the DAT *do not* translate into adverse or significant effects.  A modeled exceedance of the DAT would entail a more detailed look at deposition concerns in each of the NPS units.

In the event there is a modeled exceedance of the DAT from an individual project area, the NPS would conduct a more detailed analysis to determine (1) whether deposition is a concern in the park where the exceedance occurred (i.e. are AQRVs currently affected by deposition, and if so, how much?); and (2) whether the individual project area contribution to deposition is significant. This analysis would utilize existing information such as Park monitoring information, ecosystem characteristics/studies/risk assessments and most importantly, critical loads to evaluate whether AQRVs are currently affected by ambient atmospheric deposition.  A recently published General Technical Report from the USFS Northeastern Research Station, titled "Assessment of Nitrogen Deposition Effects and Empirical Critical Loads of Nitrogen for Ecoregions of the United States[6]" will be used by NPS to evaluate how park ecosystems may be impacted at current levels of deposition.  The document is a synthesis of all published recent nitrogen critical loads values determined for various ecosystems and components of those ecosystems across the United States.  It includes tables for each ecoregion within the US that summarize, based on existing research, the deposition loading of N that would likely affect various parts of an ecosystem (e.g. lichen, soils, biodiversity, diatoms, nitrogen leaching, etc).  The document also includes critical loads exceedance maps, highlighting areas where critical loads for some sensitive components of the ecosystem have been exceeded under current deposition levels.  This document can be used immediately to extrapolate and estimate nitrogen critical loads for a variety of ecosystems,

---

[6] Pardo reference

BLM_0109954

including those in and near National Parks.  We are working currently to synthesize this information for parks included in the analysis.  We will be happy to share our recommendations regarding any applicable nitrogen critical loads information with the BLM.  We believe this information will be relevant for both the Affected Environment and Environmental Effects sections of the EIS.

Again, we believe critical loads information is important to use in conjunction with the DAT.  The DAT allows us to determine whether the potential activities authorized under the individual RMPs contribute significantly to atmospheric deposition; the DAT is a single source or single project screening threshold.  The detailed information, including critical loads information, allows us to evaluate the modeled deposition impacts in light of the current conditions.  It is important to note that if a critical load value is used for comparative means in the analysis, it is only appropriate to use this in the context of cumulative deposition.  It is not appropriate to compare a single source, or single project's modeled deposition to a critical load value.  Likewise, the DAT was never intended to be used as a threshold for adverse effects.  Similar to visibility, the severity of deposition effects in parks should be determined through a collaborative process between our agencies.  We request that BLM consult with us regarding the modeled deposition impacts to determine the level of concern for NPS units included in the analysis.

***Editorial Comments***
Section 5.7.11 discusses the PSD increment comparison.  The protocol correctly states that comparison with the Class I and Class II increments provides a useful indicator when looking at relative changes in air quality, but the analysis completed for the NEPA document would not represent a regulatory increment analysis.  The document also clarifies that most air pollution sources associated with oil and gas development currently are not required to submit a regulatory increment demonstration.  However, it should also specify that despite not being subject to a regulatory increment demonstration, if the PSD minor source baseline date has been tripped in the area modeled, then the oil and gas sources would still "consume" available increment under the PSD regulations.  This is another reason why the increments are a useful indicator in NEPA air quality analyses.  We recommend that BLM update this section to reflect this information.

Several sections throughout the protocol document suggest that the FLAG guidance is not applicable to NEPA analyses because FLAG only applies to sources of air pollution that are subject to New Source Review (NSR) requirements.  These statements are incorrect and should be revised in the protocol.  FLAG 2010 states that the methods and procedures found in the document are also applicable to air analyses under NEPA, in addition to variety of other mechanisms for addressing AQRV effects.  For instance, the introduction to the visibility section states:  "This chapter describes methods for analyzing the impacts on visibility from new or modified air pollution sources.  This includes sources that fall under the purview of the Prevention of Significant Deterioration (PSD) regulations and *sources that are being analyzed for Environmental Assessments and/or Environmental Impact Statements under the National Environmental Policy Act (NEPA).*"  The term "sources" here refers generally to sources of air pollution, it is not limited to only sources subject to NSR.  Similar statements confirming the applicability of FLAG to NEPA analyses are found throughout the FLAG 2010 document.  Finally, the MOU also recognizes the applicability of the FLAG guidance to NEPA air analyses.  Please revise the modeling protocol document accordingly.

