## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | resources, areas not meeting Land health Standards, ect, many of the terms are missing from the glossary, the acreages associated with action items are incomplete or simply missing. Furthermore, many of the acreages or quantified values seemingly have no context, rational, or methodology as to how they were developed, thus making it difficult or impossible to evaluate if the range of alternatives has adequately been captured. In order for your vision of the development of the preferred alternative to properly function a significant amount of data and analysis are required. We are concerned that as your staff moves further into the process of developing the preferred alternative that there will be major resistance to changing or modifying the preferred should additional analysis and input from cooperating agencies be received.<br><br>That said, we are encouraged by your repeated assurances that there will be many opportunities now and in future to provide detailed input and technical assistance to you and your staff in the development of the range of alternatives and subsequently the preferred alternative. It is our understanding that the Feb 28th deadline to submit comments does not affect or limit the DOW's ability to make additional recommendations and comments on the range of alternatives should the range be found inadequate in future discussion or analysis.<br><br>We understand that the BLM has a multiple use mandate and the pressure placed on the public lands by development, grazing, recreation, and wildlife has never been greater. We cannot understate the importance of BLM lands and this planning process in the management of wildlife and wildlife habitats. As private lands become more and more developed the importance of un-fragmented functional public land habitat is the key to maintaining viable wildlife populations. In our opinion, | |



## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | the loss and fragmentation of quality transitional and winter range habitats for mule deer and elk should be of highest importance when it comes to planning future uses across the landscape. For instance, the UFO is comprised of approximately 3.1 million acres, of that approximately 10% of the entire resource area is critical elk winter range that largely supports the majority of elk that summer on the Uncompahgre Plateau. As the landscape becomes more and more fragmented and wildlife compete with other uses it becomes increasing import to preserve core areas of habitat. We believe that any time a biological resource is given equal consideration in land use decisions such as with the Desert Bighorn Sheep MOU (1989) that wildlife greatly benefit. While we applauded your staff recommendations for the Core Area concept, the analysis and mythology to designating core areas as we understand it does not have a quantifiable objectives or rational for attempting to preserve and protect areas of high concentration of wildlife that allow for sustainability of populations.<br><br>As we continue to work with your staff as a cooperating agency through this process we are assuming that there will be time to fully evaluate and address our concerns in the development of the preferred alternative, and, should we feel like there are issues (goals and action items) that have not been addressed or that we as a cooperating agency have not had sufficient time to provide input for, then BLM will be receptive to taking the appropriate amount of time and effort to consider our concerns.<br><br>We very much look forward to continuing to work with the BLM to refine this process and how best the DOW can participate in a meaningful way during this important planning process. | |

**Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)**

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | Thanks,<br>Renzo Delpiccolo | |
| 54. | 119 | B,E | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Enforce Mitigation measure (spatial, seasonal, ADD require the replacement of key habitat function and values from the impacted resource) | It is difficult to develop an action that could define when this is needed and when it would be achieved. Potentially dealt with in the Vegetation/Restoration section (please see this section). |
| 55. | 119 | Objective | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Develop and preservation, enhancement and restoration goals for game and non games species to meet population objectives. Develop a strategic long term comprehensive habitat and vegetation management models and plans to identify spatial and temporal treatments for targeted species. A landscape assessment for the entire UFO is necessary. | This is implementation. We assess about 1/10 of the field office each year. Also, management is driven by mosaic objectives in the fire management plan. |
| 56. | 124 | | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | See attached:<br>***CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado***<br>*(file name = Statewide Stips Table Final 122010.pdf)*<br>for species specific lease stipulations including TL dates and CSU buffers, etc. Most of these stips should apply to other activities besides Oil and Gas. There is one mistake the TL for production area Desert Bighorn sheep should be Feb 1-May 1. Make the date consistent with these recommendation throughout the document. Please note that some stips have CSU for density limitations these should also be added for any Alt B and E. | TL is for all uses, including and in addition to Oil and Gas (i.e. all other resource uses).<br>SSR and NGD are for other uses (non- oil/gas). SSR corresponds to CSU, and NGD to NSO. |
| 57. | 127 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | We support Alt B. NSO on SWA. Fluid mineral development on SWA is an incompatible use with the purpose, intent, and management of a SWA. | Thank you, and comment noted. |
| 58. | 127 | E | Charlie Sharp, USFWS (Cooperating | Consider combining No Lease actions with an appropriate stipulation to account for existing mineral leases or connected actions, for which an appropriate | We cannot change existing mineral leases by adding stips with this plan. |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | Agency) | COA (based on the stipulation) can be attached to the APD | |
| Fish and Aquatic Wildlife | | | | | |
| 59. | 129 | B | Steve Weist, Oxbow Mining (RAC Subgroup) | Eliminate Intermittent streams and ponds, and ephemeral/ seasonal waters, there is no way you can manage aquatic wildlife in those areas on a consistent basis. | As contributing sources to perennial systems it seems relevant to analyze as it provides a range for impact analysis. It should be pointed out that if we remove those systems there is no range to analyze. Additionally, impact analysis should show that they are in fact problematic to manage for aquatic species. |
| 60. | 130 | | Peter Mueller, The Nature Conservancy (RAC Subgroup) | For action 130 – only warm water native fish mentioned are sculpin and dace – aren't the 3 species found here: roundtale, bluehead, and flannel mouth? | Sculpin and dace are examples -- there could be more species. Also, the species you mention would fall under the SSS aquatic section. |
| 61. | 130 or 229 | | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add a row to specifically address management needs for key and declining warm water native fish, including but not limited to: roundtail chub, flannelmouth sucker, and bluehead sucker<br><br>Explanation & Notes:<br>At least these 3 native warm-water fish are key conservation target for the state, and they are relevant within waters of the UFO | Specifically addressed in SSS Fish "Designate all occupied and suitable aquatic T&E, candidate, and BLM Sensitive species habitats as key/ priority areas including FWS designated critical habitats." The species she has identified are BLM sensitive species thus we have addressed this comment adequately. |
| 62. | 130 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Action item please change to: Designate coldwater sport fishery, cutthroat trout and, warm water native species of concern as priority species. | Cutthroat trout are in the sensitive species section. We have added coldwater sport fishery to alternative C<br><br>Bruce's 3/10/2011 direction:<br>Kate/Angie, please add "Coldwater Sport Fishery" to Alt C.<br>EMPSi's edits/notes: Change made. |
| 63. | 130 | B, E | Charlie Sharp, USFWS (Cooperating Agency) | Consider omitting rainbow trout from this action under Alt E, or possibly under Alt B to manage for completely native communities | Rainbow trout has been deleted from alternative E.<br><br>Bruce's 3/10/2011 direction:<br>Angie/Kate; please make the change to Alt E<br>EMPSi's edits/notes: Change made. |
| 64. | 131 | | Brian Magee & | Add action: Coordinate aquatic habitat improvement | Add to the "Coordination" philosophy. |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | Renzo Delpiccolo, CDOW (Cooperating Agency) | projects with the CDOW to maintain, improve, and enhance priority species and public opportunity for enjoyment and use. | |
| 65. | 132 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Included structural and vegetation improvements to the list to achieve restoration. Also, change non-game native species to "priority species". | "Structural and vegetation improvements" has been added as clarification of aquatic habitat to be enhanced. Regarding species, wording is left as it is, because we feel it is more clear.<br><br>Bruce's 3/10/2011 direction:<br>Angie/Kate: make the change -- ""Annually enhance ... miles of aquatic habitat, including structural and vegetation improvements, to benefit ...)<br>EMPSi's edits/notes: Change made. |
| 66. | 132 | B | Steve Weist, Oxbow Mining (RAC Subgroup) | Wants to protect, enhance or restore 5 miles of aquatic habitat each year. Is that going to be additive or are you thinking of just 5 miles. Additive meaning 5 miles the first year, 5 new miles the next year plus maintaining last years five miles, and so on. | Intent was both additive and repetitive meaning restoration may not be accomplished with just one action. Preferred alt will not bind BLM to a mileage requirement, just direct BLM to pursue opportunities as they arise through LHA, PFC, or other agency/ constituent request. |
| 67. | 132 | Bc | Robbie Levalley (RAC SG) | Management prescriptions do not belong in objectives | EMPSi's edits/notes: Unsure what this refers to. Line 132 is an action. |
| 68. | 133 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Please change to in consultation with the CDOW remove fish barriers. In some instances as with cutthroat trout, natural and artificial barriers are use to restore cutthroat range. | EMPSi's edits/notes: Change made |
| 69. | 133 | B,C | Steve Weist, Oxbow Mining (RAC Subgroup) | Removing NATURAL migration barriers is not NATURAL and should not be done! | Sometimes removing a natural barrier will aid the priority species. Also, the current range is from removing nothing, to artificial only, to natural only, to both natural and artificial. All are implementable and reasonable. We will remove reference to the type of barrier.<br><br>EMPSi notes/edits: Removed specifics of type of fish |

BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO
RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | | barriers to be removed. |
| 70. | 138 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Unclear as to what SECTION2.x is? | This has been deleted in current fish matrix. Stocking proposals is addressed with augmentation of native species action. |
| 71. | 139 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Need to reference priority aquatic species to improve recreation values. | Kate has a comment on this action "combine with another action like augmentation or improvement and delete action alternatives)" if we do this then, I agree, there is a reference to native species in the augmentation action which will address comment.<br><br>EMPSi's edits/notes: action was combined with another action that states: "Improve fishery values in rivers to improve recreation values." Range of alternatives includes improving fisheries for recreation values and not doing so. |
| 72. | 142 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Include a NSO within 300ft of OHWM for cutthroat - See attached stip table (*CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado; file name = Statewide Stips Table Final 122010.pdf)* | Cutthroat trout are in the sensitive species section. NSO is 300 ft is added to an action. |
| 73. | 142 | | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Develop a LN or stip about decontamination of equipment to reduce the risk of the spread or introduction of Aquatic nuisance Species when working in or adjacent to riparian habitats. | The bigger issue is with recreation permits ("boats") than with oil and gas. We will add the following BMP:<br>All equipment and water craft utilized for working or transportation in aquatic systems shall be cleaned and inspected by the authorized officer prior to conducting permitted activities, to prevent the introduction of invasive aquatic species.<br><br>EMPSi's edits/notes: Added BMP. |
| 74. | 144 | | Brian Magee & Renzo Delpiccolo, CDOW | It is unclear if this action has been met or address by the objective above with a LN. Need to ensure that impacts to wildlife habitat (including aquatic) are continually evaluated and subsequently avoided, | EMPSi's edits/notes: This action was not carried forward to the action alternatives because NEPA directs us to do this. |

Page 17 of 54

Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review: January 27, 2011

BLM_0110754

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | (Cooperating Agency) | minimized, and mitigated for (including requiring replacement habitat for unavoidable impacts). | |
| Terrestrial Wildlife | | | | | |
| 75. | 146 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | The list although inclusive of habitat types that are important to wildlife, Fails to identify those patches or block of habitat that are currently functioning for wildlife at this time (ie critical habitats or habitat that are considered limiting factors for populations). Designate the priority habitat types based on the limiting factors for life cycle completion (winter, summer, breeding, ect) for the species that are designated as key priority species (both game and non game species) | We feel this is at the implementation level. For RMP level analysis, we are using CDOW mapped critical habitats (NDIS) for many species. Not all designated key priority species have this data, especially the non-game species. |
| 76. | 146 | B,C | Steve Weist, Oxbow Mining (RAC Subgroup) | It seems to me there are a multitude of areas with Pinyon-juniper, and mountain areas with ponderosa pine. Designating these as priority habitats seems extreme and unnecessary to me, unless you designate selected areas where land health is of concern. | Designation of Key priority habitats is required by the Planning Handbook. The designation says that these habitats are important for the species in that section (i.e. terrestrial wildlife, SS wildlife, Aquatic, etc.). |
| 77. | 148 | | Peter Mueller, The Nature Conservancy (RAC Subgroup) | For action 148 – are there other terrestrial wildlife species that should be key species – what about Gunnison Sage Grouse? | Sage grouse are in the sensitive species matrix, as are other sensitive species. |
| 78. | 149-150 | | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | See CDOW comment 14 (on row 119, Objective): *"Develop and preservation, enhancement and restoration goals for game and non games species to meet population objectives. Develop a strategic long term comprehensive habitat and vegetation management models and plans to identify spatial and temporal treatments for targeted species. A landscape assessment for the entire UFO is necessary."*<br><br>The habitat acreages have little context. Habitat treatments and enhancements should be based on specific species needs and formulated into a comprehensive landscape habitat management plan. | Numbers are based on the number of acres we thought possible to do based on past work and other constraints. Also, see response to comments on lines 37 and 38. |
| 79. | 148 | | Brian Magee & Renzo Delpiccolo, | Add Gunnison sage grouse to the list | Sage grouse are in the sensitive species matrix. |

**Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)**

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | CDOW (Cooperating Agency) | | |
| 80. | 149 | Be | Robbie Levalley (RAC SG) | B and e are too restrictive by putting in acre targets. If environmental conditions are not right, you did not meet target. C and D would include habitat management projects | EMPSi's edits/notes: The preferred alternative removed acre targets. See response in comment 78 above. |
| 81. | 150 | C | Steve Weist, Oxbow Mining (RAC Subgroup) | Acreage on Alt C seems to be out of line with other alternatives, it should be 300 acres instead of 3,000 ac. | Alt C is high intensity. High input for wildlife of economic value (development) instead of native non-game in Alt B. |
| 82. | 153 | | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Suggest adding a action: Wildlife will have first priority for all additional forage made available through wildlife habitat improvement projects. | We feel this is not implementable. |
| 83. | 155 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Suggest priority species and priority species habitats in addition to special species and species habitats. Also include . Avoid critical/priority habitats in future travel management planning both spatially and temporally. | The last sentence in the action covers this. |
| 84. | 156 | | Peter Mueller, The Nature Conservancy (RAC Subgroup) | Action 156 is a good example of where this percentage is useful. (close 30 or 50% of routes found to be negatively impacting key habitats or species) | Thank you for your comment. |
| 85. | 156 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Suggest: Close 100% of the routes that are impacting terrestrial habitats or species. Note: The concern is that once a route is established that the impact has already occurred through fragmentation of habitats and displacement of wildlife. At what scale are impacts evaluated? | It was thought that "at least 50% of routes that are impacting terrestrial habitats or species" would be attainable, and does not preclude additional routes (higher percentage) being closed. Some routes that are impacting wildlife may be necessary for some reason or another (i.e. ROWs, access to facilities, etc.) and could be repaired to a level that it is not or is less impacting wildlife. Development of the list of current roads that are negatively impacting wildlife would be developed at the time of a travel management plan, and would be evaluated at a landscape scale similar to what was conducted for |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | | the Dry Creek Travel Management Plan. |
| 86. | 156 | B | Steve Weist, Oxbow Mining (RAC Subgroup) | Develop a list of current areas that are negatively impacted, so you have a measure of how you did over the life of the plan. | Development of the list of current roads that are negatively impacting wildlife would be developed at the time of a travel management plan, and would be evaluated at a landscape scale similar to what was conducted for the Dry Creek Travel Management Plan. |
| 87. | 157 | | Peter Mueller, The Nature Conservancy (RAC Subgroup) | Action 157 specifically states that the ROW avoidance includes renewable energy – is this not the case throughout the document? If not, this should be evaluated. | EMPSi's edits/notes: Action removed as it is covered elsewhere. |
| 88. | 157 | Cd | Robbie Levalley (RAC SG) | You will manage those areas listed. To indicate they would not by saying no similar action is not a true reflection of what occurs on the landscape | EMPSi's edits/notes: Here, "no similar action" in Alternatives C and D means that the areas would not be ROW avoidance. |
| 89. | 159 | | Peter Mueller, The Nature Conservancy (RAC Subgroup) | Action 159 – NSO for San Miguel ACEC should be evaluated. | NSO for San Miguel ACEC is considered in the ACECs section. |
| 90. | 159 | B | Steve Weist, Oxbow Mining (RAC Subgroup) | Need Acronym description for SSR | An acronyms list and definitions/glossary will be added and available for review with the Internal Draft Chapter 2. |
| 91. | 162 | | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Currently, the deer population is under objective and the elk populations are at or near objective within the UFO. Animal distribution across the landscape is not uniform. Big game species, for a variety of reasons, vegetation type, season of use, topography, site fidelity, etc. can concentrate in areas and cause wildlife related conflicts with private lands and game damage. Reduction of the carrying capacity through grazing is irresponsible public land management. We suggest modifying the action to identify areas to conduct habitat treatments and provide seclusion areas to facilitate desired distribution patterns across the landscape. This would tie habitat treatments and wildlife emphasis areas into an over arching habitat model as described in comment #14 band #29. | This plan's life is for many years. Current populations of deer and elk, and their effect on habitat may change. This action reminds us that when populations result in impacts to the habitat (i.e. Land Health Standards), we should work with CDOW to find a solution. Suggestion of modification of the action is implementation and coordination. |
| 92. | 163 | B | Brian Magee & | Change 3000 acres to …"improve at least 15% of the | We have made the change; 15% in B and 5% in E. |



## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | Renzo Delpiccolo, CDOW (Cooperating Agency) | mapped pronghorn habitat over the life of the RMP. New action: Need to coordinate with other Field offices on management efforts when biological resources overlap administrative boundaries. | Suggested new action will be taken care of in overarching cooperation section at the beginning of Chapter 2.<br><br>Bruce's 3/10/2011 direction:<br>Angie/Kate, please make the change to the matrix<br><br>EMPSi's edits/notes: Change made.<br><br>Update: Action deleted. Suggested new action will be taken care of in overarching cooperation section at the beginning of Chapter 2. |
| 93. | 163 | B | Steve Weist, Oxbow Mining (RAC Subgroup) | In an area that can't meet current in-stream flow rates for fish. How is adding 300 Pronghorn antelope, Big horn sheep and river otters going to do anything but further degrade flow rates through the Dolores river Canyon, and harm the fish that are currently in this segment? | When we evaluate whether or not to augment populations somewhere in the UFO, effects to other resources would be evaluated in the NEPA process. |
| 94. | 164 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | We support the concept of biological core areas. However, given the limited information to review on this topic we do not think that the areas are large enough to "protect critical winter forage in sufficient quantity and quality to support sustainable populations" Suggest expand the areas to include 80% of the critical mule deer winter range and elk winter concentration areas. These areas have the highest densities of wintering animals within the UFO and are paramount in sustain population objectives. | Core/Corridors are not intended to comprehensively protect deer and elk winter habitat. Much of that can be done with protective stipulations, timing limitations, and land health standards for those species. |
| 95. | 164 | D | Robbie Levalley (RAC SG) | Wildlife corridors are mapped and protected by BLM and should be reflected. | EMPSi's edits/notes: core areas take into account important wildlife corridors.<br><br>Missy: Actually most big game corridors are mapped by CDOW. Other wildlife corridors have been mapped by various groups. Otherwise, travel corridors are assumed based on the best available science, and professional knowledge/experience. |
| 96. | 165 | B | Steve Weist, Oxbow Mining | Last Line need acronym description for IDT | An acronyms list and definitions/glossary will be added and available for review with the Internal |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | (RAC Subgroup) | | Draft Chapter 2. |
| 97. | 166 | E | Robbie Levalley (RAC SG) | Full range of alternatives would include a list of certain areas. | EMPSi's edits/notes: Alternative E is "no similar action" here because all areas would be NSO (see preceeding row in alternatives matrix). |
| 98. | 167 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Seasonal closure dates to protect Big Game should be applied to all winter range not just biological core areas unless specifically exempt in some other resource designated area such as an SRMA, ect. | Big game winter range is very expansive on the UFO. This would apply a seasonal closure over a majority of the UFO, which is impractical and not implementable. By implementing a winter closure in biological core areas, we provide reduced stress to many wildlife species, in smaller areas that are more practical and implementable. This also goes along with the basic concept of the Biological Cores being the best, most important areas to protect for wildlife, fish, and rare plants, movement/migration of these species, and more contiguous habitats for their use. |
| 99. | 168 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Manage DELETE "the following" Elk Calving area (Production areas) . Should read: Manage Elk Calving areas (production areas )... | EMPSi, make the change by deleting the two words, but leave the bulleted list.<br><br>EMPSi's edits/notes: Change made. |
| 100. | 169 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Action item should say Elk production areas are closed to human entry and motorize and mechanized travel within Elk production areas from May 15-June 30. Seasonal closure dates to protect production areas should be applied to all production area unless specifically exempt. See attached strip letter (letter dated 12/13/2010; *file name = BLM Stipulations Letter 12132010.pdf*) | Elk production habitat is a very small portion of the UFO and it would be difficult to implement/enforce a closure to human entry.<br>For all production areas comment: There is a TL for big game reproductive areas (see Line 179), similar action for Bighorn (see Line 245 [SSS Terrestrial]). |
| 101. | 169 | Be | Robbie Levalley (RAC SG) | Say the same thing | EMPSi's edits/notes: Alternatives B and E are similar but there are different dates. Alt B is from May 15 to June 15 and Alt E is from April 15 to June 30. |
| 102. | 178 | Bce | Robbie Levalley (RAC SG) | Say the same thing | EMPSi's edits/notes: Alternatives B and E are similar but Alternative E does not provide a Timing Limitation to protect moose. |
| 103. | 178 | All | Brian Magee & | Terms not in glossary, see date for winter range in | Comment noted. Change dates to CDOW |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | Renzo Delpiccolo, CDOW (Cooperating Agency) | attached stips (*CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado; file name = Statewide Stips Table Final 122010.pdf)* | Recommendation. |
| 104. | 179 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Make consistent with CDOW Comment 39 (on Row 169, Alternative B), Including helicopter over flight in Big Horn sheep habitat: *CDOW Comment 39: "Action item should say Elk production areas are closed to human entry and motorize and mechanized travel within Elk production areas from May 15-June 30. Seasonal closure dates to protect production areas should be applied to all production area unless specifically exempt. See attached stip letter."* (letter dated 12/13/2010; *file name = BLM Stipulations Letter 12132010.pdf)* | See Response 100 above. Helicopters are motorized travel.<br><br>EMPSi's edits/notes: helicopter over flight not added to this action as it is covered by previous action regarding travel management. |
| 105. | 179 | B, C, E | Steve Weist, Oxbow Mining (RAC Subgroup) | In the Glossary I have there is no definition of surface disturbing activities, or disruptive activities, need to identify which glossary it is in. | An acronyms list and definitions/glossary will be added and available for review with the Internal Draft Chapter 2. |
| 106. | 182 | Bcde | Robbie Levalley (RAC SG) | Wildlife forage allocations are clearly defined as to how they will be determined or how that information will be used | Thank you, and comment noted. |
| 107. | 183 | | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Consider action: Designate 80% of the mule deer critical winter range, and elk winter concentration areas as priority for wildlife in forage allocations. | This is not implementable. |
| 108. | 186 | B | Steve Weist, Oxbow Mining (RAC Subgroup) | 9 miles separation seems like an excessive distance, especially if there are cliffs or streams between the domestic and wild sheep. | Alternative B incorporates some of the recommendations from Western Association of Fish and Wildlife Agencies (WAFWA) wild sheep working group. As such, it is compatible with current best science as a possible solution to the domestic/wild sheep disease transmission issue. |
| 109. | 190 | All | Brian Magee & Renzo Delpiccolo, CDOW | See stipulations and buffers for raptors in attached. *(CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado; file name = Statewide Stips Table Final 122010.pdf)* | We have a CSU for 1/2 mile, and an NSO for 1/8 mile. We think this is appropriate. |

BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO
RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | (Cooperating Agency) | | |
| 110. | 191 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | See stipulations and buffers for raptors in attached. *(CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado; file name = Statewide Stips Table Final 122010.pdf)* | We have a CSU for 1/2 mile, and an NSO for 1/8 mile. We think this is appropriate. |
| 111. | 191 | B | Charlie Sharp, USFWS (Cooperating Agency) | Apply stip to all raptors including American Kestrel, to further vary range of alternatives and for MBTA compliance | As noted in Alternative A, "Kestrels are very adaptable to nest in a variety of habitats and their populations are stable and widespread." We think it is appropriate to exclude kestrels. |
| 112. | 192 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | See stipulations and buffers for raptors in attached. *(CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado; file name = Statewide Stips Table Final 122010.pdf)* | We have a CSU for 1/2 mile, and an NSO for 1/8 mile. We think this is appropriate. |
| 113. | 193 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | See stipulations and buffers for raptors in attached. *(CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado; file name = Statewide Stips Table Final 122010.pdf)* | We have a CSU for 1/2 mile, and an NSO for 1/8 mile. We think this is appropriate. |
| 114. | 198 | B | Robbie Levalley (RAC SG) | Too restrictive i.e. putting in a particular bird in an objective and associated habitat | This action has changed from the version given at Review time. The concept of "no net loss" of key migratory bird habitats has remained in some alternatives, but is tied to specific habitats instead of in general. |
| 115. | 200 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Fine to designate areas, but moving of prairie dogs is primarily up to the County. | The action is to find these locations and make them available for relocation by those entities that are responsible for such. Not that BLM would be relocating prairie dogs. |
| 116. | 202 | Be | Robbie Levalley (RAC SG) | Say the same thing | EMPSi's edits/notes: Alternatives B and E are similar but the dates are different (May 1-July 31 in Alt B |

