**Table B-4**
**Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**) Protected Resource Acres/Miles Affected[1] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| | consideration as components of sage-grouse nesting habitat. | | | | |
| | **JUSTIFICATION:** BLM: insert justification | | | | |
| *TL-CO-18 (BLM 1991)* *Raptor Nesting and Fledgling Habitat (golden eagle, accipiters, falcons [except the kestrel], buteos, and owls)* BLM Surface: 0 acres US Mineral Estate: 120 acres | **STIPULATION** Prohibit surface occupancy and use within 0.25-mile of nest site from February 1 – August 15. **MODIFICATION:** During years when a nest site is unoccupied or unoccupied by or after May 15, the seasonal limitation may be suspended. It may also be suspended once the young have fledged and dispersed from the nest. **Standard EXCEPTION and WAIVER apply.** | • | | | |
| **TL-22** *Raptor Breeding and Nesting Sites* BLM Surface: 9,830 acres US Mineral Estate: 3,510 acres | **STIPULATION:** Special Status Raptors:  Prohibit surface occupancy and surface-disturbing activities within 0.50-mile of active special status raptor nest sites and associated alternate nests during the period from nest territory establishment to dispersal of young from nest (see Table B-X, Raptor Species Breeding Periods). Non-Special Status Raptors (*except American kestrel*): Prohibit surface occupancy and surface-disturbing activities within 0.25-mile of active raptor nest sites and associated alternate nests during the period from nest territory establishment to dispersal of young from nest (see Table B-X, Raptor Species Breeding Periods). **PURPOSE:** To protect breeding special status raptors and young and to comply with the Migratory Bird Treaty Act. **EXCEPTION:** An exception would be issued in cases where topographic configuration ensures an effective visual/ noise barrier between disruptive activities and the nest site. An exception would be provided for nests that have been unoccupied by raptors for at least three consecutive breeding seasons. To qualify for an exception, bald eagle nests would require at least five consecutive breeding seasons of eyrie vacancy. During years when a nest site is unoccupied on or | | • | | |

BLM_0110970

**Table B-4**
**Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Surface-disturbing Activities**

| Stipulation Number *(Existing/New)* Protected Resource Acres/Miles Affected[1] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| | after May 15, the timing limitation may be suspended. An exception is provided for mineral leasing routine maintenance and operations. **MODIFICATION:** Standard modifications apply, plus a modification may be provided for the latter end of the seasonal restriction if it is determined that young birds have fledged AND dispersed from the nest site.. **WAIVER:** Standard waivers apply. **JUSTIFICATION:** To protect breeding raptors during critical periods. | | | | |
| **TL-23** *Raptor Breeding and Nesting Sites* BLM Surface: 8,250 acres US Mineral Estate: 1,740 acres *COSO draft stip* | **STIPULATION:** Prohibit surface occupancy and surface-disturbing activities within the following areas and during the following time period(s), or until fledging and dispersal of young: <br>• Bald Eagle: 0.50-mile radius around active nests from November 15 to July 31; <br>• Golden Eagle: 0.50-mile radius around active nests from December 15 to July 15; <br>• Ferruginous Hawk: 0.50-mile of active nest sites from February 1 to August 15; <br>• Peregrine and Prairie Falcon: 0.50-mile of active nest sites from March 15 to July 31; <br>• Northern Goshawk: 0.50-mile of active nest sites from March 1 to August 31; <br>• Osprey: 0.25-mile radius of active nests from April 1 to August 31; <br>• Red-tailed Hawk: 0.25-mile radius of active nests from February 15 to August 15; <br>• Swainson's Hawk: 0.25-mile radius of active nests from April 1 to August 15; <br>• Cooper's Hawk:  0.25-mile radius of active nests from April 1 to August 15; <br>• Sharp-shinned Hawk: 0.25-mile radius of active nests from April 1 to August 15; <br>• Northern Harrier: 0.25-mile radius of active nests from April 1 to August 15; <br>• Burrowing Owl: 0.25-mile radius of active nests from March | | | | • |

BLM_0110971

**Table B-4**
**Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Surface-disturbing Activities**

| Stipulation Number (Existing/**New**) Protected Resource Acres/Miles Affected[1] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| | 15 to August 15; <br>• Great Horned Owl: 0.25-mile radius of active nests from February 1 to August 15; <br>• Other owls and raptors (excluding kestrel): 0.25-mile radius of active nests from March 1 to August 15. <br><br>**EXCEPTION:** An exception can be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to impair the utility of nest for current or subsequent nesting activity or occupancy.  The Field Manager may also grant an exception if the nest is unattended or remains unoccupied by May 15 of the project year. An exception may be granted to these dates by the Field Manager, consistent with policies derived from federal administration of the Migratory Bird Treaty Act. <br><br>**MODIFICATION:** The Field Manager may modify the stipulation dates or buffer distances if an environmental analysis indicates that a portion of the area is nonessential to nest utility or function, or that the proposed action could be conditioned so as not to impair the utility of the nest site for current or subsequent nest activities or occupation.  The stipulation may also be modified if the proponent, Bureau of Land Management, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to raptor breeding activities and/or habitats.  Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a regional perspective.  A modification may be granted if the nest has remained unoccupied for a minimum of five years or conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10-year period. <br><br>**WAIVER:** The Field Manager may grant a waiver if conditions have changed such that there is no reasonable likelihood of site occupation within the lease area. <br><br>**JUSTIFICATION:** BLM: insert justification | | | | |

BLM_0110972

B. Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities

**Table B-4**
**Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Surface-disturbing Activities**

| Stipulation Number (Existing/**New**) Protected Resource Acres/Miles Affected[1] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| TL-CO-20 (BLM 1991) *Osprey Nesting and Fledgling Habitat* BLM Surface: No Data US Mineral Estate: No Data | **STIPULATION:** Osprey nesting and fledgling habitat - April 1 to August 31. The sensitivity of osprey to human associated disturbance activities requires a half-mile buffer zone to avoid nest abandonment. **PURPOSE:** To protect breeding special status raptors and young and to comply with the Migratory Bird Treaty Act. **EXCEPTION:** During years when a nest site is unoccupied or unoccupied by or after May 15, the seasonal limitation may be suspended. It may also be suspended once the young have fledged and dispersed from the nest. **Standard MODIFICATION and WAIVER apply.** | • | | | |
| TL-CO-22 (BLM 1991) *Bald Eagle Nesting Habitat* BLM Surface: 4,250 acres US Mineral Estate: 280 acres | **STIPULATION:** Prohibit surface use within 0.5-mile of nest site from December 15 to June 15. **PURPOSE:** To prevent disruption of nesting. This time period is extremely sensitive to human-disturbance activities and may cause nest abandonment and desertion of long established territories. **EXCEPTION:** During years when a nest site is unoccupied by or after May 15, the timing limitation may be suspended. It may also be suspended once the young have fledged and dispersed from the nest. **Standard MODIFICATION and WAIVER apply.** | • | | | |
| TL-CO-23 (BLM 1991) *Bald Eagle Winter Roost Sites* BLM Surface: 1,180 acres US Mineral Estate: 110 acres | **STIPULATION** Prohibit surface use within 0.5-mile of bald eagle winter roost sites from November 16 to April 15. **PURPOSE:** The sensitivity of bald eagles to human disturbance activities. **EXCEPTION:** If there is partial or complete visual screening of the area of activity, the primary zone around the roost site may be reduced to one-quarter mile. **Standard MODIFICATION and WAIVER apply.** | • | | | |
| TL-24 *Bald Eagle Winter Roosts* BLM Surface: 4,630 acres | **STIPULATION:** Prohibit surface occupancy and surface-disturbing activities within 0.5-mile of an active bald eagle winter roost from November 15 to March 15. **PURPOSE:** To prevent disruption of wintering bald eagles at communal roosts. | | | | • |

Information for Public Distribution    Not for Public Distribution

BLM_0110973

**Table B-4**
**Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Surface-disturbing Activities**

| Stipulation Number (Existing/**New**) Protected Resource Acres/Miles Affected[1] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| US Mineral Estate: 580 acres *COSO draft stip* | **EXCEPTION:** An exception can be granted if an environmental analysis of the proposed action indicates that the nature or conduct of the activity could be conditioned so as not to impair the utility of the roost site. **MODIFICATION:** The Field Manager may modify the size of the stipulation area or time frames if an environmental analysis indicates that a portion of the area is nonessential to roost site function and utility, or that the proposed action could be conditioned so as not to impair the utility of the roost site for current or subsequent roosting activities or occupancy. A modification may be granted if the site has failed to support roosting activities over a minimum five year period, or if the site conditions have changed such that there is no reasonable likelihood of site occupation over a minimum 10-year period. **WAIVER:** The Field Manager may grant a waiver if the site conditions have changed such that there is no reasonable likelihood of site occupation within the lease area. **JUSTIFICATION:** *BLM: insert justification* | | | | |
| *TL-SJ-7 (BLM 1991)* *Bald Eagle Winter Concentration Areas* BLM Surface: 3,750 acres US Mineral Estate: 120 acres | **STIPULATION:** Prohibit surface use from December 1 to April 15. **Standard EXCEPTION, MODIFICATION, and WAIVER apply.** | • | | | |
| *TL-UB-3 (BLM 1989a)* *Bald Eagle Winter Concentration Areas* BLM Surface: 8,650 acres US Mineral Estate: 2,650 acres | **STIPULATION:** Prohibit development activities (exploration, drilling, etc.) from December 1 – April 30. **PURPOSE:** To protect bald eagles from activities that would cause abandonment of winter concentration areas. **EXCEPTION:** This stipulation may be waived, excepted, or modified by the Authorized Officer if the lessee can demonstrate that operations can be conducted without causing unacceptable impacts on wintering bald eagles. Resource information for split-estate lands has not been verified by the BLM. Verification will occur during review of Applications for Permit to Drill APDs). On-site inspection and | • | | | |

BLM_0110974

**Table B-4**
**Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Surface-disturbing Activities**

| Stipulation Number (Existing/**New**) Protected Resource Acres/Miles Affected[1] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| | consultation with the surface owner and operator may reveal that (1) the impacts addressed by the stipulation will be avoided or mitigated to an acceptable level, or (2) the resources of concern are not present. Upon either of these determinations by the Authorized Officer, the stipulations can be waived, modified, or excepted without public notice other than that provided APD. If, after on-site inspection and consultation with the private surface landowner, it is determined by the Authorized Officer that conditions necessary to avoid impacts to private resources would adversely impact the public resources addressed by these stipulations, the impacts will be assessed. If, based upon such assessment, the Authorized Officer makes a decision to substantially change or waive one or more stipulations, a 30-day public review period will be provided in addition to the public notice period for receipt of the APD. (These two 30-day notice and review-periods may overlap.)  **Standard MODIFICATION WAIVER apply.** | | | | |
| **TL-25** *Bald Eagle Winter Concentration Areas* BLM Surface: 10,180 acres US Mineral Estate: 1,720 acres | **STIPULATION:** Prohibit surface occupancy and surface-disturbing activities from December 1 to April 30.  **PURPOSE:** To protect bald eagle crucial winter habitats and to comply with the Bald and Golden Eagle Protection Act.  **EXCEPTION:** Standard exceptions apply, plus: restriction timeframes may be adjusted on a case-by-case basis depending on weather conditions and the severity of winter, provided eagles are not observed in the proposed action area.  **Standard MODIFICATION and WAIVER apply.**  **JUSTIFICATION:** To protect Bald Eagles and to comply with the Bald and Golden Eagle Protection Act. | | • | | • |
| *TL-CO-24 (BLM 1991)* *Peregrine Falcon Cliff Nesting Complex* BLM Surface: 2,340 acres US Mineral Estate: 0 acres | **STIPULATION:** Prohibit surface use within 0.5-mile of peregrine falcon cliff nesting complex from March 16 – July 31.  **PURPOSE:** To prevent abandonment and desertion of established territories.  **EXCEPTION:** The following exception would apply only after formal Section 7 Consultation with the U.S. Fish and Wildlife Service was consummated. During years when a nest | • | | | |

BLM_0110975

**Table B-4**
**Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Surface-disturbing Activities**

| Stipulation Number (Existing/**New**) Protected Resource Acres/Miles Affected[1] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| | site is unoccupied or unoccupied by or after May 15, the seasonal limitation may be suspended. It may also be suspended once the young have fledged and dispersed from the nest. **Standard MODIFICATION and WAIVER apply.** | | | | |
| *TL-CO-21 (BLM 1991)* *Mexican Spotted Owl Nesting and Fledgling Habitat* BLM Surface: *No Data* US Mineral Estate: *No Data* | **STIPULATION:** Prohibit surface use in core area of territory from February 1 to July 31. Mexican spotted owl habitat is restricted by use of a timing limitation applied to core areas within the owl habitat territory. The territories are by definition of two types: (1) territory in which an owl(s) has been spotted, but no nests or roosts have been confirmed, and (2) territory in which there is confirmed nesting, feeding, and roosting activity. The territory of a Mexican spotted owl is thought to be about 2,000 acres and does not overlap with another individual's (or pair's) territory. Within the territory is a core area of 450 acres where there have been sightings only ([I] above), or 1,480 acres where there are confirmed nests and/or roosts ([2] above). A proposed oil and gas operation within the remainder of the territory (2,000 acres minus 450 or 1,480 acres) will be analyzed prior to permit approval and mitigated for compatibility with the owl habitat. **Standard EXCEPTION, MODIFICATION, and WAIVER apply.** | • | | | |
| **TL-26** *Mexican Spotted Owl Suitable Breeding Habitat (Nesting and Fledgling Habitat)* BLM Surface: *No Data* US Mineral Estate: *No Data* COSO draft stip | **STIPULATION:** Prohibit surface occupancy and surface-disturbing activities in suitable Mexican spotted owl breeding habitat from March 1 to August 31. **PURPOSE:** Maintain the utility of suitable breeding and brood rearing habitat as defined in the MSO Recovery Plan to promote recovery. **EXCEPTION:** An exception can be granted if an environmental analysis of the proposed action and subsequent consultation indicates that the nature or conduct of the activity could be conditioned so as not to impair the utility of suitable habitat for current or subsequent reproductive activity or occupancy. **MODIFICATION:** The Field Manager may modify the dates based on new information which would be completed in | | | | • |

BLM_0110976

**Table B-4**
**Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Surface-disturbing Activities**

| Stipulation Number (Existing/**New**) Protected Resource Acres/Miles Affected[1] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| | coordination with FWS.  The Field Manager may modify this stipulation if the proposed action could be conditioned so as not to impair the utility of suitable habitat for current or subsequent reproductive activities or occupation. Modifications could also occur if sufficient information is provided that supports the contention that the action would not contribute to the suppression of breeding population densities or the population's production or recruitment regime from a regional perspective. **WAIVER:** The Field Manager may grant a waiver if suitable habitat conditions have changed such that there is no reasonable likelihood of occupation. **JUSTIFICATION:** BLM: insert justification | | | | |
| TL-CO-19 (BLM 1991) *Ferruginous Hawk* BLM Surface: *No Data* US Mineral Estate: *No Data* | **STIPULATION:** Prohibit use within one mile of nesting and fledgling habitat from February 1 to August 15. **PURPOSE:** Required due to the sensitivity of the ferruginous hawk to human associated disturbance activities. **MODIFICATION:** Exception for Ferruginous hawks nesting habitat. During years when a nest site is unoccupied or unoccupied by or after May 15, the seasonal limitation may be suspended.  It may also be suspended once the young have fledged and dispersed from the nest. **Standard EXCEPTION and WAIVER apply.** | • | | | |
| **TL-27** *Prairie Dog Pups* BLM Surface: 1,300 acres US Mineral Estate: 160 acres | **STIPULATION:** Prohibit surface occupancy and surface-disturbing activities within 300 feet of active prairie dog colonies from March 1 to July 15. **PURPOSE:** To protect prairie dog towns. **Standard EXCEPTION, MODIFICATION, and WAIVER apply.** **JUSTIFICATION:** This stipulation is necessary to protect sensitive and federal candidate species. | | • | | |
| **TL-28** *Prairie Dog Pups* BLM Surface: 1,300 acres | **STIPULATION** Prohibit surface occupancy and surface-disturbing activities within 300 feet of active prairie dog colonies from April 1 to July 15. **PURPOSE:** To protect prairie dog towns. | | | | • |

BLM_0110977

**Table B-4**
**Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Surface-disturbing Activities**

| Stipulation Number (Existing/**New**) Protected Resource Acres/Miles Affected[1] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| US Mineral Estate: 160 acres | **Standard EXCEPTION, MODIFICATION, and WAIVER apply.** **JUSTIFICATION:** This stipulation is necessary to protect sensitive and federal candidate species. | | | | |
| **TL-29** *Active Kit Fox Dens* BLM Surface: *No Data* US Mineral Estate: *No Data* | **STIPULATION:** Prohibit surface occupancy and surface-disturbing activities within 400 feet of active kit fox dens nesting and feeding habitat areas from February 15 to August 30 (Wilson and Ruff 1999). **PURPOSE:** *BLM: insert purpose* **EXCEPTION:** *BLM: insert exeption* **MODIFICATION:** *BLM: insert modification* **WAIVER:** *BLM: insert waiver* **JUSTIFICATION:** *BLM: insert justification* | | | • | |
| **TL-30** *Active Kit Fox Dens* BLM Surface: *No Data* US Mineral Estate: *No Data* *COSO draft stip* | **STIPULATION:** Prohibit surface occupancy and surface-disturbing activities within 0.25-mile of active dens from February 1 to May 1. **PURPOSE:** Prevent disruption during denning period. **EXCEPTION:** The Field Manager may grant an exception to this stipulation if an environmental analysis indicates that the proposed or conditioned activities would not disrupt ongoing reproductive efforts or the suitability and utility of that site as fox denning habitat. An exception could also be granted if the proponent, Bureau of Land Management, and Colorado Division of Wildlife negotiate compensation that would satisfactorily offset the anticipated loss of denning habitat or reproductive activities. **MODIFICATION:** The Field Manager may modify the configuration of the stipulation area or time frames if an environmental analysis indicates that a portion of the area is nonessential to the function and utility of denning habitat, or that the proposed action could be conditioned so as not to impair the utility of fox denning habitat. Seasonal or daily timeframes may be modified if operations could be conditioned to not disrupt breeding behavior. **WAIVER:** The Field Manager may grant a waiver to this | | | • | |

BLM_0110978

B. Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities

**Table B-4**
**Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Surface-disturbing Activities**

| Stipulation Number *(Existing/***New***)* Protected Resource Acres/Miles Affected[1] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| | stipulation if site conditions have changed sufficient to preclude occupation by Swift Fox or Kit Fox. **JUSTIFICATION:** *BLM: insert justification* | | | | |
| **TL-31** *Bat Roost Sites and Winter Hibernacula* BLM Surface: 80 acres US Mineral Estate: 0 acres | **STIPULATION** Prohibit surface occupancy and surface-disturbing activities within 200 feet of all entrances to cave/mine network associated with special status bat species' maternity roost sites (April 1 to August 31) and winter hibernacula (October 15 to April 15). **PURPOSE:** *BLM: insert purpose* **EXCEPTION:** *BLM: insert exeption* **MODIFICATION:** *BLM: insert modification* **WAIVER:** *BLM: insert waiver* **JUSTIFICATION:** *BLM: insert justification* | | | | • |
| *NSO-CO-7 (BLM 1991)* *Waterfowl and Shorebirds* BLM Surface: 0 acres US Mineral Estate: 0 acres | **STIPULATION:** Prohibit surface occupancy and use on significant production areas (major areas are Waterfowl Habitat Management Areas and rookeries). **Standard EXCEPTION, MODIFICATION, and WAIVER apply.** | • | | | |
| **TL-12** *Waterfowl and Shorebirds* BLM Surface: *No Data* US Mineral Estate: *No Data* *COSO draft stip* | **STIPULATION:** Prohibit surface occupancy and surface-disturbing activities in areas designated for waterfowl, shorebird, and waterbird production from March 1 to July 31. This stipulation does not apply to operation and maintenance of production facilities. **PURPOSE:** Prevent disruption of nesting activity **EXCEPTION:** An exception can be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to impair the utility of habitat for current or subsequent nesting activity or occupancy. **MODIFICATION:** The Field Manager may modify the stipulation dates or stipulation area if an environmental analysis indicates that a portion of the area is nonessential to | | | • | |

BLM_0110979

**Table B-4**
**Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Surface-disturbing Activities**

| Stipulation Number (Existing/**New**) Protected Resource Acres/Miles Affected[1] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| | nest utility or function, or that the proposed action could be conditioned so as not to impair the utility of the nest habitat for current or subsequent nest activities or occupation.  The stipulation may also be modified if the proponent, Bureau of Land Management, and where necessary, other affected interests, negotiate compensation that satisfactorily offsets anticipated impacts to breeding activities and/or habitats. **WAIVER:**  A waiver may be granted if habitat conditions are permanently incapable of supporting production activities. **JUSTIFICATION:** BLM: insert justification | | | | |
| TL-CO-17 (BLM 1991) *White Pelican* BLM Surface: *No Data* US Mineral Estate: *No Data* | **STIPULATION:** Prohibit use within white pelican nesting and feeding habitat areas from March 16 to September 30. **Standard EXCEPTION, MODIFICATION, and WAIVER apply.** | • | | | |
| TL-CO-16 (BLM 1991) *Greater Sandhill Crane* BLM Surface: *No Data* US Mineral Estate: *No Data* | **STIPULATION:** Prohibit surface use in greater sandhill crane nesting and staging habitat areas from March 1 to October 16. **Standard EXCEPTION, MODIFICATION, and WAIVER apply.** | • | | | |
| **TL-32** *Sandhill Crane* BLM Surface: *No Data* US Mineral Estate: *No Data* COSO draft stip | **STIPULATION:** Prohibit surface occupancy and surface-disturbing activities in areas designated by the BLM Authorized Officer for sandhill crane production or migration habitat use from March 1 to October 16. **PURPOSE:**  Prevent disruption of bird behavior during key seasonal habitat use periods **EXCEPTION:** An exception can be granted if an environmental analysis of the proposed action indicates that nature or conduct of the activity could be conditioned so as not to impair the utility of habitat for current or subsequent production or migratory activity or occupancy.  The dates may also be modified if local data demonstrates the mapped habitat is used during a shorter seasonal period (nesting habitat , May 1- July 1). **MODIFICATION:** The Field Manager may modify the | | | | • |

BLM_0110980

B. Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities

**Table B-4**
**Timing Limitation (TL) Stipulations Applicable to Fluid Mineral Leasing and Surface-disturbing Activities**

| Stipulation Number (Existing/**New**) Protected Resource Acres/Miles Affected[1] | Stipulation Description | A | B | C | D |
|---|---|---|---|---|---|
| | stipulation dates or stipulation area if an environmental analysis indicates that a portion of the area is nonessential to nest or migration utility or function, or that the proposed action could be conditioned so as not to impair the utility of the habitat for current or subsequent seasonal activities or occupation. | | | | |
| | **WAIVER:** A waiver may be granted if habitat conditions are permanently incapable of supporting production or migration activities. | | | | |
| | **JUSTIFICATION:** *BLM: insert justification* | | | | |
| | Areas of Critical Environmental Concern | | | | |
| **TL-33**  *East Paradox ACEC*  BLM Surface:  5,550 acres  US Mineral Estate:  0 acres | **STIPULATION:** Close to rock climbing during Peregrine breeding season (March 1 to August 15) if peregrine falcons are present.  **PURPOSE:** *BLM: insert purpose*  **EXCEPTION:** *BLM: insert exeption*  **MODIFICATION:** *BLM: insert modification*  **WAIVER:** *BLM: insert waiver*  **JUSTIFICATION:** *BLM: insert justification* | | • | | |

[1] The sum of acres with TL stipulations in this table may add up to more than the total acres with TL stipulations presented in Chapter 2 as some areas may overlap.

