**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | habitat can become degraded, destroyed and fragmented. Habitat conversion and loss can also reduce opportunities for hunting, fishing, and wildlife observation. Wildlife conservation, use and enjoyment are part of Colorado's outdoor heritage, economic future and overall quality of life.<br><br>CDOW has a legislatively mandated mission to maintain healthy, diverse and abundant wildlife populations. The quality, quantity and conservation of wildlife habitat are essential to maintaining the state's diverse wildlife populations and wildlife-related uses. | |
| 265. | 124 | | A. Schroeder (CA) | This is another comment regarding consistency of terms. On this line several apparently synonymous terms are use with regard to non-T/E wildlife habitat (key/priority habitat, crucial habitat, and critical habitat). However, only the term "critical habitat" is defined in the glossary and that in relation to ESA species. I would suggest using the term "crucial habit" here and throughout the document for these types of habitat. At the very least, define all of the terms, as used. I will not identify other areas where these terms are used in a similar manner.<br><br>Rationale: Consistency of terms. The repeated use of different synonymous terms gets confusing. | BLM (BK): Where "Critical" is used outside of the ESA reference, we changed to "crucial". |
| 266. | 124 | D | Rogers | The only habitat type we are missing is mountain shrub. Lets just designate the entire F.O.!!  How about a reword stating where feasible and focused designate portions of the following key/priority habitats…..  Otherwise it sounds like we are designating the entire F.O. (are we?!!) | BLM (BK): Rows 124 – 126 are deleted. |
| 267. | 124 | D | CDOW | Designate the priority habitat types based on the limiting factors for life cycle completion (winter, summer, breeding, ect) for the species that are designated as key priority species (for both game and non game species). | BLM (BK): Rows 124, 125 are deleted.<br>We deleted rows regarding "priority habitats".  We felt this is not needed, unless there is a habitat that is truly unique and warrants special attention.  We determined that we do not have such habitats in the planning area. |



**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | BLM also deleted the row 126 – we did not designate priority species. Rather, they are taken care of via several other actions. |
| 268. | 125 | C | B. Sharrow[2] | Add the word "habitat" before "types" | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 269. | 125 | B, C, D | A. Schroeder (CA) | Define "crucial habitat" in the Glossary. It appears to include, at least, the habitat types bulleted here. | BLM (BK): Crucial is added to glossary. EMPSi (AA): Added to glossary: "Crucial habitat types. Include biological core areas, movement corridors, reproduction areas, severe winter range, and winter concentration areas." |
| 270. | 125 | C, D | B. Krickbaum | Kate, let's talk about this comment: When there is a list, I would rather show the complete list than to say "Same as B", or "Same as B, plus…" It is easier to read (I think) if a complete alternative is shown, rather than reading parts of the alternative in two different cells. | EMPSi (KW): Per conversation with B. Krickbaum (8/10/11), will continue to use "Same as B" or "Same as B plus" but will make sure these are part of the bullets and not part of the paragraph text. |
| 271. | 125 | D | CDOW | What species are specifically meant by carnivores? We assume you didn't mean to include all meat eating wildlife species. Please define the term. However, we feel that the way this action is presented it pits species conservation and wildlife game management against each other. The habitats that support Colorado's game species are the same habitats that support species of greatest conservation need and the BLM sensitive species.<br><br>The crucial habitat types as described in the action make the most sense when ungulate species (deer, elk, pronghorn) (which are both big game and species of economic importance) are included in all the action alternatives. Otherwise, for alternative D the biological core areas, movement corridors, reproduction areas, severe and winter concentration areas may not necessarily make sense as the priority habitat for carnivores and species of greatest conservation concern. | BLM (BK): Row 125 is deleted. We deleted rows 124 and 125 regarding "priority habitats". We felt this is not needed, unless there is a habitat that is truly unique and warrants special attention. We determined that we do not have such habitats in the planning area. |



BLM_0111065

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 272. | 125 Glossary-5 | B & D 13 | M. Siders | Add to Glossary:<br><br>**Carnivore:** Mammal of the order Carnivora. Mammal that derives its energy and nutrient requirements from a diet consisting mainly or exclusively of animal tissue, whether through predation or scavenging. Examples would include mountain lion, black bear, grey fox, weasels, otter. Distinguished by having powerful jaws and teeth adapted for stabbing, tearing, and eating of flesh. | BLM (BK). We deleted this row, and "Carnivore" no longer appears in the RMP. "Carnivore" will not be added to the glossary. |
| 273. | 126 | all | CDOW | It is unclear what "upland game species" would include in this context. The CDOW interprets that to mean all non aquatic wildlife that are legally hunted or trapped. In Colorado, we separate it into 4 categories: big game, small game, upland birds, and furbearers. Please clarify so that we can focus our comments. | BLM (BK): Row 126 is deleted. We did not designate priority species. Rather, they are taken care of via several other actions. |
| 274. | 126 | D | Rogers | I know Desert Bighorn fall under sensitive but should they not go here also? Since they are also priority and key species? | BLM (BK): Row 126 is deleted. |
| 275. | 126 | D | CDOW | CDOW believes that the population level objectives for elk may not be achievable without designating them as a priority BLM species and working cooperatively to improve, sustain, and manage habitat conditions. With the expanding ex-urban development, recreation, and industrial use, the emphasis on public land habitat must rise to the challenge to support Colorado's wildlife resources. | BLM (BK): Row 126 is deleted. We did not designate priority species. Rather, they are taken care of via several other actions. |
| 276. | 127 | All | B. Krickbaum | We need maps showing each Bio Core Area and their zones. | EMPSi: Added reference to maps. |
| 277. | 127 | B | M. Siders | Include Sims Mesa Biological Core in this alternative (Fig 2-1 already has included) | BLM (BK): Sims Mesa Biological Core added to B and D. Maps show this area; maps are correct. |
| 278. | 127 | B & C | M. Siders | Under these alternatives, Burn Canyon is the larger size (Burn Canyon Zones 1, 2, 3 [pink below] plus Naturita Canyon [orange]) and Naturita Canyon should not be listed under this alternative. If it would make it more clear across alternatives, we could change "Burn Canyon" to "Naturita Canyon" with 4 | BLM (BK): Called both, combined, "Naturita Canyon". It has 4 zones. Zone 1 is the former "Naturita 1"; Former "Burn canyon 2 and 3" will become "Naturita 2 and 3"; Former "Burn Canyon 1" will become "Naturita 4". |



Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011

BLM_0111066

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**
**Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)**

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | zones.<br> | |
| 279. | 127 | B and D | B. Krickbaum | Add Sims Mesa (map is correct) | BLM (BK): Added. |
| 280. | 127 | B, C, and D | J. Jackson | Probably need 8 ½ X11 maps identifying where the zones are located so reviewers can identify where following actions are located. | EMPSi (KW): Reference to zones will be removed for the Draft RMP so that the size of the area changes and is not dependent upon zones. |
| 281. | 127 | B,C,D | Burch | I cannot adequately comment on this action since there is no reference of what/where the "Zones" are or their descriptions.<br>   Restrictions generally appear too extensive for public uses and not compatible with our Multiple Use policy. Suggest: any reference to "Zones" be deleted or otherwise identified/described. | EMPSi (KW): Reference to zones will be removed for the Draft RMP so that the size of the area changes and is not dependent upon zones. |
| 282. | 127 | b,d | B. Day (RACSG) | Sims Mesa is shown on maps (fig 2-1) as BCA, but not in table.   If it is not made an ACEC, it should be strongly considered as possible BCA, based on BLM and CDOW scientific opinion on possibility for long term sage-grouse habitat. It should be BCA in some alt- probably D, where it isn't an ACEC-to have wide enough range of alts. | BLM (BK): Sims Mesa is a Biological Core Area. The map is correct.  Sims Mesa added to Alternatives B and D. |
| 283. | 127 | b,d | B. Day (RACSG) | Lines 127 and 522 are really impossible to consider separately, because, while they may each have a wide enough range of alts, some areas really need protection as either BCA or ACEC. Decisions on what eventually goes into Alt D obviously have to look at including some areas as BCAs if they're not included as ACECs | BLM (BK): ACECs and Biological Core Areas (BCA) do not necessarily have the same purposes, values, or management goals.  All ACECs were considered for inclusion as Biological Cores.  Some did not meet the purpose of BCA. |

BLM_0111067

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)**

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | BLM did evaluate each ACEC and biological core area in the preferred alternative while reviewing with the District. |
| 284. | 127 | D | Huisjen | We need to ensure/understand that the following statement 'Designate the following areas as Biological Core areas (156,370 acres) (Figure 2-3, Appendix A) and manage to preserve as much as possible the continuity of habitats, vegetation communities, and native wildlife within' does not preclude natural processes from occurring in a managed fashion, ie fire; this acreage is 20% of the total UFO acreage.. | BLM (BK): We added "while following vegetation mosaic objectives". "Designate the following areas as Biological Core areas (156,370 acres) (Figure 2- X, Appendix A) and manage to preserve as much as possible the continuity of habitats, vegetation communities, and native wildlife within, while following vegetation mosaic objectives:" |
| 285. | 127 | D | Rogers | I don't remember looking at Dry Creek Basin as such a big CORE area I thought we had decided on the smaller portion here. As for Roubideau/Potter/Monitor I thought we were going to the lowest canyon rim??? Need clarification here!! | BLM (BK): Per Missy Siders, the Dry Creek core area shown in Alt D is correct, and is the polygon agreed to by the group. Also per Missy, the Roubideau core area shown in Alt D is that agreed to by the group, and that stopping at the lower rim would loose some of the value of the core area. |
| 286. | 127 | D | M. Siders | Include Sims Mesa Biological Core in this alternative (Fig 2-3 already has included) | BLM (BK): Added. |
| 287. | 127 | D | Joan May (CA) | We support the concept of core areas. Include San Miguel segments 4 and 6 in Alt D | BLM (BK): Excluded because they are so broken up with private land and infrastructure. Is is difficult to have these areas meet the goals of Cores. We did keep zone 7 because it is an important travel corridor. |
| 288. | 127 | D | Steve Weist (RACSG) | There is no definition for Biological core area in the glossary. There should be one so everyone (public included) knows how this term is being used. Also, what is the biological core being protected within Terror creek? This creek is dry for the majority of the year, and there is a linear construction zone (powerline) that passes through this area. | EMPSi (KW): Biological core area added to glossary. This is an important wildlife travel corridor from the Forest Service down to the N. Fork of the Gunnison. Even with powerlines, wildlife use this area. Also, it is important habitat for greenback cutthroat trout. The creek is not dry the majority of the year. |
| 289. | 127 | D | S. Bear (RACSG) | Terror Creek – Remove Terror Creek from having a Biological Core area designation. In stakeholder group meetings, it was noted that this creek segment has a 230kV high voltage transmission line crossing though the area from north to south for approximately 2.5 | BLM (BK): See comment above. Also, a biological core area does not preclude underground coal mining. |



Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011

BLM_0111068

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | miles. Maintaining both the access roads and t-line ROW for vehicle access is critical. Also, to provide for the protection and uninterrupted operation of the electrical system, vegetation within the power line ROW (100'+ width, 30+ acres) is cleared as needed, and danger trees outside the ROW may require trimming or removal on a case by case basis. Western Area Power Administration operates and maintains this line and can be contacted for further information. Due to maintenance & clearing requirements on the 30+ acres of t-line ROW (plus additional access road ROW), it is inappropriate and unmanageable to designate this area as a biological core area.<br><br>It was also evident in stakeholder group meetings that this area is beneficial to the larger community of Delta County as a result of the potential coal resources that exist in the area, and management for potential coal development should be continued . | |
| 290. | 127-132 | | CDOW | CDOW overall is encouraged by the UFO efforts to designate biological core areas. We believe that this concept is a progressive approach to conserve diverse habitats and linkage corridors across the landscape. Emphasizing biological resources as the intended purpose of a given area will help to establish, improve, and maintain diverse and proper function ecosystems and ensure the viability of essential ecosystem services to achieve clean air, clean water, and healthy land. Healthy diverse functioning habitats are directly correlated to wildlife diversity, population persistence and resilience. Connectivity that allows for seasonal migrations for species and maintains dispersal corridors for emigration and immigration of individuals are paramount to landscape level wildlife conservation. While we recognize that the blm has a multiple use mandate wildlife emphasis areas are typically nonexistent or narrowly focused on one species through ACEC designation. Biological core area | EMPSi (KW): BLM has reviewed these alternatives and believes that CSU and ROW avoidance for these areas will best meet BLM's multiple-use mandate. Under Alternative D, the BLM is proposing to manage biological core areas to fully meet or exceed land health standards, as suggested. Land health monitoring is implementation and will be considered after the ROD is signed.<br><br>Travel Restriction: Motorized and mechanized is restricted from December 1 – April 30 (old line 443)<br>Route Density: This will be deferred but considered during travel management planning for each of the travel management areas (identified in the travel management section). |



Internal Draft Alternatives for Field Office, Cooperating Agency,
and RAC Subgroup Review: June 23, 2011

BLM_0111069

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | concept affords and opportunity to elevate the biological resources through protection and conservation measures that emphasize the biological resource over other uses. CDOW had reviewed the proposed stipulations, allowable uses, management prescriptions and prohibited activities within the designated area. CDOW recommends the following actions should be incorporated in the RMP for the biological core areas to ensure biological resources are emphasized over other uses and that specific protections and insurances are in place to ensure that these areas remain functional in the future:<br>• NSO<br>• ROW Exclusion Zone<br>• Manage and monitoring biological core areas to ensure that "Fully Meets" or "Exceeds" CO Public Land Health Standards. We suggest at a minimum these areas be monitored every 3-4 years<br>• Implement a seasonal timing restrictions for motorized from Dec1-April 15 wintering wildlife<br>• Designate and implement road densities cap at 0.5[1] mile of road /sq mile<br>[1]There is a large body of evidence documenting the effects of roads on habitat quality for a wide range of wildlife species (Foreman 2003, Hebblewhite 2008, Sawyer 2006 and 2009). The response to roads for individual species varies (Foreman 2003, Wilbert et al. 1998). In many cases responses have been documented as displacement distances or avoidance buffers for individual species (see Table 1, taken from Hebblewhite 2008,). When the average documented displacement distance or avoidance buffer for a given species exceeds the distance to the nearest road across the available habitats within a given geographic area, the habitat quality for that species has decreased significantly within that geographic area.<br>According to a recent comprehensive literature review of ungulate response to road and well development, | |



**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | significant impacts to ungulate populations begin to manifest themselves when road densities reach 0.5 - 1.0 mile of road/sq. mile (Table 6, p. 88, Hebblewhite 2008). A similar road density threshold has been implicated for maintaining sustainable populations of large carnivores and bears (Van Dyke et al. 1986, Mladenoff et al. 1995, and Clevenger et al. 1997). | |
| 291. | 128 | B | M. Siders | Include Sims Mesa Biological Core in this alternative | BLM (BK): Added |
| 292. | 128 and 130 | all | B. Krickbaum | The list of areas is the same for rows 128 and 130. Combine the rows—the row exclusion and NSO Stipulation will appear in the same row. | BLM (BK): BLM combined rows 128 and 129, and combined 130 and 131. This made more sense upon further review. |
| 293. | 128-129 | D | Joan May (CA) | We would like see these rows combined with some of the core areas identified for ROW exclusion, particularly, sections 1-7 of the San Miguel Canyon and others with roadless or wilderness character, carried into alt D. | BLM (BK): 128 and 129 have been combined.<br><br>EMPSi (KW): BLM has reviewed ROW exclusion but believes that managing San Miguel canyon as ROW exclusion is not reasonable given the existing ROW authorizations and the limitations the canyon provides should new ROWs be necessary. |
| 294. | 129 | B-D | L Reed | Biological Core Areas: Why is alt D almost 5 times more acres/restrictive than alt B? How do you get from B=35,250 "preservation" C= 69,170 "development" to D=156,370 "preferred"<br><br>Also there is a note that the acres don't match the GIS – how will Lands and Minerals know what the final acreage becomes?   If the acreage does change by very much, please let us know. | EMPSi (KW)/BLM (BK): It may appear Alt D is more restrictive than Alt B, but that is only because Alt B has more acres designated as ROW exclusion (row 128; therefore Alt B is actually more restrictive than Alt D. Rows 128 and 129 have been combined into one row to clarify this. |
| 295. | 129 | D | M. Siders | Reply to yellow/red note: Make sure that Sims mesa is part of the calculation. ROW avoidance areas should include the following:<br><br>• Adobe Zones 1, 3, and 4 (20,840 acres);<br>• Dry Creek Zones 1-3 (10,800 acres);<br>• Jumbo Mountain/ McDonald Creek Zones 1-4 (17,250 acres);<br>• La Sal Zones 1-3 (22,370 acres);<br>• Monitor/Potter/Roubideau Zones 1-11 (27,320 acres); | BLM (BK): Sims Mesa added to rewritten bio section. |



BLM_0111071

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | • Naturita Canyon (1,510 acres) (part of the former Burn Canyon unit); <br> • Ridgway Zones 1 and 2 (9,070 acres); <br> • San Miguel Zones 1, 2, 3, 5, and 7 (17,840 acres); <br> • Sims Mesa (XX acres); <br> • Spring Canyon (3,380 acres); <br> • Tabeguache Zones 1, 2, 4, 5, 6, 9, and 10 (23,760 acres); and <br><br> • Terror Creek (2,230 acres). | |
| 296. | 129 and 131 | all | B. Krickbaum | The list of areas is the same for rows 129 and 131. Combine the rows—the row avoidance and CSU Stipulation will appear in the same row. | BLM (BK): BLM combined rows 128 and 129, and combined 130 and 131. This made more sense upon further review. |
| 297. | 130 | B + E | Ela (RACSG) | Elimination of non-native Rainbow Trout is ok to enhance native species – however pragmatically is impossible. Best solution is to stock only natives throughout UED waters by CDOW and USFW. | BLM (BK): We have removed reference to "priority species". Most rows show an emphasis to native species. While BLM can determine what habitat to emphasize in management, CDOW has the authority for the actual management of wildlife and fish, and they determine the fish species to stock. |
| 298. | 130 | B | M. Siders | Include Sims Mesa Biological Core in this alternative. | BLM (BK): Added |
| 299. | 130 | B & C | M. Siders | Shouldn't this be NSO/SSR (17)? | BLM (BK): We made this an NSO/SSR (added SSR). |
| 300. | 131 | B | David Sinton | Is the inclusion of the phrase "as ROW avoidance" a typo? This row deals with CSU and SSR. Row 129 deals with ROW avoidance for biological core areas. | EMPSi (KW): Change made. |
| 301. | 131 | D | Burch | The acreage here does not match or address what was analyzed under alternative B or C. The Alternatives mention portions, only, so how did D become all 156,370 acres? | EMPSi (KW): Because portions in Alt B and C were considered as NSO whereas under Alt D none were considered as NSO, instead all are CSU. We combined 130 and 131. |
| 302. | 131 | D | Clements | Insert "such as restoration of equal or greater area to offset new disturbance" after "mitigation" | BLM (BK): Not included: the district wanted reference to "off-site mitigation" deleted. Actions changed to reflect no mention of off-site mitigation. |
| 303. | 131 | D | M. Siders | See comment #45 above. <br> Comment #45: Include Sims Mesa Biological Core in this alternative (Fig 2-1 already has included) | BLM (BK): Sims Mesa added to rewritten bio section. |
| 304. | 131 | D | Steve Weist (RACSG) | What is the biological core being protected within Terror creek? This creek is dry for the majority of the year, and there is a linear construction zone | BLM (BK): This is an important wildlife travel corridor from the Forest Service down to the N. Fork of the Gunnison. Even with powerlines, |



BLM_0111072

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | (powerline) that passes through this area. | wildlife use this area.  Also, it is important habitat for greenback cutthroat trout.  The creek is not dry majority of the year. |
| 305. | 131 | D | C. Sharp (USFWS/CA) | Biological Core Areas CSU-18/ SSR-17<br><br>An SSR stipulation really means that the BLM will plan, where practical, to minimize impacts on the identified species, habitat, or resource of interest. Shouldn't this be the minimum requirement for all projects on public lands, particularly in sensitive areas, regardless of how an area is labeled? Without specifying, quantifying, or qualifying your SSR stipulation (performance-based), we are not convinced that this provides any conservation benefit.<br><br>We commend the BLM for applying seasonal restrictions to portions of the biological core areas. This will limit disturbance impacts on wildlife populations during crucial periods. However, a key component of the "core area" model/ concept is a landscape network of intact habitat reserves and movement corridors. Habitat fragmentation should be minimized by implementing the following:<br>• NSO/ NGD in portions of core areas<br>• ROW exclusion in portions of core areas, excepting existing corridors/ routes<br>• CSU/ SSR with performance-based disturbance thresholds to limit habitat fragmentation (i.e., no more than 5% disturbance in zone, OR no more than existing disturbance in core area, AND a route density threshold such as no more than .5 miles/ mi.²)<br>• No leasing; mineral withdrawal<br>• Improvements to increase habitat carrying capacity for wildlife species<br><br>As proposed, the CSU/ SSR stipulation essentially | BLM (BK): We are keeping this as an SSR.  When considering proposals, the SSR is designed to protect the values.<br><br>Also, cores will remain CSU, ROW avoidance.<br><br>Improvements are allowed, but are an implementation decision, which would be after the RMP is completed. |



