**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | – Camping, D | | prohibit the camper from returning to that location for 30 day and/or requiring them to move at least 30 air miles away from the previously occupied location." Replace with "all other CFR language (quote CFR number) remains the same" | with changes in Chapter 2): Limit camping to no longer than 7 consecutive days at any one location; after the 7 days has been reached, prohibit the camper from returning to that location for 30 days and/or require them to move out of the SRMA. |
| 1504. | K-069 | San Miguel Zone 2 – VRM, D | B. Krickbaum | Alt D, change VRM class to III | EMPSi (KW): Change made. |
| 1505. | K-069 | San Miguel Zone 2 – VRM, D | J. Jackson | Change to Class III | EMPSi (KW): Change made. |
| 1506. | K-070 | San Miguel Zone 2 – Camping, D | J. Jackson | Delete wording "after the 7 days has been reached, prohibit the camper from returning to that location for 30 day and/or requiring them to move at least 30 air miles away from the previously occupied location." Replace with "all other CFR language (quote CFR number) remains the same" | EMPSi (KW): Changed to the following (consistent with changes in Chapter 2): Limit camping to no longer than 7 consecutive days at any one location; after the 7 days has been reached, prohibit the camper from returning to that location for 30 days and/or require them to move out of the SRMA. |
| 1507. | K-071 | San Miguel Zone 2 – Forestry, D | B. Krickbaum | Alt D, change forestry to "Prohibit wood collecting" | EMPSi (KW): Change made. |
| 1508. | K-071 | San Miguel Zone 2 – Forestry, D | J. Jackson | Change to Same as Alternative B | EMPSi (KW): Conflicts with direction from B. Krickbaum. Changed to "Prohibit wood collecting" |
| 1509. | K-073 | San Miguel River SRMA RMZ 3 – SRPS Alt D | Jackson and Sharrow | Add the word "boating" to second paragraph so reads: "Allow two commercial **boating** launches per day...." | EMPSi (KW): Change made. (global San Miguel SRMA, Alt D) |
| 1510. | K-073 | San Miguel Zone 3 – Camping, D | J. Jackson | Delete wording "after the 7 days has been reached, prohibit the camper from returning to that location for 30 day and/or requiring them to move at least 30 air miles away from the previously occupied location." Replace with "all other CFR language (quote CFR number) remains the same" | EMPSi (KW): Changed to the following (consistent with changes in Chapter 2): Limit camping to no longer than 7 consecutive days at any one location; after the 7 days has been reached, prohibit the camper from returning to that location for 30 days and/or require them to move out of the SRMA. |
| 1511. | K-077 | San Miguel Zone 4 – Camping, D | J. Jackson | Delete wording "after the 7 days has been reached, prohibit the camper from returning to that location for 30 day and/or requiring them to move at least 30 air miles away from the previously occupied location." Replace with "all other CFR language (quote CFR | EMPSi (KW): Changed to the following (consistent with changes in Chapter 2): Limit camping to no longer than 7 consecutive days at any one location; after the 7 days has been reached, prohibit the camper from returning to that location for 30 days and/or require them to move out of the SRMA. |



BLM_0111303

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | number) remains the same" | EMPSi (KW): Change made. |
| 1512. | K-078 | San Miguel River SRMA RMZ 4 – SRPS Alt D | Jackson and Sharrow | Add the word "boating" to second paragraph so reads: "Allow up to seven commercial **boating** outfitters." | Julie: In alt B do we want to keep "river outfitters" or change that to boating? (throughout San Miguel River SRMA) |
| 1513. | K-080 | Spring Creek Zone 1 – Grazing, D | J. Jackson | Consider closing zone to sheep grazing or restricting sheep dogs in the area. | EMPSi (KW): No change per BLM (BK 10/5/11) |
| 1514. | K-080 | Spring Creek Zone 1 – Travel Management, B and D | J. Jackson | Delete wording – "/ non-mechanized" should read as follows: "…; non-motorized travel limited to designated routes" | Bruce/Julie: Per direction in Ch2, changed to, "Closed to motorized use, with administrative and permitted vehicular access only, and with mechanized travel Limited to Designated Routes." |
| 1515. | K-083 | Spring Creek Zone 2 – Travel Management, B | J. Jackson | Delete wording – "/ non-mechanized" should read as follows: "…; non-motorized travel limited to designated routes" | Bruce/Julie: Per direction in Ch2, changed to, "Closed to motorized use, with administrative and permitted vehicular access only, and with mechanized travel Limited to Designated Routes." |
| 1516. | K-085 | Spring Creek Zone 3 – Forestry, D | B. Krickbaum | Alt D, forestry, change to "Prohibit commercial forest product harvest" | EMPSi (KW): Change made. |
| 1517. | K-085 | Spring Creek Zone 3 – Camping, D | J. Jackson | Change to state "Same as Alternative B" | EMPSi (KW): Change made. |
| 1518. | K-085 | Spring Creek Zone 3 – Forestry, D | J. Jackson | Change to state "Allow private forest product harvest and wood collecting unless monitoring indicates the need for change." | EMPSi (KW): Change made. |
| | | | | **Appendix L:** *Coal Screening Criteria in the Uncompahgre Field Office* | |
| | | | | No comments were received on this section. | |

[1] Comments are from Lori Armstrong, SW District Manager.  Comments entered by B. Krickbaum.

[2] Comments are from Barb Sharrow.  Comments entered by B. Krickbaum.

*The following are referenced in comments from Holsinger.*
**Standard Design Practices for Forestry Projects**
- The closure of new roads will be considered and planned for during sale preparation in accordance with existing policy.
- Clear cuts will be considered for use in the pinyon-juniper and aspen types in critical big game winter ranges and other areas where economically feasible.
- Clear cuts will be considered for use in restoring aspen sites.
- Cuts will maximize the length of edge per amount of area considering natural and manmade boundaries.
- Sale areas with less than 15 percent ground cover or with insufficient understory will be seeded using a mixture of native grasses, forbs, and/or shrubs appropriate for the ecological site.



**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

- Harvest plans will be completed on all commercial sales within woodlands and forests, showing access roads, decks and skid trail locations. Approval of these plans by the BLM Authorized Officer is required before harvest can start.
- A minimum 50 foot buffer will be maintained along all riparian areas.
- Snags with existing cavities or nests will be priority for retention.

### Best Management Practices
- Avoid heavy equipment use in riparian stands. If heavy equipment use is necessary, allow on a case by case basis and mitigate for adverse impacts.
- Protect seed and important wildlife habitat trees in pinyon-juniper stands.
- Minimize disturbance to the soil such that surface runoff does not result in sediment transport into waterbodies. Concentrate skidding on as few skid trails as needed.
- Limit primary skid trails to 10 percent of the total working area.
- Avoid widespread or random skidding patterns with repeated passes.
- Minimize placement and use of skid trails in ephemeral drainages. If skid trails must be within or cross an ephemeral drainage, additional BMPs are needed to protect water quality.
- Create skid trails only as wide as necessary to safely operate equipment and conduct the forestry operation. Avoid creating two-lane skid trails. Minimize the extent of gouges or trenches upon the ground surface that are created by the skidding of trees or logs.
- On sloping terrain, skid trails shall follow along the land contours and shall be kept to 25 percent grade or less when practical.
- Establish decks at locations where soil disturbance is minimized.
- Maintain as close to normal (pre-construction) streamflow by maintaining depth, width, gradient and capacity of the stream channel at the crossing.
- Perform construction, installation, and removal work during low-water flow if circumstances allow.
- Stabilize the approach ways and/or stream crossing locations so sediment is not transported into the stream.
- The crossing can be installed at a right-angle (90 degrees) to the stream channel so crossing distance is minimized.
- Any trees removed during these processes will be purchased by the applicant prior to commencement of operations.
- Weed management (inventory and treatment) will occur for a minimum of three years post-harvest.

### Guidelines for Christmas Tree and Firewood Harvesting
- Vehicle use is restricted to existing roads and trails.
- Do not damage adjacent trees.
- When cutting down standing trees, cut the stump 6 inches or less, or as close to the ground as possible.
- Do not top a larger tree to obtain a Christmas tree. The tree may be cut at the base 2 and then topped.
- No harvesting when soils are saturated to a depth of 3 inches to prevent damage to roads.
- UFO closed to firewood harvesting December 1 to May 1

*The following are referenced in comments from Siders.*
Domestic Sheep/Goats and Bighorn Preferred Alternative

Criteria for Risk Levels:

| | Insignificant | Low | Medium | High |
|---|---|---|---|---|
| Spatial Overlap | | <35% Overlap between wild and domestic sheep | >35%, <75% overlap between wild and domestic sheep | >75% overlap between wild and domestic sheep |



BLM_0111305

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| | Bighorn sheep Range: T:\CO\GIS\gisdata\field_offices\ufo\wildlife\ndis.gdb\bighorn_sheep\BighornOverallRange09012010<br>Domestic Sheep Range:  T:\CO\GIS\gisdata\field_offices\ufo\range\range.gdb\mar_alb_region_allot<br>T:\CO\GIS\gisdata\field_offices\ufo\range\range.gdb\Allotment_Table [Livestock_Kind = "Sheep" or "Cattle or Sheep"] | | | |
|---|---|---|---|---|
| Timing/Season of Use | | <25% Overlap of domestic season of use with bighorn critical reproductive times (rutting, breeding, lambing) | >25% overlap of season of use | >50% overlap of season of use |
| | Bighorn sheep season:  breeding November 1-December 31, lambing Feb 28-May 1, Rutting Aug 1-Sept 30<br>Sheep:  Permit on to off dates | | | |
| Topography/Natural Barriers | | Good barrier to domestic sheep due to topography/natural barriers deterring mixing | Moderate barrier due topography/natural barriers deterring mixing | Little to no barrier topography/natural barriers deterring mixing |
| | | Cliffs, Rivers | Slopes >40% | Slopes ≤40% |
| Distance of allotment boundary from Bighorn Range | Excellent barrier due to distance | Good barrier due to distance | Moderate barrier due to distance. | Little to no barrier due to distance |
| | >9miles | ≤9 but >5 miles | ≤5 but >2 miles | ≤2miles from Bighorn Range |

*The following are referenced in comments from Jackson.*
***Comment #50 – Row #441   (Initial Criteria List that needs to be added)
 Apply the following additional motorized and non-motorized route selection criteria (if needed - additional site specific criteria may be added at the time of the comprehensive transportation management plan):
1. Manage travel to meet Standards for Public Land Health, minimize the areas that meet standards with problems, and minimize impacts to sensitive resources while maintaining quality travel opportunities along with adequate and appropriate public access
2. Any emergency or administrative motorized vehicle or equipment use off designated routes on BLM-managed lands would require prior notification and approval. Should prior notification not be possible, contact would be made with the authorized BLM official within 72 hours following emergency entry.
3. Maintain appropriate, sustainable, and reasonable access for visitors, authorized users, and private landowners within the planning area.
4. Motorized and mechanized travel onto public lands from adjacent private lands would be limited to the public access points only
5. Minimize conflicts between all users and resource uses
6. Provide continuity and quality recreational loop opportunities
7. Route density for public access routes will be used as an analysis tool unless otherwise specified. Administrative route mileage would not be considered within the route density analysis due to low frequency of use on the route.
8. Route by Route analysis will be conducted within each comprehensive travel management plan and routes will adhere to the following width restrictions:
   a. Single track = 36" or less
   b. ATV = 50" or less and weighing no more than 1200 lbs
   c. Roads = Wider than 50"



Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011

BLM_0111306

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

9. Motorized and mechanized modes of travel employing advanced technology must adhere to specified route width, weight, and other restrictions as needed.
10. Prohibit cross-country motorized/mechanized travel for big game retrieval. Where appropriate, allow human-powered wheeled game retrieval carts off route in limited to designated areas only during CDOW authorized hunting seasons.
11. Users would be allowed to park motorized or mechanized modes of travel immediately adjacent and parallel to available designated routes.
12. Vehicle use associated with dispersed camping activities must adhere to parking regulations described above.
13. Designate short spur routes leading to popular dispersed campsites, scenic overlooks, or other destination locations where appropriate.
14. Routes would adhere to the buffer requirements for riparian and wetland areas except for required crossings and the number of stream crossings would be kept to a minimum, in order to reduce impacts to wetlands and riparian areas.
15. BLM re-routes or re-locations needed for erosion or other mitigation would be limited to a corridor that would be 150 feet wide on either side of the centerline of all designated routes.
16. Impacts to currently known eligible cultural properties would be avoided, minimized or mitigated in consultation with State Historical Preservation Office (SHPO). Where National Register eligible sites are known to be in danger or are currently being impacted by travel activities, routes would be closed to travel if necessary until the appropriate mitigation has been implemented.
17. BLM administrative functions related to resource management objectives (e.g., wildlife habitat and species monitoring and management, noxious weed eradication, resource enhancement and restoration, and fence repair) requiring cross-country travel using motorized vehicles or equipment, would be addressed at the project level on a case-by-case basis, and additional environmental documentation and analysis could be required for certain administrative functions.
18. Where off-highway vehicles are causing or will cause considerable adverse effects upon soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources, the affected areas shall be immediately closed to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence.
19. Close or re-route routes found to be negatively impacting threatened and endangered species or BLM-sensitive species or habitats.
20. Limit motorized over-the-snow travel to designated routes in lynx analysis units. After route designation, prohibit creation of new routes in lynx analysis units.
21. Secure multiple use access as needed and where opportunities arise (i.e. BLM easements or land exchanges)
22. Over the life of the plan, restore or relocate at least 30% of the high density route miles (more than 2 miles per square mile) that coincide with lynx habitat within a lynx analysis unit.
23. Where possible, relocate routes outside of lynx habitats or lynx analysis units, avoiding forested stringers and lynx movement corridors (ridgelines, saddles, riparian corridors) for lynx.
24. Avoid paving or rural dirt and gravel roads in lynx habitat within lynx analysis units so as not to increase traffic in the area.
25. Any fire routes established outside of the designated route system will be rehabilitated so not to attract future use.
26. Fire wood collection routes within areas where fire wood collection is permitted will be considered during route by route designation.
27. Proposed new routes will be considered during the planning process and identified where needed

****Comment #50 – Row #441    (Planning sequence that needs to be added)
Basic travel management plan process:
1. All comprehensive travel management plans will utilize an interdisciplinary approach
2. Complete route inventory data needed for the planning area through GIS, GPS, and aerial photography
3. Gather and update data needed from outside sources such as US Fish and Wildlife, Colorado Division of Wildlife, etc. for planning area
4. Conduct Scoping Comment Period – identify external and internal issues



BLM_0111307

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

5. Review and Summarize Comments and Issues
6. Develop Goals and Objectives for the area as well as any Desired Future Conditions for Sub-regions (if any)
7. Develop Additional Area Specific Criteria if needed for data analysis
8. Conduct and Document Route by Route Analysis with interdisciplinary team
9. Develop draft alternative options
10. Allow for public comment period on goals and objectives for the area as well as any desired future conditions and draft alternative options
11. Review comments and modify (as needed)
12. Develop alternatives for environmental assessment (EA) including preferred
13. Conduct EA analysis for all alternatives
14. Provide public comment period for draft EA
15. Review comments and modify (as needed)
16. Sign the Finding of No Significant Impacts (FONSI) and Decision Record (DR) for EA
17. 30 day Appeal period
18. Write an area specific implementation plan/monitoring plan
19. Publish for public comment
20. Review comments and modify (as needed)
21. Begin Travel Implementation and Monitoring
22. Write and submit supplementary rules

**Outline for additional data needs and strategy to collect:**

|   | Additional Data Needed | Strategy to Collect |
|---|---|---|
| 1 | Inventory all Existing Routes in areas not previously inventoried | Have BLM specialists, seasonals, and volunteers GPS and possibly digitize (if needed pending time and funding) then download into GIS |
| 2 | Gather, organize, and update resource information for each area | IDT Specialists will work with travel planner, BLM GIS specialist, agencies and outside sources to gather/update and organize data |

**\*\*Change DOW to new acronym (CDPW?). Global!**

**Item A:**
Row 113 and 114, combined:

| Action: | Action: | Action: | Action: |
|---|---|---|---|
| No similar action in current RMPs. | Annually enhance, protect, or restore at least 5 miles of aquatic habitat, including modification or removal of fish migration barriers in consultation with the CDOW, and structural and vegetation improvements.  Restore natural | Annually improve at least 2 miles of aquatic habitat, including modification or removal of fish migration barriers in consultation with the CDOW, and structural and vegetation improvements. Focus efforts on game fisheries. | Pursue opportunities to enhance, protect, or restore aquatic habitats, including modification or removal of special status fish migration barriers in consultation with the CDOW, and structural and vegetation improvements |



BLM_0111308

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| | | | |
|---|---|---|---|
| | hydrology and conditions to the extent possible. Focus efforts on nongame native fisheries and species. | | commensurate with other resource objectives. |

**Item B**
Rows 405 through 417:

| **Action:** | **Action:** | **Action:** | **Action:** |
|---|---|---|---|
| Manage XX acres as ERMAs (Figure 2-13, Appendix A):<br>• Uncompahgre (XX acres) to provide a wide range of diverse recreational opportunities to meet public demands for dispersed recreation. Emphasize the provision of access, visitor information, and facilities needed to address public health and safety standards (BLM 1985, 1989a).<br><mark>BLM: please verify acreages</mark> | No similar action. (Designate no ERMAs.) | Manage 208,690 acres as ERMAs to specifically address local recreation issues (Figure 2-15, Appendix A):<br>• Adobe Badlands (6,360 acres) for nonmotorized, nonmechanized uses to protect wilderness qualities;<br>• Burn Canyon (9,160 acres) to protect and provide a network of designated community recreational trails. Manage as VRM Class III;<br>• Dolores River Canyon (13,330 acres) as a nonmotorized, nonmechanized ERMA to protect and provide water-based recreational opportunities;<br>• Dry Creek (41,300 acres) to protect and provide for a diversity of dispersed recreational activities;<br>• Jumbo Mountain (5,020 acres) a to protect and provide a network of designated community recreational trails;<br>• Kinikin (11,320 acres) to protect and provide for a diversity of dispersed multiple use recreational travel opportunities. Management actions include the following: Designate 11,320 acres | Manage 76,110 acres as ERMAs to specifically address local recreation issues (Figure 2-16, Appendix A):<br>• Burn Canyon (9,160 acres) to protect and provide a network of designated community recreational trails. Manage as VRM Class III;<br>• Kinikin (11,320 acres) to protect and provide for a diversity of dispersed multiple use recreational travel opportunities. Management actions include the following:<br>  ○ Limit motorized and mechanized travel to designated routes.<br>  ○ Manage as VRM Class III;<br>• North Delta (8,530 acres) to protect and provide for a diversity of dispersed multiple use recreational travel opportunities. Management actions include the following:<br>  ○ Manage as VRM Class IV.<br>  ○ Limit motorized and mechanized travel to designated routes; and<br>• Paradox Valley (47,100 acres) to protect and provide a network of designated recreational travel |



Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011

BLM_0111309

| | | | |
|---|---|---|---|
| | | (Open OHV area) as Open to cross-country motorized and nonmotorized travel, except for full-sized vehicles. Cross-country travel will be permitted only for utility-terrain vehicles and ATVs 50 inches or less in width, motorcycles, and mountain bikes;<br>• North Delta (8,530 acres) to protect and provide for a diversity of dispersed multiple use recreational travel opportunities. Management actions include the following:<br>   ○ Designate 5,260 acres (Open OHV area) as Open to cross-country motorized and nonmotorized vehicle use, including full-sized vehicles.<br>   ○ Designate the remaining area (3,270 acres) as Limited to Designated Routes for motorized and nonmotorized use. If needed, designate routes for hiking and equestrian use.;<br>• Paradox Valley (47,100 acres) to protect and provide a network of designated recreational travel routes and rock climbing and bouldering activities;<br>• Ridgway Trails (1,100 acres) to protect and provide a network of designated community recreational trails activities. Manage as VRM Class III;<br>• Roubideau (21,660 acres) to | routes and rock climbing and bouldering activities. |



BLM_0111310

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

|  |  | protect and provide for quiet and dispersed recreational activities;<br>• San Miguel River Corridor (35,570 acres) to protect and provide for quality recreational boating and fishing activities; and<br>• Spring Creek (13,500 acres) to protect and provide a network of designated community recreational trail activities. |  |
|--|--|--|--|



BLM_0111311

# James Bode

| | |
|---|---|
| **From:** | Krickbaum, John <bkrickba@blm.gov> |
| **Sent:** | Thursday, November 10, 2011 6:06 PM |
| **To:** | Angie Adams; barbara_hawke@tws.org; Bill Bottomly; billday@paonia.com; Jennifer Whitaker; john@reams-construction.com; Kate Wynant; Kauffman, Krag D; Krickbaum, John; Magee, Deborah M; pmueller@tnc.org; rich@richdurnanphoto.com; robbie.levalley@colostate.edu; sbear@dmea.com; Sharrow, Barbara L; silvers1@tds.net; steve.weist@oxbow.com; tkctew@yahoo.com; UFO AR; wblack8709@msn.com |
| **Subject:** | Chapter 2 Comment Response |
| **Attachments:** | Ch2_UFO_AllCmts_responses_11102011.docx |

Hello RAC Subgroup,

I have attached a file with all of your comments on RMP Chapter 2 and our responses to the comments (and comments of the Cooperating Agencies and BLM Staff).  Please review if you wish prior to the meeting next Tuesday.

