

**Figure 4 - Roc Creek**

*Uncompahgre Resource Management Plan Revision and Environmental Impact Statement      June 2011
Chapter 2, Alternatives – Internal Draft for Field Office, Cooperating Agency, and RAC Subgroup Review*

BLM_0111642

## ROC CREEK

### CURRENT CONDITIONS: PRESENCE OR ABSENCE OF WILDERNESS CHARACTERISTICS

**Area Unique Identifier:**  Roc Creek
**Acreage:**  7,650

**(1)  Is the area of sufficient size?  (If the area meets one of the exceptions to the size criterion, check "Yes" and describe the exception in the space provided below):**

<p align="center">Yes ☒          No ☐</p>

**Description**

This unit is near, but not contiguous with, Sewemup Mesa WSA.

Unit is bounded as follows:

- on the east and northeast by private land and the Dolores River;
- on the north by private land, US Forest Service land, and Roc Creek Road;
- on the southwest, south and southeast by Montrose County Road Q13.

**(2)  Does the area appear to be natural?**

<p align="center">Yes ☒          No ☐          N/A ☐</p>

**Description**

Of the original 7,650 acres inventoried, 5,480 acres are natural in appearance.  The southeast part of the inventory unit in the upper Beehive Canyon/Carpenter Flats area contains many vehicle routes and linear disturbances remaining from mineral exploration.  That part of the unit is not natural in appearance to a casual observer.

Within the remaining natural-appearing part of the unit there is an old vehicle route that enters from the southwest boundary, off of Montrose County Road S8, and continues in a northeast direction.  The route shows signs of mechanical construction, but has been abandoned and unused for a number of years.  Trees and brush are growing in the former route.  Because it is neither used nor maintained, it does not meet the definition of "road" as defined for the purpose of this wilderness characteristics inventory.  It is still quite noticeable to an observer walking along its route, but it is substantially unnoticeable from almost any other vantage point, and does not detract from the naturalness of the unit as a whole.

The south and southwest boundary of the remaining (natural appearing) acres of the unit is defined by Montrose County Road Q13 and several road spurs that have be "cherry-stemmed" out of the unit.  While the lands inside the boundary appear to be natural, an observer has the feeling of being around several noticeable roads, especially when in the vicinity of the cherry-stems.

The main part of the unit is comprised primarily of steep terrain, draining toward the north into Roc Creek.  Vegetation is predominantly pinyon-juniper forest.

BLM_0111643

**(3)  Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for solitude?**

Yes ☒        No ☐        N/A ☐

**Description**

The unit is comprised primarily of rugged, steep topography and dense pinyon-juniper forest.  Both the topography and vegetation provide excellent screening for an enhanced sense of solitude.  It is also far from populated areas and receives very light recreational use.  The unit is more than 90 road-miles from Moab, Grand Junction and Montrose.  These factors combine to provide outstanding opportunities for solitude in the unit.

**(4)  Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for primitive and unconfined recreation?**

Yes ☒        No ☐        N/A ☐

**Description**

The unit is only accessible by foot or on horseback, and has no recreational facilities.

The forested ridges and slopes leading into deep and rocky canyons form a landscape that is outstandingly suited to primitive and unconfined recreational activities, especially for those seeking self-directed and challenging hiking, backpacking, or horseback riding.

**(5) Does the area have supplemental values (ecological, geological, or other features of scientific, educational, scenic, or historical value)?**

Yes ☒        No ☐        N/A ☐

**Description**

The unit has highly scenic views from the bluffs overlooking the deep drainages within the unit.

24          *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*          June 2011
*Chapter 2, Alternatives – Internal Draft for Field Office, Cooperating Agency, and RAC Subgroup Review*

BLM_0111644

## SUMMARY OF ANALYSIS*

**Area Unique Identifier:**  Roc Creek

**Results of analysis**

The original proposal from the Colorado Wilderness Network included Sewemup Mesa WSA and BLM lands in both Grand Junction and Uncompahgre field offices, as well as US Forest service lands in the Roc Creek vicinity.  This inventory focuses on BLM lands outside of existing WSAs and designated wilderness, all within the Uncompahgre Field Office planning area.

The proposal within the Uncompahgre Field Office, exclusive of WSA acres comes to 7,650 acres of BLM lands.  The adjacent US Forest Service lands were not considered because they are not administratively endorsed for wilderness protection.

250 acres on the west side of the remaining proposal were dropped because they were non-contiguous with the remainder of the unit.

An additional 2,170 acres around Beehive Canyon and the southern and eastern part of Carpenter Flats were dropped from consideration because they lack naturalness.  Numerous vehicle routes create a network of unnatural disturbances in those areas.  Montrose County Road R12 forms part of the boundary of the remaining Roc Creek wilderness characteristics unit.

The remaining unit is 5,480 acres in size.

1.  **Does the area meet any of the size requirements?**  **_X_** Yes       **___** No

2.  **Does the area appear to be natural?**       **_X_** Yes       **___** No        **___** N/A

3.  **Does the area offer outstanding opportunities for solitude or a primitive and unconfined type of recreation?**   **_X_** Yes     **___** No       **___** N/A

4.  **Does the area have supplemental values?**  **_X_** Yes       **___** No       **___** N/A

**Check one:**

**_X_**       The area, or a portion of the area, has wilderness characteristics and is identified as lands with wilderness characteristics.

**____**       The area does not have wilderness characteristics.

**Prepared by (team members):**

Edd Franz, BLM Outdoor Recreation Planner
Bruce Krickbaum, BLM Planner
Dean Stindt, BLM Range Management Specialist
Barbara Sharrow, BLM Uncompahgre Field Office Manager
Julie Jackson, BLM Outdoor Recreation Planner
Barney Buria, BLM Environmental Protection Specialist

June 2011        *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*        25
*Chapter 2, Alternatives – Internal Draft for Field Office, Cooperating Agency, and RAC Subgroup Review*

BLM_0111645

(Name, Title, Date)

**Reviewed by (District or Field Manager):**

**Name:** _____  **Title:** _____

**Date:** _____

*This form documents information that constitutes an inventory finding on wilderness characteristics. It does not represent a formal land use allocation or a final agency decision subject to administrative remedies under either 43 CFR parts 4 or 1610.5-3.

26    *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*    June 2011
*Chapter 2, Alternatives – Internal Draft for Field Office, Cooperating Agency, and RAC Subgroup Review*

BLM_0111646



**Figure 5 - Shavano Creek**

BLM_0111647

## SHAVANO CREEK

### CURRENT CONDITIONS: PRESENCE OR ABSENCE OF WILDERNESS CHARACTERISTICS

**Area Unique Identifier:** Shavano Creek
**Acreage:** 6,090

**(1) Is the area of sufficient size? (If the area meets one of the exceptions to the size criterion, check "Yes" and describe the exception in the space provided below):**

Yes ☒          No ☐

**Description**

This unit is just north of the congressionally designated Tabeguache Area. They are separated by Montrose County Road V24, and therefore are not adjacent.

The unit is bounded as follows:

- On the south by Montrose County Road V24;
- On the east by vegetative manipulations (chaining/roller-chopping), private land and US Forest Service land;
- On the north by vegetative manipulations (chaining/roller-chopping), private land, and US Forest Service land; and
- On the west by Montrose County Roads Z26 and U472, and associated roadside disturbances.

The inventory included lands in upper Campbell Creek drainage north and west of Road U475 up to Road U472 in West Campbell Creek. During field inspection it was noted that Road U475 was originally mechanically constructed (likely by bulldozer), and since it provides the only access for maintenance of a stock pond, it will continue to be mechanically maintained. In 2004 the Campbell Creek Fire burned through the area. Now trees burnt in that fire are starting to drop across the road and will be cleared using chainsaws in order to continue to maintain the stock pond. Because of this, U475 meets the definition of "road" for the purpose of the wilderness characteristics inventory, and therefore the lands in upper Campbell Creek were not included in this unit.

There is a range access route that enters the unit from the west side off of Montrose County Road Z26. It runs northeast, adjacent to Shavano Creek, and terminates about 2.5 miles in. The route was mechanically constructed (likely by bulldozer), but is no longer used by full-size vehicles. There is evidence of some ATV use, likely for range-management and/or hunting purposes. There is no sign of mechanical maintenance of this route, and it is becoming an ATV trail rather than a full-size vehicle route. Since this route does not meet the definition of a "road" for the purposes of this wilderness characteristics inventory, it was left in the unit rather than being cherry-stemmed out.

A two mile long vehicle route enters the unit from Montrose County Road V24 along the southern boundary of the unit. Both ends of the route terminate at Road V24. The route was originally mechanically constructed (likely by bulldozer) but for the most part has not been maintained in many years. There is a stock pond which is accessed from the western terminus of the route about

BLM_0111648

0.3 miles in.  The road is passable by full size vehicle to this point, and is maintained for access for pond maintenance.  Other than that section the route has severely slumped and eroded to the point that it is impassable, even to an ATV.  Therefore the only section that meets the wilderness characteristics definition of "road" is the western 0.3 miles.  That section is cherry-stemmed out of the unit.

Even though the remainder of this unit is 4,900 acres (100 acres shy of the 5,000 acre minimum guideline) it is very close (98%), and is of sufficient size to make practicable its management in an unimpaired condition.

**(2)  Does the area appear to be natural?**

Yes ☒          No ☐          N/A ☐

**Description**

Although the unit does contain the two vehicle routes described under Question 1, neither is substantially noticeable in the unit as a whole.  Where the ATV trail parallels Shavano Creek, it is clearly noticeable to an observer hiking in the drainage, but in the unit as a whole it is substantially unnoticeable.

The unit provides for important habitat continuity especially for seasonal wildlife migration.  The upper end of the unit is around 7,000 feet in elevation and connects with even higher elevation forest lands on the Uncompahgre Plateau, while the lower end of the unit drains into Tabeguache Creek, which in turn connects with the San Miguel and Dolores Rivers.

Most of the unit is covered in pinyon-juniper forest, with some ponderosa pine in the upper reaches and cottonwoods and willows in the riparian areas of Shavano Creek.  In 2004, the Campbell Creek wildfire burned through the upper reaches in the northeast portion of the unit.  There are many standing-dead trees that were burnt in the fire, with a robust understory of grasses, forbs and sagebrush.  Although it is obvious that a fire burned through that area, since wildfire is a natural phenomenon it is still natural in appearance.

**(3)  Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for solitude?**

Yes ☒          No ☐          N/A ☐

**Description**

The unit lies in a remote, lightly populated area of western Colorado, far from metropolitan areas.

The topography is moderately steep throughout much of the unit.  The exception being the upper reaches of the Campbell Canyon burn, which is gently undulating terrain.

Both the topography and rather dense pinyon-juniper forest provide ample screening for visitors to the area.  The exception to this again is the Campbell Canyon burn area in the northeast portion of the unit, where there is not much in the way of either.  Opportunities for solitude are outstanding throughout the unit, regardless of screening because visitation to the area is very light.  This is

BLM_0111649

partially due to the fact that road access along much of the boundary does not exist or goes through private property with locked gates.

Sights, sounds or evidence of other people are rare in this unit.

**(4)  Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for primitive and unconfined recreation?**

Yes ☒          No ☐          N/A ☐

**Description**

There does not appear to be much recreational use of this area at all.  The recreational use that does occur seems to be concentrated near the boundary roads.  With its proximity to the more dramatic landscape and more dependable water sources of the Tabeguache Area, this area is unlikely to become a recreational destination.

There are no developed recreational facilities in the unit.

Except for the one ATV trail, all access to this unit is by non-motorized/non-mechanized means.

There are abundant opportunities for primitive and unconfined recreation.  Opportunities for non-motorized/non-mechanized hunting in this unit are outstanding.

**(5)  Does the area have supplemental values (ecological, geological, or other features of scientific, educational, scenic, or historical value)?**

Yes ☒          No ☐          N/A ☐

**Description**

This area provides important habitat connectivity between the higher elevation forested lands on the Uncompahgre Plateau at the northeast end of the unit and the lower elevation lands to the southwest.

30          *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*          June 2011
*Chapter 2, Alternatives – Internal Draft for Field Office, Cooperating Agency, and RAC Subgroup Review*

BLM_0111650

## SUMMARY OF ANALYSIS*

**Area Unique Identifier:**  Shavano Creek

**Results of analysis**

This unit is just north of the congressionally designated Tabeguache Area.  They are separated by Montrose County Road V24, and therefore are not adjacent.

1,190 acres were excluded from the initial inventory area when it was found that Road U475 is a constructed and maintained road, and therefore formed a new boundary for the unit.  That left 4,900 acres that possess wilderness characteristics.

Even though the remainder of this unit is 100 acres shy of the 5,000 acre minimum guideline it is very close (98%), and is of sufficient size to make practicable its management in an unimpaired condition.

1.  **Does the area meet any of the size requirements?**   **X** Yes          ___ No

2.  **Does the area appear to be natural?**               **X** Yes          ___ No          ___ N/A

3.  **Does the area offer outstanding opportunities for solitude or a primitive and unconfined type of recreation?**   **X** Yes     ___ No          ___ N/A

4.  **Does the area have supplemental values?**   **X** Yes        ___ No           ___ N/A

**Check one:**

 **X**      **The area, or a portion of the area, has wilderness characteristics and is identified as lands with wilderness characteristics.**
___      **The area does not have wilderness characteristics.**

**Prepared by (team members):**

Edd Franz, BLM Outdoor Recreation Planner
Bruce Krickbaum, BLM Planner
Dean Stindt, BLM Range Management Specialist
Barbara Sharrow, BLM Uncompahgre Field Office Manager
Julie Jackson, BLM Outdoor Recreation Planner
Barney Buria, BLM Environmental Protection Specialist

**(Name, Title, Date)**
**Reviewed by (District or Field Manager):**

**Name:** _____   **Title:** _____

**Date:** _____

**\*This form documents information that constitutes an inventory finding on wilderness characteristics.  It does not represent a formal land use allocation or a final agency decision subject to administrative remedies under either 43 CFR parts 4 or 1610.5-3.**

BLM_0111651



**Figure 6 - Norwood Canyon**

*Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*      June 2011
*Chapter 2, Alternatives – Internal Draft for Field Office, Cooperating Agency, and RAC Subgroup Review*

BLM_0111652

# NORWOOD CANYON

## CURRENT CONDITIONS: PRESENCE OR ABSENCE OF WILDERNESS CHARACTERISTICS

**Area Unique Identifier:** Norwood Canyon
**Acreage:** 5,600

**(1) Is the area of sufficient size? (If the area meets one of the exceptions to the size criterion, check "Yes" and describe the exception in the space provided below):**

Yes ☐          No ☒

**Description**

The Colorado Wilderness Network proposal for the Norwood Canyon unit includes USFS lands. This wilderness characteristics inventory is limited to BLM lands within the RMP planning area. This constraint affects both the size and configuration (shape) of the unit.

Because at the approximate center of the BLM portion of the unit, the boundary constricts to a single point (see map below), this creates two separate, non-adjacent polygons, neither of which meets the minimum size requirement for BLM to continue analyzing them for wilderness characteristics. To meet size requirements an area must usually have 5,000 or more contiguous acres.

If the adjacent USFS lands that are included in the CWP were administratively endorsed by the USFS for wilderness protection, then we could have included those adjacent acres as part of the size analysis. Because those lands have no special status or recommendation from the USFS for wilderness protection, they cannot be included in the BLM analysis.

**(2) Does the area appear to be natural?**

Yes ☐          No ☐          N/A ☒

**Note: If "No" is checked, then the area does not have wilderness characteristics; check "NA" for the remaining questions below.**

**Description**

**(3) Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for solitude?**

Yes ☐          No ☐          N/A ☒

**Description**

**(4) Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for primitive and unconfined recreation?**

Yes ☐          No ☐          N/A ☒

BLM_0111653

Note:  If "No" is checked for both 3 and 4, then the area does not have wilderness characteristics; check "NA" for question 5.

**Description**

**(5)  Does the area have supplemental values (ecological, geological, or other features of scientific, educational, scenic, or historical value)?**

<div style="text-align:center">

Yes ☐        No ☐        N/A ☒

</div>

**Description**

34        *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*        June 2011
*Chapter 2, Alternatives – Internal Draft for Field Office, Cooperating Agency, and RAC Subgroup Review*

BLM_0111654

## SUMMARY OF ANALYSIS*

**Area Unique Identifier:**  Norwood Canyon

**Results of analysis**

1.  **Does the area meet any of the size requirements?** ____ Yes        **X**  No

2.  **Does the area appear to be natural?**        ____ Yes        ___ No        **X** N/A

3.  **Does the area offer outstanding opportunities for solitude or a primitive and unconfined type of recreation?**    ____Yes        ___ No        **X** N/A

4.  **Does the area have supplemental values?** ___ Yes        ___No        **X** N/A

**Check one:**
____  **The area, or a portion of the area, has wilderness characteristics and is identified as lands with wilderness characteristics.**
 **X**    **The area does not have wilderness characteristics.**


**Prepared by (team members):**

Edd Franz, BLM Outdoor Recreation Planner


**(Name, Title, Date)**

**Reviewed by (District or Field Manager):**

**Name:** _____   **Title:** _____

**Date:** _____

**\*This form documents information that constitutes an inventory finding on wilderness characteristics.  It does not represent a formal land use allocation or a final agency decision subject to administrative remedies under either 43 CFR parts 4 or 1610.5-3.**

BLM_0111655

## James Bode

| | |
|---|---|
| **From:** | Kate Wynant |
| **Sent:** | Monday, November 28, 2011 4:32 PM |
| **To:** | UFO AR |
| **Subject:** | FW: Chapter 2 Comment Response |

**Kate (Wynant) Krebs**
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite IA
Boulder, CO  80301
tel:  303-447-7160    fax:  866-625-0707
www.EMPSi.com    Twitter: EMPSInc    Facebook: EMPSi

*Bringing clarity to the complex ™*

*GSA Contract GS10F-0412S     HUBZone-certified*

Denver        Reno        San Francisco        Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

**From:** Barbara Hawke [mailto:barbara_hawke@tws.org]
**Sent:** Monday, November 28, 2011 9:33 AM
**To:** Krickbaum, John; Kate Wynant
**Cc:** Barbara_Sharrow@blm.gov; Edd_Franz@blm.gov
**Subject:** RE: Chapter 2 Comment Response

Bruce and all,
After reviewing the document we were provided Nov. 15 of major changes to Chapter 2, I believe an addition may be necessary to maintain a full range of appropriate alternatives regarding WSAs.

Although it's a little difficult to determine without seeing the revised content of the draft alternatives, I believe the alternatives should include the potential to manage WSAs or portions thereof as LWCs, even if they are released by Congressional action. The reason is that the content of legislation and Congressional intent cannot be predicted. It is possible that release legislation might not be based on a determination that the WSA no longer possesses wilderness characteristics, or does not merit management for those wilderness characteristics.

The notes you provided that released WSAs would revert to underlying ACECs and SRMAs, or GJFO actions in the case of Sewemup, is a good starting point. However, I think it should be added that, consistent with IM2011-154,  UFO shall take into serious consideration the Congressional action, as well as any changed circumstances; and then consider continued management of the area as an LWC in light of these factors; in addition to continued management of the area for any underlying ACECs or SRMAs. In addition, any wilderness characteristics should be considered in project-level decisions for the released area, and the area re-inventoried to assess such characteristics, pending the next land use plan revision.

My understanding is that some other FOs have included such an approach in their RMP revisions, including perhaps Jarbridge. If it would be helpful to see some examples, I'd be happy to see if those examples could be located and sent along to you.

**Barbara Hawke**
Dolores River Basin Wildlands Coordinator
**The Wilderness Society**| Montrose, Colorado

1

BLM_0111656

970.596.6697 (cell)
www.wilderness.org

Facebook: www.facebook.com/TheWildernessSociety
Twitter: twitter.com/Wilderness

 *We protect wilderness and inspire Americans to care for our wild places*

---

**From:** Krickbaum, John [mailto:bkrickba@blm.gov]
**Sent:** Thursday, November 10, 2011 6:06 PM
**To:** Angie Adams; Barbara Hawke; Bill Bottomly; billday@paonia.com; Jennifer Whitaker; john@reams-construction.com; Kate Wynant; Kauffman, Krag D; Krickbaum, John; Magee, Deborah M; pmueller@tnc.org; rich@richdurnanphoto.com; robbie.levalley@colostate.edu; sbear@dmea.com; Sharrow, Barbara L; silvers1@tds.net; steve.weist@oxbow.com; tkctew@yahoo.com; UFO Admin Record at EMPSi; wblack8709@msn.com
**Subject:** Chapter 2 Comment Response

Hello RAC Subgroup,

I have attached a file with all of your comments on RMP Chapter 2 and our responses to the comments (and comments of the Cooperating Agencies and BLM Staff).  Please review if you wish prior to the meeting next Tuesday.

Regards, Bruce

Bruce Krickbaum
Planner, Environmental Coordinator
BLM, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

BLM_0111657

DEC 1 6 2011

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado  81401

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

Kevin Wagner
Signature

KEVIN WAGNER
Print Name

872 HWY. 133
Address

PAONIA          Co.          81428
City             State        Zip Code

BLM_0111658

| | |
|---|---|
| **From:** | Krickbaum, John |
| **To:** | Angie Adams; Bill Bottomly; Broyles, Levi; daves@sanmiguelcounty.org; Jennifer Whitaker; joanm@sanmiguelcounty.org; joereagan741@yahoo.com; Kate Wynant; Krickbaum, John; mpelletier@gunnisoncounty.org; norwoodparker@centurytel.net; Reinkensmeyer, Dan; renzo.delpiccolo@state.co.us; Schroeder, Alan M; segfahlt@gmail.com; shansen@deltacounty.com; sharold@ci.olathe.co.us; Sharp, Charles; Sharrow, Barbara L; swhite@montrosecounty.net; townofpaonia@tds.net; UFO AR; Magee, Brian |
| **Subject:** | Draft Notes: Uncompahgre RMP Cooperating Agency Meeting #9 |
| **Date:** | Wednesday, December 21, 2011 3:08:15 PM |
| **Attachments:** | UFO-CA 2011-11-15 DraftNotes.doc |

Hello Cooperating Agency Representatives,

I have attached draft notes of the November 15 Uncompahgre RMP Cooperating Agency meeting. Please review the draft notes and let me know of any errors or omissions by Tuesday, January 10, after which they will be revised and submitted to all group members and the administrative record.

Thank you, Bruce

BLM_0111659



United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401



# COOPERATING AGENCY MEETING #9

## Tuesday, November 15, 2011 (1:00 – 4:00 PM)

### Meeting Location:
### Holiday Inn Express (Jordan Room C)
### 1391 South Townsend Avenue, Montrose, CO

# MEETING NOTES

**Attendees:**

**Cooperating Agencies:** Levi Broyles (US Forest Service), Renzo DelPiccolo (Colorado Department of Natural Resources, Southwest Region), Susan Hansen (Delta County Board of County Commissioners), Scott Harold (Town of Olathe), William Long (Town of Nucla), Joan May (San Miguel County BOCC), Mike Pelletier (Gunnison County), Barbara Peterson (Town of Paonia), Joe Reagan (Town of Norwood), Alan Schroeder (Bureau of Reclamation, Western Colorado Area Office), Charlie Sharp (US Fish and Wildlife Service), Steve White (Montrose County BOCC)

**BLM Uncompahgre Field Office:** Bruce Krickbaum, Barb Sharrow

**EMPSi:** Jennifer Whitaker, Kate Wynant

**Handouts:** Agenda; Highlights of the RMP Process to Date; Major Changes to Chapter 2 (Alternatives); Comments on June 2011 Internal Draft Chapter 2 for BLM Field Office, Cooperating Agency, and RAC Subgroup Review (via E-mail)

1. **Welcome** (Bruce Krickbaum)
   - The purpose is to review comments received on and major changes to draft Chapter 2.
   - BLM received about 1,300 comments on Chapter 2. All responses are included in the document that was emailed to you prior to this meeting (approximately 300 pages).

2. **Introductions** (Kate Wynant)

3. **Planning Process to Date** (Kate Wynant)
   - See handout: *Highlights of the Resource Management Planning Process to Date*
   - The only thing new on this handout to note is that BLM is making a few revisions to the Reasonably Foreseeable Development (RFD) scenario to address shale gas. It is not anticipated that these changes will change Chapter 2 (Alternatives). The changes will better reflect the number of wells and help us do a better job on the analysis.
   - Chapter 2 is being revised; GIS is being updated. Chapter 2 will be hand delivered to the BLM Colorado State Office on Monday, December 12, 2011. Bruce and Barb will also have a briefing with the State Office on this day. The State Office will have four weeks to review and comment

BLM_0111660

on Chapter 2. BLM will start impact analysis once all State Office comments have been resolved. BLM will encourage the Interdisciplinary Team to contact their State Office counterparts, but our hope is that our efforts of coordinating with you folks will minimize comments from the State Office.

- Barb further thanked the group for all of their hard work. This process [addressing comments] took a lot longer than we thought because of the number of comments we received, but we would much rather address these comments now rather than later. BLM's decision space is not a broad as some of us would like it to be because of existing laws.

## 4.   Comments on June 2011 Internal Draft Chapter 2 for BLM Field Office, Cooperating Agency, and RAC Subgroup Review

- See handout: *Major Changes to Chapter 2 (Alternatives)*
- *Question*: Can you please explain the difference of a Special Recreation Management Area (SRMA) verses an Extensive Recreation Management Area (ERMA)? *Answer*: The dominant use in SRMAs is recreation. BLM will focus on recreation by applying use limits, actively seeking funds, working with user groups, etc. In an ERMA, BLM knows recreation activities are occurring in the area, but there are many other uses for which the BLM will also manage. BLM may provide recreation trails and facilities in these areas, but not at the expense of other resources. If an area is managed as both an SRMA and an Area of Critical and Environmental Concern (ACEC) (e.g. for plants), then management actions will be carefully evaluated to ensure consistency between the two.
- *Question*: What is the status of Ridgway Trails? *Answer*: At the RMP level, we are looking at allocation-level decisions. There is also transportation planning which we can do within the confines of our existing plan. BLM will be doing a comprehensive travel management plan for Ridgway starting this winter; you should receive notice of that planning effort soon.
- *Question*: With the reorganization of the biological resources section, is there still a section specific to sage-grouse? *Answer*: Yes, we combined all of the management actions for raptors since they were basically all saying the same thing. There are still separate sections for wildlife and threatened and endangered species. We also eliminated redundancy (i.e., many rows said the same thing). Watchable wildlife areas were dropped because the District Manager said these areas should be reserved for very special areas.
- There is a baseline air quality analysis going on right now. The model takes a couple months to run. The model will tell us changes to air quality as a result of implementing our alternatives.
- Priority species and priority habitat has been dropped from the biological resources section. As previously written, it didn't really mean anything because it covered the entire field office and all of the species. Nothing was really "special". *Comment*: BLM should refer to the 1989 Desert Bighorn Sheep Management Plan and consider identifying desert bighorn sheep as a priority species.
  - *BLM Action*: BLM will review the 1989 Desert Bighorn Sheep Management Plan and consider the desert bighorn sheep as a priority species.
- *Comment (BLM)*: Areas that are closed seasonally to protect wildlife are closed to motorized and mechanized users. At this morning's RAC Subgroup meeting, a member asked that BLM add equestrian users to the seasonal closure noting that equestrian users can be just as damaging. BLM's question to Colorado Department of Parks and Wildlife (CPW) is: does equestrian use disturb wildlife as much as motorized and mechanized use? *CPW response*: Impacts from equestrian verses mechanized use is fairly equal. Motorized use adds the extra noise. The bigger issue it often the accompanying dogs. You don't see the dogs with motorized use, but you do see them with hikers and equestrian users.
- *Comment (BLM)*: To protect seasonal wildlife – right now seasonal closures apply to mechanized and motorized use. Should BLM add equestrian use? *CPW response*: Yes, if we are worried about moving animals out of an area. In spring, during calving and fawning, we don't usually see total

BLM_0111661

human closures. No, I don't see a difference in equestrian and mechanized use. CPW usually does total closure or motorized closure. Note that motorized users should also be distinguished between ATV users and snowmobilers.

- o *BLM Action*: BLM will re-evaluate what uses are prohibited in seasonal closures.
- o *BLM Action*: BLM will review "and/or" statements associated with motorized and mechanized use designations.

- Question (#290): Why can't you do route density as part of this planning process? *Answer*: Because it varies so much area to area. We felt there was so much of a difference that this would be better to address during the route process instead of this one. Within five years of signing the Record of Decision, we will have to finish our route designation process for the entire field office.
  - o *BLM Action*: BLM will review route density in biological core areas to determine if it makes sense to add a route density in those areas.
  - o *BLM Action*: BLM will email fish and wildlife and threatened and endangered species sections to the Cooperating Agencies for review.

- *Question*: What is the definition of trailing? *Answer*: Moving cattle from one place to another.
  - o *BLM Action*: BLM will add a definition of "trailing" to the glossary.

- *Question (#252)*: CPW inquired about this comment and BLM's response. CPW noted that flannel mouth sucker, bluehead sucker, and roundtail chub are part of an agreement and BLM should relook at the aquatic reaches to determine if these areas warrant additional protection. Razorback sucker and Colorado pikeminnow are currently listed under ESA. The Colorado River cutthroat trout is a BLM sensitive species. *Answer*: BLM will re-evaluate these management actions.
  - o *BLM Action*: BLM will reconsider the proposed management actions for flannel mouth sucker, bluehead sucker, and roundtail chub.
  - o *BLM Action*: BLM will send the Cooperating Agencies the revised VRM maps.
  - o *BLM Action*: BLM will try to establish a mechanism by which they can share their information (particularly maps), and evaluate the potential for an interactive map on BLM's website (i.e., an interactive map that shows all layers).

- Question (#382): BLM will talk to Missy and Charlie and get "proposed" back and get the definition, per Endangered Species Act and US Fish and Wildlife Service, for glossary. *[Note: the following is the definition of "proposed species" from USFWS glossary (http://www.fws.gov/endangered/esa-library/pdf/glossary.pdf): A species of animal or plant that is proposed in the Federal Register to be listed under section 4 of the Endangered Species Act.]*
  - o *BLM Action*: BLM will talk to Missy and Charlie regarding the "proposed" species.

- *Comment (#604)*: What sort of conditions do you foresee that you would allow less than a three year rest period? CPW's recommendation is you need at least three years and then you decide how to adjust from there. The vegetation may look good, but it doesn't have the vegetation base to sustain cattle. *Answer*: BLM will re-evaluate this management action.
  - o *BLM Action*: BLM will review row 379 in Chapter 2.
  - o *Comment*: If the area is disturbed from fire, I would argue that a three year rest period isn't necessary. *Comment*: If partners are going to invest money, they may expect longer rest periods.

- *Comment*: If Congress releases WSAs, will all of those areas be managed as ACECs? *Answer*: No, each WSA has different management proposed. Some would be ACECs some might be SRMAs.

## 5.   Next Steps

- Please send us any other comments/questions by end of December. You will get action items (discussed at this meeting) by December 12th.

**6.      Other Items Not on the Agenda**
N/A

**7.      Action Items / Next Meeting**
- Our next meeting will likely not be until next April or May, unless comments received from the State Office warrant otherwise.
- *BLM Action*: BLM will review the 1989 Desert Bighorn Sheep Management Plan and consider the desert bighorn sheep as a priority species.
- *BLM Action*: BLM will re-evaluate what uses are prohibited in seasonal closures.
- *BLM Action*: BLM will review "and/or" statements associated with motorized and mechanized use designations.
- *BLM Action*: BLM will review route density in biological core areas to determine if it makes sense to add a route density in those areas.
- *BLM Action*: BLM will email fish and wildlife and threatened and endangered species sections to the Cooperating Agencies for review
- *BLM Action*: BLM will add a definition of "trailing" to the glossary.
- *BLM Action*: BLM will reconsider the proposed management actions for flannel mouth sucker, bluehead sucker, and roundtail chub.
- *BLM Action*: BLM will send the Cooperating Agencies the revised VRM maps.
- *BLM Action*: BLM will try to establish a mechanism by which they can share their information (particularly maps), and evaluate the potential for an interactive map on BLM's website (i.e., an interactive map that shows all layers).
- *BLM Action*: BLM will talk to Missy and Charlie regarding the "proposed" species.
- *BLM Action*: BLM will review row 379 in Chapter 2.

BLM_0111663

| | |
|---|---|
| **From:** | Krickbaum, John |
| **To:** | Angie Adams; barbara_hawke@tws.org; billday@paonia.com; Jennifer Whitaker; john@reams-construction.com; Kate Wynant; Krickbaum, John; Magee, Deborah M; pmueiier@tnc.org; rich@richdurnanphoto.com; sbear@dmea.com; Sharrow, Barbara L; silvers1@tds.net; steve.weist@oxbow.com; tkctew@yahoo.com; UFO AR; wbjack8709@msn.com |
| **Subject:** | FW: Draft Minutes: Uncompahgre RMP RAC Subgroup Meeting #9 |
| **Date:** | Wednesday, December 21, 2011 3:03:16 PM |
| **Attachments:** | UFO-RAC 2011-11-15 DraftMinutes.doc |

Hello RAC Subgroup members,

I have attached the draft minutes of the Uncompahgre RMP RAC Subgroup meeting held on November 15.  Please review the draft minutes and let me know of any errors or omissions by Tuesday, January 10, after which they will be revised and submitted to all group members and the administrative record.

Thank you, Bruce

BLM_0111664



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401

# RAC SUBGROUP MEETING #9

## Tuesday, November 15, 2011 (9:00 AM – 12:00 PM)

## Meeting Location:
**Holiday Inn Express (Jordan Room C)**
**1391 South Townsend Avenue, Montrose, CO**

# Meeting Notes

**Attendees:**
 *RAC Subgroup:* Shelby Bear, Walt Blackburn, Bill Day, Richard Duran, William Ela, Barbara Hawke, Peter Mueller, John Reams, Steve Weist, Kathy Welt (via telephone)

 *BLM Uncompahgre Field Office:* Bruce Krickbaum, Barb Sharrow

 *EMPSi:* Jennifer Whitaker, Kate Wynant

 *General Public:* None

**Handouts:** Agenda; Highlights of the RMP Process to Date; Major Changes to Chapter 2 (Alternatives); Comments on June 2011 Internal Draft Chapter 2 for BLM Field Office, Cooperating Agency, and RAC Subgroup Review (via E-mail)

## 1. Welcome (Bruce Krickbaum)
- The purpose is to review comments received on and major changes to draft Chapter 2.
- BLM received about 1,300 comments on Chapter 2. All responses are included in the document that was emailed to you prior to this meeting (approximately 300 pages).

## 2. Introductions (all present)

## 3. Planning Process to Date (Kate Wynant)
- See handout: *Highlights of the Resource Management Planning Process to Date*
- The only thing new on this handout to note is that BLM is making a few revisions to the Reasonably Foreseeable Development (RFD) scenario to address shale gas. It is not anticipated that these changes will change Chapter 2 (Alternatives).
- *Question*: What is the status of the coal report? <u>*Answer*</u>: The Coal Potential report is near complete; it will be posted on the UFO's RMP planning website when it is final. The second coal report provides details on the unsuitability criteria, which will be an appendix to the RMP.
- Chapter 2 is being revised; GIS is being updated. Chapter 2 will be hand delivered to the BLM Colorado State Office on Monday, December 12, 2011. Bruce and Barb will also have a briefing with the State Office on this day. The State Office will have four weeks to review and comment on Chapter 2. BLM will start impact analysis once all State Office comments have been resolved.

