

# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401



# RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #10

## Friday, June 22, 2012 (9:00 AM – 12:00 PM)

### Meeting Location:
### Holiday Inn Express
### 1391 South Townsend Avenue, Montrose, CO

# MEETING NOTES

**Attendees:** Angie Adams (EMPSi), Robbie Baird-LeValley, Bill Day, William Ela, Barbara Hawke, Bruce Krickbaum (BLM Uncompahgre Field Office), John Reams, Barb Sharrow (BLM Uncompahgre Field Office), Steven Weist, Kathy Welt

Public Attendees: Lori Molitar (representing The Conservation Center [NWCC]), Scott Streit (Congressman Scott Tipton's office)

**Handouts:** Agenda, Highlights of the Resource Management Planning Process to Date

---

1. ## Welcome (Angie Adams)

2. ## Introductions (All Present)

3. ## Planning Process to Date (Angie Adams)

- Handout: Highlights of the Resource Management Planning Process to Date
- The internal draft Oil and Gas Reasonable Foreseeable Development (RFD) Scenario was completed in February 2012. Have not released it to the public yet because the BLM Colorado State Office is still reviewing the internal draft report.
- The Wilderness characteristics report was completed in November 2011 and is on the RMP website.
- BLM is currently working with the BLM State Office and the US Environmental Protection Agency on the air quality report.

4. ## Final Draft Chapter 2, Alternatives – Range of Alternatives

- Angie Adams: The Proposed RMP and final RMP can select any combination of decisions from the various alternatives in the Draft RMP/EIS. The key is that a reasonable range of alternatives is considered in the Draft RMP/EIS so that there is flexibility in the Proposed and final RMPs. Right now it does not matter which alternative different draft actions fall; do not be too concerned about what is in the agency-preferred alternative.

BLM_0112424

- Robbie LeValley: Concerned about the labels for each alternative in Sections 2.3.2 and 2.3.3, and those labels project negative connotations and two ends of a spectrum. Alternative B: Could call it "Non-consumptive Resource Emphasis." **ACTION ITEM:** Need to work on the text in Sections 2.3.2 and 2.3.3 to explain that there will be commodity use in Alternative B, for example. In Section 2.3.2, first sentence, do not state "non-consumptive;" state "less consumptive." Overall Sections 2.3.2 and 2.3.3 need a lot of work.
- RAC Subgroup: **ACTION ITEM:** Delete the "Resource Conservation Emphasis" label for Alternative B and "Resource Use Emphasis" for Alternative C. Do not use short labels for Alternatives B or C.
- Barbara Hawke: Watchable Wildlife areas are only in the conservation alternative, and that is concerning. When all conservation measures are in one alternative and not the other, that is too exclusive.
- Robbie LeValley: See page 2-19, Climate Change (row 13): Alternative C includes no similar action, and when that is under the resource use alternative, it could be perceived negatively.
- Kathy Welt: **ACTION ITEM:** Consider labeling preferred alternative as "draft preferred" or "preliminary preferred" or something to indicate that BLM can choose from any of the Draft RMP alternatives when crafting the Proposed RMP using components (objectives and actions) Alternative A, B, and/or C. Also describe this in the introductory text in Chapter 2. Explain better that Alternative A is part of the range of alternatives and that parts of Alternative A could be selected in Draft RMP and Proposed RMP.
- Bruce Krickbaum: Each column or alternative could be an RMP.
- *Wildlife – Terrestrial*
  a. Ecological Emphasis Areas (row 99): Good concept. But overall they are not very detailed by alternative. Need to consider adding more areas:
     - A riparian Ecological Emphasis Area around Dolores River canyons or tributaries.
     - Gunnison sage-grouse: need to address subpopulations and connectivity via an Ecological Emphasis Area.
     - **ACTION ITEM:** Barbara Hawke will provide BLM maps of potential additional Ecological Emphasis Areas within the next week so that BLM can address this comment.
- Steve Weist: Can we get GIS of some areas so we can compare them to our other project areas? Bruce Krickbaum: Yes. Request specifically what you want in the next few weeks, and we will provide it.
- Steve Weist: Concerned about the definition of "climate change" in the glossary. **ACTION ITEM:** Delete "(e.g., through burning fossil fuels)" in the last bullet of the definition.
- *Fluid Minerals – Oil and Gas*
  a. Barbara Hawke: The range of alternatives has a gap. Some areas, such as *all* ACECs, SRMAs, or Ecological Emphasis Areas, should be considered for No Leasing in one of the alternatives. Other RMPs do this.
  b. Row 459: Alterative B proposes about 20% of the UFO for No Leasing. It includes several different areas as outlined in the bullets within this cell. Includes three ACECs. Most or all of the rest of the ACECs would be NSO under Alternative B.
  c. Barb Sharrow: If there is a specific ACEC or SRMA that should be No Leasing, then provide that specific information to BLM, as well as supporting rationale for why NSO is not sufficient for those areas. Barbara Hawke: Main concern with NSO is that it can be excepted or modified, whereas No Leasing cannot. **ACTION ITEM:** Barbara Hawke will provide justification/rationale for which specific areas should be No Leasing under an alternative.
- Robbie LeValley: About 75% of the time, Alternative D is the same as Alternative B (in first third of the alternatives matrix). That is concerning that they are very similar. Barbara Hawke: My perception is the opposite, that with SMRAs and ACECs, the emphasis in Alternative D is from

BLM_0112425

Alternative C, not Alternative B. Barb Sharrow: Need specific comments on row numbers where the range is not reasonable. Robbie LeValley, Row 26: Alternatives D and B are essentially the same thing. Alternative C's no similar action does not make sense if you have a nonfunctioning dam. **ACTION ITEM:** Alternative C does not seem to follow a consistent pattern throughout the alternative if we are looking at resource use; need to take a hard look at Alternative C and ensure it is consistent throughout the entire alternative. Need to change the alternative labels because Alternative C label implies that use is negative.

- **ACTION ITEM:** "No similar action" needs to be defined. It does not mean that actions are prohibited, rather that they are not a requirement. Also consider changing "no similar action" to something else that does not imply that that action would be prohibited under that particular alternative stating "no similar action."
- Robbie LeValley, Row 56: Good range of alternatives.
- Robbie LeValley, Row 72: No similar action in Alternative C implies riparian areas would not be protected.
- John Reams: Where it says "no similar action," consider adding explanations to some of these where it is covered under another program or action. Some instances do this, but need to do it more globally. For example, row 73 Alternatives B, C, and D could just state "Travel management limits…" rather than stating "No similar action; travel management limits…"
- Robbie LeValley, Row 153: This needs to be clarified so reader can see difference between alternatives. **ACTION ITEM:** Instead of "no similar allowable use" for stipulations, say "No stipulation under current RMPs" (for Alternative A) or "No stipulation under this alternative." Also check Glossary for any necessary definition changes.
- *Travel Management*
    a. Barbara Hawke, Row 398: More areas need to be managed for non-motorized recreation uses to have a reasonable range of alternatives. In Alternative B, only 14% of areas are closed to motorized use. Seems like that should be higher in this alternative. Barb Sharrow: This RMP does not specify quiet use because the RMP is bigger picture than that. Barbara Hawke: Perhaps the ERMAs could indicate that a proportion would be available for quiet or motorized recreation, etc. Barb Sharrow: This will depend in part on local communities' desires and will be done in future implementation-level travel management planning.
    b. Barbara Hawke: Could we state that in Alternative B, during travel management planning, BLM would consider local community input and place a higher emphasis on quiet use. Barb Sharrow: That is very vague and cannot be analyzed in impact analysis.
- Barbara Hawke: **ACTION ITEM:** Consider using some of the Colorado River Valley Draft RMP definitions of alternatives; see Section 2.2.
- Robbie LeValley, Row 280: **ACTION ITEM:** Consider adding a bullet in Alternatives B, C, and D that requires determining if it is livestock that is causing the issue.
- Robbie LeValley, Rows 288, 291: **ACTION ITEM:** Clarify that "no similar action" means that the action would not be prohibited; need general clarification of that definition.
- *Visual Resource Management*
    a. Barbara Hawke, Row 231: For a full range of alternatives, more areas need to be considered for VRM Class II, such as Scenic Byway corridors. Bruce Krickbaum: Alternative B does include all National and BLM Byways. Barbara Hawke: Highway 141 (scenic byway) is not shown on the map as VRM II; neither is west of adobe badlands on Highway 50; these areas should be considered for VRM Class II. **ACTION ITEM:** Consider these areas for VRM II in an alternative.
- *Overall is the range of alternatives reasonable and adequate?*
    a. Steve Weist: If BLM modifies some of the definitions and address today's action items, then I am satisfied with range of alternatives.

b. Robbie LeValley: Address labeling (or not) the alternatives. Also look hard at Alternative C and ensure that it is consistent throughout the alternative.
c. Bill Ela: RMPs are generally flexible and provide discretion to the BLM. The range of alternatives is broad and fine.
d. Barbara Hawke: Two areas where one end of the range of alternatives is not reasonably full are: 1) No Leasing areas; and 2) Nonmotorized areas. Need to address this.
e. John Reams: I feel good about the range of alternatives. Do not want the entire process to be too influenced by the vocal North Fork citizens.
f. Bill Day: Range of alternatives is adequate and enough.
g. Kathy Welt: With better definitions as discussed today, and with the addition of text describing the purpose of NEPA and the purpose of the RMP, the range of alternatives is adequate.

## 5. Public Comments (11:00am)

- Lori Molitar (representing The Conservation Center [NWCC])
  a. Are there any places in the RMP that will specify areas closed to leasing? Angie Adams/Bruce Krickbaum: Yes. These vary by alternative. These are based on different criteria (row 459). Lori Molitar: Want to ensure there are No Leasing areas in the North Fork.
  b. Want the RMP to address protecting water supplies with No Leasing restrictions so that agricultural irrigation water is not being used for drilling operations. The setbacks for public water supplies that are included in the internal draft RMP alternatives are good. Concerned about contamination of supplies via diesel fuel, etc.

## 6. Next Steps

- Refer to the opposite side of the agenda for the general schedule:

  **General Uncompahgre RMP Schedule** (as of June 4, 2012)

  | | |
  |---|---|
  | BLM State Office Review of Preliminary Draft RMP | November 2012 |
  | BLM Washington Office Review of Preliminary Draft RMP | January 2013 |
  | Public Review of Draft RMP/Draft EIS (90-day comment period) | spring 2013 |
  | Public Review of Proposed RMP/Final EIS (30-day protest period) | Winter/Spring 2014 |
  | Sign Record of Decision | Summer 2014 |

## 7. Other Items Not on the Agenda

- Bruce Krickbaum: The Oil and Gas Reasonable Foreseeable Development Scenario report (internal) discusses potential development of oil and gas resource development in the Field Office; it does not address impacts. A draft Environmental Assessment addressees no significant impacts on resources; that is unrelated to the RMP process
- Bruce Krickbaum: The lease sale originally scheduled for August 2012 is deferred; some parcels may be deferred for a lease sale sometime relatively soon and others may be deferred until after the RMP. The majority of the lease sale parcels were on BLM surface lands. Barb Sharrow: BLM received thousands of public comments on the preliminary Environmental Assessment. BLM is still analyzing those comments and, when finished, will most likely be posting some or parts of parcels for future lease sale in the next year or so. There will be a 30-day protest period, and the sale will occur 90 days later. It is being deferred until BLM has time to do a complete analysis. It was deferred/delayed because BLM did not have adequate time to analyze the comments and information provided. Other portions of parcels could be deferred until after the RMP is completed.
- Projects to Consider in the Cumulative Effects Analysis

- **ACTION ITEM:** Solar project in Paradox Valley. This may need to be included in the cumulative projects list.
- **ACTION ITEM:** **BLM (Bruce): email the draft cumulative impacts projects list to the RAC Subgroup members for their review. RAC Subgroup members: email any additional projects to Bruce by Friday, June 29, 2012.

## 8. Action Items / Next Meeting

### ACTION ITEMS:

- BLM (Bruce) and EMPSi: Need to work on the text in Sections 2.3.2 and 2.3.3 to explain that there will be commodity use in Alternative B, for example. In Section 2.3.2, first sentence, do not state "non-consumptive;" state "less consumptive." Overall Sections 2.3.2 and 2.3.3 need a lot of work.
- BLM (Bruce) and EMPSi (Kate): Consider using some of the Colorado River Valley Draft RMP definitions of alternatives; see Section 2.2.
- EMPSi (Kate): Delete the "Resource Conservation Emphasis" label for Alternative B and "Resource Use Emphasis" for Alternative C. Do not use short labels for Alternatives B or C.
- BLM (Bruce) and EMPSi: Consider labeling preferred alternative as "draft preferred" or "preliminary preferred" or something to indicate that BLM can choose from any of the Draft RMP alternatives when crafting the Proposed RMP using components (objectives and actions) Alternative A, B, and/or C. Also describe this in the introductory text in Chapter 2. Explain better that Alternative A is part of the range of alternatives and that parts of Alternative A could be selected in Draft RMP and Proposed RMP.
- Barbara Hawke: Provide BLM maps of potential additional Ecological Emphasis Areas within the next week so that BLM can address this comment.
- EMPSi (Kate): In "climate change" in the glossary, delete "(e.g., through burning fossil fuels)" in the last bullet of the definition.
- Barbara Hawke: Provide justification/rationale for which specific areas should be No Leasing under an alternative.
- BLM (Bruce): Alternative C does not seem to follow a consistent pattern throughout the alternative if we are looking at resource use; need to take a hard look at Alternative C and ensure it is consistent throughout the entire alternative.
- BLM (Bruce) and EMPSi (Kate): "No similar action" needs to be defined. It does not mean that actions are prohibited, rather that they are not a requirement. Also consider changing "no similar action" to something else that does not imply that that action would be prohibited under that particular alternative stating "no similar action."
- BLM (Bruce) and EMPSi (Kate): Instead of "no similar allowable use" for stipulations, say "No stipulation under current RMPs" (for Alternative A) or "No stipulation under this alternative." Also check Glossary for any necessary definition changes.
- BLM (Bruce) and EMPSi (Kate): Row 280, Consider adding a bullet in Alternatives B, C, and D that requires determining if it is livestock that is causing the issue.
- BLM (Bruce) and EMPSi (Kate): Rows 288 and 291, Clarify that "no similar action" means that the action would not be prohibited; need general clarification of that definition.
- BLM (Bruce): Consider Highway 141 (scenic byway) and west of adobe badlands on Highway 50 for VRM II in an alternative.
- BLM (Bruce): Solar project in Paradox Valley. This may need to be included in the cumulative projects list.

BLM_0112428

- BLM (Bruce): email the draft cumulative impacts projects list to the RAC Subgroup members for their review. RAC Subgroup members: email any additional projects to Bruce by Friday, June 29, 2012.

**NEXT MEETING:**
- The purpose of the RAC Subgroup was initially to approve the range of alternatives. The three RAC members here today should discuss this up at the October 2012 RAC meeting to determine if this group will continue or not.

BLM_0112429

| | |
|---|---|
| **From:** | Krickbaum, John |
| **To:** | Angie Adams; Jon Waschbusch; Kate Krebs; Krickbaum, John; mpelletier@gunnisoncounty.org; norwoodparker@centurytei.net; renzo.deipiccolo@state.co.us; Schroeder, Alan M; shansen@deltacounty.com; Sharrow, Barbara L; townofpaonia@tds.net; UFO AR |
| **Subject:** | Draft Notes: Uncompahgre RMP Cooperating Agency Meeting #10 |
| **Date:** | Monday, June 25, 2012 1:18:48 PM |
| **Attachments:** | UFO-CA_20120621_DraftNotes.docx |

Hello Cooperating Agency Representatives,

I have attached draft notes of the June 21, 2012, Uncompahgre RMP Cooperating Agency meeting. Please review the draft notes and reply with any errors or omissions by Friday, July 6, after which they will be revised and submitted to all group members and the administrative record.

Please send a copy (Cc) of any reply to Angie (angie.adams@empsi.com); I will be out of the office July 2 – July 6.

Thank you,
Bruce

Bruce Krickbaum
Planner, Environmental Coordinator
BLM, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401



# COOPERATING AGENCY MEETING #10

## Thursday, June 21, 2012 (1:00 – 4:00 PM)

## Meeting Location:
### Holiday Inn Express
### 1391 South Townsend Avenue, Montrose, CO

# MEETING NOTES

**Attendees:** Angie Adams (EMPSi), Renzo DelPiccolo (Colorado Department of Natural Resources, Southwest Region), Brad Banulis (Colorado Department of Natural Resources, Southwest Region), Susan Hansen (Delta County BOCC), Bruce Krickbaum (BLM Uncompahgre Field Office), Mike Pelletier (Gunnison County), Barbara Peterson (Town of Paonia), Alan Schroeder (Bureau of Reclamation, Western Colorado Area Office), Barb Sharrow (BLM Uncompahgre Field Office), Jon Waschbusch (Montrose County BOCC)

**Handouts:** Agenda, Highlights of the Resource Management Planning Process to Date

---

1. ## Welcome (Angie Adams)

2. ## Introductions (All Present)

3. ## Planning Process to Date (Angie Adams)

   - Handout: Highlights of the Resource Management Planning Process to Date
   - The internal draft Oil and Gas Reasonable Foreseeable Development (RFD) Scenario was completed in February 2012. Have not released it to the public yet because the BLM Colorado State Office is still reviewing the internal draft report. The State Office is ensuring that different and new drilling technologies are considered in the report.
   - The Wilderness characteristics report was completed in November 2011 and is on the RMP website.
   - BLM is currently working with the BLM State Office and the US Environmental Protection Agency on the air quality report.

4. ## Final Draft Chapter 2, Alternatives – Range of Alternatives

   - Barb Sharrow: The alternatives are not as specific as some past RMPs; it is more general and makes broader land use plan decisions.

---

BLM_0112431

- Bruce Krickbaum: The final RMP can select a suite of decisions that are in the Draft RMP/EIS. The key is that a reasonable range of alternatives is considered in the Draft RMP/EIS so that there is flexibility in the final RMP. Right now it does not matter which alternative different draft actions fall; do not be too concerned about what is in the agency-preferred alternative.

- *Lands and Realty*
  a. Lands available for disposal: They vary by alternative because of the different criteria that were considered by alternative to determine which parcels would be considered for disposal.
     - Mike Pelletier: Are the lands being considered for disposal mapped? Barb Sharrow: Yes. See draft Figures 2-27, 2-28, and 2-29.
  b. There are also actions regarding land retention.
  c. Retention and Acquisition actions: Will add crucial winter range to the criteria list for Alternatives C and D.

- *Special Status Species – Terrestrial*
  a. Gunnison sage-grouse
     - In Alternative D, there is an NSO within 0.6-mile of a sage-grouse lek (row 156). There also is a CSU/SSR for sage-grouse leks that would apply to any surface-disturbing activity. There also is a TL for sage-grouse winter habitat; that is the only stipulation that applies to habitat (not specific to leks). There is another TL (row 157) that applies to within 4 miles of active sage-grouse leks or mapped nesting habitat.
     - Are the leks mapped as polygons or points? The CPW maps them as polygons.
     - Jon Waschbusch: Row 155, Alternative C: Montrose County submitted this comment in writing, "Include an action in this section which would not regulate surface activities based on Gunnison Sage Grouse habitat. Restricting surface activities and resource development is not appropriate for a species which is not listed as threatened or endangered. As a general comment, Alternative C should not include restrictions related to the Gunnison Sage Grouse for this reason." Bruce Krickbaum: Alternative C states "no similar allowable use," which means it would not have this TL, so that provides a range of alternatives.
  b. Raptors
     - Jon Waschbusch: Row 162 – raptor nest sites. Are we considering all raptors with some kind of buffer? Bruce Krickbaum: Yes. Look at row 162 for Alternative D, and the different bullets detail the different buffers. The last bullet encompasses all raptors except Mexican spotted owl, which is covered under a different row. **ACTION ITEM:** BLM needs to re-look at Alternative C to ensure the last bullet is accurate; shouldn't Alternative C be looking at special status raptors, not "non-special status raptors" as it states?
  c. Renzo DelPiccolo: It is concerning when the range of alternatives changes the dates of stipulations because that does not seem to be document or justified anywhere. The dates should be consistent across alternatives and also consistent with the BLM statewide stipulations. Barb Sharrow: The timing on some stipulations is variable because there are so many elevation differences in the UFO.
     - Row 172 – Kit fox: There is a variation in the timing between alternatives.
     - Brad Banulis: When looking at variation of dates across alternatives, BLM needs to consider that the dates from CPW were vetted through science and research and should be accurate. Alan Schroeder: What about location-specific changes across the state; would that justify a change in timing? Alternatives could state that time frames could be modified based on severity of winter, for example. The Gunnison Gorge RMP included something like this. **ACTION ITEM:** Barb Sharrow will check with BLM Colorado State Office on status of BLM Colorado statewide stipulations.

BLM_0112432

- Renzo DelPiccolo: Not comfortable with varying dates across alternatives; it seems arbitrary because those dates are not based on science. Would prefer that the alternatives instead show a range by some other way than varying dates within TLs. For example, one alternative would have No Leasing or NSO, another would have CSU, and another would have TL with set dates. Barb Sharrow: We are not confident that all the dates in the draft statewide stipulations will not change, and so if we do not cover various time frames in the range of alternatives, then we are concerned that we will have to re-analyze time frames in a supplemental DEIS. **ACTION ITEM:** BLM needs to consider how the alternatives can show a range by some other way than varying dates within TLs. For example, one alternative would have No Leasing or NSO, another would have CSU, and another would have TL with set dates.

d. Barbara Peterson – Row 402: **ACTION ITEM:** BLM needs to consider modifying the last paragraph ("The Field Manager may modify…") in Alternatives B and D to account for early winter.

e. Brad Banulis: **ACTION ITEM:** In Common to All Alternatives, add a bullet based on the last paragraph of row 402 ("The Field Manager may modify…"), in consultation with CPW, so there is flexibility in time frames.

f. Susan Hansen – Row 451, acres unacceptable for further consideration of coal resource development: Alternative A includes 580 acres, and the other alternatives include significantly more acres. Why? Bruce Krickbaum: This is because different alternatives consider different screening criteria when calculating acres unacceptable. **ACTION ITEM:** BLM: Consider clarifying in row 451 that Alternative A is only split-estate lands, and Alternatives B, C, and D are also BLM surface lands.

g. Susan Hansen: Has the stipulation on Oil and gas leasing within coal areas been beefed up from the current lease notices? Bruce Krickbaum: Yes; see row 455, for example. **ACTION ITEM:** BLM: Consider changing text in Alternatives B, C, and D to a CSU.

h. Mike Pelletier: What is going on with oil and gas lease sale in the North Fork?
  - Barb Sharrow: BLM received thousands of public comments on the preliminary EA. BLM is still analyzing those comments and, when finished, will most likely be posting some or parts of parcels for future lease sale in the next year or so. There will be a 30-day protest period, and the sale will occur 90 days later. It is being deferred until BLM has time to do a complete analysis. It was deferred/delayed because BLM did not have adequate time to analyze the comments and information provided. Other portions of parcels could be deferred until after the RMP is completed.
  - Mike Pelletier: Should there be a restriction on size of lease sale in the future? Barb Sharrow: This sale is actually relatively small.

i. Renzo DelPiccolo – Row 99: "Ecological Emphasis Areas" have been changed to "Biological Core Areas." **ACTION ITEM:** Need to change "Biological Core Areas" to "Ecological Emphasis Areas" in the Glossary; also change the definition using the definitions in draft Appendix G (Ecological Emphasis Areas). Also consider a change to row 99 if warranted to reflect the accurate definition to protect a corridor and not entire habitats. These areas function as corridors only if they are provided a lot of protections; need to consider this in the definition.
  - Barb Sharrow: Riparian areas are well protected, just not under the Wildlife section. Riparian area protection also will protect fish species.
  - Brad Banulis: Need to emphasize sagebrush communities. Barb Sharrow: Threatened, Endangered, and BLM Sensitive species are all priority species with protections.
  - Renzo DelPiccolo: Ecological Emphasis Areas are not necessarily the best way to protect wildlife. Barb Sharrow: There are other protections for Lands with Wilderness Characteristics outside WSAs, WSAs, and ACECs, for example that

BLM_0112433

would protect habitat types over those large ACEC areas. Brad Banulis: Through the RMP process, though, an ACEC could fall out, and there would be no protection of those habitats, so need to consider duplicate protections in different sections of the alternatives.

- Brad Banulis / Barb Sharrow: The impacts analysis needs to consider how different protections (regardless of source, such as an NSO for an SRMA, for example) overlap habitat and indirectly protect wildlife, for example.
- Brad Banulis: **ACTION ITEM:** Want the alternatives to include something specific to protect big game habitat outside of Ecological Emphasis Areas; BLM needs to consider this.
- Jon Waschbusch – Row 128: **ACTION ITEM:** Consider in Alternative C deleting sagebrush from the list of key/priority habitats.
- Barb Sharrow: **ACTION ITEM:** BLM will consider CPW's comment on noise and surface facilities in Gunnison sage-grouse habitat, keeping in mind that there already is an NSO within 0.6-mile of a lek.

j. Brad Banulis: Desert bighorn sheep
- Brad Banulis: Are desert bighorn sheep considered in the Special Status Species section? Bruce Krickbaum: They are included in "BLM sensitive species" (row 128). There are other actions for desert bighorn sheep in rows 111, 112, 113, 115. Also see the subsection for desert bighorn sheep in the Special Status Species section.
- Barb Sharrow: The suitability model (row 295) is drafted but could change when the Draft RMP is published.
- The appendix (J) for the suitability assessment is missing the maps. **ACTION ITEM:** BLM will determine whether to add maps to the appendix or change the text in the appendix to remove reference to the maps.

- *Soils and Water*
   a. Mike Pelletier – Row 5 of the "Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)"
   - Row 37 of the draft alternatives: **ACTION ITEM:** Add definition of "bank full stage" to Glossary; also send to Mike.
   - Bruce Krickbaum: The NSO buffer was the same as the COGCC's rules of 300 feet, but BLM increased it to 325 feet to match the BLM COSO suggestion.
   - Barbara Peterson: **ACTION ITEM:** Clarify that 100-year floodplain is using FEMA mapping (global). Add definition of "100-year floodplain" to Glossary.

## 5. Projects to Consider in the Cumulative Effects Analysis

- What about increased probability for wildfire? **ACTION ITEM:** BLM needs to include this somehow (in trend data? In cumulative impacts analysis?)
- Montrose County's water claim on the San Miguel River and potential future intent to convert that into a water reservoir site just offsite of the San Miguel River. This project is speculative and not reasonably foreseeable so will not be included in the cumulative impacts projects list.
- Paving the road across the Uncompahgre Plateau: Is in the County Master Plan. A contractor is being selected now to prepare an EA for the project. **ACTION ITEM:** This may need to be included in the cumulative projects list.
- **ACTION ITEM:** Crested Butte to Carbondale non-motorized trail. This may need to be included in the cumulative projects list. Joint effort between West Elk Byway and US Forest Service.
- **ACTION ITEM:** Bear Range Town east of Paonia Reservoir. This may need to be included in the cumulative projects list.

BLM_0112434

- US Bureau of Reclamation: desalinization ponds in Paradox Valley. There is an EIS that found the ponds infeasible, but a pilot test is being started on a small pond to determine feasibility. **ACTION ITEM:** This may need to be included in the cumulative projects list; Alan Schroeder will look into whether or not this is reasonably foreseeable and will tell Bruce.
- **ACTION ITEM:** Replacing ditches with pipes via Natural Resources Conservation Service and US Bureau of Reclamation; this needs to be included in general terms in the cumulative projects list.
- **ACTION ITEM:** South Canal Hydro Project; these needs to be included in the cumulative projects list.
- **ACTION ITEM:** Paonia water treatment facility project; these needs to be included in the cumulative projects list. Barbara Peterson will provide project description to Bruce.
- **ACTION ITEM:** Bruce will email the draft cumulative impacts projects list to the Cooperating Agencies for their review. Cooperating Agencies will email any additional projects to Bruce by Friday, June 29, 2012.

## 6. Next Steps

- Refer to the opposite side of the agenda for the general schedule:

  ***General Uncompahgre RMP Schedule*** (*as of June 4, 2012*)

  | | |
  |---|---:|
  | *BLM State Office Review of Preliminary Draft RMP* | *November 2012* |
  | *BLM Washington Office Review of Preliminary Draft RMP* | *January 2013* |
  | *Public Review of Draft RMP/Draft EIS (90-day comment period)* | *spring 2013* |
  | *Public Review of Proposed RMP/Final EIS (30-day protest period)* | *Winter/Spring 2014* |
  | *Sign Record of Decision* | *Summer 2014* |

## 7. Other Items Not on the Agenda

- Brad Banulis: Will CPW get responses to our December 2011 comments from the BLM? Barb Sharrow: There is not time to write responses to every comment received from Cooperating Agencies and RAC Subgroup members.

## 8. Action Items / Next Meeting

**ACTION ITEMS:**

- BLM (Bruce): Montrose County's written comments – BLM can strike these: row 140, Alternative C, and row 155, Alternative C.
- BLM (Bruce): Row 162 – Need to re-look at Alternative C to ensure the last bullet is accurate; shouldn't Alternative C be looking at special status raptors, not "non-special status raptors" as it states?
- BLM (Barb): check with BLM Colorado State Office on status of BLM Colorado statewide stipulations.
- EMPSi (Kate): Look at how other RMPs vary stipulations across the range of alternatives. Do they vary dates (timing) within TLs, or do they vary type of stipulations (TL vs. NSO vs. CSU). BLM (Bruce): consider how the alternatives can show a range by some other way than varying dates within TLs. For example, one alternative would have No Leasing or NSO, another would have CSU, and another would have TL with set dates.
- BLM (Bruce): Row 402: consider modifying the last paragraph ("The Field Manager may modify…") in Alternatives B and D to account for early winter.

BLM_0112435

- BLM (Bruce): In Common to All Alternatives, add a bullet based on the last paragraph of row 402 ("The Field Manager may modify…"), in consultation with CPW, so there is flexibility in time frames.
- EMPSi (Kate, in coordination with BLM/Bruce): Consider clarifying in row 451 that Alternative A is only split-estate lands, and Alternatives B, C, and D are also BLM surface lands.
- BLM (Bruce): Row 455: Consider changing text in Alternatives B, C, and D to a CSU.
- BLM (Bruce): Row 99: change "Biological Core Areas" to "Ecological Emphasis Areas" in the Glossary; also change the definition using the definitions in draft Appendix G (Ecological Emphasis Areas). Also consider a change to row 99 if warranted to reflect the accurate definition to protect a corridor and not entire habitats.
- BLM (Bruce): consider including in the alternatives something specific to protect big game habitat outside of Ecological Emphasis Areas.
- BLM (Bruce): Row 128: Consider in Alternative C deleting sagebrush from the list of key/priority habitats.
- BLM (Bruce): consider CPW's comment on noise and surface facilities in Gunnison sage-grouse habitat, keeping in mind that there already is an NSO within 0.6-mile of a lek.
- BLM (Bruce): determine whether to add maps to Appendix J or change the text in the appendix to remove reference to the maps.
- EMPSi (Kate): Add definition of "bank full stage" to Glossary. BLM (Bruce): Email definition to Mike Pelletier.
- EMPSi (Kate): Clarify that 100-year floodplain is using FEMA mapping (global). Add definition of "100-year floodplain" to Glossary.
- BLM (Bruce) – Update Cumulative Impacts Projects List
    1. BLM (Bruce): email the draft cumulative impacts projects list to the Cooperating Agencies for their review. Cooperating Agencies: email any additional projects to Bruce by Friday, June 29, 2012.
    2. Include increased probability for wildfire somehow in the Draft RMP/EIS (in trend data? In cumulative impacts analysis?).
    3. Paving the road across the Uncompahgre Plateau: This may need to be included in the cumulative projects list.
    4. Crested Butte to Carbondale non-motorized trail. This may need to be included in the cumulative projects list.
    5. Bear Range Town east of Paonia Reservoir. This may need to be included in the cumulative projects list.
    6. US Bureau of Reclamation desalinization ponds in Paradox Valley. This may need to be included in the cumulative projects list. Alan Schroeder: look into whether or not this is reasonably foreseeable and will tell Bruce.
    7. Replacing ditches with pipes via Natural Resources Conservation Service and US Bureau of Reclamation; this needs to be included in general terms in the cumulative projects list.
    8. South Canal Hydro Project; these needs to be included in the cumulative projects list.
    9. Paonia water treatment facility project; these needs to be included in the cumulative projects list. Barbara Peterson: provide project description to Bruce.

BLM_0112436

- BLM/EMPSi (Kate): Make all future changes to Chapter 2, Alternatives, in reviewing/track changes mode so that Cooperating Agencies (and RAC Subgroup) can see what changes from this internal draft version of Chapter 2.

**NEXT MEETING:**
- The current schedule shows the next meeting at the internal draft Proposed RMP/Final EIS stage before it is published. That will be in about fall 2013.
- Cooperating Agencies would like to have a meeting prior to when the Proposed RMP is developed to help craft the Proposed RMP. Perhaps that meeting would occur during the public comment period on the public Draft RMP/EIS.
- BLM/EMPSi: Make all future changes to Chapter 2, Alternatives, in reviewing/track changes mode so that Cooperating Agencies (and RAC Subgroup) can see what changes from this internal draft version of Chapter 2.

BLM_0112437

| From: | Krickbaum, John |
|---|---|
| To: | Angie Adams; barbara_hawke@tws.org; billday@paonla.com; john@reams-construction.com; Kate Krebs; Kauffman, Krag D; Krickbaum, John; Magee, Deborah M; pmueller@tnc.org; robbie.levalley@colostate.edu; sbear@dmea.com; Sharrow, Barbara L; sllvers1@tds.net; steve.welst@oxbow.com; tkctew@yahoo.com; UFO AR; wblack8709@msn.com |
| Subject: | Cumulative Impacts for BLM Uncompahgre RMP |
| Date: | Wednesday, June 27, 2012 11:02:55 AM |
| Attachments: | Ch4 UFO Cumulative-list  20120409  BK20120622.docx |

Hello RAC Sub-group Members,

An action item I have from our meeting last week is to send you our draft cumulative impacts project list for your review and consideration for additional items to include.

As discussed in the meeting, and in the attached,  cumulative impacts are effects on the environment that result from implementing any one of the RMP alternatives in combination with other actions outside the scope of this RMP, either within the planning area or adjacent to it (and regardless of land ownership; private or federal).

Please send a description of any past, present or reasonably foreseeable projects for inclusion in the list.  "Reasonably foreseeable" future actions are actions that have been committed to, are permitted, are in a master plan, or are known proposals that will very likely take place within the 20-year planning period (not speculative or on a "wish-list").

If you have anything to add to the attached, please forward to me and Angie Adams (angie.adams@empsi.com ) by the end of Monday July 2.  We will need the name or descriptive title and a short description of the project.  I will be out of the office next week, so be sure to copy Angie.

Thank you, Bruce


Bruce Krickbaum

Planner, Environmental Coordinator

BLM, Uncompahgre Field Office

2465 South Townsend Avenue

Montrose, CO  81401

970.240.5384

BLM_0112438

## 4.2 CUMULATIVE IMPACTS

Cumulative impacts are effects on the environment that result from the impact of implementing any one of the RMP alternatives in combination with other actions outside the scope of this RMP, either within the planning area or adjacent to it. Cumulative impact analysis is required by CEQ regulations because environmental conditions result from many different factors that act together. The total effect of any single action cannot be determined by considering it in isolation, but must be determined by considering the likely result of that action in conjunction with many others. Evaluation of potential impacts considers incremental impacts that could occur from the proposed project, as well as impacts from past, present, and reasonably foreseeable future actions. Management actions could be influenced by activities and conditions on adjacent public and non-public lands beyond the planning area boundary; therefore, assessment data and information could span multiple scales, land ownerships, and jurisdictions. These assessments involve determinations that often are complex and, to some degree, subjective.

### 4.2.1 Cumulative Analysis Methodology

The cumulative impacts discussion that follows considers the alternatives in the context of the broader human environment—specifically, actions that occur outside the scope and geographic area covered by the RMP. Cumulative impact analysis is limited to important issues of national, regional, or local significance; therefore, not all resources identified for the direct and indirect impact analysis in this EIS are analyzed for cumulative impacts.

Because of the programmatic nature of an RMP and cumulative assessment, the analysis tends to be broad and generalized to address potential effects that could occur from a reasonably foreseeable management scenario combined with other reasonably foreseeable activities or projects. Consequently, this assessment is primarily qualitative for most resources because of lack of detailed information that would result from project-level decisions and other activities or projects. Quantitative information is used whenever available and as appropriate to portray the magnitude of an impact. The analysis assesses the magnitude of cumulative impacts by comparing the environment in its baseline condition with the expected impacts of the alternatives and other actions in the same geographic area. The magnitude of an impact is determined through a comparison of anticipated conditions against the naturally occurring baseline as depicted in the affected environment (see **Chapter 3**) or the long-term sustainability of a resource or social system.

The following factors were considered in this cumulative impact assessment:

- Federal, nonfederal, and private actions;
- Potential for synergistic effects or synergistic interaction among or between effects;
- Potential for effects to cross political and administrative boundaries;

- Other spatial and temporal characteristics of each affected resource; and
- Comparative scale of cumulative impacts across alternatives.

Temporal and spatial boundaries used in the cumulative analysis are developed on the basis of resources of concern and actions that might contribute to an impact. The baseline date for the cumulative impacts analysis is 2012. The temporal scope of this analysis is the life of the RMP, which encompasses a 20-year planning period.

Spatial boundaries vary and are larger for resources that are mobile or migrate (e.g., elk populations) compared with stationary resources. Occasionally, spatial boundaries could be contained within the planning area boundaries or an area within the planning area. Spatial boundaries were developed to facilitate the analysis and are included under the appropriate resource section heading.

### 4.2.2   Past, Present, and Reasonably Foreseeable Future Actions

Past, present, and reasonably foreseeable future actions are considered in the analysis to identify whether and to what extent the environment has been degraded, maintained or enhanced, whether ongoing activities are causing impacts, and trends for activities in and impacts on the area. Projects and activities are evaluated on the basis of proximity, connection to the same environmental systems, potential for subsequent impacts or activity, similar impacts, the likelihood a project will occur, and whether the project is reasonably foreseeable.

Projects and activities considered in the cumulative analysis were identified through meetings held with cooperating agencies and BLM employees with local knowledge of the area. Each was asked to provide information on the most influential past, present, or reasonably foreseeable future actions. Additional information was obtained through discussions with agency officials and review of publicly available materials and Web sites.

Effects of past actions and activities are manifested in the current condition of the resources, as described in the affected environment (see **Chapter 3**). Reasonably foreseeable future actions are actions that have been committed to or known proposals that could take place within the 20-year planning period.

Reasonably foreseeable future action scenarios are projections made to predict future impacts—they are not actual planning decisions or resource commitments. Projections, which have been developed for analytical purposes only, are based on current conditions and trends and represent a best professional estimate. Unforeseen changes in factors such as economics, demand, and federal, state, and local laws and policies could result in different outcomes than those projected in this analysis.

Other potential future actions have been considered and eliminated from further analysis because there is a small likelihood these actions would be pursued and implemented within the life of the RMP or because so little is known about the potential action that formulating an analysis of impacts is premature. In addition, potential future actions protective of the environment (such as new potential threatened or endangered species listings or regulations related to fugitive dust emissions) have less likelihood of creating major environmental consequences alone, or in combination with this planning effort. Federal actions, such as species listing, would require BLM to reconsider decisions created from this RMP because the consultations and relative impacts might no longer be appropriate. These potential future actions may have greater capacity to affect resource uses within the planning area; however, until more information is developed, no reasonable estimation of impacts could be developed.

Data on the precise locations and overall extent of resources within the planning area are considerable, although the information varies according to resource type and locale. Furthermore, understanding of the impacts on and the interplay among these resources is evolving. As knowledge improves, management measures (adaptive or otherwise) would be considered to reduce potential cumulative impacts in accordance with law, regulations, and the approved RMP.

Projects and activities identified as having the greatest likelihood to generate potential cumulative impacts, when added to the RMP alternatives, are displayed in **Table 4-1**. Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Make up the Cumulative Impact Scenario.

**Table** Error! No text of specified style in document.**-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or**
**Actions that Make up the Cumulative Impact Scenario**

| Human Actions | |
|---|---|
| Energy and minerals development | Summary. Most oil and gas development on BLM-administered lands within the planning area has been in the ~~DeBeque/Collbran~~North Fork of the Gunnison River area ~~and near the Utah border~~. Numerous mining claims exist, but the only significant mining activity is associated with past and current uranium/vanadium mining claims. Most ~~and~~ coal mining occurs in the North Fork of the Gunnison area. Several small individual placer mining claims exist along the San Miguel and Dolores River, and a large group of recently staked uranium mining claims exist on BLM-administered public lands in the ~~GJFO,~~ Uncompahgre Field Office. Grand Junction Field Ofiice and Moab Field Office. As such, additional mining and oil and gas development is expected. ~~Alabaster/Gypsum. Historically there has been one small-scale surface mining operation south of Gateway along Highway 141. There are no active operations underway (BLM 2010c).~~ |

**Table Error! No text of specified style in document.-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or**
**Actions that Make up the Cumulative Impact Scenario**

~~Copper. As of January 2011, there is one Notice of Intent on file for collection of hand-specimen quality copper minerals (azurite and malachite) from an existing underground mine. Copper was also produced from some of the historic uranium/vanadium mines in the Uravan mineral belt within the GJFO (BLM 2010c).~~

Energy Fuels plans to begin construction of the Piñon Ridge Mill (in Paradox Valley, between Naturita and Bedrock in Montrose County, Colorado) in 2012 or 2013, pending the outcome of litigation (Energy Fuels 2012). The Colorado Radiation Control Division issued a final radioactive materials license to Energy Fuels Resources Corporation in March 2011, following the performance of an environmental impact assessment (CDPHE 2011). The license application included an Environmental Report, which outlines the proposed action alternatives, affected environment, environmental impacts, and cumulative impacts (Energy Fuels 2009a).  The mill is expected to process ore from 5 to 9 mines at any one time, and feeder mines are expected to change over the course of the mill's 40-year lifetime. A surge in uranium exploration, mining, and permitting is anticipated if the mill is constructed, including permitting and development of uranium/vanadium deposits controlled by Energy Fuels (CDNR 2012; 11 Energy Fuels 2009a, 2009b).

The Uravan mineral belt in western Colorado includes an estimated 1,200 historic mines, with production dating back to 1948. Total uranium ore production in Colorado was estimated to be over 255,000 pounds in 2005, all originating from four Cotter Corporation mines in the Uravan belt near Nucla and Naturita. All four mines ceased production in November 2005, partly due to high energy costs and the high cost of transporting ore to Cañon City for milling (USDOE, 2012).

Denison's Sunday Mines began producing uranium in San Miguel County in 2007; ore from these mines was shipped to the White Mesa Mill in Blanding (see Section 5.7.2.1).  Production at these mines ceased in 2009 due to declining uranium prices, but the BLM Tres Rios Field Office is currently preparing an Environmental Assessment for reopening of the complex (USDOE, 2012).

Limited uranium production began at Bluerock Energy's J-Bird Mine in Montrose County in 2008, but production ceased when the mine was transferred to Rimrock Exploration and Development. The mine remains in maintenance status and no production is anticipated in the immediate future. The Prince Albert (Rimrock), Last Chance (Nuvemco), and Return (Beck) Mines may have had limited production for testing within the last 4 years (USDOE, 2012).

There are 33 actively permitted uranium mine projects in Colorado, and one new permit 1 under review. No uranium production was reported from 2009 to 2011, and none of the actively permitted mine projects is producing at this time: 24 are in maintenance status, 7 are being (or 3 have been) reclaimed, and

**Formatted:** Left, Space Before:  0 pt, After:  0 pt, Widow/Orphan control

**Table** Error! No text of specified style in document.**-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or
Actions that Make up the Cumulative Impact Scenario**

two are conducting development activities. There are 12 permitted uranium mines in Utah (USDOE, 2012).

~~Coal. Until recently, there was one active underground coal mine operating within the GJFO along Highway 139 in the Book Cliffs. They have stopped operations until a Lease Modification is processed. Leasing for another larger underground coal mine is going through the NEPA/permitting process with an estimated Record of Decision sometime in the next few years~~

Coal. There are three active underground coal mines on Federal Minerals in the Uncompahgre Planning Area. The following table contains recent production data for the three coal mines in the North Fork Valley.

**Raw Coal Production - North Fork Valley - BLM-UFO
1-Year Averages**

| Average based on: | Bowie No. 2 | Elk Creek | West Elk | Totals |
|---|---|---|---|---|
| 5 Year | 2,808,556 | 4,378,814 | 5,721,944 | 12,909,314 |
| 1 Year | 1,873,357 | 3,495,575 | 6,499,048 | 11,867,980 |
| Periods ends Sept. 30, 2011 | | | | |

NOTE: The total yearly production for the North Fork is expected to remain about the same -- between 12 and 13 million tons. Each of these mining operations control coal reserves with a mix of Federal and fee coal; however, 90 percent or more of local production is Federal. As mining progresses, only Federal coal will be available in the reserve base.

- Bowie No. 2 was opened in 1997 as a room-and-pillar mine but converted to a longwall system in late 1999. It is located northeast of Paonia and is operated by Bowie Resources, LLC with a loadout northeast of Paonia. A coal lease modification to lease COC-036955 for 160 acres was issued on January 21, 2011 for the Bowie No. 2 Mine. There are 14,543 acres permitted in the combined permits of the Bowie No. 1 and No. 2 accessed by the Bowie No. 2 mine.
- The Elk Creek Mine is a longwall operation north of Somerset, operated by Oxbow Mining, LLC, with a loadout immediately north of Somerset. There are 13,429 acres permitted.
- The West Elk Mine is a longwall operation located south and east of Somerset and is operated by Mountain Coal Company with a loadout about 1 mile east of Somerset. There are 17,155 acres permitted and the mine is about the 7th largest underground longwall coal mine in the U.S.

UFO is working on environmental analysis for a Coal Exploration License on Oak Mesa (Delta County, North of Hotchkiss). The exploration drilling is proposed to confirm the quality, quantity, and extent of the coal within this area. The proposed Oak Mesa project encompasses about 13,873 acres, north of Hotchkiss. A Decision is expected in late summer 2012.

The New Horizon coal mine near Nucla is a 20-acre surface coal mine owned

**Formatted:** Left, Indent: Left: 0", Space Before: Auto, After: Auto, Don't add space between paragraphs of the same style, Bulleted + Level: 1 + Aligned at: 0.25" + Indent at: 0.5", Allow hanging punctuation, Adjust space between Latin and Asian text, Adjust space between Asian text and numbers, Font Alignment: Auto

**Formatted:** Font color: Auto

**Formatted:** Left, Space Before: 0 pt, After: 0 pt, Widow/Orphan control

**Formatted:** Left, Space Before: 0 pt, After: 0 pt, Widow/Orphan control

**Table** Error! No text of specified style in document.**-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or**
**Actions that Make up the Cumulative Impact Scenario**

and managed by Western Fuels Association. The mine is the exclusive coal supplier to the Nucla Station power plant (5 miles north), producing approximately 350,000 to 400,000 tons of coal per year. The Dakota coal from the mine is higher ash and sulfur than the types of coal mined in other parts of Colorado.

BLM routinely offers land parcels for competitive oil and gas leasing to allow exploration and development of oil and gas resources for public sale. Continued leasing is necessary for oil and gas companies to seek new areas for oil and gas production, or to develop previously inaccessible/uneconomical reserves.

Potash. There is not any potash exploration or mining in the Uncompahgre Field Office. No future activity is known.

There is a potential undefined potash resource underneath Sinbad Valley, and, in 2008, a company expressed interest in exploring the area for potential development via solution mining. Prior to 2008 there had been no exploration activity for potash within the planning area (BLM 2010c).

The BLM Dolores Public Lands Office has received 21 permit applications from RM Potash for potash exploration, affecting 40,000 acres of land in the vicinity of Egnar, Colorado (BLM 2011). BLM is preparing an environmental assessment to evaluate exploration drilling on some of these applications. After completing the NEPA review, BLM will determine whether the project has an impact on the surrounding environment; the decision is expected in 2012. If the permits are approved, exploratory drilling is expected to last up to four years (BLM 2011). No leasing or development of potash resources has been proposed.

Mineral material sales. There are two active commercial sand and gravel operations and three common use areas identified for disposal of bentonite clay, adobe fill, and red gravel via over-the-counter permit sales. Three common areas were closed due to potential impacts to cultural resources and a new NCA designation (BLM 2010c). Gravel mining on private lands in and surrounding the planning area is very common. As these resources are depleted on private lands, it is expected that demand for mining public lands will increase. There is an existing clay mine (Little Park Road community pit) that has a high occurrence potential, while there is moderate potential for clay development in other parts of the planning area.

Oil shale development. There are no active or proposed oil shale projects as of March 2011. A Final EIS was completed and a ROD was issued in November 2008, amending the 1987 RMP to make lands available for oil shale leasing. Leases have not yet been issued. A NEPA analysis would be conducted prior to lease issuance (BLM 2010c). These decisions are currently being revisited by the BLM in a programmatic planning process and any additional decisions will be adopted by this RMP, as applicable.

**Table** Error! No text of specified style in document.**-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or**
**Actions that Make up the Cumulative Impact Scenario**

The South Canal Hydropower Project is being constructed.  The two power houses that comprise the South Canal Hydro project will generate an estimated 27,000,000 kilowatt hours (kWh's) of electricity, roughly equivalent to the power used by 3,000 homes in DMEA's service territory.  Electricity will be produced uniquely during the irrigation season to match the existing flow of water.

BLM Glenwood Springs RMP Oil and Gas Leasing Amendment (1999) (Now Colorado River Field Office). The amendment evaluates the impacts of oil and gas leasing and development on BLM lands and federally owned mineral estate under private lands in the Glenwood Springs Planning Area.

BLM Grand Junction RMP (1987), as amended, and Oil and Gas Leasing Amendment (1991). These documents provide for mineral development on the BLM Grand Junction Field Office, Colorado, and are currently being revised in a new RMP planning effort. Decision expected 2014.

BLM Gunnison Field Office RMP (BLM 1993c), as amended. This RMP provides for mineral development on the BLM Gunnison Field Office, Colorado.

BLM Moab Field Office RMP (2008f). This RMP provides for mineral development on the BLM Moab Field Office, Utah.

BLM Monticello Field Office RMP (BLM 2008x). This plan sets management, protection, and use goals and guidelines for the BLM Monticello Field Office, Utah.

BLM San Juan/San Miguel RMP (1985), as amended, and Oil and Gas Leasing Amendment (1991). These plans set management, protection, and use goals and guidelines for the portions of the BLM Uncompahgre and Tres Rios Field Offices, Colorado. These plans are being revised in a new RMP planning efforts: the Uncompahgre RMP and the San Juan Public Lands Center Land Management Plan (BLM and US Forest Service). Decision expected 2014.

BLM Uncompahgre Field Office Reasonable Foreseeable Development Scenario for Oil and Gas (2012). Looks at oil and gas resources in the Uncompahgre RMP planning area and gives a 20-year prediction of development potential.

BLM Uncompahgre Field Office Mineral Potential Report (2011). Looks at all minerals (non-oil and gas), except coal and renewable energy, in the Uncompahgre RMP planning area and gives a 20-year prediction of development potential.

BLM Uncompahgre Field Office Coal Potential Report (2010). Looks at coal resources in the Uncompahgre RMP planning area and gives a 20-year prediction of development potential.

BLM Uncompahgre Field Office Renewable Energy Potential Report (2010). Looks at renewable energy resources, including geothermal, in the

BLM_0112445

**Table** Error! No text of specified style in document.**-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or
Actions that Make up the Cumulative Impact Scenario**

| |
|---|
| Uncompahgre RMP planning area and gives a 20-year prediction of development potential. |
| US Forest Service Grand Mesa, Uncompahgre, and Gunnison National Forests (1993). Final Oil and Gas Leasing EIS and Record of Decision evaluate the potential effects of alternative programs for oil and gas leasing on the Grand Mesa, Uncompahgre, and Gunnison National Forests. |
| ~~US Forest Service White River National Forest Oil and Gas Amendment. The White River National Forest issued its current oil and gas leasing availability decision in 1993 (Oil and Gas Leasing Final Environmental Impact Statement and Record of Decision). Since 1993, information and circumstances considered for that decision have changed, including the White River National Forest issuance of a revised Land and Resource Management Plan, technological advances in oil and gas exploration and development that expand development potential of previously noneconomic resources, and increased level of projected oil and gas development potential activities on the Forest. The White River National Forest plans to prepare an EIS to disclose the environmental effects from oil and gas leasing.~~ |
| Gunnison County North Fork Valley Coal Resource Special Area Regulations (Gunnison County 2003). |
| Gunnison County Temporary Regulations for Oil and Gas Operations (Gunnison County 2004). |
| Gunnison County Energy Action Plan (Gunnison County 2009). |
| ~~Orchard II Master Development Plan (2007). EnCana Oil and Gas (USA), Inc. is proposing a multi-year program of oil and gas development on approximately 12,067 acres of public, split-estate, and private lands located southeast of the town of DeBeque.~~ |
| ~~EnCana Oil and Gas (USA), Rulison Area Oil and Gas Development (2007). EnCana proposes to develop oil and gas resources in an area of approximately 1,885 acres of federal, private, and split-estate lands located southwest of Rifle in Garfield County.~~ |
| ~~Black Hills Western Properties Exploratory Proposal (2012). This project is in the planning phase, and a decision is expected in the near future. It could authorize drilling of 24 wells on 12 pads over a three-year period.~~ |
| Bull Mountain Unit Master Development Plan. This project is in the planning phase, and a decision is expected in the near future. If approved, it would authorize development of up to 150 oil/gas wells on multiple pads north of Paonia Reservoir. |
| Whitewater Master Development Plan. This project is in the planning phase, and a decision is expected in the near future. It would authorize development of oil/gas on multiple well pads. |
| ~~The Breaks Exploratory Proposal. This proposal is in the early planning stages for leases east and west of Highway 65, south of Mesa.~~ |

**Comment [BK3]:** Leave this one – it is right on the boundary of UFO/GJFO.

**Table** Error! No text of specified style in document.**-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or**
**Actions that Make up the Cumulative Impact Scenario**

| | |
|---|---|
| | ~~Cedar Bench Master Development Plan. This project is in pre-planning (exploration) stages of existing unit re-vitalization using new technology.~~ |
| | Mesa County Mineral and Energy Resources Master Plan (2011). This plan identifies known energy resources and opportunities in Mesa County and recommends policies to guide regulation and development. |
| Vegetation Management | Forestry. Past, current, and foreseeable forestry uses in the project area include personal and commercial harvest of pinyon and juniper fuel wood, poles and posts for fence building, wildings (live trees and shrubs), and Christmas trees. |
| | Vegetation treatments. ~~Mechanical~~ Prescribed fire and mechanical treatments of vegetation (e.g., chaining, rollerchops, Dixie-harrow, drill seeding, hydro-axing, brush mowing) were very common in the past on public and private rangelands in the planning area. These treatments and maintenance of these vegetation treatments are still fairly common and will likely continue (except chaining). In addition, manual and mechanical treatments of large woody invasive species such as tamarisk have occurred in the riparian areas of rivers and streams and this type of restoration work is likely to continue in the foreseeable future. |
| | Sage-grouse habitat. Implementation of conservation plans for sage-grouse within the planning area includes active management techniques to improve habitat quality for sage-grouse, maintain or increase management unit populations, and maintain or increase sage-grouse numbers. Plans include the San Miguel Basin Gunnison Sage-grouse Conservation Plan (San Miguel Basin Gunnison Sage-grouse Working Group 2009), Gunnison Sage-grouse Rangewide Conservation Plan (Gunnison Sage-grouse Rangewide Steering Committee 2005), Conservation Assessment of Greater Sage-grouse and Sagebrush Habitats (Connelly et al. 2004), and Colorado Sagebrush: A Conservation Assessment and Strategy (Boyle and Reeder 2005). |
| | Hazardous fuels reduction. Fuels treatments, including prescribed fires, chemical and mechanical treatment, and seeding, would likely continue and potentially increase in the future. |
| | Biomass. Future forestry use of woody biomass for energy production could occur. The BLM Uncompahgre Field Office Renewable Energy Potential Report (2010) looks at renewable energy resources, including biomass, in the Uncompahgre RMP planning area and gives a 20-year prediction of development potential. |
| Livestock grazing | Livestock grazing has a long history in the region. Generally, livestock use has decreased over the past 100 years. Grazing in portions of the Cumulative Impacts Analysis Area has either remained stable or declined in the recent past, and demand on BLM-administered public lands has remained stable in the last 10 years. Approximately 628,750 acres of BLM-administered public lands in the planning area (93 percent) are allocated for livestock grazing within grazing allotment boundaries and are managed by the UFO in accordance with |

**Comment [BK4]:** Show in the row after "Vegetation treatments".

**Table Error! No text of specified style in document.-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or**
**Actions that Make up the Cumulative Impact Scenario**

| | |
|---|---|
| | the current RMPs. Some allotments within the planning area are managed by other field offices  (i.e. Wray Mesa), while the UFO manages portions of allotments that are within other field offices. Total active preference (permitted use) is 43,491 AUMs, with an additional 5,291 AUMs in suspension. Approximately 85 percent of the allotment permits were for cattle, with sheep and horse grazing accounting for the remaining 15 percent. Grazing on private lands within the Cumulative Impact Analysis Area is expected to remain stable or slightly decrease as residential development increases. |
| Recreation and visitor use | Colorado's population has grown significantly in the past 10 years, and an increasing number of people are living near or seeking local public lands for a diversity of recreational opportunities characterized by the "mountain resort or outdoor lifestyle." The primary recreational activities in the UFO are motorized vehicle touring, all-terrain vehicle use, mountain biking, big and small game hunting, fishing, hiking, backpacking, horseback riding, mountain biking, sight-seeing, all-terrain vehicle use, hiking, and river boating. Recreation-based visitor use in the UFO has increased in most areas in recent years and is expected to continue to increase on BLM and non-BLM lands. |
| | A non-motorized trail has been proposed to be constructed between Crested Butte to Carbondale.  It is a Joint effort between West Elk Byway and US Forest Service. |
| Lands and realty | Since approval of the 1987  1985 and 1989 RMPs, the GJFO  UFO has exchanged 2.271##,#### acres, acquired 2.253##,#### acres through exchange, issued patents for 440 #### acres through the Recreation and Public Purposes Act, purchased 2.296##,#### acres, and acquired 375 #### acres through donation. The BLM is moving toward the consolidation of BLM lands to benefit the public. To achieve this goal, candidates for land tenure adjustment through disposal, sale, exchange, or acquisition include parcels that are difficult to manage or that do not have public access, relatively small parcels adjacent to other federal- or state-managed lands, parcels that would increase conservation of natural resources, and parcels that increase access and use of BLM lands. Residential development in the areas surrounding UFO has been increasing. |
| | Existing and Valid Rights.  Currently the GJFO UFO administers 610 #### cases (8,330##,#### acres) of FLPMA and pre-FPLMA rights-of-way and 262 #### cases (2,934##,#### acres) of Mineral Leasing Act rights-of-way. These existing authorizations are usually limited to a 30-year term, which is typically renewed, and should be considered a long-term use of the land. Most of these authorizations are for roads, power lines, natural gas pipelines/facilities, water lines, phone lines, injection wells, communication sites, and compressor stations. in addition to other types of facilities. At any one time there are on average 35 #### pending (i.e., not authorized) rights-of-way requests in the GJFO.UFO. |
| | BLM Uncompahgre Field Office Renewable Energy Potential Report (2010). Looks at renewable energy resources, including wind and solar, in the |

**Comment [BK5]:** I just re-arranged the order. and added fishing.

**Formatted:** Left, Space Before:  0 pt, After: 0 pt, Widow/Orphan control, Allow hanging punctuation, Font Alignment: Auto

**Formatted:** Highlight

**Formatted:** Highlight

**Formatted:** Highlight

**Formatted:** Highlight

**Formatted:** Highlight

**Formatted:** Highlight

**Table** Error! No text of specified style in document.**.-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or**
**Actions that Make up the Cumulative Impact Scenario**

Uncompahgre RMP planning area and gives a 20-year prediction of development potential.

McGee Land Exchange. BLM has approved a land exchange involving 150 acres of Federal land for approximately 160 acres of non-Federal land north of Colona, CO. The land exchange will consolidate federal ownership and will resolve an unintended trespass situation.

Bangs Canyon Land Acquisition. The Bangs Canyon acquisition project consisting of 4 parcels containing 200 acres adjacent to the current Bangs Canyon SRMA boundary along the Gunnison River, was completed in 2011.

Colorado Mesa University Recreation and Public Purposes Act Land Sale. In January 2012 BLM approved an application from Colorado Mesa University to acquire approximately 80 acres of public land in the Whitewater area for a regional public safety training facility.

Grand Junction Regional Airport Land Transfer. BLM is considering a request from the Grand Junction Regional Airport Authority to acquire 720 acres of public land in the North Desert, located north and adjacent to airport property. Decision expected 2012.

Mountain Island Land Exchange. The proposed exchange is located in the Glade Park/Pinyon Mesa area and consists of 788 acres (10 parcels) of BLM-managed land in exchange for 576 acres (4 parcels) of Mountain Island Ranch land. Decision expected 2012.

Designation of Energy Corridors on Federal Lands in the 11 Western States Programmatic EIS (2007). This multi-federal agency Programmatic EIS analyzes the environmental impacts of designating federal energy corridors on federal lands in 11 western states and incorporating those designations into relevant land use and resource management plans.

The Paradox Valley Unit desalinization plant is located on the Dolores River, 7 miles south of Bedrock. Operated by the U.S. Department of the Interior Bureau of Reclamation, the plant prevents natural salt loads in groundwater from entering the Dolores River by intercepting and disposing of brine via deep-well injection. Major facilities include a brine production well field, brine surface treatment facility, and deep injection well.

An all-weather paved road has been proposed to be constructed over the Uncompahgre Plateau from Montrose to Nucla, using existing graveled roads, with some realignment. The USFS Norwood Ranger District is beginning Environmental Analysis.

Bear Range Town east of Paonia Reservoir. Placeholder for more information.

Black Canyon of the Gunnison National Monument and Curecanti National Recreation Area General Management Plan (1997). This plan sets management, protection, and use goals and guidelines for the Black Canyon of the Gunnison

**Formatted:** Left, Space Before: 0 pt, After: 0 pt, Widow/Orphan control

**Formatted:** Highlight

BLM_0112449

**Table** Error! No text of specified style in document.**-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or
Actions that Make up the Cumulative Impact Scenario**

| |
|---|
| National Park. |
| Curecanti National Recreation Area Final Resource Protection Study and Environmental Impact Statement (NPS 2008). This plan sets management, protection, and use goals and guidelines for the Curecanti National Recreation Area. |
| Interim Management Policy for Dominguez-Escalante National Conservation Area and Dominguez Canyon Wilderness (2010). This plan sets management, protection, and use goals and guidelines for the Dominguez-Escalante National Conservation Area. A new RMP is being prepared and is expected to be implemented in 2012. |
| BLM Glenwood Springs RMP (1984), as amended. This plan sets management, protection, and use goals and guidelines for the BLM Colorado River Valley Field Office, Colorado, and is being revised in a new RMP planning effort. Decision expected 2013. |
| BLM Grand Junction RMP (1987), as amended, and Oil and Gas Leasing Amendment (1991). These documents set management, protection, and use goals and guidelines for the BLM Grand Junction Field Office, Colorado, and are currently being revised in a new RMP planning effort. Decision expected 2014. |
| BLM Gunnison Gorge NCA and Wilderness RMP (2004). This RMP sets management, protection, and use goals and guidelines for the BLM Gunnison Gorge NCA and Wilderness, Colorado. |
| BLM Gunnison Field Office RMP (BLM 1993c), as amended. This RMP sets management, protection, and use goals and guidelines for the BLM Gunnison Field Office, Colorado. |
| BLM Moab Field Office RMP (BLM 2008f). This plan sets management, protection, and use goals and guidelines for the BLM Moab Field Office, Utah. |
| BLM Monticello Field Office RMP (BLM 2008x). This plan sets management, protection, and use goals and guidelines for the BLM Monticello Field Office, Utah. |
| BLM San Juan/San Miguel RMP (1985), as amended, and Oil and Gas Leasing Amendment (1991). These plans set management, protection, and use goals and guidelines for portions of the BLM's Uncompahgre and Tres Rios Field Office, Colorado. These plans are being revised in a new RMP planning efforts: the Uncompahgre and the San Juan Public Lands Center Land Management Plan (BLM and US Forest Service). Decisions are expected in 2014. |
| Amended Land and RMP for Grand Mesa, Uncompahgre, and Gunnison National Forests (1991). This plan sets management, protection, and use goals and guidelines for the Grand Mesa, Uncompahgre, and Gunnison National Forests. There was a Proposed Land Management Plan in July 2006, but to date, the plan has not been approved. |

**Table** Error! No text of specified style in document.**-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or**
**Actions that Make up the Cumulative Impact Scenario**

|  |  |
|---|---|
|  | Delta County Master Plan (Delta County 1996). Countywide land use and growth plan for Delta County. |
|  | Gunnison County Land Use Resolution (Gunnison County 2006). |
|  | Mesa County Master Plan (Mesa County 2000). Countywide land use and growth plan for Mesa County. |
|  | Montrose County Master Plan (Montrose County 2010). Countywide land use and growth plan for Montrose County; edited several times, including in 2006 and 2010. |
|  | Ouray County Master Plan (Ouray County 1999). Countywide land use and growth plan for Ouray County. |
|  | Ouray County Land Use Code (Ouray County 2005). Countywide land use code for Ouray County. |
|  | San Miguel County Comprehensive Plan: 2004-2014 (San Miguel County 2004). Countywide land use and growth plan for San Miguel County. |
| Roadway development | Road construction has occurred in association with timber harvesting, historic vegetation treatments, energy development, and mining on BLM lands, private lands, State of Colorado lands, and US Forest Service lands. The bulk of new road building is occurring for community expansion and energy development. Road construction is expected to continue at the current rate on BLM and US Forest Service lands; the future rate is unknown on private and State of Colorado lands. |
| Water diversions | The UFO has been and will continue to be affected by irrigation and drinking water diversions. Reservoir operations have affected water supply, aquatic conditions, and timing. Irrigation rights are expected to continue being bought and sold in the future, with some new property owners informally changing how the right was historically used. Due to population growth and land sales, more agricultural water rights may be converted to municipal and industrial uses. Future oil shale development in the region could also result in water diversions. |
| Water | The Natural Resources Conservation Service and US Bureau of Reclamation have been replacing irrigation ditch laterals with buried pipe to conserve water and reduce salinity and selenium within the Colorado River system. |
| *Natural Processes* | |
| Spread of noxious/invasive weeds | Noxious weeds, including tamarisk, have invaded and will continue to invade many locations in the planning area. Noxious weeds are carried by wind, humans, machinery, and animals. The BLM UFO currently manages weed infestations through integrated weed management, including biological, chemical, mechanical, manual, and educational methods. The 1991 and 2007 Records of Decision for Vegetation Treatment on BLM Lands in Thirteen Western States, and the 2007 Programmatic Environmental Report, guide the management of noxious weeds in western states. The BLM UFO finalized a |

**Formatted:** Not Highlight

**Formatted:** Left, Space Before: 0 pt, After: 0 pt, Widow/Orphan control, Allow hanging punctuation, Font Alignment: Auto

**Table** Error! No text of specified style in document.**-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or**
**Actions that Make up the Cumulative Impact Scenario**

| | |
|---|---|
| | noxious weed management strategy EA in 2010 (BLM 2010e) that updated the field office integrated weed management plan. Noxious and invasive weeds are expected to continue to spread on all lands. Due to their ability to tolerate certain conditions, some species are expected to remain a serious long-term challenge in the planning area. |
| | Mesa County Noxious Weed Management Plan (Mesa County 2001). |
| | Montrose County weed management Plan (Montrose County 2011) |
| | San Miguel County Weed Control Program (http://www.sanmiguelcounty.org/departments/weeds/) |
| | Town of Ridgway, Ridgway Comprehensive Plan; Integrated Weed Management and Native Plant Restoration (Town of Ridgway, 2011) |
| | Delta County Noxious Weed Management Plan (Delta County 2010) |
| | Noxious and Invasive Weed Management Plan for Oil and Gas Operators (US Forest Service and BLM 2007). |
| | Dolores River Riparian Action Plan: Recommendations for Implementing Tamarisk Control and Restoration Efforts (Tamarisk Coalition 2010). |
| Wildland fires | Fires within the planning area are both naturally occurring and used as a management tool. Naturally occurring fires have been widely distributed in terms of frequency and severity. Increasing recurrence and severity of drought conditions have been predicted for this area as a result of climate change. This could, in turn, increase the occurrence and severity of wildfires on BLM land. |
| Spread of forest insects and diseases | Several years of drought in western states have resulted in severe stress on pine trees. This stress has made the trees less able to fend off attacks by insects such as mountain pine beetles. Mountain pine beetle infestation has been occurring in Colorado since 1996, and some pinyon pine stands in the planning area have experienced ips beetle kill. Sudden Aspen Decline is also impacting parts of the planning area. |
| Drought | For much of the last decade, most of the western US has experienced drought. Inflows to Lake Powell (indicative of the Upper Colorado Basin) have been below average since 2000, and Colorado regularly goes through periods of drought that may be statewide, region-wide, or within a more localized area. Agriculture, drinking water supplies, and wildland fires are all impacted by drought. |
| Climate change | Increased concern over greenhouse gas emissions and global warming issues may lead to future federal and state regulations limiting the emission of |

Field Code Changed

Formatted: Not Highlight

Formatted: Not Highlight
Formatted: Not Highlight
Formatted: Not Highlight
Formatted: Not Highlight

**Table** Error! No text of specified style in document.**-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or**
**Actions that Make up the Cumulative Impact Scenario**

| |
|---|
| associated pollutants. Regulation could include setting significance thresholds for greenhouse gases like those proposed under the California Environmental Quality Act. |

New References:

Energy Fuels, 2012, *Piñon Ridge Mill: Schedule*. Available at http://www.pinonridgemill.com/ schedule.html. Accessed May 7, 2012.

Energy Fuels (Energy Fuels, Inc.), 2009a, *Piñon Ridge Project Environmental Report*, prepared by Edge Environmental, Inc., Nov.

Energy Fuels (Energy Fuels Resources Corporation), 2009b, *Mine Operations Plan: Piñon Ridge 16 Mill Facility Montrose County, Colorado*, Aug.

CDPHE, 2011, *Energy Fuels Piñon Ridge Uranium Mill License Decision*, Radiation Program, March 7.

CDNR, 2012, *Uranium Mining in Colorado 2012*, Division of Reclamation, Mining, and Safety, Jan. 13.

BLM, 2011, *Notice of Public Scoping for Potassium Prospecting and Exploration*, Dolores Field Office, June 27. Available at http://www.blm.gov/pgdata/etc/medialib/blm/co/ field_offices/san_juan_public_lands/pdf.Par.22579.File.dat/20110624_SIGNED_ SCOPING_LETTER_Potash.pdf.

USDOE, 2012, *Preliminary Draft Uranium Leasing Program Programmatic Environmental Impact Statement: DOE/EIS 0472-D*, Legacy Management Program, May.

Montrose County, 2011, *Weed Management Plan*, Weed mitigation Depertment, April 2011.

Town of Ridgway, 2011, *Ridgway Comprehensive Plan Integrated Weed Management and Native Plant Restoration*, May 2011.

Delta County 2010, *Noxious Weed Management Plan*, April 2010

**Formatted:** Font: Italic

**ufo- ar**

| | |
|---|---|
| **From:** | Angie Adams <angie.adams@empsi.com> |
| **Sent:** | Tuesday, July 10, 2012 9:46 AM |
| **To:** | UFO AR |
| **Subject:** | FW: Mesa top north of Coyote Wash in SW corner of UFO -- wilderness characteristics question |

**From:** Barbara Hawke [mailto:barbara_hawke@tws.org]
**Sent:** Friday, July 06, 2012 3:03 PM
**To:** Sharrow, Barbara L
**Cc:** Tucker, Karen; Franz, Edd; Clements, Amanda R; Krickbaum, John; Kauffman, Krag D; Angie Adams
**Subject:** RE: Mesa top north of Coyote Wash in SW corner of UFO -- wilderness characteristics question

Okay! That clears it up. Thanks so much.

**Barbara Hawke**
Dolores River Basin Wildlands Coordinator
**The Wilderness Society**| Montrose, Colorado
970.596.6697 (cell)
www.wilderness.org

Facebook: www.facebook.com/TheWildernessSociety
Twitter: twitter.com/Wilderness

 *We protect wilderness and inspire Americans to care for our wild places*

**From:** Sharrow, Barbara L [mailto:bsharrow@blm.gov]
**Sent:** Friday, July 06, 2012 3:01 PM
**To:** Barbara Hawke
**Cc:** Tucker, Karen; Franz, Edd; Clements, Amanda R; Krickbaum, John; Kauffman, Krag D; 'Angie Adams'
**Subject:** RE: Mesa top north of Coyote Wash in SW corner of UFO -- wilderness characteristics question

Hey Barbara,

Everything south of Wray Mesa rim is in Tres Rios Field Office.  We examined everything that was in the citizen's wilderness proposal area that was in our field office.

Barb

**From:** Barbara Hawke [mailto:barbara_hawke@tws.org]
**Sent:** Friday, July 06, 2012 1:18 PM
**To:** Sharrow, Barbara L
**Cc:** Tucker, Karen; Franz, Edd; Clements, Amanda R; Krickbaum, John; Kauffman, Krag D; 'Angie Adams'
**Subject:** RE: Mesa top north of Coyote Wash in SW corner of UFO -- wilderness characteristics question

1

Thanks for all this. It sounds like we may not be talking about the same area. Rather than Wray Mesa, I'm asking about the upper end of Coyote Wash, the area that lies westward between the Dolores River Canyons WSA and the state line. It is shown on the attached map as the area just west of the "C" in Coyote Wash, (the Citizen Wilderness Proposal area). Perhaps this is confusing because of where the UFO boundary lies in relation to the wash, and some of this area is in Tres Rios?

The area I'm referencing is a remote area without a lot of disturbance that I'm aware of. Can you clarify if the area I'm describing is what was looked at by staff?
Thanks so much.

**Barbara Hawke**
Dolores River Basin Wildlands Coordinator
**The Wilderness Society**| Montrose, Colorado
970.596.6697 (cell)
www.wilderness.org

Facebook: www.facebook.com/TheWildernessSociety
Twitter: twitter.com/Wilderness

 *We protect wilderness and inspire Americans to care for our wild places*

---

**From:** Sharrow, Barbara L [mailto:bsharrow@blm.gov]
**Sent:** Tuesday, July 03, 2012 2:36 PM
**To:** Barbara Hawke
**Cc:** Tucker, Karen; Franz, Edd; Clements, Amanda R; Krickbaum, John; Kauffman, Krag D; 'Angie Adams'
**Subject:** FW: Mesa top north of Coyote Wash in SW corner of UFO -- wilderness characteristics question

Barbara,

Edd Franz reviewed the area that you suggested for lands with wilderness characteristics. His response is under the Google earth map. The area in question is called Wray Mesa. There are many roads, landing strip, active oil and gas leases, past and potential uranium.

I also spoke with Amanda regarding the possibility of it being an ecological emphasis area. Her response was that this is an isolated mesa and doesn't meet the criteria we were using to identify ecological emphasis areas. Rather, the Carpenter Ridge area just north of Wray Mesa was considered due to its connectivity to the National Forest Service.

Thanks for contributing your time and thoughts to the UFO RMP. We appreciate your involvement.

Barb

---

**From:** Franz, Edd
**Sent:** Tuesday, July 03, 2012 11:28 AM
**To:** Sharrow, Barbara L
**Subject:** Mesa top north of Coyote Wash in SW corner of UFO -- wilderness characteristics question

BLM_0112455



Barb –

The screen capture above is from BLM's 2009 1-meter aerial imagery. The orange line is the FO boundary (UFO to the north). This is a representative sample of the mesa top in general. As you can see it has a fairly high density of unnatural appearing linear modifications of the landscape. I doubt if these are roads that meet the "Wilderness

3

Inventory Road" definition, but it looks like the area would clearly not meet the "natural appearing" criteria, and therefore does not possess wilderness characteristics.


Edd Franz
Outdoor Recreation Planner, Bureau of Land Management
Gunnison Gorge National Conservation Area
970-240-5337 (w)
970-596-5358 (c)
efranz@blm.gov

---
This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

---
This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com
---

BLM_0112457



Dolores River Proposed Wilderness Area
*Uncompahgre Field Office*
*July 1, 2006*

LEGEND:

- Dolores River CWP
- USFS Public Lands
- BLM Public Lands
- State Lands
- Private Lands
- BLM WSA
- Highway
- Road
- Way
- Trail
- Closed Route
- Intermittent Stream
- Perennial Stream/River

0                    2.5 Miles

*Prepared by Colorado Environmental Coalition*

BLM_0112458

| From: | Krickbaum, John |
| --- | --- |
| To: | Angie Adams; barbara_hawke@tws.org; billday@paonia.com; john@reams-construction.com; Kate Krebs; Kauffman, Krag D; Krickbaum, John; Magee, Deborah M; pmueller@tnc.org; robbie.levalley@colostate.edu; sbear@dmea.com; Sharrow, Barbara L; silvers1@tds.net; steve.weist@oxbow.com; tkctew@yahoo.com; UFO AR; wblack8709@msn.com |
| Subject: | Minutes: Uncompahgre RMP RAC Subgroup Meeting #10 |
| Date: | Wednesday, July 11, 2012 11:42:45 AM |
| Attachments: | UFO-SG  20120622  FinalNotes.pdf |

Hello RAC Subgroup,

I have attached the minutes from our RAC Subgroup meeting June 22.

--Bruce

Bruce Krickbaum
Planner, Environmental Coordinator
BLM, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

 

# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401

# RESOURCE ADVISORY COUNCIL SUBGROUP MEETING #10
## Friday, June 22, 2012 (9:00 AM – 12:00 PM)

### Meeting Location:
### Holiday Inn Express
### 1391 South Townsend Avenue, Montrose, CO

# MEETING NOTES

**Attendees:** Angie Adams (EMPSi), Robbie Baird-LeValley, Bill Day, William Ela, Barbara Hawke, Bruce Krickbaum (BLM Uncompahgre Field Office), John Reams, Barb Sharrow (BLM Uncompahgre Field Office), Steven Weist, Kathy Welt

 Public Attendees: Lori Molitar (representing The Conservation Center [NWCC]), Scott Streit (Congressman Scott Tipton's office)

**Handouts:** Agenda, Highlights of the Resource Management Planning Process to Date

---

1. **Welcome** (Angie Adams)

2. **Introductions** (All Present)

3. **Planning Process to Date** (Angie Adams)

- Handout: Highlights of the Resource Management Planning Process to Date
- The internal draft Oil and Gas Reasonable Foreseeable Development (RFD) Scenario was completed in February 2012. Have not released it to the public yet because the BLM Colorado State Office is still reviewing the internal draft report.
- The Wilderness characteristics report was completed in November 2011 and is on the RMP website.
- BLM is currently working with the BLM State Office and the US Environmental Protection Agency on the air quality report.

4. **Final Draft Chapter 2, Alternatives – Range of Alternatives**

- Angie Adams: The Proposed RMP and final RMP can select any combination of decisions from the various alternatives in the Draft RMP/EIS. The key is that a reasonable range of alternatives is considered in the Draft RMP/EIS so that there is flexibility in the Proposed and final RMPs. Right now it does not matter which alternative different draft actions fall; do not be too concerned about what is in the agency-preferred alternative.

---

BLM_0112460

- Robbie LeValley: Concerned about the labels for each alternative in Sections 2.3.2 and 2.3.3, and those labels project negative connotations and two ends of a spectrum. Alternative B: Could call it "Non-consumptive Resource Emphasis." **ACTION ITEM:** Need to work on the text in Sections 2.3.2 and 2.3.3 to explain that there will be commodity use in Alternative B, for example. In Section 2.3.2, first sentence, do not state "non-consumptive;" state "less consumptive." Overall Sections 2.3.2 and 2.3.3 need a lot of work.
- RAC Subgroup: **ACTION ITEM:** Delete the "Resource Conservation Emphasis" label for Alternative B and "Resource Use Emphasis" for Alternative C. Do not use short labels for Alternatives B or C.
- Barbara Hawke: The alternatives do appear very polarized. When all conservation measures are in one alternative and not the other, that is too exclusive. Even in the Development alternative, various environmental protections would or should be incorporated. Various topics are all contained in only one alternative. For example, Watchable Wildlife areas are only in the conservation alternative, and that is concerning as those areas and the Development alternative should not be mutually exclusive. As other examples, all the SRMAs are in the Conservation alternative, and all the ERMAs are in the Development alternative. Robbie LeValley: See page 2-19, Climate Change (row 13): Alternative C includes no similar action, and when that is under the resource use alternative, it could be perceived negatively.
- Kathy Welt: **ACTION ITEM:** Consider labeling preferred alternative as "draft preferred" or "preliminary preferred" or something to indicate that BLM can choose from any of the Draft RMP alternatives when crafting the Proposed RMP using components (objectives and actions) Alternative A, B, and/or C. Also describe this in the introductory text in Chapter 2. Explain better that Alternative A is part of the range of alternatives and that parts of Alternative A could be selected in Draft RMP and Proposed RMP.
- Bruce Krickbaum: Each column or alternative could be an RMP.
- *Wildlife – Terrestrial*
  a. Ecological Emphasis Areas (row 99): Good concept. But overall they are not very detailed by alternative. Need to consider adding more areas:
     - A riparian Ecological Emphasis Area around Dolores River canyons or tributaries.
     - Gunnison sage-grouse: need to address subpopulations and connectivity via an Ecological Emphasis Area.
     - **ACTION ITEM:** Barbara Hawke will provide BLM maps of potential additional Ecological Emphasis Areas within the next week so that BLM can address this comment.
- Steve Weist: Can we get GIS of some areas so we can compare them to our other project areas? Bruce Krickbaum: Yes. Request specifically what you want in the next few weeks, and we will provide it.
- Steve Weist: Concerned about the definition of "climate change" in the glossary. **ACTION ITEM:** Delete "(e.g., through burning fossil fuels)" in the last bullet of the definition.
- *Fluid Minerals – Oil and Gas*
  a. Barbara Hawke: The range of alternatives has a gap. Some areas, such as *all* ACECs, SRMAs, or Ecological Emphasis Areas, should be considered for No Leasing in one of the alternatives. Other RMPs do this.
  b. Row 459: Alterative B proposes about 20% of the UFO for No Leasing. It includes several different areas as outlined in the bullets within this cell. Includes three ACECs. Most or all of the rest of the ACECs would be NSO under Alternative B.
  c. Barb Sharrow: If there is a specific ACEC or SRMA that should be No Leasing, then provide that specific information to BLM, as well as supporting rationale for why NSO is not sufficient for those areas. Barbara Hawke: Main concern with NSO is that it can be excepted or modified, whereas No Leasing cannot. **ACTION ITEM:** Barbara Hawke

BLM_0112461

will provide justification/rationale for which specific areas should be No Leasing under an alternative.

- Robbie LeValley: About 75% of the time, Alternative D is the same as Alternative B (in first third of the alternatives matrix). That is concerning that they are very similar. Barbara Hawke: My perception is the opposite, that with SMRAs and ACECs, the emphasis in Alternative D is from Alternative C, not Alternative B. Barb Sharrow: Need specific comments on row numbers where the range is not reasonable. Robbie LeValley, Row 26: Alternatives D and B are essentially the same thing. Alternative C's no similar action does not make sense if you have a nonfunctioning dam. **ACTION ITEM:** Alternative C does not seem to follow a consistent pattern throughout the alternative if we are looking at resource use; need to take a hard look at Alternative C and ensure it is consistent throughout the entire alternative. Need to change the alternative labels because Alternative C label implies that use is negative.
- **ACTION ITEM:** "No similar action" needs to be defined. It does not mean that actions are prohibited, rather that they are not a requirement. Also consider changing "no similar action" to something else that does not imply that that action would be prohibited under that particular alternative stating "no similar action."
- Robbie LeValley, Row 56: Good range of alternatives.
- Robbie LeValley, Row 72: No similar action in Alternative C implies riparian areas would not be protected.
- John Reams: Where it says "no similar action," consider adding explanations to some of these where it is covered under another program or action. Some instances do this, but need to do it more globally. For example, row 73 Alternatives B, C, and D could just state "Travel management limits…" rather than stating "No similar action; travel management limits…"
- Robbie LeValley, Row 153: This needs to be clarified so reader can see difference between alternatives. **ACTION ITEM:** Instead of "no similar allowable use" for stipulations, say "No stipulation under current RMPs" (for Alternative A) or "No stipulation under this alternative." Also check Glossary for any necessary definition changes.
- *Travel Management*
  a. Barbara Hawke, Row 398: More areas need to be managed for non-motorized recreation uses to have a reasonable range of alternatives. In Alternative B, only 14% of areas are closed to motorized use. Seems like that should be higher in this alternative. There is a very large and increasing demand for quiet or nonmotorized recreation for mountain bikes, horseback riding, hiking, etc., as shown by the high interest in the Ridgway Trails and Norwood Trails projects. The RMP should provide for this recreational demand. Barb Sharrow: This RMP does not specify quiet use because the RMP is bigger picture than that. Barbara Hawke: Perhaps the ERMAs could indicate that a proportion would be available for quiet or motorized recreation, etc. Barb Sharrow: This will depend in part on local communities' desires and will be done in future implementation-level travel management planning.
  b. Barbara Hawke: Could we state that in Alternative B, during travel management planning, BLM would consider local community input and place a higher emphasis on quiet use. Barb Sharrow: That is very vague and cannot be analyzed in impact analysis.
- Barbara Hawke: **ACTION ITEM:** Consider using some of the Colorado River Valley Draft RMP definitions of alternatives; see Section 2.2.
- Robbie LeValley, Row 280: **ACTION ITEM:** Consider adding a bullet in Alternatives B, C, and D that requires determining if it is livestock that is causing the issue.
- Robbie LeValley, Rows 288, 291: **ACTION ITEM:** Clarify that "no similar action" means that the action would not be prohibited; need general clarification of that definition.
- *Visual Resource Management*
  a. Barbara Hawke, Row 231: For a full range of alternatives, more areas need to be considered for VRM Class II, such as Scenic Byway corridors. Bruce Krickbaum:

BLM_0112462

Alternative B does include all National and BLM Byways. Barbara Hawke: Highway 141 (scenic byway) is not shown on the map as VRM II; neither is west of adobe badlands on Highway 50; these areas should be considered for VRM Class II. **ACTION ITEM:** Consider these areas for VRM II in an alternative.

- *Overall is the range of alternatives reasonable and adequate?*
  a. Steve Weist: If BLM modifies some of the definitions and address today's action items, then I am satisfied with range of alternatives.
  b. Robbie LeValley: Address labeling (or not) the alternatives. Also look hard at Alternative C and ensure that it is consistent throughout the alternative.
  c. Bill Ela: RMPs are generally flexible and provide discretion to the BLM. The range of alternatives is broad and fine.
  d. Barbara Hawke: Two areas where one end of the range of alternatives is not reasonably full are: 1) No Leasing areas; and 2) Nonmotorized areas. Need to address this.
  e. John Reams: I feel good about the range of alternatives. Do not want the entire process to be too influenced by the vocal North Fork citizens.
  f. Bill Day: Range of alternatives is adequate and enough.
  g. Kathy Welt: With better definitions as discussed today, and with the addition of text describing the purpose of NEPA and the purpose of the RMP, the range of alternatives is adequate.

## 5. Public Comments (11:00am)

- Lori Molitar (representing The Conservation Center [NWCC])
  a. Are there any places in the RMP that will specify areas closed to leasing? Angie Adams/Bruce Krickbaum: Yes. They vary by alternative. These are based on different criteria (row 459). Lori Molitar: Want to ensure there are No Leasing areas in the North Fork.
  b. Want the RMP to address protecting water supplies with No Leasing restrictions so that agricultural irrigation water is not being used for drilling operations. The setbacks for public water supplies that are included in the internal draft RMP alternatives are good. Concerned about contamination of supplies via diesel fuel, etc.

## 6. Next Steps

- Refer to the opposite side of the agenda for the general schedule:

  **General Uncompahgre RMP Schedule** (as of June 4, 2012)

  | | |
  |---|---|
  | BLM State Office Review of Preliminary Draft RMP | November 2012 |
  | BLM Washington Office Review of Preliminary Draft RMP | January 2013 |
  | Public Review of Draft RMP/Draft EIS (90-day comment period) | spring 2013 |
  | Public Review of Proposed RMP/Final EIS (30-day protest period) | Winter/Spring 2014 |
  | Sign Record of Decision | Summer 2014 |

## 7. Other Items Not on the Agenda

- Bruce Krickbaum: The Oil and Gas Reasonable Foreseeable Development Scenario report (internal) discusses potential development of oil and gas resource development in the Field Office; it does not address impacts. An Environmental Assessment addresses impacts on resources and a Finding of No Significant Impacts (FONSI) addresses the significance determination.
- Bruce Krickbaum: The lease sale originally scheduled for August 2012 is deferred; some parcels may be deferred for a lease sale sometime relatively soon and others may be deferred until after the RMP. The majority of the lease sale parcels were on BLM surface lands. Barb Sharrow: BLM

BLM_0112463

received thousands of public comments on the preliminary Environmental Assessment. BLM is still analyzing those comments and, when finished, will most likely be posting some or parts of parcels for future lease sale in the next year or so. There will be a 30-day protest period, and the sale will occur 90 days later. It is being deferred until BLM has time to do a complete analysis. It was deferred/delayed because BLM did not have adequate time to analyze the comments and information provided. Other portions of parcels could be deferred until after the RMP is completed.

- Projects to Consider in the Cumulative Effects Analysis
  - **ACTION ITEM:** Solar project in Paradox Valley. This may need to be included in the cumulative projects list.
  - **ACTION ITEM:** **BLM (Bruce): email the draft cumulative impacts projects list to the RAC Subgroup members for their review. RAC Subgroup members: email any additional projects to Bruce by Friday, June 29, 2012.

## 8. Action Items / Next Meeting

**ACTION ITEMS:**

1. BLM (Bruce) and EMPSi (Angie will do first draft edits and send to Bruce): Need to work on the text in Sections 2.3.2 and 2.3.3 to explain that there will be commodity use in Alternative B, for example. In Section 2.3.2, first sentence, do not state "non-consumptive;" state "less consumptive." Overall Sections 2.3.2 and 2.3.3 need a lot of work.
2. BLM (Bruce) and EMPSi (Angie will do first draft edits and send to Bruce): Consider using some of the Colorado River Valley Draft RMP definitions of alternatives; see Section 2.2.
3. EMPSi (Angie will do first draft edits and send to Bruce): Delete the "Resource Conservation Emphasis" label for Alternative B and "Resource Use Emphasis" for Alternative C. Do not use short labels for Alternatives B or C.
4. BLM (Bruce) and EMPSi (Angie will better describe how PRMP is developed; do not rename preferred alternative in DRMP/DEIS): Consider labeling preferred alternative as "draft preferred" or "preliminary preferred" or something to indicate that BLM can choose from any of the Draft RMP alternatives when crafting the Proposed RMP using components (objectives and actions) Alternative A, B, and/or C. Also describe this in the introductory text in Chapter 2. Explain better that Alternative A is part of the range of alternatives and that parts of Alternative A could be selected in Draft RMP and Proposed RMP.
5. Barbara Hawke: Provide BLM maps of potential additional Ecological Emphasis Areas within the next week so that BLM can address this comment.
6. EMPSi (Kate): In "climate change" in the glossary, replace "(e.g., through burning fossil fuels)" with "(e.g., driving automobiles)" in the last bullet of the definition.
7. Barbara Hawke: Provide justification/rationale for which specific areas should be No Leasing under an alternative.
8. BLM (Bruce): Alternative C does not seem to follow a consistent pattern throughout the alternative if we are looking at resource use; need to take a hard look at Alternative C and ensure it is consistent throughout the entire alternative.
9. BLM (Bruce) (in MSWord working version of Chapter 2 in reviewing/track changes mode): "No similar action" needs to be defined. It does not mean that actions are prohibited, rather that they are not a requirement. Also consider changing "no similar action" to something else that does not imply that that action would be prohibited under that particular alternative stating "no similar action."
10. BLM (Bruce) (in MSWord working version of Chapter 2 in reviewing/track changes mode): Instead of "no similar allowable use" for stipulations, say "No

BLM_0112464

stipulation under current RMPs" (for Alternative A) or "No stipulation under this alternative." Also check Glossary for any necessary definition changes.

11.  BLM (Bruce) and EMPSi (Kate): Row 280, Consider adding a bullet in Alternatives B, C, and D that requires determining if it is livestock that is causing the issue.

12.  BLM (Bruce) and EMPSi (Kate): Rows 288 and 291, Clarify that "no similar action" means that the action would not be prohibited; need general clarification of that definition.

13.  BLM (Bruce): Consider Highway 141 (scenic byway) and west of adobe badlands on Highway 50 for VRM II in an alternative.

14.  BLM (Bruce): Solar project in Paradox Valley. This may need to be included in the cumulative projects list.

15.  BLM (Bruce): email the draft cumulative impacts projects list to the RAC Subgroup members for their review. RAC Subgroup members: email any additional projects to Bruce by Friday, June 29, 2012.

## NEXT MEETING:

- The purpose of the RAC Subgroup was initially to approve the range of alternatives. The three RAC members here today should discuss this up at the October 2012 RAC meeting to determine if this group will continue or not.

BLM_0112465

| | |
|---|---|
| **From:** | Krickbaum, John |
| **To:** | Angie Adams; Broyles, Levi; daves@sanmiguelcounty.org; davidvarley@kaycee.net; jcoates@town.ridgway.co.us; joanm@sanmiguelcounty.org; joereagan741@yahoo.com; Jon Waschbusch ; Kate Krebs; Kauffman, Krag D; kjensen@ci.montrose.co.us; Krickbaum, John; lpadgett@ouraycountyco.gov; lynn@mtngeogeek.com; mpelletier@gunnisoncounty.org; norwoodparker@centurytel.net; pat@cedaredgecolorado.com; Randall-Parker, Tamera K; renzo.delpiccolo@state.co.us; Schroeder, Alan M; segfahlt@gmail.com; shansen@deltacounty.com; sharold@ci.olathe.co.us; Sharp, Charles; Sharrow, Barbara L; townofpaonia@tds.net; UFO AR |
| **Subject:** | Draft Notes: Uncompahgre RMP Cooperating Agency Meeting #10 |
| **Date:** | Wednesday, July 11, 2012 11:40:44 AM |
| **Attachments:** | UFO-CA_20120621_FinalNotes.pdf |

Hello Cooperating Agencies,

I have attached the final meeting notes from our Cooperating Agency meeting held June 21.

--Bruce

Bruce Krickbaum
Planner, Environmental Coordinator
BLM, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
970.240.5384

BLM_0112466



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO 81401



# COOPERATING AGENCY MEETING #10

## Thursday, June 21, 2012 (1:00 – 4:00 PM)

### Meeting Location:
### Holiday Inn Express
### 1391 South Townsend Avenue, Montrose, CO

# MEETING NOTES

**Attendees:** Angie Adams (EMPSi), Renzo DelPiccolo (Colorado Department of Natural Resources, Southwest Region), Brad Banulis (Colorado Department of Natural Resources, Southwest Region), Susan Hansen (Delta County BOCC), Bruce Krickbaum (BLM Uncompahgre Field Office), Mike Pelletier (Gunnison County), Barbara Peterson (Town of Paonia), Alan Schroeder (Bureau of Reclamation, Western Colorado Area Office), Barb Sharrow (BLM Uncompahgre Field Office), Jon Waschbusch (Montrose County BOCC)

**Handouts:** Agenda, Highlights of the Resource Management Planning Process to Date

---

1. **Welcome** (Angie Adams)

2. **Introductions** (All Present)

3. **Planning Process to Date** (Angie Adams)

   - Handout: Highlights of the Resource Management Planning Process to Date
   - The internal draft Oil and Gas Reasonable Foreseeable Development (RFD) Scenario was completed in February 2012. Have not released it to the public yet because the BLM Colorado State Office is still reviewing the internal draft report. The State Office is ensuring that different and new drilling technologies are considered in the report.
   - The Wilderness characteristics report was completed in November 2011 and is on the RMP website.
   - BLM is currently working with the BLM State Office and the US Environmental Protection Agency on the air quality report.

4. **Final Draft Chapter 2, Alternatives – Range of Alternatives**

   - Barb Sharrow: The alternatives are not as specific as some past RMPs; it is more general and makes broader land use plan decisions.

---

BLM_0112467

- Bruce Krickbaum: The final RMP can select a suite of decisions that are in the Draft RMP/EIS. The key is that a reasonable range of alternatives is considered in the Draft RMP/EIS so that there is flexibility in the final RMP. Right now it does not matter which alternative different draft actions fall; do not be too concerned about what is in the agency-preferred alternative.
- *Lands and Realty*
  a. Lands available for disposal: They vary by alternative because of the different criteria that were considered by alternative to determine which parcels would be considered for disposal.
    - Mike Pelletier: Are the lands being considered for disposal mapped? Barb Sharrow: Yes. See draft Figures 2-27, 2-28, and 2-29.
  b. There are also actions regarding land retention.
  c. Retention and Acquisition actions: Will add crucial winter range to the criteria list for Alternatives C and D.
- *Special Status Species – Terrestrial*
  a. Gunnison sage-grouse
    - In Alternative D, there is an NSO within 0.6-mile of a sage-grouse lek (row 156). There also is a CSU/SSR for sage-grouse leks that would apply to any surface-disturbing activity. There also is a TL for sage-grouse winter habitat; that is the only stipulation that applies to habitat (not specific to leks). There is another TL (row 157) that applies to within 4 miles of active sage-grouse leks or mapped nesting habitat.
    - Are the leks mapped as polygons or points? The CPW maps them as polygons.
    - Jon Waschbusch: Row 155, Alternative C: Montrose County submitted this comment in writing, "Include an action in this section which would not regulate surface activities based on Gunnison Sage Grouse habitat. Restricting surface activities and resource development is not appropriate for a species which is not listed as threatened or endangered. As a general comment, Alternative C should not include restrictions related to the Gunnison Sage Grouse for this reason." Bruce Krickbaum: Alternative C states "no similar allowable use," which means it would not have this TL, so that provides a range of alternatives.
  b. Raptors
    - Jon Waschbusch: Row 162 – raptor nest sites. Are we considering all raptors with some kind of buffer? Bruce Krickbaum: Yes. Look at row 162 for Alternative D, and the different bullets detail the different buffers. The last bullet encompasses all raptors except Mexican spotted owl, which is covered under a different row. **ACTION ITEM:** BLM needs to re-look at Alternative C to ensure the last bullet is accurate; shouldn't Alternative C be looking at special status raptors, not "non-special status raptors" as it states?
  c. Renzo DelPiccolo: It is concerning when the range of alternatives changes the dates of stipulations because that does not seem to be document or justified anywhere. The dates should be consistent across alternatives and also consistent with the BLM statewide stipulations. Barb Sharrow: The timing on some stipulations is variable because there are so many elevation differences in the UFO.
    - Row 172 – Kit fox: There is a variation in the timing between alternatives.
    - Brad Banulis: When looking at variation of dates across alternatives, BLM needs to consider that the dates from CPW were vetted through science and research and should be accurate. Alan Schroeder: What about location-specific changes across the state; would that justify a change in timing? Alternatives could state that time frames could be modified based on severity of winter, for example. The Gunnison Gorge RMP included something like this. **ACTION ITEM:** Barb Sharrow will check with BLM Colorado State Office on status of BLM Colorado statewide stipulations.

BLM_0112468

- Renzo DelPiccolo: Not comfortable with varying dates across alternatives; it seems arbitrary because those dates are not based on science. Would prefer that the alternatives instead show a range by some other way than varying dates within TLs. For example, one alternative would have No Leasing or NSO, another would have CSU, and another would have TL with set dates. Barb Sharrow: We are not confident that all the dates in the draft statewide stipulations will not change, and so if we do not cover various time frames in the range of alternatives, then we are concerned that we will have to re-analyze time frames in a supplemental DEIS. **ACTION ITEM:** BLM needs to consider how the alternatives can show a range by some other way than varying dates within TLs. For example, one alternative would have No Leasing or NSO, another would have CSU, and another would have TL with set dates.

d. Barbara Peterson – Row 402: **ACTION ITEM:** BLM needs to consider modifying the last paragraph ("The Field Manager may modify…") in Alternatives B and D to account for early winter.

e. Brad Banulis: **ACTION ITEM:** In Common to All Alternatives, add a bullet based on the last paragraph of row 402 ("The Field Manager may modify…"), in consultation with CPW, so there is flexibility in time frames.

f. Susan Hansen – Row 451, acres unacceptable for further consideration of coal resource development: Alternative A includes 580 acres, and the other alternatives include significantly more acres. Why? Bruce Krickbaum: This is because different alternatives consider different screening criteria when calculating acres unacceptable. **ACTION ITEM:** BLM: Consider clarifying in row 451 that Alternative A is only split-estate lands, and Alternatives B, C, and D are also BLM surface lands.

g. Susan Hansen: Has the stipulation on Oil and gas leasing within coal areas been beefed up from the current lease notices? Bruce Krickbaum: Yes; see row 455, for example. **ACTION ITEM:** BLM: Consider changing text in Alternatives B, C, and D to a CSU.

h. Mike Pelletier: What is going on with oil and gas lease sale in the North Fork?
   - Barb Sharrow: BLM received thousands of public comments on the preliminary EA. BLM is still analyzing those comments and, when finished, will most likely be posting some or parts of parcels for future lease sale in the next year or so. There will be a 30-day protest period, and the sale will occur 90 days later. It is being deferred until BLM has time to do a complete analysis. It was deferred/delayed because BLM did not have adequate time to analyze the comments and information provided. Other portions of parcels could be deferred until after the RMP is completed.
   - Mike Pelletier: Should there be a restriction on size of lease sale in the future? Barb Sharrow: This sale is actually relatively small.

i. Renzo DelPiccolo – Row 99: "Ecological Emphasis Areas" have been changed to "Biological Core Areas." **ACTION ITEM:** Need to change "Biological Core Areas" to "Ecological Emphasis Areas" in the Glossary; also change the definition using the definitions in draft Appendix G (Ecological Emphasis Areas). Also consider a change to row 99 if warranted to reflect the accurate definition to protect a corridor and not entire habitats. These areas function as corridors only if they are provided a lot of protections; need to consider this in the definition.
   - Barb Sharrow: Riparian areas are well protected, just not under the Wildlife section. Riparian area protection also will protect fish species.
   - Brad Banulis: Need to emphasize sagebrush communities. Barb Sharrow: Threatened, Endangered, and BLM Sensitive species are all priority species with protections.
   - Renzo DelPiccolo: Ecological Emphasis Areas are not necessarily the best way to protect wildlife. Barb Sharrow: There are other protections for Lands with Wilderness Characteristics outside WSAs, WSAs, and ACECs, for example that

BLM_0112469

would protect habitat types over those large ACEC areas. Brad Banulis: Through the RMP process, though, an ACEC could fall out, and there would be no protection of those habitats, so need to consider duplicate protections in different sections of the alternatives.

- Brad Banulis / Barb Sharrow: The impacts analysis needs to consider how different protections (regardless of source, such as an NSO for an SRMA, for example) overlap habitat and indirectly protect wildlife, for example.
- Brad Banulis: **ACTION ITEM:** Want the alternatives to include something specific to protect big game habitat outside of Ecological Emphasis Areas; BLM needs to consider this.
- Jon Waschbusch – Row 128: **ACTION ITEM:** Consider in Alternative C deleting sagebrush from the list of key/priority habitats.
- Barb Sharrow: **ACTION ITEM:** BLM will consider CPW's comment on noise and surface facilities in Gunnison sage-grouse habitat, keeping in mind that there already is an NSO within 0.6-mile of a lek.

j. Brad Banulis: Desert bighorn sheep
- Brad Banulis: Are desert bighorn sheep considered in the Special Status Species section? Bruce Krickbaum: They are included in "BLM sensitive species" (row 128). There are other actions for desert bighorn sheep in rows 111, 112, 113, 115. Also see the subsection for desert bighorn sheep in the Special Status Species section.
- Barb Sharrow: The suitability model (row 295) is drafted but could change when the Draft RMP is published.
- The appendix (J) for the suitability assessment is missing the maps. **ACTION ITEM:** BLM will determine whether to add maps to the appendix or change the text in the appendix to remove reference to the maps.

- *Soils and Water*
  a. Mike Pelletier – Row 5 of the "Comments on Internal Draft Chapter 2 for Field Office, Cooperating Agency, and RAC Subgroup Review (June 23, 2011)"
  - Row 37 of the draft alternatives: **ACTION ITEM:** Add definition of "bank full stage" to Glossary; also send to Mike.
  - Bruce Krickbaum: The NSO buffer was the same as the COGCC's rules of 300 feet, but BLM increased it to 325 feet to match the BLM COSO suggestion.
  - Barbara Peterson: **ACTION ITEM:** Clarify that 100-year floodplain is using FEMA mapping (global). Add definition of "100-year floodplain" to Glossary.

## 5. Projects to Consider in the Cumulative Effects Analysis

- What about increased probability for wildfire? **ACTION ITEM:** BLM needs to include this somehow (in trend data? In cumulative impacts analysis?)
- Montrose County's water claim on the San Miguel River and potential future intent to convert that into a water reservoir site just offsite of the San Miguel River. This project is speculative and not reasonably foreseeable so will not be included in the cumulative impacts projects list.
- Paving the road across the Uncompahgre Plateau: Is in the County Master Plan. A contractor is being selected now to prepare an EA for the project. **ACTION ITEM:** This may need to be included in the cumulative projects list.
- **ACTION ITEM:** Crested Butte to Carbondale non-motorized trail. This may need to be included in the cumulative projects list. Joint effort between West Elk Byway and US Forest Service.
- **ACTION ITEM:** Bear Range Town east of Paonia Reservoir. This may need to be included in the cumulative projects list.

BLM_0112470

- US Bureau of Reclamation: desalinization ponds in Paradox Valley. There is an EIS that found the ponds infeasible, but a pilot test is being started on a small pond to determine feasibility. **ACTION ITEM:** This may need to be included in the cumulative projects list; Alan Schroeder will look into whether or not this is reasonably foreseeable and will tell Bruce.
- **ACTION ITEM:** Replacing ditches with pipes via Natural Resources Conservation Service and US Bureau of Reclamation; this needs to be included in general terms in the cumulative projects list.
- **ACTION ITEM:** South Canal Hydro Project; these needs to be included in the cumulative projects list.
- **ACTION ITEM:** Paonia water treatment facility project; these needs to be included in the cumulative projects list. Barbara Peterson will provide project description to Bruce.
- **ACTION ITEM:** Bruce will email the draft cumulative impacts projects list to the Cooperating Agencies for their review. Cooperating Agencies will email any additional projects to Bruce by Friday, June 29, 2012.

## 6. Next Steps

- Refer to the opposite side of the agenda for the general schedule:

    ***General Uncompahgre RMP Schedule*** *(as of June 4, 2012)*

| | |
|---|---|
| *BLM State Office Review of Preliminary Draft RMP* | *November 2012* |
| *BLM Washington Office Review of Preliminary Draft RMP* | *January 2013* |
| *Public Review of Draft RMP/Draft EIS (90-day comment period)* | *spring 2013* |
| *Public Review of Proposed RMP/Final EIS (30-day protest period)* | *Winter/Spring 2014* |
| *Sign Record of Decision* | *Summer 2014* |

## 7. Other Items Not on the Agenda

- Brad Banulis: Will CPW get responses to our December 2011 comments from the BLM? Barb Sharrow: There is not time to write responses to every comment received from Cooperating Agencies and RAC Subgroup members.

## 8. Action Items / Next Meeting

**ACTION ITEMS:**

1. BLM (Bruce): Montrose County's written comments – BLM can strike these: row 140, Alternative C, and row 155, Alternative C.
2. BLM (Bruce): Row 162 – Need to re-look at Alternative C to ensure the last bullet is accurate; shouldn't Alternative C be looking at special status raptors, not "non-special status raptors" as it states?
3. BLM (Barb): check with BLM Colorado State Office on status of BLM Colorado statewide stipulations.
4. EMPSi (Angie): Look at how other RMPs vary stipulations across the range of alternatives. Do they vary dates (timing) within TLs, or do they vary type of stipulations (TL vs. NSO vs. CSU). BLM (Bruce): consider how the alternatives can show a range by some other way than varying dates within TLs. For example, one alternative would have No Leasing or NSO, another would have CSU, and another would have TL with set dates.
5. BLM (Bruce): Row 402: consider modifying the last paragraph ("The Field Manager may modify…") in Alternatives B and D to account for early winter.

BLM_0112471

6.  BLM (Bruce): In Common to All Alternatives, add a bullet based on the last paragraph of row 402 ("The Field Manager may modify…"), in consultation with CPW, so there is flexibility in time frames.

7.  EMPSi (Kate, in coordination with BLM/Bruce): Consider clarifying in row 451 that Alternative A is only split-estate lands, and Alternatives B, C, and D are also BLM surface lands.

8.  BLM (Bruce): Row 455: Consider changing text in Alternatives B, C, and D to a CSU.

9.  BLM (Kate): Row 99: change "Biological Core Areas" to "Ecological Emphasis Areas" in the Glossary; also change the definition using the definitions in draft Appendix G (Ecological Emphasis Areas). Also consider a change to row 99 if warranted to reflect the accurate definition to protect a corridor and not entire habitats.

10. BLM (Bruce): consider including in the alternatives something specific to protect big game habitat outside of Ecological Emphasis Areas.

11. BLM (Bruce): Row 128: Consider in Alternative C deleting sagebrush from the list of key/priority habitats.

12. BLM (Bruce): consider CPW's comment on noise and surface facilities in Gunnison sage-grouse habitat, keeping in mind that there already is an NSO within 0.6-mile of a lek.

13. BLM (Bruce): determine whether to add maps to Appendix J or change the text in the appendix to remove reference to the maps.

14. EMPSi (Kate): Add definition of "bank full stage" to Glossary. BLM (Bruce): Email definition to Mike Pelletier.

15. EMPSi (Kate): Clarify that 100-year floodplain is using FEMA mapping (global). Add definition of "100-year floodplain" to Glossary.

16. BLM (Bruce) – Update Cumulative Impacts Projects List

    a.  BLM (Bruce): email the draft cumulative impacts projects list to the Cooperating Agencies for their review. Cooperating Agencies: email any additional projects to Bruce by Friday, June 29, 2012.

    b.  Include increased probability for wildfire somehow in the Draft RMP/EIS (in trend data? In cumulative impacts analysis?).

    c.  Paving the road across the Uncompahgre Plateau: This may need to be included in the cumulative projects list.

    d.  Crested Butte to Carbondale non-motorized trail. This may need to be included in the cumulative projects list.

    e.  Bear Range Town east of Paonia Reservoir. This may need to be included in the cumulative projects list.

    f.  US Bureau of Reclamation desalinization ponds in Paradox Valley. This may need to be included in the cumulative projects list. Alan Schroeder: look into whether or not this is reasonably foreseeable and will tell Bruce.

    g.  Replacing ditches with pipes via Natural Resources Conservation Service and US Bureau of Reclamation; this needs to be included in general terms in the cumulative projects list.

    h.  South Canal Hydro Project; these needs to be included in the cumulative projects list.

    i.  Paonia water treatment facility project; these needs to be included in the cumulative projects list. Barbara Peterson: provide project description to Bruce.

BLM_0112472

17. BLM/EMPSi (Kate): Make all future changes to Chapter 2, Alternatives, in reviewing/track changes mode so that Cooperating Agencies (and RAC Subgroup) can see what changes from this internal draft version of Chapter 2.

## NEXT MEETING:

- The current schedule shows the next meeting at the internal draft Proposed RMP/Final EIS stage before it is published. That will be in about fall 2013.
- Cooperating Agencies would like to have a meeting prior to when the Proposed RMP is developed to help craft the Proposed RMP. Perhaps that meeting would occur during the public comment period on the public Draft RMP/EIS.
- BLM/EMPSi: Make all future changes to Chapter 2, Alternatives, in reviewing/track changes mode so that Cooperating Agencies (and RAC Subgroup) can see what changes from this internal draft version of Chapter 2.



## United States Department of the Interior
### Bureau of Land Management



| Northwest Colorado District | Southwest Colorado District |
|---|---|
| 2815 H Road | 2465 South Townsend Ave |
| Grand Junction, Colorado 81506 | Montrose, Colorado 81401 |

4000/6840 (LLCON0000/LLCOS00000)
PBA/ Grazing

Patty Gelatt
US Fish and Wildlife Service                                    SEP 2 1 2012
765 Horizon Drive, Bldg. B
Grand Junction, CO 81506

Dear Patty,

This letter transmits the Bureau of Land Management's (BLM's) amendment to the May 16,
2012 Programmatic Biological Assessment, Effects to Listed Plant Species from the Bureau of
Land Management Livestock Grazing Program.

On the conference call on August 8, 2012, between BLM and U.S. Fish and Wildlife Service
(Service) on this subject, both parties agreed upon a course of action which included BLM
revising its conservation measures to better reflect the Service's concerns. The Service also
requested a 30 day extension to the consultation period.

In an email response to you on August 22, 2102, by Wayne Werkmeister, BLM Grand Junction
(after discussion between the three field offices), we provided our draft clarified conservation
measures, addressing points you raised at the August 8 meeting. We also agreed to extend the
consultation period.

The BLM has the regulatory authority to manage livestock grazing. The management proposed
in the Biological Assessment (BA) as amended will adequately allow us to accomplish that. This
includes revising livestock grazing activities to be in conformance with the conservation
measures.

 The conservation measures include a provision for BLM  providing maps to permittees. While
we agree this would be beneficial to grazing management, we have concerns about maps
showing general plant locations being available. Our experience has been that maps available to
the public often lead to collection loss. We will comply with this measure providing FWS
requests this occur.

Your September 5, 2012 email included suggested additions to the conservation measures,
including a deadline for agreement to a plant conservation strategy, developing impact
thresholds, and developing studies that quantify the impacts of grazing. BLM and the Service
cannot at this time quantifiably ascertain what the impacts from grazing are on these plants
relative to other environmental stressors. Given the lack of quantitative data at this time, legally

BLM_0112475

defensible "triggers" cannot be established in order to implement a grazing decision. We believe our BA includes the best available information, as required by the Section 7 Consultation handbook, and do not believe that committing to future studies will help the Service reach its Biological Opinion within the consultation period.

Therefore, please consider the attached conservation measures as our amendment to the BA. We look forward to receiving your Biological Opinion by the end of the extended regulatory timeframe (October 28, 2012).

Sincerely,

Lori Armstrong
Southwest District Manager

Jim Cagney
Northwest District Manager

Attachment

BLM_0112477

... 



# United States Department of the Interior
## Bureau of Land Management



**Northwest Colorado District**
2815 H Road
**Grand Junction, Colorado 81506**

**Southwest Colorado District**
2465 South Townsend Ave
**Montrose, Colorado 81401**

**September 18, 2012**

### Amendment to Programmatic Biological Assessment Effects to Listed Plant Species from the Bureau of Land Management Livestock Grazing Program

The Conservation measures contained in the May 16, 2012 Biological Assessment are hereby amended as follows:

## Conservation Measures

The terms and conditions of grazing permits that include habitat occupied by Colorado hookless cactus, clay-loving wild buckwheat, or Debeque phacelia will include conservation measures designed to avoid, minimize, and/or remediate effects to species in mapped occupied habitat and may be specific to individual allotments.

Conservation measures to be implemented include but are not limited to the following:

1. In areas where there is a concern that Colorado hookless cactus, clay-loving wild buckwheat, and Debeque phacelia may be present, a survey will be conducted prior to any livestock management actions such as range improvements or maintenance, or weed management. The BLM Threatened, Endangered, and Sensitive (TES) species specialist will determine the need for a survey and survey scope and intensity.

2. Maps will be provided to permittees that identify sensitive areas where restrictions may apply to particular grazing-related activities for the Colorado hookless cactus, clay-loving wild buckwheat, and Debeque phacelia. As new information becomes available, and as necessary, maps will be updated by the BLM and provided to permittees. (Note: Maps provided to permittees will include sufficient buffers and randomized perimeters to avoid disclosing exact species locations.)

3. The permittee is required to notify the BLM Rangeland Management Specialist prior to any surface disturbing range project maintenance activity in any allotment (standard for all BLM allotments). Surveys and avoidance measures will be required where effects to listed plants may occur.

   - Construction of new range developments (e.g., fences, ponds, water troughs) would be designed to avoid impacts to listed species whenever feasible. New range developments that may affect listed species would not be permitted until completion of additional consultation.

4. If a permittee wishes to apply an herbicide treatment, they must obtain prior approval from the BLM. Appropriate applicator licenses must be obtained, copies of the appropriate *Pesticide Use Proposal* must be obtained from the BLM, and a *Pesticide Application Record* must be completed and returned to BLM no later than 10 days after herbicide application (standard for all BLM allotments).

- The permittee must consult with the BLM Rangeland Management Specialist and Biologist/Ecologist prior to applying herbicides or pesticides within 200 meters (656 feet) of individual plants or populations. Such treatments may be restricted or modified to avoid effects to the three listed species.

- All treatments will comply with the approved *Integrated Weed Management Plan* (IWMP) and section 7 consultation (completed for GJFO and CRVFO, in progress for UFO). The 3 field offices' IWMPs differ slightly in their requirements for avoidance distances and triggers for re-initiation of consultation. Please see those consultation documents for specific details.

5. Within 200 meters (656 feet) of listed plants, motorized access for livestock grazing operations will be limited to existing roads and routes. Any additional access proposed for grazing operations would require additional surveys and section 7 consultation.

6. As a standard permit term and condition within occupied habitat, seasonal utilization levels on palatable perennial forage will be limited to 40 percent to the extent possible, and average utilization will not exceed 50 percent. These areas will be monitored by the BLM Rangeland Management Specialist and Biologist/Ecologist to ensure compliance.

7. Permits for trailing through occupied habitat will only be issued for existing livestock trailing areas identified in Appendix I, Figure 1.

   - Where this trailing occurs, minimization measures such as the following will be implemented to reduce impacts:

      - BLM will encourage the avoidance of known individuals or populations during livestock herding and trailing activities on BLM administered lands. Maps would be provided to permittees to facilitate avoidance.

      - In areas where trailing activities cannot be avoided (e.g., Escalante Canyon) monitoring of affected populations will be established. Where monitoring suggests population decline then the following will be considered by BLM to achieve appropriate protection:

         - Use additional herders/cowboys to direct livestock away from populations.

         - Trail smaller herds through at any given time to limit physical disturbance.

         - Use temporary fencing/barricades to inhibit livestock from trailing through populations during trailing activities.

         - Should all other attempts to reduce impacts from trailing not be successful, permanent drift fences may be considered.

   - Permittee will be required to notify the BLM office at least 24 hours in advance of the trailing activity.

- Require that trailing activity be concentrated within existing road corridors as much as practicable, and done so in a timely and efficient manner. Overnighting of livestock within occupied habitat is prohibited unless the area has been cleared for TES species prior to overnight activity.

- Trailing will not be allowed during flowering periods where possible.

- Any future identified trailing activities through occupied habitat will be managed according to the above stated conservation measures. BLM will request that the newly identified trailing be included under the umbrella of this programmatic consultation.

8. No concentrations of livestock activities including but not limited to herding, routine trailing, bedding, salt or supplement, portable watering, and new stock ponds will be allowed within 200 meters (656 feet) of individual plants or populations, except as provided below:

- Concentration may be allowed where separated by a fence or topographic feature (cliff) that will render the impacts to listed plants insignificant, discountable, or if the impacts are wholly beneficial (distribute livestock away from listed plants).

- In allotments in which sheep bedding must occur within the 200 meter (656 feet) buffer, only dispersed bedding will be allowed. Dispersed bedding is defined as allowing the sheep to bed however the band has dispersed throughout the day, not congregating the band in any one common locale.

- To minimize sheep grazing impacts in allotments containing clay-loving wild buckwheat, limit sheep grazing within 200 meters (656 feet) of occupied habitat to 5 nights per use area.

- The BLM Rangeland Management Specialist will collaborate with the permittee to develop and employ appropriate grazing strategies for the allotment pastures and use areas to meet Colorado Public Land Health Standards, specifically standard 3 for upland plant communities and standard 4 for TES species. Where possible, grazing should be limited to 15 days or less in each pasture or use area during the flowering and fruiting period for the three focus species to ensure reproduction and recruitment.

9. Monitoring will be conducted (e.g., LHAs, utilization, trend, Ecological Site Inventory) to evaluate rangeland health. If monitoring/LHAs conclude that an allotment with occupied habitat is not meeting the standards for special status plants, vegetation, or soils, and livestock grazing is identified as a significant causal factor to not meeting those standards, grazing permit modifications, mitigation, or other prescriptive measures will be required by BLM, such as:

- The BLM Rangeland Management Specialist will work with the permittee to pursue opportunities to allow portions of the allotment(s) to receive yearlong rest or deferment in order to increase plant vigor.

- Exclosures or drift fences may be considered in certain areas where individual plants or populations require special protections from livestock grazing or associated activities, as determined by the BLM.

- Permit terms and conditions may be modified to minimize impacts to listed plants (e.g., improved distribution, changes in season of use/class of livestock).

10. BLM will seek to implement monitoring programs to assess grazing-related impacts to the species. Results from the monitoring will be used to inform future grazing management.

- BLM Field Offices will continue to partner with the BLM Colorado State Office and other organizations (e.g., the Service, Denver Botanic Gardens [DBG], Colorado Natural Heritage Program [CNHP], Colorado Native Plant Society), Colorado Natural Areas Program [CNAP] to monitor listed plants.

- In areas where grazing has been identified as a threat to individuals or populations BLM will explore opportunities to modify existing monitoring and develop new monitoring to assess grazing-related impacts to the species.

11. To ensure the conservation of the three listed species, BLM will coordinate with FWS to identify important areas for species conservation. This coordination may result in actions to improve species conservation, initiate adaptive management strategies to diminish grazing impacts to the three listed species, or place greater management emphasis on their conservation through BLMs planning and decision process.

12. The BLM intends to continue a similar annual inventory effort as in recent years, between 2,000 – 10,000 acres annually, across the three species range, consistent with funding and priorities. Results will be sent to CNHP to ensure data is compiled in a centralized data base.

13. BLM will provide FWS with monitoring data collected and will work with FWS to develop a cooperative monitoring strategy that will capitalize on partnerships to augment existing monitoring studies and data. BLM, with the assistance of FWS, will work on creating partnership opportunities to design and carryout additional monitoring needs.

14. BLM will report conservation actions taken annually to FWS highlighting the adaptive management that is occurring within the grazing program. Future BLM actions, monitoring (trend, grazing, and LHA), and decisions covered under this programmatic consultation will be reported annually to FWS.

15. Field Offices will individually schedule coordination meetings throughout the year with FWS and will work to address grazing impacts to listed plants.

If impacts to any of the three focal species that were not analyzed in this consultation occur or are found likely to occur due to future grazing-related activities, further section 7 consultation will occur.

## Krickbaum, John

| | |
|---|---|
| **From:** | Sharrow, Barbara L |
| **Sent:** | Tuesday, October 23, 2012 12:31 PM |
| **To:** | Krickbaum, John; 'Angie Adams' |
| **Subject:** | FW: Uncompahgre RMP Supplemental Information |
| **Attachments:** | RMP_Supplemental Information Letter_FINAL.pdf |

FYI

**From:** Kyle Tisdel [mailto:tisdel@westernlaw.org]
**Sent:** Tuesday, October 23, 2012 12:28 PM
**To:** Sharrow, Barbara L; Hankins, Helen M
**Cc:** Megan Anderson; Jim Ramey
**Subject:** Uncompahgre RMP Supplemental Information

Ms. Sharrow and Ms. Hankins,

Attached, please find a Supplemental Information Letter regarding BLM's revision to the Uncompahgre Resource Management Plan. The new information and circumstances addressed in this letter, as well as in the attached exhibits, should be considered and included in BLM's forthcoming draft of the RMP.

As the attached exhibits are too large for inclusion, here, I am also sending a hard copy of this letter and CDs with electronic versions of the exhibits.

Should you have any questions, please do not hesitate to contact me.

Regards,

Kyle Tisdel

Kyle J. Tisdel
Western Environmental Law Center
208 Paseo del Pueblo Sur, #602
Taos, New Mexico 87571

Ph: 575.613.8050
Fax: 575/751.1775

tisdel@westernlaw.org

www.westernlaw.org

1

BLM_0112482

BLM_0112483



| | |
|---|---|
| **Northwest** Eugene, Oregon | **Southwest** Taos, New Mexico |
| **Northern Rockies** Helena, Montana | **Southern Rockies** Durango, Colorado |

**Defending the West**    www.westernlaw.org

# Western Environmental Law Center

*Sent via Electronic and Certified Mail*

October 23, 2012

Barb Sharrow, Field Manager
U.S. Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado  81401
E-mail: bsharrow@blm.gov

Helen Hankins, State Director
Bureau of Land Management
Colorado State Office
2850 Youngfield Street
Lakewood, CO 80215
E-mail: hhankins@blm.gov

          Re:    **Uncompahgre Resource Management Plan, Supplemental Information**

Dear Ms. Sharrow and Ms. Hankins:

          On behalf of Citizens for a Healthy Community ("CHC"), I am writing to provide new information and circumstances that the Bureau of Land Management ("BLM") Uncompahgre Field Office ("UFO") should consider in its revision of the Uncompahgre Resource Management Plan ("RMP") and associated Environmental Impact Statement ("EIS"). *See* 75 Fed. Reg. 8739 (Feb. 25, 2010). As the Draft RMP and EIS have yet to be released, the information provided herein should be included in the forthcoming draft, thus preventing the need for a supplemental National Environmental Policy Act ("NEPA") analysis, as would otherwise be required. *See* 40 C.F.R. § 1502.9.

          CHC is a grassroots organization formed in 2010 for the purpose of protecting people and their environment from irresponsible oil and gas development in the Delta County region. CHC's members and supporters include organic farmers, ranchers, vineyard and winery owners, and other concerned citizens impacted by oil and gas development. CHC members have been actively involved in commenting on BLM's oil and gas activities since CHC's founding.

BLM_0112484

First and foremost, CHC hereby incorporates by reference a series of earlier comments and associated exhibits submitted to BLM UFO regarding oil and gas development in and surrounding the North Fork Valley. The first set of comments pertains to the now deferred August 2012 Oil and Gas Lease Sale, DOI-BLM-CO-SO50-2012-0009 EA, and includes both Scoping Comments, submitted on February 8, 2012 (hereinafter "Lease Sale Scoping Comments") (attached as Exhibit A), as well as comments on BLM's preliminary Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI"), submitted on April 19, 2012 (hereinafter "Lease Sale EA Comments") (attached as Exhibit B). In addition, CHC also includes comments submitted to BLM UFO regarding the draft EA/FONSI for the proposed Bull Mountain Master Development Plan ("MDP"), DOI-BLM-CO-150-2009-0005 EA, submitted April 23, 2012 (hereinafter "Bull Mountain Comments") (attached as Exhibit C).

The BLM UFO should be commended for recognizing that these oil and gas leasing and development plans – i.e., the August 2012 Lease Sale and the Bull Mountain MDP – demanded far greater scrutiny and analysis than was afforded through the EA processes originally undertaken. While this recognition did not cancel these plans altogether, it did result in the deferral of all 22 parcels to be included in the August 2012 Lease Sale, as well as lead to BLM's apparent determination to perform a more thorough Environmental Impact Statement ("EIS") for the Bull Mountain MDP. As both plans specifically concern leasing and development decisions on BLM lands to be included in the impending RMP revision, and are currently guided by the existing Uncompahgre Basin RMP/EIS ("1989 RMP"), the comments provided by CHC on the August 2012 Lease Sale and Bull Mountain MDP are directly relevant and applicable to the RMP revision and EIS process currently being undertaken by the UFO. Accordingly, these comments should also be used to help guide and inform the forthcoming revision.

More fundamentally, however, both the August 2012 Lease Sale and Bull Mountain MDP represent distinct but equally critical junctures in BLM's minerals management decision-making process. CHC's comments on these plans highlight the deficiency of the existing management framework, as directed by the 1989 RMP and its associated documents, and the inability of the current framework to guide oil and gas leasing and development decisions at these key junctures. Accordingly, the Uncompahgre RMP revision should, among other things, address and amend the key deficiencies of the 1989 RMP as identified in CHC's previously submitted comments.

1. **The BLM is required to suspend all oil and gas development in the Uncompahgre area for as long as the Uncompahgre RMP revision remains uncompleted.**

Due to the insufficiency of BLM's existing management framework, all oil and gas leasing and development decisions, at all stages of BLM's administrative processes, should be suspended until the Uncompahgre RMP revision is complete and these deficiencies can be addressed. An oil and gas moratorium is not only a logical approach to BLM's minerals management responsibilities; it is also required under NEPA and its implementing regulations.

As noted above, the existing 1989 RMP is no longer able to serve its intended land use planning function with regard to oil and gas development in the UFO. NEPA establishes a duty

BLM_0112485

"to stop actions that adversely impact the environment, that limit the choice of alternatives for the EIS, or that constitute an 'irreversible and irretrievable commitment of resources.'" *Conner v. Burford,* 848 F.2d 1441, 1446 (9th Cir. 1988). When a programmatic EIS is underway, as here, NEPA regulations established by the Council of Environmental Quality ("CEQ") prohibit an agency from taking any actions that would significantly impact the environment. *See* 40 C.F.R. § 1506.1(c) (1997). For example, where "[i]nterim action prejudices the ultimate decision on the program," NEPA forbids it. 40 C.F.R. § 1506.1(c)(1)-(3). Action prejudices the outcome "when it tends to determine subsequent development or limit alternatives." *Id.*

Proceeding with oil and gas leasing and development – such as the activities contemplated in the August 2012 Lease Sale and Bull Mountain MDP – is impermissible due to the inherent prejudice that any such action would create on the pending revision of the Uncompahgre RMP and EIS. *See id.* As identified in CHC's earlier comments submitted to BLM UFO, the 1989 RMP and associated documents did not anticipate the pace or scale of oil and gas leasing and development that is now proposed, and therefore, did not analyze the impacts from development which are now facing the communities of the North Fork Valley and beyond. Those managing documents contain little analysis of oil and gas development generally, much less any analysis of the impacts associated with modern extraction techniques, such as hydraulic fracturing, or the specific areas where current oil and gas development is focused. *See, e.g.,* 1989 RMP at 28, 31. Moreover, as unambiguously provided in the 1987 Technical Report, any analysis contained therein was inherently limited in its temporal scope – providing that its evaluation of projected development was limited to "the next ten to fifteen years." 1987 Technical Report, at 10-11. Indeed, it has now been 25 years since the report's release, well beyond the period where its findings are of any utility. Without the foundational land use planning guidance that is only available through a current and up-to-date RMP, it would be impossible for BLM UFO to make the type of fully informed decision that NEPA requires prior to completion of the Uncompahgre RMP revision.

BLM UFO has itself recognized the shortcomings of the existing 1989 RMP and EIS, and has provided that "[p]reparation of the [revised] Uncompahgre RMP is necessary in order to respond to changing resource conditions, new issues, and federal policies, as well as to prepare a comprehensive framework for managing public lands administered by the UFO." *See* Lease Sale EA Comments, Exhibit 2. Elsewhere, BLM states: "[m]anagement is becoming more complex due to the emergence of new issues of national significance, as well as heightened controversy surrounding certain existing issues. Increased oil, gas, and uranium activity, recreation demands, impacts from a growing population and urban interface, and pressures on wildlife and land health are among the many challenges to be addressed." *See* Lease Sale EA Comments, Exhibit 3. Given BLM's recognition of these challenges and the stated need for revision of the Uncompahgre RMP, it would be impossible for the UFO to proceed with any oil and gas leasing and development activities in this area without prejudicing the ultimate mineral management decisions to be made in the revised RMP. *See* 40 C.F.R. § 1506.1(c)(1)-(3).

Accordingly, it would serve both the public and industry alike if BLM UFO were to acknowledge this reality – that the existing RMP cannot be used to guide oil and gas leasing and development decision-making – and announce a moratorium on all oil and gas activity pending the completion of the Uncompahgre RMP revision.

BLM_0112486

**2. As part of the Uncompahgre RMP revision, BLM should also prepare a Master Leasing Plan.**

As part of BLM's revision of the Uncompahgre RMP and associated EIS, the UFO should also develop a Master Leasing Plan ("MLP") covering oil and gas development in the North Fork Valley. According to BLM IM 2010-117, the MLP process is to be conducted before lease issuance and will reconsider RMP decisions pertaining to leasing. The RMPs "identify oil and gas planning decisions, such as areas closed to leasing, open to leasing, or open to leasing with major or moderate constraints (lease stipulations) based on known resource values and reasonably foreseeable oil and gas development scenarios." IM 2010-117. The MLP is a mechanism for completing the additional planning, analysis, and decision-making, and is required for areas meeting the following listed criteria:

(1) A substantial portion of the area to be analyzed in the MLP is not currently leased;

(2) There is a majority Federal mineral estate;

(3) The oil and gas industry has expressed a specific interest in leasing, and there is a moderate or high potential for oil and gas confirmed by the discovery of oil and gas in the general area; and

(4) Additional analysis or information is needed to address likely resource or cumulative impacts if oil and gas development were to occur where there are important resource values, such as natural/cultural resource conflicts, air quality, wildlife and wilderness.

*See* IM 2010-117. The unique resource values of the North Fork Valley satisfy all MLP criteria. Moreover, the MLP process would be a natural extension of the Uncompahgre RMP revision already taking place, but would serve the additional function of helping to focus and guide this analysis for the distinct resource values at stake in the North Fork Valley.

BLM's Colorado Oil and Gas Leasing Reform Implementation Strategy, attached as Exhibit 1, provides: "The purpose of a MLP is to plan for oil and gas development in a defined area containing a high level of potential resource conflicts." As CHC has explained in detailed comments previously submitted to BLM, and as further provided below, it would be hard to find an area more deeply at odds with industrial scale oil and gas development than the North Fork Valley – which has a flourishing agricultural economy with the highest concentration of organic farms and ranches in the Rocky Mountains, an abundance of wildlife and vital habitat, and pristine ground and surface water resources. A detailed and focused analysis of these priceless resources needs to be a critical element of the Uncompahgre RMP revision, and the framework provided through the MLP process would help guide this analysis.

BLM_0112487

### 3.   The BLM should permanently protect certain lands in their natural condition.

Certain lands in the North Fork Valley and the surrounding area should be permanently protected and removed from further oil and gas leasing and development through the pending RMP. BLM is uniquely empowered to make this determination and, as codified in the agency's organic act, the Federal Land and Policy Management Act ("FLPMA") of 1976, 43 U.S.C. § 1701 *et. seq.*, taking such action is part of BLM's mandate. FLPMA's congressional declaration states:

> It is the policy of the United States that … the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will <u>preserve and protect certain public lands in their natural condition</u>; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use;

43 U.S.C. § 1701(a)(8) (emphasis added).

Indeed, BLM is duty bound to develop and revise land use plans according to this congressional mandate, so as to "observe the principles of multiple use." 43 U.S.C. § 1712(c)(1). "Multiple use" means "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." *Id.* at § 1702(c).

The RMP revision process, undertaken pursuant to FLPMA, requires BLM to engage in the type of foundational land use planning that is intended to give context to the agency's multiple use mandate. Accordingly, FLPMA provides specific criteria for land use plan revisions, requiring consideration of things such as: observation of the principles of multiple use and sustained yield; integrated consideration of physical, biological, economic, and other sciences; reliance on public lands resources and other values; consideration of present and future uses of the public lands; consideration of the relative scarcity of resource values; and weighing the long-term benefits to the public against the short-term benefits. *See* 43 U.S.C. § 1712(c)(1)-(9). Consideration of these criteria must drive BLM's Uncompahgre RMP revision.

FLPMA does not mandate that every use be accommodated on every piece of land; rather, delicate balancing is required. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004). "'Multiple use' requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage." *Public Lands Council v. Babbitt*, 167 F.3d 1287, 1290 (10th Cir. 1999) (citing 43 U.S.C. § 1702 (c)). As held by the Tenth Circuit, "[i]f all the competing demands reflected in FLPMA were focused on one particular piece of public land, in many instances only one set of demands could be satisfied. A parcel of land cannot both be preserved in its natural character and mined." *Rocky Mtn. Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 738 n. 4

BLM_0112488

(10th Cir.1982) (quoting *Utah v. Andrus,* 486 F.Supp. 995, 1003 (D.Utah 1979)); *see also* 43 U.S.C. § 1701(a)(8) (stating, as a goal of FLPMA, the necessity to "preserve and protect certain public lands in their natural condition"); *Pub. Lands Council,* 167 F.3d at 1299 (citing § 1701(a)(8)). As further provided by the Tenth Circuit:

> BLM's obligation to manage for multiple use does not mean that development *must* be allowed on [a particular piece of public lands]. Development is a *possible* use, which BLM must weigh against other possible uses – including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.

*New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 710 (10th Cir. 2009).

Accordingly, the Uncompahgre RMP revision must consider, on equal footing, the value of permanent protection and preservation of public lands in the North Fork Valley, along with the oil and gas industry's pressure to lease and develop these lands. The RMP revision process is the perfect opportunity for BLM to re-evaluate these competing resources and give suitable weight to FLPMA's mandate to, where appropriate, preserve and protect public lands in their natural condition. *See* 43 U.S.C. § 1701(a)(8).

Regarding the appropriateness of preservation, there is perhaps no better example than the North Fork Valley where protection of public lands in their natural condition should be given priority.[1] The Valley is a leader in organic agriculture, and home to the largest concentration of organic farms and ranches in the Rocky Mountains, which according to the Valley Organic Growers Association,[2] include over 65 farms and related organizations. Consisting of the communities of Paonia, Hotchkiss, Crawford, and Somerset, and extending northeast along Colorado State Highway 133 to the Paonia Reservoir State Park, the Valley produces 77 percent of Colorado's apples and 71 percent of the state's peaches. It supplies food all along Colorado's Western Slope and to farmers' markets throughout Colorado. Additional Valley products have regional and even national distribution. The Valley is also one of two certified American Viticultural Areas in Colorado, and is gaining an international reputation for handcrafted wines made from the highest altitude vineyards in the Northern Hemisphere. The area has hosted more than 80 chefs for farm-to-table workshops, and direct farm sales via community supported agriculture and farmers' markets are among the highest in the rural U.S. As the Valley's reputation for scenic beauty, organic farms, artisanal food, and world-class wine has spread, the area has seen increasing agritourism and healthy population growth.

---

[1] *See, e.g.,* Peter Heller, *The Fight Over Fracking in Colorado's North Fork Valley,* BUSINESSWEEK, July 12, 2012 (attached as Exhibit 2).

[2] *See* Valley Organic Growers Association, available at: http://www.vogaco.org/

BLM_0112489

The ecological and economic threat posed by oil and gas leasing and development is very real, and it is no exaggeration to say that the North Fork Valley's future is at stake in the Uncompahgre RMP revision. To the Valley's north, just over Grand Mesa, lie the communities of Rifle and Silt, where poor planning and foresight has resulted in oil and gas development that has littered the landscape with well pads, wastewater ponds, and a spider web of roads. In these communities, the oil and gas industry is releasing hazardous pollutants into the air and using hydraulic fracking extensively, threatening local water resources and public health. It is hard to imagine an activity more at odds with the sustainable organic agricultural communities flourishing in the North Fork Valley – and thus hard to imagine the Valley withstanding, without great if not irreparable harm, such development.

Oil and gas development also threatens the area's abundant wildlife, which includes elk, bear, mountain lion, lynx, bighorn sheep, cutthroat trout and many other important species. The Valley feeds into the Thompson Divide, an important wildlife migration route. Oil and gas development would fragment the Divide and compromise increasingly scarce wildlife corridors and habitat. Oil and gas development would also threaten growing eco-tourism in the Valley based on wildlife viewing, fishing, and hunting.

Review of BLM's oil and gas leasing and development plans over the last several years reveals little regard for protecting these vital resources of the North Fork Valley. The deferred August 2012 Lease Sale announced plans to offer roughly 30,000 acres of federal land for oil and gas leasing. These leases would encircle the Valley, with several parcels located on the Valley's iconic peaks, Mount Lamborn and Landsend Peak. Other parcels would border the edges of houses and farms and come within a few hundred feet of schools. And still others would overlay and abut springs and aquifers that serve as domestic water and irrigation sources to local farms, ranches and communities. Moreover, the Bull Mountain MDP contemplates allowing approximately 150 wells along tributary streams of the North Fork in the headwaters of the Gunnison River, as well as in alarming proximity to the Paonia Reservoir – waters essential to recreation, irrigation, livestock, and domestic use.

While certain lands may indeed be appropriate for responsible oil and gas leasing and development, it is equally evident that there are lands where other resource values should prevail. FLPMA affords BLM great authority to appropriately balance these competing interests, which expressly includes the responsibility to "preserve and protect certain public lands in their natural condition." 43 U.S.C. § 1701(a)(8). Moreover, FLPMA further delegates BLM authority to permanently withdraw lands from consideration. *See* 43 U.S.C. § 1714. This ability authorizes the Secretary to "make, modify, extend, or revoke withdrawals." *Id.* In either event, BLM UFO cannot continue its practice of prioritizing oil and gas leasing and development above the other resource values at stake. The Uncompahgre RMP revision process should be used to provide a framework where BLM can more fully realize its multiple use mandate now and into the future.

### 4. New information and circumstances to be considered by BLM.

Earlier comments submitted on behalf of CHC to BLM regarding oil and gas development in and surrounding the North Fork Valley, and attached hereto as Exhibits A, B, and C, contain an abundance of new information and circumstances relating to specific resource

BLM_0112490

concerns that BLM UFO must consider in the subject revision to the its RMP. The resources identified in these comments include the following: air quality, greenhouse gas emissions, climate change, resiliency, farmlands, soil, steep slopes, vegetation, hydraulic fracturing, seismicity, groundwater, surface water, wild and scenic rivers, migratory birds, terrestrial wildlife, aquatic wildlife, endangered and threatened species and habitat, visual, recreation, and socio-economic impacts. BLM UFO must consider the issues and possible impacts identified for these resources as the agency undertakes revision of the RMP.

In addition, BLM UFO must also consider various sources of new information not included in earlier provided comments, as outlined below.

- **Oil and Gas Policy and Agency Management:**

The BLM has lost sight of its mission in the political rush to use public lands for energy development, according to an experienced agency official. *See* Memorandum from Stan Olmstead, to the U.S. Bureau of Land Management, Sept. 28, 2012 (attached as Exhibit 3). Stan Olmstead retired in August, 2012, after 20-years at BLM, most recently as a natural resource specialist and environmental scientist in the Vernal Field Office in Utah. Mr. Olmstead described an office that promotes energy development and measures natural resources "by dollar value," leading to the neglect of sensitive species and the land's health. "The U.S. government has all the abilities to perform *state-of-the-art* environmental management and yet we continue to fail," Olmstead wrote. *Id.* (emphasis original). "We place exploitation of natural resources and profits from these resources ahead of wisdom." *Id.* While focused on his experience in the Vernal Field Office, Mr. Olmstead's experience is reflective of a much broader agency focus on energy development, and his words should be heeded as the UFO revises its RMP. His memorandum describes a field office that has "shown no concern for the cumulative impact of the developed area and provide[d] NEPA documents [with] little quantitative analysis." *Id.* Decisions were made which "fragment habitat extensively in energy areas resulting in ecosystem damage." *Id.* It is incumbent on the UFO to be cognizant of such mismanagement of our public lands and take action to avoid similar outcomes as it revises the UFO RMP.

Compounding the agency's apparent prejudice toward energy development in the management of our federal lands are environmental regulations and statutes that have been gutted in favor oil and gas exploitation.[3] As the UFO proceeds in its revision of the RMP, the agency must consider how these regulatory deficiencies could threaten other resource values if oil and gas development is approved for a particular area. Given these regulatory defects, BLM UFO must employ caution reflective of this reality, while also remaining mindful of the agency's mission "to sustain the health, diversity and productivity of public lands for the use and enjoyment of present and future generations,"[4] as it revises its RMP.

---

[3] Earthworks, *The Oil and Gas Industry's Exclusions and Exemptions to Major Environmental Statutes* (Oct. 2007) (attached as Exhibit 4).

[4] *See* Bureau of Land Management, *Who We Are, What We Do,* available at: http://www.blm.gov/wo/st/en/info/About_BLM.print.html.

UNCOMPAHGRE RESOURCE MANAGEMNT PLAN                          PAGE 8 OF 16
SUPPLEMENTAL INFORMATION

BLM_0112491

- **Climate Change and Greenhouse Gas Emissions:**

Although climate change and greenhouse gas ("GHG") emissions have previously been raised in the attached comments earlier submitted to BLM, additional research and documentation, identified herein, provide further support for the critical analysis of these issues that is required in the forthcoming revision of the RMP. There is near universal agreement in the scientific community that human activity has resulted in atmospheric warming and planetary climate change.[5] Indeed, the world's leading minds and most respected institutions – guided by increasingly clear science and statistical evidence – agree that dramatic action is necessary to avoid planetary disaster.[6] GHG concentrations have been steadily increasing over the past century,[7] and our insatiable consumption of fossil fuels is pushing the world to a tipping point where, once reached, catastrophic change will be unavoidable.[8] In fact, the impacts from climate

---

[5] *See, e.g.,* U.S. Climate Change Science Program, *Abrupt Climate Change* (Dec. 2008) (attached as Exhibit 5); James Hansen, et. al., *Global Surface Temperature Change,* REVIEWS OF GEOPHYSICS, 48, RG4004 (June 2010) (attached as Exhibit 6); *see also,* Richard A. Muller, *Conversion of a Climate Change Skeptic,* NEW YORK TIMES, July 28, 2012 (attached as Exhibit 7) (citing Richard A. Muller, et. al., *A New Estimate of the Average Earth Surface Temperature, Spanning 1753 to 2011,* (attached as Exhibit 8); Richard A. Muller, et. al., *Decadal Variations in the Global Atmospheric Land Temperatures* (attached as Exhibit 9)).

[6] *See, e.g.,* Rob Atkinson, et. al., *Climate Pragmatism: Innovation, Resilience, and No Regrets* (July 2011) (attached as Exhibit 10); Veerabhadran Ramanathan, et. al., *The Copenhagen Accord for Limiting Global Warming: Criteria, Constraints, and Available Avenues* (Feb. 2010) (attached as Exhibit 11); UNITED NATIONS, INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, *Climate Change 2007: Synthesis Report* (2007) (attached as Exhibit 12); A.P. Sokolov, et. al., *Probablistic Forecast for Twenty-First-Century Climate Based on Uncertainties in Emissions (without Policy) and Climate Parameters,* MASSACHUSETTS INSTITUTE OF TECHNOLOGY (MIT) (Oct. 2009) (attached as Exhibit 13); UNITED NATIONS, FRAMEWORK CONVENTION ON CLIMATE CHANGE, *Report of the Conference of the Parties* (Dec. 2011) (attached as Exhibit 14); Bill McKibben, *Global Warming's Terrifying New Math,* ROLLING STONE, July 19, 2012 (attached as Exhibit 15); Elizabeth Muller, *250 Years of Global Warming,* BERKLEY EARTH, July 29, 2012 (attached as Exhibit 16); Marika M. Holland, et. al., *Future abrupt reductions in summer Arctic sea ice,* Geophysical Research Letters, Vol. 33, L23503 (2006) (attached as Exhibit 17).

[7] *See* Randy Strait, et. al., *Final Colorado Greenhouse Gas Inventory and Reference Case Projections: 1990-2020,* CENTER FOR CLIMATE STRATEGIES (Oct. 2007) (attached as Exhibit 18); Robin Segall et. al., *Upstream Oil and Gas Emissions Measurement Project,* U.S. ENVIRONMENTAL PROTECTION AGENCY (attached as Exhibit 19); Lee Gribovicz, *Analysis of States' and EPA Oil & Gas Air Emissions Control Requirements for Selected Basins in the Western United States,* WESTERN REGIONAL AIR PARTNERSHIP (Nov. 2011) (attached as Exhibit 20).

[8] *See, e.g.,* James Hansen, *Tipping Point: Perspective of a Climatologist,* STATE OF THE WILD 2008-2009 (attached as Exhibit 21); GLOBAL CARBON PROJECT, *A framework for Internationally*

BLM_0112492

change are already being experienced, with drought and extreme weather events becoming increasingly common.[9]

Renowned NASA climatologist, Dr. James Hansen, provides the analogy of loaded dice – suggesting that there still exists some variability, but that climate change is making these extreme events ever more common.[10] In turn, climatic change and GHG emissions are having dramatic impacts on plant and animal species and habitat, threatening both human and species resiliency and the ability to adapt to these changes.[11] According to experts at the GAO, federal land and water resources are vulnerable to a wide range of effects from climate change, some of which are already occurring. These effects include, among others, "(1) physical effects, such as droughts, floods, glacial melting, and sea level rise; (2) biological effects, such as increases in insect and disease infestations, shifts in species distribution, and changes in the timing of natural events; and (3) economic and social effects, such as adverse impacts on tourism, infrastructure, fishing, and other resource uses."[12] BLM's RMP revision must consider the impacts that climate

---

*Co-ordinated Research on the Global Carbon Cycle,* ESSP Report No. 1 (attached as Exhibit 22); INTERNATIONAL ENERGY AGENCY, *CO₂ Emissions from Fuel Combustion,* Highlights 2011 (attached as Exhibit 23); GLOBAL CARBON PROJECT, *10 Years of Advancing Knowledge on the Global Carbon Cycle and its Management* (attached as Exhibit 24); Malte Meinshausen, et. al., *Greenhouse-gas emission targets for limiting global warming to 2° C,* NATURE, Vol. 458, April 30, 2009 (attached as Exhibit 62).

[9] *See, e.g.,* UNITED NATIONS, INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, *Managing the Risks of Extreme Events and Disasters to Advance Climate Change Adaptation* (2011) (attached as Exhibit 25); Aiguo Dai, *Increasing drought under global warming in observations and models,* NATURE: CLIMATE CHANGE (Aug. 2012) (attached as Exhibit 26); Stephen Saunders, et. al., *Hotter and Drier: The West's Changed Climate* (March 2008) (attached as Exhibit 27).

[10] *See,* James Hansen, et. al., *Climate Variability and Climate Change: The New Climate Dice* (Nov. 2011) (attached as Exhibit 28); James Hansen, et. al., *Perception of Climate Change* (March 2012) (attached as Exhibit 29); James Hansen, et. al., *Increasing Climate Extremes and the New Climate Dice* (Aug. 2012) (attached as Exhibit 30).

[11] *See* Fitzgerald Booker, et. al., *The Ozone Component of Climate Change: Potential Effects on Agriculture and Horticultural Plant Yield, Product Quality and Interactions with Invasive Species,* J. INTEGR. PLANT BIOL. 51(4), 337-351 (2009) (attached as Exhibit 31); Peter Reich, *Quantifying plant response to ozone: a unifying theory,* TREE PHYSIOLOGY 3, 63-91 (1987) (attached as Exhibit 32).

[12] GAO Report, *Climate Change: Agencies Should Develop Guidance for Addressing the Effects on Federal Land and Water Resources* (2007) (attached as Exhibit 33); *see also* Committee on Environment and Natural Resources, National Science and Technology Council, *Scientific Assessment of the Effects of Global Climate Change on the United States* (2008) (attached as Exhibit 34); Melanie Lenart, et. al. *Global Warming in the Southwest: Projections, Observations, and Impacts* (2007) (attached as Exhibit 35) (describing impacts from temperature rise, drought, floods and impacts to water supply on the Southwest).

change will have on species and their environment when evaluating the UFOs land management framework.

In addition to resource impacts from climate change, the revised RMP must also consider UFO related emission contributions. "Energy-related activities contribute 70% of global GHG emissions; oil and gas together represent 60% of those energy-related emissions through their extraction, processing and subsequent combustion."[13] Even if science cannot isolate each additional gas wells contribution to these overall emissions, this does not obviate BLM's responsibility to consider oil and gas development in the UFO from the cumulative impacts of the oil and gas sector. In other words, the BLM cannot ignore the larger relationship that oil and gas management decisions have to the broader climate crisis that we face. If we are to stem climate disaster – the impacts of which we are already experiencing, as discussed above – the agency's resource management decisions, here, as will be provided in the revised UFO RMP, must be reflective of this reality and plan accordingly.

Moreover, research conducted by the National Research Council has confirmed the fact that the negative impacts of energy generation from fossil fuels are not represented in the market price for such generation.[14] In other words, failing to internalize the externalities of energy generation from fossil fuels – such as the impacts to climate change and human health – has resulted in a market failure that requires government intervention. BLM should be mindful of this cost failure as it evaluates our nation's dependence on dirty energy from oil and gas – particularly as it relates to other incompatible resource values deserving protection in the subject RMP revision. Accordingly, the revised RMP should also contemplate a transition to renewable energy generation, not only as an alternative which may eventually suppress demand for oil and gas resources, but also as a pathway toward mitigating climate change as it relates to agency decision-making on federal lands.[15]

---

[13] International Investors Group on Climate Change, *Global Climate Disclosure Framework for Oil and Gas Companies* (attached as Exhibit 63).

[14] *See, e.g.,* National Research Council, *Hidden Costs of Energy: Unpriced Consequences of Energy Production and Use* (2010) (attached as Exhibit 36); Nicholas Muller, et. al., *Environmental Accounting for Pollution in the United States Economy,* AMERICAN ECONOMIC REVIEW at 1649-1675 (Aug. 2011) (attached as Exhibit 37); *see also,* Generation Investment Management, *Sustainable Capitalism,* (Jan. 2012) (advocating a paradigm shift to *Sustainable Capitalism;* "a framework that seeks to maximize long-term economic value creation by reforming markets to address real needs while considering *all* costs and stakeholders.") (attached as Exhibit 64).

[15] *See, e.g.,* INTERNATIONAL ENERGY AGENCY, *Energy Technology Perspectives 2012: Pathways to a Clean Energy System* (2012) (attached as Exhibit 38); UNITED NATIONS, INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, *Renewable Energy Sources and Climate Change Mitigation* (2012) (attached as Exhibit 39).

BLM_0112494

dramatic impacts – requiring onsite waste injection, trucking frack fluids offsite, and in some cases even the direct release of fracking waste into watercourses – the impacts of which can be compounded by ineffective or nonexistent regulation.[25] As also identified in earlier comments, CBNG production itself can be inefficient and wasteful – with practices such as the venting of methane,[26] and the use of vast quantities of water in the fracking process.[27] Thus, in addition to being wasteful, these practices can also be quite harmful to human health and the environment.

The wisdom of the natural gas boom is further brought into question by the underlying economics driving domestic growth. Earlier comments discussed the historically low cost of natural gas and the vast number of approved wells that industry has allowed to expire – all of which questions the imminent need for additional public lands to be made available for oil and gas development, often at the expense of other important resource values at stake in an area. However, a closer look at some of the economics motivating the oil and gas industry's push for greater production reveals sheer industry greed and speculation – driven by huge capital investment and Wall Street profits.[28] These factors cannot be ignored by BLM as it revises to UFO RMP, and must help to inform the resource values the agency elevates in its minerals management program.

## 5. Community-Supported Alternatives.

Incumbent to any NEPA process is a robust analysis of alternatives to the proposed action. Consideration of reasonable alternatives is necessary to ensure that the agency has before it and takes into account all possible approaches to, and potential environmental impacts of, a particular project. NEPA's alternatives requirement, therefore, ensures that the "most intelligent, optimally beneficial decision will ultimately be made." *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971).

---

[25] *See* Abrahm Lustgarten, *The Trillion Gallon Loophole: Lax Rules for Drillers that Inject Pollutants Into the Earth*, PROPUBLICA, Sept. 20, 2012 (attached as Exhibit 57); Earthworks, *The Crisis in Oil & Gas Regulatory Enforcement*, September 2012 (attached as Exhibit 66).

[26] Energy Policy Research Foundation, *Lighting up the Prairie: Economic Considerations in Natural Gas Flaring*, Sept. 5, 2012 (attached as Exhibit 58); *see also*, James Hansen, et. al., *Greenhouse gas growth rates*, PNAS, vol. 101, no. 46, 16109-16114, Sept. 29, 2004 (curtailing methane waste is seen as a "vital contribution toward averting dangerous anthropogenic interference with global climate.") (attached as Exhibit 67).

[27] *See* GAO, *Energy-Water Nexus: Coordinated Federal Approach Needed to Better Manage Energy and Water Tradeoffs* (Sept. 2012) (attached as Exhibit 59); Nicholas Kusnetz, *The Bakken oil play spurs booming business – in water*, High Country News, Sept. 5, 2012 (attached as Exhibit 60).

[28] *See* Deborah Rogers, *In Their Own Words: Examining Shale Gas Hype*, Energy Policy Forum (April 2012) (attached as Exhibit 61).

BLM_0112495

"[T]he heart" of an environmental analysis under NEPA is the analysis of alternatives to the proposed project, and agencies must evaluate all reasonable alternatives to a proposed action." *Colorado Environmental Coalition*, 185 F.3d at 1174 (quoting 40 C.F.R. § 1502.14). An agency must gather "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Greater Yellowstone*, 359 F.3d at 1277 (citing *Colorado Environmental Coalition*, 185 F.3d at 1174); *see also Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1528 (10th Cir. 1992). Thus, agencies must "ensure that the statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision." *Izaak Walton League of America v. Marsh*, 655 F.2d 346, 371 (D.C. Cir.1981) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976)).

Accordingly, CHC has joined a coalition of community groups and individuals in the North Fork Valley to develop an alternative – in addition to those alternatives identified in earlier submitted comments[29] – which BLM UFO must consider in its revision of the subject RMP. The Community's proposals will prescribe lands that should be closed to leasing as well as other specific management recommendations to protect the vital resources of the North Fork. Management and stipulations are being developed by drawing upon the expertise of those who know the public lands best – members of the community. This community-supported alternative is forthcoming and will be subsequently presented to the agency for consideration and inclusion in the UFO's RMP revision.

## 6.  Conclusion.

CHC appreciates your consideration of the new information and changed circumstances addressed herein, as well as the information included in the attached exhibits. This information is critical and must be included in the analysis that BLM UFO performs in the revised Uncompahgre RMP and EIS. It is CHC's hope that by providing this information now, the UFO will be able to incorporate these concerns into the corresponding analysis in the forthcoming RMP revision.

As always, should you have any questions or wish to discuss CHC's interests in greater detail, please do not hesitate to contact us.

Sincerely,

Kyle Tisdel
Megan Anderson
Western Environmental Law Center
208 Paseo del Pueblo Sur, Unit 602
Taos, New Mexico 87571

---

[29] *See, e.g.,* Lease Sale EA Comments, at 35-39; Bull Mountain Comments, at 33-35.

BLM_0112496

575.613.8050
tisdel@westernlaw.org
anderson@westernlaw.org

**COUNSEL FOR CITIZENS FOR A HEALTHY COMMUNITY**

cc.  Jim Ramey, Director, Citizens for a Healthy Community

BLM_0112497



# BLM Resource Advisory Councils
*Partners Across The West*

## COLORADO SOUTHWEST RESOURCE ADVISORY COUNCIL
## RESOLUTION 2012-02

### Resolution in Support of the Range of Alternatives for the Uncompahgre Resource Management Plan

WHEREAS: The Bureau of Land Management Uncompahgre Field Office is revising its Resource Management Plan (RMP), and

WHEREAS: The Southwest Resource Advisory Council (SWRAC) has assigned a sub-group to assist the BLM in developing the range of alternatives for the plan, and

WHEREAS: The SWRAC sub-group has met ten times and has agreed that the range of alternatives for the RMP is adequate.

THEREFORE, be it resolved that the Southwest Resource Advisory Council accepts the work of the SWRAC sub-group and recommends that the BLM move forward with the accepted range of alternatives, and that the BLM prepare a better summary of the accepted range of alternatives for the RMP.

Passed, approved and adopted October 26, 2012.


Received by Designated Federal Officer

Lori Armstrong, Southwest District Manager

Kathleen Welt, Chair

Southwest Resource Advisory Council

BLM_0112498

December 12, 2013



Barbara Sharrow
BLM Uncompahgre Field Office
2465 S. Townsend Ave
Montrose, CO 81401

Ref: North Fork Alternative Plan

Dear Ms. Sharrow,

I am greatly disappointed that your office would choose to include the "North Fork Alternative Plan" in your draft RMP.

This "plan" is at best terribly thought out, and at worst a deliberate attempt to force an anti-industry agenda on the people of this region. There is no scientific basis for any of the plans' proposals or designations; the main justification given is that the extreme restrictions placed on leasing and surface occupancy are needed to "protect public health, safety, and quality of life" as well as water supplies, soils, habitat and so forth. The never actually say what specifically all of this is supposed to be protected from – oil and gas development has been proven to not damage water supplies or air quality, has taken place alongside habitat restoration projects with great success, and actually improves the quality of life in the areas where it is allowed.

To say that this industry threatens the health and safety of surrounding communities is a ludicrous charge that demands some proof be offered. The fact is that agriculture is statistically far more dangerous than oil and gas production. Yet in this country, in both of these vital industries, we as a people have developed ways to work that reduce these risks substantially. Furthermore, what public health risks are they referring to? Multiple studies have been done in various places around the nation where oil and gas development occur, and no credible, peer-reviewed study has ever drawn any link between the industry and public health problems.

None of us want to damage our environment, pollute our rivers, or needlessly squander local habitat. But to suggest that the only way we can ensure that these resources are protected is to halt important economic development is frankly insulting. We have a long and successful history of balancing economic and conservation needs, and do not need a coalition of special interests to tell us what we can and can't do on the land in our backyard that belongs to us all, or how to we can and can't make a living. Accept their proposal as a comment if you will, but please do not give it any more weight than the comments offered by the average local resident.

Sincerely,

Holly Arkanter
1712 Pioneer Cir
Delta CO 81416

Dec. 12, 2013

RECEIVED

DEC 1 3 2013

BY:_____

BLM Uncompahgre Field Office
2465 S. Townsend Ave
Montrose, CO 81401

RE: North Fork Alternative Plan

I would like to take the opportunity to comment on a proposal that was put forth by a local chapter of the environmentalist movement and their local allies, one which you seem willing to include as a legitimate alternative in the draft Resource Management Plan for the region. I believe this is a mistake.

The proposal in question, the "North Fork Alternative Plan" is an overtly biased, unscientific blueprint for eliminating one industry from the area – oil and gas. While the plans purported goal is to "protect the economy of the region," it explicitly singles out the oil and gas industry for punitive measures. This is wrong. The oil and gas sector is not only beneficial for the local economy, in terms of jobs created and revenues generated, but also for the state and the nation. Oil and gas contributes billions to the state economy, provides a necessary and valuable product at a relatively low price, and increases the likelihood of American energy independence. All of this for minimal impact on the environment.

The North Fork Alternative Plan ignores these facts, and many others. It attempts to justify excessively strict leasing stipulations by claiming that they are to protect local natural resources, public health, and other economic activity. But it provides no evidence to back up the claims that the oil and gas industry poses any threat to these. RMP alternatives need to be based on science, not emotion.

The plan makes other claims as well, including that allowing oil and gas development will harm the quality of life of the region. This is an outrageous, highly subjective, and emotional claim. There is far more empirical evidence around to support the counter-claim, that economic development and job creation actually improves quality of life.

This plan eliminates over 90% of the federal land in its planning area from ever being leased for oil and gas development, either through outright prohibiting leasing or by imposing No Surface Occupancy stipulations, which effectively mean the same thing – even directional drilling has its limits. This is not a reasonable, responsible alternative. It is a special interest group attempting to impose its agenda through the back door, rather than through the political process. Please do not hold that door open for them.

Signed,

Heather Redden
2633 Ridge Rd
Delta, CO 81416

BLM_0112500

December 12th, 2013

RECEIVED

DEC 1 6 2013

BY:

BLM Uncompahgre Field Office
2465 S. Townsend Ave
Montrose, CO  81401
Phone: (970) 240-530

ATTN: Barbara Sharrow

Ref: North Fork Alternative Plan

Dear Ms. Sharrow,

The above-referenced "North Fork Alternative Plan", which has been submitted to your office by local representatives of the environmental lobby, fails to meet the standards for being included as an alternative in the draft RMP/EIS in several ways:

A) It does not consider the socio-economic impacts of its proposals. Denying or restricting oil and gas leasing to the extent that this plan does would have very serious economic repercussions on an area that has an economy as resource-based as this one. These need to be considered and analyzed before a proposal can be included as an alternative.

B) The plan fails to adequately define a number of terms. It provides no clear definition of "organic or non-organic farm", leaving the door open to someone planting an herb garden, and expecting the stipulations to then apply. Also, the definition of "water bodies" is similarly ill-defined, suggesting that man-made ponds, ditches, and ephemeral waters could be placed in the same category as the Gunnison River.

C) The plan fails to back up its assertions, or support its stated need for the measures and restrictions it proposes. For instance, there is no evidence whatsoever that oil and gas development, and activities such as fracturing, have the negative impacts on water, wildlife or public health that the authors are claiming. On the contrary, all available scientific evidence shows that oil and gas activity has had minimal to no negative impact on water or air quality.

D) Its characterization of certain areas as "select prominent landscape features" is extremely subjective. Measures presented for consideration in a NEPA document need to be based on objective facts, not the biases of some.

Because of these deficiencies, I cannot see how the BLM can, in good conscience, include this plan as one of the legitimate alternatives in the RMP. It should be treated as a comment like any other.

Regards,

Jenni Neil
580 Sloan St
Delta, CO  81416

DEC 1 3 2013

BY:_____

December 12, 2013

BLM Uncompahgre Field Office
2465 S. Townsend Ave
Montrose, CO  81401

ATTN: Barbara Sharrow, Field Manager

Dear Ms. Sharrow,

I do not believe that the North Fork Alternative Plan should be included in your draft RMP/EIS as a credible potential alternative. Rather, it should be considered as a comment letter, just as comments and opinions of any organization or group of organizations would be considered. There is simply too much in the alternative plan that has not been adequately thought-through, and that is not supported by objective fact.

This "alternative plan" prescribes No Leasing and No Surface Occupancy stipulations that are too broad and too restrictive, and that will have the inescapable effect of denying access to property – sub-surface mineral rights – which may even be illegal under Colorado law, which recognizes the rights of mineral owners to access their property.

The stipulations called for around "any organic or non-organic farm" not only make little sense due to the lack of any credible threat that drilling or completing a well poses to agriculture, and also because the proposal fails to define what they mean by "farm". Would a garden count? A grazing lease? If so, this could expand even further the restrictions on other economic activity.

Additionally, the plan claims as a goal to "keep development away from busy community areas." But by definition, busy community areas are already developed. Furthermore, the plan offers no evidence as to why the leasing restrictions it applies to areas around water bodies, towns, and other zones are needed. All that is presented is the author's preconceived notions that drilling poses some undefined "risk" to these resources and to public safety.

Any group is entitled to offer their opinions and thoughts on this or any other RMP on public land; but the bar to be accepted as an actual proposed alterative for management is necessarily much higher. By all means, take their ideas and opinions into account when developing the RMP alternatives, as you would anyone's ideas and opinions – but do not raise them to a higher level than they deserve.

Sincerely,

Lynn Shirk
367 Violetta Rd.
Delta, CO
81416

RECEIVED

DEC 1 8 2013

BY:

December 12, 2013

BLM Uncompahgre Field Office
Barbara Sharrow, Field Manager
2465 S. Townsend Ave
Montrose, CO  81401

Dear Ms. Sharrow,

Concerning the North Fork Alternative Plan submitted to your office by the environmental lobby group
Citizens for a Healthy Community, I would like to make a few points, indicating why I believe it should
not be accepted as an actual alternative in the draft RMP:

First, the plan was developed with the input of only a few, select groups, that do not accurately
represent the wider community, as they have tried to present themselves as representing. The
developers of this plan are an amalgam of special interests, centered on the environmental lobby, and
the plan is blatantly more about pushing a political agenda than it is about coming up with a workable
plan to balance conservation and economic activity. As such, the plan is clearly in opposition to the
interests of most people who live and work in the region.

Second, the leasing restrictions that are proposed by the plan go way too far, leaving large amounts of
mineral wealth and mineral rights unobtainable. Not only is an unreasonable amount of land shut down
by the No Leasing designation, but many acres (most in fact) that are designated as leasable, but with a
No Surface Occupancy stipulation attached, are rendered equally unobtainable. If a developer cannot
access the minerals from the surface, logic dictates that he must do so from adjacent land – but
according to the maps in the Alternative Plan, much of the NSO land is surrounded by No Leasing land.
This effectively shuts off even the NSO land from development, despite the ostensibly less restrictive
designation. As such, the plan is far from being reasonable, prudent, or balanced, though it pretends to
be. More importantly, these restrictions amount to a taking of private property. If someone owns sub-
surface minerals, they have a right to access them. This plan will unreasonably deny that right.

Third, there is precious little science or empirical evidence to back up the proposed restrictions. The plan
says that it is designed to protect resources, economies, and public health from the risks of oil and gas
production, but fails to delineate what those risks might be. Are we simply to take the word of the
authors that this particular economic activity, which has been occurring both in the North Fork Valley
and elsewhere in the state and nation for many years, bears special risks here that we never knew
about, in the face of true science that has repeatedly demonstrated the safety of the industry?

Oil and gas development has a long proven track record of responsibly providing good jobs, economic
growth, and a valuable product that keeps the lights on and people warm. The BLM should not forfeit
the many benefits of this industry on the mere say-so of a particular bloc of special interests.

Cordially,

Ryan Cannon
4387 Sundown Rd
Delta, CO  81416

RECEIVED
DEC 1 3 2013
BY:_____

12/13/2013

BLM Uncompahgre Field Office
2465 S. Townsend Ave
Montrose, CO 81401

To Whom It May Concern,

It was disappointing to read that your office is incorporating the ill-conceived "North Fork Alternative Plan" into the Draft Uncompahgre Resource Management Plan and EIS. This alternative is specifically designed to punish one particular industry, oil and gas, at the expense of severe damage to the current economy, and to any hopes of economic recovery for the region.

The plan as presented would all but eliminate the possibility of leasing public land within its planning area for oil and gas development. It imposes buffers that make no sense and that are not supported by any data, such as no-leasing stipulations ½ mile from water bodies and ¼ mile from town limits. The fact that someone or a particular lobbying group feels that there are terribly negative impacts from drilling within these artificial limits is not sufficient cause to curtail it, especially given the local benefits of job creation and small business support, and the wider economic benefits of low-cost energy. There is ample evidence that the development that is so feared by these folks does not pose any hazard to water or air quality.

BLM proposals should all be based on facts, not on political considerations or the unsubstantiated claims of a few extremists. This "Alternate Plan" should be treated by your office as simply another comment letter, nothing more, nothing less. If a group comes forward with a plan, and the data to back it up, then by all means it should be incorporated. But it is irresponsible for a federal agency tasked with making serious decisions that will impact the lives of many working families and small business owners, to give undue heed to a proposal that will risk the economic health of those same residents for the sake of a narrow political agenda disguised as a serious attempt to address a complicated issue.

I hope and trust that your office will do the right thing, and not give this "alternative plan" more weight than it ought to have.

Yours sincerely,

Joshua Amstutz
637 Howard St.
Delta, CO 81416

RECEIVED
DEC 1 3 2013
BY:

December 12, 2013

Barbara Sharrow, Field Manager
BLM Uncompahgre Field Office
2465 S. Townsend Ave
Montrose, CO  81401
Phone: (970) 240-530
uformp@blm.gov

Ref: North Fork Alternative Plan

Dear Ms. Sharrow,

I am writing to urge you not to incorporate the North Fork Alternative Plan in to the draft Uncompahgre Resource Management Plan. This "alternative plan" has too many faults and inconsistencies to be taken with any measure of seriousness.

The Alternative plan, while claiming to protect the economies of the North Fork area, fails to protect one of the most critical economies – oil and gas. In fact, the plan is specifically and maliciously biased *against* this one industry, for reasons that are not wholly or adequately explained. The plan says that it is "protecting" other resources and the community from oil and gas development, but protecting from what? Oil and gas development, especially as it is conducted currently in this country, poses no particular threat to any community or resource. The geology and physics of drilling and completion preclude against the types of risks that the paper alludes to. These wells are drilled far below the level of ground water, and incorporate many layers of steel casing and cement to further separate ground water from the well bore. Many credible, peer-reviewed scientific studies have been conducted on the safety of oil and gas drilling, completion, and production practices, and all re-affirm the environmental and public health safety of them.

While singling out this one industry for unwarranted and illegitimate attacks, the "alternative plan" fails to consider the economic consequences of its proposals; oil and gas contributes nearly $30 billion to Colorado's economy every year, and it makes up a good part of the local economy in the North Fork region as well. If this plan were to be adopted, in full or in part, the impact would be not only a potential loss of jobs and businesses in the region, as we have seen already in the region, but will also further delay, perhaps permanently, the long-hoped for economic recovery of this area.

In closing, I again urge your office to rely on science, facts, and empirical data in devising your RMP options, rather than hyperbolic, agenda-driven positions masquerading as serious solutions.

Sincerely,

Kami Collins

2745 Tessman Rd., Delta CO 81416

RECEIVED

DEC 1 3 2013

BY:_____

Dec. 13, 2013

BLM Uncompahgre Field Office
2465 S. Townsend Ave
Montrose, CO 81401
ATTN: Barbara Sharrow, Field Manager

RE: North Fork Alternative Plan

Dear Ms. Sharrow,

As a local resident, I wish to say that I strongly disagree with the decision by the BLM to include the so-called "North Fork Alternative Plan" in the draft Uncompahgre Field Office Resource Management Plan/Environmental Impact Statement that you are in the process of developing.

While I do not object to anyone or any group having their say in how our public lands are managed, I do not think it appropriate that any particular group should have their opinions elevated to the level of being included as an official alternative in an RMP/EIS unless certain academic and professional standards are met. This plan does not meet those standards.

An alternative cannot be based on mere opinion. While I respect the opinion of those who feel that oil and gas poses some distinct and egregious risk to public health, the environment, and water, until they can provide academically rigorous, peer reviewed, objective data to back up their claims, they remain just that—opinions. RMP alternatives need to be based on objective facts, not opinions or emotion. The facts, supported by experience backed up with solid science and empirical data, tells us that drilling and "fracking" are safe, and that they provide concrete economic benefits. Where there are provable impacts, these are what need to be addressed, not blanket accusations of risks to public health, water, or so forth.

The practical effect that implementing this group's opinion on the region would be to deny access to sub-surface minerals. The plan slaps No Leasing stipulations on an unreasonable amount of land, but does not stop there; most of the Leasing –NSO designated areas are unobtainable due to being surrounded by No Leasing designated land. Even much of the land subject ostensibly only to controlled surface use of timing limitations is rendered similarly unreachable.

In addition to this, pipelines and roads would be prohibited as well – so even if by some technological miracle the minerals could be accessed, they could not be transported. In either event, access to mineral rights is being denied.

Granted, the plan states that existing leases could be developed – assuming that access could be attained via existing roads; but in effect what it is saying is that "we won't steal what you have, but we will deny you access to your property", which amounts to the same thing.

BLM_0112506

Oil and gas development is a vital, necessary, and responsible use of public lands – many would argue that it is the best use, due to the return. In any case, a proposal that singularly seeks to prohibit this development, based on nothing but opinion and speculation, does not deserve any greater consideration than anyone else's opinion.

Please withdraw NFAP from your draft RMP, and take its recommendations with the same consideration you would grant to me or my neighbors.

Yours truly,

5571 Sunridge Drive
Delta, CO. 81416

c 12 13 12:54p       Delta Cabinet Company                                      08749985                              p.1

RECEIVED

DEC 1 8 2013

BY:_____

Barbara Sharrow
BLM Uncompahgre Field Office
2465 S. Townsend Ave
Montrose, CO 81401

December 13th, 2013

Dear Ms. Sharrow,

Having reviewed the "North Fork Alternative Plan" that your agency has decided to incorporate into the upcoming draft RMP/EIS, it appears that the plan falls short of what I would expect are the accepted legal and reasonable standards of a NEPA alternative.

The Plan presented by a consortium of environmental interests fails to consider the economic repercussions of what it proposes. The stipulations within their document would effectively ban oil and gas development over 94% of the land in the management area. This is bound to have impacts on the local and regional job market, especially considering that a large number of local mining jobs have just vanished. Shutting down this much land would also clearly affect the wider local economy; and yet, no analysis was conducted of what this alternative plan would mean in terms of socio-economic factors. This is irresponsible of the authors, of course, but more importantly, it is a failure that should not have been overlooked by your agency when deciding to incorporate it.

In addition, many of the terms are less than precisely defined, inviting a loose interpretation of things like "farm", "water body" and "critical habitat". The problem is that, without clearer definitions, a randomly planted herb garden could be considered a "farm" for the sake of imposing the restrictions set forth in the document; similarly, a large ephemeral or man-made pond could count as a "water body"; and what is considered "critical habitat", or a "prominent landscape feature" for purposes of visual resource management, could be left up largely to individual interpretation, which in turn could be used for the purpose of advancing an agenda, rather than for the intended conservation purposes.

Perhaps most importantly, is the fact that the No Leasing, and No Surface Occupancy stipulations directly interfere with the right to access subsurface property. If any private right exist under this BLM land, this constitutes a taking, in direct violation of federal and state laws. Even if there were no private property interests at stake, denying the public the right to access the mineral wealth via royalty payments and the like is irresponsible, and potentially a violation of the BLM's mandate.

All parties have the right to express their opinions and provide input on these NEPA related matters. But not all meet the necessarily high standards required to be considered an official alternative for public lands management. The Alternative Plan should be accepted as a public comment on the upcoming RMP and nothing more.

Sincerely,

Marc J. Kanter
Marc Kanter
1712 Pioneer Gr
Delta Co 81416

**ufo- ar**

| | |
|---|---|
| **From:** | Angie Adams <angie.adams@empsi.com> |
| **Sent:** | Wednesday, January 30, 2013 9:44 PM |
| **To:** | UFO AR |
| **Subject:** | FW: Potential Cooperating Agency |

**From:** Krickbaum, John [mailto:bkrickba@blm.gov]
**Sent:** Tuesday, January 29, 2013 5:08 PM
**To:** Angie Adams; Kate Krebs
**Subject:** Potential Cooperating Agency

Hi,

FYI, and for the record.

--Bruce

Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401
970-240-5384

---------- Forwarded message ----------
From: **Reed, Christina** <creed@blm.gov>
Date: Mon, Jan 28, 2013 at 4:13 PM
Subject: Re: Research potential cooperating agency
To: "Sharrow, Barbara" <bsharrow@blm.gov>
Cc: John Krickbaum <bkrickba@blm.gov>, Gina Jones <gmjones@blm.gov>

Hi Barb - Yes, the Delta Conservation District can be a cooperating agency on the RMP.  Eligibility for cooperating agency status is defined as an agency (federal, state, or local) that either has "jurisdiction by law" or "special expertise with respect to any environmental impact."  (See CEQ regs at 40 CFR 1508.5).  I'm assuming that the Conservation District has relevant special expertise, which is defined as, "statutory responsibility, agency mission, or related program experience" (40 CFR 1508.26).

Additionally, BLM's planning regulations and policy view special-purpose districts (like conservation districts) to be eligible as cooperating agencies if state law defines them as political subdivisions.  (See 43 CFR 1601.1-5(h), and BLM Cooperating Agency Desk Guide p.23).

Conservation districts have been cooperating agencies on other BLM planning efforts, some examples are: the NW District Greater Sage-Grouse EIS has the Garfield County Conservation District has a cooperating agency, and in BLM WY, the Bighorn Basin RMP has 7 conservation districts as cooperating agencies.

Let me know if you have questions or need more info.

1

BLM_0112509

**Christina Reed**
Planning and Environmental Coordinator
BLM Colorado State Office
2850 Youngfield St.
Lakewood, CO 80215
303-239-3677

On Mon, Jan 28, 2013 at 3:26 PM, Sharrow, Barbara <bsharrow@blm.gov> wrote:
Christina,

Thank you for helping us out on this.  Ralph D'Alessandro with the Delta Conservation District has asked to be a cooperative agency on our UFO RMP.  He asked for this back in late November, early December.

He claims the board is elected therefore is their own entity and should be allowed to be a cooperating agency.  We have never extended invitations to conservation districts to be a cooperating agency on any of our projects.  If we offer it to them, obviously, we'd have others we would also have to consider.  Also unknown is if any other BLM offices have extended the offer or have had conservation districts as cooperating agencies.

Contact info in case you need to ask questions:

Ralph D'Alessandro, president of the board
cell:  970-314-5355
wk:  970-527-4626

Staff - David Carey
690 Industrial Blvd.
Delta, CO  81416
david.carey@co.nacdnet.net or
rdinca@yahoo.com

Thanks for looking into this.  Mr. D'Alessandro was encouraged to apply by a high ranking BLM official in the Washington Office.  So if he does not qualify, we need to be clear as to why.

Thanks again.

Barb

2

**ufo- ar**

| From: | bkrickba@blm.gov on behalf of UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov> |
| From: | |
| Sent: | Friday, September 12, 2014 10:04 AM |
| To: | UFO AR |
| Subject: | Fwd: Uncompahgre RMP, Supplemental Comments |
| Attachments: | UFO RMP_Supplemental Comments(final).pdf |

---------- Forwarded message ----------
From: **Kyle Tisdel** <tisdel@westernlaw.org>
Date: Mon, Feb 3, 2014 at 3:01 PM
Subject: Uncompahgre RMP, Supplemental Comments
To: bsharrow@blm.gov, bkrickba@blm.gov
Cc: Jim Ramey <chc.director@gmail.com>, Erik Schlenker-Goodrich <eriksg@westernlaw.org>,
"<singer@westernlaw.org>" <singer@westernlaw.org>

Dear Ms. Sharrow and Mr. Krickbaum:

Please find the attached supplemental comments to the Uncompahgre RMP and EIS, submitted on behalf of Citizens for a Healthy Community, identifying significant new information and circumstances essential to the agency's decisionmaking process, which must be considered. *See* 40 C.F.R. § 1502.9(c)(1)(ii). Should you have any questions, please do not hesitate to contact me.

Regards.

Kyle J. Tisdel
Western Environmental Law Center
208 Paseo del Pueblo Sur, #602
Taos, New Mexico 87571
Ph: 575.613.8050

tisdel@westernlaw.org

www.westernlaw.org

BLM_0112511



Northwest
1216 Lincoln Street
Eugene, Oregon 97401
(541) 485-2471

Rocky Mountains
103 Reeder's Alley
Helena, Montana 59601
(406) 443-3501

Southwest
208 Paseo del Pueblo Sur #602
Taos, New Mexico 87571
(575) 751-0351

Defending the West   www.westernlaw.org

# Western Environmental Law Center

February 3, 2014

*Supplemental Comments submitted via electronic mail*

Barb Sharrow, Field Manager
Bruce Krickbaum, Environmental Coordinator
U.S. Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
E-mail: bsharrow@blm.gov
E-mail: bkrickba@blm.gov

**Re:   Supplemental Comments on the Uncompahgre Resource Management Plan**

Dear Ms. Sharrow and Mr. Krickbaum:

The Western Environmental Law Center, on behalf of Citizens for a Healthy Community ("Conservation Groups"), submit the following supplemental comments on the Bureau of Land Management ("BLM") Uncompahgre Draft Resource Management Plan ("Draft RMP") and associated Environmental Impact Statement ("Draft EIS"), identifying significant new information and circumstances essential to the agency's decisionmaking process, and bearing on the proposed RMP and its impacts. *See* 40 C.F.R. § 1502.9(c)(1)(ii). As the Draft RMP and EIS have yet to be released, the information provided herein should be included in the forthcoming draft, thus preventing the need for a supplemental National Environmental Policy Act ("NEPA") analysis, as would otherwise be required.

The new information provided herein should be considered in addition to Conservation Groups' earlier supplemental comments on the Uncompahgre RMP, submitted October 23, 2012, as well as the North Fork Alternative Plan, submitted December 2, 2013, both of which are incorporated by this reference.

## I.   NEW INFORMATION ON ACTION TO ADDRESS THE IMPACTS OF METHANE EMISSIONS

Significant recent advancements in requirements aimed to address the impacts of greenhouse gas ("GHG") emissions, and, in particular, methane emissions, from oil and gas development must be considered in the agency's decisionmaking on the Uncompahgre RMP and EIS.

Supplemental Comments                                                    1
Uncompahgre Field Office RMP

BLM_0112512

## A.      National Policy on Methane Waste

The Western Environmental Law Center, along with our national and local partners, have been successfully engaged in a broad effort to reduce methane emissions from the oil and gas industry through the adoption of new federal policy.

On November 19, 2013, a coalition of over 90 environmental, health, and sporting organizations submitted an open letter to the Secretary Jewell of the U.S. Department of Interior and Administrator McCarthy of the U.S. Environmental Protection Agency calling for action to substantially reduce emissions of methane from the oil and gas industry on public and private lands, as well as from offshore oil operations. The coalition called on Secretary Jewell to reduce emissions from oil and gas operations on public lands by updating decades-old BLM rules to prevent waste of mineral resources. Further, we asked Administrator McCarthy to directly regulate methane emissions from the oil and gas industry using existing Clean Air Act authority and to develop nationwide curbs on GHG emissions.

Such action would advance the goals addressed by President Obama in his Climate Action Plan, where he acknowledged: "Curbing emissions of methane is critical to our overall effort to address global climate change."

Notably, BLM is currently undertaking federal rulemaking pertaining to Onshore Oil and Gas Order No. 9, Waste Prevention and Use of Produced Oil and Gas for Beneficial Purposes. *See* 43 C.F.R. § 3164.1 (authorizing the Director to issue Onshore Oil and Gas Orders to implement or supplement regulations).

In a statement regarding Order No. 9, the agency provided:

This new order would establish standards to limit the waste of vented and flared gas and to define the appropriate use of oil and gas for beneficial use. This order would, among other things, delineate which activities qualify for beneficial use, minimize the amount of venting and flaring that takes place on oil and gas production facilities on Federal and Indian lands, and establish standards for determining avoidable versus unavoidable losses.

Office of Information and Regulatory Affairs, Unified Agenda and Regulatory Plan, RIN: 1004-AE14. The Uncompahgre Field Office ("UFO") must consider federal rulemaking on Order No. 9 and the implications that this rule would have on place-based action in its planning level decisionmaking.

The Western Environmental Law Center and our partners also recently submitted what we have identified as "Core Principals" that should help guide BLM's new order, and which are aimed to constructively inform the contours of BLM's rulemaking process. These Core Principals are incorporated herein, attached hereto as Exhibit A, and must also be considered by the UFO in undertaking the Uncompahgre RMP and EIS planning process. *See* 40 C.F.R. § 1502.9(c)(1)(ii).

BLM_0112513

**B.      Place-Based Implementation of Stipulations to Address Methane Waste**

There are significant advances that can be achieved at the field office level to address the impacts of climate change and, specifically, the issue of methane emissions and waste, which must be considered by the UFO as it undertakes the RMP planning process. The adoption of required methane mitigation technologies for all oil and gas development is not only consistent with the goal of curbing emissions, but is readily achievable with existing practices and technology.

Notably, certain BLM field offices have already taken pioneering steps to address methane emissions and waste through mandatory mitigation measures at the RMP stage. Specifically, in a joint Land and Resource Management Plan ("LRMP"), BLM: 1610 (CO-933), adopted by BLM Colorado's Tres Rios Field Office ("TRFO") and the San Juan National Forest ("SJNF"), the agencies broke new and essential ground in both acknowledging that significant GHG pollution would result from oil and gas development on TRFO lands and then establishing required methane mitigation standards at the planning stage that will bind future leases and permits to drill to comply with these measures. As provided in the Final EIS for the LRMP:

> NEPA analysis is typically conducted for oil and gas leasing and when permits are issued. **This FEIS is the first NEPA analysis where lands that could be made available for lease are identified <u>and stipulated.</u>** In a subsequent analysis stage, when there is a site-specific proposal for development, additional air quality impact analysis would occur. This typically occurs when an application for a permit to drill is submitted. Based on the analysis results, additional mitigation or other equally effective options could be considered to reduce air pollution.

Final EIS at 372 (emphasis added). The TRFO set a new standard by recognizing that the climate change impacts from oil and gas industry activities are cumulative and that methane losses from business-as-usual industry practices at the field office level contribute significantly to climate change and must be mitigated. In the Final EIS, the TRFO also recognized that methane emissions represent waste of a key natural resource that belongs to all U.S. citizens, and the failure to control such waste robs the U.S. and state treasuries of royalty revenues. Accordingly, the agencies adopted six important methane mitigation measures, which include:

- Centralized Liquid Gathering Systems and Liquid Transport Pipelines
- Reduced Emission Completions/Recompletions (green completions)
- Low-Bleed/No-Bleed Pneumatic Devices on all New Wells
- Dehydrator Emissions Controls
- Replace High-bleed Pneumatics with Low-Bleed/No-Bleed or Air-Driven Pneumatic Devices on all Existing Wells; and
- Electric Compression

Supplemental Comments                                                                                       3
Uncompahgre Field Office RMP

Green completions are a widely recognized Best Management Practice ("BMP") for controlling methane emissions, as are dehydrator emissions controls. An especially noteworthy measure is the requirement for operators to replace high-bleed pneumatic devices with low-bleed, no-bleed, or air-driven devices on all existing wells as well as on all new wells. *See* Final EIS at 376. Recent research (David T. Allen *et. al.*, 2013) has found methane emissions from pneumatic devices to be higher than that currently estimated by the EPA, making pneumatics a particularly important source for targeting emissions controls. In justifying this requirement, the TRFO found:

> The cost to inventory and replace high-bleed pneumatics with low-bleed pneumatic devices on existing oil and gas wells located on federal land is not high compared to the value of $CH_4$ gas lost to the atmosphere. Most replacement costs are recouped in under 1 year, resulting in a large economic benefit for industry. This measure could be applied to any existing gas well on the SJNF and TRFO.

*Id.* at 376.

As the Uncompahgre Field Office proceeds in its RMP planning process, it is essential to consider the pioneering action taken by the TRFO. *See* 40 C.F.R. § 1502.9(c)(1)(ii). The UFO's RMP should not treat climate change dismissively, particularly given the opportunity to take meaningful action at the planning stage. A critical component of the agency's strategy should be taking serious steps to address methane emissions from oil and gas development through stipulated mitigation requirements. It is incumbent upon BLM to confront the issues of climate change and methane emissions head-on, which must be accomplished through field office level decisionmaking that is reflective of challenges we face.

## C.    BLM State Office Action

In addition to both national rulemaking and precedent-setting action at the local field office level, BLM's Colorado State Office has recently adopted its Comprehensive Air Resources Protection Protocol ("CARPP"), which, as provided by the agency:

> [D]escribes the process and strategies the BLM will use when authorizing activities that have the potential to adversely impact air quality within the state of Colorado. This protocol also outlines specific measures that may be taken to address BLM-approved activities with the potential to cause significant adverse impacts to air resources … within any planning area [ ]. Further, the purposes of this protocol are to address air quality issues identified by the [BLM], or public scoping, in its analysis of potential impacts on air resources for BLM Colorado [RMPs] and [EIS']; and clarify the mechanisms and procedures that BLM will use to achieve the air resources goals, objectives, and management actions set forth in BLM Colorado RMPs.

While Conservation Groups presume that the BLM Colorado CARPP will be integral to the UFO's RMP planning process, we nevertheless feel it is important to

BLM_0112515

emphasize key provisions that will guide the agency's analysis of air quality impacts for the Uncompahgre RMP. In particular, Table V-I identifies Best Management Practices and Air Emission Reduction Strategies for Oil and Gas Development. BLM CARPP Attached hereto as Exhibit B. These practices and strategies should be integrated into the UFO's RMP as stipulated requirements for all existing and future oil and gas development that may be authorized by the UFO.

## II.    CONCLUSION

The Conservation Groups appreciate your consideration of the new information and concerns addressed herein, as well as the information included in the attached exhibits. This information is critical and must be used to supplement the agency's Draft EIS, or included in the final analysis for the Uncompahgre RMP and EIS. *See* 40 C.F.R. § 1502.9.

Should you have any questions or wish to discuss our concerns in greater detail, please do not hesitate to contact us.

Sincerely,

Kyle Tisdel
Western Environmental Law Center
208 Paseo del Pueblo Sur, Unit 602
Taos, New Mexico 87571
575.613.8050
tisdel@westernlaw.org

Counsel for Citizens for a Healthy Community

BLM_0112516

# Exhibit A

## In Support of Supplemental Comments to the RMP

BLM_0112517

# AMIGOS BRAVOS ♦ CENTER FOR BIOLOGICAL DIVERSITY ♦ CITIZENS FOR A HEALTHY COMMUNITY ♦ CLEAN AIR TASK FORCE ♦ EARTHJUSTICE ♦ EARTHWORKS ♦ GRAND CANYON TRUST ♦ LOS PADRES FORESTWATCH ♦ MONTANA ENVIRONMENTAL INFORMATION CENTER ♦ NATIONAL WILDLIFE FEDERATION ♦ SAN JUAN CITIZENS ALLIANCE ♦ SOUTHERN UTAH WILDERNESS ALLIANCE ♦ WESTERN ENVIRONMENTAL LAW CENTER ♦ WESTERN ORGANIZATION OF RESOURCE COUNCILS ♦ WILDEARTH GUARDIANS ♦ WYOMING OUTDOOR COUNCIL

January 27, 2014

The Honorable Sally Jewell
Secretary
U.S. Department of the Interior
1849 C Street N.W.
Washington, DC 20240

Dear Secretary Jewell,

As organizations with deep and longstanding concerns regarding the development of oil and gas resources in the American West, we write to express our strong support for the U.S. Bureau of Land Management's urgently needed effort to promulgate revised rules to prevent the waste of oil and gas resources, namely natural gas, from federal onshore oil and gas development.

BLM's current regulations are over 30 years old and do not adequately prevent the leaking, venting, and flaring of methane from oil and gas development. This loss of methane harms the climate and results in the waste of a valuable energy resource. Such waste contravenes the Mineral Leasing Act of 1920 which requires that the Bureau of Land Management, before granting leases to federally-owned onshore oil and gas resources, ensure that oil and gas producers "use all reasonable precautions to prevent waste of oil or gas developed...." Reducing this waste would:

- Conserve domestic oil and gas resources;

- Safeguard the climate, environment, and public health; and

- Increase federal and state royalties.

The most recent U.S. Greenhouse Gas Inventory shows that the oil and gas industry leaked, vented, or flared approximately 8.4 million metric tons of methane in 2011, comparable to the emissions of 204 coal-fired power plants, assuming the most recent estimates of methane's 20-year warming potential provided by the Intergovernmental Panel on Climate Change. And while

BLM_0112518

there are divergent research findings regarding methane emissions, one conclusion rings loud and clear: significant reductions are within reach. Leaked, vented, and flared methane emissions can be reduced with proven, off-the-shelf technologies. These technologies are often economical, paying for themselves quickly, even at today's low natural gas prices.

The attached core principles document is divided into three sections. First, we highlight the problem—and opportunity—inherent in BLM's rulemaking process. Second, we provide an analysis of BLM's authority to prevent methane waste and pollution. And finally, with this foundation, we provide ten core principles that BLM should consider as it works to craft and then implement and enforce new rules to prevent methane/natural gas waste. These core principles, to summarize, are as follows:

1. BLM's revised waste rule should be expeditiously completed, implemented, and enforced.

2. BLM should consider an interim directive to ensure that waste is prevented pending a revised waste rule.

3. BLM's revised waste rule should prevent waste from all oil and gas methane pollution and waste sources.

4. BLM's waste rule should prevent waste from existing and future oil and gas development.

5. BLM's revised waste rule should integrate methane waste prevention efforts with BLM's "front end" planning and management tools.

6. BLM's revised waste rule should mandate—before leases are executed—the use of best available technologies.

7. BLM should significantly tighten and at times prohibit natural gas venting and flaring.

8. BLM's revised waste rule should be informed by the true and full cost of methane waste and pollution.

9. BLM should use a "carrot-and-stick" approach to facilitate the prevention of natural gas waste.

10. BLM should ensure public transparency and accountability.

We look forward to engaging with BLM and other stakeholders in a constructive and informed dialogue as the agency works to curb methane waste and pollution from the development of publicly owned oil and natural gas resources. We would therefore welcome the opportunity to discuss our recommendations in more detail.

BLM_0112519

Sincerely,

Erik Schlenker-Goodrich
Executive Director
Western Environmental Law Center
Taos, New Mexico

Tom Singer
Senior Policy Advisor
Western Environmental Law Center
Santa Fe, New Mexico

Rachel Conn
Director of Programs
Amigos Bravos
Taos, New Mexico

Jeff Kuyper
Executive Director
Los Padres ForestWatch
Santa Barbara, California

Jim Ramey
Director
Citizens for a Healthy Community
Hotchkiss, Colorado

Derf Johnson
Associate Program Director
Montana Environmental Information Center
Helena, Montana

Kassie Siegel
Director, Climate Law Institute
Center for Biological Diversity
Joshua Tree, California

Jim Murphy
Senior Counsel
National Wildlife Federation
Montpelier, Vermont

Conrad G. Schneider
Advocacy Director
Clean Air Task Force
Brunswick, Maine

Mike Eisenfeld
Energy Coordinator
San Juan Citizens Alliance
Farmington, New Mexico

Robin Cooley
Staff Attorney
Earthjustice
Denver, Colorado

Stephen Bloch
Legal Director
Southern Utah Wilderness Alliance
Salt Lake City, Utah

Bruce Baizel
Director, Energy Program & Oil and Gas
Accountability Project
Earthworks
Durango, Colorado

Don Nelson
Oil and Gas Campaign Team Chair
Western Organization of Resource Councils
Keene, North DakotaWestern

Taylor McKinnon
Director of Energy
Grand Canyon Trust
Flagstaff, Arizona

Jeremy Nichols
Director, Climate and Energy Program
WildEarth Guardians
Denver, Colorado

iii

Bruce Pendery
Chief Legal Counsel
Wyoming Outdoor Council
Lander, Wyoming

iv

BLM_0112521

# WASTED OIL AND GAS RESOURCES ON FEDERAL LANDS

Core Principles To Inform Modernization Of The U.S. Bureau of Land Management's 34-Year-Old Rules

**Submitted By:**

AMIGOS BRAVOS ♦ CENTER FOR BIOLOGICAL DIVERSITY ♦ CITIZENS FOR A HEALTHY COMMUNITY ♦ CLEAN AIR TASK FORCE ♦ EARTHJUSTICE ♦ EARTHWORKS ♦ GRAND CANYON TRUST ♦ LOS PADRES FORESTWATCH ♦ MONTANA ENVIRONMENTAL INFORMATION CENTER ♦ NATIONAL WILDLIFE FEDERATION ♦ SAN JUAN CITIZENS ALLIANCE ♦ SOUTHERN UTAH WILDERNESS ALLIANCE ♦ WESTERN ENVIRONMENTAL LAW CENTER ♦ WESTERN ORGANIZATION OF RESOURCE COUNCILS ♦ WILDEARTH GUARDIANS ♦ WYOMING OUTDOOR COUNCIL

January 27, 2014

BLM_0112522

I.      INTRODUCTION ................................................................................................................. 4

II.     NATURAL GAS WASTE IS A SERIOUS PROBLEM WITH
        PROVEN AND OFTEN ECONOMICAL SOLUTIONS.............................................................. 4

        A.      OIL AND NATURAL GAS METHANE EMISSIONS AND
                EMISSION REDUCTION OPPORTUNITIES.............................................................. 4

        B.      BLM'S EFFORTS TO CONTROL METHANE WASTE ARE
                IMPROVING BUT STILL INADEQUATE .................................................................. 8

III.    BLM HAS THE EXPANSIVE AUTHORITY, RESPONSIBILITY, AND
        OPPORTUNITY TO PREVENT METHANE WASTE AND POLLUTION ...........................13

        A.      THE MINERAL LEASING ACT'S DUTY TO
                PREVENT OIL AND NATURAL GAS WASTE ..........................................................13

        B.      THE PRESIDENT'S CLIMATE ACTION PLAN, THE
                FEDERAL LAND POLICY AND MANAGEMENT ACT, THE
                NATIONAL ENVIRONMENTAL POLICY ACT, AND SECRETARIAL
                ORDER 3289 COMPEL ACTION TO PREVENT OIL AND NATURAL
                GAS WASTE AND POLLUTION .................................................................................14

IV.     BLM'S RULEMAKING SHOULD REFLECT THE
        FOLLOWING CORE PRINCIPLES ....................................................................................18

        A.      OVERVIEW .............................................................................................................18

        B.      CORE PRINCIPLES .................................................................................................18

                1.      BLM's Revised Waste Rule Should Be Expeditiously
                        Completed, Implemented, And Enforced ...........................................18

                2.      BLM Should Consider An Interim Directive To Ensure
                        That Waste Is Prevented Pending A Revised Waste Rule...............18

                3.      BLM's Revised Waste Rule Should Prevent Waste From
                        All Oil and Gas Methane Pollution And Waste Sources ..................19

                4.      BLM's Waste Rule Should Prevent Waste From Existing
                        And Future Oil And Gas Development ...................................................22

                5.      BLM's Revised Waste Rule Should Integrate Methane
                        Waste Prevention Efforts With BLM's "Front End"

**CORE PRINCIPLES**
**Page 2 of 32**

BLM_0112523

Planning And Management Tools............................................................................23

6.  BLM's Revised Waste Rule Should Mandate—Before
    Leases Are Executed—The Use Of Best Available Technologies.................26

7.  BLM Should Significantly Tighten And At Times Prohibit
    Natural Gas Venting And Flaring............................................................................26

8.  BLM's Revised Waste Rule Should Be Informed By The
    True And Full Cost of Methane Waste And Pollution.....................................27

9.  BLM Should Use A "Carrot-And-Stick" Approach To
    Facilitate The Prevention Of Natural Gas Waste..............................................29

10. BLM Should Ensure Public Transparency And Accountability......................31

V.    CONCLUSION.......................................................................................................................32

**CORE PRINCIPLES**
**Page 3 of 32**

BLM_0112524

## I.     INTRODUCTION

The U.S. Bureau of Land Management's ("BLM's") rule governing the waste of oil and gas resources on federal onshore lands, Notice to Lessees and Operators 4A ("NTL 4A"), is outdated. This 34-year old rule effectively allows oil and gas producers to waste methane—the primary constituent of natural gas—through deliberate venting and flaring, as well as through myriad unintentional fugitive leaks. This waste occurs during the production of federal, publicly owned, onshore oil and gas resources. The BLM has fortunately announced an effort to update the agency's waste prevention rule—an effort that is urgently needed as our country, for better or worse, continues to lean on natural gas as an energy resource. Such an effort is also eminently practical if harnessed to BLM's existing planning and management authorities as well as to the host of industry proven and EPA vetted methane reduction technologies and practices. Preventing methane waste conserves domestic oil and gas resources; better safeguards the climate, environment, and public health; and increases federal and state royalty revenues.

With this paper, we lay out the reasons why BLM should reduce methane waste and pollution as an essential component of the nation's climate and energy strategy. We also set forth the expansive legal basis for BLM's authority and responsibility to prevent methane waste (and pollution). Finally, we lay out a number of core principles to help guide BLM in developing an effective and enforceable new rule. We do this to spark a constructive and informed dialogue with BLM and other stakeholders.

## II.    NATURAL GAS WASTE IS A SERIOUS PROBLEM WITH PROVEN AND OFTEN ECONOMICAL SOLUTIONS

### A.     OIL AND NATURAL GAS METHANE EMISSIONS AND EMISSION REDUCTION OPPORTUNITIES

Oil and natural gas systems are the single largest industrial source of methane emissions in the United States. Indeed, oil and natural gas systems are one of the top three industrial sources of greenhouse gas ("GHG") pollution, period, when accounting for both methane and carbon dioxide ("$CO_2$").[1] And because methane is the main component of natural gas—a marketable energy resource—natural gas is wasted when methane is released into the atmosphere.

The most recent report by the Intergovernmental Panel on Climate Change ("IPCC") indicates that the oil and gas industry has a far greater climate impact than that suggested by past IPCC warming potential estimates. The IPCC now estimates methane to be upwards of 34 times more potent than $CO_2$ over a 100-year time frame and upwards of 86 times more potent than $CO_2$ over a 20-year time frame (accounting for climate-carbon feedbacks).[2] Given this potent

---

[1] http://epa.gov/climatechange/ghgemissions/gases/ch4.html.

[2] IPCC Fifth Assessment Report, Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (accepted September 26, 2013).

**CORE PRINCIPLES**
**Page 4 of 32**

BLM_0112525

warming impact, but relatively short residency time in the atmosphere (~12 years), scientists have emphasized that reducing methane emissions—specifically from oil and natural gas systems—provides a critical near-term climate mitigation opportunity to substantially reduce the risk of crossing a 2°C warming threshold and thereby avoid catastrophic climate disruption.[3]

Given its oversight of oil and gas development on roughly 700 million acres of federal onshore mineral lands, including nearly 38 million acres already leased for oil and gas development, BLM has an opportunity to make a significant contribution towards the reduction of both GHG emissions and methane waste.[4] In 2010, the Government Accountability Office ("GAO") estimated that BLM could economically eliminate up to 40% of methane vented and flared from federally authorized onshore oil and natural gas development.[5] In 2012, the Natural Resources Defense Council ("NRDC") estimated that up to 80% of methane emissions from oil and gas development could be captured using readily available technologies.[6]

Assuming a near-term 40-80% emissions reduction potential, BLM—coupled with regulatory efforts by other agencies, such as the U.S. Environmental Protection Agency ("EPA")[7]—has the opportunity to eliminate roughly 65-130 MMTCO$_2$e, assuming a 20-year warming potential of 86 for methane, of GHG pollution annually on federal lands (assuming static development levels). These annual reductions are comparable to the elimination of annual GHG emissions from 18 to 37 coal-fired power plants, or 13 to 27 million passenger vehicles.[8] Of note, these

---

[3] Shindell, D., *et al.*, *Simultaneously Mitigating Near-Term Climate Change and Improving Human Health and Food Security*. Science. Vol. 335, no. 6065 pp. 183-189 (Jan. 13, 2012).

[4] BLM, Public Land Statistics (2012) http://www.blm.gov/public_land_statistics/.

[5] GAO, Federal Oil & Gas Leases: Opportunities Exist to Capture Vented and Flared Natural Gas, Which Would Increase Royalty Payments and Reduce Greenhouse Gases, GAO-11-34 (October 2010).

[6] Harvey, S. *et al.*, *Leaking Profits: The U.S. Oil and Gas Industry Can Reduce Pollution, Conserve Resources, and Make Money by Preventing Methane Waste*, NRDC (2012) (http://www.nrdc.org/energy/leaking-profits.asp).

[7] In April 2012, EPA issued new air pollution rules applicable to oil and natural gas production. These rules, while they do not directly mandate the reduction of methane, will indirectly result in the reduction of methane emissions as a byproduct of controlling other air pollutants, such as volatile organic compounds. *See* http://www.epa.gov/airquality/oilandgas/actions.html. These rules will contribute to the aggregate emissions reduction potential of 40-80%.

[8] This calculation is based on GAO 11-34's analysis of greenhouse gas emissions data and assumes a CH$_4$ warming potential of 86 (20-year warming period) as per the Intergovernmental Panel on Climate Change's Fifth Assessment Report; coal-fired power plant and passenger vehicle equivalencies were calculated using EPA's GHG equivalencies calculator and rounded. We use the 20-year warming period to emphasize near term climate mitigation opportunities and to reflect the typical time horizon of BLM decision-making as reflected in the agency's primary management tool, Resource Management Plans, required by the Federal Land Policy Management Act. We emphasize that this is a rough projection and do not mean to convey a false sense of precision; GAO's analysis of emissions is now dated relative to new research and EPA data that has arisen since GAO 11-34 and these figures do not account for indirect methane emission reductions obtained through implementation of EPA's 2012 air rules (as modified) for oil and natural gas development (*see* note 7 above).

BLM_0112526

methane emission reductions can be achieved without necessarily prohibiting or shutting down a single oil or natural gas well.

Additional Peer-reviewed research findings strongly suggest that the scale of the waste problem identified by GAO—and thus the opportunity—may well be underestimated. Recent field-level air analyses conducted by the National Oceanic and Atmospheric Administration and University of Colorado have shown startlingly high methane losses from oil and gas development in Colorado's Denver-Julesberg Basin (2.3-7.7% loss) and Utah's Uintah Basin (6-12% loss).[9] On the other hand, a recent "bottom up" study showed very low emissions from new well drilling projects utilizing reduced emission completion technology, illustrating the available opportunities to help mitigate the methane emission problem with proven, often economical technologies and practices.[10]

Such technologies and practices are well documented by EPA's Natural Gas STAR program.[11] Gas STAR is a voluntary program that works collaboratively with industry

> to encourage partner companies to implement methane emissions reducing technologies and practices and document their voluntary emission reduction activities. Through this work, the oil and natural gas industry, in conjunction with Natural Gas STAR, has pioneered some of the most widely–used, innovative technologies and practices that reduce methane emissions.[12]

In its 2012 study, NRDC reviewed Gas STAR's documentation and identified ten of Gas STAR's most promising technologies and practices to prevent methane waste and pollution.[13] These technologies and practices are economical, often providing a payback on investment in less than a year, and in most cases no longer than three years.[14]

---

[9] Karion, A., *et al.* (2013*)*, Methane emissions estimate from airborne measurements over a western United States natural gas field, *Geophys. Res. Lett.,* 40, 4393–4397, *doi:*10.1002/grl.50811;
Pétron, G., *et al.* (2012*)*, Hydrocarbon emissions characterization in the Colorado Front Range: A pilot study, *J. Geophys. Res.,* 117, D04304, *doi:*10.1029/2011JD016360. *See also* Katzenstein, A., et al. (2012) Extensive regional atmospheric hydrocarbon pollution in the southwestern United States. *Proc. Natl. Acad. Sci.,* 100, 11975-11979, *doi:*10.1073/pnas.1635258100; Wennberg, P., et al. (2012) On the sources of methane to the Los Angeles Atmosphere. *Environ. Sci. Technol.,* 46, 9282–9289, *doi:*10.1021/es301138y.

[10] Allen, David T. et al., Measurements of methane emissions at natural gas production sites in the United States PNAS 2013; published ahead of print September 16, 2013, doi:10.1073/pnas.1304880110.

[11] http://www.epa.gov/gasstar/tools/recommended.html.

[12] http://www.epa.gov/gasstar/basic-information/index.html#overview1.

[13] Harvey, Susan, et al., *Leaking Profits*, NRDC (2012) (http://www.nrdc.org/energy/leaking-profits.asp).
[14] http://www.epa.gov/gasstar/tools/recommended.html.

**CORE PRINCIPLES**
**Page 6 of 32**

However, Gas STAR has its limitations. As a voluntary program, Gas STAR neither sets enforceable standards to ensure accountability nor ensures implementation across the full spectrum of oil and natural gas activities. Moreover, simply adopting proven Gas STAR solutions, while a good thing, would not satisfy BLM's obligation to prevent waste. Gas STAR is focused on the "back end" adoption by industry of technologies and practices, like green completions or directed inspection and maintenance. BLM management of oil and gas resources should certainly make use of these excellent technologies and practices, but BLM must also employ its "front-end" planning and management tools to ensure the orderly and efficient development of oil and gas resources, which can also prevent waste. An updated BLM waste rule that combines back-end waste reduction technologies and practices with front-end planning and management tools presents a golden opportunity to secure significant reductions in methane waste.

The investor community is, notably, increasingly paying attention to the need to address environmental costs and waste that accompanies oil and natural gas development. Just recently, Trillium Asset Management divested its client holdings in natural gas producer Range Resources and removed Range Resources from its "buy list." As Trillium explained:

> Given the importance of operational efficiency to Range Resources' profitability, as well as the regulatory, environmental, and social license risks facing the company, Trillium believes that the company's current level of disclosure related to methane leakage is woefully inadequate.

> Leaking methane also represents lost revenue and raises the potential for increased regulatory and legal expense. Better transparency and the use of best practices to mitigate fugitive emissions would benefit Range Resources' shareholders.[15]

Unfortunately, Range Resources has opposed Trillium's efforts to seek improvements in their operations and minimize methane waste.

Mirroring Trillium's concerns, mineral rights owners in North Dakota have initiated class-action lawsuits against companies operating in the Bakken Formation, including Continental Resources, XTO Energy, SM Energy, and Marathon Oil, alleging that by flaring rather than routing natural gas produced in association with oil to a sales line, these companies have wasted gas and reduced royalty payments to mineral rights owners.[16] Documenting the extent of flaring in the Bakken, the U.S. Energy Information Administration has reported flaring at rates in excess of

---

[15] http://www.trilliuminvest.com/news-articles-category/thinking-capital/trillium-sells-all-holdings-in-range-resources/.

[16] http://www.nytimes.com/2013/10/18/business/energy-environment/oil-companies-are-sued-over-natural-gas-flaring-in-north-dakota.html?_r=2&.

BLM_0112528

30% of production for several years.[17] And a recent report by CERES found that in 2012 alone, flaring resulted "in the loss of approximately $1 billion in fuel and the GHG emissions equivalent of adding one million cars to the road."[18]

The deliberate flaring of gas at this magnitude, as well as leaks and venting of methane from numerous other sources all underscore the opportunity—and urgent need—to reduce waste through improved rules.

### B.    BLM'S EFFORTS TO CONTROL METHANE WASTE ARE IMPROVING BUT STILL INADEQUATE

The GAO's 2010 report noted that BLM's existing waste rule, NTL 4A, was developed in 1980, well before many methane reduction technologies and practices were developed and understood. As GAO found, "BLM guidance is 30 years old and therefore does not address venting and flaring reduction technologies that have advanced since it was issued."[19] GAO also found that NTL 4A does not "enumerate the sources [of methane emissions] that should be reported or specify how they should be estimated."[20] Further, GAO "found a lack of consistency across BLM field offices regarding their understanding of which intermittent volumes of lost gas should be reported to [the Oil and Gas Operations Report]."[21]

GAO did note "that [BLM] thought the industry would use venting and flaring technologies if they made economic sense."[22] However, this view, as GAO found, is belied by reality: methane waste is occurring and the existence of barriers to the deployment of methane reduction technologies and practices.[23] BLM, to its credit, conceded "existing guidance was outdated given current technologies and said that they were planning to update it by the second quarter of 2012."[24]

---

[17]U.S. Energy Information Administration, Today in Energy, 11/23/11, "Over one-third of natural gas produced in North Dakota is flared or otherwise not marketed."
http://www.eia.gov/todayinenergy/detail.cfm?id=4030.

[18] Ceres, "Flaring Up," July 2013
http://www.ceres.org/resources/reports/flaring-up-north-dakota-natural-gas-flaring-more-than-doubles-in-two-years; *see also* North Dakota Pipeline Authority, Natural Gas Facts, How Much Gas is Produced and Flared
http://northdakotapipelines.com/natgasfacts/.

[19] GAO 11-34 at 27.

[20] *Id.* at 11, 27.

[21] *Id.* at 11.

[22] *Id.* at 27.

[23] *Id.* at 20-33.

[24] *Id.* at 27.

**CORE PRINCIPLES**
**Page 8 of 32**

GAO's findings reflect the results of our own investigations and engagement with BLM regarding methane waste. In 2008, the Western Environmental Law Center ("WELC") and allies, such as San Juan Citizens Alliance, began to review proposed BLM oil and gas lease sales in California, Colorado, Montana, New Mexico, and Wyoming by evaluating the agency's lease-stage documentation and underlying Resource Management Plans and accompanying environmental reviews completed pursuant to the National Environmental Policy Act.

In particular, WELC reviewed oil and gas lease sales in New Mexico that were held on April 16, 2008 and July 16, 2008 for the Carlsbad, Farmington, Roswell, and Socorro Field Offices. In Montana, WELC reviewed oil and gas lease sales that were held on April 8, 2008; June 17, 2008; August 26, 2008; and November 4, 2008 for the Billings, Lewiston, Butte, Malta, and Miles City Field Offices. In each case, WELC and its allies found that BLM's planning and leasing documentation failed to address methane waste and climate pollution. Indeed, in Montana, BLM had not even prepared lease-stage environmental reviews. WELC and its allies accordingly challenged these oil and gas lease sales, raising concerns about methane waste and pollution.

To better understand what BLM was (or was not) doing, WELC and its allies supplemented its review of BLM's planning and leasing documentation with Freedom of Information Act ("FOIA") Requests. For example, on August 14, 2008, Rocky Mountain Clean Air Act filed a FOIA request with BLM's Washington D.C. and New Mexico offices asking for records regarding methane and other greenhouse gas emissions.  BLM's October 10, 2008 response to this FOIA[25] was revealing:

- BLM could not find "any records" "addressing the efficacy of [GHG] mitigation measures on federal leaseholds."[26]

- BLM could not locate "any records" "addressing the magnitude of GHG emissions from the venting of methane gas during drilling and well testing," or "pertaining to the deployment and effectiveness of best management practices used to reduce methane."[27]

- BLM could not locate any records "pertaining to BLM's coordination and participation with the Environmental Protection Agency's Natural Gas STAR program."[28]

- BLM could not locate any records "supporting BLM's contention that existing lease stipulations and APD-level conditions of approval and operational best management practices will help reduce GHG emissions."[29]

---

[25] FOIA NM 2008-052; FOIA 2008-952.

[26] Index of Released/Withheld Records for FOIA NM 2008-052 at 3.

[27] *Id*. at 4.

[28] *Id*.

**CORE PRINCIPLES**
**Page 9 of 32**

BLM_0112530

In 2008, after WELC challenged BLM oil and gas lease sales in New Mexico, the agency did begin to complete environmental reviews that attempted to account for methane and other GHG emissions.[30] BLM did not, however, consider specific technologies and practices to prevent methane emissions or mandate these technologies and practices via stipulation attached to leases or other approvals. Nor did BLM consider methane emissions from a "waste" perspective. Rather, BLM evaluated methane emissions only as a climate issue and on this basis dismissed them as insignificant relative to total global-, national-, and regional-scale GHG emissions. BLM's approach—which the agency has used in other situations, such as the Vernal Field Office's Monument Butte Project—ignores the nature of oil and gas development: disaggregated industrial drilling, extraction, gathering, and processing operations consisting of thousands, if not millions, of pieces of individual equipment which leak or vent methane and are sprawled across landscape-scale regions. Put differently, while natural gas waste from an individual oil and gas operation may appear insignificant in isolation, it is extremely significant when industry activity is viewed cumulatively, in particular relative to pragmatic methane reduction opportunities.

In Montana, BLM took a positive step forward in 2010 by contracting with URS Corporation to complete a Climate Change Supplemental Information Report ("SIR") to look more closely at the climate impacts of oil and gas development on federal lands.[31] The SIR, prepared in response to a settlement agreement that WELC secured from BLM on behalf of the Montana Environmental Information Center, Earthworks Oil & Gas Accountability Project, and WildEarth Guardians (see Mont. Envtl. Info. Ctr. v. BLM, 08-CV-178 DWM (Dkt # 54)), examined greenhouse gas emissions (including methane) from oil and gas development. The SIR also identified methane emission reduction technologies and best practices. However, in its subsequent leasing decisions and environmental reviews, BLM did not mandate the use of these technologies and practices via stipulation or other mandatory measures.[32] Instead, BLM promised to take action at the drilling stage to control methane emissions.[33]

To determine whether BLM carried through with this promise, WELC filed, on behalf of the Montana Environmental Information Center, a FOIA request in March 2013 with the Miles City

---

[29] Id.

[30] See, e.g., BLM, Environmental Assessment for July 16, 2008 Oil and Gas Lease Sale, EA-NM-210-08-369 (Farmington Field Office).

[31] URS Corporation, Climate Change Supplemental Information Report for the Montana, North Dakota, and South Dakota BLM (October 2010) (available at: http://www.blm.gov/pgdata/etc/medialib/blm/mt/blm_programs/energy/oil_and_gas/leasing/eas.Par.26526.File. dat/SIRupdate.pdf).

[32] See, e.g., BLM, Miles City Field Office, Environmental Assessment DOI-BLM-MT-C020-2010-0249-EA (Oct. 22, 2010).

[33] U.S. BLM, Decision Dismissing Protest to Dec. 9, 2010 Montana BLM Oil and Gas Lease Sale (Dec. 27, 2010).

BLM_0112531

Field Office asking for documentation showing whether, in its drilling stage approvals, the agency had considered alternatives or analyzed the feasibility of action to require, encourage, or otherwise deploy measures to capture or mitigate methane emissions.[34] In response, BLM conceded that it had not carried through with its promise, writing that it had "[n]o responsive records because the Miles City Field Office's environmental assessments for Applications for Permits to Drill do not specifically analyze methane emissions."[35]

Nonetheless, in a step forward, the current Draft Resource Management Plan and Environmental Impact Statement of the Miles City Field Office acknowledges that "management direction is needed to identify methods to reduce greenhouse gas (GHG) emissions" and "to ensure that the BLM authorizations and management activities implement feasible GHG emission reduction strategies."[36] The Miles City Draft Resource Management Plan also identifies numerous "best management practices (BMPs)" to reduce methane waste, but, problematically, stops short of requiring their deployment as stipulations attached to future leases or as mandatory drilling-stage requirements.

Real progress has, however, been made in Colorado, where the Tres Rios Field Office, along with the San Juan National Forest, has taken the groundbreaking step of requiring several mandatory methane reduction measures for oil and natural gas development in their recently completed Final Land and Resource Management Plan ("FLRMP").[37] The FLRMP states that:

> Much emphasis is also put into reducing CH4 emissions from drilling and gas production activities. Reducing CH4 emissions would reduce emissions of a significant greenhouse gas and increase CH4 gas revenue sales benefitting both the operator and the federal government.[38]

To achieve these methane reduction goals, the FLRMP—while imperfect—adopts several widely-recognized BMPs, including centralized liquid gathering systems and liquid transport pipelines; reduced emission completions/recompletions; low-bleed/no-bleed pneumatic devices on both new and existing wells; and dehydrator emission controls.[39]

Facing updates to other resource management plans, BLM's Colorado State Office has also undertaken an unprecedented effort to standardize and broaden the use of methane reduction

---

[34] Mont. Envtl. Info. Ctr. FOIA to BLM (March 20, 2013).

[35] BLM FOIA Response, FOIA Control No. BLM-2013-00467, at 3 (May 15, 2013).

[36] Miles City Field Office, Draft Resource Management Plan and Environmental Impact Statement, Chapter 1: Purpose and Need, p. 1-11.

[37] http://www.blm.gov/co/st/en/fo/sjplc/land_use_planning.html.

[38] FLRMP EIS at 373.

[39] *Id*.

**CORE PRINCIPLES**
**Page 11 of 32**

measures in the full range of regulatory actions under the purview of the state's Field Offices. It has developed a Colorado Air Resources Protection Protocol ("CARPP") providing that:

> The BLM will ensure implementation of reasonable mitigation, control measures, and design features through appropriate mechanisms, including lease stipulations identified in RMPs, notices to lessees, and conditions of approval (permit terms and conditions) as provided for by law and consistent with lease rights and obligations. In the absence of, or in addition to effective control technologies, the BLM may manage the pace, place, density, and intensity of leasing and development to meet air quality goals and objectives as defined under any applicable RMP.[40]

The CARPP provides a comprehensive listing of widely-recognized methane reduction measures and development phasing mechanisms that BLM field offices will be able to draw upon, and require of industry, to meet the specific air quality challenges posed by oil and gas development within their jurisdictions. And while the CARPP focuses on the impact of methane to air quality, the CARPP—and use of mandatory methane reduction measures in the Tres Rios Field Office FLRMP—do help illuminate a path for BLM as it updates its methane waste rule.

In sum, BLM is making progress in acknowledging and remedying methane emissions and waste. Given the rapid pace of domestic oil and natural gas development and mounting evidence that a climate crisis is not simply a speculative possibility but, in fact, upon us, this progress must be accelerated and intensified—in part through the expeditious completion of a modernized methane waste rule.

In updating its rule, BLM should not only take advantage of lessons learned where states and field offices are already requiring methane mitigation, but also guide and strengthen such efforts—in particular in lagging states and field offices—with national-level policy. We note, for example, that despite Secretary Jewell specifically calling for methane rules to improve air quality in the Uintah Basin[41], BLM's Vernal Field Office, in a recent Draft Environmental Impact Statement for the Monument Butte Area Oil and Gas Development Project, located squarely in the Uintah Basin, has not proposed mandatory measures to reduce methane emissions[42], despite the existing authorities and responsibilities outlined in these core principles.

---

[40] Colorado BLM, *Comprehensive Air Resource Protection Protocol* (September 2013) at 9 (available at http://www.blm.gov/pgdata/etc/medialib/blm/co/field_offices/san_juan_public_lands/land_use_planning/propos ed_lrmp.Par.75621.File.dat/2013-0911%20Comprehensive%20Air%20Resource%20Protection%20Plan.pdf).

[41] http://www.deseretnews.com/article/865594644/Interior-Secretary-details-approach-to-connect-millennials-with-the-outdoors.html.

[42] http://www.blm.gov/ut/st/en/fo/vernal/planning/nepa_.html.

BLM_0112533

III.   **BLM HAS THE EXPANSIVE AUTHORITY, RESPONSIBILITY, AND OPPORTUNITY TO PREVENT METHANE WASTE AND POLLUTION**

    A.   **THE MINERAL LEASING ACT'S DUTY TO PREVENT OIL AND NATURAL GAS WASTE**

BLM has the expansive authority, responsibility, and opportunity to prevent the waste of oil and gas resources, in particular methane, which is the primary constituent of natural gas. The Mineral Leasing Act of 1920 ("MLA") provides that "[a]ll leases of lands containing oil or gas ... shall be subject to the condition that the lessee will, in conducting his explorations and mining operations, use all reasonable precautions to prevent waste of oil or gas developed in the land...." 30 U.S.C. § 225; *see also* 30 U.S.C. § 187 ("Each lease shall contain...a provision...for the prevention of undue waste...." As the MLA's legislative history teaches, "conservation through control was the dominant theme of the debates." *Boesche v. Udall*, 373 U.S. 472, 481 (1963) (citing H.R.Rep. No. 398, 66th Cong., 1st Sess. 12-13; H.R.Rep. No. 1138, 65th Cong., 3d Sess. 19 ("The legislation provided for herein...will [help] prevent waste and other lax methods....")).

BLM's implementing regulations—which underlie NTL4a and should inform BLM's revised waste rule—reflect these provisions, providing that "[t]he objective" of its MLA regulations in 43 C.F.R. Subpart 3160 "is to promote the orderly and efficient exploration, development and production of oil and gas." 43 C.F.R. § 3160.0-4. Subpart 3160 specifically requires BLM officials to ensure "that all [oil and gas] operations be conducted in a manner which *protects other natural resources and environmental quality*, protects life and property and results in the *maximum ultimate recovery of oil and gas with minimum waste and with minimum adverse effect on the ultimate recovery of other mineral resources*." 43 C.F.R. § 3161.2 (emph. added). The lease owner and or operator is similarly charged with "conducting all operations in a manner which ensures the proper handling, measurement, disposition, and site security of leasehold production; which protects other natural resources and environmental quality; which protects life and property; and *which results in maximum ultimate economic recovery of oil and gas with minimum waste and with minimum adverse effect on ultimate recovery of other mineral resources*." 43 C.F.R. § 3162.1(a) (emph. added). Thus, BLM and lessees have four duties of primary relevance: (1) to protect other natural resources and environmental quality; (2) to ensure the maximum ultimate recovery of oil and gas resources; (3) to minimize waste; and (4) to minimize adverse effects on the ultimate recovery of other mineral resources.

Two definitions are of particular importance. First, "maximum ultimate economic recovery" is defined as "the recovery of oil and gas from leased lands which a prudent operator could be expected to make from that field or reservoir given existing knowledge of reservoir and other pertinent facts and utilizing common industry practices for primary, secondary or tertiary recovery operations." 43 C.F.R. § 3160.0-5. Second, "waste" is defined as "(1) A reduction in the quantity or quality of oil and gas ultimately producible from a reservoir under prudent and proper operations; or (2) avoidable surface loss of oil or gas." 43 C.F.R. § 3160.0-5. Avoidable losses of oil or gas are currently defined as including venting or flaring without authorization, operator negligence, failure of the operator to take "all reasonable measures to prevent and/or

**CORE PRINCIPLES**
**Page 13 of 32**

control the loss" of methane, and an operator's failure to comply with lease terms and regulations, order, notices, and the like. *Id.*

As the MLA and its implementing regulations should make clear, BLM's duty to prevent waste must permeate the agency's full suite of planning and decision-making processes for oil and gas—from the point at which the agency develops broad-scale management and leasing plans, to the point that the agency executes specific leases, and onwards to the point that the agency authorizes and oversees actual drilling. Otherwise, it is entirely unclear how BLM could ensure that its duties—and the duties of oil and gas lessees—can be satisfied. Embracing this expansive view of the agency's authority and responsibility ensures that BLM integrates proven, often economical, technologies and practices to prevent methane waste with the agency's existing tools governing the very scale, pace, and nature of development.

**B.   THE PRESIDENT'S CLIMATE ACTION PLAN, THE FEDERAL LAND POLICY AND MANAGEMENT ACT, THE NATIONAL ENVIRONMENTAL POLICY ACT, AND SECRETARIAL ORDER 3289 COMPEL ACTION TO PREVENT OIL AND NATURAL GAS WASTE AND POLLUTION**

BLM's obligation to prevent waste is complemented by Administration priorities, federal laws and rules, and Department of the Interior secretarial orders. President Obama's June 2013 Climate Action Plan, in particular, categorically states that "[c]urbing emissions of methane is critical to our overall effort to address global climate change."[43] The President's statement dovetails closely with BLM's authorities and responsibilities, beyond the MLA, to reduce methane emissions, and requires swift action.

The foundation for BLM's management of our public lands and resources is the Federal Land Policy and Management Act of 1976 ("FLPMA"). FLPMA provides that BLM must manage the public lands:

> in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, *air and atmospheric*, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition, that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use.

43 U.S.C. § 1701(a)(8) (emphasis added). BLM, as a multiple use agency, must also manage the public lands and the oil and natural gas resource to "best meet the present and future needs of the American people" and to ensure that management "takes into account the long-term needs of future generations for…non-renewable resources, including….minerals." 43 C.F.R. § 1702(c). Put differently, the driving force behind BLM-authorized oil and gas development must be the

---

[43] President Barack Obama's Climate Action Plan at 10 (June 2013) (available at http://www.whitehouse.gov/the-press-office/2013/06/25/fact-sheet-president-obama-s-climate-action-plan).

BLM_0112535

long-term and broad public interest—not the too often short-term and narrow interest of oil and gas lessees. BLM rules to prevent waste must account for this driving force.

Moreover, "[i]n managing the public lands," BLM "shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). As this is written in the disjunctive, BLM must prevent degradation that is "unnecessary" as well as degradation that is "undue." *Mineral Policy Ctr. v. Norton*, 292 F.Supp.2d 30, 41-43 (D. D.C. 2003). This protective mandate applies to BLM's planning and management decisions. *See Utah Shared Access Alliance v. Carpenter*, 463 F.3d 1125, 1136 (10th Cir. 2006) (finding that BLM's authority to prevent degradation is not limited to the RMP planning process). Methane waste and pollution may cause "undue" degradation, even if the activity causing the degradation is "necessary." Where methane waste and pollution is avoidable, even if in the process of avoiding such emissions lessees or operators incur reasonable economic costs that are consistent with conferred lease rights, the loss of methane constitutes "unnecessary" degradation. 43 U.S.C. § 1732(b).

BLM ensures that these objectives and duties are adhered to through the Resource Management Plans ("RMPs"). RMPs must, *inter alia*, "use and observe the principles of multiple use and sustained yield," "consider present and potential uses of the public lands," and "weigh long-term benefits to the public against short-term benefits." 43 U.S.C. §§ 1712(c)(1), (5), (7). These criteria reinforce FLPMA's driving force: the long-term and broad public interest. Relative to oil and gas, RMPs identify areas open and closed to leasing, impose "moderate" and "major" constraints on development and production, and establish resource condition objectives and best management practices. Specifically, RMPs identify:

1.  Areas open to leasing, subject to existing laws, regulations, and formal orders; and the terms and conditions of the standard lease form.

2.  Areas open to leasing, subject to moderate constraints such as seasonal and controlled surface use restrictions. (These are areas where it has been determined that moderately restrictive lease stipulations may be required to mitigate impacts to other land uses or resource values.)

3.  Areas open to leasing, subject to major constraints such as no-surface-occupancy stipulations on an area more than 40 acres in size or more than 0.25 mile in width. (These are areas where it has been determined that highly restrictive lease stipulations are required to mitigate impacts to other lands or resource values. This category also includes areas where overlapping moderate constraints would severely limit development of fluid mineral resources.)

4.  Areas closed to leasing. (These are areas where it has been determined that other land uses or resource values cannot be adequately protected with even the most restrictive lease stipulations; appropriate protection can be ensured only by closing the lands to leasing. Such closures can be nondiscretionary or discretionary; if the

**CORE PRINCIPLES**
**Page 15 of 32**

BLM_0112536

latter a rationale should be included.)

5.  In areas open to leasing, resource condition objectives, specific lease stipulations, general/typical conditions of approval, and best management practices that will be employed to accomplish these objectives.

6.  For each lease stipulation, the circumstances for granting an exception, waiver, or modification; identification of the general documentation requirements; and any public notification associated with granting exceptions, waivers, or modifications.

7.  Whether the leasing and development decisions also apply to geophysical exploration.

8.  Whether constraints identified in the RMP for new leases also apply to areas currently under lease.

9.  Long-term resource condition objectives for areas currently under development to guide reclamation activities prior to abandonment.

BLM, Land Use Planning Handbook, H-1601-1, Appx. C at 23-24.

BLM is also subject to Secretarial Order 3289 (Dept. Int. Sept. 14, 2009). Secretarial Order 3289, in section 3(a), provides that BLM "must consider and analyze climate change impacts when undertaking long-range planning exercises, setting priorities for scientific research and investigations, developing multi-year management plans, and making major decisions regarding potential use of resources under the Department's purview." Section 3(a) of Secretarial Order 3289 also reinstates Secretarial Order 3226 (January 19, 2001).

Secretarial Order 3226 commits the Department of the Interior to address climate change through its planning and decision-making processes. As Order 3226 explains, "climate change is impacting natural resources that the Department of the Interior (Department) has the responsibility to manage and protect." Sec. Or. 3226, § 1. Order 3226 therefore "ensures that climate change impacts are taken into account in connection with Department planning and decision making." *Id*. Order 3226 obligates BLM to "consider and analyze potential climate change impacts" in four situations: (1) "when undertaking long-range planning exercises"; (2) "when setting priorities for scientific research and investigations"; (3) "when developing multi-year management plans, and/or" (4) "when making major decisions regarding the potential utilization of resources under the Department's purview." *Id*. § 3.

Order 3226 also specifically provides that "Departmental activities covered by this Order" include "management plans and activities developed for public lands" and "*planning and management activities associated with oil, gas and mineral development on public lands*." *Id*. (emphasis added). Put simply, BLM's oil and gas decisions are contemplated by and subject to section 3 of Order 3226.

**CORE PRINCIPLES**
**Page 16 of 32**

BLM_0112537

Both FLPMA and secretarial orders 3289 and 3226 help inform BLM's efforts to effectively use and comply with the National Environmental Policy Act ("NEPA"). Pursuant to NEPA, BLM must take a hard look at direct, indirect, and cumulative impacts. 40 C.F.R. §§ 1502.16(a), (b); 1508.25(c). Direct impacts include methane that is vented, flared, or leaked from oil and gas development. Indirect impacts include methane that is lost in downstream activities, as well as the consequences of combusting or otherwise using methane after it has been sold in market. And cumulative impacts include aggregate methane emissions from oil and gas development within a particular planning region (whether federal, state, or private), as well as aggregate GHG emissions from all development or other sources.

In evaluating impacts, BLM must discuss "[e]nergy requirements and conservation potential of various alternatives and mitigation measures," "[n]atural or depletable resource requirements and conservation potential of various alternatives and mitigation measures," and "[m]eans to mitigate adverse environmental impacts (if not fully covered under 1502.14(f))." 40 C.F.R. §§ 1502.16(e), (f), (h). BLM's "hard look" mandate thus requires consideration of natural gas waste and methane emissions that impact the oil and natural gas resource itself; the lands, waters, and communities overlaying that resource; and the climate.

This hard look helps inform the "heart" of the NEPA process: BLM's duty to consider "alternatives to the proposed action" and to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. §§ 4332(2)(C)(iii), 4332(2)(E); 40 C.F.R. § 1502.14(a). Alternatives are critical because, "[c]learly, it is pointless to 'consider' environmental costs without also seriously considering action to avoid them." *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Commn.*, 449 F.2d 1109, 1128 (D.C. Cir. 1971). Operating in concert with NEPA's mandate to address environmental impacts, BLM's fidelity to alternatives analysis helps "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decision maker and the public." 40 C.F.R. § 1502.14. An agency must, therefore, "[r]igorously explore and objectively evaluate all reasonable alternatives" and specifically "[i]nclude the alternative of no action." 40 C.F.R. §§ 1502.14(a), (d).

Even where impacts may be "insignificant," BLM must still consider alternatives. *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1229 (9th Cir. 1988) (agency's duty to consider alternatives "is both independent of, and broader than," its duty to complete an environmental analysis); *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1277 (10th Cir. 2004) (duty to consider alternatives "is 'operative even if the agency finds no significant environmental impact'"). This is particularly necessary where there are, as with methane waste and pollution, "unresolved conflicts concerning alternatives uses of available resources." 42 U.S.C. § 4332(E).

Fundamentally, FLPMA, Secretarial Orders 3289 and 3226, and NEPA provide BLM with essential tools that—used well—complement the MLA's duty to prevent methane waste. These tools can help ensure that BLM properly plans for and manages the oil and gas resources the agency holds in trust for the American public in a transparent, publicly accountable fashion.

**CORE PRINCIPLES**
**Page 17 of 32**

BLM_0112538

These tools can also identify opportunities to achieve additional methane emission reductions above-and-beyond what the MLA's waste prohibition may alone compel.

## IV.   BLM'S RULEMAKING SHOULD REFLECT THE FOLLOWING CORE PRINCIPLES

### A.   OVERVIEW

We offer the following core principles to constructively inform the contours of BLM's rulemaking process. These core principles—designed to satisfy the MLA and to further FLPMA, Secretarial Orders 3289 and 3266, and NEPA—will operate as a lens through which we will review and comment on the BLM's rulemaking process as well as specific, place-based planning and decision-making processes.

### B.   CORE PRINCIPLES

#### 1.   BLM's Revised Waste Rule Should Be Expeditiously Completed, Implemented, And Enforced

BLM's current 34-year old waste policy—NTL 4A—is demonstrably outdated and in urgent need of revision. BLM should therefore prioritize and expeditiously complete its revised waste rule. We would like to see BLM complete a revised waste rule by no later than the end of 2015. The agency should also ensure that it 'hits the ground running' once a revised rule is finalized through effective implementation and enforcement.

#### 2.   BLM Should Consider An Interim Directive To Ensure That Waste Is Prevented Pending A Revised Waste Rule

BLM-authorized oil and gas production is—right now—occurring on roughly 12.5 million acres of federal land. BLM should therefore consider issuing an interim directive—via Instruction Memorandum—to ensure that NTL 4A and associated waste rules and policies are fully implemented and enforced pending a new waste rule. We note that concerns regarding implementation of NTL 4A are a serious concern. As we noted above, while some field offices, namely the Tres Rios Field Office, take real action to reduce methane pollution and waste, other field offices, such as the Vernal Field Office, continue to avoid taking real action—i.e., fail to mandate the use of proven, often economical methane emission reduction technologies and practices, as required by existing rule and NTL 4A.

This directive should: (a) underscore BLM's existing authority, responsibility, and opportunity to prevent natural gas waste as per the MLA, the MLA's implementing rules, and NTL 4A; (b) require that BLM Field Offices account for waste through oil and gas-related planning and decision-making processes; (c) signal to lessees and operators that they must reduce fugitive, vented, and flared methane and significantly step up methane waste prevention efforts; and (d) encourage Field Offices to mandate the use of specific technologies and BMPs to prevent waste

BLM_0112539

in their planning, leasing, and permitting activities. Regarding (a), we emphasize a need for far
more effective implementation and enforcement of NTL 4A. In particular, better
implementation and enforcement of NTL 4A's:

- Section I provisions, in the context of Section II's definitions, regarding oversight and
  approval of well venting and flaring. "Venting" should be interpreted to include all leaks
  throughout the system, not just well venting during completions

- Section III(B) and III(c) limits on "short-term" venting or flaring during well purging, well
  evaluation, and initial production tests.

- Section IV(A) and IV(B) limits on venting and flaring, including prohibitions against venting
  or flaring, except as provided by Sections II(C) and III or as explicitly authorized by the
  "Supervisor" in Section IV(B) for oil well gas. This includes Section IV(B)'s requirement that a
  lessee or operator to submit an "action plan" that "will eliminate venting or flaring of the
  gas within 1 year from the date of the application," and meaningful review of that
  application by the "Supervisor" to determine whether venting or flaring is "justified."

- Section V tracking and reporting of avoidable losses.

- Section VI computation and enforcement of royalty due when the "Supervisor" determines
  that gas is lost due to lessee or operator negligence or failure to take all reasonable
  measures to prevent or control methane losses.

The pioneering efforts by the Tres Rios Field Office and the Colorado State Office to mitigate
the impacts of methane emissions have been noted above. An interim directive could help
highlight and build upon these laudable actions. An interim directive could also ensure that
BLM state and field offices are re-acquainted with their responsibility to prevent waste, which
could help spark creative thinking and early action to prevent waste. Such "learning by doing"
could, in turn, enable BLM's state and field offices to better inform the rule-making process.
And by ensuring that state and field offices take more robust action to prevent waste now—not
just at the conclusion of the rulemaking process—BLM would better ensure that a final rule can
be effectively and expeditiously implemented and enforced. We recommend issuing this
interim directive by no later than July 1, 2014.

3.    **BLM's Revised Waste Rule Should Prevent Waste From All Oil and Gas
      Methane Pollution And Waste Sources**

BLM's waste rule should prevent waste from all oil and natural gas sources under the agency's
purview, including exploration, production, gathering, processing, and bulk distribution
activities. Ensuring that the waste rule covers all sources is necessary to comply with the MLA's
expansive mandate to prevent waste.

As the MLA provides, oil and gas leases "shall be subject to the condition that the lessee will, in

**CORE PRINCIPLES**
**Page 19 of 32**

conducting his explorations and mining operations, use all reasonable precautions to prevent waste of oil or gas developed in the land...." 30 U.S.C. § 225. Further, MLA rules articulate that BLM must ensure the "maximum ultimate recovery of oil and gas with minimum waste and with minimum adverse effect on the ultimate recovery of other mineral resources." 43 C.F.R. § 3161.2. "[M]aximum ultimate economic recovery" is defined as "the recovery of oil and gas from leased lands which a prudent operator could be expected to make from that field or reservoir given existing knowledge of reservoir and other pertinent facts and utilizing common industry practices for primary, secondary or tertiary recovery operations." 43 C.F.R. § 3160.0-5. The "waste of oil and gas" is specifically defined as "any act or failure to act by the operator that is not sanctioned by the authorized officer as necessary for proper development and production and which results in: (1) a reduction in the quantity or quality of oil and gas ultimately producible from a reservoir under prudent and proper operations; or (2) avoidable surface loss of oil or gas." 43 C.F.R. § 3160.0-5. Moreover, *all* sources can produce waste that can be considered either "undue" for a particular activity or "unnecessary" given available reduction options. 43 U.S.C. § 1732(b). Put simply, BLM's mandate to prevent waste is not—as per the MLA's plain language and BLM's own current rules—limited to particular sources of waste such as well completions, but rather *all* sources within the agency's direct purview.

We also encourage BLM to leverage its authorities and responsibilities to ensure that downstream oil and natural gas activities—even those activities that may fall outside the agency's direct purview—do not undermine the efficacy of upstream BLM methane reduction actions and waste federal mineral resources. It makes little sense to allow for BLM to authorize the upstream production of oil and natural gas resources if those resources are lost through wasteful and inefficient downstream activities. Thus, for example, BLM should expressly coordinate its planning and management efforts with federal, state, and local agencies that regulate downstream activities, as well as with industry segments responsible for downstream activities. BLM should also strongly consider whether leases or other authorizations should contain provisions ensuring responsible downstream gathering, processing, and distribution.

Covering all sources also makes pragmatic sense because, even where individual sources may in isolation seem insignificant, they may and often do prove cumulatively significant. The loss of methane through downstream activities, while perhaps not within the direct purview of BLM, nonetheless also causes indirect impacts and weakens the rationale for upstream production operations.

Taking a hard look at indirect and cumulative impacts is, of course, compelled by NEPA. *See* 40 C.F.R. §§ 1508.7 (providing that "[c]umulative impacts can result from individually minor but collectively significant actions taking place over a period of time"), 1508.8 (requiring consideration of indirect impacts), 1508.27(b)(7) (providing that a proposed action can be significant if related "to other actions with individually significant but cumulatively significant impacts"). NEPA also requires that BLM address "[e]nergy requirements and conservation potential of various alternatives and mitigation measures," "[n]atural or depletable resource requirements and conservation potential of various alternatives and mitigation measures," and "[m]eans to mitigate adverse environmental impacts (if not fully covered under 1502.14(f))." 40

**CORE PRINCIPLES**
**Page 20 of 32**

BLM_0112541

C.F.R. §§ 1502.14, 1502.16(e), (f), (h). Taking a hard look at waste from all sources is also an essential step towards identifying effective alternatives under NEPA (40 C.F.R. § 1502.14) to actually prevent such waste and "to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the environment." 40 C.F.R. §§ 1500.2(f). BLM must also, of course, not just mitigate harm through alternatives, but expressly retain the authority to choose a "no action" alternative to prevent harm even if that would effectively prohibit development where such activity, despite mitigation, would cause undue waste. 43 U.S.C. § 1732(b); 40 C.F.R. § 1502.14(d).

NEPA analysis of all methane emissions sources thus arms BLM with information necessary to make reasoned and informed decisions to prevent waste from all sources of oil and gas methane waste. As the Supreme Court teaches, agencies, in accord with the Administrative Procedure Act, must identify a "rational connection" between the facts underlying a decision and the decision itself. *Motor Veh. Mfrs. Assn. v. State Farm Mut. Ins. Co.*, 463 U.S. 29 (1983); 5 U.S.C. § 706(2)(A). Where BLM does not comply with NEPA, it risks making decisions regarding oil and gas waste that are not rationally connected to underlying facts and analysis. *Id*. As we have noted, there is a dearth of information regarding BLM's current efforts to comply with NTL 4A, which leaves BLM action—in particular where the agency does not demonstrate that it has taken action to prevent waste—exposed and vulnerable to challenge.

Currently, we see a widespread disconnect between the MLA and NTL 4A rules, and BLM's field-level practices. This disconnect is an underlying cause of significant and unnecessary natural gas waste. As GAO found, "[e]stimates of vented and flared natural gas for federal leases vary considerably," and that data collected by Interior to track venting and flaring on federal leases "likely underestimate" venting and flaring emissions because they do not account for all sources of lost gas.[44] This is largely a product of NTL 4A itself, which is focused on venting and flaring from well completions, workovers, and liquids unloading to the exclusion of other sources of waste. That is, NTL 4A contains mechanisms for regulating venting and flaring but does not provide mechanisms for dealing with other well site emissions or emissions from activities downstream from the well site but still on federal lands. In the absence of such mechanisms and management direction, BLM field office staff lack effective guidance to prevent waste from all sources. BLM also fails to send a clear signal to lessees and operators regarding how the agency will oversee lessee and operator activities and what lessees and operators must do to prevent waste.

In crafting a revised waste rule to account for all waste sources, BLM should consider all methane emissions sources likely to be present on federal lands as identified in EPA's U.S. GHG Emissions Inventory and separate Greenhouse Gas Reporting Program and by existing BLM inventories, plans, and other documentation. Beyond drilling, such sources include other well-site equipment, gathering pipelines, compressors, separators/dehydrators, pneumatic controls, processing facilities, bulk pipelines, storage tanks, and leaks throughout the system. With a more comprehensive view of the sources of methane waste, BLM will be well positioned to

---

[44] GAO 11-34 at 10.

**CORE PRINCIPLES**
**Page 21 of 32**

craft, implement, and enforce a revised waste rule that covers all sources of methane waste from oil and gas activities.

### 4.    BLM's Waste Rule Should Prevent Waste From Existing And Future Oil And Gas Development

BLM's waste rule should prevent waste from both future and existing oil and gas development.

The MLA's expansive mandate to prevent natural gas waste does not differentiate future from existing development and therefore requires prevention of waste from both. As the current MLA waste rule explains, for example, BLM must, simply put, ensure the "maximum ultimate recovery of oil and gas with minimum waste and with minimum adverse effect on the ultimate recovery of other mineral resources." 43 C.F.R. § 3161.2.

There are, of course, significant opportunities to prevent natural gas waste from existing oil and gas operations, and older, existing fields may prove to have some of the greatest opportunities for waste reduction given that they may have been developed before the advent or widespread use of methane reduction technologies and practices. Oil and gas production is already occurring on roughly 12.5 million acres of federal lands, and an additional 25.5 million acres not yet in production have been leased. As EPA's 2011 GHG Inventory shows, operations involving well completions, workovers, and liquids unloading at existing well sites accounted for 42% of total industry methane emissions, while the existing stock of production, processing and transmission equipment accounted for a roughly equal amount of methane emissions, including compressors (15%), pneumatic controllers (11%), and fugitive emissions throughout the system (15%).[45] Reasonable methane mitigation measures are readily available for each of these existing sources, often with quick paybacks.

For example, one of the key methane reduction measures adopted by the Tres Rios Field Office is a requirement for operators to replace high-bleed pneumatics with low-bleed/no-bleed or air-driven pneumatic devices on existing wells. The justification for this action is that:

> The cost to inventory and replace high-bleed pneumatics with low-bleed pneumatic devices on existing oil and gas wells located on federal land is not high compared to the value of CH4 gas lost to the atmosphere. Most replacement costs are recouped in under 1 year, resulting in a large economic benefit for industry.[46]

According to the Tres Rios Field Office LRMP, the environmental benefit from implementation

---

[45] http://www.epa.gov/climatechange/ghgemissions/usinventoryreport/archive.html.

[46] Final Environmental Impact Statement for the Final San Juan National Forest and Proposed Tres Rios Field Office Land and Resource Management Plan, Vol. 1, Ch. 3 at 376 (available at http://www.fs.usda.gov/detail/sanjuan/landmanagement/planning/?cid=stelprdb5432707).

BLM_0112543

of high-bleed pneumatic replacement/retrofit is a 90% reduction in methane emissions, an expected savings of 100 MCF per year per well.[47]

      **5.**      **BLM's Revised Waste Rule Should Integrate Methane Waste Prevention Efforts With BLM's "Front End" Planning And Management Tools**

BLM should craft its rule to make full use of its "front end" planning and management tools, such as resource management plans and master leasing plans, to prevent oil and natural gas waste. Such back-end measures do not encompass the full suite of agency, lessee, and operator obligations and opportunities to prevent oil and natural gas waste.

By using its front-end planning and management tools, BLM best facilitates the implementation and enforcement of a revised waste rule. This is because such tools can provide field-level oil and gas supervisors with ground-truthed information (via inventories of development activities, as required by 43 U.S.C. § 1711(a)) and analysis to inform clear and strong standards to inform exploration, development, and production decisions. This has an ancillary benefit: providing lessees and operators with a clear signal and thereby ensuring that that waste prevention is not an afterthought for lessees and operators but rather a primary duty that is explicitly and specifically reflected in lease bids, lessee and operator financial arrangements, and lessee and operator exploration, development, and production plans.

Front-end planning and management tools also facilitate public transparency and accountability given public involvement requirements. By improving transparency and accountability, BLM's front-end tools can contribute to the identification and documentation of additional opportunities (through, e.g., alternatives analysis) to prevent methane pollution and waste above-and-beyond what the agency may initially think is feasible. BLM also helps identify options that not only reduce methane pollution and waste, but also protect—as is required of both the agency and lessees—"other natural resources and environmental quality." 43 C.F.R. §§ 3161.2, 3162.1(a).

Front-end planning and management tools employed by BLM include:

- **Resource Management Plans ("RMPs")**. RMPs guide and control field office management decisions. RMPs identify lands open/closed to leasing and resource objectives, and impose development constraints, including stipulations to achieve these objectives that are attached to leases before they are executed. *See* 43 U.S.C. 1712 (RMP requirements); 43 C.F.R. §§ 1600.0-1 *et seq.* (RMP rules); H-1601-01 (RMP Handbook). Notably, RMPs are informed by inventories, 43 U.S.C. § 1711(a), and approved, amended, and revised in accord with NEPA. 43 C.F.R. §§ 1601.0-6 (approvals), 1610.5-5 (amendments), 1610.5-6 (revisions).

  RMPs provide a critical opportunity to ensure the "orderly and efficient" development of oil and natural gas resources by governing the scale, pace, and nature of exploration,

---

[47] *Id.*

**CORE PRINCIPLES**
**Page 23 of 32**

BLM_0112544

development, and production activities. 43 C.F.R. § 3160.0-4. In so doing, RMPs can help overcome structural barriers that currently impede lessee and operator action to prevent methane waste and pollution. For example, RMPs can require that lessees or operators construct the necessary infrastructure, such as gathering lines, separation and treatment equipment, and compression capacity, to route captured gas to a sales line or gas liquids to processing and storage facilities. Similarly, where gas is produced in association with oil, RMPs can concentrate or phase development activity on the landscape, improving the economics of the infrastructure necessary to capture and market (rather than flare or vent) associated gas. This in turn can help reduce the number of wells, storage tanks, pneumatic valves, or other sources of methane pollution and waste that would otherwise result from unmanaged development (or require mitigation through "back end" technologies and practices). Finally, by crafting RMPs to prevent waste through orderly and efficient development, BLM can reduce impacts to and thereby benefit wildlife, water, vegetation, and other conservation values—i.e., BLM can protect "other natural resources and environmental quality...." 43 C.F.R. §§ 3161.2, 3162.1(a).

- **Master Leasing Plans ("MLPs").** MLPs are a product of oil and gas reforms adopted by BLM in 2010. MLPs allow BLM to plan for oil and gas development in a defined area within a broader landscape. We therefore encourage BLM to use MLPs to establish front-end waste prevention goals and to identify, as with RMPs, specific mitigation measures and best management practices to prevent waste. And, when BLM is preparing MLPs for other reasons, it should also account for methane waste prevention by considering both front end and back end tools. We see great opportunity for BLM to use MLPs to help drive methane waste and pollution reduction efforts.

- **Lease Sale Decisions.** Leases, once executed, confer "surface use rights." 43 C.F.R. § 3101.1-2 (defining lessee surface use rights). Such rights are subject to stipulations attached to the lease, "specific, non-discretionary statutes," and "reasonable measures" that are "consistent with lease rights granted." *Id*. Reasonable measures manifest in the form of "conditions of approval" imposed subsequent to lease execution, typically at the drilling stage. Since these "reasonable measures" provide BLM with only limited authority— authority delimited by the "lease rights granted"—it is imperative that BLM consider what actions are necessary to prevent waste *before* leases are executed. This will ensure that BLM does not unintentionally hamstring its own responsibilities and authority.

In many instances BLM can satisfy this recommendation by mandating strong waste prevention measures at the RMP or MLP stage. However, where BLM is operating in accord with older RMPs or MLPs that do not require action to prevent methane waste, BLM must consider and potentially mandate waste mitigation measures by stipulation at the lease stage, especially when opportunities to prevent waste are only discovered through lease-specific decision-making and environmental reviews. Of course, lease-specific decision-making and environmental reviews can also identify additional measures to prevent waste above-and-beyond those identified in RMPs or MLPs based on lease-specific circumstances.

BLM_0112545

Taking specific action before leases are executed also sends an early signal to oil and gas lessees and operators regarding their obligations to prevent methane waste, enabling them to integrate that knowledge into their lease bid. BLM's current practice—relying on general, boilerplate waste provisions and drilling-stage conditions of approval—does not effectively send this signal. Taking action *before* leases are granted also ensures that the agency can make use of the full range of its legal authority, reduce potential conflict over waste prevention action at the drilling stage, provide clear direction to lessees to inform how they invest in the development of a particular lease, and ultimately improve the efficacy of actions to prevent oil and natural gas waste.

- **Unit Agreements.** Unit agreements help facilitate the orderly development of oil and gas fields owned by multiple lessees by consolidating and coordinating development operations. *See* 43 C.F.R. §§ 3161.2, 3162.2-4(b) (BLM authority to require lessee unitization or communitization agreements); 43 C.F.R. Subpart 3180 (general rules pertaining to drilling unit agreements). With unit agreements, lessees share the risks and costs of development, improve the economics of development, and consolidate infrastructure. Unit agreements can help overcome potential structural barriers to methane emission measures, such as differing lessee prioritization of capital expenditures. Unit agreements also present an important "spillover" opportunity to drive methane waste reduction on state and private lands that are included within the same unitized field. Unit agreements do not, however, obviate BLM's responsibility to prevent methane waste through RMPs, MLPs, stipulations, or other tools that are available before lease rights are conferred.

- **Master Development Plans/Plans of Development ("MDPs" or "PODs").** MDPs and PODs are used to evaluate and plan for multi-well development projects, ostensibly to streamline the application for permit to drill approval process (discussed below) while also improving BLM's understanding of cumulative impacts (because BLM's analysis is not limited to a single well or well pad). Sometimes required by RMPs, MDPs or PODs provide an especially important tool to help prevent flaring because they can identify and delineate the specific infrastructure necessary for development and the specific location of that infrastructure on the landscape (specificity often lacking in earlier broader-scale planning or decision-making stages). In so doing, MDPs or PODs can ensure that infrastructure to route natural gas to market is constructed as part of the development process. Again, this helps ensure "orderly and efficient" development and the consideration and use of all appropriate methane mitigation measures. MDPs or PODs do not, however, obviate BLM's responsibility to prevent waste through RMPs, MLPs, stipulation or other tools that are used before lease rights are conferred.

- **Applications for Permit to Drill.** Once RMPs and MLPs are completed, leases and unitization agreements executed, and any MDPs or PODs crafted, BLM must still approve specific applications for permit to drill, and can impose, whether to mitigate impacts or for other reasons, "conditions of approval." *See* 43 C.F.R. §§ 3101.1-2, 3162.3-1(c). At this stage, BLM implements and enforces stipulations and "specific, nondiscretionary statutes," and can also impose "reasonable measures" (i.e., conditions of approval) so long as they are

**CORE PRINCIPLES**
**Page 25 of 32**

"consistent with lease rights granted." 43 C.F.R. § 3101.1-2. This provides BLM with a final opportunity before a lessee or operator breaks ground to prevent methane waste, whether by controlling the pace or location of development or by mandating the use of specific mitigation technologies and practices. Accordingly, APDs, while important, are not a substitute for BLM's duty to prevent waste through RMPs, MLPs, stipulation or other tools that are used before lease rights are conferred. At this stage, the updated BLM waste rule should require a final review of methane waste mitigation obligations and opportunities, and oil and gas lessees or operators should be required to certify that they are taking all prudent and necessary action to prevent methane waste.

### 6.     BLM's Revised Waste Rule Should Mandate—Before Leases Are Executed—The Use Of Best Available Technologies

BLM's revised methane waste rule should complement the agency's front-end planning and management tools by mandating the use of back-end technologies and practices to prevent and reduce methane waste and pollution. The efficacy of these technologies and practices has been well documented by EPA's Gas STAR program and by Gas STAR's industry partners. The revised waste rule should set a floor for action by state and field offices by mandating the use of best available technologies and practices. The revised waste rule should also require state and field offices to adopt additional methane waste mitigation technologies and practices that—based on field-level RMPs, MLPs, lease stipulations, unit agreements, MDPs/PODs, and APDS—are appropriate for particular oil and gas exploration, development, and production conditions.

The revised rule should require these technologies and practices at the earliest possible decision point—ideally, *before* leases are executed. In general, we think that there are myriad technologies and practices that should be categorically mandated. But, if the agency cannot anticipate what specific technologies and practices will prove appropriate (and necessary) before leases are executed, BLM should at least strengthen methane mitigation lease stipulations to explicitly provide that it may impose reasonable technologies or practices the agency deems appropriate through review of unit agreements, MDPs, PODs, or APDs.

The revised waste rule should also require BLM to maintain current information on methane mitigation measures, especially as the agency learns more about how best to prevent waste given particular field-level conditions. To encourage innovation, the revised rule should provide for the inclusion of new or improved technologies and practices and also allow lessees and operators to propose alternative technologies and practices where such alternatives would achieve equal or greater waste mitigation. Exhibit A of this White Paper contains the mitigation measure list adopted by the CARPP that the agency could use as a starting point.

### 7.     BLM Should Significantly Tighten And At Times Prohibit Natural Gas Venting And Flaring

When natural gas is vented or flared, it can no longer be sold and is no longer available for use by homes, schools, and businesses. Put simply, venting and flaring *is* waste. NTL 4A fails to

**CORE PRINCIPLES**
**Page 26 of 32**

BLM_0112547

acknowledge this and, moreover: (1) struggles to identify the circumstances where Supervisors can authorize venting or flaring; and (2) does not set criteria by which these decisions should be made. Venting or flaring without authorization is simply deemed "avoidable," with the only sanction being payment of royalty due—a sanction that does little to proactively prevent or disincentivize further waste. Following Colorado's lead, BLM's updated waste rule should discard this flawed approach and instead establish clear and strong planning requirements and mitigation measures to significantly minimize the circumstances, if any, where natural gas venting and flaring is appropriate. And, where waste does still occur, BLM's updated waste rule should require immediate action to prevent further waste. This helps (in part) overcome a serious structural flaw in BLM's current waste policy, NTL 4A: that the penalty imposed for waste is payment of lost royalties, a penalty that does little to actually *prevent* waste.

Recognition of venting and flaring as waste underscores BLM's broad obligations to ensure that oil and natural gas development serves the long-term public interest, rather than the short-term interest of lessees and operators. BLM must, in accord with its multiple use mandate, manage oil and natural gas resources to "best meet the present and future needs of the American people" and to ensure that management "takes into account the long-term needs of future generations for…non-renewable resources, including….minerals." 43 C.F.R. § 1702(c). Further, in approving, revising, and amending RMPs, BLM must, *inter alia*, "use and observe the principles of multiple use and sustained yield," "consider present and potential uses of the public lands," and "weigh long-term benefits to the public against short-term benefits." 43 U.S.C. §§ 1712(c)(1), (5), (7). This, coupled with BLM's duty to protect the climate and prevent waste, provides BLM with ample authority and responsibility to tighten the conditions under which venting or flaring is permitted and, indeed, to prohibit venting and flaring as much as possible.

### 8.    BLM's Revised Waste Rule Should Be Informed By The True And Full Cost of Methane Waste And Pollution

Some have argued that oil and gas lessees and operators do not deliberately waste methane because such waste would undermine their bottom line profit motive. This argument has been used to suggest that lessees and operators adequately prevent waste from vented, flared, and fugitive emissions sources through voluntary action, and that tighter government oversight of methane waste and pollution is unnecessary. Conversely, and compellingly, market and other barriers have been identified that impede methane waste prevention and excuse industry's failure to adequately control methane waste, most notably the waste of associated gas in the Bakken. We find the latter position compelling. GAO offered evidence of these barriers in its 2010 report, finding that:

> Despite the potential economic benefits of using these technologies, there are barriers to their implementation for some operators, according to an EPA official and technology vendors. One key barrier is that many operators are unaware of the economic advantages. In part, this is because smaller operators often do not have the time or expertise to undertake the engineering analysis to understand

BLM_0112548

whether and how they can benefit, according to EPA and technology vendors. Also, these officials said that smaller operators often do not have the capital to purchase equipment, regardless of whether they can recover the costs. According to officials, the voluntary nature of the EPA Natural Gas STAR program is not enough to spur industry to change, and one industry official stated that the sometimes contentious relationship between the federal government and private industry contributes to this lack of awareness. Private industry does not always take federal efforts to encourage industry to alter business practices at face value, according to officials. One industry representative cited reluctance to participate in EPA's Natural Gas STAR program as an example of this skepticism.

A number of other factors can also contribute to operators not adopting venting and flaring reduction technologies. Officials that we spoke with said that overcoming "institutional inertia"—a company's tendency to do business and carry out operations as it always has—is key to adopting these technologies. In a similar vein, industry and EPA officials told us that upper management support is critical for these types of efforts to go forward, and many companies' management is focused on other efforts that are deemed more important than what are seen as incremental improvements in operations. For example, the operator may choose to invest its limited available capital in drilling a new well, which may have a larger return than investments in capturing vented or flared gas from an existing well, according to industry representatives.[48]

We would also add an additional and critical barrier to the adoption of methane waste mitigation measures: the lack of a full and true accounting of the costs of oil and natural gas pollution and waste to society. Such pollution and waste impacts the climate and causes other broadly felt social costs. And, at present, markets do not account for the full and true costs of carbon pollution. Rather than internalize carbon costs, lessees and operators effectively externalize these costs onto the backs of the general public and the environment.

An updated methane waste rule should account for the full and true social costs of methane waste; i.e., GHG pollution. This is particularly important if economic costs and benefits are used as a criterion for evaluating the efficacy and viability of particular waste prevention efforts, whether in the revised rule itself or as the rule is implemented and enforced in the context of specific exploration, development, and production activities. Accounting for the full and true costs of waste and the benefits of waste prevention should help overcome barriers impeding the penetration of waste prevention technologies and practices—or at least help justify stronger regulatory action.

Quantifying costs and benefits is required by Executive Order 12866, and the Interagency Workgroup on the Social Cost of Carbon maintains a schedule, updated earlier this year, of

---

[48] GAO 11-34 at 24.

BLM_0112549

social cost of carbon estimates for use in regulatory impact analysis.[49] BLM, notably, has a duty to address the true and full social costs of methane waste and pollution pursuant to FLPMA's mandate to manage the public lands for multiple uses, and these costs should therefore be reflected in the revised waste rule. 43 U.S.C. §§ 1701(a)(8), 1702(c), 1712(1). FLPMA also mandates that the BLM not delimit its choices by what is or is not economically viable for oil and gas lessees and operators, but rather, by fully and truly accounting for what actions "best meet the present and future needs of the American people," an analysis that "takes into account the long-term needs of future generations for...non-renewable resources, including....minerals." 43 C.F.R. § 1702(c). BLM is further compelled to "consider present and potential uses of the public lands," and "weigh long-term benefits to the public against short-term benefits." 43 U.S.C. §§ 1712(c)(5), (7). Fundamentally, BLM must manage oil and gas resources for the long-term, and in the broad public interest, and this duty should be reflected in the revised methane waste rule.

Accounting for the true and full social costs of waste also conforms to NEPA's "hard look" mandate that, again, requires BLM to evaluate the direct, indirect, and cumulative impacts of actions on the "human environment." 40 C.F.R. §§ 1502.16(a), (b); 1508.25(c). NEPA also mandates that BLM address, through its environmental reviews, "[e]nergy requirements and conservation potential of various alternatives and mitigation measures," "[n]atural or depletable resource requirements and conservation potential of various alternatives and mitigation measures," and "[m]eans to mitigate adverse environmental impacts (if not fully covered under 1502.14(f))." 40 C.F.R. §§ 1502.16(e), (f), (h). This hard look, in turn, informs BLMs consideration of alternatives by "sharply defining the issues and providing a clear basis for choice among options by the decision maker and the public." 40 C.F.R. § 1502.14.

### 9.      BLM Should Use A "Carrot-And-Stick" Approach To Facilitate The Prevention Of Natural Gas Waste

Accounting for the true and full social costs of waste arms BLM with information to identify, analyze, and substantiate policy changes that account for the barriers impeding reductions in methane waste and pollution. Importantly, all of these barriers can, at least to a degree, also be overcome through a strong rule that is implemented and enforced. This is particularly the case if BLM's rule makes effective use of front-end planning and management tools (like NEPA) in combination with back-end requirements pertaining to specific methane reduction technologies and practices. Such a combination sends a potent regulatory signal that can shift how oil and gas lessees think about, plan for, invest in, and develop oil and gas resources.

To further address these barriers, BLM should also revise its incentive and disincentive provisions for waste. At present, NTL 4A provides that a lessee or operator who wastes oil or natural gas must compensate BLM, with the value of that compensation determined by

---

[49] Interagency Working Group on Social Cost of Carbon, *Technical Support Document—Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866* (May 2013) (http://www.epa.gov/otaq/climate/regulations/scc-tsd.pdf [PDF]).

BLM_0112550

calculating the royalties lost by BLM due to that waste. Given the large amounts of methane
that GAO estimated is leaked, vented, and flared on federal land, it is difficult to see how such
compensation effectively deters waste.

As part of a "carrot-and-stick" approach, we are open to considering incentive-based
mechanisms to reward lessees and operators that take exemplary action to prevent waste so
long as those incentives help overcome the barriers described above and do not allow oil and
gas lessees to obtain a windfall subsidized by the American people. That said, we emphasize,
here, the need for a better "stick." While we are still exploring how to properly incentivize
compliance and disincentivize noncompliance with a revised waste rule (and much depends on
how BLM designs the rule) we suggest a stick that makes use of the following three elements.

First, BLM should consider strengthening its existing penalty provisions by:

- Explicitly providing that a lessee or operator who repeatedly or egregiously violates the
  waste rule will have their leases and permits cancelled or suspended and, further, will be
  prohibited from acquiring new leases. We believe that such consequences would serve as a
  more effective deterrent to waste than monetary penalties alone. At present, BLM has the
  authority to, e.g., "shut down operations" in situations "where continued operations could
  result in immediate, substantial, and adverse impacts on public health and safety, the
  environment, production accountability, or royalty income." 43 C.F.R. § 3163.1(a)(3). BLM
  also has the authority, e.g., to cancel a lease for "[c]ontinued noncompliance." 43 C.F.R. §
  3163.1(a)(5). But these authorities, relative to the waste rule, should be clearly and
  explicitly defined and, if necessary, strengthened and expanded.

- Identifying what elements of the revised waste rule, if violated, would constitute a "major"
  versus "minor" violation as defined in 43 C.F.R. § 3160.0-5 and make revisions of those
  definitions as appropriate.

- Strengthening the remedies and civil penalties provisions of 43 C.F.R. § 3163.1 and § 3163.2.
  Both of these provisions give the authorized officer too much discretion as to whether and
  under what circumstances penalties shall be assessed. BLM should provide consistent
  guidance to authorized officers to ensure that waste rule requirements are met. These
  provisions also provide a penalty structure—e.g., a $500 per day assessment for a "major
  violation" as per 43 C.F.R. § 3163.1(a)(1)—that does not effectively deter violations or
  account for inflation. Accordingly, BLM should adjust the penalties to better disincentivize
  violations of the waste rule and to account for inflation.

Second, we encourage BLM to increase the royalty rate for calculating compensation due for
avoidably lost oil and gas to better disincentive waste and ensure a fair return to the American
public for the loss of domestic energy resources that are intended to be managed for the broad,
long-term public interest. And we further recommend that BLM require that lessees and
operators pay royalties on all lost natural gas, even if such loss is deemed unavoidable—
compensation that is currently not provided for pursuant to NTL 4A. This is because the

BLM_0112551

unavoidable loss of natural gas is still the loss of a valuable public resource and the cost of that loss should be born by the lessee or the operator as a cost of doing business, not by the public. In effect, BLM would use two royalty rates: (1) a royalty rate that is higher than the standard royalty rate to penalize and compensate for avoidable waste; and (3) the standard royalty rate to compensate and ensure that the public receives fair market value for unavoidable losses of natural gas. Both of these recommendations are in line with BLM's authorities and responsibilities. *See* 30 U.S.C. § 226(b)(1)(A) (providing that royalties be set "at a rate of not less than 12.5 percent in amount or value of the production removed or sold from the lease"); 43 U.S.C. § 1701(a)(9) (providing that it is U.S. policy to "receive fair market value of the use of the public lands and their resources….")

We recognize that BLM discontinued its efforts to modify royalty rates last year, despite the fact that royalty rates for onshore oil and gas production of public mineral resources are some of the lowest in the world at 12.5%. 43 C.F.R. § 3103.3-1. Nonetheless, revisions to the methane rule suggest a key opportunity for at least targeted revisions to royalty rates to better disincentivize waste.[50] We note that BLM already *reduces* royalty rates in certain instances to provide an incentive to, e.g., encourage "the greatest ultimate recovery of oil or gas an in the interest of conservation." 43 C.F.R. § 3103.4-1. We think it reasonable and indeed necessary that BLM, in addition to providing royalty "carrots," also use royalty "sticks."

Third, we encourage BLM to consider higher national minimum acceptable bids to better encourage optimization of existing leases rather than the acquisition of new leases. *See* 30 U.S.C. § 226(b)1)(B) (providing authority to Secretary to raise minimum bids "based upon a finding that such action is necessary: (i) to enhance financial returns to the United States; and (ii) to promote more efficient management of oil and gas resources on Federal lands"). This is particularly so given the stark divide between the number of acres leased for development— nearly 38 million acres—and the number of acres that are actually developed—12.5 million, a divide that does little to facilitate the production of actual energy and a divide that provokes conflict with non-mineral resources, such as wildlands, wildlife, and water protection efforts.

### 10.    BLM Should Ensure Public Transparency And Accountability

A revised methane waste rule should provide for effective public oversight of oil and gas exploration, development, and production on federal onshore oil and gas lands by ensuring that BLM, lessee, and operator activities are transparent and accountable to the public. We have recommended that BLM take advantage of existing front-end planning and management tools precisely because these tools often require public involvement and the publication of publicly available information, such as RMPs or NEPA analyses and their supporting information, that facilitates public transparency and accountability.

In addition to these front end planning and management tools, BLM should also ensure that the public can effectively track and assess whether waste is in fact being prevented, and whether or

---

[50] GAO, *Oil and Gas Resources: Action Needed for Interior to Better Ensure a Fair Return*, GAO-14-50 (Dec. 2013).

BLM_0112552

not lessees and operators have complied with the agency's waste prevention mandates. This can be done, in part, through:

- Effective monitoring and other implementation and management measures required by RMPs and other decision-documents.

- Revisions to NTL-3A, which dictates when oil and gas operators report "undesirable events," including gas leaks, to BLM. BLM should decrease the volume of vented gas that an operator must report in a Major Undesirable Event in Part I of NTL-3A from 500 to 100 Mcf and, further, expand the requirement to include not just vented, but also fugitive, emissions.

- Actions taken by BLM in response to GAO's recommendations in GAO-13-572 regarding documentation of environmental inspections, such as adding methane mitigation measures to BLM's "Inspection and Enforcement Handbook" and establishing criteria for prioritizing methane waste-related inspection of wells and other facilities.

## V.   __CONCLUSION__

We hope that BLM gives these core principles due consideration and that they are of service in informing the agency's efforts to modernize its 34-year old waste rules. As we have noted, BLM has made steady progress acknowledging and remedying methane emissions and waste but that this progress must be accelerated and intensified. This will go far in ensuring that BLM is, in fact, ensuring the responsible development if this country's onshore oil and natural gas resources.

*************************

**CORE PRINCIPLES**
**Page 32 of 32**

# Exhibit B

## In Support of Supplemental Comments to the RMP

BLM_0112554

**September 2013**



# COLORADO BUREAU OF LAND MANAGEMENT

## COMPREHENSIVE AIR RESOURCE PROTECTION PROTOCOL (CARPP)

Version Date:  September 2013

BLM_0112555

# TABLE OF CONTENTS

Section

Page

**COMPREHENSIVE AIR RESOURCES PROTECTION PROTOCOL**

Section I – Purpose, Scope, and Responsibilities .......................................................................3

Section II – Interagency Air Resources Collaboration ...........................................................4

Section III – Actions to Analyze & Protect Air Quality...........................................................4

III.A   Monitoring..................................................................................................................5

III.B   Emissions Inventories..............................................................................................6

III.C   Modeling......................................................................................................................6

III.D   Permitting ...................................................................................................................8

III.E   Mitigation ....................................................................................................................9

Section IV – Adaptive Management Processes for Air Resources................................... 10

Section V – Annual Summary Report ....................................................................................... 13

Section VI – Oil and Gas Development Emissions Reduction Strategies & BMPs........................ 13

BLM_0112556

# COMPREHENSIVE AIR RESOURCES PROTECTION PROTOCOL (CARPP)

## SECTION 1 – PURPOSE, SCOPE, AND RESPONSIBILITIES

This Comprehensive Air Resources Protection Protocol (CARPP) describes the process and strategies the BLM will use when authorizing activities that have the potential to adversely impact air quality within the state of Colorado.  This protocol also outlines specific measures that may be taken to address BLM-approved activities with the potential to cause significant adverse impacts to air resources (via the generation of significant quantities of air emissions) within any planning area (as determined on a case by case basis).  Further, the purposes of this protocol are to address air quality issues identified by the Bureau of Land Management (BLM), or public scoping, in its analysis of potential impacts on air resources for BLM Colorado Resource Management Plans and Environmental Impact Statements (RMP/EIS); and clarify the mechanisms and procedures that BLM will use to achieve the air resources goals, objectives, and management actions set forth in BLM Colorado RMPs.

### I.A    CARPP Scope

The CARPP is not a decision document, but rather a strategy to address air quality concerns throughout BLM-managed lands and resources in Colorado.  Because the CARPP is not a field office specific management tool, it may be modified as necessary to comport or comply with changing laws, regulations, BLM policy, or to address new information and changing circumstances without maintaining or amending any specific Field Office RMP (see reference version date on the cover page).

However, changes to the goals, objectives, or management actions set forth in any Colorado Field Office RMP/EIS as a result of the changes in the CARPP (or more specifically, any subsequent analysis based on such changes) would require an amendment of the specific RMP being affected.

### I.B    BLM Responsibilities under FLMPA and MLA

The BLM has the authority and responsibility under the Federal Land Policy and Management Act (FLPMA) to manage public lands in a manner that will protect the quality of air and atmospheric values [FLPMA Sec. 102(a)(8)].  The FLPMA also provides that the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands and includes provisions for implementing the Mining and Minerals Policy Act of 1970 [FLPMA Sec. 102(a)(12)].  The BLM has the responsibility under the Mineral Leasing Act (MLA) to implement the decisions of any RMP/EIS in a manner that recognizes valid and existing lease rights[1].

---

[1] H-1601-1 - LAND USE PLANNING HANDBOOK:  A plan-level decision to open the lands to leasing represents BLM's determination, based on the information available at the time, that it is appropriate to allow development of the parcel consistent with the terms of the lease, laws, regulations, and orders, and subject to reasonable conditions of approval.  When applying leasing restrictions, the least restrictive constraint to meet the resource protection objective should be used.

BLM_0112557

Further, the FLPMA provides that "In the development and revision of land use plans, the Secretary shall provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans;" [FLPMA Sec. 202(c)(8)][2].

## SECTION II – INTERAGENCY AIR RESOURCES COLLABORATION

The Bureau of Land Management is firmly committed to working with federal, state, tribal, and local air resource management partners to address complex and often cross-jurisdictional air quality issues.  As a federal agency, we have a role to provide leadership in addressing known air quality issues within our authority and domain, while upholding our responsibility to manage the public lands for multiple-use under the FLPMA.  We also recognize that the State of Colorado, specifically the Colorado Department of Public Health and Environment (CDPHE), has the primary responsibility and authority delegated by the EPA to regulate and maintain air quality standards within Colorado in accordance with the Clean Air Act.    Interagency collaboration is the key to management of air quality, as no single agency has all the necessary tools to solve these complex issues alone.  We must act together.

To that end the BLM will work collaboratively with other local, state, federal, and tribal agencies involved in the management of air resources to develop a comprehensive strategy to protect air resources from potentially significant adverse impacts resulting from BLM approved activities in Colorado.

### II.A     National Air Quality MOU

When making oil and gas implementation decisions, the BLM will consider or apply, as appropriate, the provisions of the *Memorandum of Understanding Among the US Department of Agriculture, US Department of the Interior, and US Environmental Protection Agency, Regarding Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions Through the NEPA Process*, signed June 23, 2011.

## SECTION III – ACTIONS TO ANALYZE & PROTECT AIR QUALITY

The following sections describe actions the BLM will take to ensure an adequate analysis and subsequent protection for air quality resources within Colorado.  Appropriate air resources protection requires the BLM to manage its authorized activities and actions at broad spatial and temporal scales that are dynamic and thus subject to change.  The BLM will accomplish this through an adaptive management approach, which includes establishing baseline conditions, monitoring, reevaluation, and adjustment as necessary.  Adaptive management therefore

---

[2] Note:  Where sources of air pollution emissions are regulated by an entity/agency (Federal, State, Tribal, Local), the BLM shall not craft alternatives with features or conditions that interfere with a proponents ability to comply with such laws or standards. IBLA has held that the meaning of "providing for compliance" does not require that the BLM has any obligation to ensure compliance where another agency holds such responsibility [*Wyoming Outdoor Council, et al* 176 IBLA 15, 27 (2008); Powder River Basin Resource Council, 183 IBLA 83, 94-95 (2012)]. However, the BLM should appropriately analyze such sources (as well as non-regulated sources) within the applicable NEPA context to disclose potential impacts, determine significance, and provide for mitigation as necessary and within our authority for any specific finding.

BLM_0112558

contemplates regular review and adjustment of management approaches during the authorization of emissions generating activities commensurate with changing circumstances.

## III.A  MONITORING

Ambient air monitoring provides valuable data for determining current and background concentrations of air pollutants, describing long term trends in air pollutant concentrations, and evaluating the effectiveness of air control strategies.  The BLM's comprehensive air resource protection protocol includes the ambient air monitoring measures described in this section.

### III.A.1 – Air Monitoring Network

The BLM will participate in a cooperative effort with industry, CDPHE, Forest Service, National Park Service, EPA, local counties, and other entities as appropriate, to establish, operate, and maintain a comprehensive air monitoring network within the planning areas where a need for monitoring has been identified (contingent upon available funding). The BLM will cooperate in the sharing of air monitoring data collected by the air monitoring network with other agencies and the public.

### III.A.2 – Pre-Construction Air Monitoring

The BLM may request proponents of projects with the potential to generate significant air emissions, to submit pre-construction air monitoring data from a site within or adjacent to the proposed development area.  The purpose of this air monitoring is to determine baseline air quality conditions prior to development at the site.  The need for monitoring will be determined by the BLM based on the availability or absence of existing representative air monitoring data and the factors listed in Section III.D of this protocol.  If the BLM determines that pre-construction monitoring is necessary, the project proponent must provide a minimum of one year of representative ambient air monitoring data for the pollutants of concern. The project proponent will be responsible for siting, installing, operating, and maintaining any new air monitoring equipment needed to fulfill this requirement in the absence of existing representative air monitoring data.

### III.A.3 – Life of Project Air Monitoring

The BLM may require proponents or operators of Federal mineral development projects, or proponents of other potentially significant emission generating projects, to conduct air monitoring for the life of the project based on the availability or absence of representative air monitoring data and the factors listed in Section III.D of this protocol.  The purpose of this air monitoring is to measure impacts potentially attributable to the project over time and to determine the effectiveness of emissions control measures required for the project.  The project proponent will be responsible for siting, installing, operating, and maintaining any new air monitoring equipment needed to fulfill this requirement in the absence of existing representative air monitoring data.

BLM_0112559

### III.A.4 – Monitoring Data Transparency

Project-specific monitoring data may be used by the BLM in subsequent NEPA analysis required for project approvals.  Thus public disclosure of such data is assured via the NEPA process, if used.  Additionally, the BLM will ensure that ambient air monitoring data collected as a COA for any BLM authorized activity will be made publicly available within the body or our annual report required under Section V of this protocol.

## III.B   EMISSIONS INVENTORIES

The BLM will request the proponent of an oil and gas development activity (as proposed in a permit application, plan of development, or Master Development Plan) to submit a comprehensive inventory of anticipated direct and indirect emissions associated with the proposed project.  The emissions inventory will include estimated emissions of regulated air pollutants from all sources related to the proposed activity, including fugitive emissions and greenhouse gas emissions, for each year or distinct project phase over the life of the project.  The BLM will review the emissions inventory to determine its completeness and accuracy.  In most cases the BLM will accept inventory data reported to other agencies for the purposes of meeting this requirement.  For example BLM would accept copies of actual emissions data for criteria pollutants, volatile organic compounds, hazardous air pollutants, and greenhouse gases that are submitted to CDPHE as required for applicable air permitting or APEN requirements, or submittals to COGCC in the form of drilling and production data reports, and data to EPA under the Greenhouse Gas Reporting Rule (40 CFR Part 98 Subpart W) for the authorized action.

## III.C   MODELING

Air dispersion and photochemical grid models are useful tools for predicting project-specific impacts on air quality, predicting the potential effectiveness of control measures and strategies, and forecasting trends in regional concentrations of air pollutants.  The BLM will use regional air modeling and project-specific modeling, in conjunction with other air analysis tools, to develop air resource protection strategies consistent with our responsibilities under FLPMA.  Further, the BLM will provide appropriate disclosure for any modeling of direct, indirect, and cumulative impacts of proposed actions during the required NEPA analysis.

### III.C.1 – Project-specific Modeling

The BLM may require project-specific air quality modeling, consistent with the Air Resources MOU to analyze potential impacts from a proposed Federal mineral development project or other proposed activity that has the potential to emit significant quantities of a regulated air pollutant and the effectiveness of any air emission control measures.  Project proponents may submit results from other modeling analyses that include activities similar to the proposed project for BLM's review and approval, and if approved, those modeling results may be used in lieu of new project-specific modeling.  The decision as to whether to require air quality modeling will be based on factors listed in Section III.D of this protocol.  The BLM will not require an air modeling analysis when it can be

BLM_0112560

demonstrated that the project will not cause a substantial increase in emissions of the pollutants of concern.

## III.C.2 – Modeling Protocol

The BLM will determine the parameters required for a project-specific modeling analysis through the development of a modeling protocol for each analysis. When conducting a regional model or EIS level project specific oil and gas air modeling analysis, the BLM will adhere to the *Memorandum of Understanding Among the US Department of Agriculture, US Department of the Interior, and US Environmental Protection Agency, Regarding Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions Through the NEPA Process*, signed June 23, 2011.

## III.C.3 – Regional Air Modeling

The BLM will support and participate in regional modeling efforts through multi-state and/or multi-agency organizations such as Western Governors' Association – Western Regional Air Partnership (WRAP) and the Federal Leadership Forum (FLF).  In addition, BLM will, contingent upon available funding, conduct and facilitate regional air modeling as needed.  Currently, the BLM is facilitating the Colorado Air Resources Management Modeling Study (CARMMS).  CARMMS is a BLM funded regional air quality modeling study of expected impacts on air quality from projected increases in oil and gas development across Colorado and certain upwind adjacent states.

- The CARMMS modeling protocol/study will be developed by the BLM with involvement from appropriate local, state, federal, and tribal agencies involved in the management of air resources and the authorization and regulation of oil and gas development.

- The CARMMS results will include the predicted impacts from all projected federal and non-federal oil and gas development within the region.

- The CARMMS results and analysis will be made available to the public.

## III.C.4 – Evaluation of Modeling Results

The BLM will cooperate in an interagency process to develop a comprehensive strategy to manage air quality impacts from future oil and gas development within the region. As part of that strategy, the local, state, federal, and Tribal agencies involved in the regulation of air quality and the authorization of oil and gas development would evaluate modeling results from CARMMS or other future modeling studies and identify potential air quality concerns and necessary reductions in air emissions.  If the modeling predicts significant impacts, these agencies would use their respective authorities to implement appropriate enhanced emission control strategies, operating limitations, equipment standards, and/or pacing of development.

BLM_0112561

### III.C.5 – Future Modeling Studies

Future iterations of the CARMMS, or a similar regional modeling study of expected impacts from oil and gas development, may be conducted through a collaborative interagency management mechanism and interagency / industry funding mechanism.

## III.D   PERMITTING

As part of the NEPA process and prior to the authorization of any Federal mineral development activity the BLM will conduct an air analysis to determine the potential impacts on air quality based on the estimated emissions from the activity being authorized.  The BLM may conduct such an analysis for other authorized activities with the potential to generate significant emissions of a regulated pollutant.  The BLM will consider the following factors to identify pollutants of concern and make decisions regarding the appropriate level of air analysis, monitoring, and reporting requirements for the proposed activity.

- magnitude of potential air emissions from the proposed activity

- duration of proposed activity and distinct phase considerations

- proximity to a federally mandated Class I area, sensitive Class II area (as identified on a case-by-case basis by CDPHE or a federal land management or tribal agency), population center, or other sensitive receptor
- location within or adjacent to a non-attainment or maintenance area

- meteorological and geographic conditions

- existing air quality conditions including measured exceedances of NAAQS or CAAQS and measured adverse impacts  on air quality related values (AQRVs) at Class I and sensitive Class II areas

- intensity of existing and projected development in the area

- issues identified during project scoping

### III.D.1 – Statewide Lease Notice

The following Lease Notice language will be incorporated into all new leases.

*This lease is located in an area that has or may in the future have degraded air quality or is currently designated as non-attainment or in maintenance for the National Ambient Air Quality Standards (NAAQS).*

*To support its air quality analysis for any proposed development of this lease, the BLM may request a comprehensive emissions inventory, collection of monitoring data, and air quality modeling. In addition, the BLM may consult with affected land managers and air quality regulators in other federal, state, tribal, or local agencies to identify potential mitigation options for any predicted significant impacts from the proposed development. Potential mitigation may include reasonable limitations on the time, place, and pace of*

BLM_0112562

*any proposed development, as well as requiring best management practices and emission control strategies. Mitigation measures would be analyzed to determine effectiveness, and effective measures may be required as a permit condition of approval (COA). At a minimum, all projects and permitted uses implemented under this lease will comply with state and federal requirements designed to protect air quality.*

## III.E  MITIGATION

Many activities that the BLM authorizes, permits, or allows generate air pollutant emissions that have the potential to adversely impact air quality. The primary mechanism to reduce air quality impacts is to reduce emissions via project design features and mitigation. Appropriate emission reduction measures are best identified and required at the project authorization stage, when the temporal and spatial characteristics and technological specifications of the proposed action have been defined. The project-specific information available at that stage allows for the development of an emissions inventory and impact analysis that can be used to identify effective mitigation options for predicted adverse impacts. Section IV, Emissions Reduction Strategies and Best Management Practices, provides some emission reduction technologies and strategies as an example. The list in Table VI-1 is not intended to be all inclusive or preclude the use of other effective air pollution control technologies that may be proposed.

The BLM will ensure implementation of reasonable mitigation, control measures, and design features through appropriate mechanisms, including lease stipulations identified in RMPs, notices to lessees, and conditions of approval (permit terms and conditions) as provided for by law and consistent with lease rights and obligations. In the absence of, or in addition to effective control technologies, the BLM may manage the pace, place, density, and intensity of leasing and development to meet air quality goals and objectives as defined under any applicable RMP.

### III.E.1 – Emissions Reduction Planning / Minimizing Air Emissions

The BLM will request proponents of oil and gas development projects that have the potential to significantly adversely impact air quality or predicted to exceed an air quality standard to provide an emissions reduction plan where air quality has been identified as a resource of concern in applicable NEPA analysis. Plans shall include a detailed description of operator committed measures to reduce project related air pollutant emissions including greenhouse gases and fugitive dust. All projects are required to comply with all applicable state and federal regulations.

### III.E.2 – Project-specific Mitigation

If the project-specific air quality analysis predicts future impacts on NAAQS or CAAQS (i.e. exceedances) or adverse impacts to AQRVs in Class I or sensitive Class II areas, the BLM will analyze air quality mitigation measures for emission sources. Further, if the regional air quality modeling study conducted under Section III.C.3 predicts significant cumulative impacts on air resources from expected oil and gas development in the region, the BLM may require the

BLM_0112563

proponent of an oil and gas development project to apply reasonable mitigation including but not limited to best management practices (see Section VI), emissions offsets, and other control technologies or strategies identified in the project-specific air quality analyses.

Where identified and analyzed mitigation measures cannot be reasonably implemented for a particular proposed action due to the overall project design, or substantial technical or economic barriers, the BLM will work with project proponents during the NEPA process to develop operator-committed measures or acceptable emissions offsets that would be included as conditions of approval (COA). Any operator committed measures would be required to provide an air quality benefit sufficient in type, scale, location, and timing to avoid the anticipated adverse impact or at a minimum, to reduce it to an acceptable level for the specific area and pollutant(s) analyzed.

## III.F    Protocol Implementation

The BLM will ensure that air resource protection strategies and mitigation measures are implemented by including project-specific COAs (operator-committed and/or required mitigation) for each authorized action. Any COAs applied to projects as a result of this process shall be clearly consistent with the applicable RMP management decisions and/or subsequent analysis of new or previously unavailable information upon which the BLM can reasonably rely.

# SECTION IV – ADAPTIVE MANAGEMENT PROCESSES FOR AIR RESOURCES

Adaptive management incorporates the principles of monitoring current conditions, predicting future impacts, and adapting management strategies to account for changing conditions. An adaptive management strategy for air quality resources allows the BLM to comply with NEPA and complete an appropriate analysis to ensure that activities approved by the BLM minimize adverse impacts to air quality; while allowing for development of important domestic energy resources.

The BLM will implement an adaptive management strategy to account for changing air quality conditions and to minimize adverse impacts to air resources from BLM-authorized activities. The strategy includes evaluating air quality on an on-going basis, and if necessary, implementing appropriate mitigation measures to meet the identified objectives and targets for any applicable Colorado RMP. The adaptive management strategy is intended to be transparent and as such the process includes an annual reporting component that will be made available to the public, as well as case by case incorporation of specific plan elements within individual project approvals. Components of this adaptive management strategy include the following:

## IV.A    Establish Baseline Air Quality Conditions

Existing air quality conditions will be established and continuously updated on an annual basis. To establish a periodic baseline, data must be compiled and analyzed such that air quality value trends (NAAQS & AQRVs for Class I and sensitive Class II areas) can be established or evaluated for the purpose of predicting future impacts from BLM-authorized activities. Sources of data for this analysis may include raw air quality

BLM_0112564

monitoring station data, air quality monitoring reports prepared by others (CDPHE, EPA, NPS or USFS), and/or appropriate regional modeling results.

In addition to monitored or predicted background data, regional emissions inventories will be continuously or periodically updated to reflect the annual mass of pollutants added to the atmosphere.  The data will provide an understanding between mass emissions and monitored/modeled air quality conditions and provide a reasonable basis from which to evaluate impacts from future projects or actions.

The last component of the baseline analysis includes providing a brief synopsis of the current meteorological conditions that exist for any planning area such that exceptional events and historical deviations in atmospheric values can be documented to provide additional context for the observed/reported air quality values.

## IV.B   Emissions Tracking

To provide for the periodic baseline the BLM will use the project-specific information used in its NEPA analyses as a mechanism to track emissions of criteria pollutants, volatile organic compounds, hazardous air pollutants, and greenhouse gases from BLM authorized oil and gas activities within each field office planning area.  (NOTE: the BLM may incorporate emissions inventories for other authorized activities with significant emissions to provide for an appropriate cumulative inventory, where such sources are not already included as a Colorado Air Pollution Emissions Notice, or National Emissions Inventory component).  The BLM will use emissions data from APDs to inform iterative elements of our adaptive management strategy, including modeling inputs and any subsequent prescriptive or comparative project tiering from any applicable modeling results.

## IV.C   Prescriptive Model Validation

Prescriptive model validation includes comparing the annual NEPA emissions data from BLM authorized oil and gas activities within the planning areas to emission levels analyzed in the CARMMS modeling study (or the most recent BLM or interagency air impacts analysis conducted in accordance with the provisions of the modeling Section III above).  Emissions data will include specific oil and gas indicators, such as the number of wells drilled, number of producing wells, production data, compressor stations installed, centralized liquids gathering stations, and gas treatment facilities constructed.  The actual emissions levels and new baseline air quality observations will be correlated against the modeled parameters to determine the reasonableness of the model for predicting impacts and its continued appropriateness as a reference for any subsequent project analysis.

If during the course of our annual analysis it is determined that the model has not demonstrated a reasonable correlation of predicted impacts (for modeled emissions inventory levels) compared against the actual emissions recorded for a planning area, the BLM will investigate the potential sources of the discrepancy to determine a potential cause, such as meteorological factors (ex: winter time ozone, which cannot be modeled at this time), or fee mineral development (i.e. non-BLM authorized actions).  If a probable cause for the discrepancy cannot be established, then the BLM will initiate

BLM_0112565

interagency coordination with our regulatory partners to determine if a new modeling analysis is potentially warranted.

## IV.D    Responding to Monitored Exceedances of the NAAQS

If during the course of a year a Federal Reference or Equivalent air monitor within any planning area records a validated exceedance of any NAAQS (excluding any non-attainment areas) the BLM will review the available data to determine if any BLM authorized activity caused or significantly contributed to the exceedance event.   The review will encompass the following steps.

### IV.D.1– QA/QC

The BLM will ensure the validity of the monitored data by: (a) reviewing Quality Assurance/Quality Control (QA/QC) metadata to ensure against false high readings, and (b) reviewing meteorological data to determine if an exceptional atmospheric event such as stratospheric ozone intrusion occurred.   The BLM may contact CDPHE for technical consultation and concurrence regarding possible exceptional events.

### IV.D.2 – Screening Analysis

If the monitoring data are validated, the BLM will conduct a screening analysis to determine the likely cause, source, or origin of the exceedance and whether any BLM authorized source(s) within or adjacent to the planning area caused or contributed to the monitored exceedance.   If the screening analysis indicates BLM-authorized sources did NOT cause or significantly contribute to the exceedance, then no further action will be taken by the BLM.  The data, analysis, and conclusions will be included in the annual public report described under I.C above.

### IV.D.3 – Enforcement

Should the results of the screening analysis indicate that a BLM authorized source(s) caused or significantly contributed to the monitored exceedance, the BLM will review the COA from the authorization for the source(s) to determine if all the COA were implemented as required.   Where it is determined that operators did not comply with the conditions of approval for their authorized activities, and did not submit an appropriate sundry notice for approved deviations from such conditions, BLM may issue a notice of incident of noncompliance or take other appropriate enforcement action.

### IV.D.4 – Contingency Planning

If, after review the BLM determines that an authorized source(s) caused or significantly contributed to the monitored exceedance, the BLM will initiate consultation with CDPHE, EPA, and any other applicable local, state, federal, and tribal agencies with responsibility for managing air resources to address appropriate responses to the monitored exceedances.  Responses to monitored exceedances may include employing more stringent mitigation measures within

BLM_0112566

the agencies' respective authority to reduce projected future emissions and performing additional modeling and analysis to determine the overall effectiveness of such mitigation measures.

Additionally, the BLM may implement reasonable temporary measures that have been included in a project specific authorization as conditions of approval, which could limit drilling operations, completions or well stimulations, blowdowns, or other non-essential operations during specified time periods (i.e. a timing limitation). Other actions the Bureau may take would include limiting the number of annual APD approvals issued for the affected area until such time that updated regional modeling can be conducted to provide an appropriate assessment of the expected impacts from a reasonable level of development.

## IV.E    Evaluating Projected Future Development/Emissions

Periodically, but not less than every three years, the BLM will evaluate the available or reasonably foreseeable oil and gas development projections for each planning area for the following three to five year period, and compare these projected levels to the level of predicted future development analyzed in the CARMMS modeling study (or the most recent BLM or interagency air impacts analysis conducted under the provisions of the modeling section(s) III.C.3 or III.C.5 above). The BLM will use the projected development/emissions data to determine whether the modeling analysis remains appropriate as a reference for any subsequent project analyses.

## Section V – ANNUAL SUMMARY REPORT

Annually, the BLM will prepare a comprehensive summary report (from actual project data and analysis). This report will be made available to the public. The BLM will use this annual review to evaluate whether current air resources protection strategies are meeting the goals and objectives established within the BLM Colorado RMPs. If the analysis shows that the strategies are not achieving our defined air resource protection goals, the BLM will collaborate with CDPHE and the EPA to develop or modify air resource protection strategies as necessary to effectively protect air resources within any deficient planning area. Should this result in changes to RMP goals and objectives, additional planning level analyses will be required.

## SECTION VI – OIL AND GAS DEVELOPMENT EMISSIONS REDUCTION STRATEGIES & BMPS

Table V-1 displays some emission reduction measures, their potential environmental benefits and liabilities, and feasibility. The table is not meant to be exhaustive in terms of available or acceptable emissions reduction/control technologies or techniques, but provides a baseline or starting point from which to construct design features and mitigation options for project specific or regional analyses.

BLM_0112567

**Table V-1 Best Management Practices and Air Emission Reduction Strategies for Oil and Gas Development**

| Emission Reduction Measure | Potential Environmental Benefits | Potential Environmental Liabilities | Feasibility |
|---|---|---|---|
| **Control Strategies for Drilling and Compression** | | | |
| Multi-well pad directional or horizontal drilling. | When compared to single pad vertical drilling, reduces construction related emissions, decreases surface disturbance, reduces trip frequencies, and reduces habitat fragmentation. | Could result in higher air impacts in one area with longer sustained drilling times. | Depends on geological strata, topography, and other physical constraints. |
| Improved engine technology (Tier 2 or 4) for diesel drill rig engines. | Reduced NOx, PM, CO, and VOC emissions. | | Dependent on availability of technology from engine manufacturers and, potentially differentials in cost for small operators.. |
| Selective Catalytic Reduction (SCR) for drill rig engines and/or compressors. | NOx emissions reduction, potential decreased formation of visibility impairing compounds and ozone. NOx control efficiency of 95% achieved on drill rig engines. NOx emission rate of 0.1 g/hp-hr achieved for compressors. | Potential NH3 emissions and formation of visibility impairing ammonium nitrate. Regeneration/disposal of catalyst can produce hazardous waste. | Not applicable to 2-stroke engines. |
| Non-selective catalytic reduction (NSCR) for drill rig engines and/or compressors. | NOx emissions reduction, potential decreased formation of visibility impairing compounds, and ozone. NOx control efficiency of 80-90% achieved for drill rig engines. NOx emission rate of 0.7 g/hp-hr achieved for compressor engines greater than 100 hp. | Regeneration/disposal of catalysts can produce hazardous waste. | Not applicable to lean burn or 2-stroke engines. |

**Table V-1 Best Management Practices and Air Emission Reduction Strategies for Oil and Gas Development**

| Emission Reduction Measure | Potential Environmental Benefits | Potential Environmental Liabilities | Feasibility |
|---|---|---|---|
| Natural Gas fired drill rig engines. | NOx emissions reduction, potential decreased formation of visibility impairing compounds, and ozone. | May require construction of infrastructure (pipelines and/or gas treatment equipment). May require onsite gas storage. May require additional engines to supplement needed torque. | Requires onsite processing of field gas. |
| Electrification of drill rig engines and/or compressors | Decreased emissions at the source. Transfers emissions to more efficiently controlled source (EGU). | Displaces emissions to EGU. Temporary increase in emissions with construction of power lines. | Depends on availability of power and transmission lines. |
| Improved engine technology (Tier 2, 3 or 4) for all mobile and non-road diesel engines. | Reduced NOx, PM, CO, and VOC emissions. | | Dependent on availability of technology from engine manufacturers. |
| Reduced emission (a.k.a. "green") completions. | Reduction in VOC and CH4 emissions. Reduces or eliminate flaring and venting and associated emissions. Reduces or eliminates open pits and associated evaporative emissions. Increased recovery of gas to pipeline rather than atmosphere. | Temporary increase in truck traffic and associated emissions due to delivery of onsite equipment or due to construction of infrastructure. | Need adequate pressure and flow. Need onsite infrastructure (tanks/dehydrator). Availability of sales line. Green completion required where feasible per COGCC Rule 805(b)(3) and NSPS 40 CFR 63 OOOO. |
| Flaring of completion emissions | Reduces methane, VOC, and some HAP emissions. Converts CH4 to CO2. | | |
| Minimize/eliminate venting and/or use closed loop process where possible during "blow downs". | Reduces methane, VOC, and some HAP emissions | | |

BLM_0112569

**Table V-1 Best Management Practices and Air Emission Reduction Strategies for Oil and Gas Development**

| Emission Reduction Measure | Potential Environmental Benefits | Potential Environmental Liabilities | Feasibility |
|---|---|---|---|
| Eliminate evaporation pits for drilling fluids. | Reduces VOC and GHG emissions. Reduces potential for soil and water contamination. Reduces odors. | May increase truck traffic and associated emissions. May increase pad size. | Requires tank and/or pipeline infrastructure. |
| Electrification of wellhead compression/ pumping. | Reduces local emissions of fossil fuel combustion and transfers to more easily controlled source. | Displaces emissions to EGU. | Depends on availability of power and transmission lines. |
| Wind (or other renewable) generated power for compressors. | Low or no emissions. | May require construction of infrastructure. Visual impacts. Potential wildlife impacts. | Depends on availability of power and transmission lines. |
| Compressor seals – replace wet with dry or use mechanical seal. | Reduce gas venting (VOC and GHG emissions). | | May be costly or not mechanically feasible. |
| Compressor rod packing system – use monitoring and replacement system. | Reduce gas leaks (VOC and GHG emissions). | | Requires establishing a monitoring system and doing replacements. |
| **Control Strategies Utilizing Centralized Systems** | | | |
| Centralization (or consolidation) of gas processing facilities (e.g., separation, dehydration, sweetening). | Reduces vehicle miles traveled (truck traffic) and associated emissions. Reduced VOC and GHG emissions from individual dehydration/ separator units. | Temporary increase in construction associated emissions. Higher potential for pipe leaks/groundwater impacts. | Requires pipeline infrastructure, infeasible for highly dispersed or exploratory wells. |
| Liquids Gathering systems (for condensate and produced water). | Reduces vehicle miles traveled and associated emissions. Reduced VOC and GHG emissions from tanks, truck loading/unloading, and multiple production facilities. | Temporary increase in construction associated emissions. Higher potential for pipe leaks/groundwater impacts. | Requires pipeline infrastructure . May be infeasible for highly dispersed or exploratory wells, difficult terrain, or patchy surface ownership. |

BLM_0112570

**Table V-1 Best Management Practices and Air Emission Reduction Strategies for Oil and Gas Development**

| Emission Reduction Measure | Potential Environmental Benefits | Potential Environmental Liabilities | Feasibility |
|---|---|---|---|
| Water and/or fracturing liquids delivery system. | Reduced long term truck traffic and associated emissions. | Temporary increase in construction associated emissions. Higher potential for pipe leaks/groundwater impacts. | Requires pipeline infrastructure. May be infeasible for highly dispersed or exploratory wells, difficult terrain, or patchy surface ownership. |
| **Control Strategies for Tanks, Separators, and Dehydrators** | | | |
| Eliminate use of open top tanks. | Reduced VOC and GHG emissions. | | |
| Capture and control of flashing emissions from all storage tanks and separation vessels with vapor recovery and/or thermal combustion units. | Reduces VOC and GHG emissions. | Pressure buildup on older tanks can lead to uncontrolled rupture. | |
| Capture and control of produced water, crude oil, and condensate tank emissions. | Reduces VOC and GHG emissions. | | 95% VOC control required by COGCC in some areas and by CDPHE statewide with applicability thresholds |
| Capture and control of dehydration equipment emissions with condensers, vapor recovery, and/or thermal combustion. | Reduces VOC, HAP, and GHG emissions. | | 90% VOC control required by COGCC in some areas and by CDPHE statewide with applicability thresholds |
| Use zero emissions dehydrators or use desiccants dehydrators. | Reduces VOC, HAP, and GHG emissions. | Requires desiccants (salt tablets and forms a brine solution that must be disposed of. | Can be as effective as Triethylene glycol (TEG) dehydration. |
| **Control Strategies for Misc. Fugitive VOC Emissions** | | | |
| Install plunger lift systems to reduce well blow downs. | Reduces VOC and GHG emissions. | | Can be more efficient at fluids removal than other methods; must have adequate pressure. |
| Install and maintain low VOC emitting seals, valves, hatches on production equipment. | Reduces VOC and GHG emissions. | | |

BLM_0112571

**Table V-I Best Management Practices and Air Emission Reduction Strategies for Oil and Gas Development**

| Emission Reduction Measure | Potential Environmental Benefits | Potential Environmental Liabilities | Feasibility |
|---|---|---|---|
| Initiate equipment leak detection and repair program (e.g., including use of FLIR infrared cameras, grab samples, organic vapor detection devices, and/or visual inspection). | Reduction in VOC and GHG emissions. | | |
| Install or convert gas operated pneumatic devices to electric, solar, or instrument (or compressed) air driven devices/controllers. | Reduces VOC and GHG emissions. | Electric or compressed air driven operations can displace or increase combustion emissions. | |
| Use "low" or "no bleed" gas operated pneumatic devices/controllers. | Reduces VOC and GHG emissions. | | Required by COGCC and by CDPHE in non-attainment areas. |
| Use closed loop system or thermal combustion for gas operated pneumatic pump emissions. | Reduces VOC and GHG emissions. | | |
| Install or convert gas operated pneumatic pumps to electric, solar, or instrument (or compressed) air driven pumps. | Reduces VOC and GHG emissions. | Electric or compressed air driven operations can displace or increase combustion emissions. | |
| Install vapor recovery on truck loading/unloading operations at tanks. | Reduces emissions of VOC and GHG emissions. | Pressure build up on older tanks can lead to uncontrolled rupture. | |
| **Control Strategies for Fugitive Dust and Vehicle Emissions** | | | |
| Unpaved surface treatments including watering, chemical suppressants, and gravel. | 20% - 80% control of fugitive dust (particulates) from vehicle traffic. | Potential impacts to water and vegetation from runoff of suppressants. | |
| Use remote telemetry and automation of wellhead equipment. | Reduces vehicle traffic and associated emissions. | | Not possible in some terrain. |
| Speed limit restrictions on unpaved roads. | Reduction of fugitive dust emissions. | | |

BLM_0112572

**Table V-1 Best Management Practices and Air Emission Reduction Strategies for Oil and Gas Development**

| Emission Reduction Measure | Potential Environmental Benefits | Potential Environmental Liabilities | Feasibility |
|---|---|---|---|
| Reduce commuter vehicle trips through car pools, commuter vans or buses, innovative work schedules, or work camps. | Reduced combustion emissions, reduced fugitive dust emissions, reduced ozone formation, reduced impacts to visibility. | | |
| **Miscellaneous Control Strategies** | | | |
| Use of ultra-low sulfur diesel (e.g., in engines, compressors, construction equipment). | Reduces emissions of particulates and sulfates. | | Fuel not readily available in some areas. |
| Reduce unnecessary vehicle idling. | Reduced combustion emissions, reduced ozone formation, reduced impacts to visibility, reduced fuel consumption. | | |
| Reduced pace of (phased) development. | Peak emissions of all pollutants reduced. | Emissions generated at a lower rate but for a longer period. LOP, duration of impacts is longer. | May not be economically viable or feasible if multiple mineral interests. |

BLM_0112573

# UNCOMPAHGRE PLANNING AREA WILDERNESS CHARACTERISTICS INVENTORY: 2011 UPDATE

## INTRODUCTION

As part of the land use planning process for the Uncompahgre Resource Management Plan (RMP), the BLM assessed public lands within the Uncompahgre RMP Planning Area (planning area) to determine whether wilderness characteristics are present outside of designated wilderness, existing wilderness study areas (WSAs), and the congressionally-designated Tabeguache Area. The BLM reviewed original 1980 wilderness inventories, as well as lands proposed by BLM staff and the public, in order to identify lands with potential wilderness characteristics.

Of the six areas identified through the review, five were found to possess wilderness characteristics. The BLM developed a range of RMP alternatives and analyzed impacts associated with the various management prescriptions designed to protect these characteristics. Decisions could protect all, some (including portions of some), or none of the identified lands.

### BLM Authority and the Land Use Planning Process

Land use plans identify broad-scale decisions to guide future land management actions and subsequent site-specific implementation decisions. The BLM Land Use Planning Handbook (1601-1) provides guidance to BLM employees for implementing BLM land use planning requirements. In addition, Appendix C, Section I.K of BLM Handbook 1610-1 (Wilderness Characteristics) directs BLM field offices to identify decisions to protect or preserve wilderness characteristics (including sufficient size, naturalness, and outstanding opportunities for solitude or primitive and unconfined recreation). Specific guidance for assessing wilderness characteristics is provided in BLM Manual 6310, Conducting Wilderness Characteristics Inventory on BLM Lands.

While BLM authority to conduct wilderness reviews and establish new wilderness study areas under FLPMA Section 603 expired in 1993, the BLM has authority under FLPMA sections 102 and 201 to maintain a current inventory of all public lands and their resources, including wilderness characteristics. Through the land use planning process, the BLM must consider all

2

available information to determine the mix of resource use and protection that best serves the FLPMA multiple-use mandate.

The management of areas found to possess wilderness characteristics is addressed through the development of a range of RMP alternatives. Within each alternative, the BLM identifies appropriate portions of land and develops effective management strategies (including management prescriptions, stipulations, and allowable uses).

The five existing WSAs within the planning area will continue to be managed to protect their wilderness characteristics according to BLM Manual 6330, Management of Wilderness Study Areas, until Congress designates them as wilderness or releases them for other uses.

**Scope of Assessment**
The BLM considered and evaluated wilderness characteristics for all BLM lands within the planning area outside of existing WSAs and the Tabeguache Area. The assessment did not include national forest lands or BLM lands within the Gunnison Gorge or Dominguez-Escalante national conservation areas.

FLPMA requires that the BLM maintain a current inventory of conditions and resources on public lands, including wilderness characteristics. The last inventory of wilderness characteristics was completed more than thirty years prior to this RMP revision. This update of the UFO wilderness characteristics inventory takes into consideration the possibility that conditions on the ground may have changed during this interval.

In performing this assessment, the UFO:

1) Reviewed the 1980 BLM Intensive Wilderness Inventory and updated information when necessary to ensure that information was current and accurate.

2) Reviewed proposals to inventory and protect BLM lands with wilderness characteristics submitted by BLM staff and the public.

3) Assessed potential lands in the planning area identified through BLM staff and public wilderness proposals or acquired since the 1980 inventory.

**WILDERNESS CHARACTERISTICS**
BLM Manual 6310 defines wilderness characteristics as consisting of: 1) sufficient size, 2) naturalness, 3) outstanding opportunities for solitude or primitive and unconfined recreation, and 4) supplemental values. To have wilderness characteristics, an area must meet each of the first three criteria as described below.

**Sufficient Size**
The area is roadless and has over 5,000 acres of contiguous BLM lands, or is of sufficient size to make practicable its use in an unimpaired condition. Areas adjacent to wilderness areas or WSAs that are less than 5,000 acres may have wilderness characteristics. State or private lands are not included in making this acreage determination.

BLM_0112575

3

*Roadless Definitions*

For purposes of conducting wilderness characteristics inventories, the BLM uses definitions found on page 17 of House Report 94-1163 (May 15, 1976), released prior to the enactment of FLPMA. In the report, roadless refers to:

> ...the absence of roads which have been improved and maintained by mechanical means to insure relatively regular and continuous use. A way maintained solely by the passage of vehicles does not constitute a road.

The BLM adopted the following sub-definitions of words and phrases related to roads:

- Improved and maintained: Actions taken physically by people to keep the road open to vehicle traffic. "Improved" does not necessarily mean formal construction. "Maintained" does not necessarily mean annual maintenance.

- Mechanical means: Use of hand or power machinery or tools.

- Relatively regular and continuous use: Vehicular use that has occurred and will continue to occur on a relatively regular basis. Examples are: access roads for equipment to maintain a stock water tank or other established water sources, which may entail lengthy return intervals for this purpose; access roads to maintained recreation sites or facilities; or access roads to mining claims.

A route established or maintained solely by the passage of vehicles would not be considered a road, even if it is used on a relatively regular and continuous basis. Vehicle routes constructed by mechanical means but that are no longer being maintained by mechanical methods are not roads. Sole use of hands and feet to move rocks or dirt without the use of tools or machinery does not meet the definition of "mechanical means." Roads need not be "maintained" on a regular basis but rather "maintained" when road conditions warrant actions to keep it in a usable condition. A dead-end (cherry-stem) road can form the boundary of an inventory area and does not by itself disqualify an area from being considered "roadless."

## Naturalness

Lands and resources exhibit a high degree of naturalness when affected primarily by the forces of nature and where the imprint of human activity is substantially unnoticeable (BLM IM 2003-275).

The naturalness of an area may be influenced by the presence or absence of roads and trails, fences or other developments; the nature and extent of landscape modifications; the presence of native vegetation communities; and the connectivity of habitats. The presence and diversity of wildlife species are recognized as an indicator of naturalness.

Examples of human-made features that may be considered substantially unnoticeable in certain cases are: trails, trail signs, bridges, fire towers, fire breaks, fire pre-suppression facilities, pit toilets, fisheries enhancement facilities, fire rings, hitching posts, snow gauges, water quantity and quality measuring devices, research monitoring markers and devices, radio repeater sites, air quality monitoring devices, fencing, spring developments, overgrown and barely visible two-track ways, and small reservoirs.

4

### Outstanding Opportunities for Solitude or a Primitive and Unconfined Type of Recreation

*Solitude*
Visitors may have outstanding opportunities for solitude when the sights, sounds, and evidence of other people are rare or infrequent, or where visitors can feel isolated, alone or secluded from others.

*Primitive and Unconfined Recreation*
Visitors may have outstanding opportunities for primitive and unconfined types of recreation where the use of the area is through non-motorized, non-mechanical means, and where no or minimal developed recreation facilities are encountered.

**Supplemental Values**
The area may contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

Supplemental values may be present within the inventory units but are not a required component of wilderness character; they will be described but not used as a mechanism to impact a final finding.

## ASSESSMENT PROCESS
In accordance with BLM policy outlined in BLM Manual 6310, the BLM assessment team:

- Analyzed GIS data to identify blocks of BLM land: (1) greater than 5,000 acres or adjacent to a WSA, designated wilderness, or the Tabeguache Area; and (2) that do not contain improved and maintained BLM roads, county roads, or highways (wilderness inventory roads).

- Assessed BLM 2009 one-meter aerial imagery to eliminate blocks of land that clearly lack wilderness characteristics of naturalness. The most common features indicating a lack of naturalness included obvious vegetative manipulations (such as chaining and rollerchopping) and distinct roads, dams, ditches, seismic exploration lines, and contour furrows.

- Consulted with BLM field staff familiar with assessment areas to elicit additional information and substantiate findings regarding areas eliminated from consideration.

- Conducted field visits in order to verify preliminary findings and complete inventories for qualifying areas.

**Assessment Tools**
The BLM assessment team utilized the following tools in evaluating areas for consideration and in completing the wilderness characteristics assessment:

*Past Wilderness Inventories*
The BLM reviewed the 1980 BLM Intensive Wilderness Inventory, Final Wilderness Study Areas report and maps for areas that had been assessed for the presence of wilderness characteristics, but were not included within a WSA. Because the original report documentation was not

5

available, all aspects of an area were considered in this assessment, making it more
comprehensive than a simple update.

This review enabled the BLM to determine whether any new information is available that was
not considered as part of the original inventories. As the larger landscape experiences
population growth and increased development, perceptions regarding what constitutes solitude
and outstanding opportunities for primitive and unconfined recreation change. Interest in arid
and low elevation environments has also increased. Therefore, some information related to
social values submitted by the public was considered "new information" based on changed
physical conditions of the land and social perceptions of wilderness characteristics that may have
occurred over time.

### Public Wilderness Proposals
External groups advocate for wilderness designation through legislation and participation in the
land use planning process. The BLM considered (in 2010) the most recent proposal for
protection of wilderness characteristics submitted by the Colorado Wilderness Network. This
coalition is made up of national and statewide organizations (including the Colorado
Environmental Coalition, Colorado Mountain Club, Environment Colorado, Sierra Club, The
Wilderness Society, and Western Colorado Congress), as well as local citizens groups (including
the Central Colorado Wilderness Coalition, High Country Citizens Alliance, Ridgway-Ouray
Community Council, San Juan Citizens Alliance, Sheep Mountain Alliance, Wild Connections,
and Wilderness Workshop).

### Other Documents and Data
The following information sources were considered in drafting the assessment:

- Field investigation notes
- Range improvement records (UFO Range Management Specialist and GIS)
- Colorado Natural Heritage Program databases (including potential conservation areas, rare plants, natural plant communities, raptors, and bats)
- Colorado Wilderness Network proposed wilderness GIS data layer (2007)
- BLM LR2000 databases (including rights-of-way, mining claims, and oil and gas leasing)
- Dry Creek Travel Management Plan (2009)
- UFO Travel Management Plan (2010)
- UFO road maintenance records
- UFO range allotment management records
- UFO cultural database
- UFO oil and gas lease GIS data sets
- UFO travel and transportation GIS data sets

BLM_0112578

6

## ASSESSMENT AREAS

The wilderness characteristics assessment describes known valid existing rights, grandfathered uses, and public land investments within the survey areas. BLM staff verified new information during field surveys.

**Table D-1**, Planning Area Lands Assessed for Wilderness Characteristics, identifies the planning area lands detailed within this assessment.

**Table D-1**
**Planning Area Lands Assessed for Wilderness Characteristics**

| Name | Total Inventoried Acreage* | Acreage with Wilderness Characteristics | Acreage without Wilderness Characteristics |
|---|---|---|---|
| Camel Back WSA Addition | 8,700 | 6,950 | 1,750 |
| Dolores River Canyon WSA Addition | 3,750 | 550 | 3,200 |
| Dry Creek Basin | 7,040 | 7,040 | 0 |
| Roc Creek | 7,650 | 5,480 | 2,170 |
| Shavano Creek | 6,100 | 4,900 | 1,200 |
| Norwood Canyon Unit 1 | 2,345 | 0 | 2,345 |
| Norwood Canyon Unit 2 | 3,255 | 0 | 3,255 |

*Reflects total BLM acreage within the planning area submitted by the Colorado Wilderness Network, including acreage within existing WSAs. Acreages generated through GIS mapping may vary due to rounding inconsistencies and different mapping techniques.



**Figure 1 - Camel Back WSA Addition**

BLM_0112580

8

## CAMEL BACK WSA ADDITION

**Current Conditions: Presence or Absence of Wilderness Characteristics**

**Area Unique Identifier:** Camel Back WSA Addition

**Acreage:** 8,700 (includes BLM lands in the Colorado Wilderness Network proposal, exclusive of Camel Back WSA)

**(1) Is the area of sufficient size?**

**Yes** ☒          **No** ☐

**Description**

This unit is contiguous with Camel Back WSA.

The Colorado Wilderness Network proposal includes all BLM lands of Monitor Canyon from rim to rim, most of the BLM lands on Monitor Mesa, except for an area on the south end of the mesa. Also included is Potter Canyon from the WSA boundary on the east, up to the west rim of the canyon formed by Monitor Mesa. The unit is bounded on the north by private land and on the south by US Forest Service land.

**(2) Does the area appear to be natural?**

**Yes** ☒          **No** ☐          **N/A** ☐

**Description**

Most of Monitor Mesa shows substantial evidence of human modification. In addition to constructed and maintained routes that run the length of the mesa top, nearly all of the mesa top has undergone mechanical vegetative treatments (e.g., chaining, roller-chopping) that are obvious to a casual observer. For this reason, 1,750 acres of Monitor Mesa has been excluded from the unit.

This leaves 6,950 acres, which include BLM lands in Monitor Canyon from rim to rim, and Potter Canyon from its west rim to the Camel Back WSA boundary in the bottom of Potter Canyon. The unit is bounded on the north by a road and private land and on the south by US Forest Service lands.

Both Monitor and Potter canyons (exclusive of the top of Monitor Mesa) possess a high degree of naturalness. The Camel Back WSA boundary in Potter canyon is defined by an old, impassable vehicle route that runs up the bottom of the canyon. The route was still in use when the WSA was established, but has long since fallen into disuse, and was closed by BLM's Dry Creek Transportation Plan (2009). It is no longer passable for any type of vehicle, and occasional flooding in Potter Creek together with growth of riparian vegetation is reclaiming the old route. While a person on the ground could still find evidence of the old road it is substantially unnoticeable in the unit as a whole. From the WSA boundary in the bottom of Potter Creek up to the west rim of Potter Canyon the terrain is rugged and steep with rocky outcrops and

BLM_0112581

9

ledges. Potter Creek has perennial flows. There are four small stock ponds on a bench about halfway up the slope, but they do not significantly detract from the overall naturalness.

The unit includes all BLM lands in Monitor Canyon from rim to rim. It is characterized by steep, broken cliffs and ledges with a perennial stream in the bottom. An old abandoned mineral exploration route exists in a side-drainage on the northwest side of the canyon. Though it was originally constructed, there has been no maintenance or vehicle use on the route for many years, and it is slowly weathering away. It is somewhat noticeable from certain vantage points, but does not dominate the setting. There is one small stock pond on the southwest bench of the canyon that is occasionally maintained via a short ATV access trail. The trail is open to administrative use, but closed to public use. The canyon as a whole is predominately natural appearing.

A stock trail runs from near the confluence of Monitor and Potter Creeks up the northern ridge of Monitor Mesa and onto the mesa. The portion of the trail ascending the steeper, rocky layers was originally built with mechanized equipment, likely a bulldozer. This trail is actively used by the grazing permittee, but only for driving cattle, which is accomplished on horseback. The trail is regularly maintained with hand tools to ensure its continued use. It's clearly visible from certain vantage points, but since it is a local, linear feature (as opposed to a broad area) it does not dominate the scene, and does not detract from the overall naturalness of the unit.

**(3) Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for solitude?**

Yes ☒        No ☐        N/A ☐

**Description**

With the high topographic relief, rugged terrain and lack of vehicular access outstanding opportunities for solitude exist in this unit. In the canyon bottoms, where most hiking and equestrian use occurs, the riparian vegetation provides excellent visual and aural screening.

Recreational use is mostly light in this unit, with an increase in use during the hunting season. With light use and ample size, one mostly feels alone on a large landscape. Contacts with other visitors are rare.

The closest major metropolitan area is Denver, CO, approximately 275 miles distant (by car). Grand Junction, CO (pop. 60,000) is 40 miles distant. Montrose, Delta, and Olathe are all within 20 miles of the unit and have a combined population of approximately 25,000.

The unit is approximately 10 miles from the Delta County airport, and 18 miles from the Montrose airport (measured to the nearest point). Montrose airport is the busiest airport in the area with several commercial jet flights arriving and departing each day during the busy season. The busy season is primarily the ski season in Telluride, which extends from November through April in a typical year. Typical flight paths in and out of local airports do not pass over this unit, so impacts from low-flying aircraft are not common.

BLM_0112582

10

**(4) Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for primitive and unconfined recreation?**

Yes ☒        No ☐        N/A ☐

**Description**

All recreational use of the area is non-motorized and non-mechanized. Primary activities are backpacking, day hiking, equestrian use, and hunting. There are few trails, and no recreational facilities in the area. All use is self-directed and requires basic backcountry travel and map-reading or GPS skills.

**(5) Does the area have supplemental values (ecological, geological, or other features of scientific, educational, scenic, or historical value)?**

Yes ☒        No ☐        N/A ☐

**Description**

Monitor Creek contains areas of Fremont cottonwood/skunkbush sumac riparian woodland (Populus deltoides spp. Wislizeni/Rhus trilobata), which is classified as globally imperiled by the Colorado Natural Heritage Program (CNHP). It also contains a superior (A-ranked) occurrence of the common coyote willow riparian shrubland (Salix exigua/mesic graminoids).

It also provides habitat connectivity between the higher elevation forested lands on the Uncompahgre Plateau to the lower elevation desert scrub lands at the lower end of the unit. This is important especially for seasonal wildlife migrations.

**SUMMARY OF ANALYSIS\***

**Area Unique Identifier:** Camel Back WSA Addition

**Results of analysis:**
Of the 8,700 acres analyzed, 6,950 acres have wilderness characteristics.

Most of Monitor Mesa shows substantial evidence of human modification. In addition to constructed and maintained routes that run the length of the mesa top, nearly all of the mesa top has undergone mechanical vegetative treatments (e.g., chaining, roller-chopping) that are obvious to a casual observer. For this reason, most of Monitor Mesa has been excluded from the unit.

1. **Does the area meet any of the size requirements?**     ☒ Yes          ☐ No

2. **Does the area appear to be natural?**          ☒ Yes        ☐ No          ☐ N/A

3. **Does the area offer outstanding opportunities for solitude or a primitive and unconfined type of recreation?**      ☒ Yes       ☐ No          ☐ N/A

4. **Does the area have supplemental values?**               ☒ Yes       ☐ No          ☐ N/A

**Check one:**
☒          The area, or a portion of the area, has wilderness characteristics and is identified as lands with wilderness characteristics.

☐          The area does not have wilderness characteristics.

**Prepared by (team members):**
Edd Franz, BLM Outdoor Recreation Planner
Lynae Rogers, BLM Range Management Specialist
Barbara Sharrow, BLM Uncompahgre Field Office Manager
Barney Buria, BLM Environmental Protection Specialist
Julie Jackson, BLM Outdoor Recreation Planner
Blake Treadway, BLM Outdoor Recreation Planner
Debbie Burch, BLM Range Technician

**(Name, Title, Date)**
**Reviewed by (District or Field Manager):**

Name: _Barbara Sharrow_          Title: _Field Manager_

Date: _Nov. 4, 2011_

**\*This form documents information that constitutes an inventory finding on wilderness characteristics. It does not represent a formal land use allocation or a final agency decision subject to administrative remedies under either 43 CFR parts 4 or 1610.5-3.**

BLM_0112584

12



**Figure 2 - Dolores River Canyon WSA Addition**

13

## DOLORES RIVER CANYON WSA ADDITION

### Current Conditions: Presence or Absence of Wilderness Characteristics

**Area Unique Identifier:** Dolores River Canyon WSA Addition

**Acreage:** 3,750

**(1) Is the area of sufficient size?**

Yes ☒        No ☐

**Description**
Unit is adjacent to the Dolores River Canyon WSA.

**(2) Does the area appear to be natural?**

Yes ☒        No ☐        N/A ☐

**Description**
Some lands within the unit on Davis Mesa between the WSA boundary on the northeast side of Wild Steer Canyon and Montrose County Road DD16 are natural in appearance with few signs of human-caused alterations to the natural landscape.

**(3) Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for solitude?**

Yes ☐        No ☒        N/A ☐

**Description**
Of the remaining area of the unit that possesses naturalness, much is located between road DD16 and the rim above the road on its southwest side. This area is a narrow strip of land and close to the county road. This strip varies from 0.10 to 0.25 miles in width, with the bulk of the unit overlooking the county road. Opportunities for solitude are poor in most of this area.

A 550-acre bench (shown on the attached map inside the blue outline) has opportunities for solitude because most of that area is below and out of direct line of sight of vehicle routes. However since most of the area is within 0.5 miles of the vehicle routes, the opportunities are not outstanding.

**(4) Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for primitive and unconfined recreation?**

Yes ☒        No ☐        N/A ☐

14

**Description**

A 550-acre bench (shown on the attached map inside the blue outline) has opportunities for primitive and unconfined recreation because most of that area is below and out of direct line of sight of vehicle routes. The opportunities would be outstanding in connection with the existing WSA.

All travel in this area is by non-motorized/non-mechanized means.

The area has no developed recreation facilities.

Since it is adjacent to the Dolores River Canyon WSA a dominant impression of an observer is that it is part of a great expanse of wild country. In particular, the view from the edge of this area overlooking Wild Steer Canyon is wild and dramatic. A person with proper gear and primitive outdoor travel skills would feel compelled to explore this area and continue into the WSA.

**(5) Does the area have supplemental values (ecological, geological, or other features of scientific, educational, scenic, or historical value)?**

                        **Yes** ☐        **No** ☒        **N/A** ☐

**Description**
None provided.

15

**Summary of Analysis\***

**Area Unique Identifier:** Dolores River Canyon WSA Addition

**Results of analysis:**
Much of the originally proposed unit lacks naturalness, and/or outstanding opportunities for solitude or primitive and unconfined recreation, or possesses a combination of deficiencies.

Nyswonger Mesa has a high density of old vehicle routes and linear surface disturbances. None of the routes have been maintained for many years and have fallen into disuse. They are not "roads" as defined in this wilderness characteristics inventory process. They are however wide-spread and substantially noticeable human-made (unnatural) modifications to the land. Nyswonger Mesa does not possess naturalness, and therefore does not possess wilderness characteristics.

Much of Davis Mesa, northwest of Wild Steer Canyon, has similar deficiencies preventing it from possessing wilderness characteristics. The north end of Davis Mesa (outside the WSA) has a two vehicle routes in a fairly constrained area, and therefore does not possess naturalness. The southeast end of the proposed unit on Davis Mesa also has a density of vehicle routes that precludes naturalness.

Also on Davis Mesa there are long narrow strips of land in the Colorado Wilderness Network proposal between Montrose County Road DD16 and the WSA boundary. Because these lands are topographically isolated between the cliff line of the WSA and the county road, they do not possess outstanding opportunities for solitude or primitive and unconfined recreation.

One 550-acre unit was found that is adjacent to the WSA that possesses wilderness characteristics. The unit is bounded as follows:

- By unnamed BLM roads on the northeast and southeast; and
- By the WSA on the northwest and southwest.
- It is found in parts of the sections listed in the following townships;
  - 46N 18W, Sec 2, 3, and 4
  - 47N 18W, Sec 33 and 34

There is just over a half mile of road that extends in a forked prong into the unit. It has been cherry-stemmed out of the unit. See attached map.

**1. Does the area meet any of the size requirements?** ☒ Yes ☐ No

**2. Does the area appear to be natural?** ☒ Yes ☐ No ☐ N/A

**3. Does the area offer outstanding opportunities for solitude or a primitive and unconfined type of recreation?** ☒ Yes ☐ No ☐ N/A

**4. Does the area have supplemental values?** ☐ Yes ☒ No ☐ N/A

16

**Check one:**

☒          The area, or a portion of the area, has wilderness characteristics and is identified as lands with wilderness characteristics.

☐          The area does not have wilderness characteristics.

**Prepared by (team members):**
Edd Franz, BLM Outdoor Recreation Planner
Bruce Krickbaum, BLM Planner
Dean Stindt, BLM Range Management Specialist
Barbara Sharrow, BLM Uncompahgre Field Office Manager
Julie Jackson, BLM Outdoor Recreation Planner
Barney Buria, BLM Environmental Protection Specialist

**(Name, Title, Date)**
**Reviewed by (District or Field Manager):**

Name: _Barbara Sharrow_          Title: _Field Manager_

Date: _Nov 4, 2011_

*This form documents information that constitutes an inventory finding on wilderness characteristics. It does not represent a formal land use allocation or a final agency decision subject to administrative remedies under either 43 CFR parts 4 or 1610.5-3.

BLM_0112589

17



**Figure 3 - Dry Creek Basin**

BLM_0112590

**DRY CREEK BASIN**

**Current Conditions: Presence or Absence of Wilderness Characteristics**

**Area Unique Identifier:** Dry Creek Basin

**Acreage:** 7,040

**(1) Is the area of sufficient size? (If the area meets one of the exceptions to the size criterion, check "Yes" and describe the exception in the space provided below):**

**Yes** ☒          **No** ☐

**Description**
Unit is bounded as follows:

- On the north by the Tabeguache Trail;

- On the west by vehicle routes, numerous check-dams, vegetative manipulations (chaining/roller-chopping), and (at the southern end of the western boundary) the upper rim of Dry Creek Basin;

- On the south by Olathe Reservoir Road and vegetative manipulations (chaining/roller-chopping); and

- On the east by vehicle routes and the upper rim of Dry Creek Basin.

In the southwest portion of the unit a constructed and maintained road extends into the unit for about 2 miles and terminates. This road is used to access a range development (trough) and is also used seasonally by hunters. The route is designated open in the Dry Creek Transportation Plan (2009). The route is cherry-stemmed out of the unit.

**(2) Does the area appear to be natural?**

**Yes** ☒          **No** ☐          **N/A** ☐

**Description**
The unit is natural in appearance overall with few signs of human alteration.

The unit is comprised primarily of the drainages of the East and West forks of Dry Creek, and Dry Creek itself, below their confluence.

The unit takes in elevations of 8,000 feet on the higher southern end, and drops to 6,000 at the lower end of the creek to the north. The south portion supports ponderosa pine forest and mountain shrub lands on the benches above the creeks. The creeks themselves are perennial and support lush riparian vegetation of cottonwood, skunkbush, and willow. As the elevation descends toward the north the benches above the creek give way to pinyon-juniper forest, sagebrush flats and desert scrub, while the riparian zone associated with Dry Creek continues to be dominated by cottonwood trees.

19

Because this is a relatively undisturbed and natural landscape connecting higher elevation forest with more desert-like lowlands, this unit is an important wildlife migration corridor.

There is a 3-mile ATV trail on the bench on the east side of the East Fork of Dry Creek. There are also about 5 miles of motorized single-track trails on the bench on the west side of Dry Creek. These routes are maintained open routes and are clearly visible as such for an observer following them. Because the tread is narrow (particularly on the single-track) and the vehicles using them are relatively light, they are not substantially noticeable in the unit as a whole.

There is one small spring development near the southwest boundary of the unit.

**(3) Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for solitude?**

**Yes** ☒        **No** ☐        **N/A** ☐

**Description**

The unit has moderately rugged topography. The incised creek bottoms are the most topographically isolated areas of the unit. Good vegetative screening exists in all of the riparian zone, and the pinyon-juniper and ponderosa pine uplands.

There is motorized and mechanized access into the unit. A 3-mile ATV trail runs along the bench above the East Fork of Dry Creek, and is used primarily for seasonal hunting activities. During hunting season use is moderate to heavy.

A 2-mile road spur is cherry-stemmed out of the unit on the west bench above West Fork of Dry Creek. While this road is excluded from the unit it could negatively affect perceptions of solitude for the adjacent lands within the unit. The road accesses a developed spring and trough, and provides full-size vehicle access to the area. The road is primarily used for grazing allotment management and for seasonal hunting access. During hunting season, use is moderate, and is lightly used outside the hunting season.

About 5 miles of motorized single-track trail exists on the west bench of Dry Creek, mostly on the northern half of the unit. This is primarily used for recreational trail riding in the spring and fall. Motorized and mechanized use of these trails is moderate in spring and fall, and light in summer and winter.

The vehicle routes mentioned above would have a localized negative effect on perceptions of solitude during their primary seasons of use, but those effects would not be enough to preclude outstanding opportunities for solitude throughout most of the unit.

The size of the unit and vegetative and topographic screening provide outstanding opportunities for solitude. The whole unit is within a basin defined by the upper rim of the canyon formed by Dry Creek, and is therefore isolated from the surrounding lands, which are laced with vehicle routes.

BLM_0112592

20

**(4) Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for primitive and unconfined recreation?**

**Yes** ☒        **No** ☐        **N/A** ☐

**Description**

The unit is well-suited for self-directed hiking, horseback use, and non-motorized/non-mechanized hunting use.

Despite the vehicle routes mentioned in section 3 (above) access to the vast majority of the unit is only by foot or horseback. The entire riparian zone up the main stem and both forks of Dry Creek is only accessible by foot or horse back.

Except for trails, no developed recreation facilities exist in this unit.

**(5) Does the area have supplemental values (ecological, geological, or other features of scientific, educational, scenic, or historical value)?**

**Yes** ☒        **No** ☐        **N/A** ☐

**Description**

This area provides important wildlife habitat connectivity between the higher elevation forested lands on the Uncompahgre Plateau at the south end of the unit and the lower elevation lands to the north.

BLM_0112593

**SUMMARY OF ANALYSIS\***

**Area Unique Identifier:** Dry Creek Basin

**Results of analysis:**
This unit was identified by BLM through a review and update of the UFO wilderness characteristics inventory as required by FLPMA Sec 201. It was not submitted by external groups.

The singletrack motorized trails and ATV trail within the unit are currently at a low level of use that is consistent with the findings of naturalness, and outstanding opportunities for solitude and primitive and unconfined recreation. The Dry Creek Transportation Plan (2009) designated both routes. (Note: There is one proposed ATV route that, if constructed, would cross the unit on its northern end. See attached map. This route is included in the Dry Creek Transportation Plan.)

**1. Does the area meet any of the size requirements?** ☒ Yes ☐ No

**2. Does the area appear to be natural?** ☒ Yes ☐ No ☐ N/A

**3. Does the area offer outstanding opportunities for solitude or a primitive and unconfined type of recreation?** ☒ Yes ☐ No ☐ N/A

**4. Does the area have supplemental values?** ☒ Yes ☐ No ☐ N/A

**Check one:**
☒       **The area, or a portion of the area, has wilderness characteristics and is identified as lands with wilderness characteristics.**

☐       **The area does not have wilderness characteristics.**

**Prepared by (team members):**
Edd Franz, BLM Outdoor Recreation Planner
Lynae Rogers, BLM Range Management Specialist
Debbie Burch, BLM Range Technician
Barbara Sharrow, BLM Uncompahgre Field Office Manager
Julie Jackson, BLM Outdoor Recreation Planner
Blake Treadway, BLM Outdoor Recreation Planner
Barney Buria, BLM Environmental Protection Specialist

**(Name, Title, Date)**
**Reviewed by (District or Field Manager):**

Name: _Barbara Sharrow_    Title: _Field Manager_

Date: _Nov 4, 2011_

\***This form documents information that constitutes an inventory finding on wilderness characteristics. It does not represent a formal land use allocation or a final agency decision subject to administrative remedies under either 43 CFR parts 4 or 1610.5-3.**

22



**Figure 4 - Roc Creek**

BLM_0112595

23

## ROC CREEK

**Current Conditions: Presence or Absence of Wilderness Characteristics**

**Area Unique Identifier:** Roc Creek

**Acreage:** 7,650

**(1) Is the area of sufficient size? (If the area meets one of the exceptions to the size criterion, check "Yes" and describe the exception in the space provided below):**

**Yes** ☒          **No** ☐

**Description**
This unit is near, but not contiguous with, Sewemup Mesa WSA.

Unit is bounded as follows:

- on the east and northeast by private land and the Dolores River;
- on the north by private land, US Forest Service land, and Roc Creek Road;
- on the southwest, south and southeast by Montrose County Road Q13.

**(2) Does the area appear to be natural?**

**Yes** ☒          **No** ☐          **N/A** ☐

**Description**
Of the original 7,650 acres inventoried, 5,480 acres are natural in appearance. The southeast part of the inventory unit in the upper Beehive Canyon/Carpenter Flats area contains many vehicle routes and linear disturbances remaining from mineral exploration. That part of the unit is not natural in appearance to a casual observer.

Within the remaining natural-appearing part of the unit there is an old vehicle route that enters from the southwest boundary, off of Montrose County Road S8, and continues in a northeast direction. The route shows signs of mechanical construction, but has been abandoned and unused for a number of years. Trees and brush are growing in the former route. Because it is neither used nor maintained, it does not meet the definition of "road" as defined for the purpose of this wilderness characteristics inventory. It is still quite noticeable to an observer walking along its route, but it is substantially unnoticeable from almost any other vantage point, and does not detract from the naturalness of the unit as a whole.

The south and southwest boundary of the remaining (natural appearing) acres of the unit is defined by Montrose County Road Q13 and several road spurs that have be "cherry-stemmed" out of the unit. While the lands inside the boundary appear to be natural, an observer has the feeling of being around several noticeable roads, especially when in the vicinity of the cherry-stems.

24

The main part of the unit is comprised primarily of steep terrain, draining toward the north into Roc Creek. Vegetation is predominantly pinyon-juniper forest.

**(3) Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for solitude?**

Yes ☒      No ☐      N/A ☐

**Description**
The unit is comprised primarily of rugged, steep topography and dense pinyon-juniper forest. Both the topography and vegetation provide excellent screening for an enhanced sense of solitude. It is also far from populated areas and receives very light recreational use. The unit is more than 90 road-miles from Moab, Grand Junction and Montrose. These factors combine to provide outstanding opportunities for solitude in the unit.

**(4) Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for primitive and unconfined recreation?**

Yes ☒      No ☐      N/A ☐

**Description**
The unit is only accessible by foot or on horseback, and has no recreational facilities.

The forested ridges and slopes leading into deep and rocky canyons form a landscape that is outstandingly suited to primitive and unconfined recreational activities, especially for those seeking self-directed and challenging hiking, backpacking, or horseback riding.

**(5) Does the area have supplemental values (ecological, geological, or other features of scientific, educational, scenic, or historical value)?**

Yes ☒      No ☐      N/A ☐

**Description**
The unit has highly scenic views from the bluffs overlooking the deep drainages within the unit.

**Summary of Analysis\***

**Area Unique Identifier:** Roc Creek

**Results of analysis:**
The original proposal from the Colorado Wilderness Network included Sewemup Mesa WSA and BLM lands in both Grand Junction and Uncompahgre field offices, as well as US Forest service lands in the Roc Creek vicinity. This inventory focuses on BLM lands outside of existing WSAs and designated wilderness, all within the Uncompahgre Field Office planning area.

The proposal within the Uncompahgre Field Office, exclusive of WSA acres comes to 7,650 acres of BLM lands. The adjacent US Forest Service lands were not considered because they are not administratively endorsed for wilderness protection.

250 acres on the west side of the remaining proposal were dropped because they were non-contiguous with the remainder of the unit.

An additional 2,170 acres around Beehive Canyon and the southern and eastern part of Carpenter Flats were dropped from consideration because they lack naturalness. Numerous vehicle routes create a network of unnatural disturbances in those areas. Montrose County Road R12 forms part of the boundary of the remaining Roc Creek wilderness characteristics unit.

The remaining unit is 5,480 acres in size.

**1. Does the area meet any of the size requirements?**  ☒ **Yes**    ☐ **No**

**2. Does the area appear to be natural?**  ☒ **Yes**    ☐ **No**    ☐ **N/A**

**3. Does the area offer outstanding opportunities for solitude or a primitive and unconfined type of recreation?**  ☒ **Yes**    ☐ **No**    ☐ **N/A**

**4. Does the area have supplemental values?**  ☒ **Yes**    ☐ **No**    ☐ **N/A**

**Check one:**
☒  **The area, or a portion of the area, has wilderness characteristics and is identified as lands with wilderness characteristics.**

☐  **The area does not have wilderness characteristics.**

**Prepared by (team members):**
Edd Franz, BLM Outdoor Recreation Planner
Bruce Krickbaum, BLM Planner
Dean Stindt, BLM Range Management Specialist
Barbara Sharrow, BLM Uncompahgre Field Office Manager
Julie Jackson, BLM Outdoor Recreation Planner
Barney Buria, BLM Environmental Protection Specialist

BLM_0112598

26

**(Name, Title, Date)**
**Reviewed by (District or Field Manager):**

Name: _Barbara Shaunow_ Title: _Field Manager_

Date: _Nov. 4, 2011_

*This form documents information that constitutes an inventory finding on wilderness characteristics. It does not represent a formal land use allocation or a final agency decision subject to administrative remedies under either 43 CFR parts 4 or 1610.5-3.

BLM_0112599



**Figure 5 - Shavano Creek**

BLM_0112600

## SHAVANO CREEK

**Current Conditions: Presence or Absence of Wilderness Characteristics**

**Area Unique Identifier:** Shavano Creek

**Acreage:** 6,090

**(1) Is the area of sufficient size? (If the area meets one of the exceptions to the size criterion, check "Yes" and describe the exception in the space provided below):**

**Yes** ☒        **No** ☐

**Description**

This unit is just north of the congressionally designated Tabeguache Area. They are separated by Montrose County Road V24, and therefore are not adjacent.

The unit is bounded as follows:

- On the south by Montrose County Road V24;
- On the east by vegetative manipulations (chaining/roller-chopping), private land and US Forest Service land;
- On the north by vegetative manipulations (chaining/roller-chopping), private land, and US Forest Service land; and
- On the west by Montrose County Roads Z26 and U472, and associated roadside disturbances.

The inventory included lands in upper Campbell Creek drainage north and west of Road U475 up to Road U472 in West Campbell Creek. During field inspection it was noted that Road U475 was originally mechanically constructed (likely by bulldozer), and since it provides the only access for maintenance of a stock pond, it will continue to be mechanically maintained. In 2004 the Campbell Creek Fire burned through the area. Now trees burnt in that fire are starting to drop across the road and will be cleared using chainsaws in order to continue to maintain the stock pond. Because of this, U475 meets the definition of "road" for the purpose of the wilderness characteristics inventory, and therefore the lands in upper Campbell Creek were not included in this unit.

There is a range access route that enters the unit from the west side off of Montrose County Road Z26. It runs northeast, adjacent to Shavano Creek, and terminates about 2.5 miles in. The route was mechanically constructed (likely by bulldozer), but is no longer used by full-size vehicles. There is evidence of some ATV use, likely for range-management and/or hunting purposes. There is no sign of mechanical maintenance of this route, and it is becoming an ATV trail rather than a full-size vehicle route. Since this route does not meet the definition of a "road" for the purposes of this wilderness characteristics inventory, it was left in the unit rather than being cherry-stemmed out.

BLM_0112601

29

A two mile long vehicle route enters the unit from Montrose County Road V24 along the southern boundary of the unit. Both ends of the route terminate at Road V24. The route was originally mechanically constructed (likely by bulldozer) but for the most part has not been maintained in many years. There is a stock pond which is accessed from the western terminus of the route about 0.3 miles in. The road is passable by full size vehicle to this point, and is maintained for access for pond maintenance. Other than that section the route has severely slumped and eroded to the point that it is impassable, even to an ATV. Therefore the only section that meets the wilderness characteristics definition of "road" is the western 0.3 miles. That section is cherry-stemmed out of the unit.

Even though the remainder of this unit is 4,900 acres (100 acres shy of the 5,000 acre minimum guideline) it is very close (98%), and is of sufficient size to make practicable its management in an unimpaired condition.

**(2) Does the area appear to be natural?**

Yes ☒          No ☐          N/A ☐

**Description**
Although the unit does contain the two vehicle routes described under Question 1, neither is substantially noticeable in the unit as a whole. Where the ATV trail parallels Shavano Creek, it is clearly noticeable to an observer hiking in the drainage, but in the unit as a whole it is substantially unnoticeable.

The unit provides for important habitat continuity especially for seasonal wildlife migration. The upper end of the unit is around 7,000 feet in elevation and connects with even higher elevation forest lands on the Uncompahgre Plateau, while the lower end of the unit drains into Tabeguache Creek, which in turn connects with the San Miguel and Dolores Rivers.

Most of the unit is covered in pinyon-juniper forest, with some ponderosa pine in the upper reaches and cottonwoods and willows in the riparian areas of Shavano Creek. In 2004, the Campbell Creek wildfire burned through the upper reaches in the northeast portion of the unit. There are many standing-dead trees that were burnt in the fire, with a robust understory of grasses, forbs and sagebrush. Although it is obvious that a fire burned through that area, since wildfire is a natural phenomenon it is still natural in appearance.

**(3) Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for solitude?**

Yes ☒          No ☐          N/A ☐

**Description**
The unit lies in a remote, lightly populated area of western Colorado, far from metropolitan areas.

30

---

The topography is moderately steep throughout much of the unit. The exception being the upper reaches of the Campbell Canyon burn, which is gently undulating terrain.

Both the topography and rather dense pinyon-juniper forest provide ample screening for visitors to the area. The exception to this again is the Campbell Canyon burn area in the northeast portion of the unit, where there is not much in the way of either. Opportunities for solitude are outstanding throughout the unit, regardless of screening because visitation to the area is very light. This is partially due to the fact that road access along much of the boundary does not exist or goes through private property with locked gates.

Sights, sounds or evidence of other people are rare in this unit.

**(4) Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for primitive and unconfined recreation?**

**Yes** ☒          **No** ☐          **N/A** ☐

**Description**
There does not appear to be much recreational use of this area at all. The recreational use that does occur seems to be concentrated near the boundary roads. With its proximity to the more dramatic landscape and more dependable water sources of the Tabeguache Area, this area is unlikely to become a recreational destination.

There are no developed recreational facilities in the unit.

Except for the one ATV trail, all access to this unit is by non-motorized/non-mechanized means.

There are abundant opportunities for primitive and unconfined recreation. Opportunities for non-motorized/non-mechanized hunting in this unit are outstanding.

**(5) Does the area have supplemental values (ecological, geological, or other features of scientific, educational, scenic, or historical value)?**

**Yes** ☒          **No** ☐          **N/A** ☐

**Description**
This area provides important habitat connectivity between the higher elevation forested lands on the Uncompahgre Plateau at the northeast end of the unit and the lower elevation lands to the southwest.

BLM_0112603

**SUMMARY OF ANALYSIS\***

**Area Unique Identifier:** Shavano Creek

**Results of analysis:**
This unit is just north of the congressionally designated Tabeguache Area. They are separated by Montrose County Road V24, and therefore are not adjacent.

1,190 acres were excluded from the initial inventory area when it was found that Road U475 is a constructed and maintained road, and therefore formed a new boundary for the unit. That left 4,900 acres that possess wilderness characteristics.

Even though the remainder of this unit is 100 acres shy of the 5,000 acre minimum guideline it is very close (98%), and is of sufficient size to make practicable its management in an unimpaired condition.

1. **Does the area meet any of the size requirements?**   ☒ Yes   ☐ No

2. **Does the area appear to be natural?**   ☒ Yes   ☐ No   ☐ N/A

3. **Does the area offer outstanding opportunities for solitude or a primitive and unconfined type of recreation?**   ☒ Yes   ☐ No   ☐ N/A

4. **Does the area have supplemental values?**   ☒ Yes   ☐ No   ☐ N/A

**Check one:**
☒         The area, or a portion of the area, has wilderness characteristics and is identified as lands with wilderness characteristics.

☐         The area does not have wilderness characteristics.

**Prepared by (team members):**
Edd Franz, BLM Outdoor Recreation Planner
Bruce Krickbaum, BLM Planner
Dean Stindt, BLM Range Management Specialist
Barbara Sharrow, BLM Uncompahgre Field Office Manager
Julie Jackson, BLM Outdoor Recreation Planner
Barney Buria, BLM Environmental Protection Specialist

**(Name, Title, Date)**
**Reviewed by (District or Field Manager):**

Name: _Barbara Sharrow_   Title: _Field Manager_

Date: _Nov 4, 2011_

**\*This form documents information that constitutes an inventory finding on wilderness characteristics. It does not represent a formal land use allocation or a final agency decision subject to administrative remedies under either 43 CFR parts 4 or 1610.5-3.**

BLM_0112604



**Figure 6 - Norwood Canyon**

## NORWOOD CANYON

**Current Conditions: Presence or Absence of Wilderness Characteristics**

**Area Unique Identifier:** Norwood Canyon

**Acreage:** 5,600 split into two units of 2,345 acres and 3,255 acres, respectively

**(1) Is the area of sufficient size? (If the area meets one of the exceptions to the size criterion, check "Yes" and describe the exception in the space provided below):**

Yes ☐          No ☒

**Description**

The Colorado Wilderness Network proposal for the Norwood Canyon unit includes USFS lands. This wilderness characteristics inventory is limited to BLM lands within the RMP planning area. This constraint affects both the size and configuration (shape) of the unit.

Because at the approximate center of the BLM portion of the unit, the boundary constricts to a single point (see map below), this creates two separate, non-adjacent polygons, neither of which meets the minimum size requirement for BLM to continue analyzing them for wilderness characteristics. To meet size requirements an area must usually have 5,000 or more contiguous acres.

If the adjacent USFS lands that are included in the CWP were administratively endorsed by the USFS for wilderness protection, then we could have included those adjacent acres as part of the size analysis. Because those lands have no special status or recommendation from the USFS for wilderness protection, they cannot be included in the BLM analysis.

**(2) Does the area appear to be natural?**

Yes ☐          No ☐          N/A ☒

Note: If "No" is checked, then the area does not have wilderness characteristics; check "NA" for the remaining questions below.

**Description**

**(3) Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for solitude?**

Yes ☐          No ☐          N/A ☒

34

---

**Description**

**(4) Does the area (or the remainder of the area if a portion has been excluded due to unnaturalness and the remainder is of sufficient size) have outstanding opportunities for primitive and unconfined recreation?**

**Yes** ☐      **No** ☐      **N/A** ☒

Note: If "No" is checked for both 3 and 4, then the area does not have wilderness characteristics; check "NA" for question 5.

**Description**

**(5) Does the area have supplemental values (ecological, geological, or other features of scientific, educational, scenic, or historical value)?**

**Yes** ☐      **No** ☐      **N/A** ☒

**Description**

**SUMMARY OF ANALYSIS\***

**Area Unique Identifier:** Norwood Canyon

**Results of analysis:**

1. **Does the area meet any of the size requirements?**      ☐ Yes      ☒ **No**

2. **Does the area appear to be natural?**      ☐ Yes      ☐ No      ☒ **N/A**

3. **Does the area offer outstanding opportunities for solitude or a primitive and unconfined type of recreation?**      ☐ Yes      ☐ No      ☒ **N/A**

4. **Does the area have supplemental values?**      ☐ Yes      ☐ No      ☒ **N/A**

**Check one:**

☐          The area, or a portion of the area, has wilderness characteristics and is identified as lands with wilderness characteristics.

☒          The area does not have wilderness characteristics.

**Prepared by (team members):**
Edd Franz, BLM Outdoor Recreation Planner

**(Name, Title, Date)**
**Reviewed by (District or Field Manager):**

Name: _Barbara Sharrow_      Title: _Field Manager_

Date: _Nov. 4, 2011_

\*This form documents information that constitutes an inventory finding on wilderness characteristics. It does not represent a formal land use allocation or a final agency decision subject to administrative remedies under either 43 CFR parts 4 or 1610.5-3.

BLM_0112608

36

This page intentionally left blank.

BLM_0112609