Induced Seismicity Potential in Energy Technologies

A P P E N D I X   D

National Academies study concerning possible seismicity induced by energy technologies can provide reliable information to these concerned communities and allow America to proceed safely to a cleaner and more secure energy future.

I appreciate your interest and look forward to working with you on this issue. Please do not hesitate to contact me or Elizabeth Nolan, Office of Congressional and Intergovernmental Affairs, 202-586-5450, if you have any further questions.

Sincerely,

James J. Markowsky
Assistant Secretary
Office of Fossil Energy

*210*

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113202

Induced Seismicity Potential in Energy Technologies

## APPENDIX E

# *Earthquake Size Estimates and Negative Earthquake Magnitudes*

The original and arguably the best-known magnitude scale for measuring the size of an earthquake is the Richter scale, derived by Charles Richter in 1935 at the California Institute of Technology to measure earthquake size in Southern California. Using an early seismograph he defined local magnitude $M_L$ to be

$$M_L = \mathrm{Log}A - \mathrm{Log}A_o$$

where A is the maximum amplitude of deflection of a needle on a chart, in millimeters, measured on the seismograph. $A_o$ is an empirical distance correction appropriate for the region (Richter, 1936). Richter assigned a magnitude 3 to an event with amplitude of 1 mm recorded on a Wood Anderson seismograph at 100 km distance from the source, and a magnitude 0 with amplitude 0.001 mm at 100 km, thought to be the smallest possible instrumentally recorded earthquake (Shemeta, 2010).

Since the 1930s advancements in equipment design such as more sensitive geophones and digital recording equipment and closer proximity to earthquake sources dramatically advanced the ability to record and analyze data from small earthquakes. Using borehole seismic arrays located within a few hundred meters of an earthquake source, very small earthquakes can be recorded. These events are smaller than the baseline magnitude of "0" originally designed by Richter, therefore the range of event sizes continues into the negative magnitude range (Figure E.1).

Because the Richter scale was designed for the Wood Anderson seismograph measurements, its routine use in modern seismology is now quite limited; however, most modern earthquake magnitudes are based on scales that relate back to the Richter scale.

## OTHER SIZE ESTIMATES FOR EARTHQUAKES

In practice Richter's method for estimating earthquake magnitude has been largely supplanted by other more flexible and robust measures of magnitude. The moment magnitude, which is scaled to agree with the Richter magnitude, is in wide use because it can be

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113203

Induced Seismicity Potential in Energy Technologies

## APPENDIX E



**FIGURE E.1** A plot of measured earthquake amplitude versus magnitude. The more sensitive the seismic instruments, the smaller the measureable magnitude, reaching into the negative magnitude range.

tied to other direct measures of the size of an earthquake. The seismic moment is a routine measurement describing the strength of an earthquake and is defined as

$$M_o = \mu Sd$$

where $\mu$ is the shear modulus, $S$ is the surface area of the fault, and $d$ is the average displacement along the fault. The moment magnitude, $M_w$, is related to seismic moment by the Hanks and Kanamori (1979) equation

$$M_w = \tfrac{2}{3} \, LogM_o - 6$$

where $M_o$ is in Newton meters, valid for earthquakes ranging from magnitude 3 to 7 (Shemeta, 2010). There are a variety of methods used to calculate a seismic moment from microseismic waveforms.

## EARTHQUAKE "B VALUES"

Small earthquakes occur much more often than large earthquakes. The number of earthquakes with respect to magnitude follows a power law distribution and is described by

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113204

Induced Seismicity Potential in Energy Technologies

$$\text{Log}_{10}\, N = a - bM$$

where **N** is the cumulative number of earthquakes with magnitudes equal to or larger than **M**, and **a** is the number of events of **M** = 0. The variable **b** describes the relationship between the number of large and small events and is the slope of the best-fit line between the number of earthquakes at a given magnitude and the magnitude (Gutenberg and Richter, 1944; Ishimoto and Iida, 1939). A **b** value close to 1.0 is commonly observed in many parts of the world for tectonic earthquakes. This relationship is often referred to as the Gutenberg-Richter magnitude frequency relationship.

Differences in the slope **b** reveal information about the potential size and expected number of the events in a population of earthquakes. Analysis of **b** values around the world has shown that in fluid injection scenarios the **b** value is often in the range of 2, which reflects a larger number of small events (swarm earthquakes), compared to tectonic earthquakes. In hydraulic fracturing microseismicity, **b** values in the range of 2 are commonly observed (Maxwell et al., 2008; Urbancic et al., 2010; Wessels et al., 2011). The high **b** values observed in hydraulic fracturing are thought to represent the opening of numerous small natural fractures during the high-pressure injection (Figure E.2). It is possible for a hydraulic fracture to grow into a nearby fault and reactivate it, if the orientation of the fault is favorable for slip under the current stress conditions in the reservoir. Figure E.3 is an example of a hydraulic fracture reactivating a small fault during injection.

## REFERENCES

Gutenberg, B., and C.F. Richter. 1944. Frequency of earthquakes in California. *Bulletin of the Seismological Society of America* 34:185-188.

Hanks, T.C., and H. Kanamori. 1979. A moment magnitude scale. *Journal of Geophysical Research* 84(B5):2348-2350.

Ishimoto, M., and K. Iida. 1939. Observations of earthquakes registered with the microseismograph constructed recently. *Bulletin of the Earthquake Research Institute* 17:443-478.

Maxwell, S.C., J. Shemeta, E. Campbell, and D. Quirk. 2008. Microseismic deformation rate monitoring. Society of Petroleum Engineers (SPE) 116596-MS. SPE Annual Technical Conference and Exhibition, Denver, Colorado, September 21-24.

Richter, C.F. 1936. An instrumental earthquake magnitude scale. *Bulletin of the Seismological Society of America* 25:1-32.

Shemeta, J. 2010. It's a matter of size: Magnitude and moment estimates for microseismic data. *The Leading Edge* 29(3):296.

Urbancic, T., A. Baig, and S. Bowman. 2010. Utilizing b-values and Fractal Dimension for Characterizing Hydraulic Fracture Complexity. GeoCanada—Working with the Earth. ESG Solutions. Available at www.geocanada2010.ca/uploads/abstracts_new/view.php?item_id=976 (accessed April 2012).

Wessels, S.A., A. De La Pena, M. Kratz, S. Williams-Stroud, and T. Jbeili. 2011. Identifying faults and fractures in unconventional reservoirs through microseismic monitoring. *First Break* 29(7):99-104.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113205

Induced Seismicity Potential in Energy Technologies

## APPENDIX E



**FIGURE E.2** Graph shows b values for two different microearthquake populations during a hydraulic fracture treatment. The b values vary from about 1 for reactivated tectonic microseismic events and 2 for microseismicity associated with the hydraulic fracture injection. The hydraulic fracture microseismic magnitudes are typically very small (less than **M** 0), hence the lack of larger microseismic events on this b value example. SOURCE: From Wessels et al. (2011).

*214*

Copyright © National Academy of Sciences. All rights reserved.

Induced Seismicity Potential in Energy Technologies

*Appendix E*



**FIGURE E.3** Example of a reactivated fault during hydraulic fracturing. The figure is a map view of a microseismicity (colored spheres which are colored by magnitude; cool colors are small events) during a hydraulic fracture treatment. The fracturing well is shown by the pink line and is deviated away from a central wellhead location and extends vertically through the reservoir section; the injection location is labeled "Perforations." The data were recorded and analyzed using borehole receivers (marked Geophones). The blue dots show the growth of the hydraulic fracture to the northwest, then intersecting and reactivating a small fault in the reservoir, shown by change in fracture orientation and larger magnitude events (yellow dots). SOURCE: From Maxwell et al. (2008).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113207

Induced Seismicity Potential in Energy Technologies

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113208

Induced Seismicity Potential in Energy Technologies

APPENDIX F

# The Failure of the
# Baldwin Hills Reservoir Dam

On December 14, 1963, the dam built to contain the Baldwin Hill Reservoir located in southwest Los Angeles failed, releasing 250 million gallons of water into the housing subdivisions below the dam. Approximately 277 homes were damaged or destroyed and five people were killed by the disaster (Hamilton and Meehan, 1971). Although there is speculation that waterflooding operations in the Inglewood Oil Field (located to the west and south of the reservoir) were partially to blame for the failure of the reservoir dam, the dam itself did not fail due to an induced earthquake. Records from the Seismographic Laboratory of the California Institute of Technology located 15 miles northeast of the reservoir showed no earthquakes large enough to cause internal damage to the reservoir during the period 1950-1963 (Jansen, 1988). Instead, the sealing layers in the floor of the reservoir failed due to the "creep" of several geologic fractures below the reservoir, which caused the release of water through the floor of the reservoir that resulted in the structural failure of the dam itself.

The Baldwin Hills Reservoir was constructed between 1947 and 1951 by the Los Angeles Department of Water and Power. The reservoir was constructed on a hilltop and was formed by a dam on the north side and earthen dikes on the other three sides, which were constructed of materials excavated from the reservoir bowl. The soil under the reservoir was composed of porous material and was bisected by three known geologic faults (Jansen, 1988). The floor of the reservoir was made watertight by the use of two layers of asphalt with compacted earth between them. Below the upper layer of asphalt and earth, a level of pea gravel with tile drains was installed to allow the monitoring of leakage from the bottom of the reservoir. Extensive discharge from the drainage system was recorded during the initial filling of the reservoir, and filling was discontinued until repairs to the reservoir could be made (Jansen, 1988). Cracking in concrete portions of the reservoir was noted as early as 1951.

The Inglewood Oil Field was discovered in 1924 and covered approximately 1,200 acres when fully developed. At the time of the failure of Baldwin Hills Dam in 1963, the field had more than 600 producing wells, and the closest wells were located within 700 feet of the reservoir structure. The oil reservoir is divided into multiple compartments due to a series of geologic faults. Several of these faults not only divide the Inglewood Oil Field but also continue to the surface and are present on the site of the Baldwin Hills Reservoir. The depth of the wells in the Inglewood Field is between 2,000 and 4,000 feet. Due to subsurface fluid withdrawal, the ground level above the field exhibited a surface subsidence of approximately

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113209

Induced Seismicity Potential in Energy Technologies

APPENDIX F

10 feet by 1964. In order to increase production, waterflooding operations were commenced in 1954 and expanded in 1955 and 1961. These injection operations increased pore pressure in portions of the oil field from 50 psi to over 850 psi by 1963 (Hamilton and Meehan, 1971). Injection depths were as shallow as 1,200 feet.

The dam structure failed due to subsurface leakage of reservoir water beneath the floor of the impoundment and under the foundation of the dam itself. The subsurface leakage was caused by a cracked seal extending across the floor of the reservoir in line with the breach in the dam (Jansen, 1988). Movement of the geologic faults crossing the floor of the reservoir with downward displacement of 2 to 7 inches on the western side of several faults caused cracking in the asphalt membrane seal and allowed water to enter the porous soil beneath the dam. Later excavations of the bottom of the reservoir indicated that leakage had occurred for an appreciable amount of time before the dam failure. The slow movement of the faults beneath the reservoir has been attributed to (1) natural causes inherent in the geologic setting, (2) subsidence of the ground surface caused by oil and gas operations or by the filling of the reservoir with water, or (3) pressure injection of water in the Inglewood Field at shallow depths for oil and gas operations and in the presence of a fault system.

REFERENCE

Hamilton, D.H., and R.L. Meehan. 1971. Ground rupture in the Baldwin Hills. *Science* 172(3981):326-406.
Jansen, R.B. 1988. *Advanced Dam Engineering for Design, Construction, and Rehabilitation*. New York: Springer.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113210

Induced Seismicity Potential in Energy Technologies

APPENDIX G

# Seismic Event Due to Fluid Injection or Withdrawal

To initiate a seismic event by activation of an existing fault, a critical condition involving the in situ state of stress and the pore pressure needs to be met. As discussed below, this condition stems, at least for the simplest case of slip initiation along a preexisting fault, from a combination of two fundamental concepts: (1) slip is initiated when the shear stress acting on the fault overcomes the frictional resistance and (2) the frictional resistance is given by the product of the friction coefficient times the normal effective stress, defined as the normal stress across the fault reduced by the fluid pressure. This condition of slip initiation, referred to as the Coulomb criterion, can then be translated as a limit condition on the magnitude of the vertical and horizontal stress and of the pore pressure, which depends on the inclination of the fault. The formation of a fault follows similar concepts but accounts for an additional shear resistance due to cohesion; also the actual orientation of the created fault corresponds to the inclination for which the condition of slip is first met.

Although the initial in situ stress state and pore pressure are often close to the limit condition required to cause slip on an existing fault, not all perturbations in the stress and pore pressure associated with fluid injection or extraction eventually trigger a seismic event. First, the perturbation must be destabilizing in its nature; that is, it must bring the system closer to critical conditions, irrespective of the magnitude of the perturbation. Indeed some perturbations are stabilizing, meaning that they move the system farther away from critical conditions. The degree of destabilization can be assessed by a certain parameter $m$ that characterizes the nature of the stress and pore pressure perturbation (Figure G.1). Second, if the perturbation is indeed destabilizing, the magnitude of the perturbation has to be large enough to reach critical conditions. Finally, not all slip events are seismic, although most are, as gouge-filled faults could respond in a ductile stable manner.

It is useful to contrast the case of fluid injection in reservoir rocks, where the fluid flows and is stored in the pore network of the rock, from that in crystalline impermeable rocks, where the injected fluid is essentially transmitted and stored in the fracture network. In the permeable case, the pore pressure increases in the rock induce stress variation in the reservoir and in the surrounding rock. In the impermeable case, the stress induced by injection is negligible (except in situations where the fracture network is very dense), but fluid pressure change can be transmitted over a large distance by fractures that offer little resistance to flow. Although our analysis in this appendix refers to a finite-extent reservoir, solution of the infinite case lies within the finite solution. For the purposes of understanding pore

*219*

Copyright © National Academy of Sciences. All rights reserved.

Induced Seismicity Potential in Energy Technologies

APPENDIX G



**FIGURE G.1** Effective stress change in a reservoir induced by injection or withdrawal of fluid.

pressure perturbation in an infinite reservoir, one simply takes the length of the reservoir to infinity, which causes the reference time scale to go to infinity.

## FLUID INJECTION AND EXTRACTION IN A (PERMEABLE) RESERVOIR ROCK

An increase of pore pressure in a permeable rock that is free to deform induces an increase of volume. This physical phenomenon is akin to thermal expansion (i.e., the volume increase experienced by an unconstrained material when subjected to a temperature increase). However, because the deformation of the rock is inhibited by the surrounding material, an increase of pore pressure induces a volume change that is smaller than the unconstrained volume change that would have been for the same pore pressure increase. In addition the compressive stresses in the rock are increased by an amount proportional to the pore pressure increase (see Box 2.3). But for very specific situations, the compressive stress increases in the vertical and in the horizontal directions are unequal, the stress ratio being a function of the shape of the reservoir and the contrast in elastic properties between the reservoir and the surrounding rocks (Rudnicki, 1999, 2002). In particular, the ratio of the induced vertical stress to the induced horizontal stress decreases with the aspect ratio of the reservoir (i.e., the ratio of the reservoir thickness to the lateral extent). For a "thin" reservoir, characterized by a small aspect ratio, the vertical stress change is negligible,

*220*

Copyright © National Academy of Sciences. All rights reserved.

Induced Seismicity Potential in Energy Technologies

*Appendix G*

and all the stress increase takes place in the horizontal direction, with increases that range between 40 and 80 percent of the pore pressure increase.

The expansion of the reservoir as a whole also alters the stress state in the surrounding rock, in particular inducing a decrease of the horizontal stress above and below a thin reservoir. These stress variations could in principle also trigger normal faulting in these regions; however, the combination of stress and pore pressure change caused by fluid injection is more likely to trigger seismicity in the reservoir rather than outside. The reverse is true for fluid extraction.

## FLUID INJECTION IN A FRACTURED IMPERMEABLE ROCK

Unlike fluid injection in permeable rocks, the injection of fluid in fractured impermeable rock is essentially inducing an increase of fluid pressure in the fractures, with negligible concomitant changes in the stress. It is therefore a worst case compared to the permeable rock case, where the increase of pore pressure is in part offset by an increase of the compressive stress, which is a stabilizing factor. (In other words, factor $m$ introduced in Figure G.1 is about equal to zero.) Because fractures can be very conductive and offer less storage compared to a permeable rock, the pore pressure perturbations can travel on the order of kilometers from the point of injection.

### Coulomb Criterion and Effective Stress

For slip to take place on a fault, a critical condition involving the normal stress $\sigma$ (the force per unit area normal to the fault), the shear stress $\tau$ (the force per unit area parallel to the fault), and the pressure $\rho$ of the fluid on the fault plane, must be met (see Figure G.2 for a representation of $\sigma$ and $\tau$). This condition is embodied in the Coulomb criterion, $|\tau| = \mu(\sigma - \rho) + c$, which depends on two parameters: the coefficient of friction $\mu$, with values typically in the narrow range from 0.6 to 0.8, and the cohesion $c$, equal to zero, however, for a frictional fault.

The Coulomb criterion simply expresses that the condition for slip on the fault is met when the magnitude of the "driving" shear stress, $|\tau|$, is equal to the shear resistance $\mu(\sigma - \rho) + c$. The quantity $(\sigma - \rho)$ is known as the effective stress, a concept initially introduced by Terzaghi (1940) in the context of soil failure. It captures the counteracting influence of the fluid pressure $\rho$ on the fault to the stabilizing effect of the compressive stress $\sigma$ acting across the fault.

As long as the shear resistance is larger than the shear stress magnitude, the fault is stable. However, an increase of the shear stress magnitude or a decrease of the shear strength would cause the fault to slip if the two quantities become equal. For example, an increase of the fluid pressure induced by injection could be responsible for a drop of shear strength large enough to reach the critical conditions.

*221*

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113213

Induced Seismicity Potential in Energy Technologies

## APPENDIX G



**FIGURE G.2** The normal and shear stress, $\sigma$ and $\tau$, acting across the fault depends on the vertical and horizontal stresses, $\sigma_v$ and $\sigma_h$, and the fault inclination $\beta$. The fault is infiltrated by fluid at pressure $\rho$.

The normal and shear stress on the fault can actually be expressed in terms of the in situ vertical and horizontal stresses, $\sigma_v$ and $\sigma_h$, through a relation that depends on the fault inclination $\beta$ (Figure G.2). The above Coulomb criterion can then be expressed as a limiting condition in terms of the effective vertical and horizontal stresses $\sigma'_v = \sigma_v - \rho$ and $\sigma'_h = \sigma_h - \rho$ or equivalently in terms of their half-sum and half-difference, $P'$ and $S$. Figure G.3 provides a graphical representation of the Coulomb criterion in terms of these two quantities.

The fault is stable if the point representative of the (effective) in situ stress state is below the slip criterion. A perturbation $(\Delta P', \Delta S)$, induced by fluid injection or withdrawal, to an existing state $(P'_o, S_o)$ that moves the point $(P'_o + \Delta P', S_o + \Delta S)$ to be on the Coulomb line will cause slip and trigger a seismic event. However, only some perturbations are destabilizing in nature (i.e., they move the representative stress point $[P', S]$ closer to the critical conditions). For example, the destabilizing perturbation shown in Figure G.3 is characterized by a slope $m = \Delta S / \Delta P'$ smaller than $m_c$ and a "direction" corresponding to both $\Delta P'$ and $\Delta S$ being negative. A perturbation characterized by the same slope $m$, but positive variations $\Delta P'$ and $\Delta S$, would be stabilizing.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113214

Induced Seismicity Potential in Energy Technologies

*Appendix G*



**FIGURE G.3** Stress and pore pressure perturbations from an initial stable state leading to critical conditions. The vertical intercept represents the rock cohesive strength and is zero for a preexisting frictional fault. The slope $m_o$ of the slip criterion depends on the friction coefficient $\mu$ and on the fault inclination $\beta$. The sketch corresponds to the normal conditions when $\sigma'_v > \sigma'_h$.

The existence of a perturbation $\Delta S$ reflects the fact that injection or extraction of fluid in deep layers has consequences beyond simply increasing or decreasing the pore fluid pressure. As explained in Chapter 2, the propensity of permeable rocks to expand (contract) as a response to increase (decrease) of pore pressure induces stress change not only in the reservoir but also in the surrounding rocks. Only in the particular case of impermeable rocks, where flow of fluids only takes place in a fracture network, are the perturbations essentially only of a hydraulic nature. For example, injection of fluid in fractured impermeable rock causes mainly an increase of pore pressure $\Delta p$ leading to $\Delta P' < 0$ and $\Delta S = 0$, which would cause the stress point in Figure G.3 to move horizontally ($m = 0$) to the left.

So far the discussion has been focused on slip on a preexisting fault of known inclination $\beta$. The formation of a fault associated with the large-scale shear failure of the rock can be treated within the same framework, with the critical difference that the inclination of the created fault depends only on the friction coefficient $\mu$. It also follows that in the representation of Figure G.3, the slope $m_o$ of the slip criterion (now usually referred to as the Mohr-Coulomb criterion) is exclusively a function of $\mu$. The vertical intercept of the Mohr-Coulomb criterion with the $S$ axis then embodies the cohesive shear strength of the rock.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113215

Induced Seismicity Potential in Energy Technologies

APPENDIX G

## REFERENCES

Rudnicki, J.W. 1999. Alteration of regional stress by reservoirs and other inhomogeneities: Stabilizing or destabilizing? Pp. 1629-1637 in *Proceedings of the Ninth International Congress on Rock Mechanics*, edited by G. Vouille and P. Berest. London: Taylor & Francis.

Rudnicki, J.W. 2002. Eshelby transformations, pore pressure and fluid mass changes, and subsidence. Pp. 307-312 in *Poromechanics II, Proceedings of the Second Biot Conference on Poromechanics*, edited by J.-L. Auriault et al. Leiden: A.A. Balkema.

Terzaghi, K. 1940. *Theoretical Soil Mechanics*. New York: Wiley.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113216

Induced Seismicity Potential in Energy Technologies

APPENDIX H

# *Pore Pressure Induced by Fluid Injection*

The dependence of the induced pore pressure on the operation parameters (injection rate, volume of fluid injected), on position and time, and on the hydraulic properties of the reservoir is illustrated in this appendix by considering the simple example of fluid injection in a disk-shaped reservoir. The analysis shows that different parameters control the pore pressure at the beginning of the injection operation and once enough fluid has been injected in the reservoir (see also Nicholson and Wesson, 1990).

The pore pressure induced by injection of fluid, $\Delta\rho$, is to a good approximation governed by the diffusion equation

$$c\nabla^2\Delta\rho = \partial\Delta\rho/\partial t + source$$

where $c$ denotes the hydraulic diffusivity equal to $c = k/\mu S$. In the above, $k$ is the intrinsic permeability of the rock (generally expressed in Darcy), $\mu$ is the fluid viscosity, and $S$ is the storage coefficient, a function of the compressibility of both the fluid and the porous rock. The diffusion equation imposes a certain structure on the link between the magnitude of the induced pore pressure $\Delta\rho$, the injected fluid volume $V$, and the rate of injection $Q_o$.

As an example, we consider the injection of fluid at a constant volumetric rate $Q_o$, at the center of a disk-shaped reservoir of thickness $H$ and radius $R$. It is assumed that the reservoir is thin (i.e., $H/R \ll 1$), and also that the pore pressure is uniform over the thickness of the layer, which implies, depending on the manner the fluid is injected, that some time has elapsed since the beginning of the operation.

At early time (to be defined more precisely later), the pore pressure perturbation induced by injection of fluid has not reached the boundary of the reservoir. The induced pore pressure field is then given by the source solution for an infinite domain, a solution of the form (Wang, 2000)

$$\Delta\rho(r,t) = \rho_* F(r/\sqrt{[ct]}) \tag{1}$$

where $r$ is the radial distance from the injection well, $t$ is time, and F is a known function. The quantity where $\rho_*$ is a characteristic pressure (i.e., a yardstick for measuring the induced pressure) given by

$$\rho_* = \mu Q_o/kH$$

*225*

Copyright © National Academy of Sciences. All rights reserved.

Induced Seismicity Potential in Energy Technologies

APPENDIX H

Once the time elapsed since injection started becomes larger than a fraction, say 0.1, of the characteristic time $t_* = R^2/c$, then the evolution of the induced pore pressure becomes influenced by the finiteness of the reservoir. Formally, the pore pressure solution can then be expressed as

$$\Delta\rho(r,t) = \rho_* P(r/R,\ t/t_*) \tag{2}$$

The function $P(\rho,t)$ can be determined semianalytically. If the elapsed time $t$ is expressed as the ratio of the injected volume $V$ to the rate of injection $Q_o$ (i.e., $t=V/Q_o$), then solution (2) can be written as

$$\Delta\rho(r,V) = \rho_* P(r/R\ ,V/V_*) \tag{3}$$

where $V_* = (Q_o R^2)/c$ is a characteristic fluid volume. The above expression suggests that the relationship between the induced pore pressure $\Delta\rho$, the injected volume $V$, and the injection rate $Q_o$ is not straightforward. However, Equation (3) shows important trends; for example, a decrease of the permeability causes an increase of the characteristic pressure, or an increase of the storage coefficient causes a decrease of the pore pressure, all other parameters kept constant.

At small time $t \ll t_*$, the dimensionless pressure $P = \Delta\rho/\rho_*$ reduces to the unbounded domain solution $F$, while at large time $t \gg t_*$, the pressure tends to become uniform and the pore pressure is simply given by

$$\rho \cong V/(\pi R^2 HS) \tag{4}$$

as the function $P(\rho,t)$ behaves for large $t$ as $P \cong t/\pi$. Thus, at large time, the pore pressure is simply proportional to the volume of injected fluid (Figure H.1). Equation (4) actually indicates that the large-time pore pressure is simply the ratio of the injected volume over the reservoir volume, divided by the storage coefficient.

The previous material provides some information about the link between pore pressure, injected volume, and injected rate for the particular case of an injector centered in a disk-shaped reservoir. These ideas can be generalized to more realistic cases. For example, for an arbitrarily shaped reservoir with $n$ wells, each injecting at a rate $Q_i$, the general expression for the induced pore pressure can be written as

$$\Delta\rho(x,t) = \rho_* \varsigma\{x/L,\ t/t_*;\ n,\ (x_i,\ i=1,\ n),\ reservoir\ shape\}$$

where the characteristic pressure and time are given by

*226*

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113218

Induced Seismicity Potential in Energy Technologies

*Appendix H*



**FIGURE H.1** Injection of fluid at a constant rate at the center of a disk-shaped reservoir. Plot of the dimensionless pore pressure $\Delta\rho/\rho_*$ with respect to the dimensionless time t = $t/t_*$ (equal to $V/V_*$) for three values of the dimensionless radius $Q = r/R$. This plot indicates that the pressure response is similar to the response of an unbounded reservoir as long as $t \leq 0.2$ and that the pressure is approximately uniform and proportional to the volume of fluid injected when $t \geq 10$. The dashed-line curves correspond to the solution **F** for an unbounded reservoir.

$$\rho_* = \mu Q_o / kL, \; t_* = L^2/c$$

with $L$ denoting a relevant length scale of the reservoir. Also $x$ refers to the position of the field point, and $x_i$ to the position of the source $i$. At large time, the induced pore pressure is approximately given by

$$\rho \cong V/(SV_{reservoir})$$

where $V$ is the total volume of fluid injected ($V = nQ_o t$) and $V_{reservoir}$ is the volume of the reservoir.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113219

Case No. 1:20-cv-02484-MSK   Document 62-3   filed 04/28/21   USDC Colorado   pg 19 of 127

A P P E N D I X   H

---

## REFERENCES

Nicholson, C., and R.L. Wesson. 1990. Earthquake Hazard Associated with Deep Well Injection: A Report to the U.S. Environmental Protection Agency. U.S. Geological Survey Bulletin 1951, 74 pp.

Wang, H.F. 2000. *Theory of Linear Poroelasticity with Applications to Geomechanics and Hydrogeology*. Princeton, NJ: Princeton University Press.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113220

Induced Seismicity Potential in Energy Technologies

A P P E N D I X  I

# Hydraulic Fracture Microseismic Monitoring

During a hydraulic fracture operation, very small earthquakes (**M** -4 to 0) (microseismic events) are induced from the high-pressure injection of fluids into the subsurface. These "microearthquakes" are thought to be caused by the increase in pore pressure leaking off into rock surrounding the hydraulic fracture. The increased pore pressure causes small natural fractures in the formation to slip, causing microearthquakes. These microearthquakes are thousands of times smaller than a typical earthquake that can be felt by humans. Recording and location analysis of microseismicity requires specialized seismic sensing equipment and processing algorithms. The location and size of the microseismicity are used by oil and gas operators to help determine the geometry of hydraulic fractures in the formation. Micro-seismic mapping is a very useful tool in planning fieldwide well development programs, such as horizontal well direction and the spacing between wells, as well as aiding the design of hydraulic fracturing procedures, such as injection rate and fluid volume. Microseismic data are acquired with either an array of seismic instruments (geophones or accelerometers) in one or multiple wellbores, or with a large number (100 to more than 1,000) of geophones near or on the surface (Figure I.1). Specialized data processing techniques are used to precisely locate the microseismic events in time and space and to compute source parameters such as seismic moment, magnitude, and moment tensors, if the data are adequate.



**FIGURE I.1** Diagram demonstrating microseismic monitoring of a hydraulic fracture. The hydraulic fracture induces microearthquakes that are recorded with seismometers in a nearby well bore (left) or a large number of seismometer instruments placed on or near the surface (right). SOURCE: Left, courtesy MEQ Geo Inc.; right, courtesy of MicroSeismic, Inc.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113221

Induced Seismicity Potential in Energy Technologies

A P P E N D I X  I

The hydraulic fractures typically propagate parallel to the maximum stress direction in the reservoir. In areas of low stress differences, the hydraulic fracture pattern can be quite complex, as there is no preferential direction for the fracture to grow, in contrast with areas of high stresses, where the hydraulic fracture grows parallel to the maximum stress direction. Figure I.2 shows two examples of microseismic mapping results following hydraulic fracturing procedures in Texas: an example from the Barnett shale gas horizontal well showing a complex fracture geometry (right), and the other from tight gas sands in a vertical well in the Cotton Valley formation, which shows a simple fracture geometry (left).