5

Thank you for the opportunity to comment on the modeling protocol for the GJFO, UFO and D-E NCA RMP Air Resources Modeling Protocol.  As stated previously, we believe the CAMx modeling runs will provide a comprehensive and robust analysis.  We would like to work with BLM to address our concerns related to the AQRV analyses.

6

BLM_0109956

**James Bode**

| | |
|---|---|
| **From:** | Colorado Environmental Coalition <info@ourcolorado.org> on behalf of Chad Muehling <laddypop2001@yahoo.com> |
| **Sent:** | Friday, June 17, 2011 9:15 AM |
| **To:** | uformp@blm.gov |
| **Subject:** | Conservation of the Dolores River Basin. |

Jun 17, 2011

Bureau of Land Management Uncompahgre Field Office

Dear Uncompahgre Field Office,

Please prioritize protecting the wilderness characteristics of the Dolores River Basin when developing the new resources management plan for the Uncompahgre Field Office (UFO).

At the heart of the Dolores corridor, the Dolores River Canyon Wilderness Study Area and citizen recommended additions -- with towering colorful sandstone cliffs, river otter, peregrine falcon, and outstanding opportunities for remote wilderness experience -- must be managed for the protection of the area's vast wilderness characteristics.

In addition, please make sure to consider the following:
* The Sewemup Mesa Citizens' Wilderness Proposal (CWP) areas within the Uncompahgre field office, including Carpenter Flats and Beehive Canyon, help to define a cohesive landscape of diverse canyon ecosystems, and should be managed for their wilderness characteristics.

* The Dolores Corridor, including the Paradox Valley and its rich wildlife and cultural resources, should be managed in close cooperation with adjacent BLM Field Offices and private land owners. It is important that the river ecosystem be considered as a whole in order to institute management that maintains its unique qualities.
* The Dolores River and all its eligible tributaries should receive immediate, thorough, and enduring protection.  Previous findings of wild and scenic suitability for the Dolores River should be reaffirmed in the plan update.  Few streams boast the unique natural values--and extent of threats to those values--as are found along the Dolores River.
* Oil and gas leasing should be prohibited in the Dolores River Corridor, or should at a minimum maintain No Surface Occupancy Stipulations. Impacts of development within the corridor are not consistent with protection of outstandingly remarkable values or the existing Special Recreation Management Area Designation.

Finally, the revised management plan needs to address how uranium mining in the area will occur to ensure proper protections and prohibit leasing within the river corridor.  BLM must ensure that all state and federal laws are applied to any permitted mines. The BLM must also ensure that a viable long-term plan for dealing with any radioactive or contaminated materials as well as any other waste products is securely in place. All permitted mines must:
*prove that there will be no harm to both surface and ground water quality and quantity; *prove that the long-term ecological health of the area will not be jeopardized; *have viable reclamation plans in place before permits can be granted; and *have an adequate bonding mechanism in place sufficient enough to cover the entire cost of reclamation.

Thank you for this opportunity to participate!