Page 24 of 54

Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review: January 27, 2011

BLM_0110761

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | | and May 15-July 31 in Alt E). Also, Alternative B is a broader range of species and Alternative E narrows it to focus only on Birds of Conservation Concern. |
| 117. | 202 | B, D | Bill Day (RAC Subgroup) | Lambeth and Reeder rate pinyon jay highly in every ranking methodology, and it is on USFWS BCC list. L&R list its breeding season beginning 2/21. Alt b could refer to L&R's breeding dates for all species in a habitat without listing them, or say "5/1 except for pinyon jay habitat, which would be 2/21...". Alt e should replace "May15" with "May 1", for semi/salt desert, sage, and PJ . Pinyon jays are declining everywhere and we have a sizable proportion of their population in the UFO. (Most raptors also nest earlier, but are covered elsewhere in the plan.) | Migratory birds have varying breeding dates (Lanbeth and Reeder, Table 3-1). In order to make the Stipulation reasonable, we selected one time frame that would provide protection for most birds, and is generally in line with current guidance for migratory birds. While there is concern for pinyon jays, they have not reached the level of concern to be added to the BLM Colorado sensitive species list, which would afford it more protection. |
| Special Status Species – General | | | | | |
| 118. | 207 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Also include in the Objective: Require replacement if habitat a ratio that is greater/ functionally equivalent if impacts to the habitat are unavoidable. | Reclamation objectives will be addressed in the plan and again at the project level. To require offsite or compensatory mitigation can become problematic given short term expectation of reclamation. Strong reclamation standards are far more valuable for maintaining habitat functionality than accepting sacrifice for offsite mitigation elsewhere. Additionally, requiring compensatory mitigation in certain veg types like salt desert shrub/adobe will undoubtedly be equally detrimental. |
| 119. | 208 | Cd | Robbie Levalley (RAC SG) | BLM sensitive species are managed very similiarly as compared to T and E species when out on the ground | Agreed for certain species but for many other less prominent species such as Naturita milkvetch, bluehead sucker they are not. We are only required to manage sensitive species to not contribute to the need for listing, which does allow for detrimental impacts to occur while Federal listing is far more limiting in what can occur and at what levels. |
| 120. | 208 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating | Include special status species in the list | I believe that what they are asking here is that we consider state listed species outside of what is federally listed and BLM listed. If so then we should have it covered. Plants are covered, Wildlife terrestrial has action "Manage non-special status |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | Agency) | | species that are state-recognized, endemic, rare, imperiled, or otherwise important to promote their conservation; and prevent the need for listing these species under the BLM sensitive species list and the ESA." |
| 121. | 208 | B,C | Steve Weist, Oxbow Mining (RAC Subgroup) | This seem as if you are adding in species which do not need protection, which will only enhance your management difficulties, while reducing lands that are usable by the public. | Not sure this comment has bearing given that the only species addressed are Federally listed species required by ESA and BLM sensitive species required by BLM policy and 6840 manual. |
| 122. | 210 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Add: Actively pursue… | As a rule of thumb in this document, the term "actively" is not being used in the action alternatives as the action is the same with or without the term. |
| 123. | 210 | C, D | Bill Day (RAC Subgroup) | Augmentation of low genetic variability species should be allowed in all alts, in occupied or recently occupied habitat. This could apply to Gunnison sage-grouse and kit fox especially, but could apply to both prairie dog species. C and D should be same as E. | If we add this then we lose the range to analyze. In a development scenario augmentation and expansion of rare or threatened species does drastically limit burgeoning development. Impact analysis will show that alts c&d are not viable in maintaining declining populations and that does give a range upon which to weigh decisions.<br>Missy: I think that maybe what Bill Day is getting at is that we don't say anything about the genetic quality of the individuals used to augment populations. In that case, that would be covered at the implementation level and the associated NEPA. |
| 124. | 212 | Be | Robbie Levalley (RAC SG) | Too restrictive. If science proves an animal damage activity could help restore Gunnison Sage Grouse populations, then what? | Past experience with coyote damage control in grouse habitats and Black Footed Ferret habitats has been demonstrably beneficial. Action deleted. |
| 125. | 212 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Add exception: Unless the animal damage control was part of a research or management project specifically for the T&E species. | EMPSi's edits/notes: Action deleted. |
| 126. | 212 | B | Steve Weist, | Need acronym description for USDA_APHIS | An acronyms list and definitions/glossary will be |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | Oxbow Mining (RAC Subgroup) | | added and available for review with the Internal Draft Chapter 2. |
| 127. | 213 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | BLM may be required by federal law to not permit any activities that would jeopardize the continued existence of a species. Alternative C and D need to language to address this. | ESA does not specifically prohibit this but is obviously politically unpalatable. If there was a proposal that would cause jeopardy (i.e. Tellico Damn; http://en.wikipedia.org/wiki/Tellico_Dam), it would go through a very contentious EIS, but is not illegal. This could be part of the decision for a pro development scenario and does provide range upon which to analyze impacts. |
| 128. | 215 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | "occupied habitats" not in glossary. Action should expand to NSO for all uses in T&E occupied habitats | There are separate stipulations that apply to fluid minerals and other surface-disturbing activities (lines 227, 239, 234). |
| 129. | 217 | Cd | Robbie Levalley (RAC SG) | There would be inventories conducted and that should be reflected | I believe that is what the LN says in the first sentence which binds the proponent to conduct such inventories. Inventories are not required on proposals. The need is usually determined by the BLM (wildlife biologist) as to whether they would be needed. In B & E the LN says that the holder may be expected to pay for surveys. In C&D, the surveys may not take place, or the BLM would be responsible for conducting the surveys. |
| Special Status Species – Plants | | | | | |
| 130. | 221 – 222 | | Peter Mueller, The Nature Conservancy (RAC Subgroup) | Action 221 and 222 – has the alternative of adopting the Colorado Rare Plants Conservation Strategy and BMP's – good to see!! | Thank you for your comment. |
| 131. | 226 | C | Steve Weist, Oxbow Mining (RAC Subgroup) | The 10% for high intensity management development is higher than the 5% for the preservation high intensity management, this seems backward. | The matrix is correct as Alternative C is the more development minded alt allowing 10% loss is less restrictive and therefore would be more accommodating to development/land use activities. |
| 132. | 226 | | Barbara Hawke, The Wilderness Society (RAC | Add "Also apply this stipulation for any globally imperilled - G1 or G2 - ranked plant species or plant communities that are not addressed through other | We will review the definition of sensitive species. Some, if not all, of G1/G2 species are included on the BLM Sensitive Species List. This would be the |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | Subgroup) | management prescriptions that offer a higher level of preservation"<br><br>Explanation & Notes:<br>There are a variety of extremely rare plants and plant communities in the UFO area, some of which have a federal listing status or BLM Sensitive species status, and some of which do not. These species are extremely important to the biodiversity and natural values of our public lands and need to be preserved. Typically, such rare plants are highly sensitive to disturbance, and thus require a high level of management protection. | mechanism to incorporate these species so that they fall under this stipulation.<br><br>ESA and BLM 6840 manual (BLM sensitive species) are the only mechanisms where BLM can apply land use restrictions, to apply such restrictions to non-listed species is not within BLM policy. There is an action addressing management of rare species not listed by ESA or BLM sensitive "Manage non-BLM sensitive species that are state-recognized, rare, or important species to achieve resource goals and prevent the need to protect under BLM sensitive species designation or federal listing." This while not as strong as land use stips does provide direction for managing rare species on case by case basis under NEPA. |
| Special Status Fish and Aquatic Wildlife | | | | | |
| 133. | 230 | | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Same action item as [row] 132. See CDOW comment 19 (on row 132, all alternatives):<br>*CDOW comment 19: "Included structural and vegetation improvements to the list to achieve restoration. Also, change non-game native species to "priority species"."* | "Structural and vegetation improvements" has been added as clarification of aquatic habitat to be enhanced. Regarding species, wording is left as it is, because we feel it is more clear.<br><br>Bruce's 3/10/2011 direction:<br>Angie/Kate: make the change -- ""Annually enhance ... miles of aquatic habitat, including structural and vegetation improvements, to benefit ...)<br><br>EMPSi's edits/notes: Change made. |
| 134. | 232 | New action | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | In conjunction with USFWS and CDOW developed a brood stock pond for cutthroat genetics. | This is not really an RMP level decision. DOW could elect to do this in any stream/pond capable of supporting the species as long as the LUP does not specifically preclude the activity. No stream/ pond would preclude the activity since the theme for this matrix is the management of native species. |
| 135. | 235 | All | Brian Magee & Renzo Delpiccolo, CDOW | See attached stip recommendations<br>*(CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado; file name = Statewide Stips Table Final 122010.pdf)* | NSO stip for 300 feet is now in the alternatives. |

BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO
RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | (Cooperating Agency) | | |
| 136. | 233 | B, E | Charlie Sharp, USFWS (Cooperating Agency) | Consider omitting rainbow trout from this action under Alt E, or possibly under Alt B to manage for completely native communities | Change made -- Rainbow trout are not mentioned in the alternatives for SSS fish. |
| 137. | 234 | B-E | Charlie Sharp, USFWS (Cooperating Agency) | This is a bit off-task, but also has implications for the range of alternatives: As I maintained when I was with BLM, an undetermined buffer zone is not an adequate (or true) stipulation, and cannot be meaningfully analyzed under NEPA or Sec.7; the "buffer as determined by science" language was proposed by the management team; all stipulations would be subject to the latest and greatest science, particularly under ESA situations; the buffer needs to be determined and specified (this may have been resolved in the latest version of the wildlife writeup prior to my departure, but I don't recall) | EMPSi's edits/notes: Buffers have been changed to set distances. |
| Special Status Terrestrial Wildlife | | | | | |
| 138. | 239 | C, D, E | Bill Day (RAC Subgroup) | Should be NSO in all T&E habitat in all alts. | Federal status does not require NSO in their habitats. Activities proposed in these areas would be analized and Consultation conducted with USFWS.<br>Action changed from time of review. Now has the following:<br>Alt B: NSO/NGD *Federally Threatened, Endangered Species' Occupied Habitat.*<br>Alt C: CSU/SSR *Federally Threatened, Endangered, and Candidate Species' Occupied Habitat.*<br>Alt D: No similar allowable use.<br>Alt E: NSO/NGD-xx: *Federally Threatened, Endangered, and Candidate Species' Occupied Habitat.* |
| 139. | 241 | | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Same action item as [row] 156. See CDOW comment 30 (on row 156, Alternative B):<br>*"Suggest: Close 100% of the routes that are impacting terrestrial habitats or species. Note: The concern is that once a route is established that the impact has already occurred through fragmentation of habitats and* | We think this is a reasonable expectation of what can be done. It does not prevent the closure of additional routes. |

Page 29 of 54

Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review: January 27, 2011

BLM_0110766

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | *displacement of wildlife. At what scale are impacts evaluated?"* | |
| 140. | 241 | B | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Change "50" to "90" percent<br><br>Explanation & Notes:<br>If routes are found to be negatively impacting special status species, they should be closed or rerouted. Although an obvious constraint is time & resources, if the plan has a 20 - 25 year life, the goal should be to remedy the vast majority of these problems. This alternative should not be unduly constrained by current assessments of what may be practical - within the life of the plan, new funding or partnerships might enable a greater extent of route closure and modification | We think this is a reasonable expectation of what can be done. It does not prevent the closure of additional routes. |
| 141. | 243 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Make NSO on occupied cuckoo Habitat. Refer to action [row] 215 Comment 54 (on row 212, Alternative B): *"Add exception: Unless the animal damage control was part of a research or management project specifically for the T&E species."* | EMPSi's edits/notes: Made change to add NSO to occupied cuckoo habitat in Alternative E. Moved TL to Alternative C.<br><br>Exception covered by standard exception. |
| 142. | 245 | A | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Make NSO. Also add TL dates on other activities. See Stips. (*CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado; file name = Statewide Stips Table Final 122010.pdf)* | Bighorn production areas are in areas of low O&G potential ( we will verify with Minerals). We could add NSO to Alt E (Lambing and Rutting grounds) if we think it adds to the range of alternatives. |
| 143. | 246 | A-E | Charlie Sharp, USFWS (Cooperating Agency) | Consider carrying Alt A forward in the event that CDOW identifies/ maps, or better yet, add desert bighorn and restriction period to the winter range stipulation under "Terrestrial Wildlife" section | Comment noted. Action was carried forward to the preferred based on draft CO BLM O&G stipulations. |
| 144. | 248 | | Robbie Levalley (RAC SG) | If 248 was listed, than it is not necessary to include 247, 249,250, | EMPSi's edits/notes: These actions are listed as specific allocations as part of implementing the MOU. |
| 145. | 248 – 251 | | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating | Duplicative actions. See CDOW comments 43-45 (on row 183): *"Consider action: Designate 80% of the mule deer critical winter range, and elk winter concentration areas as priority for wildlife in forage allocations."* | Duplicative actions noted and dealt with.<br><br>See response 183. |

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | Agency) | | |
| 146. | 260 | C, D | Bill Day (RAC Subgroup) | There should be NSO in any occupied Gunnison Sage-grouse habitat. Allowing surface occupancy is too wide range of alts. | Range of alternatives are appropriate give the laws, regulations, policies, etc. |
| 147. | 260 | Cd | Robbie Levalley (RAC SG) | No similar allowable use is not what occurs on the landscape. There are restrictions and increased layers | EMPSi's edits/notes: "No similar allowable use" here means that there is not a stipulation that would be similar to that proposed under Alternatives B and E for Gunnison sage-grouse habitat. Alternative C does propose other stipulations for leks, winter habitat, and breeding habitat. |
| 148. | 260 – 265 | | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | CDOW is supportive of the suggestions for stip in GUSG habitat. There are refinements that we would recommend. See stips for NO lease, NSO, CSU (noise and density limitations) and TL for Gunnison Sage grouse. (See *CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado; file name = Statewide Stips Table Final 122010.pdf)* | Items have been incorporated in COSO O&G stips and our preferred alternative. |
| 149. | 261 | | Peter Mueller, The Nature Conservancy (RAC Subgroup) | Action 261 calls for NSO for up to 1 mile of lek – is this far enough for the alternative evaluation? Timing limitations are within 6 miles of leks. | The range of buffers (0.25-1.0 mile) is within the range of recommended buffer distances for NSO for Lek habitat. We feel that it is a broad enough range. The concept we are working for is highest reduction in disturbance activities closest to the lek site, with reductions in protections as the activity gets farther away. |
| 150. | 261/262 | D | Robbie Levalley (RAC SG) | See above comment on line 28 *Comment:* No similar allowable use is not what occurs on the landscape. There are restrictions and increased layers | See responses 2, 88 and 147 |
| 151. | Special Status Wildlife | | Peter Mueller, The Nature Conservancy (RAC Subgroup) | I did not look at all the other species specific recommendations but it appears you used the CDOW BMP distances (at least from my quick look). | Thank you, and comment noted. We used the best available science in determining our actions, and many came from CDOW. |
| 152. | 262 – 263 | B | Steve Weist, Oxbow Mining (RAC Subgroup) | Row 262 shows no disturbance within 6 miles between Dec15 and March 15, while Row 263 shows no disturbance for 4 miles between March 1and June30. Either the dates need to correspond or the miles need | Row 262 deals with Gunnison sage grouse winter habitat; Row 263 deals with Gunnison sage grouse breeding (non-lek) habitat. Protection levels are different for these different habitats. |

Page 31 of 54

Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review: January 27, 2011

BLM_0110768

**Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)**

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | to be the same. | |
| 153. | 267 | | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | See stips (*CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado; file name = Statewide Stips Table Final 122010.pdf*). Also attached is CDOW recommend buffers for raptors in Colorado (see *file names = TableofSeasona(Breeding)lBuffers.pdf* and *Appendix X. Raptor Species Breeding Periods.docx)*. | Items have been incorporated in COSO O&G stips and our preferred alternative. |
| 154. | 267 | B | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Change ".5 mile" to ".5 mile, or farther if recommended by USFWS guidelines"<br><br>Explanation & Notes:<br>Draft USFWS guidelines recommend larger buffers for some raptors - notably 1 mile for Ferruginous Hawk and Peregrine Falcon | Variation of buffer distances for various raptor species has been incorporated in the preferred alternative. |
| 155. | 267 | B | Charlie Sharp, USFWS (Cooperating Agency) | Apply stip to all raptors including American Kestrel, to further vary range of alternatives and for MBTA compliance | As noted in Alternative A, "Kestrels are very adaptable to nest in a variety of habitats and their populations are stable and widespread." We think it is appropriate to exclude kestrels. |
| 156. | 267 | B, C, D, E | Bill Day (RAC Subgroup) | In all alts, golden eagle, northern harrier and burrowing owl should be added to list, unless BUOW is given larger buffers in line 268. USFWS document Guidelines for Raptor Conservation in the Western United States, March, 2008 recommends 400 m for BUOW and NOHA, 800 m for GOEA, and 1600 m / 1 mile for Ferruginous hawk, and cites the need for larger buffers for open country nesters as a factor. The cleanest way to improve this line might be to add GOEA and NOHA, and delete "[except burrowing owl]".<br>Leaving them all at 0.5 mi would be good for everything except FEHA (included under buteos), which is rare here, if they still nest at all. If line 279 is brought back, FEHA would be covered anyway, of course.<br>The same changes could be made to b,c and e. | Added northern harrier and removed exception for burrowing owls in alternatives B and E.<br><br>Cite Whittington, D.M. and G.T. Allen. 2008. Draft Guidelines for Raptor Conservation in the Western United States. U.S. Fish and Wildlife Service, Division of Migratory Bird Management, Washington, D.C. |
| 157. | 268 | | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Change the burrowing owl prescriptions to best management practices recommended by the USFWS, or higher level protective management. For example, the draft "Guidelines for Raptor Conservation in the | Added northern harrier and removed exception for burrowing owls in alternatives B and E.<br><br>Cite Whittington, D.M. and G.T. Allen. 2008. Draft |

**Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)**

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | Western United States March 2008" recommends a .25 mile spatial buffer around burrowing owl nest sites<br><br>Explanation & Notes:<br>Burrowing owls are a sensitive and declining species, and their arid-land habitat is typically quite vulnerable to degradation by inappropriate use | Guidelines for Raptor Conservation in the Western United States. U.S. Fish and Wildlife Service, Division of Migratory Bird Management, Washington, D.C. |
| 158. | 268 | B, C, D, E | Bill Day (RAC Subgroup) | Even the weakest alt should have a larger buffer around nests than alt b. I have monitored burrowing owls in GJFO area, and believe the nests near roads and orv traffic were less likely to be successful. PIF site ( http://www.rmbo.org/pif/bcp/phy87/semi-des/buow.htm ) and USFWS raptor recommendations (Guidelines for Raptor Conservation in the Western United States, March, 2008 ) seem about right-400 to 600 m. Alts b and e could have 600m and c could be 400m, or, most simply, BUOWs in all alts could just be the same as other raptors, and not be excluded from line 267. | Added northern harrier and removed exception for burrowing owls in alternatives B and E.<br><br>Cite Whittington, D.M. and G.T. Allen. 2008. Draft Guidelines for Raptor Conservation in the Western United States. U.S. Fish and Wildlife Service, Division of Migratory Bird Management, Washington, D.C. |
| 159. | 273 – 274 | B | Steve Weist, Oxbow Mining (RAC Subgroup) | Prohibits surface disturbance between Nov15 and apr30 on row 273, but prevents surface disturbance between Dec 1 and Apr 30 on row 274. These dates should be the same | 273 deals with bald eagle winter roost sites; 274 deals with bald eagle winter concentration areas. These are different mapped habitats serving different life functions, and have different time frames that need reduced disturbance. |
| 160. | 275 – 276 | | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Check the seasonal closure and limitation dates for nesting peregrine falcon. They are listed as something like March through August<br><br>Explanation & Notes:<br>On the front range, peregrines may choose a nest site in February, and typically fledge in July, so I would confirm the appropriate dates | Based on monitoring activities in this area and professional experience, the dates are appropriate. These are also similar to dates recommended by CDOW. |
| 161. | 277 | A-E | Charlie Sharp, USFWS (Cooperating Agency) | The Special Status Raptor Nest Sites stipulation only partially addresses Alt A; an stip action should be developed to address MSO territories, core areas, and roosts (This was my mistake/ oversight) | Line 277 Alts C & D should read Same as Alternative F. Alt B &E : should be Same as Alt A<br><br>Line 270 should read<br>Alt B "*except Mexican spotted owl*"<br><br>EMPSi notes/edits: change made. |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| 162. | 278 | A-E | Charlie Sharp, USFWS (Cooperating Agency) | The Special Status Raptor Nest Sites stipulation only partially addresses Alt A; an stip action should be developed to address MSO territories, core areas, and roosts (This was my mistake/ oversight) | Line 278 Alts C & D should read Same as Alternative A.<br>Alt B: should be Same as F<br>Alt E: NSO 1 mile.<br><br>EMPSi notes/edits: change made. |
| 163. | 279 | B, C, D, E | Bill Day (RAC Subgroup) | Ferrugunous hawk nests need large buffers. Maybe this was not included because there might not be any more nests in the FO, but there could be in the future-like the recent return of nesting bald eagles near Delta. (FEHA are included under buteos with a smaller buffer.) They also need wintering protection, which is harder to do. If the Salt Desert ACEC is in an alt, that would help. Lambeth and Reeder quote CDOW recommendation of .5 mile NSO buffer around nests. Others, including USFWS recommend 1 mile. I would like to see alts b and e be the same as a, unless FEHA buffer is increased to 1 mi in line 267, alts b and e. | Change made in Alt F to incorporate CO BLM State O&G Stips, which includes TL Feb. 1- Aug. 15, within 0.5 mile of active nest sites |
| 164. | 281 | all | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add additional rows for additional management prescriptions for Gunnison's and White-Tailed Prairie Dog:<br><br>Explanation & Notes:<br>Both prairie dogs are rapidly declining in the west and UFO, and they are also keystone species. Preserving and promoting the health of existing PD colonies would also support the health of multiple other sensitive species, such as Ferruginous hawk, burrowing owls, other raptors, kit fox, various reptiles, other burrowing mammals, and potentially, black-footed ferret. | If you have suggestions on possible actions that are under the jurisdiction of BLM, please provide. |
| 165. | 281 | all | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Recreational shooting: prohibit recreational shooting in active prairie dog colonies | There was an action for no shooting zones in active prairie dog colonies, but this action was deleted; recreational shooting is these areas generally are not to fixed targets. DOW manages wildlife and hunting. BLM cannot close an area to hunting. |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| 166. | 281 | all | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Prairie Dog Control: Utilize non-lethal control mechanisms (e.g. visual barries, unpalatable grasses, etc.) to manage colony size where necessary; prohibit the use of rodenticides or burrow fumigants to avoid anciallary harm to other wildlife; limit the use of other poisons to control prairie dogs, so as to preserve other natural values (vegetation, other flora and fauna, soil and water quality, etc.) to the greatest extent possible | Management of populations is not the charge of the BLM. That falls with CDOW. |
| 167. | 281 | all | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Travel management: restrict motorized travel in areas and during time periods when it reduces the optimal habitat effectiveness of active prairie dog colonies; close roads where necessary to preserve optimal habitat effectiveness for prairie dog colonies | A similar action should provide for this comment. For Alt E that states "Over the life of the plan, close at least 30 percent of routes found to be impacting threatened, endangered, or candidate species or habitats."<br><br>EMPSi: Add BLM sensitive to list for Alternatives E and F.<br><br>EMPSi's edits/notes: Action was moved to travel management planning criteria. Added BLM-sensitive species to criteria. |
| 168. | 283 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Expand date: March 1-July 15 | Expanded date has been put in Alt E.<br><br>Bruce's 3/10/2011 direction:<br>Angie/Kate; please make this change<br><br>EMPSi's edits/notes: Change made. |
| 169. | 285 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Expand CSU to 0.25 mi from Feb 1-may 1 | The CSU shown in the matrix is year-round. Alt B is changed to .25 mile.<br><br>Bruce's 3/10/2011 direction:<br>Angie/Kate - please make the change to alt B.<br>EMPSi's edits/notes: Change made.<br>David S: Update GIS |
| 170. | 285 | B, C, D, E | Bill Day (RAC Subgroup) | Kit fox recommendations (especially those pertaining to O&G, fragmentation, and ORVs) from pp. 28, 30, and 34 of USFS Kit Fox Technical Assessment should be followed. Again, an alt with the Salt Desert ACEC | See responses to 151 and 167.<br><br>151: We used the best available science in determining our actions, and many came from |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | might do this, but kit foxes should have consideration in all alts. 200M buffers seem too small, since roads and fragmentation are listed as serious negative factors in kit fox decline. It makes more sense to have just the Salt Desert ACEC, with 200m or larger buffers in the two low intensity management alts, add some of the recommended research and improvements to alts c and/or e, and more improvements plus a larger buffer to b. | CDOW.<br><br>167: A similar action should provide for this comment. For Alt E that states "Over the life of the plan, close at least 30 percent of routes found to be impacting threatened, endangered, or candidate species or habitats."<br><br>EMPSi: Add BLM sensitive to list for Alternatives E and F.<br><br>EMPSi's edits/notes: Action was moved to travel management planning criteria. Added BLM-sensitive species to criteria. |
| 171. | 288 | B,E | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Same as recommended in attached stips. (*CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado; file name = Statewide Stips Table Final 122010.pdf)* | Items have been incorporated in COSO O&G stips and our preferred alternative. |
| Visual Resources | | | | | |
| 172. | 357 | B | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add "LWCs outside of areas noted above"<br><br>Explanation & Notes:<br>LWCs should be considered for VRM I management to preserve uncommon and valuable natural scenic resources. | LWC do not need VRM Class I. We will continue to review the Lands with Wilderness Characteristics policy for further guidance. |
| 173. | 360 | | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Change Class IV to read: "Existing West Wide Energy Corridors and existing utility corridors"<br><br>Explanation & Notes:<br>My understanding is that some proposed West Wide Energy Corridor routes are in dispute. Therefore, the current exceptions in the alternatives should only extend to existing locations. This refinement of exceptions for West Wide Energy Corridors to be limited to existing locations should be carried through to other references in the alternatives to the West | The "West Wide Energy Corridor" is and will be dictated to us. We will not have decision space to designate the corridor. UFO is not aware that the routes on us are in contention. |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | Wide Energy corridors. | |
| Lands with Wilderness Characteristics outside WSAs | | | | | |
| 174. | 372 | B&E | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add "Dolores River Canyons CWP"<br><br>Explanation & Notes:<br>This area was proposed as a Citizen Wilderness Proposal area and was found by citizen inventory to meet Lands with Wilderness Characteristics. Thus to encompass a full range of alternatives, this area should be included as a LWC. | Those lands do not meet the "naturalness" criteria due to many linear disturbances (old routes and mineral exploration disturbances). |
| 175. | 372 | B&E | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add "Dolores River Canyons CWP"<br><br>Explanation & Notes:<br>BLM inventory guidance indicates that the inventory should "avoid an overly strict approach to assessing naturalness". Although some human impacts may be evident, these may be minimized over time by careful management and/or restoration. | Those lands do not meet the "naturalness" criteria due to many linear disturbances (old routes and mineral exploration disturbances). Manual 6301 (6301.13) states: "The BLM must document existing conditions as opposed to potential future conditions." |
| 176. | 372 | B&E | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add "Dolores River Canyons CWP"<br><br>Explanation & Notes:<br>Finally, portions of this area may be appropriate to include as an LWC given adjacency and proximity to the Dolores River Canyons WSA so that taken together, the area meets LWC. BLM policy guidance states that "An area can have wilderness characteristics even though every acre within the area may not meet all the criteria" | Preliminary inventory reveals that approximately 550 acres may have wilderness characteristics. However, per current BLM direction to put a hold on wilderness characteristics inventory, the area has not been formerly inventoried and thus not analyzed in an alternative. BLM will await further direction from Secretary Salazar and move forward appropriately. |
| 177. | 372 | B&E | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add "Tabeguache West Extension"<br>(see rough map of the general area for consideration; file name = img043.pdf; the green highlight area identifies a key area for consideration for preservation as a generally primitive area).<br><br>Explanation & Notes:<br>There is a significant amount of roadless area west and northwest of the existing Tabeguache [Special Management] Area. Although some trails, including a | A preliminary inventory using 2009 aerial imagery mapped the area at 4,200 acres. Montrose County Road V 24 separates the Tabeguache Area from the "Tabeguache West Extension." It is a mechanically constructed and maintained road, forming a hard boundary, and therefore the two areas are not adjacent. The "Tabeguache West Extension" is less than 5,000 acres, and therefore does not meet the size requirement for wilderness characteristics. The comment also does not meet the minimum standard |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | few mountain bike trails, traverse the area, it appears primarily roadless, wild, and with outstanding opportunities for primitive recreation. Given adjacency and proximity to an existing legislatively-designated wilderness type of area, extension of an LWC to the west and northwest would appear to meet LWC criteria. | for new information (from BLM Manual 6301). However, the area does appear to be "of sufficient size as to make practicable its preservation and use in an unimpaired condition." However, per current BLM direction to put a hold on wilderness characteristics inventory, the area has not been formerly inventoried and thus not analyzed in an alternative. BLM will await further direction from Secretary Salazar and move forward appropriately. |
| 178. | 372 | B&E | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add any known CWP areas that are not captured by the current alternatives<br><br>Explanation & Notes:<br>It appears that all "published" CWP areas outside WSAs are included in the current alternatives, except for Dolores River Canyons. However, it is difficult to determine this positively from the maps provided. | All CWP areas were inventoried for wilderness characteristics. Those (or portions thereof) that possess wilderness characteristics were brought forward into at least one alternative. |
| 179. | 372 | B&E | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add any known CWP areas that are not captured by the current alternatives<br><br>Explanation & Notes:<br>Given that a full range of alternatives is sought, and that new Wilderness Policy implementation guidelines (including Inventory) are just coming out, the alternatives should encompass all previous CWP proposals to be complete. Any necessary distillation can occur later following completion of the inventory, full implementation of the new Policy guidelines, and additional survey work. | All CWP areas were inventoried for wilderness characteristics. Those (or portions thereof) that possess wilderness characteristics were brought forward into at least one alternative.<br><br>Manuals 6301 and 6302 are in effect and require that inventories and land use planning be accomplished for lands with wilderness characteristics as part of this plan revision. |
| 180. | 374 | B | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Change "VRM Class II" to "VRM Class I"<br><br>Explanation & Notes:<br>To encompass a full range of alternatives, LWCs should be considered for VRM I management. These areas typically have outstanding scenic values which may be enjoyed by persons both within LWCs, and by persons outside LWCs but within viewing distance of LWCs. The valuable natural scenic resource of LWCs should | LWC do not necessarily need to be Class I, and may not meet the definition of class I. VRM II management is compatible with protection of wilderness characteristics. |

**Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)**

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | thus be preserved in a landscape increasingly altererd by humans. | |
| 181. | 374 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Should lands with Wilderness Characteristic exclude livestock grazing? | Livestock grazing is compatible with protection of wilderness characteristics. Allowable use limits would be established for on the ground actions such as maintenance of range improvement projects. |
| 182. | 375 | E | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Change to read "Prohibit fluid mineral leasing, development and exploration in areas managed for wilderness characteristics."<br><br>Explanation & Notes:<br>It is unclear from the existing language exactly what is being proposed as prohibited, however the range of alternatives for LWCs should include prohibition of all new fluid mineral activity, including retirement of existing leases as they expire, and any other exploration or development activities. | No change. Closed to leasing means leasing, development, and exploration. Exploration and development would not be permitted without a lease and if closed to leasing, no development or exploration could take place. |
| Forest and Woodland Products | | | | | |
| 183. | 389 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Make TL date consistent with CDOW Stip recommendations throughout RMP. (*CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado; file name = Statewide Stips Table Final 122010.pdf).* | No changes made. Alternative F will be consistent with BLM Colorado State Office stipulations when they arrive. |
| Livestock Grazing | | | | | |
| 184. | 409 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Suggest to tie AUM and grazing acreages to Land Health standard 3. | Range staff: there may or may not be a connection between not meeting Standard 3 and current livestock grazing practices. Also, BLM policy direction from the Grazing Guidelines requires that we adjust grazing management in an attempt to improve land health. Making these areas not available to grazing is something that we look at if acceptable results are not achieved through changes or adjustments to the current grazing management. |
| 185. | 409 | B-E | Charlie Sharp, | I don't see much of a range between these alternatives. | The range staff believes that we have identified an |

BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO
RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | USFWS (Cooperating Agency) | Alt E is only a 13% reduction in available acres for livestock grazing (and a 10% reduction in AUMs) from that of Alternative D, the other "extreme." Stretch the pro-grazing or preservation end of the spectrum (or stretch both) to reach a reasonable range of alternatives. | adequate range of alternatives that are based on Land Health and trend data. If there is justification for further "stretching" the range of alternatives, please provide. UFO has a much wider range of alternatives regarding available acres and AUMs than other ongoing and recently approved RMPs in this general area. |
| 186. | 411 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Do not allow sheep/goat trailing or allotments this is Desert Big horn sheep habitat. | This is a cattle allotment and as long as there is an established big horn sheep herd in the area the allotment will remain a cattle allotment with no sheep/goat trailing authorized. |
| 187. | 411 | B | Charlie Sharp, USFWS (Cooperating Agency) | Sorry, the debate continues: I don't understand how this would fall under a preservation management scenario (and grazing would still occur during trailing); the action as proposed should be moved to, or be combined with, Alt C or D. | Trailing would have a limited amount of time to occur. There would be no AUMs associated with the trailing even though some grazing would occur during trailing. This is in coordination with the USFS to address when cattle come off the south side of 7N Mesa and the permittees can't get them to go back up they need to come down through this area to get out. |
| 188. | 412 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Suggest changing 'periodically" to "Annually evaluate allotments…" | The range staff believes that annual evaluations are not necessary to identify potential grazing issues nor do we believe that annual evaluations on all field office allotments can realistically be accomplished given budget and staff limitations. |
| 189. | 413 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Add to bullet points Ecological deterioration or competition with priority species, | The range staffs interpretation is that "ecological deterioration or competition with priority species" is covered by the bullet points listed in this action (utilization, trend, and LH studies) and there is no need to list those bullets separately. |
| 190. | 415 | D | Robbie Levalley (RAC SG) | Increasing stocking rates would take more management than development/low intensity management if you keep with the theme | The range staff agrees and suggests that the "increasing" stocking rates in Alt. D be changed to "maintaining".<br>EMPSi notes/edits: Change made. |

Page 40 of 54

Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review: January 27, 2011

BLM_0110777

BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO
RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| 191. | 416 | Bcde | Robbie Levalley (RAC SG) | Implies that no new land treatments will be conducted | The range staff is comfortable that authorization for new land treatments is addressed in an action located in Row 432 of this matrix. |
| 192. | 417 | | Peter Mueller, The Nature Conservancy (RAC Subgroup) | Action 417 – allows for grass banks – this is an important evaluation. | Thank you for your comment. |
| 193. | 417 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Vacated allotments are also important to wildlife during time of drought. Consider giving equal preference to wildlife on vacated allotments. Consider retiring vacated allotments when allotment overlaps with priority species habitats. | The range staff suggests that the action in Alt. B be slightly modified as follows: Allow for establishment of grass banks on vacated or relinquished allotments to provide for increased resource management options, including wildlife use.<br><br>EMPSi notes/edits: Changed to read "Allow for establishment of grass banks on vacated or relinquished allotments to provide for increased management options." As changed, this would include wildlife use. |
| 194. | 422 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Consider adding this language back in. It is unreasonable should outside monies be available to conduct rangeland improvements designed to improve wildlife habitat that the priority of forage not be given to wildlife. This is key in leveraging funding between agencies, non profits, NGOs. Without some assurance that monies spent on wildlife habitat improvement will allow for wildlife use, willingness to fund projects may be hampered. | This action was not carried forward because it referenced an Emphasis Area in the old plan. The range staff understands the CDOW concern but does not believe we need an RMP decision to do this. |
| 195. | 432 | E | Charlie Sharp, USFWS (Cooperating Agency) | Seems like we should see an action that reflects a more hands-off preservation approach—such as "no additional range improvements would be constructed or implemented", and perhaps "existing improvements would only be maintained to avoid major ecological damage…" | The range staff agrees that the suggested wording would expand the range of alternatives for this action and it would be appropriate in Alt. E. We would like to see the word "only" removed from "existing improvements would only be maintained to avoid major ecological damage…"<br><br>EMPSi notes/edits: Changed Alternative E to read, "Prohibit new range improvements. Maintain existing range improvements to avoid major ecological damage." |

Page 41 of 54

Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review: January 27, 2011

BLM_0110778

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| 196. | 435 | D, E | Charlie Sharp, USFWS (Cooperating Agency) | There probably needs to be an objective for those stakeholders or interests that would rather not worry about bighorn at all—i.e., no similar objective/ action | Due to comments received, and state office and W.O. guidelines, this is not an option. |
| 197. | 435/436 | | Robbie Levalley (RAC SG) | Already covered in bighorn sheep section | Thank you for your comment. |
| Recreation and Visitor Services | | | | | |
| 198. | 463 | B | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add "Tabeguache West" to the list of SRMAs (see rough map of the general area for consideration; file name = img043.pdf; the green highlight area identifies a key area for consideration for preservation as a generally primitive area).<br><br>Explanation & Notes:<br>There is a significant amount of roadless area west and northwest of the existing Tabeguache [Special Management] Area. Although some trails, including a few mountain bike trails, traverse the area, it appears primarily roadless, wild, and with outstanding opportunities for primitive and low-intensity recreation. This area should be considered for an SRMA which would preserve the vast majority of the area as unroaded and closed to motorized and mechanized travel; and potentially include one to a few carefully located routes allowing mechanized (mountain bike) travel. | This area was not proposed internally or externally through scoping as a possible SRMA. A travel management plan remains to be done in the area and the comments can be addressed during that process. Until then the low route density is protected with a travel designation of "Limited to existing routes" with no cross country travel allowed. |
| 199. | 463 | all | Barbara Hawke, The Wilderness Society (RAC Subgroup) | General comment<br><br>Explanation & Notes:<br>More detail is needed as to the management prescriptions that would be associated with the proposed SRMAs and ERMAs, and their subzones, in order to comment. For example, will there be recommendations for oil and gas leasing, rights of way, or other uses for the SRMAs and/or ERMAS? This is important, because for many of the proposed areas, positive recreation goals must also consider sensitive natural and cultural resources. Additionally, some of | This is all addressed within the Recreation Appendix which will be distributed with Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup review. |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | the SRMAs or ERMAs may have stronger or more extensive goals to preserve primitive or quiet recreation in all or a portion of their area. | |
| 200. | 463 | all | Barbara Hawke, The Wilderness Society (RAC Subgroup) | General comment<br><br>Explanation & Notes:<br>I would be happy to provide additional material or ideas for more detailed management approaches for the proposed SRMAs and ERMAs, and/or to work interactively with staff on this issue. I believe other folks with recreation planning backgrounds would be happy to help as well. | Thank you, and comment noted. |
| Comprehensive Trails and Travel Management | | | | | |
| 201. | 466 | all | Barbara Hawke, The Wilderness Society (RAC Subgroup) | General comment<br><br>Explanation & Notes:<br>It appears to me that significant additional provisions are needed in the alternatives to set forth parameters for the more detailed travel management planning that is to come. For example, it seems the steps mentioned on line 466 for the RMP - identify travel management area polygons, after considering the factors noted (consistency ... through primary means of travel) remains to be done for the areas outside some of the "special areas" (SRMAs, OHV closed or open areas, etc.). | This list is from the Land Use Planning Handbook, and are items we are required to address. The list is for reference only, and will be deleted from the final alternatives chapter.<br><br>We have developed criteria for more detailed travel planning. |
| 202. | 466 | all | Barbara Hawke, The Wilderness Society (RAC Subgroup) | General comment<br><br>Explanation & Notes:<br>I think the steps mentioned of "setting characteristics that are to be maintained …" and "objectives for allowing travel in the area" are particularly important - those steps would incorporate both aspirational recreation goals, along with preservation goals for other natural and cultural resources in the area. | This list is from the Land Use Planning Handbook, and are items we are required to address. The list is for reference only, and will be deleted from the final alternatives chapter .<br><br>This is all addressed within the Recreation Appendix which will be distributed with Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup review. |
| 203. | 466 & following | all | Barbara Hawke, The Wilderness | Explanation & Notes:<br>I would have additional comments once more | This list is from the Land Use Planning Handbook, and are items we are required to address. The list |



## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | Society (RAC Subgroup) | information was available on the setting of parameters in the RMP for the subsequent more detailed TMPs | is for reference only, and will be deleted from the final alternatives chapter. |
| 204. | 469 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Un able to comment if range is adequate as there are no values. All areas of the UFO should be closed to motorized and mechanize use unless specifically exempt once a travel management plan is complete. User created roads and trails create "existing routes" and hamper responsible travel management planning. | A recent plan amendment was completed that closed all acres within the UFO with the exception of the North Delta OHV area to off-route travel and designated them as "Limited to Designated or Existing Routes (if a comprehensive travel plan has not been completed)". The seasonal closures also remained where they were identified within the current LUPs. |
| 205. | 470 | D | W. Blackburn (RAC Subgroup) | Use Alt D language in both Alt C & D | Alt C and D provide a reasonable range and by combining the two then the range has been diminished significantly. |
| 206. | 471 | B&E | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add "Paradox Zones XX"<br><br>Explanation & Notes:<br>It is important to close certain portions of the proposed Paradox SRMA - and Paradox ACECs - to motorized & mechanized use. This is necessary to protect important rare plant species, nesting peregrine falcons, primitive recreation values, and other sensitive and uncommon values in the area | Paradox Zone 1 is within the Sewemup WSA which is already listed in Alt. B and E. Also within other matrixes such as the ACEC matrix there are actions that deal with travel specifically for those sensitive areas. |
| 207. | 471 | B&E | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add "Tabeguache West Extension"<br>(see rough map of the general area for consideration; file name = img043.pdf; the green highlight area identifies a key area for consideration for preservation as a generally primitive area).<br><br>Explanation & Notes:<br>In addition to many uncommon and sensitive natural values, there exist valuable roadless and primitive recreation values in the area west and northwest of the existing Tabeguache Area. These values should be preserved through closing the area to motorized use, and closing major portions to mechanized use. This area should be studied and included in the alternatives as an area with a core of roadless, non-motorized and non-mechanized use, with a few carefully planned | A travel management plan remains to be done in the area and the comments can be addressed during that process. Until then the low route density is protected with a travel designation of "Limited to existing routes" with no cross country travel allowed. |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | routes for mechanized use outside the primitive core, and retention of motorized access on the Spring Creek county road and county road accessing Meadows ranch, to maintain access to private land. An example of some of the area that should be considered for the "Tabeguache West Extension" is shown on the attached map.<br>(see rough map of the general area for consideration; file name = img043.pdf; the green highlight area identifies a key area for consideration for preservation as a generally primitive area). | |
| 208. | 471 | C | W. Blackburn (RAC Subgroup) | Use Alt C language in both Alt C & D | Alt C is the same as Alt D; the WSAs closed to motorized and mechanized use throughout the alternatives. |
| 209. | 472 | B&E | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add "Paradox Zones XX"<br><br>Explanation & Notes:<br>It is important to close certain portions of the proposed Paradox SRMA - and Paradox ACECs - to motorized use. This is necessary to protect important rare plant species, nesting peregrine falcons, primitive recreation values, and other sensitive and uncommon values in the area. | Paradox Zone 1 is within the Sewemup WSA which is already listed in Alt. B and E. Also within other matrixes such as the ACEC matrix there are actions that deal with travel specifically for those sensitive areas. |
| 210. | 472 | B&E | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add "Paradox Zones XX"<br><br>Explanation & Notes:<br>Specific areas within the proposed Paradox SRMA that should be closed to motorized use include, but are not limited to: Sawtooth Ridge; Saucer Basin; rare plant habitat; and other proposed ACEC areas. | Paradox Zone 1 is within the Sewemup WSA which is already listed in Alt. B and E. Also within other matrixes such as the ACEC matrix there are actions that deal with travel specifically for those sensitive areas. |
| 211. | 472 | B&E | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add "Tabeguache West Extension"<br>(see rough map of the general area for consideration; file name = img043.pdf; the green highlight area identifies a key area for consideration for preservation as a generally primitive area).<br><br>Explanation & Notes:<br>In addition to many uncommon and sensitive natural | A travel management plan remains to be done in the area and the comments can be addressed during that process. Until then the low route density is protected with a travel designation of "Limited to existing routes" with no cross country travel allowed. |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | values, there exist valuable roadless and primitive recreation values in the area west and northwest of the existing Tabeguache Area. These values should be preserved through closing the area to motorized use. | |
| 212. | 472 | D | W. Blackburn (RAC Subgroup) | Use Alt D language in both Alt C & D | Alt C and D provide a reasonable range and by combining the two then the range has been diminished significantly. |
| 213. | 473 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | All areas of the UFO should be closed to motorized and mechanize use unless specifically exempt once a travel management plan is complete. User created roads and trails create "existing routes" and hamper responsible travel management planning. | A recent plan amendment was completed that closed all acres within the UFO with the exception of the North Delta OHV area to off-route travel and designated them as "Limited to Designated or Existing Routes (if a comprehensive travel plan has not been completed)". The seasonal closures also remained where they were identified within the current LUPs. |
| 214. | 473 | C | W. Blackburn (RAC Subgroup) | Use Alt C language in Alt B-D-E | The language in C about the WSA's was eliminated from the alternatives therefore making the language for the row all consistent except for the acres. |
| 215. | 474 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | User created roads and trails create "existing routes" and hamper responsible travel management planning. | A travel management plan remains to be done in the area and the comments can be addressed during that process. Until then the low route density is protected with a travel designation of "Limited to existing routes" with no cross country travel allowed. |
| 216. | 475 | B | W. Blackburn (RAC Subgroup) | **Replace Sec 2,a, ii** ATV = 50" or less weighing no more than 800 pounds **TO** ATV 50" or less weighing no more than 1200 pounds. ( this will accommodate the new 50" or less Side by Side vehicles) **Replace Sec 2, 6** Users are allowed to park motorized or mechanized modes of travel immediately adjacent and parallel to available existing routes **TO** Users are allowed to park motorized or mechanized modes of travel up to 500 feet adjacent and parallel to available existing routes.( this will allow parking and security adjacent and parallel to a trail without creating resource problems.) | Weight changed to 1200 lbs. Also, changed to include ATV and UTV (ATV/UTV) We won't make the change to #6 -- that defeats the purpose of "Limited to Designated"<br><br>Bruce's 3/10/2011 direction:<br>Angie/Kate - please make the change to 1200 lbs and ATV/UTV<br><br>EMPSi's edits/notes: Change made. |
| 217. | 475 | B | Charlie Sharp, | This is more related to content, but with implications | EMPSi: On #6 add "Unless otherwise restricted, |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | USFWS (Cooperating Agency) | for the range of alternatives; I'm concerned with #'s 6 and 8; for # 6, there would be exceptional areas where offroad parking should be strictly prohibited or restricted due to T&E populations, such as buckwheat or cactus; for # 8, a 300' corridor may not be large enough to adequately mitigate for T&E species, and possibly other resources; in other words, there should be explicit exceptions to these guidance criteria; you could use these arguments to vary the range of alternatives if desired, being more restrictive and protective under Alt E, for instance. | users…."<br><br>On #8 add "Pending cultural and T&E clearances, BLM re-routes…."<br><br>EMPSi notes/edits: Changed #6 as suggested. Changed #8 to read, "Pending applicable environmental clearances, BLM re-routes…" |
| 218. | 477 | | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add "Establish interim travel management for high-priority subzones within these TMAS to address travel management issues pending completion of full TMAs. High-priority subzones include, but are not limited to: LWCs; ACECs; areas of high use or high conflict; and areas of sensitive habitat, including but not limited to Gunnison sage grouse habitat and rare plant habitat " | Other matrixes such as the ACEC and LWC matrixes there are actions that deal with travel specifically for those sensitive areas. |
| 219. | 477 | | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add "Establish interim travel management actions to prevent illegal or unauthorized travel in areas where such unauthorized or illegal travel has recently begun or increased."<br><br>Explanation & Notes:<br>This action is necessary to preserve the options for future travel management and not allow illegal use to degrade conditions or entrench user patterns which are difficult to later reverse. | A recent plan amendment was completed that closed all acres within the UFO with the exception of the North Delta OHV area to off-route travel and designated them as "Limited to Designated or Existing Routes (if a comprehensive travel plan has not been completed)". The seasonal closures also remained where they were identified within the current LUPs. |
| 220. | 478 | All | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Elk calving area seasonal time restirction should apply to all mapped habitats. | There is very little mapped elk calving habitat - most are very small pieces. Storm King is the larger area. |
| 221. | 478 | E | W. Blackburn (RAC Subgroup) | Use Alt C language in Alt E | Changes have been made. |
| 222. | 479 | All | Brian Magee & Renzo | Winter seasonal travel limitation should apply to all mapped winter range. Change language to include | This is an unrealistic expectation since our whole field office is winter range. BLM has tried to identify |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | Delpiccolo, CDOW (Cooperating Agency) | Other areas may be OPEN in the future based on site specific travel analysis. | the severe winter ranges and other critical areas for seasonal closures. |
| 223. | 479 | C | W. Blackburn (RAC Subgroup) | Use Alt C language in Alt B-E | Alt C does not provide a reasonable range for all the alternatives and by combining the three then the range has been diminished significantly. |
| 224. | 480 | B | W. Blackburn (RAC Subgroup) | Replace = Close lynx analysis units with total route densities greater than 2 miles **TO** Close Lynx analysis units with total route densities greater than 5 miles. | EMPSi's edits/notes: alternatives C and D are no similar action, so no routes would be closed. Therefore there is a range of alternatives. No change made. |
| 225. | 481 | B | W. Blackburn (RAC Subgroup) | Replace = Over the life of the plan, restore or relocate at least 30% of the high density routes miles (more than 2 miles per square mile **TO** Over the life of the plan, restore or relocate at least 10% of the high density routes miles (more than 5 miles per square mile.) | EMPSi's edits/notes: this action moved to criteria for travel management planning. |
| 226. | 481 | E | W. Blackburn (RAC Subgroup) | Replace = Over the life of the plan, restore or relocate at least 10% of the high density route miles. (More than 2 miles per square mile **TO** Over the life of the plan, restore or relocate at least 5% of the high density route miles. (more than 5 miles per square mile.) | EMPSi's edits/notes: this action moved to criteria for travel management planning. |
| 227. | 490 | B | W. Blackburn (RAC Subgroup) | Replace = Provide non-motorized trails connecting communities to public lands. **TO** Provide motorized and non-motorized trails connecting communities to public lands. | EMPSi, Please add (alt C): "Provide non-motorized, motorized, and mechanized trails connecting communities to public lands"<br><br>EMPSi's edits/notes: Added to Alternative C. |
| Lands and Realty | | | | | |
| 228. | 495 | all | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Under exceptions, change "West Wide Energy Corridor" to "Existing West Wide Energy Corridor Locations"<br><br>Explanation & Notes:<br>My understanding is that some proposed West Wide Energy Corridor routes are in dispute. Therefore, the current exceptions in the alternatives should only | The "West Wide Energy Corridor" is and will be dictated to us. We will not have decision space to designate the corridor. The WWEC has been designated.<br><br>EMPSi: Do NOT change |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | extend to existing locations. This refinement of exceptions for West Wide Energy Corridors to be limited to existing locations should be carried through to other references in the alternatives to the West Wide Energy corridors. | |
| 229. | 495 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Edit bullet to say "Special species and terrestrial key/priority species habitats" | A ROW exclusion on special status and terrestrial key/priority habitat would result in excluding a majority of the field office. ROW exclusion and avoidance is dealt with in the appropriate sections of the sensitive species and general wildlife sections, for those species where professional judgment suggested ROW exclusion (or avoidance) was needed. |
| 230. | 504 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Change last sentence to say " Routes must follow existing roads, routes, or ROW. | Ok if we change in Alt B-Preservation.<br>But then copy current exact wording in matrix from Alt B into Alt C. We need to keep an alternative that states: "Preferred routes are adjacent to roads or within areas of existing disturbance."<br><br>EMPSi notes/edits: change made. |
| 231. | 509 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Add bullet: Key/priority habitats | Ok to change in Alt B<br><br>EMPSi notes/edits: change made. |
| 232. | 515 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Add bullet: Key/priority habitats | EMPSI – please add to alt B.<br><br>EMPSi's edits/notes: Added to Alternative B.<br><br>From Linda: EMPSi: ok to change in Alts C & D also<br><br>EMPSi notes/edits: not added to Alts C/D. this is really included under "lands containing valuable resources" |
| 233. | 521 | B | Brian Magee & Renzo | Add bullet: Key/priority habitats | EMPSI – please add to alt B. |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | Delpiccolo, CDOW (Cooperating Agency) | | EMPSi's edits/notes: Added to Alternative B.<br><br>From Linda: EMPSi: ok to change in Alt D also<br><br>EMPSi notes/edits: not added to Alts C/D. this is really included under "lands containing valuable resources" |
| Coal | | | | | |
| 234. | 532 | Goal | Steve Weist, Oxbow Mining (RAC Subgroup) | Replace "and" with "while maximizing the" | BLM is not obligated to maximize exploration and production of coal until lands with coal potential deemed acceptable for leasing are under an exploration license or coal lease. |
| 235. | 535-536 | B - E | Steve Weist, Oxbow Mining (RAC Subgroup) | Cannot comment on without a draft of the coal report, or a better definition of what screening criteria are. Or better identification of what is being used in the regulations. | Screening criteria are as follows - See 43 CFR 3420.1-4(e)(1,2,3&4)<br>(1) Deals with coal potential development<br>(2) Deals with 43 CFR 3461.5 twenty criterion<br>(3) which states in part: "Multiple land use decisions shall be made which may eliminate additional coal deposits from further consideration for leasing to protect other resource values and land uses that are locally, regionally or nationally important or unique…". This allows for screening beyond the twenty criterion listed in 43 CFR 3461.5<br>(4) Deals with screening private surface underlain by federal coal.<br><br>From (3) above we see that the RMP will cause some screening to occur as a result of actions derived from other resource matrix alternatives. |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | | | |
| 236. | 535 | | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add "LWCs" to list of areas unsuitable for surface mining<br><br>Explanation & Notes:<br>The undeveloped character of LWCs must be preserved to preserve the wilderness characteristics. | Coal resource screening will occur as a result of actions derived from the LWCs matrix alternatives. See 43 CFR 3420.1-4(e)(2&3) |
| Fluid Minerals | | | | | |
| 237. | 545 | B&E | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add "LWCs outside of areas noted above"<br><br>Explanation & Notes:<br>The full range of alternatives should encompass no fluid mineral leasing within LWCs., to preserve their wilderness characteristics. Please note that effects of fluid mineral leasing can extend below the surface - for example, potential effects on hydrology, geology, soil characteristics, ground subsidence and water quality - and thus NSO provisions may be inadequate to preserve wilderness character. | The preferred alternative for the No Lease portion of the Fluid minerals section is not yet available, as some preferred alt selections still must be made for other resources. In particular resources such as LWCs, ACECs, appear to have the No Lease option conveyed as an alternative in their specific matrix.<br><br>No lease in the case of LWC is a possibility as conveyed in:<br><br>43 CFR Ch. II Subpart 3100, 3100.0-3 (a) (2) (vii-xi) includes a list of exceptions (No Lease) from Onshore Oil and Gas leasing which the secretary can employ on public domain lands which are qualified in the list.<br><br>In response to Mrs. Hawke's comment:<br>ROW 375 of the .pdf "Combined-Alts_012511" Applies solely to Fluid Mineral Leasing in the LWWC matrix. The LWWC matrix has changed since the RAC review to include a range of alternatives which includes NSO and NL. Also the preferred alternative F had not been selected by looking at the version of the LWWC matrix Mrs. Hawke had which suggested that the only alternative besides No Lease was No similar action was not carried forward into the version of the Fluid mineral matrix which Mrs. Hawke reviewed for a "range" of alternatives and commented upon. |
| 238. | 545 | C, D | Steve Weist, | Need an abbreviation description for ISA | An acronyms list and definitions/glossary will be |



## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | Oxbow Mining (RAC Subgroup) | | added and available for review with the Internal Draft Chapter 2. |
| 239. | 545 | E | Steve Weist, Oxbow Mining (RAC Subgroup) | Need an abbreviation description for SP, SWA | An acronyms list and definitions/glossary will be added and available for review with the Internal Draft Chapter 2. |
| Locatable Minerals | | | | | |
| 240. | 556 | | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add "WSAs and LWCs" to list to be petitioned for mineral withdrawal<br><br>Explanation & Notes:<br>This can be very important to preserving the wilderness character of an area until Congress acts | Congressional legislation authorized BLM to designate WSAs under the authority of the FLPMA Section 603(a) and Section 202. FLPMA allows mining claims in WSA's.<br><br>To date, LWWC areas are not proposed to be withdrawn from mineral entry.<br><br>If Congress did not want the citizens' mineral rights withdrawn from WSAs, then one can logically infer that Congress does not want LWC areas withdrawn either. |
| Mineral Materials (Salable Minerals) | | | | | |
| 241. | 562 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | Add bullet: Key/priority habitats | Closing special status and terrestrial key/priority habitat would result in excluding a majority of the field office from mineral material sales. |
| 242. | 562 | C, D | Steve Weist, Oxbow Mining (RAC Subgroup) | Alt B has early detection Rapid Response noxious weeds species…, Need to add this to Alt's C,D, because there will be more activity and more potential for weeds to be introduced in either of these alternatives. | We will need to manage noxious weeds in "Mineral Material" sale areas – as a BMP with the permit. |
| Non-Energy Solid Leasable Minerals (e.g., sodium and potassium) | | | | | |
| 243. | 570 | | Barbara Hawke, The Wilderness Society (RAC Subgroup) | Add "LWCS" | This is for the Wilderness staff / UFO management to consider. |
| Areas of Critical Environmental Concern | | | | | |
| 244. | 576 | | Barbara Hawke, | Under exceptions, change "West Wide Energy | Wording left as it is. If the corridor changes, we |

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| | | | The Wilderness Society (RAC Subgroup) | Corridor" to "Existing West Wide Energy Corridor Locations"<br><br>Explanation & Notes:<br>My understanding is that some proposed West Wide Energy Corridor routes are in dispute. Therefore, the current exceptions in the alternatives should only extend to existing locations. This refinement of exceptions for West Wide Energy Corridors to be limited to existing locations should be carried through to other references in the alternatives to the West Wide Energy corridors. | will be able to adapt to the change without amending the RMP. |
| 245. | 578 | B, C | Steve Weist, Oxbow Mining (RAC Subgroup) | It appears to me that Alt C and B need to be switched. Alt C appears to be more restrictive then Alt B. | No -- Alt B is no leasing, alt C is NSO |
| 246. | 586 | B | Steve Weist, Oxbow Mining (RAC Subgroup) | Acreage in alt B needs to change. B has acreage expanded to top of rim, the other is just the ACEC boundary not to top of rim | The acreage is correct. A and C are the same area. Alternative D is a larger area. |
| 247. | 586 | B | Steve Weist, Oxbow Mining (RAC Subgroup) | If Alt C and E limit motorized and mechanized travel to designated routes, Alt B which has designated trails for non-motorized travel, should eliminate motorized and mechanized travel. | No change. We propose limiting motorized and mechanized travel to designated routes (roads and trails) to be consistent with the Dry Creek Travel Management plan that approved in 2010. Many areas within the proposed ACEC do not have motorized/mechanized routes. |
| 248. | 586 | C | Steve Weist, Oxbow Mining (RAC Subgroup) | If you are going to prohibit target shooting in alternatives B and E, then you need to designate a target shooting area in Alt C. | We were silent on target shooting in alternative C, which means there are not restrictions; the entire ACEC in alternative C is open to target shooting. We do not feel the need to designate a specific area for target shooting. |
| 249. | 586 | E | Steve Weist, Oxbow Mining (RAC Subgroup) | If Alt E is closed to fluid mineral leasing are Alt's B,C open to fluid mineral leasing? | Yes. If the alternative does not say it is "closed", then it is open. |
| 250. | 590 | E | Steve Weist, Oxbow Mining (RAC Subgroup) | Why are grazing and fluid leasing closed in this alternative, and not in Alt. B? | Alternative B has a "No Surface Occupancy" stipulation, and no restriction on grazing. Alternative B allows more management than E, which is one reason for the difference. The differences also expand the range of alternatives for us to consider. |

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011)

| Cmt # | Row # | Alternative | Commentor | Comment | Response (To be completed by BLM) |
|---|---|---|---|---|---|
| 251. | 594 | B | Brian Magee & Renzo Delpiccolo, CDOW (Cooperating Agency) | We are supportive of this ACEC. Refine seasonal closure date for Lekking and brood rearing habitats. Expand to include the overall range. See stip for NSO, CSU, etc. (*CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado; file name = Statewide Stips Table Final 122010.pdf)*<br>We look forward to fully developing the concept of the acec. | The overall range is a large area -- these were the BLM lands in the area. NSO, CSU, TL are in the sage grouse section of the matrix. They are the same as, or close to, your recommendations. |
| 252. | 594 | E | Steve Weist, Oxbow Mining (RAC Subgroup) | Alt. E and Alt B show 25,621 acres of the Sims-Cerro Gunnison Sage Grouse ACEC, However, Alt B map and Alt E map for ACEC are not the same for areas identified as Sims-Cerro Gunnison sites. | We made an error in acreage shown in E. This has been corrected. |
| 253. | 596 | B | Steve Weist, Oxbow Mining (RAC Subgroup) | If you are going to provide restrooms with the camping areas, you won't need the requirement about firepans and porta-poties for overnight use. | EMPSI, change alt B bullet to "…and porta-potties for overnight use if restroom not available"<br><br>EMPSi's edits/notes: Change made to "Require firepans and porta-potties for overnight use if restroom is not available." |
| 254. | 600 | C | Steve Weist, Oxbow Mining (RAC Subgroup) | The Coyote Wash ACEC appears to already be included in the Dolores Canyon ACEC. Its acreage should be removed from the Dolores Canyon ACEC, or it should be classified as a separate ACEC. | Coyote Wash is being considered as its own ACEC – the area was recommended during scoping, so we will consider it. The Dolores River ACEC does include the Coyote Wash proposed ACEC area. If the Dolores River ACEC is carried forward, the Coyote Wash will be dropped. If the Dolores River ACEC is not carried forward, we could consider just the Coyote Wash proposed ACEC. Or, we could recommend that none are carried forward. All combinations make up the range of alternatives for us to consider. |
| 255. | 602 | B | Steve Weist, Oxbow Mining (RAC Subgroup) | East Paradox ACEC is identified as 385 acres, which appears correct on the Alt E map, but the Alt B map is much bigger than 385 acres. | Acreage was shown incorrectly in Alternative B. We have corrected this error. |
| 256. | 605 | | Steve Weist, Oxbow Mining (RAC Subgroup) | Why is West Paradox Rock Art farther East than East Paradox ACEC? | EMPSi's edits/notes: West Paradox Rock Art renamed to Paradox Rock Art. |

Page 54 of 54

Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review: January 27, 2011

BLM_0110791

# CHAPTER 2
# ALTERNATIVES

Internal Not for Public Distribution

## 2.1 INTRODUCTION

This chapter details the proposed Alternatives A through D that are considered, as well as figures (**Appendix A**, Figures) that show where actions are applicable. The alternatives are directed towards responding to identified issues and concerns, resolving problems with existing management, and exploring opportunities for enhancing management of resources or resource uses. The Gunnison Gorge and Dominguez-Escalante National Conservation Areas are not in the planning area, so decisions for these areas are not included in this draft Resource Management Plan (RMP)/Environmental Impact Statement (EIS).

In the planning area (**Figure 1-1**, Uncompahgre RMP Planning Area), subsurface mineral estate administered by the United States (US) Department of Interior, Bureau of Land Management (BLM) (federal mineral estate) totals 2,234,670 million acres. The federal mineral estate acres are greater than BLM surface acres (675,800 acres) because BLM manages federal mineral estate underlying some privately owned and State-owned lands.

Minerals beneath lands administered by the US Department of Agriculture, Forest Service (US Forest Service) will typically have leasing availability decisions supported by either the Forest Land and Resource Management Plan (Forest Plan) or a Forest-wide programmatic leasing analysis.

The US Bureau of Reclamation will retain surface jurisdiction on BLM lands withdrawn for US Bureau of Reclamation where constructed projects exist. On withdrawn lands without constructed projects, the BLM retains surface jurisdiction. In both cases, however, the BLM will manage the fluid mineral estate in consultation with the Bureau of Reclamation.

The US Department of Energy (DOE) Office of Legacy Management currently administers the DOE's Uranium Leasing Program, managing 166 lease tracts containing approximately 10,820 acres within the planning area. These lands are withdrawn from mineral entry and DOE manages leasing of uranium and vanadium resources. Surface management of other resources, such as grazing and recreation, is under Uncompahgre Field Office (UFO) jurisdiction. The DOE Uranium Leasing Program is managed under the authority of and in accordance with Title 10,

Code of Federal Regulations (CFR) Part 760, in cooperation with the BLM and the State of Colorado.

This RMP revision will not amend valid existing rights. Valid existing rights include any lease established (and valid) before a new authorization is made or a land designation or regulation is changed. New management practices prescribed in this RMP that do not violate valid existing rights would be used to manage existing fluid mineral leases in the form of Conditions of Approval.

## 2.2 ALTERNATIVES DEVELOPMENT

Alternative development is the heart of the RMP and EIS process. Land use planning regulations and NEPA require the BLM to develop a reasonable range of alternatives during the planning process. Alternatives must be within the established planning criteria (43 CFR Section 1610). The basic goal of developing alternatives is to prepare different possible management scenarios that:

- Address the identified major planning issues;
- Explore opportunities to enhance management of resources or resource uses;
- Resolve conflicts among resources and resource uses;
- Meet the purpose of and need for the RMP; and
- Are feasible.

Achievement of this goal will help the BLM and public understand the various ways of addressing conflicts concerning alternative uses of available resources, as well as providing the BLM decision maker a reasonable range of alternatives with which to make an informed decision. The components of the alternatives and the general direction of each alternative are discussed below.

### 2.2.1 Developing Alternatives for the Uncompahgre Planning Area

The UFO implemented the first five steps of the BLM's planning process (**Section 1.3**, **Table 1-2**) while developing alternatives, as follows: scoping and issue identification, planning criteria development, data collection, current management assessment, and reasonable range of alternatives development. The issue identification and current management assessment processes began in 2008 with an extensive review of current land management decisions and direction by the BLM's interdisciplinary team. The team reviewed the San Juan/San Miguel Planning Area RMP (BLM 1985), the Uncompahgre Basin RMP (BLM 1989a), and subsequent amendments to those RMPs (BLM 1989b, 1991a, 1991b, 1992, 1993a, 1993b, 1994a, 2005, 2007, 2008a, 2008b, 2008c, 2009, 2010a; US Department of Energy and BLM 2009; US Forest Service and BLM 2001). From this, the BLM identified preliminary planning issues that could be addressed in a new RMP.

As discussed in **Section 1.4.2**, Issue Identification, preliminary planning issues were distributed during the scoping process for public comment, along with a request for identifying additional issues. Based on the review of current management and validated by scoping and public participation efforts, the UFO identified six planning issues, which are detailed in **Section 1.4.2**.

Internal Not for Public Distribution

Planning issues are concerns or controversies about existing and potential land and resource allowable uses, levels of resource use, production, and related management practices. Planning issues are well defined or topically discrete and entail alternatives to choose from. As this definition suggests, there are different ways to resolve each planning issue, which are summarized in **Table 2-1**, Comparative Summary of Alternatives.

***Planning Issues*** express concerns, conflicts, and problems with the existing management of public lands. Frequently, issues are based on how land uses affect resources. Some issues are concerned with how land uses can affect other land uses, or how the protection of resources affects land uses.

## 2.3 SUMMARY COMPARISON OF ALTERNATIVES

Alternative A, No Action (**Section 2.3.1**) through Alternative D, Agency Preferred Alternative (**Section 2.3.4**), **Table 2-1** (Comparative Summary of Alternatives), and the figures in **Appendix A,** in combination, highlight the meaningful differences among alternatives relative to what they establish and where they occur. The details of each alternative are described in **Section 2.7** (Management Guidance for Alternatives A, B, C, and D), including goals, objectives, management actions, and allowable uses for each resource program. The alternatives-development process is described in **Section 2.4**, Alternatives Considered for Detailed Analysis.

### 2.3.1 Alternative A (No Action)

The "No Action" alternative, Alternative A, is the continuation of present management direction and current prevailing conditions based on existing planning decisions and amendments. This alternative meets the requirements of the National Environmental Policy Act of 1969 (NEPA) (40 CFR Part 1502.14) that a no-action alternative be considered. Goals and objectives for resources and resource uses are based on the existing San Juan/San Miguel RMP (BLM 1985), Uncompahgre Basin RMP (BLM 1989a), subsequent amendments to those RMPs (refer to **Section 2.2.1**, Developing Alternatives for the Uncompahgre Planning Area), activity- or implementation-level plans, and other management decision documents. Direction contained in laws, regulations, and BLM policies superseding provisions of the existing RMP and amendments would be implemented.

The appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, timber harvest, utility corridors, and livestock grazing) would stay the same. There would be no change in goals, objectives, allowable uses, or management actions that are allowed, restricted, or prohibited on BLM lands and mineral estate. The BLM would not establish additional criteria or change present criteria to guide the identification of site-specific use levels for implementation activities.

### 2.3.2 Alternative B

Alternative B emphasizes non-consumptive use and management of resources through protection, restoration, and enhancement, while also providing for multiple uses, including livestock grazing and mineral development. This alternative would establish the greatest number of special designation areas (such as Areas of Environmental Concern [ACECs]), with specific measures to protect or enhance resource values within these areas. Goals and objectives focus on environmental and social outcomes achieved by sustaining relatively unmodified physical

Internal Not for Public Distribution

landscapes and natural and cultural resource values for current and future generations. Management direction would generally be ecologically based; existing uses would be recognized but would likely be limited to ensure the protection of natural and cultural values. The appropriate development scenarios for allowable uses, such as mineral leasing, locatable mineral development, recreation, and livestock grazing, are contingent on meeting the essential conditions of natural and heritage resources.

### 2.3.3 Alternative C

Alternative C emphasizes active management of natural resources, commodity production, and public use opportunities. Resource uses, such as recreation, livestock grazing, mineral leasing and development, would be emphasized. Management direction would recognize and give precedence to existing uses and accommodate new uses to the greatest extent possible while maintaining resource conditions. The appropriate development scenarios for allowable uses would emphasize social and economic outcomes while protecting land health.

### 2.3.4 Alternative D (Agency Preferred Alternative)

Alternative D seeks to balance resources among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining the ecological integrity of certain key habitats for plant, wildlife, and fish species. It incorporates a balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses. Goals and objectives focus on environmental, economic, and social outcomes achieved by strategically addressing demands across the landscape. Refer to **Section 2.6**, Rationale for the Identification of the Preferred Alternative, for a discussion of the selection of the preferred alternative.

**Table 2-1**
**Comparative Summary of Alternatives**

| Resource or Resource Use | Unit of Measure | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|---|
| **Biological Core Areas** | **Acres** | | *Figure 2-1* | *Figure 2-2* | *Figure 2-3* |
| Adobe | | | 40,770 | 9,320 | 20,840 |
| Burn Canyon | | | 14,110 | 7,300 | |
| Dry Creek | | | 20,340 | 9,540 | 10,800 |
| Jumbo Mountain / McDonald Creek | | | 17,250 | 12,580 | 17,250 |
| La Sal | | | 22,370 | 13,290 | 22,370 |
| Monitor / Potter / Roubideau | | | 27,320 | 10,890 | 27,320 |
| Naturita Canyon | | | 1,510 | 1,510 | 1,510 |
| Ridgway | | | 16,700 | 6,270 | 9,070 |
| San Miguel | | | 25,520 | 9,890 | 17,840 |
| Spring Canyon | | | 3,380 | 3,380 | 3,380 |
| Tabeguache | | | 31,540 | 7,660 | 23,760 |
| Terror Creek | | | 2,230 | | 2,230 |
| Total | | | 223,040 | 91,630 | 156,370 |
| **Visual Resource Management (VRM)** | **Acres** | *Figure 2-4* | *Figure 2-5* | *Figure 2-6* | *Figure 2-7* |
| VRM Class I | | 6,440 | 54,040 | 44,330 | 46,580 |
| VRM Class II | | 0 | 97,320 | 90,450 | 99,920 |
| VRM Class III | | 295,140 | 32,4510 | 236,360 | 242,610 |

Internal Draft Not for Public Distribution

**Table 2-1** *(continued)*
**Comparative Summary of Alternatives**

| Resource or Resource Use | Unit of Measure | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|---|
| VRM Class IV | | 8,420 | 194,580 | 298,900 | 281,164 |
| Undesignated | | 365,800 | 5,370 | 5,760 | 5,490 |
| **Lands Identified for Wilderness Characteristics Protection** | **Acres** | | *Figure 2-8* | | *Figure 2-8* |
| Roc Creek/Carpenter Ridge | | | 4,310 | | 4,310 |
| Monitor and Potter Canyons | | | 6,950 | | 6,950 |
| Upper Dry Creek Basin | | | 5,790 | | 5,790 |
| Total | | 0 | 17,050 | 0 | 17,050 |
| **Livestock Grazing** | **Acres or AUMs** | *Figure 2-9* | *Figure 2-10* | *Figure 2-11* | *Figure 2-12* |
| Acres open for livestock grazing | | 629,750 | 580,580 | 629,210 | 613,140 |
| Acres closed to livestock grazing | | 46,050 | 95,220 | 46,590 | 62,660 |
| Available Animal Unit Months | | 38,315 | 35,448 | 37,099 | 36,424 |
| **Extensive Recreation Management Areas (ERMA)** | **Acres** | *Figure 2-13* | *Figure 2-14* | *Figure 2-15* | *Figure 2-16* |
| Adobe Badlands | 6,360 | | | • | |
| Adobe Badlands ACEC/Outstanding Natural Area (ONA) | xx | • | | | |
| Burn Canyon Area | 9,160 | | | • | • |
| Dolores River Canyon | 13,330 | | | • | |
| Dry Creek | 41,300 | | | • | |
| Jumbo Mountain | 5,020 | | | • | |
| Kinikin Area | 11,320 | | | • | • |
| North Delta Off-highway Vehicle (OHV) | 8,530 *Alt A/D*<br>3,270 *Alt C* | • | | • | • |
| Paradox Valley | 47,100 | | | • | • |
| Ridgway Trails | 1,100 | | | • | |
| Roubideau | 21,660 | | | • | |
| San Miguel River Corridor | 35,570 | | | • | |
| Spring Creek | 13,500 | | | • | |
| Uncompahgre | 623,050 | • | | | |
| Total | | 631,580 | 0 | 208,690 | 76,110 |
| **Special Recreation Management Areas (SRMA)** | **Acres** | *Figure 2-13* | *Figure 2-14* | *Figure 2-15* | *Figure 2-16* |
| Burn Canyon Area | 9,160 | | • | | |
| Dolores River Canyon | 13,380 | • | • | | • |
| Dry Creek | 42,180 | | • | | • |
| Jumbo Mountain | 5,030 *Alt B*<br>1,360 *Alt D* | | • | | • |
| Kinikin Area | 11,320 | | • | | |
| North Delta | 8,530 | | • | | |
| Paradox Valley | 87,250 | | • | | |
| Ridgway Trails | 1,170 | | • | | |
| Roubideau | 25,360 | | • | | • |

Internal Not for Public Distribution

**Table 2-1** *(continued)*
**Comparative Summary of Alternatives**

| Resource or Resource Use | Unit of Measure | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|---|
| San Miguel River | 35,570 | • | • | | • |
| Spring Creek | 4,980 | | • | | |
| Total | | 48,950 | 243,930 | 0 | 117,870 |
| **Comprehensive Trails and Travel Management** | **Acres** | ***Figure 2-17*** | ***Figure 2-18*** | ***Figure 2-19*** | ***Figure 2-20*** |
| Open to cross-country motorized use | | 8,510 | 0 | 16,570 | 0 |
| Closed to motorized use | | 0 | 9,080 | 0 | 1,160 |
| Closed to motorized and mechanized use | | 55,620 | 80,380 | 45,220 | 56,740 |
| Limited to existing routes for motorized use | | | 0 | 0 | 0 |
| Limited to designated routes for motorized use | | | 586,340 | 614,010 | 617,890 |
| **Lands and Realty** | **Acres** | ***Figure 2-21*** ***Figure 2-25*** | ***Figure 2-22*** ***Figure 2-26*** | ***Figure 2-23*** ***Figure 2-27*** | ***Figure 2-24*** ***Figure 2-28*** |
| Right-of-way (ROW) exclusion areas | | | | | |
| ROW avoidance areas | | | | | |
| Wind development and production emphasis | | 0 | 0 | 0 | 0 |
| Identified for disposal | | 8,180 | 2,650 | 9,850 | 1,930 |
| **Coal** | **Acres** | ***Figure 2-29*** | ***Figure 2-30*** | ***Figure 2-31*** | ***Figure 2-32*** |
| Unsuitable for surface mining and surface mining operations | | | | | |
| Unacceptable for Coal Leasing | | | | | |
| Acceptable for Coal Leasing | | | | | |
| **Stipulations for Surface-disturbing Activities** *(refer to Appendix B)* | **Acres** | ***Figure 2-39*** | ***Figure 2-33*** ***Figure 2-36*** ***Figure 2-40*** | ***Figure 2-34*** ***Figure 2-37*** ***Figure 2-41*** | ***Figure 2-35*** ***Figure 2-38*** ***Figure 2-42*** |
| No ground disturbance (NGD) | | 0 | | | |
| Site-specific relocation (SSR) | | 0 | | | |
| Timing limitations (TL) | | 0 | | | |
| **Fluid Mineral Leasing** | **Acres**[1] | ***Figure 2-43*** ***Figure 2-47*** ***Figure 2-51*** | ***Figure 2-44*** ***Figure 2-48*** ***Figure 2-52*** | ***Figure 2-45*** ***Figure 2-49*** ***Figure 2-53*** | ***Figure 2-46*** ***Figure 2-50*** ***Figure 2-54*** |
| Closed to fluid mineral leasing | | 93,290 | | | |
| *Closed to leasing—BLM surface/federal minerals* | | 44,240 | 148,850 | 48,380 | 70,060 |
| *Closed to leasing—Private or State surface/federal minerals* | | 29,730 | | | |
| Open to fluid mineral leasing *(refer to Appendix B)* | | 1,071,570 | | | |
| *Open to leasing subject to standard terms and conditions—BLM surface/federal minerals* *Note to BLM: The Open and No Leasing acres add up to approximately 9,000 acres less than BLM surface. Please verify.* | | 622,740 | 518,130 | 618,600 | 596,920 |
| *Open to leasing subject to standard terms and conditions—Private or State surface/federal minerals* | | 957,960 | | | |
| *Open to leasing subject to No Surface Occupancy (NSO)* | | 124,720 | | | |
| *Open to leasing subject to Controlled Surface Use (CSU)* | | 132,700 | 640,000 | 432,470 | |