BLM_0110981

B. Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities

**Table B-5**
**Lease Notices (LN) Applicable to Fluid Mineral Leasing**

| Stipulation Number (*Existing*/**New**) Protected Resource Acres/Miles Affected | Stipulation Description | A | B | C | D |
|---|---|---|---|---|---|
| | Soils and Water | | | | |
| *LN-UFO-1* <mark>Insert name</mark> | If drilling operations are proposed, the operator is hereby notified that there are concerns about the municipal water source and water conveyance for the town of Norwood, Colorado. The lessee is hereby notified that special design, construction, and scheduling measures may be required in order to minimize the impacts of drilling and producing operations. The overall goal of these measures is to protect Norwood's municipal water source. | • | | | |
| **LN-1** <mark>Insert name</mark> | The lessee is hereby notified that this lease is within a municipal watershed or Public Water Supply area, and the lessee is required to implement special protective measures for water resources and to collaborate with municipalities. | | • | • | • |
| | Aquatic and Terrestrial Wildlife | | | | |
| **LN-2** *Biological Inventories* | The operator is required to conduct a biological inventory prior to approval of operations in areas of known or suspected habitat of special status species, or habitat of other species of interest such as, but not limited to, raptor nests, sage-grouse leks, or rare plant communities. Surveys shall be conducted by qualified biologist(s) using protocols established for potentially affected species during the appropriate time period(s) for the species. Survey reports, data, and determinations shall be submitted to the BLM for review and confirmation. Results from surveys expire three (3) years from the date of survey completion. Operators, the BLM, and the BLM Authorized Officer will use the information gathered to develop an appropriate mitigation plan. Mitigating measures may include, but are not limited to, relocation of development activities and fencing operations or habitat. If special status species are encountered during operation, operations will cease immediately, and the BLM Authorized Officer will be notified. | | • | | • |
| | Terrestrial Wildlife | | | | |
| **LN-3** *Migratory Bird Nesting Habitat* | To maintain integrity and extent of migratory bird nesting habitat, avoid or minimize disruption of migratory bird nesting activity by siting or prioritizing vegetation clearing, facility construction, and concentrated operational activities (e.g., drilling, completion, utility installation) to avoid the involvement of in high-priority habitats, particularly during the migratory bird nesting season (May 15 to July 31). | | • | | |

BLM_0110982

B. Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities

**Table B-5**
**Lease Notices (LN) Applicable to Fluid Mineral Leasing**

| Stipulation Number (*Existing*/**New**) Protected Resource Acres/Miles Affected | Stipulation Description | Alternative A | B | C | D |
|---|---|---|---|---|---|
| **LN-4** *Migratory Bird Nesting Habitat* COSO draft stip | To maintain integrity and extent of migratory bird nesting habitat, avoid or minimize disruption of migratory bird nesting activity by siting or prioritizing vegetation clearing, facility construction, and concentrated operational activities (e.g., drilling, completion, utility installation) to avoid the involvement of in high- and moderate-priority habitats, particularly during the migratory bird nesting season (May 15 to July 15). | | | | • |
| | Special Status Species | | | | |
| *LN-CO-34 (BLM 1991)* **LN-5** *Endangered Species Act Section 7 Consultation* | The lease area may now or hereafter contain plants, animals, or their habitats determined to be threatened, endangered, or other special status species. The BLM may recommend modifications to exploration and development proposals to further its conservation and management objective to avoid BLM-approved activity that will contribute to a need to list such a species or their habitat. The BLM may require modifications to or disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat. The BLM will not approve any ground-disturbing activity that may affect any such species or critical habitat until it completes its obligations under applicable requirements of the Endangered Species Act as amended, 16 USC § 1531 *et seq.*, including completion of any required procedure for conference or consultation. | • | • | • | • |
| **LN-2** *Biological Inventories* | The operator is required to conduct a biological inventory prior to approval of operations in areas of known or suspected habitat of special status species, or habitat of other species of interest such as, but not limited to, raptor nests, sage-grouse leks, or rare plant communities. Surveys shall be conducted by qualified biologist(s) using protocols established for potentially affected species during the appropriate time period(s) for the species. Survey reports, data, and determinations shall be submitted to the BLM for review and confirmation. Results from surveys expire three (3) years from the date of survey completion. Operators, the BLM, and the BLM Authorized Officer will use the information gathered to develop an appropriate mitigation plan. Mitigating measures may include, but are not limited to, relocation of development | | • | | • |

BLM_0110983

**Table B-5**
**Lease Notices (LN) Applicable to Fluid Mineral Leasing**

| Stipulation Number (*Existing*/**New**) Protected Resource Acres/Miles Affected | Stipulation Description | A | B | C | D |
|---|---|---|---|---|---|
| | activities and fencing operations or habitat. If special status species are encountered during operation, operations will cease immediately, and the BLM Authorized Officer will be notified. | | | | |
| | **Special Status Plants** | | | | |
| *LN-UFO-2* **LN-6** *Special Status Plants* | The lease area is known to contain populations of endangered plants, and may hereafter contain other species protected under the Endangered Species Act or other special status species. To avoid impacts to endangered, threatened, proposed species, designated critical habitat, or BLM special status species, lessees must contact the UFO prior to any surface activities associated with this lease. The lessee may also be required to conduct additional inventories to insure that there are no protected species present on the proposed disturbance sites. The BLM may recommend modifications to exploration and development proposals to avoid impact to any species listed under the Endangered Species Act, or proposed for listing under the Endangered Species Act, or designated or proposed critical habitat. The BLM will not approve any ground-disturbing activity that may affect any such species or critical habitat until it completes its obligations under applicable requirements of the Endangered Species Act, as amended, 16 USC 1531 *et seq.* This could include completion of any required conference or consultation with USFWS. Additionally, project modifications may be required to avoid impacts to BLM sensitive species. | • | • | • | • |
| | **Special Status Terrestrial Wildlife** | | | | |
| *LN-CO-30 (BLM 1991)* *Grouse* | In order to protect nesting grouse species, surface-disturbing activities proposed during the period between March 1 and June 30 will be relocated, consistent with lease rights granted and Section 6 of standard lease terms, out of grouse nesting habitat. Sage-grouse nesting habitat is described as sage stands with sagebrush plants between 30 and 100 centimeters in height and a mean canopy cover between 15 and 40 percent. Sharptail grouse nesting habitat is described as mountain shrub communities with a density of shrub plants from 1,700 to 32,000 shrubs per hectare and average shrub height of 30 centimeters. Nests are found primarily in shrub clumps where the shrubs are taller than average. (Nesting occurs within an | • | | | |

BLM_0110984

**Table B-5**
**Lease Notices (LN) Applicable to Fluid Mineral Leasing**

| Stipulation Number (Existing/**New**) Protected Resource Acres/Miles Affected | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| | average distance of 2 kilometers of a lek). | | | | |
| **LN-7** *Gunnison Sage-grouse: Important Sage-grouse Habitat* COSO draft stip | The lease may in part or in total contain important Gunnison sage-grouse habitat as identified by the BLM either currently or prospectively. The operator may be required to implement specific measures through a Condition of Approval to reduce impacts of oil and gas or geothermal operations on the Gunnison sage-grouse populations and habitat quality. Sage-grouse habitat conservation measures may include timing restrictions, distances or percentages of allowable surface disturbing activities, noise suppression actions, and desired density levels or other development constraints consistent with state or Range-wide Sage-grouse Conservation Planning for Colorado (including subsequent updates), current peer reviewed sage-grouse research, or as developed in conjunction with CDOW to meet local population objectives. Such measures shall be developed during the Application for Permit to Drill on-site and environmental review process, or during the environmental review process for sundry notices and associated rights-of-way, and will be consistent with lease rights granted. | | | | • |
| | Cultural Resources | | | | |
| **LN-8** *Sites Listed or Eligible for Listing on the National or State Registers of Historic Places.* | Attach the following standard stipulations to any BLM-issued permit in which there may be ground-disturbing activities or the potential for the inadvertent discovery or effects to any National Register of Historic Places- or otherwise eligible historic or archaeological cultural property:<br>• If historic or archaeological materials are uncovered during permitted activities, the operator is to immediately stop activities in the immediate area of the find that might further disturb such materials, and immediately contact the BLM Authorized Officer. Within five working days, the BLM Authorized Officer will inform the operator as to:<br>  ○ whether the materials appear eligible for the National Register of Historic Places; and<br>  ○ the mitigation measures the operator will likely have to undertake before the construction may proceed.<br>Pursuant to 43 CFR 10.4(g), the holder of the authorization must notify the BLM Authorized Officer, by telephone, with written confirmation, immediately upon the discovery of human remains, funerary items, sacred objects, or objects of | • | • | • | • |

BLM_0110985

**Table B-5**
**Lease Notices (LN) Applicable to Fluid Mineral Leasing**

| Stipulation Number (Existing/New) Protected Resource Acres/Miles Affected | Stipulation Description | A | B | C | D |
|---|---|---|---|---|---|
| | cultural patrimony. Further, pursuant to 43 CFR 10.4(c) and (d), you must stop activities in the vicinity of the discovery and protect it for 30 days or until notified to proceed by the BLM Authorized Officer. | | | | |
| | **Paleontological Resources** | | | | |
| LN-CO-29 (BLM 1991) *Paleontological Areas* | Prior to authorizing surface-disturbing activities in Class I and II Paleontological Areas, perform an inventory by an accredited paleontologist approved by the BLM Authorized Officer. | • | | | |
| **LN-9** *Class 4 and 5 Paleontological Areas* | Require a permitted paleontologist approved by the BLM Authorized Officer to perform an inventory of areas of surface-disturbing activities in Potential Fossil Yield Classification Class 4 and 5 (previously known as Class I and II) paleontological areas per BLM Instruction Memorandum No. 2008-009: Potential Fossil Yield Classification System for Paleontological Resources on Public Lands. | | • | • | • |
| | **Lands and Realty** | | | | |
| **LN-10** *US Bureau of Reclamation Dams* | The lessee is hereby notified that directional drilling is prohibited within 1,500 vertical feet below a Bureau of Reclamation dam (i.e., Ridgway, Crawford and Paonia dams) or its appurtenant structures. (Directional drilling could be conducted more than 1,500 feet below these dams and structures from outside the 1,500-foot horizontal radius of the structures.) | | • | • | • |
| | **Coal** | | | | |
| LN-UB-10 <mark>Insert name</mark> | Within the Paonia-Somerset Known Recoverable Coal Resource Area, coal and oil and gas leasing and development will be managed consistent with land use plans and lease terms. More specifically, the portions of the Known Recoverable Coal Resource Area where the overburden above the B-Seam of the Mesaverde coals is less than 3,500 feet will be managed primarily for the exploration and development of the coal resources. Oil and gas operators anticipating exploration or development operations are encouraged to consult and coordinate their activities with the affected coal operators. In the event that the oil and gas and coal operators are unable to reach agreement on proposed oil and gas exploration or development, the BLM Authorized Officer will intervene and use all pertinent lease terms, regulations, and policy to determine what course of action is | • | | | |

BLM_0110986

**Table B-5**
**Lease Notices (LN) Applicable to Fluid Mineral Leasing**

| Stipulation Number (*Existing*/**New**) Protected Resource Acres/Miles Affected | Stipulation Description | Alternative A | B | C | D |
|---|---|---|---|---|---|
| | in the public's interest. However, under no circumstances will the BLM approve any oil and gas operations that compromise maximum economic coal recovery or the safety of underground mining operations. | | | | |
| **LN-11** <br> *Insert name* | The portions of the coal potential area where the overburden above the B-Seam of the Mesaverde coal is less than 3,500 feet will be managed primarily for the exploration and development of the coal resources. Oil and gas operators anticipating exploration or development operations are encouraged to consult and coordinate their activities with the affected coal operators. In the event that the oil and gas and coal operators are unable to reach agreement on proposed oil and gas exploration or development, the BLM Authorized Officer will intervene and use all pertinent lease terms, regulations, and policy to determine what course of action is in the public's interest. However, under no circumstances will the BLM approve any oil and gas operations that compromise maximum economic coal recovery or the safety of underground mining operations. <br><br> *(BLM/Desty: please provide language to apply across UFO)* | | • | • | • |
| | Public Health and Safety | | | | |
| *LN-UFO-8* <br> **LN-12** <br> *Insert name* | The lease area is known to contain unexploded ordinance. The Colorado National Guard and Army Reserve used the lease area as a practice area for military training in the past. Periodic surface searches for ordinance may not have located and removed all of the ordinance. Prior to any new activity on the lease area, a survey for surface and subsurface unexploded ordinance is required to avoid impacts to health and safety. Lessees must contact the Uncompahgre Field Office prior to any surface activities associated with this lease. The lessee will be required to coordinate with the Colorado National Guard, Army Reserve and the Colorado Department of Public Health and Environment to conduct additional surveys to ensure that there is no unexploded ordinance present on the proposed disturbance sites and appropriate actions are taken to be sure the sites are safe for use. BLM may recommend modifications to exploration and development proposals to avoid impacts to health and safety. The lease holder agrees to indemnify the United States against any liability arising from the lease holder's and its agents activities on the lease area. | • | • | • | • |

BLM_0110987

B. Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities

**Table B-6**
**No Ground Disturbance (NGD) Restrictions Applicable to Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**) Protected Resource Acres/Miles Affected[1, 2] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| | Soils and Water | | | | |
| **NSO-1/NGD-1** *Saline/Selenium Soils* 107,170 acres | Refer to NSO-1/NDG-1 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **NSO-2/NGD-2** *Slopes of or Greater than 30 Percent* 174,570 acres | Refer to NSO-2/NDG-2 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **NL-1/NGD-3** *Major River Corridors* 26,990 acres | Refer to NL-1/NGD-3 in Table B-1, Areas Closed to Fluid Mineral Leasing. | | • | | |
| **NSO-5/NGD-4** *Perennial Streams* 40,050 acres | Refer to NSO-5/NGD-4 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **NSO-7/NGD-5** *Intermittent and Ephemeral Streams* 271,630 acres | Refer to NSO-7/NGD-5 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **NGD-6** *Municipal Watersheds and Public Water Supplies* 11,120 acres | **STIPULATION:** Prohibit surface-disturbing activities on lands within 2,640 horizontal feet of either side of a classified surface water supply stream segment (as measured from the average high-water mark of a water body) for a distance of 5 miles upstream of a public water supply intake with the classification "Water Supply" by the State of Colorado used as a public (municipal) water supply, and within 2,640 horizontal feet of all Public Water Supplies using a groundwater well or spring. **PURPOSE:** Protecting public water supplies, water quality, aquatic habitat and human health. **JUSTIFICATION:** No surface occupancy on lands with the highest migration potential and the closest proximity to a public water supply intake will provide protection for human health, and protect water quality for Water Supply Use Classification standards. Potential contaminant migration may vary by geologic strata, depth, transmissivity, percolation of groundwater. Shorter migration paths and times of travel mean less chance for dilution or degradation of the | | • | | |

BLM_0110988

**Table B-6**
**No Ground Disturbance (NGD) Restrictions Applicable to Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**) Protected Resource Acres/Miles Affected[1, 2] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| | contaminant before it reaches the intake. The proximity of the potential contaminant source to the surface water drainage network and its proximity to the intake approximates the relative migration path and time that a contaminant must travel to enter the source water and then flow to the intake. | | | | |
| *Vegetation* | | | | | |
| **NSO-9/NGD-7** *Pristine, Ancient, and Rare Vegetation Communities* 15,470 acres | Refer to NSO-9/NGD-7 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **NSO-10/NGD-8** *Naturally Occurring Riparian and Wetland Areas, Springs, and Seeps* 10,270 acres | Refer to NSO-10/NGD-8 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| *Special Status Plants* | | | | | |
| **NSO-15/NGD-9** *Federally Listed, Candidate, and Proposed Species' Occupied and Historic Habitat* 8,820 acres | Refer to NSO-15/NGD-9 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| *Special Status Fish and Aquatic Wildlife* | | | | | |
| **NSO-17/NGD-10** *Occupied Federally Listed Fish Habitat* BLM Surface: 51,460 acres | Refer to NSO-17/NGD-10 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **NSO-18/NGD-11** *Occupied Federally Listed Fish Habitat* 25,410 acres | Refer to NSO-18/NGD-11 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | • | |
| **NSO-19/NGD-12** *Occupied Federally Listed Fish and Native* | Refer to NSO-19/NGD-12 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |

BLM_0110989

B. Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities

**Table B-6**
**No Ground Disturbance (NGD) Restrictions Applicable to Surface-disturbing Activities**

| Stipulation Number (Existing/**New**) Protected Resource Acres/Miles Affected[1, 2] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| Cutthroat Trout Habitat 59,142 acres | | | | | |
| | Special Status Terrestrial Wildlife | | | | |
| **NSO-20/NGD-13** Federally Threatened, Endangered, and Candidate Species' Occupied Habitat 14,930 acres | Refer to NSO-20/NGD-13 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **NSO-22/NGD-14** Yellow-billed Cuckoo Habitat 6,080 acres | Refer to NSO-22/NGD-14 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **NL-6/NGD-15** Gunnison Sage-grouse Breeding (Lek) Habitat 1,330 acres | Refer to NL-6/NGD-15 in Table B-1, Areas Closed to Fluid Mineral Leasing. | | • | | |
| **NSO-23/NGD-16** Gunnison Sage-grouse Breeding (Lek) Habitat 2,980 acres | Refer to NSO-23/NGD-16 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | • | |
| **NSO-25/NGD-17** Gunnison Sage-grouse Breeding (Non-lek) Habitat 42,850 acres | Refer to NSO-25/NGD-17 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **NSO-27/NGD-18** Raptor Nest Sites 2,930 acres | Refer to NSO-27/NGD-18 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **NSO-28/NGD-19** Non-special Status Raptor Nest Sites (except American kestrel, red-tailed hawk, and great-horned owl) No Data | Refer to NSO-28/NGD-19 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | • | |

BLM_0110990

**Table B-6**
**No Ground Disturbance (NGD) Restrictions Applicable to Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**) Protected Resource Acres/Miles Affected[1, 2] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **NSO-29/NGD-20** *Special Status Raptor Nest Sites (except Mexican spotted owl)* 2,930 acres | Refer to NSO-29/NGD-20 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **NSO-31/NGD-21** *Bald Eagle Winter Roost Sites* 9,200 acres | Refer to NSO-31/NGD-21 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **NSO-32/NGD-22** *Bald Eagle Winter Roost Sites* 4,570 acres | Refer to NSO-32/NGD-22 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **NSO-33/NGD-23** *Mexican Spotted Owl* No Data | Refer to NSO-33/NGD-23 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **NSO-34/NGD-24** *Mexican Spotted Owl* No Data | Refer to NSO-34/NGD-24 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **NSO-35/NGD-25** *Gunnison and White-tailed Prairie Dog Towns* 6,480 acres | Refer to NSO-35/NGD-25 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **NSO-35/NGD-26** *Gunnison and White-tailed Prairie Dog Towns* 90 acres | Refer to NSO-36/NGD-26 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | • | |
| **NSO-36/NGD-27** *Bat Roost Sites and Winter Hibernacula* 2,720 acres | Refer to NSO-37/NGD-27 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **NSO-38/NGD-28** *Special Status Reptile and Amphibian (Herpetofaunal)* | Refer to NSO-39/NGD-28 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |

BLM_0110991

**Table B-6**
**No Ground Disturbance (NGD) Restrictions Applicable to Surface-disturbing Activities**

| Stipulation Number *(Existing/*New**)** Protected Resource Acres/Miles Affected[1, 2] | Stipulation Description | A | B | C | D |
|---|---|---|---|---|---|
| *Breeding Habitats No Data* | | | | | |
| | Cultural Resources | | | | |
| **NSO-40/NGD-29** *Tabeguache Caves/Tabeguache Pueblos Area and Tabeguache Canyon* 21,110 *acres* | Refer to NSO-41/NGD-29 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **NSO-41/NGD-30** *Sites Listed or Eligible for Listing on the National or State Register of Historic Places* 35,580 acres | Refer to NSO-42/NGD-30 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| | Visual Resources | | | | |
| **NSO-44/NGD-31** *VRM Class I* 35,580 *acres* | Refer to NSO-45/NGD-31 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| | Lands with Wilderness Characteristics | | | | |
| **NL-7/NGD-32** *Lands Identified for Wilderness Characteristics Protection* 17,050 *acres* | Refer to NL-7/NGD-32 in Table B-1, Areas Closed to Fluid Mineral Leasing. | | • | | |
| | Recreation | | | | |
| **NGD-33** *SRMAs* 1,790 *acres* | **STIPULATION:** Prohibit surface-disturbing activities within RMZ 4 of Paradox Valley SRMA. **PURPOSE:** BLM: Insert purpose. **JUSTIFICATION:** BLM: Insert justification. | | • | | |
| | Areas of Critical Environmental Concern | | | | |
| **NSO-49/NGD-34** *ACECs* Alternative B: 210,490 *acres* | Refer to NSO-50/NGD-34 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | • | |

BLM_0110992

**Table B-6**
**No Ground Disturbance (NGD) Restrictions Applicable to Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**) Protected Resource Acres/Miles Affected[1, 2] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| Alternative C: 80 acres | | | | | |
| | Wilderness and WSAs | | | | |
| **NGD-35** *WSAs* 36,240 acres | **STIPULATION:** Prohibit surface-disturbing activities in WSAs. **PURPOSE:** BLM: Insert purpose. **JUSTIFICATION:** BLM: Insert justification. | • | • | • | |
| **NL-12/NGD-36** *Sewemup Mesa WSA if Released from Wilderness Consideration* 1,780 acres | Refer to NL-12/NGD-36 in Table B-1, Areas Closed to Fluid Mineral Leasing. | | | | |
| | Wild and Scenic Rivers | | | | |
| **NSO-51/NGD-37** *Wild Segments* 17,830 acres | Refer to NSO-52/NGD-37 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| | Public Health and Safety | | | | |
| **NSO-60/NGD-38** *DOE Uranium Mill Tailings Remedial Action Area* 1,780 acres | Refer to NSO-61/NGD-38 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | • | | • |

[1] The sum of acres with NGD restrictions in this table may add up to more than the total acres with NGD restrictions presented in Chapter 2 as some areas may overlap.
[2] Acres are for BLM surface only; NGD restrictions do not apply to non-BLM land.