BLM_0111073

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | means that some conservation will be attained if fluid mineral activities are involved; but that there are no assurances of conservation/ protection if BLM projects or other non-oil and gas activities are proposed/ implemented.<br><br>For imperiled species, we should err on the side of conservation by beginning with truly protected areas (e.g., by prohibiting surface disturbance and surface occupancy for all activities). Where appropriate, the BLM could then provide exceptions for certain activities that meet specific criteria, subject to Sec.7 as appropriate. | |
| 306. | 131 | Preferred | T. Stranathan | This appears to be the most restrictive.  Would like to have "B" chosen. | EMPSi (KW): Portions in Alt B and C were considered as NSO whereas under Alt D none were considered as NSO, instead all are CSU. We combined rows 130 and 131. |
| 307. | 132 | all | Armstrong[1], Sharrow[2] | Delete row.  Too many travel seasonal closures. Can revisit when we do area travel management plans. | BLM (BK): See the new Wildlife/SSS.  Travel management deleted from here.  Left in Travel Management, with changes. |
| 308. | 132 | B & D | M. Siders | Add Sims Mesa Biological Core area to this action. | BLM (BK): Moved to the travel section. |
| 309. | 132 | B-D | L Reed | Wintering wildlife:  "prohibit motorized/mechanized travel  on 71,760 acres from Dec 1 thru April 30" We need to include some exceptions to this action ie where there are existing ROWs, O&G wells etc. exceptions for emergency access, maintenance, monitoring of wells, etc is allowed.    Is there a map to show where these 71,760 acres are located since it sounds like it only includes certain zones of the bio core areas and also "other" areas?<br><br>Is this restriction (Line 132) really necessary?   Alt D also includes a big game crucial winter habitat timing limitation on 495,260 surface acres covering the same time period? | EMPSi (KW): Travel restrictions would not impact existing authorizations such as ROWs, O&G well access, emergency, grazing permitees, etc. Added "except for administrative purposes" for clarification in travel management section.<br><br>Seasonal restrictions are necessary to meet the goals of the biological core areas. |
| 310. | 132 | D | Burch | Prohibiting motorized/mechanized travel in the extensive areas identified (although I can't tell for sure since it refers to "Zones" which are not identified) | EMPSi (KW): Travel restrictions would not impact existing authorizations such as ROWs, O&G well access, emergency, grazing permitees, etc. |



BLM_0111074

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | must allow for administrative purposes – due to (at least) range and grazing management. The areas include grazing allotments that have permitted use during winter time. Motorized use is critical to administration of the permit for BLM as well as the operator. | Added "except for administrative purposes" for clarification in travel management section.<br><br>Seasonal restrictions are necessary to meet the goals of the biological core areas. |
| 311. | 132 | D | Rogers | Grazing valid existing right? Can take sheep camps in, and check water and livestock?  Does this need to be stated in exceptions or considered a valid existing right? | EMPSi (KW): Travel restrictions would not impact existing authorizations such as ROWs, O&G well access, emergency, grazing permitees, etc.<br>Added "except for administrative purposes" for clarification. |
| 312. | 132 | D | Joan May (CA) | Include closure from B in Alt D for San Miguel Canyon | EMPSi (KW): Due to the highway, the BLM has determined that a closure of this area is not reasonable. |
| 313. | 132 | D | Pfifer | Current winter wildlife stip limits surface disturbing activities during these times and not access, so are administrative and permitted users still allowed access and we be exempted from this? | EMPSi (KW): Yes, administrative access permitted. Added "except for administrative purposes" for clarification. |
| 314. | 132 | D | J. Jackson | Missing areas in the matrix that are seasonally closed but map (Figure 2-20) is correct.  Such as the Sims Mesa area, additional acreage on the West End however not sure about the rest because don't have a map of the zones for each Biological Core.<br><br>Delete the following language:<br>"Add other areas as appropriate through future site-specific travel management analysis"<br><br>And add the following language (also in travel matrix):<br><br>The Field Manager may grant an exception if an environmental analysis indicates that the proposed action can be conditioned so as not to interfere with habitat function or compromise animal condition within the project vicinity. An exception may also be granted if the proponent, BLM and CDOW negotiate compensation that would satisfactorily offset anticipated impacts to wintering wildlife survival or habitat condition. An exception may also be granted | EMPSi (KW): Row deleted – covered by Comprehensive Travel management row 443.<br><br>EMPSi (JW): Edits to row 443 (per email from BK on 10/19/11)  include:<br>• Sims Mesa added to the seasonal travel restrictions in the travel management section.<br>• Did not delete "Add other areas as appropriate through future site-specific travel management analysis".<br>• Added the following paragraphs per BK:<br>The Field Manager may modify the size and time frames if Colorado Division of Wildlife monitoring information indicates that current animal use patterns are inconsistent with the areas or dates established for animal occupation, or under mild winter conditions for the last 45 days of the closure.  Severity of the winter will be determined on the basis of snow depth, snow crusting, daily mean temperatures, |



BLM_0111075

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | for actions intended to enhance the long term utility for availability of suitable habitat. The Field Manager may modify the size and time frames if Colorado Division of Wildlife monitoring information indicates that current animal use patterns are inconsistent with the areas or dates established for animal occupation, or under mild winter conditions for the last 30 days of the closure. Severity of the winter will be determined on the basis of snow depth, snow crusting, daily mean temperatures, and whether animals were concentrated on the winter range during the winter months. Modifications could be authorized if the proposed action could be conditioned so as not to interfere with critical habitat function or compromise animal condition. | and whether animals were concentrated on the winter range during the winter months. Modifications could be authorized if the proposed action could be conditioned so as not to interfere with critical habitat function or compromise animal condition. An exception may also be granted for actions intended to enhance the long term utility or availability of suitable habitat. |
| 315. | 133 Glossary - 31 | B, C, D 35 | M. Siders | Add to Glossary: Upland Game Birds:  Non-waterfowl game birds usually hunted with pointing breed, flushing spaniels, and retrievers.  Upland game birds include grouse, chukar, quail, snipe, doves, pigeons, ptarmigan, wild turkey. | EMPSi (KW): Added to glossary. |
| 316. | 133 | D | M. Siders | Should read: "Enhance or restore terrestrial habitat to benefit primarily native, nongame species.  In cooperation with CDOW, enhance or restore terrestrial habitat to support native game species populations (deer, elk, upland game birds and waterfowl), emphasizing winter range and crucial habitat types." | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 317. | 133 | D | C. Sharp (USFWS/CA) | Semantics: This decision appears to favor rare or non-game species over other species. Is that the intent? Alternatives B and C were written disparately to represent a range of alternatives, but I'm not sure adopting Alternative B as written ("benefit primarily native, non-game…") (minus the target acreage) is advisable. Perhaps it can be rewritten as a management decision that strives to provide for the wildlife community as a whole, with emphasis on imperiled | BLM (BK): Left as it is.  The action includes non-game as well as game species. |



BLM_0111076

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | species… <br><br> Without quantifying, this action is tenuous, and is just a repeat of the stated goals for this resource. We recommend tying a reasonable target to habitat improvement actions. | |
| 318. | 134 | | CDOW | Because this area was recently occupied makes is a strong and likely candidate for Critical Habitat designation. Land use modification and protections combined with habitat work are likely precursors for implementing population restoration or augmentation for the CDOW. CDOW has a strong desire to recover this species range-wide, and believes that an ACEC designation is appropriate given the tasks of habitat improvement and conservation practices necessary for GUSG recovery on Sims Mesa. However, CDOW is not familiar with the criteria used to designate ACECs and is less interested in the title of this area (ACEC or a Biological Core Area) than we are with the stipulations, allowable uses, management prescriptions and prohibited activities within the designated area. Regardless of the title, CDOW recommends the following actions should be incorporated in the RMP for the Sims ACEC/biological core area: <br> • NSO; <br> • Mineral withdrawal; (without mineral withdraw the noise standards in outlined GUSG RCP and recommendations in Appendix B for GUSG will be difficult to achieve); <br> • ROW Exclusion Zone; <br> • Increase monitoring to ensure that the area "Fully Meets" or "Exceeds" CO Public Land Health Standards. Utilize the GUSG Range-wide Conservation Plan as framework to set habitat objectives; <br> • Implement a seasonal timing restrictions from Dec1-April 15 (more TL restrictions may be implemented | EMPSi (KW): This comment does not seem to correspond to row 134 in the alternatives matrix. BLM has determined that the Sims Mesa Area will be managed like the other biological core areas (CSU, ROW avoidance). The BLM does not feel a mineral withdrawal in this area is necessary. Land health monitoring is implementation and will be considered after the ROD is signed. Travel restrictions will be implemented as suggested. Road densities will be considered during travel management planning for the travel management area (see travel management section). <br><br> BLM (BK): The Sims Mesa allotment was acquired by CDOW against BLM regulations (CFR 4110.1 (1), (2), (3)). It was never offered to other persons interested in the allotment which does not follow CFR 4130.1-1 and 4130.1-2. The objectives for Grazing Administration 4100.0-2 states to promote to orderly use improvement and development of the public lands and to provide for the sustainability of the western livestock industry and communities that are dependent upon productive healthy public rangelands. This allotment is one of the largest allotments in the Colona area contributing to the western livestock industry. This is a traditional sheep allotment that is outside the area where there are bighorn sheep and domestic sheep issues. <br><br> Last bullet does not require land use plan decision. |



BLM_0111077

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | once GUSG can be reestablished and seasonal use patterns, lekking, production, wintering, ect. can be determined);<br>• Designate and implement a road densities cap at 0.5 mile of road /sq mile<br>• Retire the Sims Mesa grazing allotment (note: this is an allotment formerly held by CDOW and is now incorporated into the JMA);<br>• Pursue opportunities such as the Land and water conservation fund to purchase private lands within the boundaries of the biological core area to reduced the threat of further habitat fragmentation and development. | |
| 319. | 134 | All | Burch | Redundant: This action already exists under vegetation (and possibly fuels). It is implied.<br>Suggest: Delete from this section. | BLM (BK): Agreed—row deleted.  Same as row 68. |
| 320. | 134 | All | Clements | Action same as ln 68-which has had suggested change in wording-is it necessary to be included twice? | BLM (BK): Agreed—row deleted.  Same as row 68. |
| 321. | 134 | all | Holsinger | Is a repeat of veg line 68 are identical would suggest eliminating one or the other to reduce redundancy. | BLM (BK): Agreed—row deleted.  Same as row 68. |
| 322. | 134 | B & D | M. Siders | Have we identified where the "vegetation mosaic objectives" come from?  i.e. Fire Plan. | EMPSi (KW): yes, added for clarification in line 68. |
| 323. | 135 | NEW Action before 135 or after 144, Alt D | CDOW | Cooperative habitat treatment projects that are funded in part by non BLM sources that are specifically designed to improve wildlife habitat will have an emphasis on wildlife use. | EMPSi (KW): BLM can do this independently of an RMP decision. |
| 324. | 145 | All | B. Krickbaum | Move to Fluid Minerals, unless there is a better location.  This doesn't seem to fit under wildlife. | EMPSi (KW): Change made. |
| 325. | 145 | D | CDOW | Fluid mineral development is incompatible the purpose and use of SWAs. We strongly support this preferred alternative and encourage the BLM to retain this throughout the ROD. | EMPSi (KW): Thank you for your comment.<br>(Also, this action has been moved to the "Fluid Mineral" section.) |
| 326. | 145 | D | C. Sharp (USFWS/CA) | Also apply stipulation/ decision to any future acquired/ designated national recreation areas, state parks, municipal parks, and wildlife areas. | BLM (BK): We deleted the list of state wildlife areas.  Now the NSO applies to all current and future State Parks, Wildlife Area and municipal parks. |
| 327. | 146 | All | B. Krickbaum | Move to the Coal section. | EMPSi (KW): Change made (included in Screen 3 |



BLM_0111078

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | list) |
| 328. | 146 | B, C, D | A. Schroeder (CA) | Add Curecanti National Recreation Area. | EMPSi (KW): Change made; moved to Coal section. |
| 329. | 146 | D | C. Sharp (USFWS/CA) | Also apply decision to future acquired/ designated state parks, national recreation areas, state wildlife areas, and municipal parks | BLM (BK): We deleted the list of state wildlife areas. Now this applies to all current and future State Parks, Wildlife Area and municipal parks. Information moved to Coal section. |
| 330. | 147 | | B. Krickbaum | Replace "to" with "as". | BLM (BK): Change made. |
| 331. | 148 | All | M. Siders | We lost the timing limitations for desert bighorn sheep.  Was in SSS section, but seems to have been lost in the merging.  Can we resurrect? Had TL-x: Desert Bighorn Sheep Reproduction (calving/ fawning/ lambing) Areas, TL -x Bighorn Sheep Crucial Winter Range (Severe Winter Range and Winter Concentration Areas), CSU/SSR-x: Desert Bighorn Sheep Summer Range | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 332. | 148 | D | B. Krickbaum | Replace bullet list with:<br><br>• Elk, pronghorn antelope, mule deer, and moose: December 1 to April 30; and<br>• Rocky Mountain and desert bighorn sheep: November 1 to April 30. | BLM (BK): Change made. |
| 333. | 148 | D | M. Siders | Should read: "Rocky mountain and Desert bighorn sheep: November 1 to April 30" | EMPSi (KW): Change made. |
| 334. | 148 | D | Pfifer | Change throughout the document "production" to "authorized" because TLs apply to ROWs and other programs as well.<br><br>Note that big game crucial winter range areas have doubled in acreage – from 267,480 to 495,350 – how can this be? Over half of the FO would be stipped out from 11 or 12/1 to 4/30, and more depending on the species, including all year | BLM (BK): The Stipulations appendix (App B), section B.1.4 (TL) has a statement the reads: "This stipulation does not apply to operation and basic maintenance activities …" The statement in the alternative matrix ("This stipulation does not apply to operation and maintenance of production factilities") is removed from all TLs, since it is stated globally in the appendix. |
| 335. | 148, 149 | D | Burch | With reference to Appendix A – map 2-50; The timing limitation appears to apply to 90% of the field office area! This amount of closure/limitation is unrealistic for the multiple use policy of public lands and our office limitations of people and funds for Enforcement. | BLM (BK): We discussed with Field Office and District management.  We will leave as it is.  Also, there is exception  criteria – see appendix B. |



BLM_0111079

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 336. | 148, 149, 167, 169, 259, B-079, B-083, B-085, B-101 | | M. Siders | Need to better define "This stipulation does not apply to operation and maintenance of production facilities." Need to refine to mean low/everyday level of disturbance (i.e. things done with a pickup truck), and activities that require larger machinery or longer periods of time (i.e. workover rigs) | EMPSi (KW): This is further discussed in Appendix B, Section B.1.4, Timing Limitations. Removed from individual stips in Chapter 2 and Appendix B. |
| 337. | 149 and 150 | D | Huijsen | Why does Line 150 allow for disturbance of elk calving areas from mechanized/motorized but line 149 prohibits any surface occupancy/surface disturbing activities in elk calving habitat?  This seems to be a discrepancy.  Also, there is some consensus that we have lots of elk (too many?!) so why are we protecting calving areas for elk anyway? | BLM (BK): BLM has very few acres of elk calving areas. Group didn't feel that travel on designated routes would be as disruptive as other surface-disturbing activities during calving period.  Given the few small pieces, it would also be difficult to manage. |
| 338. | 149 and Glossary- 30 | All 06 | M. Siders | Add to glossary. **Surface disturbing activities**: human-caused disturbance resulting in direct and pronounced alteration, damage, removal, displacement, or mortality of vegetation, soil, or substrates; usually entail motorized or mechanized vehicles or tools; typically can also be described as disruptive activities (see following definition). Examples of typical surface disturbing activities include: <br>• Earth-moving and drilling <br>• Geophysical exploration <br>• Off-route motorized and mechanized travel <br>• Vegetation treatments including woodland thinning with chainsaws <br>• Pyrotechnics and explosives <br>• Construction of powerlines, pipelines, oil and gas wells, recreation sites, livestock improvement facilities, wildlife waters, or new roads. <br>• Examples of casual use and other activities that would not normally be considered surface disturbing activities: <br>• Equestrian use <br>• Proper livestock grazing <br>• Cross-country hiking | EMPSi (JW): per email from BK on 10/17/11, definitions for "surface disturbing activities" and "disruptive activities" have been added to the glossary. |



BLM_0111080

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | • Hand-spraying weeds<br>• Minimal trimming of vegetation to maintain ROW's<br>• Motorized and mechanized travel on designated routes<br>• Maintenance of permitted areas under valid existing rights<br><br>**Disruptive activities:** human-caused disturbance that induces stress on a population, community, or ecosystem and potential loss of species fitness (survival, reproduction, and recruitment), usually within crucial habitats or other sensitive areas during specific time periods; may or may not entail surface disturbance Examples of disruptive activities:<br>• Surface disturbing activity examples provided above<br>• Potentially all casual use examples provided above<br>• Commercial recreation activities, especially large groups<br>• Abnormally loud or sustained noise<br>• Road or ROW maintenance | |
| 339. | 150 | D | B. Sharrow[2] | Change to:<br>To protect elk calving areas, prohibit motorized and mechanized travel in closure areas and during times identified in the Dry Creek Travel Management Plan and EA (BLM 2009). | BLM (BK): Change not made. We determined there were not any elk calving areas identified in the Dry Creek TMP. |
| 340. | 150 | D | M. Siders | Should read: "No similar action; this is addressed by other actions (line 149)." | BLM (BK 10/5/11): Correct, Change made. A travel restriction in the Storm King area, if needed, can be done during travel management planning. The action above this one (TL-11: *Big Game Reproduction Areas*) closes the area to surface occupancy and surface-disturbing activities 4/15 – 6/30, which is where the real protections come in to play. |
| 341. | 150 | D | CDOW | CDOW believes that a travel restriction in Elk calving areas is important in reducing neonate mortality, and thereby helping recruitment. Please add to the preferred or ensure that travel management planning avoids the areas with the dates specified in Appendix B. | BLM (BK): BLM has very few acres of elk calving areas. Group didn't feel that travel on designated routes would be as disruptive as other surface-disturbing activities during calving period. Given the few small pieces, it would also be difficult to manage. |



BLM_0111081

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 342. | 150 | D | Joan May (CA) | Why no seasonal closure for calving areas in Alt D? | BLM (BK): BLM has very few acres of elk calving areas. Group didn't feel that travel on designated routes would be as disruptive as other surface-disturbing activities during calving period.  Given the few small pieces, it would also be difficult to manage. |
| 343. | 151 | D | CDOW | While implementing the WAFWA guidelines and the Interagency MOU there should be the general focus of Desert and Rocky Mountain bighorn sheep management; actions need to be identified in the RMP that will maintain the existence of bighorn populations.  In accordance with the BLM/CDOW Desert Bighorn Management Plan (1989), bighorns will be managed as equal to all other landuses.  Furthermore, the WAFWA guidelines state that land management agencies manage domestic sheep or goat grazing to achieve effective separation, reduce risk of association, and avoid range overlap with wild sheep.  The WAFWA guidelines provide recommendations to be incorporated into RMP's, not merely referenced as BMP's.  It is also our understanding that BLM staff has made considerable changes to the draft preferred alternative, so we will be waiting to provide additional comments on that version when it is presented to the cooperating agencies. | BLM (BK): Change made – new action on sheep added (see livestock grazing – action deleted from the wildlife section). |
| 344. | 151 | D | C. Sharp (USFWS/CA) | Identify solutions now to mitigate bighorn sheep-livestock conflicts. Otherwise, this is "planning to plan". | BLM (BK): Change has been made.  A risk assessment has been completed. |
| 345. | 152 | All | CDOW | Although, desert bighorn sheep have been transplanted, a commitment to "ensure species viability in the region" remains. We encourage the BLM to adopt by reference the Colorado Desert Bighorn Sheep Management Plan (1989) and work with the CDOW to update and continue to implement the plan. | EMPSi (KW): BLM does not need a planning decision to work with CDOW to update and implement the Colorado Desert Bighorn Sheep Management Plan as long as actions in the plan are in accordance with the RMP. |
| 346. | 154 | B | B. Krickbaum | Replace "pursue options for" with "allow" | BLM (BK): Change made. |
| 347. | 155 | D | C. Sharp (USFWS/CA) | An SSR stipulation really means that the BLM will plan, where practical, to minimize impacts on the identified species, habitat, or resource of interest. Shouldn't this be the minimum requirement for all projects on public | BLM (BK): We are keeping this as an SSR.  When considering proposals, the SSR is designed to protect the values. |