Regards, Bruce


Bruce Krickbaum
Planner, Environmental Coordinator
BLM, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

---

**From:** Krickbaum, John
**Sent:** Tuesday, November 08, 2011 10:30 AM
**To:** Angie Adams; barbara_hawke@tws.org; Bill Bottomly; billday@paonia.com; Jennifer Whitaker; John@reams-construction.com; Kate Wynant; Kauffman, Krag D; Krickbaum, John; Magee, Deborah M; pmueller@tnc.org; rich@richdurnanphoto.com; Robbie.levalley@colostate.edu; sbear@dmea.com; Sharrow, Barbara L; silvers1@tds.net; Steve.weist@oxbow.com; tkctew@yahoo.com; UFO Admin Record at EMPSi; Wblack8709@msn.com
**Subject:** RAC Subgroup Meeting, Location

Hello RAC Subgroup Members,

The meeting on Tuesday November 15 will begin at 9:00, and will be located in the "Jordan C" conference room at the Holiday Inn Express in Montrose.   This room is in the west wing of the hotel, two rooms down from where we usually meet.

I received notification from one of you that you will be unable to make the meeting – thank you for letting me know.  Even though the timing is not suitable for everyone, it is the best date we could find.   We want this meeting before the BLM State Office review of Chapter 2, which begins December 12.  Because Barb and I have too full of a schedule, in addition to Thanksgiving week, November 15 is the date that appears to work best for the meeting.

Regards, Bruce

Bruce Krickbaum
Planner, Environmental Coordinator
BLM, Uncompahgre Field Office

1

2465 South Townsend Avenue
Montrose, CO 81401
970.240.5384

---

**From:** Krickbaum, John
**Sent:** Friday, October 28, 2011 2:15 PM
**To:** Angie Adams; barbara_hawke@tws.org; Bill Bottomly; billday@paonia.com; Jennifer Whitaker; John@reams-construction.com; Kate Wynant; Kauffman, Krag D; Krickbaum, John; Magee, Deborah M; pmueller@tnc.org; rich@richdurnanphoto.com; Robbie.levalley@colostate.edu; sbear@dmea.com; Sharrow, Barbara L; silvers1@tds.net; Steve.weist@oxbow.com; tkctew@yahoo.com; UFO Admin Record at EMPSi; Wblack8709@msn.com
**Subject:** RAC Subgroup Meeting, Change

Hello RAC Subgroup members,

My apologies, but due to a scheduling conflict, we need to change the date of the RAC Subgroup and Cooperating Agency meetings.
Please cancel November 18.

Please schedule the meeting for Tuesday, November 15, at 9:00 am, at the Holiday Inn Express in Montrose.

We will discuss responses to your comments on RMP Chapter 2 (alternatives). We will also discuss resulting changes to chapter 2.

I apologize for the late notice on the changed date, and I hope all of you are able to attend.

Regards, Bruce

Bruce Krickbaum
Planner, Environmental Coordinator
BLM, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401
970.240.5384

BLM_0111313

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)**

| | | |
|---|---|---|
| General Comments (p. 1) | Intro Text (p. 7) | Glossary (p. 198) |

| | | |
|---|---|---|
| Air Quality (p. 14) | National Trails and BLM Byways (p. 198) | Vegetation – General (p. 33) |
| Areas of Critical Environmental Concern (p. 170) | Native American Tribal Uses (p. 174) | Uplands (p. 35) |
| Climate Change (p. 16) | Other Minerals (p. 147) | Riparian (p. 40) |
| Coal (p. 161) | Locatable Minerals (p. 168) | Weeds (p. 44) |
| Comprehensive Trails and Travel Management (p. 144) | Mineral Materials (Salable Minerals) (p. 169) | Visual Resources (p. 112) |
| | Non-energy Solid Leasable Minerals (p. 169) | Watchable Wildlife Areas (p. 197) |
| Cultural Resources (p. 110) | Paleontological Resources (p. 112) | Wild and Scenic Rivers (p. 195) |
| Fluid Minerals (Oil and Gas and Geothermal Resources) (p. 164) | Public Health and Safety (p. 1) | Wildland Fire Ecology and Management (p. 109) |
| Forestry and Woodland Products (p. 121) | Recreation and Visitor Services (p. 132) | Wilderness and Wilderness Study Areas (p. 193) |
| Land Health (p. 19) | Soils and Water (p. 24) | Wildlife – General (p. 44) |
| Lands and Realty (p. 154) | Special Status Species – General (p. 73) | Fish and Aquatic (p. 47) |
| Lands with Wilderness Characteristics (p. 115) | Plants (p. 80) | Terrestrial (p. 49) |
| Livestock Grazing (p. 123) | Fish and Aquatic (p. 75) | |
| | Terrestrial (p. 89) | |

| | | |
|---|---|---|
| Appendix A: Figure (p. 217) | Appendix B: Restrictions Applicable to Fluid Mineral Leasing and Other Surface-disturbing Activities (p. 223) | Appendix C: Draft Wild and Scenic River Suitability Report (p. 260) |
| Appendix D: Summary of Areas of Critical Environmental Concern Report (p. 264) | Appendix E: BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado (p. 262) | Appendix F: Best Management Practices and Standard Operating Procedures (p. 265) |
| Appendix G: Draft Wilderness Characteristics Assessment (p. 276) | Appendix H: Drought Management (p. 277) | Appendix I: Livestock Grazing Allotments and Allotment Levels (p. 277) |
| Appendix J: Special Recreation Permit Evaluation Criteria (p. 278) | Appendix K: Description of Special Recreation Management Areas (p. 280) | Appendix L: Coal Screening Criteria in the Uncompahgre Field Office (p. 290) |

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | **General Comments** | |
| 1. | | General | J. Jackson | All of the NSO numbers are incorrect for SRMAs | EMPSi (KW): Acreages have been updated. |
| 2. | | General | J. Jackson | Need a statement up front explaining the hierarchy of decisions (i.e. WSAs are labeled as VRM I however in some of the SRMA's within the same areas are labeled VRM II within alternative D; since WSAs are mandated to be a VRM I this is what shows on the map however if the WSA is undesignated then it will revert to VRM | EMPSi (KW): Added the following to the end of the last paragraph in the new Section 2.3, Resulting Range of Alternatives: In some instances, varying levels of management overlap a single polygon due to management prescriptions from different resource programs. For |



**BLM – U**NCOMPAHGRE **F**IELD **O**FFICE, **C**OLORADO
**R**ESOURCE **M**ANAGEMENT **P**LAN **R**EVISION AND **E**NVIRONMENTAL **I**MPACT **S**TATEMENT

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | II.) | example, BLM guidance directs that Wilderness Study Areas (WSAs) be managed as VRM Class I, the highest standard for VRM. At the same time, management for the Adobe Badlands ACEC/ONA, which overlaps the Adobe Badlands WSA, prescribes VRM Class II for the ACEC. Because of the overlap, the ACEC would be managed as VRM Class I unless and until the WSA is released by Congress from wilderness consideration and other management is prescribed. In instances where varying levels of management prescriptions overlap a single polygon, the stricter of the management prescriptions would apply. |
| 3. | | GENERAL FINDING | T. Stranathan | We should consider limiting similar stips and COAs to an OG lease and possibly an OG permit when issued. In this RMP we are covering the same acres with multiple restrictions that seem slightly different, but end up with the same outcome for Oil and Gas.  CSUs are covered by NSOs, TL covers a multitude of CSUs and some CSUs would be better suited as Lease Notices. | EMPSi (KW): Overlapping stipulations may be necessary to protect different resources if, for example, an NSO is given an exception but an overlapping CSU may not in order to protect a different resource. |
| 4. | | General | Steve Weist (RACSG) | Throughout this plan distances switch between meters, feet, and miles. You need to be consistent either using all feet and fractional miles, or all meters. | EMPSi (KW): Per conversation with BK (9/28/11), will always include feet with meters if "meters" is driving measurement; if feet is driving measurement, won't give meters conversion. |
| 5. | | General | Gunnison County (CA) | Please consider this e-mail to be the formal comments of the Board of County Commissioners of Gunnison County, Colorado, as a cooperating agency, with regard to that portion of the above referenced document [BLM Uncompahgre Field Office Resource Management Plan Internal Draft Chapter 2: Alternatives] that addresses "Fluid mineral leasing."<br><br>A.  Water Quality Protection<br>As regards protection of water bodies and water quality, Gunnison County currently has in effect "Temporary Regulations for Oil and Gas Operations" (the "Gunnison County Temporary Regulations"). The | BLM (BK): Your letter mentions "Gunnison County Temporary Regulations".  What happens if your regulations change?   The decisions we are making will be in effect for a minimum of 20 years, and can only be changed with a Land Use Plan amendment.<br><br>We have decided to forward (to the BLM Colorado State Office) a recommendation for preferred alternative that includes:<br>--NSO within 300 feet for all perennial waters;<br>--300-foot buffer along naturally occurring riparian and wetland areas, seeps, and springs as ROW avoidance; |



BLM_0111315

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**
## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | pertinent portions of the Gunnison County Temporary Regulations include:<br>1. Definition of "water body". The current definition of "water body" is "(a) perennial or intermittent river, stream, lake, reservoir, pond, spring or wetland but does not include irrigation ditches or roadway drainage ditches or artificial lakes or ponds on wetlands that are created and used for the primary purpose of agricultural operations."<br>2. Standards. The current standards are:<br>a. "The Oil and Gas Operation shall not cause significant degradation on the quality or quantity of surface waters from the addition of non-point source pollution."<br>b. "The Oil and Gas Operation shall not cause significant degradation in the water quality or water pressure of any public or private water wells."<br>c. "Activities associated with the Oil and Gas Operation shall be located a minimum of 500 feet from any water body unless such a setback would interfere with spacing requirements established by the Colorado Oil and Gas Conservation Commission."<br>3. Technical Infeasibility Waiver. There currently is an opportunity in the Gunnison County Temporary Regulations for a "technical infeasibility waiver" of the standards above "if the Operator demonstrates to the satisfaction of the County that it is Technically infeasible to comply with the standard(s). To be granted a waiver from a standard for technical infeasibility, the burden is on the Operator to demonstrate one of the following with clear and convincing evidence:<br>1. Conflict with state or federal regulation. Conduct of the Oil and Gas Operation in Compliance with the community standard would result in an operational conflict with a | --NSO within 0.25-mile of bank-full stage or within 100 meters (328 feet) of the 100-year floodplain (whichever is greatest) on the Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and Dolores Rivers.<br><br>The request that oil and gas operations do not cause "significant degradation on the quality or quantity" is not a Land Use Plan decision, but rather, a decision handled at the implementation stage (e.g. during a subsequent EA). |



BLM_0111316

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | mandatory state or federal oil and gas regulation, condition or other requirement; or<br>2. No technology available. There is no technology available commercially available to conduct the Oil and Gas Operation in compliance with the County standard, and the applicant will implement the best available technology to conduce the Oil and Gas Operation in Compliance with the County standard to the maximum extent feasible; and<br>a. The waiver will not cause substantial injury to the owner or occupant of adjacent land(s); and<br>b. The waiver will not cause substantial injury to the environment." | |
| 6. | | General | Gunnison County (CA) | Please consider this e-mail to be the formal comments of the Board of County Commissioners of Gunnison County, Colorado, as a cooperating agency, with regard to that portion of the above referenced document [BLM Uncompahgre Field Office Resource Management Plan Internal Draft Chapter 2: Alternatives] that addresses "Fluid mineral leasing."<br><br>NOTE: The Gunnison County Planning Commission has forwarded to the Board of County Commissioners the Planning Commission's recommendation to make County Commissioners has not fully considered nor acted on that recommendation, and does not – by this letter – recommend to the Bureau of Land Management any or all of the recommendations. The Planning Commission recommendation includes – among other things – these components for your consideration:<br>I. WATER BODY BUFFERS. With the exception of linear features, and Oil and Gas Operation shall be in its entirety in compliance with the following water body buffer standards.<br>I. INNER BUFFER. The inner buffer shall extend 300 | BLM (BK): We have decided to forward (to the BLM Colorado State Office) a recommendation for preferred alternative that includes:<br><br>--NSO within 300 feet for all perennial waters;<br>--300-foot buffer along naturally occurring riparian and wetland areas, seeps, and springs as ROW avoidance;<br>--NSO within 0.25-mile of bank-full stage or within 100 meters (328 feet) of the 100-year floodplain (whichever is greatest) on the Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and Dolores Rivers.<br><br>The above also means that no pits will be located within those areas.<br>Pits will be designed, at a minimum, to comply with the BLM "Gold Book" standards.<br><br>Management of hazardous materials and pollutants will comply with state and federal regulations at a minimum. |


BLM_0111317

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | feet from the high water mark of the closest surface water body.<br>a. In no event shall any feature of an Oil and Gas Operation be located within the inner buffer unless a technical infeasibility waiver is granted pursuant to 1-107S; and<br>b. No pits shall be located within the inner buffer. This standard is not subject to the technical infeasibility waiver.<br>c. To the maximum extent feasible, linear features shall be installed to avoid crossing water bodies or being located within 300 feet of a water body. Leak detection or secondary containment shall be incorporated into pipelines that are located within the inner buffer.<br>2. OUTER BUFFER. The outer buffer shall extend from 301 to 500 feet of the high water mark of the closest surface water body.<br>a. Any pit located within the outer buffer shall be a closed loop system. This standard is not subject to the technical infeasibility waiver.<br>J. PITS. All pits shall be lined with an impermeable membrane. Once the pit has been closed, the liner and its contents shall be removed and disposed of at a facility authorized to accept this material.<br>K. MANAGEMENT OF HAZARDOUS MATERIALS AND POLLUTANTS. All Oil and Gas Operations shall meet the following requirements for management of hazardous materials and pollutants:<br>1. COMPLIANCE WITH STATE AND FEDERAL REGULATIONS. At a minimum, all hazardous materials shall be stored regulations.<br>2. STORAGE NEAR WATER BODIES RESTRICTED. Hazardous materials and pollutants shall not be stored within 300 feet of any water body.<br>3. SPILL PREVENTION. Measures will be designed and implemented to prevent spilled fuels, lubricants or other hazardous materials from | |



BLM_0111318

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | entering a water body, including grand water, during construction or operation of equipment and/or a facility. If a spill occurs, it shall be cleaned up immediately and disposed of properly.<br>4. <u>MACHINE MAINTENANCE.</u> Routine field maintenance of vehicles or mobile machinery shall not be performed within 300 feet of any water body.<br>5. <u>FUEL STORAGE AREAS.</u> Containment measures shall be provided for all fuel storage areas to prevent release to any water body. Inventory management or leak detection may be required.<br>6. <u>HAZARDOUS MATERIALS STORAGE AREAS.</u> Containment measures shall be provided for all hazardous materials storage areas to prevent release to any water body. Inventory management or leak detection may be required.<br>7. <u>SPILL RESPONSE.</u> The Operator shall demonstrate the ability to and shall control/contain all spills and releases of waste immediately upon discovery. Spills and releases of waste shall be reported in accordance with applicable state or federal regulations. Spills and releases of waste which adversely impact or threaten to adversely impact any surface or groundwater shall be immediately reported to Gunnison County dispatch. A copy of the spill/release report shall be provided to the Gunnison County Community Development Department.<br>8. <u>DISPOSAL OF HYDRAULIC FRACTURING FLUIDS.</u> The Operator shall demonstrate the ability to and shall dispose of all hydraulic fracturing fluids in accordance with the Hydraulic Fluid Fracturing Disposal Plan."<br>31. <u>CHEMICALS USED IN OIL AND GAS OPERATION.</u><br>a. An inventory of all chemicals anticipated to be | |



**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

# Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | used for the Oil and Gas Operation. The inventory of Chemical Products shall include: 1) their known potential to affect human health, property or the environment; and 2) the expected concentrations, process solution volumes, and fate of designated chemicals to be used in the Operation, based on the best information available at the time of submittal of the application; and 3) the material safety data sheets for the chemicals, if any; and 4) Chemical Abstract Service Registry Numbers for every chemical used in the Operation, whether or not such chemicals are used in a Chemical Product that is considered a Trade Secret by the vendor or service provider." | |
| 7. | | General | Durnan (RACSG) | Include some place a comprehensive comparison of SRMA vs. ERMA | EMPSi (KW): We've revised the objective for SRMAs. This will offer a comparison of SRMAs and ERMAs. |
| | | | | **Intro Text** | |
| 8. | 2-001 | 11-15 | T. Stranathan | The decision to lease is discretionary, but once leased development must be appropriately authorized. We have no language in this area of the RMP about how BLM manages development on split estate. It should be just as clear as the statement about USFS lands in the paragraph below. And wrap it up with: BLM will administer development of Federal Mineral estate to ensure the protection of public health and safety which are present beneath private lands by adhering to same Acts, orders, NTLs, regulatory guidance and Land Use Plan decisions used to develop Federal Mineral estate on Federally managed surface acres. I suggest a few quotes from Federal Onshore Order Number 1 that could contribute to an explanation: *"Surface owners still own the surface, which remains subservient to the dominate mineral ownership of the United States" (P10312)* | BLM (BK): Section 2-7 makes it clear that the identified NSO, CSU and TL apply to split estate minerals. We do not feel that quotes from the Federal Onshore Order number 1 are necessary. We need to follow Federal Onshore Order number 1, whether it is in the RMP or not. Also, the orders could change, so why quote them. |



BLM_0111320

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | **"The BLM will consider any input that the surface owner may have and will make adjustments to the operator's plans that are reasonable. These changes may include road realignment and other similar adjustments. They would not include terms of a Surface Access Agreement that are not directly related to the proposed action in the APD" (P10324)** ***"The National Environmental Policy Act (NEPA), the Endangered Species Act (ESA), and the National Historic Preservation Act (NHPA) require the BLM to regulate exploration, development, and abandonment on Federal leases on Split estate lands in essentially the same manner as a lease overlain by Federal surface. The memorandum also stated that while a private owner's wishes should be considered in decisions, they so not overrule requirements of these statutes and their implementing regulations." (P10308 and 10309).*** | |
| 9. | 2-001 | 20 | A. Schroeder (CA) | Replace the current paragraph with the following: *"BLM's management jurisdiction on US Bureau of Reclamation lands varies. Reclamation has full management jurisdiction on its acquired and withdrawn lands where there are authorized for construction or constructed Reclamation projects. Reclamation-may transfer management of such lands to BLM through a supplemental agreement. BLM has full administrative responsibility on Reclamation lands not within the boundaries of national forests or under other agency administration where there are no authorized for construction or constructed Reclamation projects,. However, in all instances, BLM will coordinate with Reclamation and undertake only those management activities which would not preclude or adversely affect use of the land for Reclamation project purposes. Also, BLM, in consultation with Reclamation, shall develop special stipulations and terms and conditions to protect Reclamation withdrawn and acquired lands for Reclamation purposes. On lands under its jurisdiction, Reclamation determines whether fluid mineral or geothermal leasing is permissible. BLM will not* | BLM (BK): We did not make any substantial change to this paragraph. The verbiage offered is too lengthy and detailed for the purposes of this introductory text. The new paragraph is consistent with Section 5 of the BOR/BLM Interagency Agreement signed 3/25/1983, and also with your points in the comment. |



**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | issue permits, leases, or licenses on lands under Reclamation's management without Reclamation's consent and concurrence on all conditions and stipulations."<br><br>Rationale: The revised paragraph more closely describes the general BOR/BLM relationship regarding BLM responsibilities on BOR lands pursuant to the 1983 BOR/BLM IA. | |
| 10. | 2-001 | 23 | Pfifer | Change fluid to federal | BLM (BK): Text changed. |
| 11. | 2-001 | 25 | Ernst | Verify DOE lease tract number / acres.  UFO does not have 166 tracts.  Is this US total? | BLM (BK): Changed to 32 tracts. |
| 12. | 2-001 | 26 | Pfifer | revise "…mineral entry, but not the mineral leasing laws, and…" | BLM (BK): Change made. |
| 13. | 2-002 | 03-07 | Pfifer | There are more to valid existing rights than just leases. revise "…any leases, claims, or other use authorizations, established…" | BLM (BK): Change made. |
| 14. | 2-002 | 04 | Ernst | Mineral rights given by the 1872 Mining Law are not leases and should be presented within this paragraph. | BLM (BK): Change made. |
| 15. | 2-003 | 30 | J. Jackson | See Maggie Magee's suggestion on re-wording | BLM (BK): Reworded. |
| 16. | 2-003 | 39 | Clements | Add ", recreational opportunities and settings" after "grazing". | BLM (BK): Change made. |
| 17. | 2-003 | 40 | Clements | Add "and Special Recreation Management Areas" after [ACECs] | BLM (BK): Change made. |
| 18. | 2-004 | 08 | Clements | Replace work "active" with "intensive" | BLM (BK): Change made. |
| 19. | 2-004 | 09 | Clements | Alt C description lists recreation as an emphasis, but Table 2-1 shows no SRMAs under Alt C, only ERMAs. Suggest insert "opportunities" after recreation | BLM (BK): Change made. |
| 20. | 2-004 | 12 | Clements | Insert "at a lower level" before the period | BLM (BK): Change made. |
| 21. | 2-004 | 13 | Clements | Replace "protecting" with "mitigating impacts to" | BLM (BK): Change made. |
| 22. | 2-004 | 16 | Clements | Delete "the" insert "across the landscape" after "integrity"; replace "of certain" with "including" | BLM (BK): Change made. |
| 23. | 2-004 Figure 2-7 | D Table 2-1 | T. Stranathan | VRM Class II: Why is preferred acreage higher number than preservation choice?  Shouldn't this number be the same as in the preservation alt?  Also, consider turn in ALT C Figure 2-6 into preferred although VRM classes are backwards in the area of the hwy 133 Scenic byway if we are going to manage private | EMPSi (KW): The preferred alternative does not always fall between Alternatives B and C as it was developed after the other alternatives were developed. As such, sometime the preferred alternative establishes one extreme in the range of alternatives. Regarding VRM for Highway 133, the |