BLM_0111665

- Barb added that as you review the comment response matrix, you will see polar opposite comments for the preferred alternative.
- *Question*: can the RAC Subgroup see the whole picture again after the State Office review? *Answer*: Yes, you will see the document once the analysis of the alternatives is complete. Prior to that, BLM will decide if State Office comments are significant enough to bring you back together to review those changes.
- In many instances, the BLM's decision space is very small. BLM is working under 100 years of legislation.

## 4. Comments on June 2011 Internal Draft Chapter 2 for BLM Field Office, Cooperating Agency, and RAC Subgroup Review (Kate Wynant)

- See handout: *Major Changes to Chapter 2 (Alternatives)*
- Desert bighorn sheep issue is a huge in this area because there are no natural boundaries for domestic and Rocky Mountain sheep.
- *Question (Recreation & Forestry)*: Does Ridgway Trail Special Recreation Management Area (SRMA) Recreation Management Zone (RMZ) 1 allow personal firewood cutting? *Answer*: No, Ridgway Trail SRMA RMZ 1 does not, but RMZ 2 does.
  - o *BLM Action*: BLM will reevaluate the distinction between Ridgway Trail SRMA RMZ 1 and 2 to ensure the management actions are accurate.
- *Comment (Recreation [#619])*: Walt meant for the comment to read, "Change the numbers more than 24 people in all other areas gathering at a single location for more than 2 hours to read....20 people & 8 hours..." The action was changed to restrict the number of people to no more than 16 in WSAs and 25 elsewhere, unless otherwise restricted. Walt agreed that this was ok. There was no discussion on the timeframe.
- *Comment (Travel Management [#719 Alternative D)*: Walt has requested that BLM change the distance to 250 feet; BLM agreed to make this change in Alternative D.
  - o *BLM Action*: BLM will change Alternative D to 250 feet (row 438).
- *Question (Recreation)*: What is the difference between an SRMA and Extensive Recreation Management Area (ERMA)? *Answer*: The dominant use in SRMAs is recreation. BLM will focus on recreation by applying use limits, actively seeking funds, working with user groups, etc. In an ERMA, BLM knows recreation activities are occurring in the area, but there are many other uses that BLM will also manage for. BLM may provide recreation trails and facilities in these areas, but not at the expense of other resources. If an area is managed as both an SRMA and an Area of Critical and Environmental Concern (ACEC) (e.g. for plants), then management actions will be carefully evaluated to ensure consistency between the two.
- *Question (General)*: are there other tools you have if multiple uses are happening in one area? Answer: Yes, BLM has laws and regulations we must follow. For example we are mandated to protect threatened and endangered species in all areas.
- *Question (Recreation)*: Are there more SRMAs being proposed in this plan than what's in existence? Answer: Yes.
- *Question (Recreation)*: What's the status of the Dolores River Canyon? If the Wilderness Study Area goes away, what would happen to the area? *Answer*: Under Alternative D that area would be managed as an ACEC and an SRMA.
- *Question (Travel Management [#664 and 700])*: Right now the Adobe Bandlands OHV Open Area is open to any motorized vehicles. Walt's comment was intended to mean that BLM should eliminate full-sized motorized vehicles in this area, and instead limit all vehicles to 50 inches or less. Also, Walt wants this area designated as Open to allow for cross-country travel. This is an area where a lot of training occurs. *Answer*: the issue in this area is the hookless cactus. At this time, all existing routes would be designated. *Comment*: to clarify, whether the travel management designation is *Limited to Designated Routes* or *Open*, the request by the OHV community is to limit vehicles to 50 inches or less in this area.

BLM_0111666

- o *BLM Action:* BLM will provide additional review of the management proposed in the Adobe Badlands area.
- *Comment (Recreation):* BLM will run into opposition if the Ridgway SRMA does not allow competitive events.
- *Question (Travel Management [#739]):* Equestrian use has more effects on wildlife than motorized vehicles sometimes. A seasonal closure should be closed to equestrian users in addition to motorized and mechanized users. Particularly if the seasonal closure is for wildlife.
  - o *BLM Action:* BLM will re-evaluate seasonal closures and determine if the action should include equestrian users.
- *BLM Comment (Coal):* BLM revised Stipulation CSU-51 to exclude operations that capture or pipe methane from a mine for beneficial use (new text below).
  - *"STIPULATION CSU-51: Federally Leased Coal. Where oil and gas operations are proposed within the area of federally leased coal, relocate them outside the area to be mined or so as to accommodate room and pillar and long wall mining operations. This stipulation does not apply to operations that capture or pipe methane from a mine for beneficial use. (Refer to Appendix B.) (Figure 2-52, 2-53, 2-54, Appendix A)"*
  - o *BLM Action:* BLM will email this stipulation (row 491) to Steve Weist, Kathy Welt, and Bill Ela for review.
- *Question (Fluid Minerals):* In certain instances, I don't feel that a No Surface Occupancy (NSO) stipulation provides adequate protection. For example, in a sensitive watershed, I don't feel convinced that an NSO stipulation has the same level of certainty as a No Leasing designation. My main concern is underground impacts. <u>Answer</u>: Some sensitive areas have been designated as No Leasing areas, such as municipal watersheds. Major river corridors also have 0.25-mile NSO stipulation (under Alternative D). These areas are also protected by other types of management tools available to BLM, such as Visual Resource Management (VRM) classes.
  - o *BLM Action:* BLM will E-mail the NSO and VRM maps to the RAC Subgroup to review the level of protections across the field office.
- *Question (ACECs):* I'm not comfortable that the uses/level of preservation are robust enough in SRMA north around Paradox Valley, and an ACEC. <u>Answer</u>: The impact analysis should help address these concerns. There is an ability to protect an area even if the area doesn't have a formal designation (e.g., ACEC), which will be described in the analysis. There are other tools that BLM has available such as designating rights-of-way as avoidance areas and managing landscapes according to VRM classes.
- *Question (Biological Resources):* Can you explain the main changes to the biological resource sections (fish, wildlife, threatened and endangered species)? <u>Answer</u>: We combined all of the management actions for raptors since they were basically all saying the same thing. There are still separate sections for wildlife and threatened and endangered species. We also eliminated redundancy (i.e., many rows said the same thing). Watchable wildlife areas were dropped because the District Manager said these areas should be reserved for very special areas.
  - o *BLM Action:* BLM will reconsider designating 23 acres north of Ridgway as a watchable wildlife area.

## 5. **Next Steps** (Kate Wynant)

- As we mentioned, we are sending Chapter 2 to the BLM Colorado State Office December 12th so it would be most useful to get comments from you by the end of December. However, we will always accept comments identifying fatal flaws in the plan.
- *Comment:* We need to remember that applying layers and layers of restrictions is going to make life very difficult for BLM to manage.
- *BLM Comment:* Our District Manager reviewed Chapter 2 row by row. All of her comments have been incorporated into the document at this time.

BLM_0111667

## 6. Other Items Not on the Agenda (Kate Wynant)
- If you weren't able to open the attachment containing the responses to comments on Chapter 2, let us know and we will send you a PDF version.
  - *BLM Action*: BLM will send Bill Ela a paper copy of the Chapter 2 Comment Response Matrix.

## 7. Public Comments / Questions (Kate Wynant)
- No members of the public were present.

## 8. Action Items / Next Meeting (Kate Wynant)
- Pending BLM's State Office review, the RAC Subgroup will either meet again early 2012 to discuss major changes resulting from the State Office's comments, or in summer 2012 to review Chapter 4 (Impact Analysis).
- *BLM Action*: BLM will reevaluate the distinction between Ridgway Trail SRMA RMZ 1 and 2 to ensure the management actions are accurate.
- *BLM Action*: BLM will change Alternative D to 250 feet (row 438).
- *BLM Action*: BLM will provide additional review of the management proposed in the Adobe Badlands area regarding OHV use.
- *BLM Action*: BLM will re-evaluate seasonal closures and determine if the action should include equestrian users.
- *BLM Action*: BLM will email this stipulation (row 491) to Steve Weist, Kathy Welt, and Bill Ela for review.
- *BLM Action*: BLM will E-mail the NSO and VRM maps to the RAC Subgroup to review the level of protections across the field office.
- *BLM Action*: BLM will reconsider designating 23 acres north of Ridgway as a watchable wildlife area.
- *BLM Action*: BLM will send Bill Ela a paper copy of the Chapter 2 Comment Response Matrix.

BLM_0111668

| From: | Delpiccolo, Renzo |
|---|---|
| To: | Krickbaum, John; Angie Adams; Bill Bottomly; Broyles, Levi; daves@sanmiguelcounty.org; Jennifer Whitaker; joanm@sanmiguelcounty.org; joereagan741@yahoo.com; Kate Wynant; mpelletier@gunnisoncounty.org; norwoodparker@centurytel.net; Reinkensmeyer, Dan; Schroeder, Alan M; segfahlt@gmail.com; shansen@deltacounty.com; sharold@ci.olathe.co.us; Sharp, Charles; Sharrow, Barbara L; swhite@montrosecounty.net; townofpaonia@tds.net; UFO AR; Magee, Brian |
| Cc: | Spezze, Tom; Gurzick, Tony; Wait, Scott; Area 18 Montrose |
| Subject: | Colorado Parks and Wildlife comments on the new revised wildlife section of Chapter 2. |
| Date: | Friday, December 30, 2011 3:52:31 PM |
| Attachments: | UFO RMP Comments_12302011_final.doc |

Thanks,

*Renzo DelPiccolo*

**Area Wildlife Manager**
**Colorado Division of Parks and Wildlife**
**2300 South Townsend Ave.**
**Montrose, CO 81401**
**970.252.6010**

BLM_0111669

UFO RMP Comments

The following comments are intended to compliment and expand, in part, on discussions that
occurred at the cooperating agency meeting on November 15, 2011.

CPW is concerned that the wildlife section of the RMP does not clearly outline goals and
objectives for the fish, wildlife, and special status species within the planning area. The goals,
objectives and actions fail to describe the desired conditions of wildlife population and wildlife
habitat across the planning area. There are no measurable objectives and actions or
implementation schedules with which to evaluate the range of alternatives and consequently the
affected environment and environmental consequences of the RMP resource allocation. It is our
understanding that the UFO will begin to write the Environmental Consequences (Chapter 4)
section next, and we are not sure that this analysis can be credible without first describing the
Affected Environment (Chapter 3) for the EIS.

CPW feels that the content of the wildlife section falls short of ensuring that wildlife populations
will be sustainable across the UFO. The wildlife section is vague on the specific opportunities
that BLM will pursue for individual species conservation and management, and does not clearly
identify how wildlife issues will be managed in association with competing resource values. We
are concerned that there may be unnecessary and undue degradation to wildlife resources as a
result from the lack of clearly defined species-specific goals and objectives that outline
measurable criteria that can be monitored during implementation of the plan.

CPW would like to see a clear description of the resource condition, goals, and objectives to be
attained within the planning area so that the EIS can substantively and reliably evaluate BLMs
proposed land use allocations with respect to wildlife.   Additionally clear descriptions of desire
conditions, goals, objective and actions would allow for comparison of Chapter 2 with other
State and Federal wildlife conservation and management plans, to ensure their compatibility and
consistency as mandated in the FLPMA.  In general, those plans would include Gunnison Sage-
grouse Range-wide Conservation Plan (2005), The Range-wide conservation agreement and
strategy for roundtail chub, bluehead sucker and flannelmouth sucker (2006), 2006 Conservation
Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming,
2006 Conservation Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah
and Wyoming, Colorado Desert Sheep Management Plan (1989), Gunnison and White-tailed
prairie dog conservation strategy (2010), Uncompahgre Habitat Partnership Program-Habitat
Management Plan (2010),   Uncompahgre Plateau Deer Management Plan D-19 (2005),
Uncompahgre Plateau Elk Management Plan E-20 (2005), to name a few.

Wildlife Stipulations

It appears that the Chapter 2 is primarily using wildlife stipulations as the only means of resource
allocation decisions.  While stipulations are import to minimize disturbance to wildlife from all
the other uses, we are not aware of other RMPs that deviated wildlife stipulations across the
range of alternatives. In other recent RMPs we have reviewed, the BLM has incorporated
consistent wildlife stipulations amongst all resource allocation alternatives to protect the wildlife
resources regardless of the alternative selected.   The content of wildlife stipulations in these

other RMPs generally does not vary significantly amongst alternatives, but the need for the stipulation may vary based on the resource allocation decision and competing uses allowed for a particular area.

Varying the stipulations is inconsistent across administrative boundaries of other USFS and BLM offices, and is inconsistent in many cases with BLM's recent State office direction on standard stipulations. It is also contrary and inconsistent with CPW's recent recommendations on stipulations. We recognize that stipulations can and should be tailored in some cases to specifically designated areas, we do not believe widely recognized stipulations such as timing limitation for wintering big game should fluctuate significantly between alternatives. For example, in TL 6, TL 7, TL 8, the species and dates for winter range of big game animals varies across the alternatives. Additionally, varying the stipulations is in some cases inconsistent with commitments and standards that were established in other BLM and outside agency planning efforts for the conservation and management of wildlife and wildlife habitat.

In addition, the manner in which some of the stipulations are written in this draft plan, will likely result in significant resource conflicts. As an example, Chapter 2 has an alternative to that does not include a seasonal timing restriction on activities around raptor nests, not only does this deviate from the norm, but CPW feels that the Chapter 2 is potentially allowing or authorizing a "take" under the MBTA and or Bald and Golden Eagle Protection Act.

Priority Species and Habitats
The UFO asserts that there is no unique habitats or key species within the planning boundaries outside of Federally designated critical habitat under the ESA, because the habitat types or species ranges extend beyond the UFO administrative boundaries. We disagree, and hold the UFO planning area in high regard for the species diversity and habitat types that occur there. Regardless of key habitats or priority species designations, the RMP is still responsible for the management, preservation, and conservation of fish and wildlife species and habitat within the planning boundaries. This may or may not include key habitats and priority species designations, but as currently written CPW is not confident that the RMP will adequately maintain wildlife populations. For instance priority habitats were highlighted for retention and acquisition under the Lands and Realty program. Since they have been removed, what criteria will ensure that those parcels that have high wildlife habitat values will be retained and/or acquired?

Biological Core Area
Initially, we applauded BLM's efforts to designate Biological Core Areas and gave some recommendations on how those should be managed. Our review of Chapter 2 and the agency preferred alternative, however, leads us to the conclusion that biological resources are not given priority in these areas, as there are too many allowances for competing uses within the core areas. These uses could substantially impact the values for which the core areas were selected. BLM staff has indicated that that these cores areas have essentially become the "key habitats". Biological core areas were selected by BLM staff with a very narrow scope to provide connectivity between large blocks of relatively un-fragmented habitats. CPW has suggested incorporating other criteria into how biological core areas might be defined, but given that many of the limiting habitat types in the planning area had already been identified as "priority habitats" we assumed that conservation efforts of those habitat were going to be emphasized outside of the

core area designations. When priority habitat types were discarded in the wildlife section, Biological Core Areas became the only emphasis area for wildlife.   It is our opinion that as currently drafted, core areas will not provide significant benefits to biological resources and that the limiting factor habitat types will not be emphasized or prioritize to sustain wildlife populations across the landscape.

Desert bighorn Sheep

There are only 3 populations of desert bighorn sheep (a BLM sensitive species) within the State of Colorado. Two of those populations are within the UFO planning area - the Dolores River Herd and the Dominguez Escalante Herd. The Chapter 2 documents we have reviewed do not acknowledgment the significance of these bighorn populations to Colorado residents. The significance and importance of these rare sheep was clearly the impetus behind the Desert Sheep Management Plan (1989). The RMP is an opportunity to address some of the resource concerns and impacts to desert sheep, but the RMP as currently written doesn't acknowledge the Desert Sheep Management Plan or emphasize the BLM's and State's past and current interest in sheep conservation efforts. While we are committed to helping the UFO in their efforts to develop a risk assessment for sheep and domestic interactions, there are a number of actions that can be included in the Wildlife sections that give direction on resource allocation for desert bighorn sheep management without the risk assessment.

Gunnison Sage Grouse and Sims Mesa

It is the policy of BLM Colorado to manage sage-grouse seasonal habitats and maintain habitat connectivity to support sustainable sage-grouse populations and/or sage-grouse population objectives as determined in coordination with CPW [BLM's IM CO-2010-028,]. While the wildlife section of the Chapter 2 contains several stipulations for GUSG, it does not incorporate a number of the tasks outlined in the BLM's IM CO-2010-028, which provides specific direction to Field Offices in their landuse planning efforts.

These include:

- Failing to identify landscape level sage-grouse resource objectives that include thresholds for allowable uses, adaptive management language to allow for consideration of new population and habitat data, as well as new scientific research and management recommendations, and a monitoring strategy to track progress in meeting those objectives.

- Falling short in the efforts to consider and evaluate sage-grouse habitat conservation measures related to timing restrictions, distances or percentages of allowable surface disturbing activities, and desired density levels or other development constraints consistent with State or Range-wide SG Conservation Planning for Colorado (including subsequent updates), current peer reviewed SG research, or as developed in conjunction with CPW to meet local population objectives, in RMP revisions or amendments.

Due to the small populations and limited geographic extent of potential sage grouse habitat in the planning area, it is likely that all occupied habitat has year round occupancy, and therefore seasonal timing restrictions alone are not likely to be effective at reducing potential impacts to GUSG to the extent needed to maintain existing or future population levels.  Recent research suggests that traditional lease stipulations and site-specific mitigation measures alone are not adequate to maintain some wildlife populations, including grouse populations, in oil and gas fields that are developed on traditional spacing patterns [Sawyer et al. 2005, 2006, 2009, 2010, Harju et al 2010, Aldridge and Boyce 2007]. In some cases, surface facility density and noise limitations applied at a landscape scale are necessary to sustain grouse populations in developing areas. Due to the landscape scale and context of these issues, these types of restrictions have not been applied effectively during the site-specific NEPA analysis at the development phase to adequately protect existing wildlife populations and habitat.

With this in mind, CPW encourages the BLM to select the No lease alternative for GUSG habitat in the planning area, and to incorporate additional surface facility density and noise limitations in GUSG habitat for the other leasing alternatives. As discussed in previous written comments to the BLM, without some specific assurances that the land use threats such as oil and gas development are addressed within Simms Mesa and San Miguel GUSG Habitat, conservation measures to restore the species will be hampered, and CPW's and BLM's investment of time, money, and effort to improve habitat and restore sage grouse in these areas will be wasted.

Aquatic Species
The Range-wide conservation agreement and strategy for roundtail chub, bluehead sucker and flannelmouth sucker (2006) outlines some of the conservation actions that can be undertaken in the land use plans. These include "rigorous habitat protection" to that end CPW has suggested to the BLM that those reaches that have important native fish species values be included as a ACEC or a Biological Core Area. In addition, CPW would like to see language that support in-stream flow protections in the wildlife section, and a commitment to working on the improvement flow condition on impaired segments by changing management of other program activities (e.g., changing livestock grazing season use) to achieve desired future condition to exceed LHA in riparian areas.

As a cooperating agency, CPW has commented extensively throughout this planning process, but cooperating agencies have had little to no opportunity for the initial development of the RMP. Cooperating agency input has largely been commenting on drafts that may or may not be the most current form of the document that BLM is working on with their consultant. To date we have not felt that the structure and use of cooperating agency process provides meaningful input in the development of the RMP.  For CPW, we've asked to be included the conceptualizing developing, writing and reviewing sections of the RMP where particular expertise in wildlife, wildlife habitat, and wildlife management is needed or in areas where other resources may have impacts on wildlife.

We look forward to working cooperatively and collaboratively with the UFO on the improvement of the Resource Management Plan.

## James Bode

| | |
|---|---|
| **From:** | Krickbaum, John <bkrickba@blm.gov> |
| **Sent:** | Tuesday, November 22, 2011 1:59 PM |
| **To:** | Magee, Brian; Angie Adams; Bill Bottomly; Broyles, Levi; daves@sanmiguelcounty.org; davidvarley@kaycee.net; jcoates@town.ridgway.co.us; Jennifer Whitaker; joanm@sanmiguelcounty.org; joereagan741@yahoo.com; Kate Wynant; Kauffman, Krag D; kjensen@ci.montrose.co.us; Krickbaum, John; lpadgett@ouraycountyco.gov; lynn@mtngeogeek.com; Magee, Deborah M; mpelletier@gunnisoncounty.org; norwoodparker@centurytel.net; pat@cedaredgecolorado.com; Randall-Parker, Tamera K; Reinkensmeyer, Dan; renzo.delpiccolo@state.co.us; Schroeder, Alan M; segfahlt@gmail.com; shansen@deltacounty.com; sharold@ci.olathe.co.us; Sharp, Charles; Sharrow, Barbara L; swhite@montrosecounty.net; townofpaonia@tds.net; UFO AR |
| **Subject:** | Wildlife and SSS Section |
| **Attachments:** | Wildlife_SSS_changed_9-21-11.docx |

Hello Cooperating Agency Representatives,

During the meeting last week, several of you expressed an interest in seeing the new Wildlife and Special Status Species section.  It is attached.

This attachment has an additional (temporary) row to the right that helps track the original row numbers and how things were moved, deleted or combined.

--Bruce

Bruce Krickbaum
Planner, Environmental Coordinator
BLM, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

BLM_0111674

| FISH & WILDLIFE | | | | Original Row Number |
|---|---|---|---|---|
| **WILDLIFE – GENERAL** | | | | |
| **GOAL:** Manage terrestrial and aquatic habitats and species to promote ecosystem diversity, productivity, viability, and natural processes. | | | | |
| **Objective:** Intensively manage for optimal aquatic wildlife habitat. Provide necessary investments to enhance wildlife habitat. Cooperate with the Colorado Division of Wildlife (CDOW) for funding of habitat improvement projects, and also cooperate with CDOW on the reintroduction program (BLM 1985).  Comply with FLPMA to maintain, enhance, and protect fish habitat on public lands. Continue to apply seasonal restrictions where they are needed to mitigate impacts of human activities on important seasonal wildlife habitat. | **Objective:** Restore, enhance, preserve, and promote aquatic and terrestrial ecosystem integrity and values. Emphasis is on native fish and cold-water sport fish, and native nongame species, while allowing for improvements to habitat for native game species.  Protect breeding habitats of migratory birds by managing for ecosystem diversity, productivity, viability and natural processes through use of the vegetation mosaic objectives (vegetation section). | **Objective:** Maintain aquatic and terrestrial ecosystem integrity and productivity.  Emphasis is on sports fisheries and upland game species.  Protect migratory birds to the extent required by the Migratory Bird Treaty Act. | **Objective:** Preserve and promote aquatic and terrestrial species conservation and ecosystem integrity and values.  Emphasis is on native fish and cold-water sport fish, and native nongame species, while allowing for improvements to habitat for native game species.  Protect breeding habitats of migratory birds by managing for ecosystem diversity, productivity, viability and natural processes through use of the vegetation mosaic objectives (vegetation section). | 105 |
| **Action:** The BLM District Manager may authorize supplemental releases and reintroduction of native or naturalized wildlife species (excluding federal or state listed endangered, threatened, or candidate species) following environmental analysis (in management units 3, 5, 8, 9, 13- | **Action:** Allow augmentation and reintroduction to expand the current range of native species in response to partner or stakeholder proposals/requests and in coordination with CDOW. | **Action:** Allow augmentation and reintroduction to expand the current range of desired game species and species of economic importance in coordination with CDOW. | **Action:** Allow augmentation and reintroduction to expand the current range of aquatic and terrestrial species or to expand population numbers to improve genetic viability of native terrestrial species in coordination with CDOW. | 106 and 162 |

1

| | | | | |
|---|---|---|---|---|
| 15) (BLM 1989a). | | | | |
| Allow CDOW to introduce chukar. Allow other game species introduction if site-specific analysis indicates that significant conflicts with livestock will not occur (emphasis area A).  (BLM 1985)  Reestablish river otters in the Dolores River (emphasis areas B, C, and D) (BLM 1985).  Allow introduction or reintroduction of bighorn sheep [in the Dolores River Canyon WSA].  Expand pronghorn antelope herds (emphasis area A) (BLM 1985).  Manage for 300 head of pronghorn antelope | | | | |
| | | | | 107 (Same as row 108) |
| | | | | 108 Same as row 191 |
| **WILDLIFE – FISH AND AQUATIC** | | | | |
| | | | | 110, deleted – no priority habitats |
| | | | | 111, |

2

BLM_0111675

| | | | | |
|---|---|---|---|---|
| **Action:** Give special management consideration to all perennial streams that have the potential of providing quality fisheries through the activity planning process and monitoring system to maintain, improve, or enhance resource conditions associated with aquatic/riparian habitat (emphasis area A) (BLM 1985).<br><br>Manage the following riparian areas to improve aquatic habitat; Roc, North Mesa, South Mesa, La Sal and Dry Creeks; and the East and West Forks of Dry Creek Canyon (BLM 1985).<br><br>Invest wildlife funds for structural improvements and vegetation restoration projects to improve high-priority riparian habitat at the following drainages: Roc, North and South Mesa, La Sal, and Dry Creeks (East and West Fork) (emphasis area B) (BLM 1985). | **Action:** Annually enhance, protect, or restore at least 5 miles of aquatic habitat, including modification or removal of special status fish migration barriers in consultation with the CDOW, and structural and vegetation improvements to benefit primarily nongame, native species. | **Action:** Annually improve at least 2 miles of aquatic habitat, including structural and vegetation improvements to benefit primarily game species and popular fisheries. | **Action:** Pursue opportunities to enhance, protect, or restore native aquatic species habitats, including modification or removal of special status fish migration barriers in consultation with the CDOW, and structural and vegetation improvements commensurate with other resource objectives. | Deleted – no priority fish species<br><br>112, 113, 114, 116, 139 |
| **Action:** Monitor, maintain, or improve | No similar action. | Same as Alternative A. | **Action:** Maintain or improve fisheries | 117 |

3

| | | | | |
|---|---|---|---|---|
| known, active fisheries habitat. Focus initially on the San Miguel and Dolores Rivers and their major tributaries. Improve aquatic habitat on these areas listed in priority order:<br>• the upper San Miguel River and its tributaries (44 miles);<br>• the upper Dolores River and its tributaries (30 miles); and<br>• the lower San Miguel River and its tributaries (20 miles).<br>Develop aquatic/riparian habitat management plans for these above three priority areas (including intensive monitoring plans) (emphasis area B) (BLM 1985). | | | habitat where consistent with maintaining native species populations. Focus initially on the San Miguel and Dolores Rivers and their major tributaries. | |
| **Allowable Use:** No similar allowable use in current RMPs. | **Allowable Use: STIPULATION** TL-3: *Coldwater Sport and Native Fish.* Prohibit in-channel stream work in all occupied streams during appropriate spring and fall spawning periods, as follows:<br>• April 1 to August 1 for rainbow and cutthroat trout and Paiute and mottled sculpin; and<br>• October 1 to November 30 for brown and brook trout.<br>(Refer to Appendix B.) (Figure 2-40, Appendix A) | **Allowable Use: STIPULATION** TL-4: *Coldwater Sport Fish.* Prohibit in-channel stream work in all trout occupied streams during appropriate spring and fall spawning periods, as follows:<br>• April 1 to June 15 for rainbow and cutthroat trout; and<br>• October 1 to November 30 for brown and brook trout.<br>(Refer to Appendix B.) (Figure 2-41, Appendix A) | **Allowable Use: STIPULATION** TL-5: *Coldwater Sport and Native Fish.* Prohibit in-channel stream work and recreational mining in all occupied streams during spawning periods, as follows:<br>• Spring: April 15 to June 30; and<br>• Fall: October 1 to November 30.<br>(Refer to Appendix B.) (Figure 2-42, Appendix A) | 119<br><br>120 and 205 |
| **Action:** Incorporate objectives to | **Action:** No similar action; this is addressed by other actions. | | | 118 |

4

BLM_0111676

| | | | | |
|---|---|---|---|---|
| protect or improve aquatic habitat into allotment management plans and habitat management plans. Develop needed habitat management plans and improvements for implementation (including monitoring plans). Habitat management plan development for aquatic species will be closely coordinated with CDOW, the US Forest Service, and, where appropriate, USFWS. Project development will require input from all resource programs to assess impacts through the environmental process (BLM 1985). | | | | 121 |
| | | | | 122 |
| *WILDLIFE – TERRESTRIAL* | | | | *123* |
| | | | | 124; Alt A moved to 127. No priority habitats in UFO |
| | | | | 125 |
| | | | | 126; No priority species in UFO |
| **Action:** | **Action:** | **Action:** | **Action:** | 127, 115, |

5

| | | | | |
|---|---|---|---|---|
| Key habitats include big game winter range, winter raptor concentration areas, bighorn sheep, pronghorn antelope, and aquatic/ riparian habitats. Maintain and improve vegetation conditions.<br><br>Protect, maintain, and enhance the following:<br>• Critical habitats for big game, upland game birds, and waterfowl; and<br>• Crucial habitats for nongame species of special interest or concern to state and other federal agencies (BLM 1985). Comply with the FLPMA to maintain, enhance, and protect fish habitat on public lands.<br><br>Manage 2,500 acres in Camelback Ridge and Upper Roubideau Creek drainages along the southeastern portion of the WSA to maintain the area's capabilities to support wintering deer, elk, and bighorn sheep. | Designate the following areas as Biological Core areas (223,040 acres) (Figure 2-1, Appendix A) and manage to preserve as much as possible the continuity of habitats, vegetation communities, and native wildlife within:<br>• Adobe Zones 1, 2, 3, and 4 (40,770 acres);<br>• Dry Creek Zones 1-5 (20,340 acres);<br>• Jumbo Mountain/McDonald Creek Zones 1-5 (17,250 acres);<br>• La Sal Zones 1-3 (22,370 acres);<br>• Monitor/Potter/Roubideau Zones 1-11 (27,320 acres);<br>• Naturita Canyon Zones 1- 4 (will be about 15,620 acres);<br>• Ridgway Zones 1-4 (16,700 acres);<br>• San Miguel Zones 1-7 (25,520 acres);<br>• Sims Mesa (XX acres);<br>• Spring Canyon (3,380 acres);<br>• Tabeguache Zones 1-10 (31,540 acres); and<br>• Terror Creek (2,230 acres). | Designate the following areas as Biological Core areas (91,630 acres) (Figure 2-2, Appendix A) and manage to preserve as much as possible the continuity of habitats, vegetation communities, and native wildlife within:<br>• Adobe Zone 3 (9,320 acres);<br>• Dry Creek Zone 4 and 5 (9,540 acres);<br>• Jumbo Mountain /McDonald Creek Zones 1 and 4 (12,580 acres);<br>• La Sal Zones 1 and 3 (13,290 acres);<br>• Monitor/Potter/Roubideau Zones 5, 6, 7, 10, and 11 (10,890 acres);<br>• Naturita Canyon Zones 1 and 4 (will be about 8,810 acres);<br>• Ridgway Zone 4 (6,270 acres);<br>• San Miguel Zones 1-3 (9,890 acres);<br>• Spring Canyon (3,380 acres); and<br>• Tabeguache Zones 4, 6, and 7 (7,660 acres).<br><br>Note to GIS: For all alternatives, Burn Canyon and Naturita Canyon are combined into one BCA (now Naturita Canyon). See the comment sheet to track zones, or see Missy | Designate the following areas as Biological Core areas (156,370 acres) (Figure 2-3, Appendix A) and manage to preserve as much as possible the continuity of habitats, vegetation communities, and native wildlife within, while following vegetation mosaic objectives:<br>• Adobe Zones 1, 3, and 4 (20,840 acres);<br>• Dry Creek Zones 2-3 (10,800 acres);<br>• Jumbo Mountain/ McDonald Creek Zones 1-4 (17,250 acres);<br>• La Sal Zones 1-3 (22,370 acres);<br>• Monitor/Potter/Roubideau Zones 1-11 (27,320 acres);<br>• Naturita Canyon Zone 1 (1,510 acres);<br>• Ridgway Zones 1 and 2 (9,070 acres);<br>• San Miguel Zones 1, 2, 3, 5, and 7 (17,640 acres);<br>• Spring Canyon (3,380 acres);<br>• Tabeguache Zones 1, 2, 4, 5, 6, 9, and 10 (23,760 acres); and<br>• Terror Creek (2,230 acres). | 135, 124 |