Microseismic mapping with borehole or surface sensors can be used to distinguish between reactivated natural faulting and hydraulic fracture events, through **b** value analysis (see Appendix D). Hydraulic fracture wells are often drilled to avoid large natural faults distinguished from three-dimensional surface seismic images, as faults can "steal" fracturing fluid and divert fluids away from the formation targeted for hydraulic fracturing. An example of this issue was discussed by Wessels et al. (2011), where a through-going fault was reactivated during hydraulic fracturing (Figure I.3).

REFERENCES

Maxwell, S.C., J. Rutledge, R. Jones, and M. Fehler. 2010. Petroleum reservoir characterization using downhole microseismic monitoring. *Geophysics* 75(5):75A129-75A137.

Warpinski, N.R., R.C. Kramm, J.R. Heinze, and C.K. Waltman. 2005. Comparison of single- and dual-array microseismic mapping techniques in the Barnett Shale. Presented at the Society of Petroleum Engineers Annual Technical Conference and Exhibition, Dallas, TX, October 9-12.

Wessels, S.A., A. De La Pena, M. Kratz, S. Williams-Stroud, and T. Jbeili. 2011. Identifying faults and fractures in unconventional reservoirs through microseismic monitoring. *First Break* 29(7):99-104.

Copyright © National Academy of Sciences. All rights reserved.

Induced Seismicity Potential in Energy Technologies

*Appendix I*



**FIGURE I.2** Examples of microseismic borehole monitoring results following hydraulic fracturing procedure. (a) On the left is a map (top) and cross section (bottom) view in the Barnett Shale after a multistage hydraulic fracture treatment in a horizontal well (red line, triangles indicate perforation in wellbore where fluid is injected); the small blue dots show the location of microseismic events mapped from two borehole observation wells shown by red squares; seismic instruments are indicated by green circles. (b) On the right is a map (top) and two cross-section (bottom) views of two vertical hydraulic fractured wells (white circles) drilled in the tight gas sands of the Cotton Valley Formation. The small gray dots show microseismic locations during a gel-based and water-based hydraulic fracturing fluid injection. SOURCE: Left, Warpinski et al. (2005); right, Maxwell et al. (2010).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113223

Induced Seismicity Potential in Energy Technologies

APPENDIX I



**FIGURE I.3** Map view of hydraulic fracture microseismic events during a four-well stimulation (dark blue lines on the map) in the Barnett Shale. Red events are interpreted to be associated with hydraulic fracturing; blue dots indicate microseismicity associated with the reactivation of a strike-slip fault. See Wessels et al. (2011) for details. Some hydraulic fracture stages were not mapped. SOURCE: Wessels et al. (2011).

*232*

Copyright © National Academy of Sciences. All rights reserved.

Induced Seismicity Potential in Energy Technologies

APPENDIX J

# Hydraulic Fracturing in Eola Field, Garvin County, Oklahoma, and Potential Link to Induced Seismicity

A hydraulic fracture treatment in January 2011 in Eola field, Oklahoma, coincided with a series of earthquakes. Eola field is located in central Oklahoma, southwest of Oklahoma City (Figure J.1). Felt seismicity was reported on the evening of January 18 from one resident near Elmore City, Oklahoma. Further analysis showed 50 earthquakes occurred that evening, 43 of which were large enough to be located, ranging in magnitude from **M** 1.0 to **M** 2.8. The earthquakes are coincident in location and timing with a hydraulic fracture in the Eola field, Picket Unit B well 4-18. The events all occurred within 24 hours of the first activity. The deepest hydraulic fracture in the Picket Unit B well 4-18 occurred 7 hours before the first earthquake was detected. Most of the events appear to be about 3.5 km (2.2 miles) from the hydraulic fracture well (Figure J.2).

Accurate event locations were difficult to establish; the closest seismic station was 35 km (22 miles) away from the locus of the events. Errors in location are estimated to be 100-500 m (~100 to more than 500 yards) in ground distance and twice that for depth. The hypocenter depths are approximately 1 to 5 km in depth, similar to the injection depth for the 4-18 well (Figure J.3).

Other cases of suspected induced activity in Oklahoma have been reported in the past. For example, in June 1978, 70 earthquakes occurred in 6.2 hours in Garvin County after a hydraulic fracture treatment. In May 1979, a well was stimulated over a 4-day period, where three different formations were hydraulically fractured over at depths of 3.7, 3.4, and 3.0 km (2.2 to 1.8 miles). The first and deepest hydraulic fracture stage was followed by 50 earthquakes over the next 4 hours. The second stage was followed immediately by 40 earthquakes in 2 hours; no activity was associated with the third and shallowest hydraulic fracture (Nicholson and Wesson, 1990). The largest event in the sequence was **M** 1.9. Just two of the earthquakes were felt. The activity was 1 km (0.6 miles) away from the Wilson seismic station in Oklahoma.

South central Oklahoma has experienced historical seismicity (Figure J.4) and has been the most seismically active part of the state since 1977. A series of Earthscope Transportable Array stations were located near the events by coincidence; without these stations, a majority of the earthquakes could not be located.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113225

Induced Seismicity Potential in Energy Technologies

A P P E N D I X   J



**FIGURE J.1** Google Earth image showing the state of Oklahoma and the location of the Eola oil field. SOURCE: Google Earth.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113226

Induced Seismicity Potential in Energy Technologies



**FIGURE J.2** Map of earthquake locations, the Picket Unit B Well 4-18. The Eola field is outlined by the gray hashed area. Faults mapped by Harlton (1964) are marked by green lines. SOURCE: Holland (2011).

Copyright © National Academy of Sciences. All rights reserved.

Induced Seismicity Potential in Energy Technologies

APPENDIX J



**FIGURE J.3** Depth distribution of hypocenters and uncertainty estimates with respect to the fracture well 4.18. SOURCE: Holland (2011).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113228

Induced Seismicity Potential in Energy Technologies

*Appendix J*



**FIGURE J.4** Map of historical seismicity from the Oklahoma Geological Survey catalog. Earthquakes from 1897 to 2010 are shown by red crosses. SOURCE: Holland (2011).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113229

Induced Seismicity Potential in Energy Technologies

## APPENDIX J

## REFERENCES

Harlton, B.H. 1964. Tectonic framework of Eola and Southeast Hoover oil fields and West Timbered Hills area, Garvin and Murray counties, Oklahoma. *Bulletin of the American Association of Petroleum Geologists* 48(9):1555-1567.

Holland, A. 2011. Examination of possibly induced seismicity from hydraulic fracturing in the Eola Field, Garvin County, Oklahoma. Oklahoma Geological Survey Open-File Report OF1-2011. Available at www.ogs.ou.edu/pubsscanned/openfile/OF1_2011.pdf. Accessed April 2012.

Nicholson, C., and R.L. Wesson. 1990. Earthquake Hazard Associated with Deep Well Injection—A Report to the U.S. Environmental Protection Agency. U.S. Geological Survey Bulletin 1951, 74 pp.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113230

Induced Seismicity Potential in Energy Technologies

## APPENDIX K

# *Paradox Valley Unit Saltwater Injection Project*

The Colorado River Basin Salinity Control Project is located in Montrose County, on the western border of Colorado. The project diverts naturally occurring seepage of salt brine that would normally flow into the Delores River (and then into the Colorado River) and injects the brine underground. The project is operated by the U.S. Department of the Interior, Bureau of Reclamation. Due to concerns of induced seismicity, seismic data for this project have been continuously recorded and analyzed since the project began in 1996 in order to understand and mitigate the effects of any induced seismic events.

The Paradox Valley Unit (PVU) is a group of wells that are part of this project. The brine is produced from nine extraction wells before it can flow into the Delores River. The brine is then injected into one disposal well. The well is located near the town of Bedrock, Colorado, approximately 1 mile southwest of the extraction wells. The well injects the brine into a limestone formation at a depth of approximately 14,100 to 15,750 feet. The project began in July 1996 with an initial injection rate of 345 gallons per minute at a pressure of 4,900 psi. Current injection rates are approximately 230 gallons per minutes at a pressure of 5,300 psi.

The possibility of induced seismicity was addressed during the planning stages of the PVU injection program because the Paradox Valley Unit injection program was comparable to both the injection programs at the Rocky Mountain Arsenal northeast of Denver and the water injection program for improved oil recovery at Rangely, Colorado. Eight years before injection was begun at the PVU site, the Bureau of Reclamation commissioned a seismic monitoring network to measure the seismic activity in the Paradox Valley region. The original network consisted of 10 seismic monitoring stations. The system was upgraded to 16 stations after the injection began in 1996 and currently totals 20 stations.

Earthquakes were recorded almost immediately after the beginning of injection in July 1996 with the first seismic event measured in November 1996. Minor earthquakes continued through mid-1999, and two magnitude 3.5 events occurred in June and July 1999. In response to the higher-magnitude earthquakes, the Bureau of Reclamation initiated a program to cease injection for 20 days every 6 months. Prior to these events they had noted the rate of seismicity had decreased during the shutdowns following unscheduled maintenance. The Bureau of Reclamation hoped stopping injection twice yearly would allow time for the injection fluid to diffuse from the pressurized fractures into the rock matrix.

After a magnitude 4.3 earthquake occurred in May 2000, PVU stopped injection for 28 days to allow evaluation of the injection program and its relationship to induced seismic

*239*

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113231

Induced Seismicity Potential in Energy Technologies

A P P E N D I X   K

events. After analysis the injection rate was decreased by one-third from 345 gallons per minute to 230 gallons per minute. The program of ceasing injection for 20 days twice per year was also continued from June 2000 to January 2002 as were the lower injection rates.

In January 2002 the injection fluid was changed to 100 percent brine water from a mixture of 70 percent brine with 30 percent freshwater, which was the injection mixture from the start of the project. This heavier fluid increased the hydrostatic pressure measured at the bottom of the injection well but no difference in the rate of induced seismicity resulted from this change.

After monitoring injection into the Paradox Valley Unit injection well for almost 15 years, the Bureau of Reclamation has recorded over 4,600 induced seismic events. The largest seismic event occurred on May 27, 2000, and had a magnitude of 4.3 (see Figure K.1). After reviewing data on injection volume, injection rate, downhole pressure, and percent of days injecting, the Bureau of Reclamation noted, "Of the four injection parameters investigated, the downhole pressure exhibits the best correlation with the occurrence of near-well seismicity over time" (Bureau of Reclamation, 2009). The Bureau of Reclamation also noted the record of seismic activity appears to be divided into three distinct clusters occurring from 1997 to January 2000, 2003 to 2005, and July 2008 to the present. The Bureau of Reclamation concludes, "There appears to be a gross correlation between the three periods of increased near-well seismic activity and periods of increased time-averaged injection pressures" (Bureau of Reclamation, 2010). These conclusions reiterate the results of other investigations into the cause of induced seismicity initiated by underground injection.

The Bureau of Reclamation continues to inject saline fluids underground as part of the Colorado River Basin Salinity Control Project, and it continues to control induced seismicity by the biennial shutdown of injection activity and by limiting the volume of fluid injected. Both of these actions minimize downhole injection pressure in an effort to limit induced seismic events.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113232

Induced Seismicity Potential in Energy Technologies

*Appendix K*



**FIGURE K.1** Twenty-year data set collected by the Bureau of Reclamation for the Paradox Valley project. Upper figure shows the average daily injection flow rate in gallons per minute. Lower figure shows all induced events and their magnitudes over the same period with distance from the injection well. SOURCE: Block (2011).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113233

Induced Seismicity Potential in Energy Technologies

APPENDIX K

## REFERENCES

Block, L. 2011. Paradox Valley Deep Disposal Well and Induced Seismicity. Presentation to the National Research Council Committee on Induced Seismicity Potential in Energy Technologies, Dallas, TX, September 14.

Bureau of Reclamation. 2009. Overview of PVU-Induced Seismicity from 1996 to 2009 and implications for Future Injection Operations. Technical Memorandum No. 86-68330-2009-22.

Bureau of Reclamation. 2010. 2009 Annual Report Paradox Valley Seismic Network, Paradox Valley Project, Colorado. Technical Memorandum No. 86-68330-2010-07.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113234

Induced Seismicity Potential in Energy Technologies

APPENDIX L

# Estimated Injected Fluid Volumes

Tables L.1–L.5 contain the data used to create Figure 3.16.

**TABLE L.1** Hydraulic Fracturing Volumes

| Development Area | Average Volume Water (gal) | Volume Water Use Per Well (gal) | Volume Water Use Per Well (m³) |
| --- | --- | --- | --- |
| Barnett | 4,600,000 | 2,800,224 | 10,600 |
| Eagle Ford | 5,000,000 | 4,253,170 | 16,100 |
| Haynesville | 5,000,000 | 5,679,699 | 21,500 |
| Marcellus | 5,600,000 | No data | No data |
| Niobrara | 3,000,000 | No data | No data |
| Average volume per well per day | 4,640,000 | — | — |

NOTE: "Daily" hydraulic fracture volume plotted assumes the hydraulic fracturing procedure would take 2 days to complete; the 1-day volume plotted is half the total well volume estimated by King (2012). "Yearly" hydraulic fracture volume assumes 15 wells per year in the development area. Postfracturing flowback volume is assumed to be 20 percent of the total volume injected.
SOURCE: King (2012); Nicot and Scanlon (2012).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113235

Induced Seismicity Potential in Energy Technologies

## APPENDIX L

**TABLE L.2** Carbon Capture and Sequestration Volumes

| | |
|---|---|
| 43 lb/ft³ | Density of liquid $CO_2$ at 80°C (AIRCO value) |
| 2000 lb | 1 ton liquid $CO_2$ |
| 47 ft³ | 1 ton liquid $CO_2$ at 80°C |
| 47,000,000 ft³ | 1 million tons liquid $CO_2$ at 80°C per year |
| 1,330,892 m³ | 1 million tons liquid $CO_2$ at 80°C per year |
| 351,355,488 gal | 1 million tons liquid $CO_2$ at 80°C per year |

Result:
$1.33 \times 10^6$ m³/year liquid $CO_2$ at 80°C per year
$3.65 \times 10^3$ m³/day liquid $CO_2$ at 80°C per year
$3.51 \times 10^8$ gal/year liquid $CO_2$ at 80°C per year
$9.63 \times 10^5$ gal/day liquid $CO_2$ at 80°C per year

NOTE: Table assumes 1 million tons of liquid $CO_2$ injection per year. The density/unit weight of liquid $CO_2$ varies significantly with temperature; the density of supercritical (liquid) $CO_2$ ranges from 0.60 to 0.75 g/cm³ (Sminchak and Gupta, 2003). If one assumes approximately 43 lb/ft³ (AIGA, 2009) for the unit weight of $CO_2$ (approximately 0.64 g/cm³) at a subsurface temperature of 80°C (AIGA, 2009) then 1 ton of $CO_2$ equates to 47 ft³, and 1 million tons/year equates to 47,000,000 ft³/year or 1,330,892 m³/year or 3646 m³/day.
SOURCE: Sminchak and Gupta (2003); AIGA (2009).

**TABLE L.3** Water Disposal Well Volume Calculations

| | |
|---|---|
| 9,000 | bbl/day |
| 42 | gal/barrel |
| 378,000 | gal/day |
| 137,970,000 | gal/year |

NOTE: Reported average saltwater disposal (SWD) injection of 8,000–11,000 bbl/day. SWD injection volumes estimated from Texas Railroad Commission for SWD wells north of DFW airport. Frohlich et al. (2010) report a survey of SWD wells in Tarrant and Johnson counties that reported rates ranging from 100,000 to 500,000 barrels per month; 9,000 bbl/day was used for graph. Nicot and Scanlon (2012) state Texas is the top shale producer in the United States.
SOURCE: Frohlich et al. (2010).

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113236

Induced Seismicity Potential in Energy Technologies

*Appendix L*

**TABLE L.4** Geysers Geothermal Field Calculations

| 1,000,000,000 | billion pounds steam/year |
|---|---|
| 8 | pounds steam/gallon |
| 328,899 | gal/day |
| 120,048,019 | gal/year |

SOURCE: Smith et al. (2000).

**TABLE L.5** Enhanced Geothermal Systems (EGS) Main Stimulation Calculations

| 11,500 | $m^3$ water injected over 6 days |
|---|---|
| 3,037,979 | gallons water injected over 6 days |
| 1,917 | avg. $m^3$/day |
| 506,330 | avg. gal/day |

SOURCE: Asanuma et al. (2008).

## REFERENCES

AIGA (Asia Industrial Gases Association). 2009. *Carbon Dioxide*, 7th ed. Singapore: AIGA 068/10. Available at www.asiaiga.org/docs/AIGA%20068_10%20Carbon%20Dioxide_reformated%20Jan%2012.pdf (accessed May 2012).

Asanuma, H., Y. Kumano, H. Niitsuma, U. Schanz, and M. Häring. 2008. Interpretation of reservoir structure from super-resolution mapping of microseismic multiplets from stimulation at Basel, Switzerland in 2006. *GRC Transactions* 32:65-70.

Frohlich, C., C. Hayward, B. Stump, and E. Potter. 2010. The Dallas-Fort Worth earthquake sequence: October 2008-May 2009. *Bulletin of the Seismological Society of America* 101(1):327-340.

King, G.E. 2012. Hydraulic Fracturing 101: What every representative, environmentalist, regulator, reporter, investor, university researcher, neighbor, and engineer should know about estimating frac risk and improving frac performance in unconventional gas and oil wells. Paper SPE 152596 presented to the Society of Petroleum Engineers (SPE) Hydraulic Fracturing Technology Conference, The Woodlands, TX, February 6-8.

Nicot, J.-P., and B.R. Scanlon. 2012. Water use for shale-gas production in Texas, U.S. *Environmental Science and Technology* 46:3580-3586.

Sminchak, J., and N. Gupta. 2003. Aspects of induced seismic activity and deep-well sequestration of carbon dioxide. *Environmental Geosciences* 10(2):81-89.

Smith, J.L.B., J.J. Beall, and M.A. Stark. 2000. Induced seismicity in the SE Geysers Field, California, USA. Presented at the World Geothermal Congress, Kyushu-Tohoku, Japan, May 28-June 10.

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113237

Induced Seismicity Potential in Energy Technologies

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113238

Induced Seismicity Potential in Energy Technologies

APPENDIX M

# *Additional Acknowledgments*

The committee gratefully acknowledges the support of three standing committees under the Board on Earth Sciences and Resources: the Committee on Earth Resources, the Committee on Geological and Geotechnical Engineering, and the Committee on Seismology and Geodynamics. In particular, the committee would like to thank the following people:

*Committee on Earth Resources*

Clayton R. Nichols, *Chair*
James A. Brierley
Elaine T. Cullen
Gonzalo Enciso
Michelle Michot Foss
Donald Juckett
Ann S. Maest
Leland L. "Roy" Mink
Mary M. Poulton
Arthur W. Ray
Norman H. Sleep
Richard J. Sweigard

*Committee on Geological and Geotechnical Engineering*

Edward Kavazanjian, Jr., *Chair*
John T. Christian
Patricia Culligan
Conrad W. Felice
Deborah J. Goodings
Murray W. Hitzman
James R. Rice
J. Carlos Santamarina

*Committee on Seismology and Geodynamics*

David T. Sandwell, *Chair*
Michael E. Wysession, *Vice-Chair*

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113239

Induced Seismicity Potential in Energy Technologies

## APPENDIX M

J. Ramon Arrowsmith
Emily E. Brodsky
James L. Davis
Stuart Nishenko
Peter Olson
Nancy L. Ross
Charlotte A. Rowe
Brian W. Stump
Aaron A. Velasco

Copyright © National Academy of Sciences. All rights reserved.

BLM_0113240

Geology, published online on 26 March 2013 as doi:10.1130/G34045.1

# Geology

## Potentially induced earthquakes in Oklahoma, USA: Links between wastewater injection and the 2011 M$_w$ 5.7 earthquake sequence

Katie M. Keranen, Heather M. Savage, Geoffrey A. Abers and Elizabeth S. Cochran

*Geology* published online 26 March 2013;
doi: 10.1130/G34045.1

| | |
|---|---|
| **Email alerting services** | click www.gsapubs.org/cgi/alerts to receive free e-mail alerts when new articles cite this article |
| **Subscribe** | click www.gsapubs.org/subscriptions/ to subscribe to Geology |
| **Permission request** | click http://www.geosociety.org/pubs/copyrt.htm#gsa to contact GSA |

Copyright not claimed on content prepared wholly by U.S. government employees within scope of their employment. Individual scientists are hereby granted permission, without fees or further requests to GSA, to use a single figure, a single table, and/or a brief paragraph of text in subsequent works and to make unlimited copies of items in GSA's journals for noncommercial use in classrooms to further education and science. This file may not be posted to any Web site, but authors may post the abstracts only of their articles on their own or their organization's Web site providing the posting includes a reference to the article's full citation. GSA provides this and other forums for the presentation of diverse opinions and positions by scientists worldwide, regardless of their race, citizenship, gender, religion, or political viewpoint. Opinions presented in this publication do not reflect official positions of the Society.

**Notes**

Advance online articles have been peer reviewed and accepted for publication but have not yet appeared in the paper journal (edited, typeset versions may be posted when available prior to final publication). Advance online articles are citable and establish publication priority; they are indexed by GeoRef from initial publication. Citations to Advance online articles must include the digital object identifier (DOIs) and date of initial publication.

© Geological Society of America



THE
GEOLOGICAL
SOCIETY
OF AMERICA

Geology, published online on 26 March 2013 as doi:10.1130/G34045.1

# Potentially induced earthquakes in Oklahoma, USA: Links between wastewater injection and the 2011 M$_w$ 5.7 earthquake sequence

Katie M. Keranen[1], Heather M. Savage[2], Geoffrey A. Abers[2], and Elizabeth S. Cochran[3]

[1]ConocoPhillips School of Geology and Geophysics, University of Oklahoma, 100 E. Boyd Street, Norman, Oklahoma 73069, USA
[2]Lamont-Doherty Earth Observatory of Columbia University, PO Box 1000, 61 Route 9W, Palisades, New York 10964, USA
[3]U.S. Geological Survey, 525 S. Wilson Avenue, Pasadena, California 91106, USA

## ABSTRACT

Significant earthquakes are increasingly occurring within the continental interior of the United States, including five of moment magnitude (M$_w$) ≥ 5.0 in 2011 alone. Concurrently, the volume of fluid injected into the subsurface related to the production of unconventional resources continues to rise. Here we identify the largest earthquake potentially related to injection, an M$_w$ 5.7 earthquake in November 2011 in Oklahoma. The earthquake was felt in at least 17 states and caused damage in the epicentral region. It occurred in a sequence, with 2 earthquakes of M$_w$ 5.0 and a prolific sequence of aftershocks. We use the aftershocks to illuminate the faults that ruptured in the sequence, and show that the tip of the initial rupture plane is within ~200 m of active injection wells and within ~1 km of the surface; 30% of early aftershocks occur within the sedimentary section. Subsurface data indicate that fluid was injected into effectively sealed compartments, and we interpret that a net fluid volume increase after 18 yr of injection lowered effective stress on reservoir-bounding faults. Significantly, this case indicates that decades-long lags between the commencement of fluid injection and the onset of induced earthquakes are possible, and modifies our common criteria for fluid-induced events. The progressive rupture of three fault planes in this sequence suggests that stress changes from the initial rupture triggered the successive earthquakes, including one larger than the first.

## INTRODUCTION

Three earthquakes with M$_w$ of 5.0, 5.7, and 5.0 (moment magnitudes from Global Centroid Moment Tensor Catalog, GCMT; http://www.globalcmt.org) occurred within the North American midcontinent near Prague, Oklahoma, United States (Fig. 1) on 5, 6, and 8 November 2011 ~180 km from the nearest known Quaternary-active fault. Earthquakes with M$_w$ ≥ 5.0 are rare in the United States east of the Rocky Mountains; however, the number per year recorded in the midcontinent increased 11-fold between 2008 and 2011, compared to 1976–2007. Of the total seismic moment released in the region, ~66% occurred in 2011 (from the GCMT). The M$_w$ 5.7 earthquake was the largest instrumentally recorded in Oklahoma. It created shaking up to intensity VIII in the epicentral region, destroyed 14 homes, damaged many other buildings, injured 2 people, and buckled pavement (U.S. Geological Survey, 2011). In this study we refer to the M$_w$ ≥ 5.0 earthquakes of 5, 6, and 8 November 2011 as events A, B, and C, respectively. Moment tensor solutions (from the GCMT;



Figure 1. A: Seismicity, centroid moment tensor mechanisms, seismic stations, active disposal wells, and oil fields in central Oklahoma, United States. Epicenters of major earthquakes (EQs) are plotted at Oklahoma Geological Survey location for event A and at our relocations for events B and C, where we had sufficient control (Table DR1 [see footnote 1]). Event A likely nucleated on fault defined by aftershock locations (permitted within location error). Faults are merged from regional compilation (Joseph, 1987) and detailed local study (Way, 1983), mapped using seismic lines, well logs, and formation tops. Wells 1 and 2 inject near aftershocks of event A. B–D: Cross sections of seismicity projected from within 4 km of plane of each section. Vertical lines beneath wells indicate well path, red where perforated or open hole. Green bands denote Hunton and Simpson Groups, and yellow bands denote Arbuckle Group. Arbuckle Group overlies basement; base depth of Arbuckle Group locally is uncertain (between 1.8 and 2.2 km depth). Depths are relative to sea level, land elevation is ~300 m. Inset shows state of Oklahoma and location of map area.

Data Repository item 2013191 | doi:10.1130/G34045.1

© 2013 Geological Society of America. For permission to copy, contact Copyright Permissions, GSA, or editing@geosociety.org.

BLM_0113242

Geology, published online on 26 March 2013 as doi:10.1130/G34045.1

Fig. 1; Table DR1 in the GSA Data Repository[1]) indicate strike-slip rupture on steeply dipping fault planes with different fault-plane orientations. Local earthquake activity began in February 2010 with an $M_w$ 4.1 earthquake within a few kilometers of event A.

The 2010 and 2011 Prague earthquakes occurred in the structurally controlled Wilzetta oil field, within the complex, ~200-km-long, Pennsylvanian-age Wilzetta fault system (Way, 1983). Structural traps in the Wilzetta field are formed by the offset of porous limestone along high-angle faults (Fig. 2). Production of oil from the Wilzetta North field, where the earthquake sequence initiated, occurred primarily in the 1950s and 1960s from the Hunton Limestone; limited production continues. There are three active fluid injection wells located within 1.5 km of aftershocks of event A, and two within the Wilzetta North field (Fig. 1). Fluid injection in these wells began after 1993 and occurs into units from the Hunton Limestone to the deeper Arbuckle Group, predominantly dolomitic limestone, between ~1.3 and 2.1 km depth (Oklahoma Corporation Commission Well Data System: http://www.occpermit.com /WellBrowse; Fig. 2).

Earthquakes are commonly considered induced by wastewater disposal if they adhere to criteria established by Davis and Frohlich (1993) that include proximity to injection wells, a change from background seismicity, and a correlation with wastewater injection parameters. In this study we demonstrate a relationship between the 2011 Oklahoma seismicity and fluid injection, and suggest modifications to the criteria for induced earthquakes. We use the term "induced" without implying a relationship between anthropogenic stresses and earthquake magnitude, following the Committee on Induced Seismicity Potential (National Research Council of the National Academies, 2012).

## METHODOLOGY

### Seismic Data and Network

We deployed seismometers within 24 h of event A, and recorded the later 2 large earthquakes and thousands of aftershocks. The first 3 seismometers deployed, within 2 km of events A and B, recorded 7 h of locatable seismicity prior to event B. Additional seismometers (3) were deployed in the 24 h after event B, and 12 in the following 5 days, using digital three-component seismometers from the University of Oklahoma and the PASSCAL RAMP (Program for Array Seismic Studies of the Continental Lithosphere,



Figure 2. Subsurface geology and compartmentalization in Wilzetta oilfields, Oklahoma, United States. A: Wilzetta fault system (area shown in Fig. 1) including fault-bounded compartments, disposal wells, earthquakes, and exploration wells into Hunton Limestone or deeper units. Boundaries between producing and dry wells closely correlate to mapped faults. Wells 1, 2, and P1 are discussed in text. B: Schematic cross-section W-w across Wilzetta North and Wilzetta compartments. High-permeability reservoirs are interbedded with low-permeability shale units vertically, and faults are low-permeability barriers to fluid flow. Well paths and injection intervals are from Oklahoma Corporation Commission Well Data System (http://www.occpermit.com/WellBrowse) database. Relative offset of fault blocks is based on formation tops at closely spaced production wells (not shown). Depths to formation tops and total depth (TD) of each injection well are noted (in km below sea level).

Rapid Array Mobilization Program) pool. The locally recorded data were supplemented by EarthScope Transportable Array stations (Meltzer et al., 1999) at 25–150 km distance. Many stations were within 1 focal depth of the nearest earthquakes, providing accurate depth estimates; nonlinear inversions on sample hypocenters give 95% confidence bounds of <500 m in epicenter and <800 m in depth for earthquakes recorded by 3 stations before event B, and <50–100 m in epicenter and depth for those recorded by the full 18 station local array. Most ray paths were <10 km from source to station, with <2 s between S and P wave arrivals. Several hundred aftershocks per hour occurred within the first few hours of each large earthquake.