Best

Mr. Chad Muehling

1

BLM_0109957

66 Pearl St
Denver, CO 80203-4167

BLM_0109958



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401



## COOPERATING AGENCY MEETING #8

### Thursday, June 23, 2011 (1:00 – 4:00 PM)

### Meeting Location:
**Holiday Inn Express (Jordan Room)**
**1391 South Townsend Avenue, Montrose, CO**

# AGENDA

1. **Welcome**

2. **Introductions**

3. **Planning Process to Date**

4. **Oil and Gas Potential** (Rob Ernst)

5. **Coal Potential**  (Desty Dyer)

6. **Comments on January 2011 Internal Rough Draft Alternatives**

7. **Internal Draft Chapter 2 for BLM Field Office, Cooperating Agency, and RAC Subgroup Review**

8. **Other Items Not on the Agenda**

9. **Action Items / Next Meeting**
   - Next meeting: Thursday, August 11, 2011, 1:00–4:00pm, Holiday Inn Express, Montrose

BLM_0109960



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401



## Highlights of the Resource Management Planning Process to Date
### *June 23, 2011*

- Notice of Intent (NOI) – 2/25/2010

- Scoping period – 12/23/2009 to 3/29/2010

- Scoping report – final report completed 7/7/2010 (on website)

- Tribal consultation – initiated 2009 (ongoing)

- Community Assessment – report completed 2/2009 (on website)

- Visual Resource Inventory – report completed 9/2009

- Migratory bird status literature review – report completed 10/2009

- Analysis of Management Situation (AMS) – report completed 6/10/2010 (on website)

- Economic workshops (6 communities) – held 3/2010

- Socioeconomic baseline assessment – final report completed 7/21/2010

- Class I paleontological resources – report completed 2/2010

- Oil & Gas Reasonable Foreseeable Development (RFD) Scenario – internal draft report completed 7/2010

- Mineral potential report (excluding coal) – internal draft report completed 8/2010

- Coal potential report – final report completed 4/26/2010

- Renewable energy potential report – final report completed 5/31/2010

- Class I cultural resources overview – draft report completed 4/2010; final report completed

- Coordination with Cooperating Agencies – invitations sent 1/23/2009; meetings planned from 5/27/2010 forward

- ACEC evaluation report – draft report completed 7/15/2010 (on website) – final report underway

- Wilderness characteristics report – draft report pending

- Air quality report – anticipated Winter 2011-2012

- Wild and scenic rivers – draft eligibility report 12/2009; final eligibility report completed 7/12/2010 (on website); suitability underway

- Recreation focus groups – completed 3/2010; report completed 6/2010 (on website)

- Alternatives development – anticipated 6/2010 through approximately 10/2011

---

BLM_0109961

BLM_0109962

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**
**Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)**

Note to Cooperating Agencies and RAC: The alternatives table you will see on June 23/24 will only have four alternatives.  Responses below refer to the 5-alternative (not including the preferred) table you commented on.  We did not tailor responses to the new 4-column table.  Also, there have been changes to actions since we responded to your comments.

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| All Resources | | | | | |
| 1. | General | General | Barbara Hawke, The Wilderness Society (RAC Subgroup) | (Via B. Hawke's first email transmitting comments:) The UFO staff have done an outstanding job of covering many important topics in the draft alternatives. They are to be commended for their thoroughness and strong effort to promote good management and conservation practices on our public lands. As requested, my comments on the document only identify gaps or omissions in the range of alternatives. | Thank you, and comment noted. |
| 2. | General | C and D | Robbie Levalley (RAC SG) | At times alternative c and d indicate that no similar action will be taken.  The reality is that there is management activities that are taken in each of those objectives so to list as if nothing would is not a true reflection of what occurs on the landscape.  Particularly in the T and E species section. | We will try to catch inconsistencies – each alternative needs to comply with laws, policy etc. So, if "no similar action" is not an option, we hope to correct the oversight.  There will, however, be times when we show an action in B or E that does not apply to the theme of C or D.  When reviewing the final draft alternatives, let us know if there is a specific instance we need to look at again. |
| 3. | General | General | Robbie Levalley (RAC SG) | My concern with so many action items ending up in the RMP is that this leaves you all more vulnerable to litigation.  With shrinking budgets, the trend should be less can actually be accomplished instead of well over 600 action items with the objectives.  Director Abbey stated to congress, we can no longer do more with less.  The question should be what can we actually do and measure and accomplish in this era of no dollars, shrinking partner dollars and increased litigation. | We agree that there are currently too many action items.  As we review the matrices further, we will try to eliminate some actions. However, there are many items that we must deal with per the Planning Handbook, the Endangered Species Act, etc. |
| 4. | General | B and E | Robbie Levalley (RAC SG) | Several places it was hard to detect actual differences between B and E. I am sure that I did not catch all of them. | Agreed.  We determined that in many cases B and E, and C and D were similar enough that we combined the columns.  There are now 4 alternatives. |
| 5. | General | D | Robbie Levalley (RAC SG) | Alternative D appears to be set up to not be considered very seriously meaning that the alternatives | All alternatives are to be taken seriously.  All alternatives are implementable, are legal, and are |



Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review: January 27, 2011

BLM_0109963

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | are actually two preservation to one development. Not sure if that is a true analysis. Appears to be scewed to begin with. | within the range of alternatives. |
| 6. | General | B | Robbie Levalley (RAC SG) | In this table, you catch yourself making alternative b the goal instead of one of the options. That might need to be reevaluated before the draft comes out. Again, that scews the outcome. | We have made changes to the alternatives. Please see the revised draft alternatives when they are provided to you to see if they satisfy the concern. If the same comment applies, please be more specific. |
| 7. | General | | Peter Mueller, The Nature Conservancy (RAC Subgroup) | In general, hard to evaluate the acres of treatments when information is not provided on the total treatment needed. When 500 acres/year will be improved is this 1% or 10% or ? of the goal? It would be helpful to show this information in the table. | We agree it is difficult to evaluate when acres are not shown. We will show acres for all actions within each column on the final draft alternatives. We will also provide maps. |
| 8. | 002, 015, 062, 065, 089, 108, 116, 128, 145, 161, 189, 194, 196, 204, 218, 228, 236, 242, 244, 252, 259, 266, 281, 284, 286, 290, 292, 296, 314, 343, 352, 369, 378, 405, 437, 440, 456, 462, 465, 491, 501, 512, 516, 525, 530, 541, 551, 558, 566, 572, 577, 579, | All | Steve White, Montrose County (Cooperating Agency) | There needs to be a range that has a Lower Intensity Management (which could include either a Preservation or Development Alternative) than the Current Management, Alternative A (No Action). Based on current trends in the Nation, we need to be able to see what the current management is, and have the ability to make a preferred alternative that may be less restrictive than the current management practice. This may also lead to the need to have the ability to use a range of alternatives for each category instead of one single alternative for each category. This would allow better flexibility in the management of individual issues. | UFO believes there is a range of implementable actions. The range generally goes from less restrictive than the Current Management (Alt A) to more restrictive. Please provide specific examples when you review the next draft. |



BLM_0109964

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | 581, 583, 585, 587, 589, 591, 593, 595, 597, 599, 601, 603, 605, 607, 609, 627, 633, 650, 668, 674, 679, 686 | | | | |
| 9. | No row # | | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Soundscapes should be added as a category with at least basic management alternatives to preserve natural soundscapes<br><br>Explanation & Notes:<br>Natural soundscapes are an important resource to both humans and wildlife. Natural soundscapes are important to achieving the experiential goals for primitive and quiet use recreation areas. Updated GIS models are available for testing to aid in staff's analysis. Other folks familiar with the model and application to soundscapes management would be happy to work with staff to develop ideas for application to RMP alternatives. | There are not specific actions that address noise levels. How sound is perceived is related to topography, humidity, vegetation characteristics, background sounds (wind, leaves rustling, creeks babbling, etc.). However, Wilderness, WSAs and Areas with Wilderness Characteristics are surrogates to preserving natural soundscapes. Some SRMAs discuss quiet use areas as a possible outcome. Also, the Wildlife actions have timing limitations which will reduce noise in certain times of the year.<br><br>Site specific planning later could address noise – for instance, travel management planning could evaluate quiet use areas. |
| 10. | No row # | | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add a category for "Climate Change"<br><br>Explanation & Notes:<br>This can be an important consideration in many public land management decisions, and a placeholder should be inserted to address expected DOI policy guidance on climate change | We have added a section on "Climate Change" |
| Air Quality | | | | | |
| 11. | 009 | B | Charlie Sharp, USFWS (Cooperating Agency) | This action seems pretty standard, even under a high development scenario. In other words, probably not a reasonable range of alternatives. | Do you have any specific suggestions on how to broaden the range? UFO does not really need a decision to do this action – unless we want to make it obvious this will be a requirement. |