Internal Not for Public Distribution

**Table 2-1** *(continued)*
**Comparative Summary of Alternatives**

| Resource or Resource Use | | Unit of Measure | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|---|---|
| | *Open to leasing subject to TL* | | 438,190 | | | |
| **Locatable, Salable, and Non-Energy Solid Leasable Minerals** | | **Acres** | *Figure 2-55* | *Figure 2-55* | *Figure 2-55* | *Figure 2-55* |
| BLM Surface | Withdrawn from locatable mineral entry | | 20 | 20 | 20 | 20 |
| | Petition for withdrawal from locatable mineral entry | | | 356,110 | 12,350 | 73,000 |
| | Open to locatable mineral exploration or development | | | 319,700 | 663,450 | 602,800 |
| | Closed to mineral material sales | | | 431,590 | 50,400 | 205,640 |
| | Open for consideration for mineral material sales | | | 244,210 | 625,400 | 470,160 |
| | Closed to non-energy solid leasable mineral exploration and development | | | 363,040 | 0 | 158,110 |
| | Open for consideration of non-energy solid leasable mineral exploration or development | | | 312,760 | 675,800 | 517,690 |
| **Locatable, Salable, and Non-Energy Solid Leasable Minerals** | | **Acres**[1] | *Figure 2-56* *Figure 2-60* *Figure 2-64* | *Figure 2-57* *Figure 2-61* *Figure 2-65* | *Figure 2-58* *Figure 2-62* *Figure 2-66* | *Figure 2-59* *Figure 2-63* *Figure 2-67* |
| Split-estate | Withdrawn from locatable mineral entry | | 0 | | | |
| | Petition for withdrawal from locatable mineral entry | | 0 | 7,490 | 2,831 | 3,290 |
| | Open to locatable mineral exploration or development | | | | | |
| | Closed to mineral material sales | | | 9,840 | 2,850 | 4,160 |
| | Open for consideration for mineral material sales | | | | | |
| | Closed to non-energy solid leasable mineral exploration and development | | | 7,490 | 0 | 2,870 |
| | Open for consideration of non-energy solid leasable mineral exploration or development | | | | | |
| **Areas of Critical Environmental Concern** | | **Acres** | *Figure 2-68* | *Figure 2-69* | *Figure 2-70* | *Figure 2-71* |
| Adobe Badlands | | 6,380 | • | | • | • |
| Coyote Wash | | 2,100 | | • | | |
| Dolores River Slickrock Canyon | | 10,670 *Alt B* 9,780 *Alt D* | | • | | • |
| East Paradox | | 7,360 *Alt B* 1,900 *Alt D* | | • | | • |
| Fairview South | | 210 | • | | | |
| Fairview South Expansion (BLM) | | 640 | | | • | • |
| Fairview South Expansion (Colorado Natural Heritage Program [CNHP]) | | 4,250 | | • | | |
| La Sal Creek | | 10,490 | | • | | |
| Lower Uncompahgre Plateau Cultural | | 31,870 | | • | | |
| Needle Rock | | 80 | • | • | • | • |

Internal Not for Public Distribution

2. Alternatives (Summary Comparison of Alternatives)

**Table 2-1** *(continued)*
**Comparative Summary of Alternatives**

| Resource or Resource Use | Unit of Measure | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|---|
| Paradox Rock Art | 1,080 | | • | | • |
| Roubideau-Potter-Monitor | 14,940 | | • | | |
| Roubideau Corridors | 8,720 | | | • | • |
| Salt Desert Shrub Ecosystem | 34,540 | | • | | |
| San Miguel Gunnison Sage-grouse | 470 | | • | | |
| San Miguel River | 22,780 *Alt A/D* 35,420 *Alt B* | • | • | | • |
| Sims-Cerro Gunnison Sage-grouse | 25,620 | | • | | |
| Tabeguache Pueblo and Tabeguache Caves | 26400 | | • | | |
| West Paradox | 5,190 | | • | | |
| Total | | 29,450 | 211,120 | 15,820 | 51,360 |
| **Wilderness and Wilderness Study Areas (WSAs)** | **Acres** | ***Figure 2-72*** | ***Figure 2-72*** | ***Figure 2-72*** | ***Figure 2-72*** |
| Adobe Badlands | 10,340 | • | • | • | • |
| Camel Back | 10,690 | • | • | • | • |
| Dolores River Canyon | 13,350 | • | • | • | • |
| Needle Rock Instant Study Area (ISA) | 80 | • | • | • | • |
| Sewemup Mesa | 1,780 | • | • | • | • |
| Tabeguache Area | 8,140 | • | • | • | • |
| **Eligible (Alternative A) or Suitable (Alternatives B and D) Wild and Scenic River Study Segments** | **Miles** *(crossing BLM land)* | ***Figure 2-73*** | ***Figure 2-73*** | | ***Figure 2-74*** |
| Gunnison River Segment 2 | 0.4 | • | • | | |
| Monitor Creek | 9.4 | • | • | | • |
| Potter Creek | 9.8 | • | • | | • |
| Roubideau Creek Segment 1 | 9.9 | • | • | | • |
| Roubideau Creek Segment 2 | 4.8 | • | • | | |
| Deep Creek | 2.5 | • | • | | |
| West Fork Terror Creek | 1.2 | • | • | | |
| Beaver Creek | 14.3 | • | • | | • |
| Dry Creek Segment 1 | 10.4 | • | • | | |
| Naturita Creek | 25.0 | • | • | | |
| Saltado Creek | 5.6 | • | • | | • |
| San Miguel River Segment 1 | 27.2 | • | • | | • |
| San Miguel River Segment 2 | 4.0 | • | • | | • |
| San Miguel River Segment 3 | 4.5 | • | • | | • |
| San Miguel River Segment 5 | 12.2 | • | • | | • |
| San Miguel River Segment 6 | 2.1 | • | • | | • |
| Tabeguache Creek Segment 1 | 3.4 | • | • | | |
| Tabeguache Creek Segment 2 | 11.6 | • | • | | |
| Lower Dolores River | 4.2 | • | • | | • |
| Dolores River Segment 1 | 8.7 | • | • | | • |
| Dolores River Segment 2 | 6.2 *Alt A/B* 5.3 *Alt D* | • | • | | • |

Internal Not for Public Distribution

2-8 *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement* June 2011
*Chapter 2, Alternatives – Internal Draft for Field Office, Cooperating Agency, and RAC Subgroup Review*

BLM_0110799

Case No. 1:20-cv-02484-MSK Document 61-2 filed 04/28/21 USDC Colorado pg 52 of 105

**Table 2-1** *(continued)*
**Comparative Summary of Alternatives**

| Resource or Resource Use | Unit of Measure | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|---|
| North Fork Mesa Creek | 8.5 | • | • | | |
| Ice Lake Creek Segment 2 | 0.6 | • | • | | |
| La Sal Creek Segment 1 | 4.8 | • | • | | |
| La Sal Creek Segment 2 | 3.3 | • | • | | • |
| La Sal Creek Segment 3 | 3.4 | • | • | | • |
| Lion Creek Segment 2 | 1.6 | • | • | | |
| Spring Creek | 2.6 | • | • | | |
| Total | | | | | |

[1]Acres are for federal mineral estate; therefore, the sum is greater than the total surface acres in the decision area.

## 2.4 ALTERNATIVES CONSIDERED FOR DETAILED ANALYSIS

Following the close of the public scoping period in March 2010, the BLM began developing alternatives by assembling an interdisciplinary team of BLM UFO resource specialists. The BLM also coordinated with cooperating agencies and the Southwest Resource Advisory Council (RAC) subgroup beginning in May 2010 and continuing throughout the planning process.

Between June 2010 and May 2011, the BLM interdisciplinary team developed management goals, objectives, and actions. During this time, the BLM interdisciplinary team undertook a three-step alternatives-development process:

1) The BLM initially developed five management alternatives. These included the no action alternative and four action alternatives. The alternatives address the six planning issues, fulfill the purpose and need (**Section 1.1**), and meet the multiple use mandates of the Federal Land Policy and Management Act of 1976 (FLPMA) (43 US Code 1716).

2) The resource specialists refined the four action alternatives from step 1 and developed a fifth action alternative, which is the BLM's preferred alternative.

3) The five action alternatives from step 2 were further refined. Because some similarities existed among the four original action alternatives, the BLM condensed the original four action alternatives into two alternatives, which are now Alternatives B and C.

The three resulting action alternatives, Alternatives B, C, and D, offer a range of management options that resolve the issues identified in the scoping process and other outreach activities including, but not limited to, input from Cooperating Agencies, the Southwest RAC subgroup, visitor studies, focus groups, informal interviews, and reports such as the Wild and Scenic River eligibility study (BLM 2010b) and Wild and Scenic River suitability study (BLM DATE) (**Appendix C**) for all rivers in the decision area, ACECs evaluation (BLM DATE) (summarized in **Appendix D**), and VRM study (Otak 2009).

Internal Not for Public Distribution

BLM_0110800

Case No. 1:20-cv-02484-MSK Document 61-2 filed 04/28/21 USDC Colorado pg 53 of 105

Each alternative represents a potential RMP and provides direction for resource programs based on the development of specific goals, objectives, and management actions. Each alternative describes specific direction influencing land management, with an emphasis on different combinations of resource uses, allowable uses, and restoration measures to address issues and to resolve user conflicts. Resource program goals are met in varying degrees across alternatives. Alternatives may also result in different long-term conditions. Resources or resource uses mandated by laws and regulations or not tied to planning issues often contain few or no differences in management between alternatives.

How the alternatives differ from one another is in the relative emphasis given to particular resources or resource uses. Each alternative has been designed to respond to the planning issues differently, providing a range of possible management approaches that the BLM could implement. That distinction is expressed in the RMP by varying specific objectives, allowable uses, management actions, and implementation actions. A complete description of all decisions proposed for each alternative is included in **Table 2-2**, Description of Alternatives A, B, C, and D, at the end of this chapter.

### 2.4.1 Components of Alternatives

Decisions in RMPs guide future land management actions and subsequent site-specific implementation decisions. The RMP decisions establish goals and objectives (desired outcomes) for resources and resource uses and the allowable uses and management actions needed to achieve those goals and objectives. The goals are the same across all alternatives, but objectives may vary. This usually results in different allowable uses and management actions across alternatives for many resources and resource uses.

More specifically, desired future conditions or desired outcomes are stated as goals and objectives. Goals are broad statements of desired outcomes (RMP-wide and resource or resource-use specific) and generally are not quantifiable or measurable. Objectives are more specifically desired conditions or outcomes to meet the resource/resource use goal.

Management actions and allowable uses are designed to achieve the objectives. Management actions include measures that will guide future and day-to-day activities. Allowable uses indicate which uses are allowed, restricted, or prohibited, and may include stipulations or restrictions. Allowable uses also identify lands where specific uses are excluded to protect resource values, or where certain lands are open or closed in response to legislative, regulatory, or policy requirements.

Implementation decisions generally constitute site-specific on-the-ground actions and are generally not addressed in the RMP revision (**Section 2.7**, Management Guidance for Alternatives A, B, C, and D).

### 2.4.2 Management Common to All Alternatives

Some of the allowable uses and management actions in Alternative A (existing RMPs) are carried forward across all alternatives because the decisions are still valid and do not need to change. These decisions are common to all alternatives. Other decisions are common only to the action alternatives (B, C, and D). Each alternative emphasizes a slightly different mix of resources and

Internal – Not for Public Distribution

BLM_0110801

Case No. 1:20-cv-02484-MSK Document 61-2 filed 04/28/21 USDC Colorado pg 54 of 105

resource uses, but at times similarities exist. All alternatives contain the following common elements:

- Complying with state and federal laws, regulations, policies, and standards, including the multiple use mandates of the FLPMA;
- Implementing actions not specifically addressed in the alternatives that stem directly from regulations, policy, and law, and are considered in conformance with the RMP alternatives (e.g., day-to-day management, monitoring, administrative functions);
- Incorporating Colorado Standards for Public Land Health (BLM 1997b) (**Appendix E**) as goals in the alternatives;
- Authorizing livestock grazing in a manner consistent with Colorado Standards for Public Land Health and Guidelines for Livestock Management (BLM 1997b) (**Appendix E**);
- Adhering to the Colorado Department of Public Health and the Environment's Air Quality Control Commission Regulations (Colorado Department of Public Health and the Environment 2010) as required by law to ensure that violation of the Clean Air Act does not occur. Special requirements to alleviate air quality impacts are included on a case-by-case basis in use authorizations (including lease stipulations) within the scope of BLM's authority;
- Continuing to manage existing WSAs in compliance with the BLM's interim management policy (BLM Handbook 8550-1, Interim Management Policy for Lands under Wilderness Review [BLM 1995c]);
- Offering a diversity of recreation opportunities that foster outdoor-oriented lifestyles and add to people's quality of life;
- Providing some sustainable forest, biomass, and woodland products while maintaining landscape diversity and ecosystem integrity;
- Applying Conditions of Approval (COAs), best management practices (BMPs) (**Appendix F**, Best Management Practices and Standard Operating Procedures), and other site-specific mitigation to all resource uses;
- Applying COAs, BMPs (**Appendix F**, Best Management Practices and Standard Operating Procedures), and other site-specific mitigation to minimize erosion, encourage rapid reclamation, retain soils using stormwater mitigation practices, maintain soil stability, and support resources;
- Collaborating through partnerships and communication with other agencies and interested parties to implement the RMP, including outreach and education, monitoring, and project-specific activities (e.g., trail development).
- Collaborating with federal and state agencies, tribes, communities, other agencies, and other individuals and organizations as needed to strive towards attainment and monitoring of water quality standards and to provide source water protection; and

Internal Not for Public Distribution

BLM_0110802

2. Alternatives (Alternatives Considered for Detailed Analysis)

- Collaborating with adjacent landowners, federal and state agencies, tribes, communities, other agencies, and other individuals and organizations as needed to monitor and implement decisions to achieve desired resource conditions.

In addition to these common elements, **Table 2-2**, Description of Alternatives A, B, C, and D, includes allowable uses and management actions common to all four alternatives. These are shown as one common cell across a row of the table.

***Plan Maintenance***

The RMP revision is based on current scientific knowledge and best available data. To be successful, the implementation of the RMP must have the flexibility to adapt and respond to new information. The decisions in the RMP will be periodically reviewed to ensure management measures are meeting the intent of the RMP goals and objectives, and that there is adequate guidance for implementation actions. The RMP may be updated and revised, and the appropriate level of environmental review and documentation will be completed.

## 2.5 ALTERNATIVES CONSIDERED BUT ELIMINATED FROM DETAILED ANALYSIS

The following alternatives were considered but eliminated from detailed study because they did not meet the purpose of and need for the RMP (**Section 1.1**) or because they were outside of the technical, legal, or policy constraints of developing an RMP for BLM land resources and resource uses.

### 2.5.1 Implement Exclusive Use or Protection

Some alternatives and general management options were not considered, specifically those that proposed exclusive use or maximum development, production, or protection of one resource at the expense of other resources or resource uses. The FLPMA mandates the BLM to manage BLM lands for multiple use and sustained yield. This eliminates such alternatives as closing all BLM lands to grazing (discussed further in **Section 2.5.8**) or oil and gas leasing, or managing those lands only for fish, wildlife, and wilderness values at the exclusion of other resource considerations. In addition, resource conditions do not warrant planning area-wide prohibition of any particular use. Alternatives eliminating traditional uses where resource conditions do not justify such measures are not reasonable. Each alternative considered allows for some level of support, protection, or use of all resources in the planning area. In some instances, the alternatives analyzed in detail do include various considerations for eliminating or maximizing individual resource values or uses in specific areas where conflicts exist.

### 2.5.2 Conduct Partial Implementation of the RMP

Alternatives that focus on only a few issues or result in partial implementation of the RMP were considered but eliminated from detailed study. Preparation and full implementation of the RMP is a BLM requirement, so these alternatives were dismissed because they are not feasible or are not practicable, or they were excluded due to legal insufficiency under BLM requirements.

### 2.5.3 Designate Entire Decision Area as Either Open or Closed to Off-highway Vehicle Use

Considered but dismissed were suggestions to designate all areas on BLM lands as entirely open for yearlong OHV use, or to entirely close all areas to OHV use, regardless of current travel restrictions. Management of BLM lands not only requires implementing restrictions to address

Internal Not for Public Distribution

2-12 Uncompahgre Resource Management Plan Revision and Environmental Impact Statement June 2011
Chapter 2, Alternatives – Internal Draft for Field Office, Cooperating Agency, and RAC Subgroup Review

BLM_0110803

travel concerns and recreation demands, but it also requires protecting resource values. In addition, the BLM concluded that the current level of open, closed, or limited OHV areas would be used as a baseline for comparing alternatives.

### 2.5.4 No Fluid Mineral Leasing Alternative

The purpose of and need for the RMP is to identify and resolve potential conflicts between competing resource uses and not to eliminate a principle use of public lands. Leasing of public lands for oil and gas exploration and production is required by the Mineral Leasing Act of 1920, as amended. The BLM's current policy is to apply the least-restrictive management constraints necessary to achieve resource goals and objectives of the principal uses of the public lands.

No leasing throughout the planning area would be an unnecessarily restrictive alternative for fluid mineral exploration and production. However, the alternatives do address no leasing in portions of the planning area in response to other identified resource needs and in specific areas where conflicts exist. As a result, a no oil and gas leasing alternative was considered but dismissed.

### 2.5.5 No Coal Leasing Alternative

The purpose of and need for the RMP is to identify and resolve potential conflicts between competing resource uses and not to eliminate a principle use of public lands. The Mineral Leasing Act of 1920, as amended, and the Mineral Leasing Act for Acquired Lands of 1947, as amended, give the BLM responsibility for coal leasing on public lands. The BLM's current policy is to apply the least-restrictive management constraints necessary to achieve resource goals and objectives of the principal uses of the public lands.

No coal leasing throughout the planning area would be an unnecessarily restrictive alternative. However, the alternatives do address no leasing in portions of the planning area in response to other identified resource needs and in specific areas where conflicts exist. As a result, a no coal leasing alternative was considered but dismissed.

### 2.5.6 No Herbicide Alternative

The BLM manages vegetation using fire, mechanical and manual methods, biological treatments, and herbicides. In an integrated vegetation management program, each management option is considered, recognizing that no one management option is a stand-alone option, and that each has strengths and weaknesses. Utilizing the strengths of each allows for a more effective and environmentally sound program.

When the BLM plans vegetation management projects, all control methods should be available for use, allowing the BLM to select the method or combination of methods that optimizes vegetation control with response to environmental concerns, effectiveness, and cost control. Prohibiting the use of pesticides under an alternative would increase the likelihood that noxious and invasive species would increase and native species would decrease, which conflicts with Standard 3 under Colorado's Standards for Public Land Health (BLM 1997b) (**Appendix E**). For these reasons, an alternative that prohibits the use of pesticides was considered but dismissed.

Internal Not for Public Distribution

Case No. 1:20-cv-02484-MSK Document 61-2 filed 04/28/21 USDC Colorado pg 57 of 105

2. Alternatives (Alternatives Considered but Eliminated from Detailed Analysis)

### 2.5.7 Place Moratorium on Land Exchanges

Placing a moratorium on land exchanges was considered but dismissed. Through the FLPMA, Congress determined that land exchanges are an efficient management tool to consolidate land ownership, as long as individual exchanges are determined to be in the public interest and are done within regulatory constraints.

### 2.5.8 Designate Additional Wilderness Study Areas

Designating additional WSAs is not being considered in because the BLM's authority for establishing WSAs ended in 1993. The BLM has an obligation under Sections 201 and 202 of the FLPMA to maintain an inventory of all public lands and their resources, including wilderness characteristics, and to consider such information during land use planning. **Appendix G** (Draft Wilderness Characteristics Assessment) includes results of the BLM's inventory of non-WSA lands for wilderness character. Areas where wilderness character was not found were not brought forward for analysis. Plan alternatives include allocations and actions that protect these lands with wilderness characteristics.

### 2.5.9 Close Entire Decision Area to Livestock Grazing

An alternative that proposes to make the entire decision area unavailable for grazing would not meet the purpose of and need for the RMP (**Section 1.1**). The NEPA requires that agencies study, develop, and describe appropriate alternatives to recommended courses of action for any proposal that involves unresolved conflicts concerning alternative uses of available resources. No issues or conflicts have been identified during this land use planning effort that requires the complete elimination of grazing within the decision area for their resolution. Where appropriate, removal of livestock and adjustments to livestock use have been incorporated into the alternatives on an allotment or area basis to address identified planning issues. Because the BLM has considerable discretion through its grazing regulations to determine and adjust stocking levels, seasons of use, and grazing management activities, and through RMPs to allocate forage to uses of the public lands, the analysis of an alternative to entirely eliminate grazing is not necessary.

An alternative that proposes to make the entire decision area unavailable for grazing would also be inconsistent with the intent of the Taylor Grazing Act, which directs the BLM to provide for livestock use of BLM lands; to adequately safeguard grazing privileges; to provide for the orderly use, improvement, and development of the range; and to stabilize the livestock industry dependent upon the public range.

The FLPMA requires that public lands be managed on a "multiple use and sustained yield basis" (Sections 302[a] and 102[7]) and includes livestock grazing as a principal or major use of public lands. While multiple use does not require that all lands be used for livestock grazing, complete removal of livestock grazing from the entire decision area would be arbitrary and would not meet the principle of multiple use and sustained yield.

For this reason and those stated above, a no-grazing alternative for the entire decision area has been dismissed from further consideration in this RMP/EIS.

Internal Not for Public Distribution

2-14 *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement* June 2011
*Chapter 2, Alternatives – Internal Draft for Field Office, Cooperating Agency, and RAC Subgroup Review*

BLM_0110805

2. Alternatives (Rationale for the Identification of the Preferred Alternative)

## 2.6 RATIONALE FOR THE IDENTIFICATION OF THE PREFERRED ALTERNATIVE

The draft RMP/EIS presents four alternatives that take into consideration comments received from other governmental agencies, public organizations, the state, tribal entities, and interested individuals. Public collaboration through the scoping process helped shape issues regarding recreation, wildlife, minerals, cultural resources, grazing, land tenure, designation of ACECs, access to public lands, and other topics.

The alternatives represent the range of management actions that resolve problems with existing management, explore opportunities for enhanced management, and address issues identified during BLM's internal scoping and public scoping. Alternatives offer a distinct choice among potential management strategies.

The Council on Environmental Quality regulations for implementing NEPA require identification of the agency's preferred alternative in the draft EIS. The preferred alternative is the alternative that, at this stage, best represents the resolution of planning issues and promotes balanced multiple use objectives. During public review of the draft EIS, the BLM is asking for comments regarding the proposed management of resources and resource uses. After consideration of comments, the BLM will develop a proposed RMP to be evaluated in the final EIS.

The Uncompahgre Field Manager must recommend to the BLM Colorado State Office which of the range of alternatives best represents the basis on which to develop the proposed RMP. As part of the UFO's ongoing consultation with the Cooperating Agencies and coordination with the RAC subgroup (Section **1.6**, Collaboration, and **Chapter 5**, Consultation and Coordination), the Field Manager asked for recommendation on the selection of the preferred alternative. The Field Manager recommends Alternative D as the preferred alternative.

## 2.7 MANAGEMENT GUIDANCE FOR ALTERNATIVES A, B, C, AND D

**Table 2-2** is a description of all decisions proposed for each alternative, including goals and objectives. All decisions in Table 2-2 are land use plan-level decisions, with the exception of some decisions that are implementation-level decisions. Implementation-level decisions will be identified in the Proposed RMP/Final EIS.

NSO, CSU, and TL are stipulation decisions and apply to fluid mineral leasing of federal mineral estate underlying BLM lands, privately owned lands, and state-owned lands, but not US Forest Service lands. Within the planning area, the BLM administers 1,558,870 million acres of split-estate. The BLM will coordinate with the surface owner when applying stipulations on split-estate at the leasing phase. NGD, SSR, and TL are restriction decisions and apply to other surface-disturbing activities on BLM-administered surface lands (675,760 acres). Definitions of these stipulations are provided in **Appendix B** (Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities).

Acreages for alternatives in this chapter and stipulations in **Appendix B** are calculated based on current information and may be adjusted in the future through RMP maintenance as conditions warrant.

Internal Not for Public Distribution

June 2011 *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement* 2-15
*Chapter 2, Alternatives – Internal Draft for Field Office, Cooperating Agency, and RAC Subgroup Review*

BLM_0110806

Case No. 1:20-cv-02484-MSK Document 61-2 filed 04/28/21 USDC Colorado pg 59 of 105

### 2.7.1 How to Read Table 2-2

The following describes how **Table 2-2** is written and formatted. Refer to the diagram on the next page for an example of how to read **Table 2-2**.

- In general, only those resources and uses that have been identified as planning issues have notable differences between the alternatives.
- In Alternative A (Current Management), decisions are guided by two RMPs and several amendments to those RMPs.
  - Objectives or actions cited as BLM 1985 are from the San Juan/San Miguel RMP and apply only to actions on lands and federal mineral estate within the UFO boundary southwest of the Uncompahgre National Forest.
  - Objectives or actions cited as BLM 1989a are from the Uncompahgre RMP and apply to the remaining lands and federal mineral estate within the UFO boundary including the North Fork area southwest to the eastern edge of the Uncompahgre National Forest boundary.
  - Stipulations cited as BLM 1991a are from the Colorado Oil and Gas Leasing and Development EIS and amendment to the San Juan/San Miguel RMP. As such, these stipulations apply only to those lands and federal mineral estate within the UFO boundary southwest of the Uncompahgre National Forest.
- Actions that are applicable to all alternatives are shown in one cell across a row. These particular objectives and actions would be implemented regardless of which alternative is ultimately selected.
- Actions that are applicable to more than one but not all alternatives are indicated by either combining cells for the same alternatives, or by denoting those objectives or actions as the "same as Alternative B," for example.