BLM_0110993

**Table B-7**
**Site-specific Relocation (SSR) Restrictions Applicable to Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**) Protected Resource Acres/Miles Affected[1, 2] | Stipulation Description | A | B | C | D |
|---|---|---|---|---|---|
| | Land Health | | | | |
| **CSU-1/SSR-1** *Lands, streams and wetlands "not meeting" or "meeting with problems" BLM Colorado Public Land Health Standards* Standard 1: 238,720 acres Standard 2: 2,980 acres Standard 3: 338,260 acres Standard 4: 49,990 acres Standard 5: 27,590 acres | See CSU-1/SSR-1 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| | Soils and Water | | | | |
| **CSU-2/SSR-2** *Saline/Selenium Soils* 107,170 acres | See CSU-2/SSR-2 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **CSU-3/SSR-3** *Saline/Selenium Soils* 107,170 acres | See CSU-3/SSR-3 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **CSU-4/SSR-4** *Potential Biological Soil Crust* 254,840 acres | See CSU-4/SSR-4 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **CSU-5/SSR-5** *East Paradox Biological Soil Crust* 7,350 acres | See CSU-5/SSR-5 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **CSU-6/SSR-6** *Potential Biological Soil Crust* 254,840 acres | See CSU-6/SSR-6 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |

Internal Draft — Not for Public Distribution

**Table B-7**
**Site-specific Relocation (SSR) Restrictions Applicable to Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**) Protected Resource Acres/Miles Affected[1, 2] | Stipulation Description | Alternative A | B | C | D |
|---|---|---|---|---|---|
| **CSU-7/SSR-7** *Slopes of or Greater than 40 percent* 115,100 acres | See CSU-7/SSR-7 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | • | |
| **CSU-9/SSR-8** *Major River Corridors* 26,990 acres | See CSU-9/SSR-8 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | • | |
| **NSO-4/SSR-9** *Major River Corridors* 26,990 acres | See NSO-4/SSR-9 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **CSU-10/SSR-10** *Perennial Streams* 40,050 acres | See CSU-10/SSR-10 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | • | |
| **NSO-6/SSR-11** *Perennial Streams* 24,030 acres | See NSO-6/SSR-11 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **CSU-11/SSR-12** *Intermittent and Ephemeral Streams.* 57,160 acres | See CSU-11/SSR-12 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **CSU-12/SSR-13** *Municipal Watersheds and Public Water Supplies* 2,210 acres | See CSU-12/SSR-13 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | • | |
| Vegetation | | | | | |
| **CSU-15/SSR-14** *Pristine, Ancient and Rare Vegetation Communities* 6,730 acres | See CSU-15/SSR-14 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | • | • |
| **CSU-16/SSR-15** *Naturally Occurring Riparian and Wetland Areas, Springs, and Seeps* | See CSU-16/SSR-15 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | • | |

BLM_0110995

B. Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities

**Table B-7**
**Site-specific Relocation (SSR) Restrictions Applicable to Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**) **Protected Resource** Acres/Miles Affected[1, 2] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| 10,270 acres | | | | | |
| **NSO-11/SSR-16** *Naturally Occurring Riparian and Wetland Areas, Springs, and Seeps* 32,100 acres | See NSO-11/SSR-16 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| Terrestrial Wildlife | | | | | |
| **CSU-18/SSR-17** *Biological Core Areas* Alternative B: 35,250 acres Alternative C: 68,440 acres Alternative D: 177,790 acres | See CSU-18/SSR-17 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | • | • | • |
| **CSU-20/SSR-18** *Desert and Rocky Mountain Bighorn Sheep Summer Range* 39,440 acres | See CSU-20/SSR-18 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | • | | • |
| **CSU-21/SSR-19** *Waterfowl and Shorebird Breeding* 112,540 acres | See CSU-21/SSR-19 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **NSO-14/SSR-20** *Waterfowl and Shorebird Breeding Habitats* 27,730 acres | See NSO-14/SSR-20 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **CSU-22/SSR-21** *Migratory Bird Breeding Habitat* 413,520 acres | See CSU-22/SSR-21 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **CSU-23/SSR-22** *Migratory Bird Breeding Habitat* | See CSU-23/SSR-22 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |

BLM_0110996

B. Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities

**Table B-7**
**Site-specific Relocation (SSR) Restrictions Applicable to Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**) **Protected Resource Acres/Miles Affected**[1, 2] | Stipulation Description | A | B | C | D |
|---|---|---|---|---|---|
| BLM Surface: 564,230 acres | | | | | |
| | Special Status Plants | | | | |
| **CSU-24/SSR-23** *BLM Sensitive Plant Species* 7,367 acres | See CSU-24/SSR-23 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **NSO-16/SSR-24** *Federally Listed and Candidate Species' Habitat* 7,570 acres | See NSO-16/SSR-24 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| | Special Status Fish and Aquatic Wildlife | | | | |
| **CSU-25/SSR-25** *Occupied Native Cutthroat Trout Habitat* 158,270 acres | See CSU-25/SSR-25 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **CSU-26/SSR-26** *Occupied Native Cutthroat Trout Habitat* 102,910 acres | See CSU-26/SSR-26 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | • | |
| **CSU-27/SSR-27** *Occupied Native Cutthroat Trout Habitat* 500 acres | See CSU-27/SSR-27 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| | Special Status Terrestrial Wildlife | | | | |
| **CSU-28/SSR-28** *Federally Threatened, Endangered, and Candidate Species' Occupied Habitat (except Canada lynx)* 7,580 acres | See CSU-28/SSR-28 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | • | |

BLM_0110997

B. Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities

**Table B-7**
**Site-specific Relocation (SSR) Restrictions Applicable to Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**) Protected Resource Acres/Miles Affected[1, 2] | Stipulation Description | A | B | C | D |
|---|---|:---:|:---:|:---:|:---:|
| **NSO-21/SSR-29** *Federally Threatened, Endangered, and Candidate Species' Occupied Habitat (except Canada lynx and Mexican spotted owl)* 7,570 acres | See NSO-21/SSR-29 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **CSU-29/SSR-30** *Yellow-billed Cuckoo Habitat* 6,080 acres | See CSU-29/SSR-30 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **CSU-30/SSR-31** *Canada Lynx Habitat* 3,860 acres | See CSU-30/SSR-31 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **CSU-31/SSR-32** *Canada Lynx Habitat* 3,860 acres | See CSU-31/SSR-32 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **CSU-32/SSR-33** *Canada Lynx Habitat Connectivity* 0 acres | See CSU-32/SSR-33 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | • | | • |
| **NSO-24/SSR-34** *Gunnison Sage-grouse Breeding (Lek) Habitat* 95,570 | See NSO-24/SSR-34 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **CSU-33/SSR-35** *Gunnison Sage-grouse Breeding (Non-lek) Habitat* 92,600 acres | See CSU-33/SSR-35 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | • | |
| **CSU-34/SSR-36** *Gunnison Sage-grouse Breeding (Non-lek) Habitat* 41,210 acres | See CSU-34/SSR-36 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |

BLM_0110998

**Table B-7**
**Site-specific Relocation (SSR) Restrictions Applicable to Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**) Protected Resource Acres/Miles Affected[1, 2] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **CSU-37/SSR-37** *Bald Eagle Habitat* 5,850 acres | See CSU-37/SSR-37 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | • | | • |
| **CSU-38/SSR-38** *Mexican Spotted Owl Suitable Breeding Habitat.* *No Data* | See CSU-38/SSR-38 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **CSU-39/SSR-39** *Gunnison and White-tailed Prairie Dog Towns* 6480 acres | See CSU-39/SSR-39 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **CSU-40/SSR-40** *Active Kit Fox Dens* *No Data* | See CSU-40/SSR-40 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **CSU-41/SSR-41** *Active Kit Fox Dens* *No Data* | See CSU-41/SSR-41 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **CSU-42/SSR-42** *Bat Roost Sites and Winter Hibernacula* 2,720 acres <mark>BLM (Missy): This is the same area as stip below. Should they be the same stip? Which language to use?</mark> | See CSU-42/SSR-42 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | • | |
| **NSO-37/SSR-43** *Bat Roost Sites and Winter Hibernacula* 2,720 acres <mark>BLM (Missy): This is the same area as stip above. Should they be the same stip? Which</mark> | See NSO-38/SSR-43 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |

BLM_0110999

**Table B-7**
**Site-specific Relocation (SSR) Restrictions Applicable to Surface-disturbing Activities**

| Stipulation Number (Existing/New) Protected Resource Acres/Miles Affected[1, 2] | Stipulation Description | Alternative | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| *language to use?* | | | | | |
| **CSU-43/SSR-44** Bat Roost Sites and Winter Hibernacula 2,720 acres | See CSU-43/SSR-44 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **CSU-44/SSR-45** Special Status Reptile and Amphibian (Herpetofaunal) Breeding Habitats No Data | See CSU-44/SSR-45 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | • | |
| **NSO-39/SSR-46** Midget Faded Rattlesnake Hibernacula No Data | See NSO-40/SSR-46 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **CSU-21/SSR-19** Waterfowl and Shorebird Breeding 112,540 acres | See CSU-21/SSR-19 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| **NSO-14/SSR-20** Waterfowl and Shorebird Breeding Habitats 27,730 acres | See NSO-14/SSR-20 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| | Cultural Resources | | | | |
| **CSU-45/SSR-47** Tabeguache Pueblos Area and Tabeguache Canyon 21,110 acres | See CSU-45/SSR-47 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| **CSU-46/SSR-48** Sites Listed on the National or State Register of Historic Places No Data | See CSU-46/SSR-48 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | • | |

BLM_0111000

*B. Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities*

**Table B-7**
**Site-specific Relocation (SSR) Restrictions Applicable to Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**) Protected Resource Acres/Miles Affected[1, 2] | Stipulation Description | A | B | C | D |
|---|---|---|---|---|---|
| **CSU-47/SSR-49** *Area of Archaeological Significance* 31,870 acres | See CSU-47/SSR-49 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| Visual Resources | | | | | |
| **CSU-48/SSR-50** *VRM Class II and III* 421,730 acres | See CSU-48/SSR-50 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |
| Lands with Wilderness Characteristics | | | | | |
| **NSO-45/SSR-51** *Lands Identified for Wilderness Characteristics Protection* 17,050 acres | See NSO-46/SSR-51 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| Areas of Critical Environmental Concern | | | | | |
| **CSU-52/SSR-52** *Areas of Critical Environmental Concern* 6,990 acres | See CSU-52/SSR-52 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | | • | |
| **NSO-49/SSR-53** *Areas of Critical Environmental Concern* 9,780 acres | See NSO-50/SSR-53 in Table B-2, No Surface Occupancy (NSO) Stipulations Applicable to Fluid Mineral Leasing. | | | | • |
| Wilderness and WSAs | | | | | |
| **SSR-54** *Tabeguache Area* 8,080 acres | **STIPULATION:** Apply site-specific relocation restrictions in the Tabeguache Area. **PURPOSE:** *BLM: Insert purpose.* **JUSTIFICATION:** *BLM: Insert justification.* | | • | • | • |
| **SSR-55** *WSAs* 31,140 acres | **STIPULATION:** Apply site-specific relocation restrictions in WSAs. **PURPOSE:** *BLM: Insert purpose.* **JUSTIFICATION:** *BLM: Insert justification.* | | | | • |
| Wild and Scenic Rivers | | | | | |
| **CSU-53/SSR-56** *Scenic and Recreational* | See CSU-53/SSR-56 in Table B-3, Controlled Surface Use (CSU) Stipulations Applicable to Fluid Mineral Leasing. | | • | | |

BLM_0111001

**Table B-7**
**Site-specific Relocation (SSR) Restrictions Applicable to Surface-disturbing Activities**

| Stipulation Number (*Existing*/**New**) Protected Resource Acres/Miles Affected[1, 2] | Stipulation Description | A | B | C | D |
|---|---|---|---|---|---|
| *Segments* 32,130 acres | | | | | |
| **SSR-58** *WSR Segments* 29,760 acres | **STIPULATION:** Apply SSR restrictions within the study corridor. | | | | • |

[1] The sum of acres with SSR restrictions in this table may add up to more than the total acres with SSR restrictions presented in Chapter 2 as some areas may overlap.
[2] Acres are for BLM surface only; SSR restrictions do not apply to non-BLM land.

BLM_0111002

**Table B-8**
**Raptor Species Breeding Periods**

| | | Breeding Period |
|---|---|---|
| **Falconiformes** | | |
| Osprey | *Pandion haliaetus* | 4/1-8/31 |
| Bald eagle | *Haliaeetus leucephalus* | 11/1-7/31 |
| Northern harrier | *Circus cyaneus* | 4/1-8/15 |
| Sharp-shinned hawk | *Accipiter striatus* | 3/15-8/31 |
| Cooper's hawk | *Accipiter cooperii* | 3/15-8/31 |
| Northern goshawk | *Accipiter gentilis* | 3/1-7/31 |
| Swainson's hawk | *Buteo swainsoni* | 4/1-7/15 |
| Red-tailed hawk | *Buteo jamaicensis* | 2/15-7/15 |
| Ferruginous hawk | *Buteo regalis* | 2/1-7/15 |
| Rough-legged hawk | *Buteo lagopus* | BLM: insert date |
| Golden eagle | *Aquila chrysaetos* | 12/15-7/15 |
| American kestrel | *Falco sparverius* | 4/1-8/15 |
| Merlin | *Falco columbarius* | 4/1-8/31 |
| Peregrine falcon | *Falco peregrinus* | 2/1-8/31 |
| Prairie falcon | *Falco mexicanus* | year round |
| **Strigiformes** | | |
| Common barn owl | *Tyto alba* | 2/1-9/15 |
| Flammulated owl | *Otus flammeolus* | 4/1-9/30 |
| Western screech owl | *Megascops kennicottii* | 3/1-8/15 |
| Eastern screech owl | *Megascops asio* | 3/1-8/15 |
| Great horned owl | *Bubo virginianus* | 12/1-9/31 |
| Northern pygmy owl | *Glaucidium gnoma* | 4/1-8/1 |
| Burrowing owl | *Athene cunicularia* | 4/1-8/15 |
| Mexican spotted owl | *Strix occidentalis lucida* | 3/1-8/31 |
| Great gray owl | *Strix nebulosa* | 3/1-8/31 |
| Long-eared owl | *Asio otus* | 2/1-8/15 |
| Short-eared owl | *Asio flammeus* | 3/1-8/1 |

BLM_0111003

**Table B-8** (continued)
**Raptor Species Breeding Periods**

|  |  | Breeding Period |
|---|---|---|
| Boreal owl | *Aegolius funereus* | 2/1-7/31 |
| Northern saw-whet owl | *Aegolius acadicus* | 3/1-8/31 |

Developed from Craig, G.R.. 2002. Recommended buffer zones and seasonal restrictions for Colorado Raptors (CDOW), and Table of Seasonal(Breeding)Buffers.xls (COSO).

1

2

BLM_0111004

B. Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities

This page intentionally left blank.

BLM_0111005

## James Bode

| | |
|---|---|
| **From:** | Kate Wynant |
| **Sent:** | Thursday, November 03, 2011 9:20 AM |
| **To:** | UFO AR |
| **Subject:** | FW: UFO-CDOW Sheep Meeting Oct 7, 2011 |
| **Attachments:** | UFO_CDOW Sheep Meeting 10072011.pdf |

**Kate (Wynant) Krebs**
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite IA
Boulder, CO  80301
tel:  303-447-7160    fax:  866-625-0707
www.EMPSi.com    Twitter: EMPSInc    Facebook: EMPSi

*Bringing clarity to the complex ™*

*GSA Contract GS10F-0412S*        *HUBZone-certified*

Denver      Reno      San Francisco      Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

**From:** Krickbaum, John [mailto:bkrickba@blm.gov]
**Sent:** Monday, October 31, 2011 12:01 PM
**To:** Kate Wynant; Jennifer Whitaker
**Subject:** UFO-CDOW Sheep Meeting Oct 7, 2011

Kate,

I have attached the sign in sheet for the BLM/CDOW Bighorn Sheep meeting held October 7.

The purpose of the meeting was to show DOW the Bighorn/Domestic Sheep model, to discuss the model, and to solicit comment.
UFO gave CDOW a CD with the model, maps, and powerpoint presentation for their review.

---Bruce

Bruce Krickbaum
Planner, Environmental Coordinator
BLM, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

BLM_0111006

date OCT 7 2011

project UFO BigHorn Sheep MTG

page Participants:

| | | |
|---|---|---|
| Dave Kauffman | BLM - Montrose | dkauffma@blm.gov |
| Bruce Krickbaum | BLM - Montrose | bkrickba@blm.gov |
| Barb Sharrow | " " | bsharrow@blm.gov |
| Ryan Swygmen | CPW | ryan.swygmen@state.co.us |
| Garett Watson | CPW | garett.watson@state.co.us |
| Enzo DelPiccolo | CPW | enzo.delpiccolo@state.co.us |
| Brian Magee | CPW | brian.magee@state.co.us |
| BRAD BANUETS | CPW | brad.banutis@state.co.us |
| Andy Windsor | BLM DEN'CA | john_windsor@blm.gov |
| Katie Stevens | BLM - D-E NCA | kasteven@blm.gov |
| Ben Blom | BLM - DENCA | bblom@blm.gov |
| Lynae Rogers | BLM - UFO/DENCA | lbroger@blm.gov |
| Missy Siders | BLM - UFO | msiders@blm.gov |
| Brodie Farquhar | BLM - DENCA | bfarquhar@blm.gov |
| Joe Cain | BLM - UFO | jccain@blm.gov |

task list:

## James Bode

| | |
|---|---|
| **From:** | Kate Wynant |
| **Sent:** | Tuesday, November 01, 2011 5:22 PM |
| **To:** | UFO AR |
| **Subject:** | FW: Bighorn Sheep Model comments |

**Kate Wynant**
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite 1A
Boulder, CO  80301
tel:  303-447-7160     fax:  866-625-0707
www.EMPSi.com     Twitter: EMPSInc     Facebook: EMPSi

*Bringing clarity to the complex* ™

*GSA Contract GS10F-0412S*     *HUBZone-certified*

Denver     Reno     San Francisco     Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

**From:** Krickbaum, John [mailto:bkrickba@blm.gov]
**Sent:** Monday, October 31, 2011 12:05 PM
**To:** Kate Wynant; Jennifer Whitaker
**Subject:** FW: Bighorn Sheep Model comments

**From:** Siders, Melissa S
**Sent:** Tuesday, October 18, 2011 4:33 PM
**To:** Kauffman, Krag D; Krickbaum, John; Sharrow, Barbara L
**Cc:** Cain, Joseph C; Rogers, Lynae B
**Subject:** FW: Bighorn Sheep Model comments

Below are the comments from CDOW re our Bighorn/Domestic sheep model.  I would suggest that their suggestions are not minor tweaks to our model and I would like input from management on how we proceed.
  A)   Should Joe move forward with the couple of tweaks we discussed during the meeting on 10/7?
  B)   Should Joe wait until he, Lynae and I can work through all the items below?
  C)   Should Joe move forward as in A above, and then he, Lynae and I work through the items below at some later date?

-Missy
ᴧνᴧ  ᴧᴠᴧ  ᴧνᴧ  ᴧνᴧ   ᴧᴠᴧ  ᴧνᴧ    ᴧᴠᴧ  ᴧνᴧ  ᴧνᴧ
**Melissa Siders**, Wildlife Biologist
Uncompahgre Field Office
2465 S. Townsend Ave., Montrose, CO 81401
970-240-5332 – office
e-mail:  Melissa_Siders@blm.gov
ᴧνᴧ  ᴧνᴧ  ᴧνᴧ  ᴧᴠᴧ    ᴧᴠᴧ  ᴧνᴧ  ᴧνᴧ   ᴧᴠᴧ
    "In the end, we will conserve only what we love.

1

BLM_0111008

We will love only what we understand.
We will understand only what we are taught."
   -Baba Dioum, Senegal, West Africa

---

**From:** Banulis, Brad [mailto:Brad.Banulis@state.co.us]
**Sent:** Tuesday, October 18, 2011 3:34 PM
**To:** Siders, Melissa S
**Cc:** Kauffman, Krag D; Sharrow, Barbara L; Krickbaum, John; Blom, Benjamin Z; Cain, Joseph C; Magee, Brian; Swygman, Ryan; Watson, Garett; Delpiccolo, Renzo; Wait, Scott; Spezze, Tom
**Subject:** RE: Bighorn Sheep Model comments

Missy,

We again want to thank you all for all the work that went into creating a model to assess risk of interaction between domestics and wild sheep for the UFO RMP.  Since our meeting on Oct. 7th, we have been evaluating this model and comparing it to the existing and abundant science on the subject.  We have also tried to do a cursory search of other risk assessments (RA) that may have already been done.  I would hope you agree that it is critically important that CPW concurs with the model and its assumptions even if we do not agree on the conclusions and ramifications.  However, it would seem that the tolerance for a die-off of a BLM sensitive species should be reasonably low and steps should be taken to assure the viability of the species.

It is likely that the criterion used in this model is based on the existing science but the limited amount of research we have done would not necessarily support these assumptions and this methodology.  Further, we would hope that this RA is consistent with other RA's that federal agencies have completed.

That said, we offer the following more specific comments and suggestions based on the literature, some of which is referenced below.  We hope this is helpful as we move forward on this difficult issue, but please don't hesitate to call us if we can better collaborate on a RA model that we would all be in accord with.  The other offer we would make is that we all sit down and look at the GPS collar data from the Dolores DBHS and the VHF collar data from the Black Ridge DBHS that could be very useful in developing a suitability model from that data.

## Risk Assessment Factors

1)  *Proximity to bighorn sheep (BHS) range*
    a.  Proximity should carry a heavier weight than other factors, as proximity buffers are the only real way to separate wild bighorn sheep from domestic sheep.
    b.  Risk evaluation should not be based on the proportion of allotment.  An allotment's risk category should be designated at the highest level that any portion of the allotment is classified.  Then, actions can be taken to mitigate risk for the rest of the allotment that falls outside of the highest risk category.  Otherwise, you are completely ignoring any portion of an allotment that may allow for high risk interaction, just because the allotment is very large.  This evaluation is contrary to the list of habitat models below, where essentially any overlap within 16km is a high risk and no risk was beyond 33km.
2)  *Natural barriers to movement*
    a.  We understand looking at natural barriers to develop buffers; however, evaluating these natural barriers seems too subjective as a value for the risk assessment because no single barrier is a barrier to both species.
    b.  As we discussed in the meeting, flat terrain is not a barrier to BHS, until the area is far removed from escape terrain.  The habitat models below provide some criteria for evaluating terrain by slope in relation to security cover.
    c.  Also, rivers might be a barrier to domestic sheep (no river is a documented barrier to BHS that we are aware of), but it is not likely that "streams" are a barrier to domestic sheep other than during runoff.

BLM_0111009

    d.  Not comfortable with the barrier factors added together and evaluated by the 14 points possible.  If we understand this correctly, in order to get a 14, you have to have a river running through a continuous cliff that is also flat. Perhaps the criteria should be evaluated individually.

3) *Allotment use vs. BHS breeding season*
    a.  Allotment use should be compared to all seasonal activities as there is potential for domestic/bighorn interaction at any time of year.  You could add additional weight to the factor if grazing occurs during the breeding season.

## Habitat evaluation models for bighorn sheep

Johnson, T. 1995.  A test of a habitat evaluation procedure for Rocky Mountain bighorn sheep. Final Report, Rocky Mountain Regional Office, National Park Service.
Core habitat- slopes > 27 degrees with occasional rock outcroppings, along with 300m buffer; adjacent segments of range no more than 1000m wide that are bounded on at least 2 sides by slopes > 27 degrees
Exotic Relatives- Consider the risk due to presence of exotic relatives in surrounding areas based on the distance of exotic relatives from underlined suitable habitat: up to 16.6km= high risk; >16.6 to 33km= moderate risk; >33km= low to no risk
Water barrier- swift and or wide rivers and lakes are barriers. Rivers with annual average stream flow 100-250 cfs may be barriers to routine, casual crossing

Johnson, T.L. and D.M. Swift. 2000. A test of a habitat evaluation procedure for Rocky Mountain bighorn sheep. Restoration Ecology 8(4S):47-56.
Core habitat- same as above
Exotic relatives- Any portion of range that might allow contact between bighorn sheep and their exotic relatives should be excluded from consideration
Water barrier- Consider swift and/or wide rivers and lakes barriers to routine movement.

Draft Risk Assessment Process- BLM Range Analysis, La Jara Field Office. 2010.
Areas having bighorn habitat, with a resident subpopulation and an area of domestic sheep use, would be considered a high risk area. Areas having only 2 of the 3 factors would be considered moderate risk. Areas with only 1 factor would be considered low risk.