BLM_0111082

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | lands, particularly in sensitive areas, regardless of how an area is labeled? Without specifying, quantifying, or qualifying your SSR stipulation, we are not convinced that this provides any conservation benefit. For instance, if you applied a specific SSR for Gunnison sage-grouse nesting areas (4-mile buffer) to avoid all surface disturbance, or no more than 1% disturbance, in all suitable nesting habitat within the defined buffer, that would be an effective SSR stipulation. As proposed, the majority of your biological stipulations prescribe an SSR combined with CSU or NSO, which essentially means that some conservation will be attained if fluid mineral activities are involved; but that there are no assurances of conservation/ protection if BLM projects or other non-oil and gas activities are proposed/ implemented.<br><br>For imperiled species, we should err on the side of conservation by beginning with truly protected areas (e.g., by prohibiting surface disturbance and surface occupancy for all activities). Where appropriate, the BLM could then provide exceptions for certain activities that meet specific criteria, subject to Sec.7 as appropriate. | |
| 348. | 156 | B | Ela (RACSG) | Use TL in managing to specific areas as a compromise with recreationability though I agree expensive in enforcement. We might get CDOW to share in enfocement since they have lots larger staff for this issue. | BLM (BK): We cannot reply – we cannot find the row you refer to (it is not 156). Sorry. |
| 349. | 156 + related | D + E | Ela (RACSG) | I would strong[ly] support for Bill's expertise on these comments, | BLM (BK): We are fully considering all of Bill Day's comments. |
| 350. | 156-159 | BCD | Joan May (CA) | Can you specify which actions address the ALT A issues? | EMPSi (KW): Addressed generally (FO-wide) by row 372 in livestock grazing section. |
| 351. | 158 | | CDOW | We are making the assumption that biological core areas will serve as the areas where wildlife are emphasized and forage priority will be to wildlife. | EMPSi (KW): The UFO is trending away from allocating forage one way or another. Land Health Standards and drought management plan will help with forage management. |
| 352. | 160 | All | B. Sharrow[2] | At the end of the action, add "Review every 5 years". | EMPSi (JW): change made to Alternatives B-D. |



BLM_0111083

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 353. | 160 | all | CDOW | We suggest to help achieve the standards for public land health incorporate additional quantitative monitoring and allocate resources to ensure that the monitoring is completed. | EMPSi (KW): Monitoring will be done during implementation after the Record of Decision for the plan is signed.  Monitoring will be in accordance with the monitoring plan. |
| 354. | 160 | B-D | M. Siders | Should read: "Develop a strategy with the CDOW to achieve desired habitat conditions for priority native species and to achieve …" | BLM (BK): Change made |
| 355. | 160 | D | C. Sharp (USFWS/CA) | We recommend tying a target date commitment to this action—i.e., "standard survey protocol for key species and habitats will be compiled no later than one year following the signing of the ROD, in coordination with CDOW, USFWS, and other partners." | BLM (BK): No change.  The implementation plan will determine the target date. |
| 356. | 167 | B | M. Siders | Should read "Apply CSU/SSR restrictions within 0.25-mile of known breeding grounds and at nest sites of all waterfowl and shorebird species" | BLM (BK): Row deleted – taken care of with row 39. |
| 357. | 167 | D | C. Sharp (USFWS/CA) | An SSR stipulation really means that the BLM will plan, where practical, to minimize impacts on the identified species, habitat, or resource of interest. Shouldn't this be the minimum requirement for all projects on public lands, particularly in sensitive areas, regardless of how an area is labeled? Without specifying, quantifying, or qualifying your SSR stipulation, we are not convinced that this provides any conservation benefit. For instance, if you applied a specific SSR for Gunnison sage-grouse nesting areas (4-mile buffer) to avoid all surface disturbance, or no more than 1% disturbance, in all suitable nesting habitat within the defined buffer, that would be an effective SSR stipulation. As proposed, the majority of your biological stipulations prescribe an SSR combined with CSU or NSO, which essentially means that some conservation will be attained if fluid mineral activities are involved; but that there are no assurances of conservation/ protection if BLM projects or other non-oil and gas activities are proposed/ implemented.<br><br>For imperiled species, we should err on the side of conservation by beginning with truly protected areas | BLM (BK): We are keeping this as an SSR.  When considering proposals, the SSR is designed to protect the values. |



BLM_0111084

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | (e.g., by prohibiting surface disturbance and surface occupancy for all activities). Where appropriate, the BLM could then provide exceptions for certain activities that meet specific criteria, subject to Sec.7 as appropriate. | |
| 358. | 169 + 183 | B + E | Ela (RACSG) | Since USFS controls 90% of productive habitat for elk, be sure the 10% wag of the dogs tail does well collaboratively with USFS to fit the dog. BLM should compromise to collaborate with USFS since USFS has 90% of elk habitat. | BLM (BK): We try to be consistent with USFS if needed.   We also feel our actions on elk habitat are adequate. |
| 359. | 171 | D | Clements | Seems outside of range of alternatives | EMPSi (KW): Preferred alternative does not fall between Alternatives B and C as it was developed after the other alternatives were developed. This allowed the preferred alternative to be outside of the range. |
| 360. | 171 | D | Clements | Can we insert "native" in front of "riparian/water"? | BLM (BK): Row deleted.  Action is covered by actions in "riparian". |
| 361. | 171 through 177 | B,D | Burch | Suggest:  Combine the language (especially that in D) into one action with the action on line# 171. Suggest to start with the overall statement as it is in 171 add 177: then list the ways to manage for all and delete the rest. (Needs condensed for the reader.) | BLM (BK): Rows deleted – covered by actions in other sections. |
| 362. | 171-176 | D | C. Sharp (USFWS/CA) | Without quantifying, this action is tenuous, and is just a repeat of the stated goals for this resource. We recommend tying a reasonable target to habitat improvement actions. | BLM (BK): Rows deleted.  All actions shows in these rows are covered by actions in other sections (e.g., vegetation, riparian, SSS). |
| 363. | 172 - 176 | Entire Row | B. Krickbaum | Replace rows 172 – 176 with the single row shown in **Attachment C**. *See comments from B. Krickbaum: Z:\Shared\Projects\F-0126 UFO RMP\2_Deliverables\17_P3T7_Alternatives(Ch2)\3.7.D_BLM-CA-RACSC-Cmts\BLM (file name: Ch2_draft_UFO-Comments_062311_Krickbaum.docx)* | BLM (BK): Rows deleted – covered by actions in other sections. |
| 364. | 173 | d | B. Day (RACSG) | D should incorporate "no net loss" from B. Range of alts is good, though. | BLM (BK): Rows deleted – covered by actions in other sections. |
| 365. | 175 | D | B. Sharrow[2] | Note: B. Krickbaum combined rows 172-176 into one.  Delete the last bullet (bullet regarding managing prairie | BLM (BK): Rows deleted.  See the new Wildlife/SSS. |


BLM_0111085

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | dog release areas).<br><br>Reason: UFO is not going to manage release areas. | |
| 366. | 175 | B,D | Burch | Migratory Birds section – "In cooperation with CDOW for developing and managing prairie dog release areas…" does NOT fit well, here. A different action should be used for the different species – just like all the rest of the wildlife section.  The prairie dog release action/analysis should have been a stand- alone. | BLM (BK): Rows deleted – covered by actions in other sections. |
| 367. | 175 | BCD | Clements | Should all be "semidesert shrub habitat" | BLM (BK): Rows deleted – covered by actions in other sections. |
| 368. | 176 | d | B. Day (RACSG) | D should incorporate "no net loss" from B.  Range of alts is good, though. | BLM (BK): Rows deleted – covered by actions in other sections. |
| 369. | 178 | All | B. Krickbaum | Delete row – intent of this LN is covered by the CSU is row 179. | BLM (BK): Rows deleted. |
| 370. | 178 | BD | Clements | Delete "in" 6th line from bottom | BLM (BK): Rows deleted – covered by actions in other sections. |
| 371. | 179 | D | B. Krickbaum | Add:  "This stipulation does not apply to operation and maintenance of production facilities." | EMPSi (KW): This sentence removed from stipulations in chapter 2 as it is covered in Appendix B. Removed from individual stipulations in Appendix B. |
| 372. | 179 | Preferred | T. Stranathan | Migratory bird habitat could possibly be the entire FO. Will there be an exception granted if Survey does not contact any live migratory birds? This would allow most oil and gas operations a 4 month only drilling window when combined with Big Game TL if exceptions were not allowed.  As it appears could happen on over 500,000+ acres if only the potential habitat is recognized by this stip.  There is also a maximum project size tied to the exception criteria, OG may typically disturb slightly larger number of acres. | BLM (BK): TL now says "where nesting birds are present". |
| 373. | 180 | D | Clements | Insert "in"before "net" 6 lines above bottom | BLM (BK): Reference to "No Net Loss' is deleted, per management preference. |
| 374. | 180 | D | B. Krickbaum | Add the word "in" between "result" and "net". So, "Manage activities so they do not result in net loss…" | BLM (BK): Reference to "No Net Loss' is deleted, per management preference. |
| 375. | 180 | D | M. Siders | "lands identified for wilderness characteristics | BLM (BK): Row 180 changed |



Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011

BLM_0111086

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | protection." Is this the correct wording at this point? Or should it read "areas identified as lands with wilderness characteristics"? | |
| 376. | 180 | D | C. Sharp (USFWS/CA) | Migratory Bird Breeding Habitat CSU-23/ SSR-22<br><br>We commend the BLM for applying measures to avoid net loss of designated key/ priority habitats for migratory bird species. This is an example of a performance-based SSR aimed at conservation benefit, along with the TL for migratory birds.<br><br>Other SSR stipulations, to the extent possible, should take a similar approach (quantified or qualified, performance-based, conditional, etc.). | BLM (BK): Reference to "No Net Loss' is deleted, per management preference. |
| | | | | **Special Status Species** | |
| | | | | **Special Status Species – General** | |
| 377. | 184 | Chapter 2 Line 184 | Ela (RACSG) | Also uses "sensitive" to add to my confusion there and elsewhere. OR does this come under the cliché which says "consistency is the hobgoblin of a small narrow-mind." | BLM (BK): BLM sensitive species of conservation concern that are identified by the BLM state director.   This is different than federally listed (Threatened and Endangered) species |
| 378. | 184 | C | M. Siders | Should read "Maintain special status terrestrial and aquatic species populations and habitats. Maintain special status plant populations …" | EMPSi (KW): Change made. |
| 379. | 184 | D | C. Sharp (USFWS/CA) | Special Status Species-General Objective<br><br>What about "protection" of these species? This is stated as part of the resource goal, so it makes sense that it would be reflected in the actions too. Include *protection* as part of decision language. | BLM (BK): We are required by law to "protect". Also, "maintain, restore, enhance, preserve" are all a part of protecting. |
| 380. | 185 | A | M. Siders | Only part of this action in Alt A matches the Actions B-D. "Protect, maintain, and enhance the following:<br>• Critical habitats for big game, upland game birds, and waterfowl;<br>Comply with the FLPMA to maintain, enhance, and protect fish habitat on public lands."<br>should be moved to the Wildlife General Section. | BLM (BK): 185 is now part of the objective (184) |



Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011

BLM_0111087

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | And "Protect, maintain, and enhance the following: • Crucial habitats for nongame species of special interest or concern to state and other federal agencies (BLM 1985). Comply with the FLPMA to maintain, enhance, and protect fish habitat on public lands." should be left here. | |
| 381. | 185 | B | David Sinton | Please remove "proposed, " | EMPSi (KW): Change made. (Also, now part of objective) |
| 382. | 185 | C, D | C. Sharp (USFWS/CA) | Special Status Species-General Designation of key species<br><br>Generally, in terms of status and obligations under ESA, proposed species are in greater need of protection/ attention than candidates, which have no legal protection or enforcement under ESA. ESA regulations allow for conferencing (similar to consulting) for proposed species, and other non-consultation programs for candidates. Since you designate candidates as a key/ priority species for these alternatives, you should also include proposed species. | BLM (BK): We have deleted reference to "proposed" species. We disagree that they need greater protection. Any species can be added to the proposed list upon submission of a proposal by anyone. |
| 383. | 186 | B | C. Sharp (USFWS/CA) | Special Status Species-General Designation of habitat types<br><br>For the preservation alternative (B), I would also expect to see an effort to protect habitat based on special status species occupancy (potential, suitable, occupied, historic habitat). Or is the assumption that these habitat types would be encompassed in the veg types listed? If not, I would recommend adding the habitat types as listed in Alt. D. | BLM (BK): Change made. |
| 384. | 186 | C | C. Sharp (USFWS/CA) | Special Status Species-General Designation of habitat types<br><br>The designated priority/ key habitats do not agree with the designated priority/ key species in line 185. For instance, under Alt. C, clay-loving wild buckwheat | BLM (BK): Change made. |



BLM_0111088

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | would be considered a key species, but not its habitat (salt-desert shrub). Edit to match and check for consistency within other alternatives as well. | |
| 385. | 186 | D | C. Sharp (USFWS/CA) | Special Status Species-General Designation of habitat types

The Service pays close attention to historic habitat for T&E, particularly unaltered historic habitat, or areas that can be remediated to suitable condition. Does the BLM UFO consider "suitable" habitat to also include historic habitat??? Please clarify and include historic habitat in this action.

Consistent with comment #3 above related to proposed species, add "proposed critical habitat" to list of designated habitats.

Finally, what do you consider occupied habitat? Populations plus a 200-meter buffer? A minimum convex polygon? Does it vary by species? Please specify here and/or include in the glossary. This has huge implications for how/ where/ etc. the stipulation will be applied. | BLM (BK): We are not including only USFWS designated habitat.

We no longer refer to Occupied. Now it reads "Recognize USFWS designated critical habitats as key-priority areas" |
| 386. | 187 | all | B. Krickbaum | Move row to after row 189. | BLM (BK): Change made |
| 387. | 187 | C | M. Siders | Should be "No similar action." This action was already stated at line 106. | BLM (BK): Change made |
| 388. | 187 | D | B. Krickbaum | Replace "Pursue opportunities for" with "Allow". Thus, "Allow augmentation…" | BLM (BK): Action changed. |
| 389. | 189 | B | C. Sharp (USFWS/CA) | Special Status Species-General Prohibitions under ESA

"…federally protected species" and proposed critical habitat—do you mean threatened and endangered species only? For Alt. B (preservation), I would expect to see protections for threatened, endangered, proposed, and candidate spp. Please clarify. | BLM (BK): Row deleted.  Not needed, since refers to jeopardy, which we cannot cause. |
| 390. | 189 | D | C. Sharp (USFWS/CA) | Special Status Species-General Prohibitions under ESA | BLM (BK): We have deleted reference to "proposed" species.  We disagree that they need |



BLM_0111089

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | And proposed species. (You included proposed critical habitat…) | greater protection.  Any species can be added to the proposed list upon submission of a proposal by anyone. |
| 391. | 190 | all | B. Sharrow[2] | Change the LN to a CSU Stipulation<br><br>Allowable Use:<br>**STIPULATION** CSU-XX: *Endangered Species Act Section 7 Consultation, and BLM Special Status Species.* The lease area may now, or is known to, contain plants, animals, or their habitats determined to be threatened, endangered, or other special status species. To avoid impacts to endangered, threatened, proposed species, designated critical habitat, or BLM special status species, lessees must contact the UFO prior to any surface activities associated with this lease.  The lessee may be required to conduct additional inventories to insure that there are no protected species present on the proposed disturbance sites. The BLM may recommend or require modifications to, or disapprove, exploration and development proposals to avoid BLM-approved activity that will contribute to a need to list such a species or their habitat. Modification or disapproval may also be required on a proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat.  This could include completion of any required conference or consultation with USFWS.  Additionally, project modifications may be required to avoid impacts to BLM sensitive species. (Refer to Appendix B.) | BLM (BK): Change made in new Wildlife/SSS section. |
| 392. | 190 | A-D | C. Sharp (USFWS/CA) | Special Status Species-General<br>LN-CO-34: ESA Sec.7 Requirements<br><br>"The BLM will not approve any ground-disturbing activity that may affect any such species until it completes obligations…under ESA…" | BLM (BK): Row deleted.  Not needed, since refers to jeopardy, which we cannot cause. |



BLM_0111090

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | ESA does not prejudice by type or severity of activity, regardless of whether that activity would cause ground disturbance. <u>Any</u> activity that "may affect" a listed species directly, indirectly, cumulatively, etc. is subject to Sec.7 of the ESA. Correct as follows: "The BLM will not approve any activity that may affect any such species until it completes obligations…under ESA…" | |
| 393. | 191 | B, C, D | B. Sharrow[2] | Replace B, C, D with the following CSU (B, C, and D will all be the same): Allowable Use: **STIPULATION** CSU-XX: *Biological Inventories.* The operator is required to conduct a biological inventory prior to approval of operations in areas of known or suspected habitat of special status species, or habitat of other species of interest such as, but not limited to, raptor nests, sage-grouse leks, or rare plant communities. Surveys shall be conducted by qualified biologist(s) using protocols established for potentially affected species during the appropriate time period(s) for the species. Survey reports, data, and determinations shall be submitted to the BLM for review and confirmation. Results from surveys expire three (3) years from the date of survey completion. Operators, the BLM, and the BLM Authorized Officer will use the information gathered to develop an appropriate mitigation plan. Mitigating measures may include, but are not limited to, relocation of development activities and fencing operations or habitat. If special status species are encountered during operation, operations will cease immediately, and the BLM Authorized Officer will be notified. (Refer to Appendix B.) | BLM (BK): This will become a BMP. See the change made in new Wildlife/SSS section. |
| 394. | 191 | D | C. Sharp (USFWS/CA) | Special Status Species-General LN-2: Biological Inventory Requirements | BLM (BK): This will become a BMP (not a Lease Notice). Thus, the timeframes will not matter. The BMP would be applied as applicable. |



BLM_0111091

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | "Results from surveys expire three (3) years from the date of survey completion." <br><br> This timeframe/ expiration may be appropriate for most perennial plants; if plants were ephemeral, however, the 3-year expiration would not make sense (1 year may be more appropriate). Clarify/ justify. <br><br> The three year-expiration clause is definitely not appropriate for most (mobile/ migratory/ ephemeral) fauna such as raptors, passerines, amphibians, and fish. To avoid/ minimize impacts, those species would likely require 1-year or seasonal expirations on survey findings to account for interim occupancy (or emergence) by species. | We now have a CSU (combined rows 190 and 201) that specify an inventory may be required. |
| 395. | 191/192 | Preferred | T. Stranathan | These appear to say the same thing. | BLM (BK): This will become a BMP (not a Lease Notice). Thus, the timeframes will not matter. The BMP would be applied as applicable. <br><br> Also, we kept 192 (minus the second paragraph), because this applies to all projects. |
| 396. | 192 | D | C. Sharp (USFWS/CA) | Special Status Species-General <br> Survey Requirements and Protocol <br><br> Reword to address the need for surveys prior to disruptive activities in these zones during sensitive periods. <u>Disruptive activities</u>- human-caused disturbance that induces stress on a population, community, or ecosystem and potential loss of species fitness (survival, reproduction, and recruitment), usually within crucial habitats or other sensitive areas during specific time periods; may or may not entail surface disturbance. <br><br> We recommend tying a target date commitment to this action—i.e., "standard survey protocol for key species and habitats will be compiled no later than one year following the signing of the ROD, in coordination with | BLM (BK): Reworded to ensure surveys are during the appropriate time. <br><br> Target date is not needed for this action (second paragraph has been deleted – covered by previous actions. |


BLM_0111092

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | CDOW, USFWS, and other partners. Survey protocol will be revisited on 3-year basis, and updated as necessary." Other BLM field offices have successfully implemented this approach, providing management consistency, certainty for operators and, ultimately, improved conservation for species. | |
| 397. | 193 | D | B. Sharrow[2] | Change the action to (this makes it the same as C): **Action:** Designate occupied habitat of known populations of federally threatened and endangered species as ROW avoidance. | EMPSi (JW): change made |
| 398. | 193 | D | Holsinger | Change "Designate federally listed candidate species' occupied habitats and known populations of Colorado hookless cactus as ROW avoidance." to "Designate federally listed candidate species' occupied habitats and occupied habitat for Colorado hookless cactus as ROW avoidance." Known populations would be avoided/mitigated as per ESA. | BLM (BK): Changed to, "Occupied habitat of known populations of federally threatened and endangered species." Also, other wording has changed. |
| 399. | 193 | D | Pfifer | Need to show acres and a map for this for both excl. and avoid. This exception also needs to be footnoted in the ROW section, perhaps in line 450, Alt D, 2nd bullet, and App B stips because it will not be tracked from here alone. | EMPSi (KW): On row 450, referred back to SSS section. First part of exception is standard for fluid minerals stipulations and is in Appendix B, but this applies only to fluid minerals. |
| 400. | 193 | D | C. Sharp (USFWS/CA) | Special Status Species-General ROW Exclusion<br><br>"An exception may be granted by the BLM Authorized Officer if it can be determined that the activity would not cause **adverse** impacts or have **negligible** impacts. In addition, **surface occupancy** may be authorized following Endangered Species Act Section 7 consultation with USFWS (for species listed under the Endangered Species Act) and it is determined that the activity would not impair values associated with the maintenance or recovery of the species. If an exception is granted, special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be | BLM (BK): We have deleted the exception, and reworded the action substantially.   You will get other opportunities to review the draft RMP. |