BLM_0111322

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | minerals on split estate in the NE of the UFO for VRM as well. By backwards, I mean the figure for VRM Alt C 2-6, shows the area next to the highway as VRM III and outside of that as VRM II. Should be VRM II in the highway corridor and VRM III on those private surface federal mineral acres outside the highway corridor. Very hard to see on map I think we'll have to modify the use of VRM to allow for private landowner input. They may not mind having an OG activity where they can see it, but we would encourage them to see what we would normally apply, then go from there as far as meeting with VRM restrictions. This is sort of like whether or not we issue a ROW across split estate. | VRM has been revised to VRM II for 0.5-mile from the northern portion of Highway and VRM III beyond that. |
| 24. | 2-004 | TABLE 2-1 REVISED | T. Stranathan | The table only includes a breakdown of NSO, CSU, TL on BLM surface. Aren't the lease stips applicable to split/estate? According to this table, all split estate is only subject to standard terms and conditions, but we'll need to eventually lease a parcel on private lands which has steep slopes. And we'd have to apply a slope stipulation in that case. So it appears that much of the split estate would be subject to at lease some NSO, CSU, TLs and LNs. | EMPSi (KW): Table includes acres for split estate and the maps also show split-estate. |
| 25. | 2-004 | Table 2-1 | Clements | Why not set up resources in alphabetical order? The existing order does not follow any logical pattern | EMPSi (KW): Resources are in order of Table 2-2 which is in order of the Land Use Planning Handbook. We have added headers for resources; resource uses; special designations. |
| 26. | 2-004 | Table 2-1 All | Huisjen | There are no rows for our various 'managed fire' alternatives. Sinton is working up final maps (as of 6/28) and will have acreages for 3 alternatives soon | EMPSi (KW): After discussion with B. Krickbaum and GIS, no acres will be added to the managed fire row. |
| 27. | 2-004 | Table 2-1 VRM acres - Undesignated B, C, and D | J. Jackson | These numbers should not vary if they are acres managed by other agencies; and if they need to have a VRM Class assigned then they should be assigned the VRI Class until further direction is given | EMPSi (KW): Acreages updated. |
| 28. | 2-005 | | Durnan (RACSG) | In the Comparative Summary of Alternatives why does Ridgway Trails ERMA show 1,100 acres and in the SRMA it is 1,170? | EMPSi (KW): Acreages updated. |
| 29. | 2-005 | Table 2-1 ERMA | J. Jackson | All the acres should be shown under the Uncompahgre ERMA since everything was and ERMA that wasn't an | EMPSi (KW): Change made |



BLM_0111323

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | A | | SRMA or we show the acres for each one listed since they are all ERMA's and the remaining acres under the Uncompahgre ERMA (not sure which way is less confusing for the public) – may need a footnote explaining what is going on with this section such as "All areas within in Alt A were considered to be an ERMA if not designated an SRMA" Bruce also made comments to this section as well. | |
| 30. | 2-005 | Table 2-1 ERMA – Ridgway Trails acres D | J. Jackson | The acres should be shown in Alt. D as well for right now. I have further comments on this however below and not in favor of leaving it an ERMA in Alt. D. Acres also should include the Uncompahgre Riverway Site along the Uncompahgre River in both Alternative C and D | EMPSi: added as SRMA to Alt D with said areas. |
| 31. | 2-005 | Table 2-1 ERMA – Ridgway Trails acres C and D | J. Jackson | Acres also should include the Uncompahgre Riverway Site along the Uncompahgre River. Map may need to be updated too.  Too large of a scale to tell if it was included. | EMPSi: added as SRMA to Alt D.  Uncompahgre Riverway Site is part of the SRMA. |
| 32. | 2-006 | Table 2-1 | Clements | Spring Creek SRMA not listed under Alt D, but shown as SRMA on map. | EMPSi: Added to table 2-1 (checked SRMAs section, Appendix K) |
| 33. | 2-006 | Table 2-1 SRMA – Spring Creek acres D | J. Jackson | Spring Creek acres need to be included in Alt. D since the area was carried forward as an SRMA.  Is showing on map (Figure 2-16) currently for Alt. D. | EMPSi: Added to table 2-1 (checked SRMAs section, Appendix K) |
| 34. | 2-006 Table 2-1 | A | M. Siders | Comprehensive Trails and Travel Management: Limited to existing routs for motorized use – Wouldn't this have numbers under this alternative.  Total is only 64,130.  Also should this be miles instead of acres (i.e. it's a linear feature)? Lands and Realty – Missing acres Coal – Missing acres Stipulations for Surface-disturbing Activities – Missing acres Fluid Mineral Leasing – Missing acres? | EMPSi (KW): No ROW avoidance in Alt A (old RMP); no change to ROW avoidance/exclusion. Coal acres have been added. Alternative A does not have NGD/SSR; stips have been added. Leasing acres added. |
| 35. | 2-007 | Table 2-1 | David Sinton | Change Fairview South Expansion (BLM) 640 to Fairview South Expansion (BLM) 610. | EMPSi (KW): Change made to Alternative D (checked ch2 globally). |
| 36. | 2-007 | Table 2-1 Locatable, Salable, | A. Schroeder (CA) | Revise the "Locatable, Salable, and Non-Energy Leasable Minerals" headings, as follows: "Locatable and | EMPSi (KW): Changed to "locatable minerals, mineral materials, and non-energy leasable minerals" |



BLM_0111324

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | and Non-Energy Leasable Minerals; | | Non-Energy Leasable Minerals, and Mineral Materials."<br><br>Note: See the general comment regarding consistent use of terms related to these minerals. | EMPSi (AA): Added to glossary: "Non-energy leasable minerals. Those minerals or materials designated as leasable under the Mineral Leasing Act of 1920. Non-energy minerals include resources such as phosphate, sodium, potassium, and sulfur." |
| 37. | 2-007 | Table 2-1 Locatable, Salable, and Non-Energy Leasable Minerals; | A. Schroeder (CA) | The lands under the "BLM Surface/Federal minerals" heading, likely include USBR lands (withdrawn for USBR projects). They need to be presented separately. I can work with BLM/consultant staff to get the right figures. | EMPSi (JW): Change made per BK direction below.<br><br>BLM (BK) to EMPSi: Put a footnote on the "BLM Surface/Federal minerals" heading. Footnote should read "Includes USBR-withdrawn non-project lands." |
| 38. | 2-007 | Table 2-1 Locatable, Salable, and Non-Energy Leasable Minerals; | A. Schroeder (CA) | The lands under the "Private or State Surface/Federal minerals" heading, includes USBR lands (withdrawn or acquired).  Lands associated with Crawford and Ridgway State Parks are USBR lands managed for recreation by the CDP&W pursuant to an agreement w/ USBR, but generally shown in this document as State or Private land. The BOR surface needs to be addressed separately because of the constraints on BLM management of those lands. I can work with BLM/consultant staff to get the right figures. | EMPSi (JW): Change made per BK direction below.<br><br>BLM (BK) to EMPSi: Change the header "Private or State Surface/Federal Minerals"  to read: "Private, State or USBR Project Lands Surface/Federal Minerals" |
| 39. | 2-007 Table 2-1 | A | M. Siders | Locatable, Salable, and Non-Energy Solid Leasable Minerals – Missing acres. Fig 2-56 shows areas for Petition for withdrawal from locatable entry, but no acres in Table 2-1<br><br>Closed to non-energy solid leasable mineral exploration and development – Missing acres? Fig 2-64 shows areas but no acres in Table 2-1. | EMPSi (KW): calculations added to table. |
| 40. | 2-007 Table 2-1 | All | M. Siders | Locatable, Salable, and Non-Energy Solid Leasable Minerals: Withdrawn from locatable mineral entry – Missing acres? Fig 2-55 shows areas for Alts A-D<br><br>Open to locatable mineral exploration or development, Open to consideration for mineral material sales and Open for consideration of non-energy solid leasable mineral exploration or development – Missing acres? | EMPSi (KW): calculations added to table. |
| 41. | 2-007 | B | M. Siders | Since one of the alternatives for ACEC is supposed to | EMPSi (KW): No change per conversation with B. |



BLM_0111325

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | Table 2-1 | | | contain all ACECs, perhaps footnote Adobe Badlands with "Area within Salt-desert Shrub ACEC" | Krickbaum. Explained in ACEC section of matrix under the objective, "Salt Desert Shrub Ecosystem" bullet. |
| 42. | 2-007 Table 2-1 | C | M. Siders | <u>Locatable, Salable, and Non-Energy Solid Leasable Minerals: Closed to non-energy solid leasable mineral exploration and development</u> – Missing acres. Fig 2-66 shows areas but no acres in Table 2-1. | EMPSi (KW): calculations added to table. |
| 43. | 2-014 | 07 | Clements | Delete "in" | EMPSi (KW): Section revised and rewritten. |
| 44. | 2-015 | 29 | A. Schroeder (CA) | This is another general comment which needs to be addressed throughout the document. Thousands of acres of USBR lands within the planning area are typically being shown or listed as BLM, NPS, State, or private lands. However, they are federal lands, with some federal, private, or state minerals. **Any management of USBR lands or their resources, including minerals, by BLM are constrained in favor of Reclamation project purposes. That needs to be shown and addressed throughout the document.** Where possible, I will try to provide specific recommendations re. USBR lands and BLM's role in management thereof.<br><br>I will be glad to work with BLM and consultant staff to get the necessary identification and appropriate wording for this document. It is too complex to do in this matrix. | BLM (BK): The paragraph now states that the BLM will coordinate with other agencies or the surface owner at the leasing phase. Also, regarding the paragraph referred to in (your) comment # 9, a sentence does state "…the BLM in consultation with the USBR develops terms and conditions to protect USBR-withdrawn lands for Reclamation purposes." |
| 45. | 2-015 | 31 | C. Sharp (USFWS/CA) | "Acreages for alternatives in this chapter and stipulations in **Appendix B** are calculated based on current information and may be adjusted in the future through RMP maintenance as conditions warrant."<br><br>Please clarify. What qualifies as RMP maintenance? I think you mean that new data/ information for species will be used to update the areas to which respective stipulations would apply. However, if areas to which stipulations apply now, as analyzed under the EIS, are modified such that those stipulations no longer apply to certain areas, or are weakened, those would entail an | EMPSi (KW): A section on plan maintenance has been added to the introduction. |



BLM_0111326

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | RMP amendment, correct? At a minimum, if those acreages for either alternative actions or stipulations involve, directly or indirectly, federally listed species, modification of those management decisions/ prescriptions would require reinitiation of section 7 consultation under ESA. | |
| 46. | 2-017 | Diagram 2-1 D | J. Jackson | It would be easier to read if alternatives stood alone without referencing other columns especially for Alternative D. That way no one can say they were not looking at the correct column or didn't understand later. | EMPSi (KW): Made some adjustments to make comparing alternatives easier but "Same as" is still used. |
| 47. | 2-274 | Table 2-3 | Sondergard | Length in Miles should be reduced to one significant digit to match table 2-4. | EMPSi (KW): Change made. |
| 48. | 2-281+ | | A. Schroeder (CA) | Add the following reference to Section 2.9 References at the appropriate location; USBR (United States Department of Interior, Bureau of Reclamation) and BLM (United States Department of Interior, Bureau of Land Management). 1983. Interagency Agreement between the Bureau of Reclamation and the Bureau of Land Management. Washington, DC. March 25, 1983✓ (no other IAs currently listed) | EMPSi (KW): Change made. |
| | | | | **Air Quality** | |
| 49. | 002 | Goal | Steve Weist (RACSG) | Delete "from authorized uses" it doesn't sound right | EMPSi (KW): removed "…from authorized uses on BLM lands." |
| 50. | 003 | B, C, D | Ela (RACSG) | We need to remove the grandfathered exemption of coal mines emissions of methane from regulation. Don't permit new coal leasing till the disposal of methane is controlled by the BLM. Specifically, the Oak Mesa exploration pending permit application | BLM (BK): Methane venting, capture, or other, is an implementation level decision, and will be analyzed at the time of leasing. While a gas company cannot drill for gas over a coal mine, the preferred alternative does have a provision that allows for mining of methane over underground coal mines for the purpose of methane capture. |
| 51. | 003 | B and D | Huijsen | Sometimes our RX and managed fire will temporarily degrade Class I Airsheds. We should discuss this and consider putting in something like 'minimize impacts to Class I Airsheds' particularly relative to RX and to some extent managed fire. (Not essential but we might | EMPSi (KW): Changed per suggestion. Row 9 also speaks to impacts from fire management. |



BLM_0111327

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | want to  recognize minimal short-term degradation) | |
| 52. | 003 | B-D | Sondergard | Ensure that "Actions to minimize emissions" still allows for prescribed burns as stated by Huisjen. | EMPSi (KW): Row 9 speaks to impacts from fire management. |
| 53. | 004 | all | Joan May (CA) | Establish a monitoring plan that verifies compliance with NAAQS and requires best available control technologies and air quality impact analysis when authorizing activities known to adversely impact air quality.  Evaluate the air quality impacts of activities authorized on BLM lands on class II air sheds if there is former or current non-attainment of NAAQS. Including visibility. | EMPSi (KW): This is implementation-level. The air quality section of chapter 2 may be revised as a result of the BLM State Office Air Quality Specialist review of the section, and also based on an air quality model analysis of the alternatives. |
| 54. | 005 | D | Krickbaum | Remove "; require at least 70 percent fugitive dust control on BLM roads." | EMPSi (JW): We have deleted reference to 70%. |
| 55. | 005 | B + D | Ela (RACSG) | What pragmatically is the difference between 80% and 70%? | BLM (BK): We have deleted reference to 70% in Alternative D. |
| 56. | 005 | D | Pfifer | How are we to measure 70% fugitive dust control on BLM roads? Does this requirement include BLM roads under the transportation management plan? If so, BLM probably couldn't even meet this action. | BLM (BK): We have deleted reference to 70%. |
| 57. | 006 | D | B. Krickbaum | Delete "during" | EMPSi (KW): Change made. |
| 58. | 006 | Preferred | T. Stranathan | Suggest not using this as a stipulation. Dust can be mitigated by applying water and most operators will ratchet back disturbance activities during these periods of time.  A NWS High wind warning can last for weeks, this does not seem achievable.  If it stands, there should be exception criteria if properly mitigated. | EMPSi (KW): Removed "e.g., NWS High wind warning." |
| 59. | 008 | BCD | Joan May (CA) | Require all engines and ancillary equipment and methods to employ best available control technology with regard to air pollution reduction when operating on BLM lands. | EMPSi (KW): Added suggestion to BMPs appendix. |
| 60. | 009 | B, C, D | Huisjen | Current wording: 'Ensure that prescribed burns are consistent with the State of Colorado permitting process and timed so as to minimize smoke impacts.' My proposal: 'Ensure that prescribed burns are implemented within the State of Colorado permit conditions in order to minimize smoke impacts and avoid NAAQS (National Ambient Air Quality | EMPSi (KW): Change made. |


BLM_0111328

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | Standards) violations' The project specific permit conditions identify dispersion index, wind direction, daily acres allowed, time to stop ignition, etc., which largely dictates the timing of prescribed burning. | |
| | | | | **Climate Change** | |
| 61. | 010-016 | All | Steve Weist (RACSG) | This whole section should be removed! Since there is no definition for what Climate Change is, How can you manage something you can't describe? Climate Change is too all encompassing and generic to be able to assign specific management techniques to. Either provide an exact definition for what climate change is, or remove the entire section. | BLM (BK): We have added a definition of climate change in the glossary. Without assigning blame or cause (human or natural), it appears there is a continuing change in climate. Maybe it will continue for 20+ years and maybe it won't. We have not assigned specific management, but rather, the plan would allow BLM to take action such as aiding native local plants move up or down in response to climate change. \n\n This definition from the EPA has been added to the glossary: (http://www.epa.gov/climatechange/glossary.html#C): Climate change refers to any significant change in measures of climate (such as temperature, precipitation, or wind) lasting for an extended period (decades or longer). Climate change may result from: \n • natural factors, such as changes in the sun's intensity or slow changes in the Earth's orbit around the sun; \n • natural processes within the climate system (e.g. changes in ocean circulation); \n • human activities that change the atmosphere's composition (e.g. through burning fossil fuels) and the land surface (e.g. deforestation, reforestation, urbanization, desertification, etc.) |
| 62. | 011 | | Hawke (RACSG) | Add a goal to consider climate change in management decisions within the purview of the FO, such as "Manage energy exploration and development to include consideration of impacts on climate change." **Explanation & Notes:** | BLM (BK): The Climate Change section addresses management of resources to respond to impacts from climate change.  There is still controversy over the cause of climate change (man-made or natural), so the UFO has been careful to not assign blame or |


BLM_0111329

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | There exist actions within the purview of the UFO that can add to, or mitigate, contributions to climate change. One concrete example is the management of methane produced by coal mining activities. Cooperative actions of the FO with industry could reduce the contribution to climate change of actions authorized by the FO. | cause.  Changes that you suggest would clearly assert that climate change is caused by humans. Cooperative actions are not a planning decision, and will occur after the RMP is approved.  The actions (as they now stand) do allow for methane capture. They do not require it, because it may not be feasible in all cases.  Whether to capture or not is an implementation decision. |
| 63. | 013 | BCD | Joan May *(CA)* | Develop a methodology to evaluate climate change effects.  Identify thresholds of change to resources that would trigger BLM management  actions and what modifications in management of which activities would occur | EMPSi (KW): These are implementation-level decisions. Several actions in the RMP, including in veg, talk about making changes where monitoring indicates a need for action. |
| 64. | 013 | B + D | Ela *(RACSG)* | Utilize best science – in BLM discretion in face of deniers of any climate change. | BLM (BK): Yes, best science in regards to climate change is still evolving, and would be used. |
| NEW | 014 | | | Row 14 is re-worded.  Please replace with row in section after this table. *EMPSi: Row is in file saved on Egnyte here: Z:\Shared\Projects\F-0126 UFO RMP\2_Deliverables\17_P3T7_Alternatives(Ch2)\3.7.E_Rvs dDraftCh2_SO-Review\CommentResponse\FromBLM (File Name: Ch2_draft_UFO-Comments_091911_Miscellaneous.docx)* | EMPSi (JW): Change made. |
| 65. | 014 | B-D | Stindt | Please replace  "according to current climate change science" with "according to current climate change science that is specific to the planning area and has been peer reviewed".<br><br>This is per the Land Use Planning Handbook, Appendix F, page 9 | BLM (BK): The row (D) has been reworded, and changed to: "Transplant or seed local native species into new habitats where needed to improve restoration and revegetation success, and to improve long term survival of plant populations." |
| 66. | 014 and 070 | Preferred | T. Stranathan | Not easy to understand.   What about current climate change science tells us to select species in this manner? It would be better to suggest incorporating climate change science into the decision to transplant and seed natives, selection of which comes from a lot of other sources than climate change science.  The revegetation selection and planting BMPs in Apdx F should be referenced here to support proper selection of reveg | BLM (BK): We changed the row (D) to: "Transplant or seed local native species into new habitats where needed to improve restoration and revegetation success, and to improve long term survival of plant populations."<br><br>Deleted row 70 – redundant. |



BLM_0111330

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | species. | |
| 67. | 015 | Preferrred | T. Stranathan | What would an unnatural "size" or unnatural intensity include? Would a single, couple, combination of, pipeline, powerline, well pad, or road be exceed these unwritten thresholds? | BLM (AC 10/5/11): Unnatural intensity would exceed the expected range or proportion of a given successional stage habitat for the vegetation community type based on what would be expected under the natural disturbance regime. We would want to minimize situations where the combination of disturbances and existing early seral stages caused a landscape (eg 1000s of acres) to have too much early seral. Patch sizes should be within what would be expected under the natural disturbance regime, whether caused by natural or manmade disturbances. |
| 68. | 016 | All | Armstrong[1], Sharrow[2] | Delete the row. | EMPSi (KW): Change made. |
| 69. | 016 | B and D | B. Krickbaum | Replace "Change" with "Shift". So, "Shift or designate additional…" | BLM (BK): After discussion with District Office, line 16 was deleted.  Shifting these areas can be accomplished via plan maintenance, and would not require an amendment (so action is not needed).  For instance, if CDOW determines severe winter range has changed, and provides BLM with a new map, BLM would base actions on the new map, and not on the old mapped areas. |
| 70. | 016 | B, D | A. Schroeder (CA) | Are "key/priority habitats" the same as "crucial habitats?" If so, then you should be consistent in the use of terms throughout the document. If not, then you should define key/priority habitats in the glossary.<br><br>Rationale: I believe the same list of habitat types is used in a listing of "crucial habitats" elsewhere in the document. | BLM (BK): After discussion with District Office, line 16 was deleted (see the row above this).  To answer the question, though, crucial habitats are a part of "key/priority habitats".  Key and priority habitats include biological core areas, animal movement corridors, animal reproduction areas, severe winter range, and winter concentration areas. |
| 71. | 016 | B,D | Burch | The listing of areas appears to be too much detail for this level of plan. | EMPSi (KW): After discussion with District Office, line 16 was deleted (see rows above). |
| 72. | 016 | D | Stindt | Please replace "Change designated key/priority habitats…" with "Redefine designated key/priority habitats…" | EMPSi (KW): After discussion with District Office, line 16 was deleted (see rows above). |
| 73. | 016 | D | Joan May (CA) | Same as B (if land base needs to change due to climate stress to accommodate preservation of key species or | EMPSi (KW): After discussion with District Office, line 16 was deleted (see rows above). |