6

| Action: | Action: | Action: | Action: | 128, 129 |
|---|---|---|---|---|
| No similar action in current RMPs. | Designate portions of the following Biological Core areas totaling 186,280 acres as ROW exclusion:<br>• Adobe Zone 1 (11,520 acres);<br>• Burn Canyon Zones 1-3 (14,110 acres);<br>• Dry Creek Zones 1-4 (14,340 acres);<br>• Jumbo Mountain/McDonald Creek Zones 1-4 (17,250 acres);<br>• La Sal Zones 1-3 (22,370 acres);<br>• Monitor-Potter-Roubideau Zones 1-11 (27,320 acres);<br>• Ridgway Zones 1-4 (16,700 acres);<br>• San Miguel Zones 1-7 (25,520 acres);<br>• Spring Canyon (3,380 acres);<br>• Tabeguache Zones 1-10 (31,540 acres); and<br>• Terror Creek (2,230 acres).<br><br>Designate portions of the following Biological Core areas totaling 35,250 acres as ROW avoidance:<br>• Adobe Zones 2 and 3 (29,250 acres); and<br>Dry Creek Zone 5 (6,000 acres). | Designate portions of the following Biological Core area totaling 69,170 acres as ROW exclusion: Tabeguache Zone 1.<br><br>Designate portions of the following Biological Core areas totaling 69,170 acres as ROW avoidance:<br>• Adobe Zone 3 (9,320 acres);<br>• Burn Canyon Zone 1 (7,290 acres);<br>• Dry Creek Zones 4 and 5 (9,540 acres);<br>• Jumbo Mountain/McDonald Creek Zones 1 and 4 (12,580 acres);<br>• La Sal Zones 1 and 3 (13,290 acres);<br>• Monitor-Potter-Roubideau Zones 5-7, 10, and 11 (10,880 acres);<br>• Ridgway Zone 4 (6,270 acres);<br>• San Miguel Zones 1-3 (9,890 acres);<br>• Spring Canyon (3,380 acres);<br>• Tabeguache Zones 3, 4, 6, and 7 (XXXX acres); and<br>• Terror Creek (2,230 acres). | Designate all Biological Core areas totaling 156,370 acres as ROW avoidance areas.<br>Note to BLM: This does not match the GIS. Please double-check and verify. | |
| Allowable Use: | Allowable Use: | Allowable Use: | Allowable Use: | 130, 131 |

| | STIPULATION NSO-12/SSR-XX: Biological Core Areas. Prohibit surface occupancy and apply SSR restrictions within portions of Biological Core areas totaling 186,280 acres: | STIPULATION NSO-12/SSR-XX: Biological Core Areas. Prohibit surface occupancy and apply SSR restrictions within portions of Biological Core areas totaling XXXX acres: | STIPULATION CSU-18/SSR-17: Biological Core Areas. Apply CSU/SSR restrictions within all Biological Core areas totaling 156,370 acres. (Refer to Appendix B.) (Figures 2-38 and 2-54, Appendix A) | |
|---|---|---|---|---|
| No similar allowable use in current RMPs, although this is partially addressed by other actions. | • Adobe Zone 1 (11,520 acres);<br>• Burn Canyon Zones 1-3 (14,110 acres);<br>• Dry Creek Zones 1-4 (14,340 acres);<br>• Jumbo Mountain/McDonald Creek Zones 1-4 (17,250 acres);<br>• La Sal Zones 1-3 (22,370 acres);<br>• Monitor-Potter-Roubideau Zones 1-11 (27,320 acres);<br>• Ridgway Zones 1-4 (16,700 acres);<br>• San Miguel Zones 1-7 (25,520 acres);<br>• Spring Canyon (3,380 acres);<br>• Tabeguache Zones 1-10 (31,540 acres); and<br>• Terror Creek (2,230 acres).<br>(Refer to Appendix B.) (Figure 2-48, Appendix A)<br><br>Allowable Use:<br>STIPULATION CSU-18/SSR-17: Biological Core Areas. Apply CSU/SSR restrictions within portions of Biological Core areas totaling 35,250 acres. | • Tabeguache Zones 1-3 (13,800 acres).<br>(Refer to Appendix B.) (Figure 2-49, Appendix A)<br><br>Allowable Use:<br>STIPULATION CSU-18/SSR-17: Biological Core Areas. Apply CSU/SSR restrictions within portions of Biological Core areas totaling 69,170 acres:<br>• Adobe Zone 3 (9,320 acres);<br>• Burn Canyon Zone 1 (7,290 acres);<br>• Dry Creek Zones 4 and 5 (9,540 acres);<br>• Jumbo Mountain/McDonald Creek Zones 1 and 4 (12,580 acres);<br>• La Sal Zones 1 and 3 (13,290 acres);<br>• Monitor-Potter-Roubideau Zones 5-7, 10, and 11 (10,880 acres);<br>• Ridgway Zone 4 (6,270 acres);<br>• San Miguel Zones 1-3 (9,890 acres);<br>• Spring Canyon (3,380 acres); | Note to BLM: This does not match the GIS. Please double-check and verify. | |

BLM_0111678

| | | | | |
|---|---|---|---|---|
| | • Adobe Zones 2 and 3 (29,250 acres); and <br> • Dry Creek Zone 5 (6,000 acres). <br> (Refer to Appendix B.) (Figures 2-36 and 2-52, Appendix A) | • Tabeguache Zones 3, 4, 6, and 7 (XXXX acres); and <br> • Terror Creek (2,230 acres). <br> (Refer to Appendix B.) (Figures 2-37 and 2-53, Appendix A) | | 132, deleted – duplicate of travel section |
| | **Action:** <br> Annually enhance or restore at least 500 acres of terrestrial habitat to benefit primarily native, nongame species, including birds, and to increase carrying capacity for native game species emphasizing winter range and crucial habitat types. | **Action:** <br> Annually treat at least 3,000 acres of terrestrial habitat to increase carrying capacity for game species, including game birds, emphasizing winter range and crucial habitat types. | **Action:** <br> Pursue opportunities to enhance or restore terrestrial habitat to benefit primarily native nongame species, including birds, and to increase carrying capacity for native game species emphasizing winter range and crucial habitat types. | 133, 115, 135, 137, 138, 141, 142, 143 |
| **Action:** <br> Implement habitat improvement projects where necessary to stabilize and/or improve unsatisfactory or declining habitat conditions. Identify such projects through habitat management plans or coordinated resource management plans. <br><br> Develop habitat management plans and design land treatment projects and other facilities to improve the quality and quantity of winter habitat (management unit 2) (BLM 1989a). <br><br> Maintain, improve, and enhance crucial habitats for nongame species of special interest or concern to state and other federal agencies (BLM 1985). <br><br> Open the planning area to land | | | | |

## Right page (10)

| | | | | | |
|---|---|---|---|---|---|
| treatments [for wildlife] and project facility development. Maintain existing wildlife facilities and land treatments (BLM 1989a). Maintain existing wildlife habitat projects on xx acres (management unit 1) (BLM 1989a). <br><br> On xx acres (management units 3, 5, 8, 9, 13-15), maintain existing wildlife habitat projects and develop new projects if they will not decrease the woodland base (BLM 1989a). <br><br> In wildlife emphasis areas (xx acres) where livestock grazing also occurs, maintain an overall hiding cover-to-forage ratio of 40:60 for wildlife (BLM 1985). | | | | | |
| **Action:** <br> Subject to the availability of manpower and funds to complete necessary wildlife habitat improvements, on xx acres (emphasis area B), manage the habitat for current levels of deer and elk (20,000 and 1,600, respectively). Consider wildlife reductions in localized areas if monitoring the vegetative resource indicates the need to maintain use within the carrying capacity. Share the reductions | **Action:** <br> Develop a strategy with the CDOW to achieve desired habitat conditions for native species and to achieve BLM Colorado Public Land Health Standards (BLM 1997) (Appendix E). | | | | 160 |

| | | | | |
|---|---|---|---|---|
| with domestic livestock depending on monitoring results (BLM 1985). | | | | |
| | | | | 134 Same as row 68 |
| **Action:** On xx acres (management unit 2), give wildlife first priority for all additional forage made available as a result of BLM habitat improvement projects (BLM 1989a).<br><br>Maintain wildlife forage allocations at current levels until studies determine adjustments are needed to achieve management directives. Divide additional forage allocations equally between wildlife and livestock grazing (management units 3, 5, 8, 9, 13-15) (BLM 1989a). | **Action:** No similar action. | | | 136, 156, 157 |
| **Action:** On crucial [now termed "severe and winter concentration areas"] deer and elk winter range (1,730 acres), give wildlife priority for forage allocations (management unit 7) (BLM 1989a). | **Action:** No similar action; this has been completed . | | | 158 |
| | | | | 137, moved to 133 |
| | | | | 139, |

11

| | | | | |
|---|---|---|---|---|
| | | | | moved to 112 |
| | | | | 140, moved to 133 |
| **Action:** Provide investments to enhance wildlife species that will benefit from uneven-aged timber management (emphasis area J) (BLM 1985). | **Action:** No similar action; this is addressed by other actions. | | | 141 |
| | | | | 142 |
| | | | | 145 Moved to fluid minerals |
| | | | | 146 Moved to coal |
| *Terrestrial Wildlife – Big Game (Mule Deer, Elk, Pronghorn Antelope, Bighorn Sheep, Moose, Black Bear, Mountain Lion)* | | | | 147 |
| Note: Bighorn sheep includes both Rocky Mountain and Desert subspecies unless otherwise designated as one or the other. | | | | |
| Allowable Use:<br>**STIPULATION** TL-CO-9 (BLM 1991a): *Big Game Species (mule deer, elk, pronghorn antelope, and bighorn sheep).* Prohibit surface-occupancy in big game crucial winter habitat [now termed "severe and winter concentration areas"], including severe big game winter range or other definable winter ranges as mapped by the CDOW, from December 1 to April 30.<br>(Refer to Appendix B.) (Figure | Allowable Use:<br>**STIPULATION** TL-6: *Big Game Crucial Winter Range (Elk, Mule Deer, Pronghorn Antelope, Moose).* Prohibit surface-occupancy and surface-disturbing and disruptive activities in big game crucial winter range, including severe winter range and winter concentration areas as mapped by the CDOW, as follows:<br>• Elk and mule deer: December 1 to April 30<br>• Pronghorn antelope: January 1 to March 31 | Allowable Use:<br>**STIPULATION** TL-7: *Big Game Crucial Winter Range (Elk and Mule Deer).* Prohibit surface-occupancy and surface-disturbing activities in big game crucial winter range, including severe winter range and winter concentration areas for mule deer and elk as mapped by the CDOW, as follows:<br>• Elk and mule deer: January 1 to March 31.<br>(Refer to Appendix B.) (Figure 2-41, Appendix A) | Allowable Use:<br>**STIPULATION** TL-8: *Big Game Crucial Winter Range (Severe Winter Range and Winter Concentration Areas).* Prohibit surface-occupancy and surface-disturbing and disruptive activities in mapped severe winter range and winter concentration areas as follows:<br>• Elk, mule deer, pronghorn antelope, and moose: December 1 to April 30.<br>• Rocky mountain and desert bighorn sheep: November 1 to | 148 |

12

BLM_0111680

| | | | | |
|---|---|---|---|---|
| 2-39, Appendix A) | • Moose: November 15 to May 30<br>Note that some travel closures and restrictions may also apply in specific geographic areas. (Refer to Appendix B.) (Figure 2-40, Appendix A) | | April 30  (Note to GIS: "desert" was added to this list)<br>(Refer to Appendix B.) (Figure 2-42, Appendix A) | |
| Allowable Use:<br>**STIPULATION** TL (BLM 1991a): *Big Game Birthing Areas (by species).* Restrict surface-disturbing activities in the following areas:<br>• Elk calving [now termed "production"]: April 16 to June 30 [Stip. Code: CO-10]<br>• Pronghorn antelope fawning: May 1 to July 15 [Stip. Code: CO-11]<br>• Rocky Mountain bighorn sheep lambing: May 1 to July 15 [Stip. Code: CO-12]<br>• Desert bighorn sheep lambing: March 16 to May 30 [Stip. Code: CO-14]<br>(Refer to Appendix B.) (Figure 2-39, Appendix A) | Allowable Use:<br>**STIPULATION** TL-9: *Big Game Reproduction Areas (Elk, Pronghorn Antelope, Rocky Mountain and Desert Bighorn Sheep, Moose Calving/Fawning/Lambing Areas).* Prohibit surface occupancy and surface-disturbing and disruptive activities in big game reproduction areas as follows:<br>• Elk: May 15 to June 30<br>• Pronghorn antelope: May 1 to July 15<br>• Rocky Mountain bighorn sheep:<br>○ May 1 to July 15 for lambing range; and<br>○ October15 to December15 for rutting grounds.<br>• Desert bighorn sheep:<br>○ March 15 to June 15 for lambing range; and<br>○ August 1 to September 30 for rutting grounds<br>• Moose: May 15 to July 15<br>Note that some travel closures and restrictions may also apply in specific geographic areas. (Refer to Appendix B.) (Figure 2-40, Appendix A) | Allowable Use:<br>**STIPULATION** TL-10: *Big Game Reproduction Areas (Elk).* Prohibit surface occupancy and surface-disturbing activities in elk reproduction areas from May 15 to June 15. (Refer to Appendix B.) (Figure 2-41, Appendix A) | Allowable Use:<br>**STIPULATION** TL-11: *Big Game Reproduction Areas (Elk, Pronghorn Antelope, Rocky Mountain and Desert Bighorn Sheep, Moose Calving/Fawning/Lambing Areas).* Prohibit surface occupancy and surface-disturbing and disruptive activities in mapped big game production areas as follows:<br>• Elk, pronghorn antelope, Rocky Mountain bighorn sheep, and moose: April 15 to June 30; and<br>• Desert bighorn sheep: February 1 to May 1.<br>(Refer to Appendix B.) (Figure 2-42, Appendix A) | 149 |

13

| | | | | |
|---|---|---|---|---|
| Action:<br>To protect elk calving areas, prohibit motorized and mechanized travel from May 15 to June 15 in the Storm King area. | Action:<br>To protect elk calving areas, prohibit motorized and mechanized travel from April 15 to June 30 in elk production/ calving areas.<br><br>Add other areas as appropriate through future site-specific travel management analyses.<br><br>Where needed, extend seasonal closures to include pedestrian or equestrian traffic. | Action:<br>To protect elk calving areas, prohibit motorized and mechanized travel from May 15 to June 15 in elk production/ calving areas.<br><br>Add other areas as appropriate through future site-specific travel management analyses.<br><br>Where needed, extend seasonal closures to include pedestrian or equestrian traffic. | Action:<br>No similar action.  (Addressed by the action above) | 150 |
| Action:<br>Transplant bighorn sheep into the Winter Mesa area if they will not conflict with livestock. The objective is to reestablish this species in historically occupied habitat, increase total population numbers, and ensure species viability in the region (management unit 1) (BLM 1989a). | Action:<br>In suitable, historic wild sheep habitat not currently stocked with domestic sheep and goats, allow for restoring wild sheep populations. | Action:<br>No similar action. | Action:<br>In suitable, historic wild sheep habitat not currently stocked with domestic sheep and goats, allow for restoring wild sheep populations, where the risk assessment depicts existing sheep allotments are not at a high or moderate risk for disease transmission. | 154, 152 |
| Allowable Use:<br>No similar allowable use in current RMPs. | Allowable Use:<br>**STIPULATION** CSU/SSR-18: *Desert and Rocky Mountain Bighorn Sheep: Summer Range*<br>Apply CSU/SSR restrictions to reduce impacts of surface-disturbing activities and operations on bighorn sheep summer range. (Refer to Appendix B.) (Figures 2-36 and 2-52, Appendix A) | Allowable Use:<br>No similar allowable use. | Allowable Use:<br>Same as Alternative B. | 155 |

14

| | | | | 151 In grazing section |
|---|---|---|---|---|
| Refer to the Livestock Grazing section for information on domestic sheep grazing. | | | | |
| **Action:** Allow for introduction of bighorn sheep and river otters in Dolores River and the Dolores River Canyon WSA (emphasis areas C and D) (BLM 1985). | **Action:** No similar action; this is addressed by other actions. | | | 153 |
| **Action:** Incorporate non-conflicting wildlife habitat management objectives, projects, and mitigating measures into new and existing forest management plans (area identified as a productive pinyon-juniper woodland important to wildlife and livestock) (management units 1 and 3) (BLM 1989a). | **Kate/Jen:  Delete this row, and combine "A" with row #349 in the Forest/Woodland Products section.** | | | 159 |
| | | | | 161; deleted, it is about the same as (old) row 160 |
| **Action:** In big game winter range (emphasis area A), limit the width of vegetation openings to approximately 150 to 200 yards (BLM 1985). | **Action:** No similar action; this is addressed by other actions. | | | 163 |
| *Terrestrial Wildlife – Raptors* | | | | 164 |
| Refer to the *Special Terrestrial Wildlife – Raptors* section. | | | | 165 |
| | | | | 166 |

15

| | | | **Kate:** Add "waterfowl" to the stipulation title on row 39 (e.g.: Major River Corridors and Waterfowl) | 167 Deleted, covered by row 39 (Major River Corridor s) |
|---|---|---|---|---|
| *Terrestrial Wildlife – Upland Game Birds (Wild Turkeys)* | | | | 168 |
| Allowable Use: No similar allowable use in current RMPs, although this is partially addressed for some species, areas, or situations. | Allowable Use: **STIPULATION TL-13:** *Wild Turkey Winter Habitat.* Prohibit surface occupancy and surface-disturbing and disruptive activities in mapped wild turkey winter habitat from December 1 to April 1. This stipulation does not apply to operation and maintenance of production facilities. (Refer to Appendix B.) (Figure 2-40, Appendix A) | Allowable Use: No similar allowable use | Allowable Use: Same as Alternative B. (Figure 2-42, Appendix A) | 169 |
| *Terrestrial Wildlife – Migratory Birds* | | | | 170 |
| **Action:** No similar action in current RMPs. | **Action:** Use adaptive management to conserve and avoid impacts to populations of Birds of Conservation Concern, Partners-In-Flight priority species, and other species of concern. | | | Includes old row 177 |
| | | | | 171 - 176 177 |
| | | | | 178 |
| Allowable Use: Avoid large-scale disrupting land use activities such as, but not limited to, surface disturbance, from May 15 to July 15 in migratory bird habitats. Focus these protection efforts on | Allowable Use: **STIPULATION** TL-14: *Migratory Bird Breeding Habitat.* Prohibit surface occupancy and surface-disturbing and disruptive activities, including vegetation-altering projects, in migratory | Allowable Use: No similar allowable use. | Allowable Use: Same as alternative B | 179 and 178 combined |

16

BLM_0111682

| | | | | |
|---|---|---|---|---|
| USFWS Birds of Conservation Concern. | bird habitats for USFWS Birds of Conservation Concern, Partners-in-Flight species where nesting birds are present, from May 1 to July 31 (Refer to Appendix B.) (Figure 2-42, Appendix A) | | | |
| Allowable Use:<br>No similar allowable use in current RMPs. | Allowable Use:<br>**STIPULATION** CSU-22/SSR-21: *Migratory Bird Breeding Habitat.* Apply CSU/SSR restrictions to minimize impacts on migratory birds. Focus these protection efforts on USFWS Birds of Conservation Concern, Partners-in-Flight species, and other conservation priority habitats. (Refer to Appendix B.) (Figures 2-36 and 2-52, Appendix A) | Allowable Use:<br>Same as Alternative A. | Allowable Use:<br>Same as Alternative B. | 180 |
| **SPECIAL STATUS SPECIES** | | | | 181 |
| *SPECIAL STATUS SPECIES – GENERAL* | | | | *182* |
| **GOAL**:<br>Protect and enhance special status species and habitats to promote their conservation, recovery, and persistence. | | | | 183 |
| **Objective:**<br>Maintain or improve historically occupied or potentially suitable threatened and endangered species habitat. Maintain or improve habitat for sensitive plant species and wildlife species of high federal interest (emphasis area A) (BLM 1985).<br><br>Require in all land use activity plans measures designed to protect threatened and | **Objective:**<br>Restore and enhance special status species and habitats. Preserve and promote special status species conservation. Prohibit any activity that would have measurable impacts on subpopulations, populations, or habitats over the short or long term. Prohibit land use activities in specific areas.<br><br>Manage all federally threatened, | **Objective:**<br>Maintain special status terrestrial and acquatic species populations and habitats. Maintain special status plant populations and habitats while maximizing land use activities and commodity production. Provide reasonable exceptions to restrictions to facilitate land use and development.<br><br>Manage all federally threatened, | **Objective:**<br>Maintain, restore, or enhance special status species populations and associated habitats. Preserve and promote special status species conservation, including subpopulations, populations, and habitats.<br><br>Manage all federally threatened and endangered species and BLM sensitive species as key/priority species. | 184, 185, 195 |



| | | | | |
|---|---|---|---|---|
| endangered species and their habitat (BLM 1989a).<br><br>Protect, maintain, and enhance crucial habitats for nongame species of special interest or concern to state and other federal agencies (BLM 1985). | endangered, candidate, and BLM sensitive species as key/priority species. | endangered, and candidate species as key/priority species. | | |
| **Action:**<br>No similar action in current RMPs. | **Action**:<br>Recognize the following as key/priority habitats for special status terrestrial wildlife:<br>• major perennial rivers;<br>• mixed conifer and aspen;<br>• riparian areas;<br>• salt-desert;<br>• sagebrush; and<br>• cliff and canyon areas.<br><br>Recognize the following priority habitats for special status fish and aquatic wildlife:<br>• perennial water sources;<br>• riparian areas;<br>• intermittent streams and ponds; and<br>• ephemeral/ seasonal waters.<br><br>Recognize USFWS designated critical habitats as key/priority areas. | **Action**:<br>Recognize the following as key/priority habitats for special status terrestrial wildlife:<br>• major perennial rivers;<br>• riparian areas; and<br>• sagebrush.<br><br>Recognize the following priority habitats for fish and aquatic wildlife:<br>• perennial water sources; and<br>• riparian areas. | **Action:**<br>Recognize USFWS designated critical habitats as key/priority areas. | 186 |
| **Action:**<br>Allow authorization of supplemental releases and reintroduction of federal and | **Action:**<br>No similar action. | **Action:**<br>No similar action. | **Action:**<br>No similar action.<br>(Allowed by policy and law) | 187 and 196 |

| | | | | |
|---|---|---|---|---|
| state-listed endangered, threatened, and candidate species following environmental analysis and consultation with USFWS, CDOW, and other affected parties (emphasis area A) (BLM 1989a). | | | | |
| **Action:** No similar action in current RMPs. | **Action:** Pursue opportunities to enhance, protect, or restore federally threatened and endangered species habitats, including structural and vegetation improvements. | **Action:** Pursue opportunities to improve habitat, including structural and vegetation improvements, to benefit primarily game species and popular fisheries. Consider projects that would also enhance nongame species. | **Action:** Pursue opportunities to enhance, protect, or restore federally threatened and endangered species habitats. | 203 |
| **Action:** Maintain species of special importance to maintain viable population levels (emphasis area L) (BLM 1989a). | **Action:** Manage non-BLM sensitive species that are state-recognized, endemic, rare, imperiled, or otherwise important to achieve resource goals and prevent the need to protect under BLM sensitive species designation or federal listing. | **Action:** No similar action. | **Action:** Promote BLM sensitive species conservation to reduce the likelihood and need for species to be listed pursuant to the Endangered Species Act (BLM Manual 6840). | 188 |
| | | | | 189 Deleted; law and manual say we can't have jeopardy. |
| **Allowable Use:** **STIPULATION** CSU-XX: *Endangered Species Act Section 7 Consultation, and BLM Special Status Species.* Project modifications may be required to avoid impacts to BLM sensitive species. The lease area may, or is known to, contain plants, animals, or their habitats determined to be threatened, endangered, or other special status species. To avoid impacts to endangered, threatened, candidate species, designated | | | | 190 and 201 (combined) |

| | | | | |
|---|---|---|---|---|
| critical habitat, or BLM special status species, lessees must contact the UFO prior to any surface-disturbing activities associated with this lease. The lessee may be required to conduct additional inventories to insure that there are no protected species present on the proposed disturbance sites. The BLM may recommend, require modifications to, or disapprove exploration and development proposals to avoid BLM-approved activity that will contribute to a need to list such a species or their habitat. Modification or disapproval may also be required on a proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat. This could include completion of any required conference or consultation with USFWS. (Refer to Appendix B.) | | | | |
| **Allowable Use:** Conduct on-sites and biological surveys by qualified individuals (BLM 1991a). | Kate, Add this to the BMP list, then delete this row. **BMP:** *Biological Inventories.* The operator is required to conduct a biological inventory prior to approval of operations in areas of known or suspected habitat of special status species, or habitat of other species of interest such as, but not limited to, raptor nests, sage-grouse leks, or rare plant communities. Surveys shall be conducted by qualified biologist(s) using protocols established for potentially affected species during the appropriate time period(s) for the species. Survey reports, data, and determinations shall be submitted to the BLM for review and confirmation. Results from surveys expire three (3) years from the date of survey completion. Operators, the BLM, and the BLM Authorized Officer will use the information gathered to develop an appropriate mitigation plan. Mitigating measures may include, but are not limited to, relocation of development activities and fencing operations or habitat. If special status species not found during inventory are encountered during operation, operations will cease immediately, and the BLM Authorized Officer will be notified. (Refer to Appendix B.) | | | 191 |
| **Action:** Conduct on-sites and biological surveys by qualified individuals (BLM 1991a). | **Action:** To protect key wildlife species, special status species, and their habitats, surveys may be required during the time period appropriate to the species and prior to surface disturbance, habitat treatments, or similar activities. | | | 192 |
| **Action:** No similar action in current RMPs. | **Action:** Designate occupied habitat of known populations of federally threatened and endangered species as ROW exclusion. | **Action:** Designate occupied habitat of known populations of federally threatened and endangered species as ROW avoidance. Surveys may be required prior to surface disturbance. | | 193 |
| *SPECIAL STATUS PLANTS* | | | | *194* |
| | | | | 195 |
| | | | | 196 |
| **Action:** No similar action in current RMPs. | **Action:** Close all federally threatened and endangered plant species' occupied habitat (plant with a 650-foot/198-meter buffer) to material material disposal. | | | 198 |
| **Allowable Use:** Promote BLM sensitive plant | **Allowable Use:** Prohibit any land use activity that | **Allowable Use:** Prohibit any land use activity that | **Allowable Use:** **STIPULATION** CSU-24/SSR-23: | 199 |

BLM_0111684

| | | | | |
|---|---|---|---|---|
| conservation and reduce the likelihood and need for species to be listed pursuant to the Endangered Species Act (BLM Manual 6840). | would damage, injure, or remove a sensitive plant element occurrence or subpopulation. Also prohibit any activity that would detrimentally alter connectivity between subpopulations. | would damage, injure, or remove more than 10 percent of a sensitive plant element occurrence or subpopulation, either by total number of individual plants or acres of occupied habitat within the activity area. Prohibit more than 10 percent cumulative disturbance of sensitive plant element occurrences or subpopulations at any one time. | *BLM Sensitive Plant Species.* Apply CSU/SSR restrictions within 325-feet (99-meters) of BLM sensitive plant species. (Refer to Appendix B.) (Figures 2-38 and 2-54, Appendix A) | |
| Allowable Use:<br>**STIPULATION** NSO-UB-2 (BLM 1989a): *Threatened, Endangered, Candidate, and Sensitive Plant Areas.* Prohibit surface occupancy in the Fairview South ACEC/Research Natural Area (RNA) to protect the threatened, endangered, candidate, and sensitive plants and their potential habitat. (Refer to Appendix B.) (Figure 2-47, Appendix A)<br><br>**STIPULATION** NSO-CO-8 (BLM 1991a): *Special Status Plant Species.* Prohibit surface occupancy in special status plant species habitat (including federally listed and proposed species for listing and candidate species). (Refer to Appendix B.) (Figure 2-47, Appendix A) | Allowable Use:<br>**STIPULATION** NSO-15/NGD-9: *Plants: Federally Listed and Candidate Plant Species Occupied and Historic Habitat.* Prohibit surface occupancy and surface-disturbing activities within 1000-feet (305- meters) of occupied habitat of federally listed, and candidate plant species. (Refer to Appendix B.) (Figures 2-33 and 2-48, Appendix A). | Allowable Use:<br>No similar allowable use. | Allowable Use:<br>**STIPULATION** CSU-17/SSR 24: Federally Listed Plant Species. Apply controlled surface use and SSR restrictions within habitat for individuals or populations of federally listed plant species. Prohibit surface disturbing and disruptive activities within 650-feet (198-meters) of identified individuals or populations of federally-listed plant species.<br><br>[Kate Jen: The same exception, modification, and waiver criteria will apply as the previous NSO, no need to change those.] | 200 |
| Action: | Action: | | | 197 |

21

| | | | | |
|---|---|---|---|---|
| Provide protection for sensitive plant species in the Coyote Wash area of Dolores Canyon (emphasis area D) (BLM 1985). | No similar action; this is addressed by other actions. | | | |
| | | | | 201 |
| *SPECIAL STATUS FISH AND AQUATIC WILDLIFE* | | | | 202 |
| | | | | 203 |
| Action:<br>No similar action in current RMPs. | Action:<br>Partner with CDOW, USFS, USFWS, and others to remove nonnative trout and other fishes from occupied native cutthroat trout habitat. | Action:<br>No similar action. | Action:<br>Same as Alternative B. | 204 |
| | | | | 205 (covered by row 120) |
| Allowable Use:<br>No similar allowable use in current RMPs. | Allowable Use:<br>**STIPULATION** NSO-17/NGD-10: *Occupied Federally Listed Fish Habitat.* Prohibit surface occupancy and surface-disturbing activities within 1.00 mile of federally listed fish occupied habitat. (Refer to Appendix B.) (Figures 2-33 and 2-48, Appendix A) | Allowable Use:<br>**STIPULATION** NSO-18/NGD-11: *Occupied Federally Listed Fish Habitat.* Prohibit surface occupancy and surface-disturbing activities within 0.50-mile of federally listed fish occupied habitat. (Refer to Appendix B.) (Figures 2-34 and 2-49, Appendix A) | Allowable Use:<br>**STIPULATION** NSO-19/SSR-XX: *Occupied Federally Listed Fish Habitat.* Prohibit surface occupancy and apply SSR restrictions within 2,500-feet (762-meters) of the ordinary high water mark of the following major river corridors, along occupied federally listed fish habitat:<br>• San Miguel River below Pinyon;<br>• Dolores River; and<br>• Lower Gunnison River below Delta.<br><br>Prohibit surface occupancy and apply SSR restrictions within 300 feet of the edge of the ordinary high-water mark (bank-full stage) | 206 |

22

**Left page (23):**

| | | | | |
|---|---|---|---|---|
| | | | of occupied native cutthroat trout habitat. (Refer to Appendix B.) (Figures 2-35 and 2-50, Appendix A) (Refer to Appendix B.) (Figures 2-35 and 2-50, Appendix A) | |
| Allowable Use: No similar allowable use in current RMPs. | Allowable Use: **STIPULATION** CSU-25/SSR-25: *Occupied Native Cutthroat Trout Habitat.* Apply CSU/SSR restrictions within .25 mile of occupied habitat for conservation populations (90 percent pure or greater) of native cutthroat trout. (Refer to Appendix B.) (Figures 2-36 and 2-52, Appendix A) | Allowable Use: **STIPULATION** CSU-26/SSR-26: *Occupied Native Cutthroat Trout Habitat.* Apply CSU/SSR restrictions within 1000-feet of occupied habitat for conservation populations (90 percent pure or greater) of native cutthroat trout. (Refer to Appendix B.) (Figures 2-37 and 2-53, Appendix A) | Allowable Use: **STIPULATION** CSU-27/SSR-27: *Occupied Native Cutthroat Trout Habitat.* Apply CSU/SSR restrictions between 300 and 500 feet (91 and 152 meters) from occupied habitat for conservation populations (90 percent pure or greater) of native cutthroat trout. (Refer to Appendix B.) (Figures 2-38 and 2-54, Appendix A) | 207 |
| *SPECIAL STATUS TERRESTRIAL WILDLIFE* | | | | 208 |
| **Action:** Develop habitat management plans for key species and their related habitat. Several key habitats in which plans might be developed include: winter raptor concentration areas; aquatic/riparian habitats; and threatened and endangered species habitat. Closely coordinate development of habitat management plans for terrestrial and aquatic species with CDOW, US Forest Service, and, where appropriate, USFWS. (BLM 1985). | **Action:** No similar action; this is addressed by the Objective. | | | 209 |
| | | | | 210 |
| Allowable Use: | Allowable Use: | Allowable Use: | Allowable Use: | 211 |

23

| | | | | |
|---|---|---|---|---|
| No similar allowable use in current RMPs. | **STIPULATION** NSO-20/NGD-13: *Federally Threatened, Endangered, and Candidate Species' Occupied Habitat.* Prohibit surface occupancy and surface-disturbing activities within known occupied habitat for federally threatened and endangered species, except for Canada lynx. (Refer to Appendix B.) (Figures 2-33 and 2-48, Appendix A) | **STIPULATION** CSU-28/SSR-28: *Federally Threatened, Endangered, and Candidate Species' Occupied Habitat.* Apply CSU/SSR restrictions within known occupied habitat for federally threatened and endangered species, except for Canada lynx. (Refer to Appendix B.) (Figures 2-37 and 2-53, Appendix A) | **STIPULATION** NSO-21/SSR-29: *Federally Threatened and Endangered Species' Occupied Habitat.* Prohibit surface occupancy and apply SSR restrictions to surface-disturbing activities within known habitat for federally threatened and endangered species, except for Canada lynx, Mexican spotted owl and yellow-billed cuckoo. (Refer to Appendix B.) (Figures 2-38 and 2-50, Appendix A) | |
| *Special Status Terrestrial Wildlife – Yellow-billed Cuckoo* | | | | 212 |
| Allowable Use: No similar allowable use in current RMPs. | Allowable Use: **STIPULATION** NSO-22/NGD-14: *Yellow-billed Cuckoo Habitat.* Prohibit surface occupancy and surface-disturbing activities in yellow-billed cuckoo habitat. (Refer to Appendix B.) (Figures 2-33 and 2-48, Appendix A) | Allowable Use: **STIPULATION** TL-16: *Yellow-billed Cuckoo Habitat.* Prohibit surface occupancy and surface-disturbing activities within 100 meters of yellow-billed cuckoo habitat in riparian areas from May 15 to August 5. (Refer to Appendix B.) (Figure 2-41, Appendix A) | Allowable Use: **STIPULATION** CSU-29/SSR-30: *Yellow-billed Cuckoo Habitat.* Apply CSU/SSR restrictions within yellow-billed cuckoo habitat. (Refer to Appendix B.) (Figures 2-38 and 2-54, Appendix A) | 213 |
| *Special Status Terrestrial Wildlife – Desert Bighorn Sheep* | | | | 214 |
| *Refer to the Terrestrial Wildlife – Big Game (Mule Deer, Elk, Pronghorn Antelope, Bighorn Sheep, Moose, Black Bear, Mountain Lion)* section. | | | | 215 |
| **Action:** Make habitat available in the Camel Back-Roubideau Creek area for possible introduction of desert bighorn sheep to increase population numbers and genetic diversity (management unit 1) (BLM 1989a). | **Action:** No similar action; this action has been completed. | | | 216 |
| *Special Status Terrestrial Wildlife – Canada Lynx* | | | | 217 |