We report results based on P and S wave arrivals for (1) all identifiable events after the array installation before event B (the $M_w$ 5.7), (2) 1–2 h time windows immediately following events B and C, and (3) larger aftershocks within 2 mo of the mainshocks and recorded on >15 stations. In most cases, both P and S wave arrival times could be picked to a precision of 10 ms or better from the local stations. Arrivals were picked manually; the high event rate caused standard automatic detection schemes to fail.

The one-dimensional velocity model (Fig. DR1 in the Data Repository) was determined by inversion methods that solve jointly for P and S wave velocities and hypocenters (Abers and Roecker, 1991) for aftershocks recorded on >15 stations. The global root mean square residual in

the velocity model is 0.029 s, and influences of possible lateral variations appear to be minimal. (For details of the network, the velocity model, and location selection, see the Data Repository.)

## RESULTS

### Aftershock Locations and Fault Rupture Areas

For this study we located 1183 aftershocks recorded by the dense network, and show the best located 798 (see the Data Repository). We use the extent of the aftershocks measured within a few hours to days after the mainshocks to estimate the area of the faults that ruptured, as is common if an event does not rupture to the surface (e.g., Kanamori and Anderson, 1975). The aftershocks we use in this study represent <10% of the total number of earthquakes, as only a few hours of data from time periods following each $M_w \geq 5.0$ event have been examined thoroughly. Hypocenters for events A, B, and C are less well constrained than the aftershocks (see the Data Repository). However, the fault rupture sequence is clear from the focal mechanisms of the large events combined with the aftershock pattern.

The earthquakes located delineate the major seismic zones as narrow, steeply dipping planes in the sedimentary section and basement (Fig. 1), well correlated to previously identified fault structures (Way, 1983; Joseph, 1987). The strikes (from the GCMT) of events A (27°) and B

[1]GSA Data Repository item 2013191, network and event details, velocity model, and 2010–2011 injection data, is available online at www.geosociety.org/pubs/ft2013.htm, or on request from editing@geosociety.org or Documents Secretary, GSA, P.O. Box 9140, Boulder, CO 80301, USA.

BLM_0113243

Geology, published online on 26 March 2013 as doi:10.1130/G34045.1

(54°) parallel the two predominant orientations within the Wilzetta fault zone, and the strike of event C (91°) defines a clear secondary orientation. Therefore, three separate segments within the Wilzetta fault network ruptured successively during the sequence. The slip on the apparent fault planes of the three largest earthquakes are consistent with an east-northeast direction of maximum horizontal stress. Significantly, the northern tip of the aftershock zone for event A is in sedimentary units near an active disposal well (Fig. 1); the closest earthquakes are 200 ± 250 m distant from the wells. The depths of 83% of the aftershocks are <5 km; 30% of early aftershocks (and 20% of all earthquakes) were located within the sedimentary units into which fluids are injected (Fig. 1).

## Fluid Triggering and Correlation of Seismicity to Fluid Injection Data

Earthquake triggering by fluid injection occurs if pore pressure at the fault increases beyond a critical pressure threshold (Hubbert and Rubey, 1959; Healy et al., 1968; Raleigh et al., 1976), lowering effective normal stress on a fault close to failure. In the induced seismicity experiment at Rangely, Colorado, downhole reservoir pressure measurements were available, and the seismicity rate rose and fell within months of changes in reservoir pressure (Raleigh et al., 1976). Pressure data available for the Wilzetta North field are limited to monthly reported wellhead pressure (pressure at the surface while pumping), and no direct measurements of pressure within the reservoir are accessible. We thus follow standard methods and investigate possible temporal correlations between seismicity rate and surface injection parameters (e.g., Healy et al., 1968; Frohlich et al., 2011; Horton, 2012).

No short-term monthly correlation is evident in the Wilzetta field (Fig. DR2). Such a temporal correlation to surface injection parameters is rare, though evident in the Rocky Mountain Arsenal in Colorado (Healy et al., 1968). A more common observation in cases of induced seismicity is the onset of earthquakes soon after the initiation of fluid injection. Seismicity began within months of the start date of injection at the Rocky Mountain Arsenal (Healy et al., 1968), in Arkansas (Horton, 2012), and at the Dallas–Fort Worth (Texas) airport (Frohlich et al., 2011). However, within oilfields near Prague, Oklahoma, the first noted earthquake ($M_w$ 4.1, 2010) did not occur until 17 yr after injection commenced (Fig. 3A). It is difficult to know if small earthquakes were occurring prior to 2010 near Prague, given the lack of nearby seismic stations; none were recorded or reported. A similarly long delay was observed at the Cogdell oil field in Texas (Davis and Pennington, 1989), where induced earthquakes began 20 yr after injection initiated.



Figure 3. Available injection data. A: Monthly volumes of wastewater disposed at injection wells 1 and 2 (Fig. 2) near nucleation of event A. Monthly volumes were reported for 2002–2011; daily average volumes are multiplied by number of days per month for 1993–2002. B: Wellhead pressure for periods with pump is active, for same wells. C: Cumulative volume injected at wells 1 and 2 (from yearly totals). Minimum capacity of reservoir is denoted as horizontal dashed line and equals volume of oil extracted from Wilzetta North field, estimated by dividing total volume extracted from three Wilzetta fields by fractional area of Wilzetta North. This is absolute minimum estimate of reservoir fluid capacity; no data are available for water extracted or reinjected during production. Gray shading notes earthquakes in 2010–2011.

## Increasing Injection (and Reservoir?) Pressure

Wellhead pressure in the Wilzetta North field appears fixed at a constant value during pumping, as it was at Rangely, Colorado (Gibbs et al., 1972), with multiyear intervals of constant surface pressure punctuated by step increases (Well 1; Fig. 3). Initially, fluid was injected into the Hunton Limestone in Well 1 at zero reported wellhead pressure (Oklahoma Corporation Commission Well Data System) (Fig. 3B), signifying an underpressured reservoir (below hydrostatic pressure) depleted by earlier hydrocarbon production. Wellhead pressure increased in steps, starting in 2001 at ~0.2 MPa (25–40 psi) and reaching a maximum of 3.6 MPa (525 psi) in 2006 (Fig. 3). The final tenfold increase in wellhead pressure, and the concurrent addition of a second disposal well into deeper units, came after the volume of water injected into the Hunton Limestone at Well 1 exceeded the volume of oil extracted from the Hunton strata at wells throughout the compartment (Way, 1983) (Fig. 3C). The volume of oil extracted is only an approximate estimate of reservoir capacity, and likely an underestimate; no data are available for water volume extracted or reinjected during production.

In the Wilzetta field, hydrocarbon accumulations were isolated to fault blocks of <1 km²

areal extent, surrounded by water-saturated zones, indicating that the compartment-bounding faults were likely seals against fluid migration over geologic time. Such low-permeability barriers are common in sedimentary basins (Bradley and Powley, 1994) and can inhibit the diffusion of fluid pressure. In an idealized sealed reservoir, reservoir pressure gradually rises as injection volume increases (Fig. 4A), and the pressure difference between wellhead pressure (corrected for the water column) and reservoir pressure decreases (Fig. 4B), along with flow rate. When wellhead pressure is increased, as in the Wilzetta North field (Fig. 3), pressure gradient and flow rate increase. With sufficient time, volume injected, and wellhead pressure, pressure at the fault may exceed the critical pressure (Fig. 4B) and trigger slip. The time required for pressure at the fault to rise to the critical pressure in a closed compartment depends upon injection rate and reservoir volume and permeability, explaining delays before the onset of induced seismicity such as observed in this study and at the Cogdell oil field (Davis and Pennington, 1989).



Figure 4. A: Reservoir pressure in simplistic sealed reservoir. Fluid pressure in reservoir, including at fault, rises through time as reservoir fills. Left edge of model is injection wellbore; right edge represents sealed fault. B: Predicted reservoir pressure compared to reported monthly wellhead pressure (plus weight of water column), apparently constant because pressure is reported only during pumping. Reservoir pressure near wellbore equals reported injection pressure while pumping, but drops when pump stops. Over multiple pumping cycles, time-averaged formation pressure near well rises slowly (A), and pressure gradient decreases, lowering flow rate and requiring longer periods of pumping (shaded in gray) to maintain constant monthly disposal volume. When wellhead pressure is increased, pressure gradient increases and pumping becomes more efficient.

BLM_0113244

Geology, published online on 26 March 2013 as doi:10.1130/G34045.1

Neither reservoir pressure data nor detailed flow rates, required to fully test this hypothesis, are available for the Prague, Oklahoma, wells. Injection rate in Oklahoma is reported as a monthly volume and the averaging of flow rate per month smooths out higher frequency variations. Alternative hypotheses to raise fluid pressure at the fault unrelated to the identified compartments, including the concurrent increase in wellhead pressure and the addition of a second injection well in 2006, cannot be rejected without reservoir pressure data. However, the agreement between original oil volume extracted and cumulative water injected prior to seismicity (Fig. 3) supports the notion that a critical volume was reached through injection in the Wilzetta N compartment.

Minor production is reported from the Hunton Limestone 500 m to the north, near the edge of the compartment (Fig. 2; well P1) (Oklahoma Corporation Commission Well Data System). It is unknown if the well is in pressure communication with the injection wells, because we have no measurements of reservoir pressure to determine connectivity. However, fluid pressure can rise throughout portions of a semirestricted reservoir following injection, and high fluid pressure can be maintained for years even if one side is infinitely open, as observed at the Rocky Mountain Arsenal (Hsieh and Bredehoeft, 1981).

## DISCUSSION

Continuing injection over 18 yr into subsurface compartments in the Wilzetta field may have refilled a compartment, eventually reducing the effective stress along reservoir-bounding faults and triggering the 2010–2011 earthquakes. Injection has continued and earthquakes with magnitudes $\geq 3.0$ continue to occur. We interpret event A ($M_w$ 5.0) to have been induced by increased fluid pressure, exceeding the largest earthquake known to be induced by injected fluid ($M_w$ 4.8; National Research Council of the National Academies, 2012). Aftershocks of event A appear to deepen away from the well, and may imply downward pressure propagation into basement. Event B, of much larger magnitude ($M_w$ 5.7), and event C may also be considered consequences of injection; however, Coulomb stress calculations show that the fault geometries are consistent with triggering by stress transfer (Cochran et al., 2012). The triggering implies that the faults were close to failure, supporting the view that favorably oriented faults are critically stressed throughout the continents (Zoback et al., 2002). In this manner, small- to moderate-sized injection-induced events may result in release of additional tectonic stress. The scalar moment released in the Oklahoma sequence exceeds predictions based on the volume of injected fluid (McGarr, 1976) by several orders of magnitude, requiring the release of substantial tectonic stress.

The 2011 Prague, Oklahoma, earthquakes necessitate reconsideration of the maximum possible size of injection-induced earthquakes, and of the time scale considered diagnostic of induced seismicity. Typically, a response of seismicity to injection within months has been sought to diagnose earthquake triggering (Raleigh et al., 1976; Davis and Frohlich, 1993). Here we present a potential case of fluid injection into isolated pockets resulting in seismicity delayed by nearly 20 yr from the initiation of injection, and by 5 yr following the most substantial increase in wellhead pressure.

## ACKNOWLEDGMENTS
We thank the Oklahoma Corporation Commission for the well database. The U.S. Geological Survey, the Oklahoma Geological Survey, Oklahoma State University, and the University of Oklahoma provided field support. The University of Oklahoma funded field acquisition costs. The PASSCAL (Program for Array Seismic Studies of the Continental Lithosphere) instrument center provided RAMP (Rapid Array Mobilization Program) instruments and logistical support. We thank two anonymous reviewers and M.D. Zoback, W. Ellsworth, E. Roeloffs, C. Scholz, and E. Brodsky for constructive reviews. D. Sumy, C. Hogan, G. Mattei, K. Pham, and C. Dieck picked many arrivals, helped with deployment, and/or maintained the seismic network.

## REFERENCES CITED

Abers, G.A., and Roecker, S., 1991, Deep structure of an arc-continent collision: Earthquake relocation and inversion for upper mantle P and S wave velocities beneath Papua New Guinea: Journal of Geophysical Research, v. 96, p. 6379–6401, doi:10.1029/91JB00145.

Bradley, J.S., and Powley, D.E., 1994, Pressure compartments in sedimentary basins: A review, *in* Ortoleva, P.J., ed., Basin compartments and seals: American Association of Petroleum Geologists Memoir 61, p. 3–26.

Cochran, E.S., Sumy, D.F., Keranen, K.M., Abers, G.A., and Savage, H.M., 2012, Coulomb stress modeling of the 2011 M5.7 Oklahoma earthquake sequence: American Geophysical Union 2012 Fall Meeting, San Francisco, California, 3–7 December 2012, S53I–05.

Davis, S.D., and Frohlich, C., 1993, Did (or will) fluid injection cause earthquakes? Criteria for a rational assessment: Seismological Research Letters, v. 64, p. 207–224.

Davis, S.D., and Pennington, W.D., 1989, Induced seismic deformation in the Cogdell oil field of west Texas: Seismological Society of America Bulletin, v. 79, p. 1477–1495.

Frohlich, C., Hayward, C., Stump, B., and Potter, E., 2011, The Dallas–Fort Worth earthquake sequence: October 2008 through May 2009: Seismological Society of America Bulletin, v. 101, p. 327–340, doi:10.1785/0120100131.

Gibbs, J.F., Healy, J.H., Raleigh, C.B., and Coakley, J., 1972, Earthquakes in the oil field at Rangely, Colorado: U.S. Geological Survey Open File Report 72–130, 48 p., http://pubs.usgs.gov/of/1972/0130/.

Healy, J.H., Rubey, W.W., and Griggs, D.T., 1968, The Denver earthquakes: Science, v. 161, p. 1301–1310, doi:10.1126/science.161.3848.1301.

Horton, S., 2012, Disposal of hydrofracking waste fluid by injection into subsurface aquifers triggers earthquake swarm in central Arkansas with potential for damaging earthquake: Seismological Research Letters, v. 83, p. 250–260, doi:10.1785/gssrl.83.2.250.

Hsieh, P.A., and Bredehoeft, J.D., 1981, A reservoir analysis of the Denver earthquakes: A case of induced seismicity: Journal of Geophysical Research, v. 86, p. 903–920, doi:10.1029/JB086iB02p00903.

Hubbert, M.K., and Rubey, W.W., 1959, Role of fluid pressure in mechanics of overthrust faulting: Geological Society of America Bulletin, v. 70, p. 115–206, doi:10.1130/0016-7606(1959)70[115:ROFPIM]2.0.CO;2.

Joseph, L., 1987, Subsurface analysis, "Cherokee" Group (Des Monesian), portions of Lincoln, Pottawatomic, Seminole, and Okfuskee Counties, Oklahoma: The Shale Shaker, v. 12, p. 44–69.

Kanamori, H., and Anderson, D.L., 1975, Theoretical basis of some empirical relations in seismology: Seismological Society of America Bulletin, v. 65, p. 1073–1095.

McGarr, A., 1976, Seismic moments and volume changes: Journal of Geophysical Research, v. 81, p. 1487–1494, doi:10.1029/JB081i008p01487.

Meltzer, A., Rudnick, R., Zeitler, P., Levander, A., Humphreys, E., Karlstrom, K., Ekström, G., Carlson, C., Dixon, T., Gurnis, M., Shearer, P., and van der Hilst, R., 1999, The USArray Initiative: GSA Today, v. 9, no. 11, p. 8–10.

National Research Council of the National Academies (Committee on Induced Seismicity Potential in Energy Technologies, Committee on Earth Resources, Committee on Geological and Geotechnical Engineering, Committee on Seismology and Geodynamics, Board on Earth Sciences and Resources, and Division on Earth and Life Studies), 2012, Induced seismicity potential in energy technologies: Washington, D.C., National Academies Press, 300 p.

Raleigh, C.B., Healy, J.H., and Bredehoeft, J.D., 1976, An experiment in earthquake control at Rangely, Colorado: Science, v. 191, p. 1230–1237, doi:10.1126/science.191.4233.1230.

U.S. Geological Survey, 2011, Earthquake summary, magnitude 5.6 Oklahoma: http://earthquake.usgs.gov/earthquakes/recenteqsww/Quakes/usb0006klz.php.

Way, H.S.K., 1983, Structural study of the Hunton Lime of the Wilzetta Field, T12–13N, R5E, Lincoln County, Oklahoma, pertaining to the exploration for hydrocarbons [M.S. thesis]: Stillwater, Oklahoma State University, 80 p.

Zoback, M.D., Townend, J., and Grollimund, B., 2002, Steady-state failure equilibrium and deformation of intraplate lithosphere: International Geology Review, v. 44, doi:10.2747/0020-6814.44.5.383.

Manuscript received 18 September 2012
Revised manuscript received 23 January 2013
Manuscript accepted 23 January 2013

Printed in USA

BLM_0113245

April 2, 2012

BLM Uncompahgre Field Office
ATTN: Oil and Gas Lease EA
2465 S. Townsend Ave.
Montrose, CO 81401

Bureau of Land Management:

The Board of Directors of the Valley Organic Growers Association is writing this letter to provide input on the Environmental Assessment (EA) regarding the August 2012 oil and gas lease sale. The Valley Organic Growers Association was founded in 1992 to support growers, educate consumers and promote the benefits of sustainable agriculture. Our guiding principles include maintaining the health of our soil, air and water and to create and support viable local agriculture. Over the past 20 years our membership has grown to include 93 small and mid-sized growers, ranchers, retailers and individuals who are committed to these guiding principles.

We wish to incorporate by reference our letter that was submitted during the first comment period in January - February 2012.

The EA and the Draft Findings Of No Significant Impact are flawed and are based on an outdated, irrelevant Resource Management Plan (RMP). The 1989 RMP does not address current community and socio-economic analysis, current and evolving technologies including those in the oil and gas industries and information technology, current agricultural practices, current consumer trends in food, recreation and lifestyle choices and current economic development. Because of this, we support the No Action/No Leasing Alternative that will result in the withdrawal of all parcels and all 30,000 acres in the proposed lease sale. We would like to note that Washington state and Oregon BLM Field Offices have set the precedent for deferring or canceling lease sales based on outdated RMPs.

The EA's statement that there are no prime farmlands that need to be considered or will be affected is truly a misrepresentation of the current situation in the North Fork Valley. The United States Department of Agriculture published the North Fork Gunnison Watershed, Rapid Assessment in December 2009. The document has a map depicting the North Fork Valley's irrigated agricultural land that covers the property of many agricultural producers. The Farmland Classification map shows that the entire North Fork Valley is classified as "farmland of statewide importance," "farmland of unique importance" and "prime farmland if irrigated."

Despite the EA's oversight regarding farmland, it recognizes that oil and gas development could "lead to increased harassment of livestock, grazing strategies foiled due to gates being left open, an increase in noxious weeds, and increases in livestock losses, especially calves, due to increases in diseases." These agricultural lands (farming and grazing) need to be protected to maintain the Valley's economic viability. Oil and gas development in this area will pose a serious threat to the water, air and soil resources needed by the Valley's agricultural producers.

The EA must include an analysis of the socio-economic impacts to the North Fork Valley. In today's economy, consumers are demanding fresh, local and organic food while at the same time, many family farms are struggling. The North Fork Valley has been an example of a place where high quality fruits, vegetables and meats are produced. Delta County has the highest concentration of organic growers in the state of Colorado and is among the top 50 counties nationally. Farmers and ranchers are responding to local, regional and direct-to-consumer markets that have created a model for a successful sustainable economy. According to USDA Economic Research Service, direct sales are highest in urban corridors in the Northeast and on the West Coast, but the region in and surrounding the North Fork Valley is an outlier – reporting up to 2.5 million or more in annual sales. This data illustrates that our rural county has successfully developed a sustainable, agriculture-based economy.

The intrusion of oil and gas development on 30,000 acres surrounding the North Fork Valley puts families and farms at risk. These real and potential hazards threaten the livelihoods of the North Fork Valley producers who are surrounded by the parcels subject for lease. Their access to clean water, soil and air is at extreme risk - a risk, if realized, would destroy their ability to be an economic factor in the Valley.

The EA reflects a poor Department of the Interior/BLM process for oil and gas lease sales for several reasons:

• The process requires that lease sales occur prior to exploration. This is not the case for coal or other minerals. The oil and gas lease sale process is advantageous to only oil and gas companies and, in fact, gives them an unfair advantage by being able to control the land and the adjacent communities prior to exploring the potential of the resources.

• The process puts off analyzing the impacts of oil and gas development until some future date. All impacts must be analyzed before selling the right to develop oil and gas in these parcels.

• The lease sale process does not include a full Environmental Impact Statement, Cumulative Effects Analysis and Community Assessment Analysis. The unintended consequences are put aside in favor of speculative greed.

BLM_0113247

• The process considers the lease sale a paper exercise of only BLM land without significant environmental or social impacts. In fact, the lease sale process holds a community hostage for up to 10 years affecting land values, economic development and social structures.

• The initial lease/sale process ignores the human factor, i.e., the cumulative impacts on human life, communities and social networks.

In their March 28, 2012 letter to BLM State Director Helen Hankins requesting a comment period extension, Colorado's U.S. Senators Mark Udall and Michael Bennet recognize that the North Fork Valley "supports key aspects of Colorado's economy, from tourism and resource development to agriculture and outdoor recreation." Oil and gas development is completely inappropriate in this rural bastion of Western Colorado where agriculture and the coal industry have co-existed for generations. We respectfully request that the BLM permanently withdraw all parcels from the oil and gas lease sale. This is the only option that truly offers no significant impact and leaves our watersheds, farmlands, recreation areas and local economy intact.

Thank you for taking VOGA's comments into consideration.

Sincerely,

Anastacia Gall, Vice President
for the Board of Directors,
Valley Organic Growers Association

## Monetary Value of North Fork Valley Domestic Water
### January 19, 2012

**Note: This valuation does not include the costs of infrastructure (e.g., storage facilities, treatment plants, pipelines, meters), legal costs, annual fees, et al.**

| Name of Company | Contact | Total No. of Taps | Value of One Tap | Total Value | Notes |
|---|---|---|---|---|---|
| Bone Mesa Domestic Water District | Cynthia Wutchiett 399-7594 | 167 | $25,000 | $4,175,000 | |
| Cathedral Water Co. | Randy Rodstrom 361-8874 | 74 | $26,000 | $1,924,000 | |
| Cattlemans Domestic | Kyle Keele 921-5335 | 400 | $5,000 | $2,000,000 | Some shareholders may be out of BLM lease area. |
| Crawford Mesa Domestic | Marici Garber 921-4604 | 301 | $25,000 | $7,525,000 | |
| Domestic Pipeline, Inc. | Norm Lewark 527-7415 | 15 | $20,000 | $300,000 | |
| Deutch Water Co, | Margaret Deutch 921-5858 | — | — | $2,000,000 | The District did not wish to divulge number of taps, but valued the company at $2,000,000. |
| Fruitland Domestic | Jackie @ Randy Fisher's Office 527-3662 | 200,000 shares 400 shares=1 tap 500 taps | $15,000 | $7,500,000 | |
| George Small Pipeline | Judy Martin 527-5533 | 6 | $10,000 | $60,000 | |
| Hanson Mesa Domestic Pipeline | King Robertson 872-4132 | 90 | $20,000 | $1,800,000 | |
| Pitkin Mesa Pipeline | Dan Stech 527-4717 | 211 | $20,000 | $4,220,000 | |
| Rogers Mesa Water District | Dahlgren Andrews 872-3415 | 365 | $8,500 | $3,102,500 | |

subtotal: $34,606,500

BLM_0113249

| | | | | | |
|---|---|---|---|---|---|
| Runzel Gulch Water Users Assoc. | Al Haack 527-4040 | 10 | $20,000 | $300,000 | |
| Stucker Mesa Domestic Water Co. | Sarah Bishop 527-6675 | 21 | $15,000 | $315,000 | |
| Sunshine Mesa Domestic Water | Mike Sawicki 527-3961 | 34 | $20,000 | $680,000 | |
| Walker Spring Overflow | Norm Lewark 527-7415 | 6 | $20,000 | $20,000 | Not yet incorporated |

| | | | | | |
|---|---|---|---|---|---|
| Town of Paonia | Barbara Peterson 527-4101 | 800 in-town 700 out-of-town | $6,000 $15,000 | $4,800,000 $10,500,000 _____ $15,300,000 | |
| Town of Hotchkiss | Marlene | 550-600 in-town 100 out-of-town | $5,500 $10,000 | $3,300,000 $1,000,000 _____ $4,300,000 | |
| Town of Crawford | Jackie 921-4725 | 224 in-town 20 out-of-town 24 commercial | $2,500 $5,000 $2,875 | $560,000 100,000 69,000 _____ $729,000 | |
| Town of Somerset | Terry Commander 929-6200 | 60 | | $3,500  $210,000 | |

**p.2 subtotal: 21,854,000**
**p.1 subtotal: 34,606,500**
_____

## GRAND TOTAL: $56,460,500

*Citizens for a Healthy Community, P.O. Box 291, Hotchkiss  CO  81419*
*On the web at: www.CitizensforaHealthyCommunity.org*

BLM_0113250

*Prepared by Citizens for a Healthy Community—January 2012*

## Monetary Value of North Fork Valley Irrigation Water

| Name of Company | Total No. Shares | Cost of 1 share | Total Value of all shares |
|---|---|---|---|
| **Fire Mountain Canal and Reservoir Co.** Trey Dennison (589-2857) | 225,000* | $300 | $67,500,000 |
| **Overland Reservoir** Philip Ceriani (527-7064) | 10,000* | $2,000 | $20,000,000 |
| **Stewart Ditch** Lee Bradley (270-7716) | 2,600* | $7,000 | $18,200,000 |
| **Clipper Ditch** Gary Kraai 921-5521} | 3,200 | $4,000 | $12,800,000 |
| **Minnesota Ditch** Willie Kistler (527-4964) | 1,700 | $5,000 | $8,500,000 |
| **Terror Ditch & Reservoir** Brent Helleckson (527-5234) | 200 | $4,000 | $800,000 |

**SUBTOTAL:    $127,800,000**[1]

---

[1] This total reflects only the value of the total number of shares.  It does not include infrastructure (dams, reservoirs, the ditches themselves and their associated structures), administrative costs, annual maintenance costs, and a host of others. This figure is an underestimate of the total value of the irrigation water in the North Fork Valley. This is because this figure does not include the value of the ditch companies listed on the following page for which insufficient data is available to arrive calculate monetary value.

1

BLM_0113251

*Prepared by Citizens for a Healthy Community—January 2012*

**List of Other Ditches in the North Fork Valley for which insufficient information is available to calculate an exact monetary value of the irrigation water, and, therefore will require an estimation of their value.**

1. Allen Mesa Ditch & Reservoir
2. Aspen Ditch
3. Big Gulch Ditch
4. Cedar Hill Lateral
5. Clough Ditch
6. Cold Water Ditch
7. Daisy Ditch Co
8. Duke Ditch
9. Dyer Fork Ditch
10. Ellington Ditch
11. Farmers Ditch
12. Feldman Ditch
13. Grand View Canal Ditch
14. Hadley Ditch
15. Hadley Ditch #2
16. Highline Ditch
17. Hightower Ditch
18. Jumbo Mt. Water
19. Lamborn Hill Irrigation
20. Leroux Creek Water Users
21. Leroux Ditch & Enlargement
22. Lone Cabin Ditch
23. Lone Rock Ditch
24. Monitor Ditch
25. Needle Rock Ditch
26. North Fork Ditch Assoc.
27. North Fork Farmers Ditch
28. North Fork Lateral Ditch
29. Paonia Ditch Co.
30. Paonia Western Extension
31. Pilot Rock Ditch
32. Rogers Mesa Water Distribution Assoc.
33. Saddle Mt. Highline Ditch
34. Shepard-Wilmot Ditch
35. Short Ditch
36. Short Ditch Extension
37. Smith Fork Project Water
38. Smith McKnight Ditch
39. Stull Ditch Co.
40. Tropic Ditch Co.
41. Turner Ditch
42. Virginia Ditch
43. Wade & Hightower Ditch
44. Willow Heights Irrigation

<u>Note:</u>  The difficulty of attaching a value to the small ditches in our Valley is complicated for several reasons:

1. A share in one ditch is not necessarily equivalent to a share in another ditch.  For example, a share in Robert-Stucker Ditch off the Overland Reservoir represents 7-8 times the amount of water that a share in Fire Mt. Canal represents.

BLM_0113252

*Prepared by Citizens for a Healthy Community—January 2012*

2. There is no market for the shares of many of the smaller ditch companies since these shares never sell separately from the properties to which they are attached. The value of these shares could be estimated by a Realtor on a property-by-property basis by estimating the value of each property with and without irrigation water—but this approach would be enormously time-consuming. Another approach would be to quantify the amount of water equal to a share of one or two of the larger ditches, and apply that to the smaller ones. The problem here is that the water conveyed by the larger ditches is most accurately described in terms of acre feet, while the smaller ditches' decrees are described as cubic feet per second. While there are conversion formulas, they depend on the timeframe each ditch is operating under, and the delivery season varies from ditch to ditch.

3. Decrees are difficult to obtain, and are often not representative of the amount of water a ditch actually delivers. The Colorado Division of Water Resources maintains a database of all the water companies in the state, but this database turns out to be difficult to use even by officials of the CDWR. Many of the documents are old and illegible. Trying to get information from ditch representatives here in the Valley is time-consuming and often frustrating, as some old-timers are reluctant to give out information for whatever reason.

4. Compounding the difficulty, some ditches get their water from multiple sources, some calculate the spring runoff separately from the regular season, and some are part of larger diversion projects such as the Crawford Water Conservancy District.

There are, however, methods for coming up with an estimate of the value of irrigation water for those ditches in which data is lacking:

1. Calculate the mean of the ditch companies for which we have data, excluding the Fire Mountain Canal because it is much larger than the others and would skew the mean, and multiply by the 44 ditch companies without data. By this method, the mean is calculated as $12,060,000. The total value of the 44 ditch companies is $530,640,000.