BLM_0109965

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| 12. | 012 | E | Steve Weist, Oxbow Mining (RAC Subgroup) | Why is alternate E more restrictive than alt. B? Either make Alt B tier 4 or Alt E tier 2. | We are not sure what the concern is.   Tier 2 and Tier 4 engines, as well as the general requirement for engines to "meet US EPA requirements" are all part of the range, and should remain for consideration. |
| 13. | 013 | B, E | Steve Weist, Oxbow Mining (RAC Subgroup) | Capturing, venting, or flaring are economic decisions. Prohibiting venting or flaring does not maximize resource recovery. Oil and Gas companies are not in the business of wasting resources, They are in the business of safely proving up a well and getting it producing. At the least you might prohibit venting, from gas wells, but should allow flaring. | B and E (which prohibit venting and flaring) are part of a reasonable range of alternatives.  Alternative D and A, which are also within the range of alternatives, do not prohibit venting and flaring.  We have made changes to this row.  If there is still a concern with the revised alternatives, please let us know. |
| Soils and Water | | | | | |
| 14. | 018 | B, D | Charlie Sharp, USFWS (Cooperating Agency) | Consider aiming to "exceed" land health standards under the preservation scenarios. | EMPSi's edits/notes: The Alternative B objective indicates meeting or exceeding standards, and the Alternative E objective indicates meeting standards. |
| 15. | 019 | B,c,d,e | Robbie Levalley (RAC SG) | Again, remove bullets and allow for more flexibility in determining what is causing the downward trend.  For example, what if it is climate change.  This restricts what BLM will actually look at. | The bulleted items are the types of activities the BLM has the ability to manage.  Even if the external factor is climate change, the BLM would still have to manage these activities to maintain the Land Health Standards. |
| 16. | 021 | B | Steve Weist, Oxbow Mining (RAC Subgroup) | If land health standards are not being met, moving it up to 200 meters on similar surface will not improve the land health, need to work with user to develop methods that will improve land health. | 200 meters in alternative B is within the range of alternatives.  Moving an action 200 meters can have beneficial effects. |
| 17. | 022 | Bcde | Robbie Levalley (RAC SG) | Similar to above comment *Comment*: Again, remove bullets and allow for more flexibility in determining what is causing the downward trend.  For example, what if it is climate change.  This restricts what BLM will actually look at. | The bulleted items are the types of activities the BLM has the ability to manage.  Even if the external factor is climate change, the BLM would still have to manage these activities to maintain the Land Health Standards. |
| 18. | 028 | B | Steve Weist, Oxbow Mining (RAC Subgroup) | Alt. B uses" ROW avoidance areas", Alt E uses "exclusion areas". Should they both be exclusion?, or is Avoidance a milder form, and they should both be avoidance? | Exclusion requires less management than avoidance in terms of level of effort. If a proposed project falls in an exclusion area, the project can't go through and the BLM's work is done.  If the project falls in an avoidance area, an EA or EIS will likely be prepared for the project, including determining the |



Internal Rough Draft Alternatives for Cooperating Agency
and RAC Subgroup Review: January 27, 2011

BLM_0109966