Internal Not for Public Distribution

BLM_0110807

Case No. 1:20-cv-02484-MSK Document 61-2 filed 04/28/21 USDC Colorado pg 60 of 105

2. Alternatives (Management Guidance for Alternatives A, B, C, and D)

## Diagram 2-1
## How to Read Table 2-2

**Table 2-2** *(continued)*
**Description of Alternatives A, B, C, and D**

| Line # | Alternative A *Current Management* *(No Action)* **Resources** | Alternative B | Alternative C | Alternative D *Agency Preferred* |
|---|---|---|---|---|
| 1. | **SOILS AND WATER** | | | |
| 2. | **GOAL – SOILS:** Manage for soil stability and productivity to maintain overall watershed health. Manage erosion to minimize downstream impacts from soil-related issues (e.g., sediment runoff, selenium, salinity). | | | |
| 3. | **Objective:** Make management units available for erosion and salinity control objectives and projects that do not conflict with primary objectives of each unit. | **Objective:** Manage surface-disturbing activities to minimize the yield of sediment, salt, and selenium contributions from BLM lands to water resources. | | |
| 4. | **Action:** Develop necessary erosion-control structures, vegetation improvements, or salinity/selenium-reduction measures to improve water quality. (BLM 1985)<br><br>Develop in-channel structures and land treatment projects designed to reduce runoff and soil erosion where it does not conflict with management of other resources. (BLM 1989a) | **Action:** Improve water quality and overall watershed health by managing the soil for adequate watershed cover and a healthy soil surface on soils high in salinity/selenium. This may include but is not limited to:<br>• Reducing livestock grazing animal unit months (AUM);<br>• Limiting livestock grazing season of use;<br>• Including additional livestock grazing rest-rotation; and<br>• Limiting recreational uses. | **Action:** No similar action. | **Action:** Improve water quality and overall watershed health by managing the soil for adequate watershed cover and a healthy soil surface on soils high in salinity/selenium. This may include but is not limited to:<br>• Modifying livestock grazing practices to reduce sediment yield;<br>• Limiting recreational uses; and<br>• Planning and implementing comprehensive travel management. |
| 5. | **Action:** No similar action in current RMPs. | **Action:** Protect rare biological soil crust in the East Paradox area by pursuing acquisition of private parcels from willing sellers. (Also refer to *Lands and Realty* section.) | **Action:** Same as Alternative A. | **Action:** Same as Alternative B. |

Goals, objectives, or actions that are applicable to more than one alternative are indicated by combining cells for the same alternatives.

Where an action in one or more alternatives does not apply to another, for example Alternative C, it states, "No similar action."

Actions that are the same as another alternative but whose cells cannot be combined are noted as, "Same as Alternative __."

Internal Not for Public Distribution

June 2011 Uncompahgre Resource Management Plan Revision and Environmental Impact Statement
Chapter 2, Alternatives – Internal Draft for Field Office, Cooperating Agency, and RAC Subgroup Review 2-17

BLM_0110808

2. Alternatives (Management Guidance for Alternatives A, B, C, and D)

**Table 2-2**
**Description of Alternatives A, B, C, and D**

| | | |
|---|---|---|
| Air Quality (p. 2-19) | Native American Tribal Uses (p. 2-272) | Vegetation – General (p. 2-42) |
| Areas of Critical Environmental Concern (p. 2-230) | Other Minerals (p. 2-222) | *Uplands* (p. 2-43) |
| Climate Change (p. 2-20) | *Locatable Minerals* (p. 2-223) | *Riparian* (p. 2-46) |
| Coal (p. 2-211) | *Mineral Materials (Salable Minerals)* (p. 2-225) | *Weeds* (p. 2-54) |
| Comprehensive Trails and Travel Management (p. 2-188) | *Non-energy Solid Leasable Minerals* (p. 2-228) | Visual Resources (p. 2-142) |
| Cultural Resources (p. 2-133) | Paleontological Resources (p. 2-141) | Watchable Wildlife Areas (p. 2-266) |
| Fluid Minerals *(Oil and Gas and Geothermal Resources)* (p. 2-217) | Public Health and Safety (p. 2-273) | Wild and Scenic Rivers (p. 2-261) |
| Forestry and Woodland Products (p. 2-152) | Recreation and Visitor Services (p. 2-175) | Wildland Fire Ecology and Management (p. 2-129) |
| Land Health (p. 2-22) | Soils and Water (p. 2-25) | Wilderness and Wilderness Study Areas (p. 2-256) |
| Lands and Realty (p. 2-197) | Special Status Species – General (p. 2-89) | Wildlife – General (p. 2-56) |
| Lands with Wilderness Characteristics (p. 2-149) | *Plants* (p. 2-95) | *Fish and Aquatic* (p. 2-60) |
| Livestock Grazing (p. 2-161) | *Fish and Aquatic* (p. 2-98) | *Terrestrial* (p. 2-65) |
| National Trails and BLM Byways (p. 2-269) | *Terrestrial* (p. 2-100) | |

Internal Distribution
Not for Public

2-18 *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement* June 2011
*Chapter 2, Alternatives – Internal Draft for Field Office, Cooperating Agency, and RAC Subgroup Review*

BLM_0110809

## *Internal Draft Chapter 2*
## *for Field Office, Cooperating Agency, and RAC Subgroup Review*

**To Cooperating Agencies and RAC Subgroup Members:**

The Internal Draft Chapter 2 is intended for internal review by the BLM Field Office, Cooperating Agencies, and RAC Subgroup for the Uncompahgre RMP Revision and EIS. The review period is from Thursday, June 23 to Friday, July 15, 2011. Please complete the MSWord comment matrix (provided at the end of these instructions) and e-mail all comments to Kate Wynant (kate.wynant@empsi.com) by **Friday, July 15, 2011**:

**Internal Draft Chapter 2**. The internal draft chapter 2 is available for review in electronic format via CD-ROM.

**Comment Matrix** (provided at the end of these instructions). This is the comment matrix you should use to capture your comments on the draft document. Please save the file with a new file name including your last name (e.g., DraftCh2_FO-CA-SG_Cmts_062311_Adams.doc), and then fill out your comments on the document.

Contact Bruce Krickbaum (970-240-5384) with questions. After receiving your feedback, Chapter 2 will be modified as appropriate.

**Top Sections to Review for Background Information.** To get an overall understanding of the document and key ideas in the document, the following are useful sections for review:

- Section 2.2, Alternatives Development (page 2-2)
- Section 2.3, Summary Comparison of Alternatives (page 2-3)
- Table 2-1, Comparative Summary of Alternatives (page 2-4)
- Diagram 2-1, How to Read Table 2-2 (page 2-17)
- Hyperlinked table at the beginning of Table 2-2, Description of Alternatives A, B, C, and D (page 2-18)
- Appendix B, Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities

## *How to Provide Valuable Feedback*

**Commenting:**
For each comment, please fill in the following information under the appropriate column heading in the comment matrix (an example has been provided below):

✓ Alternative and row number on which you are commenting.
✓ **Your comments must be specific and provide exact changes to the text.** Please be unambiguous, clear, and directive, with exact wording changes stated. Ambiguous comments, such as "What?," "Poor," or "Is this right?," are not helpful and will not be considered.
✓ If you have the same comment more than once, do not refer back to a previous comment number. Instead, please copy and paste your comment to a new row in the matrix and provide the specific page number, etc.
✓ If an action presents a conflict with existing plans or objectives of agencies, local governments, or groups, please provide specific text in this document as well as the document that the action conflicts.

**The most helpful comments at this point are regarding the range of alternative. Is the range adequate? Should something else be considered?**

BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO
RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row # | Alternative | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 1. | 127 | B | B. Krickbaum | Please replace "…below measurable limits …" with "below ambient standards …" | A. Adams: Change made. |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |
| 9. | | | | | |
| 10. | | | | | |
| 11. | | | | | |
| 12. | | | | | |
| 13. | | | | | |
| 14. | | | | | |
| 15. | | | | | |
| 16. | | | | | |
| 17. | | | | | |
| 18. | | | | | |
| 19. | | | | | |
| 20. | | | | | |
| 21. | | | | | |
| 22. | | | | | |
| 23. | | | | | |
| 24. | | | | | |
| 25. | | | | | |
| 26. | | | | | |
| 27. | | | | | |
| 28. | | | | | |
| 29. | | | | | |
| 30. | | | | | |
| 31. | | | | | |
| 32. | | | | | |
| 33. | | | | | |

EMPS Inc.

Page 1 of 1

Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011

BLM_0110811



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
Montrose, Colorado

## RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #8

**Friday, June 24, 2011 (9:00 AM – 12:00 PM)**

**Meeting Location:**
**Holiday Inn Express**
**1391 S. Townsend Avenue, Montrose, CO**

| Last Name | First Name | Initial | Address | E-Mail | Phone |
|---|---|---|---|---|---|
| Armstrong | Lori | | BLM, Southwest Colorado District Manager 2465 S. Townsend Ave. Montrose, CO 81401 | vaarmstrong@blm.gov | 970-240-5336 |
| Batts | David | | EMPSi 3775 Iris Ave, Ste 1A Boulder, CO 80301 | david.batts@empsi.com | 303-446-7160 |
| Baird-LeValley | Robbie | | Colorado State Univ. Extension 525 Dodge Street Delta, CO 81416 | robbie.levalley@colostate.edu | w: 970-874-2195 |
| Bear | Shelby | | DMEA PO Box 910 Montrose, CO 81402 | sbear@dmea.com | w: 970-240-1238 |
| Blackburn | Walt | | | | |
| Day | Bill | | | | |
| Durnan | Richard | | | | |
| Ela | William | | | | |
| Hawke | Barbara | please correct this! | The Wilderness Society, ~~Central~~ ~~Rockies Regional Office~~ ~~1660 Wynkoop St, Ste 850~~ ~~Denver, CO 80202~~ 1617 American Way Montrose CO 81401 | barbara_hawke@tws.org | w: 303-650-5818 |
| Kauffman | Dave | | BLM, Uncompahgre Field Office 2465 S. Townsend Ave. Montrose, CO 81401 | dkauffma@blm.gov | 970-240-5340 |
| Krickbaum | Bruce | | BLM, Uncompahgre Field Office 2465 S. Townsend Ave. Montrose, CO 81401 | bkrickba@blm.gov | 970-240-5384 |
| Mueller | Peter | | PO Box 3140 Telluride, CO 81435 | pmueller@tnc.org | w: 970-728-5291 |

| Last Name | First Name | Initial | Address | E-Mail | Phone |
|---|---|---|---|---|---|
| Reams | John | JR | Western Small Miner's Assoc.<br>31527 Hwy 141<br>PO Box 644<br>Naturita, CO 81422 | john@reams-construction.com | w: 970-865-2886<br>[redacted] |
| Sharrow | Barb | BS | BLM, Uncompahgre Field Office<br>2465 S. Townsend Ave.<br>Montrose, CO 81401 | bsharrow@blm.gov | 970-240-5315 |
| Weist | Steven D. | SDW | Oxbow Mining<br>3737 Hwy 133<br>PO Box 535<br>Somerset, CO 81434 | steve.weist@oxbow.com | w: 970-929-6461<br>[redacted] |
| Welt | Kathy | | 36320 Highway 92<br>Hotchkiss, CO 81419 | tkctew@yahoo.com | w: 970-929-2238<br>[redacted] |
| Wynant | Kate | KW | EMPSi<br>3775 Iris Ave, Ste 1A<br>Boulder, CO 80301 | kate.wynant@empsi.com | 303-446-7160 |
| Ernst | Robert | RE | BLM | rernst@blm.gov | 2405305 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |



**Location of Coal Regions and Coal Fields in the Planning Area**



DELTA COUNTY
DELTA COUNTY
GUNNISON COUNTY
MESA COUNTY
MONTROSE COUNTY
MONTROSE COUNTY
OURAY COUNTY
MONTROSE COUNTY
SAN MIGUEL COUNTY
OURAY CO
SAN MIGUEL COUNTY
133
65
92
348
50
550
90
62
145
Uncompahgre Field Office Planning Area
Known Potential Coal Resource
High
Low/Moderate
Low
N
W
E
S
0
Miles
25
Map produced by Bureau of Land Management, Uncompahgre Field Office, January 2010
Projection: UTM, Zone 13, Datum: NAD 1983

**Known Potential Coal Resource in the Planning Area**

BLM_0110815

**James Bode**

**From:** bkrickba@blm.gov
**Sent:** Monday, June 27, 2011 3:03 PM
**To:** Kate Wynant
**Cc:** Jennifer Whitaker; UFO AR; bsharrow@blm.gov
**Subject:** Fw: Cooperating Agency and Review of RMP Draft Alternatives
**Attachments:** Nucla_confidentiality.pdf

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 06/27/2011 03:01 PM
-----

Bruce
Krickbaum/MOFO/CO
/BLM/DOI To
segfahlt@gmail.com
06/27/2011 03:00 cc
PM nucla1@fone.net
Subject
Cooperating Agency and Review of
RMP Draft Alternatives

Hello William,

During the Cooperating Agency meeting on June 23, BLM provided each agency a CD with the BLM refined draft management alternatives for Cooperating Agency review. I would like to send you a CD for review and input. One important aspect of the review is to identify any areas where we may be in conflict with Town of Nucla plans. In addition, you may review any alternative actions that are of interest to you or the town.

The draft alternatives are pre-decisional and subject to changes resulting from Cooperating Agency review and input, as well as BLM deliberations. Because of this, the draft alternative document is confidential and not intended for release to the public.

During the meeting, we handed each agency representative in attendance their personalized copy of the attached letter. We need your (and thereby Nucla's) agreement to the terms of confidentiality expressed in the letter. Please reply with your acceptance or decline.

Upon receipt of acceptance of confidentiality, I will send you the CD with management alternatives, as well as paper copies of other meeting information. We have a 3-week review period, which ends on July 15.

Thanks, Bruce

(See attached file: Nucla_confidentiality.pdf)

<><><><><><><><><><><><><><><><><><><><>

Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401
970.240.5384



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

IN REPLY REFER TO: 1610 (UFO RMP)

June 23, 2011

Dawna Morris, Mayor
Town of Nucla
Post Office Box 219
320 Main Street
Nucla, Colorado 81424

Dear Ms. Morris,

This letter reinforces the need for confidentiality with respect to pre-decisional BLM documents provided for Cooperating Agency review under the National Environmental Policy Act.

The BLM Uncompahgre Field Office is making available for review a draft internal copy of Uncompahgre Resource Management Plan, Chapter 2 - Draft Management Alternatives. The purpose of the review is to obtain constructive feedback from Cooperating Agencies regarding the range of alternatives, and to identify potential conflicts within alternatives and with county, community, and agency planning documents.

Because Chapter 2 is currently in draft form, it is pre-decisional and subject to changes resulting from your input, as well as from BLM deliberations. <u>Chapter 2 is therefore confidential and not intended for release to the public</u>.

The BLM anticipates that you as a Cooperating Agency recognize the sensitive nature of a draft federal document and will keep the contents of Chapter 2 confidential. If, for any reason, you are not willing or able to uphold this responsibility, you should 1) not accept a copy of the CD containing the draft, and 2) leave the meeting when the draft is discussed.

If you have any questions or wish to discuss this further, feel free to call me at (970)240-5315.

Barbara Sharrow

Barbara Sharrow
Field Manager
Uncompahgre Field Office

## James Bode

**From:** bkrickba@blm.gov
**Sent:** Monday, June 27, 2011 3:20 PM
**To:** davidvarley@kaycee.net
**Cc:** Kate Wynant; Jennifer Whitaker; bsharrow@blm.gov; UFO AR
**Subject:** Cooperating Agency (Orchard City) and Review of RMP Draft Alternatives
**Attachments:** OrchardCity_confidentiality.pdf

Hello David,

During the Cooperating Agency meeting on June 23, BLM provided each agency a CD with the BLM refined draft management alternatives for Cooperating Agency review. I would like to send you a CD for review and input. One important aspect of the review is to identify any areas where we may be in conflict with Orchard City plans. In addition, you may review any alternative actions that are of interest to you or the town.

The draft alternatives are pre-decisional and subject to changes resulting from Cooperating Agency review and input, as well as BLM deliberations. Because of this, the draft alternative document is confidential and not intended for release to the public.

During the meeting, we handed each agency representative in attendance their personalized copy of the attached letter. We need your agreement to the terms of confidentiality expressed in the letter.
Please reply with your acceptance or decline.

Upon receipt of acceptance of confidentiality, I will send you the CD with management alternatives, as well as paper copies of other meeting information. We have a 3-week review period, which ends on July 15.

Thanks, Bruce

(See attached file: OrchardCity_confidentiality.pdf)

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401
970.240.5384



# United States Department of the Interior

**BUREAU OF LAND MANAGEMENT**
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

IN REPLY REFER TO: 1610 (UFO RMP)

June 23, 2011

Don Suppes, Mayor
Town of Orchard City
9661 2100 Road
Austin, Colorado 81410

Dear Mr. Suppes,

This letter reinforces the need for confidentiality with respect to pre-decisional BLM documents provided for Cooperating Agency review under the National Environmental Policy Act.

The BLM Uncompahgre Field Office is making available for review a draft internal copy of Uncompahgre Resource Management Plan, Chapter 2 - Draft Management Alternatives. The purpose of the review is to obtain constructive feedback from Cooperating Agencies regarding the range of alternatives, and to identify potential conflicts within alternatives and with county, community, and agency planning documents.

Because Chapter 2 is currently in draft form, it is pre-decisional and subject to changes resulting from your input, as well as from BLM deliberations. <u>Chapter 2 is therefore confidential and not intended for release to the public</u>.

The BLM anticipates that you as a Cooperating Agency recognize the sensitive nature of a draft federal document and will keep the contents of Chapter 2 confidential. If, for any reason, you are not willing or able to uphold this responsibility, you should 1) not accept a copy of the CD containing the draft, and 2) leave the meeting when the draft is discussed.

If you have any questions or wish to discuss this further, feel free to call me at (970)240-5315.

Barbara Sharrow

Barbara Sharrow
Field Manager
Uncompahgre Field Office

## James Bode

**From:** bkrickba@blm.gov
**Sent:** Monday, June 27, 2011 3:07 PM
**To:** lpadgett@ouraycountyco.gov; lynn@mtngeogeek.com
**Cc:** Kate Wynant; Jennifer Whitaker; bsharrow@blm.gov; UFO AR
**Subject:** Cooperating Agency and Review of RMP Draft Alternatives
**Attachments:** OurayCounty_confidentiality.pdf

Hello Lynn,

During the Cooperating Agency meeting on June 23, BLM provided each agency a CD with the BLM refined draft management alternatives for Cooperating Agency review. I would like to send you a CD for review and input. One important aspect of the review is to identify any areas where we may be in conflict with Ouray County plans. In addition, you may review any alternative actions that are of interest to you or the town.

The draft alternatives are pre-decisional and subject to changes resulting from Cooperating Agency review and input, as well as BLM deliberations. Because of this, the draft alternative document is confidential and not intended for release to the public.

During the meeting, we handed each agency representative in attendance their personalized copy of the attached letter. We need your agreement to the terms of confidentiality expressed in the letter. Please reply with your acceptance or decline.

Upon receipt of acceptance of confidentiality, I will send you the CD with management alternatives, as well as paper copies of other meeting information. We have a 3-week review period, which ends on July 15.

Thanks, Bruce

(See attached file: OurayCounty_confidentiality.pdf)

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401
970.240.5384



**United States Department of the Interior**

**BUREAU OF LAND MANAGEMENT**
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

IN REPLY REFER TO: 1610 (UFO RMP)

June 23, 2011

Heidi Albritton, Chair
Ouray County, Board of County Commissioners
Post Office Box C
Ouray, Colorado 81427

Dear Ms. Albritton,

This letter reinforces the need for confidentiality with respect to pre-decisional BLM documents provided for Cooperating Agency review under the National Environmental Policy Act.

The BLM Uncompahgre Field Office is making available for review a draft internal copy of Uncompahgre Resource Management Plan, Chapter 2 - Draft Management Alternatives. The purpose of the review is to obtain constructive feedback from Cooperating Agencies regarding the range of alternatives, and to identify potential conflicts within alternatives and with county, community, and agency planning documents.

Because Chapter 2 is currently in draft form, it is pre-decisional and subject to changes resulting from your input, as well as from BLM deliberations. <u>Chapter 2 is therefore confidential and not intended for release to the public</u>.

The BLM anticipates that you as a Cooperating Agency recognize the sensitive nature of a draft federal document and will keep the contents of Chapter 2 confidential. If, for any reason, you are not willing or able to uphold this responsibility, you should 1) not accept a copy of the CD containing the draft, and 2) leave the meeting when the draft is discussed.

If you have any questions or wish to discuss this further, feel free to call me at (970)240-5315.

Barbara Sharrow

Barbara Sharrow
Field Manager
Uncompahgre Field Office

**James Bode**

| | |
|---|---|
| **From:** | bkrickba@blm.gov |
| **Sent:** | Monday, June 27, 2011 3:32 PM |
| **To:** | pat@cedaredgecolorado.com |
| **Cc:** | Kate Wynant; Jennifer Whitaker; bsharrow@blm.gov; UFO AR |
| **Subject:** | Cooperating Agency (Cedaredge) and Review of RMP Draft Alternatives |
| **Attachments:** | Cedaredge_confidentiality.pdf |

Hello Patricia,

During the Cooperating Agency meeting on June 23, BLM provided each agency a CD with the BLM refined draft management alternatives for Cooperating Agency review. I would like to send you a CD for review and input. One important aspect of the review is to identify any areas where we may be in conflict with Town of Cedaredge plans. In addition, you may review any alternative actions that are of interest to you or the town.

The draft alternatives are pre-decisional and subject to changes resulting from Cooperating Agency review and input, as well as BLM deliberations. Because of this, the draft alternative document is confidential and not intended for release to the public.

During the meeting, we handed each agency representative in attendance their personalized copy of the attached letter. We need your agreement to the terms of confidentiality expressed in the letter.
Please reply with your acceptance or decline.

Upon receipt of acceptance of confidentiality, I will send you the CD with management alternatives, as well as paper copies of other meeting information. We have a 3-week review period, which ends on July 15.

Thanks, Bruce

(See attached file: Cedaredge_confidentiality.pdf)

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401
970.240.5384



**United States Department of the Interior**

**BUREAU OF LAND MANAGEMENT**
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

IN REPLY REFER TO: 1610 (UFO RMP)

June 23, 2011

Patricia Means, Mayor
Town of Cedaredge
Post Office Box 398
Cedaredge, Colorado 81413

Dear Ms. Means,

This letter reinforces the need for confidentiality with respect to pre-decisional BLM documents provided for Cooperating Agency review under the National Environmental Policy Act.

The BLM Uncompahgre Field Office is making available for review a draft internal copy of Uncompahgre Resource Management Plan, Chapter 2 - Draft Management Alternatives. The purpose of the review is to obtain constructive feedback from Cooperating Agencies regarding the range of alternatives, and to identify potential conflicts within alternatives and with county, community, and agency planning documents.

Because Chapter 2 is currently in draft form, it is pre-decisional and subject to changes resulting from your input, as well as from BLM deliberations. <u>Chapter 2 is therefore confidential and not intended for release to the public</u>.

The BLM anticipates that you as a Cooperating Agency recognize the sensitive nature of a draft federal document and will keep the contents of Chapter 2 confidential. If, for any reason, you are not willing or able to uphold this responsibility, you should 1) not accept a copy of the CD containing the draft, and 2) leave the meeting when the draft is discussed.

If you have any questions or wish to discuss this further, feel free to call me at (970)240-5315.

Barbara Sharrow

Barbara Sharrow
Field Manager
Uncompahgre Field Office

## James Bode

**From:** bkrickba@blm.gov
**Sent:** Monday, June 27, 2011 3:14 PM
**To:** shansen@deltacounty.com
**Cc:** Kate Wynant; Jennifer Whitaker; bsharrow@blm.gov; UFO AR
**Subject:** Cooperating Agency (Delta County) and Review of RMP Draft Alternatives
**Attachments:** DeltaCounty_confidentiality.pdf

Hello Sue,

During the Cooperating Agency meeting on June 23, BLM provided each agency a CD with the BLM refined draft management alternatives for Cooperating Agency review. I would like to send you a CD for review and input. One important aspect of the review is to identify any areas where we may be in conflict with Delta County plans. In addition, you may review any alternative actions that are of interest to you or the town.

The draft alternatives are pre-decisional and subject to changes resulting from Cooperating Agency review and input, as well as BLM deliberations. Because of this, the draft alternative document is confidential and not intended for release to the public.

During the meeting, we handed each agency representative in attendance their personalized copy of the attached letter. We need your (and thereby Delta County's) agreement to the terms of confidentiality expressed in the letter. Please reply with your acceptance or decline.

Upon receipt of acceptance of confidentiality, I will send you the CD with management alternatives, as well as paper copies of other meeting information. We have a 3-week review period, which ends on July 15.

You said you will be out of town until July 13, so I hope for a quick response once you read this, as well as letting me know the best and quickest way to get the material to you.

Thanks, Bruce

(See attached file: DeltaCounty_confidentiality.pdf)

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401
970.240.5384



**United States Department of the Interior**

**BUREAU OF LAND MANAGEMENT**
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

IN REPLY REFER TO: 1610 (UFO RMP)

June 23, 2011

Lela J. McCracken, Chair
Delta County, Board of County Commissioners
501 Palmer Street, #227
Delta, Colorado 81416

Dear Ms. McCracken,

This letter reinforces the need for confidentiality with respect to pre-decisional BLM documents provided for Cooperating Agency review under the National Environmental Policy Act.

The BLM Uncompahgre Field Office is making available for review a draft internal copy of Uncompahgre Resource Management Plan, Chapter 2 - Draft Management Alternatives. The purpose of the review is to obtain constructive feedback from Cooperating Agencies regarding the range of alternatives, and to identify potential conflicts within alternatives and with county, community, and agency planning documents.

Because Chapter 2 is currently in draft form, it is pre-decisional and subject to changes resulting from your input, as well as from BLM deliberations. <u>Chapter 2 is therefore confidential and not intended for release to the public</u>.

The BLM anticipates that you as a Cooperating Agency recognize the sensitive nature of a draft federal document and will keep the contents of Chapter 2 confidential. If, for any reason, you are not willing or able to uphold this responsibility, you should 1) not accept a copy of the CD containing the draft, and 2) leave the meeting when the draft is discussed.

If you have any questions or wish to discuss this further, feel free to call me at (970)240-5315.