Zeigenfuss, L.C., F.J. Singer, and M.A. Gudorf.  Test of a modified habitat suitability model for bighorn sheep. Restoration Ecology 8(4S): 38-46.
Core area: Slopes 27-85 degrees, areas within 300m, or within 1000m when the area is bordered by escape terrain on 2 or more sides
Water barrier- large or swift moving bodies of water
Area with <55% horizontal visibility excluded, except area with 30-55% visibility were acceptable if less than 4500m wide
Lambing habitat needs to comprise >=10%, defined as >2ha, with S, W, and E aspects of 27-85% slope, and within 1000m of water
Exotic relatives- all work was in National Parks, domestic sheep grazing did not occur and was not considered

Thanks,

*Brad Banulis*
*Terrestrial Biologist, Area 18*
*Colorado Parks and Wildlife*
*2300 S. Townsend Ave.*
*Montrose, CO  81401*
*(970)252-6051*

BLM_0111010

http://wildlife.state.co.us/

**From:** Magee, Brian
**Sent:** Friday, October 14, 2011 9:09 AM
**To:** Siders, Melissa S; Swygman, Ryan; Watson, Garett; Delpiccolo, Renzo; Banulis, Brad
**Cc:** Kauffman, Krag D; Sharrow, Barbara L; Krickbaum, John; Blom, Benjamin Z; Cain, Joseph C
**Subject:** RE: Bighorn Sheep Model comments

Missy-

Just a quick heads up. Brad is collecting and coordinating Colorado Park and Wildlife Comments. I'll touch base with him to see when he anticipates having them packaged up and ready to send to you.

Thanks,

Brian

**From:** Siders, Melissa S [mailto:msiders@blm.gov]
**Sent:** Friday, October 14, 2011 9:05 AM
**To:** Swygman, Ryan; Watson, Garett; Delpiccolo, Renzo; Magee, Brian; Banulis, Brad
**Cc:** Kauffman, Krag D; Sharrow, Barbara L; Krickbaum, John; Blom, Benjamin Z; Cain, Joseph C
**Subject:** Bighorn Sheep Model comments

Folks,
I haven't received any comments from you all re the Bighorn/Domestic sheep model we presented on 10/7/11 for the UFO and DENCA RMP efforts.

Joe will start next week to incorporate the following criteria based on CDOW comments from the 10/7/11 meeting and re-run the model:
- Within the 0-2 mile buffer of the BHS range, we will not include flat land as a barrier to BHS.
- For the larger buffers of BHS range, the flat land data will remain the same as before.
- For the Desert BHS populations (Dominguez and Dolores), we will adjust the breeding dates to Aug 1-Sept 30 to assess the seasonal overlap with domestic sheep grazing periods.
- For the Rocky Mountain BHS populations (Gunnison Gorge and Ouray), we will retain the breeding dates of November 1 – December 31 and the seasonal overlap with domestic sheep grazing periods will remain the same as before.

We will also add to the RMP matrix description for the preferred alternative for UFO and Alt C for the DENCA plan, "Require herder presence with domestic sheep herds at all times" in High Risk zone mitigation lists.  (Ben and Bruce, please make sure that these get into the current versions of the matrices – thanks!)

-Missy
^v^ ^V^ ^v^ ^v^  ^V^ ^v^   ^V^ ^v^ ^v^
**Melissa Siders**, Wildlife Biologist
Uncompahgre Field Office
2465 S. Townsend Ave., Montrose, CO 81401
970-240-5332 – office
e-mail:  Melissa_Siders@blm.gov
^v^ ^v^  ^V^ ^v^  ^v^   ^V^ ^v^ ^v^ ^v^ ^V^
   "In the end, we will conserve only what we love.
   We will love only what we understand.
   We will understand only what we are taught."

4

-Baba Dioum, Senegal, West Africa

BLM_0111012

## James Bode

| | |
|---|---|
| **From:** | Krickbaum, John <bkrickba@blm.gov> |
| **Sent:** | Thursday, November 10, 2011 6:03 PM |
| **To:** | Angie Adams; Bill Bottomly; Broyles, Levi; daves@sanmiguelcounty.org; davidvarley@kaycee.net; jcoates@town.ridgway.co.us; Jennifer Whitaker; joanm@sanmiguelcounty.org; joereagan741@yahoo.com; Kate Wynant; Kauffman, Krag D; kjensen@ci.montrose.co.us; Krickbaum, John; lpadgett@ouraycountyco.gov; lynn@mtngeogeek.com; Magee, Deborah M; mpelletier@gunnisoncounty.org; norwoodparker@centurytel.net; pat@cedaredgecolorado.com; Randall-Parker, Tamera K; Reinkensmeyer, Dan; renzo.delpiccolo@state.co.us; Schroeder, Alan M; segfahlt@gmail.com; shansen@deltacounty.com; sharold@ci.olathe.co.us; Sharp, Charles; Sharrow, Barbara L; swhite@montrosecounty.net; townofpaonia@tds.net; UFO AR |
| **Subject:** | FW: Cooperating Agency Meeting, Location |
| **Attachments:** | Ch2_UFO_AllCmts_responses_11102011.docx |

Hello Cooperating Agencies,

I have attached a file with all of your comments on RMP Chapter 2 and our responses to the comments (and comments of the RAC Subgroup and BLM Staff).  Please review if you wish prior to the meeting next Tuesday.

Regards, Bruce


Bruce Krickbaum
Planner, Environmental Coordinator
BLM, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

---

**From:** Krickbaum, John
**Sent:** Tuesday, November 08, 2011 10:18 AM
**To:** Angie Adams; Bill Bottomly; Broyles, Levi; daves@sanmiguelcounty.org; davidvarley@kaycee.net; jcoates@town.ridgway.co.us; Jennifer Whitaker; joanm@sanmiguelcounty.org; joereagan741@yahoo.com; Kate Wynant; Kauffman, Krag D; kjensen@ci.montrose.co.us; Krickbaum, John; lpadgett@ouraycountyco.gov; lynn@mtngeogeek.com; Magee, Deborah M; MPelletier@gunnisoncounty.org; norwoodparker@centurytel.net; pat@cedaredgecolorado.com; Randall-Parker, Tamera K; Reinkensmeyer, Dan; renzo.delpiccolo@state.co.us; Schroeder, Alan M; segfahlt@gmail.com; shansen@deltacounty.com; sharold@ci.olathe.co.us; Sharp, Charles; Sharrow, Barbara L; swhite@montrosecounty.net; townofpaonia@tds.net; UFO Admin Record at EMPSi
**Subject:** Cooperating Agency Meeting, Location

Hello Cooperating Agencies,

The meeting on Tuesday November 15 will begin at 1:00, and will be located in the "Jordan C" conference room at the Holiday Inn Express in Montrose.   This room is in the west wing of the hotel, two rooms down from where we usually meet.

I received notification from some of you that you will be unable to make the meeting – thank you for letting me know.  Even though the timing is not suitable for everyone, it is the best date we could find.   We want this meeting

1

before the BLM State Office review of Chapter 2, which begins December 12.  Because Barb and I have too full of a schedule, in addition to Thanksgiving week, November 15 is the date that appears to work best for the meeting.

Regards, Bruce

Bruce Krickbaum
Planner, Environmental Coordinator
BLM, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

**From:** Krickbaum, John
**Sent:** Friday, October 28, 2011 2:13 PM
**To:** Angie Adams; Bill Bottomly; Broyles, Levi; daves@sanmiguelcounty.org; davidvarley@kaycee.net; jcoates@town.ridgway.co.us; Jennifer Whitaker; joanm@sanmiguelcounty.org; joereagan741@yahoo.com; Kate Wynant; Kauffman, Krag D; kjensen@ci.montrose.co.us; Krickbaum, John; lpadgett@ouraycountyco.gov; lynn@mtngeogeek.com; Magee, Deborah M; MPelletier@gunnisoncounty.org; norwoodparker@centurytel.net; pat@cedaredgecolorado.com; Randall-Parker, Tamera K; Reinkensmeyer, Dan; renzo.delpiccolo@state.co.us; Schroeder, Alan M; segfahlt@gmail.com; shansen@deltacounty.com; sharold@ci.olathe.co.us; Sharp, Charles; Sharrow, Barbara L; swhite@montrosecounty.net; townofpaonia@tds.net; UFO Admin Record at EMPSi
**Subject:** Cooperating Agency Meeting, Change

Hello Cooperating Agencies,

My apologies, but due to a scheduling conflict, we need to change the date of the Cooperating Agency and RAC Subgroup meetings.
Please cancel November 17.

Please schedule the meeting for Tuesday, November 15, at 1:00 pm, at the Holiday Inn Express in Montrose.

We will discuss responses to your comments on RMP Chapter 2 (alternatives).  We will also discuss resulting changes to chapter 2.

I apologize for the late notice on the changed date, and I hope all of you are able to attend.

Regards, Bruce

Bruce Krickbaum
Planner, Environmental Coordinator
BLM, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

BLM_0111014

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| | | |
|---|---|---|
| General Comments (p. 1) | Intro Text (p. 7) | Glossary (p. 198) |

| | | |
|---|---|---|
| Air Quality (p. 14) | National Trails and BLM Byways (p. 198) | Vegetation – General (p. 33) |
| Areas of Critical Environmental Concern (p. 170) | Native American Tribal Uses (p. 174) | Uplands (p. 35) |
| Climate Change (p. 16) | Other Minerals (p. 147) | Riparian (p. 40) |
| Coal (p. 161) | Locatable Minerals (p. 168) | Weeds (p. 44) |
| Comprehensive Trails and Travel Management (p. 144) | Mineral Materials (Salable Minerals) (p. 169) | Visual Resources (p. 112) |
| | Non-energy Solid Leasable Minerals (p. 169) | Watchable Wildlife Areas (p. 197) |
| Cultural Resources (p. 110) | Paleontological Resources (p. 112) | Wild and Scenic Rivers (p. 195) |
| Fluid Minerals (Oil and Gas and Geothermal Resources) (p. 164) | Public Health and Safety (p. 1) | Wildland Fire Ecology and Management (p. 109) |
| | Recreation and Visitor Services (p. 132) | Wilderness and Wilderness Study Areas (p. 193) |
| Forestry and Woodland Products (p. 121) | Soils and Water (p. 24) | Wildlife – General (p. 44) |
| Land Health (p. 19) | Special Status Species – General (p. 73) | Fish and Aquatic (p. 47) |
| Lands and Realty (p. 154) | Plants (p. 80) | Terrestrial (p. 49) |
| Lands with Wilderness Characteristics (p. 115) | Fish and Aquatic (p. 75) | |
| Livestock Grazing (p. 123) | Terrestrial (p. 89) | |

| | | |
|---|---|---|
| Appendix A: Figure (p. 217) | Appendix B: Restrictions Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities (p. 223) | Appendix C: Draft Wild and Scenic River Suitability Report (p. 260) |
| Appendix D: Summary of Areas of Critical Environmental Concern Report (p. 264) | Appendix E: BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado (p. 262) | Appendix F: Best Management Practices and Standard Operating Procedures (p. 265) |
| Appendix G: Draft Wilderness Characteristics Assessment (p. 276) | Appendix H: Drought Management (p. 277) | Appendix I: Livestock Grazing Allotments and Allotment Levels (p. 277) |
| Appendix J: Special Recreation Permit Evaluation Criteria (p. 278) | Appendix K: Description of Special Recreation Management Areas (p. 280) | Appendix L: Coal Screening Criteria in the Uncompahgre Field Office (p. 290) |

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | **General Comments** | |
| 1. | | General | J. Jackson | All of the NSO numbers are incorrect for SRMAs | EMPSi (KW): Acreages have been updated. |
| 2. | | General | J. Jackson | Need a statement up front explaining the hierarchy of decisions (i.e. WSAs are labeled as VRM I however in some of the SRMA's within the same areas are labeled VRM II within alternative D; since WSAs are mandated to be a VRM I this is what shows on the map however if the WSA is undesignated then it will revert to VRM | EMPSi (KW): Added the following to the end of the last paragraph in the new Section 2.3, Resulting Range of Alternatives: In some instances, varying levels of management overlap a single polygon due to management prescriptions from different resource programs. For |



BLM_0111015

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | II.) | example, BLM guidance directs that Wilderness Study Areas (WSAs) be managed as VRM Class I, the highest standard for VRM. At the same time, management for the Adobe Badlands ACEC/ONA, which overlaps the Adobe Badlands WSA, prescribes VRM Class II for the ACEC. Because of the overlap, the ACEC would be managed as VRM Class I unless and until the WSA is released by Congress from wilderness consideration and other management is prescribed. In instances where varying levels of management prescriptions overlap a single polygon, the stricter of the management prescriptions would apply. |
| 3. | | GENERAL FINDING | T. Stranathan | We should consider limiting similar stips and COAs to an OG lease and possibly an OG permit when issued. In this RMP we are covering the same acres with multiple restrictions that seem slightly different, but end up with the same outcome for Oil and Gas. CSUs are covered by NSOs, TL covers a multitude of CSUs and some CSUs would be better suited as Lease Notices. | EMPSi (KW): Overlapping stipulations may be necessary to protect different resources if, for example, an NSO is given an exception but an overlapping CSU may not in order to protect a different resource. |
| 4. | | General | Steve Weist (RACSG) | Throughout this plan distances switch between meters, feet, and miles. You need to be consistent either using all feet and fractional miles, or all meters. | EMPSi (KW): Per conversation with BK (9/28/11), will always include feet with meters if "meters" is driving measurement; if feet is driving measurement, won't give meters conversion. |
| 5. | | General | Gunnison County (CA) | Please consider this e-mail to be the formal comments of the Board of County Commissioners of Gunnison County, Colorado, as a cooperating agency, with regard to that portion of the above referenced document [BLM Uncompahgre Field Office Resource Management Plan Internal Draft Chapter 2: Alternatives] that addresses "Fluid mineral leasing."<br><br>A. <u>Water Quality Protection</u><br>As regards protection of water bodies and water quality, Gunnison County currently has in effect "Temporary Regulations for Oil and Gas Operations" (the "Gunnison County Temporary Regulations"). The | BLM (BK): Your letter mentions "Gunnison County Temporary Regulations". What happens if your regulations change? The decisions we are making will be in effect for a minimum of 20 years, and can only be changed with a Land Use Plan amendment.<br><br>We have decided to forward (to the BLM Colorado State Office) a recommendation for preferred alternative that includes:<br>--NSO within 300 feet for all perennial waters;<br>--300-foot buffer along naturally occurring riparian and wetland areas, seeps, and springs as ROW avoidance; |



BLM_0111016

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | pertinent portions of the Gunnison County Temporary Regulations include:<br>1. Definition of "water body". The current definition of "water body" is "(a) perennial or intermittent river, stream, lake, reservoir, pond, spring or wetland but does not include irrigation ditches or roadway drainage ditches or artificial lakes or ponds on wetlands that are created and used for the primary purpose of agricultural operations."<br>2. Standards. The current standards are:<br>  a. "The Oil and Gas Operation shall not cause significant degradation on the quality or quantity of surface waters from the addition of non-point source pollution."<br>  b. "The Oil and Gas Operation shall not cause significant degradation in the water quality or water pressure of any public or private water wells."<br>  c. "Activities associated with the Oil and Gas Operation shall be located a minimum of 500 feet from any water body unless such a setback would interfere with spacing requirements established by the Colorado Oil and Gas Conservation Commission."<br>3. Technical Infeasibility Waiver. There currently is an opportunity in the Gunnison County Temporary Regulations for a "technical infeasibility waiver" of the standards above "if the Operator demonstrates to the satisfaction of the County that it is Technically infeasible to comply with the standard(s). To be granted a waiver from a standard for technical infeasibility, the burden is on the Operator to demonstrate one of the following with clear and convincing evidence:<br>  1. Conflict with state or federal regulation. Conduct of the Oil and Gas Operation in Compliance with the community standard would result in an operational conflict with a | --NSO within 0.25-mile of bank-full stage or within 100 meters (328 feet) of the 100-year floodplain (whichever is greatest) on the Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and Dolores Rivers.<br><br>The request that oil and gas operations do not cause "significant degradation on the quality or quantity" is not a Land Use Plan decision, but rather, a decision handled at the implementation stage (e.g. during a subsequent EA). |


BLM_0111017

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | mandatory state or federal oil and gas regulation, condition or other requirement; or 2. <u>No technology available.</u> There is no technology available commercially available to conduct the Oil and Gas Operation in compliance with the County standard, and the applicant will implement the best available technology to conduce the Oil and Gas Operation in Compliance with the County standard to the maximum extent feasible; and a. The waiver will not cause substantial injury to the owner or occupant of adjacent land(s); and b. The waiver will not cause substantial injury to the environment." | |
| 6. | | General | Gunnison County (CA) | Please consider this e-mail to be the formal comments of the Board of County Commissioners of Gunnison County, Colorado, as a cooperating agency, with regard to that portion of the above referenced document [BLM Uncompahgre Field Office Resource Management Plan Internal Draft Chapter 2: Alternatives] that addresses "Fluid mineral leasing."<br><br>NOTE: The Gunnison County Planning Commission has forwarded to the Board of County Commissioners the Planning Commission's recommendation to make County Commissioners has not fully considered nor acted on that recommendation, and does not – by this letter – recommend to the Bureau of Land Management any or all of the recommendations. The Planning Commission recommendation includes – among other things – these components for your consideration: 1. <u>WATER BODY BUFFERS.</u> With the exception of linear features, and Oil and Gas Operation shall be in its entirety in compliance with the following water body buffer standards. 1. <u>INNER BUFFER.</u> The inner buffer shall extend 300 | BLM (BK): We have decided to forward (to the BLM Colorado State Office) a recommendation for preferred alternative that includes:<br><br>--NSO within 300 feet for all perennial waters;<br>--300-foot buffer along naturally occurring riparian and wetland areas, seeps, and springs as ROW avoidance;<br>--NSO within 0.25-mile of bank-full stage or within 100 meters (328 feet) of the 100-year floodplain (whichever is greatest) on the Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and Dolores Rivers.<br><br>The above also means that no pits will be located within those areas.<br>Pits will be designed, at a minimum, to comply with the BLM "Gold Book" standards.<br><br>Management of hazardous materials and pollutants will comply with state and federal regulations at a minimum. |



BLM_0111018

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | feet from the high water mark of the closest surface water body.<br>a. In no event shall any feature of an Oil and Gas Operation be located within the inner buffer unless a technical infeasibility waiver is granted pursuant to 1-107S; and<br>b. No pits shall be located within the inner buffer. This standard is not subject to the technical infeasibility waiver.<br>c. To the maximum extent feasible, linear features shall be installed to avoid crossing water bodies or being located within 300 feet of a water body. Leak detection or secondary containment shall be incorporated into pipelines that are located within the inner buffer.<br>2. <u>OUTER BUFFER</u>. The outer buffer shall extend from 301 to 500 feet of the high water mark of the closest surface water body.<br>a. Any pit located within the outer buffer shall be a closed loop system. This standard is not subject to the technical infeasibility waiver.<br>J. <u>PITS</u>. All pits shall be lined with an impermeable membrane. Once the pit has been closed, the liner and its contents shall be removed and disposed of at a facility authorized to accept this material.<br>K. <u>MANAGEMENT OF HAZARDOUS MATERIALS AND POLLUTANTS</u>. All Oil and Gas Operations shall meet the following requirements for management of hazardous materials and pollutants:<br>1. <u>COMPLIANCE WITH STATE AND FEDERAL REGULATIONS</u>. At a minimum, all hazardous materials shall be stored regulations.<br>2. <u>STORAGE NEAR WATER BODIES RESTRICTED</u>. Hazardous materials and pollutants shall not be stored within 300 feet of any water body.<br>3. <u>SPILL PREVENTION</u>. Measures will be designed and implemented to prevent spilled fuels, lubricants or other hazardous materials from | |



BLM_0111019

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | entering a water body, including grand water, during construction or operation of equipment and/or a facility. If a spill occurs, it shall be cleaned up immediately and disposed of properly. <br> 4. <u>MACHINE MAINTENANCE.</u> Routine field maintenance of vehicles or mobile machinery shall not be performed within 300 feet of any water body. <br> 5. <u>FUEL STORAGE AREAS.</u> Containment measures shall be provided for all fuel storage areas to prevent release to any water body. Inventory management or leak detection may be required. <br> 6. <u>HAZARDOUS MATERIALS STORAGE AREAS.</u> Containment measures shall be provided for all hazardous materials storage areas to prevent release to any water body. Inventory management or leak detection may be required. <br> 7. <u>SPILL RESPONSE.</u> The Operator shall demonstrate the ability to and shall control/contain all spills and releases of waste immediately upon discovery. Spills and releases of waste shall be reported in accordance with applicable state or federal regulations. Spills and releases of waste which adversely impact or threaten to adversely impact any surface or groundwater shall be immediately reported to Gunnison County dispatch. A copy of the spill/release report shall be provided to the Gunnison County Community Development Department. <br> 8. <u>DISPOSAL OF HYDRAULIC FRACTURING FLUIDS.</u> The Operator shall demonstrate the ability to and shall dispose of all hydraulic fracturing fluids in accordance with the Hydraulic Fluid Fracturing Disposal Plan." <br> 31. <u>CHEMICALS USED IN OIL AND GAS OPERATION.</u> <br> a. An inventory of all chemicals anticipated to be | |



BLM_0111020

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | used for the Oil and Gas Operation. The inventory of Chemical Products shall include: 1) their known potential to affect human health, property or the environment; and 2) the expected concentrations, process solution volumes, and fate of designated chemicals to be used in the Operation, based on the best information available at the time of submittal of the application; and 3) the material safety data sheets for the chemicals, if any; and 4) Chemical Abstract Service Registry Numbers for every chemical used in the Operation, whether or not such chemicals are used in a Chemical Product that is considered a Trade Secret by the vendor or service provider." | |
| 7. | | General | Durnan (RACSG) | Include some place a comprehensive comparison of SRMA vs. ERMA | EMPSi (KW): We've revised the objective for SRMAs. This will offer a comparison of SRMAs and ERMAs. |
| | | | | **Intro Text** | |
| 8. | 2-001 | 11-15 | T. Stranathan | The decision to lease is discretionary, but once leased development must be appropriately authorized. We have no language in this area of the RMP about how BLM manages development on split estate. It should be just as clear as the statement about USFS lands in the paragraph below. And wrap it up with: BLM will administer development of Federal Mineral estate to ensure the protection of public health and safety which are present beneath private lands by adhering to same Acts, orders, NTLs, regulatory guidance and Land Use Plan decisions used to develop Federal Mineral estate on Federally managed surface acres. I suggest a few quotes from Federal Onshore Order Number 1 that could contribute to an explanation: *"Surface owners still own the surface, which remains subservient to the dominate mineral ownership of the United States" (P10312)* | BLM (BK): Section 2-7 makes it clear that the identified NSO, CSU and TL apply to split estate minerals. We do not feel that quotes from the Federal Onshore Order number 1 are necessary. We need to follow Federal Onshore Order number 1, whether it is in the RMP or not. Also, the orders could change, so why quote them. |



BLM_0111021

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | **The BLM will consider any input that the surface owner may have and will make adjustments to the operator's plans that are reasonable.  These changes may include road realignment and other similar adjustments.  They would not include terms of a Surface Access Agreement that are not directly related to the proposed action in the APD" (PI0324)** ***"The National Environmental Policy Act (NEPA), the Endangered Species Act (ESA), and the National Historic Preservation Act (NHPA) require the BLM to regulate exploration, development, and abandonment on Federal leases on Split estate lands in essentially the same manner as a lease overlain by Federal surface.  The memorandum also stated that while a private owner's wishes should be considered in decisions, they so not overrule requirements of these statutes and their implementing regulations." (PI0308 and I0309).*** | |
| 9. | 2-001 | 20 | A. Schroeder (CA) | Replace the current paragraph with the following: "*BLM's management jurisdiction on US Bureau of Reclamation lands varies. Reclamation has full management jurisdiction on its acquired and withdrawn lands where there are authorized for construction or constructed Reclamation projects. Reclamation-may transfer management of such lands to BLM through a supplemental agreement. BLM has full administrative responsibility on Reclamation lands not within the boundaries of national forests or under other agency administration where there are no authorized for construction or constructed Reclamation projects,. However, in all instances, BLM will coordinate with Reclamation and undertake only those management activities which would not preclude or adversely affect use of the land for Reclamation project purposes. Also, BLM, in consultation with Reclamation, shall develop special stipulations and terms and conditions to protect Reclamation withdrawn and acquired lands for Reclamation purposes. On lands under its jurisdiction, Reclamation determines whether fluid mineral or geothermal leasing is permissible. BLM will not*" | BLM (BK): We did not make any substantial change to this paragraph.  The verbiage offered is too lengthy and detailed for the purposes of this introductory text. The new paragraph is consistent with Section 5 of the BOR/BLM Interagency Agreement signed 3/25/1983, and also with your points in the comment. |