BLM_0111093

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | required." | |
| | | | | I think I understand the intent, but it should be clarified which species groups you are referring to. For the first part, "an exception may be granted…" I presume you are referring to non-listed species, since any effects/ impacts (neglible or adverse) would require Sec.7 consultation prior to providing an exception. If, however, you are referring to T&E species, it should be stated that Sec.7 would be conducted prior to those activities.<br><br>Because the USFWS's biological opinion for the RMP proposed action will be predicated largely on proposed conservation measures for listed species, for this and all other stipulations related to T&E, the following should be stated: "Prior to providing an exception to this stipulation, the BLM will initiate Section 7 consultation with the USFWS."  [The threshold here is *any* effect on listed species, not just surface occupancy.]<br><br>What do you consider occupied habitat? Populations plus a 200-meter buffer? A minimum convex polygon? Does it vary by species? Please specify here and/or include in the glossary. This has huge implications for how/ where/ etc. the stipulation will be applied. | |
| | | | | **Special Status Plants** | |
| 401. | 195 | All | B. Krickbaum | Combine with row 186. | BLM (BK): Change made |
| 402. | 195 | D | Holsinger | Should say "Designate all occupied and suitable habitats for special status plant species as key/priority areas." | BLM (BK): Row 195 combined with the objective. |
| 403. | 195 | D | L Reed | I'm confused what this action is really stating. "designate key/priority plant species as key/priority areas for special status plant species" Isn't there a more straight forward way to express this action than so much govt double speak that few folks will really understand what is being said. | BLM (BK): Changed and combined with the objective. |
| 404. | 195 | D | C. Sharp | Special Status Plants | BLM (BK): Changed and combined with the |



BLM_0111094

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | (USFWS/CA) | Designation of Habitats<br><br>The Service pays particular attention to historic habitat for T&E, particularly unaltered historic habitat. Does the BLM UFO consider "suitable" habitat to include historic habitat??? Clarify and include historic habitat in this action.<br><br>What do you consider occupied habitat? Populations plus a 200-meter buffer? A minimum convex polygon? Does it vary by species? Please specify here and/or include in the glossary. This has huge implications for how/ where/ etc. the designation will be applied. | objective. |
| 405. | 196 | B | M. Siders | Should read "Annually enhance at least 500 acres of special status plant habitat to promote their conservation." | BLM (BK): Row deleted |
| 406. | 196 | C | M. Siders | Should read "Offset direct impacts to special status plant species via species transplants to promote their persistence." | BLM (BK): Row deleted |
| 407. | 196 | D | Holsinger | Change to: Pursue opportunities to enhance, protect, or restore special status plant habitats or populations commensurate with other resource objectives and opportunities. | BLM (BK): Row deleted |
| 408. | 196 | D | B. Krickbaum | Change to: Allow opportunities to enhance, protect, or restore special status plant habitats or populations commensurate with other resource objectives and opportunities. | BLM (BK): Row deleted |
| 409. | 196 | D | M. Siders | Should read "Pursue opportunities to enhance, protect, or restore special status plant habitats or populations commensurate with other resource objectives and opportunities." (From Ken) | BLM (BK): Row deleted |
| 410. | 196 | D | C. Sharp (USFWS/CA) | Special Status Plants<br>Enhancing Habitat<br><br>Without quantifying, this action is tenuous, and is just a repeat of the stated goals for this resource. We recommend adopting Alternative B or similar proactive approach. | BLM (BK): Row deleted |



**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | We would like to point out the relevance of Section 7(a)(1) of the Endangered Species Act and its mandate for "affirmative conservation". Whereas Section 7(a)(2) prohibits federal agencies from doing "bad" things to listed species, Section 7(a)(1) directs agencies to do "good" things for these species, i.e., conservation efforts such as protected area designation. In other words, agencies are legally obligated to not only avoid, mitigate, or compensate for impacts on imperiled species, but to also implement proactive conservation. | |
| 411. | 198 | D | C. Sharp (USFWS/CA) | Special Status Plants Closure to Mineral Material Disposal\n\nGenerally, in terms of status and obligations under ESA, proposed species are in greater need of protection/ attention than candidates, which have no legal protection or enforcement under ESA. ESA regulations allow for conferencing (similar to consulting) for proposed species, but other non-consultation programs for candidates. Since you designate candidates as a key/ priority species for these alternatives, you should also include proposed species.\n\nWhat do you consider occupied habitat? Populations plus a 200-meter buffer? A minimum convex polygon? Does it vary by species? Please specify here and/or include in the glossary. This has huge implications for how/ where/ etc. the decision (mineral material disposal) will be applied. | BLM (BK): We have deleted reference to "proposed" species.  We disagree that they need greater protection.  Any species can be added to the proposed list upon submission of a proposal by anyone.\n\nOccupied will be the plant plus 200 meters. |
| 412. | 199 | ALL | B. Sharrow[2] | B, C and D will be combined (to read almost like A), and move up to the SSS – General section. When moved to SSS-General, leave A as it is.  Replace B, C, D with: "Promote BLM sensitive species conservation and reduce the likelihood and need for species to be listed pursuant to the Endangered Species Act (BLM Manual 6840)." | BLM (BK): Row left in, per combined discussion with District Manager and Wildlife. |



Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011

BLM_0111096

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | |
| 413. | 199 | B&C | Holsinger | The word take is used, since there is technically no take of plants under ESA I would just say " Prohibit any land use activity that would damage, injure, or remove a…"  Sorry I missed this. | EMPSi (KW): Change made. |
| 414. | 199 | D | B. Krickbaum | Change distance to 325-feet (99 meters) | BLM (BK): Change made |
| 415. | 199 | D | B. Krickbaum | Add "inside of and" before "within".  Will read: "Apply CSU/SSR restrictions inside of and within 325-feet (99 meters) of BLM …" | BLM (BK): Changed action slightly. |
| 416. | 199 | D | C. Sharp (USFWS/CA) | Special Status Plants CSU-24/ SSR-23: Sensitive Plant Spp.  What do you consider occupied habitat? Populations plus a 100-meter buffer? A minimum convex polygon? Does it vary by species? Specify here and/or include in the glossary. This has huge implications for how/ where/ etc. the decision will be applied.  An SSR stipulation really means that the BLM will plan, where practical, to minimize impacts on the identified species, habitat, or resource of interest. Shouldn't this be the minimum requirement for all projects on public lands, particularly in sensitive areas, regardless of how an area is labeled? Without specifying, quantifying, or qualifying your SSR stipulation, we are not convinced that this provides any conservation benefit. For instance, if you applied a specific SSR for Gunnison sage-grouse nesting areas (4-mile buffer) to avoid all surface disturbance, or no more than 1% disturbance, in all suitable nesting habitat within the defined buffer, that would be an effective SSR stipulation. As proposed, the majority of your biological stipulations prescribe an SSR combined with CSU or NSO, which essentially means that some conservation will be attained if fluid mineral activities are involved; but that there are no assurances of conservation/ protection if BLM projects or other non-oil and gas activities are proposed/ implemented. | BLM (BK): Action changed to "..within 100 meters of a BLM sensitive plant species".  See previous comments regarding SSR. |


BLM_0111097

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | For imperiled species, we should err on the side of conservation by beginning with truly protected areas (e.g., by prohibiting surface disturbance and surface occupancy for all activities). Where appropriate, the BLM could then provide exceptions for certain activities that meet specific criteria, subject to Sec.7 as appropriate. | |
| 417. | 200 | B | M. Siders | Should read "Federally Listed, Candidate, and Proposed Plant Species' Occupied…" | BLM (BK): We did not include proposed in the final action. |
| 418. | 200 | B and D | B. Krickbaum | B: change distance to: 1000-feet (305 meters) D: change distance to: 650 feet (198-meters) | BLM (BK): Change made. JZ: Updated in appendix B. |
| 419. | 200 | C, D | B. Krickbaum | Make the same type of change as in comment 54 (now 348). I want to make sure the action includes the habitat, and not just the area within a certain distance from the habitat. | BLM (BK): Not needed – other changes made. |
| 420. | 200 | D | M. Siders | Should read "Federally Listed and Candidate Plant Species' Habitat… within 200-meters (656-foot) of occupied habitat of federally listed and candidate plant species." | BLM (BK): Change not made:  Candidate removed by management direction. |
| 421. | 200 | D | C. Sharp *(USFWS/CA)* | Special Status Plants NSO-16/ SSR-24: Plant Habitat<br><br>Also include an NGD for non-oil and gas activities that would prohibit all surface-disturbing activities within the 200-meter zone and critical habitat for federally listed species. Also include proposed species in your list.<br><br>Why prohibit surface occupancy / surface disturbance for just fluid mineral activities— the measure should be science-based, i.e, based on the nature of effects. Surface disturbance is surface disturbance, regardless of the agent. While oil and gas activities have potentially significant impacts on sensitive resources, other non-fluid mineral activities—again, depending on the nature of effects—can result in much greater impacts (habitat loss or degradation, indirect disturbance, etc.) than oil | BLM (BK): We discussed with management, and have decided to leave "D" as an SSR, and also to change the NSO to a CSU.  The stipulation is now a CSU/SSR. It reads" Apply controlled surface use and SSR restrictions within habitat for individuals or populations of federally listed plant species.  Prohibit surface disturbing activities within 200 meters (656 feet) of identified individuals or populations of federally-listed plant species." The CSU and SSR will afford restrictions sufficient to protect the individual or populations of plants. |


BLM_0111098

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | and gas exploration/ development.<br><br>According to the best available science and USFWS policy for T&E plants in this region, any surface disturbance, and potentially disruptive activity, in the 200-meter zone [this would include critical habitat] constitutes a "may affect" (Sec.7) situation for those species.  To permit all non- fluid mineral activities via the SSR within these areas is contradictory to this policy, and to the resource goal ("protect and enhance"). For imperiled species, we should err on the side of conservation by beginning with truly protected areas (e.g., by prohibiting surface disturbance and surface occupancy for all activities). Where appropriate, the BLM could then provide exceptions for certain activities that meet specific criteria, subject to Sec.7 as appropriate.<br><br>Generally, in terms of status and obligations under ESA, proposed species are in greater need of protection/ attention than candidates, which have no legal protection or enforcement under ESA. ESA regulations allow for conferencing (similar to consulting) for proposed species, but other non-consultation programs for candidates. Since you designate candidates as a key/ priority species for these alternatives, you should also include proposed species.<br><br>Because the USFWS's biological opinion for the RMP proposed action will be predicated largely on proposed conservation measures for listed species, for this and all other stipulations related to T&E, the following should be stated: "Prior to providing an exception to this stipulation, the BLM will initiate Section 7 consultation with the USFWS."  [The threshold here is *any* effect on listed species, not just surface occupancy.]<br><br>Also see recurring SSR comments (i.e., as in Comment | |



BLM_0111099

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | #16). | |
| 422. | 200 | Preferred | T. Stranathan | There is reasonable Exception, Mod, Waiver criteria in Appendix B. | EMPSi (KW): Thank you for your comment. |
| 423. | 201 | All | L. Armstrong[1] B. Sharrow[2] | Delete row: covered by row 190. | EMPSi (JW): change made. LN-UFO-2/LN-6 deleted from Chapter 2 and Appendix B. |
| 424. | 201 | A-D | C. Sharp (USFWS/CA) | Special Status Plants LN-UFO-2/ LN-6: Special Status Plants

"The BLM may recommend modifications to exploration and development proposals to avoid impact to any species listed under the Endangered Species Act, or proposed for listing under the Endangered Species Act, or designated or proposed critical habitat."

We hope BLM would, in fact, apply measures as necessary to avoid any impacts on these species. This is written from an operator/ applicant perspective and provides little assurance that conservation will be factored into BLM's decisions. Suggest rewording as "BLM reserves the right to modify exploration and development…" | BLM (BK): 201 is deleted, and combined with 190 (CSU).

Measures to avoid impacts will be identified at the project level and through consultation, if needed, with USFWS. |
| 425. | 201 | all | B. Krickbaum | Delete row – covered by row 190 | BLM (BK): Change made. |
| | | | | **Special Status Fish and Aquatic Wildlife** | |
| 426. | 202-261 | | CDOW | CDOW Commented on Wildlife Stips in Appendix B, please cross reference. | EMPSi (KW): Comments noted and addressed below. |
| 427. | 203 | D | Holsinger | Should read "Pursue opportunities to enhance, protect, or restore special status aquatic habitats, including structural and vegetation improvements, and remove or modify special status fish migration barriers commensurate with other resource objectives and opportunities." | BLM (BK): Changes made, and row is also now combined with rows 113 and 114. |
| 428. | 203 | D | M. Siders | Should read "Pursue opportunities to enhance, protect, or restore special status aquatic habitats, including structural and vegetation improvements, and remove or modify special status fish migration barriers commensurate with other resource objectives and opportunities." | BLM (BK): Changes made, and row is also now combined with rows 113 and 114. |



**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 429. | 203 | D | C. Sharp (USFWS/CA) | Special Status Fish and Aquatic Wildlife Enhancing Habitat<br><br>Without quantifying, this action is tenuous, and is just a repeat of the stated goals for this resource. We recommend adopting Alternative B or a similar proactive approach.<br><br>We would like to point out the relevance of Section 7(a)(1) of the Endangered Species Act and its mandate for "affirmative conservation". Whereas Section 7(a)(2) prohibits federal agencies from doing "bad" things to listed species, Section 7(a)(1) directs agencies to do "good" things for these species, i.e., conservation efforts such as protected area designation. In other words, agencies are legally obligated to not only avoid, mitigate, or compensate for impacts on imperiled species, but to also implement proactive conservation. | BLM (BK): Row is also now combined with rows 113 and 114. Changes not made (do not know what change you are requesting). |
| 430. | 205 | All | M. Siders | Redundant with line 120 in Wildlife-Aquatic.  Can we just point to this line in the regular aquatic section like we did with Desert Bighorn?<br>"Refer to the Aquatic Wildlife section" | BLM (BK): Deleted – covered by row 120. |
| 431. | 205 | D | C. Sharp (USFWS/CA) | Special Status Fish and Aquatic Wildlife TL-5: Coldwater and Native Fish Habitat<br><br>What do you consider occupied habitat? Has it been mapped, or will models be used. Please specify here and/or include in the glossary. This has implications for how/ where/ etc. the action would be implemented. | BLM (BK): Occupied refers to streams that have these fish species present. |
| 432. | 206 | D | Clements | Make sure that river and habitat restoration activities are not included in NGD | BLM (BK 10/5/11): Removed "surface disturbing activities" and replaced with "apply SSR restrictions." |
| 433. | 206 | D | B. Krickbaum | Change the NGD to an SSR.<br>Replace "Surface Disturbing Activities" with "apply SSR Restrictions".<br>Change in Appendix B. | BLM (BK): Change made. |
| 434. | 206 | D | B. Krickbaum | Last paragraph -- change to read:<br>"Prohibit surface occupancy and apply SSR restrictions | BLM (BK): Change made. |



BLM_0111101

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | within 300 feet of the edge of the ordinary high-water mark (bank-full stage) of occupied native cutthroat trout habitat. (Refer to Appendix …)" | |
| 435. | 206 | D | C. Sharp (USFWS/CA) | Special Status Fish and Aquatic Wildlife NSO-19/ NGD-12: Occupied Habitat for Federally Listed Fish and Native Cutthroat

Please clarify. Does the first component of the stipulation apply to federally protected fish, and the second (300-ft. buffer) to cutthroat trout? Or is the intent really to protect big river habitat, some of which supports federally listed fish, plus waterways occupied by native cutthroat trout (or greenback cutthroat lineage)?

For Colorado River endangered fish, the stipulation metric should really factor in critical habitat, including the channel and 100-year floodplain. The floodplain and constituent elements of critical habitat have been determined to be essential to the survival and recovery of the species. A fixed buffer may not adequately address this variability, depending on the river system and characteristics. For pikeminnow and razorback critical habitat reaches (Gunnison River), we recommend adopting a two-pronged buffer, similar to NSO-4 but written as: "the 2500-ft. buffer area OR the extent of the 100-year floodplain, whichever is greater." [I'm guessing the .5 mile buffer would encompass the vast majority of the 100-year floodplain; if so, that should be explained in the stipulation. E.g., "Prohibit… activities within .5 miles of the ordinary high water mark [which includes all federally designated critical habitat]…" | BLM (BK): Yes, the first component of the stipulation applies to federally protected fish, and the second (300-ft. buffer) to cutthroat trout.

For an NSO, we should have one number.  We feel 2500 feet approximates the 100-yr floodplain for these species. |
| 436. | 206 | Preferred | T. Stranathan | Why 2500 feet on major rivers when the 300' will do on all other "occupied" cutthroat trout habitat.  There are several suitable well pad locations below pinon on the SM river which would easily have no impact on the river by staying 500' away.  Greater surface impacts | BLM (BK): 2500 feet approximates the 100-yr floodplain for these species. The native warm water species need a greater buffer than cutthroat because of critical habitat designation. |



**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | may occur on adjacent areas because the disturbance is pushed into difficult and rugged terrain. COGCC reg 317B regarding water supplies now require specific protocols be put in to play when operating in zones close to waterbodies which may already include cutthroat trout.  It seems that operators would have to already comply with regs in order to drill a well in such proximity.<br>There is no Exc. Mod Wav Criteria proposed in Appendix B at the time of this comment. | |
| 437. | 207 | D | C. Sharp (USFWS/CA) | It appears that you are referring to just Colorado River cutthroat trout here, not greenback cutthroat lineage. Please clarify. [similar questions in comment #21 above] | BLM (BK): Not sure why you think this.  The action is for "Native cutthroat trout", which includes Colorado and greenback. |
| 438. | 207 | Preferred | T. Stranathan | This should probably be an NSO if the populations are easy to locate and delineate?  Although the 200m standard move distance could keep the well bore out of this 300-500' buffer zone. If left as a CSU. | EMPSi (KW): BLM ID Team thought CSU from 300-500 feet would be adequate. |
| | | | | **Special Status Terrestrial Wildlife** | |
| 439. | 211 | B & C | M. Siders | Should read "… except for Canda lynx (see Special Status Terrestrial Wildlife – Canada lynx). …" | BLM (BK): Change not made –the reference to the lynx section is not needed. |
| 440. | 211 | D | M. Siders | Should read "… except for Canada lynx (see Special Status Terrestrial Wildlife – Canada lynx) and Mexican spotted owl (see Special Status Terrestrial – Mexican spotted owl). …" | BLM (BK): Change not made –the reference to the MSO section is not needed. |
| 441. | 211 | D | C. Sharp (USFWS/CA) | Special Status Terrestrial Wildlife<br>NSO-21/ SSR-29: TEC Occupied Habitat<br><br>Also include an NGD for non-oil and gas activities that would prohibit all surface-disturbing activities within the defined zone and critical habitat for federally listed species. Also include proposed species in your list.<br><br>Why prohibit surface occupancy / surface disturbance for just fluid mineral activities— the measure should be science-based, i.e, based on the nature of effects. Surface disturbance is surface disturbance, regardless of the agent. While oil and gas activities have potentially | BLM (BK): We considered NGD, but feel an SSR offers adequate protection.  We can apply appropriate restrictions at the project stage with an SSR. |



BLM_0111103

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | significant impacts on sensitive resources, other non-fluid mineral activities—again, depending on the nature of effects—can result in much greater impacts (habitat loss or degradation, indirect disturbance, etc.) than oil and gas exploration/ development.<br><br>An SSR stipulation really means that the BLM will plan, where practical, to minimize impacts on the identified species, habitat, or resource of interest. Shouldn't this be the minimum requirement for all projects on public lands, particularly in sensitive areas, regardless of how an area is labeled? Without specifying, quantifying, or qualifying your SSR stipulation, we are not convinced that this provides any conservation benefit. For instance, if you applied a specific SSR for Gunnison sage-grouse nesting areas (4-mile buffer) to avoid all surface disturbance, or no more than 1% disturbance, in all suitable nesting habitat within the defined buffer, that would be an effective SSR stipulation. As proposed, the majority of your biological stipulations prescribe an SSR combined with CSU or NSO, which essentially means that some conservation will be attained if fluid mineral activities are involved; but that there are no assurances of conservation/ protection if BLM projects or other non-oil and gas activities are proposed/ implemented.<br><br>What do you consider occupied habitat? Known populations plus a determined buffer? Please specify and/or include in the glossary.<br><br>Because the USFWS's biological opinion for the RMP proposed action will be predicated largely on proposed conservation measures for listed species, for this and all other stipulations related to T&E, the following should be stated: "Prior to providing an exception to this stipulation, the BLM will initiate Section 7 consultation with the USFWS." [The threshold here is | |