BLM_0111331

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | habitats it should be allowed to do so). | |
| | | | | **Land Health** | |
| 74. | 018 | CD | Joan May *(CA)* | BLM's goal should be to pursue land and stream health projects on all lands "not meeting" or "meeting with problems" Rangeland Health Standards regardless of trends. | EMPSi (KW): Goals should be broad; suggestion is too narrow but ideas are covered in objective and actions. |
| 75. | 019, 020, 066, 072, 073, 074, 098, 450, 451 | All | B. Krickbaum | Replace the work "pristine" with "exemplary". Also --- add "Exemplary" to the glossary, and delete "pristine" from the glossary.  The definition for "exemplary" is the one currently shown for "pristine" Also change on the row I provided (with my initial comments) regarding seed collection, wildings, etc. | EMPSi (JW): Made global change in Chapter 2, glossary, and Appendix B. |
| 76. | 019 | | Hawke *(RACSG)* | Move "streams and wetlands" from the second sentence to the first sentence (so that streams and wetlands would also be managed to fully meet or exceed the identified standards; "meeting with problems" would not be sufficient for streams and wetlands). (Generally this objective is very applicable and will provide a highly useful tool in meeting the various management goals of the UFO.) **Explanation & Notes:** Streams and wetlands are both especially valuable within the UFO, and particulalry susceptible to degradation of conditions because they are environmentally sensitive. Streams and wetlands provide numerous important benefits within the UFO, especially important in the arid West; such benefits include wildlife support and movement corridors, ecosystem services of water filtering, water supplies for humans/wildlife/agriculture; given the heightened importance of wetlands and streams, and their sensitivity, a higher standard for management is necessary to preserve these valuable resources for he long term. | EMPSi (KW): No change; several discussions were held over this section and it was determined to leave as-is in order to meet the multiple-use mandate. |
| 77. | 019 | C | M. Siders | Would read better if worded "Manage lands, streams and wetlands to, at a minimum, meet with problems | EMPSi (KW): Change made. |



BLM_0111332

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | the BLM Colorado Public Land Health Standards (BLM 1997) (Appendix E)," Otherwise, the focus is that we will manage to meet with problems. | |
| 78. | 019 | CD | Joan May (CA) | On Alt CD add "provided lands meeting with problems are stable or trend toward achievement of the Rangeland Health Standards. Where other resource needs are allowed to be a rationale for not fully meeting standards, what these other resource needs are and a justification for why and when they should take precedence needs to be provided. | BLM (BK10/5/11): Added to Alt C and D, "provided lands meeting with problems are stable or trend toward achievement of the BLM Colorado Public Land Health Standards." |
| 79. | 019 | D | M. Siders | See comment #58 above re "wilderness characteristics protection" | EMPSi (KW): Terminology is correct. |
| 80. | 019 | D | CDOW | We feel that the "meet with problems" the Land health Standards is not sufficient within ACEC, WSA, Biological Core Areas, ect. These areas should exemplify natural healthy lands and water resources. | EMPSi (KW): The objective for these areas is to fully meet or exceed land health standards. |
| 81. | 019 | D | Steve Weist (RACSG) | You are tying your hands by defining this objective so much. Remove "Manage ACEC's, WSA's lands identified for wilderness characteristics protection, biological core areas, areas with pristine, ancient or rare vegetation, and wild and Scenic River Segments with a plant outstandingly remarkable value(ORV) to fully meet or exceed the BLM Colorado Public Land Health Standards (BLM 1997)(Appendix E), Remove "remaining" from the next section, and just use **"Manage the lands, streams, and wetlands to meet the BLM Colorado Public Land Health Standards (BLM 1997), or to meet with problems where needed to support resource uses."** This is a better more achievable objective. | EMPSi (KW): There are special areas that we want to manage to fully meet or exceed the standards, so these are broken out from areas that we'll allow to meet or meet with problems. |
| 82. | 019 | D | J. Jackson | Don't see a map of where areas with pristine, ancient, or rare vegetation are located. | BLM (BK): There is not a map for these areas. BLM Management Team had lengthy discussion about this during preferred alternative development. It was decided that, although these areas are not currently mapped, they are defined, and we will respond to the areas during field work for site-specific projects. When these areas are found, projects would be modified to protect the areas. The only way to map |



Page 20 of 297 — Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011

BLM_0111333

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**

**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | the areas would be to do a 100% inventory of the planning area which is not possible given the timing of the RMP schedule. |
| 83. | 020 | C | Clements | need to improve wording re Health Standards, suggest "on lands, streams and wetlands rated as not meeting BLM Colorado Land Health Standards, or meeting with problems with a downward trend" to replace "in areas where relevant…."<br><br>Note from Amanda Clements—I found reading the land health section a little confusing—hopefully changing the terminology a little will help. I had more concerns with Alt D identifying actions that applied to areas meeting with problems for some actions, and applied to areas meeting with problems with a downward trend for other actions. I attempted to ID those actions which seemed inconsistent in comments below. But after some thought would it be better to simply say that these actions will take place as needed to meet the objective cited above? | EMPSi (KW): Section revised for clarity. |
| 84. | 020 | D | Burch | Alternative D is extensive and complex (Stating Implementation) far beyond what was analyzed by B & C alternatives. Too much detail. | EMPSi (KW): Alternative D focuses more specific management to specific areas whereas Alternatives B and C provide management to a blanket area of land. |
| 85. | 020 | D | Clements | need to improve wording re Health Standards, suggest "on lands, streams and wetlands rated as not meeting BLM Colorado Land Health Standards, or meeting with problems with a downward trend" to replace "in areas where relevant…." | EMPSi (KW): Changed per suggested revision from A. Clements 8/18/11. Now reads, "In the remaining lands, streams, and wetlands, apply land and stream health improvement projects in areas rated as *not meeting* BLM Colorado Public Land Health Standards (BLM 1997) (Appendix E) or on lands *meeting with problems.*" |
| 86. | 020 | D | B. Krickbaum | Deleted "and show a downward trend" (Last 5 words of the action) | EMPSi (KW): Change made. |
| 87. | 020 | D | Stindt | Please eliminate "areas with pristine, ancient, or rare (PAR) vegetation" from this action and all other actions where this or similar wording appears. Although these words are defined in the glossary, they are not mapped | EMPSi (KW): BLM Management Team had lengthy discussion about this preferred alternative development. It was decided that, although these areas are not currently mapped, they are defined, |



BLM_0111334

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | and it is therefore not possible to know the full extent of the FO area involved in the action. PAR is referenced throughout Chapter 2 in a context with "ACECs, WSAs, lands identified for wilderness characteristics protection, biological core areas, and Wild and Scenic River segments with a plant ORV" – all of which are mapped and the extent defined. It is not possible for staff to identify potential conflicts/contradictions within the plan without having the extent of PAR areas better defined.<br><br>I know you have requested that we not refer back to a previous comment. However, PAR appears in actions so many times that I am hoping you will make an exception to that directive. | and we will respond to the areas during field work for site-specific projects. When these areas are found, projects would be modified to protect the areas. The only way to map the areas would be to do a 100% inventory of the planning area which is not possible given the timing of the RMP schedule.<br><br>Other resources have restrictions that are not mapped, such as raptors, as areas will change over the course of the RMP. However these resources still warrant protection and the restrictions would be included, or excepted, based on field inventories. |
| 88. | 020 | D | Steve Weist (RACSG) | Again this alternative is too restrictive!!! If it ain't broke don't fix it. I can see stabilizing lands that are not meeting or meeting with problems and show a downward trend, but I cannot justify spending public funds on improving lands that are already meeting land health standards. This alternative should read "Monitor Land Health Standards to ensure they meet the BLM Colorado Public Land Health Standards (BLM 1997) (Appendix E) and stabilize those areas that are not meeting or meeting with problems and those areas showing a downward trend." You don't have the money to go beyond that in today's economy!!! | EMPSi (KW): There are special areas that we want to manage to fully meet or exceed the standards, so these are broken out from areas that we'll allow to meet or meet with problems. |
| 89. | 021 | B | Clements | need to improve wording re Health Standards, suggest "on lands, streams and wetlands rated as not meeting BLM Colorado Land Health Standards, or meeting with problems" | EMPSi (KW): Changed per A. Clements' suggestion 8/18/11. Now reads, "On lands, streams, and wetlands rated as *not meeting* the BLM Colorado Public Land Health Standards (BLM 1997) (Appendix E) or *meeting with problems*, where an activity has been…" |
| 90. | 021 | BCD | Joan May (CA) | BLM should modify or adjust all activities on lands not meeting rangeland health standards that have been identified as contributing to degraded rangelands and contributing to non compliance all BLM fully meeting the standards. Alt D a downward trend should not be | EMPSi (KW): Removed "downward trend" so action applies to land not meeting land health standards. |



BLM_0111335

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | need ed to initiate modification of causal factors on any lands not fully meeting standards2 | |
| 91. | 021 | C | Clements | need to improve wording re Health Standards, suggest "on lands, streams and wetlands which meet BLM Colorado Land Health Standards with problems and have a downward trend" | EMPSi (KW): Changed per A. Clements' suggestion 8/18/11. Now reads, "On lands, streams, and wetlands rated as *meeting* the BLM Colorado Public Land Health Standards (BLM 1997) (Appendix E) *with problems* with a downward trend, where an activity has been…" |
| 92. | 021 | D | Clements | I think we meant to limit or modify land health impacting activities in order to meet the land health objective. I'd suggest EITHER: applying this action "in lands which are rated as not meeting BLM Colorado Land Health Standards, or meeting with problems" (not just those with a downward trend), OR: apply the action in the ACECs, WSAs, LWWCs, etc, etc, "in lands which are rated as not meeting BLM Colorado Land Health Standards, or meeting with problems, and for the remaining lands apply the action "on lands which are rated as not meeting BLM Colorado Land Health Standards, or meeting with problems with a downward trend | EMPSi (KW): Changed to read, "On lands, streams, and wetlands rated as *not meeting* the BLM Colorado Public Land Health Standards or *meeting with problems* (BLM 1997) (Appendix E), where an activity has been demonstrated…" |
| 93. | 021 | D | Steve Weist (RACSG) | Remove "limit, modify, or" and just have "manage the causal activity" Remove the bullet points. It doesn't matter what the activity is, if it is damaging the land health, it should be managed to stabilize the land health to meet the land health standards. | EMPSi (KW): No change. BLM feels that the qualifying language and example bullet points are ok here. |
| 94. | 022 | B | Clements | need to improve wording re Health Standards, suggest "on lands, streams and wetlands rated as not meeting BLM Colorado Land Health Standards, or meeting with problems" | EMPSi (KW): Changed to read, "On lands, streams, and wetlands rated as *not meeting* the BLM Colorado Public Land Health Standards (BLM 1997) (Appendix E) or *meeting with problems*,…" |
| 95. | 022 | C | Clements | need to improve wording re Health Standards, suggest "on lands, streams and wetlands rated as not meeting BLM Colorado Land Health Standards, or meeting with problems with a downward trend" | EMPSi (KW): Changed to read, "On lands, streams, and wetlands rated as *meeting* the BLM Colorado Public Land Health Standards (BLM 1997) (Appendix E) *with problems* with a downward trend," |
| 96. | 022 | D | Clements | need to improve wording re Health Standards, suggest "on lands, streams and wetlands rated as not meeting BLM Colorado Land Health Standards, or meeting with problems" | EMPSi (KW): Changed to read, "On lands, streams, and wetlands rated as *not meeting* the BLM Colorado Public Land Health Standards (BLM 1997) (Appendix E) or *meeting with problems*," |



BLM_0111336

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | **Soils and Water** | |
| 97. | 026 | B | Burch | Table 2-2 Line 25 – Objective describes 'manage surface disturbing activities… in saline soils..' Line 26 – Alt. B is all about Livestock Grazing, which is NOT within the definition of Surface Disturbing Activities.  Please revise to address Surface Disturbing activities. Also, this action, as written, does not flow with Alternative A- which matches better and could be included into the following action Alt. A on line 27. | EMPSi (KW): Changed objective to remove "surface-disturbing activities." Left Alternative A action as is; better fit on line 26 than 27. |
| 98. | 026 | BCD | Joan May (CA) | Having no commitment to protect water quality (Alt C) required does not meet BLM's responsibilities to protect water quality from degradation or maintain compliance with water quality standards.  The protections cited should apply to all soils as sediment is a pollutant whether or not selenium and salinity are present. | EMPSi (KW): Part of planning criteria is to meet laws, regs, standards, etc., so the BLM would still be required to do that under Alternative C. |
| 99. | 026 | D | Steve Weist (RACSG) | Eliminate the bullet points they are unnecessary. | EMPSi (KW): No change; provides context and examples for the reader. |
| 100. | 027 | D | L. Armstrong[i] | Begin action with "When feasible, inventory and …" | EMPSi (JW): change made |
| 101. | 027 | D | B. Krickbaum | Add "or remove".   So, it will read "…, and rehabilitate, repair or remove those structures…" | EMPSi (KW): Changed in Alternatives B and D. |
| 102. | 027 | D | B. Krickbaum | Add "where possible".  So, it will read "…, recreation projects) where possible to increase efficiency." | EMPSi (KW): Change made. |
| 103. | 027 | D | Steve Weist (RACSG) | Modify "rehabilitate or repair those structures" to "Rehabilitate or remove those structures" If a structure is non-functional and eroding it should be removed and reclaimed to improve land health and water quality. | EMPSi (KW): Changed to "…rehabilitate, repair, or remove…" |
| 104. | 028 | D | Clements | Alt D is within the range of Alternatives? It is less restrictive than Alt C | EMPSi (KW): Preferred alternative does not fall between Alternatives B and C as it was developed after the other alternatives were developed. This allowed the preferred alternative to be outside of the range. |
| 105. | 029 | D | L. Armstrong[i] | Remove last bullet (bullet regarding the bond). | EMPSi (JW): change made in Chapter 2 and Appendix B. |
| 106. | 029 | B, C, D | Clements | Does this also apply to ROW activities? | EMPSi (KW): No. ROW restrictions are noted as |



BLM_0111337

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | ROW avoidance or ROW exclusion. |
| 107. | 029 | BCD | Joan May (CA) | As these lands are typically not highly productive, consider eliminating grazing if a cost/benefit analysis can not demonstrate revenues gained exceed administrative cost of management, restoration and impacts to water quality. This should be applied to other ground disturbing activities as well. | EMPSi (KW): removed reference to livestock grazing in Alternative B. (changed in Appendix B) |
| 108. | 029 | D | B. Krickbaum | 1ˢᵗ bullet – change to: "On projects greater than .25 acre in size, conduct site-specific soil …"<br><br>2ⁿᵈ bullet – Delete "Prior to surface disturbance". change to: " Require approval of a surface use plan by the BLM …"<br><br>2ⁿᵈ sub-bullet (beneath the second bullet), change to only "Surface runoff will be adequately controlled."<br><br>Make another bullet, which will become the 3ʳᵈ bullet (the old 3ʳᵈ and 4ᵗʰ now become the 4ᵗʰ and 5ᵗʰ).  New bullet will be: "When a Storm Water Management Plan is required by the state, the operator is required to submit the draft plan to the BLM authorized officer for review prior to submitting to the state for approval." | EMPSi (KW): Changes made in Chapter 2 and in Appendix B. |
| 109. | 029 | D | Sondergard | Awkward wording bullet #3- Suggest…To prevent the deep percolation of groundwater within saline/selenium soils, require engineered leak prevention of drilling system pits containing fluids such as flowback and stimulation fluids, produced water, and cuttings. Prohibit surface discharge of produced water and mechanical evaporation. | EMPSi (KW): Changes made in Chapter 2 and in Appendix B. |
| 110. | 030 | B | B. Krickbaum | It is 7376 acres.<br>Add "ACEC", so "…in East Paradox ACEC as…" | EMPSi (KW): Change made. Removed from ROW exclusion list in L&R section as it's covered by the ACEC. |
| 111. | 030 | C | B. Krickbaum | It is 385 acres. | EMPSi (KW): Change made. |
| 112. | 030 | D | B. Krickbaum | It is 1900 acres.<br>Add "ACEC", so "…in East Paradox ACEC as…"<br>Delete last bullet, and replace with: Bullet: "Allow | KW: Added acreage; changed to "…in the Biological Soil Crust ACEC…" Removed from ROW exclusion list in L&R section as it's covered by the |



**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | private edge-holdings ROWs for reasonable access and utilities, and only if other access is not possible." | ACEC. |
| 113. | 030 | D | Rogers | Need to put in acres | EMPSi (KW): Added acres. |
| 114. | 030 | D | Pfifer | 2nd bullet – change to read to be consistent with the read of the document "Allow reasonable access and utilities to private inholdings/edgeholdings." | BLM (BK): This area is the ACEC in east paradox. To be consistent with the ACEC, bullet changed to "Allow ROWs for private edge-holdings for reasonable access and utilities only if other access is not possible." (Note:  there are not any inholdings in the ACEC, so the word "inholding" is not included in the bullet.) |
| 115. | 030, 450, 537 | D | L Reed | Under "exceptions" to ROW Exclusion areas (see comment #4 above)  please re-add the following wording: "100' buffer along county roads and highways"<br><br>Please note this change should be made throughout the entire document.  "Highways" was included in previous versions of the matrix -  see 2-24-11 "pencils down" version of matrix.   But "highways" is now omitted from lines 30 and 537.  I don't remember a decision to delete the word "Highways" from the exception criteria,  in fact it is needed for the E Paradox ACEC, due to existing utilities along the highway. | EMPSi (KW): ACEC is less than 100-feet from the highway so highway excluded from the bullet here as it is not applicable. |
| 116. | 030, 537, 527 | D | L Reed | Rare bio soil crusts: Line 30:  Who changed the wording in our exceptions to exclusion areas? This matrix has a new spin on wording: "Manage private in-holdings…. As ROW avoidance areas" The wording we have carried thru was: "Private in-holdings or edge-holdings will be allowed ROWs for reasonable access and utilities."<br><br>Please change the wording back to our original wording/intent.  Let's not have an avoidance area in an exclusion area.  Any new ROWs would be sited to avoid resource impacts and would be subject to NEPA. | EMPSi (KW): Change made. Management decided that in certain instances the exceptions for ROW exclusion will be managed as ROW avoidance where noted in the matrix. |



BLM_0111339

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | Also see Line 527 Fairview South ACEC and Line 537 E Paradox ACEC. This wording has also been changed to: "…manage these exceptions as ROW avoidance" | |
| 117. | 031 | D | Ela (RACSG) | It's good to go beyond E. Paradox. Is this the only rare crust in the BLM planning area for ROW exclusions? Does this cause a road closing? | EMPSi (KW): The area identified under Alternative D is for the rarest of the known biological soil crusts in the field office. ROW exclusion would not affect existing ROWs (i.e., no existing roads would be closed). |
| 118. | 031 | D | Sondergard | The E. Paradox Biological Soil Crust NSO/NGD should have some mention of being carried forward and point the reader to the ACEC section. | EMPSi (KW): No change; this action is for soil crust in the FO. If a project is in the ACEC we'll look at the ACEC section for guidance. |
| 119. | 031 | D | Steve Weist (RACSG) | Is there a definition for biological soil crust development? Need more information before can review and comment on this row. | EMPSi (KW): Level of biological soil crust development would be determined using best available techniques. |
| 120. | 032 | B | M. Siders | Is the "East Paradox area" the same as the ACEC or is this a more general, larger area? | EMPSi (KW): This is a general area but Alt B would probably be the same as the ACEC whereas under Alt D it's an area greater than the ACEC size in Alt D. |
| 121. | 032 | D | Steve Weist (RACSG) | Add in "work with unwilling sellers to develop plans for protecting rare biological soil crust". | EMPSi (KW): This is outside the jurisdiction of the BLM. |
| 122. | 034 | D | Clements | Should be  NSO-3/NGD# and CSU-8/SSR-# | EMPSi (KW): Changed to NSO-3/SSR# and CSU-8/SSR-#. (added to Appendix B) |
| 123. | 034 | D | B. Krickbaum | This is not NGD. Delete "and surface disturbing activities" | EMPSi (KW): Changed to SSR; added "and SSR restrictions." (added to Appendix B) |
| 124. | 034 | D | M. Siders | Shouldn't this also be SSR for both NSO and CSU sections? | EMPSi (KW): Changed to NSO-3/SSR# and CSU-8/SSR-# (added to Appendix B) |
| 125. | 037 | BCD | Joan May (CA) | Conduct representative water quality monitoring in recreational contact designated waters to evaluate the impact of BLM approved activities adjacent to these waters on compliance with microbiological standards. | EMPSi (KW): This is implementation and will be considered at the implementation phase of the RMP once the ROD is signed. |
| 126. | 038 | BCD | Joan May (CA) | Consider making the suggested buffer an exclusion area except in existing ROWs | EMPSi (KW): No change. Identifying the major river corridors as ROW exclusion is not a reasonable alternative. |
| 127. | 039 | BCD | Joan May (CA) | With directional drilling techniques surface occupancy of the river corridor bottoms in unnecessary. These areas contribute other overriding values.  Limit surface occupancy to the canyon rims located far enough back | EMPSi (KW): Alternative B is No Leasing with 0.25-mile of each side; Alt D is no occupancy within the same area.  BLM management feels 0.25-mile is a sufficient distance in these areas to not impact visual |



BLM_0111340

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | to not impact the visual quality of the river corridors. | quality. |
| 128. | 039 | D | Rogers | Use of meters with 328 feet in () but in line 40 use feet without meters, please just make consistent. Additionally, one line 38 states 328 feet and one line states 300 foot. Can't we just make it all 328 feet (100 meters) to make it more consistent across the document. | EMPSi (KW): Per conversation with BK (9/28/11), will always include feet with meters if "meters" is driving measurement; if feet is driving measurement, won't give meters conversion. |
| 129. | 039 | D | Sondergard | After the final round of Mgmt review, my notes indicate we didn't carry a SSR forward. An SSR would make campgrounds, boat ramps, etc. very difficult to establish. I think this should be NSO only. | EMPSi (KW): Management reviewed and decided to leave SSR in Alternative D. |
| 130. | 039 | D | S. Bear (RACSG) | DMEA has existing power lines near the Gunnison River and the North Fork Gunnison River. Please add the following language, "Standard Exception: Utilities are allowed to access, operate, maintain, renew permits, rebuild or upgrade existing facilities located within major river corridors. New ROW will be considered on a case by case basis for new power lines within the river corridors as needed to provide for essential power services of end users." | EMPSi (KW): This action does not affect ROWs (only ROW exclusion/avoidance affect ROWs and do not apply to existing ROWs). |
| 131. | 040 | D | Rogers | Make consistent with line 39 in terms of buffer 328 ft (100 meters) | EMPSi (KW): Per conversation with BK (9/28/11), will always include feet with meters if "meters" is driving measurement; if feet is driving measurement, won't give meters conversion. |
| 132. | 041 | D | Clements | Should it be "apply CSU restrictions between 300 and 500 feet…" | EMPSi (KW): Change made. (updated Appendix B) |
| 133. | 041 | D | B. Krickbaum | After "STIPULATION", replace "within" with "from". It will read "…CSU restrictions from 300 – 500 feet…"   (Also, change in Appendix B. | EMPSi (KW): Change made. (updated Appendix B) |
| 134. | 042 | all | L. Armstrong[i] | Delete row (no ROW avoidance or exclusion on intermittent/ephemeral). There are several intermittent/ephemeral drainages. A ROW avoidance/exclusion would be overly restrictive and cover too much area. | EMPSi (JW): change made |
| 135. | 042 | D | Joan May (CA) | Replace with 300 ft buffer avoidance area | EMPSi (KW): After discussion with District Office, line 42 was deleted. List here was updated to reflect change (no ROW restrictions for intermittent and ephemeral streams). (updated L&R section) |