24

| Action: No similar action in current RMPs. | Action: Follow management actions from the most current Lynx Management Plan approved by USFWS. | | | 218, 219 |
|---|---|---|---|---|
| Allowable Use: No similar allowable use in current RMPs | Allowable Use: **STIPULATION** CSU-30/SSR-31: *Canada Lynx Habitat.* Apply CSU/SSR restrictions within mapped or identified Canada lynx habitat in Lynx Analysis Units, and to any activities that would negatively alter connectivity between and within Lynx Analysis Units. (Refer to Appendix B.) (Figures 2-36 and 2-52, Appendix A) | Allowable Use: Same as Alternative A. | Allowable Use: **STIPULATION** CSU-31/SSR-32: *Canada Lynx Habitat.* Apply CSU/SSR restrictions within mapped or identified Lynx Linkage Corridors and Canada lynx habitat in Lynx Analysis Units, and to any activities that would negatively alter connectivity between and within Lynx Analysis Units. (Refer to Appendix B.) (Figures 2-38 and 2-54, Appendix A) | 220, 222 |
| | | | | 221 |
| | | | | 222 |
| *Special Status Terrestrial Wildlife – Gunnison Sage-grouse* | | | | 223 |
| Allowable Use: **STIPULATION** TL-CO-15 (BLM 1991a): *Grouse.* Prohibit surface occupancy and surface-disturbing activities within grouse (sage- and mountain sharp-tailed grouse) crucial [now termed "severe and winter concentration areas"] winter habitat from December 16 to March 15. (Refer to Appendix B.) (Figure 2-39, Appendix A) | Allowable Use: **STIPULATION** TL-18: *Gunnison Sage-grouse Winter Habitat.* Prohibit surface occupancy and surface-disturbing activities within occupied winter range for Gunnison sage-grouse from October 1 to March 15. If winter habitats are not mapped or identified this stipulation would apply to the entire area within 6.00 miles of leks. (Refer to Appendix B.) (Figure 2-40, Appendix A) | Allowable Use: No similar allowable use. | Allowable Use: **STIPULATION** TL-19: *Gunnison Sage-grouse Winter Habitat.* Prohibit surface occupancy and surface-disturbing and disruptive activities in mapped important sage-grouse winter range as defined by BLM and CDOW from December 15 to March 15. (Refer to Appendix B.) (Figure 2-42, Appendix A) | 224 |
| Allowable Use: **STIPULATION** NSO-CO-2 | Allowable Use: **NO LEASING/** | Allowable Use: **STIPULATION** NSO- | Allowable Use: **STIPULATION** NSO-24/SSR- | 225 |

| *BLM 1991a): Grouse.* Prohibit surface occupancy within 0.25-mile radius of a lek site (courtship area) for grouse (sage- and mountain sharp-tailed grouse, and lesser and greater prairie chickens). (Refer to Appendix A.) (Figure 2-47, Appendix A) | NL-6/NGD-15: *Gunnison Sage-grouse Breeding (Lek) Habitat.* Close to fluid mineral leasing and geophysical exploration, and prohibit surface-disturbing activities, all Gunnison sage-grouse lek habitat plus a 0.60-mile radius. When existing leases expire, do not re-offer for lease occupied Gunnison sage-grouse habitat including a .60-mile radius. (Refer to Appendix B.) | 23/NGD-16: *Gunnison Sage-grouse Breeding (Lek) Habitat.* Prohibit surface occupancy and surface-disturbing activities within 1.00 mile of Gunnison sage-grouse leks. (Refer to Appendix B.) (Figures 2-34 and 2-49, Appendix A) | 34: *Gunnison Sage-grouse Breeding (Lek) Habitat.* Prohibit surface occupancy and surface-disturbing activities within a 0.60-mile radius of Gunnison sage-grouse leks. (Refer to Appendix B.) (Figures 2-38 and 2-50, Appendix A) | |
|---|---|---|---|---|
| Allowable Use: **STIPULATION** TL-X (BLM xx): *Sage-grouse Strutting Grounds.* Prohibit exploration, drilling, and other developmental activity on sage-grouse strutting grounds from March 15 to May 15. (Refer to Appendix B.) (Figure 2-39, Appendix A) *(BLM: what is the source of this stipulation?)* | Allowable Use: **STIPULATION** TL-20: *Gunnison Sage-grouse Breeding (Non-lek) Habitat.* Prohibit surface occupancy and surface-disturbing and disruptive activities within 6.00 miles of Gunnison sage-grouse leks from March 1 to June 30. (Refer to Appendix B.) (Figure 2-40, Appendix A) | Allowable Use: No similar allowable use. | Allowable Use: **STIPULATION** TL-21: *Gunnison Sage-grouse Breeding (Lek and Non-lek) Habitat.* Prohibit surface occupancy and surface-disturbing and disruptive activities within 4.00 miles of active Gunnison sage-grouse leks or mapped nesting habitat from March 1 to June 30. (Refer to Appendix B.) (Figure 2-42, Appendix A) (Note to GIS: this in only for suitable habitat that is within 4 miles of active leks. You will need to work with Missy to map this TL). | 226 |
| Allowable Use: **LEASE NOTICE** LN-CO-30 (BLM 1991a): *Grouse.* In order to protect nesting grouse species, surface-disturbing activities proposed during the | Allowable Use: **STIPULATION** NSO-25/NGD-17: *Gunnison Sage-grouse Breeding (Non-lek) Habitat.* Prohibit surface occupancy and surface-disturbing activities proposed during the | Allowable Use: **STIPULATION** CSU-33/SSR-35: *Gunnison Sage-grouse Breeding (Non-lek) Habitat.* Apply CSU/SSR restrictions within suitable habitat that is within 4.0 miles of | Allowable Use: **STIPULATION** CSU-34/SSR-36: *Gunnison Sage-grouse Breeding (Non-lek) Habitat.* Apply CSU/SSR restrictions within suitable habitat that is within 4.00 miles radius of a | 227, 228 |

BLM_0111687

**Page 27 (left)**

| | | | | |
|---|---|---|---|---|
| period between March 1 and June 30 will be relocated, consistent with lease rights granted and Section 6 of standard lease terms, out of grouse nesting habitat.<br><br>Sage-grouse nesting habitat is described as sage stands with sagebrush plants between 30 and 100 centimeters in height; and a mean canopy cover between 15 and 40 percent.<br><br>(BLM 1991a). (Refer to Appendix B.) | within 4.0 miles of an active lek or within mapped Gunnison sage-grouse nesting and early brood-rearing habitat. (Refer to Appendix B.) (Figures 2-33 and 2-48, Appendix A) | an active lek or within mapped Gunnison sage-grouse nesting and early brood-rearing habitat. To the degree possible, avoid construction of permanent structures or facilities. (Refer to Appendix B.) (Figures 2-37 and 2-53, Appendix A) | lek to protect Gunnison sage-grouse mapped seasonal habitats (non-lek breeding, late brood rearing, and winter habitat) or suitable sagebrush habitat.<br><br>Conservation measures may be imposed as necessary to maintain high-quality sage-grouse habitat, reduce fragmentation or loss of habitat within or between population areas, reduce cumulative effects within population areas, and reduce disturbance to sage-grouse use in the area. (Refer to Appendix B.) (Figures 2-38 and 2-54, Appendix A)<br><br>(Note to GIS: this in only for suitable habitat that is within 4 miles of active leks). | |

| | |
|---|---|
| **Raptors** | 229 |
| This section includes both special status raptors and non-special status raptors (from the *Terrestrial Wildlife – Raptors* section). | 230 |
| Special status raptors, including Birds of Conservation Concern, include Mexican spotted owl, peregrine falcon, northern goshawk, ferruginous hawk, burrowing owl, bald eagle, golden eagle, prairie falcon, and flammulated owl." | |
| Non-special status raptors include American kestrel, osprey, red-tailed hawk, Swanson's hawk, Cooper's hawk, sharp-shinned hawk, rough-legged hawk, Northern harrier, merlin, barn owl, boreal owl, Northern pygmy owl, northern saw-whet owl, short-eared owl, western screech owl, and great-horned owl. | |

| | | | | |
|---|---|---|---|---|
| Allowable Use:<br>**STIPULATION** TL-CO-18 (BLM 1991a): *Raptor Nesting and Fledgling Habitat.* Raptor nesting and fledgling habitat (includes the golden eagle and all | Allowable Use:<br>**STIPULATION** TL-22: *Raptor Breeding and Nesting Sites.* Prohibit surface occupancy and surface-disturbing and disruptive activities as follows: | Allowable Use:<br>No similar allowable use. | Allowable Use:<br>**STIPULATION** TL-23: *Raptor Breeding and Nesting Sites.* Prohibit surface occupancy and surface-disturbing and disruptive activities within the following areas and | 231, 232, 236, 240, 245 |

27

**Page 28 (right)**

| | | | |
|---|---|---|---|
| accipiters; falcons; except kestrel [which are very adaptable to nest in a variety of habitats; their populations are stable and widespread]; all buteos; all owls except Mexican spotted owl [see Stip. Code CO-21]): February 1 to August 15. Raptors that are listed and protected by the Endangered Species Act are addressed separately. This seasonal limitation applies to a 0.25-miles buffer zone around the nest site. (Refer to Appendix B.) (Figure 2-39, Appendix A)<br><br>Allowable Use:<br>**STIPULATION** TL-CO-20 (BLM 1991a): *Osprey Nesting and Fledgling Habitat.* April 1 to August 31. The sensitivity of osprey to human associated disturbance activities requires a half-mile buffer zone to avoid nest abandonment. (Refer to Appendix B.) (Figure 2-39, Appendix A)<br><br>Allowable Use:<br>**STIPULATION** TL-CO-22 (BLM 1991a): *Bald Eagle Nesting Habitat.* Prohibit surface use within 0.5-mile of nest site from December 15 to June 15. (Refer | • Special Status Raptors: within 0.50-mile of active special status raptor nest sites and associated alternate nests during the period from nest territory establishment to dispersal of young from nest (see Appendix B, Table B-8, Raptor Species Breeding Periods).<br>• Non-Special Status Raptors (except American kestrel): within 0.25-mile of active raptor nest sites and associated alternate nests during the period from nest territory establishment to dispersal of young from nest (see Appendix B, Table B-8, Raptor Species Breeding Periods).<br>(Refer to Appendix B.) (Figure 2-40, Appendix A) | associated time periods when nests are active, or until fledgling and dispersal of young:<br>• Bald Eagle: 0.50-mile radius around active nests from November 15 to July 31;<br>• Golden Eagle: 0.50-mile radius around active nests from December 15 to July 15;<br>• Ferruginous Hawk: 0.50-mile of active nest sites from February 1 to August 15;<br>• Peregrine and Prairie Falcon: 0.50-mile of active nest sites from March 15 to July 31;<br>• Northern Goshawk: 0.50-mile of active nest sites from March 1 to August 31;<br>• Osprey: 0.25-mile radius of active nest sites from April 1 to August 31;<br>• Red-tailed Hawk: 0.25-mile radius of active nests from February 15 to August 15;<br>• Swainson's Hawk, Cooper's Hawk, Sharp-shinned Hawk, and Northern Harrier: 0.25-mile radius of active nests from April 1 to August 15;<br>• Burrowing Owl: 0.25-mile radius of active nests from March 15 to August 15;<br>• Great Horned Owl: 0.25-mile radius of active nests from February 1 to August 15; | |

28

BLM_0111688

## Page 29

| | | | | |
|---|---|---|---|---|
| to Appendix B.) (Figure 2-39, Appendix A)<br><br>Allowable Use:<br>**STIPULATION** TL-CO-24 (BLM 1991a): *Peregrine Falcon Cliff Nesting Complex.* Prohibit surface use within 0.5-mile of peregrine falcon cliff nesting complex from March 16 to July 31. (Refer to Appendix B.) (Figure 2-39, Appendix A)<br><br>Allowable Use:<br>**STIPULATION** TL-CO-19 (BLM 1991a): *Ferruginous Hawk.* Prohibit use within one mile of nesting and fledgling habitat from February 1 to August 15. (Refer to Appendix B.) (Figure 2-39, Appendix A) | | | • Other owls and raptors (excluding kestrel): 0.25-mile radius of active nests from March 1 to August 15. (Refer to Appendix B.) (Figure 2-42, Appendix A) | |
| Allowable Use:<br>**STIPULATION** NSO-CO-3 (BLM 1991a): *Raptors (golden eagle, osprey, accipiters, falcons [except kestrel], buteos, and owls).* Prohibit surface occupancy and use within 0.125-mile of nest site. (Figure 2-47, Appendix A)<br><br>Allowable Use:<br>**STIPULATION** NSO-CO-4 (BLM 1991a): *Bald Eagle.* Prohibit surface occupancy and use within 0.25-mile of bald | Allowable Use:<br>**STIPULATION** NSO-27/NGD-18: *Raptor Nest Sites.*<br>• Special Status Raptors: Prohibit surface occupancy and surface disturbing and disruptive activities within 0.25-mile of active special status raptor nest sites and associated alternate nests.<br>• Non-Special Status Raptors (except kestrel): Prohibit surface occupancy and surface disturbing and disruptive activities within 0.125-mile | Allowable Use:<br>**STIPULATION** NSO-26: *Special Status Raptor Nest Sites.* Prohibit surface occupancy within the following areas:<br>• *Bald Eagle:* within 0.25-mile of bald eagle roost or nest sites.<br>• *Raptors (golden eagle, osprey, accipiters, falcons [except kestrel], buteos, and owls):* within 0.125-mile of nest site.<br>• *Peregrine Falcons:* within 0.25-mile of cliff nesting complex. (Refer to Appendix B.) (Figure 2-49, Appendix A) | Allowable Use:<br>**STIPULATION** NSO-29/SSR-20: *All Raptor Nest Sites (except Mexican spotted owl).* Prohibit surface occupancy and apply SSR restrictions within the following areas:<br>• Bald Eagle and Golden Eagle: within 0.25-mile of active and inactive nest sites or within 325-feet (99 meters) of abandoned nests (i.e., unoccupied for 5 consecutive years but with all or part of the nest remaining);<br>• Ferruginous Hawk, Peregrine | 233, 235, 241, 234 |

## Page 30

| | | | | |
|---|---|---|---|---|
| eagle roost or nest sites. (Refer to Appendix B.) (Figure 2-47, Appendix A)<br><br>Allowable Use:<br>**STIPULATION** NSO-CO-5 (BLM 1991a): *Peregrine Falcons.* Prohibit surface occupancy and use within 0.25-mile of cliff nesting complex. (Refer to Appendix B.) (Figure 2-47, Appendix A) | (660 feet) of active nest sites and associated alternate nests. (Refer to Appendix B.) (Figures 2-33 and 2-48, Appendix A)<br><br>Allowable Use:<br>**STIPULATION** CSU-35/SSR-*xx*: *Raptor Breeding Habitat.* Apply CSU and SSR restrictions within the following areas:<br>• Special Status Raptors (including Mexican spotted owl): within 1.0 mile of nest sites.<br>• Non-Special Status Raptors (except American kestrel): within 0.5-mile of nest sites. (Refer to Appendix B.) (Figure 2-52, Appendix A) | • Non-Special Status Raptors *(except American kestrel: red-tailed hawk, and great-horned owl):* within 330 feet of active nest sites and associated alternate nests. (Refer to Appendix B.) | Falcon, Prairie Falcon, and Northern Goshawk: within 0.50-mile of active and inactive nest sites;<br>• All other Special Status and Non-Special Status Raptors (except Mexican spotted owl): within 0.25-mile of active and inactive nest sites. (Refer to Appendix B.) (Figures 2-35 and 2-50, Appendix A)<br><br>Allowable Use:<br>**STIPULATION** CSU-36/SSR-*xx*: *Raptor Breeding Habitat (accipiters, falcons [except kestrel], buteos, and owls [except Mexican spotted owl]).* Apply CSU and SSR restrictions within 1.0 mile of nest sites. (Refer to Appendix B.) (Figure 2-54, Appendix A) | |
| Allowable Use:<br>**STIPULATION** TL-CO-23 (BLM 1991a): *Bald Eagle Winter Roost Sites.* Prohibit surface use within 0.5-mile of bald eagle winter roost sites from November 16 to April 15. (Refer to Appendix B.) (Figure 2-39, Appendix A) | Allowable Use:<br>**STIPULATION** NSO-31/NGD-21: *Bald Eagle Winter Roost Sites.* Prohibit surface occupancy and surface-disturbing activities within 0.50-mile of bald eagle winter roost sites. (Refer to Appendix B.) (Figures 2-33 and 2-48, Appendix A) | Allowable Use:<br>No similar allowable use. | Allowable Use:<br>**STIPULATION** NSO-32/SSR-22: *Bald Eagle Winter Roost Sites.* Prohibit surface occupancy and apply SSR restrictions within 0.25-mile of bald eagle winter roost sites. (Refer to Appendix B.) (Figures 2-35 and 2-50, Appendix A)<br><br>Allowable Use:<br>**STIPULATION** TL-24: *Bald Eagle Winter Roost Sites.* Prohibit | 237 |

BLM_0111689

| | | | | |
|---|---|---|---|---|
| | | | surface occupancy and surface-disturbing activities within 0.5-mile of an active bald eagle winter roost from November 15 to March 15. (Refer to Appendix B.) (Figure 2-42, Appendix A) | |
| Allowable Use: **STIPULATION** TL-SJ-7 (BLM 1991a): *Bald Eagle Winter Concentration Areas.* Prohibit surface use from December 1 to April 15.<br><br>**STIPULATION** TL-UB-3 (BLM 1989a): *Bald Eagle Winter Concentration Areas.* Prohibit development activities (exploration, drilling, etc.) from December 1 to April 30. (Refer to Appendix B.) (Figure 2-39, Appendix A) | Allowable Use: **STIPULATION** CSU-37/SSR-37: *Bald Eagle Habitat (Winter Concentration and Communal Roosts).* Apply CSU/SSR restrictions within bald eagle habitat to protect winter concentration areas and communal roost sites. Incorporate applicable conservation measures from the USFWS National Bald Eagle Management Guidelines. (Refer to Appendix B.) (Figures 2-36 and 2-52, Appendix A)<br><br>Allowable Use: **STIPULATION** TL-25: *Bald Eagle Winter Concentration Areas.* Prohibit surface occupancy and surface-disturbing and disruptive activities within winter concentration areas from November 15 to April 1. (Refer to Appendix B.) (Figure 2-40, Appendix A) | Allowable Use: Same as Alternative A. | Allowable Use: Same as Alternative B (CSU/SSR).<br><br>Allowable Use: Same as Alternative B (TL). | 238, 239 |
| Allowable Use: **STIPULATION** TL-CO-21 | Allowable Use: **STIPULATION** NSO- | Allowable Use: No similar allowable use; this is | Allowable Use: **STIPULATION** TL-26: *Mexican* | 242, 243, 244 |

| | | | | |
|---|---|---|---|---|
| (BLM 1991a): *Mexican Spotted Owl Nesting and Fledgling Habitat.* Prohibit surface use in core area of territory from February 1 to July 31. Mexican spotted owl habitat is restricted by use of a timing limitation applied to core areas within the owl habitat territory. (Refer to Appendix B.) (Figure 2-39, Appendix A)<br><br>**STIPULATION** NSO-CO-6 (BLM 1991a): *Mexican Spotted Owl.* Prohibit surface occupancy and use within 0.25-mile of confirmed roost and nesting sites. (Refer to Appendix B.) (Figure 2-47, Appendix A) | 33/NGD-23: *Mexican Spotted Owl.* Prohibit surface occupancy and surface-disturbing activities within 1.0 mile of confirmed roost nesting sites. (Refer to Appendix B.) (Figures 2-33 and 2-48, Appendix A) | addressed by another NSO (NSO-26: *Special Status Raptor Nest Sites*). | *Spotted Owl Suitable Breeding Habitat (Nesting and Fledgling Habitat).* Prohibit surface occupancy and surface-disturbing and disruptive activities in suitable Mexican spotted owl breeding habitat from March 1 to August 31. (Refer to Appendix B.) (Figure 2-42, Appendix A)<br><br>Allowable Use: **STIPULATION** CSU-38/SSR-38: *Mexican Spotted Owl Suitable Breeding Habitat.* Apply CSU/SSR restrictions to Mexican spotted owl breeding habitat to avoid impacts to habitat. Manage in accordance with the current MSO recovery plan. Field Manager may require the proponent/applicant to submit a plan of development that demonstrates that impacts to Mexican spotted owl habitat have been avoided to the extent practicable.<br><br>(Refer to Appendix B.) (Figures 2-38 and 2-54, Appendix A)<br><br>Allowable Use: **STIPULATION** NSO-34/SSR-24: *Mexican Spotted Owl.* Prohibit surface occupancy and apply SSR restrictions on lands identified as Protected Activity Centers for Mexican spotted owl. (Refer to | |

BLM_0111690

| Allowable Use | Allowable Use | Allowable Use | Allowable Use | # |
|---|---|---|---|---|
| | | | Appendix B.) (Figures 2-35 and 2-50, Appendix A) | 246 |
| *Special Status Terrestrial Wildlife – Gunnison's and White-tailed Prairie Dog* | | | | 247 |
| Allowable Use: No similar allowable use in current RMPs. | Allowable Use: **STIPULATION** NSO-35/NGD-25: *Gunnison and White-tailed Prairie Dogs.* Prohibit surface occupancy and surface-disturbing activities within 150 feet of active prairie dog towns. (Refer to Appendix B.) (Figures 2-33 and 2-40, Appendix A) | Allowable Use: **STIPULATION** NSO-36/NGD-26: *Gunnison and White-tailed Prairie Dogs.* Prohibit surface occupancy and surface-disturbing activities that are more than 1 acre in size within active prairie dog towns that are less than 10 acres in size. Relocate these activities outside the active prairie dog town. (Refer to Appendix B.) (Figures 2-34 and 2-49, Appendix A) | Allowable Use: **STIPULATION** CSU-39/SSR-39: *Gunnison and White-tailed Prairie Dogs.* Apply CSU/SSR restrictions within 150 feet of active prairie dog towns to minimize adverse impacts to prairie dog populations or their habitat. (Refer to Appendix B.) (Figures 2-38 and 2-54, Appendix A) | |
| Allowable Use: No similar allowable use in current RMPs. | Allowable Use: **STIPULATION** TL-27: *Gunnison and White-tailed Prairie Dog.* Prohibit surface occupancy and surface-disturbing and disruptive activities within 300 feet of active prairie dog towns from March 1 to July 15 to protect reproduction. (Refer to Appendix A.) (Figure 2-40, Appendix A) | Allowable Use: Same as Alternative A. | Allowable Use: **STIPULATION** TL-28: *Gunnison and White-tailed Prairie Dog.* Prohibit surface occupancy and surface-disturbing and disruptive activities within 300 feet of active prairie dog colonies from April 1 to July 15 to protect reproduction. (Refer to Appendix B.) (Figure 2-42, Appendix A) | 248 |
| Action: No similar action in current RMPs. | Action: Designate prairie dog colonies with burrowing owls as "no shooting zones;" | Action: No similar action. | Action: No similar action. | |
| Action: No similar action in current RMPs. | Action: In cooperation with CDOW, developing and managing prairie dog release areas on BLM lands | Action: No similar action. | Action: No similar action. | |

33

| | | | | # |
|---|---|---|---|---|
| | where private interest groups could be permitted to relocate prairie dogs from areas threatened by development on private lands. | | | 249 |
| *Special Status Terrestrial Wildlife – Kit Fox* | | | | 250 |
| Allowable Use: No similar allowable use in current RMPs. | Allowable Use: **STIPULATION** CSU-40/SSR-40: *Active Kit Fox Dens.* Apply CSU/SSR restrictions within 0.25-mile of active kit fox dens. (Refer to Appendix B.) (Figures 2-36 and 2-52, Appendix A) | Allowable Use: **STIPULATION** TL-29: *Active Kit Fox Dens.* Prohibit surface occupancy and surface-disturbing activities within 400 feet of active kit fox dens nesting and feeding habitat areas from February 15 to August 30 (Wilson and Ruff 1999). (Refer to Appendix B.) (Figure 2-41, Appendix A) | Allowable Use: **STIPULATION** CSU-41/SSR-41: *Active Kit Fox Dens.* Apply CSU/SSR restrictions within 650 feet (198 meters) of active kit fox dens. (Refer to Appendix B.) (Figures 2-38 and 2-54, Appendix A)  **STIPULATION** TL-30: *Active Kit Fox Dens.* Prohibit surface occupancy and disruptive activities within 0.25-mile of active dens from February 1 to May 1. (Refer to Appendix B.) (Figure 2-42, Appendix A) | |
| *Special Status Terrestrial Wildlife – Bats* | | | | 251 |
| Action: Maintain the Cory Lode mine (17.8 acres) to protect sensitive bats. | Action: Maintain the Cory Lode mine (17.8 acres) as withdrawn from locatable mineral entry to protect sensitive bats. Petition the Secretary of the Interior for withdrawal from locatable mineral entry for sensitive bat species' significant maternity roost or hibernaculum. | Action: Same as alternative A. | Action: Same as alternative A. | 252 |
| Allowable Use: No similar allowable use in current RMPs. | Allowable Use: **STIPULATION** NSO-37/NGD-27: *Bat Roost Sites and* | Allowable Use: **STIPULATION** CSU-42/SSR-42: *Bat Roost Sites and Winter* | Allowable Use: **STIPULATION** NSO-38/SSR-44: *BLM Sensitive Bat Species Roost* | 253 |

34

BLM_0111691

| | | | | |
|---|---|---|---|---|
| | Winter Hibernacula. Prohibit surface occupancy and surface-disturbing activities within 0.25-mile of federally listed, BLM sensitive, and Colorado State Species of Concern bat species' maternity roost sites and winter hibernacula (all entrances to cave/mine network). (Refer to Appendix B.) (Figures 2-33 and 2-48, Appendix A) | Hibernacula. Apply CSU/SSR restrictions within 0.25-mile of federally listed, BLM sensitive, and Colorado State Species of Concern bat species' maternity roost sites and winter hibernacula (all entrances to cave/mine network). (Refer to Appendix B.) (Figures 2-37 and 2-53, Appendix A) | Sites and Winter Hibernacula. Prohibit surface occupancy and apply SSR restrictions within 0.25-mile of federally-listed and BLM sensitive bat species' maternity roost sites and winter hibernacula (all entrances to cave/mine network). (Refer to Appendix B.) (Figures 2-38 and 2-50, Appendix A)<br><br>STIPULATION CSU-43/SSR-43: *Colorado State Species of Concern Bat Roost Sites and Winter Hibernacula.* Apply CSU/SSR restrictions within 0.25-mile of Colorado State Species of Concern bat maternity roost sites and winter hibernacula (all entrances to cave/mine network). (Refer to Appendix B.) (Figures 2-38 and 2-54, Appendix A) | |
| *Special Status Terrestrial Wildlife – Waterfowl and Shorebirds* | | | | *258* |
| Allowable Use:<br>**STIPULATION** NSO-CO-7 (BLM 1991a): *Waterfowl and Shorebirds.* Prohibit surface occupancy and use on significant production areas (major areas are Waterfowl Habitat Management Areas and rookeries). (Refer to Appendix B.) (Figure 2-47, Appendix A)<br><br>Allowable Use:<br>**STIPULATION** TL-CO-17 | **NO LEASING/**<br>**STIPULATION** NL-I/NGD-XX: *Waterfowl and Shorebird Breeding.* Close to fluid mineral leasing and geophysical exploration, and prohibit surface-disturbing activities, within 0.25-mile of bank-full stage or within 100 meters (328 feet) of the 100-year floodplain (whichever is greatest) on the Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and | Allowable Use:<br>**STIPULATION** CSU-XX/SSR-XX: *Waterfowl and Shorebirds.* Apply CSU/SSR restrictions within 0.25-mile of bank-full stage or within 100 meters (328 feet) of the 100-year floodplain (whichever is greatest) on the Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and Dolores Rivers. (Figures 2-XX and 2-XX, Appendix A) (Refer to Appendix B.) | Allowable Use:<br>**STIPULATION** NSO-14/SSR-20: *Waterfowl and Shorebird Breeding Habitats.* Prohibit surface occupancy and apply SSR restrictions within 0.25-mile of bank-full stage or within 325-feet (99-meters) of the 100-year floodplain (whichever is greatest) of the Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and Dolores Rivers. (Refer to Appendix B.) | 259 and 260 |

35

| | | |
|---|---|---|
| (BLM 1991a): White Pelican. Prohibit use within white pelican nesting and feeding habitat areas from March 16 to September 30. (Refer to Appendix B.) (Figure 2-39, Appendix A) | Dolores Rivers. (Refer to Appendix B.) (Figures 2-XX and 2-XX, Appendix A) | (Figures 2-38 and 2-50, Appendix A)<br>GIS: Don't double-count NSO across; this is the same as a row (19) in Soil and Water). (for all three alternatives) |
| **WILDLAND FIRE ECOLOGY AND MANAGEMENT** | | |

36

| | |
|---|---|
| **From:** | Krickbaum, John |
| **To:** | Angie Adams; Broyles, Levi; daves@sanmiguelcounty.org; davidvarley@kaycee.net; jcoates@town.ridgway.co.us; Jennifer Whitaker; joanm@sanmiguelcounty.org; joereagan741@yahoo.com; Kate Wynant; Kauffman, Krag D; kjensen@ci.montrose.co.us; Krickbaum, John; lpadgett@ouraycountyco.gov; ivnn@mtngeogeek.com; Magee, Deborah M; mpeiietier@gunnisoncounty.org; norwoodparker@centurytei.net; pat@cedaredgecolorado.com; Randall-Parker, Tamera K; Reinkensmeyer, Dan; renzo.delpiccolo@state.co.us; Schroeder, Alan M; segfahlt@gmail.com; shansen@deltacounty.com; sharold@ci.olathe.co.us; Sharp, Charles; Sharrow, Barbara L; swhite@montrosecounty.net; townofpaonia@tds.net; UFO AR |
| **Subject:** | Final Notes: Uncompahgre RMP Cooperating Agency Meeting #9 |
| **Date:** | Wednesday, January 11, 2012 8:26:43 AM |
| **Attachments:** | UFO-CA_2011-11-15_FinalNotes.pdf |

Hello Cooperating Agencies,

I have attached the final notes from the November 15 Cooperating Agency meeting.  We have not yet scheduled our next meeting but will notify you as soon as one is scheduled.

Regards,
Bruce


Bruce Krickbaum
Planner, Environmental Coordinator
BLM, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401
970.240.5384

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

BLM_0111693



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401



# COOPERATING AGENCY MEETING #9

## Tuesday, November 15, 2011 (1:00 – 4:00 PM)

## Meeting Location:
**Holiday Inn Express (Jordan Room C)**
**1391 South Townsend Avenue, Montrose, CO**

# MEETING NOTES

**Attendees:**

*Cooperating Agencies:* Levi Broyles (US Forest Service), Renzo DelPiccolo (Colorado Department of Natural Resources, Southwest Region), Susan Hansen (Delta County Board of County Commissioners), Scott Harold (Town of Olathe), William Long (Town of Nucla), Joan May (San Miguel County BOCC), Mike Pelletier (Gunnison County), Barbara Peterson (Town of Paonia), Joe Reagan (Town of Norwood), Alan Schroeder (Bureau of Reclamation, Western Colorado Area Office), Charlie Sharp (US Fish and Wildlife Service), Steve White (Montrose County BOCC)

*BLM Uncompahgre Field Office:* Bruce Krickbaum, Barb Sharrow

*EMPSi:* Jennifer Whitaker, Kate Wynant

**Handouts:** Agenda; Highlights of the RMP Process to Date; Major Changes to Chapter 2 (Alternatives); Comments on June 2011 Internal Draft Chapter 2 for BLM Field Office, Cooperating Agency, and RAC Subgroup Review (via E-mail)

---

**1.    Welcome** (Bruce Krickbaum)
- The purpose is to review comments received on and major changes to draft Chapter 2.
- BLM received about 1,300 comments on Chapter 2. All responses are included in the document that was emailed to you prior to this meeting (approximately 300 pages).

**2.    Introductions** (Kate Wynant)

**3.    Planning Process to Date** (Kate Wynant)
- See handout: *Highlights of the Resource Management Planning Process to Date*
- The only thing new on this handout to note is that BLM is making a few revisions to the Reasonably Foreseeable Development (RFD) scenario to address shale gas. It is not anticipated that these changes will change Chapter 2 (Alternatives). The changes will better reflect the number of wells and help us do a better job on the analysis.
- Chapter 2 is being revised; GIS is being updated. Chapter 2 will be hand delivered to the BLM Colorado State Office on Monday, December 12, 2011. Bruce and Barb will also have a briefing with the State Office on this day. The State Office will have four weeks to review and comment

---

BLM_0111694

on Chapter 2. BLM will start impact analysis once all State Office comments have been resolved. BLM will encourage the Interdisciplinary Team to contact their State Office counterparts, but our hope is that our efforts of coordinating with you folks will minimize comments from the State Office.

- Barb further thanked the group for all of their hard work. This process [addressing comments] took a lot longer than we thought because of the number of comments we received, but we would much rather address these comments now rather than later. BLM's decision space is not a broad as some of us would like it to be because of existing laws.

## 4.    Comments on June 2011 Internal Draft Chapter 2 for BLM Field Office, Cooperating Agency, and RAC Subgroup Review

- See handout: *Major Changes to Chapter 2 (Alternatives)*
- *Question*: Can you please explain the difference of a Special Recreation Management Area (SRMA) verses an Extensive Recreation Management Area (ERMA)? *Answer*: The dominant use in SRMAs is recreation. BLM will focus on recreation by applying use limits, actively seeking funds, working with user groups, etc. In an ERMA, BLM knows recreation activities are occurring in the area, but there are many other uses for which the BLM will also manage. BLM may provide recreation trails and facilities in these areas, but not at the expense of other resources. If an area is managed as both an SRMA and an Area of Critical and Environmental Concern (ACEC) (e.g. for plants), then management actions will be carefully evaluated to ensure consistency between the two.
- *Question*: What is the status of Ridgway Trails? *Answer*: At the RMP level, we are looking at allocation-level decisions. There is also transportation planning which we can do within the confines of our existing plan. BLM will be doing a comprehensive travel management plan for Ridgway starting this winter; you should receive notice of that planning effort soon.
- *Question*: With the reorganization of the biological resources section, is there still a section specific to sage-grouse? *Answer*: Yes, we combined all of the management actions for raptors since they were basically all saying the same thing. There are still separate sections for wildlife and threatened and endangered species. We also eliminated redundancy (i.e., many rows said the same thing). Watchable wildlife areas were dropped because the District Manager said these areas should be reserved for very special areas.
- There is a baseline air quality analysis going on right now. The model takes a couple months to run. The model will tell us changes to air quality as a result of implementing our alternatives.
- Priority species and priority habitat has been dropped from the biological resources section. As previously written, it didn't really mean anything because it covered the entire field office and all of the species. Nothing was really "special". *Comment*: BLM should refer to the 1989 Desert Bighorn Sheep Management Plan and consider identifying desert bighorn sheep as a priority species.
  - o *BLM Action*: BLM will review the 1989 Desert Bighorn Sheep Management Plan and consider the desert bighorn sheep as a priority species.
- *Comment (BLM)*: Areas that are closed seasonally to protect wildlife are closed to motorized and mechanized users. At this morning's RAC Subgroup meeting, a member asked that BLM add equestrian users to the seasonal closure noting that equestrian users can be just as damaging. BLM's question to Colorado Department of Parks and Wildlife (CPW) is: does equestrian use disturb wildlife as much as motorized and mechanized use? *CPW response*: Impacts from equestrian verses mechanized use is fairly equal. Motorized use adds the extra noise. The bigger issue it often the accompanying dogs. You don't see the dogs with motorized use, but you do see them with hikers and equestrian users.
- *Comment (BLM)*: To protect seasonal wildlife – right now seasonal closures apply to mechanized and motorized use. Should BLM add equestrian use? *CPW response*: Yes, if we are worried about moving animals out of an area. In spring, during calving and fawning, we don't usually see total

BLM_0111695

human closures. No, I don't see a difference in equestrian and mechanized use. CPW usually does total closure or motorized closure. Note that motorized users should be distinguished between ATV users and snowmobilers.