2. Calculate the median of the ditch companies for which we have data, excluding the Fire Mountain Canal because it is much larger than the others and would skew the mean, and multiply by the 44 ditch companies without data. By this method, the median is calculated as $12,800,000. The total value of the 44 ditch companies is $563,200,000.

3. If we assume that the ditch companies for which we have do not have sufficient data consists of the smaller companies, we can add the median figure ($12,800,000) to the two figures below the median ($8,500,000 and $800,000) and calculate the average of the three ($7,666,666) and multiply this figure by 44. By this method, the value of the 44 companies is $337,333,304.

4. If we assume that the ditch companies for which we have do not have sufficient data consists of the smaller companies, we can simply use the lowest figure for which we have data ($800,000) and multiply this figure times 44. By this method, the value of the 44 companies is $35,200,000.

5. If we assume that the ditch companies for which we have do not have sufficient data consists of the smaller companies, to be conservative we can calculate the mean of the two lowest calculations above (#3 and #4). By this method, the value of the 44 companies is $186,266,654.

## TOTAL ESTIMATED MONETARY VALUE OF NORTH VALUE IRRIGATION WATER

Using the most conservative figure to prevent an overestimate, we have calculated the value using #4 above for those ditches for which sufficient data is not available to calculate an exact figure.

| | |
|---|---|
| Subtotal from page 1 | $ 127,800,000 |
| Subtotal from #4 above | 35,200,000 |
| TOTAL................................... | $163,000,000 |

BLM_0113253

# Town of Paonia

P.O. Box 460
Paonia, Colorado 81428-0460

RECEIVED
JAN 3 0 2012
BY

24 January 2012

US Bureau of Land Management
Uncompahgre Field Office
Attn: Barbara Sharrow
2465 South Townsend Avenue
Montrose, CO 81401

Re:     Proposed Oil and Gas Lease Sale – August 2012
        Request for Withdrawal of Specific Parcels

Dear Ms. Sharrow,

Please accept this as legal notification that the Town of Paonia is hereby registering significant concerns with the Bureau of Land Management (BLM) in its planned leasing of parcels 6197, 6193, 6190, 6194, 6205, 6206, 6207, 6215 and 6216 for oil and gas development in the North Fork valley. As such, we request that these parcels not only be removed for consideration for leasing at this time, but also removed from consideration in any future lease sales of the BLM in perpetuity.

Furthermore, we wish to make it known to the BLM and other concerned parties that the Town of Paonia is a party of interest in the leasing of these and other parcels in the North Fork valley. As a stakeholder in these decisions, we request regular, timely, and complete updates from the BLM as its decision process on this current round of leasing proceeds.

We further request notification from the BLM of any and all dates for further comment or stakeholder action on these and any other parcels in the North Fork valley nominated in the future that may affect the integrity and safety of our water supply and distribution systems.

General considerations:

The Town of Paonia is a municipal water company, Public Water System ID #CO 0115601. It has been in continuous operation since Paonia incorporated in 1902. Paonia supplies water to 1536 water taps with an averaged equivalent of 3300 residents both in town and outside town limits, including 26 private water companies.

Paonia's water is acquired via 26 springs and the Town passed Watershed Ordinance 2003-02 on February 25, 2003. There is established by the Town of Paonia, Colorado a Watershed Designation ("Watershed") pursuant to Colorado Revised Statutes (C.R.S.) 31-15-707(1)(b). The Watershed is that area in which the Town shall exercise its powers to maintain and protect the Town's waterworks from injury and the Town's water supply from pollution. This Watershed is created under the authority granted in C.R.S. □31-15-707(1)(b), as amended. The Watershed and these regulations are created only for the purpose of protecting the Town's waterworks and water supply, and not for the purpose of regulating land use activities, which activities shall continue to

BLM_0113254

be regulated by the County of Delta, State of Colorado, and federal government, and any other authority with jurisdiction over land use activities within the Watershed. The Town shall implement and enforce these regulations for the purpose of reviewing and permitting any activity within the Watershed, which creates a foreseeable risk of injury to the Town's waterworks or pollution of the Town's water supply. The Town's review authority within the Watershed shall be exercised concurrently with the authority of Delta County or any other government entity to review and/or permit the same activity as the Town may regulate; provided however, in the event no review, approval or permit requirement exists, the Town's review authority shall occur prior to the commencement of any activity covered herein. While sanctioned by C.R.S., we understand that Federal agencies operate under primacy with regard to C.R.S. issues. As such, we respectfully request that the BLM honor, at minimum, the notification sections of the statute should development occur.

Any increases in volatile organic compounds (VOC) known to be emitted from oil and gas operations, such as benzene, toluene, ethyl benzene, xylene, gasoline range organics, diesel range organics, methylene chloride, methane, methanol and others, as well as increases in airborne particulates from fracking operation including diesel exhausts, nitrogen oxides, ozone, silica and others are of great concern to the Town of Paonia due to the possibility of contamination of our water sources and for the level of risk they pose to human and animal health. Furthermore, the deleterious health effects of these compounds are well understood. Hence, their proximity and potential miscibility to and with our water sources poses unacceptable hazards. Paonia's water has been regularly tested under the auspices of the Colorado Department of Public Health and Environment for decades and is well known for its high level of purity. It is of the highest priority that the purity standards are maintained for as long as the source water remains viable.

Regarding specific parcels:

Parcel 6197 includes two (2) source water springs; "Upper Reynolds" and "Old Original", which were decreed to the Town in the early 1900's. The parcel contains both above and underground infrastructures for the Town of Paonia water system. Although the Town is aware of where the pipelines begin and end, the exact location of the traversing lines is unknown, as the lines were installed in the early 1930's. Parcel 6197 also includes portion of the Roeber State Wildlife area and has been designated as a critical habitat area by the Division of Wildlife. This area is a calving area for elk is closed annually during the winter. Any human disturbance may affect the wildlife calving or migration. The Town has a vested interest in the hunting, recreational aspects as these types of activities create an economic interest not only for residents, but visitors as well. Many residents specifically locate to Paonia for the hiking, biking, equestrian and hunting activities this area provides, creating a quality of life that is avidly sought after by those seeking a communal experience with the pristine nature of this environment. Detrimental impact to this parcel will undoubtedly result in property values plummeting with the loss of viable water sources, infrastructure and high quality of life.

Parcel 6193 has many of the same concerns as Parcel 6197 regarding wildlife and quality of life issues. This parcel may only be accessed through the Town of Paonia. This access would have direct impact upon the Town roads. Town roads are not built to withstand the heavy truck traffic necessary for the oil and gas industry to perform its tasks. This parcel touches the town boundary and is in close proximity to a senior housing complex as well as a school bus route.

BLM_0113255

This is a heavily used local recreation area for hiking, biking, equestrian and ATV uses. There are preexisting wells on this parcel where drilling was done in the past. Because of the preexisting wells, breakout points with avenues for contamination are exponentially increased. The ground is already heavily fractured, increasing the risks of damage from direct penetration, differential pressures, seismic activity and impacts of migration of fluids and/or gas. Given the number of links that the US, Government has recently confirmed concerning the seismic hazards of fracking, and in particular within the method of reinjection anywhere within a one mile limit of any coal mining, gives grave concern for the health and welfare of our residing miners and local citizens. Simple mitigation is inadequate to address potential damages. Regardless of procedures, there is always the potential for human error and unforeseen natural consequences.

Parcel 6194 will require that all traffic up to the site be directed through the Town of Paonia. As indicated in parcel 6193 concerns, the heavy truck traffic is cause for concern at a municipal level. Industrial development will add exhaust fumes and dust from the heavy truck traffic, diesel generator on site, and fumes from the chemicals used. These fumes, laden with toxins will settle directly in this valley. Once again, this area is heavily used by residents for recreational purposes. In the event, this parcel is leased; the air quality may be expected to deteriorate to a level that impacts the town proper and its residents. The Town is committed to providing a quality of life that inherently suggests that a change in air quality should be opposed. It seems irrational that a rural area such as Paonia could possibly have air quality issues equal to either Denver or Los Angeles. Along with air quality, the possibility of contamination from either a truck breaking down, leaking or valves otherwise left open increase dramatically, thus tainting the affected ground area with unknown chemicals that cannot be mitigated. A contaminated area may not be cleaned if the contaminants are unknown. In this parcel, the groundwater is close to the surface. Accidental contamination could take time to discover and difficult to remediate and as such, should be removed from consideration.

Parcels 6189 and 6192 are in Gunnison County, however the watershed, traffic and air quality concerns remain the same as parcels 6197 and 6194.

Parcel 6205 actually encompasses a portion of the North Fork of the Gunnison River just upstream from irrigation head gates. Parcel 6207 is in close proximity to the river. The topography in 6207 contains a steep ridgeline that if a truck were unable to navigate during treacherous winter conditions would have the capability of contaminating the entire Town of Paonia via the river. Irrigation waters are used for not only the animals, but the farms and orchards that people all over the state regard highly. Many of the farms, orchards and cattle are marketed as being "free-range" and "organic", making this area an agricultural gem. Much of the Town's economic diversity relies upon the agriculture industry in the North Fork Valley. Unforeseen contamination could devastate the land, making agricultural productions cease, with the added injury of people not only losing their livelihood, but the very assets that made their existence in the valley viable. In the event agriculture productions are no longer an option, the Town will cease to function as it does currently. Mineral leasing and severance tax funds will not compensate for the loss of our agricultural endeavors and its attributed labor force.

Parcels 6206, 6215 and 6216 are in close proximity to the Paonia Reservoir. The reservoir collects runoff and is released for irrigation purposes, thereby creating the same concerns as parcels 6205 and 6207. The Army Corps of Engineers have already requested setback for fracking operations close to dams and other water control structures. The slopes along the

BLM_0113256

reservoir are notoriously unstable and prone to rockslides. Drilling in this area will only add to the geologic instability. Concerns regarding parcels 6193, 6205, 6207, 6189 and 6192 also apply to 6205, 6215 and 6216. The Paonia Reservoir is not only a source of water, but also used for recreational activities by residents and tourists alike. Highway 133 has a Scenic Byway designation, routing tourists through the North Fork Valley. The reservoir is a valuable asset and should not be subjected to any threat of avoidable contamination.

There are numerous and pervading concerns regarding the lease parcels. The Town of Paonia reiterates that parcels 6197, 6193, 6194, 6190, 6189, 6192, 6205, 6207, 6206, 6215 and 6216 should be removed for being nominated as oil and gas developable areas forever. The land in this area will not support a safe environment for development without directly impacting the economic vitality, and quality of life that currently exists.

The Town is not against mineral extraction as an industry, it does however; oppose these parcels for the above stated reasons. Please give your attention to these negative impacts and remove the parcels from consideration.

Respectfully,

Town of Paonia Board of Trustees


Nay
_____
Trustee, Brian Ayers

_____
Trustee, Sydney Lewis

Absent
_____
Trustee, Blake Kinser

_____
Trustee, Corinne Ferguson

Absent
_____
Trustee, Lucien Pevec

_____
Trustee, David Weber

_____
Mayor, Neal J. Schwieterman

BLM_0113257





Town of Hotchkiss
276 W Main St. - P.O. Box 369
Hotchkiss, Colorado 81419
(970) 872-3663

WENDELL A. KOONTZ
Mayor

MARLENE SEARLE
Town Clerk

January 29, 2012

August 2012 Lease Sale
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401

RE: AUGUST 2012 OIL AND GAS LEASE SALE

The Town of Hotchkiss is grateful for the opportunity to comment on the proposed lease sales for nominated oil and gas parcels in the North Fork Valley in Delta and Gunnison Counties of the State of Colorado. In that the Town of Hotchkiss is within proximity of the proposed lease areas, the Town and surrounding areas could incur both positive and adverse impact resulting from the exploration for and development of those resources. The Town would like to share areas of concern to be addressed in evaluating the parcels nominated and/or future lease stipulations.

The 1989 Resource Management Plan, currently being reviewed for updating to be concluded in 2013, should logically be revised and completed prior to making any decisions regarding the parcels nominated for oil and gas lease sales in the North Fork Valley. The Town recognizes there are sites that could be and sites that should not be leased based on proximity to existing domestic water sources, irrigation facilities, homes, schools, and other facilities. The Resource Management Plan requires updating to accurately reflect the existing conditions. Lease delineation should reflect those conditions with respect for private property rights and community values.

Leroux Creek, Dever Creek, Short Draw, and Jay Creek are all drainages that affect the Town's drinking water and supply the community surrounding the Town with irrigation water. The Town supplies and treats drinking water for over 1,000 households, some of which are outside of Town, scattered over approximately 20 sections of land in Township 14, Ranges 92 and 93. The watershed for the Town's drinking water supply lies partially within the proposed lease areas and requires we monitor activities that may impact it. Portions of nominated parcels 6191, 6195 and 6196 include the Town's watershed and the development of oil and gas resources therein could adversely affect the quality and quantity of those water sources and/or pose health risks to such water sources. Enclosed is a copy of a map showing the watershed in relationship to the Town service area. The Town requests those areas of the proposed leases that overlay the Towns watershed be

TRUSTEES
Sheila Maki  Marlin McCracken  Jane Wills  Lindee Cantrell  Dustyn Foster  Carrie Wingfield

BLM_0113258

withdrawn from leasing and adjoining lease tracts have sufficiently stringent stipulations as to ensure no impact to the Towns water supplies.

Access roads and drill pad construction should follow the Best Management Practices as utilized elsewhere in both oil and gas and solid mineral exploration for control of surface water runoff, soil erosion, and dust. Berms, straw bales, silt fences, gravel surfacing, etc., should be employed and maintained to protect the culinary and irrigation water for the community.

The access roads could be a substantial problem for the Town because access to parcels 6191, 6195 and 6196 might funnel energy development traffic into Town through roads on Powell Mesa, the Coal Road and/or Hanson Mesa. The Town streets and infrastructure could not withstand such increases in traffic. Air quality likewise would be adversely affected by increased vehicular traffic and equipment operation. If these parcels are leased, the Town requests stipulations to the leases that would mitigate the impacts of the traffic on Town roads and facilities.

Reclamation, reseeding, and other sediment control measures should also follow Best Management Practices to ensure long-term success of the reclamation. Construction of pipelines and other energy development infrastructure, if needed, should likewise follow the same protocol in the Best Management Practices for similar developments.

In addition to the parcels listed above, the Town is also concerned about the effects of oil and gas development on parcel 6198 because of its proximity to the Hotchkiss High School facilities and community recreation facilities, including the area public swimming pool, where numerous community activities take place.

The Town also requests notification of oversized equipment, hazardous waste shipments, or large convoys of equipment that may be transported through Town affecting events such as the Sheepdog Trials, Delta County Fair, parades, or other events. The contact can be made through Marshall D. Miller at the Hotchkiss Town Hall either by phone or by our website as listed on the letterhead.

The Town of Hotchkiss maintains that resource development must be done correctly. Whatever development may be done should meet applicable standards and regulations, performed safely, and minimize impacts to our community. Financial sureties (Bonding) in amounts that are adequate to complete and reclaim unfinished projects should be in place prior to approval of exploration or development activities.

Thank you for the opportunity to comment. The Town looks forward to additional comment periods when the Resource Management Plan revision is complete and more information on specific

activities is available.   Please let us know if you have any questions or when we may provide additional comments.

Town of Hotchkiss

By: _Wendell W. Koontz_
Mayor

xc:   Barbra Sharrow, BLM
      Desty Dyer, BLM

BLM_0113260



TDS Telecom - tds.net Mail - blm oil & gas lease sale

Page 1 of 2



townofcrawford tds.net <townofcrawford@tds.net>

# blm oil & gas lease sale

1 message

bcbair@paonia.com <bcbair@paonia.com>
To: bcbair@paonia.com, townofcrawford@tds.net

Fri, Jan 13, 2012 at 11:09 AM

**TOWN OF CRAWFORD**

P.O. BOX 56

Crawford, CO 81415

(970) 921-4725

BLM--Reference #3100

August 2012 Lease Sale

Uncompahgre Field Office

2465 South Townsend Avenue

Montrose, CO 81401

Dear Bureau of Land Management,

Thank you for the opportunity to provide input on the August 9, 2012 oil and gas lease sales in Delta and Gunnison Counties. The Town of Crawford supports the multiple use policy of the BLM in regards to Federal Lands. We have and continue to work with the BLM in association with both our water and wastewater system for the Town of Crawford. And it is also our concern that we be able to continue to provide clean drinking water, provide adequate fire protection, and retain the ability to treat and maintain both our water and wastewater systems.

The Town of Crawford believes it is vital to the health and stability of our small community to protect both our water and wastewater systems. This includes the Town's only water source at this time, Wiley Springs. Springs have been known to dry up or be altered due to surface or underground disturbances; for this reason we object to any operations that may alter or diminish the Town of Crawfords only water source. We also are committed to protecting the means to capture, store and deliver this water which includes Wiley Springs and its' collection system,over ten miles of transmission mains and two water storage tanks. Although none of the proposed parcels for this oil and gas lease sale directly overlap with our water system, they are close enough (some water mains are within 100 yards) to cause concern; especially if fracking or horizontal drilling is allowed. Any operation that could cause earth movement or contamination by infiltration of chemicals would be catastrophic to both the people that use this water as well as the water system itself.

Therefore, the Town of Crawford is opposed to the opening of parcels 6197, 6199 and 6200 for oil and gas lease sales. If the BLM does not remove these parcels we would ask that every effort be made to protect our water system, and that the impacts of any development in these areas be given special attention due to the critical importance of the Town's water supply.

In addition the Town wishes to state the importance of maintaining and operating its wastewater system. Crawford's utilizes a BLM right of way (COC-30284) that provides access to its wastewater treatment plant. It

BLM_0113262

is vital to the Town of Crawford that this access remain open. The Town of Crawford asks that this access remain open in order to continue daily operations at the wastewater facility. In addition, Crawford has a wastewater collection main that border one of the proposed parcels.

Therefore, the Town of Crawford would also be opposed to the opening of parcel 6201 in an effort to protect Crawford's wastewater treatment plant and collection main. If the BLM does not choose to close this parcel to oil and gas leasing we would request that special consideration be given to the importance of the Town of Crawford to continue to operate, treat and maintain its wastewater system.

In addition, we would like to make it known to the BLM and other concerned parties that the Town of Crawford is a party of interest in the leasing of these parcels in the Crawford/North Fork Valley area. As a stakeholder in these decisions, we request regular, timely and complete updates from the BLM in regards to this current leasing process.

Thank you for your consideration and for the opportunity to comment.

Sincerely,

The Town of Crawford Mayor and Board of Trustees:

Mayor Jim Crook

Trustee Bill Mosey

Trustee Susie Steckel

Trustee Bruce Green

Trustee Hetty Todd

Trustee Mike Tiedeman

Trustee Christie Young

Crawford Public Works Director

Bruce L. Bair

January 18, 2012

Barbara Sharrow
Uncompahgre Field Office
Attn: 22-parcel lease scoping
2465 South Townsend Avenue
Montrose, Colorado 81401

## RE: REQUEST TO WITHDRAW LEASE PARCELS

Dear Ms. Sharrow,

The Bone Mesa Domestic Water District (BMDWD) requests the BLM withdraw the following parcels from the proposed August 2012 lease sale:

- **The entirety** of parcels number 6190, 6192, 6193, 6194, 6197, 6198, 6199, 6200, 6201, 6203, 6205, and 6217; and

- Portions of the following parcels:
  - The two blocks of parcel 6189 located south of Highway 133;
  - The eastern-most detached block of parcel 6191;
  - The small detached block of 6195 and the equal-sized block of 6195 in which the northwest corner of this block contacts a corner of the largest block of 6195;
  - All of the blocks of 6198 with the exception of the western-most detached block that is located directly south of the Town of Hotchkiss and adjacent to the Hotchkiss High School; and
  - The eastern-most block of the furthest north blocks of 6202.

The BMDWD serves 167 water taps generally located south of Back River Road between the Towns of Paonia and Hotchkiss (see enclosed map). We request these parcels be withdrawn for the reasons described below.

### Potential for Water Contamination
Despite the energy industry's claim that a thick layer of bedrock safely separates the gas-containing rock layer being fractured from ground water used for drinking water, evidence is emerging that indicates that contaminants from gas wells are making their way into groundwater. Here are a few examples:

1. In a newly released draft report investigating ground water contamination near Pavillion, Wyoming, where intensive drilling and fracking has occurred, the United States Environmental Protection Agency (EPA) found 11 of 39 water samples collected from domestic wells were contaminated with chemicals linked to local natural gas fracking operations. The EPA found arsenic, methane gas, diesel-fuel-like compounds and metals including copper and vanadium. Of particular concern were compounds called adamanteanes—a natural hydrocarbon found in natural gas—and a little-known chemical

called 2-butoxyethanol phosphate, or 2-BEp. 2-BEp is closely related to 2-BE, a substance known to be used in fracking fluids. The EPA report goes on to state:

> Elevated levels of dissolved methane in domestic wells generally increase in those wells in proximity to gas production wells. (From page xiii.)

> Detection of high concentrations of benzene, xylenes, gasoline range organics, diesel range organics, and total purgeable hydrocarbons in ground water samples from shallow monitoring wells near pits indicates that pits are a source of shallow ground water contamination in the area of investigation. Pits were used for disposal of drilling cuttings, flowback, and produced water. There are at least 33 pits in the area of investigation. When considered separately, **pits represent potential source terms for localized ground water plumes of unknown extent**. When considered as whole they represent potential broader contamination of shallow ground water. (From page 33.) (Emphasis added.)

> The explanation best fitting the data for the deep monitoring wells is that **constituents associated with hydraulic fracturing have been released into the Wind River drinking water aquifer at depths above the current production zone**. (From page 33.) (Emphasis added.)

> Although some natural migration of gas would be expected above a gas field such as Pavillion, data suggest that **enhanced migration of gas has occurred to ground water at depths used for domestic water supply and to domestic wells**. (From page 37.) (Emphasis added.)

> A lines of reasoning approach utilized at this site best supports an explanation that **inorganic and organic constituents associated with hydraulic fracturing have contaminated ground water at and below the depth used for domestic water supply**.... A lines of evidence approach also indicates that **gas production activities have likely enhanced gas migration** at and below depths used for domestic wells in the area of investigation.[1] (From page 39.) (Emphasis added.)

2. A Congressional report issued in February 2011 revealed that energy companies have injected more than 32 million gallons of diesel fuel or diesel mixed with other fluids into the ground nationwide in the process of fracking to extract natural gas.[2] In Colorado, between

---

[1] United States Environmental Protection Agency. December 2011. *Investigation of Ground Water Contamination Near, Pavillion, Wyoming* (Draft). Viewed at: http://www.epa.gov/region8/superfund/wy/pavillion, on January 15, 2012.

BLM_0113265

*Bone Mesa Domestic Water District Request to Release Parcels*
*January 18, 2012*

2005 and 2009, 1.3 million gallons of fluids containing diesel fuel was used in fracking natural gas wells.[3] The EPA has stated that "the use of diesel fuel in fracturing fluids poses the greatest threat" to underground sources of drinking water.[4] According to Congresswoman Diana DeGette of Colorado, fracking with diesel fuel was done without permits in apparent violation of the Safe Drinking Water Act.[5]

3. In 2007, EPA hydrologists sampled a pristine drinking water aquifer under the Jonah Well Field near Pinedale, Wyoming. They found high levels of benzene, a known carcinogen, in 88 separate samples stretching across 28 miles in an undisturbed landscape in which the only industry that exists is natural gas extraction.

4. The Endocrine Disruption Exchange (TEDX) has documented nearly 1,000 products that energy companies inject into the ground in the process of extracting natural gas. Many of these products contain chemicals that are harmful to human health. According to TEDX:

> In the 980 products identified [for use during natural gas operations], there were a total of 649 chemicals. Specific chemical names and CAS numbers could not be determined for 286 (44%) of the chemicals, therefore, the health effects summary is based on the remaining 362 chemicals with CAS numbers...Over 78% of the chemicals are associated with skin, eye or sensory organ effects, respiratory effects, and gastrointestinal or liver effects. The brain and nervous system can be harmed by 55% of the chemicals. These four health effect categories...are likely to appear immediately or soon after exposure. They include symptoms such as burning eyes, rashes, coughs, sore throats, asthma-like effects, nausea, vomiting, headaches, dizziness, tremors, and convulsions. Other affects, including cancer,

---

[2] Environment News Service. February 4, 2011. *Toxic Diesel Fuel Used Without Permits in Fracking Operations*. Viewed at: http://www.ens-newswire.com/ens/feb2011/2011-02-04-092.html, on March 3, 2011.

[3] Frantz, Karen. February 5, 2011. *States probe use of diesel fuel*. Durango Herald. Viewed at: http://www.durangoherald.com/article/20110206/NEWS01/702069922/-1/s, on March 3, 2011.

[4] Williams, David O. February 1, 2011. *U.S. House probe alleges Halliburton, others illegally used diesel in gas fracking*. Colorado Independent. Viewed at: http://coloradoindependent.com/73593/u-s-house-probe-alleges-halliburton-others-illegally-used-diesel-in-gas-fracking, on March 3, 2011.

[5] DeGette, Diana, Markey, Edward J., & Waxman, Henry A. January 31, 2011. *Letter to Lisa Jackson, Administrator, U.S. EPA, from Congressional Representatives Henry A. Waxman, Edward J. Markey, & Diana DeGette*. Viewed at: http://degette.house.gov/index.php?option=com_content&view=article&id=1048:energy-a-commerce-committee-fracking-investigation-reveals-millions-of-gallons-of-diesel-fuel-injected-into-ground-across-us&catid=76:press-releases-&Itemid=227, on March 11, 2011.

BLM_0113266

organ damage, and harm to the endocrine system, may not appear for months or years later. Between 22% and 47% of the chemicals were associated with these possibly longer-term health effects. Forty-eight percent of the chemicals have health effects in the category labeled 'Other'. The 'Other' category includes such effects as changes in weight, or effects on teeth or bones, for example, **but the most often cited effect in this category is the ability of the chemical to cause death.**[6] (Emphasis added.)

The primary obligation of the Board of Directors of the BMDWD is to provide clean, safe, uncontaminated drinking water to the District's tap holders. All of the parcels we have asked to be withdrawn are located within a seven-mile radius of the Mays Spring—the primary source of water for the BMDWD (see enclosed map). The seven-mile radius was used based on the findings of Dennis Coleman, a leading international geologist and expert on tracking underground migration. Coleman's Illinois-based company, Isotech Laboratories, has both the government and the oil and gas industry as clients. According to Mr. Coleman, "**methane gas [can] seep underground for more than seven miles from its source. If the methane can seep, the theory goes, so can the fluids.**"[7] (Emphasis added.)

Parcel 6197 is particularly egregious because the western-most block of this parcel is located just one-half mile from the Mays Spring, which is the primary source of our District's water.

## Permeability of HDPE Pipe to Hydrocarbons

BMDWD began a capital improvement project in 2011 that includes the installation of 12 miles of water transmission pipeline. At the recommendation of its engineer/consultant at Buckhorn Geotech, in Montrose, CO, the District approved the use of high-density polyethylene pipe (HDPE), the transmission pipe that most water companies today are using. This recommendation was based on the fact that no oil or gas development was occurring or expected to occur within or near the service area of the BMDWD. Under most situations HDPE pipe performs well. However, according to the Plastics Institute, the literature suggests that permeation of organic chemicals and hydrocarbons through polyethylene pipe, though extremely rare, is possible.[8]

---

[6] The Endocrine Disruption Exchange. Undated. *Chemicals In Natural Gas Operations: Health Effects Spreadsheet and Summary*. Viewed at:
http://www.endocrinedisruption.com/chemicals.multistate.php, on February 23, 2011.

[7] Lustgarten, Abrahm. February 25, 2011. *Hydrofracked? One Man's Mystery Leads to a Backlash Against Natural Gas Drilling*. ProPublica. Viewed at:
http://www.propublica.org/article/hydrofracked-one-mans-mystery-leads-to-a-backlash-against-natural-gas-drill/single, on December 20, 2011.

[8] Plastics Pipe Institute. March 16, 2009. *PPI Comments on Permeation of Water Pipes on the AWWA-RF Report on Hydrocarbons*. Page 1. Viewed at: http://plasticpipe.org/pdf/ppi-comment-permeation-hydrocarbons.pdf, on January 15, 2012.

BLM_0113267

*Bone Mesa Domestic Water District Request to Release Parcels*
*January 18, 2012*

Of particular concern to BMDWD is the potential for spills that saturate the ground with hydrocarbons that subsequently come in contact with our water transmission lines, permeate the HDPE pipe, contaminate the water, and cause illness to a member of the community.

According to the Oil and Gas Accountability Project, there were approximately 924 spills exceeding 5 barrels in Colorado in the four-year period between June 2002 and June 2006. Spilled products included: crude oil/ condensate, produced water, and "other" products. The "other" products included diesel fuel, glycol, amine, lubricating oil, hydraulic fracturing fluids, drilling muds, other chemicals, and natural gas leaks.[9]

## Potential Monetary Value Lost/Property and Lives Damaged

The residents of our District are being asked to assume all of the risk of oil and gas development while receiving none of the rewards. Financially, here is what our tapholders are being asked to risk:

- The fair market value of each BMDWD water tap is approximately $25,000 for a total investment value of **$4,175,000**;

- Water rights to the Gelwick Springs as a cost of **$150,000, paid for by our tapholders**;

- Equity in the existing infrastructure of **$377,000** as of December 2010, **paid for by our tapholders.** This excludes the items listed below.

- The 2011 upgrade of the collection system of the Mays Springs of **$35,000, paid for by our tapholders.** The balance of the approximately $60,000 project cost was paid for by the Town of Paonia.