Barbara Sharrow

Barbara Sharrow
Field Manager
Uncompahgre Field Office

**James Bode**

---

**From:** bkrickba@blm.gov
**Sent:** Monday, June 27, 2011 3:25 PM
**To:** sharold@ci.olathe.co.us
**Cc:** Kate Wynant; Jennifer Whitaker; bsharrow@blm.gov; UFO AR
**Subject:** Cooperating Agency (Olathe) and Review of RMP Draft Alternatives
**Attachments:** Olathe_confidentiality.pdf

Hello Scott,

During the Cooperating Agency meeting on June 23, BLM provided each agency a CD with the BLM refined draft management alternatives for Cooperating Agency review. I would like to send you a CD for review and input. One important aspect of the review is to identify any areas where we may be in conflict with Town of Olathe plans. In addition, you may review any alternative actions that are of interest to you or the town.

The draft alternatives are pre-decisional and subject to changes resulting from Cooperating Agency review and input, as well as BLM deliberations. Because of this, the draft alternative document is confidential and not intended for release to the public.

During the meeting, we handed each agency representative in attendance their personalized copy of the attached letter.
We need your agreement to the terms of confidentiality expressed in the letter.
Please reply with your acceptance or decline.

Upon receipt of acceptance of confidentiality, I will send you the CD with management alternatives, as well as paper copies of other meeting information. We have a 3-week review period, which ends on July 15.

Thanks, Bruce

(See attached file: Olathe_confidentiality.pdf)

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401
970.240.5384



United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

IN REPLY REFER TO: 1610 (UFO RMP)

June 23, 2011

Rob Smith, Mayor
Town of Olathe
Post Office Box 789
Olathe, Colorado 81425

Dear Mr. Smith,

This letter reinforces the need for confidentiality with respect to pre-decisional BLM documents provided for Cooperating Agency review under the National Environmental Policy Act.

The BLM Uncompahgre Field Office is making available for review a draft internal copy of Uncompahgre Resource Management Plan, Chapter 2 - Draft Management Alternatives. The purpose of the review is to obtain constructive feedback from Cooperating Agencies regarding the range of alternatives, and to identify potential conflicts within alternatives and with county, community, and agency planning documents.

Because Chapter 2 is currently in draft form, it is pre-decisional and subject to changes resulting from your input, as well as from BLM deliberations. <u>Chapter 2 is therefore confidential and not intended for release to the public</u>.

The BLM anticipates that you as a Cooperating Agency recognize the sensitive nature of a draft federal document and will keep the contents of Chapter 2 confidential. If, for any reason, you are not willing or able to uphold this responsibility, you should 1) not accept a copy of the CD containing the draft, and 2) leave the meeting when the draft is discussed.

If you have any questions or wish to discuss this further, feel free to call me at (970)240-5315.

Barbara Sharrow

Barbara Sharrow
Field Manager
Uncompahgre Field Office



**Figure 23.**
Conventional oil and gas projected drilling densities within the Uncompahgre Study Area for 2010 through 2030.
Cedaredge
Paonia
Hotchkiss
Delta
Crawford
Olathe
Montrose
Nucla
Naturita
Norwood
Ridgway
Ouray
Sawpit
Telluride
Mountain Village
Ophir
Projected Activity
Whitewater Unit - 150 wells per township
High - more than 6 wells per township
Moderate - more than 2 to 6 wells per township
Low - more than 1 to 2 wells per township
Very Low - 0.25 to 1 well per township
Negligible - less than 0.25 wells per township
Lands Excluded From Reasonable Forseeable Development Analysis
Gunnison Gorge National Conservation Area Planning Area
Dominguez-Escalante National Conservation Area
National Forest Lands
No Leasing
BLM Wilderness
Forest Service Wilderness
Black Canyon of the Gunnison National Park
BLM Wilderness Study Areas
Dominguez Canyon Wilderness
0 15 30 Miles
1:700,000
June, 2010
Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data was compiled from various sources. This information was developed through digital means and may be updated without notification.

**Figure 24.**
Coalbed natural gas development potential and projected drilling densities within the Uncompahgre Study Area for 2010 through 2030.

Cedaredge
Paonia
Hotchkiss
Delta
Crawford
Olathe
Montrose
Nucla
Naturita
Norwood
Ridgway
Ouray
Sawpit
Telluride
Mountain Village
Ophir
Coalbed Natural Gas Development Potential (2010-2030)
High - 40 or more wells per township
Moderate - 20 to 39 wells per township
Low - 2 to 19 wells per township
Very Low - Less than 2 wells per township
None - No drilling activity is anticipated during 2010-2030
National Forest Lands
Lands Excluded From Reasonable Forseeable Development Analysis
Gunnison Gorge National Conservation Area Planning Area
Dominguez-Escalante National Conservation Area
No Leasing
BLM Wilderness
Forest Service Wilderness
Black Canyon of the Gunnison National Park
BLM Wilderness Study Areas
Dominguez Canyon Wilderness
0
15
30 Miles
1:700,000
May, 2010
Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer
No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data was compiled from various sources. This information was developed through digital means and may be updated without notification.

## James Bode

**From:** bkrickba@blm.gov
**Sent:** Tuesday, June 28, 2011 4:16 PM
**To:** pat@cedaredgecolorado.com; davidvarley@kaycee.net; segfahlt@gmail.com
**Cc:** Kate Wynant; UFO AR
**Subject:** Information from Cooperating Agency Meeting

Hello,

I have sent you the information from the Cooperating Agency meeting.

I have sent the meeting handouts and a CD with the refined draft management alternatives.
Please make comments on the comment form provided on the CD.

Comments are due on July 15. Please call me if you have any questions.

--Bruce

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401
970.240.5384

## James Bode

**From:** bkrickba@blm.gov
**Sent:** Tuesday, June 28, 2011 2:47 PM
**To:** bsharrow@blm.gov; Kate Wynant; Aschroeder@usbr.gov; kjensen@ci.montrose.co.us; renzo.delpiccolo@state.co.us; MPelletier@gunnisoncounty.org; swhite@montrosecounty.net; joanm@sanmiguelcounty.org; joereagan741@yahoo.com; townofpaonia@tds.net; jcoates@town.ridgway.co.us; charles_sharp@fws.gov; tkrandallparker@fs.fed.us; Bruce_Krickbaum@co.blm.gov; UFO AR
**Subject:** Draft Notes: Uncompahgre RMP Cooperating Agency Meeting #8
**Attachments:** UFO-CA_2011-06-23_DraftNotes.docx

Hello Cooperating Agency Representatives,

I have attached draft notes of the June 23 Uncompahgre RMP Cooperating Agency meeting. Please review the draft notes and let me know of any errors or omissions by Wednesday, July 6, after which they will be revised and submitted to all group members and the administrative record.

Our next meeting is scheduled for August 11.

Thank you, Bruce

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401
970.240.5384

(See attached file: UFO-CA_2011-06-23_DraftNotes.docx)

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.





United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401

# COOPERATING AGENCY MEETING #8

## Thursday, June 23, 2011 (1:00 – 4:00 PM)

**Meeting Location:**
**Holiday Inn Express (Jordan Room)**
**1391 South Townsend Avenue, Montrose, CO**

# Meeting Notes

**Attendees:**

***Cooperating Agencies:*** Jen Coates (Town of Ridgway), Renzo DelPiccolo (Colorado Department of Natural Resources, Southwest Region), Kerwin Jensen (City of Montose), Brian Magee (CDOW), Joan May (San Miguel County BOCC), Mike Pelletier (Gunnison County), Barbara Peterson (Town of Paonia), Tamera Randall-Parker (US Forest Service), Joe Reagan (Town of Norwood), Alan Schroeder (Bureau of Reclamation, Western Colorado Area Office), Charlie Sharp (US Fish and Wildlife Service), Steve White (Montrose County BOCC)

***BLM Uncompahgre Field Office:*** Desty Dyer, Rob Ernst, Bruce Krickbaum, Teresa Pfifer, Barb Sharrow

***EMPSi:*** David Batts, Kate Wynant

**Handouts:** Agenda; Letter to Cooperating Agencies regarding confidentiality; Highlights of the RMP Process to Date; BLM UFO RMP Revision Coal and Fluid Minerals Potential Presentation (slides from PowerPoint presentation); Response to Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011); Internal Draft Chapter 2 for Field Office, Cooperating Agencies, RAC Subgroup Review – How to Provide Valuable Feedback; CD-ROM with Chapter 2 and Appendices; and Introduction text to Chapter 2

---

1. **Welcome** (Bruce Krickbaum)
   - Purpose is to kick off review of Chapters 1 and 2.
   - Discuss how we got to where we are and tips for reviewing the chapters..

2. **Introductions** (all present)

3. **Planning Process to Date** (Kate Wynant)
   - See handout: Highlights of the Resource Management Planning Process to Date.
   - The wilderness characteristics report is still in progress due to change in policy guidance. Wild and Scenic River Suitability Report is also still in progress. No other changes from the last meeting.
   - Thanks to everyone for all their hard work.

## 4. Presentation Coal Potential (Desty Dyer)

- See PowerPoint handout for slides.
  - Slide correction. Slide title: Mesa Verde Formation Coal in the Somerset and Grand Mesa Coal Fields. Third bullet should read: "Recently, an exploration license application has been submitted covering ***14,000*** (not 1,400) acres north of Hotchkiss, on what is known as Oak Mesa."
- Presentation highlights not on the slides: North Fork serves large commercial and small scale clients. Commercial clients get coal via train; the standard unit is 10,000 tons per train load. Less than 5% of the coal mined in the UFO stays in Colorado and about 20% is shipped overseas. Coal generally blended with coal from other sources to achieve a consistent fuel. Anticipate that coal companies will start moving operations further west from current mines near Paonia. Coal located deeper than 3,500 feet is not commercially available for mining; at that point it can be drilled for gas.
- Discussion:
  - Montrose County is interested in when leases are issued. Lease modifications can be requested by existing mining companies at any point in time. Generally takes four years to get the lease modified.
  - There is some fee mining near Naturita for the Nucla Tri-State power plant. The plant is able to also burn biofuels.
  - Montrose County – this is a good resource. How is it addressed; available or not? In Chapter 2 you will be able to see how all these areas are proposed for management.
  - Discussed a question from Gunnison County that the roadless rule applies to Forest Service lands and not BLM; however, BLM is coordinating with the Forest Service to make sure BLM decisions will not conflict with management of adjacent Forest Service lands.
  - North Fork coal is cleaner then Dakota coal. Consistently less than1% sulfur; falls into the low sulfur category.

## 5. Presentation Oil and Gas Potential (Rob Ernst)

- See PowerPoint handout for slides.
- Slide correction. Slide title: Oil and Gas Lease Stipulation Definitions NSO. Bullet two, the following should be deleted, "There are no exceptions allowed for a NSO."
- Presentation highlights not on the slides: In UFO natural gas is the primary fluid mineral. RMP will designate areas as closed to leasing or open with or without stipulations (e.g., No Surface Occupancy). Stipulations are attached to the lease.
- Discussion:
  - How to handle leases near houses. The RMP revision has a stipulation for protecting domestic wells.
  - Distance for directional drilling is about 1 mile.
  - NSO is not the same as no ground disturbance (NGD); as NGD is designed for other activities.

## 6. Comments / Comment Responses on January 2011 Internal Rough Draft Alternatives

- BLM sent the response to comment file to the cooperating agency prior to the meeting.
- BLM incorporated the cooperating agencies comments to refine the alternatives and in developing the preferred alternative.
- Once the preferred alternative was developed based on cooperating agency input, then the BLM refined all the other alternatives and consolidated them down to four alternatives, including the No Action alternative. This refinement kept the range of alternatives.
- Barb thanked the group for all the excellent input; she review each one and found many extremely helpful.

- Cooperating Agencies are encouraged to refer to this comment response matrix in their review of the draft chapters 1 and 2.
- There were no questions or discussion from the group.

## 7. Internal Draft Chapter 2 for BLM Field Office, Cooperating Agency, and RAC Subgroup Review

- Handout: Letter of confidentiality.
- Barb noted that the internal draft Chapter 2 is very dynamic and pre-decisional. At this point, we are still incorporating your input so it is subject to revision. There will be a lot of changes to this document as it goes through all the different reviews.
- Handout: Internal Draft Chapter 2 for Field Office, Cooperating Agency, RAC Subgroup Review – How to Provide Valuable Feedback
- Overview of internal draft chapter 2 and appendices (Kate Wynant)
  - PDF is bookmarked to help navigation electronically.
  - Section 2.1 is an introduction to the chapter.
  - Alternative development process focused on planning issues and must meet the purpose and need statement.
  - There are now four alternative (not five like before). A: No Action, B: less consumptive uses and more resource protection, C: more emphasis on land uses, D: preferred alternative.
  - Comparative summary of alternatives table is a reader digest version of the major decisions and allocations by alternative in a comparative format.
    - *Action*: Send out a corrected Summary of Alternatives (Table 2-1) next week.
  - Based on input from cooperating agencies and RAC subgroups about having too many alternatives (5), the BLM has restructured the alternatives into four. Based on input, the BLM crafted the preferred alternative and then combine the other four action alternatives into two alternatives. Critical in this process was capturing the sideboards to ensure they still represented a good range of alternatives. In brief and in general, many of the management measures for Alternatives C and D where combined into a new Alternative B, and alternative D and E were blended into the new Alterative C.
  - Alternatives considered but eliminated include all concepts considered but that do not meet the purpose and need.
  - Went through examples on the terms in the matrix, including "Same as Alternative X;" "No similar action;" etc.
  - Appendix B contains the stipulations. In Chapter 2 stipulations are applied to different alternatives; the stipulations are defined in Appendix B along with purpose, waivers, modifications, expectations, etc. Introduction defines the fluid mineral stipulations and the NGD stipulations. There are some stipulations that are missing language which is being finalized by the BLM. Some of the acres contain multiple stipulations.
  - Comments are due Friday, July 15th. Please email comments to Kate or Bruce. Save your matrix with your last name on it.
- Discussion
  - Summary of alternatives table – need to add a footnote to define black cells or bullets.
  - Good idea to hyperlink references in the document (e.g., citations or "see Salt Desert Shrub ACEC").
  - Shapefiles are not readily available. If cooperating agencies need to see something more specifically they should coordinate with Bruce with their request.
  - What are next steps? We will refine the alternatives; then it gets more internal reviews with the BLM State and Washington offices. A comment response form will be provided showing how we addressed comments. From there it an internal draft RMP is prepared which will be available to the Cooperating Agencies.

## 8. Other Items Not on the Agenda
- Meeting adjourned at 3:35PM.

## 9. Action Items / Next Meeting
- Next meeting: Thursday, August 11, 2011, 1:00–4:00pm, Holiday Inn Express, Montrose
- ☐ *Action:* Send out a corrected Summary of Alternatives (Table 2-1) next week.
- ☐ *Action:* Send out revised Appendix B with acres included.

## James Bode

**From:** bkrickba@blm.gov
**Sent:** Tuesday, June 28, 2011 2:34 PM
**To:** sbear@dmea.com; Steve.weist@oxbow.com; John@reams-construction.com; billday@paonia.com; rich@richdurnanphoto.com; Wblack8709@msn.com; silvers1@tds.net; barbara_hawke@tws.org; bsharrow@blm.gov; Bruce_Krickbaum@co.blm.gov; Kate Wynant; UFO AR
**Subject:** Draft Minutes: Uncompahgre RMP RAC Subgroup Meeting #8
**Attachments:** UFO-RAC_2011-06-24_DraftNotes.docx

Hello RAC Subgroup members,

I have attached draft minutes of the Uncompahgre RMP RAC Subgroup meeting held on June 24. Please review the draft minutes and let me know of any errors or omissions by Wednesday, July 6, after which they will be revised and submitted to all group members and the administrative record.

Our next meeting is scheduled for August 12.

Thank you,
Bruce

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401
970.240.5384

(See attached file: UFO-RAC_2011-06-24_DraftNotes.docx)

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.



United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401

# RAC SUBGROUP MEETING #8

**Friday, June 24, 2011 (9:00 AM – 12:00 PM)**

**Meeting Location:**
**Holiday Inn Express (Jordan Room)**
**1391 South Townsend Avenue, Montrose, CO**

# Meeting Notes

**Attendees:**

***RAC Subgroup:*** Shelby Bear, Walt Blackburn, Bill Day, Richard Duran, William Ela, Barbara Hawke, John Reams, Steve Weist

***BLM Uncompahgre Field Office:*** Desty Dyer, Rob Ernst, Bruce Krickbaum, Barb Sharrow

***EMPSi:*** David Batts, Kate Wynant

***General Public:*** None

**Handouts:** Agenda; Highlights of the RMP Process to Date; BLM UFO RMP Revision Coal and Fluid Minerals Potential Presentation (slides from PowerPoint presentation); Response to Comments on Internal Rough Draft Alternatives for Cooperating Agency and RAC Subgroup Review (January 27, 2011); Internal Draft Chapter 2 for Field Office, Cooperating Agencies, RAC Subgroup Review – How to Provide Valuable Feedback; CD-ROM with Chapter 2 and Appendices; and Introduction text to Chapter 2

---

## 1. Welcome (Bruce Krickbaum)

- Purpose is to kick off review of internal draft Chapters 1 and 2.
- Discuss how we got to where we are and tips for reviewing the chapters.

## 2. Introductions (all present)

## 3. Planning Process to Date (Kate Wynant)

- See handout: Highlights of the Resource Management Planning Process to Date.
- The wilderness characteristics report is still in progress due to change in policy guidance.
- Thanks to everyone for all their hardwork.
- Desty and Rob to provide an overview of the minerals program.

## 4. Presentation Coal Potential (Desty Dyer)

- See PowerPoint handout for slides.
  - Printed slide correction. Slide title: Mesa Verde Formation Coal in the Somerset and Grand Mesa Coal Fields. Third bullet should read: "Recently, an exploration license application has

been submitted covering ***14,000*** (not 1,400) acres north of Hotchkiss, on what is known as Oak Mesa."

- Presentation highlights not on the slides: North Fork has different coal seams; there has been a mine that mined three seams. North Fork serves large commercial and small scale clients. Expected that federal coal will continue to provide about 80% or more. Anticipate that coal companies will start moving operations further west from current mines near Paonia.
- Discussion:
  - Mesa Verde coal can vary in quality, but by the time it is blended it has a fairly consistent quality. Tends to go lower in quality to the west, but the data is not conclusive.
  - Any interagency action on the Forest Service roadless rule and BLM permits? There are about 2100 acres under the roadless rule with coal potential that would prohibit development. Roadless rule would only impact new mines (existing mines can continue).

## 5. Presentation Oil and Gas Potential (Rob Ernst)

- See PowerPoint handout for slides.
- Printed slide correction. Slide title: Oil and Gas Lease Stipulation Definitions NSO. Bullet two, the following should be deleted, "There are no exceptions allowed for a NSO."
- Presentation highlights not on the slides: In UFO natural gas is the primary fluid mineral. Wherever you have coal, you generally have gas potential. Coal deeper than 3,000 acres is not feasible for coal mining, but can be drilled for gas. Historically the planning area has not been as intensively drilled as other Field Offices (e.g., Silt or Grand Junction); however, new technologies with shale gas could increase the potential for gas to be extracted economically and increase interest in the UFO. The RMP will designate areas as closed to leasing or open with or without stipulations (e.g., No Surface Occupancy [NSO]). Stipulations are attached to the lease.
- Discussion:
  - *Comment*: Shale requires fracking and it is a concerned. NSO would not be able to control that. What can control fracking and its impacts? *Response*: During the drilling permitting process the BLM does NEPA and may develop special conditions of approval. Fracking needs varies greatly by hole and formation (and how they frack – water only, other mixtures, etc.). Fracking requires a lot of water.
  - During permitting process, companies must tell the BLM which formation they are accessing and the fracking fluids. One issue is that fracking is commonly done by subcontractors, which may or may not provide accurate information on the fluids to the company or BLM. This issue is under court review.
  - San Juan Public Lands Center is doing supplement EIS on the Gothic play; but it does not cover anything in the UFO. One of the exploration wells came up dry; which shows how drilling can be part science and part guessing game.
  - What are issues that the RAC Subgroup should think about? How to address energy demands in the US. Gas is a cleaner source. Ways to extract it in an environmentally friendly manner. Horizontal drilling and collocating wells on one pad have been good developments for mitigating environmental impacts.
  - There is potash potential in Paradox area, but no exploration licenses or known interest.

## 6. Comments / Comment Responses on January 2011 Internal Rough Draft Alternatives

- BLM sent the response to comment file to the RAC Subgroup prior to the meeting.
- BLM reviewed all comments and incorporated the comments as appropriate.
- After the comments were addressed, the BLM team developed the preferred alternative; which is made up of components of the action alternatives. Preferred alternative was developed by looking at all alternatives and selecting the allocations and actions that the team felt best

addressed the planning issues. Preferred alternative can be more or less restrictive the other alternatives for a resource program.

- Additionally, the BLM refined all the other alternatives and consolidated them down to four alternatives, including the No Action alternative. This refinement kept the range of alternatives.
  - There are now four alternative (not five like before). A: No Action, B: less consumptive uses and more resource protection, C: more emphasis on land uses, D: preferred alternative.
- How are tribes being involved? BLM has extensive meetings and tribal consultation. They were invited to be a cooperating agency.
- Kate thanked the group for all the excellent input; the BLM reviewed each one and found many extremely helpful.

## 7. Internal Draft Chapter 2 for BLM Field Office, Cooperating Agency, and RAC Subgroup Review

- Barb noted that the internal draft Chapter 2 is very dynamic and pre-decisional. At this point, we are still incorporating your input so it is subject to significant revision. There will be a lot of changes to this document as it goes through all the different reviews (including BLM field staff, Cooperating Agencies, RAC Subgroup, BLM State Office, and BLM Washington Office). Public draft document will likely come out in November 2012. Everyone needs to treat this information as privileged and confidential.
- RAC Subgroup has been very valuable and has been helpful to the process.
- Handout: Internal Draft Chapter 2 for FO, Coop, RAC Subgroup Review – How to Provide Valuable Feedback and Hardcopy, Introduction to Chapter 2, and one CD-ROM of the Draft Chapter 2 plus appendices.
- Overview of internal draft chapter 2 and appendices (Kate Wynant)
  - PDF is bookmarked to help navigation electronically.
  - Document can also be searched by key word.
  - Section 2.1 is an introduction to the chapter.
  - Alternative development process focused on planning issues and must meet the purpose and need statement.
  - There are now four alternative (not five like before). A: No Action, B: less consumptive uses and more resource protection, C: more emphasis on land uses, D: preferred alternative.
  - Comparative summary of alternatives table is a reader digest version of the major decisions and allocations by alternative in a comparative format.
    - *Action*: Send out a corrected Summary of Alternatives (Table 2-1) next week.
  - Based on input from cooperating agencies and RAC subgroups about having too many alternatives (5), the BLM has restructured the alternatives into four. Based on input, the BLM crafted the preferred alternative and then combine the other four action alternatives into two alternatives. Critical in this process was capturing the sideboards to ensure they still represented a good range of alternatives. In brief and in general, many of the management measures for Alts. C and D where combined into a new Alternative B, and alternative D and E were blended into the new Alterative C.
  - Alternatives considered but eliminated include all concepts considered but that do not meet the purpose and need.
  - The alternatives are provided in a comparative matrix format.
  - Went through examples on the terms in the matrix, including "Same as Alternative X;" "No similar action;" etc.
  - Appendix C: WSR Suitability Report is still under development, so for now there is just a placeholder. Same with Appendix G, Draft Wilderness Characteristics report.
  - Appendix B contains the stipulations. In chapter 2 stipulations are applied to different alternatives; the stipulations are defined in Appendix B along with purpose, waivers, modifications, expectations, etc. Introduction defines the fluid mineral stipulations and the

Case No. 1:20-cv-02484-MSK Document 61-2 filed 04/28/21 USDC Colorado pg 93 of 105

no ground disturbance (NGD) stipulations. There are some stipulations that are missing language which is being finalized by the BLM. Some of the acres contain multiple stipulations.
  - Comments are due **Friday, July 15th**. Please email comments to Kate or Bruce. Save your comment matrix with your last name on it. Please provide direct comments with explicit recommended changes. Also, make sure the range of alternatives is adequate and that they address your issues or concerns.
- Discussion
  - Good idea to hyperlink references in the document (e.g., citations or "see Salt Desert Shrub ACEC").
  - Next meeting will be August 12th we will go over response to RAC Subgroup comments.
  - Bill E., Bill D., Barbara, and Shelby requested paper copies; BLM will print on Monday.

## 8. Public Comments

- No members of the public were present. Solicited public comments at 11:00AM; none were received.

## 9. Other Items Not on the Agenda

- Meeting adjourned at 11:50AM.

## 10. Action Items / Next Meeting

- Next meeting: August 12, 2011, 9:00am – 12:00pm, Holiday Inn Express, Montrose

☐ *Action:* Send out a corrected Summary of Alternatives (Table 2-1) next week.

☐ *Action:* Send out revised Appendix B with acres included.

BLM_0110841

## James Bode

**From:** bkrickba@blm.gov
**Sent:** Wednesday, July 06, 2011 12:52 PM
**To:** lpadgett@ouraycountyco.gov; lynn@mtngeogeek.com
**Cc:** Kate Wynant; Jennifer Whitaker; bsharrow@blm.gov; UFO AR
**Subject:** Fw: Cooperating Agency and Review of RMP Draft Alternatives
**Attachments:** OurayCounty_confidentiality.pdf

Hello Lynn,

I am sending the following email again since I have not heard from you.

--Bruce

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401
970.240.5384

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 07/06/2011 12:49 PM
-----

Bruce
Krickbaum/MOFO/CO
/BLM/DOI
To
lpadgett@ouraycountyco.gov,
06/27/2011 03:07 lynn@mtngeogeek.com
PM
cc
kate.wynant@empsi.com,
jennifer.whitaker@empsi.com,
Barbara
Sharrow/MOFO/CO/BLM/DOI@BLM,
ufo-ar@empsi.com
Subject
Cooperating Agency and Review of
RMP Draft Alternatives

Hello Lynn,

During the Cooperating Agency meeting on June 23, BLM provided each agency a CD with the BLM refined draft management alternatives for Cooperating Agency review. I would like to send you a CD for review and input. One important aspect of the review is to identify any areas where we may be in conflict with Ouray County plans. In addition, you may review any alternative actions that are of interest to you or the town.