BLM_0111022

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | issue permits, leases, or licenses on lands under Reclamation's management without Reclamation's consent and concurrence on all conditions and stipulations." Rationale: The revised paragraph more closely describes the general BOR/BLM relationship regarding BLM responsibilities on BOR lands pursuant to the 1983 BOR/BLM IA. | |
| 10. | 2-001 | 23 | Pfifer | Change fluid to federal | BLM (BK): Text changed. |
| 11. | 2-001 | 25 | Ernst | Verify DOE lease tract number / acres.  UFO does not have 166 tracts.  Is this US total? | BLM (BK): Changed to 32 tracts. |
| 12. | 2-001 | 26 | Pfifer | revise "…mineral entry, but not the mineral leasing laws, and…" | BLM (BK): Change made. |
| 13. | 2-002 | 03-07 | Pfifer | There are more to valid existing rights than just leases. revise "…any leases, claims, or other use authorizations, established…" | BLM (BK): Change made. |
| 14. | 2-002 | 04 | Ernst | Mineral rights given by the 1872 Mining Law are not leases and should be presented within this paragraph. | BLM (BK): Change made. |
| 15. | 2-003 | 30 | J. Jackson | See Maggie Magee's suggestion on re-wording | BLM (BK): Reworded. |
| 16. | 2-003 | 39 | Clements | Add ", recreational opportunities and settings" after "grazing". | BLM (BK): Change made. |
| 17. | 2-003 | 40 | Clements | Add "and Special Recreation Management Areas" after [ACECs] | BLM (BK): Change made. |
| 18. | 2-004 | 08 | Clements | Replace work "active" with "intensive" | BLM (BK): Change made. |
| 19. | 2-004 | 09 | Clements | Alt C description lists recreation as an emphasis, but Table 2-1 shows no SRMAs under Alt C, only ERMAs. Suggest insert "opportunities" after recreation | BLM (BK): Change made. |
| 20. | 2-004 | 12 | Clements | Insert "at a lower level" before the period | BLM (BK): Change made. |
| 21. | 2-004 | 13 | Clements | Replace "protecting" with "mitigating impacts to" | BLM (BK): Change made. |
| 22. | 2-004 | 16 | Clements | Delete "the" insert "across the landscape" after "integrity"; replace "of certain" with "including" | BLM (BK): Change made. |
| 23. | 2-004 Figure 2-7 | D Table 2-1 | T. Stranathan | VRM Class II: Why is preferred acreage higher number than preservation choice?  Shouldn't this number be the same as in the preservation alt?  Also, consider turn in ALT C Figure 2-6 into preferred although VRM classes are backwards in the area of the hwy 133 Scenic byway if we are going to manage private | EMPSi (KW): The preferred alternative does not always fall between Alternatives B and C as it was developed after the other alternatives were developed. As such, sometime the preferred alternative establishes one extreme in the range of alternatives. Regarding VRM for Highway 133, the |



BLM_0111023

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | minerals on split estate in the NE of the UFO for VRM as well. By backwards, I mean the figure for VRM Alt C 2-6, shows the area next to the highway as VRM III and outside of that as VRM II. Should be VRM II in the highway corridor and VRM III on those private surface federal mineral acres outside the highway corridor. Very hard to see on map I think we'll have to modify the use of VRM to allow for private landowner input. They may not mind having an OG activity where they can see it, but we would encourage them to see what we would normally apply, then go from there as far as meeting with VRM restrictions. This is sort of like whether or not we issue a ROW across split estate. | VRM has been revised to VRM II for 0.5-mile from the northern portion of Highway and VRM III beyond that. |
| 24. | 2-004 | TABLE 2-1 REVISED | T. Stranathan | The table only includes a breakdown of NSO, CSU, TL on BLM surface. Aren't the lease stips applicable to split/estate? According to this table, all split estate is only subject to standard terms and conditions, but we'll need to eventually lease a parcel on private lands which has steep slopes. And we'd have to apply a slope stipulation in that case. So it appears that much of the split estate would be subject to at lease some NSO, CSU, TLs and LNs. | EMPSi (KW): Table includes acres for split estate and the maps also show split-estate. |
| 25. | 2-004 | Table 2-1 | Clements | Why not set up resources in alphabetical order? The existing order does not follow any logical pattern | EMPSi (KW): Resources are in order of Table 2-2 which is in order of the Land Use Planning Handbook. We have added headers for resources; resource uses; special designations. |
| 26. | 2-004 | Table 2-1 All | Huisjen | There are no rows for our various 'managed fire' alternatives. Sinton is working up final maps (as of 6/28) and will have acreages for 3 alternatives soon | EMPSi (KW): After discussion with B. Krickbaum and GIS, no acres will be added to the managed fire row. |
| 27. | 2-004 | Table 2-1 VRM acres - Undesignated B, C, and D | J. Jackson | These numbers should not vary if they are acres managed by other agencies; and if they need to have a VRM Class assigned then they should be assigned the VRI Class until further direction is given | EMPSi (KW): Acreages updated. |
| 28. | 2-005 | | Durnan (RACSG) | In the Comparative Summary of Alternatives why does Ridgway Trails ERMA show 1,100 acres and in the SRMA it is 1,170? | EMPSi (KW): Acreages updated. |
| 29. | 2-005 | Table 2-1 ERMA | J. Jackson | All the acres should be shown under the Uncompahgre ERMA since everything was and ERMA that wasn't an | EMPSi (KW): Change made |



BLM_0111024

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | A | | SRMA or we show the acres for each one listed since they are all ERMA's and the remaining acres under the Uncompahgre ERMA (not sure which way is less confusing for the public) – may need a footnote explaining what is going on with this section such as "All areas within in Alt A were considered to be an ERMA if not designated an SRMA" Bruce also made comments to this section as well. | |
| 30. | 2-005 | Table 2-1 ERMA – Ridgway Trails acres D | J. Jackson | The acres should be shown in Alt. D as well for right now. I have further comments on this however below and not in favor of leaving it an ERMA in Alt. D. Acres also should include the Uncompahgre Riverway Site along the Uncompahgre River in both Alternative C and D | EMPSi: added as SRMA to Alt D with said areas. |
| 31. | 2-005 | Table 2-1 ERMA – Ridgway Trails acres C and D | J. Jackson | Acres also should include the Uncompahgre Riverway Site along the Uncompahgre River. Map may need to be updated too.  Too large of a scale to tell if it was included. | EMPSi: added as SRMA to Alt D.  Uncompahgre Riverway Site is part of the SRMA. |
| 32. | 2-006 | Table 2-1 | Clements | Spring Creek SRMA not listed under Alt D, but shown as SRMA on map. | EMPSi: Added to table 2-1 (checked SRMAs section, Appendix K) |
| 33. | 2-006 | Table 2-1 SRMA – Spring Creek acres D | J. Jackson | Spring Creek acres need to be included in Alt. D since the area was carried forward as an SRMA.  Is showing on map (Figure 2-16) currently for Alt. D. | EMPSi: Added to table 2-1 (checked SRMAs section, Appendix K) |
| 34. | 2-006 Table 2-1 | A | M. Siders | <u>Comprehensive Trails and Travel Management: Limited to existing routs for motorized use</u> – Wouldn't this have numbers under this alternative.  Total is only 64,130.  Also should this be miles instead of acres (i.e. it's a linear feature)? <u>Lands and Realty</u> – Missing acres <u>Coal</u> – Missing acres <u>Stipulations for Surface-disturbing Activities</u> – Missing acres <u>Fluid Mineral Leasing</u> – Missing acres? | EMPSi (KW): No ROW avoidance in Alt A (old RMP); no change to ROW avoidance/exclusion. Coal acres have been added. Alternative A does not have NGD/SSR; stips have been added. Leasing acres added. |
| 35. | 2-007 | Table 2-1 | David Sinton | Change Fairview South Expansion (BLM) 640 to Fairview South Expansion (BLM) 610. | EMPSi (KW): Change made to Alternative D (checked ch2 globally). |
| 36. | 2-007 | Table 2-1 Locatable, Salable, | A. Schroeder (CA) | Revise the "Locatable, Salable, and Non-Energy Leasable Minerals" headings, as follows: "Locatable and | EMPSi (KW): Changed to "locatable minerals, mineral materials, and non-energy leasable minerals" |



BLM_0111025

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | and Non-Energy Leasable Minerals; | | Non-Energy Leasable Minerals, and Mineral Materials." <br><br> Note: See the general comment regarding consistent use of terms related to these minerals. | EMPSi (AA): Added to glossary: "Non-energy leasable minerals. Those minerals or materials designated as leasable under the Mineral Leasing Act of 1920. Non-energy minerals include resources such as phosphate, sodium, potassium, and sulfur." |
| 37. | 2-007 | Table 2-1 Locatable, Salable, and Non-Energy Leasable Minerals; | A. Schroeder *(CA)* | The lands under the "BLM Surface/Federal minerals" heading, likely include USBR lands (withdrawn for USBR projects). They need to be presented separately. I can work with BLM/consultant staff to get the right figures. | EMPSi (JW): Change made per BK direction below. <br><br> BLM (BK) to EMPSi: Put a footnote on the "BLM Surface/Federal minerals" heading. Footnote should read "Includes USBR-withdrawn non-project lands." |
| 38. | 2-007 | Table 2-1 Locatable, Salable, and Non-Energy Leasable Minerals; | A. Schroeder *(CA)* | The lands under the "Private or State Surface/Federal minerals" heading, includes USBR lands (withdrawn and acquired).  Lands associated with Crawford and Ridgway State Parks are USBR lands managed for recreation by the CDP&W pursuant to an agreement w/ USBR, but generally shown in this document as State or Private land. The BOR surface needs to be addressed separately because of the constraints on BLM management of those lands. I can work with BLM/consultant staff to get the right figures. | EMPSi (JW): Change made per BK direction below. <br><br> BLM (BK) to EMPSi: Change the header "Private or State Surface/Federal Minerals"  to read: "Private, State or USBR Project Lands Surface/Federal Minerals" |
| 39. | 2-007 Table 2-1 | A | M. Siders | <u>Locatable, Salable, and Non-Energy Solid Leasable Minerals</u> – Missing acres. Fig 2-56 shows areas for Petition for withdrawal from locatable entry, but no acres in Table 2-1 <br><br> <u>Closed to non-energy solid leasable mineral exploration and development</u> – Missing acres? Fig 2-64 shows areas but no acres in Table 2-1. | EMPSi (KW): calculations added to table. |
| 40. | 2-007 Table 2-1 | All | M. Siders | <u>Locatable, Salable, and Non-Energy Solid Leasable Minerals: Withdrawn from locatable mineral entry</u> – Missing acres? Fig 2-55 shows areas for Alts A-D <br><br> <u>Open to locatable mineral exploration or development,</u> <u>Open for consideration for mineral material sales</u> and <u>Open for consideration of non-energy solid leasable mineral exploration or development</u> – Missing acres? | EMPSi (KW): calculations added to table. |
| 41. | 2-007 | B | M. Siders | Since one of the alternatives for ACEC is supposed to | EMPSi (KW): No change per conversation with B. |



BLM_0111026

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | Table 2-1 | | | contain all ACECs, perhaps footnote Adobe Badlands with "Area within Salt-desert Shrub ACEC" | Krickbaum. Explained in ACEC section of matrix under the objective, "Salt Desert Shrub Ecosystem" bullet. |
| 42. | 2-007 Table 2-1 | C | M. Siders | <u>Locatable, Salable, and Non-Energy Solid Leasable Minerals: Closed to non-energy solid leasable mineral exploration and development</u> – Missing acres. Fig 2-66 shows areas but no acres in Table 2-1. | EMPSi (KW): calculations added to table. |
| 43. | 2-014 | 07 | Clements | Delete "in" | EMPSi (KW): Section revised and rewritten. |
| 44. | 2-015 | 29 | A. Schroeder (CA) | This is another general comment which needs to be addressed throughout the document. Thousands of acres of USBR lands within the planning area are typically being shown or listed as BLM, NPS, State, or private lands. However, they are federal lands, with some federal, private, or state minerals. **Any management of USBR lands or their resources, including minerals, by BLM are constrained in favor of Reclamation project purposes. That needs to be shown and addressed throughout the document.** Where possible, I will try to provide specific recommendations re. USBR lands and BLM's role in management thereof.<br><br>I will be glad to work with BLM and consultant staff to get the necessary identification and appropriate wording for this document. It is too complex to do in this matrix. | BLM (BK): The paragraph now states that the BLM will coordinate with other agencies or the surface owner at the leasing phase. Also, regarding the paragraph referred to in (your) comment # 9, a sentence does state "…the BLM in consultation with the USBR develops terms and conditions to protect USBR-withdrawn lands for Reclamation purposes." |
| 45. | 2-015 | 31 | C. Sharp (USFWS/CA) | "Acreages for alternatives in this chapter and stipulations in **Appendix B** are calculated based on current information and may be adjusted in the future through RMP maintenance as conditions warrant."<br><br>Please clarify. What qualifies as RMP maintenance? I think you mean that new data/ information for species will be used to update the areas to which respective stipulations would apply. However, if areas to which stipulations apply now, as analyzed under the EIS, are modified such that those stipulations no longer apply to certain areas, or are weakened, those would entail an | EMPSi (KW): A section on plan maintenance has been added to the introduction. |



Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011

BLM_0111027

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | RMP amendment, correct? At a minimum, if those acreages for either alternative actions or stipulations involve, directly or indirectly, federally listed species, modification of those management decisions/ prescriptions would require reinitiation of section 7 consultation under ESA. | |
| 46. | 2-017 | Diagram 2-1 D | J. Jackson | It would be easier to read if alternatives stood alone without referencing other columns especially for Alternative D. That way no one can say they were not looking at the correct column or didn't understand later. | EMPSi (KW): Made some adjustments to make comparing alternatives easier but "Same as" is still used. |
| 47. | 2-274 | Table 2-3 | Sondergard | Length in Miles should be reduced to one significant digit to match table 2-4. | EMPSi (KW): Change made. |
| 48. | 2-281+ | | A. Schroeder (CA) | Add the following reference to Section 2.9 References at the appropriate location; USBR (United States Department of Interior, Bureau of Reclamation) and BLM (United States Department of Interior, Bureau of Land Management). 1983. Interagency Agreement between the Bureau of Reclamation and the Bureau of Land Management. Washington, DC. March 25, 1983✓ (no other IAs currently listed) | EMPSi (KW): Change made. |
| | | | | **Air Quality** | |
| 49. | 002 | Goal | Steve Weist (RACSG) | Delete "from authorized uses" it doesn't sound right | EMPSi (KW): removed "…from authorized uses on BLM lands." |
| 50. | 003 | B, C, D | Ela (RACSG) | We need to remove the grandfathered exemption of coal mines emissions of methane from regulation. Don't permit new coal leasing till the disposal of methane is controlled by the BLM. Specifically, the Oak Mesa exploration pending permit application | BLM (BK): Methane venting, capture, or other, is an implementation level decision, and will be analyzed at the time of leasing. While a gas company cannot drill for gas over a coal mine, the preferred alternative does have a provision that allows for mining of methane over underground coal mines for the purpose of methane capture. |
| 51. | 003 | B and D | Huijsen | Sometimes our RX and managed fire will temporarily degrade Class I Airsheds. We should discuss this and consider putting in something like 'minimize impacts to Class I Airsheds' particularly relative to RX and to some extent managed fire. (Not essential but we might | EMPSi (KW): Changed per suggestion. Row 9 also speaks to impacts from fire management. |


BLM_0111028

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | want to  recognize minimal short-term degradation) | |
| 52. | 003 | B-D | Sondergard | Ensure that "Actions to minimize emissions" still allows for prescribed burns as stated by Huisjen. | EMPSi (KW): Row 9 speaks to impacts from fire management. |
| 53. | 004 | all | Joan May (CA) | Establish a monitoring plan that verifies compliance with NAAQS and requires best available control technologies and air quality impact analysis when authorizing activities known to adversely impact air quality.  Evaluate the air quality impacts of activities authorized on BLM lands on class II air sheds if there is former or current non-attainment of NAAQS. Including visibility. | EMPSi (KW): This is implementation-level. The air quality section of chapter 2 may be revised as a result of the BLM State Office Air Quality Specialist review of the section, and also based on an air quality model analysis of the alternatives. |
| 54. | 005 | D | Krickbaum | Remove "; require at least 70 percent fugitive dust control on BLM roads." | EMPSi (JW): We have deleted reference to 70%. |
| 55. | 005 | B + D | Ela (RACSG) | What pragmatically is the difference between 80% and 70%? | BLM (BK): We have deleted reference to 70% in Alternative D. |
| 56. | 005 | D | Pfifer | How are we to measure 70% fugitive dust control on BLM roads? Does this requirement include BLM roads under the transportation management plan? If so, BLM probably couldn't even meet this action. | BLM (BK): We have deleted reference to 70%. |
| 57. | 006 | D | B. Krickbaum | Delete "during" | EMPSi (KW): Change made. |
| 58. | 006 | Preferred | T. Stranathan | Suggest not using this as a stipulation.  Dust can be mitigated by applying water and most operators will ratchet back disturbance activities during these periods of time.  A NWS High wind warning can last for weeks, this does not seem achievable.  If it stands, there should be exception criteria if properly mitigated. | EMPSi (KW): Removed "e.g., NWS High wind warning." |
| 59. | 008 | BCD | Joan May (CA) | Require all engines and ancillary equipment and methods to employ best available control technology with regard to air pollution reduction when operating on BLM lands. | EMPSi (KW): Added suggestion to BMPs appendix. |
| 60. | 009 | B, C, D | Huisjen | Current wording: 'Ensure that prescribed burns are consistent with the State of Colorado permitting process and timed so as to minimize smoke impacts.' My proposal: 'Ensure that prescribed burns are implemented within the State of Colorado permit conditions in order to minimize smoke impacts and avoid NAAQS (National Ambient Air Quality | EMPSi (KW): Change made. |


BLM_0111029

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | Standards) violations'<br>The project specific permit conditions identify dispersion index, wind direction, daily acres allowed, time to stop ignition, etc., which largely dictates the timing of prescribed burning. | |
| | | | | **Climate Change** | |
| 61. | 010-016 | All | Steve Weist (RACSG) | This whole section should be removed! Since there is no definition for what Climate Change is, How can you manage something you can't describe? Climate Change is too all encompassing and generic to be able to assign specific management techniques to. Either provide an exact definition for what climate change is, or remove the entire section. | BLM (BK): We have added a definition of climate change in the glossary. Without assigning blame or cause (human or natural), it appears there is a continuing change in climate. Maybe it will continue for 20+ years and maybe it won't. We have not assigned specific management, but rather, the plan would allow BLM to take action such as aiding native local plants move up or down in response to climate change.<br><br>This definition from the EPA has been added to the glossary:<br>*(http://www.epa.gov/climatechange/glossary.html#C):*<br>Climate change refers to any significant change in measures of climate (such as temperature, precipitation, or wind) lasting for an extended period (decades or longer). Climate change may result from:<br>• natural factors, such as changes in the sun's intensity or slow changes in the Earth's orbit around the sun;<br>• natural processes within the climate system (e.g. changes in ocean circulation);<br>• human activities that change the atmosphere's composition (e.g. through burning fossil fuels) and the land surface (e.g. deforestation, reforestation, urbanization, desertification, etc.) |
| 62. | 011 | | Hawke (RACSG) | Add a goal to consider climate change in management decisions within the purview of the FO, such as "Manage energy exploration and development to include consideration of impacts on climate change."<br>**Explanation & Notes:** | BLM (BK): The Climate Change section addresses management of resources to respond to impacts from climate change.  There is still controversy over the cause of climate change (man-made or natural), so the UFO has been careful to not assign blame or |



BLM_0111030

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | There exist actions within the purview of the UFO that can add to, or mitigate, contributions to climate change. One concrete example is the management of methane produced by coal mining activities. Cooperative actions of the FO with industry could reduce the contribution to climate change of actions authorized by the FO. | cause. Changes that you suggest would clearly assert that climate change is caused by humans. Cooperative actions are not a planning decision, and will occur after the RMP is approved. The actions (as they now stand) do allow for methane capture. They do not require it, because it may not be feasible in all cases. Whether to capture or not is an implementation decision. |
| 63. | 013 | BCD | Joan May *(CA)* | Develop a methodology to evaluate climate change effects. Identify thresholds of change to resources that would trigger BLM management actions and what modifications in management of which activities would occur | EMPSi (KW): These are implementation-level decisions. Several actions in the RMP, including in veg, talk about making changes where monitoring indicates a need for action. |
| 64. | 013 | B + D | Ela *(RACSG)* | Utilize best science – in BLM discretion in face of deniers of any climate change. | BLM (BK): Yes, best science in regards to climate change is still evolving, and would be used. |
| NEW | 014 | | | Row 14 is re-worded. Please replace with row in section after this table. *EMPSi: Row is in file saved on Egnyte here: Z:\Shared\Projects\F-0126 UFO RMP\2_Deliverables\17_P3T7_Alternatives(Ch2)\3.7.E_Rvs dDraftCh2_SO-Review\CommentResponse\FromBLM (File Name: Ch2_draft_UFO-Comments_091911_Miscellaneous.docx)* | EMPSi (JW): Change made. |
| 65. | 014 | B-D | Stindt | Please replace "according to current climate change science" with "according to current climate change science that is specific to the planning area and has been peer reviewed". <br><br> This is per the Land Use Planning Handbook, Appendix F, page 9 | BLM (BK): The row (D) has been reworded, and changed to: "Transplant or seed local native species into new habitats where needed to improve restoration and revegetation success, and to improve long term survival of plant populations." |
| 66. | 014 and 070 | Preferred | T. Stranathan | Not easy to understand. What about current climate change science tells us to select species in this manner? It would be better to suggest incorporating climate change science into the decision to transplant and seed natives, selection of which comes from a lot of other sources than climate change science. The revegetation selection and planting BMPs in Apdx F should be referenced here to support proper selection of reveg | BLM (BK): We changed the row (D) to: "Transplant or seed local native species into new habitats where needed to improve restoration and revegetation success, and to improve long term survival of plant populations." <br><br> Deleted row 70 – redundant. |