BLM_0111104

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

# Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | *any* effect on listed species, not just surface occupancy.] | |
| 442. | 213 | c | B. Day (RACSG) | If the alt c date is extended until at least Aug 5, if not Aug 15, then the range of alts will be wide enough. Cuckoos are probably the last migratory bird to return to the UFO area, and begin breeding very late. | EMPSi (KW): Change made to August 5. |
| 443. | 213 | D | C. Sharp (USFWS/CA) | Special Status Terrestrial Wildlife CSU-29/ SSR-30 YBCU Habitat<br><br>Studies have shown that yellow-billed cuckoos are sensitive to human disturbance/ presence, and may abandon nests when disturbed. Recommend a seasonal restriction period (restricting surface disturbance and disruptive activities) for areas that have been identified as active breeding habitat or in the vicinity of known, active nests (e.g., areas of the North Fork of the Gunnison river, portions of the San Miguel(?), portions of Dolores River(?)). We recommend a TL from May 15 through July 31 to allow for territory establishment and full fledging/ dispersal of young.<br><br>An SSR stipulation really means that the BLM will plan, where practical, to minimize impacts on the identified species, habitat, or resource of interest. Shouldn't this be the minimum requirement for all projects on public lands, particularly in sensitive areas, regardless of how an area is labeled? Without specifying, quantifying, or qualifying your SSR stipulation, we are not convinced that this provides any conservation benefit. For instance, if you applied a specific SSR for Gunnison sage-grouse nesting areas (4-mile buffer) to avoid all surface disturbance, or no more than 1% disturbance, in all suitable nesting habitat within the defined buffer, that would be an effective SSR stipulation. As proposed, the majority of your biological stipulations prescribe an SSR combined with CSU or NSO, which essentially means that some conservation will be attained if fluid mineral activities are involved; but that there are no assurances of conservation/ protection if | BLM (MS): There are no known active breeding sites on BLM lands. |



BLM_0111105

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | BLM projects or other non-oil and gas activities are proposed/ implemented. | |
| 444. | 216 | A | Holsinger | "Make habitat abitat in the Camel Back-Roubideau Creek area for" should read I think Make habitat available… | EMPSi (KW): Change made. |
| 445. | 216 | A | M. Siders | Should read "Make habitat in the Camel…" | EMPSi (KW): Change made. |
| 446. | 216 | A | Sondergard | Remove "abitat" | EMPSi (KW): Change made. |
| 447. | 216 | A | Steve Weist (RACSG) | Remove "abitat" from 1ˢᵗ line | EMPSi (KW): Change made. |
| 448. | 219 | B | B. Krickbaum | Delete the word "currently". | BLM (BK): Not needed … row changed. |
| 449. | 219 | D | C. Sharp (USFWS/CA) | This should be labeled as a CSU/ SSR (performance-based). | BLM (BK): We do not agree.  Also, we have deleted several rows, and created a new action: "Follow management actions from the most current Lynx Management Plan approved by USFWS." |
| 450. | 220 | D | M. Siders | Should read: <ul><li>"… Locate development or production facilities to avoid primary lynx habitat.</li><li>Prohibit fluid minerals development activities on BLM- administered surface lands that would contribute disproportionately to management thresholds applied to lynx habitat. i.e.:<ul><li>no more than 30 percent of mapped habitat within a LAU in unsuitable condition;</li><li>less than 15 percent of habitat within a Lynx Analysis Unit converted to unsuitable condition within a 10-year period;</li><li>maintain greater than 10 percent in habitat suitable for denning within a LAU."</li></ul></li></ul> | BLM (BK): We have deleted the bullets – the CSU wording changed to: "Apply CSU/SSR restrictions within mapped or identified Lynx Linkage Corridors and Canada lynx habitat within Lynx Analysis Units, and to any activities that would negatively alter connectivity between and within Lynx Analysis Units." |
| 451. | 221 | D | C. Sharp (USFWS/CA) | The following point should be labeled as a standard TL: "Prohibit surface use or disrupting activities in Lynx Analysis Unit denning habitat during the denning period, March 15 to July 15." | BLM (BK): We have deleted the row per management direction. We are following "management actions from the most current Lynx Management Plan approved by USFWS." |
| 452. | 222 | Preferred | T. Stranathan | Since this covers only 20 acres on private surface federal minerals.  I suggest going with a NSO on that 20 acre area if it's all connected. | BLM (BK): BLM decided to leave CSU (do not know why you think it is only 20 acres).  Also, this row is now combined with row 220. |
| 453. | 224 | D | C. Sharp (USFWS/CA) | Special Status Terrestrial Wildlife TL-18 GUSG Winter Habitat | BLM (BK): We will show these dates in Alt B (Oct 1 – Mar 15).  "D" will stay Dec 15 – March 15. |



Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011

BLM_0111106

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | Consistent with the GUSG Rangewide Conservation Plan (RCP), in GUSG <u>winter concentration areas</u>, apply a broader timing restriction, from October 1 through March 15.<br><br>These buffers should also apply to undetermined leks (activity status unknown). Lek status should be determined based on CDOW terms and definitions.<br><br>Modify stipulation to include a restriction for disruptive activities (i.e., shed hunting) in this zone during sensitive periods. *Disruptive activities-* human-caused disturbance that induces stress on a population, community, or ecosystem and potential loss of species fitness (survival, reproduction, and recruitment), usually within crucial habitats or other sensitive areas during specific time periods; may or may not entail surface disturbance.<br><br>Also, for winter habitats, a 4 to 6-mile buffer—as prescribed in Alternative B—should be included in the stipulation for <u>unmapped areas</u> (see RCP), or areas for which mapping needs to be revised. We don't want to wait until areas are mapped, or agreed upon, to apply conservation measures. | This is winter habitat – lek status and distance is not a consideration.<br><br>We have included "disruptive" in row 226.<br><br>We have decided to not include a buffer for unmapped habitats (in D) – currently winter habitats are fairly well mapped by CDOW. |
| 454. | 225 | B | M. Siders | Should read "When existing leases expire, do not re-offer for lease all Gunnison sage-grouse lek habitat plus a 0.60- mile radius." | BLM (BK): Change made. |
| 455. | 225 | D | C. Sharp (USFWS/CA) | Special Status Terrestrial Wildlife<br>NSO-24/ SSR-34: GUSG Breeding (Lek) Habitat<br><br>Research has shown the significance of the .6 mile buffer for GUSG survival/ persistence and how crucial it is to protect these areas. Considering the species' overall status and trends, its priority ranking for listing in the future, its rarity in the UFO, and its relatively limited distribution in the UFO, the Service | BLM (BK): "No Leasing" would not accomplish any more than an NSO.  With an NSO, a company cannot occupy the surface, which is what you really want.<br><br>We do not know what an "undetermined lek" is.  To protect, we need to know where it is, and that it is in fact a lek. |


BLM_0111107

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | recommends that a no-leasing stipulation be applied to the .6-mile buffer zone from active leks ("active" as defined by CDOW).<br><br>Stipulation should apply to both active and *undetermined* leks (activity status unknown).<br><br>Also include an NGD for non-oil and gas activities that would prohibit all surface-disturbing activities within the 200-meter zone and critical habitat for federally listed species. Also include proposed species in your list.<br><br>Why prohibit surface occupancy / surface disturbance for just fluid mineral activities— the measure should be science-based, i.e, based on the nature of effects. Surface disturbance is surface disturbance, regardless of the agent. While oil and gas activities have potentially significant impacts on sensitive resources, other non-fluid mineral activities—again, depending on the nature of effects—can result in much greater impacts (habitat loss or degradation, indirect disturbance, etc.) than oil and gas exploration/ development.<br><br>We are not convinced this is enough protection for the species to ensure further decline. For imperiled species, we should err on the side of conservation by beginning with truly protected areas (e.g., by prohibiting surface disturbance and surface occupancy for all activities). Where appropriate, the BLM could then provide exceptions for certain activities that meet specific criteria, subject to Sec.7 as appropriate. | |
| 456. | 226 | | C. Sharp *(USFWS/CA)* | Special Status Terrestrial Wildlife<br>TL-21: GUSG Breeding (Non-Lek) Habitat<br><br>We presume the timing stipulation would also apply to the sage-grouse breeding (lek) habitat (.6 mile-buffer zone), but it's confused by the stipulation title. That | BLM (BK): To clarify, the title is changed to "…(lek and non-lek…"<br><br>Included disruptive activities. |



BLM_0111108

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | should be clarified in the stip description or by changing the stipulation title or, better yet, by prohibiting _all_ surface disturbance in the .6-mile buffer (see notes above for line 225).<br><br>Modify to include a restriction for disruptive activities (i.e., shed hunting) in this zone during sensitive periods. _Disruptive activities_- human-caused disturbance that induces stress on a population, community, or ecosystem and potential loss of species fitness (survival, reproduction, and recruitment), usually within crucial habitats or other sensitive areas during specific time periods; may or may not entail surface disturbance. | |
| 457. | 226 | A | T. Stranathan | Not sure where this came from.  I reviewed 1991 EIS and could not locate the language.  Maybe it came from the Gorge Plan? | BLM (BK): Changed Alt A to "No similar action in current RMPs". The only TL in the ROD related to sage grouse is a winter TL.  So, the one in the matrix for breeding habitat is not applicable. |
| 458. | 226 | D | Steve Weist (RACSG) | 4 miles is excessive, you could have multiple drainages and hills between a lek and a surface activity. The distance for an eagle nest is only 0.5 miles. Why should a sage grouse be so much further? | BLM (BK): Consistent with current state stips; based on best available science, and the distance is consistent with the sage grouse range-wide plan. We have changed to action to "…within suitable habitat that is within 4.00 miles…" |
| 459. | 227 | D | Steve Weist (RACSG) | Again 4 miles is excessive, considering the typical height of sage brush, you would have to be almost on top of a lek to even see it or have it visible to the lek. At that height you would have to even prohibit planes from flying over a lek. 0.5 miles is more than sufficient. | BLM (BK): Consistent with current state stips; based on best available science, and the distance is consistent with the sage grouse range-wide plan. We have changed to action to "…within suitable habitat that is within 4.00 miles…" |
| 460. | 227 | D | C. Sharp (USFWS/CA) | Special Status Terrestrial Wildlife CSU-34/ SSR-36: GUSG Breeding (Lek) Habitat<br><br>"… protect GUSG mapped seasonal habitats…"  Since not all habitat functional types (i.e., non-lek breeding, brood-rearing, etc.) are currently mapped, will you apply the stipulation across the entire buffer area, or employ another approach to identify specific area(s) to be protected (i.e., identifying habitat types as done in Alt. C—sagebrush, riparian, wet meadow, etc.). | BLM (BK): We now say "Apply CSU/SSR restrictions within suitable habitat that is within 4 miles…" |



BLM_0111109

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | An SSR stipulation really means that the BLM will plan, where practical, to minimize impacts on the identified species, habitat, or resource of interest. Shouldn't this be the minimum requirement for all projects on public lands, particularly in sensitive areas, regardless of how an area is labeled? Without specifying, quantifying, or qualifying your SSR stipulation, we are not convinced that this provides any conservation benefit. For instance, if you applied a specific SSR for Gunnison sage-grouse nesting areas (4-mile buffer) to avoid all surface disturbance, or no more than 1% disturbance, in all suitable nesting habitat within the defined buffer, that would be an effective SSR stipulation. As proposed, the majority of your biological stipulations prescribe an SSR combined with CSU or NSO, which essentially means that some conservation will be attained if fluid mineral activities are involved; but that there are no assurances of conservation/ protection if BLM projects or other non-oil and gas activities are proposed/ implemented.<br><br>For GUSG, regarding the "operating constraints", numbers should be tied to the CSU and SSR to ensure habitat protection/ maintenance over the long term. Fragmentation of sagebrush habitats has been cited as a primary cause of the decline of Gunnison and greater sage-grouse populations. To what degree will you avoid those habitat types? We recommend applying a threshold, making this a conditional CSU (e.g., no more than 1% disturbance of sage grouse habitats, no more than .5 miles of road per sq. mile, no more than 2 major structures per 640 acres---this approach should address both total/ cumulative habitat loss and densities of disturbance). Research indicates that even if reclamation is successful, sage-grouse may not return to those areas, and/or are unlikely recover to pre-disturbance numbers (71 FR 19966). Consequently, a | |



**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | rolling-reclamation would need to factor this into the decision making process. | |
| 461. | 228 | C and D | B. Sharrow[2] | C and D will be the same. Change the LN to a CSU. Use the same language as currently in D. However, delete the last paragraph. | BLM (BK): Row is deleted, per discussions with district and FO management. Alt A is moved up a row to 227. |
| 462. | 228 | A | M. Siders | Delete "Sharptail grouse nesting habitat is described as mountain shrub communities with a density of shrub plants from 1,700 to 32,000 shrubs per hectare and average shrub height of 30 centimeters. Nests are found primarily in shrub clumps where the shrubs are taller than average. (Nesting occurs within an average distance of 2 kilometers of a lek)." Not pertinent to this plan. | EMPSi (KW): Change made. |
| 463. | 228 | B, C, D | B. Krickbaum | Apply to B and C also. | BLM (BK): BLM combined rows 227/228, and changed it to a CSU. |
| 464. | 230 | | Clements | Saw-whet owl | EMPSi (KW): Change made. |
| 465. | 230 | All | B. Krickbaum | Regarding Siders comment # 78, the list changes only the middle sentence. The first sentence "This section includes…" remains. The last sentence "Non-special status raptors…" remain. | EMPSi (KW): Change made. |
| 466. | 230 | All | M. Siders | Should read: "Special status raptors, including Birds of Conservation Concern, include Mexican spotted owl, peregrine falcon, northern goshawk, ferruginous hawk, burrowing owl, bald eagle, golden eagle, prairie falcon, and flammulated owl." | EMPSi (KW): Change made. |
| 467. | 231 | D | C. Sharp (USFWS/CA) | Special Status Terrestrial Wildlife TL-23: Raptor Breeding and Nest Sites<br><br>Editorial: Several bullet points don't make sense, need to reword (e.g., "Ferruginous hawk: 0.50-mile of active nest…")<br><br>Since the American kestrel is excluded under this stipulation, how does the BLM intend to avoid or minimize take of this species and ensure compliance with MBTA? (a requirement for compliance with MBTA is that agencies must demonstrate due diligence and effort in the implementation of MBTA) If protected | BLM (BK):<br>1st question: we do not understand the question or comment.<br><br>2nd statement: protected under MBTA, and we need to comply with the law. They are abundant across the landscape. Also, other actions require us to survey for nesting birds.<br><br>We added disruptive.<br><br>Active nests do not include alternate nests for the timing limitation. Protections are provided for |



BLM_0111111

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | through other means, that should be described here or in the exceptions/ justification section.<br><br>Expand restriction to include select disruptive activities (e.g., recreation, shed hunting, etc.) in this zone during sensitive periods. *Disruptive activities-* human-caused disturbance that induces stress on a population, community, or ecosystem and potential loss of species fitness (survival, reproduction, and recruitment), usually within crucial habitats or other sensitive areas during specific time periods; may or may not entail surface disturbance.<br><br>We presume "active nests" would include alternate nests (particularly for bald and golden eagles). Please clarify here and/or provide definition in the glossary.<br><br>Provide definitions for active/ inactive/ abandoned nests, since these terms are interpreted widely, and have a bearing on how the stip will be interpreted/ applied. Nest status determinations should factor in breeding behavior. For example, CDOW definitions for BAEA (current?): *Inactive nest*–"A former active nest location in which neither courtship, breeding, or brooding activity has been observed at any time during the last 5 years." And the flip side of that, *active nest*—"A specific location in which a pair of bald eagles have at least attempted to nest within the last five years.  Any nest location that can be directly tied to courtship, breeding, or brooding behavior is considered active. " [the point being that a nest may still be usable, or "active", even if it is not currently occupied or if birds recently abandoned the site due to disturbance]<br><br>For BGEPA compliance (and the disturbance clause), apply the timing limitation to *active nests*, as defined above (rather than just nests that are occupied at a | alternate nests in other actions (NSO and CSU). EMPSi (AA): Added to glossary:<br>**Active nest site** – a raptor nest site that is currently occupied by a pair of breeding raptors.<br>**Alternate nest site (Inactive nest)** – a raptor nest site that has been used in the past by and within the territory of a breeding pair of raptors. The nest site still maintains the characteristics of a nest structure and habitat features of a nest site, but is not currently in use.<br>**Abandoned nest:** a nest that was occupied by breeding birds earlier in the breeding season, but was abandoned at some point during breeding (i.e. failed eggs, death of young, etc.).<br><br>Regarding the commenter's last statement – we now say "…when nests are active, or until fledging and dispersal of young", |



BLM_0111112

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | given point in time). | |
| 468. | 231, 232 | D | Burch | Couldn't these 2 actions be combined to one? | EMPSi (KW): Change made. |
| 469. | 231; Glossary-01 Glossary-03 | B 15 04 | M. Siders | Add to Glossary: **Active nest site** – a raptor nest site that is currently occupied by a pair of breeding raptors. **Alternate nest site** – a raptor nest site that has been used in the past by and within the territory of a breeding pair of raptors. The nest site still maintains the characteristics of a nest structure and habitat features of a nest site, but is not currently in use. | EMPSi (KW): Change made. |
| 470. | 233 | D | B. Sharrow[2] | Delete NGD and replace with SSR and SSR language. | BLM (BK): Change made.  Also, row 233 is combined with rows 235 and 241. |
| 471. | 233 | D | M. Siders | Should read "(except Mexican spotted owl [See Special Status Terrestrial – Mexican spotted owl])" | BLM (BK): Reference not made (no change) |
| 472. | 233 | D | C. Sharp (USFWS/CA) | Special Status Terrestrial Wildlife NSO-29/ NGD-20: Special Status Raptor Nest Sites (exc. MSO)<br><br>Eagles: Where nests are blown from trees during storms or are otherwise destroyed by the elements, continue to protect the site in the absence of the nest for up to three (3) complete breeding seasons. Many eagles will rebuild the nest and reoccupy the site.<br><br>Provide definitions for active/ inactive/ abandoned nests, since these terms are interpreted widely, and have a bearing on how the stip will be interpreted/ applied. Nest status determinations should factor in breeding behavior. For example, CDOW definitions for BAEA (current): **Inactive nest**–"A former active nest location in which neither courtship, breeding, or brooding activity has been observed at any time during the last 5 years." And the flip side of that, **active nest**—"A specific location in which a pair of bald eagles have at least attempted to nest within the last five years.  Any nest location that can be directly tied to courtship, breeding, or brooding behavior is considered active. [Active nest – Any nest that is | BLM (BK): We do not have the man-power to survey and track for nests that no longer exist. Surveys at the project stage will occur, and if birds are on territory, professional judgment will provide protection for the birds.<br><br>Definitions provided above.<br><br>Applied 100-m to Golden eagle as well (your last statement) |



BLM_0111113

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | frequented or occupied by a raptor during the breeding season, or which has been active in any of the five previous breeding seasons. Many raptors use alternate nests in various years. Thus, a nest may be active even if it is not occupied in a given year.]<br><br>Regarding the 100m-buffer for *abandoned* (as defined in Alt. D) BAEA nests: For compliance with BGEPA, the same restriction, or similar approach, should be applied for GOEA nests. | |
| 473. | 233 and Glossary | D | M. Siders | Add to Glossary:<br>**Abandoned nest:** a raptor nest site that been unoccupied by at least one raptor for 5 consecutive years, but with all or part of the nest structure remaining.<br>**Inactive nest site** – a raptor nest site that is currently not occupied by a pair of breeding raptors. | BLM (BK): After clarification with M Siders, definition we used is: "**Abandoned nest:** a nest that was occupied by breeding birds earlier in the breeding season, but was deserted at some point during breeding (i.e. failed eggs, death of young, etc.)". |
| 474. | 234 | D | M. Siders | Should read "[except Mexican spotted owl {See Special Status Terrestrial – Mexican spotted owl}]" | EMPSi (KW): Change made. |
| 475. | 234 | D | C. Sharp (USFWS/CA) | Include an SSR restriction for non-fluid mineral activities, with performance-based or conditional criteria. If the area is important enough to protect from oil and gas disturbance, it is important enough to protect from other disturbance agents. | BLM (BK): SSR included. |
| 476. | 238 | D | C. Sharp (USFWS/CA) | Special Status Terrestrial Wildlife<br>CSU-37/ SSR-37: Bald Eagle Habitat<br><br>To minimize the risk of BAEA take/ disturbance, incorporate applicable conservation measures from the USFWS National Bald Eagle Management Guidelines:<br><br>http://www.fws.gov/midwest/eagle/guidelines/NationalBaldEagleManagementGuidelines.pdf<br><br>Please clarify or reword the following:<br>1. "…involvement of cottonwood stands or…." [Do you mean avoid disturbance of these areas?]<br>2. "…the pre-development potential of affected | BLM (BK): Included your first statement (reference to the eagle guidelines).<br><br>We have deleted bullets – Plan of development would identify needed restrictions.<br><br>CSU now reads:<br>"CSU-37/SSR-37: *Bald Eagle Habitat (Winter Concentration and Communal Roosts)*. Apply CSU/SSR restrictions within bald eagle habitat to protect winter concentration areas and communal roost sites. Incorporate applicable conservation measures from the USFWS National Bald Eagle Management Guidelines." |