BLM_0111341

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 136. | 042 | D | Pfifer | Have big concern with this - essentially all linear ROWs cross intermittent and ephemeral streams somewhere and it is impossible to avoid these areas. Concern with 279,270 acres being ROW avoidance, see Figure 2-24 avoidance areas – its almost everywhere – how can we get a linear ROW through the FO without going through an avoidance area which violates the intent – suggest a BMP instead that any impacts to intermittent and ephemeral streams will be mitigated | EMPSi (KW): After discussion with District Office, line 42 was deleted. List here was updated to reflect change (no ROW restrictions for intermittent and ephemeral streams). (updated L&R section) |
| 137. | 043 | all | L. Armstrong[1] | Delete row (no CSU on intermittent/ephemeral). There are several intermittent/ephemeral drainages. A CSU would be overly restrictive and cover too much area. | EMPSi (JW): change made |
| 138. | 043 | D | Rogers | Deals with the SSR stipulation associated with this action. On ephemeral streams does this stipulation exist for livestock developments since this *is* where we put livestock water developments (ponds). I would like to see ephemeral taken out of this stipulation. As for intermittent there needs to be an exception for spring and water developments. | EMPSi (KW): After discussion with District Office, line 43 was deleted. (updated Appendix B)  BLM (BK): Determined that a CSU/SSR on intermittent and ephemeral waterways is overly restrictive and not needed. |
| 139. | 043 | D | Joan May (CA) | Replace 100 ft with 300 ft as this does not preclude use, only allows for appropriate conditional use. | EMPSi (KW): After discussion with District Office, line 43 was deleted. (updated Appendix B)  BLM (BK): Determined that a CSU/SSR on intermittent and ephemeral waterways is overly restrictive and not needed. |
| 140. | 043 | Preferred | T. Stranathan | Appendix Addendum B does include exc Mod and wav Criteria, which will more than likely be requested in the majority of oil and gas project proposals.  Or modified or waived in the case of an MDP. | EMPSi (KW): After discussion with District Office, line 43 was deleted. (updated Appendix B)  BLM (BK): Determined that a CSU/SSR on intermittent and ephemeral waterways is overly restrictive and not needed. |
| 141. | 045 | All | L. Armstrong[1] | Change to a stipulation (CSU) (without an SSR) **STIPULATION** CSU-XX: This lease is within a municipal watershed or Public Water Supply area, and the lessee is required to implement special protective measures for water resources and to collaborate with municipalities. | EMPSi (KW): Changed to the following in Alternatives B-D. The LN exists in Alt A (per state stips package): **STIPULATION** CSU-XX: This lease is within a municipal watershed or Public Water Supply area. The lessee is required to collaborate with |



BLM_0111342

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | municipalities to identify and to implement special protective measures for water resources. |
| 142. | 045 | All | L. Armstrong[i] | Change to a stipulation (CSU) (without an SSR) **STIPULATION** CSU-XX:  This lease is within a municipal watershed or Public Water Supply area, and the lessee is required to implement special protective measures for water resources and to collaborate with municipalities. | EMPSi (KW): Changed to the following in Alternatives B-D. The LN exists in Alt A (per state stips package): **STIPULATION** CSU-XX:  This lease is within a municipal watershed or Public Water Supply area. The lessee is required to collaborate with municipalities to identify and to implement special protective measures for water resources. |
| 143. | 045 | BCD | Joan May *(CA)* | This should be a stipulation that lessees comply with adopted municipal watershed protection regulation where they do not create an operational conflict. | EMPSi (KW): Changed to CSU. |
| 144. | 045 | C + D | Ela *(RACSG)* | Nor Regents Mesa Domestic Water Co 1,000 feet compared to 5 miles can easily be damaging as to gas well fracking. It needs protection. Doesn't Alternative C get better coverage as to gas well fracking? | BLM (BK): All alternatives are "No Leasing" 1,000 horizontal feet of either side of a classified surface water supply stream segment for a distance of 5 miles upstream of a public water supply intake. This means that fracing would not occur beneath the water supply system and 1,000 feet either side. There is also a CSU from 1,000 feet to ½ mile where restrictions can be applied. |
| 145. | 047 | B, C, D | A. Schroeder *(CA)* | With regard to "mineral material sales" here and elsewhere in the document, I recommend replacing the term "sales" with the term "disposal."<br><br>Rationale: Mineral materials may be disposed of by means other than sales. | EMPSi (KW): Change made. |
| 146. | 047 | D | Joan May *(CA)* | Consider changing 1000 ft as in Alt C to 2640 as in Alt B. Depending on slope and soils 1000 ft may not provide enough buffer. San Miguel County appreciates BLM's recognition of Municipal Source Water Protection Areas and the extension of the NL-3 Stipulation to their boundaries. | EMPSi (KW): NL up to 1,000 feet and CSU beyond that. BLM feels that this buffer is sufficient. |
| 147. | 047 | Preferred | T. Stranathan | The edge of the No Lease area is bordered by a CSU. The No Lease should be NSO instead.  A drill rig could operate easily in the CSU area a minimum of 1000' away and drill into the subsurface without any impact what so ever on the surface water supply, we could | EMPSi (KW): BLM management discussed this action and determined that NL was appropriate. |



BLM_0111343

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | even take a tip from the BOR stip and require a minimum distance between well bore and water. What is our rationale for making this a No Lease, when an NSO will work? | |
| 148. | 048 | C | B. Sharrow[2] | Delete 3rd and,4th bullets (green fracking fluids, and construction of berms…) 6th bullet, delete "shall" | EMPSi (JW): sentence rewritten. "Shall" now used appropriately. |
| 149. | 048 | B | Clements | Should it also be a NSO otherwise seems that Alt B lets gas development occur with less restrictions than C,D | EMPSi (KW): No, it is NL (see previous row) so more restrictive. |
| 150. | 048 | C | B. Krickbaum | -Delete "SSR" in two places. -Replace "less than 1000" with "a distance greater than 1000 but less than 2640". So, it will read "…restrictions within a distance greater than 1000 but less than 2640 horizontal feet…" | EMPSi (KW): Change made. (updated Appendix B) |
| 151. | 048 | C | B. Krickbaum | Delete "and within domestic wells and springs" | EMPSi (KW): Change made. (updated Appendix B) |
| 152. | 048 | C | Sondergard | Response to Empsi question: Yes, that is correct, a CSU is unnecessary now that line 47 above no longer has an alternative with "No similar action" after collapsing the alternatives. Question 2: The SSR is left over from the concept of pairing CSU/SSR. There is no need to have a SSR only a CSU. The distance in alt C should be changed to 1000-2640 so alt C and D are the same. | EMPSi (KW): Thank you. Change made. |
| 153. | 048 | C | Sondergard | Remove the word "shall" from bullet #6. | EMPSi (KW): Change made. |
| 154. | 048 | D | B. Krickbaum | Delete, and replace with "Same as alternative C". | EMPSi (KW): Not entirely same as Alternative C. |
| 155. | 048 | D | Sondergard | Remove "and within domestic wells and springs" | EMPSi (KW): Change made. (updated Appendix B) |
| 156. | 048 | D | Pfifer | BLM does not yet have a policy on the requirement to use green fracking fluids or can define what that even is – so don't think that can be a requirement here and suggest deleting it, but it is a BMP in Alt F and as long as that definition is an acceptable to BLM, then ok to be there. 4th bullet on pg 2-38 needs to be clarified – don't know what it means. 5th bullet – per my first comment here – suggest to not define here what each sample should analyze at a | EMPSi (KW): This stipulation has been updated to reflect the statewide stipulation as of August 3, 2011. |



BLM_0111344

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|-------|---------------|-------------------------------|---------------|---------|--------------------------------------|
| | | | | minimum because this could change – if this needs to be defined, suggest doing in the BMP in Alt F instead (F-27 lines 5-9). "Each office" - which office? Note at end - ? the NSO above is for "Water Supply Streams and Public Water Supplies" and this CSU is for "Municipal Watersheds and Public Water Supplies" which these are separate throughout the document – so should they be combined because they are in fact one in the same? | |
| 157. | 048 | Preferred | T. Stranathan | Green Fracing fluids?  There is a statement in Appendix F on page F-27 lines 5-9 which may be the best language. It would be best to request fracing fluids be disclosed on proposed wells in this type of area and if possible work with operator to eliminate  chemicals which were brought on site to be used down hole that if an accident, improper handling or damage to could result in detrimental effects to the surface and water supplies. | EMPSi (KW): This stipulation has been updated to reflect the statewide stipulation as of August 3, 2011. |
| 158. | 048 | Preferred | T. Stranathan | What we are missing here is the "Green Completion" or "reduced emissions completions" idea.  It is more widely used and deals with more specific and rigorous protections at the surface as far as capturing gas from fracing and completions for placement into a nearby sales line or if not available the gas is flared off. Colorado already requires Flaring of vent gas, but this is more specific to completions of each well.  Like COGCC rule 805. | EMPSi (KW): This stipulation has been updated to reflect the statewide stipulation as of August 3, 2011. Added green completions to requirements. |
| 159. | 051 and 052 | B, C, D | B. Sharrow[2] | Combine the rows.  Replace B, C, and D with the following action (both C and D are the same as B). Change to read: **Action:** Maintain current water rights to benefit wildlife and livestock.  Object to proposals that may jeopardize existing rights.  File for new water rights for surface and groundwater sources (i.e., springs/seeps, wells, reservoirs, streams) in adequate quantities necessary to protect planning area resource needs and sustainability. | EMPSi (JW): change made |



BLM_0111345

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 160. | 054 | D | Steve Weist (RACSG) | 1000 ft. from a domestic well is too restrictive. That is equivalent to an area of over 70 acres. 500 ft. would be a more reasonable distance, with additional controls on what surface occupancy would involve.<br><br>Jedd: Is 1,000-feet basted on COGCC or anything else? *Sent to Jedd 8/11 1/11*<br>J. Sondergard (8/12/11): The 1000' buffer on domestic wells comes from the BLM state office Stipulations.  It also matches the 1000 foot buffer for Municipal Watersheds and Public Water Supplies. | EMPSi (KW): The 1,000-foot buffer on domestic wells comes from the BLM state office Stipulations. It also matches the 1000 foot buffer for Municipal Watersheds and Public Water Supplies. |
| 161. | 056 | BCD | Joan May (CA) | Provide a quantitative definition of what constitutes a "drought" triggering drought management guidelines. Are guidelines binding management requirements? | EMPSi (KW): Table H-1 in Appendix H provides a quantitative definition of different levels of drought severity. These are guidelines for management; not binding. |
| | | | | **Vegetation – General** | |
| 162. | 059 | goal | Armstrong[1], Sharrow[2] | Add "plant and animal" before "species" on the first line. | EMPSi (KW): change made. |
| 163. | 059 | Goal | Joan May (CA) | Perhaps the goal should include some reference to moving the vegetative community toward site potential with regard to native species density, diversity, variability and resilience. The site potential should be moved toward historic levels where practicable with regard to the indicators of a healthy rangeland in the rangeland health standards for vegetation and soils.  A goal to maintain "viable" populations brings to mind the minimum needed to provide adequate genetic diversity for a species to be sustained at all.  Change viable to robust? | EMPSi (KW): We believe the goal as written encompasses the suggested ideas. No change to word viable. |
| 164. | 061 | D | B. Krickbaum | Replace 2nd sentence with: "If locally derived native species are not available, are cost prohibitive, or are not likely to succeed, allow use of non-local natives or non-native species that are not invasive. | EMPSi (KW): Change made. |
| 165. | 061 | D | Steve Weist (RACSG) | This action appears to be contrary to the objective above. Using nonnative or non-local native species would only introduce more competition to the local native species you are trying to maximize. | EMPSi (KW): Action is not contrary to objective. The objective does not preclude use of non-local or non-native species but rather emphasizes natives. |
| 166. | 062 | B & C | M. Siders | Do we mean to priorities these types of treatments or | EMPSi (KW): Yes, we would only want to do this if |



BLM_0111346

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | limit to only these? i.e. "Restore areas of degraded vegetation ONLY where there is a high probability of success." | there was a high probability of success. |
| 167. | 062 | D | Clements | Suggest changing last sentence to "on other lands, restore areas of degraded vegetation where there is a high probability of success primarily as off-site mitigation for nearby resource use and development"(BK put together a more updated comment on this—my comment should defer to his) | EMPSi (KW): Changed per BK's comments. |
| 168. | 062 | D | M. Siders | See comment #58 above re "wilderness characteristics protection" | EMPSi (KW): Yes, this is the correct usage of terminology. |
| 169. | 062 | D | Joan May (CA) | Perhaps also include areas of high wildlife value or potential, lands that provide other benefits such as water quality protection or improvement and lands with high public use value in the restoration site selection criterion. However be mindful of allowing sacrifice zones in less productive lands to be mitigated elsewhere. | EMPSi (KW): Biological core areas include areas of high wildlife value based on CDOW recommendations. Other areas mentioned are included in the "other lands" category and would still be restored to basic levels. |
| 170. | 062 | D | Steve Weist (RACSG) | Row 61 and 62 should be combined to accomplish the objective desired. Breaking them up seems to be a duplication of effort without a specific overall goal to achieve. | EMPSi (KW): Rows combined. |
| 171. | 062 and 063 | All | B. Krickbaum | Replace rows 62 and 63 with action on **attachment A.**<br><br>*See comments from B. Krickbaum: Z:\Shared\Projects\F-0126 UFO RMP\2_Deliverables\17_P3T7_Alternatives(Ch2)\3.7.D_BL M-CA-RACSC-Cmts\BLM (file name: Ch2_draft_UFO-Comments_062311_Krickbaum.docx)* | EMPSi (KW): Change made. |
| 172. | 063 | B, D | M. Siders | What is meant by "basic levels of ecologic functionality"? Is that the same as Meeting Land Health Standards? | BLM (AC 10/5/11): Basic levels of ecologic functionality include successional processes are in place, energy and nutrients are being cycled effectively, soil is being appropriately stabilized…it can be functioning at a basic level of ecologic functionality without meeting land health standards. The term "ecologic functionality" has been added to the glossary. |



BLM_0111347

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | EMPSi (AA): Added to glossary: "Ecologic functionality. These levels include successional processes that are in place, energy and nutrients that are being cycled effectively, and soil that is being appropriately stabilized. An area can be functioning at a basic level of ecologic functionality without meeting land health standards." |
| 173. | 064 | all | B. Sharrow[2] | Delete row.  This is the same as row 56. | EMPSi (JW): change made |
| 174. | 064 | All | B. Krickbaum | Before row 64 (after attachment A, above), add objective and action in **attachment B**. *See comments from B. Krickbaum: Z:\Shared\Projects\F-0126 UFO RMP\2_Deliverables\17_P3T7_Alternatives(Ch2)\3.7.D_BL M-CA-RACSC-Cmts\BLM (file name: Ch2_draft_UFO-Comments_062311_Krickbaum.docx)* | EMPSi (KW): Change made. |
| 175. | 064 | D | Rogers | Appendix H:  Second bullet under extreme drought (D3) & (D4)"base changes in livestock use" needs to be reworded for understanding. Suggestion "make changes in livestock grazing management through stocking rates, season of use, and/or reduced AUMs during and immediately following  drought until range conditions improve (vigor on native perennial key species)  and precipitation returns to average. | EMPSi (KW): Change made to Appendix H. |
| | | | **Vegetation – Uplands** | | |
| 176. | 066 | D | Ela (RACSG) | Consider a request to CDOW (cooperating agency) to do at least a large game animal inventory now and periodically in order to monitor native plants and forbs restorations successes. | BLM (BK): This is not a planning decision to be put in the RMP. CDOW can monitor anytime they wish, without an RMP decision. Also, BLM has a monitoring program that evaluates existing grasses and forbs as well as restoration success. Monitoring can be accomplished without a decision in the RMP. |
| 177. | 066 | D | Burch | Should Alt D be this expanded when no other alternative mentions the same?  (Thus, to the reader – analysis was not done through the alternative process.)  Suggest:  Create actions by the list in D with appropriate analysis of management levels. (Many areas of special concern are mentioned – but not shown on a map or otherwise identifiable.)  Suggest: Delete all mention of these unmapped areas of | EMPSi (KW): Alternative D focuses management of special areas to achieve outcomes that are different from other areas. Alternatives B and C would achieve the same outcomes in all areas. |



BLM_0111348

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | concern until the Implementation stage/writing. Or on site by site management – during regular business later on. | |
| 178. | 066 | D | Holsinger | The statement "… and to support big game habitat, with naturalness and <u>sensitive species habitat</u> as secondary outcomes." The 6840 manual would suggest that not managing sensitive species as a primary outcome/objective is against BLM policy. As this is worded sage-grouse and possibly Canada Lynx could be managed for lesser outcomes. I would suggest the following "… and to support big game species habitat and naturalness as secondary outcomes." | EMPSi (KW): Changed to read, "On the remaining areas, manage vegetation structure to emphasize resource production, fuels reduction, and to support sensitive species habitat, with naturalness and big game species habitat as secondary outcomes." |
| 179. | 066 | D | Rogers | Objective: should this state "lands identified for wilderness charateristics protection" or should this state "land identified with wilderness charateristics"?? Also, area with pristine and ancient vegetation. I am really not comfortable with this since we really can't map it and I know we are told this is a very small acreage in comparison to the F.O. but until a map can be made we really have no clue where they are or how much they make up of the entire field office or how manageable they are. | EMPSi (KW): Wilderness characteristics terminology is correct. BLM Management Team had lengthy discussion about this during preferred alternative development. It was decided that, although these areas are not currently mapped, we will respond to the areas during field work for site-specific projects. When these areas are found, projects would be modified to protect the areas. The only way to map the areas would be to do a 100% inventory of the field office which is not possible given the timing of the RMP schedule.<br><br>Other resources have restrictions that are not mapped, such as raptors, as areas will change over the course of the RMP. However these resources still warrant protection and the restrictions would be included, or excepted, based on field inventories. |
| 180. | 066 | D | M. Siders | Wildlife Objective for this alternative is to preserve and promote species conservation and ecosystem integrity and values. SSS Objective is to maintain, restore or enhance SSS populations and associated habitats.  This alternative does not have a big game emphasis.  Suggested change in wording: "On the remaining areas, manage vegetation structure to emphasize resource production, fuels reduction, and to | EMPSi (KW): Changed to read, "On the remaining areas, manage vegetation structure to emphasize resource production, fuels reduction, and to support sensitive species habitat, with naturalness and big game species habitat as secondary outcomes." |



BLM_0111349

**BLM – U**NCOMPAHGRE **F**IELD **O**FFICE, **C**OLORADO
**R**ESOURCE **M**ANAGEMENT **P**LAN **R**EVISION AND **E**NVIRONMENTAL **I**MPACT **S**TATEMENT

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | support wildlife and sensitive species habitat, with naturalness as secondary outcomes." | |
| 181. | 066 | D | Steve Weist (RACSG) | Maybe I have been reviewing this to long, but this appears to say the same thing in different ways. I would combine this objective to say "**Manage vegetation structure for naturalness, and age distribution across landscape to support species habitat, and resource production, with fuels reduction as a secondary outcome."** | EMPSi (KW): Alternative D focuses management of special areas to achieve outcomes that are different from other areas. Alternatives B and C would achieve the same outcomes in all areas. Changed second paragraph to read, "On the remaining areas, manage vegetation structure to emphasize resource production, fuels reduction, and to support sensitive species habitat, with naturalness and big game habitat as secondary outcomes." |
| 182. | 067 | B & D | M. Siders | Suggested wording: " … to meet Upland objective." | EMPSi (KW): Change made. |
| 183. | 068 | B and D | L. Armstrong[i] | After "mosaic objectives", insert "specified in the Fire Management Plan" | EMPSi (JW): change made |
| 184. | 068 | All | Rogers | Needs to state mosaic objectives are the fire mosaic structure otherwise people will wonder where these obj. are housed. Like in the Fire Plan. | EMPSi (KW): Change made. |
| 185. | 068 | B, C & D | M. Siders | Redundant with Line 134. Suggest keep line 134 Alt A as is and point Alt B-D to this action. | EMPSi (KW): Row 168, B and D changed to "Make all vegetation treatments consistent with the vegetation mosaic objectives specified in the Fire Management Plan and use them to help with the development of productive and diverse vegetation communities." |
| 186. | 068 | BC | Clements | Suggest moving from B "maximize habitat conditions on winter range to support native ungulate species populations" to Alt C. I think that is more consistent with the objectives | EMPSi (KW): Change made. |
| 187. | 068 | D | Clements | Change sentence to "use vegetation treatments to help with the development of productive and diverse vegetation communities" | EMPSi (KW): Change made. |
| 188. | 069-071 | All | Steve Weist (RACSG) | You cannot manage what you cannot define. Climate change cannot be specifically identified, therefore it cannot be managed. This whole section should be removed. | BLM (BK): We have added a definition of climate change in the glossary. Without assigning blame or cause (human or natural), it appears there is a continuing change in climate.  Maybe it will continue for 20+ years and maybe it won't.  We have not assigned specific management, but rather, the plan would allow BLM to take action such as aiding native local plants move up or down in response to |