- o *BLM Action*: BLM will re-evaluate what uses are prohibited in seasonal closures.
- o *BLM Action*: BLM will review "and/or" statements associated with motorized and mechanized use designations.
- Question (#290): Why can't you do route density as part of this planning process? <u>Answer</u>: Because it varies so much area to area. We felt there was so much of a difference that this would be better to address during the route process instead of this one. Within five years of signing the Record of Decision, we will have to finish our route designation process for the entire field office.
  - o *BLM Action*: BLM will review route density in biological core areas to determine if it makes sense to add a route density in those areas.
  - o *BLM Action*: BLM will email fish and wildlife and threatened and endangered species sections to the Cooperating Agencies for review.
- *Question*: What is the definition of trailing? <u>Answer</u>: Moving cattle from one place to another.
  - o *BLM Action*: BLM will add a definition of "trailing" to the glossary.
- *Question (#252)*: CPW inquired about this comment and BLM's response. CPW noted that flannel mouth sucker, bluehead sucker, and roundtail chub are part of an agreement and BLM should relook at the aquatic reaches to determine if these areas warrant additional protection. Razorback sucker and Colorado pikeminnow are currently listed under ESA. The Colorado River cutthroat trout is a BLM sensitive species. <u>Answer</u>: BLM will re-evaluate these management actions.
  - o *BLM Action*: BLM will reconsider the proposed management actions for flannel mouth sucker, bluehead sucker, and roundtail chub.
  - o *BLM Action*: BLM will send the Cooperating Agencies the revised VRM maps.
  - o *BLM Action*: BLM will try to establish a mechanism by which they can share their information (particularly maps), and evaluate the potential for an interactive map on BLM's website (i.e., an interactive map that shows all layers).
- Question (#382): BLM will talk to Missy and Charlie to add "proposed" back and get the definition, per Endangered Species Act and US Fish and Wildlife Service, for glossary. *[Note: the following is the definition of "proposed species" from USFWS glossary (http://www.fws.gov/endangered/esa-library/pdf/glossary.pdf): A species of animal or plant that is proposed in the Federal Register to be listed under section 4 of the Endangered Species Act.]*
  - o *BLM Action*: BLM will talk to Missy and Charlie regarding the "proposed" species.
- *Comment (#604)*: What sort of conditions do you foresee that you would allow less than a three year rest period? CPW's recommendation is you need at least three years and then you decide how to adjust from there. The vegetation may look good, but it doesn't have the vegetation base to sustain cattle. <u>Answer</u>: BLM will re-evaluate this management action.
  - o *BLM Action*: BLM will review row 379 in Chapter 2.
  - o *Comment*: If the area is disturbed from fire, I would argue that a three year rest period isn't necessary. *Comment*: If partners are going to invest money, they may expect longer rest periods.
- *Comment*: If Congress releases WSAs, will all of those areas be managed as ACECs? <u>Answer</u>: No, each WSA has different management proposed. Some would be ACECs some might be SRMAs.

## 5. **Next Steps**
- Please send us any other comments/questions by end of December. You will get action items (discussed at this meeting) by December 12th.

BLM_0111696

**6.     Other Items Not on the Agenda**

N/A

**7.     Action Items / Next Meeting**

- Our next meeting will likely not be until next April or May, unless comments received from the State Office warrant otherwise.
- *BLM Action*: BLM will review the 1989 Desert Bighorn Sheep Management Plan and consider the desert bighorn sheep as a priority species.
- *BLM Action*: BLM will re-evaluate what uses are prohibited in seasonal closures.
- *BLM Action*: BLM will review "and/or" statements associated with motorized and mechanized use designations.
- *BLM Action*: BLM will review route density in biological core areas to determine if it makes sense to add a route density in those areas.
- *BLM Action*: BLM will email fish and wildlife and threatened and endangered species sections to the Cooperating Agencies for review
- *BLM Action*: BLM will add a definition of "trailing" to the glossary.
- *BLM Action*: BLM will reconsider the proposed management actions for flannel mouth sucker, bluehead sucker, and roundtail chub.
- *BLM Action*: BLM will send the Cooperating Agencies the revised VRM maps.
- *BLM Action*: BLM will try to establish a mechanism by which they can share their information (particularly maps), and evaluate the potential for an interactive map on BLM's website (i.e., an interactive map that shows all layers).
- *BLM Action*: BLM will talk to Missy and Charlie regarding the "proposed" species.
- *BLM Action*: BLM will review row 379 in Chapter 2.

BLM_0111697

| From: | Krickbaum, John |
|---|---|
| To: | Angie Adams; barbara_hawke@tws.org; billday@paonia.com; Jennifer Whitaker; john@reams-construction.com; Kate Wynant; Kauffman, Krag D; Krickbaum, John; Magee, Deborah M; pmueller@tnc.org; rich@richdurnanphoto.com; robbie.levalley@colostate.edu; sbear@dmea.com; Sharrow, Barbara L; silvers1@tds.net; steve.weist@oxbow.com; tkctew@yahoo.com; UFO AR; wblack8709@msn.com |
| Subject: | Final Minutes: Uncompahgre RMP RAC Subgroup Meeting #9 |
| Date: | Wednesday, January 11, 2012 8:29:16 AM |
| Attachments: | UFO-RAC 2011-11-15 FinalMinutes.pdf |

Hello RAC Subgroup,

I have attached the final notes from the November 15 RAC Subgroup meeting.  We have not yet scheduled our next meeting but will notify you as soon as one is scheduled.

Regards, Bruce

Bruce Krickbaum
Planner, Environmental Coordinator
BLM, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401



# RAC SUBGROUP MEETING #9

## Tuesday, November 15, 2011 (9:00 AM – 12:00 PM)

## Meeting Location:
**Holiday Inn Express (Jordan Room C)**
**1391 South Townsend Avenue, Montrose, CO**

# Meeting Notes

**Attendees:**
> **RAC Subgroup:** Shelby Bear, Walt Blackburn, Bill Day, Richard Duran, William Ela, Barbara Hawke, Peter Mueller, John Reams, Steve Weist, Kathy Welt (via telephone)
>
> **BLM Uncompahgre Field Office:** Bruce Krickbaum, Barb Sharrow
>
> **EMPSi:** Jennifer Whitaker, Kate Wynant
>
> **General Public:** None

**Handouts:** Agenda; Highlights of the RMP Process to Date; Major Changes to Chapter 2 (Alternatives); Comments on June 2011 Internal Draft Chapter 2 for BLM Field Office, Cooperating Agency, and RAC Subgroup Review (via E-mail)

## 1. Welcome (Bruce Krickbaum)
- The purpose is to review comments received on and major changes to draft Chapter 2.
- BLM received about 1,300 comments on Chapter 2. All responses are included in the document that was emailed to you prior to this meeting (approximately 300 pages).

## 2. Introductions (all present)

## 3. Planning Process to Date (Kate Wynant)
- See handout: *Highlights of the Resource Management Planning Process to Date*
- The only thing new on this handout to note is that BLM is making a few revisions to the Reasonably Foreseeable Development (RFD) scenario to address shale gas. It is not anticipated that these changes will change Chapter 2 (Alternatives).
- *Question*: What is the status of the coal report? *Answer*: The Coal Potential report is near complete; it will be posted on the UFO's RMP planning website when it is final. The second coal report provides details on the unsuitability criteria, which will be an appendix to the RMP.
- Chapter 2 is being revised; GIS is being updated. Chapter 2 will be hand delivered to the BLM Colorado State Office on Monday, December 12, 2011. Bruce and Barb will also have a briefing with the State Office on this day. The State Office will have four weeks to review and comment on Chapter 2. BLM will start impact analysis once all State Office comments have been resolved.

---

- Barb added that as you review the comment response matrix, you will see polar opposite comments for the preferred alternative.
- *Question*: can the RAC Subgroup see the whole picture again after the State Office review? *Answer*: Yes, you will see the document once the analysis of the alternatives is complete. Prior to that, BLM will decide if State Office comments are significant enough to bring you back together to review those changes.
- In many instances, the BLM's decision space is very small. BLM is working under 100 years of legislation.

## 4. Comments on June 2011 Internal Draft Chapter 2 for BLM Field Office, Cooperating Agency, and RAC Subgroup Review (Kate Wynant)

- See handout: *Major Changes to Chapter 2 (Alternatives)*
- Desert bighorn sheep issue is a huge in this area because there are no natural boundaries for domestic and Rocky Mountain sheep.
- *Question (Recreation & Forestry)*: Does Ridgway Trail Special Recreation Management Area (SRMA) Recreation Management Zone (RMZ) 1 allow personal firewood cutting? *Answer*: No, Ridgway Trail SRMA RMZ 1 does not, but RMZ 2 does.
  - *BLM Action*: BLM will reevaluate the distinction between Ridgway Trail SRMA RMZ 1 and 2 to ensure the management actions are accurate.
- *Comment (Recreation [#619])*: Walt meant for the comment to read, "Change the numbers more than 24 people in all other areas gathering at a single location for more than 2 hours to read….20 people & 8 hours…" The action was changed to restrict the number of people to no more than 16 in WSAs and 25 elsewhere, unless otherwise restricted. Walt agreed that this was ok. There was no discussion on the timeframe.
- *Comment (Travel Management [#719 Alternative D)*: Walt has requested that BLM change the distance to 250 feet; BLM agreed to make this change in Alternative D.
  - *BLM Action*: BLM will change Alternative D to 250 feet (row 438).
- *Question (Recreation)*: What is the difference between an SRMA and Extensive Recreation Management Area (ERMA)? *Answer*: The dominant use in SRMAs is recreation. BLM will focus on recreation by applying use limits, actively seeking funds, working with user groups, etc. In an ERMA, BLM knows recreation activities are occurring in the area, but there are many other uses that BLM will also manage for. BLM may provide recreation trails and facilities in these areas, but not at the expense of other resources. If an area is managed as both an SRMA and an Area of Critical and Environmental Concern (ACEC) (e.g. for plants), then management actions will be carefully evaluated to ensure consistency between the two.
- *Question (General)*: are there other tools you have if multiple uses are happening in one area? Answer: Yes, BLM has laws and regulations we must follow. For example we are mandated to protect threatened and endangered species in all areas.
- *Question (Recreation)*: Are there more SRMAs being proposed in this plan than what's in existence? Answer: Yes.
- *Question (Recreation)*: What's the status of the Dolores River Canyon? If the Wilderness Study Area goes away, what would happen to the area? *Answer*: Under Alternative D that area would be managed as an ACEC and an SRMA.
- *Question (Travel Management [#664 and 700])*: Right now the Adobe Bandlands OHV Open Area is open to any motorized vehicles. Walt's comment was intended to mean that BLM should eliminate full-sized motorized vehicles in this area, and instead limit all vehicles to 50 inches or less. Also, Walt wants this area designated as Open to allow for cross-country travel. This is an area where a lot of training occurs. *Answer*: the issue in this area is the hookless cactus. At this time, all existing routes would be designated. *Comment*: to clarify, whether the travel management designation is *Limited to Designated Routes* or *Open*, the request by the OHV community is to limit vehicles to 50 inches or less in this area.

BLM_0111700

- o *BLM Action:* BLM will provide additional review of the management proposed in the Adobe Badlands area.
- *Comment (Recreation):* BLM will run into opposition if the Ridgway SRMA does not allow competitive events.
- *Question (Travel Management [#739]):* Equestrian use has more effects on wildlife than motorized vehicles sometimes. A seasonal closure should be closed to equestrian users in addition to motorized and mechanized users. Particularly if the seasonal closure is for wildlife.
  - o *BLM Action:* BLM will re-evaluate seasonal closures and determine if the action should include equestrian users.
- *BLM Comment (Coal):* BLM revised Stipulation CSU-51 to exclude operations that capture or pipe methane from a mine for beneficial use (new text below).
  - *"STIPULATION CSU-51: Federally Leased Coal. Where oil and gas operations are proposed within the area of federally leased coal, relocate them outside the area to be mined or so as to accommodate room and pillar and long wall mining operations. This stipulation does not apply to operations that capture or pipe methane from a mine for beneficial use. (Refer to Appendix B.) (Figure 2-52, 2-53, 2-54, Appendix A)"*
  - o *BLM Action:* BLM will email this stipulation (row 491) to Steve Weist, Kathy Welt, and Bill Ela for review.
- *Question (Fluid Minerals):* In certain instances, I don't feel that a No Surface Occupancy (NSO) stipulation provides adequate protection. For example, in a sensitive watershed, I don't feel convinced that an NSO stipulation has the same level of certainty as a No Leasing designation. My main concern is underground impacts. <u>Answer</u>: Some sensitive areas have been designated as No Leasing areas, such as municipal watersheds. Major river corridors also have 0.25-mile NSO stipulation (under Alternative D). These areas are also protected by other types of management tools available to BLM, such as Visual Resource Management (VRM) classes.
  - o *BLM Action:* BLM will E-mail the NSO and VRM maps to the RAC Subgroup to review the level of protections across the field office.
- *Question (ACECs):* I'm not comfortable that the uses/level of preservation are robust enough in SRMA north around Paradox Valley, and an ACEC. <u>Answer</u>: The impact analysis should help address these concerns. There is an ability to protect an area even if the area doesn't have a formal designation (e.g., ACEC), which will be described in the analysis. There are other tools that BLM has available such as designating rights-of-way as avoidance areas and managing landscapes according to VRM classes.
- *Question (Biological Resources):* Can you explain the main changes to the biological resource sections (fish, wildlife, threatened and endangered species)? <u>Answer</u>: We combined all of the management actions for raptors since they were basically all saying the same thing. There are still separate sections for wildlife and threatened and endangered species. We also eliminated redundancy (i.e., many rows said the same thing). Watchable wildlife areas were dropped because the District Manager said these areas should be reserved for very special areas.
  - o *BLM Action*: BLM will reconsider designating 23 acres north of Ridgway as a watchable wildlife area.

## 5. **Next Steps** (Kate Wynant)

- As we mentioned, we are sending Chapter 2 to the BLM Colorado State Office December 12th so it would be most useful to get comments from you by the end of December. However, we will always accept comments identifying fatal flaws in the plan.
- *Comment*: We need to remember that applying layers and layers of restrictions is going to make life very difficult for BLM to manage.
- *BLM Comment*: Our District Manager reviewed Chapter 2 row by row. All of her comments have been incorporated into the document at this time.

## 6. Other Items Not on the Agenda (Kate Wynant)

- If you weren't able to open the attachment containing the responses to comments on Chapter 2, let us know and we will send you a PDF version.
  - o *BLM Action*: BLM will send Bill Ela a paper copy of the Chapter 2 Comment Response Matrix.

## 7. Public Comments / Questions (Kate Wynant)

- No members of the public were present.

## 8. Action Items / Next Meeting (Kate Wynant)

- Pending BLM's State Office review, the RAC Subgroup will either meet again early 2012 to discuss major changes resulting from the State Office's comments, or in summer 2012 to review Chapter 4 (Impact Analysis).
- □ *BLM Action*: BLM will reevaluate the distinction between Ridgway Trail SRMA RMZ 1 and 2 to ensure the management actions are accurate.
- □ *BLM Action*: BLM will change Alternative D to 250 feet (row 438).
- □ *BLM Action*: BLM will provide additional review of the management proposed in the Adobe Badlands area regarding OHV use.
- □ *BLM Action*: BLM will re-evaluate seasonal closures and determine if the action should include equestrian users.
- □ *BLM Action*: BLM will email this stipulation (row 491) to Steve Weist, Kathy Welt, and Bill Ela for review.
- □ *BLM Action*: BLM will E-mail the NSO and VRM maps to the RAC Subgroup to review the level of protections across the field office.
- □ *BLM Action*: BLM will reconsider designating 23 acres north of Ridgway as a watchable wildlife area.
- □ *BLM Action*: BLM will send Bill Ela a paper copy of the Chapter 2 Comment Response Matrix.

BLM_0111702

| From: | Krickbaum, John |
|-------|------------------|
| To: | Kate Wynant |
| Cc: | Angie Adams; UFO AR |
| Subject: | Bighorn/Domestic Sheep Meeting January 19, 2012 |
| Date: | Monday, January 23, 2012 4:07:22 PM |
| Attachments: | Bighorn_Domestic Sheep 01192012.pdf |

Angie/ Kate,

We met a second time with CDPW Jan 19 to discuss the bighorn/domestic sheep model.  We made a few changes at the meeting, mostly to wording and also small changes to management.  The attendance and notes are attached for the record.

--Bruce

Bruce Krickbaum
Planner, Environmental Coordinator
BLM, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

BLM_0111703

JAN 19, 2012

Big horn/Domestic Sheep Risk Assessment Meeting

| Name | Agency |
| --- | --- |
| Bruce Krickbaum | BLM |
| Barb Sharrow | BLM |
| Missy Siders | BLM |
| Lynnae Rogers | BLM |
| [illegible] | CPW |
| Evan Phillips | CPW |
| Scott Wait | CPW |
| Renzo DelPiccolo | CPW |
| DAVE KAUFFMAN | BLM |
| JOE CAIN | BLM |

BLM_0111704

*Missy Sides Notes*

*Probability of Interaction*

# Domestic/Bighorn Sheep Risk Assessment

# Management of Risk

*Some Probability*

**LOW RISK**

*Probability*

**MODERATE RISK**

*Probability*

**HIGH RISK**

*most = very low probability*

*Probability of Interaction = Medium*

## Management Outcome Associated with Species

- ➤ All ewes must be bred before turn out onto BLM.
- ➤ Mandatory use of at least 2 guard dogs per band to deter co-mingling.
- ➤ Only healthy domestic sheep shall be turned out onto BLM.
- ➤ No lambing of domestic sheep shall occur on BLM.
- ➤ Sweep allotments within 24 hours of moving off to capture any strays.
- ➤ Use of marker sheep within bands; at least 1/100hd.
- ➤ Remove sick, physically disabled or dead domestic sheep from the band or BLM lands within 24 hours of discovery.
- ➤ Use only highly gregarious breeds of domestic sheep.
- ➤ Maintain a band of no greater than 1500 head.
- ➤ No yearling ewes during the domestic sheep breeding season unless bred will be turned onto BLM.

*➤ Require submission of Actual Use Report at end of Season.*

All items in Low ~~Risk~~ plus:
- ➤ Prohibit the changing of cattle use to sheep ~~in~~ occupied Bighorn Sheep habitat (until current science mitigates risk).
- ➤ No domestic rams will be permitted in occupied habitat.
- ➤ Buffer may be required depending on available topographic/natural barriers.
- ➤ Maintain a band size of 1200 head or less.
- ➤ Mandatory use of at least 3 guard dogs per band to deter co-mingling.
- ➤ During spring use, limit band size to 900 ewes with lambs.
- ➤ Require a counting report every 2 weeks to report number of sheep. To be turned in with Actual Use Report.
- ➤ Require a submission of dead report to be turned in with Actual Use Report.
- ➤ Consider if possible swapping sheep allotments with cattle allotments.
- ➤ No yearling ewes during the ~~Bighorn~~ breeding season ~~(Sept-March)~~.
- ➤ No domestic rams will be permitted in occupied habitat.
- ➤ Decrease probability of interaction between ~~desert~~ bighorn and domestic sheep by creating barriers to movement utilizing available topographic and natural barriers in suitable habitat where feasible. *(fencing, etc.) or herding*

All items in Low ~~Risk~~ plus:
- ➤ Consider if possible swapping sheep allotments with cattle allotments.
- ➤ Maintain a band size of 900 head or less. *Bighorn Sheep Core Range*
- ➤ If domestic sheep enter ~~buffer zone~~ core range, they must be retrieved within 24 hours.
- ➤ Mandatory use of 2 herders, with at least one with the sheep at all times.
- ➤ ~~Mandatory use of at least 3 guard dogs per band to deter co-mingling.~~
- ➤ During spring use, limit band size to 700 ewes with lambs.
- ➤ Require a counting report every week to report number of sheep. To be turned in with Actual Use Report.
- ➤ Require a submission of dead report to be turned in with Actual Use Report.

*Earl's comments/notes* (handwritten)

## Domestic/Bighorn Sheep Risk Assessment

# **Management of Risk**

*Some probability* (handwritten) **LOW RISK**

**MODERATE RISK** *probability* (handwritten)

**HIGH RISK** *likely* (handwritten)

## Management Outcome Associated with Specific Risk

*and medium risk* (handwritten)

| Low Risk | Moderate | High Risk |
|---|---|---|
| ➢ All ewes must be bred before turn out onto BLM. | All items in Low Risk plus: | All items in Low Risk plus: |
| ➢ Mandatory use of at least 2 guard dogs per band to deter co-mingling. | ➢ Prohibit the changing of cattle use to sheep use in occupied Bighorn Sheep habitat (until current science mitigates risk). *allor/za'* *high* *(unless) desert* *(mitigates)* | ➢ Consider if possible swapping sheep allotments with cattle allotments. |
| ➢ Only healthy domestic sheep shall be turned out onto BLM. | ➢ No domestic rams will be permitted in occupied habitat. | ➢ Maintain a band size of 900 head or less. |
| ➢ No lambing of domestic sheep shall occur on BLM. | ➢ Buffer may be required depending on available topographic/natural barriers. | ➢ If domestic sheep enter buffer *bighorn* zone, they must be retrieved within 24 hours. *the (range)* |
| ➢ Sweep allotments within 24 hours of moving off to capture any strays. | ➢ Maintain a band size of 1200 head or less. | ➢ Mandatory use of 2 herders, with at least one with the sheep at all times. |
| ➢ Use of marker sheep within bands; at least 1/100hd. | ➢ Mandatory use of at least 3 guard dogs per band to deter co-mingling. | ➢ Mandatory use of at least 3 guard dogs per band to deter co-mingling. |
| ➢ Remove sick, physically disabled or dead domestic sheep from the band or BLM lands within 24 hours of discovery. | ➢ During spring use, limit band size to 900 ewes with lambs. | ➢ During spring use, limit band size to 700 ewes with lambs. |
| ➢ Use only highly gregarious breeds of domestic sheep. | ➢ Require a counting report every 2 weeks to report number of sheep. To be turned in with Actual Use Report. | ➢ Require a counting report every week to report number of sheep. To be turned in with Actual Use Report. |
| ➢ Maintain a band of no greater than 1500 head. | ➢ Require a submission of dead report to be turned in with Actual Use Report. | ➢ Require a submission of dead report to be turned in with Actual Use Report. |
| ➢ No yearling ewes during the domestic sheep breeding season unless bred will be turned onto BLM. | ➢ Consider if possible swapping sheep allotments with cattle allotments. | |
| | ➢ No yearling ewes during the *bighorn* breeding season (Sept-Nov). | |
| | ➢ No domestic rams will be permitted in occupied habitat. | |
| | ➢ Decrease probability of interaction between desert bighorn and domestic sheep by creating barriers to movement utilizing available topographic and natural barriers in suitable habitat where feasible. *or herders* | |

*Take lambing & putting out of model.* (handwritten)

*terminology* (handwritten)



# Recreational Airstrips
# on
# Public Lands

## A Reference Guide for Public Land Managers

Prepared by the

## Recreational Aviation Foundation
**1711 West College Avenue**
**Bozeman, Montana 59715-4913**

**www.theraf.org**
Email: **info@theraf.org**

Revised: May, 2011

1

BLM_0111707

# Recreational Airstrips on Public Lands

## Table of Contents

TOPIC                                      PAGE

| Topic | Page |
|---|---|
| Executive summary | 4 |
| General Introduction | 5 |
| Congressional action: U.S. House of Representatives Resolution 1743 | 6 |
| Airstrips on public lands, example photos | 7 |
| Effects of airstrips on the landscape | 12 |
| Other uses of recreational airstrips | 13 |
| Airstrip operations: frequency of use, season of use, type of recreation | 14 |
| Airplane camping, example photos | 15 |
| Airstrip registration and charting with the Federal Aviation Administration | 17 |
| Notification to pilots of temporary airstrip closure or condition | 17 |
| Recreational airstrip considerations in regard to aircraft performance | 18 |
| Airstrip maintenance and costs | 18 |
| Airstrips and weeds | 19 |
| Qualifications of pilots and aircraft | 19 |
| Aircraft affordability in relationship to other recreational transportation | 22 |
| Aircraft noise: people and wildlife | 23 |
| Flight altitudes, airspace and weather conditions | 25 |
| Agency liability | 27 |
| Agreements with State and Federal land agencies for public airstrip management and maintenance | 28 |
| Summary Conclusions | 29 |

BLM_0111708

# Recreational Airstrips on Public Lands

## Appendices

**A.** SAFECOM Report and photo                                              30

**B.** Legal opinions concerning the liability of landing airplanes on public
lands for recreational purposes                                              32

**C.** Sample FOIA letter regarding liability                                43

**D.** Western state aviation departments, contact person and web sites      44

**E.** Western states pilots' organizations and web sites                    46

**F.**  FAA Form 7480-1 plus instructions for filing                         47

**G.** United States House of Representatives Resolution 1473                50

**H.** Aircraft takeoff performance example                                  52

**I.**  RAF Vision, Mission and Guiding Principles                           53

BLM_0111709

# Recreational Airstrips on Public Lands

## Prepared by the Recreational Aviation Foundation
Revised, May, 2011

### Executive Summary

The Recreational Aviation Foundation represents backcountry pilots and aviation groups working to preserve and promote recreational use of airstrips on both public and private lands.

For almost a century such airstrips have been a part of our country's heritage. These airstrips enjoy a proud history of traditional use, providing valuable access to remote and scenic areas for a wide variety of purposes. These include enabling backcountry pilots and their passengers to enjoy fishing, camping, backpacking, hunting, and other recreational activities in these areas and by a method otherwise unavailable to recreational users.

Historically these airstrips have been uncontroversial, and did not represent major concerns or management difficulties for those entrusted with stewardship of public lands. Small, unattended remote strips needed little in the way of resources, and have been enjoyed quietly by many different users for more than eighty years.

However, because of changing societal needs and the increased pressures on such lands for a wide and increasing variety of uses, managers unfamiliar with aviation may unilaterally decide to neglect or close them, unaware of the many recreationists who may be using them, or of the benefits that the airstrips offer to the local and regional communities and their economy.

Concerns about potential distraction of management energy and possible costs related to dealing with potential noise issues, environmental impacts, or liability may also make those unfamiliar with aviation too quick to hamper or restrict traditional use of such airstrips.

The Recreational Aviation Foundation has worked with the public, numerous closely allied aviation groups, and a number of agencies in several states and locations in developing information and management planning tools that preserve the historic airfields and involve appropriate partnerships to provide for their ongoing management and maintenance while imposing a minimum burden on the owners of such lands, whether public or private.

Thus, the Recreational Aviation Foundation proposes working with appropriate federal land agencies to assist the various managers in making decisions that are based on credible information that local land managers can use to implement airstrip management plans for aeronautical use of the lands and facilities located within their jurisdictions. The following document was developed by the Recreational Aviation Foundation to assist the local land manager in making informed decisions in regard to recreational airstrips and their public use.

BLM_0111710

## General Introduction

The use of general aviation aircraft for recreational purposes is strong in the United States, especially in the western states. Aviation publications such as Pilot Getaways, Fly the Big Sky, Fly Utah, Fly Idaho, Plane and Pilot and other periodicals promote the west as a destination for pilots and their families with numerous types of recreational opportunities. There are several web sites that also promote backcountry flying and discuss issues pertaining to the subject. For sample web sites, refer to: www.supercub.org, www.backcountrypilot.org, www.shortfield.com.

Recreational pilots generally fall into one of two general groups. The first group consists of those pilots who use personal aircraft to fly to a destination airport where they can access more common types of outdoor recreational opportunities like resorts, or they may just land for breakfast or lunch at an airport restaurant and then fly home. They generally prefer paved runways or well maintained, smooth turf strips.

The second group often use their planes to fly to more remote locations where they can camp under the wing, take day hikes and participate in other outdoor activities such as fishing, hunting, wildlife viewing, photography, bird watching, studying plants, looking at the natural land forms and just enjoying the great outdoors. Their planes are suitable for more primitive gravel and grass runways. There are many locations on the nation's public lands that provide ideal locations for these recreational opportunities.

Recreational airstrips are an integral part of a balanced transportation system for public access wherever public lands are being managed for a variety of recreational pursuits. Airstrips not only provide public lands access to pilots with their family and friends, but also provide easy access for people of all ages who do not have the capability to travel long distances over rough roads and trails. Airstrips serve as internal trailheads.

Airstrips need to be available to a variety of aircraft and pilot capabilities. Not all pilots have received specific training for flying in the mountains, and some aircraft are not capable of safely operating in and out of higher altitude landing strips. Recreational airstrips need to be available not only in the traditional mountain setting, but also in the prairie and valley areas of the West. The average pilot, family and friends should be able to have the availability of landing and camping in a remote setting that provides the opportunity for good hiking, wildlife viewing and experiencing the flora and fauna just as other user groups can do. The only difference is the chosen mode of transportation to arrive at the remote setting.

As will be discussed in detail later, the use of aircraft as part of a balanced public lands transportation system fits right in with the multiple use mandates for most public lands without causing degradation of the land. The overall vision and management goals for public lands should, among other things, provide for: 1) diverse recreation opportunities, 2) sustainable multiple means of transportation and 3) dispersed recreation opportunities.

Currently, there are numerous locations where there are public airstrips upon lands administered by the Bureau of Land Management, U.S. Forest Service, and National Park Service. There are airstrips within Wild and Scenic River corridors. Montana has two public airstrips within a Wild

BLM_0111711

and Scenic River corridor: Meadow Creek on the South Fork of the Flathead River, and Schafer Meadows on the Middle Fork of the Flathead River. Schafer Meadows is also in the Great Bear Wilderness. There are four public use airstrips on the Middle Fork of the Salmon River in Idaho, a designated Wild and Scenic River within the Frank Church River of No Return Wilderness. In Idaho there are a total of nineteen public airstrips located throughout the Frank Church and Selway/Bitterroot Wilderness areas as provided for in the Central Idaho Wilderness Act of 1984. Although these airstrips predate the subsequent land management criteria, as will be discussed later, careful review over many years has shown these airstrips to be compatible with the natural ecosystem.

When what is now Death Valley National Park was still a National Monument, there were three public airstrips within the Monument, one of a primitive nature. Those airstrips continue to exist under the administration of the National Park Service and are open to the public.  Craters of the Moon National Monument in Idaho has three backcountry public airstrips. Utah also has active remote recreational landing strips on BLM and State lands and also in Wilderness Study Areas. The Upper Missouri River Breaks National Monument has six backcountry landing strips approved in the final Monument Resource Management Plan.

## Congressional Action: U.S. House of Representatives Resolution 1473

On September 15, 2010, the U.S. House of Representatives passed by unanimous vote House Resolution 1473, a resolution supporting backcountry airstrips and recreational aviation on public lands. The resolution was introduced by Representative Denny Rehberg (R-MT) along with co-sponsors Allen Boyd (D-FL), Vern Ehlers (R-MI), Walt Minnick (D-ID), Mike Simpson (R-ID), Sam Graves (R-MO), Pete Olson (R-TX), Jason Chaffetz (R-UT), John Salazar (D-CO), Bobby Bright (D-AL) and Collin Peterson (D-MN).  The resolution shows congressional support for backcountry airstrips and recreational aviation. The resolution concludes with the following statement:

*Resolved,* That the House of Representatives recognizes the value of recreational aviation and backcountry airstrips located on the Nation's public lands and commends aviators and the various private organizations that maintain these airstrips for public use.

The associated "Dear Colleague" letter and the full text of the resolution are found in Appendix G on page 55.

BLM_0111712

**Examples of Airstrips on Public Lands**

**1) Utah Airstrips on BLM Administered Lands:**



**Horseshoe Canyon Airstrip**

*Horseshoe Canyon airstrip, situated on BLM lands in southeast Utah, provides public access without off-road vehicle damage to the landscape.*



**Dirty Devil Airstrip**

*Dirty Devil airstrip, on a bench above the Dirty Devil River in southeast Utah, provides recreational opportunities such as hiking, exploring, geology studies, camping and solitude. There is little conflict with other public lands users in this area.*

7

**UTAH, continued**



**Public Airstrips can be a part of a balanced transportation system on public lands**
*There is plenty of room for various user groups: 4X4s, ATVs, Motorbikes, and Recreational Aircraft*



**Sign at the Mexican Mountain Airstrip**
*Cooperative efforts between the Bureau of Land Management and the Utah Backcountry Pilots Association work for everyone. This area, in a Wilderness Study Area, is used by hikers, who may not be aware of the airstrip's existence. Public safety is a primary concern for the continued operation of the airstrip.*

8

**2) Montana Public Airstrips on U.S. Forest Service Land:**



**Schafer Meadows Airstrip, Flathead National Forest**

*Schafer Meadows Airstrip in Montana's Great Bear Wilderness provides an internal trailhead for numerous recreational activities. Airstrip maintenance is a cooperative effort between the U.S. Forest Service, the Montana Aeronautics Division and the Montana Pilots' Association. Forty percent of the airstrip usage is for floater access to the Middle Fork of the Flathead River. Other uses are for camping, hunting, hiking and fishing access, plus Forest Service administrative use.*

**3) Idaho Public Airstrips on U.S. Forest Service Land:**



**Shearer Airstrip**

*Shearer Airstrip in Idaho is located within the Selway/Bitterroot Wilderness Area next to the Wild and Scenic designated Selway River. This airstrip serves to provide public access for camping, hiking, fishing, hunting and floating the Selway River. The airstrip is situated in a natural clearing and cannot be seen from the river. Whenever possible, airstrips are sited on natural open areas or on natural prairie grasslands.*

BLM_0111715

**IDAHO, continued**



**Mahoney Creek Airstrip**

*Mahoney Creek Airstrip is located in Idaho's Frank Church River of No Return Wilderness within the Wild and Scenic corridor of the Middle Fork of the Salmon River. The airstrip is used for general fishing and hunting access as well as bringing in supplies to a nearby outfitter's hunting camp. There is no evidence when floating the river that the airstrip exists.*

**4) Montana Public Airstrip on Bureau of Land Management Land**



**Black Butte Airstrip, Upper Missouri River Breaks National Monument, Montana**

*This airstrip is located on lands managed by the BLM. It is used for recreation such as camping, hiking, studying the unique geology of the area, and wildlife viewing. Maintenance is by pilots, using only hand tools.*

BLM_0111716

**5)  California Public Airstrip, Death Valley National Park**



**Chicken Strip, Saline Valley, Death Valley National Park**

*Chicken Strip is located at the north end of the Saline Valley, a short walk from the Saline Valley hot springs. This hot springs consists of several semi-primitive bathing pools and a scattering of palm trees. The only other means of visiting the site is by driving hours over a very primitive two track road using 4X4 vehicles.  The Recreational Aviation Foundation has a Memorandum of Understanding (MOU) with Death Valley National Park to assist in the maintenance of this airstrip and the other two airstrips located within the Park.*

**6) New Mexico U. S. Forest Service Public Airstrip**



**Negrito Airstrip, Gila National Forest**

*In the fall of 2010 New Mexico Recreational pilots organized a fly-in to Negrito Airstrip, a USFS airstrip situated on a grassy flat at 8,300 feet above sea level. The airstrip is used on occasion as a fire base for USFS fire operation. It has two long runways and clear approaches, and thus serves well to introduce pilots to high altitude airstrip operations. Volunteers, collaborating with the USFS, are working to maintain and improve the facilities.*

11

**Effects of airstrips on the landscape**

**1) Aircraft versus other types of motorized transportation.**

Throughout the West there are numerous forms of transportation on the public lands, from hiking, horseback and various methods of wheeled vehicles, both non-motorized and motorized. Each of these uses is legitimate as long as the disturbance to the public land resource is within limits prescribed by societal and ecological values. There is a broad mix of motorized and non-motorized means of access, each with its own effect on the environment, aesthetics and personal values and desires.