- A filtration system for the Gelwick, started in 2011 and to be completed in 2012 at a cost of **$15,000, to be paid for by our tapholders.**

- Capital improvements to the District's infrastructure and transmission lines started in 2011 with a **projected cost of $1,500,000, to be paid for by our tapholders.** The project includes the installation of two, 125,000 gallon in-ground storage tanks; and approximately 12 miles of HDPE transmission pipeline.

Therefore, at a minimum, the tapholders of our District are being asked to risk $6,252,000 if oil and gas development contaminates the District's water. As no known method of ground water remediation exists, this loss would be permanent.

---

[9] Oil and Gas Accountability Project. Undated. *Colorado Oil and Gas Industry Spills--A review of COGCC data (June 2002 – June 2006)*. Page 1. Viewed at: http://www.earthworksaction.org/files/publications/Spills.pdf?pubs/Spills.pdf, on January 15, 2012.

BLM_0113268

*Bone Mesa Domestic Water District Request to Release Parcels*
*January 18, 2012*

The $6,252,000 does not take into consideration:

- **The loss of clean domestic water.** Who will supply the District's 167 families with clean drinking water for the years to come if BMDWD's springs are contaminated?

- **The loss of delivered domestic water**. Who will reimburse our tapholders for the inconvenience of having to haul their domestic water?

- **The diminished real estate value of the tapholders' properties.** There is a substantial difference in the market value of properties that are part of a delivered water system and those that are not.

- **Living with the fear of house explosion,** as happened in Bainbridge, Ohio, on November 15, 2007. The Ohio Department of Natural Resources attributed the explosion to a methane leak from a nearby hydraulic fractured well. The faulty cement casing of the well developed a crack allowing methane to seep underground and fill the couple's basement.[10]

If our springs are contaminated, a sufficient dollar figure cannot be placed on the damage to the individual lives of the homeowners within our District that may never again have clean water delivered to their homes.

### Risk/Reward
If the lease sale goes forward, BLM will force the tap holders of the BMWD to accept all the risks of oil and gas development while receiving none of the rewards.

**On behalf of the tap holders of BMDWD, the BLM does not have the District's approval to place our residents at risk.**

---

[10] Division of Mineral Resources Management. September 1, 2008. *Report on the Investigation of the Natural Gas Invasion of Aquifers in Bainbridge Township of Geauga County, Ohio*. Ohio Department of Natural Resources. Viewed at"
http://www.dnr.state.oh.us/Portals/11/bainbridge/report.pdf, on January 15, 2012; and Demirjian, Joan. January 7, 2010. *Insurance company [sues] driller over home explosion*. Chagrin Valley times. Viewed at: http://www.chagrinvalleytimes.com/NC/0/1571.html, on January 15 2012.

BLM_0113269

*Bone Mesa Domestic Water District Request to Release Parcels*
*January 18, 2012*

Thank you for considering our comments.

Sincerely,

Mark LeValley, President
Board of Director

Eames Petersen, Vice President
Board of Director

Cynthia Wutchiett, CPA
Board of Director

cc:    Helen Hankins, BLM Colorado State Director
       Lori Armstrong, BLM Colorado Southwest Regional Director
       Ken Salazar, Secretary of Interior
       Mark Udall, U.S. Senate
       Western Slope Regional Director, Office of Senator Mark Udall
       Michael Bennet, U.S. Senate
       Monica Piergrossi, Western Slope Regional Director, Office of Senator Michael Bennet
       Scott Tipton, U.S. House of Representatives
       John Hickenlooper, Governor
       Gail Schwartz, State Senator District 5
       Don Coram, State Representative District 58
       Douglas Atchley, Delta County Commissioner
       Bruce Hovde, Delta County Commissioner
       Olen Lund, Delta County Commissioner

BLM_0113270





EXISTING 100,000 GALLON
FINISHED WATER TANK
AND MAYS CHLORINATOR

EXISTING 160,000 GALLON
RAW WATER TANK

APPROX. BONE MESA
DOMESTIC WATER DISTRICT
SERVICE AREA BOUNDARY

MAYS SPRING

GELWICK SPRING

EXISTING 15,000 GALLON
FINISHED WATER CISTERN

EXISTING (2) 35,000 GALLON
FINISHED WATER TANKS WITH
GELWICK CHLORINATOR

BUCKHORN GEOTECH
Civil, Structural & Geotechnical Engineers

BONE MESA DOMESTIC WATER DISTRICT
SYSTEM IMPROVEMENT PROJECT
EXISTING WATERLINE SCHEMATIC

DESIGNED
DRAWN        DCG
DATE         BMF
PROJ. NO.    11/22/10
DRAWING NUMBER  10-059

C-1

BLM_0113272

| | |
|---|---|
| **From:** | Lionel Atwill |
| **To:** | BLM_CO_UFO_Leasing |
| **Subject:** | concerned party, oil leasing |
| **Date:** | Monday, December 26, 2011 8:12:30 AM |

I am the representative for Jay Creek Water Company, a private water company whose address of record is Box 897, Hotchkiss, CO  81419.

Jay Creek water provides potable water for three properties located at the end of Mystic Mesa Road. The collection point for this spring is located at (UTM) 13S 0265919  4301935.

Hydrographic mapping of our water  indicates that the flow to our system originates within your proposed leasing areas 6195 and 6196. Given the resent EPA findings regarding fracking in Wyoming and the growing concern over this method of gas production, I feel it is most imprudent to open these areas to gas exploration and recovery at this time.

Water is THE most precious resource in the State of Colorado. To run the risk of contaminating potable water sources for the North Fork Valley in order to open up a relatively small portion of federal land to gas exploration in a geological area whose potential for gas production is marginal at best, using a methodology that, with each day's passing, appears to be more and more dangerous, is simply foolish. I hope you will consider withdrawing these parcels from your lease offering.

On a personal note, I would like to point out that those same areas represent a significant elk wintering ground. On any given evening from November through February, I can show you a herd of 300+ elk spilling out of that BLM land to graze on the grasses of the Mesas between BLM land and Highway 133. I am very familiar with the drilling process, and the truck traffic required to install and service just one well in that area would drive these animals out.

Thank you for the opportunity to comment.

--
Lionel Atwill
Box 897
12235 Mystic Mesa Rd.
Hotchkiss, CO  81419
(970) 361-5897 cell
(970)-872-1141

--

Lionel Atwill
Box 897
12235 Mystic Mesa Rd.
Hotchkiss, CO  81419
(970) 361-5897 cell
(970)-872-1141

BLM_0113274



Stucker Mesa Domestic Water Company
POB 130
Paonia, Colorado 81428

January 27, 2012

Barb Sharrow
Field Manager
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401

Dear Ms. Sharrow:

RE:  Withdrawal of Parcel 6191 from the August 2012 Oil and Gas Lease Sale

The Stucker Mesa Domestic Water Company (SMDWC) has significant concerns with the BLM planned leasing of parcel # 6191 for oil and gas development.  We request that this parcel be removed from consideration for leasing at this time and at any time in the future.

SMDWC considers itself to be a stakeholder in decisions concerning the proposed lease sale.  As such, we request updates from the BLM as its decision process on this current round of leasing proceeds.  We further request your alerting us to opportunities for further comment or stakeholder action on this and any other parcels in the North Fork Valley nominated in the future that may affect the integrity and safety of our water supply.

Herein are comments on the proposed August 2012 Oil and Gas Lease Sale regarding parcel 6191.  We have two domestic water concerns about possible drilling in this parcel. They include:

1) Potential impact on domestic water springs
2) Potential impact on domestic water pipeline

1) Stucker Mesa Domestic Water Company receives water from four springs, one of which, known as Vought Springs, is located in T14S/R92W Section 34 at Lat: 38 degrees 52.661'  Long: W107 degrees 39.328'  Elevation 6825'.  This spring is due west of the eastern most pieces of parcel 6191 in Sections 34 and 35.  Drilling for petroleum in this area could negatively and permanently affect the quality and quantity of water from this spring.

2) The pipeline that carries water from the Vought Springs to the company cistern lies under a corner of parcel 6191 in Section 34 just below Stucker Mesa Rd. A drilling caused rupture of this line would leave all households without water.

SMDWC serves 21 taps and 33 permanent residents on Wakefield and Stucker Mesas along Stucker Mesa Rd, above and to the northwest of Paonia. The company has existed since 1940, supplying domestic and stock water to its shareholders. Its decree was confirmed by The Water Court in 1951. The springs and pipeline have been providing water since 1906.

While the water supply has been mostly sufficient throughout the years, drought and dry conditions have caused shortages. In 2007, SMDWC received a decree on the Vought Springs, which it developed and added to its water supply. Since that time, the quantity of water available to shareholders has been sufficient to meet their needs. SMDWC cannot adequately serve its families in the future should that water supply be permanently disrupted in any way.

We are concerned that access to the area in Sections 34 and 35 (as noted in 1 above) would require construction of a road up a very steep gully, probably on top of our pipeline (only 18 inches below the surface) and through a part of the Vought Springs aquifer. This action would be unacceptable.

The mere act of drilling into the Vought Springs aquifer is unacceptable. Surface spills of fluids or those emanating from the well, whether fracking fluid or those associated with the oil or gas, could have a devastating impact on our water supply.

We are concerned that airborne dispersal of VOCs and particulates could be absorbed into the ground water that feeds Vought Springs, as we believe these springs may be under surface water influence as well. Waiting until the damage is done is unacceptable.

We are also concerned about the risk of seismic activity caused by fracking and related activities, as has recently been reported in Ohio. In the 1960's Denver experienced an unprecedented spate of small earthquakes for several years. It was determined that the cause was the injection of contaminated water from the Rocky Mountain Arsenal into deep wells, which was used as a way to dispose of various poisons. The injection was stopped, and the earthquakes stopped.

The SMDWC has direct experience with local soil instability. We replaced a couple thousand feet of our pipeline that was destroyed in a landslide. We know there are underground faults in the vicinity of our pipeline and springs. These have stopped coal mining to the east of our springs that are located above Vought Springs and are noted on

BLM_0113276

the application for coal exploration on Oak Mesa.  There are likely faults under, or near the parcel 6191 that are not known at this time.

This parcel is very steep, making it more susceptible to landslides. The portion of the parcel that is very close to Vought Springs, in addition to being very steep, was burned in the Wake Fire, and has no trees, only shallow rooted grasses and forbs, also adding to the risk of landslides.

If drilling, road building, fracking, heavy traffic, and soil disturbance causes seismic activity or landslides, it could have disastrous impacts on the SMDWC.  Sections of our pipeline could be destroyed. The Vought Springs could be destroyed. Our collection system could be destroyed.  The destruction might be reparable, at great expense, or not.

There is also the negative economic impact on the SMDWC shareholders should their domestic water source suffer damage.  A water tap would probably currently sell for $15,000. Several years ago, one sold for $10,000.  At 21 taps, the value of the company, not counting infrastructure, may be as high as $315,000.

We strongly object to BLM offering drilling leases in any area that might impact the source of water to the Vought Springs.  We believe the area in Sections 34 and 35 (as noted in 1 above) is directly adjacent to the source of that water.  Drilling there would be much too close for comfort.  We do not believe there can be adequate assurance of no impact or mitigation for this threat to our water supply.

The shareholders of SMDWC have other concerns as well.  These include:

3)  Potential impact on local agriculture
4)  Potential impact on wildlife
5)  Potential impact on hunting

3) There are several farms and ranches on Stucker and Wakefield Mesas that depend on SMDWC for stock water and water for food production.  These farms and ranches are managed free of chemicals.  Any threats to the health of the land and livestock that might arise from oil and gas drilling pose severe economic repercussions and would be totally unacceptable.

4) There are at least two elk herds that migrate through parcel 6191.  Their presence in the area and healthiness concern all of us.  Any disturbance to their habitat might prove not only hazardous their health, but possibly fatal if they were removed from their food supply.

5) The three property owners on Wakefield Mesa lease their land for hunters or allow access to BLM lands for hunting purposes.  Oil and gas development on parcel 6191, and

BLM_0113277

particularly along the elk travel routes, could compromise a small, but <u>significant</u>, portion of income for two of the ranchers.

For the above stated reasons, we respectfully request that parcel 6191 be withdrawn from the August 12, 2012 lease sale, and permanently removed from any future oil and gas lease consideration.  If you do not remove parcel 6191 from lease sale immediately, we ask that you issue a new RMP before such sale and also conduct a full EIS instead of an EA.

Thank you.

Sincerely,



Steve Wolcott, President
Stucker Mesa Domestic Water Company

Copies:  Colorado BLM State Director
         Southwest District Manager BLM
         Delta County Commissioners
         Colorado State Senator, District 5
         Colorado State Representative
         Governor of Colorado
         US Senators Bennet and Udall
         US Representative Tipton
         Secretary of the Interior
         President of the United States



BLM- Barbara Sharrow, Field Manager
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Co 81401

Dear Ms. Sharrow,

We are very concerned about the proposed lease of the BLM land for natural gas development.  We live and have  our business, Azura Winery and Gallery, within 200 yards directly downhill from proposed lease parcel # 6207. There is significant evidence that the fracking process employed at the natural gas sites seriously degrades the environment and the surface and ground water. The EPA has proven that the groundwater in Wyoming (http://www.epa.gov/region8/superfund/wy/pavillion/index.html) was contaminated by the fracking process.

The following  are the reasons why a natural gas well would directly effect our livelyhood.

• Our beautiful and spectacular  property could become virtually worthless if a natural gas operation ( with the associated traffic,noise, air and water pollution) was developed. We understand that currently it is illegal for the FHA to loan or guarantee loans for property that  are adjacent to fracking parcels. This is a clear indication that the US government knows that such activities will cause the property value to go down.

• We have a well that  is less than 800 feet downhill from  the proposed lease parcel. This well supplies our drinking water and the water required to operate our winery. In addition to fracking  pollution any spilled surface water  will eventually drain to our property which is directly downhill from the parcel and the access road to the parcel.

• We use Terror Creek Ditch water to irrigate our proposed vineyard and landscaping around the house and winery. We also have a large pond on our property that is an element in a water augmentation plan. The fill water for the pond is irrigation tail water from Terror Creek. Each fall this water(and potential carcinogens) will be released into the Gunnison River to meet a downstream call thus posing a threat to all users downstream.

• Each winter a herd of 50 to 100 elk winter in our pasture and on the adjacent mesa. Deer are also prevalent as well as turkeys, bears, foxes and coyotes. The migration routes of all of these animals cross the BLM land being proposed  as lease parcel #6207.

• Our Winery requires  clean, clear, non carcinogenic water for the production of our wine. As mentioned above, we also need unpolluted water to irrigate the vineyard we plan to plant if the lease is withdrawn from the sale.

• The Winery depends on tourism and the ambiance that we provide at our tasting room. As mentioned, clean water is imperative but we are also concerned about the amount and kind of traffic that would surely effect our business and the business of the other wineries and farms on Garvin Mesa. The commercial traffic generated by a gas well would seriously degrade the winery touring  experience which we depend on for our livelihood.

• Our daily interaction with the public makes it clear to us how important the growing popularity of agrotourism is to the North Fork Valley . People are coming in growing numbers to experience the rural beauty and wonderful

BLM_0113279

produce and wine of our special Valley. The pollution resulting from natural gas drilling and exploration on the proposed lease parcels will likely cause this booming business to disappear.

• Some consideration should be given for the spring below our property and lease parcel # 6207 in Coal Gulch. This spring supplies the water via the "George Small Pipeline" to a number of houses near Hwy #133. I don't know all of the facts but I would urge you to contact Judy Miller (970-314-3894) who lives near the lower end of Farmers Mine Rd. In addition to this spring, it is important to know that irrigation water for Black Bridge Winery/ Orchard Valley Farms flows across our property from Terror Creek.

In summary; the development of a natural gas well in the vicinity of our home and business could have catastrophic implications for us and our business. We love our special Valley and urge you to remove all of the lease parcels in the North Fork Valley watershed and particularly parcel #6207 from the August auction.

Sincerely,

Ty and Helen Gillespie
Azura Cellars & Gallery
16764 Farmers Mine Rd
Paonia, Co 81428
970-390-4251
AzuraPaonia@aol.com



CRAWFORD CLIPPER DITCH COMPANY   P.O.B  263  CRAWFORD
COLORADO

January 28, 2012

August 2012 Lease Sale
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401

Dear Reader;

The Board of Directors and the Members of the Crawford Clipper Ditch Company
 request removal of Parcel 6200 at Saddle Mountain in Crawford from the August
2012 Lease Sale because of the potentially severe impact oil or gas extraction
would have on the safety of this water supply upon which we depend for the
irrigation of our fields, the pasturing of our livestock and for stock water.

The head gate for the Crawford Clipper Ditch is located in Smith Fork Creek
below North Saddle Mountain Peak. It splits into three laterals for a total run of 26
miles.  The company has 97 shareholders who own a total of 3200 shares.

There are several potential impacts of concern to us:

Roads and ditches constructed for the drill pads could result in the silting in of the
Smith Fork Creek.  Fracking or drilling could further seriously  compromise the
stability of the ditch.

Surface spills, which occur at the rate of about one thousand documented spills a
year, consist of drilling fluid, fracking fluid and blowback - much of which is toxic.
Toxic chemicals could enter the Clipper Ditch system directly or perk down into
shallow springs , creating a poisonous domino effect on other water systems and
wells.

Disturbances to the river as a result of construction and drilling activity could
affect its normal flow.

Access to our structures  could be made more difficult due to the presence of
drilling rigs, trucks and other equipment on site.

The steepness of the slope of Parcel 6200 only adds to the impracticality and
dangers of a drilling operation at this location.

BLM_0113281

A concern of a different magnitude is in respect to the entire Colorado River system.  Should the Clipper Ditch be contaminated, not only would our livestock sicken and, perhaps die, but so would all wildlife dependent on the river here in Crawford and downstream for hundreds of miles.

As we all say, and appreciate deeply, "WATER IS EVERYTHING".  Most every one of the 22 designated parcels is vital to the irrigation and domestic water systems in this valley.  We recommend the removal of all 22 parcels.

Sincerely,

_____
Gary Kraai
President of the Crawford Clipper Ditch Company

BLM_0113282

**FIRE MOUNTAIN CANAL & RESERVOIR CO.**
**P.O. BOX 414**
**PAONIA, CO  81428**
**(970) 527-3662**
**FAX (970) 527-3023**

January 4, 2012

Bureau of Land Management
August 2012 Lease Sale
Uncompahgre Field Office
2465 South Townsend Ave
Montrose, CO  81401

Dear Sir or Madam,

The Board of Directors of the Fire Mountain Canal & Reservoir Company is writing this letter as a response to your proposed August 2012 lease sale nominations.

The Fire Mountain Canal (FMC) is located in Gunnison and Delta Counties. By contractual agreement with the North Fork Water Conservation District, via the United States Bureau of Reclamation, the FMC operates and maintains the 18,150 acre foot Paonia Reservoir, the FMC diversion structure on the North Fork of the Gunnison River, and the 34.7 mile Fire Mountain Canal. The FMC does not own the reservoir or dam structures but the FMC shareholders would certainly bear financial burden if drilling or construction activity caused environmental or structural damage to the Paonia Project facilities in the area of parcels 6206, 6215, and 6216.

The FMC board is requesting total withdrawal of the following parcels from the August 2012 lease sale: parcels 6195, 6196, 6206, 6207, 6215, and 6216.

Parcels 6206, 6216, and 6215 are in close proximity to the Paonia Reservoir and/or the Paonia Reservoir Dam structure. The FMC board is concerned that drilling and construction activity in these parcels could compromise reservoir or dam structural integrity.

Parcels 6195, 6196, and 6207 border and/or contain the actual 34.7 mile canal, siphon structures, and Leroux Creek diversion structure. The canal does not currently have adequate bridge crossings to handle the heavy equipment and vehicle/truck traffic used in gas drilling and related

BLM_0113283

construction activity; the FMC Board is concerned that heavy equipment traffic over the canal or beside the canal could cause canal failure.

In addition, many miles of the canal was constructed through hillsides, along hillsides, and through hillsides containing Mancos Shale deposits. Drilling activity, as well as construction activity, in the vicinity of the canal, above the canal, or below the canal could cause the ground or Mancos Shale to shift and result in a breach or failure of the canal, siphons, or diversion structures. Any breach or failure of the canal or related structures would result in severe financial burden to the FMC shareholders.

The FMC Board is also concerned with water quality issues related to natural gas drilling and fracking fluids. The spilling of these fluids into our watershed or canal would impact water users negatively. During the last several years our watershed, and the area the canal traverses, has been subject to several torrential downpours. The FMC Board is concerned that the structural integrity of drilling settling/storage ponds would be comprised during such a storm event and the chemicals would enter our water distribution system negatively affecting our water users.

In addition to water quality issues related to fracking, the FMC Board is also concerned about construction and drilling activity altering the flow of runoff in the area of the canal. The FMC canal is 34.7 miles long and has multiple undershots and overshots that prevent runoff water from eroding the canal bank. Any construction or drilling activity would have to be done in a manner consistent with preventing canal bank erosion.

Due to proximity to the Paonia Project reservoir, dam, diversion structures, siphons, canal crossings, and the 34.7 mile canal itself, the FMC Board requests the total withdrawal of parcels 6195, 6196, 6206, 6207, 6215, and 6216.

The FMC Board will continue to work with the Bureau of Reclamation (Reclamation) on all matters requiring specialized information related to oil and gas leases on Reclamation land and BLM land in areas adjoining Paonia Reservoir and the Fire Mountain Canal. An initial review of the proposed parcels resulted in Reclamation's request to the BLM that parcels 6195, 6196, 6206, and 6207 be removed from the August 2012 sale pending a revised Resource Management Plan and planned Environmental Impact Statement. The FMC Board is also asking for withdrawal of parcels 6215 and 6216 due to proximity to the reservoir and dam. The FMC Board will continue to monitor this action; we will review the pending updates to the Resource Management Plan and proposed EIS or NEPA. We may suggest additional stipulations to proposed leases.

Sincerely,

Randall W. Fisher
Secretary-Treasurer
For the FMC Board of Directors

Cc: Bureau of Reclamation
    2764 Compass Drive
    Grand Junction, CO  81506

Cc: North Fork Water Conservancy District
    PO Box 217
    Hotchkiss, CO  81419

BLM_0113285

31 January 2012

To:  Bureau of Land Management, Uncompahgre Field Office

From:  Saddle Mountain Ditch Company, Board of Directors

Re:  August 2012 Gas Lease Auction Parcels near Crawford

We are writing to inform the BLM that the Saddle Mountain Ditch transects gas lease parcel #6200 on the northeast slopes of Saddle Mountain approximately four miles east of Crawford.  The ditch traverses the parcel from NE to SW at the 7200 foot elevation. The ditch originates at Smith Fork Creek and provides water to 31 ranches and smaller properties that lie to the west and southwest of Saddle Mountain. We are not sure exactly how many acres the ditch irrigates, but it is probably a couple thousand.  The ditch carries 40 cubic feet per second of water.  This ditch also provides water as part of the federally funded Smith Fork Project that includes water stored in the Crawford Reservoir.

The Saddle Mountain Ditch irrigates grass and alfalfa hay fields and grass pastures for several working cattle ranches.  These ranches produce and sell hay, feeder calves, breeding stock, finished natural beef sold through the local 'Homestead Market' and commercial game herds.

About 80% of parcel #6200 lies on steep slopes above the ditch.  Most of the remainder lies on steep slopes below the ditch.  Through this parcel the ditch traverses several hundred yards across a rock-slide of igneous plate-like talus boulders that are eroding off the slopes of Saddle Mountain.  It always amazes us that the pioneers working with teams of horses were able to build a ditch that holds water across this slide-rock.  It took several decades of patiently plugging holes before the sediments finally sealed up this section. Today we do not lose much water to seepage, but we are very careful not to disturb this stretch of the ditch.

Immediately upstream of the slide-rock, on the Forest Service land that is adjacent to the BLM parcel, we have had to do expensive repairs due to landslides.  Basically where the slopes of Saddle Mountain are not slide-rock, they are dirt, and the dirt is sliding off the mountain too.  All of these steep slopes are unstable.

We are concerned about any potential ground disturbing activities such as road cuts, drill pads or seismic disturbances above or below the ditch that could cause drainage and erosion issues that might interfere with the stability of the ditch.  We are also concerned about any activities that could cause deterioration, sedimentation or contamination of the ditch water.  This parcel is mostly covered with thick brush and some timber.  Any activities that could increase the fire hazard could affect the stability of the ditch and the water quality.  We are also experiencing increasing weed invasions along the ditch and would be concerned about additional ground disturbing activities that could exacerbate the weed issue.

Please consider the Saddle Mountain Ditch and the steepness of the slopes when determining whether this parcel is realistically suitable for gas development. Anything that could jeopardize the flow of safe, useable water in this ditch could directly affect the livelihoods of several ranching families for whom it is the lifeblood of their operations.

Respectfully submitted by,
Saddle Mountain Ditch Board of Directors

Tony Prendergast
President
970 361-7126
tonyp@paonia.com

Lawrence Zeldenthuis
Vice-President

Pam Hassinger
Secretary/treasurer
1641 Buckskin Pass Rd
Crawford, CO 81415
970 921-4667
pph@paonia.com

Luther Pipher
At-large

Jim Gardner
At-large

Susan Ayer
At-large

Jerry Zeldenthuis
At-large

# The Philadelphia Inquirer

## Shale criminal charges stun drilling industry

**Andrew Maykuth, *Inquirer Staff Writer***
**Published Thursday, September 12, 2013, 1:08 AM**

Pennsylvania Attorney General Kathleen Kane's decision to prosecute a major Marcellus Shale natural-gas driller for a 2010 wastewater spill has sent shock waves through the industry.

But environmentalists Wednesday hailed the prosecution of the Exxon Mobil Corp. subsidary as a departure from the soft treatment they say the industry has received from Pennsylvania regulators.

"We have been very concerned about enforcement in the Marcellus, and we welcome the attorney general's taking an active role," said Myron Arnowitt, Pennsylvania director of Clean Water Action.

Kane's office announced charges Tuesday against XTO Energy Inc. for discharging more than 50,000 gallons of toxic wastewater from storage tanks at a gas-well site in Lycoming County.

XTO in July settled federal civil charges over the incident by agreeing to pay a $100,000 fine and deploy a plan to improve wastewater-management practices. The consent decree included no admissions of liability.

The Fort Worth, Texas, drilling company, which Exxon acquired in 2010, said it had worked cooperatively with federal and state authorities to clean up the spilled waste, known as "produced water." XTO excavated and removed 3,000 tons of contaminated soil from the site.

"Criminal charges are unwarranted and legally baseless because neither XTO nor any of its employees intentionally, recklessly, or negligently discharged produced water on the site," XTO said in a statement.

Kane's office said it did not need to prove intent to prosecute the company for crimes. XTO is charged with five counts of unlawful conduct under the Clean Streams Law and three counts of unlawful conduct under the Solid Waste Management Act.

Industry leaders said the prosecution of a company for what they called an inadvertent spill creates a hostile business environment.

"The incident has been fully addressed at the state and federal levels, and this action creates an untenable business climate that will discourage investment in the commonwealth," Kathryn Z. Klaber, president of the Marcellus Shale Coalition, said in a statement.

The Pennsylvania Chamber of Business and Industry also protested.

BLM_0113288

"This decision sends a chilling message to all businesses looking to locate in Pennsylvania that they could be held criminally liable in the event of an unintentional spill by a contractor that resulted in no injury to humans or wildlife and that had no lasting impacts on the environment," said Gene Barr, its president.

**First to be charged**

XTO is the first Marcellus Shale production company to face criminal charges.

A Western Pennsylvania waste-hauler, Robert Allan Shipman, was convicted of illegally dumping waste in 2012, and sentenced to serve seven years of probation and 1,750 hours of community service, and to pay $382,000 in restitution and fines. The attorney general has appealed the sentence, arguing that Shipman deserved jail time.

In the XTO case, a grand jury did not charge any individuals. XTO faces a fine of $25,000 a day per violation, said Kane spokeswoman Carolyn E. Myers. The leak took place during the two months the company stored wastewater on the site.

Activists believe that Kane, a Democrat, has been looking to make a statement on shale drilling since she assumed office in January.

"She has indicated that she is on the watch for a criminal prosecution opportunity in the Marcellus Shale," said Arnowitt, of Clean Water Action.

The XTO case was referred to the attorney general by the Department of Environmental Protection before Kane took office.

"The prosecutorial powers of this office are used carefully and with great consideration," First Deputy Attorney General Adrian R. King Jr. said through a spokeswoman. "We closely examine the facts and the applicable law in each case and proceed accordingly."

The XTO spill received very little public attention when it occurred.

A DEP inspector discovered wastewater leaking from an open valve on a storage tank during an unannounced visit to the Marquardt well site on Nov. 16, 2010. The wastewater spilled into a tributary of the Susquehanna River and also contaminated a spring. Pollutants were present in the stream for 65 days after the spill.

The grand jury's presentment does not say who opened the valves on the tank or why. XTO officials at the time suggested vandals might be responsible. But it noted that the drilling site had no secondary containment, little security, and no alarm system for leaks.

Shale-gas wells produce huge quantities of wastewater after they are hydraulically fractured, which involves the injection of water, chemicals, and sand deep underground. The wastewater contains fracking chemicals and pollutants from the shale formation itself, including barium, calcium, iron, magnesium, manganese, potassium, sodium, strontium, bromide, and chloride.

BLM_0113289

As part of its federal settlement, XTO agreed to implement an estimated $20 million plan to recycle more wastewater and to install a remote monitoring system at all well sites in the region to trigger alarms in case of a spill.

---

**BY THE NUMBERS**

50,000

Gallons of toxic wastewater were discharged from storage tanks at a gas-well site in Lycoming County in 2010.

$100,000

Fine XTO Energy agreed to pay. The drilling company also agreed to improve wastewater management practices.