The draft alternatives are pre-decisional and subject to changes resulting from Cooperating Agency review and input, as well as BLM deliberations. Because of this, the draft alternative document is confidential and not intended for release to the public.

During the meeting, we handed each agency representative in attendance their personalized copy of the attached letter. We need your agreement to the terms of confidentiality expressed in the letter. Please reply with your acceptance or decline.

Upon receipt of acceptance of confidentiality, I will send you the CD with management alternatives, as well as paper copies of other meeting information. We have a 3-week review period, which ends on July 15.

Thanks, Bruce

(See attached file: OurayCounty_confidentiality.pdf)

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401
970.240.5384



**United States Department of the Interior**

**BUREAU OF LAND MANAGEMENT**
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401



IN REPLY REFER TO: 1610 (UFO RMP)

June 23, 2011

Heidi Albritton, Chair
Ouray County, Board of County Commissioners
Post Office Box C
Ouray, Colorado 81427

Dear Ms. Albritton,

This letter reinforces the need for confidentiality with respect to pre-decisional BLM documents provided for Cooperating Agency review under the National Environmental Policy Act.

The BLM Uncompahgre Field Office is making available for review a draft internal copy of Uncompahgre Resource Management Plan, Chapter 2 - Draft Management Alternatives. The purpose of the review is to obtain constructive feedback from Cooperating Agencies regarding the range of alternatives, and to identify potential conflicts within alternatives and with county, community, and agency planning documents.

Because Chapter 2 is currently in draft form, it is pre-decisional and subject to changes resulting from your input, as well as from BLM deliberations. <u>Chapter 2 is therefore confidential and not intended for release to the public</u>.

The BLM anticipates that you as a Cooperating Agency recognize the sensitive nature of a draft federal document and will keep the contents of Chapter 2 confidential. If, for any reason, you are not willing or able to uphold this responsibility, you should 1) not accept a copy of the CD containing the draft, and 2) leave the meeting when the draft is discussed.

If you have any questions or wish to discuss this further, feel free to call me at (970)240-5315.

Barbara Sharrow

Barbara Sharrow
Field Manager
Uncompahgre Field Office

## James Bode

**From:** bkrickba@blm.gov
**Sent:** Friday, July 08, 2011 2:26 PM
**To:** sbear@dmea.com; Steve.weist@oxbow.com; John@reams-construction.com; billday@paonia.com; rich@richdurnanphoto.com; Robbie.levalley@colostate.edu; Wblack8709@msn.com; pmueller@tnc.org; silvers1@tds.net; tkctew@yahoo.com; barbara_hawke@tws.org; bsharrow@blm.gov; Bruce_Krickbaum@co.blm.gov; Kate Wynant; UFO AR
**Subject:** Revised Table 2-1 of RMP Chapter 2
**Attachments:** Ch2_Table2-1_Updated_070811.pdf

Hello RAC Subgroup,

We have revised Table 2-1 of the Draft RMP Alternatives (Chapter 2).
Please use the attached table, and ignore the one within your PDF file (or paper copy) of the chapter.

Please call me if you have any questions.

Thanks, Bruce

(See attached file: Ch2_Table2-1_Updated_070811.pdf)

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401
970.240.5384

2. Alternatives (Summary Comparison of Alternatives)

**Table 2-1**
**Comparative Summary of Alternatives**

| Resource or Resource Use | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|
| **Biological Core Areas (acres)** | | *Figure 2-1* | *Figure 2-2* | *Figure 2-3* |
| Adobe | | 40,770 | 9,320 | 20,840 |
| Burn Canyon | | 14,110 | 7,300 | |
| Dry Creek | | 20,340 | 9,540 | 10,800 |
| Jumbo Mountain / McDonald Creek | | 17,250 | 12,580 | 17,250 |
| La Sal | | 22,370 | 13,290 | 22,370 |
| Monitor / Potter / Roubideau | | 27,320 | 10,890 | 27,320 |
| Naturita Canyon | | | | 1,510 |
| Ridgway | | 16,700 | 6,270 | 9,070 |
| San Miguel | | 25,520 | 9,890 | 17,840 |
| Spring Canyon | | 3,380 | 3,380 | 3,380 |
| Tabeguache | | 31,540 | 7,660 | 23,760 |
| Terror Creek | | 2,230 | | 2,230 |
| **Total** | **0** | **223,040** | **91,630** | **156,370** |
| **Visual Resource Management (VRM) (acres)** | *Figure 2-4* | *Figure 2-5* | *Figure 2-6* | *Figure 2-7* |
| VRM Class I | 44,180 | 54,040 | 44,330 | 46,580 |
| VRM Class II | 22,420 | 97,320 | 90,450 | 99,920 |
| VRM Class III | 280,450 | 324,510 | 236,360 | 242,610 |
| VRM Class IV | 8,420 | 194,580 | 298,900 | 281,164 |
| Undesignated | 320,330 | 5,370[1] | 5,760[1] | 5,490[1] |
| **Lands Identified for Wilderness Characteristics Protection (acres)** | | *Figure 2-8* | | *Figure 2-8* |
| Roc Creek/Carpenter Ridge | | 4,310 | | 4,310 |
| Monitor and Potter Canyons | | 6,950 | | 6,950 |
| Upper Dry Creek Basin | | 5,790 | | 5,790 |
| **Total** | **0** | **17,050** | **0** | **17,050** |
| **Livestock Grazing** | *Figure 2-9* | *Figure 2-10* | *Figure 2-11* | *Figure 2-12* |
| Acres open for livestock grazing (acres) | 629,750 | 580,580 | 629,210 | 613,140 |
| Acres closed to livestock grazing (acres) | 46,050 | 95,220 | 46,590 | 62,660 |
| Available Animal Unit Months | 38,315 | 35,448 | 37,099 | 36,424 |
| **Extensive Recreation Management Areas (ERMA) (acres)** | *Figure 2-13* | | *Figure 2-15* | *Figure 2-16* |
| Adobe Badlands | | | 6,360 | |
| Adobe Badlands ACEC/Outstanding Natural Area (ONA) | 6,380 | | | |
| Burn Canyon Area | | | 9,160 | 9,160 |
| Dolores River Canyon | | | 13,330 | |
| Dry Creek | | | 41,300 | |
| Jumbo Mountain | | | 5,020 | |
| Kinikin Area | | | 11,320 | 11,320 |
| North Delta Off-highway Vehicle (OHV) | 8,530 | | 3,270 | 8,530 |
| Paradox Valley | | | 47,100 | 47,100 |
| Ridgway Trails | | | 1,100 | |
| Roubideau | | | 21,660 | |
| San Miguel River Corridor | | | 35,570 | |

Internal Not for Public Distribution

June 2011 Uncompahgre Resource Management Plan Revision and Environmental Impact Statement Addendum-1
Chapter 2, Alternatives – Internal Draft for Field Office, Cooperating Agency, and RAC Subgroup Review

BLM_0110846

**Table 2-1** *(continued)*
**Comparative Summary of Alternatives**

| Resource or Resource Use | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|
| Spring Creek | | | 13,500 | |
| Uncompahgre | 611,940 | | | |
| **Total** | **626,850** | **0** | **208,690** | **76,110** |
| **Special Recreation Management Areas (SRMA) (acres)** | ***Figure 2-13*** | ***Figure 2-14*** | | ***Figure 2-16*** |
| Burn Canyon Area | | 9,160 | | |
| Dolores River Canyon | 13,380 | 13,380 | | 13,380 |
| Dry Creek | | 42,180 | | 42,180 |
| Jumbo Mountain | | 5,030 | | 1,360 |
| Kinikin Area | | 11,320 | | |
| North Delta | | 8,530 | | |
| Paradox Valley | | 87,250 | | |
| Ridgway Trails | | 1,170 | | |
| Roubideau | | 25,360 | | 25,360 |
| San Miguel River | 35,570 | 35,570 | | 35,570 |
| Spring Creek | | 4,980 | | |
| **Total** | **48,950** | **243,930** | **0** | **117,870** |
| **Comprehensive Trails and Travel Management (acres)** | ***Figure 2-17*** | ***Figure 2-18*** | ***Figure 2-19*** | ***Figure 2-20*** |
| Open to cross-country motorized use | 8,510 | | 16,570 | |
| Closed to motorized use | | 9,080 | | 1,160 |
| Closed to motorized and mechanized use | 55,620 | 80,380 | 45,220 | 56,740 |
| Limited to existing routes for motorized use | 563,630 | | | |
| Limited to designated routes for motorized use | 168,650 | 586,340 | 614,010 | 617,890 |
| **Lands and Realty (acres)** | ***Figure 2-21*** ***Figure 2-25*** | ***Figure 2-22*** ***Figure 2-26*** | ***Figure 2-23*** ***Figure 2-27*** | ***Figure 2-24*** ***Figure 2-28*** |
| Right-of-way (ROW) exclusion areas | 84,920 | 524,590 | 63,660 | 58,310 |
| ROW avoidance areas | | 54,790 | 228,070 | 279,270 |
| Identified for disposal | 8,180 | 2,650 | 9,850 | 1,930 |
| **Coal (acres)** *(note: waiting on Coal Screening report to fill in acreages)* | ***Figure 2-29*** | ***Figure 2-30*** | ***Figure 2-31*** | ***Figure 2-32*** |
| Unsuitable for surface mining and surface mining operations | | | | |
| Unacceptable for Coal Leasing | | | | |
| Acceptable for Coal Leasing | 34,370 | | | |
| **Stipulations for Surface-disturbing Activities (acres)** *(refer to Appendix B)* | ***Figure 2-39*** | ***Figure 2-33*** ***Figure 2-36*** ***Figure 2-40*** | ***Figure 2-34*** ***Figure 2-37*** ***Figure 2-41*** | ***Figure 2-35*** ***Figure 2-38*** ***Figure 2-42*** |
| No ground disturbance (NGD) | | 521,750 | 57,000 | 50,940 |
| Site-specific relocation (SSR) | | 640,540 | 370,120 | 458,730 |
| Timing limitations (TL) | 481,315 | 597,590 | 522,090 | 639,680 |
| **Fluid Mineral Leasing (acres)** | | | | |
| Closed to fluid mineral leasing | 88,860 | 190,210 | 50,070 | 72,880 |

Internal
Not for Public Distribution

**Table 2-1** *(continued)*
**Comparative Summary of Alternatives**

| Resource or Resource Use | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|
| *Closed to leasing—Private or State surface/federal minerals* | 25,300 | 38,040 | 1,520 | 1,530 |
| <u>Open</u> to fluid mineral leasing *(refer to Appendix B)* | 827,160 | 725,814 | 865,954 | 843,144 |
| *Open to leasing subject to standard terms and conditions—BLM surface/federal minerals* | 612,140 (Figure 2-43) | 523,630 (Figure 2-44) | 627,250 (Figure 2-45) | 604,450 (Figure 2-46) |
| *Open to leasing subject to standard terms and conditions—Private or State surface/federal minerals* | 215,020 | 202,184 | 238,704 | 238,694 |
| *Open to leasing subject to No Surface Occupancy (NSO)—BLM surface/federal minerals* | 84,570 (Figure 2-47) | 586,990 (Figure 2-48) | 74,180 (Figure 2-49) | 262,410 (Figure 2-50) |
| *Open to leasing subject to Controlled Surface Use (CSU)—BLM surface/federal minerals* | 148,430 (Figure 2-51) | 648,630 (Figure 2-52) | 439,660 (Figure 2-53) | 656,480 (Figure 2-54) |
| *Open to leasing subject to TL—BLM surface/federal minerals* | 481,315 (Figure 2-39) | 597,590 (Figure 2-40) | 522,090 (Figure 2-41) | 639,680 (Figure 2-42) |
| **Locatable, Salable, and Non-Energy Solid Leasable Minerals (acres)** | ***Figure 2-55 Figure 2-56 Figure 2-60 Figure 2-64*** | ***Figure 2-55 Figure 2-57 Figure 2-61 Figure 2-65*** | ***Figure 2-55 Figure 2-58 Figure 2-62 Figure 2-66*** | ***Figure 2-55 Figure 2-59 Figure 2-63 Figure 2-67*** |
| BLM Surface/Federal Minerals | | | | |
| *Withdrawn from locatable mineral entry* | 45,690 | 45,690 | 45,690 | 45,690 |
| *Petition for withdrawal from locatable mineral entry* | 26,300 | 356,110 | 12,350 | 73,000 |
| *Open to locatable mineral exploration or development* | 649,500 | 319,690 | 663,450 | 602,800 |
| *Closed to mineral material sales* | 56,290 | 431,590 | 50,400 | 205,640 |
| *Open for consideration for mineral material sales* | 619,510 | 244,210 | 625,400 | 470,160 |
| *Closed to non-energy solid leasable mineral exploration and development* | 55,990 | 363,040 | | 158,110 |
| *Open for consideration of non-energy solid leasable mineral exploration or development* | 619,810 | 312,760 | 675,800 | 517,690 |
| Private or State Surface/Federal Minerals | | | | |
| *Withdrawn from locatable mineral entry* | | | | |
| *Petition for withdrawal from locatable mineral entry* | | 7,490 | 2,831 | 3,290 |
| *Open to locatable mineral exploration or development* | 220,480 | 220,480 | 220,480 | 220,480 |
| *Closed to mineral material sales* | | 9,840 | 2,850 | 4,160 |
| *Open for consideration for mineral material sales* | 220,480 | 210,640 | 217,630 | 216,320 |
| *Closed to non-energy solid leasable mineral exploration and development* | | 7,490 | | 2,870 |
| *Open for consideration of non-energy solid leasable mineral exploration or development* | 220,480 | 212,990 | 220,480 | 217,610 |
| **Areas of Critical Environmental Concern (acres)** | ***Figure 2-68*** | ***Figure 2-69*** | ***Figure 2-70*** | ***Figure 2-71*** |
| Adobe Badlands | 6,380 | | 6,380 | 6,380 |
| Coyote Wash | | 2,100 | | |
| Dolores River Slickrock Canyon | | 10,670 | | 9,780 |
| East Paradox | | 7,360 | | 1,900 |
| Fairview South | 210 | 4,250 | 640 | 640 |
| La Sal Creek | | 10,490 | | |
| Lower Uncompahgre Plateau Cultural | | 31,870 | | |

**Table 2-1** *(continued)*
**Comparative Summary of Alternatives**

| Resource or Resource Use | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|
| Needle Rock | 80 | 80 | 80 | 80 |
| Paradox Rock Art | | 1,080 | | 1,080 |
| Roubideau-Potter-Monitor | | 14,940 | | |
| Roubideau Corridors | | | 8,720 | 8,720 |
| Salt Desert Shrub Ecosystem | | 34,540 | | |
| San Miguel Gunnison Sage-grouse | | 470 | | |
| San Miguel River | 22,780 | 35,420 | | 22,780 |
| Sims-Cerro Gunnison Sage-grouse | | 25,620 | | |
| Tabeguache Pueblo and Tabeguache Caves | | 26,400 | | |
| West Paradox | | 5,190 | | |
| **Total** | **29,450** | **211,120** | **15,820** | **51,360** |
| **Wilderness and Wilderness Study Areas (WSAs) (acres)** | *Figure 2-72* | | | |
| Adobe Badlands | 10,340 | | | |
| Camel Back | 10,690 | | | |
| Dolores River Canyon | 13,350 | | | |
| Needle Rock Instant Study Area (ISA) | 80 | | | |
| Sewemup Mesa | 1,780 | | | |
| Tabeguache Area | 8,140 | | | |
| **Eligible (Alternative A) or Suitable (Alternatives B and D) Wild and Scenic River Study Segments (miles crossing BLM land)** | *Figure 2-73* | *Figure 2-73* | | *Figure 2-74* |
| Gunnison River Segment 2 | 0.4 | 0.4 | | |
| Monitor Creek | 9.4 | 9.4 | | 9.4 |
| Potter Creek | 9.8 | 9.8 | | 9.8 |
| Roubideau Creek Segment 1 | 10.0 | 10.0 | | 9.9 |
| Roubideau Creek Segment 2 | 3.5 | 3.5 | | |
| Deep Creek | 0.6 | 0.6 | | |
| West Fork Terror Creek | 0.5 | 0.5 | | |
| Beaver Creek | 14.2 | 14.2 | | 14.2 |
| Dry Creek Segment 1 | 10.4 | 10.4 | | |
| Naturita Creek | 10.0 | 10.0 | | |
| Saltado Creek | 4.1 | 4.1 | | 5.6 |
| San Miguel River Segment 1 | 17.3 | 17.3 | | 17.3 |
| San Miguel River Segment 2 | 3.6 | 3.6 | | 4.0 |
| San Miguel River Segment 3 | 5.3 | 5 | | 4.5 |
| San Miguel River Segment 5 | 2.6 | 2.6 | | 1.3 |
| San Miguel River Segment 6 | 2.3 | 2.3 | | 2.1 |
| Tabeguache Creek Segment 1 | 3.6 | 3.6 | | 3.4 |
| Tabeguache Creek Segment 2 | 7.9 | 7.9 | | |
| Lower Dolores River | 6.9 | 6.9 | | 4.2 |
| North Fork Mesa Creek | 5.8 | 5.8 | | |
| Dolores River Segment 1 | 8.7 | 8.7 | | 8.7 |
| Dolores River Segment 2 | 5.4 | 5.4 | | 5.3 |

Internal
Not for Public Distribution


Case No. 1:20-cv-02484-MSK Document 61-2 filed 04/28/21 USDC Colorado pg 102 of 105

**Table 2-1** *(continued)*
**Comparative Summary of Alternatives**

| Resource or Resource Use | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|
| Ice Lake Creek Segment 2 | 0.3 | 0.3 | | |
| La Sal Creek Segment 1 | 0.6 | 0.6 | | |
| La Sal Creek Segment 2 | 3.8 | 3.8 | | 3.3 |
| La Sal Creek Segment 3 | 3.4 | 3.4 | | 3.4 |
| Lion Creek Segment 2 | 1.3 | 1.3 | | |
| Spring Creek | 1.5 | 1.5 | | |
| **Total** | **153.2** | **153.2** | **0** | **106.4** |

[1]Acres include BLM lands managed by other agencies.
Hatching indicates zero acres or miles under that alternative.

Internal
Not for Public Distribution

BLM_0110850

**James Bode**

**From:** bkrickba@blm.gov
**Sent:** Friday, July 08, 2011 2:22 PM
**To:** bsharrow@blm.gov; dmagee@blm.gov; Kate Wynant; Aschroeder@usbr.gov; kjensen@ci.montrose.co.us; renzo.delpiccolo@state.co.us; MPelletier@gunnisoncounty.org; swhite@montrosecounty.net; joanm@sanmiguelcounty.org; daves@sanmiguelcounty.org; pat@cedaredgecolorado.com; joereagan741@yahoo.com; norwoodparker@centurytel.net; davidvarley@kaycee.net; townofpaonia@tds.net; jcoates@town.ridgway.co.us; charles_sharp@fws.gov; tkrandallparker@fs.fed.us; lbroyles@fs.fed.us; segfahlt@gmail.com; Bruce_Krickbaum@co.blm.gov; UFO AR
**Subject:** Revised Table 2-1 of RMP Chapter 2
**Attachments:** Ch2_Table2-1_Updated_070811.pdf

Hello Cooperating Agencies,

We have revised Table 2-1 of the Draft RMP Alternatives (Chapter 2).
Please use the attached table, and ignore the one within the PDF file of the chapter.

Please call me if you have any questions.

Thanks, Bruce

(See attached file: Ch2_Table2-1_Updated_070811.pdf)

<><><><><><><><><><><><><><><><><><><><>
Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401
970.240.5384

**Table 2-1**
**Comparative Summary of Alternatives**

| Resource or Resource Use | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|
| **Biological Core Areas (acres)** | | *Figure 2-1* | *Figure 2-2* | *Figure 2-3* |
| Adobe | | 40,770 | 9,320 | 20,840 |
| Burn Canyon | | 14,110 | 7,300 | |
| Dry Creek | | 20,340 | 9,540 | 10,800 |
| Jumbo Mountain / McDonald Creek | | 17,250 | 12,580 | 17,250 |
| La Sal | | 22,370 | 13,290 | 22,370 |
| Monitor / Potter / Roubideau | | 27,320 | 10,890 | 27,320 |
| Naturita Canyon | | | | 1,510 |
| Ridgway | | 16,700 | 6,270 | 9,070 |
| San Miguel | | 25,520 | 9,890 | 17,840 |
| Spring Canyon | | 3,380 | 3,380 | 3,380 |
| Tabeguache | | 31,540 | 7,660 | 23,760 |
| Terror Creek | | 2,230 | | 2,230 |
| **Total** | **0** | **223,040** | **91,630** | **156,370** |
| **Visual Resource Management (VRM) (acres)** | *Figure 2-4* | *Figure 2-5* | *Figure 2-6* | *Figure 2-7* |
| VRM Class I | 44,180 | 54,040 | 44,330 | 46,580 |
| VRM Class II | 22,420 | 97,320 | 90,450 | 99,920 |
| VRM Class III | 280,450 | 324,510 | 236,360 | 242,610 |
| VRM Class IV | 8,420 | 194,580 | 298,900 | 281,164 |
| Undesignated | 320,330 | 5,370[1] | 5,760[1] | 5,490[1] |
| **Lands Identified for Wilderness Characteristics Protection (acres)** | | *Figure 2-8* | | *Figure 2-8* |
| Roc Creek/Carpenter Ridge | | 4,310 | | 4,310 |
| Monitor and Potter Canyons | | 6,950 | | 6,950 |
| Upper Dry Creek Basin | | 5,790 | | 5,790 |
| **Total** | **0** | **17,050** | **0** | **17,050** |
| **Livestock Grazing** | *Figure 2-9* | *Figure 2-10* | *Figure 2-11* | *Figure 2-12* |
| Acres open for livestock grazing (acres) | 629,750 | 580,580 | 629,210 | 613,140 |
| Acres closed to livestock grazing (acres) | 46,050 | 95,220 | 46,590 | 62,660 |
| Available Animal Unit Months | 38,315 | 35,448 | 37,099 | 36,424 |
| **Extensive Recreation Management Areas (ERMA) (acres)** | *Figure 2-13* | | *Figure 2-15* | *Figure 2-16* |
| Adobe Badlands | | | 6,360 | |
| Adobe Badlands ACEC/Outstanding Natural Area (ONA) | 6,380 | | | |
| Burn Canyon Area | | | 9,160 | 9,160 |
| Dolores River Canyon | | | 13,330 | |
| Dry Creek | | | 41,300 | |
| Jumbo Mountain | | | 5,020 | |
| Kinikin Area | | | 11,320 | 11,320 |
| North Delta Off-highway Vehicle (OHV) | 8,530 | | 3,270 | 8,530 |
| Paradox Valley | | | 47,100 | 47,100 |
| Ridgway Trails | | | 1,100 | |
| Roubideau | | | 21,660 | |
| San Miguel River Corridor | | | 35,570 | |

Internal Not for Public Distribution

**Table 2-1** *(continued)*
**Comparative Summary of Alternatives**

| Resource or Resource Use | Alt A | Alt B | Alt C | Alt D |
|---|---|---|---|---|
| Spring Creek | | | 13,500 | |
| Uncompahgre | 611,940 | | | |
| **Total** | **626,850** | **0** | **208,690** | **76,110** |
| **Special Recreation Management Areas (SRMA) (acres)** | ***Figure 2-13*** | ***Figure 2-14*** | | ***Figure 2-16*** |
| Burn Canyon Area | | 9,160 | | |
| Dolores River Canyon | 13,380 | 13,380 | | 13,380 |
| Dry Creek | | 42,180 | | 42,180 |
| Jumbo Mountain | | 5,030 | | 1,360 |
| Kinikin Area | | 11,320 | | |
| North Delta | | 8,530 | | |
| Paradox Valley | | 87,250 | | |
| Ridgway Trails | | 1,170 | | |
| Roubideau | | 25,360 | | 25,360 |
| San Miguel River | 35,570 | 35,570 | | 35,570 |
| Spring Creek | | 4,980 | | |
| **Total** | **48,950** | **243,930** | **0** | **117,870** |
| **Comprehensive Trails and Travel Management (acres)** | ***Figure 2-17*** | ***Figure 2-18*** | ***Figure 2-19*** | ***Figure 2-20*** |
| Open to cross-country motorized use | 8,510 | | 16,570 | |
| Closed to motorized use | | 9,080 | | 1,160 |
| Closed to motorized and mechanized use | 55,620 | 80,380 | 45,220 | 56,740 |
| Limited to existing routes for motorized use | 563,630 | | | |
| Limited to designated routes for motorized use | 168,650 | 586,340 | 614,010 | 617,890 |
| **Lands and Realty (acres)** | ***Figure 2-21 Figure 2-25*** | ***Figure 2-22 Figure 2-26*** | ***Figure 2-23 Figure 2-27*** | ***Figure 2-24 Figure 2-28*** |
| Right-of-way (ROW) exclusion areas | 84,920 | 524,590 | 63,660 | 58,310 |
| ROW avoidance areas | | 54,790 | 228,070 | 279,270 |
| Identified for disposal | 8,180 | 2,650 | 9,850 | 1,930 |
| **Coal (acres)** *(note: waiting on Coal Screening report to fill in acreages)* | ***Figure 2-29*** | ***Figure 2-30*** | ***Figure 2-31*** | ***Figure 2-32*** |
| Unsuitable for surface mining and surface mining operations | | | | |
| Unacceptable for Coal Leasing | | | | |
| Acceptable for Coal Leasing | 34,370 | | | |
| **Stipulations for Surface-disturbing Activities (acres)** *(refer to Appendix B)* | ***Figure 2-39*** | ***Figure 2-33 Figure 2-36 Figure 2-40*** | ***Figure 2-34 Figure 2-37 Figure 2-41*** | ***Figure 2-35 Figure 2-38 Figure 2-42*** |
| No ground disturbance (NGD) | | 521,750 | 57,000 | 50,940 |
| Site-specific relocation (SSR) | | 640,540 | 370,120 | 458,730 |
| Timing limitations (TL) | 481,315 | 597,590 | 522,090 | 639,680 |
| **Fluid Mineral Leasing (acres)** | | | | |
| Closed to fluid mineral leasing | 88,860 | 190,210 | 50,070 | 72,880 |

Internal Not for Public Distribution