BLM_0111031

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | species. | |
| 67. | 015 | Preferrred | T. Stranathan | What would an unnatural "size" or unnatural intensity include? Would a single, couple, combination of, pipeline, powerline, well pad, or road be exceed these unwritten thresholds? | BLM (AC 10/5/11): Unnatural intensity would exceed the expected range or proportion of a given successional stage habitat for the vegetation community type based on what would be expected under the natural disturbance regime. We would want to minimize situations where the combination of disturbances and existing early seral stages caused a landscape (eg 1000s of acres) to have too much early seral. Patch sizes should be within what would be expected under the natural disturbance regime, whether caused by natural or manmade disturbances. |
| 68. | 016 | All | Armstrong[1], Sharrow[2] | Delete the row. | EMPSi (KW): Change made. |
| 69. | 016 | B and D | B. Krickbaum | Replace "Change" with "Shift". So, "Shift or designate additional…" | BLM (BK): After discussion with District Office, line 16 was deleted. Shifting these areas can be accomplished via plan maintenance, and would not require an amendment (so and action is not needed). For instance, if CDOW determines severe winter range has changed, and provides BLM with a new map, BLM would base actions on the new map, and not on the old mapped areas. |
| 70. | 016 | B, D | A. Schroeder (CA) | Are "key/priority habitats" the same as "crucial habitats?" If so, then you should be consistent in the use of terms throughout the document. If not, then you should define key/priority habitats in the glossary. Rationale: I believe the same list of habitat types is used in a listing of "crucial habitats" elsewhere in the document. | BLM (BK): After discussion with District Office, line 16 was deleted (see the row above this). To answer the question, though, crucial habitats are a part of "key/priority habitats". Key and priority habitats include biological core areas, animal movement corridors, animal reproduction areas, severe winter range, and winter concentration areas. |
| 71. | 016 | B,D | Burch | The listing of areas appears to be too much detail for this level of plan. | EMPSi (KW): After discussion with District Office, line 16 was deleted (see rows above). |
| 72. | 016 | D | Stindt | Please replace "Change designated key/priority habitats…" with "Redefine designated key/priority habitats…" | EMPSi (KW): After discussion with District Office, line 16 was deleted (see rows above). |
| 73. | 016 | D | Joan May (CA) | Same as B (if land base needs to change due to climate stress to accommodate preservation of key species or | EMPSi (KW): After discussion with District Office, line 16 was deleted (see rows above). |


BLM_0111032

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | habitats it should be allowed to do so). | |
| | | | | **Land Health** | |
| 74. | 018 | CD | Joan May (CA) | BLM's goal should be to pursue land and stream health projects on all lands "not meeting" or "meeting with problems" Rangeland Health Standards regardless of trends. | EMPSi (KW): Goals should be broad; suggestion is too narrow but ideas are covered in objective and actions. |
| 75. | 019, 020, 066, 072, 073, 074, 098, 450, 451 | All | B. Krickbaum | Replace the work "pristine" with "exemplary". <br><br>Also --- add "Exemplary" to the glossary, and delete "pristine" from the glossary.  The definition for "exemplary" is the one currently shown for "pristine" <br><br>Also change on the row I provided (with my initial comments) regarding seed collection, wildings, etc. | EMPSi (JW): Made global change in Chapter 2, glossary, and Appendix B. |
| 76. | 019 | | Hawke (RACSG) | Move "streams and wetlands" from the second sentence to the first sentence (so that streams and wetlands would also be managed to fully meet or exceed the identified standards; "meeting with problems" would not be sufficient for streams and wetlands). (Generally this objective is very applicable and will provide a highly useful tool in meeting the various management goals of the UFO.) <br>**Explanation & Notes:** <br>Streams and wetlands are both especially valuable within the UFO, and particulalry susceptible to degradation of conditions because they are environmentally sensitive. Streams and wetlands provide numerous important benefits within the UFO, especially important in the arid West; such benefits include wildlife support and movement corridors, ecosystem services of water filtering, water supplies for humans/wildlife/agriculture; given the heightened importance of wetlands and streams, and their sensitivity, a higher standard for management is necessary to preserve these valuable resources for he long term. | EMPSi (KW): No change; several discussions were held over this section and it was determined to leave as-is in order to meet the multiple-use mandate. |
| 77. | 019 | C | M. Siders | Would read better if worded "Manage lands, streams and wetlands to, at a minimum, meet with problems | EMPSi (KW): Change made. |


BLM_0111033

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | the BLM Colorado Public Land Health Standards (BLM 1997) (Appendix E)," Otherwise, the focus is that we will manage to meet with problems. | |
| 78. | 019 | CD | Joan May (CA) | On Alt CD add "provided lands meeting with problems are stable or trend toward achievement of the Rangeland Health Standards. Where other resource needs are allowed to be a rationale for not fully meeting standards, what these other resource needs are and a justification for why and when they should take precedence needs to be provided. | BLM (BK10/5/11): Added to Alt C and D, "provided lands meeting with problems are stable or trend toward achievement of the BLM Colorado Public Land Health Standards." |
| 79. | 019 | D | M. Siders | See comment #58 above re "wilderness characteristics protection" | EMPSi (KW): Terminology is correct. |
| 80. | 019 | D | CDOW | We feel that the "meet with problems" the Land health Standards is not sufficient within ACEC, WSA, Biological Core Areas, ect. These areas should exemplify natural healthy lands and water resources. | EMPSi (KW): The objective for these areas is to fully meet or exceed land health standards. |
| 81. | 019 | D | Steve Weist (RACSG) | You are tying your hands by defining this objective so much. Remove "Manage ACEC's, WSA's lands identified for wilderness characteristics protection, biological core areas, areas with pristine, ancient or rare vegetation, and wild and Scenic River Segments with a plant outstandingly remarkable value(ORV) to fully meet or exceed the BLM Colorado Public Land Health Standards (BLM 1997)(Appendix E), Remove "remaining" from the next section, and just use **"Manage the lands, streams, and wetlands to meet the BLM Colorado Public Land Health Standards (BLM 1997), or to meet with problems where needed to support resource uses."** This is a better more achievable objective. | EMPSi (KW): There are special areas that we want to manage to fully meet or exceed the standards, so these are broken out from areas that we'll allow to meet or meet with problems. |
| 82. | 019 | D | J. Jackson | Don't see a map of where areas with pristine, ancient, or rare vegetation are located. | BLM (BK): There is not a map for these areas. BLM Management Team had lengthy discussion about this during preferred alternative development. It was decided that, although these areas are not currently mapped, they are defined, and we will respond to the areas during field work for site-specific projects. When these areas are found, projects would be modified to protect the areas. The only way to map |



BLM_0111034

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | the areas would be to do a 100% inventory of the planning area which is not possible given the timing of the RMP schedule. |
| 83. | 020 | C | Clements | need to improve wording re Health Standards, suggest "on lands, streams and wetlands rated as not meeting BLM Colorado Land Health Standards, or meeting with problems with a downward trend" to replace "in areas where relevant…." <br><br> Note from Amanda Clements—I found reading the land health section a little confusing—hopefully changing the terminology a little will help. I had more concerns with Alt D identifying actions that applied to areas meeting with problems for some actions, and applied to areas meeting with problems with a downward trend for other actions. I attempted to ID those actions which seemed inconsistent in comments below. But after some thought would it be better to simply say that these actions will take place as needed to meet the objective cited above? | EMPSi (KW): Section revised for clarity. |
| 84. | 020 | D | Burch | Alternative D is extensive and complex (Stating Implementation) far beyond what was analyzed by B & C alternatives. Too much detail. | EMPSi (KW): Alternative D focuses more specific management to specific areas whereas Alternatives B and C provide management to a blanket area of land. |
| 85. | 020 | D | Clements | need to improve wording re Health Standards, suggest "on lands, streams and wetlands rated as not meeting BLM Colorado Land Health Standards, or meeting with problems with a downward trend" to replace "in areas where relevant…." | EMPSi (KW): Changed per suggested revision from A. Clements 8/18/11. Now reads, "In the remaining lands, streams, and wetlands, apply land and stream health improvement projects in areas rated as *not meeting* BLM Colorado Public Land Health Standards (BLM 1997) (Appendix E) or on lands *meeting with problems*." |
| 86. | 020 | D | B. Krickbaum | Deleted "and show a downward trend" (Last 5 words of the action) | EMPSi (KW): Change made. |
| 87. | 020 | D | Stindt | Please eliminate "areas with pristine, ancient, or rare (PAR) vegetation" from this action and all other actions where this or similar wording appears. Although these words are defined in the glossary, they are not mapped | EMPSi (KW): BLM Management Team had lengthy discussion about this during preferred alternative development. It was decided that, although these areas are not currently mapped, they are defined, |



BLM_0111035

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | and it is therefore not possible to know the full extent of the FO area involved in the action.  PAR is referenced throughout Chapter 2 in a context with "ACECs, WSAs, lands identified for wilderness characteristics protection, biological core areas, and Wild and Scenic River segments with a plant ORV" – all of which are mapped and the extent defined.  It is not possible for staff to identify potential conflicts/contradictions within the plan without having the extent of PAR areas better defined.<br><br>I know you have requested that we not refer back to a previous comment.  However, PAR appears in actions so many times that I am hoping you will make an exception to that directive. | and we will respond to the areas during field work for site-specific projects. When these areas are found, projects would be modified to protect the areas. The only way to map the areas would be to do a 100% inventory of the planning area which is not possible given the timing of the RMP schedule.<br><br>Other resources have restrictions that are not mapped, such as raptors, as areas will change over the course of the RMP. However these resources still warrant protection and the restrictions would be included, or excepted, based on field inventories. |
| 88. | 020 | D | Steve Weist (RACSG) | Again this alternative is too restrictive!!! If it ain't broke don't fix it. I can see stabilizing lands that are not meeting or meeting with problems  and show a downward trend, but I cannot justify spending public funds on improving lands that are already meeting land health standards. This alternative should read "Monitor Land Health Standards to ensure they meet the BLM Colorado Public Land Health Standards (BLM 1997) (Appendix E) and stabilize those areas that are not meeting or meeting with problems and those areas showing a downward trend." You don't have the money to go beyond that in today's economy!!! | EMPSi (KW): There are special areas that we want to manage to fully meet or exceed the standards, so these are broken out from areas that we'll allow to meet or meet with problems. |
| 89. | 021 | B | Clements | need to improve wording re Health Standards, suggest "on lands, streams and wetlands rated as not meeting BLM Colorado Land Health Standards, or meeting with problems" | EMPSi (KW): Changed per A. Clements' suggestion 8/18/11. Now reads, "On lands, streams, and wetlands rated as *not meeting* the BLM Colorado Public Land Health Standards (BLM 1997) (Appendix E) or *meeting with problems*, where an activity has been…" |
| 90. | 021 | BCD | Joan May (CA) | BLM should modify or adjust all activities on lands not meeting rangeland health standards that have been identified as contributing to degraded rangelands and contributing to non compliance all BLM fully meeting the standards.  Alt D a downward trend should not be | EMPSi (KW): Removed "downward trend" so action applies to land not meeting land health standards. |


BLM_0111036

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

# Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | need ed to initiate modification of causal factors on any lands not fully meeting standards2 | |
| 91. | 021 | C | Clements | need to improve wording re Health Standards, suggest "on lands, streams and wetlands which meet BLM Colorado Land Health Standards with problems and have a downward trend" | EMPSi (KW): Changed per A. Clements' suggestion 8/18/11. Now reads, "On lands, streams, and wetlands rated as *meeting* the BLM Colorado Public Land Health Standards (BLM 1997) (Appendix E) *with problems* with a downward trend, where an activity has been…" |
| 92. | 021 | D | Clements | I think we meant to limit or modify land health impacting activities in order to meet the land health objective. I'd suggest EITHER: applying this action "in lands which are rated as not meeting BLM Colorado Land Health Standards, or meeting with problems" (not just those with a downward trend), OR: apply the action in the ACECs, WSAs, LWWVCs, etc, etc, "in lands which are rated as not meeting BLM Colorado Land Health Standards, or meeting with problems, and for the remaining lands apply the action "on lands which are rated as not meeting BLM Colorado Land Health Standards, or meeting with problems with a downward trend | EMPSi (KW): Changed to read, "On lands, streams, and wetlands rated as *not meeting* the BLM Colorado Public Land Health Standards or *meeting with problems* (BLM 1997) (Appendix E), where an activity has been demonstrated…" |
| 93. | 021 | D | Steve Weist (RACSG) | Remove "limit, modify, or" and just have "manage the causal activity" Remove the bullet points. It doesn't matter what the activity is, if it is damaging the land health, it should be managed to stabilize the land health to meet the land health standards. | EMPSi (KW): No change. BLM feels that the qualifying language and example bullet points are ok here. |
| 94. | 022 | B | Clements | need to improve wording re Health Standards, suggest "on lands, streams and wetlands rated as not meeting BLM Colorado Land Health Standards, or meeting with problems" | EMPSi (KW): Changed to read, "On lands, streams, and wetlands rated as *not meeting* the BLM Colorado Public Land Health Standards (BLM 1997) (Appendix E) or *meeting with problems*,…" |
| 95. | 022 | C | Clements | need to improve wording re Health Standards, suggest "on lands, streams and wetlands rated as not meeting BLM Colorado Land Health Standards, or meeting with problems with a downward trend" | EMPSi (KW): Changed to read, "On lands, streams, and wetlands rated as *meeting* the BLM Colorado Public Land Health Standards (BLM 1997) (Appendix E) *with problems* with a downward trend," |
| 96. | 022 | D | Clements | need to improve wording re Health Standards, suggest "on lands, streams and wetlands rated as not meeting BLM Colorado Land Health Standards, or meeting with problems" | EMPSi (KW): Changed to read, "On lands, streams, and wetlands rated as *not meeting* the BLM Colorado Public Land Health Standards (BLM 1997) (Appendix E) or *meeting with problems*," |



BLM_0111037

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | **Soils and Water** | |
| 97. | 026 | B | Burch | Table 2-2 Line 25 – Objective describes 'manage surface disturbing activities… in saline soils..' Line 26 – Alt. B is all about Livestock Grazing, which is NOT within the definition of Surface Disturbing Activities.  Please revise to address Surface Disturbing activities. Also, this action, as written, does not flow with Alternative A- which matches better and could be included into the following action Alt. A on line 27. | EMPSi (KW): Changed objective to remove "surface-disturbing activities." Left Alternative A action as is; better fit on line 26 than 27. |
| 98. | 026 | BCD | Joan May (CA) | Having no commitment to protect water quality (Alt C) required does not meet BLM's responsibilities to protect water quality from degradation or maintain compliance with water quality standards.  The protections cited should apply to all soils as sediment is a pollutant whether or not selenium and salinity are present. | EMPSi (KW): Part of planning criteria is to meet laws, regs, standards, etc., so the BLM would still be required to do that under Alternative C. |
| 99. | 026 | D | Steve Weist (RACSG) | Eliminate the bullet points they are unnecessary. | EMPSi (KW): No change; provides context and examples for the reader. |
| 100. | 027 | D | L. Armstrong[i] | Begin action with "When feasible, inventory and …" | EMPSi (JW): change made |
| 101. | 027 | D | B. Krickbaum | Add "or remove".   So, it will read "…, and rehabilitate, repair or remove those structures…" | EMPSi (KW): Changed in Alternatives B and D. |
| 102. | 027 | D | B. Krickbaum | Add "where possible".  So, it will read "…, recreation projects) where possible to increase efficiency." | EMPSi (KW): Change made. |
| 103. | 027 | D | Steve Weist (RACSG) | Modify "rehabilitate or repair those structures" to "Rehabilitate or remove those structures" If a structure is non-functional and eroding it should be removed and reclaimed to improve land health and water quality. | EMPSi (KW): Changed to "…rehabilitate, repair, or remove…" |
| 104. | 028 | D | Clements | Alt D is within the range of Alternatives? It is less restrictive than Alt C | EMPSi (KW): Preferred alternative does not fall between Alternatives B and C as it was developed after the other alternatives were developed. This allowed the preferred alternative to be outside of the range. |
| 105. | 029 | D | L. Armstrong[i] | Remove last bullet (bullet regarding the bond). | EMPSi (JW): change made in Chapter 2 and Appendix B. |
| 106. | 029 | B, C, D | Clements | Does this also apply to ROW activities? | EMPSi (KW): No. ROW restrictions are noted as |



BLM_0111038

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | ROW avoidance or ROW exclusion. |
| 107. | 029 | BCD | Joan May (CA) | As these lands are typically not highly productive, consider eliminating grazing if a cost/benefit analysis can not demonstrate revenues gained exceed administrative cost of management, restoration and impacts to water quality. This should be applied to other ground disturbing activities as well. | EMPSi (KW): removed reference to livestock grazing in Alternative B. (changed in Appendix B) |
| 108. | 029 | D | B. Krickbaum | 1st bullet – change to: "On projects greater than .25 acre in size, conduct site-specific soil …"<br><br>2nd bullet – Delete "Prior to surface disturbance". change to: " Require approval of a surface use plan by the BLM …"<br><br>2nd sub-bullet (beneath the second bullet), change to only "Surface runoff will be adequately controlled."<br><br>Make another bullet, which will become the 3rd bullet (the old 3rd and 4th now become the 4th and 5th).  New bullet will be:  "When a Storm Water Management Plan is required by the state, the operator is required to submit the draft plan to the BLM authorized officer for review prior to submitting to the state for approval." | EMPSi (KW): Changes made in Chapter 2 and in Appendix B. |
| 109. | 029 | D | Sondergard | Awkward wording bullet #3- Suggest…To prevent the deep percolation of groundwater within saline/selenium soils, require engineered leak prevention of drilling system pits containing fluids such as flowback and stimulation fluids, produced water, and cuttings. Prohibit surface discharge of produced water and mechanical evaporation. | EMPSi (KW): Changes made in Chapter 2 and in Appendix B. |
| 110. | 030 | B | B. Krickbaum | It is 7376 acres.<br>Add "ACEC", so "…in East Paradox ACEC as…" | EMPSi (KW): Change made. Removed from ROW exclusion list in L&R section as it's covered by the ACEC. |
| 111. | 030 | C | B. Krickbaum | It is 385 acres. | EMPSi (KW): Change made. |
| 112. | 030 | D | B. Krickbaum | It is 1900 acres.<br>Add "ACEC", so "…in East Paradox ACEC as…"<br>Delete last bullet, and replace with: Bullet: "Allow | KW: Added acreage; changed to "…in the Biological Soil Crust ACEC…" Removed from ROW exclusion list in L&R section as it's covered by the |


BLM_0111039

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | private edge-holdings ROWs for reasonable access and utilities, and only if other access is not possible." | ACEC. |
| 113. | 030 | D | Rogers | Need to put in acres | EMPSi (KW): Added acres. |
| 114. | 030 | D | Pfifer | 2nd bullet – change to read to be consistent with the read of the document "Allow reasonable access and utilities to private inholdings/edgeholdings." | BLM (BK): This area is the ACEC in east paradox. To be consistent with the ACEC, bullet changed to "Allow ROWs for private edge-holdings for reasonable access and utilities only if other access is not possible." (Note:  there are not any inholdings in the ACEC, so the word "inholding" is not included in the bullet.) |
| 115. | 030, 450, 537 | D | L Reed | Under "exceptions" to ROW Exclusion areas (see comment #4 above)  please re-add the following wording: "100' buffer along county roads and highways" Please note this change should be made throughout the entire document.  "Highways" was included in previous versions of the matrix -  see 2-24-11 "pencils down" version of matrix.   But "highways" is now omitted from lines 30 and 537.  I don't remember a decision to delete the word "Highways" from the exception criteria,  in fact it is needed for the E Paradox ACEC, due to existing utilities along the highway. | EMPSi (KW): ACEC is less than 100-feet from the highway so highway excluded from the bullet here as it is not applicable. |
| 116. | 030, 537, 527 | D | L Reed | Rare bio soil crusts: Line 30:  Who changed the wording in our exceptions to exclusion areas? This matrix has a new spin on wording: "Manage private in-holdings…. As ROW avoidance areas" The wording we have carried thru was: "Private in-holdings or edge-holdings will be allowed ROWs for reasonable access and utilities." Please change the wording back to our original wording/intent.   Let's not have an avoidance area in an exclusion area.   Any new ROWs would be sited to avoid resource impacts and would be subject to NEPA. | EMPSi (KW): Change made. Management decided that in certain instances the exceptions for ROW exclusion will be managed as ROW avoidance where noted in the matrix. |



BLM_0111040

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | Also see Line 527 Fairview South ACEC and Line 537 E Paradox ACEC. This wording has also been changed to: "…manage these exceptions as ROW avoidance" | |
| 117. | 031 | D | Ela (RACSG) | It's good to go beyond E. Paradox. Is this the only rare crust in the BLM planning area for ROW exclusions? Does this cause a road closing? | EMPSi (KW): The area identified under Alternative D is for the rarest of the known biological soil crusts in the field office. ROW exclusion would not affect existing ROWs (i.e., no existing roads would be closed). |
| 118. | 031 | D | Sondergard | The E. Paradox Biological Soil Crust NSO/NGD should have some mention of being carried forward and point the reader to the ACEC section. | EMPSi (KW): No change; this action is for soil crust in the FO. If a project is in the ACEC we'll look at the ACEC section for guidance. |
| 119. | 031 | D | Steve Weist (RACSG) | Is there a definition for biological soil crust development? Need more information before can review and comment on this row. | EMPSi (KW): Level of biological soil crust development would be determined using best available techniques. |
| 120. | 032 | B | M. Siders | Is the "East Paradox area" the same as the ACEC or is this a more general, larger area? | EMPSi (KW): This is a general area but Alt B would probably be the same as the ACEC whereas under Alt D it's an area greater than the ACEC size in Alt D. |
| 121. | 032 | D | Steve Weist (RACSG) | Add in "work with unwilling sellers to develop plans for protecting rare biological soil crust". | EMPSi (KW): This is outside the jurisdiction of the BLM. |
| 122. | 034 | D | Clements | Should be  NSO-3/NGD# and CSU-8/SSR-# | EMPSi (KW): Changed to NSO-3/SSR# and CSU-8/SSR-#. (added to Appendix B) |
| 123. | 034 | D | B. Krickbaum | This is not NGD. Delete "and surface disturbing activities" | EMPSi (KW): Changed to SSR; added "and SSR restrictions." (added to Appendix B) |
| 124. | 034 | D | M. Siders | Shouldn't this also be SSR for both NSO and CSU sections? | EMPSi (KW): Changed to NSO-3/SSR# and CSU-8/SSR-# (added to Appendix B) |
| 125. | 037 | BCD | Joan May (CA) | Conduct representative water quality monitoring in recreational contact designated waters to evaluate the impact of BLM approved activities adjacent to these waters on compliance with microbiological standards. | EMPSi (KW): This is implementation and will be considered at the implementation phase of the RMP once the ROD is signed. |
| 126. | 038 | BCD | Joan May (CA) | Consider making the suggested buffer an exclusion area except in existing ROWs | EMPSi (KW): No change. Identifying the major river corridors as ROW exclusion is not a reasonable alternative. |
| 127. | 039 | BCD | Joan May (CA) | With directional drilling techniques surface occupancy of the river corridor bottoms in unnecessary. These areas contribute other overriding values.  Limit surface occupancy to the canyon rims located far enough back | EMPSi (KW): Alternative B is No Leasing with 0.25-mile of each side; Alt D is no occupancy within the same area.  BLM management feels 0.25-mile is a sufficient distance in these areas to not impact visual |