BLM_0111114

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | floodplains to develop or support…" [Think I know the intent, but it's confusing for the reader.]<br>3. "…the current/ future utility of…substrate…" [Again, I think I know the intent, but the word choice is confusing.] | |
| 477. | 239 + 281 eg + 285 eg | | Ela (RACSG) | I am confused by the acronyms between SSR and SSS. SSR is used as Alternative C? (or A?? unless SSS is really the perceived issue – as I see it. The title of the section is "Special Status" and not "site specific." | EMPSi (JW): SSR = site-specific reloation. SSS not found in Chapter 2. Perhaps it was a typo which has been revised at this point. |
| 478. | 239 | D | C. Sharp (USFWS/CA) | Special Status Terrestrial Wildlife<br>TL-25: Bald Eagle Winter Concentration Areas<br><br>We recommend changing restriction period to November 15 through April 1, according to CDOW guidelines (overall, this is a shorter timeframe than proposed in Alt D, but likely more appropriate for wintering BAEA in Colorado).<br><br>Expand restriction to include disruptive activities (e.g., recreation, shed hunting, etc.) in this zone during sensitive periods. *Disruptive activities*- human-caused disturbance that induces stress on a population, community, or ecosystem and potential loss of species fitness (survival, reproduction, and recruitment), usually within crucial habitats or other sensitive areas during specific time periods; may or may not entail surface disturbance. | BLM (BK): TL change made.<br><br>Added disruptive activities. |
| 479. | 241 + 241 | D + E | Ela (RACSG) | I can't see the rationale between listed 50%, 90% or 100%. 90% to me provides adequate flexibility. | BLM (BK): Sorry, we cannot find the row you refer to (it is not 241 or one near there). |
| 480. | 242 | D | C. Sharp (USFWS/CA) | Special Status Terrestrial Wildlife<br>TL-26: Mexican Spotted Owl Suitable Breeding Habitat<br><br>Define suitable breeding habitat here and/or in the glossary. Will this be based on habitat models? This has huge implications for how/ where/ etc. the stipulation will be applied.<br><br>This approach—based on suitable habitats—is very | BLM (BK): Added disruptive to text.<br><br>EMPSi (AA): Added to glossary:<br>**Mexican spotted owl suitable breeding habitat:** Vegetation characteristics described in the current MSO recovery plan in areas where MSO breeding has been confirmed. |

 Page 101 of 297    Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011

BLM_0111115

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | different than applying stipulations to known occurrences, nests, crucial habitats, etc. of a species. You would basically assume that MSO are present in an all areas of suitable habitat, to which the TL would apply. Considering the prevalence of "suitable habitat" for MSO in the UFO, is this feasible?<br><br>Expand restriction to include disruptive activities (e.g., recreation, shed hunting, etc.) in this zone during sensitive periods. *Disruptive activities*- human-caused disturbance that induces stress on a population, community, or ecosystem and potential loss of species fitness (survival, reproduction, and recruitment), usually within crucial habitats or other sensitive areas during specific time periods; may or may not entail surface disturbance.<br><br>Because the USFWS's biological opinion for the RMP proposed action will be predicated largely on proposed conservation measures for listed species, for this and all other stipulations related to T&E, the following should be stated: "Prior to providing an exception to this stipulation, the BLM will initiate Section 7 consultation with the USFWS." [The threshold here is *any* effect on listed species, not just surface occupancy.] | |
| 481. | 243 | D | C. Sharp *(USFWS/CA)* | Special Status Terrestrial Wildlife<br>NSO-34/ NGD-24: Mexican Spotted Owl PACs<br><br>Define PAC here and/or in the glossary.<br><br>Expand restriction to include disruptive activities (e.g., recreation, shed hunting, etc.) in this zone during sensitive periods. *Disruptive activities*- human-caused disturbance that induces stress on a population, community, or ecosystem and potential loss of species fitness (survival, reproduction, and recruitment), usually within crucial habitats or other sensitive areas during specific time periods; may or may not entail surface | BLM (BK): PCA (Protected Activity Center) is defined by the MSO Recovery Plan.<br><br>Disruptive activities has been added to the TL (TL-26).<br><br>We do not need to state section 7 consultation – that is a given if needed. |



BLM_0111116

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | disturbance.<br><br>Because the USFWS's biological opinion for the RMP proposed action will be predicated largely on proposed conservation measures for listed species, for this and all other stipulations related to T&E, the following should be stated: "Prior to providing an exception to this stipulation, the BLM will initiate Section 7 consultation with the USFWS." [The threshold here is any effect on listed species, not just surface occupancy.] | |
| 482. | 244 | D | M. Siders | Should read "Constituent elements for forest dwelling Mexican spotted owl breeding habitat include: ... . For canyon habitat dwelling Mexican spotted owls, the primary constituent elements... ." | BLM (BK): Bullets have been deleted, and we have added "manage in accordance with the current MSO recovery plan" to the text. |
| 483. | 244 | D | C. Sharp (USFWS/CA) | Special Status Terrestrial Wildlife<br>CSU-38/ SSR-38: MSO Suitable Breeding Habitat<br><br>The use of the term "constituent elements" implies that you are referring to federally designated critical habitat. Would this stipulation apply to all suitable breeding habitats for MSO, or just critical habitat, if designated in your resource area? Please clarify.<br><br>An SSR stipulation really means that the BLM will plan, where practical, to minimize impacts on the identified species, habitat, or resource of interest. Shouldn't this be the minimum requirement for all projects on public lands, particularly in sensitive areas, regardless of how an area is labeled? Without specifying, quantifying, or qualifying your SSR stipulation, we are not convinced that this provides any conservation benefit. For instance, if you applied a specific SSR for Gunnison sage-grouse nesting areas (4-mile buffer) to avoid all surface disturbance, or no more than 1% disturbance, in all suitable nesting habitat within the defined buffer, that would be an effective SSR stipulation. As proposed, the majority of your biological stipulations prescribe an SSR combined with CSU or NSO, which | BLM (BK): The bullets, which include the term "constituent elements", have been deleted. The items in the bullets are not needed for a LUP decision. The new action does include: "Manage in accordance with the current MSO recovery plan. Field Manager may require the proponent/applicant to submit a plan of development that demonstrates that impacts to Mexican spotted owl habitat have been avoided to the extent practicable. |



**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | essentially means that some conservation will be attained if fluid mineral activities are involved; but that there are no assurances of conservation/ protection if BLM projects or other non-oil and gas activities are proposed/ implemented.<br><br>For imperiled species, we should err on the side of conservation by beginning with truly protected areas (e.g., by prohibiting surface disturbance and surface occupancy for all activities). Where appropriate, the BLM could then provide exceptions for certain activities that meet specific criteria, subject to Sec.7 as appropriate. | |
| 484. | 247 | D | B. Sharrow[2] | Delete the last three bullets (only the 1st remains). Change the language at the end of the intro paragraph, since there is only one bullet remaining. | BLM (BK): Changes made. |
| 485. | 247 | D | C. Sharp (USFWS/CA) | Special Status Terrestrial Wildlife<br>CSU-39/ SSR-39: Gunnison and White-tailed prairie dog towns<br><br>An SSR stipulation really means that the BLM will plan, where practical, to minimize impacts on the identified species, habitat, or resource of interest. Shouldn't this be the minimum requirement for all projects on public lands, particularly in sensitive areas, regardless of how an area is labeled? Without specifying, quantifying, or qualifying your SSR stipulation, we are not convinced that this provides any conservation benefit. For instance, if you applied a specific SSR for Gunnison sage-grouse nesting areas (4-mile buffer) to avoid all surface disturbance, or no more than 1% disturbance, in all suitable nesting habitat within the defined buffer, that would be an effective SSR stipulation. As proposed, the majority of your biological stipulations prescribe an SSR combined with CSU or NSO, which essentially means that some conservation will be attained if fluid mineral activities are involved; but that there are no assurances of conservation/ protection if | BLM (BK): We are keeping this as an SSR.  The SSR is designed to protect the values when considering proposals.<br><br>We don't feel an NSO is necessary.  The CSU would apply to a colony of any size.  The NSO in alt C you refer to only applies to activities greater than one acre in size that are within a colony that is less than ten acres in size; greater than 10 acres, and the NSO/NGD would not apply. |


BLM_0111118

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | BLM projects or other non-oil and gas activities are proposed/ implemented.<br><br>For imperiled species, we should err on the side of conservation by beginning with truly protected areas (e.g., by prohibiting surface disturbance and surface occupancy for all activities). Where appropriate, the BLM could then provide exceptions for certain activities that meet specific criteria, subject to Sec.7 as appropriate.<br><br>In addition to the CSU, we recommend an NSO/ NGD approach similar to Alternative C. This prescription takes into account the scale of impact, the variable nature of prairie dog occupancy, and places reasonable site-specific limits on project activities. Larger prairie dog towns (i.e., larger than 10 acres, as suggested) are likely more capable of sustaining disturbance, whereas smaller colonies cannot.<br><br>Management decisions for prairie dog have far-reaching effects for the salt desert ecosystem as a whole. As a keystone species, prairie dog abundance influences the welfare of multiple species—kit fox, burrowing owl, raptors, etc. | |
| 486. | 248 | B and D | B. Sharrow[2] | Change the title to: *Gunnison and White Tail Prairie Dog Pups.* Also, add "Gunnison and White Tail" before "prairie dog" later in the paragraph. | EMPSi (JW): change made. |
| 487. | 250 | any cell | B. Sharrow[2] | Let's try to insert a small map that shows what part of the planning area the kit fox are in. | BLM (BK): A figure will be inserted if possible. David will attempt a figure, and determine if a small figure depicts anything meaningful. |
| 488. | 250 | D | C. Sharp (USFWS/CA) | Special Status Terrestrial Wildlife<br>CSU-41/ SSR-41 and TL-30: Kit Fox Active Dens<br><br>An SSR stipulation really means that the BLM will plan, where practical, to minimize impacts on the identified species, habitat, or resource of interest. Shouldn't this be the minimum requirement for all projects on public | BLM (BK): We are keeping this as an SSR. The SSR is designed to protect the values when considering proposals.<br><br>Considering the small area a den occupies, even a cluster, it would be unreasonable to apply a NSO restriction. A CSU will protect these areas |



BLM_0111119

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

**Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)**

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | lands, particularly in sensitive areas, regardless of how an area is labeled? Without specifying, quantifying, or qualifying your SSR stipulation, we are not convinced that this provides any conservation benefit. For instance, if you applied a specific SSR for Gunnison sage-grouse nesting areas (4-mile buffer) to avoid all surface disturbance, or no more than 1% disturbance, in all suitable nesting habitat within the defined buffer, that would be an effective SSR stipulation. As proposed, the majority of your biological stipulations prescribe an SSR combined with CSU or NSO, which essentially means that some conservation will be attained if fluid mineral activities are involved; but that there are no assurances of conservation/ protection if BLM projects or other non-oil and gas activities are proposed/ implemented.<br><br>For imperiled species, we should err on the side of conservation by beginning with truly protected areas (e.g., by prohibiting surface disturbance and surface occupancy for all activities). Where appropriate, the BLM could then provide exceptions for certain activities that meet specific criteria, subject to Sec.7 as appropriate.<br><br>Considering the species' overall status and trends (at current rates, predicted extirpation in the near future), its rarity in the UFO, and its relatively small distribution in the UFO, the Service recommends that an NSO/ NGD be applied to protect den clusters (historic and active). Kit fox dens, and natal dens in particular, are used repeatedly over multiple generations and should be protected/ retained. This would entail a nominal buffer, such as 100 feet, to protect the den sites themselves.<br><br>Regarding TL-30: Expand restriction to include disruptive activities (e.g., recreation, shed hunting, etc.) | sufficiently. Also, an NSO would need to be identified at the time of leasing. What if a kit fox or den appears within the lease? We would not be able to apply the NSO is that case. The CSU could be applied at any time. |



BLM_0111120

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | in this zone during sensitive periods. *Disruptive activities*-human-caused disturbance that induces stress on a population, community, or ecosystem and potential loss of species fitness (survival, reproduction, and recruitment), usually within crucial habitats or other sensitive areas during specific time periods; may or may not entail surface disturbance. | |
| 489. | 251 & 507 | | M. Siders | What happened to Petitioning the Secretary for withdrawal of additional bat roosts? Had under Alt B "Same as Alternative A plus petition the Secretary of the Interior for withdrawal from locatable mineral entry for sensitive bat species' significant maternity roost or hibernaculum." | BLM (BK): Added back to Alternative B. |
| 490. | 252 | All | B. Krickbaum | XX acres | EMPSi (KW): Change made. |
| 491. | 252 | All | M. Siders | Cory Lode mine withdrawal = 17.8 acres per FR Public Land Order No. 7735 Withdrawal (CO-923-1430-ET; COC-70704) | EMPSi (KW): Change made. |
| 492. | 253 | D | M. Siders | Should read "Prohibit surface occupancy and apply SSR restrictions within 0.25-mile of Federally listed and BLM sensitive bat species'…" | EMPSi (KW): Change made. |
| 493. | 253 | D | C. Sharp *(USFWS/CA)* | Special Status Terrestrial Wildlife Bat Roost Sites and Winter Hibernacula NSO-38/ SSR-44 CSU-43/ SSR-43 TL-31 <br><br> An SSR stipulation really means that the BLM will plan, where practical, to minimize impacts on the identified species, habitat, or resource of interest. Shouldn't this be the minimum requirement for all projects on public lands, particularly in sensitive areas, regardless of how an area is labeled? Without specifying, quantifying, or qualifying your SSR stipulation, we are not convinced that this provides any conservation benefit. For instance, if you applied a specific SSR for Gunnison sage-grouse nesting areas (4-mile buffer) to avoid all surface disturbance, or no more than 1% disturbance, in all suitable nesting habitat within the defined buffer, | BLM (BK): We are keeping this as an SSR.  The SSR is designed to protect the values when considering proposals. We don't feel that an NGD is appropriate.  An SSR for .25 miles will afford the protections needed. |

 Page 107 of 297     Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011

BLM_0111121

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | that would be an effective SSR stipulation. As proposed, the majority of your biological stipulations prescribe an SSR combined with CSU or NSO, which essentially means that some conservation will be attained if fluid mineral activities are involved; but that there are no assurances of conservation/ protection if BLM projects or other non-oil and gas activities are proposed/ implemented. <br><br> For imperiled species, we should err on the side of conservation by beginning with truly protected areas (e.g., by prohibiting surface disturbance and surface occupancy for all activities). Where appropriate, the BLM could then provide exceptions for certain activities that meet specific criteria, subject to Sec.7 as appropriate. | |
| 494. | 256 | D | Clements | There is a statewide stip for frog habitat-should it be used here for Alt D? | BLM (BK):  Row deleted per management direction; did not see a reason to leave in, since we would generally not be able to identify reptile breeding sites during the oil/gas leasing phase. |
| 495. | 256 | D | C. Sharp (USFWS/CA) | We recommend adopting Alternative C, at a minimum. You propose an NSO stipulation for midget faded rattlesnake… why this species but not others? (leopard frog, canyon tree frog, etc.) | BLM (BK): Rows (256, 257) deleted per management direction; did not see a reason to leave in, since we would generally not be able to identify reptile breeding sites during the oil/gas leasing phase. <br> Other actions have the requirement for SSS surveys in general at the project stage and also the requirement to not harm species, which will be sufficient for protection. |
| 496. | 259 | All | M. Siders | Redundant with line 167 in Terrestrial Wildlife – Waterfowl and Shorebirds.  Suggest changing line 259 to say "Refer to the Terrestrial Wildlife – Waterfowl and Shorebirds section" | BLM (BK): Deleted row 167. |
| 497. | 259 | D | C. Sharp (USFWS/CA) | Apply NGD wherever you apply NSO. The measure should be science-based, i.e. based on the nature of effects. Surface disturbance is surface disturbance, regardless of the agent. | BLM (BK): UFO made the decision to not apply NGD every time we apply NSO.  We chose SSR almost every time.  NGD means that nothing can occur on the ground – no signs, no trail, etc.  NGD in many cases, while well-intentioned, is also short- |


BLM_0111122

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | sighted and overly restrictive. |
| 498. | 261 | D | C. Sharp (USFWS/CA) | We presume based on the language that these areas would be identified in the near future. We suggest a target completion date.<br><br>On a sidenote, why the verbiage "Authorized Officer" to identify areas, and for this particular decision? The decision should be science-based, as determined by biologists in coordination with CDOW, although the Authorized Officer inevitably influences/ endorses/ or denies decisions regardless of the species or circumstances. No other decision, that I've seen, reads like this. | BLM (BK): We have deleted the row.  We feel that the several other restrictions on major rivers, streams, and waterfowl/shorebird habitat will protect the Sandhill crane breeding areas.<br><br>Regarding the sidenote, we frequently say "designated by the BLM Authorized Officer", "authorized by the BLM Authorized Officer", and such, because it is the BLM Authorized Officer (e.g. Field Manager) who makes the ultimate decision.  It is not some other biologist, CDOW or other agency.  They can make recommendations, but, because the authorized officer is responsible for management of the land, it is their call and decision. |
| | | | | **Wild Horses** | |
| | New | | Barb | Add a "Wild Horse" section.  Rows are below after this table.<br>*EMPSi: Rows are in file saved on Egnyte here: Z:\Shared\Projects\F-0126 UFO RMP\2_Deliverables\17_P3T7_Alternatives(Ch2)\3.7.E _RvsdDraftCh2_SO-Review\CommentResponse\FromBLM (File Name: Ch2_draft_UFO-Comments_091911_Miscellaneaous.docx)* | EMPSi (JW): Change made. |
| | | | | **Wildlife Fire Ecology and Management** | |
| 499. | 265 | A, B, C, D | A. Schroeder (CA) | Add BOR and federal lands and agencies besides BLM, NPS, and USFS<br><br>Dan: is BOR part of interagency fire management unit? *Sent to Dan 8/11/11*<br>Dan's response (8/17/11):  No…BOR is not part of MIFMU.  Line 265 is accurate as written. | EMPSi (KW): No change. Per Dan Huisjen (8/17/11), BOR is not part of MIFMU. Line 265 is accurate as written. |
| 500. | 266 | | A. Schroeder (CA) | I recommend that the word "natural" in the phrase "high-value natural resources" at the end of the sentence be deleted.<br><br>Rationale: Deletion of that word will yield a broader | EMPSi (KW): Change made. |



BLM_0111123

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | coverage that includes both high value manmade and natural resources. | |
| 501. | 275 | | Clements | Insert "and vegetation mosaic" after "resource" | EMPSi (KW): Change made. |
| 502. | 277 | B and D | B. Krickbaum | D:  Move "soils, watersheds" to before ACECs. Will read: "…not degraded particularly relative to soils, watersheds, ACECs, WSAs, …"<br><br>B:  Delete "Wilderness". Make the same change (soils, watersheds) as in D. | EMPSi (KW): Change made. |
| 503. | 278 | B, C, D | A. Schroeder (CA) | Define "climax vegetative community" in the Glossary. | EMPSi (KW/AA): Added the following definition: The final vegetation community and highest ecological development of a plant community that emerges after a series of successive vegetational stages. The climax community perpetuates itself indefinitely unless disturbed by outside forces. (BLM range Web site) |
| 504. | 278 | D | B. Krickbaum | Add: "or manage". Will read: "Revegetate or manage lands…" | EMPSi (KW): Change made. |
| 505. | 279 | | Clements | Make consistent with vegetation section by adding", vegetation and habitat objectives" before "or where human life" | BLM (BK 10/5/11): Changed B and D, end of sentence after last parenthesis, changed to: ", vegetation and habitat objectives, or where human life or property are at risk from post-fire impacts." |
| | | | | **Cultural Resources** | |
| 506. | 283 | All | B. Krickbaum | I don't think we need the reference to the LUP Handbook. | EMPSi (KW): Change made. |
| 507. | 296 | D | Steve Weist (RACSG) | 100 meters is 128 ft. further away than the more restrictive Alt B which is 200 ft., it should be at most 200 ft. or 60 meters. | EMPSi (KW): Preferred alternative does not fall between Alternatives B and C as it was developed after the other alternatives were developed. This allowed the preferred alternative to be outside of the range. The BLM Management team has decided to go with 100 meters to be consistent with pending state-wide stipulations. |
| 508. | 299 | D | B. Sharrow[2] | Reword D to read: **Action:** Nominate individual sites to the National or State Register of Historic Places.  Individual sites with the | EMPSi (JW): change made. BLM (BK) Note: The two different names in Alt B and Alt D are correct (Paradox Valley Rock Art district and complex), and the names do not need |



BLM_0111124

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)**

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | potential for nomination include sites identified in the: <br>• Ute Wickiup project; <br>• Uravan Uranium Mining district; <br>• Squint Moore complex; <br>• Harris site on the Uncompahgre Pleateau; <br>• Paradox Valley Rock Art complex. <br>Also nominate other sites that meet the National Register of Historic Places criteria. | to match. It is the same place, but we should use the two different names. Alt B says to nominate National Register districts and that "Potential National Register Districts include…" The list of names are all potential districts, so that is why they have "district" attached. <br><br>Since Alt D nominates sites to "National or State Register of Historic Places" we will leave "complex" attached to the name. It is now referred to as a complex. But under Alt B, it would become a district once nominated. |
| 509. | 301 | B, C, D | B. Sharrow[2] | Remove "Lease Notice" and title. Replace with "Action". Begin the action with "Attach the following…" Remainder of the text will be the same: <br><br>**Action:** <br>Attach the following standard stipulations to any BLM-issued permit in which there may be ground-disturbing activities or the potential for the inadvertent discovery or effects to any National Register of Historic Places- or otherwise eligible historic or archaeological cultural property: <br>• If historic or archaeological materials are uncovered during permitted activities, the operator is to immediately stop activities in the immediate area of the find that might further disturb such materials, and immediately contact the BLM Authorized Officer. Within five working days, the BLM Authorized Officer will inform the operator as to: <br>  o whether the materials appear eligible for the National Register of Historic Places; and <br>  o the mitigation measures the operator will likely have to undertake before the construction may proceed. <br>• Pursuant to 43 CFR 10.4(g), the holder of the authorization must notify the BLM Authorized Officer, by telephone, with written confirmation, | EMPSi (KW): Change made. (deleted from Appendix B) |