BLM_0111350

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | climate change.<br><br>This definition from the EPA has been added to the glossary: *(http://www.epa.gov/climatechange/glossary.html#C)*: Climate change refers to any significant change in measures of climate (such as temperature, precipitation, or wind) lasting for an extended period (decades or longer). Climate change may result from:<br>• natural factors, such as changes in the sun's intensity or slow changes in the Earth's orbit around the sun;<br>• natural processes within the climate system (e.g. changes in ocean circulation);<br>• human activities that change the atmosphere's composition (e.g. through burning fossil fuels) and the land surface (e.g. deforestation, reforestation, urbanization, desertification, etc.) |
| 189. | 070 | B-D | Stindt | Please replace "according to current climate change science" with "according to current climate change science that is specific to the planning area and has been peer reviewed".<br><br>This is per the Land Use Planning Handbook, Appendix F. page 9 | BLM (BK): We have added a definition of climate change in the glossary. Without assigning blame or cause (human or natural), it appears there is a continuing change in climate.  Maybe it will continue for 20+ years and maybe it won't.  We have not assigned specific management, but rather, the plan would allow BLM to take action such as aiding native local plants move up or down in response to climate change.<br><br>This definition from the EPA has been added to the glossary: *(http://www.epa.gov/climatechange/glossary.html#C)*: Climate change refers to any significant change in measures of climate (such as temperature, precipitation, or wind) lasting for an extended period (decades or longer). Climate change may result from:<br>• natural factors, such as changes in the sun's |



BLM_0111351

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | intensity or slow changes in the Earth's orbit around the sun; <br>• natural processes within the climate system (e.g. changes in ocean circulation); <br>• human activities that change the atmosphere's composition (e.g. through burning fossil fuels) and the land surface (e.g. deforestation, reforestation, urbanization, desertification, etc.) |
| 190. | 070 & 071 | All | Holsinger | Both lines are repeats of lines 14&15 and are identical would suggest eliminating one or the other to reduce redundancy. | EMPSi (KW): Yes, deleted from here. |
| 191. | 070, 071 | | Clements | Aren't these moved to the climate change section? | EMPSi (KW): Yes, deleted from here. |
| 192. | 070-071 | B-D | Sondergard | Aren't these already covered in the climate change section? | EMPSi (KW): Yes, deleted from here. |
| 193. | 072 | All | M. Siders | Since this objective includes biological cores, move lines 127-132 to here. | EMPSi (KW): Added reference to wildlife – terrestrial section for biological core areas. |
| 194. | 073 | All | Rogers | Here we are again with pristine and ancient since these can't be mapped we really can't place mgt obj. on them that may not be attainable in all cases. Nor do we know the extent of them. These make more since to be in the mgt objective for DENCA or the GGNCA. Which now make up significant amounts of acreage in the F.O. | EMPSi (KW): BLM Management Team had lengthy discussion about this during preferred alternative development. it was decided that, although these areas are not currently mapped, we will respond to the areas during field work for site-specific projects. When these areas are found, projects would be modified to protect the areas. The only way to map the areas would be to do an inventory of the field office which is not possible given the timing of the RMP schedule.<br><br>Other resources have restrictions that are not mapped, such as raptors, as areas will change over the course of the RMP. However these resources still warrant protection and the restrictions would be included, or excepted, based on field inventories. |
| 195. | 073 | D | Joan May (CA) | Same as B the unique quality of these resources warrant more binding protection. | EMPSi (BLM): BLM team feels that ROWs could be properly sited or modified in order to protect these areas and that ROW avoidance is sufficient. |
| 196. | 074 | All | Rogers | The appendix"B" SSR16 does not allow for spring developments. I would like to see the exception put in | EMPSi (KW): SSR would require best siting of these developments; it would not preclude them. |



BLM_0111352

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | place for this. | |
| 197. | 074 | D | T. Stranathan | Is it also possible that these are included in biological core areas? | EMPSi (KW): It is possible that some but not all are in biological core areas but until field inventories are done, we won't know. |
| 198. | 074 | D | Joan May (CA) | Having D be the same as B provides the same range of alternatives but provides a more appropriate level of protection. | EMPSi (KW): BLM team feels that activities could be properly sited or modified in order to protect these areas and that CSU/SSR is sufficient. |
| | | | | **Vegetation – Riparian** | |
| 199. | 075 | | Clements | What happened to the pristine, rare riparian vegetation? Could we move actions and objective 72-74 into Vegetation-General Section to then encompass rare riparian vegetation? | EMPSi (KW): Moved rows 72-74 under Vegetation – General. |
| 200. | 076 | D | Steve Weist (RACSG) | Replace same as Alt B with **"Manage naturally occurring riparian and wetland areas to maintain proper functioning condition."** | EMPSi (KW): As written, objective does not commit BLM to improve but it is part of the desired outcome to do more than maintain PFC. Part of maintaining riparian conditions necessitates maintaining hydrologic conditions. |
| 201. | 077 | B | B. Krickbaum | Change the first 4 rows to read: "Manage naturally occurring riparian and wetland areas, seeps, and springs, as well as a 100 foot buffer from their edge, as ROW exclusion areas unless…" | EMPSi (KW): Change made. |
| 202. | 077 | BCD | Clements | Change ROW exclusion/avoidance area to singular instead of plural | EMPSi (KW): Left it plural as multiple areas are listed. |
| 203. | 077 | D | Burch | The buffer distance is greater (300 Ft.) in D when only (100 ft.) was analyzed in B, and no buffer in C. | EMPSi (KW): Preferred alternative does not fall between Alternatives B and C as it was developed after the other alternatives were developed. This allowed the preferred alternative to be outside of the range. |
| 204. | 077 | D | B. Krickbaum | Change the first 4 rows to read: "Manage naturally occurring riparian and wetland areas, seeps, and springs, as well as a 300 foot buffer from their edge, as ROW avoidance areas unless…" | EMPSi (KW): Change made. |
| 205. | 077 | | Ela (RACSG) | An inconsistency between row 77 and line 77 of Chapter 2 Alternatives. Staff language creates wide flexibility but lacks specificity on winter forage used. | EMPSi (KW): Unsure as to what this comment refers. Line 77 in the alternatives matrix talks about ROW restrictions for riparian areas, wetlands, seeps, and springs. |
| 206. | 078 | | Clements | Insert "invasive species control" after "research" | EMPSi (KW): Change made. |

Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011



BLM_0111353

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 207. | 078 | | Rogers | We need to leave open for permitted (by public) removal of Tamarisk, Russian olive and Siberian Elm. | EMPSi (KW): Added "invasive species control" after "research." |
| 208. | 078 | B | B. Krickbaum | Change "(500 foot buffer)" to "(with a 500 foot buffer)" Change "(100 foot buffer)" to "(with a 100 foot buffer)" | EMPSi (KW): Change made. |
| 209. | 078 | B&D | Holsinger | No wood collection would prohibit removal of tamarisk, Russian olive, and elm which could be cost effective means of achieving resource objectives. Unless in your mind this could be considered part of a revegetation effort?  Additionally, allowing plant product collection for commercial increase could translate into lower project cost over the long-term would we not want to promote those efforts? Suggest removal or rewording to clarify. | EMPSi (KW): Added "invasive species control" after "research" in Alternative D (research is not in Alternative B). |
| 210. | 078 | B, C, D | B. Krickbaum | After "collection" add "and "harvest":  will read "…wood products collection and harvest,…" | EMPSi (KW): Change made. |
| 211. | 078 | D | B. Krickbaum | Change "(100 foot buffer)" to "(with a 100 foot buffer)" | EMPSi (KW): Change made. |
| 212. | 078 | D | Joan May (CA) | Add to D  permitted recreational activity sponsors will be required to restore  any riparian impacts to pre-event or better conditions. | EMPSi (KW): Added: Require additional riparian stipulations for commercial special recreation permits and restrict use to designated routes in least impacting locations for organized group and event permits. |
| 213. | 078 | D | J. Jackson | Reword the portion "Restrict permitted recreation activities or events to designated routes in least impacting locations" to "Provide additional riparian stipulations for commercial special recreation permits and restrict use to designated routes in least impacting locations for organized group and event permits." | EMPSi (KW): Change made. |
| 214. | 079 | B | A. Schroeder (CA) | Replace "managed fire from natural ignition" with "wildland fire use." Rationale: Consistent use of wildland fire management terms from National WFM Glossary. There is no such term as "managed fire from natural ignition;" the new term for such fire management is "wildland fire use." | EMPSi (KW): Changed to "managed wildland fire" |



BLM_0111354

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)**

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | BK/Dan: What is current terminology? *Sent to B. Krickbaum/Dan 8/11/11* Dan's response (8/17/11): I would say it's a 'managed wildland fire'. Even our state office can't answer this question very well so let's just go with that. It's definitely not wildland fire use…that went out a couple years ago. | |
| 215. | 081 | B,D | Steve Weist (RACSG) | If Historic Land use and flow regime modifications have caused the wetlands and riparian areas to be impacted, wouldn't the Historic Preservation Act, prevent you from restoring these areas, because if you correct the historic land use and flow regime modifications that created the wetlands, wouldn't that destroy the wet lands? If not, why preserve other historic artifacts for areas? This row should be deleted. | EMPSi (KW): NHPA does not apply to these topics. This action would not destroy wetlands but rather repair them ("…enhance and restore wetland and riparian areas…"). |
| 216. | 082-093 | BCD | Joan May (CA) | Why are there no similar actions to the current plan contained in the revision alternatives? Corresponding actions in the alternatives would seem to be appropriate. | EMPSi (KW): Actions from old RMPs are specific to certain areas, and some are implementation level decisions (not Land Use Plan decisions). Other actions in the riparian section for Alternatives B-D address or allow these or similar actions to occur. . |
| 217. | 083 | | Clements | Use 300' for CSU to be consistent with water section | EMPSi (KW): Change made. |
| 218. | 083 | | Clements | Insert "and intermittent" after "perennial" (2 places) | BLM (BK 10/5/11): Replaced "perennial waters" with "perennial and intermittent waters and naturally occurring wetlands, springs and seeps". Changed "perennial streams" to "perennial and intermittent waters and streams". EMPSi (JW): Change made. The new action for Alternative D reads: **STIPULATION** NSO-11/SSR-16: *Naturally Occurring Riparian and Wetland Areas, Water Bodies, Springs, and Seeps.* Prohibit surface occupancy and surface disturbing activities within a minimum buffer distance of 300 horizontal feet from all perennial and intermittent waters and naturally occurring wetlands, springs and seeps. For perennial and intermittent waters and streams, the buffer will be measured from the ordinary high water mark |



BLM_0111355

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | (bankfull stage), whereas for wetland features, the buffer will be measured from the edge of the mapped extent. For unmapped wetlands, the vegetative boundary (from which the buffer originates) will be determined in the field. Where the riparian zone extends beyond 300 feet, the NSO would be extended to include the entire riparian zone. (Refer to Appendix B.) (Figures 2-38 and 2-50, Appendix A)<br><br>**STIPULATION** CSU-17: *Naturally Occurring Riparian and Wetland Areas, Water Bodies, Springs, and Seeps.* From 300 to 500 horizontal feet from the perennial and intermittent waters and naturally occurring wetlands, springs and seeps, controlled surface use restrictions will apply. Surface disturbing activities may require special engineering design, construction and implementation measures, including re-location of operations beyond 500 feet to protect water resources within the 300 foot NSO buffer. For perennial and intermittent waters and streams, the buffer will be measured from ordinary high water mark (bankfull stage), whereas for wetland features, the buffer will be measured from the edge of the mapped extent. For unmapped wetlands, the vegetative boundary (from which the buffer originates) will be determined in the field. (Refer to Appendix B.) (Figure 2-54, Appendix A) |
| 219. | 083 | B | A. Schroeder (CA) | I suggest changing the buffer distance from "500 feet, to "660" feet for this alternative.<br><br>Rationale: BOR has a mineral development requirement of "no well to be drilled within 660 feet of a river, channel, permanent stream, tributary, or marsh site. | EMPSi (KW): Change made. |
| 220. | 083 | D | Holsinger | Buffer distance is 300 feet NSO for water line 41 and 206 for fisheries can we make this a common distance? | EMPSi (KW): Change made (300 feet). |



BLM_0111356

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 221. | 083 | D | B. Krickbaum | This is an SSR.  Replace "and surface-disturbing activities" with "and apply SSR restrictions". | EMPSi (KW): Change made. |
| 222. | 083 | D | B. Krickbaum | Replace 325 with 300 (two times) | EMPSi (KW): Change made. |
| 223. | 083 | D | B. Krickbaum | After "STIPULATION", replace 325 with 300 (two times). Replace 656 with 500. | EMPSi (KW): Change made. |
| 224. | 083 | D | Rogers | SSR 16 make exception for spring developments | EMPSi (KW): SSR would require best siting of these developments; it would not preclude them. |
| 225. | 083 | D | Joan May (CA) | Should track with the State stipulation or be more restrictive | BLM (BK): We have changed the distance to 300 feet to be consistent with COGCC requirements. This is slightly different than the suggested BLM (State Office) draft stipulation, which is 325 feet. |
| 226. | 084-093 | BCD | Clements | Do BCD need rationale or explanation? Eg "no similar action, this is addressed by other actions." | EMPSi (KW): Change made. |
| 227. | 085 | D | Ela (RACSG) | Doesn't this mean that a rock quarry or gravel pit could exist without regulations. If so I don't see that D is viable. | BLM (BK): This comment refers to row 78 in the new alternatives matrix (Chapter 2). All actions have restrictions on mineral material disposal. Alternative C is the least restrictive, which limits mineral material disposal to the least impacting location. The other two alternatives close riparian areas to mineral material disposal.  If "C" were to be chosen, there would be regulations imposed. |
| | | | | **Vegetation – Weeds** | |
| 228. | 097 | A, B, and C. | B. Krickbaum | Delete "depending on surrounding environment (e.g., threatened and endangered species, surface water, shallow water table). | EMPSi (KW): Change made. |
| 229. | 097 | B and C | B. Krickbaum | Replace "plan" (in last paragraph), with "the strategy". | EMPSi (KW): Change made. |
| 230. | 098 | B and C | B. Krickbaum | Delete "including", and delete the bulleted list. | EMPSi (KW): Change made. |
| 231. | 098 | D | B. Krickbaum |  Replace action with: "Prioritize ACECs, WSAs, biological core areas, areas with pristine, ancient, or rare vegetation, Wild and Scenic River segments with a plant ORV, and high-use areas with recreational, livestock, or mineral developments and maintained routes for weed treatment." | EMPSi (KW): Change made. |
| 232. | 098 | D | M. Siders | Why not focusing on  "lands identified for wilderness characteristics protection"?  This was included in other | EMPSi (KW): Change made. |



BLM_0111357

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | lists of focus areas. | |
| 233. | 099 | D | Holsinger | Suggest clarifying all gravel pits administered by the BLM. | EMPSi (KW): RMP decisions only apply to lands administered by the BLM. |
| 234. | 100 | All | L. Armstrong[1] | Delete row:  this action is policy. | EMPSi (JW): change made |
| 235. | 100 | All | B. Sharrow[2] | Delete row:  this action is policy. | EMPSi (JW): change made |
| 236. | 101 | B and D | L. Armstrong[1] | Change action to: Require all seed used on BLM lands meet the Colorado Noxious Weed Seed requirements of prohibited and restricted seed. In addition, seed lots shall contain less than 250 seeds per pound of cheatgrass and/or Japanese brome (in combination).  Other species determined to be noxious or invasive may be added to this list. | EMPSi (JW): change made |
| 237. | 101 | B and D | B. Sharrow[2] | Change action to (Note: this is the same as Armstrong #10): Require all seed used on BLM lands meet the Colorado Noxious Weed Seed requirements of prohibited and restricted seed. In addition, seed lots shall contain less than 250 seeds per pound of cheatgrass and/or Japanese brome (in combination).  Other species determined to be noxious or invasive may be added to this list. | EMPSi (JW): change made |
| 238. | 101 | B | B. Krickbaum | Add "In addition", or "Also" before the second sentence.  So,  "In addition, seed lots shall…" | EMPSi (KW): Change made. |
| | | | | **Fish and Wildlife** | |
| | | | | **Wildlife – General** | |
| 239. | 102+ | Wildlife section | CDOW | General comment- CDOW believes stipulations listed in the wildlife section are misplaced, and are probably best located in Appendix B Restrictions to fluid minerals leasing and other surface disturbing activities, and then discussed in Chapter 4 once the impact analysis has been complete and the stipulations are used to show impact minimization. | EMPSi (KW): Stipulations are summarized in Chapter 2 and presented in more detail in Appendix B. They are presented in Chapter 2 to show how various restrictions will change across the alternatives. |
| 240. | 102+ | Wildlife section | CDOW | Sportsmen, hunter and anglers, fund conservation for both game and non game species through hunting and fish licenses revenue and through excise tax on hunting, angling and shooting sports equipment. The structure | EMPSi (KW): It is not the intention of the management in the alternatives to manage for one over the other. Reference to priority species and habitat has been removed from the alternatives. |



BLM_0111358

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | of the alternatives within the Wildlife section appears to hold wildlife conservation and species of economic importance at odds, that the choice is between the two.  Mountain Lions and bears are species of economic importance, along with mule deer, rocky mountain bighorn sheep, waterfowl and "upland game species" and Elk (which should be included as a priority species). CDOW doesn't believe that species conservation and wildlife game management are mutually exclusive. The habitats that support Colorado's game species are same habitats types that support species of greatest conservation need and the BLM sensitive species. | |
| 241. | 106 | C and D | B. Krickbaum | Replace "Pursue opportunities for" with "Allow". Thus, "Allow augmentation…" | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 242. | 106 | D | M. Siders | Should read "Pursue opportunities for augmentation and reintroduction to expand the current range of native aquatic and terrestrial species …" | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 243. | 106 | D | CDOW | "Pursue opportunities…or to expand population numbers to improve genetic viability of (**remove** *native* **Add** *aquatic)* and terrestrial species in coordination with the CDOW." | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 244. | 107 | | CDOW | Line 107 is the same action as 188 in special status species. Remove 107 and retain in 188. | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 245. | 107 | All | B. Krickbaum | Delete row – it is the same as row 188. | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 246. | 107 &188 | All | M. Siders | 107 and 188 are redundant.  Suggest deleting line 107 and retaining for line 188 in sensitive species section. | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 247. | 108 | All | B. Krickbaum | Delete row – it is the same as row 191. | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 248. | 108 | B | M. Siders | Should read "Surveys shall be conducted by qualified and BLM approved biologist(s) …" | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |



BLM_0111359

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 249. | 108 | D | Rogers | Does this classify LS producer as an operator? Does this mean LS operator will have to have a survey done before can even clean a pond? Inquiring minds want to know!! | EMPSi (KW): No; Lease Notices are for Oil and Gas operations and would not apply to livestock grazing operations. |
| 250. | 108 | D | Pfifer | Change "operators, the BLM, and the BLM AO" to "operators and the BLM" | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 251. | 108 & 191 | All | M. Siders | 191 and 108 are redundant with LN-2 in both actions. Suggest deleting line 108 and retaining for line 191 in the Sensitive Species section. See comment #42 above. | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| | | | | **Wildlife – Fish and Aquatic** | |
| 252. | 110 | D | CDOW | The CDOW provided extensive comments to the BLM regarding important aquatic reaches during the Wild and Scenic suitability process that are occupied or suitable for special status aquatic species (flannel mouth sucker, Bluehead sucker, Roundtail chub, razorback sucker and Colorado pike minnow, Colorado cutthroat trout).The CDOW would like to see these areas highlighted as priority areas and given a higher level of protection and management by designating these as an ACEC or biological core area. | BLM (BK): We deleted rows regarding "priority habitats".  We felt this is not needed, unless there is a habitat that is truly unique and warrants special attention.  We determined that we do not have such habitats in the planning area. |
| 253. | 111 | D | CDOW | Please identify the native species as follows: mottled sculpin, speckled dace, flannelmouth sucker, bluehead sucker, roundtail chub, razorback sucker and Colorado pikeminnow, bonytail chub, Colorado River cutthroat trout to avoid confusion and concern.<br><br>Again we identified those *cold water* reaches that are of conservation interest for the cutthroat during the W&S comments. Please refer to those comments.<br><br>Other cold water fishery reaches that have not be identified as a priority for Cutthroat trout reintroduction, are very valuable fisheries, and the CDOW does not feel that management of native aquatic species  is mutually exclusive of managing Coldwater sport fisheries. The CDOW requests that | BLM (BK): BLM deleted the row – we did not designate priority species.  Rather, they are taken care of via several other actions. |