Aircraft are just one of several motorized means of accessing public lands for recreational purposes. However, aircraft have the unique capability of reaching an internal trailhead destination without traveling on the landscape except when they land and takeoff. Aircraft do not have powered wheels. Once an aircraft rolls to a stop, it remains in one place, and for all intents and purposes the occupants are hikers accessing public lands. The airstrips themselves take up very little land at a location that is usually relatively flat and not subject to erosion. These airstrips tend to maintain their vegetative cover. Since aircraft are <u>not</u> mechanized vehicles in the traditional sense, they are incapable of spinning their wheels, churning up hillsides, and otherwise tearing up the landscape. Airstrips are not suitable for use when the ground is soft and pilots are aware of seasonal limitations. Aircraft do not enter riparian areas, need stream crossings, nor do they leave ever-deepening ruts in wetlands or grassy meadows as is commonly observed with ATV traffic, trail bikes or even horses and mule pack-trains. Airstrips leave a far less over-all foot print on the landscape compared to just a few miles of dirt road or trail.

The amount of land that airstrips physically occupy is minimal and the resources needed for their maintenance require little financial input from the public land managers. Many state pilot organizations such as in Idaho, Montana, New Mexico, Oregon, Utah and Washington participate in annual airstrip maintenance sessions on public land airstrips, performing such tasks as the installation of safety items like windsocks and airplane tie-downs along with the removal of obstructions such as timber encroachment plus the maintenance of other facilities such as primitive camp grounds. In contrast, other user groups, in order to meet their needs, may require graveled roads, parking areas, equestrian trails, horse unloading ramps, picnic tables and shelters, BBQs, campgrounds, garbage service and other amenities.

In the Frank Church Wilderness in Idaho there are nineteen airstrips that were grandfathered in as part of the Central Idaho Wilderness Act. After more than 60 years of use by aviators, both private and administrative, close scrutiny and monitoring of the wilderness landing strips has shown virtually no undesirable impact to the lands they occupy and the associated ecosystems. Similar observations occur in regard to the U.S. Forest Service public airstrips in Montana.

**2)  Airstrip usage: pilot numbers and aircraft growth forecast**

Due in part to more comprehensive aircraft operator licensing requirements and pilot medical certification, there is low potential for heavy airstrip usage when compared to other methods of motorized transportation with their much less demanding licensing standards or the total absence of any standards of operation or vehicle inspection.
Unlike the rapid growth rate of most types of recreational activities, the use of personal aircraft is forecast to have very modest growth over the next twenty years. The Federal Aviation Administration forecasts that the average annual growth rate of individuals earning the basic

12

private pilot certificate to be 0.8% over the next twenty years. The average annual growth rate for numbers of fixed wing piston planes is forecast to be 0.2% over the same time frame.

In comparison to virtually any other recreational user or use, airstrips and aircraft are very low impact. The pilot community strongly subscribes to the "Tread Lightly" and "Leave No Trace" camping ethic that the U.S. Forest Service requests of users, as well as "Fly It In, Fly It Out". If you visit the current airstrips on public lands throughout the West, you will not find a garbage can, and you seldom find any trash. State pilot groups monitor airstrip usage and clean up after the few who may abuse the site.

**3)  Aircraft recreational access versus access using pack stock.**

Airstrips serve as internal trailheads to the backcountry beyond the reach of traditional motorized vehicles. The wear and tear on the land is considerably less with aircraft access than access with pack animals which may involve fording of streams, incising of trails into the landscape with associated erosion, braiding of trails across wet meadows, consumption of vegetation and damage where animals are tied to trees.

Two adults and perhaps two children plus their camping gear usually occupy the typical four place aircraft that is flown into the backcountry. In order for four people to ride into the same area on horseback, a minimum of six animals would be used; four for riding and at least two for pack stock. However, each user group should have similar opportunities to reach the backcountry by their chosen method of transportation.

**<u>Other uses of recreational airstrips</u>**

**1)  Emergencies**

Emergency landing sites are of vital importance. In the event of a mechanical problem or inclement weather, the existence of backcountry airstrips provides the opportunity to make a landing that would insure the safety of the aircraft occupants as well as prevent the destruction of the aircraft. By having the airstrips depicted on the aeronautical chart with a three character FAA identifier, a pilot can quickly find the closest airstrip using the "nearest airport" function on the aircraft GPS. One example is provided in the SAFECOM report provided in Appendix A which details an emergency landing at the Wurtz airstrip on Forest Service land in northwest Montana. However, this unfortunately happens to be an airstrip on which the Forest Service will not allow maintenance and wants the land to revert to its natural state. But it probably saved the lives of three people. The refueled aircraft barely took off in time before forest fire swept through the area.

**2)  Law enforcement and search and rescue**
Law enforcement officials and federal, state and local agencies can find these airstrips useful for fire management efforts, support of ground personnel in crime investigation, and in search and rescue.

BLM_0111719

## 3) Resource management

Aircraft are important tools in the assessment and management of natural resources. Thus, backcountry airstrips can prove useful to state and federal agencies. Many states use aircraft to monitor wildlife and track radio-collared animals and other natural resources. Aircraft and backcountry airstrips are also useful in the enforcement of fish and game regulations.  Most aircraft insurance policies are void if the aircraft is used for any unlawful activity, including the harassment of wildlife.
.

## 4) Elderly and handicap transportation

The use of aircraft to access backcountry areas can provide for a unique experience for the elderly or people with physical handicaps. The combination of a flight into the far reaches of a National Forest, BLM lands or even a National Park such as Death Valley and then touring the immediate area from the ground would be meaningful opportunity for people with limited capabilities or who cannot tolerate a long, exhausting journey by vehicle or horseback. Organized flights for the disabled would give the public land manager the opportunity to provide on-site educational presentations on the local history and ecosystems. This is currently being done in Idaho's Frank Church River of No Return Wilderness through a successful program called "Wilderness Within Reach". Pilots volunteer their time and aircraft to transport disabled people to wilderness areas they would otherwise have no possibility of visiting.

## Airstrip operations: frequency of use, season of use, type of recreation

The number of aircraft using an airstrip is limited in many ways by season and weather. Data shows that during the flying season there would be an average of no more than one aircraft operation per day at most recreational landing strips, and that would be on an irregular basis. Montana's busiest U.S. Forest Service public airstrip, Schafer Meadows, (which also has the most recreational amenities) has on average less than three operations per day on a season average. This figure is verifiable data with the U.S. Forest Service.

Various weather factors play an important role in affecting frequency and timing of recreational airstrip use. Occasional extreme summertime heat and turbulence would limit use. Frequent windy days in the spring also tend to reduce flying activity early in the flying season. During periods of low clouds and precipitation, there are usually no aircraft arrivals and departures. Little or no flying takes place during the winter months where snow renders the landing strips unusable.
Most summer flight operations occur before mid-morning or late in the day when the air is cooler and calmer. People flying in for the day would usually arrive no later than mid-morning and depart in the evening. Based on pilot registrations at various U.S. Forest Service airstrips, campers typically stay two nights or less except during hunting season.

14

# Airplane Camping Examples

**MONTANA**



**Airplane Camping in Montana's Upper Missouri River Breaks National Monument.**

*Once on the ground, the fly-in visitors are hikers. The airplane engines are shut down until the people are ready to leave.*

At the time the Monument was proclaimed in January, 2002, under the Antiquities Act, there were ten primitive backcountry airstrips within the Monument. They were constructed in the 1950s. Six of the ten airstrips are now recognized in the final Monument Resource Management Plan as open for public use. They are now depicted on the aeronautical chart, each with an FAA assigned three character identifier.

BLM_0111721

**UTAH**



### Family Camping in Utah

*A pilot from Minnesota and his ten-year-old daughter camp by their plane at Mexican Mountain airstrip on BLM lands in southeast Utah. The amount of camping equipment is limited by the physical room in the plane and the load carrying ability of the aircraft.*

This primitive airstrip is located within a Wilderness Study Area, but the construction of the airstrip predates the WSA designation. The BLM policy is "leave no trace" camping and maintenance is done by pilots using only hand tools.

16

BLM_0111722

**Airstrip registration and charting with the Federal Aviation Administration**

Public use airstrips may be registered with the Federal Aviation Administration by using Form 7480-1. A copy of this form with instructions is found in Appendix F. From the data provided on the form, the FAA can then proceed to have the public use airstrip charted and given a three-character identifier. The form must be filled out in its entirety. Complete information is located at: www.faa.gov.

**Notification to pilots of temporary airstrip closure or condition**

In the event land managers need to temporarily close an airstrip, pilots can be notified of an airstrip status change by following standard flight briefing procedures.

If the public airstrip has been issued a three-character identifier by the Federal Aviation Administration (FAA), the land management agency having jurisdiction over that particular airstrip can request the FAA to issue a NOTAM (NOtice To AirMen) on that airstrip by telephoning 1-877-487-6867.  A NOTAM is a notice containing time-critical information that is either of a temporary nature or is not known far enough in advance to permit publication on aeronautical charts or other aeronautical publications. The flying map that most pilots use is called a Sectional Chart and is revised every six months. This NOTAM information is provided to the pilot when the pilot makes a request to the FAA for a flight briefing, either by telephone, computer or radio communications. By regulation, it is the pilot's responsibility to obtain all applicable information needed for an intended flight. This includes a request from the FAA for any pertinent NOTAMS.

An example of an airstrip closure occurs in southeast Utah every fall. The Southern Utah Wilderness Alliance desires to use the site of the Hidden Splendor airstrip for an association gathering. In the spirit of cooperation and to minimize user conflicts and promote public safety, the aviation community of Utah has the FAA issue a NOTAM of airstrip closure for the duration of the gathering at the Hidden Splendor airstrip location. NOTAMs may also be issued when it is necessary to close a runway because of an unsafe condition, such as following a sudden storm that creates deep gullies and washouts across the landing area.

If the land manager determines that a particular airstrip needs to have a seasonal closure on an annual basis, the land manager notifies the FAA and this information is disseminated in the FAA Airport Facilities Directory. See the example below of an airstrip located within the Upper Missouri River Breaks National Monument. The seasonal closure is for wildlife security.

**WOODHAWK** (WH0) 15 NE UTC_7(_6DT) N47°46.77_ W109°04.72_ **GREAT FALLS**
3100 NOTAM FILE GTF
**RWY 09–27:** 1200X60 (TURF)
**AIRPORT REMARKS:** Unattended. Arpt CLOSED from Sep 1 to Nov 30 each year. No snow removal. Wildlife and cattle on and in vicinity of arpt. Rwy maintenance irregular. Rwy soft and muddy when wet. Commercial acft ctc BLM manager 406–538–1950.
**COMMUNICATIONS: CTAF** 122.9

BLM_0111723

**Recreational airstrip considerations in regard to aircraft performance**

All makes and models of aircraft have different performance characteristics depending on the design of the airframe and the engine horsepower. The take-off performance of the aircraft (ground roll and rate of climb) is affected by the altitude of the airstrip, the air temperature, the wind velocity and direction, slope of the runway, runway surface and the take-off weight of the aircraft.

Field elevation has a major influence on takeoff performance. For example, with an air temperature of 20 degrees centigrade, a field elevation of 2000' and at a maximum gross weight of 2800 lbs., a Cessna 180 (a typical four place airplane used by recreational airmen) requires, under ideal conditions, a takeoff ground roll of 775'. If the airstrip elevation is increased from 2000' to 6000', the takeoff distance increases to 1130'. The rate of climb of the aircraft is affected in a similar manner.

If a land manager decides to close an airfield situated at a relatively low elevation with the idea of shifting the use to another airfield which happens to be at a higher elevation, the result may be a curtailment of recreational opportunities (especially for those pilots with lower horsepower aircraft) and thus affecting the safety margin of aircraft. See the Appendix H for a comprehensive example of aircraft performance data.

In summary, for the greatest number of pilots to have recreational opportunities in the backcountry, there must be a selection of suitable airstrips for a wide variety of aircraft that have various levels of performance.

**Airstrip maintenance and cost**

Agreements can be reached between the aviation community and the appropriate public land agency to perform the needed maintenance work on the airstrips. Currently in Montana, there are joint airstrip maintenance plans between the U.S. Forest Service Spotted Bear Ranger District, the Montana Pilots' Association and the Montana Aeronautics Division for the Schafer Meadows, Spotted Bear and Meadow Creek airstrips. The Forest Service does not incur any expense in the direct maintenance of these airstrips. Printed airport directories describe the airfields and include any special pilot precautions that need to be observed for each airfield's safe use, plus any maintenance issues, which may render the airstrip unusable at certain times.

Joint Montana Aeronautics Division/Forest Service signs are posted at each airfield, providing useful information for pilots, as well as a pilot registration sheet to record airfield usage. The Montana Aeronautics Division provides safety items such as windsocks and runway marker cones. A similar program has long been in effect in Idaho involving the U.S. Forest Service, Idaho Aviation Association and the Idaho Division of Aeronautics. The State of Washington has similar agreements with various pilot groups, the US Army Corps of Engineers, Forest Service, and Bureau of Land Management.  Volunteer groups typically donate hundreds, and in some cases, thousands of hours to maintain aviation access to the back country.

BLM_0111724

**Airstrips and weeds**

With any recreational activity, there is the potential for the introduction of noxious weeds. However, aircraft are not "off road vehicles". Aircraft do not use travel corridors that are often weed infested. Furthermore, pilots strongly avoid taxiing their aircraft through areas of tall vegetation, which may be a weed area, to minimize the risk of encountering unseen holes and other obstacles that may damage the airframe or cause a prop strike. Thus, the risk of weed propagation/introduction is less among aircraft users of the backcountry than with other means of transportation/recreational use such as highway vehicles, mountain bikes, motorcycles, ATVs and livestock used for riding and packing due to less exposure to weed areas.

**Qualifications of pilots and aircraft**

Pilots have large amounts of time and money invested in their training and their aircraft. Pilots and their aircraft are held to a significantly higher standard than any other group involved in personal, non-commercial transportation. Obtaining an automobile driver's license requires passing a short written test and practical driving test only once in a lifetime. Motorized vehicles that are operated off public roadways require no operator's license. This includes, but is not limited to, snowmobiles, motorcycles, OHVs, trucks and cars. Boaters require no operator's license. In many states there is no required periodic safety inspection of non-commercial vehicles. Pilot requirements are far more stringent.

**1) Pilot licensing**

Pilots receive more extensive training than any other group that operates non-commercial transportation vehicles. To earn a private pilot's certificate the applicant must accumulate a minimum of forty hours of flight time composed of both flight instruction by a certified flight instructor and supervised solo time. The flight training includes landing and takeoff techniques for short and soft (non-paved) airfields under various wind conditions. Flight training is rigorous. Most persons require 60 to 80 hours of flight instruction and supervised solo time to earn their private pilot certificate**.**

Applicants for a private pilot certificate must also pass a comprehensive multiple choice written examination. The passing grade is 70% correct answers. Subject matter includes theory of flight, aircraft performance as influenced by altitude, aircraft weight and air temperature, as well as questions on weather, navigation, radio procedures, and FAA regulations. The written exam must be passed before the applicant is eligible to take the flight test. If the applicant does not take, and pass, the flight test within 24 months of passing the written examination, the written must be taken again.

When the student pilot is deemed prepared for a private pilot certificate, the applicant must take a comprehensive oral and flight examination by an FAA examiner or designee. The test covers rules, flight procedures, cross country flight planning, weather, flight maneuvers, emergency situations and the overall aptitude of the applicant. This oral exam and flight test usually lasts

BLM_0111725

more than two hours. Many pilots continue their flight training to earn advanced ratings to improve their proficiency, safety and reduce insurance costs.

Pilots must pass a physical exam that includes general health, vision and hearing. The flight physical is geared to determine the applicant's health in regards to flying a plane, not the ability to engage in vigorous physical activities. It is more than just a routine physical. The physical is also a check of cognitive ability, recent criminal history, and other related topics. Pilots are also held strictly accountable for the accuracy and truthfulness of their responses to the medical questionnaire. Flight physicals for private pilots are required every three years for those individuals under age forty and every two years for those over that age. The flight physicals can be administered only by an FAA designated medical examiner.

## 2) Recurrent training and record keeping

Pilots are required to keep a logbook of their flying time for the purpose of showing that they are qualified to fly the plane they intend to operate and to demonstrate flight currency in that aircraft. Every two years a pilot must have a flight review administered by a licensed flight instructor. The successful completion of this review is entered in the pilot's logbook. The minimum content of the review is one-hour oral critique of the pilot's aviation knowledge and one hour of flight time.

The FAA offers a "Wings" program, which is a series of seminars and flight training sessions to assist the pilot in maintaining flight proficiency as well as currency in the arena of regulations and procedures. Continuous training is paramount to achieving a high level of safety. Pilot participation may lower insurance rates.

There are several private flight schools that specialize in training pilots in mountain flying procedures. They typically last several days with flying done in the morning and ground school in the afternoon. The best known mountain flying school is McCall Mountain Canyon Flying, LLC, McCall, Idaho (www.mountaincanyonflying.com). There are several instructional books available on mountain flying operations and safety.

Pilots are also subject to unannounced "ramp checks". This occurs when an FAA inspector comes up to the pilot out on the flight ramp and requests to see the documents for both the plane and pilot. No other recreational users of the public lands are subject to such scrutiny without any probable cause. The inspector also has the authority to "ground" the aircraft if it appears from an external examination that the aircraft is not airworthy or incorrectly loaded. The pilot can be "grounded" if required documentation (license, photo ID, a current medical certificate and biannual review) are not on their person, or if they are observed to be in violation of certain regulations. Based on the FAA inspector's observations the FAA may take additional enforcement actions against pilots and aircraft owners.  Enforcement actions may include suspension or loss of some or all flight privileges, and monetary fines.

In summary, much emphasis is placed on safety throughout pilot training, certification, recurrent training and aviation culture. Furthermore, the Federal Aviation Administration serves in a strong oversight role in all aspects of aviation.

BLM_0111726

### 3) Drugs and alcohol

All pilots closely monitor their use of drugs and alcohol.  Federal Aviation Regulations clearly state that the operation of an aircraft is strictly prohibited where there is a pilot blood alcohol level .04 percent or more and that eight (8) hours have not  passed after drinking alcohol. The standard limits for driving on public roads are .08 percent, twice the level of pilot limitations. Pilots must report any drunken driving convictions to the FAA within sixty days of the infraction, as well as report any conviction when renewing their flight physical. Drunk driving or other misdemeanor convictions are grounds to deny the medical certificate.  This voids the Private Pilot Certificate, denying the pilot any flight privileges. The use of any illegal drug is strictly prohibited.  Any drug related conviction in a court of law results in loss of the pilot's license.  Illegal drug use must be reported during the flight physical.  The use of prescription drugs, and even legally purchased "over the counter" drugs, is highly regulated.

### 4) Aircraft licensing and maintenance

The design and licensing of aircraft is overseen and approved by the FAA. Every aircraft must have at least one airworthiness inspection each calendar year. An FAA licensed aircraft inspector must perform this task. The inspection is done regardless of how many hours that plane was flown in the previous year. At the time of this inspection the inspector reviews the maintenance literature to ensure that if there have been maintenance problems with other planes of that particular make and model, the problems are corrected. All maintenance performed on the engine and airframe is recorded in the aircraft logbooks. Certain problems, if not corrected, can result in the aircraft being grounded until they are resolved and repaired.

### 5) Aircraft insurance

Almost all pilots and aircraft owners carry some level of insurance. Coverage falls into three basic areas: liability, physical damage to the aircraft and medical. There are policies available for the aircraft owner as well as the renter pilot. If the aircraft is encumbered by a loan, in all probability insurance will be required by the lender. Most aircraft insurance policies are void if the pilot commits an act that violates the Federal Air Regulations. Some policies are void if the pilot engages in activities such as aerial photography, game spotting and dropping objects from the plane. Insurance premium cost is often influenced by the total amount of a pilot's flying experience, experience in the make and model aircraft being insured, recurrent training done on a regular basis and the number of advanced ratings earned by the pilot.

BLM_0111727

## Aircraft affordability in relationship to other recreational transportation

Pilots are often stereotyped in the popular press as wealthy individuals who are somewhat isolated from the rest of the public. People who fly their own aircraft are no different than others who choose other forms of recreation. Like most forms of transportation, aircraft represent a significant personal investment. However, from the owner's perspective, it is a matter of individual preference of where to spend discretionary income. There are numerous private aircraft whose retail value is less than that of a sports utility vehicle, pickup truck, boat or recreational vehicle.

For example, a typical aircraft used for recreational flying into backcountry airstrips is the Cessna 182. It will carry four people and have performance capabilities that allow it to be flown into most recreational airstrips. Most of these aircraft were manufactured from 1956 to 1994. The average value of a well-maintained early Cessna 182 is about $60,000. For camping purposes for a family of four consisting of two adults and two children, the aircraft will hold personnel and a reasonable amount of camping gear.

In contrast, two examples are offered using other forms of transportation.

a) Four persons with four riding horses and two packhorses.

b) Four persons with ATVs

| | | | |
|---|---|---|---|
| - 4 riding horses | $ 6,000 | - 4 ATVs | $25,000 |
| - 2 pack horses or mules | 3,000 | - trailer | 5,000 |
| - saddles and other tack | 2,500 | -one ¾ ton 4x4 crew cab pickup | 30,000 |
| - one six horse trailer | 20,000 | -all weather riding gear | 1,000 |
| - one ton 4x4 pickup truck | 35,000 | | $61,000 |
| | $66,500 | | |

Examples "a" and "b" include equipment that has a rapid rate of depreciation and substantial overhead costs. For those individuals who ride ATVs in the summer and also ride snowmobiles in the winter, their capital investment in recreational machines is effectively doubled. It should also be noted that the Cessna 182 example provided here is "middle of the road" with respect to costs. Entry level aircraft such as a Cessna 150 or 172 can be acquired and operated for well under half this amount.

There are a substantial number of pilots and aircraft owners in the United States. Statistics compiled by the Aircraft Owners and Pilots Association show that in 2009 there were 651,551 licensed pilots and they operated 236,235 aircraft. However, these numbers appear to be stable at this time.
Just as horseback riding or off-road vehicle use is often a family activity, passing from one generation to the next, many people who are flying today grew up in aviation families and have had planes since they were young, often inheriting them and keeping up the traditions. Thus, aviation is a broad based activity with firm roots in the middle-class.

There is another group of noteworthy aircraft owners, the airplane builders. These people build their aircraft from either a kit or from a set of plans. They often spend years on the project, turning out an airworthy, federally inspected plane, many of which are suitable for use on backcountry recreational airstrips. The largest single contribution to the final product is their labor.

BLM_0111728

**Aircraft noise: people and wildlife**

Self-propelled aircraft (i.e., fixed-wing propeller planes, jets, and helicopters) will always produce noise as they fly over the landscape. Aircraft over-flying an area may be there for many different reasons. Aircraft are used in forestry and fire management, game management, search and rescue, and for traveling to a specific destination. Recreational aircraft are used for scenic flying and to provide access to remote places. The Federal Aviation Regulations (FAR 91.119) state that a pilot should fly at such an altitude above the ground that a successful landing could be made if the engine fails. However, this is not always feasible due to the extent of the unsuitable terrain for a successful forced landing, weather conditions, or during take-off and landing.

Most recreational aircraft generate noise from two sources: the engine and the propeller. Aircraft must have fully functioning mufflers that not only reduce noise, but also provide cabin heat and heat for the engine carburetor. The mandatory annual inspection of the aircraft by an FAA licensed inspector includes pressure checking the muffler. No other motorized vehicles, especially for recreation purposes, have as extensive an annual inspection process as that of aircraft. Indeed, only a few states require annual vehicle inspections, which may or may not include a muffler check. The propeller makes most of its noise on takeoff when full power is applied. After liftoff and obstacles are cleared, engine power and RPM are reduced and the sound signature is lessened considerably.

**1) Noise and people**

While it is fairly easy to quantify noise and the science associated with noise volume and distances traveled is well developed, it is difficult to quantify people's reactions to different levels of noise. Some people are perfectly content to have occasional noise disturbance in their environment, while others are totally intolerant of any noise level created by others. The noise of a passing aircraft is usually of short duration, unlike that produced by other forms of motorized recreation. There have been numerous studies on the effect of aircraft noise on people. Two are summarized below.

*a) A study by the U.S. Forest Service entitled "Potential Impacts of Aircraft Over-flights of National Forest Service System Wilderness," which was mandated by the National Parks Over-flights Act of 1987 (P.L. 100-91), found little impact of aircraft over-flights on a visitor's experience. The study reported that: "aircraft noise intrusions did not appreciably impair surveyed wilderness users' overall enjoyment of their visits to a wilderness nor reduce their reported likelihood of repeat visits." The report further suggested that non-wilderness visitor expectations are generally not as great as for those individuals visiting a designated wilderness. Therefore, infrequent occurrence of noise from small aircraft is believed to not substantially diminish the enjoyment of non-wilderness areas by either visitors or residents.*

*b) Theodore J. Schultz, in his paper "Synthesis of Social Surveys on Noise Annoyance" (J. Acoust. Soc. Am. 64(2), Aug. 1978), stated ... "a person's attitude toward the source of noise appears to affect whether or not he expresses annoyance and the amount of his annoyance." He goes on to state ... "It has even been suggested that noise exposure itself is one of the least important determinants of people's propensity for noise annoyance; that one can more accurately predict whether an individual will be annoyed by noise from a study of his personal traits (fear, hostility, etc.) rather than by measurement of the noise to which he is exposed."*

23

BLM_0111729

In 2006 the RAF initiated two Freedom of Information Act (FOIA) requests in regard to aircraft noise complaints from the public.

The first request was to the four U.S. National Forests that encompass the Frank Church River of No Return Wilderness in Idaho. The question posed in the FOIA was: "have there been from 1995 thru 2005 any public complaints of record in regard to aircraft noise in the vicinity of public airstrips and vehicle accessible campgrounds that serve as trail heads at the boundary of the wilderness?" According to the response from the U.S. Forest Service Region 4 office in Ogden, Utah, there were no aircraft noise complaints of record for that 10-year time period.

The second FOIA request was made to Glacier National Park in regard to aircraft noise complaints over a similar time period. There were a total of seventy-five complaints of record. Sixty-two of these complaints were solely in regard to helicopters either providing scenic flights or flights for park management purposes. The remaining thirteen fixed wing reports were mostly about aircraft involved in government-sponsored wildlife surveys. Only two of the thirteen fixed wing reports involved low flying aircraft, and those occurred over the west boundary of the Park near roads.  It was not verified that the aircraft were flying below those stipulated in FAA regulations. Also, this area is in Flathead County, Montana, one of the most populated and fastest growing areas of Montana. It should be noted that Glacier National Park receives over 1 million visitors each year; many times more visitors per year than the Frank Church Wilderness.

Another source of aircraft noise is military training aircraft. It is not uncommon around military bases or Military Operation Areas (MOAs) to have a constant background drone of jet aircraft over sparsely settled areas. For example, almost the entire Upper Missouri River Breaks National Monument in Montana is under a MOA. This MOA is usually active five days a week for up to four hours each day. The occasional noise of a small, propeller driven aircraft is minor in comparison to this low-altitude jet traffic.

## 2) Noise and wildlife

Numerous research projects have been conducted in this field, mostly in regard to military activities. It is important to note that the species of most concern in an airstrip area are large ungulates and raptors.

Some of the more notable studies included:

*a) Weisenberger, et al (1996) (Journal of Wildlife Management 60:52-61) found that the heart rates of captive mountain sheep and desert mule deer were elevated for less than three minutes following jet aircraft over-flight. The duration of elevated heart rates was dependent on the noise level, which ranged from 92-112 decibels. This study involved military aircraft and noise levels that are significantly greater than that generated by a typical general aviation aircraft.  In addition to the physiological responses, the animals' behavior was altered, but returned to pre-disturbance activities within less than four minutes after noise exposure. Further, all animal responses decreased with increased exposure, suggesting that they habituated to sounds and noise levels of even low-level jet aircraft.*

BLM_0111730

**b)** *Lutz and Smith (1976) (Journal of the Acoustical Society of America, Vol. 59, No. 6) found that at an altitude of 400 feet and a slant range of 3000 feet, a passing helicopter caused no observable reaction to pronghorn antelope and the animals continued to graze. They also state that as of this date, no one has conclusively demonstrated a drop in population levels of any wild species due to noise as a single factor.*

**c)** *MacArthur, et al (1982) (Journal of Wildlife Management 46(2): 351-358) found that Mountain Sheep showed no reaction to helicopters or fixed-wing aircraft that were greater than 400 meters distant. Research was conducted using heart rate telemetry and visual cues.*

**d)** *Ellis, et al (1991) found that low level over-flights over nesting raptors caused no permanent nest abandonment or reduction in reproductive success. Typically, birds quickly resumed normal activities within a few seconds following an over-flight.*

It is also important to note that tribal, state and federal government agencies charged with protecting wildlife safety continue to use aircraft as a survey, inventory and management tool with no apparent adverse effects on the animals they are charged with managing.

Wildlife is commonly observed at many of the remote landing strips previously described. Studies show that wildlife often respond to perceived disturbances by shifting habitat use. It seems likely that if these animals were annoyed or frightened by airplane traffic, they would vacate the area. However, it is our experience that this has not been the case and that wildlife quickly learn that airplanes are not a direct threat. Many recreational pilots report that large ungulates such as elk and moose in the vicinity of the landing strip rarely even look up or otherwise interrupt their normal activity when aircraft land and depart. As an example, the approach into and departure from Idaho's Fish Lake airstrip (located within the Selway/Bitterroot Wilderness) is over the water where there are often moose feeding in the nearby wetland. Their feeding goes on uninterrupted (C. Jarecki, personal observation).

**<u>Flight altitudes and airspace</u>**

In general, the Federal Aviation Administration (FAA), as the governing agency over the Nation's airspace, sets the rules for flight altitudes over the entire country. There are some exceptions, mostly involving National security.

The minimum safe operating altitudes for general aviation fixed wing aircraft is covered under FAA regulation 91.119 and is quoted below.

*MINIMUM SAFE ALTITUDES: GENERAL*
*Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:*

*a) ANYWHERE. An altitude allowing, if a power unit fails, an emergency landing without undue hazard to persons or property on the surface.*

BLM_0111731

*b) OVER CONGESTED AREAS. Over any congested area of a city, town or settlement, or over any open air assembly of persons, an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2000 feet of the aircraft.*

*c) OVER OTHER THAN CONGESTED AREAS. An altitude of 500 feet above the surface, except over open water or sparsely populated areas. In those cases, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle or structure.*

**Flights over certain federal lands**

All Visual Flight Rules (VFR) Aeronautical Charts, which VFR pilots are required to have for their intended flight, have a reference to regulations pertaining to landing and over-flights of certain areas. The following information is printed on each chart:

*REGULATIONS REGARDING FLIGHTS OVER CHARTED NATIONAL PARK SERVICE AREAS, U.S. FISH AND WILDLIFE SERVICE AREAS AND U.S. FOREST SERVICE AREAS.*

*The landing of aircraft is prohibited on lands or waters administered by the National Park Service, U.S. Fish and Wildlife Service, or U.S. Forest Service without authorization from the respective agency. Exceptions include: 1) when forced to land due to an emergency beyond the control of the operator, 2) at officially designated landing sites, or 3) on approved official business of the Federal Government.*
*All aircraft are* `requested` *to maintain a minimum altitude of 2000 feet above the surface of the following: National Parks, Monuments, Seashores, Lakeshores, recreation Areas and Scenic Riverways administered by the National Park Service; National Wildlife Refuges, Big Game Refuges, Game Ranges and Wildlife Ranges administered by the U.S. Fish and Wildlife Service; and Wilderness and Primitive areas administered by the U.S. Forest Service. FAA Advisory Circular (AC) 91-36C, "Visual Flight Rules (VFR) Flight Near Noise-Sensitive Areas," defines the surface as: the highest terrain within 2,000 feet laterally of the route of flight, or the upper-most rim of a canyon or valley.*

Pilots generally adhere to this "request" unless conditions for a safe flight require a lower flight altitude such as a low cloud ceiling, reduced visibility, the inability of the aircraft to attain the desired altitude, and the arrival and departure from airports. Indeed, as these areas generally encompass rugged terrain with relatively few options for a safe forced landing, pilots tend to select high altitudes when transiting these areas because of safety considerations.    The boundaries of National Park Service areas, U.S. Fish and Wildlife Service areas and U.S. Forest Service Wilderness and Primitive areas are depicted on the VFR Aeronautical Charts.

Bureau of Land Management administered lands generally do not fall under the above landing restrictions or any minimum over-flight altitude requests. Exceptions would be BLM administered National Monuments in Montana and Utah where landing restrictions apply.

BLM_0111732

**Minimum weather conditions for various classes of airspace**

FAA regulation 91.155 covers minimum weather conditions for legal visual flight in various classes of airspace. The lower elevation airspace over most of the sparsely settled areas of public lands is "Class G", uncontrolled airspace.

Basically, a pilot can legally fly over most remote public lands areas during the day with a forward minimum visibility of one mile and remain clear of the clouds.

<u>**Agency liability**</u>

Aviation is just one of many forms of transportation and recreation practiced on public lands, and any liability issues associated with aviation are the same as those associated with these other activities. Throughout the public lands of the country there are recreational users of all ages that are unlicensed drivers of ATVs, motorbikes and snowmobiles traveling the transportation system or going off road. Every year there are snowmobilers caught in avalanches, skiers hitting trees and vehicle drivers going over cliffs. In addition, there are rifle and bow hunters killed or injured during hunting season. White water rafters drown or are injured while testing their mettle against a river's rapids. All these activities would appear to present risks that the public lands agencies must consider.

Aviation should not be singled out as presenting a special or heightened risk or public safety concern. Pilots are the most highly trained of all user groups, and by law must receive periodic evaluation. To single out pilots and aviation for special requirements is not based on any understanding of research into aviation or the liability risks and requirements of the federal government. In addition, as mentioned earlier, airstrips can provide vital emergency access.

Located in Appendix B is a study of State and Federal Statutes as well as case law that directly addresses liability. Although this is more specific to Montana than other states, the general application is germane to other states. The law does not prevent anyone from bringing forth a lawsuit. However, it does give a benchmark for whether a person is likely to prevail in the suit given the attitude towards public recreation, access and just plain common sense.

In April, 2007, the RAF made FOIA requests to the various state BLM offices and regional Forest Service offices in the western states, plus Death Valley National Park in California. A sample letter is found in Appendix C. The request asked for documentation that would show if the agency has ever been a defendant in a legal action in state or federal courts following an accident involving a private, non-commercial aircraft landing or taking off from a public airstrip under that agency's jurisdiction.  In the case of the BLM, the request applied to both on or off airport incidents on their administered lands.  The FOIA also requested any documents that indicated how the legal action was resolved.

Based on the responses received, there are no records showing that any of the agencies contacted have ever been involved in litigation following an aircraft accident involving a private, non-commercial aircraft. A typical response reads: "*A search of records pursuant to your FOIA request has resulted in no agency records responsive to your FOIA request*". Therefore, it

BLM_0111733

appears that any fears by agency land managers in regard to the possibility of a lawsuit following a non-commercial aircraft accident are unfounded. If requested, the RAF can provide the letters of response from the various agency offices.