---

http://www.inquirer.com/business/20130912_AG_s_criminal_charges_stun_drilling_industry.html?authenticated=1379009246439

BLM_0113290

## *The Los Angeles Times*

# Internal EPA report highlights disputes over fracking and well water

An EPA staff report suggests methane from hydraulic fracturing, or fracking, contaminated wells near Dimock, Pa., but the agency says the water's safe to drink.



A natural gas fracking operation on leased farmland near Dimock, Pa. The EPA says water from most wells in the area is still safe to drink, but critics and an internal EPA report suggest that the drilling method is causing methane contamination. (Caroline Cole / Los Angeles Tiems / December 27, 2011)

By Neela Banerjee
*July 27, 2013 8:00 p.m.*

WASHINGTON — One year ago, the Environmental Protection Agency finished testing drinking water in Dimock, Pa., after years of complaints by residents who suspected that nearby natural gas production had fouled their wells. The EPA said that for nearly all the 64 homes whose wells it sampled, the water was safe to drink.

Yet as the regulator moved to close its investigation, the staff at the mid-Atlantic EPA office in Philadelphia, which had been sampling the Dimock water, argued for continuing the assessment.

In an internal EPA PowerPoint presentation obtained by the Tribune/Los Angeles Times Washington Bureau, staff members warned their superiors that several wells had been contaminated

BLM_0113291

with methane and substances such as manganese and arsenic, most likely because of local natural gas production.

The presentation, based on data collected over 4 1/2 years at 11 wells around Dimock, concluded that "methane and other gases released during drilling (including air from the drilling) apparently cause significant damage to the water quality." The presentation also concluded that "methane is at significantly higher concentrations in the aquifers after gas drilling and perhaps as a result of fracking [hydraulic fracturing] and other gas well work."

Critics say the decision in July 2012 by EPA headquarters in Washington to curtail its investigation at Dimock over the objection of its on-site staff fits a troubling pattern at a time when the Obama administration has used the sharp increase in natural gas production to rebut claims that it is opposed to fossil fuels.

In March 2012, the EPA closed an investigation of methane in drinking water in Parker County, Texas, although the geologist hired by the regulator confirmed that the methane was from gas production. In late June, the EPA dropped a study of possible contamination of drinking water in Pavillion, Wyo., despite its earlier findings of carcinogens, hydrocarbons and other contaminants in the water.

"We don't know what's going on, but certainly the fact that there's been such a distinct withdrawal from three high-profile cases raises questions about whether the EPA is caving to pressure from industry or antagonistic members of Congress," said Kate Sinding of the Natural Resources Defense Council, an environmental group.

The EPA confirmed the authenticity of the presentation about the Dimock wells but said it was the work of one employee.

"This presentation represents one [on-scene coordinator's] thoughts regarding 12 samples and was not shared with the public because it was a preliminary evaluation that requires additional assessment in order to ascertain its quality and validity," said EPA spokeswoman Alisha Johnson.

"The sampling and an evaluation of the particular circumstances at each home did not indicate levels of contaminants that would give EPA reason to take further action," Johnson said. "Throughout EPA's work in Dimock, the agency used the best available scientific data to provide clarity to Dimock residents and address their concerns about the safety of their drinking water."

At the same time, the energy industry and its congressional allies have hammered the EPA for undertaking the studies, which they say are a pretext for regulatory overreach.

"They have attempted to link fracking to water contamination in at least three cases, only to be forced to retract their statements after further scrutiny proved them to be unfounded," Rep. Lamar Smith (R-Texas), chairman of the House Science Committee, said at a recent hearing.

Robert B. Jackson, professor of environmental sciences at Duke University, who has researched methane contamination in the Dimock area and recently reviewed the presentation, said he was disappointed by the EPA's decision.

BLM_0113292

"What's surprising is to see this data set and then to see EPA walk away from Dimock," Jackson said. "The issue here is, why wasn't EPA interested in following up on this to understand it better?"

The EPA staff presentation about Dimock was an interim analysis of water sampling data collected by Pennsylvania regulators and, later, by the EPA, from 2008 to June 2012.

The presentation provides charts for nine of the 11 Dimock-area wells, tracking natural gas production work in the area and the concentration of methane and metals over a four- to five-year period, depending on the well. Some wells underwent a "short-term disruption," or a rise in methane in the water six to eight months after nearby gas development activity. Over two or three years, the concentration of methane fell.

Four other wells experienced long-term disruption to their water quality, according to the presentation. In those instances, methane levels did not fall over time but remained high after an initial increase or began to climb after a period of decline. The presence of metals such as manganese and arsenic also rose over time in some of those wells.

A study by Jackson and other Duke scientists published in June indicates that drinking water wells near natural gas production in northeastern Pennsylvania, including Dimock, are at greater risk of methane contamination than those farther away.

Methane is the primary component in natural gas. In enclosed spaces, such as sheds and basements, it poses the risk of asphyxiation and explosion. There is little research into the long-term effects on human health from prolonged exposure to methane in drinking water.

Scientists and regulators say that when methane ends up in well water, it is usually because of faulty metal casings inside a natural gas well that allow methane to seep out as it travels to the surface or shoddy concrete work that is supposed to keep gas and water from moving into the space between the well casings and the rock.

Though EPA officials concluded that Dimock water was safe to drink, the mid-Atlantic EPA office nevertheless asked the Centers for Disease Control and Prevention to evaluate the health risk.

Cabot Oil & Gas Corp., the company drilling in Dimock, asserts that the methane in the water is unrelated to oil and gas development. "Through our investigation, Cabot concluded that methane gas existed in groundwater and water wells in the Dimock and Springville townships long before Cabot began drilling in the area," said Dan O. Dinges, Cabot's chief executive, in a May 29 letter to the Senate Energy and Natural Resources Committee.

Although methane gas occurs naturally in the area's aquifers, the Duke study showed that the chemical "fingerprint" of methane in shallow water wells near the gas sites was the same as the natural gas extracted from deep underground.

The EPA PowerPoint presentation identified five wells contaminated with methane whose chemical fingerprint, or isotopic composition, was the same as methane from the Marcellus shale formation at the center of Pennsylvania's natural gas boom.

Fred Baldassare, a former official at the Pennsylvania Department of Environmental Protection who worked on the state's Dimock studies, disputed the presentation's assertion that some wells contained Marcellus methane. Now a consultant for industry and homeowners, Baldassare said there was not enough information about the composition of the methane in the wells to draw conclusions about the origin. "It's dangerous and inappropriate to interpret this data in a vacuum," he said.

Jackson disagreed, arguing that the methane found does not naturally occur in drinking water. "The burden of proof is different here," he said. "The question we're asking is, 'Was there enough evidence to warrant further study?' The EPA scientist clearly thought so."

*neela.banerjee@latimes.com*

Copyright © 2013, Los Angeles Times

http://www.latimes.com/news/nationworld/nation/la-na-epa-dimock-20130728,0,4847442.story

BLM_0113294

**BLM_CO_UFO_Leasing**

| | |
|---|---|
| **From:** | Schroeder, Alan M |
| **Sent:** | Thursday, February 09, 2012 3:21 PM |
| **To:** | BLM_CO_UFO_Leasing |
| **Cc:** | Ozga, Kathleen B |
| **Subject:** | August 2012 Lease Sale (UFO) |
| **Attachments:** | Alan M  Schroeder.vcf; final cmt letter UFO NEPA.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

The attached letter constitutes the comments and recommendations of the Western Colorado Area Office (Bureau of Reclamation) regarding the proposed oil/gas lease parcels within the Uncompahgre Field Office.

If you have any questions, please contact me.

**Alan M. Schroeder**
Bureau of Reclamation, WCAO-GJ
Natural Resource Specialist

970-248-0692 Work
aschroeder@usbr.gov

2764 Compass Drive, Suite 106
Grand Junction, CO 81506

1



# United States Department of the Interior

BUREAU OF RECLAMATION
Upper Colorado Region
Western Colorado Area Office
2764 Compass Drive, Suite 106
Grand Junction, CO 81506

IN REPLY REFER TO:

WCG-ASchroeder
LND- 6.00

FEB 0 9 2012

Ms. Barbara Sharrow
Bureau of Reclamation
Uncompahgre Field Office
2465 Townsend Ave.
Montrose, CO 81401

Subject:  August 2012 Oil/Gas Lease Sale Parcels

Ms. Sharrow:

The Bureau of Reclamation has reviewed the 22 proposed oil/gas lease parcels identified in your letter of
December 7, 2011.  Some of these parcels encompass or are in close proximity to Reclamation lands,
facilities, or water bodies.  We have the following issues and concerns that should be addressed in your
NEPA documentation.

**General:**
1. Protection of Reclamation project lands, facilities, purposes, and water resources (both quantity and
quality).
2. Potential for increased erosion, siltation, subsidence, and mass wasting of soils, particularly on steep
slopes and fragile soils.
3. Potential for degradation of air quality through increased dust, and motor emissions associated with
oil/gas development.
4. Potential for degradation of surface and ground water quality and contamination of soils. Of particular
interest or concern are:
   - Increased salinity and selenium loading to the Gunnison and Colorado rivers and their tributaries
     from disturbance and erosion of soils derived from Mancos Shale or from other activities related
     to the lease program.
   - Underground migration of fracking fluids and natural gas following fracking.
   - Oil/gas development related spills at the well sites and ancillary facilities, or during
     transportation.
   - Seepage of oil/gas development fluids and wastes from reserve pits, evaporation ponds, tank
     batteries, etc.
5. Potential for degradation of the aesthetics, particularly the quiet or solitude of the area, around Paonia
State Park, due to increased noise levels related to development of nearby leases.
6. Vehicular access to the proposed lease parcels.
   - The most likely access to some of the parcels will cross Reclamation lands or facilities. Lessees
     need to coordinate with Reclamation and its managing entities to obtain the necessary
     authorization and requirements for any such proposed crossing of Reclamation lands or facilities.

1

- Access to some of these parcels will likely have to cross steep slopes or traverse drainages adjacent to steep slopes.
- The authorization for access across or other uses of Reclamation land, facilities and water bodies is at Reclamation's discretion.

6. What is the anticipated source of water for oil/gas development in the area? Any use of Reclamation project water is subject to project authorization, which currently does not include uses other than irrigation.

7. There is some question as to the actual status of the road identified as Gunnison County Road 2 through Paonia State Park. Additional research is needed to clarify its status.

**Parcel Specific:**

Reclamation has no issues or concerns on the following parcels, other than general ones related to the potential effects of oil/gas development on natural and cultural resources, and land or resource uses, and the effective implementation and enforcement of requirements to minimize those effects: 6190, 6192, 6193, 6194, 6197, 6198, 6199, 6200, 6203, 6205, 6211 or 6217.

The following proposed oil/gas lease parcels are in close proximity to, contain, or may directly affect Reclamation withdrawn or acquired lands, facilities, and/or project water. The general issues listed above also apply to these parcels. More specific issues, concerns, and recommendations regarding these parcels are identified by parcel. Pursuant to Section 6H of the 1983 BOR /BLM Interagency Agreement, BLM will not issue permits, leases, or licenses on acquired or withdrawn lands under Reclamation's management (i.e., Section 5A lands) without Reclamation's consent and concurrence on all conditions and stipulations.

**Parcel 6189-** The northernmost tract of Parcel 6189 lies on steep slopes and drainages above and in close proximity to the Fire Mountain Canal (FMC), Paonia Project. There are no Reclamation lands within the lease parcel.
*Issues Concerns (6189):*
- Development on steep slopes and within or across drainages above the canal could cause increased erosion, subsidence, or mass wasting, which could adversely affect the canal and delivery of irrigation water, as well as water quality.
- The access to that portion of the parcel will likely require crossing the FMC. Existing canal crossings may not be sufficient for the anticipated heavy vehicular traffic associated with oil/gas development.
- Potential for unauthorized use of Paonia project facilities or water during lease development.
*Lease Recommendations (6189):*
- No Surface Occupancy on the steep slopes and in the bottom of drainages.
- Notice to Lessee- Attach the following NTL to the Lease Offer and Lease: "Prior to the anticipated crossing of or use of Reclamation facilities associated with the Paonia Project, Colorado, the lessee shall contact Reclamation, Western Colorado Area Office, Grand Junction, Colorado to coordinate and acquire the appropriate authorization for such activities."
- APDs- Use of appropriate Best Management Practices (BMPs) to minimize potential adverse effects to natural and cultural resources, and other land and resource uses.

**Parcel 6191-** Parcel 6191 is north of and above the FMC, Paonia Project. There are no Reclamation lands or facilities within the parcel.
*Issues Concerns (6191):*
- Development on steep slopes and within or across drainages above the canal could cause increased erosion, subsidence, or mass wasting, which could adversely affect the canal and delivery of irrigation water, as well as water quality.

2

BLM_0113297

- The access to this parcel will likely require crossing the FMC. Existing canal crossings may not be sufficient for the anticipated heavy vehicular traffic associated with oil/gas development.
- Potential for unauthorized use of Paonia project facilities or water during lease development.

*Lease Recommendations (6191):*
- No Surface Occupancy on the steep slopes and in the bottom of drainages.
- Notice to Lessee- Attach the following NTL to the Lease Offer and Lease: "Prior to the anticipated crossing of or use of Reclamation facilities associated with the Paonia Project, Colorado, the lessee shall contact Reclamation, Western Colorado Area Office, Grand Junction, Colorado to coordinate and acquire the appropriate authorization for such activities."
- APDs- Use of appropriate BMPs to minimize potential adverse effects to natural and cultural resources, and other land and resource uses.

**Parcel 6195**- Parcel 6195 includes some Reclamation withdrawn lands along the FMC, Paonia Project, as well as BLM lands encompassing or in close proximity to that canal.
*Issues Concerns (6195):*
- Development on steep slopes and within or across drainages above or along the FMC could cause increased erosion, subsidence, or mass wasting, which could adversely affect the canal and irrigation water delivery and quality.
- Potential for unauthorized use of Reclamation project water and or facilities.
- The likely access to the parcel would require crossing the FMC, both on and off lease. Existing canal crossings may not be sufficient for the anticipated heavy vehicular traffic associated with oil/gas development.

*Lease Recommendations (6195):*
- No Surface Occupancy-
    - Reclamation Withdrawn Land
        - N½NE¼SE¼, SW¼NE¼SE¼, N½SE¼NE¼SE¼,Sec. 3, T14S, R92W, 6th PM- Protection of FMC (pursuant to Section 6H, 1983 IA)
    - BLM Land
        - That portion of the SW¼SW¼, Sec. 3, T14S, R9W, 6th PM, lying east of a line parallel to and at all points 200 feet westerly of the west bank of the FMC- Protection of FMC.
- Notice to Lessee- Attach the following NTL to the Lease Offer and Lease: "Prior to the anticipated crossing of or use of Reclamation facilities associated with the Paonia Project, Colorado, the lessee shall contact Reclamation, Western Colorado Area Office, Grand Junction, Colorado to coordinate and acquire the appropriate authorization for such activities."
- APDs- Use of appropriate BMPs to minimize potential adverse effects to natural and cultural resources, and other land and resource uses.

**Parcel 6196**- Parcel 6196 includes some Reclamation withdrawn lands along the FMC, Paonia Project, as well as BLM lands encompassing or in close proximity to that canal.
*Issues Concerns (6196):*
- Development on steep slopes and within or across drainages above or adjacent to the canal could cause increased erosion, subsidence, or mass wasting, which could adversely affect the FMC and delivery of irrigation water.
- Likely access to portions of the lease parcel involves crossings of the FMC, both on and off lease. Existing canal crossings may not be sufficient for the anticipated heavy vehicular traffic associated with oil/gas development.
- Potential for unauthorized use of Reclamation project water resources or facilities.

*Lease Recommendations (6196):*
- No Surface Occupancy
    - Reclamation Withdrawn Lands

BLM_0113298

- N½SW¼NW¼, Sec. 17; NW ¼NE¼NW¼, S½NE¼NW¼, E½SW¼NW¼, SE¼NW¼, Sec. 18, T14S, R92W, 6th PM- Protection of FMC (pursuant to Section 6H, 1983 IA)
  - BLM Lands
    - S½SW¼NW¼, Sec. 17- Protection of FMC
    - Steep slopes and drainages above or adjacent to the FMC
- Notice to Lessee- Attach the following NTL to the Lease Offer and Lease: "Prior to the anticipated crossing of or use of Reclamation lands, or facilities associated with the Paonia Project, Colorado, the lessee shall contact Reclamation, Western Colorado Area Office, Grand Junction, Colorado to coordinate and acquire the appropriate authorization for such activities."
- APDs- Use of appropriate BMPs to minimize potential adverse effects to natural and cultural resources, and other land and resource uses.

**Parcel 6201-** The Aspen Ditch, a Smith Fork Project facility, traverses the eastern tract of this parcel. There are no Reclamation withdrawn lands within the parcel.
*Issues Concerns (6201):*
- Access to portions of the parcel will likely involve crossings of the Aspen Ditch either on or off lease. Existing canal crossings may not be sufficient for the anticipated heavy vehicular traffic associated with oil/gas development.
- Development within and adjacent to the right-of-way for the Aspen Ditch could adversely affect the ditch and its operations/maintenance road, project water resources, and the ability of the Crawford Water Conservancy District to deliver water to its members.
- Potential for unauthorized use of project water and/or facilities.
*Lease Recommendations (6201):*
- Conditional Surface Use- NSO within 200 feet of the banks of the Aspen Ditch.
- Notice to Lessee- Attach the following NTL to the Lease Offer and Lease: "Prior to the anticipated crossing of or use of Reclamation facilities associated with the Smith Fork Project, Colorado, the lessee shall contact Reclamation, Western Colorado Area Office, Grand Junction, Colorado to coordinate and acquire the appropriate authorization for such activities."
- APDs- Use of appropriate BMPs to minimize potential adverse effects to natural and cultural resources, and other land and resource uses.

**Parcel 6202-** Parcel 6202 includes some Reclamation withdrawn lands for the Fruitland Mesa Project which was authorized for construction, but never constructed. Reclamation has previously requested that the withdrawals for the Fruitland Mesa Project be revoked in their entirety.
*Issues Concerns (6202):*
- Potential for environmental damage for which Reclamation might be held liable and potential for BLM not to accept the return of the damaged land to the public domain if Reclamation's withdrawal is not revoked prior to lease and subsequent development.
- General issue of effective protection of natural and cultural resources, and land and resource uses.
*Lease Recommendations (6202):*
- No lease until Reclamation's withdrawal is revoked.
- Following revocation of Reclamation's withdrawal, lease with applicable stipulations from the 1989 Uncompahgre Basin Resource Management Plan and without any Bureau of Reclamation special stipulations.

**Parcel 6206-** Parcel 6206 contains Reclamation withdrawn lands and facilities for the Paonia Project, including Paonia Dam and portions of Paonia Reservoir and Paonia State Park, as well as BLM lands adjacent to or in close proximity to the reservoir.
*Issues Concerns (6206):*
- Potential impacts to Paonia Reservoir and its water resources, and Paonia State Park and its recreational resources and uses as a result of nearby oil/gas development.

4

- Drilling within 1000 horizontal or vertical feet of the toes or abutments of Paonia Dam, could cause damage to the structural integrity of the dam.
- Development on steep slopes and within or across drainages above Paonia Reservoir could cause increased erosion, subsidence, or mass wasting, which could adversely affect the capacity of the reservoir and the quantity and quality of Paonia Project water resources.
- What are the potential effects to Paonia Reservoir from adjacent oil/gas development, particularly coal bed methane? Methane seeps in Paonia Reservoir suggest an interconnection with underlying coalbeds. Will depressurization of producing zones yield a back flow of water along faults/fissures with potential loss of reservoir water or failure of the reservoir and increased produced water from gas wells?
- Heavy vehicular traffic through the Paonia Reservoir Area/Paonia State Park and the associated effects to public safety, recreation, and project facilities and water resources.
- Likely access to portions of the lease parcel would be across Reclamation lands through the Paonia Reservoir Area/Paonia State Park via what is identified as Gunnison County Road 2. However, there is a question as to whether or not that road is a county road. If this road is not a county road, then Reclamation would not allow lease development traffic through the reservoir area.
- It is unclear as to how that portion of this parcel above the southeast corner of the Paonia Reservoir Area may be accessed. It is surrounded by steep slopes, and private or  Reclamation lands. Reclamation is not likely to approve any access to this lease area through Paonia Reservoir Area/Paonia State Park, except on a documented public road.

*Lease Recommendations (6206):*
- No Lease- The following Reclamation lands are unavailable for leasing for oil and gas. Development of oil and gas on these areas would be incompatible with Reclamation project purposes and their protection, and the protection of Reclamation facilities within the Paonia Reservoir Area and Paonia State Park.
  - SE¼SE¼, Sec. 5; NE¼NE¼, N½NW¼, SW¼NW¼, Sec. 8; Lots 2 and 3, Sec. 9; T13S, R89W, 6th PM- Protection of Paonia Reservoir and project facilities and uses (pursuant to Section 6H, 1983 IA).
- Special Stipulations (Reclamation)
  - No drilling within 1000 horizontal or vertical feet of the toes or abutments of Paonia Dam.
  - No vehicular access for oil/gas development through the Paonia Reservoir Area/Paonia State Park, except on documented public roads.
- No Surface Occupancy on steep slopes and within drainages.
- Notice to Lessee- Attach the following NTL to the Lease Offer and Lease: "Prior to the anticipated crossing of or use of Reclamation lands or facilities associated with the Paonia Project, Colorado, the lessee shall contact Reclamation, Western Colorado Area Office, Grand Junction, Colorado to coordinate and acquire the appropriate authorization for such activities."
- APDs- Use of appropriate BMPs to minimize potential adverse effects to natural and cultural resources, and other land and resource uses.

**Parcel 6207**- Parcel 6207 includes some Reclamation withdrawn lands along the FMC, Paonia Project, as well as BLM lands encompassing or in close proximity to portions of that canal.
*Issues Concerns (6207):*
- Development on steep slopes and within or across drainages above or along the canal could cause increased erosion, subsidence, or mass wasting, which could adversely affect the operation or capacity of the FMC or the quantity and quality of its water.
- Access to portions of the proposed lease parcel would likely cross the FMC. Existing canal crossings may not be sufficient for the anticipated heavy vehicular traffic associated with oil/gas development.
- Potential for unauthorized use of Paonia project facilities or water during lease development.
*Lease Recommendations (6207):*

5

- No Surface Occupancy
  - Reclamation Withdrawn Lands: SW¼ Lot 2, S½SW¼NE¼, Sec. 13; portions of Lots 1 and 6, Sec. 21; T13S, R91W, 6th PM- Protection of FMC (pursuant to 1983 IA)
  - BLM- steep slopes and drainages along/above the FMC.
- Notice to Lessee- Attach the following NTL to the Lease Offer and Lease: "Prior to the anticipated crossing of or use of Reclamation lands or facilities associated with the Paonia Project, Colorado, the lessee shall contact Reclamation, Western Colorado Area Office, Grand Junction, Colorado to coordinate and acquire the appropriate authorization for such activities."
- APDs- Use of appropriate BMPs to minimize potential adverse effects to natural and cultural resources, and other land and resource uses.

**Parcel 6215- (MU 16)** Parcel 6215 adjoins the east side of the Paonia Reservoir Area/Paonia State Park and encompasses steep slopes above the reservoir, as well as portions of Williams and Deep Creeks, which are tributary to the reservoir. There are no Reclamation lands within the parcel.
*Issues Concerns (6215):*
- Potential impacts to Paonia Reservoir and its water resources, and Paonia State Park and its recreational resources and uses as a result of nearby oil/gas development.
- Lease development on steep slopes and within drainages above Paonia Reservoir could cause increased erosion, subsidence, or mass wasting, which could adversely affect the capacity of the reservoir and the quantity and quality of its water resources.
- Likely access to portions of the lease parcel would be across Reclamation lands through the Paonia Reservoir Area/Paonia State Park via what is identified as Gunnison County Road 2. However, there is a question as to whether or not that road is a county road. If this road is not a county road, then Reclamation would not allow lease development traffic through the reservoir area.
- What are the potential effects to Paonia Reservoir from adjacent oil/gas development, particularly coal bed methane? Methane seeps in Paonia Reservoir suggest an interconnection with underlying coalbeds. Will depressurization of producing zones yield a back flow of water along faults/fissures with potential loss of reservoir water or failure of the reservoir and increased produced water from gas wells?
- Heavy vehicular traffic through the Paonia Reservoir Area/Paonia State Park and the associated effects to public safety, recreation, and project facilities and water resources.
- Potential for unauthorized use of Paonia project facilities or water during lease development.
*Lease Recommendations (6215)*
- No Surface Occupancy on the steep slopes and in the bottom of drainages.
- Notice to Lessee- Attach the following NTL to the Lease Offer and Lease: "Prior to the anticipated crossing of or use of Reclamation facilities associated with the Paonia Project, Colorado, the lessee shall contact Reclamation, Western Colorado Area Office, Grand Junction, Colorado to coordinate and acquire the appropriate authorization for such activities."
- APDs- Use of appropriate BMPs to minimize potential adverse effects to natural and cultural resources, and other land and resource uses.

**Parcel 6216-** Parcel 6216 adjoins the Paonia Reservoir Area/Paonia State Park on the east side and encompasses steep slopes above the reservoir. There are no Reclamation lands within the parcel.
*Issues Concerns (6216):*
- Lease development on steep slopes could cause increased erosion or subsidence which could adversely affect Paonia Reservoir and its water resources.
- What are the potential effects to Paonia Reservoir from adjacent oil/gas development, particularly coal bed methane? Methane seeps in Paonia Reservoir suggest an interconnection with underlying coalbeds. Will depressurization of producing zones yield a back flow of water along faults/fissures

6

BLM_0113301

with potential loss of reservoir water or failure of the reservoir and increased produced water from gas wells?

- Likely access to portions of the lease parcel would be across Reclamation lands through the Paonia Reservoir Area/Paonia State Park via what is identified as Gunnison County Road 2. However, there is a question as to whether or not that road is a county road. If this road is not a county road, then Reclamation would not allow lease development traffic through the reservoir area.
- It is unclear how this parcel may be accessed. It is surrounded by steep slopes private or BOR withdrawn lands. Reclamation is not likely to approve any access to this lease area through Paonia Reservoir Area/Paonia State Park, except via a documented public road.
- Heavy vehicular traffic through the Paonia Reservoir Area/Paonia State Park and the associated effects to public safety, recreation, and project facilities and water resources.
- Potential for unauthorized use of Paonia project facilities or water during lease development.

*Lease Recommendations (6216)*
- No Surface Occupancy on the steep slopes and in the bottom of drainages.
- Notice to Lessee- Attach the following NTL to the Lease Offer and Lease: "Prior to the anticipated crossing of or use of Reclamation land or facilities associated with the Paonia Project, Colorado, the lessee shall contact Reclamation, Western Colorado Area Office, Grand Junction, Colorado to coordinate and acquire the appropriate authorization for such activities."
- APDs- Use of appropriate BMPs to minimize potential adverse effects to natural and cultural resources, and other land and resource uses.

If you have any questions regarding this review and the recommendations, please contact Alan Schroeder at 9970-248-0692 or aschroeder@usbr.gov.

Sincerely,

Kathleen Ozga,
Chief, Lands and Recreation Resources Group

cc: Crawford Water Conservancy District
183 Hwy 92
Crawford, CO 81415

North Fork Water Conservancy District
PO Box 217
Hotchkiss, CO 81419

Fire Mountain Canal and Reservoir Company
PO Box 414
Paonia, CO 81428

Paonia State Park
40468 Colorado 92
Crawford, CO 81415

Crawford State Park
40468 Colorado 92,
Crawford, CO 81415

7

BLM_0113302

Mr. Kurt Mill
Colorado State Parks
361 32 Road
Clifton, CO 81520

Ms. Sharon Sales (LLCO922000)
Colorado State Director
Bureau of Land Management
Colorado State Office
2850 Youngfield Street
Lakewood, CO 80215

Attn: UC-420
Bureau of Reclamation
Upper Colorado Regional Office
125 South State Street, Room 6107
Salt Lake City, UT 84138-1102

8

BLM_0113303

| **From:** | Holst, Jon |
|---|---|
| **To:** | BLM_CO_UFO_Leasing |
| **Cc:** | Spezze, Tom; tony.gurzick@state.co.us; Wenum, J; Wait, Scott; Alves, John; Madariaga, Kirk; Magee, Brian; Titus, Shari |
| **Subject:** | August 2012 Lease Sale |
| **Date:** | Monday, February 06, 2012 4:11:15 PM |
| **Attachments:** | CPW - August 2012 OG Lease Sale Ltr_020312_approved.pdf  Attachment 1 - CPW Lease Recommendations.pdf |

To Whom it May Concern:

Colorado Parks and Wildlife's comments on the parcels nominated for BLM's August 2012 Lease Sale are attached for your review.  A hardcopy of these materials have also been sent by regular mail to:

August 2012 Lease Sale
Uncompahgre Field Office
2465 South Townsend Ave
Montrose, Colorado  81401
co_ufo_leasing@blm.gov

Please contact me if you have any questions or concerns.

*Jon Holst*
*Energy Liaison*
*Colorado Parks and Wildlife, SW Region*
*415 Turner Drive*
*Durango, CO 81303*
*(970) 759-9588*

"Don't let what you cannot do interfere with what you can do."
- John Wooden

BLM_0113304



# COLORADO PARKS & WILDLIFE

6060 Broadway • Denver, Colorado 80216
Phone (303) 297-1192 • FAX (303) 291-7109
wildlife.state.co.us • parks.state.co.us

415 Turner Drive
Durango, CO 81301

3 February 2012

August 2012 Lease Sale
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, Colorado  81401
co_ufo_leasing@blm.gov

**RE:  August 2012 Lease Sale**

Dear Ms. Sharrow,

Colorado Parks and Wildlife (CPW) has reviewed the Bureau of Land Management (BLM) scoping notice and request for comment on the August 2012 oil and gas lease sale parcels nominated in Gunnison and Delta Counties, Colorado.  CPW appreciates the opportunity to coordinate with BLM Field Office staff early in the review process for this sale, and to provide BLM with the best available information regarding protection of wildlife resources during oil and gas development.