BLM_0111041

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | to not impact the visual quality of the river corridors. | quality. |
| 128. | 039 | D | Rogers | Use of meters with 328 feet in () but in line 40 use feet without meters, please just make consistent. Additionally, one line 38 states 328 feet and one line states 300 foot. Can't we just make it all 328 feet (100 meters) to make it more consistent across the document. | EMPSi (KW): Per conversation with BK (9/28/11), will always include feet with meters if "meters" is driving measurement; if feet is driving measurement, won't give meters conversion. |
| 129. | 039 | D | Sondergard | After the final round of Mgmt review, my notes indicate we didn't carry a SSR forward. An SSR would make campgrounds, boat ramps, etc. very difficult to establish. I think this should be NSO only. | EMPSi (KW): Management reviewed and decided to leave SSR in Alternative D. |
| 130. | 039 | D | S. Bear (RACSG) | DMEA has existing power lines near the Gunnison River and the North Fork Gunnison River. Please add the following language, "Standard Exception: Utilities are allowed to access, operate, maintain, renew permits, rebuild or upgrade existing facilities located within major river corridors. New ROW will be considered on a case by case basis for new power lines within the river corridors as needed to provide for essential power services of end users." | EMPSi (KW): This action does not affect ROWs (only ROW exclusion/avoidance affect ROWs and do not apply to existing ROWs). |
| 131. | 040 | D | Rogers | Make consistent with line 39 in terms of buffer 328 ft (100 meters) | EMPSi (KW): Per conversation with BK (9/28/11), will always include feet with meters if "meters" is driving measurement; if feet is driving measurement, won't give meters conversion. |
| 132. | 041 | D | Clements | Should it be "apply CSU restrictions between 300 and 500 feet…" | EMPSi (KW): Change made. (updated Appendix B) |
| 133. | 041 | D | B. Krickbaum | After "STIPULATION", replace "within" with "from". It will read "…CSU restrictions from 300 – 500 feet…"   (Also, change in Appendix B. | EMPSi (KW): Change made. (updated Appendix B) |
| 134. | 042 | all | L. Armstrong[1] | Delete row (no ROW avoidance or exclusion on intermittent/ephemeral). There are several intermittent/ephemeral drainages. A ROW avoidance/exclusion would be overly restrictive and cover too much area. | EMPSi (JW): change made |
| 135. | 042 | D | Joan May (CA) | Replace with 300 ft buffer avoidance area | EMPSi (KW): After discussion with District Office, line 42 was deleted. List here was updated to reflect change (no ROW restrictions for intermittent and ephemeral streams). (updated L&R section) |


BLM_0111042

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 136. | 042 | D | Pfifer | Have big concern with this - essentially all linear ROWs cross intermittent and ephemeral streams somewhere and it is impossible to avoid these areas. Concern with 279,270 acres being ROW avoidance, see Figure 2-24 avoidance areas – its almost everywhere – how can we get a linear ROW through the FO without going through an avoidance area which violates the intent – suggest a BMP instead that any impacts to intermittent and ephemeral streams will be mitigated | EMPSi (KW): After discussion with District Office, line 42 was deleted. List here was updated to reflect change (no ROW restrictions for intermittent and ephemeral streams). (updated L&R section) |
| 137. | 043 | all | L. Armstrong[1] | Delete row (no CSU on intermittent/ephemeral). There are several intermittent/ephemeral drainages.  A CSU would be overly restrictive and cover too much area. | EMPSi (JW): change made |
| 138. | 043 | D | Rogers | Deals with the SSR stipulation associated with this action. On ephemeral streams does this stipulation exist for livestock developments since this *is* where we put livestock water developments (ponds). I would like to see ephemeral taken out of this stipulation. As for intermittent there needs to be an exception for spring and water developments. | EMPSi (KW): After discussion with District Office, line 43 was deleted. (updated Appendix B)<br><br>BLM (BK): Determined that a CSU/SSR on intermittent and ephemeral waterways is overly restrictive and not needed. |
| 139. | 043 | D | Joan May (CA) | Replace 100 ft with 300 ft as this does not preclude use, only allows for appropriate conditional use. | EMPSi (KW): After discussion with District Office, line 43 was deleted. (updated Appendix B)<br><br>BLM (BK): Determined that a CSU/SSR on intermittent and ephemeral waterways is overly restrictive and not needed. |
| 140. | 043 | Preferred | T. Stranathan | Appendix Addendum B does include exc Mod and wav Criteria, which will more than likely be requested in the majority of oil and gas project proposals.  Or modified or waived in the case of an MDP. | EMPSi (KW): After discussion with District Office, line 43 was deleted. (updated Appendix B)<br><br>BLM (BK): Determined that a CSU/SSR on intermittent and ephemeral waterways is overly restrictive and not needed. |
| 141. | 045 | All | L. Armstrong[1] | Change to a stipulation (CSU) (without  an SSR) **STIPULATION** CSU-XX:  This lease is within a municipal watershed or Public Water Supply area, and the lessee is required to implement special protective measures for water resources and to collaborate with municipalities. | EMPSi (KW): Changed to the following in Alternatives B-D. The LN exists in Alt A (per state stips package):<br>**STIPULATION** CSU-XX:  This lease is within a municipal watershed or Public Water Supply area. The lessee is required to collaborate with |



BLM_0111043

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | municipalities to identify and to implement special protective measures for water resources. |
| 142. | 045 | All | L. Armstrong[1] | Change to a stipulation (CSU) (without an SSR) **STIPULATION** CSU-XX: This lease is within a municipal watershed or Public Water Supply area, and the lessee is required to implement special protective measures for water resources and to collaborate with municipalities. | EMPSi (KW): Changed to the following in Alternatives B-D. The LN exists in Alt A (per state stips package): **STIPULATION** CSU-XX: This lease is within a municipal watershed or Public Water Supply area. The lessee is required to collaborate with municipalities to identify and to implement special protective measures for water resources. |
| 143. | 045 | BCD | Joan May (CA) | This should be a stipulation that lessees comply with adopted municipal watershed protection regulation where they do not create an operational conflict. | EMPSi (KW): Changed to CSU. |
| 144. | 045 | C + D | Ela (RACSG) | Nor Regents Mesa Domestic Water Co 1,000 feet compared to 5 miles can easily be damaging as to gas well fracking. It needs protection. Doesn't Alternative C get better coverage as to gas well fracking? | BLM (BK): All alternatives are "No Leasing" 1,000 horizontal feet of either side of a classified surface water supply stream segment for a distance of 5 miles upstream of a public water supply intake. This means that fracing would not occur beneath the water supply system and 1,000 feet either side. There is also a CSU from 1,000 feet to ½ mile where restrictions can be applied. |
| 145. | 047 | B, C, D | A. Schroeder (CA) | With regard to "mineral material sales" here and elsewhere in the document, I recommend replacing the term "sales" with the term "disposal." Rationale: Mineral materials may be disposed of by means other than sales. | EMPSi (KW): Change made. |
| 146. | 047 | D | Joan May (CA) | Consider changing 1000 ft as in Alt C to 2640 as in Alt B. Depending on slope and soils 1000 ft may not provide enough buffer. San Miguel County appreciates BLM's recognition of Municipal Source Water Protection Areas and the extension of the NL-3 Stipulation to their boundaries. | EMPSi (KW): NL up to 1,000 feet and CSU beyond that. BLM feels that this buffer is sufficient. |
| 147. | 047 | Preferred | T. Stranathan | The edge of the No Lease area is bordered by a CSU. The No Lease should be NSO instead. A drill rig could operate easily in the CSU area a minimum of 1000' away and drill into the subsurface without any impact what so ever on the surface water supply, we could | EMPSi (KW): BLM management discussed this action and determined that NL was appropriate. |



BLM_0111044

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | even take a tip from the BOR stip and require a minimum distance between well bore and water. What is our rationale for making this a No Lease, when an NSO will work? | |
| 148. | 048 | C | B. Sharrow[2] | Delete 3rd and,4th bullets (green fracking fluids, and construction of berms...) 6th bullet, delete "shall" | EMPSi (JW): sentence rewritten. "Shall" now used appropriately. |
| 149. | 048 | B | Clements | Should it also be a NSO otherwise seems that Alt B lets gas development occur with less restrictions than C,D | EMPSi (KW): No, it is NL (see previous row) so more restrictive. |
| 150. | 048 | C | B. Krickbaum | -Delete "SSR" in two places. -Replace "less than 1000" with "a distance greater than 1000 but less than 2640". So, it will read "...restrictions within a distance greater than 1000 but less than 2640 horizontal feet..." | EMPSi (KW): Change made. (updated Appendix B) |
| 151. | 048 | C | B. Krickbaum | Delete "and within domestic wells and springs" | EMPSi (KW): Change made. (updated Appendix B) |
| 152. | 048 | C | Sondergard | Response to Empsi question: Yes, that is correct, a CSU is unnecessary now that line 47 above no longer has an alternative with "No similar action" after collapsing the alternatives. Question 2: The SSR is left over from the concept of pairing CSU/SSR. There is no need to have a SSR only a CSU. The distance in alt C should be changed to 1000-2640 so alt C and D are the same. | EMPSi (KW): Thank you. Change made. |
| 153. | 048 | C | Sondergard | Remove the word "shall" from bullet #6. | EMPSi (KW): Change made. |
| 154. | 048 | D | B. Krickbaum | Delete, and replace with "Same as alternative C". | EMPSi (KW): Not entirely same as Alternative C. |
| 155. | 048 | D | Sondergard | Remove "and within domestic wells and springs" | EMPSi (KW): Change made. (updated Appendix B) |
| 156. | 048 | D | Pfifer | BLM does not yet have a policy on the requirement to use green fracking fluids or can define what that even is – so don't think that can be a requirement here and suggest deleting it, but it is a BMP in Alt F and as long as that definition is an acceptable to BLM, then ok to be there. 4th bullet on pg 2-38 needs to be clarified – don't know what it means. 5th bullet – per my first comment here – suggest to not define here what each sample should analyze at a | EMPSi (KW): This stipulation has been updated to reflect the statewide stipulation as of August 3, 2011. |



BLM_0111045

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | minimum because this could change – if this needs to be defined, suggest doing in the BMP in Alt F instead (F-27 lines 5-9). "Each office" - which office? Note at end - ? the NSO above is for "Water Supply Streams and Public Water Supplies" and this CSU is for "Municipal Watersheds and Public Water Supplies" which these are separate throughout the document – so should they be combined because they are in fact one in the same? | |
| 157. | 048 | Preferred | T. Stranathan | Green Fracing fluids?  There is a statement in Appendix F on page F-27 lines 5-9 which may be the best language. It would be best to request fracing fluids be disclosed on proposed wells in this type of area and if possible work with operator to eliminate  chemicals which were brought on site to be used down hole that if an accident, improper handling or damage to could result in detrimental effects to the surface and water supplies. | EMPSi (KW): This stipulation has been updated to reflect the statewide stipulation as of August 3, 2011. |
| 158. | 048 | Preferred | T. Stranathan | What we are missing here is the "Green Completion" or "reduced emissions completions" idea.  It is more widely used and deals with more specific and rigorous protections at the surface as far as capturing gas from fracing and completions for placement into a nearby sales line or if not available the gas is flared off. Colorado already requires Flaring of vent gas, but this is more specific to completions of each well.  Like COGCC rule 805. | EMPSi (KW): This stipulation has been updated to reflect the statewide stipulation as of August 3, 2011. Added green completions to requirements. |
| 159. | 051 and 052 | B, C, D | B. Sharrow[2] | Combine the rows.  Replace B, C, and D with the following action (both C and D are the same as B). Change to read: **Action:** Maintain current water rights to benefit wildlife and livestock.  Object to proposals that may jeopardize existing rights.  File for new water rights for surface and groundwater sources (i.e., springs/seeps, wells, reservoirs, streams) in adequate quantities necessary to protect planning area resource needs and sustainability. | EMPSi (JW): change made |



BLM_0111046

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 160. | 054 | D | Steve Weist (RACSG) | 1000 ft. from a domestic well is too restrictive. That is equivalent to an area of over 70 acres. 500 ft. would be a more reasonable distance, with additional controls on what surface occupancy would involve.<br><br>Jedd: Is 1,000-feet basted on COGCC or anything else? *Sent to Jedd 8/11 11/11*<br>J. Sondergard (8/12/11): The 1000' buffer on domestic wells comes from the BLM state office Stipulations.  It also matches the 1000 foot buffer for Municipal Watersheds and Public Water Supplies. | EMPSi (KW): The 1,000-foot buffer on domestic wells comes from the BLM state office Stipulations. It also matches the 1000 foot buffer for Municipal Watersheds and Public Water Supplies. |
| 161. | 056 | BCD | Joan May (CA) | Provide a quantitative definition of what constitutes a "drought" triggering drought management guidelines. Are guidelines binding management requirements? | EMPSi (KW): Table H-1 in Appendix H provides a quantitative definition of different levels of drought severity. These are guidelines for management; not binding. |
| | | | | **Vegetation – General** | |
| 162. | 059 | goal | Armstrong[1], Sharrow[2] | Add "plant and animal" before "species" on the first line. | EMPSi (KW): change made. |
| 163. | 059 | Goal | Joan May (CA) | Perhaps the goal should include some reference to moving the vegetative community toward site potential with regard to native species density, diversity, variability and resilience. The site potential should be moved toward historic levels where practicable with regard to the indicators of a healthy rangeland in the rangeland health standards for vegetation and soils.  A goal to maintain "viable" populations brings to mind the minimum needed to provide adequate genetic diversity for a species to be sustained at all.  Change viable to robust? | EMPSi (KW): We believe the goal as written encompasses the suggested ideas. No change to word viable. |
| 164. | 061 | D | B. Krickbaum | Replace 2nd sentence with: "If locally derived native species are not available, are cost prohibitive, or are not likely to succeed, allow use of non-local natives or non-native species that are not invasive. | EMPSi (KW): Change made. |
| 165. | 061 | D | Steve Weist (RACSG) | This action appears to be contrary to the objective above. Using nonnative or non-local native species would only introduce more competition to the local native species you are trying to maximize. | EMPSi (KW): Action is not contrary to objective. The objective does not preclude use of non-local or non-native species but rather emphasizes natives. |
| 166. | 062 | B & C | M. Siders | Do we mean to priorities these types of treatments or | EMPSi (KW): Yes, we would only want to do this if |


BLM_0111047

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | limit to only these?  i.e. "Restore areas of degraded vegetation ONLY where there is a high probability of success." | there was a high probability of success. |
| 167. | 062 | D | Clements | Suggest changing last sentence to "on other lands, restore areas of degraded vegetation where there is a high probability of success primarily as off-site mitigation for nearby resource use and development"(BK put together a more updated comment on this—my comment should defer to his) | EMPSi (KW): Changed per BK's comments. |
| 168. | 062 | D | M. Siders | See comment #58 above re "wilderness characteristics protection" | EMPSi (KW): Yes, this is the correct usage of terminology. |
| 169. | 062 | D | Joan May *(CA)* | Perhaps also include areas of high wildlife value or potential, lands that provide other benefits such as water quality protection or improvement and lands with high public use value in the restoration site selection criterion.  However be mindful of allowing sacrifice zones in less productive lands to be mitigated elsewhere. | EMPSi (KW): Biological core areas include areas of high wildlife value based on CDOW recommendations. Other areas mentioned are included in the "other lands" category and would still be restored to basic levels. |
| 170. | 062 | D | Steve Weist *(RACSG)* | Row 61 and 62 should be combined to accomplish the objective desired. Breaking them up seems to be a duplication of effort without a specific overall goal to achieve. | EMPSi (KW): Rows combined. |
| 171. | 062 and 063 | All | B. Krickbaum | Replace rows 62 and 63 with action on **attachment A.** *See comments from B. Krickbaum: Z:\Shared\Projects\F-0126 UFO RMP\2_Deliverables\17_P3T7_Alternatives(Ch2)\3.7.D_BL M-CA-RACSC-Cmts\BLM (file name: Ch2_draft_UFO-Comments_062311_Krickbaum.docx)* | EMPSi (KW): Change made. |
| 172. | 063 | B, D | M. Siders | What is meant by "basic levels of ecologic functionality"?  Is that the same as Meeting Land Health Standards? | BLM (AC 10/5/11): Basic levels of ecologic functionality include successional processes are in place, energy and nutrients are being cycled effectively, soil is being appropriately stabilized…it can be functioning at a basic level of ecologic functionality without meeting land health standards. The term "ecologic functionality" has been added to the glossary. |



BLM_0111048

**BLM – U**NCOMPAHGRE **F**IELD **O**FFICE, **C**OLORADO
**R**ESOURCE **M**ANAGEMENT **P**LAN **R**EVISION AND **E**NVIRONMENTAL **I**MPACT **S**TATEMENT

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | EMPSi (AA): Added to glossary: "Ecologic functionality. These levels include successional processes that are in place, energy and nutrients that are being cycled effectively, and soil that is being appropriately stabilized. An area can be functioning at a basic level of ecologic functionality without meeting land health standards." |
| 173. | 064 | all | B. Sharrow[2] | Delete row.  This is the same as row 56. | EMPSi (JW): change made |
| 174. | 064 | All | B. Krickbaum | Before row 64 (after attachment A, above), add objective and action in **attachment B**. *See comments from B. Krickbaum: Z:\Shared\Projects\F-0126 UFO RMP\2_Deliverables\17_P3T7_Alternatives(Ch2)\3.7.D_BLM-CA-RACSC-Cmts\BLM (file name: Ch2_draft_UFO-Comments_062311_Krickbaum.docx)* | EMPSi (KW): Change made. |
| 175. | 064 | D | Rogers | Appendix H:  Second bullet under extreme drought (D3) & (D4)"base changes in livestock use" needs to be reworded for understanding. Suggestion "make changes in livestock grazing management through stocking rates, season of use, and/or reduced AUMs during and immediately following  drought until range conditions improve (vigor on native perennial key species)  and precipitation returns to average. | EMPSi (KW): Change made to Appendix H. |
| | | | **Vegetation – Uplands** | | |
| 176. | 066 | D | Ela (RACSG) | Consider a request to CDOW (cooperating agency) to do at least a large game animal inventory now and periodically in order to monitor native plants and forbs restorations successes. | BLM (BK): This is not a planning decision to be put in the RMP. CDOW can monitor anytime they wish, without an RMP decision. Also, BLM has a monitoring program that evaluates existing grasses and forbs as well as restoration success. Monitoring can be accomplished without a decision in the RMP. |
| 177. | 066 | D | Burch | Should Alt D be this expanded when no other alternative mentions the same?  (Thus, to the reader – analysis was not done through the alternative process.) Suggest:  Create actions by the list in D with appropriate analysis of management levels. (Many areas of special concern are mentioned – but not shown on a map or otherwise identifiable.) Suggest: Delete all mention of these unmapped areas of | EMPSi (KW): Alternative D focuses management of special areas to achieve outcomes that are different from other areas. Alternatives B and C would achieve the same outcomes in all areas. |



BLM_0111049

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | concern until the Implementation stage/writing. Or on site by site management – during regular business later on. | |
| 178. | 066 | D | Holsinger | The statement "… and to support big game habitat, with naturalness and <u>sensitive species habitat</u> as secondary outcomes." The 6840 manual would suggest that not managing sensitive species as a primary outcome/objective is against BLM policy. As this is worded sage-grouse and possibly Canada Lynx could be managed for lesser outcomes. I would suggest the following "… and to support big game species habitat and naturalness as secondary outcomes." | EMPSi (KW): Changed to read, "On the remaining areas, manage vegetation structure to emphasize resource production, fuels reduction, and to support sensitive species habitat, with naturalness and big game species habitat as secondary outcomes." |
| 179. | 066 | D | Rogers | Objective: should this state "lands identified for wilderness charateristics protection" or should this state "land identified with wilderness charateristics"?? Also, area with pristine and ancient vegetation. I am really not comfortable with this since we really can't map it and I know we are told this is a very small acreage in comparison to the F.O. but until a map can be made we really have no clue where they are or how much they make up of the entire field office or how manageable they are. | EMPSi (KW): Wilderness characteristics terminology is correct. BLM Management Team had lengthy discussion about this during preferred alternative development. It was decided that, although these areas are not currently mapped, we will respond to the areas during field work for site-specific projects. When these areas are found, projects would be modified to protect the areas. The only way to map the areas would be to do a 100% inventory of the field office which is not possible given the timing of the RMP schedule.<br><br>Other resources have restrictions that are not mapped, such as raptors, as areas will change over the course of the RMP. However these resources still warrant protection and the restrictions would be included, or excepted, based on field inventories. |
| 180. | 066 | D | M. Siders | Wildlife Objective for this alternative is to preserve and promote species conservation and ecosystem integrity and values. SSS Objective is to maintain, restore or enhance SSS populations and associated habitats. This alternative does not have a big game emphasis. Suggested change in wording: "On the remaining areas, manage vegetation structure to emphasize resource production, fuels reduction, and to | EMPSi (KW): Changed to read, "On the remaining areas, manage vegetation structure to emphasize resource production, fuels reduction, and to support sensitive species habitat, with naturalness and big game species habitat as secondary outcomes." |



Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011

BLM_0111050

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | support wildlife and sensitive species habitat, with naturalness as secondary outcomes." | |
| 181. | 066 | D | Steve Weist *(RACSG)* | Maybe I have been reviewing this to long, but this appears to say the same thing in different ways. I would combine this objective to say "**Manage vegetation structure for naturalness, and age distribution across landscape to support species habitat, and resource production, with fuels reduction as a secondary outcome."** | EMPSi (KW): Alternative D focuses management of special areas to achieve outcomes that are different from other areas. Alternatives B and C would achieve the same outcomes in all areas. Changed second paragraph to read, "On the remaining areas, manage vegetation structure to emphasize resource production, fuels reduction, and to support sensitive species habitat, with naturalness and big game species habitat as secondary outcomes." |
| 182. | 067 | B & D | M. Siders | Suggested wording: " … to meet Upland objective." | EMPSi (KW): Change made. |
| 183. | 068 | B and D | L. Armstrong[i] | After "mosaic objectives", insert "specified in the Fire Management Plan" | EMPSi (JW): change made |
| 184. | 068 | All | Rogers | Needs to state mosaic objectives are the fire mosaic structure otherwise people will wonder where these obj. are housed. Like in the Fire Plan. | EMPSi (KW): Change made. |
| 185. | 068 | B, C & D | M. Siders | Redundant with Line 134. Suggest keep line 134 Alt A as is and point Alt B-D to this action. | EMPSi (KW): Row 168, B and D changed to "Make all vegetation treatments consistent with the vegetation mosaic objectives specified in the Fire Management Plan and use them to help with the development of productive and diverse vegetation communities." |
| 186. | 068 | BC | Clements | Suggest moving from B "maximize habitat conditions on winter range to support native ungulate species populations" to Alt C. I think that is more consistent with the objectives | EMPSi (KW): Change made. |
| 187. | 068 | D | Clements | Change sentence to "use vegetation treatments to help with the development of productive and diverse vegetation communities" | EMPSi (KW): Change made. |
| 188. | 069-071 | All | Steve Weist *(RACSG)* | You cannot manage what you cannot define. Climate change cannot be specifically identified, therefore it cannot be managed. This whole section should be removed. | BLM (BK): We have added a definition of climate change in the glossary. Without assigning blame or cause (human or natural), it appears there is a continuing change in climate.  Maybe it will continue for 20+ years and maybe it won't.  We have not assigned specific management, but rather, the plan would allow BLM to take action such as aiding native local plants move up or down in response to |



BLM_0111051

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | climate change.<br><br>This definition from the EPA has been added to the glossary: *(http://www.epa.gov/climatechange/glossary.html#C)*: Climate change refers to any significant change in measures of climate (such as temperature, precipitation, or wind) lasting for an extended period (decades or longer). Climate change may result from:<br>• natural factors, such as changes in the sun's intensity or slow changes in the Earth's orbit around the sun;<br>• natural processes within the climate system (e.g. changes in ocean circulation);<br>• human activities that change the atmosphere's composition (e.g. through burning fossil fuels) and the land surface (e.g. deforestation, reforestation, urbanization, desertification, etc.) |
| 189. | 070 | B-D | Stindt | Please replace "according to current climate change science" with "according to current climate change science that is specific to the planning area and has been peer reviewed".<br><br>This is per the Land Use Planning Handbook, Appendix F. page 9 | BLM (BK): We have added a definition of climate change in the glossary. Without assigning blame or cause (human or natural), it appears there is a continuing change in climate. Maybe it will continue for 20+ years and maybe it won't. We have not assigned specific management, but rather, the plan would allow BLM to take action such as aiding native local plants move up or down in response to climate change.<br><br>This definition from the EPA has been added to the glossary: *(http://www.epa.gov/climatechange/glossary.html#C)*: Climate change refers to any significant change in measures of climate (such as temperature, precipitation, or wind) lasting for an extended period (decades or longer). Climate change may result from:<br>• natural factors, such as changes in the sun's |