BLM_0111125

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | immediately upon the discovery of human remains, funerary items, sacred objects, or objects of cultural patrimony. Further, pursuant to 43 CFR 10.4(c) and (d), you must stop activities in the vicinity of the discovery and protect it for 30 days or until notified to proceed by the BLM Authorized Officer. | |
| | | | | **Paleontological Resources** | |
| 510. | 306 | B | B. Krickbaum | Change the sentence to read: "…site-management plan for known localities, including:" | EMPSi (KW): Change made. |
| 511. | 309 | B, C, D | B. Sharrow[2] | Same as above. Remove "Lease Notice" and title. Make it an action, beginning with "Require a permitted…". Remove "(Refer to Appendix B)" | EMPSi (KW): Change made. (deleted from Appendix B) |
| | | | | **Visual Resources** | |
| 512. | 310-316, Fig 2-7 | D | S. Bear (RACSG) | Since the Adobe ACEC is a ROW avoidance area, potential for ROW exists. Therefore, provide an area between private lands and Adobe VRM Class 1 by providing a 200 meter VRM Class 3 corridor at the edge of the Adobe ACEC. | EMPSi (KW): The ACEC is within the Adobe Badlands WSA, which is VRM Class I per BLM guidance. The area outside of the WSA is VRM Class IV which would allow for ROW development. If the WSA were to go away, the ACEC area would be managed as VRM Class II and ROW development would have to be mitigated to meet that standard. |
| 513. | 313 | B, C, and D | J. Jackson | Undesignated acres - These numbers should not vary if they are acres managed by other agencies; and if they need to have a VRM Class assigned then they should be assigned the VRI Class until further direction is given | EMPSi (KW): GIS acreages updated. |
| 514. | 314 | D | Hawke (RACSG) | Add "Paradox Valley Zone 4" | EMPSi (KW): Paradox Valley SRMA is not in Alternative D; however it would be managed as VRM Class I under Alternative B. |
| 515. | 314 & 316 | D | S. Bear (RACSG) | Correct VRM acreages, providing for the 200 meter buffer along the ACEC boundary. | EMPSi (KW): The ACEC is within the Adobe Badlands WSA, which is VRM Class I per BLM guidance. The area outside of the WSA is VRM Class IV which would allow for ROW development. If the WSA were to go away, the ACEC area would be managed as VRM Class II and ROW development would have to be mitigated to meet that standard. |
| 516. | 315 | B, C, and D | J. Jackson | See Bruce's comment on additional language needed about all other areas not mentioned or areas outside | EMPSi (KW): Changed to read, " Manage xx acres as VRM Class II including, but not limited to, the |


BLM_0111126

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | of the areas already listed. | following" |
| 517. | 315 | D | L Reed | A VRM II classification on 99,920 acres seems like it will be very difficult for resource uses such as ROWs and minerals/O&G to process applications.   We've gone from Alt A which is the San Miguel River ACEC to over 99,000 acres of VRM II lands in the new plan? Doesn't this seem restrictive for a Multi Use agency? Basically 1/6 of the FO will have some pretty stringent siting restrictions [and this doesn't include the 46,580 acres that are VRM I]<br><br>Also note the lands east and south of Montrose:  the BLM lands are typically VRM IV while the private lands are VRM II?   Also we have the entire N Fork area as VRM II -  both public and private lands?   Shouldn't there just be a buffer along the highway instead of classifying so many acres of private lands as VRM II?<br><br>I think the VRM II areas in Alt D need to be reconsidered. | BLM (BK): There will be some change to the VRM map.  The area east and south of Montrose will change to III.  The North Fork area (except for ½ mile along the highway) will be a class III. |
| 518. | 315 | D | Joan May (CA) | Add San Miguel River ACEC excepting existing utility corridors and other stream segments in B located in San Miguel County to D | EMPSi (KW): The ACEC is VRM Class III. |
| 519. | 315 | D | J. Jackson | Under SRMA's should read:<br>• Dolores River Canyon Zone 1 and 2<br>• Roubideau Zone 1<br>• San Miguel River Zone 3<br>• Spring Creek Zone 2<br>Adjust the overall acres.<br><br>*Note to BLM: Direction under Appendix K says to Change Dolores River Canyon RMZ 1 to VRM III. Please advise.*<br><br>*BLM Response (BK 10/5/11): Current matrix is correct: Dolores River RMZ1 is managed as a VRM Class II. Appendix K is incorrect, and need to change to class II.* | EMPSi (JW): Change made. |
| 520. | 316 | B, C, and D | J. Jackson | See Bruce's comment on additional language needed about all other areas not mentioned or areas outside | EMPSi (KW): Changed to read, " Manage xx acres as VRM Class III including, but not limited to, the |



BLM_0111127

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | of the areas already listed. | following" |
| 521. | 316 | D | B. Krickbaum | Insert the word "including" after "Class III". | EMPSi (JW): Change made. |
| 522. | 316 | D | B. Krickbaum | Change the bullet regarding West Elk Scenic Byway (3rd from the bottom bullet) to:  Bullet "Portion of the West Elk Scenic Byway west of Gunnison County Road 12." | EMPSi (JW): Change made. |
| 523. | 316 | D | B. Krickbaum | Do we need to describe other areas shown on the map, but not in the list of areas?  Or, will the map typically suffice? | EMPSi (KW): Changed to read, " Manage xx acres as VRM Class III including, but not limited to, the following" |
| 524. | 316 | D | J. Jackson | Under SRMA's should read:<br>• Dry Creek<br>• Jumbo Mountain<br>• Roubideau Zones 2, 3, and 4<br>• San Miguel River Zones 1, 2, and 4<br>• Spring Creek Zones 1 and 3<br>Adjust the overall acres | EMPSi (JW): Change made. |
| 525. | 317 | D | B. Sharrow[2] | Add a bullet:<br>All areas not identified as VRM Class I, II or III. | EMPSi (KW): Added to Alternatives B and C. Alt D is Same as B plus. |
| 526. | 318 | D | Hawke (RACSG) | Change to read like Alt B<br>**Explanation & Notes:**<br>Visual resources are the foundation of many other values important to manage for in the UFO, including recreation and tourism appeal. Given the rural western character that remains in significant portions of the UFO, particularly the West End, management to retain these highly valuable and rapidly vanishing visual resources merits the NSO stipulation. | EMPSi (KW): No.  BLM team decided that the management objectives for the different VRM classes would dictate land use. |
| 527. | 318 & 319 | C&D | Holsinger | Should that say same as Alternative B for C&D? | EMPSi (KW): No. BLM team decided that the management objectives for the different VRM classes would dictate land use. |
| 528. | 319 | D | Hawke (RACSG) | Change to read like Alt B<br>**Explanation & Notes:**<br>Visual resources are the foundation of many other values important to manage for in the UFO, including recreation and tourism appeal. Given the rural western character that remains in significant portions of the UFO, particularly the West End, management to retain | EMPSi (KW): BLM team decided that the management objectives for the different VRM classes would dictate land use. |



BLM_0111128

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | these highly valuable and rapidly vanishing visual resources merits the CSU/SSR stipulation. | |
| 529. | 320 | B,C,D | Steve Weist *(RACSG)* | Remove" Naturally dark (i.e.," and just have the following:" Maintain dark night sky conditions in areas that are generally unaffected by man-made light sources)". | BLM (BK 10/5/11): Objective changed to, "Maintain dark night sky conditions in areas that are generally unaffected by man-made light sources." |
| 530. | 322 | B and D | B. Sharrow[2] | Change the action to: **Action:** Require that permanent and temporary artificial outdoor lighting be shielded and downward-facing ("full cut-off" fixtures) to minimize impacts to naturally dark night skies.  An exception, with mitigation, may be granted for temporary lighting if the requirement will create a hazard. | EMPSi (KW): Change made.  A question arose: Even with permanent lighting, operators would be required to meet OSHA standards so it's possible that operators might not be able to meet this. Do we need an exception for temporary lighting if they're going to comply with OSHA standards?  BLM (BK) Reply:  Leave it as it is.  Permanent lighting can be installed that won't violate OSHA.  I don't see any problem with the requirement.  The potential hazard could be with temporary lighting -- e.g while drilling a well.  I want to leave it as is to let companies know that we really do want shielded lighting, but that if there is a problem, we can work it out. |
| | | | | **Lands with Wilderness Characteristics** | |
| 531. | 325 | NAP | Hawke *(RACSG)* | The Goal should be updated to more fully reflect the recently issued guidance on LWCs in Land Use Planning (IM 2011-154-att2), that also includes the consideration of "benefits that may accrue to other resource values and uses as a result of protecting wilderness characteristics." To more closely track the current guidance, the goal might read approximately "Manage, protect and preserve non-WSA lands with wilderness characteristics while considering other resource values and uses that might be affected, and considering manageability." **Explanation & Notes:** This is an important additional consideration now explicitly reflected in the guidance, and is especially | BLM (BK): Changed to, "Manage, protect and preserve non-WSA lands with wilderness characteristics while considering manageability and resource values and uses that might be affected." |



BLM_0111129

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | important to consider where preservation of LWCs may also benefit other resources important in the UFO, including but not limited to resource examples reflected in the new guidance: recreational opportunities, protection of watersheds, wildlife habitat, natural plant communities, cultural resources, scenic quality, and similar natural values." | |
| 532. | 327 | | | Replace matrix row 327 with the row shown below. GIS has the new maps. *EMPSi: Replacement row found in matrix saved on Egnyte here:* Z:\Shared\Projects\F-0126 UFO RMP\2_Deliverables\17_P3T7_Alternatives(Ch2)\3.7.E _RvsdDraftCh2_SO-Review\CommentResponse\FromBLM *(File Name:* Ch2_draft_UFO-Comments_092211_krickbaum.docx) | EMPSi (JW): Change made. |
| 533. | 327 | | Hawke (RACSG) | See below. *(EMPSi Note: refers to comment requesting Norwood Canyon be added to list of lands identified for wilderness characteristics protection, as well as entire Roc Creek/Carpenter Ridge CWP area)* **Explanation & Notes:** Alternatives B and D provide a very good start at preserving the important areas that possess wilderness characteristics in the UFO. However, some areas that may possess wilderness characteristics under the recently issued guidance for inventory and incorporation into land use planning are missing from the alternatives. To reflect a full range of alternatives, these missing areas should be included, as the areas reasonably may be interpreted as possessing wilderness characteristics under recent guidance (IM2011-154_att 1 & 2) | BLM (BK 10/5/11): Shavano Creek and Dolores River Canyon have been added to alternative B. EMPSi (KW): While the CWP did a good job of excluding inventory roads (meeting the definition in our manual 6301), there were some areas around the edges of the unit that have routes, ways and other disturbances that prevent those edge areas from possessing the "naturalness" criteria.  The CWP boundary was adjusted to exclude those areas during evaluation. The biggest issue, however, is with size. BLM Manual 6301 requires that to possess wilderness characteristics, an area must meet certain size criteria. While the CWP includes enough USFS adjacent land to meet the size requirement, those USFS lands are not WSAs nor Recommended Wilderness; therefore, we may only look at the BLM lands.  Since there are two pieces that meet at a corner, and that do not share a common boundary, and neither meets the size criteria, the areas do not possess wilderness characteristics. |
| 534. | 327 | B & D | Hawke (RACSG) | Add "Norwood Canyon" **Explanation & Notes:** | EMPSi (KW): While the CWP did a good job of excluding inventory roads (meeting the definition in |


BLM_0111130

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

# Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | There are several reasons under TM2011-154 att 1 why Norwood Canyon, a citizen-proposed wilderness area, should continue to be considered as LWC in the range of alternatives: The area can be demonstrated as "of sufficient size as to make practicable its preservation and use in an unimpaired condition." The area is bound by rugged canyon topography, few roads, and adjacent Forest Service land; thus the area is fairly inaccessible and can reasonably be managed as a separate unit . The area is also recommended for management under the Wild classification for Wild and Scenic River Suitability, and included in the San Miguel ACEC; these proposed special designations reflect that the area can be managed in a wild and natural state. In addition, forest service planning is currently very out of date, and the status of adjacent FS land in current plans should not be relied upon as definitive for this analysis. The BLM and FS should consult jointly to consider managing this area for wilderness character. | our manual 6301), there were some areas around the edges of the unit that have routes, ways and other disturbances that prevent those edge areas from possessing the "naturalness" criteria. The CWP boundary was adjusted to exclude those areas during evaluation. The biggest issue, however, is with size. BLM Manual 6301 requires that to possess wilderness characteristics, an area must meet certain size criteria. While the CWP includes enough USFS adjacent land to meet the size requirement, those USFS lands are not WSAs nor Recommended Wilderness; therefore, we may only look at the BLM lands.  Since there are two pieces that meet at a corner, and that do not share a common boundary, and neither meets the size criteria, the areas do not possess wilderness characteristics. |
| 535. | 327 | B & D | Hawke (RACSG) | Include in the area and acreage for "Roc Creek/Carpenter Ridge" all of the citizen-proposed wilderness area that lies within UFO; this may be more than the 4310 acres described | BLM (EF 10/5/11): Much of the CWP in the Roc Creek area does not possess the "natural" characteristic, and has been excluded from the unit. In particular, the lands in upper Beehive Canyon and Carpenter Flats in the southeast part of the CWP are laced with a network of vehicle routes. |
| 536. | 327 | B, D | E. Franz | Acreage is likely to change in Upper Dry Creek Basin and Roc Creek units.  Two new units may be added: Shavano Creek and Dolores River Canyon – Wild Steer Addition.  As a result, Alts B and D are likely to diverge. | EMPSi (JW): Made changes to row 327 (added Shavano Creek and Dolores River Canyon Addition to Alternative B; Alternative same as OLD Alternative B). Added to Table 2-1. |
| 537. | 327 | c | B. Day (RACSG) | No action / no protection is too wide range of alts. | EMPSi (KW): Managing to protect wilderness characteristics under Alternative C does not fit the theme of the alternative. Line 328 also adds to the range of alternatives. |
| 538. | 327 | D | Rogers | We need to be able to partner with USFS. They have several treatments planned for the Potter basin area and we don't need any more straight lines between the | EMPSi (KW): Management decided to leave action as-is; no good justification thus far for making it smaller. |



BLM_0111131

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | two agencies. Also need two drift fences in Potter Cyn for livestock management onto and off of USFS lands. So need to provide exceptions!! | |
| 539. | 328 | B | D. Dyer | The preferred alternative D has allowable use: close to coal, therefore it should also appear in alternative B. | EMPSi (JW): Change made. |
| 540. | 328 | B | B. Krickbaum | Add: "Allowable Use:  Close to coal leasing" | EMPSi (JW): Change made. |
| 541. | 328 | B & D | Hawke (RACSG) | Add "manage to maintain natural soundscapes" | EMPSi (KW): The term natural soundscapes is not defined. Other management actions would result in what we perceive to be natural soundscapes. In addition, the wilderness characteristic of solitude includes the visitor's opportunity to avoid sounds of other people in the area. As such, managing the area to protect wilderness characteristics would protect soundscapes to that extent. |
| 542. | 328 | B, D | B. Krickbaum | Change "Prohibit wood cutting" to "Closed to wood product sales or harvest" | EMPSi (JW): Change made. |
| 543. | 328 | B, D | A. Schroeder (CA) | Replace "salable mineral" with "mineral materials."  Rationale: Consistent use of terms (salable minerals vs mineral materials). Mineral materials may be disposed of through various methods, including sale, free use permits, etc.. | EMPSi (JW): Change made. |
| 544. | 328 | D | Tucker | Allow maintenance of existing range improvement facilities **ADD-** "in a manner consistent with the long-term preservation of wilderness characteristics;"  Note:  Maintenance should be consistent with protection of wilderness characteristics. | EMPSi (JW): Change made. |
| 545. | 328 | D | Hawke (RACSG) | Change "limit motorized and mechanized travel to designated routes" to "close to motorized use, and close to  mechanized use or at minimum, limit mechanized use to designated routes" **Explanation & Notes:** Wilderness characteristics are being lost as we use and develop our public lands, yet wilderness preserves some of the richest heritage of the natural and human American West. Motorized use impairs wilderness | BLM (BK): BLM considered the change, but decided to leave as it is. Motorized use can impair the solitude and primitive opportunities to a degree, but does not detract from the unit overall.  The Roubdideau unit does not have routes.  The Roc creek unit does have a route that a single track or ATV could use.  This will be dealt with again during travel management planning for that area.  The Dry Creek unit has some designated routes now (as a |



BLM_0111132

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | character. Any use patterns that may impair wilderness character should be prevented. This decision is clearly provided for in IM2011-154_att2 (see D.5. on page 4) | result of travel management planning).  If we determine motorized or mechanized (e.g. single-track) is incompatible with LWWC, then we may need to consider dropping Dry Creek from consideration. |
| 546. | 328 | D | Hawke (RACSG) | Add "prohibit target shooting" | EMPSi (KW): Management has decided not to add. They feel there won't be much, if any, target shooting in the area and target shooting isn't inconsistent with managing these areas. |
| 547. | 328 | D | Hawke (RACSG) | Change "ROW avoidance" to "ROW exclusion" **Explanation & Notes:** This decision would best preserve wilderness characteristics and is clearly provided for in IM2011-154_att2 (see D.3. on page 4) | BLM (BK): Management decided to leave it as avoidance.   Any ROW authorizations would have to include measures to maintain the wilderness characteristics. Underground ROW would not detract from values once the project is completed and healed. Above-ground projects, with proper mitigation, would also not impair values.  The key, regarding potential projects, is to maintain the wilderness characteristics. |
| 548. | 328 | D | Hawke (RACSG) | Add "Petition the Secretary of the Interior for withdrawal from mineral entry" **Explanation & Notes:** Mining, while important to western Colorado, holds significant potential for impacts to the landscape in a manner that may impair the wilderness character and be infeasible to reverse. This decision would best preserve wilderness characteristics and is clearly provided for in IM2011-154_att2 (see D.1. on page 4) | EMPSi (KW): Although the BLM recognizes that some of these lands are in the uranium belt, it is not policy to withdraw them and the management team has decided to leave the action as-is. |
| 549. | 328 | D | Hawke (RACSG) | Add "Issue no SRPs for competitive events" **Explanation & Notes:** Wilderness character is vulnerable to impacts from intensified human use, and user patterns should be prevented that would not sustain the wilderness character | EMPSi (KW): Management has decided to leave the way it is. Some events may be compatible and any event would have to meet the SRP permit criteria in Appendix J, Special Recreation Permit Evaluation Criteria. |
| 550. | 328 | D | Hawke (RACSG) | Change "Permit new range improvement projects … consistent with the long-term preservation of wilderness characteristics" to "Permit new range improvement projects … consistent with the long-term preservation of wilderness characteristics, and avoiding | EMPSi (KW): Management does not feel allowing short-term impacts to wilderness characteristics in order to maintain characteristics in the long-term is inconstant with IM IM2011-154. |



**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | short-term diminishment of wilderness characteristics" **Explanation & Notes:** The original language incorporates some worthy approaches, but might leave open the potential for short-term diminishment of wilderness characteristics, and this also needs to be avoided. | |
| 551. | 328 and following | B & D | Hawke (RACSG) | **Explanation & Notes:** As indicated in IM2011-154_att2, "an alternative that protects lands with wilderness characteristics must contain management actions to achieve protection." and then lists sample decisions could protect lands with wilderness characteristics. | EMPSi (KW): See response to individual comments on this section. |
| 552. | 329 | D | Hawke (RACSG) | Change NSO provision to read like NL provision in alternative B **Explanation & Notes:** This decision is provided for in IM2011-154_att2, and would best preserve wilderness character, particulalry by avoiding potential impacts to groundwater | EMPSi (KW): Management believes NSO reasonably protects the wilderness characteristics, as accessing the resource below-ground would not impact the characteristics above ground. NSO would require directional drilling from outside of the area with wilderness characteristics. |
| 553. | 329 | D | C. Sharp (USFWS/CA) | An SSR stipulation really means that the BLM will plan, where practical, to minimize impacts on the identified species, habitat, or resource of interest. Shouldn't this be the minimum requirement for all projects on public lands, particularly in sensitive areas, regardless of how an area is labeled? Without specifying, quantifying, or qualifying your SSR stipulation, we are not convinced that this provides any conservation benefit. For instance, if you applied a specific SSR for Gunnison sage-grouse nesting areas (4-mile buffer) to avoid all surface disturbance, or no more than 1% disturbance, in all suitable nesting habitat within the defined buffer, that would be an effective SSR stipulation. As proposed, the majority of your biological stipulations prescribe an SSR combined with CSU or NSO, which essentially means that some conservation will be attained if fluid mineral activities are involved; but that there are no assurances of conservation/ protection if BLM projects or other non-oil and gas activities are proposed/ implemented. | EMPSi (KW): We considered NGD, but feel an SSR offers adequate protection.  We can apply appropriate restrictions at the project stage with an SSR.  Projects proposed in these areas would need to protect the identified resource or else the project could be moved or modified. |