BLM_0111360

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | the BLM make Alternative C a separate action. | |
| 254. | 113 | All | L. Armstrong[1] | Combine rows 113 and 114. New action will be the row shown at the end of this table (**item A**). | EMPSi (JW): change made. |
| 255. | 113 | D | M. Siders | Should read "Pursue opportunities to enhance, protect, or restore native aquatic species habitats, including structural and vegetation improvements commensurate with other resource objectives" | BLM (BK): Change made: BLM emphasis is to manage for native species habitats. |
| 256. | 113 | D | Joan May *(CA)* | Substitute "pursue opportunities" with "annually improve, enhance and restore at least 3 miles" | EMPSi (KW): BLM has decided not to assign a number in the preferred alternative. It would be dependent on funds, workload, staffing, and such. |
| 257. | 117 | D | Joan May *(CA)* | San Miguel County appreciates BLM's commitment to focus on fish habitat improvement in the Dolores and San Miguel Rivers. Fishing in these rivers provides an important economic contribution in the County. | EMPSi (KW): Thank you for your comment. |
| 258. | 119 | All | B. Krickbaum | Delete action. | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 259. | 120 | D | Rogers | How are we going to control irrigation rights, pre BLM rights, to muck around in a stream for irrigation water purposes. | EMPSi (KW): The BLM would not have authority over pre-BLM rights but this action speaks more to stream projects than irrigation. |
| 260. | 120 | D | Joan May *(CA)* | Why is the period protected in B for spring shifted from what was suggested to be necessary in the conservation alternative and not carried over into Alt D? Why is recreational mining not included in B? | EMPSi (KW): BLM felt the time-periods in Alternative D were the most important time periods and in order to meet the multiple use mandate we felt this was a reasonable accommodation. Added recreational mining to Alternative B. |
| 261. | 120, 148, 149, 169, 179, 205, 221, 224, 226, 231, 237, 239, 242, 248, 250, 253, 261 | D | L Reed | These are all timing limitations for various concerns ie fish, winter habitat, reproduction areas, wild turkeys, migratory birds , lynx, sage grouse, sage grouse leks, raptors, bald eagle. All of these actions refer to the same Figure 2-42, which includes almost the entire UFO. We need to see separate maps for each of these actions, so we can see the impacts of each specific action as opposed to being lumped all on one map showing practically the entire UFO under a TL restriction. Also note if these various timing limitations are all "stacked" on top of each other in certain areas, then timing limitations could exist from | BLM (BK): We will attempt to make a map distinguishing TLs so we can visualize the various dates restricted. |


BLM_0111361

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | 11/1 thru 10/16 – in other words, ROW holders and/or operators would only have from Oct 17 to Oct 31 to access, construct, or maintain their projects. How can this be considered multi use? | |
| | | | | **Wildlife – Terrestrial** | |
| 262. | 123 | | CDOW | Actions 124-126 need technical and conceptual revisions. The actions should be dependent upon each-other from a ecosystem point of view, in that the designation of priority habitats should be the same habitats that are of importance to the species that have been identified as priority species.<br><br>In other words, designate the priority habitat types based on the limiting factors for life cycle completion (winter, summer, breeding, ect) for the species that are designated as key priority species (for both game and non game species).<br><br>CDOW believes the language from "no action' alternative in 124 accomplishes the actions 124-126 and is much simpler to understand. | BLM (BK): Deleted rows 124 – 126.  124 Alt A moved to the old row 127.  Wildlife core are essentially the key habitats.  Other actions also deal with big game and game birds, and non-game species of special interest. |
| 263. | 123 | | CDOW | Critical habitat and crucial habitat needs a definition in the glossary. "critical" habitat in the glossary, but it is the ESA definition. These terms are used interchangeable throughout the document and they should not be.<br>We suggest the adoption of CDOW nomenclature when describing species habitat classification as much of the data used in mapping these habitats across the UFO is derived from CDOWs Natural Diversity Information Source (CNDIS). | BLM (BK): We think this is row 124.  Where "Critical" is used outside of the ESA reference, we changed to "crucial". |
| 264. | 123-126 | | CDOW | Colorado's wildlife is a public trust resource and gives all the citizens who view, hunt, fish and otherwise enjoy these natural resources.  The State of Colorado holds the principal responsibility for wildlife management, yet habitat loss is the primary cause for the decline of many wildlife species in Colorado. As highly desirable lands are altered or converted to other uses, wildlife | BLM (BK): We agree that CDOW is the agency responsible for management of populations, and BLMs responsibility is habitat for those populations. Not sure what the question is. |



BLM_0111362

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | habitat can become degraded, destroyed and fragmented. Habitat conversion and loss can also reduce opportunities for hunting, fishing, and wildlife observation. Wildlife conservation, use and enjoyment are part of Colorado's outdoor heritage, economic future and overall quality of life.

CDOW has a legislatively mandated mission to maintain healthy, diverse and abundant wildlife populations. The quality, quantity and conservation of wildlife habitat are essential to maintaining the state's diverse wildlife populations and wildlife-related uses. | |
| 265. | 124 | | A. Schroeder (CA) | This is another comment regarding consistency of terms. On this line several apparently synonymous terms are use with regard to non-T/E wildlife habitat (key/priority habitat, crucial habitat, and critical habitat). However, only the term "critical habitat" is defined in the glossary and that in relation to ESA species. I would suggest using the term "crucial habit" here and throughout the document for these types of habitat. At the very least, define all of the terms, as used. I will not identify other areas where these terms are used in a similar manner.

Rationale: Consistency of terms. The repeated use of different synonymous terms gets confusing. | BLM (BK): Where "Critical" is used outside of the ESA reference, we changed to "crucial". |
| 266. | 124 | D | Rogers | The only habitat type we are missing is mountain shrub. Lets just designate the entire F.O.!!  How about a reword stating where feasible and focused designate portions of the following key/priority habitats…..  Otherwise it sounds like we are designating the entire F.O. (are we?!!) | BLM (BK): Rows 124 – 126 are deleted. |
| 267. | 124 | D | CDOW | Designate the priority habitat types based on the limiting factors for life cycle completion (winter, summer, breeding, ect) for the species that are designated as key priority species (for both game and non game species). | BLM (BK): Rows 124, 125 are deleted. We deleted rows regarding "priority habitats".  We felt this is not needed, unless there is a habitat that is truly unique and warrants special attention.  We determined that we do not have such habitats in the planning area. |



BLM_0111363

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 272. | 125 Glossary-5 | B & D 13 | M. Siders | Add to Glossary:<br><br>**Carnivore:** Mammal of the order Carnivora. Mammal that derives its energy and nutrient requirements from a diet consisting mainly or exclusively of animal tissue, whether through predation or scavenging. Examples would include mountain lion, black bear, grey fox, weasels, otter. Distinguished by having powerful jaws and teeth adapted for stabbing, tearing, and eating of flesh. | BLM (BK). We deleted this row, and "Carnivore" no longer appears in the RMP. "Carnivore" will not be added to the glossary. |
| 273. | 126 | all | CDOW | It is unclear what "upland game species" would include in this context. The CDOW interprets that to mean all non aquatic wildlife that are legally hunted or trapped. In Colorado, we separate it into 4 categories: big game, small game, upland birds, and furbearers. Please clarify so that we can focus our comments. | BLM (BK): Row 126 is deleted. We did not designate priority species. Rather, they are taken care of via several other actions. |
| 274. | 126 | D | Rogers | I know Desert Bighorn fall under sensitive but should they not go here also? Since they are also priority and key species? | BLM (BK): Row 126 is deleted. |
| 275. | 126 | D | CDOW | CDOW believes that the population level objectives for elk may not be achievable without designating them as a priority BLM species and working cooperatively to improve, sustain, and manage habitat conditions. With the expanding ex-urban development, recreation, and industrial use, the emphasis on public land habitat must rise to the challenge to support Colorado's wildlife resources. | BLM (BK): Row 126 is deleted. We did not designate priority species. Rather, they are taken care of via several other actions. |
| 276. | 127 | All | B. Krickbaum | We need maps showing each Bio Core Area and their zones. | EMPSi: Added reference to maps. |
| 277. | 127 | B | M. Siders | Include Sims Mesa Biological Core in this alternative (Fig 2-1 already has included) | BLM (BK): Sims Mesa Biological Core added to B and D. Maps show this area; maps are correct. |
| 278. | 127 | B & C | M. Siders | Under these alternatives, Burn Canyon is the larger size (Burn Canyon Zones 1, 2, 3 [pink below] plus Naturita Canyon [orange]) and Naturita Canyon should not be listed under this alternative. If it would make it more clear across alternatives, we could change "Burn Canyon" to "Naturita Canyon" with 4 | BLM (BK): Called both, combined, "Naturita Canyon". It has 4 zones. Zone 1 is the former "Naturita 1"; Former "Burn canyon 2 and 3" will become "Naturita 2 and 3"; Former "Burn Canyon 1" will become "Naturita 4". |



BLM_0111365

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | zones.<br><br>![map] | |
| 279. | 127 | B and D | B. Krickbaum | Add Sims Mesa (map is correct) | BLM (BK): Added. |
| 280. | 127 | B, C, and D | J. Jackson | Probably need 8 ½ X11 maps identifying where the zones are located so reviewers can identify where following actions are located. | EMPSi (KW): Reference to zones will be removed for the Draft RMP so that the size of the area changes and is not dependent upon zones. |
| 281. | 127 | B,C,D | Burch | I cannot adequately comment on this action since there is no reference of what/where the "Zones" are or their descriptions.<br>   Restrictions generally appear too extensive for public uses and not compatible with our Multiple Use policy. Suggest: any reference to "Zones" be deleted or otherwise identified/described. | EMPSi (KW): Reference to zones will be removed for the Draft RMP so that the size of the area changes and is not dependent upon zones. |
| 282. | 127 | b,d | B. Day (RACSG) | Sims Mesa is shown on maps (fig 2-1) as BCA, but not in table.   If it is not made an ACEC, it should be strongly considered as possible BCA, based on BLM and CDOW scientific opinion on possibility for long term sage-grouse habitat. It should be BCA in some alt- probably D, where it isn't an ACEC-to have wide enough range of alts. | BLM (BK): Sims Mesa is a Biological Core Area. The map is correct.  Sims Mesa added to Alternatives B and D. |
| 283. | 127 | b,d | B. Day (RACSG) | Lines 127 and 522 are really impossible to consider separately, because, while they may each have a wide enough range of alts, some areas really need protection as either BCA or ACEC. Decisions on what eventually goes into Alt D obviously have to look at including some areas as BCAs if they're not included as ACECs | BLM (BK): ACECs and Biological Core Areas (BCA) do not necessarily have the same purposes, values, or management goals.  All ACECs were considered for inclusion as Biological Cores.  Some did not meet the purpose of BCA. |



BLM_0111366

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | BLM did evaluate each ACEC and biological core area in the preferred alternative while reviewing with the District. |
| 284. | 127 | D | Huisjen | We need to ensure/understand that the following statement 'Designate the following areas as Biological Core areas (156,370 acres) (Figure 2-3, Appendix A) and manage to preserve as much as possible the continuity of habitats, vegetation communities, and native wildlife within' does not preclude natural processes from occurring in a managed fashion, ie fire; this acreage is 20% of the total UFO acreage.. | BLM (BK): We added "while following vegetation mosaic objectives". "Designate the following areas as Biological Core areas (156,370 acres) (Figure 2- X, Appendix A) and manage to preserve as much as possible the continuity of habitats, vegetation communities, and native wildlife within, while following vegetation mosaic objectives:" |
| 285. | 127 | D | Rogers | I don't remember looking at Dry Creek Basin as such a big CORE area I thought we had decided on the smaller portion here. As for Roubideau/Potter/Monitor I thought we were going to the lowest canyon rim??? Need clarification here!! | BLM (BK): Per Missy Siders, the Dry Creek core area shown in Alt D is correct, and is the polygon agreed to by the group. Also per Missy, the Roubideau core area shown in Alt D is that agreed to by the group, and that stopping at the lower rim would loose some of the value of the core area. |
| 286. | 127 | D | M. Siders | Include Sims Mesa Biological Core in this alternative (Fig 2-3 already has included) | BLM (BK): Added. |
| 287. | 127 | D | Joan May (CA) | We support the concept of core areas. Include San Miguel segments 4 and 6 in Alt D | BLM (BK): Excluded because they are so broken up with private land and infrastructure. Is is difficult to have these areas meet the goals of Cores. We did keep zone 7 because it is an important travel corridor. |
| 288. | 127 | D | Steve Weist (RACSG) | There is no definition for Biological core area in the glossary. There should be one so everyone (public included) knows how this term is being used. Also, what is the biological core being protected within Terror creek? This creek is dry for the majority of the year, and there is a linear construction zone (powerline) that passes through this area. | EMPSi (KW): Biological core area added to glossary. This is an important wildlife travel corridor from the Forest Service down to the N. Fork of the Gunnison. Even with powerlines, wildlife use this area. Also, it is important habitat for greenback cutthroat trout. The creek is not dry the majority of the year. |
| 289. | 127 | D | S. Bear (RACSG) | Terror Creek – Remove Terror Creek from having a Biological Core area designation. In stakeholder group meetings, it was noted that this creek segment has a 230kV high voltage transmission line crossing though the area from north to south for approximately 2.5 | BLM (BK): See comment above. Also, a biological core area does not preclude underground coal mining. |



BLM_0111367

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | miles. Maintaining both the access roads and t-line ROW for vehicle access is critical. Also, to provide for the protection and uninterrupted operation of the electrical system, vegetation within the power line ROW (100'+ width, 30+ acres) is cleared as needed, and danger trees outside the ROW may require trimming or removal on a case by case basis. Western Area Power Administration operates and maintains this line and can be contacted for further information. Due to maintenance & clearing requirements on the 30+ acres of t-line ROW (plus additional access road ROW), it is inappropriate and unmanageable to designate this area as a biological core area.

It was also evident in stakeholder group meetings that this area is beneficial to the larger community of Delta County as a result of the potential coal resources that exist in the area, and management for potential coal development should be continued . | |
| 290. | 127-132 | | CDOW | CDOW overall is encouraged by the UFO efforts to designate biological core areas. We believe that this concept is a progressive approach to conserve diverse habitats and linkage corridors across the landscape. Emphasizing biological resources as the intended purpose of a given area will help to establish, improve, and maintain diverse and proper function ecosystems and ensure the viability of essential ecosystem services to achieve clean air, clean water, and healthy land. Healthy diverse functioning habitats are directly correlated to wildlife diversity, population persistence and resilience. Connectivity that allows for seasonal migrations for species and maintains dispersal corridors for emigration and immigration of individuals are paramount to landscape level wildlife conservation. While we recognize that the blm has a multiple use mandate wildlife emphasis areas are typically nonexistent or narrowly focused on one species through ACEC designation. Biological core area | EMPSi (KW): BLM has reviewed these alternatives and believes that CSU and ROW avoidance for these areas will best meet BLM's multiple-use mandate. Under Alternative D, the BLM is proposing to manage biological core areas to fully meet or exceed land health standards, as suggested. Land health monitoring is implementation and will be considered after the ROD is signed.

Travel Restriction: Motorized and mechanized is restricted from December 1 – April 30 (old line 443)
Route Density: This will be deferred but considered during travel management planning for each of the travel management areas (identified in the travel management section). |



BLM_0111368

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | concept affords and opportunity to elevate the biological resources through protection and conservation measures that emphasize the biological resource over other uses. CDOW had reviewed the proposed stipulations, allowable uses, management prescriptions and prohibited activities within the designated area. CDOW recommends the following actions should be incorporated in the RMP for the biological core areas to ensure biological resources are emphasized over other uses and that specific protections and insurances are in place to ensure that these areas remain functional in the future:<br>• NSO<br>• ROW Exclusion Zone<br>• Manage and monitoring biological core areas to ensure that "Fully Meets" or "Exceeds" CO Public Land Health Standards. We suggest at a minimum these areas be monitored every 3-4 years<br>• Implement a seasonal timing restrictions for motorized from Dec1-April 15 wintering wildlife<br>• Designate and implement road densities cap at 0.5[1] mile of road /sq mile<br>[1]There is a large body of evidence documenting the effects of roads on habitat quality for a wide range of wildlife species (Foreman 2003, Hebblewhite 2008, Sawyer 2006 and 2009). The response to roads for individual species varies (Foreman 2003, Wilbert et al. 1998). In many cases responses have been documented as displacement distances or avoidance buffers for individual species (see Table 1, taken from Hebblewhite 2008,). When the average documented displacement distance or avoidance buffer for a given species exceeds the distance to the nearest road across the available habitats within a given geographic area, the habitat quality for that species has decreased significantly within that geographic area. According to a recent comprehensive literature review of ungulate response to road and well development, | |



Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011

BLM_0111369

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | significant impacts to ungulate populations begin to manifest themselves when road densities reach 0.5 - 1.0 mile of road/sq. mile (Table 6, p. 88, Hebblewhite 2008). A similar road density threshold has been implicated for maintaining sustainable populations of large carnivores and bears (Van Dyke et al. 1986, Mladenoff et al. 1995, and Clevenger et al. 1997). | |
| 291. | 128 | B | M. Siders | Include Sims Mesa Biological Core in this alternative | BLM (BK): Added |
| 292. | 128 and 130 | all | B. Krickbaum | The list of areas is the same for rows 128 and 130. Combine the rows—the row exclusion and NSO Stipulation will appear in the same row. | BLM (BK): BLM combined rows 128 and 129, and combined 130 and 131. This made more sense upon further review. |
| 293. | 128-129 | D | Joan May (CA) | We would like see these rows combined with some of the core areas identified for ROW exclusion, particularly, sections 1-7 of the San Miguel Canyon and others with roadless or wilderness character, carried into alt D. | BLM (BK): 128 and 129 have been combined.<br><br>EMPSi (KW): BLM has reviewed ROW exclusion but believes that managing San Miguel canyon as ROW exclusion is not reasonable given the existing ROW authorizations and the limitations the canyon provides should new ROWs be necessary. |
| 294. | 129 | B-D | L Reed | Biological Core Areas: Why is alt D almost 5 times more acres/restrictive than alt B? How do you get from B=35,250 "preservation" C= 69,170 "development" to D=156,370 "preferred"<br><br>Also there is a note that the acres don't match the GIS – how will Lands and Minerals know what the final acreage becomes? If the acreage does change by very much, please let us know. | EMPSi (KW)/BLM (BK): It may appear Alt D is more restrictive than Alt B, but that is only because Alt B has more acres designated as ROW exclusion (row 128); therefore Alt B is actually more restrictive than Alt D. Rows 128 and 129 have been combined into one row to clarify this. |
| 295. | 129 | D | M. Siders | Reply to yellow/red note: Make sure that Sims mesa is part of the calculation. ROW avoidance areas should include the following:<br><br>• Adobe Zones 1, 3, and 4 (20,840 acres);<br>• Dry Creek Zones 1-3 (10,800 acres);<br>• Jumbo Mountain/ McDonald Creek Zones 1-4 (17,250 acres);<br>• La Sal Zones 1-3 (22,370 acres);<br>• Monitor/Potter/Roubideau Zones 1-11 (27,320 acres); | BLM (BK): Sims Mesa added to rewritten bio section. |


BLM_0111370

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | • Naturita Canyon (1,510 acres) (part of the former Burn Canyon unit); <br> • Ridgway Zones 1 and 2 (9,070 acres); <br> • San Miguel Zones 1, 2, 3, 5, and 7 (17,840 acres); <br> • Sims Mesa (XX acres); <br> • Spring Canyon (3,380 acres); <br> • Tabeguache Zones 1, 2, 4, 5, 6, 9, and 10 (23,760 acres); and <br><br> • Terror Creek (2,230 acres). | |
| 296. | 129 and 131 | all | B. Krickbaum | The list of areas is the same for rows 129 and 131. Combine the rows—the row avoidance and CSU Stipulation will appear in the same row. | BLM (BK): BLM combined rows 128 and 129, and combined 130 and 131. This made more sense upon further review. |
| 297. | 130 | B + E | Ela (RACSG) | Elimination of non-native Rainbow Trout is ok to enhance native species – however pragmatically is impossible. Best solution is to stock only natives throughout UED waters by CDOW and USFW. | BLM (BK): We have removed reference to "priority species". Most rows show an emphasis to native species. While BLM can determine what habitat to emphasize in management, CDOW has the authority for the actual management of wildlife and fish, and they determine the fish species to stock. |
| 298. | 130 | B | M. Siders | Include Sims Mesa Biological Core in this alternative. | BLM (BK): Added |
| 299. | 130 | B & C | M. Siders | Shouldn't this be NSO/SSR (17)? | BLM (BK): We made this an NSO/SSR (added SSR). |
| 300. | 131 | B | David Sinton | Is the inclusion of the phrase "as ROW avoidance" a typo? This row deals with CSU and SSR. Row 129 deals with ROW avoidance for biological core areas. | EMPSi (KW): Change made. |
| 301. | 131 | D | Burch | The acreage here does not match or address what was analyzed under alternative B or C. The Alternatives mention portions, only, so how did D become all 156,370 acres? | EMPSi (KW): Because portions in Alt B and C were considered as NSO whereas under Alt D none were considered as NSO, instead all are CSU. We combined 130 and 131. |
| 302. | 131 | D | Clements | Insert "such as restoration of equal or greater area to offset new disturbance" after "mitigation" | BLM (BK): Not included: the district wanted reference to "off-site mitigation" deleted. Actions changed to reflect no mention of off-site mitigation. |
| 303. | 131 | D | M. Siders | See comment #45 above. <br> *Comment #45: Include Sims Mesa Biological Core in this alternative (Fig 2-1 already has included)* | BLM (BK): Sims Mesa added to rewritten bio section. |
| 304. | 131 | D | Steve Weist (RACSG) | What is the biological core being protected within Terror creek? This creek is dry for the majority of the year, and there is a linear construction zone | BLM (BK): This is an important wildlife travel corridor from the Forest Service down to the N. Fork of the Gunnison. Even with powerlines, |



Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011

BLM_0111371

**BLM – Uncompahgre Field Office, Colorado**
**Resource Management Plan Revision and Environmental Impact Statement**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | (powerline) that passes through this area. | wildlife use this area.  Also, it is important habitat for greenback cutthroat trout.  The creek is not dry majority of the year. |
| 305. | 131 | D | C. Sharp *(USFWS/CA)* | Biological Core Areas CSU-18/ SSR-17 <br><br> An SSR stipulation really means that the BLM will plan, where practical, to minimize impacts on the identified species, habitat, or resource of interest. Shouldn't this be the minimum requirement for all projects on public lands, particularly in sensitive areas, regardless of how an area is labeled? Without specifying, quantifying, or qualifying your SSR stipulation (performance-based), we are not convinced that this provides any conservation benefit. <br><br> We commend the BLM for applying seasonal restrictions to portions of the biological core areas. This will limit disturbance impacts on wildlife populations during crucial periods. However, a key component of the "core area" model/ concept is a landscape network of intact habitat reserves and movement corridors. Habitat fragmentation should be minimized by implementing the following: <br> • NSO/ NGD in portions of core areas <br> • ROW exclusion in portions of core areas, excepting existing corridors/ routes <br> • CSU/ SSR with performance-based disturbance thresholds to limit habitat fragmentation (i.e., no more than 5% disturbance in zone, OR no more than existing disturbance in core area, AND a route density threshold such as no more than .5 miles/ mi.²) <br> • No leasing; mineral withdrawal <br> • Improvements to increase habitat carrying capacity for wildlife species <br><br> As proposed, the CSU/ SSR stipulation essentially | BLM (BK): We are keeping this as an SSR.  When considering proposals, the SSR is designed to protect the values. <br><br> Also, cores will remain CSU, ROW avoidance. <br><br> Improvements are allowed, but are an implementation decision, which would be after the RMP is completed. |