**Agreements with federal land agencies for airstrip management and maintenance**

Several state agencies and organizations have airstrip management agreements with federal land agencies. Several examples are listed below:

**California**

The Recreational Aviation Foundation has an airport maintenance agreement with Death Valley National Park for the three public airports that are located within the Park boundaries on National Park Service lands.

**Idaho**

Idaho Aeronautics Division has special use permits for seventeen airstrips located on U.S. Forest Service and BLM lands. They are listed below:

| Airstrip Name | Federal Agency |
|---|---|
| Atlanta | USFS |
| Bear Trap | BLM |
| Big Creek | USFS |
| Big Southern Butte | BLM |
| Bruce Meadows | USFS |
| Copper Basin | USFS |
| Cox's Well | BLM |
| Grasmere | BLM |
| Hollow Top | BLM |
| Johnson Creek | USFS |
| Laidlaw Corrals | BLM |
| Magee | USFS |
| May | BLM |
| Murphy Hot Springs | BLM |
| Pine | USFS |
| Twin Bridges | BLM/USFS |
| Warm Springs | USFS |

**Montana**

The Montana Aeronautics Division and Montana Pilots' Association together have a volunteer agreement with the Spotted Bear Ranger District, Flathead National Forest, USDA, for the annual maintenance of three U.S. Forest Service airstrips that are open to the public: Spotted Bear, Meadow Creek and Schafer Meadows.

28

BLM_0111734

**Utah**

Red Tail Aviation, Price, Utah, has Title V Rights-of-Way for five airstrips situated on Bureau of Land Management lands in the state of Utah. The airstrips are: Hidden Splendor, Mineral Canyon, Fry Canyon, Hite, and Sand Wash.

The Utah Backcountry Pilots Association leases 122 acres of Utah State Trust Lands containing the Happy Canyon airstrip.

**Washington**

The Washington State Aviation Division has the following conditional use agreements:

| Airstrip Name | Federal Agency |
|---|---|
| Little Goose | Army Corps of Engineers |
| Lower Monumental | Army Corps of Engineers |
| Lower Granite | Army Corps of Engineers |
| Ranger Creek | USDA Forest Service |
| Rogersburg | Bureau of Land Management |
| Stehekin | National Park Service |
| Sullivan Lake | USDA Forest Service |

**Wyoming**

The Jackson Airport is situated within Grand Teton National Park on National Park Service lands. The Park Service leases the site back to a local airport committee. There is one paved runway that serves planes ranging in size from small, personal aircraft like Pipers and Cessnas to large commercial air carriers like Boeing 737s. The latest data available in 2003 shows 162 arrivals and departures taking place daily at the Jackson Airport.


**Summary conclusion**

The preservation and enhancement of recreational aviation resources on both public and private land is an important component of a comprehensive transportation and access plan. The non-commercial use of private aircraft for the purpose of recreational access to public lands poses minimal effect on the environment. Aviation is the most highly regulated form of recreation related transportation.  Pilots are immersed in a strong safety culture throughout their flying careers.  Close Federal oversight that holds individual pilots and aircraft owners accountable for unsafe actions is unprecedented with any other recreation users of public lands. The management of backcountry airstrips for recreational purposes should receive a rational and balanced evaluation by land managers. Pilots and their organizations are available to provide technical aviation information to help land managers make decisions which are in compliance with state and federal environmental laws. Decisions should be based on accurate information and serve to preserve and enhance the natural resources land managers are charged to protect as well as serve the needs of the recreation public.

BLM_0111735

# Appendix A

| SAFECOM<br>Aviation Safety Communique | **Tracking #:**   FS-03-0459 |
|---|---|
| | **Date Submitted:** |

**EVENT**

| **Date:** | 7/24/2003 | **Local Time:** 1120 | | **Injuries:** No | **Damage:** No |
|---|---|---|---|---|---|
| **Location:** | Wurtz Airstrip | | **State:** Montana | | |
| **Operational Control:** | Forest Service (USFS) > Region 01 Northern Rockies Region | | | | |

**MISSION**

| **Type:** | Fire, Air Attack | **Other:** | Fire, Air-Attack |
|---|---|---|---|
| **Procurement:** | CWN (Call when needed) | **Other:** | CWN |
| **Persons Onboard:** | 3 | **Special Use:** Yes | **Hazardous Materials:** No |
| **Departure Point:** | FCA-Glacier Inter. | **Destination:** Wedge Canyon Fire | |

**AIRCRAFT**

| **Manufacturer:** Piper | **Model:** PA34 |
|---|---|

**NARRATIVE**

We launched from FCA on 7/24/03 @0926 for a 3 hour mission as Air Tactical Group Supervisor on the Wedge Canyon Incident. Front seat with pilot was an air attack trainee (ATGS(T)) with fully qualified air attack in the back. Operation followed standard operational checks. At 1115 the left engine started running rough and we lost all engine power within two minutes. While trying to determine why we lost one engine the pilot discovered we were out of fuel. Our first intention was to try and return to FCA with one engine out. I had pinpointed several airstrips along the North Fork road previously from locating areas for a portable retardant plant. Directly below us we located Wurtz airstrip, a closed airstrip on Forest Service ground. The pilot executed a slow left bank turn while descending to the airstrip and we landed without incident at 1125. Pilot is currently refueling the remote aircraft to bring it back to FCA for inspection. The previous evening the pilot had requested that the aircraft be fueled by first thing in the morning. The pilot had arrived early this morning and cleaned all windows, leading edge of all wings, and pre-flighted the aircraft. With the aircraft sitting on the strip the fuel tanks still registered full. The FBO did not refuel the aircraft as thought, and the desk receptionist informed him that the receipt from fueling was still in the truck and he could get it later.

**CORRECTIVE ACTION**

This event is currently under investigation as an Incident with Potential. A report is in preparation. Investigation Follow-up: At approximately 11:15 hours on July 24, 2003, a Piper Seneca III flying an Air Attack Mission over the Wedge Canyon Fire began to lose power on one engine. During the trouble-shooting of the rough-running engine, the pilot realized his fuel gauges were showing empty. The pilot was able to make a successful forced landing into a back-country airstrip without damage to the aircraft. An interview with the pilot on the morning of July 25, 2003 revealed the following information: -the pilot asked the local FBO to "top off the tanks" on the evening of July 23, 2003. -the pilot was told by an employee of the FBO that the aircraft had been fueled on July 24, 2003. -the pilot believed the tanks were full but did not visually check the fuel in the tanks. -approximately 2 hours into the mission, when the engine began to lose power, the pilot noticed for the first time that his fuel gauges showed "empty". -the forced landing was successful to the back-country airstrip with no damage or injury. RASM COMMENTS: Pilot card was suspended and operator's contract placed on suspension pending an aviation safety plan. 9/10/03 operators safety plan was accepted by R8 Aviation and Contracting. Operator contractor returned to active status. No further action required.

BLM_0111736

**U.S. Forest Service fire contract aircraft taking off after refueling following running out of gas while on fire patrol**



**Takeoff from Wurtz Airstrip after refueling the plane**

**July 12, 2003**

BLM_0111737

# APPENDIX B

### Legal Opinion Concerning the Liability of Landing Airplanes on Public Lands for Recreational Purposes

## THE LEGALITY AND LIABLITY ISSUES OF LANDING ON PUBLIC LAND AND PUBLIC AIRSTRIPS

## LEGALITY OF LANDING ON OFF-AIRPORT LOCATIONS

**The following is taken directly from the NOAA Airport/Facility Directory:**

### AIRCRAFT LANDING RESTRICTIONS

*Landing of aircraft at locations other than public use airports may be a violation of Federal or local law. All land and water areas are owned and controlled by private individuals or organizations, states, cities, local governments, or U.S. Government agencies. Except in emergency, prior permission should be obtained before landing at any location that is not a designated public use airport or seaplane base. (This does not apply to most BLM lands.)*

### Legal Opinion Concerning the Liability of Landing Airplanes On Public Lands for Recreational Purposes

#### CLASSIFICATION OF ENTRANTS AND DUTIES OF CARE

Historically, the duty owed by landowners to those who enter upon their land was determined by the status of the entrant, whether a trespasser, licensee, or invitee. Because the duty owed to each category of entrant was different, (4) in order to determine the duty a landowner owed an entrant, it was critical to first determine the status of the entrant. (5) At times difficult, this chore became less burdensome following the Montana Supreme Court's decision in *Limberhand v. Big Ditch Co.* (6)

(1) A trespasser is a person who enters or remains upon land in the possession of another without a privilege to do so, created by the possessor's consent or otherwise. Restatement of Torts (Second), Section 329 (1965).

(2) A licensee is a person who is privileged to enter or remain on land only by virtue of the possessor's consent. Restatement of Torts (Second), Section 330 (1965).

(3) An invitee is either a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public (public invitee); or a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings

32

with the possessor of the land (business visitor). To be classified as an invitee, it is not enough to hold land open to the public; there must be some inducement or encouragement to enter, some conduct indicating that the premises are provided and intended for public entry and use, and that the public will not merely be tolerated, but is expected and desired to come. Restatement of Torts (Second), Section 332, pp. 178-179 (1965).

(4) Under the common law rules, a landowner owes licensees and trespassers a duty to merely avoid willful, wanton, or intentional conduct, but owes invitees a duty of ordinary care.

(5) The easiest way to illustrate the difference between an invitee or a licensee is by example: When a landowner tacitly permits the boys of a town to play ball on his vacant lot the boys are licensees only; but if the landowner installs playground equipment and posts a sign saying that the lot is open free to all children, there is then a public invitation, and those who enter in response to that invitation are invitees. Restatement of Torts (Second), Section 332, p. 179 (1965).

(6) 706 P.2d 491 (1985).
In *Limberhand*, the court reaffirmed its 1981, decision in *Corrigan v. Janney* that a landowner owes a single duty of ordinary care to all entrants, regardless of their status. Pursuant to statute, therefore, a landowner is liable for injuries caused by a failure to exercise reasonable care under the circumstances,a duty formerly owed only to invitees.

Without taking into account the statutory ramifications of Montana's recreational use law, a pilot flying onto government land would, in all likelihood, be considered a licensee (provided that the land is not marked 'No Trespassing' and/or the government does not issue an outright ban to the land's use.)

(7) 636 P.2d 838 (1981).

(8) 706 P.2d at 496.

(9) MONT. CODE, ANN. Section 27-1-701. "Everyone is responsible not only for the result of his willful acts but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person except so far as the latter has willfully or by want of ordinary care brought the injury upon himself."

(10) This duty, however, does not apply in cases falling under Montana's recreational use act. In cases where a landowner gratuitously makes his land and/or water available to the public for recreational use, by statute the only duty of care a landowner owes to those recreational users is to refrain from willfully or wantonly injuring the entrant. MONT. CODE, ANN. Sections 70-16-301, 70-6-302 (1995).


**FEDERAL GOVERNMENT'S LIABILITY FOR INJURIES TO PRIVATE CITIZENS WHILE ON FEDERAL LAND LOCATED IN MONTANA**

<div align="center">INTRODUCTION</div>

Because there Is an ever-decreasing amount of undeveloped land to explore and enjoy and because much of the as-yet-undeveloped land is privately owned, over the last thirty years an increasing number of states have passed

BLM_0111739

legislation designed to encourage landowners to open use of their lands and water to the public by shielding the landowners from liability for injuries to recreational users of the land. Commonly known as recreational use statutes, all fifty states now have some version of these statutes. Although recreational use statutes were originally designed to encourage private landowners to open use of their lands to the public, the shield provided by these statutes has also been used by the Federal government to protect itself from liability for injuries occurring to recreational users of federal lands open to the public. As a result, any claim brought against the United States by a person injured while engaging in recreational activity on federal land is, as a general rule, barred by the recreational use statute of the state in which the injury occurred.

(1) W. PROSSER AND W. PAGE KEATON, PROSSER AND KEATON ON TORTS SECTION 60 PP. 415–416 (5TH ED. 1984).

(2)W. PROSSER AND W. PAGE KEATON. PROSSER AND KEATON ON TORTS Section 60, p. 415, (5th ed. 1984).

(3)*See* Proud v. United States, 723 F.2d 705 (9th Cir.) *cert. denied* 467 U.S. 1252 (1984); Simpson v. United States, 652 F.2d 831 (9th Cir. 1981); Jones v. United States, 693 F.2d 1299 (9TH Cir. 1982);

(4) See O'Neal v. United States, 814 F.2d 1285 (9th Cir. 1987), McClain v. United States, 445 F.Supp. 770 (D. Or. 1978); Dorman v. United States, 812 F.Supp 685 (S.D.Miss. 1993); *But cf.* Seyler v. United States, 832 F.2d 120 (9th Cir. 1987) (holding that Idaho's recreational use statute did not bar an action brought by a motorcyclist injured on a government maintained highway because application of recreational use statute to ordinary streets or highways would ignore purpose of statute and application of the statute to "any road or highway in Idaho ... Is clearly absurd.").
In Montana, the question of whether an injured party can recover against the United States for injuries suffered while engaging in a recreational activity on federal land was most recently answered – in the negative – in the case of *Fisher v. United States*. (5)

## II FEDERAL TORT CLAIMS ACT

The Federal Tort Claims Act authorizes suits against the United States for damages for injury or loss of property, or personal injury or death If caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. The Tort Claims Act also provides that the United States shall be liable for tort claims in the same manner and to the same extent as a private individual under like circumstances. Thus, the test established by the Tort Claims Act for determining the United States' liability for the negligent acts or omissions of its employees is whether a private person would he responsible for similar negligence under the laws of the State where the acts occurred.

(5)534 F.Supp. 514 (,D. Mont. 1982). Fisher v. United States was decided prior to the 1987 and 1995 amendments to Section 70-16-302. In pertinent part, the pre-amendment version of Section 70-16-302 provided: "A landowner or tenant who permits ... any person to enter upon any property in the possession or under the control of such landowner ... for any recreational purpose... does not ... extend any assurance that such property is safe for

BLM_0111740

any purpose or confer upon such a person the status of invites or license to whom any duty of care is owed..."

(6) 28 U.S.C. Section 1346(b).

(7) 28 U.S.C. Section 2674 (1948).

(8) Rayonier Inc. v. United States, 352 U.S. 315, 319, 77 S.Ct. 374, 376, 1 L.Ed.2d 354 (1957). *See also*, Richards v. United States, 369 U.S. 1,6-8. 82 S.Ct. 585, 589-590, 7 L.Ed.2d 492 (1962).


III. MONTANA'S RECREATIONAL USE STATUTE

Because Montana is uniquely endowed with scenic landscapes and areas rich in recreational value, (9) Montana's recreational use statute (10) was enacted to encourage landowners to make their lands freely available to the public by limiting the landowners' tort liability. (11) In Montana, a person who uses property for recreational purposes is owed no duty of care by the landowner with respect to the condition of the property, except that the landowner is liable to the person for any injury to person or property for an act or omission that constitutes willful or wanton misconduct. (12) This restriction on a landowner's liability applies to both private and governmental agency landowners;(13) is applicable regardless of whether the landowner has or has not given his permission to use the property;(14) and applies to land, roads, water, watercourses, private ways, and any improvements, buildings, structures, machinery, and equipment on the property (15)


(9) MONT. CODE ANN. Section 23-2-101 (19xx).

(10) MONT. CODE ANN. Sections 70-16-301, 70-16-302 (1995)

(11) Fisher v. United States, 534 F.Supp. 514 (D. Mont. 1982); *See also* Jones v. United States, 693 F.2d 1299 (9th Cir. 1982) ("The purpose of [Washington's Recreational Land Use Act] is to encourage owners or others in lawful possession and control of land and water areas or channels to make them available to the public for recreational purposes by limiting their liability toward persons entering thereon and toward persons who may be injured or otherwise damaged by the acts or omissions of person entering thereon.").

(12) MONT. CODE ANN. Section 70-16-302(i) (1995).

(13) MONT. CODE ANN. Section 70-16-302(2) (1995).

(14) MONT. CODE ANN. Section 70-16-302(l) (1995).

(15) MONT. CODE ANN. Section 70-16-302(l)-(3) (1995).
A. "Recreational Purposes"

"Recreational purposes", as used in Montana's recreational use statute, includes hunting, fishing, swimming, boating, water skiing, camping, picnicking, pleasure driving, biking, winter sports, hiking, touring or viewing cultural and historical sites and monuments, spelunking, non-commercial aviation activities or other pleasure expeditions. (16) The statute is applicable in any case where entry onto land is made for what could reasonably be regarded by the general public as a recreational

35

BLM_0111741

purpose, regardless of some different purpose in the mind of a particular user. (17)

Therefore, even if an entrant is injured while engaged in an outdoor activity not expressly mentioned in the statute, a court would likely conclude that recovery is barred if the activity is similar to those described in the statute. (18) For example, one court has held that both snowmobiling and diving are within a statute governing "fishing, hunting, trapping, camping, hiking, sightseeing, or other similar outdoor recreational use," because these activities are widely recognized as sports, involve some degree of physical exertion, and usually require open spaces. (19)

(16) MONT. CODE ANN. Section 70-16-301 (1995).

(17) Fisher v. United States, 534 F.Supp. 514 (D. Mont. 1982) (holding that a school field trip to a wildlife refuge, a trip which included a planned lunch period, was for a 'recreational purpose' because '[a]t the time of the accident the decedent was doing the things which are done on a children's picnic..."and" [a] visit to ... a wildlife refuge may be educational, recreational, vocational, or some combination of all three.").

(18) See generally, John C. Barrett, *Good Sports and Bad Lands: The Application of Washington's Recreational Use Statute Limiting Landowner Liability*, 53 WASH. L. REV. 1, 20 (1977).

(19) Id. *But see*, Villanova v. American Federation of Musicians, 301 A.2d 469 (N.J. Super. 1973), *cert. denied*, 308 A.2d 669 (1973) (holding that defendant was not entitled to protection of New Jersey's recreational use law when injured plaintiff was a member of a band involved in a free outdoor park concert.).

### B. "Willful and Wanton Misconduct"

The term "willfully", when applied to the intent with which an act is done or omitted, denotes a purpose of willingness to commit the act or make the omission referred to; it does not require any intent to violate the law, to injure another, or to acquire any advantage. (20) Willful and wanton conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent, (21) and lies between intent to do harm and the mere unreasonable risk of harm to another (i.e. ordinary negligence). (22)

(20) MONT. CODE ANN. Section 1-1-204(5) (1977). *See*, Restatement of Torts (Second), Section 500 (1965) (defining "conduct...in reckless disregard of the safety of another" as conduct in which an actor does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent," and then likening "reckless disregard" with "wanton or willful misconduct." *See also*, Boadle v. Unites States, 472 F.2d 1014 (9th Cir. 1973) (utilizing the Restatement of Torts (Second) to define "invitee.").

(21) W. PROSSER AND W. PAGE KEATON, PROSSER AND KEATON ON TORTS Section 34, p. 214, (5th ed. 1984); *See* Jones v. United States, 693 F.2d 1299 (9th Cir.

BLM_0111742

1982) (quoting from the Washington Pattern Instruction, "willful misconduct" is the "intentional doing of an act ... or the intentional failure to do an act which one has the duty to do when he or she has actual knowledge of the peril that will be created and intentionally fails to avert the injury"; "wanton misconduct" is the "intentional doing of an act which one has a duty to refrain from doing or the intentional failure to do an act which one has the duty to do, in reckless disregard of the consequences and under such surrounding circumstances and conditions that a reasonable person would know or should know that such conduct would in a high degree of probability result in substantial harm to another." In *Jones*, the parties and the court agreed that if Washington's Recreational Use Statute was applicable, the Government's liability would be measured under Washington's common law definitions of willful and wanton misconduct.).

(22) W. PROSSER AND W. PAGE KEATON, PROSSER AND KEATON ON TORTS Section 34, p. 212, (5th ed. 1984); *See generally* Derenberger v. Lutey, 674 P.2d 485 (Mont. 1983), *citing* Adkisson v. City of Seattle, 258 P.2d 461 (Wash. 1953) (quoting the Washington Supreme Court, "Negligence and willfulness imply radically different mental states.

IV.APPLICATION OF MONTANA'S RECREATIONAL USE LAWS TO FEDERALLY
OWNED PROPERTY IN MONTANA

The applicability of state recreational use statutes to federally owned lands is well established both in Montana (23) and the Ninth Circuit. (24) The maximum liability which the United States can incur, therefore, is precisely equal to that which may be incurred by a private individual in the same circumstances. (25)

 In the case of *Fisher v. United States*, the parents of a child who was killed while playing during a school field trip to a federally owned wildlife refuge brought a wrongful death action against the Government under the Federal Tort Claims Act. In their suit, the parents alleged that because the purpose of the field trip was educational and not recreational, Montana's recreational use statute did not apply and, therefore, because their daughter was an invitee of the Government, the Government owed her a duty of care. (26) The district court disagreed with the parents' contentions as to the purpose of the trip and, in accordance with the provisions of. Negligence conveys the idea of neglect or inadvertence, as distinguished from premeditation or formed intention. An act into which knowledge of danger and willfulness enter is not negligence of any degree, but is willful misconduct...").

(23) Fisher v. United States, 534 F.Supp. 514 (D. Mont. 1982).

(24) O'Neal v. United States, 814 F.2d 1285 (9th Cir. 1987); See Gard v. United States, 594 F.2d 1230, 1233 (9th Ci-r. 1979) cert. denied, 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979) ('The principle of encouraging landowners to open their land by limiting potential tort liability applies with equal force to the Government as to other landowners.'); Proud v. United States, 723 F.2d 705 (9th Cit.), *cert. denied* 467 U.S. 1252 (1984); Jones v. United States, 693 F. 2d 1299 (9th Cir. 1982); Simpson v. United States, 652 F.2d 831 (9th Cir. 1981).

(25) O'Neal v. United States, 814 F.2d 1285 (9th Cir. 1987); See also McClain v. United States, 445 F.Supp. 770 (D. Oregon 1978) ("In other words, a state may not protect private citizens from liability without also protecting the federal government.").

37

BLM_0111743

```
(26)534 F.Supp. 514, 515 (D. Mont. 1982).
Montana's recreational use statute, granted summary judgment in favor of the
United States. (27)
V. CONCLUSION
 As noted supra, the version of Montana's recreational use statute applied in
Fisher is different than the version in effect today. However, because the
intent of Montana's recreational use law remains the same as when it was
first enacted, the outcome of Fisher - and other suits brought under the
Federal Tort Claims Act for injuries suffered while using federal land for
recreational purposes - would, in all likelihood, be the same today as it was
in 1982.

 Therefore, if a person or his property is injured while on federally owned
land in Montana, unless the proximate cause of that injury was due to willful
and wanton misconduct on the part of the Government, any claim brought by the
injured party pursuant to the Federal Tort Claims Act would be barred by
Montana's recreational use law.

(27)534 F.Supp. 514, 515-516 (D. Mont. 1982).
```

## ADDENDUM

RECENT MONTANA SUPREME COURT DECISION: Affirms Montana's Recreational use statute.

DA 06-0188

IN THE SUPREME COURT OF THE STATE OF MONTANA 2007 MT 124

THE ESTATE OF TIMOTHY A. HILSTON, by MARY ANN HILSTON, Personal Representative,

and MARY ANN HILSTON, on her own behalf.

                    Plaintiffs and Appellants, v.
THE STATE OF MONTANA,
              Defendant and Respondent.

APPEAL FROM:          District Court of the Eighth Judicial District
                      In and For the County of Cascade, Cause No. DV-05-1023, Honorable
                      Dirk M. Sandefur, Presiding Judge
                      COUNSEL OF RECORD:
For Appellants: Robert J. Vermillion, Smith, Walsh, Clarke & Gregoire, PLLP, Great Falls, Montana,
Floyd D. Corder, Corder & Allen, Great Falls, Montana

For Respondent: Elizabeth S. Baker, Hughes, Kellner, Sullivan & Alke, PLLP, Helena, MT For Amicus Curiae:

Jack R. Tuholske, Tuholske Law Office, P.C., Missoula, Montana (Montana Wildlife Federation)

                                        Submitted on Briefs: November 28, 2006
                                                      Decided: May ,2007
Justice Jim Rice delivered the Opinion of the Court.

¶1 Appellant Mary Ann Hilston, personal representative of the estate of Timothy A. Hilston, appeals from the order of

the Eighth Judicial District Court, Cascade County, granting summary judgment in favor of the State. We affirm.

38

BLM_0111744

¶2      We consider the following issue on appeal:

¶3      Did the District Court err in granting the State's motion for summary judgment on Mary Ann Hilston's claim that the State is liable for negligent grizzly management in the State's Blackfoot-Clearwater Wildlife Management Area because grizzly bears are not a "condition of the property" pursuant to § 70-16-302, MCA?

BACKGROUND

¶4      Timothy Hilston (Mr. Hilston) of Great Falls, was hunting elk in the Blackfoot/Clearwater Wildlife Management Area. Mr. Hilston shot an elk, and while he was field dressing the elk, he was attacked by grizzly bears and was killed. After Mr. Hilston was reported missing, a search and rescue team searched the area and found his body the next day. He had died of blood loss from multiple bite wounds.

¶5      An investigation team of both state and federal wildlife investigators was assembled and set traps for the offending bears. The two grizzly bears that attacked Mr. Hilston, a twelve-year-old female and one cub, were captured. Both bears, along with the adult bear's other cub of the year, were destroyed.

¶6      The Blackfoot-Clearwater Wildlife Management Area, located in the Blackfoot Valley approximately forty-five miles east of Missoula and near the Bob Marshall Wilderness Area, lies on state and private land, and is open to public access free of charge. Mr. Hilston's attack and subsequent death occurred on state-owned land within the boundaries of Powell County.

¶7      Mr. Hilston's estate, by and through his personal representative and surviving spouse, Mary Ann Hilston (Hilston), filed a complaint in federal court in September 2004, alleging negligence by the State of Montana and the United States Fish and Wildlife Service in the operation, control, leasing, maintenance, and management of grizzly bears, natural resources, land and people in the Blackfoot-Clearwater Wildlife Management Area. The federal court dismissed the complaint for lack of subject matter jurisdiction, concluding that the actions of the U.S. Fish and Wildlife Service fell within the discretionary function exemption to the Federal Tort Claims Act. The court dismissed the supplemental claim against the State of Montana without prejudice to the Plaintiff's right to re-file in state court.

¶8      Hilston filed her complaint in state court on September 6, 2005. The State filed a motion for summary judgment, based on a stipulation of facts submitted by the parties. The District Court heard the motion on January 31, 2006, and ruled from the bench that the State was entitled to judgment as a matter of law under the Recreational Use Immunity Act. Hilston appeals.

STANDARD OF REVIEW

¶9      We review a district court's grant of summary judgment de novo. *Casiano v. Greenway*

39

BLM_0111745

*Enterprises, Inc.,* 2002 MT 93, ¶ 13, 309 Mont. 358, ¶ 13, 47 P.3d 432, ¶ 13. The party moving for summary

judgment must demonstrate that there are no genuine issues of material fact. *Bruner v. Yellowstone County,* 272

Mont. 261, 264, 900 P.2d 901, 903 (1995). Once this is accomplished, the burden then shifts to the non-moving

party to prove, by more than mere denial and speculation, that a genuine issue of fact does exist. *Bruner,* 272

Mont. at 264, 900 P.2d at 903. If there is no genuine issue of material fact, this Court reviews the district court's

conclusions of law to determine whether its interpretation of the law is correct. *MacKay v. State,* 2003 MT 274, ¶

14, 317 Mont. 467, ¶ 14, 79 P.3d 236, ¶ 14, cert. denied, 541 U.S. 1041, 124 S. Ct. 2162 (2004).


DISCUSSION

¶10 Hilston argues that the District Court erred in granting summary judgment to the State under the Recreational

Use Immunity Act (Act). Hilston contends that the Act does not serve to grant immunity to the State of Montana

because the 1987 amendments to the Act make it clear that the Act applies only to defects in property. Hilston

argues that grizzly management in the Clearwater Management area is not a "condition of the property" for which

the Act grants immunity.

¶11 The State argues that the District Court correctly granted summary judgment in its favor. The State asserts the

Act provides that landowners do not owe a duty to make their property safe for recreational users who do not pay a

fee to access the property, and the State of Montana, like any other property owner, is protected from a claim that it

failed to prevent or warn of an attack by an indigenous wild animal on its land. The State contends that Mr. Hilston

was "the unfortunate victim of a natural tragedy" and "the law bars recovery for his death." The State argues that

grizzly bears are a "condition of the property" within the meaning of § 70-16-302(1), MCA, and that both the

ordinary meaning of the words and their common-law origins support the State's construction of the Act.¶12

Section 70-16-302(1), MCA, provides: A person who uses property, including property owned or leased by a public

entity, for recreational purposes, with or without permission, does so without any assurance from the landowner

that the property is safe for any purpose if the person does not give a valuable consideration to the landowner in

exchange for the recreational use of the property. The landowner owes the person no duty of care with respect to

the condition of the property, except that the landowner is liable to the person for any injury to person or property

for an act or omission that constitutes willful or wanton misconduct . . . .The purpose of the Act "is to 'grant a

landowner relief from liability to persons gratuitously entering land for recreation purposes.'" *Jobe v. City of*

*Polson,* 2004 MT 183, ¶ 25, 322 Mont. 157, ¶ 25, 94 P.3d 743, ¶ 25 (quoting *Simchuk v. Angel Island Community*

*Ass'n,* 253 Mont. 221, 226, 833 P.2d 158, 161 (1992)). "Hunting" is expressly included within the definition of

BLM_0111746

"recreational purposes." Section 70-16-301, MCA. There is no dispute here that Mr. Hilston was using state-owned land for recreational purposes, and that his use of the property was gratuitous. There is no allegation of willful or wanton misconduct by the State.

¶13 This Court has interpreted the landowner protection statute to effectuate its purposes. See *Saari v. Winter Sports*, Inc., 2003 MT 31, 314 Mont. 212, 64 P.3d 1038 (sledding at closed ski resort covered by Act); *Weinert v. City of Great Falls,* 2004 MT 168, 322 Mont. 38, 97 P.3d 1079 (sledding in city park considered recreational purpose for which city was immune from liability); and *Jobe*. In *Jobe*, the plaintiff was injured after falling through a damaged plank on the Polson city dock, and filed suit against the city for negligently maintaining the premises and for failing to warn of the unsafe condition. The district court granted summary judgment for the city on grounds that the plaintiff failed to present evidence in support of the claim that the city was aware of the defective plank before the accident, or that the city acted willfully or wantonly. The court also concluded that the plaintiff's negligence claim was precluded by § 70-16-302, MCA. On appeal, this Court concluded that the facts were sufficient to raise a genuine issue as to whether the city's failure to timely repair the damaged plank or warn the plaintiff of the danger constituted willful or wanton misconduct, precluding summary judgment. However, we agreed that the recreational use statute barred the plaintiff's negligence claim. *Jobe*, ¶ 26.

¶14 The dispositive issue in this case is whether the statute provides immunity for an attack by an indigenous wild animal on the property. Thus, the pertinent question here is whether wild animals are a "condition of the property" for which a landowner owes no duty of care. The District court determined that:

[P]ursuant to the common law recognition of . . . wildlife, as a condition of property, and pursuant to the authority of *Jobe versus City of Polson* case, and *Weinert versus City of Great Falls*, the Court concludes as a matter of law that wildlife, including grizzly bears, are a condition of the land in regard to and within the meaning of section [70-16-302(1)]. Based upon that authority, the Court more specifically concludes that the bear or bears at issue in this case were a condition of the land within the meaning of that statute. ¶15 Wild animals are known in legal terms as *ferae naturae*—"of a wild nature or disposition." Black's Law Dictionary, 635 (7th ed. 1999). Courts continue to recognize the common law distinction between domestic animals, *domitae naturae*, for which the landowner

41

assumed liability towards third parties, and wild animals, *ferae naturae*, for which the landowner generally assumed no liability. "The rule of law has developed that a landowner cannot be held liable for the acts of animals *ferae naturae*, that is, indigenous wild animals, occurring on his or her property unless the landowner has actually reduced the wild animals to possession or control, or introduced a nonindigenous animal into the area." *Nicholson v. Smith*, 986 S.W.2d 54, 60 (Tex. App. 1999). See also Restatement of Torts (Second) §§ 507-08; *Palumbo v. State Game and Fresh Water Fish Com'n*, 487 So.2d 352, 353 (Fla. App. 1986) (state not liable for alligator attack in state park).

¶16 The California Court of Appeals expressly held that wild animals "are a natural part of the condition of unimproved public property . . . ." *Arroyo v. State of California*, 40 Cal. Rptr. 2d 627, 631 (Cal. App. 1995). In Arroyo, nine-year-old Darron Arroyo was mauled by a mountain lion on a hiking trail in a state park. Arroyo sued the state for failure to warn and breach of statutory duty to eliminate or warn of dangers of mountain lions, for negligence, and for infliction of emotional distress. The relevant immunity statute was the California Tort Claims Act (Gov. Code, § 830 et seq.), § 831.2, which provided, in pertinent part, that "a public entity . . . is [not] liable for an injury caused by a natural condition of any unimproved public property, including but not limited to any natural condition of any lake, stream, bay, river or beach." The California court held that a wild animal is a "natural condition" under this statute. *Arroyo*, 40 Cal.Rptr.2d at 631.

¶17 We concur with the reasoning of these decisions. Grizzly bears are wild animals existing upon the property, and, as such, are a "condition of the property" for purposes of Montana's Recreational Use Immunity Act. Thus, the State of Montana owed no duty to protect Mr. Hilston from the grizzly bear attack that led to his unfortunate death, and the District Court correctly granted summary judgment for the State.                    /S/ JIM RICE

We concur: /S/ KARLA M. GRAY, /S/ JAMES C. NELSON, /S/ PATRICIA COTTER, /S/ W. WILLIAM LEAPHART

BLM_0111748

# APPENDIX C
## Sample FOIA letter regarding liability



**Recreational Aviation Foundation**
28517 Rocky Point Road
Polson, MT 59860
skywagon@centurytel.net
406-883-2248

April 27, 2007

FOIA Coordinator
Death Valley National Park
P.O. Box 579
Death Valley, CA 92328

Dear Sir/Madam:

I am making the following request under the Freedom of Information Act.

The Recreational Aviation Foundation (RAF) is assembling a library on aviation related lawsuits on public lands for the promotion of aviation safety and education. On behalf of the RAF I am requesting documentation that would provide details of the following:

1) The RAF requests copies of any documents that indicate the National Park Service has ever been the defendant of a legal action in either California or Federal courts following an accident involving a private, noncommercial aircraft landing or taking off from an airport in Death Valley National Park. The requested information should be considered from the time Death Valley became a National Park.

2) The RAF requests copies of any documents that indicate how such legal action may have been settled.

The Recreational Aviation Foundation is an IRS approved public charity. The documents requested will not be used for any commercial purposes, by the news media, educational institution or noncommercial scientific institution. The RAF requests the waiver of fees based on the following:

(1) Requested records pertain to the operation of the government and are of public record.
(2) Requested documents are to be used to understand how the government responded to any legal actions taken as outlined above.
(3) The RAF is a public charity and documents will enhance public understanding of public aviation.
(4) The contribution is significant since aviation safety is a national concern.
(5) There is no commercial interest in the requested documents.