The parcels nominated for the August 2012 sale contain mapped habitats for a variety of species, including mule deer, elk, black bear, turkey, dusky grouse, white-tailed prairie dogs, and a variety of raptor species.  Due in large part to plentiful big game populations, Delta and Gunnison counties received combined economic benefits of approximately $80.9 million in 2007 from hunting and fishing activities that support an estimated 912 jobs (BBC Research and Consulting 2008).  These economic benefits from hunting and fishing recreational activities are a sustainable annual source of economic benefit for Delta and Gunnison counties only if wildlife populations, and particularly big game populations, are maintained and quality hunting opportunities continue to exist.

On December 13, 2010, CPW provided BLM's State Office recommendations for oil and gas lease stipulations relevant to Resource Management Plan (RMP) revisions and quarterly lease sales in Colorado (see Attachment 1 - "Lease Recommendations").  CPW's Lease Recommendations are intended to provide consistent protections for wildlife and wildlife habitat across BLM planning area boundaries, and provide a basis for discussions regarding protections for wildlife in BLM's quarterly oil and gas lease sales.  Our hope is that implementation of consistent recommendations in RMPs and quarterly lease sales will streamline appropriate oil and gas development while also

STATE OF COLORADO
John W. Hickenlooper, Governor ● Mike King, Executive Director, Department of Natural Resources
Rick D. Cables, Director, Colorado Parks and Wildlife
Parks and Wildlife Commission: David R. Brougham ● Gary Butterworth, Vice-Chair ● Chris Castilian
Dorothea Farris ● Tim Glenn, Chair ● Allan Jones ● Bill Kane ● Gaspar Perricone  ● Jim Pribyl ● John Singletary
Mark Smith, Secretary ● Robert Streeter ● Lenna Watson ● Dean Wingfield
Ex Officio Members: Mike King and John Salazar

providing for the long-term conservation of wildlife resources across the State of Colorado.

The recommendations below echo those outlined in our December 12, 2010 Lease Recommendations and reflect our current understanding of the best available science regarding protective lease stipulations necessary to maintain existing wildlife populations in the proposed lease area.

### Big Game Crucial Winter Habitats and Migratory Corridors

Crucial winter habitats and migratory corridors are known to be a limiting factor on big game populations in western Colorado and other high mountain areas of the western United States (Sawyer et al. 2009, Bishop et al. 2009, Bartman et al. 1992). The following parcels nominated for the August 2012 lease sale include approximately 5,282 acres of mapped elk migration corridors, 11,038 acres of mapped elk winter concentration areas, and 18,875 acres of mule deer critical winter range:

**Parcel #'s   6189, 6190, 6191, 6192, 6193, 6194, 6195, 6196, 6197, 6198,
6199,   6200, 6201, 6202, 6203, 6205, 6206, 6207**

BLM's existing RMP contains a Timing Limitation Stipulation (Exhibit UB-04) for crucial deer and elk winter ranges. It does not, however, contain a Timing Limitation or other stipulation to protect migration corridors, nor does it address the impacts of road and well density on the effectiveness of crucial deer and elk winter ranges and migration corridors. There is a growing body of evidence that Timing Limitation Stipulations on oil and gas development activities are not adequate to protect crucial winter habitats and migratory corridors for big game, and that additional limitations on the density of surface facilities may be necessary to maintain big game populations in developing areas (Sawyer et al. 2006, 2009, Sawyer and Neilsen 2010).

Based on documented ungulate displacement distance and avoidance buffers from well pads and roads (Hebblewhite 2008, Sawyer 2006, 2009), residual unavoidable adverse impacts to ungulates increase dramatically when well pad densities exceed one pad/mile$^2$ (corresponding with a road density of approximately ½ mile of road/mile$^2$) (Wilbert et al. 2008). These residual adverse impacts occur from reduced habitat effectiveness regardless of the use of Timing Limitation Stipulations on drilling activities or other site-specific Best Management Practices designed to reduce impacts (Sawyer 2006, 2009, Wyoming Game and Fish Department 2008). Impacts to big game populations are considered extreme when well pad densities exceed four pads/mile$^2$ (Wyoming Game and Fish Department 2008, Lutz et al. 2011).

To address this decrease in the effectiveness of crucial big game winter and migratory habitats with increasing density of oil and gas facilities, CPW currently recommends limiting the density of surface facilities in these habitats to one well pad (or less)/mile$^2$ to

STATE OF COLORADO
John W. Hickenlooper, Governor • Mike King, Executive Director, Department of Natural Resources
Rick D. Cables, Director, Colorado Parks and Wildlife
Parks and Wildlife Commission: David R. Brougham • Gary Butterworth, Vice-Chair • Chris Castilian
Dorothea Farris • Tim Glenn, Chair • Allan Jones • Bill Kane • Gaspar Perricone • Jim Pribyl • John Singletary
Mark Smith, Secretary • Robert Streeter • Lenna Watson • Dean Wingfield
Ex Officio Members: Mike King and John Salazar

maintain existing big game populations (see Attachment 1 - Lease Recommendations). This recommendation is consistent with recommendations made by other state fish and game agencies in the Rocky Mountain Region (Wyoming Game and Fish Department 2008, Lutz et al. 2011).

If the well pad density on the nominated parcels cannot be limited to one pad/mile$^2$ through a Master Leasing Plan or appropriate lease stipulations, we recommend that BLM defer these parcels until the existing RMP can be amended to address this well pad and road density issue with respect to big game populations. Where mineral development requires surface facility densities exceeding one well pad/mile$^2$ in big game crucial winter ranges and migration corridors, CPW recommends requiring compensatory mitigation to offset the impacts to big game populations.

Compensatory mitigation to offset impacts to big game from development on the identified parcels should focus on replacing the impacted habitat (through conservation of similar habitats) and improving adjacent habitats to the extent necessary to maintain existing big game populations in the leased area. Attempting to offset development impacts on these parcels through compensatory mitigation will only be effective with careful landscape-level planning prior to leasing and development. Local CPW staff will be available to work with BLM staff in this regard if necessary.

### Golden Eagle Nest Sites and Bald Eagle Winter Roost Sites
*Golden Eagle Nest Sites:* Portions of **parcel numbers 6189** and **6190** contain an active golden eagle nest site. **Parcel 6189** also contains a winter roost site for bald eagles. Although BLM's existing RMP contains a Timing Limitation Stipulation for bald eagle winter concentration areas (Exhibit UB-03), it does not specifically address or contain a lease stipulation to protect golden eagle nest sites or bald eagle winter roosts.

There is an established body of evidence that human activities and habitat alteration in close proximity to raptor nest sites, including golden eagle nest sites, may adversely impact nest success (Oxley et al. 1974, Bortolotti et al. 1984, Scott 1985, Knight and Skagen 1988, Watson and Langslow 1989, Holmes et al. 1993, Schomburg 2003, Fuller 2010). Golden eagles typically return to the same nest locations year-after-year, making the annual breeding success of this species sensitive to direct and inadvertent human disturbance and habitat alteration at existing nest sites (Megown et al. 2007). Protecting existing nest sites and the reproductive activities at those sites is critical for managing long-term golden eagle population trends in Colorado because the breeding success at these sites determines the number of juveniles entering the population each year.

Oil and gas development and other human activities that encroach upon golden eagle nest sites may cause abandonment of nest sites during courtship, nest site selection or egg laying reproductive periods. Repeated human-caused disturbance in close proximity to a golden eagle nest sites during the incubation or nestling phase increases the probability of

STATE OF COLORADO
John W. Hickenlooper, Governor ● Mike King, Executive Director, Department of Natural Resources
Rick D. Cables, Director, Colorado Parks and Wildlife
Parks and Wildlife Commission: David R. Brougham ● Gary Butterworth, Vice-Chair ● Chris Castilian
Dorothea Farris ● Tim Glenn, Chair ● Allan Jones ● Bill Kane ● Gaspar Perricone ● Jim Pribyl ● John Singletary
Mark Smith, Secretary ● Robert Streeter ● Lenna Watson ● Dean Wingfield
Ex Officio Members: Mike King and John Salazar

nest failure due to increased adult flushing frequency and time away from the nest, which increases the probability of egg incubation failure and predation on the eggs or nestlings (Fyfe and Olendorff 1976, Call 1979, Sutter and Jones 1981, Bortolotti et al. 1984, White and Thurow 1985, Knight and Skagen 1988, Richardson and Miller 1997, Romin and Muck 1999). Even if the nest does not completely fail, human activities and habitat alteration that encroach upon active raptor nest sites, including those associated with oil and gas activities, change raptor behavior and may reduce nest productivity (i.e. numbers of chicks fledged), potentially resulting in local or regional population declines (White and Thurow 1985, Knight and Skagen 1988, Harmata 1991, Holmes et al. 1993, Romin and Muck 1999, Fuller 2010).

Spatial buffers from development and other human activities are a proven management tool to address impacts on breeding activities at raptor nest sites (Richardson and Miller 1997, Romin and Muck 1999, Demarchi and Bentley 2005, BLM 2006, Fuller 2010). CPW has established Recommended Buffer Zones and Seasonal Restrictions for Raptors in Colorado (Klute 2009). For golden eagles, CPW recommends a year-round No Surface Occupancy lease stipulation within a ¼ mile radius of active nests, and an additional Timing Limitation seasonal restriction to human encroachment from December 15 through July 15 extending ½ mile around active nests. We encourage BLM to defer parcels 6189 and 6190 until a ¼ mile no surface occupancy buffer and ½ mile seasonal restriction can be added as a lease stipulation to protect this golden eagle nesting area from development activities.

*Bald eagle winter roosts:* While Colorado provides nesting habitat for over 90 pairs of bald eagles, it also provides winter roosting and foraging habitat for approximately 1000 bald eagles. Bald eagles congregate and rely on established winter roost sites because of their proximity to sufficient food sources and capacity to provide shelter from wind and weather. **Parcel 6189** contains an active bald eagle winter roost site.

Disruptive activities in close proximity to bald eagle winter roost sites can interfere with foraging, reducing chances of adult survival, and potentially reducing nest productivity (USFWS 2007). Where human activity agitates roosting or foraging eagles to the degree that it substantially interferes with breeding, feeding, or sheltering behavior and may cause a loss of productivity or nest abandonment, the conduct of the activity violates the Bald and Golden Eagle Protection Act's prohibition against disturbing eagles (USFWS 2007). To avoid disturbing the active bald eagle winter roost associated with parcel 6189, CPW recommends a year-round No Surface Occupancy lease stipulation within a ¼ mile radius of the active bald eagle winter roost, and an additional Timing Limitation seasonal restriction on human encroachment from November 15 through March 15 extending ½ mile around the roost site (Klute 2009). CPW recommends deferring this parcel until these protections can be added as a lease stipulation for this parcel.

STATE OF COLORADO
John W. Hickenlooper, Governor ● Mike King, Executive Director, Department of Natural Resources
Rick D. Cables, Director, Colorado Parks and Wildlife
Parks and Wildlife Commission: David R. Brougham ● Gary Butterworth, Vice-Chair ● Chris Castilian
Dorothea Farris ● Tim Glenn, Chair ● Allan Jones ● Bill Kane ● Gaspar Perricone ● Jim Pribyl ● John Singletary
Mark Smith, Secretary ● Robert Streeter ● Lenna Watson ● Dean Wingfield
Ex Officio Members: Mike King and John Salazar

### Aquatic Habitat Recovery and Conservation Waters

CPW maps Recovery and Conservation Waters for a variety of aquatic species. **Parcels 6205** and **6207** contain recovery and conservation waters for roundtail chub, a Candidate species for listing under the Federal Endangered Species Act. **Parcel 6207** also contains recovery and conservation waters for cutthroat trout, a State of Colorado Species of Concern.

In order to avoid impacts to Recovery and Conservation Waters for roundtail chub and cutthroat trout, CPW recommends a 300-foot No Surface Occupancy buffer for these habitats extending from the outermost limit of the riparian vegetation zone. In addition, CPW recommends that a Timing Limitation stipulation be implemented for any temporary stream crossings or other in-stream work to protect spawning activities for these species. For parcels 6205 and 6207 we recommend no in-stream work between May 15 and July 15 to protect spawning activities for roundtail chub. For parcel 6207 we also recommend no in-stream work between June 1 and September 1 to protect cutthroat trout spawning. If these protections cannot be added under the existing RMP, CPW recommends deferring these parcels until such time that these protection are incorporated into the RMP and corresponding lease stipulations.

### Conclusion

CPW appreciates BLM's early review of upcoming lease sales for potential surface conflicts and your efforts to resolve those conflicts prior to leasing. CPW has identified a number of parcels nominated for the August 2012 sale where the best available information indicates that the lease stipulations in BLM's existing RMP will not be adequate to effectively address impacts to wildlife resources. With this in mind, we request that the identified parcels be deferred until such time that the lease stipulations can be updated to reflect the best available information. We appreciate your consideration of these comments on the parcels proposed for the August 2012 sale. If you have any questions, please contact Jon Holst, SW Region Energy Liaison, at (970) 759-9588.

Sincerely,

Tom Spezze
SW Region Manager
Colorado Parks and Wildlife

xc: CPW – J. Wenum, Area 16 Wildlife Manager; Jon Holst, SW Region Energy Liaison; Scott Wait, SW Region Senior Terrestrial Biologist; John Alves, SW Region Senior Aquatic Biologist

STATE OF COLORADO
John W. Hickenlooper, Governor ● Mike King, Executive Director, Department of Natural Resources
Rick D. Cables, Director, Colorado Parks and Wildlife
Parks and Wildlife Commission: David R. Brougham ● Gary Butterworth, Vice-Chair ● Chris Castilian
Dorothea Farris ● Tim Glenn, Chair ● Allan Jones ● Bill Kane ● Gaspar Perricone ● Jim Pribyl ● John Singletary
Mark Smith, Secretary ● Robert Streeter ● Lenna Watson ● Dean Wingfield
Ex Officio Members: Mike King and John Salazar

**Literature Cited**

Bartman, R. M., G. C. White, and L. H. Carpenter. 1992. Compensatory mortality in a Colorado mule deer population. Wildlife Monographs 121, Supplement to the Journal of Wildlife Management.

BBC Research & Consulting. 2008. The economic impacts of hunting, fishing and wildlife watching in Colorado (Final Report). 24 pp.

Bishop, C. J., G. C. White, D. J. Freddy, B. E. Watkins, and T. R. Stephenson. 2009. Effect of enhanced nutrition on mule deer population rate of change. Wildlife Monographs 172, Supplement to the Journal of Wildlife Management. 28 pp.

Bortolotti, G.R., J.M. Gerrard, P.N. Gerrard, and D.W.A. Whitefield. 1984. Minimizing investigator induced disturbance to nesting bald eagles. Pages 85-103 *in* J.M. Gerrard and T.M. Ingram, eds. The bald eagle in Canada. Proc. Bald Eagle Days, Winnepeg.

Call, M. 1979. Habitat management guides for birds of prey. U.S. Dep. Inter. Bur. Land Manage. Tech. Note 338. Denver, CO. 70pp.

Demarchi, M.W. and M.D. Bentley. 2005. Best management practices for raptor conservation during urban and rural land development in British Columbia. (Revisions by L. Soppuck)

Foreman T.T., Sperling D., Bissonette J.A., Clevenger A.P., Cutshall C.D., Dale V.H., Fahrig L., France R., Goldman C.R., Heanue K., Jones J.A., Swanson F.J., Turrentine T., and T.C. Winter. 2003. Road Ecology. Island Press, Washington, D.C. 481 pp.

Fuller, M. R. 2010. Raptor nesting near oil and gas development: an overview of key findings and implications for management based on four reports by Hawk Watch Internationl. U.S. Dep. Inter. Bur. Land Manage. Tech. Note 432. Denver, CO. 11pp.

Fyfe , R.W., and R.R. Olendorff. 1976. Minimizing the dangers of nesting studies to raptors and other sensitive species. Can. Wildl. Serv. Occas. Pap. 23. 17pp.

Harmata, A.R. 1991. Impacts of oil and gas development on raptors associated with Kevin Rim, Montana. Kevin Rim Raptor Study Group. Montana State Univ. Bozeman. Prepared for U.S. Dep. Inter. Bur. Land Mgmt., Great Falls Res. Area, Montana. 37pp.

Hebblewhite, M. 2008. A literature review of the effects of energy development on ungulates: Implications for central and eastern Montana. Report prepared for Montana Fish, Wildlife and Parks, Miles City, MT. 125 pp.

STATE OF COLORADO
John W. Hickenlooper, Governor • Mike King, Executive Director, Department of Natural Resources
Rlck D. Cables, Dlrector, Colorado Parks and Wildllfe
Parks and Wildlife Commission: David R. Brougham • Gary Butterworth, Vice-Chair • Chris Castilian
Dorothea Farris • Tim Glenn, Chair • Allan Jones • Bill Kane • Gaspar Perricone  • Jim Pribyl • John Singletary
Mark Smith, Secretary • Robert Streeter • Lenna Watson • Dean Wingfield
Ex Officio Members: Mike King and John Salazar

Holmes, T. L.; Knight, R. L.; Stegall, L., and G. R. Craig. 1993.  Responses of Wintering Grassland Raptors to Human Disturbance. Wild. Soc. Bull 21:461-468.

Klute, D.  2009.  Recommended buffer zones and seasonal restrictions for Colorado raptors.  Colorado Parks and Wildlife.  Denver, CO  22 pp.

Knight, R.L., and S.K. Skagen. 1988. Effects of recreational disturbance on birds of prey: a review. Pages 355-359 *in* R.L. Glinski, B.G. Pendleton, M.B. Moss, M.N. LeFranc, B.A. Millsap, and S.W. Hoffman, eds. Proc. of southwest raptor management symposium and workshop. Natl. Wildl. Fed., Washington, D.C.

Lutz, D. W., J. R. Heffelfinger, S. A. Tessmann, r. S. Gamo, and S. Siegel. 2011.  Energy development guidelines for mule deer.  Mule Deer Working Group, Western Association of fish and Wildlife Agencies, USA.  27 pp.

Megown, R.A., L.A. Romin, K. Steenhof, M.N. Kochert.  Raptor nest reuse. Unpublished Report, version date July 2007. Salt Lake City, Utah.  U.S. Fish and Wildlife Service Utah Ecological Services

Nietvelt, C.G.  2002.  The effects of roads on wildlife: bibliography.  Report prepared for U.S. Forest Service Bridger-Teton National Forest, Jackson, Wyoming.  73 pp.

Olendorff, R.R., and M.N. Kochert.  1992.  Raptor habitat management on public lands: a strategy for the future.  Fish and Wildlife 2000: National Strategy Plans,  U.S. Dep. Inter. Bur. Land Manage.  46pp.

Oxley, D.J., M.B. Fenton, and G.R. Carmody.  1974.  The effects of roads on populations of small mammals.  J. App. Ecology.  11:51-59.

Richardson, C.T. and C.K. Miller.  1997.  Recommendations for protecting raptors from human disturbance: a review.  Wildl. Soc. Bull. 25:634-638.

Romin, L.A., and J.A. Muck. 1999. Utah field office guidelines for raptor protection from human and land use disturbances. USDI Fish and Wildlife Service, Utah Field Office. Salt Lake City , Utah, 42pp.

Rost, G. and Bailey, J. distribution of mule deer and elk in relation to roads. The Journal of Wildlife Management 43(3), 634-641. 1979. Allen Press.

Sawyer, H.and R. Neilsen.  2010.  Mule deer monitoring in the Pinedale Anticline Project Area.  Pinedale Anticline Planning Office (PAPO), Pinedale, WY. 19 pp.

STATE OF COLORADO
John W. Hickenlooper, Governor ● Mike King, Executive Director, Department of Natural Resources
Rick D. Cables, Director, Colorado Parks and Wildlife
Parks and Wildlife Commission: David R. Brougham ● Gary Butterworth, Vice-Chair ● Chris Castilian
Dorothea Farris ● Tim Glenn, Chair ● Allan Jones ● Bill Kane ● Gaspar Perricone  ● Jim Pribyl ● John Singletary
Mark Smith, Secretary ● Robert Streeter ● Lenna Watson ● Dean Wingfield
Ex Officio Members: Mike King and John Salazar

BLM_0113311

Sawyer, H., Kauffman M.J., and R.M. Nielson. 2009. Influence of well pad activity on winter habitat selection patterns of mule deer. Journal of Wildlife Management 73:1052-1061.

Sawyer, H., Nielson, R., Lindzey, F., and L. Mcdonald. 2006. Winter habitat selection of mule deer before and during development of a natural gas field. Journal of Wildlife Management 70(2), 396-403. 2006

Schomburg, J. W. 2003. Development and Evaluation of Predictive Models for Managing Golden Eagle Electrocutions. M.S. Thesis. Montana State Univ. 98 pp.

Scott, T.A. 1985. Human impacts on the golden eagle population of San Diego County from 1928-1981. M.S. Thesis. San Diego State Univ. 101pp.

Sutter, G.W. II, and J.L. Jones. 1981 Criteria for golden eagle, ferruginous hawk, and prairie falcon nest site protection. Raptor Res. 15:12-18.

USDI Bureau of Land Management. 2006. Best management practices for raptors and their associated habitats in Utah. Instruction Memorandum No. UT 2006-096. Utah State Office, Salt Lake City, UT 16 pp.

USDI Fish and Wildlife Service. 2007. National bald and golden eagle management guidelines. USFWS Division of Migratory Bird Management, Washington D.C. 23pp.

Watson, J. and D.R. Langslow. 1989. Can food supply explain variation in nesting density and breeding success amongst golden eagles *Aquila chrysaetos*? Pages 181-186 *in* Meyburg, B.U. and R.D. Chancellor, eds. Raptors in the modern world. Proc. of the III world conference on birds of prey and owls. 22-27 March 1987.

White, C.M. 1994. Population trends and current status of selected western raptors. Studies in Avian Biology 15:161-172.

White, C.M. and T.L. Thurow. 1985. Reproduction of ferruginous hawks exposed to controlled disturbance. Condor 87:14-22

Wilbert, M., Thomson, J., and N. Culver. 2008. Analysis of habitat fragmentation from oil and gas development and its impact on wildlife, The Wilderness Society ecology and economic research department, Washington, D.C. 31 pp.

Wyoming Game and Fish Department. 2008. Recommendations for development of oil and gas resources within crucial and important wildlife habitats. Internal Document. Cheyenne, Wyoming. 237 pp.

STATE OF COLORADO
John W. Hickenlooper, Governor • Mike King, Executive Director, Department of Natural Resources
Rick D. Cables, Director, Colorado Parks and Wildlife
Parks and Wildlife Commission: David R. Brougham • Gary Butterworth, Vice-Chair • Chris Castilian
Dorothea Farris • Tim Glenn, Chair • Allan Jones • Bill Kane • Gaspar Perricone • Jim Pribyl • John Singletary
Mark Smith, Secretary • Robert Streeter • Lenna Watson • Dean Wingfield
Ex Officio Members: Mike King and John Salazar

**STATE OF COLORADO**

**Bill Ritter, Jr., Governor**
**DEPARTMENT OF NATURAL RESOURCES**

# DIVISION OF WILDLIFE
AN EQUAL OPPORTUNITY EMPLOYER

Thomas E. Remington, Director
6060 Broadway
Denver, Colorado 80216
Telephone: (303) 297-1192
*wildlife.state.co.us*

*For Wildlife-*
*For People*

December 13, 2010

Helen Hankins
State Director-BLM-Colorado State Office
BLM Colorado State Office
2850 Youngfield St.
Lakewood, CO 80215

Re:   **CDOW Recommendations for Resource Management Plan Revisions and Quarterly Oil and Gas Lease Sales**

Dear Helen,

The Colorado Division of Wildlife (CDOW) would like to thank you for meeting with us regarding quarterly lease sales and the leasing reform process.  We found these meetings to be highly productive.  We continue to appreciate your cooperation.  CDOW values the opportunity for us to work together on issues that will help link the common threads of our missions, including the protection and management of wildlife and wildlife habitat.

As you know, CDOW has statutory authority to protect, preserve, enhance and manage the wildlife of Colorado for the use, benefit, and enjoyment of the people of Colorado and its visitors.  We encourage BLM to develop a standardized approach that will protect wildlife and wildlife habitats across planning area boundaries.

The purpose of this letter is two-fold.  One is to make recommendations for Resource Management Plan (RMP) guidance that will allow appropriate oil and gas exploration and development while also providing for the long-term conservation of wildlife and wildlife habitats across the State of Colorado; the second is to provide our expectations for adequate wildlife stipulations in the quarterly oil and gas lease sale process to improve efficiency.

**Wildlife Protection Considerations in Resource Management Plans**

CDOW is actively participating in the RMP revision process across the State by attending regular meetings with BLM staff and submitting comments through the Department of Natural Resources' Cooperating Agency Agreement.  We appreciate the opportunity to engage with BLM on wildlife and land use issues, and to provide comment during the draft RMP and quarterly oil and gas lease sale processes.  We have also found that engaging early with BLM by attending Notices of Staking has been

DEPARTMENT OF NATURAL RESOURCES, Mike King, Executive Director
WILDLIFE COMMISSION, Tim Glenn, Chair • Robert Streeter, Vice Chair • Mark Smith, Secretary
Members, David R. Brougham • Dennis Buechler • Dorothea Farris • Allan Jones • John Singletary • Dean Wingfield
Ex Officio Members, Mike King and John Stulp

BLM_0113313

effective for exchanging information that results in benefits for operators and wildlife.  CDOW also appreciates the opportunity to engage in BLM's new leasing reform process.

CDOW continues to be concerned that mitigating impacts on a site-by-site basis does not result in an effective conservation strategy over the long term. We recommend that the RMPs provide landscape-level analysis and guidance that, in addition to deciding which parcels are made available and under what stipulations, also addresses broader approaches such as phased or clustered development. CDOW requests that these comments be integrated, as appropriate, into relevant chapters and appendices within RMPs that are currently being revised.

As the surface density of development increases beyond one well pad per section, literature sources strongly suggest that avoidance and minimization measures alone are no longer sufficient to address adverse impacts to some species, and compensatory mitigation is necessary to offset the permanent loss of wildlife resources.  We would like to see RMPs incorporate avenues to seek compensatory mitigation when surface density exceeds one well pad per section (within the habitats we've identified) or when other development parameters exceed the point where normal operational practices provide sufficient avoidance and minimization of impacts to wildlife.  CDOW would also like to highlight the importance of implementing adaptive management and monitoring programs to assess oil and gas development with respect to resulting impacts on the landscape.

**Recommendations for Lease Stipulations**

As you are aware, CDOW has prepared a detailed list of Best Management Practices (BMPs) for oil and gas development, titled *"Actions to Minimize Adverse Impacts to Wildlife Resources."* The first part of the document contains general BMPs and the last part contains species-specific BMPs.  The species-specific BMPs include recommendations on protective buffers (grouse, raptors, riparian, etc.), timing information (winter range, breeding periods, etc.), and recommendations on surface density caps (mule deer and grouse).  While this document does not cover all wildlife species in Colorado, it does cover the majority of the species that CDOW is concerned about.

As a tool to assist you, we have summarized the information from the species-specific BMPs into a simplified matrix which is attached to this letter.  The matrix includes those wildlife species and habitats that would be best protected through BLM's implementation of these recommendations as standard stipulations in RMPs and quarterly lease sales.  The matrix lists wildlife species, habitat types, and area or buffer distance recommendations for No Surface Occupancy Stipulations, buffer distance and time periods associated with Timing Limitation Stipulations, and facility density, surface disturbance and noise limitations for Controlled Surface Use Stipulations.

**No Surface Occupancy Stipulations**

**No Surface Occupancy** is recommended at nest and breeding sites for certain species (see attached table for details) including: bighorn sheep, Brazilian free-tailed bat, Townsend's big-eared bat, fringed myotis, Columbian sharp-tailed grouse, cutthroat trout, greater sage-grouse, greater prairie chicken, Gunnison sage-grouse, least tern, lesser prairie chicken, mountain plover, northern leopard frog, piping plover, plains sharp-tailed grouse, Preble's and New Mexico meadow jumping mouse, various raptors, southwest willow flycatcher, western boreal toad, and certain aquatic habitats including 300 feet from the ordinary high water mark.

In addition, CDOW recommends **No Lease**, or at a minimum **No Surface Occupancy**, within some categories of wildlife habitat and other special management areas significant to wildlife and wildlife recreation in Colorado, including: State Wildlife Areas, greater sage-grouse core areas, Gunnison sage-grouse occupied habitat, gold medal waters, designated cutthroat trout habitat, roadless areas, and Wilderness Study Areas.

**Timing Limitation Stipulations**

**Timing Limitation** stipulations recommendations are made for certain species (see attached table for details) including: bighorn sheep, black-footed ferret, Columbian sharp-tailed grouse, cutthroat trout, mule deer, elk, greater sage-grouse, greater prairie chicken, Gunnison sage-grouse, kit fox, least tern, lesser prairie chicken, mountain plover, piping plover, plains sharp-tailed grouse, prairie dogs, pronghorn antelope, raptors, southwest willow flycatcher, swift fox, and various aquatic species.

Several species are recommended for **Lease Notices** to require habitat surveys, as appropriate including: bats, black bear, black footed ferret, kit fox, least tern, lynx, mountain plover, northern leopard frog, piping plover, prairie dogs, Preble's and New Mexico jumping mouse, raptors, river otter, southwest willow flycatcher, and swift fox.