BLM_0111052

BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO
RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | intensity or slow changes in the Earth's orbit around the sun; <br>• natural processes within the climate system (e.g. changes in ocean circulation); <br>• human activities that change the atmosphere's composition (e.g. through burning fossil fuels) and the land surface (e.g. deforestation, reforestation, urbanization, desertification, etc.) |
| 190. | 070 & 071 | All | Holsinger | Both lines are repeats of lines 14&15 and are identical would suggest eliminating one or the other to reduce redundancy. | EMPSi (KW): Yes, deleted from here. |
| 191. | 070, 071 | | Clements | Aren't these moved to the climate change section? | EMPSi (KW): Yes, deleted from here. |
| 192. | 070-071 | B-D | Sondergard | Aren't these already covered in the climate change section? | EMPSi (KW): Yes, deleted from here. |
| 193. | 072 | All | M. Siders | Since this objective includes biological cores, move lines 127-132 to here. | EMPSi (KW): Added reference to wildlife – terrestrial section for biological core areas. |
| 194. | 073 | All | Rogers | Here we are again with pristine and ancient since these can't be mapped we really can't place mgt obj. on them that may not be attainable in all cases. Nor do we know the extent of them. These make more since to be in the mgt objective for DENCA or the GGNCA. Which now make up significant amounts of acreage in the F.O. | EMPSi (KW): BLM Management Team had lengthy discussion about this during preferred alternative development. it was decided that, although these areas are not currently mapped, we will respond to the areas during field work for site-specific projects. When these areas are found, projects would be modified to protect the areas. The only way to map the areas would be to do an inventory of the field office which is not possible given the timing of the RMP schedule. <br><br>Other resources have restrictions that are not mapped, such as raptors, as areas will change over the course of the RMP. However these resources still warrant protection and the restrictions would be included, or excepted, based on field inventories. |
| 195. | 073 | D | Joan May (CA) | Same as B the unique quality of these resources warrant more binding protection. | EMPSi (BLM): BLM team feels that ROWs could be properly sited or modified in order to protect these areas and that ROW avoidance is sufficient. |
| 196. | 074 | All | Rogers | The appendix"B" SSR16 does not allow for spring developments. I would like to see the exception put in | EMPSi (KW): SSR would require best siting of these developments; it would not preclude them. |



BLM_0111053

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | place for this. | |
| 197. | 074 | D | T. Stranathan | Is it also possible that these are included in biological core areas? | EMPSi (KW): It is possible that some but not all are in biological core areas but until field inventories are done, we won't know. |
| 198. | 074 | D | Joan May *(CA)* | Having D be the same as B provides the same range of alternatives but provides a more appropriate level of protection. | EMPSi (KW): BLM team feels that activities could be properly sited or modified in order to protect these areas and that CSU/SSR is sufficient. |
| | | | | **Vegetation – Riparian** | |
| 199. | 075 | | Clements | What happened to the pristine, rare riparian vegetation? Could we move actions and objective 72-74 into Vegetation-General Section to then encompass rare riparian vegetation? | EMPSi (KW): Moved rows 72-74 under Vegetation – General. |
| 200. | 076 | D | Steve Weist *(RACSG)* | Replace same as Alt B with **"Manage naturally occurring riparian and wetland areas to maintain proper functioning condition."** | EMPSi (KW): As written, objective does not commit BLM to improve but it is part of the desired outcome to do more than maintain PFC. Part of maintaining riparian conditions necessitates maintaining hydrologic conditions. |
| 201. | 077 | B | B. Krickbaum | Change the first 4 rows to read: "Manage naturally occurring riparian and wetland areas, seeps, and springs, as well as a 100 foot buffer from their edge, as ROW exclusion areas unless…" | EMPSi (KW): Change made. |
| 202. | 077 | BCD | Clements | Change ROW exclusion/avoidance area to singular instead of plural | EMPSi (KW): Left it plural as multiple areas are listed. |
| 203. | 077 | D | Burch | The buffer distance is greater (300 Ft.) in D when only (100 ft.) was analyzed in B, and no buffer in C. | EMPSi (KW): Preferred alternative does not fall between Alternatives B and C as it was developed after the other alternatives were developed. This allowed the preferred alternative to be outside of the range. |
| 204. | 077 | D | B. Krickbaum | Change the first 4 rows to read: "Manage naturally occurring riparian and wetland areas, seeps, and springs, as well as a 300 foot buffer from their edge, as ROW avoidance areas unless…" | EMPSi (KW): Change made. |
| 205. | 077 | | Ela *(RACSG)* | An inconsistency between row 77 and line 77 of Chapter 2 Alternatives. Staff language creates wide flexibility but lacks specificity on winter forage used. | EMPSi (KW): Unsure as to what this comment refers. Line 77 in the alternatives matrix talks about ROW restrictions for riparian areas, wetlands, seeps, and springs. |
| 206. | 078 | | Clements | Insert "invasive species control" after "research" | EMPSi (KW): Change made. |



BLM_0111054

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 207. | 078 | | Rogers | We need to leave open for permitted (by public) removal of Tamarisk, Russian olive and Siberian Elm. | EMPSi (KW): Added "invasive species control" after "research." |
| 208. | 078 | B | B. Krickbaum | Change "(500 foot buffer)" to "(with a 500 foot buffer)" Change "(100 foot buffer)" to "(with a 100 foot buffer)" | EMPSi (KW): Change made. |
| 209. | 078 | B&D | Holsinger | No wood collection would prohibit removal of tamarisk, Russian olive, and elm which could be cost effective means of achieving resource objectives. Unless in your mind this could be considered part of a revegetation effort?  Additionally, allowing plant product collection for commercial increase could translate into lower project cost over the long-term would we not want to promote those efforts? Suggest removal or rewording to clarify. | EMPSi (KW): Added "invasive species control" after "research" in Alternative D (research is not in Alternative B). |
| 210. | 078 | B, C, D | B. Krickbaum | After "collection" add "and "harvest:  will read "…wood products collection and harvest,…" | EMPSi (KW): Change made. |
| 211. | 078 | D | B. Krickbaum | Change "(100 foot buffer)" to "(with a 100 foot buffer)" | EMPSi (KW): Change made. |
| 212. | 078 | D | Joan May (CA) | Add to D  permitted recreational activity sponsors will be required to restore  any riparian impacts to pre-event or better conditions. | EMPSi (KW): Added: Require additional riparian stipulations for commercial special recreation permits and restrict use to designated routes in least impacting locations for organized group and event permits. |
| 213. | 078 | D | J. Jackson | Reword the portion "Restrict permitted recreation activities or events to designated routes in least impacting locations" to "Provide additional riparian stipulations for commercial special recreation permits and restrict use to designated routes in least impacting locations for organized group and event permits." | EMPSi (KW): Change made. |
| 214. | 079 | B | A. Schroeder (CA) | Replace "managed fire from natural ignition" with "wildland fire use." Rationale: Consistent use of wildland fire management terms from National WFM Glossary. There is no such term as "managed fire from natural ignition;" the new term for such fire management is "wildland fire use." | EMPSi (KW): Changed to "managed wildland fire" |



BLM_0111055

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | BK/Dan: What is current terminology? *Sent to B. Krickbaum/Dan 8/11/11* Dan's response (8/17/11): I would say it's a 'managed wildland fire'. Even our state office can't answer this question very well so let's just go with that. It's definitely not wildland fire use…that went out a couple years ago. | |
| 215. | 081 | B,D | Steve Weist *(RACSG)* | If Historic Land use and flow regime modifications have caused the wetlands and riparian areas to be impacted, wouldn't the Historic Preservation Act, prevent you from restoring these areas, because if you correct the historic land use and flow regime modifications that created the wetlands, wouldn't that destroy the wet lands? If not, why preserve other historic artifacts for areas? This row should be deleted. | EMPSi (KW): NHPA does not apply to these topics. This action would not destroy wetlands but rather repair them ("…enhance and restore wetland and riparian areas…"). |
| 216. | 082-093 | BCD | Joan May *(CA)* | Why are there no similar actions to the current plan contained in the revision alternatives? Corresponding actions in the alternatives would seem to be appropriate. | EMPSi (KW): Actions from old RMPs are specific to certain areas, and some are implementation level decisions (not Land Use Plan decisions). Other actions in the riparian section for Alternatives B-D address or allow these or similar actions to occur. . |
| 217. | 083 | | Clements | Use 300' for CSU to be consistent with water section | EMPSi (KW): Change made. |
| 218. | 083 | | Clements | Insert "and intermittent" after "perennial" (2 places) | BLM (BK 10/5/11): Replaced "perennial waters" with "perennial and intermittent waters and naturally occurring wetlands, springs and seeps". Changed "perennial streams" to "perennial and intermittent waters and streams". <br><br>EMPSi (JW): Change made. The new action for Alternative D reads: **STIPULATION** NSO-11/SSR-16: *Naturally Occurring Riparian and Wetland Areas, Water Bodies, Springs, and Seeps.* Prohibit surface occupancy and surface disturbing activities within a minimum buffer distance of 300 horizontal feet from all perennial and intermittent waters and naturally occurring wetlands, springs and seeps. For perennial and intermittent waters and streams, the buffer will be measured from the ordinary high water mark |


BLM_0111056

**BLM – U**NCOMPAHGRE **F**IELD **O**FFICE, **C**OLORADO
**R**ESOURCE **M**ANAGEMENT **P**LAN **R**EVISION AND **E**NVIRONMENTAL **I**MPACT **S**TATEMENT

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | (bankfull stage), whereas for wetland features, the buffer will be measured from the edge of the mapped extent. For unmapped wetlands, the vegetative boundary (from which the buffer originates) will be determined in the field. Where the riparian zone extends beyond 300 feet, the NSO would be extended to include the entire riparian zone. (Refer to Appendix B.) (Figures 2-38 and 2-50, Appendix A)

**STIPULATION** CSU-17: *Naturally Occurring Riparian and Wetland Areas, Water Bodies, Springs, and Seeps.* From 300 to 500 horizontal feet from the perennial and intermittent waters and naturally occurring wetlands, springs and seeps, controlled surface use restrictions will apply.  Surface disturbing activities may require special engineering design, construction and implementation measures, including re-location of operations beyond 500 feet to protect water resources within the 300 foot NSO buffer. For perennial and intermittent waters and streams, the buffer will be measured from ordinary high water mark (bankfull stage), whereas for wetland features, the buffer will be measured from the edge of the mapped extent. For unmapped wetlands, the vegetative boundary (from which the buffer originates) will be determined in the field. (Refer to Appendix B.) (Figure 2-54, Appendix A) |
| 219. | 083 | B | A. Schroeder (CA) | I suggest changing the buffer distance from "500 feet, to "660" feet for this alternative.

Rationale: BOR has a mineral development requirement of "no well to be drilled within 660 feet of a river, channel, permanent stream, tributary, or marsh site. | EMPSi (KW): Change made. |
| 220. | 083 | D | Holsinger | Buffer distance is 300 feet NSO for water line 41 and 206 for fisheries can we make this a common distance? | EMPSi (KW): Change made (300 feet). |


BLM_0111057

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 221. | 083 | D | B. Krickbaum | This is an SSR.  Replace "and surface-disturbing activities" with "and apply SSR restrictions". | EMPSi (KW): Change made. |
| 222. | 083 | D | B. Krickbaum | Replace 325 with 300 (two times) | EMPSi (KW): Change made. |
| 223. | 083 | D | B. Krickbaum | After "STIPULATION", replace 325 with 300 (two times). Replace 656 with 500. | EMPSi (KW): Change made. |
| 224. | 083 | D | Rogers | SSR 16 make exception for spring developments | EMPSi (KW): SSR would require best siting of these developments; it would not preclude them. |
| 225. | 083 | D | Joan May (CA) | Should track with the State stipulation or be more restrictive | BLM (BK): We have changed the distance to 300 feet to be consistent with COGCC requirements. This is slightly different than the suggested BLM (State Office) draft stipulation, which is 325 feet. |
| 226. | 084-093 | BCD | Clements | Do BCD need rationale or explanation? Eg "no similar action, this is addressed by other actions." | EMPSi (KW): Change made. |
| 227. | 085 | D | Ela (RACSG) | Doesn't this mean that a rock quarry or gravel pit could exist without regulations. If so I don't see that D is viable. | BLM (BK): This comment refers to row 78 in the new alternatives matrix (Chapter 2). All actions have restrictions on mineral material disposal. Alternative C is the least restrictive, which limits mineral material disposal to the least impacting location. The other two alternatives close riparian areas to mineral material disposal.  If "C" were to be chosen, there would be regulations imposed. |
| | | | | **Vegetation – Weeds** | |
| 228. | 097 | A, B, and C. | B. Krickbaum | Delete "depending on surrounding environment (e.g., threatened and endangered species, surface water, shallow water table). | EMPSi (KW): Change made. |
| 229. | 097 | B and C | B. Krickbaum | Replace "plan" (in last paragraph), with "the strategy". | EMPSi (KW): Change made. |
| 230. | 098 | B and C | B. Krickbaum | Delete "including", and delete the bulleted list. | EMPSi (KW): Change made. |
| 231. | 098 | D | B. Krickbaum | Replace action with: "Prioritize ACECs, WSAs, biological core areas, areas with pristine, ancient, or rare vegetation, Wild and Scenic River segments with a plant ORV, and high-use areas with recreational, livestock, or mineral developments and maintained routes for weed treatment." | EMPSi (KW): Change made. |
| 232. | 098 | D | M. Siders | Why not focusing on  "lands identified for wilderness characteristics protection"?  This was included in other | EMPSi (KW): Change made. |



BLM_0111058

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | lists of focus areas. | |
| 233. | 099 | D | Holsinger | Suggest clarifying all gravel pits administered by the BLM. | EMPSi (KW): RMP decisions only apply to lands administered by the BLM. |
| 234. | 100 | All | L. Armstrong[1] | Delete row: this action is policy. | EMPSi (JW): change made |
| 235. | 100 | All | B. Sharrow[2] | Delete row: this action is policy. | EMPSi (JW): change made |
| 236. | 101 | B and D | L. Armstrong[1] | Change action to: Require all seed used on BLM lands meet the Colorado Noxious Weed Seed requirements of prohibited and restricted seed. In addition, seed lots shall contain less than 250 seeds per pound of cheatgrass and/or Japanese brome (in combination). Other species determined to be noxious or invasive may be added to this list. | EMPSi (JW): change made |
| 237. | 101 | B and D | B. Sharrow[2] | Change action to (Note: this is the same as Armstrong #10): Require all seed used on BLM lands meet the Colorado Noxious Weed Seed requirements of prohibited and restricted seed. In addition, seed lots shall contain less than 250 seeds per pound of cheatgrass and/or Japanese brome (in combination). Other species determined to be noxious or invasive may be added to this list. | EMPSi (JW): change made |
| 238. | 101 | B | B. Krickbaum | Add "In addition", or "Also" before the second sentence. So, "In addition, seed lots shall…" | EMPSi (KW): Change made. |
| | | | | **Fish and Wildlife** | |
| | | | | **Wildlife – General** | |
| 239. | 102+ | Wildlife section | CDOW | General comment- CDOW believes stipulations listed in the wildlife section are misplaced, and are probably best located in Appendix B Restrictions to fluid minerals leasing and other surface disturbing activities, and then discussed in Chapter 4 once the impact analysis has been complete and the stipulations are used to show impact minimization. | EMPSi (KW): Stipulations are summarized in Chapter 2 and presented in more detail in Appendix B. They are presented in Chapter 2 to show how various restrictions will change across the alternatives. |
| 240. | 102+ | Wildlife section | CDOW | Sportsmen, hunter and anglers, fund conservation for both game and non game species through hunting and fish licenses revenue and through excise tax on hunting, angling and shooting sports equipment. The structure | EMPSi (KW): It is not the intention of the management in the alternatives to manage for one over the other. Reference to priority species and habitat has been removed from the alternatives. |



BLM_0111059

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

# Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | of the alternatives within the Wildlife section appears to hold wildlife conservation and species of economic importance at odds, that the choice is between the two.  Mountain Lions and bears are species of economic importance, along with mule deer, rocky mountain bighorn sheep, waterfowl and "upland game species" and Elk (which should be included as a priority species). CDOW doesn't believe that species conservation and wildlife game management are mutually exclusive. The habitats that support Colorado's game species are same habitats types that support species of greatest conservation need and the BLM sensitive species. | |
| 241. | 106 | C and D | B. Krickbaum | Replace "Pursue opportunities for" with "Allow". Thus, "Allow augmentation…" | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 242. | 106 | D | M. Siders | Should read "Pursue opportunities for augmentation and reintroduction to expand the current range of native aquatic and terrestrial species …" | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 243. | 106 | D | CDOW | "Pursue opportunities…or to expand population numbers to improve genetic viability of (**remove** *native* **Add** *aquatic*) and terrestrial species in coordination with the CDOW." | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 244. | 107 | | CDOW | Line 107 is the same action as 188 in special status species. Remove 107 and retain in 188. | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 245. | 107 | All | B. Krickbaum | Delete row – it is the same as row 188. | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 246. | 107 &188 | All | M. Siders | 107 and 188 are redundant.  Suggest deleting line 107 and retaining for line 188 in sensitive species section. | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 247. | 108 | All | B. Krickbaum | Delete row – it is the same as row 191. | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 248. | 108 | B | M. Siders | Should read "Surveys shall be conducted by qualified and BLM approved biologist(s) …" | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |



BLM_0111060

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 249. | 108 | D | Rogers | Does this classify LS producer as an operator? Does this mean LS operator will have to have a survey done before can even clean a pond? Inquiring minds want to know!! | EMPSi (KW): No; Lease Notices are for Oil and Gas operations and would not apply to livestock grazing operations. |
| 250. | 108 | D | Pfifer | Change "operators, the BLM, and the BLM AO" to "operators and the BLM" | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 251. | 108 & 191 | All | M. Siders | 191 and 108 are redundant with LN-2 in both actions. Suggest deleting line 108 and retaining for line 191 in the Sensitive Species section. See comment #42 above. | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| | | | | **Wildlife – Fish and Aquatic** | |
| 252. | 110 | D | CDOW | The CDOW provided extensive comments to the BLM regarding important aquatic reaches during the Wild and Scenic suitability process that are occupied or suitable for special status aquatic species (flannel mouth sucker, Bluehead sucker, Roundtail chub, razorback sucker and Colorado pike minnow, Colorado cutthroat trout).The CDOW would like to see these areas highlighted as priority areas and given a higher level of protection and management by designating these as an ACEC or biological core area. | BLM (BK): We deleted rows regarding "priority habitats". We felt this is not needed, unless there is a habitat that is truly unique and warrants special attention. We determined that we do not have such habitats in the planning area. |
| 253. | 111 | D | CDOW | Please identify the native species as follows: mottled sculpin, speckled dace, flannelmouth sucker, bluehead sucker, roundtail chub, razorback sucker and Colorado pikeminnow, bonytail chub, Colorado River cutthroat trout to avoid confusion and concern.<br><br>Again we identified those **cold water** reaches that are of conservation interest for the cutthroat during the W&S comments. Please refer to those comments.<br><br>Other cold water fishery reaches that have not be identified as a priority for Cutthroat trout reintroduction, are very valuable fisheries, and the CDOW does not feel that management of native aquatic species  is mutually exclusive of managing Coldwater sport fisheries. The CDOW requests that | BLM (BK): BLM deleted the row – we did not designate priority species.  Rather, they are taken care of via several other actions. |



**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | the BLM make Alternative C a separate action. | |
| 254. | 113 | All | L. Armstrong[i] | Combine rows 113 and 114. New action will be the row shown at the end of this table (**item A**). | EMPSi (JW): change made. |
| 255. | 113 | D | M. Siders | Should read "Pursue opportunities to enhance, protect, or restore native aquatic species habitats, including structural and vegetation improvements commensurate with other resource objectives" | BLM (BK): Change made: BLM emphasis is to manage for native species habitats. |
| 256. | 113 | D | Joan May (CA) | Substitute "pursue opportunities" with "annually improve, enhance and restore at least 3 miles" | EMPSi (KW): BLM has decided not to assign a number in the preferred alternative. It would be dependent on funds, workload, staffing, and such. |
| 257. | 117 | D | Joan May (CA) | San Miguel County appreciates BLM's commitment to focus on fish habitat improvement in the Dolores and San Miguel Rivers. Fishing in these rivers provides an important economic contribution in the County. | EMPSi (KW): Thank you for your comment. |
| 258. | 119 | All | B. Krickbaum | Delete action. | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 259. | 120 | D | Rogers | How are we going to control irrigation rights, pre BLM rights, to muck around in a stream for irrigation water purposes. | EMPSi (KW): The BLM would not have authority over pre-BLM rights but this action speaks more to stream projects than irrigation. |
| 260. | 120 | D | Joan May (CA) | Why is the period protected in B for spring shifted from what was suggested to be necessary in the conservation alternative and not carried over into Alt D? Why is recreational mining not included in B? | EMPSi (KW): BLM felt the time-periods in Alternative D were the most important time periods and in order to meet the multiple use mandate we felt this was a reasonable accommodation. Added recreational mining to Alternative B. |
| 261. | 120, 148, 149, 169, 179, 205, 221, 224, 226, 231, 237, 239, 242, 248, 250, 253, 261 | D | L Reed | These are all timing limitations for various concerns ie fish, winter habitat, reproduction areas, wild turkeys, migratory birds , lynx, sage grouse, sage grouse leks, raptors, bald eagle. All of these actions refer to the same Figure 2-42, which includes almost the entire UFO. We need to see separate maps for each of these actions, so we can see the impacts of each specific action as opposed to being lumped all on one map showing practically the entire UFO under a TL restriction. Also note if these various timing limitations are all "stacked" on top of each other in certain areas, then timing limitations could exist from | BLM (BK): We will attempt to make a map distinguishing TLs so we can visualize the various dates restricted. |


BLM_0111062

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | 11/1 thru 10/16 – in other words, ROW holders and/or operators would only have from Oct 17 to Oct 31 to access, construct, or maintain their projects. How can this be considered multi use? | |
| | | | | **Wildlife – Terrestrial** | |
| 262. | 123 | | CDOW | Actions 124-126 need technical and conceptual revisions. The actions should be dependent upon each-other from a ecosystem point of view, in that the designation of priority habitats should be the same habitats that are of importance to the species that have been identified as priority species.<br><br>In other words, designate the priority habitat types based on the limiting factors for life cycle completion (winter, summer, breeding, ect) for the species that are designated as key priority species (for both game and non game species).<br><br>CDOW believes the language from "no action' alternative in 124 accomplishes the actions 124-126 and is much simpler to understand. | BLM (BK): Deleted rows 124 – 126.  124 Alt A moved to the old row 127.  Wildlife core are essentially the key habitats.  Other actions also deal with big game and game birds, and non-game species of special interest. |
| 263. | 123 | | CDOW | Critical habitat and crucial habitat needs a definition in the glossary. "critical" habitat in the glossary, but it is the ESA definition. These terms are used interchangeable throughout the document and they should not be.<br>We suggest the adoption of CDOW nomenclature when describing species habitat classification as much of the data used in mapping these habitats across the UFO is derived from CDOWs Natural Diversity Information Source (CNDIS). | BLM (BK): We think this is row 124.  Where "Critical" is used outside of the ESA reference, we changed to "crucial". |
| 264. | 123-126 | | CDOW | Colorado's wildlife is a public trust resource and gives all the citizens who view, hunt, fish and otherwise enjoy these natural resources.  The State of Colorado holds the principal responsibility for wildlife management, yet habitat loss is the primary cause for the decline of many wildlife species in Colorado. As highly desirable lands are altered or converted to other uses, wildlife | BLM (BK): We agree that CDOW is the agency responsible for management of populations, and BLMs responsibility is habitat for those populations. Not sure what the question is. |


BLM_0111063