**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | For special areas and sensitive resources, we should err on the side of conservation by beginning with truly protected areas (e.g., by prohibiting surface disturbance and surface occupancy for all activities). Where appropriate, the BLM could then provide exceptions for certain activities that meet specific criteria, subject to Sec. 7 as appropriate. | |
| 554. | 330 | Header | B. Krickbaum | Delete row, unless there is a reason for the header "Resource Uses". | EMPSi (KW): Moved to before Forest and Woodland Products heading. |
| | | **Forestry** | | | |
| 555. | 339 | | Clements | "where consistent with Land Health and vegetation mosaic objectives" after "same as Alternative B" | EMPSi (JW): Change made. |
| 556. | 340 | | Clements | Add ", pristine or ancient" after rare | EMPSi (JW): Changed to, "exemplary, ancient, and rare." |
| 557. | 340 | B | B. Krickbaum | Not all ACEC are closed to wood product sales.  Show the following ACEC:<br>Fairview South ACEC/RNA;<br>Needle Rock ACEC/RNA/ISA;<br>San Miguel River ACEC;<br>Dolores Slickrock Canyon ACEC;<br>Roubideau/Potter/Monitor ACEC | EMPSi (JW): Change made. Also updated the ACEC section. Revised the management action to match the wording in the forestry section. Revised "Close to forest product harvest" **to** "Close to wood product sales and/or harvest". |
| 558. | 340 | B | B. Krickbaum | Add SRMAs:<br>-Dolores River Canyon Zones 1, 2<br>-Dry Creek Zones 1, 2, 4<br>-Jumbo Mountain Zone 1<br>-Kinikin Hills Zones 1, 2<br>-North Delta Zones 1, 2<br>-Paradox Valley Zones 1, 2<br>-Ridgway Trails Zone 1<br>-Roubideau Zones 1, 2, 3<br>-San Miguel River Zones 1, 2, 3, 4<br>-Spring Creek Zones 1, 2, 3 | EMPSi (JW): Change made to forestry section. Also added Roubideau RMZ 4 per Appendix K and discussion with BK (10/5/11). |
| 559. | 340 | B & D | M. Siders | See comment #58 above re "wilderness characteristics protection" | EMPSi (KW): Terminology is correct. |
| 560. | 340 | B and D | B. Krickbaum | In the introduction paragraph, after "harvest" add: "(unless there is an exception shown below)" | EMPSi (JW): Change made. |



BLM_0111135

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 561. | 340 | B and D | B. Krickbaum | Some areas allow personal wood collecting or permitted wood harvest (such as firewood). <br><br> Add the following in parenthesis after ACECs, and SRMAs (Refer to the ACEC [*or SRMA*] for specific restrictions and allowed wood product use or harvest). <br><br> After biological core areas add: (Prohibit commercial sales and harvest only). | EMPSi (KW): Change made. |
| 562. | 340 | B, C, D | B. Krickbaum | Figures need changed. Figure for alternative: <br> B is 2-76; <br> C is 2-77; <br> D is 2-78. | EMPSi (JW): Change made. |
| 563. | 340 | B, D | B. Krickbaum | Add a bullet for: <br> Ancient woodlands and forest. | EMPSi (JW): Change made. |
| 564. | 340 | C | B. Krickbaum | Add ACEC: Fairview South | EMPSi (JW): Change made to Forestry and ACEC sections. |
| 565. | 340 | D | B. Krickbaum | Not all ACEC are closed to wood product sales. Show the following ACEC: <br> Fairview South ACEC/RNA; <br> Needle Rock ACEC/RNA/ISA; <br> San Miguel River ACEC; <br> Dolores River Slickrock Canyon ACEC; <br> Roubideau Corridors ACEC | EMPSi (JW): Change made to Forestry and ACEC sections. |
| 566. | 340 | D | B. Krickbaum | Delete Burn Canyon Zone 1 from the list. <br> Add Zones 1, 2, 3, 4 to San Miguel <br><br> Add to the SRMA list: <br> -Dolores River Canyon Zones 1, 2 <br> -Dry Creek Zones 1, 2, 4 <br> -Roubideau Zones 1, 2, 3, 4 | EMPSi (JW): Change made to Forestry section. Also added Jumbo Mountain RMZ 2 per Appendix K and conversation with BK (10/5/11). |
| 567. | 340 | D | C. Sharp (*USFWS/CA*) | Also close to wood product sales and/or harvest all NSO/ NGD- stipulated areas (e.g., raptor nests). These areas could be excepted, depending on circumstances, on a case-by-case basis (i.e., for habitat improvement not detrimental to target species). <br><br> On a sidenote, we would consider most wood cutting | EMPSi: added bullet for NGD areas (except for private firewood permits). |



BLM_0111136

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | activities to be *surface-disturbing*—human-caused disturbance resulting in direct and pronounced alteration, damage, removal, displacement, or mortality of vegetation, soil, or substrates; usually entail motorized or mechanized vehicles or tools; typically can also be described as disruptive activities | |
| 568. | 342 | D | B. Krickbaum | Add "Make byproducts from forest management activities available for biomass utilization or for insect and disease control." So the **action will read**: "In appropriate forest cover types, allow biomass production where compatible with vegetation mosaics and other resource uses. Make byproducts from forest management activities available for biomass utilization or for insect and disease control." | EMPSi (JW): Change made. |
| 569. | 342 | D | B. Krickbaum | Add "and utilization" after "production". Will read: "…biomass production and utilization where compatible…" | EMPSi (JW): Change made. |
| 570. | 349 | B, C, D | A. Schroeder (CA) | There was no action identified for these alternatives. | EMPSi (JW): Change made. |
| 571. | 349 | B,C,D | B. Krickbaum | Add "No similar action" | EMPSi (JW): Change made. |
| 572. | 353 | | B. Sharrow[2] | We don't want to be required to appraise and sell the woodland product in every instance. For example, the wood quantity may be so small (2 or three trees) that is would not be worth our time to carry this out. | EMPSi (KW): Added the following sentence to the end of the action: The BLM may waive this requirement if the quantity of woodland product is of a small enough quantity to make the requirement unfeasible. |
| | | | | **Livestock Grazing** | |
| 573. | 359 | all | CDOW | The objective for the preferred alternative fails to connect grazing to land health and adjust management accordingly. Currently LHA's are to be conducted every 10 years. Therefore to suggest that long term studies should be conducted **after** determination through the LHA process that the habitat is not meeting standards, is indicating that BLM will not take steps to correct problems they have identified on the land until years, even decades after discovery of such | EMPSi (KW): The long-term studies referred to in the objective does not just include LHAs, but also allotment-specific monitoring. These and other studies allow the BLM to respond to problems when identified. Predetermined and definite steps are part of implementation and not a land use plan decision. |



BLM_0111137

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | problems.  Instead we suggest that a there should be a commitment to the public that if livestock grazing is determined to be having negative effects on habitat, that certain predetermined and definite steps will be taken to rectify the problems. | |
| 574. | 360 | | Clements | As this is written, it sounds like changing available AUMs would require RMP revision, also appears to conflict with Action 372. Suggest wording indicating this number is flexible. | EMPSi (KW): End of action 360 includes language to change AUMs (change grazing preference based on monitoring). The change could be an increase or a decrease in AUMs or a change in livestock class. This does not conflict with Action 372. |
| 575. | 360 | all | CDOW | This AUM value is not a commensurate decrease in stocking rate based on Colorado public health standards in Line 359. The AUM are not tied to the LHA if they were, one would expect more than 2% decrease based on current evaluations of LHA that attribute livestock grazing as the primary cause to not meeting the standards. | BLM (LR 10/5/11): LHA results do not target livestock grazing as the major attribute in most areas not meeting LHS. From the no action alternative there is an actual 5% decrease in AUMs for alternative D. Grazing guidelines to not suggest reducing AUMs off the top without first changing management action to address areas where livestock grazing is contributing to a decline in LHS. |
| 576. | 360 | B,C,D | Burch | In third sentence: "Change grazing preference based on long term (global) monitoring…" Delete the word: "(global)"  because it does not fit with our intent. (Range did not enter this word) | EMPSi (KW): Change made. |
| 577. | 360 | B,C,D | Burch | Following the statement of '…Colorado Public Land Health Standards (BLM 1997) (Appendix E).' Enter this sentence: "Areas available to livestock grazing implies the allotment is open to any class of livestock unless otherwise designated." | EMPSi (KW): Changing grazing preference includes class of livestock. Added "(e.g., AUMs, periods of use, class of livestock)" EMPSi: Update glossary definition of "grazing preference." Per Bruce/BLM: **Grazing Preference**: Grazing preference or preference means the total number of animal unit months on public lands apportioned and attached to base property owned or controlled by a permittee, lessee, or an applicant for a permit or lease. Grazing preference includes active use and use held in suspension. Grazing preference holders have a superior or priority position against others for the purpose of receiving a grazing permit or lease. (43 CFR 4100.0-5). |
| 578. | 360 | D | CDOW | Alternative D is approximately 2.5% decrease from the current acres available for livestock grazing. Grazing is | BLM (LR 10/5/11): LHA indicate 13% was not meeting LHS. However this was not totally due to |



BLM_0111138

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | the most pervasive use across the planning area. In the Analysis of the Current Management Situation (June 2010) 93% of the UFO is open to grazing. Land Health Assessments indicate that 13% was not meeting the standards and 38% was meeting the standards with problems (pg 74-75). Approximately 51% of the UFO that is in poor range health and/or has enough problems to be of concern to BLM staff. Approximately 17% (35/203) of allotments have identified grazing as the direct cause for not meeting the standards (Pg.151). | livestock grazing. Other uses occur on the landscape and these acres also include noxious weed infestations. 51% of the UFO that is stated to be in poor land health is also due to noxious weed infestations, fire rehab failures, historic and not current grazing, recreation, and O&G activities. |
| 579. | 360 | D | C. Sharp *(USFWS/CA)* | This does not constitute a reasonable range of alternatives. | BLM (LR 10/5/11): The alternatives range from zero to almost 8% reduction in acreage and AUMs. Acreage and AUM decreases should be considered only when other management options have been implemented to correct a problem and have not succeeded in this correction. We cannot arbitrarily make AUM and acreage cuts just to randomly create a range of alternatives. |
| 580. | 361 | B, C, D | B. Krickbaum | Replace the word "areas" (on the third line) with "unalloted land". <br><br> This action is awkward to read, so maybe should be reworded. <br><br> Would this work: Make XX acres unavailable for livestock grazing, which includes allotments, portions of allotments, and unalloted land. The purpose includes protection of threatened and endangered species, protection of a classified surface water supply, or avoidance of sensitive resources such as those described in the *Areas of Critical Environmental Concern* section. Refer to Appendix I, Livestock Grazing Allotments. | EMPSi (KW): Change made. |
| 581. | 361 | D | C. Sharp *(USFWS/CA)* | The USFWS commends this decision, but would like to see the rationale/ details of those decisions (i.e., species benefits). | BLM (BK): The rationale for making portions of allotments unavailable for livestock grazing will be part of the Administrative Record. |
| 582. | 362 | d | CDOW | This area is a riparian desert canyon that is highly | BLM (BK): We have changed Alternative D from |


BLM_0111139

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | sensitive. It is within the WSA. There is no impact or injury to an existing permitee. It is an important area wildlife including wintering elk, deer, and desert bighorn sheep. This area should remain closed to grazing. | making the Camelback pasture available for livestock grazing to trailing only, which would be "limited by time, and managed within the riparian objective". |
| 583. | 363 | B&D | CDOW | The bullets points are important components to monitoring of land health. CDOW understands that grazing leases are reviewed on a 10 year basis and that LHA are evaluated on a 10 year basis. CDOW suggests defining what periodically means. In addition we suggest including at a minimum including a midterm grazing evaluation (at year 5) at a minimum. Otherwise factors that are contributing to a downward trend may be exasperated the longer the monitoring period. | BLM (BK 10/5/11): Permits are reviewed and renewed every 10 years At this point allotments are evaluated on a landscape scale and problems, if any, are addressed through management changes. Periodically means every 10 years or less. Allotments are evaluated through utilization and cover transects several times within a 10 year period and if problems arise management actions are taken to address the problems that are directly attributed to livestock grazing. |
| 584. | 363 | D | C. Sharp (USFWS/CA) | Define "major impact"; would those be insignificant, adverse, or jeopardizing impacts (under ESA regulations)? | EMPSi (KW): This definition and threshold could change depending upon the species, but in the case of listed species, ESA regulations would help determine the impact. |
| 585. | 364 | | M. Siders | For the range of alternatives, shouldn't there be one alternative where AUMs will not increase for domestic livestock use (B?). | EMPSi (KW): Line 364 discusses a change in AUMs, increase or decrease. However line 372 specifically states that additional forage will not be allocated to livestock, so under Alternative B, AUMs can only decrease or stay the same. |
| 586. | 366 | C | M. Siders | Suggested wording: "… place greater emphasis on increasing available forage (AUMs) for domestic livestock…" | EMPSi (KW): Change made. |
| 587. | 368 | D | B. Krickbaum | Delete the second "to provide for increased management options" (beginning on the 5th line). | EMPSi (KW): Change made. |
| 588. | 368 | D | K. Kubik | In line 5 and 6 please delete "...to provide for increased management options..." This is a redundant statement. | EMPSi (KW): Change made. |
| 589. | 372 + line 228 | D + F? (or E?) | Ela (RACSG) | The hold from Sec. Salazar; seems to me to control the areas of "wildlands" which changes responses and comments on the whole of "terrestrial status," "wildlife" and "plants"; to leave open till Washington has spoken further. | EMPSi (KW): This comment appears to refer to a previous version of the alternatives. However the concept of lands with wilderness characteristics is separate from management of plants and wildlife. |
| 590. | 372 | All | B. Krickbaum | Move to row so it is immediately after row 366. | EMPSi (KW): Change made. |



BLM_0111140

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 591. | 372 | D | M. Siders | Suggested wording: "Through an interdisciplinary process, allocate increases in forage (AUMs) where applicable and feasible to livestock, wildlife, land health, or a combination of these." | EMPSi (KW): Change not made. An increase would be analyzed in an EA, and the EA should be carried out in an interdisciplinary process. |
| 592. | 372 | d | CDOW | We are concerned that this could be in conflict with Item 360, which limits the total AUMs on the UFO. In addition, in many cases increase of AUMs may have negative effects on wildlife resources.<br><br>Allocation of resources may sound fair and equitable on the surface, however, if a certain amount of plant biomass is allocated to wildlife, but wildlife are left with less nutritious plant parts (seconds), then they are not meeting their nutritional requirements even though they were allocated a certain %. On winter ranges in the UFO, studies indicate that mule deer especially, are lacking in nutrition which is contributing population declines. | EMPSi (KW): End of action 360 includes language to change AUMs (change grazing preference based on monitoring). The change could be an increase or a decrease in AUMs or a change in livestock class. This does not conflict with Action 372. |
| 593. | 378 | | Clements | Change "permit" to "do not allow" and insert "except in areas that have been identified and previously approved by the BLM." After "in areas…" | EMPSi (KW): Change made per BK's comment below. Changed to: "Limit livestock trailing use to established roads and trails to the extent possible. Permit trailing livestock to overnight or bed in riparian zones in areas identified by and only with prior approval from the BLM." |
| 594. | 378 | B,C,D | Burch | Add at the beginning of this Action: "Permit domestic livestock trailing with prior approval from the BLM." | EMPSi (KW): Change made to Alternative D per BK's comment below. Also see response above. |
| 595. | 378 | D | B. Krickbaum | Add the word "only" after "and". Will read: "…identified by and only with prior approval…" | EMPSi (KW): Change made. |
| 596. | 378 | D | M. Siders | Add "Prohibit trailing livestock from overnighting or bedding in occupied federally listed plant habitat." | EMPSi (KW): Livestock trailing requires a permit and this stipulation can be added to the permit, if necessary. |
| 597. | 378 | D | CDOW | Alt B should be the preferred. Sensitive areas including fragile desert riparian areas, should be protected to the greatest extent possible.<br><br>Livestock trailing should be confined to established roads and trials to the extent possible. | EMPSi (KW): Management decided to leave as-is. Concerns over other sensitive areas, such as T&E habitat, would be reviewed at the time a permit for trailing is issued, and stipulations to protect the sensitive areas may be added to the permit if necessary. |



BLM_0111141

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 598. | 378 | D | C. Sharp (USFWS/CA) | In general, we disagree with this practice. However, if the BLM is proposing to do so, we suggest rewording as follows: "Subject to approval from the BLM, permit trailing livestock to overnight or bed in riparian zones in areas identified by the Land Health Assessment team (or ID Team)." | EMPSi (KW): Changed action to, "Limit livestock trailing use to established roads and trails to the extent possible. Permit trailing livestock to overnight or bed in riparian zones in areas identified by and only with prior approval from the BLM." |
| 599. | 378 and 379 | All | B. Krickbaum | Move rows 378 and 379 to follow row 362. | EMPSi (KW): Change made. |
| 600. | 379 | | Clements | Insert "comply with" before "BLM Colorado" | EMPSi (KW): Change made. |
| 601. | 379 | C and D | Stindt | Sentence is not complete – add "comply with" BLM Colorado Standards …. | EMPSi (KW): Change made. |
| 602. | 379 | C,D | B. Krickbaum | Add the word "achieve" between "to" and "BLM". Will read: "…extent needed to achieve BLM …" | EMPSi (KW): Change made per Clements' comment above. |
| 603. | 379 | C/D | K. Kubik | (Inadequate grammar affecting clarity and meaning).  In line 1 replace the words "a fire event" with "fire events".  In line 3 insert the word "meet" so it will say…."extent needed to meet BLM Colorado Standards".… | EMPSi (KW): Change made for fire events. Other change made per Clements' comment above. |
| 604. | 379 | D | CDOW | CDOW is concerned that without a minimum standard for rest from livestock grazing onto disturbed areas (including habitat treatments) grazing could jeopardize reclamation or restoration efforts. It is widely recognized by natural resource managers that a minimum of three years is the standard to defer grazing.  See discussion in Monsen et al. (2004) in Restoring Western Ranges and Wildlands, Particularly instructive are Tables 1 and 2 on page 195, which provide recommendations for minimum years rest from grazing following re-vegetation for different vegetative types and landuse. | EMPSi (KW): Management decided not to assign years as it could be that certain treatments wouldn't require 3-years rest. Rest would be determined based on conditions; could be more or less. |
| 605. | 379 | D | C. Sharp (USFWS/CA) | Rest period should be based on site potential and recovery. We would begin with the minimum rest period of 3 years, then adjust from there, either relaxing or extending the restriction, based on site conditions/ recovery. | EMPSi (KW): Management decided not to assign years as it could be that certain treatments wouldn't require 3-years rest. Rest would be determined based on conditions; could be more or less. |
| 606. | 380 | All | B. Krickbaum | Move row to after 366 (and after the old 372). | EMPSi (KW): Change made. |
| NEW | 383 - | | B. Krickbaum | Replace rows 383 – 386 with rows in the section after | EMPSi (JW): Change made. |



BLM_0111142

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | 386 | | Lynae | this table. *EMPSi: Rows are in file saved on Egnyte here: Z:\Shared\Projects\F-0126 UFO RMP\2_Deliverables\17_P3T7_Alternatives(Ch2)\3.7.E_Rvs dDraftCh2_SO-Review\CommentResponse\FromBLM (File Name: Ch2_draft_UFO-Comments_091911_Miscellaneous.docx)* | |
| 607. | 384 Figure 2-12 | B and D | Stindt | The intent of the action in the Livestock Grazing matrix was to identify allotments with occupied and suitable wild sheep habitat and close them to domestic sheep grazing. Figure 2-12 identifies "wild sheep summer range" (I am unsure of how occupied and suitable habitat relates to summer range) AND adds a 5 mile buffer to depict allotments closed to domestic sheep grazing. This is not consistent with the intent of the action. I propose modifying Figure 2-12 to eliminate the 5 mile buffer from mapped summer range. This will significantly reduce the number of allotments closed to domestic sheep grazing. Also – it does not seem to be consistent w/ alternative themes to have fewer allotments closed to sheep grazing in Alt. B than in Alt. D | EMPSi (JW): Row replaced with new text from BLM (9/22/11). |
| 608. | 384 | B, C, & D | David Sinton | Please specify **Desert Bighorn Sheep** or **Desert and Rocky Mountain Bighorn Sheep** | EMPSi (KW): The action will be for both; will specify. BLM (BK) to Kate/Jen: Regarding the sheep action I sent on the comments called "Ch2_draft_UFO-Comments_091911_Miscellaneous", **please insert** "Desert and Rocky Mountain" before Bighorn Sheep. EMPSi (JW): Change made. Added "desert and Rocky Mountain" in front of every instance of bighorn sheep. |
| 609. | 384 | C,D | Burch | In the bullet statement: "Prohibit changing cattle allotments to sheep allotments in occupied and suitable bighorn habitat…" Delete the words "and suitable". | BLM (BK): Action has been revised. |
| 610. | 384 | D | B. Krickbaum | 2nd bullet, change to: "Prohibit trailing domestic sheep and goats or changing | BLM (BK): Action has been revised. |



BLM_0111143