BLM_0111372

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | means that some conservation will be attained if fluid mineral activities are involved; but that there are no assurances of conservation/ protection if BLM projects or other non-oil and gas activities are proposed/ implemented.<br><br>For imperiled species, we should err on the side of conservation by beginning with truly protected areas (e.g., by prohibiting surface disturbance and surface occupancy for all activities). Where appropriate, the BLM could then provide exceptions for certain activities that meet specific criteria, subject to Sec.7 as appropriate. | |
| 306. | 131 | Preferred | T. Stranathan | This appears to be the most restrictive. Would like to have "B" chosen. | EMPSi (KW): Portions in Alt B and C were considered as NSO whereas under Alt D none were considered as NSO, instead all are CSU. We combined rows 130 and 131. |
| 307. | 132 | all | Armstrong[1], Sharrow[2] | Delete row. Too many travel seasonal closures. Can revisit when we do area travel management plans. | BLM (BK): See the new Wildlife/SSS. Travel management deleted from here. Left in Travel Management, with changes. |
| 308. | 132 | B & D | M. Siders | Add Sims Mesa Biological Core area to this action. | BLM (BK): Moved to the travel section. |
| 309. | 132 | B-D | L Reed | Wintering wildlife: "prohibit motorized/mechanized travel on 71,760 acres from Dec 1 thru April 30" We need to include some exceptions to this action ie where there are existing ROWs, O&G wells etc. exceptions for emergency access, maintenance, monitoring of wells, etc is allowed.    Is there a map to show where these 71,760 acres are located since it sounds like it only includes certain zones of the bio core areas and also "other" areas?<br><br>Is this restriction (Line 132) really necessary?   Alt D also includes a big game crucial winter habitat timing limitation on 495,260 surface acres covering the same time period? | EMPSi (KW): Travel restrictions would not impact existing authorizations such as ROWs, O&G well access, emergency, grazing permitees, etc. Added "except for administrative purposes" for clarification in travel management section.<br><br>Seasonal restrictions are necessary to meet the goals of the biological core areas. |
| 310. | 132 | D | Burch | Prohibiting motorized/mechanized travel in the extensive areas identified (although I can't tell for sure since it refers to "Zones" which are not identified) | EMPSi (KW): Travel restrictions would not impact existing authorizations such as ROWs, O&G well access, emergency, grazing permitees, etc. |



Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011

BLM_0111373

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | must allow for administrative purposes – due to (at least) range and grazing management. The areas include grazing allotments that have permitted use during winter time. Motorized use is critical to administration of the permit for BLM as well as the operator. | Added "except for administrative purposes" for clarification in travel management section.

Seasonal restrictions are necessary to meet the goals of the biological core areas. |
| 311. | 132 | D | Rogers | Grazing valid existing right? Can take sheep camps in, and check water and livestock?  Does this need to be stated in exceptions or considered a valid existing right? | EMPSi (KW): Travel restrictions would not impact existing authorizations such as ROWs, O&G well access, emergency, grazing permitees, etc. Added "except for administrative purposes" for clarification. |
| 312. | 132 | D | Joan May (CA) | Include closure from B in Alt D for San Miguel Canyon | EMPSi (KW): Due to the highway, the BLM has determined that a closure of this area is not reasonable. |
| 313. | 132 | D | Pfifer | Current winter wildlife stip limits surface disturbing activities during these times and not access, so are administrative and permitted users still allowed access and we be exempted from this? | EMPSi (KW): Yes, administrative access permitted. Added "except for administrative purposes" for clarification. |
| 314. | 132 | D | J. Jackson | Missing areas in the matrix that are seasonally closed but map (Figure 2-20) is correct.  Such as the Sims Mesa area, additional acreage on the West End however not sure about the rest because don't have a map of the zones for each Biological Core.

Delete the following language:
"Add other areas as appropriate through future site-specific travel management analysis"

And add the following language (also in travel matrix):

The Field Manager may grant an exception if an environmental analysis indicates that the proposed action can be conditioned so as not to interfere with habitat function or compromise animal condition within the project vicinity. An exception may also be granted if the proponent, BLM and CDOW negotiate compensation that would satisfactorily offset anticipated impacts to wintering wildlife survival or habitat condition. An exception may also be granted | EMPSi (KW): Row deleted – covered by Comprehensive Travel management row 443.

EMPSi (JW): Edits to row 443 (per email from BK on 10/19/11)  include:
- Sims Mesa added to the seasonal travel restrictions in the travel management section.
- Did not delete "Add other areas as appropriate through future site-specific travel management analysis".
- Added the following paragraphs per BK:
The Field Manager may modify the size and time frames if Colorado Division of Wildlife monitoring information indicates that current animal use patterns are inconsistent with the areas or dates established for animal occupation, or under mild winter conditions for the last 45 days of the closure.  Severity of the winter will be determined on the basis of snow depth, snow crusting, daily mean temperatures, |



BLM_0111374

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)**

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
|  |  |  |  | for actions intended to enhance the long term utility for availability of suitable habitat.<br><br>The Field Manager may modify the size and time frames if Colorado Division of Wildlife monitoring information indicates that current animal use patterns are inconsistent with the areas or dates established for animal occupation, or under mild winter conditions for the last 30 days of the closure. Severity of the winter will be determined on the basis of snow depth, snow crusting, daily mean temperatures, and whether animals were concentrated on the winter range during the winter months. Modifications could be authorized if the proposed action could be conditioned so as not to interfere with critical habitat function or compromise animal condition. | and whether animals were concentrated on the winter range during the winter months. Modifications could be authorized if the proposed action could be conditioned so as not to interfere with critical habitat function or compromise animal condition. An exception may also be granted for actions intended to enhance the long term utility or availability of suitable habitat. |
| 315. | 133 Glossary - 31 | B, C, D 35 | M. Siders | Add to Glossary:<br><br>Upland Game Birds:  Non-waterfowl game birds usually hunted with pointing breed, flushing spaniels, and retrievers.  Upland game birds include grouse, chukar, quail, snipe, doves, pigeons, ptarmigan, wild turkey. | EMPSi (KW): Added to glossary. |
| 316. | 133 | D | M. Siders | Should read: "Enhance or restore terrestrial habitat to benefit primarily native, nongame species.  In cooperation with CDOW, enhance or restore terrestrial habitat to support native game species populations (deer, elk, upland game birds and waterfowl), emphasizing winter range and crucial habitat types." | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 317. | 133 | D | C. Sharp (USFWS/CA) | Semantics: This decision appears to favor rare or non-game species over other species. Is that the intent? Alternatives B and C were written disparately to represent a range of alternatives, but I'm not sure adopting Alternative B as written ("benefit primarily native, non-game…") (minus the target acreage) is advisable. Perhaps it can be rewritten as a management decision that strives to provide for the wildlife community as a whole, with emphasis on imperiled | BLM (BK): Left as it is.  The action includes non-game as well as game species. |



BLM_0111375

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | species…<br><br>Without quantifying, this action is tenuous, and is just a repeat of the stated goals for this resource. We recommend tying a reasonable target to habitat improvement actions. | |
| 318. | 134 | | CDOW | Because this area was recently occupied makes is a strong and likely candidate for Critical Habitat designation. Land use modification and protections combined with habitat work are likely precursors for implementing population restoration or augmentation for the CDOW. CDOW has a strong desire to recover this species range-wide, and believes that an ACEC designation is appropriate given the tasks of habitat improvement and conservation practices necessary for GUSG recovery on Sims Mesa. However, CDOW is not familiar with the criteria used to designate ACECs and is less interested in the title of this area (ACEC or a Biological Core Area) than we are with the stipulations, allowable uses, management prescriptions and prohibited activities within the designated area. Regardless of the title, CDOW recommends the following actions should be incorporated in the RMP for the Sims ACEC/biological core area:<br>• NSO;<br>• Mineral withdrawal; (without mineral withdraw the noise standards in outlined GUSG RCP and recommendations in Appendix B for GUSG will be difficult to achieve);<br>• ROW Exclusion Zone;<br>• Increase monitoring to ensure that the area "Fully Meets" or "Exceeds" CO Public Land Health Standards. Utilize the GUSG Range-wide Conservation Plan as framework to set habitat objectives;<br>• Implement a seasonal timing restrictions from Dec1-April 15 (more TL restrictions may be implemented | EMPSi (KW): This comment does not seem to correspond to row 134 in the alternatives matrix. BLM has determined that the Sims Mesa Area will be managed like the other biological core areas (CSU, ROW avoidance). The BLM does not feel a mineral withdrawal in this area is necessary. Land health monitoring is implementation and will be considered after the ROD is signed. Travel restrictions will be implemented as suggested. Road densities will be considered during travel management planning for the travel management area (see travel management section).<br><br>BLM (BK): The Sims Mesa allotment was acquired by CDOW against BLM regulations (CFR 4110.1 (1), (2), (3)). It was never offered to other persons interested in the allotment which does not follow CFR 4130.1-1 and 4130.1-2. The objectives for Grazing Administration 4100.0-2 states to promote to orderly use improvement and development of the public lands and to provide for the sustainability of the western livestock industry and communities that are dependent upon productive healthy public rangelands. This allotment is one of the largest allotments in the Colona area contributing to the western livestock industry. This is a traditional sheep allotment that is outside the area where there are bighorn sheep and domestic sheep issues.<br><br>Last bullet does not require land use plan decision. |



**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

**Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)**

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | once GUSG can be reestablished and seasonal use patterns, lekking, production, wintering, ect. can be determined);<br>• Designate and implement a road densities cap at 0.5 mile of road /sq mile<br>• Retire the Sims Mesa grazing allotment (note: this is an allotment formerly held by CDOW and is now incorporated into the JMA);<br>• Pursue opportunities such as the Land and water conservation fund to purchase private lands within the boundaries of the biological core area to reduced the threat of further habitat fragmentation and development. | |
| 319. | 134 | All | Burch | Redundant: This action already exists under vegetation (and possibly fuels). It is implied.<br>Suggest: Delete from this section. | BLM (BK): Agreed—row deleted.  Same as row 68. |
| 320. | 134 | All | Clements | Action same as ln 68-which has had suggested change in wording-is it necessary to be included twice? | BLM (BK): Agreed—row deleted.  Same as row 68. |
| 321. | 134 | all | Holsinger | Is a repeat of veg line 68 are identical would suggest eliminating one or the other to reduce redundancy. | BLM (BK): Agreed—row deleted.  Same as row 68. |
| 322. | 134 | B & D | M. Siders | Have we identified where the "vegetation mosaic objectives" come from?  i.e. Fire Plan. | EMPSi (KW): yes, added for clarification in line 68. |
| 323. | 135 | NEW Action before 135 or after 144, Alt D | CDOW | Cooperative habitat treatment projects that are funded in part by non BLM sources that are specifically designed to improve wildlife habitat will have an emphasis on wildlife use. | EMPSi (KW): BLM can do this independently of an RMP decision. |
| 324. | 145 | All | B. Krickbaum | Move to Fluid Minerals, unless there is a better location.  This doesn't seem to fit under wildlife. | EMPSi (KW): Change made. |
| 325. | 145 | D | CDOW | Fluid mineral development is incompatible the purpose and use of SWAs. We strongly support this preferred alternative and encourage the BLM to retain this throughout the ROD. | EMPSi (KW): Thank you for your comment.<br>(Also, this action has been moved to the "Fluid Mineral" section.) |
| 326. | 145 | D | C. Sharp (USFWS/CA) | Also apply stipulation/ decision to any future acquired/ designated national recreation areas, state parks, municipal parks, and wildlife areas. | BLM (BK): We deleted the list of state wildlife areas.  Now the NSO applies to all current and future State Parks, Wildlife Area and municipal parks. |
| 327. | 146 | All | B. Krickbaum | Move to the Coal section. | EMPSi (KW): Change made (included in Screen 3 |



BLM_0111377

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | | list) |
| 328. | 146 | B, C, D | A. Schroeder (CA) | Add Curecanti National Recreation Area. | EMPSi (KW): Change made; moved to Coal section. |
| 329. | 146 | D | C. Sharp (USFWS/CA) | Also apply decision to future acquired/ designated state parks, national recreation areas, state wildlife areas, and municipal parks | BLM (BK): We deleted the list of state wildlife areas. Now this applies to all current and future State Parks, Wildlife Area and municipal parks. Information moved to Coal section. |
| 330. | 147 | | B. Krickbaum | Replace "to" with "as". | BLM (BK): Change made. |
| 331. | 148 | All | M. Siders | We lost the timing limitations for desert bighorn sheep.  Was in SSS section, but seems to have been lost in the merging.  Can we resurrect? Had TL-x: Desert Bighorn Sheep Reproduction (calving/ fawning/ lambing) Areas, TL -x Bighorn Sheep Crucial Winter Range (Severe Winter Range and Winter Concentration Areas), CSU/SSR-x: Desert Bighorn Sheep Summer Range | EMPSi (KW): Section rewritten by BLM per discussion with District Office. Comment considered and incorporated as appropriate. |
| 332. | 148 | D | B. Krickbaum | Replace bullet list with:  • Elk, pronghorn antelope, mule deer, and moose: December 1 to April 30; and • Rocky Mountain and desert bighorn sheep: November 1 to April 30. | BLM (BK): Change made. |
| 333. | 148 | D | M. Siders | Should read: "Rocky mountain and Desert bighorn sheep: November 1 to April 30" | EMPSi (KW): Change made. |
| 334. | 148 | D | Pfifer | Change throughout the document "production" to "authorized" because TLs apply to ROWs and other programs as well.  Note that big game crucial winter range areas have doubled in acreage – from 267,480 to 495,350 – how can this be? Over half of the FO would be stipped out from 11 or 12/1 to 4/30, and more depending on the species, including all year | BLM (BK): The Stipulations appendix (App B), section B.1.4 (TL) has a statement the reads: "This stipulation does not apply to operation and basic maintenance activities …" The statement in the alternative matrix ("This stipulation does not apply to operation and maintenance of production factilities") is removed from all TLs, since it is stated globally in the appendix. |
| 335. | 148, 149 | D | Burch | With reference to Appendix A – map 2-50; The timing limitation appears to apply to 90% of the field office area! This amount of closure/limitation is unrealistic for the multiple use policy of public lands and our office limitations of people and funds for Enforcement. | BLM (BK): We discussed with Field Office and District management.  We will leave as it is.  Also, there is exception  criteria – see appendix B. |



BLM_0111378

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 336. | 148, 149, 167, 169, 259, B-079, B-083, B-085, B-101 | | M. Siders | Need to better define "This stipulation does not apply to operation and maintenance of production facilities." Need to refine to mean low/everyday level of disturbance (i.e. things done with a pickup truck), and activities that require larger machinery or longer periods of time (i.e. workover rigs) | EMPSi (KW): This is further discussed in Appendix B, Section B.1.4, Timing Limitations. Removed from individual stips in Chapter 2 and Appendix B. |
| 337. | 149 and 150 | D | Huijsen | Why does Line 150 allow for disturbance of elk calving areas from mechanized/motorized but line 149 prohibits any surface occupancy/surface disturbing activities in elk calving habitat?  This seems to be a discrepancy.  Also, there is some consensus that we have lots of elk (too many?!) so why are we protecting calving areas for elk anyway? | BLM (BK): BLM has very few acres of elk calving areas. Group didn't feel that travel on designated routes would be as disruptive as other surface-disturbing activities during calving period.  Given the few small pieces, it would also be difficult to manage. |
| 338. | 149 and Glossary-30 | All 06 | M. Siders | Add to glossary. **Surface disturbing activities**: human-caused disturbance resulting in direct and pronounced alteration, damage, removal, displacement, or mortality of vegetation, soil, or substrates; usually entail motorized or mechanized vehicles or tools; typically can also be described as disruptive activities (see following definition). Examples of typical surface disturbing activities include: <br> • Earth-moving and drilling <br> • Geophysical exploration <br> • Off-route motorized and mechanized travel <br> • Vegetation treatments including woodland thinning with chainsaws <br> • Pyrotechnics and explosives <br> • Construction of powerlines, pipelines, oil and gas wells, recreation sites, livestock improvement facilities, wildlife waters, or new roads. <br> • Examples of casual use and other activities that would not normally be considered surface disturbing activities: <br> • Equestrian use <br> • Proper livestock grazing <br> • Cross-country hiking | EMPSi (JW): per email from BK on 10/17/11, definitions for "surface disturbing activities" and "disruptive activities" have been added to the glossary. |



BLM_0111379

**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| | | | | • Hand-spraying weeds<br>• Minimal trimming of vegetation to maintain ROW's<br>• Motorized and mechanized travel on designated routes<br>• Maintenance of permitted areas under valid existing rights<br><br>**Disruptive activities:** human-caused disturbance that induces stress on a population, community, or ecosystem and potential loss of species fitness (survival, reproduction, and recruitment), usually within crucial habitats or other sensitive areas during specific time periods; may or may not entail surface disturbance<br>Examples of disruptive activities:<br>• Surface disturbing activity examples provided above<br>• Potentially all casual use examples provided above<br>• Commercial recreation activities, especially large groups<br>• Abnormally loud or sustained noise<br>• Road or ROW maintenance | |
| 339. | 150 | D | B. Sharrow[2] | Change to:<br>To protect elk calving areas, prohibit motorized and mechanized travel in closure areas and during times identified in the Dry Creek Travel Management Plan and EA (BLM 2009). | BLM (BK): Change not made. We determined there were not any elk calving areas identified in the Dry Creek TMP. |
| 340. | 150 | D | M. Siders | Should read: "No similar action; this is addressed by other actions (line 149)." | BLM (BK 10/5/11): Correct, Change made. A travel restriction in the Storm King area, if needed, can be done during travel management planning.  The action above this one (TL-11: *Big Game Reproduction Areas*) closes the area to surface occupancy and surface-disturbing activities 4/15 – 6/30, which is where the real protections come in to play. |
| 341. | 150 | D | CDOW | CDOW believes that a travel restriction in Elk calving areas is important in reducing neonate mortality, and thereby helping recruitment. Please add to the preferred or ensure that travel management planning avoids the areas with the dates specified in Appendix B. | BLM (BK): BLM has very few acres of elk calving areas. Group didn't feel that travel on designated routes would be as disruptive as other surface-disturbing activities during calving period.  Given the few small pieces, it would also be difficult to manage. |



**BLM – UNCOMPAHGRE FIELD OFFICE, COLORADO**
**RESOURCE MANAGEMENT PLAN REVISION AND ENVIRONMENTAL IMPACT STATEMENT**

## Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)

| Cmt # | Row #/ Page # | Alternative/ Line #/ Figure # | BLM Commentor | Comment | Response (To be completed by EMPSi) |
|---|---|---|---|---|---|
| 342. | 150 | D | Joan May (CA) | Why no seasonal closure for calving areas in Alt D? | BLM (BK): BLM has very few acres of elk calving areas. Group didn't feel that travel on designated routes would be as disruptive as other surface-disturbing activities during calving period.  Given the few small pieces, it would also be difficult to manage. |
| 343. | 151 | D | CDOW | While implementing the WAFWA guidelines and the Interagency MOU there should be the general focus of Desert and Rocky Mountain bighorn sheep management; actions need to be identified in the RMP that will maintain the existence of bighorn populations.  In accordance with the BLM/CDOW Desert Bighorn Management Plan (1989), bighorns will be managed as equal to all other landuses.  Furthermore, the WAFWA guidelines state that land management agencies manage domestic sheep or goat grazing to achieve effective separation, reduce risk of association, and avoid range overlap with wild sheep.  The WAFWA guidelines provide recommendations to be incorporated into RMP's, not merely referenced as BMP's.  It is also our understanding that BLM staff has made considerable changes to the draft preferred alternative, so we will be waiting to provide additional comments on that version when it is presented to the cooperating agencies. | BLM (BK): Change made – new action on sheep added (see livestock grazing – action deleted from the wildlife section). |
| 344. | 151 | D | C. Sharp (USFWS/CA) | Identify solutions now to mitigate bighorn sheep-livestock conflicts. Otherwise, this is "planning to plan". | BLM (BK): Change has been made.  A risk assessment has been completed. |
| 345. | 152 | All | CDOW | Although, desert bighorn sheep have been transplanted, a commitment to "ensure species viability in the region" remains. We encourage the BLM to adopt by reference the Colorado Desert Bighorn Sheep Management Plan (1989) and work with the CDOW to update and continue to implement the plan. | EMPSi (KW): BLM does not need a planning decision to work with CDOW to update and implement the Colorado Desert Bighorn Sheep Management Plan as long as actions in the plan are in accordance with the RMP. |
| 346. | 154 | B | B. Krickbaum | Replace "pursue options for" with "allow" | BLM (BK): Change made. |
| 347. | 155 | D | C. Sharp (USFWS/CA) | An SSR stipulation really means that the BLM will plan, where practical, to minimize impacts on the identified species, habitat, or resource of interest. Shouldn't this be the minimum requirement for all projects on public | BLM (BK): We are keeping this as an SSR.  When considering proposals, the SSR is designed to protect the values. |



Internal Draft Alternatives for Field Office, Cooperating Agency, and RAC Subgroup Review: June 23, 2011

BLM_0111381