Attached are the by-laws of the RAF, background material on the operation and function of the Foundation and current Foundation brochure. Further information may be found on the RAF web site: www.recreationalaviationfoundation.org.

Please contact me if you require further information.

Sincerely,


Charles M. Jarecki, Director, Recreational Aviation Foundation

43

BLM_0111749

# APPENDIX D
## <u>Western State Aviation Directors</u>
(As of October, 2010)

**Alaska**
Alaska Department of Transportation &
Public Facilities – Statewide Aviation
4111 Aviation Ave
PO Box 196900
Anchorage AK  99519-6900
Phone: 907-269-0730
Fax: 907-269-0489
www.dot.state.ak.us

**Arizona**
Arizona Division of Aeronautics
PO Box 13588
Phoenix AZ  85002
(602) 294-9144
bdick@azdot.gov

**California**
California Division of Aeronautics
PO Box 942874
Sacramento CA  94274-0001
(916) 654-499959
mary_frederick@dot.ca.gov

**Colorado**
Colorado Department of Transportation,
Division of Aeronautics
5126 Front Range Parkway
Watkins, CO 80137
Phone: 303-261-4418
Cell: 303-877-1211
Fax: 303-261-9608
www.colorado-aeronautics.org

**Idaho**
Idaho Department of Transportation,
Division of Aeronautics
3483 Rickenbacker St
Boise ID  83707-1129
Phone: 208-334-8775/334.8776
Fax: 208-334-8789
www.state.id.us/itd.aero/aerohome.htm

**Montana**
Montana Department of Transportation,
Aeronautics Division
2630 Airport Rd
PO Box 200507
Helena MT  59620-0507
Phone: 406-444-9569/444-2506
Fax: 406-444-2519
www.mdt.mt.gov/aviation

**New Mexico**
New Mexico Aviation Division
PO Box 1149
Santa Fe NM  87504-1149
(505) 476-0930
thomas.baca@state.nm.us

**Nevada**
Nevada Dept of Transportation
1263 South Stewart Street
Carson City NV  89712
(775) 888-7002
kcooper@dot.state.nv.us

**Oregon**
Oregon Department of Aviation
3040 25th Street, SE
Salem OR  97302-1125
Phone: 503-378-4880
Fax: 503-373-1688
www.oregon.gov/Aviation

44

BLM_0111750

**Utah**
Utah Department of Transportation
Aeronautical Operations Division
135 North 2400 West
Salt Lake City UT  84116
Phone: 801-715-2260
Fax: 801-715-2276
www.udot.utah.gov/main

**Washington**
Washington Dept. of Transportation
Department of Aeronautics
18204 59 Dr., NE, suite B
Arlington, WA 98223
360-651-6300
www.wsdot.wa.gov/aviation

**Wyoming**
Wyoming Department of Transportation
Aeronautics Division
200 East 8th Ave.
Cheyenne, WY 82001
Phone 307- 777-3952
Fax: 307-637-7352
www.wydotweb.state.wy.us

BLM_0111751

# APPENDIX E

## Western State Pilot Associations

Arizona Pilots Association
P.O. Box 61242
Phoenix, AZ 85082
www.azpilots.org

California Pilots Association
P.O. Box 6868
San Carlos, CA 94070
(800) 319-5286
www.calpilots.org

Colorado Pilots Association
P.O. Box 200911
Denver, CO 80220
(303) 367-0670
www.coloradopilots.org

Idaho Aviation Association
P.O. Box 963
Nampa, ID 83650
208-861-9056
www.flyidaho.org

Montana Pilots' Association
P.O. Box 4311
Helena, MT 59604
www.montanapilots.org

Oregon Pilots Association
23115 Airport Road NE, #13
Aurora, OR 97002
1-877-OPA-PILOT
www.oregonpilot.org

New Mexico Pilots Association
33 Wind Road, NW
Albuquerque, NM 87120
www.nmpilots.org

Recreational Aviation Foundation
1711 West College Street
Bozeman, MT 59715
(406) 587-5199
www.theraf.org

Utah Back Country Pilots
Skypark Airport
1887 South Redwood Road #16
Woods Cross, UT 84087
(801) 583-0341      (voice mail)
www.utahbackcountrypilots.org

Washington Pilots Association
227 Bellevue Way NE
Bellevue, WA 98004
(800) WPA-FLYS
www.wpaflys.org

Wyoming Pilots' Association
3904 Central Ave. Suite A # 134
Cheyenne, WY 82001
(307)634-0221
www.wyomingpilots.org

BLM_0111752

# Appendix F

## FAA Form 7480-1 plus instructions for filing

Form approved OMB No. 2120-0036

**U.S. Department of Transportation**
**Federal Aviation Administration**

### NOTICE OF LANDING AREA PROPOSAL

| Name of Proponent, Individual , or Organization | Address of Proponent, Individual , or Organization (No., Street, City, State, Zip Code) |
|---|---|

☐ Check if the property owner's name and address are different than above, and list property owner's name and address on the reverse.

☐ Establishment or Activation  ☐ Deactivation or abandonment  } OF  ☐ Airport  ☐ Ultraflight Flightpark  ☐ Vertiport
☐ Alteration  ☐ Change of Status  ☐ Heliport  ☐ Seaplane Base  ☐ Other (Specify)

**A. Location of Landing Area**

| 1. Associated City/State | 2. County/State (Physical Location of Airport) | | 3. Distance and Direction From Associated City or Town | |
|---|---|---|---|---|
| 4. Name of Landing Area | 5. Latitude ° ' " | 6. Longitude ° ' " | 7. Elevation | Miles | Direction |

**B. Purpose**

| Type Use ☐ Public ☐ Private ☐ Private Use of Public Land/Waters | If Change of Status or Alteration, Describe Change | ☐ Establishment or change to traffic pattern (Describe on reverse) | Construction Dates | |
|---|---|---|---|---|
| | | | To Begin/Began | Est. Completion |

| C. Other Landing Areas | Ref. A5 above | | D. Landing Area Data | Existing (if any) | | | Proposed | | |
|---|---|---|---|---|---|---|---|---|---|
| | Direction From Landing Area | Distance From Landing Area | | Rwy #1 | Rwy #2 | Rwy #3 | Rwy | Rwy | Rwy |
| | | | 1. Airport, Seaplane Base, or Flightpark | | | | | | |
| | | | Magnetic Bearing of Runway (s) or Sealane | | | | | | |
| | | | Length of Runway (s) or Sealane (s) in Feet | | | | | | |
| | | | Width of Runway (s) or Sealane (s) in Feet | | | | | | |
| | | | Type of Runway Surface (Concrete, Asphalt, Turf, Etc.) | | | | | | |
| | | | 2. Heliport | | | | | | |
| | | | Dimensions of Final Approach and Take off Area (FATO) in Feet | | | | | | |
| | | | Dimensions of Touchdown and Lift-Off Area (TLOF) in Feet | | | | | | |
| | | | Magnetic Direction of Ingress/Egress Routes | | | | | | |

| E. Obstructions | | Direction From Landing Area | Distance From Landing Area | Type of Surface (Turf, concrete, rooftop, etc.) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Type | Height Above Landing Area | | | | | | | | | |

| | 3. All Landing Areas | Description of Lighting (if any) | | | | Direction of Prevailing Wind | |
|---|---|---|---|---|---|---|---|

**F. Operational Data**

**1. Estimated or Actual Number Based Aircraft**

| Airport, Flightpark, Seaplane base | Present (if est indicate by letter "E") | Anticipated 5 Years Hence | Heliport | Present (if est indicate by letter "E") | Anticipated 5 Years Hence |
|---|---|---|---|---|---|
| Multi-engine | | | Under 3500 lbs. MGW | | |
| Single-engine | | | Over 3500 lbs. MGW | | |
| Glider | | | | | |

**2. Average Number Monthly Landings**

| G. Other Considerations | Direction From Landing Area | Distance From Landing Area | | Present (if est indicate by letter "E") | Anticipated 5 Years Hence | | Present (if est indicate by letter "E") | Anticipated 5 Years Hence |
|---|---|---|---|---|---|---|---|---|
| Identification | | | Jet | | | Helicopter | | |
| | | | Turboprop | | | Ultralight | | |
| | | | Prop | | | Glider | | |

3. Are IFR Procedures For The Airport Anticipated
☐ No  ☐ Yes  Within _____ Years  Type Navaid: _____

**H. Application for Airport Licensing**
☐ Has Been Made  ☐ Not Required  ☐ County
☐ Will Be Made  ☐ State  ☐ Municipal Authority

**I. CERTIFICATION: I hereby certify that all of the above statements made by me are true and complete to the best of my knowledge.**

| Name, title (and address if different than above) of person filing this notice -- type or print | Signature (in ink) | |
|---|---|---|
| | Date of Signature | Telephone No. (Precede with area code) |

FAA Form 7480-1 (1-93) Supersedes Previous Edition    Central Region Electronic Revision per ACE-620 (March, 2000)

BLM_0111753

**Paperwork Reduction Act Statement:** The information collected on this form is necessary because it is the description of the physical and operational characteristics of the airport that will be on file with the FAA. The information on all airports will be maintained in FAA computers for record keeping purposes and used in airspace studies. Some of the information on public use airports is safety-critical and will be published in flight information handbooks and charts for pilot use. The burden associated with completing this form is estimated to be 30 minutes. Providing this information is mandatory if the proponent wishes to have the airport on file with the FAA and entered into the National Airspace System. No assurances of confidentiality are given. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control number associated with this collection is 2120-0036.

## INSTRUCTIONS
## NOTICE OF LANDING AREA
## PROPOSAL
### As Used Herein, The Term "Airport" Means
### Any Landing or Takeoff Area such as Airport, Heliport, Helistop, Vertiport, Gliderport, Seaplane Base, Ultralight Flightpark, or Balloonport

Federal Aviation Regulations Part 157 requires all persons to notify the FAA at least 90 days before any construction, alteration, activation, deactivation, or change to the status or use of a civil or joint-use (civil/military) airport. Notice is not required for the establishment of a temporary airport at which operations will be conducted under visual flight rules (VFR) and will be used for less than 30 days with no more than 10 operations per day. Notice also is not required for the intermittent use of a site that is not an established airport, which is used for less than one year and at which flight operations will be conducted only under VFR. Intermittent use means the use of the site for no more than 3 days in any one week and for no more than 10 operations per day.

Required notice shall be submitted on this form from each person who intends to do any of the following:

1. Construct or otherwise establish a new airport or activate an airport.
2. Construct, realign, alter, or activate any runway, or other aircraft landing or takeoff area of an airport.
3. Construct realign, alter, or activate a taxiway associated with a landing or takeoff area on a public-use airport.
4. Deactivate, discontinue using, or abandon an airport or any landing or takeoff area of an airport for a period of one year or more.
5. Deactivate, abandon, or discontinue using a taxiway associated with a landing or takeoff area on a public-use airport.
6. Change the status of an airport from private use (use by the owner or use by the owner and other persons authorized by the owner) to an airport open to the public or from public-use to another status.
7. Change status from IFR to VFR or VFR to IFR.
8. Establish or change any traffic pattern or traffic pattern altitude or direction.

The notice required shall be made by submitting this form to the nearest Federal Aviation Administration Regional Office or Airports District Office. However, in an emergency involving essential public service or when the delay arising from the 90-day advance notice requirement would result in an unreasonable hardship, you may provide notice to the appropriate FAA Airports District/Field Office by telephone in lieu of submitting this form. The FAA may require the subsequent submission of this form when necessary for safety or other reasons.

Section 901 of the Federal Aviation Act of 1958, as amended, provides that any person who violates a rule, regulation or order issued under Title III of this Act shall be subject to a civil penalty not to exceed $ 1,000 for each violation.

BLM_0111754

## GENERAL INSTRUCTIONS

1. For any project falling in categories 1, or 2 above, complete all appropriate sections.
2. For any project falling in categories 3, 4, or 5 above, complete sections A, B, D (if appropriate), and I.
3. For status change (categories 6 or 7 above), from private use to public use or from VFR to IFR, complete sections A, B, E, G, and I. For all other changes, complete sections A, B, and I.
4. For traffic pattern establishment or change (category 8) complete all appropriate sections. Traffic pattern description should be entered on the reverse side of FAA Form 7480-1.
5. Express all bearings as magnetic and mileages as nautical.
6. **Please Print or Type All Items.**

**Section A** - Identify Reference Datum of Coordinates (NAD 83 or NAD 27)

**Section B** - If the airport is to be used by the owner only, or by the owner and persons authorized by the owner, check "private". If the landing and takeoff area of the airport is publicly owned and the operator is a non-government entity, then check "private use of public lands". If the airport is to be available for use by the general public without a requirement for prior approval of the owner or operator, then check "public". If necessary, use the reverse side of the form or a separate sheet of paper to describe changes or alterations.

**Section C** - Airport or seaplane base: List VFR airports and heliportsw within 5NM, and IFR airports within 20NM. Heliports: List VFR airports and heliports within 3NM and IFR airports within 10NM.

**Section D** - Attach U.S. Geological Survey quadrangle map or equivalent. Plot locations of facility to the nearest second, runway alignments, associated taxiways or sealane alignments. When appropriate, use city map for heliports.

**Section E** - List and plot on quadrangle map or equivalent any obstructions within 3NM of a VFR airport or a seaplane base; 5NM of an IFR airport; or 5,000 feet of a heliport.

**Section F** - Self-explanatory.

**Section G** - List schools, churches and residential communities within a 2NM radius for airports and within a 1NM radius for heliports. List all waste disposal sites within a 5NM radius.

**Section H** - Self-explanatory.

**Notification to the FAA does not waive the requirements of any other government agency.**

### ADDRESSES OF THE REGIONAL OFFICES

Submit your completed form by mail to:

**Western Pacific Region**
AZ, CA, HI, NV, GU
Federal Aviation Administration
Airports Division, AWP-600
15000 Aviation Boulevard
Hawthorne, CA 90261
Mail Address:
P. O. Box 92007
Worldway Postal Center
Los Angeles, CA 90009
Tel: 310-725-3608   Fax: 310-725-6847

**Alaskan Region**
AK
Federal Aviation Administration
Airports Division, AAL-600
222 West 7th Avenue, Box 14
Anchorage, AK 99513
Tel: 907-271-5438   Fax: 907-271-2851

**Eastern Region**
DC, DE, MD, NJ, NY, PA, VA, WV
Federal Aviation Administration
Airports Division, AEA-600
1 Aviation Plaza
Jamaica, NY 11434-4809
Tel: 718-553-3330   Fax: 718-995-5694

**Southern Region**
AL, FL, GA, KY, MS, NC, SC, NT, PR, VI
Federal Aviation Administration
Airports Division, ASO-600
1701 Columbia Avenue
College Park, GA 30337
Mail Address:
P. O. Box 20636
Atlanta, GA 30320
Tel: 404-305-6700   Fax: 404-305-6730

**Northwest Mountain Region**
CO, ID, MT, OR, UT, WA, WY
Federal Aviation Administration
Airports Division, ANM-600
1601 Lind Avenue, S.W., Suite 315
Renton, WA 98055-4056
Tel: 425-227-2600   Fax: 425-227-1600

**Great Lakes Region**
IL, IN, MI, MN, ND, OH, SD, WI
Federal Aviation Administration
Airports Division, AGL-600
2300 East Devon Avenue
Des Plaines, IL 60018
Tel: 847-294-7272   Fax: 312-294-7036

**Southwest Region**
AR, LA, NM, OK, TX
Federal Aviation Administration
Airports Division, ASW-600
2601 Meacham Boulevard
Fort Worth, TX 76137-4298
Tel: 817-222-5600   Fax: 817-222-5984

**Central Region**
IA, KS, MO, NE
Federal Aviation Administration
Airports Division, ACE-625 9
01 Locust
Kansas City, MO 64106-2325
Tel: 816-329-2600   Fax: 816-329-2610

**New England Region**
CT, MA, ME, NH, RI, VT
Federal Aviation Administration
Airports Division, ANE-600
12 New England Executive Park
Burlington, MA 01803
Tel: 781-238-7600   Fax: 781-238-7608

BLM_0111755

# Appendix G

## United States House of Representatives Resolution 1473

### Congress of the United States
#### Washington, DC 20515

June 24, 2010

### Support Recreational Aviation and Backcountry Airstrips
*Cosponsor H.Res. 1473*

Dear Colleague:

We respectfully ask you to join us in supporting H.Res. 1473, a resolution supporting recreational aviation and backcountry airstrips on America's public lands.

Backcountry airstrips are a part of life for many Americans, especially in the West. They provide countless benefits to the general public, including search and rescue, fire management, research, disaster relief and wildlife management. They also allow public access to some of the most beautiful, remote federal lands in America—regardless of one's physical ability to otherwise enjoy the backcountry.

Backcountry airstrips serve as efficient access points for tourists, who in turn contribute to local economies and small businesses. More importantly, in the event of mechanical problems or inclement weather, they serve as emergency landing sites when larger airports are out of reach. Too often, however, these airstrips are targeted for closure by the federal government or well-funded special interest groups, or simply ignored by bureaucrats in Washington, D.C.

During a time when our lands are under threat from drought, insect infestation and wildfire, and when our economy continues to struggle, backcountry airstrips serve a valuable role for land managers and visitors alike. Please join us in recognizing the value of recreational aviation and backcountry airstrips, in addition to commending aviators and the various private organizations that maintain these airstrips for public use.

If you have any further questions or would like to cosponsor H.Res. 1473, please contact Eric Bierwagen in Congressman Rehberg's office at eric.bierwagen@mail.house.gov.

Sincerely,

Denny Rehberg
Member of Congress

Vernon Ehlers
Member of Congress

Allen Boyd
Member of Congress

Mike Simpson
Member of Congress

Walt Minnick
Member of Congress

PRINTED ON RECYCLED PAPER

50

BLM_0111756

111TH CONGRESS

2D SESSION **H. RES. 1473**

Supporting backcountry airstrips and recreational aviation.

IN THE HOUSE OF REPRESENTATIVES

JUNE 24, 2010

Mr. REHBERG (for himself, Mr. EHLERS, Mr. BOYD, Mr. SIMPSON, and Mr. MINNICK) submitted the following resolution; which was referred to the Committee on Transportation and Infrastructure.

# RESOLUTION

Supporting backcountry airstrips and recreational aviation.

Whereas recreational aviation represents a significant portion of the Nation's aviation activity;

Whereas recreational aviators utilize backcountry airstrips as access points for a variety of activities;

Whereas backcountry airstrips provide multiple benefits to the general public, including search and rescue, fire management, research, disaster relief, and wildlife management;

Whereas recreational aviation helps State economies by providing efficient access for visitors seeking recreational activities;

Whereas backcountry airstrips serve as emergency landing sites in the event of mechanical problems or inclement weather;

Whereas backcountry airstrips provide access for those who do not have the physical ability to access backcountry areas by other means; and

Whereas recreational airstrips have a small footprint on the landscape, provide for dispersed recreational activity, and act as internal trailheads within backcountry areas:

Now, therefore, be it

*Resolved,* **That the House of Representatives recognizes the value of recreational aviation and backcountry airstrips located on the Nation's public lands and commends aviators and the various private organizations that maintain these airstrips for public use.**

BLM_0111757

# APPENDIX H

## Aircraft Takeoff Performance Example

## TAKEOFF DISTANCE
### MAXIMUM WEIGHT 2800 LBS

SHORT FIELD

CONDITIONS:
Flaps 20°
2400 RPM, Full Throttle and Mixture
  Set Prior to Brake Release
Cowl Flaps Open
Paved, Level, Dry Runway
Zero Wind

NOTES:
1. Short field technique as specified in Section 4.
2. Prior to takeoff from fields above 5000 feet elevation, the mixture should be leaned to give maximum power in a full throttle, static runup.
3. Decrease distances 10% for each 9 knots headwind. For operation with tailwinds up to 10 knots, increase distances by 10% for each 2 knots.
4. For operation on a dry, grass runway, increase distances by 15% of the "ground roll" figure.

| WEIGHT LBS | TAKEOFF SPEED KIAS | | PRESS ALT FT | 0°C | | 10°C | | 20°C | | 30°C | | 40°C | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIFT OFF | AT 50 FT | | GRND ROLL | TOTAL TO CLEAR 50 FT OBS | GRND ROLL | TOTAL TO CLEAR 50 FT OBS | GRND ROLL | TOTAL TO CLEAR 50 FT OBS | GRND ROLL | TOTAL TO CLEAR 50 FT OBS | GRND ROLL | TOTAL TO CLEAR 50 FT OBS |
| 2800 | 52 | 57 | S.L. | 560 | 1090 | 605 | 1165 | 645 | 1245 | 695 | 1330 | 740 | 1420 |
| | | | 1000 | 615 | 1190 | 660 | 1275 | 705 | 1365 | 760 | 1455 | 810 | 1560 |
| | | | 2000 | 670 | 1305 | 720 | 1395 | 775 | 1495 | 830 | 1600 | 890 | 1715 |
| | | | 3000 | 735 | 1430 | 790 | 1535 | 850 | 1645 | 910 | 1765 | 975 | 1895 |
| | | | 4000 | 805 | 1575 | 865 | 1695 | 930 | 1820 | 1000 | 1955 | 1070 | 2100 |
| | | | 5000 | 885 | 1745 | 955 | 1875 | 1025 | 2020 | 1100 | 2175 | 1180 | 2345 |
| | | | 6000 | 975 | 1935 | 1050 | 2090 | 1130 | 2285 | 1215 | 2435 | 1305 | 2630 |
| | | | 7000 | 1075 | 2180 | 1160 | 2340 | 1245 | 2530 | 1340 | 2745 | 1440 | 2980 |
| | | | 8000 | 1190 | 2425 | 1280 | 2635 | 1380 | 2865 | 1485 | 3120 | 1600 | 3410 |

Figure 5-4. Takeoff Distance (Sheet 1 of 2)

## TAKEOFF DISTANCE
### 2600 LBS AND 2400 LBS

SHORT FIELD

REFER TO SHEET 1 FOR APPROPRIATE CONDITIONS AND NOTES.

| WEIGHT LBS | TAKEOFF SPEED KIAS | | PRESS ALT FT | 0°C | | 10°C | | 20°C | | 30°C | | 40°C | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIFT OFF | AT 50 FT | | GRND ROLL | TOTAL TO CLEAR 50 FT OBS | GRND ROLL | TOTAL TO CLEAR 50 FT OBS | GRND ROLL | TOTAL TO CLEAR 50 FT OBS | GRND ROLL | TOTAL TO CLEAR 50 FT OBS | GRND ROLL | TOTAL TO CLEAR 50 FT OBS |
| 2600 | 50 | 55 | S.L. | 475 | 925 | 510 | 985 | 545 | 1050 | 585 | 1120 | 625 | 1195 |
| | | | 1000 | 515 | 1005 | 555 | 1075 | 595 | 1145 | 635 | 1225 | 680 | 1305 |
| | | | 2000 | 565 | 1100 | 605 | 1175 | 650 | 1255 | 695 | 1340 | 745 | 1430 |
| | | | 3000 | 620 | 1200 | 665 | 1285 | 710 | 1375 | 765 | 1470 | 815 | 1570 |
| | | | 4000 | 675 | 1320 | 725 | 1410 | 780 | 1510 | 835 | 1620 | 895 | 1735 |
| | | | 5000 | 740 | 1450 | 800 | 1555 | 860 | 1670 | 920 | 1790 | 985 | 1920 |
| | | | 6000 | 815 | 1600 | 880 | 1720 | 945 | 1850 | 1015 | 1990 | 1085 | 2140 |
| | | | 7000 | 900 | 1775 | 965 | 1910 | 1040 | 2060 | 1115 | 2220 | 1200 | 2395 |
| | | | 8000 | 990 | 1980 | 1070 | 2135 | 1150 | 2305 | 1235 | 2495 | 1325 | 2700 |
| 2400 | 48 | 53 | S.L. | 395 | 770 | 420 | 825 | 460 | 875 | 485 | 930 | 515 | 990 |
| | | | 1000 | 430 | 840 | 460 | 895 | 490 | 950 | 525 | 1015 | 555 | 1080 |
| | | | 2000 | 465 | 915 | 500 | 975 | 535 | 1040 | 575 | 1105 | 615 | 1180 |
| | | | 3000 | 510 | 995 | 550 | 1065 | 590 | 1135 | 630 | 1210 | 675 | 1290 |
| | | | 4000 | 560 | 1090 | 600 | 1165 | 645 | 1240 | 690 | 1325 | 740 | 1415 |
| | | | 5000 | 610 | 1190 | 655 | 1275 | 705 | 1365 | 755 | 1460 | 810 | 1560 |
| | | | 6000 | 670 | 1310 | 720 | 1405 | 775 | 1505 | 830 | 1610 | 890 | 1725 |
| | | | 7000 | 740 | 1445 | 795 | 1550 | 855 | 1665 | 915 | 1785 | 980 | 1915 |
| | | | 8000 | 815 | 1600 | 875 | 1720 | 940 | 1850 | 1010 | 1990 | 1080 | 2140 |

Figure 5-4. Takeoff Distance (Sheet 2 of 2)

BLM_0111758

# APPENDIX I



# Recreational Aviation Foundation

## VISION

Preserving the legacy and promoting the enjoyment of aviation in the backcountry of America.

## MISSION

Keeping the legacy of recreational aviation strong by preserving, maintaining and creating public use recreational and backcountry airstrips nationwide.

## GUIDING PRINCIPLES

• The RAF works in a cooperative manner with public and private landowners/managers and aviation advocacy organizations on State and National levels.

• Aviation is a valid and appropriate way to access recreational opportunities on public or private land.

• Access to backcountry is well served by low-impact airstrips as trailheads.

• Safety education will help ensure the future of successful recreational aviation.

• Aviation safety through pilot education is paramount to the successful use and enjoyment of backcountry airstrips.

• The RAF, a volunteer-driven organization, works to develop partnerships in protecting the common interest of the recreational flying community.

BLM_0111759

# APPENDIX A
# FIGURES

1-1      Uncompahgre RMP Planning Area
1-2      Federal Mineral Estate
2-1      Alternative B: Ecological Emphasis Areas
2-2      Alternative C: Ecological Emphasis Areas
2-3      Alternative D: Ecological Emphasis Areas
2-4      Alternative A: Visual Resource Management
2-5      Alternative B: Visual Resource Management
2-6      Alternative C: Visual Resource Management
2-7      Alternative D: Visual Resource Management
2-8      Alternatives B and D: Lands Identified for Wilderness Characteristics Protection
2-9      Alternative A: Grazing Allotments
2-10     Alternative B: Grazing Allotments
2-11     Alternative C: Grazing Allotments
2-12     Alternative D: Grazing Allotments
2-13     Alternative A: Recreation Management Areas
2-14     Alternative B: Recreation Management Areas
2-15     Alternative C: Recreation Management Areas
2-16     Alternative D: Recreation Management Areas
2-17     Alternative A: Comprehensive Travel and Transportation Management
2-18     Alternative B: Comprehensive Travel and Transportation Management
2-19     Alternative C: Comprehensive Travel and Transportation Management
2-20     Alternative D: Comprehensive Travel and Transportation Management
2-21     Alternative A: Right-of-Way Exclusion and Avoidance Areas
2-22     Alternative B: Right-of-Way Exclusion and Avoidance Areas
2-23     Alternative C: Right-of-Way Exclusion and Avoidance Areas
2-24     Alternative D: Right-of-Way Exclusion and Avoidance Areas
2-25     Alternatives A, B, C, and D: Designated Utility Corridors
2-26     Alternative A: Lands Identified for Disposal
2-27     Alternative B: Lands Identified for Disposal

BLM_0111760

2-28    Alternative C: Lands Identified for Disposal
2-29    Alternative D: Lands Identified for Disposal
2-30    Alternative A: Coal Leasing
2-31    Alternative B: Coal Leasing
2-32    Alternative C: Coal Leasing
2-33    Alternative D: Coal Leasing
2-34    Alternative A: Fluid Minerals Leasing
2-35    Alternative B: Fluid Minerals Leasing
2-36    Alternative C: Fluid Minerals Leasing
2-37    Alternative D: Fluid Minerals Leasing
2-38    Alternative B: No Ground Disturbance, Site-specific Relocation, and Timing Limitation
        Restrictions for Other Surface-disturbing Activities
2-39    Alternative C: No Ground Disturbance, Site-specific Relocation, and Timing Limitation
        Restrictions for Other Surface-disturbing Activities
2-40    Alternative D: No Ground Disturbance, Site-specific Relocation, and Timing Limitation
        Restrictions for Other Surface-disturbing Activities
2-41    Alternative A: Lands Withdrawn and to be Petitioned for Withdrawal from Locatable Mineral
        Entry
2-42    Alternative B: Lands Withdrawn and to be Petitioned for Withdrawal from Locatable Mineral
        Entry
2-43    Alternative C: Lands Withdrawn and to be Petitioned for Withdrawal from Locatable Mineral
        Entry
2-44    Alternative D: Lands Withdrawn and to be Petitioned for Withdrawal from Locatable Mineral
        Entry
2-45    Alternative A: Mineral Materials
2-46    Alternative B: Mineral Materials
2-47    Alternative C: Mineral Materials
2-48    Alternative D: Mineral Materials
2-49    Alternative A: Non-energy Solid Leasable Minerals
2-50    Alternative B: Non-energy Solid Leasable Minerals
2-51    Alternative C: Non-energy Solid Leasable Minerals
2-52    Alternative D: Non-energy Solid Leasable Minerals
2-53    Alternative A: Areas of Critical Environmental Concern
2-54    Alternative B: Areas of Critical Environmental Concern
2-55    Alternative C: Areas of Critical Environmental Concern
2-56    Alternative D: Areas of Critical Environmental Concern
2-57    Alternatives A, B, C, and D: Tabeguache Area and Wilderness Study Areas
2-58    Alternatives A and B: Segments Eligible (Alternative A) or Suitable (Alternative B) for Inclusion
        in the National Wild and Scenic Rivers System
2-59    Alternative D: Segments Suitable for Inclusion in the National Wild and Scenic Rivers System
2-60    Alternative B: Watchable Wildlife Areas
2-61    Alternative A: Forest Management
2-62    Alternative B: Forest Management
2-63    Alternative C: Forest Management

BLM_0111761

2-64     Alternative D: Forest Management
2-65     Alternative A: No Target Shooting Areas
2-66     Alternative B: No Target Shooting Areas
2-67     Alternative C: No Target Shooting Areas
2-68     Alternative D: No Target Shooting Areas
2-69     Alternatives A, B, C, and D: Designated Routes in the Dry Creek Travel Management Area
2-70     Alternatives B, C, and D: Travel Management Areas for Future Route Designation
2-71     Existing Land Withdrawals and Powersite Classifications
2-72     Alternatives A, B, C, and D: Moss Rock Common Use Area
2-73     Alternative A: National Historic Trails
2-74     Alternative B: National Scenic, Historic, and Recreational Trails and State and BLM Byways
2-75     Alternative C: National Scenic, Historic, and Recreational Trails and State and BLM Byways
2-76     Alternative D: National Scenic, Historic, and Recreational Trails and State and BLM Byways

April 2012          *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*          A-3
*Chapter 2, Alternatives – Internal Draft for Impacts Analysis*

BLM_0111762

This page intentionally left blank.

BLM_0111763



Figure 1-1    Uncompahgre RMP Planning Area

BLM_0111764



Figure 1-2    Federal Mineral Estate

BLM_0111765



Figure 2-1    Alternative B: Ecological Emphasis Areas

April 2012                Uncompahgre Resource Management Plan Revision and Environmental Impact Statement                A-7
Chapter 2, Alternatives – Internal Draft for Impacts Analysis

BLM_0111766



Figure 2-2    Alternative C: Ecological Emphasis Areas

BLM_0111767



Figure 2-3    Alternative D: Ecological Emphasis Areas

April 2012    Uncompahgre Resource Management Plan Revision and Environmental Impact Statement    A-9
Chapter 2, Alternatives – Internal Draft for Impacts Analysis

BLM_0111768



**Classification**
- I
- II
- III
- IV
- Unclassified

Figure 2-4     Alternative A: Visual Resource Management

BLM_0111769



Figure 2-5    Alternative B: Visual Resource Management

April 2012          Uncompahgre Resource Management Plan Revision and Environmental Impact Statement          A-11
Chapter 2, Alternatives – Internal Draft for Impacts Analysis

BLM_0111770



Figure 2-6     Alternative C: Visual Resource Management

BLM_0111771



Figure 2-7    Alternative D: Visual Resource Management

April 2012          Uncompahgre Resource Management Plan Revision and Environmental Impact Statement          A-13
                    Chapter 2, Alternatives – Internal Draft for Impacts Analysis

BLM_0111772



Figure 2-8     Alternatives B and D: Lands Identified for Wilderness Characteristics Protection

BLM_0111773



Figure 2-9   Alternative A: Grazing Allotments

BLM_0111774



Figure 2-10   Alternative B: Grazing Allotments

*Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*
*Chapter 2, Alternatives – Internal Draft for Impacts Analysis*

BLM_0111775



Figure 2-11    Alternative C: Grazing Allotments

April 2012          Uncompahgre Resource Management Plan Revision and Environmental Impact Statement          A-17
Chapter 2, Alternatives – Internal Draft for Impacts Analysis

BLM_0111776



Figure 2-12    Alternative D: Grazing Allotments

BLM_0111777



Figure 2-13    Alternative A: Recreation Management Areas

BLM_0111778



Figure 2-14    Alternative B: Recreation Management Areas

A-20                Uncompahgre Resource Management Plan Revision and Environmental Impact Statement                April 2012
                    Chapter 2, Alternatives – Internal Draft for Impacts Analysis

BLM_0111779



Figure 2-15    Alternative C: Recreation Management Areas

BLM_0111780



Figure 2-16    Alternative D: Recreation Management Areas

BLM_0111781



Figure 2-17    Alternative A: Comprehensive Travel and Transportation Management

April 2012          Uncompahgre Resource Management Plan Revision and Environmental Impact Statement          A-23
Chapter 2, Alternatives – Internal Draft for Impacts Analysis

BLM_0111782



Figure 2-18     Alternative B: Comprehensive Travel and Transportation Management

*Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*
*Chapter 2, Alternatives – Internal Draft for Impacts Analysis*

BLM_0111783



Figure 2-19    Alternative C: Comprehensive Travel and Transportation Management

BLM_0111784



Figure 2-20     Alternative D: Comprehensive Travel and Transportation Management

BLM_0111785



Figure 2-21      Alternative A: Right-of-Way Exclusion and Avoidance Areas

BLM_0111786



Figure 2-22    Alternative B: Right-of-Way Exclusion and Avoidance Areas

BLM_0111787



Figure 2-23     Alternative C: Right-of-Way Exclusion and Avoidance Areas

BLM_0111788



Figure 2-24    Alternative D: Right-of-Way Exclusion and Avoidance Areas

A-30                    *Uncompahgre Resource Management Plan Revision and Environmental Impact Statement*                    April 2012
*Chapter 2, Alternatives – Internal Draft for Impacts Analysis*

BLM_0111789