**Controlled Surface Use Stipulations**

A **Controlled Surface Use** Stipulation is recommended to restrict density of surface development to one well pad per section (above this level of disturbance, off site and/or on site mitigation is recommended, as appropriate) within select habitats for certain species, including: bighorn sheep, Columbian sharp-tailed grouse, cutthroat trout, mule deer, elk, greater sage-grouse, greater prairie chicken, Gunnison sage-grouse, lesser prairie chicken, plains sharp-tailed grouse, southwest willow fly catcher, western boreal toad, and generally aquatic species.

As a minimum standard for sage grouse, CDOW recommends a **Controlled Surface Use** stipulation which caps disturbance at less than or equal to 1 percent of the total surface area of mapped sage grouse seasonal habitats (located within core areas), or if seasonal habitats are unmapped, within the core area boundary. Note that for Gunnison sage-grouse, occupied habitat is considered the core area boundary. For occupied greater sage-grouse habitat outside of core areas, CDOW recommends a 5 percent cap on surface disturbance within mapped seasonal habitats, or if seasonal habitats are unmapped, within the occupied habitat boundary.

CDOW also recommends a **Controlled Surface Use Stipulation** in all mapped sage grouse seasonal habitats and core areas to limit noise emissions from oil and gas facilities consistent with the recommendations in both the Colorado Greater Sage-grouse Conservation Plan and the Gunnison Sage-grouse Rangewide Conservation Plan. Similar noise limitations within mapped seasonal habitats and core areas (where defined) are likely to benefit Columbian sharp-tailed grouse, plains sharp-tailed grouse, and lesser prairie chickens.

**Lease Notices**

**Lease Notices** are also recommended for several species which may be threatened or endangered or candidates for listing including: black-footed ferret, cutthroat trout, Gunnison sage-grouse, least tern, lynx, piping plover, Preble's and New Mexico jumping mouse, southwest willow fly catcher, and western boreal toad.

CDOW also recommends that **Lease Notices** be applied to any lease issued in habitat where threatened and endangered species exist, within Gunnison and greater sage-grouse production areas, State of Colorado listed sensitive species, migration corridors (where surface density caps may provide the most effective protection), designated cutthroat trout habitat, and critical habitat areas where wildlife species are in decline, and within habitats that are irreplaceable and unique. These Lease Notices should notify lessees that additional restrictions may be applied to protect these key wildlife habitats. Other information contained within the BMPs document could be utilized to formulate Conditions of Approval attached with Applications for Permits to Drill, as BLM deems appropriate.

**Ongoing Coordination**

CDOW's recommendations are based on recent peer-reviewed research of the impacts of development on wildlife and wildlife habitats. Our recommendations are likely to evolve through time as new wildlife science becomes available. This is particularly true for some species, such as greater and Gunnison sage-grouse, where our understanding of development impacts on these species continues to improve. Change in status of species which are petitioned for inclusion as threatened or endangered under the Endangered Species Act may also influence future recommendations.

It is not CDOW's intent to create static recommendations regarding lease stipulations, as species and habitats and their priorities often change. We appreciate that recommendations must remain flexible and these recommendations must reflect current conditions as we know them. However, regular communication between the CDOW and BLM Geospatial Information Systems Departments' should help ensure that stipulations retain sufficient flexibility to be applied to the most appropriate places over time.

We look forward to continuing to work with you in the future and continuing productive dialog on this subject. Please let us know if we can provide any more information that BLM would find helpful.

Sincerely,

Thomas E. Remington
Director

CC:    Sherri Thompson-Denver BLM Office
       Steve Bennett, BLM NW District Office
       Lori Armstrong, BLM SW District Office
       Greg Shoop, BLM Front Range District Office
       Nancy Warren, CDOW
       Ron Velarde, CDOW
       Dan Prenzlow, CDOW
       Tom Speeze, CDOW
       Steve Yamashita, CDOW
       K. Kaal, CDOW
       D. Riggs, CDOW
       B. Petch, CDOW
       J. Holst, CDOW
       C. Greenman, CDOW
       A. Trujillo, CDOW

## CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado

| Wildlife Species | Habitat Types | No Surface Occupancy Stipulation (area or buffer distance) | Timing Limitation Stipulation (time period - may be greater than 60 days) | Controlled Surface Use Stipulation (potential facility relocate or other operational constraint) |
|---|---|---|---|---|
| Bats (Brazilian Free-tailed, Townsend's Big-eared, Fringed Myotis) | Roost Sites | Within 0.25 Miles of Roost Site | N/A | A bat inventory may be required prior to approval of operations within historic mining complexes. These are areas where bats are suspected or the habitat is deemed suitable but no bats have been documented.  The inventory data will be used to apply conservation measures to reduce the impacts of surface disturbance on bat habitat |
| Bighorn Sheep | Production Areas | Entire Mapped Production Area | (TL for human activities in these habitats including over flights) April 15-June 30 (Rocky Mountain) February 28-May 1 (Desert) | N/A |
| | Winter Range | Entire Mapped Winter Range Area | November 1-April 15 | N/A |
| Black Footed Ferret | Release Areas | N/A | Entire Area March 1-July 15 | N/A |
| Columbian Sharp-tailed Grouse | Leks | Within 0.4 Miles of Lek Sites | N/A | N/A |
| | Winter habitat | N/A | Restrict development between Dec 1- March 15 | Limit noise not to exceed 49 dB  measured 30 ft. from source. |
| | Production Areas (Breeding and Nesting habitat) | N/A | Within 1.25 Miles of Lek Sites March 15-July 30 | Surface Density Limitation of one pad per section; Relocate compressors > 1.25 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| Cutthroat Trout | Designated Cutthroat Habitat | 300-Feet from OHWM | SEE Aquatic Species stip | N/A |
| | Designated Cutthroat Habitat Watershed | N/A | N/A | Surface Density Limitation of one pad per section |
| Mule Deer | Crucial Winter Ranges (Severe Winter Range and Winter Concentration Areas) | N/A | December 1-April 15 | Surface Density Limitation of one pad per section or consider off site mitigation |
| Elk | Crucial Winter Ranges (Severe Winter Range and Winter Concentration Areas) | N/A | December 1-April 15 | Surface Density Limitation of one pad per section or consider off site mitigation actions |
| | Production Areas | N/A | May 15-June 30 | Surface Density Limitation of one pad per section or consider off site mitigation actions |

BLM_0113317

| Gunnison/Greater Sage-grouse | | | | |
|---|---|---|---|---|
| | Leks [1] | Within 0.6 Miles of Lek Sites | N/A | N/A |
| | Core Areas (Occupied Habitat = Core Area for Gunnison sage-grouse) | No Lease | N/A | Surface Density Limitation of one pad per section; Relocate compressors > 4 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| | Winter Range | N/A | December 1-March 15 | Surface Density Limitation of one pad per section; Relocate compressors > 4 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| | Production Areas (Breeding and Nesting habitat | N/A | Within 4 Miles of Lek Sites  March 1-June 30 | Surface Density Limitation of one pad per section; Relocate compressors > 4 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| Greater Prairie Chicken | | | | |
| | Leks | Within 0.6 Miles of Lek Sites | N/A | N/A |
| | Production Areas (Breeding and Nesting habitat | N/A | Within 2.2 miles of Lek sites March 1-June 30 | Surface Density Limitation of one pad per section; Limit noise not to exceed 49 dB  measured 30 ft. from source. |
| Kit Fox | | | | |
| | Den Sites | N/A | Within 0.25 mile of den sites February 1-May 1 | Pre-construction survey for den sites may be required |
| Least Tern | | | | |
| | Production Areas (Breeding and Nesting habitat) | Within 300 Feet OHWM | 0.5 Miles-No Human Encroachment-April 1-July 31 | N/A |
| Lesser Prairie Chicken | | | | |
| | Leks [2] | Within 0.6 Miles of Lek Sites | N/A | N/A |
| | Core Areas | No Lease | N/A | Surface Density Limitation of one pad per section; Relocate compressors > 2.2 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| | Production Areas (Breeding and Nesting Habitat) | | Within 2.2 Miles of Lek Sites March 15-June15 | Surface Density Limitation of one pad per section; Relocate compressors > 2.2 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| Lynx | | Consult with DOW regarding Lynx use of the development area | | |
| Mountain Plover | Active Nest Site | Within 300 Feet of Active Nest | N/A | Pre-construction survey for nest sites may be required |
| Piping Plover | Production Areas (Breeding and Nesting Habitat) | Within 300 Feet OHWM | Within 0.5-No Human Encroachment-April 1-July 31 | N/A |

BLM_0113318

| | | | | |
|---|---|---|---|---|
| **Plains Sharp-Tailed Grouse** | | | | |
| | Leks | Within 0.4 Miles of Lek Sites | N/A | N/A |
| | Core Areas | No Lease | N/A | Surface Density Limitation of one pad per section; Relocate compressors > 1.25 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| | Production Areas (Breeding and Nesting Habitat) | N/A | Within 1.25 Miles of Lek Sites-March 1- June 30 | Surface Density Limitation of one pad per section; Relocate compressors > 1.25 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| **Prairie Dogs (White-tailed/Gunnison's)** | | | | |
| | Colonies | N/A | March 1-June 15 | Pre-construction survey for active colonies may be required; avoid direct disturbance to active colonies when possible |
| **Preble's and New Mexico Meadow Jumping Mouse** | | | | |
| | Known and Potential Occupied Habitat | Within 300 ft. of stream centerline | N/A | N/A |
| **Pronghorn Antelope** | | | | |
| | Winter Concentration Areas | N/A | January 1-March 31 | N/A |
| **Bald Eagle** | | | | |
| | Active Nest Site [3] | Within 0.25 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | Active Nest Site | N/A | 0.5 Miles- No Human Encroachment October 15-July 31 | |
| | Active Winter Night Roost Sites [4] | Within 0.25 Miles of Roost Site | N/A | Pre-construction roost surveys may be required |
| | Active Winter Night Roost Sites | N/A | 0.5 Miles- No Human Encroachment November 15 1-February 28 | |
| **Ferruginous Hawk** | | | | |
| | Active Nest Site [3] | Within 0.5 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | Active Nest Site | N/A | 0.5 Miles- No Human Encroachment February 1-July 15 | |
| **Golden Eagle** | | | | |
| | Active Nest Site [3] | Within 0.25 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | Active Nest Site | N/A | 0.5 Miles- No Human Encroachment December 15-July 15 | |
| **Mexican Spotted Owl** | | | | |
| | Protected Activity Centers (PAC) | Entire PAC | N/A | Pre-construction nest surveys may be required |
| | Protected Activity Centers (PAC) | N/A | Adjacent PAC Areas- No Human Encroachment March 1-August 31 | |
| **Northern Goshawk** | | | | |
| | Active Nest Site [3] | Within 0.5 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | Active Nest Site | N/A | 0.5 Miles- No Human Encroachment March 1-September 15 | |
| **Osprey** | | | | |
| | Active Nest Site [3] | Within 0.25 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | Active Nest Site | N/A | 0.25 Miles- No Human Encroachment April 1-August 31 | |
| **Peregrine Falcon** | | | | |
| | Active Nest Site [3] | Within 0.5 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | Active Nest Site | N/A | 0.5 Miles- No Human Encroachment March 15-July 31 | |

BLM_0113319

| | | | | |
|---|---|---|---|---|
| **Prairie Falcon** | | | | |
| | *Active Nest Site* [3] | Within 0.5 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.5 Miles-No Human Encroachment March 15-July 15 | |
| **Swainson's Hawk** | | | | |
| | *Active Nest Site* [3] | Within 0.25 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.25 Miles- No Human Encroachment April 1-July 15 | |
| **Other Raptors Not Listed Above** | | | | |
| | *Nesting Habitat* | N/A | No Human Encroachment January 1-July 15 | Pre-construction nest surveys may be required |
| | *Roost Sites* | N/A | No Human Encroachment November 15-April 1 | |
| **Burrowing Owl** | | | | |
| | *Active Nest Site* | N/A | 300 Foot March 1-August 15 | N/A |
| **River Otter** | | | | |
| | *Occupied Habitat* | N/A | N/A | Minimize disturbance of riparian vegetation and road development within 300 ft. of occupied habitat |
| **Southwest Willow Flycatcher** | | | | |
| | *Active Nest Site* | Within 300 Feet of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Suitable habitat (USFWS minimum patch size definition)* | | Restrict activities between May 15-Aug 1 | Pre-construction nest surveys may be required |
| **Swift Fox** | | | | |
| | *Den Sites* | N/A | 0.25 Mile March 15-June 15 | Pre-construction survey for den sites may be required |
| **Northern Leopard Frog** | | | | |
| | *Breeding Sites* | Within 0.25 Miles of Breeding Site | N/A | N/A |
| **Western Boreal Toad** | | | | |
| | *Breeding Sites* | Within 0.5 Miles of Breeding Site | N/A | N/A |
| **Aquatic Species** | | | | |
| | *Gold Medal Water* | 300 Feet from OHWM | N/A | N/A |
| | *Rainbow Trout* | N/A | March 1-June 15 | N/A |
| | *Brown Trout* | N/A | October 1-May 1 | N/A |
| | *Brook Trout* | N/A | August 15-May 1 | N/A |
| | *Cutthroat Trout* | N/A | June 1-September 1 | N/A |
| | *Bluehead Sucker* | N/A | May 1-July 15 | N/A |
| | *Flannelmouth Sucker* | N/A | April 1-July 1 | N/A |
| | *Roundtail Chub* | N/A | May 15-July 15 | N/A |

[1] Greater and Gunnison sage-grouse lek = any lek active within last 10 years (core area); any lek active within last 5 years (outside core area)

[2] Lesser prairie chicken lek = any lek active within last 3 years

[3] Active Nest Site = any nest that is frequented or occupied by a raptor during the breeding season, or which has been frequented or occupied in any of the five previous breeding seasons

[4] Active Bald Eagle Winter Night Roost = Areas where bald eagles gather and perch overnight, and sometimes during the day in the event of inclement weather.

BLM_0113320

## BLM_CO_UFO_Leasing

| | |
|---|---|
| **From:** | Cathy Purves <CPurves@tu.org> |
| **Sent:** | Thursday, February 09, 2012 10:07 AM |
| **To:** | BLM_CO_UFO_Leasing |
| **Cc:** | Robert Meulengracht |
| **Subject:** | TU comments to UFO August Leasing EA |
| **Attachments:** | TU- UFO August 2012 Lease Sale EA Scoping Comments.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hello Ms. Sharrow,

Please accept the attached comments from Trout Unlimited on the August 2012 lease sale proposed EA.

Thank you.

Cathy

Cathy Purves
*Science & Technical Advisor*
Trout Unlimited
250 North 1st Street
PO Box 64
Lander, WY   82520
307-332-6700 phone
307-332-9299 fax
307-349-2558 cell
cpurves@tu.org

BLM_0113321

   

*Email to:* [blm_co_ufo_leasing@blm.gov](blm_co_ufo_leasing@blm.gov) *and via U.S. Postal*

February 9, 2012

Barb Sharrow, Field Manager
BLM Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO   81401

**RE:  Comments to  Colorado's August 2012 Oil and Gas Lease Sale Environmental Assessment**

Dear Ms. Sharrow,

Please accept the following scoping comments from Trout Unlimited and Colorado Trout Unlimited  for the Bureau of Land Management's (BLM) proposed environmental assessment on the leasing evaluation of  30,000 acres within the Uncompahgre resource area for the August 2012 Competitive Oil and Gas Lease Sale.  We appreciate the opportunity to provide input for the future environmental assessment which will guide the determination process for which parcels will become available for future lease sales.

Trout Unlimited and Colorado Trout Unlimited (collectively referred to as "TU") appreciate the opportunity to participate in the public commenting process offered under the new oil and gas leasing process authorized through the  May 2010  BLM Instructional Memorandum 2010-117 on oil and gas leasing reform.  We feel strongly that this new process will increase the ability to review and provide thoughtful and useful analysis comments to the BLM prior to any offering of oil and gas leasing parcels for sale.  We sincerely hope that the incidences of protests to parcel sales will be decreased as a result of these new reforms.

## General Background

TU has a strong base support of anglers and hunters who depend on Colorado's natural resources for their multiple-use activities both now and in the future.  Members of our organization value these public lands that sustain some of the cleanest water, the healthiest habitats and finest fishing and hunting in North America. TU is composed of more than 150,000 members nationwide and has dedicated staff and

BLM_0113322

volunteers working toward the protection of sensitive ecological systems necessary to support robust native and wild trout and salmon populations in their respective ranges.

In Colorado, TU's membership of more than 10,000 anglers and 23 chapters spend countless volunteer hours each year working on projects that meet the mission of the organization. Included are members of the local TU chapters in Gunnison, Montrose and Grand Junction. In addition, thousands of TU members and non-members also participate in hunting and recreational activities in Colorado each year and depend on federal lands for these activities.

## General Scoping Comments

TU has several major considerations we feel the Uncompahgre Field Office (UFO) should consider in the Environmental Assessment (EA) prior to the offering of any lease parcels. Based on the review of the BLM's Colorado Oil and Gas Leasing Reform Implementation Strategy (March 2011) we support a leasing alternative that includes the following:

1. TU requests that the BLM withdraw all proposed lease parcels from further review until the updated version of the Uncompahgre Resource Management Plan (RMP) is completed. We feel that an analysis of the potential impacts from leasing these parcels that relies on the existing 1989 RMP would be inaccurate because the existing RMP and accompanying documents are obsolete.

2. TU request that the UFO not issue any new leases until the *1987 Draft Technical Report for the Oil and Gas, and Geothermal Resources for the Uncompahgre Basin Resource Area RMP and Environmental Impact Statement* ( 1987 Technical Report) is updated. New trends and improved access to previously unattainable energy resources makes the use of the 1987 Technical Report inaccurate.

3. TU requests all lease parcels located within a quarter-mile of coldwater fisheries be permanently withdrawn to protect the habitat required for supporting sensitive native fish species, including Colorado River cutthroat trout.

4. The Reasonable Foreseeable Development Scenario (RFDS) presented in the 1987 Technical Report is no longer applicable for use as supporting analyses given the current leasing conditions within the UFO. Underestimated impacts and inaccurate analyses on oil and gas surface locations will not provide any accuracy for the analysis of the current leases being considered, including soils, vegetation, air quality, water quality, and fish and wildlife impacts.

5 A comprehensive water quality analysis must be completed prior to any leasing based on the numerous businesses and communities within the lease proposal areas that are dependent these water sources for agricultural, tourism, and municipal purposes.

## Specific Scoping Comments

### 1. Withdraw lease parcels until the RMP is completed.

TU recommends that the BLM select the Alternative I (No Leasing Alternative) as the choice until the new RMP is completed. As mentioned above, the current RMP is dated in its reference to a significant amount of information and research. In May 2010 the BLM issued Instructional Memorandum (IM) 2010-117 on oil and gas leasing reform and TU recommends that the August 2012 Lease EA include the new processes outlined in that IM, including those strategies outlined in the Colorado Oil and Gas Leasing Strategy.

BLM_0113323

All lease parcels are located in high value fish and wildlife habitat areas, with some areas having multiple and overlapping fish and wildlife species occupancy.  Based on new research and science based studies on energy development and wildlife impacts, TU feels that the use of the 1989 RMP lease stipulations may no longer be adequate or appropriate. ***The new oil and gas leasing IM allows for the revision of old lease stipulations and the development of new lease stipulations.*** We request that, if the BLM continues to offer the leases for sale despite requests for deferral or removal, the BLM implement stronger lease stipulations that adequately protect surface waters, streams, rivers, and riparian habitat with buffer setbacks of .25 mile or more, depending on the value of the area.

For big game habitat protections, we recommend the BLM include timing restrictions in the EA that cover O & M operations in areas containing big game critical winter range, severe winter range, and critical summer range.  Due to the sensitive nature of critical winter range and the specific needs it supplies for the survival of healthy populations of mule deer and elk, timing stipulations applied only during exploration and development do not adequately prevent impacts to big game. Only by utilizing an NSO stipulation for the life of the well will the impacts from disturbances caused by maintenance and servicing wells be prevented. Moreover, timing limitations do nothing to prevent the direct loss of critical winter range and the associated reduced carrying capacity of the lands to support wildlife.

Research by wildlife biologist Hall Sawyer (among others) on the impacts of oil and gas developments over a 10-year period on mule deer in western Wyoming is clear: a 46% decline in use on critical winter range and a 60% decline in population abundance is directly attributable to the impacts from energy development and relaxing the timing restrictions (Sawyer, Hall, R. Nielson. 2010. *"Mule Deer Monitoring in the Pinedale Anticline Project Area: 2010 Annual Report"*. Presented to the Pinedale Anticline Planning Office).  Timing stipulations only speak to the stress or displacement factors discussed earlier, and then only partially. While a timing stipulation prevents surface use, the stipulation definitions often allows "routine operations and maintenance of facilities". In other words, stipulations only apply during the exploration and development stage of energy development.  The production stage, which may take place for an additional 30-40 years in the life of an ordinary well, continues to impact big game and other wildlife through the constant year-round presence of vehicles, roads, noise, and human presence; this further stresses deer and elk during the winter.

Other impacts to deer and elk from development on crucial winter range are the results of direct habitat loss and fragmentation. While it is fairly easy to quantify direct habitat impacts (loss of vegetation, surface disturbance, etc.), indirect impacts become more difficult to document.  In a study, again by Sawyer, on the Pinedale Anticline in western Wyoming, it was found that winter habitat selection and distribution patterns of mule deer were affected by well pad development.  Changes in habitat selection and use by mule deer were immediate and little to no acclimation to these well pads was evidenced after 10 years of monitoring (Sawyer, Hall, et al. 2006. *"Winter Habitat Selection of Mule Deer Before and During Development of a Natural Gas Field"*. Journal of Wildlife Management 70:396-403; Sawyer, H., et al. 2009b. *"Influence of well pad activity on the winter habitat selection patterns of mule deer."* Journal of Wildlife Management 73:1052-1061).  Because critical and/or severe winter habitat is limited in size, it becomes even more important to limit any type of development within these critical areas.

It is important to note that while Sawyer's study focused on critical winter range, other ranges such as summer, transition, and migratory ranges are equally important components of mule deer and elk range and the loss or degradation of one will not be compensated for by others. The Western Governors' Association (WGA) established an initiative on Wildlife Corridors and Crucial Habitat in 2007 and in June 2010 established policy resolution that committed western state agencies to coordinate common

definitions and further research crucial habitat and wildlife corridors. By developing coordinated data, which includes landscape scale mapping projects of important habitats, a better understanding of potential impacts to crucial wildlife habitat and important corridors results. Incorporating the new BLM IM 2012-039 into the EA analysis will help in assessing priority habitat areas. Known now as the CHAT (Crucial Habitat Assessment Tool), the opportunity to identify better mitigation options can be implemented with a confidence that priority habitat areas will be protected and impacts will be minimized, allowing responsible energy development to occur.

Research by Hall Sawyer (2008; 2009) on the importance of maintaining mule deer migration routes becomes particularly important in their proximity to gas fields. Distinguishing between high use areas (which may concentrate deer on key forage habitat and create slow movement through an area) and lower-use areas (which provides faster corridor movement and connectivity between high use areas) can provide opportunities for better pad and road development structure, avoiding fragmentation and ensuring deer have safe access between areas (Sawyer, Hall, M. Kauffman. 2008. *"Identifying Mule Deer Migration Routes Along the Pinedale Front"*. Report prepared for the Wyoming Wildlife and Natural Resources Trust. May 2008; Sawyer, H. et. al. 2009. *"Identifying mule deer migration routes to and from the Pinedale Anticline Project Area"*. Report prepared for University of Wyoming School of Energy Resources, Laramie, WY. November 2009).

In another study in the Atlantic Rim area of south-central Wyoming, Sawyer found that sustaining migratory populations of mule deer requires the maintenance and protection of suitable seasonal ranges and maintaining functional uses of migration routes (Sawyer, Hall. 2007. *"Final Report for the Atlantic Rim Mule Deer Study"*. Prepared for Anadarko Petroleum, BLM, and the Wyoming Game and Fish Department. April 2007).

Roads continue to play a role in disturbing big game movements and security. The potential impacts to big game and sage grouse from increases in truck traffic has significant implications. Studies show big game are affected by roads. Elk displacement by roads strengthens the need for the BLM to consider their analysis on road impacts very thoughtfully. Since elk will displace up to 2 miles from roads and human activity, the actual worst-case disturbance to elk habitat is a 2-mile perimeter around all aspects of the proposed development, particularly if located near corridors or crucial winter range. This goes for all other wildlife that are affected and displaced by road development.

Given all the information above, TU recommends the UFO withdraw all leases until appropriate and up-to-date analysis be completed under a new RMP guidance.


### 2. Outdated use of the 1987 Draft Technical Report for the Oil and Gas, and Geothermal Resources for the Uncompahgre Basin Resource Area RMP and EIS.

Applying outdated information to the proposed leasing EA would most likely result in an inaccurate view of the impacts to the environmental resource. TU has many concerns with the 1987 Technical Document since it significantly underestimates the amount of potential oil and gas development which in turn, results in incomplete assessments on the level of impacts to be expected.

Data used in the Technical Document referenced dates from 1975 to 1981. While most likely an accurate description for the 1980's, it is insufficient for use in the EA analysis today. Exploration and development operations have made tremendous advancements and much of what is described in the earlier document is not applicable nor does it consider the potential impacts to the landscape on the

BLM_0113325

scale being proposed in the UFO at this time.  Discussions ranging from seismic operations to the estimate of maximum number of wells expected to be drill are outdated and lack realistic information on impacts that these disturbances would have on the environment.

 Reclamation potential in this semi-arid area must be given substantial consideration.  The 1987 Technical Report estimates it will take 10 years to reestablish previous ground cover. For lease parcels located in crucial habitat and sensitive stream areas, lack of a functioning habitat could have long-term effects to big game populations.

### 3.  Implement a quarter-mile buffer setback in perennial and sensitive fish waters.

The EA must contain a discussion on their obligations to the management of Colorado River cutthroat trout (CRCT). As indicated by Figures 1-6, the proposed lease parcels are located within or near CRCT habitat.

The Colorado BLM is a signatory to the Colorado River Cutthroat Trout Conservation Agreement and Strategy (CAS), established in 2002.  Regions 2 and 4 of the U.S. Forest Service have designated the CRCT as a sensitive species and the BLM has the CRCT on the Sensitive Species List, while the Colorado Division of Parks and Wildlife (CDPW) have identified the CRCT as a species of special concern.  The designation to the Sensitive Species List means they could become endangered or extinct in the state and, more specific to these lease parcel areas, include those species with typically small or fragmented populations, and inhabiting specialized refugia or other unique habitats. This fish is also considered a species of special concern by the American Fisheries Society (J.E. Williams, et al. 1989. Fishes of North America endangered, threatened, or of special concern: 1989. Fisheries 14(6):2-20).

Oil and gas activities have been shown to degrade soils, contribute to erosion potential, and increase sedimentation loads to watersheds.  The UFO has identified this area as having steep terrains with loose unstable Mancos shale soils.  Most of the parcels are located in areas of fragile soil bases.  Based on the soil analysis and steep slopes, TU requests that No Surface Occupancy (NSO) stipulations be applied on slopes greater than 25 percent.  Access to gas plays located on steep slopes can be obtained through other options such as directional drilling.  Applying stipulations such as NSO on steep slopes prevents increases in man-caused sedimentation and erosion in addition to protecting these fragile soils, which have very limited reclamation potential. Though our preference is that all parcels in CRCT watersheds be withdrawn permanently or until the revised RMP is released and analysis is completed, increasing protection measures now on the lease parcels in sensitive areas would allow the BLM to meet the Conservation Agreement objectives they agreed to as signatories to the Agreement.

The EA must contain an analysis  of the importance of these watersheds and associated drilling impacts to the CRCT.  The CAS directs the agencies on specific objectives and goals for enhancement and survival of CRCT. Reconnecting and protecting habitat continues to be problematic when faced with the continued pressure of leasing and ensuing drilling activities in cutthroat trout habitat. Protecting the remaining conservation populations is extremely important but is not likely to be enough to insure the long-term viability of this species across its range.  Given the limited extent and highly fragmented nature of the remaining CRCT populations, it is necessary to restore connectivity between isolated populations to provide opportunity for movement to new streams when events such as fire or floods or energy development make existing habitat unsuitable.

BLM_0113326

Many of the remaining populations are isolated in headwater streams which are buffered from warming temperatures associated with climate change but may be more vulnerable to uncharacteristic winter flooding and wild fire.  However, to reconnect these populations and restore the migratory life history from the lower elevation main stem, such as those found in the UFO resource area, healthy habitats become important.  In many cases, these streams are more vulnerable to increasing summer temperatures which may aggravate systems that are already often compromised by land use activities in the valley bottoms.  TU advocates an aggressive approach towards reducing outside stressors and reconnecting populations as a critical component for building the resistance and resilience of populations to the habitat altering affects of climate change.  For these reasons, we urge the BLM to not lease in the higher stream reaches where conservation populations of CRCT are struggling to survive.

Finally, TU recommends the UFO consider impacts from impending oil and gas disturbances to expansion habitat for CRCT.   As a reminder, CRCT CAS requires protecting both existing <u>and potential habitat</u>, and requires the BLM's RMP's and land use decisions to do just that. The CRCT CAS states:

> *Land management agencies agree to protect <u>existing and potential cutthroat waters</u> from adverse effects of other land uses and to consult with wildlife agency biologists on forest plans, permit processes, and other proposed activities to avoid or minimize potential negative impacts. Signatory <u>agencies will ensure that their planning documents are consistent with this Strategy</u>.* (CRCT Conservation Strategy, page 20) (emphasis added).



Figure 1. Grove Creek Lease Parcels



Figure 2.  Henderson Creek Lease Parcels

BLM_0113327



Figure 3.  North Fork Gunnison Lease Parcels



Figure 4.  Paonia Reservoir Lease Parcels



Figure 5.  Smith Fork Lease Parcels



Figure 6.  Terror Creek Lease Parcels